## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA,**                           **CIVIL ACTION**
    **Plaintiff**

**VERSUS**                                                             **No. 12-1924**

**CITY OF NEW ORLEANS,**                                **SECTION "E"**
    **Defendant**

### ORDER AND REASONS

Before the Court are Motions to Intervene filed by the Crescent City Lodge No. 2, Fraternal Order of Police, Inc. and Walter Powers, Jr. in his official capacity as Acting President of FOP (the "FOP") ; Walter Powers, Jr. in his individual capacity ("Powers");[1] Community United for Change ("CUC");[2] the Police Association of New Orleans and Michael Glasser in his official capacity as President of PANO ("PANO"); Michael Glasser in his individual capacity ("Glasser");[3] the Office of the Independent Police Monitor ("OIPM") and Susan Hutson in her official capacity as Independent Police Monitor for the City of New Orleans ("IPM"); and Susan Hutson in her individual capacity ("Hutson").[4]

### Background

The Complaint in the above case was brought by the United States of America ("United States") against the City of New Orleans, Louisiana (the "City"), under the provisions of the Violent Crime Control and Law Enforcement Act, 42 U.S.C. § 14141 ("Section 14141"); the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. §

---

[1] R. Doc. 9.

[2] R. Doc. 11.

[3] R. Doc. 13.

[4] R. Doc. 15.

3789d (the "Safe Streets Act"); and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d to 2000d-7, and its implementing regulations, 28 C.F.R. §§ 42.101-.112 ("Title VI"), in order to remedy an alleged pattern or practice of conduct by the New Orleans Police Department (the "NOPD") that subjects individuals to excessive force in violation of the Fourth Amendment, unlawful searches and seizures in violation of the Fourth Amendment, and discriminatory policing practices in violation of the Fourteenth Amendment, the Safe Streets Act, and Title VI.  The proposed Consent Decree contains detailed provisions concerning changes in NOPD policies and practices related to: (1) the use of force; (2) investigatory stops and detentions, searches, and arrests; (3) custodial interrogations; (4) photographic lineups; (5) bias-free policing; (6) community engagement; (7) recruitment; (8) training; (9) officer assistance and support; (10) performance evaluations and promotions; (11) supervision; (12) the secondary employment system, also known as the paid detail system; (13) misconduct complaint intake, investigation, and adjudication; and (14) transparency and oversight.  In addition, the proposed Consent Decree includes detailed provisions regarding the implementation and enforcement of the Consent Decree.

On July 31, 2012, this Court entered an order requiring any person wishing to seek intervention in this case under Federal Rule of Civil Procedure 24 to file a contradictory motion to intervene no later than August 7, 2012, and any party opposing any motion(s) to intervene to file an opposition to the motion(s) no later than August 14, 2012.  On August 6, 2012, FOP and Powers filed a motion to intervene.  On August 7, 2012, CUC, PANO and Glasser, and OIPM, IPM and Hutson filed their motions to intervene.  On August 14, 2012, the City and the United States filed memoranda in opposition to the motions to intervene.[5]

---

[5] R. Docs. 26 (City's opposition) and 27 (United States' opposition).

The Court heard oral argument on all four motions to intervene on August 20, 2012.

## I.   Intervention under Rule 24

### A.   Intervention of Right

To intervene as of right under Federal Rule of Civil Procedure 24(a), four requirements must be met:

> (1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; [and] (4) the applicant's interest must be inadequately represented by the existing parties to the suit.

*New Orleans Public Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 463 (5th Cir. 1984) (en banc), *cert. denied*, 469 U.S. 1019 (1984).  If a party seeking to intervene fails to meet any one of those requirements, it cannot intervene as a matter of right.  *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (citing *Kneeland v. Nat'l Collegiate Athletics Ass'n*, 806 F.2d 1285, 1287 (5th Cir. 1987), *cert. denied*, 484 U.S. 817 (1987)).

With respect to the requirement that the party seeking to intervene as of right be sufficiently interested, the U.S. Court of Appeals for the Fifth Circuit ("Fifth Circuit") has underscored that "[n]ot any interest, however, is sufficient."  *Saldano v. Roach*, 363 F.3d 545, 551 (2004).  Rather, intervention of right requires an interest that is " 'direct, substantial, [and] legally protectable.' "  *Id.* (quoting *Doe v. Glickman*, 256 F.3d 371, 379 (2001)).  For such an interest to be "legally protectable," it must "be one which the *substantive* law recognizes as belonging to or being owned by the applicant."  *United Gas Pipe Line Co.*, 732 F.2d at 464.  The claim asserted by the applicant must be one as to which

the applicant is the real party in interest.  *Id.*

Furthermore, a proposed intervenor has the burden of establishing that the existing parties to the lawsuit inadequately represent the applicant's interests.  *See Hopwood v. Texas*, 21 F.3d 603, 605 (5th Cir. 1994); *Espy*, 18 F.3d at 1207.   This inadequate representation requirement is satisfied "if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal."  *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10, 92 S.Ct. 630, 636 n.10 (1972).  Nevertheless, "[a]lthough the applicant's burden of showing inadequate representation is minimal, 'it cannot be treated as so minimal as to write the requirement completely out of the rule.' "  *Edwards v. City of Houston*, 78 F.3d 983, 1005 (5th Cir. 1996) (quoting *Cajun Elec. Power Coop.*, 940 F.2d at 120).

The Fifth Circuit recognizes two presumptions of adequate representation.  *See Edwards*, 78 F.3d at 1005.  First, in a suit involving a matter of sovereign interest, the governmental entity is presumed to represent the interests of all of its citizens.  *Id.* (citing *Hopwood*, 21 F.3d at 605.  This presumption of adequate representation arises whether the would-be intervenor is a citizen or subdivision of the governmental entity.  *Id.*  To overcome this presumption, the applicant must show "that its interest is in fact different from that of the [governmental entity] and that the interest will not be represented by [it]."  *Id.* (citing *Hopwood*, 21 F.3d at 605) (quoting *Envtl. Def. Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C.Cir. 1979)).   This presumption, and the heightened showing required to overcome it, is restricted to lawsuits involving matters of sovereign interest.  *Id.* at 1005.  Where the governmental entity appears in its capacity as an employer and not in its capacity as a sovereign, however, this presumption is inapplicable.  *Id.*

4

The second presumption of adequate representation arises when the would-be intervenor has the same ultimate objective as a party to the lawsuit. *Id.*; *see Kneeland v. Nat'l Collegiate Athletic Ass'n*, 806 F.2d 1285, 1288 (5th Cir.), *cert. denied*, 484 U.S. 817, 108 S.Ct. 72 (1987). In such cases, the applicant for intervention must show adversity of interest, collusion, or nonfeasance on the part of the existing party to overcome the presumption. If neither presumption applies, the court reverts to the *de minimis* standard of proof required by *Trbovich* to establish inadequate representation.

## B.   Permissive Intervention

Rule 24 provides for permissive intervention under subdivision (b).[6] As the Fifth Circuit has recognized, permissive intervention "is wholly discretionary with the [district] court . . . even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied." *United Gas Pipe Line Co.*, 732 F.2d at 470-71 (quoting 7C C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1913, at 376-77 (2d ed. 1986)). "In acting on a request for permissive intervention the district court may consider, among other factors, whether the intervenors' interests are adequately represented by other parties . . . and whether intervention will unduly delay the proceedings or prejudice existing parties." *Kneeland*, 806 F.2d at 1289 (citing *United Gas Pipe Line Co.*, 732 F.2d at 472 and Fed. R. Civ. P. 24(b)).

---

[6] Rule 24(b) provides, in pertinent part:

(b) Permissive Intervention.
   (1) In General. On timely motion, the court may permit anyone to intervene who:
      (A) is given a conditional right to intervene by a federal statute; or
      (B) has a claim or defense that shares with the main action a common question of law or fact.

Fed. R. Civ. P. 24(b)(1).

II.   **The Motions to Intervene**

   A.   **OIPM's Motion to Intervene**

OIPM's motion to intervene, filed on August 7, 2012, was filed on behalf of the OIPM, the IPM and Susan Hutson in her official capacity as IPM for the City, seeking intervention as a matter of right pursuant to Federal Rule of Civil Procedure 24(a)(2), or, in the alternative, permissive intervention pursuant to Rule 24(b).  Hutson in her official capacity is, in effect, the OIPM and the Court will consider those arguments in tandem. *Kercher v. May*, 484 U.S. 72, 78 (1987) ("[T]he real party in interest in an official capacity suit is the entity represented and not the individual office holder.").  Hutson has also sought to intervene in her individual capacity.  The Court will consider Hutson's motion regarding her individual capacity separately.

Rule 17(b) of the Federal Rules of Civil Procedure instructs that "capacity to sue or be sued shall be determined . . . by the law of the state in which the district court is held." Fed. R. Civ. P. 17(b).  If a proposed intervenor lacks legal capacity to sue or be sued under state law, intervention is not permissible.  *See, e.g., Biance v. Lemieux*, No. 11-429, 2012 WL 1466517 (D. Me. Apr. 27, 2012) (denying motion to intervene on grounds that the proposed intervenor, an LLC that had been dissolved and cancelled under New Hampshire law, lacked capacity to sue); *compare Huntington Nat'l Bank v. Caroll*, No. 12-7, 2012 WL 2466968 (N.D.W.Va. Jun. 27, 2012) (granting motion to intervene under Rule 24(b) only after holding that the proposed intervenor possessed legal capacity under West Virginia law). Therefore, the Court must determine, as an initial matter, whether OIPM has the legal capacity to sue or be sued under Louisiana law such that it is capable of intervening in this action.

Under Louisiana law, an entity must qualify as a "natural person" or a "juridical person" to possess the capacity to sue or be sued.  *See, e.g., Dugas v. City of Breaux Bridge Police Dep't,* 99-1320 (La. App. 3 Cir. 2/2/00); 757 So.2d 741, 743.  It is clear that OIPM is not a natural person.  Nor is Hutson when acting in her official capacity as IPM.  *Kercher*, 484 U.S. at 78.  A juridical person is "an entity to which the law attributes personality, such as a corporation or partnership."  La. Civ. Code. Ann. art. 24.  Comment (d) to article 24 also provides that "the capacity of a juridical person is governed by provisions in its charter, governing legislation, and customs." La. Civ. Code. Ann. art. 24, cmt. (d).  "[I]n the absence of law providing that an entity may sue or be sued, the entity lacks such capacity." *Dantzler v. Pope*, No. 08-3777, 2009 WL 959508, at *1 (E.D.La. Apr. 3, 2009) (Africk, J.) (citing *City Council of Lafayette v. Bowen*, 94-584 (La. App. 3 Cir. 11/2/94); 649 So.2d 611).

In *Roberts v. Sewerage & Water Bd. of New Orleans,* the Louisiana Supreme Court set forth the framework for determining whether an entity qualifies as a juridical person and, as a result, has the capacity to sue and be sued:

> The important determination with respect to the juridical status or legal capacity of an entity is not its creator, nor its size, shape, or label.  Rather the determination that must be made in each particular case is whether the entity can appropriately be regarded as an additional and separate government unit for the particular purpose at issue. In the absence of positive law to the contrary, a local government unit may be deemed to be a juridical person separate and distinct from other government entities, when the organic law grants it the legal capacity to function independently and not just as the agency or division of another governmental entity.

92-2048 (La. 3/21/94); 634 So.2d 341, 346.  Where there is no constitutional or statutory authority for the entity to sue or be sued, that entity is without capacity to be sued under the *Roberts* analysis.  *Green v. District Attorney Office*, No. 08-3685, 2009 WL 651132, at

*4 (E.D. La. Mar. 10, 2009) (Feldman, J.) (citing *Bowen,* 649 So.2d at 613-16).

OIPM asserts that, although it is part of the City by virtue of its position within the Office of the Inspector General ("OIG"), OIPM, and by extension the IPM, is operationally independent from the legislative and executive branches of City government. OIPM further asserts that it is "functionally independent" from the OIG because, while it is classified as a division of the OIG, it does not report to the OIG. Rather, OIPM argues, it reports to a City Council committee, and the OIG does not have authority to remove the IPM from office or otherwise "oversee or impact" the work of the IPM.[7] Thus, OIPM asserts, it has juridical capacity necessary to intervene under Louisiana law.[8]

It is uncontested that OIPM is a division of a City agency – the OIG. A 2008 amendment to the Home Rule Charter of the City of New Orleans created the OIG and provided that the OIG was to establish an Independent Police Monitor division within the OIG.[9] Subsequently, the OIPM was created by City ordinance as a division within the OIG. The City Code provides that OIG, not OIPM, is "operationally independent" from the

---

[7] R. Doc. 38 at p. 3 (citing New Orleans City Code, sec. 2-1120(3)-(20)).

[8] R. Doc. 38 at p. 1-3.

[9] Home Rule Charter, Article IX, Sec. 9-401 (Office of Inspector General) states, in pertinent part:

(1) The Council shall by ordinance create an Office of Inspector General (OIG) and otherwise provide with respect thereto.

(2) The OIG shall provide for a full-time program of investigation, audit, inspections, and performance review to provide increased accountability and oversight of entities of city government or entities receiving funds through the city, and to assist in improving agency operations and deterring and identifying, fraud, waste, abuse, and illegal acts. The OIG is specifically authorized to conduct audits of City entities. The OIG shall also provide for *an Independent Police Monitor Division,* charged with monitoring the operations of the New Orleans Police Department, particularly in the areas of civilian and internally-generated complaints, internal investigations, discipline, significant uses of force, and in-custody deaths . . . .

legislative and executive branches of city government.[10]  Nothing in the City Code or Home

Rule Charter provides that OIPM has the capacity to sue or be sued.  Nothing in the City

Code or Home Rule Charter provides that OIPM is "operationally independent."

OIPM is housed by the City as part of the OIG.[11]  OIPM is funded by the City as a

subset of the funding allocated to the OIG.[12]  The IPM reports to the criminal justice

committee of the City Council.[13]  The IPM may be removed by the City's ethics review board,

whose members are appointed by the Mayor and approved by the City Council.[14]  OIPM is

---

[10] R. Doc. 15-1 at p. 11 (citing City Code, sec. 2-1120, par. 6(b)); R. Doc. 38 at pp. 1-3 (citing City Code, sec. 2-1120).  Section 2-1120(6)(b) provides that the *OIG* is "operationally independent" from other City agencies:

> (a) The office of inspector general is "operationally independent" from the legislative and executive branches of the city, including the Council of the City of New Orleans, and the office of the mayor, but is authorized and encouraged to work cooperatively with the ethics review board. "Operationally independent" shall be defined as follows: "not preventing, impairing, or prohibiting the inspector general from initiating, carrying out, or completing any audit, investigation, inspection or performance review."

[11] *See* City Code, sec. 2-1120(14) ("Physical facilities. [T]he city shall provide the . . . office of inspector general with appropriately located office space, which shall be located in close proximity, but off site from city hall. The city shall also provide the ethics review board and the office of inspector general with sufficient and necessary equipment, office supplies, and office furnishings to enable the ethics review board and the office of inspector general to perform their functions and duties.")

[12] *See* Home Rule Charter, Article IX, Sec. 9-401 (Office of Inspector General) ("(3) The OIG, in conjunction with the Ethics Review Board, shall receive an annual appropriation from the Council in an amount not less than .75% (three-quarters of one percent) of the General Fund operating budget, adopted pursuant to Section 3-115(2), which individual appropriation may not be vetoed by the Mayor . . . ."). *See also* 2012 Annual Operating Budget, City of New Orleans, available at: http://www.nola.gov/HOME/Mayors-Office/City-of-New-Orleans-Budget/, at p. 419 (showing the total funding allocated to OIPM for personal services and other operating expenses for 2012); p. 420 (showing the funding allocated to the OIG in 2010, 2011, and 2012); and p. 421 (listing the Independent Police Monitor, Deputy Police Monitor, and Executive Director of Community Relations for the Police Monitor as personnel of the OIG, along with their City pay grades).

[13] City Code, sec. 2-1121(16).

[14] City Code, sec. 2-1121(20) ("Removal of independent police monitor from office. The independent monitor shall only be removed based on the recommendation of the inspector general and approved by a majority vote of the ethics review board."); City Code, sec. 2-719 (establishing the ethics review board, with appointments by the Mayor with approval by the City Council).

"independent" mainly in the sense that the IPM cannot be removed by the Mayor, who appoints the Chief of Police.  However, the IPM may be removed by the ethics review board created by the City.   The OIPM division of OIG is not a juridical person separate and distinct from other government entities.  Neither the law nor custom attributes juridical personality to the OIPM.  For all of these reasons, using the *Roberts* analysis, the Court finds that the OIPM lacks juridical capacity to sue or be sued and thus lacks capacity to intervene as of right or pursuant to this Court's discretion.

Notwithstanding the fact that OIPM does not have the capacity to sue and thus cannot intervene in this case, the City cannot use the proposed Consent Decree to avoid compliance with the ordinance creating OIPM, for example, by changing the budget allocated to OIPM.[15]  The Court does not assume that the City is attempting to do so.  In fact, the proposed Consent Decree specifically provides that entry of the Consent Decree will in no way diminish the authority of OIPM, and the entire Memorandum of Understanding between OIPM and the NOPD is incorporated into the proposed Consent

---

[15] Indeed, the City and the United States have already agreed to four changes clarifying that the proposed Consent Decree is not intended to avoid compliance with the ordinance.  At oral argument, counsel for the Department of Justice and the City represented that they have agreed to make the following changes to the proposed Consent Decree:

> (1) Paragraph 426: Change "The PIB and IPM *shall* coordinate and confer . . ." to "the PIB and IPM *should* coordinate and confer . . .".

> (2) Paragraph 443: Change "The IPM *will* coordinate with the Monitor and the NOPD. . ." to "The IPM *may* coordinate with the Monitor and the NOPD . . .".

> (3) Paragraph 454: Change "The Monitor *may* coordinate with the IPM . . ." to "The Monitor *shall* coordinate with the IPM . . . ".

> (4) Paragraph 459: Change "The Monitor *may* coordinate and confer with the IPM . . . " to "The Monitor *shall* coordinate and confer with the IPM . . . ".

Decree.[16]  Further, the United States has stated that, had the OIPM "not already been in existence in New Orleans, it would have insisted that such an office be created because long term civilian oversight is critical to ensuring constitutional policing."[17]

Hutson, individually, has legal capacity.  However, she has not provided the Court with argument regarding her individual interest and how any such interest would be impaired as a result of the proposed Consent Decree.  Consequently, Hutson has not met the requirements to intervene as of right or pursuant to the Court's discretion.

### B.    CUC's Motion to Intervene

CUC filed its motion to intervene August 7, 2012.  CUC is "a non-profit association of people in New Orleans who have done admirable work for decades to transform the New Orleans Police Department [NOPD] into a constitutional policing department that respects the rights of all residents."[18]

CUC claims that it meets the requirements for intervention as of right because: (1) its motion was timely filed in accordance with the Court's order of July 31, 2012; (2) it has a demonstrated interest in transformation of the NOPD based on decades of work by its members and work on the Consent Decree process; (3) disposition of this case through the proposed Consent Decree without CUC's involvement would impede the ability of CUC and citizens to protect their interests; and (4) there is no existing party which adequately represents the interests of "the people who are the primary victims of the culture and

---

[16]  R. Doc. 2-1 at pars. 440, 442.

[17]  R. Doc. 23 at p. 13.  The Court recognizes that the OIPM does not represent community groups in a legal sense.

[18]  R. Doc. 11 at p. 1; R. Doc. 33 at p. 1.  The Court notes that under Louisiana law "[a]n unincorporated association, in its name, may institute, defend, intervene, or participate in a judicial, administrative, or other governmental proceeding."  La. Rev. Stat. § 12:507(A).

corruption pointed out by DOJ."[19]

With respect to intervention as of right, first, there is no dispute as to the timeliness of CUC's motion to intervene.  With respect to the "interest" requirement, CUC asserts that it has such an interest by virtue of its decades of work on police reform in New Orleans.  The Court certainly recognizes and appreciates the work that CUC has done and acknowledges that CUC is interested in the resolution of this case.  Nonetheless, CUC has failed to cite any – and the Court is not aware of any – "legally protectable interest" in the subject matter of this litigation that the substantive law recognizes as belonging to or owned by CUC.  *See United Gas Pipe Line Co.*, 732 F.2d at 463.  For example, CUC has not cited any contractual rights or property rights of its members that may be impaired by the disposition of this action.  Because a party cannot intervene if it fails to fulfill any one requirement for intervention as of right, *Espy,* 18 F.3d at 1205, the CUC is not entitled to intervention as of right.

Moreover, even if CUC did have a legally protectable interest related to the subject matter of this litigation, the Court finds that CUC's interests are not, as a practical matter, impaired by this litigation.  The proposed Consent Decree does not prevent CUC, any other community organization, or any individual community member, from initiating suit against NOPD officers who engage in unconstitutional practices.  Nor does the proposed Consent Decree prevent CUC, any other community organization, or any community members, from continuing to work on police reform.  *See, e.g., City of Los Angeles,* 288 F.3d at 402 (likewise holding that the interests of numerous community groups and individuals were not impaired by the litigation involving a consent decree between the City of Los Angeles

---

[19]  R. Doc. 11-1 at p. 4 and R. Doc. 33 at p. 2.

and the Department of Justice to reform the Los Angeles Police Department).[20]  As a result, the CUC does not meet the "practical impairment" requirement for intervention as of right.

In the alternative, the CUC has sought permissive intervention pursuant to Rule 24(b).  As the Fifth Circuit has recognized, permissive intervention "is wholly discretionary" with the district court.  *United Gas Pipe Line Co.*, 732 F.2d at 470-71.  "In acting on a request for permissive intervention the district court may consider, among other factors, whether the intervenors' interests are adequately represented by other parties . . . and whether intervention will unduly delay the proceedings or prejudice existing parties." *Kneeland*, 806 F.2d at 1289.  In this case, the Court finds that permissive intervention by CUC is not appropriate because it will unduly delay these proceedings and prejudice the existing parties while not offering significant assistance to the Court.

### C.    FOP and PANO's Motions to Intervene

FOP and PANO (the "Police Associations")[21] filed motions to intervene on August 6 and 7, 2012, respectively, on their own behalves and on behalf of their members.  FOP and PANO are nonprofit corporations organized under the laws of the State of Louisiana to

---

[20] In *City of Los Angeles*, the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit") remanded the matter with respect to the Community Intervenors' motion to intervene permissively because the district court did not "conduct the proper analysis in determining permissive intervention." *City of Los Angeles*, 288 F.3d at 403.  On remand, the district court granted the Community Intervenors' renewed motion to intervene permissively but "concede[d] to being skeptical that the promised benefits to be derived from the [Community Intervenors'] participation [would] materialize."  No. 00-11769 (C.D. Cal. Oct. 3, 2002), R. Doc. 193 at p. 2.  The district court further cautioned that "if the participation of the [Community Intervenors] should prove counter-productive . . . then the Court will not hesitate to consider vacating [its Order granting intervention] and terminating the intervention of [the Community Intervenors]."  *Id.*
This Court is not convinced that CUC's intervention in this case is appropriate.  Consequently, as set forth in this Order, the Court also denies CUC's motion in the alternative to intervene permissively.

[21] Powers and Glasser seek to intervene in their official capacities as acting president and president of FOP and PANO, respectively.  As Powers and Glasser's interests in their official capacities do not differ from those of FOP and PANO, the Court's discussion regarding the "Police Associations" addresses arguments they assert in their official capacities.

represent the interests of NOPD officers.[22] These organizations advocate for their members'
interests in various situations, including employment disputes, civil service appeals, and
civil and criminal litigation.[23]  Neither association has a collective bargaining agreement
with the City.[24] Because the issues raised in both motions are sufficiently similar, the Court
analyzes them together.  The Police Associations both seek intervention as of right, or, in
the alternative, permissive intervention.  Powers and Glasser, sworn NOPD officers, also
seek to intervene in their individual capacities.  The Court will address Powers and Glasser
separately from the Police Associations.[25]

With respect to the first requirement for intervention as of right, there is no dispute
as to the timeliness of the Police Association's motions to intervene.  With respect to the
"interest" requirement, the Police Associations assert that, because the members of the
NOPD are protected by Civil Service under Article X, Section 8 of the Louisiana
Constitution, they have a property right in their employment that is sufficient to satisfy the
"substantial and legally protectable interest" requirement for intervention.[26]  The Police
Associations further assert that, as associations, they have standing to sue on behalf of their
members.[27]  In addition, FOP asserts that the NOPD officers have an interest sufficient to
support intervention because the proposed Consent Decree is binding on the NOPD officers

---

[22] *See* R. Doc. 9-2 at p. 2; R. Doc. 13-1 at p. 3.

[23] R. Doc. 9-2 at p. 2; R. Doc. 13-1 at p. 3.

[24] *See* R. Doc. 9-2 at p. 2; R. Doc. 27 at p. 10.

[25] *See* pp. 22-23, *infra.*

[26] *See* R. Doc. 9-2 at p. 6; R. Doc. 13-1 at p. 5.

[27] R. Doc. 9-2 at p. 7; R. Doc. 13-1 at pp. 5-6 (each citing *Central and South West Serv., Inc. v. U.S.
E.P.A.*, 220 F.3d 683, 698 (5th Cir. 2008)).

as employees and because the mandates set forth in the proposed Consent Decree directly affect the officers.[28]

The Police Associations are correct that their NOPD officer members, by virtue of their status as civil servants, have a property interest in their jobs. *See Wallace v. Shreve Memorial Library*, 79 F.3d 427, 431 (5th Cir. 1996); *Moore v. Ware*, 839 So.2d 940 (La. 2003); *Bell v. Dept. of Health and Human Resources*, 483 So. 2d 945, 949-950 (La. 1986), *cert. denied,* 479 U.S. 827, 107 S. Ct. 105, (1986). Nonetheless, the Court does not agree that the NOPD officer members – and thus the Police Associations – have the legally protectable interest *in the subject matter of this litigation* required for intervention as of right.

The Police Associations cite *Edwards v. City of Houston,* 78 F.3d 983, 999 (5th Cir. 1996) in support of their argument that the NOPD officers, as Civil Service employees, may intervene to protect their vested interests. Although FOP acknowledges that the "*Edwards* Court did not directly address the issue of civil service property rights as a basis for intervention,"[29] it urges the Court to read *Edwards* as authorizing the Police Associations' intervention under an impairment of property rights theory. FOP argues that "the police officers who sought intervention were civil servants and . . . the proposed consent decree in Edwards . . . superseded some applicable provision of the Texas and Police Civil Service Act."[30] However, the *Edwards* Court did not permit the appellants to intervene under an impairment of property rights theory, but instead because of the preclusive effects of Title

---

[28] R. Doc. 9-2 at p. 7.

[29] R. Doc. 40 at p. 3.

[30] R. Doc. 40 at p. 3.

VII. *Edwards* is inapplicable given the facts of this action.

The consent decree at issue in *Edwards* resolved a Title VII employment discrimination lawsuit filed against the City of Houston, Texas, regarding racially-based job promotions within the Houston Police Department ("HPD").  In order to remedy past discrimination by the HPD against its own employees, the original parties to the lawsuit proposed that a specific number of promotions would be guaranteed to African-American and Hispanic-American officers.  Organizations representing officers who were not members of those minority groups moved to intervene.  The would-be intervenors argued that such a plan guaranteeing promotions to officers of certain minority groups denied other officers the ability to advance within the HPD.  The organizations argued that officers wishing to intervene had a constitutional right to a promotion system that was "without reference to race, color, or national origin."  Edwards, 78 F.3d at 1004.  The district court denied the motions to intervene and the would-be intervenors appealed.  The Fifth Circuit reversed the district court and allowed the organizations to intervene, citing the preclusive effect of 42 U.S.C. § 2000e-2(n)[31] that would prohibit the non-party officers – if they were

---

[31] At the time the Fifth Circuit was considering *Edwards*, the relevant portion of 42 U.S.C. § 2000e-2(n) stated:

(1)(A) Notwithstanding any other provision of law, and except as provided in paragraph (2), an employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under the Constitution or Federal civil rights laws **may not be challenged** under the circumstances described in subparagraph (B).

(B) A practice described in subparagraph (A) may not be challenged in a claim under the Constitution or Federal civil rights laws –

(I) by a person who, prior to the entry of the judgment or order described in subparagraph (A), had –

(I) actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such

not allowed to intervene – from collaterally challenging the consent decree after the district court approved it.[32]  Because Section 2000e-2(n) precluded the would-be intervenors from filing any future lawsuit to contest allegedly discriminatory employment practices perpetrated against them, the Fifth Circuit found that such practices would "become unassailable by these applicants and their privies."  *Id.* at 1002.

The *Edwards* consent decree resolved complaints of employment discrimination against police department employees under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e).  The notice provision set forth in 42 U.S.C. § 2000e-2(n)(1) only applies to consent decrees brought under Title VII ("[A]n employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under the Constitution or Federal civil rights laws may not be challenged . . . . .").  42 U.S.C. § 2000e-2(n)(1)(A).  The complaint seeking entry of the proposed NOPD Consent Decree is brought under Title VI of the Civil Rights Act of 1964

judgment or order by a future date certain; and

> (II) a reasonable opportunity to present objections to such judgment or order; or

> (ii) by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact.

*Edwards*, 78 F.3d at 996 (quoting 42 U.S.C. § 2000e-2(n)(1)) (emphasis added).

[32]  The Fifth Circuit in *Edwards* provides an extensive overview of the legislative and jurisprudential history of 42 U.S.C. § 2000e-2(n).  *See Edwards*, 78 F.3d at 995-99.  In essence, Congress enacted subsection (n) because " '[o]nce an employment dispute has reached the courts, the parties, all nonlitigants with a stake in the outcome, and the public have a strong interest in bringing the litigation to an expeditious end. [Accordingly], all related interests and claims should be adjudicated *in one proceeding*.' "  *Id.* at 997 (quoting H.R.Rep. part 1 at 53, reprinted in 1991 U.S.C.C.A.N. at 591) (emphasis and alterations in original).

Subsection (n) provides non-parties notice of, and an opportunity to be heard at, a fairness hearing regarding the type of consent decree at issue in *Edwards*.  However, subsection (n) further prohibits non-parties from filing "a new, independent lawsuit challenging the implementation of a court-approved consent decree."  *Id.* at 998.  Congress specifically drafted subsection (n) "to preclude such successive litigation."  *Id.*

(regarding discrimination by government agencies receiving federal funds; 42 U.S.C. § 2000d to 2000d-7), as well as the Violent Crime Control and Law Enforcement Act (42 U.S.C. § 14141) and the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. § 3789d).  These statutes do not contain any preclusive language analogous to 42 U.S.C. § 2000e-2(n)(1).  Moreover, the proposed Consent Decree does not remedy complaints about the NOPD discriminating against its own employees in violation of Title VII, and the Police Associations do not seek to challenge any alleged incidents of Title VII employment discrimination.  Instead, the complaints to be remedied are Title VI non-employment claims having to do with the NOPD's practices with respect to citizens.  *Edwards* is inapposite to this case.  Consequently, it  provides no authority for the Police Associations to intervene.

The Court recognizes that the proposed Consent Decree does reference the Civil Service system, and, as discussed above, that officers do have a property right in their employment.  Nevertheless, as it is currently written, the proposed Consent Decree in no way modifies the Civil Service system for NOPD officers.  The proposed Consent Decree provides that (1) NOPD "agrees to work with Civil Service" to develop an NOPD-specific system for performance evaluations and new promotions practices that comport with best practices and the proposed Consent Decree;[33] (2) NOPD and the City, working with the Civil Service, agree to develop and implement a comprehensive recruitment program; and (3) the City shall restructure the NOPD's secondary employment system and that only officers having attained certain Civil Service designations may work secondary employment.[34]

---

[33] *See* R. Doc. 2-1, pars. 295-305.

[34] *See id.,* Section IX.

However, the Police Associations have not indicated how these provisions of the proposed Consent Decree would impact or impair any of their property rights guaranteed under the Civil Service system, and the Court does not read these references as impacting or impairing such rights.

At oral argument the Court requested additional briefing from the City and the United States to address this issue. The Parties responded that the anticipated changes to NOPD policies will in no way affect any vested rights.[35]  As the City states in its supplemental memorandum,

> The proposed Consent Decree does not purport to make any changes to the existing rules of the [Civil Service Commission of the City of New Orleans].  The proposed Consent Decree addresses NOPD polices and procedures, which are separate from the CSC rules promulgated to ensure that all classified employees are guaranteed due process with regard to their employment positions.[36]

Thus, the proposed Consent Decree does not affect NOPD officers' property interests in their employment.  Consequently, the Police Associations are not entitled to intervene as of right pursuant to a property rights theory.

Nevertheless, the Court underscores, the City and the United States cannot use the proposed Consent Decree as a means of legally sanctioning a violation of the Civil Service rules.  The changes to NOPD policies required by the proposed Consent Decree will be clarified during the implementation phase of the Consent Decree.  If changes are proposed to any NOPD policies that may conflict with the Civil Service rules and procedures, FOP

---

[35]  *See* R. Docs. 53 and 56.

[36]  R. Doc. 56 at p. 1.

and/or PANO may move to intervene for the limited purpose of asserting their Civil Service property rights.   Given the circumstances of this case, and the denial of the Police Associations' motions to intervene at this stage of the proceedings, the Court will give due deference to the Police Associations' arguments that such motions to intervene are timely under Fed. R. Civ. P. 24(b).

In addition, the Police Associations cite *United States v. City of Los Angeles*, 288 F.3d 391 (9th Cir. 2002), the case involving the consent decree to reform the Los Angeles Police Department ("LAPD"), in which the Ninth Circuit held that the police union was entitled to intervention as of right.   In *City of Los Angeles,* the Court analyzed the police union's interest as follows:

> Except as part of court-ordered relief after a judicial determination of liability, an employer cannot unilaterally change a **collective bargaining agreement** as a means of settling a dispute over whether the employer has engaged in constitutional violations.   *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 528-30, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (noting that parties settling their own dispute cannot impose obligations on third parties and that "a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree"); *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 771, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) ("Absent a judicial determination, the [EEOC], not to mention the Company, cannot alter the collective bargaining agreement without the Union's consent."); *United States v. City of Hialeah,* 140 F.3d 968, 975 (11th Cir.1998); *United States v. City of Miami,* 664 F.2d 435, 441-42 (5th Cir.1981).

> Thus, the Police League's interest in the consent decree is two-fold. To the extent that it contains or might contain provisions that contradict terms of the officers' **MOU**, the Police League has an interest. Further, to the extent that it is disputed whether or not the consent decree conflicts with the **MOU**, the Police League has the right to present its views on

the subject to the district court and have them fully considered in conjunction with the district court's decision to approve the consent decree. *See EEOC v. AT & T,* 506 F.2d 735, 741-42 (3d Cir.1974).

288 F.3d at 400 (emphasis added).  Unlike the Police League in *City of Los Angeles,* the Police Associations seeking intervention in this case do not have a collective bargaining agreement or memorandum of understanding with the City.  This distinction is important because no contractual rights of the NOPD officer members are threatened or impaired by the proposed Consent Decree.

The FOP has represented that it is "not opposed to the entry of the Consent Decree as such . . . .  They do, however, want a role in implementing its directives."[37]  At oral argument, counsel for PANO also acknowledged that the organization supported the objectives that the City and United States were pursuing in negotiating the proposed Consent Decree.[38]  Clearly, both the Police Associations and the United States are in favor of constitutional policing through the proposed Consent Decree.  The Police Associations have not met the interest requirement for intervention as of right and this is why their requests have been denied.  The Court notes further that the proposed intervenors have not shown that the United States will inadequately represent their interests at this stage of the proceedings.  The United States, as a governmental entity, is presumed to represent its citizens' interests.  To overcome this presumption, the proposed intervenors have the burden of proving that their interests are not represented by the United States.  Both the United States and the Police Associations are interested in seeing the Consent Decree put

---

[37]  R. Doc. 40 at p. 8.

[38]  R. Doc. 47 at 25.

into place, although they may differ on some aspects of implementation that, for the most part, have yet to be articulated.

The Police Associations have also sought permissive intervention pursuant to Rule 24(b).   However, the Court finds that permissive intervention by the Police Associations is not appropriate because such intervention would unduly delay these proceedings.   The Court has provided ample opportunity for the Police Associations to assist the Court in its consideration of the proposed Consent Decree without prejudicing the parties or delaying the proceedings.

### D.        Powers and Glasser's Motions to Intervene

Powers and Glasser are sworn NOPD officers, and they have moved to intervene in their individual capacities.   Again, as officers Powers and Glasser are protected by Civil Service under Article X, Section 8 of the Louisiana Constitution, they have a property right in their employment.   Nonetheless, as discussed above with respect to the Police Associations, the proposed Consent Decree does not impair their property rights at this time.   For the same reasons, Powers and Glasser do not have a legally protected interest that would authorize their intervention of right at this time.   Concomitantly, the Court finds in its discretion that permissive intervention by Powers and Glasser is not appropriate because such intervention would unduly delay these proceedings.

### Conclusion

In conclusion, the Court recognizes the importance of the goals that the City and United States seek to achieve through implementation of the proposed Consent Decree, as well as the sincere interest of those organizations and individuals seeking to intervene.   The

City and the United States have studied the NOPD and drafted a Consent Decree of historic proportions, with extensive input from stakeholders in the process.   Nevertheless, before approving the Consent Decree this Court must be convinced that it is fair, reasonable and adequate after a rigorous examination of its provisions, including consideration of the comments of the public and the proposed Intervenors.  The Court will not rubber stamp any plan that does not meaningfully address the legitimate concerns expressed by the OIPM, IPM, CUC and the Police Associations.

The Court has provided ample opportunity for the proposed Intervenors and members of the community to assist the Court in its consideration of the proposed Consent Decree without prejudicing the parties or delaying the proceedings.  The Court has allowed any person wishing to comment upon the proposed Consent Decree to do so by filing a written submission no more than 20 pages in length.[39]  The Court will consider all such written submissions in the nature of *amicus* briefs as part of its consideration of the fairness, adequacy, and reasonableness of the proposed Consent Decree.  In addition, the Court will allow the OIPM, CUC, FOP and PANO to participate, as set forth in this Order, in the hearing on the proposed Consent Decree, which is scheduled for September 12, 2012 at 10:00 a.m. (the "Fairness Hearing").[40]

## Order

For the reasons set forth above,

**IT IS ORDERED** that the Motions to Intervene by OIPM, IPM, Hutson, and CUC

---

[39]  R. Doc. 7 at p. 3.

[40]  *See* p. 25, *infra.*

be and hereby are **DENIED**.

**IT IS FURTHER ORDERED** that the Motions to Intervene by the FOP, PANO, Powers, and Glasser be and hereby are **DENIED**.  However, if the proposed Consent Decree is approved, the Court will consider renewed motions to intervene by the FOP, PANO , Powers and Glasser during the implementation phase of the Consent Decree if the United States, the City  and/or NOPD seek to make changes which may implicate the Civil Service or other legally protected rights afforded to members of FOP and PANO.

The Court is of the opinion that the knowledge and experience of the organizations seeking to intervene in this case (OIPM, CUC, FOP, and PANO) will be of assistance to the Court in making its determination of the fairness, adequacy, and reasonableness of the proposed Consent decree.  Accordingly, the Court has requested written comments[41] from the proposed Intervenors regarding the terms of the proposed Consent Decree pursuant to the Court's previous order.[42]  In addition,

**IT IS ORDERED** that the Court will allow the proposed Intervenors to participate in the Fairness Hearing scheduled for September 12, 2012 at 10:00 a.m. in the following manner:

1.  First, the  OIPM, CUC, FOP, and PANO each will  have a total of **thirty (30) minutes** during which to offer the live testimony of witnesses and to offer documentary evidence relating to the organization's objections to the approval of the proposed Consent Decree.  These organizations should

---

[41]  The Court will treat these comments in the nature of amicus briefs.

[42]  R. Doc. 7 (Order of the Court dated July 31, 2012).

be mindful that the purpose of the Fairness Hearing is to assist the Court in determining whether the proposed Consent Decree is "fair, adequate, and reasonable;" thus, the testimony should be related to those issues.

2.  Second, the OIPM, CUC, FOP and PANO may submit proposed questions they would like the Court to ask the United States or the City at the Fairness Hearing.  Proposed questions must be submitted to the Court via email at **efile-Morgan@laed.uscourts.gov** no later than **twenty-four (24) hours prior to the Fairness Hearing.**

**New Orleans, Louisiana, this __31st__ day of August, 2012.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**