## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CIVIL ACTION NO.** |
| | | **12-CV-01924** |
| **VERSUS** | : | |
| | | **SECTION E** |
| | : | **JUDGE SUSIE MORGAN** |
| **CITY OF NEW ORLEANS** | | |
| | : | **DIVISION 2** |
| | | **MAGISTRATE WILKINSON** |

---

### MEMORANDUM IN SUPPORT OF MOTION TO VACATE CONSENT DECREE PURSUANT TO RULE 60 OF THE FEDERAL RULES OF CIVIL PROCEDURE

The Defendant, the City of New Orleans ("City"), moves this Honorable Court for an order vacating the Consent Decree entered by the Court on January 11, 2013. Mayor Mitchell J. Landrieu began reforming the New Orleans Police Department ("NOPD") when he took office in May 2010 and remains committed to implementing reforms to ensure that the NOPD is the best police department in the nation.

## INTRODUCTION

The City invited DOJ to participate in the reform of NOPD. The City originally believed that DOJ would be a partner with the City to improve the NOPD. This belief no longer exists, and justifiably so. Now, nearly six months after the City and DOJ filed the Motion to Enter the Consent Decree and signed the proposed Consent Decree, the City is forced to withdraw its consent to the Consent Decree due to the tainted nature of the negotiations that led to its signing.

This DOJ's misconduct falls into three distinct but related categories.

- **Failure to Disclose Costs to Fix Orleans Parish Prison ("OPP") Until After NOPD Consent Decree Executed**

  With full knowledge of the City's financial constraints, the DOJ waited until after the NOPD Consent Decree was executed to hit the City with DOJ's estimate to implement the OPP consent decree.

- **DOJ's Designation of Sal Perricone as the U.S. Attorney's "Point Person" During the NOPD Consent Decree Initial Investigation and Negotiations**

  Mr. Perricone attempted to become the Superintendent of Police during the Landrieu administration[1] and his subsequent blogging related to Mayor Landrieu, Superintendent Ronal Serpas, the timeliness of the signing of the proposed consent decree, the appropriateness of a court-appointed police monitor, secondary employment ("paid details"), and the need for DOJ intrusion in the reform process.  Reports have shown that Perricone was the originator of the comment that the paid detail system was the "aorta of corruption" in the NOPD.[2] Such invective in a public forum by the DOJ's representative who was engaged in the negotiations wholly undermines the integrity of the negotiation process.

- **The Consent Decree's Secondary Employment Provisions May Run Afoul of the Fair Labor Standards Act ("FLSA").[3]**

  During the negotiations, the DOJ insisted upon secondary employment provisions in the Consent Decree, which is particularly interesting in light of Mr. Perricone's extreme focus in his blogs on "paid details."  Even more interesting is the fact that the City had already demonstrated its un-waivering commitment to reforming secondary employment by instituting certain important reforms before it even began negotiations with the DOJ, and secondary employment was not related to the constitutional policing issues the Consent Decree was intended to address. The issue of whether those provisions are FLSA compliant remained pending and unresolved on January 11, 2013, when the Court reversed course and signed the original Consent Decree which it had previously indicated that it would not sign without modification.

In addition to the DOJ's tactics, procedural deficiencies underlying the entry of the Consent Decree warrant a grant of the City's Motion.  The Court has entered a Consent Decree, which was the subject of a Fairness Hearing with suspended rules of evidence and procedure.

---

[1] *See* List of Chief of Police Resumes attached hereto as Exhibit A.

[2] *See* March 20, 2012 Times Picayune article by Brendan McCarthy attached hereto as Exhibit B.

[3] Because the issue of secondary employment is unresolved and this Court has yet to rule on that issue, the City reserves its rights to raise all defenses, arguments, objections related to applicable defenses and intends to assert these defenses if any issues are raised in the future related to any allegations that the City is violating the FLSA by instituting any of the provisions related to secondary employment.

Subsequent to the Fairness Hearing, the Court ordered the parties to engage in further negotiation of the terms of the document, even though such terms were not presented at any Fairness Hearing (which the City submits is tantamount to a ruling that the proposed Consent Decree was not fair, adequate or reasonable).  When the City requested a court reporter to move to withdraw from the Consent Decree on the record, which request was denied, the Court entered the originally filed Consent Decree.  After entry of the Consent Decree, the Court has continued to modify the terms of the document.  The City has withdrawn its consent to the proposed Consent Decree and certainly has not consented to any modified Consent Decree, and the Court's order entering the Consent Decree should be vacated.

The City does not file this Motion cavalierly but with a serious commitment to the citizens of the City and the protection of the taxpayer dollars to ensure that citizens are able to get *all* services to which they are entitled.

I.      **FACTUAL BACKGROUND**

A.      **The DOJ Misled the City By Withholding Information.**

Immediately upon taking office, on May 5, 2010, Mayor Landrieu invited the DOJ to join with him in reforming the NOPD.  After a lengthy investigation and a broad sweeping findings letter issued on March 16, 2011, the DOJ sent the City a first draft of a consent decree on October 26, 2011, and negotiations ensued.   Mayor Landrieu's promise to the citizens of New Orleans was and is to reform the NOPD.   Since taking office and hiring Ronal Serpas as Superintendent of Police, the Mayor has begun and continues to reform NOPD.   The City thought that it had a partner in DOJ, which would assist in this endeavor, but it now realizes that it has been misled.

3

From the outset, the City made it abundantly clear that the finances and budget of the City were such that any monies necessary for the reform would result in cuts in other departments.  Time and again the City requested assistance with funding from DOJ to implement the reforms.  These requests fell on deaf ears.

While the City and DOJ were negotiating a consent decree, at the same time DOJ (including some of the same attorneys) was negotiating a separate consent decree regarding the conditions at OPP.  Cognizant of the City's concerns related to funding, the DOJ never provided its estimate of costs that it believed the City would be obligated to pay to implement the OPP consent decree until after the NOPD consent decree was finalized.  One month after the NOPD Consent Decree was signed, the DOJ, for the first time, stated that it believed the City would be required to pay $34.5 million dollars to fund the OPP consent decree.  The DOJ then intervened in a class action lawsuit and quickly resolved outstanding issues with Sheriff Marlin Gusman related to conditions at OPP.

As noted above, the City and the DOJ executed the NOPD consent decree on July 24 2012, and filed a Joint Motion for Approval of the Consent Decree with this Court. (*See* Rec. Doc. No. 2).  Following several status conferences, the Court held a Fairness Hearing on September 21, 2012.  (*See* Rec. Doc. No.132 ).  A mere three days later, the DOJ intervened in a class action lawsuit against Sheriff Marlin Gusman, styled *Jones v. Gusman* (12-cv-859) (*Jones*, Rec. Doc. No. 68), even though the DOJ originally investigated and issued a findings letter to Sheriff Gusman in September of 2009.  One week after the Fairness Hearing, on October 1, 2012, Sheriff Gusman filed a third party complaint against the City in *Jones v. Gusman*.  (*Jones*, Rec. Doc. No. 75).  Shortly thereafter, despite issuing an initial findings letter related to OPP more than three years ago, the DOJ executed the OPP consent decree on December 11, 2012,

without the City as a party to the document.  (*See* Rec. Doc. No. 101).  Now, Sheriff Gusman, with the DOJ's support, is seeking approximately $40 million dollars to implement the OPP consent decree.

Had the City known in July 2012 that a few months later the DOJ would be seeking at least an additional $12.5 million dollars to fund the OPP consent decree, it would not have signed the NOPD consent decree and committed to the financial obligations associated with it.

**B.      Sal Perricone Seems to Have Had Ulterior Motives.**

Sal Perricone attempted to become the Superintended of Police under the Landrieu administration.  From the outset of the DOJ's investigation into NOPD, Sal Perricone was the "point person" for the United States Attorney's Office in the Eastern District of Louisiana.  In fact, Mr. Perricone attended a meeting outlining the parameters of the DOJ's investigation of the NOPD on May 17, 2010.  While Mr. Perricone's aliases and his penchant for blogging are now well known, his influence in the negotiation process is only now being fully realized.   Mr. Perricone reportedly was the author of the term "aorta of corruption" used to describe the secondary employment or paid detail system of the NOPD.  It appears that Mr. Perricone, as a former member of NOPD and as an Assistant U.S. Attorney ("AUSA"), had a unique insight that was relied upon by those investigating the NOPD and members of the DOJ negotiating team.  But what was not known at the time was how his desire to become NOPD Superintendent[4] led to his attempts to sway public opinion against NOPD paid details.

On March 19, 2012 during the height of the negotiations between the City and DOJ, it was revealed that Sal Perricone had been blogging on nola.com under the screen name "HenryLMencken1951."   There were several blogs that related to the NOPD, the City's legal team, paid details, the Consent Decree, and Superintendent Serpas under this moniker.  As a

---

[4] *See* Exhibit A.

result of this revelation, former U.S. Attorney Jim Letten personally came to a negotiation session and assured the City's legal team that Mr. Perricone's blogs were an aberration and that no one else in the U.S. Attorney's office was aware of the activity.  But it appears that the U.S. Attorney was unaware that Mr. Perricone had been blogging for quite some time and that Mr. Letten's First Assistant U.S. Attorney had been blogging as well.  The extent of the blogging by U.S. Attorneys in the Eastern District of Louisiana is still under investigation. (*See* Rec. Doc. No. 1070 in Case No. 10-CR-00204.)

It was not until after the Consent Decree was executed that Mr. Perricone admitted to blogging on nola.com under the alias "legacyusa."[5]  Under this moniker, Mr. Perricone sought to sway public opinion against the NOPD as a whole, the paid detail system, and Superintendent Serpas.  He also used this platform to push his own agenda to become Superintendent of Police and to disparage the paid detail system.

A review of Mr. Perricone's blogs demonstrates his hidden agenda.  When Mayor Landrieu began his search to hire a new Police Superintendent in early 2010, Mr. Perricone was touting his own attributes online and persistently ranting to have the Mayor appoint him NOPD Superintendent:

- "Get a police chief who knows how to fight corruption, Mitch!!!!!!" (legacyusa February 11, 2010 at 9:35 pm)[6]

- Mitch, put a federal presence in the police department!!!!!!! (legacyusa February 27, 2010 at 10:02 a.m.)

- MITCH: GET LETTEN OR ONE OF HIS BOYS OR GIRLS TO BE THE NEXT CHIEF!!!!!! (legacyusa March 09, 2010 at 4:13 pm)

---

[5] *See* August 1, 2012 New Orleans Magazine article by Allen Johnson, Jr. attached hereto as Exhibit C.
[6] Attached hereto as Exhibit D *in globo* are comments from legacyusa cited herein.  The attached represents only a sampling of the legacyusa blogs as hundreds of comments exist under this moniker.

- Mitch, have you tried begging Letten?  Get someone like him!!!! (legacyusa April 07, 2010 at 10:24PM)

When Superintendent Serpas was named as one of the finalists to lead the NOPD, Mr.

Perricone took aim at Superintendent Serpas:

- If we get Serpas, it won't be that much different. Get the FEDs in there now, Mitch. (legacyusa May 01, 2010 at 9:34 a.m.)

- Well it, indeed, looks like he was the choice from day one. All one has to do is read the criteria the mayor wanted—it seemed to be tailored for Serpas.
  ps: can you lose some weight. We have enough fat cops in New Orleans. (legacyusa May 7, 2010)

- Ronal Serpas and Mitch Landrieu are the Les Miles of city executives. Alll [sic] they can do is TALK, TALK, TALK TALK. Whenever it gets bad, they run to the camera and micophones. TALK,TALK, TALK. This the political solution to a massive social problem they are incapable of solving.NO MORE NEWS CONFERENCES. Get the job done!!! ACT!!! (Henry L. Mencken1951 January 14, 2012, 8:22AM)[7]

- Serpas is a terrible police superintendent, but a good fisherman. Feb. 15, 2012, 7:45 am, nola.com.

- Tiny frog is declared the world's smallest vertebrae; Maybe we can convince him to be police superintendent.  It is abundantly clear that larger vertebrae can't do the job. nola.com.

Mr. Perricone's agenda and the lengths to which he went to "poison the well" are just beginning to come to light.  The City did not know the extent to which Mr. Perricone would go to undermine the NOPD and Superintendent Serpas when it sat across the table from him and negotiated the consent decree in good faith.

In fact, Mr. Perricone reportedly coined the now infamous phrase "aorta of corruption" to describe the NOPD's paid detail system, which term appears in both the DOJ's findings report and Mr. Perricone's blogs.  The inclusion of changes to the paid detail or secondary employment

---

[7] Attached hereto as Exhibit E *in globo* are the blog entries under the username Henry L. Mencken1951.

system in the Consent Decree was an issue of intense negotiations.   The inclusion of secondary employment or paid detail provisions in a Consent Decree intended to address constitutional policing was not necessary.   Mr. Perricone had a personal viewpoint that permeated the negotiations; the DOJ apparently relied on Mr. Perricone's tainted assessment of paid details in its findings report, which led to its insistence on including secondary employment in the Consent Decree.   As this Court is aware, the secondary employment provisions in the Consent Decree have created unforeseen issues and may conflict with the FLSA.

Almost one year before the DOJ released its March 2011 findings letter and report, Mr. Perricone was espousing his views on secondary employment, and he continued to do so throughout the investigation and negotiation process.

- When the feds get in there, they need to investigate the paid details structure and determine who getting what… therein lies the big surprise. The nasty little secrets about to be exposed… Hey feds, check out the tax returns for the NOPD, if you can find them. (legacyusa April 13, 2010 at 7:37 AM)

-  MORE DETAILS!!!!!! You want nice cops—you have to pay. (legacyusa March 09, 2010 at 7:14 AM)

- The sad reality is that the paid details, for years, ran the police department.  It was the nucleus of the NOPD, and fundamental police services were subordinate to the detail system.  Nov. 3, 2011, 7:59 am, nola.com.

- Mitch you may not have run as a reform mayor, but many of us, perhaps gullibly believed you would be.  Now you have a big challenge on your hands.  You have the most corrupt police department under your control—or does it have you under its control. . .Terminate this commander and anyone who had anything to do with this detail.  DEMAND that police officers not split shifts to work details.  When they do that they put their financial interests above the safety of our city.  Can't you see that?  Act now!  Act decisively! May 4, 2011, nola.com.

Under the guise of Henry L. Mencken1951, Mr. Perricone continued to lambast the detail system and attempt to persuade the public of the need for federal oversight.

- Vern you are sooo right!! When the DOJ reported in March that the detail system inside the NOPD was the aorta of corruption, I thought it was hyperbole. But not anymore. Since then, we have learned how endemic the outside detail system worked and operated inside our police department. Moreover, I have learned, and this is most shocking, that Defillo control a significant portion of the details and all that that implies. Defillo knew too much and people under him knew it as well. The details controlled relationships and it was those relationships that controlled the behavior of officers, no matter what their rank.

- The DOJ can't get here soon enough. I am glad, and New Orleans is blessed that Defillo is gone. He' made his money and should be happy that he's not going to jail. I just hope the media will dig into his activities more and more. Perhaps the truth will surface. God knows, we need more truth in this city. (Henry L. Mencken1951 August 27, 2011, 10:16AM)

- The Justice Department launched an investigation into the department in 1996, two years after Pennington was hired, and began reforming internal investigations, police details and other operations. In 2004, the agency decided that federal oversight was not needed." Question: Who was Pennington's #2 when the NOPD decided that Federal oversight was NOT NEEDED? None other than Ronal Serpas.
  Why has it taken so long to implement a Consent Decree? Why is the city dragging its feet? Do you see a pattern here?
  The NOPD will never change if left to its own devices. It's a corrupt culture which has existed for years. I am opposed to the Federal government residing in our lives, but this is one time I can make an exception. (Henry L. Mencken1951 February 05, 2012, 8:25AM)

- Serpas' success as police superintendent is directly proportionate to how vigorous the court-appointed police monitor will enforce the consent decree. Left to his own devices, the NOPD, under his control, will backslide into the morass it has become over the past 20years. (Henry L. Mencken1951 12, 2011, 9:55PM)

- While these heros [sic] are making promises, where is the consent decree they promised? You can't have reform without the Justice Department in this city.  I financially support Mitch, but I beginning to have second thoughts.  SHUT UP AND PRODUCE!!!! November 22, 2011, nola.com.

When it was revealed in March 2012 that Mr. Perricone was blogging under the pseudonym Henry L. Mecken1951, the City expressed its serious concerns to the DOJ regarding the blogging and the effect that Mr. Perricone may have had on negotiations.  The DOJ assured

the City that Mr. Perricone's conduct was an isolated anomaly.  The DOJ further assured the City

that Mr. Perricone did not participate in or influence the underlying investigation. The City

accepted the DOJ's assurances and continued negotiating with the DOJ in good faith.

Recently, the Police Association of New Orleans re-urged its Motion to Intervene motion

based on concerns about Mr. Perricone.  Since the Consent Decree was executed in July 2012,

additional facts have come to light, which make clear that Mr. Perricone's behavior was not

isolated nor an anomaly.  As noted above, additional pseudonyms have been uncovered, the U.S.

Attorney and First Assistant U.S. Attorney are no longer with the office, and the DOJ Office of

Inspector General is investigating the matter.  These actions by the DOJ's designated "point

person" tainted the entire negotiation process.

## II.  **PROCEDURAL HISTORY**

After the DOJ and the City filed the Joint Motion to Approve the Consent Decree on July

24, 2012, the Court held numerous status conferences and communicated with the City and the

DOJ via email.  During the first status conference on July 26, 2012, the Court requested

background information on other jurisdictions under consent decrees, the Court's obligation prior

to signing the agreement, and the process for selecting a Consent Decree monitor, which the

parties provided.[8]  Through subsequent emails and status conferences, the Court requested

additional clarification and background information from the parties on topics such as existing

NOPD policies and civil service commission rules, which the parties also provided.[9]  In addition,

the Court reviewed and made redlined revisions to the Request for Proposals for the Consent

---

[8] *See* Declaration of Erica N. Beck attached hereto as Exhibit F at ¶1.
[9] *See* Exhibit F at ¶2.

Decree monitor.[10]  Similarly, the Court reviewed and made redlined revisions to the City's draft professional service agreement for the Consent Decree monitor.[11]

On September 21, 2012, a Fairness Hearing was held to determine whether the Consent Decree was fair, adequate, and reasonable, and the Federal Rules of Evidence and Civil Procedure were discounted.  *See* Rec. Doc No.132.  After the Fairness Hearing, on October 1, 2012, the Court submitted 129 questions to the DOJ and the City raising concerns about the Consent Decree.[12]  The Court held subsequent status conferences to discuss these concerns between October 3, 2012 and January 11, 2013, wherein the Court stated to the parties that it would not sign the original Consent Decree without certain modifications.  To that end, the Court began revising the Consent Decree, and the Court has continued to revise the document even after entering the January 11, 2013 Order approving the original Consent Decree.

On October 3, 2012, this Court held a status conference with the City and the DOJ to suggest modifications to the Consent Decree based on questions raised at the Fairness Hearing by some of the potential interveners and/or the Court's.  The DOJ enjoyed a tactical advantage in agreeing to the Court's suggested modifications because many of the changes either benefitted the DOJ or added costs to the City.  In some instances, the modifications at issue had been extensively debated in the negotiations process, and the DOJ had acquiesced. By early October 2012, there was no meeting of the minds between the City and the DOJ to proceed with the modifications proposed by this Court.[13]

---

[10] *See* Exhibit F at ¶¶7-13, 17-18, 21-22, 33, 37, 42,44.
[11] *See* Exhibit F at ¶¶23, 24, 26, 31, 32, 34, and 35.
[12] *See* Exhibit F at ¶39.
[13] *See* Exhibit F at ¶¶39-40.

On November 19, 2012, the Court emailed a redlined draft of the Consent Decree to the parties.[14]  At a December 4, 2012, status conference, the DOJ and the City raised concerns with the Court's proposed edits.  Because the DOJ and the City themselves were not in agreement about the Court's proposed modifications, both parties emailed the Court their respective concerns with the proposed edits on December 14, 2012.[15]  Three days later, the Court emailed the DOJ and the City another version of the Consent Decree incorporating comments from the December 4, 2012 status conference and December 14, 2012 emails.[16]  That same day, the City reiterated to the Court its outstanding issues with the current draft.[17]

On December 19, 2012, the Court held another status conference to discuss outstanding issues with the Consent Decree and the proposed modifications.  On January 2, 2013, the Court emailed the DOJ and the City the most recent version of the Consent Decree as revised by the Court.[18] The email noted that the Court did not edit the section regarding secondary employment because it had not yet received any feedback from the parties.[19]  The Court asked the parties whether there were any additional issues to discuss at the upcoming January 11, 2013 status conference, and the City indicated that it wanted to discuss the following issues at the status conference:

- the motion recently filed by PANO
- the status of the appeals regarding intervention
- funding and
- secondary employment.[20]

---

[14] *See* Exhibit F at ¶47.
[15] *See* Exhibit F at ¶49.
[16] *See* Exhibit F at ¶50.
[17] *See* Exhibit F at ¶51.
[18] *See* Exhibit F at ¶47.
[19] *See id.*
[20] *See* Exhibit F at ¶54.

At the status conference on January 11, 2013, the City indicated its intent not to proceed with executing the revised Consent Decree until the certain issues could be resolved.[21]   The City attempted to orally move to withdraw its consent to the joint motion and withdraw from the Consent Decree.[22]   Counsel for the City requested a court reporter make its motion and to state its reasons on the record.   This request was denied, and, despite previous assertions that the Court would not sign the original Consent Decree as executed on July 24, 2012, the Court signed an Order approving the original version of the Consent Decree that day.[23]

## III.   LAW AND ARGUMENT

### A.   The Order Entering the Proposed Consent Decree Should be Vacated Under Rule 60(b) of the Federal Rules of Civil Procedure.

The United States Supreme Court has stated that a consent decree is "subject to the rules generally applicable to other judgments and decrees."   *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992).   The Supreme Court reasoned that a consent decree, therefore, is governed by the same standards that govern modifications of consent decrees as set forth in Federal Rule of Civil Procedure 60(b).   Rule 60(b) of the Federal Rules of Civil Procedure provide that the Court may relieve the City from the January 11, 2013 Order entering the Consent Decree for, among other reasons, mistake, inadvertence, newly discovered evidence, misrepresentation, changed circumstances, misconduct of by the opposing party, or any other reason that justifies relief.   The City submits that each of the foregoing reasons allow, and in fact require, the Court to vacate its January 11, 2013 Order.

---

[21] *See* Exhibit F at ¶58.
[22] *See id.*
[23] *See id.*

**i.**        **Mistake, Inadvertence, and Misrepresentation**

The United States Fifth Circuit Court of Appeals' ruling in *Ibarra v. Texas Employment Commission*, 823 F.2d 873 (5th Cit. 1987) is particularly instructive on this issue and supports a grant of the City's Motion.  In *Ibarra*, plaintiffs, Mexican citizens, filed suit because they were denied unemployment benefits by the Texas Employment Commission ("TEC").  The complaint alleged that the TEC denied benefits to eligible immigrants by improperly construing the requirement that immigrants be "permanently residing in the United States under color of law," which requirement is set forth in the Federal Unemployment Tax Act ("FUTA").   In particular, the TEC interpreted the requirement to mandate that immigrants produce an Immigration and Naturalization Service ("INS") work authorization.  The parties entered into a consent decree whereby the TEC would construe the requirement to include immigrants who the INS is aware are present in the United States and with regard to whom there has been an affirmative case-specific or class-specific determination that allows the immigrant to remain in the United States indefinitely.  The consent decree also listed specific categories of immigrants that the parties agreed satisfied this definition.  Subsequently, the Department of Labor ("DOL") send a letter to TEC stating that several of the specified categories of immigrants set forth in the consent decree were inconsistent with federal law, and the DOL warned TEC that compliance proceedings would be instituted against it.  After TEC received the DOL's letter, TEC sought to withdraw from the consent decree.  The district court approved the consent decree, and the Fifth Circuit found that the district court abused its discretion in approving the consent decree.  The Fifth Circuit reasoned that the TEC entered the consent decree on the basis of a mistake as to the DOL's position and that third-party employers could lose their FUTA tax credits if Texas' program was de-certified by the DOL.  The court stated that "[m]istake is as much a ground for

voiding a consent decree as is fraud or collusion." The court noted that TEC sought throughout the proceedings to ensure that it would not be subject to de-certification by the DOL but entered into the consent decree because it mistakenly believed that the decree complied with the DOL's interpretation of FUTA. The Fifth Circuit reversed the district court's order approving the consent decree.

Similarly, this Court's order approving the Consent Decree should be vacated. Like TEC, the City has throughout these proceedings sought to ensure that it would not be subjected to excessive costs and that the secondary employment provisions contained in the Consent Decree comply with the Fair Labor Standards Act ("FLSA").

The City worked diligently during the negotiation process to obtain cost estimates related to the implementation of every provision of the NOPD Consent Decree, and the City conveyed to the DOJ that it can ill afford excessive costs in light of its financial limitations. The City, however, was not provided the DOJ's assessment of the cost for implementation of the OPP consent decree until *one month after* the City signed the NOPD Consent Decree. This was a glaring misrepresentation by omission committed by DOJ. Such misconduct at the very least does not comport with good faith negotiations by the DOJ.

The DOJ has repeatedly conveyed to the City and the Court that other jurisdictions legally have implemented secondary employment policies such as the provisions contained in the Consent Decree. The DOJ, however, has been unable to provide the City with any example of another jurisdiction that has implemented an equivalent secondary employment provision in accordance with FLSA. In spite of its consistent past representations, as recently as January 23, 2012, the DOJ acknowledged that it had not yet sought a DOL opinion on this issue. Such a

statement further highlights the DOJ's pattern of misrepresenting facts in an effort to obtain and maintain the City's consent to the Consent Decree.

Throughout these proceedings, the City has maintained that it is further examining this issue to ensure FLSA compliance. Indeed, as the City stated during the Fairness Hearing, the City engaged outside legal counsel who specializes in labor and employment to examine this issue.

As this Court is well aware, there are significant ramifications for violating FLSA. The DOL can bring suit against a violating employer and collect up to $1,100 per violation in civil monetary penalties. *See* 29 U.S.C. §211(a); 29 C.F.R. §578.3. In addition, criminal enforcement can be brought against employers who violate the law. *See* 29 U.S.C. §216(a). Employees claiming FLSA violations can sue their employers for various remedies, including back pay, liquidated damages, punitive damages, emotional distress damages, and reasonable attorney's fees and costs. *See* 29 U.S.C. §216(b).

The issue raised is whether the Office of Secondary Employment, which is required by the Consent Decree, merely facilitates detail work or "whether the [Office]'s actions [go] beyond that permitted in the guiding regulation." *See Specht v. City of Sioux Falls*, 639 F.3d 814, 822 (8th Cir. 2011). In *Specht*, the court focused on the terms of the contractor agreement between the City and the State and reasoned that the level of control that the City exercised over the firefighters under the agreement reflected that the City was actually the firefighters' "employer" when they were contracted to the State. *See id.* at 824-25.

The distinction becomes blurred when the primary employer and the secondary employer are related entities and not truly separate and independent. *See, e.g., Clark v. City of Forth Worth*, 800 F.Supp. 2d 781 (N.D. Tex. 2011) (police officers worked for city and performed

detail work as security guards for city-owned facilities). *See also Baltimore County FOP Lodge 4 v. Baltimore County*, 565 F.Supp.2d 672 (D.Md. 2008) (officers worked for both county and school board); *Barajas v. Unified Government*, 87 F.Supp.2d 1201, 1204 (D. Kan. 2000) (police officers worked for city and participated in housing authority patrol assignment). The secondary employment provisions of the Consent Decree, therefore, potentially conflicts with the FLSA.[24] The Court was fully aware of this issue when it entered its Order approving the Consent Decree on January 11, 2013 over the City's objection.

### ii.   Misconduct of the DOJ

Rule 60(b)(3) provides relief from judgments that were unfairly obtained. *See General Universal Sys., Inc. v. Lee*, 379 F. 3d 131, 156 (5th Cir. 2004). Such relief may be granted when a party knowingly misrepresents or conceals a material fact when they have a duty to disclose, and such concealment is done to induce another party to act to its detriment. *See Info-Hold, Inc. v. Sound Merch., Inc.*, 538 F. 3d 448, 455-56 (6th Cir. 2008). In this case, the DOJ, acting through its representative Sal Perricone, knowingly misrepresented and concealed Mr. Perricone's blogging, which blogs undermined the integrity and confidentiality of the entire negotiation process leading to the Consent Decree.

The DOJ's misconduct is patent. Mr. Perricone, a former candidate for Superintendent of Police under the Landrieu administration, attended a meeting with the City as early as May 17, 2010 to discuss the nature and parameters of the DOJ's investigation of the NOPD. The DOJ indicated during that meeting that most of the investigative work would be done by its Washington, D.C. office. Mr. Perricone reportedly participated in the NOPD investigation, after

---

[24] Because the issue of secondary employment is unresolved and this Court has yet to rule on that issue, the City reserves its rights to raise all defenses, arguments, objections related to applicable defenses and intends to assert these defenses if any issues are raised in the future related to any allegations that the City is violating the FLSA by instituting any of the provisions related to secondary employment.

he was not selected as Superintendent of NOPD.  The investigation resulted in the March 2011 DOJ report, which condemned the NOPD's secondary employment/paid detail system and labeled it the "aorta of corruption."  Mr. Perricone then participated in negotiations with the City insisting on including secondary employment provisions in the Consent Decree, even though the City had already made significant changes to its secondary employment program under Mayor Landrieu and secondary employment was not related to the constitutional policing issues the Consent Decree was intended to address.  Simultaneously, Mr. Perricone was surreptitiously blogging about the NOPD, paid details, Superintendent Serpas, and Mayor Landrieu using some of the same language contained in the DOJ's report and presumably in reliance on information he obtained in the context of the DOJ investigation and confidential settlement negotiations with the City. His relentless blogging against Superintendent Serpas and NOPD, which ran from the transitional period of the Landrieu administration in February 2010 until he was unmasked in March 2012, was clearly aimed at prejudicing the initial DOJ investigation of NOPD as well as the entire Consent Decree process.

 Such conduct cannot be overlooked and warrants a grant of the City's Motion.

### iii.    Newly Discovered Evidence, Changed Circumstances, and Any Other Reason that Justifies Relief

In *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), after a finding that the Suffolk County Jail conditions were unconstitutional, officials and inmates entered into a consent decree providing for construction of a new jail, which would provide for single occupancy cells for pretrial detainees.  While construction of the new jail facility was underway, the sheriff moved to modify[25] the consent decree under Rule 60(b)(5) based on a change in circumstances

---

[25] The Court in *Rufo* addressed modification of a consent decree under Rule 60.  Rule 60, however, also allows a court to vacate a consent decree, particularly when the entire document is affected by a substantial change in

because the number of pretrial detainees increased. The district court denied the sheriff's motion; the United States First Circuit Court of Appeals affirmed; and, the Supreme Court granted certiorari and vacated the decision of the district and appellate court.

The Supreme Court rejected the notion that only a showing of a "'grievous wrong evoked by unforeseen conditions'" mandates a change in a consent decree. *Id.* at 377. Instead, the Court stated that a modification of a consent decree under Rule 60(b) should occur when it is established that a "significant change in circumstances warrants revision of the decree." *Id.* at 383; *see also Jacksonville Branch, NAACP v. Duval County Sch. Bd.*, 978 F.2d 1574, 1582 (11th Cir. 1992). The Supreme Court specifically noted that "[m]odification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous." "Modification is also appropriate when a decree proves to be unworkable because of unforeseen obstacles." The Supreme Court also noted that financial constraints are legitimate concerns and are appropriately considered when modifying a consent decree. Without question, there has been a significant change in circumstances warranting that the Order entering the Consent Decree be vacated, and the financial constraints imposed on the City must be considered in this analysis.

The City was not provided with the DOJ's estimate of the cost of implementing the OPP consent decree until one month after the City signed the Proposed Consent Decree in this matter. Presumably, the DOJ had the information related to the estimated cost of the OPP consent decree at the time the NOPD Consent Decree was executed, but the DOJ failed to provide such information. As the Supreme Court recognized, this evidence of cost is certainly material to the issue before this Court. *See Thermacor Process, L.P. v. BASF Corp.*, 567 F. 3d 736, 744 (5th Cir.

circumstances, which is the case here. Accordingly, the Supreme Court's analysis with regard to modification also applies to vacating a consent decree.

2009).  Funding the NOPD Consent Decree as well as the OPP consent decree will be totally unworkable for the City.  In addition, the scope of Perricone's prolific blogging against NOPD was not known until after the NOPD consent decree was executed by the City on July 24, 2012, and pursuant to *Rufo*, the City's Motion should be granted.

**B.     Under Louisiana Contract Principles, the Consent Decree is Not a Valid Contract and Should Not Have Been Entered by the Court.**

For enforcement purposes, a consent agreement is interpreted under the principles of contract law.  *See Jacksonville Branch*, 978 F. 2d at 1578.  There is no allegation that the City has not complied with a provision of the Consent Decree as the City maintains its commitment to reforming the NOPD.  Nonetheless, Louisiana contract law must be considered because, prior to the entry of the Order approving the Consent Decree, the City informed the Court that it was withdrawing its consent to the agreement.  Further, whether the Consent Decree is a valid contract is determined by Louisiana substantive law, and under Louisiana law the Consent Decree is not a valid contract.  *See Federal Trade Comm'n v. American Entertainment Distributors, Inc.*, No. 11-10150, 2011 WL 2672545 *1 (11th Cir.  July 8, 2011).[26]  Rather than setting the City's Motion to Withdraw for contradictory hearing or receiving briefing on the issue, the Court refused the City's request to place its motion on the record with a court reporter, depriving the City of its right even to bring the motion before the Court.  Accordingly, the City now addresses the contract principles that allowed it to withdraw its consent.

---

[26] In *Federal Trade Comm'n*, the appellate court held that the district court properly entered the consent judgment even though one defendant moved to withdraw her consent.  The appellate court noted that the defendant did not allege that she did not freely consent to the agreement.  The City, however, does allege that it was under duress in signing the Consent Decree as set forth herein.  Unlike the defendant in *Federal Trade Comm'n*, the City was not allowed to make its arguments in support of its Motion to Withdraw much less actually file a motion for consideration by the Court.

> **i.    The City Properly Withdrew its Consent, and the Order Approving the Consent Decree Should be Vacated.**

It is well-established that there must be a "meeting of the minds" for a contract to exist, and a consent decree is no exception.  "A consent judgment is a bilateral contract and must be based on consent, an essential element of a contract." *Succession of Morvant*, 578 So. 2d 549, 552 (La. App. 3 Cir. 1991).  In *King v. Crawford*, 334 So. 2d 476 (La. App. 1 Cir. 1976), the parties agreed to a consent judgment during trial, but counsel for the defendant refused to sign the judgment after it was drafted stating that the judgment did not reflect the agreement of the parties.  The trial court signed and entered the judgment.  The appellate court refused to dismiss the appeal, finding that although a consent judgment had been signed by the trial court, the appellant signified that he withdrew his consent because the judgment did not reflect the agreed upon provisions.  Similarly, the City withdrew its consent to the Consent Decree because the document does not reflect the true intent of the parties, particularly in light of the DOJ's bad faith negotiations.   In short, the essential element of a contract—consent—is absent, and the Consent Decree is not a valid contract.

> **ii.    Any Consent by the City is Vitiated by Error.**

Error vitiates consent to a contract when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known by the other party. *See* LA. CIV. CODE ANN. arts. 1948, 1949.  Error may concern a cause when it bears on the nature of the contract, the thing that is the contractual object, the law, or any other circumstance the parties regarded, or should in good faith have regarded, as a cause of the obligation. *See* LA. CIV. CODE ANN. art. 1950.  "[A] contract may be invalidated for unilateral error as to a fact which was the principal cause for making the contract, where the other party

knew or should have known it was the principal cause." *Nugent v. Stanley*, 336 So. 2d 1058, 1063 (La. App. 3 Cir. 1976).

Further, an obligation cannot exist without a lawful cause, and the cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy. *See* LA. CIV. CODE ANN. arts. 1956 and 1968.

Any consent by the City to the Proposed Consent Decree is vitiated by error. As set forth previously, the City diligently worked to ascertain the costs associated with implementing the NOPD Consent Decree, and it was no secret that cost was a primary concern to the City. Regardless of the City's repeatedly stated concern about cost, the DOJ failed to act in good faith and ignored the City's statements that funding was a driving consideration in the City's negotiation of the document. The City acted in good faith, considered all information provided to it regarding costs and best practices, and negotiated with that information in mind. The City, however, did not know that the DOJ believed that the City's obligation to fund the OPP consent decree would be at a minimum an additional $12.5 million per year. The DOJ waited to share that information with the City until one month after the City signed the Consent Decree. In fact, the same attorneys negotiating for the DOJ in this matter were negotiating the OPP consent decree, which demonstrates that the DOJ knew, or at a minimum should have known, its position with regard to costs that would be imposed on the City.

In addition, the secondary employment provisions of the Consent Decree provide a basis for invalidating the agreement. The DOJ has insisted that similar secondary employment requirements have been implemented in other jurisdictions, and the City proceeded with negotiations on this basis. Now, the City has obtained a legal opinion which calls into question the validity of the provisions related to secondary employment, which error vitiates any consent.

### iii.  Any Consent by the City is Vitiated by Duress.

"Consent is vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation." LA. CIV. CODE ANN. art. 1959.   The NOPD's reputation was directly implicated during the negotiation process, and the DOJ, through Assistant United States Attorney Sal Perricone, acted in bad faith, breached the confidentiality of the negotiation process, and undermined the integrity of the negotiation and the validity of the Consent Decree by making public comments related to the NOPD, Mayor Landrieu, and Superintendent Serpas.   Mr. Perricone's negative comments placed on the internet injected an element of duress into the negotiation process as the City was compelled to include costly provisions, such as secondary employment provisions, in the Consent Decree.

Further, it has been reported that Mr. Perricone was involved in the DOJ's investigation of the NOPD, which led to the March 2011 findings letter and executive summary that characterized the NOPD's secondary employment ("paid detail") system as the NOPD's "aorta of corruption."   When questioned, the DOJ has not denied that Mr. Perricone coined the term "aorta of corruption."   Mr. Perricone then blogged about the NOPD paid detail system, using the exact same term—"aorta of corruption."   Mr. Perricone's blogs also included the following statements, which statements certainly called into question the City's, the Mayor's, the NOPD's, and Superintendent Serpas' reputations:

- Serpas is a terrible police superintendent, but a good fisherman. Feb. 15, 2012, 7:45 am, nola.com.

- Why has it taken so long to implement a Consent Decree?  Why is the city dragging its feet?  Do you see a pattern here?  Feb. 5, 2012 at 8:25 am, nola.com.

- The NOPD will never change if left to its own devices. It's a corrupt culture which has existed for years. I am opposed to the Federal government residing in our lives, but this is one time I can make an exception. *See id.*

- The sad reality is that the paid details, for years, ran the police department. It was the nucleus of the NOPD, and fundamental police services were subordinate to the detail system. Nov. 3, 2011, 7:59 am, nola.com.

- Serpas' success as police superintendent is directly proportionate to how vigorous the court-appointed police monitor will enforce the consent decree. Left to his own devices, the NOPD, under his control, will backslide into the morass it has become over the past 20 years. September 12, 2011, nola.com.

- When the DOJ reported in March that the detail system inside the NOPD was the aorta of corruption, I thought it was hyperbole. But not anymore. Since then, we have learned how endemic the outside detail system worked and operated inside our police department. . .The DOJ can't get here soon enough. Aug. 27, 2011, 10:16 am.

- While these heros [sic] are making promises, where is the consent decree they promised? You can't have reform without the Justice Department in this city. I financially support Mitch, but I beginning to have second thoughts. SHUT UP AND PRODUCE!!!! November 22, 2011, nola.com.

- Mitch you may not have run as a reform mayor, but many of us, perhaps gullibly believed you would be. Now you have a big challenge on your hands. You have the most corrupt police department under your control—or does it have you under its control. . .Terminate this commander and anyone who had anything to do with this detail. DEMAND that police officers not split shifts to work details. When they do that they put their financial interests above the safety of our city. Can't you see that? Act now! Act decisively! May 4, 2011, nola.com.

- Tiny frog is declared the world's smallest vertebrae; Maybe we can convince him to be police superintendent. It is abundantly clear that larger vertebrae can't do the job. nola.com.

The importance and damaging nature of Mr. Perricone's comments cannot be overlooked, and Judge Kurt Engelhardt of this Court has recognized the detrimental effects of such commentary in *United States v. Bowen, et al.*, United States District Court for the Eastern District of Louisiana, Docket No. 10-204. Judge Engelhardt noted that Mr. Perricone "focused on NOPD corruption" and made statements such as:

24

- It [corruption] has been there for years and will be until the DOJ leashes it to a Consent Decree.

- As the DOJ acutely noticed in their letter to the mayor last March, the detail system at the NOPD is at the heart of the corrupt practices of the police department.

- Ps: isn't it curious that the first major scandal to hit Serpas had to do with a paid detail?

Judge Engelhardt stated the following:

> In light of this backdrop, along with the still unknown extent to which AUSA Perricone, First AUSA Mann, and perhaps others, took liberties with knowledge possessed through positions of authority in the United States' Attorneys' Office, the court believes further inquiry is warranted and that Defendants' motion . . . can hardly be considered frivolous. . . . the undersigned [Judge] is unwilling to assume a "nothing to see here—move along now" attitude. The Court will not simply turn a blind eye toward such matters of consequence.

The same reasoning applies here. Mr. Perricone, who clearly focused on NOPD corruption and the NOPD's secondary employment system, was at the negotiation table, and those negotiations led to the inclusion of secondary employment provisions in the Consent Decree. It is not clear if those provisions comport with the FLSA. Even though the NOPD had already made changes to the secondary employment system when negotiations with the DOJ began, the DOJ and Mr. Perricone maintained and the DOJ continues to maintain that the provisions related to secondary employment must be included in the Consent Decree.

Mr. Perricone's vilification of the NOPD on a blog likely was the result of information he obtained in his capacity as an Assistant United States Attorney. Use of such information to publicize disparaging information certainly unjustly threatens the City's reputation. Mr. Perricone's sustained presence on internet blogs, including the widely accessed nola.com website, using multiple monikers, beseeching the DOJ's aid in supervising the NOPD through a

Consent Decree placed undue duress on the City to sign the Consent Decree.  As such, the City's Motion should be granted.

       **iv.**       **Any Consent by the City is Vitiated by Fraud.**

"Fraud is a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." LA. CIV. CODE ANN. art. 1953.  Silence or inaction may also lead to fraud.  *See id*.  "Error induced by fraud need not concern the cause of the obligation to vitiate consent, but it must concern a circumstance that has substantially influenced that consent." LA. CIV. CODE ANN. art. 1955.

As set forth above, the DOJ failed to disclose the amount that it estimated the City would be required to pay to implement the OPP consent decree.  The DOJ failed to disclose the existence of other bloggers in the United States Attorney's Office, which information the City recently discovered.  The DOJ failed to take action to determine whether other United States Attorney's were involved in blogging about the NOPD and the Consent Decree.  Instead, the DOJ offered an unverified assurance to the City that Mr. Perricone was the only blogger and he did not participate in the investigation of the NOPD.  It defies logic that Mr. Perricone did not participate in the investigation of the NOPD, which led to a findings letter that characterized the NOPD "paid detail" system as the "aorta of corruption," when Mr. Perricone included the exact terminology in his blog and focused on "paid detail" in his blogging.  The media has reported that Mr. Perricone participated in the investigation of the NOPD.  If Mr. Perricone, a former candidate for the Superintendent of Police position under Mayor Landrieu, participated in an investigation of the NOPD, guided that investigation with regard to secondary employment issues, then sat at the negotiation table insisting on including a secondary employment provision that may not be FLSA compliant, all while blogging about the need to reform "paid details" with

26

the DOJ's supervision, there is no question that the Consent Decree is not valid.  Interesting, in the Motion and Memorandum to Enter the Consent Decree, which was drafted by the DOJ, the DOJ touted advantages of a consent decree and quoted *United States v. City of Jackson, Miss.*, 529 F.2d 1147, 1152, n.9 (5th Cir. 1975):  "the parties. . . minimize costly litigation and adverse publicity."  Doc. No. 2, p. 6.  The DOJ certainly undermined the very advantage of a consent decree that it quoted to this Court by engaging in such tactics, and the City's Motion should be granted.

### C.    The Court Failed to Follow the Rules of Civil Procedure and Evidence in Entering its Order Approving the Proposed Consent Decree.

Although the Court has the authority to approve or reject an agreement negotiated by the parties, the Court may not require the parties to accept a settlement or consent order to which they have not agreed.  *See Dandridge v. Jefferson Parish Sch. Bd.*, No. 64-14801, 2009 WL 24462, *2 (E.D. La. Jan. 5, 2009).    "[T]he Court does not have the power to modify a proposed consent decree and to order its acceptance over either party's objection."  *Id.*  A court need not approve a consent decree, but if it did not or "suggested or attempted a substantial change in the proposed consent judgment, each party to the consent decree, at the very least, would be free to withdraw from the stipulated 'consent.'"  *City of Burbank v. General Elec. Co.*, 329 F.2d 825, 831 (9th Cir. 1964).

The process that led to the Court's approval of the Consent Decree is inconsistent with the law of this Court.  In particular, the Court held a Fairness Hearing on the Consent Decree, suspending the rules of evidence and procedure.  Cross examination of witnesses was not allowed, and the Court allowed nearly every document to be introduced into evidence—even though most of the documents introduced into evidence were unauthenticated hearsay.  Further, subsequent to the Fairness Hearing, the Court engaged in a protracted process of redlining the

Consent Decree and informed the parties that the Consent Decree as submitted would not be approved by the Court.   Indeed, the multiple redlined versions of the document, which are attached hereto, demonstrate that the Court did not intend to approve the Consent Decree.  The City submits that the Court's edits to the Consent Decree imposed upon the City an obligation to accept a document to which it never agreed, and such edits after the Fairness Hearing is tantamount to a ruling that the Consent Decree is not fair, adequate, or reasonable.

Nonetheless, when the City attempted to move to withdraw from the Consent Decree, the Court approved the original Consent Decree submitted to the Court.  Subsequent to the entry of the Order approving the Consent Decree, the Court has continued to modify the document.  Such actions entitle the City to withdraw its consent under *Dandridge* and *City of Burbank*.  Further, the Order approving the Consent Decree is related to a document that continues to be revised.  In *Cotton v. Hinton*, 559 F.2d 1326, 1330, the United States Fifth Circuit Court of Appeal stated that a trial judge, when approving a settlement, must "support his conclusions by memorandum opinion or otherwise in the record."   There is no such evidence in the record related to the amended Consent Decree that the Court intends to enforce.

Another procedural deficiency lies in the fact that the City was deprived of its right to even move to withdraw from the Consent Decree.  The Court has conducted virtually the entire litigation "off the record" by emails to the parties and in closed door status conferences without court reporters.  In advance of the January 11, 2013 status conference, at the Court's request, the City identified significant concerns related to the Consent Decree via email.  During the status conference, when the City determined that it had to move to withdraw from the Consent Decree, the City requested that it be allowed to orally make its motion on the record in the presence of a court reporter.  The Court did not allow the City to make its motion on the record, never ruled on

the City's motion to withdraw, and simply entered the January 11, 2013 Order approving the Consent Decree—which document the Court originally indicated would not be approved.  Such actions deprived the City its right to make a record and to present its arguments in support of its Motion to Withdraw, which conceivably could affect the standard of review that is applied in this analysis.

Finally, it cannot be overlooked that the parties that sought to intervene in this matter have filed appeals of the Court's order denying their motions to intervene.  Because these matters are on appeal, conceivably all of the Court's actions subsequent to the order denying the motions to intervene may have to be re-visited.  In particular, if the appellate court determines that the Court should have allowed the appellants to intervene, all of the redlining of the Consent Decree that has been done and continues to be done may be subject to further debate.

## IV.    CONCLUSION

The City's Motion to Vacate should be granted under Rule 60(b) because the DOJ acted in bad faith and misled the City on key issues related to the Consent Decree.  Such misconduct warrants a grant of the City's Motion.

Respectfully submitted,

/s/ Sharonda R. Williams
MATTHEW J. LINDSAY (LSB #30599)
ASSISTANT CITY ATTORNEY
CHRISTY HAROWSKI (LSB #30712)
ASSISTANT CITY ATTORNEY
MARY KATHERINE TAYLOR (LSB#32719)
ASSISTANT CITY ATTORNEY
CHURITA HANSELL (LSB#25694)
DEPUTY CITY ATTORNEY
ERICA N. BECK (LSB #30000)
CHIEF DEPUTY CITY ATTORNEY
SHARONDA R. WILLIAMS (LSB#28809)
CHIEF DEPUTY CITY ATTORNEY
RICHARD F. CORTIZAS     (LSB #28890)
CITY ATTORNEY
1300 Perdido Street, Ste. 5E03
New Orleans, Louisiana  70112
Telephone:  504-658-9920
Facsimile:  504-658-9868
shrwilliams@nola.gov


BRIAN CAPITELLI (LSB#27398)
RALPH CAPITELLI (LSB#3858)
CAPITELLI & WICKER
Energy Centre
1100 Poydras Street, Ste. 2950
New Orleans, LA  70163
Telephone:  504-582-2425


**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading has been served on all counsel of record through the Court's CM/ECF electronic filing system this 31st day of January, 2013.

/s/  Sharonda R. Williams
SHARONDA R. WILLIAMS

30