# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA,**                    **CIVIL ACTION**
     **Plaintiff**

**VERSUS**                                        **No. 12-1924**

**CITY OF NEW ORLEANS,**                          **SECTION "E"**
     **Defendant**

## ORDER AND REASONS

Before the Court is the motion to vacate filed by the City of New Orleans ("City").[1]

The City seeks to vacate the Consent Decree regarding the New Orleans Police Department

("NOPD") entered as a judgment of this Court on January 11, 2013, pursuant to Rule 60(b)

of the Federal Rules of Civil Procedure.[2]  The United States of America ("United States")

---

[1] R. Doc. 175.  The City has also filed a reply memorandum.  *See* R. Doc. 202.  In addition, Crescent City Lodge No. 2, Fraternal Order of Police, Inc. ("FOP"), sought leave to file an amicus curiae memorandum in support of the City's motion.  *See* R. Doc. 186.  The Court granted FOP leave to file its memorandum and has considered FOP's arguments in conjunction with the instant motion.  *See* R. Doc. 191.

[2] R. Docs. 159 and 160.  The Court recognizes that the City has also filed an appeal with the U.S. Court of Appeals for the Fifth Circuit ("Fifth Circuit") regarding the Court's approval of the Consent Decree.  *See* R. Doc. 180.  Nevertheless, because the Court is denying the City's requested relief, the Court has jurisdiction to rule on the motion to vacate.  *See* Fed. R. Civ. P. 62.1(a); Fed. R. App. P. 4(a)(4)(B)(I); *Thermacor Process, L.P. v. BASF Corp.*, 567 F.3d 736, 744 (5th Cir. 2009).  As the Eleventh Circuit has explained,

> following the filing of a notice of appeal district courts do not possess jurisdiction to grant a Rule 60(b) motion.  Accordingly, a district court presented with a Rule 60(b) motion after a notice of appeal has been filed should consider the motion and assess its merits.  It may then deny the motion or indicate its belief that the arguments raised are meritorious. If the district court selects the latter course, the movant may then petition the court of appeals to remand the matter so as to confer jurisdiction on the district court to grant the motion.

. . .

*Bovee v. Coopers & Lybrand*, C.P.A., 272 F.3d 356, 359 n.1 (6th Cir. 2001) (internal citations omitted); *see also Boyko v. Anderson*, 185 F.3d 672, 675 (7th Cir. 1999) (same); *Fobian v. Storage Tech. Corp.*, 164 F.3d 887, 890-91 (4th Cir. 1999) (same); *Hoai v. Vo*, 935 F.2d 308, 312 (D.C. Cir. 1991) (same); Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 11 Federal Practice and Procedure § 2873 (2d ed. 1997) (discussing the holding of several

opposes the City's motion.[3]  For the following reasons, the motion is **DENIED**.

## *Background*

Mitchell J. Landrieu ("Mayor Landrieu" or "the Mayor") assumed office as Mayor of the City of New Orleans, Louisiana, on May 3, 2010.  On May 5, 2010, Mayor Landrieu wrote to U.S. Attorney General Eric H. Holder, Jr. "to ask for [his] support and partnership in transforming the New Orleans Police Department into one of the best police forces in the United States."[4]  According to the Mayor, he "inherited a police force that has been described by many as one of the worst police departments in the country."[5]  In his opinion, "nothing short of a complete transformation is necessary and essential to ensure safety for the citizens of New Orleans.  The police force, the community, [and] . . . citizens are desperate for positive change."[6]  Mayor Landrieu's letter requested the U.S. Department of Justice ("DOJ") to conduct an "independent investigation" of the NOPD in order "to determine how to prevent, detect, and discipline misconduct as well as introduce best

---

circuits that "during the pendency of an appeal the district court may consider a Rule 60(b) motion and if it indicates that it is inclined to grant it, application then can be made to the appellate court for a remand," and concluding that "[t]his procedure is sound in theory and preferable in practice").

*Mahone v. Ray*, 326 F.3d 1176, 1180 (11th Cir. 2003).

[3] R. Doc. 184.  Community United for Change ("CUC") also sought leave to leave to file an amicus curiae memorandum in opposition to the City's motion.  *See* R. Doc. 195.  The Court granted CUC leave to file its memorandum and has considered CUC's arguments in conjunction with the instant motion.  *See* R. Doc. 197.

[4] R. Doc. 184-1.

[5] R. Doc. 184-1.

[6] R. Doc. 184-1.

practices for public safety."[7]

      Shortly thereafter, the DOJ opened an investigation of the NOPD pursuant to the Violent Crime Control and Law Enforcement Act of 1994 ("Section 14141," 42 U.S.C. § 14141); the Omnibus Crime Control and Safe Streets Act of 1968 ("Safe Streets Act," 42 U.S.C. § 3789d); and Title VI of the Civil Rights Act of 1964 ( "Title VI," 42 U.S.C. § 2000d to 2000d-7 and its implementing regulations, 28 C.F.R. §§ 42.101-.112).[8] Seven lawyers and other staff from the DOJ's Civil Rights Division in Washington, D.C., conducted the investigation.[9]  Approximately eleven law enforcement professionals – which included current and former police chiefs; supervisors; and experts in officer assistance, investigation of sexual assaults, custodial interrogations, and law enforcement response to persons in mental heath crisis[10] – assisted the DOJ attorneys (collectively, "the investigative team" or "the team").[11]  Furthermore, the U.S. Attorney's Office for the Eastern District of Louisiana and then-U.S. Attorney James B. Letten ("Letten") also assisted the investigation. Letten assigned then-assistant U.S. Attorney Salvador Perricone ("Perricone") to act as a liaison between the investigative team and the U.S. Attorney's Office for the Eastern District of Louisiana.  Other federal services, including the DOJ's Community Relations Service; the Federal Bureau of Investigation; the U.S. Marshal Service; the Bureau of Alcohol, Tobacco,

---

[7] R. Doc. 184-1 ("I ask that you assign a team from the [DOJ's] Civil Rights Division to begin working with me and within the NOPD.  I am confident that this partnership will bring about significant change that will lead to a better police force in New Orleans.").

[8] R. Doc. 1-1.

[9] R. Doc. 184-12 at p. 1.

[10] These experts "provided in-depth knowledge about how to detect and respond to law enforcement challenges."  R. Doc. 1-1 at p. 26.

[11] R. Doc. 184-12 at p. 1.

Firearms and Explosives; the Office of Justice Programs; the Office of Community Oriented Policing Services; the Office on Violence Against Women; the Office on Juvenile Justice and Delinquency Prevention; and the Access to Justice Initiative likewise provided assistance.[12]

The investigative team conducted "interviews and meetings with NOPD officers, supervisors and command staff, as well as members of the public, City and State officials, and other community stakeholders."[13]  In addition, the team gathered information from NOPD documents, including "policies and procedures, training materials, incident reports, use of force reports, crime investigation files, data collected by the Department, complaints of misconduct, and misconduct investigations;" participated in ride-alongs with officers and supervisors, attended COMSTAT meetings,[14] observed police activity, and met with representatives of police fraternal organizations; and solicited the views of officers, community members, judges from state and municipal courts, members of the Orleans Parish District Attorney's Office, the Orleans Public Defender, the Civil Service Commission, the Office of the Independent Police Monitor, the City Council, Louisiana State Legislators, the Business Council of New Orleans & the River Region, the New Orleans Police and Justice Foundation, and the New Orleans Crime Coalition.[15]  Finally, the investigative team participated in more than forty community meetings.[16]

---

[12] R. Doc. 1-1 at p. 25.

[13] R. Doc. 1-1 at p. 26.

[14] COMSTAT meetings are the NOPD's weekly crime-statistic reporting meetings that are open to the public.  R. Doc. 1-1 at p. 131.

[15] R. Doc. 1-1 at p. 26.

[16] R. Doc. 1-1 at p. 26.  Some community meetings were initiated at the investigative team's request, while others were regularly-scheduled community meetings, such as those held by the New Orleans Neighborhood Police Anti-Crime Council and the Rape Crisis Network.  R. Doc. 1-1 at p. 26.

Approximately ten months after its investigation commenced, the DOJ memorialized its findings in a comprehensive report dated March 16, 2011.[17]  The investigation identified an alleged pattern or practice of unconstitutional conduct with respect to the use of force; stops, searches, and arrests; and discriminatory policing based on race, ethnicity, gender, and sexual orientation, all in violation of the U.S. Constitution and federal law.[18]  Generally, the DOJ concluded that

> the Department has been largely indifferent to widespread violations of law and policy by its officers.  NOPD does not have in place the basic systems known to improve public safety, ensure constitutional practices, and promote public confidence. . . . [D]eficiencies that lead to constitutional violations span the operation of the entire Department, from how officers are recruited, trained, supervised, and held accountable, to the operation of Paid Details.[19]  In the absence of mechanisms to protect and promote civil rights, officers too frequently use excessive force and conduct illegal stops, searches and arrests with impunity.   In addition, the Department's culture tolerates and encourages under-enforcement and under-investigation of violence against women. The Department has failed to take meaningful steps to counteract and eradicate bias based on race, ethnicity, and LGBT status in its policing practices, and has failed to provide critical policing services to language minority communities.[20]

Specifically, with respect to officers' use of force, the DOJ found that the NOPD "routinely use[s] unnecessary and unreasonable force in violation of the Constitution," including

---

[17] U.S. Department of Justice Civil Rights Division, *Investigation of the New Orleans Police Department* (Mar. 16, 2011).  *See* R. Doc. 1-1.

[18] R. Doc. 1-1 at pp. 28-78.

[19] "Paid details" are referred to as "secondary employment" in the Consent Decree.  As summarized in the DOJ's report, the "Detail system is essentially a form of overtime work for officers.  Officers may work *ad hoc* Details providing, for example, extra security for special events or individuals visiting New Orleans.  Or an officer may have a regularly-scheduled Detail, such as being hired by a business to provide security in a retail establishment or by a neighborhood association to patrol the neighborhood.  When on Detail, however, officers are paid and largely controlled by entities other than NOPD."  R. Doc. 1-1 at p. 17.  Many NOPD officers seek secondary employment assignments in order to supplement their NOPD salaries.

[20] R. Doc. 1-1 at p. 6.

particular deficiencies with respect to the "use of deadly force, force against restrained individuals, . . . and the use of canines."[21] Furthermore, with respect to Fourth Amendment violations, the DOJ opined that "detentions without reasonable suspicion are routine, and lead to unwarranted searches and arrests without probable cause;" that a large proportion of surveyed arrest reports "reflected constitutional deficiencies;" and that the NOPD leaves its officers "without the basic foundation to perform their duties within constitutional boundaries."[22]

The DOJ attributed these ongoing constitutional violations to entrenched deficiencies within "a wide swath of City and NOPD systems and operations," including failures to

> adopt and enforce appropriate policies; properly recruit, train, and supervise officers; adequately review and investigate officer uses of force; fully investigate allegations of misconduct; identify and respond to patterns of at-risk officer behavior; implement community policing; oversee and control the system of Paid Details; provide officer assistance and support; or enact appropriate performance review and promotional systems.[23]

Specifically with respect to paid details, the DOJ's investigation revealed that there "are few aspects of NOPD more broadly troubling than its Paid Detail system" and that this system "was a significant contributing factor to both the perception and the reality of NOPD as a dysfunctional organization."[24]

On March 17, 2011, Mayor Landrieu announced the results of the DOJ's investigation

---

[21] R. Doc. 1-1 at pp. 28-30.

[22] R. Doc. 1-1 at pp. 8, 57-58.

[23] R. Doc. 1-1 at p. 13-14.

[24] R. Doc. 1-1 at p. 96.

at a press conference with Deputy Attorney General James Cole, Assistant Attorney General Thomas Perez ("Perez"), Letten, and NOPD Superintendent Ronal Serpas ("Chief Serpas") in attendance.  In a press release memorializing the conference, the Mayor called the report "the result of an invitation" to the DOJ to "partner with the [City's] administration in the wholesale transformation" of the NOPD and further remarked that it was "an honest assessment" which would help the City undertake "a data-driven approach to making [the City's] streets safer and reforming the NOPD."[25]  The report's "findings are sobering and the challenges ahead are daunting," Mayor Landrieu continued, "but [the City] will do what ever [sic] it takes to make this right."[26]

Thereafter, the Mayor gave Chief Serpas "a strong directive to completely and totally overhaul the [NOPD] paid detail system."[27]  In his May 15, 2011 letter to Mayor Landrieu regarding paid details, Chief Serpas recognized that "[b]oth you and I know that the flawed paid detail system has failed both the NOPD, and more importantly, our citizens."[28]  According to Chief Serpas, the City would be incapable of achieving a "wholesale reform of the NOPD without steadfast diligence in implementing a complete and total overhaul of the paid detail system."[29]  To remedy these problems, Chief Serpas recommended "**taking the**

---

[25] R. Doc. 184-15.

[26] R. Doc. 184-15.

[27] R. Doc. 184-14 at p. 2.

[28] R. Doc. 184-14 at p. 4.  As the Mayor explained at a July 24, 2012 press conference, "[i]n the old NOPD, many officers' first duty was to their paid details which were not managed in any centralized system. The result was conflict of interest, officers with divided loyalty spending most of their time on details, unequal access to earn extra money, cash exchanges, and the perversion of the command structure."  July 24, 2012 press conference video (*see infra* n.37).

[29] R. Doc. 184-14 at p. 16.

**management of the paid detail system out of the NOPD**."[30]  "Given the apparent size and scope of paid details," Serpas wrote, "it is preferable to have an independent entity manage this process to free NOPD leadership to focus exclusively on the mission of the NOPD.  In its place, we are recommending creating a central office to be responsible for coordinating all elements and services relating to paid details."[31]  Under Chief Serpas' proposal, this central office would be administered by "a civilian director out of NOPD control and controlled facilities."[32]

Furthermore, in the months following the release of the March 16, 2011 report, DOJ attorneys began drafting language for a cooperative agreement between the United States and the City to remedy the NOPD's alleged pattern or practice of unconstitutional conduct.[33]  DOJ attorneys provided their initial draft of this document, which was labeled a "Consent Decree," to attorneys for the City on October 25, 2011,[34] and counsel for the City and the United States (together, "the Parties") commenced negotiations regarding the proposed Consent Decree's terms in November 2011.[35]  After nine months of "protracted negotiations conducted by experienced and sophisticated litigants, aided on both sides by subject matter experts, and with an eye towards their shared goals of reform,"[36] the Parties

---

[30] R. Doc. 184-14 at p. 2 (bold and underlining in original).

[31] R. Doc. 184-14 at p. 2.

[32] R. Doc. 184-14 at pp. 2-3.

[33] R. Doc. 184-16.

[34] R. Doc. 184-16.

[35] R. Doc. 184-16.

[36] R. Doc. 2 at p. 9.

announced at a press conference on July 24, 2012, that they had reached a compromise and were submitting a proposed Consent Decree to the U.S. District Court for the Eastern District of Louisiana for approval.[37]  In the company of U.S. Attorney General Holder, Perez, Letten, Chief Serpas, and then-City Attorney Richard Cortizas ("Cortizas"), Mayor Landrieu lauded the City's "voluntary partnership" with the DOJ[38] and discussed the details of the proposed Consent Decree that were intended to "fundamentally change the culture of the NOPD once and for all."[39]  "We can and we must change," the Mayor vowed.[40] Referencing the proposed Consent Decree, Mayor Landrieu concluded that the City "now ha[d] a clear roadmap forward."[41]

On the same day as the July 24, 2012 press conference, the United States filed its complaint in this case against the City pursuant to Section 14141; the Safe Streets Act; and Title VI.[42]  The complaint alleged that the NOPD engages in a pattern or practice of conduct that subjects individuals to excessive force in violation of the Fourth Amendment of the U.S. Constitution, unlawful searches and seizures in violation of the Fourth Amendment of the

---

[37] The City video-recorded the July 24, 2012 press conference and uploaded a copy of such video on the Mayor's official YouTube Channel.  *See* "Mayor Landrieu, Justice Department announce details of consent decree," available at https://www.youtube.com/watch?v=Fkhrv4xgl-4 ("July 24, 2012 press conference video").  The Court has reviewed the video and all quotations taken therefrom were transcribed by the Court after its review.

[38] July 24, 2012 press conference video ("On my third day in office, I invited the Department of Justice to partner with us to reform the NOPD.  That voluntary partnership, I believe, will be the thing that allows true change to take hold. On May 17, 2010, the DOJ began a formal and independent investigation into the patterns and practices of this Department. We asked for it and we got it. In March 2011, the Civil Rights Division described a Department that in many ways had lost its way.").

[39] July 24, 2012 press conference video.

[40] July 24, 2012 press conference video.

[41] July 24, 2012 press conference video.

[42] R. Doc. 1.

U.S. Constitution, and discriminatory policing practices in violation of the Fourteenth Amendment of the U.S. Constitution, the Safe Streets Act, and Title VI.[43] Contemporaneously therewith, the Parties filed a joint motion[44] seeking the Court's approval of the proposed Consent Decree attached thereto[45] that would remedy the NOPD's alleged pattern or practice of unconstitutional conduct.[46] The proposed Consent Decree contained detailed provisions concerning changes in NOPD policies and practices related to (1) the use of force; (2) investigatory stops and detentions, searches, and arrests; (3) custodial interrogations; (4) photographic lineups; (5) bias-free policing; (6) community engagement; (7) recruitment; (8) training; (9) officer assistance and support; (10) performance evaluations and promotions; (11) supervision; (12) the secondary employment system, also known as the paid detail system; (13) misconduct complaint intake, investigation, and adjudication; and (14) transparency and oversight.  In addition, the proposed Consent Decree included detailed provisions regarding its implementation and enforcement.

According to the Parties' joint motion, the DOJ's March 16, 2011 report of its NOPD investigation, which was attached to the United States' complaint and incorporated therein by reference, "establishe[d] a more than adequate factual record supporting the legitimacy" of the proposed Consent Decree.[47]  The Parties represented in the joint motion that they

---

[43] R. Doc. 1.

[44] R. Docs. 2 and 114.  The Parties filed a supplemental joint motion on September 14, 2012.  *See* R. Doc. 114.

[45] R. Doc. 2-1.

[46] The City denied the allegations contained in the complaint.  R. Doc. 2 at p. 2.

[47] R. Docs. 2 at p. 5 and 2-1 at pp. 6-7.

were "intimately familiar with the practices of the NOPD and spent long hours negotiating the [proposed] Consent Decree."[48] "This adversarial posture, combined with the respective duties of these government agencies towards those they represent," the Parties argued, provided "assurance" that the proposed Consent Decree was "fair, adequate, and reasonable"[49] and was "fully consistent with the statutes being enforced and the public objectives of those statutes."[50] The Parties urged the Court to expeditiously approve the proposed Consent Decree in order "to dramatically and fundamentally reform NOPD to achieve protection of the constitutional rights of all members of the community, improve the safety and security of the people of New Orleans, and increase public confidence in NOPD."[51]

The Court immediately scheduled a status conference with the Parties for July 26, 2012, to discuss the procedure for approving the proposed Consent Decree.[52] At the status conference, the Parties exhorted the Court to move quickly, as the Parties sought to begin reforming the NOPD as soon as possible.[53] To ensure the Court satisfied its duty to determine whether the proposed Consent Decree was in fact "fair, adequate, and

---

[48] R. Doc. 2 at p. 8.

[49] R. Doc. 2 at p. 8.

[50] R. Doc. 2 at p. 3.

[51] R. Doc. 2 at p. 9.

[52] R. Doc. 3.

[53] The Court conducted further status conferences with the Parties on August 3, 2012, August 8, 2012, and August 14, 2012. *See* R. Docs. 8, 19, and 25. At these conferences the Parties again emphasized the proposed Consent Decree's importance and that they sought to expeditiously initiate the reform process.

reasonable" before approving it,[54] the Court afforded an opportunity for any interested party to move to intervene in the case pursuant to Rule 24 of the Federal Rules of Civil Procedure. The Court entered an order on July 31, 2013, instructing any such party to file a motion to intervene no later than August 7, 2012, and any party opposing any such motion(s) to intervene to file an opposition to the motion(s) no later than August 14, 2012.[55] The Court's July 31, 2012 Order also set the Parties' joint motion for approval of the proposed Consent Decree for hearing on August 29, 2012, at 10:00 a.m. (the "Fairness Hearing"), in order to assist the Court in determining whether the proposed Consent Decree was "fair, adequate and reasonable."[56] Neither party objected to the Court's proposed

---

[54] As the Court stated in its order finding that the proposed Consent Decree was fair, adequate, and reasonable,

> Settlement is to be encouraged. *United States v. Cotton*, 559 F.2d 1326, 1331 (5th 1977). "Because of the consensual nature of [a consent decree], voluntary compliance is rendered more likely . . . . At the same time, the parties . . . minimize costly litigation and adverse publicity and avoid the collateral effects of adjudicated guilt." *United States v. City of Jackson, Miss.*, 519 F.2d 1147, 1152 n.9 (5th Cir. 1975). Indeed, "the value of voluntary compliance is doubly important when it is a public employer that acts, both because of the example its voluntary assumption of responsibility sets and because the remediation of governmental discrimination is of unique importance." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 290, 106 S.Ct. 1842 (1986) (O'Connor, J., concurring). Nonetheless, "[a] consent decree, although founded on the agreement of the parties, is a judgment." *United States v. City of Miami*, 664 F.2d 435, 439 (5th Cir. 1981) (citing *United States v. Kellum*, 523 F.2d 1284, 1287 (5th Cir. 1975)). Thus, a court "must not merely sign on the line provided by the parties. Even though the decree is predicated on consent of the parties, the judge must not give it perfunctory approval." *Miami*, 664 F.2d at 440-441.

> When presented with a proposed consent decree, a court must ascertain that the settlement is "fair, adequate and reasonable" and is not the product of "fraud, collusion, or the like." *Id.* at 441; *Cotton*, 559 F.2d at 1330. "The court must also consider the nature of the litigation and the purposes to be served by the decree. If the suit seeks to enforce a statute, the decree must be consistent with the public objectives sought to be attained by Congress." *Miami*, 664 F.2d at 441.

*See* R. Doc. 159 at pp. 6-7.

[55] R. Doc. 7.

[56] R. Doc. 7.

procedures for conducting the Fairness Hearing.  In addition, the Court advised that any person wishing to comment upon the proposed Consent Decree could be permitted to do so by filing a written submission with the Court no later than August 24, 2012, at 4:30 p.m.[57]  Public notice of the Court's order and the Fairness Hearing was published in *The Times-Picayune.*[58]  The Court also published a copy of the proposed Consent Decree on the website for the U.S. District Court for the Eastern District of Louisiana.

Crescent City Lodge No. 2, Fraternal Order of Police, Inc., and Walter Powers, Jr. in his official capacity as Acting President of FOP ("FOP"); Walter Powers, Jr. in his individual capacity ("Powers"); Community United for Change ("CUC"); the Police Association of New Orleans and Michael Glasser in his official capacity as President of PANO ("PANO"); Michael Glasser in his individual capacity ("Glasser"); the Office of the Independent Police Monitor ("OIPM") and Susan Hutson in her official capacity as Independent Police Monitor for the City of New Orleans ("IPM"); and Susan Hutson in her individual capacity ("Hutson") (collectively, the "Proposed Intervenors"), filed motions to intervene.[59]  The City and the United States opposed the motions to intervene.[60]  The Court heard oral argument on all four motions on August 20, 2012.[61]

---

[57] The Court later continued the Fairness Hearing until September 21, 2012, at 10:00 a.m., because Hurricane Isaac made landfall in Louisiana on August 28, 2012.  *See* R. Docs. 54 and 109.  The Court published notice that the Fairness Hearing had been rescheduled on the website for the U.S. District Court for the Eastern District of Louisiana.

[58] R. Doc. 42.

[59] FOP and Powers filed their motion to intervene on August 6, 2012.  *See* R. Doc. 9.  CUC, PANO and Glasser, and OIPM, IPM and Hutson filed their motions to intervene on August 7, 2012.  *See* R. Docs. 11, 13 and 15.

[60] R. Docs. 26 and 27.

[61] R. Doc. 37.

Thereafter, the Court denied the Proposed Intervenors' intervention as of right, and declined to allow them to permissively intervene.[62] Specifically, the Court found that CUC, FOP and PANO did not have any legally protectable interests that would be impaired by the proposed Consent Decree, and thus that they were not entitled to intervene as of right.[63] The Court, in its discretion, did not allow them to permissively intervene because the Court determined that it had otherwise provided ample opportunity for them to assist the Court in its consideration of the proposed Consent Decree without prejudicing the Parties or delaying the proceedings.   As for Powers and Glasser in their individual capacities, the Court found that they did not demonstrate any legally protectable interest separate from that of FOP and PANO and, for the same reasons, they could not intervene as of right or permissively.   With respect to OIPM, the Court determined that the office lacked juridical capacity under Louisiana law and thus was legally incapable of intervening.   Finally, because Hutson failed to provide the Court with any argument regarding her individual interest and how any such interest would be impaired as a result of the proposed Consent Decree, the Court determined that she could not intervene as of right or permissively. Accordingly, the Court denied the motions to intervene on August 31, 2012.[64]  By the same order, the Court further provided that it would allow the Proposed Intervenors to present

---

[62] R. Doc. 102.

[63] With respect to FOP and PANO, organizations seeking to protect and represent the interests of NOPD officers, the Court underscored that "as it is currently written, the proposed Consent Decree in no way modifies the Civil Service system for NOPD officers."  R. Doc. 102 at p. 18.  Nevertheless, the Court provided that "[i]f changes are proposed to any NOPD policies that may conflict with the Civil Service rules and procedures, FOP and/or PANO may move to intervene for the limited purpose of asserting their Civil Service property rights."  *See* R. Doc. 102 at pp. 21-22.  The Court recognizes that PANO has reurged its argument that the Court should permit it to intervene in this case.  *See* R. Doc. 165.  The Court will address PANO's arguments by separate order.  FOP and CUC have appealed the Court's order denying their motions to intervene.  *See* R. Docs. 118 and 144.

[64] R. Doc. 102.

live testimony and documentary evidence at the Fairness Hearing and would permit the Proposed Intervenors to submit questions for the Court to ask the United States and the City.[65]   In addition, the Court created a publicly-accessible website where pleadings, motions, orders, public comments, the City's Request for Proposals to serve as Consent Decree Court Monitor, and copies of the proposed Consent Decree could be downloaded without charge and without the need to access the Eastern District of Louisiana's CM/ECF system.[66]

Prior to the Fairness Hearing, on September 14, 2012, the Parties filed a joint motion to supplement their previously filed motion for approval of the proposed Consent Decree.[67] The Parties attached to the motion a revised copy of the proposed Consent Decree containing a small number of changes to the version of the proposed Consent Decree submitted to the Court on July 24, 2012.[68] The Parties informed the Court that they agreed to the changes reflected in the revised proposed Consent Decree.[69]

On September 21, 2012, the Court conducted the Fairness Hearing.[70]   The United States, the City, and the Proposed Intervenors presented six hours of live testimony and

---

[65] R. Doc. 102 at p. 25.

[66] *See* http://www.laed.uscourts.gov/Consent/consent.htm.  The Court continues to regularly update the website to provide notice of case activity to the public.

[67] R. Doc. 114.

[68] R. Docs. 114-1 and 114-2.

[69] R. Doc. 114.

[70] R. Doc. 132.

documentary evidence to the Court.[71]  OIPM presented the live testimony of Hutson and Jasmine Groves, and OIPM's Exhibit 1 was admitted into evidence.[72]  FOP presented the live testimony of Sergeant Christopher Landry and Dr. Bart Leger, and FOP's Exhibits 1 through 11 were admitted into evidence.[73]  CUC presented the live testimony of W.C. Johnson, Malcolm Suber, Randolph J. Scott, Cynthia Parker and Terry Simpson, and CUC's Exhibits 1 through 8 were admitted into evidence.[74]  Counsel for PANO made a presentation to the Court on the organization's behalf.  The United States presented the live testimony of Santos Alvarado, Delmy Palencia, Alfred Marshall, Tania Tetlow, and Ira Thomas, and the United States' Exhibits 1 through 7 were admitted into evidence.[75]  In addition, 158 public comments from individuals and organizations were submitted for the Court's consideration.[76]

Following the United States' presentation, counsel for the City addressed the Court to underscore that the proposed Consent Decree was "the most extensive and far reaching in this nation's history" and that it would "have a lasting effect in transforming the New

---

[71] *See* R. Doc. 132 and its attachments.  Roy Austin, Jr., Emily Gunston, Letten, Christy Lopez, Stephen Parker, Corey Sanders, and Jude Volek appeared on behalf of the United States; Erica Beck, Cortizas, Brian Capitelli, Ralph Capitelli, Churita Hansell, and Sharonda Williams ("Williams") appeared on behalf of the City; C. Theodore Alpaugh, III, and Claude A. Schlesinger appeared on behalf of FOP and Powers; Eric J. Hessler appeared on behalf of PANO and Glasser; William P. Quigley appeared on behalf of CUC; and John S. Williams appeared on behalf of OIPM and Hutson.

[72] R. Docs. 132-1 to 132-2.

[73] R. Docs. 132-3 to 132-16.

[74] R. Docs. 132-17 to 132-24, and 132-37.  Exhibits 3 and 6 were admitted into evidence with redactions agreed to by counsel for the City and CUC.  Exhibit 8 was admitted as a proffer and ordered placed under seal.  R. Doc. 132 at p. 2.

[75] R. Docs. 132-25 to 132-32.

[76] *See* R. Docs. 58 to 100, 105-106, 111-112, 141 and 145.  The comments provided by CUC, PANO, FOP and OIPM are filed in the record at R. Docs. 66, 85, 86 and 141, and 92, respectively.

Orleans Police Department and make [the] city a safer place to live, work, and visit."[77]  The City then introduced Exhibits A, B, and C and the exhibits were admitted into evidence.[78] The City also presented the testimony of Chief Serpas, who stated he felt "very comfortable that [the proposed Consent Decree was] fair, reasonable, and adequate."[79]  "Negotiating is difficult and not everybody gets their way," Chief Serpas observed.[80]  "But in my impression having been a police chief . . . for 12 years," he continued, the proposed Consent Decree "is a document that holds [the NOPD] to the standards [the NOPD] should [observe] and it holds [the NOPD] to the [standards] the community" expects.[81]  Chief Serpas urged the Court to approve the proposed Consent Decree because, in his opinion, what the NOPD "needs more than anything and what this community needs more than anything is the independence of [the] [C]ourt and the independence of [the Court's] monitor who says to the people of New Orleans this department has improved."[82]  Following Chief Serpas' testimony, the Court held the hearing open in the event the Court concluded it needed additional evidence or testimony to determine whether the proposed Consent Decree was fair, adequate, and reasonable.[83]

In the months following the Fairness Hearing, the Court reviewed hundreds of pages

---

[77] R. Doc. 208 at p. 181.

[78] R. Docs. 132-33 to 132-36.

[79] R. Doc. 208 at p. 193.

[80] R. Doc. 208 at p. 193.

[81] R. Doc. 208 at p. 193.

[82] R. Doc. 208 at p. 198.

[83] R. Doc. 208 at p. 201.

of public comments regarding the proposed Consent Decree.[84]  The Court conducted status conferences with the Parties to discuss concerns raised in the public comments.[85]  The Parties assured the Court that the concerns expressed would be given due consideration as policies and procedures were developed and implemented.

After carefully considering the proposed Consent Decree,[86] the comments received from the public and the Proposed Intervenors, the testimony and evidence presented at the September 21, 2012 Fairness Hearing, the Parties' representations, and the fact that the City committed adequate funding to implement the proposed Consent Decree, the Court found that the proposed Consent Decree, as amended, was fair, adequate and reasonable, and was not the product of fraud, collusion, or the like.[87]

At a January 11, 2013 status conference, the Court informed[88] the Parties that it would approve the proposed Consent Decree filed by the Parties on July 24, 2012,[89] as amended by changes shown on the Parties' Errata Sheet filed on September 14, 2012 ("Consent Decree"),[90] and would enter the Consent Decree as a judgment of the Court.[91]  At that status conference, the City orally informed the Court that it wished to withdraw from

---

[84] *See* R. Docs. 58 to 100, 105-106, 111-112, 141 and 145.

[85] *See* R. Docs. 139, 152, 153, and 161.

[86] The Court reviewed and considered both the July 24, 2012 and September 14, 2012 versions of the proposed Consent Decree.

[87] R. Doc. 159.

[88] R. Doc. 161.

[89] R. Doc. 2-1.

[90] R. Doc. 159.

[91] R. Doc. 160.

18

the Consent Decree and that it intended to file a motion seeking relief from judgment under the Federal Rules of Civil Procedure.[92]  Following the status conference, the Court formally approved the Consent Decree and entered it as a judgment of the Court.[93]  In its order explaining the Court's reasons for approving the Consent Decree and its minute entry memorializing the status conference, the Court noted the City's objection and established a procedure allowing the City to file a written motion no later than Friday, January 31, 2013.[94]  The City timely filed its motion to vacate[95] and the motion is now before the Court for decision.

## Law and Analysis

The City moves to vacate the Consent Decree pursuant to Rule 60(b) on five grounds. First, the City complains that the DOJ waited to disclose the costs to fix the Orleans Parish Prison ("OPP")[96] until after the Parties signed the Consent Decree at issue in this case. Second, former assistant U.S. Attorney Perricone served as the DOJ's local "point person" in New Orleans and participated in negotiations for the Consent Decree.  According to the City, Perricone's surreptitious commenting on nola.com[97] articles regarding the Mayor, Chief Serpas, the proposed Consent Decree, the need for a Court-appointed Monitor,

---

[92] R. Doc. 161.

[93] R. Doc. 160.

[94] R. Doc. 159 at p. 9.

[95] R. Doc. 175.

[96] Litigation regarding whether the conditions at OPP are constitutionally sufficient is also pending in the Eastern District of Louisiana.  *See Lashawn Jones, et al. v. Marlin Gusman, et al.*, Civ. Action No. 12-859 (E.D. La.) ("*Jones*").  *Jones* is allotted to another section of this Court.

[97] This news website, accessible at www.nola.com, is affiliated with *The Times-Picayune* newspaper of New Orleans.

secondary employment, and the need for the DOJ to participate in the reform process poisoned public opinion against the NOPD and the Consent Decree.  Third, the City contends that the Consent Decree's terms regarding secondary employment may run afoul of the Fair Labor Standards Act of 1938 ("FLSA," 29 U.S.C. § 201 *et seq.*) and expose the City to legal liability for FLSA violations.  Fourth, the City maintains that, under Louisiana law, the Consent Decree is not a valid contract because the City withdrew its consent to the agreement and any prior consent is vitiated by error, duress and/or fraud.  Fifth, the City complains that the Court "failed to follow the rules of civil procedure and evidence in entering its order approving the proposed Consent Decree."[98]  The Court examines each argument in turn.

Rule 60(b) provides that a court, "[o]n motion and just terms," may "relieve a party or its legal representative from a final judgment, order, or proceeding" due to

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b)(1)-(6).  The purpose of Rule 60(b) "is to balance the principle of finality of a judgment with the interest of the court in seeing that justice is done in light of all the facts."  *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 638 (5th Cir. 2005).  As the moving party, the City has the burden to show why the Court should vacate the Consent Decree.  *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 438

---

[98] R. Doc. 175-1 at p. 27.

(5th Cir. 2011).  The determination of whether the City has satisfied its burden lies within this Court's sound discretion. *Rocha v. Thaler*, 619 F.3d 387, 400 (5th Cir. 2010).

Granting relief under Rule 60 is "an extraordinary remedy which should be used sparingly." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004); *see also Pease v. Pakhoed*, 980 F.2d 995, 998 (5th Cir. 1993) ("Courts are disinclined to disturb judgments under the aegis of Rule 60(b)."). Consequently, the "scope of relief that may be obtained under Rule 60(b) is strictly limited." 12 Moore's Federal Practice § 60.02 (3d ed. 2010). A motion to vacate a judgment is "not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet*, 367 F.3d at 478.

A consent decree is a final judgment, even though it is a consensual judgment resulting from an agreement between the parties, rather than one rendered on the merits following trial. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 391 (1992). As a result, a consent decree is still "subject to the rules generally applicable to other judgments and decrees," including Rule 60. *Rufo*, 502 U.S. at 378. Thus, as with judgments obtained after adversarial proceedings that proceeded through trial, policy considerations do not favor setting aside a consensual judgment on a Rule 60(b) motion.[99] 12 Moore's Federal Practice § 60.22 (3d ed. 2013).

In order to obtain relief from a judgment under Rule 60(b), the movant must show

---

[99] By contrast, many circuits, including the Fifth Circuit, are more liberal in setting aside default judgments pursuant to Rule 60 because a judgment on the merits is preferred to a judgment obtained due to a default. *See, e.g.*, *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1459 (5th Cir. 1992) ("This court applies Rule 60(b) 'most liberally to judgments in default . . . [because] . . . [t]runcated proceedings of this sort are not favored.' ") (quoting *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 403 (5th Cir. 1981)) (brackets and ellipses in original).

he has a meritorious claim or defense such that the presiding court is convinced that vacating the judgment, and retrying the matter, is not an empty exercise. *Pease*, 980 F.2d at 998 ("It is well established that Rule 60(b) requires the movant to demonstrate that he possesses a meritorious cause of action."). However, "[t]he requirement that a [moving] party . . . must show a 'meritorious' claim or defense . . . does not mean that the moving party must show that he or she is likely to prevail." 12 Moore's Federal Practice § 60.24 (3d ed. 2010). Rather, "the movant must make allegations that, *if established at trial*, would constitute a valid claim or defense." 12 Moore's Federal Practice § 60.24 (emphasis in original). Consequently, conclusory statements that a claim or defense is meritorious are insufficient. *Pease*, 980 F.2d at 998; 12 Moore's Federal Practice § 60.24.

## I.   Unrelated Litigation Regarding OPP: Relief Requested Under Rules 60(b)(2), (5), and (6)

First, the City argues the Court should vacate the Consent Decree due to developments in unrelated litigation regarding OPP, the jail facility serving Orleans Parish.[100] Marlin N. Gusman, Sheriff of Orleans Parish ("Sheriff Gusman" or "the Sheriff"), is tasked with overseeing OPP.[101] On April 2, 2012, a putative class of men, women and adolescents incarcerated at OPP filed a complaint[102] in the U.S. District Court for the

---

[100] New Orleans is located in Orleans Parish. Pursuant to Louisiana law, the City has certain obligations to fund OPP. The exact scope and nature of the City's legal duties regarding OPP is at issue in *Jones*. *See infra* pp. 23-25

[101] Pursuant to Louisiana law, the Sheriff is the "keeper of the public jail of [Orleans] [P]arish, and shall by all lawful means preserve the peace and apprehend all disturbers thereof, and other public offenders." La. Rev. Stat. § 15:704.

[102] The *Jones* plaintiffs allege that

[i]ndividuals housed at the jail are at imminent risk of serious harm. Rapes, sexual assaults, and beatings are common place throughout the facility. Violence regularly occurs at the hands of sheriffs' deputies, as well as other prisoners. The facility is full of homemade knives, or "shanks." People living with serious mental illnesses languish without treatment, left

Eastern District of Louisiana alleging that they are subjected to abusive and unconstitutional conditions of confinement at OPP ("*Jones*").[103] Neither the United States nor the City was named as a party in the *Jones* plaintiffs' original complaint.[104] The *Jones* Court permitted the United States to intervene as a party on September 25, 2012, and granted Sheriff Gusman's motion for leave to file a third-party complaint against the City on October 1, 2012.[105] The Sheriff's third-party complaint alleges that the City "is responsible for funding jail facilities of the Orleans Parish Sheriff's Office pursuant to various provisions of Louisiana law."[106] To "the extent that the Court should conclude that the Sheriff must provide prospective relief in the form of additional staffing, training, care, treatment or other services to Orleans Parish inmates which will necessitate funding over and above that currently provided by the City of New Orleans," the Sheriff's third-party complaint argues, "judgment should also be entered in favor of the Sheriff ordering the City

---

vulnerable to physical and sexual abuse. These conditions have created a public safety crisis that affects the entire City of New Orleans. The jail is oversized, understaffed, and Sheriff Gusman's classification and security policies and practices are dangerously deficient. The men and women housed there are at constant risk of physical harm due to the presence of contraband and weapons in the facility, which, coupled with the absence of meaningful mental health services, places the lives of people incarcerated there in immediate jeopardy.

*Jones*, R. Doc. 1 at p. 2.

[103] With respect to facts the Court has not personally observed while presiding over this case, Rule 201 of the Federal Rules of Evidence permits a court, on its own volition, to take judicial notice of "a fact that is not subject to reasonable dispute." Fed. R. Evid. 201(b), (c)(1).  According to Fifth Circuit precedent, "a court may take judicial notice of a 'document filed in another court . . . to establish the fact of such litigation and related filings.' " *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998) (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992)) (ellipses in original).  Given the City's repeated references to the OPP Consent Decree, the Court must take judicial notice of the pleadings filed in *Jones* for the limited purpose of tracing the procedural history of the OPP litigation *vis-à-vis* the procedural history of this litigation.

[104] *Jones*, R. Doc. 1.

[105] *Jones*, R. Docs. 69, 70, 74, 75, and 76.

[106] *Jones*, R. Docs. 75 at p. 3 and 76 at p. 3.

of New Orleans to pay the Sheriff the full cost . . . of providing such prospective relief."[107]

Sheriff Gusman, the United States, and the *Jones* plaintiffs reached a settlement in December 2012, which they memorialized in a proposed consent decree (the "OPP Consent Decree")[108] and presented to the court for approval via joint motion on December 11, 2012.[109] The City[110] contends it "was not provided with the [United States'] estimate of the cost of implementing the OPP Consent Decree until one month after the City signed" the NOPD Consent Decree, even though the United States allegedly had this information prior to July 24, 2012.[111] Specifically, the City alleges that the United States committed a "glaring misrepresentation" by withholding its "assessment" that "the City would be required to pay $34.5 million dollars[112] to fund the OPP consent decree."[113] Had it "known in July 2012 that

---

[107] *Jones*, R. Docs. 75 at p. 3 and 76 at p. 3.

[108] For the sake of clarity, throughout the remainder of this order where it is necessary to distinguish between the OPP Consent Decree at issue in *Jones* and the NOPD Consent Decree at issue in this case, the Court uses the terms "OPP Consent Decree" and "NOPD Consent Decree," respectively. Unless the Court indicates otherwise, any generic reference to the "Consent Decree" means the NOPD Consent Decree.

[109] *Jones*, R. Docs. 101 and 183.  In accordance with a court order directing the City to respond to this motion, the City argued that, although "it would not be appropriate for the City to comment in detail on the pending motion[]" because plaintiffs had not alleged that any action by the City had caused the supposed unconstitutional conditions at OPP, "applicable Louisiana statutes are clear that it is the Sheriff's responsibility (and not the City['s]) to ensure that Orleans Parish Prison is operated and maintained in a constitutional manner."  *Jones*, R. Doc. 109 at pp. 6 and 14.

[110] The Court recognizes that the City is not a party to the OPP Consent Decree in *Jones*.  *See Jones*, R. Docs. 101 and 183.

[111] R. Doc. 175-1 at p. 19.

[112] The City has not drawn the Court's attention to any evidence indicating when and by what medium the United States provided this estimate to the City.  The United States maintains that this $34.5 million figure is derived from an August 22, 2012 e-mail sent by Laura Coon ("Coon"), a DOJ attorney, to Cortizas and Williams, attorneys for the City.  The e-mail states in pertinent part:

Good morning Richard [Cortizas] and Sharonda [Williams]:

To start the conversation regarding a reasonable compromise dollar amount for FY13 City funding of OPP pending staffing analyses by the monitor called for by the [proposed OPP

24

a few months later the DOJ would be seeking at least an additional $12.5 million dollars"

more than the 2012 OPP budget, the City maintains, "it would not have signed the NOPD

consent decree."[114]  As a result, the City asserts that the Court should vacate the NOPD

Consent Decree due to "newly discovered evidence, changed circumstances, [or] any other

reason that justifies relief,"[115] because it is "totally unworkable" for the City to pay the cost

of implementing the NOPD and OPP consent decrees at the same time.[116]

### A.    Unrelated Litigation Regarding OPP: Rule 60(b)(2)

Rule 60(b)(2) permits a Court to grant relief due to " newly discovered evidence that,

with reasonable diligence, could not have been discovered in time to move for a new trial

under Rule 59(b)."  The new evidence actually must be relevant to the matter the Court is

being asked to reconsider.  Indeed, the movant must demonstrate he "exercised due

---

Consent Decree], what about $34.5 million?  That is in between what the City paid this year pre-consent decree ($22.5 M) and what the Sheriff is requesting post-consent decree ($45 M)."

*See* R. Docs. 184 at p. 30 and 184-34 at p. 2.  The United States maintains that it "mentioned $34.5 million not as a cost estimate, but rather as a useful starting point for negotiations over funding for OPP given that the figure was the midpoint between OPP's $22 million operating budget in 2012 and the OPP Sheriff's request for $45 million for fiscal year 2013."  R. Doc. 184 at p. 30.  Consequently, according to the United States "[t]here is no justification for the City's inexplicable claim that the United States withheld any cost information from the City."  R. Doc. 184 at p. 30.  The Court observes that even assuming *arguendo* the United States withheld its cost estimate from the City, the City represents that it was in possession of this information "one month" after it signed the Consent Decree on July 24, 2012.  R. Doc. 175-1 at p. 19.  Thus, the City had this knowledge at the time it continued to urge the Court, via joint motion with the United States, to enter the Consent Decree.  *See* R. Doc. 114.  The City only reversed course *several months after* it allegedly learned of the OPP Consent Decree's purported $34.5 million price tag.

[113] R. Doc. 175-1 at p. 29.

[114] R. Doc. 175-1 at p. 5.

[115] The United States has interpreted the City's arguments regarding OPP as invoking Rule 60(b)(1), (2), and (5).  R. Doc. 184 at p. 32.  However, as the Court reads the City's motion, the City appears to be seeking relief pursuant to Rule 60(b)(2), (5), and (6).  As a result, the Court has analyzed the City's arguments regarding OPP under Rule 60(b)(2), (5), and (6).  The Court notes that the result would not change if the Court also analyzed the City's arguments regarding OPP under Rule 60(b)(1).

[116] R. Doc. 175-1 at pp. 18 (capitalization removed) and 20.

diligence in obtaining the information; and (2) that the evidence is material and controlling and clearly would have produced a different result if present before the original judgment." *Hesling*, 396 F.3d at 639 (internal quotation marks and citation omitted).   These requirements must be strictly met for relief to be granted.   *See Ag Pro, Inc. v. Sakraida*, 512 F.2d 141, 143 (5th Cir. 1975), *judgment rev'd on other grounds*, 425 U.S. 273 (1976).

The City's argument that it had no knowledge of the potential cost ramifications for the OPP Consent Decree at the time it signed the NOPD Consent Decree is patently false. At least as early as July 19, 2012, several days before the City signed the NOPD Consent Decree on July 24, 2012, the City was on notice that the Sheriff intended to request "$22.5 million of 'new' estimated costs" that would "bring[] the total budget [for OPP] to $45 million" for 2013.[117] Thus, this evidence regarding the NOPD Consent Decree is not "newly discovered" within the meaning of Rule 60(b)(2).   In addition, even if these additional costs were "newly discovered," the City has not provided the Court with any evidence that, despite acting with due diligence, it was unable to obtain such information prior to signing the NOPD Consent Decree.   *Hesling*, 396 F.3d at 639.   Furthermore, while the Court understands the City's argument that the ultimate cost of the OPP Consent Decree is relevant to this case in a general sense because the City has finite resources, *Jones* is an entirely separate proceeding from this case.   Finally, as the Court has previously noted, "inadequate resources can never be an adequate justification for depriving any person of his constitutional rights."   *Udey v. Kastner*, 805 F.2d 1218, 1220 (5th Cir. 1986).   Thus, in

---

[117] *See* R. Doc. 184-10.  This document is an e-mail from the Sheriff's counsel to Coon and Williams.  The United States attached the e-mail as an exhibit to its memorandum in opposition to the City's motion.  The Court observes that the City's reply memorandum does not address this exhibit whatsoever.

the context of this case, the outcome of the *Jones* litigation is not "material and controlling" such that this Court should grant relief under Rule 60(b)(2). *Hesling*, 396 F.3d at 639.

### B.     Unrelated Litigation Regarding OPP: Rule 60(b)(5)

The City further relies on the U.S. Supreme Court's decision in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), to argue that the Court should vacate the NOPD Consent Decree pursuant to Rule 60(b)(5) due to changed circumstances because the City was not previously aware of the OPP Consent Decree's price tag.[118] Rule 60(b)(5) permits a court to grant relief where "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Litigation in *Rufo* began in 1971 "when inmates sued the Suffolk County sheriff, the Commissioner of Correction for the State of Massachusetts, the mayor of Boston, and nine city councilors, claiming that inmates not yet convicted of the crimes charged against them were being held under unconstitutional conditions at what was then the Suffolk County Jail." *Rufo*, 502 U.S. at 371. The jail facility, originally erected in 1848, confined inmates in large tiers of barred cells and was a "relic of the past" that had to replaced. *Inmates of Suffolk Cnty. Jail v. Eisenstadt*, 360 F. Supp. 676, 687 (D. Mass. 1973). In 1979, the parties entered into a consent decree mandating the construction of a new jail facility containing 309 "[s]ingle occupancy rooms," a design which "was based on a projected decline in inmate population." *Rufo*, 502 U.S. at 375-76. Construction of the new facility finally began in 1987, and by that time the county's growing inmate population necessitated more cells to accommodate the additional prisoners. *Rufo*, 502 U.S. at 376. In 1989, while the jail was still under construction, the Suffolk County sheriff moved to

---

[118] R. Doc. 175-1 at pp. 18-19.

modify the consent decree due to changed circumstances to permit double-bunking to increase the jail's capacity; the district court refused to grant the request. *Rufo*, 502 U.S. at 376. The U.S. Supreme Court reversed, holding that modification of consent decrees in prison reform litigation may be appropriate pursuant to Rule 60(b)(5) when the moving party can "establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 392.

Consequently, following *Rufo*, the moving party seeking to modify a consent decree pursuant to Rule 60(b)(5) must "show that the change in circumstance is significant, and not merely that it is no longer convenient to live with the decree's terms." *City of Boerne*, 659 F.3d at 437 (citation omitted). If the City meets this standard by showing significantly changed factual or legal circumstances, it must then demonstrate that "the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383.

The Court, given the facts of this case, does not find the City is entitled to any relief based on the standard set forth in *Rufo*. Just six months, not several years, have passed between the date the City signed and presented the NOPD Consent Decree to the Court and the date the City filed its motion to vacate. The City has not demonstrated that any factual or legal circumstances have "significantly changed" such that enforcing the Consent Decree is no longer equitable. No evidence is before the Court showing the NOPD Consent Decree at issue here is *itself* more expensive to implement now compared to when it was signed. Moreover, even if the costs of the unrelated OPP Consent Decree were a factor the Court should consider, the City has failed to come forward with any evidence contradicting the United States' proof that the City was on notice of the OPP Consent Decree's cost on July

28

19, 2012. As a result, at most, the City's argument regarding the cost of the OPP Consent Decree amounts to a claim that enforcing the Consent Decree as written is no longer convenient because the City anticipates that, at some undetermined point in the future, the City will incur additional financial liability. Finally, the Court observes that *Rufo* permitted *modification* of a consent decree. By contrast, the City urges the Court to vacate the NOPD Consent Decree. *Rufo* and its progeny do not mandate the relief requested.

### C.  Unrelated Litigation Regarding OPP: Rule 60(b)(6)

Next, the City submits that the Court should vacate the NOPD Consent Decree due to the United States' allegedly belated disclosures regarding the OPP Consent Decree pursuant to Rule 60(b)(6). This subsection, which permits a court to grant a motion to vacate for "any other reason that justifies relief," is a "catchall" that has been referred to as a court's "grand reservoir of equitable power to do justice." *Rocha*, 619 F.3d at 400 (quoting *Williams v. Thaler*, 602 F.3d 291, 311 (5th Cir. 2010)). Nevertheless, a court may invoke Rule 60(b)(6) only for "any other reason than those contained in the preceding five enumerated grounds" and only in "extraordinary circumstances." *Rocha*, 619 F.3d at 400. As the Court has described above, the City was aware of the Sheriff's demands with respect to the OPP Consent Decree when it entered into, and repeatedly urged this Court to approve, the NOPD Consent Decree. The City's current displeasure regarding the OPP Consent Decree does not constitute extraordinary circumstances sufficient for relief pursuant to Rule 60(b)(6).

### II.  Perricone: Relief Requested Under Rule 60(b)(3)

Second, the City argues that the Court should vacate the Consent Decree because Perricone was a member of the DOJ team that negotiated the agreement. Perricone's

involvement, according to the City, "undermined the integrity and confidentiality of the entire negotiation process leading to the Consent Decree" and ultimately constitutes misconduct within the meaning of Rule 60(b)(3).[119]   The City concludes that "[s]uch conduct cannot be overlooked and warrants a grant of the City's Motion."[120]

In March 2012, Perricone, a former high-ranking assistant U.S. Attorney for the Eastern District of Louisiana, was unmasked as the author of comments posted on nola.com under the handle "Henry L. Mencken1951."[121]  Perricone's prolific nola.com comments are now a matter of general public knowledge in the Eastern District of Louisiana and have affected many criminal investigations and proceedings, including, most notably, the "Danziger Bridge" case.[122]  Perricone publically admitted he was Henry L. Mencken1951 and resigned on March 20, 2012.[123]  Other nola.com identities eventually linked to Perricone after March 2012 include "legacyusa," "dramatis personae" and "campstblue."[124]  The United States does not dispute that Perricone authored the statements the City has submitted for the Court's review.

The City asserts that Perricone, who applied for the position of NOPD Superintendent in 2010 but was not selected, had a "hidden agenda" to "poison the well"

---

[119] R. Doc. 175-1 at p. 17.

[120] R. Doc. 175-1 at p. 18.

[121] R. Doc. 175-3 at pp. 1-10.

[122] R. Doc. 175-3 at pp. 1-10; *see also United States of America v. Kenneth Bowen, et al.*, Criminal Action No. 10-204 (E.D. La.) ("*Bowen*"), R. Doc. 1070.

[123] R. Doc. 175-3 at pp. 1-10; *see also  Bowen*, R. Doc. 1070 at p. 3.

[124] R. Doc. 175-3 at pp. 1-10; *see also Bowen*, R. Doc. 1070.

of public opinion against the NOPD.[125]   The City notes that Perricone posted about his desire to become NOPD Superintendent,[126] Chief Serpas' credentials,[127] his dislike of paid details,[128] and his belief that federal supervision of the NOPD was necessary.[129]   Perricone also participated in the DOJ's 2010 investigation of the NOPD and, according to the City, insisted on including provisions in the Consent Decree causing a wholesale overhaul of the paid detail system.[130]   The City argues that Perricone's "relentless [posting on nola.com] against Superintendent Serpas and the NOPD, which ran from the transitional period of the Landrieu administration in February 2010 until he was unmasked in March 2012, was clearly aimed at prejudicing the initial DOJ investigation of the NOPD as well as the entire Consent Decree process."[131] The United States responds that the City has not demonstrated how Perricone's involvement in fact prejudiced the City during negotiations.  The United States also underscores that Perricone's characterization of the paid detail system was

---

[125] R. Doc. 175-1 at pp. 6-7.

[126] *See, e.g.,* R. Doc. 175-1 at p. 6 ("MITCH: GET LETTEN OR ONE OF HIS BOYS OR GIRLS TO BE THE NEXT CHIEF!!!!!!" – legacyusa, March 9, 2010. at 4:13 p.m.).

[127] *See, e.g.,* R. Doc. 175-1 at p. 7 ("Ronal Serpas and Mitch Landrieu are the Les Miles of city executives. Alll [sic] they can do is TALK, TALK, TALK TALK. Whenever it gets bad, they run to the camera and microphones. TALK, TALK, TALK. This the political solution to a massive social problem they are incapable of solving. NO MORE NEWS CONFERENCES. Get the job done!!! ACT!!!" – Henry L. Mencken1951, January 14, 2012, 8:22 a.m.).

[128] *See, e.g.,* R. Doc. 175-1 at p. 8 ("MORE DETAILS!!!!!! You want nice cops—you have to pay." – legacyusa, March 9, 2010, at 7:14 a.m.).

[129] *See, e.g.,* R. Doc. 175-1 at p. 9 ("While these heros [sic] are making promises, where is the consent decree they promised? You can't have reform without the Justice Department in this city. I financially support Mitch, but I beginning to have second thoughts. SHUT UP AND PRODUCE!!!!" – November 22, 2011.).

[130] R. Doc. 175-1 at pp. 17-18.  Perricone, the City insists, is the source for the line in the DOJ's report labeling paid details as the "aorta of corruption" within the NOPD.  R. Doc. 175-1 at p. 18.  The DOJ does not dispute this assertion.  R. Doc. 184 at p. 12.

[131] R. Doc. 175-1 at p. 18.

31

included in the DOJ's report "because it was entirely consistent with the facts regarding paid details that were confirmed by numerous members of the public, NOPD officers, local judges and federal law enforcement officials during the Civil Rights Division's extensive investigation of NOPD."[132]

Pursuant to Rule 60(b)(3), a court may relieve a party from a final judgment due to fraud, misrepresentation, or other misconduct of an adverse party.  A party making a Rule 60(b)(3) motion must establish, by clear and convincing evidence, "(1) that the adverse party engaged in fraud or other misconduct, and (2) that this misconduct prevented the moving party from fully and fairly presenting his case."[133] *Hesling*, 396 F.3d at 641 (citation omitted).  "Rule 60(b)(3) is aimed at judgments which were unfairly obtained, not at those which are factually incorrect.  The rule is remedial and should be liberally construed." *Hesling*, 396 F.3d at 641 (internal citations and quotation marks omitted).

To satisfy its burden under Rule 60(b)(3), the City argues that Perricone's nola.com comments prevented the City from fully and fairly presenting its case.  That is, because the City did not know of Perricone's clandestine behavior,[134] the United States unfairly obtained the City's agreement to enter into the Consent Decree and that, as a result, the City was unable to negotiate terms favorable to the City, especially with respect to paid details. Perricone's identity as Henry L. Mencken1951 was publically revealed before the end of

---

[132] R. Doc. 184 at p. 12.

[133] Because the Court finds, as explained *infra* at pp.33-34, the City has failed to demonstrate how Perricone's alleged misconduct prevented the City from fully and fairly presenting its case, there is no need for the Court to determine whether Perricone's behavior is misconduct imputed to the United States.

[134] Failing to disclose information may be a basis for a Rule 60(b)(3) motion.  *See Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (1978) (holding that a plaintiff could obtain relief under Rule 60(b)(3) when a defendant failed to respond to an interrogatory even though the defendant had knowledge it had possession of a document arguably responsive to the interrogatory).

March 2012, Perricone immediately resigned from the U.S. Attorney's Office and, at the same time, he was removed from the DOJ team negotiating the Consent Decree. The City, fully aware that Perricone was Henry L. Mencken1951,  nevertheless moved forward with the proposed Consent Decree rather than abandoning its collaboration with the DOJ. After three additional months of negotiation following Perricone's resignation, the Parties presented a proposed Consent Decree to the Court. Despite having actual notice of the nature of Perricone's online activities, at least to the extent he used the moniker Henry L. Mencken1951 through March 2012, the City knowingly continued to negotiate the terms of the Consent Decree and ultimately pressed the Court for its approval. The City's behavior belies its assertion that Perricone's comments enabled the United States to unfairly obtain the City's agreement to enter into the Consent Decree.

Furthermore, the City has not identified any language Perricone or any other DOJ attorney allegedly inserted into the Consent Decree – either before or after March 2012 – that would have been omitted but for Perricone's involvement in the negotiation process. Indeed, with respect to terms regarding paid details specifically, both the Mayor and Chief Serpas have acknowledged that the paid detail system contributes to the NOPD's longstanding problems and is in great need of reform.[135]  Likewise, the DOJ's March 16, 2011 report includes a substantial discussion of the problems associated with paid details. The City itself represented to the Court, well after Perricone's identity as Henry L. Mencken1951 was revealed,[136] that the report contains a "more than adequate factual record

---

[135] *See supra* pp. 7-8

[136] The City repeatedly points to Perricone's "aorta of corruption" phrase in the DOJ's report, *see* R. Doc. 1-1 at p. 17, as evidence that Perricone helped author, and thereby biased, the report. Perricone, as Henry L. Mencken1951, did in fact use this phrase. *See, e.g.*, nola.com comment at R. Doc. 175-3 at p. 167

supporting the legitimacy" of the Consent Decree's terms.[137]

Finally, the City's assertion that it did not learn Perricone was posting under the name legacyusa until some time in December 2012 or January 2013 is also not dispositive.[138]  While the City claims it did not know the full extent of legacyusa's vitriol toward the City, the NOPD, the Mayor, and Chief Serpas prior to the end of 2012,[139] the City still cannot demonstrate how Perricone's legacyusa comments allowed the United States to unfairly obtain the City's assent or identify what, if any, terms of would have been omitted or substantially changed but for Perricone's involvement.  In sum, the City has failed to satisfy its burden under Rule 60(b)(3) to prove by clear and convincing evidence that Perricone's antics[140] prevented it from fully and fairly presenting its case.

### III.    Secondary Employment and the FLSA: Relief Requested Under Rule 60(b)(1)

Third, the City argues that the Consent Decree provisions regarding paid details –

---

("When the DOJ reported in March that the detail system inside the NOPD was the aorta of corruption, I thought it was hyperbole.  But not anymore.  Since then, we have learned how endemic the outside detail system worked and operated inside our police department. . . . The DOJ can't get here soon enough." – Henry L. Mencken1951, August 27, 2011, at 10:16 a.m.).  Nevertheless, the Court observes that Perricone had been unmasked as Henry L. Mencken1951 well before the City relied on the DOJ's report to urge the Court to approve the NOPD Consent Decree.

[137] R. Docs. 2 at p. 5 and 2-1 at pp. 6-7.

[138] The Court observes it became a matter of general public knowledge in the Eastern District of Louisiana in August 2012 that Perricone was posting under the name "legacyusa" due to an extensive confessional interview Perricone gave to *New Orleans Magazine*.  That interview was memorialized in the article "Sal Perricone's Next Chapter," which was published in the magazine's August 1, 2012 edition.  During the interview, Perricone confirmed that he commented on nola.com under several monikers in addition to Henry L. Mencken1951 – including legacyusa.  *See* R. Doc. 175-3 at pp. 3-10; *see also Bowen*, R. Doc. 1070 at pp. 10-11.

[139] R. Doc. 202 at pp. 8-9.  The City argues it did not know about Perricone's writings as legacyusa because legacyusa's comments were not retrievable via nola.com until the end of 2012.

[140] Again, the Court declines to determine whether Perricone's misconduct may be imputed to the United States because such determination is unnecessary.  The Court underscores it in no way condones Perricone's behavior.

34

referred to as "secondary employment" in the Consent Decree – violate the FLSA and any belief to the contrary is "mistaken" within the meaning of Rule 60(b)(1).  The City's reasoning as to why the Consent Decree violates the FLSA is as follows: the Consent Decree requires the City to establish an independent Secondary Employment Coordinating Office ("Coordinating Office") to manage and supervise officers' secondary employment; the Coordinating Office's vast control over officers' off-duty hours will cause the City to be the officers' employer for such off-duty hours; the FLSA obligates an employer to pay overtime for hours worked above a certain threshold; the City refuses to pay officers FLSA-mandated overtime for hours worked for secondary employment; thus, the Consent Decree orders the City to violate the FLSA.  In essence, the City argues that it was incorrect, at the time it signed the NOPD Consent Decree, in believing the secondary employment provisions complied with the FLSA.  As a result, the City further argues that the Court, relying on the Parties' assertions that their agreement was legally sound, thus erroneously entered the Consent Decree as its own judgment.

In the Fifth Circuit, Rule 60(b)(1) "may be invoked for the correction of judicial error, but only to rectify an obvious error of law, apparent on the record.  Thus, it may be employed when the judgment obviously conflicts with a clear statutory mandate or when the judicial error involves a fundamental misconception of the law."  *Hill v. McDermott, Inc.*, 827 F.2d 1040, 1043 (5th Cir. 1987) (footnotes and internal quotation marks omitted).  Nevertheless, the error to be addressed must be one that is so obvious that the trial judge can easily recognize and correct it, thereby making an appeal an otherwise waste of appellate resources.  *Hill*, 827 F.2d at 1043 ("[A] Rule 60(b)(1) motion filed within the time for appeal saves the parties and the court the time and expense of a needless appeal.");

*Alvestad v. Monsanto Co.*, 671 F.2d 908, 912-13 (5th Cir. 1982).  The Fifth Circuit is "insistent that Rule 60(b) is not a substitute for the ordinary method of redressing judicial error – appeal."  *Alvestad*, 671 F.2d at 912.

The City relies on *Ibarra v. Texas Employment Commission*, 823 F.2d 873 (5th Cir. 1987) as authority for the Court to vacate the Consent Decree under Rule 60(b)(1) due to mistake.  In *Ibarra*, the Texas Employment Commission ("TEC") entered into a consent decree with a plaintiff class of aliens defining which categories of aliens were "permanently residing in the United States under color of law" and thus were eligible to receive unemployment compensation from the TEC pursuant to the Federal Unemployment Tax Act ("FUTA").  *Ibarra*, 823 F.2d at 874.  During negotiations of such consent decree, the TEC sought to ensure the agreement complied with the U.S. Department of Labor's (the "DOL") interpretation of the FUTA so that Texas' employment security program would be consistent with federal law.  The TEC, relying on the DOL's interpretation of the FUTA, agreed to the consent decree's terms.  However, the DOL later changed its position, informed the TEC that it considered the consent decree inconsistent with federal law, and warned that it might institute compliance proceedings.  As a result, the TEC moved to withdraw its consent to the agreement.  The district court refused the request and gave final approval of the consent decree.  *Ibarra*, 823 F.2d at 874.  The Fifth Circuit reversed, finding that the TEC's mistake was a valid reason for vacating the TEC's agreement to the consent decree.  *Ibarra*, 823 F.2d at 879.

*Ibarra*'s facts are inapposite to the case before the Court.  In *Ibarra*, the DOL reversed its position and advised the TEC that it considered the decree inconsistent with federal law.  The TEC notified the district court of this fact.  *Ibarra*, 823 F.2d at 876.  Thus,

36

the party seeking to withdraw from the consent decree in *Ibarra* offered unassailable evidence that it had materially erred in its interpretation of applicable law relating to an issue central to the agreement. *Ibarra*, 823 F.2d at 879.

In this case, the issue is whether the Consent Decree's secondary employment provisions satisfy the FLSA's law enforcement exception. The law enforcement exception allows officers to voluntarily work paid details for separate and independent employers without the officer's main employer – the law enforcement agency – running the risk that the secondary employment counts towards the calculation of hours for overtime pay purposes. *See* 29 U.S.C. § 207(p)(1);[141] *see also* 29 C.F.R. § 553.227(d) (providing that law enforcement agencies can "select the officers for special details from a list of those wishing to participate, negotiate their pay, and retain a fee for administrative expenses" as well as require the detail employer to "pay the fee for such services directly to the department"). Unlike in *Ibarra* where the relevant federal agency reversed its position that the agreement was lawful, in this case the United States has steadfastly maintained that the NOPD Consent Decree's secondary employment provisions squarely fall within the FLSA's law enforcement exception. In fact, the United States has obtained an opinion letter from the DOL bolstering the United States' position that the Consent Decree does not violate the FLSA because it satisfies the law enforcement exception.[142] Thus, this case is not analogous to *Ibarra*. *Ibarra* provides no basis for vacating the NOPD Consent Decree.

---

[141] The United States provided the Court with a letter, dated January 9, 2013, setting forth in greater detail its reasoning why the Consent Decree meets the law enforcement exception. *See* R. Doc. 184-28.

[142] R. Doc. 184-11 (opining that the § 207(p)(1) law enforcement exception "would apply to the particular special details described in the Consent Decree and permit [the NOPD] to exclude its police officers' hours worked on those special details when calculating the officers' hours worked for [FLSA purposes].").

Furthermore, the City's assertion that *Specht v. City of Sioux Falls*, 639 F.3d 814 (8th Cir. 2011) supports its argument that the Consent Decree violates the FLSA is not persuasive.  A main employer's liability for overtime due to the hours an officer spends at his secondary employment depends on whether the main employer merely "facilitates" the officer's ability to work secondary employment, or whether the main employer's actions go "beyond" what is permitted in the guiding regulation.  *Specht*, 639 F.3d at 822.  In *Specht*, the City of Sioux Falls ("Sioux Falls" or "the city") had an agreement with the State of South Dakota whereby Sioux Falls would provide firefighters at the state's request to fight wildfires.  *Specht*, 639 F.3d at 815.  Sioux Falls did not count any hours the firefighters spent fighting wildfires for the state when calculating overtime because, according to the city, (1) such hours were voluntary special details subject to the FLSA's law enforcement exception set forth in 29 U.S.C. § 207(p)(1); and (2) the firefighters were state employees at the time they performed their duties on behalf of the state.  *Specht*, 639 F.3d at 815.

Aggrieved firefighters seeking overtime pay sued Sioux Falls, and the district court granted summary judgment in the city's favor, agreeing that the state details were voluntary and that the firefighters were state employees at the time they were fighting wildfires for the state.  *Specht*, 639 F.3d at 819.  The Eighth Circuit reversed,[143] holding that genuine issues of material fact existed regarding whether the firefighters actually were state employees given (1) that the firefighters fought the wildfires for the state during their regular shifts and not their off-duty hours, (2) that the city agreed to pay the firefighters their full salary even if they did not meet the city's monthly hour quota when working for

---

[143] The Eighth Circuit did not reverse the district court's determination that firefighters' work on behalf of the state was in fact voluntary.  *Specht*, 639 F.3d at 821.

the state, and (3) the language of the agreement between the city and the state.[144]  *Specht*, 639 F.3d at 820-22.

The Consent Decree in this case presents no factually analogous issues.   All secondary employment must be performed for a third-party employer – i.e., *not* the City – and must occur during NOPD officers' off-duty hours.  In addition, if the City deems it necessary to enter into any contracts regarding officers' secondary employment, the City may draft carefully circumscribed agreements that avoid the pitfalls such as those at issue in *Specht*.   Consequently, *Specht*, like *Ibarra*, is inapposite and provides no basis for vacating the Consent Decree.

In sum, the City has not demonstrated that this Court made any "obvious" legal error, within the meaning of Rule 60(b)(1), when it approved the Consent Decree containing the secondary employment provisions at issue.  The United States has never deviated from its position that the Consent Decree's secondary employment provisions satisfy the FLSA's law enforcement exception set forth in 29 U.S.C. § 207(p)(1).  Likewise, the City has not provided any caselaw or authority contradicting the DOL's opinion letter stating that the Consent Decree satisfies the law enforcement exception. Thus, the City has

---

[144] As the Eighth Circuit observed,

> Throughout the agreement [between the City and the State], the City is referred to as "CONTRACTOR."   A "contractor" is "one who contracts to do work or provide supplies for another." Black's Law Dictionary 327 (7th ed. 1999).  The Agreement provides that the State will reimburse the City for "all wage expenses it incurs," which includes "all overtime and backfill wages."  The Agreement also explicitly, and tellingly, provides that the State "is not a party to any union contract or other employment arrangements between city *and its employees*" and that the State will reimburse the City "for all wage expenses it actually incurs as a result of its personnel assisting the Wildland Fire Coordinator including all overtime and backfill wages. . . . Thus, the Agreement specifically acknowledges that the firefighters are, in fact, the employees of the City, not the State.

*Specht*, 639 F.3d at 822 (emphasis in original).

failed to demonstrate that the Court made an error so plainly obvious in approving the Consent Decree that it should vacate the judgment and thereby disregard the normal process for correcting legal error – i.e., appellate review.  Rule 60(b)(1) does not afford the City relief absent any indication the judgment "obviously conflicts with a clear statutory mandate" or that the Court made a "judicial error involv[ing] a fundamental misconception of the law."[145]  *Hill*, 827 F.2d at 1043.

### IV.   Whether the Contract is Valid Under Louisiana Law: Relief Requested Under Rule 60(b)(1)

Fourth, the City argues that, under Louisiana law, the Consent Decree is not a valid contract and should not have been entered by the Court.  The City maintains that it withdrew its consent to the agreement and, as a result, there was no meeting of the minds necessary to form an enforceable contract.  In addition, according to the City, any consent it did give[146] was vitiated by error because (1) the Consent Decree contains terms that violate the FLSA, and (2) despite the City's good faith attempts to ascertain the NOPD Consent Decree's costs, the United States withheld relevant cost information regarding the OPP Consent Decree.  The City further maintains that any consent was vitiated by duress due to Perricone's negative nola.com comments – that is, Perricone poisoned the public's opinion about the NOPD, thereby forcing the City to agree to the Consent Decree under

---

[145] The Court notes that vacating the Consent Decree because certain portions regarding secondary employment *may* conflict with the FLSA, rather than reforming the offending language if necessary, is not a proper request for relief at this time.  The Consent Decree requires the City to implement the Coordinating Office within 365 days of the January 11, 2013 effective date, not immediately.  Any concerns raised can be addressed without vacating the Consent Decree in its entirety.  *See* R. Doc. 159-1 at ¶ 338.

[146] The Court observes that the City signed the original proposed Consent Decree on July 24, 2012, filed its joint supplemental motion regarding the revised proposed Consent Decree on September 14, 2012, and continued to press for the Court to approve the Consent Decree until attempting to withdraw from the Consent Decree on January 11, 2013.

duress.  Finally, the City also asserts that any consent was vitiated by fraud because of Perricone's presence at the negotiating table.  In essence, the City argues that the Court erred by approving an invalid contract and, because the Consent Decree is now a judgment of the Court, the City is subject to the Court's contempt power if it is not in compliance such invalid contract.  The City, in effect, is again asking the Court to vacate the Consent Decree due to legal error within the meaning of Rule 60(b)(1).[147]

The United States responds that federal common law governs contracts, including consent decrees, when the federal government is a party.  *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) ("[O]bligations to and rights of the United States under its contracts are governed exclusively by federal law."); *Smith v. United States*, 497 F.2d 500, 507 (5th Cir. 1974); *Ctr. for Marine Conservation v. Brown*, 905 F. Supp. 383, 385 (S.D. Tex. 1995) ("As a general rule, federal law governs contracts to which the federal government is a party.")  The United States submits that every federal court of appeals that has directly addressed the issue has held that, even prior to a court's required approval of a settlement agreement, a party may not withdraw from an agreement once that agreement has been reached and submitted for approval.  *See, e.g., White Farm Equip. Co. v. Kupcho*, 792 F.2d 526, 530 (5th Cir. 1986) (rejecting pre-judgment attempt to withdraw from settlement agreement); *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008) (finding that, where parties "reached an enforceable settlement agreement subject to court approval," defendant could not withdraw from agreement even before court approval); *Stovall v. City of Cocoa, Fla.*, 117 F.3d 1238, 1242 (11th Cir. 1997) (finding "the district court here was not free to reject the consent decree solely because the City no longer wished to

---

[147] R. Doc. 175-1 at pp. 20-27 (citing the Louisiana Civil Code and caselaw).

honor its agreement"); *Moore v. Beaufort Cnty., N.C.*, 936 F.2d 159 (4th Cir. 1991) (holding the defendant county was bound by its settlement agreement and could not withdraw from it even before court approval); *Reed By and Through Reed v. United States*, 891 F.2d 878, 881 n.3 (11th Cir. 1990) ("Once an agreement to settle is reached, one party may not unilaterally repudiate it."). The City, the United States concludes, cannot retreat from its commitments under the Consent Decree simply because it no longer wishes to honor the agreement.

In the alternative, the United States argues that, even if Louisiana law applies to the question of whether the City may withdraw from the Consent Decree, the result would be the same. Under Louisiana law, a consent judgment becomes binding at the moment of agreement between the parties. *See Ritchey v. Azar*, 383 So.2d 360, 363 (La. 1980) ("[A] judgment obtained by consent of the parties gets its binding force and effect from the parties' consent."); *see also Gulledge v. Gulledge*, 738 So.2d 1229, 1230 (La. App. 2d Cir. 1999) ("A consent judgment is essentially a bilateral contract which is voluntarily signed by the parties and accepted by the court. It has binding force from the voluntary acquiescence of the parties, not from the court's adjudication.").

The Court agrees with the United States that, regardless of whether federal common law or Louisiana applies, the result is the same. The City's argument that it withdrew its consent after signing the Consent Decree but before the Court gave its final approval to the agreement is unavailing. The Consent Decree became binding on the Parties at the moment of agreement – that is, on July 24, 2012, when the Parties signed and submitted the proposed Consent Decree to the Court, and again on September 14, 2012, when the Parties filed their Errata Sheet and supplemental joint motion to approve the revised proposed

Consent Decree. The Parties' written agreement is enforceable and the City is not free to unilaterally withdraw its consent. *White Farm Equip. Co.*, 792 F.2d at 530; *Ritchey*, 383 So.2d at 363. Furthermore, as the Court has discussed in depth above, the City is unable to demonstrate how Perricone's involvement, the monetary obligations the City might incur in the unrelated OPP litigation, or the NOPD Consent Decree's secondary employment provisions, have vitiated the Parties' agreement. Thus, the City has not made a colorable showing that the contract is invalid due to error, duress or fraud. Again, the City has failed to demonstrate that the Court made an error so plainly obvious in approving the Consent Decree that it should vacate the judgment and preclude appellate review.

### V.    Court's Procedure in Approving the Consent Decree: Relief Requested Under Rule 60(b)(1)

The City's final argument assigns fault to the Court's process in considering and approving the Consent Decree. The City complains that the Court (1) relaxed the Federal Rules of Evidence at the Fairness Hearing, (2) questioned the Parties about the meaning of certain terms in the Consent Decree and proposed changes for the Parties' consideration, and (3) did not permit the City to withdraw from the Consent Decree before the Court entered it as a final judgment.[148] The United States responds that the Court approved the Consent Decree in a procedurally proper manner. In essence, the City, again, requests the Court to vacate the Consent Decree pursuant to Rule 60(b)(1) due to legal error.

### A.    The Fairness Hearing

The City challenges the manner in which the Court conducted the September 21, 2012 Fairness Hearing. On July 24, 2012, the date the Parties submitted the Consent

---

[148] R. Doc. 175-1 at pp. 27-29.

Decree to the Court, the Parties strongly urged the Court to approve the agreement immediately.  While the Court appreciated the Parties' request to move quickly, the Court nevertheless observed it had a duty to ensure the Consent Decree was "fair, adequate, and reasonable" before bestowing any approval.[149]  *See United States v. City of Miami*, 664 F.2d 435, 440-41 (5th Cir. 1981) (A court "must not merely sign on the line provided by the parties.  Even though the decree is predicated on consent of the parties, the judge must not give it perfunctory approval.").  As the public comments the Court has received since this case began have so aptly shown, the citizens of New Orleans, as well as Chief Serpas and NOPD officers, are greatly concerned with having a constitutional police force that serves and the protects the community.  To determine the process by which the Court would evaluate whether the Consent Decree in fact will remake the NOPD into a world class police force for both the public and officers, the Court held status conferences with the Parties in July, August, and September 2012.

As a result of these status conferences, the Court concluded that, although one was not required by law, a fairness hearing, held in open court and on the record, would greatly increase public confidence in the process and provide the public with an opportunity to communicate any concerns to the Court and the Parties.  At the same time, the Court was mindful of the Parties' exhortations that reform needed to begin forthwith, and sought to balance the Parties' desires with those of the public.  Recognizing that a "trial court may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision," *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977), the Court concluded that the Fairness Hearing need not adhere to the strict rules regarding the

---

[149] R. Doc. 7.

receipt of evidence for a trial. *See also UAW v. General Motors Corp.*, 235 F.R.D. 383, 387 (E.D. Mich. 2006) (rejecting objections to admission of evidence during fairness hearing that would be inadmissible under Federal Rules of Evidence because "a fairness hearing is not a trial, but instead has a very singular and narrow purpose – to determine whether the settlement at issue is fair, reasonable, and adequate"). The Court intended the day-long Fairness Hearing to serve as an information-gathering session allowing the Court to evaluate the need for the Consent Decree and permitting the public to participate, without the time and expense that a proceeding conducted like a trial on the merits would entail. Indeed, the Parties' repeated admonitions regarding the City's tight finances and the need to put the Consent Decree in place as soon as possible spurred the Court to move quickly, while respecting the judicial process, in order to expedite the Consent Decree's consideration. The Court communicated its plan to relax the Rules of Evidence at the Fairness Hearing to the Parties.[150] The City did not object[151] to the Court's proposed process and fully participated in the Fairness Hearing.

Contrary to the City's assertions otherwise, the Court was not required to conduct the Fairness Hearing in the nature of a trial on the merits strictly adhering to the Federal Rules of Evidence. *Cotton*, 559 at 1331; *UAW*, 235 F.R.D. at 387. The Court is entitled to elicit whatever information is necessary to determine whether a consent decree is fair, adequate, and reasonable. Over a period of more than five months prior to approving the agreement, the Court became intimately familiar with the Consent Decree and the

---

[150] R. Docs. 5 and 8.

[151] The Court recognizes that the City objected to the admission of certain evidence at the Fairness Hearing, *see* R. Doc. 208 *passim*, but the City did not object to the Court's proposed process or the relaxation of the Federal Rules of Evidence.

deficiencies it is designed to remedy.  The evidence the City claims was inadmissable was a small part of the Court's education about the NOPD's needed reforms and was not, by itself, dispositive with respect to the Court's determination that the Consent Decree presented a fair, adequate, and reasonable method of reforming the NOPD.  Thus, the City's argument that the manner in which the Court conducted the Fairness Hearing somehow invalidates its approval of the Consent Decree is without merit.

### B.    The Court's Questions and Proposed Changes

Next, the City complains that the Court, via e-mail and at status conferences with the Parties, questioned the Parties about the Consent Decree's terms and the Court proposed changes to the Consent Decree.  Again, as set forth above, the Court did not have the institutional knowledge that the Parties gained during the DOJ's investigation of the NOPD and the Parties' extended negotiation of the Consent Decree's terms.  When presented with the Consent Decree, the Court had to familiarize itself with the NOPD's deficiencies in need of remediation and the processes by which such remediation would be achieved.  Given that the Consent Decree seeks to entirely remake the NOPD, an institution that affects every citizen of and visitor to New Orleans, the Court was tasked with approving an agreement of far greater impact than entering a consent judgment on behalf of private litigants.[152]  To ensure that the Consent Decree as approved would protect the public interest, the Court had to understand how the Consent Decree would be interpreted and implemented.

To that end, and still mindful of cost and the Parties' desire to move as quickly as possible, the Court met informally with counsel in order to query the Parties on the Consent

---

[152] Indeed, the City repeatedly reminded the Court throughout this process that the NOPD Consent Decree "is the most extensive and far reaching [police consent decree] in this nation's history."  R. Doc. 208 at p. 181.

Decree's scope and how its aims would come to fruition.  During this time as Court was considering the Consent Decree, members of the public submitted written comments outlining their concerns regarding the agreement's terms.  After exchanges with counsel, the Court was assured that the public's concerns would be given due consideration as policies and procedures were developed and implemented.  In time, the Court became confident the agreement was fair, adequate, and reasonable, and served the public interest.

Ultimately, the Court approved[153] the Consent Decree submitted via joint motion on July 24, 2012,[154] as later supplemented by the Parties' subsequent joint motion on September 14, 2012.[155]  The Court's actions were proper, given its duty to confirm that the Consent Decree was fair, adequate, and reasonable prior to approval.

### C.    The City's Motion to Withdraw

Finally, the City asserts that the Court erroneously refused to permit it to withdraw from the Consent Decree at the January 11, 2013 status conference.  At that time, the executed Consent Decree was a binding contract and the Parties were bound by its terms.  *See White Farm Equip. Co.*, 792 F.2d at 530; *Ritchey*, 383 So.2d at 363.  The Court provided a procedure for the City to present its arguments in writing to the Court, which the City has now done, and the Court has carefully considered them.  The Court has not deprived the City of any opportunity to be heard and the City's assertions to the contrary are unavailing.

In sum, the City has not identified how the Court made any obvious legal error in

---

[153] R. Docs. 159-1 and 159-2.

[154] R. Doc. 2-1.

[155] R. Docs. 114-1 and 114-2.

conducting the Fairness Hearing, conversing with the Parties regarding the Consent Decree's terms and meaning, or not allowing the City to unilaterally withdraw from the Consent Decree after it had been signed.  The Court finds the City has not satisfied its burden pursuant to Rule 60(b)(1) and the City is not entitled to the extraordinary relief of having the Consent Decree vacated.

### *Conclusion*

The Court found the Consent Decree to be fair, adequate, and reasonable, and entered the Consent Decree as a final judgment on January 11, 2013.  Having now reviewed the City's arguments for vacating the Consent Decree, the Court finds that the City has not presented any legally cognizable basis for relief pursuant to Rule 60 of the Federal Rules of Civil Procedure, or otherwise.  The Court remains convinced that the Consent Decree is a fair, adequate, and reasonable solution for transforming the NOPD into a world class police force.

Accordingly, for the reasons assigned,

**IT IS ORDERED** that the City's motion to vacate is **DENIED**.


**New Orleans, Louisiana, this 23rd day of May, 2013.**


_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**