UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CIVIL ACTION |
| Plaintiff | * | NUMBER: 12-1924 |
| v. | * | SECTION: E<br>JUDGE SUSIE MORGAN |
| THE CITY OF NEW ORLEANS | * | |
| Defendant | * | DIVISION 2<br>MAG. J. WILKINSON |

* * *

**UNITED STATES' MEMORANDUM RECOMMENDING
SHEPPARD MULLIN AS CONSENT DECREE MONITOR**

The United States and the City of New Orleans ("City") (collectively, "the Parties") entered into a Consent Decree ("Decree") in July 2012 to address entrenched systemic problems within the New Orleans Police Department ("NOPD") and "ensure that police services are delivered to the people of New Orleans in a manner that complies with the Constitution and laws of the United States." *See* Joint Motion for Entry of Consent Decree [ECF No. 2]. This Court entered the Decree as an order of the Court on January 11, 2013. Order Approving Consent Decree [ECF No. 159]. There is no serious question, given the nature and scope of the problems within NOPD, as well as NOPD's previous unsuccessful attempts at self-correction, that the Decree is necessary to correct the longstanding patterns of constitutional misconduct identified by the United States during its exhaustive investigation of the police department. *See* March 16, 2011 Findings Report [ECF No. 1-1] ("Findings") at 1-50. For the Decree to be successful, the best available monitoring team should be selected. After assessing each of the applicants to be Monitor, the United States found that the Sheppard Mullin Richter & Hampton LLP ("Sheppard Mullin") Team, far more than any other candidate, possesses the necessary qualifications to effectively and efficiently guide NOPD's implementation of the Decree.

The Monitor has myriad responsibilities under the Decree. For example, the Monitor must be able to credibly report to the Court and the public whether the requirements of the Decree are being met. The City has asserted that the requirements of the Decree are already being implemented and that reform is well under way.[1] Yet, there are strong indications that the problems that the United States documented in its Findings nearly two years ago persist.[2] Without an effective monitor in place, no one will truly know whether constitutional policing is in fact taking hold in NOPD.

In addition to having the capacity to accurately and credibly assess compliance, it is also essential that a monitoring team have direct experience facilitating wide-scale police reform; be led by a strong and credible lead monitor; be independent and be perceived to be independent; and have the capacity not only to determine whether compliance has been achieved, but why noncompliance might exist and what steps are necessary to correct it.

The United States has sought to work cooperatively with the City since the outset of this investigation to identify such a Monitor. Unfortunately, the Parties have been unable to reach consensus and, as provided for in the Decree, now look to the Court to resolve this dispute.

---

[1] *See, e.g.*, City's Reply Mem. in Support of Mot. to Vacate Consent Decree Pursuant to Rule 60 of the Federal Rules of Civil Procedure [ECF No. 202] at 3-4 ("The City is continuing its reform of the NOPD and will do so regardless of the existence of the NOPD Consent Decree."); NOPD Reform Status Report, May 2010-December 2012, at 31-32 [attached as Exhibit A] (asserting that by December 2012 NOPD had achieved 40% of the 147 action items recommended by DOJ's Report, and that the Decree essentially captures most of these action items).

[2] *See, e.g.*, Office of the Inspector General, Independent Police Monitor, City of New Orleans, *Review of the New Orleans Police Department's Field Interview Policies, Practices, and Data,* March 12, 2013 [attached as Exhibit B] (finding ongoing constitutional violations in NOPD's field interview policies and practices); John Simerman, *Crime Experts Question NOPD Stats that Paint New Orleans as a Safe City with a Murder Problem*, The Times Picayune, May 18, 2013 [attached as Exhibit C] (calling into question NOPD's crime statistics and reporting practices, similar to the problematic classification practices of sexual assault found by the United States in 2010); Edmund W. Lewis, *Residents Want End to Violence, Consent Decree*, The Louisiana Weekly, May 20, 2013 [attached as Exhibit D]; *see also* John Simerman, *Mayor Landrieu to Federal Judge: NOPD Consent Decree 'Not Necessary,'* The Times Picayune, Feb. 22, 2013 [attached as Exhibit E] (quoting Superintended Serpas as saying "I absolutely think the consent decree in the long run is what the department is going to need"); Letter from Jacinta Gonzalez *et al.*, Congress of Day Laborers, to NOPD Supt. Serpas (June 12, 2013) [attached as Exhibit F] (raising concerns that deficiencies in NOPD's delivery of services to non-English speakers are ongoing); Comments of Wes Ware, Director, BreakOut! New Orleans, at June 13, 2013 Monitor Selection Committee Meeting (Tr. forthcoming) (voicing concerns regarding NOPD's current interactions with LBGT and Latino communities).

While there is value in achieving agreement on the selection of a Monitor, reaching consensus must not come at the expense of selecting a monitoring team that will be effective.  The interests at stake—the civil rights of tens, if not hundreds, of thousands of New Orleans residents; NOPD's effectiveness as a law enforcement agency; and the trust between the people of New Orleans and the officers sworn to serve them—require selection of a team with the experience, independence, and quality to successfully implement the Consent Decree.

Therefore, as requested in the Court's June 6, 2013 Order [ECF No. 267], the United States submits this Memorandum recommending that the Court select the Sheppard Mullin Team as Consent Decree Monitor.

## BACKGROUND

The Decree provides that, "within 90 days of the Effective Date,[3] or additional time if agreed to by the Parties, the City and DOJ shall together select a Monitor, acceptable to both" who will "assess and report whether the requirements of this Agreement have been implemented, and whether the implementation is resulting in the constitutional and professional treatment of individuals by NOPD."  Decree ¶¶ 477, 444.  The Decree further provides that, if "the Parties are unable to agree on a Monitor or an alternative method of selection within the timeframes agreed to by both parties as of the Effective Date, then the Court shall resolve the disagreement." *Id.* at ¶ 478.

Pursuant to these provisions, the Parties began the task of selecting a monitoring team well before the Court entered the Decree in January 2013.  On September 6, 2012, the Parties issued a Request for Proposals to Serve as Consent Decree Court Monitor of the New Orleans Police Department [ECF No. 110-1] ("RFP").  The RFP outlined the primary responsibilities of the Monitor as set forth in the Decree.  *See* RFP at 6-7.  To ensure that monitoring candidates

---

[3]  Ninety days from the Effective Date was April 11, 2013.

possessed the requisite capacities, the RFP also identified a list of qualifications that any monitor candidate should possess. RFP at 8. This list of qualifications included, *inter alia*: expertise in law enforcement practices, including training, community policing and problem-oriented policing, and complaint and use of force investigation; expertise in monitoring, auditing, evaluating, or otherwise reviewing performance of organizations, including experience in monitoring settlements, consent decrees, or court orders; expertise in evaluating the breadth and depth of organizational change, including the development of outcome measures; and institutional transformation and change management. RFP at 8. The RFP also required candidates to provide a detailed price proposal. RFP at 9.

Eleven candidates submitted proposals. The Parties formed an Evaluation Committee ("Committee") and each designated five persons to serve on it. *See* January 23, 2013 Order [ECF No. 162]. The Parties agreed that "the Monitor selection process is not subject to the City's procurement rules," but nonetheless established a selection process that was transparent and allowed for significant public comment. *See* Joint Notice of Agreement on Process to Select a Consent Decree Monitor and Request to Modify Feb. 20, 2013 Order [ECF No. 205]; Mar. 6, 2013 Order [ECF No. 206] (granting motion). Pursuant to that agreement, the Committee held four public meetings between March 7, 2013 and April 15, 2013. At these public meetings, the Committee discussed the monitoring proposals; interviewed a "short list" of candidates to be considered; solicited and considered comments from the community regarding the potential monitors; and further narrowed the candidates for Monitor. *See* March 6, 2013 Order [ECF No. 206] (setting forth selection process schedule).

On April 3, 2013, the Committee narrowed the field to two candidates: the United States recommended the Sheppard Mullin Team, led by Jonathan Aronie, David Douglass, and former Charlotte-Mecklenburg Chief Dennis Nowicki; the City recommended the Hillard Heintze Team,

led by Arnette Heintze and former Chicago Superintendent of Police Terry Hillard ("Hillard Heintze").  *See* Tr. of April 3, 2013 Committee meeting [ECF No. 272] at 151-60.  Since narrowing the candidates to the above two teams, the Parties have been engaged in almost daily correspondence and discussions in an attempt to agree on a single proposal or to reach a compromise.  Two members from each of the Parties conducted more than ten additional interviews of team leadership, members, potential members, and references.  In their efforts to agree upon a monitor, the Parties also devoted significant time to exploring alternative teams.  The Parties asked Sheppard Mullin and Hillard Heintze to each consider one alternative configuration and provide a cost proposal based on this configuration.  Ultimately, these efforts were unsuccessful, in part because of the Parties' fundamental disagreement about team leadership, and in part because several of the individuals named as part of these newly configured teams indicated that they would not likely agree to serve on a team with different leadership.  On June 13, 2013, the Parties held a fifth public meeting at which they announced that they were unable to agree on a Monitor.

## DISCUSSION

The Sheppard Mullin Team has demonstrated experience monitoring comprehensive agreements designed to correct civil rights violations and ensure constitutional policing.  Further, the Sheppard Mullin Team will be seen from the outset as independent, capable, and credible.  It also is significantly superior to any of the "compromise" teams the Parties explored during the monitor evaluation period, was publicly vetted, and represents the most cost-effective choice for the City.

I.  **The Sheppard Mullin Team has a Depth and Breadth of Skills and Experience that Place it in the Best Position to Effectively Monitor this Decree**

The Sheppard Mullin Team stood out among all the candidates as having assembled a team—including team leadership—that is ready and able to successfully monitor and assist NOPD's efforts to implement this Decree. The Team not only embodies a breadth of experience that covers each area addressed by the Decree and each qualification required by the RFP, but also reflects a diversity of perspectives that will enrich and inform the Team's analysis, allowing the Team to engage more effectively with a broad spectrum of stakeholders.

The Sheppard Mullin Team is comprised of the following:[4]

1. **Jonathan Aronie** is the lead Monitor of this Team. He is the co-managing partner of the Washington, D.C. office of Sheppard Mullin[5] and has helped lead long-term police reform efforts. As Deputy Monitor of the Metropolitan Police Department ("MPD") in Washington, D.C. pursuant to its Memorandum of Agreement with the United States, Mr. Aronie developed the monitoring plan for MPD. This plan was successfully carried out, resulting in MPD exiting that agreement in six years, with most requirements fulfilled well before that time. *See* Final Report of the Independent Monitor for the MPD, *available at* http://www.policemonitor.org/MPD/MPDindex.html.

2. **David Douglass** is one of two Deputy Monitors on the Sheppard Mullin Team. Mr. Douglass also is a partner at Sheppard Mullin. He is a former federal prosecutor in the Criminal Section of the Civil Rights Division, and thus brings an important civil rights perspective to the Team. He has also prosecuted individuals who committed unlawful acts against the police as an Assistant U.S. Attorney in Massachusetts. Further preparing him for his role as Deputy Monitor, Mr. Douglass has conducted high-profile, closely scrutinized reviews of critical incidents, including: the 1994 White House Security Review following a small-plane crash on the White House lawn, and the Treasury Department's 1993 investigation of the raid on the David Koresh compound in Waco, Texas.

3. **Chief Dennis Nowicki**, the second Deputy Monitor, brings deep subject matter expertise, as well as extensive monitoring experience. Chief Nowicki is a leading

---

[4]  Resumes and profiles are attached as Exhibit G (Aronie); H (Douglass); I (Nowicki); J (Bowman); K (McNeilly); L (Viverette); M (Alpert); N (Del Carmen); O (Williams Dangerfield).

[5]  Additional Sheppard Mullin employees will be available as necessary to assist in this monitoring effort. *See* Sheppard Mullin Proposal [ECF No. 270] at 6, 10. Having the resources of a major U.S. law firm available on an as-needed basis will likely decrease costs by allowing some tasks to be completed at a lower cost or by administrative personnel for whom Sheppard Mullin does not bill. *See* Letter from Jonathan Aronie to Danny Cazenave and Christy Lopez (April 24, 2013) [attached as Exhibit P].

authority on use of force, including officer involved shootings.  In addition, he was one of the earliest, and remains one of the strongest, supporters of community and problem-solving policing.  He has played lead roles overseeing implementation of the agreements to reform MPD and the U.S. Virgin Islands Police Department.

4. **Chief Theron Bowman** is one of three subject matter experts.  Until recently, he served as the Chief of the police department in Arlington, Texas, a City that resembles New Orleans in both size and demographics.  He is currently the Deputy City Manager and Public Safety Director of the City of Arlington.  He is widely recognized as a leading authority on community policing.  He holds a Doctor of Philosophy and wrote his thesis on *The Predictive Value of Policies in Determining Police Officer Actions.*

5. **Chief Robert McNeilly** is the second of three subject matter experts.  He brings a wide range of subject matter expertise, especially in the area of stops, searches, and arrests, as well as Early Warning Systems.  He also offers the unique perspective of having been through the process of being monitored—he served as police chief in Pittsburgh throughout its consent decree with the Department of Justice.  The City of Pittsburgh reached compliance with that decree in two and a half years, and was released from the decree in five and a half years in 2002.  Pittsburgh maintains one of the lowest crime rates per capita in the nation.

6. **Chief Mary Ann Viverette** is the third of three subject matter experts.  She is the former chief of the Gaithersburg, Maryland Police Department, is a past president of the International Association of Chiefs of Police and assessor with the Commission for Accreditation for Law Enforcement Agencies.  As such, she has helped to establish model police practice standards, and has reviewed the policies and procedures of hundreds of departments nationwide.  She also has been a leader in the area of improving police investigations of sexual assault and domestic violence, a critical component of this Decree that has not been included in previous police department consent decrees.

7. **Professor Geoffrey Alpert** provides an analytical and evidence-based perspective that is necessary for the successful execution of many of the Monitor's duties under the Decree.  Dr. Alpert has conducted extensive study in myriad aspects of police practice and has long been a national leader in the field of officer use of force.

8. **Professor Alejandro Del Carmen** has done significant work studying the interactions between police and marginalized community members and recently wrote a book on racial profiling.  Dr. Del Carmen also is a native Spanish speaker, which will enhance the Team's ability to work directly with non-English speaking Latino members of the New Orleans community.

9. **Judith Williams Dangerfield** will perform community outreach for the Sheppard Mullin Team.  Ms. Williams Dangerfield and her firm have significant community organizing expertise.  She has demonstrated experience in seeking information from a

broad swath of the community, including those who do not attend community meetings and who do not have access to the internet.[6]

### A. The Sheppard Mullin Team Leadership has the Experience and Understanding Necessary to Guide Constitutional Reform.

A monitoring team's leadership should be the primary selection criteria. That leadership will determine the team's approach; direct and plan the team's efforts; and recruit or let go team members and subcontractors throughout the term of the Decree (within the parameters set out in the Decree). Monitoring leadership must have fortitude, integrity, and the courage of their convictions to withstand the critique and pressure to which they are certain to be subjected throughout their tenure. Their experience, values, and judgment will guide the difficult decisions that monitoring requires on a nearly daily basis, and will ultimately determine whether the monitoring team becomes a help or a hindrance to achieving constitutional policing.

In addition, it is particularly important here that the monitoring team's leadership have specific skill and experience in the area of monitoring a comprehensive agreement meant to correct longstanding patterns of unconstitutional conduct. The breadth of this Decree is unprecedented in the area of police reform, and the dynamics surrounding it are complex. Given this, as well as the urgent need for reform, this project is not an appropriate one for a leadership team to gain the needed skills and experience while the project is ongoing.

The Sheppard Mullin Team has the leadership necessary to effectively monitor this Decree. Jonathan Aronie, the lead monitor, served as Deputy Independent Monitor overseeing implementation of MPD's agreement to reform that department. He served in this role for over a

---

[6] The Sheppard Mullin Team elected to wait to select its local team members until after it consulted with the Parties and members of the New Orleans community, an approach for which the community has expressed support. *See* Sheppard Mullin Proposal at 36-37; Apr. 3 Tr. at 32-33, 45-48, 59-60, 104-05; Comments of Norris Henderson, Director, VOTE New Orleans (Tr. forthcoming) (voicing approval of Sheppard Mullin's approach). Ms. Williams Dangerfield was initially included on the Hillard Heintze proposal and participated in the interviews of the Hillard Heintze Team on April 2. Impressed with Ms. Williams Dangerfield's experience and expertise, the Parties inquired and confirmed that she would be willing to serve on any selected monitoring team. The Sheppard Mullin Team has agreed to add her to their Team should they be selected. *See* Email from Jonathan Aronie to Monitor Selection Committee re: "New Orleans Monitorship-Alternate Cost Estimate" (May 10, 2013) [attached as Exhibit Q].

year, and made a significant and foundational contribution to that monitoring effort. City and United States members of the Committee spoke with the MPD officer who was tasked with coordinating MPD's implementation of that agreement. This officer reported that he had significant contact with Mr. Aronie and that Mr. Aronie oversaw the day-to-day implementation of the agreement. The officer reported that MPD officers found Mr. Aronie open-minded, fair, and highly effective.

Joshua Ederheimer, a former member of the MPD command staff who took the lead role on MPD's implementation efforts, has a similar assessment of Mr. Aronie. Mr. Ederheimer, who now serves as Acting Director of DOJ's Office of Community Oriented Policing Services ("COPS"), was asked by the United States to serve on the Evaluation Committee in February 2013 because of the officer perspective he would provide. Discussing Mr. Aronie during a monitor selection public meeting, Mr. Ederheimer stated:

> As a police commander—as a sworn police commander in Washington DC for the Washington DC Police Department, I, in essence, was the one being monitored. And I felt that from a police perspective he was incredibly knowledgeable, but he was fair, unbiased, and had a lot of common sense. And I think that's one of the reasons why the DC Police agreement was resolved in a relatively fast fashion. And that was a pretty major reform.

Tr. of Apr. 15, 2013 Committee meeting [ECF No. 273] at 40.

David Douglass, one of the two Deputy Monitors, adds a critical civil rights perspective to the Team. This Decree stems entirely from NOPD's alleged pattern of violating constitutional rights. As such, any monitoring team needs to ensure that this perspective informs its review and assessment of NOPD's practices. Moreover, including a civil rights perspective will help ensure that a monitoring team's findings will be more credible to a broader spectrum of stakeholders than if they reflect only the police perspective. As a former federal civil rights prosecutor, Mr. Douglass understands the contours of constitutional rights and the legal limits on police conduct.

9

*See* Douglass Resume.  Mr. Douglass's civil rights background will be vital to the Team's review of specific police actions, including use of force incidents and stops, searches, and arrests. *See, e.g.,* Decree ¶¶ 450-55.

Chief Dennis Nowicki is also a Deputy Monitor on the Sheppard Mullin Team, and is its lead police practice expert.  Chief Nowicki has a long career in law enforcement, having served five years as the Chief of Police for the City of Charlotte-Mecklenburg and 26 years in the Chicago Police Department (rising to the rank of Deputy Superintendent).  As a Chief, he was a leader in community policing.  *See* Apr. 3, 2013 Tr. at 84-85.  Chief Nowicki has significant experience as a monitor and law enforcement expert in other constitutional reform police cases. *See id.* at 12-13; Nowicki Resume.  Chief Nowicki's background as both a reform police chief *and* an experienced monitor provides him with unique experience that enables effective oversight and that would lend credibility to his findings and recommendations.

The Sheppard Mullin Team's leadership stands in stark contrast to the leadership offered by the Hillard Heintze Team.  Hillard Heintze is a security and law enforcement management consultant group.  *See, e.g.*, Hillard Heintze Proposal at Appendices H, I, J [ECF Nos. 269-3, 269-4].  Neither Superintendent Hillard nor Mr. Heintze has monitored constitutional reform in police departments on any scale—nor has either guided implementation of a large, complex, department-wide police department decree.

Having served as Superintendent of Chicago Police for a number of years, Superintendent Hillard does bring considerable police practice experience to the Team; but that experience does not automatically translate into the skill set and judgment that this project requires.  A monitor has a distinct focus, mandate, and set of responsibilities from a chief. Superintendent Hillard's tenure in Chicago does not alone equip him for the position of Monitor, and does not alone reflect any particular ability or dedication to ensuring constitutional policing.

10

Mr. Heintze brings even less relevant experience to bear, as he is not a police practice expert, has no legal expertise, and has no experience monitoring a department-wide reform effort. Mr. Heintze is a retired U.S. Secret Service Agent with expertise in the field of Homeland Security. As Mr. Heintze's own team-members conceded during the follow-up interviews, the Secret Service, charged primarily with providing security, does not resemble a large, urban police department such as NOPD in either function or practice. Mr. Heintze's lack of relevant experience is especially concerning given that, by all indications, it is Mr. Heintze, not Superintendent Hillard, who would be directing this monitoring effort if the Hillard Heintze Team is selected. Mr. Heintze has played the lead role for the Hillard Heintze Team during every phase of the monitor selection process: he appears to have made all personnel decisions for the Hillard Heintze Team; he was the primary presenter during the Team's April 2, 2013 interview and directed its responses to all subsequent inquiries from the Committee; he has drafted all correspondence the Hillard Heintze Team has sent to the Committee; and he has directly submitted several letters of reference to the Court under the process ordered by the Court to receive *public* comment. *See* Letter from Arnette Heintze to U.S. Dist. Judge Morgan (May 30, 2013) [ECF No. 264].

In contrast to the civil rights perspective within the leadership of the Sheppard Mullin Team, the Hillard Heintze Team's leadership lacks this direct civil rights perspective in its leadership or elsewhere on the Team. Even more concerning, Hillard Heintze decisions already have indicated they may not have a full understanding of how critical this perspective is. As initially composed, the Hilliard Heintze Team included Scott Greenwood, a civil rights attorney with police reform experience. Hillard Heintze proposal [ECF No. 269] at 22. However, Mr. Heintze removed Mr. Greenwood from the team, as he did Chief Thomas Streicher, who has experience implementing a police reform agreement in Cincinnati. *See* Letter from Arnette

11

Heintze to Monitor Selection Committee (March 1, 2013) [attached as Exhibit R].  When asked whether he intended to replace Mr. Greenwood and Mr. Streicher with individuals with civil rights expertise, Mr. Heintze told the Committee that he did not see the need to replace them. *See* Tr. of Apr. 2, 2013 Committee meeting [ECF No. 271] at 48-49.

The Hillard Heintze Team also lacks monitoring experience.  The Team's Deputy Monitors, Chief Kathleen M. O'Toole and Chief Robert L. Davis are able subject matter experts. However, they would be acting at the direction of Mr. Heintze, rather than directing the Team themselves, and have neither monitoring nor direct civil rights experience (although since February 2013 Chief O'Toole has been gaining monitoring experience as monitor of the approximately 55-person East Haven, Conn., Police Department).

After the United States alerted Hillard Heintze of its concerns regarding the Team's dearth of relevant monitoring and civil rights experience, Hillard Heintze attempted to improve on these deficiencies by adding to the Team Michael Bromwich, a former monitor and lawyer in private practice, and Michael Gennaco, a former federal civil rights prosecutor and current independent auditor of the Los Angeles Sheriff's Department.[7]  Letter from Arnette Heintze to Monitor Selection Committee (April 25, 2013) [attached as Exhibit S].  While both bring considerable expertise, the Parties have received conflicting information about the nature and duration of their roles with this project.  With respect to Mr. Bromwich, the April 25 letter from Mr. Heintze did not define the role that he would play.  When the Parties spoke to Mr. Bromwich about his role, he informed the Parties that he envisioned that he would assist in the drafting of the monitoring plan, but did not provide any specifics of his commitment beyond that.  Mr. Heintze initially described the contribution of Mr. Bromwich as "maybe a couple of days a

---

[7]  Both Mr. Bromwich and Mr. Gennaco were the primary monitors of other monitoring team candidates.  *See* Proposal, The Bromwich Group, and Proposal, OIR Group, *available at* http://new.nola.gov/purchasing/consent-decree.  While these teams made the five-team short list, they were not selected.  As such, the public has not had an opportunity to vet them to the same extent as the members of the Sheppard Mullin and Hillard Heintze teams.

month or a couple of meetings per month," but in a later communication, described a more significant role for Mr. Bromwich. [8] In any case, even if Mr. Bromwich or Mr. Gennaco were to play a significant role on the Hillard Heintze Team, the Team still would be directed by leaders with neither monitoring nor civil rights experience.

      **B.**    **Sheppard Mullin's Police Practice and Academic Experts Provide a Breadth and Depth of Experience Unmatched on Other Teams.**

The need for highly qualified police practice experts in monitoring a police reform decree is plain. Perhaps less obvious but equally critical is expertise studying policing, including data gathering and analysis. Of all the teams that submitted a proposal to monitor this Decree, the Sheppard Mullin Team has the deepest skill and broadest diversity of experience among its police and academic experts.

The Sheppard Mullin Team includes preeminent police practice academics who will provide an analytical and evidence-based perspective that is necessary for the successful execution of many of the Monitor's duties under the Decree, including developing and implementing methodologies for audits and reviews, and the design and implementation of outcome measures to evaluate compliance. The academic experts on the Sheppard Mullin Team include Dr. Geoff Alpert, arguably the preeminent police practices-focused academic expert in the entire nation. In addition, Dr. Alpert has extensively researched the use of outcome measures in police work, and has himself developed outcome measures that are specifically designed to accurately measure the lawfulness and effectiveness of police action. That experience will prove crucial to the fundamental monitoring responsibility of measuring NOPD's compliance with the Decree. *See* Decree ¶¶ 448-49. Dr. Alejandro del Carmen is another widely-respected expert

---

[8]    *See* Letter from Arnette Heintze to Sharonda Williams and Christy Lopez, (May 10, 2013) [attached as Exhibit T]. It is not clear that Mr. Bromwich agreed to this increased role, as the role of another potential member of that team was described in equal detail, even though that member told the Parties that he had not been advised by Mr. Heintze what the level of his involvement would be. Email from Dennis Nowicki to Committee re: "Monitor Team Composition" (May 10, 2013) [attached as Exhibit U; non-relevant contact information redacted].

who has studied community dynamics related to crime and whose recent work has focused on racial profiling. That experience is also specifically needed for successful implementation of the Decree. *See, e.g.*, Decree ¶¶ 125, 127, 142, 223-33.

Sheppard Mullin's three law enforcement experts and Deputy Monitor Nowicki have explicit and specific expertise in each of the areas covered by the Decree. Each expert is a national leader in police practices, and each has a broad, experience-based expertise with all aspects of policing covered by the Decree. For example, *every one* of Sheppard's law enforcement experts has expertise in successful secondary employment systems; *each* has been at the forefront of policing, including devising and putting into place strategies for policing diverse communities; and *all* have experience devising and implementing early warning systems ("EWS"). *See* April 15, 2013 Tr. at 26-30; April 3, 2013 Tr. at 123, 127-30 (discussion of experience with secondary employment systems); *id.* at 109-12 (discussion of experience implementing EWS); Nowicki, Bowman, McNeilly and Viverette Resumes.

## II.     The Sheppard Mullin Team Is, and Will Be Viewed as, Fair and Independent

To be successful, a monitoring team must accurately and objectively evaluate NOPD's implementation of the Decree and must have credibility with the Court and the community so that its evaluations are accepted. Therefore, the Monitor must be independent from the entity being monitored. The Monitor must be able to make difficult calls, such as whether uses of force or stops and searches were reasonable, and whether the findings of misconduct investigations are supported by the evidence. These calls must be accurate, objective, and credible. In addition, pursuant to this Decree, the Monitor has numerous, concrete community outreach obligations to ensure that a diverse range of community members are included as real participants in the reform process. *See, e.g.*, Decree ¶¶ 231, 461. The Monitor must be able to identify community concerns; measure change in the community's view of NOPD over time; and facilitate enduring

14

partnerships between the community and NOPD so that, even after the Decree's termination, NOPD has the capacity to continue to engage community members on its own, and sustain lawful and effective policing. Completing these tasks will prove difficult if the Monitor lacks the community's confidence. For these and other reasons, it is critical that the monitoring team has the requisite independence and credibility to successfully monitor this Decree. Indeed, one of the fundamental goals of this Decree is to restore the community's trust in NOPD. After decades of division between NOPD and the community, as well as a long history of failed promises of reform, the Decree can only repair that trust if the community believes that the Monitor is independent and that its findings are trustworthy.

The Sheppard Mullin Team is the more credible monitoring team in each of these respects. A broad spectrum of New Orleans residents has overwhelmingly voiced support for the Sheppard Mullin Team. The President of the New Orleans branch of the NAACP stated on behalf of that organization that the Sheppard Mullin Team is the "superior choice." *See* Apr. 15, 2013 Tr. at 130-32 (comments of Mr. Danatus King). Approaching the monitor selection decision from a different vantage point, another commenter stated that, although he does not usually agree with the NAACP and has no issue with Mayor Landrieu, it was clear that the Sheppard Mullin Team was the right choice to monitor NOPD. *See id.* at 146-50. Community United for Change, one of the organizations that attempted to intervene in this case, also spoke in favor of the Sheppard Mullin Team at the Committee meeting, and provided a letter of support for the Team. *See id.* at 135-138; Letter from W.C. Johnson *et al.*, Community United for Change, to U.S. Dist. Judge Morgan (May 12, 2013) [ECF No. 240].[9]

---

[9] While the City has raised concerns regarding the independence of some members of the Sheppard Mullin Team, specifically Mr. Aronie and Chief Bowman, these concerns are at odds with the City's support for other monitors and team members who have the same or even greater involvement with DOJ. The City has expressed concern that, more than a decade ago, current attorney for the United States Christy Lopez and Mr. Aronie were both part of the same unsuccessful proposal to serve as monitor of the Prince George's County, Md., Police

In contrast to the broad support the Sheppard Mullin Team has received, there has been little community support for the Hillard Heintze Team, with the overwhelming majority of local voices weighing in against the Team. Significantly, among the most consistent critiques is a concern that the Hillard Heintze Team will not be perceived as independent from the City and NOPD. *See, e.g.*, Letter from William P. Quigley, Community United for Change, to U.S. Dist. Judge Morgan (Apr. 15, 2013) [ECF No. 224] (doubting Team's independence and expressing view that Hillard Heintze represents "the one applicant which was most vehemently objected to by community observers of the process"). Among the reasons cited by the community in opposing the Hillard Heintze Team is its selection of Rev. Charles Southhall and Professor Peter Scharf as team members. It is clear from the community comments voiced at monitor selection meetings and submitted to the Court that members of the community question Rev. Southhall's ability to vigorously monitor the Decree given his ties to Mayor Mitch Landrieu. *See, e.g.*, Andrew Vanacore, *Community Group Pans Landrieu Administration's Choice to Monitor NOPD Reforms in Consent Decree*, The Times Picayune, Apr. 15, 2013 [attached as Exhibit V]; Apr. 15, 2013 Tr. at 112-14, 138. The community has similar concerns about Mr. Scharf, including his public statements expressing doubt about the need for the Decree. *See, e.g.,* Quigley Letter, supra at 3. Concerns have also been raised about Superintendent Hillard's commitment to constitutional policing, both from long-time New Orleans' advocates for police reform, and from

---

Department. The City has expressed no concern, however, that Superintendent Hillard was also a part of that same team. Similarly, while the City has expressed concern that Chief Bowman served as an expert during the United States' investigation of NOPD, it actively supports Dr. Ellen Scrivner as a member of the Hillard Heintze Team, even though she also was an expert for the United States during its investigation of NOPD and was, at the time, a DOJ employee. *See* Scrivner Resume, Hillard Heintze Proposal [ECF No. 269-1] at *59. Nor has the City expressed any concerns about other members of the Hillard Heintze Team who have past or current relationships with the United States, including Mr. Bromwich; Mr. Gennaco, a former Civil Rights Division prosecutor; or Chief O'Toole, who was recently selected by the United States to monitor another consent decree. Moreover, the City pressed for recent COPS Director Barney Melekian as a possible lead monitor, despite his recent DOJ employment during which he was "personally and substantially" involved in the development of both the United States' findings and the Decree, barring him by criminal law from serving as monitor. *See* 18 U.S.C. § 207.

individuals who have knowledge of Superintendent Hillard's tenure as Superintendent of Chicago PD.[10]

The United States understands that no monitoring group will have the support of every member of the community, and that choosing a monitor should not be based on which team enjoys the support of the broadest (or loudest) swath of the community at the time of selection. Nonetheless, the fact that individuals with diverse perspectives in New Orleans have voiced strong opposition and distrust of the Hillard Heintze Team casts doubt upon its capacity to be effective.

Further, the United States believes that there is merit to the community's doubts about the Hillard Heintze Team's independence and commitment to meaningful reform, and believes that the need for these qualities is especially resonant here, where Mayor Landrieu has led the City's recent efforts to avoid its obligations under the Decree.

## III.     The Sheppard Mullin Team is Cost Effective for the City

The United States is very mindful of cost in recommending the Sheppard Mullin Team. At the outset however, it is critical to note that the cost of reform, including a Monitor, exists only because of the City's failure, going back decades, to ensure that its police department respects the civil rights of its own people.  The City's persistent objection to the Decree on the basis of its cost is fundamentally an erroneous assertion that the City need not comply with the Constitution or ensure safe and effective policing if doing so costs money.  The City's complaints about the cost of police reform also disregard the very real, if less quantifiable, cost of police abuse on the lives and livelihoods of New Orleans residents.  Given the City's

---

[10]     *See, e.g.*, Letter from Mary Howell re: Monitor Selection Process (Apr. 25, 2013) [ECF No. 225]; Andrew Vanacore, *Past Torture Stirs Debate*, The Advocate, June 3, 2013 (quoting Locke Bowman, director of the MacArthur Justice Center at Northwestern Law School as saying, "You're looking for a person who is fearless about taking on corruption and making things right.  Nobody would say that Terry Hillard fits that bill.  Nobody would.  He's obviously the wrong guy for the job.") [attached as Exhibit W].

unquestionable obligation to ensure that NOPD polices lawfully, and the importance of the civil rights at stake, the selection of a monitor must ultimately depend on which team will most effectively help end NOPD's longstanding pattern of violating constitutional rights.

In any event, the Sheppard Mullin Team not only is the most qualified, but it also is the most cost effective for the City. Its four-year cost estimate is higher than Hillard Heintze's.[11] But any consideration of costs must center around an evaluation of value. Mr. Aronie has put together a small and dynamic team of experts from all relevant fields that is unparalleled in its experience and that can proficiently and efficiently monitor all aspects of the Decree. The Hillard Heintze proposal, on the other hand, is not carefully tailored to the needs of the Decree and includes such questionable costs as having *every* member of its 22-person Team review *every* policy, an unnecessary duplication of effort and cost. *See* Hillard Heintze Proposal at 17. There is additional cause to be concerned that Hillard Heintze's cost proposal is not fully thought out. For example, when Hillard Heintze initially modified its Team to include Mr. Gennaco and Mr. Bromwich, it did not modify its cost proposal at all. *See* Letter from Arnette Heintze to Sharonda Williams and Christy Lopez (April 25, 2013), *supra*. That the addition of these two relatively expensive members (Mr. Bromwich's hourly rate is $495), without the removal of others, did not alter the Team's cost estimate is, in the view of the United States, an indication either that the estimate is unrealistic, or that these two men were not expected to play meaningful roles.[12] When evaluating cost, the City and the Court should consider not only what the City is paying the monitor, but what the City is getting for its money.

---

[11] Hillard Heintze's four-year capped cost estimate is $7,007,542. Sheppard Mullin's four-year cost estimate is $7,880,786, with a cap of $8,900,000. Hillard Heintze claimed in an unsolicited letter to the Committee that its cost proposal includes more hours and more dedicated time in New Orleans than Sheppard Mullin's proposal. *See* Letter from Arnette Heintze to Danny Cazenave and Christy Lopez (Apr.14, 2013) [attached as Exhibit X]. Sheppard Mullin submitted a letter that effectively refuted those claims. *See* Letter from Jonathan Aronie to Cazenave and Lopez (Apr. 24, 2013) *supra*.

[12] At the request of the Parties, Mr. Gennaco and Mr. Bromwich were given greater roles in Hillard Heintze's revised proposal. Their addition in this more meaningful capacity increased Hillard Heintze's cost estimate from

In addition, the selection of an experienced, independent monitor represents a cost savings that could dwarf the difference in these four-year cost proposals. Earning release from the Decree—and concluding the monitorship—in a timely fashion will confer the greatest cost savings for the City.

## CONCLUSION

The end goal of the Consent Decree is to ensure that NOPD fully complies with the Constitution and federal law, and to ensure that constitutional policing is sustained. Ideally, the United States and the City would have reached agreement on a monitor, but selecting a monitor who will effectively and efficiently guide implementation of the Decree must be of paramount importance.

Through scores of hours of discussion, the Parties sought to reach compromise, but were unable to agree on team leadership. Further, none of the many alternatives considered approached the strength of the Sheppard Mullin Team.

To provide the greatest assurance that the Consent Decree will successfully be implemented, the United States respectfully requests that the Court select the Sheppard Mullin Team as Consent Decree Monitor.

---

$7,007542 to $7,508,154. *See* Letter from Arnette Heintze to Sharonda Williams and Christy Lopez (May 10, 2013), *supra*. The tentative team to which this revised cost proposal pertained was rejected during negotiations and the cost proposal is thus irrelevant. It remains unclear what the proposed cost of the Hillard Heintze Team, with the addition of Mr. Gennaco and Mr. Bromwich playing meaningful roles, actually would be.

| | |
|---|---|
| DANA J. BOENTE<br>Acting United States Attorney<br>Eastern District of Louisiana | THOMAS E. PEREZ<br>Assistant Attorney General<br>Civil Rights Division |
| STEPHEN C. PARKER (TN 12747)<br>Assistant United States Attorney<br>Eastern District of Louisiana | ROY L. AUSTIN, JR. (DC 980360)<br>Deputy Assistant Attorney General<br>Civil Rights Division |

JONATHAN M. SMITH
Chief
Special Litigation Section

CHRISTY E. LOPEZ (DC 473612)
Deputy Chief
Special Litigation Section

EMILY A. GUNSTON (T.A.) (CA 218035)
     /s/ Jude Volek                          
JUDE VOLEK (NY 10041483)
Trial Attorneys
Special Litigation Section
United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel.:  (202) 353-1077
Email:  jude.volek@usdoj.gov