


# New Orleans Consent Decree Monitor
# Third Quarterly Report of 2014
# December 19, 2014

**Office of the Consent Decree Monitor**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana

# WHAT'S IN THIS REPORT?




**Office of the Consent Decree Monitor**

**Third Quarterly Report for 2014**

**Covering July 1, 2014 – September 30, 2014**

**December 19, 2014**

## WHAT WE DID THIS QUARTER

- Reviewed and worked with NOPD to revise policies and procedures
- Monitored Academy training
- Reviewed individual uses of force by NOPD officers
- Reviewed PIB's process for handling citizen complaints involving racial profiling
- Monitored officer and supervisor disciplinary hearings
- Assessed fulfillment of NOPD supervisor responsibilities
- Audited the use and functionality of CEW, in-car, and Body Worn cameras
- Audited availability of citizen complaint forms in NOPD districts

## WHAT WE FOUND

- NOPD's Training Academy continues to suffer from serious deficiencies, however, recent leadership changes and other initiatives give the Monitoring Team hope things now will change
- Although improvements have not occurred as quickly as we would have liked, toward the end of the reporting quarter, NOPD's policy drafting process improved and NOPD now is making progress toward compliance
- NOPD still has not met its Crisis Intervention Team obligations
- NOPD supervision and record keeping still are lacking in many areas
- Technology continues to hinder some of NOPD's compliance efforts, including its efforts to deploy fully functional in-car cameras, but additional funding obtained from the City should held these efforts

## NEXT QUARTER'S ACTIVITIES

- Continue closely monitoring uses of force, training, citizen complaints, misconduct investigations, and disciplinary hearings
- Continue closely monitoring the Training Academy, and expand monitoring to other components of NOPD's training program
- Continue to work closely with NOPD on drafting Consent Decree compliant policies.
- Perform a more in-depth analysis of NOPD's supervision in all areas of the Consent Decree
- Monitor NOPD's progress in meeting its Crisis Intervention Team obligations
- Analyze the results of the police, detainee, and community survey conducted over the course of the prior two quarters




## I. Note

"The Monitor shall be subject to the supervision and orders of the [United States District Court for the Eastern District of Louisiana], consistent with [the Consent Decree]. The Monitoring Team shall only have the duties, responsibilities, and authority conferred by [the Consent Decree]. The Monitoring Team shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent."

**-Consent Decree Paragraph 455**




## II. Table of Contents

I. Note ..... 3
II. Table of Contents ..... 4
III. Glossary of Acronyms ..... 7
IV. Introduction to Fourth Quarterly Report ..... 9
V. Summary of Monitoring Activities ..... 14
VI. POLICIES AND TRAINING ..... 15
VII. USE OF FORCE (CD 27-100) ..... 17
VIII. CRISIS INTERVENTION TEAM (CD 111-121) ..... 18
IX. CUSTODIAL INTERROGATIONS ..... 20
A. Interrogation Recordings (CD 164 and 165) ..... 20
B. Interrogation Case Files (CD 166) ..... 22
C. Interview Rooms and Functioning Equipment (CD 167) ..... 22
D. Qualified Interpreters (CD 168) ..... 23
X. PHOTOGRAPHIC LINE-UPS (CD 171 - 176) ..... 24
A. CD 171 ..... 24
B. CD 172 ..... 24
C. CD 173 ..... 25
D. CD 174 ..... 25
E. CD 175 and 176 ..... 25
XI. BIAS FREE POLICING (CD 177-194) ..... 25
XII. POLICING FREE OF GENDER BIAS (CD 195-222) ..... 26
XIII. COMMUNITY ENGAGEMENT (CD 223-233) ..... 27
XIV. RECRUITMENT (CD 234-244) ..... 28
XV. ACADEMY AND IN-SERVICE TRAINING (CD 245-288) ..... 30
A. Introduction ..... 30
B. Lesson Plans ..... 30
C. Outdated Materials ..... 31
D. Academy Leadership ..... 32




E. Instructors and Instruction ... 32
1. Ethics Training ... 32
2. Community Policing & Ethics Training ... 33
3. Driver and Vehicle Pursuit Training ... 33
4. Domestic Violence Training ... 33
5. Crimes Classification Training ... 34
6. CEW Training ... 35
7. Cultural Diversity and Sensitivity Training ... 35
XVI. SUPERVISION (CD 306-331) ... 36
A. Duties of Supervisors (CD 306-313) ... 36
1. CD 306 ... 36
2. CD 307 ... 38
3. CD 308 ... 40
4. CD 309 ... 40
5. CD 310 ... 40
6. CD 311 ... 41
7. CD 312 ... 41
8. Paragraph 313 ... 42
B. Supervisor and Command-Level Training ... 43
1. CD 314 ... 43
2. CD 315 ... 43
C. Early Warning System ... 43
1. CD 316 ... 43
2. CD 317 ... 44
D. Visual and Audio Documentation of Police Activities (CD 327-331) ... 44
1. Introduction To Camera Audit ... 44
2. Camera Findings ... 47
3. Conclusion Regarding Cameras Generally ... 55
4. AVL and In-Car Camera Functionality (CD 327) ... 56
5. Equipment Testing (CD 329) ... 58
6. Supervisory Responsibility (CD 330) ... 59




7. Handheld Recording Devices (CD 331) ... 60
XVII. SECONDARY EMPLOYMENT (CD 332 - 374) ... 60
XVIII. MISCONDUCT COMPLAINT INTAKE, INVESTIGATION, AND ADJUDICATION (CD 375-426) ... 62
A. Citizen Complaint Forms (CD 385 and 386) ... 62
B. Complaint Forms in Multiple Languages (CD 387) ... 63
C. Camera Discipline ... 63
XIX. TRANSPARENCY AND OVERSIGHT (CD 427-443) ... 63
A. Availability of NOPD Audits and Reports (CD 427) ... 63
B. Availability of Policies and Procedures On NOPD Web Site (CD 428) ... 64
XX. AGREEMENT IMPLEMENTATION AND ENFORCEMENT (CD 444 – 492) ... 65
A. Coordination with IPM (CD 459) ... 65
B. NOPD Consent Decree Implementation Unit (CD 467) ... 65
C. NOPD and City Cooperation (CD 470 – 476) ... 65
XXI. CONCLUSION ... 66
XXII. APPENDICES ... 67
Appendix 1 ... 67
Appendix 2 ... 68
Appendix 3 ... 69




## III. Glossary of Acronyms

| | |
|---|---|
| "ASU" | Administrative Services Unit |
| "AUSA" | Assistant United States Attorney |
| "AVL" | Automatic Vehicle Locator |
| "BWC" | Body Worn Cameras |
| "CCMS" | Criminal Case Management System |
| "CD" | Consent Decree |
| "CEW" | Conducted Electrical Weapon (*see also* ECW) |
| "CIT" | Crisis Intervention Team |
| "CODIS" | Combined DNA Index System |
| "ComStat" | Computer Statistics |
| "CPI" | California Psychological Inventory |
| "CSC" | Civil Service Commission |
| "CUC" | Citizens United for Change |
| "DA" | District Attorney |
| "DI-1" | Disciplinary Investigation Form |
| "DMVAD" | Digital Mobile Voice Audio Recording (in-car cameras) |
| "DOJ" | Department of Justice |
| "DVU" | Domestic Violence Unit |
| "ECW" | Electronic Control Weapon (*see also* CEW) |
| "EWS" | Early Warning System |
| "FBI" | Federal Bureau of Investigation |
| "FIT" | Force Investigation Team |
| "FOB" | Field Operations Bureau |
| "FTO" | Field Training Officer |
| "IACP" | International Association of Chiefs of Police |
| "ICO" | Integrity Control Officers |
| "IPM" | Independent Police Monitor |
| "KSA" | Knowledge, Skill and Ability |
| "LEP" | Limited English Proficiency |
| "LGBT" | Lesbian, Gay, Bi-sexual, and Transgender |
| "MMPT" | Minnesota Multiphasic Personality Inventory |
| "MOU" | Memorandum of Understanding |
| "NNDDA" | National Narcotics Detection Dog Association |
| "NOFJC" | New Orleans Family Justice Center |
| "NOPD" | New Orleans Police Department |




| | |
|---|---|
| "NPCA" | National Police Canine Association |
| "OCDM" | Office of Consent Decree Monitor |
| "OIG" | Office of Inspector General |
| "OPSE" | Office of Public Secondary Employment |
| "PIB" | Public Integrity Bureau |
| "POST" | Police Officer Standards Training Counsel |
| "PsyQ" | Psychological History Questionnaire |
| "RFP" | Request for Proposal |
| "SART" | Sexual Assault Response Team |
| "SOD" | Special Operations Division |
| "SRC" | Survey Research Center |
| "SUNO" | Southern University of New Orleans |
| "SVS" | Special Victims Section |
| "UNO" | University of New Orleans |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |
| "VAW" | Violence Against Women |




## IV. Introduction to Fourth Quarterly Report

This is the third Quarterly Report of the Consent Decree Monitoring Team for 2014, and the Team's fourth Quarterly Report. This Report reflects the status of NOPD's compliance with the terms of the Consent Decree from July 2014 through September 2014. In short, NOPD continues to make progress in some areas but not in others. Before setting out the various areas of progress (or, in some cases, lack thereof), it must be emphasized that, due to the inherent nature of the Consent Decree reporting process, this Report discusses somewhat historic findings. Indeed, several negative findings in this Report already have been remedied by NOPD, and others are in the process of being remedied. To ensure future reports are issued closer in time to the findings being reported, the Monitoring Team sought and received permission from the Court to issue more frequent, targeted reports in the future. Such reports will focus on a limited number of topics (*e.g.*, supervision or training), and will be issued closer in time to the audits or evaluations being reported. The Monitoring Team believes this new process also will render the Team's Reports more understandable and easier to digest, and, thus, more useful to the citizens of New Orleans.

The current Quarterly Report, however, like the ones before it, continues to encompass a wide range of NOPD activities and Monitoring Team findings. As noted above, the Monitoring Team had both positive and negative findings during the July 2014 – September 2014 reporting period. Those findings are set forth herein, and are summarized below.

On the negative side, the Monitoring Team continues to be seriously concerned with the quality of NOPD's training program. We previously have reported on the mixed quality of Academy instruction, the absence of lesson plans, and the lack of strong leadership. Sadly, we found all three problems to persist into this reporting quarter. Training, however, simply is too important not to receive the Department's utmost attention. Without effective training by qualified instructors using modern teaching materials, tools, and techniques, NOPD's newest officers will continue to mimic the practices of their predecessors. Cultural change and, thus, constitutional policing, cannot come about in the absence of an effective training program. Over the course of this and last quarter, the Monitoring Team was vocal in making its views regarding the NOPD Training Academy known to the NOPD Compliance Bureau, NOPD management, and the prior and current superintendent.

The Monitoring Team also has been concerned about the pace of the policy drafting, review, and revision process in this quarter. Policies submitted to the Monitoring Team were confusing and incomplete, and revised policies too often failed to remedy the Monitoring Team's and/or the Department of Justice's ("DOJ") concerns. Toward the end of the reporting period, however, as the Department's Consent Decree Compliance Implementation Team assumed greater control over the process, the pace and quality of the policies submitted for review began to improve. These improvements have continued and we are optimistic we will see significant improvement in future quarters.




A third area in which the Monitoring Team continues to have concern is in the area of close and effective supervision. The absence of records within the various police districts, the absence of complete recordings of interrogations, and the frequency of malfunctioning equipment all contribute to an inability of supervisors to supervise closely and effectively the officers under their command – and the continued lack of progress in these areas further reflects the lack of adequate supervision.

Finally, beyond the foregoing, there are some areas where NOPD has made almost no visible progress at all. In the area of the Crisis Intervention Team (CD IV), for example, NOPD still is not in compliance with almost every Consent Decree obligation. Indeed, NOPD still has not even stood up its Crisis Intervention Planning Committee, a requirement NOPD had to meet by February 2014.[1]

But this reporting quarter was by no means uniformly negative. The NOPD Compliance Bureau expanded its oversight of in-car and body worn camera functionality and usage. While the results of this increased oversight were not reflected in our third quarter audit – which revealed ongoing problems – we believe they will be reflected in future audits. Additionally, the City Council's passage of a bill that included funding for the purchase of new NOPD camera servers should go a long way in fixing the frequently non-functional camera issue identified by the Monitoring Team last quarter, which continued into this quarter.

The NOPD took another important step forward during this reporting quarter to remedy the serious deficiencies the Monitoring Team identified at the NOPD Training Academy. As noted above, the Monitoring Team has been an outspoken critic of the Academy both within and outside NOPD. We are pleased to report NOPD now is taking action. First, on October 17, 2014, as part of a broader-based reshuffling of NOPD management, newly appointed Superintendent Harrison replaced the leader of the Training Academy. In her place, he installed a recently-promoted Commander from the Public Integrity Bureau ("PIB"), Richard A. Williams, Sr. Second, NOPD has begun removing under-performing teachers from its roster of instructors. One such instructor had been the subject of prior negative reviews by the Monitoring Team. Third, the Academy has reached out to find professional instructors outside of NOPD, including within the Tulane Law School. Finally, the Academy, in association with the NOPD Compliance Bureau, has acknowledged the absence of actual lesson plans and has embarked on a concerted effort to remedy that significant non-compliance. While the Monitoring Team finds the time it took the Academy to begin making these changes unfortunate, we are hopeful the Academy now is heading in the right direction.

At the same time the Monitoring Team audits and evaluates NOPD's compliance with the many paragraphs of the Consent Decree, we continue to meet with community stakeholders to explain the Monitor's reports and to hear community perspectives of police interactions. (CD

[1] Subsequent to this reporting period, the NOPD Consent Decree Implementation Unit, with the urging of the Monitoring Team, has begun pushing NOPD forward in this area. As described later in this Report, a Crisis Intervention Team Planning Committee has been formed and plans to meet in January 2015.




461) Our primary vehicle for informing the public of our reports and receiving feedback is through our quarterly public meetings. These meetings provide citizens the opportunity to learn more about the Monitoring Team's findings, to ask questions regarding the state of NOPD compliance with the Consent Decree, and generally share views regarding the ongoing monitoring activities.

We also receive input through our email mailbox, monitoringteam@consentdecreemonitor.com, and meet with community stakeholders who provide us invaluable information concerning their experiences with the NOPD. For example, this quarter, in addition to the numerous citizens with whom we communicate during our various in-person monitoring activities, we attended a presentation on the history and culture of the Black Masking Indians (Mardi Gras Indians). This event helped us to understand that unique and rich cultural tradition as well as the history of the conflicts between the NOPD and these groups. The knowledge we gained will inform our monitoring of how the NOPD manages the Black Masking Indian parades.

Additionally, the Court held a public hearing on our camera findings, during which the Court addressed some of the input it had received from the community.

An illustrative list of community input we received this quarter includes the following:

- ***Frustration with the pace of change***

We and the Court have received comments expressing frustration over how long it appears to be taking to change the NOPD's practices. We and the Court understand and share that frustration. As we have explained at our community meetings, the project is a large one and change takes time. Nevertheless, we want the community to understand that observable, demonstrable change is occurring. As the Court stated at the public hearing, "a great deal of work has been done and the stage is set for the pace of progress to increase." The Monitoring Team agrees with that sentiment and will see that that progress becomes more and more visible to the citizens of New Orleans. Among the changes we have seen so far are the NOPD's creation and staffing of a fully-functioning Consent Decree Implementation Unit; the creation and staffing of the Office of Police Secondary Employment, which is managing all hourly based details; significant recent changes to the Police Academy, including leadership changes; and, while perhaps not visible to the public, significant revisions to NOPD polices, which the Court described as "a huge task."

The Court concluded the public hearing by stating: "Please be assured that I do share your concerns [that] the Consent Decree be enforced completely and as soon as possible, but this won't happen overnight. I'm interested in comprehensive and lasting change in the New Orleans Police Department. And, most importantly, I want to be sure that we change attitudes so that these changes will be permanent." The Monitoring Team understands the sense of urgency. We will continue to do all we can to help the NOPD achieve full and sustained compliance with the Consent Decree.




- ***Consequences***

Several community members questioned why the Monitoring Team had not "held NOPD accountable for their non-compliances." This question was echoed by other community members who expressed concern that the Monitoring Team lacks the authority to sanction NOPD for a failure to comply with the Consent Decree. As we explained in our Quarterly Meeting, the Monitoring Team is tasked by the Consent Decree to review and report on the NOPD's and the City's compliance with the Consent Decree. The Monitoring Team has no authority to sanction anyone. But that is not to say the Monitoring Team is powerless to effect change. Quite the opposite. Through our unfettered access to NOPD data, facilities, and personnel, the Monitoring Team has unique visibility into the NOPD and its compliance efforts. All non-compliances are reported publicly by the Monitoring Team each quarter. Further, the U.S. District Court holds an in-chambers status hearing (or, as with the issue of in-car cameras, a public court hearing) every quarter where the NOPD must respond to non-compliances identified by the Monitoring Team.[2]

The Judge's decision to hold a public hearing in response to the Monitoring Team's findings on the NOPD's in-car cameras functionality issue illustrates how our efforts result in holding the NOPD accountable. At the hearing, then-acting Superintendent Harrison testified as follows:

> [S]pecifically about the use of cameras, the in-car cameras and body cameras that we're talking about today, we began at that and we found there were some discrepancies. So, we began to build and implement a system of accountability that are in place now, and we're strengthening that as we speak, that lets us know what equipment we have, what equipment works, what equipment doesn't work, who uses it and who doesn't use it. And a system now is being looked at if a supervisor caught it or didn't catch it so we can properly manage that.

In short, our monitoring efforts identify areas in which the NOPD is not in compliance with its own policies or the Consent Decree. Our findings are brought to the attention of Judge Morgan, who then can take action that causes the NOPD to respond. The Court, on its own or in response to a motion by the DOJ, has the power to sanction the NOPD if it finds they are not making good faith efforts toward compliance. Thus, while the Monitoring Team does not have authority over the NOPD, our efforts are part of an oversight system that is holding the NOPD accountable and causing change.

---

2 As of November 2014, the Court began holding monthly in-chambers status hearings to expedite the pace of change. Additionally, the Court will hold at least three public hearings in 2015.




- ***Community Input***

Some community members have expressed the sentiment that the quarterly meetings provide insufficient opportunity to provide input to the Monitoring Team. We are very committed to making the Consent Decree's requirements for public access meaningful. Because there are restrictions on what we can say publicly, to whom and in what manner, the public meetings we hold in conjunction with the release of our quarterly reports are likely to remain our primary vehicle for communicating with the community. Nevertheless, we expect to be able to create more opportunities for community groups to meet with us to provide input concerning their perceptions of and experiences with the NOPD to ensure our efforts are closely aligned with the concerns and issues of the New Orleans community.

- ***Absence of Paid Citizen Monitoring***

Some community members expressed anger that more members of the New Orleans community are not being paid to serve on the Monitoring Team. The Monitoring Team is made up primarily of experts in various aspects of constitutional policing from outside of New Orleans. These individuals are wholly independent, and completely unaligned with any group, organization, or individual within the City. The Team's independence and expertise give its findings great credibility – whether they are negative or positive toward the NOPD.

The Monitoring Team appreciates the comments received from the citizens of New Orleans and encourages others to share their views as well.




## V. Summary of Monitoring Activities

This quarter, like the last, involved a mix of qualitative and quantitative assessments. While we continued to spend significant time reviewing policies and other internal documents, attending training, observing disciplinary hearings, and observing officers on the street, we also continued to gather, code, and review extensive data. Our data analysis this quarter included the following:

- An analysis of CEW, in-car, and Body Worn Camera usage in the various NOPD districts;
- An analysis of NOPD uses of force;
- An ongoing analysis of citizen complaints involving racial profiling; and
- An ongoing analysis of NOPD disciplinary hearings.

These analyses, of course, require the careful attention of policing experts. Accordingly, the Monitoring Team spent many hours this quarter reviewing Use of Force Reports, listening to audio interviews of citizen complaints, watching video footage (from CEW cameras, in-car cameras, and Body Worn Cameras), and reviewing case files. While some of these analyses are ongoing, others have been completed and have revealed important results, which are shared later in this Report.

The Monitoring Team also spent significant time this quarter reviewing NOPD policies, suggesting revisions to those policies, and reviewing the revised policies returned from NOPD. While it is not always immediately apparent to an outsider why this process should take so long, unfortunately it does. At our last Quarterly Meeting, one citizen had this to say about the time it is taking NOPD to draft compliant policies: "How hard can it be. Just write that cops are not allowed to pull people over because of their race. It's not rocket science." While we are attracted to the simplicity of the suggestion – and, frankly, share the speakers' view that the process initially was made harder by NOPD than it should have been – the truth is that drafting effective, comprehensive, compliant policies is not an easy undertaking. Ensuring that policies are well written; well organized; consistent with all related NOPD policies and procedures; and compliant with every provision of the Consent Decree is a painstakingly difficult but critical task.

The Monitoring Team likewise spent significant time this quarter personally observing NOPD training. Like its policies, NOPD's training program in many ways is one of the Department's most important tools to ensure effective, constitutional policing. Accordingly, the Monitoring Team puts its collective decades of experience together to observe personally as much training as possible. As reported below, this observation has revealed some very important findings.




In the area of sexual assault and domestic violence, as discussed in greater detail later in this Report, the Monitoring Team continues to track a number of PIB investigations and, in three of those investigations this quarter, has prompted the PIB to re-focus, expand, and/or give new urgency to its ongoing investigation.

Finally, as we have done since our appointment, the Monitoring Team has spent time meeting with and listening to the parties to the Consent Decree. The Team is in regular contact with the City, the NOPD, and DOJ. We continue to meet regularly with the NOPD Consent Decree Implementation Team, the PIB, the NOLA OIG, and the members of the Independent Police Monitor.

## VI. POLICIES AND TRAINING

We have reported previously on the serious deficiencies in NOPD's policies and the flaws in its process for revising those policies to comply with the Consent Decree's requirements. *See* Second Quarterly Report at 28, Third Quarterly Report at 16. We attributed the deficiencies to a lack of policy-drafting expertise, organizational structure, and personnel assigned to the task. On an encouraging note, however, last quarter we reported our observation that the staffing of the NOPD's Consent Decree Implementation Team ("Implementation Team") had improved the process, and we expressed our optimism that this development would improve the quality of the policies submitted for review, expediting the approval process. While that improvement did not occur as quickly as we had hoped, toward the end of this reporting quarter the changes, to the process implemented by the Implementation Team produced noticeable improvement. Importantly, subsequent to this reporting period, as a result of the changes the process gained momentum and the quality of policies submitted for review improved. While we cannot report that the problems that have plagued the process thus far have been solved, we are optimistic the improvements will be permanent. We will provide a more comprehensive assessment in a future report.

Focusing on activities in this reporting quarter, the parties and the Monitoring Team reviewed policies dealing with use of force, mobile vehicle cameras, and investigative stops. Other policies were submitted by NOPD and reviewed by the Monitoring Team as well. The Use of Force Policy actually is embodied in 14 separate policies. The basic Use of Force Policy is Policy 300. Because of inconsistencies and contradictions between and within the various Use of Force policies, the Monitoring Team and DOJ decided first to review, revise, and approve Policy 300 and then to conform the various Use of Force subsidiary policies to it. The Policy required extensive revision. Nevertheless, progress was made and the Monitoring Team expects it to be approved shortly. We also anticipate that the mobile vehicle camera policy will be approved in the coming quarter. The investigative stops policy requires substantial development and we cannot currently forecast when it will be acceptable.

Going forward we expect the Department to continue to implement the following process improvements:




- At the beginning of the drafting process, review and assess policies of other police departments and model policies for their suitability to serve as a starting point for the NOPD's revision process.

- Develop procedures to ensure definitions and terms used in a policy are consistent with other polices and the accompanying procedure. Intentional inconsistencies should be specifically identified and defined in the policy.

- Develop procedures to ensure policies comply with the relevant Consent Decree provisions.

- Consult with internal subject matter experts to ensure the policies can be implemented effectively as written

- Prior to submitting the policy to the Monitoring Team and the DOJ, consider not only whether the policy is compliant and understandable, but whether the words, organization, and tone of the policy send the correct message to officers.

- Provide additional training to policy drafting personnel.

The Monitoring Team has provided NOPD a Policy Development Checklist to promote uniformity in the process and to ensure all the critical steps in the policy drafting process have been performed. It requires each task to be initialed by the individual responsible for its completion and lists the following tasks:

- Compliant with all related paragraphs of the Consent Decree (list paragraphs)
- NOPD subject matter expert consulted during drafting
- External subject matter expert(s) consulted
- Person(s) responsible for training on policy were involved in development
- Stakeholder input obtained
- Is the purpose of the policy clearly stated
- Are all key terms defined
- Are definitions checked for consistency with Master Log of definitions
- Are definitions internally consistent
- Is each required task or procedure included
- Person or unit responsible for each required task or procedure is identified
- Required tasks or procedures are presented in a logical sequence
- Due dates are clearly delineated
- Associated polices are referenced as appropriate
- Paragraphs are correctly numbered
- Draft has been proofed for grammar and spelling




- Department staff who will have to follow policies have been consulted
- Command level have reviewed the final draft

We recommend the NOPD submit this completed checklist when submitting polices for initial review. Additionally, as the pace of the process improves, we also recommend the Department assign or hire additional civilian personnel to the policy revision process to accelerate the pace at which policies can be revised and, in turn, approved. Implementation of these recommendations will streamline the review process by improving the quality of policies submitted for review.

## VII. USE OF FORCE (CD 27-100)

In this quarter, we continued our review and analysis of use of force incidents and reporting. This review consists of studying both what the data show concerning force use and reporting (a quantitative, horizontal analysis), and examining individual uses and reporting of force used (a qualitative, vertical analysis). We previously reported the data showed two important correlations:

- First, the data revealed generally that if a police-subject encounter is recorded on video, whether through recordings by officers on the scene or by citizens, less force is used.

- Second, the data also showed a troubling failure to follow current NOPD policy concerning video recording and preservation, obtaining witness interviews, completing force statements, and supervisory review.

Thus, these two data sets suggest consistent observation may have an ameliorating effect on the amount of force used by NOPD officers, but, by not closely investigating and reviewing each use of force incident, the NOPD may be tolerating higher than necessary levels of force.

While it may seem obvious, the failure to comply with NOPD's current use of force reporting requirements – including the failure of supervisors to respond to the scene of the use of force to conduct the required investigation, photograph injuries, and obtain force statements for all officers observing a use of force – and the failure to interview all civilian witnesses to a use of force incident, impede the important NOPD responsibility to determine whether the force used was reasonable. The absence of this information harms the NOPD in two ways. First, it prevents the NOPD from holding officers accountable for improper use of force, which was the subject of significant findings in the DOJ investigation and remains a paramount concern of the community. Second, it impairs the NOPD's ability to learn from use of force incidents to improve policies, procedures, tactics, training, and equipment.

In this quarter, we focused on those individual instances that required further in-depth analysis in order to make a finding concerning the reasonableness of the force used. That effort entails a detailed review of each file. Additionally, in some instances we had to locate evidence




not available at the time of our initial review, which we did. That process is time-consuming and our findings will be reported in a stand-alone report when complete. Nevertheless, the analysis we have conducted thus far has yielded some interesting, albeit preliminary, findings.

Focusing on just Level 3 and Level 4 uses of force (the two highest levels identified in the Consent Decree), [3] the Monitoring Team identified 50 use of force events for analysis. Seventeen of the files we reviewed did not have force statements from all involved or witness officers. In 14 cases, the investigating supervisor did not document that he or she responded to the scene to conduct the investigation, which is a requirement of current NOPD policy and the Consent Decree. In 40 of the 50 cases the Monitoring Team reviewed, there was no evidence that photos of the subject were taken to either confirm or refute the presence and degree of injuries. In 9 of the 25 events occurring since the deployment of body worn cameras, no BWC video of the incident was identified as available for review. In five of the 16 cases where there was a BWC video recording, the supervisor's investigative report does not indicate whether he or she reviewed and considered the video in determining whether the use of force was reasonable or unreasonable. In 7 cases, our review of documents included in the file indicate the presence of one or more citizen witnesses, yet the investigating supervisor does not document any of their interviews.

NOPD has been responsive to the Monitoring Team's identification of these shortcomings and has taken steps to correct them. The Monitoring Team continues to work closely with NOPD to ensure future uses of force are documented and investigated fully and properly.

## VIII. CRISIS INTERVENTION TEAM (CD 111-121)

Section IV of the Consent Decree deals with the establishment of a Crisis Intervention Team ("CIT") within the NOPD. The Consent Decree requires NOPD to stand up a CIT and implement an effective crisis intervention structure in order "to minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder." ***NOPD has not complied with the Consent Decree requirements relating to the CIT.***

Specifically, paragraphs 111 and 112 of the Consent Decree require NOPD and the City to implement a Crisis Intervention Planning Committee "to direct the development and

[3] Level 3 uses of force "include any strike to the head (except for a strike with an impact weapon); use of impact weapons where contact is made (except to the head), regardless of injury; or the destruction of an animal." Level 4 uses of force include all "serious" uses of force, defined by the Consent Decree to include "(1) all uses of lethal force by an NOPD officer; (2) all critical firearm discharges by an NOPD officer; (3) all uses of force by an NOPD officer resulting in serious physical injury or requiring hospitalization; (4) all neck holds; (5) all uses of force by an NOPD officer resulting in a loss of consciousness; (6) all canine bites; (7) more than two applications of an ECW on an individual during a single interaction, regardless of the mode or duration of the application, and whether the applications are by the same or different officers, or ECW application for longer than 15 seconds, whether continuous or consecutive; and (8) any strike, blow, kick, ECW application, or similar use of force against a handcuffed subject." (CD 14, 76)




implementation of the CIT." The Committee is required to have representation from NOPD and City-contracted mental health professionals, and to seek representation from the Mobile Crisis Transportation Unit, local municipal government, the New Orleans Metropolitan Human Services District, community mental health professionals, professionals from emergency health care receiving facilities, members of the local judiciary, the Orleans Parish Criminal Sheriff's Office, homeless service agencies, and mental health professionals and advocates. Notwithstanding this requirement, the Monitoring Team has seen no evidence the Planning Committee has been constituted, let alone held its first meeting. ***NOPD is not in compliance with this Consent Decree requirement.***[4]

Paragraph 113 requires NOPD and the City to implement a comprehensive first responder CIT program to develop and maintain specially trained CIT officers. ***NOPD is not in compliance with its CIT program development obligations.***

Paragraphs 114-119 set forth the training NOPD must give its CIT officers, non-CIT officers, and dispatchers. Among other things, the required training includes 40 hours of comprehensive training to CIT officers, a 40 hour curriculum and in-service training program for first responders, 16 hours of specialized training for all new NOPD recruits, and 40 hours of crisis intervention training for new and current dispatchers. ***NOPD is not in compliance with these Consent Decree-mandated training requirements.***[5]

Finally, it must be noted NOPD has made no progress in the foregoing areas despite the offer of free resources from outside sources. The Metropolitan Human Services District ("the MHSD"),, for example, previously offered NOPD free CIT training conducted by national experts.[6] NOPD did not take the MHSD up on its offer. Unfortunately, such inaction is not an anomaly. We have seen NOPD fail to take advantage of free resources in other areas as well. While NOPD has advised the Monitoring Team that it recently has reached out to the MHSD and will take advantage of the offer, its delay in doing so reflects not only an apparent lack of commitment to the CIT requirements of the Consent Decree, but also an absence of effective supervision and/or leadership within the Department.

---

4 NOPD reports it began making progress on its CIT obligations in November 2014. We will review and report on that progress next quarter.

5 Paragraph 115 of the Consent Decree, relating to training 20% of the NOPD's patrol division in the CIT program, requires compliance within three years of August 9, 2013.

6 The MHSD is one of ten districts across Louisiana created by the state legislature in 2003 to oversee the delivery of publicly-funded, community-based mental health, addictive disorders and developmental disabilities services to our area.




## IX. CUSTODIAL INTERROGATIONS

### A. Interrogation Recordings (CD 164 and 165)

The Consent Decree requires NOPD to ensure officers conduct custodial interrogations in accordance with the subjects' constitutional rights. In order for NOPD supervisors (and the Monitoring Team) to monitor compliance with the Department's obligations in this area, custodial interrogations must be recorded and complete and accurate logs must be maintained. Notwithstanding these obligations, NOPD was unable to provide the Monitoring Team full access to its custodial interrogation recordings. Of the eight police districts, Sexual Assault, Homicide, and SOD units the Monitoring Team visited this reporting quarter, only some locations were able to retrieve audio/video recordings of custodial interrogations.

The Monitoring Team reviewed a sample of the available recordings and confirmed the absence of any indication of physical violence or threat of physical violence. (We also, of course, confirmed the absence of any gaps in the recordings, late initiations, and early terminations.) While the Monitoring Team is comforted by the absence of inappropriate conduct in the recordings we were able to review, we remain troubled by NOPD's inability to provide all recordings to the Monitoring Team for review. We further remain troubled by the apparent lack of recognition of the seriousness of the problem within some districts.

The **First District**, for example, could not provide complete access to any of its custodial interrogation recordings. The District log indicated there were eight recordings of either custodial interrogations or photographic line-ups during the months of July and August, but District personnel were unable to retrieve any of the recordings. Notably, this was our fifth audit of the First District in which the District was unable to provide the requested recordings due to purportedly malfunctioning recording equipment. This same problem prevented viewing recordings when we conducted audits in November 2013, January 2014, March 2014, and July 2014. As indicated below, several of the other Districts similarly were unable to produce all recordings requested by the Monitoring Team.

The **Second District** did not have a recording for multiple interrogations listed on its interrogation log. When we audited the District in July, NOPD personnel were unable to produce recordings of four interrogations identified on the District's log. Moreover, we identified two recordings not shown on the interrogation log. Due to the incompleteness of the District's log, we reviewed all recordings in the Second District during our July audit. Unfortunately, many of those recordings were of such poor quality, the Monitoring Team was unable to hear or see the discussion taking place in the interrogation room. The lack of quality not only presents challenges to the Monitoring Team, but again highlights the fact that supervisors cannot be conducting close and effective supervision as required by the Consent Decree.

The Monitoring Team was presented with a log of custodial interrogations in the **Third District**. Unfortunately, the log of custodial interrogations was not accurate (not all recordings




were logged and entries did not exist for each recording). Additionally, one recording was not logged as a custodial interrogation even though the subject was read his rights, and another interrogation seemed to constitute a "pre-interrogation" in violation of Paragraph 164 (two detectives questioned a subject for over an hour without reading him his rights, only to leave and return an hour later, read him his rights, and attempt to obtain a statement).

The **Fourth District** was unable to produce recordings for two entries on its Custodial Interrogation log. The Monitoring Team reviewed what has made available, but the District's lack of preparedness hampered the Monitoring Team's review.

**Fifth District** personnel were able to produce recordings for all interrogations completed in June and July.

The Monitoring Team was unable to review any custodial interrogations in the **Sixth District** during our audit because the District's computer server was down due to excessive heat. According to the Sixth District personnel with whom we met, the server had been down for more than one week.

During our audit of the **Seventh District**, the Monitoring Team was advised that no custodial interrogations had been conducted over the course of the prior six months. Upon further investigation, however, we found interrogations had in fact been conducted. The Monitoring Team was advised, however, that all documentation regarding those interrogations had been provided to a Deputy Chief and no copies of the documents were retained by District personnel for viewing by the Monitoring Team. Obviously, scenarios like this are totally unacceptable and cannot be allowed to continue.[7]

To its credit, the **Eighth District** was able to produce a log of its custodial interrogation recordings. The Monitoring Team reviewed 44 of those recordings. Thirty-five of the recordings, however, had video, but no audio; only static.[8] This prevented a proper review of those recordings. The officers we interviewed claimed to be unaware of the malfunctioning recording units, which suggests to us the Eighth District supervisors have not been reviewing recordings as part of the "close and effective" supervision required by the Consent Decree. Further suggesting a lack of supervisory review of recordings is the fact that the District's recorder was left recording June 10, 12, and 13, resulting in multiple one-hour recordings of an empty room, making an efficient supervisory review wholly impractical. In all, of the 44 recordings we reviewed, only 9 were fully reviewable.[9]

---

7 The matter was made known to the Compliance Bureau and the Monitoring Team has witnessed a marked increase in the responsiveness of the Districts since our September audits.

8 There were no documents available for inspection at any of the Districts we audited documenting equipment failure.

9 None of those nine indicated an improper use of force or other violation of the Consent Decree.




The Monitoring Team had a similar unsatisfactory experience when we audited NOPD's Sex Crimes Unit. According to the personnel we interviewed, the **Sex Crimes Unit** does not maintain a log of custodial interrogations. The Monitoring Team was unable to locate any custodial interrogation recordings, and, when questioned, NOPD personnel advised the Monitoring Team no custodial interrogations occurred over the course of the prior nine months. Since the absence of a single custodial interrogation over the course of ¾ of a year seems unlikely to us, the Monitoring Team has expanded our focus into the issue to confirm the veracity of the statements regarding custodial interrogations.

Similarly, **SOD** was unable to produce video of any custodial interrogations.

In contrast to many of the other districts and units audited, NOPD's **Homicide Unit** was able to present the Monitoring Team with a complete log of its custodial interrogations. We reviewed the two most recent recordings, neither of which showed any evidence of physical force or threatened force.

In sum, notwithstanding some recent positive development, ***NOPD remains unable to demonstrate compliance with paragraphs 164 and 165 of the Consent Decree***. This non-compliance is problematic in its own right, but also reflects yet another failure of supervisors to provide close and effective supervision to officers.

### B. Interrogation Case Files (CD 166)

Paragraph 166 of the Consent Decree requires that officers "maintain in the case file their notes taken during interviews and interrogations." None of the districts, however, were able to produce all of their case files as requested by the Monitoring Team. Some districts were able to provide some case files, but not others. Much of the unavailability of case files appears to be due to the files having been forwarded to Central Evidence for use in a criminal case. The Monitoring Team is working with the NOPD Compliance Bureau to devise a more effective means of assessing NOPD's compliance with this particular Consent Decree requirement. Because NOPD personnel were unable to produce case files when requested by the Monitoring Team, however, ***NOPD was unable to demonstrate compliance with this requirement in most districts.***

### C. Interview Rooms and Functioning Equipment (CD 167)

The Consent Decree requires NOPD to "designate interview rooms for all districts and specialized units, and ensure that interview rooms are equipped with functioning audio and video recording technology that allows for recording and maintenance of all phases of interrogations." While each district, SOD, and Homicide have a designated or have ready access to an interview room and Sex Crimes has access to two interview rooms as noted above, the functionality and/or use of the audio and video recording equipment remains a problem. Of the eight districts, Homicide, Sex Crimes, and SOD units audited this period, only five duty locations demonstrated evidence of functioning equipment. For complete details, please see Appendix 1.







Figure 2

The Monitoring Team remains troubled by the frequency of non-functional equipment within the NOPD. As reported in our prior Quarterly Report, we uncovered a similar problem with respect to NOPD's in-car cameras. The problem here, however, goes beyond the equipment. In our view, the equipment problems shine a spotlight on the continued lack of supervision. While we understand technology is bound to fail now and then, we expect to see such failures treated by NOPD with a sense of urgency. Without recordings, supervisors cannot do their jobs, training opportunities are missed, and citizens rightly will remain suspicious about the cause of the equipment failures and/or whether they were human-caused. The Monitoring Team likewise has no choice but to remain suspicious regarding what happened during unrecorded and/or unlogged interrogations.

### D. Qualified Interpreters (CD 168)

The Consent Decree requires NOPD to use qualified interpreters for any interrogation of a Limited English Proficiency ("LEP") individual, and Miranda warnings be provided to the subject in his or her primary language. NOPD has not yet demonstrated compliance with this Consent Decree requirement as it has not yet provided the Monitoring Team with a list of authorized interpreters or evidence of effective training in interpretation protocols.




## X. PHOTOGRAPHIC LINE-UPS (CD 171 - 176)

In executing the Consent Decree, NOPD agreed to ensure that "photographic line-ups are conducted effectively and in accordance with the rights secured or protected by the Constitution and laws of the United States …" The Consent Decree sets forth several requirements to achieve this result.

### A. CD 171

Paragraph 171 of the Consent Decree makes clear that no officer who is involved in an investigation may participate in administering a photographic lineup. Paragraph 171 further requires that the individual who administers the lineup shall not have any knowledge as to which photograph depicts the suspect in the investigation. NOPD was unable to demonstrate compliance with this requirement because it was unable to produce complete records for review by the Monitoring Team. Some districts, for example, were not able to provide a log of their photographic line-ups. Indeed, only the NOPD Homicide Unit was able to demonstrate full compliance with paragraph 171. Accordingly, the Monitoring Team was unable to evaluate whether the officer (outside of Homicide) conducting the lineup was involved in the investigation. The Monitoring Team has suggested to several NOPD supervisors, including the NOPD Compliance Bureau, how NOPD can remedy this recordkeeping shortcoming. ***Until NOPD modifies its practices, however, it will remain unable to demonstrate compliance with this Consent Decree requirement***.[10]

### B. CD 172

Paragraph 172 of the Consent Decree requires that, "before any lineup is administered, eyewitnesses shall be informed that the suspect might or might not be present in the lineup." For the reasons noted above involving poor record keeping, NOPD cannot yet demonstrate compliance with this requirement. Notwithstanding the absence of complete records, the Monitoring Team reviewed those photographic lineup files and/or recordings that were available to evaluate compliance with the Consent Decree. While the reviewed files did suggest eyewitnesses were being admonished pursuant to the requirements of the Consent Decree, ***the unavailability of files and/or recordings prevents the Monitoring Team from finding NOPD in compliance with paragraph 172***. It should be noted, however, that the NOPD Homicide Unit again stands out as an exception to the rule; exhibiting not only compliant recording keeping practices, but verifiable compliance with paragraph 172. The Homicide Unit recorded 24 photographic lineups during our audit period, 12 of which elicited a positive identification. The Monitoring Team reviewed 6 of these recordings, and all 6 demonstrated compliance with paragraph 172 of the Consent Decree.

---

[10] Subsequent to this reporting quarter, the NOPD Compliance Bureau has confirmed it is working with the various NOPD districts to implement the suggestion of the Monitoring Team. We are hopeful the new reporting protocols will help NOPD meet its obligations under the Consent Decree.




**C. CD 173**

Consent Decree paragraph 173 provides, among other things, that NOPD shall select "filler" photographs—those that do not depict the suspect—of individuals who generally fit the witness's description of the perpetrator. For the reasons noted above involving poor record keeping, ***NOPD cannot yet demonstrate compliance with this requirement***.

**D. CD 174**

Paragraph 174 requires that NOPD maintain a complete record of each photographic lineup that includes the time, date, location, identity of the viewing person, photograph numbers, and name of the administrator of the line-up. Here again, most districts were unable to demonstrate compliance with this requirement. The photographic line-up log maintained by District Two, for example, did not contain the six items of information required by the Consent Decree. Other districts offered similarly inadequate logs to the Monitoring Team for review. Only the NOPD Homicide Unit was able to demonstrate its use of a photographic lineup log that met the requirements of paragraph 174 of the Consent Decree. ***NOPD cannot yet demonstrate compliance with this requirement***.

**E. CD 175 and 176**

***NOPD was unable to demonstrate full compliance with paragraphs 175 and 176 of the Consent Decree*** due primarily to the absence of complete photographic lineup records. However, it should be noted that some districts have shown significant improvement in these areas. The Seventh District, for example, was able to produce evidence demonstrating compliance with paragraph 176 of the Consent Decree.

## XI. BIAS FREE POLICING (CD 177-194)

Section VIII of the Consent Decree requires NOPD to deliver police services that are equitable, respectful, and bias-free in a manner that promotes broad community engagement and confidence in the Department. As part of a broad-based audit of NOPD's compliance with the Bias Free requirements of the Consent Decree, the Monitoring Team initiated an audit in connection with the Independent Police Monitor ("IPM") focusing on racial profiling.

The joint Monitoring Team/IPM project involves listening to a statistically valid sample of citizen complaints presented to the NOPD PIB to identify those that allege racial profiling. The joint team then reviews the associated PIB intake report to determine whether PIB's coding of the complaint is consistent with the complaint itself. In other words, we are looking to see whether complaints alleging racial profiling are being coded as something other than racial profiling.

The Monitoring Team also is using this joint project as an opportunity to evaluate whether complaining citizens are being treated properly by the PIB. By listening to the intake




recordings, we can assess whether citizens are being discouraged from pursuing their complaints or otherwise are being intimidated or coerced, whether officers are being respectful, and whether the NOPD is complying with its obligations under the Consent Decree regarding the complaint intake process.

Due to the importance of this project, the Monitoring Team expects to issue its findings as part of a special interim report in the future.

## XII. POLICING FREE OF GENDER BIAS (CD 195-222)

Section IX of the Consent Decree focuses on policing free of gender bias. Among other things, this section covers NOPD's handling of Sex Crimes Unit and domestic violence issues, training issues, supervision, coding of incidents, and dealing with victims of crimes. Prior to the issuance of the Consent Decree, DOJ looked closely at this area and identified a number of significant problems with NOPD's policies, procedures, and practices. Over the course of this reporting quarter, the Monitoring Team continued to spend significant time focusing on this important topic.

As an initial observation, we note the NOPD Sex Crimes Unit has had at least four different leaders over the course of the past 14 months. This constant change in leadership has made it extremely hard for NOPD to focus on remedying the problems identified by DOJ and meeting the requirements imposed by the Consent Decree. The Monitoring Team believes such management inconsistency reflects a lack of focus – or perhaps even a lack of commitment – to this critical topic by NOPD leadership. We hope we are wrong, but until we see evidence otherwise, we will continue to find NOPD not in compliance with the Consent Decree in this area.

In our prior quarterly report, we did recognize NOPD had made progress in some areas. The Department, for example, in accordance with Consent Decree paragraph 206, did issue a directive to Special Victims Section ("SVS") detectives prohibiting the use of miscellaneous "complaint" item codes (called "Signal 21s") to classify Sex Crimes. Over the course of this reporting quarter, we interviewed numerous SVS detectives and officers, almost all of whom were aware of the directive. Nonetheless, the Monitoring Team found the directive to fall short of the broad-based pronouncement needed to ensure compliance with the Consent Decree. Accordingly, we advised NOPD to broaden the applicability of the directive and to incorporate it into a formal policy. NOPD is in the process of drafting a comprehensive Sex Crimes and domestic violence policy, which incorporates the Signal 21 directive. ***While NOPD has made progress in this area, it has not yet demonstrated compliance with its Consent Decree obligations.***

Even in advance of the formal policy, the directive to SVS detectives appears to be having an impact on the actions of NOPD personnel. According to NOPD records, there have been only 6 uses of a Signal 21 in the context of a Sex Crime in 2014, which suggests the directive is having its intended effect. The Monitoring Team is in the process of conducting an




audit of Signal 21s in coordination with the New Orleans OIG to evaluate NOPD's compliance with this requirement.

In addition to assessing compliance with the specific Consent Decree requirements, the Monitoring Team spent significant time this reporting quarter investigating and tracking the progress of specific Sex Crimes and domestic violence cases. In this context, we brought three cases to the attention of the NOPD where we thought the initial investigation was inadequate or the actions of the NOPD were otherwise deficient. These cases have involved a sex crime, a domestic violence homicide, and a burglary/stalking case. With respect to these cases, the Monitoring Team worked closely with the IPM, PIB, and DOJ to ensure each case received the attention it deserved.

The Monitoring Team also has closely observed the NOPD's progress with respect to the City's Sexual Assault Response Team ("SART"). As described in prior reports, the SART is a collaboration of agencies working together to strengthen the City's response to sexual assaults. ***The Monitoring Team has been impressed by the SART program***. The recent media attention involving rape victims being charged for emergency room exams came directly from SART partners exchanging information and reaching out to those who can change the laws. SART leaders also recently materially contributed to the drafting of NOPD's Domestic Violence policy and currently are working on a similar policy to cover NOPD's response to Sex Crimes. Both policies will require annual reports from NOPD with statistics and narratives available to the public.

Finally, although occurring beyond the end of the current reporting period, we would be remiss not to mention the recently released report by the New Orleans Office of the Inspector General ("OIG") concerning NOPD's Special Victims Section. The OIG found serious deficiencies and widespread neglect upon reviewing 2012/2013 case files of a select number of detectives in NOPD's Sex Crimes and Child Abuse Units. Similar problems were identified by DOJ in its initial report preceding the Consent Decree, and the Monitoring Team's work has shown that many of the shortcomings identified by DOJ persist. The Monitoring Team is closely observing the NOPD Task Force charged with re-investigating the files identified by the OIG and continues closely to monitor the Special Victims Section's work in all areas.

## XIII. COMMUNITY ENGAGEMENT (CD 223-233)

This reporting quarter, the Monitoring Team finalized its plans for conducting the community portion of the Biennial Survey and completed its analysis of the results of the police officer portion of that survey, conducted earlier this year. The community survey was conducted in early December and involved a door-to-door oral survey administered throughout New Orleans. The survey was designed to ensure a statistically valid cross-section of the City in terms of neighborhoods, ethnicities, income, and other demographic factors. The final prong of the Biennial Survey – the detainee survey – was conducted just prior to the release of this report. The results of the community survey and the detainee survey will be analyzed and presented




alongside the results of the already-conducted police officer survey in a forthcoming interim report.

## XIV. RECRUITMENT (CD 234-244)

The Consent Decree requires NOPD and the City to develop and implement a "comprehensive recruitment program that successfully attracts and hires a diverse group of highly qualified and ethical individuals to be NOPD police officers." (CD XI). To do this, NOPD is required to, among other things, "develop a written, strategic recruitment plan that includes clear goals, objectives, and action steps for attracting high-quality applicants." (CD 234). The Consent Decree further encompasses recruitment requirements relating to staffing, qualifications, training, transparency, community outreach, and more.

While the Monitoring Team has not yet conducted a full audit of the NOPD's recruitment activities, it should be pointed out that ***NOPD has made progress in this area***. On August 24, 2014, for example, the Mayor, Superintendent Harrison, and several others visited 20 faith-based organizations across the city in an effort to recruit qualified candidates for the NOPD. This is the sort of affirmative community outreach activity that is contemplated by paragraph 239 of the Consent Decree.

In fact, according to NOPD's records, Department personnel were engaged in a number of community outreach and other Consent Decree-related activities throughout this reporting quarter, as indicated in Figure 3 below.





Figure 3

These activities included attending community meetings, staffing the Department's recruitment vehicle at events (such as Mardi Gras), attending job fairs, and attending Consent Decree requirement training. The breakdown of NOPD's recruiting activities was as follows:




Figure 4

In July, the City and the NOPD, in conjunction with the New Orleans Police and Justice Foundation ("NOPJF") announced an expanded recruitment effort titled "Get Behind the Badge." The program incorporates an online presence (www.joinnopd.org), digital marketing, and the use of "job posting tactics" on career-based websites. According to the NOPJF, the number of new candidates applying to join the NOPD has expanded greatly since the initiation of the Get Behind the Badge program. According to NOPD's records, the Department interviewed 38 new candidates in July and an additional 37 in August. The Monitoring Team will undertake a thorough assessment of NOPD's recruitment program in a future quarter.




## XV. ACADEMY AND IN-SERVICE TRAINING (CD 245-288)

### A. Introduction

The importance of effective training for police officers is beyond question. A department's training program is a new officer's first taste of the culture, rules, and expectations of being a police officer. It likewise is the department's first opportunity to make clear what it values and what it will not tolerate. The Monitoring Team's prior Quarterly Report, however, identified significant shortcomings in NOPD's training programs. In addition to non-existent lesson plans, we recognized that, while some of the instruction we observed was substantively high quality, taught by a dynamic instructor using teaching techniques appropriate for an adult audience, some of the instruction we observed was substantively inadequate, not well presented, and ineffective. Unfortunately, our observations this quarter revealed that many of those previously-identified shortcomings remain.

Moreover, our observations this quarter continue to leave us with the strong impression that the NOPD has not given adequate attention to the importance of training. Since our appointment, the Monitoring Team has not seen any dynamic innovations, any creativity, or any real passion toward this critical component of the Consent Decree. What we have seen (with the noted exception of the NOPD Consent Decree Implementation Unit) is an effort – sometimes explicit, sometimes implied – to do the bare minimum to check off boxes per the Consent Decree. To put it bluntly, that will not cut it. The Consent Decree contemplates material and lasting change in order to achieve constitutional policing. Such change comes about not through checking boxes. It comes about first by recognizing problems exist, and second by dedicating the time, resources, skill, and money to fix them. It comes about when passionate and energetic people commit themselves to change. We have not seen any of that yet within the NOPD as it relates to training.

The following sections highlight some of the Monitoring Team's specific findings relating to training. A forthcoming special report (and public court hearing) will present a more holistic assessment of NOPD's training program beyond the specific non-compliances noted below.

### B. Lesson Plans

A lesson plan, according to experts, is an "instructor's road map of what students need to learn and how it will be done effectively during the class time."[11] Few would argue over this fundamental premise of effective teaching. Yet, despite prior findings of the Monitoring Team, NOPD continued to operate the Academy throughout this reporting quarter with inadequate and, in most cases, non-existence lesson plans. In response to our inquiries, the Academy did produce all materials that it *claimed to be lesson plans;* but, in fact, most of these materials simply were

---

[11] University of Michigan, Center for Research on Learning and Teaching. (http://www.crlt.umich.edu/gsis/p2_5).




PowerPoint presentations. Paragraph 253 of the Consent Decree describes the content of a compliant lesson plan. Specifically, the Consent Decree makes clear a lesson plan must set forth:

- Course title;
- Course overview;
- Date lesson plan was created or updated;
- Learning objectives;
- Prerequisites (if any);
- Course length;
- Required materials;
- Equipment and facilities;
- Safety measures required (if applicable);
- Testing/certification; and
- Reference list.

A sufficient lesson plan also must "describe content and instructional strategies in sufficient detail to ensure consistent delivery of instruction by different instructors."

While NOPD previously had notified the Monitoring Team that all lesson plans and curricula were available at the Training Academy, the Department's July 2014 "Status Report" acknowledged that "lesson plans do not exist for all training modules . . . ." In fact, our observations revealed that lesson plans do not exist for most training modules. ***Accordingly, NOPD is not in compliance with this Consent Decree requirement.*** Even more importantly, however, NOPD is virtually ensuring substandard training for its officers.

### C. Outdated Materials

As reported in prior quarters, the NOPD Academy continues to rely upon outdated and, in some cases, questionable materials. Until very recently, for example, the Academy on-boarded new officers by showing them a 1967 clip from the then-popular Dragnet TV series. In the clip, Sergeant Joe Friday, played by Jack Webb, lectures a rookie officer on what it means to be a police officer. While the clip certainly identified some of the difficulties associated with being an officer, on balance the clip reeks of an "us versus them" (*i.e.*, police versus citizen) attitude, which is a highly inappropriate message for any officer – let alone a new recruit – and inconsistent with the spirit and letter of the Consent Decree's community engagement provisions. The Monitoring Team presented its concerns to the NOPD and the video has been removed from the Academy curriculum. We were discouraged, however, that the issue had to be identified and raised by the Monitoring Team rather than being proactively recognized and remedied by the Academy itself.




## D. Academy Leadership

To be effective, the NOPD Academy must have adequate facilities, accurate and engaging materials, and instructors who understand and can present those materials in a manner that maximizes absorption by the students. An effective Academy also must have strong, passionate, proactive, and effective leadership. The Monitoring Team previously criticized the Academy's leadership for failing to meet these standards. On October 17, 2014, however, Superintendent Harrison announced a "realignment" of his senior leadership, which involved the replacement of the Commander of the Training Academy. Specifically, NOPD replaced the prior Academy Commander with Richard A. Williams Sr., who, until recently, served as a Lieutenant in the PIB. Commander Williams is a 23-year veteran of the NOPD. He has an Associate's Degree in Criminal Justice from Delgado Community College, a Bachelor's Degree in Criminal Justice from Loyola University New Orleans, a Master's Degree in Public Administration from University of New Orleans, and is currently working to complete a Doctorate of Philosophy in Urban Studies from University of New Orleans. The Monitoring Team has met with Commander Williams and has impressed upon him the importance of remedying the shortcomings in the Academy.

We recognize, of course, that a new Academy Commander is not a panacea. The Academy is just one leg of NOPD's training stool. NOPD needs to fix the inadequacy of the Academy to be sure, but the Department also must rethink its commitment to training more generally. And such rethinking should not focus on what is the bare minimum to comply with the requirements of the Consent Decree. The NOPD should be striving to create a holistic training program that encompasses all training components (the Academy, in-service training, the Department's research bureau, and more), identifying creative and innovative solutions to problems, and recognizing the critical importance of training officers in best practices. There is no room for a "that's how we do things here" attitude. The Consent Decree was imposed to change the way things are done here.

## E. Instructors and Instruction

The quality of NOPD's Academy instructors and instruction continues to be a mixed bag. The Monitoring Team attended several in-service training classes this reporting quarter. As indicated below, we observed some very positive things and some very negative things. An illustrative sample of some of those observations follows:

### 1. Ethics Training

The ethics course started more than 30 minutes later than scheduled. The course was taught by an instructor who had not taught an ethics course previously, and was serving as a substitute teacher. While we understand every instructor needs to teach his or her first course at some point, we would have much preferred to have had that first course co-taught by an experienced instructor alongside the new instructor. Such an approach would have prevented many of the shortcomings of this course. For example, as the instructor went through the




PowerPoint slides he conceded he did not know what some of the slides contained and was not prepared to discuss them. Overall, the sergeant was not prepared to instruct the course, had no lesson plan, and was unfamiliar with course content that was contained in the PowerPoint presentation. Again, we understand that this was a substitute teacher, but that does not excuse inadequate preparation. The teacher should have prepared, should have taught with an experienced teacher, or the class should have been rescheduled.

Our initial dissatisfaction with the course was further solidified when the instructor informed the students that "ethics can't be taught since one either has it or does not." We believe (and ethics experts disagree) that personnel can be and regularly taught organizational ethics and values. Quality ethics courses are taught every day within private industry and the public sector, including by Assistant U.S. Attorneys, Offices of Inspector General, and ethics officers. The view espoused by the instructor not only was incorrect, but was counter-productive and contrary to the explicit terms of the Consent Decree. (CD 266). In short, the Monitoring Team was quite disappointed with the content, presentation, and tone of this course.

### 2. Community Policing & Ethics Training

While we had no objection to the substance of this course, we noted a tendency of the instructor to lose control of the classes. This loss of control led to extraneous conversations going on in the back of the room that were quite distracting to those officers trying to pay attention. Moreover, the instructor was unable to explain to the students why certain things were supposed to be done a certain way, which prompted negative reactions from some of the students. Quality instructors are able to explain not only what the rule is, but the reason for the rule.

### 3. Driver and Vehicle Pursuit Training

The Monitoring Team was impressed by the quality of this instructor. He not only had knowledge of his subject matter, but also spoke with passion and enthusiasm for his job. He had excellent knowledge of the NOPD's pursuit policy and stated the policy verbatim. Speaking with some officers, the instructor clearly is well-respected by the students. Unfortunately, the policy itself is outdated and is in the process of being revised, and therefore the instructor continues to teach practices that are inconsistent with the Consent Decree. Once the revised policy is finalized, however, we expect the instructor to embrace the revision and teach the new practices with a similar level of knowledge and enthusiasm.

### 4. Domestic Violence Training

We found this course significantly below par, led by an inadequate instructor. Not only did this instructor lack a lesson plan, but he relied upon outdated materials. He also presented the material in a manner that did not incorporate adult learning techniques, which made it hard for students to absorb.




The instructor began the class with a one-sentence description of his background, which made it hard for the students to assess his qualifications for teaching. The instructor also provided no explanation of the goals or objectives of the course. His teaching tools included one handout and a very uninteresting PowerPoint. Not only was the material uninteresting to the Monitoring Team, but we observed many of the class attendees were uninterested as well, engaging in distracting discussions throughout the course, which the instructor did not stop. The instructor's presentation style certainly contributed to the students' lack of attention.

While the use of personal experiences can serve as a useful teaching tools, good instructors think through the pros and cons of the experiences they choose to share. Both mistakes and successes can serve as useful tools if presented properly by a good instructor. The Academy's Domestic Violence instructor, however, spent ten minutes during class talking about his personal situation with his ex-wife. The substance of the discussion had no obvious training component, and the lack of attention of the students seemed to confirm the Monitoring Team's view. And the instructor's message, which he summarized as "protect yourself," once again contributed to an "us versus them" attitude which undermines constructive policy/community relations.

While the course had its positives – the primary instructor did discuss new laws and did answer questions with some practical (and constitutional) advice – overall it was not engaging, interactive, or effective.

It is important to note the Monitoring Team previously expressed dissatisfaction regarding the NOPD's primary Domestic Violence Course instructor (and the course generally) following a prior observation. Notwithstanding this dissatisfaction, the instructor continued to teach the course when we returned to observe it again. We immediately brought the issue to the attention of the NOPD Compliance Bureau, and have been assured NOPD is working to identify a new instructor for this course. In fact, we have confirmed that NOPD has reached out to Tulane University to identify a new instructor. While we are impressed with Tulane's willingness to support the Academy and have been impressed by the quality of the instruction we have seen among the Tulane team, we view the assistance of Tulane more as a Band-Aid than a solution. At the end of the day, NOPD should develop its own qualified, quality instructors.

**5. Crimes Classification Training**

In contrast to the Academy's Domestic Violence course, we were impressed by this training taught by a retired NOPD sergeant. The sergeant showed an excellent command of the subject matter and the class, and his presentation tools were quite interesting and effective, prompting a healthy and proactive discussion with the members of the class. He used an excellent PowerPoint as well as camera recording to help make certain points. He showed himself to be quite passionate about the importance of complying with the rules and won points from the class when he quite professionally – and correctly – rejected a student's suggestion of a convenient, but non-compliant, approach to crime classification.




### 6. CEW Training

The Monitoring Team attended NOPD's in-service training program covering the use of Conducted Electrical Weapons ("CEW"), [12] *i.e.*, Tasers. The training took place in the Third District Station. While the training facility was less than ideal, the quality of the instruction was excellent. The instructor, an NOPD lieutenant, is an excellent trainer. He is certified by Taser (the manufacturer of the CEW used by NOPD) and by the Peace Officer Standard and Training Council ("POST") to teach the CEW class. Unlike most other instructors we observed, this lieutenant did teach from a lesson plan.

The lieutenant used a PowerPoint presentation during his course, which the Monitoring Team found to be excellent. He also included a wide variety of videos to assist in making his points. The instructor also provided hand-outs with policy, reporting guidelines, and Taser warnings. He covered all the appropriate topics, engaged the class in discussion, and used videos to illustrate correct and incorrect policing. The videos were relevant and reinforced the instruction. The lieutenant explained that many of the positive changes in NOPD's new policy and procedure were the result of the Consent Decree, which reinforces the Consent Decree requirement that NOPD promote awareness of and compliance with the Consent Decree. Indeed, unlike some instructors we have observed, all of the lieutenant's comments were favorable toward the Consent Decree and the need for continued improvement by the NOPD.

In short, the Monitoring Team was impressed. The instructor was well-qualified, well spoken, polished, prepared, and engaging. He kept the attention of his students, used adult-learning techniques, and clearly left the officers better prepared for the proper use of the CEW.

### 7. Cultural Diversity and Sensitivity Training

The Monitoring Team attended NOPD's Cultural Diversity Class held by the Training Academy. As with some of the other classes we observed, the instructor here, an NOPD sergeant, had some trouble controlling his class. Several side conversations, including comments among small groups of officers that resulted in laughter, went on through much of the course and were not addressed by the instructor. Such laxity by an instructor, especially in an area as susceptible to misunderstanding and offense as cultural diversity, can lead to an appearance that the instructor does not embrace the subject matter. Of course, it also can demonstrate the instructor, in fact, does not embrace the subject matter. That being said, for the most part, the instructor created a laid-back atmosphere that encouraged interaction, which we viewed as a positive.

The cultural diversity PowerPoint presentation mainly consisted of various groups who experienced discrimination in the United States due to sexual preference, sex, race, religion, culture, and national origin. Throughout the class the sergeant stressed working with the

---

[12] Under the new NOPD policy, the proper term is CEW (Conducted Electrical Weapons) rather than ECW (Electronic Control Weapons), which was used previously.




community to rebuild relationships. However, the majority of comments from the class did not focus on cultural sensitivity issues, but rather complained about various issues including a lack of administrative support. One officer said he would leave for another department if he could. Many of the other complaints were in regard to public perception, poor equipment, negative media reports, lack of take-home cars, and low pay.

One officer sincerely spoke of the need for officers to think about how they treat the people they encounter. Many officers agreed that good people skills were the most important attribute that make good police officers.

The presentation and the direction the instructor's comments made clear the instructor did not develop a lesson plan for this course. The class merely had a PowerPoint presentation and the comments and discussion varied widely from the course subject matter.

## XVI. SUPERVISION (CD 306-331)

As we have in the past three quarters, the Monitoring Team again spent significant time this quarter focusing on NOPD supervision and supervisors. ***And we continued to identify serious deficiencies in the level and effectiveness of supervision we see from NOPD's sergeants, lieutenants, captains, and commanders.*** We saw these deficiencies in most districts as well as in specialized units; and we saw them in a multitude of contexts, including failing to review Use of Force Reports, failing to review video recordings, inadequate record keeping, the non-existence of lesson plans, unreported non-functioning equipment, and more. These are serious problems that must be remedied.

Moreover, in contrast to prior quarters, we did not receive the full cooperation of all the supervisors with whom we dealt. In several districts, personnel were not made readily available, supervisors did not give adequate attention to the importance of the audit, documents were not presented in an organized fashion, and the district generally was unprepared for the audit – notwithstanding the fact that most of these audits were announced to the district in advance. We expressed our dissatisfaction with the level of cooperation to the NOPD and the problems were remedied promptly. ***The level of cooperation the Monitoring Team received in September and October was far superior to what we received in July and August.*** Nonetheless, as it is NOPD's burden to establish compliance with the elements of the Consent Decree, where the necessary documents and/or personnel were not made available to the Monitoring Team, we were unable to find NOPD in compliance with its Consent Decree obligations. (CD 486)

### A. Duties of Supervisors (CD 306-313)

#### 1. CD 306

Paragraph 306 of the Consent Decree provides that NOPD supervisors shall be held accountable for providing the "close and effective supervision" necessary to direct and guide their officers. Specifically, paragraph 306 requires supervisors to respond to the scene of certain




arrests, review each arrest report, respond to the scene of uses of force, investigate each use of force, review the accuracy and completeness of officers' Daily Activity Reports, respond to each complaint of misconduct, ensure that officers are working actively to engage the community and increase public trust and safety, and provide counseling, redirection, and support to officers as needed. Moreover, the Consent Decree requires that NOPD hold supervisors accountable for performing each of these tasks.

As we have in each of the preceding quarters, the Monitoring Team conducted in-person audits of the several NOPD districts, as well as the specialty units, to evaluate whether such close and effective supervision was being conducted in each of these areas. Our audits revealed only partial compliance.

Our audits revealed some evidence supervisors responded to the scene of certain arrests as required by the Consent Decree. However, since all arrest case files were not available, we were unable to confirm the consistency of supervisor responses. We likewise identified some evidence that supervisors reviewed some arrest reports and that supervisors reviewed the officers' daily activity reports (most reports we reviewed were signed by supervisors). Here again, however, the absence of some records in some districts prevents us from finding NOPD in full compliance with this Consent Decree requirement.

Another obligation of supervisors is to provide counseling and/or redirection for officers in need. Our review identified few documents that provided evidence of counseling or redirection, and few documents were produced to provide evidence of disciplinary action to hold officers accountable for violations of NOPD rules. Few districts had a list of counseling memos or disciplinary actions initiated, and few of the districts had copies of disciplinary (D1 or D2) paperwork. This is problematic since supervisors who are unaware of their subordinate's discipline are not providing "close and effective" supervision as required by the Consent Decree.

With respect to community engagement, which is another obligation of supervisors, we identified few documents in any of the districts indicating officers and/or supervisors are engaging with the community as required by the Consent Decree. We likewise identified few documents evidencing that supervisors were held accountable for performing their community engagement duties.

Most districts did not provide documents of roll call subject matter to provide evidence of "close and effective" supervision, that officers are working actively to engage the community and increase public trust and safety, that supervisors responded to citizens' complaints, or that supervisors responded to each use of force. In fact, nearly half of police Use of Force Reports reviewed do not document a supervisor responded to the scene, initiated an investigation into the use of force, or made assessments regarding the justification or reasonableness of the use of force.

Some district platoon supervisors did have a file for each officer assigned to the platoon. The file contained letters of appreciation from the public, written counseling, awards,




disciplinary reports, Use of Force Reports, and job enhancement performance reports. The supervisors on those shifts maintain documentation of good and poor performance and the actions they took as supervisors to address the performance of officers under their command. The vast majority of shift supervisors, however, could not produce any or any significant amount of documentation of subordinates' performance.

The supervisor's activity reports (trip sheets) we reviewed generally lack the capacity to capture meaningful information to provide evidence of "close and effective supervision." These reports generally do not document that supervisors are meeting the obligations set forth in the Consent Decree. Indeed, the supervisor's activity report is little more than an officer's activity report (trip sheet) with the word "supervisor" replacing the word "officer" as the title of the form. The form fails to differentiate the responsibilities of a supervisor and signifies the supervisor completes the same duties as an officer. The supervisors' activity sheets are referred to as "trip" sheets indicating they track each individual call just as the officers track calls. In short, the supervisors' activity report are inadequate to document the function of supervisors. Supervision involves more than tracking calls answered during a shift. Supervisors' duties are vastly different, encompass much more than what can be tracked using an officer's activity sheet, and should include the duties specifically completed by supervisors and required by the Consent Decree.

It is the view of the Monitoring Team that supervisor reports should include monitoring of officers, guidance provided to officers, counseling, discipline initiated or administered, responding to and investigating citizen complaints, responding to and investigating use of force incidents, responding to certain arrests, approving arrest reports, approving activity reports (trip sheets), completing performance evaluations, and ensuring officers work actively to engage the public and increase public trust.

In conclusion, supervisors have provided anecdotal information in regard to some of their activities that could provide evidence of compliance with paragraph 306 of the Consent Decree ,but there is no systemic method to document or track compliance. The supervisor report does not track what supervisors' responsibilities should be. It is geared to primarily address internal NOPD data reporting obligations (COMSTAT). An appropriate supervisor's report should be utilized to provide data as evidence of compliance with the Consent Decree as the current report provides data for the COMSTAT meetings.

**2. CD 307**

Paragraph 307 of the Consent Decree requires that, within 270 days of the Effective Date of the Consent Decree, all Field Operations Bureau District officers (including patrol, task force, district investigative, and narcotics units) shall be assigned to a single, consistent, and clearly-defined supervisor. The Monitoring Team evaluated compliance with this requirement in each NOPD district.




As a preliminary matter, in the Spring of 2014, the NOPD merged its district Task Forces and Narcotics Task Forces into a single organization called "General Assignments." We were unable to identify work schedules for General Assignments to determine compliance with paragraph 307. The officers assigned to this new unit work various days and shifts that differ from the hours and shifts the supervisor is scheduled to work. The result of working these overlapping shifts is that the officers assigned to General Assignments are supervised by various platoon supervisors. This violates paragraph 307 of the Consent Decree.

The lone supervisor works some days, generally four days per week, with subordinate officers. The days the supervisor does not work with subordinate officers, the subordinate officers report to the platoon supervisors. Platoon supervisors have advised the Monitoring Team in the past that they generally know when the General Assignment supervisor is off because those personnel will summon the platoon supervisors when a supervisor is needed. This does not demonstrate compliance.

In contrast, ***we found most but not all NOPD districts to be in compliance with paragraph 307*** with respect to most of its patrol officers and investigators as follows:

- The First District was able to demonstrate compliance.
- The Second District was unable to provide any information regarding supervisor assignments. They were unable to provide work schedules for the three platoons, the two investigations squads, and the General Assignment positions. Accordingly, the Second District was unable to demonstrate compliance with paragraph 307 of the Consent Decree.
- The Third District was able to demonstrate compliance with respect to two of its three platoons.
- The Fourth District was able to demonstrate compliance with respect to its platoons.
- The Fifth District was able to demonstrate compliance with respect to its platoons.
- The Sixth District was not able to demonstrate compliance with respect to its platoons. The work schedules were not available for the Monitoring Team. The District's administrative officer was unable to locate the schedules when requested to do so.
- The Seventh District was able to demonstrate compliance with respect to its platoons.




- The Eighth District was unable to produce all requested work assignments, thus, was unable to demonstrate compliance with this requirement.

Overall, ***only four of NOPD's eight Districts were able to demonstrate compliance with the requirements of Consent Decree paragraph 307.***

**3. CD 308**

Paragraph 308 of the Consent Decree requires that Task Force and narcotics supervisors work the same days and hours as the officers they are assigned to supervise absent unusual circumstance (*i.e.* when the supervisor is on vacation, in training, or ill). The paragraph goes on to require that investigative unit supervisors work generally the same days and hours as the officers they are assigned to supervise, taking into account that shift differences will not permit complete supervisory overlap. Our review revealed NOPD was unable to demonstrate consistent compliance with this requirement. Most of the districts were unable to provide the Monitoring Team with work schedules for its "General Assignment" personnel. The materials we were able to review, however, suggested that investigators did NOT work the same days as their supervisors. Accordingly, ***NOPD has not demonstrated compliance with this Consent Decree requirement.***

**4. CD 309**

Paragraph 309 requires that District Platoon Patrol supervisors be assigned to the same platoon as the officers they supervise and actually work the same days and hours as the officers of that platoon absent unusual circumstances or when the supervisor is on vacation, training, or ill. ***Our audit revealed every NOPD district was in compliance with this requirement.***

**5. CD 310**

Paragraph 310 of the Consent Decree provides that first-line patrol supervisors be assigned to supervise no more than eight officers. On duty patrol supervisors must be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units. Our audit of district personnel records confirmed compliance with this requirement in most districts with respect to platoon officers. Personnel records provided evidence that each officer and supervisor was assigned to a single supervisor in most districts. Generally, there were at least three supervisors assigned to a platoon with 8 -12 officers. Some districts, however, were unable to produce sufficient records to demonstrate compliance with this requirement.

With respect to "General Assignment" officers, again, several districts were unable to produce documentation demonstrating compliance with paragraph 310 of the Consent Decree. Moreover, when a General Assignments sergeant is not on duty, those detectives/officers are supervised by the platoon supervisor. Although we identified very few instances of a supervisor supervising more than eight subordinates during this quarter's audit, there exists the possibility




that there could be more than eight personnel reporting to one supervisor if the entire narcotics unit or task force unit worked while reporting to a platoon supervisor when there was only one platoon supervisor on duty. Overall, ***NOPD was unable to demonstrate compliance with this paragraph of the Consent Decree.***

**6. CD 311**

Paragraph 311 of the Consent Decree requires NOPD to develop and implement a program to identify and train acting patrol supervisors who can fill in, on a temporary, as-needed basis, for assigned supervisors who are on vacation, in training, ill, or otherwise temporarily unavailable. Further, NOPD is required to ensure consistent supervision by acting supervisors for supervisors who are on extended leave, and to reassign officers to a new permanent non-acting supervisor when the currently assigned supervisor has been or is expected to be absent for an extended period of over six weeks.

The Monitoring Team's review found ***NOPD was unable to demonstrate compliance with this paragraph***. Specifically, our review revealed the Training Academy has not developed training or trained any personnel as acting patrol supervisors. Further, no program exists to identify and train acting patrol supervisors who can fill in for assigned supervisors.

**7. CD 312**

Paragraph 312 of the Consent Decree requires that district commanders and platoon lieutenants be responsible for the close and effective supervision of officers under their command. Further, paragraph 312 requires that NOPD commanders and platoon lieutenants ensure that all subordinates under their direct command comply with NOPD policy, state and federal law, and the requirements of the Consent Decree. ***Our review found that NOPD continues to be unable to demonstrate compliance with these requirements.***

As noted above, the supervisors' activity reports we reviewed are not designed to capture information to provide this evidence. The supervisors' activity sheets do not include direction they provided at roll call, any orders that were conveyed to officers, their expectations while interacting with the public, any counseling they provided, any disciplinary actions initiated, any complaints to which they responded, any monitoring of officer activity on calls for service or traffic stops, or other actions taken by a supervisor to ensure compliance with paragraph 312 of the Consent Decree.

Further, our review revealed police reports are not completed for every arrest. Supervisors need to review every report to determine the basis for the arrest and how it was completed. The lack of adequate supervisor reports prevents documentation of actions taken by a supervisor when they respond to the field to supervise including actions taken to address use of force incidents and citizens' complaints.




Failure to complete police reports for all arrests is problematic. Supervisors are responsible for monitoring a subordinate's arrests, but the NOPD does not require police reports for all arrests. The NOPD explained they are only able to track their own arrests by obtaining information from the Sheriff's Office. Systems should be in place to simplify a police officer's duties. A complex system to determine if and how an arrest is documented complicates the officers' duties and an auditor's review of arrests. A simple system would be to make an arrest report when an arrest was made.

The Use of Force Reports we reviewed suffer from some of the same inadequacies as the arrest reports. Specifically, Use of Force Reports often lack sufficient detailed information to determine whether supervisors were at the scene of incidents, whether they conducted an investigation, and, if so, their assessment regarding the justification for the force used.

Among the external forces likely contributing to close and effective supervision is the non-existence of an effective Early Warning System ("EWS"). Without access to the information typically housed in an effective EWS, most NOPD supervisors cannot provide much information regarding their subordinates. Our audit revealed most supervisors are unable to relate the number for each subordinate of Use of Force Reports, vehicle collisions, citizen complaints, arrests, and other important performance measures. Some supervisors have performance files for each officer assigned to their platoon, but many do not. Providing close and effective supervision is difficult without adequate ability to assess performance.

### 8. Paragraph 313

Paragraph 313 of the Consent Decree requires NOPD to hold commanders and supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.

Few documents were produced to the Monitoring Team over the course of this quarter that presented evidence of counseling or redirection, and even fewer documents were produced to provide evidence of disciplinary action to hold officers (or commanders and supervisors, for that matter) accountable for close and effective supervision. Most commands did not have a list of counseling memos or disciplinary actions initiated. Most commands referred the Monitoring Team to PIB to obtain any evidence of supervisors identified and effectively responded to misconduct.

Our audit of the several districts uncovered no documents that provided evidence supervisors were held accountable for performing their supervisory duties. Likewise, supervisors' reports did not include information concerning orders relayed from higher authority, counseling provided to officers, direction to officers regarding engagement of the public, or discipline. Supervisors' performance evaluations were generally not available, few counseling memos were available, and few disciplinary reports were available. Further, the performance




evaluations the Monitoring Team viewed were not adequate to assess supervisors' performance. The evaluations did not include a section to evaluate "whether commanders and supervisors identify and effectively respond to misconduct, as part of their performance evaluations" as required by paragraph 313 of the Consent Decree. Accordingly, ***NOPD was unable to demonstrate compliance with the requirements of paragraph 313 of the Consent Decree.***

## B. Supervisor and Command-Level Training

### 1. CD 314

Among other things, paragraph 314 of the Consent Decree requires NOPD to develop and implement mandatory supervisory training for all new and current supervisors. To its credit, NOPD did develop and implement mandatory supervisory training for all new and current supervisors. The training, however, was implemented without a fully thought-out lesson plan. NOPD relied upon a lesson plan used by the federal government for training FBI supervisory agents, which had not been tailored for the needs of local police departments.

With respect to the specific minimum hours requirements set forth in the Consent Decree, ***NOPD was unable to provide documentation to demonstrate compliance with this requirement for all supervisors appointed prior to August 9, 2013***. For supervisors promoted since, however, NOPD has demonstrated they received the required 160 hours of supervisory training.[13]

### 2. CD 315

Paragraph 315 of the Consent Decree requires NOPD to provide supervisory training programs on a number of enumerated topics. ***NOPD was unable to provide documentation sufficient to demonstrate compliance with this requirement.***

## C. Early Warning System

### 1. CD 316

Paragraph 316 of the Consent Decree requires the City and NOPD to develop, implement, and maintain an EWS to support the effective supervision and management of NOPD officers and employees, including the identification of and response to potentially problematic behaviors as early as possible. The Consent Decree further requires that NOPD regularly use EWS data to promote constitutional and professional police practices; to manage risk and liability; and to evaluate the performance of NOPD employees across all ranks, units, and shifts.

13 The Consent Decree requires all current NOPD supervisors receive 200 hours of mandatory supervisory training within two years of August 9, 2013.




While NOPD has selected a vendor to implement its EWS system, ***the Department is not yet in compliance with this requirement of the Consent Decree.***[14]

### 2. CD 317

Paragraph 317 of the Consent Decree requires the City and NOPD agree to create a plan for the implementation of the EWS, which shall include the hiring of at least one full-time equivalent qualified information technology specialist within 270 days of the Effective Date, to facilitate the development, implementation, and maintenance of the EWS. The City and NOPD further are required to maintain sufficient staffing to facilitate EWS data input and provide training and assistance to EWS users. ***Our review found NOPD in partial compliance with this Consent Decree requirement.***

While the EWS has not yet been developed and implemented, NOPD has developed a plan for the implementation of the EWS. The Department also has hired an information technology specialist. Without an operable EWS, it can't be determined whether there will be sufficient staffing to facilitate EWS data input, provide training and assistance to EWS users. ***NOPD is moving forward toward compliance with this Consent Decree requirement.***

## D. Visual and Audio Documentation of Police Activities (CD 327-331)

### 1. Introduction To Camera Audit

In its March 16, 2011 Findings Letter following its investigation of the NOPD, DOJ recognized NOPD had taken steps to implement technologies designed to promote constitutional policing and officer and citizen safety, including in-car video cameras. The DOJ found, however, that the cameras "are reportedly underused and, particularly with in-car cameras, often in disrepair. The DOJ recognized this as an issue of great importance not only to the community, but to the NOPD officers as well.

In its prior Quarterly Report, the Monitoring Team identified and reported on a significant number of non-functional in-car cameras. We described this as a particularly troubling finding in light of the critical role cameras play in providing transparency into a police department's activities:

> Our review this quarter revealed that, more than three years after DOJ expressed concern over the functioning of the NOPD's in-car cameras, those camera[s] still often are in disrepair. Indeed, … our

---

14 Following an open national competition, the City now has selected a vendor to assist NOPD in designing and implementing its EWS. The selected vendor has experience implementing Early Warning Systems in other jurisdictions under Consent Decrees, including the Los Angeles Police Department and the Oakland Police Department. According to the NOPD, the City has negotiated a scope of work with the vendor, as well as detailed pricing. The City reports project implementation is expected to begin in the first quarter of 2015.




> review found that a significant percentage of the Department's in-car cameras were non-functional. This not only violates the Consent Decree, but it puts citizens and officers at risk. It also fosters an unhealthy cynicism among officers. For example, following the newer sergeants training regarding in-car cameras, several officers approached the Monitoring Team and described the training as "BS" because "the cameras never work anyway."

Third Quarterly Report at 63. The U.S. District Court likewise found the Monitoring Team's finding troubling and held a public hearing to discuss the issue and NOPD's plans to implement prompt corrective action.

At the hearing, the new Superintendent of Police, Superintendent Harrison, acknowledged the problems identified by the Monitoring Team, and committed to make remediation of the problem a top priority of his Department. The Chief of the NOPD Compliance Bureau likewise took responsibility of the camera problem and ensured the Court his team would implement immediate corrective actions. Those corrective actions included quicker replacement of broken units, closer supervision by district personnel, more aggressive monitoring by the Compliance Bureau, and, importantly, an effort to upgrade NOPD's camera servers, which appear to be responsible for a significant number of the non-functional cameras. In fact, on the day of the Court hearing, Superintendent Harrison informed the Court that three of the Department's servers had failed just that morning.

In light of our findings last quarter, we expanded our focus this quarter to look not only at the functionality of in-car cameras, but also officer use of cameras. Specifically, during this quarter we examined the functionality and use of video recording devices currently deployed throughout the NOPD. We focused on the Department's three primary outward looking (as opposed to, for example, in-station cameras) video recording devises – In-Car Cameras, CEW Cameras, and Body Worn Cameras:

- The Consent Decree requires NOPD to maintain and operate video cameras in all marked or unmarked vehicles that are assigned to routine calls for service, task forces, tactical units, prisoner transport, or SOD canine and to repair or replace all non-functioning video cameras as necessary for reliable functioning. (CD327) The digital mobile video audio recording devices (called "DMVARs" or, in plain English, "in-car cameras"), are to be activated for all traffic stops and pursuits until the motor vehicle stop is completed and the stopped vehicle departs, or until the officer's participation in the motor vehicle stop ends. (CD 328) The camera automatically begins recording when the officer activates the vehicle's emergency lights and can also be activated manually by the officer, either on the camera control head or remotely from the portable microphone.

- CEWs are widely carried throughout the Department. Each CEW is equipped with a recorder that captures the audio and video of the event from the moment




the officer turns off the safety. The Consent Decree (CD 328) requires the Department to ensure the audio/video recorder is activated as designed, *i.e.* when the safety switch is turned off.

- Body Worn Cameras ("BWC") have been deployed throughout the Department since late May. Though not specifically mentioned in the Consent Decree, it does require that all "recordings are captured, maintained and reviewed." (CD 327) BWC cameras have to be activated by the officer for the camera to record.

The scope of our review varied depending on the audio/video recording device. For the in-car cameras, we tested only the functionality of the cameras at this stage. We did so during visits to police districts specifically for that purpose, during announced and unannounced audits of supervisory requirements of the Consent Decree, and during ride-a-longs. Our tests included whether the camera turned on, whether it was capable of recording a video, whether it was linked to the server so that the recordings could be downloaded, what the remaining camera capacity was and whether vehicles assigned to patrol were equipped with a camera. During our review of Use of Force investigation reports we checked to see whether the report indicated an in-car camera recording was available and, if so, whether the investigating sergeant reviewed the video.

CEW videos were reviewed in conjunction with our review of Use of Force Reports. As reported elsewhere in this Quarterly Report, during this quarter we continued to review use of force events and supervisors' investigations that are documented in Use of Force Reports. If the force used by the officer included discharge of a CEW, we checked to see whether the investigating sergeant reviewed the CEW video as part of his or her investigation. We also reviewed the video ourselves and compared it to the officer's force statement, the Electronic Police Reports ("EPR") associated with the event, and the sergeant's Use of Force investigation report.

Our audit of Body Worn Cameras was more detailed. First, during our review of investigative reports prepared by field supervisors for uses of force such as a strike by impact weapons where contact is made (except to the head which is consider a serious use of force and requires an investigation by FIT), regardless of injury or where the subject is forcibly taken to the ground, we checked to see whether the officer was assigned a BWC, whether he or she activated it during the encounter with the subject as required by NOPD policy, and whether the investigating supervisor reviewed the BWC recording as part of the investigation. We also checked the BWC video database to locate videos of assisting and witness officers. When we found a video, we reviewed it and compared it to the officer's force statement and the investigating supervisor's Use of Force Report.

Second, we obtained a list of all domestic violence calls for service for the months of June, July, and August. From the provided list we randomly selected 20 events. We then obtained copies of the police reports and checked to see whether the assigned officer had recorded the event on a BWC video. When we found a video we compared the content of the video to the narrative of the police report.




We also randomly selected 20 officers, searched for police reports prepared by the officer, then checked to see whether there was a BWC video associated with the call for service in which the report was prepared. If a video was located we compared the video and the narrative of the report.

For each record included in our audit where we found a written report and an associated video, we read the complete written file and compared the available videos for each event. The variables included the following:

1. Is the sequence of events similar in the report(s) and video(s)?

2. The justification for the police encounter with the subject: CFS; Self-Initiated; or Flagged?

3. Was there evidence that force was used during the officer/citizen interaction?

4. If force was used, was there a force statement prepared by the officer?

For the purpose of the audit related to use of force events, the files reviewed consisted of, where relevant, officer's force statements, Use of Force Reports documenting the supervisor's investigation into the use of force, associated EPR, and any other reports about the incident that were available. Videos available on Evidence.com were observed for all of the incident numbers in each sample.

**2. Camera Findings**

**a. Digital Mobil Voice Audio Recordings (In-Car Cameras)**

According to information received from NOPD's Compliance Bureau, there are currently 187 Department vehicles that should be equipped with in-car cameras. During this quarter we visited each of the eight districts, the canine unit, and Special Operation Division to check in-car camera units. We were able to check 116 of the 187 vehicles (62%).

Our audit showed that 82 of the in-car camera's turned on and *34 did not*. Seven cars that should have had cameras, based upon trip sheet records showing they were used by patrol officers, did not have in-car camera's. We could not access five cars that had cameras, and therefore were unable to check their functionality.

Of the 82 cameras that did turn on, ten did not link to the server to download the videos, though the vehicle was checked at a place where the link should have been available. Two of those ten vehicles were at full capacity, a condition likely cause by the inability to link to the server (connecting to the server allows the camera to download the recording and clear the camera's memory to allow for new recordings). Sixteen of the cameras that turned on were shown to be at full capacity. Six of those were assigned to the Eighth District, three were




assigned to the Canine unit and are take-home vehicles, and two were assigned to SOD. We learned that the Eighth District continues to have problems establishing the link between the in-car camera and server due to the placement of the receptor antennas and the allotted parking places for vehicles. We were also told that, even when the link is made, the server is often at full capacity and cannot accept any additional video downloads.




**Figure 5**

NOPD's Compliance Bureau's review of the in-car cameras found 68% (125 of 183) of cameras working. Our review found 57% of the 116 we checked fully functional: 82 that turned on less 16 that were full, leaving 66 fully functional. We acknowledge that the date of our checks are different and could account for the difference of our findings. ***Regardless, neither finding should be viewed as an acceptable level of operability for the NOPD's in-car camera equipment.***

We did not review any in-car camera videos associated with a police report. During the course of our audit, we were unable to locate any in-car camera videos associated with a use of force investigation. It is noteworthy that NOPD could not locate a single video recording outside the context of a use of force investigation wherein the contact did or may have started with a traffic stop (thus automatically generating an in-car camera recording).

And, though we also requested a listing of all traffic stops for the period of June 1, 2014 to August 30, 2014 with the intent of randomly selecting 20 traffic stops by Item Number, we




were unable to find copies of reports associated with the traffic stops. After further inquiry we were informed that, while there is an Item Number assigned to each traffic stops, few result in a police report. The vast majority result in the issuance of a traffic citation, copies of which are not available in any NOPD database and, thus, not readily available for our review.

**b. Conducted Electrical Weapon ("CEW")**

The Monitoring Team's audit of CEW recordings occurred as part of our review of use of force investigations. There were 33 use of force events wherein the involved officer reported the deployment of a CEW. We were able to locate all but one of the associated videos. In two of the videos found, the recorder malfunctioned resulting in a video that was either of a duration of less than a second or just a recording of a trigger pull but no video.

In the Use of Force Report documenting the investigation for each of the 33 events, the investigating supervisor reports reviewing the CEW video in only 11 cases. In the other 21 cases there is no mention in the investigative report that the supervisor viewed the video and considered it in reaching his or her conclusion on the reasonableness of the use of force and use of the CEW. In one of the events, the investigating supervisor reported that the CEW malfunctioned and was not available for his review; yet, we were able to find and review the video. For a detailed breakdown of supervisor-reviewed CEW videos, please see Appendix 3.[15]

---

15 The Monitoring Team recognizes these findings could reflect a record-keeping problem rather than a supervision problem, but it is NOPD's burden to prove that to the Monitoring Team. Accordingly, the Monitoring Team will continue to view the issue as a failure to supervise until the facts demonstrate otherwise.







Figure 6

Our review of the videos associated with CEWs showed the following:

- A sergeant deployed his CEW three times in succession, each for a duration of five seconds, even after the subject was on the ground. The video did not capture the events leading up to the deployment nor the actions of cuffing the subject following the deployments.

- An officer deployed the CEW at the subject as he was at the top of a six foot fence, a deployment that is contrary to NOPD training.

- An officer deployed his CEW on a mentally unstable subject 4 times in succession, even after the subject was face down on the ground.

- An officer's conduct warranted further action by the Department. Though the force eventually was deemed reasonable, the officer's use of vulgarities and other inappropriate language was not.

When the Monitoring Team reviewed the last two videos with NOPD's chief CEW trainer, he confirmed that the officers' conduct was not consistent with department policy and training. These events were brought to the attention of the CEW coordinator at the Academy.




In 29 of the 32 of the videos we reviewed, the sequence of events documented in the force statements are representative of the events seen in the video. However, the CEW videos generally were not helpful in confirming whether the initial contact by the officers of the subject were justified because the CEW video only activates when the officer draws the CEW and switches off the safety. In addition, because of the manner in which CEW's are generally deployed, 10 of the videos failed to capture any warning by the officer. Generally, what is seen and heard is the subject actively resisting arrest by fleeing or threatening the officer and the officer commanding the subject to get to the ground and the officer issuing a verbal warning that he is about to deploy the CEW.

**c. Body Worn Cameras**

At initial deployment, BWC equipment was assigned with priority given to each of the primary patrol shifts in each district and other uniform operations assigned under the Field Operations Bureau. As of September 2014, NOPD reports there were 382 BWC cameras assigned to uniform officers: 298 to Patrol District officers, 10 to Gang Taskforce officers, 7 to Canine Unit officers, 12 to Mounted Unit officers, 29 to SOD Tactical officers, and 26 to Traffic Unit officers. There were an additional 20 BWC cameras shown as not yet assigned as of September 10, 2014. Officers assigned a BWC must wear it at all times while on duty.

NOPD policy mandates BWC activation in all investigative and enforcement contacts. Activation is required on all calls for service and in all field contacts involving actual or potential criminal conduct including: traffic stops, emergency responses, vehicle pursuits, suspicious vehicles, arrests and transports, vehicle searches, consents to search, physical or verbal confrontations or uses of force, pedestrian stops, domestic violence calls, SWAT deployments, and high risk warrant searches. Officers are required to turn on the BWC as soon as practicable at the onset of any such event and continue to record the event until its completion and they have left the scene. All BWC-equipped officers coming on the scene to assist the primary officer must similarly activate their camera. Although the policy identifies those situations in which activation of the BWC is required, an officer has discretion to manually activate the system any time the officer believes it would be appropriate or valuable to document an incident.

During the use of force investigation review component of the BWC audit, we found 18 use of force events that occurred on or after June 1, 2014. Forty-six officers were identified as participants in those events, 30 of them using force and 16 as witnesses to the use of force. Eight of the participants were sergeants, one a lieutenant, and one a detective. The figure below reflects our findings on BWC videos for those officers who were issued a BWC on the date of the event; that is, it excludes the eight sergeants, one lieutenant and one detective who were not issued BWC's.







Figure 7

The Monitoring Team performed a comparative assessment of the BWC videos with the associated case files to determine whether the nature and sequence of events in the written report was supported by the video evidence. The Monitoring Team reviewed 12 recordings (11 officer-involved, one officer witness) covering ten unique events. Although the contents of the associated files varied, they generally included the officers' force statements, the Use of Force Reports documenting the supervisor's investigation into the use of force, associated ERP, and any other reports about the incident that were available.

Our review found that the contents of written reports were adequately supported by the video evidence for all 10 unique events. The Monitoring Team's review of the associated case files also revealed that sergeants reviewed the BWC videos for 6 of these 10 unique events as part of their supervision duties.

To supplement our audit, we also reviewed 20 randomly selected calls for service involving domestic violence occurring in the months of June, July, and August. Of these 20 calls for service, we found and reviewed 17 police reports (we could not locate a police report for three calls). We then searched the video evidence database for BWC videos associated with the call for service and found video for only 7 of the 17 reported calls for service.







Figure 8

We compared the content of the available videos to the narrative of the corresponding police reports. While the unavailability of 10 of 17 video recordings is troubling, of the seven we were able to find and did review, the contents of the police reports were consistent with the contents of the seven videos reviewed.

Finally, we also audited police reports from 20 randomly selected officers to determine if we could locate video recordings associated with those reports. We identified 24 police reports prepared by the 20 officers and only found a BWC video associated with the call for service for 13 of the 24 reports, as reflected in the graph below.







Figure 9

Of the 13 videos reviewed: one was cut short by the officer and therefore did not record the important interview with the victim; another was started late and missed some important information; a third captured multiple incidents, not just the domestic violence call; and in two the report did not fully document all the information the officer obtained from the victim, as seen on the video. Nine of the videos show information consistent with the contents of the police report. None revealed any use of force by the officer.

* * *

The foregoing findings, obviously, do not yet reflect full compliance by the NOPD with the terms of the Consent Decree as they relate to cameras. First, BWC cameras continue to be unavailable in too many cases. Second, NOPD supervisors are not routinely reviewing videos. As we discuss elsewhere in this report, supervisors cannot perform "close and effective supervision" if they are not reviewing camera footage when investigating a use of force and when approving police reports resulting from a call for service. Third, NOPD's current practices do not facilitate review of the videos. Specifically, we identified the following issues that should be the focus of additional training:

- ***Officers turn the BWC on too late***. We found four cases where important parts of the officer/citizen contact were not captured on the video.




- ***Officers do not clearly label (tag) the video in a way that facilitates locating it later for review.*** In addition to labelling the BWC video with an Item Number, the officer can draft and enter into the BWC video database information describing the nature of the call. The Monitoring Team's review demonstrated that, fairly often, the summaries provided by officers do not provide any real detail as to the nature of the service call. For example, two of the most common descriptions used were "other call for service" and "traffic stop." We found those labels incorrectly tagged to videos for domestic violence calls and service calls resulting in a use of force.[16]

- ***The Item Numbers associated with the video do not always match the Item Number of the police report.*** In at least five of the cases reviewed, the Item Number associated with the video was incorrect.

- ***Officers turn the BWC on too soon and leave it running too long.*** In several of the cases reviewed, the BWC was activated at the moment the call was received, resulting in a lengthy recording that captured the entire journey from the location the officer was when he received the call to the scene of the event. Likewise, the officer left the camera on while he left the scene and was sitting in his car writing up his report. In several cases, there were multiple 30 minute videos associated with a call for service. Although this is preferable to the officer turning on the camera too late, the Monitoring Team believes that effective training will result in proper use of the BWC technology.

We recognize the adoption and proper use of any new technology takes time, and imperfections are to be expected at the outset. As our findings relate to events taking place in July, August, and September, some of the non-compliance likely was the result of an understandable learning curve. While this does not excuse the non-compliance, it does explain it to some extent. Nonetheless, our review identified ongoing shortcomings in NOPD's implementation of its cameras and several areas for improvement.

### 3. Conclusion Regarding Cameras Generally

As a result of the Monitoring Team's and the Court's focus on camera use and functionality, NOPD updated its policies and committed to more proactive monitoring of the Department's compliance with that policy. Under the modified policy, NOPD expanded the category of officers who are required to wear BWCs. Specifically, the modified policy requires officers working in plainclothes, but in a proactive capacity, to wear BWCs. Additionally,

[16] Subsequent to this reporting quarter, NOPD began developing a new program to enhance the "tagging" of BWC videos. Once implemented, the new program should great enhance NOPD's (and the Monitoring Team's) ability to identify and review video recordings.




NOPD has committed to require supervisors to conduct "random reviews of their subordinates to ensure recording accuracy and proper use of body worn cameras." NOPD August 2014 Status Report to Judge Morgan. In addition, NOPD's Compliance Bureau also committed to produce a weekly "Body Worn Camera Report" and share it with all District Commanders and District Systems Administrators to ensure accurate recording categorization and proper use. Finally, NOPD committed to share BWC reports with supervisors within the Operations Bureau so that they can compare their activity logs and video produced with the body worn camera to ensure they are being used properly. The Monitoring Team has incorporated these new commitments into its monitoring activities to ensure they are actually undertaken in practice.

### 4. AVL and In-Car Camera Functionality (CD 327)

No district could demonstrate that any of its AVLs were functioning.[17] In contrast, the functionality of the in-car cameras varied by district. For a complete breakdown of the Monitoring Team's in-car camera audit, please see Appendix 2.

The **First District** was unable to demonstrate full functionality of its in-car cameras. Moreover, the Monitoring Team found the documentation produced by the First District to be unhelpful in assessing compliance with the Consent Decree. The list of vehicles assigned to the First District provided by the District was incomplete and/or inaccurate. Specifically:

- The list identified 21 vehicles as assigned to the District, with several identified as being unavailable for inspection because they were off-site and out of service. One of the vehicles marked out of service, however, was parked on the street next to the District station. The car had a camera but the camera was not functioning.
- The Monitoring Team also identified five police cars parked in the vicinity of the station but not included on the list of assigned units. None of these five cars were equipped with cameras.
- Two of the vehicles listed as being out of service were used by officers during the period in which they purportedly were out of service.

The officer trip sheets we reviewed in the First District indicated several instances where in-car cameras were non-functional. Our review of the available cameras revealed that, excluding the vehicles marked out of service, there were 13 vehicles that should have operable cameras. Of those 13 vehicles, only seven vehicles had operable cameras. It also is worth noting that, according to NOPD records, most of these vehicles did not have operable cameras up until days prior to the audit. Had the audit been conducted one week prior, the compliance rate would have been 0% or close to 0%.

---

17 In early October 2014, NOPD rolled out a new AVL system designed to remedy the non-functionality of its prior system. Subsequent to this reporting quarter, the Monitoring Team reviewed the new system and confirmed its functionality.




Notwithstanding the ongoing functionality problems we identified in the **First District**, we did note that a District supervisor had initiated two separate disciplinary proceedings after reviewing in-car camera footage. One concerned a use of force incident and one concerned a pursuit following a supervisor ceasing the pursuit. The action of that supervisor illustrates a proper use of camera footage for supervisory purposes.

The **Second District** also could not demonstrate full compliance with regard to in-car cameras. One unit we reviewed was unable to upload. It appeared to be recording but no recordings were logged from that unit. To NOPD's credit, however, the problem was corrected by the end of the day, and Second District did demonstrate an overall compliance rate of 94%.

The **Third District** could not demonstrate full compliance. While the Monitoring Team was advised all in-car cameras were working, the first officer selected to demonstrate camera operation was unable to do so because his camera could not record. Moreover, our review of recordings from another police car began but ceased recording during the traffic stop prior to the officer getting out of his car.

We conducted a random review of vehicles in the **Fourth District** to evaluate functionality. First, we inspected the five cars assigned to "General Assignments." Of those five cars, three had cameras, but only one was working. We then inspected four of the 20 platoon cars with cameras. Of those four, three had operable cameras even though the officer assigned to ensure the cameras insisted every camera was working. Not only was one of the car cameras non-functional, but it had stopped functioning days before our audit, but had not been reported immediately and was not promptly sent for repair as required.

The **Fifth District** was unable to demonstrate any of its cars had functioning cameras. On July 22, the District moved to its new location on North Claiborne. From that date through our audit in early August, there were no recordings downloaded onto the District computers. Indeed, notwithstanding a sergeant telling the Monitoring Team he regularly reviews in-car camera recordings as part of his supervisory responsibility, when asked to pull up a recording from August 5, 2014, he could not do so. The sergeant had to go back to July 21, 2014, to produce an in-car camera recording. The Monitoring Team understands, however, that the problems at the Fifth District have been resolved, and will confirm during our next in-car camera audit.

In the **Sixth District**, the Monitoring Team inspected ten platoon cars of which four had working cameras and three had non-functional cameras (three were unavailable for inspection because they were in the garage). The General Assignments unit had six cars assigned, five of which did not have cameras. The one vehicle with a camera had not downloaded video to the server since May 16, 2014, and the keys to the vehicle were not available to allow for a Monitoring Team inspection. Similarly, the General Assignments van camera was not working due to the storage device being at full capacity (demonstrating an inability to download to the server).




The Monitoring Team returned to the **Sixth District** to conduct a follow-up audit in September 2014. During that audit, we were told by the sergeant serving as our point of contact that platoon officers were required to use only platoon vehicles since those cars were the ones required to have cameras. Our review of the District's Daily Activity Logs, however, revealed platoon officers did use non-platoon vehicles contrary to the representation of the sergeant. Indeed, we identified at least five cars used by patrol officers that did not have cameras.

Our September review revealed the **Sixth District** sergeants did occasionally review camera recordings. Specifically, we saw evidence of only seven reviews of the 320 recordings available during the period of our review. The Monitoring Team finds such a small number of reviews, approximately 2%, not to reflect the close and effective supervision contemplated by the Consent Decree.

In the **Seventh District** we identified 18 vehicles that should have had functioning cameras, but only ten of those cameras were functioning.

Finally, our review of the **Eighth District** revealed that no in-car cameras were uploading to the District server. Thus, none were recording video during the time of our review.

As a whole, ***the Monitoring Team finds the current status of NOPD's in-car camera technology to be troubling and clearly not in compliance with paragraph 327 of the Consent Decree***. Not a single district could demonstrate full in-car camera functionality (*i.e.*, all cars had cameras installed, the camera turned on, it recorded video, and uploaded this video to the server). While the Monitoring Team is hopeful that increased funds dedicated to resolving these issues will improve the functionality of the technology, including the server issues, it will take a concerted effort by NOPD to bring the Department into compliance with paragraph 327.

### 5. Equipment Testing (CD 329)

Paragraph 329 of the Consent Decree requires NOPD to develop and implement a schedule for testing AVL, in-car camera, and CEW recording equipment to confirm it is in proper working order. As indicated in the Monitoring Team's prior Quarterly Report, and as acknowledged by the NOPD at the public Court hearing held in September, ***NOPD has not been in compliance with this requirement for some time***. Our review this quarter did not identify significant progress on this front. Indeed, while the NOPD Compliance Bureau expressed that testing has been scheduled for all subject equipment, our interviews with personnel in Districts 1, 2, 3, 8, and SOD revealed that personnel there were unaware of any departmental testing of AVL, in-car cameras, or CEW cameras. Moreover, the Monitoring Team was not provided with any documentation confirming such testing has taken place.

Following the Court hearing regarding camera functionality, and NOPD's representation to the Court that it was committed to fixing all non-functional equipment, the Monitoring Team continued to conduct its district-by-district audits to evaluate the condition of the equipment. We discovered that equipment continues to be non-functional, including some equipment reported to




the Monitoring Team to be working. Accordingly, ***NOPD has not yet demonstrated compliance with this Consent Decree requirement.***

### 6. Supervisory Responsibility (CD 330)

Paragraph 330 of the Consent Decree requires that supervisors be responsible for ensuring officers under their command use in-car camera recording equipment, AVL equipment, CEW cameras, and similar equipment, as required by NOPD policy. Supervisors further must report equipment problems and seek to have equipment repaired as needed and refer for investigation any officer found to fail to properly use or care for in-car camera recording, AVL, CEW camera, or similar equipment. Our review found NOPD to be in partial compliance with this requirement.

While some supervisors in some districts do check in-car camera use and functionality periodically, other supervisors in other districts clearly do not. Our audit of the Fifth District, for example, revealed that supervisors there were unaware that their cameras were not operable and had not been operable for approximately two weeks. Other districts produced logs showing some equipment reviews, but far too few to qualify as close and effective supervision. Although there were hundreds of recordings available to be reviewed, one platoon in one district could document only five reviews, another platoon documented only two reviews, and the third platoon failed to document any reviews.

Our findings with respect to supervisors reviewing the functionality of AVLs was similarly unimpressive. Some supervisors we interviewed acknowledged their AVL equipment does not work. Others conceded they had no idea whether it was working or not. Still others explained they did not know how to determine whether the equipment was working or not. ***NOPD has not yet demonstrated compliance with this requirement.***

We likewise did not identify any consistent means of evaluating the use or functionality of CEW cameras in the various districts. Indeed, several supervisors explained to the Monitoring Team they would not know if the CEW cameras are working until they have been used and the Academy personnel who monitor their use would advise them whether the cameras worked.

With respect to Body Worn Cameras, we have witnessed supervisors monitoring their officers' use of Body Worn Cameras while in the field – *i.e.*, by reminding officers to turn on their cameras and looking for the visual indicator that the camera was turned on. We also have observed officers reminding one another to turn on their cameras. We have not, however, seen a systematic effort to review BWC use and functionality by district supervisors. The lack of a review process makes it very difficult for NOPD to identify non-functioning equipment and/or officers who fail to use the equipment properly.




### 7. Handheld Recording Devices (CD 331)

Paragraph 331 of the Consent Decree requires that NOPD provide each supervisor with handheld digital recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations. Our review found that many, but not all, districts comply with this requirement.

The platoon sergeants we interviewed in Districts 3, 4, 5, 6, and 8 all had ready access to their recorders, all knew how to use them, and all correctly explained when they were to be used. First and Seventh Districts, on the other hand, had been issued recorders, but clearly had not used them and did not know when to use them. Similarly, Second District had been issued a recorder and knew when to use it, but had never used it. ***NOPD is in partial compliance with this Consent Decree requirement.***

## XVII. SECONDARY EMPLOYMENT (CD 332 - 374)

***The City continues to make progress toward fully complying with the Consent Decree's secondary employment requirements.*** As of the conclusion of this quarter, all time-based details are being managed by OPSE. To ensure that NOPD members understood the requirements for secondary employment eligibility, Superintendent Harrison directed each NOPD member to be notified by e-mail and to sign and return a hard-copy of the e-mail. Officers are overwhelmingly complying with the policies governing secondary employment. There have, however, been reported instances of non-compliance by officers who accepted secondary employment jobs outside of OPSE. These incidents were reported to the PIB for investigation and any appropriate disciplinary action. We will continue to monitor compliance with secondary employment policies. It is important for NOPD members to understand that any found to be in non-compliance with secondary employment policies will be referred to NOPD's PIB for investigation.

To respond to new information not available to the City when it entered into the Consent Decree, the City sought approval to modify certain of the Consent Decree's secondary employment provisions. Specifically, the City sought to modify Consent Decree paragraph 348 to authorize the Court, instead of the City, to set the fee schedule for secondary employment. The City also asked the Court to establish additional tiers for secondary employment rates to enable OPSE to respond to changed market conditions. Specifically, potential customers were finding that rates under the existing rate structure at times were no longer sufficient to attract officers and the process for creating authorizing additional rates impractical. This created anomalous circumstances in which customers were willing to pay more to hire NOPD officers but were prevented from doing so. This situation frustrated the overall purposes of the Consent Decree.

The Monitoring Team worked closely with the City to understand and evaluate the basis for its request and to ensure the proposed modifications would not undermine the core safeguards of the Consent Decree's secondary employment provisions. In July, the Court approved the




City's motion to modify paragraph 348. It also approved the City's motion to establish additional pay rates and to establish a process by which the City could seek the Court's approval for additional one-time exceptions to the new rate structure. The changes create additional secondary employment opportunities for NOPD members without undermining the Consent Decree.

The Court also approved temporarily suspending certain secondary employment provisions of the Consent Decree, as provided in paragraph 487, to accommodate unique circumstances of SMG, the public facilities management company that manages the Superdome and the Smoothie King Center, which are in many ways unique, due to the number of secondary employees hired, the nature of their responsibilities, and the demands of SMG's customers, which include the Saints, the New Orleans Pelicans, and major event sponsors. The Monitoring Team worked closely with the City and SMG to understand the validity of the stated reasons for the request. The Monitoring Team concluded that due to the way the SMG uniquely manages its secondary employment, certain provisions of the Consent Decree could be suspended to allow SMG to continue to employ NOPD members, without compromising the Consent Decree's underlying purposes and protections. It should be noted, however, that not all of the modifications sought by SMG or the City were approved. We are confident that the Consent Decree's core requirements and SMG's unique needs are appropriately balanced. The Monitoring Team would like to note its appreciation for SMG's willingness to modify its hiring practices to support the Consent Decree's goals. The people of New Orleans should know that SMG's willingness to work with the City to enable it to continue to use NOPD officers reflects its commitment to being a good corporate citizen of New Orleans.

The City's success in implementing the secondary employment system is being noticed. A Times-Picayune article reports that "after running a deficit in 2014, the Office of Police Secondary Employment expects to be self-sufficient in 2015 …" The article quoted OPSE Director John Salomone as stating, "A more flexible pay scale and an agreement with the firm that runs operations at the Superdome have boosted the number of officers participating in the program as well as the number of hours they are working." As a result, the number of paid-detail hours being worked are approaching the number of hours worked before the DOJ issued its findings concerning the negative impact the unregulated secondary employment system had on law enforcement in New Orleans, according to Director Salomone.[18]

In the coming months, OPSE will undertake to assume responsibility for task-based details; those in which the pay rate is based not on the number of hours worked but the detail or task. Task-based details include motorcycle escorts and special events staffing and raise unique pricing and management issues.

---

[18] See NOPD paid-detail system taking off, city officials say," available at http://www.nola.com/politics/index.ssf/2014/11/nopd_paid-detail_system_taking.html (last viewed November 12, 2014).




## XVIII. MISCONDUCT COMPLAINT INTAKE, INVESTIGATION, AND ADJUDICATION (CD 375-426)

### A. Citizen Complaint Forms (CD 385 and 386)

Paragraph 385 of the Consent Decree requires that NOPD and the City make "complaint forms and informational materials, including brochures and posters, available at appropriate government properties, including, at a minimum, NOPD headquarters, district stations, NOPD and City websites, City Hall, courthouses within New Orleans, all public libraries, the IPM, the Orleans Public Defenders, and at the offices or gathering places of community groups." Our review of NOPD's website confirmed the availability of an electronic citizen complaint form, which was found under a pull down menu for community services at www.nola.gov/nopd/citizen-services/complaints/. The web page instructs citizens that in addition to the electronic submission, a written complaint can be submitted to the Office of the Inspector General, the District Attorney's Office, the FBI, and DOJ, and links to the website and a telephone number for each is provided. (Notably, the web page does not refer citizens to the IPM to file a complaint.) As well, the web page instructs citizens filing a complaint with any of these agencies to also send a copy to the PIB. In addition to the City's general web site, we also confirmed the existence of an electronic citizen complaint form on NOPD PIB's web site.

Our findings regarding the availability of citizen complaint forms and materials at the NOPD's physical locations were less positive. We visited all NOPD districts, as well as NOPD Headquarters, the PIB, and City Hall.[19] At each location, we requested from the desk personnel a copy of a citizen complaint form to report officer misconduct. Only PIB was able to provide a complaint form in response to our inquiries. Most other locations referred us to PIB. Two districts (2 and 6) offered to take our complaint orally by a ranking officer in the district, but could not give us a form by which we could submit the complaint anonymously. In all cases, our inquiries were responded to professionally.

In addition to the non-availability of citizen complaint forms at the various districts, we also noted the unavailability of any brochures, posters, or other materials advising citizens of their rights and/or the citizen complaint process. We did not identify any such materials in any NOPD or City location beyond the PIB. This finding is troubling not only because it is a violation of the Consent Decree, but because we have raised it with the NOPD on several occasions during our regular visits to the districts.

Closely related to the non-availability of citizen complaint forms and materials is the non-existence of a placard in each police facility describing the external complaint process. Paragraph 386 requires that NOPD "post and maintain a permanent placard at all police facilities describing the external complaint process. The placards shall include relevant contact

[19] To conduct our audit of NOPD's physical locations, we tasked two local citizens – a male and a female, both middle-aged, African American, New Orleans natives – to visit the locations and make the necessary inquiries using a prepared script.




information, such as telephone numbers, email addresses, and internet sites." Our review this reporting quarter revealed not only that such placards do not exist at the eight police districts, they also do not exist at PIB or City Hall. As noted above, however, we did find the required information on NOPD's and the City's website.

### B. Complaint Forms in Multiple Languages (CD 387)

Paragraph 387 of the Consent Decree requires that citizen complaint forms and related materials be made available and posted in Spanish, Vietnamese, and English. In connection with our audit of citizen complaint forms generally, we also reviewed the availability of non-English language materials. We found no Spanish or Vietnamese information regarding the citizen complaint process at any NOPD district, NOPD Headquarters, the PIB, or City Hall. When we inquired at each location regarding the availability of non-English forms, only PIB responded that the form could be translated at the request of a citizen. The other locations could provide no helpful information on the subject.

When asked about the process for non-English speaking Hispanic citizens to file a complaint, most locations were able to advise our auditor of the availability of a translation device and/or the ability to have a Spanish translator on the phone to assist with the complaint process either at the district station or at the PIB office. The representatives at one district, however, advised that they have no access to translation equipment and could not advise as to how non-English speaking citizens can file a complaint. Our review of the City of New Orleans' NOPD website revealed the site's multi-language translation capability (www.nola.gov/nopd/about-us/bureaus/public-integrity/) including the ability to translate the form.

### C. Camera Discipline

At the public court hearing convened by Judge Morgan following the publication of the Monitoring Team's last Quarterly Report, Deputy Chief Westbrook of the NOPD's Public Integrity Bureau advised the Court 24 misconduct investigations were underway relating to camera misuse or non-use. As of the close of this reporting quarter, those investigations were ongoing and had not yet evolved to the disciplinary stage. The Monitoring Team plans to review every one of the 24 cases to ensure the issue of camera usage is given the significance it deserves.

## XIX. TRANSPARENCY AND OVERSIGHT (CD 427-443)

### A. Availability of NOPD Audits and Reports (CD 427)

The Consent Decree requires that all "NOPD audits and reports related to implementation of this Agreement shall be publically available via website and at the Police Department, City Hall and other public locations to the fullest extent permissible under law." (CD 427) Our review of NOPD's website revealed access to information about the Consent Decree




(www.nola.gov/nopd/nopd-consent-decree/), including a copy of the Consent Decree itself, copies of all three quarterly reports issued by the Monitoring Team, and a copy of the NOPD Bi-annual report. The site also has links to the Consent Decree Monitor website and to the webpage for the NOPD Consent Decree Compliance Bureau (www.nola.gov/nopd/administration/bureaus/compliance/). While we believe NOPD still has room to build out and increase the usefulness of its site, ***we find the site, as it currently stands, to meet the requirements of the Consent Decree.***

The Monitoring Team, however, did not find the same level of compliance with paragraph 427 at the various physical locations identified in the Consent Decree. We visited all NOPD districts, NOPD Headquarters, the NOPD PIB, and City Hall, and none was able to provide us a copy of the Consent Decree, or any Consent Decree related reports. Requests for Consent Decree materials at the Districts, Headquarters, and City Hall were referred to the NOPD website. While the referral is understandable and, perhaps, helpful for some citizens, the Consent Decree contemplates hard copies in physical locations, likely because all citizens do not have ready access to the Internet.

### B. Availability of Policies and Procedures On NOPD Web Site (CD 428)

Paragraph 428 of the Consent Decree requires that each NOPD policy, procedure, and manual, including those created pursuant to this Agreement, be posted online and otherwise made publicly available, unless NOPD documents a reasonable security reason for keeping the policy, procedure, or manual private. As of the close of this reporting quarter, NOPD still had not complied with this requirement. While many NOPD policies still remain unapproved by DOJ and the Monitoring Team, those policies nonetheless continue to inform and guide officer conduct. The Monitoring Team believes citizens have a right to see the policies under which the NOPD is operating – whether those policies have been approved or not. Accordingly, we advised NOPD to expedite its compliance with paragraph 428.

On October 3, 2014 (just following the close of this reporting quarter), NOPD confirmed to the Monitoring Team it would post all operable policies – whether or not approved – to the Department's web site as required by paragraph 428 of the Consent Decree. Because NOPD believes certain policies may have to be redacted for security reasons before posting (for example, perhaps a policy reflecting operational tactics relating to terrorism), the Department has initiated a review of all policies for that purpose. The Monitoring Team will review every redaction to ensure they are necessitated by a "reasonable security reason." (CD 428)[20]

---

[20] As of November 1, 2014, NOPD's internal review was still ongoing and NOPD still had not posted its policies online.




## XX. AGREEMENT IMPLEMENTATION AND ENFORCEMENT (CD 444 – 492)

### A. Coordination with IPM (CD 459)

The Consent Decree provides that the Monitoring Team shall coordinate and confer with the Independent Police Monitor. (CD 459) The Monitoring Team and IPM communicated frequently during this quarter and coordinated their efforts to the extent practicable. The Monitoring Team continues to be impressed by the passion, dedication, and impact of the IPM; and recognizes the respect the organization has within the New Orleans community. The Monitoring Team and the IPM continue to work together on a joint analysis of racial profiling complaints filed with PIB, and are in the process of initiating other joint activities. The Monitoring Team remains pleased with and grateful for the level of cooperation it receives from the IPM.

### B. NOPD Consent Decree Implementation Unit (CD 467)

Paragraph 467 of the Consent Decree provides that the City and NOPD will "hire and retain, or reassign current NOPD employees to form, an inter-disciplinary unit with the skills and abilities necessary to facilitate implementation" of the Consent Decree. The Consent Decree goes on to explain this unit "will serve as a liaison between the Parties and the Monitoring Team and will assist with the implementation of and compliance with this Agreement."

As noted in the Monitoring Team's prior two quarterly reports, "a fully functioning, adequately staffed, and properly resourced Consent Decree Implementation Unit is a critical component of NOPD's ability to come into compliance with the terms of the Consent Decree." Previously, the Monitoring Team found NOPD not in compliance with this requirement, but last quarter, ***the NOPD fully staffed the Consent Decree Implementation Unit, which brought the Department into compliance***. The Monitoring Team continues to be pleased by the Unit's knowledge, skill level, and demonstrated commitment to the Consent Decree process; and recognizes the full cooperation it continues to receive from the Unit.

### C. NOPD and City Cooperation (CD 470 – 476)

The Consent Decree provides that the City and NOPD shall fully cooperate with the Monitoring Team in all aspects of its responsibilities. We are pleased to report that the City and NOPD did cooperate with the Monitoring Team throughout this reporting quarter.

The Monitoring Team also continues to receive the full cooperation of and continues to work closely with the New Orleans Office of Inspector General ("OIG"). While the OIG's activities do not fall within our monitoring responsibilities under the Consent Decree, the OIG has kept us apprised of its audit plans as they relate to the NOPD. We continue to be impressed by the quality of the OIG personnel with whom we work and with the quality and thoroughness of the OIG's work product. The Monitoring Team looks forward to an ongoing positive relationship with the OIG, and, in fact, is in the process of coordinating a joint project with the




OIG, which will focus on NOPD's use of "Signal 21" codes to classify calls for service as a miscellaneous "complaint."

## XXI. CONCLUSION

The Monitoring Team's activities during this reporting quarter revealed NOPD still has a long road ahead to meet the requirements of the Consent Decree. Significant deficiencies remain, which must be remedied. Training, supervision, and record keeping are just three areas that are in serious need of attention. There are more. As the Mayor recently reminded the public in the context of the OIG's Sex Crimes Investigation, this is why New Orleans needs the Consent Decree. We agree. That being said, the progress NOPD has made in certain areas keeps us cautiously optimistic that NOPD is moving in the right direction. Our cautious optimism is bolstered by our several meetings with newly-appointed Chief Harrison, veteran Deputy Chief Westbrook (PIB), and newly-promoted Commander Williams (Training), among others. All three managers have made clear their commitment to the Consent Decree, to working closely with the Monitoring Team, and to implementing meaningful and lasting change within the Department. All three (and many others) readily have acknowledged the seriousness of the problems that need fixing and have taken ownership of those problems. We welcome Chief Harrison and his management team to their new position and look forward to working with them.




## XXII. APPENDICES

### Appendix 1

Interview Room Camera Functionality

| District/Unit | Fully Functioning? |
|---|---|
| One | No |
| Two | Yes |
| Three | Yes |
| Four | Yes |
| Five | No |
| Six | No |
| Seven | No |
| Eight | No |
| Homicide | Yes |
| Sex Crimes | No |
| SOD | Yes |




**Appendix 2**

In Car Camera Functionality

| District/Unit | Vehicles Checked | Cameras Checked | Functioning Cameras | Nonfunctioning Cameras | Camera Failed to Link to Server | Camera Capacity Full |
|---|---|---|---|---|---|---|
| 1st | 27 | 12 | 7 | 5 | 0 | 0 |
| 2nd | 27 | 16 | 16 | 0 | 0 | 1 |
| 3rd | 10 | 3 | 2 | 1 | 2 | 1 |
| 4th | 32 | 15 | 8 | 7 | 0 | 0 |
| 5th | 14 | 12 | 10 | 2 | 0 | 1 |
| 6th | 31 | 16 | 6 | 10 | 0 | 0 |
| 7th | 21 | 17 | 12 | 5 | 2 | 2 |
| 8th | 13 | 13 | 10 | 3 | 6 | 6 |
| SOD K9 | 6 | 6 | 5 | 1 | 0 | 3 |
| SOD Tact | 6 | 6 | 6 | 0 | 0 | 2 |
| Total | 187 | 116 | 82 | 34 | 10 | 16 |




## Appendix 3

Cross Tabulations of CEW Recording Reviewed by Supervisor and Availability of CEW Recording (Incident-level)

| | N/A | | Yes | | No | | Unknown | | Total |
|---|---|---|---|---|---|---|---|---|---|
| CEW Recording | *N* | *%* | *N* | *%* | *N* | *%* | *N* | *%* | *N* |
| Yes | 0 | 0.0% | 11 | 36.4% | 9 | 27.3% | 12 | 36.4% | 32 |
| No | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 |
| Total | 1 | 3% | 11 | 33.3% | 9 | 27.3% | 12 | 36.4% | 33 |