

# Report of the Consent Decree Monitor
# For the New Orleans Police Department Consent Decree
# April 28, 2015

**Office of the Consent Decree Monitor**
**New Orleans, Louisiana**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana

## WHAT'S IN THIS REPORT?



**Office of the Consent Decree Monitor**

**April 28, 2015**

### WHAT WE DID THIS QUARTER

- Continued to review and revise NOPD's policies, several of which were approved
- Monitored newly created training programs at the Academy
- Audited NOPD Canine Unit to determine compliance with the applicable sections of the Consent Decree
- Attended meetings of the newly-created Crisis Intervention Team Planning Committee
- Completed the first Biennial Survey and conducted a first-phase analysis of the data collected
- Reviewed and analyzed Use of Force reports
- Conducted District-by-District and Unit-by-Unit compliance audits of photographic lineups, custodial interrogations, supervision, camera use, technology functionality, and training
- Met frequently with Sexual Assault Response Team, Independent Police Monitor, Public Integrity Bureau, Academy, and Compliance Bureau personnel

### WHAT WE FOUND

- NOPD's revised Use of Force policy meets the requirements of the Consent Decree and will help ensure constitutional policing
- Other policies approved by the Department of Justice and the Monitoring Team similarly will facilitate constitutional policing
- The Canine Unit has demonstrated compliance with some, but not all, of the applicable requirements of the Consent Decree
- The creation of the Crisis Intervention Team Planning Committee is a positive step toward compliance with paragraphs 111-121 of the Consent Decree
- The results of the Community Survey provide useful insight into police/citizen relations, but will be more valuable once those data are analyzed by demographic group
- While we have seen greater attention given to the NOPD Academy, we continue to see shortcomings in the Academy's progress
- The Monitoring Team has not seen adequate evidence demonstrating NOPD's hiring practices are designed to consistently hire qualified police candidates as required by the Consent Decree

### NEXT QUARTER'S ACTIVITIES

- Provide Technical Assistance to the NOPD Academy to help the Academy draft compliant and effective lesson plans for its various training courses
- Audit the Public Integrity Bureau's complaint intake and administrative investigation process
- Continue performing an in-depth analysis of NOPD's supervision
- Present current supervision findings at public court hearing
- Drill down into Community Survey responses to analyze data by demographic group



## I.   CONSENT DECREE AUTHORITY

"The Monitor shall file with the Court quarterly written, public reports covering the reporting period that shall include:

> a) A description of the work conducted by the Monitoring Team during the reporting period;

> b) A listing of each [Consent Decree] requirement indicating which requirements have been: (1) incorporated into implemented policy; (2) the subject of sufficient training for all relevant NOPD officers and employees; (3) reviewed or audited by the Monitoring Team in determining whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitoring Team to have been fully implemented in practice;

> c) The methodology and specific findings for each audit or review conducted, redacted as necessary for privacy concerns. An unredacted version shall be filed under seal with the Court and provided to the Parties. The underlying data for each audit or review shall not be publicly available but shall be retained by the Monitoring Team and provided to either or both Parties upon request;

> d) For any requirements that were reviewed or audited and found not to have been fully implemented in practice, the Monitor's recommendations regarding necessary steps to achieve compliance;

> e) The methodology and specific findings for each outcome assessment conducted; and

> f) A projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the [Consent Decree]."

**Consent Decree Paragraph 457**



## II.    NOTES

"The Monitor shall be subject to the supervision and orders of the [United States District Court for the Eastern District of Louisiana], consistent with [the Consent Decree]. The Monitoring Team shall only have the duties, responsibilities, and authority conferred by [the Consent Decree]. The Monitoring Team shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent."

**Consent Decree Paragraph 455**



## III.    TABLE OF CONTENTS

I.     Consent Decree Authority ..................................................................... 3

II.    Notes ..................................................................................................... 4

III.   Table of Contents ................................................................................. 5

IV.    Glossary of Acronyms .......................................................................... 9

V.     Introduction to Quarterly Report ...................................................... 11

VI.    Summary of Monitoring Activities .................................................... 16

VII.   Policies ............................................................................................... 18

   A.   Use of Force .................................................................................... 18

   B.   Domestic Violence .......................................................................... 19

VIII.  USE OF FORCE (CD 27-100) ........................................................... 22

   A.   Use of Canines ................................................................................ 22

      1.    Training and Certification ......................................................... 22

      1.    Search Triggering Event ........................................................... 24

      Table 1 – Initial Offense Suspected v. Offense Charged ............. 25

      2.    Deployment Approval ............................................................... 26

      Table 2 – Presence of Approving Supervisor .............................. 27

      3.    Warnings and On/Off Leash Searches ...................................... 28

      Table 3 - Warnings & Off Leash Searches ................................... 28

      4.    Apprehensions & Bites ............................................................. 29

      Table 4 – Bite Ratio .................................................................... 30

      5.    Location of Apprehension ......................................................... 30

      Table 5 – Apprehension Location ................................................ 31

      6.    Deployment Outcome ................................................................ 31

      Table 6 – Outcome of Canine Search Requests ........................... 31

      7.    Body Worn Cameras ("BWC") ................................................. 32

IX.    CRISIS INTERVENTION TEAM (CD 111-121) ............................... 33



X.      BIAS FREE POLICING (CD 177-194) .................................................................. 34

XI.     POLICING FREE OF GENDER BIAS (CD 195-222) ......................................... 35

A.  SA and DV Policies ................................................................................ 35

B.  SA and DV Practices .............................................................................. 36

C.  Sexual Assault Response Team ("SART") ............................................. 37

D.  NOFJC Program ..................................................................................... 37

E.  SA and DV Training ............................................................................... 37

    1.  Sexual Assault Training .................................................................. 37

    2.  Recent SA Training Developments ................................................ 39

F.  Domestic Violence and Sexual Assault Charging Conferences ............ 40

G.  OIG Report Follow-Up .......................................................................... 40

XII.    COMMUNITY ENGAGEMENT (CD 223-233) ................................................ 41

A.  Community Survey ................................................................................. 41

    1.  Community Survey Methodology ................................................... 41

    2.  Community Survey Demographics ................................................. 42

    3.  Community Survey Findings .......................................................... 44

B.  Detainee Survey ..................................................................................... 48

    1.  Detainee Survey Introduction ....................................................... 48

    2.  Detainee Survey Demographics ..................................................... 49

    3.  Detainee Survey Findings .............................................................. 49

XIII.   RECRUITMENT (CD 234-244) ............................................................................ 55

XIV.    ACADEMY AND IN-SERVICE TRAINING (CD 245-288) ............................. 60

XV.     Officer Assistance & Support (CD 289-294) ..................................................... 63

XVI.    SUPERVISION (CD 306-331) ............................................................................. 64

A.  Duties of Supervisors (CD 306-313) ..................................................... 66

    1.  Paragraph 306 (Duties) .................................................................. 66

    2.  Paragraph 307 (Assignments) ....................................................... 68

    3.  Paragraph 308 (Task Force/Narcotics Supervisors) ..................... 68

    4.  Paragraph 309 (District Platoon Patrol Supervisors) .................... 69

    5.  Paragraph 310 (Patrol Supervisor Ratio) ...................................... 69

    6.  Paragraph 311 (Acting Patrol Supervisor Training) ..................... 70



7.   Paragraph 312 (Commanders and Lieutenants) .......................... 71

8.   Paragraph 313 (Holding Commanders Accountable) ................... 71

B.   Supervisor and Command-Level Training ....................................... 72

1.   Paragraph 314 (Supervisory Training) ....................................... 72

2.   Paragraph 315 (Supervisory Training Program) ......................... 73

C.   Visual and Audio Documentation of Police Activities ................... 74

1.   Paragraph 327 (Operational Equipment) .................................... 74

2.   Paragraph 329 (Testing Schedule) .............................................. 75

3.   Paragraph 330 ............................................................................. 76

D.   Early Warning System ("EWS") ..................................................... 77

XVII.    MISCONDUCT COMPLAINT INTAKE, INVESTIGATION, AND ADJUDICATION (CD 375-426) ................................................................................................... 78

XVIII.   AGREEMENT IMPLEMENTATION AND ENFORCEMENT (CD 444 – 492) ............... 79

A.   Coordination with IPM (CD 459) ................................................... 79

B.   NOPD Consent Decree Implementation Unit (CD 467) ................. 79

C.   NOPD and City Cooperation (CD 470 – 476) ................................ 79

XIX.   CONCLUSION ........................................................................................ 81

XX.   APPENDICES ......................................................................................... 82

Appendix 1 POLICE SURVEY RESPONSES ................................................ 83

Table 7 - Distribution of Responses for Section 1: "Police Work and Your Working Environment" ...................................................................... 84

Table 8 - Distribution of Responses for Section 2: "Managers and Supervisors" ........ 85

Table 9 - Distribution of Responses for Section 3: "Personnel and Management Systems" ....................................................................................... 87

Table 10 - Distribution of Responses for Section 4: "Community Policing and Police/Community Relations ......................................................... 89

Table 11 - Distribution of Responses for Section 5: "Expectations about the Police Role" ............................................................................................. 92

Table 12 - Distribution of Responses for Section 6: "General Questions about the Public and the Department" ......................................................... 94

Table 13 - Respondent Characteristics ....................................................... 96



Appendix 2 COMMUNITY SURVEY DATA ................................................................97

    Table 14 - Community survey respondent demographic characteristics...................... 98

    Table 15 - Citizens' satisfaction with NOPD officers during most recent interaction 99

    Table 16 - Citizens' satisfaction with NOPD ............................................................100

    Table 17 - Citizens' perceptions of NOPD procedural justice and trustworthiness..102

    Table 18 - Citizens' willingness to cooperate with the NOPD...........................................104

    Table 19 - Citizens' views regarding how they believe NOPD officers should behave
    .......................................................................................................................................105

    Table 20 - Citizens' perceptions of how NOPD officers treat minorities and other
    groups...........................................................................................................................106

Appendix 3 DETAINEE SURVEY DATA ...............................................................107

    Table 21 - Detainee survey respondent demographic characteristics...........................108

    Table 22 - Detainees' attitudes toward with NOPD officers (specifically) and police
    officers (generally) .......................................................................................................109

    Table 23 - Detainees' perceptions of NOPD professionalism, community relations,
    and respectful treatment ..............................................................................................111

    Table 24 - Detainees' perceptions of NOPD treatment of people from different races
    and genders.................................................................................................................113

    Table 25 - Detainees' perceptions of NOPD job quality .........................................114

Appendix 4 CANINE DATA ...................................................................................115

Appendix 5 ADDITIONAL SURVEY METHODOLOGY.............................................117

    Table 26 ......................................................................................................................118

    Table 27 - Sample Goals by Race or Ethnicity and Gender .................................119



## IV.    GLOSSARY OF ACRONYMS

| "ASU" | Administrative Services Unit |
| "AUSA" | Assistant United States Attorney |
| "AVL" | Automatic Vehicle Locator |
| "BWC" | Body Worn Cameras |
| "CCMS" | Criminal Case Management System |
| "CD" | Consent Decree |
| "CIT" | Crisis Intervention Team |
| "CODIS" | Combined DNA Index System |
| "ComStat" | Computer Statistics |
| "CPI" | California Psychological Inventory |
| "CSC" | Civil Service Commission |
| "CUC" | Citizens United for Change |
| "DA" | District Attorney |
| "DI-1" | Disciplinary Investigation Form |
| "DOJ" | Department of Justice |
| "DVU" | Domestic Violence Unit |
| "ECW" | Electronic Control Weapon |
| "EWS" | Early Warning System |
| "FBI" | Federal Bureau of Investigation |
| "FIT" | Force Investigation Team |
| "FOB" | Field Operations Bureau |
| "FTO" | Field Training Officer |
| "IACP" | International Association of Chiefs of Police |
| "ICO" | Integrity Control Officers |
| "IPM" | Independent Police Monitor |
| "KSA" | Knowledge, Skill and Ability |
| "LEP" | Limited English Proficiency |
| "LGBT" | Lesbian, Gay, Bi-sexual, and Transgender |
| "MMPT" | Minnesota Multiphasic Personality Inventory |
| "MOU" | Memorandum of Understanding |
| "NNDDA" | National Narcotics Detection Dog Association |
| "NOFJC" | New Orleans Family Justice Center |
| "NOPD" | New Orleans Police Department |
| "NPCA" | National Police Canine Association |



| | |
|---|---|
| "OCDM" | Office of Consent Decree Monitor |
| "OIG" | Office of Inspector General |
| "OPSE" | Office of Public Secondary Employment |
| "PIB" | Public Integrity Bureau |
| "POST" | Police Officer Standards Training Counsel |
| "PsyQ" | Psychological History Questionnaire |
| "RFP" | Request for Proposal |
| "SART" | Sexual Assault Response Team |
| "SOD" | Special Operations Division |
| "SRC" | Survey Research Center |
| "SUNO" | Southern University of New Orleans |
| "SVS" | Special Victims Section |
| "UNO" | University of New Orleans |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |
| "VAW" | Violence Against Women |



## V.    INTRODUCTION TO QUARTERLY REPORT

Prior reports of the Monitoring Team have taken NOPD to task for its slow, or sometimes nonexistent, progress in achieving full compliance with the Consent Decree.  More recent reports have noted progress in some areas, but not in others.  This Report presents a similar "mixed bag" of progress.  Before getting to the contents of that "mixed bag," however, a few words are in order regarding something positive; something that often gets overshadowed by the negative.

The Monitoring Team has been on the ground in New Orleans since August 9, 2013, and over the course of those 17 months, we have had countless occasions to observe and interact with NOPD officers in each of the City's eight police Districts.  We have ridden with officers and supervisors during all shifts, and personally have observed them interacting with citizens in all manner of situations.  We also have observed citizen/police interactions without being seen by the officers involved, either as unidentified citizen "passersby" or by reviewing Body Worn Camera recordings.

One thing we have learned from these many personal observations is that the majority of NOPD officers are caring, capable, conscientious men and women who work day in and day out to make the NOPD a better department and New Orleans a safer place to live.  Certainly, not every member of the NOPD is deserving of this characterization and certainly the NOPD continues to be saddled with institutional (and other) obstacles that render even the best officers less effective than they should be, but the dedication, passion, and effectiveness of so many officers should not be ignored.

Be it the lieutenant who held a young girl having an asthma attack in his arms while his partner kept the swarming Bourbon Street Mardi Gras crowds at bay until EMS arrived, or the patrol officer in the Lower 9th Ward who returned to a single mother's house later in his shift to make sure her ex-boyfriend had not returned after an earlier encounter, or the canine officer who led a team down a neighborhood's dark alleys in search of an armed fugitive, or the officer first on the scene of a recent triple shooting who pumped oxygen into a 10-year-old girl's lungs while EMS tended to the gun-shot wound, or simply the Bourbon Street "promenade" officer who puts up with all manner of harassment from drunken visitors and reacts with patience and professionalism, NOPD officers every day perform great acts of bravery and simple acts of kindness.  These officers and their contributions to making life better for the citizens of New Orleans should not be lost in the din created by the NOPD's other problems or in the seemingly daily national stories of police officers and agencies that without question are worthy of our outrage.  The Monitoring Team recognizes these heroic contributions, and continues to see evidence of them taking place every day.

Of course, the existence of great police efforts does not cause us to ignore the unrelated negatives we continue to identify in NOPD's compliance actions or to "go easy" on the NOPD as an institution (or on any individual officer embracing a different ethic from those described above).  Indeed, in many ways, the positives we see from most officers further fuel our desire to



help NOPD identify and overcome the negatives.  So, with that as background, here is a summary of what we found this quarter – both the positive and the negative.

On the positive side, NOPD continues to make progress in several areas, including the following:

- Several new policies have been developed, vetted, revised, and approved by DOJ and the Monitoring Team.  These new policies comply with the requirements of the Consent Decree, and, as required by the Consent Decree, incorporate well-recognized policing best practices.

- The NOPD training Academy has expanded its course offerings and implemented several new training programs taught by well-recognized national experts.  The Monitoring Team has attended these new courses and has been impressed with the quality of the instructors, the instruction, and the materials.

- Body Worn Cameras have been deployed to most personnel handling calls for service.  Further, NOPD has committed to expediting the deployment of BWCs to sergeants and lieutenants.

- Updated technology has been purchased to resolve the problems of non-functional in-car cameras previously identified by the Monitoring Team.

- NOPD's Office of Police Secondary Employment continues to function as intended and continues to meet the needs of the New Orleans business community in compliance with Consent Decree requirements.

- NOPD's Canine Unit has demonstrated compliance with some of the requirements of the applicable paragraphs of the Consent Decree.

- Some NOPD districts and units have restructured their record keeping practices to bring into compliance several key areas where they previously were deficient.

- NOPD has created a functioning Crisis Implementation Team Planning Committee charged with bringing the Department into compliance with Section IV.A of the Consent Decree.  As described later in this Report, the Monitoring Team attended the inaugural meeting of this group and was impressed by the expertise, commitment, and energy of the participants.

Of course, as seems to be the Monitoring Team's consistent refrain, all the news has not been so positive.  Several police districts continue not to maintain adequate records to demonstrate compliance with a variety of Consent Decree requirements, many supervisors continue to lack the time, interest, and/or skill to provide close and effective supervision to their



officers, and the Department has made very little progress in meeting any of its Officer Assistance & Support obligations.

Other areas of Consent Decree compliance continue to lag as well. The Academy, for example, continues to be a primary focus of the Monitoring Team – and of the Court. As the Monitoring Team described at a recent public Court hearing, the Academy continues to operate without approved lesson plans, a meaningful evaluation of its instructors, and a comprehensive "get well" plan. While NOPD described its efforts to turn the Academy around at the recent Court hearing, these efforts have not been fully implemented and, thus, have not yet resulted in tangible change. While the Monitoring Team has been impressed by the energy and commitment of the Academy's new commander, compliance will be measured by results, not aspirations.

Moreover, NOPD must provide adequate support and resources to the Academy in order for it to be turned around as contemplated by the Consent Decree. So far, however, despite the increased focus on this issue by the Court and the Monitoring Team, we have not seen adequate progress. Simply put, the speed of NOPD's progress in the training context is too slow.

Finally, other Consent Decree areas seem to command the NOPD's attention only after being highlighted by the Monitoring Team. The Monitoring Team, however, will not be in New Orleans forever, and NOPD must do a better job taking the initiative to transform itself.

At the same time the Monitoring Team audits and evaluates NOPD's compliance with the many paragraphs of the Consent Decree, we continue to meet with individuals and community groups to hear their concerns, discuss policing matters, and gain additional insight into the community's view of the NOPD. (CD 461) In addition to these informal meetings, we also continue to hold public meetings following the issuance of our reports. The Monitoring Team's last meeting was held at the Ashe Cultural Center on January 27, 2015, and was attended by more than 75 citizens. The information we learn at these meetings informs our ongoing monitoring efforts. An illustrative list of community input we received this quarter includes the following:

- ***Continued frustration with the pace of change.***

As in prior community meetings, several community members expressed ongoing frustration with the observed pace of change. While the Monitoring Team shares the community's concerns regarding the speed of change, the fact is that positive change is taking place. As noted, new policies have been developed, vetted, and approved. New training has been implemented. New leadership has been put in place. And new practices, protocols, and procedures have been rolled out. While these achievements, and more, are demonstrable positive developments, we share the community's view that "the proof of the pudding is in the eating." In other words, while we continue to see real progress being made, until that progress manifests



itself in sustained constitutional policing on the street, we must view the progress with guarded optimism.

- ***Concern over the elimination of the college credit requirement for NOPD recruits.***

Several citizens expressed great concern to the Monitoring Team over the NOPD's decision to eliminate the 60-hour college credit requirement from its hiring standards. As described in greater detail later in this Report, the Monitoring Team shares this concern. While we do not believe college credits automatically makes someone a good police officer or that the absence of college credits automatically makes someone a bad police officer, we do know modern policing is complicated and calls for officers who are patient, sensitive, culturally aware, committed, and possess critical thinking skills. Many experts, including the Monitoring Team, believe at least some college improves the likelihood a candidate will have those traits. The Monitoring Team is closely reviewing the entirety of NOPD's recruitment and hiring process to ensure the officers it brings on the force will be part of the solution and not part of the problem.

- ***Greater citizen visibility into NOPD's activities.***

One citizen at the public hearing recommended greater public visibility into NOPD's activities, including access to all BWC recordings. While the Monitoring Team recognizes that (a) the Consent Decree requires NOPD to "collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to NOPD decision making and activities," and (b) some police agencies are testing the viability of making BWC recordings available to the public (Seattle, for example, is undertaking such a pilot program), the specific matter of public access to NOPD BWC video recordings is beyond the scope of the Monitoring Team's authority.

- ***Greater visibility into citizen complaints against officers.***

One citizen at the public meeting asked why the Community did not have access to an officer's disciplinary file, or at least the ability to see what complaints have been lodged against an officer. As noted above, while the Consent Decree requires NOPD to "collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to NOPD decision making and activities," mandating accessibility to officer records is beyond the scope of the Monitoring Team's authority.

\*     \*     \*

Additionally, as it did last quarter, the Court held a public hearing to focus on the Monitoring Team's findings. The February hearing focused on the NOPD Academy and training program, and was guided, in part, by information the Monitoring Team had collected from the public.



The Monitoring Team appreciates the comments received from the citizens of New Orleans and encourages others to share their views as well.



## VI.    SUMMARY OF MONITORING ACTIVITIES

This quarter, like the last, involved a mix of qualitative and quantitative assessments. Among many other things, our team spent the last quarter performing the following monitoring activities:

- We completed the Consent Decree's first Biennial Survey, which incorporated a survey of more than 425 police officers, 57 detainees within the Orleans Parish Jail, and 549 households from across the community.  (The results of this survey are presented later in this Report, and will be analyzed further and incorporated into future Reports as well.)

- We worked with the Department of Justice and the NOPD to review and revise NOPD's policies to ensure full compliance with the Consent Decree and to incorporate best practices.

- We reviewed serious use of force reports, including the contemporaneous officer reports, supervisor reports, the subsequent FIT investigation file, and relevant video footage.  Where we had questions or concerns about an investigation, we brought the matter to the attention of the NOPD Public Integrity Bureau and the NOPD Compliance Bureau.  We then ensured NOPD took the necessary action to respond to and remedy, if necessary, any concerns.

- We conducted an evaluation of NOPD's canine unit, including reviewing Canine Unit training, certifications, deployment reports, and associated case reports in light of the Consent Decree requirements and the current NOPD policy.

- We reviewed and monitored a number of ongoing PIB investigations.

- We conducted regular district-by-district and unit-by-unit audits of compliance with the Consent Decree's requirements relating to photographic lineups, custodial interrogations, supervision, camera use, technology functionality, and training.

- We attended Sexual Assault Response Team ("SART") meetings to assess and help facilitate the development of comprehensive sexual assault and domestic violence policies and procedures.

- We attended disciplinary hearings to evaluate the fairness of the hearing, the appropriateness of the discipline, and overall compliance with the Consent Decree. We met with the Independent Police Monitor in advance of significant disciplinary hearings and obtained the IPM's view of the matter to ensure the



view is adequately considered by the Deputy Chief or Commander conducting the hearing.

- We gave significant attention to the NOPD Academy, meeting with the new Academy commander, his direct reports, and several instructors on multiple occasions. We also personally observed training at the Academy, as well as outside training conducted by experts in various fields, including recently implemented instructor training conducted by the FBI. Additionally, due to the importance of training and criticism the Monitoring Team has leveled against the Academy in the past, U.S. District Court Judge Morgan visited the Academy to meet with its new leadership, tour the facility, and personally observe new-recruit training.

- The Monitoring Team observed NOPD officers and supervisors in the field, in all districts and during all shifts. We did this on weekdays and weekends. We also personally observed NOPD handling its major events, including Superdome events, Mardi Gras, and other City-wide festivals.

- We continued our assessment of PIB's handling of citizen complaints alleging racial profiling. As discussed in greater detail later in this report, the Monitoring Team is conducting this assessment in conjunction with the IPM.

And finally, as we have done since our appointment, the Monitoring Team spent time meeting with and listening to the parties to the Consent Decree. The Monitoring Team is in regular contact with the City, the NOPD, and the DOJ. We also continue to meet regularly with the NOPD Consent Decree Implementation Team, the PIB, the NOLA OIG, and the members of the Independent Police Monitor's team.



## VII.    POLICIES

The process of reviewing and revising NOPD's policies to ensure they meet constitutional standards and reflect best practices continues to be a time-consuming challenge. Drafting policies that also communicate effectively and succinctly requires meticulous care. Compounding the challenge is a constant need to ensure uniformity and consistency where definitions, procedures, or responsibilities touch different policies.

While earlier reports have criticized NOPD's approach – includes its past approach of separating policies and procedures into separate documents – we more recently noted process improvements have expedited the goal of drafting and implementing Consent Decree compliant policies.  Those changes have begun to bear fruit.  The following policies were approved in the 4th quarter:

- Use of Force Generally

- Use of Force Reporting and Investigation

- Misconduct Complaints/Disciplinary Investigations

- Domestic Violence

- Employee Conduct:  Minor Violation/Infraction

Two of the revised policies, Use of Force and Domestic Violence will significantly impact the community and warrant further discussion.

### A.    Use of Force

NOPD's use of force policies are extensive and set forth in multiple and related policies. For example, the NOPD's basic use of force policy is now set forth in Chapter 1.3 (formerly Policy 300).  The policy governing investigation of an officer's use of force and policies governing specific applications of force, such as vehicle pursuits, canine, etc., are set forth in subsidiary policies.  Because these policies rely upon the definitions and provisions of Use Of Force Chapter 1.3, the parties focused on first revising the basic policy and then revised the Use of Force Reporting and Investigation policy.  Upon approval of those two policies, we turned to the following related policies: (1) Vehicle Pursuits; (2) Canine, (3) Use of Force Review Board, (4) Conducted Electrical Weapons (commonly referred to as Tasers), (5) Firearms Training and Qualification, (6) Scenario-Based Firearms training, (7) Handcuffing and Restraints, (8) Control Devices and Techniques, and (9) Ammunition.  Approval of these policies should occur in the next quarter.  Upon release, the policies are posted and are publicly available on the NOPD's website.



Obviously, drafting Consent Decree compliant use of force policies is and will be a significant and consequential achievement.  The NOPD's use of force was a major focus of the Department of Justice's Findings Letter as well as a major concern within the New Orleans Community.  The revised use of force policy responds to deficiencies identified in the DOJ Findings Letter, satisfies the requirements of the Consent Decree, and reflects current law enforcement best practices.  The language concerning justifications for the use of force was revised to more accurately reflect constitutional standards and requirements.  For example, the revised policy clarifies that whether a given use of force is constitutional is determined by whether the use was "objectively reasonable" under standards articulated by the Supreme Court rather than simply reasonable in the judgment of the officer using the force.

The revised policy also provides clearer definitions and guidance concerning levels and types of force. A graphic depicting the Use of Force Continuum was revised to more accurately illustrate the appropriate response to a given level of resistance.  The requirements and guidance included in the policies also were reordered sequentially, making them easier to follow and more useful as a reference.  The revised policies also ensure responsibility for complying with a requirement under the policy is explicitly assigned to a designated individual, which will promote accountability.  The policies also emphasize the roles and responsibilities of officers witnessing a use of force, including the obligation to intervene to stop an inappropriate use of force, as well as supervisor's responsibilities in responding to a reported use of force.

Importantly, the policies emphasize the necessity of using de-escalation techniques and other alternatives to force.  For the first time, NOPD policy provides that,

> [w]here consistent with protecting the safety of the officer, the subject, or the public, officers *shall* use de-escalation techniques to avoid or reduce the need for the use of force.  (Emphasis added.)

Overall, combined with quality training and supervision, the revised policies should protect both NOPD officers and the public by (1) reducing the frequency with which force is used as well as reducing the level of force used in a given encounter, and (2) improving reporting, tracking and oversight of uses of force.

**B.      Domestic Violence**

The domestic violence policy is the product of a community-wide effort by partners involved in the New Orleans Blueprint for Safety, a DOJ-funded collaboration of City and community stakeholders that joined to develop a coordinated criminal justice response to domestic violence.  According to the DOJ,

> [t]he Blueprint for Safety is an approach to domestic violence cases that coordinates agency responses around the shared goals of safety and Justice . . . .  The whole point of the Blueprint is to



make sure that we're keeping victims safe and holding offenders
accountable.

Bea Hanson, principal deputy director of the Office on Violence Against Women, Department of
Justice, assisted the NOPD in drafting a domestic violence policy that now reflects a national
model for response to domestic violence.  Prior to beginning the drafting process, this group
identified existing responses to domestic violence, reviewed police reports, rode along with
NOPD patrol officers, listened in on 911 calls, and interviewed NOPD officers about the
Department's domestic violence policies and practices.  The revised policy incorporates the
Blueprint for Safety foundational principles which include: adhering to an interagency approach
and collective intervention goals; building attention to context and severity of abuse into each
intervention; and, recognition that most domestic violence is a patterned crime requiring
continuing engagement with victims and offenders.  It also emphasizes the importance of the
initial response to a domestic violence incident.  It explains that a single incident of domestic
violence is usually part of a patterned use of coercion, intimidation, and the use of threat of
violence – namely battering.  It outlines steps the responding officer must take to lay the
foundation for each subsequent intervener.

The NOPD domestic violence policy now delineates commissioned member's duties
from the initial response through the follow-up investigation.  The new policy provides guidance
to the Communications Division and incorporates an updated Standard Operating Procedure for
call-taking and dispatch.  It provides a domestic violence patrol checklist to guide the responding
officer's handling of a domestic violence incident.  The checklist, when used by the officer on
the scene, is an effective tool in performing a "primary aggressor" assessment to make more
appropriate and effective arrest decisions.

The new policy is victim-centered and specifically guides the NOPD responder in ways
to deal effectively with a victim of domestic violence.  It provides officers detailed guidance for
conducting domestic violence risk assessments.  The policy strongly discourages "dual arrests"
for domestic violence incidents.  It provides guidance on proper collection of evidence and
specific information on the signs and symptoms of strangulation.  The policy requires a report to
be made for all domestic violence investigations regardless of whether an arrest was made.
Officers are also required to complete the new NOPD Domestic Violence Patrol Report
Checklist (Form #46) and injury documentation on the Domestic Violence Supplemental page.

Also new, should the officer believe the parties do not meet the relationship criteria for
intimate partners, family members or household members, the policy provides the officer shall
obtain supervisory approval to proceed with the investigation as a non-domestic incident.
Conversely, should the officer believe the parties DO meet the relationship criteria for a
domestic violence incident, but the incident has not been classified as a domestic violence
incident, the officer shall notify dispatch to change the signal code to a domestic incident.



     The policy provides the Domestic Violence Unit is responsible for follow-up investigations of felonies, certain misdemeanors, and certain cases where the offender has left the scene.  The DVU has a new Standard Operating Procedure that was improved to include the requirements of the new policy.  In sum, the revised policy incorporates best practices for responding to domestic violence, provides clearer guidance to officers, equips them with more resources to support the victims of domestic violence, promotes improved coordination between the NOPD and victim support organizations, increases consistency, limits discretion and provides for greater supervisory oversight.



## VIII.   USE OF FORCE (CD 27-100)

As noted in prior Reports, the issue of appropriate use of force is critical to Constitutional policing.  Accordingly, the Monitoring Team focuses on this important issue every month.  We review policies, attend training, review Use of Force Reports, review FIT files, and watch contemporaneous video recordings of NOPD use of force events.

In this report, we focus on NOPD use of canines, which is a component of use of force.  Our next report will focus on a different component of use of force.

### A.  Use of Canines

The Consent Decree requires NOPD to implement canine policies and procedures that comply with the law and the requirements of the Consent Decree, and that comport with best practices and current professional standards.  Late in 2014, the Department presented a revised draft canine policy that was approved in early March and is expected to be released to officers in May.  Meanwhile, as part of our monitoring activities, we reviewed canine unit training, certifications, deployment reports, and associated case reports in light of the Consent Decree requirements and the current NOPD policy.

#### 1.  Training and Certification

Paragraph 48 of the Consent Decree requires the Department to establish and maintain a canine certification program that ensures:  (1) canines and their handlers demonstrate control and proficiency in specific, widely accepted obedience and criminal apprehension exercises; (2) canines and their handlers receive a minimum of 16 hours of training every four weeks; (3) the trainer keeps detailed records of whether each canine team has met specific control criteria for each control exercise, and what remedial training was given if a canine team was deficient in any area; and (4) the trainer reports all deficiencies to the unit supervisor.  Each canine team must be certified annually by a nationally recognized trainer or organization.  ***NOPD has not demonstrated full compliance with this paragraph of the Consent Decree.***

The training and certification records of each handler and each canine are maintained in a separate file as are the training and certification records of the lead trainer.  Records indicate all but one of the handler/canine teams have been certified annually by an outside certification agency.  Records of this year's certification were found in each handler's training records file.

NOPD utilizes two different nationally recognized certification agencies – the National Narcotics Detection Dog Association ("NNDDA") and the National Police Canine Association ("NPCA") – to ensure canines and handlers demonstrate control and proficiency in specific, widely accepted obedience and criminal apprehension exercises.  During one visit to SOD, the Monitoring Team observed three teams take and pass NNDDA's drug detection dog certification test.



According to NOPD, a handler/canine team will not be deployed unless its certification is current.  The Monitoring Team reviewed each handler's training records and determined all handler/canine teams currently being deployed as patrol dogs have been certified annually by NPCA.  Although each handler/canine team possessed the annual certification, the Monitoring Team found two teams failed the recall exercise in the criminal apprehension phase of the certification.[1]  This is a significant shortcoming as the ability to recall the canine can be a major factor in reducing bites.  The Monitoring Team strongly recommends the canine unit's trainer work with the two teams to ensure that the handler can recall the dog when necessary.

In addition to the basic certification, weather permitting, NOPD holds in-service training once a week on Tuesday mornings for the handler/canine teams, meeting the requirement for 16 hours of training per month.  We observed this training on several occasions in 2014 and reviewed the training records maintained by the canine trainer. We found the training records contain limited detail on the content of each training session and on the performance of each canine team.  In light of our finding that two of the canine teams failed the recall exercise of the criminal apprehension grouping of the NPCA certification test, evidence that these deficiencies were addressed during the weekly training sessions should have been found in the training records, but was not.  Due to these deficiencies, *we cannot find NOPD in complete compliance with paragraph 48 of the consent decree.*

We noted in a prior Report that a canine team comprised of the unit's most junior handler with a recently acquired canine failed to meet certification requirements.  Our current review found that same team has not been retested by NPCA and has not met the certification requirements.  The Monitoring Team was advised the handler/canine team is not being used in canine deployments.  Our review of the 66 deployments in 2014 verified this team was not used.

Paragraph 49 of the Consent Decree requires NOPD to employ a qualified trainer who is capable of providing certified canine training.  *NOPD has been able to demonstrate compliance with this paragraph*.  The current department trainer, Harold Chambliss, is a certified handler who also has been assigned his own dog.  Mr. Chambliss also is certified as a trainer by K-9 Concepts, Inc., based in Broussard, LA.  Mr. Chambliss completed a 320-hour instructor's course for the training of police patrol and detection dogs in 2010, and 40-hour instructor retraining course in police patrol and narcotics detection in 2011.  Copies of the certifications were found in his Canine Unit personnel file.

---

[1]     The patrol dog certification conducted by NPCA consists of 16 exercises in four groupings that test both the handler's ability to control the dog and the dog's obedience, behavior, and stamina.  The obedience section consists of tests on healing, turning, drop off, and stay on gunfire.  Both the area search group and the building search group consist of tests assessing the handler's deployment tactics, his ability to read the canine's behaviors as indicators of present of subject, his tactics, and the canine's behavior when a subject is found.  The criminal apprehension section tests the handler's ability to recall the dog and the dog's obedience to the command to release the bite.  For a more complete description of the certification process and include tests see *the National Police Canine Association Standards for Training & Certification*, revised – August 14th, 2014.



The NPCA Standards for Training & Certification Manual does not set out retraining requirement for canine trainers.  The NPCA manual does, however, require certifying officials to attend a re-training course once every three years.  Considering the dynamic nature of police work, the changes in case law related to use of canine, and evolving best practices in the use of police canine for apprehensions, we encourage the NOPD to send its in-house canine trainer to a re-training course at least once every three years.  The course should include a legal update on the use of police canines. Furthermore, though the unit is relatively small, the Department should anticipate the retirement of the current trainer and prepare someone to assume the trainer role when he leaves.  Becoming a certified canine trainer is a multi-year process.  In identifying the best trainer candidate, the Department should develop desired traits and selection criteria, involve ranking members of the Department, and consider including a respected local veterinarian and a community member as part of the selection review board. Because training records maintained by the trainer contain limited detail on the content of each training session and on the performance of each canine team, we find that ***NOPD has demonstrated only partial compliance with paragraph 49 of the Consent Decree.***

## 1.      Search Triggering Event

NOPD policy limits canine deployments to those situations where there is reasonable belief "that the individual has either committed or threatened to commit any serious offense and if any of the following conditions exist:

- There is a reasonable belief the individual poses an imminent threat of violence or serious harm to the public, any officer or the handler.

- The individual is physically resisting or threatening to resist arrest and the use of a canine reasonably appears to be necessary to overcome such resistance.

- The individual is believed to be concealed in an area where entry by other than the canine would pose a threat to the safety of officers or the public."  NOPD Policy 318.2.

In addition to looking at the event that precipitated the deployment, the Monitoring Team also examined the canine deployments for factors that contributed to the apprehensions resulting in a bite.  Consent Decree paragraph 43 requires handlers only allow their canines to engage a subject by biting if: (a) the subject's actions pose a risk of imminent danger to the handler or others; a risk of serious harm to the canine; or the subject is actively resisting (active resistance does not include concealment and refusal to surrender without more) and (b) the handler is in visual and auditory range of a subject, except where the subject is hiding in a confined space (e.g., a crawl space) and refuses to surrender, or escaping.  Handlers will not allow their canine to engage a subject by biting if a lower level of force could reasonably be expected to control the subject or allow for the apprehension.  As previously stated, NOPD's canine policy, in place during the period of this audit, was not a policy approved by DOJ or the Monitoring Team.



Thus, canine supervisors and handlers were not given Consent Decree-compliant guidance on when deployments can occur and how handlers should control their dog when conducting the search.  ***NOPD has not yet demonstrated compliance with the requirements of paragraph 43 of the Consent Decree.***

NOPD's deployment reports include information on what triggered the police interaction with the subject, including what the subject was wanted for and whether or not there was information the subject was or might be armed.  We found in the 66 deployment reports we reviewed, 16 subjects were suspected of violent felonies and 17 others were believed to be armed.  Encounters between a subject and a police officer are initiated in many ways.  The officer may learn a subject is wanted for a past crime, or may observe the subject committing a crime.  Where an encounter ends in an arrest, the cause of the arrest may or may not be the same as the cause of the initial encounter.  The following table presents data on the initial offense that caused the officer to focus attention on the subject in the first place, and the offense with which the subject ultimately was charged:

The deployment and associated item reports include information on what triggered the police interaction with the subject, including what the subject was wanted for or suspected of, and whether or not there was information the subject was or might be armed.  We found in the 66 deployment reports we reviewed, 16 subjects were suspected of violent felonies and 17 others were believed to be armed.  Encounters between a subject and a police officer can be initiated in many ways.  The officer may learn a subject is wanted for a past crime or may observe the subject committing a crime.  Once the officer focuses attention on the subject, a series of events often follow ending in arrest. The following table presents data on the initial offense that caused the officer to focus attention on the subject, and the offense the subject was charged with when apprehended.

**Table 1 – Initial Offense Suspected v. Offense Charged**

| Initial Offense Suspected | Offense Charged | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Agg. Assault | Att. Murder | Armed Robbery | Residence Burglary | Possess firearm | Auto Burg | Auto Theft | Resisting | TOTAL |
| Aggravated Assault | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Armed Robbery | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Attempt Murder | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Auto Burglary | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 3 |
| Residential Burglary | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |



| Initial Offense Suspected | Offense Charged | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Agg. Assault | Att. Murder | Armed Robbery | Residence Burglary | Possess firearm | Auto Burg | Auto Theft | Resisting | TOTAL |
| Carjacking | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |
| Drug Violation | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Illegal Carrying | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 6 |
| Stolen Vehicle | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 |
| Suspicious Behavior | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 6 |
| Traffic Violation | 3 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 6 |
| **TOTAL** | 5 | 2 | 4 | 1 | 15 | 1 | 4 | 3 | 35 |

## 2.   Deployment Approval

The Consent Decree requires a canine handler obtain approval from an on-duty or on-call supervisor prior to conducting a search for a subject.  If the handler is unable to contact a Canine-unit supervisor, the handler must get approval from the watch commander before the canine can be deployed.  In 2014, the NOPD Canine unit responded to 84 requests to assist in locating and apprehending a subject.  Sixty-six were approved for search; 18 were not.  We reviewed the deployment reports of 66 of the searches, including all deployments that resulted in an apprehension, with or without a bite.

The Canine Unit is a sub-unit of the Special Operations Division ("SOD").  As previously reported, because there is only one sergeant assigned to the Canine unit, the Department decided to train all sergeants assigned to SOD and require handlers to obtain approval first from their sergeant, and if not available, then from an on duty SOD supervisor.  If neither is available, the handler must get approval from a district watch commander or supervisor.  Of the 66 deployment reports we reviewed, 75.8% were approved by either the Canine unit sergeant (36.4%), the SOD Captain to whom the canine sergeant reports (21.2%), or a trained on duty SOD supervisor (18.2%).  Fewer than 5% were approved by a District watch commander and 18.2% were approved by a District sergeant (Table 1).

Providing specialized training to the SOD supervisors is a noteworthy practice.  If the training is well designed and delivered, it should improve the quality of the decisions made by the supervisors.  Missing from NOPD's files, however, are the instructional lesson plans and the attendance records.  As with any training provided to members of the Department, a lesson plan should be prepared by the instructor.  It should be in the approved format and subjected to the



same review and quality control as other training courses.  Furthermore, as is the case for other in-service training, attendance records should be maintained. The canine unit supervisor was unable to provide any of these documents.

When the canine supervisor was on duty but not available to respond to the scene, the handler would contact him by phone to obtain approval.  The same practice took place when an on-duty SOD supervisor was not available at the scene of the event.  As depicted in Table 1, the handler contacted a Canine Unit or trained SOD supervisor by radio for approval rather than obtain the approval from an on scene district supervisor in 25 deployments.  A Canine Unit or SOD supervisor was unavailable and the approving district supervisor was on scene in the 16 deployments where the handler obtained approval from a district supervisor.

Because NOPD policy requires that trained SOD supervisors or District watch commanders approve deployments when the Canine Unit supervisor is unavailable and because the training provided to the SOD supervisors is not properly documented with an approved lesson plan and attendance records, *we cannot find NOPD in compliance with Paragraph 41 of the Consent Decree.*

**Table 2 – Presence of Approving Supervisor**

| Approving Supervisor's Unit | Searches Approved | Percent | On Scene | Percent |
|---|---|---|---|---|
| Canine | 24 | 36.4% | 15 | 62.5% |
| SOD Captain | 14 | 21.2% | 4 | 28.6% |
| On Duty SOD | 12 | 18.2% | 6 | 50% |
| District Lieutenant | 3 | 4.5% | 3 | 100% |
| District Sergeant | 12 | 18.2% | 12 | 100% |
| Not identified in report | 1 | 1.5% | 1 | 100% |
| Total Deployments Reviewed | 66 | | 40 | 60.6% |



### 3.    Warnings and On/Off Leash Searches

Paragraph 42 of the Consent Decree requires, prior to a search, the handler must "issue three loud and clear warnings that a canine will be deployed and advise the subject to surrender, unless such warnings impose an imminent threat of danger to the canine handler or other officers on scene.  A canine handler must allow a sufficient period of time between each warning to provide a subject an opportunity to surrender."

As Table 3 details, of the 66 deployments reviewed, the handler gave the required warning in all but one case.  That case involved a search for a subject who shot at the police as the subject was fleeing.  In the handler's deployment report, he states "that, due to the severity of the crime the subject was wanted for," he did not give any warning.  The deployment report indicates the canine sergeant was the approving supervisor and on the scene, but it does not indicate the handler advised the supervisor of his decision to deploy the dog without giving a warning and that the sergeant gave approval to the decision.  The subject was eventually located by the canine and taken into custody with a bite.  He was charged with two counts of attempted murder and with possession of a firearm by a felon.  Although the facts demonstrate the handler made a reasonable and justifiable decision to unleash the canine without giving the required warning, the deployment report did not document any approval received from the sergeant.

**Table 3 - Warnings & Off Leash Searches**

|  | On Leash | | Off Leash | |
|---|---|---|---|---|
| Warning Given | 65 | 98.2% | 1 | 1.8% |
| Warning Not Given | 1 | | 0 | |
| TOTAL | 66 | | 1 | |

Consent Decree paragraph 39 limits "off-leash canine deployments, searches, and other instances where there is an increased risk of a canine bite to a subject to instances in which the subject is wanted for a violent felony or is reasonably suspected to be armed based upon individualized information specific to the subject."  The current NOPD policy, Policy 318.2, includes the same limitation.  In only one deployment was a canine released from the tracking leash.  In that case, the search started out on lead.  The handler was informed that the subject was observed by two officers at different points in the preceding foot pursuit to have a gun in his hand as he fled from them. During the search, the canine alerted to some brush.  The handler, concluding the subject was hiding in the brush, gave verbal commands to the subject to surrender.  The subject chose to jump up and flee toward a wooded area.  The handler released his dog from the leash, letting the dog apprehend the subject by bringing him to the ground.  The



subject sustained bites to the right shoulder and left thigh.  He was treated at the hospital for his injuries.  He was charged with aggravated assault and carrying a weapon.

## 4.    Apprehensions & Bites

Consent Decree paragraph 51 requires NOPD "to track canine deployments and canine apprehensions, and to calculate and track canine bite ratios on a monthly basis to assess its canine unit and individual canine teams."  The bite ratio is computed by dividing the number of apprehensions by the number of bites.  The NOPD Canine Unit prepares a monthly and annual report tracking deployments, apprehensions and bites by handler/canine team.  The Consent Decree gives guidance on how the bite ratio should be used by the department to manage its use of canines, and paragraph 52 requires the department to include bite ratios as an element of the Early Warning System, which is not yet in place.  It requires the Department to review the performance of any handler whose bite ratio exceeds 20 percent in any six-month period, or if the unit's bite ratio exceeds that threshold, and to require interventions as appropriate.[2]

In 2014, the Canine Unit assisted in the apprehension of 35 subjects (Table 4).  Twenty-three of those apprehensions occurred without a bite.  Twelve of the apprehended subjects were bitten by the dog.  All 12 were treated at the hospital for their injuries.  Thus, the Department had an overall bite ratio of approximately thirty-four percent.  The following table presents data on apprehensions for individual canine teams and the unit overall.

---

[2]     It should be note that  in compliance with the Consent Decree NOPD revised its policy to redefine a bite  as any physical contact between a canine's teeth and a person or animal regardless of whether the skin is punctured or lacerated.  Under the prior policy a "bite" was defined as a puncture or laceration of the skin.  Thus, the revised policy broadens the definition of a bite, which will increase the number of bites reported but will result in a more comprehensive understanding of apprehensions and bites.



**Table 4 – Bite Ratio**

| Handler/Canine | Jan-Jun | | | Jul-Dec | | | Overall | | |
|---|---|---|---|---|---|---|---|---|---|
| | Apprehend | Bite | % | Apprehension | Bites | % | Apprehend | Bite | % |
| Team A | 6 | 2 | 33% | 7 | 1 | 14.3% | 13 | 3 | 23.1% |
| Team B | 1 | 1 | 100% | 1 | 0 | 0 | 2 | 1 | 50% |
| Team C | 2 | 2 | 100% | 0 | 0 | - | 2 | 2 | 100% |
| Team D | 3 | 1 | 33% | 2 | 0 | 0 | 5 | 1 | 20% |
| Team E | 6 | 3 | 50% | 5 | 1 | 20% | 11 | 4 | 36.4% |
| Team F | 0 | 0 | - | 2 | 1 | 50% | 2 | 1 | 50% |
| Team G | 0 | 0 | - | 0 | 0 | - | 0 | 0 | - |
| TOTAL | 18 | 9 | | 17 | 3 | | 35 | 12 | 34.3% |

As the data indicate, the unit's overall bite ratio and the bite ratio of all but one handler exceeds 20 percent.  Although weapons were recovered in 16 of the 29 incidents that resulted in the 35 apprehensions, and 8 of the 12 bites occurred to subjects apprehended in tight crawl spaces, the overall bite ratio of 34.3% should cause NOPD to review each handler's search tactics and ability to control the canine.  Furthermore, the newly approved Use of Force Policy 1.3 requires, when feasible, canine handlers to consider area containment and waiting out a subject in order to reduce the number of apprehensions resulting in bites.  This new requirement should be presented in the weekly Canine Unit training without waiting for training on the new Use of Force policy in the Department's in-service training.

**5.      Location of Apprehension**

The Consent Decree recognizes that certain circumstances increase the chance the dog will bite the subject.  Accordingly, the Monitoring Team looked at where the subject was found by the canine.  The following table provides information on where the subject was located when apprehended.  66.7% of the bites occurred to subjects found hiding in a crawl space.



**Table 5 – Apprehension Location**

|  | Apprehension | % | Bite | % |
|---|---|---|---|---|
| Commercial Building | 3 | 8.6% | 2 | 16.7 |
| Residential Structure | 1 | 2.9% | 0 | 0 |
| Open Field/Brush/Woods | 7 | 20% | 1 | 8.3 |
| Crawl Space | 22 | 62.8% | 8 | 66.7 |
| Other | 2 | 5.7% | 1 | 8.3 |
| TOTAL | 35 |  | 12 |  |

## 6.    Deployment Outcome

As depicted in Table 5, 66 of the 84 requests for assistance to locate and apprehend a subject resulted in searches and 18 did not.  Apprehensions were made in 29 of the searches; 6 resulting in the apprehension of 2 subjects.  Weapons were recovered in 16 of the searches with apprehensions.  Four weapons were recovered in 4 searches that did not result in an apprehension.

**Table 6 – Outcome of Canine Search Requests**

|  | Outcomes of Requests for Searches for Subjects | |
|---|---|---|
| Apprehension | 29 | 34.5% |
| No Apprehension | 37 | 44.1% |
| Not Deployed | 18 | 21.4% |
| TOTAL | 84 |  |



### 7.    Body Worn Cameras ("BWC")

Since early May 2014, members of the Department were issued body worn camera and are required to activate them each time officers respond to a call for service or interact with the public.  We looked for corresponding body worn camera videos in our review of the canine deployment reports.  Thirty of the 66 deployments we reviewed occurred after deploying body worn cameras.  We found body worn camera videos covering 27 of the 30.  We were unable to locate a video in three of the deployments.  In one case, the video captured the handler's exchange with the requesting officer but went dark before the search commenced.  The last thing seen on the video is the handler donning his protective gear.  It is apparent the gear blocked the cameras video recording.  However, the audio of the entire search was captured by the BWC.

BWC videos present valuable evidence of what occurs in police-citizen encounters.  They are useful supervisory tools, as is evidenced by the Department's requirement that supervisors review BWC videos when conducting use of force investigations or allegations of misconduct.  The Department also requires supervisors to conduct weekly randomly BWC video reviews of their subordinates.  The Monitoring Team found several instances where the canine handler's body worn camera video was not associated with the correct item number.  There are many reasons why this could occur, and most are not the fault of the canine handler.  For example, the Monitoring Team has observed several instances where multiple item numbers are associated with a single event, leaving involved officers to choose one of several options.  The Department has recognized this problem and is currently in the process of obtaining software that will link dispatch data to BWC records.  Hopefully, this will alleviate the problem.



## IX.    CRISIS INTERVENTION TEAM (CD 111-121)

Section IV of the Consent Decree deals with the establishment of a Crisis Intervention Team ("CIT") within the NOPD.  According to the National Alliance on Mental Illness ("NAMI"), a CIT program is a "local initiative designed to improve the way law enforcement and the community respond to people experiencing mental health crises."  The Consent Decree requires NOPD to stand up a CIT and implement an effective crisis intervention structure in order "to minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder."

In our last report, we found NOPD had made almost no progress toward complying with its CIT obligations during the reporting period.  We noted, however, "subsequent to this reporting period, the NOPD Consent Decree Implementation Unit, with the urging of the Monitoring Team, has begun pushing NOPD forward in this area."  Specifically, we noted "a Crisis Intervention Team Planning Committee has been formed and plans to meet in January 2015."  OCDM December Report at 10.

As promised, NOPD stood up its CIT Planning Committee and held a kick-off meeting in early 2015.  The meeting was facilitated by Mr. Danny Murphy of NOPD's Compliance Bureau, and was attended by NOPD managers, EMS professionals, two judges, Coroner Jeffrey C. Rouse, M.D., senior management of the Metropolitan Huron Services District, and a number of community health care experts.  The Monitoring Team attended the meeting and was *very impressed*.  We were impressed by the turn out; the knowledge, experience, and commitment of the participants; and, frankly, the energy of the meeting.  While mindful of the old adage "well begun is half done," the Monitoring Team believes NOPD's CIT effort is off to a promising start.  NOPD, however, clearly needs to make up for lost time.  We are hopeful the Department takes advantage of the current level of energy and moves forward toward compliance in this area with great speed.  ***At the moment, though, notwithstanding promising progress, we must continue to find NOPD not yet in compliance with its Consent Decree obligations***.



## X.      BIAS FREE POLICING (CD 177-194)

Section VIII of the Consent Decree requires NOPD to deliver police services that are equitable, respectful, and bias-free in a manner that promotes broad community engagement and confidence in the Department.  As part of a broad-based review of NOPD's compliance with the Bias Free requirements of the Consent Decree, the Monitoring Team initiated an audit in connection with the Independent Police Monitor ("IPM") focusing on racial profiling.

The joint Monitoring Team/IPM project involves listening to a sample of citizen complaints presented to the NOPD PIB to identify those that alleged racial profiling.  The joint team then reviewed the associated PIB intake report to determine whether PIB's coding of the complaint is consistent with the complaint itself.  In other words, we are looking to see if complaints alleging racial profiling are being coded as something other than racial profiling.

The Monitoring Team also is using this joint project as an opportunity to evaluate whether complaining citizens are being treated properly by the PIB.  By listening to the intake recordings, we can assess whether citizens are being discouraged from pursuing their complaints or otherwise are being intimidated or coerced, whether officers are being respectful, and whether the NOPD is complying with its obligations under the Consent Decree regarding the complaint intake process.

Due to the importance of this project, the Monitoring Team expects to issue its findings as part of a special interim report in the future.



## XI.    POLICING FREE OF GENDER BIAS (CD 195-222)

The Consent Decree encompasses a wide variety of issues relating to NOPD's handling of sexual assault and domestic violence matters.  The Consent Decree requirements are far-reaching, encompassing NOPD's policies, practices, training, record keeping, supervision, and more.  The Monitoring Team continues to evaluate NOPD's progress in all of these areas.  Before getting into those activities, however, an initial observation is in order.  And sadly, it is an observation we have made in the past.

In our prior report, we offered the following comment regarding NOPD leadership in the area of sexual assault and domestic violence matters:

> [We] note the NOPD Sex Crimes Unit has had at least four different leaders over the course of the past 14 months.  This constant change in leadership has made it extremely hard for NOPD to focus on remedying the problems identified by DOJ and meeting the requirements imposed by the Consent Decree.  The Monitoring Team believes such management inconsistency reflects a lack of focus – or perhaps even a lack of commitment – to this critical topic by NOPD leadership.  We hope we are wrong, but until we see evidence otherwise, we will continue to find NOPD not in compliance with the Consent Decree in this area.

Unfortunately, the past few months have not given us any reason to change our view.  In fact, NOPD once again is changing its Special Victims Section leadership.  The commander, who had led the Unit only since September 2014 was moved out of the Unit earlier this month.  NOPD reports there will be other changes as well.  While NOPD very well may have valid reasons for making the change, one should not think such changes come without cost in terms of consistency, energy, and progress.  As we said last month, the Monitoring Team continues to be concerned over ongoing management inconsistency.  We are hopeful this most recent change will constitute a lasting fix.

With that as background, the following sections summarize NOPD's and the Monitoring Team's activities in the areas of sexual assault and domestic violence over the past few months.

### A.    SA and DV Policies

Over the course of the last few months, the Monitoring Team has worked closely with NOPD to facilitate the final approval of its domestic violence policy.  The Monitoring Team shared best practices and recommendations to ensure the final policy was comprehensive, practical, and effective.  We met with nationally known domestic violence experts, victim advocacy groups, the Department of Justice, and NOPD leaders on a number of issues, including critical foundational matters, such as whether the Department's policy should be "mandatory



arrest" (as it was) or "pro-arrest (as is the current best practice).[3]  The final pro-arrest policy was approved by the Monitoring Team and the Department of Justice in February 2015.

Supplementing the new DV policy, NOPD Superintendent Harrison issued a special order in late 2014 focusing on DV responsibilities of officers and supervisors.  The special order was accompanied by a new reporting form (NOPD Domestic Violence Patrol Report Checklist) developed to assist officers in collecting the proper amount of information on the scene of a domestic violence event.  The new form is to be filled out by officers on the scene and added as addendums to their police reports.  The Monitoring Team has incorporated a periodic audit of the new forms into its ongoing monitoring.

NOPD currently is working to complete its sexual assault response policy.  The original goal for finishing this policy was December; however, as of the March publication of this Report, the draft is incomplete.

## B.     SA and DV Practices

Beyond the sexual assault and domestic violence policies described above, the Monitoring Team continues to monitor NOPD's practices regarding responding to and investigating both areas.  To ensure NOPD's policies and training were being implemented in practice, the Monitoring Team initiated random reviews of domestic violence reports and BWC videos.  We review the written materials to assess the correct use of victim terminology and whether the reports present a fair representation of the actual scene.  We review the videos to evaluate NOPD's treatment of victims reporting domestic violence. We also compare the written reports to the videos to ensure the reports are complete and accurate.

The Monitoring Team also meets frequently with members of the Orleans Parish District Attorney's Office to discuss domestic violence issues and to obtain their views as to whether NOPD is adhering to internal procedures.  For example, the Monitoring Team, along with the DA's office, regularly reviews the number of "dual arrest" reports submitted by NOPD personnel, high numbers of which could suggest a violation of the Consent Decree.  As we reported in the past, neither the District Attorney's Office nor the Monitoring Team has seen a high number of such arrests.

---

[3]     As the name implies, a "mandatory arrest" policy is one where a police officer must make an arrest where probable cause exists that an offense has been committed.  In contrast, a "pro arrest" policy is one where a police officer is encouraged to, but is not required to, make an arrest where the offense is minor in nature and the use of discretion by a police officer is in the best interest of the victim.  The Violence Against Women Act ("VAWA") of 1994 explicitly endorsed a mandatory arrest policy.  In 2005, however, the reauthorization of VAWA moved from a mandatory to a "pro-arrest" stance.  Currently, the best practice among most police departments is to adopt a "pro arrest" policy for domestic violence matters.



### C.     Sexual Assault Response Team ("SART")

NOPD continues to be an active participant in SART, New Orleans's implementation of a nationally recognized Sexual Assault Response Team.  The purpose of the SART program is to help communities, like New Orleans, develop and implement "a coordinated, multidisciplinary, and victim-centered first response to victims of sexual assault."  The Monitoring Team attends SART meetings along with NOPD personnel, and so far we have been pleased with the efforts of the SART group, although, as in most areas of the Consent Decree, we would like to see greater speed in achieving its goals.

The SART has been active in NOLA since February 2013 and has facilitated positive interaction among community members, experts, and NOPD to develop a community-wide response to sexual assault matters.  These interactions have borne fruit.  The recent media attention about rape victims being charged for ER exams, for example, came directly from SART partners exchanging information and reaching out to those who can change the laws.

The Monitoring Team continues to observe SART's activities and continues to be impressed with the knowledge, energy, and commitment of the SART participants.  Its ability to achieve meaningful and broad-based success, however, has been slowed by the frequent changes in NOPD Special Victims Section leadership noted above.

### D.     NOFJC Program

The New Orleans Family Justice Center "is a partnership of agencies dedicated to ending family violence, child abuse, sexual assault, and stalking through prevention and coordinated response by providing comprehensive client-centered, empowerment services in a single location."  NOPD continues to support a number of NOFJC programs through its involvement with SART.  NOPD's domestic violence detectives, for example, work closely with the NOFJC and, from the Monitoring Team's observations, play an integral part in NOFJC's daily operations.  NOPD should be commended for its efforts in this regard.

### E.     SA and DV Training

In part as a result of the Monitoring Team's and the NOPD's Compliance Bureau's continued focus in this area, coupled with last year's disturbing OIG report on sex crime investigations, NOPD announced toward the end of 2014 it would enhance its sexual assault and domestic violence training for officers, supervisors, and commanders.  The following sub-sections summarize our review of NOPD's recent training.

#### 1.     Sexual Assault Training

In November 2014, the Monitoring Team attended training for investigators and officers handling sexual assault investigations in and around New Orleans.  The training, held at the New



Orleans Child Advocacy Center, was made available as a result of a grant awarded to the New Orleans SART program by the Office on Violence Against Women, U.S. Department of Justice. The training materials used in the class were created by the Oregon Attorney General's Sexual Assault Task Force (ORSATF), a nationally known leader in this area. The Instruction was provided by contractors from Oregon who are active law enforcement command staff officers and recognized experts in sexual assault investigation.

This class accommodated approximately forty participants and was offered to a variety of local police agencies, including NOPD. NOPD sent six detectives assigned to sex crimes investigations, including its newly appointed (but recently departed) Commander, two detectives assigned to child abuse and domestic violence investigations, two homicide detectives, eight officers assigned to various NOPD police Districts, and one detective assigned to ISB. The Monitoring Team reviewed the training materials and attended the training, and was impressed.

The instruction incorporated video recordings, a terrific PowerPoint presentation, and handouts. The class was provided a lesson-plan booklet with presentation notes, which allowed students the opportunity to pay close attention to the instructors. The instructors used adult learning techniques, incorporated many examples of fact-based scenarios, and covered both stranger and non-stranger sexual assault investigations. The instructors used humor when appropriate to keep the class interested, and were at all times professional and skilled in their instructional delivery. ***This instruction covered all elements of Consent Decree sections 204 and 205 relative to training***.

Among the many important topics covered by the Oregon training were the following:

- ***Understanding and evaluating seeming inconsistencies in victim statements.*** The instructors described common victim reactions to trauma and explained how trauma can impact a victim's perception of his/her experience. The instructors walked the class through the dynamics of victim trauma and explained its impact on memory, which prompted more than one senior investigator taking the class to remark he wished he had been taught this years ago. The instructors even provided webinar information on neurobiology of trauma for those interested in learning more on the topic.

- ***Myth-busting sexual assault statistics***. The instructors explained national research has shown less than 10% of sexual assault complaints are proven to be false. This statistic, and others, helped the class differentiate myth from fact. According to the instructors (and the Monitoring Team's own years of experience), police officers often have a view that sexual assault complaints are credible less often than they often are. Much of this misunderstanding is due to not understanding the reasons for inconsistencies in victim's initial statements.



- ***Accuracy of sexual assault statistics***.  Sexual assault is highly under-reported.  According to some statistics,  65% of sexual assaults are not reported to police.[4]  The instructors spent a lot of time describing the barriers to reporting and explaining why law enforcement needs to be victim-centered rather than the cause of a victims' secondary victimization.  The videos and class interaction used during this component of the course were extremely effective in helping officers understood potential casus of police bias.

- ***Investigations***.  The instructors described what to look for in a serial sex offender investigation.  They covered the interview and interrogation of sexual offenders and pointed out clues for detecting deception.  They made it clear all reports of sexual assault should be considered truthful, unless the investigation and evidence prove otherwise. The determination that a report of sexual assault is false can be made only if the investigation establishes no crime was committed or attempted.  It is not proper to unfound a case solely because a victim recants. For students interested in learning more about this important topic, the instructors shared "The Undetected Rapist" study conducted by Dr. David Lisak[5] and provided additional information for students to follow-up on this research after class.

- ***Stranger vs. Non-Stranger Sex Offenders***.  The instructors discussed differences between stranger and non-stranger sex offenders.  The instructors spent a lot of time on the credibility of subjects versus victims, and shared real-life investigations experiences to enhance the class and make their instruction more interesting.

In short, as noted above, the class was excellent.  The Monitoring Team is hopeful NOPD finds a way to embed the Oregon program – or at least the substance of the Oregon program – into its annual training curriculum.  To that end, on November 19, 2014, NOPD held a meeting to plan an internal train-the-trainer session within NOPD based upon the Oregon model. The Monitoring Team will be following the progress of that effort.

## 2.      Recent SA Training Developments

In the fall of 2014, NOPD announced it had secured the services of subject matter expert Tania Tetlow to provide enhanced sexual assault training as part of NOPD's in-service training program.  Ms. Tetlow is a well-recognized expert in the areas of sexual assault and domestic violence, instructing both civilians and law enforcement across the country, in addition to

---

[4]      Berzofsky, Marcus, Christopher Krebs, Lynn Langton, Hope Smiley-McDonald, Bureau of Justice Statistics, NCJ 238536, *Nearly 3.4 Million Violent Crimes Per Year Went Unreported to Police from 2006 to 2010,* August 9, 2012 (2015), <http://www.bjs.gov/index.cfm?ty=pbdetail&iid=4962>.

[5]      *See* Lisak, David, *Repeat Rape and Multiple Offending Among Undetected Rapists*, Vol. 17, No. 1. Violence and Victims (2002).



prosecuting cases and holding a tenured position of professor at Tulane Law School. The course will be taught in partnership with NOPD Officer Corey Lymous, a detective within NOPD's Sex Crimes Unit. The NOPD Compliance Bureau and the Monitoring Team have reviewed the proposed course materials, and both groups will review the lesson plan and presentation materials before this course is implemented.

### F. Domestic Violence and Sexual Assault Charging Conferences

As part of our monitoring of NOPD's handling of sexual assault investigations, the Monitoring Team periodically meets with members of the Orleans District Attorney's Office and attends DA sexual assault charging conferences. These meetings and observations help the Monitoring Team assess the quality and completeness of NOPD's investigations, which, while they are better than they have been in the past, still leave room for improvement. For example, the District Attorney's office still often has to conduct its own investigation to obtain sufficient information before proceeding to trial.

### G. OIG Report Follow-Up

As we noted last quarter, and as was widely reported in the media, the New Orleans Office of Inspector General published a report in November 2014, in which it highlighted many significant deficiencies in NOPD's Special Victims Section processes, including the non-investigation of cases by NOPD detectives. As a result of the OIG's findings, NOPD Superintendent Harrison appointed Commander Paul Noel to oversee a Task Force to look into incomplete investigations. The Monitoring Team reviewed the training provided to the Task Force members (which we found to be solid) and receives regular updates from Commander Noel. Additionally, along with the New Orleans OIG, we will have full access to the Task Force's files to ensure the reinvestigations are unbiased, complete, and effective.

Through our oversight of Commander Noel's Task Force, the Monitoring Team raised concerns regarding what appeared to be a large number of unprocessed Sexual Assault Kits ("SAKs"). While some (or even many) of these unprocessed SAKs may be from investigations where processing was not appropriate, the seemingly high number of unprocessed kits has not yet been adequately explained to the Monitoring Team. At the request of the Monitoring Team, the NOPD Compliance Bureau is working to obtain more definitive data, which then will be validated, tested, and analyzed by the Monitoring Team.



## XII.   COMMUNITY ENGAGEMENT (CD 223-233)

Paragraph 230 of the Consent Decree requires the completion of a biennial survey of members of the New Orleans community "regarding their experiences with and perceptions of NOPD and of public safety." To meet this requirement, the Monitoring Team worked closely with the City, NOPD, and the Department of Justice to develop a three-part survey that would measure public satisfaction with policing, attitudes among police personnel, and the quality of police-citizen encounters. The surveys were designed to include a representative sample of City residents, police personnel, and detained arrestees. (CD 231)

The first phase of the survey was conducted in 2014 and included more than 400 police department sworn officers and supervisors. Members of the Monitoring Team personally administered the survey to police officers in their duty locations. Officers were requested to complete a 95-item questionnaire before leaving the room and the completed questionnaire was handed directly to the Monitoring Team member administering the survey in an envelope. The responses then were coded and analyzed by the Monitoring Team. The aggregated findings of the Police Officer Survey were set forth in Appendix 1 to the Monitoring Team's previous Report. For the convenience of the reader, and so all results can be viewed together, the Police Officer Survey results have been reprinted in this report as Appendix 1.

This past quarter saw the completion of the two additional phases of the Biennial Survey – the Community Survey and the Detainee Survey. The Community Survey was conducted door-to-door by local residents trained and overseen by the Monitoring Team. The Detainee Survey was conducted in the Orleans Parish Prison by senior members of the Monitoring Team with the permission and cooperation of the Orleans Parish Sherriff. Details regarding our methodology and the aggregate raw results of each survey can be found below and at Appendices 1 - 3. What follows here is a summary of our findings. Before considering these findings, though, it is important to keep in mind our survey measures *perceptions* – not facts. For example, a detainee's view of NOPD conduct may or may not reflect the reality of that conduct. Any number of factors could affect the detainee's response. Understanding a detainee's perception, however – just like understanding an officer's perception and a citizen's perception – is an important component of the survey project. Measuring changes in perception over time gives the Monitoring Team and the NOPD an additional data element with which to assess the effectiveness of the various requirements of the Consent Decree. Additionally, identifying perceived problems allows the Monitoring Team to focus its resources to determine whether the perceptions equate with reality.

### A.   Community Survey

#### 1.   Community Survey Methodology

To conduct the Community Survey portion of the Biennial Survey and to ensure it reflected the demographics of New Orleans as a whole, the Monitoring Team identified a sample



of housing units, with one adult interviewed per household.  Since we were sampling households, our process employed what is known as a "multi-stage random area sampling process."  In plain English, this means the Monitoring Team identified its sample in stages, starting with specified geographical areas, and then were divided into smaller, more targeted geographic groupings, and then, finally, were divided into individual households.  Each stage was based upon random sampling.

The Monitoring Team's goal was to conduct face-to-face interviews at 600 New Orleans homes across twenty of the City's neighborhoods.  We assumed a response rate of 50 percent due to vacancies, refusals, or non-availability of respondents.  Accordingly, we selected a sample of 1,200 households as our starting point.  To achieve a sample of that size, we randomly selected 60 households per selected neighborhood to survey. [6]

To ensure the representativeness of our survey sample, we looked to New Orleans' population figures (for residents 18 years or older) as set out in the *2012 American Community Survey 1-Year Estimates of New Orleans*.  The demographic goals for the community survey can be found at Appendix 5 of this Report.  Additional details regarding our methodology can be found at Appendix 5.

The survey was administered by local residents trained by the Monitoring Team.  The training was comprehensive and took place over several days.  The last training date was December 3rd, 2014. Each survey was administered by a team of surveyors.  A total of 57 surveyors participated in the project.  Of these, most were recruited from the University of New Orleans ("UNO"), Southern University of New Orleans ("SUNO"), Loyola, and local churches.  As mentioned previously, a total of 20 neighborhoods were surveyed on December 4 - 8, 13, and 14, 2014.

## 2.    Community Survey Demographics

The Monitoring Team surveyed more than 500 citizens in December 2014.  The sample was randomly chosen to mirror the demographic make-up of the City as a whole.  As graphically shown below, the sample was nearly evenly split between male and female respondents.  Half of the respondents identified themselves as black, while 38% identified themselves as white.  A majority of the sample is between 24 and 44 years old.  About one-quarter indicated their highest level of education was high school.  Nearly half (47.5%) however, has had some college or received a college degree, and 12.8% have a graduate/professional degree.  Over 40% of the sample (40.4%) reported being single, 33.5% married, and 11.7% divorced.  The sample was

---

[6]    Ten census blocks randomly were pulled from each tract for a cluster size of six housing units per block.  Since neighborhoods, census tracts, and census blocks vary in size and number of households, the Monitoring Team weighted selection probabilities in proportion to households using a probability proportional to size (PPS) sampling methodology.  This methodology ensured households have an equal probability of being selected into the sample across neighborhoods, tracts, and blocks.



composed of a close to even split between individuals who own their home (47.4%) and those that rent (44.3%).  A majority of survey respondents indicated they were born in New Orleans (62.8%).

Complete aggregated details regarding respondent demographics can be found at Table 14 of Appendix 2.  For convenience, some of those data are graphically summarized here:

## Gender



## Age



## Race/Ethnicity





# Education



- Grade School
- Grade 9-11
- High School
- Some College
- College Degree

As noted, further details regarding the surveyed population can be found at Table 14 of Appendix 2.

**3. Community Survey Findings**

**a. Citizens' Satisfaction With NOPD Officers During Most Recent Interaction**

Several survey questions asked respondents about their satisfaction with their most recent interaction with an NOPD officer, if they had one. This series of questions began by asking the respondent "when was the last time you interacted with a New Orleans Police Officer?" Over half of respondents (58.7%) indicated having had contact with an NOPD officer at some point in the past and 41.3% indicated no contact. Overall, the findings indicate most residents who have had an experience with an NOPD officer have a favorable view of the NOPD officer with whom they dealt. For most questions in this series, over 60% of respondents "agreed" or "strongly agreed" (where agreement indicates a more satisfied or favorable view of officers). Of course, this also indicates about 30% of residents were not satisfied with or felt they were treated poorly during the interaction.

The detailed results of this series of questions are set out at Table 15 of Appendix 2.

**b. Citizen Satisfaction With The NOPD**

The next series of questions in the Community Survey focused on citizen perception of the NOPD generally, whether or not they ever had had an interaction with an NOPD officer. In other words, the previous section related the opinions of citizens who have had recent interactions with NOPD officers, while this section incorporates all responses, whether or not the citizen had an interaction with an NOPD officer. This series of questions were asked to all



respondents.  While the detailed aggregated data is compiled at Table 16 of Appendix 2, a few notable findings are summarized here:[7]

- Slightly more than half (53.9%) of the sample agreed NOPD officers follow the law during their police duties. However, 42.4% of respondents disagreed officers follow the law.

- A majority of respondents <u>disagreed</u> that corruption is low in the NOPD (62.2%).

- Most citizens indicated they do not fear interacting with NOPD officers (66.5%). However, over 30% of respondents fear such interaction.

- A majority of citizens believe scandals reflect current NOPD practices (48.3%) (43.9% agree scandals do not reflect current practices).

- Most respondents disagreed the NOPD is a better department since Katrina (51.9%).

- More than half (57.2%) of citizens are not satisfied with the way NOPD officers do their job (38.7% are satisfied).  Likewise, 68.1% of respondents disagree that officers respond in a timely manner.

- About 48% of citizens disagreed that they have more confidence in the NOPD compared to 3 years ago (44.3% agree that they have more confidence).

- A majority of respondents believe most crimes are not solved by the NOPD (53.2%) and the NOPD has little impact on crime (54.2%).

Finally, one of the most notable findings is that 82.5% of all respondents believe NOPD is in great need of more professionalization.[8]

### c.   Citizen Perception of NOPD Procedural Justice and Trustworthiness

The next series of questions focused on citizen perception of NOPD procedural fairness and trustworthiness issues.  Several broad themes emerged from this analysis.  First, sizeable

---

[7]   The description of the survey results incorporates a double negative as the questions were asked in a negative way.  Survey research normally incorporates questions asked in the positive and negative direction to assure subjects pay attention to the meaning of the questions.  We apologize for any confusion or inconvenience.

[8]   Future analyzes will examine the survey findings in greater detail and evaluate the results by respondent demographic (i.e., parse the results by race, gender, etc.).



portions of the sample disagree that NOPD officers are honest, fair in their decision making, professional, and have integrity.  In fact, nearly half (and sometimes more than half) of the sample has this perception.  Of course, this also implies about half of the sample agrees that NOPD officers are honest, fair in their decision making, and professional.  What is more, most respondents (70.1%) agree that NOPD officers know they have to win the confidence of the public to be effective.

Thus, although some respondents may have negative evaluations of NOPD officers, this may suggest they acknowledge NOPD is trying to better itself.  Further, despite fairly negative evaluations of NOPD officers, most citizens indicated they respect the NOPD (66.3%).  This may suggest that citizens differentiate between the NOPD as an organization and individual NOPD officers (i.e., the negative evaluations may be constrained to specific officers  the citizens are thinking about when answering the survey questions rather than generalizing to the entire organization). At the same time, it is important to realize 30.9% of respondents do not respect the NOPD.

Two questions were asked on the survey pertaining specifically to "stop and frisk."  A majority of the sample disagreed NOPD officers stop and frisk people for legitimate reasons (50.3%).  Likewise, the final question in Table 17 of Appendix 2 (coded in opposite direction as other items; higher scores indicate disagreement) indicates 52.1% of the sample believes stop and frisk is used to harass people.

Additional details regarding this series of questions is set forth at Table 17, Appendix 2.

### d.      Citizen Willingness to Cooperate With The NOPD

The next series of questions focused on citizen willingness to cooperate with the NOPD.  Interestingly, a majority of respondents indicated they would report dangerous or suspicious activity to the NOPD (72.6%).  More than one-fifth (22.8%) of citizens, however, would not report such behavior.  Similarly, and troublingly, only 57% of respondents indicated they would help the NOPD find a subject if asked, which means 43% would not.

More than one-quarter (27.7%) of respondents would <u>not</u> call the NOPD if they witnessed a crime.  A follow-up question asked these individuals why they would not call the NOPD if they witnessed a crime.  Of the 196 respondents, 24.4% indicated they would not call the NOPD because "I do not trust the NOPD," 13.8% because "I do not want to be seen cooperating with the NOPD," 8.2% because "I would fear negative consequences from the NOPD," 17.3% because "I simply wouldn't want to get involved," and 38.3% because "I would cooperate anonymously, for example, through Crime Stoppers."

The aggregated raw response frequencies can be found at Table 18, Appendix 2.



### e.    How NOPD Should Behave

This series of questions evaluated how citizens think NOPD should behave, and whether NOPD met those expectations.  As expected, a vast majority of citizens believe NOPD officers should be accountable for their actions (93.8%), keep the public informed (92.1%), be open and honest when dealing with the public (94%), treat people with respect (95.3%), and be interested in the well-being of ordinary citizens (92.3%).  A majority of those respondents, however, felt the working conditions for NOPD officers are not good (58.1%).

This series of questions also probed citizen perception of NOPD language resources. Almost 40% believe NOPD officers have access to language interpretation services. Similarly, 52.1% of respondents disagreed that NOPD has enough Spanish speaking officers.

The detailed results of this series of questions is set out at Table 19, Appendix 2.

### f.    Citizen Perception of How NOPD Officers Treat Minorities and Other Groups

The final series of Community Survey questions focused on how NOPD officers treat minority and other disadvantaged citizens.  Most respondents (63.4%) disagreed NOPD officers treat African Americans fairly.  Nearly half (49.2%) of respondents disagreed that NOPD officers treat Latinos fairly.  More than one-third (36.6%) of respondents disagreed that NOPD officers treat members of the Vietnamese community fairly.  Finally, over 46% of citizens indicated NOPD officers do not treat members of the LGBT community fairly.

Other notable findings follow.  It is important to keep in mind, however, the Monitoring Team has not yet broken down the survey responses by race, gender, etc.  Consequently, we readily recognize the following findings do not tell the whole story.  For example, a finding that 58.3% of respondents do not believe victims in the Latino community fear reporting crime due to fear of deportation (as noted below), is not highly instructive until we dig into those data to see *how the members of the Latino community themselves feel*.  Those analyses will be published in a forthcoming report.

- Most respondents (58.3%) do not believe victims in the Latino community fear reporting crime due to fear of deportation.

- Nearly 30% of citizens disagree that NOPD officers often engage in racial profiling.  This suggests that most (60.5%) believe racial profiling is a common practice by NOPD officers.

- Over two-thirds of the sample (67.6%) believes the African-American community expects to be harassed by NOPD and 71.3% agree the African-American community does not believe the NOPD is credible. Similarly, 63.6% of citizens



agree there is a great deal of unfairness and bias by the NOPD toward the
African-American community.

- About 46% of respondents believe the LGBT community does not have
  confidence in the NOPD.

- Finally, a majority of citizens (56.8%) agree that the homeless are often treated
  poorly by the NOPD.

In summary, a large portion of surveyed citizens believe NOPD does <u>not</u> treat racial and
ethnic minority residents fairly.  Most notably, a majority of citizens believe members of the
African-American community are not treated fairly and are routinely harassed by the NOPD.
Relatedly, most respondents believed racial profiling is a common NOPD practice.  Unfair and
poor treatment of members of the LGBT community also was commonly perceived by citizens.

**B.    Detainee Survey**

    **1.    Detainee Survey Introduction**

Surveying detainees helps the Monitoring Team learn about how those most recently in
contact with the New Orleans police view NOPD's behavior.  While this is a "biased" study in
that it uses information from those who have been arrested, it nonetheless provides useful
information regarding how those individuals perceive they were treated by the NOPD.  This is
important information for the citizens of New Orleans.  While many national studies have
focused on jail inmates (for example, the Bureau of Justice Statistics, U.S. Department of Justice,
has focused on characteristics of detainees), few have focused on detainees' attitudes toward
those who arrested them.  The resulting survey data will help not only the Monitoring Team, but
also the NOPD as it can use these data to better train its officers to deal with detainees.

The New Orleans detainee survey was designed to obtain personal information and
opinions from individuals arrested by officers of the New Orleans Police Department and booked
into the local jail.  Monitor Team members trained community members who had worked on the
community survey to conduct interviews of the detainees.  A member of the Monitoring Team
was present for most interview sessions.

There were 67 detainees available to us and 55 completed the interviews (82% response).
As soon as the detainees were transferred from police custody to the jail and had provided
preliminary information to the jail staff, they were asked to sit in chairs in front of the room
where they would be interviewed.  We identified ourselves as representatives of the Federal
Monitoring Team for the New Orleans Police Department and asked each detainee if he/she
would talk to us about his/her experiences with NOPD.  The detainees who agreed were asked a
series of questions by one interviewer and another interviewer recorded the responses.  This was



done in case a detainee could not read or did not understand the question.  If the detainee needed clarification about the question, the interviewer provided the information.

### 2.      Detainee Survey Demographics

The Monitoring Team interviewed 57 detainees at the Orleans Parish Prison over the course of four days and nights.  A majority of the cohort (79.3%) was male; 19% was female.[9] The ages of those interviewed ranged from 18-67, with an average age of 35.  Most detainees were black (69%), 12.1% were white, 3.4% were Latino, 1.7% were Vietnamese, and 12.1% reported the "other" race/ethnicity category.

# Detainee Respondents



- ■ Black
- ■ White
- ■ Latino
- ■ Vietnamese
- ■ Other

As noted, further details regarding the surveyed population can be found at Table 21 of Appendix 3.

With respect to residence, nearly 80% of respondents indicated they live in New Orleans whereas 19% of detainees do not live in the city.

### 3.      Detainee Survey Findings

#### a.      Detainees' Attitudes Toward NOPD Officers (Specifically) And Police Officers (Generally)

This series of questions probed detainees' attitudes toward NOPD officers specifically, and police officers more generally.  Detainees, on average, have negative perceptions of NOPD officers and the police in general.  About 46% of detainees disagree NOPD officers do the right thing.  About one-quarter of interviewed detainees agree they do the right thing.  (27.6% neither disagree or agree with the statement).

---

[9]      We call this a "cohort" rather than a "sample" because it reflects whatever responsive population was available during a snapshot in time, rather than the sort of effort undertaken with Community Survey to ensure a demographically representative sample of the population as a whole.



# NOPD Officers Do The Right Thing



As noted, further details regarding the surveyed population can be found at Table 22 of Appendix 3.

In comparison, equal proportions of respondents (38%, respectively) disagreed or agreed that police officers in general do the right thing (24.1% neither disagree or agree with the statement).

More than half (53.4%) of detainees were not satisfied with the way NOPD officers conduct themselves. About one-quarter of respondents were satisfied with NOPD conduct (22.4% neither disagree or agree with the statement). More than one-third (36.5%) of respondents believed they were not treated with respect by NOPD officers, whereas 31% felt they were treated with respect (22.4% neither disagree or agree with the statement).

Nearly half (48.3%) of detainees believed NOPD officers are not polite when dealing with them. About one-third believe they are treated politely (34.5) (15.5% neither disagree or agree with the statement). Slightly more than one-quarter (27.6%) of respondents felt NOPD officers are not polite when dealing with the public, whereas 31% agreed that officer are polite to the public (39.7% neither disagree or agree with the statement).

Additional notable findings are set forth below:

- More than half (55.1%) of the respondents disagreed NOPD officers listen to them. About one-quarter agree NOPD officers listen to them (17.2% neither disagree or agree with the statement).



- A majority of detainees were not satisfied with how they were treated by NOPD (55.1%). Only 20.6% of respondents were satisfied with NOPD's treatment (22.4% neither disagree or agree with the statement).

- Similarly, 62% of detainees were not satisfied with the outcome of their experience with NOPD, whereas only 15.5% of respondents were satisfied (20.7% neither disagree or agree with the statement).

- About two-thirds (65.5%) of detainees indicated they do not trust the police, generally. Only 10.3% of respondents trust the police (22.4% neither disagree or agree with the statement). However, 56.9% of detainees disagreed and 22.4% agreed that they have confidence in the police (19.0% neither disagree or agree with the statement).

- Most respondents were not satisfied with the way police do their job, generally (46.6%). About 22% of detainees, however, were satisfied with police performance (29.3% neither disagree or agree with the statement).

- Finally, 44.8% of detainees felt the NOPD is not highly competent.

In summary, a significant portion of detainees have negative views of the NOPD. Most detainees are not satisfied with the NOPD and do not believe they are polite, listen, or are competent. Negative attitudes also were common regarding the police, in general. However, these attitudes were less negative in comparison to detainees' views of the NOPD, specifically. More details regarding these survey responses can be found in Appendix 3.

### b.     Detainees' Perceptions Of NOPD Professionalism, Community Relations, And Respectful Treatment

This series of questions revealed 86.2% of detainees believe the NOPD is **unprofessional**. Only 12% of respondents indicated the agency is professional. Compared to three years ago, about one-quarter (25.9%) of respondents believe the NOPD's professionalism has improved.[10] A majority of detainees believe professionalism in the agency is about the same as three years ago and 22.4% believe NOPD is less professional.

More than one-third (34.4%) of detainees believe community relations with the NOPD are positive. However, 37.9% believe community relations with the NOPD are negative (nearly one-quarter believe they are "very negative"). (22.5% neither disagree or agree with the statement.)

---

[10]     The Monitoring Team specifically asked respondents to compare NOPD professionalism now to 3 years ago. This finding is not a comparison to prior survey results.



# NOPD/Community Relations



- ■ Very Negative
- ■ Somewhat Negative
- ■ Neither Positive Nor Negative
- ■ Somewhat Positive
- ■ Very Positive

As noted, further details regarding the surveyed population can be found at Table 23 of Appendix 3.

Compared to 3 years ago, most respondents believe community relations are about the same (44.8%). About one-fifth (20.7%) of detainees indicated community relations with the NOPD have improved over the past 3 years, whereas only 12.1% of respondents believe relations are worse.

Finally, about one-third of respondents indicated most or almost all NOPD officers treat them (the detainees) and their friends and family with respect (34.4%). About an equal amount (31%), however, feel about the same number of NOPD officers treat them with disrespect as treat them with respect. Furthermore, 31% of detainees believe most or almost all officers treat them with disrespect. Compared to 3 years ago, however, most respondents feel they are treated the same now by NOPD officers (44.8%). One-fifth (20.6%) of detainees believe they (and their friends and family) are treated more respectfully now than 3 years ago. About 14% of respondents feel NOPD treats them (and their friends and family) with less respect than they did 3 years ago.

### c. Detainees' Perceptions Of NOPD Treatment Of People From Different Races And Genders

As we did with the Community Survey, we questioned the detainees about their view of how NOPD treats people of different races and genders. Almost 20% (18.9%) of detainees believe the NOPD treats people from different races and genders the same most of or almost all of the time. About 29% of respondents believe the NOPD treats people from different races the same some of the time, and 31% believe this almost never happens.



# Does NOPD Treat Different Races The Same?



- Almost Never
- Some of the Time
- Most of the Time
- Almost All of the Time

As noted, further details regarding the surveyed population can be found at Table 24 of Appendix 3.

About 29% of respondents believe people from different genders are almost never treated the same (19% believe equal treatment between races occurs some of the time).

Compared to three years ago, 22.4% of respondents believe NOPD officers treat people from different races worse now.  One-third of detainees believe NOPD treats people from different races about the same as 3 years ago.  About 17% of respondents believe people from different races are treated better by the NOPD than 3 years ago.

### d.      Detainees' Perceptions Of NOPD Performance

We asked detainees to offer their views on how NOPD officers are doing their job.  A majority of detainees believe the NOPD is doing a bad or terrible job today (43.1%).  Over two-thirds of respondents believe they are doing neither a good nor a bad job.  Only about 19% of detainees believe the NOPD is doing a good or excellent job.



# How Is NOPD Doing Its Job?



- ■ Terrible
- ■ Bad
- ■ Neither Good Nor Bad
- ■ Good
- ■ Excellent

As noted, further details regarding the surveyed population can be found at Table 25 of Appendix 3.

Compared to three years ago, 27.6% of respondents believe the quality of the job done by the NOPD has improved.  About 22% of detainees believe the quality of work is about the same as three years ago.  About 19% believe the NOPD's quality of work has gone down.



## XIII.   RECRUITMENT (CD 234-244)

Section XI of the Consent Decree requires NOPD and the City, working with the Civil Service, "to develop and implement a comprehensive recruitment program that successfully attracts and hires a diverse group of highly qualified and ethical individuals to be NOPD police officers."  In the context of such comprehensive program, the Consent Decree required NOPD to "develop a written, strategic recruitment plan that includes clear goals, objectives, and action steps for attracting high-quality applicants."  The plan, which was due on February 9, 2014, was required to include "specific strategies for attracting applicants with strategic thinking and problem-solving skills, interpersonal skills, emotional maturity, capacity to use technology, fluency in Spanish and Vietnamese . . . , and the ability to collaborate with a diverse cross-section of the community."  (CD 234)

The Monitoring Team has been evaluating NOPD's recruitment and hiring efforts this past quarter and has identified some progress in this area.  Among other things, the City has:

- Brought its applications online,

- Removed a residency requirement from its recruit process that was reducing the candidate pool,

- Increased major media and targeted online advertising,

- Streamlined the length of the pre-employment process, and

- Outsourced background investigations to a professional firm.

These improvements, most of which fall into the category of promoting awareness of the NOPD's hiring needs, should be applauded.  However, we have seen less progress in the area of developing *a selection process* that is smartly tailored to meet the requirements of the Consent Decree.  In fact, the Monitoring Team has identified several shortcomings in the NOPD's selection process, the consequences of which, unfortunately, may take years to manifest themselves.

NOPD always has required its officer candidates to meet certain criteria.  Among other things, potential officers have to pass background and criminal history checks and have at least some college credits (or have served in the military).  On January 6, 2015, however, the Monitoring Team discovered (not from NOPD) that the Department planned to eliminate the college credit requirement in an effort to increase the number of applicants.  While the Consent Decree does not mandate any minimum college credit hours for officer candidates, the Monitoring Team expressed concern over this change and requested detailed information from NOPD as to how it planned to secure officers "with strategic thinking and problem-solving skills, interpersonal skills, emotional maturity, capacity to use technology, fluency in Spanish



and Vietnamese . . . , and the ability to collaborate with a diverse cross-section of the community."

To be clear, it is not the view of the Monitoring Team that college credits necessarily make someone a great police officer.  Nor is it our view that everyone without college credit will be a poor police officer.  It is our view, however, that some college course work gives officers, especially new officers, a better perspective in the increasingly complicated world of policing; and that removal of the 60 college credit hours requirement for a police recruit is contrary to current thinking in modern police departments.[11]  While removing the college credit requirement may attract more applicants, are they the ones who will be successful officers in NOPD?  Unless the removal of the college credit requirement is tied to a robust and holistic recruiting and hiring strategy, we are not convinced they will be.  As is obvious from its actions and its statements, NOPD management disagrees with the Monitoring Team in this regard.

Rather than reducing qualifications to gain a larger pool of candidates, police agencies country-wide are focusing on expanding their recruitment efforts, focusing on colleges and universities for applicants, identifying candidates with good and successful work habits, and raising pay to attract candidates they think will succeed.[12]

While the Monitoring Team remains of the view some college credit is a best practice, since it is not a requirement of the Consent Decree, we focused our attention this quarter on how NOPD's selection process as a whole is structured to ensure the selection of qualified officers – an obligations that clearly is in the Consent Decree.

According to NOPD, the heart of its selection process is (i) an applicant test administered by the Civil Service Commission, (ii) a face-to-face interview process, (iii) psychological testing, and (iv) testing covering physical and mental components.  While the Monitoring Team continues to review each of these components, our preliminary findings are not favorable.  To understand our concerns, it will be helpful to understand the full scope of NOPD's hiring process:

---

[11]   *See* Louis Mayo, College Education and Policing, 113th Annual IACP Conference, available at http://www.police-association.org/library/articles/iacp_aug06_college-ed-policing2.pdf.

[12]   Rostker, Bernard D.; Hix, William M.; Wilson, Jeremy M.; *See e.g.,* RAND Gulf States Policy Institute, *Recruitment and Retention: Lessons for the New Orleans Police Department*.  Law Enforcement Recruitment Toolkit, COPS/IACP Leadership Project, June 2009.





While these steps are typical to police officer vetting and hiring in most large cities, the Monitoring Team's concerns go to the robustness of certain of these steps.

First, until recently, the Monitoring Team had not been given a copy of the Civil Service exam. More notably, it appears many within NOPD management do not have access to the exam themselves. Without Department involvement in the testing process, we find it difficult to understand how the test truly can be viewed as a core component of NOPD's strategic recruitment plan. Moreover, there is a long and well-developed literature on recruiting and hiring police applicants that shows tests are better at ruling candidates out rather than identifying characteristics and applicants likely to succeed.[13]

Second, the Monitoring Team has studied the purportedly "enhanced" "structured interview" process, which was put into effect this month. NOPD made positive, strategic moves by inviting private sector Human Resources directors and knowledgeable individuals to participate in the interview process. While the Team was impressed with the Human Resources experts the City had engaged to help implement the new process, we remain troubled by certain aspects of NOPD's hiring practices.

NOPD should use industry standards and "best practices" to hire the best candidates. Unfortunately, the current process is designed to remove the subjective nature of the interview process and take away the interviewer's ability to ask questions, follow-up on partial answers, and probe the candidate for more information. This process, because it stresses rigidity and removes subjective decision making, is defendable in a legal challenge (by an unsuccessful candidate), but it is not designed to determine the best candidates: it is more likely to identify "the lowest common denominator" candidate.

---

[13]     Rostker, Bernard D.; Hix, William M.; Wilson, Jeremy M.; *See e.g.,* RAND Gulf States Policy Institute, *Recruitment and Retention: Lessons for the New Orleans Police Department.*



The interview procedures currently used by NOPD are "standardized" to the point that there is little need for human interaction.  The questions can be asked of a candidate and the responses videotaped for mass evaluation.  In fact, that is the way the interviewer training was conducted.  There is no interactive process and no role for the interviewers to ask questions, clarify responses, or humanize the candidate.  While this process may be appropriate to hire a person to conduct a factory job that does not change or require human interaction, it does not allow the interviewer to assess the candidate beyond an initial response to the "scripts."  In fact, the process prohibits discussion of the candidate's ability to show how she or he might "negotiate" a situation, to talk a person through a tough time, or other real-world interactions.  Candidates may be saying what they think the interviewers want to hear and, without follow-up questions, or examples, there is no way to determine whether the candidate truly understands a situation or script.  Different candidates may interpret a script or question differently, but there is no method to determine what the person is thinking or exactly what she is answering.  Answers remain a superficial response to the scripts.

Research shows for a police interview to be effective, the interviewer must be able to explain questions, respond to questions from the applicant, and, most important, probe into areas raised during the questioning.[14]  Unfortunately, NOPD has instructions they may not deviate at all from the interview script.  They may not answer questions, may not explain questions a candidate finds confusing, and may not probe into areas of concern.  While we understand the desire to adhere to a script from a litigation-reduction perspective (and from an efficiency perspective), such blind adherence reduces the effectiveness of the interview substantially.  The Monitoring Team believes the City's process will not achieve the intended result precisely because the interview is designed more to reduce the City's liability to an unsuccessful candidate than to identify officers most likely to succeed.

The City stands by its interview process, and has offered statements from the process developers regarding its integrity and effectiveness.  Unfortunately, only time will tell whether the Monitoring Team's fears will be realized.

Beyond the interview process, the Monitoring Team has not seen adequate credible evidence demonstrating NOPD has established a strategic plan that will secure for it quality candidates.  While our review is ongoing, at this point, we have expressed concerns to NOPD regarding:

- The benchmarks used to establish the exercises and pass/fail criteria on the physical agility test at the Academy,

- The validity of the multiple choice and writing exercise exams,

---

[14]     "Structured Interviews: A Practical Guide," US Office of Personnel Management, September 2008; *see also*, "Interview Techniques for Effective Hiring" By Lauren Simonds, Time Magazine, October 9, 2013.



- The criteria applied to determine which applications are the "best,"

- The validity and applicability of the oral interview as discussed above, and

- The structure, rigor, and delivery of the psychological exam.

And, of course, as noted above, we continue to have concerns about the potential long-term impact of the elimination of the college-credit requirement without a robust, holistic strategic plan put in its place.

The Monitoring Team has met with Superintendent Harrison and his leadership team regarding these issues, and believes NOPD is committed to expanding its ranks and improving the quality of all officers – recruits and veterans.  As noted above, however, good faith disagreements exist over the best way to turn that commitment into reality.  We will continue to work closely with the Department to ensure its means are likely to achieve the intended ends, which are expressly required by the Consent Decree.



## XIV.   ACADEMY AND IN-SERVICE TRAINING (CD 245-288)

Over the past several months, the Monitoring Team has identified a number of significant shortcomings in NOPD's training program.  Among other things, we expressed concern over the mixed quality of Academy instructors, the absence of lesson plans, the lack of a holistic strategic "get-well" plan, insufficient resources, inadequate facilities, and more.  At the same time, we expressed "cautious optimism" with respect to several initiatives recently undertaken, including the promotion of a new Academy director (Commander Richard Williams), the engagement of a dedicated Curriculum Director, and the creation of multiple new courses taught by a variety of in-house and outside experts.

Notwithstanding these positive developments, we continue to have significant concerns regarding the pace of change at the Academy.  As of the publication of this report, the Academy still is operating without approved lesson plans, still does not have a holistic training plan, and still has not completed a meaningful evaluation of courses and instructors.  Efforts are in process to cure these deficiencies, but they have not been cured yet.

We also continue to have concerns regarding the Academy's prioritization of the many tasks the lie before it.  For example, the Monitoring Team and the Department of Justice recently learned the Academy was planning to delay in-service training (*i.e.*, the annual training for current NOPD officers) until its revised lesson plans were prepared and approved.  While compliant lesson plans obviously are critical to a meaningful training program (and to Consent Decree compliance), delaying necessary in-service training is not an acceptable solution to the problem of ongoing delays in completing such plans.  Upon learning of the Academy's plan, the Monitoring Team and the Department of Justice encouraged the Academy to re-start in-service training (which it did), and provided the Academy with an initial critique of the in-service training materials, subject to a later complete review.

Due to the importance of training to the future of the NOPD, the United States District Court held a public hearing in open court on February 24, 2015.  The purpose of the hearing was to hear from the Department of Justice, the Monitoring Team, and the NOPD regarding the problems facing the Academy and the Academy's plans to fix them.  Among other speakers, the Court heard from Superintendent Michael Harrison, Academy Commander Richard Williams, and NOPD Compliance Bureau implementation manager Alexandra Skaggs.

At the hearing, NOPD described a lengthy list of improvements planned for the Academy, as well as a list of improvements already implemented.  These improvements, which have been confirmed by the Monitoring Team, include the following:

- The Academy has undertaken efforts to procure a new computer system to track and maintain all NOPD policies and the training relating thereto.  This system, called PowerDMS, is intended to cover all Academy courses and all teaching materials.  The system also is expected to be capable of sending notices to NOPD



personnel reminding them of their training obligations, forthcoming courses, and certification requirements.

- Oregon's Sexual Assault Task Force provided training to NOPD officers and supervisors in November 2014, provided the Academy a $1000 technology grant, and made available a host of best practice teaching materials. The Academy used the grant to purchase a video system, which will enable the Academy to record and retain its training programs. It also will facilitate supervisor evaluation and critique.

- In conjunction with the City, the Academy implemented a Domestic Violence webinar for all Command-level officers. The Academy also secured a grant to provide training for Supervisors on Domestic Violence and provide a Domestic Violence Train-the-Trainer course.

- At no cost to the City, the Academy engaged an outside expert to provide *Supervision and Leadership Level II* Training.

- NOPD partnered with the FBI to send Academy staff and adjunct instructors to specialized training put on by the FBI. This training included 40 hours of Law Enforcement Instructor School for all NOPD adjunct instructors. To date, 37 instructors have been trained. The Monitoring Team attended the FBI training, and was impressed with the quality and breadth of the program.

- NOPD reached out to obtain expert assistance offered by the DOJ COPS program. As a result of this effort, the COPS program has engaged the Virginia Center for Policing Innovation to provide expert technical assistance to NOPD. The COPS program is well respected in its ability to provide assistance to local police departments, and the Monitoring Team believes this will be a very positive relationship for NOPD.

- More recently, the Department secured the services of Dr. Lorie Fridell to provide *Fair and Impartial Policing,* addressing bias-free policing, community policing and use of force. The Monitoring Team is familiar with Dr. Fridell's course, and believes this to be a very positive development.

In addition to these tangible improvements, Commander Williams provided the Court with a long list of other initiatives he and the Compliance Bureau are undertaking to improve all aspects of the Department's training program, including recruit training, in-service training, and Field Officer Training. While the Monitoring Team is impressed with the scope and breadth of the list – and, so far, has been pleased with the commitment, energy, and dedication of Commander Williams and the Compliance Bureau – as we made clear during the Court hearing, we have no choice but to remain unconvinced until we see the results of the efforts. As they say



in Missouri, "eloquence neither convinces nor satisfies me; you have got to show me."  We very much look forward to being shown.

      The Monitoring Team views NOPD's training program as one of our primary monitoring tasks.  We will continue to monitor this issue very closely.



## XV.    OFFICER ASSISTANCE & SUPPORT (CD 289-294)

While most people think of the NOPD Consent Decree as focusing on the relationship between officers and citizens, an important component of the Consent Decree is its focus on the relationship between the Department and its officers.  As the Department of Justice recognized in its Findings Letter, "policing is undeniably difficult," and "police executives owe a duty to their community and officers to provide the services necessary to ensure the mental and physical wellness of their officers."  The Department of Justice concluded that NOPD was "failing to provide such critical officer assistance and support services."  To remedy this deficiency, the Consent Decree requires NOPD "to provide officers and employees ready access to the mental health and support resources necessary to facilitate effective and constitutional policing."  (CD XIII)

While the Monitoring Team has not yet conducted a full evaluation of NOPD's Officer Assistance & Support ("OA&S") efforts, we have begun looking into this area and, preliminarily at least, have not been impressed.  The Consent Decree required NOPD to develop "a department-wide mental and physical health and wellness program" by February 5, 2014.  (CD 290)  To date, the Department has no such program in place.  Indeed, as far as we can tell, ***NOPD is not yet in compliance with any element of the OA&S requirements***.

Due to the lack of progress in this area – as we did when we saw no progress with respect to the Crisis Intervention Team (CD IV) – the Monitoring Team met with the Deputy Chief responsible for OA&S to discuss NOPD's plans to move forward toward compliance.  The Monitoring Team learned that NOPD has sought approval from the Civil Service Commission to hire an outside expert to lead the Department's OA&S efforts.  While this is a positive step, the approval, vetting, hiring, and getting-up-to-speed process will take some time.  The Monitoring Team has made it clear to NOPD we do not believe officers should go without necessary services while the prospective new employees work their way through the hiring process.  We have requested a specific plan be prepared by NOPD outlining the steps the Department will take in the near-term to meet its OA&S obligations while working toward its longer term plans.

Additionally, the Monitoring Team has begun supplementing its many one-on-one meetings with officers with small group meetings focused primarily on OA&S issues.  Our first such group meeting was informative, and, frankly, emotional.  We recommend, as NOPD moves forward with its OA&S compliance efforts, NOPD do the same thing; spend time listening to its officers, understanding their stresses and hardships, and incorporating their input into their OA&S plans.



## XVI.   SUPERVISION (CD 306-331)

As we have in the past three quarters, the Monitoring Team again spent significant time this quarter focusing on NOPD supervision and supervisors. ***And we continued to identify deficiencies in the level and effectiveness of supervision we see from NOPD's sergeants, lieutenants, captains, and commanders.*** We saw these deficiencies in most districts as well as in specialized units; and we saw them in a multitude of contexts, including failing to review Use of Force Reports, failing to review video recordings, inadequate record keeping, non-existence of lesson plans, unreported non-functioning equipment, and more. These are ongoing problems that must be remedied.

Modern policing asks a lot of police supervisors, and especially a lot of sergeants. Among other things, sergeants are responsible for supervising officers, reviewing videos, reviewing and approving police reports and Daily Activity Report "trip sheets," conducting disciplinary investigations, compiling and preparing crime statistics for NOPD management, responding to calls for service, and much more. On top of this all, sergeants (and lieutenants, commanders, etc.) are responsible for providing "close and effective" supervision to those who work under them, which, per the Consent Decree, requires them to respond to the scene of certain arrests; review each arrest report; respond to the scene of uses of force as required by this Agreement; investigate each use of force (except those investigated by FIT); review the accuracy and completeness of officers' Daily Activity Reports; respond to each complaint of misconduct; ensure that officers are working actively to engage the community and increase public trust and safety; and provide counseling, redirection, and support to officers as needed, and that supervisors are held accountable for performing each of these duties.

As the Monitoring Team has reported in the past, NOPD continues to fall short of providing the sort of close and effective supervision contemplated by the Consent Decree. There could be several reasons for this. Some supervisors may lack the interest. Others may lack the skill. But many may just lack the time. Regardless of the reason, the fact is NOPD continues to have a ways to go to build up its supervisory capabilities to the level contemplated by the Consent Decree.

The Monitoring Team audited NOPD's eight police districts, as well as the Special Operations Division, the Sex Crimes Division, and the Homicide Division, during the last three months of 2014, just as we have during each preceding quarter. ***Our review revealed some areas of improvement and some areas where compliance continues to lag.*** On the positive side, NOPD has developed and implemented new "trip sheets" and "supervisor logs," which will help facilitate effective supervision. Additionally, some districts have developed new, more robust (and more auditable) procedures to facilitate effective supervision.

NOPD's Fourth District provides a great example of Consent Decree progress. The District's record keeping practices were greatly improved this past quarter as compared to prior



quarters.  Due, in part, to the personal attention of a conscientious lieutenant, the Fourth District made considerable progress toward full compliance.  Similarly the Eighth District was able to attain compliance with several additional Consent Decree due to a focused effort by managers.

In contrast to these positive stories, the Monitoring Team continues to see little evidence of consistent progress across NOPD Districts with several other areas of the Consent Decree relating to supervision.  For example, supervisors in many districts only sporadically review the functionality and use of in-car cameras, hand-held recording devices, custodial interrogation records/recordings, and photographic line-up record/recordings.  Even simple elements of the Consent Decree are not broadly implemented.  Paragraph 174, for example, requires NOPD to "keep a complete record of each [photographic lineup] display procedure and results."  The Consent Decree goes on to require such record to "include the time, date, location, identity of the viewing person, photograph numbers, and name of the administrator of the line-up."  Although supervisors in all districts were advised the NOPD Homicide Division had developed an effective form to comply with paragraph 174, many districts still have not implemented it, or any other equivalent form.

The following examples illustrate the sort of potentially inadequate supervision we continue to see in many districts:

- A platoon sergeant noted in his log an officer was counseled for not notifying the sergeant of a use of force.  The District, however, had no record of such counseling having been provided.

- A sergeant recorded in his log he had to advise officers to turn on their body worn cameras.  No documentation, however, indicated the sergeant referred the matter to PIB notwithstanding the requirement of Consent Decree paragraph 330, which provides "Supervisors shall refer for investigation any officer found to fail to properly use or care for in-car camera recording, AVL, ECW camera, or similar equipment."

- A third example involved an officer purportedly conducting undercover surveillance in plain clothes and in an unmarked vehicle.  A sergeant noted in his log the officer made a traffic stop for seat belt non-use.  The log explained the officer was not wearing a body worn camera because he was working "undercover."  While undercover officers are exempt from NOPD's BWC requirement, we question the undercover status of an officer conducting seat belt traffic stops.  While there could be a plausible justification for this, the documentation did not provide one.

To be sure, some element of NOPD's inability to demonstrate full compliance with certain Consent Decree paragraphs is due more to inadequate record keeping than it is to a failure of supervision.  But, as we have said before, from the Monitoring Team's perspective, if the NOPD



cannot demonstrate compliance, we cannot find compliance. This is consistent with paragraph 486 of the Consent Decree, which provides "at all times, the City and NOPD shall bear the burden of demonstrating full and effective compliance with this Agreement."

While the Monitoring Team has made all of its concerns known to the NOPD, some of the more pressing concerns are outlined below.

## A.    Duties of Supervisors (CD 306-313)

### 1.    Paragraph 306 (Duties)

As noted above, the list of duties for which NOPD supervisors are responsible is quite long. Per Paragraph 306 of the Consent Decree, supervisors must perform the following functions:

> [R]espond to the scene of certain arrests; review each arrest report; respond to the scene of uses of force as required by this Agreement; investigate each use of force (except those investigated by FIT); review the accuracy and completeness of officers' Daily Activity Reports; respond to each complaint of misconduct; ensure that officers are working actively to engage the community and increase public trust and safety; and provide counseling, redirection, and support to officers as needed, and that supervisors are held accountable for performing each of these duties.

The Monitoring Team's audits during the last three months of 2014 revealed NOPD was not consistently performing these tasks – or, at least, was not able to offer documentation demonstrating these tasks consistently were being performed.

While NOPD was able to offer evidence supervisors often responded to the scene of arrests, reviewed arrest reports, and reviewed officer daily activity reports, the Department's record keeping system precluded a full showing of compliance in these areas. As noted above, this may be more a problem with documentation than with performance. Nonetheless, without adequate documentation, the Monitoring Team cannot find the Department in compliance even in these areas where progress does seem to have been made. Lack of documentation not only prevents the Monitoring Team from evaluating compliance, but, more importantly, it prevents NOPD upper-level supervisors from determining whether District sergeants and/or lieutenants are doing their jobs.

In contrast to the evidence NOPD was able to show in the foregoing areas, the Department produced few documents evidencing counseling or redirection for officers and few documents reflecting disciplinary action to hold officers accountable. Few districts maintained a list of counseling memoranda or disciplinary actions initiated. Few districts had copies of DI1 or



DI2 paperwork.  While some supervisors referred the Monitoring Team to PIB to obtain such information, the existence of disciplinary materials at PIB does not excuse district supervisors from having to be aware of what is going on in their districts.  District supervisors who are unaware of their subordinate's discipline cannot be providing the "close and effective" supervision required of the Consent Decree.

The Monitoring Team did identify several individual platoon supervisors who maintained a file for each officer assigned to his/her platoon, in which he/she maintained letters of appreciation from the public, written counseling, awards, disciplinary reports, use of force reports, and job enhancement performance reports.  These supervisors did maintain documentation of good and poor performance, and the actions they took as supervisors to address the performance of officers under their command.  While these supervisors deserve praise for their understanding of and compliance with this element of the Consent Decree, the majority of shift supervisors we interviewed could not produce either any or any significant amount of documentation of subordinates' performance.

Another area where the NOPD was unable to provide documentation demonstrating compliance was with respect to community engagement.  Per the Consent Decree, supervisors must "ensure that officers are working actively to engage the community and increase public trust and safety."  While the Monitoring Team certainly has observed many officers performing this function admirably, we have not seen evidence that sergeants and lieutenants consistently are supervising this area to ensure all officers are living up to this obligation.  Similarly, NOPD was not able to offer documentation demonstrating that officers who did not take this obligation seriously ever were disciplined or even counseled.  The absence of discussions focused on this topic from the many roll calls the Monitoring Team attended suggests this may be more than a record keeping problem.

With respect to uses of force, NOPD was unable to produce consistent records that supervisors "respond to the scene of uses of force" and "investigate each use of force (except those investigated by FIT)."  In fact, nearly half of the Use of Force reports the Monitoring Team reviewed in the Districts did not document a supervisor (i) responded to the scene (although they are not required to respond to level one uses of force), (ii) initiated an investigation into the use of force, (iii) conducted interviews, (iv) utilized the recording device to record interviews, (v) canvass for witnesses, (vi) reviewed audio/video recordings, or (vii) made assessments regarding the justification or reasonableness of the use of force.

While NOPD should be commended for having improved its officer "trip sheets" to capture the data elements necessary to permit close and effective supervisions (and to facilitate compliance with several Consent Decree requirements), the Monitoring Team observed these improved trip sheets are not yet being completed fully and consistently.

Additionally, the "daily activity reports" completed by supervisors continue to ignore many aspects of "close and effective" supervision.  Supervisors frequently are not documenting



whether they responded to the scene of certain arrests, reviewed each arrest report, responded to the scene of uses of force, investigated each use of force, responded to each complaint of misconduct, ensured that officers were working actively to engage the community and increase public trust and safety, or provided counseling, redirection, and support to officers as needed. An effective supervisors' report should include monitoring of officers, guidance provided to officers, counseling, discipline initiated or administered, responding to and investigating citizen complaints, responding to and investigating use of force incidents, responding to certain arrests, approving arrest reports, approving activity reports (trip sheets), completing performance evaluations, and ensuring officers work actively to engage the public and increase public trust.

While many supervisors have provided credible, but anecdotal, information regarding some of their activities that could provide evidence of compliance with paragraph 306 of the Consent Decree, there is no systemic method to document or track compliance. The supervisor report does not track what supervisors' responsibilities should be. It is geared primarily to address "comstat" needs. An appropriate supervisor's report should be utilized to provide data as evidence of compliance with the Consent Decree as the current report provides data for the comstat meetings.

### 2.      Paragraph 307 (Assignments)

Paragraph 307 of the Consent Decree requires that "all Field Operations Bureau District officers (including patrol, task force, district investigative, and narcotics units) shall be assigned to a single, consistent, and clearly-defined supervisor." ***NOPD's eight police districts are in full compliance with this requirement with respect to patrol officers, general assignment officers, and investigators.***

### 3.      Paragraph 308 (Task Force/Narcotics Supervisors)

Paragraph 308 of the Consent Decree requires that "task force and narcotics supervisors shall actually work the same days and hours as the officers they are assigned to supervise absent unusual circumstance or when the supervisor is on vacation, in training, or ill. Investigative unit supervisors shall work generally the same days and hours as the officers they are assigned to supervise, taking into account that shift differences will not permit complete supervisory overlap." ***NOPD is not yet able to demonstrate compliance with this requirement.***

First, detectives are assigned to work seven days per week, but supervisors work only five days per week. Similarly, Investigations supervisors are generally scheduled off from work two days per week, but the detectives they supervise are scheduled to work all seven days each week. While some of these gaps may fall within the "shift differences" exception to the Consent Decree requirement, the Monitoring Team is not yet convinced supervisor coverage has been implemented as required.



With respect to "General Assignments" (the successor group to NOPD's proactive District-based Task Forces), there are times when General Assignment officers are working without a supervisor assigned.  Some officers are not assigned to work the same dates as the supervisor.  Investigators and their supervisor work staggered times.  Detectives in General Assignments and Investigations do not work the same hours and days as the supervisors.  Detectives are not assigned to work the same dates and hours as their supervisor.  With the merger of task force and narcotics personnel into the General Assignments section of the district, the sole task force supervisor no longer works the same shift and days as the officers assigned to the supervisor.

### 4.      Paragraph 309 (District Platoon Patrol Supervisors)

Consent Decree paragraph 309 requires that District Platoon Patrol supervisors "be assigned to the same platoon as the officers they supervise and shall actually work the same days and hours as the officers of that platoon absent unusual circumstances or when the supervisor is on vacation, training, or ill." *NOPD was able to demonstrate compliance with this requirement for each of its eight districts.*  The Monitoring Team still is assessing compliance with respect to NOPD's Special Operations unit.

### 5.      Paragraph 310 (Patrol Supervisor Ratio)

Paragraph 310 of the Consent Decree requires that first-line patrol supervisors "be assigned to supervise no more than eight officers. On duty patrol supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units." *While NOPD has made progress in this area, it is not yet able to demonstrate full compliance.*

The records reviewed by the Monitoring Team confirmed that most officers were assigned to a single supervisor.  Generally, this translated into at least three supervisors assigned to a platoon made up of 8 - 12 officers.  Some districts, however, were unable to produce records of days off, which made it impossible to evaluate whether the expected ratios are implemented consistently in each district. *The notable exceptions were NOPD's Fourth and Sixth Districts, which were able to demonstrate full compliance with Paragraph 310 of the Consent Decree*.  Other Districts were unable to demonstrate compliance.  For example:

- The First District was unable to provide a list of days off for multiple supervisors.

- The Second District was unable to produce supervisor work schedules.  Moreover, the records produced by the Second District showed the District was not consistently in compliance with the ratio requirement, with several shifts having a ratio of 9:1 rather than 8:1.  In addition, there was at least one week with no supervisor assigned to General Assignments.  During that period, the officers assigned to General Assignments report to the platoon supervisors.  While those



officers at least had a responsible "stand in" supervisor, the arrangement violated the 8:1 Consent Decree ratio.

- The Third District was unable to provide a comprehensive list of supervisor work schedules.

- The Fifth District was unable to produce work schedules for General Assignments detectives. On dates their supervisor is not working, the detectives of that unit report to platoon supervisors. Without work schedules, it cannot be determined if a platoon supervisor is assigned more than eight officers.

- The Seventh District was unable to provide a comprehensive list of supervisors scheduled to work in the afternoon and evening shifts.   In addition, on at least one day, 12 officers were scheduled to work without any supervisor listed on the schedule.

- The Eighth District could not consistently demonstrate compliance with paragraph 310 because, on some days, a supervisor was not listed on the work schedule.  Additionally, platoon supervisors were scheduled to oversee officers not in their platoon, including the officers assigned to the "Day Watch" and the "Promenade."

- The Special Operations unit was unable to produce documents demonstrating compliance.  Accordingly, the Monitoring Team is unable to find the Special Operations Division in compliance with paragraph 310 of the Consent Decree.

As noted above, while some progress has been made, NOPD still cannot demonstrate compliance with paragraph 310.

### 6.      Paragraph 311 (Acting Patrol Supervisor Training)

Paragraph 311 of the Consent Decree requires NOPD "to develop and implement a program to identify and train acting patrol supervisors who can fill-in, on a temporary, as-needed basis, for assigned supervisors who are on vacation, in training, ill, or otherwise temporarily unavailable. NOPD shall ensure consistent supervision by acting supervisors for supervisors who are on extended leave, and shall reassign officers to a new permanent non-acting supervisor when the currently assigned supervisor has been or is expected to be absent for an extended period of over six weeks." ***NOPD is not in compliance with this requirement***.  The Training Academy has not developed training or trained any personnel as acting patrol supervisors.



### 7.　　Paragraph 312 (Commanders and Lieutenants)

Consent Decree paragraph 312 provides that "District commanders and platoon lieutenants shall be responsible for the close and effective supervision of officers under their command."  The paragraph goes on to provide that "All NOPD commanders and platoon lieutenants shall ensure that all subordinates under their direct command comply with NOPD policy, state and federal law, and the requirements of this Agreement."  Although the supervisors' activity reports were revised recently, they are not being completed fully and consistently.  As a result, the supervisors' activity sheets are missing critical information such as the direction they provided at roll call, any orders conveyed to officers, their expectations while interacting with the public, counseling they provided, disciplinary actions initiated, complaints to which they responded, monitoring of officer activity on calls for service or traffic stops, or other actions taken by a supervisor to ensure compliance with paragraph 312 of the consent decree.  The lack of adequate supervisor reports prevents documentation of actions taken by supervisors when they respond to the field to supervise including actions taken to address use of force incidents and citizens' complaints.

While the Monitoring Team has observed progress in many districts and has observed commanders and lieutenants working to implement these requirements, most districts still are unable to document (and, thus, demonstrate) compliance with this requirement.  Notably, the Fourth District has taken significant steps toward compliance, having assigned the project to a capable lieutenant.

### 8.　　Paragraph 313 (Holding Commanders Accountable)

Paragraph 313 of the Consent Decree requires that NOPD "hold commanders and supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate."  As noted above, NOPD was able to produce few documents demonstrating compliance with this requirement.  Few documents were produced to provide evidence of counseling or redirection, and only a few documents were produced to provide evidence of disciplinary action to hold officers accountable.  Most commands did not have a list of counseling memos or disciplinary actions initiated.  Most commands referred the Monitoring Team to PIB to obtain any evidence of supervisors identified and effectively responded to misconduct.  We were provided no documents that provided evidence supervisors were held accountable for performing their duties.[15]

---

[15]　In early 2015, NOPD implemented a new "performance evaluation matrix" to facilitate the evaluation of Department rank.  The Monitoring Team will explore this improvement in a future period.



Supervisor's reports did not include information concerning orders relayed from higher authority, counseling provided to officers, direction to officers regarding engagement of the public, or discipline. Supervisor's performance evaluations were generally not available, few counseling memos were available, and few disciplinary reports were available. The performance evaluations reviewed were not adequate to assess supervisors' performance. The evaluations did not include a section to evaluate "whether commanders and supervisors identify and effectively respond to misconduct, as part of their performance evaluations" as required by paragraph 313 of the Consent Decree.

### B.    Supervisor and Command-Level Training

#### 1.    Paragraph 314 (Supervisory Training)

Consent Decree paragraph 314 requires that NOPD "develop and implement mandatory supervisory training for all new and current supervisors." Specifically, the Consent Decree requires that "[a]ll current supervisors shall receive 200 hours of mandatory supervisory training within two years of the Effective Date." The Consent Decree goes on to lay out the details of such training as follows:

> NOPD shall receive credit for professional police leadership training being provided in 2012 to current NOPD supervisors. All officers becoming supervisors within two years of the Effective Date shall receive 160 hours of initial supervisory training before assuming supervisory duties. All officers becoming supervisors after two years of the Effective Date shall receive 80 hours of initial supervisory training before assuming supervisory duties. In addition to this initial supervisory training, NOPD agrees to require each supervisor to complete at least 40 hours of supervisor-specific training annually thereafter. In-service training for supervisors, including commanders, shall provide necessary updates and refreshers, as well as training in new skills.

NOPD developed and implemented mandatory supervisory training for all new and current supervisors. The training follows an FBI-developed lesson plan. The Consent Decree requires that all supervisors promoted between 8/9/13 and 8/9/15 receive 160 hours of initial supervisory training before assuming supervisory duties. Sergeants promoted in April of 2014 received 160 hours of supervisory training, meeting this requirement of the Consent Decree. *This represents a positive step forward by NOPD.*

Other areas of this requirement, however, are harder to assess due to inadequate records. For example, NOPD was unable to produce records demonstrating every supervisor completed at least 40 hours of supervisor-specific annual training. *Similarly, NOPD was unable to demonstrate lieutenants and commanders had taken required in-service supervisor training.*



*In short, while NOPD has made progress, the Department cannot yet demonstrate full compliance with paragraph 314.*

### 2.    Paragraph 315 (Supervisory Training Program)

Paragraph 315 of the Consent Decree requires NOPD to develop a supervisory training program that incorporates the following enumerated elements.

- Techniques for effectively guiding and directing officers, and for promoting effective and ethical police practices

- De-escalating conflict, including through peer intervention.

- Evaluation of written reports, including what constitutes a fact-based description, and how to identify "pat," "boilerplate," or conclusory language that is not explained by specific facts.

- Investigating officer uses of force.

- Operation of supervisory tools such as the EWS, mobile recording equipment, and AVL.

- Burdens of proof, interview techniques, and the factors to consider when evaluating officer, complainant, or witness credibility, to ensure that investigative findings, conclusions, and recommendations are unbiased, uniform and legally supported.

- Evaluating officer performance as part of NOPD's annual performance evaluation system.

- Fostering positive career development and imposing appropriate disciplinary sanctions and non-disciplinary corrective action.

- Building community partnerships and guiding officers.

- Incorporating integrity-related data into COMSTAT reporting.

NOPD was unable to demonstrate full compliance with any of these Consent Decree-mandated training requirements.  One exception to this general conclusion related to NOPD's teaching of techniques for effectively guiding and directing officers, and for promoting effective and ethical police practices.  NOPD's current supervisory training does include a one and one-half (1 ½) hour ethics training session provided by PIB personnel.  The instruction was provided by PIB personnel.



### C.    Visual and Audio Documentation of Police Activities

#### 1.    Paragraph 327 (Operational Equipment)

Paragraph 327 of the Consent Decree requires NOPD "to maintain and operate video cameras and AVL in all marked or unmarked vehicles that are assigned to routine calls for service, task forces, tactical units, prisoner transport, or SOD canine and shall repair or replace all non-functioning video cameras or AVL units, as necessary for reliable functioning." The Consent Decree goes on to require that "one-half of these vehicles will be equipped with video cameras and AVL" by August 2014. The Consent Decree further provides NOPD must "ensure that recordings are captured, maintained, and reviewed as appropriate by supervisors, in addition to any review for investigatory or audit purposes, to assess the quality and appropriateness of officer interactions, uses of force, and other police activities."

The Monitoring Team audits the functionality of in-car cameras on a monthly basis. Prior reports have identified significant shortcomings in the NOPD's compliance with paragraph 327. Some of these shortcomings were the fault of officers, who failed to report non-functional cameras; others were the fault of supervisors, who failed to take action when reports were made. The primary driver of non-compliance now, however, seems to be technological. NOPD simply lacks the server capacity to ensure the functionality of all its in-car cameras. The Monitoring Team brought this matter to the attention of the Court, and the Court has been requiring frequent updates from the City regarding its efforts to expand its server capacity. As of the publication of this report, the City reports new servers have been ordered, but not yet installed.

With that as background, the Monitoring Team's most recent audit findings regarding in-car camera functionality are as follows:



## In-Car Cameras



While this is a significant improvement as compared to past assessments – ***and does meet the Consent Decree's interim 50% requirement*** – certain Districts still have a ways to go to achieve 100% camera functionality.  The Monitoring Team believes the forthcoming implementation of the new camera servers will go a long way toward achieving that goal.

The Monitoring Team's reviews of NOPD's Automatic Vehicle Location System revealed NOPD is in ***full compliance*** with this requirement.  Our audit of each of the Department's eight police districts confirmed all audited cars were equipped with the necessary system and that it was functioning.

Finally, while progress has been made regarding the requirement that supervisors conduct reviews of in-car equipment, the Monitoring Team cannot yet find NOPD in full compliance with this requirement.  Many Districts were able to demonstrate compliance, but some could offer only anecdotal evidence that such reviews were regularly conducted.  In one District, notwithstanding the claims that reviews were conducted regularly, the supervisors failed to notice that only two of the in-car cameras had operable external microphones.  This disconnect highlights why the Monitoring Team requires documentary rather than anecdotal evidence.

### 2.       Paragraph 329 (Testing Schedule)

Consent Decree paragraph 329 provides that NOPD shall "develop and implement a schedule for testing AVL, in-car camera, and ECW recording equipment to confirm that it is in proper working order, [and that] officers shall be responsible for ensuring that recording equipment assigned to them or their car is functioning properly at the beginning and end of each



shift and shall report immediately any improperly functioning equipment." ***NOPD is unable to demonstrate compliance with this requirement.***

While the NOPD Compliance Bureau previously performed a District by District audit of NOPD's in-car cameras, we have not seen that audit implemented as a standard, consistent practice. The Monitoring Team has no seen Districts conduct such audits on a consistent basis.

While not routinely testing, it is worth mentioning that NOPD's Fourth District does maintain a spreadsheet that tracks when officers report non-operating equipment, when the supervisors report the non-operating equipment to the appropriate personnel, and when the equipment is repaired. We commend the Fourth District for implementing this rather simple and effective practice, and hope other Districts undertake similar efforts to ensure equipment is functioning as it should.

3.      **Paragraph 330**

Paragraph 330 of the Consent Decree provides that supervisors shall be responsible for "ensuring that officers under their command use in-car camera recording equipment, AVL equipment, ECW cameras, and similar equipment, as required by policy. Supervisors shall report equipment problems and seek to have equipment repaired as needed. Supervisors shall refer for investigation any officer found to fail to properly use or care for in-car camera recording, AVL, ECW camera, or similar equipment." ***NOPD is in partial compliance with this requirement.***

Most supervisors in most districts were unable to provide documentation evidencing compliance with paragraph 330. Moreover, many supervisors in many districts admitted they did not know how to ensure the functionality and use of certain types of equipment. Several supervisors explained, for example, they do not know if a CEW (Taser) camera is working until they have been used and the academy personnel who monitor their use would advise them if the cameras worked.

With respect to the supervisors' obligation to report problems with equipment, the Monitoring Team has noted an improvement over past months, ***but has not yet seen full compliance with the Consent Decree requirement***. With respect to in-car microphones, for example, we have seen problems go unreported for significant periods of time. Supervisors from Districts 1, 2, 3, and 8, for example, were either unaware that most external microphones on mobile video recordings were not operable or they took no action upon learning they were inoperable. And none of those Districts maintained effective documentation to document and track the functionality of technology equipment. In contrast, the Fourth District maintains a simple spreadsheet that tracks when officers report non-operating equipment, when the supervisors report the non-operating equipment to the appropriate personnel and when the equipment is repaired.



NOPD recently implemented a new officer "trip sheet" and supervisor report form, which are designed to help officers and supervisors identify non-functioning equipment.  While the new form only recently was rolled out, the Monitoring Team believes it will help NOPD meet its obligations under paragraph 330.  In the meantime, ***our reviews reveal NOPD is not yet in full compliance***.

    **D.**      **Early Warning System ("EWS")**

The Consent Decree requires the City and NOPD to develop, implement, and maintain an EWS to support the effective supervision and management of NOPD officers and employees, including the identification of and response to potentially problematic behaviors as early as possible.  The Consent Decree further requires that NOPD regularly use EWS data to promote constitutional and professional police practices; to manage risk and liability; and to evaluate the performance of NOPD employees across all ranks, units, and shifts.

In the Monitoring Team's prior Report, we recognized that, following an open national competition, the City had selected a vendor (Sierra-Cedar) to assist it in designing and implementing its EWS.  The selected vendor has experience implementing Early Warning Systems in other jurisdictions under Consent Decrees, including the Los Angeles Police Department and the Oakland Police Department.  More recently, in February 2015, the City signed a contract with the contractor.

Also in February, the City and its vendor initiated substantive implementation efforts.  Among other things, the City hired an internal team to facilitate implementation – a critically important choice since one of the most common reasons large scale IT implementations fail is the absence of dedicated management.  This implementation team includes an NOPD project manager and two business analysts.  The team also includes a database administrator staffed within the City of New Orleans' IT section.

The Monitoring Team continues to watch closely the City's progress toward meeting its EWS obligations.



## XVII.  MISCONDUCT COMPLAINT INTAKE, INVESTIGATION, AND ADJUDICATION (CD 375-426)

The Monitoring Team continues to monitor NOPD's complaint intake, investigation, and adjudication process closely.  We attend disciplinary hearings, meet with PIB and IPM to discuss our findings and their views, and request additional NOPD attention to matters where we believe an investigation was incomplete or inadequate.  We also continue to review all serious Use of Force incidents.

In addition to our ongoing reviews, the Monitoring Team is in the process of several targeted reviews focused at certain key elements of the Consent Decree.  These reviews include the following:

- A review of PIB's coding of citizen complaints alleging racial profiling.  The purpose of this review is to determine whether complaints alleging racial profiling actually are being coded by PIB as racial profiling complaints.  The Monitoring Team is performing this review in conjunction with the IPM.

- A review of all PIB investigations involving Body Worn Camera non-use or mis-use.  This project involves a review of the PIB investigation file by a member of the Monitoring Team to evaluate the effectiveness of the PIB investigation and to assess the fairness, consistency, and meaningfulness of the resulting discipline.

- The Monitoring Team is working closely with the Department of Justice and the NOPD Compliance Bureau to review, revise, and finalize NOPD's policies relating to misconduct investigations and adjudications.

Additionally, as noted above, the Monitoring Team continues to attend and compile data on disciplinary hearings, which ultimately will inform our analysis of the quality, consistency, and fairness of such hearings.

The results of these reviews will be published in forthcoming stand-alone reports.



# XVIII. AGREEMENT IMPLEMENTATION AND ENFORCEMENT (CD 444 – 492)

## A.      Coordination with IPM (CD 459)

The Consent Decree provides the Monitoring Team shall coordinate and confer with the Independent Police Monitor. (CD 459)  The Monitoring Team and IPM communicated frequently during this quarter and coordinated their efforts to the extent practicable.  The Monitoring Team continues to be impressed by the passion, dedication, and impact of the IPM; and recognizes the respect the organization has within the New Orleans community.  The Monitoring Team and the IPM continue to work together on a joint analysis of racial profiling complaints filed with PIB, and intends to initiate other joint activities.  The Monitoring Team remains pleased with and grateful for the level of cooperation it receives from the IPM.

## B.      NOPD Consent Decree Implementation Unit (CD 467)

Paragraph 467 of the Consent Decree provides that the City and NOPD will "hire and retain, or reassign current NOPD employees to form, an inter-disciplinary unit with the skills and abilities necessary to facilitate implementation" of the Consent Decree.  The Consent Decree goes on to explain this unit "will serve as a liaison between the Parties and the Monitoring Team and will assist with the implementation of and compliance with this Agreement."

As noted in the Monitoring Team's prior two quarterly reports, "a fully functioning, adequately staffed, and properly resourced Consent Decree Implementation Unit is a critical component of NOPD's ability to come into compliance with the terms of the Consent Decree." Previously, the Monitoring Team found NOPD not in compliance with this requirement, but in 2014, the NOPD fully staffed the Consent Decree Implementation Unit, which brought the Department into compliance.  The Monitoring Team continues to be pleased by the Unit's knowledge, skill level, and demonstrated commitment to the Consent Decree process; and recognizes the full cooperation it continues to receive from the Unit.

## C.      NOPD and City Cooperation (CD 470 – 476)

The Consent Decree provides the City and NOPD shall fully cooperate with the Monitoring Team in all aspects of its responsibilities.  We are pleased to report that the City and NOPD generally did cooperate with the Monitoring Team throughout this reporting quarter.  The one area where we did not receive the full cooperation of the NOPD was in response to our request for information following the Department's surprising elimination of the college credit requirement from its recruitment standards.  The Monitoring Team requested details from the NOPD demonstrating it had a sensible and well-thought-out plan to ensure the change in standards would not impact any element of the Consent Decree.  NOPD did not provide the information requested by the Monitoring Team.  Subsequently, the issue was discussed with the Court and the Monitoring Team has received confirmation the requested information will be provided.



      The Monitoring Team continues to receive the full cooperation of and continues to work closely with the New Orleans Office of Inspector General ("OIG").  While the OIG's activities do not fall within our monitoring responsibilities under the Consent Decree, the OIG has kept us apprised of its audit plans and investigators as they relate to the NOPD.  We continue to be impressed by the quality of the OIG personnel with whom we work and with the quality and thoroughness of the OIG's work product.  The Monitoring Team looks forward to an ongoing positive relationship with the OIG, and, in fact, is in the process of coordinating a joint project with the OIG, which will focus on NOPD's use of "Signal 21" codes to classify calls for service as "miscellaneous."

      Finally, the Monitoring Team also has been impressed with the close working relationship between NOPD's current domestic violence detectives and the Orleans Parish District Attorney's Office, and the level of cooperation we continue to receive from the DA's office.



## XIX.   CONCLUSION

The Monitoring Team's activities during this reporting quarter, like the last, revealed progress in some areas, but lagging compliance in others.  Significant deficiencies remain, which must be remedied, including in the areas of training, supervision, record keeping, and Officer Assistance & Support.  The progress NOPD has made in other areas, however, keeps us cautiously optimistic that NOPD is moving in the right direction.  As we noted in our last report, our cautious optimism continues to be bolstered by the personal commitment to the spirit and letter of the Consent Decree we have seen from NOPD's leadership, including Superintendent Harrison, Deputy Chief Westbrook (PIB), Deputy Chief Ginsberg (Compliance Bureau), and newly-promoted Commander Williams (Training), among others.  Each manager has made clear his/her commitment to the Consent Decree, to working closely with the Monitoring Team, and to implementing meaningful and lasting change within the Department.  That is not to say the Monitoring Team always agrees with the path NOPD travels to achieve compliance – the elimination of the college credit requirement without a robust, holistic recruitment/hiring plan in its place is such an example – but, lately, we have been given little reason to doubt their personal commitment to achieving compliance.  Each manager (and many others) readily has acknowledged the seriousness of the problems that need fixing and has taken ownership of those problems.  While their shared attitude does not mean NOPD is nearing the finish line, it does help ensure there is a finish line.

Page 82 of 119
April 28, 2015
www.consentdecreemonitor.com



## XX.    APPENDICES



**Appendix 1**
**POLICE SURVEY RESPONSES**



**Table 7 - Distribution of Responses for Section 1: "Police Work and Your Working Environment"**

| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly Agree (4) |
|---|---|---|---|---|
| | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) |
| *Survey questions (Mean in parentheses):* | | | | |
| 1. Generally, civilians in my district treat me with respect. ($M$ = 2.75) | 33 (7.3) | 89 (19.8) | 260 (57.9) | 46 (10.2) |
| 2. Generally, in my District, my fellow officers treat me with respect. ($M$ = 3.36) | 6 (1.3) | 13 (2.9) | 231 (51.4) | 179 (39.9) |
| 3. Generally, in my District, my supervisors treat me with respect. ($M$ = 3.24) | 14 (3.1) | 34 (7.6) | 215 (47.9) | 164 (36.5) |
| 4. My district/division provides a quality work environment. ($M$ = 2.50) | 63 (14.0) | 134 (29.8) | 194 (43.2) | 43 (9.6) |
| 5. I receive training from the Police Department that helps me do my job effectively. ($M$ = 2.49) | 52 (11.6) | 148 (33.0) | 205 (45.7) | 31 (6.9) |
| 6. I receive quality equipment from the Police Department that helps me do my job effectively. ($M$ = 1.87) | 162 (36.1) | 178 (39.6) | 86 (19.2) | 9 (2.0) |
| | Very bad (1) | Somewhat bad (2) | Somewhat good (3) | Very good (4) |
| 8. Overall, how would you rate the relationships among the racial and ethnic groups in NOPD? ($M$ = 2.86) | 31 (6.9) | 82 (18.3) | 242 (53.9) | 78 (17.4) |

*Note*: Entries are the frequency for each response category ($N$) and the percentage of respondents who fell into the category in parentheses (%). Percentages do not sum to 100% because of missing values (i.e., nonresponse). The mean (i.e., average) score is reported in parentheses next to each question ($M$). Survey question #7 is not included in this table because it featured different response categories.



**Table 8 - Distribution of Responses for Section 2: "Managers and Supervisors"**

| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly Agree (4) |
|---|---|---|---|---|
| | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) |
| *Survey questions (Mean in parentheses):* | | | | |
| 9. Most officers treat other officers the same regardless of gender. ($M = 2.79$) | 25 (5.6) | 103 (22.9) | 244 (54.3) | 63 (14.0) |
| 10. Most superiors treat officers the same regardless of gender. ($M = 2.62$) | 42 (9.4) | 134 (29.8) | 203 (45.2) | 54 (12.0) |
| 11. Most officers treat other officers the same regardless of their race/ethnicity. ($M = 2.79$) | 24 (5.3) | 98 (21.8) | 258 (57.5) | 56 (12.5) |
| 12. Most superiors treat officers the same regardless of their race/ethnicity. ($M = 2.68$) | 37 (8.2) | 125 (27.8) | 211 (47.0) | 61 (13.6) |
| 13. Most officers treat other officers the same regardless of their sexual orientation. ($M = 2.87$) | 21 (4.7) | 81 (18.0) | 266 (59.2) | 67 (14.9) |
| 14. Most superiors treat officers the same regardless of their sexual orientation.($M = 2.85$) | 22 (4.9) | 90 (20.0) | 253 (56.3) | 68 (15.1) |
| 15. My immediate supervisor gives me regular feedback on the quality of my work.($M = 2.97$) | 33 (7.3) | 69 (15.4) | 210 (46.8) | 121 (26.9) |
| 16. I consistently work with the same supervisor. ($M = 3.24$) | 11 (2.4) | 44 (9.8) | 206 (45.9) | 172 (38.3) |
| 17. My district/division commander is open to new ideas and ways of working. ($M = 2.87$) | 44 (9.8) | 64 (14.3) | 207 (46.1) | 99 (22.0) |



| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly Agree (4) |
|---|---|---|---|---|
| | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) |
| 18. My district/division commander has improved relations with the community in which I work. ($M$ = 2.91) | 25 (5.6) | 61 (13.6) | 223 (49.7) | 75 (16.7) |
| 19. My district/division commander is a good leader. ($M$ = 3.04) | 33 (7.3) | 43 (9.6) | 211 (47.0) | 124 (27.6) |
| 20. The current Superintendent of Police is leading us in the right direction. ($M$ = 1.73) | 225 (50.1) | 110 (24.5) | 61 (13.6) | 25 (5.6) |

*Note*: Entries are the frequency for each response category ($N$) and the percentage of respondents who fell into the category in parentheses (%). Percentages do not sum to 100% because of missing values (i.e., nonresponse). The mean (i.e., average) score is reported in parentheses next to each question ($M$).



## Table 9 - Distribution of Responses for Section 3: "Personnel and Management Systems"

| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly Agree (4) |
|---|---|---|---|---|
| | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) |
| *Survey questions (Mean in parentheses):* | | | | |
| 21. The Department today hires qualified people. ($M$ = 2.35) | 75 (16.7) | 140 (31.2) | 189 (42.1) | 17 (3.8) |
| 22. The performance evaluation system is fair. ($M$ = 2.25) | 95 (21.2) | 141 (31.4) | 175 (39.0) | 14 (3.1) |
| 23. The investigation of civilian complaints is fair. ($M$ = 1.85) | 183 (40.8) | 146 (32.5) | 77 (17.1) | 20 (4.5) |
| 24. The investigations now conducted by NOPD's Public Integrity Bureau (PIB) are fair. ($M$ = 1.86) | 170 (37.9) | 154 (34.3) | 84 (18.7) | 13 (2.9) |
| 25. The way my Commander administers discipline is fair. ($M$ = 2.88) | 29 (6.5) | 58 (12.9) | 250 (55.7) | 66 (14.7) |
| 26. I understand clearly what type of behavior will result in discipline. ($M$ = 3.06) | 30 (6.7) | 63 (14.0) | 188 (41.9) | 147 (32.7) |
| 27. I am afraid I will be punished for making an honest mistake. ($M$ = 3.20) | 24 (5.3) | 69 (15.4) | 134 (29.8) | 204 (45.4) |
| 28. Most civilian complaints against officers are frivolous. ($M$ = 3.12) | 11 (2.4) | 65 (14.5) | 207 (46.1) | 139 (31.0) |
| 29. My career has been negatively affected by civilian complaints. ($M$ = 2.19) | 104 (23.2) | 192 (42.8) | 75 (16.7) | 55 (12.2) |



| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly Agree (4) |
|---|---|---|---|---|
| | *N* (%) | *N* (%) | *N* (%) | *N* (%) |
| 30. The complaint system makes the Department more accountable to the public. (*M* = 2.41) | 72 (16.0) | 144 (32.1) | 165 (36.7) | 40 (8.9) |
| 31. The Early Warning Program (PPEP) helps the Department identify risky behavior among officers. (*M* = 2.29) | 89 (19.8) | 152 (33.9) | 154 (34.3) | 30 (6.7) |
| 32. The Early Warning Program (PPEP) helps the Department prevent police misconduct. (*M* = 2.13) | 106 (23.6) | 173 (38.5) | 127 (28.3) | 16 (3.6). |

*Note*: Entries are the frequency for each response category (*N*) and the percentage of respondents who fell into the category in parentheses (%). Percentages do not sum to 100% because of missing values (i.e., nonresponse). The mean (i.e., average) score is reported in parentheses next to each question (*M*).



**Table 10 - Distribution of Responses for Section 4: "Community Policing and Police/Community Relations**

| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly Agree (4) |
|---|---|---|---|---|
| | *N* (%) | *N* (%) | *N* (%) | *N* (%) |
| *Survey questions (Mean in parentheses):* | | | | |
| 33. Officers in my district are respected by residents in the community. ($M$ = 2.61) | 31 (6.9) | 114 (25.4) | 243 (54.1) | 17 (3.8) |
| 34. Generally, NOPD receives more support from the community than a year ago.  ($M$ = 2.23) | 70 (15.6) | 189 (42.1) | 122 (27.2) | 20 (4.5) |
| 35. The manner in which I interact with civilians influences the way the community perceives NOPD. ($M$ = 3.38) | 5 (1.1) | 32 (7.1) | 180 (40.1) | 200 (44.5) |
| 36. Law enforcement strategies in my district negatively affect community relations.  ($M$ = 2.22) | 40 (8.9) | 242 (53.9) | 86 (19.2) | 19 (4.2) |
| 37. Police Community Coordinating (CoCo) Sergeants do valuable work for the Department.  ($M$ = 2.56) | 61 (13.6) | 95 (21.2) | 177 (39.4) | 49 (10.9) |
| 38. Quality of Life Officers do valuable work for the Department.  ($M$ = 2.76) | 45 (10.0) | 72 (16.0) | 225 (50.1) | 64 (14.3) |
| 39. Youth programs improve relations between the NOPD and the community where I work. ($M$ = 2.61) | 48 (10.7) | 109 (24.3) | 171 (38.1) | 56 (12.5) |
| 40. Youth programs help reduce crime. ($M$ = 2.82) | 41 (9.1) | 89 (19.8) | 188 (41.9) | 81 (18.0) |
| 42. The NOPD today is a better organization than it was three years ago. ($M$ = 1.74) | 199 (44.3) | 139 (31.0) | 50 (11.1) | 22 (4.9) |



| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly Agree (4) |
|---|---|---|---|---|
| | *N* (%) | *N* (%) | *N* (%) | *N* (%) |
| 47. NOPD today brings offenders to justice while respecting their rights and complying with the law. (*M* = 3.07) | 14 (3.1) | 43 (9.6) | 250 (55.7) | 99 (22.0) |
| 51. Residents in the community I work in trust the NOPD. (*M* = 2.45) | 43 (9.6) | 148 (33.0) | 186 (41.4) | 16 (3.6) |
| 52. If I lived in my district I would be satisfied with the police services.  (*M* = 2.17) | 104 (23.2) | 139 (31.0) | 131 (29.2) | 21 (4.7) |
| | Almost never (1) | Only some of time (2) | Most of the time (3) | Always (4) |
| 43. The officers in my district/division treat all individuals (regardless of racial, ethnic, gender, sexual, or other affiliation) equally. (*M* = 3.12) | 14 (3.1) | 66 (14.7) | 187 (41.6) | 142 (31.6) |
| 44. The officers in my district/division treat all individuals (regardless of racial, ethnic, gender, sexual, or other affiliation) fairly. (*M* = 3.15) | 15 (3.3) | 51 (11.4) | 202 (45.0) | 142 (31.6) |
| | Poor (1) | Fair (2) | Good (3) | Excellent (4) |
| 41. Overall, the services of the police in New Orleans are (*M* = 2.20) | 103 (22.9) | 153 (34.1) | 142 (31.6) | 22 (4.9) |
| | Very badly (1) | Somewhat badly (2) | Somewhat well (3) | Very well (4) |
| 48. Overall, how would you say that racial and ethnic groups in New Orleans are getting along with one other these days? (*M* = 2.67) | 38 (8.5) | 88 (19.6) | 255 (56.8) | 25 (5.6) |



| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly Agree (4) |
|---|---|---|---|---|
| | *N* (%) | *N* (%) | *N* (%) | *N* (%) |
| | No | Yes | | |
| 49. Is there a group that is treated unfairly by officers in NOPD? | 105 (23.4) | 295 (65.7) | | |

*Note*: Questions are not in the same order as the survey to allow for groupings of response categories. Entries are the frequency for each response category (*N*) and the percentage of respondents who fell into the category in parentheses (%). Percentages do not sum to 100% because of missing values (i.e., nonresponse). The mean (i.e., average) score is reported in parentheses next to each question (*M*).



**Table 11 - Distribution of Responses for Section 5: "Expectations about the Police Role"**

| Response categories: | Not Important At All (1) | Not Important (2) | Not So Important (3) | Important (4) | Very Important (5) |
|---|---|---|---|---|---|
| | *N* (%) | *N* (%) | *N* (%) | *N* (%) | *N* (%) |
| *Survey questions (Mean in parentheses):* | | | | | |
| 53. Testifying in court. (*M* = 4.61) | 3 (0.7) | 3 (0.7) | 10 (2.2) | 117 (26.1) | 274 (61.0) |
| 54. Handling drunk driving offenders. (*M* = 4.45) | 3 (0.7) | 4 (0.9) | 26 (5.8) | 163 (36.3) | 235 (52.3) |
| 55. Obtaining statements from witnesses. (*M* = 4.67) | 1 (0.2) | 0 | 7 (1.6) | 123 (27.4) | 299 (66.6) |
| 56. Making arrests.  (*M* = 4.10) | 6 (1.3) | 7 (1.6) | 74 (16.5) | 194 (43.2) | 147 (32.7) |
| 57. Dealing with domestic disputes.  (*M* = 4.29) | 3 (0.7) | 5 (1.1) | 46 (10.2) | 187 (41.6) | 187 (41.6) |
| 58. Working with community to make neighborhoods safer. (*M* = 4.57) | 1 (0.2) | 1 (0.2) | 14 (3.1) | 151 (33.6) | 261 (58.1) |
| 59. Responding to calls for service. (*M* = 4.57) | 3 (0.7) | 2 (0.4) | 10 (2.2) | 145 (32.3) | 268 (59.7) |
| 60. Talking to civilians to help identify problems. (*M* = 4.50) | 0 | 3 (0.7) | 20 (4.5) | 166 (37.0) | 240 (53.5) |
| 61. Dealing with street crime. (*M* = 4.64) | 0 | 0 | 8 (1.8) | 136 (30.3) | 284 (63.3) |
| 62. Completing criminal offense reports. (*M* = 4.47) | 0 | 3 (0.7) | 23 (5.1) | 172 (38.3) | 232 (51.7) |
| 63. Conducting foot patrol. (*M* = 3.55) | 18 (4.0) | 38 (8.5) | 140 (31.2) | 152 (33.9) | 79 (17.6) |
| 64. Providing crime prevention education to the public.(*M* = 4.18) | 3 (0.7) | 11 (2.4) | 51 (11.4) | 202 (45.0) | 161 (35.9) |
| 65. Working with juveniles. (*M* = 4.24) | 5 (1.1) | 6 (1.3) | 54 (12.0) | 181 (40.3) | 182 (40.5) |
| 66. Conducting drug raids. (*M* = 4.16) | 5 (1.1) | 9 (2.0) | 56 (12.5) | 197 (43.9) | 159 (35.4) |
| 67. Maintaining crowd control. (*M* = 4.27) | 3 (0.7) | 5 (1.1) | 45 (10.0) | 199 (44.3) | 178 (39.6) |
| 68. Stopping and searching suspects. (*M* = 3.99) | 7 (1.6) | 11 (2.4) | 76 (16.9) | 215 (47.9) | 115 (25.6) |



| Response categories: | Not Important At All (1) | Not Important (2) | Not So Important (3) | Important (4) | Very Important (5) |
|---|---|---|---|---|---|
| | *N* (%) | *N* (%) | *N* (%) | *N* (%) | *N* (%) |
| 69. The legality/constitutionality of stops and searches. (*M* = 4.61) | 1 (0.2) | 3 (0.7) | 14 (3.1) | 127 (28.3) | 281 (62.6) |
| 70. Patrolling the streets. (*M* = 4.57) | 2 (0.4) | 2 (0.4) | 10 (2.2) | 148 (33.0) | 265 (59.0) |
| 71. General patrol duties. (*M* = 4.47) | 3 (0.7) | 2 (0.4) | 14 (3.1) | 181 (40.3) | 227 (50.6) |
| 72. General traffic duties. (*M* = 3.92) | 4 (0.9) | 12 (2.7) | 81 (18.0) | 247 (55.0) | 82 (18.3) |
| 73. Controlling traffic. (*M* = 3.85) | 5 (1.1) | 15 (3.3) | 96 (21.4) | 231 (51.4) | 78 (17.4) |
| 74. Issuing traffic tickets. (*M* = 3.48) | 11 (2.4) | 32 (7.1) | 172 (38.3) | 160 (35.6) | 49 (10.9) |
| 75. Handling neighborhood disputes. (*M* = 4.16) | 4 (0.9) | 5 (1.1) | 40 (8.9) | 247 (55.0) | 128 (28.5) |
| 76. Controlling the crowds at public events. (*M* = 4.36) | 6 (1.3) | 7 (1.6) | 30 (6.7) | 167 (37.2) | 217 (48.3) |
| 77. Dealing with noisy parties. (*M* = 3.34) | 17 (3.8) | 34 (7.6) | 194 (43.2) | 143 (31.8) | 35 (7.8) |

*Note*: Entries are the frequency for each response category (*N*) and the percentage of respondents who fell into the category in parentheses (%). Percentages do not sum to 100% because of missing values (i.e., nonresponse).  The mean (i.e., average) score is reported in parentheses next to each question (*M*).



**Table 12 - Distribution of Responses for Section 6: "General Questions about the Public and the Department"**

| Response categories: | Strongly disagree (1) | Disagree (2) | Not Sure (3) | Agree (4) | Strongly Agree (5) |
|---|---|---|---|---|---|
| | *N* (%) | *N* (%) | *N* (%) | *N* (%) | *N* (%) |
| *Survey questions (Mean in parentheses):* | | | | | |
| 78. Many people in society will harm you if you give them the opportunity. ($M$ = 3.22) | 16 (3.6) | 130 (29.0) | 87 (19.4) | 136 (30.3) | 61 (13.6) |
| 79. Most people are honest.  ($M$ = 3.18) | 19 (4.2) | 102 (22.7) | 110 (24.5) | 183 (40.8) | 18 (4.0) |
| 80. In an emergency, most community members would come to the aid of a police officer who needs assistance. ($M$ = 3.11) | 36 (8.0) | 76 (16.9) | 147 (32.7) | 154 (34.3) | 21 (4.7) |
| 81. In general, you should be suspicious of people.  ($M$ = 3.19) | 7 (1.6) | 139 (31.0) | 78 (17.4) | 176 (39.2) | 29 (6.5) |
| 82. The community shows a lot of respect for the police. ($M$ = 2.68) | 66 (14.7) | 143 (31.8) | 94 (20.9) | 123 (27.4) | 7 (1.6) |
| 83. Residents do not understand the problems that we face as police officers. ($M$ = 4.36) | 7 (1.6) | 14 (3.1) | 23 (5.1) | 161 (35.9) | 229 (51.0) |
| 84. Many residents try to make us look bad. ($M$ = 3.45) | 8 (1.8) | 96 (21.4) | 94 (20.9) | 161 (35.9) | 72 (16.0) |
| 85. Most civilians have confidence in the police. ($M$ = 3.06) | 24 (5.3) | 106 (23.6) | 134 (29.8) | 152 (33.9) | 15 (3.3) |
| 86. I get tired of listening to civilians complain about everything. ($M$ = 2.66) | 36 (8.0) | 215 (47.9) | 59 (13.1) | 93 (20.7) | 24 (5.3) |
| 87. The community doesn't appreciate what we at NOPD do for them. ($M$ = 3.48) | 14 (3.1) | 100 (22.3) | 78 (17.4) | 143 (31.8) | 97 (21.6) |
| 88. Police officers could do a better job if upper management did not interfere so much. ($M$ = 3.70) | 10 (2.2) | 81 (18.0) | 66 (14.7) | 143 (31.8) | 128 (28.5) |
| 89. Rarely do officers get rewarded for doing a good job.($M$ = 4.25) | 7 (1.6) | 30 (6.7) | 21 (4.7) | 164 (36.5) | 209 (46.5) |



| Response categories: | Strongly disagree (1) | Disagree (2) | Not Sure (3) | Agree (4) | Strongly Agree (5) |
|---|---|---|---|---|---|
| | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) |
| 90. Landing a good assignment is based on whom you know. ($M$ = 3.96) | 8 (1.8) | 56 (12.5) | 54 (12.0) | 139 (31.0) | 171 (38.1) |
| 91. If you make a mistake, the department will give you a second chance. ($M$ = 2.33) | 98 (21.8) | 159 (35.4) | 109 (24.3) | 54 (12.0) | 8 (1.8) |
| 92. If you work hard, you can get ahead in NOPD. ($M$ = 2.70) | 85 (18.9) | 127 (28.3) | 78 (17.4) | 111 (24.7) | 28 (6.2) |
| 93. Police officers could do a better job if politicians did not interfere. ($M$ = 3.96) | 9 (2.0) | 36 (8.0) | 87 (19.4) | 127 (28.3) | 170 (37.9) |
| 94. In general, the news media treat the police fairly. ($M$ = 1.74) | 226 (50.3) | 136 (30.3) | 32 (7.1) | 25 (5.6) | 11 (2.4) |
| 95. The media are interested in stories about the police only when a police officer gets in trouble. ($M$ = 4.49) | 11 (2.4) | 13 (2.9) | 18 (4.0) | 100 (22.3) | 286 (63.7) |

*Note*: Entries are the frequency for each response category ($N$) and the percentage of respondents who fell into the category in parentheses (%). Percentages do not sum to 100% because of missing values (i.e., nonresponse). The mean (i.e., average) score is reported in parentheses next to each question ($M$).



**Table 13 - Respondent Characteristics**

|  | N | Missing | Average or percent | Minimum | Maximum |
|---|---|---|---|---|---|
| Years of service | 311 | 138 | 16.36 | 1 | 45 |
| Rank: | 355 | 94 | -- | -- | -- |
| Police officer | 198 | -- | 44.1% | -- | -- |
| Detective | 56 | -- | 12.5% | -- | -- |
| Sergeant | 59 | -- | 13.1% | -- | -- |
| Lt. or Capt. | 28 | -- | 6.2% | -- | -- |
| Commander | 14 | -- | 3.1% | -- | -- |
| Reside in New Orleans: | 378 | 71 | -- | -- | -- |
| Yes | 145 | -- | 32.3% | -- | -- |
| No | 233 | -- | 51.9% | -- | -- |
| Sex: | 352 | 97 | -- | -- | -- |
| Female | 54 | -- | 12.0% | -- | -- |
| Male | 298 | -- | 66.4% | -- | -- |
| Age | 266 | 183 | 43.7 | 24 | 67 |
| Hispanic: | 313 | 136 | -- | -- | -- |
| Yes | 15 | -- | 3.3% | -- | -- |
| No | 298 | -- | 66.4% | -- | -- |
| Racial minority: | 300 | 149 | -- | -- | -- |
| Yes | 180 | -- | 40.1% | -- | -- |
| No | 120 | -- | 26.7% | -- | -- |
| Racial group breakdown: | 300 | 149 | -- | -- | -- |
| White | 120 | -- | 26.7% | -- | -- |
| African American | 149 | -- | 33.2% | -- | -- |
| Asian | 5 | -- | 1.1% | -- | -- |
| Vietnamese | 3 | -- | 0.7% | -- | -- |
| Latino | 4 | -- | 0.9% | -- | -- |
| Other | 19 | -- | 4.2% | -- | -- |

*Note*: Percentages do not sum to 100% because of missing values (i.e., nonresponse).



# Appendix 2 COMMUNITY SURVEY DATA



**Table 14 - Community survey respondent demographic characteristics**

|  | N | % |
| --- | --- | --- |
| Gender |  |  |
| Male | 270 | 49.2% |
| Female | 264 | 48.1% |
|  |  |  |
| Age |  |  |
| 18-24 | 28 | 5.1% |
| 25-34 | 133 | 24.2% |
| 35-44 | 112 | 20.4% |
| 45-54 | 102 | 18.6% |
| 55-64 | 86 | 15.7% |
| 65+ | 71 | 12.9% |
|  |  |  |
| Race/ethnicity |  |  |
| Black | 277 | 50.5% |
| White | 208 | 37.9% |
| Asian | 7 | 1.3% |
| Hispanic | 14 | 2.6% |
| Other | 20 | 3.6% |
|  |  |  |
| Education |  |  |
| Grade school | 9 | 1.6% |
| Grade 9 to 11 | 51 | 9.3% |
| High school | 135 | 24.6% |
| Some college | 122 | 22.2% |
| College degree | 139 | 25.3% |
| Graduate/professional degree | 70 | 12.8% |
|  |  |  |
| Marital status |  |  |
| Single | 222 | 40.4% |
| Married | 184 | 33.5% |
| Divorced | 64 | 11.7% |
| Widowed | 32 | 5.8% |
| Partnered | 27 | 4.9% |
|  |  |  |
| Rent or own home |  |  |
| Own | 260 | 47.4% |
| Rent | 243 | 44.3% |
|  |  |  |
| Born in New Orleans |  |  |
| Yes | 345 | 62.8% |
| No | 182 | 33.2% |

*Note*: Percentages do not sum to 100% because of missing values (i.e., nonresponse).



**Table 15 - Citizens' satisfaction with NOPD officers during most recent interaction**

| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly agree (4) |
|---|---|---|---|---|
| | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) |
| 1. I felt that the police officer was trustworthy. ($M = 2.68$; $N = 311$) | 31 (9.6) | 78 (24.2) | 163 (50.6) | 39 (12.1) |
| 2. I had confidence the police officer was following the correct police procedure. ($M = 2.69$; $N = 311$) | 21 (6.5) | 92 (28.6) | 159 (49.4) | 39 (12.1) |
| 3. I was satisfied with how the police officer behaved. ($M = 2.67$; $N = 313$) | 31 (9.6) | 80 (24.8) | 163 (50.6) | 39 (12.1) |
| 4. I followed the specific instructions given to me by the police officer. ($M = 3.18$; $N = 303$) | 3 (0.9) | 14 (4.3) | 212 (65.8) | 74 (23.0) |
| 5. The police officer treated me with dignity. ($M = 2.73$; $N = 311$) | 32 (9.9) | 69 (21.4) | 162 (50.3) | 48 (14.9) |
| 6. The police officer treated me with respect. ($M = 2.74$; $N = 312$) | 24 (7.5) | 76 (23.6) | 168 (52.2) | 44 (13.7) |
| 7. The police officer was polite when dealing with me. ($M = 2.73$; $N = 313$) | 27 (8.4) | 78 (24.2) | 162 (50.3) | 46 (14.3) |
| 8. If I was stopped or questioned, the police officer adequately explained the reasons why. ($M = 2.65$; $N = 211$)[1] | 20 (9.5) | 57 (27.0) | 110 (52.1) | 24 (11.4) |
| 9. The police officer gave me the opportunity to express my view. ($M = 2.55$; $N = 206$)[1] | 24 (11.4) | 63 (29.9) | 100 (47.4) | 19 (9.0) |
| 10. Overall, the police officer did a good job. ($M = 2.60$; $N = 207$)[1] | 28 (13.3) | 55 (26.1) | 96 (45.5) | 28 (13.3) |
| 11. I was satisfied with how I was treated by the police officer. ($M = 2.58$; $N = 227$)[1] | 28 (13.3) | 53 (25.1) | 104 (49.3) | 22 (10.4) |
| 12. I was satisfied with the outcome of my experience with the police. ($M = 2.57$; $N = 206$)[1] | 26 (12.3) | 60 (28.4) | 96 (45.5) | 24 (11.4) |

*Note*: Entries are the frequency for each response category ($N$) and the percentage of respondents who fell into the category in parentheses (%).  Percentages do not sum to 100% because of missing values (i.e., nonresponse).  The mean score ($M$) and total number of respondents who answered the question ($N$) are presented in parentheses next to each question.
[1] Question was only asked to those respondents that indicated they had been "stopped and questioned" (N = 211).



## Table 16 - Citizens' satisfaction with NOPD

| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly agree (4) |
|---|---|---|---|---|
| | *N* (%) | *N* (%) | *N* (%) | *N* (%) |
| 1. While conducting their police duties, NOPD officers follow the law. (*M* = 2.50; *N* = 529) | 55 (10.0) | 178 (32.4) | 275 (50.1) | 21 (3.8) |
| 2. The level of corruption in the New Orleans Police Department is low. (*M* = 2.22; *N* = 528) | 98 (17.9) | 243 (44.3) | 161 (29.3) | 26 (4.7) |
| 3. I do not fear interacting with New Orleans police officers. (*M* = 2.75; *N* = 533) | 40 (7.3) | 128 (23.3) | 291 (53.0) | 74 (13.5) |
| 4. There is more police presence in the French Quarter than in other areas of the City of New Orleans. (*M* = 3.17; *N* = 524) | 17 (3.1) | 69 (12.6) | 248 (45.2) | 190 (34.6) |
| 5. I feel the scandals associated with the New Orleans Police Department in the past do not reflect the current practices of the NOPD. (*M* = 2.43; *N* = 506) | 51 (9.3) | 214 (39.0) | 215 (39.2) | 26 (4.7) |
| 6. Since Hurricane Katrina, the New Orleans Police Department has become a better police department. (*M* = 2.30; *N* = 510) | 93 (16.9) | 192 (35.0) | 206 (37.5) | 19 (3.5) |
| 7. I am satisfied with the way NOPD officers do their job. (*M* = 2.29; *N* = 526) | 81 (14.8) | 233 (42.4) | 193 (35.2) | 19 (3.5) |
| 8. NOPD officers respond, when called, in a timely manner. (*M* = 2.02; *N* = 526) | 155 (28.2) | 219 (39.9) | 136 (24.8) | 16 (2.9) |
| 9. When compared to 3 years ago, my neighborhood now has more confidence in the NOPD. (*M* = 2.40; *N* = 507) | 61 (11.1) | 203 (37.0) | 225 (41.0) | 18 (3.3) |
| | *Strongly agree (1)* | *Agree (2)* | *Disagree (3)* | *Strongly disagree (4)* |
| *10. Most crimes that take place in New Orleans are not solved by the police. (M = 2.38; N = 504)* | *58 (10.6)* | *234 (42.6)* | *176 (32.1)* | *36 (6.6)* |



| | | | |
|---|---|---|---|
| *11. Overall, the New Orleans Police Department has little impact on crime in New Orleans. (M = 2.37; N = 523)* | *54 (9.8)* | *244 (44.4)* | *200 (36.4)* | *25 (4.6)* |
| *12. There is a great need for more professionalization in the New Orleans Police Department. (M = 1.85; N = 526)* | *170 (31.0)* | *283 (51.5)* | *57 (10.4)* | *16 (2.9)* |

*Note*: Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement). Entries are the frequency for each response category (*N*) and the percentage of respondents who fell into the category in parentheses (%). Percentages do not sum to 100% because of missing values (i.e., nonresponse). The mean score (*M*) and total number of respondents who answered the question (*N*) are presented in parentheses next to each question.



**Table 17 - Citizens' perceptions of NOPD procedural justice and trustworthiness**

| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly agree (4) |
|---|---|---|---|---|
| | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) |
| 1. Police officers in New Orleans are, for the most part, honest. ($M = 2.47$; $N = 527$) | 70 (12.8) | 159 (29.0) | 277 (50.5) | 21 (3.8) |
| 2. Police officers in New Orleans are superior to other police departments in terms of integrity. ($M = 2.21$; $N = 506$) | 80 (14.6) | 260 (47.4) | 146 (26.6) | 20 (3.6) |
| 3. Police officers in New Orleans are fair. ($M = 2.41$; $N = 534$) | 73 (13.3) | 186 (33.9) | 256 (46.6) | 19 (3.5) |
| 4. Police officers in New Orleans are professional. ($M = 2.42$; $N = 531$) | 70 (12.8) | 189 (34.4) | 253 (46.1) | 19 (3.5) |
| 5. Police officers in New Orleans are not racist or biased against minorities. ($M = 2.29$; $N = 519$) | 81 (14.8) | 236 (43.0) | 175 (31.9) | 27 (4.9) |
| 6. I can count on New Orleans police officers to treat me fairly. ($M = 2.50$; $N = 538$) | 59 (10.7) | 182 (33.2) | 264 (48.1) | 33 (6.0) |
| 7. New Orleans police officers treat victims of crime very well. ($M = 2.34$; $N = 509$) | 72 (13.1) | 207 (37.7) | 216 (39.3) | 14 (2.6) |
| 8. Police officers in New Orleans know they have to win the confidence of the public to be effective. ($M = 2.86$; $N = 532$) | 31 (5.6) | 116 (21.1) | 280 (51.0) | 105 (19.1) |
| 9. Police officers in New Orleans treat tourists in the same manner they treat citizens of New Orleans. ($M = 2.27$; $N = 518$) | 95 (17.3) | 212 (38.6) | 187 (34.1) | 24 (4.4) |
| 10. I trust the NOPD. ($M = 2.38$; $N = 529$) | 104 (18.9) | 157 (28.6) | 232 (42.3) | 36 (6.6) |
| 11. I have confidence in the NOPD. ($M = 2.35$; $N = 526$) | 86 (15.7) | 197 (35.9) | 216 (39.3) | 27 (4.9) |
| 12. I respect the NOPD. ($M = 2.71$; $N = 534$) | 55 (10.0) | 115 (20.9) | 295 (53.7) | 69 (12.6) |
| 13. I feel a moral obligation to obey the law. ($M = 3.26$; $N = 532$) | 14 (2.6) | 31 (5.6) | 288 (52.5) | 199 (36.2) |
| 14. The NOPD tries to be fair when making decisions. ($M = 2.50$; $N = 525$) | 51 (9.3) | 185 (33.7) | 267 (48.6) | 22 (4.0) |
| 15. Generally, NOPD officers stop and frisk people for legitimate reasons. ($M = 2.36$; $N = 503$) | 70 (12.8) | 206 (37.5) | 202 (36.8) | 25 (4.6) |
| 16. During routine encounters with members of the public, NOPD officers use appropriate language. ($M = 2.61$; $N = 513$) | 40 (7.3) | 147 (26.8) | 299 (54.5) | 27 (4.9) |



| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly agree (4) |
|---|---|---|---|---|
| | *N* (%) | *N* (%) | *N* (%) | *N* (%) |
| 17. For the most part, NOPD officers use language that is not degrading when interacting with citizens. (*M* = 2.54; *N* = 508) | 41 (7.5) | 171 (31.1) | 275 (50.1) | 21 (3.8) |
| | *Strongly agree (1)* | *Agree (2)* | *Disagree (3)* | *Strongly disagree (4)* |
| *18. Police officers in New Orleans stop and frisk people as a form of harassment. (M = 2.32; N = 506)* | *79 (14.4)* | *207 (37.7)* | *200 (36.4)* | *20 (3.6)* |

*Note*: Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement). Entries are the frequency for each response category (*N*) and the percentage of respondents who fell into the category in parentheses (%).  Percentages do not sum to 100% because of missing values (i.e., nonresponse).  The mean score (*M*) and total number of respondents who answered the question (*N*) are presented in parentheses next to each question.



**Table 18 - Citizens' willingness to cooperate with the NOPD**

| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly agree (4) |
|---|---|---|---|---|
| | *N* (%) | *N* (%) | *N* (%) | *N* (%) |
| 1. I would report a dangerous or suspicious activity to the NOPD. (*M* = 2.94; *N* = 524) | 23 (4.2) | 102 (18.6) | 284 (51.7) | 115 (20.9) |
| 2. If asked, I would help the NOPD find someone who is suspected of having committed a crime. (*M* = 2.58; *N* = 519) | 59 (10.7) | 147 (26.8) | 268 (48.8) | 45 (8.2) |
| | *Strongly agree (1)* | *Agree (2)* | *Disagree (3)* | *Strongly disagree (4)* |
| *3. I would not call the NOPD if I witnessed or became aware of a crime. (M = 2.80; N = 521)* | *43 (7.8)* | *109 (19.9)* | *280 (51.0)* | *89 (16.2)* |

*Note*: Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement). Entries are the frequency for each response category (*N*) and the percentage of respondents who fell into the category in parentheses (%). Percentages do not sum to 100% because of missing values (i.e., nonresponse). The mean score (*M*) and total number of respondents who answered the question (*N*) are presented in parentheses next to each question.



**Table 19 - Citizens' views regarding how they believe NOPD officers should behave**

| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly agree (4) |
|---|---|---|---|---|
| | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) |
| 1. The NOPD should be accountable for their actions. ($M$ = 3.47; $N$ = 535) | 6 (1.1) | 14 (2.6) | 239 (43.5) | 276 (50.3) |
| 2. The NOPD should keep the public informed. ($M$ = 3.39; $N$ = 536) | 7 (1.3) | 23 (4.2) | 262 (47.7) | 244 (44.4) |
| 3. The NOPD should be open and honest when dealing with the public. ($M$ = 3.46; $N$ = 534) | 5 (0.9) | 13 (2.4) | 248 (45.2) | 268 (48.8) |
| 4. The NOPD should treat people with respect. ($M$ = 3.56; $N$ = 535) | 7 (1.3) | 5 (0.9) | 204 (37.2) | 319 (58.1) |
| 5. The NOPD should be interested in the well-being of ordinary citizens. ($M$ = 3.47; $N$ = 532) | 5 (0.9) | 20 (3.6) | 228 (41.5) | 279 (50.8) |
| 6. Working conditions for police officers in New Orleans are good. ($M$ = 2.30; $N$ = 512) | 61 (11.1) | 258 (47.0) | 170 (31.0) | 23 (4.2) |
| 7. To the best of my knowledge, NOPD officers have ready access to language interpretation services to help communicate with those who does [sic] not speak English. ($M$ = 2.42; $N$ = 435) | 38 (6.9) | 185 (33.7) | 203 (37.0) | 9 (1.6) |
| 8. The NOPD has enough Spanish speaking officers who can interact with Spanish speaking suspects. ($M$ = 2.22; $N$ = 416) | 48 (8.7) | 238 (43.4) | 121 (22.0) | 9 (1.6) |

*Note*: Entries are the frequency for each response category ($N$) and the percentage of respondents who fell into the category in parentheses (%).  Percentages do not sum to 100% because of missing values (i.e., nonresponse).  The mean score ($M$) and total number of respondents who answered the question ($N$) are presented in parentheses next to each question.



**Table 20 - Citizens' perceptions of how NOPD officers treat minorities and other groups**

| Response categories: | Strongly disagree (1) | Disagree (2) | Agree (3) | Strongly agree (4) |
|---|---|---|---|---|
| | *N* (%) | *N* (%) | *N* (%) | *N* (%) |
| 1. New Orleans police officers treat members of the African American community fairly. (*M* = 2.10; *N* = 506) | 113 (20.6) | 235 (42.8) | 151 (27.5) | 7 (1.3) |
| 2. New Orleans police officers treat members of the Latino community fairly. (*M* = 2.29; *N* = 452) | 62 (11.3) | 208 (37.9) | 173 (31.5) | 9 (1.6) |
| 3. New Orleans police officers treat members of the Vietnamese community fairly. (*M* = 2.52; *N* = 442) | 38 (6.9) | 163 (29.7) | 213 (38.8) | 28 (5.1) |
| 4. New Orleans police officers treat members of the Lesbian, Gay, Bisexual and Transgender (LGBT) community fairly. (*M* = 2.31; *N* = 446) | 56 (10.2) | 201 (36.6) | 182 (33.2) | 7 (1.3) |
| | *Strongly agree (1)* | *Agree (2)* | *Disagree (3)* | *Strongly disagree (4)* |
| *5. Many victims in New Orleans Latino community fear reporting a crime due to fear of deportation. (M = 2.85; N = 430)* | *16 (2.9)* | *94 (17.1)* | *257 (46.8)* | *63 (11.5)* |
| *6. New Orleans police officers often engage in racial profiling. (M = 2.19; N = 496)* | *92 (16.8)* | *240 (43.7)* | *142 (25.9)* | *22 (4.0)* |
| *7. The African American community in New Orleans expects to be harassed by the NOPD. (M = 2.09; N = 499)* | *109 (19.9)* | *262 (47.7)* | *102 (18.6)* | *26 (4.7)* |
| *8. The African American community in New Orleans does not believe the NOPD is credible. (M = 2.08; N = 503)* | *97 (17.7)* | *294 (53.6)* | *88 (16.0)* | *24 (4.4)* |
| *9. There is a great deal of unfairness and bias by the NOPD toward the African American community. (M = 2.09; N = 490)* | *113 (20.6)* | *236 (43.0)* | *123 (22.4)* | *18 (3.3)* |
| *10. The Lesbian, Gay, Bisexual and Transgender (LGBT) community does not have confidence in the NOPD. (M = 2.34; N = 442)* | *51 (9.3)* | *202 (36.8)* | *175 (31.9)* | *14 (2.6)* |
| *11. During encounters between the NOPD and the homeless population in New Orleans, the homeless are often treated poorly by the NOPD. (M = 2.18; N = 488)* | *107 (19.5)* | *205 (37.3)* | *157 (28.6)* | *19 (3.5)* |

*Note*: Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).Entries are the frequency for each response category (*N*) and the percentage of respondents who fell into the category in parentheses (%).  Percentages do not sum to 100% because of missing values (i.e., nonresponse).  The mean score (*M*) and total number of respondents who answered the question (*N*) are presented in parentheses next to each question



**Appendix 3 DETAINEE SURVEY DATA**



**Table 21 - Detainee survey respondent demographic characteristics**

|  | N | % of Mean |
| --- | --- | --- |
| Gender |  |  |
|   Male | 46 | 79.3% |
|   Female | 11 | 19.0% |
|  |  |  |
| Age (range = 18 to 67) | 57 | 35.61 |
|  |  |  |
| Race/ethnicity |  |  |
|   White | 7 | 12.1% |
|   Black | 40 | 69.0% |
|   Latino | 2 | 3.4% |
|   Vietnamese | 1 | 1.7% |
|   Other | 7 | 12.1% |
|  |  |  |
| Live in New Orleans |  |  |
|   Yes | 46 | 79.3% |
|   No | 11 | 19.0% |

*Note*: Percentages do not sum to 100% because of missing values (i.e., nonresponse).



**Table 22 - Detainees' attitudes toward with NOPD officers (specifically) and police officers (generally)**

| Response categories: | Strongly disagree (1) | Disagree (2) | Neither agree/disagree (3) | Agree (4) | Strongly agree (5) |
|---|---|---|---|---|---|
| | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) |
| 1. NOPD officers do the right thing. ($M = 2.64$; $N = 58$) | 10 (17.2) | 17 (29.3) | 16 (27.6) | 14 (24.1) | 1 (1.7) |
| 2. Generally, police officers do the right thing. ($M = 2.93$; $N = 58$) | 5 (8.6) | 17 (29.3) | 14 (24.1) | 21 (36.2) | 1 (1.7) |
| 3. I am satisfied with the way NOPD officers conduct themselves. ($M = 2.60$; $N = 58$) | 6 (10.3) | 25 (43.1) | 13 (22.4) | 14 (24.1) | 0 (0.0) |
| 4. NOPD officers treat me with respect. ($M = 2.69$; $N = 58$) | 10 (17.2) | 17 (29.3) | 13 (22.4) | 17 (29.3) | 1 (1.7) |
| 5. NOPD officers are polite when dealing with me. ($M = 2.74$; $N = 57$) | 8 (13.8) | 20 (34.5) | 9 (15.5) | 19 (32.8) | 1 (1.7) |
| 6. NOPD officers are polite when dealing with the public. ($M = 2.91$; $N = 57$) | 7 (12.1) | 9 (15.5) | 23 (39.7) | 18 (31.0) | 0 (0.0) |
| 7. NOPD officers listen to me. ($M = 2.53$; $N = 57$) | 10 (17.2) | 22 (37.9) | 10 (17.2) | 15 (25.9) | 0 (0.0) |
| 8. I am satisfied with how I am treated by NOPD. ($M = 2.51$; $N = 57$) | 10 (17.2) | 22 (37.9) | 13 (22.4) | 10 (17.2) | 2 (3.4) |
| 9. I am satisfied with the outcome of my experiences with NOPD. ($M = 2.30$; $N = 57$) | 14 (24.1) | 22 (37.9) | 12 (20.7) | 8 (13.8) | 1 (1.7) |
| 10. I trust the police generally. ($M = 2.07$; $N = 57$) | 21 (36.2) | 17 (29.3) | 13 (22.4) | 6 (10.3) | 0 (0.0) |
| 11. I have confidence in the police generally. ($M = 2.42$; $N = 57$) | 13 (22.4) | 20 (34.5) | 11 (19.0) | 13 (22.4) | 0 (0.0) |
| 12. I am satisfied with the way police do their job generally. ($M = 2.61$; $N = 57$) | 8 (13.8) | 19 (32.8) | 17 (29.3) | 13 (22.4) | 0 (0.0) |
| 13. I think NOPD is highly competent. ($M = 2.68$; $N = 57$) | 8 (13.8) | 18 (31.0) | 15 (25.9) | 16 (27.6) | 0 (0.0) |



| Response categories: | Strongly disagree (1) | Disagree (2) | Neither agree/disagree (3) | Agree (4) | Strongly agree (5) |
|---|---|---|---|---|---|
| | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) |

*Note*: Entries are the frequency for each response category ($N$) and the percentage of respondents who fell into the category in parentheses (%). Percentages do not sum to 100% because of missing values (i.e., nonresponse). The mean score ($M$) and total number of respondents who answered the question ($N$) are presented in parentheses next to each question.



## Table 23 - Detainees' perceptions of NOPD professionalism, community relations, and respectful treatment

| Response categories: | Highly unprofessional (1) | Mostly unprofessional (2) | Somewhat unprofessional (3) | Mostly professional (4) | Highly professional (5) |
|---|---|---|---|---|---|
| | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) |
| 1. How would you describe the professionalism of the NOPD? ($M$ = 2.72; $N$ = 57) | 6 (10.3) | 12 (20.7) | 32 (55.2) | 6 (10.3) | 1 (1.7) |
| | Much less professional today (1) | Somewhat less professional today (2) | About the same as three years ago (3) | Somewhat more professional today (4) | Much more professional today (5) |
| 2. How would you describe changes in the professionalism of the NOPD over the past three years? ($M$ = 2.91; $N$ = 46) | 9 (15.5) | 4 (6.9) | 18 (31.0) | 12 (20.7) | 3 (5.2) |
| | Very negative (1) | Somewhat negative (2) | Neither positive nor negative (3) | Somewhat positive (4) | Very positive (5) |
| 3. How would you describe the relations between the NOPD and your community? ($M$ = 2.75; $N$ = 55) | 14 (24.1) | 8 (13.8) | 13 (22.5) | 18 (31.0) | 5 (3.4) |
| | Much worse (1) | Somewhat worse (2) | About the same (3) | Somewhat better (4) | Much better (5) |
| 4. Compared with three years ago, how would you describe the relations between the NOPD and your community? ($M$ = 3.11; $N$ = 45) | 3 (5.2) | 4 (6.9) | 26 (44.8) | 9 (15.5) | 3 (5.2) |
| | Almost none treat us with respect (1) | Most do not treat us with respect (2) | About same treat with respect as do not (3) | Most treat us with respect (4) | Almost all treat us with respect (5) |
| 5. How many of the NOPD officers you encounter treat you, your friends, and your family members with respect? ($M$ = 3.00; $N$ = 56) | 8 (13.8) | 10 (17.2) | 18 (31.0) | 14 (24.1) | 6 (10.3) |



| | Much less respectful (1) | Somewhat less respectful (2) | About the same (3) | Somewhat more respectful (4) | Much more respectful (5) |
|---|---|---|---|---|---|
| 6. How would you describe the way NOPD treats you, your friends, and your family members compared with three years ago? ($M$ = 3.04; $N$ = 46) | 4 (6.9) | 4 (6.9) | 26 (44.8) | 10 (17.2) | 2 (3.4) |

*Note*: Entries are the frequency for each response category ($N$) and the percentage of respondents who fell into the category in parentheses (%).  Percentages do not sum to 100% because of missing values (i.e., nonresponse).  The mean score ($M$) and total number of respondents who answered the question ($N$) are presented in parentheses next to each question.



**Table 24 - Detainees' perceptions of NOPD treatment of people from different races and genders**

| Response categories: | Almost never (1) | Some of the time (2) | Most of the time (3) | Almost all of the time (4) |
|---|---|---|---|---|
| | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) |
| 1. Does the NOPD treat people from different races the same? ($M = 1.96$; $N = 46$) | 18 (31.0) | 17 (29.3) | 6 (10.3) | 5 (8.6) |
| 2. Does the NOPD treat people from different genders the same? ($M = 2.00$; $N = 39$) | 17 (29.3) | 11 (19.0) | 5 (8.6) | 6 (10.3) |

*Note*: Entries are the frequency for each response category ($N$) and the percentage of respondents who fell into the category in parentheses (%). Percentages do not sum to 100% because of missing values (i.e., nonresponse). The mean score ($M$) and total number of respondents who answered the question ($N$) are presented in parentheses next to each question.



**Table 25 - Detainees' perceptions of NOPD job quality**

| Response categories: | Terrible (1) | Bad (2) | Neither good nor bad (3) | Good (4) | Excellent (5) |
|---|---|---|---|---|---|
| | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) | $N$ (%) |
| 1. Overall, how well do you think the NOPD is doing its job today? ($M$ = 2.49; $N$ = 57) | 17 (29.3) | 8 (13.8) | 21 (36.2) | 9 (15.5) | 2 (3.4) |
| | Much worse (1) | Somewhat worse (2) | About the same (3) | Somewhat improved (4) | Much improved (5) |
| 2. Compared with three years ago, how do you think the NOPD has changed the quality of the job they perform? ($M$ = 3.08; $N$ = 40) | 6 (10.3) | 5 (8.6) | 13 (22.4) | 12 (20.7) | 4 (6.9) |

*Note*: Entries are the frequency for each response category ($N$) and the percentage of respondents who fell into the category in parentheses (%).  Percentages do not sum to 100% because of missing values (i.e., nonresponse).  The mean score ($M$) and total number of respondents who answered the question ($N$) are presented in parentheses next to each question.



## Appendix 4 CANINE DATA



## Appendix 5 ADDITIONAL SURVEY METHODOLOGY

The first stage of the Community Survey sampling procedure began with neighborhoods with 20 of them being randomly chosen from the city's 72 neighborhoods as determined by the Greater New Orleans Community Data Center (GNOCDC). [16]  First, a sampling interval was calculated by taking the total number of households in New Orleans (142,158) and dividing it by 20, the number of neighborhoods wanted for the sample. The sampling interval came to every 7,108[th] housing unit being chosen as a sampling point.

Next, the number 2,024 was drawn from a table of random numbers, determining the starting point for the sample and also establishing the designated housing unit of the first neighborhood. [17]  The starting point and the sampling interval were then added together to provide the designated housing unit of the second neighborhood (2,024 + 7,108 = 9,132 households). The interval was added in again to determine the designated housing unit of the third neighborhood. This process was continued until all 20 neighborhoods had a designated housing unit.  The selected neighborhoods and their associated demographic characteristics are found in Tables 26 and 27.

---

[16]     http://www.datacenterresearch.org/maps/reference-maps/

[17]     Backstrom and Hursh-Cesar, p. 86.



**Table 26**

| Neighborhood | African-American | White | Hispanic | Household Income | People living in poverty |
|---|---|---|---|---|---|
| | | | | | |
| Audubon | 4.8% | 85.0% | 5.0% | $134,503 | 18.0% |
| Behrman | 81.5% | 8.4% | 7.3% | $39,944 | 23.3% |
| Bywater | 33.1% | 56.1% | 6.7% | $43,504 | 24.4% |
| City Park | 7.6% | 82.9% | 6.1% | $70,853 | 11.0% |
| East Riverside | 41.4% | 50.0% | 5.4% | $52,538 | 26.8% |
| French Quarter | 4.4% | 87.6% | 3.8% | $95,246 | 7.2% |
| Gentilly Woods | 69.3% | 23.0% | 2.2% | $42,061 | 24.5% |
| Lake Terrace & Oaks | 25.9% | 57.1% | 8.0% | $132,629 | 11.0% |
| Leonidas | 62.0% | 30.7% | 4.4% | $48,563 | 31.4% |
| Little Woods | 92.6% | 3.0% | 2.3% | $43,849 | 25.4% |
| Lower Garden District | 18.9% | 67.2% | 8.2% | $94,332 | 20.6% |
| Marlyville/Fontainebleau | 23.9% | 63.9% | 6.0% | $85,352 | 17.6% |
| Milan | 59.0% | 32.3% | 6.0% | $59,215 | 24.3% |
| Old Aurora | 54.5% | 35.6% | 5.6% | $66,498 | 14.1% |
| Plum Orchard | 95.7% | 0.8% | 2.5% | $33,973 | 20.7% |
| Seventh Ward | 87.4% | 6.6% | 3.8% | $32,442 | 44.1% |
| St. Claude | 81.1% | 14.0% | 3.1% | $28,149 | 46.7% |
| Tall Timbers/Brechtel | 69.8% | 21.4% | 4.6% | $56,165 | 26.5% |
| U.S. Naval Support Area | 67.0% | 24.0% | 6.0% | $42,289 | 22.9% |
| West End | 11.0% | 74.6% | 8.3% | $94,606 | 17.7% |



**Table 27 - Sample Goals by Race or Ethnicity and Gender**

|        | Black   | White  | Asian | Hispanic | Other | Total   |
|--------|---------|--------|-------|----------|-------|---------|
| Male   | 72,750  | 49,443 | 4,363 | 8,966    | 2,775 | **138,297** |
| Female | 91,587  | 48,753 | 4,427 | 6,641    | 1,440 | **152,848** |
| **Total** | **164,337** | **98,196** | **8,790** | **15,607** | **4,215** | **291,145** |
|        |         |        |       |          |       |         |
|        |         |        |       |          |       |         |
|        |         |        |       |          |       |         |
|        | %Black  | %White | %Asian | %Hispanic | %Other |         |
| Male   | 25.0%   | 17.0%  | 1.5%  | 3.1%     | 1.0%  |         |
| Female | 31.5%   | 16.7%  | 1.5%  | 2.3%     | 0.5%  |         |
|        |         |        |       |          |       |         |
|        |         |        |       |          |       |         |
|        |         |        |       |          |       |         |
|        | Black   | White  | Asian | Hispanic | Other | **Total** |
| Male   | *150*   | *102*  | *9*   | *18*     | *6*   | **285** |
| Female | *189*   | *100*  | *9*   | *14*     | *3*   | **315** |
| **Total** | **339** | **202** | **18** | **32** | **9** | **600** |