

# Report of the Consent Decree Monitor on the New Orleans Police Department's Supervision Policies and Practices July 21, 2015

**Office of the Consent Decree Monitor**
**New Orleans, Louisiana**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana



## Table of Contents

I.    Notes ........................................................................................................................... 3

II.   Introduction ................................................................................................................. 4

III.  Executive Summary .................................................................................................... 7

    A.   Findings ................................................................................................................. 7

    B.   Recommendations ................................................................................................. 7

    C.   NOPD's Response ................................................................................................. 8

IV.   Detailed Findings and Recommendations ................................................................. 9

    A.   Supervision Generally .......................................................................................... 9

    B.   Ensuring that Supervision Enforces Policy ....................................................... 10

    C.   The Importance of Documenting Supervision ................................................... 12

    D.   Ensuring Supervisory Accountability. ............................................................... 13

    E.   Supervisor Workload ......................................................................................... 14

    F.   Supervisor Assignments (¶¶307-312) ............................................................... 17

    G.   Supervisor and Command-Level Training (¶¶314-315) .................................... 18

    H.   Additional Findings re Supervision ................................................................... 19

    I.   Recommendations ............................................................................................... 19

        1.   NOPD Should Ensure that the Consent Decree's Supervisory Requirements Are Consistently Discharged. ....................................................................................... 19

        2.   NOPD Should Provide Newly Assigned Supervisors a List of the Consent Decree Requirements for Supervision, Custodial Interrogation, and Photographic Line-Ups and Ensure They Are Discharged. .................................................................... 19

        3.   Track Consent Decree Compliance as Rigorously as COMSTAT Performance ..... 20

        4.   Supervisors Should Meet Monthly to Evaluate and Improve Supervision. ........... 20

        5.   Assess and Right-Size Supervisory Workloads ............................................. 20

    J.   Conclusion ......................................................................................................... 21



## I.    NOTES

"The Monitor shall be subject to the supervision and orders of the [United States District Court for the Eastern District of Louisiana], consistent with [the Consent Decree]. The Monitoring Team shall only have the duties, responsibilities, and authority conferred by [the Consent Decree]. The Monitoring Team shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent."

**Consent Decree Paragraph 455**



## II.     INTRODUCTION

Effective supervision is integral to achieving the lasting reform the Consent Decree prescribes.  As the Consent Decree observes, "close and effective supervision" is "necessary for officers to improve and grow professionally, to police actively and effectively; and to identify, correct and prevent misconduct."  CD p. 77 (XV Supervision).    Some reforms, such as revising policies, improving training, or adopting an Early Warning System, are unavoidably time-consuming and their impact on the Department's actual and perceived practices occurs much later. Effective supervision of officer compliance with current policies and Consent Decree requirements can, on the other hand, deliver meaningful, observable change almost immediately. Put another way, while some reforms called for in the Consent Decree involve time-consuming structural and systemic change, significant short-term progress can be made by ensuring NOPD members' practices conform to current policies and applicable Consent Decree requirements.  In this report we examine NOPD's supervisory systems, practices, and performance as observed over the course of our monitoring.

Paragraph 306 of the Consent Decree enumerates the following elements of "close and effective supervision" for which NOPD supervisors shall be held accountable:

- Respond to the scene of certain arrests;

- Review each arrest report;

- Respond to the scene of uses of force;

- Investigate each use of force;

- Review accuracy and completeness of officers' daily activity reports;

- Respond to each complaint of misconduct;

- Ensure that officers are working actively to engage the community and increase public trust;

- Provide counseling redirection and support to officers.

The substance of these actions, however, are spread throughout the Consent Decree.  For example, while paragraph 306 provides supervisors must respond to the scene of uses of force, what a supervisor is expected to do upon responding is articulated in Section III, Use Of Force, which provides that upon responding to the scene of a use of force, "a supervisor shall inspect and observe subjects for injury or complaints of pain resulting from the use of force, and immediately obtain any necessary medical care."  (CD ¶27)



Similarly, although the Supervision section does not specifically address a supervisor's responsibilities with respect to search warrants, Section V, Stops, Searches and Arrests, provides supervisors must review search warrant applications "for appropriateness, legality, and conformance with NOPD policy and [the Consent Decree]" including an "examination for "boilerplate" or "pat" language, inconsistent information" and the failure to establish probable cause. (CD ¶136)  Supervisors must "document in an auditable format" and take appropriate disciplinary or corrective action in response to search warrant requests that are legally unsupported, violate NOPD or the Consent Decree, or otherwise indicate a need for corrective action or review. (CD ¶137)  Similar supervisory responsibilities apply to arrest reports.  *See* CD ¶¶145-146.  Further,  "[a] command-level official shall review, in writing, all supervisory reviews related to arrests that are unsupported by probable cause, are in violation of NOPD policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics or training." (CD ¶42)

Viewed as a whole, the Consent Decree's supervision requirements ensure that NOPD policy is practiced uniformly and consistently and that deviations are identified and addressed. In that regard, effective supervision can be viewed as the driveshaft that converts NOPD policy to practice on the street and transmits what is happening on the street to NOPD supervisors and leadership, who can then evaluate whether policies and procedures are being implemented effectively or whether additional or modified training on policies is warranted.   In the absence of "close and effective supervision," it is unrealistic to expect policing practices will be meaningfully reformed.

The success of NOPD's commitment to provide close and effective supervision is dependent not simply on prescribing supervisory responsibilities but on ensuring accountability for their exercise.  The Consent Decree provides, "NOPD supervisors shall be held accountable for providing the close and effective supervision necessary to direct and guide officers." (CD ¶306)

We have previously reported on the state of NOPD's compliance with the Consent Decree's supervisory requirements as an element of subject-specific compliance.  The specific subject of this report, however, is supervision itself.  In this report we discuss some of our most pertinent findings regarding supervision to reveal structural or systemic obstacles to providing the close and effective supervision the Consent Decree requires.   We also make recommendations for achieving the goal of "close and effective supervision" as provided in the Consent Decree.

Our findings and recommendations were the subject of a public hearing convened by the Hon. Susie Morgan on May 21, 2014.  At the hearing, the Department of Justice reviewed its prior findings concerning the absence and importance of close and effective supervision and the supervisory deficiencies identified in its Findings letter.  We summarized our findings and recommendations.  The NOPD then responded to our findings and identified actions it has and plans to implement in response.  Specifically, NOPD concurred in many of our findings and recommendations, reported it had already made some changes, and was in the process of



implementing others.  These changes are identified below.  The court actively questioned all parties concerning the findings, recommendations and responses and emphasized to the Department that it is essential that corrections and remedies be implemented expeditiously.  To ensure this occurs, the court advised the NOPD it would be meeting with NOPD supervisors to ensure they understood their responsibilities and inspecting NOPD Districts to observe whether the changes have been implemented.



## III.   EXECUTIVE SUMMARY

### A.      Findings

- Over several quarters of monitoring, we have found persistent non-compliance with supervisory requirements of NOPD policy and the Consent Decree.

- This persistent non-compliance is primarily attributable to lack of attention, guidance, and/or accountability devoted to supervision by NOPD.

- The consequences of this lack of attention, direction, and accountability is illustrated by, among other things, supervisors' response to the recently implemented in-car camera policy.  We observed supervisors are not ensuring compliance with the policy by the NOPD members they oversee nor are they discharging their responsibility to report malfunctioning cameras.

- We have also found, however, supervisors are overburdened with non-supervisory responsibilities that consume time that would be more effectively devoted to supervision.

- Those districts that adopted forms for reporting and tracking supervision made substantial progress toward fulfilling consistently their supervision responsibilities, in some instances achieving 100% compliance.

- NOPD is making progress toward complying with supervisory ratios prescribed under the Consent Decree, but, while initial assignment ratios are often compliant, shifting assignments and lack of personnel frequently cause supervisor-to-officer ratios to exceed the limits specified in the Consent Decree.

- NOPD has initiated supervisor training.  Although that training does not currently meet the requirements of the Consent Decree, it is progressing in the right direction and we will continue to monitor to ensure progress continues.

### B.      Recommendations

- NOPD leadership should implement forms and reporting requirements, as already adopted in certain districts, to communicate to supervisors their responsibilities, ensure those responsibilities are discharged and hold accountable those supervisors who fail to adequately and consistently execute their responsibilities.

- NOPD should examine the current non-supervisory workload of its supervisors.  To the maximum extent practicable, non-supervisory tasks should be automated, civilianized, streamlined, or eliminated.



- NOPD should take appropriate steps to ensure supervisors monitor compliance with the in-car camera policy. NOPD should take similar steps to ensure supervisors enforce compliance with all newly adopted policies.

- NOPD should continue to develop supervisor training tailored to the responsibilities of NOPD supervisors and that meets the requirements of the Consent Decree.

**C.     NOPD's Response**

The NOPD reports it has undertaken the following actions in response to our findings:

- NOPD has revised the officers' Daily Activity Reports to capture whether body worn cameras are functional and used.

- NOPD has revised supervisors' reports to better document that supervisory responsibilities are being discharged.

- NOPD has created new forms to improve information reporting and compliance documentation.

- NOPD is implementing a pilot program to reduce the amount of time supervisors must devote to entering payroll information.

- NOPD has conducted an assessment of supervisory workloads and is also hiring a workload consultant to address this issue.

- NOPD is exploring ways to reduce the time it takes for supervisors to request from the Civil Service Commission extensions for completing disciplinary investigations.

- NOPD is promoting lieutenants and sergeants, which will increase supervisory capacity.

- NOPD is civilianizing the crime lab, which will allow for deployment of three additional supervisors.

- NOPD is developing an Early Warning System that it expects will further streamline data collection and reporting.

- NOPD has implemented new performance evaluations for supervisors.

The monitoring team will monitor and report on NOPD's execution of these reforms.



## IV.    DETAILED FINDINGS AND RECOMMENDATIONS

### A.    Supervision Generally

As we have previously reported, although we have observed *ad hoc* compliance with some of the Consent Decree's supervisory requirements by individual supervisors and a genuine effort by many supervisors to perform to a high standard under difficult circumstances, more generally we observed persistent non-compliance across districts and specialized units. Deficiencies identified in one quarter remain uncured quarter after quarter.   The persistent supervision deficiencies we previously observed include the following:

- Documents for photographic identification line-ups, which serve to ensure that lineups are conducted constitutionally, were often not preserved or were incomplete, inaccurate, disorganized, and hard to locate.   Practices differed between districts, with some districts far worse than others.   As discussed below, however, as an example of the simple steps that can be taken to achieve compliance, after Districts 4 and 8 adopted a Consent Decree checklist, photographic lineup compliance approached 100%.

- We have reported on similar deficiencies with respect to custodial interrogations. Required recordings were often not made or not maintained.   Recordings were often unintelligible.   Some districts did not understand the requirements for recording custodial interrogations, which caused them to create unnecessary recordings.   Logs were replete with inaccuracies.   The lack of recordings made it impossible to verify information contained in the logs.

- Our report for the fourth quarter of 2014 observed that, of four use of force incidents we reviewed, supervisors observed officers' failures to follow procedures but did not respond appropriately.

- We observed that supervisors' activity reports, also known as trip sheets, did not call for supervisors to provide the information necessary to demonstrate "close and effective supervision."[1]

We have consistently observed and reported that district supervisors and command-level staff fail to demonstrate that they provide close and effective supervision of their officers.   For example, we observed in most districts as well as in the specialized units a failure to adequately review use of force reports and video recordings, and a failure to report non-functioning equipment.   Some, but not all, supervisors review some arrest and daily reports but we are unable to confirm that they reviewed all reports as required by the Consent Decree.   While we did observe that supervisors in certain districts respond to the scene of certain arrests, lack of

---

[1] In December 2014,  NOPD modified its trip sheets to better document compliance with policy and Consent Decree requirements.



documentation precludes determining whether, upon responding, the supervisor performed the tasks called for by NOPD policy and the Consent Decree.

In many cases, NOPD personnel were either unaware of their supervisory responsibilities or disregarded them.[2] In a few instances, we observed disdain for these responsibilities and our efforts to monitor compliance. That supervisors felt comfortable expressing these views is indicative of a lack of direction, oversight, and accountability. That full supervisory compliance remains the exception rather than the rule evidences a failure by NOPD leadership to clearly communicate expectations concerning the importance of "close and effective" supervision, as an element of Consent Decree compliance, and ensure accountability for discharging supervisory responsibilities.

Supervisors have provided anecdotal information that provides some evidence of compliance with paragraph 306 of the Consent Decree. Additionally, officers report they receive counseling from their supervisor. There is scant written evidence, however, documenting the level, uniformity, or consistency of supervision and counseling. Beyond the absence of documentation of supervision, however, our observations of persistent, wide-spread non-compliance with NOPD policies and Consent Decree requirements leads to the conclusion that supervisors are not providing "close and effective supervision." For example, the audit of one district during April 2015 revealed the following:

- A review of custodial interrogations showed 0% compliance. There have been no recordings, due to equipment failure, since 9/23/14. (Seven months)

- A review of photographic line-ups revealed some entries did not include times, dates, the name of the viewing individual, photographic numbers, and correct name of the investigating detective. All of these are required. Many of the case files were unavailable for inspection. The information provided during the audit demonstrated evidence of compliance between 37% and 62% for paragraphs 171 to 176.

Obviously, these deficiencies were readily observable by the district supervisors. Whether they weren't observing or weren't responding, either explanation fails to constitute supervision, much less close and effective supervision.

## B.      Ensuring that Supervision Enforces Policy

To examine the relationship between NOPD policy and "close and effective supervision," we compared supervisory response to the NOPD's In Car Camera policy, 41.3.8 (effective March 8, 2015). We noted that in many instances supervisors were not monitoring officer's

---

[2] The Consent Decree defines "supervisor" as a sworn NOPD employee at the rank of sergeant or above (or anyone acting in those capacities) and non-sworn NOPD personnel with oversight responsibility for other officers. CD ¶14, bbbb.



compliance with the policy and in some instances were unaware of the policy's requirements. Discrepancies between policy requirements and practices in the districts for this policy include the following:

- Supervisors are not monitoring and ensuring compliance with NOPD policy that requires, "The body microphone shall be worn and remain active during the officer's tour of duty." Policy 41.3.8, ¶23. The in-car camera policy requires supervisors to ensure officers wear the accompanying external microphone, which is different from the microphone in the body worn camera, but the policy is not being enforced. Less than 5% of body microphone recordings audited by OCDM provide evidence that the external microphone is working and being worn by officers. Many supervisors explain the officers do not wear the external microphones since they are wearing body worn cameras, which also record audio. Regardless, that does not comply with NOPD policy.

- The policy requires police officers to document malfunctioning in-car cameras and the name of the supervisor to whom the malfunction was reported, on the officer's daily activity report. Policy 41.3.8, ¶ 29. A majority of officers, approximately 60%, failed to complete the section of their daily activity report that requires documentation of the operability of the in-car camera. It should be noted, however, that all platoons in District 3 completed their reports, including supervisor signatures. District six showed great disparity. The third platoon was fully compliant, the second platoon was mostly compliant, but the first platoon was entirely non-compliant. The remaining districts were predominately non-compliant. Our audits clearly reveal that supervisors are not uniformly enforcing compliance with the requirement that officers provide all information called for by the daily activity reports.

- The policy provides, "Supervisors shall immediately report non-functioning or full In-Car Camera systems in writing to their respective District/Division System Administrator (DSA) with a copy forwarded to the District/Division Commander. In addition, the supervisor shall document the In-Car Camera malfunction on his/her daily activity report." Policy 41.3.8, ¶ 32. Supervisors generally report this obligation is accomplished via e-mail yet they have not produced the emails. Only District 4 provided documentation of inoperable equipment. Most supervisor reports fail to document inoperable equipment. Thus, the majority of officers and supervisors are not reporting non-functioning In-car Cameras.

- The policy also provides, "Supervisors shall review all In-Car Camera recordings of officers listed on any report involving injuries to detainees/prisoners or officers; uses of force; vehicle pursuit; or misconduct complaints, as well as any recordings related to an incident the officer believes may result in a misconduct compliant." Policy 41.3.8, ¶ 34. District 4 has the documentation evidencing these recordings



were reviewed. All other district supervisors report they conduct random reviews of recordings, but the Monitoring Team's audits of four districts since the release of the policy, in March 2015, reveals only one district was in compliance.

- The policy provides, "…supervisors shall regularly review In-Car Camera recordings of their subordinates to incorporate the knowledge gained from this review into the Supervisors' ongoing evaluation and supervision of officers." Policy 41.3.8, ¶ 35. Generally, supervisors report they are unaware that their evaluations of recordings are to be incorporated into evaluations as required by this regulation.

Close and effective supervision will go a long way toward bridging the divide between policy and practice.

### C.    The Importance of Documenting Supervision

As our reports have shown, one of the obstacles to close and effective supervision is the absence of systems and requirements to document supervision. In the City's Biannual Report on the status of the NOPD's efforts to implement the Consent Decree, the City took issue with our view that lack of documentation is indicative of a lack of supervision. According to the City:

> The lack of documentation should not be construed as a lack of supervision, and the Department is confident that revised reporting forms will assist in conveying to the Monitor that supervisors are closely and effectively supervising their subordinate.

Biannual Report of the New Orleans Police Department at 9 (1231/14).

Inadequate or non-existent documentation does not merely frustrate monitoring Consent Decree compliance, however. The primary purpose and importance of adequate documentation is not to assess compliance with the Consent Decree, although that is certainly vital. *Adequate documentation is essential to effective supervision*. As our reports have shown, there has been persistent non-compliance with numerous Consent Decree requirements, which supervisors have observed but not addressed. The core deficiency is not a lack of documentation, but a lack of supervision and systems for holding supervisors accountable.

Documentation is the means by which institutions communicate, coordinate, and evaluate their standards, activities, and performance. For instance, the absence of documentation impairs supervisors' ability to communicate among themselves, across shifts for example, concerning discipline or counseling provided to officers. Consequently, each supervisor's knowledge is effectively limited to his or her observations and actions. When officers are transferred between districts or change shifts, their new supervisor has no ability to determine whether there are particular performance issues concerning the new officer the supervisor should be alert to. For example, as we previously reported, supervisors in more than one district informed us that



information concerning disciplinary actions taken against their officers is not readily available to them.  To check for disciplinary actions filed against any of their officers would require checking each officer's file or obtaining the information from the NOPD Public Integrity Bureau ("PIB").[3]

As we have previously observed, lack of documentation precludes upper-level supervisors from determining whether sergeants and lieutenants are discharging their supervisory responsibilities adequately.  It also frustrates other important aspects of effective policing, which are called for in the Consent Decree.  For example, inadequate or non-existent documentation of discipline or counseling impairs the NOPD's ability to identify signs that an officer needs training, counseling, or discipline.

Inadequate documentation by supervisors also impairs the NOPD's ability to evaluate whether an officer meets the criteria for promotion.  As part of the annual performance review process, for example, supervisors are required to meet with their subordinates on an ongoing basis and annually to discuss their performance and document the supervisor's ongoing efforts and communications regarding officer performance challenges and areas of growth.  NOPD has also agreed to work with Civil Service to

> develop and implement an NOPD-specific system that comports with best practices and the requirements of this Agreement to accurately evaluate officer performance in areas related to integrity, community policing and critical police functions, on both an ongoing and annual basis.

(CD ¶295)  It is simply unrealistic to believe a supervisor can meaningfully perform this duty if he or she has not documented the officers' performance on an ongoing basis.

A disturbing indicator of the NOPD's failure to hold supervisor's accountable is our observation that some supervisors' attitudes toward compliance with their supervisory responsibilities has ranged from indifference to hostility.  Fortunately, the initiative shown by individual sergeants and lieutenants has demonstrated that proper documentation can be transformative.  By implementing checklists and focusing on continuous improvement, districts have gone from significant non-compliance to virtually 100% compliance.

### D.    Ensuring Supervisory Accountability.

The NOPD clearly knows how to hold supervisors accountable.  It employs systems and requirements that measure and hold supervisors accountable for their performance; namely

---

[3] According to NOPD, the Early Warning System currently being developed will be a central repository for tracking disciplinary  information, which supervisors will be able to readily access.



COMSTAT.[4]  Sergeants and lieutenants are required to and do closely track their COMSTAT statistics and are held accountable for their response at weekly COMSTAT meetings.  Given this demonstrated ability to communicate and ingrain in supervisors the importance of COMSTAT performance, there is simply no reason the same cannot be done with the equally important Consent Decree requirements.   In fact, one sergeant on his own developed a compliance checklist for his district.   As an unfortunate counterpoint to this initiative to implement the Consent Decree, when a member of the Monitoring Team commended the sergeant's initiative as a model for other districts to a district lieutenant, the lieutenant responded he would discipline an officer for creating an unauthorized form.  Fortunately, that lieutenant's attitude appears atypical (and he wisely did not carry through on his initial threat).  By contrast, the District 4 lieutenant implemented a checklist that brought that district into compliance.  Other districts eventually also adopted the form.

NOPD adopted a new supervisory report on January 1, 2015. All eight districts and SOD were monitored for compliance since the new supervisor form was put into use.   Only approximately half of the districts completed the form fully.   That some districts are using the report to achieve and ensure compliance demonstrates that documentation can drive compliance and underscores the importance of all districts doing so.

### E.    Supervisor Workload

It has become abundantly clear to the Monitoring Team that a major impediment to achieving close and effective supervision is the number of non-supervisory tasks currently imposed on supervisors.  When supervisors are tasked with performing duties that are not supervisory in nature their limited time is unproductively diverted from supervising.  Considerable effort, time and expense is dedicated to selecting and training supervisors so they can ensure officers complete their duties effectively and in compliance with law, NOPD policies, and the Consent Decree. Duties that are not supervisory in nature should be either eliminated, computerized, or civilianized to the extent feasible. At a minimum, they should be conducted as efficiently as practicable.

We interviewed NOPD supervisors concerning their workload and the amount of time each task consumed.  The following chart summarizes the activities they identified and the minimum and maximum amount of time consumed by each activity.  The chart is based on the supervisors' subjective accounts, although the amounts of time reported were generally consistent.  The amounts are also consistent with our observations and our experts' familiarity with these kinds of activities. Nevertheless, allowing for some imprecision and even overstatement, it is clear that supervisors are tasked with significant non-supervisory responsibilities.

---

[4] COMSTAT,  an abbreviation for Computer Statistics (also often referred to as COMPSTAT),  is a data-driven management tool used by police departments to track crime reports to enable the police to identify  and respond to trends.



| Supervisors' Daily Activity Load (Average) | | |
|---|---|---|
| Activity | min | max |
| Conduct roll call | 20 | 35 |
| Line up to desk officer | 2 | 5 |
| Court notifications | 10 | |
| 966 book (witness drug test of seized drugs) | 5 | |
| Prisoner book | 5 | |
| Evaluations | 5 | |
| Check MVR microphones/BWCs | 0 | 5 |
| Review and approve trip sheets | 30 | 60 |
| Complete supervisor activity report | 10 | 15 |
| Review police reports (EPR/CRASH) | 120 | 480 |
| Review/sign citations and affidavits | 15 | 20 |
| Enter officer's stats from trip sheet | 30 | 90 |
| Reviewing recordings | 65 | 180 |
| Review punches in ADP (payroll) | 60 | |
| Trip system (old payroll system) | 30 | |
| Domestic violence reports (4 risk questions) | 30 | |
| FIC database | 10 | 20 |
| Log in police reports from previous day's REPO5 | 20 | 30 |
| **Total Time (in minutes)** | **467** | **940** |

| Supervisors' Monthly Activity Load | | |
|---|---|---|
| Activity (weekly) | from | to |
| Complete arrest/stat for district COMSTAT | 180 | 240 |
| Prepare for district COMSTAT | 30 | |
| Scheduling | 60 | 320 |
| Training (Includes in-service, roll call, and Daily training bulletins) | 60 | |
| Weekly lock ADP/trip, beat-roll book, ADP Schedule, Monitor J and T time | 60 | |
| Platoon filing system | 60 | |
| **Total Time (in minutes)** | **450** | **560** |



| Additional Supervisory Duties | | | |
|---|---|---|---|
| Activity | from | to | frequency |
| File for DI1 extension | 120 | 180 | approx. 1-2x monthly |
| DI1 investigation | 1440 | 4800 | 1-2x quarterly |
| Officer/Month nominations | 60 | | monthly |
| Review and submit beat book to admin (payroll) | 5 | | monthly |
| Domestic violence stats | 5 | | monthly |
| **Total Time (in minutes)** | **1630** | **4980** | |

The process for obtaining extensions from Civil Service for completing DI-1 investigations listed in the table is inordinately cumbersome and time-consuming and warrants further explanation.[5]  Supervisors regularly seek extensions because the standard deadlines are short and, as shown above, they have many competing daily and weekly duties.  They also can be detailed to various events, such as Jazzfest, Mardi Gras, and others.  Supervisors report it is their understanding that to request an extension the Civil Service Commission requires them to do the following:

1. Compose a letter to Civil Service requesting an extension of the time limits. (Approximately 20 minutes);

2. Travel to Civil Service to file the letter and then drop it off at PIB as required and return to the station.  (Approximately 45 to 60 minutes)

3. Travel to the hearing (many times while not scheduled to work).  (Up to one hour)

4. Testify at hearing in support of extension.  (Up to 60 minutes)

This amounts to roughly 3 to 3 ½ hours of work to request a routine extension, on virtually every case assigned.[6]

---

[5] A DI-1 is a memo used to initiate disciplinary action.

[6] It is unclear whether the Commission in fact requires this process to be followed or whether the belief is the product of misunderstanding or lack of clarity.



In addition to the above times, supervisors report the following activities also prevent them from performing as a supervisor on the street:

- Officers spend 2-3 hours to obtain an arrest warrant. During that time, a supervisor is often required to serve as back-up on calls due to officer shortages.[7]

- Officers are required to categorize all recordings for calls, consuming a great deal of time during which time supervisors have to serve as back-up. The sergeants must also review and complete recording information. The sergeants state their officers had been using their personal cell phones that automatically included much of the information that was from an application on their phone. However, the sergeants state personnel are prohibited from using the cell phone application to expedite the transfer of information into the categorization of recordings.

In sum, there is a clear and pressing need for NOPD to evaluate supervisory workloads and establish its priorities.  The failure to do so not only impedes close and effective supervision but is unfair to those supervisors who are assigned unreasonable workloads.

### F.      Supervisor Assignments (¶¶307-312)

Paragraphs 307-312 of the Consent Decree generally provide for clear and consistent supervisory reporting and accountability.  All Field Operations Bureau district officers (including patrol, task force, district investigative, and narcotics units) shall be assigned to a single, consistent, and clearly-defined supervisor. (CD ¶307)  Although three districts were able to demonstrate compliance with this requirement, five were not.  Only one district demonstrated compliance with paragraph 308's requirement that task force and narcotics supervisors work the same days and hours as the officers they are assigned to supervise.  NOPD has complied with the requirement of paragraph 309 that district platoon Patrol supervisors shall be assigned to the same platoon as the officers they supervise and work the same days and hours.

Paragraph 310 provides "first-line patrol supervisors are to be assigned to supervise no more than eight officers" and that "on duty patrol supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units."  (CD ¶310)  Generally, supervisors are not initially assigned to supervise more than eight officers.  Due to shifting assignments or lack of personnel, however, the ratios frequently fall out of compliance resulting in supervisor to officer ratios that exceed the prescribed limits.   Additionally, again, the documentation maintained by some shifts fails to list the schedule supervisors have worked, which precludes assessing compliance.

---

[7] NOPD reports that it is in the process of acquiring an electronic warrant system that will greatly reduce the time consumed obtaining an arrest warrant.



NOPD has not identified and trained "acting patrol supervisors who can fill-in, on a temporary, as-need basis, for assigned supervisors who are on vacation, in training, ill, or otherwise temporarily unavailable." (CD ¶311)[8]

## G.    Supervisor and Command-Level Training (¶¶314-315)

The Consent Decree requires that NOPD's supervisory training program include instruction in the following topics:

a)  techniques for effectively guiding and directing officers, and for promoting effective and ethical police practices;

b)  de-escalating conflict, including through peer intervention when necessary;

c)  evaluation of written reports, including what constitutes a fact-based description, and how to identify "pat," "boilerplate," or conclusory language that is not explained by specific facts;

d)  investigating officer use of force;

e)  responding to and investigating allegations of officer misconduct;

f)  operation of supervisory tools such as EWS, mobile recording equipment, and AVL;

g)  burdens of proof, interview techniques, and the factors to consider when evaluating officer, complainant, or witness credibility, to ensure that investigative findings, conclusions, and recommendations are unbiased, uniform and legally supported;

h)  evaluating officer performance as part of NOPD's annual performance evaluation system;

i)  fostering positive career development and imposing appropriate disciplinary sanctions and non-disciplinary corrective action;

j)  building community partnerships and guiding officers on same; and

k)  incorporating integrity-related data into COMSTAT reporting. (CD 315)

l)  NOPD has relied upon a lesson plan used for training FBI agents to provide the requisite mandatory supervisory training for all new and current supervisors. (CD

---

[8] NOPD reports there are legal constraints on its ability to comply with this provision of the Consent Decree, which it is addressing with Department Of Justice.



¶314)  NOPD has not, however, developed lesson plans tailored to the duties of NOPD officers and the requirements of the Consent Decree, as enumerated in paragraph 315:

It is self-evident that training on the NOPD officers' specific duties and responsibilities is essential for ensuring supervisors are able to provide the guidance and accountability critical to reforming the NOPD's practices. The FBI training, while of some value, is not tailored to the needs of NOPD members and in certain respects covers matters not applicable to NOPD.

## H.    Additional Findings regarding Supervision

In-car cameras.  In-car cameras remain plagued with inoperability.  Officers are unable to use in-car cameras due to malfunctions. Only one district tracks whether supervisors report malfunctioning cameras. There is little documentation of a malfunctioning camera even though it is required of the Consent Decree.

Use of Force Reports:  For most of the use of force reports for which a recording was not completed, the supervisor indicates the officer was counseled. However, there is no accompanying documentation (DI-2 or 105) as evidence of supervisory follow-through.

Handheld Digital Recording Devices.  Each supervisor is required to have a handheld digital recording device to use during all complainant and witness statements taken as part of use of force or misconduct complaint investigations.   A few supervisors don't have recording devices. Some supervisors are unsure when their use is required.   Very few supervisors document that they record use of force investigations in their reports.

## I.    Recommendations

NOPD must re-energize its efforts to ensure close and effective supervision.  To that end, we offer the following recommendations consistent with the requirements of the Consent Decree.

### 1.    NOPD Should Ensure that the Consent Decree's Supervisory Requirements Are Consistently Discharged.

Our monitoring has revealed that supervisors are not consistently discharging the supervisory responsibilities specifically enumerated in paragraph 306.  Without systems to track compliance NOPD is unable to ensure that supervisors discharge these responsibilities.  NOPD should implement systems to ensure that discharge of these responsibilities is documented in an auditable form.

### 2.    NOPD Should Provide Newly Assigned Supervisors a List of the Consent   Decree   Requirements   for   Supervision,   Custodial



Interrogation, and Photographic Line-Ups and Ensure They Are Discharged.

The list should be distributed to each district, Homicide, Special Operations, and Special Victims so they can refer to its direction for preparation of the next audit.  Also, the use of the manual should provide instruction for newly assigned personnel when transfers are made.

3.     **Track Consent Decree Compliance as Rigorously as COMSTAT Performance.**

NOPD should develop systems to track compliance with the Consent Decree's supervision requirements with the same diligence COMSTAT data are tracked throughout the Department.

Bulletin boards contain mostly COMSTAT information for the district. Equivalent importance should be given Consent Decree requirements. Bulletin boards in districts and SOD should contain information concerning compliance with the last Consent Decree compliance audit of that duty location.

4.     **Supervisors Should Meet Monthly to Evaluate and Improve Supervision.**

There should be regular, at least monthly, meetings of designated supervisors from each duty location to include all districts, SOD, Homicide and Special Victims Section held by the Compliance Bureau to evaluate compliance issues regarding supervisory responsibilities.

The designated supervisors in each duty location are generally aware of the duty location's compliance performance, successes, and challenges. These meetings will foster idea-sharing and allow supervisors to compare their compliance to their peers' performance.

5.     **Assess and Right-Size Supervisory Workloads**

Supervisors' workloads should be reviewed and assessed to determine which duties can be civilianized, computerized, streamlined, or eliminated. The two payroll systems currently being managed by sergeants should be either computerized or civilianized. In addition, data transfers from officer activity sheets onto supervisor activity sheets or onto other reports used for COMSTAT or other purposes should be computerized or civilianized. Inefficiencies in Civil Service procedures should be addressed.



### J.    Conclusion

Despite the noteworthy efforts of certain individual supervisors to meet the supervision standards set forth in the Consent Decree, more than two years after entering into the Consent Decree and over the approximately 18 months we have been monitoring Consent Decree compliance, NOPD has neither developed nor implemented adequate procedures and practices to ensure "close and effective" supervision, including, supervisory training, assignments, and performance measures.  The failure to ensure "close and effective supervision" frustrates and delays achieving compliance under the Consent Decree with respect not only to the supervision requirements, but the substantive reforms necessary to remedy the practices identified in the Department of Justice Findings Letter.  NOPD leadership should take immediate steps to implement appropriate systems to ensure that supervisors understand their responsibilities, fulfill them consistently, and are held accountable for their failure to do so.

It is equally important, however, that NOPD examine supervisors' workloads.  It is clear many supervisors want to provide proper supervision to their officers, but are overburdened with administrative duties.  These administrative duties cause supervisors to sacrifice time available for supervision and that can be better performed more cost-effectively in other ways.  Some of these deficiencies can and should be remedied immediately.  For those that cannot, however, NOPD should establish an implementation deadline.  Aggressive and effective implementation of the supervisory requirements of NOPD policy and the Consent Decree is one of the most cost-effective measures NOPD can take to expeditiously remedy the practices found in the Department of Justice findings letter and increase compliance with the Consent Decree.

As reported above, in the course of the public hearing on supervision, NOPD reported that it has implemented a number of changes to address the deficiencies we reported and additional changes are planned.  We will continue to monitor and report on the implementation and effectiveness of these changes.