

# Report of the Consent Decree Monitor
# For the New Orleans Police Department Consent Decree
# October 2, 2015

**Office of the Consent Decree Monitor**
**New Orleans, Louisiana**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana

## WHAT'S IN THIS REPORT?



**Office of the Consent Decree Monitor**

**October 2, 2015**

### WHAT WE DID THIS QUARTER

- The Monitoring Team continued to review policies, procedures, and training. We also performed a special, in-depth review of NOPD's supervision practices and its officer selection practices. We published special reports highlighting our findings in those areas. In addition, among other things, the Monitoring Team conducted assessments of Body Worn Camera usage, uses of force, use of force record keeping, vehicle pursuits, and PIB's handling of administrative investigations. We also provided technical assistance to the Academy and to the PIB Force Investigations Team.

### WHAT WE FOUND

- NOPD rolled out an impressive Crisis Intervention Team ("CIT") program, including drafting policies, assigning a dedicated program manager, providing train-the-trainer sessions, and conducting its first training of CIT officers.
- The Department hired a full time program director to develop, initiate, and roll-out the Consent Decree-required Officer Assistance & Support program.
- While recent progress has been made at the Academy, the speed of change earlier this year was slow. Even with the recent progress, lesson plans still have not been approved, instructors still have not been evaluated, and a training manual still has not been developed.
- NOPD's use of force investigations and record keeping practices have improved in some respects, but more improvement is necessary, especially in the area of administrative investigations of serious uses of force.
- NOPD has improved its data keeping for vehicle pursuits, but still has room for further improvement.
- Most police districts have achieved substantial compliance with the Consent Decree Photographic Line-up requirements, but many still are lagging in the area of Custodial Interrogations.
- The Department's handling of the investigation, manhunt, arrest, and processing of the alleged killer of Officer Daryle Holloway was professional, ethical, and compliant with the Consent Decree.

### NEXT QUARTER'S ACTIVITIES

- Conduct follow-up audit of PIB's administrative investigations to assess improvements against the baseline established this quarter.
- Conduct follow-up audit of BWC use and related discipline.
- Work with NOPD and the Department of Justice to agree upon objective compliance measurements for each paragraph of the Consent Decree.
- Continue providing technical assistance to and monitoring progress at the NOPD Academy, including new officer training, in-service training, and the FTO program.
- Continue reviewing policies, reviewing lesson plans, monitoring training, and personally observing officers in the field.



## I.  CONSENT DECREE AUTHORITY

"The Monitor shall file with the Court quarterly written, public reports covering the reporting period that shall include:

> a) A description of the work conducted by the Monitoring Team during the reporting period;
>
> b) A listing of each [Consent Decree] requirement indicating which requirements have been: (1) incorporated into implemented policy; (2) the subject of sufficient training for all relevant NOPD officers and employees; (3) reviewed or audited by the Monitoring Team in determining whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitoring Team to have been fully implemented in practice;
>
> c) The methodology and specific findings for each audit or review conducted, redacted as necessary for privacy concerns. An unredacted version shall be filed under seal with the Court and provided to the Parties. The underlying data for each audit or review shall not be publicly available but shall be retained by the Monitoring Team and provided to either or both Parties upon request;
>
> d) For any requirements that were reviewed or audited and found not to have been fully implemented in practice, the Monitor's recommendations regarding necessary steps to achieve compliance;
>
> e) The methodology and specific findings for each outcome assessment conducted; and
>
> f) A projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the [Consent Decree]."

**Consent Decree Paragraph 457**



## II.    NOTES

"The Monitor shall be subject to the supervision and orders of the [United States District Court for the Eastern District of Louisiana], consistent with [the Consent Decree]. The Monitoring Team shall only have the duties, responsibilities, and authority conferred by [the Consent Decree]. The Monitoring Team shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent."

**Consent Decree Paragraph 455**



## III.    TABLE OF CONTENTS

I.    Consent Decree Authority ................................................................................................ 3

II.    Notes ............................................................................................................................... 4

III.    Table of Contents ........................................................................................................... 5

IV.    Glossary of Acronyms ..................................................................................................... 7

V.    Introduction to Quarterly Report ................................................................................... 9

VI.    Summary of Monitoring Activities ................................................................................ 13

VII.    Policies .......................................................................................................................... 17

VIII.    Use of Force Review ..................................................................................................... 18

  A.    Introduction ................................................................................................................ 18

  B.    Reporting Use of Force ................................................................................................ 20

    1.    Requirements ......................................................................................................... 20

    2.    Officers Compliance with Reporting Requirements .............................................. 22

    3.    Supervisor's Investigation of Reported Use of Force ............................................ 24

    4.    Quality of Force Statement & Use of Force Reports ............................................. 27

  C.    Summary of Our Findings on Select Elements of Use of Force Events ........................ 31

    1.    How events resulting in force were initiated ......................................................... 31

    2.    Outcomes of application of force – Injuries to officer .......................................... 34

    3.    Outcomes of application of force – Injuries to subject ......................................... 35

    4.    Supervisor Responds to the Scene ........................................................................ 36

    5.    Supervisor Interviews of Subjects of Uses of Force ............................................. 37

    6.    Supervisor's Findings ............................................................................................ 38

  D.    Critical Firearms Discharges ....................................................................................... 38

  E.    Quality of FIT Investigations ...................................................................................... 40

    1.    Criminal Investigation ........................................................................................... 40

    2.    Administrative Investigations ............................................................................... 41

    3.    FIT Administrative Section Investigation Guide .................................................... 44

  F.    Force Factor Analysis .................................................................................................. 45

IX.    Vehicle Pursuits ............................................................................................................. 48



| X. | Crisis Intervention Team | 50 |
| XI. | Policing Free of Gender Bias | 54 |
| XII. | Community Engagement (CD 223-233) | 56 |
| A. | Community Engagement Survey | 56 |
| B. | Availability of Information | 60 |
| C. | Mardi Gras Indians | 61 |
| XIII. | Community Survey (CD 223-233) | 63 |
| XIV. | Training (CD 245-288) | 65 |
| XV. | Officer Assistance & Support | 68 |
| XVI. | Supervision (CD XV) | 69 |
| A. | Custodial Interrogations | 69 |
| B. | Photographic Line-Ups | 69 |
| C. | Body Worn Cameras | 70 |
| D. | Camera Discipline | 70 |
| E. | In-Car Cameras | 72 |
| F. | Supervisor Work Load | 72 |
| XVII. | Signal code review | 73 |
| XVIII. | Agreement Implementation And Enforcement (Cd 444 – 492) | 75 |
| A. | Coordination with IPM (CD 459) | 75 |
| B. | NOPD Consent Decree Implementation Unit (CD 467) | 75 |
| C. | NOPD and City Cooperation (CD 470 – 476) | 75 |
| XIX. | Conclusion | 77 |
| XX. | Appendices | 79 |
| | Appendix 1 -- Vehicle Pursuit Data | 80 |
| | Appendix 2 Community Survey: Demographic Breakdown Analysis | 84 |
| | Appendix 3 N.O.P.D. EDUCATION AND TRAINING DIVISION | 135 |



## IV.    GLOSSARY OF ACRONYMS

| | |
|---|---|
| "ASU" | Administrative Services Unit |
| "AUSA" | Assistant United States Attorney |
| "AVL" | Automatic Vehicle Locator |
| "BWC" | Body Worn Cameras |
| "CCMS" | Criminal Case Management System |
| "CD" | Consent Decree |
| "CIT" | Crisis Intervention Team |
| "CODIS" | Combined DNA Index System |
| "ComStat" | Computer Statistics |
| "CPI" | California Psychological Inventory |
| "CSC" | Civil Service Commission |
| "CUC" | Citizens United for Change |
| "DA" | District Attorney |
| "DI-1" | Disciplinary Investigation Form |
| "DOJ" | Department of Justice |
| "DVU" | Domestic Violence Unit |
| "ECW" | Electronic Control Weapon |
| "EWS" | Early Warning System |
| "FBI" | Federal Bureau of Investigation |
| "FIT" | Force Investigation Team |
| "FOB" | Field Operations Bureau |
| "FTO" | Field Training Officer |
| "IACP" | International Association of Chiefs of Police |
| "ICO" | Integrity Control Officers |
| "IPM" | Independent Police Monitor |
| "KSA" | Knowledge, Skill and Ability |
| "LEP" | Limited English Proficiency |
| "LGBT" | Lesbian, Gay, Bi-sexual, and Transgender |
| "MMPT" | Minnesota Multiphasic Personality Inventory |
| "MOU" | Memorandum of Understanding |
| "NNDDA" | National Narcotics Detection Dog Association |
| "NOFJC" | New Orleans Family Justice Center |
| "NOPD" | New Orleans Police Department |
| "NPCA" | National Police Canine Association |



| | |
|---|---|
| "OCDM" | Office of Consent Decree Monitor |
| "OIG" | Office of Inspector General |
| "OPSE" | Office of Public Secondary Employment |
| "PIB" | Public Integrity Bureau |
| "POST" | Police Officer Standards Training Counsel |
| "PsyQ" | Psychological History Questionnaire |
| "RFP" | Request for Proposal |
| "SART" | Sexual Assault Response Team |
| "SOD" | Special Operations Division |
| "SRC" | Survey Research Center |
| "SUNO" | Southern University of New Orleans |
| "SVS" | Special Victims Section |
| "UNO" | University of New Orleans |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |
| "VAW" | Violence Against Women |



## V.   INTRODUCTION TO QUARTERLY REPORT

This report marks the end of NOPD's second year under the Consent Decree, as measured from the appointment of the Monitoring Team on August 9, 2013.  And while NOPD still has a long road ahead of it, it has made notable progress in several areas, particularly in the past year.  For example:

- NOPD's policy drafting and vetting process is much improved and, as a result, its policies are much improved.  Several policies already have been approved by the Department of Justice and the Monitoring Team, and several more have been submitted and are awaiting approval.  While drafting, vetting, and revising policies is an inherently slow process, NOPD clearly has made significant progress in this area.

- The NOPD Academy has new, competent leadership; lesson plans are being developed in an organized fashion; teachers are being trained, video-taped, and evaluated; and the Department of Justice ("DOJ") has come through with additional technical assistance (at DOJ's expense) to help the Academy improve several of its courses.  To be clear, the Academy still has a long way to go to come into full compliance with the Consent Decree, but NOPD's recent progress in this area is nonetheless notable.

- The NOPD Compliance Bureau has proven itself to be extremely effective. The Monitoring Team has been working closely with each member of the Compliance Bureau and looks forward to working closely with the Bureau's new director, Deputy Chief Tim Averill.  At the outset of our monitorship, we identified the lack of a Compliance Bureau as one of the key obstacles in front of NOPD and its efforts to promote compliance with the Consent Decree.  We now can say without hesitation the Compliance Bureau is one of the key forces of change and reform within the NOPD.

- A Crisis Intervention Team ("CIT") program has been developed, an energetic and skilled leader has been engaged to run it, an impressive train-the-trainer session was conducted by outside experts, and training of CIT officers has begun.  The program is modeled after an extremely effective program that has been in place for years in Memphis.  On September 17, 2015, 24 men and women graduated from the program as NOPD's first class of specially trained CIT officers.  The program is one about which NOPD should be quite proud. The Monitoring Team is confident the program will make a material difference in the lives of mental health "consumers," police officers, and citizens generally.



- After a slow start, NOPD now has a full-time Officer Assistance and Support ("OA&S") program manager. Led by a civilian mental health professional, Cecile Tebo, the program will fill a huge gap in the support NOPD historically has given its officers. While much work still needs to be done in this area to develop and roll out the actual programs supporting officers, the appointment of Ms. Tebo represents a material step forward.

- The Office of Police Secondary Employment has been up and running for some time, and officer resistance to the program has gone way down. While we acknowledge some within NOPD (and even some within the business community) are not thrilled with having police details now centrally coordinated and monitored, the program does seem to be working as evidenced by the increasing number of officer participants and customers.

- NOPD continues set a good example for departments across the country in the implementation of Body Worn Cameras. And it must be acknowledged, NOPD moved forward in this area even though BWCs were not required by the Consent Decree. Not only has NOPD outfitted all its patrol officers with BWCs, but most officers are using their cameras consistently now, and capturing important information. Indeed, the Monitoring Team's ongoing reviews of camera recordings gives us confidence camera use by officers is becoming the norm. Implementation of any new technology takes time and effort and NOPD has made important progress.

- On the technology front, NOPD recently remedied a significant gap identified by the Monitoring Team involving in-car cameras. One of our prior audits identified that many in-cameras were not working and/or not recording. NOPD subsequently traced the problem to a lack of server capacity and/or outdated servers. While this technological went uncorrected for far too long in our view, as of August 2015, the City completed the installation of new servers throughout the Department, which has greatly reduced the number of non-functional cameras in the Department's cars.

NOPD's most notable achievement in our view, however, is not technological, but rather human. Over the course of the last year or so, the Monitoring Team has noticed a palpable transformation in the attitude of NOPD management toward change, the Consent Decree, and the work of the Monitoring Team generally. Rather than pushing back at every turn, most within NOPD with whom we deal seem to have embraced change, reform, and improvement. NOPD leadership now seems genuinely committed to reform. While we continue to run into disagreements from time to time, and while we remain not fully satisfied with the pace of change, we rarely are given cause anymore to question the Department's commitment to achieving full and sustained compliance with all elements of the Consent Decree.



Of course, NOPD and the Monitoring Team still have much work to do. Unfortunately, the time spent during the first year of the Consent Decree arguing with NOPD and the City over the need for a Consent Decree, undoing a dysfunctional policy drafting process, working without a Compliance Bureau, dealing with non-existent Academy leadership, and wading through a culture of "well, that's how we do it here" delayed change and, thus, NOPD's accomplishments.  And even now, notwithstanding the significant progress listed above, NOPD continues to lag in some areas, including supervision, training, and recruit selection.  For example:

- As described in our Quarterly Report dated April 28, 2015, several police districts continue not to maintain adequate records to demonstrate compliance with a variety of Consent Decree requirements, and many supervisors continue to lack the time – and some may lack the interest and/or the skill –to provide close and effective supervision to their officers.

- As discussed at the public court hearing in February 2015, NOPD's training program still needs a lot of work.  The Academy continues to operate without approved lesson plans, a meaningful evaluation of its current instructors, and a comprehensive strategic plan to remedy known shortcomings.  The quality of the instruction, the materials, and the curriculum also remains inconsistent.  While, as noted above, we have seen recent progress in all these areas, more work needs to be done, and it needs to be done faster.

- As described in our recent Special Report focusing on NOPD's hiring process, the Monitoring Team has identified multiple shortcomings in the way NOPD selects its new officers.  In short, we took issue with the Department's multiple-choice exam, its written exam, and its new interview process.  Specifically with respect to the interview process, while we recognized significant improvements, we criticized the City's unwillingness to allow its interviewer's to ask clarifying questions, follow-up on partial answers, and probe the candidate for relevant information.  The process's hyper-rigidity prevents the process from helping NOPD identify the best recruits, but rather serves more to screen out bad candidates.  It is a least common-denominator process that poorly serves NOPD's mission to recruit those individuals most likely to personify the professional police force the Department is trying to build and New Orleans deserves.[1]

---

[1]     We would be remiss here if we did not mention one impressive improvement to the new officer selection process implemented by NOPD with the assistance of the local business community.  NOPD now involves private sector Human Resource professionals on the recruit interview panels.  The



- And as described later in this report, the Department's use of force record keeping and its vehicle pursuit record keeping need further attention.

One other area where NOPD still has room for improvement is the professionalism of some of its officers.  To be clear, *most* of the officers and supervisors we come across (either in person or through watching BWC videos) are professional, helpful, and committed to the community they serve.  But there remains a small subset whose attitude is unbecoming of a modern police department.  We recognize no large organization ever will rid itself of all unprofessional personnel, but NOPD must continue to work hard to reduce the impact of those officers upon the Department.  As one professional psychologist recently put it at a meeting with NOPD leadership, "it is high time for the good kids to take back the school yard."  By refocusing and re-energizing its efforts at recruiting, hiring, training, and supervision, NOPD can ensure that happens.

Against this backdrop, this third year is a critical one for NOPD.  The Department needs to focus its energy like never before and accelerate its progress.  To help NOPD move forward, the Monitoring Team is in the process of working closely with the Compliance Bureau to ensure the Department has clear, objective standards for each of its various Consent Decree obligations – something that only became possible with the recent change in the attitude of the Department's leadership.  We are confident NOPD can build upon its recent achievements, accelerate its progress in other areas, and turn prior failures into opportunities.  This is an exciting time for NOPD and for the citizens of New Orleans.

---

Monitoring Team has met with many of these professionals and has been extremely impressed with their knowledge, skill, and commitment to the Department.  Indeed, the Monitoring Team currently is working with several of the professionals to devise ways to remedy the remaining shortcomings of NOPD's selection process.



## VI.    SUMMARY OF MONITORING ACTIVITIES

This quarter, like the last, involved a mix of qualitative and quantitative assessments.  Among many other things, our team spent the last quarter performing the following monitoring activities:

- We continued to work with the Department of Justice and the NOPD to review and revise NOPD's policies to ensure full compliance with the Consent Decree and to incorporate best practices.

- We reviewed serious use of force reports, including the contemporaneous officer reports, supervisor reports, the subsequent Force Investigations Team ("FIT") investigation file, and relevant video footage.  Where we had questions or concerns about an investigation, we brought the matter to the attention of the NOPD Public Integrity Bureau ("PIB") and the NOPD Compliance Bureau.

- We provided specialized training to the NOPD Use of Force Review Board members and FIT to help them move closer to full compliance with the requirements of the Consent Decree.

- We reviewed and monitored a number of ongoing PIB investigations.

- We conducted regular district-by-district and unit-by-unit audits of compliance with the Consent Decree's requirements relating to photographic lineups, custodial interrogations, supervision, camera use, technology functionality, and training.  In July, Judge Morgan accompanied the Monitoring Team on these audits in several districts to assess NOPD's compliance efforts for herself.

- We attended Sexual Assault Response Team ("SART") meetings to assess and help facilitate the development of comprehensive sexual assault and domestic violence policies and procedures.

- We attended disciplinary hearings to evaluate the fairness of the hearing, the appropriateness of the discipline, and overall compliance with the Consent Decree.

- We gave significant attention to the NOPD Academy, meeting with the new Academy commander, the new Curriculum Director, a new Lieutenant serving as the Academy's Training Officer/Coordinator, other Academy staff, and several instructors on multiple occasions.  We also personally observed training at the Academy, as well as outside training conducted by experts in



various fields, including recently implemented instructor training conducted by the FBI. Additionally, the Monitoring Team engaged with VCPI, a consulting group made available to the NOPD by the U.S. Department of Justice Community Oriented Policing office.

- The Monitoring Team observed NOPD officers and supervisors in the field, in all districts and during all shifts. We did this on weekdays and weekends. We also personally observed NOPD's handling of its major events.

- We performed an initial audit of PIB's administrative investigation processes and practices. The results of this initial audit will serve as a baseline for a forthcoming follow-up audit. The results of the follow-up audit, along with observable trends (either positive or negative) will be published in a forthcoming report.

Further, as we have done since our appointment, the Monitoring Team spent time meeting with, and listening to, the parties to the Consent Decree. The Monitoring Team is in regular contact with the City, the NOPD, and the DOJ. We also continue to meet regularly with the NOPD Compliance Bureau, the PIB, the NOLA OIG, and the members of the Independent Police Monitor's team.

Finally, one other activity is worth special mention here. On Saturday, June 20, 2015, 5th District NOPD officer Daryle Holloway was shot and killed while transporting a prisoner to the Central Lockup facility. The prisoner, Travis Boys, had been arrested by officers on the earlier shift for shooting a handgun at a woman in the home they reportedly shared. While in the back of Officer Holloway's car, Mr. Boys managed to maneuver his arms to the front of his body where he then produced a handgun he had kept concealed from the arresting officers, crawled through the vehicle's partition, and shot Officer Holloway, killing him. Officer Holloway had three children, and, by all accounts, was a model New Orleans police officer.

The tragic killing of Officer Holloway put a lot of wheels into immediate and concurrent motion. The police department, supported by several local and federal agencies, had to notify Officer Holloway's family, secure the crime scene, find Mr. Boys (who had escaped on foot), support Officer Holloway's fellow officers, and ensure the public had timely and accurate information regarding the shooting, the manhunt, and the ultimate arrest.

The killing put wheels into motion for the Monitoring Team as well. From the first word of Officer Holloway's killing, the Monitoring Team was on the ground in New Orleans working to ensure the understandably highly-charged emotions of Officer Holloway's colleagues did not result in any inappropriate actions being taken against citizens (or



against Mr. Boys once he was found).  We are pleased to report that NOPD comported itself admirably.

- First, NOPD, led by FIT, quickly secured and maintained the crime scene.

- Second, NOPD worked closely with local, regional, and federal authorities to initiate a thorough and well thought-out manhunt for Mr. Boys.

- Third, PIB immediately reviewed (and re-reviewed, frame-by-frame) the video recordings of not only the shooting, but the events leading up to the shooting, and stayed on full alert throughout the manhunt to ensure NOPD followed the law.

- Fourth, the NOPD Office of Assistance & Support quickly engaged a group of expert psychologists, peer counselors, and clergy to provide support and counseling to the officers of the 5th district.

The Monitoring Team personally observed each of the foregoing steps – including accompanying officers involved in the manhunt – and was extremely impressed by the speed and thoughtfulness of NOPD's actions.  During the "C Shift" roll call the night Officer Holloway was shot, the Commander of the 5th District gave his officers a speech about the tragedy and what was to come.  Among other things, Commander Goodly emphasized that the killing was committed by one man, not a city, a community, or a neighborhood.  He cautioned his officers to stay vigilant and fight against the natural tendency to blame others for the actions of one.  He stressed the importance of protecting the community's rights and the rights of Mr. Boys once he was captured and arrested.  Commander Goodly issued these warnings professionally, sincerely, and in a manner that got his officers' attention.  It was an impressive message on a very sad and emotionally-charged day.

The Monitoring Team also was highly impressed by the professionalism of the NOPD upon the arrest of Mr. Boys, which occurred around 8 am the next morning.  Immediately following the radio call from the arresting officer that he had Mr. Boys in custody, a district lieutenant got on the radio and did four things.  First, he confirmed that neither Mr. Boys nor the officer had been injured during the arrest.  (Neither had.)  Second, he reminded all officers that their Body Worn Cameras should be on and remain on throughout the arrest and transportation of Mr. Boys.  Third, he ordered a ranking officer (a sergeant or lieutenant) to accompany the arresting officer during transport.  And fourth, he ordered that Mr. Boys be transported and placed in the custody of PIB FIT immediately.  He followed these directions with a warning along the following lines: "The entire City's eyes are on us.  Everything will be done by the book."  And from the Monitoring Team's vantage point, it was.



From the moment of Mr. Boys' arrest and transport to FIT, NOPD rank, the NOPD Compliance Bureau, the Independent Police Monitor, and the PIB detectives leading the investigation never left his side – and neither did the Monitoring Team.  We observed his treatment from his arrest, through his medical assessment by EMS, his interrogation at FIT, a hospital visit (ordered by FIT out of an abundance of caution), and his ultimate hand-off to the Orleans Parish Sherriff.  Throughout this time, NOPD acted honorably, professionally, and in full compliance with the Consent Decree.

Subsequent to the shooting and arrest of Mr. Boys, the Monitoring Team re-watched the videos leading up to Mr. Boys' arrest.  Based upon those videos, we provided NOPD with a list of questions and training recommendations.  To its credit, NOPD already had initiated some of these recommendations on its own.  For example, the Department promptly re-trained all officers in all districts on proper handcuffing procedures.  The Monitoring Team currently is working with the Compliance Bureau to ensure our other questions are answered and other necessary corrective actions are promptly put into place.

Corrective actions, of course, cannot bring Officer Holloway back or provide a father to his three children.  NOPD's willingness to study the events that led to the shooting with an honest and critical eye, and to learn from, rather than hide from, those tough lessons, though, undoubtedly will help reduce the risk of a similar tragedy in the future.



**VII.    POLICIES**

As noted above, NOPD's policy drafting and vetting process has improved greatly since the outset of the Consent Decree, and, as a result, its policies are much improved. Several policies already have been approved by the Department of Justice and the Monitoring Team, and several more have been submitted and are awaiting approval.  While drafting, vetting, and revising policies is an inherently slow process, ***NOPD clearly has made significant progress in this area.***

Last quarter, the Monitoring Team reported on the approval of the following policies:

- Use of Force
- Use of Force Reporting and Investigation
- Misconduct Complaints/Disciplinary Investigations
- Domestic Violence
- Employee Conduct:  Minor Violations/Infraction

More recently, seven additional policies have been added to the list:

- Search & Seizure
- Investigative (Terry) Stops
- Search Warrants
- Handcuffing and Restraints
- Prisoner Transport
- Canines
- FIT/Officer Involved Shootings

NOPD, the Department of Justice, and the Monitoring Team continue to work well together, and are moving forward with several critical policies.  Among the policies currently being worked on are:  Academy, Immigration Status, Conducted Electrical Weapons, Adjudication of Misconduct, Disciplinary Matrix/Penalty Schedule, Misconduct Complaint Investigator Responsibilities, and Sexual Assault.  Approval of most, if not all, of these policies likely will occur in the current quarter.



## VIII.   USE OF FORCE REVIEW

### A.   Introduction

As discussed in earlier monitoring reports, the Consent Decree requires NOPD to develop and implement force policies, training, and review procedures that ensure force by NOPD officers is used in accordance with the rights secured and protected by the Constitution and laws of the United States, and that any unreasonable uses of force is identified and responded to appropriately.  (CD III)  In order to manage use of force by its officers and to enable identification of misconduct or patterns with respect to force, four elements are necessary.

- First policies and procedures for reporting use of force must be implemented.

- Second, members of the Department must receive competent training on the policy requirements.

- Third, the Department must ensure it knows the full extent of force used by its officers.

- Fourth, the Department has to identify policy violations and abuses of force, and take timely and appropriate corrective action when necessary.

This Quarterly Report provides an assessment of compliance with aspects of those requirements *covering the period October, 2014 through February, 2015*.  In addition to assessing practices in place at the time of our reviews, the Monitoring Team will be using these data as a baseline from which to measure improvement in the ensuing months.[2]

Before getting into the details of our findings, however, we should note much effort has been undertaken by the NOPD since February 2015 on the issues covered by this Report.  ***Indeed, since NOPD's appointment of a new FIT commanding officer in July 2015, the Monitoring Team has noted material progress***.  For example, since July, FIT has created guides for the criminal and administrative investigators that incorporate the essential investigative steps required by the Consent Decree. (CD 97c)  The Monitoring Team commends FIT for this recent progress.

---

[2]    To help NOPD's PIB move into full compliance with the Consent Decree, on July 8, 2015, Professor (and member of the Monitoring Team) Geoffrey Alpert and Deputy Monitor Dennis Nowicki presented a training class to members of the Use of Force Review Board, the Training Academy and PIB's Force Investigations Team.  The training focused on managing use of force: reporting, investigating and review of use of force by police officers.  The training was requested by the Public Integrity Bureau.



The Consent Decree requires NOPD to "develop and implement policy and procedure manuals for, at a minimum, the following functions: d) Use of Force Reporting, Investigation, and Review, including both Supervisory and FIT investigations." (CD 18) Throughout 2014, the Department functioned under a policy it issued in mid-2013 that was not approved by the Department of Justice or the Monitoring Team, as required by the Consent Decree. (CD 21) *On March 27, 2015, however, the Department's policies on Use of Force, Reporting Use of Force, and Use of Force Review Board were approved.*

Though the officers were guided by a policy not yet approved by the Monitoring Team and DOJ, the Monitoring Team nonetheless assessed compliance with the Department's then-current policy and with the requirements of the Consent Decree, recognizing, in the absence of an approved policy, our assessment would find certain practices inconsistent with Consent Decree requirements[3]. Because use of force reporting, investigation, and several other Consent Decree requirements were incorporated in the 2014 policies, however, our assessments from that period are nonetheless instructive.

The Monitoring Team developed a process to ensure our use of force reviews are comprehensive and consistent, and over several months we gathered data to identify the strengths and weaknesses of the Department's use of force practices. The data we gathered not only provide important insight into the Department's practices, but they also provide important benchmarks to facilitate the "outcome assessment" required by the Consent Decree, and, we hope, to measure improvements over time.

The Monitoring Team's use of force review process captures up to 86 data elements for each use of force event, depending on the number of officers using force or witnessing the use of force.[4] Our process includes an assessment of the requirements of the Consent Decree, the quality of the investigation into the use of force and whether the force was justified based on the totality of the circumstances. Once the approved policies are issued by the Department and officers are trained, our now well-tested methodology will enable the Monitoring Team to continue giving timely feedback on individual use of force events and investigations so that, where appropriate, NOPD can take corrective action. It also will enable the Department and the public to see the tangible benefits derived from improvements in the policy, training, and supervision mandated by the Consent Decree.

---

[3]   For a discussion of the progress of policy development overall see the March 2015 Monitoring Team's Quarterly Report.

[4]   The range of possible data elements is determined by the number of officers involved in or witnessing the use of force. For each involved or witness officer our review captures the officer's name, rank, whether a force statement was submitted, whether the officer used force or witnessed the use of force and whether the officer activated her/his body worn camera during the event



Since our last report of our review of use of force investigation, the Monitoring Team gained access to NOPD's Electronic Police Reporting ("EPR") system, the Body Worn Camera ("BWC") video records, and Conducted Electrical Weapons ("CEWs," more commonly known as "Tasers"®) videos. These records have enabled us to complete more comprehensive reviews of each use of force event, identify deficiencies in the investigations by supervisors, and assess the sufficiency of the various reports required from officers.

Fundamentally, any use of force analysis is only as good as the available data. Information that did not make it into the reports, obviously, cannot be considered by the Monitoring Team. Going forward, with the implementation of an approved policy, and with ready access to more complete data including CEW, BWC, and in-car camera video footage, we anticipate being even better able to assess the reasonableness of specific use of force events in accordance with Constitutional standards and the requirements of the Consent Decree.

## B. Reporting Use of Force

### 1. Requirements

To promote effective reporting, the Consent Decree requires the NOPD to "develop and implement a uniform reporting system pursuant to a Use of Force Reporting Policy, using a uniform supervisor Use of Force Report, which will include individual officer Force Statements." (CD 76) For reporting and investigative assignment purposes, NOPD uses of force are divided into four levels:

- **Level 1** uses of force include pointing a firearm at a person and hand control or escort techniques (*e.g.*, elbow grip, wrist grip, or shoulder grip) applied as pressure point compliance techniques or that result in injury or complaint of injury.

- **Level 2** uses of force include use of an CEW (including where a CEW is fired at a person but misses); use of an impact weapon to strike a person but where no contact is made; use of a baton for non-striking purposes (*e.g.*, prying limbs, moving or controlling a person); and weaponless defense techniques (*e.g.*, elbow strikes, kicks, leg sweeps, and takedowns).

- **Level 3** uses of force include any strike to the head (except for a strike with an impact weapon); use of impact weapons where contact is made (except to the head), regardless of injury; or the destruction of an animal.



- **Level 4** uses of force include all serious uses of force, as defined by [the Consent Decree], and shall be investigated by NOPD's Force Investigation Team.[5]

Each officer who uses a Level 1 force is required to prepare a force statement that completely and accurately describes the force used and includes: (1) a detailed account of the incident from the officer's perspective; (2) the reason for the initial police presence; (3) a specific description of the acts that led to the use of force; (4) the level of resistance encountered; and (5) a description of every type of force used. (CD 78) Supervisors also may require witness officers to prepare a force statement at their discretion, and these statements must be submitted by the end of the work day. The force statement must be be reviewed by a supervisor who was neither involved[6] nor a witness to the incident. (CD 83)[7]

Similarly, each officer who uses or witnesses a Level 2 or Level 3 use of force is required to prepare a force statement. In such events, a non-involved supervisor is required to respond to the scene, conduct a thorough investigation into the use of force, and document her/his investigation in a Use of Force Report[8] within 72 hours. (CD 86, 87)

The Consent Decree requires supervisors' use of force reports, including officers' force statements, be maintained centrally by PIB. (CD 81) NOPD has assigned that responsibility to PIB's FIT unit. Until recently, the task of receiving, reviewing, and maintaining the associated files was assigned to a FIT sergeant who also was tasked with conducting the administrative investigations of serious use of force events, overseeing the data entry into IAPro (PIB investigations tracking and management system), managing the

---

[5]   "Serious use of force" means: (1) all uses of lethal force by an NOPD officer; (2) all critical firearm discharges by an NOPD officer; (3) all uses of force by an NOPD officer resulting in serious physical injury or requiring hospitalization; (4) all neck holds; (5) all uses of force by an NOPD officer resulting in a loss of consciousness; (6) all canine bites; (7) more than two applications of an ECW on an individual during a single interaction, regardless of the mode or duration of the application, and whether the applications are by the same or different officers, or ECW application for longer than 15 seconds, whether continuous or consecutive; and (8) any strike, blow, kick, ECW application, or similar use of force against a handcuffed subject.

[6]   For reporting purposes NOPD defines an "involved officer" as an officer who uses force. Officers who observe the use of force are considered "witness officers."

[7]   Additionally, "Officers' Force Statements shall completely and accurately describe the force used or observed. The use of force reporting policy shall explicitly prohibit the use of conclusory statements without supporting detail, including "boilerplate" or "pat" language (e.g., "furtive movement" or "fighting stance") in all statements and reports documenting use of force. Officers shall be subject to disciplinary action for material omissions or inaccuracies in their Force Statements." (CD 79)

[8]   The Consent Decree defines a "Use of Force Report" as a written report documenting a supervisor's investigation of a use of force as required by this Agreement.



Department's Professional Performance Enhancement Program, including teaching a block of instruction included in that program, and reviewing officers' force statements and field investigators use of force reports.  The scope and breath of his assigned duties left little time for quality control over use of force investigations completed by field supervisors. Consequently, as our earlier reports revealed, quality control of use of force investigation was lacking.

Whenever an officer uses a reportable level of force, the officer must notify a supervisor.  Once notified, the supervisor must contact FIT.  Upon notification, FIT assigns a unique force tracking number ("FTN") and records sufficient information about the event to enable tracking of the completion of the required reports.  The name of the involved and witness officers, the incident report number, the name of the subject the force was used against, and the type and level of force used are recorded on the force log.  As shown in Figure 1 below, there were a total of 413 use of force events recorded by FIT in 2014.

**Figure 1.      Use of Force Events by Unit of Assignment of Involved Officer(s)**

### 2014 USE OF FORCE EVENTS BY DISTRICT

- Other, 22
- 1st District, 37
- 2nd District, 25
- 3rd District, 29
- 4th District, 32
- 5th District , 46
- 6th District, 50
- 7th District, 44
- 8th District, 87
- SOD, 41

### 2.      Officers Compliance with Reporting Requirements

To verify that officers are complying with the mandated reporting requirements, the Monitoring Team obtained from NOPD a database of all 2014 police reports wherein an arrestee was charged with battery of a police officer, assault of a police officer, or resisting



arrest.  Such events are likely also to involve the use of force to overcome the resistance or to defend against the assault or battery.  The database we received identified 657 reports of events occurring in 2014 wherein an offender was charged with one of those offenses.[9]

We matched the resulting item numbers to item numbers found in the listing of 413 use of force events logged on the FIT force log.  Our comparison found that, of the 657 reports, 170 were associated with a use of force event found on the FIT force log.

Recognizing that a charge of resisting arrest or assault on a police officer can result from an event in which no force was used by the arresting officer, the Monitoring Team considered reviewing each report to determine if, in fact, force was used.  Such a review is labor intensive and time consuming.  Consequently, we decided to review only those cases occurring in the last quarter of 2014, in the months of October, November, and December.  One hundred and forty-one cases occurred in those three months.  We obtained and read copies of all 141 incident reports.

In many cases, the charge of resisting arrest was associated with behavior such as fleeing from the officer or providing false identification.  There were also several cases in which the victim of the resisting or assault was a member of another law enforcement agency, that is, the Louisiana State Patrol or the Orleans Parish Sheriff's Office.  Unless there also was evidence of physical force used against or by an NOPD officer, we did not expect to find a force statement and use of force report associated with the event.

After removing all such events from the list of item reports, we found that 35 of the 141 cases contain evidence that reportable force was used by a member of the New Orleans Police Department.  We alerted NOPD PIB personnel of all 35 cases and asked them to provide all associated force statements and use of force reports.  The Department was able to locate and provide Force Statements and Use of Force Reports on only 10 of the identified cases.  They were logged under a different item number than the item number assigned to the report documenting the arrest.[10]  In three other cases, the subject was arrested by another law enforcement agency.

---

[9]     It is important to note the data underlying this analysis is from 2014.  As we currently are in the third quarter of 2015, these data may not reflect NOPD's current state of compliance.  The data, however, will serve as a critical benchmark from which we will measure progress as NOPD moves forward.

[10]    The practice of a single event being assigned multiple control numbers (item numbers) has been noted in the past and brought to the attention of NOPD.  The Department acknowledges the problem and is working on remediating it.  This practice has a significant adverse impact on supervisors' ability to review the work of their subordinates, including reviewing BWC videos associated with use of force events.



The Department conducted its own review of the facts associated with those 35 cases and had concluded that no force was used in 8 of the 25 cases for which we or they were unable to locate associated use of force reports.  Those findings are different from ours and are a consequence of the historically poor reporting practices of some NOPD officers and of inadequate supervisory review by their sergeants.  Those 8 reports were very short on detail, which should have been caught and remediated at the time by the approving sergeant.[11]

The Department had initiated disciplinary investigations in 14 of the 17 remaining cases, alleging failure to comply with the use of force reporting requirements.  Three of those cases occurred in the 1st District, 2 in the 4th District, 2 in the 5th District, 1 in the 7th District, and 5 in the 8th District.  There were 26 officer and 6 sergeants identified in those 14 cases.  Three officers and 2 sergeants were involved in 2 un-reported use of force events.  ***As of June 1, 2015, none of the investigations had been completed by PIB – a troubling finding of our audit.***

As noted above, these data are somewhat outdated, but should nonetheless be concerning to the NOPD.[12]  The Monitoring Team currently is in the process of conducting a similar use of force analysis using 2015 data for which the 2014 findings will serve as an important benchmark.

### 3.    Supervisor's Investigation of Reported Use of Force

We selected 178 of the 413 reported use of force events occurring in 2014 to review.  We reviewed the investigating supervisor's Use of Force Report, all officer Force Statements in the file, and the Department's response to the use of force.  As pointed out above, since our fourth quarter 2014 Quarterly Report, we gained access to NOPD's Electronic Police Reporting system, the Body Worn Camera video records, and CEW videos. These records enabled us to complete more comprehensive reviews of each use of force event and to identify deficiencies in the investigation by the supervisor and the submission of reports required from the officers.  For each review, we captured up to 96 data elements

---

[11]    The Monitoring Team's Special Report on NOPD Supervision, published early this year, reveals that the Department still has work to do to bring its supervisory functions into compliance with the Consent Decree.  More recently, although improvements in some areas have been noted, the Monitoring Team continues to find supervisory shortcomings in many of the Districts during our monthly district-by-district audits.

[12]    Of course, the data examined by the Monitoring Team reflected *reported* uses of force.  Obviously, *unreported* uses of force need to be assessed by other means.  The Monitoring Team looks for and evaluates unreported uses of force by reviewing BWC video recordings and by reviewing certain types of charges that often are associated with a use of force, such as a *resisting arrest* charge.



to assist us in assessing the completeness and sufficiency of the investigation, and the appropriateness of the finding.

As a reminder, the Consent Decree requires all officers using a Level 1 through 4 use of force, and officers witnessing a Level 2, Level 3, or Level 4 use of force, to write a Force Statement before the end of shift.  As in our earlier review, not all officers complied with the requirement that they submit a force statement when they use or witness a use of force. Table 1 presents the number of incidents where we found force statements from all involved and identified witness officers.  Of the 178 Use of Force files we reviewed, we identified 40 that did not include the required Force Statements from all involved and witness officers.

**Table 1.        Frequency of incidents where all involved & witness officers submitted required force statements**

| Force statement submitted by all officers | $N$ | % |
|---|---|---|
| Yes | 138 | 77.5% |
| No | 40 | 22.5% |
| Total | 178 | |

As reflected above, a force statement was submitted by all involved and witness officers in 67.4% of these incidents.  Thus, in 32.6% of incidents we reviewed in late 2014, a force statement was not submitted by all involved and witness officers.

In most use of force events, more than one officer participated either as an involved officer or a witness.  In the 178 cases we reviewed, force was used by 297 officers with 144 officers witnessing the event.  Table 2 shows the percent of involved or witness officers who submitted the required force statement.  ***A force statement was found for a majority of involved officers (90.6%).***  However, force statements were found for 76.1% of witness officers, where required.  In other words, about four out of every ten witness officers failed to provide a force statement.



**Table 2.    Cross Tabulations of Force Statement Found and Involved and Witness Officers**

|  | Force Statement Found | | | | | Total |
|  | Yes | | No | | | |
|  | $N$ | % | $N$ | % | $N$ |
|---|---|---|---|---|---|
| Officer Involved | 269 | 90.6% | 28 | 9.4% | 297 |
| Officer Witness | 86 | 76.1% | 27 | 23.9% | 113 |
| Total | 355 | 86.6% | 55 | 13.4% | 410 |

As reflected above, a force statement was found for a vast majority of involved officers (90.6%).  No force statement was found for 9.4% of involved officers.  Force statements were found for 76.1% of witness officers in Level 2 – 4 use of force events.  Accordingly, more than 2 out of every 10 witness officers did not provide a force statement (23.9%).  Across all involved and witness officers, a force statement was found for 86.6% and was not found for 13.4%.

We found that officers who stated they did not observe the actual application of force were often not required by the investigating supervisor to submit a force statement.  A best practice, however, is to have every officer present when the force was applied submit a report documenting what he or she saw or heard, even if he or she did not actually hear or see the force being used.  The recently-approved Use of Force reporting policy contains that requirement.[13]

**The NOPD has not yet demonstrated compliance with the use of force reporting requirements required by the Consent Decree, although we remind the reader these data are from late 2014 and early 2015, and NOPD has been working to enhance its record-keeping practices since that time.**

---

[13]    The Use of Force Reporting policy was approved on March 27, 2015.



#### 4.      Quality of Force Statement & Use of Force Reports

In our review, we considered whether the investigation was sufficient, whether the supervisor reported that he or she responded to the scene of the incident, whether the subject was injured, whether the injuries were photographed, whether the incident was recorded (*e.g.,* by a body worn camera, CEW or in-car camera), and more.  We also captured the demographic information contained in the Use of Force Reports, including gender and race.  We followed-up with NOPD on every Use of Force Report about which our initial review raised questions and/or concerns.[14]

We found the files too often were incomplete and, thus, they did not facilitate adequate oversight by the Force Investigation Team or by the Monitoring Team.  Minimally, in addition to the supervisor's Use of Force Report documenting his or her investigation, the file must contain Force Statements from all officers using force and from all officers witnessing the event (where requested or required).  A complete Use of Force Report file also should include a copy of the offense report, copies of all associated video recordings, or pointers to where those files can be located – all evidence required to be collected and maintained by the Consent Decree.  It also should contain copies of hospital treatment records and photos of injuries to officers and subjects.  The reviewing supervisor's use of force report should include a statement indicating his findings of whether, based on the available evidence, the force was justified and within department policy.

The Monitoring Team found few files complete.  In fact, only one file included a video recording of a witness statement, even though forty-seven of the investigative reports indicated a recording was available.  And none of the files included photos of the subjects of the use of force.  As discussed below, it is a requirement of the Consent Decree (CD 86d) (and a common police practice) that photos be taken of all subjects who claim injury, and especially of subjects not injured to preserve evidence that they were not injured.

***Encouragingly, we found improvement in the quality of the files for events occurring late in 2014 and early in 2015***.  We attribute the improvement to the addition of a second sergeant to the administrative section of FIT.  The sergeant has been tasked with reviewing the completeness and sufficiency of the field supervisors' investigations of Level 2 and Level 3 uses of force. ***Her efforts are producing the desired results.***  Her approach is to review the incident report prepared by the involved officers, the force

---

[14]      In July 2015, the Monitoring Team and the NOPD Compliance Bureau worked together to develop an "immediate action form" that now is used by the Monitoring Team to facilitate and track critical issues raised by the Monitoring Team and the responsive actions taken by NOPD.  The Immediate Action Forms are made available to the Court as well.



statements of the involved and witness officers, the field supervisor's use of force report, and the associated body worn camera and/or CEW videos.  She ensures the files are complete and that all required investigative steps have been completed.  When she finds deficiencies, she returns the files back to the investigating supervisor with specific instructions on what further steps are required.  A copy of her memo of deficiencies also is sent to the investigating supervisor's commanding officer, thus enabling the commander to ensure a proper investigation is completed and to provide remedial attention to the supervisor when the supervisors continually has his investigations returned for further action.

### a.      Quality of Force Statements

An officer's Force Statement must include:  (1) a detailed account of the incident from the officer's perspective; (2) the reason for the initial police presence; (3) a specific description of the acts that led to the use of force; (4) the level of resistance encountered; and (5) a description of every type of force used. (CD 78)  Force statements are to completely and accurately describe the force used or observed. (CD 79)  Only 138 of the 178 files contained force statements from every involved or witness[15] officer identified in the incident report and/or the supervisor's use of force report.

The Monitoring Team's review, however, revealed that even when the officer did submit a force statement, it often was short on details.  Deficiencies found included:

- Lack of sufficient descriptions of the presenting behavior that caused the subject to come to the attention of the officer.

- Failure to use accurate and specific descriptive language, instead using "boilerplate" or "pat" language in documenting investigatory stops, detentions, or searches.[16]

---

[15] For our review, we considered an officer to be a 'witness' if she/he was present at the scene when a Level 2 through 4 use of force occurred.

[16] As noted above, paragraph 79 of the Consent Decree prohibits "the use of conclusory statements without supporting detail, including 'boilerplate' or 'pat' language (e.g., "furtive movement" or "fighting stance") in all statements and reports documenting use of force."



- Lack of specific descriptions of the actions of the subject that constituted resistance, for example, using general descriptors such as:

  o "was acting aggressively."

  o "he refused to comply."

- Force statements from two or more involved officers that are nearly identically worded, thus appearing to not be in each officer's own words.

- General terms used to describe the type of force the officer used, for example "used a takedown to control the subject"

- The description of the force used arises to a reporting level higher than the level it was classified as.  For example, reviewing a forcible cuffing as compliant cuffing when the BWC shows two officers struggling to get the subject to submit to cuffing.

### b.     Quality of Use of Force Reports

An *uninvolved* supervisor must investigate all Level 2 & 3 use of force events and detail her/his findings in a Use of Force Report.  As with Force Statements, we found many deficiencies in the quality of the reports completed by the supervisor.  The deficiencies included:

- Failure to mention viewing BWC video.

- Though the supervisor did review the BWC, he fails to include in his narrative whether the video captured the resistance or the officer's application of force.

- Where no BWC video was present because the officer was not assigned one because of the nature of his assignment, the report fails to explain.

- Failure to document that he viewed the Taser video.

- Failure to indicate that he checked availability of MVR video.

- Failure to indicate whether he responded to the scene.

- Internal inconsistencies in describing the actions of involved and witness officers, for example:



- Stating that officer A cuffed the individual at one point in the narrative then that Officer B cuffed the subject later in the narrative.

- Identifying the nature of the injuries differently throughout the narrative.

- At one point stating that officers and subject fell to the ground and elsewhere stating that a takedown maneuver was applied.

- Little or no information on the injury and treatment the subject received.

- Photos of injuries not included in investigative file.

- If photos were not taken, no explanation as to why.

- Failure to report whether he attempted to interview the subject.

- If interviewed, no indication if interview was recorded, or if not, why not.

- No assessment of the event for tactical or training implications.  No assessment of whether the officer attempted de-escalation or if such tactics were feasible.

- Failure to identify and assess missed opportunities for officers to use verbal persuasion or de-escalation techniques before resorting to use of force.

- Failure to reach a finding as to whether or not the use of force was justified and consistent with NOPD policy.

***An encouraging finding is that the FIT sergeant tasked since late October with quality control review over the force investigations conducted by field supervisors is catching these shortcomings and returning the files back to the field supervisors for further action.***  Since early November through the end of 2014, she has returned more than 30 investigative files for further action.  The Monitoring Team has reviewed several of her memos and found they contained very specific assessments of the investigation and guidance on what needs to be done to complete the investigation.  Examples of her instructions are:

- Describe what the subject did that was considered resisting.

- If not injured by the officer, describe how the subject received his injuries.

- Were the BWC videos reviewed?



- Ensure that an FIC was completed.

- Include a finding of whether or not the force was justified.

- Investigation requires:  interviews of the subject and witnesses, photographs of injuries or the lack thereof, if de-escalation techniques were used, the reasonableness of the force used, and if the officer acting within NOPD policy, state and federal laws.

- There is no force statement from Officer "A", there is no mention of photographs of subject, and most importantly his "aggressive manner" needs to be described in detail.

- When an officer is involved in a use of force and they have not been issued a body worn camera a canvass of surrounding businesses and residences could be beneficial.

***This quality control effort is paying off.  We reviewed 14 randomly selected Use of Force report files of investigations of incidents occurring in 2015 and found the investigations much improved.  We found that all involved and witness officers submitted force statements, and the investigating sergeant reported conducting the investigation on the scene in 77% of Level 3 force events.***  There was only one Level 4 use of force in our sample, a case involving taking a cuffed subject to the ground and restraining him by placing a leg against his side to keep him against a wall after he kicked an officer in the chest from his prone position.  It was first reported as a Level 3 force, but upon subsequent review by the FIT sergeant of a BWC video, re-classified as a Level 4. The video shows the subject on the ground with the officer's leg against the side of his neck.  It was subsequently investigated by FIT.

The lack of thoroughness of the supervisors' investigations as documented in Use of Force Reports falls short of being useable for the critical intended purposes of managing use of force by its officers, identifying misuse of force and implementing corrective actions including discipline and training improvements.  But, as noted above, we have seen some recent progress in filling the gaps identified through our use of force analysis.

### C.    Summary of Our Findings on Select Elements of Use of Force Events

### 1.    How events resulting in force were initiated

A police encounter with a citizen can be initiated for several reasons.  The officer can be assigned by police dispatch to a citizen's call for the police.  Or the officer could be driving down the street and be flagged by a citizen.  An officer can observe a crime in progress and take action, even when off duty.  Or officers may learn of an outstanding



warrant or, themselves, obtain a warrant allowing them to search a home or to arrest someone.

Officers also are sometimes assigned to a high crime area and instructed to engage in "proactive patrol," stopping people engaging in suspicious activity. Detectives, when following up on a past crime, often approach individuals known to have committed similar crimes with similar methods. Depending on the attendant facts, officer actions in such encounters can range from conducting a voluntary interview of a citizen, wherein the citizen can refuse to talk to the officer and walk away, to temporarily detaining the citizen while the officer checks him out, or to arresting the citizen when probable cause exists.

For the officer to detain the citizen, he must, minimally, have reasonable suspicion that a person has been, is, or is about to be engaged in the commission of a crime. The officer must be able to articulate the facts that constituted reasonable suspicion and include them in his report.

We looked at how the encounter was initiated in 178 cases from 2014, and, based upon the information documented in the reports, assessed whether the officer had reasonable suspicion to detain or arrest the subject. In 6 of the cases, we found no reasonable suspicion for the officer to stop the subject. Significantly, because the officer's report contained few facts, we were unable to determine with certainty that reasonable suspicion existed in 65 cases. *Each of these cases was referred back to the NOPD for further action.*

The Consent Decree addresses the importance of managing investigative stops, requiring the Department to have in place a robust stop, search, and detention data collection and review system. Officers must capture an array of information for every stop, detention, search, or seizures they undertake and submit the information before the end of shift so that the officer's supervisor can review it. Absent exceptional circumstances, field supervisors are obligated to review investigatory reports within 12 hours of receiving them. If the review identifies any violations or deficiencies the supervisor is further obligated to ensure corrective action is initiated, either through counseling and/or referring the incident for administrative or criminal investigation. (CD 150 & 151)[17]

---

[17] Ensuring field contacts are documented, as required by the Consent Decree, is beyond the scope of this review, but is being reviewed by the Monitoring Team and will be addressed in a forthcoming report. Tracking court outcomes, for all arrests and certainly for arrests involving force, is a best practice for police departments. Such a practice enables the Department to evaluate officer behavior and identify officers who repeatedly stop people without legal justification. Our review did not include comparing Force Statements with reports found in the Field Interview database or following a case forward to learn the disposition in the courts.



Table 3 presents the frequencies for how each encounter was initiated by whether there was reasonable suspicion.  Forty-one percent (74) of the encounters started out as a call for service.  In 63% (47) of those, the officer's Force Statement provided sufficient information to establish reasonable suspicion.  Overall, however, incident reports (EPRs), arrest reports, or force statements in 65 (33.8%) of the 178 cases contained insufficient documentation to allow us to make a determination that reasonable suspicion was presented.

**Table 3.        Cross-tabulation of how encounter was initiated by whether the officer had reasonable suspicion**

|  | Reasonable suspicion | | | | |
|---|---|---|---|---|---|
| How was encounter initiated? | Yes | No | Insufficiently Documented | N/A | Total |
| Dispatched | 47 | 0 | 25 | 2 | 74 |
| Flagged by citizen | 9 | 0 | 5 | 0 | 14 |
| On view | 13 | 1 | 14 | 1 | 29 |
| Proactive patrol | 24 | 4 | 7 | 0 | 35 |
| Follow-up investigation | 5 | 0 | 5 | 0 | 10 |
| Warrant service | 2 | 0 | 0 | 1 | 3 |
| Other | 0 | 0 | 4 | 0 | 4 |
| Off duty | 2 | 1 | 5 | 1 | 9 |
| Total | 102 | 6 | 65 | 5 | 178 |

The following summary bullet points highlight the Monitoring Team's findings as reflected in the forgoing table:

- Most encounters were initiated by the officer being dispatched (41.6%).  Of these incidents, 63.5% (N = 47) involved reasonable suspicion whereas reasonable suspicion was not sufficiently documented in 33.8% of these incidents.

- Fourteen encounters were initiated by being flagged down by a citizen and it was determined that reasonable suspicion existed in 9 of the incidents (64.3%). In the remaining 5 there was insufficient information in the reports to reach a conclusion.

- With respect to "on view" initiated incidents (N = 29), 44.8% had reasonable suspicion sufficiently documented and in 48.3% of the events reasonable



suspicion was not sufficiently documented in the reports. One "on view" initiated incident did not have reasonable suspicion (3.4%).

- 35 encounters were initiated on proactive patrol (19.7% of all incidents). Reasonable suspicion existed in 68.6% of these incidents. However, reasonable suspicion was not documented in 11.4% of the proactive patrol initiated use of force encounters.

- Ten incidents occurred as a result of a follow-up investigation and half involved reasonable suspicion (not determined in the other half of such incidents).

- Three incidents were initiated during a warrant service. Two of these cases had reasonable suspicion and one was classified as N/A.

- Nine use of force encounters occurred while the officer was off duty (5.1% of all incidents). Of these incidents, it was determined that reasonable suspicion existed in two, no reasonable suspicion in one, and one was coded as N/A. Reasonable suspicion has not been determined in five of these incidents.

- With respect to the unit of assignment and the six incidents that did not have reasonable suspicion, Districts 1 and 8 each had one such incident initiated by proactive patrol. Two incidents in the ISB/SGU unit were initiated by proactive patrol and did not have reasonable suspicion. District 5 had one incident initiated by an off-duty officer that did not involve reasonable suspicion. K9 had one incident that was determined not to have reasonable suspicion that was initiated by "on view."

- None of the documents found in the use of force investigation files, that is, the incident report (EPR), the Force Statement, or the Use of Force Report included sufficient documentation in 65 cases to allow us to determine if the officer had reasonable suspicion to stop the subject.  Generally that means that the report was totally void of any explanation of why the officer decided to stop the individual.

## 2.    Outcomes of application of force – Injuries to officer

Most uses of force did not involve injury to the officer.  In fact, in 145 of the 178 cases, the reporting officer reported receiving no injury from the use of force.



**Table 4.      Frequency and type of officer injuries**

| Type of injury | *N* | % |
|---|---|---|
| No injury | 145 | 81.5% |
| Fatal | 0 | 0.0% |
| Gunshot | 1 | 0.6% |
| Hospitalized/non-gunshot | 1 | 0.6% |
| Treated and released/broken bone | 1 | 0.6% |
| Treated and released | 28 | 15.7% |
| Treated by EMT | 1 | 0.6% |
| Declined treatment | 1 | 0.6% |
| Total | 178 | |

The data reflected above reveal that at least one officer was injured in 18.5% of these incidents (N =33). Thus, in 81.5% of incidents no officers were injured. Further, within the incidents where an officer was injured, 84.8% involved the officer being treated and released (N = 28; 15.7% of the total number of incidents).

### 3.      Outcomes of application of force – Injuries to subject

Our review of the late 2014 data revealed supervisors routinely fail to document the extent of injury to the subject of the force, and to take photographs of the injuries. As reflected in Table 5 below, less than half of the arrestees that fell within our review sample were injured in the course of the arrest. The Consent Decree provides that during the investigation of a use of force (other than a Level 1 use of force) photographs of the subject of the force should be taken. (CD 86)  NOPD procedures similarly require that the investigating supervisor shall "ensure that all evidence to establish material facts related to the use of force, including audio and video records, photographs, and other documentation of injuries or the absence of injuries is collected."  The files we reviewed, however, show photographs were infrequently taken following Use of Force events.  As reflected in Table 5 photographs of the subject of the force were taken in only 13 of the investigations, including 3 of arrestees who were not injured.



**Table 5.    Cross-tabulation of the number of arrestees injured by whether photos were taken of the injury**

| | Arrestee injured | | | | | | | | | | |
| | Yes | | No | | Not by PO | | Unknown | | N/A | | Total |
| | *N* | % | *N* | % | *N* | % | *N* | % | *N* | % | *N* |
| Photos taken of injury | | | | | | | | | | | |
| Yes | 10 | 12.5% | 3 | 3.4% | 1 | 33.3% | 0 | 0.0% | 0 | 0.0% | 14 |
| No | 66 | 82.5% | 41 | 46.1% | 2 | 66.7% | 0 | 0.0% | 0 | 0.0% | 109 |
| Unknown | 2 | 2.5% | 2 | 2.2% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 4 |
| N/A | 2 | 2.5% | 43 | 48.3% | 0 | 0.0% | 4 | 100.0% | 2 | 100.0% | 51 |
| Total | 80 | 44.9% | 89 | 50.0% | 3 | 1.7% | 4 | 2.2% | 2 | 1.1% | 178 |

The foregoing data show that a total of 80 arrestees were injured during these use of force incidents.  Of these incidents, only 10 indicated that photos were taken of the injured arrestee (12.5%).  No photos were taken in 82.5% of incidents involving an injured arrestee.  Two injured shown as N/A were force used against an animal, one a snake and the other a dog.

### 4.    Supervisor Responds to the Scene

The Consent Decree requires a supervisor to respond to the scene of every Level 2, 3, and 4 use of force.  Response to the scene of a Level 1 use of force is not required. (CD 84) The recently approved NOPD policy on reporting use of force contains similar requirements with the exception that it encourages the supervisor to respond to Level 1 events, stating "the supervisor shall, if possible, respond to the scene of the event to conduct an on-scene review."

As Figure 2 shows, and as one would expect, the data reveal a correlation between the level of force used and a supervisor's appearance on the scene.  As the force level decreases, a supervisor was less likely to have made an appearance.  Indeed, in the context of a Level 2 use of force, a supervisor arrived on the scene in only slightly more than half of the cases.  In Level 3 events, the on scene presence exceeded 70%.  In the more serious use



of force events, Level 4 force, which include force resulting in serious physical injury or requiring hospitalization, neck holds, force resulting in a loss of consciousness, canine bites, more than two applications of an CEW on an individual during a single interaction or CEW application for longer than 15 seconds, and any strike, blow, kick, ECW application, or similar use of force against a handcuffed subject, the supervisor responded to the scene nearly 80% of the time.  And in those Level 4 cases where the field supervisor was not on the scene, they either involved force against an animal (shot a snake) or the force level was elevated after a preliminary investigation by the supervisor.  In all use of force events that were clearly identified as a Level 4 reporting category from the outset, a first line supervisor responded to the scene and notified FIT.

**Figure 2.        Supervisor Responded to Scene**

## Supervisor Responded to Scene

■ On Scene   ■ Not On Scene

(bar chart: ON SCENE axis 0–40; FORCE REPORTING LEVEL axis)

| | Level 1 | Level 2 | Level 3 | Level 4 |
|---|---|---|---|---|
| On Scene | ~32 | ~22 | ~38 | ~23 |
| Not On Scene | ~24 | ~18 | ~14 | ~6 |

*The Use of Force Reports we reviewed suggest NOPD cannot yet demonstrate compliance with this requirement.*

### 5.        Supervisor Interviews of Subjects of Uses of Force

The Consent Decree requires for all Level 2 and Level 3 uses of force the investigating supervisor must, among other things, interview the subject for complaints of pain after advising the subject of his/her rights, and ensure that the subject receives medical attention from an appropriate medical provider."  (CD 86)

We found that the investigating sergeant interviewed or attempted to interview the subject of the force 56.2% of the time.  In 34.8% of the time the sergeant reports no interview or attempt to interview the subject, though she/he was available to be interviewed.  *These data suggest NOPD cannot yet demonstrate compliance with this element of the Consent Decree.*



### 6. Supervisor's Findings

The supervisor must make a preliminary determination of the appropriateness of the use of force, including whether the force was reasonable and within policy. (CD 87)  Of the 178 Reports we reviewed, 83% clearly indicated the supervisor reached a conclusion regarding the reasonableness of the Use of Force.

Use of force was justified according to NOPD in 80.9% (N =144) of incidents. Of these cases, the OCDM determined that 90.3% (N =130) were reasonable. Thus, 8.3% of cases that NOPD concluded were justified were determined by the OCDM to be unreasonable (N =12) (1.4% of these cases the files were significantly incomplete, such that OCDM was unable to determine reasonableness).

In three cases NOPD determine that force was not justified (OCDM agreed with each finding).  NOPD's findings were unknown in 31 (17.4%) incidents. However, within these cases the OCDM determined that 26 (83.9%) were reasonable and 4 (12.9%) were unreasonable.

Finally, the OCDM determined that a majority of force incidents were reasonable (87.6%; N =156) while 10.7% of incidents were classified as unreasonable (N =19).

The cases of disagreement were discussed with NOPD for further action.

***NOPD has not yet demonstrated compliance with this Consent Decree requirement.***

### D. Critical Firearms Discharges

The preceding analysis deals with lower-level force, including Level 2 and Level 3 uses of force. In such events the involved officer's chain of command conducts the investigation and review. The officer's sergeant, in addition to screening a force incident and classifying the incident, serves as the primary investigator.  For more serious force, including all critical firearms discharges, the Force Investigation Team ("FIT") responds to the scene and conducts the investigation.

A critical firearm discharge is any discharge of a firearm by an NOPD officer, including discharges when no person or animal is struck.  It does not include range and training firings, destruction of animals, and off-duty hunting discharges where no person is struck.  Each critical firearms discharge is subjected to two levels of investigation, one criminal and the other administrative.  All critical firearms discharges are investigated by FIT.  Included in the 178 use of force events reviewed are 11 critical firearms discharges.

Two of the 11 critical firearms discharges resulted in fatalities. In another case the subject received a non-fatal graze wound to the head.  In five of the shootings, no one was



hit.  Two of the other cases involved animals. In one of those an officer shot a snake he found in his back yard, in the other an off-duty officer shot a dog he claimed was attacking his family. In the last case, an officer negligently discharged a found rifle he was unloading before submitting it to the NOPD property clerk.  The below table represents data on the eight deadly force events involving human subjects.

**Table 6.        Use of Deadly Force**

|           | Subject Armed | Subject Not Armed | Total |
|-----------|---------------|-------------------|-------|
| **Fatal**     | 2 | 0 | 2 |
| **Non-Fatal** | 0 | 1 | 1 |
| **Not Hit**   | 3 | 2 | 5 |
| **Total**     | 5 | 3 | 8 |

One of the fatal cases is the widely publicized ambush of an officer working a detail at a fast food restaurant.  Though he was ambushed and seriously injured, he returned fire at his assailants, one of whom later died of his injuries.  The other involved an armed subject who pointed a firearm at a pursuing officer.  Weapons were recovered in both cases.  Both investigations were presented to the District Attorney's Office for review.  No criminal violations were lodged against the involved officers.  Additionally, the Department's Administrative investigation found no violations of Department rules or regulations.  The Monitoring Team concurs with the finding in both cases.

In the case in which an unarmed subject received non-life threatening injuries, the case was not presented to the District Attorney's Office for review.  The FIT criminal investigation concluded that "based on the evidence collected and witness officer's statement" the subject "grabbed [the officer's] handgun during the struggle. . . ." The criminal investigator concluded that she "did not find probable cause to charge" the officer with a criminal offense.  Though the investigative file reports that the matter was presented to the District Attorney's Office for screening for charges against the arrestee, it makes no mention of seeking an opinion from the District Attorney's Office on the conduct of the officer.

The administrative investigation found no fault by the officer for the discharge, though the officer was investigated for failure to wear her body worn camera.  The incident occurred on August 11, 2014; the administrative investigation was completed on April 22, 2015.  The administrative investigation concluded that: "There is no evidence to suggest that [the officer's] use of deadly force was unreasonable or violated any departmental policies or procedures".  OCDM found the administrative investigation deficient in several



ways.  It did not addresses the poor tactics used by the officer that placed her into a situation where she ended up struggling with the subject, causing her weapon to discharge and graze the subject's head.  She approached the subject with her pistol in one hand and her cuffs in the other.  We discuss the poor quality of the administrative investigations later in this report.[18]

### E.    Quality of FIT Investigations

FIT is divided into two units, FIT Criminal and FIT Administrative.  Both FIT Criminal and FIT Administrative respond to the scene of a critical firearms discharge and conduct independent but parallel investigations, with FIT Criminal initially taking the lead.  The following sections provide our findings on the general quality of the investigations by NOPD's Force Investigation Team.

### 1.    Criminal Investigation

The quality and rigor of the investigations by FIT Criminal were found to be objective, thorough, and fastidious. The investigations were like any homicide investigation conducted by a competent, experienced homicide investigator.  Each investigation began with a timely response to the scene of the event, securing the scene, isolating the involved officers and any witness identified at the outset, and collecting the evidence.  If not already obtained before the FIT investigator arrives, the investigator obtained a public safety statement from the involved officers. The search for physical evidence was thorough.  Witness canvasses were done, not only the day of the incident but in some cases a second canvass was done a day or more later to locate people who may have been reluctant to answer their door the day of the incident.

Group interviews were avoided.  Interviews with officer and citizen witnesses were recorded, as were interviews of the officer who fired his/her weapon.  The investigators avoided asking leading questions.  Leads developed through interviews were followed up.

Body worn camera, conductive energy weapon, and mobile video recording videos were preserved and reviewed by the investigators.  Canvasses for business or residential cameras that may have captured the incident are routine, and any videos located were preserved, reviewed and considered in the investigative summary.

---

[18]    Since the Monitoring Team brought these concerns to the attention of the NOPD, we are pleased to report that members of the Department's Force Investigations Team and Compliance Bureau have been working closely and constructively with the Monitoring Team to develop investigation guides and checklists to ensure these gaps are remedied in future investigations.



In cases when the subject was shot, the weapon was secured, inspected for the number of rounds and subjected to firearms examination and ballistics testing. The officer's weapons training records were checked. Hospital records and, in fatal cases, autopsy reports were collected and reviewed. The shooting scene was thoroughly photographed and searched with the aim of recovering all ballistic evidence, including shell casings and bullets.

The investigators reviewed all evidence, including crime scene, physical, ballistic and forensic evidence, and witness statements in reaching a conclusion. When there are conflicts between physical evidence and statements, or between the statements of one witness with another, the investigative summary addressed and resolved them.

The thoroughness of the investigations was shown in one case where an officer alleged the subject was armed with a pistol and pointed it at him. The search conducted in the immediate aftermath failed to locate any weapon, thus leaving some doubt of the officer's report. The location of the event was a large field overgrown with weeds. The FIT investigator subsequently obtained the assistance of an ATF canine team trained to locate weapons and conducted a search of the field where the subject was last observed. The search recovered a pistol fitting the description of the weapon the officer said he observed.

### 2. Administrative Investigations

Our review found that administrative investigation commenced at the same time as the criminal investigation, and, generally proceeded on a parallel track to a point. The lead FIT administrative investigator responded to the scene of the shooting and actively assisted in the investigations. Generally, the lead FIT criminal investigator controlled the scene and gave assignments to other FIT investigators, including the lead FIT administrative investigator. In different incidents and at different times, the FIT administrative investigator, for example, assisted in preserving the incident scene and gathering evidence, identifying involved and witness officers, conducting canvasses for witnesses, canvassing for security system videos, and interviewing the injured or otherwise involved offenders. Generally, the administrative investigator was fully involved in the investigation from the outset. At the early stages of the investigation, however, the FIT administrative investigator refrained from interviewing the officer who used force, leaving that task to the FIT Criminal Investigator.

***Unlike our findings in criminal investigations, the reports of the Administrative investigation in these 11 Critical Firearms Discharges, disappointingly, were deficient in several ways.*** Though the administrative investigator was fully engaged at the outset of each investigation and was instrumental in gathering evidence used in reaching a conclusion in both the criminal and administrative review of the conduct of the involved officers, the level of assessment of the actions of the involved officers in relation to NOPD



policy, training and approved tactics, as documented in the administrative investigators report, were almost nonexistent.

Throughout 2014, we had conversations with FIT's commanding officer about the status of the administrative investigations, making it clear that we needed access to the administrative investigation file as well.  We were informed that each administrative investigation was being attended to and further assured we would be given the file for review once the administrative investigation and investigative summary reports were completed.  Though we had expectations that the administrative investigation summaries would be available for review in a timely manner, we learned early in 2015 that only 3 were available.

When we finally demanded copies of the 8 other administrative investigation files, in whatever degree of completion they were in, we were informed that they were maintained by the FIT commanding officer, who had since left the department.  FIT staff were unable to locate any administrative investigation reports for the 8 cases.  We finally received the investigations, all dated between April 22-30, 2015.

### Table 7.        Critical Firearms Discharges -- NOPD Investigations

| Incident | Occurred | Criminal Investigation Completed | Administrative Investigation Completed | Use of Force Finding | Sent to DA for Review |
|---|---|---|---|---|---|
| 1 | 5-Jan-14 | | 27-Apr-15 | Justified | No |
| 2 | 15-Jan-14 | 12-Mar-14 | 3-Apr-14 | Justified | No |
| 3 | 30-Jan-14 | 2-Mar-14 | 22-Apr-15 | Justified | No |
| 4 | 14-Feb-14 | 17-Feb-14 | 22-Apr-15 | Accidental | No |
| 5 | 15-Feb-14 | 24-Mar-14 | 24-Apr-15 | Justified | No |
| 6 | 16-Feb-14 | | 14-Oct-14 | Justified | Yes |
| 7 | 10-May-14 | 23-Jul-14 | 24-Apr-15 | Justified | Yes |
| 8 | 11-Aug-14 | | 22-Apr-15 | Justified | No |
| 9 | 6-Sep-14 | | 17-Oct-14 | Justified | No |
| 10 | 14-Sep-14 | | 22-Apr-15 | Justified | Yes |
| 11 | 21-Dec-14 | 6-Mar-15 | 30-Apr-15 | Justified | No |

The reports received followed a format, we learned, that was created by the former commanding officer.  After a summary of the evidence, identical to the summary found in the criminal investigation, each report addressed only the following issues:

- The functionality and state of the Involved Officer's weapon.

- The P.O.S.T.-mandated firearm qualification status of the Involved Officer.



- Causation for the Involved Officer's use of deadly force.

- A conclusion by the FIT investigator on whether or not the force was justified and within policy.

It was clear that the reports were assembled in haste to meet our demand.  In one case, text from the report of one incident appeared in the report of an unrelated incident, as if it were cut and pasted.  The focus of each report was limited to the above areas of accountability.  There were no discussions of the decisions made by the officer that caused her or him to be placed into a situation where the use of force was unavoidable.  For example, in the case when the subject received a graze wound to his head, the reported tactic of the officer who approached the subject with her gun in one hand and her handcuffs in the other was not thoroughly assessed for compliance with NOPD training or safe practices.  As reported earlier, the investigator incredibly concluded that "there is no evidence to suggest that [the officer's] use of deadly force was unreasonable or violated any departmental policies or procedures."

In two of the cases found to be justified by the administrative investigation, OCDM disagrees with the findings.  In one an officer fired one round at a vehicle occupied by three people.  No one was hit and no arrests were made. Based on the officer's statement, the threat from the subjects was passed when he fired his weapon.  He did not report they were armed, only that as they hurried to leave the parking lot they swerved toward him.  The vehicle's right front bumper cover made contact with his right thigh and knocked him to the ground.  At first he reported he was not injured but later decided to go to the hospital where he was examined and released.  At the time he fired at the vehicle, the threat to him was over.  The vehicle sped off and was never seen again.

In the other incident, an officer was flagged down by a woman who told him a suspicious person was knocking on doors.  The officer located the suspect and attempted to speak with him.  The suspect turned toward the officer and 'displayed a defensive posture.'  The officer deployed his TASER at the suspect but it had no effect.  The suspect began to advance toward the officer who then drew his firearm and ordered the suspect to the ground.  A scuffle ensued during which the officer struck the male twice in the head with the gun 'to create distance.'  The pistol discharged, striking no one.  The officer was then assisted by a citizen and eventually gained control of the suspect.  The officer did not report seeing a weapon nor was any weapon recovered. Based on the facts documented in the investigation, the officer was not justified in drawing and pointing his weapon.  Furthermore, using a pistol as a striking weapon is an unacceptable tactic, and striking the subject in the head is prohibited unless deadly force is justified.

The administrative investigation in the first case resulted in a sustained finding for multiple rule violations, none related to the firing of the pistol.  The officer was charged with violating secondary employment and timekeeping policies.  He resigned before any



discipline could be carried out.  In the second case, the administrative investigation found no rule violations.

The impact of a critical firearms discharge on the citizen and the officers, whether involving a fatality, injury or no injury, is not inconsequential. While it may not be possible to avoid such events completely, much can be learned from conducting a comprehensive analysis of such events.  Identifying each critical decision points within the event and examining the options that were available to the officer, based on what he knew at the time, could contribute to improvements in policies, training, and tactics, and thereby enhance officer safety and reduce harm to citizens.  It could result in a prescriptive intervention with the involved officers to enhance their decision-making and skills.

The focus of any administrative investigation, whether it be an investigation into a use of force or into an allegation of misconduct, must not be restricted to identifying policy or rule violations and discipline; the focus must be broader to include assessment of current policies, training and equipment.[19]

An officer-involved shooting is best analyzed from the point the police officer is made aware of a need to respond. Each key strategic or tactical decision by the officers thereafter should be identified and subjected to a thorough review in which alternatives are considered.  The process has to be structured, of course, and the reviews must ensure they consider only facts discernable before the application of force. We found none of this kind of review in the investigations of the critical incident we reviewed.

### 3.    FIT Administrative Section Investigation Guide

On July 24, 2015, PIB appointed a new leader of the Force Investigations Team, Lt. Kevin Burns.  The Monitoring Team has been working closely with Lt. Burns since his appointment and has been impressed by his ideas, his commitment, and his energy.  As one example of his commitment to facilitate compliance with the Consent Decree, on September 3, 2015 (subsequent to this reporting period, but worthy of mention here), Lt. Burns prepared and submitted a revised FIT Administrative Section Investigation guide.  The guide was designed to facilitate more thorough and compliance FIT administrative investigations.  The Monitoring Team reviewed the guide, provided constructive feedback, and encouraged Lt. Burns to "test" it by using it to complete an administrative investigation on a case for which the criminal investigation already was completed previously.  .  While we expect the test will identify additional opportunities for improvement, the Monitoring Team found the current draft well thought-out and well-written and a significant improvement over prior materials.

---

[19]      NOPD's PIB has indicated full agreement with the Monitoring Team in this regard.



F.      **Force Factor Analysis**

As we have explained in earlier reports, it is important to understand police use of force in the context of suspect resistance.  The relationship between the degree of resistance and the degree of force is an accepted methodology known as the "Force Factor."  In the current case, The Force Factor relies on official police reports and is used to compare only the maximum level of force used by the officer to the maximum level of resistance encountered.  Other uses of the Force Factor include exploring the phases or iterations of an event that involves force.  To calculate the Force Factor in our report, we coded each use of force event (Degree of Resistance 1 – Degree of Resistance 7) and degree of force (Degree of Force 1 – Degree of Force 7) each scale goes from low to high.  A negative value indicates a higher level of subject resistance as compared to the level of officer force.  A value of 0 indicates proportional force to the level of resistance.  Positive values indicate increasing levels of force being used vis-à-vis the level of subject resistance.  Negative values indicate less force vis-à-vis the level of subject resistance.  One expects to see most uses of force in the -1 to +1 range.  In other words, one expects the level of officer force applied to be equal to or no more than one step beyond the level of subject resistance.  Before we explain our findings, it is important to provide the necessary qualification.

*The Force Factor does not provide an assessment of the reasonableness of the officer's decision to use force in any given situation*.  In other words, the Force Factor does not explain or justify any use of force.  Those issues are determined by The Monitoring Team based on a review of the totality of the available evidence, including reports, witness statements, video recordings, and more; not on a statistical analysis.  As noted above, this finding reflects only the official information reported by the police department.  Obviously, police uses of force not reflected in Use of Force Reports are NOT reflected in our data.  Likewise, Use of Force Reports that include inaccurate accounts of the events could skew the results of our assessment as well.

The Force Factor is calculated simply as follows:

$$Officer\ Force\ Applied - Subject\ Resistance = Force\ Factor$$

A negative value indicates a higher level of subject resistance as compared to the level of officer force.  A value of 0 indicates proportional force to the level of resistance.  Positive values indicate increasing levels of force being used vis-à-vis the level of subject resistance.  Negative values indicate less force vis-à-vis the level of subject resistance.  One expects to see most uses of force in the -1 to +1 range.  In other words, one expects the level of officer force applied to be equal to or no more than one step beyond the level of subject resistance.  Our Force Factor assessment gave us the following results.



**Figure 3.    Percent of Use of Force Incidents by Force Factor**



This figure presents the percent of use of force incidents by the calculated force factor (i.e., officer force – subject resistance). A majority of incidents have a force factor between -1 and +1 (77%). Only 9.5% of incidents had a force factor of -2 or lower and 13.5% had a force factor of +2 or higher.  In other words, instances of potential disproportionate force to resistance existed, but did not dominate the data we reviewed. Importantly, ***this finding does not provide an assessment of the reasonableness of the officer's decision to use force in any given situation.***  The Monitoring Team based those assessments upon a review of the totality of the available evidence, including reports, witness statements, video recordings, and more; not on a statistical analysis.

Further, as noted above, this finding goes only as far as the data reviewed. Obviously, police uses of force not reflected in Use of Force Reports are NOT reflected in our data.  Likewise, Use of Force Reports that include inaccurate accounts of the events could skew the results of our assessment as well.

While it is not our place to tell NOPD how to analyze and use its evidence and data on the use of force, as we have been creating a general Force Factor score, we believe NOPD can take our preliminary figures, expand them, and create Force Factor scores for Districts,



assignments, and even calls for service.  Once these scores are created, NOPD can determine which areas, districts and calls for service are in need of the most attention in managing use of force in terms of training, supervision, and accountability.



## IX.    VEHICLE PURSUITS

Paragraphs 30 and 31 of the Consent Decree deal with Vehicle Pursuits.  Among other things, paragraph 30 prohibits vehicle pursuits

> except where an officer obtains express supervisory approval, and the officer and supervisor have considered multiple factors and determined that the immediate danger to the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large.

Paragraph 31, on the other hand, focuses on the tracking and analysis of vehicle pursuits. Specifically, paragraph 31 requires that NOPD

> track and analyze vehicle pursuits, including the violation that prompted the pursuit; the officer(s) involved in the pursuit; the supervisor approving the pursuit; the outcome of the pursuit; any officer, suspect, or bystander injuries or deaths; property damage; and related criminal or civil legal actions.

The Consent Decree further requires that vehicle pursuit data and analysis "be included in the EWS [Early Warning System] and in NOPD's Use of Force Annual report."

The Monitoring Team reviewed NOPD's data relating to vehicle pursuits from January 2014 and February 2015.  ***Our review shows that NOPD has improved its data-keeping function, but needs further improvement***.  Specifically, NOPD records each pursuit as a data element, but does not yet capture the specific reason for the pursuit, and does not capture whether or not a supervisor approved the pursuit.  See Appendix 1.  While there have not been a great number of pursuits, it is important to determine whether or not the ones conducted are within the NOPD policy.  These data can serve as a baseline for future monitoring.

Appendix 1, Tables 11 - 16 provide the data underlying the Monitoring Team's vehicle pursuit analysis.  While the data speak for themselves, here is a summary of some of the more notable findings:

- 21 of the 66 (32%) pursuits that occurred between January 2014 and February 2015 were prompted by felony crimes (and hit and runs).  The data



maintained by NOPD, however, do not provide insight into whether the crime was a violent felony.[20]

- 27 of the pursuits that occurred during this period were prompted by traffic violations or misdemeanors.  While one would not expect a vehicle pursuit in these circumstances, additional data would help NOPD make that determination for itself.

- Roughly 25% of pursuits in 2014 resulted in some degree of property damage.  In the first 2 months of 2015, *at least* 40% of pursuits resulted in property damage.  No charges were filed against any of the officers, or the city of New Orleans, for pursuits occurring between January 2014 and February 2015.

- About 65% of pursuits in 2014 resulted in the suspect stopping voluntarily.  About 45% of pursuits in 2014 resulted in the suspect stopping, but then fleeing on foot.  In January and February of 2015, 50% of pursuits resulted in the suspect stopping voluntarily (at least 4 of whom then fled on foot).

- Almost 10% of pursuits in 2014 resulted in either the suspect being involved in a collision or the officer's car being disabled.

- NOPD terminated roughly 12% of pursuits in 2014.  NOPD terminated 30% of pursuits occurring in January and February 2015.  More specificity would be helpful here as well. In some cases the data indicate that the pursued vehicle stopped, but nothing further. Other cases were more specific— indicating what happened after the vehicle stopped (*e.g.*, suspect fled and escaped, or suspect fled and was arrested).

In the future, NOPD should explore the possibility of including, in addition to the greater specificity of the underlying crime as noted above, the characteristics of the officer (age, gender, race, shift, squad, experience, etc.) to see if any patterns emerge with respect to the reasons for initiating the pursuits and the pursuit outcomes.[21]

---

[20]   While NOPD's Vehicle Pursuit policy authorizes a vehicle pursuit only in the case of a violent felony, it is important that NOPD collect data on all vehicle pursuits whether or not within policy.

[21]   NOPD has created an internal system to capture these data.  The system includes a new vehicle pursuit form created in consultation with the Monitoring Team, which will be released concurrent with the Department's new vehicle pursuit policy.



### X.    CRISIS INTERVENTION TEAM

Section IV of the Consent Decree deals with the establishment of a Crisis Intervention Team ("CIT") within the NOPD.  According to the National Alliance on Mental Illness ("NAMI"), a CIT program is a "local initiative designed to improve the way law enforcement and the community respond to people experiencing mental health crises."  The Consent Decree requires NOPD to stand up a CIT and implement an effective crisis intervention structure in order "to minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder."

In our fourth quarter report for 2014, we found NOPD had made almost no progress toward complying with its CIT obligations during the reporting period.  We noted, however, "subsequent to this reporting period, the NOPD Consent Decree Implementation Unit, with the urging of the Monitoring Team, has begun pushing NOPD forward in this area."  Specifically, we noted "a Crisis Intervention Team Planning Committee has been formed and plans to meet in January 2015."  OCDM December 2014 Report at 10.

As noted in our last report, NOPD stood up its CIT Planning Committee and held a kick-off meeting in early 2015.  The meeting was facilitated by Mr. Danny Murphy of NOPD's Compliance Bureau, and was attended by NOPD managers, EMS professionals, two judges, Coroner Jeffrey C. Rouse, M.D., senior management of the Metropolitan Human Services District, and a number of community health care experts.  The Monitoring Team attended the meeting and was ***very impressed***.

Subsequently, the Monitoring Team has closely monitored the progress of the implementation of the CIT program.

Since our last report, NOPD has held multiple CIT Planning Committee meetings, developed a CIT policy and a crisis transportation policy, held a "train-the-trainer" session in May taught by Dr. Randy DuPont (the "father" of the modern CIT program), created a special email address to make it easier for officers to find out about and become involved in the program, and, most recently, conducted the first week-long CIT training for volunteer NOPD officers.

CIT participants are selected from among the various NOPD districts and platoons.  To help generate interest, NOPD's Compliance Bureau, its Officer Assistance & Support Director, and its recently-appointed CIT program manager visited the various police districts throughout the City to describe the program, its benefits to officers, their families, and the community, and the process to become involved.

To become a CIT officer, one must apply and be accepted into the CIT program.  Each interested officer must go through a panel interview developed in accordance with the "Memphis Model."  Each officer must be in good standing, have a supervisor



recommendation, and undergo a PIB review.  CIT participants receive no extra money, but they do receive a CIT lapel pin, extra training, and, it should not be forgotten, the opportunity to serve the community and their fellow officers in a way most other officers cannot.  Each CIT officer goes through 40 hours of special CIT training, the first session of which took place in late August.

The Monitoring Team reviewed the training conducted in late August and found it to be well thought-out and smartly implemented.  Here is a summary of the training:

- **DAY 1**.  Monday began with an introduction to Crisis Intervention concepts, language, and the structure of the program led by the newly-assigned CIT program director Sgt. Marc Hedgemon.  Following this half hour introduction, the newly appointed CIT team member Cecile Tebo taught a segment on the signs and symptoms of chronic mental illness.  Following a lunch break, the students heard from two medical experts who focused on developmental disabilities and personality disorders.  Finally, Day 1 ended with a legal discussion led by Ms. Tebo.

- **DAY 2**.  Tuesday started with a discussion of legal issues and NOPD's pending CIT policy followed by a series of field trips to five community facilities, including University Hospital, the Veterans Center, and others.

- **DAY 3**.  Wednesday opened with training on substance abuse and law enforcement followed by a discussion of medical issues led by New Orleans EMS.  The rest of the third day focused on crisis intervention techniques, in many ways the core of the CIT training.  The techniques were taught by Sgt. Hegemon, a long-time police officer and a registered nurse, and are based upon the CIT model pioneered by Dr. Dupont and others in Memphis.

- **DAY 4**.  Thursday included several modules focused on specific "consumers" of mental health services.  The morning began with a presentation by the National Alliance of Mental Illness (NAMI) called "In Our Own Voice."  The NAMI presentation is designed to "change attitudes, assumptions and stereotypes by describing the reality of living with mental illness."  Following the NAMI discussion, the instruction moved to educating students about the resources available to police officers and consumers with respect to homeless assistance, veteran mental health assistance, and special assistance for children and adolescents.

- **DAY 5**.  Friday focused on role playing, a critical element of the Memphis model of teaching crisis intervention.  The students and instructors spent most of the day practicing, critiquing, and honing the various crisis intervention skills learned throughout the week.  The students also had the



opportunity to watch and discuss a BWC video recording of a recent successful NOPD intervention.[22]  Following the program, a modest "graduation" ceremony was held to recognize the students' accomplishment.

The Monitoring Team interviewed several CIT candidates prior to the August training and was impressed by their commitment to – and, frankly, their excitement about – the program.  We then interviewed several additional officers following the training to gain their perspective of the quality of the training.  All felt the training was important, engaging, and well-presented.[23]

So far, 24 officers have taken and passed the new CIT training and now are designated as CIT officers.  Future training sessions are being scheduled for November 2015, the Spring of 2016, and the Fall of 2016.  ***NOPD is on target to have 20% of its patrol officers CIT trained by August 2016.***

Our one criticism of the CIT program was that the current program manager, Sgt. Marc Hedgemon, initially had been given substantial new responsibilities, but had not been relieved of any of his current supervisory responsibilities.  Just prior to the publication of this Quarterly Report, however, this changed.  Sergeant Hedgemon now has been detailed to the CIT program until mid-November to help ensure the CIT program is fully operational.  This is an important and welcomed change.  No matter how much energy Sgt. Hedgemon has – and from our many interactions with him over the past two years, he has quite a lot – the task likely would have proven to be too much for one, part-time manager. The CIT program, for now at least, requires a full time manager to deal with the various training issues, logistics issues, roll out issues, and major reporting, data collection, and data analysis issues.

---

[22]   The Monitoring Team commends NOPD for its use of recent BWC videos in the CIT training.  The Monitoring Team for some time has been pushing for a similar use of BWC videos at the Academy, and is impressed by the CIT's leadership to do precisely that without our prompting.

[23]   Representative comments from the CIT officers regarding the recently-conducted training include the following:  (A) "The class was very helpful and I can see where a lot of these methods, more specifically de-escalation, can be used in a variety of ways in regular every day patrolling and service calls."  (B) "The training was amazing!  Sincerely, thank you for considering me for this class. We need more of this type of training.  Not only will it improve community relations, but I absolutely believe that if we put this practice into use, we will have far fewer use of force incidents. Thank You!"  (C) "I was very pleased with the training.  It shed a light on the severity of the mental illness problem we have here."  (D) "One highlight for me was the sharing of the stories from the persons who suffer from a mental illness. A personal account of what it is like to live with [a mental illness] gave me a better understanding."



In short, we continue to be impressed by the work NOPD is doing in this area.  The commitment of those involved, the thoughtfulness of the program's structure, and the quality of the materials is obvious.  ***Notwithstanding a slow start, NOPD now is well on its way toward full compliance with the Consent Decree's CIT requirements.***



## XI.   POLICING FREE OF GENDER BIAS

As noted above, on November 12, 2014, the New Orleans Office of Inspector General released the results of an inquiry into sex crime investigations by five detectives in the Special Victims Section of the New Orleans Police Department.  The OIG Investigations Division reviewed 90 randomly selected NOPD sex crime related reports, and found, among other problems, significant concerns with 23 reports from five detectives.  The Monitoring Team has been closely observing the NOPD's response to the OIG findings since November, including regularly meeting with the OIG, reviewing the results of NOPD's re-investigations, and monitoring PIB's ongoing investigations of the detective's implicated in the OIG's report.

In November 2014, as a result of the OIG's troubling findings, Mayor Landrieu appointed a Task Force, led by NOPD Commander Paul Noel, to reinvestigate the cases included in the audit.  The Mayor also directed Chief Harrison to make immediate reforms to ensure the events described in the OIG's report could never happen again.  The Mayor's Advisory Committee sought input from survivors, advocates, the DA's office, and from within the Department to identify systemic problems and to offer solutions.

On August 11, 2015, the Mayor held a press conference to report the results of the work of the Advisory Committee.  Among the structural and practical improvements NOPD has implemented are the following:

- NOPD assigned two new detectives and one new supervisor to the Sex Crimes and Child Abuse units, and Chief Harrison committed to doubling the size of both units as the Department grows.

- Sex Crimes and Child Abuse detectives no longer may be a part of the rotation for special events duty, a change which keeps detectives focused on investigations and allows an already short-staffed office more time to do investigation work.

- Detectives now have pre-approved authorization to work overtime when necessary to conduct adequate investigations, a change that will help ensure detectives do not improperly hurry their investigations.

- NOPD has provided detectives with new equipment to assist in their investigations of sex crimes, including new vehicles, smart phones, digital cameras, and laptops.

- New policies have been drafted and currently are being reviewed by the Department of Justice and the Monitoring Team.



- The Department has strengthened supervision by requiring regular, detailed case review, using an investigative checklist, as well as by conducting a qualitative review of taped interviews.

- New training modules have been developed for sexual assault, and detectives are now required to receive 32 hours of specialized training, including individualized training in interviewing skills.

- All officers in the department, and all new recruits, now will receive four hours of training on sexual assault response based on national best practices.

- The Department has hired a third DNA analyst at the State Crime Lab to more quickly process rape kits.

- To avoid any future backlogs, the department has tightened its policies on sexual assault kits, requiring that DNA request forms be submitted to the DNA officer within 24 hours and written reports be provided to explain any delays in submission.

The Monitoring Team has confirmed the foregoing corrective actions have been implemented.[24]  We are in the process now of evaluating whether those actions are being implemented effectively and are having the desired outcome.

In addition to the foregoing enhancements, the Advisory Committee recommended and the NOPD accepted a number of changes focusing specifically on the survivor of the sexual assault, including housing the NOPD sex crimes unit in the NOFJC where victims who meet with detectives immediately can connect with counseling and other victim resources. Further, (a) the NOPD is currently hiring three social workers to respond with detectives to assist with victim follow-ups, (b) a representative of victim advocates soon will be involved in selecting detectives who will be assigned to the sex crimes unit, (c) in order to attract and retain the best detectives in the SVU, a 5% incentive pay increase will be proposed in the 2016-2017 budget, and (d) to expedite the clearing of the current backlog, the current backlog of 180 SAKs will be tested at a private lab.

---

24    We should add here a word concerning the quality of the policy drafting process that led to the new policies referenced above.  According to Dr. Tania Tetlow, a member of the Mayor's Task Force and the former director of the Domestic Violence Center at Tulane University, the process by which NOPD crafted the new policies was excellent.  The Department engaged outside experts and advocates who worked hand-in-hand with the Department's and the City's own resources.  The Department of Justice likewise commended the policy drafting process.  It was an impressive example of multiple stakeholders working together to solve a critical important problem.



## XII.   COMMUNITY ENGAGEMENT (CD 223-233)

### A.   Community Engagement Survey

The Consent Decree requires NOPD to support community groups in each District and to meet regularly with the communities each District serves. (CD 227)  The Monitoring regularly meets with and surveys community- and faith-based organizations to determine if NOPD is meeting this obligation.  Earlier this year, the Monitoring Team distributed an electronic questionnaire to neighborhood and community leaders and/or administrators about their relationship and interaction with the NOPD.  The questionnaire was distributed electronically or hand-delivered to 627 neighborhood and civic associations,  non-profit organizations, and faith-based institutions.[25]  Following the initial distribution of the questionnaire, each organization was contacted by telephone (where a telephone number was provided) or in person and asked to participate in the survey.  Ultimately, 76 organizations responded to our questionnaire.

The organizations represented neighborhood and civic associations, community-based organizations, direct service providers, non-profits institutions and faith-based institutions with organizational missions as detailed in the table below.



---

[25]     Neighborhood Associations were taken from the City of New Orleans' Office of Community Engagement webpage  (http://nola.gov/neighborhood-engagement/organizations/).



Of the 76 responding organizations, 60% noted faith-based missions and 16% indicated quality of life as their organizational charge.  Direct service providers accounted for 15% of the total and other non-profits represent 9%.

The respondents were asked about the geographic area they serve and the NOPD District that serves their organization.  All eight NOPD Districts were represented in the survey outcomes as detailed below.



Among other things, each respondent was asked about the importance of having a good relationship between the NOPD and their organization, and each advised that a relationship with NOPD is important or very important.  When asked to describe the relationship between their organization and the NOPD, responses ranged from very good to poor as illustrated below, with most indicating they had a "very good" relationship with the NOPD.





Most respondents (49%) reported a good or very good relationship with the NOPD. A third (33%) described their relationship as working (i.e. working relationship, getting better, could be better, cordial, etc.) and 17% characterized the relationship as poor (i.e. mistrustful, strained, unapproachable, antagonistic, disrespectful, etc.).

When asked if they believed the NOPD to be responsive to requests for information or assistance, respondents overwhelmingly characterized the NOPD as responsive, with 85% advising that the NOPD is responsive or very responsive, 12% advising that the NOPD is somewhat responsive and only 3% characterizing the NOPD as unresponsive.

Respondents were asked if representatives of the NOPD participate in their events and if they participate in events sponsored by the Department with similar results as illustrated below.





Here again the overwhelming majority of respondents indicated that the NOPD participates in their events and activities and that they are invited to and participate in events and activities hosted by the Department at 79% and 78% respectively.

When asked for recommendations to improve NOPD support of community organizations and constituents/members, 40% of respondents recommended outreach and communications (accessibility, better communications, more engagement, come out and meet the businesses, participate in community, etc.) and 10% specifically recommended more community policing. Twenty-nine percent of respondents recommended more patrols and 21% advised that the NOPD does a good or great job and had no recommendations for improvement.





The results of our questionnaire are generally consistent with our team's own observations.

### B.    Availability of Information

The Consent Decree also required the City and NOPD to make complaint forms and informational materials, including brochures and posters, available at appropriate government properties, including, at a minimum, NOPD headquarters, District stations, NOPD and City websites, City Hall, courthouses within New Orleans, all public libraries, the IPM, the Orleans Public Defenders, and at the offices or gathering places of community groups.  Our last quarterly report revealed NOPD was not in compliance with these requirements.  ***We are pleased to report, NOPD took a major step forward this past quarter***.

Earlier this year, the Monitoring Team conducted unannounced site visits to the various NOPD Districts, as well as to NOPD Headquarters, the Public Integrity Bureau (PIB), and City Hall to determine the availability of complaint forms and relevant informational materials.  All NOPD district locations with the exception of the 5th District were able to provide a written copy of the complaint form.  The 5th District provided a pamphlet describing the complaint process.  Complaint forms also were available at PIB and NOPD Headquarters.

Relative to accessibility, only the 3rd, 7th, and 8th Districts and Headquarters had complaint forms in plain sight.  As well, the complaint pamphlets at the 5th District were in plain sight.  At all other locations the forms had to be requested from NOPD Personnel, but were provided when requested.



Of the eight Libraries visited, only two (Broad Street and Napoleon Avenue) provided complaints forms. Of the government locations, the Independent Police Monitor (IPM) provided a copy of the complaint form and City Hall provided a copy of the pamphlet. Complaint forms were not available at Criminal, Juvenile or Traffic Court buildings.

While NOPD is not yet in full compliance, it has shown great improvement from our prior assessment. Its progress in the area of posting and maintaining "permanent placards at all police facilities describing the external complaint process" (CD 386), however, was less great. Our site visit of all NOPD Districts, as well as NOPD Headquarters, PIB and City Hall revealed the absence of placards, posters, or information in public view at all locations except the 2nd District which had signage located behind the counter, but still in citizen view.

With respect to its obligation to maintain complaint forms and related information in English, Spanish, and Vietnamese (CD 387), NOPD remains in non-compliance. Our site visit to all NOPD Districts, as well as NOPD Headquarters, PIB and City Hall revealed there were no forms available in Spanish or Vietnamese and no posted information in Spanish or Vietnamese at any location.

Finally, the Monitoring Team also assessed the Department's compliance with Consent Decree paragraph 427, which required NOPD to make its audit reports related to implementation of the Consent Decree publicly available via website and at the Police Department, City Hall, and other public locations. Our unannounced visits to the various police Districts revealed partial compliance. First, NOPD does post the Consent Decree, its reports, and the Monitoring Team's reports on its web site. The Consent Decree likewise is available in the various police districts as well as Headquarters, PIB, and the IPM's office. Copies of the Consent Decree were not evidenced at our visits to the Public Libraries, Civil, Criminal and Traffic Court, and City Hall. Nor were we able easily to locate hard copies of NOPD's audit report in these locations or in the police districts.

### C.    Mardi Gras Indians

On August 12, 2015, the Monitoring Team attended a special New Orleans City Council Criminal Justice Committee meeting honoring the Mardi Gras Indians generally, and the late Big Chief "Tootie" Montana specifically, for their peaceful work with the City to improve relations among the City, the NOPD, and the various tribes. As is well known through New Orleans, Chief Montana died at the City Hall podium on June 27, 2005 while speaking about police relations during the Saint Joseph's night celebrations. At that time, the relationship between the police department and the Mardi Gras Indians was a combative one.

At the August event, the City honored Chief Montana with a plaque situated on the podium recognizing his 50 years fighting peacefully for respect and recognition of the



Mardi Gras Indians.  The Chief's family spoke about what a good man he was and how he taught them respect for others.

The Police Department was well-represented at the meeting with Chief Harrison, Chief Bardy, and most District Commanders in attendance.  Notably, the Indian representatives gave current Deputy Chief Bardy much of the credit for repairing the then-broken relationship between the police department and the Indians, and for his continuing support of the Indians to this day.  Chief Bardy spoke at the event, noting that he did what he did "because it was the right thing to do."

The Monitoring Team monitored the interaction between the NOPD and the Mardi Gras Indians on St. Joseph's night this year, and was extremely impressed by the professionalism, helpfulness, and cultural sensitivity of the officers and supervisors on patrol.  What we viewed first-hand was consistent with the comments we heard at the City Council event.  Deputy Chief Bardy stood side-by-side his officers throughout the evening.  It was a great example of leadership and supervision.  We witnessed a number of Mardi Gras Indians – and passers-by for that matter – approach police officers simply to say "thank you."  The entire event was impressive and provided a great illustration of the distance NOPD has come in this area.

We are hopeful NOPD learns from its success with the Mardi Gras Indians, and applies that same level of energy, patience, and cultural sensitivity to the other groups with which it interacts on a daily basis.  In his remarks at the event honoring Chief Montana, Chief Harrison spoke of expanding cultural training at the Academy.  The Monitoring Team wholeheartedly agrees that such training is necessary.



### XIII.   COMMUNITY SURVEY (CD 223-233)

Paragraph 230 of the Consent Decree requires the completion of a biennial survey of members of the New Orleans community "regarding their experiences with and perceptions of NOPD and of public safety." To meet this requirement, the Monitoring Team worked closely with the City, NOPD, and the Department of Justice to develop a three-part survey that would measure public satisfaction with policing, attitudes among police personnel, and the quality of police-citizen encounters. The surveys were designed to include a representative sample of City residents, police personnel, and detained arrestees. (CD 231)

The first phase of the survey was conducted in April, 2014 and included more than 400 police department sworn officers and supervisors. The two additional phases of the Biennial Survey – the Community Survey and the Detainee Survey – were conducted in December, 2014. The Detainee Survey was conducted in the Orleans Parish Prison by senior members of the Monitoring Team with the permission and cooperation of the Orleans Parish Sherriff. The Community Survey was conducted door-to-door by local residents trained and overseen by the Monitoring Team. Details regarding demographics of the Community Survey respondents have been reprinted in Appendix 2, Table 1.

The results of all three phases of the Biennial Survey were reported in the Appendices of Monitoring Team's last quarterly report, issued April 28, 2015. This quarter's report now breaks down the Community Survey results by respondent demographics (*e.g.,* gender, race, age).

Appendix 2, Tables 1.1 through 7.6 present the results of our demographic analysis of the Community Survey data. An asterisk (* or **) in the right-hand column indicate that the difference between the comparison groups is statistically significant. For example, question 1 on Table 1.6 presents the following survey question:

> *New Orleans police officers treat members of the African American community fairly.*

Respondents were asked whether they agreed or disagreed with this statement. A higher number indicated more agreement than a lower number. As shown in Table 3.6, we compared the results of white respondents with racial minority respondents. The comparison shows the average score among whites to be 1.98 versus the average score among racial minorities to be 2.30. As this difference is statistically significant, the table shows an asterisk (*) to the right of the results.

The concept of statistical significance is an important one. Differences in results that are not statistically significant could be the result of nothing more than chance. Differences in results that are statistically significant bring with them a high degree of



confidence that the results are meaningful.  For example, in Table 1.1 (Appendix 2) female respondents, on average, were more likely to agree with the statement "I felt the police officer was trustworthy" compared to male respondents.  In other words, females had higher average scores on this item than males.  The statistical significance of this difference (2.57 compared to 2.76) indicates we can be highly confident (95% confident, to be technical) that females score higher than males on this question in the overall population. In contrast, females appear also to be more likely to agree with the statement "I had confidence the police officer was following the correct police procedure" compared to males.  The mean difference here (2.63 compared to 2.67), however, was not statistically significant.  This suggests the difference simply could have been observed by chance.  In the end, we have more confidence in the mean differences in each of the tables that are statistically significant.



## XIV.   TRAINING (CD 245-288)

NOPD's efforts to improve its Academy, its instructors, and its training programs continue to be a primary focus of the Monitoring Team.  We are pleased to report NOPD is making progress in this area.  While a future Special Report will be dedicated to the topic of training, the following bullets summarize the areas in which we have seen recent progress:

- ***Physical Plant***

On June 23, 2015 NOPD moved its Academy from its prior cramped, run-down home next to the Third District to larger, newer space on UNO's campus in northern New Orleans. The new space provides significant advantages to students and teachers, and is much more conducive to learning.  Chief Harrison as well as Judge Morgan were on hand for the ribbon cutting ceremony.

- ***Leadership***

On May 18, Chief Harrison appointed former NOPD police chief Duane Johnson to serve as Curriculum Director, working closely with Academy Director Commander Richard Williams.  The Monitoring Team now has worked closely with both Mr. Johnson and Commander Williams for several months and continues to be impressed with their commitment and energy.  Within days of coming on board, for example, Mr. Johnson had developed an accountability matrix for the Academy.  NOPD and the Monitoring Team continue to use this matrix to track the Academy's progress.

- ***Lesson Plans***

As past Quarterly Reports have indicated, the Monitoring Team has been frustrated for some time over the lack of progress in developing lesson plans.  As the fundamental document that encompasses what will be taught and how it will be taught, lesson plans should have been in existence long ago.  Over the past 3 months, the Monitoring Team finally is seeing progress in this area.  While that progress needs to continue and, indeed, accelerate, we now are seeing far more progress than we saw before.  Currently, as shown in the table below, 52 of 164 lesson plans have been drafted, reviewed by Academy management, revised if necessary, and submitted to the NOPD Compliance Bureau for final review before heading to the Department of Justice and the Monitoring Team.



**Table 8.**　　　**Lesson Plan Development**

|  | Total Lesson Plans | Awaiting First Draft From Instructor | Awaiting Academy Review | Awaiting Revised Draft From Instructor | Awaiting Final Review From Compliance Bureau |
|---|---|---|---|---|---|
| Recruit | 123 | 29 | 0 | 59 | 35 |
| In-Service | 12 | 1 | 0 | 6 | 5 |
| FTO | 8 | 4 | 0 | 2 | 2 |
| New Supervisor | 21 | 9 | 0 | 2 | 10 |
| Totals | 164 | 0 | 0 | 52 | 10 |

While this number represents only 32% of all lesson plans that need to be drafted, and while the speed at which NOPD is moving in this area continues to frustrate the Monitoring Team, the recent forward movement in contrast to prior stagnation causes us to list this accomplishment among NOPD's successes.

- ***Academy Manual***

While still not complete, the Academy has moved forward with the development of a comprehensive manual covering all aspects of the Academy, from the hiring and evaluation of Academy staff, to the development of lesson plans and materials, to the evaluation of the quality of courses and teachers.

\*　　　\*　　　\*

The foregoing successes, however, must be tempered with sluggishness in other areas. Notwithstanding NOPD's efforts, the Academy still is operating without a strategic plan, a training manual, a full set of lesson plans, or a cohesive hiring plan. Likewise, while progress has been made in this area, the Academy still has not performed a "gap analysis" designed to identify areas in need of improvement.[26]

---

[26]　　More recently, the NOPD Academy has made progress in each of these areas, including working closely with the Monitoring Team to perform a meaningful gap analysis.



The Academy also has failed to make adequate progress in other areas, including record keeping (CD 245-251),[27] supervisor training (CD 314-315), and the Field Training program (CD 275-282).  The Monitoring Team recognizes, however, that the Academy Staff currently lacks sufficient personnel to come into compliance with all areas of the Consent Decree at the same time.  ***We feel, against this unfortunate constraint, the Academy has done a good job prioritizing the many tasks it must tackle.***

At bottom, our primary criticism of NOPD's efforts is that, while progress is being made, it is coming too slowly.  There are several reasons for this.  First, as just noted, the Academy is not robustly staffed.  NOPD management is asking a lot of a small number of people.  Second, as noted above, the Academy still does not have a strategic plan, or even a training manual to help guide its reformation.  Third, the hiring of new personnel takes far too long.  This obstacle – which, in all fairness, seems to be more properly laid at the feet of the Civil Service Department than the NOPD – has plagued not only the Academy, but other functions within NOPD as well.  NOPD and the City must work to breakdown each of these inhibitors to progress.

---

[27]  NOPD soon will be implementing a new software program called *PowerDMS*, which, once fully rolled out, should help alleviate most of the Academy's record keeping problems.



## XV.    OFFICER ASSISTANCE & SUPPORT

Section XIII of the Consent Decree requires that NOPD "provide officers and employees ready access to the mental health and support resources necessary to facilitate effective and constitutional policing."  NOPD also must "develop and offer a centralized and comprehensive range of mental health services that comports with best practices and current professional standards, which include: readily accessible confidential counseling services with both direct and indirect referrals; critical incident debriefings and crisis counseling; peer counseling; and stress management training. (CD 289)  After months of inactivity, in May 2015, NOPD finally took a positive step forward in instituting an Officer Assistance & Support Program.  Specifically, on May 22, 2015, NOPD announced the appointment of a full-time civilian Director of Officer Assistance Program, Cecile Tebo, a licensed clinical social worker who previously helped the Department create its first crisis transportation unit.

The notice announcing the appointment of Ms. Tebo explained that she will "develop and implement a comprehensive, confidential counseling program for officers, civilian members and their families."  The notice went on to explain:

> The program has been designed to promote mental health wellness for all employees and their families with direct intervention and immediate availability. The program will offer individual, couple and family counseling services, along with outside referrals, if the need arises.

> The NOPD created this outreach effort to ensure all employees have access to confidential mental health services. Deputy Chiefs, Commanders and all supervisors should apprise their officers and support staff of this vital program and encourage them to use it when appropriate.

The new office is housed at NOPD Headquarters and, even though it is not fully staffed yet, already has begun providing support to officers.  In fact, on the evening of the tragic death of Officer Daryl Holloway, Ms. Tebo was instrumental in making available professional, faith, and peer support resources for NOPD officers impacted by the tragic loss of a colleague.

While the Monitoring Team finds NOPD not yet compliant with its obligation to "develop and offer a centralized and comprehensive range of mental health services," and remains concerned with the speed of the roll-out of the full breadth of Officer Assistance & Support resources required by the Consent Decree, ***we recognize the appointment of Ms. Tebo as an important and meaningful step forward.***



## XVI.   SUPERVISION (CD XV)

The Monitoring Team issued a Special Report focusing on supervision on July 21, 2015.  Prior to that, Judge Morgan held a public hearing focusing on the Monitoring Team's findings regarding the Department's non-compliance with many of the Consent Decree requirements relating to supervision.  The Monitoring Team continues to spend significant time focusing on this area and plans to issue a follow-up Special Report in the near future to assess the many corrective actions promised by the Department.  In the meantime, however, NOPD has shown some recent progress in the following areas.

### A.   Custodial Interrogations

As we have for most every quarter since the outset of the monitorship, the Monitoring Team continues to conduct monthly detailed audits of each district's compliance with the Custodial Interrogation requirements of the Consent Decree.  ***Unfortunately, NOPD continues to struggle to achieve substantial compliance in this area.***  Much of this struggle has been due to the absence of a good interrogation room camera system.  In response to the Monitoring Team's identification of multiple non-functioning cameras, the Department began using BWCs to record custodial interrogations.  While we applaud NOPD for its creativity in devising a short-term solution to the problem, the solution has not been complete.  The Monitoring Team's most recent audit continued to find most districts making multiple errors even with functioning BWCs, including not properly logging BWC recordings correctly, not being able to retrieve recordings when asked, misplacement of the camera in the interrogation rooms, and placing items in front of the camera that affect the video and audio.

While most districts continue to be in non-compliance with the Custodial Interrogation requirements of the Consent Decree, we are pleased to report that District 6 has attained substantial compliance with nearly all Consent Decree paragraphs in this area.  The Sixth District demonstrated that even with a less-than-desirable camera system, NOPD can achieve compliance simply by paying attention to the details.[28]

### B.   Photographic Line-Ups

As with Custodial Interrogations, the Monitoring Team continues to audit NOPD's compliance with its Photographic Line-Up obligations every month.  While NOPD continued to be out of compliance in this area prior to May 2015, in July 2015 Judge Morgan joined

---

[28]   NOPD's Sixth District also made considerable progress in other areas of the Consent Decree relating to supervision.  The Monitoring Team has recommended that the Department use the Sixth District as a model to help the other districts improve their compliance levels.



the Monitoring Team on its monthly district-by-district audit.  The Judge's visit apparently was the impetus the District needed.  Consequently, since May 2015, nearly every police district has made significant progress in this area.  Indeed, ***as of July 2015, nearly every district and unit had reached substantial compliance.  And some units are at 100% compliance.***

### C.    Body Worn Cameras

Since a supervisor cannot be everywhere at once, the availability of BWC recordings is quickly becoming a critical element of full and effective supervision.  Not only do these recordings give supervisors (and the Monitoring Team) timely visibility into police/citizen interactions throughout New Orleans, but they provide a more accurate picture of those interactions in that the actions of the officers have not been colored by the proximity of a supervisor (or a Monitor) looking over the officer's shoulder watching his/her every move.

As noted elsewhere in this report, and in our prior reports, NOPD deserves significant credit for embracing BWCs and rolling them out to patrol officers even though the requirement is not included in the Consent Decree.  As of August 2015, all regular patrol officers in all districts have been issued BWCs.  This is a significant – and costly – accomplishment.

The Monitoring Team's one remaining criticism of the roll out of the BWCs relates to those officers who have not yet been given the cameras.  Currently, sergeants, for example, are not issued BWCs.  While we acknowledge the high cost of cameras, and agree with the Department's prioritization of camera deployments (i.e., platoon officers first), we hope the City finds funds to outfit sergeants with cameras soon.  It is a common occurrence to have sergeants answering calls for service alongside – or even instead of – patrol officers.  In that context, BWCs should be issued to sergeants.

Interestingly, while many officers resisted the issuance of BWCs initially, the attitude toward the cameras has notably shifted.  The Monitoring Team now is far more likely to hear a sergeant complaining that he or she wants a camera than an officer complaining about having to wear one.

### D.    Camera Discipline

As of August 2015, NOPD has initiated 143 investigations relating to activating Body Worn Cameras.  Of the 79 investigations initiated in 2015, 38 resulted in the investigation "sustaining" the complaint (i.e., finding that the complaint was valid and the officer should be counseled and/or disciplined).  So far, of those 38 sustained complaints, NOPD has held 12 hearings and another 26 had been scheduled as of the drafting of this Quarterly Report.  Of the 12 hearings held, 10 officers received a 1-day suspension, and 2 officers received a 5-day suspension.



While it still is too early to assess whether NOPD's disciplinary process is effectively prompting officers to activate their cameras properly and consistently, anecdotally the Monitoring Team can say camera use is most definitely becoming the norm among officers. We rarely see officers on scenes without their cameras activated. While NOPD officers obviously have not achieved perfection in this regard, progress is being made. Our observations in this regard, of course, will be confirmed (or not) by the actual data. Several months ago, the Monitoring Team conducted a baseline review of camera usage by NOPD officers. We now are in the process of conducting a follow-up review and will report the results, which we expect will show positive trends, in a forthcoming report.

In the meantime, other data suggest progress is being made. In 2014, for example, PIB received 64 complaints regarding camera non-use or misuse. (Importantly, this number should not be surprising considering cameras still were a new technology in 2014.) Of those 64 complaints, 15 were initiated by NOPD supervisors and 49 were initiated by citizens. So far in 2015, however, PIB has received 79 camera related complaints. That this number is higher than the prior year should be expected and, frankly, is not a negative. First, more officers have cameras than in 2014. Second, with the Monitoring Team and the NOPD Compliance Bureau closely observing supervisors and their review of BWC recordings, those supervisors are more diligently reviewing BWC videos in 2015 than they were in 2014. The following graph is instructive:





Notably, the number of citizen-initiated complaints has remained mostly constant since 2014, but the number of supervisor-initiated complaints has gone up significantly. While, obviously, we want to see fewer complaints over time, at this point, an increase in such complaints is a good thing and reflects positively on NOPD.

### E.    In-Car Cameras

As noted in our last several Quarterly Reports, NOPD's in-car cameras frequently were non-operative. It turned out, much of the problem here was due to outdated technology and inadequate server capacity. After significant pushing by the Monitoring Team, and, admittedly, significant effort by the City and the NOPD, the Department upgraded its server technology in August 2015 and solved most of the problems in this area. The Monitoring Team's most recent review of in-car cameras revealed that almost all were fully functional.

### F.    Supervisor Work Load

In our recently-published Special Report on NOPD Supervision, and at the associated public court hearing, the Monitoring Team criticized NOPD for overburdening sergeants with administrative work, which reduced the time they were able to spend actually supervising the officers under their command. While administrative work (e.g., reporting writing, time keeping, etc.) always has been and always will be a component of a sergeant's work load, we pushed the Department to take a hard look at the tasks assigned to supervisors to ensure all were necessary. To NOPD's credit, it now is in the process of doing exactly that.

In June, the Department engaged an outside consulting firm to help it catalog, review, and evaluate the tasks given to field supervisors. One immediate result of NOPD's focus in this area already has been implemented. In August, NOPD initiated a change to its timekeeping/payroll system to reduce the time supervisors have to sit in front of a computer doing administrative work. (Prior to this change, supervisors actually must type work schedules into two different systems, wasting significant time and effort.)

Another significant technology enhancement that will insure to the benefit of supervisors (and officers) is the implementation of new software that will ensure camera videos are "tagged" with date, location, and event information directly from the Department's CAD system. By automating this process rather than relying on officers to re-type the information into a different system after their shifts, supervisors will have more accurate, more timely, and more useful information as they review officer BWC recordings.



## XVII.   SIGNAL CODE REVIEW

Paragraph 206 of the Consent Decree provides that during the first year of the Consent Decree, "neither patrol officers nor detectives shall code reported sexual assaults in a miscellaneous or non-criminal category without the express written approval of the Investigative Services Bureau Special Victim Section Commander and the Investigative Services Bureau Criminal Investigations Division Commander."  The Consent Decree goes on to command that, following the first year, "patrol officers shall not code reported sexual assaults in a miscellaneous or non-criminal category," and that "any decision by a detective to do so shall receive close secondary review and shall be approved in writing by an immediate Sex Crimes unit supervisor and the Division commander."

To assess the Department's compliance with paragraph 206, and as a follow-up to the New Orleans OIG's November 2014 Special Victims Unit report,[29] the Monitoring Team randomly selected 53 items coded by NOPD as a "Signal 21."  ("Signal 21" is NOPD's code for a miscellaneous complaint.)  The selected items covered the period October 2014 – December 2014.  We then reviewed the available incident reports, BWC recordings, Field Interview Cards, and other documentation associated with those 53 items to evaluate whether (a) they were properly coded as a Signal 21, (b) NOPD appropriately investigated any underlying sex crime, and (c) the involved officer's BWC was turned on and operated in a compliant manner.

Of the 53 Signal 21s reviewed, we found only 34% of them had sufficient information to evaluate the correctness of the signal and the completeness of the follow-through by NOPD.  ***Of these, we determined that all were properly coded as a Signal 21 and all were investigated as appropriate***.  66% of cases reviewed, however, required additional information from NOPD in order to validate the correctness of the signal and/or the follow-up.  ***Importantly, these 35 items (i.e., 66%) may have been properly coded and may have been properly investigated***.  Our findings at this point go only to the availability of the information necessary to reach a conclusion.  The Monitoring Team presented the NOPD Compliance Bureau with a list of those 35 cases for further review.

The Monitoring Team will report the results of NOPD's follow-up on these 35 cases in a future report.  In the meantime, however, we recommend NOPD take steps to ensure items coded as a Signal 21 include some additional comments in the communications

---

[29]   On November 12, 2014, the New Orleans Office of Inspector General released the results of an inquiry into sex crime investigations by five detectives in the Special Victims Section of the New Orleans Police Department.  The OIG Investigations Division reviewed 90 randomly selected NOPD sex crime related reports, and found significant concerns with 23 reports from five detectives.



notations so that supervisors are able to see the nature of the call and the propriety of the signal.



## XVIII.  Agreement Implementation And Enforcement (Cd 444 – 492)

### A.     Coordination with IPM (CD 459)

The Consent Decree provides the Monitoring Team shall coordinate and confer with the Independent Police Monitor. (CD 459)  As in the past, the Monitoring Team and IPM communicated frequently during this quarter and coordinated their efforts to the extent practicable.  The Monitoring Team remains pleased with and grateful for the level of cooperation it receives from the IPM.

### B.     NOPD Consent Decree Implementation Unit (CD 467)

Paragraph 467 of the Consent Decree provides that the City and NOPD will "hire and retain, or reassign current NOPD employees to form, an inter-disciplinary unit with the skills and abilities necessary to facilitate implementation" of the Consent Decree.  The Consent Decree goes on to explain this unit "will serve as a liaison between the Parties and the Monitoring Team and will assist with the implementation of and compliance with this Agreement."

The NOPD Compliance Bureau now has been fully staffed since July 2014, and the Monitoring Team continues to be pleased by the Unit's knowledge, skill level, and demonstrated commitment to the Consent Decree process; and recognizes the full cooperation it continues to receive from the Unit.  Indeed, we confidently can say that much of the Department's recent progress has been due, in part at least, to the efforts or the Compliance Bureau.

On July 20, 2015, NOPD changed management of the Compliance Bureau.  The new Bureau director, Deputy Chief Timothy Averill comes to the Department from the Louisiana Supreme Court, where he served as the Judicial Administrator.  The Monitoring Team looks forward to working with Deputy Chief Averill, and thanks outgoing Deputy Chief Ginsberg for his outstanding leadership setting up and staffing a top-notch Compliance Bureau.

### C.     NOPD and City Cooperation (CD 470 – 476)

The Consent Decree provides the City and NOPD shall fully cooperate with the Monitoring Team in all aspects of its responsibilities.  We are pleased to report that the City and NOPD did fully cooperate with the Monitoring Team throughout this reporting quarter.

The Monitoring Team also continues to receive the full cooperation of and continues to work closely with the New Orleans Office of Inspector General ("OIG").  While the OIG's activities do not fall within our monitoring responsibilities under the Consent Decree, the OIG has kept us apprised of its audit plans and investigators as they relate to the NOPD.



Finally, the Monitoring Team also has been impressed with the close working relationship between NOPD's current domestic violence detectives and the Orleans Parish District Attorney's Office, and the level of cooperation we continue to receive from the DA's office.



## XIX.    Conclusion

The past quarter was one of significant progress in several areas of the Consent Decree, but ongoing frustration in some other areas.  All in all, however, the Monitoring Team has been encouraged in 2015 by the Department's energy, thoughtfulness, and commitment toward the Consent Decree, and toward improving the Department generally.  As we noted in the introduction to this Report, while we continue to remain frustrated by the pace of change, we have noticed over the past 12 months an encouraging change in the attitude of NOPD leadership.  This change has enabled NOPD to make new strides toward compliance, and also has enabled the Monitoring Team to move forward with certain critical monitoring/assessment activities that were not practical in the first year of monitoring.

The two most important of these activities are (1) developing objectively verifiable measurements to evaluate full and effective compliance with each paragraph of the Consent Decree and (2) initiating the outcome measurements required by the Consent Decree.  Paragraph 491 of the Consent Decree provides that NOPD will emerge from the Consent Decree – and, accordingly, the oversight of the Monitoring Team and the federal district court – when it has been in "full and effective" compliance with the Consent Decree for two years.  "Full and effective compliance" is defined as "sustained compliance with all material requirements" of the Consent Decree, or "sustained and continuing improvement in constitutional policing" as demonstrated by the Consent Decree's "outcome measurements."  Consequently, both of these activities are critically important because they serve as the gatekeepers to termination of the Consent Decree.

To understand the importance of developing objectively measurable compliance standards, one first must understand the Consent Decree often speaks in general terms.  For example, the Consent Decree requires NOPD supervisors to provide "close and effective" supervision to officers.  But without a clear understanding of what constitutes "close and effective" supervision, it will be difficult for NOPD to demonstrate "sustained" compliance.  To remedy this, the Monitoring Team has nearly completed a detailed effort to ensure each paragraph of the Consent Decree is objectively measurable and that the standards by which each paragraph will be measured are well known to NOPD.

Concurrent with our work on the objective compliance measurements, the Monitoring Team also has been working closely with the NOPD Compliance Bureau to identify the data necessary to conduct the outcome measurements required by the Consent Decree.  Much of the data necessary to perform this critical evaluation, however, still is not maintained by NOPD.  But to the Department's credit, it has been working hard to remedy such gaps.  We are confident we will be able to begin conducting the outcome measurements in the near future.



      The new progress in the forgoing areas, however, and the ongoing progress in the other areas outlined in this Report should not be read to suggest that all yet is well.  The Department still has a ways to go in several areas, including the Academy, supervision, and hiring, among others.  But real progress is being made.



## XX.    Appendices



**Appendix 1  -- Vehicle Pursuit Data**

**Table 9.        Frequency of pursuits by month, January 2014 – February 2015**

| Month | 2014 | | 2015 | | Total | |
|---|---|---|---|---|---|---|
| | N | % | N | % | N | % |
| January | 2 | 3.5 | 9 | 90.0 | 11 | 16.4 |
| February | 4 | 7.0 | 1 | 10.0 | 5 | 7.4 |
| March | 5 | 8.8 | -- | -- | 5 | 7.4 |
| April | 4 | 7.0 | -- | -- | 4 | 6.0 |
| May | 4 | 7.0 | -- | -- | 4 | 6.0 |
| June | 9 | 15.8 | -- | -- | 9 | 13.4 |
| July | 6 | 10.5 | -- | -- | 6 | 9.0 |
| August | 5 | 8.8 | -- | -- | 5 | 7.4 |
| September | 7 | 12.3 | -- | -- | 7 | 10.4 |
| October | 4 | 7.0 | -- | -- | 4 | 6.0 |
| November | 4 | 7.0 | -- | -- | 4 | 6.0 |
| December | 3 | 5.3 | -- | -- | 3 | 4.5 |
| Total | 57 | 100.0 | 10 | 100.0 | 67 | 100.0 |

*Note*: % Columns may not add to exactly 100 due to rounding.

**Table 10.        Frequency of pursuits by day of week, January 2014 – February 2015**

| Day of week | 2014 | | 2015 | | Total | |
|---|---|---|---|---|---|---|
| | N | % | N | % | N | % |
| Monday | 7 | 12.3 | 1 | 10.0 | 8 | 11.9 |
| Tuesday | 12 | 21.1 | 0 | 0.0 | 12 | 17.9 |
| Wednesday | 7 | 12.3 | 0 | 0.0 | 7 | 10.4 |
| Thursday | 9 | 15.8 | 4 | 40.0 | 13 | 19.4 |
| Friday | 9 | 15.8 | 2 | 20.0 | 11 | 16.4 |
| Saturday | 7 | 12.3 | 0 | 0.0 | 7 | 10.4 |
| Sunday | 6 | 10.5 | 3 | 30.0 | 9 | 13.4 |
| Total | 57 | 100.0 | 10 | 100.0 | 67 | 100.0 |

*Note*: % Columns may not add to exactly 100 due to rounding.



**Table 11.        Violation prompting pursuit, January 2014 – February 2015**

| Violation | 2014 | | 2015 | | Total | |
|---|---|---|---|---|---|---|
| | N | % | N | % | N | % |
| DWI | 1 | 1.8 | 0 | 0.0 | 1 | 1.5 |
| Felony | 16 | 28.6 | 6 | 60.0 | 20 | 30.3 |
| Hit and run | 0 | 0.0 | 1 | 10.0 | 1 | 1.5 |
| Medical | 1 | 1.8 | 0 | 0.0 | 1 | 1.5 |
| Misdemeanor | 2 | 3.6 | 0 | 0.0 | 2 | 3.0 |
| Possible auto theft | 1 | 1.8 | 0 | 0.0 | 1 | 1.5 |
| Stolen vehicle | 11 | 19.6 | 1 | 10.0 | 12 | 18.2 |
| Switched plate | 1 | 1.8 | 0 | 0.0 | 1 | 1.5 |
| Traffic | 23 | 41.1 | 2 | 20.0 | 25 | 37.9 |
| Total | 56 | 100.0 | 10 | 100.0 | 66 | 100.0 |

*Note*: % Columns may not add to exactly 100 due to rounding.

**Table 12.        Number of injured officers, January 2014 – February 2015**

| Injuries | 2014 | 2015 | Total |
|---|---|---|---|
| 0 | 53 | 10 | 63 |
| 1 | 1 | 0 | 1 |
| 2 | 1 | 0 | 1 |
| Total | 55 | 10 | 65 |

**Table 13.        Number of injured suspects, January 2014 – February 2015**

| Injuries | 2014 | 2015 | Total |
|---|---|---|---|
| 0 | 54 | 10 | 64 |
| 1 | 1 | 0 | 1 |
| Total | 55 | 10 | 65 |



**Table 14.    Number of injured bystanders or private vehicles, January 2014 – February 2015**

| Injuries | 2014 | 2015 | Total |
|---|---|---|---|
| 0 | 54 | 9 | 63 |
| 1 | 1 | 1 | 2 |
| Total | 55 | 10 | 65 |

**Table 15.    Property damage stemming from pursuits, January 2014 – February 2015**

| Damage | 2014 | | 2015 | | Total | |
|---|---|---|---|---|---|---|
| | N | % | N | % | N | % |
| None | 41 | 74.5 | 5 | 50.0 | 46 | 70.8 |
| Light | 11 | 20.0 | 2 | 20.0 | 13 | 20.0 |
| Medium | 2 | 3.6 | 1 | 10.0 | 3 | 4.6 |
| Heavy | 1 | 1.8 | 1 | 10.0 | 2 | 3.0 |
| Unknown | 0 | 0.0 | 1 | 10.0 | 1 | 1.5 |
| Total | 55 | 100.0 | 10 | 100.0 | 65 | 100.0 |

*Note*: % Columns may not add to exactly 100 due to rounding.



**Table 16.**    **Pursuit outcomes, January 2014 – February 2015**

| Outcome | 2014 | | 2015 | | Total | |
|---|---|---|---|---|---|---|
| | N | % | N | % | N | % |
| NOPD terminates pursuit | 6 | 11.8 | 3 | 30.0 | 9 | 14.8 |
| NOPD unit disabled | 1 | 2.0 | 0 | 0.0 | 1 | 1.6 |
| Pursued vehicle escapes | 3 | 5.9 | 0 | 0.0 | 3 | 4.9 |
| Pursued vehicle in collision | 4 | 7.8 | 2 | 20.0 | 6 | 9.8 |
| Pursued vehicle spins out | 3 | 5.9 | 0 | 0.0 | 3 | 4.9 |
| Pursued vehicle stops | 6 | 11.8 | 1 | 10.0 | 7 | 11.5 |
| Pursued vehicle stops, driver arrested | 4 | 7.8 | 0 | 0.0 | 4 | 6.6 |
| Pursued vehicle stops, driver flees on foot | 18 | 35.3 | 4 | 40.0 | 22 | 36.1 |
| Pursued vehicle stops, driver flees on foot, is arrested | 3 | 5.9 | 0 | 0.0 | 3 | 4.9 |
| Pursued vehicle stops, driver flees on foot, escapes | 2 | 3.9 | 0 | 0.0 | 2 | 3.3 |
| Pursuit ended by another agency | 1 | 2.0 | 0 | 0.0 | 1 | 1.6 |
| Total | 51 | 100.0 | 10 | 100.0 | 61 | 100.0 |

*Note*: % Columns may not add to exactly 100 due to rounding.



**Appendix 2 Community Survey: Demographic Breakdown Analysis**



Table 1.        Community survey respondent demographic characteristics

|  | N | % |
| --- | --- | --- |
| **Gender** |  |  |
| Male | 270 | 49.2% |
| Female | 264 | 48.1% |
|  |  |  |
| **Age** |  |  |
| 18-24 | 28 | 5.1% |
| 25-34 | 133 | 24.2% |
| 35-44 | 112 | 20.4% |
| 45-54 | 102 | 18.6% |
| 55-64 | 86 | 15.7% |
| 65+ | 71 | 12.9% |
|  |  |  |
| **Race/ethnicity** |  |  |
| Black | 277 | 50.5% |
| White | 208 | 37.9% |
| Asian | 7 | 1.3% |
| Hispanic | 14 | 2.6% |
| Other | 20 | 3.6% |
|  |  |  |
| **Education** |  |  |
| Grade school | 9 | 1.6% |
| Grade 9 to 11 | 51 | 9.3% |
| High school | 135 | 24.6% |
| Some college | 122 | 22.2% |
| College degree | 139 | 25.3% |
| Graduate/professional degree | 70 | 12.8% |
|  |  |  |
| **Marital status** |  |  |
| Single | 222 | 40.4% |
| Married | 184 | 33.5% |
| Divorced | 64 | 11.7% |
| Widowed | 32 | 5.8% |
| Partnered | 27 | 4.9% |
|  |  |  |
| **Rent or own home** |  |  |
| Own | 260 | 47.4% |
| Rent | 243 | 44.3% |
|  |  |  |
| **Born in New Orleans** |  |  |
| Yes | 345 | 62.8% |
| No | 182 | 33.2% |

*Note*: Percentages do not sum to 100% because of missing values (i.e., nonresponse).

- Table 1 was provided in the initial community survey analysis submitted to the OCDM team in February 2015. The table is provided again in this report simply for reference.



**SECTION 1**

**Community Survey Results:
Breakdown across Gender**



Table 1.1.    Citizens' satisfaction with NOPD officers during most recent interaction—Across gender

|  | Male | Female |
|---|---|---|
| 1. I felt that the police officer was trustworthy. | 2.57 | 2.76* |
| 2. I had confidence the police officer was following the correct police procedure. | 2.63 | 2.76 |
| 3. I was satisfied with how the police officer behaved. | 2.62 | 2.71 |
| 4. I followed the specific instructions given to me by the police officer. | 3.11 | 3.27** |
| 5. The police officer treated me with dignity. | 2.59 | 2.86** |
| 6. The police officer treated me with respect. | 2.61 | 2.87** |
| 7. The police officer was polite when dealing with me. | 2.63 | 2.82* |
| 8. If I was stopped or questioned, the police officer adequately explained the reasons why. [1] | 2.53 | 2.78* |
| 9. The police officer gave me the opportunity to express my view. [1] | 2.40 | 2.72** |
| 10. Overall, the police officer did a good job. [1] | 2.47 | 2.68† |
| 11. I was satisfied with how I was treated by the police officer. [1] | 2.45 | 2.70* |
| 12. I was satisfied with the outcome of my experience with the police. [1] | 2.48 | 2.63 |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
[1] Question was only asked to those respondents that indicated they had been "stopped and questioned."
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 1.2.    Citizens' satisfaction with NOPD—Across gender

|  | Male | Female |
| --- | --- | --- |
| 1. While conducting their police duties, NOPD officers follow the law. | 2.48 | 2.50 |
| 2. The level of corruption in the New Orleans Police Department is low. | 2.14 | 2.29* |
| 3. I do not fear interacting with New Orleans police officers. | 2.69 | 2.78 |
| 4. There is more police presence in the French Quarter than in other areas of the City of New Orleans. | 3.20 | 3.13 |
| 5. I feel the scandals associated with the New Orleans Police Department in the past do not reflect the current practices of the NOPD. | 2.46 | 2.38 |
| 6. Since Hurricane Katrina, the New Orleans Police Department has become a better police department. | 2.28 | 2.31 |
| 7. I am satisfied with the way NOPD officers do their job. | 2.27 | 2.29 |
| 8. NOPD officers respond, when called, in a timely manner. | 2.02 | 2.03 |
| 9. When compared to 3 years ago, my neighborhood now has more confidence in the NOPD. | 2.41 | 2.37 |
| *10. Most crimes that take place in New Orleans are not solved by the police.* | *2.38* | *2.38* |
| *11. Overall, the New Orleans Police Department has little impact on crime in New Orleans.* | *2.39* | *2.36* |
| *12. There is a great need for more professionalization in the New Orleans Police Department.* | *1.84* | *1.86* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 1.3.    Citizens' perceptions of NOPD procedural justice and trustworthiness—Across gender

| | Male | Female |
|---|---|---|
| 1. Police officers in New Orleans are, for the most part, honest. | 2.44 | 2.48 |
| 2. Police officers in New Orleans are superior to other police departments in terms of integrity. | 2.12 | 2.28 |
| 3. Police officers in New Orleans are fair. | 2.38 | 2.43 |
| 4. Police officers in New Orleans are professional. | 2.39 | 2.42 |
| 5. Police officers in New Orleans are not racist or biased against minorities. | 2.25 | 2.31 |
| 6. I can count on New Orleans police officers to treat me fairly. | 2.45 | 2.54 |
| 7. New Orleans police officers treat victims of crime very well. | 2.31 | 2.35 |
| 8. Police officers in New Orleans know they have to win the confidence of the public to be effective. | 2.90 | 2.81 |
| 9. Police officers in New Orleans treat tourists in the same manner they treat citizens of New Orleans. | 2.25 | 2.28 |
| 10. I trust the NOPD. | 2.32 | 2.42 |
| 11. I have confidence in the NOPD. | 2.31 | 2.37 |
| 12. I respect the NOPD. | 2.67 | 2.75 |
| 13. I feel a moral obligation to obey the law. | 3.25 | 3.27 |
| 14. The NOPD tries to be fair when making decisions. | 2.48 | 2.50 |
| 15. Generally, NOPD officers stop and frisk people for legitimate reasons. | 2.30 | 2.42 |
| 16. During routine encounters with members of the public, NOPD officers use appropriate language. | 2.61 | 2.61 |
| 17. For the most part, NOPD officers use language that is not degrading when interacting with citizens. | 2.54 | 2.55 |
| *18. Police officers in New Orleans stop and frisk people as a form of harassment.* | *2.34* | *2.30* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 1.4.    Citizens' willingness to cooperate with the NOPD—Across gender

|  | Male | Female |
|---|---|---|
| 1. I would report a dangerous or suspicious activity to the NOPD. | 2.86 | 3.00* |
| 2. If asked, I would help the NOPD find someone who is suspected of having committed a crime. | 2.52 | 2.63 |
| *3. I would not call the NOPD if I witnessed or became aware of a crime.* | *2.75* | *2.84* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 1.5.    Citizens' views regarding how they believe NOPD officers should behave—Across gender

|  | Male | Female |
|---|---|---|
| 1. The NOPD should be accountable for their actions. | 3.54 | 3.40** |
| 2. The NOPD should keep the public informed. | 3.45 | 3.33* |
| 3. The NOPD should be open and honest when dealing with the public. | 3.50 | 3.42 |
| 4. The NOPD should treat people with respect. | 3.60 | 3.53 |
| 5. The NOPD should be interested in the well-being of ordinary citizens. | 3.50 | 3.44 |
| 6. Working conditions for police officers in New Orleans are good. | 2.31 | 2.32 |
| 7. To the best of my knowledge, NOPD officers have ready access to language interpretation services to help communicate with those who does [sic] not speak English. | 2.39 | 2.45 |
| 8. The NOPD has enough Spanish speaking officers who can interact with Spanish speaking suspects. | 2.23 | 2.22 |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 1.6.    Citizens' perceptions of how NOPD officers treat minorities and other groups—Across gender

| | Male | Female |
|---|---|---|
| 1. New Orleans police officers treat members of the African American community fairly. | 2.04 | 2.17† |
| 2. New Orleans police officers treat members of the Latino community fairly. | 2.23 | 2.34 |
| 3. New Orleans police officers treat members of the Vietnamese community fairly. | 2.52 | 2.52 |
| 4. New Orleans police officers treat members of the Lesbian, Gay, Bisexual and Transgender (LGBT) community fairly. | 2.31 | 2.31 |
| 5. Many victims in New Orleans Latino community fear reporting a crime due to fear of deportation. | 2.87 | 2.85 |
| *6. New Orleans police officers often engage in racial profiling.* | *2.13* | *2.25†* |
| *7. The African American community in New Orleans expects to be harassed by the NOPD.* | *2.06* | *2.12* |
| *8. The African American community in New Orleans does not believe the NOPD is credible.* | *2.05* | *2.10* |
| *9. There is a great deal of unfairness and bias by the NOPD toward the African American community.* | *2.11* | *2.08* |
| *10. The Lesbian, Gay, Bisexual and Transgender (LGBT) community does not have confidence in the NOPD.* | *2.37* | *2.31* |
| *11. During encounters between the NOPD and the homeless population in New Orleans, the homeless are often treated poorly by the NOPD.* | *2.16* | *2.20* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



**SECTION 2**

**Community Survey Results:**
**Breakdown across Age**



Table 2.1.    Citizens' satisfaction with NOPD officers during most recent interaction—Across age

|  | 18 to 34 | 35 and older |
|---|---|---|
| 1. I felt that the police officer was trustworthy. | 2.44 | 2.77** |
| 2. I had confidence the police officer was following the correct police procedure. | 2.56 | 2.75† |
| 3. I was satisfied with how the police officer behaved. | 2.48 | 2.75* |
| 4. I followed the specific instructions given to me by the police officer. | 3.20 | 3.17 |
| 5. The police officer treated me with dignity. | 2.50 | 2.83** |
| 6. The police officer treated me with respect. | 2.59 | 2.80* |
| 7. The police officer was polite when dealing with me. | 2.54 | 2.80* |
| 8. If I was stopped or questioned, the police officer adequately explained the reasons why. [1] | 2.49 | 2.73* |
| 9. The police officer gave me the opportunity to express my view. [1] | 2.33 | 2.64* |
| 10. Overall, the police officer did a good job. [1] | 2.31 | 2.68** |
| 11. I was satisfied with how I was treated by the police officer. [1] | 2.38 | 2.64* |
| 12. I was satisfied with the outcome of my experience with the police. [1] | 2.32 | 2.66** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
[1] Question was only asked to those respondents that indicated they had been "stopped and questioned."
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 2.2.   Citizens' satisfaction with NOPD—Across age

|  | 18 to 34 | 35 and older |
|---|---|---|
| 1. While conducting their police duties, NOPD officers follow the law. | 2.38 | 2.54* |
| 2. The level of corruption in the New Orleans Police Department is low. | 2.05 | 2.28** |
| 3. I do not fear interacting with New Orleans police officers. | 2.68 | 2.77 |
| 4. There is more police presence in the French Quarter than in other areas of the City of New Orleans. | 3.25 | 3.13† |
| 5. I feel the scandals associated with the New Orleans Police Department in the past do not reflect the current practices of the NOPD. | 2.19 | 2.52** |
| 6. Since Hurricane Katrina, the New Orleans Police Department has become a better police department. | 2.23 | 2.32 |
| 7. I am satisfied with the way NOPD officers do their job. | 2.14 | 2.34** |
| 8. NOPD officers respond, when called, in a timely manner. | 1.81 | 2.12** |
| 9. When compared to 3 years ago, my neighborhood now has more confidence in the NOPD. | 2.26 | 2.45* |
| *10. Most crimes that take place in New Orleans are not solved by the police.* | *2.25* | *2.44** |
| *11. Overall, the New Orleans Police Department has little impact on crime in New Orleans.* | *2.31* | *2.40* |
| *12. There is a great need for more professionalization in the New Orleans Police Department.* | *1.73* | *1.90** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 2.3.    Citizens' perceptions of NOPD procedural justice and trustworthiness—Across age

| | 18 to 34 | 35 and older |
|---|---|---|
| 1. Police officers in New Orleans are, for the most part, honest. | 2.31 | 2.53** |
| 2. Police officers in New Orleans are superior to other police departments in terms of integrity. | 2.08 | 2.26* |
| 3. Police officers in New Orleans are fair. | 2.25 | 2.48** |
| 4. Police officers in New Orleans are professional. | 2.28 | 2.47* |
| 5. Police officers in New Orleans are not racist or biased against minorities. | 2.19 | 2.32† |
| 6. I can count on New Orleans police officers to treat me fairly. | 2.37 | 2.56* |
| 7. New Orleans police officers treat victims of crime very well. | 2.16 | 2.40** |
| 8. Police officers in New Orleans know they have to win the confidence of the public to be effective. | 2.92 | 2.82 |
| 9. Police officers in New Orleans treat tourists in the same manner they treat citizens of New Orleans. | 2.18 | 2.30 |
| 10. I trust the NOPD. | 2.17 | 2.46** |
| 11. I have confidence in the NOPD. | 2.21 | 2.40* |
| 12. I respect the NOPD. | 2.52 | 2.79** |
| 13. I feel a moral obligation to obey the law. | 3.20 | 3.29 |
| 14. The NOPD tries to be fair when making decisions. | 2.34 | 2.56** |
| 15. Generally, NOPD officers stop and frisk people for legitimate reasons. | 2.17 | 2.45** |
| 16. During routine encounters with members of the public, NOPD officers use appropriate language. | 2.47 | 2.67** |
| 17. For the most part, NOPD officers use language that is not degrading when interacting with citizens. | 2.47 | 2.57 |
| *18. Police officers in New Orleans stop and frisk people as a form of harassment.* | *2.15* | *2.39** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 2.4.     Citizens' willingness to cooperate with the NOPD—Across age

|  | 18 to 34 | 35 and older |
|---|---|---|
| 1. I would report a dangerous or suspicious activity to the NOPD. | 2.79 | 2.99** |
| 2. If asked, I would help the NOPD find someone who is suspected of having committed a crime. | 2.46 | 2.63* |
| *3. I would not call the NOPD if I witnessed or became aware of a crime.* | *2.72* | *2.83* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 2.5.    Citizens' views regarding how they believe NOPD officers should behave—Across age

|  | 18 to 34 | 35 and older |
|---|---|---|
| 1. The NOPD should be accountable for their actions. | 3.65 | 3.39** |
| 2. The NOPD should keep the public informed. | 3.58 | 3.31** |
| 3. The NOPD should be open and honest when dealing with the public. | 3.64 | 3.38** |
| 4. The NOPD should treat people with respect. | 3.72 | 3.50** |
| 5. The NOPD should be interested in the well-being of ordinary citizens. | 3.62 | 3.41** |
| 6. Working conditions for police officers in New Orleans are good. | 2.34 | 2.30 |
| 7. To the best of my knowledge, NOPD officers have ready access to language interpretation services to help communicate with those who does [sic] not speak English. | 2.43 | 2.42 |
| 8. The NOPD has enough Spanish speaking officers who can interact with Spanish speaking suspects. | 2.28 | 2.19 |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 2.6.    Citizens' perceptions of how NOPD officers treat minorities and other groups—Across age

|  | 18 to 34 | 35 and older |
| --- | --- | --- |
| 1. New Orleans police officers treat members of the African American community fairly. | 1.98 | 2.16* |
| 2. New Orleans police officers treat members of the Latino community fairly. | 2.16 | 2.34* |
| 3. New Orleans police officers treat members of the Vietnamese community fairly. | 2.54 | 2.51 |
| 4. New Orleans police officers treat members of the Lesbian, Gay, Bisexual and Transgender (LGBT) community fairly. | 2.21 | 2.35† |
| 5. Many victims in New Orleans Latino community fear reporting a crime due to fear of deportation. | 2.95 | 2.82† |
| *6. New Orleans police officers often engage in racial profiling.* | *2.04* | *2.26** |
| *7. The African American community in New Orleans expects to be harassed by the NOPD.* | *1.84* | *2.20** |
| *8. The African American community in New Orleans does not believe the NOPD is credible.* | *1.79* | *2.21** |
| *9. There is a great deal of unfairness and bias by the NOPD toward the African American community.* | *1.82* | *2.22** |
| *10. The Lesbian, Gay, Bisexual and Transgender (LGBT) community does not have confidence in the NOPD.* | *2.15* | *2.43** |
| *11. During encounters between the NOPD and the homeless population in New Orleans, the homeless are often treated poorly by the NOPD.* | *2.01* | *2.26** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



**SECTION 3**

**Community Survey Results:
Breakdown across Race**



Table 3.1.    Citizens' satisfaction with NOPD officers during most recent interaction—Across race

|  | Racial minority | White |
|---|---|---|
| 1. I felt that the police officer was trustworthy. | 2.55 | 2.82** |
| 2. I had confidence the police officer was following the correct police procedure. | 2.49 | 2.94** |
| 3. I was satisfied with how the police officer behaved. | 2.50 | 2.88** |
| 4. I followed the specific instructions given to me by the police officer. | 3.20 | 3.17 |
| 5. The police officer treated me with dignity. | 2.55 | 2.97** |
| 6. The police officer treated me with respect. | 2.60 | 2.92** |
| 7. The police officer was polite when dealing with me. | 2.56 | 2.93** |
| 8. If I was stopped or questioned, the police officer adequately explained the reasons why. [1] | 2.52 | 2.83** |
| 9. The police officer gave me the opportunity to express my view. [1] | 2.43 | 2.69* |
| 10. Overall, the police officer did a good job. [1] | 2.36 | 2.85** |
| 11. I was satisfied with how I was treated by the police officer. [1] | 2.40 | 2.79** |
| 12. I was satisfied with the outcome of my experience with the police. [1] | 2.40 | 2.77** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
[1] Question was only asked to those respondents that indicated they had been "stopped and questioned."
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 3.2.    Citizens' satisfaction with NOPD—Across race

|  | Racial minority | White |
|---|---|---|
| 1. While conducting their police duties, NOPD officers follow the law. | 2.35 | 2.71** |
| 2. The level of corruption in the New Orleans Police Department is low. | 2.21 | 2.23 |
| 3. I do not fear interacting with New Orleans police officers. | 2.68 | 2.85* |
| 4. There is more police presence in the French Quarter than in other areas of the City of New Orleans. | 3.23 | 3.04** |
| 5. I feel the scandals associated with the New Orleans Police Department in the past do not reflect the current practices of the NOPD. | 2.39 | 2.46 |
| 6. Since Hurricane Katrina, the New Orleans Police Department has become a better police department. | 2.15 | 2.53** |
| 7. I am satisfied with the way NOPD officers do their job. | 2.15 | 2.48** |
| 8. NOPD officers respond, when called, in a timely manner. | 1.91 | 2.22** |
| 9. When compared to 3 years ago, my neighborhood now has more confidence in the NOPD. | 2.24 | 2.62** |
| *10. Most crimes that take place in New Orleans are not solved by the police.* | *2.38* | *2.38* |
| *11. Overall, the New Orleans Police Department has little impact on crime in New Orleans.* | *2.26* | *2.56*** |
| *12. There is a great need for more professionalization in the New Orleans Police Department.* | *1.83* | *1.88* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 3.3.    Citizens' perceptions of NOPD procedural justice and trustworthiness—Across race

|  | Racial minority | White |
|---|---|---|
| 1. Police officers in New Orleans are, for the most part, honest. | 2.28 | 2.74* |
| 2. Police officers in New Orleans are superior to other police departments in terms of integrity. | 2.17 | 2.24 |
| 3. Police officers in New Orleans are fair. | 2.28 | 2.59* |
| 4. Police officers in New Orleans are professional. | 2.27 | 2.61* |
| 5. Police officers in New Orleans are not racist or biased against minorities. | 2.26 | 2.32 |
| 6. I can count on New Orleans police officers to treat me fairly. | 2.29 | 2.82** |
| 7. New Orleans police officers treat victims of crime very well. | 2.24 | 2.46** |
| 8. Police officers in New Orleans know they have to win the confidence of the public to be effective. | 2.80 | 2.94† |
| 9. Police officers in New Orleans treat tourists in the same manner they treat citizens of New Orleans. | 2.13 | 2.49** |
| 10. I trust the NOPD. | 2.19 | 2.65** |
| 11. I have confidence in the NOPD. | 2.19 | 2.57** |
| 12. I respect the NOPD. | 2.62 | 2.84** |
| 13. I feel a moral obligation to obey the law. | 3.23 | 3.32 |
| 14. The NOPD tries to be fair when making decisions. | 2.35 | 2.71** |
| 15. Generally, NOPD officers stop and frisk people for legitimate reasons. | 2.28 | 2.49** |
| 16. During routine encounters with members of the public, NOPD officers use appropriate language. | 2.50 | 2.78** |
| 17. For the most part, NOPD officers use language that is not degrading when interacting with citizens. | 2.44 | 2.70** |
| *18. Police officers in New Orleans stop and frisk people as a form of harassment.* | *2.13* | *2.64** * |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 3.4.    Citizens' willingness to cooperate with the NOPD—Across race

|  | Racial minority | White |
|---|---|---|
| 1. I would report a dangerous or suspicious activity to the NOPD. | 2.75 | 3.21** |
| 2. If asked, I would help the NOPD find someone who is suspected of having committed a crime. | 2.38 | 2.89** |
| *3. I would not call the NOPD if I witnessed or became aware of a crime.* | *2.63* | *3.08*** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 3.5.    Citizens' views regarding how they believe NOPD officers should behave—Across race

|  | Racial minority | White |
|---|---|---|
| 1. The NOPD should be accountable for their actions. | 3.42 | 3.54* |
| 2. The NOPD should keep the public informed. | 3.32 | 3.51** |
| 3. The NOPD should be open and honest when dealing with the public. | 3.41 | 3.55** |
| 4. The NOPD should treat people with respect. | 3.51 | 3.65** |
| 5. The NOPD should be interested in the well-being of ordinary citizens. | 3.41 | 3.56** |
| 6. Working conditions for police officers in New Orleans are good. | 2.37 | 2.23* |
| 7. To the best of my knowledge, NOPD officers have ready access to language interpretation services to help communicate with those who does [sic] not speak English. | 2.40 | 2.46 |
| 8. The NOPD has enough Spanish speaking officers who can interact with Spanish speaking suspects. | 2.25 | 2.19 |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 3.6.    Citizens' perceptions of how NOPD officers treat minorities and other groups—Across race

|  | Racial minority | White |
|---|---|---|
| 1. New Orleans police officers treat members of the African American community fairly. | 1.98 | 2.30** |
| 2. New Orleans police officers treat members of the Latino community fairly. | 2.22 | 2.37* |
| 3. New Orleans police officers treat members of the Vietnamese community fairly. | 2.49 | 2.55 |
| 4. New Orleans police officers treat members of the Lesbian, Gay, Bisexual and Transgender (LGBT) community fairly. | 2.23 | 2.41** |
| 5. Many victims in New Orleans Latino community fear reporting a crime due to fear of deportation. | 2.84 | 2.88 |
| *6. New Orleans police officers often engage in racial profiling.* | *2.15* | *2.26* |
| *7. The African American community in New Orleans expects to be harassed by the NOPD.* | *2.03* | *2.19** |
| *8. The African American community in New Orleans does not believe the NOPD is credible.* | *2.06* | *2.11* |
| *9. There is a great deal of unfairness and bias by the NOPD toward the African American community.* | *1.96* | *2.32*** |
| *10. The Lesbian, Gay, Bisexual and Transgender (LGBT) community does not have confidence in the NOPD.* | *2.29* | *2.42†* |
| *11. During encounters between the NOPD and the homeless population in New Orleans, the homeless are often treated poorly by the NOPD.* | *2.14* | *2.26* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



# SECTION 4

## Community Survey Results:
## Breakdown across Education



Table 4.1.    Citizens' satisfaction with NOPD officers during most recent interaction—Across education

| | Less than college degree | College degree or higher |
|---|---|---|
| 1. I felt that the police officer was trustworthy. | 2.53 | 2.84** |
| 2. I had confidence the police officer was following the correct police procedure. | 2.53 | 2.90** |
| 3. I was satisfied with how the police officer behaved. | 2.49 | 2.90** |
| 4. I followed the specific instructions given to me by the police officer. | 3.19 | 3.18 |
| 5. The police officer treated me with dignity. | 2.54 | 2.96** |
| 6. The police officer treated me with respect. | 2.56 | 2.97** |
| 7. The police officer was polite when dealing with me. | 2.56 | 2.94** |
| 8. If I was stopped or questioned, the police officer adequately explained the reasons why. [1] | 2.53 | 2.88** |
| 9. The police officer gave me the opportunity to express my view. [1] | 2.44 | 2.73* |
| 10. Overall, the police officer did a good job. [1] | 2.43 | 2.81** |
| 11. I was satisfied with how I was treated by the police officer. [1] | 2.46 | 2.76* |
| 12. I was satisfied with the outcome of my experience with the police. [1] | 2.43 | 2.76** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
[1] Question was only asked to those respondents that indicated they had been "stopped and questioned."
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 4.2.    Citizens' satisfaction with NOPD—Across education

|  | Less than college degree | College degree or higher |
|---|---|---|
| 1. While conducting their police duties, NOPD officers follow the law. | 2.40 | 2.64** |
| 2. The level of corruption in the New Orleans Police Department is low. | 2.23 | 2.18 |
| 3. I do not fear interacting with New Orleans police officers. | 2.68 | 2.84* |
| 4. There is more police presence in the French Quarter than in other areas of the City of New Orleans. | 3.18 | 3.14 |
| 5. I feel the scandals associated with the New Orleans Police Department in the past do not reflect the current practices of the NOPD. | 2.39 | 2.46 |
| 6. Since Hurricane Katrina, the New Orleans Police Department has become a better police department. | 2.18 | 2.48** |
| 7. I am satisfied with the way NOPD officers do their job. | 2.22 | 2.38* |
| 8. NOPD officers respond, when called, in a timely manner. | 1.98 | 2.10 |
| 9. When compared to 3 years ago, my neighborhood now has more confidence in the NOPD. | 2.31 | 2.52** |
| *10. Most crimes that take place in New Orleans are not solved by the police.* | *2.37* | *2.39* |
| *11. Overall, the New Orleans Police Department has little impact on crime in New Orleans.* | *2.28* | *2.52**￼* |
| *12. There is a great need for more professionalization in the New Orleans Police Department.* | *1.86* | *1.83* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 4.3.    Citizens' perceptions of NOPD procedural justice and trustworthiness—Across education

|  | Less than college degree | College degree or higher |
|---|---|---|
| 1. Police officers in New Orleans are, for the most part, honest. | 2.36 | 2.62** |
| 2. Police officers in New Orleans are superior to other police departments in terms of integrity. | 2.21 | 2.20 |
| 3. Police officers in New Orleans are fair. | 2.33 | 2.51** |
| 4. Police officers in New Orleans are professional. | 2.33 | 2.52** |
| 5. Police officers in New Orleans are not racist or biased against minorities. | 2.28 | 2.29 |
| 6. I can count on New Orleans police officers to treat me fairly. | 2.38 | 2.67** |
| 7. New Orleans police officers treat victims of crime very well. | 2.26 | 2.42* |
| 8. Police officers in New Orleans know they have to win the confidence of the public to be effective. | 2.89 | 2.80 |
| 9. Police officers in New Orleans treat tourists in the same manner they treat citizens of New Orleans. | 2.24 | 2.31 |
| 10. I trust the NOPD. | 2.29 | 2.50** |
| 11. I have confidence in the NOPD. | 2.26 | 2.47** |
| 12. I respect the NOPD. | 2.67 | 2.75 |
| 13. I feel a moral obligation to obey the law. | 3.24 | 3.28 |
| 14. The NOPD tries to be fair when making decisions. | 2.41 | 2.62** |
| 15. Generally, NOPD officers stop and frisk people for legitimate reasons. | 2.37 | 2.34 |
| 16. During routine encounters with members of the public, NOPD officers use appropriate language. | 2.55 | 2.70* |
| 17. For the most part, NOPD officers use language that is not degrading when interacting with citizens. | 2.49 | 2.62* |
| *18. Police officers in New Orleans stop and frisk people as a form of harassment.* | *2.17* | *2.57** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 4.4.    Citizens' willingness to cooperate with the NOPD—Across education

|  | Less than college degree | College degree or higher |
|---|---|---|
| 1. I would report a dangerous or suspicious activity to the NOPD. | 2.79 | 3.14** |
| 2. If asked, I would help the NOPD find someone who is suspected of having committed a crime. | 2.45 | 2.78** |
| *3. I would not call the NOPD if I witnessed or became aware of a crime.* | *2.62* | *3.08** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 4.5.    Citizens' views regarding how they believe NOPD officers should behave—Across education

|  | Less than college degree | College degree or higher |
|---|---|---|
| 1. The NOPD should be accountable for their actions. | 3.44 | 3.51 |
| 2. The NOPD should keep the public informed. | 3.34 | 3.47* |
| 3. The NOPD should be open and honest when dealing with the public. | 3.45 | 3.49 |
| 4. The NOPD should treat people with respect. | 3.53 | 3.62† |
| 5. The NOPD should be interested in the well-being of ordinary citizens. | 3.42 | 3.55* |
| 6. Working conditions for police officers in New Orleans are good. | 2.39 | 2.20** |
| 7. To the best of my knowledge, NOPD officers have ready access to language interpretation services to help communicate with those who does [sic] not speak English. | 2.45 | 2.39 |
| 8. The NOPD has enough Spanish speaking officers who can interact with Spanish speaking suspects. | 2.26 | 2.18 |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 4.6.    Citizens' perceptions of how NOPD officers treat minorities and other groups—Across education

|  | Less than college degree | College degree or higher |
|---|---|---|
| 1. New Orleans police officers treat members of the African American community fairly. | 2.04 | 2.20* |
| 2. New Orleans police officers treat members of the Latino community fairly. | 2.29 | 2.27 |
| 3. New Orleans police officers treat members of the Vietnamese community fairly. | 2.55 | 2.48 |
| 4. New Orleans police officers treat members of the Lesbian, Gay, Bisexual and Transgender (LGBT) community fairly. | 2.28 | 2.34 |
| 5. Many victims in New Orleans Latino community fear reporting a crime due to fear of deportation. | 2.86 | 2.85 |
| *6. New Orleans police officers often engage in racial profiling.* | *2.17* | *2.22* |
| *7. The African American community in New Orleans expects to be harassed by the NOPD.* | *2.05* | *2.15* |
| *8. The African American community in New Orleans does not believe the NOPD is credible.* | *2.05* | *2.13* |
| *9. There is a great deal of unfairness and bias by the NOPD toward the African American community.* | *2.00* | *2.23\*\** |
| *10. The Lesbian, Gay, Bisexual and Transgender (LGBT) community does not have confidence in the NOPD.* | *2.30* | *2.40* |
| *11. During encounters between the NOPD and the homeless population in New Orleans, the homeless are often treated poorly by the NOPD.* | *2.09* | *2.33\*\** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



# SECTION 5

## Community Survey Results:
## Breakdown across Marital Status



Table 5.1.    Citizens' satisfaction with NOPD officers during most recent interaction—Across marital status

|  | Married[2] | Single[3] |
|---|---|---|
| 1. I felt that the police officer was trustworthy. | 2.74 | 2.61 |
| 2. I had confidence the police officer was following the correct police procedure. | 2.79 | 2.62† |
| 3. I was satisfied with how the police officer behaved. | 2.81 | 2.55** |
| 4. I followed the specific instructions given to me by the police officer. | 3.19 | 3.18 |
| 5. The police officer treated me with dignity. | 2.87 | 2.62* |
| 6. The police officer treated me with respect. | 2.87 | 2.64* |
| 7. The police officer was polite when dealing with me. | 2.89 | 2.60** |
| 8. If I was stopped or questioned, the police officer adequately explained the reasons why. [1] | 2.77 | 2.57† |
| 9. The police officer gave me the opportunity to express my view. [1] | 2.77 | 2.40** |
| 10. Overall, the police officer did a good job. [1] | 2.74 | 2.44** |
| 11. I was satisfied with how I was treated by the police officer. [1] | 2.74 | 2.45* |
| 12. I was satisfied with the outcome of my experience with the police. [1] | 2.67 | 2.47† |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
[1] Question was only asked to those respondents that indicated they had been "stopped and questioned."
[2] Includes those who are married or reported having a partner.
[3] Includes those who reported being single, divorced, or widowed.
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 5.2.    Citizens' satisfaction with NOPD—Across marital status

|  | Married[1] | Single[2] |
|---|---|---|
| 1. While conducting their police duties, NOPD officers follow the law. | 2.54 | 2.46 |
| 2. The level of corruption in the New Orleans Police Department is low. | 2.13 | 2.27† |
| 3. I do not fear interacting with New Orleans police officers. | 2.75 | 2.73 |
| 4. There is more police presence in the French Quarter than in other areas of the City of New Orleans. | 3.14 | 3.17 |
| 5. I feel the scandals associated with the New Orleans Police Department in the past do not reflect the current practices of the NOPD. | 2.52 | 2.36* |
| 6. Since Hurricane Katrina, the New Orleans Police Department has become a better police department. | 2.38 | 2.24† |
| 7. I am satisfied with the way NOPD officers do their job. | 2.33 | 2.25 |
| 8. NOPD officers respond, when called, in a timely manner. | 2.06 | 2.00 |
| 9. When compared to 3 years ago, my neighborhood now has more confidence in the NOPD. | 2.46 | 2.34† |
| *10. Most crimes that take place in New Orleans are not solved by the police.* | *2.42* | *2.35* |
| *11. Overall, the New Orleans Police Department has little impact on crime in New Orleans.* | *2.42* | *2.34* |
| *12. There is a great need for more professionalization in the New Orleans Police Department.* | *1.92* | *1.80†* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
[1] Includes those who are married or reported having a partner.
[2] Includes those who reported being single, divorced, or widowed.
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 5.3.    Citizens' perceptions of NOPD procedural justice and trustworthiness—Across marital status

|  | Married[1] | Single[2] |
|---|---|---|
| 1. Police officers in New Orleans are, for the most part, honest. | 2.56 | 2.39* |
| 2. Police officers in New Orleans are superior to other police departments in terms of integrity. | 2.29 | 2.14* |
| 3. Police officers in New Orleans are fair. | 2.53 | 2.32** |
| 4. Police officers in New Orleans are professional. | 2.50 | 2.34* |
| 5. Police officers in New Orleans are not racist or biased against minorities. | 2.30 | 2.27 |
| 6. I can count on New Orleans police officers to treat me fairly. | 2.62 | 2.42** |
| 7. New Orleans police officers treat victims of crime very well. | 2.43 | 2.26* |
| 8. Police officers in New Orleans know they have to win the confidence of the public to be effective. | 2.78 | 2.91† |
| 9. Police officers in New Orleans treat tourists in the same manner they treat citizens of New Orleans. | 2.36 | 2.21* |
| 10. I trust the NOPD. | 2.49 | 2.29* |
| 11. I have confidence in the NOPD. | 2.43 | 2.28* |
| 12. I respect the NOPD. | 2.77 | 2.67 |
| 13. I feel a moral obligation to obey the law. | 3.26 | 3.26 |
| 14. The NOPD tries to be fair when making decisions. | 2.59 | 2.43* |
| 15. Generally, NOPD officers stop and frisk people for legitimate reasons. | 2.39 | 2.35 |
| 16. During routine encounters with members of the public, NOPD officers use appropriate language. | 2.64 | 2.59 |
| 17. For the most part, NOPD officers use language that is not degrading when interacting with citizens. | 2.57 | 2.53 |
| *18. Police officers in New Orleans stop and frisk people as a form of harassment.* | *2.46* | *2.23*** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
[1] Includes those who are married or reported having a partner.
[2] Includes those who reported being single, divorced, or widowed.
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 5.4.    Citizens' willingness to cooperate with the NOPD—Across marital status

|  | Married[1] | Single[2] |
|---|---|---|
| 1. I would report a dangerous or suspicious activity to the NOPD. | 2.92 | 2.94 |
| 2. If asked, I would help the NOPD find someone who is suspected of having committed a crime. | 2.67 | 2.53* |
| *3. I would not call the NOPD if I witnessed or became aware of a crime.* | *2.90* | *2.73\** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
[1] Includes those who are married or reported having a partner.
[2] Includes those who reported being single, divorced, or widowed.
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 5.5.    Citizens' views regarding how they believe NOPD officers should behave—Across marital status

|  | Married[1] | Single[2] |
|---|---|---|
| 1. The NOPD should be accountable for their actions. | 3.42 | 3.50 |
| 2. The NOPD should keep the public informed. | 3.29 | 3.46** |
| 3. The NOPD should be open and honest when dealing with the public. | 3.39 | 3.51* |
| 4. The NOPD should treat people with respect. | 3.52 | 3.59 |
| 5. The NOPD should be interested in the well-being of ordinary citizens. | 3.43 | 3.50 |
| 6. Working conditions for police officers in New Orleans are good. | 2.31 | 2.32 |
| 7. To the best of my knowledge, NOPD officers have ready access to language interpretation services to help communicate with those who does [sic] not speak English. | 2.45 | 2.40 |
| 8. The NOPD has enough Spanish speaking officers who can interact with Spanish speaking suspects. | 2.19 | 2.23 |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
[1] Includes those who are married or reported having a partner.
[2] Includes those who reported being single, divorced, or widowed.
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 5.6.    Citizens' perceptions of how NOPD officers treat minorities and other groups—Across marital status

|  | Married[1] | Single[2] |
|---|---|---|
| 1. New Orleans police officers treat members of the African American community fairly. | 2.19 | 2.05* |
| 2. New Orleans police officers treat members of the Latino community fairly. | 2.34 | 2.25 |
| 3. New Orleans police officers treat members of the Vietnamese community fairly. | 2.51 | 2.52 |
| 4. New Orleans police officers treat members of the Lesbian, Gay, Bisexual and Transgender (LGBT) community fairly. | 2.31 | 2.30 |
| 5. Many victims in New Orleans Latino community fear reporting a crime due to fear of deportation. | 2.75 | 2.93** |
| *6. New Orleans police officers often engage in racial profiling.* | *2.26* | *2.14* |
| *7. The African American community in New Orleans expects to be harassed by the NOPD.* | *2.16* | *2.04* |
| *8. The African American community in New Orleans does not believe the NOPD is credible.* | *2.15* | *2.03†* |
| *9. There is a great deal of unfairness and bias by the NOPD toward the African American community.* | *2.21* | *2.02**￼* |
| *10. The Lesbian, Gay, Bisexual and Transgender (LGBT) community does not have confidence in the NOPD.* | *2.42* | *2.29†* |
| *11. During encounters between the NOPD and the homeless population in New Orleans, the homeless are often treated poorly by the NOPD.* | *2.29* | *2.10*￼* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
[1] Includes those who are married or reported having a partner.
[2] Includes those who reported being single, divorced, or widowed.
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



# SECTION 6

## Community Survey Results:
## Breakdown across Home Ownership Status



Table 6.1.    Citizens' satisfaction with NOPD officers during most recent interaction—Across home ownership status

|  | Home owner | Renter |
|---|---|---|
| 1. I felt that the police officer was trustworthy. | 2.79 | 2.57* |
| 2. I had confidence the police officer was following the correct police procedure. | 2.81 | 2.62* |
| 3. I was satisfied with how the police officer behaved. | 2.81 | 2.54* |
| 4. I followed the specific instructions given to me by the police officer. | 3.15 | 3.21 |
| 5. The police officer treated me with dignity. | 2.85 | 2.63* |
| 6. The police officer treated me with respect. | 2.87 | 2.64* |
| 7. The police officer was polite when dealing with me. | 2.85 | 2.62* |
| 8. If I was stopped or questioned, the police officer adequately explained the reasons why. [1] | 2.76 | 2.60 |
| 9. The police officer gave me the opportunity to express my view. [1] | 2.66 | 2.44† |
| 10. Overall, the police officer did a good job. [1] | 2.72 | 2.45* |
| 11. I was satisfied with how I was treated by the police officer. [1] | 2.70 | 2.46* |
| 12. I was satisfied with the outcome of my experience with the police. [1] | 2.71 | 2.44* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
[1] Question was only asked to those respondents that indicated they had been "stopped and questioned."
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 6.2.    Citizens' satisfaction with NOPD—Across home ownership status

|  | Home owner | Renter |
|---|---|---|
| 1. While conducting their police duties, NOPD officers follow the law. | 2.57 | 2.42* |
| 2. The level of corruption in the New Orleans Police Department is low. | 2.26 | 2.19 |
| 3. I do not fear interacting with New Orleans police officers. | 2.77 | 2.70 |
| 4. There is more police presence in the French Quarter than in other areas of the City of New Orleans. | 3.12 | 3.20 |
| 5. I feel the scandals associated with the New Orleans Police Department in the past do not reflect the current practices of the NOPD. | 2.52 | 2.31** |
| 6. Since Hurricane Katrina, the New Orleans Police Department has become a better police department. | 2.38 | 2.22* |
| 7. I am satisfied with the way NOPD officers do their job. | 2.39 | 2.19** |
| 8. NOPD officers respond, when called, in a timely manner. | 2.13 | 1.95* |
| 9. When compared to 3 years ago, my neighborhood now has more confidence in the NOPD. | 2.48 | 2.30** |
| *10. Most crimes that take place in New Orleans are not solved by the police.* | *2.44* | *2.36* |
| *11. Overall, the New Orleans Police Department has little impact on crime in New Orleans.* | *2.42* | *2.32* |
| *12. There is a great need for more professionalization in the New Orleans Police Department.* | *1.91* | *1.80†* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 6.3.   Citizens' perceptions of NOPD procedural justice and trustworthiness—Across home ownership status

|  | Home owner | Renter |
|---|---|---|
| 1. Police officers in New Orleans are, for the most part, honest. | 2.61 | 2.33** |
| 2. Police officers in New Orleans are superior to other police departments in terms of integrity. | 2.26 | 2.16 |
| 3. Police officers in New Orleans are fair. | 2.51 | 2.32** |
| 4. Police officers in New Orleans are professional. | 2.50 | 2.30** |
| 5. Police officers in New Orleans are not racist or biased against minorities. | 2.36 | 2.22† |
| 6. I can count on New Orleans police officers to treat me fairly. | 2.62 | 2.38** |
| 7. New Orleans police officers treat victims of crime very well. | 2.41 | 2.26* |
| 8. Police officers in New Orleans know they have to win the confidence of the public to be effective. | 2.84 | 2.85 |
| 9. Police officers in New Orleans treat tourists in the same manner they treat citizens of New Orleans. | 2.35 | 2.20* |
| 10. I trust the NOPD. | 2.51 | 2.23** |
| 11. I have confidence in the NOPD. | 2.48 | 2.21** |
| 12. I respect the NOPD. | 2.77 | 2.65 |
| 13. I feel a moral obligation to obey the law. | 3.25 | 3.27 |
| 14. The NOPD tries to be fair when making decisions. | 2.56 | 2.42* |
| 15. Generally, NOPD officers stop and frisk people for legitimate reasons. | 2.46 | 2.26** |
| 16. During routine encounters with members of the public, NOPD officers use appropriate language. | 2.63 | 2.58 |
| 17. For the most part, NOPD officers use language that is not degrading when interacting with citizens. | 2.56 | 2.53 |
| *18. Police officers in New Orleans stop and frisk people as a form of harassment.* | *2.44* | *2.20** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 6.4.    Citizens' willingness to cooperate with the NOPD—Across home ownership status

|  | Home owner | Renter |
|---|---|---|
| 1. I would report a dangerous or suspicious activity to the NOPD. | 3.02 | 2.86* |
| 2. If asked, I would help the NOPD find someone who is suspected of having committed a crime. | 2.69 | 2.46** |
| *3. I would not call the NOPD if I witnessed or became aware of a crime.* | *2.90* | *2.71*** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† *p* < 0.10; *p* < 0.05; ** *p* < 0.01.



Table 6.5.    Citizens' views regarding how they believe NOPD officers should behave—Across home ownership status

|  | Home owner | Renter |
|---|---|---|
| 1. The NOPD should be accountable for their actions. | 3.38 | 3.55** |
| 2. The NOPD should keep the public informed. | 3.32 | 3.45* |
| 3. The NOPD should be open and honest when dealing with the public. | 3.40 | 3.52* |
| 4. The NOPD should treat people with respect. | 3.50 | 3.65** |
| 5. The NOPD should be interested in the well-being of ordinary citizens. | 3.41 | 3.55* |
| 6. Working conditions for police officers in New Orleans are good. | 2.32 | 2.28 |
| 7. To the best of my knowledge, NOPD officers have ready access to language interpretation services to help communicate with those who does [sic] not speak English. | 2.44 | 2.39 |
| 8. The NOPD has enough Spanish speaking officers who can interact with Spanish speaking suspects. | 2.24 | 2.20 |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 6.6.    Citizens' perceptions of how NOPD officers treat minorities and other groups—Across home ownership status

| | Home owner | Renter |
|---|---|---|
| 1. New Orleans police officers treat members of the African American community fairly. | 2.19 | 2.04* |
| 2. New Orleans police officers treat members of the Latino community fairly. | 2.30 | 2.28 |
| 3. New Orleans police officers treat members of the Vietnamese community fairly. | 2.47 | 2.55 |
| 4. New Orleans police officers treat members of the Lesbian, Gay, Bisexual and Transgender (LGBT) community fairly. | 2.35 | 2.28 |
| 5. Many victims in New Orleans Latino community fear reporting a crime due to fear of deportation. | 2.82 | 2.88 |
| *6. New Orleans police officers often engage in racial profiling.* | *2.29* | *2.10\*\** |
| *7. The African American community in New Orleans expects to be harassed by the NOPD.* | *2.15* | *2.00\** |
| *8. The African American community in New Orleans does not believe the NOPD is credible.* | *2.11* | *2.00†* |
| *9. There is a great deal of unfairness and bias by the NOPD toward the African American community.* | *2.19* | *2.00\** |
| *10. The Lesbian, Gay, Bisexual and Transgender (LGBT) community does not have confidence in the NOPD.* | *2.44* | *2.23\*\** |
| *11. During encounters between the NOPD and the homeless population in New Orleans, the homeless are often treated poorly by the NOPD.* | *2.34* | *2.06\*\** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† *p* < 0.10; *\*p* < 0.05; \*\* *p* < 0.01.



SECTION 7

**Community Survey Results:**
**Breakdown across Born in New Orleans (Yes or No)**



Table 7.1.    Citizens' satisfaction with NOPD officers during most recent interaction—Across born in New Orleans

|  | Yes | No |
|---|---|---|
| 1. I felt that the police officer was trustworthy. | 2.61 | 2.74 |
| 2. I had confidence the police officer was following the correct police procedure. | 2.65 | 2.76 |
| 3. I was satisfied with how the police officer behaved. | 2.63 | 2.70 |
| 4. I followed the specific instructions given to me by the police officer. | 3.20 | 3.17 |
| 5. The police officer treated me with dignity. | 2.68 | 2.79 |
| 6. The police officer treated me with respect. | 2.71 | 2.77 |
| 7. The police officer was polite when dealing with me. | 2.68 | 2.79 |
| 8. If I was stopped or questioned, the police officer adequately explained the reasons why. [1] | 2.62 | 2.70 |
| 9. The police officer gave me the opportunity to express my view. [1] | 2.51 | 2.60 |
| 10. Overall, the police officer did a good job. [1] | 2.51 | 2.65 |
| 11. I was satisfied with how I was treated by the police officer. [1] | 2.56 | 2.57 |
| 12. I was satisfied with the outcome of my experience with the police. [1] | 2.49 | 2.64 |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
[1] Question was only asked to those respondents that indicated they had been "stopped and questioned."
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 7.2.    Citizens' satisfaction with NOPD—Across born in New Orleans

|  | Yes | No |
|---|---|---|
| 1. While conducting their police duties, NOPD officers follow the law. | 2.43 | 2.60** |
| 2. The level of corruption in the New Orleans Police Department is low. | 2.23 | 2.19 |
| 3. I do not fear interacting with New Orleans police officers. | 2.73 | 2.75 |
| 4. There is more police presence in the French Quarter than in other areas of the City of New Orleans. | 3.20 | 3.11 |
| 5. I feel the scandals associated with the New Orleans Police Department in the past do not reflect the current practices of the NOPD. | 2.42 | 2.40 |
| 6. Since Hurricane Katrina, the New Orleans Police Department has become a better police department. | 2.22 | 2.45** |
| 7. I am satisfied with the way NOPD officers do their job. | 2.24 | 2.35 |
| 8. NOPD officers respond, when called, in a timely manner. | 1.99 | 2.09 |
| 9. When compared to 3 years ago, my neighborhood now has more confidence in the NOPD. | 2.35 | 2.45 |
| *10. Most crimes that take place in New Orleans are not solved by the police.* | *2.41* | *2.33* |
| *11. Overall, the New Orleans Police Department has little impact on crime in New Orleans.* | *2.35* | *2.42* |
| *12. There is a great need for more professionalization in the New Orleans Police Department.* | *1.88* | *1.79* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 7.3.   Citizens' perceptions of NOPD procedural justice and trustworthiness—Across born in New Orleans

|  | Yes | No |
|---|---|---|
| 1. Police officers in New Orleans are, for the most part, honest. | 2.39 | 2.60** |
| 2. Police officers in New Orleans are superior to other police departments in terms of integrity. | 2.22 | 2.16 |
| 3. Police officers in New Orleans are fair. | 2.36 | 2.49† |
| 4. Police officers in New Orleans are professional. | 2.37 | 2.47 |
| 5. Police officers in New Orleans are not racist or biased against minorities. | 2.29 | 2.24 |
| 6. I can count on New Orleans police officers to treat me fairly. | 2.44 | 2.61* |
| 7. New Orleans police officers treat victims of crime very well. | 2.35 | 2.27 |
| 8. Police officers in New Orleans know they have to win the confidence of the public to be effective. | 2.84 | 2.88 |
| 9. Police officers in New Orleans treat tourists in the same manner they treat citizens of New Orleans. | 2.25 | 2.29 |
| 10. I trust the NOPD. | 2.31 | 2.46† |
| 11. I have confidence in the NOPD. | 2.29 | 2.43† |
| 12. I respect the NOPD. | 2.71 | 2.69 |
| 13. I feel a moral obligation to obey the law. | 3.28 | 3.23 |
| 14. The NOPD tries to be fair when making decisions. | 2.46 | 2.55 |
| 15. Generally, NOPD officers stop and frisk people for legitimate reasons. | 2.38 | 2.33 |
| 16. During routine encounters with members of the public, NOPD officers use appropriate language. | 2.56 | 2.71* |
| 17. For the most part, NOPD officers use language that is not degrading when interacting with citizens. | 2.49 | 2.63* |
| *18. Police officers in New Orleans stop and frisk people as a form of harassment.* | *2.25* | *2.44*** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement. Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 7.4.     Citizens' willingness to cooperate with the NOPD—Across born in New Orleans

|  | Yes | No |
| --- | --- | --- |
| 1. I would report a dangerous or suspicious activity to the NOPD. | 2.90 | 3.01 |
| 2. If asked, I would help the NOPD find someone who is suspected of having committed a crime. | 2.49 | 2.75* |
| *3. I would not call the NOPD if I witnessed or became aware of a crime.* | *2.72* | *2.96** |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 7.5.    Citizens' views regarding how they believe NOPD officers should behave—Across born in New Orleans

|  | Yes | No |
| --- | --- | --- |
| 1. The NOPD should be accountable for their actions. | 3.42 | 3.55* |
| 2. The NOPD should keep the public informed. | 3.34 | 3.50** |
| 3. The NOPD should be open and honest when dealing with the public. | 3.43 | 3.54* |
| 4. The NOPD should treat people with respect. | 3.54 | 3.61 |
| 5. The NOPD should be interested in the well-being of ordinary citizens. | 3.42 | 3.56** |
| 6. Working conditions for police officers in New Orleans are good. | 2.35 | 2.24 |
| 7. To the best of my knowledge, NOPD officers have ready access to language interpretation services to help communicate with those who does [sic] not speak English. | 2.44 | 2.39 |
| 8. The NOPD has enough Spanish speaking officers who can interact with Spanish speaking suspects. | 2.26 | 2.14† |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



Table 7.6.    Citizens' perceptions of how NOPD officers treat minorities and other groups—Across born in New Orleans

|  | Yes | No |
|---|---|---|
| 1. New Orleans police officers treat members of the African American community fairly. | 2.07 | 2.17 |
| 2. New Orleans police officers treat members of the Latino community fairly. | 2.31 | 2.24 |
| 3. New Orleans police officers treat members of the Vietnamese community fairly. | 2.55 | 2.48 |
| 4. New Orleans police officers treat members of the Lesbian, Gay, Bisexual and Transgender (LGBT) community fairly. | 2.28 | 2.35 |
| 5. Many victims in New Orleans Latino community fear reporting a crime due to fear of deportation. | 2.78 | 3.01** |
| *6. New Orleans police officers often engage in racial profiling.* | *2.18* | *2.21* |
| *7. The African American community in New Orleans expects to be harassed by the NOPD.* | *2.10* | *2.07* |
| *8. The African American community in New Orleans does not believe the NOPD is credible.* | *2.09* | *2.06* |
| *9. There is a great deal of unfairness and bias by the NOPD toward the African American community.* | *2.06* | *2.18* |
| *10. The Lesbian, Gay, Bisexual and Transgender (LGBT) community does not have confidence in the NOPD.* | *2.37* | *2.30* |
| *11. During encounters between the NOPD and the homeless population in New Orleans, the homeless are often treated poorly by the NOPD.* | *2.19* | *2.15* |

*Note*: Entries are the mean score (average) on each item within the respective demographic subgroup. All survey questions range in values from 1 to 4. Thus, higher scores indicate more agreement to the statement.  Italicized questions are coded in the opposite direction as all other questions (i.e., higher scores indicate more *disagreement* with the statement).
† $p < 0.10$; *$p < 0.05$; ** $p < 0.01$.



### Appendix 3    N.O.P.D. EDUCATION AND TRAINING DIVISION

### Consent Decree Performance Metrics

**Lesson Plan Measures – Week ending 8/28/15**

**Milestone status % of Lesson Plans in each major program area:**

|  | **TOTAL** | **1st DRAFT DUE** | **IN REVIEW** | **FINAL DUE** | **COMPLIANCE** |
|---|---|---|---|---|---|
| RECRUIT | 123 | 29 (24%) | 0 (0%) | 59 (48%) | 35 (28%) |
| IN-SERVICE | 12 | 1 (8%) | 0 (0%) | 6 (50%) | 5 (42%) |
| FTO | 8 | 4 (50%) | 0 (0%) | 2 (25%) | 2 (25%) |
| NEW SUPV/DET | 21 | 9 (43%) | 0 (0%) | 2 (9%) | 10 (48%) |
| TOTAL LP's | 164 | 43 (26%) | 0 (0%) | 69 (42%) | 52 (32%) |

**Milestone status % of Lesson Plans specific to Consent Decree mandate:**

|  | **TOTAL** | **1st DRAFT DUE** | **IN REVIEW** | **FINAL DUE** | **COMPLIANCE** |
|---|---|---|---|---|---|
| CD Specific | 59 | 12 (20%) | 0 (0%) | 24 (41%) | 23 (39%) |