MINUTE ENTRY
MORGAN, J.
May 19, 2016

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**  Plaintiff | **CIVIL ACTION** |
| **VERSUS** | **No. 12-1924** |
| **CITY OF NEW ORLEANS,**  Defendant | **SECTION "E"** |

On Thursday, May 19th, 2016, the United States District Court for the Eastern District of Louisiana, Judge Susie Morgan presiding, held the sixth in a series of public hearings focusing on the New Orleans Police Department's progress under the Consent Decree entered in this matter. In attendance were counsel for the United States, counsel for the City of New Orleans, three members of the Consent Decree Monitoring Team, NOPD leadership, and multiple members of the NOPD Public Integrity Bureau Force Investigation Team ("FIT"). Following an introduction by Judge Morgan, the Court heard from lead monitor Jonathan Aronie, who provided a brief summary of NOPD's progress to date.

## Monitor

Mr. Aronie recognized the Department's "significant progress" in several areas, including its Crisis Intervention Team ("CIT"), its Force Investigation Team ("FIT"), its Canine program, its Body Worn Camera ("BWC") program, and the recent implementation of a formal policy promoting the voluntary public release of critical incident BWC videos. Mr. Aronie also noted the high level of cooperation the Monitoring Team has received from the NOPD leadership and from rank and file officers. According to Mr. Aronie: "When one looks at other consent decrees around the country, what works best is when the Monitoring Team, the Court, the Department of Justice, and the [Police] Department work together and cooperate; and we definitely get that here. Superintendent Harrison and his leadership team continue to fully cooperate with us." Mr. Aronie added "The Department responds quickly to the gaps that we – our team has identified, and often they identify the gaps on their own and fix gaps on their own." The Court likewise recognized the high level of cooperation it has seen among the Police Department, the Department of Justice, and the Monitoring Team.

Among those areas that continue to require the attention of NOPD and the Monitoring Team, Mr. Aronie included community oriented policing, the

Academy, and supervision. Mr. Aronie noted the Department agreed with the Monitoring Team regarding these gaps and was working closely with the Monitoring Team and the Department of Justice to remedy them.

**Use of Force**

Following Mr. Aronie's opening comments, the Court heard from the Police Department regarding the progress it has made responding to the Consent Decree's use of force requirements. Noting that some force is to be expected from police officers due to the nature of their work, the Court emphasized that a core goal of the Consent Decree was to reduce the use of excessive force by officers. The Court explained that the Consent Decree seeks to achieve this critical goal by requiring new policies, training, levels of supervision, and discipline in the use of force area.

NOPD Compliance Manager Bruce Hamilton began NOPD's use of force presentation. After acknowledging use of forces issues were one of the most important elements of the Consent Decree, Mr. Hamilton provided the Court relevant background regarding force issues generally and the Department's process for dealing with officer uses of force in particular.

As an initial matter, Mr. Hamilton confirmed that "NOPD officers are expected to use the minimum amount of force that an objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control while protecting themselves or the lives of others." Mr. Hamilton went on to provide an overview of the Department's use of force investigations policies and practices. Mr. Hamilton then turned the lectern over to the leader of the NOPD PIB Force Investigation Team, Lieutenant Kevin Burns.

Lt. Burns walked the Court through the process of a FIT investigation. Lt. Burns described the difference between a FIT administrative investigation and a FIT criminal investigation – noting an administrative investigation looks for violations of policy, training gaps, and other opportunities for process improvement, while a criminal investigation focuses on whether there has been a violation of law, and explained how both can proceed simultaneously in appropriate cases. According to Lt. Burns, FIT investigated 47 uses of force in 2015.

Lt. Burns also explained NOPD's force classification system, which is an outgrowth of the Consent Decree. In summary fashion, Lt. Burns explained NOPD's four levels of force, which are described in the Consent Decree as follows:

- Level 1 uses of force include pointing a firearm at a person and hand control or escort techniques (e.g., elbow grip, wrist grip, or shoulder grip) applied as pressure point compliance techniques or that result in injury or complaint of injury.

- Level 2 uses of force include use of an ECW [Electronic Control Weapon or Taser®] (including where an ECW is fired at a person but misses); use of

2

an impact weapon to strike a person but where no contact is made; use of a baton for non-striking purposes (e.g., prying limbs, moving or controlling a person); and weaponless defense techniques (e.g., elbow strikes, kicks, leg sweeps, and takedowns).

- Level 3 uses of force include any strike to the head (except for a strike with an impact weapon); use of impact weapons where contact is made (except to the head), regardless of injury; or the destruction of an animal.

- Level 4 uses of force include all serious uses of force, as defined by this Agreement, and shall be investigated by NOPD's Force Investigation Team.

Notably, pursuant to paragraph 77 of the Consent Decree, "hand control or escort techniques applied for the purposes of handcuffing or escorts that are not used as pressure point compliance techniques, do not result in injury or complaint of injury, and are not used to overcome resistance, are not reportable uses of force."

According to Lt. Burns, NOPD FIT reviews all NOPD uses of force, including minor uses of force that are investigated by a District sergeant in the first instance. More serious (Level 4) uses of force are investigated only by FIT.

Lt. Burns also described the Department's newly constituted Use of Force Review Board. According to Lt. Burns, with the help of the Monitoring Team, the NOPD established and held its first Use of Force Review Board on January 22, 2016, and has held nine Review Boards since. Lt. Burns described the Review Board as an opportunity for the FIT to be self-critical: "We self-critique. And we have deputy chiefs ... Paul Noel, Rannie Mushatt, Chief Westbrook [participate]. We even have members of the Academy attend. So everyone has input and they have their opportunity to critique the case done by FIT, by the department, everything as a whole. It is a more broad critique of the investigation as a whole." The Monitoring Team commended NOPD on the Use of Force Review Board: "Our experience with police departments across the country is [that it is] very difficult to start up a use of force review board, and I want to compliment NOPD for taking the lead, the initial lead, and starting off a great process with Chief Noel, Chief Mushatt, and Chief Westbrook with the open self-critical analysis that took place on January 22nd."

Sergeant John Helou followed Lt. Burns and presented the Court with an analysis of use of force data from 2014, 2015, and 2016. According to NOPD's data:

- Uses of force per arrest increased from 2014 to 2015 (from 1.1% to 2.6%), driven (a) by a 22.5% decrease in arrests and a 77% increase in reported uses of force, and (b) by a 156% increase in reported firearm/ECW pointing event (an event not deemed reportable prior to the Consent Decree).

- Comparing the first quarter of 2015 to the first quarter of 2016, NOPD's data show an increase in officer uses of force of 28% (from 136 to 174). Here again, however, the data suggest the increase was driven primarily by a

3

> marked increase in the reporting of firearm/ECW pointing events (as noted above, an event not deemed reportable prior to the Consent Decree).

While the data show an increase in reported uses of force, Sgt. Helou explained that, in addition to reflecting the new requirement to capture firearm/ECW pointing events as uses of force, the increase reflected better self-reporting of uses of force generally rather than an actual increase in uses of force.  The Monitoring Team, which conducts regular audits to identify unreported uses of force, agreed with the Department's interpretation.  According to Deputy Monitor Dennis Nowicki, "the work [the Monitoring Team has] done . . . supports the fact that there is greater reporting of use of force events, particularly in the area of drawing and pointing the weapon."  The Monitoring Team attributes the greater reporting of use of force events to the implementation of clearer policies, enhanced training, the use of body-worn cameras among patrol officers, and an increased departmental focus on reporting, supervision, and discipline since the approval of the Consent Decree by the Court.

Among other statistics, Sgt. Helou reported the following:

- A 10% drop in NOPD's "canine bite ratio" from 2014 to 2015,

- No "off leash" canine deployments in 2015 or 2016,

- A 28% reduction in the use of ECWs (Tasers®) from 2014 to 2015, and

- Two additional firearms discharges from 2014 (10) to 2015 (12).

Following the Department's use of force presentation, the Court heard from Deputy Monitor Dennis Nowicki and Monitor Chet Epperson.  Both monitors are former police chiefs and both focus on use of force issues for the Monitoring Team.  Chief Nowicki began the presentation by providing an overview of how the Consent Decree deals with use of force issues through policies, training, supervision, and discipline – something Chief Nowicki referred to as "PTSD."  Chief Epperson then described some of the audits and reviews the Monitoring Team conducts to assess the NOPD's level of compliance with its use of force policies.  These monitoring tools include, among other things:

- Reviewing policies,

- Attending training,

- Reviewing BWC videos,

- Reviewing a significant sample of all use of force reports,

- Reviewing all Level 4 use of force reports,

- Reviewing all serious use of force investigations,

- Reviewing <u>all</u> canine authorizations and deployments, and

- Providing technical assistance to the Department in the form of counseling, advice, and in person training.

In response to questions from the Court, the Monitoring Team also described some of the tests they perform specifically to identify unreported uses of force. These tests include:

- Reviewing BWC videos,

- Reviewing incidents where "resisting arrest" charges have been brought against the subject,

- Reviewing civil law suits against the City alleging excessive force, and

- Reviewing citizen complaints alleging excessive force to see if the officer had recorded the alleged force on his/her own.

While recognizing there is more work to be done, the Monitoring Team commended NOPD for developing an effective Force Investigation Team and praised the professional use of force investigations conducted by FIT's criminal investigation team. The Monitoring Team also recognized a significant improvement in FIT's administrative investigations, an area previously identified by the Monitoring Team as needing improvement.

In the area of Canine, the Monitoring Team called out NOPD officer Harold Chambliss and Sergeant Blanchard for special recognition. Chief Epperson noted he "reviewed their logs in terms of their lesson plans and their data, and they have a really good component." Chief Epperson contrasted the current level of compliance with the poor record keeping the Monitoring Team noted in the past. "At this point," he noted, "the Canine unit is doing a tremendous job."

The Monitoring Team ended its presentation with a summary of the areas where the Police Department was on track for achieving compliance with the Consent Decree and those where the Department was not yet on track. These findings will be reported in greater detail in the Monitoring Team's next Quarterly Report.

In addition to hearing reports on use of force issues, the Court also heard from various members of the Police Department regarding what progress had been made in the areas that were the subject of prior public hearings.

**Body Worn Camera Usage**

The Police Department first presented data regarding its deployment of Body Worn Cameras ("BWCs") and the level of BWC compliance among officers. According to Mr. Danny Murphy, a compliance manager in the Department's Compliance Bureau, the NOPD currently has 564 BWCs deployed to its officers

who interact with the general public. Mr. Murphy confirmed all patrol officers, and most sergeants, had been issued BWCs. Previously, all patrol sergeants had BWCs, but the Department's recent redeployment of administrative officers to patrol duties resulted in a shortfall of cameras. The Department ensured the Court new cameras had been ordered and would be deployed as soon as they arrived.

Continuing his discussion of BWC issues, Mr. Murphy suggested the NOPD was "far ahead" of most departments with respect to BWC issues. "We're definitely on the cutting edge in that respect," he added. The Monitoring Team agreed with Mr. Murphy's assessment.

With respect to the use of (as opposed to the deployment of) BWCs, Mr. Murphy presented the results of the Department's monthly BWC usage audits. According to the Department's data, each monthly audit since August 2015 has demonstrated an extremely high level of compliance among officers (over 98% in most cases). The Monitoring Team's independent audits likewise have confirmed a high level of compliance with respect to BWC usage.

**Supervision**

Following its BWC presentation, Superintendent Harrison presented the Court with a summary of recent steps the Department had taken to respond to the Monitoring Team's concerns regarding the inadequate level of supervision officers were receiving in the Department's various districts. The Superintendent identified several steps the Department has taken to help increase the level of supervision sergeants, lieutenants, and commanders exercise over those who report to them:

- Since the start of 2016, the Superintendent reported NOPD "promoted nine lieutenants and 17 new sergeants as part of an ongoing commitment to continue to strengthen supervisors across the department." The Superintendent added "these promotions are in addition to the 22 lieutenants and ten sergeants promoted in 2015 during our initial efforts to balance the supervisor to police officer ratio."

- Superintendent Harrison went on to explain the Department gives all new supervisors, including specialized leadership training and 40 additional hours of training in the Department's Use of Force reporting and misconduct policies.

- New sergeants "are provided with 40 hours of instruction and new lieutenants have a 16-hour training program," he continued.

In addition to the training, Superintendent Harrison provided the Court with a progress report on the Department's forthcoming "early intervention system," the implementation of which is required by the Consent Decree. According to the Superintendent, once implemented, the new system will "provide supervisors with

6

more reflective management tools in monitoring the activities and behavior of their subordinates, thereby increasing overall departmental effectiveness."

Superintendent Harrison next described the Department's creation of a working group to identify administrative tasks that take time away from supervisors' ability to ensure close and effective supervision without adding substantive value. The Monitoring Team previously reported to the Court on the effectiveness of a similar working group for patrol officers, and highlighted its focus on reducing their administrative burden to allow them to focus on calls for service, community policing, and other core functions.

**<u>Discipline</u>**

The Police Department next updated the Court on its efforts at bringing its misconduct investigation and discipline practices into compliance with the Consent Decree. Deputy Chief Tim Averill of the NOPD's Compliance Bureau described five important policies revised and approved by the Monitoring Team and the Department of Justice, including a new investigation policy and discipline matrix that, as the Department of Justice noted at the last public hearing, incorporates national best practices. Deputy Chief Averill also described the Department's newly issued critical incident BWC release policy. With respect to the critical incident release policy, the Court commended the Department as follows: "…This is intended to allow for transparency sooner after the incident occurs, not years later but … relatively quickly after an incident occurs. And you all did a good job of rolling out that policy and of releasing the videos and explaining to the press so they could explain to the public exactly what they are seeing."

Mr. Aronie, the lead monitor, added his commendations regarding the new policy as well: "This policy is especially impressive because, while departments and cities across the country are actually working to keep videos from going public, the [NOPD] has taken a pretty vocal and public stand in favor of transparency. We don't see that a lot and it's worthy of note."

Deputy Chief Arlinda Westbrook, the leader of the NOPD Public Integrity Bureau ("PIB"), next presented data showing the number of misconduct investigations and the level of discipline imposed by PIB over the prior reporting period.

Deputy Chief Westbrook informed the Court of an 18% increase in complaints from 2015 to 2016, but noted the increase likely resulted from two things: First, the Department's new policies treat more issues as formal complaints whereas some issues previously would not have resulted in a formal complaint; and second, a greater willingness among citizens to file complaints, due to growing confidence in the Department's complaint process. At a prior hearing, the Monitoring Team advised the Court that a short-term increase in citizen and/or rank-initiated complaints often is a reflection of growing citizen confidence in a Department. Deputy Chief Westbrook added that future comparisons of 2016 data to 2017 data will be more instructive.

Deputy Chief Westbrook next walked the Court through data reflecting the discipline imposed following misconduct investigations. According to the Deputy Chief, the most notable change from 2015 to 2016 was an increase in the severity of the discipline imposed. With respect to discipline imposed as a result of BWC non-use or misuse, Deputy Chief Westbrook explained the Department had initiated 150 investigations so far and completed 139 of those investigations. Of those, the Department's data show 105 were sustained, 19 were exonerated, 9 were unfounded, and 6 were not sustained. According to the Deputy Chief, "of the investigations that were found sustained, 65 received the one-day suspension. Three received the two-day suspension. Two received the three-day suspension. Six received five days. Two received 15 days. One received 20 days. And two received 23 days. We had 14 letters of reprimand. And we have about five that are still awaiting hearing."

Deputy Chief Westbrook ended her presentation with compliments for the IPM's mediation program: "I've been particularly impressed with the IPM's mediation program. I think she's here today and I want to thank her for some of the things that have been happening with the program because I don't know that the numbers are as reflective of what I'm hearing from the citizens and the officers that have been participating in it, but there are many of these cases that would have possibly ended with a not sustained or with the complainant leaving feeling unresolved in terms of the incident."

**Police Academy**

The new Deputy Chief responsible for the Department's training program (John Thomas) next updated the Court on the progress being made at the Police Academy. Among other things, the Department introduced newly appointed Commander Chris Goodly who assumed command at the Academy earlier this month. Deputy Chief Thomas also advised the Court the Department had made an offer to an accomplished academic to join the Department to run the academic program at the Academy. The Department expressed optimism the new Academic Director will help the Academy respond to the concerns raised by the Monitoring Team regarding the consistency, structure, and documentation of the Academy's new-recruit and in-service classes.

**Recruitment/Hiring**

Finally, the Department's Deputy Chief of Staff, Jonathan Wisby, provided the Court with a brief update regarding the Department's recruiting and hiring efforts. With respect to the current Academy class, Mr. Wisby commented "it is the largest class that we've started since 2010, with 39 new officers beginning training." He continued, "it is the class that really was processed in the quickest amount of time." Mr. Wisby then commented on the Department's engagement of Louisiana Technical Institute to develop a new multiple choice test and written exam for new recruits. Mr. Wisby expressed optimism the new tests would resolve the concerns previously raised by the Monitoring Team regarding several elements of the current tests. Mr. Wisby also presented the Court with data indicating the

Department has enhanced its recruiting and selection process to more quickly and efficiently vet potential new recruits. Specifically, Mr. Wisby informed the Court "In 2014 half of all investigations took over 71 days. By 2015, that bar was at 56 days … And then in 2016, … we are processing 75 percent of people within 54 days…."

The Court expressed gratitude toward NOPD and its efforts to facilitate its hiring of new officers: "It is the City's priority and the Mayor's priority to hire additional police officers, 150 this year; and thus it is so important to decrease the time between a person's application and their notification that they will be hired … It's so important because we're losing people because it took too long; and so congratulations on all of the changes that have been made and shortening the time."

**Department of Justice**

The Court next heard from the United States Department of Justice. DOJ counsel Jonas Geissler explained the United States was encouraged by the reports of the NOPD and the Monitoring Team. Mr. Geissler made a point of commending "NOPD from the Chief all the way through the organization to the line officers for progress made thus far." Mr. Geissler also commended the Monitoring Team not only for its monitoring efforts, but also for "providing valuable consulting to the [NOPD] to improve it as it goes through the [Consent Decree] process."

While recognizing the strong policies now in place, however, Mr. Geissler cautioned the Court that the Department still needs to focus on its training and supervision practices in order to ensure the new policies are effective. Mr. Geissler also cautioned the Court "today's hearing is not yet an assessment of compliance. There is still work to do. [The Monitoring Team] has not presented an overall testament of reasonableness versus unreasonableness from the larger world of uses of force by the NOPD, nor has the United States." Mr. Geissler added "that is not to detract, however, from that first take home point which is commendation to NOPD for the work they have done."

Following Mr. Geissler's comments, the Court thanked NOPD, the Department of Justice, and the Monitoring Team for their collective hard work and the high level of cooperation. "So we have made a lot of progress. We're not there all the way, but I really see a lot of improvement and I think we're headed in the right direction … It's going to take a period of time for all these things to happen, for the training to be done  …  [But the Monitoring Team is] now at a point where they can really begin monitoring and comparing 2015/16 and 2016 and 2017, and that's when we'll know for sure that … everything has been done that needs to be done. But I think I agree with you, we're headed in the right direction."

The hearing then was adjourned. The next public hearing is scheduled for August 18, 2016 at 1:30 pm Central Time. The courtroom and topic will be announced in advance of the hearing on the Court's, the Monitoring Team's, and NOPD's web site.

New Orleans, Louisiana, this 31st day of May, 2016.

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

JS10 (2:16)