UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | * | Docket No. 12-1924 |
| VS | * | May 19, 2016 |
| CITY OF NEW ORLEANS, Defendant. | * | Section "E" |

***************************************************************

**REPORTER'S OFFICIAL TRANSCRIPT OF THE PUBLIC HEARING BEFORE THE HONORABLE SUSIE MORGAN, UNITED STATES DISTRICT JUDGE.**

***************************************************************

**APPEARANCES:**

For the United States: Theodore Carter, Jonas Geissler

For the City of New Orleans: Churita Hansell

For the NOPD: Michael Harrison, Tim Averill, Arlinda Westbrook, Kevin Burns, Jr., John Helou, Regina Williams, Christina Watson, David Barnes, Michael McCleary, Travis Ward, Chris Mark, Chris Goodley

For the Monitoring Team: Jonathan Aronie, Chet Epperson, Dennis Nowicki

**REPORTED BY:** Mary V. Thompson, RMR, FCRR
500 Poydras Street, Room 275
New Orleans, Louisiana 70130
(504) 589-7783

**P R O C E E D I N G S**

(Call to order of the court.)

THE COURT: All right. Be seated.

THE CASE MANAGER: Civil Action 12-1924, *United States of America vs State of Louisiana*.

01:32:38

THE COURT: Just a second. This chair is so low, I can't see over the lectern.

(A pause in the proceedings.)

THE COURT: Well, I don't know how to do that so I'll just have to deal with it.

01:33:00

I feel like I'm peeking over the top.

CHIEF HARRISON: I've got it, Your Honor.

MR. ARONIE: Media opportunity.

THE COURT: He is a full-purpose chief.

Perfect. Thank you so much.

01:33:30

MR. ARONIE: I monitored that whole environment right there and thought he did a fine job.

THE COURT: The record should reflect that the Chief of Police knows how to work a chair.

All right. Welcome everyone. I'm so glad to see all of you this afternoon. As usual we introduce the people who are here, but I wanted to say a few things before we get started.

01:33:42

This is our sixth public hearing, and we're focusing on the -- well, this hearing is going to be about use of force.

Since the Court's approval of the consent decree in

01:34:12

January 2013, we've been at work on a number of fronts as most of you in the room know all too well. I share the department's progress and their hurdles with the public. The monitoring team publishes regular reports which are posted on the team's website and on the court's website.

To further promote transparency, last year I established a practice of holding quarterly public hearings focusing on a number of critical consent decree topics. Past hearings have focused on body-worn camera usage, training and the academy, supervision, and other topics.

In addition to these public hearings, the Court holds monthly meetings in chambers with the parties including the superintendant and the deputy mayor. Today's hearing will focus on the use of force, a core topic of the consent decree.

Before we get to that, we have a few preliminary matters.

First I want the representatives of the police department who are here to introduce themselves.

And, Tim, I'm going to start with you, and then we'll also go through the jury box.

DEPUTY AVERILL: Thank you. My name is Tim Averill. I head the Compliance Bureau in the NOPD.

DEPUTY CHIEF WESTBROOK: Arlinda Westbrook. I head the Public Integrity Bureau, NOPD.

CHIEF HARRISON: Michael Harrison, Superintendant of

01:35:47
01:35:57
01:36:08
01:36:25
01:36:39

Police.

MS. HANSELL: Churita Hansell on behalf of the City of New Orleans, City Attorney's office.

THE COURT: Start here.

LIEUTENANT BURNS: Lieutenant Kevin Burns, Jr., assigned to the NOPD Force Investigation Team.

SERGEANT HELOU: Sergeant John Helou, also assigned to the NOPD Force Investigation Team.

SERGEANT WILLIAMS: I'm Sergeant Regina Williams, assigned to the Force Investigation Team, criminal section.

SERGEANT WATSON: Sergeant Christina Watson, assigned to the NOPD Force Investigation Team.

THE COURT: Speak up so the court reporter can hear you.

SERGEANT BARNES: Sergeant David Barnes, assigned to the Force Investigation Team.

DETECTIVE MCCLEERY: Detective Michael McCleery, Force Investigation Team.

SERGEANT WARD: Sergeant Travis Ward, Force Investigation Team, criminal side.

THE COURT: Thank you.

Then the representatives of the monitoring team and the Department of Justice.

MR. ARONIE: Jonathan Aronie, a consent decree monitor.

MR. NOWICKI: Dennis Nowicki, a member of the

monitoring team.

MR. EPPERSON: Chet Epperson, member of the monitoring team.

MR. CARTER: Theodore Carter, United States Attorney's office.

01:36:47

MR. GEISSLER: Jonas Geissler for the United States.

THE COURT: So thank you. I'm glad to have all of you here and the others who are in the audience as well.

I understand that we have a new commander at the academy that you-all would like to introduce.

01:37:00

MR. THOMAS: Yes, Your Honor. We have Commander Chris Goodley appointed on May 1st who is the commander of the academy.

We also have in attendance Mr. Chris Mark with the civilian fleet. Mr. Chris Mark is our civilian fleet manager. He's been on the job about a month or so.

01:37:20

THE COURT: All right. So we've introduced Commander Chris Goodley. And then your new fleet manager, what's his name?

CHIEF THOMAS: Mr. Chris Mark.

THE COURT: Chris Martin?

CHIEF THOMAS: Mark, M-a-r-k.

01:37:33

THE COURT: Okay. All right. Well, Commander Goodley and Mr. Mark, I'm glad to have you here today, and we welcome you to the -- what we consider to be a team. And we know you're going to be team players for us and help us get the job done. So we're glad to have you, and you're welcome to come back any time.

01:37:48

So now I would like for the monitor to give us a brief update on their current activities and areas of focus.

MR. ARONIE: Thank you, Your Honor. Jonathan Aronie, consent decree monitor.

01:38:11 Your Honor, we've been working on this project since August 2013, and I'm pleased to report that the police department is making very good progress. In fact, in many areas they've made significant progress. We've talked about these in prior hearings. We've mentioned their rollout of the body-worn camera program, and they're actually one of the cities to lead the nation in a rollout of such a program. 01:38:30

We've mentioned the rollout of the crisis intervention team program, CIT program, which is up and running and working very well.

01:38:43 We talked about -- and I know the police department will talk more about an innovative camera/video release policy.

We've talked and said great things about the Force Investigative Team, the work that the K9 unit is doing, and there are others.

01:38:57 So I'm very happy to report all this good progress.

And in areas that need more progress, I'm happy to report that the department and the monitoring team agree on what those areas are and have been working hand-in-hand to solve the gaps that we've identified in areas of community policing, training and the academy, and supervision. There's no argument 01:39:16

about where those gaps are. There is just -- to say partnership might be a little of an overstatement, but we're all working very closely together and we're rowing in the same direction to be sure.

01:39:31 I think as important as those substantive areas, the other point that's definitely worthy of mentioning again is that we continue to receive full cooperation from the New Orleans Police Department. And that's very important because, as one knows, when one looks around at other consent decrees around the 01:39:49 country, what works best is when the monitoring team, the Court, the Department of Justice, and the department do work together and cooperate. And we definitely get that here. Superintendant Harrison and his leadership team continue to fully cooperate with us.

01:40:03 As I said last time, we no longer waste any time fighting about things. We are really working hand-in-hand. The department responds quickly to the gaps that we -- our team has identified, and often they identify the gaps on their own and fix gaps on their own.

01:40:20 And we're also working hand-in-hand on a number of very creative solutions to some of the problems they have, and I'm sure the department might mention some of those.

Today I have two members of the monitoring team with me, Deputy Monitor Dennis Nowicki and Monitor Chet Epperson, and 01:40:37 they're going to be focusing on use of force. That's one of the

areas that they focus on throughout our day-to-day work.

And with that, we look forward to presenting, but I will let us get closer to that, and I'll step down unless you have questions.

01:40:49 THE COURT: Thank you. That's a good report. And I echo what the monitoring team is saying, that we're working so well together, the city, the police department, the monitors, DOJ, and it really is a team effort, and I appreciate that attitude of cooperation on all parts.

01:41:08 And especially all of you at NOPD, we're so glad you're here today to participate in the hearing because we know you're the people who really make this happen.

So as usual we spend a little time going back to the pre -- the issues that we've had previous public hearings on. 01:41:31 And I've asked to do that once again, and we'll keep it brief, but it's just a way to keep the public informed of the progress that we've made on these other issues as well.

So let's start with the body-worn camera technology and other issues.

01:41:52 MR. MURPHY: Afternoon, Your Honor. Danny Murphy, compliance manager with NOPD.

A brief update on body-worn cameras and in-car cameras.

So a little history. We deployed the body-worn cameras in May of 2014. Currently we have 564 cameras deployed in the 01:42:12 field with units interacting with the public.

 01:42:30 01:42:51 01:43:07 01:43:22 01:43:38

38 of 55 patrol sergeants are currently equipped with BWCs. We expect to reequip all patrol sergeants when we receive more cameras as part of a DJA-funded body-worn camera grant.

We attended a national conference on body-worn cameras last month, and Commander Sandifer from the compliance bureau presented on our policies and the way that we've rolled out the body-worn camera program. And we're very far ahead of most departments in this respect, so a lot of departments came up to us asking advice on what do you do about this policy question, how do you look at utilization rates, how do you deal with discipline when the cameras aren't being used. So we're definitely on the cutting edge in that respect.

And so we continue to review the BWC utilization rates each month, and I'll go over the process just very quickly.

THE COURT: Just to clarify, you said 38 of 55 sergeants, but all the patrol officers?

MR. MURPHY: Yeah, the patrol officers are equipped and they are the priority. The patrol sergeants was a pilot program. In April all of them had cameras, but as a result of the redeployment and getting more officers out on the street, we had to shift some of the cameras from the patrol sergeants to the patrol officers out on the streets. But we expect to fully equip them shortly.

So moving to the next slide, each month we select one day and do a body-worn camera scorecard. We take all of the trip

01:43:56 01:44:12 01:44:34 01:44:51 01:45:03

sheets, or daily activity reports, from all of the districts, all of the patrol districts, for one day and we look for a corresponding video. And then we mark whether there is a corresponding video or not and we come up with a percentage of how many calls that should have had a video and actually had a video.

And this chart shows our progress over time. Dating back to May 5th of 2015, you can see our utilization rate was at 85 percent. And the literature does show that it takes a little time to fully implement and utilize these new technologies.

You can see a steady increase from there. By August of 2015, we're at 96 percent, and we haven't looked back since.

Most recently, our last review had us at 99 percent. And we're hovering at 99, 98, 97 percent, so we're pleased to see a deep integration of the body-worn camera technology into our practices and that officers are regularly using them out in the field.

THE COURT: All right. So that has been very informative and helpful and encouraging to all of us that you've seen this kind of usage.

MR. MURPHY: And we'll continue to monitor it going forward.

THE COURT: All right. And I want to mention that I recently asked you to start looking at -- now that we've worked out some of the kinks with the dashboard cameras in the cars,

01:45:15
01:45:34
01:45:51
01:46:05
01:46:22

we're going to make sure that all of those are working properly.

MR. MURPHY: Yes. We can present results on that to you next month at our meeting.

THE COURT: Okay. Thank you.

MR. MURPHY: Thank you.

THE COURT: The next area will be supervision.

CHIEF HARRISON: Good morning, Your Honor. Michael Harrison, Superintendant of Police.

With the Court's permission I would like to provide a brief update into our efforts to provide close and effective supervision throughout the ranks of our police department.

Close and effective supervision is at the core of our transformation to becoming the best police department in America, and we're committed to not only getting close and effective supervision right but we're also committed to being the best police department in the country.

In the 2011 investigation of the department, the U.S. Department of Justice found that supervisors did not routinely review reports of arrests and officers' use of force, even signing off on reports that had obvious flaws. The Justice Department concluded that supervisors were responsible for far too many subordinates, with sometimes a ratio of supervisors supervising up to sometimes more than 20 police officers.

Since the start of 2016, I've promoted nine lieutenants and 17 new sergeants as part of an ongoing commitment to continue

to strengthen supervisors across the department. These promotions are in addition to the 22 lieutenants and 10 sergeants promoted in 2015 during our initial efforts to balance the supervisor-to-police-officer ratio.

01:46:39 The new managers joined those supervisors already in the field who directly oversee, manage, and lead officers every day. These new supervisors have already participated in our leadership in police organizations or LPO training. This professional management program was developed by the 01:46:55 International Association of Chiefs of Police, and it emphasizes the systematic development of leaders at all levels in the organization. NOPD has now provided this topnotch leadership instruction to 290 members of the department, representing over 30,000 hours of intensive supervisor training devoted to just 01:47:15 this one program.

These new leaders also undergo 40 hours of instruction related to use of force reporting and our misconduct policies. This training is conducted by both members of the Public Integrity Bureau and through a system of outside support staff.

01:47:31 In addition to that, these supervisors are required to participate in two separate tracks of training designed specifically for new supervisors. New sergeants are provided with 40 hours of instruction, and new lieutenants have a 16-hour training program. This is in addition to the 40-hour in-service 01:47:48 training required for all supervisors to attend.

01:48:07 01:48:23 01:48:42 01:48:59 01:49:14

We continue to move forward on time, on task, and on budget with the development and phase implementation of our state-of-the-art early intervention system that we call Insight. This advanced IT system will provide supervisors with more reflective management tools in monitoring the activities and behavior of their subordinates, thereby increasing overall departmental effectiveness.

Insight will integrate nine NOPD existing IT systems into a single, customized, next generation police report system that will streamline the workflow and provide supervisors with 24/7 online access to critical performance indicators.

In addition to large scale IT projects like Insight, we are continually upgrading all of our IT systems that supervisors have available to them. These tools help supervisors manage police services more effectively by ensuring that calls for service are responded to as quickly as possible, and identifying some existing data shortfalls and creating new ways to track response efforts has really helped our supervisors dramatically improve on the delivery of police services, especially when it relates to emergency calls.

Our supervisors need to be able to focus on those duties specific to their assigned area of responsibility so as previously suggested by the Court in 2015, the NOPD command staff and the federal monitoring team formed a working group of police officers to study everyday tasks performed in an attempt to

improve efficiency. This highly successful approach has recently been expanded now to include workload reduction and working groups of field lieutenants from across district assignments.

The first meeting of this group was held two weeks ago and was chaired by the chief of operations, Chief Paul Noel. After reviewing a host of assigned duties, the group was asked to report back at their next meeting with any recommendations they had to improve effectiveness. So the new lieutenants participating in this work group are very enthusiastic, they were highly focused on their mission, and we will continue to report back to the Court on the progress of these efforts.

Lastly, every day we assess our IT capacity and we assess our supervisors technical and human skills to ensure that all these entities working together allow us to not only provide close and effective supervision, not only provide accountability at every level, but also gives us the ability to cultivate and develop the future supervisors, managers, and leaders of the department.

So thank you for giving me an opportunity to share that with you.

THE COURT: Thank you for that report. We really are starting to see some real improvement. I know your supervisors are going to appreciate it because you've added new lieutenants and sergeants, we've increased their training, and we're looking for ways to make what they have to do -- to lessen their burden

01:50:47 01:51:02 01:51:28 01:51:47 01:52:09

so that they can supervise more. And all the new technology that you're implementing I think is really going to make a difference, and even over the next six months we're going to see a lot of changes.

And I love the working groups of the patrol officers and now the field -- the FTO officers and the lieutenants. I think that's a great idea and can't wait to see what the lieutenants come up with.

CHIEF HARRISON: Thank you for all your support.

THE COURT: Thank you.

Discipline.

DEPUTY AVERILL: Good afternoon, Your Honor. My name is Tim Averill. I head up the compliance bureau.

I would like to spend a few minutes updating the Court on policies that were not final when we last had our hearing on discipline. They are now final. They all became final on May 15th. And then I'll spend a few minutes on a topic that Mr. Aronie mentioned, which is our critical incidents policy.

So effective last Sunday, we have four new discipline-related policies. The first is called Adjudication of Misconduct. The policy establishes fair and impartial procedures for conducting disciplinary and penalty hearings in order to assess the appropriateness of discipline and penalties for violations of NOPD policies, rules, and procedures.

The policy provides for bifurcated disciplinary

proceedings, one to contest or dispute the charges called the predisposition conference and one to consider the appropriate penalty for a sustained violation called the pre-disciplinary hearing. An important change from past practice is that the Public Integrity Bureau will also now be conducting predisposition conferences.

The second policy is called the Disciplinary Matrix Penalty Schedule. This policy promotes the equitable, consistent imposition of discipline. The goal is to provide similar penalties for similar violations depending upon the aggravating or mitigating circumstances of each case.

Seven offense levels have been established based on the seriousness of the violation. Within each offense level our penalty ranges for a given offense together with enhanced penalties for repeat offenses. The policy also incorporates 18 factors that justify a lesser or harsher penalty depending on the circumstances of the case.

If I might digress just for a minute to note that at our last conference on discipline, one of the DOJ lead attorneys, Emily Gunston, was here and she was very happy that we had reached agreement on these two policies.

With regard to adjudication, I think she was very hopeful that we agreed to a policy where a clear, neutral evaluation was going to assess misconduct in serious cases, and that is PIB.

01:54:06 01:54:20 01:54:39 01:55:04 01:55:26

With regard to the matrix, we all were in agreement that the prior matrix was not narrowly tailored enough, was not clean enough, and didn't offer predictability on penalty. I think she was very happy with that also.

I wanted to mention that because I think it's important.

THE COURT: I agree. She was very complimentary of the department, and she couldn't have been more pleased with these policies. And I think she'll be telling other departments about these policies and using them as examples.

DEPUTY AVERILL: Yes, ma'am.

The third policy is called the Body-Worn Camera Inadvertent Misuse and Non-Use Policy. This policy authorizes a supervisor to counsel -- we call it redirection of an employee -- to correct inadvertent violations of the body-worn camera policy.

The process can only be used for inadvertent, unintentional violations, and it cannot be used if the alleged violation involves an alleged use of force, any criminal allegation, any other violation of NOPD rules, or any public complaints.

Officers are allowed three documented instances of redirection in a one-year period. A fourth redirection may be allowed if the member self-reports the violation.

The process is one in which the supervisor meets with the employee and makes a determination that it was, in fact,

unintentional. If it's intentional, that's a serious violation under our disciplinary matrix, and there are factors that it looks at. Longevity, circumstances of the stop, et cetera.

01:55:46 So if the supervisor determines that it was inadvertent and unintentional, he then meets with the employee, instructs the employee on the proper way to go on the policy, the camera, the turn on, when it's to be turned on. He then documents the redirection in what we call a 105 Form, which is the interoffice memorandum. That goes in the personnel file, and a copy gets sent to PIB. 01:56:08

The fourth policy, probably not as sexy as our other three, is called Misconduct Complaint Investigator Responsibilities. This policy simply outlines the procedures that our investigators follow for receiving, investigating, and processing complaints regarding allegations of misconduct. 01:56:23

I would also like to mention, with regard to an update, that the Office of the Consent Decree Monitor, the Department of Justice, and the NOPD are considering the possibility of expanding our use of negotiated settlement. The policy on negotiated settlement agreements provides an expeditious, 01:56:43 efficient mechanism for resolving instances of more minor misconduct without the need for a formal hearing. Currently only rank-initiated cases are eligible for negotiated settlement, so that issue would be one that would be on the table if we expand the use of that process. 01:57:02

THE COURT: That's the one where basically the officer does not contest -- does not dispute the incident occurred and doesn't contest what the discipline will be, and is more efficient?

01:57:19 DEPUTY AVERILL: Yes, ma'am.

THE COURT: It gets resolved quicker. The -- and that's better for the officer.

DEPUTY AVERILL: It's a win-win for everyone involved.

MR. ARONIE: And, Your Honor, if I can note that the 01:57:29 department's negotiated settlement policy in a sense goes hand-in-hand with the IPM's mediation policy, both working towards the same end.

DEPUTY AVERILL: I would like to just briefly take a minute to discuss our release of critical incident recording 01:57:44 directives. This is a PIB directive that we put together and passed in February.

What does the policy do? It facilitates the proper release of video recordings of critical incidents involving the NOPD so long as the release is consistent with the legitimate 01:58:04 needs of ongoing law enforcement operations.

What is a critical incident? A critical incident is an event in which an NOPD officer uses force resulting in hospitalization or death, intentionally shoots his or her gun, strikes someone in the head with an impact weapon, engages in a 01:58:27 vehicle pursuit that results in death or in injury requiring

01:58:46
01:59:02
01:59:18
01:59:31
01:59:42

hospitalization, or an arrested or detained subject dies in NOPD custody. So that's the parameters of what this policy is geared toward looking at.

And overview of the process.

So we have a critical incident. Then what?

First, PIB forwards the recording to the interested parties.

Who are they? There's four of them. The DA's office, the city attorney's office, the compliance bureau, and the U.S. attorney's office.

The deputy chief of PIB confers with the interested parties to obtain their input regarding whether or not the incident recording should be released.

The deputy chief then makes a recommendation to the superintendant regarding that release.

The interested parties may object.

Then the superintendant determines whether the recording should be released.

THE COURT: Which I believe, when they object, what they would also do is contact the chief and say, We object to this --

DEPUTY AVERILL: Yes. We would file a written objection so he would have that and then he assesses whether it should be released.

And his determination, if in fact that determination is

not to release, is subject to your review.

Issues to consider regarding disclosure.

So what is it that we consider when we're looking at these critical incident videos?

01:59:59 The safety of witnesses including officers.

Privacy concerns.

Input from the recipient of the force.

Witnesses.

And, if warranted, family members.

02:00:11 The needs of law enforcement officials in the course of an ongoing investigations.

And the location of the incident. If it was in someone's home or if it was in the middle of the street, that would be a factor.

02:00:22 The policy provides for redaction and blurring. NOPD may redact or blur portions of the recording if necessary to address privacy and security concerns.

Time period of the process.

The directive envisions a process in which the time 02:00:46 period from the incident to the superintendant's release decision is about ten days.

How many critical incident releases have been performed to date?

We have done two. And when these critical incidents 02:01:00 occur, we'll be doing more.

02:01:20 02:01:31 02:01:50 02:02:02 02:02:21

THE COURT: All right. Of course that was within the last month or so that those videos were released. I guess I'll explain to the people that don't know it already, some people in the audience, this is not -- this is intended to allow for transparency sooner after the incident occurs, not years later but --

DEPUTY AVERILL: Yes, ma'am.

THE COURT: -- relatively quickly after an incident occurs.

And you-all did a good job of rolling out that policy and of releasing the videos and explaining to the press so they could explain to the public exactly what they were seeing. And congratulations on the successful rollout of that policy. And we'll continue -- I'm sure it will continue to be used in the years ahead.

And I think we're on the cutting edge of this, too, around the country, and we're going to avoid some problems that others have faced because of this decision.

DEPUTY AVERILL: Thank you, Your Honor.

MR. ARONIE: Your Honor, if I just very briefly might say that this policy is especially impressive because, while departments and cities across the country are actually working to keep videos from going public, the police department has taken a pretty vocal and public stand in favor of transparency. We don't see that a lot and it's worthy of note.

THE COURT: I agree.

DEPUTY CHIEF WESTBROOK: Good afternoon, Your Honor. Arlinda Westbrook. I'm the Deputy Chief of the Public Integrity Bureau, and I'm charged with handling all misconduct investigations and complaints.

02:02:34

So what I wanted to do after Tim, who introduced the policies, is talk a little bit about some of the statistics that we have in reference to our misconduct complaints to date.

One of the first things we want to talk about and we want to compare is the first half of 2015 to 2016.

02:02:50

We have about an 18 percent increase in complaints which will be indicative of the new policies which call for allegation-driven complaints. So that would be consistent with now we have more formalized complaints that are being fully investigated and so we have an increase of those complaints.

02:03:15

And we also have more -- when I look at the next slide --

THE COURT: What you're saying is it doesn't mean that there's more misconduct, more bad conduct, it just means there's more reporting?

02:03:30

DEPUTY CHIEF WESTBROOK: There's more reporting so that -- and that's sometimes indicative of people feeling more trust to come in and report. And we also have changes in how we classify misconduct under the consent decree so that would also speak to the changes. So it will be better for us to do

02:03:47

comparisons going forward now that we have new policies in place.

THE COURT: Right. So it's kind of apples and oranges now --

DEPUTY CHIEF WESTBROOK: Correct.

02:03:58 THE COURT: -- but 2016/2017 will be a better comparison?

DEPUTY CHIEF WESTBROOK: Yes, ma'am.

And when we look at the next slide, what I did was break down rank-initiated versus citizen-initiated complaints.

02:04:14 And you'll see when I compare 2015 to 2016, we have an increase not only with citizen-initiated complaints but also with rank-initiated complaints. So some of the things that have been put in place are with supervisors taking a more proactive look at whether, in fact, the subordinates that they're supervising are 02:04:36 violating certain policies instead of waiting for a citizen to come in. We see a more proactive approach on the rank side also when it comes to initiating complaints this year. So of course that would also speak to the close and effective supervision.

The next slide, Your Honor, is hearing outcomes.

02:04:58 So what this would be indicative of is after we investigate a misconduct complaint and we find a "sustain," which would mean that we found that the officer violated policy, this would be the hearing outcomes in terms of the discipline that would be imposed on the individual officers.

02:05:18 And so what we did was a comparison of 2015 and 2016,

2016 being the red, 2015 being blue. And this is an apple-to-apples comparison in term of the months. We did the first half of 2016 and the first half of 2015.

We have an increase of the amount of suspension days that was given in 2016.

And we also have an increase of the -- I'm sorry, a decrease in the amount of letters of reprimand. So what that means is a letter of reprimand would be more of an informal type of discipline, and we found an increase of actually giving more suspension days in 2016.

The other thing we wanted to talk about is the mediation program. I've been particularly impressed with the IPM's mediation program. I think she's here today, and I want to thank her for some of the things that have been happening with the program because I don't know that the numbers are as reflective of what I'm hearing from the citizens and the officers that have been participating in it. There are many of these cases that would have possibly ended with a "not sustained" or with the complainant leaving feeling unresolved in terms of the incident.

So just the idea of the citizens coming together with the officer and having an ability to talk about the incident has been truly helpful, because many have come back and was pleasantly surprised at the process, pleasantly surprised at the officers' willingness to engage and their willingness to

communicate and participate.

So I think one of the things I learned when I was helping to put the program together -- I don't know if the mediation numbers -- because there are a number of them that start off in mediation and they may end with an investigation, but I don't know if those numbers necessarily reflect the fact that the citizen had the opportunity to sit and talk with the officer. They may have decided they wanted to go further in the process, but just the idea that they had an opportunity to have a conversation, I found many came out feeling better about the process overall.

So I'm going to talk a little bit about some of the numbers.

We had 11 in 2016 that have been completed. What it means by "completed" is they went through a full mediation versus going through the mediation process and at some point needing to move to the disciplinary process because they weren't able to find resolution.

So in 2015 we had 22 that were actually completed through full mediation.

The number of cases that were returned for investigation are pretty even in 2015 and 2016. Roughly about half of the cases get to a point where they move through the process and at some point, for whatever reason, are not able to come to some agreement.

02:08:35 02:08:55 02:09:08 02:09:25 02:09:46

THE COURT: Is this just the first -- are you just talking about the first five months of 2015 and the first five months of 2016?

DEPUTY CHIEF WESTBROOK: Yes, ma'am. We have to, as we go through the year, do a larger comparison.

One of the things that I've also -- I've gotten such good feedback, so I'm hoping that with the talks on the negotiated settlement and the expansion of that -- and hopefully also the IPM's office can expand the amount of mediations they can do. I think it will be extremely helpful, both of those processes, in helping officers feel better about the process because they have some ownership in deciding their discipline, and on the mediation side allowing for the citizen and the officer to just have conversations.

So I think both of those processes have been known to increase transparency and trust, and so I'm hopeful that we can expand both of those programs.

I'm going to give you a little update on the body-worn camera discipline.

When we look here, what this is, is we -- I'm looking back on the body-worn cameras from January 2015 to date. We've initiated 150 investigations involving misuse or non-use of body-worn cameras.

86 of those investigations stem from rank-initiated complaints.

02:10:02 02:10:20 02:10:43 02:11:00 02:11:19

64 of them initiated from -- are citizen initiated. So a citizen would come in and -- they would actually come in and allege other misconduct. And then when my intake investigators would search for any body-worn camera video and found that in fact the officer had failed to activate his body-worn camera video, then that would initiate or institute discipline at that stage.

So the way the numbers break down, I broke down the 150 cases that have been initiated so far.

And what we had is 139 of those investigations have been completed; 11 are still under investigation; 105 were sustained; 19 were exonerated; nine were unfounded; and six were not sustained.

Of the investigations that were found sustained, 65 received the one-day suspension, three received the two-day suspension; two received the three-day suspension; six received five days; two received 15 days; one received 20 days; and two received 23 days.

We had 14 letters of reprimand.

And we have about five that are still awaiting hearing.

Now, I know Tim spoke of the policy in terms of inadvertent use. The other thing we'll be updating on in the future will be, when we document inadvertent misuse of the body-worn cameras, we'll also be documenting for the next report for Your Honor and for the court how many of those redirections

we have in reference to body-worn cameras in the future.

THE COURT: And the different level -- the different number of days for suspension depends on how many violations there have been by that officer or --

02:11:36 DEPUTY CHIEF WESTBROOK: How many violations by that officer and also other allegations within the complaint that would potentially increase the amount of days.

So in general when we have 23 days, we have an officer that might have repeated an incident of failure to activate a 02:11:54 body-worn camera but also have other misconduct within the investigation that would increase the amount of days also.

THE COURT: Well, I don't think we can overstate how advanced New Orleans is in this area. I think we find, going into other cities, they're still struggling with policies and 02:12:12 getting the money to buy the cameras and teaching people to use them. And we've got good policies in effect. Effective discipline. We've given -- you-all have given a lot of thought to it to try to make it appropriate and fair but also effective. And we've got great usage figures, so I really think that that's 02:12:33 something to be proud of.

DEPUTY CHIEF WESTBROOK: Yes.

I also want to speak on one of the updates from the last hearing is the superintendant has since given me two additional FIT members that are here today on the FIT team. I've 02:12:47 also gotten a new lieutenant and also an additional captain of

police. So we're definitely also increasing in terms of personnel, and I wanted to thank the superintendant for that also.

THE COURT: Right. More and more responsibility gets put on PIB, and thank you, Chief, for making sure they have the resources to do the work that they do.

DEPUTY CHIEF WESTBROOK: Thank you.

THE COURT: All right. The training.

DEPUTY THOMAS: Good afternoon, Your Honor, and the people attending this public hearing. Thank y'all for attending and I appreciate it. It means a lot to see the courtroom packed.

Recruit Class 173, which had 29 members, they're currently on the street as of April 30th, 2016.

Recruit Class 174, we just graduated on April 29th. They're currently out in the field. They started their FTO training May the 1st, 2016, and will be trained for about 16 weeks.

Recruit Class 175 has 28 members and one lateral for a total of 29, and their projected graduation is July 15th of 2016.

Recruit Class 176 has 35 members and four laterals for a total of 39, and they're four weeks into training.

The academy, with the assistance of the superintendant -- I asked him to allow us to put out interviews, do interviews with people who come to the academy. He continues to support the efforts that we continue to put classes into that.

Personnel, he actually -- we're getting the best and the brightest. He actually gave us one person as of Friday, Mr. Jacob Lundy, who was working with our EPIC program. That program has been off and running. He's going to be the main instructor of that program at the academy. He's also going to teach some other classes.

We have some very good candidates. We'll continue to work with the superintendant as we grow the department and these classes graduate for him to actually back-staff us and give us more people to make sure we get the proper staffing there.

We mentioned Commander Chris Goodley taking over May 1st, and he's doing an excellent job. We met with Dr. Delcarmen. We're on the same page.

I'm happy to report, Your Honor, with your assistance and the superintendant's that I conducted Dr. McGee. She has a 10:00 appointment tomorrow to do the background, and she's starting -- actually when I called her, she asked me could she come start today, but I told her we had to do background first.

THE COURT: I wish you would have invited her to come today. We could have met her.

DEPUTY THOMAS: Yes, ma'am. I just talked to her.

The CIT program, that's off and running, crisis intervention. We've had two classes that's actually graduated so far, and we have another one that starts Monday. That's very intricate. It's a part of the officer assistance program and

02:15:52 02:16:03 02:16:14 02:16:28 02:16:41

CCT. They're both very involved in that. And we're actually getting that program up. They wear their little CIT badge, and that's actually a very, very good program for our mentally ill that's actually out in the community, to get treatment for that.

Some of things we want to bring up with our new academy director -- we can't call him "academy director" because of POST, but our new academy personnel we're going to hire has a Ph.D. He'll assist us with the academic part of it.

As part of that, she's going to be assisting us with getting the practical exercises. Right now we're doing practical exercises. We're doing --

THE COURT: Slow down a little so the court reporter can get you. Slow down a little.

DEPUTY THOMAS: I'm sorry.

Right now we're doing practical exercises as a part of our curriculum. We want to build on that. But we know that learning model is the model that a lot of the men need to learn it from. And it's just more hands-on training that makes it that much easier for the people to absorb what it is that we're trying to get.

Our lesson plans continue to be updated.

POST is going to release the lesson plans in the June/July time frame. We're actually sending instructors now to the mandated 40-hour POST if they didn't have FBI instructor development courses. If they did, they're going to an eight-hour

course. And that's going to be released in the June/July time frame, the new lesson plans of all the state under the POST umbrella.

De-escalation training. We continue to emphasize de-escalation training in all of our training where it's applicable. We want to make sure that we're on the cutting edge.

If y'all probably noticed in the news that there's going to be a national use of force standard. We're going to reach out to Dr. Jeff Albert, who is kind of like the expert around the country, and we're going to make sure that we're above and beyond what the national standards are or at least parallel with what they're going to do. So we're looking forward to that, and we want to be ahead of what the legislature puts out. They recommend it takes about a year, but I think we're way ahead of where we're going to need to be.

And that concludes my briefing, Your Honor.

THE COURT: That's good. I think it's really great that we're moving towards getting the staffing that we need at the academy, and I'm hopeful that that's really going to make a big difference. And we welcome Commander Goodley and look forward to working with him. Thank you.

DEPUTY THOMAS: Thank you.

THE COURT: And then hiring and recruiting new officers.

MR. WISBEY: Good afternoon, Your Honor. Jonathan

Wisbey reporting on officer selection and hiring.

I wanted to begin by talking about what's been our biggest success since last time we met in these chambers. The starting class, 176, started earlier this month. This class is significant for a number of reasons. It is the largest class that we've started since 2010 with 39 new officers beginning training. It is the class that really was processed in the quickest amount of time. Five of those new hires were processed from the point that they submitted an online application to the point where they were hired in under three-and-a-half months, and that number includes someone who was processed within 60 days or two months.

It also is significant because it continues a trend of NOPD classes being very diverse geographically. There are 15 different states represented in this recruit class. That's nearly a third of all the states in America. It includes veteran officers choosing to come to NOPD from departments in Ohio, North Dakota, South Carolina, and Mississippi, and so that's a very significant accomplishment.

And finally there is some significant language diversity as well within that class. There are speakers of Spanish, Vietnamese, Persian, and Portugese within that class, and so we think that the skills they're going to bring to the force are significant as well. So we're very proud of that class starting earlier this month.

02:19:28 02:19:45 02:20:00 02:20:16 02:20:32

And the other thing that's important to note about it as well, I think, is we now have a stable pipeline to start new classes. The last two recruit classes have both been started essentially the first working day after the previous class had graduated. So we graduate a class on Friday, we get the academy a new class to start on Monday. That's a sign of a sustainable recruit system.

In terms of the testing and selection process, I want to provide you with a couple of updates on various phases of that process.

First the civil service multiple choice and written examinations. We're still underway with rewriting and reimagining those tests. Louisiana Tech is currently engaged in analyzing over a hundred surveys completed by NOPD patrol officers in leadership to identify the proper job knowledge, skills, and abilities required for policing, and they're going to be turning that into new test questions which we expect to be able to put online and start administering in the classroom sometime around the end of June.

So we're very excited about the progress there.

Regarding the agility test, one of the things that you've noted to us on a number of occasions is that the agility test is one of the most infrequently held elements of the selection process. Right now we're only able to hold two agility tests a month, and it does hinder the administration process.

02:20:51 02:21:04 02:21:19 02:21:37 02:21:50

We've asked civil service for the ability to hire a private contractor to administer and oversee the agility tests which would allow us to go to five times weekly. So from twice monthly to almost 20 times monthly. That would be a real game changer for us. Our understanding is they're considering that among their agenda on Monday at the commission hearing, and we're hopeful that that may be supported by the commission and go forward.

With regard to background investigations, one of the things that you mentioned in the original hearing that we had on the subject was that you were interested in making sure that we continue to push to reduce background processing times. If you recall, when we first started hiring back in 2014, our background processing times were extremely slow. Over 50 percent of background investigations took more than 71 days to complete.

Since then the superintendant has authorized the significant expansion of the staff. We've gone from having four investigators to having ten, and we've improved the internal office processes. And I'm happy to be able to show you that the evolution of that is a significant decrease in processing times.

So in 2014 half of all investigations took over 71 days.

By 2015, that bar was at 56 days. So half of our investigations took over 56 days, and only 25 percent took 73 days or more, so we basically had cut out that middle portal.

02:22:11 02:22:26 02:22:44 02:23:00 02:23:19

And then in 2016, again it's early in the year, but through the first five months what we've seen is that image continue to be reflected. So now we are processing 75 percent of people within 54 days, which we had only gotten 50 percent of people in 56 days last year. So we're continuing to expand the number of people that we can examine quickly.

And you can see that as well in some of the quickest investigations that we've been able to conduct. Last year we had a total -- year-long total, 12-month total, of eight investigations completed in under 30 days. Thus far in the first five months of this year, we've already had six. So we're very nearly surpassing that number just in the first five months of this year, and that's as a result of the dedicated resources as well as continuing to monitor and change policies as needed to ensure the processing times are kept low.

And then finally on the psychological evaluation process, we heard loud and clear from you and from the monitor that we need more information in order to accurately evaluate trends over time in the psychological testing process, and we have released an RFP, which is a request for proposals, to obtain a contract that will allow us to receive regular reports and require cyclical reports from that psychologist as well, giving us an idea of the trends that she is finding or -- he or she is finding in those evaluations so we can start to analyze over time the effectiveness of the psychological testing as well as its

02:23:38 02:23:59 02:24:16 02:24:31 02:24:57

ability to predict future behavior.

So that is expected to be -- the response is due by June 10th, and we're hopeful that that will allow us to have a contract where we can require and receive more accurate and complete reporting on psychological exams.

THE COURT: It's the city's priority and the mayor's priority to hire additional police officers, 150 this year. And this is so important in decreasing the time between a person's application and their notification that they will be hired or accepted into the academy. It's so important because we were losing people because it took too long.

And so congratulations on all of the changes that have been made and shortening the time. And you're going to continue to do that over the next couple of months, and I hope it -- I believe it's going to help us reach the goal of 150 new officers this year.

DEPUTY CHIEF WISBEY: Yes, Your Honor.

THE COURT: Thank you.

All right. For those who have been paying attention to this process from the beginning, hearing all these things is really gratifying, and I'm really proud of the progress that we've made. And I want to thank again the Chief and the NOPD and our monitoring team and DOJ for helping make this possible.

Today we want to talk about use of force. We all know the occasional use of force comes with the job of being a police

02:25:16 officer, but eliminating excessive force among police officers is a core goal of civilians everywhere and of the consent decree. So sometimes it's obvious when force is excessive, and we've all seen examples of that usually on the news. Often, however, deciding how much force is necessary in a given situation is complicated.

02:25:33 To deal with this complication, the consent decree deals with use of force in a number of ways. Among other things, the consent decree calls for new policies, new practices, new training, new investigative techniques, new recordkeeping, new supervision, and new data analysis. A lot's been going on over the past two-and-a-half years to reduce excessive force in New Orleans.

02:25:53 This is one of the -- when the Justice Department did its investigation, there was a lot of criticism of the department for its use of force policies and violations. It's very important to the citizens of New Orleans that they are confident that the police will protect them but only use as much force as is necessary.

02:26:13 So I think this is really an important topic to the public, and I'm looking forward to the presentation today from the police department and the monitors.

So I want to ask the NOPD first to give its presentation.

02:26:42 MR. HAMILTON: Good afternoon, Your Honor. My name is

Bruce Hamilton. I'm a compliance manager with the NOPD. I work in the consent decree implementation unit which is part of the compliance bureau.

One of my areas of focus is use of force, specifically use of force reporting and investigations. One of my colleagues, Compliance Manager Michael Pfeiffer, shares the responsibility of focusing on use of force. He deals with more discrete types of force -- use of forces such as taser, vehicle pursuits, K9s.

I don't think it's an exaggeration to say that use of force is one of the most important elements of the consent decree. Certainly it's an area of primary concern for the public. One can measure the quality of a police department in many ways such as the effectiveness of its criminal investigations and how well it maintains safety and order. But the public is understandably concerned with use of force, and that's readily evident in the many newsworthy events that have garnered public attention recently.

The New Orleans Police Department also is very concerned with the use of force, and it's committed to ensuring that its officers' uses of force are reasonable.

I think that commitment is reflected in its policies which I'll touch on briefly. It's reflected in the deployment of body-worn cameras which is a key tool for transparency and supervision. It gives supervisors an opportunity to review officers' activities day to day.

02:28:46 02:29:04 02:29:24 02:29:47 02:30:10

The commitment is also reflected in the critical incident video release policy which enables the public and the media to have access to some of these recordings and see how these critical incidents unfold.

It's reflected in the discipline that is meted out to officers whose use of force is deemed unreasonable or excessive.

And it's also reflected in the resources the department has dedicated to use of force investigation and reporting.

You'll hear from members of the Force Investigation Team, which is an elite unit created in the Public Integrity Bureau with the exclusive responsibility of investigating serious uses of force and reviewing lower-level uses of force that are investigated by other supervisors.

You'll hear from them, and they will also explain to you, in addition to their role, the Use of Force Review Board, which is a higher-level, command-level body that reviews FIT's investigations and provides another level of oversight.

You'll also hear from them use of force statistics that I believe show the department is committed to reporting and tracking its uses of force in a comprehensive and transparent manner. These data show, for example, that the use of force by New Orleans police is a relatively rare occurrence. When you compare, for example, the number of arrests in 2015 to the number of use of force incidents, the percentage is actually very low. And when you consider that the greater majority of contacts

between officers and members of the public that do not result in arrests, the percentage is even smaller.

Judge, I know that you understand the legal framework by which one determines whether use of force is constitutional, but for the benefit of the public, I will just say that the legal test is, very broadly speaking, whether use of force is necessary and reasonable.

That is by necessity a very subjective question. And I bring this up because I want to emphasize that the very serious decision of whether to use force is not made in a vacuum. Officers often make this decision in a very confusing and chaotic situation. What is reasonable to a person facing an imminent violent threat may seem very different to a person who considers and analyzes that decision at leisure. To reduce that decision to an extraction is really to do a disservice to the men and woman in law enforcement who face that decision every day.

So what do we mean by police use of force? The phrase is maybe hard to define. Some members of the public may perceive the mere presence of an officer as forceful, a person in a uniform and a badge who carries a weapon as a use of force. Others may think that when an officer draws his or her weapon but does not point it or use it, that that is not a use of force.

So there's really no single accepted definition among researchers, analysts, and police; but our policy, the New Orleans Police Department's policy, defines use of force as a

physical effort to compel compliance by an unwilling subject above unresisted handcuffing including pointing a firearm at a person.

THE COURT: Is that another slide? Are you on the third slide?

MR. HAMILTON: I'm getting there, Your Honor.

THE COURT: I just wanted to remind you.

MR. HAMILTON: I'm just trying to put everything in context.

So it's important to emphasize that use of force can be defined differently, and that there are varying levels of use of force going all the way from using one's hands to using a firearm.

So why do police use force?

Police officers daily encounter tense, dangerous, and volatile situations while doing their jobs, as I discussed, and they must make split-second decisions with limited information to respond to those situations quickly.

Under law, police are legally authorized to use reasonable and necessary force to protect themselves, to protect others, to affect an arrest or detention, and to conduct a lawful search.

NOPD's use of force policy is to value and preserve human life when using lawful authority to use force.

And these are statements of policy taken directly from

02:33:34 02:33:53 02:34:14 02:34:35 02:34:50

the policy.

NOPD officers are expected to use the minimum amount of force that an objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control while protecting themselves or the lives of others.

Now, officers are not expected to retreat or be exposed to physical injury before using reasonable force. However, officers are instructed to try to deescalate the situation before resorting to force. And our policy requires that when it's feasible based on the circumstances, officers use de-escalation techniques -- disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, and/or calling in a specialized unit such as the crisis intervention team -- to reduce the need for force and to increase officer and public safety.

When we talk about the police -- the New Orleans Police Department's use of force policy, we're actually talking about a panoply of various forces. The main use of force policy has a number of subsidiary policies. And I'm not going to go through all of them, but I provide this list, Your Honor, to give everyone an idea of how many subsidiary policies are involved, including canines, vehicle pursuits, tasers. All of these things are governed by individual policies.

THE COURT: And all of those have been rewritten over the last year or so and now have been approved by everyone?

02:35:07

MR. HAMILTON: That's right. All of these policies were revised and submitted for review and have been thoroughly vetted by the Office of the Consent Decree Monitor and the Department of Justice. And these all became effective -- these new policies became effective December 6th of last year.

Unless you have any more questions for me, Your Honor, I'll call up Lieutenant Burns who is the leader of the Force Investigation Team.

THE COURT: All right. Thank you.

02:35:20

LIEUTENANT BURNS: Kevin Burns, NOPD Force Investigation Team. I'll just give you a brief history of the Force Investigation Team.

It was originally formed in late 2011. Back then it consisted of one lieutenant and one sergeant. Their

02:35:50

responsibility was to investigate officer-involved shootings and serious uses of force.

The consent decree stated that the Force Investigation Team would conduct such investigations which was previously investigated by the NOPD homicide sections, and it would be the

02:36:11

supervisors within that particular division.

Again, I'm Kevin Burns, Jr. I recently headed the Force Investigation Team as a lieutenant back in July of last year.

The Force Investigation Team --

02:36:31

THE COURT: Tell me what your title is now.

02:36:42 02:37:01 02:37:22 02:37:43 02:38:07

LIEUTENANT BURNS: I'm currently a lieutenant. I'm over the NOPD Force Investigation Team.

I'm now going into what types of investigations we investigate.

THE COURT: All right.

LIEUTENANT BURNS: So the Force Investigation Team consists of a criminal section and an admin section.

At this particular point in my presentation, I was going to introduce my team, but we already did that. Those are some of the best detectives the department has ever seen, and I'm glad to be a part of the team with them.

Most of our -- well, all of our detectives on the criminal side have experience in homicide. They've investigated hundreds of homicide investigations during their careers. That included at the time officer-involved shootings, homicides, unclassified deaths, and also in-custody deaths.

Being a member of the homicide unit and also to be a member of our unit, it takes extensive training such as interviews and interrogations, managing death investigations, homicide scene, scene management -- basically a laundry list of training that we've had even prior to coming to FIT.

So what FIT investigates.

We investigate serious uses of force including critical firearms discharges, any use of force indicating apparent criminal conduct by an NOPD officer, any use of force by members

with the rank of lieutenant or higher no matter the level of force. It could be one, two, three, or four.

And I'll get into the different levels of force later on.

02:38:21 And any in-custody death or someone who will require any type of hospitalization as a result of force used by a New Orleans police officer.

Besides the uses of force we investigate, FIT is the final approving body of all of the department's use of force. On 02:38:45 average we, as a department -- when I say "we," as a department we average anywhere from 500 to 600 uses of force per year, and we review and approve, kickback, critique, and provide training for all those uses of force.

And again I'll talk a little bit more about what a use 02:39:07 of force report is a little later on.

In 2015 -- I'll just give you some stats.

For 2015 the Force Investigation Team investigated 47 serious uses of force for the year. That included 13 critical firearms discharges.

02:39:25 We also investigate canine bites.

CEW, which is a conducted electrical weapon also known as a taser.

We investigate force to any person whose -- correction.

We investigate instances involving a handcuffed person 02:39:45 where force was applied by an NOPD officer such as a strike,

blow, kick, or CEW discharge to that person.

We investigate neck holds, which a no-no unless it's a lethal force encounter.

We also -- based upon a new policy, we also investigate vehicle chases that involve injury, death, or someone to be admitted to the hospital.

Other investigations we investigate. We investigate the administrative shooting investigations. I'll get a little bit into that once we get into the Use of Force Review Board.

We also investigate formal disciplinary investigations. Also it was known as a DI-1 back in the day.

So this -- these types of investigations will involve allegations of force by members of the public. It could be rank-initiated, but any unauthorized force allegation, FIT typically investigates.

THE COURT: So if a citizen makes a complaint about excessive use of force, FIT investigates it?

LIEUTENANT BURNS: Correct. So not only the cases that come from the public, they may come from supervisors with close --

THE COURT: Right. I don't mean -- that's not the only thing you do.

LIEUTENANT BURNS: Correct. Yes, ma'am.

THE COURT: I just wanted the members of the public to know that.

LIEUTENANT BURNS: Okay.

The last thing is we author our use of force reports.

So on this particular slide is the levels of force. It's numbered one, two, three. The more severe, of course, is red, Level 4s. So I'll begin with Level 1 use of force.

These are typically pointing of weapons like some of the previous presenters stated; cuffing with anatomical compliance techniques, or in more simple terms, basically a wrist flex or shoulder roll; or when a person complains of an injury. These are the types of cases we would not typically investigate unless it involved a lieutenant or above.

These are self-reporting incidents that can be documented in an incident report by the officer. That officer is required to complete a force statement, and that supervisor should review the body-worn camera, the report, and the incident for consistency to make sure that it is actually the proper level of reporting.

THE COURT: I have two questions for you. If the officer takes a gun out but doesn't point it, is that a Level 1?

LIEUTENANT BURNS: Well, so, if an officer draws his weapon -- if you're in this position (indicating), this is called gun ready. So that's typically a maneuver that's trained at the academy, to go into gun ready. So if you're in the gun-ready position, it does not require a use of force report. When you point it at someone, it's a Level 1 use of force.

02:42:56 02:43:09 02:43:33 02:43:56 02:44:10

THE COURT: What about tasers?

LIEUTENANT BURNS: The same thing. If it's removed from its holster, remains in gun ready or at the ground and not pointed at anyone, it does not require a report.

However, if it's activated, that officer will have to go to the academy and download that video footage just so we can make sure that it was never pointed.

But again, if the officer points the taser, it will be a Level 1.

THE COURT: Okay.

LIEUTENANT BURNS: Moving on to Level 2 uses of force.

This involves takedowns; actually deploying your taser for anything under 15 seconds of exposure; and weaponless techniques such as strikes, kicks, elbows, knees, or the sort.

So this is not a self-reported incident. Anything over a Level 1 has to be reported and documented by a supervisor.

The officers would still provide their force statements. The -- if a supervisor is involved in this incident, that supervisor cannot author that use of force report.

So on all Level 2s and above, it requires witness statements in addition to the force statement.

So the difference between a force statement and a witness statement is the person that is involved or uses force will have to complete a force statement.

THE COURT: So for a Level 2, the officer completes the

force statement, so in that sense it's self-reporting, but the sergeant also investigates it and does a report?

LIEUTENANT BURNS: Yes. And also any officer that witnesses a Level 2 or a 3 has to also complete the witness statement.

THE COURT: Okay.

LIEUTENANT BURNS: Again, if you're a ranking officer and you are involved, you cannot author that use of force report.

So moving on to the Level 3s, which can be baton strikes -- we don't see many of those, what we consider your PR 24, your expandable baton. I believe it was still called an ASP. We don't see many of those. I think since I've been in FIT, I've maybe had one or two, three at the most.

Again, the same process involving the force statements, witness statements, and who it's investigated by, meaning the uninvolved supervisors.

So on to the good part, the Level 4s. That's when FIT comes out. This usually involves fatalities, weapon discharges, canine bites, and all of the other list of calls we would be called out for.

THE COURT: Does it include taser strikes?

LIEUTENANT BURNS: No, ma'am. So if you are exposed -- well, let me slow down a little bit.

If an officer deploys his taser or CEW, one trigger pull equals 15 seconds. So if you are exposed to 15 seconds'

02:46:12 02:46:39 02:46:55 02:47:18 02:47:36

worth of CEW, FIT comes out for those. Or if it's one while the person is handcuffed, we'll come out for those.

So again, the Level 4 involves serious uses of force. Like I mentioned before, canine bites; blows to the head, which is considered lethal, a form of lethal force; weapons discharges. We would complete that entire investigation, my team. All of us would respond and complete the entire investigation.

THE COURT: And your team does a report, and are those reports ever public? Maybe Chief Westbrook knows that.

DEPUTY CHIEF WESTBROOK: The use of force reports?

THE COURT: The FIT investigation, their report. I assume they produce a report at the end of this process.

DEPUTY CHIEF WESTBROOK: If they've even been requested meaning we have had public record requests for reports at the conclusion of the administrative investigation, and those have been made public.

LIEUTENANT BURNS: All right. So the Level 4 investigations, particularly the shooting investigations or any investigations involving employee misconduct, will typically go before the -- sorry about that.

So let me get into the Level 4s, the shooting investigations.

So again, as I stated earlier, FIT consists of two sections, a criminal section and an admin section. These investigations that we conduct run concurrent with one another.

So as your criminal investigation is going on, you'll have your admin section doing an investigation alongside the criminal portion.

02:47:56 So what the criminal investigators focus on -- of course in addition to responding to the scene, what we focus on are the criminal charges that could possibly be brought about in this investigation. That could include charges against the officer or charges against a member of the public. So that's the main focus of the criminal portion of the investigation.

02:48:15 The admin investigation focuses on policy violations. The most common thing that we look for again are body-worn cameras, any violations of policy, excessive force. We also look for opportunities to improve the NOPD policy or anything in the chapter. Anything that would help the department to do its job better or more efficiently. 02:48:40

While conducting these cases, many times we're shadowed, we have some oversight by the monitoring team. I see Jonathan a lot. Susan Hudson left. We also worked closely with the FBI, Steve Zeringue. The DA's with Raymond Martin. So we have a lot of oversight for our investigations from the minute of notification all the way through the end, which could include the Use of Force Review Board. 02:49:05

One last thing I would like to add to the admin section, there may be discipline associated with this investigation so the officer may not necessarily be held liable 02:49:29

02:49:50 02:50:11 02:50:28 02:50:42 02:51:02

criminally but can absolutely be held liable for violating any policies, any department policies.

So again, once we finish our cases, especially involving fatalities, we now have in place where there's even oversight of our reports that would go through our Deputy Chief Westbrook before submitting it to the DA's office for a declination order or implementation of charges.

THE COURT: Let me ask you a question before I forget about it. We were talking about the drawing of a weapon but not pointing it at anyone. Does that get reported anywhere, the fact that the officer has taken his weapon out but not pointed it at anyone?

LIEUTENANT BURNS: Well, it should be included in the incident report which will be written by the officer. So if an officer writes a very thorough incident report, it should indicate that he actually pulled his weapon out and didn't point it.

In some cases we'll get a phone call. You know, the officers want to make sure they're in compliance, and they'll give us a call. And we'll inform them that it's not recordable but you did make the phone call, mark us notified, and provide a unit number just for reporting purposes.

THE COURT: Does your team use the body-worn camera videos and dash -- the in-car camera videos in your investigations?

02:51:21

LIEUTENANT BURNS: Absolutely. So when we respond to the scene, Sergeant Helou, Sergeant Watson, and Sergeant Barnes, which is the admin team, they will do those downloads directly from the scene. We recently got a mobile command unit. We have laptop wifi that we can download those videos right on the scene.

There's even cases where, if it was readily available, we can let the monitors look at it right from the scene, the DA's office look at it right from the scene. So that's definitely a tool that we use.

02:51:40

THE COURT: Okay. Good.

DEPUTY CHIEF WESTBROOK: I just want to clarify, too, Your Honor, it is required that they report that in the incident report that they've pulled a weapon, so it is documented someplace.

02:51:51

LIEUTENANT BURNS: All right. So getting to the Use of Force Review Board, that's sort of the tail-end of what we do, meaning by this time the criminal report has been completed. Any administrative violations will have been, for the most part, investigated, and some type of recommendation handed down whether it be discipline, mediation, training -- a bunch of other things.

02:52:17

So our criminal -- scratch that.

Our administrative shooting investigations is another type of investigation that the admin team produces. So as of September 15th -- correction, September 2015, we really didn't have a structure for the administrative shooting investigations

02:52:41

that we completed. So I'm working closely with the monitors. They had some oversight and a lot of involvement in helping my team -- myself and my whole team produce a draft that will help us to produce a better product for the Use of Force Review Board.

02:53:01 So in 2016, January 22, 2016, we had our first Use of Force Review Board. At that time we were backlogged with about 13 serious cases, firearm discharges. Some included fatalities and some non-fatal; accidental; animals. A different variety of types of cases within that 13.

02:53:27 Since then we've held nine Use of Force Review Boards.

And what the Use of Force Review Board does, it serves as oversight of our investigations. So there's a -- I don't know, for lack of a better term, there's even some oversight of us. We self-critique. And we have our deputy chief, our chairman, Paul Noel, Randy Mushatt, Chief Westbrook. We even have members of the academy to attend. So everyone has input and they have the opportunity to critique the case done by FIT, by the department, everything as a whole. It's a more broad critique of the investigation as a whole.

02:54:08 So during the administrative shooting investigation, there are things that the admin lead investigator would look for. Again, typically any department violations will have been addressed. So the next thing we'll focus on is policy, tactics, training, any opportunities for de-escalation, or any equipment that can help the officers to do the job better.

02:54:36

For example -- let me think of something off the top of my head.

I can't think of anything, but there's a lot of things -- a lot of things --

02:54:50 THE COURT: Anybody want to help him out?

(No response.)

LIEUTENANT BURNS: But it's just too many. It's just too many.

But so what the board can do, the board at that time 02:54:59 when the meeting -- after the administrative investigator presents his case, the floor is opened. The board at that time can recommend more investigation. They can agree or disagree with the recommendations made by the FIT investigation.

So for example, if an officer responds to a scene and 02:55:23 he pulled up directly in front of the door, that's bad tactics, so they can -- we can recommend the officer be retrained at the academy.

When we send these recommendations over to the academy, it's not just the academy looking at the paper, but they may also 02:55:38 make some additional recommendations. And that has happened.

At the conclusion of the review board, there's a vote. Three members get to vote if the force was justified and within policy. And they'll also have the opportunity to concur or not concur with the recommendations. And also have the opportunity 02:56:00 to add additional recommendations.

At the next review board, we will follow up with the recommendations that was made from the previous review board.

We have one sergeant who's not here today, Sergeant Sam Davis. He was recently appointed the Use of Force Review Board secretary, which the consent decree calls for. He's not here today, but Sam has been tracking all the training that the Use of Force Review Board recommends.

And if you have any questions, I'm available for some questions.

02:56:20

THE COURT: This has really been a big improvement, and it's really important to get this underway. And the monitors are going to talk about -- I know about what they've been doing, and I know they're going to applaud you for the things that you-all have done and for the changes you've made.

02:56:38

I think we'll see -- we finally got all this in place, and as you say the first review board was in January. And so we'll see as this year goes on, and then we'll be able to compare it to next year. And then we'll really have a good basis of measuring the progress you've made.

02:57:02

But I really think you've got a good process in place now, and it seems to be working well. And I appreciate the hard work that all of you do. I know there's a backlog, and I'm glad you got some more help to get it done.

02:57:21

LIEUTENANT BURNS: Thank you.

THE COURT: So we'll hear from the monitors now -- oh,

02:57:37

02:57:50 02:58:08 02:58:27 02:58:51 02:59:21

do we have somebody else first?

LIEUTENANT BURNS: One more. Stats.

THE COURT: Okay. They can wait. They're paid by the hour.

MR. ARONIE: Yes, we can.

SERGEANT HELOU: Good afternoon, Your Honor. My name is Sergeant John Helou. I'm an administrative investigator with the Force Investigation Team of the Public Integrity Bureau Office, and I'm going to discuss this afternoon our use of force data that we've analyzed and compiled.

The New Orleans Police Department tracks, analyzes, and reports data concerning all uses of force. These data enable the department to identify areas in which policies should be modified or for which training and discipline may be required.

It also helps us ensure that the uses of force by the New Orleans Police Department are appropriate, comply with department policies, and reflect the best practices of policing.

Since the implementation of the consent decree, there have been several key changes in how use of force is reported in the New Orleans Police Department. These changes, a lot of them, they've been touched on by other presenters. They include, but are not limited to, body-worn cameras rollout back in 2014 and our restructured force-tracking database, which is a component of our IAPro internal affairs database software. This included changing the data field categories where the force is reported

for a more accurate and detailed account of the force. That way we can better analyze it. And any opportunities for training or further policy development, we can take from the data.

The new, exhaustive policies mentioned by Bruce Hamilton that took effect on December 6th, which included the implementation of our Blue Team Program. That's basically an electronic use of force reporting system. Previously use of force reports were handwritten, and they had to be manually forwarded to us for review. And if there was an error with them, we'd have to either scan them and e-mail them back, and then they would in turn return them back to us. With the electronic system, everything's done electronically. It's paperless. It comes to us for review -- well, scratch that.

Let me -- the sergeant does it. He sends it up his chain of command. And as each person in that command reviews it, he or she can send it back or approve it and send it up to the next chain, and then it gets forwarded to us where we approve it or disapprove it for various reasons. And there's an audit trail that shows where it's been, the comments made by each reviewer, and the like. It's light-years ahead of the system we were using prior to it.

Additionally we added -- additional administrative staff was added to the Force Investigation Team to help us review all the use of force coming in and act as quote-unquote quality control for the use of force process, reporting process.

03:01:18 Next we're going to speak about the specific force data from basically 2014 to 2016.

And before I show the slide, it's going to show -- the raw data is going to show the force data has actually increased, but it doesn't mean that our officers are using more force. In fact, the opposite is true.

So this is a comparison of the 2014 to the 2015 data.

And I would just like to point out the use of force per arrest has slightly gone up from 1.1 to 2.6.

03:01:54 And as Mr. Hamilton previously mentioned, that's on account of 27,974 arrests that were made in 2015. And this doesn't count the countless number of other police interactions with the citizens, calls for service, field interviews, and the like, that did not result in force.

03:02:15 Several of the -- several of the more physical types of force have actually dropped from 2014 to 2015.

I would like to point out the discharges of CEW -- that's when the taser is actually fired at somebody -- has dropped dramatically.

03:02:34 So has the use of the impact weapons, the batons, as mentioned by Lieutenant Burns.

Additionally, the number of strikes, the physical strikes, has dropped from 5 to 0.

THE COURT: Do you have any thoughts about why the 03:02:51 number of the firearms exhibited has increased?

SERGEANT HELOU: We feel that this is due to the body-worn camera, number one. It's created a greater accountability among the officers as well as the supervisors that -- to ensure that all force used is reported.

03:03:13 In addition, we attribute this to better training that has been implemented since -- via the academy in-service training bulletins. Members of FIT have gone to the academy and taught at the in-services, basically explaining to them what constitutes a use of force and what needs to be reported.

03:03:32 That's the -- that's the justification for the increase in the reporting.

MR. NOWICKI: Your Honor, we agree with their finding, and we have some evidence of some of the work we've done that supports the fact that there's greater reporting of use of force events, particularly in the area of drawing and pointing the weapon. 03:03:50

SERGEANT HELOU: I would like to move on to the year-to-year first quarter comparison of 2014 to 2016.

Again, I would like to point out the dramatic drops between 2015 and 2016. 03:04:08

The firearm discharge in 2015, those two were actual intentional discharges.

The one reported for the first quarter of 2016, that was actually an accidental discharge and was not an intentional discharge at a citizen, animal, or anything like that. 03:04:32

Again, firearms exhibited have gone up, but again we're attributing that to body-worn cameras as well as better training and also close and effective supervision with the supervisors and their subordinate officers.

03:04:48 Again, the baton has dropped to zero.

Even hands have significantly dropped between -- you know, officers actually putting their hands on citizens when they're using force.

Canine has dropped from 11 to 8.

03:05:08 And again the strikes are 0 and 0.

And moving into the canines, as you know from 2014 to 2015, our -- the number of canine bites, actual bites to citizens, have dropped by two.

However, our apprehensions have increased from 35 to 42 with that drop. 03:05:35

And I would like to point out the 10 percent drop in the canine bite ratio from 2014 to 2015.

I would also like to note that we have had no off-leash apprehensions in 2015 to 2016 where the canine is actually released off the leash and is free to roam. 03:05:54

I'm going to move on to the stats for the conducted electrical weapons or the taser s as they're called.

Again, 2014 to 2015, CEW uses -- this is not including the pointing the taser, this is actually when the taser is discharged at a subject or an animal. 03:06:15

It has gone down from 138 to 94.

Accidental discharges, these are due to the result of improper testing of the weapon, which is required every day prior to the start of the officer's tour of duty. Most likely it's involving not removing the cartridge prior to testing it and it discharges. Nine times out of ten it will go into a wall, ceiling, or floor. It's not accidently discharged at a person or anything like that.

Moving on to firearms.

Again, the critical discharges, they did go up by two from 2014 to 2015.

As did the intentional.

Accidental discharges remained the same.

And lastly I want to talk about the force misconduct complaints of 2015.

What everybody commonly refers to as excessive force, the NOPD's term is actually unauthorized force. And these are basically the complaints both from citizens and rank-initiated complaints where an allegation of unauthorized force was made against an officer.

And you'll see that 21 total citizen complaints alleging unauthorized force were made against an officer, and five complaints initiated by rank alleging unauthorized force made against officers in 2015.

Of those, the three that are -- I'm sorry, the four

that are still active, these involve criminal allegations other than the unauthorized force, and they're still being investigated. Those require a more thorough, exhaustive investigation. But everything else has been closed out.

03:08:19 Five were not sustained.

Six were exonerated.

Nine were unfounded.

One was an NFIM which is no formal investigation merited. This was involving a non-NOPD officer.

03:08:40 And I already mentioned the four that were active.

So a total of 26 complaints in 2015 for unauthorized force.

That concludes my presentation.

THE COURT: All right. Thank you very much. I appreciate it.

03:08:54 SERGEANT HELOU: You're welcome.

THE COURT: Now we'll hear from the monitors.

MR. NOWICKI: Good afternoon, Your Honor. Dennis Nowicki with the monitoring team.

03:09:06 As the Judge noted, most citizens recognize that police officers have to occasionally use force, but they expect that force to be used prudently and with restraint. And in order to manage the use of force in any police agency, it's necessary that policy be in place.

03:09:45 We've talked about the policies already from the

03:10:08 03:10:32 03:10:55 03:11:16 03:11:35

perspective of the NOPD, from the police department. But policy alone doesn't get it done. You need to also deal with the training, supervision, and discipline. The consent decree recognizes that and requires that compliance can only be met if there is that combination of policy, training, supervision, and discipline.

And also as the Judge has pointed out, the consent decree's emphasis on use of force is fairly significant. 23 of the 88 definitions are force related. Force is mentioned over 309 times and 86 of the 492 paragraphs of the consent decree deal with use of force.

It's been pointed out that the policies were implemented on December 6th. They were actually approved in the spring of 2015 and only became implemented after training was commenced in the fall of 2015.

Use of force policies.

They allow the department and community to better understand where and why officers use force.

They enable the department to determine the appropriateness of the officer's actions during the incident.

They enable the department to identify necessary changes in NOPD policies, tactics, training, and equipment.

And most importantly, force reporting and investigation is a critical component to citizen safety, officer safety, and integrity of the department. And absent the policy of reporting

and investigating, that could not occur.

Policies inform officers of what is expected of them and can hold them accountable when they don't meet those expectations.

03:11:55 It's been pointed out already that FIT is part of the Public Integrity Bureau, which is headed up by a civil deputy superintendant. We met the new FIT commander, Lieutenant Burns. He came in in July.

We've also heard that the FIT staff has been increased 03:12:15 significantly. We see a couple of the new members here. One of the members that has been added to that cadre of investigators is a sergeant whose primary tasks are to support the Use of Force Review Board but also to ensure the quality of the investigations that are done by anyone other than the Force Investigation Team.

03:12:43 As has been pointed out, the Force Investigation Team has the criminal and administrative. I think Lieutenant Burns very adequately pointed out the differences between the focus of those two. The administrative unit looks at not just whether there's a violation of a policy or a rule but also whether 03:13:01 there's opportunities for improving tactics, equipment, or training.

I think it's also useful to understand what happens when a force -- a level of force occurs.

If the force is of Level 2 or Level 3 -- well, at 03:13:24 Level 1 we know that the officer creates his force statement and

the supervisor reviews that. That was pointed out by Lieutenant Burns.

In Levels 2 and 3, when the officer uses force, he has to notify -- he or she has to notify their supervisor. The supervisor has to respond to the incident.

THE COURT: By going to the scene?

MR. NOWICKI: He goes to the scene. He has to get there at the scene.

He has to obtain an FTN number, which is the number that ensures that an event is tracked all the way through the system.

The officer has to produce a force statement as do witness officers have to produce a witness statement.

Then the supervisor conducts an investigation, enters his report into Blue Team, which is a front-end component of the IAPro, which is the repository of the reports.

If the supervisor finds the force justified, he forwards that all electronically through the Blue Team to FIT for that quality control review.

If, however, he decides that there's not -- it's not justified, he can and should request a DI-1 which triggers the investigative process.

You'll hear a little bit later on from Chet, when he gets up here -- from Chet Epperson when he gets up here that things are going fairly well in this flow, but there are some

problem areas. One is the one that you just addressed, Your Honor, the supervisor's response to the scene. Whether or not they respond or not isn't always documented in the report, and frequently it's an indication that they have not responded.

03:15:10 And we don't always find force statements from all witness officers as we review the files.

And thirdly, it's not always clear by the report from the supervisor that the force was determined to be justified.

I would have to say, though, those quality control issues are often caught and most often caught by the quality review and are sent back for further review.

03:15:35

THE COURT: I assume Lieutenant Burns is listening to this and taking mental notes about some of the issues that --

LIEUTENANT BURNS: Yes, ma'am.

03:15:47 MR. NOWICKI: But again, that quality control is in place. They find it or we find it, and it gets back. Mostly it's being now found by the quality control review. In certain snapshots taken in the past, that wasn't always the case.

After it's forwarded to FIT for its review, FIT does review it. They can approve it. If they do, that's the end of it. It's entered in IAPro. It will become a part of the Insight analysis going forward, but the investigative phase of it is completed.

03:16:15

If it does -- if they do not agree with it, as we just indicated, it will get returned back to the unit for further

03:16:37

investigation. Or if they see fit, FIT can take over the investigation.

If a DI-1 -- that earlier slide where a DI-1 is opened by the supervisor at the field level, the district level, FIT will determine whether that supervisor completes that investigation or whether it should be taken into PIB for further investigation into the misconduct. They can keep it or return it.

If they keep it, of course they will complete the investigation to the standards set in the PIB. If they return it to the district, it still comes back to them for that quality control review before it's considered finalized.

I think, Chet, you're going to take over and complete the next -- the mid-section of the report.

MR. EPPERSON: Good afternoon, Your Honor. Chet Epperson with the monitoring team.

We wanted to provide you our areas of monitoring.

We have our monitoring team audits and reviews.

Some of the things that we're doing here at NOPD is we receive all the command desk notifications from the communications center.

We review, evaluate, and critique all the FIT criminal and administrative investigation reports. That's all the Level 4 uses of force.

We're reviewing and evaluating a significant sample of

Levels 1, 2, and 3 uses of force investigations.

We review use of force training to include SWAT, FIT, patrol officers, and K9.

We review all canine authorizations and deployments.

03:18:43 We audit resisting arrest and use of force data. We'll talk about that a little later, what I found on my third quarter of 2015 audits.

Conduct continuous reviews of body-worn camera videos.

We are evaluating Blue Team entries.

03:18:59 Conducting review of citizen complaints.

We're conducting an audit of civil lawsuits.

And conducting an inquiry into arrestee audit -- or for injuries and will be starting that very soon.

Our monitoring team targeted use of force reviews consisted of a couple of things. 03:19:23

One, serious uses of force and those are Level 4.

We review all of those. In 2014, we reviewed 11 incidents. In 2015, 13. And this year so far, there are four pending that we have not reviewed all the cases, but we do have preliminary briefings from Lieutenant Burns and his staff and Chief Westbrook. 03:19:45

Other uses of force, Levels 1 through 3, we have a sample review of those.

In 2015 we conducted 178 reviews and in 2016, 50 reviews. 03:20:01

03:20:22 03:20:41 03:20:55 03:21:26 03:21:48

Under our K9 monitoring, there are four components.

One is we observe the training. Chief Nowicki and myself were just here a couple months ago and reviewed that training.

We reviewed the obedience, the recall from the handlers and the actually dogs.

We review all the deployment reports from K9. In 2015 we reviewed 54 deployments, 42 apprehensions.

We review all the bites. There's been ten bites.

Zero off-leash searches.

And we review all those components in the FIT investigation.

We really want to thank Officer Harold Chambliss and Sergeant Blanchard. I reviewed their logs in terms of their lesson plans and their data, and they have a really good component. And in the past that was not well, it was poor record keeping, but at this point the K9 unit is doing a tremendous job.

As I said earlier, we conducted a 2015 third quarter resisting arrest audit, but let's go back a second. We did this in 2014, and we mirrored this just recently for 2015.

In resisting arrest reports, there's a great likelihood that there's going to be some sort of force with someone with an NOPD officer and someone that they arrested in a resisting arrest. So if we want to get a good opportunity to monitor those arrest reports that have to do with resisting arrest, that's

03:22:07 03:22:21 03:22:45 03:23:04 03:23:22

probably likely where it's going to happen.

So in 2014, Chief Nowicki reviewed 141 resisting arrest reports in the fourth quarter, and the end result was there were 35 incidents were found to involve force, but those electronic police reports by the officers did not have associated force tracking numbers. There was not a force indicated in those police reports.

Further inquiry found 17 were not reported.

And there were 14 officers that were disciplined.

If we go fast forward to 2015, the third quarter resisting arrest audit, I mirrored the methodology that Chief Nowicki did. I took a random sample of some 230 incidents in that quarter. The random sample was 31 resisting arrest reports. I checked if force was reported, as Chief Nowicki did. I also reviewed body-worn camera videos.

In this audit, the previous audit in 2014, the body-worn camera was not available. And in all my audits I could not find any unreported uses of force, meaning that the resisting reports that I located, there was, on the body-worn camera or anything in the police report, any indication of any force.

THE COURT: In other words, you confirmed --

MR. EPPERSON: I confirmed that the reports that were left by the officers were accurate. And there was no force located in any of the body-worn cameras or the police reports, meaning that what the officer said was true.

03:23:46

I want to provide you, Your Honor, with a current state of the NOPD reported uses of force. And this is just a snapshot of January through March of 2015 and January through March of 2016.

And in '15 the total incidents were a total of 136. I believe Sergeant Helou covered some of them.

And in '16 we have 174 total incidents quarter to quarter.

The total officers involved are 261 in 2015.

03:24:02

And in this quarter, 345.

So you have more officers that are being accounted for in the uses of force and the total incidents.

We also looked at the Level 1s and the levels going across the chart.

03:24:16

168 Level 1 uses of force in 2015 compared to 208 for this quarter.

Level 2s were 30 and 50.

And then we broke up the Level 4s. We looked at the shooting levels. They were one-for-one. One last year -- the

03:24:35

last quarter of '15 compared to this quarter, one.

There was six other levels of force that are not shootings but are serious uses of force.

In the first quarter of 2015 there were six, and in this year there are two.

03:24:49

The monitoring team is -- has provided technical

03:25:19 assistance to NOPD, FIT, PIB, and the Force Investigation Team twice now. In July of 2015 and in January of 2016. We provided training on the mechanics of the administrative shooting investigations. It included FIT, the Force Investigation Team; the IPM, the Independent Police Monitor; SWAT; the City Attorney's Office; and Communications.

We supported the development of the administrative investigation template.

03:25:30 We supported development of the administrative investigation manual.

We provided regular input on ongoing investigations.

I also just received one from Sergeant Helou a couple hours ago, so we'll be reviewing that.

03:25:47 And lastly we provided decision point analysis training that Chief Nowicki will take over now.

THE COURT: While you're both there, I will ask you this. You mentioned one of the ways that you do this, but there are ways that you are looking to see if -- to find any unreported uses of force. I think -- could you tell us what those ways are?

03:26:10 MR. NOWICKI: Two of them -- one besides the audit of resisting arrests?

THE COURT: Yes. I was thinking that's one. I think there's some other ways.

03:26:20 MR. NOWICKI: Yeah. The other way is we're now going to look at injury to officers as well. Injury to -- injury to

03:26:37
03:26:56
03:27:14
03:27:31
03:27:46

arrestees, rather.

We looked at that about a year and a half ago or two years ago, but at that time there was not a searchable field within the electronic police report for injury. The new system has that information, so now we can go and just ask for a printout of all those showing injury to arrestee. We can then pull those electronic police reports and read them and see how the injury occurred. And then also now watch videos to see if there was actually force. And then determine if a force tracking number and a force investigation was completed.

As you know, Your Honor, we also do a lot of body-worn camera videos. This is an ongoing practice of ours. And in there, if we see any indication -- it's not just looking at those body-worn cameras associated with the use of force, which Chet and I looked at, but all members of our team look at videos for other purposes. And then we just do a random audit.

And while we're looking at those videos, if we observe any use of force, we quickly go to see if there's been a force investigation. If not, we alert FIT to find out why and then expect a response back.

All those allow us to be more confident about the level of reporting of use of force events.

MR. ARONIE: Your Honor, there's actually a fourth way that we look for unreported uses of force, and we're starting now to add to the three already mentioned.

We look at citizen complaints of uses of force to then look to see if there was use of force and if the paperwork and reports were filled out.

So we have four ways to look for unreported uses.

03:28:01 MR. NOWICKI: We did the training back in July and in January. We trained FIT and the members of the Use of Force Review Board and other members were brought in, people from the academy.

When Bruce Hamilton was up, he said the officers have to make split-second decisions with limited knowledge. What we're suggesting is that the kind of review that needs to take place of use of force events has to ensure that that officer is making decisions based upon all the knowledge he or she could have if everything worked correctly. And that's what the decision point analysis and the phases of use of force event and the different focus is all about.

So if anybody in the department, such as the dispatcher, knows some information that that officer who is responding to that scene should know, that information should get to that officer.

And if you're not paying attention to that and reviewing that as you're reviewing the use of force, and only focusing on the decision to use force, you're missing opportunities to improve and missing opportunities to prevent the use of force. And that's what the training was all about.

There are multiple decisions made every time a use of force -- most every time a use of force event occurs. And it's not just the decision made by the officer to use force -- generally that focus and that review and that investigation into that decision has been pretty good -- but the decisions made along the way.

03:29:30

And also in the decision point analysis, if you look at anticipation, that includes everything from the moment the first -- the matter is first brought to the attention of anybody in the department.

03:29:47

Entry and initial contact, that's the tactics of approaching to make sure you don't put yourself in a position where force is your only alternative or deadly force is your only alternative.

03:30:01

Dialogue and information exchange, that's where de-escalation comes in.

So anyway, we provided that training. The Use of Force Review Board's structured review uses this structure to conduct its review.

03:30:15

Again, just to summarize, it reviews the actions of all members involved in a use of force incident, not just the member who used force.

It identifies and reviews each key decision point preceding and following the use of force.

03:30:36

What happens after the use of force is also an

important -- can sometimes be an important learning activity.

It assesses the quality of each decision.

And it reaches a decision of whether the seriousness of force by the member was justified based upon the preponderance of evidence.

And, again, through that structured process, it facilitates the identification of policy, training, supervision, and/or equipment implications.

The FIT investigators are using this structure in their investigation, and they are identifying those policy, training, and supervision issues.

Then the second -- the next phase of that, the Use of Force Review Board, they come over them and sometimes even identify more than the FIT folks identified in there.

So there's a lot of quality control being put in place in the investigation of the use of force cases.

MR. EPPERSON: Your Honor, we wanted to provide to you a review of the Use of Force Review Board for the nine cases that the NOPD has heard. There have been three hearings since January 22nd of 2016.

And if I can speak on behalf of Chief Nowicki, in our experience with police departments across the country, it is very difficult to start up the Use of Force Review Board, and I want to compliment NOPD for taking the lead, the initial lead, and starting off a great process with Chief Noel, Chief Mushatt, and

03:32:33 03:32:50 03:33:10 03:33:28 03:33:44

Chief Westbrook with the open, self-critical analysis that took place on January 22nd.

These are the incidents. There has been nine of them. And we have the nature of the use of force which is listed.

Shooting at a person, an animal, negligent discharge, two more people, a couple of animals, and then a shooting at a person.

One of the functions of the Use of Force Review Board's quality control is to look at the FIT investigation to make sure that it was done properly and satisfactory toward the consent decree and also policy and best practice.

The Use of Force Review Board will make a decision on the incident, if it's within policy or out of policy.

One significant part of that is does the board recommend any policy changes, any technical changes, any training for the involved officers?

It's listed here what the board did.

One of the significant things is it's one thing to state that they want policy changes and training, and it's another thing, does it actually happen?

And this use of force board administrator, Sergeant Davis, has kept a log. And not only has FIT, with Lieutenant Burns, put a template together, but when someone is sent for training, the trainer has to sign off on the training, date and time, what was the lesson plan, and if there's any

deficiencies, and how well the training took place.

The academy took it upon themselves on one particular training to not only did they implement the training that the force board recommended, but they went above and beyond that and provided some additional training.

So they're in a very good position, and there will be another hearing in the first week of June.

THE COURT: Before you leave that slide, I noticed that on the last one on that page it talks about reviewing and clarifying policy. I thought that was an example of when it went beyond just that particular use of force to illustrate the fact that this is about more than that. It's really about identifying policy changes that would affect the entire department.

MR. EPPERSON: That's correct. To make NOPD -- if there's an opportunity to make it better than it was at that incident, if there's a policy change that has to be made.

THE COURT: I assume some of the training, I guess maybe at the academy, if you're finding issues through this Use of Force Review Board, it might indicate that they need some changes in training, too, you know, if you see a particular problem reoccur.

MR. EPPERSON: That's correct. During the force board hearings, if there's repetitive deficiencies, it's an opportunity. And the academy is at the force board and they are at the table. They're a non-voting member, but they do have

discussions and input. It's an opportunity to mold and maybe rearrange the training that's afforded to the NOPD officers based on the hearings that take place.

MR. NOWICKI: Your Honor, I just recall one of the board meetings where they were discussing one of the animal shootings. They had a pretty healthy discussion about the kind of training officers receive on how to deal with a violent animal.

And I don't know -- it doesn't show up there, but, Kevin, you remember they were talking about bringing some expertise into the academy so that they might -- I don't know if there was a follow-up on that or not -- so they might provide better training to officers so they know how to recognize it. They even identified an individual that they thought about bringing in to help the department.

Those kind of discussions do go on. They're very healthy discussions.

THE COURT: And I understand they don't treat each other with kid gloves.

MR. NOWICKI: No.

MR. EPPERSON: No. My estimation is it's a very open, self-critical analysis. It's very professional, but at the end of the day the NOPD wants to make its officers safe and its citizens and the community.

I'm going to switch now to some -- what we call

03:36:38 03:36:50 03:37:07 03:37:29 03:37:42

on track, off track, and this is going to deal with training.

So on track is the active shooter drills and training that's taking place where the monitoring team is monitored.

The firearms skills, we've monitored that. They're on track.

Conducted energy weapon, which is the taser. They're on track.

Some off track areas for training.

Lesson plans are not -- are off track because there are no lesson plans when it comes to use of force.

Use of practical exercises.

De-escalation is off track. We talked a little bit about that with the audits that I reviewed.

Use of CIT assistance. We're seeing some of our body-worn camera reviews and some of our force incidents that Chief Nowicki and myself have examined.

And use of real world examples.

Under supervision, they're on track for use of force reporting. They do -- officers do report the use of force overall.

The Force Investigation Team is led by Lieutenant Burns and his staff. And we look forward to working with the two newer members, Chief Nowicki and myself.

The Use of Force Review Board is on track.

Off track are the supervisors' investigations with

Level 1 and Level 2. And that's based on a third quarter 2015 use of force audit. I found that there's a lack of response to the scene from the supervisors. And if they're not responding to the scene, it's very difficult for me in the audit to discern did they go to the scene or not because it's not memorialized in their Level 2 investigations.

A lack of assessing injuries from the supervisors.

A lack of conferring with other officers as to what took place in the Level 2 use of force.

And a lack of assessing the force incident.

Beyond just stating that this force is within NOPD policy, a Level 2 force assessment is more -- much more broader. Is there any opportunities for de-escalation? Is there any opportunities to not have the force at all? And to look more broadly beyond just the actual force that was used.

MR. NOWICKI: As kind of a wrap-up, Your Honor, on --

THE COURT: Before you move on and before I forget it, Chief Westbrook, at our next status conference, maybe you can take a look back at the things that have been identified and discussed today and give us a report on how you and Lieutenant Burns are going to change those practices and --

LIEUTENANT BURNS: Just took it down.

DEPUTY CHIEF WESTBROOK: Yeah. One of the things I wanted to speak to is a number of the things he's talking about that we've been able to improve is because we've been trained. A

03:39:35 03:39:47 03:39:58 03:40:09 03:40:28

number of the supervisors still are being trained in the area of looking broader at use of force. So I think when this training continues to happen, then we should see improvement in that area.

LIEUTENANT BURNS: And also in July, improved training should start at the academy in July. There's going to be some additional use of force training.

In addition to that, we've gone out to the districts and provided some training.

We've invited supervisors to our office for one-on-one type of training.

We participated in some of the scenarios at the academy.

We would like to start seeing, when we do simulation training, which is live training with firearms, how the officers will complete their force statements.

So we are working with the academy to improve the investigations.

THE COURT: All right. Good.

MR. NOWICKI: Your Honor, as you know, a lot of what we say is a snapshot of things that -- how things were when we were doing our particular audit, so there's continuous improvement going on in what they're doing. And we see that. I'm sure the next time we're before you, you'll see that as well. I'm sure Chief Westbrook will as well.

Just a kind of a summary at the end, current state

compliant, this means that in these areas the department has reached that threshold where we can maybe begin holding -- like counting them as in compliance for that period of time they need to be in compliance before they are considered to be in compliance with the consent decree.

As you heard a couple times already, they're doing fairly well in K9. And we find a lot of what they do -- off-leash searches approved by supervisors, canine warnings -- with the benefit of the body-worn cameras, we can assess these things very well. And we find them consistently giving warnings. Response to bites is appropriate, the bite ratio -- all those things are clearly within the area of compliance.

Conductive energy weapons as well, the taser. Multiple application restrictions are in place. Dry stun restrictions are in place. And the prohibited use areas are in place.

In these areas the department is doing well.

Other areas are doing well, moving forward, and considered on track, but still need a ways to go before they get to that compliant threshold.

Their policies are in place, but they haven't fully trained on those policies.

General use of -- all the policies, the general use of force policy, vehicle pursuit, tracking and analysis, they have good policies. They're beginning to do the training, but the training has not been fully completed based upon approved lesson

plans. So we can't give them -- we can't count them as compliant in those areas.

It shows here the investigations, the use of force administrative investigations, of serious use of force as on track. I can say this with confidence, that if we were to use data from the current cases, the current administrative investigations done by FIT, we would move that up to a higher level of compliance. Those investigations are improving. There's a lot of back and forth between us and them, and they're very receptive to our critiques. And the next time we see investigations that have been critiqued or done by that investigator, we see significant improvements.

Where there is a need for more attention, our -- again, based upon a snapshot at one time, the use of conducted energy weapons against handcuffed subjected, we've seen a couple of those. We shouldn't see any of those. And we would hope that closer attention is paid to that. Not so much in the investigation as in the training and supervision to prevent those from happening.

There's no SWAT policy, which we need to get that in place.

That's a combination of -- they can't take all the blame. We have to approve those and we have yet to see a SWAT policy presented to us.

Correct Tim?

DEPUTY AVERILL: Yes, sir. And that's because we have some policies in the queue.

MR. NOWICKI: Correct me if I'm wrong in this, please.

But anyway, investigation of use of force involved supervisors conducting investigations. You heard that from Lieutenant Burns, that occasionally that might take place. Those get kicked back. But, again, by this time investigators should know that they can't even present that case to them. We're still seeing those showing up. FIT still catches those and has to return those.

That concludes our presentation.

THE COURT: All right. Thank you very much. It's been very informative.

I wanted to give Jonas Geissler a chance to speak to us on behalf of the DOJ.

MR. GEISSLER: Jonas Geissler for the Department of Justice.

Your Honor, the United States did not assess independently compliance with the force provisions of the consent decree for the sake of this hearing, but there are two take-home points the United States would like the Court to know.

The first is a point of commendation to the NOPD from the Chief all the way through the organization to the line officers for progress made thus far.

Mr. Hamilton noted that the policies on uses of force

have only been in place since December 5th -- that is five months, 14 days before today -- but the monitor's office has found fidelity already in the reporting of uses of force in most instances.

03:45:08 I note that as Lieutenant Burns was presenting, I saw Chief Nowicki sitting at the table with a look of pride in his face as Lieutenant Burns described the internalization of the skills and processes to do the force review board and the FIT in general.

03:45:22 There is also a commendation, Your Honor, for OCDM. In the process of going through the consent decree, the city's invested in OCDM not just as the oversight mechanism, but OCDM is providing valuable consulting to the organization to improve it as it goes through the process.

03:45:38 The second take-home point, Your Honor, is that today's hearing is not yet an assessment of compliance. There is still work to do. OCDM has not presented an overall testament of reasonableness versus unreasonableness from the larger world of uses of force by the NOPD nor has the United States.

03:45:56 And I commend Your Honor to Chief Nowicki's first slide, the PTSD. The policies have been in place since December 5th. The training and supervision, however, are still large items that he mentioned at the very end of his presentation that the NOPD still needs to work on, and we agree with that assessment as well.

03:46:16

That is not to detract, however, from that first take-home point which is the commendation to NOPD for the work that they have done.

THE COURT: Thank you. I agree with you. I know it was music to Chief Harrison's ears when he was hearing "this has been done," "this has been done." We're all -- we want to do the right thing and we want to -- but it's always nice also to be able to check something off the list.

So we've made a lot of progress. We're not there all the way, but I really see a lot of improvement, and I think we're headed in the right direction, so we'll just follow this up.

And it's going to take a period of time for all of these things to happen, for the training to be done and then for the monitors.

They're now at a point where they can really begin monitoring and comparing 2015 to '16 and 2016 and '17, and that's when we'll know for sure that we -- everything has been done that needs to be done.

But I think I agree with you, we're headed in the right direction and that everybody involved should be commended.

And including you. Thank you for your help.

MR. GEISSLER: Thank you, Your Honor.

THE COURT: I want to thank everybody for their comments today and for all of the hard work that went into getting us here. I don't know if anyone has any other comments

that they didn't get a chance to make.

I'm sure you don't. I thought I would give you a chance.

(No response.)

03:47:49 THE COURT: Our next hearing is August 18th at 1:30, and we have not decided what our topic will be yet. We might do the sex crimes and domestic violence units. We might talk about EPIC. We just haven't decided yet, but we'll announced that well in advance so that everyone can be prepared and the public can 03:48:14 know.

Court is adjourned. Before I leave, I'm going to come over and say hello to all the members of the FIT.

(Proceedings adjourned.)

* * * *

**CERTIFICATE**

**I hereby certify this 31st day of May, 2016, that the foregoing is, to the best of my ability and understanding, a true and correct transcript of the proceedings in the above-entitled matter.**

***/s/ Mary V. Thompson***

**Official Court Reporter**