

**Report of the Consent Decree Monitor
For the New Orleans Police Department Consent Decree
Covering the First & Second Quarters of 2016
Released September 26, 2016**

**Office of the Consent Decree Monitor
New Orleans, Louisiana**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana



## WHAT'S IN THIS REPORT?



**Office of the Consent Decree Monitor**

**September 26, 2016**

| WHAT WE DID THIS PERIOD |
| --- |

- The Monitoring Team continued to approve policies, review Body Worn Camera videos, and evaluate uses of force. We also spent significant time focusing on the Police Academy, including recruit and in-service training. In addition, the Team conducted audits of photo lineups, custodial interrogations, use of force reporting, SA/DV investigations, and the CIT program. We also worked closely with NOPD and DOJ to support the development of a number of new programs, including a Use of Force Review Board and a police peer intervention program.

| WHAT WE FOUND |
| --- |

- With the Support of the Monitoring Team, NOPD created and implemented an impressive Use of Force Review Board.
- NOPD drafted several new excellent policies, which were approved by the Monitoring Team and DOJ.
- Supported by Department leadership, NOPD officers created a nation-leading officer peer intervention program called EPIC (for Ethical Policing is Courageous). The program has been applauded by other police agencies, several experts, and the *New York Times*.
- The Public Integrity Bureau has improved its administrative investigations process to remedy past negative findings.
- The Special Victims' Section has made a "remarkable turnaround" following negative prior findings by the DOJ, the New Orleans IG, and the Monitoring Team.
- While new leadership has led to recent improvements at the Academy, the Department's overall training program still needs additional improvement.
- NOPD has yet to roll out a compliant community oriented policing program, although it has assigned a full-time lieutenant to move these efforts forward.
- For a number of reasons, supervisors still find it hard to closely and effectively supervise their patrol officers.

| NEXT PERIOD'S ACTIVITIES |
| --- |

- Continue to focus closely on all aspects of the Academy.
- Conduct a "deep dive" audit of the Department's Field Training Officer ("FTO") program.
- Conduct a follow-up BWC audit focusing on ensuring patrol officers are performing their duties in a professional, respectful, bias-free, and compliant manner.
- Continue reviewing all significant uses of force.
- Continue the Team's ongoing review of Stop, Search, and Arrest data.
- Perform multiple other audits and reviews, and provide technical assistance, as necessary.



## I.    CONSENT DECREE AUTHORITY

"The Monitor shall file with the Court quarterly written, public reports covering the reporting period that shall include:

a) A description of the work conducted by the Monitoring Team during the reporting period;

b) A listing of each [Consent Decree] requirement indicating which requirements have been: (1) incorporated into implemented policy; (2) the subject of sufficient training for all relevant NOPD officers and employees; (3) reviewed or audited by the Monitoring Team in determining whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitoring Team to have been fully implemented in practice;

c) The methodology and specific findings for each audit or review conducted, redacted as necessary for privacy concerns.  An unredacted version shall be filed under seal with the Court and provided to the Parties.  The underlying data for each audit or review shall not be publicly available but shall be retained by the Monitoring Team and provided to either or both Parties upon request;

d) For any requirements that were reviewed or audited and found not to have been fully implemented in practice, the Monitor's recommendations regarding necessary steps to achieve compliance;

e) The methodology and specific findings for each outcome assessment conducted; and

f) A projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the [Consent Decree]."

**Consent Decree Paragraph 457**



## II.    NOTES

"The Monitor shall be subject to the supervision and orders of the [United States District Court for the Eastern District of Louisiana], consistent with [the Consent Decree.  The Monitoring Team shall only have the duties, responsibilities, and authority conferred by [the Consent Decree].  The Monitoring Team shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent."

**Consent Decree Paragraph 455**



## III.    TABLE OF CONTENTS

I.     Consent Decree Authority ........................................................................................ 3

II.    Notes ....................................................................................................................... 4

III.   Table of Contents ................................................................................................... 5

IV.    Glossary of Acronyms ........................................................................................... 7

V.     Introduction to Quarterly Report .......................................................................... 9

VI.    Summary of Monitoring Activities ...................................................................... 14

VII.   POLICIES AND TRAINING GENERALLY ....................................................... 18

VIII.  USE OF FORCE ................................................................................................... 20

   A.  Use of Force Generally ...................................................................................... 20

   B.  Use of Force Review Board ............................................................................... 24

IX.    CRISIS INTERVENTION TEAM ......................................................................... 26

   A.  CIT Program ....................................................................................................... 26

   B.  CIT In Practice ................................................................................................... 27

X.     CUSTODIAL INTERROGATIONS ...................................................................... 29

   A.  Paragraph 163 .................................................................................................... 31

   B.  Paragraph 164 .................................................................................................... 31

   C.  Paragraph 165 .................................................................................................... 32

   D.  Paragraph 166 .................................................................................................... 33

   E.  Paragraph 167 .................................................................................................... 34

XI.    DETECTIVE SELECTION ................................................................................... 36

   A.  Paragraph 169 .................................................................................................... 36

   B.  Paragraph 170 .................................................................................................... 37

XII.   PHOTOGRAPHIC LINE-UPS ............................................................................. 39

   A.  Paragraph 171 .................................................................................................... 39

   B.  Paragraph 172 .................................................................................................... 40

   C.  Paragraph 173 .................................................................................................... 41

   D.  Paragraph 174 .................................................................................................... 41



E.     Paragraph 175 ................................................................................42
F.     Paragraph 176 ................................................................................43
XIII.    POLICING FREE OF GENDER BIAS .................................................. 44
XIV.    COMMUNITY ENGAGEMENT............................................................ 50
XV.    RECRUITMENT ................................................................................ 52
XVI.    ACADEMY AND IN-SERVICE TRAINING.......................................... 53
A.     Academy In General.........................................................................53
B.     Classroom Size ................................................................................55
C.     Ethical Policing Is Courageous ("EPIC")..........................................57
XVII.    OFFICER ASSISTANCE AND SUPPORT ........................................ 60
XVIII.    SUPERVISION ................................................................................ 62
A.     Quarterly Supervision Audit Results.................................................62
   1.    Duties of Supervisors.................................................................. 62
   2.    Supervisor and Command-Level Training.................................... 70
   3.    Early Warning System ................................................................ 70
   4.    Visual and Audio Documentation of Police Activities .................. 71
XIX.    MISCONDUCT COMPLAINT INTAKE, INVESTIGATION, AND ADJUDICATION ............ 76
XX.    TRANSPARENCY AND OVERSIGHT .............................................. 85
A.     Technical Assistance........................................................................89
XXI.    AGREEMENT IMPLEMENTATION AND ENFORCEMENT ...................... 91
A.     Coordination with IPM (CD 459) ......................................................91
B.     NOPD Consent Decree Implementation Unit (CD 467)......................91
C.     NOPD and City Cooperation (CD 470 – 476)....................................91
XXII.    CONCLUSION ................................................................................ 93



## IV.    GLOSSARY OF ACRONYMS

| | |
|---|---|
| "ASU" | Administrative Services Unit |
| "AUSA" | Assistant United States Attorney |
| "AVL" | Automatic Vehicle Locator |
| "BWC" | Body Worn Cameras |
| "CIT" | Crisis Intervention Team |
| "CCMS" | Criminal Case Management System |
| "CD" | Consent Decree |
| "CIT" | Crisis Intervention Team |
| "CODIS" | Combined DNA Index System |
| "ComStat" | Computer Statistics |
| "COCO" | Community Coordinating [sergeants] |
| "CPI" | California Psychological Inventory |
| "CSC" | Civil Service Commission |
| "CUC" | Citizens United for Change |
| "DA" | District Attorney |
| "DI-1" | Disciplinary Investigation Form |
| "DOJ" | Department of Justice |
| "DV" | Domestic Violence |
| "DVU" | Domestic Violence Unit |
| "ECW" | Electronic Control Weapon |
| "EPIC" | Ethical Policing is Courageous (NOPD peer intervention program) |
| "EWS" | Early Warning System |
| "FBI" | Federal Bureau of Investigation |
| "FIT" | Force Investigation Team |
| "FOB" | Field Operations Bureau |
| "FTO" | Field Training Officer |
| "IACP" | International Association of Chiefs of Police |
| "ICO" | Integrity Control Officers |
| "IPM" | Independent Police Monitor |
| "KSA" | Knowledge, Skill and Ability |
| "LEP" | Limited English Proficiency |
| "LGBT" | Lesbian, Gay, Bi-sexual, and Transgender |
| "MMPT" | Minnesota Multiphasic Personality Inventory |
| "MOU" | Memorandum of Understanding |



| | |
|---|---|
| "NNDDA" | National Narcotics Detection Dog Association |
| "NOFJC" | New Orleans Family Justice Center |
| "NOPD" | New Orleans Police Department |
| "NPCA" | National Police Canine Association |
| "OCDM" | Office of Consent Decree Monitor |
| "OIG" | Office of Inspector General |
| "OPSE" | Office of Public Secondary Employment |
| "PIB" | Public Integrity Bureau |
| "POST" | Police Officer Standards Training Counsel |
| "PsyQ" | Psychological History Questionnaire |
| "QOL" | Quality of Life [officers] |
| "RFP" | Request for Proposal |
| "SA" | Sexual Assault |
| "SART" | Sexual Assault Response Team |
| "SOD" | Special Operations Division |
| "SRC" | Survey Research Center |
| "SUNO" | Southern University of New Orleans |
| "SVS" | Special Victims Section |
| "UNO" | University of New Orleans |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |
| "VAW" | Violence Against Women |



## V.    INTRODUCTION TO QUARTERLY REPORT

The last few months have seen a number of heart-wrenching policing events in the United States. Police shootings made the news in Baton Rouge, Minneapolis, and North Miami; while shootings of police officers made the news in Dallas, Baton Rouge, and Austin.  And during the same period, gun violence took the lives of literally hundreds of men and women across the U.S. These are trying times for law enforcement.

The national stories dominating the press, however, only highlight the criticality of finding ways to restore trust between civilians and those charged with protecting them.  That is precisely the goal of the New Orleans Consent Decree.  In agreeing that a Consent Decree was necessary in New Orleans, the City, the Police Department, and the Department of Justice recognized that "the ability of a police department to protect the community it serves is only as strong as the relationship it has with that community."

To rebuild that relationship in New Orleans, the Consent Decree outlines a wide range of reforms aimed at "protect[ing] the constitutional rights of all members of the community, improve[ing] the safety and security of the people of New Orleans, and increase[ing] public confidence in the New Orleans Police Department."  Since the outset of the Consent Decree, the New Orleans Police Department has made significant progress toward implementing these reforms.

Among others, the Police Department rightly can claim material achievements in the following areas:

- Creation and implementation of a Use of Force Review Board that provides NOPD leadership a vehicle for the candid, substantive review of critical uses of force and a platform to identify gaps in policies, training, and practices.  NOPD already has held multiple Board Reviews.  The Monitoring Team has observed each Review and was highly impressed with the substance, completeness, and frankness of the discussions.

- Development and implementation of a nation-leading officer peer intervention program. NOPD's EPIC program (for Ethical Policing is Courageous) incorporates social science research from leading experts and teaches officers how to intervene in another officer's actions before mistakes are made and/or misconduct take place.  The EPIC program is the result of a cooperative efforts of community members, outside experts, the Monitoring Team, and, most importantly, the rank and file members of the Police Department.  EPIC goes beyond the requirements of the Consent Decree and is worthy of very high praise.

- Improvement of PIB's administrative investigation process to remedy the Monitoring Team's prior negative findings and incorporate a host of best practices.

- Partnering with the Innocence Project New Orleans to co-develop a training program for new detectives.  The training, aimed at conducting quality criminal investigations,



received high marks from the detectives attending the inaugural course, and quite possibly represents one of the nation's first training partnerships between a police department and an Innocence Project.

- Significantly reforming its Sexual Assault and Domestic Violence (SA/DV) practices. Following a highly critical report by the New Orleans Office of Inspector General and similarly negative findings by the Monitoring Team, NOPD dedicated significant efforts and resources to turn around its Special Victims Section.  Since that time, the Monitoring Team and the OIG have noted a "remarkable turnaround" in the Department's SA/DV practices.

- Implementing a number of new and revised policies incorporating national best practices, Consent Decree requirements, and a number of innovations flowing out of an effective department/DOJ/Monitoring Team policy review and development process.

- Initiating a new internal "ComStat" structure that promises to make better use of data to give Commanders more effective resources to manage their Districts, deploy resources in a more targeted fashion, identify practices in need of reform, and identify officers in need of additional supervision.

And these achievements complement the achievements already made in the prior quarters:

- Implementation of a best-practice Crisis Intervention Team program, modeled after a highly publicized model used for years in Memphis, which trains patrol officers to handle interactions with civilians in mental health crisis, thus reducing the risk officers will have to use force against such civilians and increasing the safety of the officers themselves.

- Implementation of a nation-leading BWC program with a strong policy, meaningful discipline for non-compliance, and an extremely high adoption rate by officers.

- A strong and effective canine program that has remedied almost all the shortcomings identified by DOJ in its initial Findings Letter.

- Expansion of a telephone response unit within the Department, which frees up patrol officers to dedicate more time to answering calls for service.

- A highly effective Force Investigative Team ("FIT") responsible for the criminal and administrative investigation of all serious uses of force involving officers.  The Monitoring Team reviews all FIT investigations and continues to be impressed with the thoroughness of the Team's work.

- Development and implementation of a trail-blazing critical incident video release policy. While police agencies and legislatures across the country are building obstacles to the



release of video recordings, the NOPD took a strong stand in favor of transparency and adopted a policy aimed at tearing down those obstacles.

- Creation and continuation of an Office of Police Secondary Employment, which effectively resolved the problems with the Department's prior manner of handling paid details.

- Implementation of more than 40 new or revised policies incorporating best practices and meeting the requirements of the Consent Decree.

These accomplishments are meaningful, and NOPD should be commended.  They not only reveal a significant step toward sustained compliance with the Consent Decree, but, more importantly, they reflect a sincere commitment to reform.

Of course, as in past quarters, there exist other areas that require greater attention by the NOPD in order to achieve compliance with the Consent Decree.  These areas include the following:

- ***The Police Academy***.  This has been a consistent negative finding by the Monitoring Team.  We previously have criticized the quality (and, sometimes, the existence of) lesson plans, curriculum, training materials, and the quality of the instruction.  While progress has been made in some areas, progress has been inconsistent and insufficient.  And, as one would expect, we continue to see the results of training shortcomings on the street in terms of the way some officers perform their job responsibilities.  To its credit, NOPD recently responded to the Monitoring Team's concerns by making yet another change to the Academy leadership.  In addition to a new Deputy Chief over the Department's Management Services Bureau (Chief John Thomas) and a new Commander of the Academy (Commander Chris Goodly) – both of whom have demonstrated a clear commitment to reform – the Department just hired its first Academic Coordinator, Dr. Deirdre Magee.  We are hopeful the combination of Chief Thomas, Commander Goodly, and Dr. Magee will move the Academy toward compliance, but we remain concerned the Academy lacks sufficient personnel and resources to move forward effectively.

- ***Supervision***.  The Monitoring Team has criticized the level of supervision patrol officers have received since the outset of the Consent Decree.  We have recognized, however, the most significant hurdle to "close and effective supervision" (the term used by the Consent Decree) is not a lack of knowledge or desire by supervisors, but rather a lack of time, resources, and/or efficient practices.  The Department recently brought together a group of lieutenants to identify current inefficiencies and opportunities for improvement.  We are hopeful this group will identify solutions to this important problem.  Until then, the combination of training gaps and supervision gaps creates the very real risk that the excellent progress NOPD has made with its policies, procedures, and institutions will too slowly find its way to the officers on the street.



- ***Community Oriented Policing***.  The New Orleans Police Department never has had a comprehensive community oriented policing program.  Previously, the Department relied primarily on its "CoCo" sergeants and its Quality of Life Officers to engage with the community, but even this was not true community oriented policing.  And, notwithstanding the benefits these programs offered many members of the community, the CoCo and QOL officers often were used as a crutch by the Department, which inhibited the involvement of other officers in the Department's community policing efforts.  In any event, as a result of the Department's efforts to transfer more officers to patrol, the CoCo and the QOL programs now have been disbanded.  In its place, the Department has tasked a single lieutenant to develop and implement a Department-wide community oriented policing program that involves all officers and supervisors.  While we have been impressed by Lt. Williams and are working closely with her to ensure her program is comprehensive, compliant, and effective, we question whether the Department has focused adequate resources at this important area.  While we understand the need to maximize officers on the streets answering calls for service and fighting crime, we remain of the view that an effective partnership with the community is a critical component of building trust, serving the community, and fighting crime.  To quote the Department of Justice's Bureau of Justice Assistance, "[a] foundation of trust will allow police to form close relationships with the community that will produce solid achievements.  Without trust between police and civilians, effective policing is impossible."[1]

- ***Stops, Search & Arrests***.  One of the fundamental purposes of the Consent Decree is to "ensure that all NOPD investigatory stops, searches, and arrests are conducted in accordance with the rights secured or protected by the Constitution and laws of the United States."  The Monitoring Team continues to audit the Department's stops, searches, and arrests by analyzing data, reviewing BWC footage, and watching police/citizen encounters during ride-alongs.  Our past audits identified ongoing shortcomings in this important area.  We brought our findings to the attention of the Department, and, after a slow initial response, we are pleased to report the Department has taken meaningful steps to cure the deficiencies the Monitoring Team raised.  Even with this recent effort, this area remains a critical focus of the Monitoring Team.

Each of these areas needs additional NOPD attention.

Despite the work still ahead of it, from what the Monitoring Team has seen, the Department is taking the right steps to bring itself into full and sustained compliance with the Consent Decree. Further, the Monitoring Team remains convinced NOPD's management team is committed to reform.  A member of the Monitoring Team who took his own city (Pittsburgh) through a DOJ

---

[1]    Bureau of Justice Assistance, "Understanding Community Policing:  A Framework for Action" (Aug. 1994).



Consent Decree years ago is fond of saying the key to working through a Consent Decree and emerging as a better department on the other side is leadership committed to reform.  The past two years have seen so much progress by the NOPD for precisely this reason.  Superintendent Michael Harrison, Chief Paul Noel, Chief Arlinda Westbrook, Chief John Thomas, Chief Rannie Mushatt, Chief Danny Murphy, and many others continue to impress the Monitoring Team with their commitment to achieving full and sustained compliance with the Consent Decree.  While a lot of people deserve great credit for bringing the NOPD this far along the path toward compliance, the Department's successes could not have been achieved without the commitment, energy, and wisdom of these remarkable leaders.



## VI.    SUMMARY OF MONITORING ACTIVITIES

The Monitoring Team has been extremely busy since our last report.  Among other things, our team has undertaken the following activities over the course of the last two quarters:

- Reviewed all serious use of force incidents and a significant number of other use of force incidents.

- Observed Use of Force Review Board sessions.

- Conducted a multi-faceted audit of NOPD's use of force practices and data, including an audit of reported uses of force versus unreported uses of force.

- Studied NOPD's stop, search, and arrest data.

- Conducted multiple audits of each police district's handling of custodial interrogations, photographic lineups, record keeping, and supervision practices.

- Conducted multiple audits of the functionality and use of each districts in-car cameras, body warn cameras, CEW (Taser ®) cameras, and in-car gps systems.

- In coordination with the New Orleans Office of Inspector, conducted multiple audits of NOPD's progress implementing the reforms called for by the OIG following its investigation into the Department's prior sexual assault investigation practices.

- Provided technical assistance to NOPD's PIB, its FIT team, the Academy, and the Department's new community engagement coordinator.

- Reviewed Academy curriculum, lesson plans, and teaching materials; and observed instructors and Academy leadership on countless occasions.

- Reviewed, revised, and ultimately approved multiple policies.

- Met with community members, community groups, and business leaders to get their views of NOPD progress.

- Attended monthly status conferences with NOPD leadership, the Department of Justice, and Judge Morgan at which the NOPD and the Monitoring Team provided updates on all areas of concern to the Court.

- Personally observed police officers in countless "ride-alongs" in all districts and during all shifts.



- Responded to the scene of critical use of force incidents, including officer involved shootings.

Additionally, the Monitoring Team worked closely with the NOPD in support of its EPIC (Ethical Policing is Courageous) program, which was rolled out earlier this year.  As described further in the body of this report, EPIC is a comprehensive peer intervention program created by NOPD officers with the support of outside experts that teaches officers how effectively to intervene to prevent a problem or stop a problem from escalating, empowers officers to intervene, and then protects them when they do.  The program is trail-blazing, and the Monitoring Team believes it will become a model for policing across the country in time.

In addition to the foregoing, the Monitoring Team also spent significant time this period, as it always does, meeting with and listening to civilians, community leaders, and officers regarding the police department, the Consent Decree, and police reform generally.  While we cannot recount all the questions, suggestions, and concerns we have fielded over these months, the following questions are illustrative.

   *Question/Comment*.  Doesn't the current crime rate call for more aggressive policing?

   ***Monitoring Team Response***.  Like most big cities in the United States, New Orleans has seen an uptick in crime (including violent crime) over the past few years.  While some experts attribute a rise in crime to economic factors – *e.g.*, wage stagnation, job loss, housing costs, school costs, etc. – some commentators have used crime as a rallying call for more aggressive policing nationwide.  We strongly disagree.  The Monitoring Team believes the most effective tools in a police agencies' crime fighting toolbox are clear policies that give officers meaningful guidance, well-trained officers who have respect for all members of the community; robust training that incorporates procedural justice, respect for all members of the community, and constitutional standards; committed and competent supervisors; thorough and competent investigations into police use of force and allegations of misconduct; and strong partnerships with the community.  All of these tools lie at the core of the Consent Decree.

In short, it is the view of the Monitoring Team that a more violent society does not call for more violent policing; a more violent society calls for more effective policing.  So far, NOPD has shown itself to be an adherent of this view.  By implement the reforms encompassed by the Consent Decree, by providing its officers better training, by respecting individuals' rights, by building stronger bonds with the community, NOPD will be able to better protect civilians and officers.  The Monitoring Team will continue to monitor NOPD's ongoing efforts to do all these things.

   *Question/Comment*.  What is NOPD doing to engage with the community now that the Community Affairs Coordinators and Quality of Life Officers have been redeployed to patrol duties?



    *Monitoring Team Response*.  In January 2016, NOPD announced a major departmental restructuring which, among other things, did away with the positions of Community Affairs Coordinator and Quality of Life Office in an effort to put more patrol officers on the streets. According to NOPD, the restructuring will involve "becoming a community policing focused department."  As of the publication of this report, however, NOPD still is working on what this new focus will look like.  The Monitoring Team has reviewed early drafts of the forthcoming community oriented policing plan, and believe the effort has sensible goals.  The timing of the plan's implementation continues to concern us, though.  Also, we will withhold judgment on whether the ultimate plan can and will be implemented effectively.  Currently, only one member of NOPD is working on the plan,[2] which will make it hard for NOPD truly to become a "community policing focused department," as it says is its goal.

    *Question/Comment*.  What is the Monitoring Team doing about other jurisdictions operating in New Orleans, and why don't they have to following NOPD's rules?

    *Monitoring Team Response*.  The Monitoring Team has heard this question from numerous people in numerous contexts, including from members of the civil rights community, participants at our public meeting, and a collection of young men who have spent time in the justice system.   The questioners generally recognized the improvements within the NOPD, but express concern over other jurisdictions operating in New Orleans beyond the reach of NOPD's new policies and practices.  NOPD's rules governing vehicle pursuits, uses of force, firing at automobiles, conducting force investigations, and de-escalation have been held up at these meetings as best practices to which other jurisdictions should have to adhere.  One young man captured the views of many others in the room when he asked "why don't you just make everyone follow NOPD's new rules.  They are obviously better."

    The Monitoring Team recognizes the multitude of non-NOPD jurisdictions operating in New Orleans, including other New Orleans law enforcement agencies, regional sheriff's offices, the Louisiana State Police, and multiple federal agencies.  The Consent Decree, however, reaches only the New Orleans Police Department, and the activities of non-NOPD agencies is not within the oversight authority of the Monitoring Team.  That being said, the Monitoring Team, with the support of the Court, has taken steps to ensure NOPD's Force Investigations Team handles all investigations of any non-federal / non-state police-involved shooting in New Orleans.[3]

---

[2]    The Monitoring Team recognizes others within the NOPD are contributing to Lt. Williams's efforts, but the community policing project is the primary focus only of Lt. Williams.

[3]    Police shootings by federal agencies are investigated by the federal authorities.  Police shootings by state agencies (*e.g.*, the Louisiana State Police) are investigated by state authorities.  The New Orleans Police Department is responsible for conducting criminal investigations of all other non-NOPD police-involved shootings in New Orleans.



      Additionally, Superintendent Harrison has proactively reached out and met with surrounding police agency leadership to emphasize that NOPD's Public Integrity Bureau would be the sole investigating agencies on any non-state/non-federal police use of force in New Orleans.  The Monitoring Team applauds Superintendent Harrison for taking this step.

      Finally, while the Consent Decree governs only the NOPD and the City of New Orleans, we are hopeful other local (and national) law enforcement agencies will take note of NOPD's reform efforts over the past three years.  NOPD new policies, programs, and practices are trail-blazing and already are having a meaningful impact on the community.

*     *     *

As we have done since our appointment, the Monitoring Team also spent significant time meeting with, and listening to, the parties to the Consent Decree.  The Monitoring Team is in regular contact with the City, the NOPD, and the DOJ.  We also continue to meet regularly with the NOPD Compliance Bureau, the PIB, the NOLA OIG, and the members of the Independent Police Monitor's team, as well as community advocacy groups like SART and the New Orleans Family Justice Center.



## VII.    POLICIES AND TRAINING GENERALLY

The process implemented by the NOPD, the DOJ, and the Monitoring Team in 2014 to facilitate the review, revision, and approval of Department policies continues to be effective.  NOPD completed numerous additional policies these past two quarters, which supplement a large number of policies previously approved by DOJ and the Monitoring Team.  To date, the following policies have been approved:

| | |
|---|---|
| Search and Seizure | Terry Stops |
| Search Warrant Content, Forms and Reviews | Use of Force |
| Handcuffing and Restraints | Control Devices and Techniques |
| Force Investigative Team ("FIT") | Reporting Use of Force |
| Use of Force Review Boards | Firearms |
| Authorized Ammunition | Firearms Training Qualification and Requalification |
| Conducted Electrical Weapon | Arrests/Arrest Warrants/Wanted Persons |
| Miranda Rights | Audits and Reviews Audit and Review Unit Standard Operating Guidelines |
| Commendations and Awards | Secondary Employment |
| Mediation Settlement | Adjudication of Misconduct |
| Disciplinary Matrix/Penalty Schedule | Employee Counseling |
| Foot Pursuits | Body-Worn Camera ("BWC") Inadvertent Misuse and Non-use |
| In-Car Camera | Body-Worn Camera – General |
| Release of Critical Incident BWC Recordings | Vehicle Pursuits |
| Immigration Status | Bias-Free Policing |
| Canines | Crisis Intervention |
| Crisis Transportation Service | Sexual Assault (and Sex Crimes Operating Guidelines) |



| Domestic Violence | Disciplinary Hearings/Penalties |
|---|---|
| Misconduct Compliant Investigator Responsibilities | Negotiated Settlement |
| Prisoner Transportation | |

In addition to these approved policies, a number of other policies have been revised by NOPD, and are awaiting review and approval by the Monitoring Team and DOJ.



## VIII.   USE OF FORCE

### A.   Use of Force Generally

On Thursday, May 19, 2016, Judge Morgan held the sixth in a series of public hearings focusing on the New Orleans Police Department's progress under the Consent Decree entered in this matter.  In attendance were counsel for the United States, counsel for the City of New Orleans, three members of the Consent Decree Monitoring Team, NOPD leadership, and multiple members of the NOPD Public Integrity Bureau Force Investigation Team ("FIT").  Among other things, the Court heard from the Monitoring Team, the DOJ, and the NOPD regarding NOPD's progress toward achieving compliance with its Consent Decree obligations relating to the Use of Force.[4]

Following introductory comments from the Monitoring Team, Judge Morgan opened the hearing with a general discussion regarding the importance of the Use of Force provisions of the Consent Decree.  Noting that some force is to be expected from police officers due to the nature of their work, Judge Morgan emphasized that a core goal of the Consent Decree was to reduce the use of excessive force by officers.  Judge Morgan explained that the Consent Decree seeks to achieve this critical goal by requiring new policies, training, levels of supervision, and discipline in the use of force area.

NOPD Compliance Manager Bruce Hamilton began NOPD's use of force presentation. After acknowledging use of forces issues were one of the most important elements of the Consent Decree, Mr. Hamilton provided the Court and the public relevant background regarding force issues generally and the Department's process for dealing with officer uses of force in particular. As an initial matter, Mr. Hamilton confirmed that

> NOPD officers are expected to use the minimum amount of force that an objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control while protecting themselves or the lives of others.

Mr. Hamilton then went on to provide an overview of the Department's use of force investigations policies and practices.

Mr. Hamilton then turned the lectern over to the leader of the NOPD PIB Force Investigation Team, Lieutenant Kevin Burns.  Lt. Burns walked the Court through the process of a FIT investigation.  Lt. Burns described the difference between a FIT administrative investigation and a FIT criminal investigation – noting an administrative investigation looks for violations of policy, training gaps, and other opportunities for process improvement, while a criminal

---

[4]    Following the hearing, the Court published a summary of the proceedings.  The following report borrows heavily, sometimes verbatim, from the Court's summary.



investigation focuses on whether there has been a violation of law, and explained how both can proceed simultaneously in appropriate cases.  According to Lt. Burns, FIT investigated 47 uses of force in 2015.  Lt. Burns also explained NOPD's force classification system, which is an outgrowth of the Consent Decree.  In summary fashion, Lt. Burns explained NOPD's four levels of force, which are described in the Consent Decree as follows:

- Level 1 uses of force include pointing a firearm at a person and hand control or escort techniques (e.g., elbow grip, wrist grip, or shoulder grip) applied as pressure point compliance techniques or that result in injury or complaint of injury.

- Level 2 uses of force include use of an ECW [Electronic Control Weapon or Taser®] (including where an ECW is fired at a person but misses); use of an impact weapon to strike a person but where no contact is made; use of a baton for non-striking purposes (e.g., prying limbs, moving or controlling a person); and weaponless defense techniques (e.g., elbow strikes, kicks, leg sweeps, and takedowns).

- Level 3 uses of force include any strike to the head (except for a strike with an impact weapon); use of impact weapons where contact is made (except to the head), regardless of injury; or the destruction of an animal.

- Level 4 uses of force include all serious uses of force, as defined by this Agreement, and shall be investigated by NOPD's Force Investigation Team.

Notably, pursuant to paragraph 77 of the Consent Decree, "hand control or escort techniques applied for the purposes of handcuffing or escorts that are not used as pressure point compliance techniques, do not result in injury or complaint of injury, and are not used to overcome resistance, are not reportable uses of force."  According to Lt. Burns, NOPD FIT reviews all NOPD uses of force, including minor uses of force that are investigated by a District sergeant in the first instance.  More serious (Level 4) uses of force are investigated only by FIT.

Lt. Burns also described the Department's newly constituted Use of Force Review Board. According to Lt. Burns, with the help of the Monitoring Team, the NOPD established and held its first Use of Force Review Board on January 22, 2016, and has held five Review Boards since covering a total of 14 cases.  Lt. Burns described the Review Board as an opportunity for the FIT to be self-critical:

> We self-critique. And we have deputy chiefs . . . Paul Noel, Rannie
> Mushatt, Chief Westbrook [participate]. We even have members of
> the Academy attend. So everyone has input and they have their
> opportunity to critique the case done by FIT, by the department,
> everything as a whole.  It is a more broad critique of the
> investigation as a whole.



The Monitoring Team commended NOPD on the Use of Force Review Board: "Our experience with police departments across the country is [that it is] very difficult to start up a use of force review board, and I want to compliment NOPD for taking the lead, the initial lead, and starting off a great process with Chief Noel, Chief Mushatt, and Chief Westbrook with the open self-critical analysis that took place on January 22nd."

Sergeant John Helou followed Lt. Burns and presented the Court with an analysis of use of force data from 2014, 2015, and 2016.  According to NOPD's data:

- Uses of force per arrest increased from 2014 to 2015 (from 1.1% to 2.6%), driven (a) by a 22.5% decrease in arrests and a 77% increase in reported uses of force, and (b) by a 156% increase in reported firearm/ECW pointing event (an event not deemed reportable prior to the Consent Decree).

- Comparing the first quarter of 2015 to the first quarter of 2016, NOPD's data show an increase in officer uses of force of 28% (from 136 to 174).  Here again, however, the data suggest the increase was driven primarily by a marked increase in the reporting of firearm/ECW pointing events (as noted above, an event not deemed reportable prior to the Consent Decree).

While the data show an increase in reported uses of force, Sgt. Helou explained that, in addition to reflecting the new requirement to capture firearm/ECW pointing events as uses of force, the increase reflected better self-reporting of uses of force generally rather than an actual increase in uses of force.

Based upon the Monitoring Team's regular audits to identify unreported uses of force, we agree with the Department's interpretation of the data.  The work the Monitoring Team has done supports the fact that there is greater reporting of use of force events, particularly in the area of drawing and pointing the weapon.  We attribute the greater reporting of use of force events to the implementation of clearer policies, enhanced training, the use of body-worn cameras among patrol officers, and an increased departmental focus on reporting, supervision, and discipline since the approval of the Consent Decree by the Court.

Among other statistics, Sgt. Helou reported the following:

- A 10% drop in NOPD's "canine bite ratio" from 2014 to 2015,

- No "off leash" canine deployments in 2015 or 2016,

- A 28% reduction in the use of ECWs (Tasers®) from 2014 to 2015, and

- Two additional firearms discharges from 2014 (10) to 2015 (12).



Following the Department's use of force presentation, the Court heard from Deputy Monitor Dennis Nowicki and Monitor Chet Epperson. Both monitors are former police chiefs and both focus on use of force issues for the Monitoring Team.

Chief Nowicki began the Monitoring Team's presentation by providing an overview of how the Consent Decree deals with use of force issues through policies, training, supervision, and discipline – something Chief Nowicki referred to as "PTSD." Chief Epperson then described some of the audits and reviews the Monitoring Team conducts to assess the NOPD's level of compliance with its use of force policies. These monitoring tools include, among other things:

- Reviewing policies,

- Attending training,

- Reviewing BWC videos,

- Reviewing a significant sample of all use of force reports,

- Reviewing all Level 4 use of force reports,

- Reviewing all serious use of force investigations,

- Reviewing all canine authorizations and deployments, and

- Providing technical assistance to the Department in the form of counseling, advice, and in person training.

In response to questions from the Court, the Monitoring Team also described some of the tests they perform specifically to identify unreported uses of force. These tests include:

- Reviewing BWC videos,

- Reviewing incidents where "resisting arrest" charges have been brought against the subject,

- Reviewing civil law suits against the City alleging excessive force, and

- Reviewing citizen complaints alleging excessive force to see if the officer had recorded the alleged force on his/her own.

While recognizing there is more work to be done, the Monitoring Team commended NOPD for developing an effective Force Investigation Team and praised the professional use of force investigations conducted by FIT's criminal investigation team. The Monitoring Team also



recognized a significant improvement in FIT's administrative investigations, an area previously identified by the Monitoring Team as needing improvement.

In the area of Canine, the Monitoring Team called out NOPD officer Harold Chambliss and Sergeant Blanchard for special recognition. Chief Epperson noted he "reviewed their logs in terms of their lesson plans and their data, and they have a really good component." Chief Epperson contrasted the current level of compliance with the poor record keeping the Monitoring Team noted in the past. "At this point," he noted, "the Canine unit is doing a tremendous job." The Monitoring Team ended its presentation with a summary of the areas where the Police Department was on track for achieving compliance with the Consent Decree and those where the Department was not yet on track.

### B.    Use of Force Review Board

Paragraph 108 of the Consent Decree requires NOPD to "develop and implement a Use of Force Review Board to review all serious uses of force and other FIT investigations." As detailed in the Consent Decree, NOPD's Review Board is comprised of the Deputy Superintendent of the Public Integrity Bureau, the Deputy Superintendent of the Field Operations Bureau, the Deputy Superintendent of the Investigations & Support Bureau, and other members.

The Consent Decree spells out the tasks of the Use of Force Review Board, which we summarize here:

- Review NOPD use of force investigations to ensure they are complete and that the findings are supported by a preponderance of the evidence.

- Hear a case presentation from the lead investigator and discuss the case as necessary with the investigator to gain a full understanding of the facts of the incident.

- Order additional investigation when necessary.

- Determine whether the force violated NOPD policy, and, if so, refer the matter to PIB for disciplinary action if such action has not already been initiated.

- Determine whether the incident raises policy, training, equipment, or tactical concerns, and refer such incidents to the appropriate unit within NOPD to ensure they are resolved.

- Direct District supervisors to take and document non-disciplinary corrective action to enable or encourage an officer to improve his or her performance.

The Consent Decree requires that the Review Board document its findings and recommendations in a formal Use of Force Review Board Report within 45 days of receiving the FIT investigation and within 15 days of the case presentation.



As noted in our prior Report, NOPD convened its first Use of Force Review Board on Friday, January 22, 2016, with the Monitoring Team in attendance.  The Review Board examined three uses of force by NOPD officers.  While outside the period covered by our prior Quarterly Report, we nonetheless reported on its effectiveness since it was such an important development for the NOPD.  Among other things, we found the following:

> In short, the first Review Board session was handled extremely well. The Review Board's discussion was thoughtful, introspective, and substantive. Newly-appointed Deputy Chief Paul Noel facilitated the session, and was an active participant.  Voting members of the Board, including PIB Chief Arlinda Westbrook and ISB Chief Rannie Mushatt, were active participants.  Non-voting members, Academy Commander Richard Williams, Fifth District Commander Christopher Goodly, SWAT Commander Bryan Lampard, and the several other participants, also substantively and effectively contributed to the discussion. ***In the view of the Monitoring Team, all did a great job.***

February 2016 Monitoring Team Report at 26.  For these and other reasons, the Monitoring Team found that all participants did a great job and strongly commended NOPD for this important accomplishment.

We are pleased to report, NOPD's great work with its Use of Force Review Board continues.  The Monitoring Team attended all Review Board hearings conducted so far in 2016, and Judge Morgan herself attended one in person.  Like the first one we reviewed, the subsequent hearings continue to reflect open, honest, thoughtful, and self-critical (where appropriate) discussion.  The key now, of course, will be ensuring the candid Review Board findings get translated into action by NOPD leadership and supervisors in the field.



## IX.   CRISIS INTERVENTION TEAM

### A.   CIT Program

Section IV of the Consent Decree requires NOPD to "minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder."  To achieve this outcome, NOPD agreed to create a properly trained Crisis Intervention Team ("CIT").

The NOPD began actively developing its CIT program (including a policy, an Academy curriculum, a training program, and training materials) in August 2015.  The first class of 24 officers graduated on September 18, 2015.  By May 2016, the NOPD had trained its third class of CIT officers, bringing the total number of trained CIT officers to sixty-nine.  NOPD's most recent graduating class, the fourth, brought another 30 officers into the CIT program on September 6, 2016.  The NOPD anticipates hosting another CIT training class in October, putting it on track to exceed Consent Decree paragraph 115, which requires training 20% of the patrol division in CIT.



In addition to training CIT officers, the Police Department conducted its first crisis intervention training sessions for call takers and dispatchers in June and will offer additional communications trainings throughout the year in compliance with CD ¶ 119.  NOPD also is providing eight hours of CIT in-service training to all officers in 2016 to bring it into compliance with paragraph 118 of the Consent Decree.



Consistent with its new CIT training program, the Department developed and received approval for two related NOPD policies, Chapter 41.25, "Crisis Intervention," and Chapter 41.26, "Crisis Transportation Service." The new policies went into effect March 13, 2016. The NOPD drafted these policies in collaboration with the CIT Planning Committee, which is composed of community experts. The implementation of these policies represents another significant step forward for NOPD's CIT program.

In addition to developing new policies and training CIT officers, NOPD also has begun using its CIT data for multiple purposes. NOPD has utilized these data to identify individuals who have been involved in multiple crisis encounters with the NOPD. The department has formed a Mental Health Review Board with partner agencies to develop solutions to assist these individuals in obtaining appropriate care solutions. Through the use of the Crisis Intervention Form data, the Department has enhanced the Planning Committee's ability to serve as a "problem-solving forum" as called for in CD ¶ 120. The Department intends to publish midyear aggregate data compiled from Crisis Intervention Forms on its website in compliance with Consent Decree ¶ 113.

The Department's CIT program has been gaining recognition from community partners for the valuable role it plays in the community's response to mental health and substance abuse issues. The NOPD has provided Crisis Intervention trainings to outside agencies including Probation and Parole, and the New Orleans Family Justice Center. NOPD's CIT coordinators have presented at the annual members meeting for National Alliance on Mental Illness ("NAMI") New Orleans, a statewide NAMI conference, and a Metropolitan Human Services District regional council meeting, and the development of NOPD's CIT program was highlighted in a quarterly newsletter from NAMI New Orleans.

### B.     CIT In Practice

In June 2016, the Monitoring Team conducted an audit to determine how often a CIT trained officer was dispatched to calls for service dealing with individuals in a mental health crisis. Since the new policy on Crisis Intervention officially went into effect in March 2016, the monitors randomly selected a review sample from April and May 2016 dispatched calls for mental health crisis. There were 443 mental health-related calls dispatched in the April-May 2016 time-frame. The Monitoring Team selected approximately 10% of those calls and identified 47 item numbers to review and determine whether a CIT-trained officer was dispatched.

The NOPD Compliance Bureau was able to cross-reference in the Computer-Aided Dispatch (CAD) system (1) a list of CIT officer ID numbers and (2) a list of item numbers from which we identified calls involving mental health crisis. The Monitoring Team used these data to determine how often a CIT officer was assigned to calls involving individuals in mental health crisis. Overall, the CAD data indicate that CIT officers were assigned to mental health crisis calls slightly more than half of the time so far in 2016.





While this number reflects an underutilization of the CIT program, it also reflects a reality of the phasing in of CIT training.  The current response rate will serve as a baseline for future audits of CIT response.  It is anticipated, by the NOPD and the monitoring team, that the percentage of CIT-trained officer response will increase as the number of trained officers increases and the CIT program becomes more systematically in-grained in the department.



## X.    CUSTODIAL INTERROGATIONS

The Monitoring Team conducted multiple Custodial Interrogation audits since January. We audited Districts 1, 6, 8, and the Homicide Unit in February 2016. We subsequently audited Districts 2, 3, 6, 8, and the Special Victims Section in April and May 2016. In general, NOPD **has shown improvement** in most areas relating to Custodial Interrogations. But compliance still is inconsistent. Accordingly, we find NOPD to be in **partial compliance** with its obligations under Section VI of the Consent Decree.

The Consent Decree requires NOPD to "ensure that custodial interrogations are conducted professionally and effectively, so as to elicit accurate and reliable information." To accomplish this objective, the Consent Decree identifies a number of specific steps NOPD must take with respect to custodial interrogations. In order to evaluate whether those steps were taken, NOPD must maintain and make available to the Monitoring Team certain documentation, including video recordings of the interrogations. As it is NOPD's burden to demonstrate compliance, where we were unable to locate a video we have no choice but to find the Department in non-compliance.

Previously, NOPD did a poor job making materials and recordings available to the Monitoring Team, which meant these materials and recordings likewise were not readily available to supervisors. While some districts did better than others, compliance was inconsistent. While we have seen improvement, inconsistencies remain. Before examining NOPD's compliance with each paragraph, it is worth summarizing the overall compliance we have seen in the various districts.

This period, the First District showed improvement. Earlier this year, our review of interrogations in the First District was slow and arduous. It took First District personnel more than four hours to attempt to locate 11 of 13 recordings. More recently, the process had improved, but still was inconsistent. Some entries in the custodial interrogation logs we reviewed were listed as interviews, but actually were interrogations.[5] Similarly, some entries in the log actually were photographic line-ups instead of interviews or interrogations.

Our audit of the Second District also revealed inconsistent compliance. The Second District audit was made particularly difficult because officers mixed interviews and interrogations in the same record and mislabeled many of the recordings as interrogations when they were interviews, and mislabeled interviews as interrogations. In addition, one case of a photographic line-up was entered into the interrogation log as opposed to the photographic line-up log as required. This

---

[5]    An interview is different from a Custodial Interrogation. An interview simply is any "questioning for the purpose of eliciting facts or information." Consent Decree at 14(pp). A Custodial Interrogation takes place where there are "words or actions on the part of an officer that the officer knows or should know are reasonably likely to elicit an incriminating response, after a person has been taken into custody." Consent Decree at 14(s).



reflected careless record-keeping and failed to show supervisory review of the records or the recordings.  Importantly, we do not criticize these practices because they make our job more difficult.  We criticize these practices because if we cannot find materials we know supervisors cannot find them either.

In addition to record keeping, we identified other lingering problems in the Second District.  The first problem encountered was that the in-District camera system had not been utilized and was not working during the first quarter of 2016.  The Second District also had difficulty locating recordings, while other recordings that were located were not viewable due to technological problems or user error.  For example, we found muffled recordings, mislabeled recordings, recordings ceased prior to the end of the interrogation, incomplete recordings, and erratic sequencing of recordings due to multiple cameras recordings different parts of a single interrogation.  We also identified multiple carelessness log entries.  In short, the Second District was not able to demonstrate significant compliance with any of the consent decree paragraphs regarding custodial interrogations.

Our review of the Third District revealed *significant improvement over prior audits*.  Not only did the Third District show significant improvement, but the District showed initiative by implementing its own internal auditing program to identify deficiencies on its own.

Our review of the Sixth District showed *significant improvement over prior audits as well*.  Indeed, the Sixth District was the only duty location that demonstrated acceptable levels of compliance with custodial interrogation requirements from the audits conducted of four duty locations audited in April.  (In contrast, our February reviewed found the Sixth District 81% compliance with most paragraphs in this area.)  But even here, there remains room for further improvement.  For example, our review revealed the District had some recordings on the official in-District camera system (an L3 system) and some on their BWC cameras.  Indeed, eight of the 15 recording we audited were recorded on a BWC.  While the recordings were made available to us, the practice conflicts with NOPD police and with the Department's prior representations that its L3 cameras were in full working order and full use.

The primary problem identified in the Eighth District related to the quality of their recordings.  The Eighth District does have an L3 camera system, however, the microphone was improperly situated leading to an extremely low audio volume that could not record either the subject being interrogated or both the subject and the interrogating officer.  But even with this audio problem, the Eighth District demonstrated improvement from prior audit periods.

While the Special Victims Section has seen dramatic improvement over the past 12 months, our audit identified some lingering problems with recording custodial interrogations.  Of the 27 recording we reviewed during our Q1 audit, most of the recordings had some discrepancy in that they could not be found, were inaccurately listed as an interview, did not contain both audio/video, the volume was too low to capture audio, or the recording ceased while the subject



remained in the interrogation room.[6]  The SVS leadership, however, took prompt action to remedy these problems when they were brought to their attention.

With this as background, our specific findings regarding compliance with the several Custodial Interrogation paragraphs of the Consent Decree follows:

###   A.      Paragraph 163

Paragraph 163 provides that "officers shall not use physical violence or make threats to carry out harm to the individual or the individual's family during custodial interrogations."  While the Monitoring Team identified no physical violence during interrogations, the absence of some recordings prevents us from finding the NOPD in full compliance in some districts. Accordingly, we find NOPD demonstrated partial compliance.



Of the Districts monitored, some were able to retrieve all audio/video recordings of custodial interrogations and some were able to retrieve the majority of recordings.  Those reviewed did not contain any indication of physical violence or threats of physical violence.

###   B.      Paragraph 164

Paragraph 164 requires that "all custodial interrogations that take place in a police facility, and all interrogations that involve suspected homicides or sexual assaults, shall be video and audio recorded.  All recorded custodial interrogations will be recorded in their entirety.  NOPD appropriately rejects the concept of a 'pre-interview' and prohibits any decision not to record any portion of the interrogation based on such categorization. The recording equipment shall not be turned off unless the suspect states that he/she does not want the interview to be recorded. If the

---

[6]      The primary issue with SVS compliance in this area relates to the Section's use of DVDs to capture interrogations rather than the Department's official L3 camera system.



suspect requests that he/she does not want the interview to be recorded, the interviewer will record the subject making this request and shall document this request in the case report." Because NOPD was unable to make all recordings available to the Monitoring Team, we continue to find NOPD *partially compliant* with this requirement.



The low score for SVS is due primarily to the inadequate compliance of the Special Victims Section. While the SVS has made remarkable improvements in many areas – as the OIG found and as our ongoing audits continue to find – many of the recordings we reviewed this period had the audio portion recorded too low to understand (11 of 27 recordings), five recordings had the audio portion only (no video recording), and five recordings could not be located or the DVD would not play. Only six of the 27 recordings were in compliance with this section of the Consent Decree.

C.    Paragraph 165

Paragraph 165 requires that, if the interrogation is not able to be video and audio recorded because of equipment failure or malfunction, detectives shall record the interrogation by means of a digital or cassette recorder. Any equipment failure shall be explained and documented in the case report, the case file, and in a memo to the Deputy Chief of the Investigation & Support Bureau. NOPD is in *partial compliance* with its obligations under this paragraph:





The low level of compliance in the Second District was due to multiple equipment failures. The problem was immediately brought to the attention of the Commander of the Second District, and the District has taken steps to resolve the non-compliance.

In the Eighth District, officers apparently did not recognize the audio portion of their recordings was too low to be of much use. The failure of the audio portion should have led to a report. Apparently, officers either did not review the recordings to learn there was an audio failure or they believed that was the best the system was able to provide. Supervisors likewise either did not review the recordings to determine if they were being properly conducted or they believed the non-functioning audio was acceptable. Many of the recordings had the audio portion recorded too low to understand (11 of 27 recordings), five recordings had the audio portion only (no video recording), and five recordings could not be located or the DVD would not play. Only six of the 27 recordings were in compliance with this section of the Consent Decree.

       **D.**     **Paragraph 166**

Paragraph 166 of the Consent Decree requires officer to "maintain in the case file their notes taken during interviews and interrogations." NOPD has demonstrated ***partial compliance*** with this paragraph.





The Second District's score is low because evidence of notes in case files were provided for three of the six cases reviewed in which detectives appeared to have taken notes. Indeed, our audit found the Second District in 50% compliance. The problem immediately was brought to the attention of the Commander of the Second District, and the District has taken steps to resolve the non-compliance. The Monitoring Team plans to conduct a follow-up audit in the Second District in the near future to confirm these steps have been effective.

### E. Paragraph 167

Paragraph 167 requires NOPD to "designate interview rooms for all Districts and specialized units, and ensure that interview rooms are equipped with functioning audio and video recording technology that allows for recording and maintenance of all phases of interrogations." While all Districts and SOD have a designated interview room, some districts had failures when attempting to retrieve recordings.





The Second District's low level of compliance was due to malfunctioning audio and video equipment.  None of the interrogation recordings we reviewed was clear enough to assess more than a negligible level compliance.  The problems immediately were brought to the attention of the Commander of the Second District, and the District has taken steps to resolve the non-compliance.

In the Eighth District, the interrogation room had inadequate placement of the microphone leading to failure to capture the audio portion of the recordings.  NOPD stated the microphones were being replaced and the room would provide acceptable audio/video for future interrogations and audits.  The Monitoring Team will conduct a follow-up audit in the near future to ensure these steps have been taken.

The Special Victims Section was unable to demonstrate full compliance primarily due to malfunctioning recording equipment in some interrogation recordings.  Moreover, on the day we audited, the Section's L3 system was not being used even though Department officials had represented all L3 systems were functioning and in use.  Further, SVS supervisors informed us that detectives do not yet have the capability to audio/video record interrogations in the field even though this is Consent Decree required.



## XI.   DETECTIVE SELECTION

The Consent Decree covers detective selection in two paragraphs, 169 and 170.  Paragraph 169 provides that "NOPD shall post all detective openings throughout the Department and shall revise eligibility criteria for detectives in Districts and specialized units to require appropriate experience, writing samples, supervisor recommendations, and an interview."  Paragraph 170 provides that "NOPD shall develop and deliver at least 24 hours of formal training for newly assigned detectives on interrogation procedures and methods."

The Monitoring Team audited the Detective Selection elements of the Consent Decree in February, April, and May.  Specifically, we audited Districts 2, 6, 8, and SVS on April 25-29, 2016 and Districts 1, 3 and SOD in May.  NOPD demonstrated ***partial compliance*** in some districts, but was out of compliance in the Second District.  The following summaries present our consolidated findings from our April/May audits.

### A.   Paragraph 169

With respect to paragraph 169, the First District was in partial compliance.  The district was unable to document that one of its two recently-appointed detectives had the requisite experience or a supervisor recommendation.

The Second District likewise was unable to produce the necessary documentation to demonstrate compliance with paragraph 169.  One detective had served a one-day suspension in April 2015 for a violation of performance of duty, neglect of duty, and failing to take appropriate and necessary police action.  While prior mistakes (and even some misconduct) do not disqualify one from being a great detective, when the supervisor was questioned about the reason for the suspension, he was unable to provide much information.  It appeared he either didn't know the reason for the suspension or was reluctant to discuss the reason.  The Monitoring Team researched the matter further and obtained the information on our own.  With that information in hand, it became clear the District had not adequately documented the detective's selection process.  The District also failed to have copies of writing samples as required in this paragraph, it failed to have a supervisor's recommendation, and it failed to have any documentation of an interview process that all other detective interviews in the department have.  Consequently, we find the Second District ***NOT in compliance*** with paragraph 169.

While the third and sixth districts reported no detective assignments since January 2016, the district did have three positions open and was receiving applications.  The notices for the open positions included all of the consent decree requirements.  Accordingly, we found the Third District ***in compliance***.

The Eighth was able to demonstrate ***partial compliance***, but not full compliance.  For the most recent detective assigned, the District documented his experience level and writing samples, but



was not able to produce evidence that a supervisor's recommendation was considered or that an interview was conducted.

The Special Operations Division selected three detectives during this reporting period. The SOD advised the Monitoring Team that the detectives were selected according to job performance, writing skills, initiative, and willingness to work call-outs. However, there was no documentation regarding their experience level, writing samples, supervisor recommendations or interviews regarding their selection. Therefore, the SOD was ***NOT able to demonstrate compliance*** during this period.

###### B.        Paragraph 170

Paragraph 170 of the Consent Decree requires NOPD to develop and deliver at least 24 hours of formal training for newly assigned detectives on interrogation procedures and methods. The Consent Decree provides that the training shall include "legal standards, ethics, the mechanics of conducting effective and constitutional investigations, and causes for investigative failures and false confessions." Further, NOPD must provide "regular, and at least annual, in-service training to all detectives on updates and changes to the law regarding interrogations and confessions." The police districts audited this period showed inconsistent performance under paragraph 170. Specifically, some current detectives have not had in-service training on updates and changes to the law regarding interrogations and confessions, and others did not have the required training prior to be appointed as a detective.

NOPD primarily relies on a Federal Bureau of Investigations lesson plan for its detective training. The lesson plan does contain some information regarding legal standards and does mentions the word "ethics," but it does not meet the Consent Decree requirements set forth above. The Monitoring Team brought this shortcoming to the attention of the NOPD, and the Department took action. Specifically, the Department engaged retired Deputy Chief Bouyelas, currently with the Orleans Parish DA's office, to teach a two-hour segment of training on the second day of the new detectives' five-day training. This new program was rolled out to new detectives the week of May 23, 2016.

While NOPD was not able to produce a lesson plan for Chief Bouyelas's class, the class nonetheless was well thought out and well presented.[7] The class covered most of the requirements of Consent Decree paragraph 170, including legal standards, the mechanics of conducting a constitutional investigation, and the causes for investigative failures. Further, Chief Bouyelas maintained the attention of the entire class throughout the training, something, from our experience, not all Academy instructors are able to do. He applied adult learning techniques by asking questions and involving the class in discussion.

---

[7]        The Monitoring Team expects to receive and will review the lesson plan to ensure future classes are taught from an approved plan.



The Consent Decree also requires the detective training to cover Ethics as a core part of the training.  While Chief Bouyelas certainly mentioned ethical concepts, the topic was not discussed in detail, which reflects a gap in the class and a non-compliance with Consent Decree paragraph 170.  Ethics is such a critical component of custodial interrogations that it should be discussed in more detail and as a separate topic just as each of the other three components of the training.



## XII.   PHOTOGRAPHIC LINE-UPS

The Consent Decree requires NOPD to ensure that photographic line-ups are conducted effectively and in accordance with the rights secured or protected by the Constitution and laws of the United States, so as to elicit accurate and reliable information.  In April and May 2016, the Monitoring Team audited Districts 1, 2, 3, 6, and 8, as well as SVS and SOD.  These audits follow prior audits of these and other districts in January and February 2016.

In general, NOPD showed improvements over our prior audits.  Some districts showed significant improvement over our prior audits.  The Third District, for example, demonstrated 100% compliance with all Consent Decree paragraphs regarding photographic line-ups.  In contrast, other districts have room for continued improvement.  Several districts, for example, despite an improved level of compliance, continue to use "filler photographs" (*i.e.*, photographs in a photo line-up that are not of the actual subject) that were not similar to the subject photograph or did not resemble the suspect in significant features, and failed to document the statements made by the viewing individual.

Of particular note, the Monitoring Team identified multiple shortcomings in the Eighth District.  Forms were not completed by investigating detectives to include the statements made by the person viewing the line-up.  Some statements were fragmented and not understandable such as "the person running."  In addition, the first three cases used the same photo line-up that had six young men with dreadlocks.  One man, the subject, had long dreadlocks with the bottom half of them dyed gold.  Two men had dreadlocks with golden tints, and three men had black dreadlocks. The witness picked out the subject and wrote he would know the man due to his long dreadlocks that came out from under his hat.

The following subsections highlight the areas of compliance and non-compliance for the various districts audited this period.  Where a District was unable to prove its compliance through adequate documentation, we recorded the District as "Unable to Demonstrate Compliance."  While these Districts actually may be IN compliance with the Consent Decree, it is the NOPD's burden to demonstrate compliance; and where it does not do so we cannot find it in compliance.

### A.   Paragraph 171

Paragraph 171 provides that no officer involved in the investigation shall participate in administering the photographic lineup.  Paragraph 171 further provides that the individual who administers the lineup shall not have any knowledge as to which photograph depicts the suspect in the investigation.  As indicated below, NOPD is in ***partial compliance*** with this paragraph.





Following prior negative findings by the Monitoring Team, NOPD developed new forms to help drive compliance in this area.  The new forms were well thought out and effective.  The forms now have been in use since September 2014, and nearly all units are using them.  Not all detectives, however, are completing the forms as required at all times.  The inconsistent use of the forms, for example, prevented the Monitoring Team from finding the Eighth District in compliance with this Consent Decree requirement.

**B.    Paragraph 172**

Paragraph 172 requires that, before any lineup is administered, eyewitnesses shall be admonished that the suspect might or might not be present in the lineup.  NOPD is in ***partial compliance*** with this requirement.





Here again, it is worth reiterating it is NOPD's burden to demonstrate compliance per paragraph 486 of the Consent Decree.  While the Special Victim's Section may actually be meeting the requirements of paragraph 172, it was unable to demonstrate its compliance to the Monitoring Team during our audit.

C.    **Paragraph 173**

Paragraph 173 of the Consent Decree requires NOPD to select "filler" photographs – i.e., photographs that do not depict the suspect—of individuals who generally fit the witness's description of the perpetrator.  According to the Consent Decree, "when there is a limited or inadequate description of the perpetrator provided by the witness, or when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features."



During our May audits, the First District, Eighth District, and the SVS unit failed to provide adequate documentation demonstrating their compliance with paragraph 173.  The Eighth District was especially out of compliance.  The Eighth District had a 75% compliance rate when the Monitoring Team audited this paragraph in February, and showed no improvement when we re-audited the district in April/May.

D.    **Paragraph 174**

Paragraph 174 of the Consent Decree requires NOPD to keep a complete record of each display procedure and the corresponding results.  The Consent Decree provides "the record shall include the time, date, location, identity of the viewing person, photograph numbers, and name of the administrator of the line-up."  NOPD is in ***partial compliance*** with this obligation.





With respect to SVS, the log provided to the Monitoring Team did not contain all the information required in paragraph 174 of the Consent Decree. When this was brought to the attention of SVS supervisors, a second log was prepared and provided that did include the detailed required by paragraph 174.

### E.    Paragraph 175

Paragraph 175 of the Consent Decree requires NOPD to document "other information pertinent to the display procedure, including any statements made by the viewing individual and identities of other persons present during the procedure." The NOPD demonstrated compliance only in the Third District this audit period.





While the First District was unable to demonstrate full compliance, it did show significant improvement from our first audit in February to our follow-up audit in May. The Monitoring Team's February audit showed the District 35% compliant with respect to recording the statements of those present, and 78% compliant with respect to identifying other persons present. In May, these numbers moved to 53% and 100% respectively.

### F.      Paragraph 176

Paragraph 176 requires NOPD, if a suspect selection is made during a photographic lineup, "to mark and maintain as evidence the photographs used in the lineup, including a copy of the photo array if one was used." The paragraph also requires NOPD to maintain the documentation "as evidence until the final disposition of the case, at which time it shall become a part of the permanent case file." NOPD was mostly compliant with this paragraph during our April/May audit.



SVS was unable to provide copies of the photographs used in its line-up in 4 of the 15 cases we reviewed.



## XIII.   POLICING FREE OF GENDER BIAS

Section IX of the Consent Decree requires NOPD, among other things, to "to respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias, in accordance with the rights secured or protected by the Constitution and laws of the United States."  At the outset of the Consent Decree, NOPD was not doing these things.  In fact, even a year into the Consent Decree, the Department continued to be seriously out of compliance with Section IX.  In November 2014, the New Orleans Inspector General issued a report identifying additional serious flaws in the NOPD SVS, including the following:

- Of 1,290 Item Numbers reviewed, only 179 (14%) contained supplemental reports documenting any additional investigative efforts beyond the initial report.

- Of 450 Item Numbers reviewed wherein initial reports were written or comments were made by the five detectives, 271 (60%) contained no supplemental reports documenting any investigative effort beyond the initial report.

- Five detectives, in 271 specific instances, either failed to provide documentation of investigative efforts or provided questionable documentation.

- NOPD supervisors failed to identify the problems concerning the documentation of investigative efforts by the five detectives for the three year period.

*See* New Orleans OIG Report 13-0017-I (November 12, 2014).  Based on these findings, and others, the OIG observed that "[t]he widespread failure to submit supplemental reports as well as the discrepancies between reports and other factual documentation means there was no effective supervision of these five detectives over a 3-year period.  Nor could there have been any effective supervision of the supervisors, nor any review of the outcome of the cases assigned to these five detectives."  *Id*.

Since the publication of the OIG's report, the NOPD Special Victim's Section has worked hard to turn itself around.  The Monitoring Team, in cooperation with the OIG, has audited the SVS's work throughout this process.  While the road has been a long and hard one, we share the OIG's recently reported view that NOPD's SVS has made a "remarkable turnaround."  *See* New Orleans OIG Final Report (June 22, 2016).

On Thursday, August 18, 2016, the United States District Court for the Eastern District of Louisiana, Judge Susie Morgan presiding, held a public hearing focusing on the state of NOPD's compliance under Section IX of the Consent Decree.  In attendance were counsel for the United States, counsel for the  City of New Orleans,  four members of the Consent Decree Monitoring Team,  NOPD  leadership, and multiple members of the NOPD Special Victim's



Section ("SVS"), including representatives from the SVS Sex Crimes Unit, Child Abuse Unit, and Domestic Violence Unit.

Additionally, due to the focus of this particular hearing, also in attendance were Ed Quatrevaux, the New Orleans Inspector General; Howard Schwartz, the Assistant Inspector General for Investigations; Ms. Tania Tetlow, law professor at Tulane and chair of the Mayor's advisory committee on the reform of NOPD's response to sexual assaults; Ms. Mary Claire Landry, Executive Director of the New Orleans Family Justice Center; and Ms. Amanda Tonkovich with the New Orleans Sexual Assault Response Team ("SART").[8]

Commander Doug Eckert, leader of the NOPD's Criminal Investigations Division, made the initial presentation for the Department. After introducing his leadership team, Commander Eckert introduced the many officers, detectives, and civilians making up the sexual assault, child abuse, elder abuse, and domestic violence units within the Special Victims Section ("SVS"). Following the introductions, Commander Eckert explained the structure of the SVS and highlighted the sizeable caseload the group handles with limited personnel.

Commander Eckert also discussed the New Orleans Inspector General's November 2014 Report highlighting glaring inadequacies in the Department's handling of sexual assault and domestic violence cases. Commander Eckert acknowledged the Department's prior failings and explained the work undertaken to respond to the IG's Report and to bring the SVS along the path toward full compliance with the Consent Decree.

Commander Eckert next turned the lectern over to the leader of the Section's Domestic Violence Unit, Sergeant Rick Pari. Sgt. Pari explained the benefits of the Unit's co-location in the New Orleans Family Justice Center, and of the strong partnership that has developed between the NOPD and the Family Justice Center over the years. Sgt. Pari explained how the NOPD incorporates the resources of the FJC in its "street level" work by, among other things, handing out Family Justice Center literature to victims to make them aware of the services available to them – a practice that did not occur in the past. Sgt. Pari also explained the importance of the comprehensive domestic violence policy developed in partnerships with the Orleans Parish District Attorney's office, the Mayor's Task Force, and several advocacy groups, including the Family Justice Center.

Sgt. Pari next discussed the *Blueprint for Safety*, a project initiated by the City in October 2014 with funding from the U.S. Department of Justice, Office on Violence Against Women. The *Blueprint for Safety* introduced a coordinated criminal justice response to domestic violence cases from 911 calls through probation and parole. Sgt. Pari explained some of the significant

---

[8]  This summary borrows heavily, often verbatim, from the Court's official summary of the hearing proceedings. The Monitoring Team presented its report on the improvement within SVS at the public hearing.



benefits the *Blueprint for Safety* has had on civilians in New Orleans, and on the Police Department.

Following Sgt. Pari's comments, Commander Eckert walked the Court through the efforts and accomplishments of the Special Victim's Section's Sex Crimes Unit. Among other things, Commander Eckert highlighted the close working relationship between the NOPD and the New Orleans Sexual Assault Response Team ("SART"), the Department's improved processes for handling sexual assault reporting and investigations, and a vastly enhanced protocol for processing sexual assault kits. Commander Eckert also discussed some of the Department's staffing changes that have materially contributed to better police responses for survivors, including more detectives, additional civilian investigators, and the engagement of in-house social workers.

Commander Eckert ended his comments by acknowledging the invaluable assistance SVS has received from the Family Justice Center, the New Orleans Inspector General, the advocacy groups, and the Consent Decree Monitoring Team.

Following the Department's SA/DV presentation, the Court heard from Monitoring Team member Chief Mary Ann Viverette. Chief Viverette began her presentation by describing the problems initially identified by the Department of Justice and confirmed by the Monitoring Team following the Team's appointment in August 2013. Chief Viverette also described the slow start the Department had between August 2013 and March 2015. The appointment of Commander Eckert over the SVS in March 2015, however, according to Chief Viverette, marked a turning point in the Department's compliance efforts. Chief Viverette re-emphasized the high degree of cooperation and support the Department receives from the advocacy groups, including the Family Justice Center, the Sexual Assault Response Team, and the Mayor's Committee. Chief Viverette also highlighted the instrumental role the Inspector General played in helping the Section move forward.

Chief Viverette described the Monitoring Team's process for monitoring SVS progress, including reviewing policies, observing and evaluating training, reviewing BWC camera footage, and conducting regular on-site audits. Chief Viverette echoed the IG's finding that both the Sex Crimes Unit and the Domestic Violence Unit had made a "remarkable turnaround" over the past two years.

One area Chief Viverette identified as needing additional attention is the response of NOPD's patrol officers to domestic violence calls for service. While the Monitoring Team has seen significant improvement over the past 2-3 years, and has been extremely impressed in particular with the improvements of the SVS detectives, the Monitoring Team's audits still identify more room for growth with respect to patrol officers. Specifically, the Monitoring Team's last audit identified 35% of patrol officer responses leaving room for improvement. A portion of these were the result of the Department's inability to make it to the call in enough



time to meet with the complainant, a problem the Department's new call-back procedures will help alleviate.

Chief Viverette concluded her remarks by reiterating what was a clear theme of the hearing: "So in conclusion, we have seen improvement since I've been reviewing and monitoring over the last three years in both the sexual assault area and domestic violence. I can't say enough about the current leadership and the supervision in both units. They're committed, they're effective, and they deal with things seriously and quickly when I ask them to do so."

The United States Department of Justice next offered the Court its view of the current state of SVS compliance. After reiterating the positive comments made by the earlier speakers, lead counsel Emily Gunston asked the Court to consider the impact these improvements have had on countless individuals' lives: "When we first came into the department, we did our investigation and we found this wasn't being handled well; that . . . meant women were being discriminated against; it meant women were living in fear, living in terror; dangerous criminals were being left on the street; let alone the effect it has on somebody to feel like nobody cares that this is happening to me and nobody is going to do anything about it."

Ms. Gunston went on to contrast the past with the Department's recent improvements: "When this is done well, as the New Orleans Police Department is doing now, it can be hard to measure the effect that you're having on people's lives. It's hard to know how many women are no longer living in terror or no longer being victimized. But one thing that we can look at and I want to focus on [is] the increase in reporting. That is an extraordinary number that is a real testament to the work that you've done."

Ms. Gunston went on further to "commend the police department [for its] real openness to learning." "The police departments who are insular," she explained, "are having problems, and world-class police departments have this kind of open-mindedness." "[T]he work that you've done here gives me confidence that that kind of work can be done in the rest of the police department as well."

Ms. Gunston concluded as follows: "What you have now are policies that are a model for the rest of the nation – and NOPD is not the only police department that was having this problem. Lots of departments are having this problem. And when they come to us now and they say, 'How do we fix this,' one of the things we can say to them is, 'You know what? You-all should go look and see what the New Orleans Police Department is doing because they have some of the best policies in the nation on this.'"

In addition to hearing from the Parties and the Monitoring Team, the Court heard from several stakeholders.

Professor Tania Tetlow spoke first and described the committee the Mayor established to reform the police department's SVS. After praising the work the Department had done to meet the



Mayor's direction and the Consent Decree's obligations, Professor Tetlow described the achievements that she has seen so far. "I think the greatest measure of the results have been the trust shown by victims in the increase in reporting which has been an increase of 83 percent of reporting in 2015 of sexual assaults and a projected increase of 78 percent in 2016. That's . . . the greatest sign of trust from the community."

Notably, as the Department of Justice explained later in the hearing, these numbers do not reflect an increase in sexual assault, but rather an increase in victims' willingness to report sexual assault.  According to the Department of Justice, "one of the ways we know that -- one of the ways we knew there was a problem -- is that the numbers [of reported sex crimes] didn't make sense relative to the rest of the crime rate. And as those numbers go up and they make more sense, what that reflects is an increase in reporting, not an uptick in the crime. What that means is that people -- mostly women -- who at one point thought, 'No one is going to help me, and I need to try to deal with this on my own,' now are saying to themselves, 'I'm going to go to the New Orleans Police Department, and the people there are going to help.'"

Professor Tetlow concluded her remarks with the following praise for NOPD's accomplishments in this area:  "So this has been an extraordinary accomplishment that I can't tell you how impressed I've been by NOPD, by the City. Everything we've done, we've worked together with them. They never tell us no. The chief works closely in partnership with all of the advocate community in ways that he really sees this as the work we do together."

The New Orleans Office of the Inspector General next addressed the Court. Howard Schwartz, Assistant Inspector General for Investigations, presented the IG's remarks. Mr. Schwartz walked the Court through the "really disturbing" problems his office identified during its 2014 audit and investigation. Mr. Schwartz explained that walking through the negative history was important in order to contrast that history with how much the Department has changed in the past two years.

Mr. Schwartz emphasized that the Department took full responsibility for the problems identified by the IG, and initiated an immediate action plan to fix them. "From the inception, . . . when we told Chief Harrison of what we had found, from day one, Chief Harrison and his staff, including Chief Westbrook and her staff, [were] unbelievably professional. [We had] fantastic cooperation from day one." Mr. Schwartz went on to illustrate the importance of the Department's response by noting "this is the first time I can say the police department has taken complete responsibility for their actions and that is the reason for this transformation." Mr. Schwartz reemphasized the remarkable turnaround he has seen, and concluded his remarks by thanking the men and women of the SVS units.

The Court next heard from Ms. Mary Claire Landry of the New Orleans Family Justice Center, who described the strong partnership between the NOPD SVS and the Center. Ms. Landry also praised a number of other groups involved in the NOPD SVS transformation. In Ms. Landry's view, the NOPD's success in this area has been due to an "integrated response."



"It's not one nonprofit; it's not one public entity; it's not one governmental structure," she explained. "It's all of us looking at what is creating the crime in our community and what is creating so much of the violence and the poverty in our community." Ms. Landry added, "I can say without equivocation that the progress that we have seen finally over these last two years has been amazing and I'm probably the only person in the City that thanks God for the Consent Decree because I know it's been painful and I know it's been difficult and it's created a lot of challenges, but I think it has brought the reform and the oversight and the accountability that survivors have needed in this community."

Finally, the Court heard from Ms. Amanda Tonkovich, with the New Orleans Sexual Assault Response Team ("SART"). Ms. Tonkovich began by describing her recollections of the prior state of NOPD's sexual assault response. She then contrasted this with the far different state of affairs she has seen over the past year. Ms. Tonkovich commented on the improved policies, improved training, improved leadership, and a strong cooperative spirit among the NOPD and its many partners, including SART. Ms. Tonkovich concluded her remarks with the following observation: "[N]ow we can really confidently say that when a police [officer] comes -- when someone from the sex crimes unit comes, the Domestic Violence Unit, they are trauma-informed. They understand how victims act in trauma and they're going to have a compassionate initial response and interview; and I don't have to worry anymore that we're going to have to protect survivors from a law enforcement response or butt heads."

*       *       *

While the Monitoring Team, for good reason, is quite pleased with the turnaround of NOPD's sex assault and domestic violence units, we continue to conduct regular audits and reviews of both units. Our most recent review demonstrated both units continue to show a very high level of compliance. The detailed results of that audit will be published in our next report.



## XIV.   COMMUNITY ENGAGEMENT

The Monitoring Team has criticized the NOPD's approach to community policing in the past. Rather than implementing a comprehensive, department-wide strategy and recognizing the benefits that would come from such an approach, NOPD instead relied on dedicated Community Coordinating ("CoCo") Sergeants and Quality of Life ("QOL") officers in the various districts and a general policy of encouraging officers to attend community events.

In January 2016, the Department announced it was doing away with its CoCo and QOL officers in an effort to transfer more officers to the street to answer calls for service. While fully supporting the Department's goal of getting more officers on the streets, the Monitoring Team expressed concern over the loss of these dedicated district-level community resources. Specifically, the Monitoring Team expressed concern that the Department took this step before it had true community policing to put in its place.

In an effort to create an effective community policing strategy, the Department assigned a lieutenant (Lieutenant Williams) to develop and implement a department-wide community policing approach. The core of the Department's new philosophy is to engage all members of the NOPD in community policing by (a) developing a Department-wide mission and strategy, (b) teaching officers community policing skills, (c) giving them time in their day to engage with the community, and (c) holding them accountable for doing so. While the Monitoring Team commends the Department on its effort to expand officer involvement in its community policing efforts, we question whether one lieutenant has the bandwidth to pull off such a bold program – even a lieutenant as qualified and committed as Lieutenant Williams seems to be.

To better monitor and support NOPD's new community policing project, the Monitoring Team has modified the way we plan to evaluate the City's community policing efforts. The Monitoring Team's new approach reflects our goal of monitoring not just community interaction, but rather true community engagement, i.e., community policing. Our approach also reflects the fact that community engagement issues are scattered throughout the Consent Decree. Indeed, there are many provisions of the Consent Decree that related directly and indirectly to community engagement, but are not part of the section, such as stops, searches and arrests, bias-free policing, including gender bias, supervision, etc. It would not be too much of a stretch to say that virtually the entirety of the Consent Decree concerns community policing.

Due to the scattered nature of community policing concepts throughout the Consent Decree, the Monitoring Team decided to adopt a holistic approach to assessing community engagement/ community policing. Rather than focusing on checking off boxes that may or may not lead to actual community policing, the Monitoring Team's approach focuses on supporting the



development of a best-in-class community oriented policing program and then monitoring NOPD's progress toward achieving that best-in-class end goal.[9]

The Monitoring Team has been working closely with Lieutenant Williams as she develops the details of the new program, and will continue to do so until it is implemented.  While we have been impressed by Lt. Williams' ideas and her passion, we continue to believe the Department needs to give greater focus (and resources) to this critical element of the Consent Decree.  We firmly believe that building stronger partnerships between the police and the community is a critical step toward building trust, promoting citizen cooperation, and fighting crime.

---

[9]   It should be noted, if we did focus our efforts on "checking off boxes," there would not be sufficient boxes checked off in this area.  While most districts do engage with their communities through various meetings, events, and other initiatives, the Districts we audited this period all were unable to demonstrate full compliance with the community engagement elements of this Consent Decree because the Department as a whole lacks a Department-wide community engagement / community policing plan.  The Department's elimination of the COCO/QOL programs before a substitute program was put in its place has made it harder for the Districts to demonstrate compliance with their obligations.  As described above, the Department is in the process of working on a new community engagement/community policing plan, which should remedy the current gaps in the various districts.



## XV.   RECRUITMENT

Section XI of the Consent Decree requires NOPD "to develop and implement a comprehensive recruitment program that successfully attracts and hires a diverse group of highly qualified and ethical individuals to be NOPD police officers."  Since the outset of the Consent Decree, NOPD has dedicated much attention to its recruiting efforts.  Among other things, as we have noted in the past, NOPD has shortened the hiring process, engaged more staff to conduct background investigations, worked with local businesses to improve the interview structure, and developed a new marketing campaign designed to attract new officers from New Orleans and across the country.

This past period, NOPD undertook additional efforts to bolster its recruiting practices, including the following:

- Developed a one-stop recruiting process so candidates can get most of the process done in one visit.

- Assumed control of much of the recruiting process from the Civil Service Commission, which has shortened the time it takes to vet new officers.

- Expanded its out-of-state recruiting to include visits to colleges and military bases outside of Louisiana.

- Implemented onsite testing so recruits can be tested without having to travel to New Orleans.

- Updated its recruiting web site to provide more information for candidates and to be mobile friendly.

Additionally, as noted in our prior report, the Department has engage Louisiana Tech University to develop a new test for new recruits.  La Tech already has conducted a thorough "job study" to identify the qualifications an effective test needs to test for, developed a catalog of potential new test questions, and now is in the process of working with NOPD and the Monitoring Team to vet the new questions.  According to LA Tech, the new test should be ready for implementation in September.

In addition to the new multiple choice test, the Department also will be implementing a new test that assesses a recruit's writing ability as well as a new oral assessment that, unlike the Department's prior assessment, allows interviewers to ask follow-up questions, probe responses, and otherwise evaluate the candidate as a whole.  The Monitoring Team will be reviewing and commenting all each new element of the Department's recruitment process.



# XVI.   ACADEMY AND IN-SERVICE TRAINING

## A.   Academy In General

As noted above, the Monitoring Team continues to be concerned with the progress being made at the NOPD Academy.  Indeed, this has been a consistent negative finding by the Monitoring Team.  We previously have criticized the quality (and, sometimes, the existence of) lesson plans, curriculum, training materials, and the quality of the classroom teaching by the instructors.  We have observed a lack of consistent quality instruction, poor organization, and poor discipline in class, with students (in-service students; not recruits) texting, not paying attention, and even leaving class to take cell phone calls.  *Our more recent audits confirm the Academy still is not in compliance with the Consent Decree with respect to some of these areas; and, as importantly, our observations of officers on the streets emphasize the need for additional and/or more effective training.  While recent progress clearly has been made – for example, the most recent in-service classes we reviewed were far more disciplined and focused than prior classes – progress still is inconsistent and insufficient.*

NOPD recently responded to the Monitoring Team's concerns by making another change to the Academy leadership team.  In addition to a new Deputy Chief over the Department's Management Services Bureau (Chief John Thomas) and a new Commander of the Academy (Commander Chris Goodly) – both of whom have demonstrated a clear commitment to reform – the Department recently hired its first Academic Director, Dr. Deirdre Magee.  Dr. Magee brings to the Academy a wealth of knowledge and experience designing, implementing, and evaluating academic programs outside the police environment.  We are hopeful the combination of Chief Thomas, Commander Goodly, and Dr. Magee will move the Academy toward compliance.  *We remain concerned however, the Academy simply lacks sufficient personnel and resources to move forward effectively and in a timely fashion.*

Notwithstanding the Academy's insufficient prior progress and the Monitoring Team's ongoing concerns, the Academy has achieved some noteworthy accomplishments worthy of recognition.  One such accomplish is the Department's partnership with the Innocence Project New Orleans to develop and provide specialized training to new detectives.

In the words of its leadership, the Innocence Project New Orleans

> is a nonprofit law office that represents innocent prisoners serving
> life sentences in Louisiana and Mississippi at no cost to them or
> their loved ones, and assists them with their transition into the free
> world upon their release. IPNO uses its cases to explain how
> wrongful convictions happen and what we can all do to prevent
> them. IPNO works with legislators, judges, lawyers, law
> enforcement and policymakers to protect the innocent within the
> criminal justice system.



www.ip-no.org.  Like the NOPD, the Innocence Project New Orleans has a vested interest in promoting professional, thorough, and legal criminal investigations by police officers. Recognizing this shared interest, NOPD and the Innocence Project New Orleans partnered to co-teach an investigations course to NOPD detectives.

The Monitoring Team commends NOPD for its willingness to work with the Innocence Project to implement such an innovate training program for its officers.  As far as we know, this may be the first police agency/Innocence Project training partnership in the United States.

The Monitoring Team attended the Department's first detective class taught in conjunction with the Innocence Project New Orleans.  The instruction team included members of the NOPD, the District Attorney's Office, and the Innocence Project.  Emily Maw, the director of the Innocence Project New Orleans and a highly energetic and passionate advocate for unassailable police investigations, began the class by introducing the Innocence Project New Orleans and highlighting the successes the group has had representing innocent people convicted of crimes. She stated they are one of the most successful innocence projects in the country.  She said they have read hundreds of police reports on serious crimes.  The cases they review include people who have generally been in prison for more than 20 years.  She discussed the lack of time limits they have to review case files as opposed to police officers that have relatively short periods of time to investigate cases.  Ms. Maw explained that most wrongful convictions were not the result of bad intent by officers but through sloppy police work.

Through a combination of lecture, discussion, and hands-on exercise, the training program highlighted techniques to help detectives conduct better, more thorough, and more accurate investigations.  The training also focused on the subject of mistaken identifications.  This part of the training began with a short video and an interactive session to discuss the positives and negatives of the scene in the video.  The second video was of a line-up and engaged officers to try to pick out the suspect in the line-up.  This exercise was discussed later in the class and quite successfully highlighted the difficulties and risks of eyewitness identification.  A third video was provided and the students were asked to write down information they observed in the video. The purpose of the video was to demonstrate how when people focus on one subject they miss other important information that is occurring at the same time.  The information for that exercise was discussed immediately following the video.

The class also discussed the importance of documenting all elements of the investigation.  An instructor from the DA's office, Chief Bouyelas, highlighted the importance of proper documentation.  The Monitoring Team was quite pleased to see this element incorporated into training because our audits have found highly inconsistent results in these areas during our audits of consent decree monitoring of paragraphs 171 through 176.

Among other things, the class focused on dealing with lying witnesses, false confessions and voluntary confessions; the risks of making false assumptions and succumbing to tunnel vision



when focusing on one subject, and risks of false memories, and other common cognitive illusions and biases of officers.

Finally, the training program ended with a robust discussion of some basic tools for conducting better investigations, including:

1. Leaving the eyewitness line-up to later in the investigation since it is the least reliable information.

2. Be over inclusive with information instead of following information that will lead to one person.

3. Conduct follow-up investigations, don't develop tunnel vision and avoid checking other important information.

4. Don't consider the case completed just because an arrest was made.

The Monitoring Team was impressed by this training program.  The topic was important, the instruction was impressive, and the exercises were instructive.  The instructors held the attention of a majority of the class during the training and all of the class at some points.  All instructors employed adult learning techniques by asking questions, involving the class in discussion, and utilizing class exercises.  It was obvious the presenters were very knowledgeable in the subject of photo line-ups.  The information relayed is important for the detectives who will use what they learned in future investigations.

In addition to the Innocence Project training, the Monitoring Team observed a number of other Academy courses, including other detective training courses, crime scene investigation course, dealing with hearing impaired subjects, defensive tactics, and firearms, among others.

**B.    Classroom Size**

Consent Decree paragraph 273 provides that recruit classes shall not exceed 30 candidates per class.  Earlier this year, the Department exceeded this limit.  While the Monitoring Team understands NOPD's desire to bring more officers onto the force, the Consent Decree's size requirements were incorporated into the Consent Decree for a reason.  The size of an Academy class is an important component of the effectiveness of the Academy's training program.

Among other things, classes that are too large:

- Lead to significant erosion of classroom/contact hours.

- Take longer to transition between classes and class types, which erode away valuable classroom/contact time needed for learning. For example, more time is needed for



recruits to transition from physical training into classroom attire. The training days generally are not lengthened to accommodate for these disruptions.  Similarly, larger classes often lead to facility shortages.

- Create hurdles for the planning of curriculum, classes, and class organization.  They require additional academy staff to instruct , monitor, and evaluate.  Even if the same instructors are used for the classes, larger class sizes create organization hurdles and cause some classes to be taught out of order, eliminating the benefits that come with teaching courses in a certain progressive order.

- Cause problems with the FTO program.  The cadre of available FTOs is generally optimized to meet average class loads.  Additional recruits require additional FTOS which themselves require a selection process to identify , select and train the best qualified candidates. The increase in the number of FTOs could have resulting quality consequences.

- Increase the likelihood that students will not pay attention in class and that instructors will not be able to maintain adequate class discipline.

In light of the ongoing challenges at the Academy, the Monitoring Team and the Court directed the NOPD to provide the Court with a plan showing that an increase in class size will not negatively impact the quality of Academy training.

The initial information purportedly supporting its request to increase class size was insufficient. Accordingly, the Monitoring Team went back to the Police Department with additional specific questions, including the following:

- What are all of the classes NOPD offers to the current Academy and expects to offer in the upcoming Academy?

- Of those classes, which does NOPD propose to provide in 40-person settings?

- How will you address the need for physical skills classes which require a smaller student to instructor ratio?

- Of the remaining classes, identify by class name what sizes the classes will be and where the NOPD will teach them?

- Identify the Instructors for all of the classes.

- What will you be doing to address Instructor fatigue and morale?



- The availability of instructors has been a problem in the past. Specifically, how are you addressing this concern?

- Identify the approved lesson plans for all of the classes, or, if there is not an approved lesson plan, specify the date by which the NOPD will provide it for OCDM and DOJ review.

- What is the current status of the FTO Program? How will you address the need for additional FTO's on the street (see below)?

In July 2016, the Court approved a slight increase in class size following NOPD's responses to the Monitoring Team's questions and the Department's commitment to a plan to help mitigate the risks inherent in larger class sizes. The Department has alerted the Monitoring Team that it will request a further increase in class size. The Monitoring Team has made clear to the Department, however, that it will not support a further increase until the Department is able to convincingly give assurances that the risks outlined above are mitigated.

### C.     Ethical Policing Is Courageous ("EPIC")

Earlier this year, NOPD began implementing what is perhaps the country's first comprehensive police peer intervention training program. The program, called EPIC, for Ethical Policing is Courageous, was designed by NOPD officers with the support of national experts, community members, the Department of Justice, and the Monitoring Team, and is worthy of high praise.

NOPD describes EPIC as an officer survival program, a community safety program, and a job satisfaction program. Having reviewed all aspects of the EPIC program, the Monitoring Team agrees with this characterization. EPIC reflects a cultural change in policing that gives officers the tools to intervene before misconduct or mistakes take place, encourages them to use those tools courageously, and then protects officers when they do. EPIC not only empowers officers to step in and say to a colleague "don't do what you are about to do; you will regret it forever," but it transforms such interventions into a career survival skill that is teachable and that is expected from all officers. The Monitoring Team is extremely impressed with the program. EPIC not only responds to the Consent Decree requirements to incorporate peer intervention training into NOPD training (e.g., CD paragraph 109, 266, etc.), but EPIC goes beyond what is required of the Consent Decree.

According to NOPD's EPIC Teacher's Manual (excerpts from which are attached to this report as an Appendix):

> Police officers today readily understand what an *active bystander* is because they take on that role every day as they interact with the community. Officers step in to help others all the time. However, officers are far less quick to step in to stop a fellow officer from



doing something wrong, unethical, dangerous, or even illegal or immoral. EPIC seeks to overcome this disconnect, to inculcate active bystandership into everything an officer does, and to provide officers with the tools and resources needed to do it well.

NOPD's EPIC program strives to redefine police culture so that intervention to prevent or stop harmful action is not an exception to good teamwork, it is the very definition of good teamwork. The Monitoring Team has met with NOPD's leadership team, its EPIC working group, and the outside experts supporting the development of the program, and is convinced not only of the quality of the program, but of NOPD leadership's commitment to the program as well.

To date, NOPD has achieved the following milestones in its EPIC development and implementation plan:

- Developed the program's concept, mission, and structure.

- Prepared first-rate teaching materials.

- Trained members of NOPD's leadership, including Superintendent Harrison, his deputy chiefs, and the rest of his command staff.

- Trained sergeants and FTOs.

- Initiated training of all patrol officers.

Additionally, NOPD is in the process of supplementing the ongoing EPIC training with the following elements:

- Peer intervention elements will be incorporated into every Academy training program, so, for example, peer intervention will be taught not only as a stand-alone concept, but also as a fundamental component of other substantive areas, including Use of Force, investigations, Stops/Search/Arrests, and more.

- NOPD has authorized a new EPIC pin as an official element of an officer's uniform. The pin not only signifies the officer has been through EPIC peer intervention training, but, more importantly, serves as a visual reminder that the wearer of the pin gives permission to others (regardless of rank) to intervene in the wearer's actions.

- With the support of the University of New Orleans, NOPD will be developing a national peer intervention web site, which will provide officers across the country a forum for sharing their peer intervention strategies, tactics, and success stories.



- NOPD is developing a reinforcement program so that the core components of peer intervention are reinforced through roll call training, comstat presentations, and other internal awareness campaigns.

Without question, a peer intervention program is not a panacea for all the problems facing U.S. police departments today, or even for the specific hurdles still facing NOPD, but credit clearly must be given to the NOPD for developing such an innovative and important program that holds so much promise for police officers and civilians.  The Monitoring Team firmly believes NOPD's EPIC program will become a model of ethical policing that other police agencies across the country soon will follow, and will continue to monitor its implementation closely.



## XVII.  OFFICER ASSISTANCE AND SUPPORT

Section XIII of the Consent Decree provides that NOPD shall "provide officers and employees ready access to the mental health and support resources necessary to facilitate effective and constitutional policing."  Following a slow start, NOPD has made recent significant progress in expanding its officer assistance and support program.  The Monitoring Team continues to monitor NOPD's progress in this area, and noted the following accomplishments during the first two quarters of 2016:

- To date, 81 officers, and/or family members have accessed NOPD's OAP program to receive in-house services and/or referrals to outside professionals/agencies for effective care.

- The Monitoring Team reviewed and approved NOPD's newly-developed OAP policies and procedures.

- The Director and Clinical Coordinator of the OAP program continues to facilitate and/or participate in weekly in-service trainings for officers. The training consists of seven hours CIT training and one hour in Officer Assistance. The class consists of education on officer stress, effects of stress, signs and symptoms that would benefit from assistance from OAP programs as well as services that are offered through the assistance program.

- The Policy for the OAP Peer Support Program (known as the New Orleans Police Peer Assistance, "NOPPA") has been completed and submitted to DOJ for final review.

- The OAP developed and began to roll out the NOPPA campaign.  OAP leadership will be attending NOPD roll calls to reinforce this program and the needs for participation. The Southern Law Enforcement Foundation[10] has committed to providing a free 3-day training for Peer Counselors once the first enrollees have been identified.  OAP will begin interviews for Peer Support Counselors in the coming weeks.

- A new OAP program is known as the "Family Boot Camp" which consists of a half-day program for families of new officers two weeks prior to their graduation.  This program is currently in the development phase.  The boot camp will familiarize family members with OAP services for officers and family members.  The camp will also inform family members of common stress related issues for officers and their significant others and resources that will now be available to them.

---

[10]      The SLE Foundation's mission is to support police officers who "go through a critical incident and help them to reduce the negative impact of that critical stress through sound crisis intervention methods."  *See* www.slefoundation.com.



As we have said before, the emotional health of police officers correlates with community safety. Emotionally healthy officers are safer officers, more likely to exhibit patience, more likely to apply de-escalation techniques, and more likely to follow rules.  Accordingly, NOPD's OAP efforts are important not only for the health and wellness of NOPD's rank and file, but equally important for the health and wellness of the New Orleans community.



# XVIII. SUPERVISION

## A.   Quarterly Supervision Audit Results

The Monitoring Team audited the supervision paragraphs of the Consent Decree in February, April, and May, 2016.  Our audits covered Districts 1, 2, 3, 6, and 8, as well as SVS and SOD.  While NOPD has shown improvement in many areas over the past year, its level of compliance continues to be inconsistent, and supervision generally continues to be a core area of concern for the Monitoring Team.  Without close and effective supervision, NOPD is unable to ensure its officers improve and grow professionally, police actively and effectively, and avoid misconduct.  It is no exaggeration to say full and effective supervision is a critical element of constitutional policing without which a Department's other efforts are doomed to fail.

### 1.   Duties of Supervisors

#### a.   Paragraph 306

Paragraph 306 of the Consent Decree provides that supervisors shall be held accountable for providing the ***close and effective supervision necessary to direct and guide officers***.  Close and effective supervision requires that supervisors: respond to the scene of certain arrests; review each arrest report; respond to the scene of uses of force as required by this Agreement; investigate each use of force (except those investigated by FIT); review the accuracy and completeness of officers' Daily Activity Reports; respond to each complaint of misconduct; ensure that officers are working actively to engage the community and increase public trust and safety; and provide counseling, redirection, and support to officers as needed, and that supervisors are held accountable for performing each of these duties.

As documented in the Monitoring Team's prior reports, most NOPD districts have had a hard time demonstrating compliance with this requirement in the past.  Most districts, however, also showed improvement over the past quarter.  Districts 1 and 3, for example, showed dramatic improvement from our prior audit to our most recent audit.  In those districts, and others, the use of force reports in their files are more complete than they were in prior audits.  The officer daily activity reports also are more complete, and generally provide evidence they were reviewed by supervisors.

Most districts also now are able to provide well-maintained citizen complaint logs to register citizen complaints registered at the district or on the street.  Most districts also are now providing evidence of compliance with counseling and redirection of personnel.

This being said, the NOPD apparently still has not provided direction in regard to documenting and tracking information to provide evidence of "supervisors ensure officers work actively to engage the community and increase public trust" or with providing "officer support."

Page 63 of 93
September 26, 2016
www.consentdecreemonitor.com



With that as background, the following summarizes the level of compliance we are seeing in the various districts for the various obligations under this paragraph.

| | Supervisors Respond to Scene of Arrests | Supervisors Review Arrest Reports | Supervisors Respond to and Investigate Uses of Force | Supervisors Review Daily Activity Reports | Supervisors Respond to and Investigate Citizen Complaints | Supervisors Ensure Officers Engage With Community | Supervisors Provide Counseling & Redirection | Supervisors Support Officers As Needed |
|---|---|---|---|---|---|---|---|---|
| **1D** | Compliant | Compliant | Unable to Demonstrate | Compliant | Unable to Demonstrate | Unable to Demonstrate | Compliant | Partial |
| **2D** | Compliant | Compliant | Partial | Unable | Compliant | Unable to Demonstrate | Compliant | Partial |
| **3D** | Compliant | Compliant | Unable to Demonstrate | Compliant | Partial | Unable to Demonstrate | Partial | Unable to Demonstrate |
| **6D** | Compliant | Compliant | Unable to Demonstrate | Compliant | Compliant | Unable to Demonstrate | Partial | Partial |
| **8D** | Not compliant | Partial | Not compliant | Unknown[11] | Unable to Demonstrate | Unable to Demonstrate | Partial | Unable to Demonstrate |
| **SOD** | Compliant | Compliant | Compliant | Compliant | Compliant | Unable to Demonstrate | Partial | Unable to Demonstrate |

Of note in the above summary is that the Eighth District was unable to provide documentation that its supervisors responded to the scene of certain arrests. And, in fact, the contemporaneous documents made clear the supervisors were not on those scenes. This is contrary to the requirements of the Consent Decree. *See* Consent Decree ¶ 306.

Additionally, the Eighth District was not able to demonstrate compliance with its force investigation procedures. Of the use of force reports reviewed, at least 13 lacked necessary information.

In contrast, the Second District showed significant improvement over prior audits. It received a partial compliance in the area of investigating uses of force only because one report did not

---

[11]     As a result of its inability to demonstrate compliance with multiple elements of this Consent Decree paragraph, the audit of the Eighth District was not completed. Instead, NOPD leadership and the leadership of the Eighth District were called into Court to appear before Judge Morgan to discuss the non-compliance and present a "get-well" plan.



mention whether the supervisor conducted a canvass, and two of three officers didn't have recordings.

The Sixth District did send supervisors to the scene of uses of force, however, its records were insufficient and, consequently, it was unable to demonstrate supervisors fully investigated all uses of force.  Specifically, four different cases audited lacked evidence that the investigation involved a canvas or a supervisor assessment of the use of force.  It is very possible these steps were taken, but unless the District can demonstrate compliance, the Monitoring Team will not assume compliance.

### b.    Paragraph 307

Paragraph 307 of the Consent Decree provides that all Field Operations Bureau District officers (including patrol, task force, district investigative, and narcotics units) shall be assigned to a single, consistent, and clearly-defined supervisor.  The NOPD was able to demonstrate ***partial compliance*** with this requirement as indicated below.

|    | Patrol | General Assignments | Investigators |
|----|--------|---------------------|---------------|
| 1D | Compliant | Compliant | Partial Compliance |
| 2D | Compliant | Compliant | Partial Compliance |
| 3D | Compliant | Partial Compliance | Compliant |
| 5D | Compliant | Partial Compliance | Partial Compliance |
| 8D | Compliant | Partial Compliance | Audit Deferred |

It should be noted, the work schedules in some districts are printed months in advance and often are inaccurate to determine compliance with paragraphs 307-310.  The only means of auditing what days officers worked and under whose supervision is to query the NOPD payroll system and analyze payroll data.  These districts would benefit from better record keeping procedures.

### c.    Paragraph 308

Paragraph 308 requires that Task force and narcotics supervisors "actually work the same days and hours as the officers they are assigned to supervise absent unusual circumstance or when the supervisor is on vacation, in training, or ill."  The Consent Decree further provides that "Investigative unit supervisors shall work generally the same days and hours as the officers they



are assigned to supervise, taking into account that shift differences will not permit complete supervisory overlap."  NOPD is not yet in compliance with its obligations under paragraph 308.

|     | **General Assignments** | **Investigators** |
| --- | --- | --- |
| **1D** | Compliant | Compliant |
| **2D** | Partial Compliance | Compliant |
| **3D** | Partial Compliance | Compliant |
| **6D** | Unable to Demonstrate Compliance | Partial Compliance |
| **8D** | Not Yet Compliant | Unable to Demonstrate Compliance |

Of particular note in the above table, obviously, is the Eighth District.  With the merger of task force and narcotics personnel into the General Assignments section of the district, the sole task force supervisor no longer works the same shift and days as the officers assigned to the supervisor.  This issue has been brought to the attention of the Eighth District leadership, which is working to remedy the issue.

### d.    Paragraph 309

Paragraph 309 requires that all District Platoon Patrol supervisors be assigned to the same platoon as the officers they supervise and shall actually work the same days and hours as the officers of that platoon absent unusual circumstances or when the supervisor is on vacation, training, or ill.  ***The NOPD was in full compliance in all districts audited this period***.

### e.    Paragraph 310

Paragraph 310 of the Consent Decree requires that first-line patrol supervisors shall be assigned to supervise no more than eight officers.  The Consent Decree further provides that "on duty patrol supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units."

The Monitoring Team's review of NOPD personnel records demonstrated that each officer and supervisor was assigned to a single supervisor in most districts.  Generally, there were at least three supervisors assigned to a platoon with 8 -12 officers.  When a sergeant is not on duty in the General Assignments unit, those detectives/officers are supervised by the platoon supervisor. There are times that there are more than eight personnel reporting to one supervisor when



investigators and/or general assignments officers work while reporting to a platoon supervisor when there was only one platoon supervisor on duty. Our findings with respect to the specific districts audited this period follow.

The First District was able to demonstrate Partial Compliance. Generally, platoon supervisors do not supervise more than eight personnel. However, there are times when the supervisor/subordinate ratio exceeds 1:8, for example when investigators and/or general assignments officers work while reporting to a platoon supervisor when there was only one platoon supervisor on duty.[12]

The Second District was unable to demonstrate compliance during this period.

Notwithstanding some days of imperfect compliance due to the unavailability of supervisors for various reasons, the Third, Sixth, and Eighth Districts were able to demonstrate partial compliance with its obligations under this paragraph.

### f.     Paragraph 311

Paragraph 311 requires NOPD to develop and implement a program "to identify and train acting patrol supervisors who can fill-in, on a temporary, as-needed basis, for assigned supervisors who are on vacation, in training, ill, or otherwise temporarily unavailable." NOPD further must "ensure consistent supervision by acting supervisors for supervisors who are on extended leave, and shall reassign officers to a new permanent non-acting supervisor when the currently assigned supervisor has been or is expected to be absent for an extended period of over six weeks." ***The NOPD is NOT yet in compliance with this requirement***. The Training Academy has not developed training or trained any personnel as acting patrol supervisors; and no program current exists to identify and train acting patrol supervisors who can fill-in for assigned supervisors.

### g.     Paragraph 312

Paragraph 312 of the Consent Decree provides that District commanders and platoon lieutenants shall be responsible for the ***close and effective supervision*** of officers under their command. To this end, all NOPD commanders and platoon lieutenants "shall ensure that all subordinates under their direct command comply with NOPD policy, state and federal law, and the requirements of this Agreement."

The Monitoring Team has criticized the sufficiency of NOPD's supervision practices since the outset of the Consent Decree. As noted in the introduction to this Report, our primary criticism is that may sergeants and lieutenants lack the time and/or resources to adequately supervise the patrol officers under their command. We also have seen inconsistent competence by supervisors

---

[12]     NOPD does not designate "acting sergeants," which makes it more difficult to maintain the required supervisor/patrol officer ratio.



at the scene of events, which the Monitoring Team believes could be mitigated by more and/or better training. ***We continue to view this as a serious problem, and continue to view supervision generally as a core area of concern***.

In addition to our general concern, we continue to identify ongoing specific concerns as well. Supervisors' activity reports, for example, still generally do not capture information to provide the necessary evidence to find NOPD in compliance. And the supervisors' activity sheets still generally do not include their expectations while interacting with the public, any complaints to which they responded, any monitoring of officer activity on calls for service or traffic stops, or other actions taken by a supervisor to ensure compliance with paragraph 312 of the Consent Decree.

The lack of information documented in supervisor reports in some districts prevents documentation of actions taken by supervisors including actions taken to address use of force incidents, review of officer daily activity reports, civilians' complaints, ensuring officers work actively to engage the community and increase public trust, provide counseling, provide redirection and provide officer support.[13]

Notwithstanding the foregoing ongoing concerns, the Department has made progress in several areas that are worthy of praise, including the development of an effective Supervisory Burden Reduction Working Group and a new Comstat program, both described below.

### (1)    Burden Reduction Working Group

In October 2015, in cooperation with the Monitoring Team, the NOPD created a working group of patrol officers to identify areas of inefficiency and/or waste that were hindering the Department's efforts to (a) put more officers on the streets and (b) reduce their response time when answering calls for service. The working group developed multiple constructive recommendations, many of which already have been implemented (or are in the process of implemented) by the Department. Encouraged by the success of the patrol officer working group, in June 2016, the Department created a second working group of lieutenants to focus on identifying areas of inefficiency and/or waste that were hindering the Department's supervision efforts.

While the existence of a working group is not a direct requirement of the Consent Decree, ensuring a structure that permits supervisors to provide "close and effective" supervision as required by the Consent Decree (CD XV) is. As of the publication of this report, the Department's supervisor working group has met twice and is in the process of compiling a list of

---

[13]    We would be remiss here if we did not recognize the significant improvement of NOPD's Sixth District with regard to documentation of its supervision activities. The Sixth District provided the Monitoring Team a considerable amount of information regarding documentation in supervisors' reports.



recommended actions items.  The Monitoring Team has asked the Department to report on the progress of both working groups on a monthly basis.

### (2)   COMSTAT

Like many police agencies, the New Orleans Police Department holds weekly meetings among its leadership as a key management tool.  These meetings, called Comstat (short for Computer Statistics) bring the Department's leaders together to analysis crime data and other statistics in order to better manage the Department's resources.  *Police Chief Magazine* summarizes the purpose of Comstat as follows:  "Collect, analyze, and map crime data and other essential police performance measures on a regular basis, and hold police managers accountable for their performance as measured by these data." *Police Chief Magazine* 73:9 (Sept. 2006).

Paragraph 229 of the Consent Decree requires that NOPD "remake" its COMSTAT meeting. The Consent Decree requires NOPD to "use the underlying collection and reporting of accurate and meaningful data regarding crime trends and other public safety measures to drive discussion of community-policing successes and challenges."  Among other things, NOPD must "ensure the COMSTAT meeting includes discussion and analysis of trends in misconduct complaints and community priorities to identify areas of concern, and to better develop interventions to address them. NOPD agrees to use techniques such as spatial mapping and scientific deployment analysis to enable COMSTAT to better support and measure community and problem-solving policing efforts."

While NOPD made no material changes to its Comstat program in the first two years of the Consent Decree, earlier this year, Superintendent Michael Harrison and Deputy Chief Paul Noel presented the Monitoring Team and the Court with a new approach they are calling MAX, for Management Analytics for eXcellence.  Working in close consultation with the Department's impressive new Director of Data Analytics, Ben Horwitz, the Department has developed a bold new approach to using data more effectively to guide the Department's strategic decision-making.

NOPD describes its new program as a holistic, data-driven approach to police management.  The Monitoring Team has observed the design, development, and beta testing of MAX, and agrees it shows great promise.  The new system goes well-beyond the sharing of crime trends, and expands the information into other areas for which District Commanders have responsibility. MAX will include data permitting a deep dive into systematic issues of crime, management, community policing, and risk management.  It also will offer NOPD management a more robust and meaningful view of data relating to personnel management, misconduct, use of force, vehicle risk management and Consent Decree Compliance.

NOPD designed MAX to provide data not only to the entire Department, but to the public as well.  The NOPD has described MAX as reflecting its commitment to data transparency and



accountability.  Assuming the resulting data are shared with the public as we expect them to be, we agree with the Department's description.

The NOPD is beta-testing the MAX system now.  The Department expects the system to be fully operational, and the information available to the public on-line, by November 1st of this year. We will continue monitoring the progress of the system's development, testing, and implementation.

### h.        Paragraph 313

Consent Decree Paragraph 313 provides that NOPD "shall hold commanders and supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate."  NOPD was unable to provide documentation demonstrating its supervisors were held accountable for performing their duties.  The performance evaluations we viewed were not adequate to assess supervisors' performance.  The evaluations did not include a section to evaluate "whether commanders and supervisors identify and effectively respond to misconduct, as part of their performance evaluations" as required by paragraph 313 of the Consent Decree.

NOPD employs a performance evaluation form that includes a section for evaluating "close and effective supervision."  In several of the Districts, however, the information included in that section by managers is too vague to be useful.  For example, one commander in one district had this to say about a particular lieutenant:  "She is a great leader.  She leads from the front and she is directly involved in and directly monitors her employees' behavior."  While these comments obviously are positive, they are too vague to be useful to assess performance.  And they are illustrative of other equally vague comments we have seen in other districts.

Similarly, in many cases, the counseling/appraising sections of the performance evaluation forms were not completed, presumably because they were labeled "optional" on the form.

It also is notable that NOPD's performance evaluation forms do not explicitly measure Consent Decree compliance.  Reasoning from the old adage that one can tell what is important to an organization by seeing what is measured, the Monitoring Team recommends the Department re-examine its performance evaluation forms to incorporate Consent Decree compliance as a meaningful measurement.

In short, the requirements of Consent Decree paragraph 313 are not yet fully addressed with the current performance evaluations.  Accordingly, NOPD has not yet demonstrated full compliance with its obligations under this paragraph.



### 2.    Supervisor and Command-Level Training

#### a.    Paragraph 314

Paragraph 314 of the Consent Decree requires NOPD "to develop and implement mandatory supervisory training for all new and current supervisors." While NOPD has developed and implemented mandatory supervisor training for all new and current supervisors, NOPD was not able to produce evidence that all supervisors appointed prior to August 9, 2013 received 200 hours of supervisory training by August 9, 2015. In contrast, NOPD was able to demonstrate compliance with its obligations regarding newly promoted supervisors. Specifically, Sergeants promoted since April 2014 did receive 160 hours of supervisory training. Finally, while NOPD maintains records regarding in-service training for sergeants, it was unable to produce documentation that lieutenants and commanders received similar in-service training. Consequently, NOPD is in ***partial compliance*** with its obligations under paragraph 314.

#### b.    Paragraph 315

Paragraph 315 provides a number of topics on which supervisors must be trained. NOPD was NOT able to demonstrate compliance with this paragraph. NOPD was not able to show its supervisors were trained in many of the specific topics identified in the Consent Decree.

### 3.    Early Warning System

An Early Warning System ("EWS"), also called an Early Intervention System, "is a data-based management tool designed to identify officers whose performance exhibits problems, and then to provide interventions, usually counseling or training, to correct those performance problems." DOJ COPS Report (Early Intervention Systems for Law Enforcement Agencies) (2003). According to the Department of Justice, early warning systems "have emerged as an important mechanism for ensuring police accountability." *Id*.

Paragraph 316 of the Consent Decree requires the City and NOPD "to develop, implement, and maintain an [early warning system] to support the effective supervision and management of NOPD officers and employees, including the identification of and response to potentially problematic behaviors as early as possible." The Consent Decree further requires NOPD "to regularly use EWS data to promote constitutional and professional police practices; to manage risk and liability; and to evaluate the performance of NOPD employees across all ranks, units, and shifts." *Id*.

NOPD began working on its EWS system, called *Insight*, in 2012. Earlier this year, the Monitoring Team sought and received an updated briefing on the status of the EWS development effort. At that point, the development process was on Schedule, and a more recent briefing suggests it still is so. The release of the *Insight* testing system was timely initiated. The final release is scheduled for October 2016.



The development of any EWS system is extremely complicated and time-consuming. Once online, though, a properly developed EWS serves as a critical management and supervision tool by aggregating a huge amount of data so managers can identify patterns and trends that otherwise may remain invisible. NOPD's *Insight* system will aggregate data from a number of the Department's current systems, including Electronic Police Reports (EPRs), Field Interview Cards (FIC), data from the Department existing discipline database (IAPro), CAD, payroll data (ADP), OPDA, training data (Power DMS), and more. These data will be used to identify risk areas, including officers in need of extra attention.

One particularly interesting and useful part of the system that is being developed is the creation of the NOPD *Early Intervention Unit*. The unit will be comprised of a director and three analysts. Their duties are to ensure all personnel receive the follow-up that is recommended by the supervisors and ordered by the commanding officers following the alerts and comparison of an officer's performance compared to the performance of officers in that peer group. This is to ensure officers receive the training, counseling, anger management, discipline or other measures once it is recommended. This should provide good follow-through and ensure ordered training or counseling is always addressed. Once the system is operating and recommendations are made, the Monitoring Team will monitor the follow-up as part of monitoring supervision.

The Monitoring Team has made recommendations to the NOPD throughout the development process, including our recommendation to develop a "dashboard" so that the massive amount of data in the system actually will be usable by supervisors and managers. A user-friendly dashboard provides immediate access to information regarding all of the officers exceeding thresholds as compared to the performance of that officer's peer group. Without a dashboard, the only method that seems to be incorporated to determine officer performance is the individual alerts.[14]

The Monitoring Team also recommended regular command staff meetings in order to discuss the findings of each commander in regard to the regular reviews of information contained in the EIS. This recommendation ensures all districts and divisions are completing the required reviews, documenting the reviews, and making adequate and similar recommendations to ensure impartiality in measures taken.

## 4.    Visual and Audio Documentation of Police Activities

As noted throughout this Report, a core focus of the Consent Decree is on transparency and accountability. To promote both goals, as well as supervision generally, the NOPD has a number of audio and video tools at its disposal, including Body Warn Cameras (BWCs), in-car cameras, CEW (Taser ®) cameras, and in-car GPS devices. Several paragraphs compel NOPD to make sure these various tools are properly deployed, well maintained, and effectively used. While

---

[14]     The NOPD has advised the Monitoring Team it now has added a dashboard to the *Insight* system.



BWCs are not specifically identified in the Consent Decree, since the outset of the Consent Decree, the Monitoring Team has monitored compliance with NOPD's BWC program as "similar equipment" per Consent Decree paragraph 328.

As noted in prior reports, NOPD

> deserves significant credit for embracing BWCs and rolling them out to patrol officers even though the requirement is not included in the Consent Decree. As of August 2015, all regular patrol officers in all districts have been issued BWCs. This is a significant – and costly – accomplishment.

*See* October 2015 Report. Our ongoing audits continue to ensure the full deployment of BWCs, while also continually focusing on the regular and proper use of BWCs by officers.

The following subparagraphs review NOPD's compliance with the various Consent Decree paragraphs regarding its video and audio equipment.

### a.      Paragraph 327

Paragraph 327 of the Consent Decree requires NOPD "maintain and operate video cameras and AVL in all marked or unmarked vehicles that are assigned to routine calls for service, task forces, tactical units, prisoner transport, or SOD canine and shall repair or replace all non-functioning video cameras or AVL units, as necessary for reliable functioning." Paragraph 327 further provides "One-half of these vehicles will be equipped with video cameras and AVL within one year of the Effective Date." Finally, NOPD is required to "ensure that recordings are captured, maintained, and reviewed as appropriate by supervisors, in addition to any review for investigatory or audit purposes, to assess the quality and appropriateness of officer interactions, uses of force, and other police activities." NOPD demonstrated ***partial compliance*** with these requirements.

At this point, NOPD should have all cars engaged in patrol activities equipped with working AVLs. Due to a number of technological hurdles, however, NOPD is not yet in full compliance with this requirement. Neither is NOPD yet in compliance with its obligations to have 100% of its patrol vehicles equipped with functioning in-car cameras.





**Working In-Car Cameras (Q2 2016)**

It is important to note, much of these negative scores were due to technology breakdowns, and not non-compliance by an individual officer or supervisor.  Nonetheless, NOPD as an institution is held accountable for the functionality of its technology.

It also should be noted that, even where cameras were in working order, we identified frequent failures to record the associated audio.  Per NOPD policy, officers are required to affix a small microphone to their uniforms before leaving their cars.  Many officers don't do this.  Since being alerted to this by the Monitoring Team, NOPD has taken steps to reinforce the requirement to use the in-car microphone as well as the BWC.

Of note with respect to the Third District is the absence of in-car cameras for the cars that patrol the Lakeview Crime Prevention District.  As these cars are apt to be called into service when necessary, they should be equipped with cameras.

**b.      Paragraph 328**

Paragraph 328 requires NOPD to develop and implement policies and procedures regarding AVL, in-car cameras, ECWs, and similar equipment, among other things.  NOPD is generally in compliance with the policy/procedure elements of this requirement.  NOPD has developed and implemented policies and procedures regarding BWCs, AVLs, CEWs, and in-car cameras.



NOPD also does retain and preserve recordings for at least two years, or, if a case remains under investigation or litigation longer than two years, at least three years after the final disposition of the matter, including appeals.

One area where NOPD's compliance continues to lag relates to supervisors incorporating the knowledge gained from the review of BWC recordings into their ongoing evaluation and supervision of officers. There is no supporting documentation to provide evidence of compliance with this provision. Thus, NOPD is not yet in full compliance with this requirement.

Finally, on a related note, but admittedly outside the scope of paragraph 328, NOPD still does not take adequate advantage of its BWC and in-car recordings as a learning tool. As one would imagine, NOPD now has a large collection of camera recordings. Some of these recording show admirable practices, while some show inadequate and/or unsafe practices. Both categories provide important material for training. The Monitoring Team previously has requested NOPD develop a system to identify important videos and incorporate them into Academy, in-service, and/or roll call training. NOPD has not yet taken effective steps to do this.

### c.      Paragraph 329

Paragraph 329 requires NOPD to "develop and implement a schedule for testing AVL, in-car camera, and ECW recording equipment to confirm that it is in proper working order." Paragraph 329 further provides that "officers shall be responsible for ensuring that recording equipment assigned to them or their car is functioning properly at the beginning and end of each shift and shall report immediately any improperly functioning equipment."

Our audits in early 2016 revealed continued noncompliance with this requirement. Most district personnel were unaware of any AVL, in-car cameras, or ECW testing. And NOPD provided no documentation of such testing. More recently, however, the NOPD Compliance Bureau rolled out a program in the various districts to test all equipment at the outset of each shift. While some districts already had been doing this, now we are seeing this being done on a more consistent basis among all districts. This new practice no doubt will help the Department achieve compliance with this Consent Decree obligation.

### d.      Paragraph 330

Paragraph 330 requires officers to use their recording equipment as directed by policy and requires supervisors to ensure officers under their command do so. The paragraph further requires supervisors to "report equipment problems and seek to have equipment repaired as needed," and "refer for investigation any officer found to fail to properly use or care for in-car camera recording, AVL, ECW camera, or similar equipment. Prior Monitoring Team audits revealed significant non-compliance in this area. Our more recent audits, however, revealed *significant improvement*. NOPD now is able to demonstrate *partial compliance* with these requirements, and is on track toward demonstrating full compliance.



### e.    Paragraph 331

Paragraph 365 requires NOPD to "provide each supervisor with handheld digital recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations."  As of our last audit, Districts 1, 3, and 8 were in ***full compliance*** with this requirement.  District 2 was in partial compliance.  The other districts will be audited next period.



## XIX.   MISCONDUCT COMPLAINT INTAKE, INVESTIGATION, AND ADJUDICATION

The Consent Decree provides that NOPD must "ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported using the preponderance of the evidence standard and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent."  Within the NOPD, the Public Integrity Bureau ("PIB") is primarily responsible for these functions.  The PIB receives complaints from civilians and NOPD personnel, investigates those complaints, and recommends a disposition to NOPD leadership.  The Monitoring Team consistently has reviewed various elements of PIB compliance since the implementation of the Consent Decree.

This period the Monitoring Team conducted an audit of PIB's administrative investigations.  This audit supplements similar audits conducted in June 2015 and November 2015.  Among other things, the Monitoring Team reviewed 32 randomly selected PIB administrative investigations to determine whether the PIB documentation accurately captured the content of the recorded intake interviews and whether the investigations were handled thoroughly.[15]  We selected the cases to review from the 112 citizen initiated complaints initiated between November 2015 and January 2016.  We selected this period in an effort to review cases that already had been investigated.  PIB was unaware of the months or cases we planned to audit prior to the morning of the audit.

Our review revealed that PIB had responded effectively to our findings and recommendations of our prior audit.  Specifically, we found that PIB investigative case files were better organized and PIB's final reports were more detailed and maintained in a more organized manner than the reports reviewed during June 2015 and November 2015.  In short, we noticed *significant improvement* on the part of PIB.

The improvements we noted were due in large part to the creation of new protocols, practices, and forms by PIB Commander Nolan, the NOPD Compliance Unit, and PIB Deputy Chief Arlinda Westbrook.  Subsequent to our initial review, PIB implemented a new Universal Complaint Form (used in the field to document citizen complaints), a new Final Report format with meaningful sub-headings, a Three-day Misconduct Complaint Determination form, a date tracking log.  The PIB also made important alterations to existing forms that further enhanced available evidence of compliance with many consent decree paragraphs.

---

[15]     Of the thirty-two cases reviewed, one (1) was closed as withdrawn (not one of the four consent decree authorized findings), four (4) were forwarded to mediation, seven (7) were closed as No Formal Investigation Merited, one (1) was merged with another complaint, and one (1) was an employee complaint. This left eighteen (18) of the original thirty-two (32) cases that could be fully evaluated for administrative investigation compliance.



As a result of these improvements:

- Final reports are better organized and include important sections that were lacking in prior reports such as credibility assessments and recommendations for changes in training, policy, and tactics.

- The individual case files are better organized in order to locate evidence of policy and consent decree compliance with matters including the timelines related to notifications to the complainant, return of completed investigations to PIB when they are investigated in the field, and the completion of the case.

- PIB initiated a date tracking log on the front cover of each case file in order to track the case progress and the timelines required at various stages of the investigation.  This has improved the Bureau's ability to monitor and demonstrate compliance with requirements that cases be assigned within 3 days and that a determination be made within 3 days whether the case will be handled as a criminal investigation or an administrative investigation.

Another positive development for PIB during this reporting period is the completion of Policy 52.1.1, approved by OCDM and DOJ in March 2015, and issued by PIB in July 2015. This policy addresses internal affairs investigations, including how to perform credibility assessments and how to provide recommendations regarding training and policy needs, and tactical matters that should be addressed.  As of the publication of this report, few officers had received training on this policy, which obviously must be remedied.  We expect, however, that once supervisors receive training in the proper method of conducting administrative investigations that compliance with many consent decree paragraphs, we will see further improvement within PIB.

One area that would benefit from further improvement is the Bureau's use of "IA Pro," the Bureau's core complaint and investigation tracking database.  PIB establishes an IA Pro record for each allegation of misconduct that contains the (1) number, (2) the nature, (3) the status of misconduct complaints from initial intake to final disposition, (4) the investigation timeliness, (5) the notification to the complainant of the interim status, and (6) the final disposition of the investigation.  Unfortunately, the Department is not taking advantage of the full capacity of the system to keep all of the data required of paragraph 396 of the Consent Decree.  It includes only partial information or limited information regarding the following.

- Status – The IAPro record includes only the day the complaint was received, if it is pending, and if it is closed rather than the multiple steps of its status such as being assigned to district personnel, case file return from the district to PIB, awaiting approval of various reviewers, and other stages of processing.

- Investigation timeliness – The IAPro system is currently set up to track only when the complaint was received and when it was closed. It does not track or alert PIB personnel



when investigative or review timelines are exceeded.  This has resulted in several PIB cases exceeding the time limit for completion of the investigation and/or the review of the investigation.

- Notification to the complainant – The IAPro system tracks the date the final letter was sent to the complainant. It is not set up to track whether the complainant was kept informed periodically regarding he status of the investigation. Many of the cases reviewed indicated the complainant received an initial notification of the investigation and the final letter when the case was closed. Although PIB requires a notification to the complainant after 45 days of investigation, many cases did not have documentation the notification was provided to the complainant.

The Monitoring Team has discussed these issues with PIB and is working with the Bureau to make better use of its current systems.

In addition to the tracking that IA Pro provides, NOPD's PIB separately tracks first amendment rights violations.  NOPD reported to us that it received no first amendment complaints from November 2015 through January 2016, and our review turned up no such complaints within our sample.  PIB also separately tracks misconduct complaints alleging discriminatory policing violations.

PIB's records reflected 390 complaints (282 citizen complaints; 108 rank initiated complaints) from January 2016 to May 2016.  This is higher than those registered during the same period in 2015, when PIB received 320 complaints, which likely illustrates greater faith/trust in NOPD's internal affairs process .  PIB's handling of the 2016 complaints breaks down as follows:





The top three types of complaints PIB handles are (1) neglect of duty, (2) professionalism, and (3) adherence to instructions.  During the period we reviewed, 53 cases contained sustained charges.  Of those, 34 were rank initiated investigations and 19 were citizen initiated charges.

As noted above, our audit found significant improvement on the part of PIB from the last time we conducted our audit.  The specific compliance rates for the various relevant CD paragraphs are as follows:

| Paragraph | Compliance | Notes |
|---|---|---|
| 375 | 93% | Misconduct was reported to supervisors in the cases we reviewed, but PIB was not notified immediately in two cases. |
| 376 | 100% | The Consent Decree requires supervisors to take appropriate disciplinary action.  We found appropriate disciplinary action taken in each case we reviewed. |
| 389 | 100% | All complaints must be accepted for investigation.  We found no evidence of PIB rejecting a complaint, discouraging a complaint, otherwise not investigating a complaint. |
| 390 | 100% | All misconduct complaints were accepted by PIB.  All but one complaint was made in English.  One case required translation service, which was provided as required by the Consent Decree. |
| 391 | 90% | Paragraph 391 requires all citizen complaints filed in the field be reported to PIB by the end of the shift.  Our audit identified three instances of delayed reporting. |
| 392 | N/A | PIB did not identify any cases originating from a complaint from the City Attorney's Office, the DA, a judge, or a magistrate. |
| 393 | Compliant | As required by the Consent Decree, cases are tracked separately for allegations that officers' violated a citizen's first amendment rights.  There was no evidence in the 32 cases reviewed that officers detained or arrested an individual for interfering with a law enforcement investigation, disorderly conduct, or similar charges for a civilian exercising first amendment rights to observe, record, and/or verbally comment on the performance of police duties. |
| 394 | Compliant | Cases are tracked separately for allegations of discriminatory policing. |
| 395 | 95% | An identifying number was provided to the complainant by the field supervisor accepting the complaint for all but two cases. |
| 396 | Partially Compliant | NOPD's centralized numbering and tracking system contains all information except information indicating investigation status, investigation timeliness, and whether the complainant was notified. |



| Paragraph | Compliance | Notes |
|---|---|---|
| 397 | 96% | Supervisors in the field gathered all required evidence in all cases except one. |
| 398 | 93% | The cases were assigned in three days in all cases except two. |
| 399 | Compliant | NOPD has embraced an "allegation-driven" complaint classification process.  An allegation-driven system is one where the assignment of complaint action to a particular investigative unit is based on the complainant's allegation rather than on the possible outcome of the investigation. |
| 400 | 100% | All cases closed as unfounded or exonerated were free of misconduct. |
| 401 | 93% | Investigations were conducted by non-involved supervisor in all but two cases. |
| 403 | 75% | Eight investigations were not conducted within the applicable 90 or 120 day timeline. |
| 404 | 87% | We identified four investigations the Monitoring Team believed were not sufficiently thorough.  The gaps were not dramatic, but did require additional effort on the part of NOPD.  These cases were brought to the attention of PIB for follow-up work by the Bureau's investigators. |
| 405 | 93% | Written statements or recorded statements were provided for all cases except two. |
| 406 | 100% | Interviews were conducted and recorded in all cases except those that properly warranted an NFIM (no formal investigation merited) disposition. |
| 407 | 96% | All complainants spoke English except one who was given a translator.  One case, however, did not have a separate interview. |
| 408 | 93% | Investigator conducted further investigations in all reviewed cases except two. |
| 409 | Compliant | All recordings were available. |
| 410 | Compliant | All officers cooperated with all investigations. |
| 411 | N/A | There were no criminal investigations reviewed as part of the audit. |
| 412 | N/A | The Monitoring Team did not assess NOPD's compliance with paragraph 412 because the applicable policy has not yet been issued by the Department. |
| 413 | 52% | Discussed below. |



| Paragraph | Compliance | Notes |
|---|---|---|
| 414 | 96% | Paragraph 414 provides that case must not be withdrawn, but should be investigated thoroughly.  One case was withdrawn among the sample reviewed by the Monitoring Team. |
| 415 | 87% | Discussed below. |
| 416 | 96% | The PIB commander accepted and approved the investigator's recommended disposition unless the disposition was unsupported by a preponderance of the evidence or additional investigation was necessary to reach a reliable finding in all cases except one. |
| 417 | 90% | Investigators made recommendations for training, policy, etc. in all cases except three. |
| 418 | 96% | District level investigations were provided to PIB within three business days except in one instance. |
| 419 | 100% | Investigator reports and related documentation and evidence is securely maintained in a central and accessible location. The reports were all available to the Monitoring Team. |
| 420 | 96% | Complainants were updated on the status of the investigation and the complainant was notified of the outcome within 10 days except in one case. |

These findings reflect significant improvement from our prior PIB audit, as shown in the graph below:





Notwithstanding this significant improvement, PIB still has room for additional improvement in some areas. Two particular area where PIB still needs to pay particular attention are Consent Decree paragraph 413 and paragraph 415. Paragraph 413 requires NOPD to "consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations based upon that evidence." PIB's compliance with this paragraph remains inconsistent. While all relevant evidence was considered in all but three cases, we noted lingering shortcomings with respect to the Bureau's credibility determinations. Of the 32 cases we reviewed, credibility determinations should have been made in 19 cases.

Of those 19, credibility determinations were insufficient in 9 of the 19. In 4 of these 9, credibility determinations were mentioned, but the report provided insufficient information to determine how the investigator made his/her determination. In 5 of the 9 cases, the report reflected no evidence that a credibility determination was conducted at all. While it is possible



credibility determinations were made in all 19 cases where one should have been made, if the record does not reflect it, the Monitoring Team considers it as not having occurred.  Per paragraph 486 of the Consent Decree, it is the Department's burden of demonstrating its compliance with the Consent Decree.

PIB likewise needs additional focus on paragraph 415.  Paragraph 415 requires that NOPD's misconduct investigators must "explicitly identify and recommend one of" four identified dispositions "for each allegation of misconduct in an administrative investigation."  The four dispositions are "unfounded," "sustained," "not sustained," and "exonerated."  The Monitoring Team identified four cases that were not closed used these four dispositions.  We recognize, however, that our findings in this area may be different once PIB's investigators are better trained in making credibility assessments.

In all cases where we identified less than 100% compliance, we referred the offending investigation to PIB for corrective action.  We also consistently provide recommendations to PIB (and all other NOPD departments) where we identify opportunities for improvement.  Following our most recent PIB review, we made the following recommendations:

- All department supervisors should receive comprehensive training on all relevant policies, including newly approved Policy 52.1.1 titled "Misconduct Complaint Intake and Investigation."  Specifically, patrol supervisors would benefit from additional training on:

    o How civilians' complaints are to be received, documented and logged;

    o Conducting and documenting credibility assessments;

    o The preponderance of evidence standard;

    o Identifying and reporting training, policy, and tactical deficiencies uncovered during the investigation; and

    o What constitutes the acceptable investigative outcomes: sustained, not sustained, unfounded and exonerated.

- PIB should identify ways to improve the timeliness of its field investigations.

- PIB should implement a more effective case tracking system for cases returned to PIB from the patrol division to help reduce delays in completed cases awaiting final approval.

- NOPD should review current policy and practices for responding to an officer's complaint against a supervisor to determine whether it would be more effective to handle such complaints in the same way a citizen complaint is handled and investigated.



- PIB should evaluate whether it has adequate personnel to accomplish its various obligations in a timely fashion.

- PIB should update its internal tracking program (IAPro) to take full advantage of its capabilities and incorporate all requirements of Consent Decree paragraph 396.

To date, we have been impressed with PIB responsiveness to the recommendations of the Monitoring Team.  The cooperation we have received from PIB since the implementation of the Consent Decree has been excellent.  We have no doubt PIB will see continued compliance improvement over the coming months.



## XX.    TRANSPARENCY AND OVERSIGHT

The Consent Decree has a lot to say about transparency.  Among other things, the Consent Decree requires NOPD to make available to the public all audits and reports related to Consent Decree implementation (CD 427), all policies, procedures, and manual including, but not limited to, those required by the Consent Decree (CD 428), and "all data and records necessary to facilitate and ensure transparency and wide public access to information related to NOPD decision making and activities, as permitted by law."  (CD 429)  Over the past year, NOPD has taken significant steps toward meeting these obligations.  Its actions in this area are testament to its sincere ongoing efforts to "facilitate effective and constitutional policing and increase trust between NOPD and the broader New Orleans community," as contemplated by the Consent Decree.  Indeed, in taking its most recent steps in this area, Superintendent Harrison observed "The most important thing is our willingness to be transparent. . . . I can't imagine building trust to this degree and then taking it away."  *Times Picayune* (8/10/16)  Superintendent Harrison went on to commit to continuing to provide this level of open access "as long as he's chief . . . even after the Consent Decree is resolved."  *Id.*

Following is a summary of NOPD's achievements with respect to promoting transparency.

First, since the initiation of the Consent Decree, NOPD has posted its compliance reports and the Monitoring Team's compliance reports on its web site.  These reports are available at www.nola.gov/nopd, and include the City's Biennial Self-Assessment, the Monitoring Team's Quarterly Reports, as well as a number of other reports as indicated in the chart below.



| 2014 | 2015 |
|------|------|
| •Training annual report<br>•Domestic Violence annual report<br>•Sexual Assault annual report<br>•Use of Force annual report<br>•Bias Free Policing annual report<br>•Recruitment annual report<br>•Community Engagement annual report<br>•Public Integrity Bureau annual report<br>•Crisis Intervention Team annual report<br>•Stop and Search annual report | •Training annual report<br>•Training class roster<br>•Domestic Violence annual report<br>•Sexual Assault annual report<br>•Sexual Assault mid-year report<br>•Use of Force annual report<br>•Bias Free Policing annual report<br>•Community Engagement annual report<br>•Public Integrity Bureau annual report<br>•Crisis Intervention Team annual report<br>•Stop and Search annual report |

Additionally, so far this year, NOPD has published its first quarter Community Engagement First Quarter Report, its mid-year Sexual Assault report, and its biennial compliance report.

While the Monitoring Team previously took issue with the accuracy and completeness of some of the initial self-assessments published by the NOPD, we have found the City's subsequent reports generally fair and accurate.

Second, NOPD has made its policies and procedures available on its public website as required by the Consent Decree.  The website currently provides citizen access to the following policies that have been reviewed and approved by the U.S. Department of Justice and the Monitoring Team:

| | |
|---|---|
| Chapter 1.2.4 Search and Seizure | Chapter 1.2.4.1 Stops/Terry Stops |
| Chapter 1.3 Use of Force.pdf | Chapter 1.3.1.1 Handcuffing and Restraint Devices.pdf |
| Chapter 1.3.1.2 Control-Devices-and-Techniques.pdf | Chapter 1.3.2 Force Investigation Team.pdf |
| Chapter 1.3.6 Reporting Use of Force.pdf | Chapter 1.3.7 Use of Force Review Board.pdf |
| Chapter 1.4 Authorized Firearms.pdf | Chapter 1.4.1 Authorized Ammunition.pdf |
| Chapter 1.4.2 Firearms Training Qualification and Requalification | Chapter 1.7.1 Conducted Electrical Weapon(CEW).pdf |



| Chapter 1.9 Arrests | Chapter 1.9.1 Miranda Rights |
| Chapter 26.2.1 Disciplinary Matrix/Penalty Schedule | Chapter 26.2 Adjudication of Misconduct |
| Chapter 35.1.7 Non-Disciplinary Employee Counseling For Minor Violations.pdf | Chapter 41.3.2 Body Worn Camera (BWC) Inadvertent Misuse and Non-use |
| Chapter 41.3.8 In Car Camera.pdf | Chapter 41.3.10 Body Worn Camera.pdf |
| Chapter 41.4 Foot Pursuits.pdf | Chapter 41.5 Vehicle Pursuits.pdf |
| Chapter 41.6.1 Immigration Status.pdf | Chapter 41.13 Bias-Free Policing |
| Chapter 41.22 Canine.pdf | Chapter 41.25 Crisis Intervention.pdf |
| Chapter 41.26 Crisis Transportation Service.pdf | Chapter 42.2 Sexual Assault.pdf |
| Chapter 42.4 Domestic Violence.pdf | Chapter 52.1.1 Misconduct Complaint Intake and Investigation.pdf |
| Chapter 52.1.2 Misconduct Complaint Investigator Responsibilities | Chapter 52.2 Negotiated Settlement Agreements.pdf |
| Chapter 61.4.5 Abandoned Boats.pdf | Chapter 71.1 Prisoner Transportation and Guarding.pdf |

Additional policies are posted as they are approved by the Department of Justice and the Monitoring Team.

Third, to its great credit, the City recently made available through its web site a sizeable new collection of policing data.  According to NOPD, these new "policing data reports offer insight into investigations and policies regarding calls for service, field interviews, use of force, sexual assault, domestic violence, community engagement, crisis intervention and more."  We agree. The data publically available now includes the following:

- ***Current calls for Service Data***, which reflect the "events captured in NOPD's Computer-Aided Dispatch (CAD) system used to facilitate incident response."  This data collection included raw data in a user-friendly dashboard that permits civilians, the media, researchers, etc. to perform their own analysis on these data.  The collection is derived from data provided by the Orleans Parish Communication District (OPCD), the administrative office of 9-1-1 for the City of New Orleans.  According to the NOPD, "in order to protect the privacy of victims, addresses are shown at the block level and the call types cruelty to juveniles, juvenile attachment and missing juvenile have been removed in accordance with the Louisiana Public Records Act, L.R.S. 44:1."

- ***Current Stop and Search (Field Interview Card) data***, which "summarize the stop and search data collected for the past year, analyze that data, and articulate the steps taken to correct any problems identified or to build on success."  As with the Calls for Service



data, these data include raw data in a user-friendly dashboard that permits civilians, the media, researchers, etc. to perform their own analysis on these data.

- **BWC and In-Car Camera metadata**, which reflect the existence of camera recording (but not the recordings themselves).

As noted above, NOPD's willingness to share these (and other[16]) data with the public reflects not only a commitment to meet its obligations under the Consent Decree, but a commitment to promoting transparency to achieve the core goals of the Consent Decree. NOPD could have adopted a more limited data release policy and still met its obligations under the Consent Decree. The Department deserves significant credit for going beyond its obligations and providing the public with more meaningful data.

Finally, a word should be said here about a recent report published by the Leadership Conference on Civil and Human Rights,[17] which gave the New Orleans Police Department a mediocre grade for transparency. Among other things, the Leadership Conference criticized the Department's policy allowing officers to review camera footage before writing reports, its policy of not deleting recordings, its policy of not allowing civilians filing complaints to access video recordings, and not limiting the use of biometric technologies to identify individuals in recordings. *See* www.bwcscorecard.org.

The Monitoring Team takes no position on these criticisms as NOPD's policy is in compliance with the Consent Decree. Moreover, it is important to note the correctness of the Leadership Conference's positions is not without challenge. In fact, the issues upon which the group criticized the NOPD are fiercely debated topics with reasonable arguments offered on both sides of the debate. Legislatures throughout the country (including the Louisiana legislature) are struggling with these issues, and, as far as the Monitoring Team knows, none yet have found an answer acceptable to all stakeholders.

Notwithstanding these ongoing debates, the Monitoring Team believes the New Orleans Police Department deserves significant credit for taking it upon itself to stake out a position with respect to transparency and BWC recordings. The Monitoring Team described NOPD's accomplishment this way in our last report:

> As police departments across the country roll out BWC programs, they have found themselves struggling with a host of collateral issues, including, among

---

[16]    More recently, NOPD added Use of Force data to its on-line offering as well.

[17]    According to its web site, the Leadership Conference is "a coalition charged by its diverse membership of more than 200 national organizations to promote and protect the civil and human rights of all persons in the United States. Through advocacy and outreach to targeted constituencies, the Leadership Conference works toward the goal of a more open and just society – an America as good as its ideals." *See* www.civilrights.org.



many other things, whether, when, and how to release video recordings to the public. The national news has shown us all the power of video footage in the context of justified and unjustified police shootings. To ensure New Orleans dealt with this issue in a fair, consistent, and compliant manner, in November, U.S. District Court Judge Susie Morgan recommended the NOPD develop a written policy governing the release of NOPD video recordings of critical incidents (*e.g.*, officer involved shootings, in-custody deaths, etc.). Consistent with the Consent Decree's demand that the police department promote transparency, and recognizing that transparency facilitates increased trust between the NOPD and the New Orleans community, Judge Morgan sought a policy that would facilitate the prompt release of video recordings of critical incidents involving the NOPD so long as the release is consistent with the legitimate needs of ongoing law enforcement operations.

In December, the City, the NOPD, the District Attorney's Office, and the Department of Justice worked together to develop a policy consistent with Judge Morgan's recommendation. The Monitoring Team has reviewed the policy and believes it represents a well thought-out approach toward promoting transparency while protecting privacy rights as well as the legitimate interests of law enforcement. . . .

We continue to view's NOPD's commitment to transparency as worthy of praise

A.    **Technical Assistance**

Paragraph 455 of the Consent Decree authorizes the Monitoring Team to provide "technical assistance" to the NOPD "to ensure timely, full, and effective implementation of this Agreement and its underlying objectives." During this reporting period, as in prior reporting periods, the Monitoring Team provided Technical Assistance to the Department in many areas including Use of Force, bias-free policing, sexual assault investigations, training, policy drafting, and other areas.

In addition to the areas in which the Monitoring Team provides ongoing Technical Assistance, this period we also observed the work of the City's 911 call takers and police dispatchers in order to provide recommendations as to how that important function can foster the implementation of the Consent Decree.

In March 2016, with the cooperation of the Orleans Parish Communications Center, the Monitoring Team observed the work of several call-takers and dispatchers. Our observations involved meeting with Center management, interviewing Center employees, and monitoring their calls. Overall, we were impressed by the competence and professionalism of the Communications Center personnel with whom we dealt. They understood their jobs well and



performed their tasks conscientiously.  With their cooperation, we came away with several recommendations, which we shared with the Department.  Among them were the following:

- Provide additional training to call-takers.  Neither call-takers nor dispatchers receive periodic or even annual training.  While they received training when they are brought on board and supervisors are available to provide one-on-one training when necessary, we believe Center personnel would be more effective by receiving, and NOPD would benefit from, additional regular training much like NOPD itself offers regular in-service training for its officers.

- Provide suggested scripts or at least guidelines for common calls to better ensure consistency among Center personnel.

- Implement Call Center routines that make maximum use of the Center's Computer Aided Dispatch System.

- Prepare an updated procedure manual.

- Provide more thorough training with respect to the use of the APR function.

- Develop a process for dealing with tow truck service.

Subsequent to our meetings with Communications Center personnel, the Monitoring Team returned to Communications Center in July and will continue monitoring progress toward implementing these recommendations.[18]

---

[18]    The Orleans Parish Communications District recently brought on a new Director of Operations, Ms. Shinar Haynes (MBA RPL).  Ms. Haynes is an impressive addition to the Communications team, and the Monitoring Team looks forward to continuing to work with her.



## XXI.   AGREEMENT IMPLEMENTATION AND ENFORCEMENT

### A.      Coordination with IPM (CD 459)

The Consent Decree provides the Monitoring Team shall coordinate and confer with the Independent Police Monitor. (CD 459)   The  Monitoring Team continues to be impressed by the passion, dedication, and impact of the IPM;  and recognizes the respect the organization has within the New Orleans community.  The Monitoring Team  remains pleased with and grateful for the level of cooperation it receives from the IPM.

### B.      NOPD Consent Decree Implementation Unit (CD 467)

Paragraph 467 of the Consent Decree provides that the City and NOPD will "hire and retain, or reassign current NOPD employees to form, an inter-disciplinary unit with the skills and  abilities necessary to facilitate implementation" of the Consent Decree.  The Consent Decree  goes on to explain this unit "will serve as a liaison between the Parties and the Monitoring Team  and will assist with the implementation of and compliance with this Agreement."

As noted in the Monitoring Team's prior reports, "a fully functioning, adequately staffed, and properly resourced Consent Decree Implementation Unit is a critical component of NOPD's ability to come into compliance with the terms of the Consent Decree."  NOPD has been in compliance with its obligations under paragraph 467 since 2014 when it fully staffed the Consent Decree Implementation Unit.  The Monitoring Team continues to be pleased by the Unit's knowledge, skill level, and demonstrated commitment to the Consent Decree process; and recognizes the full cooperation it continues to receive from the Unit.

Unfortunately, the leader of the NOPD Compliance Bureau, Deputy Chief Tim Averill, just retired.  Chief Averill was a passionate champion of reform, a committed employee of the NOPD, and a friend to the Monitoring Team.  Under his watch, the Compliance Bureau continued to play a significant role in moving the NOPD toward full compliance with its obligations under the Consent Decree.  We will miss Chief Averill, and wish him luck in whatever is next on his professional agenda.

Chief Averill's successor, Deputy Chief Danny Murphy, recently was promoted from Compliance Manager within the Compliance Bureau.  The Monitoring Team has worked with now-Deputy Chief Murphy for several years, and holds him in very high regard.  We look forward to working with Chief Murphy as he builds upon the progress made by Chief Averill.

### C.      NOPD and City Cooperation (CD 470 – 476)

The Consent Decree provides the City and NOPD shall fully cooperate with the  Monitoring Team in all aspects of its responsibilities.  We are pleased to report that the City and  NOPD continued to cooperate with the Monitoring Team throughout this reporting period.  The level of



cooperation we received from the Superintendent and his leadership team is worthy of particular note here. Superintendent Harrison, Chief Noel, Chief Thomas, Chief Westbrook, Chief Averill, Commander Eckert, and many others all continue to play a critical role in implementing the reforms of the Consent Decree and in ensuring their respective teams work closely with the Monitoring Team. The Department would not have made the progress it has made so far without their leadership.

The Monitoring Team also continues to receive the full cooperation of and continues to work closely with the New Orleans Office of Inspector General ("OIG"). While the OIG's activities do not fall within our monitoring responsibilities under the Consent Decree, the OIG has kept us apprised of its audit plans and investigators as they relate to the NOPD. We continue to be impressed by the quality of the OIG personnel with whom we work and with the quality and thoroughness of the OIG's work product. The Monitoring Team looks forward to an ongoing positive relationship with the OIG.

Finally, the Monitoring Team also has been impressed with the close working relationship between NOPD's current domestic violence detectives and the Orleans Parish District Attorney's Office, and the level of cooperation we continue to receive from the DA's Office.



## XXII.  CONCLUSION

As noted at the outset of this Report, the New Orleans Police Department has made great progress over the past two years in meeting its obligations under the Consent Decree.  This progress has been driven in large part by a leadership team committed to reform, transparency, and cooperation.  Over the course of this reporting period, and as reflected throughout this Report, the Monitoring Team has seen improvements in many Consent Decree areas.  The burden is on NOPD, however, to institutionalize and sustain these improvements.  Sadly, the history of police reform in the United States is filled with stories of backsliding.  Neither the Monitoring Team nor the Court will allow that to happen here.

In addition to institutionalizing and sustaining the achievements already made, the Department also needs to continue focusing its attention on the areas that need further improvement, including the Academy, Supervision, and Community Oriented Policing.

Finally, and of critical importance, the Department needs to ensure its institutional improvements are having the intended outcomes – that is to say, to ensure the improvements are finding their way to the officers on the street, and into the cars, yards, and homes of every citizen of and visitor to New Orleans.  The great progress NOPD has made improving its policies, institutions, and processes, now gives the Monitoring Team more opportunity to focus its efforts on assessing precisely that.