

# Report of the Consent Decree Monitor
# For the New Orleans Police Department Consent Decree
# Covering the Third and Fourth Quarters of 2016
# Released June 19, 2017

**Office of the Consent Decree Monitor**
**New Orleans, Louisiana**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana



## WHAT'S IN THIS REPORT?



**Office of the
Consent Decree
Monitor**

**June 19, 2017**

### WHAT WE DID THIS PERIOD

- The Monitoring Team continued to review and approve policies, review Body Worn Camera videos, and evaluate uses of force. This period, we also spent significant time focusing on the Police Academy, including recruit and in-service training. We also conducting the second biennial Community Survey required by the Consent Decree. We surveyed the community, police officers, and detainees. In the area of Use of Force, we completed a comprehensive Use of Force analysis, completed a comparison of historic Use of Force data to more recent Use of Force data, and performed a multi-pronged evaluation of the integrity of NOPD's Use of Force data.

### WHAT WE FOUND

- The data reflect continued NOPD improvement in the area of uses of force.
- NOPD vastly improved its custodial interrogation, photographic lineup, and supervisory processes.
- NOPD needs to provide its supervisors with additional training on its new Early Warning System, called Insight, to realize the full benefits the system offers.
- While the Academy continues to make progress, the Monitoring Team continues to be concerned with the slow pace of full reform.
- As noted in a prior report, we identified significant problems in the Department's recruit evaluation process, however, our more recent follow up audit showed dramatic improvement in this area.

### NEXT PERIOD'S ACTIVITIES

- Continue to focus closely on all aspects of the Academy, including continuing to provide Technical Assistance on the development of lesson plans.
- Conduct a follow-up audit on the way NOPD's PIB handles citizen complaints.
- Continue the ongoing follow-up BWC audit focusing on ensuring patrol officers are performing their duties in a professional, respectful, bias-free, and compliant manner.
- Continue reviewing all significant uses of force.
- Continue the Team's ongoing review of Stop, Search, and Arrest data.
- Perform multiple other audits and reviews, and provide technical assistance, as necessary.



## I.      CONSENT DECREE AUTHORITY

"The Monitor shall file with the Court quarterly written, public reports covering the reporting period that shall include:

> a) A description of the work conducted by the Monitoring Team during the reporting period;

> b) A listing of each [Consent Decree] requirement indicating which requirements have been: (1) incorporated into implemented policy; (2) the subject of sufficient training for all relevant NOPD officers and employees; (3) reviewed or audited by the Monitoring Team in determining whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitoring Team to have been fully implemented in practice;

> c) The methodology and specific findings for each audit or review conducted, redacted as necessary for privacy concerns.  An unredacted version shall be filed under seal with the Court and provided to the Parties.  The underlying data for each audit or review shall not be publicly available but shall be retained by the Monitoring Team and provided to either or both Parties upon request;

> d) For any requirements that were reviewed or audited and found not to have been fully implemented in practice, the Monitor's recommendations regarding necessary steps to achieve compliance;

> e) The methodology and specific findings for each outcome assessment conducted; and

> f) A projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the [Consent Decree]."

**Consent Decree Paragraph 457**



## II.  NOTES

"The Monitor shall be subject to the supervision and orders of the [United States District Court for the Eastern District of Louisiana], consistent with [the Consent Decree].  The Monitoring Team shall only have the duties, responsibilities, and authority conferred by [the Consent Decree].  The Monitoring Team shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent."

**Consent Decree Paragraph 455**



## III.    TABLE OF CONTENTS

I.    Consent Decree Authority ...................................................................................3

II.    Notes ...................................................................................................................4

III.    Table of Contents ..............................................................................................5

IV.    Glossary of Acronyms ......................................................................................8

V.    Introduction to Quarterly Report ......................................................................10

VI.    Summary of Monitoring Activities ...................................................................13

VII.    POLICIES AND TRAINING GENERALLY ...................................................19

VIII.    USE OF FORCE ..............................................................................................21

IX.    CRISIS INTERVENTION TEAM ....................................................................22

X.    Custodial Interrogations ....................................................................................23

    A.    Paragraph 163 .......................................................................................23

    B.    Paragraph 164 .......................................................................................23

    C.    Paragraph 165 .......................................................................................24

    D.    Paragraph 166 .......................................................................................25

    E.    Paragraph 167 .......................................................................................25

    F.    Paragraph 168 .......................................................................................26

XI.    Detective Selection ...........................................................................................27

    A.    Paragraph 169 .......................................................................................27

    B.    Paragraph 170 .......................................................................................27

XII.    Photographic line-ups ......................................................................................29

    A.    Introduction ..........................................................................................29

    B.    District-By-District Summary ...............................................................29

        1.    Paragraph 171 ............................................................................29

        2.    Paragraph 172 ............................................................................29

        3.    Paragraph 173 ............................................................................30

        4.    Paragraph 174 ............................................................................31

        5.    Paragraph 175 ............................................................................31

        6.    Paragraph 176 ............................................................................32



C.  Note Regarding Single Photo "Line-ups" ........................................................ 32

XIII.  POLICING FREE OF GENDER BIAS ............................................................... 33

XIV.  COMMUNITY ENGAGEMENT & Community Policing ................................ 34

A.  Community Policing Introduction/Overview ................................................. 34

B.  Community Policing – Current Progress ........................................................ 38

XV.  Biennial Community Survey ............................................................................ 41

XVI.  ACADEMY AND IN-SERVICE TRAINING ................................................... 42

XVII.  SUPERVISION ................................................................................................. 43

A.  Supervision Generally ..................................................................................... 43

B.  Supervisory Duties and Related Items ............................................................ 43

1.  Paragraph 306 .......................................................................................... 43

2.  Paragraph 307 .......................................................................................... 45

3.  Paragraph 308 .......................................................................................... 45

4.  Paragraph 309 .......................................................................................... 46

5.  Paragraph 310 .......................................................................................... 46

6.  Paragraph 311 .......................................................................................... 46

7.  Paragraph 312 .......................................................................................... 46

8.  Paragraph 313 .......................................................................................... 47

9.  Paragraph 314 .......................................................................................... 47

10.  Paragraph 315 .......................................................................................... 48

C.  The *Insight* Early Warning System ............................................................... 48

1.  EWS Status Overview .............................................................................. 49

2.  EWS Specific Findings ............................................................................ 49

2.  *Insight* EWS Summary:  Areas For Further Improvement ..................... 55

D.  Supervision:  Visual and Audio Documentation of Police Activities ............ 57

1.  Paragraph 327 .......................................................................................... 57

2.  Paragraph 328 .......................................................................................... 58

3.  Paragraph 329 .......................................................................................... 58

4.  Paragraph 330 .......................................................................................... 59

5.  Paragraph 331 .......................................................................................... 59

XVIII.  AGREEMENT IMPLEMENTATION AND ENFORCEMENT ........................ 60

Page 7 of 62
June 19, 2017
www.consentdecreemonitor.com



A.    Coordination with IPM (CD 459)..............................................................................60

B.    NOPD Consent Decree Implementation Unit (CD 467)............................................60

C.    NOPD and City Cooperation (CD 470 – 476)...........................................................60

XIX.    CONCLUSION...............................................................................................................62



## IV.      GLOSSARY OF ACRONYMS

"ASU"          Administrative Services Unit
"AUSA"        Assistant United States Attorney
"AVL"          Automatic Vehicle Locator
"BWC"         Body Worn Cameras
"CIT"           Crisis Intervention Team
"CCMS"       Criminal Case Management System
"CD"            Consent Decree
"CIT"           Crisis Intervention Team
"CODIS"       Combined DNA Index System
"ComStat"     Computer Statistics
"COCO"        Community Coordinating [sergeants]
"CPI"            California Psychological Inventory
"CSC"           Civil Service Commission
"CUC"           Citizens United for Change
"DA"             District Attorney
"DI-1"           Disciplinary Investigation Form
"DOJ"           Department of Justice
"DV"             Domestic Violence
"DVU"           Domestic Violence Unit
"ECW"          Electronic Control Weapon
"EPIC"          Ethical Policing is Courageous (NOPD peer intervention program)
"EWS"           Early Warning System
"FBI"            Federal Bureau of Investigation
"FIT"            Force Investigation Team
"FOB"           Field Operations Bureau
"FTO"           Field Training Officer
"IACP"          International Association of Chiefs of Police
"ICO"           Integrity Control Officers
"IPM"           Independent Police Monitor
"KSA"           Knowledge, Skill and Ability
"LEP"           Limited English Proficiency
"LGBT"         Lesbian, Gay, Bi-sexual, and Transgender
"MAX"          Management Analysis for Xcellence
"MMPT"        Minnesota Multiphasic Personality Inventory
"MOU"          Memorandum of Understanding



| "NNDDA" | National Narcotics Detection Dog Association |
|---------|---------|
| "NOFJC" | New Orleans Family Justice Center |
| "NOPD" | New Orleans Police Department |
| "NPCA" | National Police Canine Association |
| "OCDM" | Office of Consent Decree Monitor |
| "OIG" | Office of Inspector General |
| "OPSE" | Office of Public Secondary Employment |
| "PIB" | Public Integrity Bureau |
| "POST" | Police Officer Standards Training Counsel |
| "PsyQ" | Psychological History Questionnaire |
| "QOL" | Quality of Life [officers] |
| "RFP" | Request for Proposal |
| "SA" | Sexual Assault |
| "SART" | Sexual Assault Response Team |
| "SOD" | Special Operations Division |
| "SRC" | Survey Research Center |
| "SUNO" | Southern University of New Orleans |
| "SVS" | Special Victims Section |
| "UNO" | University of New Orleans |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |
| "VAW" | Violence Against Women |



## V.   INTRODUCTION TO QUARTERLY REPORT

As the Monitoring Team reported at the February public court hearing, NOPD continues to make significant progress in most every area of the Consent Decree.  While the Department experienced a recent set-back in one area (recruit vetting), which was the subject of a Special Report issued by the Monitoring Team on January 18, 2017, other areas continue to move forward with notable results.  Among NOPD's accomplishments to date are the following:

- Establishment of an effective Use of Force Review Board.

- Creation of 66 new policies incorporating national best practices.

- Development of a Crisis Intervention Team program, including the training of all NOPD officers and supervisors and the special training of 144 certified CIT officers.

- Establishment of a functioning Officer Assistance and Support program.

- Establishment of a specially trained Force Investigations Team within the NOPD's Public Integrity Bureau.

- A wholesale restructuring of the way the Department investigates crimes against women and a remarkable turnaround of the Departments Special Victim's Section.

- Development of a first-in-the-nation department-wide peer intervention program called Ethical Policing Is Courageous ("EPIC").

- Development of an effective Office of Police Secondary Employment ("OPSE") to ensure officer details are handled fairly and effectively.

- Significant improvement within the NOPD Police Academy.

- Significant improvement in the way the Department handles Custodial Interrogations and Photographic Lineups.

- Creation of a new supervisory tool called MAX (for Management Analytics for Excellence), which makes a sizable volume of data available to police managers as well as to the public.

- Creation of an excellent officer-involved collision reporting system and database.

- Creation of an excellent police vehicle pursuit reporting system and database.

- Creation of an excellent ECW (Taser®) reporting and data collection system.



- • Creation of multiple new public datasets that make sizable volumes of data (including calls for service data and use of force data) available to the public.

Notwithstanding these notable accomplishments – and they are notable – other areas continue to require additional NOPD attention. For example, while the Monitoring Team has recognized a significant improvement in the professionalism and efficiency of the Academy, too often Academy instructors still are teaching without approved lesson plans and/or without approved course materials. Similarly, while the Monitoring Team has seen significant progress made in the development of a meaningful Community Engagement/Community Policing program, the Department still has a long way to go before it can be rolled out effectively. And, as noted in prior reports, while the Department has made progress promoting the supervision of its officers, such supervision still is not at the "close and effective" level contemplated by the Consent Decree. Also, as noted in the Monitoring Team's recent Special Report, the Department needs to reform the process through which it evaluates and selects new recruits.

Another area that requires significant additional attention by the Department is the implementation and use of *Insight*, its new Early Warning System. Insight, once fully rolled out, will provide the Department with a critical management and supervision tool by aggregating a huge amount of data so managers can identify patterns and trends that otherwise may remain invisible. For example, *Insight* will aggregate data from a number of the Department's current systems, including Electronic Police Reports (EPRs), Field Interview Cards (FIC), data from the Department existing discipline database (IAPro), CAD, payroll data (ADP), OPDA, training data (Power DMS), and more. These data will be used to identify risk areas, including officers in need of extra attention. The Monitoring Team has been observing the Department's implementation of *Insight* and has found the Department's current *Insight* training **insufficient**. (We also have noted the absence of some important information within the *Insight* system, but we acknowledge NOPD is working to remedy those gaps.) NOPD's current training focuses more on how to use the *Insight* software, not how to use the *Insight* data. This is an important distinction. It is one thing to know how to turn on the system, but quite another to know how to access and how to use the critical data in the system. Our conversations with supervisors demonstrate few supervisors have a working knowledge of how to take full advantage of the benefits *Insight* has to offer.

While these are important issues that must be remedied, no one should mistake the need for further improvement in some areas with a lack of progress in other areas. As noted above, NOPD has made significant improvement in almost every areas of the Consent Decree, and it deserves credit for doing so. Such credit should be given not only to the Department's current management team, led by Superintendent Harrison, but to the hundreds of officers who have embraced reform and are working day in and day out to transform NOPD into a world-class department.

With the implementation of NOPD's strong structural reforms, of course, the Department now must focus its attention on whether those reforms are manifesting themselves in more effective, less biased, and more respectful policing on the streets. A strong Stop & Search policy, for



example, is only effective if officers adhere to it.  Better Use of Force training is only effective if officers learn from it.  And expanded supervisory tools are only meaningful if supervisors use them.  Accordingly, the Monitoring Team is now expanding our monitoring activities to give more focus to "outcome assessments."  Paragraph 448 of the Consent Decree specifically requires the Monitoring Team to "conduct assessments to measure whether implementation of this Agreement is resulting in constitutional policing."  While the Monitoring Team has been working closely with the NOPD Compliance Bureau to conduct such assessments for several years now, the results of those assessments now are more important than ever.

Finally, an important word should be said here about the occasional set-backs NOPD experiences during its march toward full Consent Decree compliance.  Notwithstanding the Department's significant progress, the Monitoring Team still sees officers occasionally making mistakes and/or engaging in wrongdoing.  The recent arrest of an Academy recruit for domestic abuse provides just one such example, but others exist.  NOPD observers and members of the community must keep in mind, however, that no police department is perfect – just like no member of the community is perfect.  And while the Monitoring Team believes in holding the NOPD and its officers to a very high standard, we do not believe any police department should be held to an impossibly high standard of perfection.  Police officers are human and are bound to make mistakes, and police departments are bound to have bad apples among their officers.  What we all should expect, however, is that when mistakes are made they are openly identified, honestly evaluated, and meaningful remedied.  And when bad apples are discovered, they are dealt with fairly, seriously, and swiftly.

We offer this distinction between a flawed department and flawed individuals because it is an important one.  Just as we cannot let the Department's progress blind us to areas in need of further reform, we likewise cannot let the mistakes or misconduct of some blind ourselves to the progress the Department has made in so many areas.



## VI.      SUMMARY OF MONITORING ACTIVITIES

The Monitoring Team spent significant time during the period covered by this Quarterly Report reviewing, auditing, and evaluating multiple areas of Consent Decree compliance.  Among other things, the Monitoring Team:

- Reviewed and analyzed extensive Use of Force data and published Special Report focusing on Use of Force in May 2017.

- Conducted targeted audits to ensure NOPD officers are consistently reporting Uses of Force.

- At the direction of the Court, provided significant, hands-on technical assistance to the NOPD Academy, including supporting the development of curricula, lesson plans, and presentation materials.

- Observed multiple recruit and in-service training courses.

- Conducted multiple district-by-district audits of NOPD's compliance with its obligations relating to Photographic Line-ups, Custodial Interrogations, Detective Selection, Audio/Video Recordings, and Supervision.

- Developed, planned, and conducted a follow-up, in-person Community Survey that covered police officers, detainees, and community members.  (The community survey involved house-to-house surveys of community members throughout New Orleans.)

- Conducted regular audits of NOPD's Special Victims Section, focusing on, among other things, NOPD's compliance with its obligations relating to sexual assault and domestic violence investigations.

- Reviewed extensive Body Worn Camera video recordings to evaluate camera usage and the conduct of the officers recorded.

- Separately reviewed BWC video recordings to evaluate NOPD compliance with its Bias-Free Policing obligations, including the way the Department handles stops, searches, and arrests.

- Oversaw the development of the Department's Early Warning System, called *Insight*.

- Provided Technical Assistance to NOPD's Public Integrity Bureau's Force Investigation Team and administrative investigations section.



- Conducted a targeted audit of NOPD's recruit selection practices, which led to a special report published earlier this year.

- Oversaw the development of a new NOPD Community Policing/Community Engagement initiative, and provided Technical Assistance to help facilitate the prompt implementation of the new program.

- Provided *pro bono* technical assistance to the development and implementation of the Department's "EPIC" peer intervention program.

In addition to the foregoing, the Monitoring Team also spent significant time this period, as it always does, meeting with and listening to civilians, community leaders, and officers regarding the police department, the Consent Decree, and police reform generally. While we cannot recount all the questions, suggestions, and concerns we have fielded over these months, the following questions are illustrative.

*Question/Comment*. **What is the Monitoring Team doing about the apparent rise in crime in New Orleans?**

*Monitoring Team Response*.

The Monitoring Team's role is strictly constrained by the Consent Decree. Our job is to serve as the eyes and ears of the U.S. District Court (and the public), and report to the public regarding NOPD's compliance with its obligations under the Consent Decree. While we are permitted to provide Technical Assistance to the NOPD when requested to do so, and we have done so many times, the Consent Decree explicitly states our job is not to take the place of the NOPD. Thus, the Monitoring Team leaves fighting crime to the police department. Our job simply is to ensure the Department does so constitutionally.

That being said, the Monitoring Team has identified several actions we can take within our authority that could help NOPD do its job more efficiently. For example, the Monitoring Team provides Technical Assistance in a number of areas to help NOPD become a more effective Department. We pushed for and participated in an internal "Burden Reduction Working Group," designed to identify ways to provide officers more time to focus on their core policing function (i.e., answering calls for service, engaging with the community, fighting crime, etc.). The Working Group identified a number of actions, which NOPD is implementing, that will have the effect of putting more officers on the streets. More recently, at the request of NOPD, the Monitoring Team has engaged with a new internal working group to identify additional opportunities for efficiencies. While the Monitoring Team has only limited authority, by working closely with NOPD, DOJ, the community, and the Court, we have helped NOPD identify a number of innovative ways it can better meet the needs of the community.

Finally, it is worth noting here that while there are multiple factors that contribute to crime rates in any given city (*e.g.*, unemployment, wages, education, despair, the availability of



social services, the efficiency of the local court system, the availability of beds for those in need of mental health services, etc.), the principles embraced by the Consent Decree are not among them.  The Consent Decree calls for clear and understandable policies; practical and memorable training; close and effective supervision; respectful and unbiased policing; and fair, effective, and unbiased discipline.  None of these principles contributes to crime.[1]

> *Question/Comment*.  **Will the change in leadership within the U.S. Department of Justice reduce the Monitoring Team's focus on NOPD?**

> *Monitoring Team Response*.  No.  First, the Monitoring Team reports to U.S. District Court Judge Susie Morgan, not to the Department of Justice.  The change in DOJ leadership has no impact on the job of the Monitoring Team.  Second, the Consent Decree is under the jurisdiction of the U.S. District Court, not the DOJ.  Judge Morgan has made clear she is fully committed to ensuring the reforms set forth in the Consent Decree are fully implemented.  Third, notwithstanding the change in DOJ leadership, the Monitoring Team has not seen any reduced interest or attention to the Consent Decree by the DOJ team assigned to this matter.  As far as we can tell, the Department of Justice remains fully committed to the process of police reform in New Orleans.

> *Question/Comment*.  **Is there "de-policing" in New Orleans?**

> *Monitoring Team Response.*  There has been a lot of speculation across the country the past few years about whether the extensive media coverage of recent police use of force incidents in Ferguson, Baltimore, and other cities has caused police officers to be less proactive in performing their duties.  Often called the "Ferguson effect," the concern expressed by some is that officers "are conscious of the negative publicity surrounding their profession, understand that their actions could be recorded by the public at any given time, and become less willing to do their job as a way to avoid being accused of racial profiling or excessive force."[2]  The result, some argue, is "de-policing."

Experts disagree on the actual existence of the *Ferguson effect* and, if it exists at all, its actual impact on policing.  This disagreement, however, does not stop many from pointing to de-policing as a significant contributor to crime in many major cities, usually without any evidence to support the connection.  While the existence of and potential causes of de-policing will continue to be studied by experts, suffice it to say the Monitoring Team acknowledges there

---

[1]    It is interesting to note that the overall crime rate in the country's 30 largest cities stayed relatively steady from 2015 to 2016, rising by just 0.3%.  *See* Brennan Center's Crime in 2016: Updated Analysis.  The violent crime rate, however, has significantly increased in several of the country's major cities.  From 2015 to 2016, for example, the violent crime rates rose by 17.7% in Chicago, 10.6% in Los Angeles, 23.5% in San Antonio, 13.4% in Charlotte, 10.6% in Baltimore, 11.8% in San Jose, and 11.1% in Dallas.  None of these Cities were under a Consent Decree in 2015 or 2016.

[2]    *See* Wolfe, Scott, *The Alleged "Ferguson Effect" and Police Willingness to Engage in Community Partnership*, LAW AND HUMAN BEHAVIOR, Vol. 40 (2016).



exists at least a *perception* of de-policing among many in the United States, including among some in New Orleans.

At a recent meeting of several New Orleans business leaders, for example, the question was asked of the Monitoring Team whether NOPD may be experiencing de-policing as a result of the "Ferguson effect." A second questioner asked whether the Consent Decree might be contributing to de-policing. While the Monitoring Team has heard anecdotes of de-policing in New Orleans over the past few years, we have not seen credible data evidencing actual de-policing. Nonetheless, the Monitoring Team is in the process of looking at additional data to evaluate whether NOPD officers are, in fact, being less proactive than they should be. With respect to the cause of any such diminution in proactivity, however, we are confident in saying the Consent Decree is not it. The Consent Decree, drafted collectively by the City, the NOPD, and the U.S. Department of Justice, promotes constitutional policing by calling for clear policies that give officers meaningful guidance; well-trained officers who have respect for all members of the community; robust training that incorporates procedural justice, respect for all members of the community, and constitutional standards; committed and competent supervisors; thorough and competent investigations into police use of force and allegations of misconduct; and strong partnerships with the community. All of these tools lie at the core of the Consent Decree, and none should give any thoughtful police officer pause about performing his/her duties.

The Monitoring Team speaks regularly with NOPD officers about policing in general, policing in New Orleans, and the Consent Decree. One officer's description of the Consent Decree is worth sharing here because it reflects what we hear from many officers: "If you do your job, the Consent Decree won't bother you. It just puts on paper what we all should be doing anyway. Plus it actually helped us fix some things that needed to be fixed." We think that is a fair and insightful understanding.

*Question/Comment*. **Does the Monitoring Team meet directly with victims of domestic violence and sexual assault to make victim-focused recommendations to the NOPD?**

*Monitoring Team Response*. The Monitoring Team meets regularly with victims' advocate groups, including members of the New Orleans Sexual Assault Response Team, the New Orleans Family Justice Center, the Orleans Parish District Attorney's Office, and other groups. The Monitoring Team also has met with individual victims in the past. Following this question from an attendee at our most recent Quarterly Public Meeting, the Monitoring Team reached out to Family Justice Center Executive Director Mary Claire Landry and SART Chairperson Amanda Tonkovich to discuss the possibility of receiving more insight and feedback from victims. As a result of these conversations, the Family Justice Center now will make it a practice to advise victims they can contact the Monitoring Team (as well as the PIB and the IPM) directly should they have any concerns regarding the way NOPD handles their cases. Further, the Monitoring Team reached out to NOPD Commander Doug Eckard who is responsible for the Department's Special Victims Section to ensure NOPD brings victim complaints to the attention of the Monitoring Team in a timely fashion.



*Question/Comment*.  **Why can NOPD officers no longer engage in high speed car chases?**

*Monitoring Team Response*.  Thanks to Hollywood, many people have come to associate high speed car chases with "real policing."  But Hollywood rarely shows the way high speed chases typically start and end in real life.  Contrary to Hollywood's depiction, the majority of police pursuits involve a stop for nothing more than a traffic violation and all too often end with innocent civilians and/or the officers seriously injured or killed.  In fact, according to experts, one person dies every day as a result of a police pursuit; and, on average, from 1994 through 1998, "one law enforcement officer was killed every 11 weeks in a pursuit. . . ."  Further, "1 out of every 100 high-speed pursuits results in a fatality."[3]

In light of these statistics, enlightened departments years ago began instituting more common-sense vehicle pursuit policies.  NOPD implemented a new vehicle pursuit policy in December 2015.[4]  Among other things, NOPD's policy permits vehicle pursuits only where the officer has "a reasonable suspicion that a fleeing suspect has committed or has attempted to commit a crime of violence . . . and the escape of the subject would pose an imminent danger of death or serious bodily injury to the officer or to another person."[5]  The policy further requires that officers receive "supervisory approval prior to initiating the pursuit."  The policy expressly prohibits pursuits "for property offenses, misdemeanor offenses, traffic, or civil infractions."

NOPD's vehicle pursuit policy has been approved by the U.S. Department of Justice and by the Monitoring Team, and reflects a best practice among reform-minded departments.  It was designed to protect civilian and officer lives while affording the police department the flexibility it needs to engage in a pursuit where necessary.  Studies have shown that a restrictive vehicle pursuit policy like that employed by NOPD does not hinder a police department's ability to fight crime.  Further, NOPD's policy could generate additional advantages as well.  At least some experts, for example, contend that the adrenaline rush of a high speed pursuits increases the likelihood that excessive force will be used at the end of the pursuit.[6]

In short, while we recognize some citizens and officers will not be convinced by the data and will remain of the view that "real police" should be free to engage in high speed vehicle pursuits, NOPD should be commended for its development and implementation of a sensible, safe, and effective vehicle pursuit policy.

\*        \*        \*

---

[3]     Schultz, David, Hudak, Ed, and Alpert, Geoff, *Evidence-Based Decisions on Police Pursuits*, FBI Law Enforcement Bulletin (2010).

[4]     *See* http://nola.gov/getattachment/NOPD/NOPD-Consent-Decree/Chapter-41-5-Vehicle-Pursuits.pdf/.

[5]     NOPD Policy 41.5.

[6]     *See, e.g.,* Becknell, Conon *et al.*, "Policy Restrictiveness and Police Pursuits," International Journal of Police Strategies and Management , Vol. 22, No. 1 (1999) (citing Alpert, Geoff, *et al.*).

Page 18 of 62
June 19, 2017
www.consentdecreemonitor.com



As we have done since our appointment, the Monitoring Team also spent significant time meeting with, and listening to, the parties to the Consent Decree.  The Monitoring Team is in regular contact with the City, the NOPD, and the DOJ.  We also continue to meet regularly with the NOPD Compliance Bureau, the PIB, the NOLA OIG, and the members of the Independent Police Monitor's team, as well as community advocacy groups like SART and the New Orleans Family Justice Center.



## VII.  POLICIES AND TRAINING GENERALLY

The process implemented by the NOPD, the DOJ, and the Monitoring Team in 2014 to facilitate the review, revision, and approval of Department policies continues to be effective.  NOPD completed numerous additional policies these past two quarters, which supplement a large number of policies previously approved by DOJ and the Monitoring Team.  To date, the following policies have been approved:

- Search and Seizure (Custody Searches rolled into this policy)
- Terry Stops
- Search Warrant Content, Forms and Reviews
- Public Video Recording and Photographing Police Activity
- Use of Force
- Handcuffing and Restraints
- Control Devices and Techniques
- Force Investigative Team (FIT)
- Reporting Use of Force
- Use of Force Review Boards
- Firearms
- Authorized Ammunition
- Firearms Training Qualification and Requalification
- Conducted Electrical Weapon
- Arrests/Arrest Warrants/Wanted Persons
- Miranda Rights
- Audits and Reviews
- Audit and Review Unit Standard Operating Guidelines
- Commendations and Awards
- Secondary Employment
- Mediation Settlement
- Adjudication of Misconduct
- Disciplinary Matrix/Penalty Schedule
- Promotions and Promotion Committee
- Employee Counseling

- Insight
- Early Intervention Unit
- Rule 5-Restricted Activities
- BWC Inadvertent Misuse and Non-use
- In-Car Camera
- Body-Worn Camera
- Foot Pursuits
- Vehicle Pursuits
- Immigration Status
- Bias-Free Policing
- Canines
- Crisis Intervention
- Crisis Transportation Service
- Interacting with Homeless persons
- Sexual Assault (and Sex Crimes Operating Guidelines)
- Domestic Violence
- Custodial Interrogations
- Disciplinary Hearings/Penalties
- Misconduct Compliant Investigator Responsibilities
- Negotiated Settlement
- Victim and Witness Assistance
- Prisoner Transportation
- Hate Crimes



The Monitoring Team and the U.S. Department of Justice expect to approve additional policies over the coming months.



## VIII.   USE OF FORCE

Since the outset of the Consent Decree, the Monitoring Team consistently has reviewed all serious uses of force by NOPD officers.  Additionally, the Monitoring Team regularly conducts broader Use of Force audits to ensure uses of force are being accurately reported, meaningfully reviewed by supervisors, and, where necessary, fully evaluated by NOPD PIB.  On May 5, 2017, the Monitoring Team published a Special Report focusing on NOPD Use of Force.  The Report included the following analyses:

- ***A comparative analysis of uses of force from 2012 through November 2016****.* The Monitoring Team analyzed a sizable amount of data.  The trends that emerge from those data are important in evaluating NOPD's progress under the Consent Decree.

- ***Multiple analyses aimed at assessing the integrity of NOPD's use of force data.*** These analyses are important to determine whether NOPD's use of force data are reliable.  Obviously, a data analysis is only as good as the integrity of the underlying data.  Our analyses in this area give us strong comfort that NOPD's current and recent use of force data are reliable.

- ***A preliminary analysis of 2016 uses of force****.*  Because our most recent comprehensive Use of Force audit was conducted over the course of the last two quarters of 2016 and used data from 2015, the Monitoring Team supplemented that Use of Force audit with more current data from 2016.

- ***A discussion of specific 2016 uses of force****.*  The Monitoring Team reviewed all serious uses of force by the NOPD.  Our prior report described several illustrative uses of force analyzed by the Monitoring Team.

- ***A comprehensive historic analysis of 2015 uses of force****.*  This analysis covered all material elements of uses of force, including NOPD's investigation into those uses of force.

The Special Report is available at www.consentdecreemonitor.com.



## IX.    CRISIS INTERVENTION TEAM

Section IV of the Consent Decree requires NOPD to "minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder." To achieve this outcome, NOPD agreed to create a properly trained Crisis Intervention Team ("CIT").

The NOPD began actively developing its CIT program (including a policy, an Academy curriculum, a training program, and training materials) in August 2015. The first class of 24 officers graduated on September 18, 2015. By May 2016, the NOPD had trained its third class of CIT officers, bringing the total number of trained CIT officers to sixty-nine. NOPD's most recent graduating class, the fourth, brought another 30 officers into the CIT program on September 6, 2016.

According to NOPD's records, as of the end of February 2017, the Department had provided basic training to all new officers and specialty training to 144 officers. In addition to these 144 CIT officers, the Department has provided special training to six social workers, two crisis transportation service volunteers, and one reserve officer.

The Monitoring Team has seen CIT officers in action and has spoken to numerous officers and community members regarding the CIT program. The results, so far, have been positive. NOPD officers and community members uniformly praise the CIT program. The Monitoring Team, however, must reserve final judgment on the effectiveness of the program until an in-depth outcome assessment/analysis is conducted.



## X.   CUSTODIAL INTERROGATIONS

The Monitoring Team conducted a periodic Custodial Interrogation audit of Districts 3, 6, and SVS during the week of January 3, 2017 and of Districts 4, 5, 7, and SOD during the week of January 30, 2017.  In general, the districts showed great improvement over prior audits.  A summary of our findings follows.

### A.   Paragraph 163

Paragraph 163 provides that "[o]fficers shall not use physical violence or make threats to carry out harm to the individual or the individual's family during custodial interrogations."  The Monitoring Team reviewed 36 of 63 recordings.  Those reviewed did not contain any indication of physical violence or threat of physical violence.



### B.   Paragraph 164

Paragraph 164 provides that "all custodial interrogations that take place in a police facility, and all interrogations that involve suspected homicides or sexual assaults, shall be video and audio recorded."  The paragraph goes on to provide as follows:  "[a]ll recorded custodial interrogations will be recorded in their entirety. NOPD rejects the concept of a pre-interview and prohibits any decision not to record any portion of the interrogation based on such categorization.  The recording equipment shall not be turned off unless the suspect states that he/she does not want the interview to be recorded.  If the suspect requests that he/she does not want the interview to be recorded, the interviewer will record the subject making this request and shall document this request in the case report."  NOPD demonstrated *full compliance* in the districts we audited this period.





### C.    Paragraph 165

Paragraph 165 provides that, "[i]f the interrogation is not able to be video and audio recorded because of equipment failure or malfunction, detectives shall record the interrogation by means of a digital or cassette recorder. Any equipment failure shall be explained and documented in the case report, the case file, and in a memo to the Deputy Chief of the Investigation & Support Bureau."  NOPD demonstrated **full compliance** in the districts we audited this period.





### D.    Paragraph 166

Paragraph 166 of the Consent Decree requires officer to "maintain in the case file their notes taken during interviews and interrogations."  As reflected below, NOPD demonstrated *full compliance* with this paragraph during this audit period.



### E.    Paragraph 167

Paragraph 167 provides that "NOPD shall designate interview rooms for all Districts and specialized units, and ensure that interview rooms are equipped with functioning audio and video recording technology that allows for recording and maintenance of all phases of interrogations." Here again, NOPD demonstrated *full compliance* with these requirements during this audit period.





### F.      Paragraph 168

Paragraph 168 provides that "NOPD shall use qualified interpreters for any interrogation of an LEP individual, and Miranda warnings shall be provided to the subject in his or her primary language."  Paragraph 168 further provides as follows:  "[b]ecause of the dual role bilingual NOPD employees may have when conducting an interrogation and simultaneously acting as an interpreter, they should only be used as an interpreter during an interrogation if they have identified themselves as officers or employees of the Department, are authorized as NOPD interpreters, and are trained in using interpretation protocols consistent with best practices, as required by this Agreement and NOPD's language assistance policy and plan."  NOPD was unable to demonstrate full compliance with paragraph 168 this period.  While NOPD has provided the names of authorized interpreters, the Department has yet to provide evidence of the interpreters being trained in interpretation protocols.



## XI.    DETECTIVE SELECTION

The Monitoring Team audited Districts 3, 4, 5, 6, 7, SVS, and SOD this period to evaluate NOPD's compliance with the Detective Selection elements of the Consent Decree.  NOPD showed marked improvement over prior audits.  The following sections summarize our findings.

### A.    Paragraph 169

Paragraph 169 of the Consent Decree requires NOPD to "post all detective openings throughout the Department and shall revise eligibility criteria for detectives in Districts and specialized units to require appropriate experience, writing samples, supervisor recommendations, and an interview."  NOPD is nearly in full compliance with these requirements.



Two SOD detectives were assigned within the past six months, but SOD was unable to produce documentation of the KSA process for the selection of these detectives.  Likewise, SOD was unable to produce KSA documentation for three detectives assigned to the Department's Traffic division.

### B.    Paragraph 170

Paragraph 170 requires NOPD to "develop and deliver at least 24 hours of formal training for newly assigned detectives on interrogation procedures and methods."  The paragraph goes on to provide that the detective training "shall include legal standards, ethics, the mechanics of conducting effective and constitutional investigations, and causes for investigative failures and false confessions[; and that] NOPD shall provide regular, and at least annual, in-service training to all detectives on updates and changes to the law regarding interrogations and confessions."  NOPD could not demonstrate full compliance with these requirements this audit period.





While NOPD developed and uses a lesson plan for new detective training, its lesson plan for in-service refresher training still is in development.  Further, the Monitoring Team continues to come across detectives who have not yet been afforded the opportunity to attend new detective training and/or refresher training.  An updated in-service training program focusing on changes to the law regarding interrogations and confessions is in the works, but has not been fully developed.

While the Seventh District, like the other districts we audited, still has not achieved full compliance with paragraph 170, the Monitoring Team would be remiss not to recognize the impressive system developed by the Seventh District to track detective training.  Other Districts would be wise to emulate the Seventh in this regard.



## XII.    PHOTOGRAPHIC LINE-UPS

The Monitoring Team audited NOPD Districts in January and early February 2017 to assess compliance with the Consent Decree requirements regarding Photographic Line-ups.  We audited Districts 3, 4, 5, 6, 7, SVS, and SOD.  A summary of our findings follows.

### A.    Introduction

NOPD agreed "to ensure that photographic line-ups are conducted effectively and in accordance with the rights secured or protected by the Constitution and laws of the United States, so as to elicit accurate and reliable information."  NOPD continues to make strong progress in achieving full Consent Decree compliance in this area.

### B.    District-By-District Summary

#### 1.    Paragraph 171

Paragraph 171 provides that "[n]o officer who is involved in the investigation shall participate in administering the photographic lineup."  Paragraph 171 provides further that "[t]he individual who administers the lineup shall not have any knowledge as to which photograph depicts the suspect in the investigation."  NOPD demonstrated *full compliance* with these requirements in the districts we audited this period.



#### 2.    Paragraph 172

Paragraph 172 requires that, "before any lineup is administered, eyewitnesses shall be admonished that the suspect might or might not be present in the lineup."  NOPD has made terrific progress in this area, and each district audited this period was able to demonstrate full compliance with the Consent Decree requirements.





### 3. Paragraph 173

Paragraph 173 provides that "NOPD agrees to select 'filler' photographs—those that do not depict the suspect—of individuals who generally fit the witness's description of the perpetrator. When there is a limited or inadequate description of the perpetrator provided by the witness, or when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features."



While NOPD continues to make progress in this area, some photo arrays continue to include individuals who do not fairly resemble the suspected perpetrator.  In our review of photo line-ups, we identified multiple line-ups that included individuals who did not adequately resemble the suspect.  While we did not identify any intentional effort to use unlike filler photographs in order to guide a witness to a certain individual, photographs that are materially different nonetheless could have that unintended consequences.  NOPD's own training, conducted by DA investigator (and former Deputy Chief) Kirk Bouyelas, emphasizes the importance of using filler photographs that are as similar as possible, including facial features, facial hair, body markings, and even clothing.



### 4.    Paragraph 174

Paragraph 174 provides that "NOPD agrees to keep a complete record of each display procedure and results. The record shall include the time, date, location, identity of the viewing person, photograph numbers, and name of the administrator of the line-up."



| 3D | 4D | 5D | 6D | 7D | SVS | SOD |
|----|----|----|----|----|-----|-----|
| Compliant | Compliant | Compliant | Compliant | Compliant | Compliant | Partially Compliant |

The only reason SOD could not demonstrate full compliance with paragraph 174 was because SOD failed to list photographic numbers on the line-ups in three of the four line-ups we reviewed during this audit period.

### 5.    Paragraph 175

Paragraph 175 provides that "NOPD agrees to document other information pertinent to the display procedure, including any statements made by the viewing individual and identities of other persons present during the procedure."



| 3D | 4D | 5D | 6D | 7D | SVS | SOD |
|----|----|----|----|----|-----|-----|
| Compliant | Compliant | Compliant | Compliant | Compliant | Substantially Compliant | Compliant |

The errors we identified during our SVS audit were relatively minor and easily remedied.



### 6.      Paragraph 176

Paragraph 176 provides that, "[i]f a suspect selection is made, NOPD agrees to mark and maintain as evidence the photographs used in the lineup, including a copy of the photo array if one was used.  It shall be kept as evidence until the final disposition of the case, at which time it shall become a part of the permanent case file.



Obviously, these results reflect an effective effort on the part of NOPD's various districts to work toward full and sustained Consent Decree compliance.

### C.      Note Regarding Single Photo "Line-ups"

Most NOPD Districts have opted to not enter single photo identifications on the photographic line-up record.  The only District entering single photos in the line-ups is NOPD's Sixth District, which we commend.  The other districts contend such activities do not constitute "line-ups" since photos are shown only to victims or witnesses when they know the identity of the subject. The Monitoring Team, however, has seen instances where detectives presented a single photo when a line-up should have been provided.  Without entering the single photo "line-ups" into the photographic line-up log, it makes it extremely difficult for supervisors (or the Monitoring Team) to locate cases of single photos being presented in the field.



## XIII.   POLICING FREE OF GENDER BIAS

Section IX of the Consent Decree requires NOPD, among other things, to "to respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias, in accordance with the rights secured or protected by the Constitution and laws of the United States."

In February 2017, the Monitoring Team conducted an audit of Sexual Assault, Domestic Violence and Child Abuse case files in the Special Victims Unit of the NOPD.  The cases were selected randomly from case files assigned to investigators in October, November, and December 2016.  In all cases the Monitoring Team found competent initial investigations and at least one supplement in the case files.  In cases where interviews were conducted, investigators were empathetic and victim-centered while conducting victim and witness interviews.  There were several cases where the Monitoring Team believed a second supplement was necessary.  In those cases, the investigators actively were involved in the open cases and were prepared to initiate a second supplement detailing actions taken since the initial follow-up investigation.

These audit findings are reflective of the many improvements the SVU has made over the past two years.  The consistency of detailed case files during our most recent audit indicates to the Monitoring Team that there is more steadfast oversight by SVU supervisors and a more systematic process by investigators to complete more in-depth investigations.  The recent audit is consistent with the results reported in more detail by the Monitoring Team during the August 2016 Public Hearing.

The Monitoring Team continues, on a regular basis, also to review the Department's patrol response to Domestic Violence incidents. Monitors review random samplings of Body Worn Camera footage and police incident reports of domestic violence cases in all eight Districts. The Monitoring Team follows up on cases reported to be Gone On Arrival (GOA) to determine whether there was a delay in the police response that may have contributed to the GOA clearance.  In about 15 percent of the cases, the Monitoring Team directs the cognizant District supervisor to review the same cases as the Monitor to determine whether a re-direction, re-training or discipline is in order when it is determined that the incident was handled incorrectly or the responding officer could have done a better job with their response.  The Monitoring Team finds vast improvements in the patrol response since we began reviewing these cases in 2014. We continue to expect further improvement with in-service training enhancements and the fact that the policy has now been in place for more than two years.



## XIV.   COMMUNITY ENGAGEMENT & COMMUNITY POLICING

### A.   Community Policing Introduction/Overview

As noted in our prior Quarterly Report, in January 2016, NOPD announced a major departmental restructuring which, among other things, did away with the positions of Community Affairs Coordinator and Quality of Life Office in an effort to put more patrol officers on the streets. According to NOPD, the restructuring will involve "becoming a community policing focused department."

More recently, NOPD has expressed its community policing vision as follows:

> Community policing will enhance the NOPD's ability to fulfill our mission to provide professional police services to the public in order to maintain order and protect life and property. It is a long-term, aspirational goal to transform the organization to effectively engage the community in every interaction and collaborate with the community in efforts to problem-solve and build partnerships, as well as utilize procedural justice. Officers will foster positive community engagement interactions between citizens and NOPD, utilize community policing ideals, create opportunities for substantive engagement with the community, substantive collaboration with the community as well as civic engagement.

NOPD has made progress with its community policing initiative over the past two quarters, but still has a ways to go to fully realize its stated vision.

Traditionally, *Community Policing* has been defined as the philosophy that formulates how policing is conducted across a department.  Community engagement, collaborative problem solving, and organizational change often are cited as the foundational supports of the philosophy.  While Community Policing is a major feature of the Consent Decree, the Monitoring Team previously expressed some concern that the Department was focusing on community engagement at the expense of an across-the-board implementation of a true Community Policing model designed to change how the Department does business.  Part of the Department's confusion may have stemmed from how the Consent Decree itself embeds the Community Policing paragraphs within the overall Community Engagement Section of the Decree (*see* Section X; paras 223-233).  Consequently, it seemed some within the Department felt (or at least acted as though) community engagement had to take precedence over Community Policing.

Superintendent Michael Harrison framed Community Policing most appropriately at a February Status Conference when he defined Community Policing as a "mindset" that must be adopted across the Department.  He also spoke at a PERF Conference in March 2016 where he correctly



defined cultural change as the "hardest challenge."  Despite challenges, it is apparent to the Monitoring Team through our various interviews and meetings that this mindset and culture shift are being reinforced appropriately through a variety of activities involving policy, training, practices, and transparency.

- **POLICY**

The Police Department's Operations Manual (Chapter 10.0) defines Community Engagement as a fundamental policy, and defines how the policy formalizes the Community Engagement and Policing Program.  However, a good example of departmental interest in making change includes proposed revisions to the Operations Manual, Chapter 10.0, which are currently under review and which include revising the Manual Chapter Heading to read *Community Policing and Community Engagement*.  The proposed revisions go beyond revising the order of the words in the title, though.  The current text refers to community engagement as a "Program" in contrast to a department-wide philosophy.  The current text also describes community engagement as any "non-enforcement practice" that promotes and strengthens partnerships with the community through active engagement.  NOPD worked with the Monitoring Team to expand this somewhat narrow practice definition by adding other activities including those that "promote and strengthen community partnerships, engage constructively with the community, ensure collaborative problem solving, ensure ethical and bias free policing, and increase the demand for increasing community confidence in the Department."

The Manual then defined Community Policing as

> a philosophy that promotes organizational strategies which support the systematic use of partnerships and problem solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder and fear of crime.

The forthcoming revisions will better capture the philosophy of Community Policing and all it entails, including community engagement, and will present a less confusing picture of how Department strategies will reflect Community Policing across the city.  Further, the NOPD Mission Statement now references the Department's commitment to *the philosophy* of Community Oriented Policing and Problem Oriented Policing.  All suggest major changes are in play and indicate that the Department is prioritizing community policing at the policy level.

- **TRAINING**

Another change that is consistent with the policy move from community engagement to Community Policing involves the Academy; particularly the recent introduction of a new eight-hour course on Relationship-Based Policing.  This training, which uses a scenario-based adult



learning model, has been integrated into both Recruit and In-Service Training.  The course focuses on building trust and public confidence while sustaining crime fighting partnerships with the community, and it works on developing skills to engage in collaborative problem solving partnerships.

Further, there are a number of other Academy courses related to Community Policing, including Fair and Impartial Policing, Tactical De-escalation, and Attaining Respect, to name just a few.  There also is a separate course called Consent Decree Introduction.  In total, in addition to the Relationship-Based Policing course, Recruit classes will be trained in 17 other courses that are related to Community Policing, and In-Service participants will be trained in 4 other Community Policing courses.  The introduction of these courses also is consistent with changes that have taken place at the Academy and which have introduced a professional development model into police training.

- **PRACTICES**

Central to the Policy and Training initiatives are the community groups in each district that have been working with the District Commanders and the officers to create stronger problem solving relationships.  Currently, they are preparing to work hand-in-hand with the police in each district to identify and solve specific problems identified by the particular community as critical to be solved in ways that go beyond simply arresting perpetrators.  These plans are referred to as each District's Community Outreach and Public Information Plan and they are different for each District.  The plans are complex, establish priorities that are supported by concerns prioritized by community members, and develop actionable items that are concrete steps that the District will take to implement the Community Outreach and Public Information Plan.  As such, they include transparent steps that will be updated monthly.  All Districts are preparing to roll out their Community Outreach Public Information Plans, which include Community Engagement Night Outs that will provide forums where community members will be encouraged to prioritize their public safety concerns.

In a separate community initiative, the Department will conduct a series of community focus groups that will be held across the city.  This initiative has been identified as the Department's PROMISE Program and was scheduled to begin in April.  Aside from problems specific to each District, these groups will focus more on procedural justice issues across the city and facilitators will seek input from participants as to what the Department needs to do to ensure procedurally just and respectful policing.  These priorities will be reassessed every 3 to 6 months and the police will work with the community to see if priorities should be reassessed or new ones addressed.



- **TRANSPARENCY**

Beyond what is built into the Consent Decree in terms of evaluation, required community surveys, data collection, and public reporting supported by the Compliance Bureau, the Community Plans are another measure of heightened transparency as are the model policies of the Department.  Further, the different community meetings provide an opportunity for transparency in terms of open discussion, information exchange, and problem solving.

*      *      *

In Summary, at least some of the Department's initial confusion may have stemmed from the Consent Decree's focus on community engagement versus Community Policing.  It probably is worth keeping in mind that, at the time that the Consent Decree was formulated by DOJ, many events had occurred across the country that had diverted attention from Community Policing, such as events of September 11, the use of metrics or "policing by the numbers", and the development of predictive policing models.  In any event, Department's recent efforts are properly Community Policing-focused.

The Department's recent (and ongoing) efforts also are consistent with the findings of the President's Task Force on 21st Century Policing, which was formed in response to events across the country that have exposed serious rifts in trust between police and the communities they serve.  The Task Force organized their recommendations around Six Main "Pillars" with Pillar Four identified as *Community Policing and Crime Reduction*.  This Pillar presents Community Policing as a

> philosophy that promotes organizational strategies that support the systematic use of partnerships and problem solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social reflected disorder, and fear of crime.

*See* Task Force Report at 41.  This definition is consistent with that provided by the COPS Office (www.cops.usdoj.gov), and also seems to be consistent with the proposed Community Outreach and Public Information Plans developed at each NOPD district.

Given the documented changes seen in Policy, Training, Practices, and Transparency throughout the Department, particularly those involving active collaboration with the community to identify and solve problems across all Divisions, the Monitoring Team believes the change in Mindset discussed by Superintendent Harrison is (albeit slowly) gaining momentum across the Department.  While the Department may not yet be at the top of the list of "community policing departments," they have come a long way and seem to be continuing to move forward.  The Compliance Bureau has collaborated with the Monitoring Team regarding changes and have



worked closely to help Divisions reach their goals.  Further, they are engaged in continual evaluation to assess progress and sustained change and, along with the guidance from Drs. Alpert and Burns, will be most helpful to ensuring that the change in mindset is not short lived, and that activities to sustain reforms continue to expand and become institutionalized.

As such, the confusion that surrounded much of the Department's early Community Policing efforts is at least partly attributable to the Consent Decree's emphasis and focus on Community Engagement.  However, more recent activities demonstrate that Community Policing is the predominant philosophy driving the New Orleans Police Department.  While the Department still has work to do to reach all Community Policing compliance goals, as described in greater detail below, ***they have made significant progress and show the capacity to continue to move in that direction.***

> **B.      Community Policing – Current Progress**

To date, NOPD has developed an extensive community policing plan and is working to finalize a community policing policy that implements that plan.  The plan outlines the principles of community policing, including problem solving, collaborative problem-solving, procedural justice, and youth engagement.  NOPD has provided the Monitoring Team with the following illustrations of how it intends to implement these core community policing components:

- ***Problem-solving***.  Through the Department's MAX[7] process, supervisors already are being held accountable for how they problem-solve to address issues related to crime, investigations, and management.  At each MAX meeting, the Deputy Superintendent of the Field Operations Bureau is briefed on previous problems identified and strategies utilized to address the problems to ensure supervisors are implementing problem-solving strategies consistently.

- ***Collaborative problem-solving***.  One example of how NOPD engages in collaborative problem-solving is its community outreach and public information effort.  NOPD developed district-specific collaborative partnership to solve problems faced by the community.  Once approved by the Monitoring Team, the results of the plan will be incorporated in MAX as described below.  .

- ***Procedural Justice***.  Officers should be treating people with treating people with dignity and respect, giving individuals "voice" during encounters, being neutral and transparent in decision making, and conveying trustworthy motives.  For example, officers should introduce themselves on a traffic stop, professionally

---

[7]      NOPD stood up its MAX program in October 2016.  MAX stands for "Management Analysis for Xcellence."  *See* http://nopdnews.com/post/october-2016/how-did-nopd-create-max/ for NOPD's description of the MAX program.



explain why the person was stopped, and articulate any police actions and answer any reasonable questions during the encounter, among other responsibilities related to procedural justice.

- ***Youth engagement***.  As part of youth engagement, the school resource officers will be the Department's front-line personnel to collaborate with different entities such as the Health Department and community groups to engage youth. In addition, NOPD is working to develop a policy on youth engagement to create a more strategic and community-focused school resource officer program.  Further, the NOPD recently announced the creation of a Youth Advisory Council, which is intended to create a stronger relationship between the city's youth and the police department.

NOPD's community policing plan also incorporates several elements to ensure accountability. According to NOPD, it will measure the effectiveness of its community policing efforts in several ways:

> First, we are incorporating the results of the District community policing plans into MAX. This includes describing the project, providing status updates, and including any relevant data to show status of the process for each project.  Moreover, performance evaluations for officers will include an assessment of community policing.  In addition, the Compliance Bureau's Audit Unit will conduct reviews examining thoroughness of performance evaluations, procedural justice, and other components of community policing throughout their audit schedule.  Finally, other measurements of community policing include accountability metrics for implementation activities, large surveys such as the OCDM biannual survey, the annual NOPD survey, and text-based surveys of PCABs and community groups. Outcome measures will be derived from the accountability framework for community policing.

NOPD also rightly recognizes that training is an integral component of any effective community oriented policing program.  Accordingly, NOPD has developed a new in-service curriculum focused on teaching and reinforcing the topics in procedural justice, relationship building, tactical de-escalation, problem-solving, and collaborative problem-solving.

The Monitoring Team has been overseeing and collaborating with NOPD throughout its development of its Community Policing Plan, and while we continue to be concerned that NOPD may not be dedicating sufficient resources to such an important topic, we readily acknowledge the Department's current aspirations are properly focused.  The Monitoring Team recognizes,



however, that NOPD's success in transforming the police department into a community-oriented-policing police department ultimately will have to be measured in years, not months.  But at this point, we now can say we are confident the Department is heading in the right direction.  The success of its efforts, however, will depend on (i) whether NOPD will be able to dedicate adequate personnel to transform its plan into a department-wide philosophy and (ii) whether patrol officers will have adequate time to engage with the community in problem solving in a meaningful way.  At the moment, with officers running from call to call, we see little opportunity for engaging with the community to collaboratively solve problems.



## XV.    BIENNIAL COMMUNITY SURVEY

Paragraph 230 of the Consent Decree requires the completion of a biennial survey of members of the New Orleans community "regarding their experiences with and perceptions of NOPD and of public safety."  The Monitoring Team conducted its first survey – which covered police officers, community members, and detainees – in late 2014 and early 2015.  The Monitoring Team worked closely with the City, NOPD, and the Department of Justice to develop a three-part survey that would measure public satisfaction with policing, attitudes among police personnel, and the quality of police-citizen encounters.  The surveys were designed to include a representative sample of City residents, police personnel, and detained arrestees. (CD 231)

The Monitoring Team developed and conducted its follow-up survey in late 2016 and early 2017.  The results of the Surveys will be presented in a forthcoming Special Report, due out early July 2017.



## XVI.  ACADEMY AND IN-SERVICE TRAINING

While the NOPD Academy continues to make progress toward transforming itself into a professional institution, and while the Academy's current management clearly are leading the Academy in that direction, the Monitoring Team continues to have concerns regarding the pace of change and our inability to fully evaluate quality in the absence of some course materials.

One area of particular concern is the ongoing lack of approved lesson plans.  As just one very recent example, the Academy scheduled supervisory in-service training in early March.  When the Monitoring Team showed up to observe the training, we were told the course had been postponed because only one lesson plan had been prepared.  Other courses likewise still are operating without approved lesson plans.

Last quarter, at the request of the Court, the Monitoring Team initiated an expanded effort to provide Technical Assistance to the Academy.  Through this effort, which we refer to as a "Bottom's Up Approach," the Monitoring Team has partnered with the various members of the Academy to support the review and revision of curricula, lesson plans, and teaching materials.  To date, the Monitoring Team has approved multiple lesson plans, but there is much work left to do in this area.

Notwithstanding the slow progress in this area, as we reported to the Court at a recent status conference, the Monitoring Team remains quite pleased with the cooperation we receive from Academy personnel since the initiation of the Bottom's Up Approach as well as the commitment to reform we continue to receive from Academy management.  We are confident the Academy is heading in the right direction albeit more slowly than we (and probably they) would like.[8]

---

[8]    While not reviewed in detail this reporting period, the Monitoring Team remains concerned with the resources the City has made available to the Academy.  The absence of an NOPD firing range, outdated technology, limited equipment, and, until recently, an outdated building all present obstacles to the ongoing efforts by NOPD, Academy personnel, the DOJ, and the Monitoring Team to transform the Academy into a world-class institution.  The Monitoring Team's next report will provide a more detailed discussion of these ongoing concerns.



## XVII.  SUPERVISION

### A.    Supervision Generally

The Monitoring Team continues to conduct regular audits and reviews of NOPD's compliance with the supervision requirements of the Consent Decree.  Among other things, we continue to conduct regular audits of each District's compliance with the Consent Decree's Custodial Interrogation, Photographic Line-up, and Supervision requirements.  The results of these reviews show *improvements in most every district*.

The two areas that continue to require further attention by NOPD are (1) finding a way to give supervisors time to actually supervise, and (2) teaching supervisors how to use the Department's new *Insight* system to supervise effectively.  As the Monitoring Team has noted in the past, the number of responsibilities of supervisors and the previously-inadequate focus on efficiency combine to make it extremely difficult for even the best supervisors to find time to closely and effectively supervise their officers.  Further, as described elsewhere in this report, while the new *Insight* early warning system offers great new tools to facilitate close and effective supervision, if supervisors are not sufficiently trained on how to take advantage of those tools, NOPD's efforts to achieve full compliance with its Supervision obligations will continue to lag.

### B.    Supervisory Duties and Related Items

#### 1.    Paragraph 306

Paragraph 306 of the Consent Decree provides that "NOPD supervisors shall be held accountable for providing the close and effective supervision necessary to direct and guide officers."  The Consent Decree goes on to define close and effective supervision as including the following:

- Responding to the scene of certain arrests;

- Reviewing each arrest report;

- Responding to the scene of uses of force as required by this Agreement;

- Investigating each use of force (except those investigated by FIT);

- Reviewing the accuracy and completeness of officers' Daily Activity Reports;

- Responding to each complaint of misconduct;

- Ensuring that officers are working actively to engage the community and increase public trust and safety; and



- Providing counseling, redirection, and support to officers as needed, and that supervisors are held accountable for performing each of these duties.

As summarized below, NOPD demonstrated either full or partial compliance with the following items this audit period:

| | 3D | 4D | 5D | 6D | 7D |
|---|---|---|---|---|---|
| **Respond to Arrests** | Compliant | Partial | Compliant | Compliant | Compliant |
| **Review Arrests** | Compliant | Compliant | Compliant | Compliant | Compliant |
| **Review Daily Activity** | Partial | Compliant | Compliant | Compliant | Compliant |
| **Respond to Complaints** | Compliant | Partial | Compliant | Partial | Compliant |
| **Investigate Complaints** | Compliant | Compliant | Compliant | COMP | Compliant |
| **Engage Community** | Partial | Partial | Partial | Partial | Partial |
| **Provide Counsel** | Compliant | Compliant | Partial | Compliant | Compliant |
| **Provide Redirection** | Compliant | Compliant | Partial | Compliant | Compliant |
| **Provide Support** | Partial | Partial | Compliant | Compliant | Compliant |

Some of the reasons for some of the partial compliance scores noted above include trip sheets from General Assignment officers not available for review by the Monitoring Team, the absence of evidence that some supervisors actively prompt officers to engage in community policing, and the absence of evidence of community policing and/or community engagement.  While some districts were able to provide evidence of several commendable community events, often these events were organized by the same officers.  Several Districts were unable to provide evidence



that all or at least most supervisors were actively working to ensure their officers meaningfully engage with the Community. We should note here, however, that the NOPD's forthcoming Community Policing program likely will help remedy this compliance gap.

### 2.      Paragraph 307

Paragraph 307 provides that "all Field Operations Bureau District officers (including patrol, task force, district investigative, and narcotics units) shall be assigned to a single, consistent, and clearly-defined supervisor." The Districts audited this period demonstrated either full or partial compliance with the obligations under paragraph 307, as summarized below:

|  | 3D | 4D | 5D | 6D | 7D |
|---|---|---|---|---|---|
| Patrol | Compliant | Compliant | Compliant | Compliant | Compliant |
| General Assignments | Partial | Compliant | Substantial Compliance | Partial | Compliant |
| Investigators | Compliant | Compliant | Compliant | Partial | Compliant |

### 3.      Paragraph 308

Paragraph 308 provides that "task force and narcotics supervisors shall actually work the same days and hours as the officers they are assigned to supervise absent unusual circumstance or when the supervisor is on vacation, in training, or ill." Paragraph 308 goes on to provide that "Investigative unit supervisors shall work generally the same days and hours as the officers they are assigned to supervise, taking into account that shift differences will not permit complete supervisory overlap."

|  | 3D | 4D | 5D | 6D | 7D |
|---|---|---|---|---|---|
| General Assignments | Partial | Non-Compliant | Partial | Partial | Compliant |
| Investigators | Partial | Compliant | Partial | Partial | Partial |

The Fourth District was not in compliance this audit period because the General Assignment sergeant in the Fourth District works with one-half of his subordinate officers and the other one-half report to other supervisors when he is not scheduled to work.



### 4. Paragraph 309

Paragraph 309 provides that "District Platoon Patrol supervisors shall be assigned to the same platoon as the officers they supervise and shall actually work the same days and hours as the officers of that platoon absent unusual circumstances or when the supervisor is on vacation, training, or ill." The Districts we reviewed this period were ***fully compliant*** with this requirement.

### 5. Paragraph 310

Paragraph 310 provides that "first-line patrol supervisors shall be assigned to supervise no more than eight officers." The paragraph goes on to provide that "on duty patrol supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units." The Districts we reviewed this period were able to demonstrate either full compliance (the 4th and the 5th districts) or partial compliance (the 3rd, 6th, and 7th districts).

### 6. Paragraph 311

Paragraph 311 requires NOPD "to develop and implement a program to identify and train acting patrol supervisors who can fill-in, on a temporary, as-needed basis, for assigned supervisors who are on vacation, in training, ill, or otherwise temporarily unavailable." The paragraph further requires NOPD to "ensure consistent supervision by acting supervisors for supervisors who are on extended leave, and shall reassign officers to a new permanent non-acting supervisor when the currently assigned supervisor has been or is expected to be absent for an extended period of over six weeks." NOPD continues to be ***Not In Compliance*** with this paragraph. The Training Academy, for example, has not developed training or trained any personnel as acting patrol supervisors. Further, no program currently exists to identify and train acting patrol supervisors who can fill-in for assigned supervisors.

### 7. Paragraph 312

Paragraph 312 provides that "District commanders and platoon lieutenants shall be responsible for the close and effective supervision of officers under their command." Paragraph 312 further requires that "all NOPD commanders and platoon lieutenants shall ensure that all subordinates under their direct command comply with NOPD policy, state and federal law, and the requirements of this Agreement." Little evidence was provided during the Monitoring Team's audit that supervisors were routinely meeting the obligations under this paragraph. NOPD, thus, is ***not yet in compliance*** with its obligations under Paragraph 312.



8.      **Paragraph 313**

Paragraph 313 provides that "NOPD shall hold commanders and supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate."

The Monitoring Team's audit identified very few documents that provided evidence supervisors were held accountable for performing their duties. Supervisors' reports generally did not include information concerning orders relayed from higher authority, direction to officers regarding engagement of the public, or discipline. Supervisors' and officers' performance evaluations generally were not available and few disciplinary reports were available.

Neither were the performance evaluations we reviewed adequate to assess supervisors' performance. Generally, the evaluations did not include a section to evaluate "whether commanders and supervisors identify and effectively respond to misconduct, as part of their performance evaluations" as required by paragraph 313 of the consent decree. The Department, thus, is ***not yet in compliance*** with its obligations under Paragraph 313.

9.      **Paragraph 314**

Paragraph 314 requires NOPD "to develop and implement mandatory supervisory training for all new and current supervisors." The paragraph further provides that supervisors shall receive 200 hours of mandatory supervisory training within two years of the Effective Date; that all officers becoming supervisors within two years of the Effective Date shall receive 160 hours of initial supervisory training before assuming supervisory duties; that all officers becoming supervisors after two years of the Effective Date shall receive 80 hours of initial supervisory training before assuming supervisory duties; and that each supervisor to complete at least 40 hours of supervisor-specific training annually thereafter.

NOPD demonstrated partial compliance with its obligations under Paragraph 314. For example, NOPD has developed and implemented mandatory supervisory training for all new and current supervisors. The lesson plans for this training, however, have not been provided for review.

The Department was able to demonstrate full compliance with its obligations to provide sergeants promoted since April 2014 160 hours of supervisory training and its obligation to provide sergeants promoted since April 2014 received at least 80 hours of supervisory training. In other areas, however, NOPD may be in compliance, but the Department was unable to provide documentation of compliance.



### 10. Paragraph 315

Paragraph 315 provides that "NOPD's supervisory training program shall include instruction in several enumerated topics, including techniques for effectively guiding and directing officers, and for promoting effective and ethical police practices." While the Department's supervisory training schedule lists ethics as a one and one-half hour training session, a lesson plan was not available to determine whether the ethics training was designed for guiding and directing officers and for promoting effective and ethical police practices. Similarly, while the Academy informed the Monitoring Team that the necessary subject matter was included in the police issues and ethics course provided in 2015, again, a lesson plan has not been provided.

With regard to de-escalating conflict training, report writing, and investigations into uses of force, use of supervisory tools, burdens of proof, interview techniques, and several others, the Department was unable to demonstrate compliance because it still is unable to provide a compliant lesson plan.

Specifically with regard to EWS (Insight) training, the Department is not yet in compliance with its training obligations. The Monitoring Team attended the Department's *Insight* course, which did not incorporate the required materials. Furthermore, a lesson plan has not been produced yet.

### C. The *Insight* Early Warning System

An Early Warning System ("EWS"), also called an Early Intervention System, "is a data-based management tool designed to identify officers whose performance exhibits problems, and then to provide interventions, usually counseling or training, to correct those performance problems." DOJ COPS Report (Early Intervention Systems for Law Enforcement Agencies) (2003). Paragraph 316 of the Consent Decree requires the City and NOPD "to develop, implement, and maintain an [early warning system] to support the effective supervision and management of NOPD officers and employees, including the identification of and response to potentially problematic behaviors as early as possible." The Consent Decree further requires NOPD "to regularly use EWS data to promote constitutional and professional police practices; to manage risk and liability; and to evaluate the performance of NOPD employees across all ranks, units, and shifts." *Id.*

The Monitoring Team audits NOPD's various districts on a monthly or bi-monthly basis, focusing on a variety of Consent Decree compliance areas. Since our last Quarterly Report, we audited every district at least once. Our most recent audit took place in January 2017 and covered Districts 3, 4, 5, 6, 7, and SOD, and focused on NOPD's compliance with the Early Warning System elements of the Consent Decree. We also met with and evaluated Headquarters personnel. A summary of our findings follows.



### 1.      EWS Status Overview

NOPD has demonstrated an impressive commitment to designing, developing, and rolling out an effective early warning system.  Development of the system, called *Insight*, has been a massive undertaking, and NOPD deserves significant credit for keeping the project on target, on budget, and on schedule.  While our audits identified a need for further EWS training for NOPD supervisors and identified areas for system improvements, those findings should not take away from the impressive work undertaken to date.

### 2.      EWS Specific Findings[9]

#### a.      Paragraph 316

Paragraph 316 requires the City and NOPD to "develop, implement, and maintain an EWS to support the effective supervision and management of NOPD officers and employees, including the identification of and response to potentially problematic behaviors as early as possible.  NOPD will regularly use EWS data to promote constitutional and professional police practices; to manage risk and liability; and to evaluate the performance of NOPD employees across all ranks, units, and shifts."  The NOPD has made progress in each of these areas, but more work needs to be done.



In all fairness to NOPD, the Monitoring Team would not expect any more than "Partial Compliance" from the Department at this point.  The *Insight* system came on-line only recently, and its full functionality and full use necessarily will take some time.

---

[9]      The following sections present illustrative findings.  For purposes of brevity, we have not presented the Monitoring Team's findings for each subsection of each paragraph.  That detail, however, has been provided to NOPD to facilitate the Department's ongoing efforts to achieve full and sustained compliance with all elements of the Consent Decree.



### b.    Paragraph 317

Paragraph 317 requires the City and NOPD "to create a plan for the implementation of the EWS, which shall include the hiring of at least one full-time-equivalent qualified information technology specialist within 270 days of the Effective Date, to facilitate the development, implementation, and maintenance of the EWS."  The City and NOPD further must "maintain sufficient staffing to facilitate EWS data input and provide training and assistance to EWS users."  NOPD is ***compliant*** with certain elements and ***partly compliant*** with other elements of Paragraph 317.  For example:



The Monitoring Team has raised its training concerns with NOPD and is working with the Department to ensure all supervisors are fully trained in *Insight's* capabilities and in how effectively to apply those capabilities.

### c.    Paragraph 318

Paragraph 318 requires the City and NOPD to "develop and implement a protocol setting out which fields shall include historical data; the historical start date for each field; deadlines for inputting data related to current and new information; and the individuals responsible for capturing and inputting data. NOPD is not expected to include any historical data prior to January 1, 2006."  NOPD is in ***full compliance*** with this paragraph.





The protocols developed by NOPD are consistent with the Consent Decree and properly aimed at creating an effective early warning system.

### d.    Paragraph 319

Paragraph 319 required the City and NOPD "to develop and implement a protocol for using the EWS and information obtained from it."  "The protocol for using the EWS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying officers for intervention, supervisory use, supervisory/departmental intervention, documentation and audit." NOPD is in *Partial Compliance* with these requirements.  For example:



The Monitoring Team maintains regular contact with NOPD personnel charged with developing NOPD's early warning system, and will continue working with NOPD to ensure effective implementation and use of *Insight*.



### e.       Paragraph 320

Paragraph 320 sets out the data to be included in NOPD's EWS.  The Consent Decree requires that the EWS "include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve a multitude of data."  The Monitoring Team reviewed whether the data were available AND whether supervisors were able to locate the data.  In most cases, the required data were included in the EWS, but in several cases supervisors were not able to access the data.  Accordingly, NOPD is in compliance with some, but not all of the Consent Decree requirements.  For example:



NOPD is aware of the areas in which it is not yet compliant, and has committed to work diligently to bring itself into compliance in these areas in short order.  The Monitoring Team will continue to monitor the Department's progress in these areas.

### f.       Paragraph 321

Paragraph 321 requires that NOPD's *Insight* system "include appropriate identifying information for each involved employee (i.e., name, badge number, shift, and supervisor) and civilian (*e.g.*, race, ethnicity, and gender).  NOPD is in compliance with this paragraph.





### g.    Paragraph 322

Paragraph 322 requires the City and NOPD "to maintain computer hardware, including servers, terminals, and other necessary equipment, in sufficient amount and in good working order to permit personnel, including supervisors and commanders, ready and secure access to the EWS system to permit timely input and review of EWS data as necessary to comply with the requirements of this Agreement."  NOPD is in compliance with these requirements.



### h.    Paragraph 323

Paragraph 323 requires NOPD to "maintain all personally identifiable information about an officer included in the EWS for at least five years following the officer's separation from the agency except where prohibited by law."  Paragraph 323 further requires that "information necessary for aggregate statistical analysis will be maintained indefinitely in the EWS, [and that] on an ongoing basis, NOPD will enter information into the EWS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner."  Finally, Paragraph 323 provides that "no individual within NOPD shall have access to individually identifiable information that is maintained only within the EWS and is about an officer not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes."  NOPD is mostly in compliance with these obligations.





The only reason NOPD receives a "Partial Compliance" in one area is because, as noted above, the *Insight* system is not yet populated with all data required by the Consent Decree.

### i.        Paragraph 324

Paragraph 324 requires that the "EWS computer program and computer hardware will be operational, fully implemented, and used in accordance with policies and protocols that incorporate the requirements of [the Consent Decree] pursuant to an interim schedule that includes full implementation within three years of the Effective Date."  Paragraph 324 goes on to require that, prior to full implementation of the new EWS, "NOPD will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of officers."



While, as noted above, NOPD has made significant progress, the Monitoring Team's audit revealed some District Supervisors still are unable to locate some required information.  Further, our audits revealed the need for additional supervisor training regarding how to use *Insight*. Finally, while much of *Insight* is populated with required data, some required information has yet to be included.



### j.      Paragraph 325

Paragraph 325 requires that NOPD "provide in-service training to all employees, including officers, supervisors, and commanders regarding EWS protocols prior to its implementation, as required to facilitate proper understanding and use of the system."  The paragraph further requires that "NOPD supervisors shall be trained in and required to use the EWS to ensure that each supervisor has a complete and current understanding of the employees under the supervisor's command."  Finally, the paragraph provides that "Commanders and supervisors shall be trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns."  NOPD is in **partial compliance** with these obligations.



In short, while training has been provided, additional training is necessary so that supervisors have a complete understanding of EWS, when it is to be used and the purpose of its use including performance evaluations.

### 2.      *Insight* EWS Summary:  Areas For Further Improvement

While NOPD has made significant progress and the *Insight* system holds great promise, the Department now must focus its efforts on effectively training its supervisors to take advantage of the wealth of information contained in *Insight*.  NOPD's training efforts should take into consideration the following Monitor Team findings:

- Some supervisors are not aware that PIB information from one district followed the officer to another District when the officer was transferred.

- Some supervisors are unable to locate some information in EWS. This included interviews and interrogations in violation of NOPD policy, declination to prosecute due to officer credibility, disciplinary actions, non-disciplinary actions, and sick leave.



- Some supervisors were unable to use *Insight* to provide a list of all subordinates.

- Some supervisors had not reviewed all subordinates' information.

- Some supervisors were not aware if subordinates had reviewed their information.

- Some supervisors had not reviewed the information with subordinates to determine if it is correct.

- Some supervisors only located some information after searching when monitored by the Monitoring Team. This included criminal proceedings, civil proceedings, and restraining orders.

- Some supervisors were unaware of periodic checks of EWS information regular reviews of information that had to be at least quarterly.

- Some supervisors stated they had not viewed any unusual activity. No training has been provided to identify unusual activity.

- Most supervisors could not explain how to "identify patterns of conduct" as required in paragraph 324.

- Supervisors need additional training to understand how to process an alert. Instead of reviewing only the information contained in the alert, a proper review should also include other officer activity to determine if a trend is developing (For example, if a citizen complaint is the cause for an alert, the supervisor should be reviewing all citizen complaints, use of force in comparison with the officer's peer group, sick time, counseling, discipline, and other important indicators.

- Supervisors, when handling alerts, are reviewing the information in that alert and answering the questions related to the alert. Most do not review other officer information while addressing the alert.  This is something supervisors should do.

- More training is necessary so that supervisors understand the purpose of EWS and its use with quarterly reviews and completion of performance evaluations.

- Training should be provided to instruct supervisors to document the periodic reviews, conducted at least quarterly, of *Insight* information.

Our audits also identified a need for additional effort on the part of NOPD to include certain categories of data in the *Insight* system.



That being said, and as noted above, the Department's efforts designing, developing, and rolling out its EWS system have been impressive.  The *Insight* system holds great promise for the Department and the Community.

### D.      Supervision:  Visual and Audio Documentation of Police Activities

The Monitoring Team conducted a periodic Supervision audit of Districts 3 and 6 during the week of January 3, 2017 and of Districts 4, 5, 7, and SOD during the week of January 30, 2017. A summary of our findings follows.

### 1.      Paragraph 327

Paragraph 327 requires NOPD, among other things, to "maintain and operate video cameras and AVL in all marked or unmarked vehicles that are assigned to routine calls for service, task forces, tactical units, prisoner transport, or SOD canine and shall repair or replace all non-functioning video cameras or AVL units, as necessary for reliable functioning."[10]  The paragraph also requires NOPD "to ensure that recordings are captured, maintained, and reviewed as appropriate by supervisors, in addition to any review for investigatory or audit purposes, to assess the quality and appropriateness of officer interactions, uses of force, and other police activities."  NOPD continues to make *significant progress* meeting these requirements.

The following tables reflects the results of our audit of operable in-car cameras:

| District | No. Vehicles | No. Operable Cameras | Percentage Operable Cameras |
|----------|--------------|----------------------|-----------------------------|
| D3 | 20 | 18 | 90% |
| D4 | 24 | 24 | 100% |
| D5 | 14 | 14 | 100% |
| D6 | 24 | 24 | 100% |
| D7 | 19 | 19 | 100% |
| SOD | 20 | 18 | 90% |

The Monitoring Team's audits also assessed whether NOPD's vehicles are equipped with operable AVL (automatic vehicle locator) capabilities.  NOPD demonstrates *full compliance* with its AVL obligations this period.

---

[10]      An AVL is an Automatic Vehicle Locator.



### 2. Paragraph 328

Paragraph 328 provides that "NOPD agrees to develop and implement policies and procedures regarding AVL, in-car cameras, ECWs, and similar equipment. . . ."  NOPD demonstrated substantial compliance with this requirement during this audit period with one exception noted below.  The areas in which NOPD is in compliance include the following:

- NOPD developed and implemented policies and procedures regarding, <u>in-car cameras</u> that require activation of in-car cameras for all traffic stops and pursuits until the motor vehicle stop is completed and the stopped vehicle departs, or until the officer's participation in the motor vehicle stop ends.  ***COMPLIANT***

- NOPD developed and implemented policies and procedures regarding activation of <u>in-car cameras</u>, where vehicle is so-equipped, to record requests for consent to search a vehicle, deployment of drug- detection canines, and vehicle searches.  ***COMPLIANT***

- NOPD developed and implemented policies and procedures regarding activation of <u>in-car cameras</u> for incidents in which a prisoner being transported is violent or resistant.  ***COMPLIANT***

- NOPD developed and implemented policies and procedures regarding supervisors to review <u>in-car camera</u> recordings of all officers listed in any NOPD report regarding any incident involving injuries to a prisoner or an officer, uses of force, vehicle pursuits, or misconduct complaints.  ***COMPLIANT***

- NOPD supervisors review recordings regularly.  ***COMPLIANT***

- NOPD officer promptly notify supervisors where an event was not recorded.  ***COMPLIANT***

The one area that still needs additional NOPD attention relates to supervisors incorporating the knowledge gained from the review of recordings into their ongoing evaluation and supervision of officers.  NOPD currently maintains no documentation to provide evidence of compliance with this provision.  Performance evaluations do not include this field and the performance evaluations reviewed do not include this information.

### 3. Paragraph 329

Paragraph 329 obligates NOPD "to develop and implement a schedule for testing AVL, in-car camera, and ECW recording equipment to confirm that it is in proper working order."  The paragraph provides further that "[o]fficers shall be responsible for ensuring that recording



equipment assigned to them or their car is functioning properly at the beginning and end of each shift and shall report immediately any improperly functioning equipment."

NOPD has developed and implemented a schedule for testing AVLs. In fact, the Districts we audited this period (3, 4, 5, 6, 7 and SOD) conduct daily tests of equipment. The Monitoring Team likewise found NOPD to be in compliance with the other elements of Paragraph 329. Thus, for the period audited, NOPD is in *Full Compliance* with its obligations under Paragraph 329.

### 4.　　Paragraph 330

Paragraph 330 provides that "supervisors shall be responsible for ensuring that officers under their command use in-car camera recording equipment, AVL equipment, ECW cameras, and similar equipment, as required by policy. Supervisors shall report equipment problems and seek to have equipment repaired as needed. Supervisors shall refer for investigation any officer found to fail to properly use or care for in-car camera recording, AVL, ECW camera, or similar equipment." NOPD was able to demonstrate *full compliance* with its obligations under Paragraph 330 this period.

### 5.　　Paragraph 331

Paragraph 331 requires NOPD "to provide each supervisor with handheld digital recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations." The Districts we audited this period were in *full compliance* with this requirement.



# XVIII. AGREEMENT IMPLEMENTATION AND ENFORCEMENT

## A.   Coordination with IPM (CD 459)

The Consent Decree provides the Monitoring Team shall coordinate and confer with the Independent Police Monitor. (CD 459)  The Monitoring Team continues to be impressed by the passion, dedication, and impact of the IPM; and recognizes the respect the organization has within the New Orleans community.  The Monitoring Team remains pleased with and grateful for the level of cooperation it receives from the IPM.

## B.   NOPD Consent Decree Implementation Unit (CD 467)

Paragraph 467 of the Consent Decree provides that the City and NOPD will "hire and  retain, or reassign current NOPD employees to form, an inter-disciplinary unit with the skills and  abilities necessary to facilitate implementation" of the Consent Decree.  The Consent Decree goes on to explain this unit "will serve as a liaison between the Parties and the Monitoring Team  and will assist with the implementation of and compliance with this Agreement."

As noted in the Monitoring Team's prior reports, "a fully functioning, adequately staffed, and properly resourced Consent Decree Implementation Unit is a critical component of NOPD's ability to come into compliance with the terms of the Consent Decree."  NOPD has been in compliance with its obligations under paragraph 467 since 2014 when it fully staffed the Consent Decree Implementation Unit.  The Monitoring Team continues to be pleased by the Unit's knowledge, skill level, and demonstrated commitment to the Consent Decree process; and recognizes the full cooperation it continues to receive from the Unit.

## C.   NOPD and City Cooperation (CD 470 – 476)

The Consent Decree provides the City and NOPD shall fully cooperate with the  Monitoring Team in all aspects of its responsibilities.  We are pleased to report that the City and  NOPD continued to cooperate with the Monitoring Team throughout this reporting period.  The level of cooperation we received from the Superintendent and his leadership team is worthy of particular note here.  Superintendent Harrison, Chief Noel, Chief Thomas, Chief Westbrook, Chief Murphy, Commander Eckert, Commander Goodly, Dr. Magee, and many others all continue to play a critical role in implementing the reforms of the Consent Decree and in ensuring their respective teams work closely with the Monitoring Team.  The Department would not have made the progress it has made so far without their leadership.

The Monitoring Team also continues to receive the full cooperation of and continues to work closely with the New Orleans Office of Inspector General ("OIG").  While the OIG's activities do not fall within our monitoring responsibilities under the Consent Decree, the OIG has kept us apprised of its audit plans and investigators as they relate to the NOPD.  We continue to be



impressed by the quality of the OIG personnel with whom we work and with the quality and thoroughness of the OIG's work product.  The Monitoring Team looks forward to an ongoing positive relationship with the OIG.



## XIX.    CONCLUSION

As noted at the outset of this Report, the New Orleans Police Department has made great progress over the past two years in meeting its obligations under the Consent Decree.  This progress has been driven by numerous facts, including support, guidance, and pressure from an active federal judge overseeing NOPD's progress, assistance from a supportive Department of Justice team with extensive experience in police reform, and extensive technical assistance from a Monitoring Team that firmly believes the best results come from collaboration rather than combat.  But as much as this support has helped guide NOPD forward, it all would be for naught if NOPD didn't have an innovative, open-minded, and energetic leadership team committed to reform.  As we have said previously, while NOPD's progress has hit roadblocks from time to time, and while the Department continues to face hurdles, the Department's current management continues to impress the Monitoring Team.  Likewise, the bulk of the Department's current supervisors and patrol officers with whom we regularly deal also seem committed to reform.  As one officer put it to us recently, "I just want to work for a Department I can be proud of.  And we're getting there."  We heartily agree.