

# 2017 Annual Report of the Consent Decree Monitor
# For the New Orleans Police Department Consent Decree
# April 10, 2018

**Office of the Consent Decree Monitor New Orleans, Louisiana**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana



# Table of Contents

I.      GLOSSARY OF ACRONYMS ................................................................ 3

II.     INTRODUCTION ................................................................................. 5

III.    SUMMARY OF MONITORING ACTIVITIES ........................................ 7

IV.     SUMMARY OF KEY ACTIVITIES AND FINDINGS ............................. 9

V.      POLICIES AND TRAINING GENERALLY ........................................... 13

VI.     USE OF FORCE .................................................................................. 14

   *A.*   *Use of Force Generally* ................................................................... **14**

   *B.*   *Force Investigation Team (FIT)* ..................................................... **15**

   *C.*   *Canine* .......................................................................................... **16**

   *D.*   *Conducted Electrical Weapons (CEW)* ........................................... **16**

VII.    CRISIS INTERVENTION TEAM ......................................................... 17

VIII.   STOPS, SEARCHES, AND ARRESTS .................................................. 18

IX.     CUSTODIAL INTERROGATIONS ....................................................... 19

X.      PHOTOGRAPHIC LINE-UPS ............................................................. 20

XI.     BIAS-FREE POLICING ...................................................................... 21

XII.    POLICING FREE OF GENDER BIAS .................................................. 22

XIII.   COMMUNITY ENGAGEMENT ............................................................ 24

XIV.    RECRUITMENT ................................................................................. 28

XV.     ACADEMY AND IN-SERVICE TRAINING ........................................... 29

XVI.    OFFICER ASSISTANCE AND SUPPORT ............................................. 32

XVII.   PERFORMANCE EVALUATIONS AND PROMOTIONS .......................... 34

XVIII.  SUPERVISION .................................................................................. 35

XIX.    SECONDARY EMPLOYMENT SYSTEM .............................................. 37

XX.     MISCONDUCT COMPLAINT INTAKE, INVESTIGATION, AND ADJUDICATION ............ 38

XXI.    TRANSPARENCY AND OVERSIGHT .................................................. 39

XXII.   FUTURE MONITORING ACTIVITIES ................................................ 40

XXIII.  POLICY APPROVALS ........................................................................ 41



## I.    Glossary of Acronyms

"ASU"        Administrative Services Unit
"AUSA"       Assistant United States Attorney
"AVL"        Automatic Vehicle Locator
"BWC"        Body Worn Cameras
"CIT"        Crisis Intervention Team
"CCMS"       Criminal Case Management System
"CD"         Consent Decree
"CIT"        Crisis Intervention Team
"CODIS"      Combined DNA Index System
"ComStat"    Computer Statistics
"COCO"       Community Coordinating [sergeants]
"CPI"        California Psychological Inventory
"CSC"        Civil Service Commission
"CUC"        Citizens United for Change
"DA"         District Attorney
"DI-1"       Disciplinary Investigation Form
"DOJ"        Department of Justice
"DV"         Domestic Violence
"DVU"        Domestic Violence Unit
"ECW"        Electronic Control Weapon
"EPIC"       Ethical Policing is Courageous (NOPD peer intervention program)
"EWS"        Early Warning System
"FBI"        Federal Bureau of Investigation
"FIT"        Force Investigation Team
"FOB"        Field Operations Bureau
"FTO"        Field Training Officer
"IACP"       International Association of Chiefs of Police
"ICO"        Integrity Control Officers
"IPM"        Independent Police Monitor
"KSA"        Knowledge, Skill and Ability
"LEP"        Limited English Proficiency
"LGBT"       Lesbian, Gay, Bi-sexual, and Transgender
"MAX"        Management Analysis for Xcellence
"MMPT"       Minnesota Multiphasic Personality Inventory
"MOU"        Memorandum of Understanding



| | |
|---|---|
| "NNDDA" | National Narcotics Detection Dog Association |
| "NOFJC" | New Orleans Family Justice Center |
| "NOPD" | New Orleans Police Department |
| "NPCA" | National Police Canine Association |
| "OCDM" | Office of Consent Decree Monitor |
| "OIG" | Office of Inspector General |
| "OPSE" | Office of Public Secondary Employment |
| "PIB" | Public Integrity Bureau |
| "POST" | Police Officer Standards Training Counsel |
| "PsyQ" | Psychological History Questionnaire |
| "QOL" | Quality of Life [officers] |
| "RFP" | Request for Proposal |
| "SA" | Sexual Assault |
| "SART" | Sexual Assault Response Team |
| "SOD" | Special Operations Division |
| "SRC" | Survey Research Center |
| "SUNO" | Southern University of New Orleans |
| "SVS" | Special Victims Section |
| "UNO" | University of New Orleans |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |
| "VAW" | Violence Against Women |



## II.      Introduction

The NOPD today is undeniably a better, stronger, more professional organization than it was when the Monitoring Team began its work in 2013. Over the course of the last four and a half years, the NOPD has brought itself into compliance with many of the Consent Decree requirements. More importantly, NOPD has established many of the policies and procedures needed to achieve and sustain the constitutional policing, public safety, and community trust called for by the Consent Decree. The Department has promoted reform-minded leaders, adopted new policies, documented new processes in Standard Operating Procedures, and made far more data available to the public than in the past. In short, NOPD has developed and implemented the building blocks necessary to transform the NOPD into a police department of which the New Orleans community rightfully can be proud.

Credit for this progress belongs to many groups and individuals, including NOPD leadership; the majority of NOPD members, who have embraced reform as good for the Department; civic groups; and the New Orleans community. Credit also goes to the City leaders who have provided the resources and support to facilitate NOPD's so-far-successful journey along the path to full and sustained Consent Decree compliance.

The City Council, for example, adopted a Regulation formalizing the City's commitment to the Consent Decree's core principles. Passed pursuant to Section 4-107 of the Home Rule Charter and Section 2-1000 of the City Code, the new Regulation covers use of force, crisis intervention, sexual assault and domestic violence response, community policing, the training academy, body-worn cameras, transparency, compliance, and audits. The adoption of this Regulation was a notable and praise-worthy achievement. While such regulations can be revised by future leaders, they cannot be revised by a future NOPD superintendent alone, and they cannot be revised without official, public action.

The NOPD's success in putting in place the core structures of constitutional policing does not, however, mean its journey is at an end. Policies, procedures, and resources do not translate into constitutional *practices* overnight. As we have reported previously, the Consent Decree's ultimate purpose is to change policing on the street. The Consent Decree paragraphs relating to training; bias-free policing; stops, searches, and arrests; close and effective supervision; and community engagement all play a key role in effecting such a change. Compliance with these elements requires consistently and repeatedly educating officers on the Consent Decree's requirements, monitoring officers' performance, and demonstrating where and how officers' actions meet or fail to meet the Consent Decree requirements —through review of video footage and reports—until the "right way of doing things" becomes ingrained. The goal is to reinforce the new policies and procedures until compliance with them becomes second nature. This process takes time, but it is the key to sustained reform.



Our future monitoring efforts will focus on NOPD taking the steps necessary to ensure the reforms in the Consent Decree are delivered to and observable by the people of New Orleans. We will examine how officers interact with residents on the streets, complete field interview cards, and draft police reports. We will monitor supervisors to ensure they provide the close and effective supervision that is not only required by the Consent Decree, but is critical to ingraining reforms in officers' behavior. We will work closely with residents and community stakeholders to understand their perception of the NOPD's reforms and whether the reforms are making a difference in the lives of New Orleanians.

No one should confuse the need for more work by the NOPD with a lack of progress. NOPD has made significant progress, but ensuring the changes NOPD has made result in real, measurable, and sustainable constitutional policing cannot be rushed. The Monitoring Team (and the U.S. Department of Justice) will continue to conduct additional audits and evaluations before we can conclude with confidence the NOPD has achieved success in these more challenging areas. We remain steadfast in our commitment to ensure the promise of effective, constitutional policing is fulfilled for the people of New Orleans.

While the Department's success in no way relieves the pressure on the Department to continue its reform journey, it does give us confidence the City is on the right path. The NOPD has proven itself to be a respected, forward-thinking, reform-minded police agency to which other agencies now routinely come for guidance. The Monitoring Team looks forward to continuing to work with the NOPD toward full and sustained compliance.



### III.    Summary Of Monitoring Activities

The journey we embarked upon with the NOPD and the New Orleans community in 2013 has been an eventful one for us and, we are pleased to report, a positive and consequential one for New Orleans. NOPD's commitment to reform has delivered substantial progress toward accomplishing the transformation contemplated by the Consent Decree. How do we know? Because we have observed every step along the way, providing guidance, contributing expertise and technical assistance, working collaboratively with NOPD to implement change, and ensuring the change is real, meaningful, and sustained.

The Monitoring Team audits and reviews the NOPD's compliance with Consent Decree requirements and implementation of its goals. We review NOPD audio and video footage and records at the district and special unit level. We conduct spot audits, review documents, observe training, assess trends, analyze data, attend community meetings, and observe departmental community policing efforts. We conduct interviews and surveys. We review FIT, Use of Force Review Board investigations, and PIB investigations and adjudications.

We work closely with the Superintendent, deputy chiefs, lieutenants, unit commanders, sergeants, and civilian employees initially to understand how they have discharged their responsibilities; and, then, help to implement the changes mandated by the Consent Decree. We contribute our team's expertise to help NOPD adopt policing best practices. For example, we relied on our team's and DOJ's expertise to assist NOPD in revising its policies, standard operating procedures, Academy curriculum, and Academy lesson plans. We helped NOPD completely restructure its Special Victims and domestic violence units to: address serious deficiencies in its response to, and investigation of, sexual assaults and domestic violence; revise its use of force policies and practices; establish an effective Use of Force Review Board; and completely restructure its disciplinary investigations and adjudications process to increase independence and objectivity. In 2017, our focus was on overhauling the NOPD Training Academy, the results of which are discussed below.

We have many different tools available to us to assess NOPD's performance and evaluate whether the structural changes are manifesting themselves in how NOPD officers do their jobs day-to-day. We review police reports (EPRs), use of force reports, field interview cards (FICs), and camera recordings (including BWC, controlled electrical weapon (CEW), in-car camera, and interrogation video). This footage gives us an exceptional window into day-to-day policing and officers' interactions with the public. Additionally, NOPD's adoption of its MAX supervision system and Insight early intervention system give us unprecedented access to data concerning NOPD's performance. We go "hands on" to review officer performance in the districts and special units.

We review line-up and custodial interrogation logs.  We inspect the body worn and in-car cameras regularly. We inspect the interrogation rooms. We review investigative files. We



study supervisory deployments and assignments. We check to see whether NOPD is making information available concerning how complaints can be filed as required by the Consent Decree. We ride along with NOPD officers to observe how they work and the challenges they face to better understand their perspectives and the perspectives of the victims of crime. For example, it was information we learned from officers during our ride alongs that led to the formation of a burden reduction working group within the NOPD. This working group brings officers of different ranks together to explore innovative ways to increase officer efficiency and to achieve the goals of the Consent Decree.

Our work extends beyond the Department to organizations that help NOPD fulfill its public-service missions, such as the Orleans Communications District (i.e., the police dispatch organization), the DA's office, the Orleans Parish Prison, and New Orleans EMS. We work with individuals and organizations who work with NOPD, such as the Family Justice Center, and advocacy groups, such as Breakout, El Congreso, VAYLA and New Orleans residents who contact us to share their experiences and views. In 2017 we issued special reports on: (1) Supervision Policies and Practices, (2) officer selection practices, (3) NOPD background investigation practices, (4) use of force, (5) our biennial survey of the community, police and detainees, and (6) domestic violence. Judge Morgan also held public hearings on: (1) Insight (NOPD's Early Warning System), (2) inter-agency cooperation, (3) training, (4) domestic violence, and (5) the Ethical Policing is Courageous (EPIC) program.

In short, over the past four and a half years, we have studied every aspect of NOPD from top to bottom.



### IV.     Summary of Key Activities and Findings

**Policies** – NOPD continues to review and revise its policies to comply with the Consent Decree and best practices. Although this comprehensive review and approval process has been time-consuming, in terms of both scope and the level of detail the process requires, NOPD has devoted appropriate resources, and dedicated professionals who continue to work diligently to keep NOPD moving forward toward completion of this task. To date, the Monitoring Team and the Department of Justice have reviewed, revised, and ultimately approved almost two hundred NOPD policies.

**Use of Force** - The Monitoring Team reviews all serious uses of force and regularly samples other uses of force.  We previously issued a Special Report[1] on NOPD's Use of Force. We will issue an updated report in 2018.

**Force Investigative Team (FIT)** - We reviewed FIT investigations, including the review of four officer-involved shootings. We also provided technical assistance to the Force Investigation Team's development of an operations manual.

**SWAT** - We conducted an in-depth review of NOPD SWAT's operation plans, after-action reports, deployment protocols, and member tenure. We also performed an assessment of the Special Operation Division culture by reviewing use of force and resisting arrest reports, injury reports, BWC videos, civilian and rank generated complaints, and suspect interrogations. A special report outlining these findings will be issued in Spring 2018.

**Canine** - As we previously reported, the NOPD canine unit was successfully transformed early in the Consent Decree process.  We continue to monitor the unit's compliance with the Consent Decree.  There were no off-leash deployments or canine bites in 2017.

**Controlled Electronic Weapons (CEW)** - We reviewed NOPD's uses of Controlled Electronic Weapons (CEW), often colloquially referred to as Tasers, through a random sample of CEW uses, as part of a broader review of Uses of Force that were investigated by FIT. A special report outlining these findings will be issued in 2018.

**Stops, Searches, and Arrests (SSA)** - We reviewed police reports, warrant affidavits, and BWC footage to determine whether Stops, Searches, and Arrests (SSAs) are being conducted in compliance with law, NOPD policy, and the Consent Decree. We found potential non-compliance in approximately 20% of the BWC videos reviewed. We note, however, that,

---

[1]     *See* Report of the Consent Decree Monitor For the New Orleans Police Department Consent Decree on NOPD Use of Force, May 5, 2017, available at
http://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/517-1%20Monitor's%20Special%20Report%20on%20the%20NOPD's%20Uses%20of%20Force.pdf.



according to NOPD, some of the findings may be attributable to an internal systems error with the Electronic Police Report, rather than substantive non-compliance. If, instead, our findings are accurate, this is an unacceptably high level and we remain concerned. We will be working closely with NOPD to focus on this issue and we have established monthly SSA-focused conference calls to ensure SSA compliance receives the attention it needs.

**Photographic Line-Ups** – We regularly audit photographic line-ups as part of our monthly district-focused audits. We found most districts have demonstrated full compliance with the Consent Decree requirements in this area.

**Bias-Free Policing** – We found NOPD has adopted policies and conducted trainings to implement the Consent Decree's bias-free policing requirements. While proving lack of bias can be challenging, the data and information available to us demonstrate continuing progress.

**Policing Free of Gender Bias** – NOPD continues to make progress toward compliance with Gender-Bias Free policing. The SVS unit continues to perform well. As we have reported previously,[2] however, individual patrol officer response to sexual assault and domestic violence crimes continues to be uneven. NOPD responded to our concern by taking prompt action to implement a corrective action plan. Additionally, NOPD initiated disciplinary proceedings against officers who violated NOPD's DV policies. We continue to monitor this issue closely and work with NOPD to ensure DV calls are handled appropriately

**Community Engagement** – NOPD adopted and is in the process of implementing a community engagement plan that reflects and advances Superintendent Harrison's commitment to community policing. A key element of that plan is the creation of community policing signal codes that will enable NOPD to track and manage community policing activities and responses to calls for community policing services. Each district has developed a district-specific community policing plan based on priorities established by focus groups including district residents. The Department conducts public MAX (Management Analytics for eXcellence) meetings that provide district residents with information concerning community policing in their districts and an opportunity for residents to provide feedback to NOPD concerning its community policing efforts. We view these actions, and others detailed in this Report, as important steps in satisfying the community engagement provisions of the Consent Decree and we continue to monitor them closely.

**Survey** - Our 2017 biennial survey of residents, officers, and detainees revealed that respondents support NOPD's focus on community policing and engagement, as measured by the

---

[2]        *See* Special Report of the Consent Decree Monitor for the New Orleans Police Department Consent Decree on Domestic Violence Patrol Response, December 21, 2017, available at http://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/12-1924%20DV%20Special%20Report.pdf.



level of satisfaction with NOPD services.[3] While the feedback generally was positive, there remains dissatisfaction with the timeliness of response to calls and impact on crime. Additionally, a majority of respondents believed that NOPD engages in racial profiling and expects the African-American community to be harassed by NOPD officers.

**Recruitment** – We conducted an in-depth review of NOPD's recruitment policies and practices, including recruit background checks. Our findings, which we reported in January 2017,[4] found numerous deficiencies, including insufficient training of background investigators, incomplete investigations, and a flawed review process. NOPD responded by appointing a new Recruitment Director to guide and oversee changes. We believe the corrective action plan developed by NOPD is appropriate, and have seen improvements since the issuance of our January report. We will continue to monitor hiring and recruitment closely.

**Academy and In-Service Training** – This topic was the object of heightened focus by us in 2017. Our findings and NOPD's reforms were the subject of a public hearing in November 2017. While our monitoring revealed numerous deficiencies, the attention devoted to correcting them by NOPD, with the assistance of our team, has resulted in significant improvement. In response to our finding that lesson plans were of inconsistent quality and too often not reviewed by Academy staff, we worked with NOPD and DOJ to conduct a review of all lesson plans. This review led to improvements in the quality of lesson plans as well as a lesson plan tracking system.

**Officer Assistance and Support (OAP)** – We reviewed and approved the OAP policy, lesson plans, classes, and protocols. The classes have been well received. The Department continues weekly training and officer awareness outreach. NOPD, working with experts, has created a ground-breaking officer support program called EPIC, which stands for Ethical Policing is Courageous. EPIC seeks to train and empower each of the Department's more than 1100 officers, supervisors, and leadership personnel to effectively and safely intervene to prevent misconduct. EPIC is a form of officer assistance, not discipline, because its principles teach officers that intervention and prevention can save officers' lives and careers, as well as protect the public. At its simplest, it gives officers tools and strategies to protect their fellow officers.

---

[3]     *See* Report of the Consent Decree Monitor For the New Orleans Police Department Consent Decree on the Results of the Second Biennial Community Survey, July 24, 2017, available at http://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/12-1924%20OCDM%20Second%20Biennial.pdf.

[4]     *See* Special Report of the Consent Decree Monitor for the New Orleans Police Department on NOPD Background Investigation Practices, January 18, 2017, available at http://nopdconsent.azurewebsites.net/Media/Default/Documents/Docket%20Items/12-1924%20report%20on%20nopd%20background%20inv%20practices.pdf.



**Performance Evaluations and Promotions** – We reviewed performance evaluations in Spring 2017. We found deficiencies and weaknesses in the evaluation process. NOPD responded by revising its performance evaluation process. We will review annual performance evaluations in the first and second quarters of 2018.

**Supervision** – NOPD made significant progress in 2017 toward meeting the Consent Decree's supervision requirements. Nevertheless, our reviews show mixed results concerning the processes and practices that enable effective supervision, including ensuring supervisors work the same shifts as the officers they supervise. This is obviously a critical component of effective supervision. NOPD has implemented Insight, a personnel management and early warning system, that will help NOPD track data that may suggest an officer needs assistance. We have found that supervisors are still learning how to use the system effectively, which is to be expected with a new system.

**Video and Audio Recording** – We found partial compliance with these provisions, in part due to maintenance issues. NOPD also has been unable to demonstrate that supervisors incorporate knowledge gained from video and audio recording in their ongoing evaluation and supervision of officers.

**Secondary Employment System** – The Office of Secondary Employment (OPSE) continues to work well and is in compliance with virtually all applicable Consent Decree provisions. The parties requested certain amendments to the Consent Decree in light of current approved operations. Since 2014, when OPSE began managing all NOPD secondary employment, there have been consistent year-over-year increases in officer participation, hours worked, customers served, and gross revenues.

**Misconduct Complaint Intake, Investigation, and Adjudication** – We reviewed PIB administrative investigations. We found PIB to be in general compliance, although we noted deficiencies with respect to credibility assessments and timely-completion of investigations. Both issues require additional training. We also attend PIB in-service training on complaint intake. We worked with PIB to develop a new Force Investigation Team manual.

**Transparency and Oversight** – NOPD is in compliance with the transparency and oversight provisions.



### V.    POLICIES AND TRAINING GENERALLY

The process implemented by the NOPD, DOJ, and the Monitoring Team from 2014 through 2017 to facilitate the (1) drafting, (2) review, (3) revision, and (4) approval of Department policies continues to be effective. In 2017, NOPD completed substantial review and revision of most material policies. The Monitoring Team anticipates all policies will have been reviewed and approved by the end of the first quarter of 2018. Appendix 1 lists policies approved in 2017 and all policies approved as of the date of this Report.



## VI.    USE OF FORCE

NOPD continues to progress toward compliance with all Use of Force Consent Decree requirements. As a general matter, NOPD has adopted appropriate policies and rules for regulating use of force. Where we see ongoing non-compliance is in the districts by patrol officers and supervisors. For example we continue to observe officers failing to file use of force reports in a timely fashion. We also see the use of boilerplate or conclusory language in use of force statements. Supervisors do not consistently report to the scene to investigate lower level uses of force. They also do not consistently document findings regarding whether the use of force was appropriate. These findings are consistent with our general observation that, while NOPD has established compliant policies, procedures, and training, there remains a need to focus on officers' and supervisors' conduct until it is consistently compliant. Consequently, going forward we will be devoting additional focus to patrol officer and supervisor compliance.

### A.    Use of Force Generally

The Monitoring Team continues to review all serious uses of force, as defined in the Consent Decree.[5] We also continue to review randomly selected use of force reports to ensure NOPD reports uses of force accurately, meaningfully, and with appropriate oversight by supervisors and, where necessary, NOPD PIB. We previously issued a Special Report focusing on NOPD Use of Force.[6]

We also continue to review FIT investigative cases presented to the Use of Force Review Board. In this context, we most recently observed the Board's deliberations for four officer-involved shootings: a July 2015 officer-involved shooting, a Fall 2017 accidental shooting incident, a January 24, 2017 shooting in New Orleans East, and the shooting of the subject who murdered Officer McNeil.

Beyond our observations of the Use of Force Review Board, we conducted an in-depth review of NOPD SWAT's operational plans, after-action reports, deployment protocols, and member tenure (CD Paragraphs 70-75). We also conducted a Special Operation Division (SOD)

---

[5]    The Consent Decree defines a "serious use of force" as: (1) all uses of lethal force by an NOPD officer; (2) all critical firearm discharges by an NOPD officer; (3) all uses of force by an NOPD officer resulting in serious physical injury or requiring hospitalization; (4) all neck holds; (5) all uses of force by an NOPD officer resulting in a loss of consciousness; (6) all canine bites; (7) more than two applications of an CEW on an individual during a single interaction, regardless of the mode or duration of the application, and whether the applications are by the same or different officers, or CEW application for longer than 15 seconds, whether continuous or consecutive; and (8) any strike, blow, kick, CEW application, or similar use of force against a handcuffed subject.

[6]    Special Report of the Consent Decree Monitor for the New Orleans Police Department Consent Decree on NOPD Uses of Force, available at, http://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/517-1%20Monitor's%20Special%20Report%20on%20the%20NOPD's%20Uses%20of%20Force.pdf



"Culture Assessment" by reviewing use of force and resisting arrest reports, injury reports, BWC videos, civilian and rank-generated complaints, and suspect interrogations. A special report outlining these findings will be issued in 2018.  Our review demonstrates NOPD is in compliance with the majority of the general use of force provisions.

### B.        Force Investigation Team (FIT)

We provided technical assistance to NOPD's efforts to develop its Force Investigation Team Manual and its Critical Incident Response Guide & Investigative Procedures. (FIT Manual). The FIT Manual provides an overview of FIT, including its history, mission and organizational structure, excerpts of the relevant Consent Decree provisions, the responsibilities of FIT members, FIT rules and procedures, and other information relevant to FIT's responsibilities. The Monitoring Team also provided Technical Assistance to NOPD with developing a template for conducting administrative investigations. This template acts as an operational guide for FIT team members when conducting administrative investigations. We have observed FIT's investigations. Overall they are conducted in compliance with the Manual and the template. Although we continue to identify instances in which the Manual directives are not followed, in those instances FIT has addressed the issue appropriately. FIT also has been receptive to the best practices guidance provided by our team. NOPD has demonstrated compliance with the requirement to establish a Force Investigation Team.

One deficiency noted through audits, reviews, and observation is that while many investigations are complete and thorough, some NOPD investigators continue to ask "leading questions" (i.e., questions that suggest a certain answer to the subject of the interview) while conducting interviews in criminal and administrative investigations. This issue is being addressed through additional training and the development of operational guidelines.

An important public safety issue addressed this year, as part of the Monitoring Team's policy revision and approval project, was the conduct of non-NOPD law enforcement personnel operating in New Orleans. If these personnel, who are not subject to the Consent Decree or to NOPD's rules, are conducting law enforcement operations in New Orleans, they pose a risk that the public will be exposed to differing and perhaps conflicting law enforcement actions. To mitigate this risk and improve coordination and consistency among law enforcement agencies operating in New Orleans, NOPD entered into several Memoranda of Understanding with a number of local police agencies in an effort to delineate more clearly the role of non-NOPD police agencies operating in New Orleans. NOPD also drafted, and we approved, Chapter 1.1 to make clear the scope and limits of NOPD officers' authority and the Department's zero tolerance of abuse of law enforcement authority.

Chapter 1.1 also describes the limits of non-NOPD law enforcement agencies operating within New Orleans. Specifically, it provides "Law Enforcement agencies other than the NOPD operating within the geographic limits of the City of New Orleans may exercise only the specific



authority granted to the by law or pursuant to a grant of authority by the Superintendent of Police as authorized by law."[7]

Importantly, Chapter 1.1 also establishes NOPD FIT's authority to investigate uses of force by both NOPD and non-NOPD officers. The Memoranda of Understanding outline the roles and responsibilities of law enforcement agencies operating in New Orleans, and clarifies how future uses of force would be investigated. The Monitoring Team commends the Department for proactively seeking cooperation and coordination with its neighboring agencies. Judge Morgan hosted a public hearing on this matter of importance to the Department's effectiveness in meeting constitutional policing goals.

### C.    Canine

NOPD is currently in compliance with the requirements regarding use of canines. NOPD implemented the approved canine policy and SOP, both of which were approved by DOJ and our team. These changes have had an impact.  In 2017 there were no canine bites or off-leash deployments, reflecting the impact of a stricter policy, training on the policy, and close and effective supervision.

### D.    Conducted Electrical Weapons (CEW)

We review uses of Conducted Electrical Weapons (CEW) (commonly referred to as Tasers). NOPD has implemented appropriate policies governing the use of CEWs. Our review of CEW uses demonstrates that the majority are compliant with NOPD policy and the Consent Decree's requirements. Additionally, CEW uses are reviewed by NOPD's FIT. We monitor FIT investigations and provide technical assistance, as called for under the Consent Decree, in the form of advice and guidance requirements to assist FIT in conducting thorough and impartial investigations. Where we find errors or omissions in FIT investigations we report these to FIT and work with it to address them. FIT has been receptive and responsive to our guidance and suggestions, although this is not to say there are not occasionally differences of opinion. With respect to CEW uses, we have pointed out deficiencies in FIT investigations, which FIT remedied.

---

[7]       Policy 1.1, Policy Statement.



### VII.    CRISIS INTERVENTION TEAM

Section IV of the Consent Decree requires NOPD to "minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder." To achieve this outcome, NOPD agreed to create a properly trained Crisis Intervention Team (CIT). The NOPD has developed its CIT program (including a policy, Academy curriculum, a training program, and training materials) and has provided basic training to all new officers and specialty training to more than 140 volunteer CIT officers, as required by the Consent Decree. This reflects a higher percentage than the 20% required by the Consent Decree. The Department also has trained local social workers, and at least two crisis transportation service volunteers, and is extending availability of CIT training to those with a reserve officer classification.

The Monitoring Team has seen CIT officers in action and has spoken to numerous officers and community members regarding the CIT program. Commentary, so far, has been positive. NOPD has established a CIT Planning Committee that includes partners set out at Paragraph 112 of the Consent Decree, each entity has participated in at least one Planning Committee meeting. This year, NOPD Policy Chapter 41.25 Crisis Intervention and Chapter 41.26 Crisis Transportation Service were approved, which outline the CIT selection process, officer duties, training, and policies. CIT training will continue to be implemented for recruits and incorporated into in-service training. This training integrates local experts and covers the topical areas outlined in Section IV of the Consent Decree. The new 4-hour in-service course is designed to prepare officers to recognize crisis intervention symptoms, incorporate the practice of verbal de-escalation, identify tactics to handle aggressive behavior, and guide officers on how to consider diversion options and available alternatives to the mental hospital when addressing critical incidents.



### VIII.   STOPS, SEARCHES, AND ARRESTS

The Monitoring team regularly reviews police reports, warrant affidavits, and BWC footage to determine whether stops, searches, and arrests (SSA) comply with the law and NOPD policy and whether police reports accurately describe the officer's conduct. This remains an area of concern given repeated findings across audits of possible CD violations in approximately 20% of the BWC videos reviewed.[8] To address this, the Monitoring Team and NOPD conduct monthly SSA-focused conference calls with NOPD's Compliance Bureau to explore these ongoing issues. The Monitoring Team also worked with NOPD to develop a new SSA auditing form and process. The initial findings from our Quarter 1 Stops, Searches, and Arrests Audit will serve as a basis to conduct a more in-depth, targeted review in the near future.

---

[8]      NOPD advises that part of the non-compliance is attributable to placement of checkboxes in the Field Investigative Card (FIC), which was causing officers to erroneously report a search as a pat down. NOPD revised the form in early 2018 and will retrain officers on its use. We of course will monitor the data to assess the extent to which the change improves compliance.



### IX.    CUSTODIAL INTERROGATIONS

We have observed steady progress toward department-wide compliance with the Consent Decree requirements for custodial interrogations and detective selection/training. Most districts audited in 2017 demonstrated high levels of compliance with requirements for custodial interrogations. All districts and specialized units reviewed in 2017 were in compliance with the requirement to designate interview rooms and ensure they are equipped with functioning audio and video recording technology that allows for recording and maintenance of all phases of interrogations. We observed no indication of physical force or a threat to carry out harm to anyone, In addition, NOPD continues to make progress in Limited English Proficiency requirements across locations audited. All the monitored interrogations were conducted in English. The Department has ELSAs ("Enabling Language Service Anywhere" a mobile interpretation device) available in the event another language is required during an interrogation.

Our inspections found interrogations in all districts were recorded in their entirety. There was no indication of a pre-interview. No recording failures were found during any audit. Most officers and detectives conducting interrogations did not take notes, but this is not required by the Consent Decree. When detectives took notes, however, we found they were preserved and were made available for inspection from the case file. SOD, however, has yet to provide evidence of compliance with new detective training or in-service training.[9]

Paragraph 170 specifies criteria for training new detectives on interrogation procedures and methods. NOPD is still developing these materials. Once they are developed and reviewed, we expect paragraph 170 will be satisfied.

---

[9]    NOPD's Compliance Bureau reviewed SOD's training records in January 2018 and found the unit in compliance with Consent Decree requirements.  The Monitoring Team will be conducting its own review in the Spring of 2018.



### X.      PHOTOGRAPHIC LINE-UPS

Most districts demonstrated full compliance with the Consent Decree requirements for photographic line-up processes and procedures. NOPD has maintained compliance with CD Paragraphs 174 – 176, as we previously have reported. These paragraphs require NOPD to keep a complete record of each photo line-up display procedure and the results. Partial compliance was noted in CD Paragraph 173 due to the observed use of dissimilar "filler" photographs in some instances.[10]

The Monitoring Team observed compliance across CD Paragraphs 171 and 172, which address administration of photographic line-ups. We note the Department does not preserve photos used for single photo identifications. The Department's position is that single photos are used only when the witness already knows the identity of the subject. Accordingly, the Department argues, single photos do not constitute line-ups as used in the Consent Decree. It is the Monitoring Team's view that the better practice is for NOPD to preserve single photograph line-ups just as it preserves multiple photo line-ups. Preserving the photograph would allow subsequent verification that the officer showed the witness the correct person, which in the vast majority of cases would refute any challenge to the accuracy of the identification or the veracity of an officer's account of the photograph he or she showed a witness.

---

[10]      The Monitoring Team noted significantly improved compliance with regard to Paragraph 173 during its most recent audit, the results of which will be reported in the Team's next quarterly report.



## XI.   BIAS-FREE POLICING

NOPD has adopted policies and conducted training to implement its commitment to bias-free policing, as required by the Consent Decree. Documenting the absence of biased policing is a challenge, but we do see anecdotal signs of improvement: Both NOPD and the Monitoring Team are receiving fewer complaints of biased police conduct; our biennial survey shows improvement in the public's overall perception of the NOPD; NOPD is making progress toward satisfying the Consent Decree's language assistance requirements; and, working closely with Breakout and other LGBTQ advocates, NOPD has adopted a LGBTQ policy that should prove to be a model for other departments. We also employ a number of monitoring tools, including audits, surveys, and interviews to assess the extent to which bias-free policing is being practiced on the streets.



### XII.   POLICING FREE OF GENDER BIAS

The Monitoring Team has continued to review the Special Victims "SVS" practices and finds the SVS unit continues to perform well. It is staffed with specially-trained detectives and social workers who, as the Monitoring Team's audits have confirmed, continue to improve their compliance rate in handling DV calls.

Members of our team met with the New Orleans Family Justice Center personnel to discuss any outstanding concerns related to victim outreach. SVU members all attended the SATF Oregon training to complete training for all newly assigned investigators and to update training of all employees. The training was well received and allowed the SVU to come into compliance with all areas of the CD except for those dealing with the patrol response to DV.

As our December 21, 2017 Special Report on Domestic Violence observed, the NOPD SVS detectives typically are not the first to respond to DV calls. In almost all cases, district-based patrol officers are the first officers on the scene. The Monitoring Team audits patrol officer responses to DV calls in the eight police districts on at least a quarterly basis. These audits revealed troubling inconsistencies in the handling of such calls. These findings prompted us to undertake a more targeted review, focusing specifically on the problem areas. We selected a sample of calls for service that included (a) calls designated as "Necessary Action Taken" (a designation typically not appropriate for a DV call), (b) calls designated as "Gone on Arrival" where the officer was on the scene more than 15 minutes, and (c) calls reclassified from a "Code 2" (higher) priority to a "Code 1" (lower) priority.

We found the majority of patrol officers who respond to DV calls for service and initiate a report on the scene are doing a much better job than they did just two years ago, but we also found serious deficiencies as well, outlined in our Special Report of the Consent Decree Monitor for the New Orleans Police Department Consent Decree on Domestic Violence Patrol Response.[11] In fact, our review raised questions in 67% of the cases studied. Specifically, we reported that too many officers responded ineffectively and, in some instances, inappropriately. We also found unjustifiably delayed response times, which may be attributable in part to inappropriately reclassified signals. These deficiencies risked compromising victim safety and protection.

The Monitoring Team shared its findings with the NOPD prior to the publication of the Special Report, and the Department took prompt action to develop and initiate a meaningful corrective action plan. In consultation with the Monitoring Team, NOPD

---

[11]     http://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/12-1924%20DV%20Special%20Report.pdf.



- Changed the way DV cases are coded in its Computer Aided Dispatch (CAD) system[12]

- Implemented enhanced training for patrol officers and supervisors,

- Met with supervisors and commanders to increase oversight of officers handling DV calls, and

- Initiated disciplinary proceedings against officers who have acted in violation of NOPD's DV policy.

In fact, NOPD has initiated disciplinary proceedings against more than 35 officers for violations of NOPD's DV policy for the handling of incidents that occurred between March and September 2017. While these remedial steps are meaningful, NOPD will have to do even more to resolve the concerns laid out in this report. To this end, NOPD Superintendent Michael Harrison met with the Monitoring Team and Judge Morgan on October 17, 2017 and committed the full attention of his leadership team to this matter. Notably, Superintendent Harrison was candid and straightforward regarding what needed fixing and what steps the Department planned to take. His frankness is noteworthy and, in itself, highlights how far the Police Department has come since the entry of the Consent Decree in 2012.

We continue to closely monitor patrol officer and supervisor handling of domestic violence calls and will be working closely with NOPD to develop a plan to ensure these calls are consistently handled appropriately.

---

[12]     A CAD system is a computer-based system that permits the centralized dispatch of officers to calls for service. The NOPD CAD system provides patrol officers and supervisors important information concerning each call, including, among other things, the nature, priority, and location of the incident. The CAD system also permits officers to relay important information back to the centralized dispatch unit.



### XIII.   COMMUNITY ENGAGEMENT

Community engagement is an important component of a broader community policing model, although the distinction is often overlooked or misunderstood. According to the Presidential Task Force on 21st Century Policing:

> Community policing is a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime". (March 2015). Within this context, it is a more accountable and transparent means of policing, and is focused on building trust and legitimacy with the community as both police and the community collaborate to solve problems.

> Community engagement is a key attribute of community policing. It provides a major path forward to achieving the goal of ensuring that police and community members collaborate through regular meetings that focus on identifying the community problems that need to be solved, and creating ongoing problem solving partnerships. It is built upon maintaining open communication, respectful interactions, and providing feedback as to what works in contrast to what doesn't. These interventions are central to organizational transformation as reflected in a change in direction that is seen throughout police policies, practices, and training, all of which have a goal of ensuring that the principles of community policing become part of the core values of a police department.[13]

Superintendent Harrison repeatedly has expressed his commitment to moving the NOPD toward a community policing model. In 2017, the NOPD took a significant step toward realizing the Superintendent's vision by developing and adopting a Community Engagement Manual to express, describe, and implement its commitment to community policing.[14] In developing the Manual, the NOPD sought input from community groups, leaders, and stakeholders through a survey and district meetings. It also met with officials at police departments recognized for their successful commitment to community policing. Additionally, NOPD relied on the expertise of our team's police chiefs and academics who are nationally recognized community policing experts. Our team provided feedback during the development phase of the plan, attended the district meetings at which NOPD solicited community input, reviewed and provided feedback to the Manual, and after its adoption, met with and interviewed officers responsible for core elements of the plan, such as the School Resource and Community Liaison Officers.

---

[13]     Task Force Report available at https://ric-zai-inc.com/Publications/cops-p311-pub.pdf

[14]     Available at https://www.nola.gov/getattachment/NOPD/NOPD-Consent-Decree/Community- Engagement-Manual- (3).pdf/



The key elements of the NOPD's community engagement plan are as follows:

- <u>Community Policing Signals.</u> The NOPD has established police signals for community policing activities. These dedicated signals enable NOPD to better track calls for community policing services as well as the officer responses and community policing activities.[15] The new Community Policing Signals are:

  o **22A – Area Check**. Used by an officer when patrolling an area generally without a specific mission.

  o **22B – Business Check**. Used when an officer physically exits the patrol car and engages occupants at a business

  o **22D – Directed Patrol**. Used when an officer is directed to a specific area or is executing a specific mission in an area

  o **22R - Residence Check**. Used when an officer physically exits the patrol car and engages occupants at a residence.

  o **22W – Walking Beat**. Used while executing a defined and assigned walking beat.

- <u>District Community Policing Plans.</u> Each NOPD district has developed a district-specific community policing plan based on the priorities expressed by district residents. Follow-up meetings are held in coordination with NONPAC public meetings, at which the district reports to the residents the progress made toward addressing the concerns raised at the prior meeting and updating the priorities as needed.[16]

- <u>MAX Meetings</u>: MAX will be used to measure and assess community policing strategies

- <u>Youth Engagement</u>. The Department reports it conducts youth dialogues at schools throughout the city. Additionally, it has formed a Youth Advisory Council, a group of high school students who provide information and ideas to the police. The Department has also created a Cadet Program, which is comprised of youth ages 17-20 who are interested in pursuing a career in Law Enforcement.

---

[15]    In 2017, NOPD recorded over 37,000 total "signal 22's."

[16]    https://public.tableau.com/profile/nola?utm_campaign=City_of_New_Orleans&utm_content=&utm_medium=email&utm_source=govdelivery&utm_term=#!/vizhome/MAX_0/TableofContents



- <u>Community Policing and School Resource Officers</u>. NOPD has dedicated officers to interacting with schools and serving as a liaison to the community. We are still assessing the effectiveness of these positions.

The Consent Decree requires the Monitoring Team to conduct biennial surveys of the community, NOPD, and detainees. These surveys support community policing and engagement by measuring the level of satisfaction with NOPD services reported by these stakeholders. Our 2017 survey[17] of Orleans parish residents', separately reported in July 2017, revealed the following:

- Respondents now have better perceptions of their most recent contact with the NOPD, are more satisfied with the NOPD, have more trust in the NOPD, and are more willing to cooperate with the NOPD.

- Respondents who interacted with NOPD felt they were more likely to be treated with dignity, respect, and politeness.

- Respondents noted improvements in officer honesty, fairness, professionalism, and integrity.

- Respondents felt that improvements in policing had been made in New Orleans, that the NOPD had become a better police department, and that the NOPD was less likely to use excessive force than two years ago.

- Respondents were more likely to believe corruption in the NOPD is low and that past NOPD scandals did not reflect current practices.

Our 2017 survey of New Orleans Police Department officers' views, reported in July 2017, revealed a greater proportion of officers believe their supervisors are good leaders, are taking the Department in the right direction, and treat fellow officers fairly regardless of race, ethnicity, gender, or sexual orientation.

Although the feedback was very positive for the state and direction of the NOPD, it was not unqualified. For example, in the community survey, more than 40% of respondents were not satisfied with the way NOPD officers are doing their jobs. Almost 60% believe officers do not respond to calls in a timely manner, and 55% of respondents believe the NOPD has little

---

[17]     *See* Report of the Consent Decree Monitor For the New Orleans Police Department Consent Decree on the Results of the Second Biennial Community Survey, July 24, 2017 available at http://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/12-1924%20OCDM%20Second%20Biennial.pdf.



impact on crime.[18] Although Black respondents' perceptions of NOPD is improving faster relative to Whites, in absolute terms there remains a significant disparity between the views of Black respondents and the views of White respondents, which indicates opportunity for improvement.[19]

The disparity between Black and White perceptions may reflect an ongoing strained relationship between the NOPD and the Black community: A majority of respondents felt that the NOPD engaged in racial profiling, felt the Black community expects to be harassed by the NOPD, and that the Black community did not see the NOPD as credible. With respect to the Latino community, the average response to the item, "Members of the New Orleans Latino community don't report crimes to NOPD due to fear of deportation," fell in the "agree" category. On the positive side, the average ratings for items asking about the LGBT community's confidence in the NOPD and the treatment of homeless individuals were neutral. Broadly, respondents felt that body worn cameras reduced the likelihood of improper use of force against minorities.

Although we commend the Department for its commitment to community policing and its progress thus far, we still have questions concerning elements of the plan. For example, the Monitoring Team has reservations about continuing the Community Liaison and School Resource Officer roles inasmuch as they are inconsistent with the community policing concept that *every officer* engages in community policing. Nevertheless, we also received complaints from community members and organizations when the Community Liaison position was eliminated as part of a redeployment initiative. Additionally, we recognize the value of having officers dedicated to the core components of community policing, especially during the transition process. We will continue to monitor and assess whether newly appointed SLOs and the SRO program are effective, and remain constructive components of the Department's community policing efforts. As we did this year, the Monitoring Team will observe the next Community Policing Academy.

Overall, we believe NOPD has laid a solid foundation for evolving toward a true community policing model. Transitioning a police department to a community policing model is a long process. While appropriate policies and procedures are essential to community policing, more is required. It is a philosophy and a mindset. There must be a commitment from the top, but that commitment must be infused throughout the organization. We will continue to monitor its progress, provide guidance and feedback, and, of course, publicly report our findings.

---

[18]     *Id.*

[19]     Special Report of the Consent Decree Monitor for the New Orleans Police Department Consent Decree on the Results of the Second Biennial Community Survey, available at, http://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/12-1924%20OCDM%20Second%20Biennial.pdf



### XIV.   RECRUITMENT

The Monitoring Team continues to monitor and support NOPD's efforts to improve its recruit candidate evaluation and hiring process (including review of files for Academy classes 180, 181, and 182). While the Monitoring Team shares NOPD's goal of increasing its ranks, it is critical that NOPD undertake these efforts in a manner that ensures the men and women who seek to join the Department are "diverse [,] highly qualified, and ethical" as required by the Consent Decree. (CD XI).

Most in the law enforcement community are well aware of the price the District of Columbia Police Department paid following its "hiring binge" in the late 1980s and early 1990s. *See, e.g.*, D.C. Police Paying for Hiring Binge, WASHINGTON POST, (8/28/94). DC is not alone in making that mistake. Accordingly, the Monitoring Team views the integrity of NOPD's hiring process as an extremely high priority in the context of ensuring constitutional policing throughout the City of New Orleans. To this end, on October 24, 2016, the Monitoring Team initiated a review of the Department's background investigation process. We also monitored multiple choice/writing test development processes, the professional psychological services selection process, implementation of a new civil service exam, pass/fail rates and discriminatory impact. NOPD management supported the Monitoring Team's review from the outset, and cooperated fully throughout.

Our in-depth review of candidate background files encompassed findings that included insufficient training of background investigators, incomplete investigations, a review process overly focused on "automatic disqualifiers" at the expense of other facts that collectively signal relevant risks, lack of documentation of steps taken to investigate a candidate, and a myriad of other concerns and deficiencies.

NOPD developed a plan to remedy the shortcomings we found. NOPD committed to "evaluate candidates more holistically and implement additional quality control mechanisms to ensure that any issues that may arise in the hiring process are addressed promptly." NOPD appointed a new Recruitment Director to guide these changes. NOPD also implemented an enhanced screening process and a Compliance Bureau review process. We will continue to monitor hiring and recruitment activities, observe implementation of the Department's corrective actions and our recommendations to reengineer NOPD's recruitment and selection process to comply with the Consent Decree and best practices.



### XV.    ACADEMY AND IN-SERVICE TRAINING

At the request of the Court, the Monitoring Team initiated an expanded effort to provide Technical Assistance to the Academy last year. Some key areas of concern included inadequate resources available to the Academy, including outdated technology, limited equipment, and aging physical facilities. These concerns have been mitigated in part by additional resources the City provided the Academy, including a new training facility, enhanced technological equipment and capacity, and improvements in support to personnel and staff dedicated to the training division. The Academy moved into its new educational facility, which is a major improvement over the prior facility and reflects a significant investment in NOPD training.

Other longstanding deficiencies, such as an ongoing failure to implement approved lesson plans, showed a significant turnaround. Last year, the Monitoring Team, the NOPD, and the DOJ partnered with members of the Academy to review and revise curricula, lesson plans, and teaching materials. The Compliance Bureau, Academy leadership, and Monitoring Team implemented a lesson plan tracking system this year. The number of courses operated without approved lesson plans (both recruit and in-service training) greatly diminished this year but was not eliminated entirely. For example, in-service supervision training scheduled for the week of 3/6/17 was postponed until the week of 3/27/17 due to untimely completion of lesson plans.

Approved lessons plans reflect productive partnerships among NOPD instructors, the Monitoring Team, and DOJ. For example, a new 185+ page Integrated Use of Force Lesson Plan was created and approved through iterative collaboration and involvement of relevant experts. We also provided feedback and guidance to the Department and instructors on associated use of force lesson plans.

In addition, a new 8-hour training session on community policing was introduced this year as a requirement for all trainees, including recruits, in-service, and supervisory/command personnel. Beyond integration of core principles, like community policing and procedural justice, Academy courses also reflect more organized and pragmatic training in areas such as "simunition" training that reflect real-life encounters. The Monitoring Team attended in-service training for Insight, SA, DV, and Child Abuse. These observed trainings encompassed effective delivery of course goals.

In early 2017, LA POST (the official police officer standards and training organization for the state of Louisiana) introduced new requirements for Recruit Lesson Plans throughout the state. These requirements mandated the use of LA POST Lesson Plans, in contrast to those developed by the Academy, many of which already had been reviewed by the Monitoring Team. Consequently, the Academy faced immediate demands to review all Recruit Lesson Plans; to determine the revisions necessary to meet POST requirements; and to determine how to make those revisions while ensuring that NOPD/Consent Decree requirements were maintained in



these new Lesson Plans. The new requirements further mandated that all instructors be certified through the LA POST certification, in contrast to the FBI Certification that is required by the Consent Decree. Management staff introduced the new LA POST requirements to Academy and Adjunct Instructors and achieved mandated adjustments.

Professional development activities should continue to foster ongoing improvement in instructors' classroom leadership to address shortcomings observed by the Monitoring team, including more student engagement by instructors, less reading of prepared course materials, and more deliberate use of adult learning techniques in the classroom.[20]

Currently, the NOPD Academy lacks its own shooting range, which forces officers to drive a long distance to another agency's range. The absence of a range also creates a perception among instructors and students that the Academy is not a high priority of the Department. Funds have been set aside, however, for a feasibility study to build a new shooting range.

The Academy made progress in creating a more professional learning environment, in which greater transparency and accountability are emphasized by requiring performance evaluations of course instructors, professional development curricula for Academy staff and adjunct instructors, and an improved Recruit Manual and Academic Review Board. Another key gain includes the revitalization of the Training Advisory Committee (TAC), now meeting on a regular basis, and which contributes to the Academy's annual needs assessment.

At a November Public Hearing held by the Court, the Monitoring Team reported that the NOPD is making significant progress toward reforming the Academy and that the progress toward substantial compliance was a notable success in 2017. The hearing afforded NOPD the opportunity to demonstrate its commitment to reforming the Education and Training Division so that it produces officers committed to and trained in protecting the public through effective and constitutional policing who will represent the City of New Orleans to its residents and the millions of visitors who come to New Orleans each year in a professional manner.

Toward the end of 2017, at the request of the Court, the Monitoring Team engaged an additional resource to help the NOPD Academy more quickly achieve full compliance with the Consent Decree. Specifically, the Monitoring Team engaged Deputy Chief Bill Murphy, the former director of the LA Police Department Academy, to provide technical assistance to and monitoring over the NOPD Academy. Chief Murphy previously helped move the LAPD forward

---

[20]     We also note, the NOPD Academy lacks its own shooting range, which forces officers to drive a long distance to use other agencies' ranges. The absence of a range also creates a perception among instructors and students that the Academy is not a high priority of the Department. Funds have been set aside, however, for a feasibility study to build a new shooting range.



following the entry of its Consent Decree and we have high confidence he will provide the same practical and effective guidance here.



### XVI.   OFFICER ASSISTANCE AND SUPPORT

NOPD is in compliance with the Consent Decree's Officer Assistance and Support requirements. The policy, lesson plans, and OAP protocols were approved this year by the Monitoring Team, DOJ, and NOPD. The Monitoring Team observed classes on OAP given to Command level staff in the Fall of 2017. The classes were well received and generated positive feedback. The Department continues weekly training and officer awareness outreach related to the program at the Academy. The number of those accessing the OAP continues to grow each month. OAP staff also presented at the September Status Conference with Judge Morgan and NOPD staff.

In 2016, the NOPD took another big step along the path of innovation with the creation of its EPIC peer intervention program. EPIC (for "Ethical Policing Is Courageous") is a program created by NOPD's own officers with the help of experts that builds upon years of social science research into "active bystandership." In a collaboration among the Department's Field Operations Bureau, Management Services Bureau, PIB, and Compliance Bureau, EPIC seeks to train and empower each of the Department's more than 1,100 officers and supervisors and leadership personnel to effectively and safely intervene in other officers' conduct before a mistake is made or misconduct occurs. Through classroom training (which includes lecture and discussion along with scenario-based role play), and department-wide reinforcement, EPIC trains officers to notice when an intervention may be necessary, gives them the tools to take action effectively and safely, empowers them to act regardless of the rank of the person requiring the intervention, and protects them when they do intervene. (NOPD's recently-adopted discipline policy identifies a successful intervention as a formal mitigating factor that must be considered in any disciplinary proceeding.)

In 2017, nearly all officers completed EPIC training. EPIC teaches officers of all ranks that a good-faith intervention is not something to spurn, but something to embrace as a sign of caring, respect, and teamwork. The premise of training officers to prevent serious mistakes or misconduct before they occur is an elegant solution to a long-existing problem. The NOPD EPIC program is still in its infancy, but it shows great promise. The principles of peer intervention are being taught as a stand-alone academy course—for new recruits as well as veteran officers—and are being incorporated into all other Academy courses.

Consequently, in addition to learning about active bystandership in the EPIC training module, officers also explore those principles in their use-of-force course, their handcuffing course, their driving course, and so forth. In addition, the Department has designed the training component of the EPIC program on a "continuous improvement" basis. The ideas, tactics, and strategies developed by the officers during their role-play scenarios are incorporated into the EPIC training and shared with each subsequent class of officers. In this way, NOPD's officers truly are the developers of the course's content.



     The NOPD continues to make progress in reinforcing EPIC principles throughout the Department. Active bystandership and peer intervention will be emphasized in roll call training, periodic electronic training bulletins, and video reminders from leadership. NOPD believes its efforts to promote EPIC not only will help protect civilians, but also will help save officers' lives.



### XVII.   PERFORMANCE EVALUATIONS AND PROMOTIONS

The Monitoring Team conducted an audit and review of the Performance Evaluations and Promotions section of the Consent Decree in the Spring 2017. We found supervisory reports to be deficient. We determined that the existing performance evaluations contain little information and that new NOPD forms with prompts for the supervisors are inadequate to obtain the information necessary to meet the requirements of the Consent Decree. Our findings revealed the need for additional prompts and updated training. For example, community policing performance measurements are not incorporated within the current performance evaluation forms.

NOPD has responded to these findings. A revised process for conducting performance evaluations is on track and awaiting Civil Service approval in 2018. We anticipate implementation will occur in 2018.

The feedback on the new performance evaluation tool has been positive. Supervisors will need additional training and better oversight by Command staff before their evaluations will be acceptable. All elements of the Consent Decree are included in the new performance evaluations, training has been conducted, and supervisors will be re-trained in the new process just prior to the evaluation timeframes. The Department expects to practice with the new evaluation once more before it is used for merit based pay evaluations.



### XVIII.  SUPERVISION

NOPD made significant progress during 2017 in meeting its obligations under the Supervisions paragraphs of the Consent Decree. NOPD has made progress in civilianizing some positions, and is working to ensure officers are able to focus on the most critical issues at hand. Nearly all duty locations audited this year, however, still revealed Supervision paragraphs that show mixed results concerning scheduling. The Monitoring Team continues to note a disconnect between the number of sergeants at NOPD and the prevalence of sergeants in the field. The Consent Decree Monitoring Team has reviewed data to determine whether there are adequate sergeants distributed and on-duty at each district.

NOPD'S implementation of the Consent Decree-required early intervention system (EWS) called Insight has been impressive, notwithstanding some points in the road to promoting effective use of the system. Insight tracks numerous officer performance data to provide supervisors information to help them manage and supervise their subordinates and to help them spot trends that suggest an officer may need assistance. Insight Unit personnel provide regular individual training and group training at the district level. In addition, they provided all supervisors with training at the Training Academy during October and November 2017. Insight is so new and different from previous supervisory tools used by the NOPD that the Department has struggled to develop adequate supervisory training. Supervisors received two hours of training in 2016 and were listed for 2 hours of training in 2017, although only one of those hours actually was dedicated to Insight. (The other hour was dedicated to employee assistance.) Districts and duty locations were monitored to determine supervisors' ability to use the Insight system. We found not all supervisors had received notice that they were to use Insight by the time of our review. For those who had received notice, we found that some supervisors were able to use Insight effectively but most were not able to locate all of the information they should be using. This is not surprising for a new system. Subsequent reviews have demonstrated improvement, however.

Additionally, we found all supervisors are not able to view all personnel under their command in Insight. Each sergeant in each district generally is able to view only a portion of the officers assigned to the shift the sergeant supervises. (The Monitoring Team's more recent Insight audits have noted improvements in this area, which will be reflected in the Team's next quarterly report.) The ADP payroll system currently feeds into Insight. Insight permits a supervisor access only to those officers assigned through ADP. Other sergeants on the shift can view the other officers assigned to that shift. This means there are many cases where supervisors may not able to view the performance of all subordinates. Finally, the annual performance evaluations to provide evidence of compliance with this portion of the paragraph are yet to be conducted.[21]

---

[21]     The Monitoring Team reviewed these evaluations in 2018, which is outside of the time period covered by



We will continue to monitor use of Insight and work with NOPD to ensure supervisors are able to obtain all the benefits the system offers.

In addition to auditing supervision, the Monitoring Team reviewed video/audio recording in the fourth quarter. We found partial compliance with the Consent Decree requirement for maintenance and operation of video cameras and AVL (a GPS system for police cars) in all marked or unmarked vehicles assigned to routine calls for service, task forces, tactical units, prisoner transport, or SOD canine.[22] Some cars, however, did not have operable cameras at the time of the audit. Additionally, NOPD has been unable to provide evidence that supervisors incorporate the knowledge gained from the review of CEW, BWC and in-car camera recordings into their ongoing evaluation and supervision of officers. Performance evaluations did not include this requirement. New performance evaluations include this information for 2018. NOPD has developed and implemented approved policies and procedures detailing in-car camera and Body Worn Camera (BWC) operation, supervisory review, and reporting this year.

---

this report. Our assessment of those evaluations will be addressed in our report for the first quarter of 2018.

[22]    The Monitoring Team found significant improvement in its Q1 2018 audit, which will be reported in the Team's next quarterly report.



### XIX.    SECONDARY EMPLOYMENT SYSTEM

The Office of Police Secondary Employment (OPSE) has continued to make steady progress toward full compliance with the Consent Decree. OPSE is now managing all secondary employment by NOPD members. The Monitoring Team commends OPSE Director, Lt. Col. John Salomone, for his steadfast commitment to establishing and leading OPSE and for his dedication to working closely with us to ensure that OPSE met the requirements of the Consent Decree. As our early reports observed, the establishment of OPSE was one of the most intensely controversial and opposed aspects of the Consent Decree. As a sign of its progress, however, currently OPSE officers work more secondary employment hours than prior to the Consent Decree. Since September 2014, when OPSE began managing all secondary employment, there have been consistent year over year increases in officer participation, hours worked, customers served and gross revenues.

In 2016/2017, NOPD's Compliance unit audited OPSE's operations with the exception of special events, which, at the time of the audit were being managed by the NOPD's Special Events office. We reviewed and approved the methodology and findings, which were consistent with our own. The audit was released publicly in June. In July, OPSE issued an updated Policy Manual, which we reviewed and approved.

Col. Salomone's disciplined focus and exemplary project management skills allowed him to chart a course that enabled the City to meet the requirements of the Consent Decree and to navigate through the opposition. He has helped to establish a smoothly running office that meets the requirements of the Consent Decree as well as the needs of NOPD members and OPSE's customers. Some remaining paragraphs for which the City is still non-compliant are ones that have been rendered unnecessary or unfeasible because they were based on assumptions that no longer match OPSE's current, approved operations. The parties, with the Monitor's approval, have filed a motion with the court to eliminate or modify these provisions. Thus, as a practical matter OPSE is compliant. Accordingly, in 2018 our focus will be on monitoring OPSE's operations for sustained compliance.



## XX.    MISCONDUCT COMPLAINT INTAKE, INVESTIGATION, AND ADJUDICATION

The Monitoring Team continues to support the Public Integrity Bureau (PIB) in achieving substantial compliance and effectiveness in its oversight of NOPD conduct. This year, the Monitoring Team conducted a review of PIB administrative investigations. The two main deficiencies found were credibility assessments and completing investigations within the 90 or 120-day timelines. The Monitoring Team also conducted a Special Operation Division (SOD) "Culture Assessment," by reviewing use of force and resisting arrest reports, injury reports, BWC videos, civilian and rank– generated complaints, and suspect interrogation.

The previously discussed Force Investigation Team Manual provided PIB investigators a additional tool to guide them in conducting interviews. Our team reviewed that manual and provided feedback and suggestions to PIB.

We also collaborated with NOPD in developing a case investigation management check-off list and Administrative Shooting Template for the Force Investigation Team, which will ensure essential elements of serious use of force investigations are completed in a timely manner.

Monitoring Team members attended Public Integrity Bureau In-Service Training at the Academy regarding the intake portion of complaint investigations. We found the presentation was conducted well and the supervisors and instructors had very good questions and inquiries about the process. The presentation was well done, and elicited healthy discussion among the students and instructors.

Continued attention to training and personnel development are important as our audits of FIT cases have revealed areas for additional learning, such as the need for a refresher course in interview and interrogation. We noticed instances where the investigator used leading questions when interviewing an involved officer. The Monitoring Team presented technical assistance training to district lieutenants and sergeants regarding use of force investigations and areas of enhancement consistent with the last two Monitoring Team audits. The two meetings went very well and there was open discussion and pertinent questions regarding the role of supervisors in use of force investigations.



### XXI.    TRANSPARENCY AND OVERSIGHT

We have found that NOPD is in compliance with the Consent Decree's Transparency and Oversight requirements.



### XXII.   FUTURE MONITORING ACTIVITIES

While NOPD has made steady and impressive compliance progress, our findings reveal that, for the New Orleans community to realize the improvements contemplated by the Consent Decree, NOPD must focus on daily performance of its officers and supervisors. Improvement will come from better training of officers on the new policies and procedures NOPD has adopted, especially through roll call training; closer supervision by platoon sergeants and lieutenants, who are best positioned to provide prompt counseling; and, where necessary, disciplinary action. We will be working closely with NOPD to develop a plan to ensure supervisors provide the close and effective supervision required by the Consent Decree.

Closely related to supervisors' ability to devote the time necessary to provide close and effective supervision, we have been working with a group of NOPD members to identify unnecessary inefficiencies. This burden reduction group has made a number of recommendations, some of which have been implemented.

We also will be expanding our audits of NOPD's Stops, Searches, and Arrest (SSA) practices. The Monitoring Team worked closely with the Department of Justice to perform an extensive SSA audit in late 2017. That audit identified the need for additional audits and reviews in targeted areas. The results of the preliminary audit and the subsequent targeted reviews will be made public in the coming months.

Finally, in additional to the ongoing audits, evaluations, and outcome assessments necessary to ensure NOPD demonstrates compliance with every paragraph of the Consent Decree, the Monitoring Team will continue to observe Academy training, roll call training, and officers on the streets to ensure Consent Decree providing the reforms are intended benefits to the community. We also will continue providing Technical Assistance to help the NOPD take its impressive achievements to date to the next level.



### XXIII.  Policy Approvals

**Approved Policies Include:**
1.1 Law Enforcement Authority
1.12 Diplomatic and Consular Contacts /
    Arrest or Detention of Foreign Nationals
1.14 Arrest of a Postal Employee
1.17 Arrest of a Special Officer, Reserve
    Officer, or Honorary Officer
1.18 Arrest of a Law Enforcement Officer
    from Another Jurisdiction
1.2.10 Public Recording of Police Officers
1.2.4 Search and Seizure (Custody Searches
    rolled into this policy)
1.2.4.1 Terry Stops
1.2.4.2 Search Warrant Content, Forms and
    Reviews
1.22 Arrest of a City of New Orleans
    Employee
1.2.6 Alternatives to Arrest – Diversion
1.3 Use of Force
1.3.1.1 Handcuffing and Restraints Devices
1.3.1.2 Control Devices and Techniques
1.3.2 Force Investigative Team/Officer
    Involved Shooting
1.3.6 Reporting Use of Force
1.3.7 Use of Force Review Boards
1.4 Authorized Firearms
1.4.1 Authorized Ammunition
1.4.2 Firearms Training Qualification and
    Requalification
1.4.3 Scenario Based Firearms Training
1.7.1 Conducted Electrical Weapon (CEW)
1.9.1 Miranda Rights
11.0.1 Duties and Responsibilities of District
    Commanders, Supervisory Personnel
    and Patrol Officers
11.4.1 Audits and Reviews
13.29 Self Identification/Building Security
13.35 Commendations and Awards
16.5 Volunteers

22.2.6 Officer Assistance Program Member
    Mental Health Services
22.2.7 Officer Assistance Program
    Traumatic Incident Stress Management
22.2.8 Officer Assistance Program: New
    Orleans Police Peer Assistance (NOPPA)
24.2 Mediation Settlement
25.1 Grievances: Employee
    Nondiscriminatory Complaints
26.2 Adjudication of Misconduct
26.2.1 Disciplinary Matrix
26.3 Workplace Discriminatory
    Harassment/Retaliation
33.1 Training and Career Development
33.1.1 Training Advisory Committee
33.2 Training Types and Availability
34.2 Promotions and Promotion Committee
35.1.10 Early Intervention Unit
35.1.7 Employee Counseling
35.1.7 Non-Disciplinary Responses to Minor
    Violations
35.1.9 Insight
41.13 Bias Free Policing
41.13.1 Interactions with LGBTQ Persons
41.22 Canines
41.25 Crisis Intervention
41.26 Crisis Transportation Service
41.3.10 Body-Worn Camera
41.3.2 Body-Worn Camera Inadvertent
    Misuse and Non-Use
41.3.8 In-Car Camera
41.3.9 License Plate Recognition System
41.36 Interacting with Homeless Persons
41.4 Foot Pursuits
41.4.1 Officer Response to Calls
41.4.2 Alternative Police Response (APR)
41.5 Vehicle Pursuits
41.6.1 Immigration Status
41.8 Affidavits and Summons



42.11 Custodial Interrogations
42.12 Hate Crimes
42.15 District Attorney Case Screening
42.19 Child Abuse
42.2 Sexual Assault
42.4 Domestic Violence
42.8.1 Eyewitness Identification -
   Photographic Line-Up
44.1 Child and Dependent Adult Safety
46.7 Crisis Response Unit – SWAT
52.1.1 Complaint Investigation
52.2 Negotiated Settlement Agreements
55.1 Victim and Witness Assistance
55.4 Limited English Proficiency Services
   (LEP)
55.5 Disabilities Services
55.5.1 Communication with persons who
   are deaf or hearing impaired
61.3 Traffic Citations
61.4.5 Abandoned Boats
71.1 Prisoner Transportation
82.4 Complaint Signals Changing of Item
   Signals or Dispositions

**2017 Approvals (Revised):**
1.11 Warrant Inquiries
1.15 Felony Wanted Vehicle Entry in NCIC
1.24 In Custody Deaths
1.25 Concealed Handgun Permit
1.8 Weapons Evaluation Committee
11 Organizational Command Responsibility
12.1 Department Operations Manual
12.2 Departmental Orders
13.14 Vehicle Fueling and Fuel Services
13.19 Excusal on the Night Watch
13.2 Department Forms: Development and
   Implementation
13.22 Crash Review Board
13.25 Lost or Misplaced Driver's License
13.27.1 Job Performance Improvement Plan
13.3 Personnel Files

13.37 Payroll Records
13.38 Nepotism and Employment Conflicts
13.5 Unit Goals and Objectives
13.8 Administrative Communications
15.1 Crime Analysis
16.3 Reserves
17.01 Fiscal Management
17.2.2 Take Home Vehicles
17.3 Department Owned and Personal
   Property
17.4 Damage and Repair to Private Property
2.1 Mutual Aid and Outside Agency
   Assistance
2.2 Reporting Law Enforcement Activity
   Outside of the Jurisdiction
22.2 Limited-Duty Assignments
22.6 Exit Interviews
22.9 Outside Employment
31.1 Recruitment
32.1 Personnel Hiring Selection
33.4 Driver Training Program
41.1 District Patrol Function
41.1.1 Unusual Occurrences
41.1.2 Uniformed Patrol: Platoon Structure,
   Assignments, AWP Days
41.10 Uniform Regulations
41.11 Body Armor
41.2 Roll Call
41.21 Mounted Patrol
41.23 Missing Person Reporting
41.23.1 Public Alerts
41.3.11 Department Technology Use
41.3.3 Seat Belt Use
41.3.4 Personal Communication Devices
41.31 Damage to Public Property
41.33 Death Investigation
41.34 Animal Control
41.37 Notifications
41.39 Identity Theft
41.4.3 Property Loss Report
42.1 Interviews



42.16 Preliminary Forensic Drug Testing
42.18 Adult Abuse
42.2.10 Auto Theft Investigations
42.3 Task Forces
42.5 Computer Voice Stress Analyzer (CVSA), Polygraph Testing and Psychological Stress Evaluator (PSE)
42.8 Eyewitness Identification
43.1 Asset Forfeiture
43.3 Use of Surveillance and Undercover Equipment
43.7 Vice, Narcotics and Organized Crime Investigations
43.8 Registered Offender Information
45.2 Emergency Utility Notifications
46.1 Hostage and Barricade Incidents (approved)
46.16 Weapons of Mass Destruction (WMD)
46.2 Emergency Operations Plan
46.3 Response to Bomb Calls
46.3.4 Hazardous Material Response
46.5 Security of Visiting Dignitaries
46.9 Marine Search and Rescue Unit
52.8 Suspensions and Emergency Suspensions of Members
55.5 Service Animals
61.09 Traffic Direction and Control
61.1.9 Speed Measuring Devices
61.11 School Crossing Guards
61.13 Disabled Vehicles
61.13.1 Abandoned and Nuisance Vehicles
61.2 Compulsory Motor Vehicle Liability Security
61.2 Parking Citations / Voiding
61.21 Vehicle Towing and Release
61.7 Traffic Crash Response and Reporting
74.3.1 Failure to Appear
81.1 Communication Operations
81.13 Major Incident Notification
81.3 Police Radios
81.4 Mobile Digital Computer and

Automatic Vehicle Locator Use
81.7 Police Complaint Signals and Dispositions
81.8 M.O.T.I.O.N. Computer Inquiries
82.1.1 Records Release and Security
82.2.6 Department Electronic Mail
82.3.6 Criminal History Record Information (CHRI)
82.8 Bulletins
83.1 Collection and Preservation of Evidence
83.2 Computers and Digital Evidence
84.1 Evidence and Property
84.2 Evidence and Property Disposal (CE&P)