

**Annual Report of the Office of the Consent Decree Monitor for 2020**

**February 16, 2021**



## I.        Executive Summary

The NOPD has come a long way since the outset of the Consent Decree in 2012 and the appointment of the Monitoring Team in 2013.  In January 2019, at a proceeding at Loyola University New Orleans School of Law, the Monitoring Team recognized the significant progress the NOPD has made in many areas, and moved several areas into "full and effective" compliance with the Consent Decree.  We also clearly articulated to the NOPD the steps it needed to take to complete its journey and move into the two-year sustainment period provided for by the Consent Decree.

Since that time, the NOPD has continued to make progress in some areas, and, as described in the body of this Report, brought additional areas into full and effective compliance with the terms of the Consent Decree.  Compliance in other areas, however, notwithstanding the hard work of many within the Department, has lagged, including in the areas of

- Supervision (including promotions),
- Stops/Searches/Arrests, and
- Performance Evaluations.

Further, the Department's continued focus on these areas has kept the parties and the Monitoring Team from being able to conduct a thorough assessment of the Department's compliance with the Bias-Free elements of the Consent Decree.[1]

Some of the delay in completing NOPD's progress toward achieving full compliance is understandable.  As is well known to the New Orleans' community, the City has faced a series of challenges; namely, a December 2019 cyber-attack that incapacitated many of the City's critical information technology systems; the COVID-19 health crisis that imposed new, urgent health safety demands on the Department; and a series of serious threatened and actual hurricanes that also resulted in NOPD devoting its full attention to protecting public safety.

Nevertheless, these obstacles do not fully explain the lack of progress. NOPD could and should have made more progress toward compliance in 2020.  Many of the systems for implementing and managing NOPD's practices could have been developed without diverting personnel or resources needed to navigate the Department and the City through this unprecedented year.  In other words, the challenges the City faced this year simply do not justify the City's ongoing noncompliance with many aspects of the Consent Decree intended to ensure the delivery of constitutional policing to the New Orleans community.

In November 2020, the City asked the Department of Justice to join it in seeking release from the Consent Decree in advance of meeting its substantive obligations under the Consent Decree.  Importantly, this request for an early exit from the Consent Decree was submitted without providing evidence the City had achieved compliance.  This request appears to us particularly

---

[1]        To be clear, the Department has and continues to fully cooperate with the Monitoring Team.



concerning juxtaposed against a number of developments since our January 2019 proceeding, including:

- A pattern of questionable practices by District-based Task Forces so troubling it prompted the Department to disband those Task Forces.[2]

- An alleged conspiracy among NOPD officers in the 8th District to provide false testimony concerning an arrest.[3]

- Credible reports the Monitoring Team has received from the Public Defender's Office of unconstitutional searches and seizures, also in the 8th District.

- A questionable use of force against protestors on the Crescent City Connection.

While the Department responded quickly and made changes in response to each of these events, it is not enough simply to respond to unconstitutional policing after it occurs.  The Consent Decree's requirements are intended to prevent events like these from occurring in the first place, and to give the public confidence such events will not occur.[4]  Most importantly, responding on an ad hoc basis does nothing to address the primary areas of ongoing concern identified in January 2019.[5]

2020 is a year many of us will be happy to put behind us and focus on the future.  In that spirit, regardless of the reasons for slower progress toward compliance since our January 2019 proceeding, it is our hope that the Department and the City will reenergize their efforts to implement and sustain the Consent Decree reforms as promised.

---

[2]     See https://www.nola.com/news/courts/article_a9e269aa-9939-11ea-8e0a-23018c568292.html.
[3]     See https://www.nola.com/news/courts/article_48cba680-97be-11ea-bf0a-d7edda47a1b1.html.
[4]     The City's request is a matter between it and the Department of Justice and, accordingly, we will not address the matter further except as requested by the parties or Judge Morgan.  We will remain focused on meeting our Consent Decree responsibility to assist in and report on the NOPD's efforts to achieve compliance and our commitment to the people of New Orleans that we will persevere until the Department achieves full and sustained compliance.
[5]     We would be remiss, however, if we did not recognize the ongoing excellent work performed by the NOPD Public Integrity Bureau.  The progress NOPD has made in this area gives the Monitoring Team comfort that when NOPD experiences officer misconduct, such transgressions will be dealt with fairly, professionally, and effectively.



## II.    Table of Contents

# Contents

I.      Executive Summary ...............................................................................................2

II.     Table of Contents ..............................................................................................4

III.    Authority............................................................................................................5

IV.     Glossary of Acronyms .....................................................................................6

V.      Introduction .......................................................................................................7

VI.     Compliance Update ........................................................................................11

  A.   Academy ..........................................................................................................11

  B.   Recruitment......................................................................................................12

  C.   Misconduct Investigations ...........................................................................13

  D.   Supervision ......................................................................................................16

  E.   Performance Evaluations & Promotions....................................................18

    1.   Performance Evaluations .............................................................................19

    2.   Promotions.....................................................................................................22

  F.   Community Engagement .................................................................................23

  G.   Stops, Searches, Arrests .................................................................................27

  H.   Bias-Free Policing ...........................................................................................31

VII.    Ongoing Focus on Use of Force ..................................................................33

    1.   Unity One Vehicle Pursuit ...........................................................................33

    2.   High Risk Warrant ........................................................................................35

    3.   Crescent City Connection (CCC) Incident ..............................................36

VIII.   Monitoring Costs............................................................................................38

IX.     Conclusion .......................................................................................................40

X.      Appendix ..........................................................................................................41

  A.   Table 1:  NOPD SSA Audit Compliance Findings (CD Paragraphs) .......42

  B.   Table 2:  NOPD SSA Audit Compliance Findings (Policies)....................44



### III.   Authority

*Consent Decree Paragraph 444*

The Monitor shall assess and report whether the requirements of this Agreement have been implemented, and whether this implementation is resulting in the constitutional and professional treatment of individuals by NOPD.

*Consent Decree Paragraph 486*

To ensure that the requirements of this Agreement are properly and timely implemented, the Court shall retain jurisdiction of this action for all purposes until such time as the City has achieved full and effective compliance with this Agreement and maintained such compliance for no less than two years. ***At all times, the City and NOPD shall bear the burden of demonstrating full and effective compliance with this Agreement.*** DOJ acknowledges the good faith of the City in trying to address measures that are needed to promote police integrity and ensure constitutional policing in New Orleans. DOJ, however, reserves its right to seek enforcement of the provisions of this Agreement if it determines that the City has failed to fully comply with any provision of this Agreement. DOJ agrees to consult with officials from the City before instituting enforcement proceedings.



## IV.    Glossary of Acronyms

| | |
|---|---|
| "BWC" | Body Worn Cameras |
| "CD" | Consent Decree |
| "COCO" | Community Coordinating [sergeants] |
| "DA" | District Attorney |
| "DI-1" | Disciplinary Investigation Form |
| "DOJ" | Department of Justice |
| "DV" | Domestic Violence |
| "DVU" | Domestic Violence Unit |
| "ECW" | Electronic Control Weapon |
| "EPIC" | Ethical Policing is Courageous (NOPD peer intervention program) |
| "EWS" | Early Warning System |
| "FBI" | Federal Bureau of Investigation |
| "FIT" | Force Investigation Team |
| "FOB" | Field Operations Bureau |
| "FTO" | Field Training Officer |
| "IPM" | Independent Police Monitor |
| "KSA" | Knowledge, Skill and Ability |
| "LAP" | Language Assistance Plan |
| "LEP" | Limited English Proficiency |
| "LGBT" | Lesbian, Gay, Bi-sexual, and Transgender |
| "NOPD" | New Orleans Police Department |
| "OCDM" | Office of Consent Decree Monitor |
| "PIB" | Public Integrity Bureau |
| "QOL" | Quality of Life [officers] |
| "SOD" | Special Operations Division |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |



## V.    Introduction

In January 2019, at a proceeding held at Loyola New Orleans School of Law, the Monitoring Team announced that several sections of the Consent Decree had moved "into the green" — that is, were found to be in substantial compliance with the Consent Decree.



Eight areas, however, were identified as requiring more attention by the Department to bring them into compliance:

1. Supervision
2. Performance Evaluations & Promotions
3. Recruitment
4. Community Engagement
5. Stop, Search, and Arrest
6. Academy
7. Misconduct Investigations
8. Bias-Free Policing

The NOPD committed to focus its attention on these areas following the Loyola proceeding and, to varying degrees, has achieved some notable successes.  Upon the recommendation of the Monitoring Team and the DOJ, the Court moved the Academy portion of the Consent Decree into "Full & Effective Compliance" at the end of 2019, Recruitment into "Full & Effective Compliance" in late 2020, and Misconduct Investigations into "Full & Effective Compliance" in early February 2021.  And as described in greater detail below, Community Engagement is close to achieving "Full & Effective Compliance."  NOPD is to be commended for its achievements in these important areas.



2020 brought challenges to the NOPD, the City, and, indeed, the nation.  In December 2019, a cyber-attack shut down the City's computer systems.  The cyber-attack, of course, was followed by a virus of a different sort, COVID-19.  The summer also brought a series of actual and threatened hurricanes that demanded a response from the NOPD, the City, and the New Orleans' community.  These challenges were compounded by civil unrest in cities across the country including in New York, Philadelphia, Milwaukee, and New Orleans, to name just a few.

Despite these challenges, the Monitoring Team has been able to continue to closely monitor, guide, and assist the NOPD's progress toward compliance.  We increased our use of body worn camera footage to monitor whether NOPD's practices conformed to the Consent Decree and NOPD's policies.  We conducted compliance audits.  And, like the rest of the country, we became adept at video conferencing.  Although we have not held a public community meeting in some time, we maintain close communication and coordination with NOPD, the DOJ, Judge Morgan (who is responsible for determining when the NOPD has come into substantial compliance with the Consent Decree in order to begin the two-year sustainment period), and the many other reform stakeholders in New Orleans.  In sum, we have been able to meet our Consent Decree responsibilities notwithstanding the many obstacles 2020 put in front of all of us.

At present, *four sections of the Consent Decree require significant ongoing attention by the NOPD*.  For efficiency sake and because of logical overlap, we put these four remaining items into two categories:

- Supervision, Performance Evaluations, and Promotions
- Stops, Searches, & Arrests and Bias-Free Policing

These areas are critical elements of the Consent Decree and of great importance to the New Orleans community.  If the NOPD lacks an effective structure to evaluate, promote, and supervise officers — some of whom will become the future leaders of the Department — then no one can have confidence in the sustainability of the many achievements NOPD has made to date.  Likewise, the Department's attention to Stops, Searches, and Arrests, and Bias-Free Policing, lies at the very heart of the Consent Decree.

Notwithstanding the hard work of many within the NOPD, events over the past 18 months have confirmed the Monitoring Team's and DOJ's view that the Department still has material work to do in these areas.

- In March 2019, a policy-violating high speed chases led to the death of three civilians, injury to several others, and extensive damage to a local business.  The incident also prompted a joint Monitoring Team/PSAB/PIB investigation that uncovered additional unreported high speed chases in violation of clear NOPD policy.

- In June 2020, the Monitoring Team discovered significant policy violations stemming from the Department's management of its District-based Task Forces, many of which stemmed



from a failure of supervision by District leaders. The findings were serious enough to prompt the Department to terminate its entire District-based Task Force program.

- In November 2020, the Department's own Professional Standards & Accountability Bureau (PSAB) completed a detailed audit of the Departments compliance with the Stop/Search/Arrest (SSA) provisions of the Consent Decree and found troublingly low levels of compliance in several important areas, including supervisors not responding to the scene when required, officers failing to document the reasons for a search, officers failing to complete Field Interview Cards, supervisors failing to review Field Interview Cards in a timely manner, and officers failing to document articulable justifications for the pat downs they conducted.

- In December 2020, PSAB conducted an audit of the Department's compliance with its new Performance Evaluation policies and protocols and again found unacceptably low levels of compliance by supervisors both in performing evaluations of their subordinates and in ensuring their subordinates performed meaningful evaluations of others.

- The Department has known it needed a meaningful, compliant promotions process since the outset of the Consent Decree, and that the DOJ and the Monitoring Team found the current process inadequate for years, but only provided the Monitoring Team with an acceptable draft Standard Operating Procedure in mid-December 2020.[6]

While we recognize that the NOPD has made significant progress in every area since the outset of the Consent Decree, the progress since January 2019 in the areas not yet in full and effective compliance has slowed, and, consequently, the Department still is not in full and effective compliance with the Consent Decree in the areas noted above. Accordingly, we continue to work closely with the Department of Justice to provide guidance and support to the NOPD to help bring these remaining critical areas into compliance.

In addition to focusing on the critical areas not yet in compliance with the Consent Decree, the Monitoring Team also has continued throughout 2020 to review all critical incidents involving NOPD officers. Summaries of our activities in this regard are included in the body of this annual report. As you will see, we remain satisfied with the NOPD Public Integrity Bureau's handling of the problems that have materialized from time to time.

Finally, it is worth taking a step back and saying a word or two about the big picture. In 2011, by all accounts, the NOPD was one of the most dysfunctional and, many would say, corrupt, police agencies in the country. As DOJ found in its comprehensive 2011 investigation, the Department lacked the basic structures of constitutional policing. Today, in many respects, the NOPD is a

---

[6]     According to the City, some of this delay was caused by the need for the Department to work with the City's Chief Administrative Officer to develop a new promotions process for the Police Department and the Fire Department. The CAO issued Policy Memorandum 143(R) in August 2020, which did help advance the parties' and the Monitoring Team's discussions regarding a compliant promotions process.

changed agency.  With the exceptions noted in this report, the Department has implemented meaningful and sustainable structures that will help ensure, in the words of the Consent Decree, the NOPD "protect[s] the constitutional rights of all members of the community, improve[s] the safety and security of the people of New Orleans, and increase[s] public confidence in the New Orleans Police Department."  CD at 1.

The Monitoring Team is proud of the strides the Department has made, and is hopeful the City and NOPD now complete the job they started.



## VI.    Compliance Update

Pursuant to the terms of the Consent Decree, the NOPD can demonstrate full and effective compliance by demonstrating *sustained compliance* with all material elements of the Consent Decree. The Consent Decree makes clear "[a]t all times, the City and NOPD shall bear the burden of demonstrating full and effective compliance with this Agreement." CD at P466.  The sections below provide a summary of the state of NOPD compliance in those areas that were not yet in Full and Effective Compliance at the time of the January 2019 Loyola Proceeding. [7]

### A.    Academy



The Monitoring Team recommended and the Court found the NOPD Academy to be nearing full and effective compliance with the Consent Decree in December 2019.  Thanks in large part to a dedicated effort by the Academy staff, the DOJ, and the Monitoring Team, the Academy remedied the remaining gaps identified at the January 2019 Loyola proceeding.  Additionally, in late 2020, to ensure the Academy was sustaining the progress it made over the course of the past several years, the Monitoring Team conducted a limited follow-up review of the Academy.  In addition to wanting to ensure there had been no backsliding, we also were prompted by stories about another department using offensive materials in its academy, and we wanted to ensure no inappropriate materials had crept into the NOPD Academy curriculum subsequent to finding the Academy into compliance with the Consent Decree.

The following summarizes our approach and findings.

- We re-interviewed the NOPD Academy Curriculum Director who confirmed that he personally reviews and approves all curriculum and videos.  The Director further confirmed that the 211 Academy lesson plans previously reviewed and approved by the Monitoring Team and DOJ still are being used at the Academy.
- We interviewed the Assistant Commanding Officer of the Education and Training Division who confirmed the continuation of the standard Academy practice of obtaining approval from the Curriculum Director before adding any material to an Academy class.  The Assistant Commanding Officer further confirmed he personally observes/audits all Academy classes to ensure the class is being taught in a manner wholly consistent with the curriculum.

---

[7]        The NOPD also can achieve full and effective compliance by demonstrating sustained and continuing improvement in constitutional policing as demonstrated by a number of pre-determined "outcome assessments" identified in the Consent Decree.  Here again, it is the City's burden to demonstrate full and effective compliance.



- We reviewed and approved the 2020 Academy Annual Master Training Plan (as we have with the prior annual Training Plans) and confirmed it is consistent with the Consent Decree.
- We reviewed all Problem-Based Learning exercises and confirmed all are consistent with the Consent Decree and the Academy's Annual Master Training Plan.

We are pleased to report the Academy continues to operate in full and effective compliance with the Consent Decree. The Academy now has a redesigned curriculum, new lesson plans, a highly qualified academic "dean," and a meaningful professional development program for its staff. The Academy also now has written Standard Operating Procedures and the capability to capture and analyze data, both of which will help the Academy sustain the achievements it has made to date.

### B.    Recruitment

| January 2019 | Nearing Full & Effective Compliance | January 2021 | Full & Effective Compliance |
|---|---|---|---|

Thanks to a concerted joint effort by the NOPD, the DOJ, and the Monitoring Team, the NOPD resolved the remaining gaps in recruitment identified at the 2019 Loyola proceeding. Consequently, we are pleased to report the Court has recognized the Department to be in Full and Effective Compliance with the Consent Decree in this area.

The road to compliance in this area was a long one. In mid-2018, due to NOPD's inadequate progress in meeting its obligations under the Consent Decree relating to recruiting, the Monitoring Team pressed for greater focus by NOPD leadership in this area. To help organize and energize this new focus, the Monitoring Team and NOPD agreed upon a number of concrete projects designed to transform the Recruitment Division into a professional organization that would:

- Attract and hire a diverse group of highly qualified and ethical candidates for the Academy,
- Vet those candidates effectively, fairly, and expeditiously,
- Provide a high level of job satisfaction for all recruitment personnel, and
- Establish a respected brand, within NOPD and beyond, that is commensurate with the importance of the Recruitment Division as the vanguard of the NOPD's reform initiatives.

NOPD designated this effort the "SURGE" initiative (Strategic Urgency to Recruit Great Employees).

The SURGE initiative had a slow start, but began bearing fruit in late 2018. By early 2019, the NOPD was nearing full and effective compliance in this area. Progress slowed a bit in 2019 and the Department's efforts were hindered by the cyber-attack and pandemic of 2020. But the persistence



of the NOPD Recruitment team paid off, and, based upon the Monitoring Team's and DOJ's recommendation, the Court moved this area into full and effective compliance in early January 2021.

Among the many accomplishments for which the NOPD Recruitment Division now can claim credit are the following:

- Development of rewritten policies, procedures, and practices covering the identification, recruitment, evaluation, and on-boarding of recruits.
- Creation of organizational workflows to ensure all members of the recruitment staff understand their responsibilities, perform in a professional manner, and document their work product.
- Development of a Standard Operating Procedure designed to help ensure the sustainability of the changes put in place.
- Technology upgrades, including electronic recruit testing capability, better record keeping, and a variety of impressive dashboards that permit managers to assess the effectiveness of the Department's recruitment efforts at any time.
- Physical workplace upgrades, including a professional office, user-friendly signage, and an easily accessible testing center.
- Expanded partnerships with outside organizations to help infuse private sector efficiency into the recruitment process.
- Development of best-in-class data collection and evaluation tools to promote effective end-to-end management of the recruitment process.
- Upgraded record keeping capabilities.
- Enhanced self-auditing capabilities.
- Creation of new programs to facilitate recruitment (e.g., Recruitment Family Night to address the needs of recruit families along with the recruits themselves).

While it will take time to see the full results of these efforts, they unquestionably have helped transform the Recruitment Division from the "anemic, entirely passive, and lacking clear goals, plans, or accountability" Division the DOJ found when it investigated the Department prior to implementation of the Consent Decree.  (DOJ Findings Letter at xiv.)

### C.    Misconduct Investigations



At the January 2019 Loyola proceeding, the Monitoring Team recognized the progress the Department had made in conducting misconduct investigations.  Among other things, the Monitoring Team noted that the Department, under the leadership of Chief Arlinda Westbrook, had

developed a transparent and professional investigations unit that conducts fair and impartial internal investigations. We noted, however, a few gaps remained before we could recommend to the Court to move this area into full and effective compliance with the Consent Decree.

In December 2019, a Monitoring Team audit of PIB administrative investigations found two paragraphs still out of compliance with the Consent Decree:

- Paragraph 413, requiring that credibility determinations be based upon the evidence, was only 87% compliant. The Monitoring Team found that the lingering problems, however, were attributable more to investigations conducted by District-based supervisors rather than PIB investigators.
- Paragraph 420, requiring that complainants be notified of the outcome of the investigation, in writing, within 10 business days of the completion of the investigation, was only 68% compliant.

Subsequently, in August 2020, the PIB Quality Assurance Unit conducted a self-assessment of compliance using the same methodology used by the Monitoring Team audits, with the following results:

- Paragraph 413 - PIB's self-audit confirmed PIB continues to make adequate credibility determinations as part of their misconduct investigations. This finding is consistent with the Monitoring Team's prior findings. The self-audit, however, found ongoing flaws in District-level investigations. Specifically, 7 of the 40 cases reviewed were not in compliance with paragraph 413.
- Paragraph 420 - PIB's self-audit identified a significant, ongoing failure to document compliance. PIB was able to confirm only 55% of the required notices went out on time. While it is possible all notices went out on time, if PIB cannot document it, the Monitoring Team cannot find it.

Notwithstanding the low score PIB gave itself in the area of timing of notifications and the continued shortcomings of District-level credibility determinations, the Monitoring Team nonetheless believes PIB should move into full and effective status. Our reasoning is as follows:

First, with respect to paragraph 413, as noted elsewhere in this Report, we also are considering District-level investigations under the Supervision section of the Consent Decree rather than the Misconduct section of the Consent Decree. The Monitoring Team's and PIB's own audits continue to confirm PIB is compliant in this area.

Second, with respect to Paragraph 420, in January 2020, PIB implemented a new system to track the timing of all complainant notifications. The Monitoring Team has been pushing PIB to employ such a system for some time, and we are pleased the Department finally accepted our recommendation. We will re-audit this area in March 2021 to confirm it is in place and functioning as expected.

Third, in 2018, PIB expanded its Quality Control unit, which reviews the investigations conducted by District supervisors.  The existence of the Quality Control unit gives the Monitoring Team less concern over the improvements still needed by District supervisors.

Fourth, we are further comforted by the positive findings of PIB's recent Paragraph 404 self-audit, which evaluated whether misconduct investigations are as thorough as necessary to reach reliable and complete findings.  Of the 40 cases reviewed, PIB found *only two* to be out of compliance, and both were conducted by district investigators.  The Monitoring Team spot checked PIB's work and found no reason to disagree with PIB's findings.

One area, however, requires additional effort on the part of PIB notwithstanding our Full and Effective compliance determination, and, thus, requires some additional discussion here.  Paragraph 383 of the Consent Decree requires NOPD to conduct a series of proactive audits, sometimes called "sting audits."  While PIB and PSAB have employed a wide range of proactive audits over the past few years, until recently the Department's proactive audit plan did not encompass the full scope of activities called for by the Consent Decree.  For example, Paragraph 383 contemplates "secret shopper" type stings – i.e., where someone poses as a complainant and attempts to file a complaint against an officer to test the effectiveness, fairness, and compliance of the complaint intake process.  PIB is working closely with the Monitoring Team and DOJ to finalize a plan for conducting a broader range of proactive audits, which we expect to be completed shortly, and has committed to continue doing so as long as necessary to ensure sustained compliance.  In light of the significant improvement we have seen within PIB since the outset of the Consent Decree and the ongoing commitment of PIB leadership to continuous improvement, we do not believe this issue should hold PIB back from a "full and effective" compliance finding.[8]  The Court and the DOJ have agreed with this recommendation.

Thanks to the hard work of Chief Westbrook and her team, NOPD's accomplishments in this area (supplementing the accomplishments already recognized at the January 2019 proceeding) have included meaningful training of investigators, more effective and professional credibility determinations, new internal controls to ensure the timely commencement and completion of investigations, and improved documentation of policy, training, and tactics.  While room exists for further improvement in a few areas, and the Monitoring Team will ensure those further improvements are made over the coming months, the Consent Decree does not call for perfection.  Accordingly, we are pleased to move NOPD into Full and Effective Compliance in the area of Misconduct Investigations.

---

[8]      We, of course, will continue to monitor PIB's development and implementation of the promised proactive audit plan.



### D.    Supervision

| January 2019 | Significant Progress | January 2021 | Significant Progress |
|---|---|---|---|

The NOPD's path to bringing this area into compliance with the Consent Decree has been a slow one.  While the Department's practices are a far cry from the grossly deficient practices found by the Department of Justice during its 2011 investigation, there continue to exist systemic deficiencies and the Department still is unable to show full and effective compliance with the Consent Decree in this area.  We identified several of these deficiencies at the January 2019 Loyola proceeding, including the following:

- Inconsistent review of force statements by supervisors
- Supervisors not consistently working same shifts as those they supervise
- Districts not consistently meeting patrol/supervisor ratio
- Insight Early Warning System still not used to full capacity[9]
- Supervisors performing inadequate evaluations
- Roll call training inconsistent
- Inconsistent quality of supervision

Notwithstanding these clearly identified shortcomings, the Department continued to give this topic inadequate attention.  This lack of attention prompted the Monitoring Team in August 2019 to request a high-level working group of multiple Captains (then Commanders) and Deputy Chiefs to develop a clear and meaningful plan to remedy the ongoing significant deficiencies related to supervision.  The Working Group put together a thoughtful and practical blueprint to (a) remedy the Department's supervision shortcomings and (b) bring the Department into compliance with the supervision requirements of the Consent Decree.  We refer to this effort as NOPD's "Supervision Initiative."  The initiative outlined necessary improvements in multiple specific areas designed to bring NOPD into compliance with the Consent Decree in the area of supervision.

In late 2019, the Department's Supervision Initiative began to get traction and make progress.  Little by little, the Department began to chip away at the wall that seemingly has stood in the way of

---

[9]        Due to the Cyber-attack in December 2019, the City's pace of response, and the City's decision to change some data systems and remove some data interfaces, Insight and MAX were unavailable to the Department much of 2020. As of November 20, 2020, many systems still had not been restored, including district attorney screening data, K9 data, and secondary employment data.  Insight was not available to supervisors for nearly one year, and the 2018 performance evaluations were completed without the benefit of Insight data.  Insight now is only partially restored.  The Monitoring Team continues to observe the restoration of MAX, and will continue to do so until all systems have been restored and are back in use.

compliance in this area since the outset of the Consent Decree. Unfortunately, that progress slowed in 2020.

Currently, the Department still is not in compliance with its obligations to ensure close and effective supervision of its officers. As but one example, in October 2019, the Monitoring Team initiated a thorough review of the Department's District-Based Task Forces, to focus significant attention on the supervision of those task forces. The resulting report, which we shared with the public in March 2020,

> identified serious shortcomings in multiple areas relating to Task Force operations, including lack of close and effective supervision, lack of a clear daily mission, multiple inefficiencies, and poor documentation.

These shortcomings not only led to some Task Force officers violating NOPD policy, but also led to Task Force operations being far less effective and far more dangerous than they should be. In response to this assessment, the Department disbanded its District-based task forces.

Another area relating to supervision where the Department continues to fail to meet its obligations is in the area of performance evaluations and promotions. While we will discuss both issues elsewhere in this report, suffice it here to say the Department's actions in these areas continue to impede the NOPD's progress toward compliance with the supervision elements of the Consent Decree.

Still another area of inadequate progress relates to misconduct investigations. As noted above, in NOPD's most recent self-audit, the Department found 7 of 40 investigations (17.5%) lacking adequate credibility determinations by the investigating officers. All seven of these were conducted by District-level investigators (i.e., they were not conducted by PIB). This finding is consistent with the Monitoring Team's prior findings. Paragraph 413 requires adequate credibility determinations as part of all misconduct investigations. While this paragraph falls under the Misconduct section of the Consent Decree, we consider as part of the Supervision section because the shortcoming rests with District investigators, not PIB investigators. Of the 7 non-compliant investigations, all of them were (or should have been) reviewed by upper level District supervisors before being submitted to PIB as final reports.

The ability to provide close and effective supervision of officers not only is critically important to ensuring NOPD's compliance with the Consent Decree, but with the U.S. Constitution. The Department of Justice highlighted the importance of close and effective supervision in its 2011 findings letter:

> Front line supervision, especially of officers patrolling and responding to calls in the field, is a lynchpin of effective and constitutional policing. Field supervisors provide the close and consistent supervision necessary to guide officers' conduct and to

help them learn from their mistakes. They are in best position to recognize a problem with an officer's conduct and intervene immediately to ameliorate or prevent harm. When a supervisor is on-scene and realizes that a patrol officer has made an arrest without probable cause, the supervisor can instruct the officer to release the arrestee and immediately counsel the officer about what the officer did wrong. When a community member is upset about how an officer responded to a call, a supervisor can immediately take a complaint—or sometimes address the concern to prevent a complaint. How a field supervisor conducts him or herself, and whether he/she requires adherence to policy and ethics, sets a tone of accountability and integrity—or not.

Field supervisors also are in the best position to ensure that street level crime prevention efforts are as effective as possible; they know how productive their officers are, and what they need to be more effective. Properly trained and deployed, field supervisors can identify the strengths and weaknesses of each officer under their command, adjusting their level and type of supervision accordingly.  (DOJ Findings Letter at xv)

While the Monitoring Team recognizes significant progress has been made since the outset of the Consent Decree, and certainly recognizes the Department employs many excellent supervisors who provide close and effective supervision to their officers, the Department institutionally continues to show gaps and inconsistencies in this area.

But there is reason for cautious optimism.  In late 2020, at the request of the Monitoring Team, the Department gave shared responsibility for the Supervision Initiative to two deputy chiefs, Chief Otha Sandifer and Chief John Thomas.  The NOPD also assigned an innovation manager from the PSAB, Michael Pfeiffer, to help push the project forward.  We are already seeing improved progress and are hopeful giving this project the high level attention it warrants will allow the Department to make progress in this area more rapidly than it has made in the past.

### E.   Performance Evaluations & Promotions



No transformation of any complex organization can be sustained without an effective process of identifying, evaluating, and selecting its future leaders.  In the NOPD, this is done through a multi-prong performance evaluation and promotions process.  Historically, this process has not been

18

effective.  The DOJ found significant flaws in the Department's performance evaluation and promotions processes in 2011:

> NOPD's promotional system does not adequately assess or consistently reward the officers who are best able to police effectively and constitutionally. Promotional decisions do not adequately consider misconduct by officers or their ability to lead with integrity and diligence. Performance evaluations do not sufficiently assess officers' conduct or value constitutional policing. As they currently function, NOPD's performance evaluation and promotion systems erode public confidence in the Department and facilitate officers' unconstitutional conduct.

While the performance evaluation process has improved since 2011, the Monitoring Team continues to identify significant shortcomings in both areas.

### 1.   *Performance Evaluations*

To remedy the inadequate (and often non-existent) process of evaluating officers and supervisors in the past, the Consent Decree directed NOPD to overhaul its performance evaluation process and develop a process that meaningfully evaluated every employee in the following areas:

a) Community engagement and communication with the public as appropriate to assignment;

b) Use of community-policing and problem-solving strategies as appropriate to assignment;

c) Civilian commendations and complaints;

d) Disciplinary actions;

e) Compliance with policies on usage of sick leave and other leave;

f) Compliance with policies on secondary employment;

g) Safety (e.g., POST officer safety standards and vehicle operations);

h) Training;

i) Report writing; and

j) Decision-making skills.

In 2018, in an effort to encourage the Department to rethink the way it evaluates and promotes officers and supervisors and develop a system that captured each of these elements in a meaningful

way, the Department committed to wholly restructure its performance evaluation process. This effort resulted in a reworked performance evaluation process and audit tool.[10] Supervisors were trained in how to use the new audit tool. The Monitoring Team and the DOJ reviewed and approved the new audit tool before it was put into place.

The Department first "beta tested" its new personnel evaluation process in 2019 with unsatisfactory results. While the tool itself was well designed, the supervisors conducting the evaluations failed to put in the time necessary to record meaningful information. Many supervisors, for example, failed to list a single specific example supporting their evaluations. (The evaluation tool requires supervisors to provide specific examples supporting their evaluations to ensure the evaluations are based on facts and not guesswork or bias.)

To its credit, the NOPD recognized the results of its trial run were unsatisfactory and set about to provide additional guidance and training to its supervisors. At the request of the Monitoring Team, the Department also implemented a process through which officers themselves conduct an initial self-evaluation that can help inform a supervisor's evaluation, a process used extensively in the private sector. The supervisors may not substitute the self-evaluation for the supervisor's own independent judgment, but may look to that self-evaluation to help identify events in each officer's job performance that took place over the past 12 months.

While these advances did improve compliance among supervisors, they did not do enough to bring the Department into compliance with the Consent Decree. In fact, the Department's own PSAB conducted an audit of supervisor performance evaluations in late 2020 and concluded that supervisor evaluations were deficient in numerous aspects.

The PSAB audit, which was thorough and very well done, found troublingly low rates of compliance in multiple areas. For example, only 23% of the evaluation samples provided support for whether the officer engaged in safe policing practices. Only 37% of the evaluations provided support for the officer's decision-making skills. The tables below present the totality of PSAB's findings:

---

[10] We use the term "tool" here to describe collectively the audit process, written protocol, and survey instrument (i.e., form).



### Supervisor Performance Evaluation Scorecard
Compliance percentages for supervisor performance evaluation requirements

Review Period: 2019 Annual

| District | # PE's Reviewed | Q1 Reporting Skills | Q2 Decision Making | Q3 Safety Employed | Q4 A-B Community Engagement and Problem Solving | Q5 A-H Insight Verification | Q6 Search Warrant Log Verification | Q7 Stops, Pat-Downs, Or Arrests Verification | Q8 A-B Quarterly Check-ins Date(s) Verification | Q9 Bilingual Pay Verification |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 5 | 60% | 100% | 60% | 60% | 79% | 100% | 100% | 89% | 100% |
| 2 | 5 | 20% | 40% | 40% | 20% | 63% | 100% | 80% | 60% | 100% |
| 3 | 4 | 75% | 25% | 25% | 38% | 77% | 100% | 100% | 100% | 100% |
| 4 | 4 | 50% | 25% | 25% | 13% | 52% | 100% | 100% | 50% | 100% |
| 5 | 5 | 40% | 0% | 20% | 50% | 75% | 100% | 100% | 60% | 100% |
| 6 | 4 | 25% | 25% | 25% | 13% | 77% | 75% | 75% | 25% | 100% |
| 7 | 5 | 40% | 20% | 0% | 20% | 61% | 80% | 80% | 70% | 100% |
| 8 | 6 | 17% | 67% | 17% | 50% | 19% | 67% | 100% | 42% | 83% |
| SOD | 6 | 60% | 50% | 33% | 40% | 83% | 100% | 100% | 92% | 100% |
| FOB-Other | 5 | 75% | 100% | 60% | 33% | 61% | 100% | 100% | 50% | 100% |
| Academy | 1 | 100% | 100% | 100% | - | 100% | - | - | 100% | - |
| CID Other | 1 | 100% | 0% | 0% | 0% | 0% | 100% | 100% | 50% | 100% |
| Homicide | 1 | 100% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% |
| ISB* | 3 | 33% | 33% | 0% | 25% | - | 100% | 100% | 33% | 100% |
| Other | 1 | 0% | 0% | 0% | 0% | 0% | - | - | 0% | 0% |
| PIB | 4 | 25% | 0% | 0% | 100% | 0% | 100% | 100% | 0% | 100% |
| PSAB | 1 | 100% | 100% | 0% | 50% | 88% | 100% | 100% | 50% | 100% |
| MSB* | 13 | 15% | 23% | 8% | 27% | - | 75% | 88% | 42% | 73% |
| SID | 2 | 0% | 0% | 0% | 0% | 53% | 100% | 100% | 50% | 100% |
| SVS | 4 | 75% | 25% | 25% | 63% | 27% | 100% | 100% | 75% | 100% |
| Overall | 80 | 41% | 37% | 23% | 38% | 59% | 91% | 94% | 56% | 93% |

Review Period: 2019 Annual

### Supervisor's Performance Review

| Q10.1 Described How Employee Deterred and/or Addressed Misconduct | Q10.2 A-D Conducted Regular Reviews of Insight | Q10.3 Addressed All Non-Compliance as Distributed by ARU | Q10.4 Ability and Effectiveness in Conducting Supervisory Reviews | BWC Video is Referenced in Eval | SVS Examples of Victim Interactions Used | Reporting Supervisor Signed the Eval | Employee Signed the Eval | Reviewing Supervisor Signed the Eval | Self-Assessment Attached | Employee Summary Report Attached | Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 67% | 67% | 67% | 67% | 80% | - | 100% | 100% | 100% | 80% | 80% | 82% |
| 100% | 100% | 100% | 100% | 0% | - | 100% | 80% | 80% | 80% | 60% | 70% |
| 100% | 100% | 100% | 100% | 75% | - | 100% | 100% | 100% | 75% | 75% | 82% |
| 100% | 83% | 50% | 100% | 50% | - | 100% | 100% | 100% | 75% | 50% | 70% |
| 100% | 100% | 100% | 100% | 40% | - | 100% | 80% | 80% | 80% | 80% | 74% |
| 100% | 100% | 50% | 100% | 0% | - | 100% | 100% | 100% | 75% | 75% | 65% |
| 100% | 83% | 100% | 100% | 20% | - | 100% | 100% | 100% | 100% | 100% | 72% |
| 67% | 78% | 100% | 33% | 17% | - | 100% | 83% | 83% | 17% | 17% | 56% |
| 100% | 100% | 100% | 100% | 40% | - | 100% | 100% | 100% | 83% | 83% | 82% |
| 100% | 100% | - | 100% | 0% | - | 100% | 80% | 60% | 60% | 60% | 74% |
| 100% | 100% | - | 100% | - | - | 100% | 100% | 100% | 100% | 100% | 100% |
| - | - | - | - | - | - | 100% | 100% | 100% | 0% | 0% | 54% |
| - | - | - | - | 0% | - | 100% | 100% | 100% | 100% | 100% | 80% |
| 100% | - | 0% | 100% | 0% | - | 100% | 67% | 67% | 33% | 33% | 60% |
| - | - | - | - | - | - | 0% | 0% | 0% | 0% | 0% | 0% |
| 50% | 33% | 100% | 50% | 0% | - | 100% | 75% | 50% | 25% | 0% | 48% |
| - | - | - | - | 100% | - | 100% | 100% | 100% | 0% | 100% | 79% |
| 75% | - | 75% | 75% | 0% | - | 83% | 69% | 62% | 62% | 69% | 54% |
| 100% | 100% | 100% | 100% | 0% | - | 100% | 100% | 100% | 100% | 100% | 69% |
| 50% | 100% | 100% | 100% | 0% | - | 100% | 75% | 75% | 75% | 50% | 71% |
| 86% | 84% | 81% | 85% | 26% | 100% | 96% | 85% | 81% | 65% | 63% | 69% |

Importantly, the NOPD PSAB not only conducted a high quality audit in this area, but also, at the Monitoring Team's urging, has prepared a corrective plan to ensure the shortcomings noted in the audit report are remedied promptly. The Monitoring Team and the DOJ have reviewed the corrective action plan and found it thoughtful and reasonable.



The Monitoring Team recognizes that completing a thorough and meaningful evaluation takes time. We also recognize that, unfortunately, some supervisors do not consider supervision as important as their "real" police work. We disagree. In its Findings Letter, DOJ emphasized the importance of a robust performance evaluation process to correct the patterns of constitutional misconduct identified during the investigations. DOJ expressed concern that it would be impossible to remedy those persistent violations "without also correcting the failings" of the performance evaluation system. (Findings Letter at xvi.) DOJ is obviously correct. If NOPD does not identify the officers who exhibit the traits the community expects in an ethical and effective police officer – as well as those who do not – the Department will not be able to sustain the reforms that have taken place over the course of the Consent Decree.

### 2. Promotions

The NOPD promotions process is joined at the hip with the performance evaluation process. These two processes, working in tandem, form the foundation for ensuring long term sustainability within any organization. Community members and the officers themselves expect and deserve a promotions process that is designed not just to identify and weed out underperforming officers, but also to identify and reward potential leaders. Unfortunately, for years, the Department's promotions process has come up short in both areas.[11]

The Department's failure to adopt a promotions process that employs a holistic review of an officer's supervisory and leadership skills before putting him or her in a supervisory position is one of several factors that led to the supervisory failures the Monitoring Team continues to report in our audits and reviews, including the concerns that led to the Team's Special Report on Task Force Operations and the Department's subsequent disbandment of those Task Forces.

We are pleased to report that the Department now supports a more holistic review of promotional candidates. This welcomed change seems to have been encouraged by the hard work of the Department's Supervision Initiative Working Group and new guidance from the City's Chief Administrative Officer ("CAO") relying, in part, on input from the NOPD.

Specifically, in 2019, with the full support of the Superintendent, the Supervision Initiative Working Group outlined a well-thought-out approach to promotions based on test scores, performance evaluations, disciplinary history, and a broad review of each candidate's professional resume. Then, in December 2019, the CAO for the City of New Orleans issued a directive for a more holistic promotions process for the NOPD and NOFD that is consistent with the recommendations of the Working Group. Among other things, the CAO's policy called for the creation of an NOPD Promotion Committee to conduct "a holistic review of each applicant's merit and fitness for

---

[11]      As noted above, the City attributes some of the delay in this area to the Department's efforts to work closely with the City Administrative Officer to develop a new promotions policy that would cover the NOPD and the NOFD. The City further has explained to the Monitoring Team that the NOPD was attempting to be as deliberate as possible to ensure it acted in complete compliance with all applicable Civil Service rules.



promotion to the vacant position, as demonstrated based on the following information: (1) Performance evaluations, (2) Disciplinary history, [and] (3) Job history."

While the Monitoring Team is encouraged the Department finally is willing to embrace a high-quality promotions process, we remain frustrated with the slow pace of progress. The NOPD only shared its initial draft promotions protocol with the Monitoring Team and DOJ on July 15, 2020, which required extensive revisions. It was not until December 11, 2020 that the Department submitted an acceptable version. This final product, we are pleased to report, was vastly improved and has all the elements of a fair, effective, and compliant promotions process, but it took far too long to get to that point.[12]

The Monitoring Team is sensitive to the constraints under which the Department has operated over the past 12 months. The NOPD obviously has its hands full with the vestiges of the cyber-attack and the ongoing COVID-19 pandemic response. But recent events further highlight the need for a meaningful promotions process. We continue to be disappointed the Department has not made more progress in this area.

### F.    Community Engagement

| January 2019 | Nearing Full & Effective Compliance | January 2021 | Nearing Full & Effective Compliance |
|---|---|---|---|

The Community Engagement section of the Consent Decree requires the NOPD

> to promote and strengthen partnerships within the community, and to engage constructively with the community, to ensure collaborative problem-solving and ethical and bias-free policing, and to increase community confidence in the Department.

The current Mission Statement of the Department reflects NOPD's commitment to community problem-oriented policing (CPOP) and implementation of CPOP into its organizational infrastructure, including management, policies, and training.

The NOPD has developed a meaningful Community Engagement Policy, Community Engagement Manual, special "signal codes" to assist in the measurement and supervision of community

---

[12]    To say the promotions protocol now is compliant with the Consent Decree, however, says nothing about the implementation of that protocol. The Monitoring Team will closely monitor the implementation of the new protocol over the coming weeks. Further, the Department has indicated an interest in ultimately turning over the responsibility for conducting supervisor candidate interviews to Civil Service. The Monitoring Team has not evaluated the impact of such a change and, frankly, has significant concerns in removing one of the NOPD's few tools for personally evaluating its own candidates. Accordingly, our comfort with the NOPD's new promotions protocol should not be taken as reflecting comfort with potential future changes.

engagement, and compliance review tools for assessing the quality of officers' engagement with the community.  Other key accomplishments relating to community engagement include the creation of an online community policing reporting system (automated community policing forms- CPFs), replacement of ComStat with Management Analysis for eXcellence (MAX)[13], and the development of district Community Policing Plans.  In addition, the Department has taken a major step toward compliance with the assignment of Community Liaison Officers (CLOs) to each district.  CLO's are not routinely assigned to answer calls for service.  The new job description of the CLO requires her/him to maintain contact with community groups, attend their meetings, and work with the community to identify and solve problems.

At the January 2019 Loyola proceeding, the Monitoring Team recognized the progress the NOPD had made related to the community engagement section of the Consent Decree.  The Department, with strong coordination by PSAB, had developed a plan for establishing effective CPOP.  The operational implementation of this plan, however, was an important next step for the Department's path to achieving full and effective compliance in Community Engagement.

Further, the Monitoring Team also identified additional work needed from NOPD in key areas before recommending to the Court to move this area into full and effective compliance with the Consent Decree, such as implementing the Consent Decree's geographic deployment provisions.  NOPD's last *Community Policing and Engagement Annual Report* (2018) stated the Department is, "working to develop additional tracking mechanisms for documenting community policing activities more consistently and thoroughly," and that, "Improving the collection of community engagement and policing data, reporting on this data in internal and external meetings, and utilizing this data to improve our community engagement and policing are critical goals…"

Since the 2019 Loyola proceeding, NOPD has made further progress in two key areas within the Community Engagement framework:

- NOPD developed and implemented a geographic deployment plan and directive, and
- NOPD built an in-house capacity to conduct ongoing compliance reviews of these areas of the Consent Decree.

---

[13]       According to the DOJ Bureau of Justice Statistics, ComStat "is a performance management system that is used to reduce crime and achieve other police department goals. Comstat emphasizes information-sharing, responsibility and accountability, and improving effectiveness."  CompStat has proponents and opponents.  In 2016, the NOPD developed "MAX" to replace ComStat.  According to the NOPD, MAX is a "holistic, data-driven approach to police management."  "MAX replaced the department COMSTAT meetings which were mainly focused on information sharing regarding crime trends. The [then-new] program, which [was] available to the public online, [took ] that approach even further by focusing not only on crime, but on all other topics for which a police commander has responsibility."  In the view of the Monitoring Team, MAX reflected a greatly improved way of thinking about law enforcement management.  *Unfortunately, MAX has been significantly impacted by the cyber-attack.  The Monitoring Team is paying close attention to the steps NOPD takes to restore its data collection and reporting systems.  The Department previously and understandably touted MAX as playing an essential rule in achieving the goals of the Consent Decree.  We expect NOPD to fully restore its systems with full promised functionality.*

The Monitoring Team and the DOJ approved the Department's Geo-Deployment directive as "a fundamental component of the Department's Community Policing Strategy."  At the January 2019 Loyola proceeding, NOPD had not yet assigned platoon personnel to areas in New Orleans deemed "regular response zones" as required by the Consent Decree.  The Geographic Deployment plan was initially rolled out as a pilot program in the 3rd district in the latter part of 2019 and then expanded throughout all districts.  The Department now has fully implemented the geographic deployment plan, which is a significant accomplishment for Superintendent Ferguson, Chief Deputy John Thomas, Deputy Chief Otha Sandifer, and their teams.  The gist of the plan is as follows:

- Each District will be split into 2 to 4 sectors
- Each patrol officer will be assigned a sector
- Officers' sector assignments are not expected to change except in exigent circumstances
- Patrol officers should engage in community interactions in their area of assignment when they are not on a call for service or conducting proactive patrols of hot spot areas
- As appropriate, officers should complete the automated Community Policing Forms (CPFs)

The NOPD will be utilizing its automated CPFs to track areas including the geographic deployment plan and CLO activities & effective problem-solving in the community.  Additionally, NOPD will be using a new geo-deployment deviation form to track deviations from the deployment plan.

In order to achieve full and effective compliance, the NOPD must assign officers in a manner that ensures all neighborhoods have regularly assigned officers familiar with the area.  The Department must fully implement the geographic deployment plan.  The NOPD must develop and implement mechanisms to measure officer outreach and support to a broad cross-section of community members, and measurements must be used to assess the effectiveness of its community partnerships and problem-solving strategies and report these findings publicly.

In 2019, the Monitoring Team conducted monthly audits, attended numerous NOPD-sponsored programs and NONPACC meetings, and reviewed the NOPD's internal reports on its community engagement efforts.  Our ongoing review of these items, however, was delayed during this year as the Department's technological capacity, auditing capacity, community engagement programming, and in person outreach meetings were challenged.  The Monitoring team has remained in communication with NOPD to receive updates on external and internal impacts to the Department's community engagement compliance efforts.  In addition, the Monitoring Team continues to observe NOPD's integration of collaborative problem-solving activities into the weekly MAX accountability meetings.

Overall, NOPD is making continued progress in its operational implementation of an effective community engagement plan.  In 2019, NOPD made great strides in establishing its community engagement plan and developing compliance review and accountability tools. Currently, NOPD is working on effectively applying its compliance reviews, intended to track efforts and outcomes related to the Community Engagement Policy, Community Policing Plans, Community Engagement manual, and the role of the Community Liaison Officers, among other Consent Decree provisions.

In general, though, the Department's capacity to track, document, and report on these innovations has been limited this year.[14]

The Monitoring Team will continue to consider NOPD's compliance reviews and reporting documentation, and the Department's forward looking plans to address changes in MAX reporting and capacity for in-person community outreach.  Over the next quarter, the Monitoring Team and DOJ expect to consider NOPD's compliance reviews related to its efforts to:

- Implement a geographic officer deployment strategy
- Provide documentation on CLO, SRO, & social worker activities
- Provide required internal auditing reviews, assessments or (quarterly/annual) reports
- Review effectiveness of the online community policing reporting system that requires officers and command staff to document community interactions and community problem-solving activities to measure the effectiveness of its community engagement and community problem-solving efforts

The Monitoring Team will be assessing the effectiveness of the Department's continued efforts in these areas of community engagement.  Key follow up areas include NOPD's compliance review results, updated reports and scorecards, CLO activities, progress reports on the problems identified in each District's annual community policing plan, and updated data on the community engagement activities captured by the CAD signals.[15]

Further, the NOPD and the City are still working to bring back the elements of the electronic reporting and evaluation process that track community-oriented problem solving and priorities. Lastly, the Monitoring Team also assesses compliance in the area of community oriented policing through a Consent Decree-required biennial community survey.  The third biennial survey was completed in late 2018.  The next survey would be underway during late 2020, but has been postponed due to public health precautions related to covid-19.

---

[14]    We also should note that the Department's external community meetings have slowed significantly over the past year.  PCAB meetings have all but ceased during COVID, and virtual NONPACC meetings have been inconsistent at best.  Obviously, COVID has made it difficult to engage with the community in the same way the NOPD did in the past, but it is incumbent upon the Department to find new and more innovative ways to do so.  It not only is a Consent Decree obligation, but it is a community expectation.

[15]    The Monitoring Team also will be watching closely to ensure the Department maintains adequate leadership over the community policing program.  It recently came to the Monitoring Team's attention that, without notice to the Monitoring Team or the Court, the Department had reduced the scope of the community policing commander's responsibilities over the community policing program.  Following discussions with the Monitoring Team, DOJ, and the Court, the Department now has remedied this significant compliance gap.



### G.    Stops, Searches, Arrests

| January 2019 | Significant Progress | January 2021 | Significant Progress |
|---|---|---|---|

In its 2011 Findings Letter, the DOJ made clear it had found "reasonable cause to believe that NOPD officers violate the Fourth Amendment by engaging in a pattern or practice of stopping, searching, and arresting individuals without the requisite reasonable suspicion or probable cause." Consequently, in the Consent Decree, the Department committed to "ensure that all NOPD investigatory stops, searches, and arrests are conducted in accordance with the rights secured or protected by the Constitution and laws of the United States."  NOPD further committed to "ensure that investigatory stops, searches, and arrests are part of an effective overall crime prevention strategy; are consistent with community priorities for enforcement; and are carried out with fairness and respect."  While NOPD has made significant progress in this area since the outset of the Consent Decree, the Department still has not met its burden of demonstrating full and effective compliance in this area.

While the Monitoring Team has reviewed NOPD stops, searches, and arrests since the outset of the Consent Decree, in 2019, the NOPD, the DOJ, and the Monitoring Team agreed the time had come to conduct a comprehensive audit of the Department's compliance in this area.  Accordingly, the parties worked closely with the Monitoring Team to develop and conduct a detailed audit that covered all material elements of the Consent Decree's SSA requirements.

The efforts to design the comprehensive SSA review began in earnest in mid-2019.  The parties worked together to identify the material questions that needed to be answered (e.g., were stops documented, did officers document reasonable suspicion for each stop, did the officer have a valid legal basis for each search, were the officers respectful, or were the stops recorded properly), select the data that would be reviewed, and develop a high quality evaluation tool to guide and capture the audit results.  This process took several months of back and forth between the DOJ and the Department, and then was slowed because of the cyber-attack and the pandemic.

The process ultimately was completed after (1) jointly developing the PSAB compliance review tools in December 2019, (2) jointly conducting a pilot of the SSA compliance review tools using first Quarter of 2019 (pre- cyber-attack) data, (3) jointly evaluating the outcomes of the pilot audit, (4) finalizing the SSA audit approach, and (5) providing all PSAB reviewers with training in June 2020.  Following this effort, the Monitoring Team was notified that the NOPD began the SSA Audit on June 22, 2020.  The first audit sample focused on data from May 2020.

The parties agreed that NOPD would conduct the audit in the first instance using the tools and methodologies jointly developed by the parties, and then the Monitoring Team and the DOJ would review the same data on their own to determine whether they agreed with the NOPD's findings.

This not only introduced an important element of quality control; it also provided an important opportunity to assess the capabilities of PSAB's audit team since that team will be responsible for conducting ongoing audits once the Consent Decree comes to an end.[16]

In November 2020, PSAB internally reported its preliminary SSA Audit findings.  As of the publication of this report, the Monitoring Team and DOJ are conducting their independent review of the data underlying the PSAB audit.  As an initial matter, however, it should be noted that so far *we are impressed by the effort put forth by the PSAB auditors and the professionalism of the PSAB report*.  The Monitoring Team, the DOJ, and PSAB have worked together for the last 12 months on improving PSAB's audit capabilities and processes, and it is comforting to see that joint effort paying off.

While the overall quality of the PSAB audit give us comfort in the ability of PSAB to help sustain the achievements the Department has made since the outset of the Consent Decree, PSAB's substantive findings continue to give us concern that NOPD has not yet achieved full and effective compliance in the area of SSA.[17]

---

[16]     On November 13, 2017, the City adopted a Regulation designed to ensure the sustainability of the many improvements brought about by the Consent Decree.  Among other things, the Regulation provided for the maintenance of "a Compliance Bureau [now called PSAB] within NOPD led by a Deputy Superintendent with sufficient staff to carry out the duties of the Bureau."  The Regulation set forth the functions PSAB shall serve, including working with NOPD and the public "to ensure continuing compliance with the principles of the Consent Decree following the termination of the Consent Decree," developing and conducting "regular audits and reviews to assess the NOPD's compliance with its policies and procedures," developing and conducting "annual audits and/or reviews to evaluate NOPD's compliance with this regulation," determining "the schedules and subjects for audits and reviews," and conducting annual outcome assessments to evaluate the ongoing effectiveness of NOPD's reform efforts" among other things.  See Regulation at XV.  In order to ensure PSAB has the capabilities, processes, and resources to meet its obligations under the Regulation, the Monitoring Team and the Department of Justice have been providing extensive Technical Assistance to PSAB to develop written "protocols" covering all significant audits PSAB will have to conduct upon the Monitoring Team's departure.  While this effort has been a significant one, it also has been an essential one.

[17]     This and the next graph are available in an easier-to-read table format in the appendix to this Report.



As the table shows, several paragraphs remain well below full and effective compliance with the Consent Decree. These compliance gaps include:

- Not clearly articulating in a Field Interview Card or arrest report the legal basis for each search (CD paragraphs 123 and 149)
- Failing to document all stops (CD paragraphs 126, 149, and 150)
- Material inconsistencies between arrest reports and BWC videos (CD paragraph 123), and
- Supervisors failing to show up at the scene of certain searches and arrests as mandated by the Consent Decree (CD paragraphs 133 and 143).

The PSAB audit also examined the Department's compliance with the policies adopted pursuant to the Consent Decree. The findings there likewise show the need for further improvement:[18]

---

[18]     Several of the items on this chart also have Consent Decree implications, for example, data concerning pat downs and probable cause.



As with certain CD paragraphs, the Department's review of its compliance with its own policies likewise shows ongoing noncompliance.

These results are troubling. Without accurate documentation, it is sometimes impossible to show that a stop, search or arrest is constitutional, even in incidents captured on camera footage. And close and effective supervision in this core area of policing is critical. NOPD found ongoing issues with documentation and supervision. For example:

- NOPD's review of Consent Decree paragraphs 126, 149 and 150 examined whether officers documented stops in a Field Interview Card or Electronic Police Report as required. NOPD found that officers failed to document the stop 10% of the time.
- NOPD's review of Consent Decree paragraph 123 examined whether officers' written reports are consistent with the BWC footage of the incident. This review revealed that only 65% of the reports matched what is seen on the BWC videos. The discrepancies ranged from minor errors to more material issues, such as failing to accurately document the type of search that occurred.
- NOPD's review of Consent Decree paragraphs 133 & 143 examined whether supervisors responded to the scene of SSA incidents as required. The review revealed that a supervisor made the scene of an SSA only 63% of time he/she was required to be present.

These (and other) findings demonstrate beyond question that the NOPD needs to dedicate more attention to these areas. They also further emphasize the importance of the ongoing Supervision



Initiative because many of the SSA findings should have been identified and corrected by supervisors, but were not.[19]

We note that because of the relative infrequency of consent searches (Consent Decree paragraphs 128, 129, 131) and strip/body cavity searches (Consent Decree paragraphs 132, 133, 134), a targeted sample will be necessary to assess NOPD's compliance for those specific types of searches. Additionally, NOPD's audit materials do not yet include questions about search warrants (Consent Decree paragraphs 135, 136, 137). Those questions will be finalized following the approval of pending changes to the related policy, Chapter 1.2.4.2 – Search Warrants.

### H.    Bias-Free Policing



Ensuring the NOPD policies are implemented in a manner free from bias is at the heart of the Consent Decree. Indeed, it fairly can be said that most paragraphs in the Consent Decree are aimed at achieving this very outcome. The many structural changes required by the Consent Decree — a functioning Academy, new policies, close and effective supervision, a professional audit function — all serve as building blocks to ensure "that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, or gender identity, and in accordance with the rights secured or protected by the Constitution and laws of the United States."

Unfortunately, the Department has made inadequate progress in this area over the past 24 months.[20] We are hopeful, with the recent movement of other areas of the Consent Decree into Full &

---

[19]    In January 2021, NOPD published its annual *Stops and Searches Report* for 2019. The Report provides data concerning stops and searches by NOPD officers. Although the report provides some analysis and context concerning the data, it does not answer important questions concerning the constitutionality of those stops. For example, the Report notes that "[b]ecause officers pat down people they suspect of being armed and dangerous, it seems logical to compare the race/ethnicity distribution of people NOPD has patted down to that of people NOPD has arrested for violent crimes." The NOPD's Report then goes on to state that "In 2019, 89% of the people NOPD arrested for violent crimes were black of African-American and 7.4% were white, while 85.1% of the people NOPD patted down were black or African-American and 12.8% were white." The NOPD's reasoning is flawed because the data fails to show a connection between those arrested for violent crimes and those patted down. Moreover, without further analysis, the two data points raised by NOPD in its Report equally could suggest racial bias and/or historical over-policing of African-American communities. The Monitoring Team, the DOJ, and the NOPD are nearing the conclusion of their comprehensive Stop/Search/Arrest audit, which will be followed by a comprehensive Bias audit. The result of these audits will tell us whether NOPD's 2019 or 2020 stops reflect unconstitutional bias or not.

[20]    One area where we have noted a particular lack of progress relates to the Consent Decree's Limited English Proficiency (LEP) requirements, including the development of a compliant Language Assistance Plan (LAP) and Policy. The NOPD has not met its Consent Decree obligations or its Title VI obligations in this area. The delay in achieving compliance in this area is inexplicable.

Effective Compliance, the Department will be able to refocus its attention on this critical area. To help ensure this happens, now that the Monitoring Team's and DOJ's audit of Stops, Searches, and Arrests is well underway, the parties and the Monitoring Team have begun drafting a robust review plan to assess the Department's compliance with the bias-free components of the Consent Decree. The Monitoring Team's focus on bias-free policing, of course, is not new. We have consistently reviewed BWC videos and other data since the start of the Consent Decree to monitor for evidence of bias in the Department's programs and practices. The current effort presents a more formal opportunity to look at a multitude of metrics in a holistic fashion to determine whether the NOPD is policing free from bias. We expect to be able to report our findings in the second quarter of 2021.



## VII.     Ongoing Focus on Use of Force

The Monitoring Team found the NOPD to have met its Consent Decree obligations regarding uses of force in January 2019.  The topic has been discussed in detail in a prior Public Report.[21] Compliance in this area, however, does not mean the Monitoring Team closes its eyes to the Department's efforts to sustain that compliance.  The Monitoring Team continues to review all serious uses of force, respond to the scene of NOPD critical incidents, and review a wide range of use of force data.

The following chart highlights the trends we have seen since the outset of the Consent Decree:



Notwithstanding this impressive trend,[22] police uses of force have not been eradicated in New Orleans, nor should one expect they ever will be.  Over the course of 2019 and 2020, the Monitoring Team reviewed a number of NOPD uses of force, several of which were the subject of significant media stories.  Several of these are worth discussing here as they illustrate how the Monitoring Team handles such matters

### 1.     Unity One Vehicle Pursuit

In March 2019, officers working with the NOPD's 6th District Task Force engaged in an unauthorized vehicle pursuit that ended tragically in a fiery crash claiming three lives, injuring several others, and destroying the Unity One Beauty Supply, a long-time community institution. Consequently, Superintendent Shaun Ferguson fired four officers and suspended two more for violating the Department's vehicle pursuit policy and video camera policy.  The terminated officers had been members of the NOPD from two to four years.  According to NOPD's public statements, the 6th District Task Force officers had been involved in multiple prior unauthorized vehicle pursuits.

---

21        See Monitor's Report on NOPD Progress Under the Consent Decree (Jan. 25, 2019).

22        A linear trend line is a computed line used to help visualize whether data over time are trending up or down.

The NOPD Use of Force Review Board met in August 2019 to review the Unity One incident and the Department's response thereto.  The Department's Force Investigations Team (FIT) presented the facts and its findings that several officers were in violation of multiple NOPD policies with respect to the high-speed chase.  After hearing the evidence, the UFRB concurred with FIT's findings.  The identified violations included failure to activate body worn cameras, failure to activate in-car cameras, failure to receive supervisory approval prior to the chase, and failure to communicate required information over the radio to dispatch and/or a supervisor.

The Monitoring Team closely observed every element of the Department's investigation of the Unity One incident.  We reviewed Body Worn Cameras and in-car cameras, monitored criminal and administrative interviews, critically reviewed the administrative investigation, and monitored the UFRB hearing itself.  Based on our close review, we can say with a high degree of confidence that FIT conducted a thorough and professional investigation of the incident and took quick and decisive action against the officers primarily involved.[23]

The facts and circumstances surrounding the Unity One incident raised concerns that the involved officers' conduct was not an outlier and that other officers may have been engaging in unreported high-speed chases in violation of policy.  To address this concern, the Monitoring Team launched a review of vehicle pursuits in conjunction with NOPD's PSAB and PIB.  This joint review involved a review of 245 self-initiated pursuits.  Of those 245 pursuits, we found 24 possible violations of the Department's pursuit rules.[24]  These 24 incidents were forwarded to PIB for further investigation.  PIB subsequently opened 16 disciplinary investigations, and referred the remaining less egregious matters to District Captains for counseling and/or redirection.[25]

An area where we expressed concern to the NOPD, and continue to have concerns, relates to the Department's *inadequate focus during the course of its investigation on supervisor failures*.  In fact, the lax supervision we saw in this incident, and the Department's failure to fully focus on that issue, fueled the initiation of the Task Force audit by the Monitoring Team described earlier in this Report.

---

[23]     While the NOPD terminated four officers involved in the unauthorized pursuit, all four ultimately negotiated a voluntarily resignation with the City Attorney's Office (rather than a termination) to avoid a Civil Service appeal.  The Monitoring Team has confirmed that the employment files of all four officers will continue to show "resigned in lieu of termination," and that that disposition will be shared with any law enforcement agency reaching out to the NOPD as part of a future background investigation.

[24]     The Monitoring Team identified 24 potential violations.  NOPD PIB identified 33 potential violations.

[25]     In late January 2021, the NOPD published its annual Use of Force Report for 2019.  Putting aside the delay in issuing the report, which the Department attributes to the 2020 cyber-attack, the Report identified multiple vehicle pursuits that were not in compliance with NOPD policy or the Consent Decree.  The incidents reflected in the NOPD's report previously were identified by the NOPD and the Monitoring Team during the course of a targeted 2019 vehicle pursuit audit.  The Monitoring Team/NOPD 2019 vehicle pursuit audit identified a number of concerning violations as well as a seeming practice of hiding such violations from Departmental reviewers.  Indeed, the review process undertaken at that time, which was crafted to identify unreported vehicle pursuits, identified 11 unreported vehicle pursuits.  As that review involved only a sample of incidents, the identification of 11 violations identified a clear NOPD failing, which the Department took immediate steps to correct.  Each of the deficiencies identified in the audit was addressed by the Department through appropriate discipline.  The number of such violations was reduced dramatically in 2020 as a result of these corrective actions.

Coupled with Unity One, the Task Force audit revealed significant supervisory, tactical, and operational shortcomings in NOPD's Task Force Operations, as well as an overall lack of effective management. This finding, coupled with other findings described elsewhere in this Report, led to NOPD disbanding its District-based Task Forces.

The Unity One incident also prompted several other efforts, including the following:

- Coupled with the Task Force audit, the Unity One incident fueled many of the specific items included in the NOPD's own *Supervision Initiative*, including plans for more effective training, proactive mentoring, sensible promotions practices, more meaningful assessment of newly promoted supervisors during their probationary period, and more.
- Administrative reform of policies and operational protocols. The NOPD revised Chapter 41.5 and created a new radio call disposition code designated "10-28NP," which clarified reporting procedures for vehicle pursuits and non-pursuits. NOPD also initiated a monthly audit on all "10-28NP" incidents. These policy changes were accompanied by enhanced training as well.

As a result of the changes to the pursuit policy, efforts to audit potential violations, training at the Academy, and holding officers accountable for violations, PSAB reported an approximate 93% reduction in violations of the Department's vehicle pursuit policy as of November 2019. PSAB is currently working on an updated compliance report on the status of unauthorized vehicle pursuits for 2020 and will forward the results to the Monitoring Team for further review in February 2021.

## 2.   *High Risk Warrant*

In late April 2020, two NOPD Task Force officers, operating without supervision, executed a high-risk warrant without a plan, without proper uniforms, without vests, and without an appropriate focus on officer or civilian safety. The Task Force officers also apparently directed two patrol officers to join them in this high-risk activity without any meaningful operational briefing, putting those two officers at great personal risk as well. Because the matter was under active investigation by FIT, we were unable to share additional details at the time we published our Special Report focusing on NOPD's Task Forces. We did note, however, that the incident spoke volumes about the culture of the Districts in which the Task Forces operate, as well as the need for more meaningful supervision by District leaders.

Following this incident, the Monitoring Team reviewed the relevant body-worn camera recordings, and monitored PIB's criminal and administrative interviews of all involved officers, supervisors, and witnesses. We also monitored the Department's UFRB hearing, which, as usual, was thorough and substantive. The Monitoring Team concurred with the multiple violations identified by PIB and the UFRB.



### 3.       Crescent City Connection (CCC) Incident

Following the killing of George Floyd by members of the Minneapolis Police Department in March 2020, citizen demonstrations grew in intensity across the country.  New Orleans saw its share of citizen demonstrations as well.  Most of these were quite peaceful.  In one notable (and, in our view, admirable) moment, members of the NOPD even kneeled alongside and in solidarity with members of their community in a peaceful demonstration that ended without a single use of force.  On June 3, 2020, however, the New Orleans Police Department engaged in a use of force that reflected a significant break from its historic practices.

The facts of the CCC incident have been widely reported in the press and will not be repeated here. Suffice it to say it was an event no one wants to see repeated in New Orleans.  The event generated 17 citizen complaints and prompted a FIT investigation, which included 30 witness interviews of police officers and members of the public who were involved in the incident.  It also generated a warranted written public apology from the Superintendent to the community.

The Monitoring Team followed the course of the Department's response to the event closely, including the FIT investigation and the subsequent UFRB.  We watched all relevant BWC videos, reviewed all complaints, read all investigative reports, and observed select witness interviews.  All in all, the resulting FIT report included over 300 pages of written materials.  We found the FIT investigation thorough and professionally conducted.  We also fully agree with the NOPD's finding that its policies and procedures regarding civil disturbances and protests were inadequate and needed immediate revision.[26]

There is cause for concern about the CCC incident.  Through a series of bad decisions, inadequate policies, and insufficient supervision, the Department ended up using force in a dangerous situation in a manner neither the police nor the community wanted.  While the Department clearly made some missteps in the immediate aftermath of the event, we were pleased to see the Department involve community stakeholders in crafting and implementing a meaningful corrective action plan.

*       *       *

Force, sadly, is a reality of policing.  From time to time, a police officer has no choice but to use force to protect him/herself or others.  It is not the goal of the Consent Decree to eliminate police uses of force.  Rather, the Consent Decree is directed at ensuring the NOPD uses force "in accordance with the rights secured or protected by the Constitution and laws of the United States, and that any unreasonable uses of force are identified and responded to appropriately."  To that end, the NOPD agreed in the Consent Decree to ensure its "officers use non-force techniques to affect compliance with police orders whenever feasible; use force only when necessary, and in a manner

---

[26]       The Consent Decree does not cover the NOPD's civil disturbance policies likely because there has not been an incident like the CCC incident in the collective memory of New Orleans.  Nonetheless, due to the clear nexus between civil disturbances and the possibility of uses of force, the Monitoring Team and DOJ reviewed and approved the Department's recent changes to its outdated policies in this area.

that avoids unnecessary injury to officers and civilians; and deescalate the use of force at the earliest possible moment."

As we found in 2019, the NOPD has met these requirements.[27]  The uses of force we continue to see, including those described above, do not suggest a return to the Department's patterns and practices.  To the contrary, they reflect exceptions to NOPD's normal practice rather than the rule.  As importantly, when they occur NOPD acts promptly to investigate and, if appropriate, to implement corrective measures.  While the exceptions highlight areas for further training, policy improvements, and enhanced supervision, frankly, uses of force are not unexpected in any law enforcement organization the size of the NOPD.

---

[27]     The Monitoring Team will be conducting a follow-up Use of Force audit in 2021 to ensure the Department's compliance has been sustained.



## VIII.   Monitoring Costs

Since our appointment by the U.S. District Court in 2013, the Monitoring Team has conducted reviews and audits (which, collectively, we will call "reviews" here for ease of discussion) of all material elements of the Consent Decree.  These reviews have varied in complexity over the years. In the early years, we were unable to conduct anything more than the most rudimentary reviews because the Department lacked credible data or even structures worth reviewing.  Moreover, during the early years of the Consent Decree the Department spent more time objecting to the Consent Decree than it did trying to comply with the Consent Decree.

In early 2015, the Department began working toward Consent Decree compliance in earnest, which allowed the Monitoring Team to begin monitoring in earnest.  Because the basic building blocks of a constitutional department were missing, the Monitoring Team and the DOJ had to spend a significant portion of their time providing Technical Assistance to the Department to support the NOPD's efforts to build an infrastructure that could be trusted and that could sustain the reforms called for by the Consent Decree.  While the work at times was painful, it was critical and ultimately paid off.  From 2015-2019, as we reported at the Loyola proceeding in January 2019, the NOPD made significant progress under the Consent Decree in every area.

When the Consent Decree began, the City, the DOJ, and the Monitoring Team understood that transforming the NOPD – at that time, one of the most dysfunctional departments in the country – would not be an easy or inexpensive task.  The parties and the Monitoring Team expected the monitoring portion of the Consent Decree to cost the City about $164,000 per month.  While this is no small sum of money, it pales in comparison to the financial cost of unconstitutional policing – a fact graphically illustrated by the City's payment of $13.3 million to settle just three Katrina-era police-related civil rights cases in 2019.[28]  And that cost doesn't even come close to matching the societal cost of unconstitutional policing.

We are pleased to report, however, that as the NOPD has transformed itself, and brought more areas into Consent Decree compliance, the cost of monitoring has gone down significantly.  Indeed, the monthly cost of monitoring and technical assistance by the Monitoring Team has continued in a steadily downward trend since 2017.

---

[28]     New Orleans, of course, is far from the only City that has paid a high price for unconstitutional policing. Baltimore spent $12.8 million in settlements related to police misconduct between 2014 and 2020.  The City of New York paid out $125.9 million in settlements (and claims) for police-related lawsuits in FY2019 alone.  Louisville paid a $12 million settlement in September 2020 for a single police excessive force case.



As the chart shows, average monthly costs of monitoring have declined significantly over the past few years.  Obviously, even with this significant decline in Monitoring Team fees, the total cost of moving the NOPD toward compliance with the Consent Decree has not been insignificant.  But it is important to remember why these expenses are being incurred.  As the DOJ noted back in 2013, "*the cost of reform, including a Monitor, exists only because of the City's failure, going back decades, to ensure that its police department respects the civil rights of its own people.*"

The cost to achieve compliance with the remainder of the Consent Decree rests with the City, as it has over the past two years.  While the NOPD made significant progress through early 2019, as noted in this Report, that progress slowed in 2019 notwithstanding the continued hard work of many within the Department.  That slowing then was made worse by the December 2019 cyber-attack, the start of the COVID-19 pandemic in early 2020, and civil unrest that swept the nation following the killing of George Floyd in May 2020.  Whether due to these events or others, the Department has made less progress over the past two years than it did in the period from 2015-2018.  If the City wants to reduce the costs of monitoring even further, the City needs to redouble its efforts to bring itself into full and effective compliance with the Consent Decree as soon as possible.



## IX.    Conclusion

The NOPD has come a long way since 2011.  While we have seen a slow-down in the Department's progress since early 2019, which likely was caused by a multitude of factors, we are hopeful the NOPD will bring itself into compliance with the remainder of the Consent Decree this year.

The Department is well aware of what it needs to do to complete its outstanding tasks and move into the sustainment period of the Consent Decree.  It has had the blueprint in its hands since the January 2019 Loyola proceeding.  In short, NOPD needs to do the following:

- Implement the Corrective Action Plan to remedy the shortcomings identified in the Department's recent SSA audit.
- Implement the Corrective Action Plan to remedy the shortcomings identified in the Department's recent Performance Evaluation audit.
- Implement the new promotions process recommended by the Supervision Initiative Working Group.
- Complete the tasks identified by the Supervision Initiative Working Group.
- Work with the Monitoring Team and DOJ to design, conduct, and analyze a comprehensive Bias-Free audit.
- Complete the few remaining audit protocols.
- Ensure its community policing leader has and exercises appropriate authority and control over the community policing program.
- Implement a Language Access Plan that ensures compliance with the City's obligations under federal law and a receipt of federal funds.[29]
- Complete the items identified in the paragraph-by-paragraph *Compliance Tracker* with which the NOPD is well aware.

These are the tasks that are standing in the way of the NOPD achieving full and effective compliance with the Consent Decree and beginning the two-year sustainment period.  All are within the Department's capabilities and reach.  But they will take the ongoing attention and commitment of NOPD leadership to achieve.

---

[29]    Title VI of the Civil Rights Act of 1964, as amended (42 USC § 2000d), and regulations promulgated pursuant thereto.



**X.    Appendix**

A.    Table 1:  NOPD SSA Audit Compliance Findings (CD Paragraphs)

| CD ¶ | Paraphrased Question | Compliance Rate |
|------|----------------------|-----------------|
| **122** | Did officer(s) have reasonable suspicion or probable cause to stop? CD 122 | 97.7% |
| **122, 123, 126, 149, 150** | Does report clearly articulate reasonable suspicion or probable cause to stop? CD 122, 123, 126, 149, 150 | 89.1% |
| **123** | Are video(s) and reports significantly consistent? CD 123 | 65.0% |
| **123, 149, 150** | Does CE+P receipt description match evidence as seen on video? CD 123, 149, 150 | 96.0% |
| **123, 136, 145** | In reports, did officer(s) use specific descriptive language when articulating reasonable suspicion and/or probable cause? CD 123, 136, 145 | 95.0% |
| **126,149, 150** | If required, does FIC exist for stop? CD 126, 149, 150 | 90.0% |
| **130** | Legal search on subject on parole or probation? CD 130 | 100.0% |
| **141** | Did officer have probable cause to arrest subject? CD 141 | 100.0% |
| **133 , 143** | If supervisor required to make scene, does video show supervisor made scene? CD 133, 143 | 63.0% |

| CD ¶ | Paraphrased Question | Compliance Rate |
|---|---|---|
| **123 , 149** | Does report document a valid legal basis for every search of subject? CD 123, 149 | 82.9% |
| **150** | Did officer submit FIC to his/her supervisor by end of shift? CD 150 | 80.0% |
| **150** | Did supervisor review FIC within 72 hours? CD 150 | 73.0% |
| **150** | If evidence seized, is there CE+P receipt? CD 150 | 100.0% |
| **181** | Does video show officer reasonably professional and courteous when interacting during stop? CD 181 | 94.0% |
| **181** | Does video show officer verbally identify him/herself as a soon a practical? CD 181 | 64.0% |
| **181** | Does video show officer explain reason for stop/interaction as soon as practical? CD 181 | 97.0% |
| **139 , 181** | Does video show stop was no longer than necessary? CD 139, 181 | 98.0% |

**B.    Table 2:  NOPD SSA Audit Compliance Findings (Policies)**

| CD ¶ or Policy | Paraphrased Question | Compliance Rate |
|---|---|---|
| **122** | Based on all the evidence available to you, did the officer(s) have reasonable suspicion or probable cause to stop this subject | 97.7% |
| **122, 123, 126, 149, 150** | Does the report clearly articulate reasonable suspicion or probable cause to stop this subject? | 89.1% |
| **123** | Are the video(s) and reports significantly Consistent? | 65.0% |
| **123, 149, 150** | If evidence was seized, and there is a CE+P receipt, does the description on the receipt match the evidence as seen on video? | 96.0% |
| **123, 136, 145** | In the reports, did the officer(s) use specific descriptive language when articulating reasonable suspicion and/or probable cause for any stop, detention, search, or arrest? | 95.0% |
| **126,149, 150** | If required, does an FIC exist for this stop? | 90.0% |
| **130** | Was this subject on parole or probation? Based on all the evidence available to you, did the officer(s) have a valid legal basis to search the subject? | 100.0% |
| **141** | Based on all the evidence available to you, did the officer have probable cause to arrest this subject? | 100.0% |

| CD ¶ or Policy | Paraphrased Question | Compliance Rate |
|---|---|---|
| **133 , 143** | If the supervisor is required to make scene, does video show the supervisor made the scene? | 63.0% |
| **123 , 149** | Does the report document a valid legal basis for every search of this subject? | 82.9% |
| **150** | Did the officer submit the FIC to his/her supervisor by the end of the shift? | 80.0% |
| **150** | Did the supervisor review the FIC within 72 hours? | 73.0% |
| **150** | If evidence was seized, is there a CE+P receipt? | 100.0% |
| **181** | Does video show the officer was reasonably professional and courteous when interacting with the subject or other civilians during the stop? | 94.0% |
| **181** | If reasonably possible, does video show the officer verbally identify him/herself as a soon a practical? | 64.0% |
| **181** | If reasonably possible, does video show the officer explain the reason for the stop/interaction as soon as practical? | 97.0% |
| **139 , 181** | Does video show the stop was no longer than necessary to take appropriate action? | 98.0% |

| CD ¶ or Policy | Paraphrased Question | Compliance Rate |
|---|---|---|
| **CD 141, 145; Ch 1.9 P14; Ch 82.1 P4; Ch 41.1; 2 P15** | Did officer clearly document probable cause [to arrest] in report? CD 141, 145;  Ch 1.9; Ch 82.1; Ch 41.12 | 98.4% |
| **Ch 1.9 p27- 29** | Video or reports show officer entered residence to make arrest? Ch. 1.9 | 100.0% |
| **CD 123,  Ch 41.12; P12J** | If pat down correctly indicated, did officer give specific details about subject of pat down to believe subject armed and dangerous in justification? CD 123; Ch. 41.12 | 65.6% |
| **Ch 41.13 P9E** | If subject had reasonable questions or concerns, does video show officer respond to them? Ch. 41.13 | 99.0% |
| **Ch 41.3.10 P11** | Did officer(s) & supervisors who conducted stop, search, or arrest activate BWC as required? Ch. 41.3.10 | 88.0% |
| **CD 149, 150; Ch. 1.2.4 P1** | Based on evidence available, did officer(s) have valid legal basis to search subject? CD 149, 150; Ch. 1.2.4 | 89.0% |
| **Ch. 1.3.1** | If officer put subject in handcuffs, did officer document a reason to handcuff in FIC? Ch. 1.3.1 | 64.8% |
| **Ch. 1.3.1.1 P25** | If subject handcuffed, does evidence available show handcuffing within policy? Ch. 1.3.1.1 | 75.3% |

| CD ¶ or Policy | Paraphrased Question | Compliance Rate |
| --- | --- | --- |
| **NA** | Does video show officer allowed subject opportunity to explain his/her situation, ask questions, or voice concerns? | 99.0% |
| **NA** | Does video show officer communicate result of stop/interaction to subject? | 99.0% |
| **183** | Was subject arrested due to immigration status? CD 183 | 100.0% |
| **183** | Was subject questioned about their immigration status in a manner not relevant to crime in question? CD 183 | 100.0% |
| **185** | Did officer say something possibly offensive about/to LGBTQ individuals? CD 185 | 100.0% |
| **185** | Did officer address subject by their chosen name, title, and pronoun? CD 185 | 98.5% |