1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4
  UNITED STATES OF AMERICA        *        12-CV-1924
5                                 *
  versus                         *        Section E
6                                 *
  CITY OF NEW ORLEANS            *        June 13, 2017
7                                 *
  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

8

9                          PROCEEDINGS BEFORE
10                     THE HONORABLE SUSIE MORGAN
                   UNITED STATES DISTRICT JUDGE
11

12  Appearances:

13
  For the United States:      U.S. Department of Justice
14                            BY:  EMILY A. GUNSTON, ESQ.
                            950 Pennsylvania Avenue NW
15                            Washington, DC 20530

16
  For the City of            City Attorney's Office
17  New Orleans:              BY:  REBECCA H. DIETZ, ESQ.
                            1300 Perdido Street, 5th Floor
18                            New Orleans, Louisiana 70112

19
  Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
20                            500 Poydras Street, Room B-275
                            New Orleans, Louisiana 70130
21                            (504) 589-7778

22

23
  Proceedings recorded by mechanical stenography using
24  computer-aided transcription software.

25

1                            <u>**INDEX**</u>

2                                                          <u>Page</u>

3        Jonathan Aronie                        8

4        Paul Noel                             11

5        Daniel Murphy                         12

6        Emily Gunston                         16

7        Rebecca Dietz                         20

8        Douglas Farrell                       22

9        James Scott                           23

10       Rebecca Dietz                         24

11       Bruce Adams                           26

12       Henry Dean                            27

13       Kerry Najolia                         27

14       Kelsh Kerry                           28

15       Robert Anderson                       28

16       Rebecca Dietz                         29

17       Emily Gunston                         37

18       Graymond Martin                       38

19       Jonathan Aronie                       43

20

21

22

23

24

25

1                          **<u>PROCEEDINGS</u>**

2                        **(June 13, 2017)**

3     **THE COURT:**  Be seated.

4         This is *United States of America v. City of*

5 *New Orleans*, Civil Action 12-1924.  Would the parties please

6 introduce themselves for the record.

7     **MS. DIETZ:**  Rebecca Dietz, Your Honor -- good

8 morning -- on behalf of the City of New Orleans.  I have with

9 me Paul Noel and Danny Murphy.

10     **MS. GUNSTON:**  Good morning.  Emily Gunston for the

11 United States.

12     **MR. ARONIE:**  Jonathan Aronie, the monitor of the

13 police department.

14     **THE COURT:**  I want to thank the parties for planning

15 for the hearing today and for participating on relatively short

16 notice.  I asked the monitoring team to issue personal

17 invitations to other law enforcement agencies operating within

18 New Orleans.  I would like to ask Jonathan Aronie, our lead

19 monitor who issued those invitations, if he would introduce

20 those in attendance.

21     **MR. ARONIE:**  Yes, Your Honor.  Apologies if I miss

22 anyone.  From the United States Marshals Service, we have

23 Chief Deputy U.S. Marshal Douglas Farrell.  From the Orleans

24 Levee District, we have Chief Kerry Najolia.  Also from the

25 Levee District, we have executive counsel, Nyka Scott.

1                   From Southern University of New Orleans,

2      Chief Bruce Adams and former NOPD officer Bruce Adams.   From

3      Delgado Community College, Assistant Chief Henry Dean.   From

4      Xavier University, Captain Kelsh Kelly.   From the Housing

5      Authority Police -- I think I have it right -- Chief Robert

6      Anderson.   From the Orleans Parish District Attorney's Office,

7      First Assistant District Attorney Graymond Martin.

8                   I won't name them all, but there are some other

9      members of the police department here as well.   Although he

10     will not be speaking, we have Claude Schlesinger from the FOP

11     with us today as well.

12                   Did I miss anyone?   Okay.   Thank you.   Thank

13     you, Your Honor.

14              THE COURT:   Well, thank you all for being here.   I

15     appreciate it.   We always appreciate your participation and

16     your input.   At appropriate times during the presentation

17     today, we are going to ask if you all would come make some

18     brief remarks.   Also, I want to welcome any members of the

19     public and the media that we have here today.

20                   As you all know, the Court does quarterly public

21     hearings on matters of importance to the consent decree.   Our

22     next one is August 17, 2017, at 1:30, and we haven't decided

23     the topic yet.   Those are regularly scheduled.   This is a

24     special public hearing called for the purpose of examining the

25     jurisdiction and responsibility of the NOPD with respect to:

1              (1)   The jurisdiction of other agencies to
2    conduct policing activities within the city of New Orleans;
3              (2)   The coordination between NOPD and those
4    other agencies;
5              (3)   The investigation of officer-involved
6    shootings in New Orleans involving non-NOPD officers; and
7              (4)   Any related matters that may come before
8    the Court.
9              As you all are well aware, in 2010
10   Mayor Landrieu requested that the Department of Justice do an
11   assessment of the New Orleans Police Department.  DOJ responded
12   to that request and on March 16, 2011, DOJ released a
13   comprehensive report on its investigation of the NOPD.
14              On July 24, 2012, the United States and the City
15   of New Orleans filed a joint motion for entry of a consent
16   decree requiring comprehensive reform of the NOPD.  That was
17   shortly after I got on the federal bench, and it was my good
18   fortune to have that case assigned to me.  I entered an order
19   approving the consent decree on January 11, 2013.
20              The consent decree was intended to guarantee
21   constitutional policing for the citizens of and visitors to the
22   city of New Orleans.  There's a reason why DOJ and the city
23   focused their attention on the New Orleans Police Department as
24   the way to guarantee constitutional policing in the city of
25   New Orleans, and that's because the NOPD is the chief law

1    enforcement agency of our city.

2              Over the last five years, I've learned a great

3    deal about the operations of the NOPD, including its joint

4    operations with various state and federal law enforcement

5    agencies also operating in Orleans Parish.  In all of these

6    relationships, the NOPD has consistently sought collaboration

7    and cooperation in the interest of the welfare and safety of

8    the public.  I applaud and support those efforts, but

9    nevertheless jurisdictional and legal limits on the authority

10   of the various agencies must be understood and respected, and

11   the capabilities of various agencies must be taken into

12   account.

13             Over the last couple of years, I have learned to

14   my consternation that some of these collaborative relationships

15   are not well defined or clear.  Unfortunately, some of my

16   knowledge of the lack of clarity has come as the result of

17   real-life events that perhaps should have been handled

18   differently.  In any event, it has become clear to me that

19   clarity on this topic will benefit everyone: the NOPD, the

20   cooperating agencies, and the public.  I believe, based on our

21   conversations, that NOPD, DOJ, and the monitoring team agree.

22             All of us know the challenges facing the NOPD

23   and the other law enforcement agencies in our area.  The

24   decrease in the number of NOPD officers and the rising crime

25   has made it even more important for NOPD and other law

1   enforcement agencies to work closely together to protect the

2   citizens of and visitors to New Orleans.  The increasing

3   dangers that law enforcement officers face also highlight the

4   need for coordination.

5          I convened this hearing to focus the attention

6   of the city and NOPD on this issue.  I also wanted to ensure

7   that the various agencies operating in New Orleans had an

8   opportunity to attend and to offer any comments they might

9   have.  I have invited representatives of those agencies to

10  attend and participate today and many of those agencies are

11  here, which I appreciate.

12         I value your input and your perspective.

13  Certainly I understand that your being here does not mean that

14  you are subject to the consent decree.  As we all know, the

15  consent decree is between the City of New Orleans and DOJ.  As

16  a result, it binds only the NOPD.

17         Today I have asked representatives of the NOPD,

18  the DOJ, and the consent decree monitor to make presentations

19  to the Court to assist me in ensuring that joint policing

20  activities in New Orleans are being conducted in accordance

21  with the law and with best policing practices and that the

22  protocols for these joint operations are clear to everyone.

23         We are going to begin by hearing from our lead

24  monitor, Jonathan Aronie, with respect to the level of

25  cooperation between NOPD and other agencies operating in

 1    New Orleans.  The monitoring team has been here on the ground

 2    in New Orleans since 2013, and its members have had a unique

 3    opportunity to observe NOPD's activities firsthand.

 4                    Mr. Aronie, if you want to come to the podium.

 5         **MR. ARONIE:**  Thank you, Your Honor.  As you know, my

 6    team and I have been monitoring the police department since

 7    August of 2013.  Over the course of that time, we have seen

 8    significant improvements in the department's policies,

 9    procedures, and practices in almost every area of the consent

10    decree.

11                    I'm pleased to report, as I mentioned at the

12    last hearing, that the New Orleans civilians, the civilian

13    community, has taken most of NOPD's efforts and the result of

14    those efforts and noticed them.  While the community, like NOPD

15    itself, recognizes more work needs to be done, our research

16    shows that the community increasingly views the New Orleans

17    Police Department as trustworthy, professional, and respectful.

18    In fact, later this month we will publish the result of our

19    recent biennial community survey which provides greater details

20    regarding this positive development.

21                    We also, of course, regularly speak to the

22    community members about areas of ongoing concern.  One issue

23    that consistently comes up in these discussions is the role of

24    non-NOPD police agencies operating in New Orleans.  Another

25    area is whether NOPD's force investigative team is authorized

1    to investigate officer uses of force involving other agencies.

2                    As an initial matter, I find it quite notable,

3    Your Honor, that the community wants NOPD to investigate

4    officer uses of force regardless of the police agency involved.

5    This is not something we would have heard from the community

6    four years ago, prior to the execution of the consent decree.

7    We now hear it frequently, and NOPD rightfully should be proud

8    that its FIT unit has come so far in just a few years.

9                    While I think the community understands that FIT

10   cannot handle every police use of force case by every agency,

11   the community wants to know that NOPD's FIT unit is handling

12   all the investigations that fall within its jurisdiction.  The

13   community wants this comfort for three primary reasons:

14                   First, NOPD's FIT unit has specialized training

15   and has developed specialized skills to handle the unique

16   issues involved in police use-of-force cases.

17                   Second, NOPD's public integrity bureau, the

18   parent organization of FIT, has some measure of independence

19   from the daily operations of the NOPD.  The bureau is run by a

20   civilian chief and is not involved in field operations.

21                   Third, Your Honor, is accountability.  NOPD

22   FIT's work is reviewed and evaluated by the superintendent of

23   police, the independent police monitor, the District Attorney's

24   Office, my monitoring team, and of course this Court.

25                   There are a lot of eyes on FIT's work, which

1  understandably gives the community greater comfort in the

2  integrity of that work.  The monitoring team shares these

3  community views, and thus we were pleased to see NOPD enter

4  into a number of memoranda of understanding with a number of

5  local police agencies to outline roles and responsibilities and

6  to clarify how police use of force will be investigated.

7            NOPD should be commended for reaching out to and

8  embracing the help of other agencies the way they have.  As

9  major cities across the country struggle with increasing

10  violent crime, NOPD's cooperation and coordination with its

11  neighboring agencies is logical, wise, and we would say

12  essential.

13            We are also quite pleased with the nearly

14  approved revisions to NOPD's policy 1.1, which outlines the

15  authority of NOPD and the role the NOPD force investigation

16  team plays in use of force by NOPD officers and other officers.

17            Finally, Your Honor, the monitoring team is

18  pleased that the Court elected to hold this hearing.  The

19  importance of sensible, compliant, and clear guidelines

20  regarding interagency cooperation cannot be overstated.

21  Without clearly understood roles and responsibilities, officer

22  and civilian lives are put at risk.

23            Thank you, Your Honor.  Of course, I will be

24  happy to answer additional questions as the hearing proceeds.

25            **THE COURT:**  Thank you, Mr. Aronie.  I echo your

comments about the public integrity bureau and the force
investigation team.  I applaud the city for putting the
resources in place that were needed to make that happen.

Now I would like to ask Chief Paul Noel of the
New Orleans Police Department if you would tell us what your
job title is and what you do, to set the stage.

**MR. NOEL:**  I'm the deputy superintendent over field
operations, so I'm over all eight police districts, special
operations, and I also lead our efforts on all disasters and
special events throughout the city.

The New Orleans Police Department has a long
history of cooperating and working well with our state, local,
and federal partner law enforcement agencies that work with us
on a daily and a continuing basis.  One only has to look at a
recent protest which occurred in the city to see the importance
of cooperation from our state, local, and federal partners.

Additionally, New Orleans hosts many large-scale
special events.  Securing those events would be more difficult
without the help of state agencies, local police departments,
and also our federal partners which provide the New Orleans
Police Department with tremendous support before, during, and
after those events.

Additionally, our fight with violent crime, it's
critical that state, local, and federal agencies cooperate and
coordinate their efforts with us in our push to reduce violence

1    in our city.  On behalf of Superintendent Michael Harrison, I
2    would like to thank our state, local, and federal partners for
3    their help in the past and their continued support and
4    cooperation in the future.  Thank you.
5        **THE COURT:**  Thank you, Chief.  Certainly we do know
6    that it's imperative that we have this cooperation.  One of the
7    things I have heard over the last few years -- I have learned
8    there are some issues, but I've always heard how great the
9    cooperation is and how closely you all work together and how
10   much that is appreciated and how much it means to the city of
11   New Orleans.
12       **MR. NOEL:**  Yes, Your Honor.
13       **THE COURT:**  Thank you.
14       **MR. NOEL:**  Thank you.
15       **THE COURT:**  Now I would like to ask Danny Murphy to
16   come forward and introduce himself, tell us what his role is,
17   and talk to us about one of the policies of the NOPD that
18   affects this issue.
19       **MR. MURPHY:**  Thank you.  Danny Murphy, deputy chief
20   of the compliance bureau at NOPD.  I work on implementing the
21   consent decree.
22            As you know, we have been hard at work on
23   Chapter 1.1, Law Enforcement Authority, with your input,
24   Department of Justice, consent decree monitors, NOPD, city
25   attorney, many different voices involved in drafting this

1  policy.  The goal of this policy is to achieve some of the
2  goals you outlined at the front of this meeting, to have
3  clarity regarding our collaboration with other law enforcement
4  agencies and just making sure everyone has a great
5  understanding of authority and jurisdiction in that
6  collaboration and cooperation.
7          We have revamped an old policy to provide
8  greater depth and guidance on how we work together, outlining
9  our authority, concurrent jurisdiction with other agencies, how
10 we would handle an officer-involved shooting or other serious
11 uses of force, as Mr. Aronie said, having a proactive
12 investigative stance with our force investigation team who has
13 that great training and great trust to handle those
14 investigations.
15         We will be listening today to hear what the
16 other agencies say as we continue to push forward with
17 finalizing this policy in the coming days or weeks.  Once we
18 are finished with this policy, we will be posting it online for
19 the community to see how we have settled this whole very
20 interesting and complex situation.
21         **THE COURT:**  All right.  I think one thing that led to
22 our revamping Chapter 1.1 was when we started discussing this
23 issue over the last couple of years and we began looking at
24 this chapter, it became clear it did not really encapsulate all
25 the nuances that we now know exist.

1          **MR. MURPHY:**  Absolutely.

2          **THE COURT:**  It's a very complicated area.  It's kind

3    of like peeling the onion.  Every time we peel one layer off,

4    we realize there's some other issue to address.

5               I think the goal of Chapter 1.1 is to set out

6    the broad policy statements of the NOPD.  Maybe you could just

7    tell us those in broad strokes, not too much detail.

8          **MR. MURPHY:**  Yes.  So right up front we say

9    New Orleans police officers are granted the authority to

10   perform their function based on established legal authority and

11   does not tolerate abuse of law enforcement authority.  The

12   authority is set out in the charter and ordinances of the city

13   of New Orleans, and there's just a statutory background for our

14   authority and many other agencies throughout the city.

15              It spells out how we handle those different

16   jurisdictional authorities when a use of force comes up.  Those

17   are also spelled out in greater detail in the MOUs that the

18   city attorney will be discussing later in terms of specific

19   agreements with different agencies, spelling out how we will

20   handle these types of situations.

21              It goes into some depth about how we will handle

22   serious uses of force and lower level uses of force that we can

23   look into when there is reasonable suspicion that a crime has

24   occurred.  With higher level uses of force, it spells out very

25   clearly that our FIT team will investigate when it has the

1    authority to do so.

2             **THE COURT:**  Elsewhere in the policies the four

3    different levels of use of force by officers are set out.

4    Chapter 1.1 provides that for Levels 1 through 3, if there's --

5             **MR. MURPHY:**  Reasonable suspicion.

6             **THE COURT:**  Those will be investigated by NOPD, but

7    investigated by the district offices.

8             **MR. MURPHY:**  Uh-huh.

9             **THE COURT:**  If a Level 4 use of force -- which is if

10   shots are fired?

11            **MR. MURPHY:**  Yes, shots are fired, very serious,

12   critical uses of force.  The FIT team would investigate in all

13   circumstances unless the Louisiana State Police were involved

14   or -- we're still working out the exclusive jurisdiction issue.

15            **THE COURT:**  If there's any use of force by an officer

16   in the city of New Orleans, which is contiguous with the parish

17   of Orleans, NOPD will investigate.  What this policy does is

18   clarify if it's 1 through 3, it's investigated by the

19   department just as it would be if it were an NOPD officer

20   involved.  If it's a Level 4, it's investigated by FIT.

21            **MR. MURPHY:**  Uh-huh.

22            **THE COURT:**  The exceptions to that are limited

23   circumstances where either the federal government has exclusive

24   jurisdiction or NOPD has agreed with the federal government and

25   the Louisiana State Police that those agencies, if their

1  officers are involved, will take the lead.

2          **MR. MURPHY:**  Uh-huh.

3          **THE COURT:**  I think that is helpful to clarify that

4  not only for the public, but also for NOPD officers.  We expect

5  them to follow a policy from the top of the department all the

6  way to the bottom, so the policy needs to be clear.

7                  I understand that Chief Arlinda Westbrook at PIB

8  is now drafting -- I think they are called directives for PIB

9  and FIT.

10         **MR. MURPHY:**  Based on our conversations and

11  continuing to peel back the layers on all this, the FIT manual,

12  they are going to revise some of that to clearly spell out in

13  their procedures how to handle these types of circumstances so

14  that the team that's handling those critical uses of force has

15  very clear guidance on how to proceed if such a situation

16  arises.

17         **THE COURT:**  All right.  Well, thank you.  I

18  appreciate it.

19         **MR. MURPHY:**  Thank you.

20         **THE COURT:**  Now I would like to ask Emily Gunston,

21  who is here representing the Department of Justice, if she

22  would give us some perspective on this issue.

23         **MS. GUNSTON:**  Thank you, Your Honor.

24                 Your Honor, we are pleased to see that the

25  New Orleans Police Department is coordinating with other

enforcement agencies within the city to clarify all of their roles to ensure that they are able to keep officers and the public safe.  I wanted to give a little bit of history on the FIT team so that Your Honor and the public can understand our thinking behind investing authority to investigate Level 4 uses of force in NOPD's FIT team.

When we conducted our investigation, at least some serious uses of force were conducted by the homicide unit. The officer who was engaged in that particular use of force would be assigned to the homicide unit, and then the homicide unit would investigate that serious use of force.  We found that that was not affording the investigation appropriate independence in order to instill confidence in the investigation.

Within the consent decree, we created a force investigation team that was intended to be a specialized unit that would investigate these serious uses of force.  That's because these serious uses of force, including uses of lethal force, are the most sensitive and most difficult to investigate.  In NOPD in particular, the public integrity bureau, which as everyone here knows is the equivalent of an internal affairs bureau, was headed by a civilian.  That afforded the public integrity bureau a certain amount of confidence in the community.  For that and other reasons, we included in the consent decree that the force investigation

1  team would be housed within the public integrity bureau.

2  The New Orleans Police Department consent decree

3  requires significant and specialized training for people

4  assigned to the force investigation team.  It's an extra

5  40 hours before they begin work in the force investigation team

6  and then additional annual in-service training.  That training

7  is specific on policies and procedures of the NOPD and, in

8  particular, how to ensure independence and appropriate

9  confidence in the investigation.

10  Those requirements also ensure that there are

11  appropriate protocols in place for NOPD to coordinate with

12  other agencies when they are investigating these more serious

13  uses of force, including the District Attorney's Office and

14  federal agencies, in case there needs to be a criminal

15  investigation along with the administrative investigation.

16  As the monitor has noted, the investigations by

17  the force investigation team are also overseen by a force

18  review board to review all of the investigations to ensure that

19  they are sufficient, including sufficiently independent, and

20  the monitoring team does special audits of the investigations

21  done by the force investigation team.

22  As we have seen here in New Orleans, that has

23  achieved really great results, the results we had intended to

24  achieve by the consent decree, meaning that the investigations,

25  as reviewed by the use of force review board and by the

1    monitoring team, have been excellent.  The community can have

2    confidence that when there is a serious use of force in the

3    city of New Orleans and it's investigated by the force

4    investigation team, that that force investigation team's

5    investigation and its findings can be relied upon.

6         **THE COURT:**  Well, I think you would agree with me

7    that the city has put a lot of resources and efforts into

8    making the FIT team be well trained, well monitored, reliable,

9    and independent.  Not every agency in the city can do that, but

10   NOPD, as the largest agency in the city, has put the resources

11   in to make sure that it has that kind of team in place.  I

12   think that's why I feel comfortable with FIT investigating

13   these Level 4 uses of force whether an NOPD officer or an

14   officer from another agency is involved.

15        **MS. GUNSTON:**  That's right, Your Honor.  Both the

16   United States and the monitoring team, as I understand it, have

17   been very impressed by the quality of the investigations by

18   NOPD's force investigation team.

19        **THE COURT:**  Well, thank you for being here today.  I

20   appreciate it --

21        **MS. GUNSTON:**  Thank you, Your Honor.

22        **THE COURT:**  -- and for all your help over the course

23   of this process.

24             Now I would like to ask Rebecca Dietz, of the

25   City Attorney's Office, to talk about some specific

1  relationships with different agencies.

2  **MS. DIETZ:**  Thank you, Your Honor.  Good morning.

3  There are numerous entities with varying authority to engage in

4  law enforcement in New Orleans.  The authority enjoyed by these

5  entities is prescribed by federal or state law or the home rule

6  charter.

7  Through specialized task forces, the New Orleans

8  Police Department engages with federal and state partners, as

9  well as partners from neighboring jurisdictions, on key

10  initiatives to address discrete criminal activity.  Examples of

11  these partnerships with federal entities include the NOPD and

12  DEA tactical task force.  The purpose of this task force is for

13  the agencies to jointly combat trafficking of controlled

14  substance pharmaceuticals.

15  The NOPD and the FBI have a public corruption

16  task force.  The purpose is for the agencies to jointly conduct

17  investigations of public officials who have engaged in

18  corruption schemes or abuse of public office.  In this instance

19  the FBI is responsible for supervising, directing, and

20  overseeing the task force consistent with FBI policies.

21  **THE COURT:**  The FBI public corruption, and then does

22  DEA oversee the tactical task force?

23  **MS. DIETZ:**  They do.  In that instance the NOPD has

24  assigned one officer to the task force and the DEA has assigned

25  five special agents.

1          The NOPD and the DEA also have a financial

2     investigations task force.  This is to jointly combat

3     trafficking of all controlled substances within New Orleans;

4     again, similar breakdown where the NOPD assigns one experienced

5     officer to that task force and the DEA has five.

6          The NOPD and the ATF have a task force.  The ATF

7     group is to proactively enforce the federal firearms laws

8     within New Orleans.  This relates to prohibited persons in

9     possession of firearms and investigating how that person came

10    to possess the firearm.  This particular task force can be

11    activated by NOPD or the ATF.

12         NOPD and the FBI also have a safe streets task

13    force.  This includes FBI, NOPD, the Jefferson Parish Sheriff's

14    Office, and the St. Tammany Parish Sheriff's Office.

15    Detectives on this task force investigate groups involved in

16    criminal enterprise associated with illegal narcotics and

17    crimes of violence.  Again, this task force can be activated by

18    any member of the task force when they come into information

19    that would necessitate the task force coming together.

20         NOPD and DEA have another HIDTA task force.

21    This is tasked with identifying, targeting, and dismantling

22    violent drug-trafficking organizations within New Orleans.

23         NOPD and the FBI also have a joint terrorist

24    task force.  This includes Jefferson Parish, the State Police,

25    St. Charles Parish, the Harbor Police, Border Patrol, IRS, and

the Coast Guard.

I think we do have a few representatives of some of our federal partners here today.  I would like to ask if any of them want to say a few words, and then I will move on to the other one.

THE COURT:  Okay.  Thank you.

Chief Deputy Farrell.

MR. FARRELL:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. FARRELL:  The U.S. Marshals Service has an outstanding relationship with the New Orleans Police Department mostly in the element of arresting violent fugitives locally here.  The U.S. Marshals fugitive task force works with the violent offender warrant squad with the special operations division of the New Orleans Police Department in locating and apprehending fugitives wanted for violent state and local crimes.  We will work cases that they have outside the parish and outside the state.  Additionally, our members will also work within the city on other cases where the fugitive may reside in Orleans Parish.

THE COURT:  Thank you.  Thanks for being here today.

MR. FARRELL:  Thank you, Your Honor.

THE COURT:  Thanks for all the good work that you do here and with the NOPD.

MR. FARRELL:  I appreciate it.  Thank you.

1          **THE COURT:**  Is James Scott here who works with NOPD?

2  Maybe he can say a few words.

3          **MR. SCOTT:**  Good morning.  My name is James Scott.

4  All the federal agencies, the task force officers basically are

5  under my supervision.

6               Let me just talk about the partnership.  Doug

7  and I go back numerous years when I was in the tactical and the

8  SWAT.  When we have these other agencies come in -- actually

9  DOJ and stuff, everyone seems to be very, very impressed with

10  our federal partnership, the relationships that we have with

11  the SACs, especially the U.S. Marshals, in targeting violent

12  offenders.

13               Ever since Katrina, when we had Katrina, we lost

14  all of our basic intelligence and intelligence on the groups

15  because, of course, the neighborhoods came in and we started

16  from scratch.  If it wasn't for those federal partners, when we

17  initially got started after Katrina, we would have really been

18  lost.  DEA provided us with cars and equipment.  U.S. Marshals

19  came in and started going after fugitives.  DEA assisted us

20  with narcotics investigations as everything started developing

21  and the people started coming back into the city.  We have now

22  got to the point where we are right now.

23               We have approximately 11 people in the federal

24  agencies.  We communicate on a regular basis, weekly.  We do a

25  weekly meeting that's chaired by Chief Noel.  That's all our

1    multiagencies.  On a weekly basis we discuss every shooting

2    that occurs in the city, every homicide this occurs in the

3    city, and narcotics trafficking.  In that meeting, Doug Farrell

4    is in there.  In that meeting, DEA is in there.  In that

5    meeting, deputy chiefs are there and SAC level from federal

6    agencies.  ATF has representatives.

7              That's the partnership that we developed.

8    That's our weekly accountability.  I'm required to give a

9    report each week to the superintendent of police, and it

10   outlines the activities weekly of all our federal partners.

11        **THE COURT:**  Thanks for being here today and telling

12   us about the work of those task forces.  I know it's very

13   important.  Keep up the good work.

14        **MR. SCOTT:**  Thank you.

15        **MS. DIETZ:**  Your Honor, I'll also identify some of

16   the memorandums of understanding that the New Orleans Police

17   Department has with other jurisdictions to assist NOPD and to

18   delineate the responsibilities that fall to the other

19   jurisdictions and the responsibilities that fall to NOPD when

20   they are engaged in law enforcement within the city.

21             NOPD is a signatory to a memorandum of

22   understanding between the NOPD, the Port Harbor Police, the

23   Orleans Parish Levee District Police, Tulane University Police,

24   Dillard University Police, Southern University Police, Delgado

25   College Police, and Xavier University Police.  The MOU I'm

referring to specifically addresses officer-involved shootings.

In addition to the relationship that the NOPD shares with these organizations on a daily basis, there's an MOU that governs and formalizes the process for referring the investigation of police-involved shootings to the NOPD FIT team.  All parties to the MOU agree that in an incident in which an officer discharges a weapon, all agencies shall refer for investigation the officer-involved shooting to the NOPD FIT team.  So this particular MOU that's been recently signed by all parties states that the FIT investigation team will deal with officer-involved shootings even if it's within the jurisdiction of the other police force.

THE COURT:  I think one of the things I noticed in the MOU is it's very specific about informing the particular agency about what they are expected to do while they await the arrival of FIT.

MS. DIETZ:  That's right.

THE COURT:  That was something that, number one, we needed to clarify, that FIT was going to do the investigation. Two, we needed to let people know what to do in the interim; call FIT, but what do you do while you are waiting for them to come.

MS. DIETZ:  That's right.  It is very specific as to statements, evidence, etc., and consistent with the FIT directives that Arlinda is putting together.

1          **THE COURT:**  It's not anything different from what

2     NOPD would do, basically.

3          **MS. DIETZ:**  Correct.

4          **THE COURT:**  It's preserve the scene so that you can

5     have a good investigation.

6          **MS. DIETZ:**  That's right.  I think we have some

7     representatives from that MOU here, as well, who might want to

8     say a few words.

9          **MR. ARONIE:**  Your Honor, we have Delgado, SUNO,

10    Xavier, and Levee Board all within the list Rebecca mentioned

11    and all here today.

12         **THE COURT:**  Okay.  If you want to say a few words, we

13    would be happy to hear from you.

14         **MR. ADAMS:**  Good morning, Your Honor.

15         **THE COURT:**  It's a good chance for you to talk in

16    court without being on the witness stand.

17         **MR. ADAMS:**  That's unusual.

18         **THE COURT:**  Much more pleasant.

19         **MR. ADAMS:**  I, too, am enjoying a great working

20    relationship with the New Orleans Police Department.

21         **THE COURT:**  Tell us your name.

22         **MR. ADAMS:**  I'm sorry.  Bruce Adams.  I'm the chief

23    of police with Southern University at New Orleans, retired NOPD

24    after 40-plus years.  I am enjoying a great working

25    relationship with the New Orleans Police Department.  Of

course, we have had hiccups along the way, but we have managed
to meet and work every one of them out admirably between both
parties.

**THE COURT:**  All right.  Well, good.  Thank you.  Stay
in close communication with them.  If you have issues, let them
know, and they will work it out with you.

**MR. ADAMS:**  Yes.  Thank you.

**MR. DEAN:**  Good morning, Your Honor.  I'm Henry Dean.
I'm the assistant director of security at Delgado Community
College.  When I was first presented with the MOU for the FIT
team, people came to my office and wanted to know why I was
jumping for joy, and actually so did my officers.  They readily
accepted it.  We defer almost daily to NOPD.  By deferring, we
honor their jurisdiction, but we implore their help, and they
have never failed us.

**THE COURT:**  Thank you so much.

**MR. DEAN:**  Thank you.

**THE COURT:**  That's nice to hear that your officers
are confident also.

**MR. NAJOLIA:**  Good morning, Your Honor.  Kerry
Najolia with the Orleans Levee District Police Department.  We
bring 30 full-time police officers, approximately 16 reserve
officers to be partners with the New Orleans Police Department.
I've been assigned as the chief for just a few months, March 1,
so we are in the process of feeling our way.

1          The district commander of the Orleans Levee

2   District has been a policeman for Orleans for 35 years, so he

3   has informed me that he has a great working relationship and,

4   as chief, we pledge to maintain that relationship with our good

5   partners with NOPD.

6          **THE COURT:**  Good.  Thank you.  Thanks for being here

7   today.

8          **MR. KELLY:**  Good morning, Your Honor, Xavier

9   University Police Department Captain Kelsh Kelly.  We have a

10  great working relationship with the New Orleans Police

11  Department.  My office had the opportunity to go into both

12  Comstat meetings, the 2nd and the 6th District.  Whenever we

13  need some assistance of any sort, they have always been there

14  for us and backed us up.  We look forward to working with them

15  in the future in helping them pull off the consent decree.

16         **THE COURT:**  Thank you.  Appreciate it.

17         **MR. KELLY:**  Thank you, ma'am.

18         **THE COURT:**  We also have Chief Robert Anderson from

19  the Housing Authority in New Orleans.  Is there an MOU with

20  HANO?  Why don't you come up and introduce yourself and say a

21  few words before we leave this topic.

22         **MR. ANDERSON:**  Good morning, Your Honor.  Robert

23  Anderson, chief of the Housing Authority Police Department.  We

24  do have an MOU.  It was signed in 2012 with NOPD.  However,

25  based upon listening this morning, we are going to have to

 1    incorporate the FIT team investigation.  It's written in there
 2    that NOPD is responsible for handling our shootings.  We did,
 3    in fact, have an officer-involved shooting in 2015.  One of our
 4    officers was murdered.  NOPD homicide was still responsible and
 5    handled the investigation.
 6             **THE COURT:**  Ms. Dietz, we need to look at that MOU
 7    and change it and also add those provisions about specifically
 8    what you-all are expected to do before FIT arrives.  It will be
 9    helpful to your officers, I hope.
10             **MR. ANDERSON:**  We look forward to it.  We do have an
11    outstanding relationship with the superintendent, Paul, and all
12    the district commanders.  We are on the street with them every
13    day.  They are backing us up.  We are backing them up.  They
14    provide us training.  We couldn't ask for a better
15    relationship.
16             **THE COURT:**  Thank you.  I'm glad to hear that.
17             **MR. ANDERSON:**  Thank you, ma'am.
18             **THE COURT:**  Ms. Dietz, what about the Louisiana
19    State Police?  Were you through with those topics?
20             **MS. DIETZ:**  I was through with those topics.  I do
21    understand that the city has an agreement with the Louisiana
22    State Police regarding investigations of traffic accidents on
23    the interstate.  There are other agreements with the Louisiana
24    State Police.  Paul might actually be better to speak of them
25    because not all of them are written down.

 1           We have a very open and cooperative relationship
 2    with the Louisiana State Police.  We can reach out to the
 3    superintendent when we need additional resources.  There is a
 4    contingency at State Police that are assigned to the
 5    French Quarter, specifically through an agreement with the
 6    French Quarter Management District.  We have State Police
 7    throughout the city that work collaboratively with NOPD, and
 8    any agreement with respect to investigation is one that's been
 9    worked out between the State Police and the city.
10           THE COURT:  My understanding is that with respect to
11    officer uses of force that if it's within the city of
12    New Orleans, but involves a State Police officer, that the
13    State Police do that investigation.
14           MS. DIETZ:  Yes.  That's my understanding as well.
15           THE COURT:  Otherwise, NOPD does the investigation.
16           MS. DIETZ:  Yes, that's my understanding.
17           THE COURT:  With respect to the federal government, a
18    similar situation if an FBI or DEA or other federal agency
19    officer is involved in a use of force, that the federal agency
20    will do the investigation.
21           MS. DIETZ:  Yes.  That's my understanding as well.
22           THE COURT:  I think our discussions have helped all
23    of us get some clarity in that area, as well, over the last
24    year or so, but you seem to have gotten a good plan in place
25    now and everyone is executing that plan.  We will just continue

1    to monitor that and make sure that no problems arise.

2              **MS. DIETZ:**  Yes.

3              **THE COURT:**  The last topic that we want to talk

4    about, there is another agency that has in the past done some

5    policing operations in the city of New Orleans that have been

6    more troubling than all these relationships we have been

7    discussing so far, which have been more mutually agreeable.

8              Over the past year or so, I became concerned by

9    reports that agents employed by the Louisiana Attorney

10   General's Office were performing police operations and making

11   arrests in the city of New Orleans.  I'm well aware that the

12   Attorney General's Office does have statutory authority to do

13   some criminal investigations, but my concern was that the

14   activities of these agents were outside of that office's

15   narrowly tailored statutory authority.

16             I invited the attorney general to send

17   representatives to meet with me and the NOPD in January of this

18   year.  The AG did send several representatives to meet and

19   discuss this issue, but the representatives of the AG's office

20   were unable to answer my questions or provide any statutory

21   authority for some of the operations that they were conducting.

22             I want to make it clear that I know that the

23   AG's office has some fine individuals who work for them as

24   agents, who have integrity and many years of training and

25   experience.  Many of them are former NOPD officers.  I know

1  that they have an important mission and that what they do is
2  worthwhile and important.  That is not the issue.  The issue is
3  what is their authority for just general policing activities
4  within the city of New Orleans.
5              After this meeting with the AG's office at which
6  his representatives were unable to provide me any authority for
7  some of these activities, I said, "Well, if you want to go back
8  and think about this and do some more research, write me and
9  tell me the authority that you have that supports your
10 activity."  That was in January, and I have not received
11 anything else from them to date.
12             I reached out a month or two ago and asked the
13 AG to either come meet with me again or to have a telephone
14 conference so I could see where we are and what exactly the
15 AG's agents were doing to see whether there was any cause for
16 concern, but I did not get any response.
17             I asked the consent decree monitor to
18 specifically reach out to the AG's office, to issue a personal
19 invitation for them to appear today to explain the sources of
20 their authority and to talk about cooperation and collaboration
21 between the AG's office and the NOPD in the areas where it
22 would be appropriate and needed, but the AG's office responded
23 that they would not be sending anyone to attend or represent
24 the AG here today.
25             Over the last year or so, the City Attorney's

1   Office has done research to determine what the authority of
2   special agents of the AG's office is, and I would ask Ms. Dietz
3   to report to us on what she has found.
4          **MS. DIETZ:**  Thank you, Your Honor.  I will start by
5   saying that as should be evident from the people sitting in
6   this room and the agreements that I have just described, the
7   NOPD and the city welcome lawful assistance from other law
8   enforcement agencies.  It's crucial to the way we conduct our
9   business.  We encourage and facilitate those relationships.
10          As I also stated before, however, authority to
11  engage in law enforcement activity varies and is prescribed by
12  state law or the home rule charter.  The Louisiana attorney
13  general has no independent statutory authority to conduct law
14  enforcement activities in New Orleans.  According to the
15  constitution, the attorney general is the chief legal officer
16  of the state.  The constitution does not provide any specific
17  law enforcement powers to the Attorney General's Office.
18          Under state law the division of State Police is
19  tasked with state law enforcement responsibilities, and that
20  division falls within the Department of Public Safety under the
21  governor.  In New Orleans the mayor is the chief law
22  enforcement officer and the New Orleans Police Department is
23  charged via the charter with all law enforcement in
24  New Orleans.
25          The attorney general does enjoy investigatory

1    authority in certain areas and, as NOPD has done with other law

2    enforcement bodies as well as our federal partners, we welcomed

3    the attorney general's assistance in a certain investigatory

4    manner.  We offered a written memorandum of understanding to

5    the attorney general that would have outlined specific

6    assistance NOPD could use, specific lawful assistance the NOPD

7    could use from the Attorney General's Office.

8            I would like to be very clear that New Orleans

9    and the NOPD have never rejected assistance from the Attorney

10   General's Office so long as that assistance was lawful and fell

11   within their statutory authority.  Any cooperation with the

12   Attorney General's Office must be consistent with the law and

13   fall within the authority the attorney general has been given

14   by state law.  This is to ensure the public that the police

15   department charged with law enforcement is leading all related

16   law enforcement efforts.

17           The Attorney General's Office would not agree to

18   sign the memorandum of understanding as we presented it to

19   them.  Again, moving forward, I'll say again the city welcomes

20   assistance from other law enforcement agencies and would

21   welcome lawful assistance from the Attorney General's Office,

22   but any such assistance should be written down and clarify the

23   legal authority each body has.

24           **THE COURT:**  Could you give me some examples of the

25   areas in which the AG's office does have authority to do

certain investigations.

      **MS. DIETZ:**  I think Medicare fraud, certain civil fraud actions.  They have the authority to intervene in certain criminal proceedings if requested by the district attorney.  In those instances they have to prove to the court that their intervention is necessary.  I can get the list of the other things.

      **THE COURT:**  I think one thing I was concerned about and I'm sure you looked at, also, is whether the AG's office has statewide power to arrest --

      **MS. DIETZ:**  They do not.

      **THE COURT:**  -- for violations of any criminal law enacted by the State of Louisiana.

      **MS. DIETZ:**  They do not.  Under state law only certain individuals that fall under the scope of a peace officer have authority to arrest, and it's specifically designated under state law who has the authority to arrest.

      So while you might have, for example, a reserve sheriff's deputy from another parish working for the attorney general, his or her status as a peace officer for the parish does not translate to the authority to be a peace officer under the direction of the attorney general.  So the attorney general umbrella has to stay within the statutory authority given to them.

      **THE COURT:**  So the AG could not give an officer from

1   a neighboring parish the authority to come into New Orleans and

2   make arrests because the AG doesn't have that authority.

3            **MS. DIETZ:**  That's correct.

4            **THE COURT:**  It's important that the policing is done

5   by entities with the authority to do the policing for a number

6   of reasons; for example, for the arrest to be valid and for any

7   seizure of evidence to be constitutional.

8            **MS. DIETZ:**  Yes.

9            **THE COURT:**  These questions have real life

10  ramifications in the criminal justice system.  It's not a

11  technicality.  It's very important.

12           **MS. DIETZ:**  That's right.  We do have opportunities

13  for the attorney general to assist the New Orleans Police

14  Department that fall within their lawful authority, but

15  engaging in active policing on the street isn't one of them.

16           **THE COURT:**  For example, the AG's office, they are

17  investigators and they have expertise, and they have some

18  resources that you-all probably don't have.  Is that an example

19  of an area in which you would request assistance?

20           **MS. DIETZ:**  It is.  It is.  That was an example in

21  which we asked for assistance with investigations.  I forget

22  specifically which investigation.

23           **THE COURT:**  I think it was homicide.

24           **MS. DIETZ:**  Yes, I think that's correct.  Yes.

25           **THE COURT:**  The concepts that are in Chapter 1.1, I

1    think it all ties together that what we are trying to be sure

2    of is what the authority is and what is the source of it for

3    the NOPD, as well as these other agencies, and to make sure

4    that NOPD is exercising its obligation under the city code and

5    the home rule charter to be the chief law enforcement agency of

6    the city of New Orleans.

7              I think that the concepts in Chapter 1.1 are

8    implicit in the consent decree, but I'm wondering if it might

9    be advisable for us to consider an amendment to the consent

10   decree and make those concepts explicit.

11        **MS. DIETZ:**  The city would certainly work with the

12   Department of Justice and the Court to consider that.

13        **THE COURT:**  We will think about that as the days go

14   ahead.

15              Ms. Gunston, do you have any comments about this

16   issue, about the importance of Chapter 1.1 and exercising

17   authority within one's jurisdiction?

18        **MS. GUNSTON:**  Only to agree with the Court,

19   Your Honor, that of course it's important, in order for NOPD to

20   continue to keep the officers and public safe, that they would

21   coordinate with any agencies within NOPD that are engaged in

22   law enforcement activities.

23        **THE COURT:**  All right.  In the days ahead, I'm sure

24   we will have more discussions about how to tie up all the loose

25   ends that we might have out there on this topic.  It's clear to

1     me that the AG's office has limited statutory authority to

2     investigate crimes within certain areas, but it doesn't have

3     the ability to make statewide arrests for violations of state

4     law.

5               I will continue to do what I need to do to make

6     sure that the integrity of policing in the city of New Orleans

7     is maintained, and by that I mean that only entities with

8     authority to make arrests do that.  I also want to make clear I

9     echo what Ms. Dietz said.  There are many areas where the AG's

10    office has expertise.  We welcome their assistance particularly

11    with investigating homicides because we all know that that's a

12    concern and an area of emphasis for us right now.

13              I think Mr. Martin from the DA's office is here.

14    I didn't know if you wanted to make any comments.

15         **MR. MARTIN:**  Judge, Graymond Martin, first assistant

16    DA for the Parish of Orleans.  A little off topic, but we are

17    the number one user of the information that the police

18    department, all the law enforcement agencies in New Orleans

19    generates.  It is our job to review that information, institute

20    prosecutions where we deem appropriate, and we seek just

21    resolutions of all these issues that are brought before us.

22    The New Orleans Police Department is our number one source of

23    supply for case work.  The other agencies bring us a case from

24    time to time.

25              We are also well integrated in the task forces

1    that you heard about.  We actually have two lawyers in my

2    office that are special assistant United States attorneys who

3    work in conjunction with the task force to sort the cases, and

4    we decide whether we take them state or federal as the

5    investigation comes to culmination.

6              One is the mag unit, which has been

7    statistically successful in reducing the number of murders.

8    They are back up from where they were, but Eric Asher published

9    some statistics to show that when we first got started and we

10   put probably seven or eight of these gang cases together, spun

11   three or four of them to the state, three or four of them to

12   the feds, that there was a significant dip in the number of

13   murders.  We believe that murder in our town is a crime of

14   recidivism -- repeat offenders, serial murderers, if you

15   will -- and we think that you have to be on your toes every

16   day, all day to have a meaningful impact.

17             Our relationship with the New Orleans Police

18   Department is good.  I personally am critical from time to

19   time.  I try to keep my criticisms off the public record and

20   have direct conversations with the people to whom I think can

21   do better.  Some people do better without being asked.

22             I just told Chief Noel a few moments ago that

23   the police department's district investigative units that are

24   handling a lot of the armed robberies in conjunction with the

25   TIGER team are doing a much better job in making their

presentations to me.

I know Mr. Aronie has visited our charge conference.  He thought it was pretrial prep.  It was just going through the case before we made our determination.  We are very vigorous in our interrogation of the police officers and insisting they gather the appropriate evidence and carry it out.  I'm pleased to report that on the gun charge conference scene it is steadily improving.  That's a mark of confidence.

As you know, it is our duty to review all deaths in the city of New Orleans that we believe someone has some criminal culpability for.  We, as a matter of policy, review all police-involved shootings that result in death.  As a matter of courtesy, we will meet with the FIT team on the other uses of force.  Unless they are prepared to say they are going to make an arrest, we don't generally substitute our judgment for theirs unless there's a public outcry that the FIT team is not doing its job appropriately.  We have not heard that.

I think that the comments that were made about the FIT team are correct.  We have great confidence in their ability to put together a thorough and complete investigation and bring it to us.  They do from time to time meet with us in the conduct of it to see if there's anything else we would like to see or whatever, and we are very pleased with that process.

Any police agency that discharges a firearm that results in a death, we will look at that case.  Who conducts

1   the investigation is a matter of the protocols amongst the

2   various agencies.  I will say with the exception of the federal

3   agencies -- which we had an incident with a federal agency.  We

4   looked at it carefully.  We were re-reviewing their

5   investigation and we realized that no matter what conclusion we

6   came to, we would be precluded from doing much about it because

7   the Supremacy Clause of the United States Constitution

8   basically says any federal agent who, in pursuit of his duties,

9   causes the death of a person is a federal question, not a state

10  law question.  We kind of backed off of that one a little bit.

11  All the rest of them we have looked at and taken what we

12  consider to be appropriate action.

13          **THE COURT:**  Well, I know that you work closely with

14  NOPD and with FIT, and I know they appreciate your constructive

15  criticism.  I think everybody knows we can all improve, but I'm

16  glad to see the level of cooperation that you have.  The NOPD

17  knows it's not perfect and they are continuing to try to

18  improve.  Your input is valuable to them.

19          **MR. MARTIN:**  We are committed to working with them.

20  Our philosophy has always been we won't allow the lowest common

21  denominator to set the level of success.  We work very closely

22  with the police department.  Sometimes we miss the ball and

23  they point out to us, you know, you didn't see this, you didn't

24  do this.  Sometimes they miss the ball.  I will say that they

25  have been more amenable to the extra effort that we request to

 1   deliver to us a better final product.

 2           THE COURT:  Okay.  Well, thank you.  It's nice to see

 3   you.  Thanks for being here today.

 4               I also wanted to ask if Mr. Claude Schlesinger

 5   was here.  I just wanted to have him stand up so we could

 6   recognize him.  Thank you for being here.  Mr. Schlesinger

 7   represents the Fraternal Order of Police.  We are always happy

 8   to have you here representing your members.  Thank you.

 9           MR. SCHLESINGER:  Thank you very much.

10           THE COURT:  We do have some things to do.

11   Mr. Aronie, do you have any notes?  I had a few things on my

12   list.

13           MR. ARONIE:  I'm sure you do.

14           THE COURT:  You tell me if I missed anything, or

15   anybody else.

16               We want to complete the revisions to

17   Chapter 1.1, Law Enforcement Authority, and get that approved

18   by everyone.

19               Maybe this has already been taken care of.  We

20   wanted to be sure the MOUs with all the state agencies had been

21   executed.  If they haven't, then we need to get that done.

22               We need to revise the PIB FIT directives so that

23   we give the FIT members very clear instructions about what they

24   are to do in these different situations.  I think Chief

25   Westbrook is doing that.

1              Did you have anything else?

2         **MR. ARONIE:**  Your Honor, the only other thing I had

3    is, as I made it clear to the other agencies here today, that

4    to the extent they ever need to reach out to us to talk about

5    any further improvements that I'll make myself available to

6    them as well.

7         **THE COURT:**  Of course.  In closing, I want to again

8    thank all of you for being here today, the parties and our

9    guests.  We have made progress on these issues.  As I said,

10   every time we peel off one layer, we say, "Oh, there's another

11   issue we need to resolve."  I think we have some work left to

12   do.

13             I think the clarity is going to benefit the NOPD

14   and the other agencies operating in the city of New Orleans

15   and, in the final analysis, will benefit the citizens and

16   visitors to New Orleans.  I know the NOPD appreciates the

17   assistance provided by your agencies.  NOPD has expressed its

18   commitment to working with its partners to make our city safe.

19             Court is now adjourned.  As is my usual custom,

20   I will leave the bench and come into the courtroom to thank you

21   all personally, but Court will stand in recess now.

22         **THE DEPUTY CLERK:**  All rise.

23         (Proceedings adjourned.)

24                        *  *  *

25

1          **<u>CERTIFICATE</u>**

2          I, Toni Doyle Tusa, CCR, FCRR, Official Court

3   Reporter for the United States District Court, Eastern District

4   of Louisiana, certify that the foregoing is a true and correct

5   transcript, to the best of my ability and understanding, from

6   the record of proceedings in the above-entitled matter.

7

8

9                    */s/ Toni Doyle Tusa*
                    Toni Doyle Tusa, CCR, FCRR
10                   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25