**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** <br> **Plaintiff,** | **CIVIL ACTION NO.** <br> **2:12-CV-01924-SM-DPC** |
| **V.** | **JUDGE SUSIE MORGAN** |
| **CITY OF NEW ORLEANS,** <br> **Defendant.** | **MAG. DONNA PHILLIPS CURRAULT** |

**BRIEF IN SUPPORT OF MOTION TO TERMINATE THE CONSENT DECREE**
**BY THE CITY OF NEW ORLEANS**

Respectfully submitted this 16th day of August 2022,

*Davillier Law Group, LLC*
Daniel E. Davillier, La. No. 23022
Charles F. Zimmer II, La. No. 26759 (T.A.)
Jonathan D. Lewis, La. No. 37207
935 Gravier Street, Suite 1702
New Orleans, LA  70112
Phone: (504) 582-6998
Fax: (504) 582-6985
ddavillier@davillierlawgroup.com
czimmer@davillierlawgroup.com

**Counsel for the City of New Orleans**

Contents

| | | |
|---|---|---|
| **I.** | **Summary of Issues Presented** ........................................................................... | **1** |
| A. | Substantial Compliance ...................................................................................... | 2 |
| B. | Continued and Sustained Improvement in Constitutional Policing.................... | 3 |
| C. | Unapproved Modification of the Decree ............................................................. | 4 |
| **II.** | **Law of Federal Supervision** .............................................................................. | **5** |
| A. | Federal Rule of Civil Procedure 60(b) ............................................................... | 9 |
| **III.** | **Pertinent Factual and Procedural History** ...................................................... | **12** |
| A. | The Agreed Upon Reform Structure..................................................................... | 13 |
| B. | The Agreed Upon Objective Outcome Assessments ............................................. | 15 |
| C. | 2020 Notice of Compliance to DOJ ..................................................................... | 18 |
| **IV.** | **Substantial Compliance Has Been Achieved** ................................................... | **22** |
| A. | Transforming NOPD: 2011 to 2022 ..................................................................... | 22 |
| B. | Compliance Findings .......................................................................................... | 25 |
| **V.** | **Compliance Through Sustained and Continuing Improvement in  Constitutional Policing.** ...................................................................................................................... | **27** |
| A. | Section V, "Stops, Searches, And Arrests"......................................................... | 27 |
| B. | Section VIII, "Bias-Free Policing" .................................................................... | 28 |
| **VI.** | **Changes of Condition that Warrant Termination** ........................................... | **30** |
| A. | The 95% Compliance Threshold Imposed by the Monitor.................................. | 30 |
| B. | NOPD Tasked with the Monitor's Audit Process................................................ | 32 |
| C. | Design, Conduct and Analyze Audits .................................................................. | 33 |
| D. | Ever Shifting Goals............................................................................................. | 36 |
| E. | Corrective Action Plans ...................................................................................... | 37 |
| F. | NOPD Supervision Initiative Working Group..................................................... | 40 |
| G. | DOJ's Continuous Investigation ......................................................................... | 41 |
| H. | Mandated Inefficiencies...................................................................................... | 43 |
| **VII.** | **There are No Ongoing Violations of Federal Law and Durable Remedies have been Implemented.** ...................................................................................................... | **46** |
| **VIII.** | **Conclusion** ........................................................................................................ | **50** |

**Cases**

*Bd. of Educ. v. Dowell*, 498 U.S. 237, 247, 111 S. Ct. 630, 112 L. Ed. 2d 715 (1991) .................. 9

*Chisom v. Edwards*, 2022 U.S. Dist. LEXIS 100009, at *16 (E.D. La. May 24, 2022) ................ 2

*Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland*, 669 F.3d 737, 741 (6th
 Cir. 2012) ...................................................................................................................... 10

*Frew v. Hawkins*, 540 U.S. 431, 442, 124 S.Ct. 899, 906, 157 L.Ed.2d 855, 866 (2004) ............. 6

*Frew v. Young*, No. 21-40028 (5th Cir. 2022) 2022 U.S. App. Lexis 1027* 2022 WL 135126
 ................................................................................................................................... passim

*Horne v. Flores*, 557 U.S. 433, 450, 129 S. Ct. 2579, 2595, 174 L. Ed. 2d 406, 421 .................. 6

*Milliken v. Bradley*, 433 U.S. 267, 282, 97 S. Ct. 2749, 53 L. Ed. 2d 745 (1977) ........................ 6

*Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 601-02 (6th Cir. 2012) ................................ 10

*Peery v. City of Miami*, 977 F.3d 1061, 1069 (11th Cir. 2020) ....................................................... 8

*People's Bank v. Calhoun, 102 U.S. 256, 260-61, 26 L.Ed. 101, 102 (1880)* ................................ 7

*Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384-85, 112 S.Ct. 748, 760, 116 L.Ed.2d 867,
 886-87 (1992) .................................................................................................. 4, 10, 11, 30

*United States v. Int'l Union*, 2021 U.S. Dist. LEXIS 195788, at *4 (E.D. Mich. Oct. 12, 2021). 10

*United States v. Washington,* 573 F.3d 701, 710 (9th Cir. 2009) ................................................... 8

**Statutes**

42 U.S.C. § 14141 .......................................................................................................................... 12

42 U.S.C. § 3789d .......................................................................................................................... 12

42 U.S.C. §§ 2000d ........................................................................................................................ 12

Federal Rule of Civil Procedure 60 ........................................................................................... 1, 9

**NOW INTO COURT**, comes Defendant, City of New Orleans (the "City"), who supports its motion to terminate the Consent Decree (R. Doc. 565) pursuant to Rule 60, as follows:

## I.   SUMMARY OF ISSUES PRESENTED

The City presents three bases upon which termination of the Consent Decree ("Decree") is appropriate at this time. First, the City has substantially and materially satisfied the letter and spirit of the Decree through durable reforms; and any systemic violations of federal law were remedied years ago. According to the numerous NOPD and Monitor[1] reports, there are no ongoing violations of the federal laws cited by the DOJ's complaint. Second, even if the City is not found in full compliance with every line of the Decree, the City has satisfied the Decree's definition of "full and effective compliance" through "sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures" at Paragraph 448.

Finally, termination is warranted based on the drastic modifications to the Decree process imposed upon the City. Those changes to the agreed upon reform process have rendered compliance a completely subjective decision for the United States Department of Justice ("DOJ"). That subjectivity has added years to the process and exhausted the City's resources. The City has already achieved compliance with the federal law provisions whose violation over a decade ago the Decree sought to remedy. The City would assuredly continue such compliance in the absence of continued judicial supervision. Accordingly, resolution of federal control over the City's police department is warranted, necessary and proper.

_____

[1] The Sheppard Mullin Richter & Hampton, LLP law firm of Washington, D.C., was appointed by the U.S. District Court for the Eastern District of Louisiana to serve as the monitor of NOPD's compliance with the terms of its agreement with DOJ.

A.      **Substantial Compliance**

Federal Rule of Civil Procedure 60(b)(5) authorizes the Court to relieve the City of New Orleans (the "City") from the Decree (R. Doc. 565) if the "decree has been satisfied or implemented."[2] The Fifth Circuit Court of Appeals recently explained that Courts must give Rule 60(b)(5) a "liberal construction," and that "substantial compliance" with a consent decree excuses deviations that do not severely impair the consent decree's purpose.[3] The Decree consists of over 490 numbered paragraphs in addition to more than 350 substantive subparagraphs. It is the most expansive consent decree ever entered in an institutional reform case.[4] Of the 17 categories for which the Decree directs fundamental changes, the Monitor and DOJ have agreed publicly that NOPD has satisfied 15.[5] Most of those areas have been in compliance for more than two years. The two remaining – "Stop, Search and Arrest," and "Bias Free Policing" – are awaiting a compliance determination and NOPD has already made its compliance presentations to the Court for each.

Even assuming, *arguendo*, that NOPD has not reached full compliance with every one of the 700-plus elements of the Decree, it is undeniable that NOPD has substantially and materially satisfied the constitutional goals of the Decree in good faith, and eliminated the systemic

---

[2] *Chisom v. Edwards*, 2022 U.S. Dist. LEXIS 100009, at *16 (E.D. La. May 24, 2022).
[3] *Frew v. Young*, No. 21-40028 (5th Cir. 2022) 2022 U.S. App. Lexis 1027* 2022 WL 135126
[4] Police Executive Research Forum, Critical Issues In Policing Series, Civil Rights Investigations of Local Police: Lessons Learned, 2013, ("On July 24, 2012, U.S. Attorney General Eric Holder announced a plan to overhaul the New Orleans Police Department that was broader in scope and more detailed than any other consent decree the DOJ had issued since it was given the authority 18 years earlier to investigate local police departments.") https://www.policeforum.org/assets/docs/Critical_Issues_ Series/civil%20rights%20investigations%20of%20local%20police%20- %20lessons%20learned%202013.pdf
[5] *See* Ex. 21, Prepared Public Hearing Remarks of Jonathan S. Aronie, Lead Monitor, NOPD Consent Decree Before Judge Susie Morgan, U.S. District Court For The Eastern District of Louisiana, April 20, 2022

violations of federal law identified by the DOJ's 2011 investigation. The goal of durable constitutional policing by the NOPD has been achieved. After nearly a decade of federal control over the NOPD, it is necessary and appropriate for the Decree to be terminated.

**B.      Continued and Sustained Improvement in Constitutional Policing**

The termination provisions of the Decree specifically provide for compliance if NOPD has achieved "sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures" at Paragraph 448. The Outcome Assessments were initially designed to satisfy the DOJ's policy requirement for objective criteria to avoid the known pitfalls of subjective compliance determinations in institutional reform cases. However, the objective goals of the Decree have all but vanished, replaced by highly subjective evaluations of NOPD policy, audit protocols and corrective action plans imposed unilaterally by DOJ.

For example, the Outcome Assessment at Paragraph 448 measure for constitutional "supervision" requires: "Initial identification of officer violations and performance problems by supervisors, and effective response by supervisors to identified problems."[6] In contrast, the process to reach full and effective compliance to DOJ's satisfaction required years chasing well-intended, but subjective policy ideas about what might achieve effective supervision.

A critical function of the Monitor is to conduct and publicly report on these objective Paragraph 448 measurements "at least annually."[7] The Monitor has not done the outcome assessment analysis despite acknowledging the duty to perform them.[8] In fact, the Monitor has

---

[6] Consent Decree at para. 448(g). (Rec. Doc. 565)
[7] Consent Decree at paras. 447 - 457. (Rec. Doc. 565)
[8] Counsel for the City acknowledges the Court's prior instruction not to criticize the Monitors work. It is the obligation of counsel, however, to point out the factual circumstances impacting the City's compliance efforts. *See* Ex. 1, email from the Monitor regarding the decision not to do outcome assessments.

not even provided the "methodology" for the assessments, which the Decree requires to be proposed to the City three months before the assessment is conducted.[9] The absence of this public information has deprived the City of the ability to trigger compliance pursuant to the "sustained and continuing improvement" standard set out at Paragraph 491. The Decree was never modified pursuant to the procedures set forth in the Decree (joint motion with Court approval) to allow any change to the Monitor's unfulfilled obligation to conduct and report on objective Paragraph 448 measurements.

In Section V below, NOPD presents support for compliance in the two areas not yet publicly deemed in compliance according to the outcome measures of Paragraph 448. The objective data shows that NOPD is in full and effective compliance because it has shown "sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures" and is therefore entitled to relief pursuant to both Rule 60(b)(5) and the terms of the Decree.

## C.      Unapproved Modification of the Decree

Federal Rule of Civil Procedure 60(b)(5) also authorizes the Court to relieve the City of New Orleans from the Decree (R. Doc. 565) if continued application of the order is no longer equitable based on changes in condition that render compliance substantially more onerous or impracticable.[10] The City settled the claims of the DOJ in exchange for undertaking detailed reform obligations. DOJ, on the other hand, released its discovery rights in exchange for those concessions by the City and an independent monitor of compliance. Any change to the terms of

---

[9] Consent Decree at para. 453. (R. Doc. 565)
[10] *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384-85, 112 S.Ct. 748, 760, 116 L.Ed.2d 867, 886-87 (1992), and *Chisom v. Edwards*, 2022 U.S. Dist. LEXIS 100009, at *30 (E.D. La. May 24, 2022).

the Decree requires a joint motion and approval of the Court, and is not a unilateral right either party or the Monitor possesses.

Since 2013, however, the path to NOPD compliance has veered dramatically from the blackletter instructions of the Decree. The NOPD continuously finds itself subject to increasingly more onerous compliance requirements to avoid the costs and risks of litigation. These drastic and resource draining deviations have never been approved through the methods required under the Decree. A lack of compliance with the Decree by the Monitor and DOJ is a major factor contributing to NOPD remaining under federal control. For example, NOPD is tasked with a raft of assignments that are actually the Monitor's obligation to perform under the express terms of the Decree. NOPD is also subject to a level of DOJ control not authorized by any of the 700-plus paragraphs of the Decree.

The City agreed to pay the Monitor to evaluate NOPD's compliance with the Decree, not to facilitate an endless DOJ investigation of NOPD at the City's expense. These resource exhausting tasks and subjective approval requirements at each step compound to make compliance exceedingly subjective, impractically costly and greatly delayed. As explained in detail below at Section IV, the Monitor and DOJ have failed to follow the timelines and processes required under the Decree and are not being held accountable to those obligations. Pursuant to U.S. Supreme Court precedent, these stark changes in condition warrant termination of the Decree pursuant to Rule 60(b)(5).

## II.   LAW OF FEDERAL SUPERVISION

The unique nature of a Decree involving a sovereign state agency being regulated by a third-party law firm appointed by a federal judge has led to a body of law highlighting the delicate edges of federalism at issue. When federal courts step into the role of supervising

sovereign state agencies, the constitutional rights of citizens interacting with the police must be balanced against the constitutional rights of the citizens as the democratic electorate of a sovereign state. The Supreme Court has made clear that the constitutional rights of the individuals interacting with the NOPD must take precedence, but that once the systemic constitutional violation(s) have been remedied, the constitutional authority – *i.e., jurisdiction* – for federal supervision ends.[11] Noble and worthy mandates to eradicate undesired conditions that are not violations of federal law, are themselves violations of the state's sovereign rights.[12] The Decree puts the Court in a unique position, but does not eliminate jurisdictional limits.

Modern jurisprudence has come to require a flexible approach to analyzing Rule 60 motions where federalism concerns run headlong into multiyear consent decrees resting on constantly changing conditions. "In applying this flexible approach, courts must remain attentive to the fact that 'federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.'" *Horne v. Flores*, 557 U.S. 433, 450, 129 S. Ct. 2579, 2595, 174 L. Ed. 2d 406, 421; *quoting Milliken v. Bradley*, 433 U.S. 267, 282, 97 S. Ct. 2749, 53 L. Ed. 2d 745 (1977). "It needs no citation of authorities to show that the mere consent of parties cannot confer upon a court of the United States the jurisdiction to hear and decide a case." *People's Bank v. Calhoun, 102 U.S. 256, 260-*

---

[11] *Frew v. Hawkins*, 540 U.S. 431, 442, 124 S.Ct. 899, 906, 157 L.Ed.2d 855, 866 (2004) ("a federal consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based.")

[12] *Horne v. Flores*, 557 U.S. 433, 434, 129 S.Ct. 2579, 2585, 174 L.Ed.2d 406, 412 (2009) ("Because of these features of institutional reform litigation, federal courts must take a flexible approach to Rule 60(b)(5) motions brought in this context, ensuring that responsibility for discharging the State's obligations is returned promptly to the State and its officials when circumstances warrant.") (*cleaned up*)

*61, 26 L.Ed. 101, 102 (1880)*. As such, a consent agreement cannot expand the jurisdiction of Article III courts beyond their constitutional confines.

The direction of the Supreme Court has further importance in regard to the management of ongoing consent decrees. In every institutional reform case, control must be turned back over to the state and to the officials elected to run those agencies, *at some point*. The federal government simply does not run state agencies *ad infinitum*. In an ongoing Decree where many subjective goals and topics are included in the Agreement between the litigants (the federal government and the state government), the Supreme Court precedent on federalism directs that once individual areas of the Agreement are pulled into durable (*albeit not perfect*) constitutional compliance, the federal court **must** release its managerial control back to the elected state officials. Complying with this Supreme Court precedent, the DOJ's own Civil Rights Litigation policies prohibit the maintenance of federal control over a sovereign local government *via* consent decree after the specific cited violations of federal law are remedied.[13]

> [D]ecrees should encourage the parties to **affirmatively recommend termination of sections of the decree** for which jurisdictions achieve and sustain compliance. **Compliance with a consent decree is not an all-or-nothing goal. Progress will inherently happen incrementally, and the monitorships should be designed with that in mind.** By standardizing the use of partial termination provisions, the Department can reward jurisdictions that have been making efforts to come into compliance.

Local control should increase proportionately with the department's progress to assure sustained compliance after the decree is lifted. In contrast here, the Monitor maintains that the instant

---

[13] *See* U.S. Department of Justice, The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present Civil Rights Division, January 2017, at p. 35 "VII. Concluding the Civil Rights Division's Police Reform Agreements," at www.justice.gov/crt/file/922421/download.

decree is all-or-nothing with every area mandated to be in full compliance simultaneously before a two-year sustainment period even begins.[14]

As the Eleventh Circuit summarized the Supreme Court precedent, "[c]ourts must ensure that responsibility for discharging the State's obligations is returned promptly to the State and its elected officials when the circumstances warrant. To do otherwise is to usurp the role of elected officials and deprive the people of their right to a democratically accountable government. Once a durable remedy is in place, 'continued enforcement of the [consent decree] is not only unnecessary, but improper.'"[15]

This critical restraint on Article III courts was also acknowledged by the Ninth Circuit:

> The [Supreme] Court has repeatedly reminded us that institutional reform injunctions were meant to be temporary solutions, not permanent interventions, and could be kept in place **only so long as the violation continued**. Most recently, the Court stated this term that "[i]f a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper."[16]

This critical constitutional framework shapes the analysis applicable below. This is also in keeping with the concept of substantial compliance in contract law. This "substantial compliance" link between contract law and the Decree was discussed by the Eleventh Circuit:

> Because a consent decree is a contract, we measure compliance in terms of substantial performance.
>
> Substantial performance, or **substantial compliance, exists when the consent decree's fundamental purpose has been accomplished**, and any deviations from the decree are unintentional and so minor or trivial as not substantially to defeat the object which the parties intended to accomplish. **There need not be strict and**

---

[14] *See* February 17, 2021, Annual Report of 2020, Rec. Doc. 613-1

[15] *Peery v. City of Miami*, 977 F.3d 1061, 1069 (11th Cir. 2020) (*internal quotation marks and citations omitted*), *citing Horne*, 557 U.S. at 450, and Ross Sandler & David Schoenbrod, *Democracy by Decree*: What Happens When Courts Run Government (2003), Yale University Press, at www.jstor.org/stable/j.ctt1nq7zt.

[16] *United States v. Washington,* 573 F.3d 701, 710 (9th Cir. 2009) (*emphasis added*)

> **literal compliance with the contract provisions**. So a federal court should terminate supervision once the defendant comes into substantial compliance with the law, because indefinite federal court oversight of state institutions is disfavored.[17]

As the Eleventh Circuit further analyzed regarding consent decrees:

> To prove the consent decree's purpose has been "fully achieved," the City had to establish (1) current substantial, good-faith compliance, and (2) that it is "unlikely . . . [to] return to its former ways" absent the consent decree. *Bd. of Educ. v. Dowell*, 498 U.S. 237, 247, 111 S. Ct. 630, 112 L. Ed. 2d 715 (1991). If the City has put a "durable remedy" in place, the district court should terminate the consent decree. *Horne*, 557 U.S. at 450.

*Peery v. City of Miami*, 977 F.3d 1061, 1075 (11th Cir. 2020). Recognizing this limit, the Decree itself only requires compliance with the "material requirements" therein.[18]

It is critical, therefore, not to focus exclusively on the 124-page laundry list of compliance items from 2012, but to evaluate whether today's NOPD has substantially complied with the Decree when considering the current circumstances. As explained by the Fifth Circuit in *Frew v. Young*[19] "substantial compliance" excuses deviations from a consent decree's provisions that do not severely impair the consent decree's purpose.

## A.    Federal Rule of Civil Procedure 60(b)

The Decree includes provisions for its termination (or modification) *via* joint motion of the parties, or unilateral motion by the City per Paragraphs 491 and 492. Rule 60, however, supersedes those provisions. "[A]although a consent decree may be contractual in nature, it is nonetheless subject to Rule 60(b) because it is a judicial decree that is subject to the rules

---

[17] *Peery v. City of Miami*, 977 F.3d 1061, 1075 (11th Cir. 2020) (*internal quotation marks and citations omitted*)
[18] Consent Decree at para. 491, R. Doc. 565, p. 129.
[19] *Frew v. Young*, No. 21-40028 (5th Cir. 2022) 2022 U.S. App. Lexis 1027* 2022 WL 13512

generally applicable to other judgments and decrees."[20] In fact, "[e]ven when consent decrees explicitly provide instructions for their own modification, Rule 60(b) governs."[21] Rule 60(b)(5) authorizes the Court to relieve the City of New Orleans from the Decree if the Order has been satisfied through substantial compliance. The Fifth Circuit recently reiterated that Rule 60(b)(5) requires "liberal construction," and that "substantial compliance" with a consent decree excuses deviations that do not severely impair the consent decree's purpose.[22] The City has substantially complied with the Decree, as discussed below, and is entitled to termination of DOJ supervision.

With respect to the specific terms of the Decree, the Outcome Assessments of Paragraph 448 are important to the Court's evaluation of substantial compliance as defined at Paragraph 491. As the Monitor has explained to the public, "the New Orleans Decree requires the Monitoring Team to perform 'outcome assessments' in addition to its compliance reviews and audits…While the outcome assessments do not impose an additional compliance hurdle upon the NOPD, they do provide both parties a means of assessing whether the Decree is working as intended – that is, whether it is resulting in constitutional policing."[23] For NOPD, the outcome assessments are critical because, "[t]he outcome assessments… also provide the NOPD an alternative means of emerging from the Decree…"[24] Despite these clear acknowledgments by the Monitor in 2015 and 2016, it has failed to provide even a single outcome assessment that is

---

[20] *United States v. Int'l Union*, 2021 U.S. Dist. LEXIS 195788, at *4 (E.D. Mich. Oct. 12, 2021) *citing Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 601-02 (6th Cir. 2012) *and Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992) (*cleaned up*)

[21] *Ne. Ohio Coal. v. Husted*, 696 F.3d 580, 602 (6th Cir. 2012), *citing Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland*, 669 F.3d 737, 741 (6th Cir. 2012).

[22] *Frew v. Young*, No. 21-40028 (5th Cir. 2022) 2022 U.S. App. Lexis 1027* 2022 WL 135126

[23] Report of the Consent Decree Monitor for the Third and Fourth Quarters of 2015 Issued February 26, 2016, (R. Doc. 472-1), at p. 86 of 100.

[24] Report of the Consent Decree Monitor for the Third and Fourth Quarters of 2015 Issued February 26, 2016, (R. Doc. 472-1), at p. 86 of 100.

clearly required to be done "at least annually" by the Decree.[25] This failure of the Monitor should not work to the detriment and financial damage of the City and NOPD.

Rule 60(b)(5) also allows for the termination of the Decree if "applying [the Order] prospectively is no longer equitable." As the Supreme Court has explained in the context of institutional reform cases, "[m]odification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384, 112 S.Ct. 748, 760, 116 L.Ed.2d 867, 886 (1992). Given the length of most institutional reform cases and the complexity of a modern police force, this guidance is especially applicable here.

Over the decade between drafting the Decree's detailed terms in 2012 and the current application of these terms against NOPD, much has radically evolved. Beyond those changes obvious to outsiders – *e.g.*, body worn cameras, nation-wide police reform movements, COVID-19, *etc.* – the actual application of the Decree has drastically expanded, amounting to a loss or difference of the originally understood desired outcome. Critically, the Monitor cannot unilaterally modify or deviate from the Decree.[26] The City and DOJ may jointly move this Court to modify its terms, which has been done on minor items over the years.[27] However, as detailed below, unauthorized changes have rendered compliance substantially more onerous on the City than ever envisioned, resulting in material delay and increased expense. This increased difficulty as well as the NOPD's already achieved elimination of violations of federal law warrant the relief sought by the City of New Orleans to conclude the Decree.

---

[25] Consent Decree at para. 450, R. Doc. 565.
[26] Consent Decree at para. 456, Rec. Doc. 565.
[27] Consent Decree at para. 487, Rec. Doc. 565.

### III.    PERTINENT FACTUAL AND PROCEDURAL HISTORY

Following Hurricane Katrina's destabilization of New Orleans and its police force, Mayor Landrieu's administration invited a DOJ investigation into the NOPD practices in 2010. The resulting investigation report was issued in 2011 and alleged violations of three federal statutes which implemented the Fourth and Fourteenth Amendments of the U.S. Constitution. More critical for these purposes than the conduct at issue was the lack of structures in place to discourage, identify, and punish unconstitutional conduct.

The DOJ thereafter filed a formal complaint with this Court which triggered the Court's jurisdiction pursuant to 42 U.S.C. § 14141; 42 U.S.C. § 3789d; and 42 U.S.C. §§ 2000d to 2000d-7, as implemented by 28 C.F.R. §§42.101 to 42.11. Specifically, the DOJ suit sought "to remedy an alleged pattern or practice of conduct by the NOPD that subjects individuals to **excessive force** in violation of the Fourth Amendment, **unlawful searches and seizures** in violation of the Fourth Amendment, and **discriminatory policing** in violation of the Fourteenth Amendment, the Safe Streets Act, and Title VI."[28] As with any case, the federal jurisdictional bounds of the complaint set the limits of the Court's power to adjudicate remedies in this matter as the parties to litigation cannot confer additional jurisdiction on the Court by agreement.

On the same day that DOJ filed the instant suit, July 24, 2012, it and the City also set out the terms of a settlement agreement – the Decree – which became an order of the Court on January 11, 2013. (Rec. Doc. 159-1) The instant Decree was the broadest in scope, and the most detailed of any such agreement used by the DOJ to date,[29] consisting of over 490 main paragraphs, and over 350 additional substantive subparagraphs.

---

[28] Order and Reasons, R. Doc. 159 at p. 2.
[29] Police Executive Research Forum, Critical Issues In Policing Series, Civil Rights Investigations of Local Police: Lessons Learned, 2013, https://www.policeforum.org/assets/docs/Critical_Issues_

A.      **The Agreed Upon Reform Structure**

The Decree creates a logical structure that requires the Monitor (a team of lawyers and subject area experts) to develop audit protocols at the front end of the process. The Monitor was obligated to provide a plan for conducting the outcome assessments of Paragraph 448 and audits within 90 days of its appointment.[30] Any proposed changes to the outcome assessments themselves were due for consideration within 120 days.[31] And 90 days prior to conducting the "at least annual" outcome assessments of Paragraph 448 and audits, the Monitor was to provide NOPD and DOJ with the proposed *methodology* for its compliance evaluation – *i.e.*, the measurement and audit protocols.[32] Despite the clear obligations under the Decree, the Monitor has never produced a single outcome assessment report.[33]

This is critical because compliance, and the resulting end of federal supervision, was defined by the parties as follows:

> "Compliance with a ***material requirement*** of this Agreement requires that the City and NOPD have: (a) **incorporated** the requirement into policy; (b) **trained** all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) ensured that the requirement is being **carried out** in actual practice."[34]

In short, NOPD was to develop the policies with technical assistance from the Monitor's team, train officers on the new policies, and test compliance *via* the Monitor's annual compliance

---

Series/civil%20rights%20investigations%20of%20local%20police%20-%20lessons%20learned%202013.pdf
[30] *See* Consent Decree (R. Doc. 565) at para. 450. (*emphasis added*)
[31] Consent Decree at para. 451, R. Doc. 565.
[32] *See* Consent Decree (R. Doc. 565) at paras. 450 – 453.
[33] Counsel for the City requested all outcome assessments prepared by the Monitor. No outcome assessments were provided. *See, e.g.*, Ex. 1.
[34] *See* Consent Decree (R. Doc. 565) at para. 447.

audits.[35] The Decree put the audit criteria at the front of the process so that NOPD could target and track specific outcomes towards those set objectives. As the DOJ has acknowledged, subjective aspects of a consent decree are unhealthy and lead to a lack of clarity regarding achievement of compliance. As DOJ explains, "[t]hose outcome measures are designed to eliminate guesswork and reduce subjectivity in the determination of whether an agency's reform efforts are resulting in constitutional policing."[36]

The goal of this process and the detail and length of the requirements was to effectively place the policy requirements into the agreement, leaving few vagaries that would delay implementation. That approach *should* have eliminated time "reinventing the wheel" at each phase or chasing moving goals and evolving policy ambitions. Anticipating the efficiency gains expected from this approach, the parties agreed they would seek to reach "full and effective compliance" with the Decree's terms by the end of 2016, four years after the entry of the Decree.[37] That timeline included the two-year "sustained compliance" period and an estimated $8 million[38] monitoring budget.[39] The parties agreed that if a compliance finding had not occurred within six (6) years, then the City was authorized to seek termination through Paragraph 492.

---

[35] *See* Consent Decree (R. Doc. 565) at paras. 447 and 450.
[36] *See* U.S. Department of Justice, The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present Civil Rights Division, January 2017, at p. 35 "VII. Concluding the Civil Rights Division's Police Reform Agreements," at www.justice.gov/crt/file/922421/download.
[37] *See* Consent Decree (R. Doc. 565) at para. 491.
[38] *See* Sheppard Mullin Proposal for the New Orleans Police Department's Consent Decree Court Monitor (Rec. Doc. 270) at p. 51.
[39] *See, e.g.*, R. Doc. 565, paras. 15 and 20.

**B.      The Agreed Upon Objective Outcome Assessments**

The parties to this agreement recognized the substantial compliance doctrine and that the simultaneous compliance of every paragraph of the 700-plus paragraph agreement could be impossible as a practical matter. They created two different paths to show full and effective compliance with the terms of the Decree. The controlling Agreement between the parties requires as follows:

> "Full and Effective Compliance" shall be defined to require sustained compliance with all *material requirements* of this Agreement **or sustained and continuing improvement in constitutional policing**, as demonstrated pursuant to the Agreement's outcome measures [at paragraph 448].[40]

The use of outcome measures separate and apart from the detailed contents of the Decree is a critical part of the DOJ's Civil Rights guidelines for institutional reform litigation. As the DOJ has long acknowledged, these measurements are critical to "assess whether the underlying goal of police reform – to restore community trust and promote effective, constitutional policing – is being achieved."[41] The Outcome Assessments of paragraph 448 in the instant Decree use objective and specific benchmarks that are more susceptible to quantification than the rest of the document. And this objective intent is not limited to the instant Decree, but is a policy of the Civil Rights Division of the Department of Justice:

> [T]he Division's current generation of reform agreements focuses on defined outcome measures to ensure that the court and the independent monitoring team have concrete, objective benchmarks for assessing whether a law enforcement agency has effectively implemented an agreement. Those outcome measures are designed to **eliminate guesswork** and **reduce subjectivity in the determination of whether an agency's reform efforts are**

---

[40] Rec. Doc. 565, CD at para 491 (*emphasis added*)
[41] The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present
Civil Rights Division, U.S. Department of Justice, January 2017, *supra*, at p. 25 "Outcome Measures to Assess Progress."

> **resulting in constitutional policing**. They are also designed to validate the reforms mandated by an agreement, and ensure that new policies, training, and organizational change **accomplish the underlying goals of eliminating patterns of police misconduct**.[42]

The Decree specifically directs at multiple different locations that the Monitors "shall" evaluate and report on the Outcome Assessments of paragraph 448 in order to provide the clarity DOJ policy demands:

> The Monitor **shall** file with the Court quarterly written, public reports covering the reporting period that shall include…(e) The methodology and specific finding for each outcome assessment conducted."

*See* Monitor's June 19, 2017, Report (Rec. Doc. 525-1) at p. 3 (*emphasis added, citing* Decree Paragraph 457). Paragraph 448 further directs that:

> In addition to compliance reviews and audits, the Monitor **shall conduct assessments** to measure whether implementation of this Agreement is resulting in constitutional policing. These outcome assessments shall include collection and analysis of the following outcome data:…

*See also* Paragraph 446 ("…the Monitor shall conduct the reviews, audits, and **assessments** specified below…"), Paragraph 450 (the Monitor "shall… (b) set out a schedule for conducting **outcome assessments** for each outcome measure **at least annually**…"), and Paragraph 453 ("the Monitor shall submit a proposed **methodology** for the **assessment**, review or audit to the Parties.") (*emphasis added*).

---

[42] *Id*, at p. 35 "VII. Concluding the Civil Rights Division's Police Reform Agreements." (*emphasis added*)

These "Outcome Assessments" are required for a determination of "Full and Effective Compliance" by Paragraph 491.[43] The methodology[44] to be used to measure the data is critical, but because the Monitor has never provided that information, NOPD has had to track its own internal data. *See* Appendix A and the publicly available reports listed at Ex. 26. Those measurements support the City's position that it has met the contractual definition of full and effective compliance pursuant to the express terms of the Decree.

The first report on the Outcome Assessments was due within one year of the order and quarterly reports on methods and findings were also required.[45] Clearly, the litigants and the Court placed significant weight on these measurements. The Monitor was aware of their importance as well, mentioning their value several times between 2014 and 2019.[46] In fact, the Monitor explained the value of the Outcome Assessments in one of its public reports as follows:

> Unlike prior federal Consent Decrees, the New Orleans Consent Decree requires the Monitoring Team to perform "outcome assessments" in addition to its compliance reviews and audits. (CD 448) While the outcome assessments do not impose an additional compliance hurdle upon the NOPD, **they do provide both parties a means of assessing whether the Consent Decree is working as intended – that is, whether it is resulting in constitutional policing.**
>
> The outcome assessments, however, **also provide the NOPD an alternative means of emerging from the Consent Decree**…the Monitoring Team believes the time is right to initiate several of the assessments. While NOPD still is a long way from being able to show compliance with many areas of the Consent Decree,

---

[43] '"Full and Effective Compliance" shall be defined to require… sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures." R. Doc. 565 at para. 491.

[44] The Monitor was required to provide the methodology for the outcome assessments three months prior to performing the analysis. *See* Consent Decree para. 453. (R. Doc. 565)

[45] Consent Decree at para. 457(e), Rec. Doc. 565.

[46] *See* First and Second Quarter 2015 Monitor Report, Rec. Doc. 453-1, p. 19 of 135, and Report of the Consent Decree Monitor for the Third and Fourth Quarters of 2015 Issued February 26, 2016 Document 472-1, at Page 2 of 100.

> significant progress has been made in several areas, and NOPD has enhanced its data keeping capabilities, such that this progress is capable of being measured more accurately now…**The Monitoring Team plans to initiate several outcome assessments in the comings months.**[47]

This repeated acknowledgment of the critical value of the Outcome Assessments and the plan to conduct them nevertheless failed to produce a public report on the outcome assessments. Cryptic entries continued to be left in the public record, without any actual analysis or outcome assessment report ever being completed, provided or reported. "While the Monitoring Team has been working closely with the NOPD Compliance Bureau to conduct such assessments for several years now, **the results of those assessments now are more important than ever.** Accordingly, the Monitoring Team is now expanding our monitoring activities to give more focus to "outcome assessments.'"[48] Still, as of the filing of this motion, the Monitor has never issued a public report on the mandated Outcome Assessments; not a single report in over eight years. Counsel for the City requested these reports from the Monitor, and none were provided.[49] This critical deficiency focuses the importance of the City's instant motion to terminate the Decree based on alternative paths forward in light of NOPD's successfully implemented durable remedy to sustain constitutional policing.

## C.     2020 Notice of Compliance to DOJ

In 2019, the NOPD determined that its performance according to the Outcome Assessments of Paragraph 448 should satisfy the compliance according to Paragraph 492. A full compliance determination was believed to be around the corner so the City did not move forward

---

[47] *Id.*, at 86 of 100.
[48] Report of the Consent Decree Monitor For the New Orleans Police Department Consent Decree Covering the Third and Fourth Quarters of 2016 Released June 19, 2017, Rec. Doc. 525-1, p. 12 of 62, see also, Annual Report of 2017 — Rec. Doc. 550, and 2019 Monitor Report, Rec. Doc. 575 at p. 59.
[49] *See* Ex. 1.

on that front. With DOJ affirmed compliance always slipping further off into the future, the City notified the DOJ on November 30, 2020, ("City's Notice") that it believed it was in full and effective compliance with the Agreement because it has demonstrated sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures at Paragraph 448.[50] Pursuant to the process established by Paragraph 492, the parties conferred by phone after this notice. The DOJ was granted a "reasonable period" to evaluate the Notice by the Decree. No additional testing or data was requested regarding the City's Notice.

After the City's Notice, the Monitor still did not issue a report on the Outcome Assessments of Paragraph 448. Instead, the Monitor directed that NOPD should prepare the missing analysis, suddenly shifting this burden to the City. Pursuant to the plain text of Paragraph 492, therefore, the City is authorized to file the instant motion to terminate the Decree. As discussed above, the City has always retained that right under Rule 60, but the City is concurrently seeking relief under Paragraph 492 of the Decree.

The DOJ tendered a letter to the City Attorney on August 8, 2022,[51] claiming *erroneously* that it had never received the City's Notice pursuant to Paragraph 492. Curiously, this incorrect legal conclusion from a private letter between DOJ and the City Attorney was repeated in the press, creating the false storyline that the City had not complied with the Decree on this point.[52] This position is inexplicable given the publicity of the City's Notice in 2020. It is, however, consistent with DOJ's refusal to be bound by the letter or spirt of the Decree. The DOJ's letter

---

[50] Attached as Ex. 2 is the Notice pursuant to Paragraph 492 tendered to the DOJ.
[51] *See* DOJ Letter at Ex. 3.
[52] Nola.com, "Judge sets hearing over NOPD consent decree after Mayor Cantrell demands exit", August 12, 2022, at https://www.nola.com/news/courts/article_4c64fb7a-1a66-11ed-b765-2f1ac3b24581.html.

seeks to trigger delay provisions. However, those provisions were already satisfied in 2020 by the City's Notice and cannot be reprised now in 2022 to cause more delay.

The only formal response from the Monitor to the City's Notice in 2020 was an attack on the City's intent in filing the Notice. While acknowledging that the City's Notice was sent to DOJ, and a procedural matter only between the City and DOJ, the Monitor nevertheless publicly declared that the City's Notice was "particularly concerning" and filed prematurely without evidence in support of terminating the Decree (even though no such evidence was required in the City's Notice).[53] The Monitor did not acknowledge its ongoing failure to perform the assessment analysis at the heart of the City's Notice. At that time, the most recent public statement by the Monitor was from December of 2019, wherein the Monitor favorably reported that NOPD was "nearing the finish line"[54] as to Decree compliance. The City pointed out to the Monitor at that time that the Monitor's public comments about the intent of the City was legally incorrect, improper and counterproductive:

> [T]he City objects to the overt mischaracterization of its notice pursuant to paragraphs 491 and 492 of the Consent Decree to the DOJ. As an initial matter, the notice was, as required, directed to the Department of Justice. As the Monitor was compelled to acknowledge, it does not involve the Federal Monitor or impact its efforts and should not be "particularly concerning" in any way. Further, the Monitor misstates the requirement for that notice, incorrectly implying to the public that the City was obligated to "prove" something in the notice. The Consent Decree is very clear that the City must notify the DOJ of its position, and that was done. To imply there was an evidentiary requirement to issue a letter to DOJ advising of the City's position is misleading and intended, again, to demean the NOPD's intent and accomplishments.[55]

---

[53] *See* February 17, 2021, Annual Report of 2020, Rec. Doc. 613-1 at pp. 2 – 3.
[54] Ex. 11, Public Hearing Opening Statement of Jonathan S. Aronie, Consent Decree Monitor Over the New Orleans Police Department Before the U.S. District Court for The Eastern District of Louisiana Focusing on the NOPD Police Academy, 17 December 2019.
[55] February 12, 2021, email objection by counsel for the City, attached as Ex. 4.

The Monitor's retaliatory response to the City's Notice was not unexpected. The City, and NOPD employees specifically, anticipated this harsh response from its long history in this matter where any pushback from NOPD was met harshly. Fear of such retaliation (and the lack of publicly reported Outcome Assessments) caused the City to delay pursuing its rights pursuant to Paragraph 492 out of fear it would cause a further "delay" in a final compliance determination.

As of today, 15 of the 17 categories of the Decree have been found in compliance under the more rigorous standard that requires full and effective compliance with all of the terms of the material provisions of the Decree.[56] Most have been in compliance for more than two years. Anticipating a full compliance determination, the Monitor requested the City's proposal for a two-year sustainment period. The Decree does not explain what happens during that two-year period. The City proposed that NOPD should be allowed to show sustainment – *i.e.*, maintaining the *status quo* constitutional policing – standing on its own without DOJ interference or support from Monitor staff. The *joint* response from DOJ and the Monitor makes clear that they demand NOPD remain shackled to the same pre-sustainment state of DOJ control during the two-year "sustainment period."[57] That is not what the City envisioned as it essentially makes a compliance determination meaningless beyond starting a subsequent, additional 24-month clock.

Moreover, with the extreme subjectivity rooted in the Decree monitoring process now, maintaining compliance would effectively be left to the whim of DOJ. If the Monitor or DOJ assert there is noncompliance in any one area of the Decree, they might require the City to start over and demonstrate full and effective compliance in every single area again in order to start a

---

[56] *See* Ex 21, and Ex. 23.
[57] *See* Ex. 14. While commonly referred to by the Monitor as the "sustainment period" the Consent Decree actually states that: "[t]he Parties may agree to jointly ask the Court to terminate this Agreement after this date, provided that the City and NOPD have been in full and effective compliance with this Agreement for two years." Consent Decree para. 491. (R. Doc. 565)

new two-year sustainment period clock. With the onerous requirement of 95% compliance rate applied to every audit criterion and separate DOJ approval of every policy, protocol and corrective action plan, it is easy to envision many scenarios where the City might *never* exit the Decree under this regime. As such, it is in the City's best interest to formally move to end control of its police department pursuant to Rule 60(b). The City's motion to terminate is also entirely consistent with applicable jurisprudence and constitutional law.

## IV.   SUBSTANTIAL COMPLIANCE HAS BEEN ACHIEVED

### A.   Transforming NOPD: 2011 to 2022

"Transformation" is a word the Monitor has used for the NOPD, and it is uniquely appropriate. The residents of New Orleans should be proud and comforted by the NOPD's turnaround since 2011 when DOJ did its investigation. In stark contrast to 2011 when DOJ found that NOPD lacked policies, training, internal discipline, accountability, *etc.*, the NOPD now has implemented DOJ and Court-approved policies on the use of force, and every other aspect of policing.  Such policies are used to train NOPD officers in the renowned DOJ and Court-approved Academy.[58] Once those officers reach the street, their stops, use of force and all other material interactions are audited and, if necessary, judged by multiple investigatory arms of the NOPD, each built to DOJ and Court-approved standards.

The Monitor has reviewed each serious use of force investigation since 2013.[59] The Monitor has not found any systemic concerns with the use of force by NOPD. In fact, the transformation of NOPD's fundamental mindset has been so successful that the Monitor and

---

[58] *See* Ex. 11, Public Hearing Opening Statement of Jonathan S. Aronie, Consent Decree Monitor Over the New Orleans Police Department Before the U.S. District Court For The Eastern District of Louisiana Focusing on the NOPD Police Academy, 17 December 2019.
[59] Consent Decree at para. 454. (R. Doc. 565)

DOJ have not disagreed with the findings of a single use of force investigation by the NOPD in over five years. That is an incredible achievement for any police force. That achievement parallels the finding of NOPD's Public Integrity Bureau (PIB), generically known as "internal affairs," in full and effective compliance with the Decree.

The NOPD now adheres to DOJ and Monitor crafted policies on over 200 topics from use of force to the translation of documents to Spanish and Vietnamese. These policies are taught and implemented to effect and sustain real change uniformly. A timely example of this can be found in the February 12, 2021, report by Nola.com comparing the favorable variance between NOPD and other equivalent police forces when using police dogs:

> The seven [canine] calls in 2019 marked a third straight year of steeply declining work for the dogs. It was also the third straight year with no bites…The restraint NOPD has shown with its dogs in that span contrasts sharply with the Baton Rouge Police Department, whose dogs have bitten 146 people during the same period.[60]

Use of dogs in 2011 and the injuries they caused were just two objective measures of the overall state of the NOPD's use of force policies since the DOJ's initial investigation. The stated goal was to merely reduce canine events, but NOPD went above and beyond by virtually eliminating them. This sharp decline is in line with the overall drastic reduction in the use of force by NOPD officers. Firearm discharges by police officers have stayed in the single digits for over five years.[61] And, as the Monitor expressed in 2019, use of force statistics "lie at the very heart of the purpose of the Decree."[62]

---

[60] "NOPD's K-9 unit, once a major concern for Justice Department, now rarely bites suspects" Nola.com, February 12, 2021. https://www.nola.com/news/crime_police/article_30bae60e-6cc6-11eb-bc2a-ef3065a16ea0.html
[61] 2020 NOPD Use of Force Annual Report at
https://nola.gov/nola/media/NOPD/Consent%20Decree/2020-Use-of-Force-Annual-Report-FINAL.pdf
[62] R. Doc. 574-1, Comprehensive Reassessment of the Consent Decree Monitor Pursuant to Paragraph 456 of the NOPD Consent Decree Released January 24, 2019, p. 12.

The NOPD has gone from effectively zero officers trained to deal with mental health subjects to over 335 officers trained for the Crisis Intervention Team by the end of 2020.[63] Stops, searches and arrests are now recorded by body worn cameras and subject to exacting reporting standards and multiple layers of supervisory review.[64]

At this juncture, New Orleans has conceivably the most transparent police department in the United States. The Decree requires that the NOPD publish certain limited reporting data.[65] NOPD has surpassed that requirement for years by making the same statistical data used by NOPD officers available to the public. "Over the past few years, the New Orleans Police Department has made an unprecedented volume of data publicly available."[66] This drive to do more than the Decree requires is indicative of the systemic constitutional mindset of NOPD stakeholders around sustainability and durability of its current standards of accountability.

The overall transformation of the NOPD has been so successful that the Monitors teach other departments how to be like the NOPD.[67] The citizens of New Orleans can be proud of this success and comforted that their valid complaints were heard and addressed head on. NOPD built a compliance dashboard to track compliance with each paragraph of the Decree relatively early on in the process. By early 2019, NOPD understood it was in compliance with over 90%

---

[63] *See* 2020 Annual Crisis Intervention Report by NOPD at https://nola.gov/getattachment/NOPD/NOPD-Consent-Decree/CIT-2020-Annual-Report.pdf/?lang=en-US

[64] *See* 2019 Annual SSA Report, at https://nola.gov/getattachment/NOPD/NOPD-Consent-Decree/2019-Stop-and-Search-Annual-Report.pdf

[65] Consent Decree at paras. 427 - 429. (R. Doc. 565)

[66] Ex. 9, Jonathan Aronie, David Douglass, and Joseph Jay, Sheppard Mullin Richter & Hampton, "From the Big Easy to The Big Ten, And Beyond. What the Process of Reforming the New Orleans Police Department Can Teach Colleges and Universities, Tip 3: Set expectations and lock in transparency." p. 3, www.Sheppardmullin.com.

[67] *See* Active Bystandership for Law Enforcement (ABLE) Project, www.law.georgetown.edu/innovative-policing-program/active-bystandership-for-law-enforcement/ (New Orleans Police Department developed the EPIC Peer Intervention Program and ABLE builds upon EPIC.)

the Decree's individual paragraphs.[68] The Monitor disputed the percentage but agreed the City

was nearing the end. It is surprising then that according to the Monitor three-and-a-half years

later, the City is purportedly still looking at no less than two more years of in-depth DOJ control

over the NOPD's operations. Objective data and demonstrable internal NOPD monitoring (in the

absence of any public Monitor assessment reports) contradicts that notion and supports the

instant motion for termination of the Decree.

**B.      Compliance Findings**

In January of 2019, more than two years ago, the Court recognized ten (10) of 17

assessment areas as compliant, with several having been "in the green" for years.[69] Two years

later in January of 2021 the Court moved two additional areas into compliance.[70] And in April of

2022 two additional categories were moved into the green. In sum, of the 17 categories of the

Decree, the following 15 have already been deemed in compliance, and most for over two (2)

years:

- Policies and Training Generally (Section II Paragraphs 15-26)
- Use of Force (Section III Paragraphs 27-110)
- Crisis Intervention Team (Section IV Paragraphs 111-121)
- Custodial Interrogations (Section VI Paragraphs 163-170)
- Photographic Line-Ups (Section VII Paragraphs 171-176)
- Policing Free of Gender Bias (Section IX Paragraphs 195-222)
- Community Engagement (Section X Paragraphs 223-233)
- Recruitment (Section XI Paragraphs 234-244)
- Academy and In-Service Training (Section XII Paragraphs 245-288)
- Officer Assistance and Support (Section XIII Paragraphs 289-294)
- Performance Evaluations and Promotions (Section XIV Paragraphs 295-305)
- Supervision (Section XV Paragraphs 306-331)

---

[68] *See, e.g.*, compliance dashboard of NOPD at Ex. 15, and December 6, 2018, letter from the City
Attorney regarding status of compliance at Rec. Doc. 568.
[69] *See* Ex. 21, Prepared Public Hearing Remarks of Jonathan S. Aronie, Lead Monitor, NOPD Consent
Decree Before Judge Susie Morgan, U.S. District Court For The Eastern District of Louisiana, April 20,
2022.
[70] *Id.*

- Secondary Employment System (Section XVI Paragraphs 332-374)
- Misconduct Complaint Intake, Investigation, and Adjudication Section XVII (Paragraphs 375-426)
- Transparency and Oversight (Section XVIII Paragraphs 427-443)

The following two sections have not *yet* officially been deemed in compliance as of this date, but the NOPD has made its compliance presentation to the Court already:[71]

- Stops, Searches, And Arrests (Section V Paragraphs 122-162)
- Bias-Free Policing (Section VIII Paragraphs 177-194)

The formal public hearing to announce compliance was scheduled to occur already. According to the Monitor, the hearing was delayed due to the "optics" of a compliance finding while news reports on NOPD's secondary employment system were fresh. Optics aside, the remaining two assessment areas are, in fact, in full compliance and NOPD deserves to have that fact made public. The NOPD's public annual reports, audit reports, and special reports document in detail its compliance in each of the 17 areas of the Decree for more than two years.[72] Those documents were edited and approved by the Monitor and DOJ prior to publication.

An affirmed and explicit compliance determination would officially put NOPD in "sustained compliance with all material requirements of this Agreement."[73] More importantly, this shows "substantial compliance" under Rule 60(b)(5) as applied by the Fifth Circuit in *Frew v. Young*.[74] The *Frew* opinion made clear that substantial compliance excuses deviations from a consent decree's provisions that do not severely impair the consent decree's purpose. *Id*, at *9. The purpose of the Decree was to remedy violations of federal law cited by the DOJ in 2011. Further, the Decree seeks to ensure NOPD engages in constitutional policing. None of the

---

[71] *See* Ex. 6 and Ex. 7.
[72] *See* Ex. 26.
[73] Consent Decree at para. 491. (R. Doc. 565)
[74] *Frew v. Young*, No. 21-40028 (5th Cir. 2022) 2022 U.S. App. Lexis 1027* 2022 WL 13512

numerous reports from the Monitor or NOPD in the last two years have shown any deviations from the provisions of the Decree that would "severely impair" its purpose. In fact, those documents show that any systemic violations of federal law have been remedied for more than two years. Thus, the City is entitled to terminate the Decree under the first prong of the Rule 60(b)(5) standard as "substantial compliance" with the Decree has been achieved, demonstrated and acknowledged by any reasonable objective standards.

## V.    COMPLIANCE THROUGH SUSTAINED AND CONTINUING IMPROVEMENT IN CONSTITUTIONAL POLICING.

Additionally, pursuant to Paragraph 492, the City moves for a compliance determination pursuant to the Outcome Assessments of Paragraph 448 for the two areas that have not already been formally found in compliance, putting NOPD into compliance *via* "sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures."[75]

### A.    Section V, "Stops, Searches, And Arrests"

Section V, "Stops, Searches, And Arrests", represents some of the most focused and extensive positive changes in the NOPD structure. The policies and training on these topics were fundamentally rewritten to meet the highest standards endorsed by DOJ. The outcome measures to determine continued and sustained improvement in constitutional policing evaluate the results of those reforms rather than the checklist of reform documentation:

> **Stop, Search, and Arrest measurements, including:**
>
> (1)    Number and rate of arrests for which there is documented reasonable suspicion for the stop and probable cause for the arrest, overall and broken down by geographic area (i.e., zone), type of arrest, age, race, gender, and ethnicity;

---

[75] *Id.*

>    (2)    The DA's acceptance and refusal rates of arrests made by
>    NOPD and reasons for refusals, when made available by the DA,
>    including those factors and information indicating that a failure to
>    prosecute was due to the quality of officer arrests or concerns
>    regarding officer conduct, overall and broken down by geographic
>    area (i.e., zone), type of arrest, age, race, gender, and ethnicity; and
>
>    (3)    Number and rate of searches that result in a finding of
>    contraband, overall and broken down by geographic area (i.e., zone)
>    type of arrest, age, race, gender, and ethnicity.[76]

Appendix A hereto includes support for each of these criteria. The NOPD reports this data to the public annually in great detail. Additionally, the presentation made by the NOPD to the Court regarding Stop, Search, and Arrest is attached here as Exhibit 6. Those reports confirm continued and sustained improvement in constitutional policing regarding stops, searches and arrests. Not perfection, but constitutionally compliant continued and sustained improvement. For example, 97.7% of all audited stops in 2020 had proof of sufficient reasonable suspicion or probable cause for the stop.[77] Perfection has not been reached, but NOPD would put this number up against any police force anywhere in the country.

**B.    Section VIII, "Bias-Free Policing"**

"Proving" a negative, such as lack of bias, is generally an extraordinarily difficult task. Even the Monitor has acknowledged, "it is inherently difficult to prove a negative."[78] The outcome measures to determine continued and sustained improvement in constitutional policing regarding Section VIII, "Bias-Free Policing", on the other hand, include five data points. This subparagraph of the Decree is especially useful as NOPD has been repeatedly told that they are

---

[76] Consent Decree at para. 488(b). (R. Doc. 565)
[77] Annual Report of the Office of the Consent Decree Monitor for 2020, (R. Doc. 613), at p. 42 of 47.
[78] Comprehensive Reassessment of the Consent Decree Monitor Pursuant to Paragraph 456 of the NOPD Consent Decree (January 24, 2019) Rec. Doc. 574-1, at 37.

the first department to even attempt to implement and test these highly subjective reforms.

Developing tests for this area has proven to be a theoretical exercise with new testing methods

being applied by DOJ as recently as 2022.[79] At this late stage, the Monitor and DOJ still do not

have a finalized audit protocol to test for compliance in this area. But the DOJ and the City

agreed in 2012 that the following objective data should be considered in the analysis

improvements by NOPD:

> **Bias-Free Policing and Community Engagement measurements,**
> **including:**
>
> (1)  Number and variety of community partnerships, including
>       particular partnerships with youth;
>
> (2)  Homicide clearance rate;
>
> (3)  Comparative response time between LEP and non-LEP
>       individuals seeking assistance from NOPD, and change in
>       response time to LEP individuals.;
>
> (4)  Accurate classification of reports of sexual assault and domestic
>       violence; and
>
> (5)  Clearance rate of sexual assault and domestic violence cases,
>       overall and broken down by whether the case was cleared by
>       arrest or by exception, including accuracy of clearance type.[80]

Appendix A hereto includes support for each of these criteria and shows that NOPD has

achieved continued and sustained improvement in constitutional policing regarding bias.

Additionally, the presentation made by the NOPD to the Court regarding Bias Free

Policing is attached here as Exhibit 7. None of the reports from the Monitor or NOPD over the

last several years have indicated that the NOPD is engaged in systemic unconstitutional policing

or otherwise violating federal law, which was the basis and purpose of the Decree in the first

---

[79] *See* proposed analysis by DOJ at Ex. 5.
[80] Consent Decree at para. 488(c). (R. Doc. 565)

place. These thorough presentations on every aspect and action of NOPD make it clear that the City is also entitled to terminate the Decree under the standard set forth in Paragraph 492 as the City has shown continued and sustained improvement in constitutional policing for more than two years.

## VI.   CHANGES OF CONDITION THAT WARRANT TERMINATION

As noted, Rule 60(b)(5) also allows for the termination of the Decree if "applying [the Order] prospectively is no longer equitable." As the Supreme Court has explained in the context of institutional reform cases, "[m[odification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384, 112 S.Ct. 748, 760, 116 L.Ed.2d 867, 886 (1992). The conditions surrounding the application of the terms of the Decree have drastically changed and expanded since 2013 in such a way to have rendered sustained compliance utterly subjective with moving, and, in certain cases, poorly defined targets.

### A.    The 95% Compliance Threshold Imposed by the Monitor

As noted, the Decree directs that "[c]ompliance with a material requirement of this Agreement requires that the City and NOPD have: (a) **incorporated** the requirement into policy; (b) **trained** all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) ensured that the requirement is being **carried out** in actual practice."[81] The "carried out" aspect of the proof of compliance rubric is shown through the mandated audits, reviews and compliance assessments. But the audit process imposed on NOPD requires a 95% audit score in every area simultaneously to trigger a compliance determination. This is an

---

[81] Consent Decree at para. 447, Rec. Doc. 565.

exceedingly high threshold that is not representative of compliance in practice. In short, all audit items are weighted equally. For example, in the 2020 audit data the question "Did officer(s) have reasonable suspicion or probable cause to stop?" was found to be 97.7% compliant.[82] In that same audit the questions "Did the supervisor review the FIC [field interview card] within 72 hours?" was found 73% compliant.[83]

Both are important NOPD policies, but compliance with constitutional mandates is likely not equal to timeliness of review of field interview cards to New Orleans residents, or under the law. Moreover, multiple questions about certain topics can overshadow other areas. For example, "If reasonably possible, does video show the officer verbally identify him/herself as soon as practical?" was found only 64% in compliance with NOPD policy.[84] When added to several questions about the interaction of the officer with a suspect, the 97.7% compliance for "probable cause to stop" can be weighted down and minimized.

This is not a sweeping indictment of the audit process – far from it. The process is strong and viable. The point is that the universal 95% threshold adopted by DOJ and the Monitor is arbitrary and not indicative of carrying out the policies as trained in actual practice. This threshold has hampered NOPD's ability to demonstrate compliance, and is a change in condition that has only gotten more onerous as encroaching layer after layer are laid upon the audit protocols.[85]

---

[82] Annual Report of the Office of the Consent Decree Monitor for 2020, (R. Doc. 613), at p. 42 of 47.
[83] *Id*., at 45 of 47.
[84] *Id*., at 45 of 47.
[85] *See, e.g*., 8/9/2022 Email regarding "NOPD: SSA and Search Warrants Protocol Updates" attached as Ex. 10.

**B.      NOPD Tasked with the Monitor's Audit Process**

One example of the Monitor shifting its obligations to the NOPD is requiring NOPD to develop audit protocols and then conduct the "Decree Compliance Audits."[86] For example, on December 17, 2019, the lead Monitor noted the need to develop a method to test the compliance of the NOPD's Stop, Search and Arrest and Bias Free Policing policies.[87] The Decree clearly assigns that task to the Monitor at the very front of this long compliance journey.[88] Yet, despite the clear language of the Decree, NOPD has been forced to carry the bulk of the work in drafting the audit protocols, subject to DOJ instruction and approval.[89] This was a huge task applied to most of the 17 areas of the Decree that was not NOPD's obligation to undertake. NOPD should have been able to take the audit protocols used by the Monitor for its own use once federal supervision ended. That is part of the service the City has paid more than $14.4 million to the Monitor to provide.[90] *See* Paragraph 453 ("At least 90 days prior to the initiation of any outcome measure assessment or compliance review or audit, the **Monitor shall submit a proposed methodology** for the assessment, review, or audit **to the Parties**.")

---

[86] *See, e.g.*, draft Consent Decree Compliance Audit Standards, Article 14 Performance Evaluations & Promotions, attached as Ex. 12.

[87] Ex. 11, Public Hearing Opening Statement of Jonathan S. Aronie, Consent Decree Monitor Over The New Orleans Police Department Before The U.S. District Court For The Eastern District of Louisiana Focusing on the NOPD Police Academy 17 December 2019. ("NOPD, DOJ, and the Monitoring Team have been meeting weekly over the past few months to develop the tools necessary to evaluate NOPD's compliance in this area. We expect those tools to be finalized this month, and a series of final deep-dive audits to be conducted early next year.)

[88] *See* Consent Decree at para. 450 to 453, and 457.

[89] *See* Ex. 12, recent DOJ change to Bias Free Audit ("See Dr. Ross Bias Free Modifications (separate attachment) for proposed revised SSA section.  He lays out the methodology for the various assessments we're proposing to conduct."). *See also*, spreadsheet of assignments allocated protocol drafting to NOPD for DOJ and Monitor review at Ex. 17.

[90] Historical invoice data at Ex. 25.

C.      **Design, Conduct and Analyze Audits**

The following task assigned to NOPD by the Monitor and DOJ on the path to compliance is an illustrative example that also exhausts NOPD's limited resources and causes years of delay: "Work with the Monitoring Team and DOJ to **design, conduct**, and analyze a comprehensive Bias-Free audit."[91] As noted, the Decree directs that the Monitor "shall" develop a plan for conducting the Outcome Assessments and audit/reviews immediately upon being hired.[92] The audit plan for each topic audit must be presented ***by*** the Monitor ***to*** NOPD and DOJ three months before the annual audits.[93] There is no Decree requirement that NOPD design, conduct or analyze the audits for DOJ. That was part of the Monitor's fee. No change to these Decree requirements has ever been officially authorized (joint motion and Court approval is required for any change under the Decree).

The unofficial shifts in resource draining burdens to the NOPD is far from isolated. In fact the problem is ubiquitous across nearly every one of the 17 categories of the Decree. The attached excerpt from one weekly 2021 assignment spreadsheet at Ex. 17 exemplifies how every audit protocol and audit was tasked to NOPD, followed by DOJ and Monitor comment and approval. To the extent NOPD decides to use audit procedures to confirm the Department is operating according to its policies, it makes sense for NOPD to simply adopt some or all of the audit protocols used by the attorneys and consultants hired for millions of dollars as professional auditors of police departments. Despite this logical approach and court-ordered requirement, the

---

[91] *See* February 17, 2021, Annual Report of 2020, Rec. Doc. 613-1 at p. 40 of 47.
[92] Consent Decree at para. 450. (R. Doc. 565)
[93] Consent Decree at para. 450.

Monitor and DOJ publicly chastises the NOPD for not designing, conducting and analyzing a Bias-Free audit.[94]

The requirements for the NOPD to draft audit protocols and conduct audits are **not** part of the Decree, and have rendered the Decree dramatically more onerous than its terms require. The Monitor undoubtedly has the authority to audit NOPD in order to determine if the NOPD has: "(c) ensured that the [policy] is being carried out in actual practice."[95] The authority to audit does not, however, relieve the Monitor of the duty to assess "whether [NOPD's efforts are] resulting in constitutional policing" through the objective Outcome Assessments.[96]  In sum, the Monitor spent months of NOPD personnel and Monitor time to develop "tools" to test compliance in these areas. All the while, the Monitor refused to comply with the order that it "shall conduct assessments" listed at Paragraph 448 "at least annually," including these outcome assessments that support NOPD's right to terminate federal supervision. Being kept under federal supervision while the Monitor refuses to comply with the Decree is a dramatic change in circumstances. This data would have either demonstrated NOPD's compliance, or established clear *statistical* benchmarks NOPD could then aim to improve upon over time. That was the goal of the Decree process, and it has been stripped from NOPD. In contrast, the City and NOPD are held hostage by a seemingly never-ending loop of comments concerning obligations that were improperly shifted to NOPD by the parties actually responsible for those tasks without meaningful accountability.

---

[94] *See* February 17, 2021, Annual Report of 2020, Rec. Doc. 613-1 at p. 40 of 47.
[95] Consent Decree at para. 447. (R. Doc. 565)
[96] Report of the Consent Decree Monitor for the Third and Fourth Quarters of 2015 Issued February 26, 2016, (R. Doc. 472-1), at p. 86 of 100.

This is not an immaterial change. For example, "community policing" is a long-term aspirational goal of the NOPD that is difficult to assess as it is essentially subjective.[97] Neither DOJ nor the Monitor could provide an accepted audit procedure for community policing that NOPD can aim to satisfy. As DOJ recognizes, this is a trap for the unwary:

> Creating a standard set of assessment tools that is available to monitors will not only increase the consistency of monitor assessments but also **provide monitored entities with clearer expectations of the metrics that may be used to assess progress** and thus also a clearer understanding of the kind of systems and data collection efforts they might need to implement in order to reach compliance.[98]

The NOPD should know at the front end what objective measures will be applied so it can develop its policies, training, and data collection to demonstrate success on the applicable evaluation – *i.e.*, "the kind of systems and data collection efforts" needed to show compliance. Over eight (8) years into federal supervision, NOPD is still in search of the measures DOJ deems acceptable to demonstrate community engagement, bias-free policing and other highly subjective, and difficult to quantify aspects of the Decree.[99] This is not what was expressly required under the terms of the Decree. Meanwhile, the more objective criteria for these categories at Paragraph 448 has never been assessed and reported to the public as required.

DOJ has also been allowed to insert itself into the unauthorized process forcing NOPD to draft its own audit procedures because the Monitor has failed to perform this function by blocking approval of NOPD audit procedures. DOJ comments and edits must be accepted (no

---

[97] Report of the Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Third and Fourth Quarters of 2016, (R. Doc. 525-1) at p. 34 of 62.

[98] *See* U.S. Department of Justice, Memorandum of the Attorney General, "Review Of The Use Of Monitors In Civil Settlement Agreements And Consent Decrees Involving State And Local Governmental Entities" (September 13, 2021), p. 6 at https://www.justice.gov/ag/page/file/1432236/download

[99] *See, e.g.*, Ex. 13, December 2021, NOPD seeking approval for Supervision audit protocol in order to begin the audit.

matter how subjective or distant from the constitutional standard of compliance), or the draft will simply be returned for another round of edits until it is accepted as time is of no consequence to DOJ. Even if treated as an NOPD policy rather than the Monitor's audit methodology, the Decree, as legally enforced, would still permit such a process. As noted above, Paragraphs 15 through 23 of the Decree set out a detailed and time-limited process for editing policies. In contrast, the current editing process is one-sided and goes on for years at a time at the whim of DOJ and the Monitor.

At every turn, NOPD has asked for a model that DOJ has approved as constitutional already to speed up the process of drafting from a clean sheet of paper. DOJ refuses to provide that data, instead stating it needs to be an NOPD creation. Where NOPD has been able to start from audit standards Monitor team members used in this matter, the DOJ still demands its additional testing methods be added. Again, NOPD is not obliged by the Decree to audit itself pursuant to DOJ directed protocols, or draft audit protocols for the Monitor. And DOJ is not authorized to demand specific audit procedures become part of the NOPD internal audit protocol. This endless process has cost NOPD years in extended federal supervision with no end in sight and has certainly made the Decree much more onerous on the City.  What then has been the fruit of the first decade of the Decree and the combined efforts of the parties thereto beyond depletion of the City's resources?

**D.       Ever Shifting Goals.**

DOJ policy directs that the goal line for compliance in institutional reform cases must be clear. The Monitor has declared publicly since 2019 that the NOPD has a clear set of tasks ahead of it, and if it just wanted to, it could be in compliance, stating in multiple variations:

> The Department is well aware of what it needs to do to complete its
> outstanding tasks and move into the sustainment period of the

> Consent Decree. It has had the blueprint in its hands since the January 2019 Loyola proceeding. Contrary to the City's oft-stated belief that "the goal line keeps moving," the City has known where the goal line is since the January 2019 public hearing, but has failed to cross it.[100]

The *short* task list the Monitor provided three and a half years ago in its January 2019 Loyola presentation implied compliance was closely at hand. And this is a good example of why the City says the Monitor and DOJ keep moving the goal posts for termination of federal supervision. The January 2019 report publicly demanded more "consistency" and "efficiency" by the NOPD.[101] Seemingly easy, but equally vague and subjective. In contrast, the non-public creeping to-do list "compliance tracker" spreadsheet was hundreds of lines long and ever-growing.[102] The demands upon NOPD in that spreadsheet included newly added tasks every week, many outside the scope of the Decree. This unsanctioned process has made compliance with the Decree drastically more onerous for the City and generated uncertainty as to how to emerge, if ever.

## E.  Corrective Action Plans

The assignment spreadsheet shows, for example, that NOPD was tasked with assignments that are not within the Decree requirements and, in some cases, are actually the responsibility of the Monitor (as discussed above).[103] Two of the tasks required by the Monitor for the NOPD to perform are:

- ▪ Develop and implement a meaningful and effective **Corrective Action Plan** targeted at the shortcomings identified in the Department's recent SSA audit.

---

[100] 2020 Annual Report by the Monitor, at Rec. Doc. 613.
[101] *See* (R. Doc. 575), p. 56 of 60, Path To Reform, Report to Judge Morgan on NOPD Progress Under the Consent Decree, January 2019, Loyola University New Orleans School of Law.
[102] *See, e.g.*, Ex. 17, excerpt of assignment list.
[103] *See, e.g.*, excerpt of 2021 assignment spreadsheet at Ex. 17.

- ▪ Develop and implement a meaningful and effective **Corrective Action Plan** targeted at the shortcomings identified in the Department's recent Performance Evaluation audit.

The Decree does not require NOPD to have a Corrective Action Plan approved by the Monitor or DOJ before it can be deemed in compliance. Compliance requires that NOPD adopt policies, train officers on those policies, and carry them out in actual practice.[104] A formal corrective action plan may be a good practice in some instances, and one the NOPD has done, but it is not *constitutionally* required or listed in the Decree and, therefore, should not delay the end of federal supervision. Despite this fact, DOJ demands a corrective action plan after every report NOPD prepares and NOPD is then compelled to accept DOJ's revisions to the plan.

As this excerpt from the 2021 assignment spreadsheet at Ex. 17 exemplifies, it is now the standard practice that NOPD must prepare a Corrective Action Plan after *every* audit or report, which plan must conform to DOJ and Monitor "comments" before it can move to the next step. This is beyond the terms of the Decree.

| JAN 2019 COMPLIANCE STATUS | CD AREA |
|---|---|
| Significant Progress | V. Stops Searches & Arrests |
| CD PARAGRAPH | TASKS OR DOCUMENT REQUEST |
| | FOR NOPD: Develop SSA Corrective Action Plan per audit findings |
| | OCDM to review 2020 SSA correction action plan |
| | DOJ to review 2020 SSA correction action plan |
| | DOJ/OCDM comments on corrective action plan to be sent to NOPD |
| | NOPD working on revisions to Corrective Action Plan |

This process also creates a subjective set of goals for compliance. The DOJ dictates what corrective actions are required after each report or audit.[105] Often those corrections include changes to policy, training, or supervision and demands for proof of compliance. In turn those

---

[104] Consent Decree at para. 447.
[105] *See, e.g.*, draft corrective action plan and DOJ review edits at Ex. 18.

changes may be tied to new audit protocols to evaluate the effect of the changes. As such, NOPD is always testing new criteria in its audits. As systemic changes take time to implement and become standard operating practices, the audits immediately following a corrective action plan will not likely show immediate compliance at the arbitrary 95% audit threshold set by the DOJ and Monitor.[106] This is diametrically opposed to the process ordered in the Decree where: (1) the Monitor drafts audit protocols, (2) NOPD drafts the policy, (3) NOPD trains the policy, and (4) the Monitor audits compliance. This current process effectively allows the DOJ to unilaterally determine when it wants to release NOPD from federal supervision. The extreme detail and length of the Decree was designed to specifically rid the relationship of this dreaded subjectivity and DOJ micro-control, which DOJ acknowledges can rot a reform initiative.[107]

Multiply this routine part of DOJ effective management of NOPD across the 17 broad categories of the Decree and the process becomes a perpetual loop. A review of the assignments to NOPD over the last few years shows most of their effort goes to drafting Decree Compliance Audit protocols,[108] conducting the internal audits, editing the resulting report per DOJ, preparing a Corrective Action Plan incorporating all DOJ mandates including new audit protocols, and then repeating the process in preparation for the next internal audit cycle.[109]

---

[106] *See, e.g.*, Ex. 30, at p. 2, regarding discussion of delaying NOPD audits to allow recent changes demanded in corrective action plans to be implemented before the audit. ("We understand NOPD paused the upcoming SSA audit until it had sufficient time to implement the SSA Corrective Action Plan for a month following the May 2020 sample. Is that correct? If so, can you confirm the anticipated timeline for 1) revising the Corrective Action Plan and 2) starting that audit?")

[107] The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present Civil Rights Division, U.S. Department of Justice, January 2017, *supra*, at p. 25 "Outcome Measures to Assess Progress." at www.justice.gov/crt/file/922421/download

[108] *See* example at Ex. 19, Protocol drafts regarding Gender Bias Audits

[109] *See* assignment spreadsheets attached as Ex. 17.

It should be observed that the City believes the DOJ and Monitor staffs are making these unauthorized demands in an effort to make the NOPD the best police force in the world. The City is not complaining of ill intent in this regard. To the contrary, both DOJ and the Monitoring team have broad ideas about what is needed to make NOPD a "world class police force."[110] The City and NOPD also have their own ideas about how to reach that goal. But the Decree did not empower DOJ to create its vision of a world-class police force or use NOPD as a policy testbed in perpetuity. The Decree empowers the Monitor to evaluate NOPD's compliance with detailed reform steps designed to forge a *constitutional* police force. That has already been achieved and sustained and marketed as a model for other police forces nationally.

**F.      NOPD Supervision Initiative Working Group**

Another goal line marked by the Monitor deals with supervision. The Monitor directed that to reach compliance, the NOPD must:

- **Complete the tasks identified by the Supervision Initiative Working Group.**

The proposals of the NOPD Supervision Initiative Working Group are self-initiated, aspirational ideas the NOPD was (and is) working towards. Those ideas are not, however, required by the extensively thorough Decree. They overlap in places, but they are not the same. In stark contrast, the Outcome Assessment measure for constitutional supervision requires simply: "Initial

---

[110] *See* Order, Rec. Doc. 256 (05/23/13), pp. 44, 48, and Public Hearing Opening Statement of Jonathan S. Aronie, Consent Decree Monitor Over The New Orleans Police Department Before The U.S. District Court For The Eastern District of Louisiana Focusing on the NOPD Police Academy 17 December 2019 at
http://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/OCDM%20JSAronie%20Opening%20for%20Academy%20Hearing%202019-12-17.pdf

identification of officer violations and performance problems by supervisors, and effective response by supervisors to identified problems."[111] *That is all.*

The Monitor has failed to provide a report on this metric pursuant to Paragraph 448, while it has reported extensively on the broader subjective elements of Supervision, including the internal NOPD Supervision Initiative Working Group binder. Moreover, the Monitor has not even tendered the proposed methodology for conducting the above outcome assessments which is required three months in advance of the actual analysis.[112] This is merely an example of how the subjective terms of the Decree have been stretched to include anything NOPD does, or DOJ wants. It is a Catch-22. If NOPD tries to improve it will then subject itself to longer and deeper supervision as every new idea is turned into a Decree requirement, audit area, and corrective action target without formal modification of or constitutional justification under the Decree.

## G.     DOJ's Continuous Investigation

The stated public benefit of a Decree, as with any settlement, is to reduce litigation costs and risks by agreeing to the terms of compliance at the outset. The City took on considerable obligations in this exchange. DOJ gave up its role as litigant to use the tools of discovery under the Federal Rules of Civil Procedure in exchange for the City obligations. The defined process of the Decree puts the Monitor into the role of unbiased evaluator of compliance. However, those terms have not been followed for many years, if ever.

Here, the Monitor has empowered the DOJ to use the process to carry out the investigation on a continuous basis. DOJ demands "proof" during every policy, protocol, or

---

[111] Consent Decree at para. 448(g). (R. Doc. 565)
[112] Consent Decree at para. 453. (R. Doc. 565) ("At least 90 days prior to the initiation of any outcome measure assessment or compliance review or audit, the Monitor shall submit a proposed methodology for the assessment, review, or audit to the Parties.")

report editing process, even when no unconstitutional conduct is alleged to be ongoing.[113] The Monitor has expressed that, without DOJ agreement, it will not generally recommend a compliance finding. This is not only unsupported by the Decree, but antithetic to its very purpose of an *independent* monitor.[114]

This was not contemplated by the Decree. DOJ should not be allowed to block compliance by refusing to approve a policy if NOPD does not provide evidence it is already in compliance with that draft policy. This problem stems from the fact that DOJ has no natural economic rationale in terms of finances or human resources to restrain the process to only those aspects truly necessary for constitutional compliance. Any idea is worth pursuing as the City must pay the Monitor's invoices and time is not a concern for DOJ. DOJ policy discourages this recognized condition, but it is a rampant problem here:

> The benefits derived from a monitorship are substantial, as the human and financial costs of permitting unconstitutional police practices to persist are enormous. But **the Department must also recognize that implementing the changes involved with a consent decree often requires expending substantial public resources** as the agency puts in place new systems, training, and policies. Though the cost of a monitorship ultimately depends on how swiftly a jurisdiction comes into compliance, **monitorships must nonetheless be designed and administered with awareness that every dollar spent on a monitorship is a dollar that cannot be spent on other policy priorities**.[115]

---

[113] *See, e.g.,* comments to NOPD Language Assistance Plan, Ex. 23 (DOJ: "Please provide the record of this review by the LAC.… Please provide a record of this since 2018.… Please provide the fulsome data, particularly for 2018 to present…Has this taken place?  Please provide us the review.…Please provide us the completed EPR and LEP menu… Please provide us a list of the data that NOPD has kept on LEP need, unmet need, and fulfilled need since 2018.")

[114] *See* Ex. 16, DOJ, Review of the Use of Monitors in Civil Settlement Agreements and Consent Decrees involving State and Local Governmental Entities (August 13, 2021) (Monitors act as neutral arbiters of a jurisdiction's compliance with a decree.)

[115] DOJ memorandum on Use of Monitors in consent decree matters, at Ex. 16.

This troubling dynamic also makes continued federal supervision more onerous on the City. The problem that has only gotten worse in the past few years as the City edged closer to ending DOJ's role through compliance determinations.

## H.    Mandated Inefficiencies

A recent but highly routine example of this inefficiency is the Language Assistance Plan ("LAP") policy as part of the Bias Free Policing policy of the NOPD. The NOPD received approval for its LAP policy on November 30, <u>2016</u>.[116] On behalf of this Court, the Office of Decree Monitor stated at that time:

> This letter constitutes confirmation that the Office of Consent Decree Monitor ("OCDM") has reviewed and provided comments on the revised Language Assistance Plan. The OCDM has no objection to the policy as revised. **We believe that the revised Language Assistance Plan, incorporates all requirements of the Consent Decree and sets forth clear and appropriate rules to guide officer conduct.**[117]

Pursuant to the Decree and the Monitor's approval, this policy has been added to NOPD officer training and subjected to routine audits. As also required by the Decree and noted by the Monitor, NOPD reviewed the LAP plan annually and revised as needed to address current needs and lessons learned.[118] Despite this black and white managerial obligation, DOJ chastised the NOPD for making said updates without DOJ approval. [119] In January of 2021, DOJ demanded new changes to that policy because NOPD changed the electronic translation services it was

---

[116] *See* Ex. 20, correspondence from David L. Douglass, for Sheppard Mullin Richter & Hampton LLP, November 30, 2016.

[117] *Id.*

[118] Consent Decree at para. 18. (R. Doc. 565); and Ex. 20, correspondence from David L. Douglass, for Sheppard Mullin Richter & Hampton LLP, November 30, 2016. ("We also note NOPD's obligation to review this policy after a year of implementation to ensure it "provides effective direction to NOPD personnel and remains consistent with the Agreement, best practices, and current law.")

[119] *See* Ex. 23, redline comments to LAP policy. ("DOJ: NOPD has posted a revision to its Limited English Proficiency Services policy dated November 1, 2020. There was no OCDM approval.")

using. The electronic devices are a second method of translation in case an NOPD interpreter is not available. The devices are not required by the Decree, or DOJ policy.[120] NOPD made those changes and submitted them to DOJ for another approval process. DOJ *rejected* the tendered policy updates – a power not listed in the Decree.

As noted above, Paragraphs 21 and 22 of the Decree gives, (i) the DOJ 15 days to object to policy language, (ii) the NOPD 15 days to address the objection, and (iii) the Monitor 15 days to resolve the dispute. Failing this process, the Court resolves the issue of what the policy should state. If an audit or review reveals a significant failure with a policy adopted by NOPD, *after* approval by DOJ and the Monitor, DOJ can send a "notice of significant policy deficiency."[121]

There was no notice of significant policy deficiency sent to NOPD regarding this policy. DOJ simply rejected NOPD's effort to satisfy the DOJ's latest LAP policy and directed NOPD to fix the issues and bring it back to DOJ for another round of review.[122] On one of the many weekly calls between the parties and Monitors, the DOJ made clear it would not even *review* the LAP policy again until the City contract for the backup translation equipment mentioned in the policy was *signed* by the City, stating "finalization [of the plan] should at earliest occur no earlier than when the DOJ and Court are aware that the LAP and the still-outstanding contract for translation services align." [123] DOJ constantly demands that NOPD prove compliance before

---

[120] Department of Justice Language Access Plan, March 2012, available at
http://www.justice.gov/crt/about/cor/Pubs/eolep.pdf.
[121]  Consent Decree at para. 18. (R. Doc. 565).
[122] *See* Ex. 29, January 25, 2021, Compliance Worksheet notes from Federal Monitor. ([LAP policy deadline from NOPD] "extended to 1/8); NOPD to return document with DOJ/OCDM comments resolved and final comments 1/11; DOJ sent back to NOPD on 1/13 with specific direction")
[123] *See* Ex. 22, January 13, 2021, email from DOJ trial counsel. ("For tracking purposes, I suggest that the LAP task remains with NOPD.  It would be inefficient for OCDM and DOJ to return another redline of the LAP until these still outstanding issues are resolved.  Those issues answer the unresolved comments already in the document.  We are willing, of course, to discuss with NOPD a means to finalize the LAP even if there is an outstanding need to gather older data. But, finalization should at earliest occur no

allowing them to implement new policies. This is not allowed by Paragraphs 18 through 22 of the Decree.

This was yet another movement of the goalpost. DOJ demanded just days earlier that LAP policy approval required that DOJ be provided "an ***understanding*** of the status of the contract."[124] NOPD provided that "understanding" regarding the status of the order, contract approval and pending signature. DOJ then shifted the goal and refused to even *review* the policy until the contract was signed. NOPD should be allowed to finalize ***policies*** before such contracts are signed. A later audit will determine if NOPD is in compliance with that policy. That is what the Decree requires at Paragraph 447. Every policy is under constant edit as time goes on, no matter that NOPD already complied with the Decree requirement to draft a policy that obtained approval from DOJ and the Federal Monitor. Other examples from the LAP process demonstrate this is not a one-off example.[125]

The Bias-Free Policing Policy was approved on June 9, 2016. It remained in an infinite edit loop until recently. Chapter 1.2.4 regarding Search and Seizures was approved by the Monitor and DOJ on January 15, 2019.[126] On February 1, 2021 NOPD was still responding to demands for edits by DOJ and the Monitor. Chapter 1.2.4.2. regarding "No-Knock" Search Warrants was approved on November 29, 2018, but remained under active comment by the Monitor and DOJ for years thereafter.[127] These endless reviews and edits of approved policies

---

earlier than when the Parties and Court are aware that the LAP and the still-outstanding contract for translation services align.")

[124] Ex. 22, January 13, 2021, email from DOJ trial counsel (*emphasis added*) and line 103 of Exhibit 17.

[125] *See, e.g.*, Ex. 27, emails regarding DOJ counsel changing demands for data once NOPD provides the originally requested data and refusing to accept draft policy without proof of compliance with the draft.

[126] *See* effective dates of Chapter 1.2.4 at www.nola.gov/getattachment/NOPD/Policies/Chapter-1-2-4-Search-and-Seizure-Effective-5-15-2022.pdf/?lang=en-US

[127] *See* effective dates of Chapter 1.2.4.2 at www.nola.gov/getattachment/NOPD/Policies/Chapter-1-2-4-2-Search-Warrants-EFFECTIVE-5-25-21.pdf/?lang=en-US

have further rendered the Decree more onerous on the City and warrants termination pursuant to Rule 60(b)(5).

**VII.    THERE ARE NO ONGOING VIOLATIONS OF FEDERAL LAW AND DURABLE REMEDIES HAVE BEEN IMPLEMENTED.**

As the Ninth Circuit reiterated, "[t]he [Supreme] Court has repeatedly reminded us that institutional reform injunctions were meant to be temporary solutions, not permanent interventions, and could be kept in place **only so long as the violation continued**."[128] NOPD's policies, training and practices do not currently violate federal law. Moreover, the enacted constitutional structure is durable, rendering a return to unconstitutional practices unlikely.

The Monitors have many times expressed unfettered enthusiasm for the NOPD's "stunningly successful reform effort" on behalf of this Court.[129] The City is well aware, however, that the NOPD's reforms must be built on a stable foundation that implies durability. The Monitor has commented on the durability of NOPD's reforms, noting:

> It's also important to recognize that a "green" finding provides no guarantee that future problems will not materialize. There will be mistakes, occasional backsliding, sporadic misconduct, and the like. The recent OPSE scandal regarding officers taking advantage of their secondary employment details gives us an unfortunate example. There will be other transgressions in the future. But we have greater confidence that when presented with such problems the NOPD will face them rather than try to sweep them under the rug.[130]

The Monitor even uses the durability of the New Orleans structure as a model for other institutions, explaining that the foundation of the NOPD's reform is built on interwoven dependencies that make change by elected officials difficult. In other words, deep changes

---

[128] *United States v. Washington,* 573 F.3d 701, 710 (9th Cir. 2009) (*emphasis added*)

[129] Ex. 9, *supra*, Tip 1: Care about the reform as much as the perception of reform." p. 2, www.Sheppardmullin.com.

[130] *See* Ex. 21, Prepared Public Hearing Remarks of Jonathan S. Aronie, Lead Monitor, NOPD Consent Decree, April 20, 2022.

cannot be made without upsetting the *status quo* in so many areas that all stakeholders would be made aware of the change. As an article by the Monitors for their private law firm details, the first bulwark against erosion is transparency through public data, an area which the NOPD is declared first rate:

> ***Tip 3: Set expectations and lock in transparency.***
> …
> Over the past few years, the New Orleans Police Department has made an **unprecedented volume of data publicly available**…As a result, the New Orleans community has come to expect this sort of openness from its police department. **This expectation will make it tough for a future leader to reverse course.**[131]

The next mechanism to curb later administrations' efforts is a slew of policies and procedures that are nested together and difficult to change in isolation. The Federal Monitors designed these programs to make them hard to dismantle and again point out that NOPD is an example of this durable remedy:

> ***Tip 4: Establish institutions that are difficult to dismantle.***
> …
> As the Police Department and the Monitoring Team worked together to implement these reforms, **we looked for ways to ensure the programs put in place would be hard to dismantle by a future administration**…**The highly integrated nature of the resulting reforms will make it hard for future leaders to move in a different direction…**[132]

Again, by creating "more work for more people" in the event of systemic change to the NOPD there is an alarm function that alerts many to any small changes. As a vast organization which itself is a subdepartment of another organization, these alarms cannot be easily quieted.

---

[131] Ex. 9, *supra*, Tip 3: Set expectations and lock in transparency." p. 3, www.Sheppardmullin.com. (*emphasis added*)

[132] Ex. 9, *supra*, Tip 4: Establish institutions that are difficult to dismantle" p. 3, www.Sheppardmullin.com. (*emphasis added*)

This element of the NOPD's success is now being franchised across the globe by the Federal Monitors as a beacon of success in institutional reform situations even outside of policing. Yet, the NOPD remains under federal supervision. That fact chafes against the next recommendation of the Monitors: "Tip 5: Establish institutions that the organization's personnel do not want to dismantle."[133] Bearing the brand of an "unconstitutional police force" despite the unassailable progress is a heavy weight on the force.

As the Monitor promotes, the City has also taken the reform effort outside the NOPD to interlock the legislative branch with the Mayor's executive duty to administer the NOPD. Through formal action by the New Orleans City Council, key elements of the NOPD reform works have been adopted as City regulations to apply once NOPD is returned to City administration. The Monitor praised the critical importance of this durability step as follows:

> **Tip 7: Formalize reform initiatives into policy.**
> …
> Four years after the Pittsburgh Consent Decree came to a successful end in 2002, a new mayor dismissed the police chief who had championed the reform process and rolled back many of the changes he had put in place…
>
> One step the City of New Orleans took to help lock in its police department's reforms was to incorporate the core components of its Consent Decree into a formal City regulation. While a regulation can be undone by a future City Council, **it cannot be undone in secret by a new police chief**. Consequently, the community would be made aware of any backsliding and would have the opportunity to weigh in on the legislative process to fight for the continuation of the reforms.…[134]

---

[133] Ex. 9, *supra*, Tip 5: Establish institutions that the organization's personnel do not want to dismantle." p. 4, www.Sheppardmullin.com. (*emphasis added*)

[134] Ex. 9, *supra*, Tip 7: Formalize reform initiatives into policy." p. 3, www.Sheppardmullin.com. (*emphasis added*)

It is also noteworthy that the above quote cites Pittsburgh as an example of fragile policies. The article relies on a New York Times article as its source to brand Pittsburgh a failure example. But the DOJ has made subsequent studies of Pittsburgh's reform which found the reforms were durable.[135] The relevance here is that the Monitor has installed a reform framework in New Orleans it deems *more durable* than that employed in Pittsburgh, while the DOJ's Civil Rights Division says even the Pittsburgh model is sufficiently durable to pass constitutional rigor. This is a high endorsement of the durability of NOPD's structure.

Finally, the article by the Monitor points out the importance of testing data to confirm compliance and again uses NOPD as the gold star example:

> **Strategy 8: Implement meaningful measurement techniques, including audits and evaluations**
>
> Indeed, to help sustain the Department's reforms, the New Orleans City Council has committed to maintain a "Compliance Bureau" within the police department. This Compliance Bureau is charged with evaluating, on an ongoing basis, the full range of NOPD programs, including all Consent Decree-driven reform initiatives.[136]

As the above quote implies, and as this Court is aware, the Decree requires NOPD to report on a vast array of datapoints on a continuous basis. The Monitor and DOJ require NOPD to perform audits of each compliance category. This resource-intensive task will allow the Mayor, the City Council, the NOPD and the public to gauge NOPD's progress and compliance year over year, once management is returned to the elected officials.

---

[135] The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present Civil Rights Division, U.S. Department of Justice, January 2017, at p. 38 "VIII. Conclusion: Assessing the Impact Of Pattern-Or-Practice Enforcement On Police Reform"
[136] Ex. 9, at p. 5, www.Sheppardmullin.com. (*emphasis added*)

It is further noted that the public record reflects that the Monitor has not provided the required quarterly public reports for most of the quarters since 2016.[137] Like the Outcome Assessments, the required quarterly reports were to include critical information on what NOPD has achieved each quarter, what specific requirements remain to be done, and critically, the Monitor's recommendations on *how to close out open items*.[138] The Monitor prepared these critical quarterly reports for 2015 and 2016, but has not published one on a quarterly basis since the fourth quarter of 2016.[139]  Quarterly reports function to give NOPD easily trackable objective goals on a constant basis.[140] Thus, the Monitor's failure to provide formal quarterly reports have also made compliance more onerous on the City and NOPD.

## VIII.  CONCLUSION

NOPD has been engaged in constitutional policing for more than two years now. The remaining objectives are worthy, but "are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.'" *Horne v. Flores*, 557 U.S. 433, 450, 129 S. Ct. 2579, 2595, 174 L. Ed. 2d 406, 421. "If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Id*.

Termination of the Decree is appropriate at this time based on three current conditions. First, the City has substantially complied with the Decree under the standard repeated recently by the Fifth Circuit in *Frew*[141] regarding the application of Rule 60(b)(5) institutional reform

---

[137] List of Monitor Reports spreadsheet at Ex. 8.
[138] *See*, *e.g.*, Consent Decree at para. 457, (R. Doc. 565) and Monitor Report (R. Doc. 525-1), at p. 3 of 62.
[139] *See* (R. Doc. 525-1).
[140] It is perhaps not a coincidence that NOPD made significant progress during that time, as noted by the Monitor and that the Monitor's invoices reduced in 2017. *See* Ex. 25, and Annual Report of the Office of the Consent Decree Monitor for 2020, (R. Doc. 613).
[141] *Frew v. Young*, No. 21-40028 (5th Cir. 2022) 2022 U.S. App. Lexis 1027* 2022 WL 13512

consent decrees. Second, even if the City is not found in full compliance with every line of the Decree it has satisfied its definition of "full and effective compliance" through "sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures" at Paragraph 448.

Finally, termination is warranted based on the drastic modifications to the Decree process imposed on the City. Those changes to the agreed upon reform process have rendered compliance a completely subjective decision for the DOJ. That subjectivity has added years to the process and exhausted the City's resources. Resolution of federal control over the City's police department is warranted and best for the people of New Orleans. Moreover, since the objective of the Decree – constitutional policing by NOPD – has been achieved, and a durable remedy has been implemented, continued enforcement of federal supervision would be improper. *See Horne v. Flores, supra*. Federal Rule 60(b)(5) warrants termination of the Decree.

*Respectfully submitted*, this 16th day of August 2022.

*Davillier Law Group, LLC*

/s/ Charles F. Zimmer II
Daniel E. Davillier La. No. 23022
Charles F. Zimmer II (T.A.) La. No. 26759
Jonathan D. Lewis, La. No. 37207
935 Gravier Street, Suite 1702
New Orleans, LA  70112
Phone: (504) 582-6998
Fax: (504) 582-6985
ddavillier@davillierlawgroup.com
czimmer@davillierlawgroup.com

*Counsel of Record for*
*the City of New Orleans*

51

**CERTIFICATE OF SERVICE**

I certify that I have served a copy of the above and foregoing pleading via Notice of Electronic filing using this Court's CM/ECF system to counsel of record participating in the CM/ECF system on this 16th day of August 2022.

/s/ Charles F. Zimmer II