

September 12, 2022


Honorable Judge Susie Morgan
U.S. District Court, Eastern District of Louisiana
New Orleans, Louisiana


Your Honor:

On behalf of the Monitoring Team, and as you directed at the October 17, 2022 public court
hearing, we're pleased to submit for public review this report regarding opportunities for further
innovation and enhancement to the NOPD's current structures, policies, and practices. This Report
was shared in draft with the NOPD on May 18, 2022, and a slightly updated version was shared on
June 8, 2022. Please note, the recommendations in this report are just that — recommendations.
NOPD leadership has been open to meaningful collaboration throughout this process, and we are
hopeful these recommendations are taken in that spirit. There may be reasons some of these
recommendations turn out to be operationally impractical, unduly burdensome, too expensive, or
simply ineffective. We intended these recommendations simply to start a discussion consistent with
NOPD's stated goal of continuous self-improvement.

## I.      Authority

The Monitoring Team undertook this review at the direction of the Court pursuant to Consent
Decree paragraph 455, which requires the Monitoring Team to make recommendations to the
parties regarding measures necessary to ensure timely, full, and effective implementation of this
agreement *and its underlying objectives*. [CD paragraph 455]

## II.     Scope and Methodology

To prepare this list, we solicited the views of the members of the Monitoring Team. These men and
women have vast experience in all manner of policing and have seen first-hand the way law
enforcement agencies across the United States have solved problems. Their input was invaluable in
putting together this report. We also spent significant time meeting with scores of officers of all
ranks regarding their experiences within the NOPD, including meeting with three police associations
representing officers of the NOPD: the Fraternal Order of Police (FOP), the Police Association of
New Orleans (PANO), and the Black Organization of Police (BOP). For this report, we did not
meet with or solicit information from members of the public, although we have done so consistently
throughout the implementation of the Consent Decree.

The officers and police associations with which we met were generous with their time, and engaged
in constructive dialogue on a number of very complex issues. We thank them for their cooperation
in this process. While some of the recommendations in this report are consistent with
recommendations made by one or more of them, it is important to know that no recommendation



has been included in this report *because* one or more police association pushed for it. Every recommendation in this report reflects the Monitoring Team's independent collective judgment whether or not an association previously has made the same recommendation.

For convenience, we have organized our recommendations into five broad categories:

- Officer Trust and Job Satisfaction, Inclusion, and Retention,

- Efficiency and Burden Reduction,

- Sustainment and Continuous Improvement,

- Community Trust, and

- Recruitment.

As you will see, there is overlap in these categories. But they serve a useful organizational structure.

Where applicable, we have referenced sections of the Consent Decree that relate to our recommendations and/or made reference to what we have seen work in other departments.

## III.    NOPD Response

The NOPD submitted a written response to the Monitoring Team's recommendations on August 16, 2022, which it updated on September, 9, 2022. The updated response is attached to this Report as Attachment A.

## IV.    Monitoring Team Recommendations

### A.    **Officer Trust and Job Satisfaction, Inclusion, and Retention**

While the Consent Decree, for obvious reasons, focuses primarily on the NOPD's interaction with the community, NOPD's internal interactions are important. The way the NOPD treats its officers has a dramatic effect on a number of critical functions, including recruitment, retention, and performance. Study after study has shown that better treated employees perform better, are more efficient, engage in less misconduct, work harder, and live healthier lives.[1] While there always will be aspects of a police organization and policing in general that create frustration, stress, and even danger to officers — in other words, reduce job satisfaction — to the extent the NOPD can minimize these negative forces, the officers, their families, the Department, the City, and the community will benefit.

---

[1]      *See, e.g., Does Employee Happiness have an Impact on Productivity?* Oxford University, Saïd Business School (Oct 2019) https://ssrn.com/abstract=3470734; *Proof that Positive Work Cultures are More Productive,* Harvard Business Review (Dec 2015) (https://hbr.org/2015/12/proof-that-positive-work-cultures-are-more-productive ).



Moreover, a disciplined focus on officer job satisfaction is consistent with the spirit and letter of the Consent Decree. For example, paragraph 12 of the Consent Decree provides that "the City is responsible for providing necessary support and resources to NOPD to enable NOPD to fulfill its obligations under [the Consent Decree." [CD at 12] Section XIII requires officers be provided "ready access to mental health and support resources." Section XIV ensures officers are afforded a fair and effective performance evaluation and promotions process. And Paragraph 377 ensures officers operate in an environment that is free from retaliation.

Following are several recommendations we believe are worth serious consideration by the NOPD leadership team.

- **Develop a more transparent KSA review and feedback process**

NOPD uses the term KSA (which stands for "Knowledge, Skills, and Abilities") to refer to the process through which Departmental units can internally advertise job opportunities, share the job requirements and expected officer qualifications, and select the officer who is the best fit for the job. Our review identified a widely-held perception among officers that the KSA process is not fair and that supervisors give plum assignments to friends rather than to the most qualified candidate. While the current process met the requirements of the Consent Decree and the Monitoring Team has seen no material evidence of misconduct or violations of the Consent Decree in the KSA process, the current process would benefit from greater structure and documentation, more consistent use of appropriate selection rubrics to guide decision-makers, and greater transparency. Specifically, we recommend the NOPD consider (a) developing a clear, written selection rubric for every KSA (other than those appointed directly by the Superintendent or a Deputy Chief) so that candidates understand the qualifications and skills being sought, (b) direct supervisors to document the reasons for their selection decision in a manner that clearly articulates why they chose the candidate they chose based upon the advertised rubric, and (c) ensure supervisors inform unsuccessful candidates of why they were not selected with sufficient detail to permit the officer the opportunity to improve upon those areas for future KSAs. For similar KSAs issued in multiple Districts (*e.g.*, the DCAT KSA), we recommend a standard template be used across all Districts from which Districts can deviate only where they have an articulable need (*e.g.*, to incorporate a skill of particular importance due to the unique nature of a given District).

- **Improve the physical facilities in which officers work**

The environment in which an individual works affects the way that individual works. Multiple studies have shown that work conditions influence behavior, performance, loyalty, and ethical conduct.[2] As a case in point, one can look to the NOPD Academy, which underwent a transformation into a new building with a professional interior several years ago.[3] PIB underwent a

---

[2]     See Shobe K, Productivity Driven by Job Satisfaction, Physical Work Environment, Management Support and Job Autonomy, Business and Economics Journal, 9: 351 (2018).

[3]     We note, however, the establishment of a professional firing range within the confines of the City of New Orleans took significantly longer and continued to be a source of frustration and inefficiencies among officers and rank.



similar transformation with a similar result. In the view of the Monitoring Team, the upgraded work environments demonstrably contributed to a dramatic improvement of the professionalism and job satisfaction of the Academy and PIB staffs. (We also suspect, consistent with multiple studies, that the better quality facilities at the Academy will positively impact student learning.[4])

In contrast, other officers — including those working in NOPD headquarters — continue to work in facilities with dilapidated structures, uncared-for mechanical systems, and unsightly interiors. It is an understatement to say that many NOPD officers work in less than ideal conditions. They deserve better.

We understand that City-wide financial constraints may prevent the NOPD from making all the improvements its officers and its community deserve, but we cannot overstate the importance of establishing an aggressive plan for improving facilities where possible. While significant capital improvements may take time, more modest improvements like new paint, replacing moldy carpets and ceiling tiles, fixing broken windows and doors, taking advantage of available natural light,[5] and adding art[6] should be doable now. Further, from a workplace safety perspective, failing to make some of these improvements could create physical risk to officers and legal risk for the City.

- **Identify ways to ensure opportunities (education, conferences, special assignments, etc.) for officers are given on a fair, impartial, and non-biased basis**

While fairness in the internal selection process is important in any police organization, it has become more important to NOPD recently because the Department now considers job experiences as part of the promotions process. Some officers have complained that considering specialized experiences (*e.g.*, PERF training, homicide experience, FBINA, Southern Police Institute, etc.) creates an inherent unfairness because some officers are not given *the opportunity* to participate in such activities. These complaints are exacerbated by a perception that some officers are selected for such activities simply by virtue of their relationships with certain influential department leaders.

While the Monitoring Team continues to believe considering specialized training, assignments, and experiences provides a meaningful benefit to the Department, the City, and the community, we are sensitive to the counter argument that such consideration could be unfair to officers who have not had the chance to take advantage of such opportunities. The solution, in our view, is to maximize

---

[4]     *See, e.g.*, "The Importance of School Facilities in Improving Student Outcomes," PennState Center for Evaluation and Education Policy Analysis. https://sites.psu.edu/ceepa/2015/06/07/the-importance-of-school-facilities-in-improving-student-outcomes/.

[5]     Research shows that workstations with natural light boost productivity. According to one study, "Specific benefits of workspaces incorporating natural light "include better health, reduced absenteeism, increased productivity, financial savings, and preference of workers." https://www.nrel.gov/docs/fy02osti/30769.pdf.

[6]     Something as simple as art has been shown reduce stress, increase productivity, and increase morale. *See* https://www.umass.edu/fac/spotlight/1.9.html.



the fairness of the section process to ensure opportunities are made available to officers fairly, transparently, and without bias.

To that end, we recommend (a) the Department establish threshold qualifications for officers being proposed for special opportunities (*e.g.*, above average performance evaluations, above average attendance history, history of community-focused activities, etc.), (b) supervisors be required to articulate and document the basis for their selection decisions (referencing those threshold qualifications among other things of importance to the supervisor), (c) supervisors be provided training in how to make selection decisions free from bias, and (d) PSAB review the selection decisions on a semi-annual basis to look for department-wide patterns of bias (including racial, gender, age, and familiarity).

- **Provide officers take-home vehicles as soon as financially feasible**

NOPD and its officers would benefit from take-home vehicles. The NOPD emphasized how take-home vehicles would serve a critical public function by improving the visibility of NOPD officers throughout Orleans Parish and also lead to long-term cost savings. This view is consistent with research that has quantified the benefit of take-home vehicles.[7] For example, one study in Tacoma, Washington "compared a fleet of 30 take-home assigned vehicles to a pool of 34 unassigned vehicles for eight years," and concluded that:

> "On average, shared vehicles lasted only 20-26 months while assigned vehicles lasted 60 months. The study found massive reductions in accident and damage repair costs. Shared vehicles would reach up to $8,400 a year while assigned vehicles went up to $1,375. There is not only an increase for backup potential within police departments but a higher morale amongst employees."[8]

Additionally, we note that to an officer his/her vehicle is his/her office. The opportunity to have a vehicle that you can keep clean, organized, and performing not only increases officer job satisfaction, but also likely will result in better care of NOPD's property. We believe take home cars also will act as a powerful recruitment tool. Moreover, surrounding law enforcement agencies provide take home vehicles for their officers, which creates a perception that NOPD values its officers less than these other agencies.[9]

---

[7]     Cost-Benefit Analysis of Tacoma's Assigned Vehicle Program, Donald T. Lauria, Police Quarterly, vol. 10, 2: pp. 192-217 (Jun 2007), find at: https://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.985.6897&rep=rep1&type=pdf.

[8]     http://www.themunicipal.com/2017/03/benefits-of-take-home-vehicles-and-keeping-the-program-in-its-prime/.

[9]     We recognize that implementing a productive take-home vehicle program must include policies governing their use to ensure vehicles are use for official purposes and officers are held accountable for proven misuse.



- **Improve the in-office work environment by upgrading and updating equipment, ensuring readily available supplies, etc.**

Currently, officers struggle to find working computers, supplies, and even chairs that function properly. The Department's OAP office, for example, is outfitted with broken furniture salvaged and repaired (to the extent possible) by a very committed officer. Other officers are plagued with unstable internet. Such outdated and/or non-functioning equipment sends a message that the NOPD does not value the officers' work.[10] We recognize that over time many within the NOPD have become resolved to the Department's financial plight and have accepted old technology and uncomfortable equipment, but being resigned to something does not change its negative impact. As noted below, outdated equipment and inadequate resources not only decreases job satisfaction, it also creates expensive inefficiencies.[11]  We recommend NOPD dedicate appropriate funds to its Districts and Bureaus to upgrade office products and technology (including wireless technology), purchase supplies, and otherwise improve the working conditions of its officers.[12]

- **Be more open and transparent with officers**

Employees in most industries value transparency.[13] Police officers are no exception.[14] While the nature of police work certainly requires that some decision-making be conducted behind closed doors, meaningful efforts to promote transparency to the maximum extent possible is in the interest of the Department, its officers, and the community. This includes transparency within the misconduct and disciplinary investigation process. The Department of Justice COPS office emphasizes that adopting "procedural justice internally throughout the agency" and being "transparent with the complaint intake process" are critical guiding principles for law enforcement internal affairs programs.[15] We recommend the NOPD enhance its internal procedural justice by (a) letting officers know when they are under investigation as early as practicable in the process

---

[10]  *How Your Office Space Impacts Employee Well-Being,* Forbes, https://www.forbes.com/sites/alankohll/2019/01/24/how-your-office-space-impacts-employee-wellbeing/?sh=42bffa64f31a.

[11]  *See* "Convincing Skeptical Employees to Adopt New Technology" Harvard Business Review, Rebecca Knight (March 2015) https://hbr.org/2015/03/convincing-skeptical-employees-to-adopt-new-technology.

[12]  We remind the City in this context that the Consent Decree requires working computer networks in order to evidence *sustainable* remedies have been implemented. The Consent Decree requires fully operational systems for electronic police reports, BWC reviews, INSIGHT alerts, supervisory feedback logs, and many more technology-dependent remedies.

[13]  "Got Transparency? Why Trust Does More for Workplace Culture than Flash Perks" Forbes,, Jim Link (March 2020) https://www.forbes.com/sites/forbeshumanresourcescouncil/2020/03/13/got-transparency-why-trust-does-more-for-workplace-culture-than-flashy-perks/?sh=2832222a6b50.

[14]  *See* "Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practices Guide for Local Law Enforcement", International Association of Chiefs of Police (2009) https://cops.usdoj.gov/RIC/ric.php?page=detail&id=COPS-P170.

[15]  *See* Law Enforcement Best Practices, lessons Learned From The Field (2019). https://cops.usdoj.gov/RIC/Publications/cops-w0875-pub.pdf.



(within the limits of the needs of the investigation); (b) enhancing PIB's efforts to ensure broad understanding of PIB's mission, processes, and effectiveness, (c) continuing/expanding PIB's efforts to share data and dispel myths (*e.g.*, expand publication of the new myth buster emails), and (d) share more broadly PIB data, including investigations, findings, dispositions, non-disciplinary dispositions, non-disciplinary recommendations, etc.

Similarly on the topic of openness and transparency, several officers commented that they would appreciate better communication from NOPD leadership regarding the reasons for policy decisions and directives. We have noted a similar push for better communication by employees in other industries as well (including the legal profession). While we have recommended this multiple times previously, we continue to believe the Department would benefit from a more robust internal and external communications plan, including more frequent video communications from the NOPD leadership team. A monthly video from the Superintendent and/or the Deputy Chiefs would go a long way to meeting officer demands for better communication.

- **Consider the pros and cons of allowing officers to provide a short paragraph to accompany SFL counseling and redirection**

After a slow start, the NOPD now is proficient in using its SFL (Supervisor Feedback Log) process, which is a non-disciplinary means of recording counseling or redirection given to officers by supervisors. It also provides an efficient means of recording positive recommendations and commendations. The use of SFLs has increased dramatically over the last few years. Unlike the NOPD disciplinary process, however, officers are not afforded an opportunity to comment on SFL entries. While we do <u>not</u> support incorporating an appeal process into the SFL process, we do see *potential* advantages in allowing officers to include a short paragraph of explanation alongside SFL entries to which they disagree. We recommend NOPD leadership consider the pros and cons of this approach.

- **Consider involving a community member and/or an HR professional in promotions decisions**

There is a widely-held perception among NOPD officers that officers often are promoted for reasons other than merit. While the Monitoring Team has <u>not</u> found evidence of any such pattern or practice within the NOPD — and, in fact, has found NOPD to be very thoughtful in the promotions process — we recognize the perception persists and likewise recognize the perception degrades officer job satisfaction, which, of course, degrades officer retention. We believe NOPD leadership continually should explore better ways to ensure officers are promoted on the basis of merit AND ways to combat the perception of an unfair promotions system.

The promotions system implemented by the NOPD and found compliant by the Monitoring Team is a good (not perfect, but good) process. As we outlined in our public reports, the process facilitates a robust, holistic look at each candidate, which balances the benefits of various selection techniques (test, interview, performance evaluations, etc.). Nonetheless, the role NOPD rank plays in that selection process, a role we support, seems to have contributed to some ongoing misperceptions about the process. Multiple officers expressed concern to us, for example, that the selection panel



simply will give low scores to "officers they don't like" regardless of merit. Again, we have not found evidence of this and are skeptical that it happens with great frequency, but have heard it from enough officers to know it is a widely held perception.

To counter this perception — and reduce decisions based on other than merit to the extent they exist — we recommend NOPD consider adding a community member and/or an HR professional to the promotions panels. As these one or two non-NOPD members would not have existing relationships with the officers under consideration for promotion, their input would help quell the perception of favoritism in the promotions process. Moreover, involving these non-NOPD voices in the promotions process would be consistent with the Department's commitment to ensure the community has a meaningful voice in as many NOPD decisions as possible.

- **Identify ways to reduce the time it takes to conduct PIB investigations**

Multiple officers with whom we spoke identified the time it takes to conduct PIB investigations as a significant factor in their job dissatisfaction. Several officers offered very specific examples of exceedingly long timelines. While there very well may be extenuating circumstances that warrant such long timelines, and we recognize that often the timeline is not in NOPD's control, the negative perception is pervasive. Moreover, we suspect most everyone would agree that, as a general principle, resolving questions about potential misconduct as quickly as practicable benefits officers, the Department, and the community.

Not only are long timelines demoralizing to officers under investigation, they create discontent among officers not under investigation.[16] They also create the very real risk that guilty officers are remaining on the job unpunished, innocent officers are living with a cloud over their head unnecessarily, and guilty officers will not be punished due to time lapses. We recommend tasking PSAB and/or the IPM to conduct a detailed audit of PIB timelines as the Monitoring Team did several years ago, for the purpose of identifying ways to decrease (again, where practicable) the time it takes to conduct, and finalize an investigation.[17] We also recommend NOPD engage a professional to conduct a workload study to determine if adequate manpower is available to improve the timeliness of investigations.  Finally, we recommend PIB make available to all officers data on investigation timelines (without names and investigation details, of course).

- **Rotate officers and rank through specialized assignments**

There is no clear best practice with regard to how long officers should stay assigned to specialized units. Obviously, there are advantages of allowing officers to remain in a specialized unit long

---

[16]     https://www.ojp.gov/pdffiles1/nij/234052.pdf.

[17]     Decreased investigation timelines also may help reduce the perception that PIB treats officers unfairly. To be clear, the Monitoring Team has seen no evidence that PIB treats officers unfairly, but NOPD's recent survey suggests there is a perception among some officers that it does. https://www.fox8live.com/2022/03/18/nopd-internal-retention-survey-shows-lack-support-stress-flawed-disciplinary-process-contributing-manpower-shortage/.



enough to build up expertise.[18] This benefits the unit, the Department, and the community. Allowing officers to remain in a specialize position for longer periods of time also can reduce training and onboarding costs.[19] Further, longevity in certain areas provides critical consistency the absence of which can harm critical departmental efforts.[20]

But there also are significant advantages to rotating officers through specialized units in that a reasonable rotation provides a vehicle for bringing new ideas and energy into the unit, helps dispel myths about the unit as officers reintegrate into the general population of the agency, helps dispel perceptions of favoritism[21] and unfairness (especially in a department that rewards a diversity of expertise through its performance evaluations process as New Orleans does), and gives more officers the chance to cultivate new skills and gain more career development opportunities.[22]

The Monitoring Team believes the arguments, on balance, favor mandatory rotations for officers in specialized units *where practicable*. To be clear, we are not in favor of rotating officers too frequently since that would prevent the NOPD ever from gaining the benefits of the learning curve every new officer goes through. We also understand that some units (*e.g.*, perhaps motorcycle, the Academy, community policing, mounted, SOD) require particularly specialized skills and training that counsels in favor of longer rotation periods.[23] But these factors, to us, go to how long a duration is, not whether there should be a duration.

The NOPD units we believe might benefit from a reasonable rotation system include SOD, DCAT, Homicide, Narcotics, PSAB, and PIB. (We recognize some of these units already incorporate a mandatory rotation.) Again, we concede reasonable people can argue about *how long* a duration achieves the right balance between the competing factors; and we cannot say whether an efficient and effective rotation is 2, 3, 4, etc. years. But we do believe some rotation will benefit the officers, benefit the agency, create greater opportunities for more officers, and help dispel perceptions of favoritism.

---

[18]    "Rotation: is it Organizationally Sound" Federal Bureau of Investigation Law Enforcement Bulletin (April 1992) https://www.ojp.gov/pdffiles1/Digitization/136172NCJRS.pdf.

[19]    Police Recruitment and Retention for the New Millennium, RAND Center with Community Oriented Policing Services (Department of Justice) https://cops.usdoj.gov/RIC/Publications/cops-p199-pub.pdf.

[20]    For example, the frequency of movement among officers leading the Department's community engagement efforts has slowed the Department's achievements in that area.

[21]    We note that 21% of the 271 respondents to the recent NOPD Retention Survey identified "favoritism" as a reason for officer attrition. https://www.fox8live.com/2022/03/18/nopd-internal-retention-survey-shows-lack-support-stress-flawed-disciplinary-process-contributing-manpower-shortage/.

[22]    Police Recruitment and Retention for the New Millennium, RAND Center with Community Oriented Policing Services (Department of Justice) https://cops.usdoj.gov/RIC/Publications/cops-p199-pub.pdf.

[23]    Notwithstanding the need for longer rotations for some units, it is important to ensure these units do not operate in "echo chamber," but rather are subject to the same supervision, oversight, and accountability as all other parts of NOPD.



It is worth adding a quick word here about PIB which has not had a mandatory rotation system in place below the lieutenant rank. It is our view that the benefits identified above likely will be particularly notable in the context of an accountability-focused organizations. The DOJ COPS Office Guide to Internal Affairs has this to say about such rotations for internal affairs organizations:

> "Consideration should be given to limiting the tour of duty in Internal Affairs. One agency limits its tours to 2 or 3 years, with two 1-year extensions permitted in unusual circumstances up to a maximum of 5 years. There are at least several reasons for limiting the tour of service. Too long a stay in Internal Affairs may, in some cases, create investigators who become biased. The development of such an attitude—or any other bias—is not helpful to the employee or the investigations. In some cases, investigators become emotionally drained or even bored after extended stays in Internal Affairs. It is a uniquely difficult assignment and its psychological effects are important in determining whether a tour limit should apply and how long it might be.
>
> The experience in Internal Affairs can be extremely valuable in the promotion process and in giving promotees a view on employee behavior that would not be available elsewhere. Seeing firsthand the kinds of trouble people get into by investigating the incidents and talking with the persons harmed by the allegations and the misconduct is a management insight that should be offered to as many qualified people as is practical. Also, knowing that not all allegations are true—even the most horrific ones—helps those who leave Internal Affairs respond correctly to allegations that come before them as they advance in rank. Finally, there is wisdom that comes from dealing with the complexities of investigative controversies from start to finish that can be invaluable in helping form a mature leader. Allowing as many qualified investigators as practical to acquire that wisdom by cycling them through Internal Affairs can infuse the agency with a maturity in the leadership team they may otherwise lack."

It should be noted that while we have not seen bias on the part of PIB investigators, we agree with the COPS recommendation and believe a mandatory rotation would help dispel *the perception* of bias. We also believe the skills learned during a PIB rotation will help improve the quality of District-level investigations.

- **Involve officers in decision-making processes**

Years ago, the Monitoring Team held a series of Burden Reduction Working Group meetings. They were well attended and very productive. We took great efforts to listen to the officers, act on their



suggestions, and, importantly, follow up with the officers to show they were listened to. The feedback from the officers was overwhelmingly positive, especially with regard to the feedback. Multiple officers reported they entered the process "convinced" their thoughts would be ignored, and were quite energized to learn they were wrong.

Giving officers a voice in important organizational decisions, where practicable, has been shown to increase job satisfaction, performance ratings, engagement, and retention.[24]  Additionally, we believe involving officers in the process, even if only in an early advisory role, will make it easier for those officers to generate buy-in among other officers by sharing the integrity of the process and the thoughtfulness of the decision-makers.[25] To this end, we recommend the NOPD consider the following:

- Constitute an advisory panel made up of officers from all ranks to review and comment on draft policies. NOPD also could consider including a community representative on the panel as well.[26] As the Consent Decree requires a wholesale policy review every year, this panel could play a valuable role in the continuous improvement of the Department's already-compliant policies.

- Add officers from various ranks to the Academy's Training Advisory Committee.

- As noted below, conduct regular Burden Reduction Working Groups with a rotating collection of officers, a process for taking action based on their advice, and a clear feedback loop to ensure the officers see the results of their efforts.

- Consider constituting other advisory boards and working groups in other areas that would benefit from practical, on-the-street expertise.

We understand a police agency was not designed to run as a democracy, and that is not what we are suggesting. We also recognize that decision-making can become lengthy and impracticable if too many voices have the opportunity to weigh in on the process. But we are confident the benefits of soliciting a diversity of views, giving those views meaningful consideration, and being transparent as to why views were or were not accepted will go a long way in increasing officer — and community — buy-in to key decisions.

---

[24]     https://workinstitute.com/defining-of-voice-of-the-employee-why-it-is-important/; *see also*, https://www.shrm.org/resourcesandtools/hr-topics/employee-relations/pages/whatandwhy.aspx.

[25]     Increasing employee participation via discussion sessions and pushing decision making processes lower in the organization restores a sense of pride and personal ownership. https://hbr.org/2019/11/balancing-the-companys-needs-and-employee-satisfaction.

[26]     The ABA smartly recognized the advantages of community involvement in a 2021 article by Terry Cunningham called *How Police and Communities Can Move Forward Together.* https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/civil-rights-reimagining-policing/how-police-and-communities-can-move-forward-together/.



- **Provide appropriate support to officer health & wellness**

We found the NOPD in compliance with its Consent Decree Officer Assistance & Support obligations some time ago. Since that time, the Department has not maintained a consistent focus on this critical area. The Department also has missed opportunities to expand its focus on officer health and wellness. The current officer assistance program is run by a phenomenally committed officer (Chris Abbott) who for years has done excellent work with skeletal resources. Through Mr. Abbott's (and previously Ms. Tebo's and others') efforts, NOPD officers have been afforded a credible health & wellness program. Nonetheless, we recommend NOPD renew its focus on this area and implement several improvements.

We cannot over-emphasize the importance of officer health & wellness. Police officers across the country suffer from mental depression, suicide, alcoholism, sleep deprivation, family problems, and other mental health issues above national averages.[27] These problems impact not only the officers; they impact the officers' families and the community at large. Mentally healthy officers are less likely to make mistakes, engage in excessive force, commit misconduct, leave the profession,[28] or get injured on the job. Physically healthy officers are less likely to take sick days, get injured on the job, or develop mental health problems.[29] The entire New Orleans community has a vested interest in ensuring their officers are mentally healthy, physically healthy, well rested,[30] and are given adequate professional resources to seek help when they need it.

To that end, the Monitoring Team recommends NOPD consider implementing the following improvements to the current officer health and wellness program as soon as possible:

- **Hire full-time social workers**. When we moved the Department into compliance in this area, the NOPD Officer Assistance Program (OAP) employed two social workers in addition to Mr. Abbott (who serves as the Department's lead peer counselor). Currently, OAP employs no social workers. These positions should be filled immediately.

- **Sign a contract with a psychologist.** When we moved the Department into compliance in this area, the Department had a contract with a qualified psychologist, Dr. McDermott. As

---

[27]      *See, e.g.*, Law Enforcement Mental Health & Wellness Act, Report to Congress, DOJ COPS, March 2019. *See also* https://www.waldenu.edu/programs/criminal-justice/resource/five-reasons-the-mental-health-of-police-officers-needs-to-be-a-priority.

[28]      Early research suggests that burnout and depression have been rising among police officers since 2020, and that resignations have been increasing as a result. See, *e.g.*, https://www.gpb.org/news/2021/06/14/violence-stress-scrutiny-weigh-on-police-mental-health.

[29]      According to the U.S. Department of Justice, "There is a strong correlation between physical and mental health, and the two should not be thought of as separate. Maintaining physical health helps law enforcement officers sustain long and difficult careers that are filled with stressors, which may take a toll on the individual. . . ." https://www.justice.gov/file/1354561/download.

[30]      The link between lack of sleep and health and wellness is clearly established. By focusing more on officer sleep, the NOPD will reduce mental health issues, reduce physical health issues, reduce medical costs, reduce sick days, reduce mistakes, and reduce misconduct.



we understand it, Dr. McDermott has been operating without a contract (and has not been paid) in the last eight months. The City should remedy this shortcoming immediately to ensure compliance with its obligations under the Consent Decree.[31]

- **Identify new ways to ensure officer confidentiality**.  One of the things that makes NOPD's peer support program successful is the assurances of confidentiality. Current operating procedures, however, can put that confidentiality at risk, or at least can create a perception of non-confidentiality, which could dissuade officers from taking advantage of the services offered. For example, to afford an officer in need of mental health counseling time off to take advantage of such counseling, the peer support director must send a request to the officer's supervisor with adequate details in support of the request. That supervisor then must send the request to his/her supervisor, etc. While we have not seen or heard of breaches of confidentiality in NOPD's peer support program, it seems to us there are ways to better protect against future inadvertent breaches. We recommend NOPD explore procedural changes that further reduce the number of supervisors required to review such requests and the scope of the details subject to review.

- **Adequately equip the OAP.** The NOPD OAP lacks adequate equipment, furniture, and resources. Frankly, one of the reasons it functions so well is because the current peer support director invests much of his personal money — and much of his personal ingenuity — to its success. Relying on the generosity of a single officer, however, is not sustainable and does not reflect a proper Departmental commitment in officer health and wellness. NOPD should ensure the OAP has adequate facilities, furniture that is not broken, IT equipment (including a computer and printer) that works, and automobiles that reflect the Department's commitment to the program.

- **Provide OAP staff greater opportunities to attend training.** Research into best practices in the area of officer health and wellness is constantly expanding and improving. NOPD and its officers would benefit significantly if OAP staff were afforded more opportunities to attend national trainings, conferences, and the like. As the knowledge and ideas gained from engaging nationally on such critical issues will benefit NOPD, its officers, and the New Orleans community at large, NOPD should fund an initiative to ensure its OAP leadership team participate in relevant educational events.

- **Provide OAP a budget for incidentals and supplies.**  While the OAP has limited financial needs, its needs are not non-existent. We recommend NOPD meet with the current peer support director to compile an inventory of reasonable needs and fund those needs immediately.

- **Create a working group of officers from various ranks to identify, discuss, and recommend innovative solutions to health and wellness concerns.** NOPD's officers would benefit from a more deliberate effort to innovate in this critical area. We recommend

---

[31]     Subsequent to the first draft of this report being shared with the NOPD, the City finally processed Dr. McDermott's contract.



identifying a diverse collection of officers from all ranks to meet regularly, discuss officer needs, and recommend innovative solutions to health and wellness issues. We further recommend the Department take concrete steps to ensure these recommendations are meaningfully considered by Department leadership and the City CAO (if additional funding is required).

- **Consider mandatory officer wellness checks**. Notwithstanding ongoing national efforts to change the narrative, seeking support from a mental health professional still carries with it a stigma among officers.[32] One way to combat that pervasive stigma would be to mandate periodic check-ins with mental health professionals (psychologist, social worker, counselor, peer support officer, etc.). While we are not aware of conclusive data regarding the efficacy of mandatory mental wellness checks, we think there is good reason to believe such a practice would be of great value to officers and to the community.[33] The practice has been implemented in a number of other departments, including certain divisions of the FBI.

As noted above, the entire New Orleans community has a vested interest in ensuring their officers are mentally healthy, physically healthy, well rested, and are given adequate professional resources to seek help when they need it. We are confident the foregoing recommendations will achieve that shared goal.

## V.    Efficiency and Burden Reduction

The Monitoring Team has been focused on burden reduction for years. In 2017, with the help of then-chief of staff Danny Cazenave, we constituted several Burden Reduction Working Groups comprised of officers at all levels within the Department. Each group was charged with identifying wasteful practices and suggesting approaches to increase efficiencies without compromising quality. The groups identified a number of opportunities for burden reduction, many of which were implemented by the NOPD.

We continue to believe NOPD and its efforts to sustain the reforms prompted by the Consent Decree will benefit from a more deliberate and diligent focus on burden reduction. We identified several opportunities in our conversations with officers. We are confident NOPD could identify more with a more comprehensive outreach and listening effort.

Following are several recommendations we believe are worth serious consideration by the NOPD leadership team:

---

[32]     For a good discussion of the stigma of seeking mental health services in the law enforcement profession, *see* pages 25-30 of Law Enforcement Mental Health & Wellness Act, Report to Congress, DOJ COPS, March 2019. https://cops.usdoj.gov/ric/Publications/cops-p370-pub.pdf.

[33]     *See id.* for a good discussion of mandatory mental wellness checks.



- **Eliminate duplicative reports.** Duplicative reports not only waste officer time, they frustrate officers and decrease job satisfaction.[34] For example, the FIC and the EPR forms contain much of the same information and, perhaps, could be consolidated into a single form — or at least one form could auto-populate the other. NOPD should seek to identify additional areas for paperwork reduction.

- **Employ electronic trip sheets.** Currently, notwithstanding efforts to modernize the trip sheet practices in the past, most NOPD officer complete hand-written trip sheets following each call. This practice not only can take significant time, it also can put officers in vulnerable situations while they sit head-down in their cars completing paperwork. Since most data elements required by a trip sheet already are contained in the CAD system, it would appear that an electronic solution would make great sense here.

- **Make better use of BWCs**. Most every officer in the NOPD wears a body worn camera. BWCs capture high quality video and audio recordings when used properly. These recordings are then organized and maintained in an manner that permits relatively easy retrieval. It seems to us it is worth exploring ways to make better use of BWCs. For example, perhaps BWCs could be used to document certain activities instead of a written report, or to record injuries to a victim without the need to locate and bring a separate camera to the scene.[35]

- **Expand officer workspace at the jail**. NOPD used to have a computer and printer at the jail's intake facility, which allowed officers to avoid having to return to the district station to print reports. We understand the computer and printer no longer exist or no longer are operative. This wastes significant officer time.[36]

- **Expand the use of APR**. As you know, "APR" stands for Alternative Police Response. The term describes an NOPD unit charged with addressing certain calls for service that can be handled without a district officer personally visiting the scene (or at least not personally visiting the scene in the first instance). The goal of APR is to allow more officers to remain in the areas to which they are assigned, focusing their primary attention on proactive activities, community engagement, and emergency response.[37] The APR unit has been very effective for NOPD, and, thus, for the people of New Orleans. Other agencies make even

---

[34]     Routine, repetitive tasks make employees feel bored, constricted, and burnt-out, while stifling creative drive.  https://clockify.me/time-spent-on-recurring-tasks.

[35]     One potential benefit of body worn cameras is corroborating evidence, suggesting that footage may be used as evidence and reduce the time required for completing paperwork. https://www.ojp.gov/pdffiles1/nij/252035.pdf.

[36]     NOPD confirmed it has remedied this shortcoming subsequent to the issuance of this report.

[37]     *See* NOPD Operations Manual, Chapter 41.4.2 (Alternative Police Response).



more use of their APR units.[38] We recommend NOPD reach out to agencies with robust APR units to identify ways to expand the reach of this important unit.

- **Reduce officer time spent at traffic accidents.** This has been a topic of discussion for years. Several years ago, the City contracted with an outside contractor to respond to certain traffic accidents. From what we have heard, this program has been effective, but it still is very limited. We recommend, as we have previously, expanding the program and pushing the state legislature for even further expansions.

- **Educate the community.** The New Orleans community is used to calling the police for all manner of concerns, including minor traffic accidents, quality of life inconveniences, medical issues, mental health issues, and more. A recent anecdote will help illustrate the point. A citizen called the police because he was involved in a hit and run earlier in the day. His car was side-swiped on the high rise and the other car did not stop. He waited 3 hours for police and finally gave up and went home. An officer finally visited his home at midnight. Had the citizen understood he didn't need an officer to come to his home, he likely would have saved NOPD's time and his own time (and frustration). Some agencies across the United States have done a better job than New Orleans in resetting the expectations of the community. A more robust education campaign likely would increase community use of APR thereby freeing up significant officer time.

- **Invest in technology.** We have noticed wasted officer time in the current way the DA's Office and the NOPD interact. Rather than using a secure file sharing site, an NOPD officer must personally deliver reports and evidence to the DA's office. A simple file-sharing process would save significant time and also increase the integrity of the process by providing both the DA's Office and the NOPD with a clear record of all files shared. We raised this issue with the DA, and he agreed a filing sharing protocol would help both agencies. We recommend NOPD work with the DA's Office to identify a cost-effective file sharing solution and consider sharing the cost since it will benefit both agencies. Further with regard to technology, we continue to recommend NOPD consider providing officers, or at least detectives, with department-issued smart devices (*e.g.*, Apple iPad, Samsung Galaxy, etc.). We believe the expense of such technology is well justified by increased officer efficiencies, increased conviction rates, and increased officer and community satisfaction. It's even possible the cost could be offset by allowing a manufacture to promote the NOPD's use of its technology.

- **Request the State Police handle Interstate accidents and enforcement.** NOPD officers spend significant time handling vehicle enforcement and accidents on the Interstate highways that cross New Orleans. Outside New Orleans, however, the State Police handle

---

[38]     *See, e.g.,* Eugene, Oregon offers CAHOOTS, a mobile crisis intervention program staffed by city vehicles and clinic personnel. https://www.eugene-or.gov/4508/CAHOOTS; Denver, Colorado offers their STAR program, a mobile crisis response team for low-level mental health calls. https://www.policeforum.org/criticalissues10feb21.



such incidents, and are highly trained to do so. We recommend the City of New Orleans attempt to have the LSP handle incidents on the Interstate.

- **Improve the speed of fixing officer cars**. When we visit District stations, which we do regularly, we frequently see vehicles unavailable to officers because they are in need of repairs. We also have seen the unavailability of cars cause officers to have to "double up," which reduces the reach of NOPD's efforts in a District. Further, we have seen officers have to pay for their own car repairs to avoid a car from being taken out of service for an extended period of time. We recommend the City consider adding resources to the division responsible for automobile repairs to shorten the time it takes fix police cars.

- **Explore the benefits of a more robust internal grievance process**. When officers do not have faith in the internal NOPD HR grievance process, they often turn to the PIB disciplinary process to revolve interpersonal disputes. This slows down the disciplinary process for others, creates additional stress among officers, and too often leave both officers unsatisfied. A more thoughtful grievance process might create efficiencies for NOPD, and significant benefits for officers who often simply are looking for an apology.

Beyond these specific recommendations, we continue to believe NOPD would benefit from a more deliberate review of the paperwork currently required to be completed by officers. While we remain firm in our view that documentation and reporting is critical to integrity, accountability, solving and prosecuting crimes, and building community trust, we likewise remain opposed to needless duplication of effort that does not contribute to those goals. A concerted effort to identify the current practices that are taking officer time and a thoughtful discussion regarding whether those efforts materially contribute to the running of the Department, and the trust the community has in the Department, will go a long way in increasing officer job satisfaction, increasing community trust, saving money, and dealing with the current officer shortage.[39] We also believe reducing the administrative burden on officers will help fight crime as well as it will maximize the time officers are able to spend on the street protecting the public.[40]

## VI.    Sustainment and Continuous Improvement

The Consent Decree was designed not only to remedy past unconstitutional and dysfunctional practices, but to ensure those remedies would be sustainable over time. To help achieve sustainability, at the direction of the Court, the NOPD, the DOJ, and the Monitoring Team have dedicated significant time to activities designed to ensure the achievements of the last eight years will not degrade over time. For example, we have built strong policies, developed a meaningful internal

---

[39]     Increased administrative demands and overly complex business processes are drivers of work overload, and left unaddressed can damage employee engagement and lower quality of work. https://www2.deloitte.com/us/en/insights/focus/human-capital-trends/2015/work-simplification-human-capital-trends-2015.html.

[40]     https://www.policechiefmagazine.org/paperwork-burden-in-policing/.



audit program, increased data available to the public, and supported the promulgation of a City Council Regulation that codifies many of the most important elements of the Consent Decree.

But there are other steps NOPD could take to help ensure the sustainability of its achievements. Following are several recommendations we believe are worth serious consideration by the NOPD leadership team:

- **Elevate the Academy to a Bureau level organization.** Rather than housing the Academy under the Management Services Bureau,[41] we recommend elevating the stature of the Academy by transforming it into the NOPD Education & Training Bureau (ETB). The ETB could including the Academy, the NOPD Policy function,[42] the Department's EPIC/ABLE program, and perhaps other education-related functions as well. It could be run by a civilian chief who also could serve at the Academy's Academic Dean, which would help the Department attract and retain a high qualified leader, the importance of which has been highlighted by the departure of the most recent academic director, Dr. Deidre Magee; a departure prompted at least in part by the Department's inability to offer a competitive salary.

- **Continue demilitarizing the Academy**. The NOPD Academy has undergone significant changes since the outset of the Consent Decree. It now is a professional institution, in a professional setting, run by an academic dean. But more could be done.[43] We recommend NOPD make a more concerted effort to create more of a collegiate experience within the Academy. We further recommend NOPD consider partnering with one of the many colleges and universities in New Orleans to bring even greater value to NOPD recruits and veteran officers.

- **Establish a process for external investigations of NOPD leaders**. Like any law enforcement agency, NOPD receives occasional complaints against its leaders. Such complaints often cannot be investigated by the NOPD.[44] Previously, the Department would

---

[41]     Subsequent to the issuance of this Report, the NOPD moved the Academy under the Professional Standards and Accountability Bureau.

[42]     Moving the policy drafting function to the ETB would create great synergies between policy drafting and training. Policy drafting and training should be a continuous circular process, with new policing informing new training, and lessons learned from training informing new policies. Housing those two functions within a single Bureau makes great sense in our view. Further, moving the Policy drafting function to the ETB would turn PSAB into a true compliance / audit / innovation organization, and avoid the risk that PSAB would be auditing policies that PSAB itself drafted.

[43]     One such example of demilitarization is the Washington State Criminal Justice Training Commission, run by Sue Rahr, the organization of which is outlined in this article. https://www.ojp.gov/pdffiles1/nij/248654.pdf.

[44]     The Society of Human Resources suggests guidelines for selecting an investigator, including one who can investigate without bias, one who has no stake in the outcome, and no personal relationship with the involved parties. This suggests using an outside investigator for concerns at the leadership level.



refer such investigations to the New Orleans Inspector General. More recently, however, the IG has expressed a reluctance to take on such matters. We recommend NOPD revisit the matter of investigation referrals with the IG or the IPM, or with another trusted outside entity.[45]

- **Increase coordination with the DA's office**. We have met with the DA and several of his officials, as well as with NOPD's A-Case officers and PSAB members who interact with the DA. We identified a number of efficiencies that could be gained by establishing a more productive working relationship between the NOPD and the DA. To that end, we recommend monthly or quarterly coordination meeting among NOPD's A-Case officers and the DA's screening attorneys, development of a secure file sharing platform, and development of a more effective process of sharing information and lessons learned.

- **Accelerate the transition from the EPIC curriculum to the ABLE curriculum**. While the EPIC program was born in New Orleans, in 2020 it evolved into a national best practice called ABLE. The NOPD committed to transitioning its current EPIC curriculum into the ABLE curriculum. To date, however, NOPD has not done so. NOPD, its officers, and the community would benefit from accelerating this transition. Moreover, the principles of ABLE will support NOPD's efforts to ensure its Consent Decree reforms are sustained by educating and empowering officers to intervene on another officer to prevent harm.

- **Establish a regular schedule for public compliance reports to the City Counsel and to the IPM**. To keep pressure on the NOPD and the City to sustain its accomplishments of the past eight years, we recommend NOPD propose to present to the City Council in a public setting on a monthly or quarterly basis. These presentations could focus on PSAB compliance audits, its findings, and NOPD's response to those findings. Similarly, NOPD should consider establishing a regular reporting structure to the IPM.

- **Re-energize the PCAB process**.  PCAB leaders report a range of experiences in their dealings with the NOPD. Most, however, have reported a lack of interest in the process by NOPD and City leaders. The PCABs not only are required by the Consent Decree, they are an effective avenue for ensuring community input into NOPD decision-making. We recommend the NOPD and the City make a more concerted effort to re-energize the PCABs.[46] We also recommend Captains be evaluated on their efforts in working with their PCABs.

---

https://www.shrm.org/resourcesandtools/tools-and-samples/how-to-guides/pages/howtoconductaninvestigation.aspx.

[45]     NOPD should be sure to memorialize agreements with outside entities in formal MOUs.  Indeed, the ability to carry out compliant investigations of NOPD leaders is necessary to implementation of a sustainable remedy for officer accountability.

[46]     We note that in May 2022 Superintendent Ferguson sent a letter to PCAB leaders re-committing himself and his leadership team to the PCAB process. Superintendent Ferguson subsequently sent letters to



- **Designate a "floater" sergeant and lieutenant.** Districts often must operate with a fewer-than-ideal number of supervisors. This creates compliance and safety risks. The NOPD should consider designating a sergeant and/or lieutenant not assigned to a particular District who could be deployed in any given District to cover for absent supervisors. Such an initiative also would help NOPD maintain compliance with the close and effective supervision requirements of the Consent Decree.

- **Conduct more meaningful exit interviews of officers leaving NOPD.** We understand NOPD's HR unit attempts to conduct exit interviews of officers leaving the Department. Information from exit interviews, if conducted in the right way, can give NOPD a unique perspective on what it is doing well and not so well. We recognize, however, that meaningful exit interviews often are hard to achieve for a number of reasons, including officer unwillingness to participate, officer unwillingness to be fully candid, and the interviewer's implicit or explicit biases about the Department and/or the departing officer. We recommend NOPD consult with local HR professionals in an effort to improve its current exit interview process. Corporate HR professionals often have significant experience in this area and likely will be able to suggest improvements to NOPD's current program.

We are confident NOPD can identify additional steps to foster not only sustainment, but also a culture of continuous improvement.

One additional recommendation warrants repeating here. As noted above, NOPD should reinvigorate its Health & Wellness Program (and ensure the availability of a full time psychologist, preferably an in-house psychologist). The President's Task Force on 21st Century Policing included officer health and wellness among its core recommendations as follows:

> **Pay attention to officer wellness and safety**
> Law enforcement officers face all kinds of threats and stresses that have a direct impact on their safety and well-being. Ensure that officers have access to the tools that will keep them safe, such as bulletproof vests and tactical first aid kits and training. Promote officer wellness through physical, social, and mental health support.[47]

Consistent with the Task Force recommendations (as well as with a wealth of other research), the Consent Decree expressly requires NOPD "to provide officers and employees ready access to the mental health and support resources necessary to facilitate effective and constitutional policing." (CD Section XIII) Specifically, NOPD must "develop and offer a centralized and comprehensive range of mental health services that comports with best practices and current professional standards, which include: readily accessible confidential counseling services with both direct and indirect referrals; critical incident debriefings and crisis counseling; peer counseling; and stress management training." While we previously moved this area into compliance with the minimum requirements of

---

all Captains directing them to re-energize their cooperation with the PCABs and letting the Captains know they would have to report on their process at the Department's leadership (MAX) meetings.

[47]     https://cops.usdoj.gov/RIC/Publications/cops-p341-pub.pdf#7.



the Consent Decree, there exists significant room for improvement in this area.[48] The men and women of the NOPD deserve nothing less than a top-notch health and wellness system.

Not only is a robust health and wellness program a moral imperative (and a requirement of the Consent Decree), but it pays dividends to the community, the Department, and the City. For example, research suggests

- "Lack of wellness drives up costs of health care, leads to more sick-days, and loss of productivity…."[49]

- Officers under stress "experience narrowed perception, increased anxiety and fearfulness, and degraded cognitive abilities."[50]

- Officers who participate in a quality health and wellness program are less likely to be injured and retire on disability.[51]

- Mentally healthy officers are less likely to use force.[52]

To enhance NOPD's current health & wellness offering, we recommend the NOPD (a) ensure the availability of qualified psychologists, social workers, and peer counselors, (b) explore incentives for the voluntary use of mental health resources, (c) consider *mandatory* periodic meetings with a mental health professional for all officers and leaders (thereby reducing the stigma of affirmative requesting such support), (d) make a more concerted and visible effort to ensure officers are getting adequate sleep, (e) continue to promote EPIC/ABLE among all NOPD personnel, and (f) reach out to other agencies to explore and, if appropriate, adopt new and innovative programs to support officer mental health. Additionally, NOPD should embrace a willingness to assess, reevaluate, and adjust its program based on officer feedback and measurable outcomes.

## VII.   Community Trust

Building community trust is one of the central tenets of the Consent Decree and, frankly, one of the central tenets of most national police reform efforts. As was clearly stated in the Consent Decree:

---

[48]      At the time we moved OAP into compliance with the Consent Decree, that program was adequately staffed. While the current leader of the program is terrific in our view, he lacks adequate staffing, equipment, and resources.

[49]      https://www.inc.com/adam-heitzman/why-workspace-is-so-critical-to-employees-success.html.

[50]      https://cops.usdoj.gov/RIC/Publications/cops-p370-pub.pdf.

[51]      A series of case studies found positive results from implementing more robust wellness programs, including a physical fitness on-duty program that reduced heart attacks, postponed early retirements, and reduced other injuries and health problems. https://cops.usdoj.gov/RIC/Publications/cops-p332-pub.pdf.

[52]      https://cops.usdoj.gov/RIC/Publications/cops-w0864-pub.pdf at 6, finding that job stress impairs officers' decision-making abilities, particularly in use of force incidents.



> The Parties have a shared recognition that the ability of a police department to protect the community it serves is only as strong as the relationship it has with that community. Public safety, constitutional policing, and the community's trust in its police force are thus interdependent. The full and sustained implementation of this Agreement is intended to protect the constitutional rights of all members of the community, improve the safety and security of the people of New Orleans, and increase public confidence in the New Orleans Police Department.[53]

NOPD has made remarkable strides over the past eight years in rebuilding community trust. Our periodic community surveys have documented NOPD's progress. More can be done, however.

Following are several recommendations to build even greater community trust we believe are worth serious consideration by the NOPD leadership team:

- As noted above, re-energize the PCAB process.

- Ensure NOPD community policing leaders stay in their positions long enough to be effective. (In this regard, NOPD may want to consider assigning two community policing leaders with overlapping but staggering terms to ensure longevity and smoother transitions that we have seen in the past.)

- Maximize the data made available to the community. And explore new ways to educate the community in how to use those data.

- Continue to release critical incident videos as quickly as practicable.

- Continue to investigate all allegations of misconduct.

- Explore new and innovative ways to give the community insight into NOPD policies, procedures, and decision-making.

While we are confident these recommendation will help build an even stronger relationship between the NOPD and the community, the primary driver of that relationship, of course, is NOPD's actions. As cases of misconduct and excessive force go down, and NOPD accountability and transparency goes up, community trust will continue to grow.[54]

---

[53]    Consent Decree at 1. ([http://www.laed.uscourts.gov/sites/default/files/nopdconsent/12-1924%20%20%23565%20Amended%20and%20Restated%20CD.pdf](http://www.laed.uscourts.gov/sites/default/files/nopdconsent/12-1924%20%20%23565%20Amended%20and%20Restated%20CD.pdf)).

[54]    One study found internal affairs policies and procedures, providing comprehensive, accessible, fair, and transparent complaint, investigation, and disposition processes increased trust of the community. [https://cops.usdoj.gov/RIC/Publications/cops-p170-pub.pdf](https://cops.usdoj.gov/RIC/Publications/cops-p170-pub.pdf).



## VIII.   Recruitment

No police department can achieve its potential if it cannot attract and retain good officers.[55]  The Consent Decree recognized this fact and required NOPD to implement a comprehensive recruitment program that successfully attracts and hires a diverse group of highly qualified and ethical individuals to be NOPD police officers. Police agencies across the U.S., however, are struggling with recruitment.[56] To distinguish itself from the mix, we recommend NOPD consider the following actions:

- **Increase the frequency and quality of personal contact with recruits.** Recruitment experts, including those at the NOPFJ, explain that the frequency and quality of contacts plays a significant role in whether those candidates follow through with their applications.

- **Involve on-duty officers (i.e., non-recruiting professionals) to participate in outreach efforts.** NOPD may want to consider asking officers and supervisors of various ranks to make calls to candidates in the application process to encourage them to follow through. We suspect a call from an actual officer/supervisor "on the street" would go a long way in promoting candidate enthusiasm.

- **Improve facilities and equipment.**  See discussion above.

- **Expand the use of take-home cars.** See discussion above.

- **Identify new benefits for officers that distinguish the NOPD from other agencies.** Innovative police agencies find innovative ways to attract recruits (and retain officers). While pay certainly plays a role in recruiting and retention — and we support fair pay for NOPD officers commensurate with the complexities and dangers of the job —pay is not the only tool for attracting and retaining high quality officers. The officers we spoke to identified a multitude of "perks," which they strongly felt would help attract recruits and retain senior officers. Their ideas included take home cars (mentioned above), free or reduced-fee gym memberships (which also plays a significant role in promoting officer health and wellness), better in-house athletic facilities (*e.g.*, a proper headquarters gym available to all officers), reduced tuition to officers attending local colleges, greater tuition reimbursement for officers, reduced tuition for officer family members (primary, secondary, and/or higher education), more rewards/recognition for commendable performance, better uniform allowance (including free replacement if a uniform is torn in the performance of one job duties), laptops in vehicles, VPN access from home, and more. While some of these "perks" may seem too expensive for the City of New Orleans, we submit that the inability to recruit a sufficient number of officers and the inability to keep officers who have been trained by NOPD ends up being far more expensive. Further, we suspect the local corporate

---

[55]    Struggles with recruitment lead to overwork and burnout of existing officers, and increase the strain on the police organization.
https://www.theiacp.org/sites/default/files/239416_IACP_RecruitmentBR_HR_0.pdf.

[56]    https://www.theiacp.org/sites/default/files/239416_IACP_RecruitmentBR_HR_0.pdf.



community may be willing to offset the cost of some of these ideas if they seem likely to improve recruitment and retention.

- **Promote NOPD's transformation under the CD**. We suspect the target candidates for NOPD recruits has changed over the years. Millennials are different from GenXers, and GenXers were different from Baby Boomers. Young people today may be more attracted to a Department that has undergone the transformations NOPD has undergone over the past eight years. We recommend NOPD promote those transformations and take better advantage of the "new NOPD" as a recruitment tool.

- **Take greater advantage of EPIC and ABLE**. NOPD is the developer of what is now a national best practice in policing — active bystandership. NOPD's EPIC program, which soon will be transformed into ABLE (although will maintain the EPIC name) helps lay the foundation for cultural change, continuous improvement, and ever-increasing fairness and equity. Historically, however, NOPD has not done a good job promoting this critical program. Officers, the Department, and the community would benefit from a more concerted effort in this regard.

- **Work with NOPJF to identify ways to reduce the administrative burden on recruits.** Recruiting a diverse array of high quality, ethical candidates continues to be one of the greatest challenges facing police agencies across the U.S. As most agencies continue to struggle in this area, NOPD can distinguish itself from other agencies by simplifying its application process. Studies have shown that the more complicated the process, the less likely officer candidates will stay with the recruitment process. In one study, for example, "[a]pplicants who were offered simpler, standardized processes completed more tests and were more likely to be hired. Later reductions to perceived burden led to an 8% increase in compliance at one stage, with a 60% increase in compliance within two weeks."[57] We recommend NOPD engage more meaningfully with NOPJF and Civil Service to explore areas for simplification.

As agencies across the U.S. struggle to attract new qualified candidates to a professional under siege nationally, NOPD must be creative, innovative, and disciplined in its efforts. It must continually evaluate current practices for effectiveness, look to others for new ideas, and try new things. We are hopeful the recommendations above will supplement NOPD's ongoing efforts.

## IX.    Beyond the NOPD

The foregoing recommendations focus on actions the NOPD can take to enhance officer job satisfaction, help retention, and build further trust with the community. NOPD obviously is not the only actor in this complicated equation, however. Multiple other City agencies have a role to play in recruitment, retention, job satisfaction, and community trust. For example, the following actions, which go beyond the NOPD, also could go a long way in achieving NOPD's goals. We recognize

---

[57]    *See* https://gspp.berkeley.edu/assets/uploads/research/pdf/RnR_FinalSubmission_forResearchGate.pdf.



that each of these recommendations requires cooperation of non-NOPD agencies, which we concede historically has not always been forthcoming.

- Work with the DA's office to find better ways to communicate and cooperate.

- Work with the DA's office to develop an electronic means of sharing files/evidence.

- Work with local courts to implement new procedures and protocols that are more sensitive to officer schedules.

- Work with the jail to provide better work facilities (*e.g.*, computer, printer, office space, etc.) for NOPD officers, which would reduce the need for time consuming travel back and forth by those officers.

- Work with the Mayor's Office of Neighborhood Engagement to re-energize the PCAB process.

- Work with the New Orleans Inspector General to enter into an MOU that provides for the OIG to investigate high level NOPD officers where PIB is unable to conduct the investigation.

- Work with City officials to continue to explore ways to ensure NOPD officers are paid fairly and given the benefits of surrounding jurisdictions.

- Work with City officials to expand resources available to consumers of mental health services, the current dearth of which creates a great hardship not only to those consumers, but to NOPD officers as well.

Only through a coordinated effort by all agencies and Departments in the City of New Orleans will we be able to achieve our goals of better, safer, fairly, and more effective policing.

## X.    Conclusion

NOPD has made clear its reform journey is not driven by the Consent Decree, but by a self-motivated sense of doing what is right. Superintendent Ferguson has said about the NOPD's reforms, "this is who we are now." We agree. The NOPD is a different department from the one DOJ investigated in 2011. We are hopeful these recommendations provide the NOPD a number of potential avenues to help sustain and build upon its achievements to date.

Respectfully,

Jonathan S. Aronie
Federal Monitor
Sheppard Mullin LLP