**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>                         **Plaintiff,** | **CIVIL ACTION NO.**<br>**2:12-CV-01924-SM-DPC** |
| **V.** | **JUDGE SUSIE MORGAN** |
| **CITY OF NEW ORLEANS,**<br>                         **Defendant.** | **MAG. DONNA PHILLIPS CURRAULT** |

---

**BRIEF IN SUPPORT OF MOTION TO RECONSIDER**
**BY THE CITY OF NEW ORLEANS**

---

Respectfully submitted this 23rd day of September 2022,

*Davillier Law Group, LLC*
Daniel E. Davillier, La. No. 23022
Charles F. Zimmer II, La. No. 26759 (T.A.)
Jonathan D. Lewis, La. No. 37207
935 Gravier Street, Suite 1702
New Orleans, LA  70112
Phone: (504) 582-6998
Fax: (504) 582-6985
ddavillier@davillierlawgroup.com
czimmer@davillierlawgroup.com

**Counsel for the City of New Orleans and
the New Orleans Police Department**

# CONTENTS

I.     Issues Presented ......................................................................................... 1

II.    Standard of Review ..................................................................................... 2

III.   Pertinent Facts ............................................................................................ 2

IV.   Law of Reconsideration .............................................................................. 4

V.    Reconsideration is Warranted ..................................................................... 5

   A.    The City did not abandon its rights. ....................................................... 5

   B.    The discovery period is unnecessary. ..................................................... 8

   C.    Extending the seven-month delay indefinitely is counterproductive. ............................ 9

   D.    Unnecessary delay should be eliminated ............................................... 10

   E.    The Consent Decree does not envision the Monitor taking discovery. ...................... 12

   F.    Full and Effective Compliance has been reached. ................................. 14

   G.    The City of New Orleans is not under a global consent decree. ................................ 17

   H.    Paragraph 458. ....................................................................................... 20

   I.    Press conferences regarding the litigation are not allowed........................... 21

   J.    Unsupported compliance concerns........................................................ 22

   K.    Management of the NOPD. .................................................................... 23

VI.   Conclusion ................................................................................................ 24

Cases

*BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers - Transp. Div.*, 973 F.3d
    326, 333-34 (5th Cir. 2020) ................................................................................. 2

*Cochran v. United States SEC*, 20 F.4th 194, 214-15 (5th Cir. 2021)........................................ 19

*Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993)...................................... 5

*Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574, 104 S. Ct. 2576, 81 L. Ed. 2d
    483 (1984) ................................................................................................. 9, 19

*Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n.10 (5th Cir. 1998)...................... 4

*M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018) ................................. 2

*Shaffer v. Perry's Rests., Ltd.*, 2019 U.S. Dist. LEXIS 94047, at *4-5 (W.D. Tex. June 5, 2019). 5

*Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 336 (5th Cir. 2018) ..................................... 19

*State v. Ysleta Del Sur Pueblo*, 955 F.3d 408, 413 (5th Cir. 2020), as revised (Apr. 3, 2020) ...... 2

*Templet v. HydroChem Inc.*, 367 F.3d 473, 478 (5th Cir. 2004) .................................................. 5

**Statutes**

42 U.S.C. § 14141 ................................................................................................. 2

42 U.S.C. § 3789d ................................................................................................. 2

42 U.S.C. §§ 2000d................................................................................................. 2

**NOW INTO COURT**, comes Defendant, City of New Orleans (the "City"), who supports its motion to reconsider, as follows:

## I.   ISSUES PRESENTED

Pursuant to Federal Rules of Civil Procedure 59 and 60, the City of New Orleans requests that certain recent orders of the Court be reconsidered based on facts and arguments unavailable to the City as there was no motion practice or hearing for the City to voice its objections. The City's motion addresses: (a) compliance with the terms of the Consent Decree, (b) due process, and (b) fundamental fairness. Specifically, the City moves for reconsideration of:

A.   The Court's ruling that the City abandoned its Paragraph 492 Notice;

B.   The Court's scheduling order granting seven months for DOJ to respond to the City's motion to terminate the Consent Decree;

C.   The Court's scheduling order preemptively vacating the seven-month period upon the filing of a motion by DOJ alleging the City abandoned its Paragraph 492 Notice;

D.   The Court's order that the Monitor be entitled to "discovery" not provided for in the Consent Decree;

E.   The Court's order that NOPD was not yet in full and effective compliance of any of the 17 areas of the Consent Decree;

F.   The Court's order that City's executive branch staff appear in closed-door meetings with the Court to address the means and methods of funding NOPD;

G.   The Court's order setting a public hearing for September 27, 2022, without the City having the ability to properly prepare;

H.   The Court's order directing press conferences explicitly by the Monitor, or by way of public hearings without the opportunity for the City to be heard;

I.   The Court's announcement and remedial orders to address concerns regarding NOPD no longer being in compliance without the benefit of a public report to substantiate those concerns; and

J.   The Court's order to embed Monitoring team members as technical assistants in such a way as to effectively take over management of the operations of NOPD, and the City.

## II.   STANDARD OF REVIEW

The Court's September 12, 2022, scheduling order directs that all briefs shall address the standard of review. (Rec. Doc. 641) The orders at issue are generally in the nature of permanent injunctions as they direct specific action by, and/or cost upon, the City. The Fifth Circuit has explained the applicable standard of review as follows:

> A trial court's grant of a permanent injunction is reviewed for abuse of discretion. The district court abuses its discretion if it (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief. The district court's order is entitled to deference, but we review de novo any questions of law underlying the decision.

*BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers - Transp. Div.*, 973 F.3d 326, 333-34 (5th Cir. 2020) (*cleaned up*), *citing, State v. Ysleta Del Sur Pueblo*, 955 F.3d 408, 413 (5th Cir. 2020), as revised (Apr. 3, 2020); and *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018).

## III.   PERTINENT FACTS

Following Hurricane Katrina's destabilization of New Orleans and its police force, Mayor Landrieu's administration invited a DOJ investigation into the NOPD practices in 2010.

The resulting investigation report was issued in 2011 and alleged violations of three federal statutes which implemented the Fourth and Fourteenth Amendments of the U.S. Constitution.

The DOJ thereafter filed a formal complaint with this Court which triggered the Court's jurisdiction pursuant to 42 U.S.C. § 14141; 42 U.S.C. § 3789d; and 42 U.S.C. §§ 2000d to 2000d-7, as implemented by 28 C.F.R. §§42.101 to 42.11. As with any case, the federal jurisdictional bounds of the complaint set the limits of the Court's power to adjudicate remedies in this matter as the parties to litigation cannot confer additional jurisdiction on the Court by agreement. On that same day the DOJ and City entered into a Consent Decree. (Rec. Doc. 565). A "consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based." *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 335 (5th Cir. 2018), *citing Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004). The Consent Decree requires NOPD to draft each policy to protect the constitutional rights of the public, train officers on those polices, and ensure those policies are being implemented in practice.

After many years of federal supervision, NOPD has made incredible advancements. The City believes NOPD has substantially satisfied the goals of the Consent Decree and has reached full and effective compliance. On August 4, 2022, the Mayor of New Orleans announced the desire to bring Consent Decree to an end. On August 12, 2022, the Court scheduled a public hearing for August 17, 2022. (Rec. Doc. 624) The City filed its motion to terminate the Consent Decree on August 16, 2022. (Rec. Doc. 626). During the public hearing on August 17th the Court issued numerous orders from the bench.

The City met with DOJ representatives in Washington D.C. on August 22, 2022, to discuss the City's motion. The parties agreed to work on a schedule for submission of the issues to the Court.[1] DOJ proposed an October 18, 2022, submission date for its opposition brief. The City agreed.[2] The Court vacated the submission date set with the filing of the City's motion on August 31, 2022. (Rec. Doc. 631) On that same day, the City filed a motion for miscellaneous relief, including the issuance of written orders for the orders orally issued from the bench on August 17, 2022. The Court denied the motion as moot because the names of the court reporters assigned to the two hearings at issue were provided to the undersigned on September 1, 2022. The transcripts were ordered and the transcript for the August 17, 2022, public hearing was provided on September 9, 2022. The transcript for the April 20, 2022, is still in process by court reporter.

The Court set a status conference regarding the City's motion to terminate for September 6, 2022. (Rec. Doc. 641). After that status conference, the Court issued a scheduling order regarding the City's motion that set the submission date for DOJ's opposition on April 6, 2023.

## IV.   LAW OF RECONSIDERATION

There is no federal rule that expressly grants any party the right to seek reconsideration of an order. The Courts have, however, interpreted such requests as motions to alter or amend a judgment under Rule 59(e) or a motion for equitably relief from a judgment or order under Rule 60(b). *See, e.g., Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n.10 (5th Cir. 1998). Motions under Rule 59(e) must be filed within 28 days of judgement. Rule 60(c) requires

---

[1] *See* Letter of Timothy D. Mygatt of August 26, 2022, at Ex. 1.
[2] *See* emails regarding the schedule proposal, at Ex. 2.

the motion be filed within a reasonable time, and within a year. The City obtained the transcript of the August 17, 2022, hearing on September 9, 2022, less than 28 days ago.

Rule 59(e) deals with correcting rulings, while Rule 60(b)(6) focuses on the equity of the ruling. *See, e.g.*, *Templet v. HydroChem Inc.*, 367 F.3d 473, 478 (5th Cir. 2004). Neither Rule allows parties to reargue defeated positions or evidence. "Rather, a motion under Rule 59(e) must clearly establish either a manifest error of law or fact or must present newly discovered evidence." *Shaffer v. Perry's Rests., Ltd.*, 2019 U.S. Dist. LEXIS 94047, at *4-5 (W.D. Tex. June 5, 2019) (cleaned up.) The courts are most commonly concerned with protecting the finality of judgments while always addressing the need to render just decisions. *See, e.g., Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993). It is acknowledged by the City that reconsideration is "an extraordinary remedy that should be used sparingly." *Templet*, 367 F.3d at 479. Rule 60(b)(6) authorizes the Court to relieve the City of New Orleans from an order of the Court for good cause.

The City raises a number of issues that have not been previously briefed or argued. The City is not raising old facts or arguments, but instead seeks its first opportunity to oppose certain recent findings of the Court that deeply impact the rights and property interest of the City.

## V.   RECONSIDERATION IS WARRANTED

### A.   The City did not abandon its rights.

On September 6, 2022, the Court held a status conference[3] *via* the Zoom video service regarding the City's motion to terminate the Consent Decree.[4] During that conference, the

---

[3] Rec. Doc. 641.
[4] Rec. Doc. 629.

undersigned understood[5] the Court announced that the City had abandoned its right to file a motion to terminate under Paragraph 492 of the Consent Decree. As such, the DOJ will not be obligated to respond to the City's motion to terminate within the sixty (60) day period set forth at Paragraph 492. As the undersigned understood, the Court determined that after the Paragraph 492 Notice was tendered to DOJ in November of 2019, the City was obligated to push the resolution of the issue in some way. But that is not what the Consent Decree states.

Paragraph 492, as agreed to by the DOJ and the City, only states as follows, and requires DOJ, not the City, to take steps if it chooses to oppose the motion:

> If after six years from the Effective Date, the Parties disagree whether the City has been in full and effective compliance for two years, either Party may seek to terminate this Agreement. In the case of termination sought by the City, **prior to filing a motion to terminate, the City agrees to notify DOJ in writing when the City has determined that it is in full and effective compliance with this Agreement and that such compliance has been maintained for no less than two years.** Thereafter, the Parties shall promptly confer as to the status of compliance. If, after a reasonable period of consultation and the completion of any audit or evaluation that DOJ and/or the Monitor may wish to undertake, including on-site observations, document review, or interviews with the City and NOPD's personnel, the Parties cannot resolve any compliance issues, **the City may file a motion to terminate this Agreement.** If the City moves for termination of this Agreement, **DOJ will have 60 days after the receipt of the City's motion to object to the motion.** If DOJ does not object, the Court may grant the City's motion. If DOJ does make an objection, the Court shall hold a hearing on the motion and the burden shall be on the City to demonstrate that it is in full and effective compliance with this Agreement and has maintained such compliance for at least two years.

---

[5] The status conference was not transcribed. The undersigned must rely on notes and confirmation of same with the City's other representative in attendance on the video conference.

The City properly gave formal notice to DOJ.[6] The dismissive response from the DOJ and Monitor during the required conference after receipt of said notice was effectively, "we look forward to NOPD proving compliance." And that is exactly what the City's motion to terminate the Consent Decree aimed to do. The Monitor and DOJ had "a reasonable period" to undertake any audits or reviews. Since November of 2019 many audits have been done, and the DOJ and Monitor have reviewed a tremendous amount of data. Not a single email or phone call has been made seeking information specific to the pending Paragraph 492 Notice. This is in stark contrast to the specific data request tended by DOJ on August 26, 2022, seeking information regarding compliance regarding the City's motion to terminate.[7] NOPD has not withheld any data on any topic. DOJ and the Monitor have requested and received streams of data since 2019. What is it that the City or NOPD failed to do that could constitute abandonment? How could the City abandon its right after giving notice and providing every item of data DOJ or the Monitor requested?

The undersigned counsel requested a formal written order from the Court to this effect as the City strongly disputed that it waived, or even had the ability to waive, the requirements under Paragraph 492. The Court instructed that an order would not be forthcoming as the DOJ had not yet challenged the City's motion to terminate the Consent Decree as premature based on the abandonment argument.

The City moves the Court to reconsider this ruling given the plain language of Paragraph 492 and the express written notice provided to DOJ on November 30, 2019, at (Rec. Doc. 629-5). The City has not abandoned its right to a prompt hearing as set out in the Consent Decree.

---

[6] Rec. Doc. 626-7.
[7] *See* Ex. 1.

**B.**   **The discovery period is unnecessary.**

As the undersigned understands it, if the City abandoned its Paragraph 492 Notice, its motion to terminate would be premature as DOJ did not have the time needed to conduct any audits or reviews it required to oppose the motion. Despite the lack of a pending motion regarding abandonment, the Court vacated the existing submission date and ordered a discovery period *via* scheduling order (Rec. Doc. 641) that creates a six-month discovery period plus an addition month for DOJ to compile a brief. This order exceeds the sixty (60) day period set forth in the Consent Decree at Paragraph 492 for DOJ to oppose the City's motion to terminate. In short, the schedule as ordered deems the City's notice abandoned and grants DOJ relief not yet requested.

The result of DOJ filing and prevailing on a prematurity motion would be to allow for the audit and review period detailed in Paragraph 492 before the City could file its motion to terminate the Consent Decree. This ruling should be reconsidered. DOJ abandoned its ability to conduct audits and reviews (*if neither were done*) in response to the City's formal notice of compliance. (Rec. Doc. 629-5) Or, perhaps DOJ did conduct this analysis? The City cannot know what DOJ did to evaluate the City's notice. But it is undisputable that since the Notice was provided, DOJ has requested an endless stream of data and received item it asked for.

By granting the DOJ six months to do "discovery" plus an additional month to prepare its brief before filing an opposition to the City's motion to terminate, the Court has granted the relief DOJ's motion would seek before that motion is filed. The City objects to the prejudgment of a potential DOJ motion and the lack of due process available to the City. The City has the right to meaningfully argue the merits of such a motion before relief is granted, and it has been denied that right.

8

The Court further advised it would consider changing the Consent Decree based on the City's objection. The Consent Decree only allows modifications to that agreement of the parties through the joint stipulation of those two parties – DOJ and the City. *See* Paragraph 487. Neither party moved to amend the timelines set out in Paragraph 492 through the agreed upon amendment process found at Paragraph 487. The Consent Decree is an agreement of the parties enforced by the Court. The parties did not agree to any unilateral changes by the Court or either party. And the City objects to any injunctive ruling that imposes on the City further than agreed to through the Consent Decree. "[T]he scope of a consent decree must be discerned within its four corners." *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574, 104 S. Ct. 2576, 81 L. Ed. 2d 483 (1984).

The City moves the Court to, (i) reconsider its abandonment finding without the benefit of briefing or other due process, and (ii) enforce the City's rights under the Consent Decree to have a hearing within 60 days. The seven-month delay (five months beyond the 60-day limit) violates the Consent Decree and creates a direct cost to the City that warrants reconsideration.

## C.   Extending the seven-month delay indefinitely is counterproductive.

The Scheduling Order of the Court (Rec. Doc. 641) further orders that *if* the DOJ files a prematurity challenge to the City's motion by October 6, 2022, all of the delays ordered for discovery shall be vacated pending a ruling. This would add indefinite delay in the prosecution of the City's motion. The relief sought by such a prematurity motion would be the same seven-month period already ordered and underway. (Rec. Doc. 641) There is no reason to vacate and then restart that period if DOJ's motion is granted at a date that is currently uncertain. The Court has already granted the relief for an abandonment finding. It has to be assumed that the motion will be granted as the Court has already stated this finding.

If DOJ's motion is filed and granted, the parties will already be on that new "abandonment" timeline. If the motion is denied, DOJ's opposition brief should be due within the sixty (60) days agreed to and ordered at Paragraph 492.

**D.     Unnecessary delay should be eliminated.**

The Court instructed during the September 6, 2022, status conference that DOJ needed six months for discovery to evaluate the City's motion to terminate the Consent Decree and an additional month to prepare its brief. The undersigned advised the Court that through meetings with the DOJ and its trial attorneys before that status conference, the parties were working towards (*or had reached*) an agreement for the DOJ to file its opposition on October 18, 2022. *See* Exs. 1 and 2. The DOJ did not request seven months to properly oppose the City's motion. Instead, it negotiated for an October 18, 2022, opposition deadline. The City agreed and rushed its already taxed personnel to respond to extensive document requests DOJ propounded in exchange for this agreement. The Court should reconsider the need for a month's long delay in advancing this critical motion. The NOPD has worked tirelessly to respond materially to every single one of the DOJ extensive data requests[8] within two (2) weeks of the request. *See* Discovery Response at Ex. 3. The City has produced more than 57,000 pages so far with another 39,000 pages in the bates stamp process now that will upload shortly.

This effort was undertaken in good faith to meet the terms of the agreement thought to have been reached with DOJ to resolve the City's motion timely. Simply put, DOJ asked for two weeks to review the data and does not need six months, nor did it ever openly request that delay from the Court. The DOJ agreed to a multi-week review and then a discussion of what areas of

---

[8] *See* Letter of Timothy D. Mygatt of August 26, 2022, at Ex. 1.

agreement could be reached. This is in keeping with the 60-day deadline set forth in the agreement between the parties – *i.e.*, the Consent Decree – that this Court must enforce. There is no support for the idea that DOJ needs seven months to respond to the City's motion to terminate the Consent Decree.

NOPD has been under federal supervision via a full-time monitor since 2013. By 2019 the Monitor had announced publicly the finish line was in sight, with important steps left to achieve. As of April of this year the Court advised the public that she expected the final three areas to come into formal compliance this (2022) summer.[9] It is, therefore, not surprising that by August the City had reached the classic consent decree question of "are we there yet?" It is not disputed, however, that DOJ has had open access to NOPD's documents and personnel since it began its investigation in 2010. It demands information on an almost daily basis and is given every bit of information it desires from NOPD. The record of this case is devoid of a single motion to compel or motion for contempt for failure by the NOPD to provide requested data.

There is, therefore, no need to delay the hearing of the City's motion as if DOJ needs to discover the facts regarding NOPD's compliance – it has done this every single day for at least the past 10 years. DOJ will continue to demand and receive any data it wants under its infinitely broad reading of the Consent Decree no matter the status of a discovery period. (The Consent Decree does not grant DOJ broad audit powers, as the City's motion to terminate discusses at Rec. Doc. 629.) The only result of this extended "discovery" period will be: (a) unnecessary delay in hearing the City's motion and appellate review of that ruling by the City or DOJ; and (b)

---

[9] "As I mentioned in April, I expected that bias-free policing and stop, searches, and arrests would come into compliance this summer. The NOPD has made significant progress in both of those closely-related areas, and the monitoring team and DOJ currently are evaluating their progress, including the results of the audits in those areas. I'm hopeful we'll be in a position to schedule those presentations soon." Transcript of August 17, 2022, at Ex. 4, 6:2 – 10.

added expense to the City. There will be no change in the amount of information available or delivered to DOJ.

**E.      The Consent Decree does not envision the Monitor taking discovery.**

The City further requests that the Court reconsider granting the court appointed monitor undefined "discovery" powers. If, as asserted here, the City's Paragraph 492 Notice was valid and not abandoned, then its motion to terminate the Consent Decree can only be opposed by DOJ. The Consent Decree authorizes a traditional motion and opposition cycle. The City and DOJ are the only parties to that process. If the City fails to meet its burden at the hearing of its motion, the Court will deny the motion. The Consent Decree does not grant any "discovery" powers to the Monitor in regard to the motion.

Paragraph 492 does allow the Monitor to conduct audits and reviews in response to the City's Notice, just as it allowed for DOJ. But that power as to the Monitor already exists in the form of mandatory obligations to review and audit. DOJ, in contrast, only has that power during the Paragraph 492 process. Discovery, however, is a new term in this unique relationship.

The Monitor is charged with the duty (and is paid by the City) to report on the compliance of NOPD as to each of the 17 categories of the Consent Decree "at least annually." Paragraph 450. As it has been explained multiple times in the past:

> As you well know, this Court appointed the Monitoring Team in August 2013. Since that time, we have vigilantly served as the Court's and public's eyes and ears regarding every element of the Consent Decree. We do this using a number of tools:
> - We conduct audits,
> - We perform reviews,
> - We review and suggest revisions to policies, procedures, directives, and lesson plans,
> - We meet with community stakeholders to learn from their experiences interacting with the NOPD, and

12

- We meet with and ride with officers at all ranks to ensure we understand the nuances and complexities of the job from their perspective.

These activities afford us a holistic perspective of NOPD's level of effort and level of success in meeting its obligations under the Consent Decree.[10]

The Monitor should find no benefit from "discovery." The very core of its professional engagement with the City is to gather information regarding compliance and be able to report on the compliance status in short order. There is nothing for it to discover that it does not already have ready access to and an existing obligation to publicly report.

As such, the Monitor has no limits on the information it demands and receives from NOPD. What does discovery mean for someone who has unlimited access to all information already? The Court's order does not explain how this will work. Participation in discovery by the Monitor is duplicative and puts the Monitor at odds with the City if the Federal Rules of Civil Procedure are to apply. Is the Monitor now required to provide formal discovery requests pursuant Rule 26? Can the City now object to such requests? Does the City have the delays of the Federal Rules to respond to discovery demands? All of this would seem to retard the case rather than advance it.

Moreover, the Monitor should be neutral. The City should not have to pay for the Monitor to conduct discovery to oppose its motion. The Monitor has reports on compliance already, what would it be seeking now that is different? If the Monitor is allowed to oppose the City's motion outside the bounds of the Consent Decree, that cost should be borne by DOJ.

---

[10] Prepared Public Hearing Remarks of Jonathan S. Aronie, Lead Monitor, NOPD Consent Decree Before Judge Susie Morgan, U.S. District Court For The Eastern District of Louisiana, April 20, 2022, at http://consentdecreemonitor.com/reports

F.    **Full and Effective Compliance has been reached.**

During the September 6, 2022, status conference it was understood that the Court

announced that NOPD had not been found compliant with *any* area of the Consent Decree. This

startling statement directly contradicts the fundamental understanding of the most central issue in

this case by every party involved, including the Court appointed Monitor.

The DOJ publicly acknowledged the uncontroversial understanding that the City is

compliant in at least 15 of the 17 areas as recently as the public hearing on August 17, 2022:

> As the monitor has found, and we have agreed, **the City has
> achieved initial compliance in 15 of the 17 substantive areas
> covered by the consent decree**. This is due to a tremendous amount
> of hard work by many people throughout the New Orleans Police
> Department. There has not yet been any formal assessment of
> whether the City and NOPD have sustained compliance with these
> 15 areas of the consent decree.[11]

This statement carves out "sustained compliance" which will not be argued here, but obviously

the City strongly disagrees. Nevertheless, it is undisputed that DOJ understands, as does the City,

that 15 of 17 areas had, in fact, been deemed in full and effective compliance.

The Monitor has also repeatedly stated that specific areas were in Full and Effective

Compliance, using the language of Paragraph 491 of the Consent Decree. As recently as April

20, 2022, the Monitor explained that 13 of the 17 areas had been "moved into the green" which

he explained, means "**they have achieved 'Full and Effective Compliance' with the Consent

Decree.**"[12] In that same pronouncement, the Monitor stated that he was asking the Court to move

two additional areas into full and effective compliance. As the Monitor summarized, "[a]fter

---

[11] Transcript at Ex. 4, at 29:2 – 8.
[12] Prepared Public Hearing Remarks of Jonathan S. Aronie, Lead Monitor, NOPD Consent Decree Before
Judge Susie Morgan, U.S. District Court For The Eastern District of Louisiana, April 20, 2022, at
http://consentdecreemonitor.com/reports

today, assuming the Court approves our recommendations, the NOPD will be left with three areas of the CD not yet in full and effective compliance…"[13] The Court did not deny this recommendation or otherwise imply that full and effective compliance had not been reached. An additional area was "moved to the green" after this hearing following the same path. The Court also noted at the August 17, 2022, public hearing that "[a]s I mentioned in April, I expected that bias-free policing and stop, searches, and arrests would **come into compliance** this summer."[14] Everyone understood compliance to mean "'Full and Effective Compliance' with the Consent Decree."[15]

> To reverse course now, so many years into this process, is a dramatic change that rocks the very foundation of the City's efforts. More pointedly, this dramatic change threatens the City's trust in the process. Not knowing where the finish line is and feeling like the goalposts are moving are reportedly common issues with federal consent decrees seeking institutional reform. But not knowing after a decade whether you are in compliance in any area is a fundamental failure of the process. The parties and the Monitor had been working on plans for the anticipated sustainment period, built on the understanding that that only two[16] more areas needed a compliance determination, which determination was soon at hand.[17]

> Again, the Monitor is paid to report on the City's compliance in 17 areas. It is unfair to publicly declare compliance and then shift the burden onto the City prove compliance by

---

[13] *Id.*
[14] August 17, 2022, Transcript at Ex. 4, at 6:2 – 4.
[15] Prepared Public Hearing Remarks of Jonathan S. Aronie, Lead Monitor, NOPD Consent Decree Before Judge Susie Morgan, U.S. District Court For The Eastern District of Louisiana, April 20, 2022, at http://consentdecreemonitor.com/reports
[16] Community Engagement was understood to have been moved to Full and Effective Compliance after this April public hearing.
[17] August 17, 2022, Transcript at Ex. 4, at 6:2 – 4.

rebuilding all the work it has paid the Monitor to provide. Further, the only way under the Consent Decree for the Monitor to **not** evaluate compliance in any given area of the Consent Decree is by agreement of the parties that said area is already compliant:

> Where the Monitor recommends and the Parties agree, the Monitor may refrain from conducting a compliance audit or review of a requirement previously found to be in compliance by the Monitor pursuant to audit or review, or where outcome assessments indicate that the outcome intended by the requirement has been achieved.[18]

It is patently unfair to the City, and in violation of the black letter text of the Consent Decree, to allow the Monitor to announce full and effective compliance and/or not report on compliance, and then demand that NOPD prove compliance going back years.

This fundamental understanding is why the section of the City's motion to terminate pursuant to Paragraph 492's "sustained and continuous improvement in constitutional policing" focused on the two remaining areas, and not all 17 areas. The compliance review, audits and outcome assessments of the Consent Decree are the agreed upon tools to show compliance. *See* Paragraphs 444 – 458.  NOPD has paid millions of dollars for this compliance monitoring work and should not be forced to redo it now from scratch at additional costs to prove compliance yet again.

The City moves the Court to reconsider its apparent *sua sponte* determination that NOPD has not achieved full and effective compliance in any area of the Consent Decree, and confirm that, in fact, 15 of the 17 areas have already been found to be in Full and Effective Compliance with Consent Decree.

---

[18] Paragraph 452 of Rec. Doc. 565.

16

**G.      The City of New Orleans is not under a global consent decree.**

During the public hearing on August 17, 2022, the Court issued a number of orders. The undersigned requested those orders be put in writing and made part of the docket by motion on August 31, 2022. (Rec. Doc. 632) The motion was denied as moot because the names of the court reporters for the two hearings at issue were relayed to counsel after the motion was filed. (Rec. Doc. 635) The transcript of the August 17, 2022, hearing was provided on September 9, 2022. The City awaits transmission of the April 2022 hearing transcript.

One of the orders issued in open court on August 17, 2022, was that the Chief Administrative Officer of the City of New Orleans must appear before the Court monthly and "for the foreseeable future" to:

> ensure the City follows through on its plans to direct additional resources to the NOPD and its officers, including, as I mentioned, proper equipment, professional facilities, functioning information technology, and reasonable pay.[19]

This Honorable Court has the power to enforce compliance with the terms of the Consent Decree, which may include outcomes that trigger financial impacts on the City. And it is not disputed that "[t]he City is responsible for providing necessary support and resources to NOPD to enable NOPD to fulfill its obligations under this Agreement."[20] Respectfully, it is not within the Court's Article III powers to order executive branch staff of the City to appear in chambers to discuss the allocation of taxpayer funds in a closed-door session. This is the quintessential role of elected officials. There are also important transparency laws in place to assure such decisions are made in the open by those elected to make such decisions and who are, in turn, answerable to the

---

[19] August 17, 2022, Transcript, at Ex. 4, p. 37.
[20] Paragraph 12 of Rec. Doc. 565.

public *via* election. The operations and budget of the City of New Orleans are not under a consent decree, nor are its elected City Council members.

Moreover, there has been no motion, report or finding that the City has failed to provide support or recourses needed to comply with the Consent Decree. There is a manpower shortage. That is true nationwide.[21] The Consent Decree does not deal with manpower levels beyond assuring each demographic community is equally serviced. Violent crime is up. But the Consent Decree does not seek to lower crime. The Consent Decree demands constitutional and equal treatment of every person the NOPD encounters.[22] This Court was not empowered by the agreement set forth in the Consent Decree to direct fixes for NOPD staffing shortages or alter the prioritization of funding by the executive or legislative branch of the City. The Court's tireless efforts to address these issues is undisputedly well intended, but the very pillars of democracy do not allow it. As the Fifth Circuit recently repeated, this concept was a driving force to the very formation of our Constitution:

> **The separation of powers is the defining feature and virtue of our Constitution.** As James Madison wrote, "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 301 (C. Rossiter ed. 1961). So the Founders separated the legislative, executive, and judicial powers into three distinct branches and then balanced them against one another. See The Federalist No. 51, at 321-23; *Bowsher v. Synar*, 478 U.S. 714, 722, 106 S. Ct. 3181, 92 L. Ed. 2d 583 (1986) ("Even a cursory examination of the Constitution reveals the influence of Montesquieu's thesis that checks and balances were the foundation of a structure of government that would protect liberty.")

---

[21] As the Court noted, "[t]he current rising climb in crime and decline in officer recruitment and retention are national trends. This is happening in cities all over the country, most of which are not under consent decrees." Transcript of August 17, 2022, public hearing, at Ex. 4, at 8:3 – 6.

[22] *See, e.g.*, Paragraph 13 of Rec. Doc. 565.

18

*Cochran v. United States SEC*, 20 F.4th 194, 214-15 (5th Cir. 2021). Just as courts supervising desegregation consent decrees cannot go outside the bounds of those decrees to effect worthy social benefits, this Court is limited by the four corners of the Consent Decree. As the Fifth Circuit articulated in *Smith v. Sch. Bd. of Concordia Parish*, well-intended mandatory injunctions outside the four corners of the decree are not within the Court's jurisdiction:

> One aspect of the relief ordered, however, surpasses the scope of the consent decree. The district court ordered that Delta could not enroll students from other parishes under desegregation orders without permission from the relevant school boards. This requirement appears intended to limit Delta's interference with the desegregation obligations of other parishes. But Delta's consent decree says nothing about other parishes. The scope of the consent decree, and the scope of this case, is limited to eliminating the vestiges of *de jure* segregation in Concordia Parish. To be sure, the issue of how a charter school that is authorized to enroll students throughout the state fits into a patchwork of desegregation orders is a very difficult one, and **we have no doubt that the district court was motivated by the best of intentions in trying to address that issue.** However, **the district court exceeded its remedial authority by extending its reach into parishes that are not part of this case and not contemplated in the original consent decree.** We therefore vacate that portion of the district court's order requiring Delta to obtain authorization before enrolling students from other parishes under separate desegregation orders.

*Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 336 (5th Cir. 2018) (*cleaned up*), *citing Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574, 104 S. Ct. 2576, 81 L. Ed. 2d 483 (1984) ("[T]he 'scope of a consent decree must be discerned within its four corners.")

The City was also not provided with any due process opportunity to object to this order before it was publicly issued. No motion was filed, and the oral report of the Monitor on August 17, 2022, was issued in violation of the Consent Decree as no written report or draft was ever provided to NOPD or the City as required by Paragraph 458. The City moves the Court to reconsider this order given the facial federalism issues it raises.

19

**H.      Paragraph 458.**

The City objected to the oral report of the Monitor at the August 17, 2022, public hearing as being in violation of Paragraph 458.[23] On this same basis, the City moves the Court to reconsider the order setting a public compliance hearing on September 27, 2022. It is now less than ten days before the scheduled hearing and the City still has not seen any report from the Monitor. The undersigned requested this information from the Monitor on September 8, 2022. The Monitor agreed to send an agenda when it was ready. An agenda of what NOPD was expected to report on, and who needed to testify, was finally tendered to NOPD at 7:39 p.m. on Thursday, September 22nd, in advance of the Tuesday September 27th public hearing.

The "agenda" directs which NOPD and City employees are expected to speak on behalf of the City. There is no provision for this kind of "public hearing" in the Consent Decree or the Federal Rules of Civil Procedure. The Monitor has access to NOPD personnel to ***report on compliance***. The Consent Decree does not allow for individual employees of the City to be compelled to testify in open court under examination by a federal judge, in front of the press, without so much as the right to legal counsel. The City reiterates its objection.

The City moves the Court to reconsider the order setting a hearing without proper notice of its purpose or content so that the City, the defendant in this litigation, may properly prepare and present its case to the Court and public. The City again objects to the Monitor issuing an oral report on the status of compliance at the scheduled public hearing on September 27, 2022, or any future date, without complying with Paragraph 458 of the Consent Decree.

---

[23] *See* Rec. Doc. 632, denied as moot by Rec. Doc. 635.

**I.**     **Press conferences regarding the litigation are not allowed.**

The DOJ and City empowered the Court to enforce the terms of the Consent Decree. The DOJ and City agreed that press conferences by the Monitor are not allowed without the approval of the City and DOJ. Paragraph 462 states as follows:

> Except as required or authorized by the terms of this Agreement or the Parties acting together, the Monitor, including any agent, employee, or independent contractor thereof, shall not make any public statements or issue findings with regard to any act or omission of the City or its agents, representatives, or employees; or disclose non-public information provided to the Monitor pursuant to the Agreement. **Any press statement made by the Monitor regarding its employment or monitoring activities under this Agreement shall first be approved by DOJ and the City.**

The "except as required" phrase makes clear that the Monitor can "meet with community stakeholders to explain the Monitor's reports, to inform the public about the Agreement implementation process, and to hear community perspectives of police interactions" as required by Paragraph 461. Making a statement to the press as a means to reach stakeholders and inform the public is a "press statement" as set forth in Paragraph 462, not the public meetings described in Paragraph 461. The City moves the Court to reconsider its order that the:

> monitoring team to schedule two public meetings in September, one for the community and <u>one more [sic] the media</u>… These two meetings will give the public directly, <u>and through the press</u>, the opportunity to have their questions answered by the individuals who have served as my eyes and ears since the outset of the consent decree, the monitoring team.[24]

This order instructs the Monitor to make statements to the press in violation of the Consent Decree. Further, a public hearing without proper notice of its contents or the opportunity to effectively reply to the Monitor's oral report is a *de facto* press conference. Compelling NOPD

---

[24] Transcript at Ex. 4, 39:19 – 40:2.

employees to speak on behalf of the NOPD and City in open court should not happen. The Consent Decree allows the Monitor to have access to data and people to monitor compliance. There is no provision in the Consent Decree wherein employees of the defendant in litigation can be called to testify without the benefit of the protections of the Federal Rules of Civil Procedure. The City objects. All parties to *all* litigation in federal court are entitled to due process and the City objects to this abuse of its due process rights, and the terms of the controlling agreement of the parties.

**J.      Unsupported compliance concerns.**

The City also moves the Court to reconsider its publicly announced concern that the City has failed to maintain its prior compliance achievements. This is obviously a critical finding at the heart of the entire case, and central to the City's pending motion to terminate the Consent Decree. It is the Monitor's sole function to report on the status of compliance. The entire Consent Decree process is founded firmly on the concept of routine reports on the status of compliance. There is no basis for the Court tasked with evaluating compliance publicly raising concerns, and ordering multiple steps to address the concerns, when no public report by the Monitor has been issued supporting such concerns in compliance with the Consent Decree.

The Court appears to have based its finding on a report to be issued by the Monitor at a future date. If there is no report for the Court, the public or NOPD to consider, the Court should reconsider its remedial orders. Again, the City has due process rights, and it cannot effectively defend its rights when it is not given the information or opportunity to respond before the issue is publicly raised and resolved in open court. Transparency is a critical aspect of the Consent Decree, and the City moves this Court to reconsider its announced findings until after the Monitor has reported on those areas and given NOPD the chance to respond.

K.      **Management of the NOPD.**

The City moves the Court to reconsider its order that the Monitor embed third-party technical assistance staff into various functions of the City and NOPD, including: staffing, officer retention, recruiting, transparency, alternative police response, and burden reduction, all at the City's expense. The Consent Decree makes clear that "technical assistance" may be provided in response to a request from the City or DOJ. *See* Paragraph 455. No such request has been made. There is no provision for the involuntary imposition of the cost and control of a technical assistance team onto NOPD or the City.

The Court's order is further concerning when considered in the context of the Court's order of August 17, 2022, that the Monitor will report on the extent to which NOPD has adopted the Monitor's "recommendations" from its April 2022 Technical Assistance Report – another technical assistance exercise not requested by the City. The combination of an embedded monitoring team with the apparent *obligation* on the City to accept and incorporate the "recommendations" of that team is *de facto* management of the NOPD. The Consent Decree makes clear that the Monitor is not empowered to manage NOPD. *See* Paragraph 445. "The Monitor may make recommendations to the Parties regarding measures necessary to ensure timely, full, and effective implementation of this Agreement [Consent Decree] and its underlying objectives. Such recommendations may include a recommendation to change, modify, or amend a provision of the Agreement; a recommendation for additional training in any area related to this Agreement; or a recommendation to seek technical assistance." Paragraph 455.

The Consent Decree tests whether NOPD has, "(a) incorporated the requirement into policy; (b) trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) ensured that the requirement is being carried out in actual practice."

Paragraph 447. Nothing in the Consent Decree envisions a Monitoring team embedding themselves in the various city functions to manage those functions as opposed to monitoring for compliance with the agreed terms of the Consent Decree.

## VI.   CONCLUSION

The City is facing a growing wave of issues that are raised and ruled upon without it having the chance to respond. This is unfair to the City of New Orleans. The City agreed to empower the Court to enforce the terms of the Consent Decree. The City did not, however, give up all its rights or sovereignty. The elected officials of the City retain the power to direct, fund and organize its departments. The NOPD is obligated to draft legal policies, train officers on those policies, and show that the policies are being properly implemented by those officers. Every problem that impacts the NOPD does not automatically become part of the Consent Decree and thus expand federal control.

The City asks that it be given the ability to review reports of the Monitor before publication and thus be able to inform the public of its response. The City asks that it be allowed to brief issues before the Court rules. The City asks that it be given proper notice and an opportunity to respond in accordance with fundamental due process. The City asks that the four corners of the Consent Decree be applied.

WHEREFORE, the City moves for reconsideration of:

K. The Court's ruling that the City abandoned its Paragraph 492 Notice;

L. The Court's scheduling order granting seven months for DOJ to respond to the City's motion to terminate the Consent Decree;

M. The Court's scheduling order preemptively vacating the seven-month period upon the filing of a motion by DOJ alleging the City abandoned its Paragraph 492 Notice;

N.  The Court's order that the Monitor be entitled to "discovery" not provided for in the Consent Decree;

O.  The Court's order that NOPD was not yet in full and effective compliance of any of the 17 areas of the Consent Decree;

P.  The Court's order that City's executive branch staff appear in closed-door meetings with the Court to address the means and methods of funding NOPD;

Q.  The Court's order setting a public hearing for September 27, 2022, without the City having the ability to properly prepare;

R.  The Court's order directing press conferences explicitly by the Monitor, or by way of public hearings without the opportunity for the City to be heard;

S.  The Court's announcement and remedial orders to address concerns regarding NOPD no longer being in compliance without the benefit of a public report to substantiate those concerns; and

T.   The Court's order to embed Monitoring team members as technical assistants in such a way as to effectively take over management of the operations of NOPD, and the City.


[*Signature block on the following page*.]


25

**Respectfully submitted,** this 23rd day of September 2022.

*Davillier Law Group, LLC*

/s/ Charles F. Zimmer II
Daniel E. Davillier La. No. 23022
Charles F. Zimmer II (T.A.) La. No. 26759
Jonathan D. Lewis, La. No. 37207
935 Gravier Street, Suite 1702
New Orleans, LA  70112
Phone: (504) 582-6998
Fax: (504) 582-6985
ddavillier@davillierlawgroup.com
czimmer@davillierlawgroup.com

**Counsel for the City of New Orleans and the New Orleans Police Department**

### CERTIFICATE OF SERVICE

I certify that I have served a copy of the above and foregoing pleading via Notice of

Electronic filing using this Court's CM/ECF system to counsel of record participating in the

CM/ECF system on this 23rd day of September 2022.

/s/ Charles F. Zimmer II