

# Annual Report of the Office of the Consent Decree Monitor for 2022

## New Orleans Police Department Consent Decree

## February 24, 2023

**Office of the Consent Decree Monitor**
**New Orleans, Louisiana**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana



## I.    EXECUTIVE SUMMARY

2022 has been a challenging year for the NOPD. The Department has seen high levels of attrition leading to severe understaffing (and all of the problems that come with it), multiple high-profile investigations of NOPD officers relating to time-charging and other misconduct, and most recently, the retirement of Superintendent Shaun Ferguson. Despite these challenges the NOPD continues to progress toward compliance with the Consent Decree, but further progress remains to be made.

This Report provides an overview of the Monitoring Team's activities over the last 12 months and since our last public report, as well as our current assessment of the status of NOPD's compliance, compliance challenges, and our future monitoring plans. This year, the Monitoring Team conducted multiple audits, reviews, and spot checks covering many areas of Consent Decree compliance. As described more fully in the body of this Report, although the NOPD continues to make progress in many areas, our monitoring in 2022 identified a number of areas that currently do not comply with the Consent Decree's requirements. These include misconduct investigations and adjudications; community engagement; stops, searches and arrests; supervision, including Insight (Early Warning System); and the Officer Assistance Program (OAP).[1]

Looking ahead, there are a number of areas that the Monitoring Team still needs to evaluate before NOPD can be found to be in full and effective compliance with the Consent Decree. For example, the recent issues concerning Secondary Employment required changes to the payroll systems used by OPSE and NOPD, and the completion of administrative investigations. We will monitor these changes to determine whether these solutions worked. Additionally, we have been monitoring PIB's investigations of additional potential violators and the dispositions of those investigations. Finally, as has been addressed in recent court hearings, the Monitoring Team and Judge Morgan have concerns that the severe attrition NOPD has experienced has caused some slippage in compliance and in NOPD's ability to sustain reforms that have been implemented to date. The public also has overwhelmingly expressed these same concerns to us. For these reasons, we have committed to further review of key Consent Decree requirements, including those related to internal affairs, professional standards and accountability, close and effective supervision, response times, recruitment and hiring, performance evaluations, promotions, and community policing.

As we have said at multiple public hearings over the last few years, an important element of NOPD's ability to sustain full and effective compliance is its own audit capability.

---

[1]    This report constitutes a summary of the Monitoring Team's activities for 2022. It is not intended to be an exhaustive description of all our activities, reviews, and findings. Additionally, as our work is ongoing, our findings and evaluation of the state of NOPD's compliance with the Consent Decree could change subsequent to the findings described in this report.



The Monitoring Team, DOJ, and the NOPD have worked collaboratively to establish detailed NOPD audit protocols and an audit schedule, which will be compiled into an audit manual to ensure that NOPD audits address the Consent Decree's elements, are consistent with the Monitoring Team's methodology, and are completed in a timely manner. We expect the manual to be completed by NOPD and approved by DOJ and the Monitoring Team prior to a finding of substantial compliance and the start of the two-year sustainment period. Once we shift into the sustainment period, the Monitoring Team will continue to work with NOPD's Professional Standards and Accountability Bureau (PSAB) and the Independent Police Monitor (IPM) to ensure consistency in standards and audit methodology and timeliness. The audits—including a periodic audit of the audit schedule to ensure the individual audits are being completed as scheduled—will be an important tool to enable public oversight of NOPD during the sustainment period.

With respect to the sustainment period (provided for in paragraph 486 of the Consent Decree), once NOPD has been found by the Court to have achieved full and effective compliance, the Court will enter an order so finding and moving the City and NOPD into this new phase of the reform effort. This two-year period provides the Court, the Department, and the community the opportunity to evaluate whether the changes that have taken place over the past several years of Consent Decree oversight will be sustained over time. It also provides the Department a realistic chance to demonstrate its ongoing achievements and improvement. NOPD's ability to conduct objective and accurate audits and correct deficiencies will be essential to NOPD demonstrating its ability to sustain the Consent Decree's reforms. The Monitoring Team is working closely with the IPM to ensure that Office plays a meaningful role in NOPD's ultimate transition out of the Consent Decree.



## II.    CONSENT DECREE AUTHORITY

"The Monitor shall assess and report whether the requirements of this Agreement have been implemented, and whether this implementation is resulting in the constitutional and professional treatment of individuals by NOPD."

**Consent Decree Paragraph 444**

"To ensure that the requirements of this Agreement are properly and timely implemented, the Court shall retain jurisdiction of this action for all purposes until such time as the City has achieved full and effective compliance with this Agreement and maintained such compliance for no less than two years. ***At all times, the City and NOPD shall bear the burden of demonstrating full and effective compliance with this Agreement***. DOJ acknowledges the good faith of the City in trying to address measures that are needed to promote police integrity and ensure constitutional policing in New Orleans. DOJ, however, reserves its right to seek enforcement of the provisions of this Agreement if it determines that the City has failed to fully comply with any provision of this Agreement. DOJ agrees to consult with officials from the City before instituting enforcement proceedings."

**Consent Decree Paragraph 486**

Page 5 of 58
February 24, 2023
www.consentdecreemonitor.com



### III.   NOTES

"The Monitor shall be subject to the supervision and orders of the [United States District Court for the Eastern District of Louisiana], consistent with [the Consent Decree]. The Monitoring Team shall only have the duties, responsibilities, and authority conferred by [the Consent Decree]. The Monitoring Team shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent."

**Consent Decree Paragraph 455**



## IV.    TABLE OF CONTENTS

I.      EXECUTIVE SUMMARY ................................................................................................2

II.     CONSENT DECREE AUTHORITY ............................................................................4

III.    NOTES ...................................................................................................................................5

IV.     TABLE OF CONTENTS ..................................................................................................6

V.      GLOSSARY OF ACRONYMS ......................................................................................8

VI.     OVERVIEW OF MONITORING ACTIVITIES ......................................................10

VII.    POLICIES AND TRAINING GENERALLY ..........................................................12

A.      Facial Recognition .........................................................................................................12

B.      Courtesy Rides .................................................................................................................13

C.      Annual Policy Review ...................................................................................................13

D.      Training on Policies .......................................................................................................14

VIII.   USE OF FORCE ...............................................................................................................15

IX.     CRISIS INTERVENTION TEAM ...............................................................................17

X.      STOPS, SEARCHES, AND ARRESTS (SSA) .......................................................20

XI.     CUSTODIAL INTERROGATIONS ...........................................................................23

XII.    PHOTOGRAPHIC LINE-UPS ....................................................................................25

XIII.   BIAS-FREE POLICING .................................................................................................27

XIV.    POLICING FREE OF GENDER BIAS .......................................................................32

A.      Child Abuse ......................................................................................................................32

B.      Sex Crimes ........................................................................................................................32

C.      Domestic Violence Investigations ............................................................................32

D.      Domestic Violence Patrol Responses ......................................................................32

XV.     COMMUNITY ENGAGEMENT .................................................................................34

XVI.    RECRUITMENT ..............................................................................................................36

XVII.   ACADEMY AND IN-SERVICE TRAINING ..........................................................37

XVIII.  OFFICER ASSISTANCE AND SUPPORT ..............................................................38

XIX.    PERFORMANCE EVALUATIONS AND PROMOTIONS ..................................40

A.      Performance Evaluations .............................................................................................40

B.      Promotions ........................................................................................................................43



XX.      SUPERVISION ................................................................................................ 46

A.       Supervision Generally ................................................................................... 46

B.       Insight .......................................................................................................... 47

C.       Supervision Conclusion ................................................................................ 48

XXI.     SECONDARY EMPLOYMENT SYSTEM ....................................................... 49

XXII.    MISCONDUCT COMPLAINT INTAKE, INVESTIGATION, AND ADJUDICATION ............ 50

XXIII.   TRANSPARENCY AND OVERSIGHT ........................................................... 51

XXIV.    CONCLUSION .............................................................................................. 52

XXV.     APPENDICES ................................................................................................ 53

Appendix 1 ................................................................................................................ 53

Key Examples of Public Questions and the Monitoring Team's Responses ...................... 53

Appendix 2 ................................................................................................................ 58



## V.     GLOSSARY OF ACRONYMS

| | |
|---|---|
| "ASU" | Administrative Services Unit |
| "AUSA" | Assistant United States Attorney |
| "AVL" | Automatic Vehicle Locator |
| "BWC" | Body Worn Cameras |
| "CCMS" | Criminal Case Management System |
| "CD" | Consent Decree |
| "CIT" | Crisis Intervention Team |
| "CODIS" | Combined DNA Index System |
| "ComStat" | Computer Statistics |
| "CPI" | California Psychological Inventory |
| "CSC" | Civil Service Commission |
| "CUC" | Citizens United for Change |
| "DA" | District Attorney |
| "DI-1" | Disciplinary Investigation Form |
| "DOJ" | Department of Justice |
| "DSA" | District Systems Administrator, a.k.a District Administrative Sergeants |
| "DVU" | Domestic Violence Unit |
| "ECW" | Electronic Control Weapon |
| "EWS" | Early Warning System |
| "FBI" | Federal Bureau of Investigation |
| "FIT" | Force Investigation Team |
| "FOB" | Field Operations Bureau |
| "FTO" | Field Training Officer |
| "GOA" | Gone on Arrival |
| "IACP" | International Association of Chiefs of Police |
| "ICO" | Integrity Control Officers |
| "IPM" | Independent Police Monitor |
| "KSA" | Knowledge, Skill and Ability |
| "LEP" | Limited English Proficiency |
| "LGBT" | Lesbian, Gay, Bi-sexual, and Transgender |
| "MMPT" | Minnesota Multiphasic Personality Inventory |
| "MOU" | Memorandum of Understanding |
| "NNDDA" | National Narcotics Detection Dog Association |
| "NOFJC" | New Orleans Family Justice Center |



| | |
|---|---|
| "NOPD" | New Orleans Police Department |
| "NPCA" | National Police Canine Association |
| "OCDM" | Office of Consent Decree Monitor |
| "OIG" | Office of Inspector General |
| "OPSE" | Office of Public Secondary Employment |
| "PIB" | Public Integrity Bureau |
| "POST" | Police Officer Standards Training Counsel |
| "PSAB" | Professional Standards & Accountability Bureau |
| "PsyQ" | Psychological History Questionnaire |
| "RFP" | Request for Proposal |
| "SART" | Sexual Assault Response Team |
| "SOD" | Special Operations Division |
| "SRC" | Survey Research Center |
| "SUNO" | Southern University of New Orleans |
| "SVS" | Special Victims Section |
| "UNO" | University of New Orleans |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |
| "VAW" | Violence Against Women |



## VI.    OVERVIEW OF MONITORING ACTIVITIES

The Monitoring Team spent significant time during 2022 in New Orleans and virtually reviewing, auditing, and evaluating multiple areas of Consent Decree compliance. Among other things, the Monitoring Team:

- Reviewed and analyzed uses of force

- Worked with NOPD and DOJ to develop and implement audit protocols for all areas of the Consent Decree at the City's request

- Reviewed Community Engagement

- Reviewed Performance Evaluations

- Reviewed Promotions

- Partnered with DOJ and NOPD to audit for bias

- Reviewed the PSAB SSA audit report and initiated a Monitoring Team spot audit of SSA incidents to independently assess NOPD's progress in Stops, Searches, and Arrests

- Partnered with OIPM to review BWC videos

- Audited Supervision (including Insight, NOPD's early warning system)

- Audited NOPD's responses to sexual assault/domestic violence calls

- Conducted a review of secondary employment practices following allegations of misconduct and mismanagement

- Maintained extensive weekly meetings and technical assistance collaboration

- Partnered with the City and NOPD to support hiring new personnel and establishing new positions within the NOPD

- Participated in on-site reviews and meetings in a multitude of areas, including training, community engagement, and force investigations



- Observed recruit training and in-service training

- Partnered with the City's CAO to facilitate the City's and NOPD's compliance with Consent Decree paragraph 12, requiring the City provide adequate resources to the NOPD to allow it to meet its obligations under the Consent Decree.

In addition to the foregoing, the Monitoring Team also spent significant time, as it always does, listening to community stakeholders, business leaders, and officers regarding the police department, the Consent Decree, and police reform generally. While we cannot recount all of the public questions, suggestions, and concerns we have fielded over the last year, some illustrative examples are provided in **Appendix 1** of this Report. Additionally, members of the public are encouraged to provide feedback, comments, or questions regarding the Consent Decree to the Court or Monitoring Team via email to: ***aburns@consentdecreemonitor.onmicrosoft.com***. Judge Susie Morgan will endeavor to review all public questions, and respond during upcoming NOPD Consent Decree Compliance court hearings.

SMRH:4860-5010-8498



## VII.    POLICIES AND TRAINING GENERALLY

The Consent Decree provides that NOPD's policies and procedures shall reflect and express the Department's core values and priorities, and provide clear direction to ensure officers and civilian employees enforce the law effectively and constitutionally. The Monitoring Team has been heavily involved in drafting, revising, and reviewing NOPD's policies and procedures over the years. Two new policies, Facial Recognition and Courtesy Rides, are worth mentioning here in more detail.

### A.    Facial Recognition

The NOPD drafted and submitted for approval by the Monitoring Team and DOJ a policy to govern use of Facial Recognition Technology (FRT). Generally, FRT scans a photograph or image of an individual's face, identifies facial features, known as landmarks, that make an individual's face unique.[2] Each human face has 80 nodal points that make up their face.[3] A nodal point can be the distance between one's eyes or the shape of one's cheekbones.[4] All of these nodal points create one's own personal facial signature.[5] This unique facial signature is then compared to a database of known faces.

FRT can be an effective and efficient tool for identifying individuals. Facial recognition can be used to identify suspects, prevent crime, and locate missing persons. Equally important, however, it can also be used exonerate wrongly accused individuals. Beyond law enforcement use, FT is also widely used by private companies as a security measure, for example unlocking cell phones.

In perfect conditions, facial recognition systems can have near-perfect accuracy. In the real-world, however, where conditions are rarely perfect, the same technology can be highly inaccurate, which can lead to false arrests, improper prosecutions, and wrongful convictions.

Given the risks attendant to this relatively new technology, the Monitoring Team devoted significant time to evaluating NOPD's proposed policy. We note that NOPD was sensitive to the potential risks and was committed to adopting a policy only if it could reasonably reduce the risks. The policy, which the Monitoring Team ultimately approved,

---

[2]     Panda Security, "The Complete Guide to Facial Recognition Technology - Panda Security," *Panda Security Mediacenter*, Oct. 13, 2020, www.pandasecurity.com/mediacenter/panda-security/facial- recognition-technology/.

[3]     *Id.*

[4]     Brian Newlin, "A Closer Look at Facial Recognition Technology." *WDIV*, ClickOnDetroit, Oct. 4, 2019, www.clickondetroit.com/2019/10/04/a-closer-look-at-facial-recognition-technology-2/.

[5]     *Id.*



allows for FRT in limited, specified circumstances, only by trained investigators that must be approved by the investigator's immediate supervisor before being sent to the Investigation Support Division – Intelligence Unit of ISB.[6] Additionally, the known and target photographs as well as other relevant investigative information related to the facial recognition must be maintained. The Monitoring Team will audit and evaluate NOPD's use of FRT to ensure that the required safeguards achieve their intended purpose. The Monitoring Team's letter to NOPD concerning its FRT policy is attached as Appendix 2.

### B.    Courtesy Rides

In July, the Monitoring Team approved Chapter 10.1 Public Safety Rides. This new policy allows NOPD officers to transport individuals who are neither suspects nor believed to be "armed and dangerous" from a place of danger or risk to a place of safety. For example, under the policy it is appropriate for an officer to provide a ride to a motorist stranded in an unsafe place who is unable to provide for their own transportation.

It is essential that the policy protect public and officer safety within constitutional bounds. However, prior to this policy being enacted, there was confusion among officers about whether officers could check someone for weapons before providing them a ride. The policy as approved achieves this balance by making clear that these rides are to be provided when other reasonable alternatives are unavailable, the officer has no safety concerns related to giving the person a ride, and the ride is approved by a supervisor. Additionally, the policy makes clear that public safety rides are not a form of detention or arrest, officers are not authorized to search the individual(s) accepting an offer for a public safety ride except when conducting a consent search as provided by Chapter 1.2.4 – Search and Seizure. Finally, the justification and approval of the ride must be documented. The Monitoring Team will audit the use of public safety rides to ensure the policy is effective.

### C.    Annual Policy Review

As reflected in the Consent Decree, NOPD agreed to review each policy within 365 days after implementation and annually thereafter.[7] NOPD, however, has not reviewed all policies annually.  NOPD currently is developing a process for annual policy reviews, which we will monitor and assess.[8]

---

[6]     NOPD Operations Manual, Ch. 51.1.1, Use of Facial Recognition for Criminal Investigations (Eff. Oct. 2, 2022), *available at* https://nola.gov/getattachment/NOPD/Policies/Chapter-51-1-1-%E2%80%93-Use-of-Facial-Recognition-Technology-for-Criminal-Investigations-Effective-10-2-22.pdf/?lang=en-US.

[7]     CD ¶18.

[8]     NOPD has suggested that the number of policies may make annual review unduly burdensome, and has proposed that certain policies be reviewed less frequently. In the event we and the DOJ agree with such a proposal, the process for modifying the Consent Decree will be followed.



With respect to new policies, we commend NOPD on recognizing the benefit of soliciting feedback from a diverse range of stakeholders, such as supervisors, patrol officers, the OPIM (as representative of the public) and others, to promote understanding and effectiveness. NOPD has committed to the Monitoring team that it is in the process of creating a *policy review panel* that will include these respective viewpoints.

### D. Training on Policies

In management, it is often said "The message received is the message." Feedback from officers, the OIPM, and others suggests that some NOPD policies still are not understood by officers. We will be reviewing how NOPD educates officers concerning the adoption, meaning, and revision of its policies to ensure they are understood as intended, as required by Consent Decree paragraph 25.

SMRH:4860-5010-8498



## VIII.   USE OF FORCE

The Monitoring Team continues to monitor closely uses of force by NOPD officers. In particular, the Monitoring Team continues to review all serious uses of force, respond to the scene of NOPD critical incidents, and review a wide range of use of force data. We also review and evaluate the accuracy of PSAB audits; attend Use of Force Review Board (UFRB) hearings; respond to scenes of Officer Involved Shootings and serious uses of force; monitor Force Investigation Team (FIT) investigations; and evaluate specific uses of forces, including vehicle pursuits, as warranted.

Additionally, the Monitoring Team currently is in the process of:

- Conducting spot check audits to measure continued compliance with various paragraphs of the Consent Decree (including BWC, Vehicle Pursuits, CEW, Firearm and Ammunition[9]) with primary emphasis on serious use of force incidents;

- Reviewing canine training records of handlers and dogs;

- Monitoring canine bite ratios;

- Coordinating oversight protocols with IPM in preparation for transitional authority;

- Providing FIT training for new FIT officers;

- Providing training for newly appointed auditors for the PSAB auditing unit;

- Spot checking approved/unapproved police pursuits; and

- Assessing all serious use of force incidents.

We will report on the findings of the above ongoing activities in more detail in future reports.

---

[9] When the Monitoring Team requested PSAB's audits related to firearms and ammunition, we were informed PSAB discontinued auditing this area, as a result, we have not been provided any audit forms in over a year and a half. PSAB should not have discontinued these audits, which provide key information for assessing compliance. Ensuring that audits related to firearms and ammunition are re-implemented is a priority for 2023.



The following chart highlights the annual total NOPD uses of force from 2016 through 2022:[10]



More recently in 2021 and 2022, the NOPD's reported annual total use of force incidents have been trending up from a relatively steady decline from 2017 through 2020. We note, however, that although total uses of force have increased, *serious* (level 4) uses of force have continued to decline. Nevertheless, this is a trend we will continue to monitor and evaluate.

The recent increase in NOPD uses of force further highlights the importance of the Department's Use of Force Review Board, an institution required by the Consent Decree. In 2022, NOPD held UFRB hearings only in March, April, May, October, November, and December, which resulted in a backlog of hearings. The Department has committed to clearing the backlog of hearings. For example, during the most recent UFRB on January 26, 2023, NOPD heard five cases.

---

[10]     The 2022 numbers in the chart are current as of December 7, 2022.



## IX.     CRISIS INTERVENTION TEAM

Section IV of the Consent Decree requires NOPD to "minimize the necessity for the use of force against individuals in crises due to mental illness or diagnosed behavioral disorder." To achieve this outcome, NOPD created the Crisis Intervention Team (CIT) program, which was adopted from a nationally recognized CIT "best practices" model designed to minimize the necessity for the use of force against individuals in crisis due to a mental health episode or diagnosed behavioral disorder.

In May 2022, the Monitoring Team conducted a review of the 2021 CIT PSAB audit, BWC footage, and available underlying data. Overall, the Monitoring Team agreed with the PSAB's compliance findings. In the sample of the 26 cases we reviewed, the Monitoring Team found the officers were professional, empathetic, and patient when responding to incidents requiring the CIT. This does not mean, of course, that every NOPD response was perfect, or even appropriate. As is the nature of a spot audit, there will be many situations not included in the review. A November 15, 2022 shooting by an NOPD officer of an individual at the Superdome, for example, while not included in the Monitoring Team's random selection of cases to audit, has raised questions that are being looked at by PIB and the Monitoring Team.

In December 2022, the Monitoring Team conducted another spot-check audit of calls for service requiring the CIT. This audit covered CIT responses between July 1, 2022 and September 30, 2022. There were a total of 682 such calls for service during the selected audit period, and the Monitoring Team randomly selected and reviewed the BWC footage of 5% of those calls (34 events).

Overall, the events we reviewed indicate the NOPD is well-trained in its response to calls for service requiring the CIT. In all situations in the sample we reviewed where officers arrived on the scene, they handled the events within policy, professionally, and with empathy, as necessary. In 12 of the 34 events reviewed, there were no CIT-certified officers on the call. Despite the lack of certification, the non-CIT certified officers all responded professionally and empathetically and handled the calls for service within NOPD policy. This suggests the basic CIT training and the annual refresher training provided during In-Service training are working to ensure a qualified response to calls for persons in a mental health or behavioral crisis.

While NOPD officers generally are providing qualified responses to calls for service when they arrive at the scene, our recent reviews show response times related to such calls for service are an issue, as they are across the Department. Notably, Gone on Arrivals (GOAs) are becoming increasingly problematic and most often result from No Units Available (NUA)



at the time of the calls.[11] Out of the 682 CIT calls for service requiring CIT in the universe of data we selected for our review, 180—**or 26%**—of the calls were cleared as GOA. In other words, when officers arrived to those calls for service, they reported the subject of the call was no longer there.

The absence of the subject of the call likely was prompted by the length of time it took NOPD to respond to the call. The average time it took an officer to respond to the GOA calls in our sample *was 5 ½ hours*. The median response time (which eliminates the excess weight of the 7th District's 14 hour and 45 minute average response time) was just over 3 hours. In either case, NOPD's response times clearly are impacting its ability to get CIT officers to individuals in mental health crisis. This information is depicted in the chart below for all districts.

| District | Count of Time to Close (Create - Close) | Average of Time (Create - Close) |
|---|---|---|
| 1st | 14 | 3:01:44 |
| 2nd | 6 | 1:20:47 |
| 3rd | 14 | 3:06:45 |
| 4th | 16 | 2:58:25 |
| 5th | 18 | 8:21:01 |
| 6th | 10 | 6:12:00 |
| 7th | 48 | 14:42:33 |
| 8th | 15 | 2:27:52 |
| Other[12] | 39 | 8:10:16 |
| **Grand Total** | **180** | **5:35:43** |

The response times for GOAs are concerning, particularly in the Seventh District, which is by far the NOPD's geographically most expansive district. The Seventh District has more than double the number of GOAs and sometimes more than triple the response time, as compared to other Districts. *The inability to respond effectively and in a timely manner to more than one-fourth of calls requiring the CIT indicates non-compliance with the over-arching goal of the Consent Decree, which requires the NOPD to ensure proper police services are delivered to the citizens of New Orleans.* The response times for GOAs also indicate a disparity in response times for citizens residing in the Seventh District. The Monitoring Team has communicated these initial findings to NOPD. In response, the NOPD has

---

[11]     Response times and GOAs create problems in other areas as well beyond CIT, as discussed elsewhere in this report.

[12]     The "other" category represents anyone who responded to a call for service requiring the CIT who was not assigned to a specific District at the time (*e.g.*, a HQ detective, a traffic officers assigned to a Special Operations Unit, etc.).



committed to attempting to find solutions to reduce GOAs. We will closely monitor and report on this issue.[13]

The Monitoring Team also conducted a spot-check to verify the NOPD remains in compliance with the Consent Decree requirement that a minimum of 20% of patrol officers be CIT-certified. The Department reports 40% of its patrol-assigned officers are CIT trained, and we believe this number is accurate based on the documents we reviewed during out spot-check. Notwithstanding the high number of GOAs, overall, the Monitoring Team continues to be very impressed with NOPD's work in this area of the Consent Decree.

---

[13]     The NOPD does not agree that the response time data cited above indicate non-compliance. NOPD argues, among other things, that its slow response times reflect not "a failure to provide services for a certain group of individuals, but a decline in available policing services for *all* members of the community." This is a fair point, which the Monitoring Team recognizes. But saying many members of the New Orleans community are not receiving prompt police service does not change that fact that individuals in mental health crisis also are not receiving prompt police service. NOPD further emphasizes that its officers respond "effectively and with compassion and empathy" when they do make it to calls in a timely fashion. As noted above, the Monitoring Team agrees with this point. But compassion and empathy are effective only if the officers actually make it to the calls while the individual in crisis is still there. Through no fault of the officers, this is not happening consistently.

SMRH:4860-5010-8498



### X.      STOPS, SEARCHES, AND ARRESTS (SSA)

The SSA section of the Consent Decree requires that the NOPD agrees

> to ensure that all NOPD investigatory stops, searches, and arrests are conducted in accordance with the rights secured or protected by the Constitution and laws of the United States. NOPD agrees to ensure that investigatory stops, searches, and arrests are part of an effective overall crime prevention strategy; are consistent with community priorities for enforcement; and are carried out with fairness and respect.

The NOPD, the DOJ, and the Monitoring Team have been working collaboratively to further the Department's progress in the area of SSA, and to remedy previously-identified shortcomings. This process has required significant effort over the past three years to collaboratively develop, refine, and implement comprehensive SSA auditing tools and review of processes in order to monitor and assess compliance with the requirements of the Consent Decree in this section.[14]

The SSA audit, SSA annual report, and corrective action processes now in place are designed to ensure that all stops, searches, and arrests are conducted and executed consistent with NOPD policy and constitutional law, are documented appropriately, that documentation is complete and accurate, and they are carried out with fairness and respect. Fundamentally, these reviews and corrective actions are intended to function as effective and essential elements for both identifying deficiencies and tracking progress toward compliance.

Over the last three years, SSA audit findings continued to give the Monitoring Team concern over the pace of NOPD's progress toward compliance in the area of SSA. For example, PSAB's audit of May 2021 NOPD stops, searches, and arrest incidents and subjects identified deficiencies, including the following:

- Documentation of stops (including timely submission of the correct documentation);

- Legal basis documented for all searches (especially for pat downs);

---

[14] These tools and processes cover material elements of many but not all of the Consent Decree's SSA requirements. Due to the relative infrequency of certain searches – e.g., consent searches (Consent Decree paragraphs 128, 129, 131) and strip/body cavity searches (Consent Decree paragraphs 132, 133, 134) – more targeted review samples are required for some sections of the Consent Decree. Additionally, a new search warrant audit tool was developed to address search warrants (Consent Decree paragraphs 135, 136, 137). Similarly, SSA CD paragraphs must be reviewed outside of the audit tool, for example, field supervision (CD 136, 137, 144, 146, 147, 150, 151), DA refusals (148), Bias (125, 127, and 152-161).



- Reasonable Suspicion/Probable Cause to stop (including articulating the legal basis in reports);

- Inconsistencies between BWC and documentation;

- Documentation of evidence; and

- Miranda issues.

    Further, the most recent PSAB Audit conducted of NOPD's March – May 2022 identified a need for continued progress in areas including:

- Pat down justification;

- Articulating the legal basis for searches;

- Miranda issues;

- Inconsistencies between BWC and documentation;

- Incomplete BWC (such as not starting the video early enough or not starting it at all); and

- Supervision issues.

Beginning in the Fall of 2021, the Monitoring Team has worked with the Field Operations Bureau (FOB) and PSAB to develop and implement more field-based approaches for promoting progress in SSA compliance and identifying and addressing areas of non-compliance.

    A major development over the last year has been a new plan for the Department's FOB to regularly conduct SSA related "inspections." This is referred to as the Department's "FOB Inspection" process. The FOB Inspections are intended to provide more timely corrective action specifically related to serious deficiencies and concerns noted in the Department's 2020, 2021, and 2022 PSAB audits. These reviews are conducted by NOPD administrative Sergeants, field Sergeants, Lieutenants, and District Captains. Because the SSA audits and findings are based on a representative sample, they provide a clearer measure of NOPD's overall progress in this area than the FOB inspections, which serve a different purpose as a management tool. Ideally, FOB inspections should enhance accountability for officers and incidents across the Districts and platoons by requiring more frequent review of BWC footage and documentation from SSA incidents.

    These inspections will improve close and effective supervision of the Department's stops, searches, and arrests. Further, if any inspection identifies misconduct,

SMRH:4860-5010-8498



noncompliance with the Consent Decree or serious violations of Department policy, the reviewer must immediately notify their Chain of Command and ensure appropriate supervisory feedback and action. In addition, this process also encourages rewarding positive results with Supervisor Feedback Logs (SFL) and formal commendations. The Department will continue to monitor the effectiveness of its newly implemented FOB inspection process, and is working to develop and implement a formal Standard Operating Procedure (SOP).

The Monitoring Team has conducted a "look behind" to ensure the integrity of the FOB Inspection process, and the results were positive. The attention NOPD has paid to these initiatives, corrective action, and regular reinforcement through the FOB Inspection process has resulted in notable improvement in 2022 over the May 2021 SSA Audit findings in some areas. The Monitoring Team is currently conducting a spot audit of SSA incidents since the last PSAB audit period.

We will continue to monitor progress related to key deficiencies previously observed with respect to documentation of stops (including timely submission of the correct documentation), legal basis documented for all searches (especially for pat downs), reasonable suspicion/probable cause to stop (including articulating the legal basis in reports), inconsistencies between BWC and documentation, evidence not being documented as being submitted timely to Central Evidence and Property, Miranda issues, and close and effective supervision of the Department's stops, searches, and arrests. We will also be reviewing additional elements of SSA compliance including supervision, DA refusals, and search warrants.



## XI.     CUSTODIAL INTERROGATIONS

Following a number of Monitoring Team audits in 2019, responsibility for custodial interrogation audits was transitioned to PSAB. The most recent PSAB audit reports (specifically the Custodial Interrogations and Interviews Audit, published on April 6, 2022 and covering September 2021 to February 2022; and the Custodial Interrogations and Interviews Audit published on October, 26 2022 and covering March 2022- August 2022) show improvement in the level of compliance, leading to overall compliance scores above 95%, although some individual district scores for some requirements are significantly below 95%, which indicates some slippage. Additionally, both reports show the overall score for the Custodial Interview Log check at 92%. For compliance scores below 95%, NOPD has taken appropriate corrective action.

In November 2022, the Monitoring Team conducted its first audit since the audit responsibility was transitioned to PSAB. The November 2022 audit found 100% compliance (across all relevant paragraphs of the Consent Decree) in all Districts, except for District 7, which was unable to provide any evidence of compliance. For the months of May-October 2022, District 7 entered no interrogations into the electronic custodial interrogation log. Further, District 7 was unable to provide any recordings because the L-3 recording system memory was full and the system was unable to record or retrieve recordings. In short, none of the recordings (if any exist) were available to be reviewed by the Monitoring Team.[15]

The Monitoring Team is encouraged by the 100% compliance rates for Districts 1-6 and District 8. The inability to demonstrate compliance in District 7 is concerning, however. Not only was it non-compliant when PSAB audited, but District 7's failure to electronically log and record custodial interrogations apparently went unnoticed for at least six months, and the issues were not discovered by PSAB during its audits nor by any District 7 supervisors, who are required to review the custodial interrogations to fulfill their supervisory obligations.

---

[15]       NOPD takes issues with the Monitoring Team's findings regarding the 7th District. According to NOPD, "although the Monitors were not able to access recordings on the day they visited the Seventh District, the recordings do exist. Rather the Lieutenant who met with the member of the monitoring team was not able to access them at the moment in time he visited the station. To report that these recordings did not exist creates the false impression that NOPD is not recording interrogations. This is patently untrue." First, the Monitoring Team is not suggesting the recordings do not exist. We simply find that NOPD was unable to demonstrate compliance with its Consent Decree obligations as it is its obligation *and burden* pursuant to Consent Decree paragraph 486. Moreover, it was not just the recordings that were unavailable. Our in-person audit also found that 7th District personnel could not provide any of the Custodial Interrogation logs of the type maintained by the other NOPD districts. NOPD has represented that it has located the previously-unavailable logs and videos, which the Monitoring Team will confirm on our next onsite audit.

February 24, 2023
www.consentdecreemonitor.com



      The Monitoring Team will continue to oversee PSAB's audits and also conduct its own spot-check audits to verify PSAB's scores and process.



## XII.    PHOTOGRAPHIC LINE-UPS

This is also an area in which PSAB's audits and the Monitoring Team's most recent audit have demonstrated compliance slippage. Similar to custodial interrogations, following a number of Monitoring Team audits in 2019, responsibility for photo line-up audits was transitioned to PSAB. In November 2022, in parallel with the custodial interrogation audit, the Monitoring Team conducted its first audit of photo line-ups since the audit responsibility was transitioned to PSAB at the end of 2019. The findings from the November 2022 audit are summarized in the following table:

| UNIT | Number of Lineups | ¶171 | ¶172 | ¶173 | ¶174 | ¶175 | ¶176 |
|------|-------------------|------|------|------|------|------|------|
| D1 | 10 | 70% | 80% | 70% | 80% | 60% | 80% |
| D2 | 7 | 100% | 100% | 100% | 100% | 43% | 100% |
| D3 | 8 | 100% | 100% | 100% | 88% | 100% | 100% |
| D4 | 20 | 90% | 90% | 90% | 90% | 90% | 90% |
| D5 | 7 | 100% | 100% | 100% | 57% | 85% | 100% |
| D6 | 10 | 100% | 100% | 100% | 100% | 90% | 100% |
| D7 | Unknown | ** | ** | ** | 0% | ** | ** |
| D8 | 10 | 100% | 100% | 100% | 100% | 90% | 100% |
|  |  |  |  |  |  |  |  |
| **District unable to provide evidence of compliance* The highlighted sections did not achieve at least 90% compliance.* |  |  |  |  |  |  |  |

The Monitoring Team found several individual district scores were significantly below 90%, highlighted in the chart above, which shows slippage. Additionally, as with custodial interrogations, District 7 was unable to provide any evidence of compliance for photo line-ups for June-October 2022. District 7 again was unable to provide the Monitoring Team with an accurate log of photo line-ups and was unable to provide any recordings because the L-3 recording system memory was full and the system was unable to record or retrieve recordings. NOPD has informed the Monitoring Team that it has taken meaningful corrective action to bring District 7 into compliance with its Consent Decree obligations. The Monitoring Team will be assessing the impact of those corrective actions over the coming weeks.

NOPD's reports show similar issues. While NOPD reports an overall compliance score of close to 95%, that overall score masks non-compliance on individual requirements at the district or unit level as low as 65% with several in the 70 to low 80% range, which illustrates the limitations of aggregating individual compliance scores. Additionally, PSAB's audits indicate certain elements as not-applicable without explanation. The following table summarizes the results of PSAB's, most recent photographic lineup audit, for the period September 2021 through March 22.



**Photographic Line-up Checklist Audit By District**

Review Period: September 2021 - March, 2022

Percent of line-ups that are in compliance by requirement

| | Check-List Questions | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Homicide | Child Abuse | Sex Crimes | Overall Score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Is the item number recorded correctly in the log? | 67% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 97% |
| 2 | Is the date the line up was administered recorded in the log? | 67% | 100% | 100% | 100% | 100% | 100% | 75% | 100% | 100% | 100% | 100% | 94% |
| 3 | Is the time the lineup was administered recorded in the log? | 67% | 100% | 100% | 100% | 100% | 100% | 75% | 100% | 100% | 100% | 100% | 94% |
| 4 | Is the location in which the line-up was administered recorded in the log? | 67% | 100% | 100% | 100% | 100% | 100% | 75% | 100% | 100% | 100% | 100% | 94% |
| 5 | Is the name of the witness who viewed the line-up recorded in the log? | 67% | 100% | 100% | 100% | 100% | 100% | 75% | 100% | 100% | 100% | 100% | 94% |
| 6 | Does the log include identifying information for each photo used in the lineup? | 67% | 100% | 100% | 100% | 100% | 100% | 63% | 100% | 100% | 100% | 100% | 92% |
| 7 | Is the person who administered the line-up recorded in the log? | 67% | 100% | 100% | 100% | 100% | 100% | 75% | 100% | 100% | 100% | 100% | 94% |
| 8 | Is the person who administered the line-up different than the lead case detective? | 100% | 100% | 100% | 83% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 98% |
| 9 | Is the officer displaying the lineup NOT involved in the investigation? | 83% | 100% | 88% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 97% |
| 10 | Is the officer displaying the lineup unaware of the suspects photograph? | 83% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 98% |
| 11 | Does the report or the audio/video indicates eyewitnesses were admonished that the suspect might or might not be present in the lineup? | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | - | 100% | 100% | 100% |
| 12 | Are the photos used in this line-up filed; can you find them? | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 13 | Are all of the photos marked and maintained as evidence in the case file, if suspect selection is made? | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 14 | Do the filler photographs (those that do not depict the suspect) generally fit the witness's description of the perpetrator, if available? | 100% | 100% | 80% | 100% | 100% | 100% | 100% | 83% | 100% | 100% | 100% | 95% |
| 15 | Do the "filler" photographs (those that do not depict the suspect) resemble the suspect in significant features? | 100% | 100% | 88% | 80% | 100% | 100% | 100% | 83% | 100% | 100% | 100% | 94% |
| 16 | If the photos are filed, if you could find them, are they in color? | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 17 | Are photographs initialed as required for positive or negative identifications? | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 91% | 100% | 80% | 75% | 95% |
| 18 | If a single photo was displayed, was the use of a single photo appropriate? | - | - | - | 100% | - | 100% | - | - | 100% | - | - | 100% |
| 19 | Does a form 277 exist in the case file for this line-up? | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 20 | Did the person who administered the line-up sign the form 277? | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 21 | Is the witness' statement recorded verbatim on form 277? | 67% | 100% | 75% | 80% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 92% |
| 22 | Are the name(s) of additional person(s) in the room during the ID procedure recorded on Form 277? Or does the form document that no additional people were present? | 60% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 67% | 95% |
| | **Total** | **84%** | **100%** | **97%** | **97%** | **100%** | **100%** | **92%** | **99%** | **100%** | **99%** | **97%** | **96%** |

General Comments
ARU audited the Use of Force Level 1-3 sample list case files for the defined period, for completeness and accuracy as required by the Consent Decree.

For an explanation of the procedures and scoring system for this review, see the associated "Protocol" document.

For a list of relevant policies, contact ARU as needed.

For the audit results for each case file, see the accompanying RawData spreadsheets.

Scores below **95%** are highlighted in **red**.

As with custodial interrogations, we will support and monitor, directly and through PSAB, NOPD's efforts to correct the observed deficiencies reflected in the audit effectively and sustainably.



### XIII.   BIAS-FREE POLICING

The Bias Free Policing section of the Consent Decree requires that the NOPD agrees

> to deliver police services that are equitable, respectful, and bias-free, in a manner that promotes broad community engagement and confidence in the Department. In conducting its activities, NOPD agrees to ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, or gender identity, and in accordance with the rights secured or protected by the Constitution and laws of the United States.

While the Consent Decree contains a specific section on bias-free policing, the issue of biased policing was central to the DOJ's findings of a pattern and practice of unconstitutional policing. As the DOJ found:

> Indeed the limited arrest data that the Department collects points to racial disparities in arrests of white and African Americans in virtually all categories with particularly dramatic disparity for African-American youth under the age of 17. Arrest data provided by NOPD indicates that in 2009, the [NOPD] arrested 500 African-American males and eight white males under the age of 17 for serious offenses, which range from homicide to larceny over fifty dollars. During this same period the [NOPD] arrested 65 African-American females and one white female in this same age group. Adjusting for population, these figures mean that the ration of arrest rates for both African-American males to white males, and African American females to white females was nearly 16 to 1, […] Nationally in 2009, among those agencies reporting data, the arrest ratio of African-American youth to white youth, for the same offenses, was approximately 3 to 1.[16]

The DOJ also found troubling racial disparities with respect to use of force. For example, DOJ found, "Of the 27 instances between January 2009 and May 2010 in which NOPD

---

[16]   United States Department of Justice Civil Rights Division, "Investigation of the New Orleans Police Department," (March 16, 2011) at x.



officers intentionally discharged their firearms at people, all 27 of the subjects of this deadly force were African American."[17]

Beyond race, the DOJ found discriminatory treatment of LGBT individuals, including improperly targeting transgender women for prostitution arrests and fabricating evidence of solicitation. These women also were more likely to be charged under the state's "crimes against nature" statute. Indeed, nearly 40% of the Orleans Parish sex offender registry consisted of individuals charged with crimes against nature. The DOJ also found that the NOPD failed to protect certain groups from violent crimes, including failure to protect victims of domestic violence and sexual assault and failure to provide effective police services to individuals with limited English proficiency.

It is worth noting that eliminating all instances of bias, actual or perceived, is not reasonably achievable for any police department (or for most other professions for that matter), nor does the Consent Decree require it. Rather, the Consent Decree was structured to address documented, *systemic* practices by the NOPD that either subject marginalized communities to unconstitutional policing practices or deprive them of meaningful access to police services and protection. It is that goal that has guided the Monitoring Team since the outset of this critical project.

The Monitoring Team, the DOJ, and the NOPD have worked collaboratively in this area over the past year, and have progressed substantially toward compliance, as reflected in the NOPD's 2021 Bias Free Annual Report, which can be accessed HERE.

A key framework for the bias free policing changes has been the new policies and training approaches related to this section of the Consent Decree. The Department now has specific policy guidance prohibiting biased conduct in several policy chapters, including:

- Chapter 41.13 – Bias-Free Policing

- Chapter 41.13.1 – Interactions with Lesbian, Gay, Bisexual, Transgender, and Questioning Persons

- Chapter 41.36 – Interacting with Homeless Persons

- Chapter 42.2 – Sexual Assault

- Chapter 42.12 – Hate Crimes

- Chapter 55.5 – Disability Services

---

[17]    United States Department of Justice Civil Rights Division, "Investigation of the New Orleans Police Department," (March 16, 2011) at x.



- Chapter 55.5.1 – Communication with Persons who are Deaf or Hard of Hearing

- Chapter 41.6.1 – Immigration Status

- Chapter 1.2.4 – Search & Seizure

- Chapter 1.2.4.1 – Stops / Terry Stops

- Chapter 1.2.4.2 – Search Warrants

- Chapter 1.9 – Arrests

- Chapter 26.3 – Workplace Discrimination, Sexual harassment, and Retaliation

The Department continues to conduct training related to this area of the Consent Decree. Training is conducted annually in the Academy, In-Service, Roll-Call, Department Training Bulletins (DTB), and online related to bias free policing. This instruction has included some of the following:

- E-Learning Modules: Making the Arrest Decisions; Safeguarding Fairness in Citizen Stops

- Problem Based Learning Curriculum: Applied Problem Oriented Policing; Documenting Probable Cause; MDTS Tactics; Procedural Justice Solutions; Suspicious Person and Vehicle Stops; Field Interview Card Review; Suspicious Person and Vehicle Stops Practical Exercises.

Further, the Department's Field Operations Bureau conducts weekly inspections that focus on procedural justice, including whether officers introduce themselves; explain the reason for the stop; give subjects a chance to explain; respond to subjects' questions; are reasonably courteous; keep stops no longer than necessary; do not make offensive LGBTQ comments; and address people with their chosen pronouns. NOPD uses the results of these inspections to increase compliance through enhanced training, officer counseling, and, where necessary, officer discipline. The NOPD has LGBTQ liaisons in place, and they can be a valuable resource available for the community to voice their concerns or feedback.

With respect to one specific requirement of this section, delivering services to individuals with limited English proficiency, we are pleased to report that the Department has established a Language Access Plan (LAP) to achieve compliance with the City's



obligations under federal law and its receipt of federal funds.[18] The PSAB successfully completed an audit of the NOPD's implementation of this Plan and the Department's compliance with the LAP elements of the Consent Decree.

The Limited English Proficiency (LEP) Audit addresses Consent Decree and NOPD requirements for relevant policies and plans, accessibility of translated documents translation / interpretation and recordation of services provided, Public Integrity Bureau (PIB) records of complaints and intake forms, maintenance and accuracy of the authorized interpreter list (NOPDAI), distribution of relevant departmental policies, plans, and translated documents, training, bi-lingual officer recruitment efforts, collaboration with other LEP organizations for the expansion of services and languages served, and Orleans Parish Communications District records.

The LEP Audit is conducted on a bi-annual basis to ensure LEP services are addressed in accordance with the rights secured or protected by the Constitution and laws of the United States. The Department also provides an Annual Report.[19] This process is regulated by the New Orleans Police Department's Chapter 55.4: Limited English Proficiency Services, Chapter 42.11: Custodial Interrogations, Chapter 52.1.1: Misconduct Complaint Intake and Investigation, and the Language Assistance Plan.[20] The audit addresses Consent Decree[21] requirements under paragraphs 42, 189, 190, 191, 192, 193, 194, 266, 390, 407, and 448. The LEP audit consists of a documentation review of: CAD data analysis, the completed Authorized Interpreter Activity Forms, Recruitment and Human Resource records, PIB records, translated NOPD forms, OPCD training, NOPD policies and NOPD AI lists, records of distribution of information to NOPD personnel, and meeting notes and agendas with LEP collaborators.

The previous LEP Audit Report (including the period of September 1, 2021 - February 28, 2022) identified some shortfalls, which the Department has agreed to address:

- NOPD provided interpretation on 16 calls for service from bilingual personnel who were not certified as Authorized Interpreters for the Department.
- Members provided services through other means not approved by the Department, including Google (4 incidents), by-standers, and family/friends (32 incidents).

---

[18]     Title VI of the Civil Rights Act of 1964, as amended (42 USC § 2000d), and regulations promulgated pursuant thereto.

[19]     The complete 2021 LEP Annual Report can be viewed HERE.

[20]     NOPD Language Assistance Plan (June 2021), *available at* https://nola.gov/getattachment/NOPD/Policies/Language-Assistance-Plan-2021-English.pdf/?lang=en-US.

[21]     *U.S. v. City of New Orleans*, 2:12-CV-1924-SM-DPC Rec. Doc. 565.



- LEP related Departmental meeting notes and agenda records were not maintained.

- NOPD could not track all bi-lingual employees and personnel in the initial employment application and lacked employee profile details to do so in the Human Resources Electronic Applications.

NOPD's December 2022 LEP Audit Report includes the period of March 1, 2022 - August 31, 2022. This audit noted additional efforts needed to determine and resolve potentially disparate response times for LEP vs. non-LEP calls for service.[22] NOPD has identified a need for continued training, Roll Call specific topics, LEP spot checks, and conducting qualitative interviews intended to allow the Department to gain further perspective on steps conducted from the Orleans Parish Communication District, the time the LEP call reaches dispatch, to the officer arriving on scene. In addition, three additional Authorized Interpreters were certified (NOPD continues to have approximately 31 NOPDAIs) during the most recent LEP audit reporting period. There was a gap in language assistance between the cyberattack and when the current Voiance came on line; use and implementation is still underway. Additionally, NOPD officers now have more access to phones that have the VOIANCE app on it, which should also help NOPD maintain its ability to provide authorized interpretations.

The achievements described above represent only a few examples of the ongoing transformation of the NOPD since the outset of the Consent Decree. Overall, while NOPD's own audit reports show more work needs to be done, the Department's ongoing commitment to and implementation of bias free policing centered policies, training, programs, and accountability systems has been remarkable.

---

[22]     The Monitoring Team recognizes that NOPD does not control the Orleans Parish Communications District, which operates the New Orleans 911 system. Accordingly, NOPD does not control how long it takes for an LEP caller to reach a 911 dispatcher.



### XIV.  POLICING FREE OF GENDER BIAS

In November 2022, the Monitoring Team conducted "spot check" audits of child abuse cases, sex crimes cases, domestic violence investigations, and domestic violence patrol responses. PSAB had conducted audits throughout 2022, but they primarily captured incidents that took place in 2021. Generally, our spot checks, which included data from 2022, found very high levels of compliance in these areas, and are discussed in more detail in the following sections.

### A.  Child Abuse

The Monitoring Team randomly selected nine cases investigated by Child Abuse detectives in 2022 to determine whether the information included in the investigation file was consistent with the Consent Decree requirements. Overall, we found the Child Abuse Unit is well-supervised and the investigations are sufficient to meet the requirements of the Consent Decree.

### B.  Sex Crimes

The Monitoring Team randomly selected ten sex crimes cases investigated by the Special Victims Department detectives in 2022 to determine whether the information included in the investigation file was consistent with the Consent Decree requirements. Overall, we found 100% compliance for the cases reviewed. Generally the case files were in good order and contained sufficient information to meet the requirements of the Consent Decree.

### C.  Domestic Violence Investigations

The Monitoring Team reviewed cases investigated by Domestic Violence Unit (DVU) detectives in August and September 2022 to determine whether the information included in the investigation file was consistent with the Consent Decree requirements. Overall, we found 100% compliance for the cases reviewed. The files had a well-documented file check list with required reports, audio recordings, evidence collection, warrant copies and criminal history checks. The follow-ups were completed within the Consent Decree guidelines and the supervisory sign-offs were timely. We note the DVU continues to be well-supervised and the case files we reviewed were in excellent order.

### D.  Domestic Violence Patrol Responses

The Monitoring Team conducted a spot-check audit of the NOPD's patrol response to 66 randomly selected Domestic Violence incidents from July 2022 through September 2022. Overall, we found the officers to be patient, empathetic, and diligent about documenting domestic violence incidents and making necessary arrests or obtaining



warrants. Of the reports we reviewed, only one had deficiencies, and it will be addressed by NOPD supervisors.

Overall, the Monitoring Team found the response to DV by patrol officers within Consent Decree requirements.

Notwithstanding the commendable actions by responding NOPD officers, PSAB conducted an audit in May 2022, which, while finding an overall score of 96% for DV Patrol response, also identified five important deficiencies.[23] Based on PSAB's audit findings, PSAB and the Monitoring Team provided a number of recommendations to remedy the identified non-compliances. PSAB reported it provided feedback to all personnel after the May 2022 audit by roll-call training and "Employee All" e-mails. Notably, the Monitoring Team did not observe the same level of deficiencies noted in the May 2022 audit when we conducted the November 2022 spot-check review. This suggests the recommendations and corrective actions may be working, and the Monitoring Team would like to commend NOPD for the ongoing progress in this area.

An ongoing major concern, however, is unduly long response times, which correlates to a large number of responses where the victim and/or the suspect was gone by the time NOPD arrived on the scene ("GOAs"). This is a problem that impacts many areas of NOPD's Consent Decree compliance. For example, of the domestic violence incidents we reviewed in November 2022, 27% were cleared as GOA. Similarly, we continue to look into a concerning NOPD practice of downgrading certain calls for service from Code 2 (emergency) to Code 1 (non-emergency) seemingly in order to avoid contributing to lengthy Code 2 response times. We are working with NOPD to improve response times and minimize improper downgrading of calls.[24]

We continue to closely monitor patrol officer and supervisor handling of domestic violence calls and will be working closely with NOPD to develop a plan to ensure these calls are consistently handled appropriately.

---

[23]     The identified deficiencies related to (i) recording whether children witnesses were separated, (ii) conducting a risk assessment, (iii) referring victims to NOFJC, (iv) providing victims appropriate forms and brochures, and (v) noting signs and symptoms of strangulation.

[24]     Distinct from reviewing the downgrading of calls for service from Code 2 to Code 1, the Monitoring Team also continues to assess whether calls are not improperly downgraded from one signal (e.g., domestic violence) to another (*e.g.*, domestic disturbance). We observed no indication of downgrading to a different signal when the call was initiated as DV-related. It also is commendable that 23% of the calls we reviewed were upgraded to DV, which requires police to complete a report.



## XV.    COMMUNITY ENGAGEMENT

The Community Engagement section of the Consent Decree requires the NOPD to promote and strengthen partnerships within the community, and to engage constructively with the community, to ensure collaborative problem-solving and ethical and bias-free policing, and to increase community confidence in the Department.

Despite the significant progress the Department has made with respect to community engagement since the outset of the Consent Decree, NOPD's most recent 2021 Community Engagement Annual Report, 2022 Quarterly Reports, and Corrective Action Plan (May 2022) highlight the fact that many challenges still exist in complying with all of the requirements of the Consent Decree. Through internal and external audits and reviews of the Community Policing Forms (CPFs), NOPD quarterly reports, and Performance Standards and Accountability Standards (PSAB) scorecards, the Monitoring Team has observed the Department's challenges in fully and consistently implementing its written policy, properly categorizing its community policing activities, and consistently applying its community policing tracking tools. This has been especially apparent for the categories of problem solving, crime prevention and trends, public meetings, tracking and documenting district community policing plan efforts, and supervision.[25]

Personnel turnover has hampered NOPD's implementation of its community engagement policies.  Additionally, the most recent NOPD report of its community policing activities is overdue, hampering our ability to assess compliance. To help NOPD work through this significant hurdle, the Monitoring Team continues to collaborate with the NOPD, the City, and the DOJ to provide technical assistance; convene regular NOPD community engagement working group meetings; re-energize the City's Police Community Advisory Board (PCAB) program that had languished for several years; and consider and review NOPD's departmental plans, documents, and community policing compliance and reporting.

In addition to the foregoing, in order to demonstrate compliance with the Consent Decree, the NOPD also needs to devote further attention to fully implementing its geodeployment plan and ensuring it assigns officers in a manner designed to ensure all neighborhoods have regularly assigned officers familiar with the area. The Department also needs to implement mechanisms to measure officer outreach and support to a broad cross-

---

[25]    In its review of PSAB's early 2022 community engagement audit, the Monitoring Team not only noted shortcomings in the Department's underlying community engagement efforts, but also noted shortcomings in PSAB's audits of those efforts. For example, PSAB identified police activities as good examples of community oriented problem solving that clearly had no relationship to community oriented problem solving at all, for example, pulling over a car for speeding. While PSAB's audits generally have been thorough and careful, this early 2022 audit was concerning to the Monitoring Team and further highlighted the work that needs to be done in this important area.



section of community members, maintain its assessments of the effectiveness of its community partnerships and problem-solving strategies, and report these findings publicly. Through ongoing data collection and reviews, in the future we expect to see the Department tracking, assessing, and reporting on geodeployment deployment quarterly. These reviews will serve as key management and accountability tools for determining whether supervisors enable geographical deployment, officers spend time in their assigned sectors, and whether deviation reasons are appropriate.

We will continue to monitor the NOPD's operations, performance, and outcomes related to this section of the Consent Decree and work with NOPD to assess community engagement and address any deficiencies identified. The Monitoring Team also assesses compliance in the area of community oriented policing through a Consent Decree-required biennial community survey. The biennial survey was postponed in 2020 and 2022 due to public health precautions related to COVID-19.



## XVI.    RECRUITMENT

The debilitating attrition and low numbers of new officers NOPD is experiencing highlights the importance of an effective recruitment program. Based on media reports and comments we received directly from community members and NOPD officers, it is clear that the effectiveness of NOPD's recruitment program is of great public concern. The Monitoring Team and Judge Morgan share those concerns. The data concerning NOPD's recruitment efforts demonstrate a need but also an opportunity for improvement. The City and NOPD are working to improve the recruitment process and its results. This effort includes working with the New Orleans Police and Justice Foundation (NOPJF) to expand its involvement in recruiting NOPD officer candidates.

The Monitoring Team is working closely with the City, NOPD, and other community stakeholders to achieve much needed improvements as expeditiously as feasible. This working group has been addressing significant roadblocks in terms of clearing background checks, low yield of NOPD-employed recruiters, and insufficient coordinated management of the process to usher potential candidates into jobs, all of which raise questions regarding the current state of NOPD compliance with the recruitment requirements of the Consent Decree. Even so, the NOPD has made progress since August 2022, including the hiring of a new HR Director, approval of additional civilian positions within the NOPD, and a re-energized unified effort among the NOPD, the CAO's office, the Civil Service, and the NOPJF to address the NOPD's recruitment problems.

To address attrition, the Monitoring Team also has worked closely with the City and the NOPD to ensure officers are provided the resources they need to do their jobs — and to ensure the City meets its obligations under paragraph 12 of the Consent Decree (and to the public generally). The Monitoring Team is pleased to report that this collaborative effort has achieved significant recent results, including a focused effort by the City to repair dilapidated NOPD buildings, purchase new police cars, upgrade technology, hire additional civilian personnel to reduce the burden on officers, and generally ensure officers have the supplies they need to do their jobs. The Monitoring Team thanks City CAO Gilbert Montano for taking the lead on this critical project. At the time of this report, PSAB is conducting a Recruitment Audit and we look forward to reviewing its findings and reporting to the public.



## XVII.    ACADEMY AND IN-SERVICE TRAINING

Over the course of the Consent Decree, the Monitoring Team has worked closely with NOPD on developing its curriculum and training materials. We continue to be involved in changes and updates to training materials and training schedules. In November 2022, the Monitoring Team conducted a *spot check* audit on nine separate Academy audit protocols that focused upon training credentials, records management, and adherence to the Annual Master Training Plan. With a few minor exceptions, the findings confirmed the Academy follows the policies and procedures outlined in the Academy's Standard Operating Procedures and other training manuals. In the first quarter of 2023, we expect to conduct a full audit of NOPD's Academy and in-service training to assess compliance.

This past year, the Academy lost its Curriculum Director, Dr. Dierdre Magee, who played a leading role in raising the quality of NOPD's education and training material and methods. Her departure is certainly a loss to the Department. Nevertheless, personnel turnover is an inescapable reality for any organization and, by the same token, sustained compliance can never depend on a single individual. We expect to see the Academy fill this important vacancy as soon as feasible.



## XVIII.  OFFICER ASSISTANCE AND SUPPORT

Earlier this year, we reported that subsequent to finding this section was meeting the Consent Decree's requirements we observed significant backsliding in this area. We observed:

> The Department has also missed opportunities to expand its focus on officer health and wellness. The current officer assistance program is run by a phenomenally committed officer (Chris Abbott) who for years has done excellent work with skeletal resources. Through Mr. Abbott's (and previously Ms. Tebo's and others') efforts, NOPD officers have been afforded a credible health & wellness program. Nonetheless, we recommend NOPD renew its focus on this area and implement several improvements.

We further commented:

> We cannot over-emphasize the importance of officer health & wellness. Police officers across the country suffer from mental depression, suicide, alcoholism, sleep deprivation, family problems, and other mental health issues above national averages. These problems impact not only the officers; they impact the officers' families and the community at large. Mentally healthy officers are less likely to make mistakes, engage in excessive force, commit misconduct, leave the profession, or get injured on the job. Physically healthy officers are less likely to take sick days, get injured on the job, or develop mental health problems. The entire New Orleans community has a vested interest in ensuring their officers are mentally healthy, physically healthy, well rested, and are given adequate professional resources to seek help when they need it.

Simply put, NOPD has not consistently been meeting its Consent Decree obligations to "offer a centralized and comprehensive range of mental health services that comports with best practices and current professional standards." NOPD has committed to address the deficiencies and vacancies we observed.

One additional point needs to be raised here. The loss of OAP staff apparently was not noticed by NOPD leadership and was not flagged by PSAB audits. In fact, PSAB's June 2022 audit of OAP wrongly identified key elements of the agreed-upon audit protocol "not applicable." It appears PSAB employed the term "not applicable" or "compliant" in cases it



should have found non-compliant. The "not applicable" findings distorted PSAB's conclusions and painted a rosier picture than actually existed within OAP at the time.[26]

---

[26]     NOPD disagrees with the Monitoring Team's criticism regarding OAP backsliding. While NOPD does not disagree that it lost members of its OAP team in 2022, that it never informed the Monitoring Team of the loss, and that PSAB never uncovered the loss in its routine compliance audits, NOPD takes issue with the Monitoring Team's criticism of PSAB marking multiple areas "not applicable." According to NOPD, PSAB marked areas "not applicable" because there "was no activity regarding the audit questions during the particular audit period." However, there was "no activity" because PSAB didn't have anyone in the position to perform the activity. Not undertaking a required activity because you lack the staff to do so does not render the activity "not applicable." It renders it not performed.



## XIX.    PERFORMANCE EVALUATIONS AND PROMOTIONS

The Performance Evaluations & Promotions section of the Consent Decree requires the NOPD

> to ensure that officers who police effectively and ethically are recognized through the performance evaluation process, and that officers who lead effectively and ethically are identified and receive appropriate consideration for promotion. NOPD shall further ensure that poor performance or policing that otherwise undermines public safety and community trust is reflected in officer evaluations so that NOPD can identify and effectively respond.

No transformation of any complex organization can be sustained without an effective process of identifying, evaluating, and selecting its future leaders. In the NOPD, this is done through a multi-prong performance evaluation and promotions process. Thanks to a concerted joint effort by the NOPD, the DOJ, and the Monitoring Team, NOPD has made steady improvements in this area since the outset of the Consent Decree. Determining whether the Department is conducting fair and effective performance evaluations will be determined in the Department's forthcoming annual performance evaluation process, and the anticipated audit of the 2022 performance evaluations and promotions.

### A.    Performance Evaluations

To remedy the past inadequate (and often non-existent) process of evaluating officers and supervisors, the Consent Decree directed NOPD to overhaul its performance evaluation process and develop a process that meaningfully evaluated every employee in the following areas:

- Community engagement and communication with the public as appropriate to assignment;

- Use of community-policing and problem-solving strategies as appropriate to assignment;

- Civilian commendations and complaints;

- Disciplinary actions;

- Compliance with policies on usage of sick leave and other leave;

- Compliance with policies on secondary employment;



- Safety (e.g., POST officer safety standards and vehicle operations);

- Training;

- Report writing; and

- Decision-making skills.

Beginning in 2018, NOPD devoted significant time, effort and resources to improving and strengthening its performance evaluation processes.

*In 2018*, in an effort to rethink the way it evaluates and promotes officers and supervisors and develop a system that captured each of these elements in a meaningful way, the Department committed to wholly restructure its performance evaluation process. This effort resulted in a reworked performance evaluation process and internal audit tool. At the request of the Monitoring Team, the Department also implemented a process through which officers themselves conduct an initial self-evaluation to help inform a supervisor's evaluation, a process used extensively in the private sector and other law enforcement agencies. The supervisors may not substitute the self-evaluation for the supervisor's own independent judgment, but may look to that self-evaluation to help identify events in each officer's job performance that took place over the past 12 months.

*In 2019*, the Department first "beta tested" its new personnel evaluation process with unsatisfactory results. While the tool itself was well designed, the supervisors conducting the evaluations failed to put in the time necessary to record meaningful information. Many supervisors, for example, failed to list a single specific example of officer behavior supporting their evaluations. (The evaluation tool requires supervisors to provide specific examples supporting their evaluations to ensure the evaluations are based on facts and not guesswork or bias.) The NOPD set about to provide additional guidance and training to its supervisors.

*In 2020*, the Monitoring Team continued to provide technical assistance in the area of Performance Evaluations. In late 2020, PSAB conducted an audit of supervisor performance evaluations and concluded that supervisor evaluations were deficient in numerous aspects. The audit found troublingly low rates of compliance in multiple areas. The Monitoring Team reviewed and verified the findings of the 2020 PSAB audit. The findings indicated that NOPD needed to focus on improving evaluations in the areas of report writing, decision making, safety, community engagement, and problem-solving narratives. At the time, we made the following recommendations, including:

- NOPD supervisors (and PSAB) (a) should focus more on pattern identification to ensure compliance with Consent Decree paragraphs 313 and 319 (g), and (b) should implement supplemental training in this area.



- All supervisors of the rank of lieutenant through the deputy chiefs should receive additional training for the proper completion of the community engagement portion of performance evaluations.

- NOPD should consider reflecting the failure to complete the self-assessment in the officer's evaluation.

- Three sections of the performance evaluations need additional training for the supervisors completing the evaluations and for the auditors assessing the completed evaluations. Those three areas are section 4b (problem solving), 8b (subordinates' areas of growth and challenges), and sections from 10.1 through 10.4 (sections completed for all supervisors being evaluated).

- NOPD should provide expanded training for auditors to adequately evaluate community engagement.

- NOPD should provide additional training on how to audit Sections 4b (problem-solving), 8b (areas of growth), and Sections 10.1 through 10.4.

*In 2021*, NOPD completed a number of corrective actions, including enhancing training to PSAB auditors, new supervisors, veteran supervisors, and officers to promote sustained compliance in the area of performance evaluations. NOPD also now has a well-developed internal auditing protocol to measure and enforce ongoing adherence to the requirements of the Consent Decree. DOJ and the Monitoring Team requested that NOPD continue training supervisors in the use and monitoring of Insight. Additional training also was recommended to ensure PSAB auditors were further trained on Performance Evaluations and Promotions ("Supervision Binder") auditing processes.

In response, NOPD conducted District-level remedial trainings in the Fall of 2021 and early 2022 that highlighted "common mistakes," "how-tos" using internal self-evaluation forms, Q & A, and specific compliance/ noncompliance examples related to effective and successful completion of performance evaluations. The Monitoring Team observed this training. We also recommended that NOPD supervisors receive progress alerts during the rating period as reminders to complete evaluations before the deadline. To ensure supervisors complete their subordinates' evaluation in a timely manner as the deadline approaches, NOPD has agreed to have PSAB email alerts to the Department's District supervisors and Command Staff to address pending evaluations at various stages of the rating period. In addition, PSAB continues to encourage officers' use of Self Evaluation forms to support NOPD's performance evaluations process.

*In April 2022*, PSAB issued its 2021 Performance Evaluation Audit, which showed an overall composite score of 82%. Notably, while the performance evaluation scores still



fall short of compliance, the overall score improved significantly over the prior year – increasing from 69% (in the 2021 audit report) to 82% (in the 2022 audit report).

We have observed significant improvement in the NOPD's performance evaluations internal audit process, along with promising upward trends in its audit findings across many key areas. The Monitoring Team confirmed that the NOPD evaluation forms are appropriate for their intended purpose. They include the information required by the Consent Decree. Officer submissions of self-evaluations, which assist supervisors prepare evaluations, continues to increase but there is need for further improvement. Although some self-assessments have proven inadequate, many have provided useful information to their superior officers during the completion of the annual evaluation. The NOPD supervisors are providing better narratives than they did when the new performance evaluations first were introduced, and those narratives, in most cases, have provided useful examples of performance to justify the rating. In addition, the PSAB auditors have provided accurate assessments as to whether the ratings and explanations were adequate to demonstrate compliance with Consent Decree requirements in most areas.

In sum, the NOPD performance evaluations have improved steadily from year to year. Nevertheless, there needs to be increased focus by supervisors (all the way up the chain of command) on preparing and reviewing performance evaluations to ensure accuracy and accountability, as well as to provide meaningful feedback to their direct reports to help with their professional development. The Monitoring Team expects improvement will result from increased supervisory oversight at every level. We expect to monitor and observe the NOPD's continued improvement in evaluating performance in the areas of report writing, decision making, safety, community engagement, and problem-solving narratives, although compliance findings in these areas now generally show steady improvement. We also expect we will continue to see continued improvement in the quality and completeness of performance evaluations.

## B.    Promotions

For years, the Monitoring Team has criticized the NOPD for failing to adopt a holistic promotions process that meaningfully assesses a promotions candidate's leadership skills before putting him or her in a supervisory position. As we previously reported, the Department now supports a more holistic review of promotional candidates, supported by the efforts of the Department's Supervision Initiative Working Group, guidance from the City's Chief Administrative Officer ("CAO"), and input from the NOPD.

The Department's current promotions policy establishes minimum guidelines for promotion within the Civil Service classifications of Senior Police Officer through Police Captain, and outlines the responsibilities of the Promotions Committee. The new policy (designated Chapter 34.2) is thoughtful and compliant with the Consent Decree. When



assessing a promotions candidate's eligibility, several factors now must be considered, including the following:

- effective use of community policing strategies,

- number of complaints,

- number and circumstances of use of force,

- disciplinary history,

- problem solving skills,

- interpersonal skills,

- education,

- specialized training,

- departmental integrity measures,

- attendance, and

- performance evaluations of subordinates.

The Monitoring Team and the Department of Justice worked closely with the NOPD over many months to hone this process, providing extensive technical assistance over the course of multiple early iterations of the promotions policy. While the process was arduous, it was worthwhile as the result, as noted above, is far improved from the prior test-driven approach The promotions process now incorporates a healthy balance of written testing, job experience reviews, discipline reviews, and personal interviews.

In November 2022, the Monitoring Team conducted a "spot check" audit of NOPD's promotion files to determine if NOPD followed the approved guidelines set out in its policy (Chapter 34.2). The Monitoring Team randomly selected one candidate from each rank (Senior Policy Officer, Sergeant, Lieutenant, and Captain) and reviewed the supporting materials for his or her 2022 promotion decision. The Monitoring Team found NOPD followed the Chapter 34.2 Promotions and Promotion Committee guidelines for all four of the promotional processes we spot checked.

We would be remiss, however, if we did not note that there is room for further improvement in this area. The current promotions structure gives NOPD evaluators (usually Deputy Chiefs) far too little flexibility to delve into areas of concern, ask probing questions, and react in real-time to concerning candidate comments. For example, if a



candidate for promotion answers one of the set interview questions in a manner that conflicts with a prior answer, the interview panel is not permitted to probe into the disconnect. Instead, the panel is constrained to ask only pre-established follow up questions, such as "tell me more." This artificial constraint reduces the effectiveness of the interview process.

Likewise, the overly structured nature of the process makes it very hard for NOPD evaluators to probe into areas publicly known to the Department, but not revealed by the candidate in the interview. For example, if an officer is known to have been disciplined multiple times for a given transgression, the evaluators cannot ask the candidate to discuss what he/she learned from the experience – if anything – in his/her interview. And they cannot ask how a given answer comports with the candidate's disciplinary record. This again creates an artificial and unnecessary constraint that unreasonably limits the effectiveness of the interview process.

In short, the current promotions process reflects a *significant* improvement over the Department's prior process. But it would benefit from further improvement. We are hopeful the Department will conduct a meaningful "after action" assessment of the current process following completion of its recent promotions and seriously consider further enhancements to the current process.



## XX.  SUPERVISION

The Supervision section of the Consent Decree requires that the NOPD and the City agree to "ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide the close and effective supervision necessary for officers to improve and grow professionally; to police actively and effectively; and to identify, correct, and prevent misconduct." Since the outset of the Consent Decree, the Monitoring Team has noted the Department's slow progress in this critical area.

### A.  Supervision Generally

To attempt to address a number of acknowledged deficiencies in the area of Supervision, Superintendent Ferguson formed a Supervision Initiative Working Group in 2020. This effort brought significantly more attention to this critical area, and yielded many positive results.

The Department's efforts to implement the recommendations of the Working Group, however, have been less than robust, and the Monitoring Team continues to see examples of the lack of close and effective supervision. The recent scandal involving officers violating NOPD and OPSE secondary employment rules was, at its heart, a supervision failure. The loss of significant personnel in the Officer Assistance Program without a prompt solution was a supervision failure. The loss of PIB quality assurance personnel without a prompt solution was a supervision failure. The compliance slippage in the area of Custodial Interrogation and Photographic Lineup in the 7th District was a supervision failure. There are more examples, including a wholesale lack of supervision of NOPD officers assigned to the Mayor's Executive Protection detail.

Similarly, we would be remiss if we did not note a lack of follow-up by the NOPD in certain areas relating to Supervision. For example, one of the commitments NOPD undertook in 2020 was to develop a *Serious Discipline Review Board* that would operate like the existing Use of Force Review Board. The SDRB was to be made up of Department Deputy Chiefs and was to review the accountability of supervisor for actions of subordinates; look for patterns and trends across matters, bureaus, and districts; and seek to identify opportunities for further structural improvements in terms of policies, training, and internal controls. The SDRB was a very encouraging innovation to promote close and effective supervision. The Department failed to hold a single SDRB session in 2022, however. The Monitoring Team and PSAB will be assessing the extent to which each of these innovations has been implemented and is functioning as promised.

This is not to say the Department has not made progress in this area or that the Department doesn't have many terrific supervisors. It has and it does. Nor is it to suggest that the Department has not satisfied many of the specific paragraphs of the Consent Decree. It has. But more work needs to be done in order to achieve the Consent Decree's



overarching requirement that supervisors provide "close and effective supervision necessary for officers to improve and grow professionally; to police actively and effectively; and to identify, correct, and prevent misconduct." CDE at XV.

B.    **Insight**

The Monitoring Team and the DOJ have devoted significant time supporting and tracking the NOPD's efforts toward full deployment of a meaningful early warning/early intervention system, and its progress toward substantial compliance with the requirements of the Consent Decree in this area. Key improvements and notable progress have included development of a data entry protocol for the Department's early warning system, the implementation of frequent internal PSAB reviews related to the status of Insight compliance with the Consent Decree, weekly working meetings with the parties and NOPD related to the status of ongoing IT-related tasks, and ongoing technical assistance from the Monitoring Team. Notwithstanding these improvements, additional progress is necessary for Insight to function effectively as an early warning system.

An effective EWS must meet two requirements: (1) accurate data entry, and (2) effective use of the data. Previous audits conducted by the Monitoring Team found several Insight elements were missing data and was limited use of the data when available. Following an October 2021 Monitoring Team audit, PSAB made many changes to Insight. PSAB also agreed to conduct six monthly audits to improve the Department's internal processes, data collection, and data entry that feed into Insight. The Department has not consistently maintained monthly audits of Insight, however, and those audits PSAB did conduct continued to show deficiencies.

Throughout 2022, the Monitoring Team conducted independent reviews and audits of NOPD's compliance with the Consent Decree requirements related to Insight data entry and use, and Supervision more generally. During these reviews and audits, the Monitoring Team found PSAB and NOPD personnel to be candid about the issues they have faced while trying to ensure all Insight data are accurate. An example includes PIB's failure to enter 2022 data that should have fed into INSIGHT, causing a significant gap in available information (and a consequent gap in the usefulness of Insight itself). PSAB continues to exhibit a commitment to correcting problems to ensure future data accuracy. The NOPD and the Monitoring Team jointly will continue to audit the integrity of all Insight data. Moreover, the Monitoring Team recommends PSAB continue to conduct monthly audits until the accuracy of each performance measure is at least 95%.

Of course, even if the data were available, it is useless if supervisors and leaders are not well-trained in its use. To that end, the Monitoring Team is working with NOPD to develop enhanced supervisor training and informational bulletins focused on the capabilities and proper use of the Insight early warning system. Here again, the Monitoring



Team will conduct reviews during the Sustainment Period to ensure NOPD follows through on its training commitment.

One final point regarding Insight is worth mentioning here. Identifying officers in need of an early intervention reflects only half the risk-reduction equation. Upon identifying an at-risk officer, the Department then must provide a meaningful intervention tailored to the identified risk. DOJ described it this way back in 2011: "Interventions developed based on early warning system data should be tailored to the specific problem presented, and the intervention should be monitored and refined as necessary until the problem is resolved." As the Insight system is not fully operational, the Monitoring Team cannot yet evaluate the quality and effectiveness of the Department's Insight-prompted interventions.

### C.    Supervision Conclusion

As noted above, NOPD has struggled in this area since the outset of the Consent Decree. Constitutional policing requires "close and effective" supervision. Certainly, every element of the Consent Decree has a supervision component. The Supervision section of the Consent Decree specifically explains what close and effective supervision requires in Paragraph 306. Additionally, the Consent Decree dedicates 25 paragraphs to this section. Other sections of the Consent Decree identify additional responsibilities for supervisors, like reviewing and addressing deficiencies in stops, searches, and arrests. There can be no questioning the importance of this topic. A police department is built upon the principle of close and effective supervision. Without it, all other efforts fail. NOPD still has significant work to do in this area.



## XXI.    SECONDARY EMPLOYMENT SYSTEM

Earlier last year there were media reports that some NOPD officers were violating the rules concerning secondary employment, also known as details. The Monitoring Team also received these allegations directly. The violations fell into two categories, (a) billing for secondary employment that the officer did not perform (or, alternatively, billing NOPD for work the officer did not perform because he/she left work early to travel to a detail) and (b) working in excess of 16.49 hours within a 24 hour period, on-duty and detail work combined. (Consent Decree paragraph 365.) Violations of the daily work limits were pervasive but the violations ranged from minimum to severe. As has been publicly reported, several officers suspected of billing without working are under criminal investigation. We also observed that the timekeeping systems allowed for the possibility that officers would be paid a detail even though they were traveling to the detail. The weakness was corrected by changing the OPSE timekeeping system to require a 15 minute buffer between logging out of NOPD time and being paid for detail time.

With regard to officers who violated the daily hour limit, investigation by PIB, which was monitored by the Monitoring Team and the IPM, revealed that the more minor violations could have resulted from confusion concerning how the daily limit should be calculated. Officers whose violations could be attributed to this confusion were counseled. Those whose violations could not be reasonably explained by this misunderstanding have been administratively disciplined. The Monitoring Team has reviewed the disciplinary process.

Investigation into how these violations occurred revealed the cause to be in part that the OPSE and NOPD payroll systems operated independently. Thus, neither system was able to detect and report daily work limit violations or overlaps (e.g., no time for transition or travel). The Department has committed to modifying the two systems so they can now prevent and identify violations. To date, the Department has not provided proof the modifications have taken place. The Monitoring Team is continuing its assessment of potential violations and whether the system modifications are sufficient.



## XXII.   MISCONDUCT COMPLAINT INTAKE, INVESTIGATION, AND ADJUDICATION

In November 2022, the Monitoring Team audited PIB's administrative investigations. Overall, our audit found that, as compared to the Monitoring Team's previous audit in 2019, the NOPD's compliance rate remained the same for 20 paragraphs, improved for two paragraphs, and decreased for 12 paragraphs.

A central focus of the 2022 audit was to determine whether administrative investigations are being completed within timelines prescribed by the Consent Decree and NOPD policy. Our audit revealed that an excessive number of investigations were not completed within prescribed timelines and NOPD had no justification for this noncompliance. The paragraphs related to compliance with timelines and with properly documenting disciplinary cases and decisions saw the highest rates of non-compliance. PIB attributed the backlog of disciplinary hearings and complainant notifications to the cyber-attack on the City of New Orleans in December 2019, the COVID-19 pandemic during 2020 and 2021, and staff shortages. We also learned there were ongoing vacancies in the PIB's Quality Assurance Unit. We will be working with PIB to ensure that the causes of this non-compliance are identified and remedied.

We also evaluated a sample of PIB files involving less-serious violations and the resulting dispositions to determine whether discipline is being administered unfairly, disproportionately, or excessively. In other words, whether the punishment fit the crime. We did not find evidence that discipline was dispensed unfairly, disproportionally, or excessively. We are conducting additional analyses of dispositions for indicia of unfairness, favoritism, or bias.



## XXIII.  TRANSPARENCY AND OVERSIGHT

The NOPD has made publicly available much data and many reports over the life of the Consent Decree. We will be auditing whether NOPD is in compliance with the requirement to make publicly available all NOPD audits and reports related to the implementation of the Decree. (Consent Decree ¶427) Similarly, we will be auditing whether NOPD has complied with its public meeting obligations, as set forth in paragraph 433.

As discussed above in the context of Community Policing, the Monitoring Team recognized significant community criticism in 2022 over the NOPD's and the City's lack of attention to the Consent Decree-required PCAB process. In response to these concerns, the Monitoring Team met with community members, PCAB leaders, City leaders, and NOPD leaders in an effort to assess the current state of the PCAB program. This effort revealed the City and the NOPD had not lived up to their PCAB commitments in the Consent Decree (Consent Decree ¶¶436-438). Accordingly, the Monitoring Team requested NOPD and the City re-energize this important avenue for public engagement. The Monitoring Team has been closely following the Department's and the City's efforts to address the concerns we – and the community – raised throughout 2022 related to the PCAB. We will report on the Department's and the City's progress in our next report.

We also will continue to assess the extent to which the City and the NOPD are meeting their obligation to "provide the IPM ready and timely access to the information necessary to fulfill its duties . . . and to abide by the November 10, 2010, Memorandum of Understanding between the NPD and the IPM." (Consent Decree ¶441-442)



## XXIV.  CONCLUSION

The NOPD continues to progress toward full and effective compliance with the Consent Decree's requirements. There can be no dispute that the Department is a far better one than the one described in DOJ's 2011 Findings Letter. We look forward to working with NOPD under its new leadership to complete its path to compliance. In 2023 we will continue our monitoring activities, with particular attention to those areas that are non-compliant or may have suffered some slippage, providing technical assistance and support to NOPD as needed and reporting on our work and findings to the public.



## XXV.   APPENDICES

### Appendix 1

### Key Examples of Public Questions and the Monitoring Team's Responses

*Question/Comment*. How does the City's motion to terminate the Consent Decree affect the Monitoring Team's work?

*Monitoring Team Response*. The short answer is that it does not. We continue to monitor, support, and advise the NOPD in an effort to help it achieve compliance with the Consent Decree and we will continue to do that until we are directed otherwise by Judge Morgan.

*Question/Comment*. What is the Monitoring Team's position regarding whether the Consent Decree should be terminated?

*Monitoring Team Response*. The Monitoring Team takes no position with respect to the City's motion. Our role and responsibility is to report to the parties, Judge Morgan, and the public concerning our assessment of the status of NOPD's compliance with the Consent Decree, its progress toward achieving full and effective compliance, and our efforts as Monitor. As set forth in this Report, it is our current assessment that while the NOPD continues to make progress toward achieving full and effective compliance, there remains progress to be made. Specifically, we are concerned that there has been some slippage with respect to the progress previously made in some areas. We will be closely monitoring these areas and reporting to the NOPD, the parties, the Court and the public concerning what we find.

*Question/Comment*. Who is going to monitor the NOPD when the Consent Decree comes to an end?

*Monitoring Team Response*. The Department of Justice, the NOPD, and the Monitoring Team have worked closely together over the last few years to ensure structures are in place to promote constitutional policing even after the conclusion of the Consent Decree. Within the Department, NOPD now has a strong Public Integrity Bureau (PIB) and Professional Standards and Accountability Bureau (PSAB), both required by City Regulation to be maintained following the conclusion of the Consent Decree. External to the Department, the Office of the Independent Police Monitor (OIPM) has statutory power to watch over the NOPD in a number of areas, including uses of force and community complaints. Finally, and perhaps most importantly, as a result of the Consent Decree, the New Orleans community now is far better equipped to hold the Department accountable for its actions. The data and reports now routinely made available to the public give the community a level of visibility and power it never had before. Indeed, the recent investigation into alleged misconduct and corruption in secondary employment highlights



the power of the public in holding NOPD accountable. That investigation was triggered by a community member carefully reviewing public OPSE data.[27]

*Question/Comment*. What is the Monitoring Team doing about the apparent rise in crime in New Orleans?

*Monitoring Team Response*. Sadly, crime, and violent crime in particular, is up in most every major city in the U.S. The *New York Times* recently reported, "In 2020, murders in the United States spiked more than 27 percent — the largest percentage increase in at least six decades." And murders across the U.S. went up again in 2021. According to the *New York Times*, "Those murders resulted in the deaths of thousands more Americans, and returned the U.S. to homicide rates not seen since the mid-1990s." New Orleans has not been immune from this national crime wave.

While the Monitoring Team is keenly aware of crime in New Orleans, the Monitoring Team also is keenly aware that its role is strictly limited to serving as the eyes and ears of the U.S. District Court and reporting to the public regarding NOPD's compliance with its obligations under the Consent Decree. Thus, the Monitoring Team leaves fighting crime to the police department.

That being said, the Consent Decree authorizes us to provide technical assistance to the Department and we have done so throughout the course of our work. Our team of experts has identified many practices that were not merely obstacles to constitutional policing, but also barriers to effective crime fighting. As discussed below, for example, in response to input from our team, the NOPD dismantled task forces that were not merely engaging in a pattern of unconstitutional stops, but also were ineffective in deterring crime and apprehending criminals. The NOPD is in the process of rethinking how best to deploy its officers in a closely supervised and mission-driven manner directed at identified criminal activity.

More broadly, racially biased policing, similarly diverts a police department's attention and resources from focusing on proven indicia of criminality. It also undermines the community's trust in the police, which makes civilians reluctant to provide information and evidence to the police. Interrogations or photographic line-ups that are biased can cause the guilty to escape conviction. Better data analysis, also a Consent Decree reform, provides more accurate information the Department can use to better target areas that warrant heightened scrutiny or the need to redeploy the Department's limited resources. Community engagement and problem-oriented policing can produce more and better intelligence to prevent crime and target criminal activity. The heart of the New Orleans

---

[27] *See* https://www.fox8live.com/2021/11/18/zurik-nopd-suspends-26-officers-secondary- employment-following-attention-details-investigation/.



Consent Decree is to target practices that policing experts identify as not merely unconstitutional, but also ineffective at protecting the public, preventing crime, and catching criminals.

NOPD leadership has been receptive to implementing new practices that advance its goal of making the NOPD a more effective crime-fighting organization. Indeed, NOPD has made clear it considers Consent Decree compliance its floor not its ceiling. NOPD's attitude has been if it makes sense, we'll do it. Thus, while we leave crime fighting to the NOPD, NOPD has recognized that our subject matter experts have a wealth of tested experience that can help it achieve its mission and consistently has embraced the opportunity to avail itself of that expertise.

***Question/Comment***. Are vehicle pursuits outlawed in New Orleans?

***Monitoring Team Response***. No. Like many cities across the U.S., New Orleans adopted a vehicle pursuit policy that prohibits high speed chases for non-violent offenses. This is a best practice across the U.S. in that it protects officers and community members from the catastrophic results that so often accompany high speed chases. The New Orleans community is all too familiar with the risks of unchecked high speed pursuits as this Nola.com article should remind us all. The New Orleans policy allows vehicle pursuits (approved by a supervisor) when necessary to stop the perpetrator of "a felony involving the infliction or threatened infliction of serious bodily injury or death." A carjacking at gunpoint or knife-point, for example, is a felony that would permit a vehicle pursuit, again, subject to supervisor approval and general public safety concerns. Since the first quarter of 2019, NOPD has engaged in 116 authorized pursuits, as reflected in the chart below.



*Figure 1 Source: NOPD PSAB.*

NOPD Policy 41.5 outlines the requirements of an authorized pursuit, and is available HERE.



*Questions/Comments.* Did the Monitoring Team ban task forces?

*Monitoring Team Response.* No. On 24 July 2020, the Monitoring Team issued a report highly critical of the NOPD's district-based task forces. The Monitoring Team's report identified "serious shortcomings in multiple areas relating to Task Force operations, including lack of close and effective supervision, lack of a clear daily mission, multiple inefficiencies, and poor documentation." Based upon the Monitoring Team's findings – and NOPD's agreement with those findings – the Department opted to disband the District-based task forces until adequate supervision could be assured. The Monitoring Team recommended "NOPD thoroughly evaluate whether the Task Forces are the most reasonable and effective way to meet the needs of the community, and whether the Task Forces can and should be reinstated in a manner that is mission-driven, community-focused, and fully compliant with the terms of the Consent Decree." In the event the Department concluded the Task Forces should be reinstated, the Monitoring Team recommended certain steps be taken to ensure their effectiveness, safety, and constitutionality.

*Question/Comment.* I heard a New Orleans official say the Consent Decree is costing the City hundreds of thousands of dollars per month and those costs will come to an end when the Consent Decree ends. Is this true?

*Monitoring Team Response.* No. This is not true. First, the Consent Decree is not costing New Orleans hundreds of thousands of dollars per month. It is unclear where that number comes from, but it most assuredly is not Consent Decree Costs. From January 2021 through January 2022, the Monitoring Team has cost the City approximately *$78,000 per month,* much of which was incurred providing technical assistance *at the request of the NOPD and the City.* When the Consent Decree began, the City, the DOJ, and the Monitoring Team understood that transforming the NOPD – at that time, one of the most dysfunctional departments in the country – would not be an easy or inexpensive task. The parties and the Monitoring Team expected the monitoring portion of the Consent Decree to cost the City about $164,000 per month. This amount has come down significantly as the Department has moved more and more areas of the Consent Decree into compliance. Even so, we recognize that even $78,000 is no small sum of money. However, we also recognize that cost pales in comparison to the financial cost of unconstitutional policing – a fact graphically illustrated by the City's payment of $13.3 million to settle just three Katrina-era police-related civil rights cases in 2019. And that cost doesn't even come close to matching the societal cost of unconstitutional policing.

In any event, it is important to remember why these expenses are being incurred. As the DOJ noted back in 2013, "the cost of reform, including a Monitor, exists only because of the City's failure, going back decades, to ensure that its police department respects the civil rights of its own people." The reforms implemented by NOPD since the outset of the Consent Decree – many of which no doubt cost the City money – were and continue to be



necessary to transform the NOPD into a constitutional police agency. The Department, the Mayor, and the City Council have made clear they are committed to maintaining these reforms. In fact, the City Council has legislated that these reforms shall continue by incorporating them into a City Regulation, which you can read HERE. Thus, even upon NOPD's release from the Consent Decree, these costs will continue.

*Question*. I recently heard a member of a New Orleans police association tell the news media the Consent Decree is to blame for police officers leaving the NOPD. Is that true?

*Monitoring Team Response*. The Monitoring Team has seen no evidence that officers are leaving NOPD because of the Consent Decree, which simply reflects the community's demand for a constitutional police department. The unfortunate truth is that police departments across the United States — whether or not they are implementing constitutional reforms — are having trouble recruiting and keeping officers. The Police Executive Research Forum, a law enforcement think tank in Washington, found an 18% increase in the resignation rate of police officers from 2020 to 2021. Police leaders across the country have shared similar findings from their own agencies. The police chief of Washington DC's Metropolitan Police Department recently told reporters his staffing levels are "the lowest we've had in 20 years." Hundreds of miles away, the police chief of Menasha, Wisconsin expressed similar frustrations: "When I started over 25 years ago," he told a local reporter, "I was chosen out of over 150 applicants . . . . The City of Menasha has now grown 20 percent and I actually have less officers on the road today than what we did when I started."

It is clear that agencies across the United States, whether their cities have a Consent Decree or not (and most do not), are seeing declines in recruiting, increases in departures, and increases in retirements. Notwithstanding the many possible reasons for increased officer attrition, we are confident one of the reasons is NOT the community's demand for a professional, constitutional police department. Over the course of the Consent Decree, we have spent significant time with countless officers of all ranks in New Orleans. Those officers were extremely candid with us, sharing all manner of concerns and complaints about policing in general and, earlier in the Consent Decree primarily, the NOPD in particular. Very few, however, complained about the changes brought about by the Consent Decree (with the exception of the changes to their detail system, OPSE, which, frankly, many did complain about and blame the Consent Decree for). In fact, most officers with whom we have met have been very supportive of the changes brought about by the Consent Decree. While a few officers have expressed an interest in going back to what they called the "good old days," we unapologetically say we have no problem that many of those officers have chosen to embark on a career change over the past eight years.



## Appendix 2

NOPD CONSENT DECREE MONITOR
NEW ORLEANS, LOUISIANA



September 20, 2022

File Number: 37PA-191555

Deputy Superintendent Otha Sandifer
Compliance Bureau, New Orleans Police Department
714 Broad Street
New Orleans. LA  70119

Dear Deputy Superintendent Sandifer:

This letter constitutes confirmation that the Office of Consent Decree Monitor ("OCDM ") has reviewed and provided comments on Chapter 51.1.1 – Use of Facial Recognition Technology for Criminal Investigations.  The OCDM has no objection to the policy as written.

We believe that Chapter 51.1.1 – Use of Facial Recognition Technology for Criminal Investigations, incorporates all requirements of the Consent Decree and sets forth clear and appropriate rules to guide officer conduct.  We will continue to assess the adequacy of this policy following its implementation.  If we identify any concerns following implementation, we will present those concerns to you and the Department of Justice.  Additionally, we note that, pursuant to the Consent Decree, NOPD has agreed to review and revise policies and procedures as necessary upon notice of a significant policy deficiency.  We also note NOPD's obligation to review this policy after a year of implementation to ensure it "provides effective direction to NOPD personnel and remains consistent with the Agreement, best practices, and current law."  Consent Decree at ¶ 8.

We appreciate your team's effort, cooperation, and responsiveness throughout this process.
Very truly

Very truly yours,

David L. Douglass
For SHEPPARD MULLIN RICHTER & HAMPTON LLP*
2099 PENNSYLVANIA AVE., N.W., SUITE 100
WASHINGTON, DC  20006

CC:   HONORABLE SUSIE MORGAN (VIA ELECTRONIC MAIL)
       TIMOTHY MYGATT, DEPARTMENT OF JUSTICE (VIA ELECTRONIC MAIL)
       DONESIA D. TURNER, CITY ATTORNEY (VIA ELECTRONIC MAIL)

SMRH:4816-6540-9429.7

Office of the Consent Decree Monitor
* Appointed By Order Of The U.S. District Court For The Eastern District of Louisiana