

**NOPD RESPONSE**
**to the**
**2022 ANNUAL REPORT OF THE CONSENT DECREE MONITOR**

**FEBRUARY 9, 2023**

**NOPD's Response to Section I. Executive Summary:**

The Consent Decree mandates that the court appointed Monitor develop methodologies[1] and then conduct audits, reviews and conduct outcome assessments[2] in order for NOPD to demonstrate compliance with the Consent Decree. The NOPD believes it is in substantial material compliance with the terms of the Consent Decree and strives to provide the data necessary to demonstrate compliance. NOPD has undertaken an internal audit process that seeks to replicate the goals of the Consent Decree, but cannot agree with the Monitor's assertion that NOPD has an obligation under the Consent Decree to design, plan and conduct audits in order prove compliance.

**NOPD's Response to Section II. Consent Decree Authority:**

NOPD agrees with the application of Consent Decree Paragraphs 444 and 446. It is important to note that NOPD is also in compliance if it has achieved "sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures" at Paragraph 448.

**NOPD's Response to Section VII. Policies and Training Generally:**

A.      Facial Recognition – The auditing of this policy implementation is outside of the Consent Decree.  Facial Recognition Technology was not discussed in the Consent Decree.  There are areas of the Consent Decree audit process that search for bias-based policing and those audit tools will ensure identification procedures are properly followed.   NOPD does not believe new audits, reports, or measurements are necessary to guide NOPD's response to this technology.

B.      The monitoring team instructs that it will audit the use of public safety rides to ensure the policy is effective.  The Consent Decree does not have any provision on public safety rides. Any concerns regarding illegal stops, searches or arrests associated with a public safety ride are already covered by the other robust NOPD polices and already subject to audits approved by DOJ and the Monitor. NOPD has drafted a policy to give our officers guidance on public safety rides, but to review and audit the use of these rides is outside the bounds of the Consent Decrees to the extent it reaches beyond already monitored interactions between NOPD officers and the public.

C.      NOPD's Professional Standards and Accountability Bureau ("PSAB") and other units reference and consider the content of NOPD's policies on a routine basis. NOPD has not instituted a tracking process to record each review of NOPD's polices. There is a schedule for policy review which has been developed.  NOPD submitted the described policy review schedule on January 25, 2023.  NOPD is

---

[1] Consent Decree paragraph 453.
[2] Consent Decree paragraphs 447 – 453, and 457 – 458.

**NOPD Response**
to the
**2022 ANNUAL REPORT OF THE CONSENT DECREE MONITOR**

awaiting feedback from the Office of the Consent Decree Monitor ("OCDM").  OCDM has recommended a three-year review interval for non-critical policies. This will require a change to the Consent Decree which NOPD is currently pursuing.  The critical chapters listed in Consent Decree paragraph 21 would remain on a yearly review basis.

D.       NOPD's academy has been previously found in compliance and uses training approved by DOJ and the Monitor. NOPD's training far exceeds the training required for employment in any other police department in the region. The Monitor's report does not convey any audit element that NOPD has failed to satisfy. NOPD has not been provided with the cited feedback from officers or the Office of Independent Police Monitor ("OIPM") and is eager to understand the Monitor's findings.

**NOPD's Response to Section IX. Crisis Intervention Team:**

NOPD does not agree that the response time data cited by the Monitor indicates non-compliance. The slow response by one District distorts the average response time dramatically.  While response times are a challenge for a department which is understaffed, to label this area as non-compliant based on one data analysis is a faulty conclusion considering the metrics implemented by DOJ and the Monitor.  Additionally, to make this statement without the context of a number of calls for service are being labeled as gone on arrival ("GOA") due to no units available "(NUA") lacks the framework needed to understand this is not a failure to provide services for a certain group of individuals, but a decline in available policing services for *all* members of the community.  The requirement that "police services are delivered to the people of New Orleans in a manner that complies with the Constitution and laws of the United States" is being met and exceeded, and that applies equally to the Crisis Intervention Team ("CIT") category of calls. The CIT program is alive, well, and thriving in NOPD and far exceeds the requirement of the Consent Decree.  The lack of officers throughout the department does not negate the fact that when Officers respond to a CIT call, they do so effectively and with compassion and empathy.

**NOPD's Response to Section XI. Custodial Interrogations:**

The finding of non-compliance in District 7 is concerning, and NOPD has already implemented changes. However, the Monitor's conclusions lack important context.  Although the Monitors were not able to access recordings on the day they visited the Seventh District, the recordings do exist. Rather the Lieutenant who met with the member of the monitoring team was not able to access them at the moment in time he visited the station.  To report that these recordings did not exist creates the false impression that NOPD is not recording interrogations.  This is patently untrue.

Many of the issues experienced by the Seventh District were technology based. The recordings are initially stored in a local server.  When this server is full, they are electronically transferred to a centralized server. Although officers record interviews, retrieving them is often hampered by technology either being temporarily offline, recordings being automatically transferred to remote storage necessitating a search in a different server, or other IT errors and complexities.  To correct this, the interrogation room equipment has been upgraded to "evidence.com" based footage using a BWC, the leading vendor package available.

**NOPD Response**
to the
**2022 ANNUAL REPORT OF THE CONSENT DECREE MONITOR**

In September 2022, 50 interrogations were reviewed by PSAB (March – August 2022), two of which were from the Seventh District interview room. There were zero deficiencies with the recorded videos.

Further, in January 2023, all interview rooms were equipped with a body worn camera ("BWC") mounted to the wall and written guidance was provided *via* a departmental wide special order instructing officers to use said device until the rooms can be upgraded to a permanent evidence.com based system.

**NOPD's Response to Section XII. Photographic Line-ups**

The audit methodologies created and approved by the Monitor and DOJ to prove compliance aggregate the responses of all audit categories. The NOPD, however, provides its leadership both the aggregate scores as well as the individual columns as displayed by the chart on page 25.  This is done to give management feedback on both how they are doing overall as well as where their shortcomings are.  There are no limitations regarding aggregating scores when they are accompanied by very detailed categories for every district and divisions.  In short, we provide all of this information to our leadership team. For Consent Decree compliance it is the aggregated score that is applicable.

**NOPD's Response to Section XIII.  Bias-Free Policing**

The OCDM's focus on alleged practices by the NOPD in 2009 – 2010 is not helpful in conveying the current condition of NOPD. NOPD would remind the citizens of New Orleans that since 2010 it has been reporting on its dramatic progress in this, and all areas of the Consent Decree. There was no annual report provided by the Monitor for 2021, but the bias-free audit conducted in 2022 was very positive and shows that the decade old figures the Monitor is highlighting are not accurate representations of current conditions. The Monitor chose not to include this most recent analysis on bias free policing, and NOPD objects to that stark omission. NOPD directs the public's attention to its 2021 Bias-Free Policing Annual Report which was published on November 10, 2022[3], for a detailed review of the issues that far exceed the summary data provided by the Monitor's 2022 Annual Report.  The audits found no disparities in the decision to stop, pat down searches, use force, or handcuff based on the measurable criteria. These positive results reflect NOPD's dedication to bias-free policing, the programs and policies covered in this report, and other innovative NOPD programs such as: Ethical Policing is Courageous/Active Bystandership for Law Enforcement (EPIC/ABLE), close and effective supervision, allegation-based misconduct investigations, and internal auditing; with a level a granularity that exceeds other law enforcement agencies.

The Department affirms its commitment to maintaining transparency and recognizing that continued reforms must be internally driven.  That is why on an annual basis, NOPD is committed to reviewing, adapting, and executing its bias-free programs and reporting the details to the public as part of its robust accountability systems.

The NOPD also wants the public to understand that it is not in control of the Orleans Parish Communications District which operates the 911 system.  It is not within the NOPD's control to determine how long it takes for a LEP caller to OPCD to reach a dispatcher as none of these employees or systems

---

[3] https://nola.gov/nola/media/NOPD/Consent%20Decree/2021-Bias-Free-Policing-Annual-Report.pdf

**NOPD Response**
to the
**2022 ANNUAL REPORT OF THE CONSENT DECREE MONITOR**

are controlled by NOPD.  The State of Louisiana is responsible for Orleans Parish Communications District and any deficiencies in audit scoring must be addressed outside of NOPD.

**NOPD's Response to Section XV. Community Engagement**

Only one quarterly report for Community Engagement is overdue, while the draft report uses the word "reports".

Geo-deployment is a policing philosophy that recognizes the need to deviate from strict targets to address current needs[4].  This goes to the issue of manpower and the current deployment data are reported quarterly and annually in the community engagement quarterly and annual report.  Relationships are being maintained throughout the city with Community Groups and Community Leaders, including faith-based and LGBTQ+ organizations.  Community Engagement will continue to use the CPS, the CPFs, and its dashboard to track and report publicly activities, along with the publication of all reports.

**NOPD's Response to Section XVII. Officer Assistance and Support**

NOPD disagrees with the implication of backsliding on compliance in OAP.  PSAB reported in June 2021 an 80% score in the audit. Since that audit OAP has scored 97% or above in the following three audits reported. In the audit where the score was 97% it was due to not having an OAP director. Audit questions have been answered "N/A" is because there was no activity regarding the audit questions during the particular audit period.  It is not reasonable or accurate to score a question "NC" because it did not happen to report on the answer should be reported as "Not applicable".

**NOPD's Response to Section XIX. Performance Evaluations and Promotions**

    A.       Promotions:

NOPD employs an evaluation and promotion process designed and approved by the DOJ and Monitor. While the Monitor desires NOPD give more flexibility in the promotions process, it is not an area that NOPD can change at the Monitor's direction as there are numerous legal complexities involved. The promotions process is a key area raised by officers departing NOPD and, as such, it is an area of great concern and attention. PSAB is currently conducting a review of the promotional process to ensure all current existing requirements were followed for each candidate promoted from the current Sergeant, Lieutenant, and Captain lists.

**NOPD's Response to Section XX. Supervision**

    B.       Insight

The Monitor and NOPD have different scores regarding this measurement as there are different interpretations surrounding the data.  As such the NOPD is above the 95% threshold in more performance indicators then the monitors noted.

---

[4] https://nola.gov/getattachment/NOPD/Policies/Community-Engagement-Manual-2021.pdf/?lang=en-US

**NOPD Response**
to the
**2022 ANNUAL REPORT OF THE CONSENT DECREE MONITOR**

A review of the monitor's analysis[5] (italicized below) compared to NOPD's review of the data provided by the department to the monitoring team demonstrates the following:

*Our audit found that six of the 22 Insight performance indicators contained data that was 100% accurate.*

NOPD's review of this data found 8 indicators which were at 100% *and three indicators contained data that was between 95-99% accurate.*

NOPD's review of this data found 7 indicators between 95-99%

*However, 10 indicators contained data that less than 95% accurate,* NOPD's review of the provided data found 7 indicators were less then 95% *with two indicators falling between 40-60% accurate.* NOPD's review of the data did not locate any indicators falling within the range between 40-60%

*Three of the indicators either were not included in Insight, or the data was completely missing from Insight.*

NOPD's data found 2 indicators which may fall into this category

One example which may account for the Monitor's scores regarding their review of non-disciplinary corrective action data was that the monitors scored all entries, including ones which were not finalized, i.e. not yet approved by a supervisor.  NOPD, however, scored only finalized approved entries made by supervisors.  NOPD did so understanding non-approved entries were subject to changes and corrections and thus were not yet part of the employee's insight record.  This difference in data interpretation leads to these disparate compliance scores.

---

[5] Page 46 of OCDM 2022 Annual Report