# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CIVIL ACTION NO.**<br>**2:12-CV-01924** |
| **Plaintiff,** | |
| **V.** | **SECTION E**<br>**JUDGE SUSIE MORGAN**<br>**DIVISION 2** |
| **CITY OF NEW ORLEANS,** | **MAG. DONNA PHILLIPS CURRAULT** |
| **Defendant.** | |

## UNITED STATES' MEMORANDUM IN OPPOSITION TO THE CITY OF NEW ORLEANS' MOTION TO TERMINATE THE CONSENT DECREE

## Table of Contents

I.  Introduction ................................................................................................ 1

II. Background ................................................................................................ 3

    A.  The United States' Findings and Complaint ................................... 3

    B.  The Consent Decree ........................................................................ 4

    C.  The Parties' Collaborative and Flexible Implementation of the Decree, and NOPD's Progress Towards Compliance........................................... 7

    D.  The City's November 2020 Letter ................................................. 10

    E.  The City's Motion to Terminate the Consent Decree .................... 11

    F.  Recent Developments.................................................................... 12

III. Legal Standard.......................................................................................... 13

IV. Argument .................................................................................................. 16

    A.  The City Has Not Demonstrated That It Has Satisfied the Consent Decree.................. 16

        1.  The City Has Not Established Substantial Compliance with the Consent Decree's Material Provisions................................. 16

        2.  The City Has Not Satisfied the Consent Decree Within the Meaning of Rule 60(b)(5)............................................ 31

    B.  The City Has Not Established Full and Effective Compliance Under Paragraph 448's Outcome Measures. ......................................... 35

    C.  The City Has Not Identified Any Significant Changes in Fact That Require Termination of the Consent Decree. ............................. 39

Conclusion...................................................................................................... 46

## Table of Authorities

**Cases**

*Agostini v. Felton*, 521 U.S. 203(1997) ...................................................................... 15

*Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021) ........................................................... 13

*Anderson v. City of New Orleans*, 38 F.4th 472 (5th Cir. 2022 ........................................ 15, 39, 41

*Caliste v. Cantrell*, 2020 WL 814860 (E.D. La. Feb. 19, 2020) ...................................... 13

*Direct Tech Drilling, LLC v. Danrik Constr., Inc.*,
    235 So.3d 1173 (La. Ct. App. 2017) ....................................................................... 14

*Frazier v. Ladd*, 457 F.3d 432 (5th Cir. 2006) ............................................................. 15, 32, 34

*Frew v. Hawkins*, 540 U.S. 431 (2004) ........................................................................ 13, 32, 34

*Frew v. Janek*, 780 F.3d 320 (5th Cir. 2015) ............................................................... 14, 16, 17, 32

*Frew v. Janek*, 820 F.3d 715 (5th Cir. 2016) ............................................................... 13, 14, 15, 25

*Frew v. Young*, 2022 WL 135126 (5th Cir. Jan. 13, 2022) ............................................ 14, 30, 33

*Horne v. Flores*, 557 U.S. 433 (2009) ......................................................................... 15

*League of United Latin Am. Citizens v. City of Boerne*,
    659 F.3d 421 (5th Cir. 2011) ................................................................................. 13, 15, 41

*Northeast Ohio Coalition v. Husted*, 696 F.3d 580 (6th Cir. 2012) .............................. 17

*Reeves v. AcroMed Corp.*, 103 F.3d 442 (5th Cir. 1997) .............................................. 17

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) ....................................... 15, 39, 46

*Skyline Corp. v. Nat'l Labor Relations Bd.*, 613 F.2d 1328 (5th Cir. 1980) ................... 16

*Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404 (5th Cir. 1994) ................... 16

*United States v. City of New Orleans*, 32 F. Supp. 3d 740 (E.D. La. 2014) .................. 4, 41

*United States v. City of New Orleans*, 947 F. Supp. 2d 601 (E.D. 2013) ....................... 4

*United States v. Willowridge Estates*, 2013 WL 3489864 (E.D. La. July 10, 2013)................... 15

**Statutes and Rules**

34 U.S.C. § 12601...................................................................................................................... 3

Fed. R. Civ. P. 60(b)(5)....................................................................................................... *passim*

## I.       INTRODUCTION

The City of New Orleans seeks to terminate the Consent Decree on three grounds.  Each lacks merit.  First, the City contends that it has "satisfied" the Consent Decree under Federal Rule of Civil Procedure 60(b)(5), even though the evidence shows that the City has not achieved "full and effective" compliance with the Consent Decree and sustained that compliance for two years.  Doc. 565 (Consent Decree), ¶ 491.  Second, the City contends that it has demonstrated full and effective compliance with the Consent Decree through "sustained and continuing improvement" in the Decree's "outcome measures," *id.*, even though the evidence is woefully lacking.  Third, the City contends that "applying [the Decree] prospectively is no longer equitable" under Rule 60(b)(5), because of unanticipated changed factual circumstances relating to how the Office of the Consent Decree Monitor (Monitor) and the United States are fulfilling their respective obligations to assess compliance with the Decree and enforce its terms.  The objections are unfounded, do not identify an unanticipated changed circumstance, and in any event could be resolved by the Court interpreting the Decree, not terminating it.

The Consent Decree has produced enormous benefits for the City, the New Orleans Police Department (NOPD) and the community.  There are, for example, new policies and training, and improved supervision and accountability systems, covering the use of force, stops, searches, and arrests, and seeking to prevent discriminatory policing.  This progress has been achieved through the hard work of the City and NOPD, and by the parties and the Monitor working collaboratively under the Court's guidance, to implement the Consent Decree fully and effectively.  When the parties showed that changes were necessary, the Court modified the Decree—changing more than 25 provisions in 11 separate orders—including to simplify the compliance process and reduce NOPD's burden.  *See* Doc. 564-1.  The United States remains

committed to proceed in this collaborative fashion.  A collaborative approach will assist the City's efforts to achieve full and effective compliance that is durable, and will most quickly result in an end to the need for the Decree.

But progress towards compliance is not the same as full and effective compliance that has proven durable.  NOPD's own files, along with the Monitor's reports, reveal that the City is out of compliance with key sections of the Decree.  NOPD officers have used unjustified force, engaged in dangerous pursuits, and failed to justify pat-downs.  As described more fully below, NOPD's own audits over the past year have found that officers failed to provide an adequate justification for nearly a third of pat-downs or frisks and failed to adequately advise people of their *Miranda* rights in 13 percent of arrests reviewed.  *See infra* at 18.  According to the City's own Office of the Independent Police Monitor (OIPM), NOPD's Use of Force Review Board determined that 17 of the 28 serious uses of force by NOPD officers in 2021—61 percent—were not justified.  *See infra* at 23–24.  NOPD's November 2022 assessment of bias in its policing activities found that white drivers "are less likely to be asked to exit their vehicle relative to minority occupants," and Black drivers who were asked to get out of their cars were less likely to be arrested than white drivers, which is consistent with NOPD applying "a lower threshold for asking minority occupants to exit their vehicle."  *See infra* at 20.  And the City admits that only 10 of the 34 sergeants in the Public Integrity Bureau—the Bureau responsible for investigating violations of NOPD policy—completed the supervisor-specific training required by the Consent Decree and NOPD policy.  *See infra* at 27.  The United States is actively working with NOPD to address areas of non-compliance and bring the Consent Decree to a close as expeditiously as possible.  Further efforts to achieve and sustain full and effective compliance are warranted, not termination of the entire Decree.

II.    **BACKGROUND**

 **A.  The United States' Findings and Complaint**

In 2011, the United States found reasonable cause to believe that the New Orleans Police Department engaged in a pattern or practice of conduct that deprived people of rights protected by the Constitution and federal law, including excessive force; unlawful stops, searches, and arrests; and discriminatory policing.  *See* Doc. 1-1; 34 U.S.C. § 12601.  Those legal violations, detailed in a report that the United States incorporated into its Complaint, were caused in part by widespread deficiencies in supervision and accountability systems within NOPD and the City. Doc. 1, ¶¶ 14–44; Doc. 1-1.

As the United States explained in its findings report, the NOPD had "long been a troubled agency," where "too many officers of every rank either do not understand or choose to ignore the boundaries of constitutional policing."  Doc. 1-1 at 6.  For example, the United States concluded that NOPD had engaged in a pattern of excessive force, including the use of both deadly and less lethal force contrary to NOPD policy or law.  *Id.* at 28–29.  In addition, the United States concluded that NOPD officers "failed to articulate sufficient facts to justify stops, searches, and arrests," and that officers did not understand the constitutional limits on warrantless detentions or pat-downs for weapons.  *Id.* at 9, 55–56.

In addition, the United States concluded that NOPD engaged in discriminatory policing in violation of Title VI of the Civil Rights Act of 1964 and the Safe Streets Act.  The United States discussed Black residents' unwarranted and negative encounters with NOPD's "task forces," who community members described as "jump out boys."  *Id.* at 62.  NOPD failed to ensure adequate training and supervision for these task forces, and their activities undermined community trust.  *Id.* at 63.  As part of its finding of discriminatory policing, the United States

also detailed NOPD's failure to provide meaningful access to police services to community members with Limited English Proficiency, including "delays in or denial of services" that resulted from language barriers, such as slow response times to calls for service.  *Id.* at 12–13.

NOPD's legal violations were caused in part by "systemic deficiencies" in supervision, accountability, training, and support for officers.  *Id.* at 13–14.  For example, NOPD did not "provide the supervision necessary to prevent or detect misconduct and ensure effective policing."  *Id.* at 16; *see also id.* at 87–96.  The United States found that NOPD's paid detail system "drastically undermines the quality of NOPD policing," "facilitates abuse and corruption by NOPD officers," and "contributes to inequitable policing."  *Id.* at 97; *United States v. City of New Orleans*, 32 F. Supp. 3d 740, 741 (E.D. La. 2014) ("[T]he DOJ's investigation revealed that there 'are few aspects of NOPD more broadly troubling than its Paid Detail system'").  The United States identified "significant weaknesses in NOPD's investigation of officer misconduct" and disciplinary practices.  Doc. 1-1 at 18–19; *see also id.* at 106–127.  And the United States found that NOPD failed to "provide [] critical officer assistance and support services," which increased the risk of ineffective and unlawful conduct by officers.  *Id.* at 21; *see also id.* at 133–34.

### B.  The Consent Decree

To remedy the legal violations described in the United States' findings report and alleged in the Complaint, the City agreed to enter into the Consent Decree Regarding the New Orleans Police Department in 2013.  Doc. 159-1.  Shortly after this Court entered the Decree, however, the City filed a motion under Rule 60(b) to vacate the Decree.  *See United States v. City of New Orleans*, 947 F. Supp. 2d 601 (E.D. 2013), *aff'd* 731 F.3d 434 (5th Cir. 2013).  The Court denied the City's motion because the City "has not demonstrated that any factual or legal circumstances

have 'significantly changed' such that enforcing the Consent Decree is no longer equitable," and "[n]o evidence is before the Court showing the NOPD Consent Decree" is "more expensive to implement now compared to when it was signed."  947 F. Supp. 2d at 620.  The Fifth Circuit agreed, holding that the district court "correctly rejected" the City's arguments under Rule 60(b)(5).  731 F.3d at 440–41.

After the courts rejected the City's first Rule 60(b)(5) motion, the parties turned to implementing the Consent Decree.  To eliminate the pattern or practice of unlawful conduct and protect the rights of people in New Orleans, the Consent Decree requires NOPD to use force in a safe and lawful manner; conduct lawful stops, searches, and arrests; and engage in bias-free policing.  Consent Decree, Sections III–IX.  The Decree seeks to ensure a durable remedy by addressing the root causes of NOPD's unlawful conduct, including by requiring effective supervision and accountability.  Consent Decree, Sections X–XVIII.

An important part of implementing reform is developing and revising policies.  The Consent Decree sets forth a mechanism for policy revisions.  Consent Decree, ¶¶ 15–23.  The Consent Decree also contains provisions about monitoring, technical assistance, and compliance. In addition to the Lead Monitor and the Deputy Monitor, the Office of the Consent Decree Monitor includes a team of law enforcement experts.[1]  The Consent Decree provides that the Monitor will "assess and report whether the requirements of this Agreement have been implemented" and will "conduct compliance reviews or audits as necessary to determine whether the City and NOPD have implemented and continue to comply with the material requirements of this Agreement."  Consent Decree, ¶¶ 444, 447.  In addition to these compliance reviews and audits, the Consent Decree states that the Monitor "shall conduct assessments to measure

---

[1] *See* Consent Decree Monitor, *About Us*, http://consentdecreemonitor.com/about-us.

whether implementation of this Agreement is resulting in constitutional policing." *Id.* ¶ 448. These "outcome assessments" include analyses of data related to use of force; stops, searches, and arrests; bias-free policing and community engagement; recruitment and training; officer assistance and support; performance evaluations and promotions; supervision; secondary employment; and accountability. *Id.* ¶ 448(a)–(i). The Monitor "may use any relevant data" to conduct these outcome assessments, "provided that it has determined, and the Parties agree, that this data is reasonably reliable and complete." *Id.* ¶ 449. The Monitor may also provide technical assistance to NOPD and the City. *Id.* ¶ 455.

Consistent with the need for flexibility, the Consent Decree provides that the City and the United States can agree to modify the Decree, subject to the Court's approval. *Id.* ¶ 487. Modifications "shall be encouraged when the Parties agree . . . that the Agreement provision as drafted is not furthering the purpose of the Agreement, or that there is a preferable alternative that will achieve the same purpose." *Id.*

A party may move to terminate the Consent Decree when the City has achieved "full and effective compliance" with the Decree and maintained such compliance for a period of no less than two years. Consent Decree, ¶¶ 486, 492. The Decree sets forth two ways of demonstrating full and effective compliance. Under the first path, the City can show "sustained compliance with all material requirements of this Agreement." *Id.* ¶ 491. Under the second path, the City can show "sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures." *Id.* ¶ 491; *see also id.* ¶ 448. Under either path, the City bears the burden of demonstrating that it has achieved and maintained full and effective compliance. *See id.* ¶ 486. The City also bears the burden of collecting and

maintaining reliable and complete data and records to document compliance with the Agreement. *See id.* ¶¶ 449, 468.

If the parties agree that the City has achieved full and effective compliance and sustained it for two years, then they may jointly move to terminate the Decree.  Consent Decree, ¶ 491.  If the parties disagree, Paragraph 492 of the Decree provides a process by which either party may seek termination.  If the City seeks termination, it must satisfy certain requirements before filing a motion to terminate the Decree.  Under Paragraph 492, "prior to filing a motion to terminate," the City must "notify DOJ in writing when the City has determined that it is in full and effective compliance with [the Consent Decree] and that such compliance has been maintained for no less than two years."  After this notice, the parties "shall promptly confer as to the status of compliance," and the United States is entitled to "a reasonable period of consultation and the completion of any audit or evaluation," including "document review" and "interviews with the City and NOPD's personnel."  If, "after" this period, the parties "cannot resolve any compliance issues," then the City "may file a motion to terminate" the Consent Decree.  The Consent Decree provides that "the burden shall be on the City to demonstrate that it is in full and effective compliance with [the Consent Decree] and has maintained such compliance for at least two years."

### C.  The Parties' Collaborative and Flexible Implementation of the Decree, and NOPD's Progress Towards Compliance

As NOPD and the City implemented the Consent Decree, NOPD began to improve in a number of areas and make progress towards constitutional policing.  NOPD, the United States, and the Monitor have worked collaboratively, including holding regular meetings to discuss the status of compliance in various areas.  *See, e.g.,* Doc. 552 at 9 (NOPD 2017 Annual Report) ("NOPD continues to collaborate with DOJ and OCDM to institute best practice policies that

7

incorporate all Consent Decree requirements.").  In addition, the United States and the Monitor

provide extensive technical assistance to NOPD.  *See, e.g.,* Apr. 20, 2022 Hr'g Tr. 29:10–17

(Deputy Superintendent Sandifer) (thanking the Monitor and the United States for "continued

support" and "technical assistance").

     In January 2019, following the Monitor's comprehensive reassessment of NOPD's

compliance with the Consent Decree, the Monitor determined that the City had achieved initial

compliance with 10 of the 17 sections of the Decree.[2]  Doc. 574-1.  The Monitor stated that

NOPD had moved "into the green" for those areas.  *Id.* at 15.[3]  These statements did not reflect

formal determinations by the Court that NOPD had achieved full and effective compliance in

these areas.  Doc. 669 at 2.  In other areas, such as Supervision and Stops, Searches, and Arrests,

the Monitor stated that NOPD "has more work to do." *Id.* at 16.  The Monitor explained that

"NOPD's 2-year clock will begin to run when all sections of the Consent Decree are in full and

effective compliance." *Id.* at 17.  Between December 2020 and April 2022, the Monitor

determined that NOPD had moved "into the green" in all but two areas—Bias-Free Policing and

Stops, Searches, and Arrests.[4]  NOPD's leaders highlighted the benefits of the Consent Decree.

At the January 2019 hearing, for instance, then-Superintendent Shaun Ferguson said, "I have

witnessed firsthand how the Consent Decree has transformed our department as well as our

citizens for the better of all of us."[5]

---

[2] The Monitor determined that NOPD was "in the green" for the following sections by January 2019: Policies and Training, Use of Force, Crisis Intervention Team, Custodial Interrogations, Photographic Line-Ups, Gender Bias, Academy and In-Service Training, Officer Assistance and Support, Secondary Employment, and Transparency and Oversight.
[3] The City and the United States understood that moving a Section "into the green" meant that the City had initially achieved compliance with that Section.  Doc. 653 at 19.
[4] The Monitor moved the following sections "into the green" between December 2020 and April 2022: Recruitment (January 2021), Misconduct Investigations (January 2021), Community Engagement (October 2021), Performance Evaluations & Promotions (April 2022), and Supervision (April 2022).
[5] Charles Maldonado, *Watch Friday's NOPD consent decree hearing*, The Lens (Jan. 23, 2019) (1:25:58 in embedded video), https://thelensnola.org/2019/01/23/live-video-friday-nopd-consent-decree-hearing/.

In implementing reforms, the parties modified the Consent Decree to streamline the compliance process and better serve the aims of the Decree. *See* Sept. 27, 2022 Hr'g Tr. 45:15–20 (noting that "there have been many amendments to the Consent Decree to address concerns of the City and NOPD or of the DOJ, and they have been done in a collaborative manner"). The United States supported the City's requests to make more than 25 amendments to the Decree pursuant to Paragraph 487. *See* Doc. 564-1. For example, the parties alleviated the burden on supervisors by reducing the number of force incidents to which supervisors must respond. *See* Doc. 564-1 at 30; Doc. 519; Doc. 520; Doc. 530; Doc. 531. Another modification allowed NOPD to more quickly and efficiently resolve certain allegations of officer misconduct through non-disciplinary counseling, a negotiated settlement agreement, or mediation. *See* Doc. 564-1 at 103–105; Doc. 389; Doc. 402; Doc. 561; Doc. 562. The parties also agreed to provide for additional flexibility regarding secondary employment. *See* Doc. 564-1 at 94–95; Doc. 504; Doc. 505; Doc. 506; Doc. 507; Doc. 530; Doc. 531; Doc. 546; Doc. 549. On October 2, 2018, the Court entered the Amended and Restated Consent Decree. Doc. 565.

As NOPD progressed in certain areas, it also encountered setbacks. For example, in a June 2020 Special Report, the Monitor found that officers in NOPD's task forces "[s]top vehicles with questionable legal basis," "[e]ngage in unsafe practices," "[p]repare and maintain inadequate records of their activities," and "[o]perate with inadequate supervision by sergeants, lieutenants, and captains." Doc. 593-1 at 3. In March 2019, task force officers "engaged in an unauthorized vehicle pursuit that ended tragically in a fiery crash claiming three lives, injuring several others, and destroying the Unity One Beauty Supply, a long-time community institution." *Id.* at 2 n.3. The Monitor emphasized that "supervision of the Task Forces requires the immediate personal attention of the Superintendent of Police," and pointed to "NOPD's inability

9

to achieve 'close and effective supervision' of its officers generally."  *Id.* at 4.  Although the

Monitor shared these concerns with NOPD in October 2019, "many of the shortcomings

persist[ed]" through June 2020.  *Id.* at 3.  NOPD concurred with the "findings, conclusions and

overall recommendations" in the Monitor's Special Report, and Superintendent Ferguson later

disbanded the task forces.  *Id.* at 27.

> **D.  The City's November 2020 Letter**

In November 2020, the City sent the United States a memorandum asserting that it had

achieved and sustained full and effective compliance for two years, as shown by the Consent

Decree's outcome measures.  *See* Doc. 629-5.  The City asked the United States to confer on the

status of compliance.  *Id.* at 24.  The City's memorandum did not provide the factual support

needed to show compliance.  The assertions of compliance also overlooked recent evidence of

backsliding.  At that time, according to the Monitor, the City had not yet moved "into the green"

with 7 of the 17 sections of the Decree,[6] including the sections covering bias-free policing and

stops, searches, and arrests.  *See* Doc. 613-1 (describing NOPD's own November 2020 audit of

stops, searches, and arrests that showed "troublingly low levels of compliance," significant

policy violations by task forces, and a March 2019 fatal pursuit that led to the discovery of

additional unreported high-speed chases).  The Monitor stated that the City's letter was

"particularly concerning" when "juxtaposed against a number of developments since our January

2019 proceeding," such as a "pattern of questionable practices" by task forces, "[a]n alleged

conspiracy among NOPD officers in the 8th District to provide false testimony concerning an

---

[6] The City sent the November 2020 memorandum before the Monitor moved additional sections "into the green" between December 2020 and April 2022, including Recruitment (January 2021), Misconduct Investigations (January 2021), Community Engagement (October 2021), Performance Evaluations & Promotions (April 2022), and Supervision (April 2022).

arrest," reports of "unconstitutional searches and seizures," and a "questionable use of force against protestors on the Crescent City Connection."  Doc. 613-1 at 3.

The United States participated in subsequent calls with the City, during which the City promised to provide data supporting its assertion that it was in compliance under Paragraph 448, but the City never provided the promised data and never followed up on its request that the United States join a motion to terminate.  Doc. 653 at 7.  As the Court explained in denying the City's Motion to Reconsider: "After the letter was sent on November 30, 2020, the parties continued to engage in monthly and sometimes weekly or daily status conferences both with the Monitor and with the Court. NOPD continued to seek and accept the extensive technical assistance of the Monitor and DOJ in an effort to come into compliance with the Consent Decree . . . The conduct of the parties clearly reflected their joint determination to concentrate their efforts on the City coming into full and effective compliance, rather than the City filing a motion to terminate the Consent Decree at that time."  Doc. 669 at 4.

### E.  The City's Motion to Terminate the Consent Decree

On August 4, 2022, Mayor LaToya Cantrell and Superintendent Ferguson convened a press conference to call for termination of the Consent Decree.  The City did not notify the United States before this announcement.  On August 8, 2022, the United States sent a letter to the City seeking the basis for the City's determination that it had achieved full and effective compliance with the Consent Decree, especially in those areas where the Monitor "has determined that the City has not, yet, reached full and effective compliance."  Doc. 629-6 at 3. The City did not respond to that letter.  Instead, on August, 18, 2022, the City filed its Motion to Terminate.  Doc. 629.

In the Motion, the City asserts three grounds for termination of the Consent Decree. First, the City argues that it has "substantially and materially satisfied the letter and spirit of the Decree through durable reforms" and "there are no ongoing violations of the federal laws cited by the DOJ's complaint." Doc. 629-1 at 4 (citing Fed. R. Civ. P. 60(b)(5)). Second, the City argues that it has achieved and maintained full and effective compliance for two years through "sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures." *Id.* (citing Consent Decree, ¶ 448). Third, the City argues that "termination is warranted" because of alleged unanticipated changes in fact that render continued application of the Decree inequitable. *Id.* (citing Fed. R. Civ. P. 60(b)(5)).

### F.  Recent Developments

Four months after the City filed its Motion, Superintendent Ferguson announced that he would retire. *See* Doc. 674-1 at 2.[7] The Mayor appointed an interim superintendent, Michelle Woodfork, in December 2022.[8]

Additionally, in February 2023, the Monitor filed an Annual Report covering 2022. Doc. 674-1. In the report, the Monitor described 2022 as "a challenging year for the NOPD," citing a range of challenges, including "multiple high-profile investigations of NOPD officers relating to time-charging and other misconduct." *Id.* at 2. The Monitor stated that "although the NOPD continues to make progress in many areas, our monitoring in 2022 identified a number of areas that currently do not comply with the Consent Decree's requirements," such as Misconduct Investigations, Supervision, and Stops, Searches, and Arrests. *Id.*

---

[7] Mike Perlstein, *NOPD Superintendent Shaun Ferguson to retire in seismic shake-up*, WWLTV (Dec. 6, 2022), https://www.wwltv.com/article/news/local/orleans/nopd-chief-shaun-ferguson/289-612174dc-ef81-4cb2-98f9-ae8db97a8210.

[8] *See Superintendent of Police*, New Orleans Police Department, https://nola.gov/nopd/about-us/superintendent-of-police/.

### III.   LEGAL STANDARD

This Court has a "strong federal interest" in enforcing the Consent Decree, which protects rights secured by the Constitution and federal law.  *Caliste v. Cantrell*, 2020 WL 814860, at *4 (E.D. La. Feb. 19, 2020); *see also Frew v. Hawkins*, 540 U.S. 431, 439 (2004) ("[E]nforcing the decree vindicates an agreement that the state officials reached to comply with federal law."). Consent decrees "have elements of both contracts and judicial decrees."  *Frew*, 540 U.S. at 437. A consent decree is "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees."  *Id.*  Consent decrees are "interpreted 'according to general principles of contract law'" in "the relevant state, here Louisiana."  *Allen v. Louisiana*, 14 F.4th 366, 371 (5th Cir. 2021).  Under Louisiana law, contract interpretation starts with the text: "courts seek the parties' common intent starting with the contract's words, which control if they are clear and lead to no absurdities."  *Id.*; *Frew v. Janek*, 820 F.3d 715, 729 (5th Cir. 2016) ("This Court must interpret [a corrective action order provision] according to its 'plain meaning'").

The City has moved to terminate the Consent Decree, in part, under Rule 60(b)(5), which permits a court to modify or terminate a consent decree if "[1] the judgment has been satisfied, released, or discharged; [2] it is based on an earlier judgment that has been reversed or vacated; or [3] applying it prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).  Here, the City argues for termination based on Rule 60(b)(5)'s first and third prongs.  As the movant, the City has the burden to show why the Court must terminate the Consent Decree.  *See League of United Latin Am. Citizens v. City of Boerne*, 659 F.3d 421, 438 (5th Cir. 2011) ("The burden is on the moving party to prove that modification is warranted, regardless of whether the party seeks to

lessen its own responsibilities under the decree, impose a new and more effective remedy, or vacate the order entirely."); *see also* Consent Decree, ¶¶ 486, 492.

To show satisfaction of a consent decree under Rule 60(b)(5)'s first prong, a party must demonstrate compliance with the decree's terms.  *See Frew*, 820 F.3d at 726 (termination of consent decree not warranted where defendants "put forth no evidence" concerning plans to address "shortage[s]").  As the Fifth Circuit has explained, a party "fulfill[s] the purpose of the Decree by implementing the broad range of supportive initiatives memorialized in the Decree." *Frew v. Janek*, 780 F.3d 320, 328 (5th Cir. 2015).2015).  After all, "[t]he whole point of negotiating and agreeing on a plethora of specific, highly detailed action plans was to establish a clearly defined roadmap for attempting to achieve the Decree's purpose."  *Id*.  "Substantial compliance excuses deviations from a contract's provisions that do not severely impair the contractual provision's purpose."  *Frew v. Young*, 2022 WL 135126, at *3 (5th Cir. Jan. 13, 2022).  Substantial compliance, or "substantial performance," is "a question of fact" that depends on "the extent of the defects or non-performance" and "the degree to which the purpose of the contract has been impaired," among other factors.  *Direct Tech Drilling, LLC v. Danrik Constr., Inc.*, 235 So.3d 1173, 1177 (La. Ct. App. 2017).

Here, the Consent Decree "requires full and effective compliance with the 'Agreement,' which is the entire Consent Decree, not portions of the Consent Decree."  Doc. 669 at 2 (quoting Consent Decree, ¶ 492).[9]  And "before the City moves into the two-year sustainment period provided by the Consent Decree, the City must be in full and effective compliance with all

---

[9] The Consent Decree's express termination provisions thus distinguish this case from *Frew*, which involved 11 separate corrective action orders intended to the State into compliance with the corresponding provisions of a consent decree.  *Frew*, 820 F.3d at 718.  Under the court's order, each corrective action order was to be evaluated separately and, when satisfied, the corrective action order and the corresponding paragraphs of the consent decree could be terminated.  *Id.*

14

sections of the Consent Decree." *Id.* at 2–3.  Accordingly, if the City has not satisfied Paragraph 492's express termination provision, it has not satisfied the Decree under Rule 60(b)(5)'s first prong.

To show that "prospective application" of a consent decree is "no longer equitable" under Rule 60(b)(5)'s third prong, a party must first show that "a significant change in circumstance warrants revision of the decree." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992); *see also Horne v. Flores*, 557 U.S. 433, 447 (2009).[10]  The party must "show that the change in circumstance is 'significant', and not merely that 'it is no longer convenient to live with [the decree's] terms.'" *City of Boerne*, 659 F.3d at 437.  Nor may a party rely on circumstances that could have been anticipated at the time the parties entered into the consent decree, such as increased compliance costs.  *See Agostini v. Felton*, 521 U.S. 203, 216 (1997)  ;); *Anderson v. City of New Orleans*, 38 F.4th 472, 480 (5th Cir. 2022).

Moreover, even if a party can demonstrate a significant change in fact warranting modification of a consent decree, the Court must "determine whether the proposed modification is 'suitably tailored'" to "resolve the problems created by the change in circumstances." *City of Boerne*, 659 F.3d at 439; *Rufo*, 502 U.S. at 391.  Where the evidence does not support wholesale termination of a consent decree, that relief would be "'grossly ill-tailored' to the facts." *Frazier v. Ladd*, 457 F.3d 432, 441 (5th Cir. 2006); *see also United States v. Willowridge Estates*, 2013 WL 3489864, at *8 (E.D. La. July 10, 2013) ("Cancellation of the entire consent decree goes beyond addressing the problems created by the changed circumstances.").

---

[10] In *Horne v. Flores*, the Supreme Court clarified the standard under Rule 60(b)(5)'s third prong, as applied to a declaratory judgment order.  557 U.S. at 447.  The Court did not apply the Rule's first prong or determine whether a party had substantially complied with a consent decree.  *See id.* at 447, 454.

To justify termination under either prong of Rule 60(b)(5), the City must establish an evidentiary record to justify termination. *See Frew*, 820 F.3d at 726 (rejecting termination where defendants "put forth no evidence"); *see also Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1409 (5th Cir. 1994) (affirming denial of 60(b)(6) motion where party's "contention" was "unsupported by an affidavit or other evidentiary basis"). Mere assertions by counsel cannot satisfy a party's evidentiary burden: "Statements by counsel in briefs are not evidence." *Skyline Corp. v. Nat'l Labor Relations Bd.*, 613 F.2d 1328, 1337 (5th Cir. 1980).

## IV.    ARGUMENT

The City fails to carry its burden to show that termination of the Consent Decree is required because: (A) the City has not established that it has satisfied the Decree under Paragraph 492, the express termination provision; (B) the City has not shown "continuing and sustained improvement" in the Consent Decree's outcome measures: and (C) the City has not identified any significant, unforeseeable changes in fact that require termination. The Court should deny the City's Motion to Terminate.

### A.    The City Has Not Demonstrated That It Has Satisfied the Consent Decree.

#### 1.    The City Has Not Established Substantial Compliance with the Consent Decree's Material Provisions.

The City has not shown that it has satisfied the terms of the Consent Decree. The Consent Decree requires the City to establish "full and effective compliance with th[is] Agreement for two years." Consent Decree, ¶ 491. As the Court explained in denying the City's motion to reconsider, this path requires "full and effective compliance with all sections of the Consent Decree," but "[t]he Court has not issued orders finding the City is or is not in compliance with particular sections of the Consent Decree." Doc. 669 at 3. The Fifth Circuit has recognized the importance of enforcing the parties' bargain in consent decree cases,

including where parties bargained for specific "termination conditions."  *See Frew*, 780 F.3d at 329–330.  Here, the parties did bargain for a termination provision that the Court should enforce. Because the City has not established compliance with the Consent Decree's expressly stated grounds for termination, it has not "satisfied" the Decree under Rule 60(b)(5).  *See Frew*, 780 F.3d at 328.[11]

Even if the City were permitted to bypass Paragraph 492's requirement that the City must achieve and sustain compliance with the entire Consent Decree for two years, it cannot show that it has satisfied each Section of the Decree.  In its Motion to Terminate, the City has not provided evidence sufficient to demonstrate that it has satisfied each section of the Consent Decree, including Stops, Searches, and Arrests, Bias-Free Policing, and Use of Force.

As an initial matter, the City is wrong to assert that NOPD has "satisfied" or has been "found in compliance" with 15 of the Decree's 17 sections.  Doc. 629-1 at 2, 21.  The Monitor has moved 15 sections "into the green," or initial compliance, but as the Court explained in its Order denying the City's Motion for Reconsideration, "[t]he Court has not issued orders finding the City is or is not in compliance with particular sections of the Consent Decree."  Doc. 669 at 3.[12]  This finding is law of the case, which binds determination of the City's Motion to Terminate.  *See Reeves v. AcroMed Corp.*, 103 F.3d 442, 448 (5th Cir. 1997).

Moreover, the evidence presented by the City in its Motion to Terminate does not show compliance the Decree's material provisions.  In its recent Annual Report, the Monitor explained

---

[11] The City quotes the Sixth Circuit for the point that Rule 60(b) governs "[e]ven when consent decrees explicitly provide instructions for their own modification."  Doc. 629-1 at 13 (quoting *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 601–02 (6th Cir. 2012)).  But in *Husted*, the Sixth Circuit held that state officials failed to justify modifying a consent decree and that the decree's "good cause" standard did not "circumvent[]" Rule 60(b).  *Id.* at 602.  The City cites no authority holding that a party can satisfy a consent decree under Rule 60(b)(5)'s first prong without satisfying the decree's express termination provisions.

[12] The City cites April 20, 2022 remarks from the Monitor to support its assertion of compliance.  Doc. 629-1 at 24 n.56.  In those remarks, however, the Monitor stated that "once all areas are 'in the green,' NOPD *can begin its two-year Sustainment Period*, which is the path out of the Consent Decree."  Doc. 629-24 at 2 (emphasis added).

17

that significant concerns persist regarding NOPD's progress in sections such as Supervision

(XV) and Misconduct (XVII). Doc. 674-1. And NOPD's own files contain additional evidence

that show non-compliance with the Consent Decree's terms.

    **Stops, Searches, and Arrests (Section V).** The City has not demonstrated that it has

satisfied Section V of the Consent Decree, which covers Stops, Searches, and Arrests (SSA).

The City cited NOPD's 2019 SSA Annual Report; a 2020 SSA Audit finding regarding

Paragraph 122's requirement for stops; and NOPD's presentation to the Court about SSA. Doc.

629-1 at 27–28, 30–31. The City did not attempt to show that it satisfied each provision of

Section V, and more recent evidence—including NOPD's own audits—shows that NOPD is not

yet in compliance.

    Importantly, the Monitor has never found NOPD "in the green" for this Section, and

NOPD's recent audits have given the Monitor "concern over the pace of NOPD's progress

toward compliance in the area of SSA." Doc. 674-1 at 20. According to NOPD's audit of

incidents from March–May 2022, for example, officers failed to provide an adequate justification

for nearly one-third of pat-downs or frisks, and supervisors were aware or should have been

aware of policy violations in a significant portion of incidents reviewed. Ex. 1 (NOPD Audit of

March–May 2022 SSA incidents) at 16, 19, 53; Consent Decree, ¶¶ 123, 125, 126, 149, 150.

NOPD's audit also found that officers failed to adequately advise people of their *Miranda* rights

in 13 percent of arrests reviewed. Ex. 1 at 3, 20, 53. Similarly, an NOPD audit of May 2021

incidents, found that "officers are conducting 'Pat-Downs' without adequately articulating their

reasons for believing subjects may be armed and dangerous," resulting in a compliance score of

60 percent, and that "officers aren't adequately documenting a legal basis to search." Ex. 2

(NOPD Audit of May 2021 SSA incidents) at 2, 11, 19, 49–50; Consent Decree, ¶¶ 122, 123,

125, 126, 149, 150.  These pat-downs potentially violated the Fourth Amendment rights of New Orleans residents.  The audit also found that, for nearly one out of every five searches, the officer failed to document a valid legal basis for the search.  *See* Ex. 2 at 2, 11, 19; Consent Decree, ¶¶ 122, 123, 125, 126, 149, 150.  In other words, officers may be violating the Fourth Amendment rights of a significant portion of the people they search.

These problems are not new—NOPD has known about them for years.  In the 2011 findings report, the United States discussed NOPD's failure to articulate the legal basis for pat-downs.  Doc. 1-1 at 9, 55–56.  NOPD's own audits show that these violations persist, as do the reports of the Monitor.  In June 2020, the Monitor released a report about NOPD's Task Forces, which found that "some Task Force officers [s]top vehicles with questionable legal basis, [e]ngage in unsafe practices, [p]repare and maintain inadequate records of their activities, and [o]perate with inadequate supervision by sergeants, lieutenants, and captains."  Doc. 593-1 at 3.  The Monitor found that "many of the shortcomings we identified in October 2019 (and, frankly, some of the shortcomings the DOJ identified in 2011) persist."  *Id.*; *see also* Doc. 1-1 at 62–63.  And in February 2021, the Monitor's report discussed "the City's ongoing noncompliance with many aspects of the Consent Decree."  Doc. 613-1 at 2.  As an example, the Monitor cited "[c]redible reports . . . from the Public Defender's Office of unconstitutional searches and seizures."  *Id.* at 4.[13]

**Bias-Free Policing (Section VIII)**.  Neither the Court nor the Monitor has found that NOPD achieved initial compliance with the Bias-Free Policing Section of the Decree.  The City has not provided evidence demonstrating full and effective compliance with Bias-Free Policing, or that the City has sustained such compliance for two years.  The Consent Decree prohibits

---

[13] The Monitor is currently reviewing incidents involving stops, searches, and arrests.  Doc. 674-1 at 20.

NOPD from discriminating based on race, gender, national origin, and other protected

characteristics; and NOPD must "provide clear guidance on prohibited conduct, including

selective enforcement or non-enforcement of the law and the selection or rejection of particular

tactics or strategies based upon stereotypes or bias." Consent Decree, ¶¶ 178, 179. To that end,

NOPD must assess all "programs, initiatives, and activities to ensure that they are not

administered in a manner that discriminates against individuals" based on protected

characteristics. Consent Decree, ¶ 188. NOPD published its first-ever comprehensive

assessment of bias in November 2022, after receiving extensive technical assistance from the

United States and the Monitor. Ex. 3 (2021 Bias-Free Policing Annual Report at 1–2). As the

City explained in a presentation to the Court, the data analysis "found disparities for people of

color in vehicle exits, firearm pointing, and response times." Doc. 629-10 at 50. The analysis

did not find disparities in other uses of force, handcuffing, and other enforcement actions. *Id*.

But the data raised concerns about racial discrimination by NOPD. For example, the assessment

found that white drivers "are less likely to be asked to exit their vehicle relative to minority

occupants," and Black drivers who were asked to get out of their cars were less likely to be

arrested than white drivers, which is consistent with NOPD applying "a lower threshold for

asking minority occupants to exit their vehicle." Ex. 3 (2021 Bias-Free Policing Annual Report

at 28–29).

　　　For the areas where the analysis showed disparities, NOPD identified follow-up steps to

ensure that these actions will be administered in a manner that does not discriminate against

people. Ex. 3 (2021 Bias-Free Policing Annual Report at 11, 13) (describing steps to address

vehicle exits and committing to reevaluating its officer deployment strategy to address response

times). But NOPD has not completed all of the follow-up steps identified by the assessment to

ensure against discrimination.  Nor has NOPD demonstrated that it can conduct the Bias-Free

Policing analysis independently, without assistance from the United States and the Monitor.

NOPD is currently working on its second analysis of discriminatory policing, but that analysis is

not complete.  *See* Ex. 4 (Sept. 13, 2022 Response to Request for Information at 44).  Without a

track record of analyzing and addressing enforcement disparities, NOPD has not shown that it

has established a durable remedy to identify and address discriminatory policing.  *See Frew*, 820

F.3d at 726 (defendants "put forth no evidence" concerning "plans to address 'shortage[s]'

identified by [] assessments").

Nor has the City established that it has satisfied the Consent Decree's language access

provisions.  The United States found that NOPD violated Title VI of the Civil Rights Act of 1964

by failing to provide language assistance to people with limited English proficiency.  Doc. 1

¶ 21; Doc. 1-1 at 67–70.  To remedy this legal violation, the Consent Decree sets forth specific

requirements to ensure that NOPD provides policing services to people with limited English

proficiency.  *See* Consent Decree, ¶¶ 42, 168, 189–194, 266(k), 390, 407.  The City has not

shown that NOPD satisfied these requirements and sustained compliance for two years.  For

example, NOPD did not have commonly used forms translated into Spanish and Vietnamese as

of April 5, 2021, even though NOPD's own Language Access Policy specified that some of these

forms required translation.[14]

Further, in 2020, after NOPD suffered a cyber-attack, it lost the use of the electronic

translation device NOPD officers used to offer translation services to those in need.  *See* Ex. 5

(City's Response to Request for Admission No. 49) ("NOPD stopped using ELSA in January

---

[14] Ex. 6 (Feb. 6, 2021 email from S. LeBeouf); Ex. 7 (Jun. 1, 2022 email from J. Geissler).

2020").[15]  After more than a year, NOPD entered into a contract with a language-line telephonic service to replace the device's capacity and provided smart phones to begin using the service. Ex. 5 (City's Response to Request for Admission No. 48) (admitting that NOPD did not have access to Voiance language line service until April 8, 2021).  But, NOPD's own data showed little use of interpretation in that period without a device.  From March 1, 2021 to August 31, 2021, NOPD received 384 calls for service requesting language assistance.  *See* Ex. 9 (Dec. 7, 2021 Limited English Proficiency Audit Report at 11).  NOPD Authorized Interpreters provided services in only 82 of those calls and electronic translation in 10 calls.  For 150 of the 384 calls, by the time NOPD arrived on the scene, the caller was not there.  And in 52 calls, NOPD officers responded to a person requesting language assistance but failed to use an authorized translation service.  This represents a significant portion of calls where NOPD did not provide the interpretation services needed.[16]  People who needed police services but could not speak English were disadvantaged.  This struggle for people of New Orleans who have limited English proficiency is precisely what the Consent Decree aimed to remedy—and the City's own data show the lack of initial and sustained compliance.

**Use of Force (Section III)**.  The City has not demonstrated substantial compliance regarding Use of Force.  Although the Monitor found NOPD "in the green" with this Section in 2019, the City fails to demonstrate NOPD has sustained full and effective compliance for at least two years, and more recent evidence indicates that NOPD has fallen out of compliance.  In its

---

[15] Even the City's now asserted January 2020 date may not be true.  In November 2020, NOPD indicated that the devices stopped working in 2019.  *See* Ex. 8 (Nov. 24, 2020 email from L. Kurtz).

[16] From September 1, 2021 to February 28, 2022, NOPD received 530 calls for service requesting language assistance.  *See* Ex. 10 (June 2022 Limited English Proficiency Audit Report at 9).  NOPD's audit report does not account for all 530 calls for service: Item 2 only lists 221 responses.  NOPD reports that it did not provide authorized interpretation services for 27 calls. NOPD provided additional information about the remaining calls for service not accounted for in the June 2022 audit report, but those numbers further demonstrate that NOPD did not provide the interpretation services in a significant portion of calls.

Motion, the City cites NOPD's 2020 Use of Force Annual Report, asserting that there has been an "overall drastic reduction in the use of force by NOPD officers."  Doc. 629-1 at 26.  But the Monitor's 2022 Annual Report shows that overall uses of force *increased* from 2020 to 2021 (348 uses in 2020 to 397 in 2021) and again from 2021 to 2022 (437 in 2022).  Doc. 674-1 at 16. The City also ignored the Consent Decree's specific requirements that ensure NOPD's uses of force are consistent with the Fourth Amendment and best practices.  For example, the Consent Decree provides that "[u]se of force by NOPD officers, regardless of the type of force or weapon used, shall abide" by certain requirements, including that officers must use warnings and verbal persuasion, when possible, before resorting to force; and that officers may not strike a person's head with a hard object or discharge their firearms at moving vehicles except under limited circumstances.  Consent Decree, ¶¶ 27, 28, 35.  The City did not submit any evidence that NOPD officers' uses of force are constitutional and consistent with the Consent Decree's requirements.

Other evidence raises concerns that the City is not in compliance with the Use of Force provisions, and the City did not address this evidence in its Motion to Terminate.  One example is NOPD's Use of Force Review Board, which must "conduct timely, comprehensive and reliable reviews" of "all serious uses of force."  Consent Decree, ¶ 108.  The Consent Decree requires the Review Board to review each force investigation "within 30 days" of receiving the report and to "document its findings and recommendations . . . within 45 days."  *Id.* ¶ 108(a), (g). But the Review Board did not conduct timely hearings in 2022, resulting in a backlog, as the Monitor explained in the recent Annual Report.  Doc. 674-1 at 16.  When the Review Board did conduct hearings, the findings were troubling: According to the Office of the Independent Police Monitor (OIPM), the Review Board determined that 17 of the 28 serious uses of force by NOPD

officers in 2021—61 percent—were not justified.[17]    NOPD's unjustified uses of force are not

mere policy violations.  For example, on August 10, 2020, an NOPD officer used a taser to stop

an unarmed man who walked away with his hands raised.  Ex. 11 (2020-0463-R).  The man was

wanted only for a municipal summons.  *Id.* at 3.  The officer gave no "verbal commands" and did

not "instruct [the man] to show his hands or put anything down."  *Id.* at 7.  The man "did not

make any moves towards" the officer "and raised his hands."  *Id.*  NOPD ultimately found that

this use of force was unjustified and violated policy, but the officer's lieutenant defended the

officer's "lawful right to use his Taser to detain" the man.  *Id.* at 21.

While it is laudable that NOPD itself identified this and other incidents as unjustified,

which is progress from where it was in 2010, these uses of force nevertheless violated specific

requirements of the Consent Decree. *See, e.g.*, Consent Decree, ¶ 54.  The City admits that

"NOPD counts 15 unjustified uses of force" based on Use of Force Review Boards in 2021

alone, confirming that OIPM's report is largely accurate.  Ex. 5 (City's Response to Request for

Admission No. 15).[18]  The high rate of unjustified force raises concerns that NOPD has not

achieved a durable remedy to ensure lawful uses of force.

Nor did the City show that NOPD has complied with the Consent Decree's restrictions on

vehicle pursuits.  *See* Consent Decree, ¶¶ 30–31.  On March 20, 2019, for instance, NOPD

officers "conducted an unauthorized vehicle pursuit of a potentially stolen vehicle" driven by "a

minor with another minor riding next to him."  Doc. 593-1 at 11.  As the Monitor explained, the

officers "pursued at a high rate of speed (in clear violation of NOPD policy), and the minor's car

tragically crashed into the Unity One Salon, resulting in the deaths of the two minors in the

---

[17] Office of Independent Police Monitor, 2021 Annual Report at 32, https://nolaipm.gov/wp-content/uploads/2022/08/2021-OIPM-Annual-Report.pdf.

[18] It is unclear why the City's count (15) and OIPM's count (17) of the number of unjustified uses of force found by the Use of Force Review Board in 2021 differs, raising concerns about the accuracy of NOPD's data.

vehicle, the death of a customer having her hair done at the salon, injuries to several others in the salon, and the destruction of the salon itself." *Id.* Even after this tragedy, however, NOPD continued to engage in unjustified pursuits. In 2021, NOPD opened formal disciplinary investigations for 19 of the 52 pursuits that year, or 37 percent of all pursuits. Ex. 22 (2021 Use of Force Annual Report at 17).

Deficient supervision may contribute to continued dangerous pursuits. On January 12, 2022, NOPD task force officers in an unmarked car initiated an unauthorized pursuit of a car driven by minors. The unauthorized pursuit resulted in a crash that seriously injured a pedestrian. *See* Ex. 12 (May 20, 2022 Use of Force Review Board Minutes, CTN2022-0017-R). On June 14, 2022, an NOPD member—assigned to a task force despite a history of pursuit and force policy violations—took part in an authorized pursuit of a stolen moped. During the pursuit, the officer rammed the moped three times without authorization. *See* Ex. 13 (Oct. 21, 2022 Use of Force Review Board Minutes, FDI2022-0271-R, at 6). Other members violated policy by failing to report this use of force, which resulted in a broken hand. *Id.* at 7. NOPD's own recent documents show that officers have continued to engage in pursuits that resulted in serious injuries.

The City bears the burden of establishing compliance with the terms of the Consent Decree. Consent Decree, ¶¶ 486, 492; *Frew*, 820 F.3d at 726. Because the City did not provide evidence sufficient to show that NOPD has satisfied the Consent Decree's requirements regarding uses of force and sustained compliance for two years, there is no factual basis for the Court to make that finding. *See Frew*, 820 F.3d at 726.[19]

---

[19] The Monitor is currently "[a]ssessing all serious use of force incidents" and reviewing pursuits. Doc. 674-1 at 15.

**Supervision (Section XV).**  The United States found that systemic deficiencies in NOPD's supervision contributed to a pattern or practice of unlawful conduct, and the parties agreed to detailed requirements for supervision in the Consent Decree to remedy these deficiencies.  *See* Doc. 1, ¶¶ 14, 20, 23–24; Doc. 1-1 at 15–16, 87–96.  In April 2022, the United States agreed that the Supervision section could be moved "into the green," or initial compliance.  More recent evidence shows backsliding in key areas.

As the Monitor explained in the recent Annual Report: "Since the outset of the Consent Decree, the Monitoring Team has noted [NOPD's] slow progress in this critical area," and NOPD "still has significant work to do."  Doc. 674-1 at 46, 48.  The Monitor "continues to see examples of the lack of close and effective supervision," including a "recent scandal involving officers violating . . . secondary employment rules," "[t]he loss of PIB [Public Integrity Bureau] quality assurance personnel without a prompt solution," "compliance slippage in the area of Custodial Interrogation and Photographic Lineup in the 7th District," and "a wholesale lack of supervision of NOPD officers assigned to the Mayor's Executive Protection Detail."  *Id.* at 46.  The Monitor has long identified NOPD's supervision as an area of concern.  *See, e.g.,* Doc. 613-1 (Feb. 17, 2021 Annual Report stating that supervision "require[s] significant ongoing attention by the NOPD").

In August and September 2022, for example, the Monitor visited with NOPD supervisors to assess NOPD's implementation of the early warning system required by the Consent Decree to identify officers at risk of engaging in problematic conduct.  The Monitor determined that some supervisors did not know how to handle alerts from the early warning system or identify patterns of behavior by officers.  Ex. 14 (Aug. 2022 INSIGHT Audit at 11–17); Ex. 15 (Sept. 2022 INSIGHT Audit); Consent Decree, ¶ 316.  The City admitted that the INSIGHT system did not

even track all of its domains required by Consent Decree Paragraph 320 for the entire first half of

2022.  Ex. 5 (City's Response to Request for Admission 66).

The City and NOPD have admitted that supervision is an ongoing issue, which weighs

against any finding of compliance.  At the January 12, 2023 meeting with the parties and the

Court, NOPD Superintendent Woodfork stated to the Court that supervision was lacking, and

that her top priority was to make sure NOPD did not backtrack again.  Nor has the City

demonstrated that it has satisfied the discrete provisions of Section XV.  For example, the

Consent Decree requires supervisors to complete supervisor-specific training, but the City

admitted that only 10 of the 34 sergeants in the Public Integrity Bureau completed the required

training.  Ex. 5 (City's Response to Request for Admission 62).

Finally, the Monitor has not determined that NOPD supervisors provide close and

effective supervision with respect to the other sections of the Consent Decree, including Use of

Force and Stops, Searches, and Arrests.  NOPD's own audits suggest that supervision is deficient

in some areas:  when nearly one-third of pat-downs by officers are not supported by documented

reasonable articulable suspicion, that is evidence that NOPD may lack close and effective

supervision.  Ex. 1 (NOPD Audit of March–May 2022 SSA incidents) at 16, 19, 53.

**Secondary Employment System (Section XVI).**  Closely associated with the Consent

Decree's requirements for close and effective supervision are its requirements governing

secondary employment—i.e., voluntary overtime details paid for through taxing district authority

or by private entities.  The Consent Decree required that the City establish a separate office to

manage secondary employment and that NOPD set up rules to ensure NOPD officers would not

supervise a higher rank on those details, but rather that there be appropriate supervision.

Specifically, the rules forbade officers from billing for most travel time and forbade direct solicitation of details.

The Monitor moved the City "into the green" with this Section in January 2019, but it has not shown that it has sustained full and effective compliance.  Moreover, several concerning recent developments—including high-profile scandals and potentially criminal conduct—suggest non-compliance.  *See* Apr. 20, 2022 Hr'g Tr. 21:10-15.  For example, OIPM recently described a scandal involving numerous officers violating NOPD policies and Consent Decree requirements.[20]  According to OIPM, NOPD officers "appeared to have overlapping time," which "could be a form of payroll fraud"; one officer "allegedly was at home and on the Westbank of New Orleans racing cars when he was scheduled for secondary employment details or NOPD shifts"; and the allegations resulted in "lasting fallout," including questions about whether "the celebrated reforms of the Consent Decree are working and if corruption is again a factor in the secondary employment system."[21]  Despite public calls to correct the secondary employment system, the City admits that its payroll systems, which permitted many of the known policy violations for secondary employment, continue to permit overlapping time entries.  *See* Ex. 5 (City's Response to Request for Admission No. 77).  In its recent Annual Report, the Monitor discussed reports that "some NOPD officers were violating the rules concerning secondary employment" and stated that the City "has not provided proof" that it has modified payroll systems that led to these violations.  Doc. 674-1 at 49.

**Misconduct (Section XVII).**  Holding officers accountable for misconduct is another core area of the Consent Decree, and deficiencies in misconduct investigations and discipline

---

[20] *See* Office of Independent Police Monitor, *Secondary Employment Report* (Feb. 21, 2023), https://nolaipm.gov/wp-content/uploads/2023/02/2-13-2023-Secondary-Employment-Systemic-Changes-and-Education-Report-with-NOPD-Response.pdf.
[21] *Id.* at 8–9.

contributed to the legal violations described in the United States' findings report.  Doc. 1, ¶¶ 14, 23–24; Doc. 1-1 at 18–19, 106–127.  The Monitor moved the City "into the green" with this Section in January 2021.  In November 2022, however, the Monitor reviewed dozens of misconduct investigations and identified problems with the timeliness of investigations, failures to timely notify civilian complainants, and untimely discipline.  Ex. 16 (Nov. 2022 PIB Audit). Indeed, the City admits to a "backlog of disciplinary hearings and letters."  Ex. 5 (City's Responses to Requests for Admission Nos. 79, 80).  In both 2021 and 2022, "the majority of disciplinary letters issued were over 30 days from the date the Superintendent of Police signed off on the penalty."  Ex. 5 (City's Responses to Requests for Admission Nos. 86, 87); Consent Decree, ¶ 403 (NOPD "shall have 30 days to determine and impose the appropriate discipline"). Nor did NOPD timely notify complainants of the outcome of misconduct investigations. *Compare* Ex. 5 (City's Responses to Requests for Admission Nos. 88 & 89), *with* Consent Decree, ¶ 420.

In addition, the Consent Decree requires NOPD to have a "sufficient number of well-trained staff [] assigned and available to complete and review thorough and timely misconduct investigations."  Consent Decree, ¶ 379.  But the City admits that "staffing deficiencies damagingly impacted the PIB Quality Assurance Unit" and "the PIB In-Take Unit."  Ex. 5 (City's Response to Request for Admission No. 82).  Similarly, the Consent Decree requires NOPD to conduct integrity audit checks "to identify and officers engaging in at-risk behavior." Consent Decree, ¶ 383.  But the City admits that "[n]o integrity checks were conducted in 2021." Ex. 5 (City's Response to Request for Admission No. 83).  NOPD had "19 delinquent investigations" in 2022, and "17 delinquent" investigations in 2021.  Ex. 5 (City's Responses to Requests for Admission Nos. 84 and 85).

Rather than finding evidence of compliance, the Monitor has found signs of backsliding in NOPD's accountability systems.  As the Monitor explained in the recent Annual Report, the November 2022 audit "found that, as compared to the Monitoring Team's previous audit in 2019, the NOPD's compliance rate remained the same for 20 paragraphs, improved for two paragraphs, and decreased for 12 paragraphs."  Doc. 674-1 at 50.  The Monitor "will be working with PIB to ensure that the causes of [NOPD's] non-compliance are identified and remedied." *Id.*  The City has not disputed these findings.[22]  The Monitor has also raised concerns about the misconduct investigation into issues related to the Mayor's Executive Protection detail.  Ex. 17 (Feb. 17, 2023 letter from J. Aronie).

<p style="text-align:center">*      *      *</p>

The City asserts in its Motion that "[n]one of the numerous reports from the Monitor or NOPD in the last two years have shown any deviations from the provisions of the Decree that would 'severely impair' its purpose."  Doc. 629-1 at 30.  That is not the standard for termination under Rule 60(b)(5): The Fifth Circuit explained last year that the "substantial compliance" standard permits "deviations from a contract's provisions that do not severely impair *the contractual provision's purpose*."  *Frew*, 2022 WL 135126, at *3 (emphasis added).  Even if the City accurately stated the legal standard, the evidence above undermines its assertion of no deviations from the Consent Decree's purpose.

The Monitor has repeatedly highlighted concerns regarding core areas of the Consent Decree and constitutional policing, not only in its most recent Annual Report but also in reports from 2020 and 2021.  NOPD's own audits confirm many of these concerns.  Importantly, in

---

[22] The City submitted a deficient document objecting to certain parts of the Monitor's report, and that document did not discuss issues related to the Misconduct section of the Consent Decree.  Doc. 675.  The Court ordered the City to file a corrected document by March 16, 2023.  *See* Mar. 9, 2023 Minute Order.  The City failed to do so.

addition to the City's failure to demonstrate satisfaction of sections such as Use of Force and Stops, Searches, and Arrests, there is evidence of non-compliance in NOPD's supervision and accountability systems.  These deficiencies, which contributed to the legal violations that led to the Consent Decree, cut against the City's argument that there is a durable remedy in place to address any unlawful conduct by officers.

The City also failed to submit any evidence or argue that it has satisfied other sections of the Consent Decree.  The City incorrectly relies on past statements by the Monitor that NOPD was "in the green" for certain sections.  As the Court made clear, those statements were not determinations of compliance. Doc. 669 at 3–4.  In any event, the question for purposes of the City's Motion is "whether the City is in full and effective compliance" with the Consent Decree; this compliance must be current and sustained, not at some temporary point in the past.  *Id.* at 6; *see also* Doc. 629-1 at 12 ("It is critical . . . to evaluate whether today's NOPD has substantially complied with the Decree.").  The City has not met that burden in its Motion, and the Monitor's recent assessment shows areas of non-compliance.  *See, e.g.*, Doc. 674-1 at 38 ("Simply put, NOPD has not consistently been meeting its Consent Decree obligations to 'offer a centralized and comprehensive range of mental health services that comports with best practices and current professional standards.'"); *id.* at 34 (citing recent reports showing that "many challenges still exist in complying with all of the requirements of the Consent Decree" concerning community engagement).  The City has not shown that it has satisfied the terms of the Consent Decree.

## 2.   The City Has Not Satisfied the Consent Decree Within the Meaning of Rule 60(b)(5).

Because the City cannot show that it has satisfied the Consent Decree, it cannot demonstrate that termination is required under Rule 60(b)(5)'s first prong.  The City tries to sidestep its failure to meet its evidentiary burden by arguing that termination is warranted

because NOPD complies "with the federal law provisions whose violation . . . the Decree sought to remedy." Doc. 629-1 at 4. But, as explained above, NOPD's own audits and the Monitor's reports contain evidence that there are ongoing violations of federal law. Moreover, the City misunderstands the its burden under Rule 60(b)(5) and the Consent Decree. The City entered into the Consent Decree to remedy the legal violations alleged in the complaint and described in the United States' findings report. The City relinquished the right to litigate the merits of those legal violations, and it acknowledges that the parties entered into the Consent Decree "to reduce litigation costs and risks by agreeing to the terms of compliance at the outset." Doc. 629-1 at 44. Like the order in *Frew*, the Consent Decree "implement[s]" federal statutory and constitutional requirements "in a highly detailed way, requiring [City] officials to take some steps" that federal law "does not specifically require." *Frew*, 540 U.S. 431, 439 (2004). As the Supreme Court has explained, "enforcing the decree vindicates an agreement that [City] officials reached to comply with federal law." *Id.*

The Fifth Circuit has rejected the argument advanced by the City here. That court has repeatedly stated that Rule 60(b)(5)'s first prong requires compliance with the Consent Decree's terms, not "mere compliance with the minimum requirements of federal law." *Frazier*, 457 F.3d at 438. In *Frazier*, the Fifth Circuit quoted with approval the following portion of the district court's ruling: "If the basis for a meritorious Rule 60(b) motion is that the claims underlying the consent decree are not meritorious, then parties to consent decrees would be permitted to file periodic Rule 60(b) motions asserting compliance with federal law and, in effect, continually re-litigate the underlying claims until a court determines the defendants are in compliance with federal law and the decree is dissolved." *Id.*

Similarly, in *Frew v. Janek*, the Fifth Circuit did not ask whether the defendants were in compliance with federal law to determine whether they had satisfied a consent decree, but rather whether they had "implement[ed] the broad range of supportive initiatives memorialized in the Decree." 780 F.3d at 328.  As the court explained, "[t]he whole point of negotiating and agreeing on a plethora of specific, highly detailed action plans was to establish a clearly defined roadmap for attempting to achieve the Decree's purpose. In other words, the parties already agreed that substantial compliance with this roadmap would achieve their common goal." *Id.*; *see also id.* at 331–32 (termination was not "clearly erroneous" where "Defendants had completed the discrete, information-conveying actions required by this section of the Decree"). Here, however, the City has not shown that it has substantially complied with the Consent Decree's detailed requirements.

The City argues that it has "substantially complied with the Decree under the standard repeated recently by the Fifth Circuit in *Frew*." Doc. 629-1 at 53 (citing *Frew v. Young*, 2022 WL135126 (5th Cir. Jan. 13, 2022)).  But in *Frew v. Young*, the Fifth Circuit did not examine whether the state complied with federal law, unmoored from the text of the relevant corrective action order provisions.  Rather, the court held that the district court "did not abuse its discretion in concluding that the defendants had satisfied" the corrective action order's specific instructions.  *Id.* at *4.  In support of that holding, the court explained that the State provided a "reasonable explanation" of its compliance, supported by "thousands of pages of evidence" that "plaintiffs did not refute."  *Id.* at *4, *5.  In contrast, "plaintiffs offered only counsel argument." *Id.* at *4.  Here, the City has not provided evidence of compliance with the Consent Decree's specific requirements.  Under the standard articulated in *Frew*, the City's Motion fails to satisfy Rule 60(b)(5)'s first prong.  The law is clear: "A Rule 60(b) motion is not a vehicle by which

Defendants may disregard the voluntary obligations contained in the Consent Decree, allow time to pass, and then litigate the underlying claims in hopes of never actually complying with [] its terms." *Frazier*, 457 F.3d at 438.[23]

The City also overlooks the Supreme Court's guidance about consent decrees in *Frew v. Hawkins*. In that case, state officials argued that "a federal court should not enforce a consent decree arising from an *Ex parte Young* suit unless the court first identifies, at the enforcement stage, a violation of federal law." 540 U.S. at 438. The Supreme Court "[d]isagree[d] with this view." *Id.* A consent decree, the Court explained, "is a federal-court order that springs from a federal dispute and furthers the objectives of federal law." *Id.* The plaintiffs in the case had moved to enforce "a remedy the state officials themselves had accepted when they asked the District Court to approve the decree." *Id.* at 439.

Even if evidence of ongoing legal violations were relevant under Rule 60(b)(5)'s first prong, the City could not demonstrate compliance. NOPD's own audits and files contain evidence of unlawful conduct, *see supra*, and further evidence is publicly available.[24] But under the existing standard set by the Supreme Court and the Fifth Circuit, the City has not established that is has satisfied the Consent Decree within the meaning of Rule 60(b)(5).

---

[23] The City also cites the Eleventh Circuit's decision in *Peery v. City of Miami*, but that case upheld a district court's termination of consent decree based on an interpretation of the decree's text and a seven-day evidentiary hearing. 977 F.3d 1061, 1068, 1070–72 (11th Cir. 2020).

[24] *See, e.g., VIDEO: NOPD officer picks up, carries, drops woman during altercation along parade route*, FOX 8 (Feb. 20, 2023), https://www.fox8live.com/2023/02/20/video-nopd-officer-picks-up-carries-drops-woman-during-altercation-along-parade-route/; Judgment, *United States v. Vicknair*, 2:22-cr-00212, Doc. 48 (Mar. 14, 2023) (NOPD officer sentenced to federal prison for sexually assaulting a 15-year-old girl); *Upton v. Vicknair*, 2023 WL 2043333, at *3 (E.D. La. Feb. 16, 2023) (finding that an analysis of NOPD's own data—showing 236 complaints of sexual assault and/or intimate violence by 189 NOPD officers between 2014 and 2020—provided a credible basis to allege "a pattern of sexual abuse" by NOPD officers that "put decisionmakers on notice of violations of constitutional rights.").

B.  **The City Has Not Established Full and Effective Compliance Under Paragraph 448's Outcome Measures.**

The City has not shown full and effective compliance through "sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures." Consent Decree, ¶ 491. As the City's own arguments make clear, it has not attempted to make an evidentiary showing that the outcome measures provide an independent alternative ground for termination of the entire Decree at this time. *See id.*, ¶¶ 486, 492. Even if the outcome measures could provide independent alternative grounds, however, the Monitor has not verified the City's data, as required by the Decree. Even if the Monitor had verified the City's data, the Decree does not permit the City to unilaterally select the relevant outcome measures. And even if the Court considered the City's data as potential evidence to support termination, that data does not show "sustained and continuing improvement."

*First*, the City does not argue that there is evidence that the Decree's outcome measures provide an independent alternative ground for termination of the entire Consent Decree here. The City's argument is limited to two sections of the Decree: Bias-Free Policing and Stops, Searches, and Arrests. *See* Doc. 629-1 at 30 (seeking "a compliance determination pursuant to the Outcome Assessments of Paragraph 448 *for the two areas that have not already been formally found in compliance*") (emphasis added). Indeed, the City only attached evidence related to outcome measures for Bias-Free Policing and Stops, Searches, and Arrests; it did not attach evidence related to the outcome measures for the other areas listed in Paragraph 448. *See* Doc. 629-3 (Appendix A); Consent Decree, ¶ 448(a), (d), (e), (f), (g), (h), (i). Instead, the City appears to assume that the Monitor's prior statements about sections being "in the green" amounted to compliance findings, but the Court expressly rejected that assumption in denying the City's motion to reconsider. Doc. 669 at 3 ("The Court has not issued orders finding the City

35

is or is not in compliance with particular sections of the Consent Decree.").  Without a finding that the City has achieved—and sustained—full and effective compliance with the other sections of the Decree, the City cannot justify termination based solely on outcome measures for Bias-Free Policing and Stops, Searches, and Arrests.

*Second*, the City cannot unilaterally decide how compliance will be assessed.  The list of outcome measures in Paragraph 448 is non-exclusive, as shown by its use of "including."  *See* Consent Decree, ¶ 14(nn) ("'Including' means 'including, but not limited to.'").  Some relevant measures are not explicitly enumerated in Paragraph 448, such as the number and rate of searches for which there is a documented legal basis for the search and the rate of arrests for which NOPD gave appropriate *Miranda* warnings. Accordingly, Paragraphs 448 and 449 contemplate that the parties will discuss and agree to a set of outcome measures.  In January 2016, the parties did exactly that:  they met to discuss the outcome measures to be assessed, including how the data would be collected and how the measures would be calculated.  *See* Ex. 18 (Jan. 2016 retreat agenda) at 1–2.  The parties have continued discussions since 2016, but NOPD has never provided all of the necessary data and analysis, and the parties never finalized the full set of outcome measures.  The City cannot now unilaterally determine which outcome measures should be considered, nor should it be permitted to show compliance through its self-selected metric.

*Third*, the Monitor has not determined that the data are "reasonably reliable and complete."  Consent Decree, ¶ 449.  Paragraph 448 identifies outcome measures for various sections of the Consent Decree.  Paragraph 449, in turn, ensures that these measures are based on reliable and accurate data.  Paragraph 449 states; "In conducting these outcome assessments the Monitor may use any relevant data collected and maintained by" NOPD, the Inspector General,

or the Independent Police Monitor, "provided that it has determined, and the Parties agree, that this data is reasonably reliable and complete."  Here, the Monitor has not determined that the outcome assessment data cited in the City's motion are "reasonably reliable and complete."  The City does not state in its Motion that the Monitor has made such a determination or that the parties agree, nor has the City requested such a determination from the Monitor.  Indeed, NOPD's own audits undermine the reliability of some of its data.  For example, NOPD found that nearly one-fifth of search warrants it audited were not logged as required.  Ex. 19 (2022 Search Warrants Audit) at 2, 7, 9.  NOPD also found that in nearly one-fifth of the stops, searches and arrests occurring from March to May 2022 that it audited, officers' reports were inconsistent with what video footage revealed about the event.  Ex. 1 (NOPD Audit of March–May 2022 SSA incidents) at 13, 52.  And in NOPD's audit of May 2021 incidents, 35 percent of officer reports were inconsistent with video footage.  Ex. 2 (NOPD Audit of May 2021 SSA incidents) at 14, 49, 8; *see also* Doc. 613 at 30, 42; Doc. 674-1 at 20–22.  This significant number of inconsistencies between what video shows and what NOPD's documentation says raises concerns about the reliability of NOPD's overall data on stops, searches, and arrests.  Because the City has not satisfied a prerequisite of full and effective compliance through outcome measures, it cannot meet its burden to terminate the Decree through that route.

*Fourth*, the City's data do not reflect "sustained and continuing improvement" for Bias-Free Policing and Stops, Searches, and Arrests.  Under Paragraph 448(c), the outcome measures on Bias-Free Policing include homicide clearance rates, comparative response time between Limited English Proficiency (LEP) and non-LEP individuals, and clearance rate of sexual assault and domestic violence cases.  Consent Decree, ¶ 448(c).  The City's Appendix does not show sustained and continuing improvement in these measures.  Doc. 629-3 at 12–40.  NOPD's

clearance rates for domestic violence, sexual assault, and aggravated rape cases all declined, rather than improved, over the relevant period:

- NOPD's clearance rate for domestic violence cases was 28.66 percent in 2017 and 21.47 percent in 2021.  *Id.* at 30.

- NOPD's clearance rate for sexual assault cases was 16.14 percent in 2017 and 4.74 percent in 2021.  *Id.* at 37.

- NOPD's clearance rate in aggravated rape cases was 17.13 percent in 2017 and 3.2 percent in 2021.  *Id.* at 38.

NOPD's homicide clearance rate was flat at best; it was 41.4 percent in 2016, dropped to 30.7 percent in 2020, and was 43.60 percent in 2022.  *Id.* at 25.  And NOPD's data showed consistently slower response times for calls by people with Limited English Proficiency.  *Id.* at 26.  Similarly, NOPD's Bias-Free Policing Audit showed that "NOPD was slower to respond to both emergency and non-emergency calls for service in 2021 that occurred in majority [Black] neighborhoods."  Ex. 3 (2021 Bias-Free Policing Annual Report at 40).

In addition, NOPD's own analysis of Stops, Searches, and Arrests includes outcome data, and the City does not demonstrate that these data support full and effective compliance.  As noted above, for example, NOPD's audit of incidents from March–May 2022 found that officers failed to provide an adequate justification for nearly a third of pat-downs or frisks, and officers failed to adequately advise people of their *Miranda* rights in 13 percent of arrests reviewed.  Ex. 1 (NOPD Audit of SSA incidents occurring March–May 2022) at 2, 19, 20, 53.  Nor were unjustified pat-downs a new concern: NOPD's audit of May 2021 incidents found that officers did not adequately document the legal basis for pat-downs in 40 percent of the incidents reviewed.  Ex. 2 (NOPD Audit of May 2021 SSA Incidents) at 2, 11, 19, 50; *see also* Ex. 20

(May 2020 SSA Audit) at 12, 16, 17.  The Monitor has continued to express concern about these issues.  *See e.g.* Doc. 613 at 10; Doc. 674-1 at 20–21.

The City has not demonstrated full and effective compliance with Bias-Free Policing and Stops, Searches, and Arrests through "sustained and continuing improvement" in the Consent Decree's outcome measures.  Consent Decree, ¶ 491.  Accordingly, even if the Court considers the data provided by the City, that data does not establish full and effective compliance with the Consent Decree.

### C.  The City Has Not Identified Any Significant Changes in Fact That Require Termination of the Consent Decree.

The City has not shown that significant, unforeseeable changes in fact require termination of the Consent Decree because "applying it prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).  The City must demonstrate that "a significant change" in "factual conditions" renders compliance with the Consent Decree "substantially more onerous" or "unworkable because of unforeseen obstacles."  *Rufo*, 502 U.S. at 384.  Even if the City could meet that burden, the City's "proposed modification"—here, complete termination of the Decree—must be "suitably tailored to the changed circumstance."  *Id.* at 383.  The City argues that certain aspects of the compliance process require terminating the Decree.  Doc. 629-1 at 33–49.  That argument is meritless.

*First*, the City's "changed conditions" arguments belong in a motion to *enforce* the Consent Decree, not a motion to terminate it, because every "changed condition" cited by the City is a purported deviation from the processes set forth in the Consent Decree itself.  The City cites no case granting termination under Rule 60(b)(5) based on alleged problems with processes mandated by a consent decree itself.  Instead, Rule 60(b)(5) termination cases typically involve changed conditions *external* to the consent decree process.  *See, e.g., Anderson*, 38 F.4th at 479

39

(rejecting City's argument that decline in jail population and budget shortfall justified relief). Here, however, the City admits that "NOPD does not object to the requirements imposed by the [Consent Decree]." Ex. 4 (Sept. 13, 2022 Response to Request for Information) at 5. If the City objects to the Monitor's performance or the United States' interpretation of the Consent Decree's compliance goals, then it could have filed a motion seeking to enforce its interpretation of the Consent Decree. But it has not done so. For example, the City has never invoked Paragraph 484 of the Consent Decree, which permits a party to seek appropriate relief from the Court concerning the Monitor's performance. In any event, the issues cited by the City do not constitute the kinds of changed factual circumstances warranting relief under Rule 60(b)(5).

*Second*, the Consent Decree itself provides for modifications by the parties, and the parties have modified the Decree more than 25 times over the years, which shows that wholesale termination is inappropriate. *See, e.g.,* Doc. 564-1 (Consent Decree showing modifications); Doc. 335 (Motion to Amend); Doc. 362 (same); Doc. 467 (same); Doc. 621 (Order Granting Motion to Amend). As the parties explained in a joint motion to amend in 2018: "In negotiating the Decree, the Parties contemplated that changes to the Decree may be necessary to reflect changes in circumstance and experience implementing the Decree." Doc. 561 at 1. The parties agreed to changes that would streamline the compliance process and help NOPD. For example, the parties revised rules concerning eligibility for secondary employment to make the calculation "much simpler for NOPD to implement." *Id.* at 3. The parties agreed to delete Paragraph 311 because "audits demonstrate that NOPD now has enough sergeants to consistently meet the supervisory ratios required by Paragraph 310 without resorting to the use of acting supervisors." *Id.* at 2. And the parties amended Paragraph 430 because "monthly meetings" were "no longer [] necessary for accomplishing the objectives" of the "criminal justice coordination group." *Id.* at

3.  The parties could have discussed similar types of changes here.  Instead, the City filed a Motion to Terminate without notifying the United States that it desired further modification of the Decree.

Third, the City failed to provide evidentiary support for the purported changed conditions it argues in its brief, and evidence is required.  *See City of Boerne*, 659 F.3d at 438–39.  The City knows how to identify changed conditions and provide supporting evidence: in a prior motion to modify the Consent Decree, for example, the City submitted an affidavit from the Executive Director of the Office of Police Secondary Employment (OPSE).  *United States v. City of New Orleans*, 32 F. Supp. 3d 740, 743 (E.D. La. 2014).  The Director swore to facts related to the secondary employment system, and the Court found "the facts established by [the] affidavit" were "sufficient for the City to meet its burden," noting that the Director had "personal knowledge of the topics covered in his affidavit." *Id.* at 744.  The City's proposed amendment was "suitably tailored to address changed circumstances," and the Court concluded that changes to the rate and fee structure would "provide additional flexibility . . . to ensure OPSE's success." *Id.* at 745, 747.  The City has not even tried to make that evidentiary showing here.[25]

Fourth, the City fails to show that the purported changes are "significant" or even factually accurate.  *See Anderson*, 38 F.4th at 479–80 (holding that the City's asserted changed condition "does not exist" because "[t]here is ample evidence, including testimony from independent monitors, that the existing facility remains inadequate").  For example, the City

---

[25] The City's Motion lists eight "Changes of Condition that Warrant Termination."  Doc. 629-1 at 33–49.  The City is limited to these eight supposed changes asserted in its brief.  *See Frew v. Young*, 2022 WL 135126, at *3 (5th Cir. Jan. 13, 2022) (plaintiffs "forfeited any challenge to the district court's decision to terminate [] six sections and related paragraphs of the consent decree" because they "offer[ed] specific argument only with respect to the first section"); *Taylor v. LeBlanc*, 2023 WL 19789825, at *4 (5th Cir. Feb. 14, 2023) ("A single, unsupported sentence isn't enough to adequately brief the issue.").

argues that the "universal 95% threshold adopted by DOJ and the Monitor" is "arbitrary."  Doc. 629-1 at 34.[26]  But NOPD's own policy—adopted nearly seven years ago—requires that audits must "[t]est for a 95% rate of compliance with relevant policy."[27]  If the City believed this threshold was "arbitrary" and "not indicative of carrying out the policies as trained in actual practice," Doc. 629-1 at 34, then it could have sought to modify the threshold through the mechanisms provided in the Consent Decree.  *See, e.g.,* Consent Decree, ¶¶ 21–23.  The City did not do so.  Moreover, NOPD's own audits of areas like Use of Force and Stops, Searches, and Arrests show percentages far below 95 percent, *see supra*, so the City has not shown that a particular compliance threshold is preventing NOPD from achieving compliance.

The next two purported changes relate to NOPD's audits—the City contends that the Consent Decree must be terminated because NOPD has been "[t]asked with the Monitor's [a]udit [p]rocess" and must "[d]esign, [c]onduct, and [a]nalyze [a]udits."  Doc. 629-1 at 35–39.  Again, if the City believed that NOPD should not conduct audits and that the Monitor "refuses to comply with the Decree," *id.* at 37, it could have raised that with the United States and the Monitor and filed a motion seeking to enforce the Consent Decree.  The City did not do so.  That is unsurprising because the parties *agreed* that NOPD would develop and conduct audits with the assistance of the United States and the Monitor.  For example, at the October 19, 2022 hearing, the Court stated, "My understanding is that all the parties agree . . . to work together to develop the ways to audit" Bias-Free Policing and Stops, Searches, and Arrests.  Doc. 656 at 40:22–24.  Superintendent Ferguson responded, "Yes, ma'am."  *Id.* at 40:25.  He also agreed with the Court's statement that NOPD "has requested the help" of "the DOJ" to "figure out how to do

---

[26] The United States has never asserted that a 95 percent threshold is necessary for all compliance determinations.

[27] New Orleans Police Department Operations Manual, Ch. 11.4.1, *Audits and Reviews* (Effective July 10, 2016) at 3, 5, https://nola.gov/getattachment/NOPD/NOPD-Consent-Decree/Chapter-11-4-1-Audit-and-Reviews.pdf.

these audits." *Id.* at 41:1–7.  And the Monitor explained that NOPD was a "full partner[]": "We worked together. We were more than happy to be asked for the help. Our team has a lot of expertise and DOJ likewise." *Id.* at 41:8–11.  By developing its own auditing capabilities, NOPD would be prepared to sustain constitutional policing practices after the Consent Decree, and the City would reduce the costs associated with the Monitor conducting audits.[28]  The parties' agreement about NOPD's auditing goes back years.  For example, in June 2018, NOPD's Deputy Superintendent for Compliance sent an email attaching "some written guidance on how the audit unit approaches some of the more complex audit questions."  Ex. 21 (Jun. 8, 2018 email from D. Murphy); *see also* Doc. 613 at 27 (explaining DOJ, NOPD, and the Monitor agreed "NOPD would conduct" the Stops, Searches and Arrests audits, which "provided an important opportunity to assess the capabilities" NOPD's audit team.).

The next three purported changes cited by the City are "[e]ver [s]hifting [g]oals," "[c]orrective [a]ction [p]lans," and the "Supervision Initiative Working Group."  Doc. 629-1 at 39–44.  The City mischaracterizes the compliance process.  The City criticizes a compliance tracking spreadsheet, *id.* at 40, but that document merely broke down the Consent Decree's requirements into more specific, concrete action items for the parties.  The City fails to explain how a spreadsheet that provides direct guidance on how to achieve compliance is a changed circumstance.  If the City seeks more certainty around the compliance process, the spreadsheet helps provide that certainty.  If this certainty is insufficient, the City should work with the United States and the Monitor to propose relevant modifications to the Decree—consistent with the parties' longstanding practice in this case.

---

[28] *See* Doc. 656 at 41:16–21 (audit tools are "something that the NOPD can continue to use"); Dep't of Justice, Civil Rights Division, *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994–Present* at 23 (Jan. 2017) (discussing efforts to resolve cost concerns and "ensure that the monitoring team remains focused and works efficiently"), https://www.justice.gov/crt/file/922421/download.

Likewise, the City cites no authority for the statement that NOPD must "have a Corrective Action Plan approved by the Monitor or DOJ before it can be deemed in compliance." *Id.* at 41.  Corrective Action Plans, even if they are "not . . . listed in the Decree," *id.*, are merely a tool to help the City achieve compliance with the Decree, regardless of whether they are required by the Decree.  It is difficult to conceive how the City intends to remedy an area of non-compliance without some plan to correct it.

On supervision, the City provides no support or citation for its assertion that the Monitor has "directed that to reach compliance, the NOPD must [c]omplete the tasks identified by the Supervision Initiative Working Group." *Id.* at 43.  The Monitor's efforts to improve supervision—a longstanding deficiency at NOPD—do not require terminating the Decree.  *See* Doc. 674-1 at 46–48.  Indeed, aspects of the Supervision Initiative Working Group concerned specific requirements of the Consent Decree, including Paragraph 302's requirement that NOPD "implement fair and consistent promotions practices that comport with best police practices" and "result in the promotion of officers who are both ethical and effective." Consent Decree, ¶ 302.

Next, the City argues incorrectly that the United States has prevented NOPD from achieving full and effective compliance.  Doc. 629-1 at 44–49 (citing "DOJ's Continuous Investigation" and "Mandated Inefficiencies").  Although the City cites delays in approving certain policies, *id.*, Paragraph 22 of the Consent Decree authorizes the Monitor to resolve objections regarding policies, and if the City disagrees with the Monitor's resolution, then it can seek relief from the Court.  The City has not used this mechanism, and it is not a changed circumstance when the City has not followed the agreement's own mechanism for resolving disputes.  The City also misstates the facts.  For example, the City asserts that NOPD's Bias-Free Policing policy which was approved on June 9, 2016, "remained in an infinite edit loop until

recently." Doc. 629-1 at 48.  That is not accurate.  The publicly available version of this policy

shows that it took effect on July 10, 2016; it was not stuck in an "infinite edit loop."[29]  Similarly,

the City cites revisions to the Search and Seizure and Search Warrant policies, Doc. 629-1 at 48,

but the Consent Decree requires an annual review and revision process for all policies to ensure

their effectiveness and consistency with the Decree, including submission to the United States

and the Monitor.  Consent Decree, ¶¶ 18, 21, 23.  Nor did the City move to enforce its rights

under the Decree to resolve disagreements about policies by seeking relief from the Monitor or

the Court.  Consent Decree, ¶¶ 21–23.  The United States is not engaged in a continuous

investigation, nor is it interested in prolonging the Consent Decree; instead, it is seeking to work

collaboratively and in good faith with the City to implement the Decree expeditiously.

Finally, in a separate section of its brief, the City asserts that "the Monitor's failure to

provide formal quarterly reports have also made compliance more onerous on the City and

NOPD." Doc. 629-1 at 53.  But if the City is implying that NOPD does not receive regular

feedback and compliance updates from the Monitor, that is not true.  The Monitor provides

regular audits and compliance reviews to NOPD, members of the Office of the Consent Decree

Monitor frequently visit New Orleans to meet with NOPD commanders and supervisors, and the

Monitor identifies tasks that NOPD must complete in order to achieve compliance in various

areas.  *See, e.g.*, Exs. 14-16.  If the City believes that, despite these efforts, NOPD lacks "easily

trackable objective goals," Doc. 629-1 at 53, then the City can work collaboratively with the

United States and the Monitor to agree upon those goals (as the parties have done for years) or

seek relief by filing a motion with the Court.  For its part, the United States remains willing to

---

[29] New Orleans Police Department Operations Manual, Ch. 41.13, *Bias-Free Policing* ("Effective: 07/10/2016"), https://nola.gov/getattachment/NOPD/Policies/Bias-Free.pdf/.

engage with NOPD and the City on any aspects of the compliance process that could be improved.

*Fifth*, even if the City could show that aspects of the compliance process are a changed circumstance, any relief must be "tailored to resolve the problems created by the change in circumstances," and the City has not even tried to show that termination of the entire Consent Decree is appropriate here. *Rufo*, 502 U.S. at 391. Because the City can obtain the relief it seeks by simply filing a motion to enforce its interpretation of the Consent Decree, it cannot show that complete termination of the Decree is appropriate, let alone required.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the City's Motion to Terminate the Consent Decree.

Date: April 6, 2023

<div style="margin-left: 40%;">

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief

TIMOTHY D. MYGATT (DC 1021564)
Deputy Chief

/s/ Suraj Kumar
R. JONAS GEISSLER (NJ 025752001)
MEGAN R. MARKS (NY 5495676)
MEHVEEN RIAZ (DC 1030021)
SURAJ KUMAR (NY 5620745)
Trial Attorneys
Special Litigation Section
Civil Rights Division

</div>

United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel.: (202) 598-1211
Email: suraj.kumar@usdoj.gov

*Attorneys for the United States*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2023, I filed the foregoing through the Court's CM/ECF system, which will serve a true and correct copy of the filing on all counsel of record in this matter.

/s/ Suraj Kumar