**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br> Plaintiff, | CIVIL ACTION NO. <br> 2:12-CV-01924-SM-DPC |
| V. | JUDGE SUSIE MORGAN |
| **CITY OF NEW ORLEANS**, <br> Defendant. | MAG. DONNA PHILLIPS CURRAULT |

---

REPLY BRIEF IN SUPPORT
OF MOTION TO TERMINATE THE CONSENT DECREE
BY
THE CITY OF NEW ORLEANS

---

Respectfully submitted this 21ˢᵗ day of April 2023,

DAVILLIER LAW GROUP, LLC
Daniel E. Davillier, La. No. 23022
Charles F. Zimmer II, La. No. 26759 (T.A.)
Jonathan D. Lewis, La. No. 37207
935 Gravier Street, Suite 1702
New Orleans, LA  70112
Phone: (504) 582-6998
Fax: (504) 582-6985
ddavillier@davillierlawgroup.com
czimmer@davillierlawgroup.com

**Counsel for the City of New Orleans**
**and the New Orleans Police Department**

CONTENTS

I.  **Perfection is an Unattainable Standard** ..................................................1

II.  **The City has Substantially Satisfied the Decree.** ...........................4

A.  **Substantial Compliance Has Been Proven.** ..............................7

B.  **A Holistic View Improves NOPD's Compliance** .......................8

  1.  Stop, Searches, and Arrests (SSA) (Section V) ......................9

  2.  Bias-Free Policing (Section VIII) ...........................................11

  3.  Use of Force (Section III) ......................................................16

  4.  Supervision (Section XV) .......................................................22

  5.  Misconduct (Section XVII) ....................................................23

III.  **Drastic Modifications Have Rendered Further Enforcement  Inequitable  Under Rule 60(b)(5)** .....................................................................................24

A.  **NOPD and the City have been deprived of the neutral arbiter  contemplated by the Consent Decree.** ...........................................24

  1.  Ex parte cannot be the norm. .................................................26

  2.  Public Statements Regarding Pending Litigation .................31

  3.  The prohibition on management has been so repeatedly violated that it has harmed NOPD's supervisory structure. .......................................................36

  4.  Prohibited Monitor Press Statement are Harming NOPD .....38

B.  **Lack of critical mandatory reporting by the Monitor** ...............39

IV.  **Conclusion** ...........................................................................40

Cases

*Chisom v. Edwards*, 2022 U.S. Dist. LEXIS 100009, at *16 (E.D. La. May 24, 2022) .............. 8

*Frew v. Hawkins*, 540 U.S. 431, 441, 124 S.Ct. 899, 905, 157 L.Ed.2d 855, 865 (2004) ......... 25

*Frew v. Young*, No. 21-40028 (5th Cir. 2022) 2022 U.S. App. Lexis 1027*
 2022 WL 135126 .................................................................................................................. 4, 8

*Horne v. Flores*, 557 U.S. 433, 448 (2009) ............................................................................... 34

*In re Gee,* 941 F.3d 153, 159 (5th Cir. 2019). ............................................................................ 25

*Kansas v. Colorado*, 206 U.S. 46, 90-91, 27 S.Ct. 655, 664, 51 L.Ed. 956 (1907) .................. 25

*Younger v. Harris*, 401 U.S. 37, 44 (1971) ................................................................................ 29

Statutes

Federal Rule of Civil Procedure 60 .............................................................................................. 8

## I.    PERFECTION IS AN UNATTAINABLE STANDARD

In exchange for the sweeping reforms of the Decree, DOJ agreed to hand off compliance evaluation to a monitor that would focus on systemic constitutional faults using agreed upon methods and reports. Now, faced with losing control over NOPD, the DOJ shifts to a perfection-based model – asserting that any example of policy violation by an officer renders NOPD incapable of self-management.[1] This was not the agreement, and it highlights the growing chorus that consent decrees are a trap for the unwary.

DOJ's opposition brief demonstrates the source of frustration for the NOPD and other entities trapped in consent decrees. DOJ prepared a report in 2011 that stated NOPD was riddled with systemic unconstitutional police policies and practices, with no functional disciplinary safeguards. DOJ alleged that individuals in police custody died without real investigations. Use of force was seldom investigated or even questioned according to the report. Damaging and deadly police chases were allegedly accepted as part of the job. This system, DOJ concluded, led to the systemic violations of the Fourth and Fourteenth Amendment rights of New Orleans residents. That 2011 report was based on a 2010 investigation. That was then.

Now, after 10 years of federal control at the molecular level, NOPD has rebuilt every practice, procedure and training method of the force. Most NOPD officers only know the Consent Decree-way as their entire careers have occurred under its rubric. By April of 2022, NOPD had undisputedly reached full and effective compliance in at least 15 of the 17 areas of

---

[1] *See, e.g.*, Oppo. at 30, Rec. Doc. 682 ("[T]he evidence above undermines its assertion of no deviations from the Consent Decree's purpose.")

the sweeping Decree.[2] The remaining two areas were expected to move into "the green"

within 90 days. And that announcement came years after the Court and Monitor publicly

announced NOPD was nearing the finish line. Today, eight months after the City filed the

instant motion, NOPD is in full and effective compliance with over 87% of the paragraphs of

the Decree. The remaining 13% includes 12.7% which the Monitor has marked as "under

review" and only 0.3% that do not technically match the Decree's 2013 language.[3]

If the goal of the DOJ were to achieve the sweeping reforms of the Decree, it would

join the City in welcoming a transition from federal control to local elected control in

compliance with the Justice Department's policy to focus only on areas which still need this

level of oversight.[4] "Ultimately, the Division's goal is for its reform agreements to leave a law

enforcement agency with an enduring ability to self-correct when misconduct occurs and a

culture that strongly supports constitutional and effective policing—and to make these

changes as quickly and efficiently as possible."[5] The DOJ's opposition brief, unfortunately,

demonstrates a federal effort to perpetually retain control over local police departments as

perfection is not achievable in any organization. DOJ minimizes and dismisses the massive

---

[2] DOJ Opposition Brief ("Oppo.") at 10, Rec. Doc. 682.

[3] "Under Review" is a new category employed by the Monitor. Previously the categories where: (1) No Meaningful Progress, (2) Inadequate Progress, (3) Significant Progress, (4) Nearing Full & Effective Compliance, and (5) Full & Effective Compliance. *See* "Comprehensive Reassessment of the Consent Decree Monitor Pursuant To Paragraph 456 of the NOPD Consent Decree, Released January 24, 2019," Rec. Doc. 574-1, at 13

[4] *See* Review Of The Use Of Monitors In Civil Settlement Agreements And Consent Decrees Involving State And Local Governmental Entities, at www.justice.gov/ag/page/file/1432236/download

[5] "The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present," January 2017, at p. 37, at www.justice.gov/crt/file/922421/download.

successes of the NOPD and then magnifies isolated statistics and episodes to irresponsibly imply *systemic* problems.

As a cursory review of any news article about its recent opposition brief highlights, the DOJ cites a deadly chase, a Tazing incident, and a statistic from the Office of Independent Police Monitor in New Orleans to make its case for a violent undisciplined NOPD. Buried in the details is that: (i) the deadly chase was from four (4) years ago and resulted in four officers being terminated and enhanced discipline for even justifiable chases thereafter; (ii) the use of the Tazer in the example cited was found to be *justified* by the Civil Service Commission after NOPD disciplined the officer;[6] and (iii) the cherry-picked statistics ignore that the City and DOJ contractually agreed to the methods to gauge compliance to avoid either side highlighting the individual instances and ignore the agreed upon methods for measuring compliance.

The DOJ does not think NOPD has reached its full potential. And that is true, as it is for every institution, including the federal executive and judicial branches of government. The constitutional limits on federal control over a sovereign city department, however, do not empower either to maintain control once *systemic* violations of constitutional law have been remedied. "[W]e all must remember that perfection is not the goal of the consent decree, full and effective compliance is."[7] Full and Effective compliance is obtained when NOPD has drafted complaint policies, trained officers on those policies, and shown that the policies have been put into practice – not that policies are never violated. NOPD has reached the goal set by the Decree, and substantially satisfied its elements.

_____

[6] Exh. 105, Dept. of Civil Service Decision, No. 9435.
[7] Exh. 116 at 8:23-25.

## II.     THE CITY HAS SUBSTANTIALLY SATISFIED THE DECREE.

The Fifth Circuit Court of Appeals explained that "substantial compliance" with a consent decree excuses deviations that do not severely impair the consent decree's purpose.[8] The *purpose* in this case was to provide constitutionally compliant policing services to residents of New Orleans in response to DOJ's allegations of violations of the Fourth and Fourteenths Amendments of the Constitution. The data available today shows that after many years of federal monitoring, NOPD has made incredible advancements. As the Court often notes, "it's actually quite remarkable what we have accomplished in less than a decade." Exh. 114, at 9:9-24. And the Court has come to expect high levels of compliance from NOPD.[9] Of the 17 categories for which the Decree directs fundamental changes, the Monitor and DOJ agreed that as of April 2022, NOPD had satisfied 15, and the remaining two were expected to be deemed compliant soon thereafter.[10] The District Court announced at the public hearing on April 20, 2022 that it was hopeful that over the following three months NOPD would enter into a two-year sustainment period after the remaining few areas were shown to be compliant.[11] DOJ consented to this plan.[12]

---

[8] *Frew v. Young*, No. 21-40028 (5th Cir. 2022) 2022 U.S. App. Lexis 1027* 2022 WL 135126
[9] Exh. 110, at 35:15 – 36:9 ("I've grown increasingly concerned about the impact of NOPD's staffing shortages and lack of resources are having on its ability to sustain the high level of compliance we have grown accustomed to finding at these public hearings.")
[10] *See* Exh. 115, Prepared Public Hearing Remarks of Jonathan S. Aronie, Lead Monitor, NOPD Consent Decree Before Judge Susie Morgan, U.S. District Court For The Eastern District of Louisiana, April 20, 2022.
[11] *See* Exh. 116 at 5:19-6:1 and OCDM presentation at http://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/Loyola%20Proceeding%20Deck%20-%20March%202021.pdf .
[12] *See* Exh. 106, DOJ Objections and Responses to Discovery

As the Court knows, "full and effective compliance" is the defined burden of proof the City must meet to end federal monitoring under the first path of Paragraph 491. Rec. Doc. 565, at paras. 486, 491, 492. The City acknowledges that the Court has stated since then that it never actually found any section in compliance. DOJ has joined this position, claiming it never agreed NOPD was compliant with any section of the Decree. The City respectfully disagrees. As expressed by the Deputy Chief of DOJ, initial compliance determinations had been reached, and agreed to by all involved:

> We do want to acknowledge, and indeed applaud, the significant progress the City has made in implementing the consent decree. As the monitor has found, **and we have agreed**, the City has achieved initial compliance in 15 of the 17 substantive areas covered by the consent decree. …In the two remaining areas of the consent decree, stops, searches, and arrests and bias-free policing, the City is nearing compliance under one of the methods set forth in the consent decree.[13]
> ….
> Pertinent to this hearing though are both the Department of Justice's **bases for agreeing to finding NOPD in substantial compliance**, and the plan for the compliance plan going forward. **We agree with the monitor's determination that NOPD is now in substantial compliance** based upon a number of steps that NOPD has taken, including the last two areas that we've discussed, performance evaluations and promotions.[14]

And as the Monitor publicly explained, these initial determinations of the Court with DOJ consent were critical to NOPD's path to a final compliance determination:

> But Your Honor, it's important that I take a minute and at least be very clear about what it means to **put an area into the green**. First, it means that **NOPD has reasonably met**

---

[13] Exh. 110, at 28:25 – 29:16.
[14] Exh. 116, at 78:15-21*; see also*, Exh. 103, 12/9/22 Mygatt letter, noting "Areas Previously Found To Be In Compliance."

**its obligations under the consent decree in that area**. And it means that the structures required by the consent decree are in place, they're working, and they're being audited. But it does not mean that everything is perfect. It does not mean that there isn't room for further improvement. It does not mean that it's exactly how we would do it if we ran the police department, but we don't run the police department. **What it means is that it is compliant with the consent decree**.[15]

….

After today, Your Honor, **assuming the Court approves our recommendations, the NOPD will be left with three areas of the consent decree that still need to be moved into the green**.[16]

Even this Court has recognized the success of NOPD's reform effort, acknowledged substantial compliance, stating:

I do agree with your recommendation that the areas of supervision, performance evaluations and promotions should be moved into the green, as we say**, to reflect that the department is in substantial compliance in these areas**.[17]

As the City has noted previously, it is a significant and demoralizing change in circumstances to have known and agreed upon compliance metric pulled out from under NOPD's feet ten years into the process without any reason whatsoever. Rec. Doc. 643. As the Monitor publicly declared, "[t]his all matters Your Honor because getting all of the areas into the green is what's necessary to begin the two-year sustainment period. So every element of the consent decree that moves into the green is one step closer to starting the sustainment period.") Exh. 110, at 18:1 – 19:25. This reversal (or revelation) renders all public hearings before the Court effectively meaningless as they do not resolve any open issues. The City and

---

[15] Exh. 116, at 20:1-11.
[16] Exh. 116, at 22:9 – 11.
[17] Exh. 116, at 86:23 – 87:1.

6

NOPD cannot rely on a "compliance determination" until the final determination is made on every paragraph at one time.

This change is inequitable, and irrevocably harms the NOPD's efforts to bring the Decree to its natural conclusion. At a minimum, this change renders the Decree more onerous on the City. It also conflicts with the Justice Department's own policy that encourages partial termination once compliance is sustained in specific areas.[18]

### A.  Substantial Compliance Has Been Proven.

In further support of its position, the NOPD has prepared Exhibit 108, which is the most recent compilation of all parties' input on what specific paragraphs NOPD is in compliance with, which paragraph are still under review by the Monitor and DOJ, and which paragraph require further proof. As of this filing, NOPD has undisputedly shown compliance with 87% of the individual paragraphs of the Decree. Of the 13% remaining, less than 1.0% is actually non-compliant, as opposed to "under review." This is represented graphically below. The second bar represents the Monitor's latest position on compliance. But as shown in Exhibit 108, NOPD has provided proof of compliance for most of the 33% the Monitor is still reviewing.

---

[18] "Review of the use of monitors in civil settlement agreements and consent decrees involving state and local governmental entities", 9/13/2021, at pp. 8-9, at www.justice.gov/ag/page/file/1432236/download



Exhibit 117 summarizes the compliance tracker (Exhibit 108) in a graphical format. The City reasserts that even with those few paragraphs still to be met, NOPD has reached "substantial compliance" as defined by the Fifth Circuit to terminate federal control. Federal Rule of Civil Procedure 60(b)(5) authorizes the Court to relieve the City of New Orleans (the "City") from the Decree (R. Doc. 565) if the "decree has been satisfied or implemented."[19] The Fifth Circuit Court of Appeals recently explained that Courts must give Rule 60(b)(5) a "liberal construction," and that "substantial compliance" with a consent decree excuses deviations that do not severely impair the consent decree's purpose.[20]

### B.    A Holistic View Improves NOPD's Compliance

Looking from a different angle than a flat percentage of paragraphs, the NOPD has a much better compliance rate than even the near-90% stated above. In terms of the 17 areas of the Decree, the only area that NOPD views as in need of new modification is Secondary Employment. To be clear, the system in place is compliant with goals of the Decree and policies created and approved with Court and DOJ's involvement and approval. But recent

---

[19] *Chisom v. Edwards*, 2022 U.S. Dist. LEXIS 100009, at *16 (E.D. La. May 24, 2022).
[20] *Frew v. Young*, No. 21-40028 (5th Cir. 2022) 2022 U.S. App. Lexis 1027* 2022 WL 135126

violations of NOPD's policy have shown that the external system put in place to physically separate NOPD work from external work has some blind spots that need to be addressed.

Software systems need to address the now-separate timekeeping systems that have allowed overlapping of hours to go undetected. Those fixes are in progress and will close the backdoor that allowed some officers to overlap billing to NOPD and secondary employers.

Outside of Secondary Employment, NOPD is fully and effectively compliant with the Decree. It is not perfect, and never will be, but NOPD has met the extraordinarily high hurdles set by the Decree. DOJ's opposition fails to expose any systemic failures or material deficiency using the measures of compliance agreed to in the Decree. The Monitor's 2022 Annual Report raises additional issues which are addressed by NOPD's response thereto, attach as Exh. 121.

*1.* ***Stop, Searches, and Arrests (SSA) (Section V)***

If the Decree were followed by DOJ and the Monitor, the Monitor should propose audit methodologies and conduct audits on NOPD data. Instead, the Monitor has largely hoisted its obligations to prepare audit methodologies and to conduct audits on NOPD. The methodologies were agreed to by DOJ after extensive line-by-line edits. As a result of those extremely detailed efforts, NOPD conducted an audit of Stop, Search and Arrest for March, April and May of 2022. (Op. Ex. 1, Rec. Doc. 682-1) After the audit was completed NOPD provided its report to DOJ and the Monitor. Each demanded changes to the report. Again, this is not a process NOPD is obligated to undertake. In any regard, after resolving all comments of DOJ and the Monitor, NOPD was finally allowed to publish its audit report on November 2, 2022.

DOJ cites this report as Exhibit 108 to its opposition. DOJ claims the audit report shows that NOPD is not compliant with the Decree.[21] DOJ ignores the actual findings of the audit. There were 38 SSA elements audited (measured for compliance) in June 2022.  The overall compliance score was **96%** across all 38 elements. Of the 38 audited elements, 30 elements were in compliance, with only eight (8) below the 95% level, and of those eight (8) only four (4) were below 90%. Quoting the PSAB audits is indicative of the good work PSAB is doing in monitoring NOPD compliance and establishing corrective actions. That makes NOPD compliant in relation to the Decree, as oversight and constant vigilance is key to what is happening. According to the May 2021 SSA Audit Results, 96% of searches were legal. For June 2022 that rate improved to 97%.

To further contrast DOJ's conclusion with reality, below is a summary of the findings of the audit report, as approved by DOJ:

- SSA Incidents - Scorecard has an overall score of 90%. It shows continuous improvement over previous audit score of 87%.

- SSA Procedural Justice - Scorecard has an overall score of 98%. It shows continuous improvement over previous audit score of 94%.

- Stops Subjects - Scorecard has an overall score of 97%, which shows continuous improvement over the previous score of 93%.

- Searches Subjects - Scorecard has an overall score of 93%, which shows continuous improvement over the previous score of 79%.

- Arrests Subjects - scorecard has an overall score of 96% which is still compliant. The previous audit score of 99% did not include the new question regarding "Miranda Given, if required". This metric scored 87% in this initial review, which lowered the overall score of the audit area.

---

[21] Rec. Doc. 680-2 at 22.

- SSA – Probation & Parole - Scorecard has an overall score of 96%. It shows continuous improvement over previous audit score of 93%.

- SSA - Consent to Search –Scorecard has an overall score of 88%, which shows nearly flat over the previous score of 87%.

- Consent to Search – Subject scorecard has an overall score of 20%. Overall scores impacted by policy issues with Public Safety Rides. **Five of the 8 incidents audited were for courtesy rides, and 2 were Crisis Interventions**, and 1 Incident to Arrest. These deficiencies have been addressed with the publication of the new Public Safety Ride (PSR) Policy 10. 1

- SSA – Strip & Cavity –Scorecard has an overall score of 90%, which shows slight improvement over the previous score of 87%.

- Strip & Cavity Search – Subject scorecard has an overall score of 94% compared to the previous score of 100%.[22]

This is indicative of what NOPD's daily existence under the DOJ's thumb looks like. What is the point of the costly and exhausting Decree if DOJ can cherry-pick individual statistics and ignore the body of compliance metrics the parties contractually agreed would control? The DOJ has routinely acknowledged that it works hand-in-glove with the Monitors at every phase and is convinced the audit methods are sound.[23] Pursuant to the terms set between the parties, NOPD is compliant with the SSA section of the Decree. DOJ's objection to a compliance finding is meritless.

### 2. *Bias-Free Policing (Section VIII)*

The Decree unequivocally requires the Monitor to report on each and every section of Decree at least annually, ***unless*** a section is already deemed compliant by all parties.[24] Moreover, the Decree requires the Monitor to spell out to NOPD the necessary steps to reach

---

[22] Rec. Doc. 682-1, Oppo. Ex. 1, SSA Audit by NOPD.
[23] *See, e.g.,* Exh. 116, at 77:1-5.
[24] Consent Decree (Rec. Doc. 565) at para. 452.

compliance on a quarterly basis.[25] For Section VIII, Bias-Free Policing, the Monitor did not create the methodology or conduct the analysis to measure compliance. The Monitor repeatedly announced how difficult the analysis was to formulate in a manner that generated useful data on bias. The Monitor, DOJ and NOPD all agreed that trying to interpret statistics beyond those already used in the SSA section would take time, and that there was no model to follow. Nowhere in the Decree did it state that NOPD would have to forge the first statistical model to test for bias.

NOPD began working with the DOJ and OCDM in 2020 (over seven years into the process) to develop a bias-free audit methodology. A finalized protocol for the first-ever audit was firmed up in February 2022. Not until 2022 – after almost a decade and $15 million in monitoring fees – did the Monitor and DOJ finally agree to testing methodologies. Then they had NOPD do the audit that is required to be done by the Monitor. As the audit report notes, "[i]t is important to note that the group did not have the benefit of a guide or SOPs from other departments to aid in the design of the audit.")[26]

The audit report by NOPD (every word of which is approved by DOJ) warns about the limited utility of the data generated, stating that, "[i]t is important to note that a disparity in the data does not conclusively mean bias exists but NOPD is committed to further investigating disparities identified by data analyses and implementing programs in an attempt to resolve them." *Id.* The initial results were so inconclusive that DOJ wanted more testing. Its own experts developed a "Veil of Darkness" test with complex inter-twilight comparisons that are novel, at best. *Id.*, at 10. These seek to find indicia of bias in the treatment by comparing

---

[25] Consent Decree (Rec. Doc. 565) at para. 457.
[26] Oppo. Ex. 3 at 9, Rec. Doc. 682-3.

the same time of day when that time is dark compared to when that time of day is light – *i.e.*, can the officer see race when deciding to make a stop. (Tinted windows and other visual limitations are not accounted for in the analysis.) Even applying these novel DOJ tests, the conclusion was that, "[t]he bias-free audit found the majority of the results to be positive and identified few areas of improvement. For example, the audit found no disparities in the decision to stop, pat down searches, uses of force, and handcuffing."

One result was that white drivers were more likely to be pulled over than black or Hispanic drivers. If useful, this statistic would find bias against white drivers. Another statistic, if applied literally, holds that less black drivers who are pulled over are arrested by NOPD officers. This, DOJ claims, is evidence of bias against black drivers. This assumes the basis for the stops must have been unsupported if an equal number of black drivers was not arrested after being pulled over. The report makes no effort to consider socio-economic impacts on these results. Were a higher number of less-wealthy drivers are arrested because once pulled over they have a higher rate of driving without insurance, lapsed registration, pending warrants, *etc*? The statistics are silent. But DOJ clings to the faintest claim of bias to justify perpetual federal control. This is not the agreed upon standard for determining compliance.

  a)  ***Translations for people with limited English proficiency.***

DOJ also claims bias in NOPD's services to people that do not speak English proficiently. The Decree requires NOPD to translate six (6) documents into Spanish and Vietnamese.[27] NOPD translated each of the six required documents by 2021. In addition to

_____

[27] Consent Decree (Rec. Doc. 565) at para. 189(j).

the six documents identified by the Decree, NOPD has translated an additional 33 documents. Despite this fact, DOJ claims that "[t]his struggle for people of New Orleans who have limited English proficiency is precisely what the Decree aimed to remedy—and the City's own data show the lack of initial and sustained compliance."[28]

Here again, DOJ focuses the court and the press not on the agreed upon compliance and measurable criteria, but individual data points and moved targets of DOJ's choosing. For example, DOJ cites an email from 2022 regarding a contract for electronic interpretation to support an assertion that NOPD has not complied with the Decree by failing to provide "commonly used forms translated into Spanish and Vietnamese."[29] DOJ's position is intentionally vague, implying to the uninformed reader that NOPD has not translated its documents as agreed.

DOJ and the Court know this is not true as the 39 translated documents and policies have been listed on NOPD's webpage and reported to the Court in multiple prior NOPD reports. *See, e.g.,* 2021 LEP Annual Report (posted on NOLA.gov), at p. 4 (Listing all of the documents translated including the six (6) required by the Decree 189(j); March 2022 - August 2022 LEP Audit Report (posted on NOLA.gov); and September 2021 - February 2022 LEP Audit Report (posted on NOLA.gov).

The truth is that NOPD has translated all of the documents required by the Decree and continues to translate additional documents and polices on an on-going basis. The DOJ's position is unsupported by the facts or the Decree. As DOJ's own policies warn, objective

---

[28] Oppo. at 22, Rec. Doc. 682.
[29] Oppo. at 21, Rec. Doc. 682.

criteria should reduce goal shifting. But here, even where the criteria for compliance is tied to an easily quantified dataset, DOJ will not concede compliance.

DOJ also alleges NOPD has failed to provide translations at the scene of a call. As DOJ is aware, NOPD has been consistently improving in this area. It will take time to recruit more multi-lingual officers, but NOPD has policies in place to encourage and retain such skills. Moreover, the most recent audit data shows that DOJ's chosen statistics do not represent the current situation.

The next audit showed an improvement in responses to LEP calls through authorized measures and recruitment of certifying additional officers to provide authorized interpretations. *See* September 2021- February 2022 audit report at Nola.gov. The audit results show that NOPD received 530 calls and requests for LEP services to be assessed. Of the 530 calls, 221 calls were assessed during the audit. It was determined that 141 calls received interpretation services from an Authorized Interpreter, 26 calls received interpretation services provided by VOIANCE via the Electronic Devices, and 29 calls received interpretation through an unauthorized source (bilingual officer not certified as an Authorized Interpreter, google translation, or friend, family member or bystander), with an additional 35 instances where an Authorized Interpreter (31 interpretations by AIs)  or Interpreter (4 interpretations using the interpretation device) via the interpretation device was used for interviews and/or interrogations.  NOPD has certified and approved four (4) additional NOPD personnel members to become Authorized Interpreters to increase the total number of Authorized Interpreters to 30 (28 Spanish Interpreters and two (2) Vietnamese Interpreters). During the audit period, NOPD received one citizen complaint by PIB for LEP services not provided or poorly rendered. Through VOIANCE the Language Access

Coordinator (LAC) was able to track and monitor the use of the Electronic Device by the Department.

The following audit (March 2022 - August 2022) shows another increase of authorized interpretation at 492 NOPDAI usages, and additional 68 electronic devices uses, one unauthorized interpretation was provided by a City employee but not an NOPD employee, and 13 calls where the translation need was not met. Nine (9) of that group of 13 occurred where the interpreter was no longer needed. The facts demonstrate that the NOPD has achieved substantial compliance in this area as well.

### 3.      *Use of Force (Section III)*

DOJ admits the Monitor publicly announced that NOPD had reached full and effective compliance with Use of Force in 2019. And as the Court has announced, "[u]ses of force are consistently reported and evaluated by thoughtful supervisors and leaders."[30] And the progress in the use of force in New Orleans is something DOJ should celebrate as an example of achievement under a Decree. Instead, DOJ seeks to maintain control by ignoring systemic pattern and practice success and micro-level disciplinary proceedings to focus on unrepresentative statistics, and individual officers failing to follow NOPD policies.

Again, refusing to abide by its agreement, the Plaintiff, United States Department of Justice, asserts as follows, as if the parties had not agreed to a controlling metric for compliance: "[t]he City did not submit any evidence that NOPD officer uses of force are constitutional and consistent with the Decree requirement."[31] This is manifestly untrue and misleading as to the entire Decree process. Use of Force has been monitored extremely

---

[30] Exh. 116, at 7:17-18.
[31] Oppo. at 27, Rec. Doc. 682.

closely by the Monitor according to terms demanded by DOJ. The Monitor issues reports as does NOPD. "A wealth of data is shared with the public on NOPD's website so the public can help hold the NOPD accountable for its behavior."[32] Again, what is the point of this process if DOJ will create its own criteria for success once its control is threatened?

DOJ was extensively engaged in the drafting of the audit and review methodologies that were used to collect and measure "the evidence that NOPD officer uses of force are constitutional and consistent with the Decree requirement." Unable to refute NOPD's compliance based on the agreed upon metrics, DOJ again seeks to grab random statistics out of context to obscure the audit findings and create soundbites for the press. DOJ weakly proclaims "the high rate of unjustified forces raises concerns" about NOPD's compliance. DOJ's theoretical concerns are not the measure by which federal control over a sovereign city department is triggered. If all the DOJ can muster is concern after 10 years, then it needs to move on to another City with less theoretical needs for DOJ's guidance.

As with any statistic, context is critical. In 2021, there were 30 cases presented to the Use of Force Review Board. As DOJ notes, 15 were deemed by NOPD's review to be "not justified." What DOJ knows but does not state is that nine (9) of those were based on a policy violation, not an unreasonable use of force. This is a critical distinction. The rate of force use is down drastically, and *every* use of force is closely and strictly evaluated with significant penalties being administered where violations occurred. These are not the systemic concerns DOJ raised to create federal jurisdiction – *i.e.*, violation of Forth and Fourteenth Amendment

---

[32] Exh. 116, at 7:15-17.

rights. The extremely rigid disciplinary system used by NOPD today is always going to generate more "not justified" findings because the review is now hyper critical in the pursuit of zero unreasonable uses of force. A summary of every use of force review proceeding in 2021 is attached as Exh. 100.

The DOJ also chose to rely on the OIPM[33] report as its source for hand-picked examples. But what does the OIPM say about NOPD's use of force? Contrary to the picture DOJ put forth for public consumption, OIPM data shows that NOPD's use of force has declined both in quantity and severity over the years. And critical incidents (as used by OIPM), those incidents that gave great weight to the DOJ's 2011 report, have plummeted over the years.



_____

[33] Office of Independent Police Monitor for New Orleans.

It is a disservice to the public and NOPD's officers for DOJ to ignore the incredible achievements of NOPD in reducing uses of force. It is a damnation of the illusory benefits of Decrees for DOJ to seek to maintain control over NOPD by staring at trees, blinded by the forest of continued and sustained improvements in constitutional policing before them.

| Year | Total Cls | OISs | Hospitalizations | ICD | Head Strikes | Other | Deaths |
|------|-----------|------|------------------|-----|--------------|-------|--------|
| 2011 | 19 | 19 | 0 | 0 | 0 | 0 | 2 |
| 2012 | 22 | 20 | 1 | 1 | 0 | 0 | 3 |
| 2013 | 17 | 12 | 1 | 2 | 0 | 2 | 2 |
| 2014 | 17 | 11 | 3 | 2 | 2 | 2 | 4 |
| 2015 | 14 | 12 | 1 | 1 | 0 | 0 | 5 |
| 2016 | 8 | 7 | 1 | 1 | 0 | 0 | 1 |
| 2017 | 5 | 5 | 1 | 0 | 0 | 0 | 1 |
| 2018 | 5 | 4 | 0 | 1 | 0 | 0 | 0 |
| 2019 | 10 | 9 | 2 | 0 | 0 | 0 | 3 |
| 2020 | 11 | 9 | 1 | 0 | 2 | 0 | 0 |
| 2021 | 8 | 5 | 5 | 0 | 1 | 1 | 0 |
| Totals | 117 | 99 | 10 | 8 | 2 | 4 | 18 |

Far worse than the above examples of focusing on real, *but isolated* incidents, DOJ also seeks to tarnish NOPD with disproven conspiracy theories from the press. With access to every file in NOPD, there is no valid reason to troll old conspiracies as a basis to support continued federal control of a sovereign city agency.

Specifically, DOJ cites at page 10 of its opposition brief that there was "[a]n alleged conspiracy among NOPD officers in the 8th District to provide false testimony concerning an 11 arrest." DOJ knows the fact that five (5) officers of an 8th District task force had criminal

and administrative allegations levied against them. The disciplinary system for NOPD determined the criminal and administrative claims were unfounded. The FBI (of the same Justice Department as DOJ) was informed of and given access to the information regarding the case.

The FBI did not pursue any actions after the NOPD investigation found the claims unfounded. Rather than state these facts, DOJ repeats the disproven conspiracy theory with the only goal of tarnishing NOPD's reputation so as to justify continued DOJ control. This is the modern DOJ consent decree. The criteria required by the Decree also show that the NOPD has achieved substantial compliance with the Use of Force requirements of the Decree.

a)        *Consent Decree Restrictions on Vehicle Pursuits*

The Court has noted the public and officer concerns regarding NOPD's ability to fight crime by chasing criminal suspects that flee arrest. As the Court has announced, NOPD policy does not prohibit **all** vehicle pursuits.[34] NOPD policies were amended to comply with the Decree and restrict vehicle pursuits by officers to those that risk. The policy follows a national trend in weighing the benefits of pursuits versus the damage to property and life that they risk. ***It is not a constitutional requirement***, but a policy choice agreed to by the City in the Decree process.

To convince the Court that NOPD requires years more federal control, DOJ fuels press articles about deadly vehicle pursuits to again impugn the NOPD's reputation as a professional police force. DOJ, in April of 2023, asserts in its opening paragraphs that NOPD

---

[34] Exh. 118, at 7.

"has engaged in dangerous pursuits."[35] It bolsters this view by retelling the horrific events of the March 20, **2019**, pursuit of a stolen vehicle – more than four years ago. This rhetoric is not helpful or accurate in the present context. As a result of that event, DOJ notes NOPD cracked down severely on vehicle pursuits. As proof, NOPD opened disciplinary investigations against 37% of the officers that chased a criminal suspect in the sampled data.[36]

While a percentage of pursuits will always be deemed outside of NOPD's strict policy, the public should know these are examples of NOPD officers trying to fight crime, trying to make the city safer. And pursuits are **not** violations of the Fourth or Fourteenth Amendment rights of the fleeing suspects, they are potentially violations of NOPD's strict policy against vehicle pursuits in all but the most extreme situations.

DOJ also cites a 2022 event as example of NOPD's alleged unconstitutional policing. In this case there was a 35-second vehicle pursuit of armed suspects that tried to carjack an off-duty police officer. The officers in the brief pursuit did not get adequate authorization from a supervisor as required by policy. Tragically, a pedestrian was struck and injured by the fleeing suspects, requiring a night in the hospital.[37] The disciplinary process found the officers that pursued the armed carjackers violated policy and they were appropriately disciplined. The process worked.

Again, as DOJ's quotes, "[t]he whole point of negotiating and agreeing on a plethora of specific, highly detailed action plans was to establish a clearly defined roadmap for

---

[35] Oppo. at 2, Rec. Doc. 682.
[36] Oppo. at 25, Rec. Doc. 682.
[37] Oppo. at 25, Rec. Doc. 682.

attempting to achieve the Decree's purpose."[38] Despite this, DOJ ignores the highly detailed

testing methodology to determine compliance with the Decree, instead cherry-picking events

to say they better represent the tens of thousands of interactions between NOPD officers and

the citizens of New Orleans. The testing methods agreed upon show substantial compliance

has been reached, but DOJ looks elsewhere.

### 4.    Supervision (Section XV)

"As you're going to hear, NOPD has met its obligations under the supervision section

of the consent decree…it's important that we recognize that moving into the green does not

mean everything is perfect, but it does mean [NOPD] is compliant."[39] Not only is NOPD

complaint with expansive elements of the Decree, but it has created a model system. As the

Court noted, "[supervision] is a major element of what was required by and requested by the

Department of Justice… And you've really – I think this is a model of a system…"[40] "A

Fortune 500 company would be proud to have the kinds of processes that you have

implemented."[41] This model system of April 2022 could not have been broken so quickly as

DOJ asserts now.

To support its new position, DOJ incorrectly asserts, for example, that "the City

admitted that only 10 of the 34 sergeants in the Public Integrity Bureau completed the

required training."[42] Incorrect. The City admitted that 10 of the recently promoted sergeants

completed the 40-hour PIB Supervisory Training. That is not the same as DOJ's claim that 24

---

[38] Oppo. at 14, Rec. Doc. 682; quoting *Frew v. Janek*, 780 F.3d 320, 328 (5th Cir. 2015).
[39] Monitor testimony, 4/22/2022, Exh. 116, at 20:13-21.
[40] Exh. 116, at 44:9-15.
[41] Exh. 116, at 58:24 – 59:4.
[42] Oppo. at 27, Rec. Doc. 682.

sergeants **assigned to PIB** have not received all of their PIB training. As DOJ knows, of 20

commissioned officers in PIB, just three haven't completed their training and only one of

them is a sergeant. All three are scheduled to attend the May class.

Of the civilian investigators, five have had the training and seven are new hires that are not

handling cases. They are scheduled to go to the May training. DOJ's picture is intentionally

misleading. The status of this area is best summarized by trial counsel for the DOJ:

> The United States is pleased to come alongside the NOPD and the
> court monitor today to recognize the work that the city has done to
> bring Section XIV, performance evaluations and promotions and
> Section XV, ensure substantial compliance. It is fitting that these
> two sections come into compliance together today as they are
> highly interrelated."[43]

DOJ's brief does not present accepted compliance evidence to demonstrate that this area has

fallen out of full and effective compliance, much less substantial compliance.

## 5.  *Misconduct (Section XVII)*

DOJ repeats the conclusions from the Monitor's 2022 Annual Report regarding

Misconduct. There was no 2021 Annual Report prepared by the Monitor to compare its

current opinions. NOPD generally agrees with five of the Monitor's recommendations for

improvement, but disagrees with the following:

Paragraph 381.  The rotations of Lieutenants into PIB have reasonably resumed since

the passing of COVID-19 restrictions, the scheduling strains including Bayou Classic, the

bowl games, Christmas, New Years and carnival season.  The Monitors acknowledged that

"with regard to 2023, PIB was able to demonstrate its rotation program has been re-energized

and that it has a schedule to ensure every lieutenant spends at least one week in PIB".

---

[43] Exh. 116, at 76:9-14.

Paragraph 382.  PIB required each investigator to participate in 8 hours of annual training.  This training includes interviewing techniques and best-practices along with interrogation techniques and best practices.  Detective training is in addition to PIB's in-service training.

Paragraph 383. PIB has conducted integrity checks. The Monitoring Team acknowledged reviewing 57 integrity checks conducted by PIB in 2022.  Secondary Employment abuses is a measure described in the Decree that is subject to integrity checks. The Monitor finds PIB non-compliant seemingly for not conducting certain types of integrity checks with the benefit of hindsight.

Paragraph 424. PIB has created a standing operational directive with the City Attorney's office for a monthly working group conference.  This collaborative focus group discusses policy and procedures impacting investigations and discipline. This has resulted in a working group on March 29, 2023, and April 19, 2023.

The remaining five (5) paragraphs are being addressed and the non-compliant nature reflects the audited period only and not NOPD's current compliance. Again, based on the measures of substantial compliance articulated by the Fifth Circuit Court of Appeals, this section remains in compliance with the Decree.

## III.   DRASTIC MODIFICATIONS HAVE RENDERED FURTHER ENFORCEMENT INEQUITABLE UNDER RULE 60(B)(5)

### A.   NOPD and the City have been deprived of the neutral arbiter contemplated by the Consent Decree.

The City of New Orleans is a sovereign state governmental body, constitutionally empowered to govern and regulate its political affairs without interference up to the point

such affairs have been delegated to the United States.[44] Through the execution of a Consent Decree in 2013 the City ceded certain of its sovereign rights regarding the policies and conduct of its police department to the United Stated District Court for the Eastern District of Louisiana. The City agreed to: (a) incorporate the Decree's requirements into policy; (b) train officers as necessary to fulfill their responsibilities pursuant to the Decree's requirements; and (c) ensure that those requirements are being carried out in actual practice.[45]

The City contends that in the noble pursuit of world class institutional reforms the Court has exceeded the broad discretion provided by Article III and the Decree.[46] The Court has reiterated multiple times since the City's motion was filed eight months ago that it is the "monitor" defined in the Decree. This interpretation of the Decree then allows the Court to directly contact NOPD and City employees, and to communicate with the press about the pending litigation as the "monitor." As the City has noted, it respectfully disagrees with this interpretation of the Decree and asserts that the Court's functions as monitor represent a fundamental change to the terms of the Decree. These changes render the process drastically more onerous and warrant termination of the Decree pursuant to Rule 60(b)(5).

---

[44] *See USCS Const. Amend. 10* (*"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."*)*; see also, Kansas v. Colorado*, 206 U.S. 46, 90-91, 27 S.Ct. 655, 664, 51 L.Ed. 956 (1907), and *, Frew v. Hawkins*, 540 U.S. 431, 441, 124 S.Ct. 899, 905, 157 L.Ed.2d 855, 865 (2004) ("If not limited to reasonable and necessary implementations of federal law, remedies outlined in consent decrees involving state officeholders may improperly deprive future officials of their designated legislative and executive powers. They may also lead to federal-court oversight of state programs for long periods of time even absent an ongoing violation of federal law.").

[45] *See* Consent Decree (R. Doc. 565) at para. 447.

[46] *See, e.g., In re Gee,* 941 F.3d 153, 159 (5th Cir. 2019).

The Decree sets out the role of each party, the Monitor, and the Court, as separate and distinct. *See, e.g.*, Consent Decree (Rec. Doc. 565) at paras. 23, 451, 478, 479, 480, 483, 484, 491, 492. Conflating the roles of the Court and the court-appointed monitor under the Decree deprives the City of the neutral arbiter of disputes set out in that controlling agreement. That is the purpose behind American Bar Associations' Model Code of Judicial Conduct, Canon 2.9(C) "Ex Parte Communications," which reads as follows:

> A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed.

The Code of Conduct for United States Judges has similar guidance at Canon 3. Both rules highlight the inequity of having the Court serve as the investigator of NOPD's daily compliance efforts, conducting meetings with groups of City employees to guide hiring and other services, and assigning tasks directly to them.[47] For the Court to function in this role deprives the City of a neutral arbiter of highly contested issues. While certainly well intended, and generally helpful, this role is simply not within the jurisdiction of the Court.

## 1.    *Ex parte cannot be the norm.*

Interpreting the Decree to cast itself as the monitor referenced in Paragraph 472, the Court has engaged in extensive *ex parte* communications with City and NOPD employees outside of the presence of legal counsel or their supervisors. *Ex parte* communications by the Court with the employees of litigants is generally prohibited. As the Code of Conduct for United States Judges explains:

---

[47] *See, e.g.,* Exh. 104, "NOPD Consent Decree Retreat Week" agenda; and Exh. 101, email re hiring status of individual recruits.

> Except as set out below, a judge should not initiate, permit,
> or consider ex parte communications or consider other
> communications concerning a pending or impending matter
> that are made outside the presence of the parties or their
> lawyers.[48]

There are exceptions that allow for *ex parte* communications with litigants about ongoing

litigation, but such exceptions should be rare, not the norm. The City has objected to this

practice and asserts that it has irreparably harmed the City's efforts to demonstrate

compliance with the terms of the Decree.[49] Any assignment by the Court to a City or NOPD

employee is effectively a new injunction by a United States federal district court. The lack of

formal recordation of these injunctions directing NOPD and City employees to respond to

Court-issued assignments deprives the City of its due process rights to challenge such orders

and prejudices the City's ability to present its basis for compliance unaffected by points of

information outside the litigation.[50] This harm is irreparable and ongoing.

The Court's April 3, 2023, Order directing NOPD and City personnel to prepare

presentations on various topics to inform the community was an example of the injunctions in

question. The Court relied on Paragraph 12 for its authority, but the United States Fifth

Circuit Court of Appeals clarified that reliance on that paragraph did not authorize the Court

to order public presentations not required by the Decree. *See* Rec. Doc. 684.

That public event was to include an update to the Court regarding traffic cameras and

radar vehicles. As a monitoring team member relayed to NOPD staff, the Court expected to be

---

[48] Code of Conduct for United States Judges, Canon 3(A)(4).
[49] *See* Motion to Reconsider at Rec. Doc. 643.
[50] *See* Exh. 107, Zimmer 2/17/23 letter to the Court.

updated on these topic by NOPD.[51] These are not Decree items and tasking NOPD with such reporting is outside the Court's jurisdiction.[52]

In another example, during a weekly hiring meeting held by the Court with numerous NOPD employees, the Court directly instructed the head of the NOPD's Crime Lab to prepare a procurement report for the District Court by the end of that week showing what resources were needed to get the DNA lab up and running. This came soon after certain city council members declared the need for a DNA lab in New Orleans to combat crime.[53] The Decree does not have any requirement for this report, or a DNA lab. No NOPD supervisor or legal counsel was contemporaneously informed of this injunction to the NOPD employee.[54]

These weekly hiring meetings require NOPD employees to convey detailed information about the hiring process that are not covered by the Decree. *See, e.g.*, Exh. 101, emails from the Court to NOPD personnel regarding the status of medical and psychiatric exams for specific recruits. And on at least one occasion the Court invited City Council member Helena Moreno to attend the meetings. This blending of city legislative and federal judicial authorities to manage a local executive branch creates obvious federalism and separation of powers concerns.

In another example, the Court directly tasked an NOPD Deputy Superintendent to get an organizational chart while he was patrolling a Mardi Gras parade on foot. He completed

---

[51] Exh. 109, March 20, 2023, Viverette email.
[52] *See also*, Exh. 120, email re topics assigned to NOPD for discussion.
[53] *See* Natasha Robin, 2/15/203, "Battling for New Orleans: How rapid DNA testing could prevent future crimes," at https://www.fox8live.com/2023/02/16/battling-new-orleans-how-rapid-dna-testing-could-prevent-future-crimes/.
[54] Exh. 107, Zimmer letter to Judge Morgan, 2/17/2023.

the assignment while performing the critical patrol task.[55] Nothing in the Decree envisions the Court making direct assignments to City employees. In sum, these functions amount to investigative efforts, not authorized by the Decree.

For the cancelled April 3, 2023 Loyola public meeting the Court relayed through the Monitor that an NOPD employee needed to make a public presentation on the NOPD's homelessness initiatives.[56] Homelessness is an important public concern, but not part of the Decree (outside of the requirement for constitutional treatment of all residents). No supervisor or legal counsel was included in this directive from the Court, through the Monitor, to an NOPD employee to prepare for and testify before the Court and press, *on behalf of NOPD*, about an area completely outside the Decree.

The Monitor is authorized to access information from NOPD employees relevant to its role in preparing public reports. The Court is not authorized to direct NOPD employees to make public presentations about topics of interest to the Court. Again, this *ex parte* conduct inequitably harms the NOPD and its efforts to build a functional command structure. It also prioritizes NOPD's limited resources on tasks of importance to the Court over those of the Superintendent and other elected officials. That is the very management that is prohibited by the Decree at paragraph 445,[57] and was the great concern of the founders regarding "Our Federalism." *Younger v. Harris*, 401 U.S. 37, 44 (1971).

---

[55] *See* Exh. 119, email from the Court.
[56] Exh. 122, Email string including February 13, 2023, email.
[57] Consent Decree paragraph 445 ("The Monitor shall only have the duties, responsibilities, and authority conferred by this Agreement. The Monitor shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent.")

During a visit to the NOPD Academy on February 7, 2023, the Court directly instructed NOPD employees to: (i) paint the interior walls, (ii) clean the carpet, (iii) repair the exterior lighting system, (iv) replace the air filters, and (v) replace water stained ceiling tiles throughout the building.[58] These injunctions were not recorded, or communicated through counsel or the Superintendent. Management of NOPD facilities maintenance is not a function assigned to the Monitor or the Court, and it is inequitable for NOPD employees to be forced to comply with a federal court's order outside the bounds of Article III or the Decree.

As an additional example, Exhibit 123 is an email from a Monitoring team member to convey the Court's direction to the Superintendent's Chief of Staff to prepare the Superintendent to give statements at the next public hearing endorsing civilization. Days later, the Court directed that NOPD prepare a handout for the press at the public hearing regarding civilianization efforts, so the press does not get the story wrong.[59] These injunctions change the process set forth in the Decree and render further proceedings inequitable. Civilianization is an initiative important to the Court to address the national problem of decreasing officer ranks.[60] But it is not required under the Decree. Making it, and other Court initiatives, requirements for compliance renders the Decree more onerous than the City negotiated with DOJ. *See Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384, 112 S.Ct. 748, 760, 116 L.Ed.2d 867, 886 (1992) ("Modification of a consent decree may be warranted when changed

---

[58] *See* Exh. 124.

[59] Exh. 126 3-20-23 email re: "Public Meeting handout for Press on new civilian hires"

[60] Exh. 110, Transcript 8/17/2022, at 35:19-25. ("I recognize law enforcement agencies across the country have faced all manner of hurdles over the past two years. Crime is up and recruiting and retention are down everywhere. New Orleans has not been immune from these disturbing national trends.")

factual conditions make compliance with the decree substantially more onerous.") These changes to the factual conditions of the Decree could not be predicted by the City in 2012.

These *ex parte* examples are illustrative, not exhaustive, of the current administration of the Decree. The Court is routinely instructing a litigant's employees to perform tasks allegedly related to the pending litigation. These are off-the-record injunctions often relying on *ex parte* communications. They are beyond the four corners of the Decree and far afield of the DOJ's Fourth and Fourteenth Amendment claims that set the Court's Article III jurisdiction. The specific injunctions mentioned here may seem innocuous in isolation. The interactions as a practice, however, evidences a constitutional crisis unfolding in real time that is harming NOPD and the City.

Pushing back against these overreaches puts the City in a completely inequitable position. As has been made clear, there are direct implications for NOPD standing up for its contractual and procedural rights. As the Deputy Monitor told the Superintendent, refusing to comply with the Court's "requests" would be deemed non-cooperative.[61] As promised, the next draft report from the Monitor asserted the City had become uncooperative recently. This process has become utterly inequitable and drastically more onerous than agreed upon. Termination of the Decree to transfer control to the locally elected government is necessary and appropriate.

**2.      *Public Statements Regarding Pending Litigation***

The Court's decision to merge the roles of Court and Monitor as defined in the Decree has also led to other irreparable harms. The Court's decision meet with community

---

[61] Exh. 125, Zimmer letter.

stakeholders and inform the public about the consent decree process has put it in an untenable position. The Code of Conduct for United States Judges Canon 3(A)(6) directs, "[a] judge should not make public comment on the merits of a matter pending or impending in any court…but this limitation does not extend to public statements made in the course of the judge's official duties." *United States v. Eduardo Garcia-Velazquez*, 2022 U.S. App. LEXIS 19603, at *11-12 (11th Cir. July 15, 2022), quoting Code of Conduct for United States Judges, Canon 3(A)(6) (2019) (cleaned up).

Public events where the Court offers opinions about the merits of the central issues in dispute outside the context of deciding those issues, are prejudicial to the City. The Monitor is engaged to issue public reports and explain them to the community. The federal court is not similarly engaged. In prior years, "public hearings" were used to announce the Monitor's recommendation of a finding of full and effective compliance. As of April 2022, 15 of the 17 areas of the Decree had been deemed in full and effective compliance through such public events. For those previous "public hearings," the Monitor directed who the Court wanted to hear from at NOPD. The DOJ joined the Monitor in editing NOPD's presentation so that the "public hearing" was effectively an orchestrated press conference to announce compliance, and the City consented.

That changed after the Mayor announced in August of 2022 that the City would seek to end federal control after almost a decade based on substantial compliance and its impact on the NOPD. The Court explained the expedited need for the August 17th "hearing" just after the Mayor's public comments was in part to respond to allegedly "inaccurate statements made

by the City"[62] There was no motion pending before the Court except the City's Rule 60(b)

motion to terminate, which was filed the day before and expressly *not* considered.

At the "public hearing," the Court made clear that it disagreed with the Mayor's

statements. The Court directed the City, and ostensibly the elected mayor of the City, to speak

"accurately" and have "evidence" in hand before voicing an opinion about the Decree that

was not in line with the Court.[63] Specifically, the Court announced from the bench its

disagreement with reports attributed to the Mayor, and reprimanded the Mayor and the City to

not mislead the public.[64] These public comments, and many others from the same event, were

highly prejudicial regarding a pending matter and not part of the Court's official role.

It must also be noted that the Mayor's comments were not unsupported. Even the

Monitor has acknowledged that disciplinary investigations and promotions are two areas of

complaint by NOPD officers.[65] Surveys of exiting officers have reported that the Decree is

one cause of officer dissatisfaction. For instance, Dr. Asraf Esmail, Criminal Justice Program

Coordinator and Director of the Center for Racial Justice at Dillard University, explained to

reporters that, "[w]hen you survey officers as we did last year, many of them indicated that

the consent decree was one of the reasons they were leaving the force or leaving the NOPD."

The Police Association of New Orleans has also proclaimed that "the consent decree is

causing problems recruiting officers and it's causing problems for officers who want to stay

---

[62] Exh. 110, at 6:11 – 7:6.
[63] *Id.*, at 8:7-12.
[64] Exh. 110, at 6:24 – 9:6.
[65] *See, e.g.*, Exh. 110, 24:25 – 25:3 ("We also have heard complaints from officers, your Honor, about PIB what I guess they would say is over discipline.").

here…"[66] The inability to recruit and retain officers does impact officer safety. Officers have sued over the Court-approved promotion process. And the Court has heard directly from NOPD supervisors that officers complain that proactive policing puts them at more risk of violating NOPD policy and that this concern risks officers resorting to reactive policing.

The Court obviously disagrees,[67] but right or wrong, the Mayor has the right and an obligation to advise her constituents about a department she was elected to manage. It cannot be that just because the Court believes in the reform process that the Mayor, the City or the NOPD forfeit their First Amendment rights or the right to do the job they were elected or hired to perform. Accusing them of misleading the public from the bench is highly prejudicial and renders further enforcement of the Decree inequitable.

Respectfully, a strongly held desire to protect the consent decree reform effort, from criticism is misplaced given the extreme federalism concerns at risk as it prioritizes the Decree over the constitutional rights of the City and its residents. *Horne v. Flores*, 557 U.S. 433, 448 (2009) ("[I]nstitutional reform injunctions often raise sensitive federalism concerns.") Moreover, it puts the Court in an adversarial position to the City and NOPD. This is inequitable and was a specific fear of the framers of the constitution in giving federal courts equitable power to enforce judgments.

Other comments of the Court from the bench paint the NOPD in a negative light without any link to the expansive requirements of the Decree. *See, e.g.*, Exh. 110, at 35:22 – 37:10. ("[D]ifficult problems call for innovative solutions, and frankly, and unfortunately, I

---

[66] *See* "Federal monitor says there's backsliding on the consent decree; NOPD responds" at https://www.fox8live.com/2023/03/10/federal-monitor-says-theres-backsliding-consent-decree-nopd-responds/
[67] *See* Exh. 110, transcript of 8/17/2022.

have seen very little innovation on the part of the City or the NOPD in response to what I

view as a city crisis…. I still do not see that the City or NOPD have a holistic plan to deal

with the current emergency… To remedy this, I am going to take the following actions…")

The same is true of the Court's official statements that the City was somehow

avoiding transparency by declining to participate in public meetings set by the Court. In the

order cancelling the Loyola public event, the Court asserted: "[t]he City's communications

asserted that participation in these hearings is not a Consent Decree requirement. The Court

disagrees." Rec. Doc. 678. The Court went on to "assure[] the public that it has heard its

requests for transparency and accountability" implying that the City, a litigant before the

Court, was seeking to hide the truth about the merits of the litigation from the public and was

failing to comply with the Decree. *Id.* at 2.

Respectfully, that is inaccurate and unfair to the City. The City and NOPD have been

completely transparent throughout. It is the Monitor, not the City, that has sought to keep

compliance related meetings secret under the guise of settlement discussions.[68] The Fifth

Circuit's ruling and the subsequent vacatur of the public event does not erase the harm done

to the City, and specifically to NOPD's community engagement efforts, by these public

statements. More pointedly, they have rendered the process more onerous, inequitable and

impracticable and has left the City without the independent and neutral "court" required under

the Decree.

---

[68] *See* Exh. 102, Douglas email re using FRCP 408 to seal discussion regarding compliance
with the Court.

35

3.     ***The prohibition on management has been so repeatedly violated that it has harmed NOPD's supervisory structure.***

Recognizing the inherent threat (and inefficiency) of direct federal court management of a local governmental body, the drafters of the Decree made clear that the Monitor's role was limited to the evaluation of progress. Direct management is expressly prohibited at Paragraph 445. Despite that prohibition, the Court has moved from its judicial role to that of Monitor, and then into manager of NOPD.

The City Attorney in 2018 objected to the District Court about Monitor conduct that equated to management and reported that the City's concerns had been met with "disdain."[69] The Monitor responded on behalf of the District Court to this objection – *about the Monitor* – dismissing the concerns out of hand.[70] The breadth of the involvement of the Court and the Monitor in root level management of NOPD has only expanded since that well founded 2018 objection.

The Monitor has followed the Court's lead, working to manage NOPD without any of the constraints placed on a city employee answerable to a supervisor and an electorate. For example, earlier this year the Monitor called the Superintendent and demanded that certain personnel changes be made to satisfy the Monitor's desires regarding the ongoing investigation of a highly publicized officer assigned to the Mayor's protection staff. The Superintendent listened to the Monitor's demands and declined to move the personnel. She was certain her personnel plan would accomplish NOPD's goals and complete the Vappie investigation properly and on time. On January 12, 2023, undeterred by the Superintendent of NOPD's decision, the Monitor sent an email directly to a subordinate of the Superintendent,

---

[69] Rec. Doc. 568.
[70] Rec. Doc. 569.

without copying the Superintendent, tacitly instructing that specific people be assigned to the investigation.[71]

This email came **after** the Monitor spoke directly to the Superintendent who rejected the reassignment request. Ignoring the answer from the head of the NOPD, the Monitor then went behind the Superintendent's back and tried to get her subordinate to do his bidding anyway.[72] The disregard for basic concepts of investigational integrity, NOPD's chain of command, and federalism in the Monitor's tacit demand is striking.

The Monitor is charged to draft audit protocols and test that NOPD (*i.e.*, Public Integrity Bureau, in this example) investigations are done according to policy and that NOPD supervision is effective. *See* Consent Decree at para. 444. The Monitor – the declared "eyes and ears"[73] of the Court – is not authorized under the Decree to direct, *even tacitly*, by whom and how a specific politically sensitive PIB investigation is to be conducted. The Superintendent is the head of the police department and the Monitor is prohibited from interfering in that function. *See* Consent Decree at para. 445. And public comments about the investigation should be made by the Monitor while the investigation is pending.[74]

The Superintendent appropriately responded to the overt violation of her command structure explaining: "Mr. Aronie, going forward, please direct any request or suggestions

---

[71] *See* "Council members call for federal monitors to investigate Cantrell's possible conflicts of interest", 11/10/2022, at https://www.fox8live.com/2022/11/10/council-members-call-federal-monitors-investigate-cantrells-possible-conflicts-interest/

[72] Jonathan Aronie email, January 10, 2023, attached as Exh. 113 [*italic emphasis in original, bold added*]

[73] Exh. 111, transcript at 3:22-24.

[74] The Monitor then responded to press questions about the pending investigation, stating that the Monitor stopped the investigated officer from returning to his role. *See* Exh. 112, at https://www.fox8live.com/2023/03/08/zurik-vappies-return-mayor-cantrells-protection-detail-scuttled-nopd-federal-monitor-says/

concerning personnel changes or the detail of my command staff or essential personnel, directly to me."[75] The need for the Superintendent's email evidences that the process has veered so far from the four corners of the Decree that it has become inequitable. This is not "monitoring," and is not a role or process the Decree empowers the Monitor to conduct. In fact, this is another example of the Monitor violating the express prohibition in the Decree against the Monitor managing or supervising the NOPD. This conduct violates the Decree's core structure and is inequitable and has caused irreparable damage to the City. It warrants immediate termination of the Decree pursuant to Rule 60(b)(5).

### 4.       *Prohibited Monitor Press Statement are Harming NOPD*

The Monitor went on to publicly cast doubt, again, as the eyes and ears of the Court, on the decision to change leadership at NOPD's Public Integrity Bureau (PIB) in 2022, stating, according to the press: "Aronie lamented the city's decision to replace … the longtime civilian head of NOPD's internal affairs arm.[76]

Months later, the 2022 Annual Report by the Monitor claimed that PIB during time of Aronie's comments, was one of the few departments arguably not performing at the level it had previously achieved. And recent news reports revealing internal PIB investigations show there were issues warranting supervisory attention at that time. But the public would only know the Court's "eyes and ears" cast concern on the change in leadership at PIB long before the 2022 report, thus painting then Superintendent Ferguson and NOPD's command structure

---

[75] Exh. 113.
[76] https://www.nola.com/news/crime_police/federal-judge-praises-nopds-push-to-hire-civilian-workers-for-low-level-police-work/article_76222e6e-3f6a-11ed-b2a8-bb90233bc0cc.html

with a very negative brush. The cascade of opinions outside the framework of the Decree have harmed NOPD and undermined its efforts to show compliance.

## B.      Lack of critical mandatory reporting by the Monitor

The Decree clearly and unequivocally requires that the Monitor prepare quarterly and annual reports on the status of compliance in **each** area.[77] Compliance reviews and audits are to be completed by the Monitor – not NOPD – at least annually regarding every requirement of the Decree, **unless compliance is agreed**.[78] The Monitor has failed to provide the required quarterly reports since 2017, and the Monitor has never provided a single outcome assessment report, which is required annually.[79] DOJ admits this and that the Decree was never amended to allow for this change. Thus, compliance is the default presumption under the Decree in the absence of the required reports.[80] Those reports are required to advise NOPD on what specific steps were needed to demonstrate compliance.[81]

There was no 2021 Annual Report issued by the Monitor, and no quarterly reports have been published since 2017. At the Court's instruction, the Monitor did prepare a "Technical Assistance" report in 2022, focused on ideas for retention of officers.[82] Officer retention and job satisfaction is very important, and a challenge across the country, but unlike the quarterly and annual reports, the issue is not mandated by the Decree and does not satisfy

---

[77]  *See* Consent Decree at para. 457, "Monitor Reports".
[78] *See* Consent Decree at paras. 450 and 457(b).
[79] *See* Exh. 106, DOJ Objections and Responses to Discovery at responses to interrogatory No. 3 and request for production No. 4.
[80] *See* Monitor's webpage for list of all reports to date, at
http://nopdconsent.azurewebsites.net/reports.
[81] *See* Consent Decree (Rec. Doc. 565) at para. 457(d).
[82] *See* Exh. 110, August 2022 Transcript, at 10:6-19; and Rec. Doc. 640, 09/12/22, Report on Officer Trust and Job Satisfaction, Inclusion, and Retention, Efficiency and Burden Reduction, Sustainment and Continuous Improvement, Community Trust, and Recruitment.

the Monitor's obligations under paragraph 457. The lack of a report that includes the specific steps the Monitor asserts are needed to reach compliance is a material change in the terms negotiated by the City in the settlement agreement with DOJ. The lack of access to this information, which is fundamental to the role of the Monitor, continues to harm NOPD by rendering compliance goals subjective and subject to change. Rec. Doc. 674.

As the original brief in support of this motion discussed, the Monitor has also refused to conduct the annual outcome assessments required by the Decree and essential to NOPD's rights under the Decree.[83] This has not changed since the motion was filed eight months ago. The Monitor's continued refusal to provide the City with reports necessary to satisfy Paragraph 491 and 492 has rendered continued compliance efforts inequitable as compared to the obligation the City agreed to undertake. As DOJ asserts, without the Monitor's report, or even a methodology to build the reports for the Monitor, NOPD faces an onerous challenge to access its contractual rights under paragraphs 491 and 492. *See* Oppo. at 36, Rec. Doc. 682.

## IV.   CONCLUSION

"As I said in the opening, this does not mean everything is perfect. It does not mean there's no areas in need of further improvement, but it does mean that NOPD has reasonably met its consent decree obligations in these areas."[84] That is the standard at issue today. NOPD

---

[83] *See, e.g.*, Consent Decree (Rec. Doc. 565) at para. 457 ("The Monitor **shall** file with the Court quarterly written, public reports…that shall include…specific finding for each outcome assessment conducted."); *id.*, at 448 ("Monitor **shall conduct assessments** to measure whether implementation … is resulting in constitutional policing."); *id., at* 446 ("…the Monitor shall conduct the reviews, audits, and **assessments** specified below…"), *id.*, at 450 (the Monitor "shall… (b) set out a schedule for conducting **outcome assessments** for each outcome measure **at least annually**…"); and *id.*, at 453 ("the Monitor shall submit a proposed **methodology** for the **assessment**, review or audit to the Parties.") (*emphasis added*).
[84] Exh. 116 at 86:7-10.

has met this threshold. Continuing efforts in the current process have been rendered impractical, decisively more onerous, and inequitable given the unusual circumstances surrounding by role of the Court, the conduct of the Monitor, and the DOJ's efforts to avoid holistic analysis of systemic conditions.

Termination of the Decree is the proper, natural conclusion to this long and successful process.

*Respectfully submitted*, this 21st day of April 2023.

***Davillier Law Group, LLC***

/s/ Charles F. Zimmer II
Daniel E. Davillier La. No. 23022
Charles F. Zimmer II (T.A.) La. No. 26759
Jonathan D. Lewis, La. No. 37207
935 Gravier Street, Suite 1702
New Orleans, LA  70112
Phone: (504) 582-6998
Fax: (504) 582-6985
ddavillier@davillierlawgroup.com
czimmer@davillierlawgroup.com

***Counsel of Record for***
***the City of New Orleans***

### CERTIFICATE OF SERVICE

I certify that I have served a copy of the above and foregoing pleading via Notice of Electronic filing using this Court's CM/ECF system to counsel of record participating in the CM/ECF system on this 21st day of April 2023.

/s/ Charles F. Zimmer II