1

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | Civil Action |
| | * | No. 12-CV-1924 |
| Plaintiff, | * | |
| | * | Section "E" |
| v. | * | |
| | * | New Orleans, Louisiana |
| CITY OF NEW ORLEANS, | * | April 20, 2022 |
| | * | |
| Defendant. | * | |

* * * * * * * * * * * * * * * *


**TRANSCRIPT OF PUBLIC HEARING PROCEEDINGS,**
**BEFORE THE HONORABLE SUSIE MORGAN,**
**UNITED STATES DISTRICT JUDGE**



APPEARANCES:

For the United States:        U.S. Department of Justice
                              By:  R. JONAS GEISSLER, ESQ.
                              950 Pennsylvania Avenue NW
                              Washington, DC 20530


For the City of New Orleans:  City Attorney's Office
                              By:  DONESIA D. TURNER, ESQ.
                              1300 Perdido Street, 5th Floor
                              New Orleans, Louisiana 70112



For the Monitoring Team:      JONATHAN ARONIE
                              DAVID DOUGLASS
                              ASHLEY BURNS
                              BOB McNEILLY



For the Office of the         STELLA CZIMENT
Independent Police
Monitoring:

APPEARANCES (CONT'D.):

For the New Orleans          SUPERINTENDENT SHAUN FERGUSON
Police Department:           CHRISTOPHER GOODLY
                             LAWRENCE DUPREE
                             ARLINDA WESTBROOK
                             PAUL NOEL
                             OTHA SANDIFER
                             ERNEST LUSTER
                             NICOLE POWELL
                             MICHAEL PFEIFFER
                             FAITH BUTLER
                             NICHOLAS GERNON
                             JOE WAGUESPACK
                             CHRIS HART
                             MICHELLE WOODFORK
                             SABRINA RICHARDSON
                             KENDRICK ALLEN
                             PRECIOUS BANKS
                             JONETTE WILLIAMS
                             KEVIN STAMP
                             ERIC GILLARD
                             BRUCE HANEY
                             LEJON ROBERTS
                             HANS GANTHIER
                             PRESTON M. BAX, JR.
                             RONNIE LOBRANO (PHONETIC)
                             TERRY ST. GERMAIN
                             ERNEST DANFEEL (PHONETIC)
                             RAY BURKART
                             MIKE GLASSER
                             JOHN THOMAS


Official Transcriptionist:   Sherryl Robinson
                             c/o U.S. District Court
                             500 Poydras Street, Room B-275
                             New Orleans, Louisiana 70130
                             (504) 589-7724




Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

3

# I N D E X

|                          | Page: |
|--------------------------|-------|
| Jonathan Aronie          | 16    |
| Superintendent Ferguson  | 23    |
| Christopher Goodly       | 27    |
| Otha Sandifer            | 29    |
| Michael Pfeiffer         | 32    |
| Nicole Powell            | 44    |
| Michael Pfeiffer         | 52    |
| Ernest Luster            | 59    |
| Faith Butler             | 67    |
| Superintendent Ferguson  | 73    |
| Jonas Geissler           | 76    |
| Stella Cziment           | 82    |
| Jonathan Aronie          | 85    |

4

1               P R O C E E D I N G S

2           (Wednesday, April 20, 2022)

3           (Call to Order of the Court)

4               *   *   *   *   *

5           **CONSENT DECREE HEARING**

6               *   *   *   *   *

7           THE COURT:  Be seated.

8           It is so nice to see that sea of white out there.

9   It's beautiful.  Well, good afternoon and thank you for joining

10  us today for this important Public Hearing regarding the New

11  Orleans Police Department's progress under the Consent Decree

12  between the City of New Orleans and the United States

13  Department of Justice.

14          As you likely know the NOPD began this journey way

15  back in 2011.  At that time DOJ at the urging of our mayor and

16  many community members, conducted an investigation into the

17  operations of the NOPD and found that clear patterns and

18  practices of unconstitutional policing existed.

19          That finding led to the negotiation of a Federal

20  Consent Decree between the City of New Orleans and the DOJ and

21  the filing of a joint motion for approval of that consent

22  decree in 2012.  I appointed a federal monitor in 2013 to

23  assist the Court and the NOPD.

24          Over the course of the consent decree I have held

25  many public hearings to keep the community apprised of NOPD's

1   progress towards implementation of the decree.  Our hearings

2   have focused on a variety of topics including NOPD's policies

3   regarding use of force, the revamping of the training academy

4   and in-service training for officers, recruiting, officer

5   wellness, NOPD's misconduct investigations process and more.

6           Separately, I've held monthly and sometimes weekly

7   internal meetings with NOPD leadership, the DOJ and the

8   Monitoring Team.  The Monitoring Team has held, at least up

9   until COVID at least, regular meetings with members of the

10   public.  At these meetings the public is given an opportunity

11   for public comments and questions.  Over the years the monitors

12   have released many reports on various aspects of NOPD's

13   implementation of the consent decree, both regularly scheduled

14   reports and special reports as issues arose.

15           All of this is to say that the Court and the

16   Monitoring Team have regularly reported to the public and to

17   the media the progress the NOPD has made toward implementation

18   of the consent decree.

19           Today we're here to hear from the Monitoring Team,

20   the DOJ, the Office of the New Orleans Independent Police

21   Monitor and the NOPD regarding the status of NOPD's efforts to

22   reach substantial compliance with the terms of the consent

23   decree.  I'm hopeful this will be the first of three hearings

24   to be held over the next three months, culminating in the

25   Department entering the two year sustainment period of the

1  consent decree.

2          Today's hearing will focus on supervision,

3  performance evaluations and promotions.  I anticipate that the

4  May hearing will be at 3:00 p.m. on May 25th and will focus on

5  community engagement and bias-free policing.  The public

6  meeting will be either that evening or May 26th.  We will

7  confirm those dates and issue notice to the public and the

8  media closer to that date.

9          I anticipate the June hearing will focus on stops,

10  searches and arrests.  At that hearing I hope to be ready to

11  explain to the public the way we will proceed during the two

12  year sustainment period.  I also will detail for the public the

13  mechanisms that will be in place to ensure that the reforms

14  that the NOPD has made will be sustained into the future.

15  While this schedule is not etched in stone, it is a shared goal

16  among the parties, the Monitoring Team and this Court.

17          Before we get to the substance of today's hearing and

18  even before we introduce the multitude of folks in the

19  courtroom, I'd like to share a few thoughts about the

20  transformation I have seen over the past eight plus years.

21          First, as I've said before, the NOPD is a far cry

22  from the NOPD of 2013.  While not a perfect department the NOPD

23  is most definitely a changed department.  There are clear and

24  Constitutional policies in place.  These policies represent the

25  best practices in policing that have been developed not only

1   hear in New Orleans, but also in progressive police departments

2   across the country and also by professional policing

3   organizations.

4          The Academy has become a professional educational

5   institution run by a top notch academic dean and staffed with

6   knowledgeable and caring instructors who are teaching from well

7   vetted lesson plans.

8          The Public Integrity Bureau investigates all citizen

9   complaints in accordance with documented standard operating

10  procedures.

11         The Professional Standards and Accountability Bureau,

12  the Department's internal compliance mechanism, employs a

13  professional staff that conducts regular audits and reports the

14  results to the public.

15         A wealth of data is shared with the public on NOPD's

16  website so the public can help hold the NOPD accountable for

17  its behavior.  Uses of force are consistently reported and

18  evaluated by thoughtful supervisors and leaders.

19         The Department has created review boards for use of

20  force, vehicle crashes and supervision.  These review boards

21  look at these areas to determine whether any Department-wide

22  corrective action is needed such as additional training or

23  clearer policies and procedures.  This is one of the most

24  important ways the NOPD is constantly seeking to improve its

25  performance and its service to the citizens of New Orleans.

1            I'm particularly proud that in a number of areas the

2   Department has developed innovations that have been national

3   best practices.  The Department's Ethic Active Bystandership

4   Program, which has evolved into a national model called the

5   Active Bystandership for Law Enforcement or ABLE project is

6   just one example.  While there will always be room for

7   improvement in every complex organization, and the NOPD is no

8   exception, I am proud of how far the NOPD has come.

9            Second, the NOPD leadership team continues to impress

10  me in terms of its commitment to cultural transformation.

11  Chief Noel, Chief Westbrook, Chief Goodly, and recently retired

12  Chief Thomas threw themselves into this reform project

13  wholeheartedly from the very beginning.  And now Superintendent

14  Ferguson, Chief Sandifer and Chief Dupree likewise have proven

15  themselves to be true proponents of reform.  I could not ask

16  for a better group of partners in a project of this magnitude.

17           Third, it's important that you all keep in mind that

18  the NOPD is not a perfect department.  The recent revelation

19  regarding officers double-billing, some potentially criminally

20  on their secondary employment detail was quite concerning.  The

21  current slowdown in recruiting is troubling.  And the fact that

22  some districts continue to adhere to outdated and inefficient

23  administrative practices is frustrating.  But we all must

24  remember that perfection is not the goal of the consent decree,

25  full and effective compliance is.  As you will hear today the

1   NOPD continues to make great strides toward that goal.

2           Fourth and finally, I want to say a word about how

3   long this journey has taken us.  Remember the DOJ conducted its

4   investigation in 2011.  I approved the consent decree in 2012,

5   and I appointed the Monitoring Team in 2013.  If you start

6   counting from August 2013, the month the Monitoring Team came

7   onboard, we have been actively pursuing reform for almost nine

8   years.

9           While that may seem like a long time by some

10  measures, it's actually quite remarkable what we have

11  accomplished in less than a decade.  Changing culture is no

12  easy task.  The process of changing culture has been likened to

13  turning an aircraft carrier.  The NOPD not only has changed its

14  culture over the course of the consent decree, but it has done

15  so in the face of a global pandemic, a massive city cyber

16  attack, hurricanes, national civil unrest, sporadic officer

17  shortages and the city's financial limitations.  And let's not

18  forget that the culture that led to the imposition of the

19  consent decree was incubated within the department for far

20  longer than ten years.

21          Notwithstanding these hurdles, the NOPD has not

22  deviated from its course, its desire to become a department the

23  New Orleans community can be proud of has not waivered.  And

24  for that I truly thank you all.

25          I'm so pleased to see so many members of the NOPD

1   here today and I look forward to meeting you all in person and

2   talking with you after the hearing.  While the folks with stars

3   on their shoulders often give the public credit for the

4   department's success, I know how hard you all have worked to

5   bring us to where we are today.  I know it's no easy task to

6   try to comply with a far reaching, comprehensive consent

7   decree, respond to ever changing community demands and

8   expectations, and fight crime all at the same time with limited

9   staffing and a limited budget.

10          On behalf of myself as a citizen of New Orleans and

11  the New Orleans community more generally, I want to thank you

12  for all that you do for us.  I hope you know that even when I

13  get frustrated that something isn't going as smoothly or as

14  quickly as I would like, I never forget for a moment how hard

15  all of you are working.

16          Thanks also to the media and the public for joining

17  us here today.  The media has performed a critical service to

18  the New Orleans community throughout the consent decree, and we

19  are pleased to have you join us again today.  As always, at

20  these public hearings you will be able to chat with the members

21  of the Monitoring Team and the NOPD following today's hearing,

22  and so long as you wait for our official proceedings to end,

23  you can even snap a few still photographs for your reports.

24          But I'm getting ahead of myself.  We have much to get

25  through before we get to that, so let's begin.  There are a lot

1    of people with us in the courtroom today.  Let's start by

2    having the members of the NOPD introduce themselves and tell me

3    what you do for the Department, starting with those at counsel

4    table.

5                SUPERINTENDENT FERGUSON:  Good morning Your Honor.

6    Superintendent Shaun Ferguson, I'm Chief of the New Orleans

7    Police Department.

8                I have with me my executive command staff as well as

9    our overall command staff that are here with us today, ma'am.

10               THE COURT:  Okay.  Thank you.  And thank you for

11   making the effort to have everyone here today.  I know that

12   many of them will participate in the presentation.  And I also

13   am so happy to have you here so that we can recognize all of

14   you and thank you personally and probably for what you do.  So

15   thank you for making the effort to have everyone here.

16               SUPERINTENDENT FERGUSON:  Thank you.

17               MR. GOODLY:  Good afternoon Your Honor, Christopher

18   Goodly, Chief Deputy Superintendent of the New Orleans Police

19   Department, Field Operations Bureau.

20               THE COURT:  All right.

21               MR. DUPREE:  Good afternoon Your Honor, Lawrence

22   Dupree, Deputy Chief Management Services Bureau.

23               THE COURT:  All right.

24               MS. WESTBROOK:  Good afternoon Your Honor, Arlinda

25   Westbrook, Deputy Chief Public Integrity.

1             MR. NOEL:  Good afternoon Your Honor, Paul Noel,

2    Investigative and Support Bureau.

3             MR. SANDIFER:  Good afternoon Your Honor, Otha

4    Sandifer, Deputy Chief of the Professional Standards and

5    Accountability Bureau.

6             THE COURT:  Okay.

7             MR. LUSTER:  Good afternoon Your Honor, Ernest

8    Luster, Lieutenant Assistant Commander of the Third District.

9             MS. POWELL:  Good afternoon Your Honor, Nicole

10   Powell, Field Operations Bureau, Staff Assistant.

11            MR. PFEIFFER:  Good afternoon Your Honor, Michael

12   Pfeiffer, Compliance Manager -- or Innovation Manager now,

13   excuse me, NOPD.

14            THE COURT:  Thank you.

15            MS. BUTLER:  Good afternoon Your Honor, I'm Faith

16   Butler, Innovation Manager with the Professional Standards and

17   Accountability Bureau.

18            THE COURT:  All right.

19            MS. TURNER:  Good afternoon Your Honor, Donesia

20   Turner, City Attorney, City of New Orleans.

21            THE COURT:  All right.

22            MR. GERNON:  Good afternoon Your Honor, Nicholas

23   Gernon, I'm the Captain of the Crime Lab.

24            MR. WAGUESPACK:  Joe Waguespack, Captain of Special

25   Victims Unit.

1          MR. HART:  Good afternoon ma'am, Captain Chris Hart,

2     Central Evidence and Property.

3          MS. WOODFORK:  Good afternoon Your Honor, I'm Captain

4     Michelle Woodfork.  I'm the Captain of the Management Services

5     Bureau.

6          MS. RICHARDSON:  Good afternoon Your Honor, Captain

7     Sabrina Richardson, Commander of the Third Police District.

8          MR. ALLEN:  Good afternoon Your Honor, Kenneth Allen,

9     Captain, Public Integrity Bureau.

10         MS. BANKS:  Good afternoon Your Honor, Captain

11    Precious Banks, Professional Standards and Accountability

12    Bureau.

13         MS. WILLIAMS:  Good afternoon Your Honor, Jonette

14    Williams, Captain of the Fourth District.

15         MR. STAMP:  Good afternoon Your Honor, Captain Kevin

16    Stamp, Commander of the Seventh Police District.

17         MR. GILLARD:  Good afternoon Your Honor, Eric

18    Gillard, Captain of the New Orleans Police Department Second

19    District.

20         MR. HANEY:  Good afternoon Your Honor, Bruce Haney,

21    Captain of the New Orleans Police Department's Education and

22    Training Division.

23         MR. ROBERTS:  Good afternoon Your Honor, Lejon

24    Roberts, Captain of the Special Operations Division.

25         MR. GANTHIER:  Good afternoon Your Honor, Hans

1   Ganthier, Captain of the Eighth District.

2          MR. BAX:  Good afternoon Your Honor, Preston M. Bax,

3   Jr., I'm the Captain of the Sixth District.

4          MR. LOBRANO:  Good afternoon Your Honor, Captain

5   Ronnie Lobrano (phonetic), I'm over the Homicide Section.

6          MR. ST. GERMAIN:  Good afternoon Your Honor, I'm

7   Terry St. Germain, Captain of the First District.

8          MR. DANFEEL:  Good afternoon Your Honor, Ernest

9   Danfeel (phonetic), Operations Bureau.

10          MR. BURKART:  Good afternoon Your Honor, Ray Burkart,

11   Administrative Duties Division.

12          MR. GLASSER:  Good afternoon Your Honor, Captain Mike

13   Glasser, Investigation and Support Bureau.

14          THE COURT:  All right.  Is that everyone?

15          I tell you I feel in good hands.  I feel very

16   secure.

17      (Laughter)

18          THE COURT:  All right.  It's really great to see all

19   of you.  Many of you I've met before and it's nice to see those

20   I haven't met before and to see all of the Captains of the

21   various districts.  I'm just thrilled to have you all in the

22   courtroom today.

23          I'd like now for Mr. Geissler with the Department of

24   Justice to introduce himself.

25          MR. GEISSLER:  Good afternoon Your Honor, Jonas

1    Geissler for the United States.

2              THE COURT:  And Jonas, tell us what your title is?

3              MR. GEISSLER:  Your Honor, I'm a Senior Trial

4    Attorney with the Civil Rights Division of the United States

5    Department of Justice.

6              THE COURT:  All right.

7              MR. GEISSLER:  I come from Washington, DC.

8              THE COURT:  All right.

9              MR. GEISSLER:  Thank you.

10             THE COURT:  And now the Monitoring Team?

11             MR. ARONIE:  Hello Your Honor, Jonathan Aronie, the

12   Monitoring Team.

13             MR. DOUGLASS:  Good afternoon Your Honor, David

14   Douglass, Deputy, Monitoring Team.

15             MR. McNEILLY:  Good afternoon Your Honor, Bob

16   McNeilly, Monitoring Team.

17             MS. BURNS:  Good afternoon Your Honor, Ashley Burns,

18   Monitoring Team.

19             MS. CZIMENT:  Good afternoon, thank you for having

20   me, Stella Cziment, Office of the Independent Police

21   Monitoring.

22             THE COURT:  All right.  All right, so is that

23   everyone who is participating in the proceeding today, or

24   representing one of the parties?

25             MR. ARONIE:  I think it is.  Although just so you

1    know, our former Chief John Thomas is hiding in the background.

2         THE COURT:  All right.  Chief Thomas, stand up and

3    let us -- and tell us what your new position is?

4         MR. THOMAS:  Director of Public Safety and Homeland

5    Security for the City of New Orleans.

6         THE COURT:  All right.  It's nice to see you and

7    congratulations on your new job.

8         MR. THOMAS:  Thank you.

9         THE COURT:  All right.  So thank you all for being

10   here.  Your commitment to this project means so much to the

11   people of New Orleans.

12        With that as the background let's jump into the

13   substance of today's proceeding.  To kick things off I'd like

14   to hear from Jonathan Aronie our lead monitor; followed by the

15   NOPD; the Department of Justice; and then the Office of

16   Independent Police Monitoring.

17        MR. ARONIE:  Thank you Your Honor.

18        On behalf of the entire Monitoring Team I'm pleased

19   to be here to share with the Court and the public some of

20   NOPD's recent milestones under the consent decree.  Before

21   getting to that though I'd like to give a brief overview of,

22   you know, where we came from, where we are and where we're

23   going.

24        As you well know and as you said in your opening

25   remarks the Court appointed the Monitoring Team in August 2013.

1    Since that time our team has vigilantly served as the Court's

2    and the public's eyes and ears regarding every element of the

3    consent decree.  And we do this using a number of tools.  We

4    conduct audits, we conduct reviews.  We review and suggest

5    revisions to policies, procedures, directives, lesson plans,

6    SOPs, standard operating procedures.

7         We meet with community members, community

8    stakeholders to learn from their experiences interacting with

9    the NOPD.  In fact we have a community meeting tonight, as you

10   know.  We also meet and ride along with officers every time

11   we're down here, because it's very important -- and we do this

12   at all ranks, because it's very important to understand the

13   nuances and complexities of the job from their perspective as

14   well.  These activities collectively afford us a holistic

15   perspective of the NOPD's level of effort and level of success

16   in meeting their obligations under the consent decree.

17        In addition to our monitoring function we also

18   perform a very important technical assistance function and we

19   do that routinely.  Our team is filled with police practices

20   experts, civil rights experts, Ph.D.s, former police leaders,

21   organizational experts; and we have made these experts

22   available to the city and to the New Orleans Police Department

23   throughout the consent decree.  And to their credit they have

24   taken advantage of this expertise, and most of the things that

25   have been solved were solved together.

1             Over the course of our eight years together, like you

2    Your Honor, I have seen quite a transformation in the NOPD.

3    This transformation has allowed us to move many areas of the

4    consent decree into what we call into the green.   Into the

5    green means compliance with the obligations in a specific area

6    of the consent decree.   Named into the green because our charts

7    have that in green.

8             There are 17 discreet sections of the consent decree.

9    When we began the process, obviously all of these areas were

10   what we'd call in the red, with very little progress having

11   been made.   We briefed the Court and the public in January '19

12   at a proceeding which you'll remember, at Loyola.   And at that

13   point we were able to tell the public that NOPD had made

14   progress in every one of those 17 areas.   Ten of them at that

15   time we moved, quote, into the green.   In other words, they had

16   achieved full and effective compliance with those obligations.

17   Two of the areas were moved into what we'll call the light

18   green, nearing full and effective compliance.   And five areas

19   were given the designation significant progress.

20            Two years later, again in a proceeding hosted by

21   Loyola, we updated the Court and the public --

22            THE COURT:   I think you didn't mention that first one

23   was January 19th, 2019.

24            MR. ARONIE:   2019, exactly.

25            THE COURT:   2019.

1          MR. ARONIE:  Yeah, and that was in person.

2          THE COURT:  Yes.

3          MR. ARONIE:  Our 2021 update was not in person, it

4    was via Zoom, still hosted by Loyola, and at that point we

5    updated the buckets, if you will, and we were able to tell the

6    Court that 13 areas were at that point in full and effective

7    compliance with the consent decree.  Four areas had moved to

8    nearing full and effective compliance and no areas were even in

9    the blue, which wasn't a bad thing to start with.  So

10   everything was in the green or the light green.

11          This all matters Your Honor because getting all of

12   the areas into the green is what's necessary to begin the two

13   year sustainment period.  So every element of the consent

14   decree that moves into the green is one step closer to starting

15   the sustainment period.

16          And I'm very pleased today that after you hear from

17   all the parties, Your Honor, I'm going to have the pleasure of

18   asking you to move three additional areas into the green.  And

19   you're going to hear about performance evaluations.  You're

20   going to hear about promotions, which in the consent decree are

21   joint.  And you're going to hear about supervision.  Like you,

22   I'm very impressed with the dedication I've seen from the New

23   Orleans Police Department and the hard work they've put in and

24   I'm very proud of the accomplishments that we're going to share

25   with you today.

1          But Your Honor, it's important that I take a minute

2    and at least be very clear about what it means to put an area

3    into the green.  First, it means that NOPD has reasonably met

4    its obligations under the consent decree in that area.  And it

5    means that the structures required by the consent decree are in

6    place, they're working, and they're being audited.  But it does

7    not mean that everything is perfect.  It does not mean that

8    there isn't room for further improvement.  It does not mean

9    that it's exactly how we would do it if we ran the police

10   department, but we don't run the police department.  What it

11   means is that it is compliant with the consent decree.

12          Take supervision, which you'll hear a lot about

13   today, Your Honor, as an example.  As you're going to hear,

14   NOPD has met its obligations under the supervision section of

15   the consent decree.  But there is room for further improvement.

16   Indeed, as we request that that be moved into the green, we're

17   specifically calling out some areas that require further

18   improvement and NOPD has committed to do those things.  So

19   it's important that we recognize that moving into the green

20   does not mean everything is perfect, but it does mean it is

21   compliant.  And these agreements to further improve, which NOPD

22   embraces, is very important to what the sustainment period

23   looks like.

24          Now, what gives us comfort in making those

25   recommendations is our firsthand experience with the leadership

1    team of the Department's commitment to do -- to complete the

2    journey, to never say we're good enough, but to always be

3    looking for ways to improve further.

4              It's also important to recognize Your Honor that

5    moving something into the green is no guarantee that future

6    problems will not materialize.  There have been already and

7    there will from time to time be mistakes.  There will be areas

8    of occasional backsliding.  There will be sporadic misconduct

9    and the like.

10             The recent secondary employment scandal -- I guess

11   I'll call it a scandal -- which you're well aware of regarding

12   officers taking advantage of secondary employment details,

13   gives us a recent example.  And there will be other

14   transgressions as in any complex organization there are, in the

15   future.

16             In that sense, the recent OFFC (phonetic) events,

17   Your Honor, while quite disturbing also reflect much about the

18   changed New Orleans Police Department on the upside, if you

19   will.  A diligent citizen discovered much of this because New

20   Orleans was transparent with its data, something that didn't

21   exist in the past.  PIB and PSAB took the allegations very

22   seriously, launched an investigation that even extended beyond

23   what the citizen had found.  And NOPD coordinated with the

24   Office of the Independent Monitor through each step of the way.

25   These are all changes.  These are all changes and these are

1    things that didn't exist in the past.

2           And on that point, a quick word, I'm pleased to be

3    sitting here with Ms. Cziment.  We have started working very

4    closely with the Office of the Independent Monitoring now.  We

5    are thrilled that she's here with us today and we are confident

6    that the relationship that she's building with the NOPD and

7    with the Monitoring Team is going to facilitate entry into the

8    sustainment period.

9           After today, Your Honor, assuming the Court approves

10   our recommendations, the NOPD will be left with three areas of

11   the consent decree that still need to be moved into the green.

12   Community engagement, stop, search and arrest, and bias-free

13   policing.  Each is currently nearing full and effective

14   compliance.  But the road map you laid out and the timing, we

15   also are confident that that is going to work, and we're

16   looking forward to the May hearing and we're looking forward to

17   the June hearing.  We hope that everything will be in the green

18   in the coming months.

19          Today however is about what we're moving into the

20   green today, and I thank you letting me provide this brief

21   overview; but unless you have any questions, I think we should

22   get to the New Orleans Police Department and hear what they

23   have to say.

24          THE COURT:  All right.  I'm ready.

25          MR. ARONIE:  Thank you Your Honor.

1          SUPERINTENDENT FERGUSON:   Good afternoon again, Your

2   Honor.   I want to thank you for this opportunity to speak

3   before you.   I want to thank our monitors as well as the DOJ

4   for hosting this public hearing today.

5          I am proud of the successes we are reporting today in

6   the areas of supervision, promotions, as well as performance

7   evaluations.   This could not have happened without the hard

8   work of this command staff that you see before you as he

9   leaders of this New Orleans Police Department.   I believe that

10  everyone here agrees that the New Orleans Police Department of

11  2022 is not the New Orleans Police Department that we knew in

12  2013.

13         It was also through this hard work with our federal

14  monitors as well as the Department of Justice as well as the

15  Independent Monitors Office, NOPD has transformed itself into a

16  leader in Constitutional policing.   Every NOPD philosophy and

17  practice has been reset and ingrained through training.   NOPD

18  has brought every policy and aspect of critical infrastructure

19  in line with best practices which includes use of force, crisis

20  intervention training, custodial interrogations, photographic

21  lineups, recruitment, training, PIB misconduct, complaint

22  intake investigation and adjudication.

23         Use of force incidents have steadily declined year

24  after year.   Command surveys show continued trust gained.

25  There has been no finding of a pattern or practice of

1   unconstitutional policing by the New Orleans Police Department

2   in many years.  And today, performance evaluations and

3   promotions as well as supervision have met those high standards

4   as well.  The evaluations include a series of questions that

5   supervisors must answer with specific examples of decision

6   making skills and reporting -- report writing to ensure the

7   process is thorough and meaningful.

8           Through supervisor feedback logs we now have the

9   infrastructure in place to facilitate an ongoing dialogue

10  between supervisors and those in their command.  This provides

11  an opportunity for a conversation about performance that we can

12  take place merely in real time.  So the feedback is quick, it

13  is constant and it is constructive.  And that quick, detailed

14  feedback has helped reimagine the way in which officers are

15  evaluated for promotions.  This in turn has helped us to make

16  informed decisions that provide an opportunity for career

17  advancement within the New Orleans Police Department.

18          Beginning in 2021 the New Orleans Police Department

19  has promoted 57 (sic) officers to the following ranks:  18

20  captains, 19 lieutenants, and 30 sergeants.  The New Orleans

21  Police Department now adheres to the Department of Justice and

22  the federal monitors' approved policies on over 240 topics from

23  use of force to the translation of documents including Spanish

24  and in Vietnamese.

25          Our New Orleans Police Department policies are taught

1    and implemented by the Department of Justice and monitor

2    approved academy to effect and sustain real change by training

3    future generations of officers to police in a respectful and

4    Constitutional manner.

5            In its 2017 annual report the monitors declared:  The

6    NOPD has proven itself to be a respected forward thinking

7    reform-minded police agency to which other agencies now

8    routinely come for guidance.  This remains the same here today.

9    That progress has continued

10           We are also hopeful that community engagement, bias-

11   free policing and stop, search and arrest will join that list

12   of accomplishments shortly in the time line in which you have

13   given.  Even those few areas are not yet deemed in full

14   compliance by the monitors, they have significantly improved

15   and we are continuing to do the hard work of ensuring that NOPD

16   remains a leader in Constitutional policing.

17           Our Professional Standards and Accountability Bureau

18   is a dedicated team of professionals focused exclusively on

19   ensuring Constitutional policing and accountability any way

20   that allows us to sustain our many reformed accomplishments.

21           And Your Honor, if there are no questions for me, I

22   would like to turn this over to Deputy Chief Superintendent

23   Christopher Goodly for a few remarks as well.

24           THE COURT:  All right.  Before we do that --

25           SUPERINTENDENT FERGUSON:  Yes, ma'am.

1          THE COURT:  I wanted to tell you and the others here

2   that a few weeks ago I attended a consent decree conference in

3   Fort Worth and many representatives of police departments all

4   over the country were there and five other federal judges who

5   work with different police departments were there; and I was so

6   proud because many times during that conference the NOPD was

7   mentioned as a model and an example to these other departments

8   of what, you know, what -- a transformation can take place and

9   that they can implement the consent decree, and that they'll be

10  a better department for it.

11          So I just -- it really gave me a lot of pride to hear

12  you all praised that way at this consent decree conference.

13  You would have been happy if you could have heard it.

14          SUPERINTENDENT FERGUSON:  Yes, thank you Your Honor.

15          Again, I apologize as I mentioned before, I had a

16  prior engagement but however, I have spoken to my counterparts

17  here with me today as well as my colleagues across the country

18  and they stated the same.

19          THE COURT:  Yes.

20          SUPERINTENDENT FERGUSON:  I think it was a very good

21  conference and we remain again as one of those leading agencies

22  across the country that are looked upon for the best

23  Constitutional practices across the country.

24          THE COURT:  Yes.  And one thing that became clear to

25  me from talking with my fellow judges was that the NOPD is

27

1    farther along in complying with its consent decree than any

2    other city that's currently working under a consent decree.

3              Would you all agree with that?

4              UNIDENTIFIED SPEAKER:  Yes, Your Honor.

5              SUPERINTENDENT FERGUSON:  Do you all agree?

6         (Laughter)

7              SUPERINTENDENT FERGUSON:  Thank you Your Honor, yes.

8              THE COURT:  But I mean that was a great thing to

9    hear.

10             SUPERINTENDENT FERGUSON:  Yes, ma'am.

11             THE COURT:  And you know, I was kind of strutting

12   around, you know?

13             SUPERINTENDENT FERGUSON:  Yes.

14             THE COURT:  So thank you all for making that

15   possible.

16             SUPERINTENDENT FERGUSON:  Yes, ma'am.

17             THE COURT:  I took all the credit.

18        (Laughter)

19             SUPERINTENDENT FERGUSON:  Thank you again.

20             Now I'll ask Chief Goodly to step up, please.  Thank

21   you.

22             MR. GOODLY:  Thank you Superintendent.

23             And thank you for those kind words, Your Honor.  Good

24   afternoon.  My name is Christopher Goodly and I do oversee the

25   New Orleans Police Department's Field Operations Bureau.

1          Thank you to the Department of Justice, the federal

2   monitors, the IPM, the City Administration and the citizens of

3   New Orleans.

4          Superintendent Ferguson thank you for leading the

5   charge, providing a stewardship to ensure the organization

6   continues moving forward with compliance and accountability

7   reforms that are sustainable well beyond the consent decree,

8   that we are a transformational police department and are at the

9   forefront of 21st Century policing reforms.

10         My predecessor who is standing in the back, or

11   sitting in the back, John Thomas, who retired from the NOPD and

12   now is the Director of Public Safety but is still very engaged

13   in ensuring the required tasks and efforts are completed, left

14   a great path forward to ensure sustainability with the consent

15   decree reforms as well.

16         Also present here today is the executive leadership

17   team directly involved in ensuring all measures of the reforms

18   within the consent decree are in compliance and are sustainable

19   for years to come as our organization progresses forward and

20   continues to be the leaders in police reform.  Our presence

21   here today is a continuous commitment for ensuring a path

22   forward in policing, strived with excellence for all of our

23   citizens.

24         There are many, many team members that have made

25   tremendous contributions to get us here today.  There are a few

1   key members you will hear from today who will demonstrate how

2   our great department is moving forward.  And now I will turn it

3   over to Chief Otha Sandifer of our Professional Standards and

4   Accountability Bureau, who will begin NOPD's presentation.

5              Thank you Your Honor.

6              THE COURT:  Thank you.

7              MR. SANDIFER:  Good afternoon again, Your Honor.

8              Thank you Deputy Chief Goodly, Superintendent

9   Ferguson.

10             If it pleases the Court I do believe that protocol

11  has already been established.  However, I would be remiss if I

12  did not personally thank on behalf of the members of the

13  Professional Standards and Accountability Bureau as well as the

14  Police Department, Bob McNeilly; Mary Ann Viverette in her

15  absence, she couldn't be here today; and Dr. Ashley Burns; as

16  well as Jonas Geissler for their continued support of our

17  department with their technical assistance.

18             Again, I am Otha Sandifer, Deputy Chief of the

19  Professional Standards and Accountability Bureau, which is

20  dedicated to Constitutional compliance.  Now in my current

21  position, of course, I can personally attest to the changes

22  that our department has made since the Department of Justice

23  issued its report on operations in 2011.

24             Now of course, it is never easy to change fundamental

25  attitudes and longstanding practices.  It's also never easy to

1    take a long hard look at yourself in the mirror and accept

2    those changes to achieve the best version of our department

3    that we care so deeply about.  But I can stand here today and

4    state without hesitation that our department has done just

5    that.  We have made those changes and I can say to the citizens

6    of New Orleans that they can be proud of their police

7    department.

8            Our trainings, our procedures, our compliance audits

9    as well as our protocols that govern those audits have all been

10   put in place to bring sections such as performance evaluations,

11   supervision, peer intervention, officer assistance beyond

12   Constitutional minimums.  And they all have been implemented

13   into our academy to ensure that the next generation of our

14   police officers not only start with the strongest foundation

15   possible, but also for effective Constitutional policing.

16           We would also like the citizen of New Orleans to know

17   that it is no longer the mandates set forth in the consent

18   decree that govern our conduct.  It is who we are.  We, your

19   New Orleans Police Department, have become the change agents of

20   our professions.  We train others, we set the standard and it

21   is our standards that others follow.

22           So we have with us today members of the Field

23   Operations Bureau:  Lieutenant Nicole Powell, Lieutenant Ernest

24   Luster, as well as members of the Professional Standards and

25   Accountability Bureau:  Faith Butler and Michael Pfeiffer, who

1   are part of our team, to ensure that we hold ourselves

2   accountable and as well as to self-govern and take the

3   necessary corrective actions when deficiencies are noted in our

4   audit findings in order to maintain reform.

5          Now of course, Your Honor, reform is not the end

6   goal.  It is the cyclical process of critical self-assessments

7   that we, our department, must take as we evolve with our

8   training, our policies and/or our practices.

9          And finally, from my personal point of view, Your

10  Honor, I can say without a doubt that from the level of

11  commitment that I've seen from the women and men of this

12  department that is dedicated to innovation reforms, we have

13  catapulted ourselves into the national spotlight in modern day

14  policing, if you will.

15         For example, as you mentioned earlier, ethical

16  policing as courageous has evolved into able, active

17  bystandership for law enforcement with well over 200 law

18  enforcement agencies that have implemented the program.  And of

19  course we hope again today that what you will hear from our

20  team relative to supervisor review board as well as our

21  comprehensive performance evaluations and promotion system that

22  we will once again set the standards for us to follow.

23         And so now I will turn it over to Michael Pfeiffer as

24  well as Lieutenant Nicole Powell who will speak to supervision,

25  followed by Faith Butler as well as Ernest Luster who will

1    speak to performance evaluations and promotions.

2              THE COURT:  All right.  I agree with you that you, in

3    many areas, are forging new ground and coming up with

4    innovative ways to do things that others will emulate, and I

5    really respect that the department has been so willing to share

6    with others and to collaborate with others, to take what you

7    could from others and learn from others but also to share with

8    others what you've learned through this process.  And I really

9    think it's going to make a difference in the whole country, and

10   I thank you for that.

11             MR. SANDIFER:  Thank you Your Honor.

12             MR. PFEIFFER:  Good afternoon Your Honor.

13             Today's presentation is basically going to be three

14   formats.  I'm going to open it, FOB Lieutenant Nicole Powell

15   will then focus on the duties and responsibilities of

16   supervisors and audio video documentation which were the

17   issues, some of the issues raised in the previous audit report

18   by the monitors.  And then I'm going to close with an overview

19   of the supervision initiatives which kind of culminated and

20   rolled all of this into a more operational format for the

21   department.

22             THE COURT:  Well, and I wanted to mention that this

23   is -- the supervision, of course you all have been working on

24   that for years, but it was -- you had to get the foundation in

25   place to give everyone the training and the tools they needed

1    to do this effective supervision.  And so, I'm so glad to see

2    that you're at this stage of the process for supervision,

3    because it has been a long hard road.

4            MR. PFEIFFER:  Yes, the Monitoring Team and DOJ and

5    the department recognized rather early on that supervision

6    would be achievable or at least working towards a goal the

7    whole way, but achievable at the end.

8            THE COURT:  Right.

9            MR. PFEIFFER:  There are so many other things that

10   had to take place before we got there.

11           THE COURT:  Right, right.

12           MR. PFEIFFER:  Because it's an overarching concept

13   under the consent decree that covers basically everything.

14           THE COURT:  And there have been improvements along

15   the way.  It's not that there haven't been improvements, but it

16   took to get many other things in place for you to get to this

17   point.

18           MR. PFEIFFER:  Yes.  NOPD's processes for the consent

19   decree provisions that govern supervision are covered in

20   Section 15 which is Paragraphs 306 through 331 of the consent

21   decree.  They've been previously reviewed by the office of the

22   consent decree monitor in a supervision audit report, and

23   significant ongoing progress was reported.  The NOPD has made

24   consistent measured improvement in all areas except for some

25   specific issues that were raised in that report and which have

1     since been addressed and will be covered by Lieutenant Nicole

2     Powell with Field Operations Bureau as part of the

3     presentation.

4           Each of the areas presented highlights fee aspects of

5     the consent decree relating to supervision.  NOPD working with

6     the office of the consent decree monitor and the Department of

7     Justice has addressed each provision and defined how we plan to

8     sustain compliance in the future.

9           The opening provisions of the consent decree dealing

10    with supervision basically outline each of the major areas to

11    be addressed.  As you can see here (indicating) the blue

12    indicates the key words of those provisions such as adequate

13    number, referring to having a sufficient number of supervisors

14    to maintain a working ratio of supervisors to officers of eight

15    to one or less.

16          Qualified; referring to the selection and training of

17    first line supervisors.  Deployed; referring to having

18    sufficient numbers of supervisors working to respond in the

19    field.  Cause and effect of supervision; referring to the

20    active, timely participation and oversight by supervisors in

21    the field for critical areas such as arrests, complaints and

22    use of force.

23          Improve and grow: refers to supervisors guiding

24    officers and improving performance skills and job knowledge.

25    Police actively and effectively; referring to efficient

1   deployment and coordination of the resources.  And identify,

2   correct and prevent misconduct; referring to the utilization of

3   our early warning system INSIGHT to monitor work performance

4   and detect and prevent actions that may lead to problematic

5   behaviors and complaints.

6        All of these critical supervision provisions when

7   addressed provide a framework for improving police supervision.

8   By doing so they directly and positively impact the performance

9   of officers leading to a measurable improvement in the ability

10  of the New Orleans Police Department to fight crime and provide

11  more efficient and effective policing.

12       NOPD has focused on those elements most critical to

13  fostering close and effective supervision within the intent of

14  the consent decree, such as ensuring there's always enough

15  supervisors in the field to provide guidance and direction

16  under any circumstances.  This is promoted by ensuring that the

17  critical supervisory ratio does not exceed eight officers to

18  one supervisor and to improve supervision and enhance work

19  performance and clarity of direction, which is sometimes

20  referred to as unity of command.

21       Officers generally report to the same supervisor for

22  not only their shift assignments and direction but also for

23  their performance evaluations.  However, when illness,

24  mandatory training, emergency leave and demands of special

25  assignments impact the number of available supervisors,

1    supervisors from other units are assigned to support and fill

2    that gap.

3         Supervisors are required to make the scenes of all

4    felony arrests, all citizen complaints and uses of force.  Not

5    only to review the officers' critical decision making but to

6    provide guidance and reduce any potential harm from poor

7    decisions.

8         Our early warning system INSIGHT which is a data

9    warehouse allows supervisors to review and coordinate work

10   activity in real time across many dimensions and a comparison

11   to the officer's peers.  Problematic activity or indicators and

12   INSIGHT will even send an automatic alert to notify a

13   supervisor to check, investigate and determine if an

14   intervention may be necessary.

15        Supervisors have been provided checklists and

16   protocols to ensure that the tools and equipment officers need

17   to do their jobs effectively are available and working properly

18   at each shift.  Items such as marked police units, body-worn

19   cameras, in-car cameras, tasers and mobile computer terminals

20   are checked by the officer and any issues are immediately

21   reported to their supervisor, who ensures that all required

22   repairs are expedited and tracked.

23        Training of supervisors both newly promoted and

24   veteran ensures that they have the requisite skills and tools

25   to be effective.  The NOPD has invested more than the minimum

1  number of training hours required by the consent decree since

2  2016 and has consistently revised and upgraded the training

3  both in basic supervision and annual in-service training.  Over

4  240 hours overall is dedicated to supervisors' specific

5  training.  Two hundred hours in the basic supervision training

6  course and an additional 40 hours of annual in-service

7  training.

8         Unlike in the past when supervisors' training

9  focused on how to use and complete job-related forms and were

10  conducted in a purely lecture format, modern training is

11  formatted on the problem based learning model.  Problem based

12  learning is a student centered method in which students learn

13  about are subject to the experience of solving an open-ended

14  problem found in real world scenarios and exercises.  The

15  problem based learning process does not focus on problem

16  solving with a defined solution, but allows for the development

17  of other desirable skills and attributes such as knowledge,

18  acquisition, enhanced group collaboration and communication

19  skills.

20         The Department's recent adjustments to the training

21  schedule and plan due to the impact of COVID is an example of

22  the flexible approach to provide training.  Much of the

23  training was done either online or in a reduced class size

24  necessary for social distancing.  In the past the training

25  would have just been cancelled until the pandemic passed.

1            The content of the supervision training material is

2    adjusted either annually in the master training plan and based

3    on input from supervision working groups are with directed

4    training to address and identify short-term issues in

5    department training bulletins as was recently done for the

6    annual performance evaluations, questions that were dealing

7    with supervisory use of INSIGHT and supervisory evaluation of

8    higher level -- by higher level supervisors of their

9    subordinate supervisors in using INSIGHT effectively in the

10   performance evaluations.

11           As you can see on this slide (indicating) their

12   supervisor training program includes instruction in eleven

13   major areas.  They cover a wide range of skills, job duties,

14   critical policy issues and interpersonal communications.

15           So with INSIGHT; why is there a need for a system

16   like INSIGHT in a police department?  Police departments were

17   once smaller organizations and far less complicated than they

18   are today.  Supervisors might have been able to know everything

19   about their officers' work and their issues that may crop up in

20   their personal lives that could affect their work.  However,

21   NOPD is a large diverse organization that runs 24/7, 365 days a

22   year, and our officers constantly interact with the public, the

23   district attorney and the courts.

24           NOPD's around the clock work generates massive

25   amounts of officer performance data, far more than any one

1    supervisor could dedicate to memory.  INSIGHT works because it

2    operates in the background.  It's an automatic tool for

3    supervisors.  INSIGHT draws daily from the attendance and other

4    performance-based records.  It draws what data, as the data is

5    generated for other records such as district attorney refusals,

6    motions to suppress evidence.  Equipped with automated records

7    and multiple risk and performance factors for each officer

8    under their command, supervisors can now intervene in a timely

9    manner.

10           Some of these interventions validate good performance

11   such as community and supervisory recommendations that are

12   noted in INSIGHT.  And some are directed to improve performance

13   where needed.  An improving performance is not just

14   disciplinary, improving performance is just that.  You did

15   fine, could be better.  Here's how it could be better.

16           A major goal of INSIGHT is predictive, to help

17    officers to prevent potentially career damaging behavior

18   before it occurs.  And at the same time to prevent poor

19   outcomes from the public before they become an issue.

20           INSIGHT means NOPD does not have to wait for a

21   problem to occur and then react to it.  INSIGHT provides

22   supervisors with a tool to address potential risks before there

23   is a problem.  The early warning system uses data pulled from

24   multiple sources to provide a statistical analysis of all NOPD

25   employees.  The data is analyzed and comparisons are done

1    within clearly defined peer groups made up of officers who

2    perform the same or very similar job duties.  So it's comparing

3    apples to apples.

4          By conducting comparisons within these peer groups,

5    those who show measurable differences in the data compared to

6    their peers can be reviewed to determine the supervisory

7    intervention may be desirable or necessary to address a

8    possible concern.  Noted "possible concern."  The investigation

9    by the supervisor is going to determine if there is an issue

10   and if an intervention may help.

11         These differences do not necessarily have to be

12   serious such as the number of citizen complaints or uses of

13   force, but it can be as simple as excessive use of sick time,

14   which upon the supervisor's investigation could indicate a

15   personal or family issue that may be affecting their work.

16   Supervisory interventions do not necessarily need to be formal

17   such as a disciplinary investigation would be, but may be as

18   simple as counseling, a counseling session leading to a

19   referral for peer support or family counseling by a

20   professional.

21         INSIGHT is not a system to design to be punitive, but

22   to provide early detection of possible problems so that harm

23   can be prevented and an officer's career is not jeopardized.

24         Although the INSIGHT system is the product of a third

25   party vendor it has been recently upgraded to INSIGHT 2.0,

1    which is the web-based platform and it's monitored by the Early

2    Intervention Unit of the New Orleans Police Department.  The

3    EIU can adjust alerts, can adjust formats to report and

4    generate template reports which aid the supervisor in

5    evaluating their employees and subordinates.

6          As part of integrity control, the Professional

7    Standards and Accountability Bureau is conducting monthly

8    audits of the data and INSIGHT for both the timeliness in the

9    entry of the data and the accuracy of the data until the next

10   major comprehensive audit of INSIGHT occurs.

11         All supervisors are trained in the purpose and the

12   use of INSIGHT and are critically evaluated on their own use of

13   the system when conducting annual performance evaluations of

14   their subordinates.  INSIGHT alerts which are prompted by peer

15   group data analysis is sent to the supervisor for their

16   individual subordinates.  Since INSIGHT does not have the

17   capacity to make a judgment call on the data, the supervisor is

18   the necessary human element in the INSIGHT review process.

19   Should the supervisor determine that an intervention is

20   necessary, they can design one to fit the specific needs.  It

21   can involve counseling, additional training or any other

22   supervised and monitored action plan.

23         All interventions are documented in writing and

24   entered into INSIGHT.  An officer's performance data in

25   INSIGHT can be reviewed by a newly assigned supervisor when

1   the officer is transferred or reassigned.  This provides a

2   greater in-depth background for the new supervisor to know what

3   that subordinate's past activities have been.  To facilitate

4   the transparency and accuracy of INSIGHT data, a data entry

5   protocol was developed and outlined, and outlines who is

6   responsible for an in data, when it must be entered and when

7   the INSIGHT data must be displayed.

8        This was made part of the INSIGHT policy as an

9   appendix, so anybody can see what the responsibilities are and

10  what's covered.  When INSIGHT was originally structured in

11  2016, it had fifteen defined alerts based on the consent decree

12  requirements at the time.  Most involved the critical highlight

13  issues such as uses of force and complaints.  Additional data

14  points in the areas of lawsuits, all forms of discipline, sick

15  leave use, declinations to prosecute, in-custody injuries, lost

16  departmental property and suppressed evidence were added to the

17  employee databases so that one overall report mechanism could

18  be used to review all of the officers' performance data.

19        Along with the audit data fields, some 26 original

20  and new alerts are active covering every identified area of

21  possible concern.  These alerts will be sent to the officers'

22  supervisor automatically and will require the supervisor to

23  review the data to determine if an intervention may be

24  necessary.  It doesn't demand that one, it just flags it for

25  the supervisor to follow up.

1          All data in the INSIGHT system, including personal

2    identifying information on an officer is captured and

3    maintained securely and is only accessible by secure terminals

4    and with properly predefined access.  It is not reviewable by

5    any supervisor, only those in the member's chain of command,

6    the Public Integrity Bureau, and Professional Standards and

7    Accountability Bureau for audit purposes.  Personal

8    identifying information on an officer is maintained for five

9    years after separation unless prohibited -- otherwise

10   prohibited by law.  After that period it is anonymized and kept

11   for statistical purposes indefinitely.  All officer performance

12   based data is now accessible through INSIGHT rather than the

13   previous multiple separate data files we maintained.

14          THE COURT:  Uh-huh.

15          MR. PFEIFFER:  As technology changes and our needs

16   grow with experience, INSIGHT can be adapted to meet those

17   needs.  Fields can be added, alerts can be changed, new

18   documents and reports added or modified as appropriate.  All

19   proposed changes will of course be submitted to the office of

20   the consent decree monitor for review to ensure the ongoing

21   compliance with the consent decree.

22          The current configuration of use of INSIGHT are an

23   example of how the NOPD has gone above and beyond the basic

24   requirements of the consent decree for an early warning system

25   and crafted a system that captures significantly more officer

1    performance based data and provides a methodology for its use

2    and direct supervision and performance assessments.

3            Next, you're going to hear from Lieutenant Nicole

4    Powell of the Field Operations Bureau staff on their efforts to

5    address the issues that were noted in the monitor's audit

6    report on supervision.

7            I will then come back and conclude on an overview of

8    the supervision initiative.

9            THE COURT:  All right.  So I think for those of you,

10   not at NOPD and even those who are, you can just imagine what a

11   massive undertaking this has been and it has taken many years

12   to get to this point.  This is a major element of what was

13   required by and requested by the Department of Justice after

14   their investigation to put this system into place.  And you've

15   really -- I think this is a model of a system and I want to

16   thank all of you for the work you did and I also want to thank

17   Chief McNeilly.  I know that he has been very helpful in

18   getting the INSIGHT system in place.

19           So congratulations.

20           MR. PFEIFFER:  Thank you.

21           MS. POWELL:  Good afternoon Your Honor.

22           I will go over Consent Decree Section 15, duties of

23   a supervisor, which covers Paragraphs 306 to 313; video and

24   audio documentations of police activities, which covers

25   Paragraphs 327 and 331.

1        Close and effective supervision deals with the

2   critical functions and duties of supervisors towards their

3   subordinates.  As a supervisor, the key elements of supervision

4   is close and effective supervision, accountability, and to

5   direct and guide officers.  Supervisors are required to be on

6   scene for all felony arrests and review reports, investigate

7   use of forces.  Supervisors are required to review officers'

8   daily activity reports, respond to and investigate citizen

9   complaints.

10       But more importantly, supervisors encourage officers

11  to work actively to engage the community to form partnerships

12  which continues to build and strengthen public trust; to

13  provide redirection and counseling, and more importantly,

14  employee recognition; provide support to officers through the

15  Officer's Assistance Program.

16       NOPD has maintained and sustained the requirements of

17  the consent decree of all district officers are assigned to a

18  single constant and clearly defined supervisor.  As well as

19  supervisors and officers are assigned the same platoon and

20  working the same days and hours.

21       In the supervision audit conducted by the Office of

22  Consent Decree Monitors district investigative units,

23  supervisors work generally the same days and hours as the

24  officers they were assigned to supervise.  Prior to the

25  corrective actions Field Operations Bureau implemented, all

1    district investigative units only had monthly schedules.  What

2    we implemented was all district investigation unit sergeants

3    are required to maintain daily schedules.  The daily schedule

4    consists of sergeants and detectives working status and working

5    hours.  District investigative unit sergeants are scheduled

6    working with the detectives under their command or working.

7         Your Honor, this is an example of a daily lineup

8    (indicating).  This is a real example from the Sixth District.

9    And as you can see that this is the evening time.  They work

10   mid shift evenings.  The "N" denotes for an off day.  The "W"

11   denotes for work day.  So as you can see that the supervisor is

12   working during the same time the two detectives was working.

13        However, in the event that there is no district

14   investigative unit supervisor working, vacation days, sick,

15   training, the detective will be placed on the platooned daily

16   schedule and the platoon ranks have ensured that the officer

17   maintains their ratio.

18        So as you can see here (indicating), this was Good

19   Friday, which it was a week ago.  And this detective was placed

20   on the second watch -- second watch daily lineup and his direct

21   supervisor was Sergeant Scott in the Sixth District.

22        In the supervision audit conducted by the Office of

23   Consent Decree Monitors the district platoon sergeants are

24   assigned eight or less.  This was a deficiency in that audit.

25   The Field Operations Bureau implemented the following process

47

1    to ensure compliance with the supervisor/officer ratio and this

2    process addresses any deficiencies found.  The Field Operations

3    Bureau requires monthly manpower reports from the district to

4    ensure compliance in the supervisor/officer ratio.

5            This is an example of the first police district

6    (indicating).  And as you can see, highlighted here, is that

7    for each sergeant is eight officers or less across all of these

8    platoons.

9            Field Operations Bureau receives a weekly audit from

10   Professional Standards and Accountability Bureau on the

11   officer to supervisor ratio.  This particular is a scorecard

12   from the week of January the 16th through January the 22nd

13   (indicating).  And as you can see all the districts were at 100

14   percent; however, we did note a deficiency for the Seventh

15   District which this was at 86 percent.

16           THE COURT:  But in the top, the AD, CD is a platoon?

17           MS. POWELL:  It's a platoon.

18           THE COURT:  Okay.

19           MS. POWELL:  Yes, ma'am.

20           Furthermore, that particular scorecard breaks it down

21   not only per platoon but per day.  So we can see on Monday

22   which is January the 17th for the Seventh District it was the A

23   platoon that had nine officers to one sergeant.  So that was

24   the deficiency that was found.

25           From that process we actually sent out an email to

1   all the district captains giving them the scorecard, but more

2   importantly, we also commend those districts who was at 100

3   percent.  But more importantly, it takes everybody's -- the

4   accountability of the officers, the sergeants, the lieutenants,

5   the district captains, as well as the deputy chief for this

6   overall success for the Field Operations Bureau, and that's

7   denoted right here (indicating) in the email.

8         So the email was sent of the same week which is

9   January the 31st, Wednesday, which is February the 2nd, Chief

10  Goodly conducted a captain's meeting.  And here, highlighted,

11  is him talking about that supervisor ratio (indicating).  So

12  he's required by the end of the week for that district that had

13  that deficiency to respond if warranting any corrective

14  actions.

15        The district captain did respond by the end of the

16  week and this is actually a form.  The date right here is the

17  17th (indicating), which is the date that the deficiency was

18  found.  And the response was:  On the lineup there was actually

19  a field training officer and an officer in training.  We

20  counted it as one instead of two.

21        So what I did was to get with Professional Standards

22  and Accountability Bureau and we talked about it and we

23  realized that they count this as two persons instead of one.

24  So the corrective action here is actually training in

25  information to all the districts to ensure that when we do the

1  officer/supervisor ratio that we take into account if they have

2  a field training officer and an officer in training that we

3  count those as two, to make sure that we don't go over that

4  ratio.

5          So I just wanted to show you, Your Honor, that we're

6  just not -- I'm not just not telling you what the corrective

7  action is, but this is the corrective action in process in

8  working.

9          NOPD has maintained or sustained the requirements of

10  the consent decree in the area that supervisors ensure that all

11  subordinates receive close and effective supervision as well as

12  following all laws and NOPD policy.  Captains and supervisors

13  at all levels are directly accountable for the quality of close

14  and effective supervision.

15          And it's through accountability as documented through

16  corrective actions by redirection, counseling and the

17  initiation of former investigation as warranted.  And the way

18  that we assess this compliance is through INSIGHT records and

19  the annual performance evaluation audit.

20          NOPD has invested heavily in technology and such as

21  body-worn cameras, in-car cameras, audio/video interview rooms,

22  and held-hand audio recorders for supervisors to promote

23  accuracy and transparency.  NOPD policy mandates their use.

24          In the supervision audit conducted by the Office of

25  Consent Decree Monitors these three paragraphs were found to

1    have deficiencies.  One of the areas was that the

2    administrative cause was placed on the same roster as the

3    platoon cause.  We realized that this was an administrative

4    error.  All district administrative vehicles were removed from

5    the platoon fleet roster.  This would distinguish between

6    administrative vehicles as well as platoon vehicles.

7            The platoon ranks are required to complete a

8    checklist in examining platoon vehicles.  The in-car cameras,

9    body-worn cameras, control electronic weapon, mobile data

10   terminal, automatic vehicle locator, and vehicle issues.  This

11   occurs at the start of shift and is documented on the

12   sergeant's daily activity sheet.  And highlighted right here,

13   Your Honor (indicating), if you could see the equipment in

14   review, that all of these must be documented at the start of

15   the shift; a representative is -- a rep is notified, it's

16   usually our NOPD tech, and any comments to that.

17           If an equipment is discovered to be inoperable, the

18   platoon rank reports the issue via email to NOPD tech, the

19   platoon tenant, the district system administrator and the

20   district fleet personnel.  If it's during NOPD tech working

21   hours, the platoon rank shall instruct the officer to bring the

22   vehicle to police headquarters for repairs.

23           Prior to bringing the vehicle for repairs the rank or

24   the district fleet personnel will call or email NOPD tech to

25   schedule a time to bring the vehicle in.  If it's before or

1   after hours the platoon rank shall notify the next platoon rank

2   of these issues.  In all repairs NOPD tech do create a ticket

3   documenting this request.

4           Highlighted here (indicating) is an actual back of a

5   officer's activity sheet.  And as you see at the start of the

6   shift, they have to go through the same checklist of checking

7   it right here, highlighted.  And at the end of the shift they

8   have to go through that same check.

9           To ensure compliance the district administrator

10   sergeants conduct random checks for compliance with the

11   operability of the video cameras and accuracy of fleet records

12   ensuring documentation for malfunction and repairs as proof

13   issues that's being corrected as well as the timeliness of the

14   repairs and notification.

15           I will now turn it back over to Michael Pfeiffer.

16           THE COURT:  You know, some of this sounds like it

17   should -- it would be easy, but I know it's not, and it has

18   been really a Herculean effort to get the systems, these

19   systems, in place.  And so I just want everybody to know this

20   was quite an accomplishment.

21           MS. POWELL:  And I must say it takes the work of all

22   of us.

23           THE COURT:  Yes.

24           MS. POWELL:  So we don't take credit, it's the men

25   and women out there in the district that do it day in and day

1    out, so I definitely give them credit for the overall success

2    of Field Operations Bureau in supervision.

3            THE COURT:  I agree.

4            MS. POWELL:  Thank you.

5            MR. PFEIFFER:  Before I begin I just want to point

6    out one thing that may be a little glossed over by Lieutenant

7    Powell's presentation.  When the issues that she addressed were

8    raised in the initial OCDM supervision review, we sat down and

9    discussed with Field Operations and clarified what those were.

10   But from then on they took the ball and ran with it.  They

11   defined their own directives.

12           You know Chief and Lieutenant Powell defined their

13   own directives, their own approach to it, their own feedback

14   mechanisms, and they have really internalized it and taken it

15   all on themselves.

16           THE COURT:  Uh-huh.

17           MR. PFEIFFER:  So they deserve a great deal of credit

18   for that.

19           THE COURT:  Okay.

20           MR. PFEIFFER:  Superintendent Ferguson established

21   the supervision initiative in August of 2019 to help move the

22   Department into compliance with the consent decree requirements

23   regarding supervision.  Notwithstanding its remarkable

24   improvements in so many areas the NOPD was struggling to meet

25   its supervision obligations since the outset of the consent

1   decree.

2          The Superintendent created a supervision initiative

3   working group of captains and chiefs and tasked the supervision

4   initiative working group to identify concrete, practical and

5   effective solutions that resolve the known compliance gaps and

6   would bring the NOPD into compliance with national best

7   practices and help NOPD achieve the requirements of the consent

8   decree in the area of supervision.

9          The supervision initiative working group developed a

10  list of concrete and practical recommendations to help bring

11  the department into compliance with the consent decree.  The

12  recommendations were not constrained by existing department

13  practices.  Members of the working group were instructed to

14  assume a clean slate and freely and broadly consider new

15  approaches that were likely to bring NOPD into compliance with

16  national best practices and the requirements of the consent

17  decree in regarding the area of supervision, and to do it as

18  quickly as practical.

19         The recommendations of the supervision initiative

20  working group were presented to the Office of the Consent

21  Decree Monitor and the Department of Justice, and working

22  collaboratively with them led to the supervision initiative

23  reporting document, sometimes referred to as the supervision

24  binder by the working group.

25         Areas included in the supervision initiative led to

 1  significant changes such in the areas of promotion -- excuse

 2  me, in the promotion process.  Previously, promotions were a

 3  closely held function of the superintendent and the deputy

 4  chiefs with some limited input from captains.  No specific

 5  process was defined and utilized other than the list generated

 6  from Civil Service, from which the superintendent made the

 7  selections.  Now the promotion process is guided by a chief

 8  administrative office policy memorandum 143(R) and New Orleans

 9  Police Department Chapter 34.2

10      The Creative Promotion Committee follows a

11  structured, clearly outlined selection process with required

12  documentation and review by all committee members to ensure

13  that the selectees are evaluated according to established

14  criteria.  Upon completion of the selection processes outlined

15  by the Chapter, the Professional Standards and Accountability

16  Bureau reviews the Promotion Committee minutes, the promotion

17  rubric or checklist and all related documentation to ensure

18  that the selectees were evaluated according to the established

19  criteria and done by each member of the committee.

20      This document with this literal check off sheet of

21  each element of the selection process for each applicant

22  reviewed by the Promotion Committee members is then verified by

23  the Professional Standards and Accountability Bureau during the

24  review of those files.  The report of this review is done and

25  forwarded to the Deputy Chief of Professional Standards and

1   Accountability Bureau along with any recommendations for

2   improvement of the process.

3        Prior to this initiative disciplinary investigations

4   focused on the complaint, related violations and the accused

5   member.  There was no specific review to determine if any

6   actions or inactions by the accused member's supervisor may

7   have contributed to the violation.  The serious discipline

8   review board was created as a quality control mechanism to

9   ensure timely reviews of all serious discipline imposed on

10  members to determine if the appropriateness of the supervision

11  of the member involved in the infraction and it -- was involved

12  in the infraction if any inadequate supervision or a failure in

13  the chain of command was present and caused or enabled the

14  violations.  So it's looking past the obvious.

15       The serious discipline review board is charged with

16  reviewing all serious discipline imposed by the department with

17  the goal of identifying if inadequate supervision or failure in

18  the chain of command was present and caused or enabled the

19  violation.  Reviewing less serious disciplinary events where a

20  members bureau chief identified the pattern or practice which

21  may warrant a command level review of the discipline or any

22  review that is directed by the superintendent can also be done

23  by the serious discipline review board.

24       The actions that the board may take are very broad

25  and include ordering further investigation when it appears

1   there's additional relevant evidence that may assist in

2   resolving inconsistencies or improve the reliability or

3   credibility of the findings, evaluating each case to either

4   affirm or reject the supervisor's role in the misconduct.  And

5   if the board determines the supervisor's role violated NOPD

6   policy, referring it to PIB for disciplinary action.

7          They review the incident to determine whether it

8   raises policy, training, equipment or tactical concerns and

9   resolve those.  They can direct district supervisors to take

10  and document non-disciplinary corrective actions on minor

11  issues that were noted.  And it can encourage improvement in

12  the officer's performance and the supervisor's performance.

13         All serious discipline review board training

14  recommendations are forwarded to the Education and Training

15  Division for use in the annual training needs assessment.  And

16  the captain of the Education and Training Division uses these

17  findings of the board to assess the adequacy and where

18  possible, to enhance the Department's training on supervision

19  and discipline.

20         The captain ensures that the supervisory deficiencies

21  identified for the board are addressed in all future training

22  modules for both new supervisors as well as in-service.  This

23  formal process is the first of its kind and a model for other

24  agencies to follow.  It's another example of how the NOPD has

25  identified an issue and developed a method to address that

1    issue that goes beyond the base recommendations of the consent

2    decree.

3            Prior to this initiative newly promoted supervisors

4    were evaluated in their probationary period on the much more

5    generic Civil Service evaluation forms, and that was the limit

6    of the evaluation process.  These forms were applicable to all

7    classified employees in city government and not directed to the

8    task specific to policing.  Now, new supervisors are reviewed

9    and evaluated during their probationary period as well as part

10   of a mentorship program.  The coaching or mentorship program

11   was established and paired newly promoted supervisors with

12   seasoned supervisors as mentors to assist the new supervisor

13   with navigating the challenges of first line supervision.

14           The senior supervisors are responsible for mentoring

15   and coaching the new supervisors.  The mentors also train and

16   evaluate the newly promoted supervisors on at least 16

17   different processes and tasks and provide bimonthly evaluations

18   on their progress in each one of those tasks.  The bimonthly

19   evaluations along with the end of probation evaluation is used

20   in assessing if the areas have been mastered and the

21   suitability of the new supervisor to attain permanent status at

22   the end of the probationary period.

23           The new supervisors captain also addresses the

24   supervisors progress in an interoffice correspondence to the

25   Field Operations Bureau chief for their assessment as to

1    permanent status.  The process was outlined in a Field

2    Operations Bureau directive, Number 49.  The documentation and

3    process as follows is reviewed by the Professional Standards

4    and Accountability Bureau for each new supervisor once it has

5    been completed.

6           In communication; leadership messages targeted a

7    close and effective supervision including innovative leadership

8    strategies are done through monthly messages to officers in the

9    community from the superintendent and captains and in their

10   revamped, restructured roll call process.

11          We also have the burden reduction working group.

12   This works to identify the processes, forms and potential areas

13   where we may be able to reduce or eliminate unnecessary

14   burdens, documents and forms.  This is an ongoing effort in

15   part, and has even become part of the new hexagon document

16   management system.

17          That's just an overview of some of the highlights of

18   the supervision binder.  It went on for 150 pages.

19          THE COURT:  Yes, I remember.

20          MR. PFEIFFER:  Lieutenant Ernest Luster is now going

21   to present on how INSIGHT is utilized by supervisors in

22   addressing issues arising in the field and how it's used as

23   part of the annual performance evaluation process.

24          THE COURT:  Okay.  And I hope everyone, all our

25   visitors and the media and the public, understand what the

 1    level of work that you all have done and the professionalism

 2    and the sophistication of the systems that you've put into

 3    place.  A Fortune 500 company would be proud to have the kinds

 4    of processes that you have implemented.

 5              MR. PFEIFFER:  They have really moved forward with a

 6    mission, you know, with an identified approach taking it to

 7    where it could do more for us, leveraging it.  You know, the

 8    INSIGHT was the biggest example of that.  We didn't just use it

 9    as an early warning system, we used it as a performance -- a

10    data performance measuring tool, as well.

11              So we as a department have tried to do that with

12    almost every provision in the consent decree where it's

13    possible to leverage it to make us more effective.

14              THE COURT:  Uh-huh.

15              MR. PFEIFFER:  It has really been remarkable.

16              THE COURT:  It has.  And thank you.

17              MR. LUSTER:  Good afternoon Your Honor.

18              THE COURT:  Good afternoon.

19              MR. LUSTER:  So I'm here to talk about the

20    performance evaluations.  So as a front line supervisor for 14

21    years I can attest to the evolution of these performance

22    evaluations, where they came from and where they are today.

23              So in the past, you know, formal evaluations they

24    were very vague.  You know, they gave a general oversight of

25    officer's performance but it didn't dig into the specifics of

 1   their past accomplishments.  And this was a problem because it

 2   became systemic.  It ended up grouping all of the officers in

 3   very small categories and no officer was able to stand out as

 4   to their performance and their past accomplishments.  And a lot

 5   of times officers would approach the supervisors and want to

 6   know how they were doing, how they can best do something

 7   better, and how they can perform better in the future.

 8          So to change that process the Professional Standards

 9   and Accountability Bureau came up with a different template to

10   accurately assess officers in their performance evaluations.

11   And this template came with several categories:  Report

12   writing, decision making, safety protocols, engagements with

13   the community, and so forth and so on.  So before that process

14   can be implemented into the New Orleans Police Department, it

15   had to come with training for every front line supervisor.

16          So what they would do is they came up with a training

17   practice that helped each supervisor go over each category and

18   accurately assess that officer by giving him sufficient

19   verbiage to use as they marked out those different

20   accomplishments.  And this was very helpful to the lieutenants

21   and the sergeants, and each year the supervisors would receive

22   a refresher course in how to use best practices in evaluating

23   each officer.  And we find that to be a very valuable tool.

24   But not only that, we had other tools that helped us accurately

25   evaluate performance evaluations.  So I'm going to talk about

1  three -- three of those tools that are very efficient and

2  help:

3          Number one, the self-assessment form.  The self-

4  assessment form is a form that each individual officer uses to

5  accurately give an overview of their own accomplishments.  So

6  this officer is required to go over the past year, look at

7  every report, look at their accomplishments as well as areas

8  where they need to improve and they're given -- they give that

9  supervisor an opportunity to overview this assessment form and

10 use that as a template to accurately evaluate that officer.

11         Now I must note that this is not a total reliance on

12 the assessment form, but it's something that his supervisors

13 use to vet each and every individual officer.  So they would

14 take that data, research the data and then verify if that data

15 was accurate.

16         THE COURT:  Uh-huh.

17         MR. LUSTER:  So with the implementation of the self-

18 assessment form, this cut down on a lot of arduous and

19 complicated work for the supervisor, because in past, prior to

20 the self-assessment form being in play, it took a supervisor

21 hours to just do one officer, and you might have one supervisor

22 in charge of several officers.  So with the responsibilities of

23 being on scenes for different crimes, excessive reports,

24 dealing with each officers and their payrolls and trip sheets

25 and so forth, and then add on a performance evaluation with no

1    template; this added on more burden.  With the self-assessment

2    form this cut down that time and it gave us a reduction in

3    completing an accurate performance evaluation.  So that's been

4    a very helpful tool in this performance evaluation process.

5            One of the second tools that I'll talk about is the

6    INSIGHT.  Mr. Pfeiffer has given you an overview of INSIGHT but

7    I want to give you some specific details and how we use it for

8    the performance evaluation.

9            So if you look at the screen, all right (indicating),

10   so there's several highlighted areas.  Now this is a

11   highlighted area of not one officer, but three different

12   officers.  On one side of the screen if you look at it, it

13   shows arrests, commendations, K9 bites, complaints, and on one

14   side you'll see account.  That account in the employee category

15   represents the account of that particular officer and how many

16   times did they have a complaint.

17           If you look at the second category it shows where all

18   of NOPD have received complaints or with that particular number

19   and then all -- that's in the air.  And then if you look at the

20   far right, it shows you what the average alert threshold should

21   be.  So in this case for example, this officer received nine

22   complaints related to professionalism, when the average is

23   1.88.  This is a problem, so it alerted us.  When we got the

24   officer in we had a counseling session, myself and another

25   supervisor, spoke with the officer.  Went over INSIGHT,

1    explained to this officer what the problem was and then we

2    found out that this officer had personal marital problems, and

3    they were dealing with a lot of domestic issues.

4           So, as a preventative measure to keep this officer

5    from getting in trouble, we went out and reached out to the

6    Officer's Assistance Program because not only do concern

7    ourselves with preventive measures of officer's misconduct, but

8    we were also concerned about officer's mental health and

9    wellness.  So referring to them to the Officer's Assistance

10   Program gave this officer an opportunity to receive counseling

11   and then he was able to get some time off and then those

12   numbers dropped as his report begins to come through on a

13   quality basis, and we even showed him where he improved and

14   thus saved this officer's career.

15          The second category, if you're looking at the second

16   highlighted area (indicating), this shows sick leave hours.

17   All right, as I stated before, officers are allowed a certain

18   amount of sick hours during their yearly activity.  The normal

19   is 137 hours.  As you can see, this officer used over 598 hours

20   as sick.  We received an alert because of that.

21          So as we did before, we brought the officer in, we

22   found out that this officer had a legitimate medical issue, and

23   the officer brought in proper documentation stating what the

24   issue was and why they were using that sick time.  That sick

25   time was because he was receiving medical treatment on a just

1    different various of times and it was causing him to generate

2    a number of sick hours.  So we were able to document that in

3    his INSIGHT file and then he was, you know, absolved because it

4    was a legit medical reason.

5         If you look at the third category (indicating), this

6    is use of force.  So on the far right each officer is, you

7    know, allowed 2.1.6 hours of instance of uses of force within a

8    time frame.  This officer had six.  At this particular time

9    when it alerted us, this officer was assigned to Bourbon

10   Street.  Bourbon Street is an assigned unit.  If you looked at

11   Lieutenant Powell's attendance ratio it showed ABC Platoon, and

12   then you saw a category that said Promenade.  That's the

13   Bourbon Promenade.  It's a different unit assigned to police

14   Bourbon Street.

15        All of us have had an experience on Bourbon Street,

16   we know Bourbon Street is filled with bars, dance clubs, and

17   other establishments that serve an enormous amount of alcohol.

18   As a result of that, we receive a number of calls of people

19   who consume alcohol and they begin to be belligerent and

20   violent at the time of the call, which as a result, we're

21   called out and the officer may engage in a use of force

22   incident which was done according to our policies and done

23   with the standards.  However, they were alerting to the

24   system.

25        So we did some research and we found out that the

1    Bourbon Promenade threshold was significantly lower compared to

2    all of the thresholds throughout the city, which we believed

3    after discussing it with our captain and our lieutenants, that

4    this was not an adequate sufficient threshold for Bourbon

5    Street.  But we didn't stop there.  We didn't just leave it at

6    the threshold being raised, we also wanted to look into what

7    was causing the issues on Bourbon Street where officers were

8    engaging in use of force incidents.

9            So we went out to different bars on Bourbon and one

10   particular block which was the 500 block of Bourbon, we went

11   out and we found that there was insufficient lighting, some of

12   the bars did not have adequate security, and we as front line

13   supervisors realized this particular block needed more officers

14   present to police that area so that we could keep our citizens

15   and tourists safe.

16           In addition to that, that gave our officers an

17   opportunity to engage with the community which I know is a very

18   important part of our consent decree compliance.  So this was a

19   two-fold effect.  We looked at the problem on a city level as

20   well as a technological level.  When we spoke to some of the

21   managers we were able to get them to increase their security

22   personnel.  We were able to reach out to have sufficient

23   lighting added to the block, and we also added other officers

24   so that we could adequately police.  And then we saw those

25   numbers begin to decline.

1           However, we did write to the INSIGHT early warning

2   system and we said:  Listen, we need a little bit more, a

3   raised threshold level so that these officers won't alert,

4   because it wasn't just one particular officer, it was several

5   officers who were alerting.  We just pulled out this one as an

6   example.

7           THE COURT:  Uh-huh.

8           MR. LUSTER:  So this was also a helper too in our

9   process with evaluating officers, because we're able to go back

10  into the INSIGHT system, look at their history, look at their

11  accomplishments, look at everything that they've done and also

12  look at the areas they need to improve.

13          The third and final tool that we use in performance

14  evaluations is the supervisor feedback log.  Chief Ferguson

15  gave you an eloquent example of that system.  That system is

16  used for the supervisors to put in information in real time.

17  If the officers perform a recognizable accomplishment, we enter

18  that data in and they are noted for their accomplishment.  If

19  they attend a community event or they volunteer or they go

20  beyond the scope of their duties, we enter that data into our

21  supervisor feedback log and it's kept as an accurate record of

22  their accomplishment.  And we also use it as a means to

23  redirect the officers should we see a decline in their

24  performance or if there's a minor violation in policy that

25  doesn't meet the threshold of Public Integrity Bureau

1    investigation.  So, with these three tools in place, it gives

2    the supervisor an opportunity to give a great overview of the

3    officer's performance throughout the year.

4          Now we're not saying that every officer is a super

5    hero and every officer is fantastic because we're not a perfect

6    department.  But this tool is very efficient and it helps us to

7    be the police department that we are today and why everybody

8    follows our example.

9          THE COURT:  Yes.

10         MR. LUSTER:  So I hope if you have any -- no

11   questions I will turn it over --

12      (Laughter)

13         MR. LUSTER:  I hope I explained that and I'll turn it

14   over to Faith Butler.

15         THE COURT:  You did.  You did a great job.

16         MR. LUSTER:  Thank you.

17         THE COURT:  Thank you very much.

18         MS. BUTLER:  Good afternoon Your Honor.

19         The New Orleans Police Department has collaborated

20   with the Civil Service Department as well as the Department of

21   Justice and the Office of Consent Decree Monitors to develop

22   and implement meaningful and effective performance evaluation

23   process that highlights officer performance based on integrity,

24   community policing, job duties and responsibilities on an

25   annual basis.  The evaluation process is also used as a

1    component for the promotional practice.  In 2021 a total of 94

2    commissioned officers were promoted, including fourteen

3    captains, five lieutenants, and 22 sergeants.

4           Performance evaluations are used as a component in

5    the ranking system for promotions along with their interviews,

6    the Civil Service test score, their resumes, and disciplinary

7    records.  Performance evaluation covers over ten paragraphs and

8    five sections in the consent decree ranging from officer

9    performance; close and effective supervision; INSIGHT, which is

10   the internal database to execute close and effective

11   supervision; as well as assessing supervisor's ability to

12   effectively supervise their subordinates.

13          Over the past three years the process of training

14   supervisors, preparation, updating the internal database system

15   to complete performance evaluations have been extremely

16   beneficial with a progression of accurate and complete

17   evaluations conducted by our department supervisors, INSIGHT,

18   which is monitored by our Early Intervention Unit to maintain

19   and verify the accuracy of its use.  In addition, the

20   Professional Standards and Accountability Bureau will do spot

21   checks and conduct monthly audits for its accuracy and

22   completion of this system.

23          The performance evaluations address the requirements

24   of Paragraph 296(A) through (J) which include community

25   engagement as well as community problem solving, complaints by

1    citizens and supervisors, sick leave usage, training,

2    disciplinary measures, safety, report writing and decision

3    making.  The evaluations assess the officer's performance for

4    an entire year, from January 1st to December 31st.

5            Supervisors are also assessing the growth of their

6    subordinates in their particular job duties as well as how

7    their career advancements benefit the department.  Supervisors

8    are also assessed and held accountable for their ability to

9    effectively and accurately supervise their subordinates as well

10   as completing the performance evaluations.

11           Districts and divisions of the department receive

12   reminders throughout the evaluation process and given a status

13   update of how each evaluation is progressing throughout the

14   three months.  District and division -- the timeliness and

15   completion of the performance evaluations are documented in the

16   actual supervisor's evaluations to hold them accountable for

17   completing their subordinate evaluations.

18           The review of INSIGHT and subordinate's profile with

19   quarterly review is also a major part of the evaluations.  The

20   self-assessments as Lieutenant Luster mentioned are a valuable

21   tool for supervisors to complete evaluations.  By using these

22   self-assessments the supervisors are able to have a reminder of

23   what their subordinates did throughout the year.  Supervisors

24   are not solely using the self-assessments to complete these

25   evaluations but they give themselves a note on how the officers

1    can improve in their job functions as well as how they are

2    correctly assessing their subordinates.

3           So, supervisors receive ongoing training that is

4    conducted at the academy as well as district and unit specific

5    training that is arranged by the Professional Standards and

6    Accountability Bureau.  In these trainings the supervisors are

7    given an opportunity to address any questions, concerns, give

8    suggestions that will help the performance evaluations become

9    better as well as they give firsthand exercises on how to

10   complete the narrative section in the performance evaluations.

11          The audit and review team that actually audit and

12   assess the performance evaluations, they also receive a

13   training.  So in their training they are instructed to ensure

14   that all evaluations are assessed based on individual officer

15   performance and job duties.  They also are instructed to audit

16   based on the instructions that were given to the supervisors on

17   how to complete these evaluations to ensure that the audit

18   assessment is correct.

19          So the (inaudible) of our system is where the

20   performance evaluations are housed.  The Professional Standards

21   and Accountability Bureau collaborates with Civil Service to

22   maintain the evaluations, to make any corrections that needs to

23   be made, any edits, any changes, and that way that we're

24   ensuring that all supervisors understand what is needed to

25   complete these performance evaluations.  PSAB also collaborates

1    with internal departments such as Personnel to make sure that

2    the hierarchies are correct, that INSIGHT is correct, and that

3    the ADP payroll system is correct to ensure that supervisors

4    have the adequate information that they need to assess their

5    subordinates.

6           During the audit assessment the audit and review

7    team, like I said, assess each evaluation according to a sample

8    size, so we're not auditing each and every individual

9    evaluation completed by the supervisors, but a sample of those

10   evaluations.  When they audit partial compliance is not given;

11   however, the auditors are reviewing these based on the

12   protocols and reconciliation between the auditors takes place

13   to ensure, like I said, that these evaluations are assessed

14   accurately.

15          On an annual basis and after the completion of the

16   performance evaluation audit, the Professional Standards and

17   Accountability Bureau produces a scorecard of its findings and

18   a corrective action plan if necessary to address the

19   deficiencies of the department.  We also get feedback for the

20   supervisors on how they did when they completed their

21   performance evaluations.  The audit and the scorecard, as well

22   as the corrective action plan, are additional tools that the

23   supervisors can use in the future on how to assess their

24   subordinates.  The scorecard has increased from last year's

25   percentage of 69 to this year's percentage of 82, so that's a

1    major improvement for our department with completing

2    performance evaluations.

3              THE COURT:  In other words, the percentage of

4    supervisors who are doing the performance evaluations

5    correctly?

6              MS. BUTLER:  Yes.

7              THE COURT:  Is that -- okay.

8              MS. BUTLER:  Yes.  So we went from --

9              THE COURT:  And the percentage increased?

10             MS. BUTLER:  Right, yes, ma'am.

11             Performance evaluations are also a way to recognize

12   the achievements and diligent work of the officers.  Officers

13   are able to see that their hard work is not going unnoticed and

14   they appreciate the detailed feedback that they receive from

15   their supervisors.

16             The collaborative efforts and guidance from Chief

17   Robert McNeilly as well as Chief Mary Ann Viverette have been

18   crucial factors of the NOPD having significant progress in the

19   area of performance evaluations.  By supplying the department

20   with chief tools such as continued training, monitoring

21   INSIGHT, the supervisor feedback log database and maintaining

22   those internal manpower hierarchy lists, the NOPD has the

23   ability to lead the way in providing and completing fair and

24   meaningful performance evaluations.

25             With the current performance evaluation process the

1    department is ensuring that officers receive an adequate

2    assessment of their performance of how their growth and

3    improvement in their job duties can benefit the department.

4    The department has continued to show improvement in the area of

5    performance and documenting subordinate performance based on

6    the tools and database that we have provided them.   The New

7    Orleans Police Department is dedicated to maintaining its

8    success in this area and we are determined to sustaining all of

9    our achievements with performance evaluations, promotions and

10    supervision.

11            Thank you.

12            THE COURT:   Well, I'm looking forward I think as you

13    go into next year and you do another round of these we'll see

14    even higher percentages.

15            MS. BUTLER:   We are looking forward to the same.

16            THE COURT:   Yes.

17            MS. BUTLER:   Thank you Your Honor.

18            THE COURT:   Congratulations.

19            SUPERINTENDENT FERGUSON:   Thank you again Your Honor.

20            And again to the Department of Justice as well as to

21    the federal monitors and of course the Court's again for

22    allowing us and affording us this opportunity to present to you

23    all our performance evaluations, promotions, and supervision.

24            It's evident you can see, Your Honor, that our

25    department remains committed to Constitutional police reforms

74

1    and embedding this through all our processes, but also going

2    above and beyond in some instances.  And so, where do we go

3    from here?

4            So, as stated performance evaluations are now

5    completed.  The federal monitors, of course Bob McNeilly and

6    Mary Ann Viverette are doing the look behind to ensure that

7    what they're seeing, that our auditors are conducting that it

8    marries together.  But also, the next supervision audit will

9    take place in August and then we also continue to work with the

10   federal monitoring team as well as the Department of Justice in

11   the area of community engagement by street policing as well as

12   stop, searches and arrests.

13           And we are definitely looking forward to having

14   another public hearing in May and we will have members of the

15   Professional Standards and Accountability Bureau as well as

16   members from the department to present to the Court as well.

17           In addition to that we have been collaborating with

18   our new Independent Police Monitor, Stella Cziment.  Again,

19   congratulations to her on that accomplishment as well.

20           But we were working hand in hand with her previous to

21   that when she was interim.  They've been to different trainings

22   that we have conducted and collaborated with the academy as

23   well as with the federal monitors.

24           And of course, all of our reports, Your Honor, are

25   located on the city's website at NOLA.GOV.

1          THE COURT:  Uh-huh.

2          SUPERINTENDENT FERGUSON:  And so as we continue as a

3    department to grow and develop all of our reports are going to

4    be housed on the website and we're looking forward again to

5    continuing our police reforms and setting the standards across

6    the nation.

7          And I think now I'll turn it over to Jonas Geissler,

8    Department of Justice.

9          THE COURT:  Well, let me --

10          SUPERINTENDENT FERGUSON:  Yes, ma'am.

11          THE COURT:  Let me thank all of the presenters for

12    all the information that you've provided today.  It's really

13    impressive and I mean I think all of you have talked about what

14    you're going to do in the future, which shows your commitment

15    to reform and to sustaining the reform and that you have

16    methods in place to make sure that happens and that you're

17    committed to that process.

18          So thank you all for the presentation.  And thank you

19    all for -- all of the people who did the work behind the

20    presentation.

21          SUPERINTENDENT FERGUSON:  Thank you Your Honor.

22          And so I'm glad you said that.  I would be remiss if

23    I did not thank the members of the Professional Standards and

24    Accountability Bureau, Matt Segraves, Tim Lindsey, Faith

25    Butler, as well as Michael Pfeiffer, and all of our auditors as

1   well.

2              But the systems instructions that are in place now

3   would not be possible without the monitoring team and the

4   Department of Justice.

5              THE COURT:  Yes, agreed.

6              SUPERINTENDENT FERGUSON:  Thank you.

7              MR. GEISSLER:  Good afternoon again Your Honor, Jonas

8   Geissler for the United States.

9              The United States is pleased to come alongside the

10  NOPD and the court monitor today to recognize the work that the

11  city has done to bring Section XIV, performance evaluations and

12  promotions and Section XV, ensure substantial compliance.  It

13  is fitting that these two sections come into compliance

14  together today as they are highly interrelated.

15             The Department of Justice has worked collaboratively

16  with the court monitor and NOPD for several years in these

17  areas, but ultimately it is the City of New Orleans and the

18  individuals in this room and the mid-level managers in NOPD who

19  have done all the heavy lifting to put in place the systems

20  necessary to bring these two areas into compliance.

21             And it fitting also because in order for these to be

22  truly doable remedies, the city has to embrace the remedies

23  itself.  The remedies must meet NOPD's business needs and NOPD

24  needs to have ownership of the remedies going forward with

25  respect to performance evaluations, Your Honor.

1              We have been onsite with the monitors, experts, as

2    they conducted NOPD's performance evaluation audit and have

3    conducted our own look-behind assessment, having been convinced

4    that the monitors' methodology and goals that they were sound,

5    we relied upon the monitors' audits.  Much credit is due to

6    Chiefs McNeilly and Viverette for their thoroughness and the

7    technical systems that they offered NOPD to develop the self-

8    assessment tools and the evaluation process altogether.

9              We also continue to verify the constant internal

10   messaging at NOPD.  We frequently attend the weekly NOPD max

11   meetings, their command meetings, if you will.  At these

12   meetings we have heard the frequent statement, repeated calls

13   from districts of the need to complete their own training on

14   how to complete evaluations.  We have attended some of those

15   virtually as well; the need to complete self-evaluations and

16   driving the deadlines for those and ultimately the evaluations

17   themselves.

18              With respect to promotions, Your Honor, that is

19   taking a different but related path.  Performance evaluations

20   in part inform promotions, but as a part of the supervision

21   initiative that NOPD put together for this Court, there was a

22   formal promotion rubric as NOPD called it, and candidly, the

23   Court Monitor and the Department of Justice were highly

24   critical albeit collaborative with NOPD, but highly critical of

25   the promotion rubric to seek a process that asked the difficult

1   questions of those who would be supervisors.

2          So how would someone who wants to be a supervisor,

3   for example, explain how they themselves have been receptive to

4   discipline in the past, or they themselves have dealt with

5   instances of bias that they have seen?

6          The result of the promotion rubric and a formal

7   promotion policy with significant work from NOPD's Dante

8   Bidwell and the Court Monitor, the results have proven

9   effective.  A look behind audit found 99.6 percent completion

10  of all of the required ratings necessary for the promotion of

11  the candidates who sought that elevation.

12         Lastly, Your Honor, supervision is an overarching

13  issue out of decree.  Indeed there's -- it is so far reaching

14  and so much work has been done on it that we could spend much

15  time to discuss it.  Pertinent to this hearing though are both

16  the Department of Justice's bases for agreeing to finding NOPD

17  in substantial compliance, and the plan for the compliance plan

18  going forward.  We agree with the monitor's determination that

19  NOPD is now in substantial compliance based upon a number of

20  steps that NOPD has taken, including the last two areas that

21  we've discussed, performance evaluations and promotions.

22         But in part this also included focus on chain of

23  command investigations, supervisory ratios and consistent spans

24  of control and continuity of men, supervisory training and use

25  of technologies like body-worn cameras that act as a force

1   multiplier for remote supervision.  We have found that NOPD has

2   substantially complied in each of these areas.  We assessed the

3   chain of command investigations with Chiefs McNeilly and

4   Viverette.  We received records of supervision which indeed

5   ensure that task force officers and detectives were assigned to

6   platoons if needed so that no individual officers were working

7   on their own without supervision.

8           THE COURT:  Uh-huh.

9           MR. GEISSLER:  And we found that NOPD has a long-

10  established practice of using body-worn cameras for supervisors

11  to review the interactions of their subordinates.

12          One of the most challenging hurdles for supervision

13  has been INSIGHT as Your Honor has heard today.  INSIGHT is an

14  early warning system to identify officers who may be at risk of

15  behavior outside the norms of their peers.  We, the Department

16  of Justice, as the sort of remedy to our policing consent

17  decrees generally, to mitigate risks of behavior that could

18  potentially end in Civil Rights issues or career ending

19  situations before those situations even occur.

20          While no predictive system will ever be perfect, NOPD

21  has assembled a multi-variable system that when used

22  effectively should mitigate precisely those risks.  Here credit

23  is due to Chief McNeilly and also the Performance Standards

24  Innovation Manager Matt Segraves.  I know we support the

25  finding, Your Honor, of substantial compliance.  There are

1   other areas that will always need more work and in the coming

2   months during the compliance period there are three in

3   particular for supervision.

4           NOPD, the consent decree monitor and Department of

5   Justice all agree to assess supervisory approval of arrests

6   through the search, seizure and arrest audit.  More to come on

7   that audit in future hearings.

8           The consent decree monitor will perform a look-behind

9   audit of INSIGHT to ensure that NOPD is not overly relying upon

10  that one innovation manager's work but instead the INSIGHT

11  system itself is working as intended and to generally check

12  NOPD's progress in using INSIGHT.

13          And third, NOPD will make some tweaks to the INSIGHT

14  system as recommended by Chief McNeilly to adjust calculations,

15  delete duplicate alerts, and to train on the date adjustment

16  systems to use for quarterly and annual reviews.

17          But finally Your Honor, a take-home point that I hope

18  our friends in the rear of the courtroom will also take note

19  of, we would like to close today by noting something that the

20  U.S. Department of Justice Civil Rights Division has said in

21  many contexts:

22          Constitutional policing is effective policing.  And

23  what does that mean here?  It means that the implementation of

24  performance evaluations for motion practices and (inaudible)

25  supervision does not equate to ineffective policing, quite the

81

1    opposite.  When NOPD equips itself with these tools it

2    improves the effectiveness of its officers overall to complete

3    all of their tasks, and in particular their fundamental tasks

4    including enforcement of the criminal law and crime prevention.

5         We thank you, Your Honor.

6         THE COURT:  Thank you.

7         And I want to thank the entire staff at the Civil

8    Rights Division of the Department of Justice for all of the

9    support that you have given the NOPD and the City of New

10   Orleans and the monitoring team and me for many years now.

11   You've never given up on us, never deserted us, you hung in

12   there even during the pandemic, and it has made all the

13   difference in the world.  It has been very collaborative and

14   cooperative and I think as Jonathan Aronie mentioned, we have

15   resolved any issues that came up collaboratively.  It has not

16   been a lot of conflicts because of that close working

17   relationship, and I thank you for that.  It surely made a huge

18   difference.

19        MR. GEISSLER:  It's our pleasure, Your Honor.

20        And I would be remiss if I didn't also acknowledge

21   the hard work of our colleagues at the U.S. Attorney's Office,

22   David Sinkman and Theodore Carter for their work on this case

23   as well.

24        THE COURT:  Thank you.  I agree, and I appreciate

25   their efforts also.

1          MR. GEISSLER:  Thank you Your Honor.

2          THE COURT:  It has really been a team effort.

3          MS. CZIMENT:  Good afternoon Your Honor.

4          First, thank you Judge Morgan for giving me the

5    opportunity to address this Court.

6          And thank you to the federal monitors and to the

7    Department of Justice for your continued and very valuable

8    partnership and oversight.

9          I introduced myself earlier but I am Stella Cziment

10   and I am the Independent Police Monitor for the City of New

11   Orleans.

12         I would like to introduce Bonycle Sokunbi who

13   unfortunately had to leave and was also late arriving, because

14   she was on the scene monitoring an investigation.

15         THE COURT:  Uh-huh.

16         MS. CZIMENT:  I was formally appointed by the Ethics

17   Review Board on April 11th and I've served as the interim

18   police monitor since May of last year.  I was appointed based

19   on feedback from the community, organizational leaders, the

20   police department and OIPM staff.  And I was appointed based on

21   feedback that was received that I was fair, critical and

22   constructive.

23         These are qualities that Your Honor, the public and

24   the police department can expect from my leadership and from my

25   office moving forward.  I want to highlight these qualities

1  since once the police department moves into sustainment it

2  will be the Office of the Independent Police Monitor local

3  oversight that will transition into a larger role in providing

4  police oversight to the NOPD.

5         THE COURT:  Ms. Cziment, can I ask you to -- I'm

6  going to have to step off the bench for just a minute.

7         MS. CZIMENT:  Yes.

8         THE COURT:  If you all will -- I'll be right back.

9  I may be two or three minutes.

10        MS. CZIMENT:  Yes.

11     **(Recess from 4:58 p.m. to 5:02 p.m.)**

12        THE COURT:  All right.  You all be seated.

13        I apologize for the interruption, and Ms. Cziment,

14 let's proceed.  Maybe remind me of what you were saying, I was

15 distracted.

16        MS. CZIMENT:  I was just assuring the Court and the

17 public that I have faith this will be a smooth transition

18 between federal oversight to local oversight because of the

19 efforts of everyone in this room to get the police department

20 into compliance and to make the NOPD an example of reform.

21        It has been clear that the spirit of reform will

22 continue long past the consent decree, showing our community

23 and even our country that the consent decree in New Orleans is

24 the floor, not the ceiling for how much this department will

25 achieve.  This commitment to reform is one that I've seen the

1   leadership of the NOPD from Chief Ferguson, of course, to his

2   whole leadership team.

3          I believe under the careful and thoughtful leadership

4   of this, of the officers in this room, this police department

5   will continue to grow and improve.  I've had the opportunity to

6   work with, monitor and review the work of almost every

7   department leader in this room, whether it's in disciplinary

8   hearings, use of force review boards, on the scene during

9   investigations, or even during some of your interviews for

10  captain.  I've gotten to see your unique leadership styles and

11  hear your ideas on how to be more effective and more

12  empathetic.  I've seen your commitment to policy less

13  practices, new and innovative solutions and accountability.

14         Just recently I had the opportunity to see one

15  example of this ongoing commitment to reform in the newly

16  developed supervisory review boards.  This new board is an

17  opportunity for experienced captains and deputy chiefs to

18  provide valuable input and feedback to supervisory officers and

19  to look for opportunities for these supervisors to improve.

20         I highlight this example because of all that it

21  represents.  A commitment to effective leadership, innovative

22  solutions, best practices, transparency and accountability.

23  Best of all it was an idea of a captain, one that I believe is

24  in this room today.

25         It is ideas like this and other departmental projects

1    that I'm seeing across the city, from pilot programs of

2    mediation that's happening between neighbors in the Seventh

3    District, from social workers that are participating in

4    responses in the Third District, to the way that our district

5    leadership meets regularly with street performers and musicians

6    in the Eighth District.  These are the things that makes the

7    police department impactful, receptive and responsive to the

8    community that it seeks to serve.

9            The NOPD through the consent decree has become

10   national leaders in policing.  And I look forward to

11   monitoring, reviewing and collaborating with this department on

12   the many accomplishments that I'm sure to come through the end

13   of the consent decree, the eventual sustainment period and

14   everything beyond.

15           Thank you Your Honor.

16           THE COURT:  Thank you.  Congratulations on your

17   appointment as the -- to the head of the office and we look

18   forward to working with you in the future.  And thank you for

19   the contributions you've already made, particularly with

20   respect to the investigation of the Office of Police Secondary

21   Employment.  So thank you for that.

22           MS. CZIMENT:  Thank you Your Honor.

23           MR. ARONIE:  Thank you Your Honor.  There's a lot of

24   wonderful information today.

25           As I'm not a party to this case, I cannot move the

1    Court for anything so I will ask the Court something.  I would

2    ask that you formally recognize the progress that NOPD has made

3    in the areas of performance evaluations, promotions and

4    supervisions, and you put those in -- you recognize that

5    they're in full and effective compliance with the consent

6    decree.  In other words, we move them into the green.

7         As I said in the opening, this does not mean

8    everything is perfect.  It does not mean there's no areas in

9    need of further improvement, but it does mean that NOPD has

10   reasonably met its consent decree obligations in these areas.

11        We're proud of the progress the New Orleans Police

12   Department has made and we look forward to continue working

13   with the department, its officers and the community to ensure

14   sustainability and ongoing improvements.

15        THE COURT:  All right.  And thank you.  I want to

16   thank the monitors who are here and the ones who aren't for all

17   of the contributions you've made to this process, particularly

18   Jonathan Aronie and David Douglass.  Thank you so much for the

19   leadership that you have given in this process.  One of the

20   best decisions I've made in my judicial career is picking you

21   all as the lead monitors of the team, because it has really

22   made all the difference in the world.

23        I do agree with your recommendation that the areas of

24   supervision, performance evaluations and promotions should be

25   moved into the green, as we say, to reflect that the department

1   is in substantial compliance in these areas.

2          And so congratulations Chief Ferguson on that

3   accomplishment.  It is a huge accomplishment and I want to be

4   sure that you and the entire department are recognized for all

5   the contributions you've made and the progress you've made.

6          I do want all of you and the citizens to know that

7   during the two year sustainment period we will continue to look

8   at these areas, your Professional Standards and Accountability

9   Bureau will continue to monitor these areas to make sure that

10  the reforms are being complied with and that you're following

11  all of the procedures and policies that you've put into place,

12  and I feel confident you will be.  But we will be looking at

13  those over those two years, as well as all of the other areas

14  of the consent decree.

15         And there will be changes.  There will be less

16  involvement I believe of probably the DOJ and the monitoring

17  team, but they will still be involved and they will still be

18  assisting me and the department in any way they can.

19         I want to let everyone know that the monitors are

20  holding a public meeting tonight at 6:30 p.m. at the Ashe'

21  Cultural Center.  The public and the media are encouraged to

22  attend.  You can ask questions there.  You can take videos.

23  You can take pictures, whatever.  We hope that you will go and

24  cover it so that you can provide another avenue for the public

25  to learn about what the police have done toward implementation

1   of the consent decree.

2           I want to let you know that in the next few days the

3   monitors will issue a special comprehensive report on the

4   status of the implementation of the consent decree, and we're

5   all looking forward to the report and I encourage all of you to

6   read it.  It will be available on the record in this case and

7   also on the monitor's website, which is

8   consentdecreemonitor.com.

9           Is that -- am I right?

10          UNIDENTIFIED SPEAKER:  Yes, ma'am.

11          THE COURT:  Yes, okay.

12          So I look forward to working with all of you in the

13  future.  I congratulate you on your continued progress.

14          And the public hearing is adjourned but I'm going to

15  come down as I have in the past at these public hearings and

16  visit with all of you and thank you personally for all that you

17  have done.

18          So, the public hearing is adjourned.

19                  *   *   *   *   *

20              (Proceedings adjourned.)

21

22

23

24

25

**C E R T I F I C A T E**

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

**S/Sherryl P. Robinson**                 **_9/26/2022_**
**Sherryl P. Robinson**                    **Date**