1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4   UNITED STATES OF AMERICA      *      12-CV-1924
                                  *
5   versus                        *      Section E
                                  *
6   CITY OF NEW ORLEANS           *      February 2, 2023
    * * * * * * * * * * * * * * * *

7

8
              TRANSCRIPT OF PUBLIC HEARING BEFORE
9                  THE HONORABLE SUSIE MORGAN
                 UNITED STATES DISTRICT JUDGE
10

11  Appearances:

12
    For the United States        Jonas Geissler, Esq.
13  of America:

14  For the City of              Donesia Turner, Esq.
    New Orleans:                 Kevin Hill, Esq.
15                               Charles Zimmer, Esq.

16  For the New Orleans          Supt. Michelle Woodfork
    Police Department:           Hans Ganthier
17                               Nicholas Gernon

18  For the Monitoring Team:     David Douglass
                                 Ashley Burns
19
    For the Office of the        Stella Cziment
20  Independent Police Monitor:

21  Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
                                 500 Poydras Street, Room B-275
22                               New Orleans, Louisiana 70130
                                 (504) 589-7778
23

24
    Proceedings recorded by mechanical stenography using
25  computer-aided transcription software.

## INDEX

Page

Supt. Michelle Woodfork                                    9

David Douglass                                            14

Supt. Michelle Woodfork                                   17

**<u>PROCEEDINGS</u>**

**(February 2, 2023)**

03:00

1

2

3   **THE COURT:**  Please be seated.

4      **THE DEPUTY CLERK:**  Civil Action 12-1924,

5   *United States of America v. City of New Orleans.*

6      **THE COURT:**  Well, good afternoon everyone.  It's

7   great to see all of you here.  I recognize most of the faces

8   today, but I am going to ask the parties to introduce

9   themselves before we get started, those at table, and then I

10  would also like for the officers who are here to introduce

11  themselves.

12          We will start with you.

13      **MR. ZIMMER:**  Charles Zimmer --

14      **THE COURT:**  Stand up, please.

15      **MR. ZIMMER:**  Charles Zimmer, counsel for the city and

16  the NOPD.

17      **MS. TURNER:**  Donesia Turner, city attorney.

18      **SUPT. WOODFORK:**  Superintendent Michelle Woodfork

19  with NOPD.

20      **MR. GERNON:**  Deputy Superintendent Nicholas Gernon,

21  NOPD.

22      **MR. HILL:**  Kevin Hill, senior chief deputy, city

23  attorney.

24      **MR. GANTHIER:**  Hans Ganthier, deputy superintendent,

25  New Orleans Police Department.

03:13

1          **MR. DOUGLASS:**  David Douglass, consent decree
2   monitoring team, Your Honor.
3          **MS. BURNS:**  Ashley Burns, monitoring team,
4   Your Honor.
5          **MS. CZIMENT:**  Good afternoon.  Stella Cziment,
6   independent police monitor.
7          **MR. GEISSLER:**  Good afternoon, Your Honor.  Jonas
8   Geissler, United States Department of Justice, Civil Rights
9   Division, for plaintiff, United States.
10          **THE COURT:**  Thank you.
11          (The officers present in the audience introduced
12   themselves.)
13          **THE COURT:**  So this is our first hearing of the new
14   year, and NOPD has new leadership.  In a moment I'm going to
15   ask Superintendent Michelle Woodfork to come forward and make a
16   few remarks to us if she would like to, and I hope she will.
17               Then I'm going to ask the monitor to give a
18   brief report on the monitoring team's activities.  Then I would
19   like to hear again from the superintendent about the NOPD's
20   progress towards civilianization by expanding its alternative
21   police response unit.
22               I know you all know, as we have discussed in
23   prior hearings, NOPD, like many other police departments, is
24   experiencing a personnel shortage.  Attrition is high and
25   recruiting officers is a long and challenging process.  We all

03:16

1    know the simple truth is that NOPD can no longer police the way

2    it used to.  It's going to find new ways to provide services

3    with fewer uniformed officers.  Relying on civilians to provide

4    services that do not require a uniformed officer is one of

5    those ways, and I look forward to hearing about NOPD's progress

6    in that area.

7               Before we begin, I want to remind you all that I

8    do ask the public to send comments, questions, and concerns

9    through the monitoring team's website and also at the public

10   hearings conducted by the monitors.  The monitors do share

11   those questions with me and I review them.  I promised that I

12   would try to respond to a few of them at public hearings so

13   that that information can then get back to the people who had

14   the questions and who are concerned.

15              First, the majority of questions continue to

16   concern generally the process for NOPD to get out of the

17   consent decree.  Specifically, most of the concerns are about

18   whether the NOPD will be released from the consent decree

19   prematurely.

20              The NOPD has to satisfy the monitors, the DOJ,

21   and me that it has achieved full and effective compliance with

22   all the paragraphs of the consent decree before we begin the

23   next stage of the process.  When NOPD has achieved full and

24   effective compliance, it will then enter a two-year period,

25   which we call the sustainment period, during which the monitor,

03:17

1   DOJ, and I will continue to observe whether the NOPD remains in

2   full and effective compliance.  In short, I'm sure the NOPD

3   will not be released from the consent decree prematurely.

4              We have received questions concerning the role

5   of outside agencies during Mardi Gras.  That is part of what we

6   will be discussing at today's hearing, so I think that question

7   will be answered during the course of our proceedings.

8              We have received questions about response times

9   and what the monitor is doing about improving response times.

10  The monitoring team does not make decisions for NOPD and cannot

11  directly improve response times.  The monitoring team is

12  evaluating this issue closely with NOPD and providing advice

13  and support to NOPD as it works to improve response times.  You

14  will hear today about the NOPD's progress in civilianization

15  and increasing its alternative police response capabilities,

16  and these are the most important initiatives we have that will

17  help NOPD improve its response times.

18             We have also received questions about how NOPD

19  handles sexual assault and domestic violence crimes.  These are

20  obviously very serious crimes.  The monitoring team has audited

21  the NOPD's response to these crimes and their findings are in

22  the monitor's 2022 annual report, which will be issued publicly

23  in the near future and discussed in detail during our next

24  hearing.  You will get more answers to that question in the

25  annual report and in our next public hearing.

03:19

1    The monitors do receive information and reports

2  from members of the public and other organizations about these

3  issues, and they are taking that information into account as

4  they evaluate how NOPD responds to sexual assault and domestic

5  violence crimes.

6    Another question we get:  Are vehicle pursuits

7  outlawed under the consent decree?  We are still getting that

8  question.  No, absolutely not.  They are not outlawed.  Like

9  many cities across the country, New Orleans has adopted a

10  vehicle pursuit policy that permits high-speed chases.  This is

11  what the policy says:  When a suspect has committed or has

12  attempted to commit a violent offense and the escape of the

13  subject would pose an imminent danger of death or serious

14  bodily injury to the officer or to another person, such as a

15  member of the public, high-speed chases have to be authorized

16  by a supervisor.  Pursuits for nonviolent offenses are not

17  permitted.

18    This protects officers and the public from the

19  risks associated with high-speed chases, and I think you all

20  have read stories in the paper lately about high-speed chases

21  that have had tragic results.  Of course, we have had incidents

22  in New Orleans where there were tragic results from high-speed

23  chases.

24    The prevailing best practice across the country

25  is that you should not initiate a high-speed chase for a

03:21

1    nonviolent offense.  NOPD's policy is in keeping with best

2    practices and what is done in most police departments across

3    the United States.

4              Now, there are other questions we have been

5    asked.  I think many of them will be addressed in the

6    monitoring team's annual report that we will see soon, but I do

7    want to encourage people to continue to send in questions or

8    comments.  You can send them to www.consentdecreemonitor.com

9    and those questions will get to me.

10              They are important to me because not only do I

11   just want to try to answer them to the extent I can, but they

12   also help me know what needs to be addressed at these public

13   hearings, what is it that the public is interested in.  Please

14   do send in questions and just comments.

15              I also want to say one of the things that I read

16   and hear is -- I see the stories about the consent decree just

17   like you all do.  Some of the comments that are made are,

18   "Well, we want to end the consent decree so that the NOPD has

19   more flexibility," I don't even know what -- they are basically

20   saying, "We want to do something different."

21              Well, when the consent decree is terminated, the

22   reforms should not go away.  That is the whole purpose of the

23   consent decree process.  It is not so that we can do all this,

24   the consent decree can be terminated, and then NOPD can go back

25   to doing what it was doing before.  These are reforms that NOPD

03:23  1   has initiated and implemented.

2          The termination of the consent decree should not

3   be read by anyone as a return to what was happening before.

4   The reforms that are put in place should continue.  That

5   doesn't mean that nothing will change over time, but the

6   concept is not that things will completely change when the

7   consent decree is terminated.

8          With those opening remarks, I would like to

9   welcome Superintendent Michelle Woodfork to speak to us,

10  congratulate her on her promotion, and to let her know how much

11  we all appreciate her long career and the enthusiasm that she

12  is bringing to this task she has undertaken and how much we

13  look forward to working with you.

14      **SUPT. WOODFORK:**  Good afternoon, Judge.  Good

15  afternoon, everyone.  Thank you for allowing me to give these

16  brief comments.

17          I would like to start off by saying I am an avid

18  proponent of constitutional policing.  I'm proud to represent

19  the men and women of the New Orleans Police Department, who

20  have worked diligently on various areas of the consent decree.

21          As you are aware, the New Orleans Police

22  Department has been under federal consent decree for over

23  ten years.  The immediate goal is to ensure full compliance in

24  all areas of the consent decree, that being: use of force;

25  crisis intervention; stops, searches, and arrests; custodial

interrogations; photographic lineups; bias-free policing; community engagement; recruitment; academy and in-service; officer assistance and support; performance evaluations and promotions; supervision; secondary employment; misconduct; and transparency and oversight.

As a result of our initial meeting, specific emphasis will be placed on the following areas to align our goals for compliance: performance evaluations and promotions; use of force; misconduct investigations; the academy; custodial investigations; photographic lineups; CIT; and OAP.  My primary goal is to obtain sustainable compliance and move into the sustainability phase of the consent decree.

Earlier today I had a press conference to launch my strategic crime plan for 2023.  The goals that I outlined in my strategic plan are pivotal in shaping the future of the New Orleans Police Department as we strive to further our mission.  The implementation of organizational and operational changes will ensure the critical work to reduce crime and prevent disorder is performed utilizing every available resource in the most efficient manner.

These goals contain identified objectives that are valuable toward the achievement of those goals and I believe valuable toward the achievement of compliance under the consent decree.  The goals that I have are three goals.

The first one is improving public safety through

03:26

1   meaningful partnerships and efficient use of resources.  That

2   means leveraging those relationships we have with our state and

3   federal partners, joining with them to fight and reduce crime,

4   collaborate with community organizations, faith-based leaders,

5   elected officials, and other stakeholders, private and public

6   alike.

7           The second goal is retaining, recruiting, and

8   creating a positive work environment.  That means making a

9   commitment to and supporting our current and future employees,

10  improving facilities, equipment, and work spaces.

11         I think we are improving on that currently.  We

12  are pushing our recruitment section.  Earlier, after I was

13  sworn in, we only had two recruits for the academy.  From the

14  hard work of Deputy Chief Jonette Williams and also Lieutenant

15  Nicole Powell, I had sent Nicole on a mission and said, "Go

16  over there.  Let's streamline these processes.  Let's get this

17  going."  On Monday we had 19 recruits enter the police academy.

18       **THE COURT:**  Let's give that a round of applause.  We

19  don't clap very often in the courtroom, but that one deserved a

20  clap.  That's good news.

21       **SUPT. WOODFORK:**  Right.  We have at last four or five

22  more ready to start the next class that will start April 10.

23  We are really pushing and driving the recruitment effort.

24         Of course, it's very, very important to retain

25  the great folks that we have.  An operation is only as good as

03:28

1    the people that are there, and I think we have some great

2    people.  With the incentives that have been offered, with the

3    new technology that we are working on using, the brand-new cars

4    that the city has spent over $30 million on, just so many

5    things that the city is pushing so that the officers are fully

6    equipped and can do their jobs in a more efficient manner, I

7    think we are really working on that, and I think we have made

8    some ground on those things.

9              The last goal is creating an evolution of

10   systems and processes that improve the efficiency of the

11   department, and that's utilization of technology for innovative

12   solutions, analysis of administrative systems to include

13   internal and external communications, and that means it's

14   really important to get those innovative tools:

15             To use the RTCC; to buy into the Ring neighbor

16   program that we just signed up for; and again always looking

17   for new technology that is going to assist and helping our

18   officers do their jobs; the administrative systems, to make

19   sure they are also streamlined, those processes are efficient

20   and effective for helping us do our job and definitely help us

21   get through the consent decree; holding everyone accountable

22   from the very top, myself, through the executive team, the

23   command staff, all the way through to patrolmen.

24             In closing, I assure you there will be

25   accountability up and down the chain as it relates to every

03:30

1   aspect of compliance relative to supervision under the consent

2   decree.  I appreciate your time and continued support.  Thank

3   you, Judge.

4       **THE COURT:**  Thank you, Superintendent.  I really

5   believe that you are committed to this and determined that you

6   are going to make a difference --

7       **SUPT. WOODFORK:**  Thank you.

8       **THE COURT:**  -- in the NOPD.  What a great achievement

9   for you that will be.

10      **SUPT. WOODFORK:**  Thank you.

11      **THE COURT:**  I think one of the things you mentioned

12  that you are going to put more emphasis on is accountability.

13      **SUPT. WOODFORK:**  Yes.

14      **THE COURT:**  We have discussed many times the issues

15  we have had, that NOPD has had with supervision and

16  accountability, and how that's so key to making the reforms and

17  then having the reforms last.  I'm really gratified to hear --

18      **SUPT. WOODFORK:**  We even got the command staff and

19  the executive team to get in on the recruitment effort.  They

20  have called a list of 10 people.  They all had a list of 10,

21  calling those people back who recently resigned trying to see

22  if we can get them to come back on.  Everybody is going to be

23  held accountable.  Everybody is on the recruitment team.

24      **THE COURT:**  Oh, that's great.  The people I have met

25  at NOPD I have been so impressed with -- and all of you who are

03:31

1   here today -- with the caliber of people you have and the

2   leadership.  I believe you are the people who can get people to

3   join the department because you all are such outstanding people

4   and have really made a difference to get out there and recruit,

5   I agree.  Thank you.

6               **SUPT. WOODFORK:**  Thank you.

7               **THE COURT:**  We will hear from you again a little

8   later.

9               **SUPT. WOODFORK:**  Okay.

10               **THE COURT:**  Then we have David Douglass, of our

11   monitoring team, who will give us an update on their

12   activities.

13               **MR. DOUGLASS:**  Thank you, Your Honor.  Good

14   afternoon.

15               Let me first start by closing out 2022.  It was

16   a very busy and productive year.  We have submitted our

17   required annual report of our activities to the parties for

18   their review.  When we receive their comments, we will then

19   make any revisions that we deem appropriate and will file it

20   with the Court.  I understand we can then present it at our

21   next hearing.

22               **THE COURT:**  When you send it to me, it goes in the

23   case and on our website for the case, and then it also will go

24   on the monitors' website; is that right?

25               **MR. DOUGLASS:**  That's correct.

03:32

1          THE COURT:  It's available to the media and to the

2   public.

3          MR. DOUGLASS:  Absolutely, Your Honor.

4          THE COURT:  Are you going to have any of the

5   back-up -- I guess there's some appendices to the report.  Are

6   there other things that are -- the supporting documents, are

7   those ever also put on the website?

8          MR. DOUGLASS:  The reports that we issue all go on

9   the website.  The supporting internal work papers, we don't put

10  all of those on the website unless we append them to a report.

11  It's a large volume of material.  It's a big team doing a lot

12  of things, so they generate a lot of work papers.

13         THE COURT:  I think if the public or the media look

14  at the annual report and they have questions, then they should

15  come to our next public hearing or to your next public meetings

16  to ask about specifics.  That's where they can get that

17  information.

18         MR. DOUGLASS:  Absolutely.  We are happy to,

19  obviously, discuss any of it or provide information as

20  appropriate, additional information.

21              Turning to this year, our activities, as

22  Your Honor mentioned, we are starting a new year with a new

23  leadership team.  We started out by having two full days of

24  meetings with the superintendent, the PSAB bureau, city

25  attorney, many of the command staff here, assessing the state

03:34

1   of compliance under the consent decree, identifying areas where

2   further work is needed, developing a plan to get that done, as

3   I know everybody, including us, is anxious to do.

4              They were long days.  They were productive days.

5   They were very substantive.  We developed good plans for really

6   focusing on the issues that really need remaining work as well

7   as our audits to make sure that those areas that we have said

8   previously were in the green are still in the green and that

9   there's been no slippage.

10             As we have discussed with the superintendent and

11  the department, our focus going forward is really going to be

12  supervision because that's how we ensure that practices are

13  being consistently followed.  So we will be working closely

14  with the department on supervision and making sure it is close

15  and effective, as provided for in the consent decree.

16             I would like to take one moment to express our

17  appreciation and gratitude to former Deputy Chief Otha Sandifer

18  for all the work he did moving the department toward

19  compliance.  He was a great partner in that effort.  We have

20  already established a great partnership with Deputy Chief

21  Gernon.  I'm sure he will carry on that work, and we look

22  forward to working with him.

23             You had mentioned questions from the public

24  concerning the role of outside agencies during Mardi Gras.  We

25  have met with the superintendent and her team about their role.

03:35

1    It may be appropriate for me to let me her speak to it, but she

2    has assured us that they will be in a very defined role to

3    provide crowd control in connection with parades.  They will be

4    under NOPD supervision.  They will be briefed about NOPD's

5    policies and expectations.  Of course, members of the team will

6    be here to observe and make sure that all of that is

7    implemented as anticipated.

8              THE COURT:  The superintendent has assured you and me

9    that the NOPD has plans, too, that will make sure that the NOPD

10   officers know what their responsibilities are and that the

11   outside agencies will know what their responsibilities are.  We

12   think that's the best way to ensure that it all goes smoothly.

13             MR. DOUGLASS:  Absolutely, Your Honor.  That was a

14   brief report that covers actually what was a lot of activity.

15   We look forward to going into it in more depth when we present

16   our annual report at the next hearing.

17             THE COURT:  Thank you.

18             MR. DOUGLASS:  Thank you.

19             THE COURT:  Now, Superintendent Woodfork, I ask if

20   you would come back up.  You are doing double duty today.

21             I know that the public and the media are

22   interested in the progress the department has made in its

23   civilianization efforts.  I would ask that you give us a report

24   on that.

25             SUPT. WOODFORK:  Sure.  We are concentrating on

03:37

1    recruiting both commissioned and civilian personnel.  We have

2    hired 19 recruits for Class 197, which recently started, and we

3    plan to start Class 198 in April of 2023.  If I'm not mistaken,

4    we have four -- five?  Every day we are getting more and more,

5    so I have to check with Nicole.  We have five people we have

6    already hired for Recruit Class 198.  In 2022 we hired a total

7    of 58 civilians and year to date a total of 13.

8              We have conducted 22 interviews for police

9    intake specialists for APR with 19 still in background.  We

10   have --

11             **THE COURT:**  Wait.  Let me back up.

12             **SUPT. WOODFORK:**  I'm sorry.

13             **THE COURT:**  If you could explain who these people

14   are, the police intake specialists who you are talking about

15   that you hired, who are those people and where will they work?

16             **SUPT. WOODFORK:**  The police intake specialists will

17   work in our alternative police response unit, and that unit is

18   basically a report-writing unit.  It lets officers on the

19   street -- it relieves them from those minor reports that can be

20   handled just over the phone.  There's no evidence they have to

21   go out -- you can even report a stolen car because the car is

22   not there.  There's really nothing for the police officer to

23   see when they go out.  It takes the burden off the police

24   officers on the street and allows our officers to respond to

25   calls in a timely fashion, which brings our response times

03:38

1    down.

2            THE COURT:  So the alternative police response unit,

3    it already exists --

4            SUPT. WOODFORK:  Yes.

5            THE COURT:  -- but it's being beefed up so that it

6    has much more capacity.  That unit takes online reports.  It

7    can do reports by the telephone.

8            SUPT. WOODFORK:  Right.

9            THE COURT:  That's going to take some people to do

10   that work, so those are the police intake specialists who you

11   are talking about?

12           SUPT. WOODFORK:  Yes.

13           THE COURT:  What will their job be?

14           SUPT. WOODFORK:  The police intake specialists are

15   going to work in the alternative police response unit.

16           I just have to go back and say I had the

17   pleasure of being allowed to start the APR unit in 2012.  It

18   was me and two people, so it's light years away from what it

19   was.  It grew over the years and stuff.  I think we are doing a

20   great job.  We are civilianizing that unit, making sure there's

21   enough people there to handle the volume of calls that we get

22   that police really don't have to respond to.

23           That's what those police intake specialists will

24   do, the reports, speak to people about if they can actually do

25   some reports online.  Some things you don't even have to wait

03:40

1   for anyone to call you back on it and get all your information.
2   You can do it right away online and not have to wait.
3            THE COURT:  Tell me how many positions are available.
4            SUPT. WOODFORK:  There are 25.  25 police intake
5   specialists have been added for APR.
6            THE COURT:  Do you know what the salary is?
7            SUPT. WOODFORK:  Not offhand.  I saw it once or
8   twice.  I would have to ask --
9            THE COURT:  I don't remember.
10           SUPT. WOODFORK:  $39,000 to $46,000.
11           THE COURT:  Do you know how many applications you
12  got?
13           SUPT. WOODFORK:  I don't have that, but we have
14  interviewed 36 police investigative -- I'm sorry, 19 for that
15  position, and they are in background right now.
16           THE COURT:  So everybody you interviewed went to
17  background?
18           SUPT. WOODFORK:  According to this -- I don't know.
19  I'm not sure.
20           THE COURT:  19 people have gone to background?
21           SUPT. WOODFORK:  Yes, ma'am.
22           THE COURT:  Those who clear background will then be
23  onboarded, and they will go to the APR unit and begin learning
24  how to do that job?
25           SUPT. WOODFORK:  Yes, that's the process.  As soon as

03:41

1   they are finished with background, once they clear background

2   and if they are cleared for hire, they are onboarded by our HR

3   department.  They will go to the APR unit, and they are trained

4   on what to do as far as responding to the calls via phone or

5   instructing people to go online and put reports in there.  They

6   will be trained in that area once they get there.

7            THE COURT:  Those positions are still available and

8   you are still interviewing.  Any people who are interested in

9   working with the police department, this is an opportunity for

10  them to get involved.

11           SUPT. WOODFORK:  I will give a shameless plug.  The

12  NOPD is hiring civilian and commissioned officers, so go on

13  joinnopd.org.

14           THE COURT:  If they go there, it will direct them to

15  where they need to go to apply for the police intake specialist

16  position.

17           SUPT. WOODFORK:  Absolutely.

18           THE COURT:  That's good.  It sounds like you have had

19  a good response to the position so far.

20           SUPT. WOODFORK:  I think so.

21           THE COURT:  Okay.  Then let's talk about your other

22  civilianization position.

23           SUPT. WOODFORK:  The police investigative

24  specialists, there are 12 in background currently.  Again, I

25  don't know how many made it from the application portion to the

03:43

1   background, but right now we have 12 that are in background.

2   That position, police investigative specialist, they actually

3   work in our specialized units assisting investigators in sex

4   crimes, child abuse, during those investigations.

5           THE COURT:  Am I right, don't we have 36 -- maybe

6   somebody else knows.  How many positions --

7           SUPT. WOODFORK:  36 were interviewed and 12 were sent

8   to background.

9           THE COURT:  How many positions are available?  I

10  think it's 35, 37.  I would say it's about 35 positions --

11          SUPT. WOODFORK:  About 50.

12          THE COURT:  Throughout the department, but the new

13  positions, I think, 37.  Is that right?  37 new civilian

14  positions created.  The reason there's a difference is there

15  already were some investigative specialists in PIB, sex crimes

16  maybe, and PSAB.  So there were a few already there, but this

17  is tripling the number of police investigative specialists.  So

18  36, 37 new positions, 12 people are in background for that

19  position, so you are also continuing to interview for that.

20          SUPT. WOODFORK:  Yes, ma'am.  In that capacity they

21  actually help speed up the investigations, move them along a

22  little bit better because they are assisting in investigations

23  that commissioned officers are handling.

24          THE COURT:  Do you know what the salary is for that?

25          UNIDENTIFIED SPEAKER:  47 to 56.

1   **THE COURT:**  $47,000 to $56,000 --

2   **SUPT. WOODFORK:**  Yes, ma'am.

3   **THE COURT:**  -- so these are good jobs.  Both of these

4   are good-paying jobs.  The work that these police investigative

5   specialists are going to do is going to be interesting and

6   challenging.  They will go out and actually assist with

7   investigations.  They will learn how to do things like take

8   fingerprints and collect evidence.

9               It's an excellent position for people who might

10   be interested in going to the academy because they would come

11   in and be an investigative specialist.  Maybe they are not old

12   enough to be in the academy.  They could do this kind of work

13   and learn about policing, and then we hope that some of them

14   will go on to the academy to become police officers.

15   **SUPT. WOODFORK:**  Right.  For positions like this, we

16   were hoping to reach out to our local universities,

17   universities in the metro area, and look into their criminal

18   justice programs and see if they have people who are not quite

19   21, but still can work for the department, maybe take those

20   positions and then move on to a police recruit or even higher.

21   **THE COURT:**  Yes, absolutely.  This is the future for

22   the NOPD.  I believe the monitoring team and I and everybody I

23   have talked to in your department believe that this is really

24   going to be a help to NOPD because it will free up officers

25   from responding to calls that don't require the immediate

03:46

1    response of a police officer so that the officers can respond

2    to more crimes that maybe do need an immediate response or that

3    they do need an officer on the scene.  I'm very excited about

4    it.

5            SUPT. WOODFORK:  I think it's what's going on around

6    the nation that a lot of police departments are moving to

7    civilianization in a lot of areas.  It just helps because a lot

8    of people aren't joining law enforcement to be police anymore,

9    so we need that support.  We need that help for those people

10   who are actually out there commissioned doing the work on the

11   street.  It gives a lot of relief.  I think it's going to pay

12   dividends for the New Orleans Police Department.

13           THE COURT:  Anything else about the APR or

14   civilianization that we can report?

15           SUPT. WOODFORK:  Nothing at this time.

16           THE COURT:  Well, thank you.  That is what I wanted

17   to hear today, that people are being interviewed and are being

18   sent to background, and now we just have to make sure we get

19   them through background in a timely manner.

20               I think we will in the near future have a public

21   hearing that the focus of it will be the new APR department,

22   the policies, the procedures, educating the community about it,

23   because it is going to take a change of behavior among the

24   community.  If you have been used to calling if you have a

25   stolen bicycle and you think a police officer should come to

03:48

1   your house for you to do a police report on that, that's not

2   going to happen anymore.  It's important for the community to

3   understand that because that means that if you do have a

4   serious crime, a serious situation, that you will get a

5   response quicker.  It's going to be better for all of us.

6   Thank you for that report.

7              We are going to get into great detail about this

8   either in February or, if not February, we will do it in March.

9   I know the NOPD is working on a communication plan to explain

10  this to the community and all the citizens so that they will

11  know what's happening, what to expect, and how they can do

12  their part to make it a success and support the NOPD.

13             Then also there will be a lot of communication

14  that we will have to depend on you all for to get it to your

15  officers so that they understand how this works, why it's

16  important, and why it helps them so they can explain it to the

17  public.  They are out there every day and they are the ones who

18  have the most communication with the public.

19             Now I would like to offer the Department of

20  Justice an opportunity to make any comments, if you have any.

21       **MR. GEISSLER:**  No additional comments, Your Honor.

22  Thank you.

23       **THE COURT:**  Thank you.

24             How about from the independent police monitor?

25       **MS. CZIMENT:**  No comments.  Thank you, Your Honor.

03:50

1          **THE COURT:**  Thank you both for being here today.  Of

2     course, when you come, even if you don't speak at the hearings,

3     I know that it gives you an opportunity to be here and visit

4     with people, both the NOPD and the monitoring team.  We

5     appreciate your making the time to come here and do that.

6               In conclusion, I want to remind everybody that

7     there's a public meeting tonight at the Ashe Power House

8     Theater, 1731 Baronne Street.  That's from 6:00 to 7:00 p.m.

9     The monitoring team will be there, open to the public, and it's

10    an opportunity for the public to make comments or to ask

11    questions.  Please, I encourage all of you to go and encourage

12    your friends and community leaders and groups to go.

13              Our next court hearing is going to be on

14    Thursday, February 16, at 10:00 a.m.  Among the topics we

15    will address will be an in-depth discussion of the monitor's

16    report of its 2022 activities and findings.  I hope to see all

17    of you there then.  I thank you all for attending today.  As

18    usual, I'm going to leave the bench and come down and say hello

19    to everyone.

20          **THE DEPUTY CLERK:**  All rise.

21          (Proceedings adjourned.)

22                         *  *  *

23

24

25

1        **<u>CERTIFICATE</u>**

2              I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, certify that the foregoing is a true and correct

5    transcript, to the best of my ability and understanding, from

6    the record of proceedings in the above-entitled matter.

7

8

9                                   */s/ Toni Doyle Tusa*
                                    Toni Doyle Tusa, CCR, FCRR
10                                  Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25