

**Office of the Consent Decree Monitor's**
**Report on the New Orleans Police Department Public Integrity Bureau**
3 May 2023

Page 2



## I.      EXECUTIVE SUMMARY

Notwithstanding significant progress since 2013, the NOPD Public Integrity Bureau (PIB) is not yet in compliance with the requirements of the Consent Decree. In some areas, PIB never has been in full compliance. In other areas, PIB has experienced material backsliding over the past year or so. In either case, PIB must refocus its efforts to remedy the multiple shortcomings identified in this Report. Specifically:

- PIB continues to come up short with regard to the timeliness of its investigations.

- As evidenced by its recent investigation into allegations relating to Officer Jeffrey Vappie, PIB failed properly to consider circumstantial evidence and failed properly to apply the required "preponderance of the evidence" standard.

- PIB failed to abide by its obligation to provide the Monitoring Team a copy of its investigation report into the allegations against Officer Vappie as required by the Consent Decree.

- FIT conducted inadequate investigations into multiple uses of prohibited neck holds by NOPD officers.

- PIB continues to fail to meet the requirements of other paragraphs within the Misconduct Investigation section of the Consent Decree as outlined in this Report.

Importantly, these shortcomings are eminently remediable. But it will take focus, commitment, and cooperation. The Monitoring Team remains available to support the NOPD's efforts, but the NOPD must want that help. To paraphrase an old adage, we can lead the NOPD to water, but we cannot make them drink.

In this regard, NOPD also must return to cooperating with the Monitoring Team. Since the outset of the Consent Decree, the Monitoring Team has received full cooperation from the PIB. Documents were turned over promptly. Communications were responded to quickly and fully. Meetings were scheduled without hesitation. Sadly, the level of cooperation the Monitoring Team is receiving from NOPD has gone down recently. This non-cooperation cannot continue as it is harming the Department's ability to achieve compliance with its Consent Decree obligations. It also is degrading the public's perception of the NOPD's commitment to constitutional policing.

It is worth remembering that the items outlined in the PIB section of the Consent Decree are critical to the functioning of a constitutional and trusted law enforcement agency. As DOJ recognized when it conducted its initial investigation in 2011, "An effective system for investigating complaints of officer misconduct can prevent constitutional violations and transform a community's perception of its police department." DOJ clearly is correct. The

Page 3



functioning of NOPD's PIB is at the heart of NOPD's ability to prevent misconduct, build trust among its officers, and build community trust.

SMRH:4885-5443-7982.2

Page 4



## II.    CONSENT DECREE AUTHORITY

"NOPD and the City agree to ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported using the preponderance of the evidence standard and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent."

*-Consent Decree Section XVII.*

"The Monitor shall assess and report whether the requirements of this Agreement have been implemented, and whether this implementation is resulting in the constitutional and professional treatment of individuals by NOPD."

*-Consent Decree Paragraph 444*

"City and NOPD shall provide each investigation of a serious use of force or use of force that is the subject of a misconduct investigation, and each investigation report of a serious misconduct complaint investigation (i.e., criminal misconduct; unreasonable use of force; discriminatory policing; false arrest or planting evidence; untruthfulness/false statements; unlawful search; retaliation; sexual misconduct; domestic violence; and theft), to the Monitor before closing the investigation or communicating the recommended disposition to the subject of the investigation or review. The Monitor shall review each serious use of force investigation and each serious misconduct complaint investigation and recommend for further investigation any use of force or misconduct complaint investigations that the Monitor determines to be incomplete or for which the findings are not supported by a preponderance of the evidence. The Monitor shall provide written instructions for completing any investigation determined to be incomplete or inadequately supported by the evidence. The Superintendent shall determine whether the additional investigation or modification recommended by the Monitor should be carried out. Where the Superintendent determines not to order the recommended additional investigation or modification, the Superintendent will set out the reasons for this determination in writing. The Monitor shall provide recommendations so that any further investigation or modification can be concluded within the timeframes mandated by state law. The Monitor shall coordinate with the IPM in conducting these use of force and misconduct investigation reviews."

*-Consent Decree Paragraph 454*

Page 5



"The Monitor may make recommendations to the Parties regarding measures necessary to ensure timely, full, and effective implementation of this Agreement and its underlying objectives. Such recommendations may include a recommendation to change, modify, or amend a provision of the Agreement; a recommendation for additional training in any area related to this Agreement; or a recommendation to seek technical assistance. In addition to such recommendations, the Monitor may also, at the request of DOJ or the City and based on the Monitor's reviews, provide technical assistance consistent with the Monitor's responsibilities under this Agreement."

*-Consent Decree Paragraph 455*



## III.    TABLE OF CONTENTS

## Contents

I.      EXECUTIVE SUMMARY ................................................................................. 2

II.     CONSENT DECREE AUTHORITY ............................................................... 4

III.    TABLE OF CONTENTS..................................................................................... 6

IV.     GLOSSARY OF ACRONYMS........................................................................... 7

V.      INTRODUCTION ............................................................................................... 9

VI.     AUDIT AND COMPLIANCE HISTORY ..................................................... 11

VII.    SUBSTANTIVE FINDINGS............................................................................ 14

    A.    PIB Investigation of Officer Jeffrey Vappie ................................................. 14

        1.    Review of PIB Investigation of Officer Jeffrey Vappie ............................. 14

        2.    The Confidentiality Of PIB's Investigation............................................... 16

        3.    Policy Recommendations .......................................................................... 17

        4.    Conclusion ................................................................................................ 20

    B.    2023 Compliance Audit of PIB..................................................................... 21

        1.    Summary of Findings ................................................................................ 21

        2.    2023 Audit Findings ................................................................................. 22

    C.    Review of PIB Discipline Fairness ............................................................... 37

    D.    Analysis of FIT Activities ............................................................................. 39

        1.    Incident from August 11, 2022................................................................. 39

        2.    Incident From August 10, 2022................................................................ 39

        3.    Incident from August 17, 2022................................................................. 40

        4.    Incident From February 17, 2023 ............................................................ 41

        5.    Conclusion ................................................................................................ 42

VIII.   CONCLUSION ................................................................................................. 44



## IV.    GLOSSARY OF ACRONYMS

| | |
|---|---|
| "ASU" | Administrative Services Unit |
| "AUSA" | Assistant United States Attorney |
| "AVL" | Automatic Vehicle Locator |
| "BWC" | Body Worn Cameras |
| "CCMS" | Criminal Case Management System |
| "CD" | Consent Decree |
| "CIT" | Crisis Intervention Team |
| "CODIS" | Combined DNA Index System |
| "ComStat" | Computer Statistics |
| "CPI" | California Psychological Inventory |
| "CSC" | Civil Service Commission |
| "CUC" | Citizens United for Change |
| "DA" | District Attorney |
| "DI-1" | Disciplinary Investigation Form |
| "DOJ" | Department of Justice |
| "DSA" | District Systems Administrator, a.k.a District Administrative Sergeants |
| "DVU" | Domestic Violence Unit |
| "ECW" | Electronic Control Weapon |
| "EWS" | Early Warning System |
| "FBI" | Federal Bureau of Investigation |
| "FIT" | Force Investigation Team |
| "FOB" | Field Operations Bureau |
| "FTO" | Field Training Officer |
| "GOA" | Gone on Arrival |
| "IACP" | International Association of Chiefs of Police |
| "ICO" | Integrity Control Officers |
| "IPM" | Independent Police Monitor |
| "KSA" | Knowledge, Skill and Ability |



| "LEP" | Limited English Proficiency |
| "LGBT" | Lesbian, Gay, Bi-sexual, and Transgender |
| "MMPT" | Minnesota Multiphasic Personality Inventory |
| "MOU" | Memorandum of Understanding |
| "NNDDA" | National Narcotics Detection Dog Association |
| "NOFJC" | New Orleans Family Justice Center |
| NOPD" | New Orleans Police Department |
| "NPCA" | National Police Canine Association |
| "OCDM" | Office of Consent Decree Monitor |
| "OIG" | Office of Inspector General |
| "OPSE" | Office of Public Secondary Employment |
| "PIB" | Public Integrity Bureau |
| "POST" | Police Officer Standards Training Counsel |
| "PSAB" | Professional Standards & Accountability Bureau |
| "PsyQ" | Psychological History Questionnaire |
| "RFP" | Request for Proposal |
| "SART" | Sexual Assault Response Team |
| "SOD" | Special Operations Division |
| "SRC" | Survey Research Center |
| "SUNO" | Southern University of New Orleans |
| "SVS" | Special Victims Section |
| "UNO" | University of New Orleans |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |
| "VAW" | Violence Against Women |



## V.    INTRODUCTION

In its 2011 investigation leading up to the imposition of the Consent Decree, the U.S. Department of Justice raised significant concerns regarding the NOPD's internal affairs function administered by its Public Integrity Bureau (PIB). Among other things, DOJ found the following:

> NOPD's system for receiving, investigating, and resolving misconduct complaints, despite many strengths and recent improvements, does not function as an effective accountability measure. Policies and practices for complaint intake do not ensure that complaints are complete and accurate, systematically exclude investigation of certain types of misconduct, and fail to track allegations of discriminatory policing. Field supervisors are not sufficiently trained or supported in conducting misconduct investigations. Deficiencies in policies, resources, training, and oversight weaken investigations and result in findings that are unsupported by the evidence.
>
> Discipline and corrective action are meted out inconsistently and, too often, without sufficient consideration of the seriousness of the offense and its impact on the police-community relationship. Louisiana State law requiring that internal administrative investigations be completed within 60 days is laudable in intent, but in practice has allowed officers to commit egregious misconduct and get away with it. Apparent criminal misconduct by officers is inadequately investigated and has in the past too rarely been prosecuted.

*See* DOJ Findings Letter at xviii.

Based on these troubling findings, the Consent Decree agreed to by the parties imposed broad obligations on the NOPD and the City to bring PIB in line with constitutional requirements and national best practices. Specifically, the Consent Decree required that the NOPD and the City ensure all allegations of officer misconduct are received and are investigated fully and fairly; all investigative findings are supported using a preponderance of the evidence standard and documented in writing; and all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. *See* CD at XVII.

The Monitoring Team has worked closely with the NOPD and the DOJ over the past years to bring PIB into compliance with the Consent Decree. The Department has achieved significant results, which have been reported to the Court and to the public by the Monitoring Team. Indeed, as reflected in the "Audit and Compliance History" section below, the Monitoring Team



previously advised the Court that PIB had made such progress that the Monitoring Team could relax its regular Consent Decree audits.

This 2023 Report documents the results of several more recent PIB-related audits and reviews. Specifically, this Report covers the following:

- The Monitoring Team's review of PIB's recent investigation into Officer Jeffery Vappie.

- The Monitoring Team's review of policies and procedures relating to NOPD's role in providing executive security to the Mayor.

- The Monitoring Team's 2023 audit of PIB's compliance with the several sections of the Consent Decree focusing on PIB.

- The Monitoring Team's 2023 review of the fairness and consistency of PIB's findings and NOPD's discipline.

- The Monitoring Team's 2023 review of several FIT investigations.

Our findings in each area are set out below following a summary of the Monitoring Team's prior PIB audits for historical context.



## VI.    AUDIT AND COMPLIANCE HISTORY

Following imposition of the Consent Decree in 2012, the NOPD, the Monitoring Team, and the DOJ dedicated significant resources to remedying the material shortcomings identified in DOJ's Findings Letter. These efforts led to some very early successes for the NOPD. It was not until January 2019, however, that the Monitoring Team was able to find that PIB was "nearing full and effective compliance" with its Consent Decree obligations. In its January 2019 report, the Monitoring Team commended PIB for making auditable data readily available; the implementation of a new complaint intake, classification, assignment, and tracking process; properly handling reports of misconduct; and conducting thorough and objective misconduct investigations.

A year later, in December 2019, the Monitoring Team continued to applaud improvements at PIB, but also found two paragraphs still out of compliance with Consent Decree requirements:

- Paragraph 413, requiring that credibility determinations be based upon the evidence, was only 87% compliant. The Monitoring Team found that the lingering problems, however, were attributable more to investigations conducted by District-based supervisors than PIB investigators.

- Paragraph 420, requiring that complainants be notified of the outcome of the investigation, in writing, within 10 business days of the completion of the investigation, was only 68% compliant.

At the same time, the Monitoring Team, NOPD, and the DOJ all recognized PIB continued to struggle with the timeliness of its investigations. PIB agreed to continue to work to improve its compliance in this area. One innovation PIB implemented in this regard was the engagement of additional PIB Quality Control experts in 2018. The Monitoring Team commended PIB on this decision and agreed to hold off on further timeliness audits to give the new process the chance to take hold.

Subsequently, in August 2020, the PIB Quality Assurance Unit conducted a self-assessment of compliance using the same methodology employed by the Monitoring Team, with the following results:

- Paragraph 413.  PIB's self-audit showed PIB was making adequate credibility determinations as part of its misconduct investigations. This finding was consistent with the Monitoring Team's findings. The self-audit, however, found ongoing flaws in District- level investigations. Specifically, 7 of the 40 cases reviewed were not in compliance with paragraph 413.

- Paragraph 420. PIB's self-audit identified a significant, ongoing failure to document compliance. PIB was able to confirm only 55% of required notices went out on time.

Page 12



> While the Monitoring Team recognized it was *possible* all notices went out on time, because PIB could not document it, the Monitoring Team could not find it.

Notwithstanding the low score PIB gave itself in the area of timing of notifications and the continued shortcomings of District-level credibility determinations, the Monitoring Team nonetheless recommended PIB be moved "into the green," terminology the Monitoring Team used to signal a high enough level of compliance to warrant spending less time auditing a given area of the Consent Decree. Our reasoning for this recommendation was as follows:

- First, with respect to paragraph 413, the Monitoring Team considered District-level investigations under the Supervision section of the Consent Decree rather than the Misconduct section of the Consent Decree. The Monitoring Team's and PIB's own audits continued to confirm that *PIB* was compliant in this area.

- Second, with respect to Paragraph 420, in January 2020, PIB implemented a new system to track the timing of all complainant notifications. The Monitoring Team had been pushing PIB to employ such a system for some time, and the Department finally accepted our recommendation. We noted that we would re-audit this area to confirm it was in place and functioning as expected.

- Third, as noted above, in 2018, PIB expanded its Quality Control unit, which reviews the investigations conducted by District supervisors. The existence of the Quality Control unit gave the Monitoring Team comfort that PIB could deal with the improvements still needed by District supervisors.

- Fourth, we were further comforted by the positive findings of PIB's Paragraph 404 self-audit, which evaluated whether misconduct investigations are as thorough as necessary to reach reliable and complete findings. Of the 40 cases reviewed, PIB found only two to be out of compliance, and both were conducted by district investigators. The Monitoring Team spot checked PIB's work and found no reason to disagree with PIB's findings.

The Monitoring Team noted one further area, however, that required additional effort on the part of PIB notwithstanding our overall initial compliance recommendation. Paragraph 383 of the Consent Decree requires NOPD to conduct a series of proactive audits, sometimes called "sting audits." While we recognized PIB and PSAB had employed a wide range of proactive audits since the outset of the Consent Decree, we noted the Department's proactive audit plan did not encompass the full scope of activities called for by the Consent Decree.

For example, Paragraph 383 contemplates "secret shopper" type stings – *i.e.*, where someone poses as a complainant and attempts to file a complaint against an officer to test the effectiveness, fairness, and compliance of the complaint intake process. PIB agreed to work closely with the Monitoring Team and DOJ to finalize a plan for conducting a broader range of proactive audits, which it promised would be completed shortly, and committed to continue doing so as long as necessary to ensure sustained compliance. In light of the significant



improvement we had seen within PIB since the outset of the Consent Decree and the ongoing commitment of PIB leadership to continuous improvement, we decided this issue should not hold PIB back from an "in the green" determination. The Court and the DOJ agreed with this recommendation.

The "in the green" designation for PIB allowed the Monitoring Team to spend less time focusing on PIB's ongoing compliance activities so as to dedicated its resources to those areas that had made less progress.

In finding PIB "in the green," the Monitoring Team thanked PIB for their hard work. We recognized several important NOPD accomplishments in this area (supplementing the accomplishments already recognized at the January 2019 proceeding) including meaningful training of investigators, more effective and professional credibility determinations, new internal controls to ensure the timely commencement and completion of investigations, and improved documentation of policy, training, and tactics. While we recognized room existed for further improvement in a few areas, we noted the Consent Decree does not call for perfection.

We didn't return to conducting significant PIB audits until November 2022, when, as noted in the Monitoring Team's 2022 Annual Report, the Monitoring Team re-audited PIB's administrative investigations. Overall, our audit found that, as compared to the Monitoring Team's previous audit in 2019, the NOPD's compliance rate remained the same for 20 paragraphs, improved for two paragraphs, *and decreased for 12 paragraphs*.

A central focus of our 2022 audit was to determine whether administrative investigations are being completed within timelines prescribed by the Consent Decree and NOPD policy. Our audit revealed that an excessive number of investigations were not completed within prescribed timelines and NOPD had no justification for this noncompliance. The paragraphs related to compliance with timelines and with properly documenting disciplinary cases and decisions saw the highest rates of non-compliance. PIB attributed the backlog of disciplinary hearings and complainant notifications to the cyber- attack on the City of New Orleans in December 2019, the COVID-19 pandemic during 2020 and 2021, and staffing shortages. We also learned there were ongoing vacancies in the PIB's Quality Assurance Unit.

In our Annual Report, we let the public know we would be working with PIB to ensure that the causes of this non- compliance are identified and remedied.

At the same time, we also evaluated a sample of PIB files involving less-serious violations and the resulting dispositions to explore whether discipline is being administered unfairly, disproportionately, or excessively. In other words, whether the punishment fit the crime. We did not find evidence that discipline was dispensed unfairly, disproportionally, or excessively. We noted we would be conducting additional analyses of dispositions for indicia of unfairness, favoritism, or bias.



## VII.   SUBSTANTIVE FINDINGS

### A.   PIB Investigation of Officer Jeffrey Vappie

#### 1.   Review of PIB Investigation of Officer Jeffrey Vappie

In early November 2022, local New Orleans TV station Fox8 ran a series of stories involving NOPD's executive protection team. The story raised a number of questions regarding the operation of that team as well as the actions of a particular member, Officer Jeffrey Vappie. PIB opened an investigation into the allegations raised in the story on November 9, 2022.

On November 10, 2022, the New Orleans City Council requested that the Office of the Consent Decree Monitor and the Office of the Independent Monitor conduct their own independent investigation into the Vappie allegations, citing "significant concerns about the apparent conflict of interest with the New Orleans Police Department being allowed to, again, investigate serious allegations involving Mayor Cantrell." The Monitoring Team responded to the City Council on November 11 explaining that it lacked the authority to conduct investigations, but that it would monitor PIB's investigation of Officer Vappie closely to ensure it was effective, efficient, and without bias.

Consistent with its response to the City Council and its obligations under the Consent Decree to closely monitor significant misconduct investigations,[1] the Monitoring Team met with Deputy Chief Keith Sanchez and PIB's investigators Captain Kendrick Allen and Lieutenant Lawrence Jones on an almost weekly basis over the course of PIB's investigation. While we were not involved in the day-to-day affairs of the investigation (the Consent Decree makes clear the Monitoring Team has no role in running the NOPD[2]), the PIB team was open with us regarding their strategy and the status of their activities. We appreciate the cooperation we received from PIB.

On February 17, 2023, prior to the conclusion of the investigation, the Monitoring Team sent an "immediate action notice" to Deputy Chief Sanchez alerting him to several issues we believed the NOPD should address right away. Rather than waiting until the conclusion of PIB's investigation, we brought these matters to PIB's attention at that time to ensure NOPD would take immediate steps to correct the concerns we identified. Our opinions and recommendations related only to larger policy/process issues that were unrelated to the then-still-forthcoming substantive findings of the PIB Vappie investigation team.

---

[1]   *See, e.g.*, Consent Decree paragraphs 377, 444, 454, 455.
[2]   Consent Decree paragraph 445.



PIB completed its investigation into the actions/inactions of Officer Vappie on March 10, 2023, and submitted the investigation report to Deputy Chief Sanchez the same day. Deputy Chief Sanchez and Interim Superintendent Michelle Woodfork[3] reviewed and concurred with the investigators' findings on March 16, 2023, as reflected in the signature block of the PIB report, copied here:



NOPD, however, refused to share a copy of its investigation report with the Monitoring Team until April 3, 2023.

The Consent Decree requires NOPD to provide every serious misconduct complaint investigation "to the Monitor before closing the investigation or communicating the recommended disposition to the subject of the investigation or review." CD at 454. This was not done here despite the Monitoring Team making numerous requests for access to the investigators' report. This is a violation of the Consent Decree that impacts the Monitor's obligations to review "each serious misconduct complaint investigation and recommend for further investigation any . . . misconduct complaint investigations that the Monitor determines to be incomplete or for which the findings are not supported by a preponderance of the evidence." *Id*. Further, the Consent Decree directs the Monitoring Team to "provide written instructions for completing any investigation determined to be incomplete or inadequately supported by the evidence." *Id*. By withholding the investigation from the Monitoring Team until well after communicating the disposition of the investigation with the subject, NOPD thwarted the Monitoring Team's ability to meet its obligations under the Consent Decree.[4]

---

[3]        NOPD has taken the position that Interim Superintendent Woodfork did not review the investigation report despite the report being signed on her behalf.

[4]        In its response to the Monitoring Team's request for comments from the parties on an earlier draft of this report, NOPD took the position that the PIB investigation into the actions/inactions of Officer Vappie was not



Nonetheless, the Monitoring Team performed a careful review of the PIB report shared with us on April 3, and provided NOPD with a series of substantive recommendations as required by the Consent Decree. Since the discipline phase of the Vappie investigation has not concluded yet, the Monitoring Team is not in a position to share its numerous specific recommendations in this Report. We will do so at a future time.

### 2.      The Confidentiality Of PIB's Investigation

At the outset of the Vappie investigation, the Monitoring Team and the IPM advised PIB to implement additional protections to ensure the confidentiality of its investigation. Because of public and media focus on the investigation and the fact that the Mayor, the ultimate boss of the PIB members, many witnesses, and the subject of the investigation, likely would be a material witness in the investigation herself, we felt extra precautions were necessary to protect the integrity of the investigation and avoid any appearance of impropriety. Among other things, the Monitoring Team and the IPM advised PIB to establish a small circle of individuals authorized to have access to investigation materials, and to preclude all others from such access. PIB agreed on the importance of confidentiality and agreed that only a small circle within PIB would have access to investigation materials.

PIB failed to take the necessary steps to implement the protections it promised.

- First, it appears PIB shared a copy of witness interview audio recordings with the City Attorney's Office. While we recognize the City Attorney represents PIB and the City, and, at some point, may have a need to review those recordings (*e.g.*, as part of a Civil Service appeal), requesting those recordings prior to the conclusion of the investigation created a risk of an inadvertent breach as well as an appearance of impropriety.[5]

- Second, the audio recordings shared with the City Attorney apparently were shared on a non-password-protected USB drive, increasing the risk and consequence of an inadvertent disclosure.

- Third, NOPD reassigned the two PIB investigators into the districts during the investigation, which meant they were working on highly confidential matters from their

---

subject to Consent Decree paragraph 454 because it was not "a serious misconduct complaint investigation." NOPD Response at 3. For reasons that will be spelled out in greater detail in a separate report, NOPD is wrong. The PIB investigation into the actions/inactions of Officer Vappie focused on, among other things, alleged *payroll fraud*. PIB confirmed to the Monitoring Team and to the IPM on multiple occasions it was investigating, among other things, alleged payroll fraud. The Consent Decree defines a "serious misconduct complaint investigation" as one that involves alleged "untruthfulness/false statements." Alleged "untruthfulness/false statements" most definitely includes alleged payroll fraud. As noted, the details demonstrating that PIB's investigation covered alleged payroll fraud will be spelled out in a separate report to be filed with the Court later this month.

[5]      The City Attorney's Office has acknowledged an inadvertent public disclosure of the PIB interview recordings in the Vappie matter.



district offices rather than from the protected confines of PIB. This decision created an additional risk of an inadvertent breach of confidentiality.

The confidentiality of PIB investigations is critical for many reasons, including ensuring the integrity of the investigation itself, avoiding improper pressure on the investigation team and the witnesses, and avoiding the risk that information from an administrative investigation could contaminate a parallel or subsequent criminal investigation. It is too early to know whether the failure to ensure the confidentiality of the Vappie investigation will lead to these problems.

### 3.     Policy Recommendations

On February 17, 2023, prior to the conclusion of PIB's investigation into the actions/inactions of Officer Jeffrey Vappie, the Monitoring Team sent an "immediate action notice" to the Deputy Chief of PIB alerting him to several policy and structural issues we believe the NOPD should address right away. Rather than waiting until the conclusion of PIB's investigation, we brought these matters to PIB's attention at that time to ensure NOPD could take immediate steps to correct the concerns we identified. We made clear to PIB we were offering no opinions or recommendations regarding the Vappie investigation itself since we had not seen the investigation report yet. Our opinions and recommendations related only to larger policy/process issues that are not tied to the substantive findings of the Vappie PIB investigation team.[6]

The Monitoring Team recommended the following actions based on our review of the early stages of the PIB investigation into the actions/inactions of Officer Vappie, and reiterates those recommendations here:

- **Supervision**. The NOPD officers assigned to the Executive Protection team receive little if any oversight from NOPD supervisors. This appears to have been the case for years. The members of the team indicated their belief that their only supervisor was the Mayor herself. While the Mayor seemingly is responsible for assignments and schedules, there is no indication the Mayor played any role in supervision beyond that. NOPD should take immediate action to ensure the members of the Executive Protection team receive the "close and effective supervision" required by the Consent Decree.[7]

- **Policy**. No written policy guides the operation of the Executive Protection team or the actions of the officers assigned to that team. Likewise, no written document (policy or otherwise) sets out the standards and protocols with which members of the Executive Protection team are expected to comply. The lack of written guidance almost certainly hindered PIB's investigation of Officer Vappie. NOPD should take immediate action to develop clear policies and procedures governing the operation of Executive Protection

---

[6]     We note that on April 5, 2023, the New Orleans Inspector General released a similar list of very thoughtful policy recommendations regarding NOPD's Executive Protection Team.

[7]     *See* Consent Decree section XV for a discussion of "close and effective" supervision.

Page 18



team and the officers assigned to that team.[8] As required by the Consent Decree, such policies and procedures should "define terms clearly, comply with applicable law and the requirements of the Consent Decree, and comport with best practices."[9]

- **Performance Evaluations**. The Consent Decree requires that "officers who police effectively and ethically are recognized through the performance evaluation process, and that officers who lead effectively and ethically are identified and receive appropriate consideration for promotion" and that "poor performance or policing that otherwise undermines public safety and community trust is reflected in officer evaluations so that NOPD can identify and effectively respond."[10] Without any meaningful NOPD supervision, it is unclear to us who, if anyone, evaluates the performance of members of the Executive Protection team. NOPD should take immediate action to ensure members of the Executive Protection team are evaluated in the same manner as other NOPD officers.

- **Efficiency**. We understand that members of the Executive Protection team are paid for a full shift whether or not the Mayor is in town. It is unclear, however, what work they are performing while the Mayor is not in town beyond occasional administrative tasks like cleaning the Mayor's car and catching up on Departmental paperwork. At a time when NOPD has vocally complained about its lack of officers — and used the lack of officers to justify its inability to comply with various Consent Decree obligations — it is quite inefficient to have multiple days when 1-2 additional officers are available to perform patrol work, but they are not performing patrol work. NOPD should consider identifying meaningful tasks members of the Executive Protection team can perform while the Mayor is out of town to contribute to the Department's well-publicized efforts to combat its lack of personnel.

- **Legal Conflicts**. The City Attorney provides "legal advice to the Mayor, the City Council, and other city offices, departments, and boards," including the NOPD.[11] While this joint representation normally creates no conflict, when the Mayor is or may be a material witness in a PIB investigation, the risk of a real or perceived conflict is significant. Indeed, this occurred in the Vappie investigation when the City Attorney visited PIB to monitor the second interview of Officer Vappie. Situations like this can create the perception that City Hall is attempting to intimidate interviewees or investigators, or otherwise interfere in a PIB investigation. Such perception may be avoided when the Mayor is or may be a witness by (i) the imposition of a formal wall to block the exchange of information between the Mayor's office/City Attorney's Office and PIB and (ii) engaging outside counsel to support PIB throughout the investigation.

---

[8]     NOPD's PSAB shared a draft policy with the Monitoring Team subsequent to the preparation of these recommendations. That policy currently is under review by the Monitoring Team and DOJ.

[9]     *See* Consent Decree section II.A.

[10]    Consent Decree section XIV sets out the requirements regarding Performance Evaluations.

[11]    *See* www.nola.gov/city-attorney.



The Office of the Independent Police Monitor made this suggestion in a thoughtful public letter to the City Council on February 9, 2023. The Monitoring Team agrees with the IPM's concerns. NOPD should consider engaging outside counsel to advise PIB on matters when the City Attorney's representation of the City, Mayor's Office, and PIB could create a real or apparent conflict of interest.

- **Reassignment Of Officers Under Investigation**. We understand, pursuant to Policy 13.1, the Superintendent has the discretion to administratively reassign officers during certain PIB investigations. In this case, Officer Vappie had been moved out of the Executive Protection team pending the PIB investigation, which was a sensible decision considering the nature of the allegations, the public profile of the investigation, and the likelihood that the Mayor would be a material witness in the investigation. Prior to the conclusion of the PIB investigation, however, the Monitoring Team was alerted to an effort to return Officer Vappie to the Executive Protection team. While this ultimately did not happen, the effort created at the very least the appearance of interference in a PIB investigation. NOPD should consider revising its policy to prohibit officers reassigned due to a PIB investigation from being assigned back to their previous units until the conclusion of the PIB investigation without the express approval of the PIB Deputy Chief.

- **PIB Investigators**. During the course of the PIB investigation, the two investigators assigned to the Vappie investigation were moved out of PIB. The lead investigator, Lawrence Jones, was promoted to lieutenant and moved to a district patrol unit. The PIB Captain, Kendrick Allen, was assigned to command a district. Without at all suggesting these two promotions were not warranted, NOPD should have considered detailing both individuals back to PIB until the completion of the Vappie investigation. While Superintendent Woodfork assured the Monitoring Team both officers would be given adequate time to complete their investigation, as a practical matter, this is difficult to accomplish in practice. PIB readily concedes it lacks adequate personnel to perform aspects of its investigations in the best of times (*e.g.*, reviewing videos and documents). Adding a full time job to Allen's and Jones's schedules on top of their PIB jobs virtually guaranteed both jobs would be compromised to some extent. NOPD should consider adopting a policy of detailing promoted officers back to PIB for limited timeframes when necessary to complete significant pending investigations.

- **Initial Investigation Letters**. At the outset of the investigation, PIB alerted Officer Vappie it had opened an administrative investigation initiated by a public complaint. The letter advised Officer Vappie that PIB would focus on an alleged violation of the 16.58 hour rule as well as other matters. PIB was aware at that time, however, of several other potential violations by Officer Vappie as a result of the Fox 8 coverage, including potential violations of NOPD's professionalism, conflict, and time charging (i.e., payroll) rules. While PIB represented to the Monitoring Team that the general "other matters" language was all that was required to put Officer Vappie on notice of the allegations



against him, *including the payroll fraud allegation*, the limited wording of the initial letter created avoidable problems during the Vappie interview. NOPD should consider the pros and cons of including a more complete description of the conduct under investigation in its initial letters to investigation subjects.

The Monitoring Team believes these recommendations are critical to ensure compliance with the Consent Decree and to ensure the sustainability of the many reforms NOPD has made over the years. While we are aware that the NOPD has taken steps to implement some of these recommendations, PIB has not yet responded to our February 2023 letter outlining these recommendations so we are not in a position to opine on the meaningfulness of NOPD's corrective actions at this time.

### 4.  Conclusion

The Vappie investigation was a stressful one for PIB. The City Council made clear it would be reviewing the matter closely. The media made clear they would be reviewing the matter closely. And the Monitoring Team and the IPM made clear they would be reviewing the matter closely. Notwithstanding the stress likely caused by so much oversight, PIB undertook its investigation professionally and with integrity. While the Monitoring Team takes issue with multiple aspects of the investigation report, as detailed in a separate report already shared with NOPD, overall, we find that PIB did a good job with the underlying investigation. Investigators Allen and Jones took the matter seriously, comported themselves professionally, and showed no signs of being influenced by outside pressures. We commend PIB for its investigative work. We are hopeful, however, that the opportunities for improvement outlined in the analysis the Monitoring Team shared with NOPD will be taken seriously by PIB and NOPD and will be implemented promptly.

To that end, pursuant to Consent Decree paragraph 454, the Monitoring Team reminded the NOPD that the Superintendent is obligated to determine whether or not to order the Monitoring Team's recommendations. Should the Superintendent decide not to order the Monitoring Team's recommendations, she must "set out the reasons for this determination in writing."[12]

---

[12]     As noted above, the NOPD takes the position that paragraph 454 of the Consent Decree does not apply to the Vappie investigation because it purportedly was not an investigation into "serious misconduct." This position flies in the face of the facts and the express terms of the Consent Decree, however. Among the issues covered by the Vappie investigation was *alleged payroll fraud*, which clearly constitutes serious misconduct. This matter will be discussed in detail in a Monitoring Team Report to be made public later this month.



### B.      2023 Compliance Audit of PIB

As part of its ongoing effort to evaluate NOPD's readiness to move into the Sustainment Period of the Consent Decree, the Monitoring Team undertook a review of PIB's administrative investigations practices. The review focused specifically on those paragraphs not audited in a number of years as well as those paragraphs found not in compliance during our October 2022 audit.

### 1.      Summary of Findings

The following table summarizes the Monitoring Team's 2023 PIB audit findings:

| ¶ | Findings | Subject of paragraph |
|---|---|---|
| 377 | Not Compliant | Prohibit retaliation |
| 379 | Not Compliant | Sufficient personnel in PIB |
| 380 | Compliant | PIB personnel qualifications |
| 381 | Not Compliant | Lt. rotations through PIB |
| 382 | Not Compliant | PIB investigators' required training |
| 383 | Not Compliant | SIS investigations |
| 385 | Compliant | Brochures, posters, forms |
| 386 | Compliant | Taking complaints, placards |
| 387 | Compliant | Forms and information in other languages |
| 388 | Compliant | Intake…tracking number |
| 393 | Compliant | First amendment rights |
| 394 | Compliant | Discriminatory policing |
| 395 | Compliant | PIB tracking number |
| 396 | Compliant | Tracking status |
| 399 | Compliant | Allegation based complaints |
| 402 | Compliant | Time frame for administrative investigations |
| 403 | Not Compliant | Timely investigations/timely discipline |
| 404 | Compliant | Thoroughness of investigations |
| 412 | Compliant | Public safety statement |
| 413 | Compliant | Credibility |
| 420 | Not Compliant | Communication with complainant |



| ¶ | **Findings** | **Subject of paragraph** |
|---|---|---|
| 422 | Compliant | Disciplinary matrix |
| 423 | <u>Not Compliant</u> | Adherence to matrix |
| 424 | <u>Not compliant</u> | City Attorney's Office participation |
| 425 | Compliant | Civil Service reporting |
| 426 | Compliant | Annual report |

The following section describes the purpose of each audited paragraph and the basis for the Monitoring Team's findings. Each finding is supported by detailed audit data. Due to the confidential and often personal nature of the underlying data, such data have not been included in this public Report.

Importantly, the Monitoring Team recognizes that not every paragraph below is as material as every other. Some paragraphs relate to administrative matters that can be remedied by the NOPD rather easily. While NOPD is obligated to comply with all paragraphs, the Monitoring Team takes a practical approach to overall compliance and would not avoid a full and effective compliance recommendation where only minor paragraphs remain out of compliance.

### 2.    2023 Audit Findings

#### a.    *Paragraph 377*

The City and NOPD agreed to prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. The City and NOPD further agreed that PIB shall regularly review NOPD's anti-retaliation policy and the implementation of that policy. This review must consider all alleged incidents of retaliation.

In auditing NOPD's compliance with paragraph 377, the Monitoring Team reviewed the current PIB retaliation policy; PIB documentation of internal policy reviews; all retaliation complaints for 2021 and 2022, including imposed discipline; and other related materials. *Based on our review, we found PIB NOT in compliance with the requirements of paragraph 377.*

Specifically, we found that while PIB does have a compliant retaliation policy, it was unable to offer evidence of the required annual policy review or the required annual retaliation review. Related, NOPD was unable to offer evidence that it had considered and acted on policy recommendations offered by three deputy chiefs following a particular investigation.



**b.**    *Paragraph 379*

NOPD and the City agreed to ensure that a sufficient number of well-trained staff are assigned and available to complete and review thorough and timely misconduct investigations in accordance with the requirements of the Consent Decree. NOPD and the City further agreed to provide sufficient resources and equipment to ensure that thorough and timely criminal and administrative misconduct investigations are conducted.

In auditing NOPD's compliance with Paragraph 379, the Monitoring Team reviewed evidence of the thoroughness of PIB investigations, PIB staffing levels (including staffing of the PIB Quality Assurance Unit), and the timelines of PIB investigations. *Based on our review, we found PIB NOT in compliance with the requirements of paragraph 379.* The primary flaws the Monitoring Team identified were (i) a failure by PIB to adequately staff its Quality Assurance Unit and (ii) a failure by PIB to consistently conduct timely investigations.

The Monitoring Team reviewed 21 of 24 PIB investigations stemming from citizen complaints between November and December 2022. Our audit revealed improvements in several areas over our prior audit. For example, the thoroughness of the PIB investigations was 88% at the time of our November 2022 audit compared to a score of 95% in our 2023 audit. Similarly, we found only 79% compliance with regard to the quality of NOPD's credibility determinations — a critical element of a thorough and fair investigation — in November 2022, and noted a compliance rate of 95% in our 2023 audit.

Notwithstanding these (and other) improvements, our 2023 audit noted continued shortcomings in several areas, including PIB compliance with various investigation timelines. Specifically, our audit revealed ongoing struggles to timely notify complainants following the conclusion of an investigation, impose discipline within timelines, and fully document discipline.

Our review also noted shortcomings in PIB staffing. For example, staffing shortages negatively impacted the PIB Quality Assurance Unit by reducing the size of the team from the original five to only two. This reflects a significant change to a process PIB implemented specifically to remedy prior Consent Decree non-compliances. The change also hurt PIB's efforts to ensure timely investigations and to ensure quality investigations from district-level investigators.

PIB has advised the Monitoring Team that it has implemented a plan to addresses the staffing shortages. This plan includes the assignment of a team to and address PIB's current backlog of cases, a new process for handling discipline letters, and a new process for documenting key dates. The Monitoring Team will re-audit PIB in the near future to assess the efficacy of PIB's corrective actions.

**c.**    *Paragraph 380*

Among other things, Paragraph 380 of the Consent Decree requires PIB investigators and commanders to possess excellent investigative skills, a reputation for integrity, the ability to



write clear reports, and the ability to be fair and objective in determining whether an officer committed misconduct.

To assess NOPD compliance in this area, the Monitoring Team pulled records for all PIB staff, including copies of supervisor recommendations, writing samples, performance evaluations, complaint history, and more. Notwithstanding some identified shortcomings — for example, some PIB evaluations were less than robust and provided little useful information to actually assess the investigator's performance — *our review demonstrated NOPD is generally in compliance with its paragraph 380 obligations*.

The Monitoring Team's review did identify one PIB investigator with a questionable disciplinary history. This investigator was found to have violated NOPD's Secondary Employment rules. We raised this issue with NOPD leadership and requested that they reassess whether the officer should continue to be assigned to PIB.

On the same topic, notwithstanding our finding that PIB is generally in compliance with paragraph 380, we did express concern over the number of PIB investigators potentially implicated in the ongoing Secondary Employment scandal. Here again, PIB has agreed to take a hard look at every PIB investigator involved in the ongoing Secondary Employment investigation to determine whether any should be removed from PIB. NOPD agrees that PIB investigators must be held to a high standard when it comes to adherence to NOPD rules.

### d.    *Paragraph 381*

The Consent Decree requires that officers promoted to the rank of Lieutenant shall, within a reasonable time frame, serve a rotation in PIB. To comply with this requirement, PIB has adopted a policy that all lieutenants shall spend at least one week stint in PIB. To assess compliance with this requirement, the Monitoring Team reviewed a list of all lieutenants and all lieutenants assigned to PIB since 2013, including the dates of all assignments. *We found PIB to be NOT yet in compliance with its paragraph 381 obligations*.[13]

The Monitoring Team found that 19 of 23 lieutenants served the required PIB rotation during the May-December 2019 audit period. While this reflects a satisfactory degree of compliance, NOPD was unable to provide any documentation regarding PIB rotations in 2020, 2021, and 2022. NOPD explained that the lack of documentation was due to COVID.

With regard to 2023, PIB was able to demonstrate its rotation program has been re-energized and that it has a schedule to ensure every lieutenant spends at least one week in PIB. The Monitoring Team will reassess PIB's compliance in this area in the near future.

---

[13]     NOPD disagrees with this finding, but offers no basis for its disagreement. *See* NOPD Response at 5. According to NOPD, it complied with the rotation requirement in 2019 and then again in 2023. NOPD does not take issue with the Monitoring Team's finding, noted below, that NOPD has no evidence of compliance from 2020-2022.



SMRH:4885-5443-7982.2

    **e.**    ***Paragraph 382***

Consent Decree paragraph 382 requires that all NOPD personnel conducting misconduct investigations whether assigned to PIB, a District, or elsewhere, shall receive at least 40 hours of initial training in conducting officer misconduct investigations, and shall receive at least eight hours of supplemental training each year. This training shall include instruction in, among other things, investigative skills; the particular challenges of administrative police misconduct investigations; relevant local, state, and federal law; and NOPD rules, policies, and procedures.

To review NOPD's compliance in this area, the Monitoring Team focused on the training records of all personnel assigned to PIB as investigators or supervisors. *Our review revealed that NOPD is NOT yet in compliance with this paragraph.*

First, we were unable to identify confirmation of training for all PIB personnel. Second, two sergeants had not received their required 40 hours of investigator training. Similarly, two SIS officers lacked the required proof of training. Additionally, NOPD was unable to produce any evidence that PIB officers had attended their required 8 hours of annual training in 2021 or 2022.

    **f.**    ***Paragraph 383***

The Consent Decree requires NOPD to develop and implement a plan for conducting regular, targeted, and random integrity audit checks, or "sting" audits, to identify and investigate officers engaging in at-risk behavior, including: unlawful stops, searches, and seizures (including false arrests); discriminatory policing; use of excessive force; secondary employment abuse; failure to take a complaint; failure to report misconduct or complaints; or other patterns of misconduct or potentially criminal behavior.

To review NOPD compliance with this requirement, the Monitoring Team reviewed a list of all integrity checks conducted by PIB to evaluate the topic, timing, and result of the checks. *Our review revealed that PIB is NOT yet compliant with its Consent Decree obligations in this area.*

This is not the first time we assessed NOPD's compliance in this area. In the course of previously moving PIB "into the green," we noted an ongoing noncompliance with respect to the required "stings." We raised our concerns with PIB, which was unable to provide any documentation that stings were being conducted. PIB took the position that they didn't have to conduct dedicated stings because their routine misconduct investigations covered the topics outlined in the Consent Decree. The Monitoring Team recognized that many investigations did overlap with the sting requirements, but emphasized that a proactive sting is different from a reactive investigation.

To reassess NOPD compliance in this area, the Monitoring Team reviewed 57 purported integrity checks conducted in 2022. 44 of the 57 checks were conducted in two months (August and November). Fewer than 5 integrity checks were conducted in January, February, March,



May, June, September, October, and December. No integrity checks were conducted in January, February, March, and December.

More problematic than the lack of a meaningful sting schedule is the absence of stings in the specific areas outlined in the Consent Decree. Most of the integrity checks (52 of the 57) conducted by PIB in 2022 focused on Secondary Employment abuses. PIB concedes it did not conduct integrity checks in the other areas required by the Consent Decree.[14]

PIB has informed the Monitoring Team that it is focusing on improving compliance in this area. According to PIB, it has conducted 32 integrity checks in the first quarter of 2023. However, here again, most (30 of the 32) focus only on Secondary Employment. The Monitoring Team is hopeful NOPD expands its efforts in this area to bring the Department into compliance with its Consent Decree obligations in the near future.

### g.      *Paragraph 385*

To foster transparency and public awareness, the Consent Decree requires NOPD to make complaint forms and informational materials, including brochures and posters, available at appropriate government properties, including, at a minimum, NOPD headquarters, District stations, NOPD and City websites, City Hall, courthouses within New Orleans, all public libraries, the Office of the IPM, the Orleans Public Defenders Office, and at the offices or gathering places of community groups. Further, the Consent Decree requires that individuals be able to submit misconduct complaints through NOPD and City websites.

The Monitoring Team's review of this area demonstrated that NOPD *is in compliance* with its Paragraph 385 obligations. PIB was able to provide evidence of the required forms in the required public buildings, and the Monitoring Team was able to spot check several of those public buildings.

### h.      *Paragraph 386*

The Consent Decree requires NOPD to post and maintain a permanent placard at all police facilities describing the external complaint process. The placards must include relevant contact information, such as telephone numbers, email addresses, and internet sites. Further, officers are required to provide the officer's name and badge number upon request. If an individual indicates that he or she would like to make a complaint or requests a complaint form, the officer shall immediately inform his or her supervisor who will respond to the scene to assist the individual in

---

[14]      Notwithstanding PIB's prior concession that it has not been conducting the integrity checks required by the Consent Decree, in response to reviewing a draft of this Report, NOPD contends it "complied with conducting integrity checks." NOPD Response at 5. NOPD's response, however, offers no data in support of its new position. Contrary to NOPD's new position, the data in fact show that the only integrity checks NOPD has conducted with any regularity relate to Secondary Employment. NOPD offers no evidence that it has been conducting integrity checks in the other areas required by the Consent Decree, or that it has been conducting even its Secondary Employment checks consistently.



providing appropriate forms and/or other available mechanisms for filing a misconduct complaint.

To review NOPD compliance with Paragraph 386, the Monitoring Team reviewed complaints alleging a failure of an officer to notify a supervisor of a complaint. We also visited City facilities to look for evidence of the required placards.

NOPD was able to produce evidence of the required placards in all eight police district offices and in headquarters. The placards included the required information. Further, we reviewed NOPD misconduct policies, which encompassed the requirement that officers must provide their name and badge number upon citizen request. Finally, our review of relevant PIB complaints did not identify any instance where an officer refused to provide his/her name and badge number or refused to forward a complaint to a supervisor. While we have seen instances over the years where one officer or another was reluctant to forward complaints to a supervisor, in our experience, these have been the exception and not the rule.

We find NOPD to be *in general compliance* with its obligations under Paragraph 386.

### i.    *Paragraph 387*

The Consent Decree requires that complaint forms and related materials be made available to the public in Spanish, Vietnamese, and English. The Monitoring Team audited compliance with this requirement at the same time it monitored compliance with NOPD's obligations to post informational placards and information regarding misconduct complaints in various City facilities. Our review confirmed NOPD *is in compliance* with its obligations under Paragraph 387.

### j.    *Paragraph 388*

The Consent Decree required NOPD to train all officers and supervisors to ensure that they properly handle complaint intake, including how to properly provide complaint materials and information and the consequences for failing to take complaints. To review NOPD compliance in this area, the Monitoring Team reviewed the current NOPD policy regarding misconduct complaints as well as NOPD training materials provided to investigators and their supervisors. Our review confirmed NOPD *was in compliance* with its obligations under Paragraph 388.

### k.    *Paragraph 393*

The Consent Decree obligates NOPD to track, as a separate category of misconduct complaints, allegations that an officer has in any way interfered with a civilian's First Amendment right to observe, record, and/or verbally comment on the performance of police duties in an area open to the public, or where the individual has a right to be, such as a person's home or business. Improper interference with this right includes improperly detaining or arresting individuals for interfering with a law enforcement investigation, disorderly conduct, or similar charges.



To assess compliance in this area, the Monitoring Team reviewed complaints relating to allegations of officer interference with First Amendment rights as well as all files allegation any manner of First Amendment violations. Our review confirmed NOPD *is in compliance* with this requirement.

PIB reports only one allegation of officers interfering with a civilian's First Amendment rights while they were recording the performance of police duties in 2021. There were no complaints of this type in 2022 and no similar complaints in 2023. The Monitoring Team asked PIB to retrieve one more year and the records indicate there were two officers investigated in 2020 for this violation.

We commend NOPD for its accomplishments in this area. There is no lack of reports from other cities showing that some officers do not understand the community's First Amendment right to film police encounters (so long as they are not interfering with the encounter). Indeed, only a few years ago, an out-of-town deputy sheriff standing in front of the Convention Center can be seen on the news smacking a camera out of a community member's hand. Our experience suggests this is an unlikely occurrence when dealing with the NOPD.[15]

NOPD's high level of compliance in this area reflects (a) the changing culture we have seen in the NOPD over the past decade and (b) the positive impact of body worn cameras. The fact PIB has received only three complaints over a three-year period is quite encouraging.

### l.   *Paragraph 394*

The Consent Decree requires NOPD to track, as a separate category of misconduct complaints, allegations of discriminatory policing, along with characteristics of the complainants. NOPD agreed to ensure that complaints of discriminatory policing are captured and tracked appropriately.

To assess NOPD's compliance in this area, the Monitoring Team reviewed PIB complaints alleging discriminatory policing as well as officer misconduct files. We assessed PIB's record keeping, the thoroughness of the investigations, and the reasonableness of the PIB findings. Our review confirmed PIB *generally is in compliance* with its obligations under Paragraph 394.[16]

PIB data revealed three allegations of discriminatory policing in 2021 and six cases in 2022. The cases are easily accessible in NOPD's IA-Pro system. Of the three cases in 2021, two were unfounded and one was not sustained. In 2022, there were two cases cleared as unfounded and

---

[15]     To say this is an unlikely occurrence does not mean it is an impossible occurrence. In fact, during the drafting of this report, a TikTok video began circulating purporting to show two NOPD officers improperly taking steps to stop a civilian from filing a police encounter. The Monitoring Team referred the matter to PIB and will evaluate PIB's handling of the matter upon completion of the investigation.

[16]     The Monitoring Team has reached out to the Office of the Independent Police Monitor in order to compare its files to PIB's files in order to ensure the files shared by PIB are complete.



one case cleared as not sustained. The remaining three cases in 2022 are pending investigations initiated in November and December 2022.

For the purpose of this audit, the Monitoring Team selected random investigative case files alleging an officer's discriminatory policing. The Monitoring Team reviewed three of the six completed files to determine if there was evidence of a bias complaint, to determine the thoroughness of the investigation, and to determine if the findings were reasonable. Our review confirmed PIB's investigations were thorough and its findings were reasonable.

### m.      *Paragraph 395*

The Consent Decree requires NOPD to develop and implement a centralized numbering and tracking system for all misconduct complaints. Upon the receipt of a complaint, PIB shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant at the time the complaint is made. Where a misconduct complaint is received in the field, a supervisor shall obtain the unique numerical identifier and provide this identifier to the complainant.

The Monitoring Team reviewed PIB's policy and PIB records demonstrating compliance with the policy and concludes that PIB *is meeting its obligations* under Paragraph 395 of the Consent Decree.

### n.      *Paragraph 396*

The Consent Decree requires NOPD to maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. This system shall be used to determine the status of complaints and to confirm that a complaint was received, as well as for periodic assessment of compliance with NOPD policies and procedures and this Agreement, including requirements on the timeliness of administrative investigations.

To assess compliance in this area, the Monitoring Team reviewed all complaints from 2021 and 2022. Our review confirmed NOPD *generally is in compliance* with its Paragraph 396 obligations. We note, however, that NOPD was not able to demonstrate compliance during 2019 and 2020 purportedly due to the City-wide cyber-attack. Nonetheless, we have confirmed that the current system does track the required data and that NOPD is using that system properly.

### o.      *Paragraph 399*

The Consent Decree requires NOPD to develop and implement a complaint classification protocol that is allegation-based rather than anticipated outcome-based to guide PIB in determining where a complaint should be assigned. In short, the Consent Decree requires that all



complaints be investigated to some extent regardless of what an investigator believes the outcome will be.

To assess compliance in this area, the Monitoring Team reviewed the relevant PIB policies and protocols and reviewed a sample of PIB complaints to ensure all were appropriately investigated. The Monitoring Team's review confirmed NOPD continues to employ an allegation-based system. Additionally, NOPD's policy complies with all Consent Decree requirements. Further, our review of a robust sample of PIB investigations confirmed NOPD continues to employ an allegation-based intake process in practice as required by the Consent Decree. Accordingly, we find NOPD *to be meeting its obligations* under Paragraph 399.

### p.    *Paragraph 402*

The Consent Decree requires NOPD and the City to make good faith efforts to have state law amended to permit a reasonable timeframe for the completion of administrative investigations of officer misconduct so that such investigations can be thorough, reliable, and complete. Our review of documentation provided by PIB confirmed *NOPD has made a good faith effort* to secure the contemplated state law amendment.

### q.    *Paragraph 403*

The Consent Decree requires that all administrative investigations conducted by PIB shall be completed within the time limitations mandated by state law and within 90 days of the receipt of the complaint, including assignment, investigation, review, and final approval, unless granted an extension as provided for under state law or Civil Service exemption, in which case the investigation shall be completed within 120 days. Further, where an allegation is sustained, NOPD shall have 30 days to determine and impose the appropriate discipline, except in documented extenuating circumstances, in which case discipline shall be imposed within 60 days. All administrative investigations shall be subject to appropriate interruption (tolling period) as necessary to conduct a concurrent criminal investigation or as provided by law.

To assess PIB compliance in this area, the Monitoring Team reviewed misconduct complaints from 2021 and 2022, including intake dates, investigation timelines, and completion dates, and all other relevant dates/timelines. Our review revealed that *NOPD continues to be NOT compliant* with its obligations under Paragraph 403.

The primary areas of ongoing non-compliance relate to a failure to consistently complete investigations within the prescribed time period and a failure to impose discipline within the prescribed time period. With regard to the first, we found NOPD compliance rates to range from 76% to 95%. With regard to the imposition of discipline, we found NOPD compliance rates to be less than 20%.



### r.    *Paragraph 404*

The Consent Decree requires misconduct investigations to be thorough, reliable, and complete. Misconduct complaint investigators must interview each complainant in person, absent extenuating circumstances, and this interview shall be recorded in its entirety, absent specific, documented objection by the complainant.

To assess compliance with Paragraph 404, the Monitoring Team reviewed administrative case files closed during the months of November 2022, December 2022, and January 2023. While we find flaws in some of the investigations we reviewed, *we nonetheless conclude PIB is generally compliant with its Paragraph 404 obligations*. Indeed, in each case we reviewed PIB did interview (or at least try to interview) the complainant and did record the interview. While not all investigations were thorough, most were. We found 95% of the investigations we reviewed to be adequately thorough.

We do note one particular matter that raised concerns regarding the thoroughness of the PIB investigation. In the investigation of Jeffrey Vappie, as described elsewhere in this report, PIB initially resisted interviewing all material witnesses, including supervisors, the former Superintendent, and the Mayor. Notwithstanding its initial resistance, upon the advice of the Monitoring Team, PIB ultimately did attempt to interview the Superintendent and the Mayor, both of whom refused to be interviewed. PIB did not accept the Monitoring Team's advice to interview all supervisors in Officer Vappie's chain of command. This issue is discussed in greater detail above.

### s.    *Paragraph 412*

The Consent Decree makes clear that NOPD officers are required to provide a "public safety statement" regarding a work-related incident or activity regardless of the likelihood of a PIB investigation. NOPD agreed to make clear in policy and training that all officer statements in incident reports, arrest reports, use of force reports, and similar documents, and statements made in interviews such as those conducted in conjunction with NOPD's routine use of force review and investigation process, are part of each officer's routine professional duties.

To assess NOPD compliance with Paragraph 412, the Monitoring Team reviewed the relevant PIB policies. We also have reviewed countless PIB investigations and have identified no instance of an officer refusing to provide a public safety statement. We find PIB *compliant* with its obligations under Paragraph 412.

### t.    *Paragraph 413*

The Consent Decree requires NOPD investigators to consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations based upon that evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will NOPD disregard a witness' statement merely because the



witness has some connection to the complainant or because of any criminal history. NOPD shall make efforts to resolve material inconsistencies between witness statements. Notably, this is an area where NOPD has struggles for years, as reflected in multiple Monitoring Team reports.

To assess compliance in this area, the Monitoring Team reviewed PIB investigations closed during the months of November 2022, December 2022, and January 2023. We focused our review on the existence and quality of NOPD's credibility determinations. Our review revealed improved compliance in this area. While we continue to identify shortcomings, overall, the level of NOPD compliance has improved to an extent where *we are comfortable reporting that NOPD has achieved substantial compliance in this area*. Specifically, our audit revealed NOPD is 100% compliant with its obligations to (i) consider all relevant information, (ii) not give automatic preference to officers, and(iii) not disregard a witness's statement due to criminal history. Our audit also revealed a 95% compliance rate with respect to (i) credibility determinations and (ii) resolving inconsistencies in investigations.

Notwithstanding our willingness to find NOPD insubstantial compliance in this area, it is important to point out that more work needs to be done in this area. One example of a recent shortcoming relates to the investigation of Officer Jeffrey Vappie. While there is much PIB did right in its investigation into the allegations against Officer Vappie, PIB's failure to thoughtfully examine circumstantial evidence and its failure to make a credibility determination regarding the multiple hours Officer Vappie spent in the Upper Pontalba apartment was notable. We discuss this issue in greater detail in a forthcoming public report.

### u.     *Paragraph 420*

The Consent Decree requires that NOPD keep each misconduct complainant informed periodically regarding the status of the investigation. The complainant must be notified of the outcome of the investigation, in writing, within 10 business days of the completion of the investigation, including regarding whether any disciplinary or non-disciplinary action was taken. To assess compliance with Paragraph 420, the Monitoring Team audited a sample of 2022 and early 2023 administrative investigations with a specific focus on start and end dates, and the dates correspondence with shared with the complainant. Our audit revealed that *NOPD is NOT yet in compliance with its Paragraph 420 obligations*.

Specifically, in 10% of the cases we reviewed, the complaint was not kept informed of the investigation process or progress. Further, in 24% of the cases we reviewed, the complainant was not informed of the result of the investigation within 10 days of the conclusion of the investigation.

The Monitoring Team has been pushing PIB to revolve these shortcomings in its processes for many years. PIB is well aware of its ongoing noncompliance in this area. We are hopeful PIB will remedy these shortcomings by the time of our next compliance audit.



### v.   *Paragraph 422*

The Consent Decree requires NOPD to employ a disciplinary matrix that establishes a presumptive range of discipline for each type of rule violation, and provides for aggravating and mitigating factors, among other things. To assess compliance in this area, the Monitoring Team reviewed the current discipline matrix as well as a sample of PIB investigations with sustained findings. Additionally, we reviewed any documented justifications for upward or downward departures from the matrix. *Our review revealed that NOPD is meetings its obligations under Paragraph 422.*

Notwithstanding our finding in this area, we note NOPD continues to fail to meet investigation timelines, as discussed above. For example, PIB's own audit of its compliance in October 2022 revealed a significant failure to hold disciplinary hearings in a timely fashion. Indeed, of the 90 sustained PIB administrative investigations between January 2022 and October 2022, NOPD held timely disciplinary hearings only 8% of the time. PIB has advised the Monitoring Team it has undertaken a robust interview process to get rid of the existing backlog and ensure timely discipline hearings in the future. The Monitoring Team expects to audit this area again in the near future to ensure PIB follows through on this commitment. If it does not, the Monitoring Team will be recommended a return to a "non-compliant" status for Paragraph 422.

### w.   *Paragraph 423*

The Consent Decree requires NOPD to establish a unified system for reviewing sustained findings and assessing the appropriate level of discipline pursuant to NOPD's disciplinary matrix in order to facilitate consistency in the imposition of discipline. All disciplinary decisions must be documented, including the rationale behind any decision to deviate from the level of discipline set out in the disciplinary matrix. Our review of this area revealed that *NOPD continues to be non-compliant*.

With respect to PIB's obligations to document all discipline, our 2022/2023 audit showed a compliance rate of only 50%. With respect to the obligation to provide a rationale for deviations from the discipline matrix, the Monitoring Team was unable to find NOPD in compliance due to the backlog of PIB discipline cases. NOPD had not yet imposed and documented discipline in 5 of the 6 investigations we reviewed. As it is NOPD's burden to demonstrate compliance, we cannot find NOPD in compliance without data supporting such a finding.

### x.   *Paragraph 424*

The Consent Decree required NOPD and the City to develop and establish written policies and procedures to ensure that the City Attorney's Office provides close guidance to NOPD at the disciplinary stage to ensure that NOPD's disciplinary decisions are as fair and legally defensible as possible. *The Monitoring Team cannot yet find NOPD in compliance in this area* because there is no documented policy or procedure for guidance to NOPD at the disciplinary stage to ensure that NOPD's disciplinary decisions are as fair and legally defensible as possible.

Page 34



As PIB prepared for the Monitoring Team's audit, they asked the City Attorney's Office for documentation of compliance with paragraph 424. On February 15, 2023, the City Attorney's Office provided a memorandum to PIB with an interpretation of CD 403, which deals with timelines related to discipline. PIB disagreed with the guidance provided in this memorandum and will be asking for a meeting to discuss timeline procedures. In any event, this memorandum only deals with one aspect of handling discipline timelines and does not meet the requirements of CD 424.

We look forward to working with PIB and the City Attorney's Office to help bring NOPD into compliance with Paragraph 424.[17]

**y.    *Paragraph 425***

The Consent Decree requires NOPD to request the Civil Service Commission to post online its full decisions related to NOPD discipline in a timely manner. We find that *NOPD has met its obligations* under Paragraph 425.

This Section only deals with "sustained" cases where the officers appealed the decisions to Civil Service. PIB personnel provided a lengthy list of Civil Service Commission decisions over a ten-year period, dating back to 2013 through initial entries beginning in 2023. There are three entries in the first Quarter of 2023. The document and information were pulled directly from the Nola.gov website, in preparation for this March 2023 OCDM audit.

There are hundreds of entries on the Civil Service Department website under the heading Commission Decisions. The Monitoring Team verified the document provided matches the information on Nola.gov. NOPD member appeals go directly to Civil Service; therefore, appeals are not kept in a database in PIB and there is no information to cross-check whether all decisions are posted.

**z.    *Paragraph 426***

The Consent Decree requires PIB to issue an annual report that includes a summary of each misconduct complaint, including a description of the allegation, the final approved disposition, and any discipline imposed. PIB's annual report shall also include aggregate misconduct complaint data showing the number of each type of complaint and the number and rate of sustained cases after final approval, and shall provide an analysis of this data that identifies trends and concerns and documents NOPD's response to the identified trends and concerns. The PIB and IPM should coordinate and confer with each other in collecting, analyzing, and reporting this data to avoid or minimize duplication of efforts or resources.

---

[17]    According to NOPD, PIB has created a "standing operational directive with the City Attorney's office for a monthly working group conference." NOPD Response at 6. Further according to NOPD, "this collaborative focus group discusses policy and procedures impacting investigations and discipline." *Id.* The Monitoring Team looks forward to reviewing this new directive.



To assess NOPD compliance in this area, the Monitoring Team reviewed PIB's 2021 Annual Report. Our review reveals PIB *is meeting its obligations* under Paragraph 426.

The Monitoring Team concluded that all required elements of Section 426 are included in the PIB Report. Trends are indicated both by numbers of complaints and incidents, as well as by descriptions of types of complaints. All complaint numbers are consistent with prior years. The only significant difference in numbers is from year 2020, which was the main COVID year. The Report is 91 pages with the majority of length included as Addendums A (Misconduct Complaint Summaries) and B (Actions Taken).

### aa.   *Monitoring Team Review of Individual PIB Investigations*

Over the course of this most recent audit, the Monitoring Team conducted an in-depth review of 21 PIB investigations. Our review included reviewing the entire investigation file, including relevant report and video footage, in order to evaluate the quality, thoroughness, and reasonableness of PIB's process and findings. We have shared our detailed findings with NOPD. For purposes of this Report, in summary, our review revealed the following:

- NOPD thoroughly investigated nearly all complaints and included the required credibility determinations.

- The NOPD has a disciplinary matrix although there remains a backlog of sustained cases awaiting disciplinary hearings.

- NOPD has provided required placards, posters, and brochures at each duty location and other government offices.

- NOPD still struggles to meet timelines of notifications to the complainant on the status and the results of the investigations.

While we did identify some flaws in the investigations we reviewed, it is important to remember the Consent Decree does not call for perfection. Even with the occasional flaws identified, the Monitoring Team was impressed with the quality of the PIB investigations we reviewed. On the whole, the investigators were careful and thorough.

### bb.   *Recommendations*

Based on our audit findings, the Monitoring Team recommends the NOPD undertake the following actions:

- PIB, in conjunction with PSAB, should undertake a review of all alleged incidents of retaliation. PIB should document the methodology and results of this review, including what discipline, if any, was imposed for the alleged retaliation.

Page 36



- PIB and PSAB should consider modifying NOPD's current policy to prevent PIB investigators from investigating their immediate supervisors.

- PIB should review its current staffing levels, including its Quality Assurance Unit, and supplement staffing as necessary to ensure Administrative investigations are completed thoroughly and in a timely fashion.

- PIB should develop a more efficient process to ensure disciplinary hearings are scheduled and conducted, and discipline is imposed, within 30 days from the date the investigation concluded.

- PIB should adopt a policy requiring investigators to document the reasons any time discipline is not imposed within 30 days of the conclusion of the investigation.

- PIB should adopt a policy requiring investigators to document whether discipline falls within the Discipline Matrix guidelines, and, if it does not, to document the reasons why.

- PIB should work with the Academy to ensure all members conducting investigations receive new detective training and annual detective update training. Additionally, PIB should work with the Academy to ensure all PIB supervisors receive new supervisor training.

- PIB leadership should pay closer attention to special investigations, including "sting" investigations. A plan should be developed to ensure periodic investigations relating to unlawful stops, searches and seizures, biased policing, excessive force, second employment abuse, failure to take a complaint, failure to report misconduct, and other patters of potentially criminal behavior.

- PIB should adopt a new process to ensure timely notifications are sent to the complainant following the conclusion of the investigation. The notification should be documented, accurately dated, and maintained within the appropriate case file.

- The City Attorney's Office should review its process for providing guidance to PIB relating to the disciplinary process of administrative investigations.

- PIB should update its Standard Operating Procedures to include a "last revised" date.

Additionally, as noted elsewhere in this Report, PIB should take immediate steps to consider the recommendations of the Monitoring Team relating to the Vappie investigation.



### C.    Review of PIB Discipline Fairness

To assess the fairness of PIB discipline, the Monitoring Team conducted an initial audit of low-level PIB discipline in mid-2022. We shared the results of our findings with PIB at that time. The following summarizes our methodology and our findings.

Importantly, this audit reflects only one of multiple ongoing efforts to ensure the fairness of NOPD's discipline process and the absence of favoritism in that process. While this initial audit did not suggest over-discipline or favoritism, other more robust audits are in process.

In any event, we began this initial review with PIB data identifying less serious misconduct allegations occurring over a two-year period from July 2020 - July 2022. These cases included recommended Suspensions of 10-days and fewer, and also Letters of Reprimand. We focused on lower level allegations for purposes of this audit since our primary goal was to determine whether PIB had become overly aggressive or otherwise unfair/unbalanced with regard to its discipline recommendations. In other words, the Monitoring Team wanted to be sure the PIB punishment fit the officer's transgression.

The Monitoring Team focused on 164 PIB cases completed in 2020 and 29 cases completed in 2021. The list for 2021 was significantly shorter due to a backlog of PIB cases. The 2020 spreadsheet included, among the 164 listed cases: 93 letters of reprimand, 47 cases with a one-day suspension, and 24 cases with 2 or more days of suspension as a disposition. The 2021 spreadsheet included, among the 29 cases listed: 11 letters of reprimand, 1 oral reprimand, 12 cases with a one-day suspension, and 5 cases with 2 or more days of suspension as a disposition. The Monitoring Team reviewed all cases with a Suspension disposition of 2-days or more and reviewed a randomly selected number of cases with one-day Suspensions and Letters of Reprimand as dispositions. It is important to note that the Monitoring Team's initial data universe included only violations for which officers received discipline of ten days or fewer.

The Monitoring Team reviewed thirty cases resulting in a one-day Suspension. We did not find any indication of excessive discipline. Most of the cases were Rank-initiated and all of the investigations appeared sufficiently thorough.

Examples of the types of violations receiving a one-day Suspension in this sample of cases, includes: failing to write a report, improper handling of an accident scene, failure to properly conduct a search, evidence not collected properly, failure to properly secure NOPD property (stolen), failure to handle a call for service within policy, pursuits for minor traffic violations, and reporting late for duty after being previously warned.

The Monitoring Team flagged one case for further review by PIB due to the serious nature of the violation. The officer received a one-day suspension for changing a call related to an alleged crime of a sexual nature to clear it NAT (Necessary Action Taken). This type of call clearance, per policy, must be approved by a SVU detective. After reviewing the BWC in the event, the Monitoring Team recommended the case should have been handled from the perspective of a



failure to fully investigate a crime, and failure to document an EPR. PIB will follow-up on this case and provide additional information.

Most of the Letters of Reprimand over the two-year period were for BWC and Mask policy violations. The policy and discipline for those two types of violations has been reduced over the past two years.

The Monitoring Team reviewed a small number of randomly selected cases where officers were disciplined with a Letter of Reprimand for failing to follow a direct order. The Monitoring Team determined that these violations were serious enough to merit a Letter of Reprimand.

In short, the Monitoring Team's review of the data suggests PIB is NOT over-disciplining its officers. We found only one case in the two-day and greater list of cases that appeared to be slightly excessive. That case concluded with a two-day Suspension. We raised our concern with PIB, which responded with additional context, demonstrating that the PIB discipline was not unreasonable.

Overall, the Monitoring Team's review of randomly selected cases with Suspensions of 10-days or fewer indicates no basis for any allegations that the NOPD is administering discipline in an unfair, heavy-handed, or biased manner. We understand that an approach to discipline and final decisions on taking action for various policy violations can be subjective and at times the approach to officer actions or inactions may vary among supervisors. It appears in this review that NOPD supervisors are appropriately following disciple matrix guidelines when disciplinary action is taken, and the findings include a policy guideline for a Suspension or Letter of Reprimand.



### D. Analysis of FIT Activities

The Monitoring Team reviewed multiple FIT investigations during the audit period, and identified several where FIT mishandled situations involving neck holds. Per Consent Decree paragraph 27, NOPD policy explicitly prohibits neck holds.

### 1. Incident from August 11, 2022

The incident initially was handled by PIB FIT as a Level 1 use of force. The Monitoring Team questioned the Level 1 designation after reviewing the body worn camera (BWC) video and associated documents.

The incident involved officers taking a male in mental health crisis into protective custody. The officers transported the individual to the hospital for an assessment. At the hospital, the male began to argue with officers and refused to sit down when a nurse attempted to give him an injection. A tussle ensued between the male and the officers, and all fell to the ground. The video shows one officer place his hand around the subject's neck/throat area during the tussle.

Based on our review of the BWC, the Monitoring Team forwarded the following questions to the PIB FIT:

- Why did FIT not view this as a Level 4 use of force?

- Did FIT recommend supplemental training? If so, please provide the attendance and completion records.

- Did FIT recommend a policy change. Is so, please provide a copy of the recommendation.

- The Use of Force report does not mention the neck hold. Was this noted in the Supervisory Feedback Log?

PIB FIT failed to respond to these questions. Subsequently, the Monitoring Team raised the matter with PIB Captain Precious Banks who agreed the matter should have been investigated as a Level 4 use of force.

### 2. Incident From August 10, 2022

The Monitoring Team reviewed another Level 4 use of force from August 2022. The involved officer placed his hand around a handcuffed individual's neck in a hospital after the officer/subject struggled with each other. PIB FIT responded to the hospital and commenced an administrative investigation. The Monitoring Team identified several investigation deficiencies, including the following:

Page 40



- Even though a FIT criminal investigator responded to the scene and viewed the incident via a hospital camera, FIT did not launch a criminal investigation until November 2022, and only after being instructed to do so by a supervisor.

- The administrative investigation did not probe/inquire as to why the officer placed his hand around the subject's neck for several seconds.

- The officer interview consisted of inappropriate leading questions, seemingly designed to help provide justification for the officer's use-of-force.

- No photos were taken of the subject of force.

- A nurse and another individual were observed on the hospital camera, but they were not interviewed.

- The administrative investigation was completed on November 8, 2022, but the Use of Force Review Board hearing was not conducted until March 9, 2023.

The Monitoring Team notified PIB FIT of these deficiencies. The FIT administrative sergeant did not address any of the above investigative concerns. Further, the Monitoring Team inquired about the criminal investigation and learned the investigation is not complete as a decision has not been made on potentially criminally charging the officer.

### 3.    Incident from August 17, 2022

This incident involved a police sergeant handling a call about drug sales in a residential neighborhood. Upon arriving on the scene, the sergeant exited his squad car and approached three individuals. He asked if the individuals had seen anyone selling drugs. The subjects said they did not observe anything. The sergeant then proceeded to a neighborhood store and turned off his body worn camera. The sergeant then is observed outside the store speaking with someone from the store. After a few minutes, the sergeant walks away from the individual and returns to his squad car. The sergeant throws a beverage bottle into the squad car and proceeds back down the street toward the initial three individuals. The sergeant approaches a woman sitting in a chair and ultimately places his hands on her throat. The woman was seated in a chair and appeared intoxicated at the time. The woman complained several times that the sergeant choked her.

The sergeant conceded in his interview that he grabbed the woman by her upper throat. The involved officer said he placed his hand on the neck/throat area because he did not want the woman to spit at him, but there is no evidence from the video the woman attempted to spit at the sergeant.

The Monitoring Team assessed this incident and identified several concerns, including the following:



- The sergeant placed his hands around the throat area of the woman who, from our review of the BWC, was not in a position to harm the sergeant.

- The FIT sergeant did not ask the involved sergeant if he applied pressure to the throat. The FIT sergeant did not probe or inquire as to the pressure the sergeant applied to the woman's neck.

- The FIT sergeant indicated he did not observe any bruising or redness on the woman's neck that would have indicated pressure to the neck, however, neither redness nor swelling is necessary to conclude pressure was applied to a neck.

- During the involved sergeant's interview, his attorney asked several questions that were not related to any question by the FIT sergeant. It was obvious the attorney was seeking to create a positive appearance by the sergeant.

- The sergeant stated during his interview he did not injure the woman and he did not choke her, even though the BWC shows the sergeant's hand around the woman's neck/throat and shows the woman stating she was choked.

The FIT sergeant attempted several times to contact the subject of force as part of his investigation, but he could not locate her. Consequently, the FIT sergeant indicated he could not sustain the choking allegation against the involved sergeant because he could not "prove" the woman was choked by the sergeant, even though the woman was not interviewed and the woman indicated several times on the BWC that she was choked.

The Monitoring Team raised these deficiencies with PIB FIT.

### 4.      Incident From February 17, 2023

Two sergeants and one lieutenant were working in the French Quarter during Mardi Gras. The three observed a male with a handgun in his waistband. The officers approached the male who resisted the officers by pulling away. The male was taken to the ground and the officers had to physically restrain the male in order to put handcuffs on him. The officers seized the handgun.

The Monitoring Team reviewed this incident and raised several concerns:

- BWC footage showed one of the sergeants placed his hand around the subject's neck, yet this was not stated in the Use of Force Report.

- The BWC showed the subject had a bloody face and bloody nose from his encounter with the officers.

- During the struggle, one officer can be heard yelling at the male to show his hands or he was going to "get another one."

Page 42



- The male was very upset over the incident and began yelling and moving around agitatedly as he was escorted to the 8th District. The officers stop and one officer can be heard via the BWC stating, "if you don't stop you will get another one."

- The lieutenant contacted FIT and requested they review the BWC. A FIT sergeant arrived at the 8th District and reviewed the BWC and determined the 8th District would handle the investigation.

- The lieutenant was involved in the incident, but nevertheless conducted the use-of-force investigation, which is contrary to NOPD Policy and Consent Decree paragraph 85. The lieutenant forwarded his investigation to the District Captain who approved it and forwarded it to PIB.

- The lieutenant indicated in his investigation report that he did not interview the subject of the force as he thought FIT was going to handle the investigation, but, according to FIT's report, FIT made clear the District was to handle the investigation.

- The subject of force was taken to the hospital after being first brought to the 8th District Station. The subject of force sustained a brain bleed and doctors kept him at the hospital for observation prior to releasing.

- The investigating lieutenant indicated in his report that the subject did not complain his head was injured during the use of force incident. However, the BWC clearly indicates the subject of force had facial injuries when officers picked him up off of the ground.

- The investigating lieutenant indicated in his report that the sergeant briefly placed his left hand around the subject's neck, but did not restrict the subject from breathing. However, the investigation does not indicate the lieutenant ever interviewed the sergeant to determine if he restricted the subject's breathing.

Here again, the Monitoring Team raised these deficiencies with PIB FIT.

### 5.    Conclusion

The foregoing findings go to the heart of the Consent Decree's provisions governing Use of Force and Misconduct Investigations. These instances suggest that FIT no longer is addressing all observable violations. This failure further could suggests an unwillingness to conduct thorough, independent investigations, which gives us serious concern that our prior recognition of the quality of FIT investigations may no longer hold true. *Moreover, it has come to the Monitoring Team's attention that some FIT investigators are conducting Use of Force investigations before they have received their required training, an extremely dangerous*

Page 43



*practice.* As these various failures reflect clear violations of the Consent Decree, the NOPD must make a concerted effort to remedy these problems immediately.



Page 44

## VIII.   CONCLUSION

The operations of NOPD's Public Integrity Bureau are far improved from what existed at the time of the DOJ investigation in 2011. In certain areas, however, like the timeliness of investigations, PIB continues to come up short. In other areas, PIB has backslid. Bringing PIB into compliance with the requirements of the Consent Decree should not be a monumental effort. But it will take dedication and focus. It also will take greater cooperation with the Monitoring Team that we currently are seeing. As noted in this Report, NOPD has become less cooperative over the past few months, refusing to share required information with the Monitoring Team, failing to respond to simple requests, and rejecting attempts to meet to resolve even minor issues. This new uncooperative stance is in no one's interest – not the NOPD's and certainly not the community's. We are hopeful NOPD turns itself around and refocuses its efforts on achieving full compliance. This is critical as PIB is not the only area of the Consent Decree currently not in compliance.