


*CITY OF NEW ORLEANS*

# DEPARTMENT OF POLICE

*715 South Broad Street*
*New Orleans, LA 70119*

*"to protect and to serve"*

**LaToya Cantrell**
MAYOR

**Michelle M. Woodfork**
SUPERINTENDENT

**"an equal opportunity employer"**

Response to OCDM Report on the New Orleans Police Department
Public Integrity Bureau April 2023

### NOPD's Response to Section I. Executive Summary

The Public Integrity Bureau is critical to the overall success of the New Orleans Police Department as the Court-appointed monitor rightly described that PIB "is at the heart of the NOPD's ability to prevent misconduct, build trust among its officers, and build community trust".[1]  It is important to note and clarify the role of the Public Integrity Bureau.  PIB is not a prosecutorial or disciplinary agency.  PIB is a fact-finding bureau; it is a professional investigative organization.  NOPD holds constitutional policing as an ongoing and unwavering standard and PIB does not approach investigations with an intention to make the facts fit.  PIB investigates complaints by following the lead of the facts wherever they lead and when the trail of the facts ends, the conclusion of the investigation begins.

The New Orleans Police Department and its Public Integrity Bureau remains eager and hopeful to continue to work with the Office of the Consent Decree Monitor ("OCDM") and others that genuinely want to help NOPD accomplish its mission of providing professional police services to the public.

### NOPD's Response to Section II. Consent Decree Authority

A. **Consent Decree Section XVII**.  **"**NOPD and the City agree to ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported using the preponderance of the evidence standard and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent."

B. **Consent Decree Paragraph 444**. The Monitor shall assess and report whether the requirements of this Agreement have been implemented, and whether this implementation is resulting in the constitutional and professional treatment of individuals by NOPD.

C. **Consent Decree Paragraph 454**.  "City and NOPD shall provide each investigation of a serious use of force or use of force that is the subject of a misconduct investigation, and each investigation report of a serious misconduct complaint investigation (i.e., criminal misconduct; unreasonable use of force; discriminatory policing; false arrest or planting evidence; untruthfulness/false statements; unlawful search; retaliation; sexual misconduct; domestic violence; and theft), to the Monitor before closing the investigation or communicating the recommended disposition to the subject of the investigation or review. The Monitor shall review each serious use of force investigation and each serious misconduct complaint investigation and recommend for further investigation any use of force or misconduct

---

[1] OCDM Report on the NOPD Public Integrity Bureau, April 2023, Page 2-3.

complaint investigations that the Monitor determines to be incomplete or for which the findings are not supported by a preponderance of the evidence. The Monitor shall provide written instructions for completing any investigation determined to be incomplete or inadequately supported by the evidence. The Superintendent shall determine whether the additional investigation or modification recommended by the Monitor should be carried out. Where the Superintendent determines not to order the recommended additional investigation or modification, the Superintendent will set out the reasons for this determination in writing. The Monitor shall provide recommendations so that any further investigation or modification can be concluded within the timeframes mandated by state law. The Monitor shall coordinate with the IPM in conducting these use of force and misconduct investigation reviews."

**D. Consent Decree Paragraph 455**.  "The Monitor may make recommendations to the Parties regarding measures necessary to ensure timely, full, and effective implementation of this Agreement and its underlying objectives. Such recommendations may include a recommendation to change, modify, or amend a provision of the Agreement; a recommendation for additional training in any area related to this Agreement; or a recommendation to seek technical assistance. In addition to such recommendations, the Monitor may also, at the request of DOJ or the City and based on the Monitor's reviews, provide technical assistance consistent with the Monitor's responsibilities under this Agreement."

NOPD and the Public Integrity Bureau are following the plain language of the above Consent Decree authority.

## NOPD's Response to Section VII. Substantive Finding

### A. PIB Investigation of Officer Jeffery Vappie

The Officer Jeffery Vappie administrative investigation has drawn an uncanny amount of attention and has become a polarizing jewel for many factions. However, the Public Integrity Bureau (PIB) has not wavered from its goal to fairly and thoroughly investigate misconduct allegations made against employees of the New Orleans Police Department. PIB's overall mission is consistent with the express language of the opening paragraph of section XVII of the Amended and Restated Consent Decree ("Consent Decree") that ensures "all allegations of officer misconduct are received and are fully and fairly investigated". From the moment the allegations were received and assigned, the PIB captain and lieutenant conducted an exhaustive, thorough, and fair investigation. NOPD agrees with the assessment that PIB undertook its investigation professionally and with integrity and we further join in commending the investigators and PIB for a good job.

The highly public nature of the complaint and its subsequent investigation has drawn unprecedented interest from the City Council, the media, the Monitoring Team and the OIPM. This level of scrutiny has been fruitful in several ways. First, it allows casual observers an opportunity to learn of the high quality, expertise, and performance of the men and women of the New Orleans Police Department. It specifically showcases the skills and professionalism of the investigators and the completeness of investigations conducted within the Public Integrity Bureau.

This is noteworthy and these efforts are worthy of applause.

Second, the numerous monitoring reviews have presented concerned parties with another reason and opportunity to review, with specificity, the tenets of the Consent Decree.  We disagree with the Monitoring Team Analysis that PIB violated the Consent Decree by refusing to share a copy of the PIB report with the Monitoring Team when requested.  The plain language of Paragraph 454 of the Consent Decree states that "City and NOPD shall provide each investigation of a serious use of force or use of force that is the subject of a misconduct investigation, and each investigation report of a serious misconduct complaint investigation (i.e., criminal misconduct; unreasonable use of force; discriminatory policing; false arrest or planting evidence; untruthfulness/false statements; unlawful search; retaliation; sexual misconduct; domestic violence; and theft), to the Monitor before closing the investigation or communicating the recommended disposition to the subject of the investigation or review".[2]

Under the most liberal reading and interpretation, the Consent Decree would <u>not</u> describe the Officer Vappie investigation as one that entitles the Monitor to the investigation before its completion.  It would not identify the investigation as a use of force investigation or a serious misconduct complaint investigation.   More precisely, the investigation: 1) did not involve a serious use of force; 2) did not involve use of force that is the subject of a misconduct investigation; and 3) was not a serious misconduct complaint investigation further enumerated and clarified as "criminal misconduct; unreasonable use of force; discriminatory policing; false arrest or planting evidence; untruthfulness/false statements; unlawful search; retaliation; sexual misconduct; domestic violence; and theft".   Under the Consent Decree only these three specific types of investigations trigger the requirement of NOPD to provide the Monitor the investigation prior to its conclusion.

No allegation of misconduct, by Officer Vappie, was described, suggested, hinted at or articulated as conduct that requires the release of the investigation pursuant to Paragraph 454.  The Monitor is expressly granted limited power and authority to "<u>review each serious use of force investigation and each serious misconduct complaint allegation</u> and recommend for further investigation…".  At its request, the Monitor is not eligible to receive each, every, and all investigations, no matter the stage of the investigation.  Therefore, we vehemently disagree with the suggestion that the Public Integrity Bureau violated the Consent Decree by refusing to share a copy of the PIB report with the Monitoring Team. It should also be noted that the Monitor was thoroughly involved in, and kept aware of, the investigation at every stage.

Third, the NOPD has the occasion to educate and clarify the role of the Public Integrity Bureau.  The PIB is critical to the overall success of the New Orleans Police Department.  It is important to note that PIB is not a prosecutorial or disciplinary agency, but it is a fact-finding bureau.  Although the governing standard for administrative investigations is a preponderance of the evidence, PIB does not approach investigations with an intention to make the facts fit.  We investigate the complaint by following the lead of the facts wherever they lead and when the trail of the facts ends, we begin the conclusion of the investigation.

While we appreciate OCDM's suggestion that the investigators should have obtained the Officer's

---

[2] Amended and Restated Consent Decree regarding NOPD, paragraph 454.

personal cell phone for further research and investigation.  However, we find no legal, fair, or reasonable basis for doing so.  Under the current administration, we hold constitutional policing as an ongoing and unwavering standard.  As we understand it, the Fourth Amendment prohibits warrantless searches of places or seizures of persons or objects where there is a reasonable expectation of privacy.  The courts apply a test that basically weighs and balances the public interest against the intrusion of privacy.

Here, the initial complaint alleged that the officer may have violated the 16.35-hour rule.  Based on an investigation and review of the officer's timesheets and payroll records it was determined that the Officer violated the NOPD policy.  The information that <u>could have been</u> discovered in Officer Vappie's cellphone was discovered early in the investigation and through other means. Applying the balance test under the facts of the Officer Vappie administrative investigation, to take his personal cellphone reeks of a constitutional violation making this issue ripe for an appeal. Furthermore, the ramifications of taking an officer's personal cellphone as part of an administrative investigation would deplete and flatten the morale of the entire NOPD.  This type of rogue and violative action is not the direction in which I am leading and intend to lead the bureau.

Lastly, it presents opportunities for the New Orleans Police Department to consider ways to improve and make appropriate adjustments.  We recognize that NOPD must create new policies and procedures to ensure that our employees' behavior reflects the professional and accountability standards of the NOPD.  We are working to upgrade the protocols within the Executive Protection team.  We are establishing procedures that incorporate this specialized unit within a clearly defined and delineated chain of command for supervision and accountability.  This includes the placement of an immediate supervisor within the EP team.

Through this process we have also recognized the need to adjust our current documents and forms to more clearly reflect our operating procedures.  In other words, we have an opportunity to make our documents less confusing and commensurate with our actual protocols.  One such example is in the penalty recommendation document wherein the investigators submit their recommendations to their chain of command.  These recommendations allow for the investigators' Platoon Commanders, District Captains, and their respective Deputy Superintendent to review the investigation and acknowledge their opinion by circling either "concur" or "does not concur" and then signing their signature above their name.

This recommendation form/document allows for two final signatures, the Deputy Superintendent of the Public Integrity Bureau and the Superintendent of Police. As a matter-of-sequence, the Deputy Superintendent signs in their official capacity, and then signs "for" the Superintendent. While this practice is loosely described in old policies and is subject to various interpretations, we are reviewing to determine its utility at this stage.  However, in the Officer Vappie investigation, this process was continued.

By way of clarity, Superintendent Michelle M. Woodfork did not review this investigation, nor did she sign acknowledging that she did at this phase.  Perhaps because the practice is commonplace it seems obvious that the signature for the Deputy Superintendent of PIB and the signature for the Superintendent of Police are the same.  Additionally, the word "for" after the

Deputy Superintendent's signature with an arrow pointing to the Superintendent's name should have been a clear identifier that the Deputy Superintendent was in fact signing for the Superintendent.

As previously described, Deputy Superintendent Keith A. Sanchez signed his name in his official capacity on the recommendations and as customary Deputy Superintendent Keith A. Sanchez signed for Superintendent Michele M. Woodfork. This customary policy has been in place for many years, and it presents an opportunity to evaluate the reason it has been done this way or should it continue. I would welcome any recommendations or approaches OCDM have considered over the years to change this since it has been the practice ever since the Monitoring Team has been engaged.

The entire New Orleans Police Department echoes the sentiments of the Monitoring Team and commend PIB and its investigators for a fair, thorough, and complete investigation.

### B. 2023 Compliance Audit of PIB

The Monitoring Team's audit focused on paragraphs not audited in several years as well as those found in compliance during the October 2022 audit. The Monitoring Team admits that not every paragraph is as material as others and those that relate to administrative matters can be remedied by the NOPD rather easily. Of the 26 paragraphs audited, 9 were described as "Not Compliant" in which we disagree with the following findings:

1. Paragraph 381. The rotations of Lieutenants into PIB have reasonably resumed since the 2019 City of New Orleans cyber-attack, the COVID-19 restrictions, the scheduling strains of 2022 including Bayou Classic, the bowl games, Christmas, New Years, and 2023 carnival season. We provided the 2019 Lieutenant Rotation List to the Monitors along with the commenced rotation plan. The Monitors acknowledged that "with regard to 2023, PIB was able to demonstrate its rotation program has been re-energized and that it has a schedule to ensure every lieutenant spends at least one week in PIB".[3]

2. Paragraph 382. PIB required each investigator to participate in 8 hours of annual training. This training includes interviewing techniques and best-practices along with interrogation techniques and best practices. Detective training is in addition to PIB's in-service training.

3. Paragraph 383. PIB has continuously conducted integrity checks. The Monitoring Team acknowledged reviewing 57 integrity checks conducted by PIB in 2022. Secondary employment abuses are an example of behavior that is the subject of integrity audit checks described in the consent decree[4] The audited sample only included integrity checks for secondary employment abuses. There is no requirement or direction within the consent decree that describes that certain integrity checks are required within a particular period or the frequency in which they should be conducted. During the audited period, PIB complied with conducting integrity checks.

---

[3] OCDM Report on the NOPD Public Integrity Bureau, April 2023, page 24.
[4] Amended and Restated Consent Decree regarding NOPD, paragraph 383.

4. Paragraph 424.  PIB has created a standing operational directive with the City Attorney's office for a monthly working group conference.  This collaborative focus group discusses policy and procedures impacting investigations and discipline.  This has resulted in a working group on March 29, 2023, and April 19, 2023.

The remaining 5 paragraphs are being addressed and have been addressed and the non-compliant nature reflects the audited period only and not our current compliance.

### C.  Review of PIB Discipline Fairness

The Monitoring Team reported that the initial audit did not suggest over-discipline or favoritism. Of the thirty cases reviewed for one-day suspensions, the Monitoring Team did not find any indication of excessive discipline.  All the investigations were described as sufficiently thorough.[5] The Monitoring Team concluded that the data strongly suggests PIB is NOT over-discipling its officers and found that a raised concern was responded to with additional context and ultimately demonstrating that PIB discipline was not unreasonable.[6]  The Monitoring Team also opined that NOPD supervisors are appropriately following discipline matrix guidelines when disciplinary action is taken.[i]

### D.  Analysis of FIT Activities

The Monitoring Team reported that its review of multiple FIT investigations shows that FIT mishandled neck holds as described in Paragraph 27 of the Consent Decree.  We disagree with the assessments as follows:

1. Incident #1 from August 11, 2022.  This incident was assigned to a qualified FIT Sergeant who originally classified the incident as a Level 4 (Neck Hold).  The submitted investigation was reclassified as a Level 1 (Takedown with no injury) without the investigating Sergeant documenting how she made this determination.  During Mardi Gras 2023, OCDM brought the incident to the FIT Lieutenant and PIB Captain's attention. PIB's Captain agreed the incident should have been investigated as a Level 4 use-of-force incident and determined that FIT would proceed with the investigations.  FIT's Lieutenant reviewed the corresponding BWC footage and did not observe a neck hold.  The Lieutenant then reached out to the New Orleans Police Academy ("Academy") and PSAB requesting a review of the associated BWC footage and to provide an analysis regarding the officers' actions.  Both the Academy and PSAB concurred that the officers' actions **did not constitute a neck hold**.  The corrective action included the Sergeant re-documenting the incident as a Level 4 Use of Force showing each investigative step taken to determine a neck hold was not employed.

2. Incident # 2 from August 11, 2022.  The investigation deficiencies identified by the Monitoring Team were identified and responded to appropriately by FIT chain of command.  The FIT investigator could have improved its investigation by asking pertinent

---

[5] OCDM Report on the NOPD Public Integrity Bureau, April 2023, page 37.
[6] OCDM Report on the NOPD Public Integrity Bureau, April 2023, page 38.

questions regarding the positioning of the officer's hands around the subject of force's neck. The FIT Lieutenant issued an SFL to the FIT investigator for deficiencies noted in his investigation. Nonetheless the investigation led to an FDI which resulted in a recommended Sustained disposition for a Level 4 Unauthorized Force. A criminal investigation into this incident was opened and is currently pending a charging decision. The corrective action included reinforcing proper investigatory thoroughness through SFLs addressing the necessity to interview an exhaustive list of witnesses, the inappropriateness of accepting a Force Statement containing boilerplate language, and the importance of probing questions.

3. <u>Incident # 3 from February 17, 2023.</u> FIT was contacted shortly after the incident's occurrence and a FIT Sergeant viewed BWC footage of the incident, which showed an officer's hand around the subject of force's neck and she claiming she was choked. The FIT supervisor, unable to view the video until the following day advised that another 2nd District Field Supervisor document the incident as a Level 1 Use of Force until he could review the video. As a result, the individual was not interviewed by either FIT or the Field Supervisor that day. The following day the incident was upgraded to a Level 4 and an FDI was initiated against the officer. During the investigation the Sergeant was unable to locate the subject to interview and ultimately was unable to determine whether her breathing was inhibited by the officer. Upon viewing the video, New Orleans Police Academy instructors expressed several concerns regarding the officer's actions. The investigating Sergeant recommended a sustained disposition against the officer for a Level 1 Unauthorized force for using unjustifiable force against a passively resistant person without first giving warnings / advisements to comply, as well as for Professionalism. The officer is currently awaiting a Captain's Panel Hearing.

4. <u>Incident # 4 from February 17, 2023.</u> A Lieutenant on the scene of the incident contacted FIT advising that he was unsure if he performed a takedown on an individual who was punched once in the face after the individual reached for an officer's gun (which is Level 3 Use of Force). A FIT Sergeant responded as FIT is requited to conduct Use of Force investigations on anyone at the rank of lieutenant and higher who uses reportable force. While at the station, the investigating Sergeant reviewed BWC footage of the incident, which showed that the requesting Lieutenant used no reportable force. The individual went to the ground through no action of any officer. Once this determination was made by FIT, the Use of Force was then investigated by the lieutenant in accordance with NOPD Chapter 1.3.6, Paragraph 8, which states, "A supervisor who uses force or ordered the use of force being investigated shall not investigate the use of force or review the Force Statements for approval." The lieutenant neither used force nor ordered the force being used, making him eligible to investigate the Use of Force – **this policy was revised in October 2022 removing the prohibition that a supervisor on the scene of a Use of Force incident could not investigate it. Additionally, an allegation of a neck hold was never mentioned to the FIT Sergeant or Lieutenant on the night of the incident.**

A public complaint was received regarding this incident on February 20, 2023, by the individual's mother regarding her son receiving a brain bleed from this incident. An FDI was initiated by FIT against the Sergeant for an alleged violation of Unauthorized Force. It should be noted that the individual's medical release paperwork indicated that an initial

CT scan showed a small subdural hematoma; the same paperwork indicated a second CT scan performed on the individual showed no signs of any brain bleed / brain injury and the individual was cleared for booking at the OJC. According to the same paperwork, no further medical follow-up was recommended for the individual. The entire Use of Force incident is being investigated by the initial FIT Sergeant and any potential neck hold will be examined. An attempt will also be made to interview the individual. If the investigation determines the on-scene Lieutenant was deficient in his Use of Force investigatory duties regarding his failure to interview the individual, it will be address via an SFL entry.

Under the current administration, the New Orleans Police Department will work in partnership with those who genuinely seek to help NOPD operate at its maximum capacity and potential. It is appreciated that OCDM separated its strongly held opinions of what could have been done and fairly graded our investigators and the PIB on what they did. Although NOPD created new policies, procedures, and protocols to address the issues that were discovered through this investigation, we look forward to reviewing further OCDM's recommendations and seeing how we may utilize them best.

---

[i] OCDM Report on the NOPD Public Integrity Bureau, April 2023, page 38.