```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3    ******************************************************************

 4    UNITED STATES OF AMERICA

 5                              CIVIL ACTION NO. 12-1924 "E"
                               NEW ORLEANS, LOUISIANA
 6    VERSUS                   WEDNESDAY, MAY 17, 2023, 2:00 P.M.

 7

 8    NEW ORLEANS CITY

 9    ******************************************************************

10         TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
           HEARD BEFORE THE HONORABLE SUSIE MORGAN
11               UNITED STATES DISTRICT JUDGE

12

13    APPEARANCES:

14

15    FOR THE MONITORING TEAM:      JONATHAN ARONIE
                                    DAVID DOUGLASS
16                                  ASHLEY BURNS

17

18    FOR THE DEPARTMENT OF JUSTICE:  R. JONAS GEISSLER
                                     MEHVEEN RIAZ
19

20
      FOR THE NEW ORLEANS
21    POLICE DEPARTMENT:            MICHELLE WOODFORK
                                    NICHOLAS GERNON
22

23    FOR THE CITY OF NEW ORLEANS:  KEVIN HILL
                                    DONESIA TURNER
24                                  CHARLES, ZIMMER

25

                    OFFICIAL TRANSCRIPT
```

02:44:25

1    APPEARANCES CONTINUED:

2

3    OFFICIAL COURT REPORTER:     CATHY PEPPER, CRR, RMR, CCR
                                  CERTIFIED REALTIME REPORTER
4                                 REGISTERED MERIT REPORTER
                                  500 POYDRAS STREET, ROOM B-275
5                                 NEW ORLEANS, LA  70130
                                  (504) 589-7779
6                                 Cathy_Pepper@laed.uscourts.gov

7

8    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         OFFICIAL TRANSCRIPT

**I N D E X**

SPEAKERS                                                    PAGE


THE COURT........................................................   5

MR. ARONIE.......................................................   7

MR. ZIMMER.......................................................  39

MR. RIAZ.........................................................  59

MR. GEISSLER.....................................................  60

THE COURT........................................................  66

*OFFICIAL  TRANSCRIPT*

1 **P-R-O-C-E-E-D-I-N-G-S**

2 A F T E R N O O N   S E S S I O N

02:44:25 3 WEDNESDAY, MAY 17, 2023

02:01:16 4 (STATUS CONFERENCE CALLED TO ORDER)

02:01:16 5

02:01:21 6

02:01:22 7 THE DEPUTY CLERK:  All rise.

02:01:22 8 THE COURT:  Please be seated.

02:01:45 9 THE DEPUTY CLERK:  Calling Civil Action 12-1924,

02:01:53 10 United States of America versus City of New Orleans.

02:01:54 11 Will the parties make their appearances for the

02:01:55 12 record.

02:01:56 13 MR. ZIMMER:  Charles Zimmer on behalf of the City of

02:01:59 14 New Orleans and the NOPD.

02:02:00 15 MS. TURNER:  Donesia Turner, City Attorney, City of

02:02:10 16 New Orleans.

02:02:12 17 MR. HILL:  Kevin Hill, City Chief, City Attorney,

02:02:16 18 City of New Orleans.

02:02:18 19 THE COURT:  All right.  Superintendent Woodfork, why

02:02:21 20 don't you make an appearance.

02:02:23 21 SUPERINTENDENT WOODFORK:  Hello.

02:02:26 22 Superintendent Michelle Woodfork, New Orleans Police

02:02:29 23 Department.

02:02:29 24 DEPUTY SUPERINTENDENT GERNON: Deputy Superintendent

02:02:29 25 Nicholas Gernon, NOPD.

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 02:02:31 | 1 | THE COURT:  All right.  Well, thank you.  Glad to see |
| 02:02:36 | 2 | you all here today. |
| 02:02:37 | 3 | All right.  How about for the monitors? |
| 02:02:42 | 4 | MR. ARONIE:  Your Honor, this is Jonathan Aronie. |
| 02:02:48 | 5 | Thank you for allowing me to do this by Zoom.  I think everyone |
| 02:02:51 | 6 | knows I have a little medical issue, and I really appreciate |
| 02:02:56 | 7 | the accommodation.  I'm also here with team member |
| 02:02:58 | 8 | Ashley Burns, who is in the courtroom, and David Douglass, who |
| 02:03:00 | 9 | is listening in as well. |
| 02:03:02 | 10 | THE COURT:  Thank you. |
| 02:03:05 | 11 | The Department of Justice. |
| 02:03:06 | 12 | MR. RIAZ:  Good afternoon, Mehveen Riaz.  My partner, |
| 02:03:12 | 13 | Jonas Geissler, is on as well. |
| 02:03:14 | 14 | THE COURT:  Is anyone from the independent police |
| 02:03:19 | 15 | monitor here as well? |
| 02:03:20 | 16 | MR. ZIMMER:  The IPM alerted us that they were not able |
| 02:03:25 | 17 | to make it, but they will be at the next hearing, Your Honor. |
| 02:03:27 | 18 | THE COURT:  Anyone else? |
| 02:03:28 | 19 | Okay.  Well, thank you all for being here today. |
| 02:03:32 | 20 | As you know, you are welcome to these proceedings that we have |
| 02:03:36 | 21 | in the courtroom.  I appreciate your being here, and I |
| 02:03:39 | 22 | appreciate the interest that you show in the New Orleans Police |
| 02:03:44 | 23 | Department and in the consent decree process.  I really |
| 02:03:49 | 24 | appreciate you taking the information that you get in these |
| 02:03:53 | 25 | sessions back to the members of the public so that they will |

OFFICIAL TRANSCRIPT

02:03:58 1    know what's going on in this process because there is a lot of

02:04:02 2    public interest.

02:04:03 3            In my order setting this status conference, I

02:04:08 4    asked the parties to let me know by May 15th who would make

02:04:12 5    presentations today and on what topics and approximately how

02:04:16 6    long each presentation would last.  The Department of Justice

02:04:20 7    and the City sent me letters.  The Department of Justice, in

02:04:24 8    its letter, informed the Court who would make presentations and

02:04:29 9    have since let the Court know through the monitor how long

02:04:33 10   these presentations are expected to last.

02:04:35 11           The City sent a letter saying only that its

02:04:38 12   counsel would attend the status conference and address the

02:04:42 13   monitor's reports as needed.  This response did not comply with

02:04:45 14   the Court's order.

02:04:47 15           The Court has set the next status conference on

02:04:51 16   June 7th at two o'clock p.m.  In that order I asked the parties

02:04:56 17   to let me know by June 5th who would make presentations, on

02:04:59 18   what topics, and how long the presentation would be expected to

02:05:02 19   last.

02:05:04 20           This is not the only case on the Court's docket.

02:05:07 21   I routinely require parties to let me know approximately how

02:05:13 22   long the proceeding is expected to last.  I don't require that

02:05:16 23   parties provide an exact time.  It can be an estimate.  This

02:05:20 24   allows me to plan my calendar.

02:05:24 25           I'm letting the parties know that if my order

OFFICIAL TRANSCRIPT

02:05:27  1    regarding the June 7th status conference is not complied with,

02:05:31  2    they will risk not being afforded the opportunity to speak or

02:05:34  3    make presentations or having the time that will be allowed

02:05:40  4    decided by me.

02:05:41  5                I wanted to let the City of New Orleans know that

02:05:44  6    we did not receive any additional questions from the public,

02:05:48  7    and so that's why I did not let you know what they were.  We

02:05:53  8    didn't receive any.

02:05:54  9                Our lead monitor, Jonathan Aronie, will now make

02:06:00 10    a presentation on the monitor's third quarterly report for 2023

02:06:06 11    and certain portions of the monitor's PIB report, specifically

02:06:11 12    section 7, subsections (b), (c), and (d.)  Section 7(a) of the

02:06:18 13    PIB report, which deals largely with matters relating to, are

02:06:23 14    brought to our attention by the Vappie investigation, will be

02:06:28 15    covered at our June 7th status conference.  On that date we

02:06:32 16    will also cover the PIB Vappie investigation report.

02:06:36 17                The monitor's first quarterly report for 2023 and

02:06:42 18    the monitor's PIB report are now filed in the record of this

02:06:46 19    case, and they also are available on the monitor's website at

02:06:54 20    consentdecreemonitor.com.  The monitor did not receive any

02:06:59 21    comments from the City regarding the first quarterly report for

02:07:05 22    2023.

02:07:05 23                So, Jonathan, we're ready for our presentation?

02:07:09 24          MR. ARONIE:  Very good.  Just a quick logistic check.

02:07:15 25    Can you see me?

OFFICIAL TRANSCRIPT

02:07:16  1          THE COURT:  Yes.

02:07:16  2          MR. ARONIE:  I probably look bigger than life at the

02:07:20  3  moment, right?  Am I on the big screen?

02:07:23  4          THE COURT:  Yes, you are.  This is your big moment.

02:07:26  5          MR. ARONIE:  We'll quickly change that when I get my

02:07:29  6  PowerPoint up.  Thank you for this opportunity, Your Honor.  As

02:07:31  7  I said, thank you for letting me do this by Zoom.  Even though

02:07:34  8  I'm feeling much better, I have the immune system of a

02:07:39  9  six-month-old, they tell me, so I'm not supposed to be in

02:07:40 10  crowds quite yet.

02:07:42 11          To streamline the presentation, Your Honor, I put

02:07:44 12  together some slides that really summarize what are in the two

02:07:49 13  reports.  Let's see if we max out my technological abilities

02:07:54 14  here by attempting to share my screen.  Since you're the one I

02:07:56 15  can see, Your Honor, you can just confirm you can see my

02:08:00 16  PowerPoint?

02:08:01 17          THE COURT:  Yes.

02:08:02 18          MR. ARONIE:  Very good.  Okay.  Let's jump in.  So I

02:08:06 19  think if Your Honor can start -- just as a reminder of kind

02:08:10 20  where we are with respect to the various reports, there are

02:08:13 21  kind of five reports that are of recent vintage.  It would be

02:08:20 22  the annual report covering all of 2022.  That was back in

02:08:26 23  February.  We already had a status conference about that in

02:08:29 24  April.

02:08:29 25          The next two reports are the PIB report and the

OFFICIAL TRANSCRIPT

02:08:33 1    first quarter report.  The PIB report was docketed on May 3rd.

02:08:39 2    The first quarter report was docketed this morning.  Even

02:08:43 3    though the parties had it for at least ten business days prior,

02:08:47 4    we're going to be talking about those two reports today.

02:08:49 5         The next two reports will be the one you

02:08:53 6    mentioned, the one we're not talking about today, which is our

02:08:57 7    analysis of PIB's investigation of Officer Vappie.  The

02:09:02 8    expected publication date of that is around the 5th or 6th, and

02:09:07 9    then we will set a court hearing for that on the 7th.

02:09:09 10        Then, finally, there is a special report on

02:09:13 11   special assault investigations expected later this month with

02:09:17 12   likely the status conference in July.  So that's where we are

02:09:21 13   with respect to our various reports.

02:09:23 14        Now, focusing on today, my goals are to summarize

02:09:28 15   the quarterly report that was docketed today, summarize the PIB

02:09:32 16   report, again, other than anything to do with Officer Vappie --

02:09:37 17   that was docketed previously -- highlight the ongoing and

02:09:41 18   future monitoring activities, and then, of course, answer any

02:09:44 19   questions you might have.

02:09:44 20        With that, let's jump into the quarterly report

02:09:49 21   highlights.  I have not -- I should be clear I have not

02:09:54 22   attempted to restate everything from the report here,

02:09:59 23   Your Honor.  The report is posted.  It has a lot of pages, a

02:10:02 24   lot of detail.  I took what I thought were highlights to give

02:10:07 25   the Court and the public a broad understanding of what's in

OFFICIAL TRANSCRIPT

02:10:12  1    there.

02:10:12  2            We'll start with the discussion in the report on

02:10:15  3    neck holds.  As the Court knows, the consent decree prohibits

02:10:19  4    neck holds in most situations.  The easiest way to think about

02:10:23  5    it is, the only time you should ever do a neck hold is where

02:10:27  6    lethal force would be otherwise authorized.

02:10:31  7            During one of our routine audits, not long ago

02:10:32  8    members of our team identified four separate incidents

02:10:35  9    involving officer neck holds.  Each one of those had elements

02:10:41 10    of it that didn't appear to us to be properly handled by the

02:10:45 11    Force Investigative Team.

02:10:46 12            Now, that was somewhat surprising for us because

02:10:50 13    we had been very complimentary of FIT over the years.  It was,

02:10:55 14    in fact, one of the first groups within NOPD to get itself into

02:10:59 15    shape and to come into compliance, and we will continue to be

02:11:04 16    generally complimentary to FIT.  So this was kind of surprising

02:11:08 17    that we had four incidents all involving neck holds where

02:11:11 18    questions were raised.

02:11:12 19            We sent an Immediate Action Notice.  That's just

02:11:17 20    a term we used to describe when we send a letter immediately to

02:11:21 21    NOPD saying, "Hey, you need to look at something right way."

02:11:23 22    We brought to their attention the four incidents.

02:11:28 23            The reason these were so important to our -- one,

02:11:31 24    we need to make sure that neck holds are being properly

02:11:34 25    investigated.  We need to make sure they are being properly

OFFICIAL TRANSCRIPT

02:11:37  1    classified as to Level 4 uses of force that they are.  We need

02:11:41  2    to make sure that they are being properly brought on to the use

02:11:41  3    of force review board.

02:11:47  4         PIB did take the immediate action notification

02:11:48  5    seriously, looked into the matters, gave us some preliminary

02:11:52  6    responses, and the parties now are getting ready to have deeper

02:11:57  7    discussions into these issues.  Some of them might come out to

02:12:03  8    disagreements in what is a neck hold or not.  I know it kind of

02:12:07  9    sounds like it should be easy to determine.  Sometimes it's not

02:12:11 10    as easy as it might sound.

02:12:14 11         We know PIB's initial response, and we're going

02:12:17 12    to be meeting with them to figure out if there are corrective

02:12:22 13    actions necessary, but we think there are and make sure those

02:12:25 14    are implemented efficient.

02:12:27 15         Moving on to the next area, staying within the

02:12:31 16    quarterly report, is vehicle pursuits.  When we were reviewing

02:12:36 17    vehicle pursuits for 2022, our team and the IPM saw some of the

02:12:44 18    pursuits that raised questions, and it prompted us to request

02:12:48 19    additional information from the police department.

02:12:52 20         It turned out to be much harder for the police

02:12:56 21    department to provide the data we were looking for than we

02:12:59 22    expected.  The reason, it turns out, is because their system

02:13:02 23    for tracking vehicle pursuits and the investigation of vehicle

02:13:06 24    pursuits is very manual.  Think of it as a paper-based

02:13:10 25    spreadsheet system.  I think to call it a *system* might even be

02:13:14 1    overly generous.

02:13:15 2            So they were able to provide some data for 22 but

02:13:18 3    not for 23.  We also determined from the data we did have that

02:13:23 4    PIB had a number of incomplete investigations, which, of

02:13:27 5    course, made it harder for us to assess the PIB analysis.

02:13:32 6            To PIB's -- sorry.  To NOPD's credit, they

02:13:36 7    reached out to us, recognized right away they had a paper-based

02:13:40 8    system, and asked us to get on a meeting with them to try to

02:13:44 9    figure out if there is a better way to do it.  We did have that

02:13:48 10   meeting.

02:13:48 11           We brought in some experts from our team,

02:13:54 12   Your Honor.  PSAB was there and had experts from their team.

02:13:57 13   We walked through some potential ways to automate the system.

02:13:59 14   As it turns out, PSAB had already been moving forward with a

02:14:03 15   plan, and so they already recognized its problem.

02:14:06 16           The way they described it to us makes it sound

02:14:09 17   like this new plan is promising.  We obviously can't opine on

02:14:13 18   it until we see it implemented and working, but it's comforting

02:14:18 19   to see that.

02:14:19 20           We've spent so much time over the years pushing

02:14:23 21   NOPD to automate as much of its work as possible that we were a

02:14:28 22   little bit let down.  I think NOPD was let down too.  This one

02:14:31 23   somehow had fallen into the cracks, but we are optimistic that

02:14:35 24   the new system Pete Staub is working on will solve this

02:14:39 25   problem.

                              OFFICIAL TRANSCRIPT

02:14:39 1          Next, Your Honor, we conducted a spot-check of

02:14:47 2  the canine unit.  You might remember at a hearing some time ago

02:14:50 3  where we stressed concern that some areas might be

02:14:56 4  back-sliding.  You asked us to identify areas that concerned

02:14:58 5  us, conduct either some new audits or some spot-checks, so

02:15:02 6  that's what you're seeing here.  You're seeing the results of

02:15:05 7  some of these audits and spot-checks.

02:15:07 8          This was the spot-check of the canine unit, and

02:15:10 9  it was overall pretty positive.  We found -- we sat in on

02:15:15 10 roll-calls, and after all these years, the roll-calls were

02:15:17 11 still good, sufficient.  Information was communicated well.

02:15:21 12          Generally speaking, with one exception we'll talk

02:15:23 13 about, the training and the medical records were well

02:15:26 14 documented.  The training continues to be thorough.  Those

02:15:31 15 items are very, very important.  It's been that way for some

02:15:34 16 time there, so it's very good to see there was no back-sliding

02:15:38 17 in that area.

02:15:38 18          The one shortcoming we identified that actually

02:15:41 19 caused a lot of discussion was:  There is one dog, it's a

02:15:44 20 narcotics dog, didn't have its training record or its medical

02:15:48 21 records in the system.  Now, one dog doesn't sound like a lot,

02:15:51 22 but there aren't that many dogs in the first place, so every

02:15:56 23 one matters here.

02:15:56 24          In the big picture, as we look going forward,

02:16:00 25 that's no longer an issue.  NOPD retired the dog, but it still

OFFICIAL TRANSCRIPT

02:16:05  1    raises the question, but why that dog's training and health

02:16:10  2    records weren't in the system?

02:16:11  3              We started to talk to ISB about that.  We're

02:16:17  4    going to continue those discussions, not so much focusing on

02:16:20  5    the ISB dogs, but making sure we all agree what the requirement

02:16:25  6    is going forward.  For example, one of the questions raised is,

02:16:27  7    well, if this is an ISB dog, not a dog that gets called out on

02:16:34  8    patrol to look for a suspect, do the same rules apply?  My

02:16:36  9    answer is the consent decree doesn't make any difference.

02:16:41 10    Those are the sort of good-faith discussions we're having to

02:16:42 11    make sure we don't have another noncompliance like this again,

02:16:46 12    and NOPD seems perfectly, you know, willing to have those

02:16:50 13    good-faith discussions.

02:16:51 14              The next one, Your Honor, is probably one of the

02:16:56 15    biggest issues that we talked about many, times.  It's stop,

02:17:00 16    searches, and arrests.  As you know, for some time there has

02:17:04 17    been a significant multi prong audit going on.  Because there

02:17:09 18    weren't -- there aren't really existing protocols for this,

02:17:13 19    NOPD and DOJ and the monitoring team worked hand-in-hand to

02:17:17 20    come up with a whole series of protocols, and that was a very

02:17:21 21    impressive joint effort.

02:17:24 22              Based on those protocols, our prior audits did

02:17:30 23    identify some significant concerns, some of them constitutional

02:17:32 24    concerns.  We had identified failure to consistently give

02:17:35 25    Miranda warnings, which is a big surprise to us, since that's

OFFICIAL TRANSCRIPT

02:17:38  1   probably the one thing everyone knows how to do from watching

02:17:43  2   every TV shows ever made.

02:17:44  3            We also noticed some potential bias in the way

02:17:48  4   passengers were removed from cars on traffic stops, whether

02:17:51  5   African-Americans were removed more often than white

02:17:56  6   passengers.  The parties are working through those big issues.

02:18:00  7   I have not seen NOPD try and run away from those issues.  We

02:18:05  8   are all trying to stick those together.

02:18:06  9            More recently, the monitoring team conducted a

02:18:11 10   spot audit looking at some of NOPD's audits.  On one of them we

02:18:16 11   found -- at least our team looked like 10 percent of the

02:18:20 12   incidents weren't in compliance with the consent decree.

02:18:24 13            Now, of those ten percent, as I recall, most of

02:18:27 14   them are not of the Miranda warning constitutional issues, but

02:18:30 15   they are important issues, and they are consent decree issues.

02:18:34 16   The 10 percent is roughly consistent with what we previously

02:18:37 17   saw from NOPD's own audit.

02:18:41 18            NOPD has, I think, very correctly asked to sit

02:18:44 19   down with us and our police practices expert, Dr. Bowman, to

02:18:49 20   walk through these specifically to see where we agree and we

02:18:52 21   don't degree and then, where necessary, to jointly agree on any

02:18:55 22   corrective actions, and that's what's happening next.

02:18:59 23            In fact, I think, I think we were going to meet

02:19:01 24   initially today, but, duh, we have the hearing instead.

02:19:05 25   Certainly, Deputy Chief Gernon has been pressing for this, and

02:19:12 1   we will make sure that happens very soon.

02:19:15 2           The next topic is one I can do rather quickly,

02:19:19 3   custodial interrogations, so it will line up.  NOPD has

02:19:23 4   actually been doing really well in this area for some time.  It

02:19:26 5   took them a while to get into compliance, but once they did,

02:19:31 6   they maintained it for quite some time.

02:19:35 7           Last year the audit we conducted, we did notice

02:19:39 8   some back-sliding, especially in one particular district.  I'm

02:19:44 9   pretty sure it was the Seventh District.  NOPD's position was

02:19:48 10  they were in compliance; they just couldn't produce the

02:19:52 11  supporting documentation in time.

02:19:54 12          Well, our position is rather simple:  The

02:19:58 13  documentation is your burden to prove you're in compliance, so

02:20:01 14  we can't find you in compliance without the documentation.  I'm

02:20:05 15  happy to report we audited all the districts again and found

02:20:09 16  every district in compliance with custodial interrogation.  All

02:20:17 17  but one in photo lineup had a 100 percent, and that one had

02:20:21 18  90 percent, so we felt very strongly that both of these are

02:20:24 19  back on track.

02:20:26 20          We also did some spot audits on detective

02:20:31 21  selection and training.  This, Your Honor, is also an area that

02:20:33 22  NOPD has been doing well at for some time.  We conducted our

02:20:38 23  spot audit.  I won't read through all these, but there is a

02:20:41 24  list on the page of the various things we were looking for.

02:20:44 25          In the course of this audit, we found only two

OFFICIAL TRANSCRIPT

02:20:48  1    deficiencies.  Both of those are relatively minor and easily

02:20:51  2    fixed by NOPD, so we're happy to see we didn't see significant

02:20:56  3    back-sliding in this area either.

02:20:57  4            We looked at mobile video recording sections of

02:21:04  5    the consent decree, and I want to pause for a second to explain

02:21:08  6    why this is so important.  It might sound like it's just a

02:21:13  7    paperwork issue, but for years NOPD didn't have the trust of

02:21:21  8    the community because when something went wrong, NOPD didn't

02:21:25  9    have any camera footage to show what really happened, or when

02:21:29 10    they did have cameras, if an officer turned off the camera or

02:21:32 11    the camera wasn't working, then the community immediately

02:21:36 12    thought something was afoot, afoul.

02:21:38 13            We had many years where cameras were not deployed

02:21:43 14    properly or consistently, and they weren't working, and that

02:21:46 15    created a lot of noncompliance and a lot of distrust from the

02:21:50 16    community, so we worked really hard with NOPD to come up with

02:21:55 17    systems to ensure recording equipment is working and is in the

02:22:01 18    cars and that the officer are only using the cars with working

02:22:05 19    systems.

02:22:05 20            The two paragraphs we looked at had 327 and 330.

02:22:11 21    327 requires that the cameras have to be maintained and

02:22:16 22    operating in good order.  330 requires that they have to be

02:22:20 23    used.

02:22:21 24            Our review in March found very poor recordkeeping

02:22:24 25    in this area with respect to repairs.  Now, maybe NOPD is more

OFFICIAL TRANSCRIPT

02:22:30  1   compliant than we think, but without any records, we can't

02:22:33  2   know.

02:22:35  3          Additionally, our firsthand experience suggests

02:22:38  4   that, to this day, these cameras still break quite a lot.  Now,

02:22:43  5   I grant you, the wear and tear on a police car is no small

02:22:47  6   thing, so it doesn't surprise me that things break.

02:22:53  7          But, you know, when I think back, Your Honor,

02:22:55  8   until I got sick, I was -- I would go on multiple ride-alongs

02:23:01  9   with officers every time I'm in town, which was one week every

02:23:04 10   single month, and I can't tell you the number of times I had to

02:23:08 11   walk around the parking lot with the officer I'm riding with to

02:23:11 12   find a car with a working system.

02:23:13 13          So, the fact that they didn't have the records

02:23:18 14   demonstrating compliance here doesn't really surprise me based

02:23:21 15   on my experience.  I --

02:23:23 16      THE COURT:  I had a comment.  I remember, and some of

02:23:29 17   you in the room will remember that we spent a lot of time on

02:23:32 18   this process, and the NOPD spent a lot of time figuring out how

02:23:37 19   it was going to make sure that officers reported when a camera

02:23:43 20   didn't work and that it was convenient for them to download the

02:23:49 21   videos.

02:23:50 22          So it's disappointing that after all that work

02:23:53 23   and effort went into solving this problem, that then the

02:23:58 24   procedures that were put in place were not followed.  So, I

02:24:01 25   hope they are back on track.

                          OFFICIAL TRANSCRIPT

02:24:05  1      MR. ARONIE:  Yeah, I hope it's back on track, too.

02:24:08  2           I will note that, you know, just as I called out

02:24:11  3  the Seventh District for being the sole district in

02:24:16  4  noncompliance in that prior audit I mentioned, I should call

02:24:19  5  out the Fifth District here as being the sole district clearly

02:24:22  6  in compliance.

02:24:22  7      THE COURT:  I do wonder about it.  You've got it as

02:24:26  8  being a relatively simple corrective action plan.  I wonder if

02:24:30  9  that's going to be true because I remember how difficult it was

02:24:35 10  the last time.  It didn't seem that simple to me.

02:24:38 11      MR. ARONIE:  No.  That's a fair point, but what is

02:24:42 12  interesting what happened last time, though, is if it was one

02:24:45 13  district with one particular -- wasn't the captain back then,

02:24:51 14  but one particular lieutenant who understood the requirement

02:24:56 15  and got it right in her district every time.  Finally, what

02:25:01 16  NOPD did was, they said:  She keeps getting it right, why don't

02:25:04 17  we just have her tell all the other districts how to do it.

02:25:08 18           So maybe part of the answer is here is figure out

02:25:11 19  why the Fifth is a hundred percent compliant, and let's have

02:25:14 20  some lessons learned for the other districts.

02:25:18 21           We, too, are hopeful this can be a relatively

02:25:23 22  simple corrective action, but we likewise remember things we

02:25:27 23  thought were simple before weren't.

02:25:28 24           So, Your Honor, that, obviously, as I said, is

02:25:31 25  not the entire quarterly report, but it does highlight some of

02:25:35 1   the points.  Unless you have questions on that, I'm going to

02:25:38 2   move to the PIB report now.

02:25:42 3         THE COURT:  Okay.

02:25:45 4         MR. ARONIE:  So before I get into some specific

02:25:48 5   paragraphs, let me just give a brief overview.  Probably one of

02:25:54 6   the more important ongoing problems we see is PIB's inability

02:25:57 7   to hit its timeline on the investigation timelines and

02:26:03 8   notification timelines, to complainants, the discipline

02:26:06 9   timelines.

02:26:06 10        That's very important.  It's been a problem for a

02:26:08 11  long, long time.  We've mentioned it.  We even stressed it

02:26:12 12  years ago when PIB otherwise was doing most other things right,

02:26:18 13  so we all have to continue to focus on that.

02:26:21 14        I already mentioned about the investigations of

02:26:25 15  multiple neck holds.  I said why that surprised me since FIT

02:26:33 16  generally does a really, really good job on its investigations.

02:26:35 17        Then 26 paragraphs we audited this time, nine

02:26:38 18  were not in compliance.  To be clear, some of them are more

02:26:42 19  important than others, and I'll explain that as we go.  I don't

02:26:44 20  want to suggest that every one of those is equally important or

02:26:48 21  equally unimportant.

02:26:50 22        Let's start with paragraph 377.  The way I set

02:26:53 23  these up is a very shorthand summary of what the obligation is.

02:27:00 24  Quick statements about where we found them, and then a couple

02:27:03 25  of bullet points of specifics.

OFFICIAL TRANSCRIPT

02:27:06  1          377 prohibits retaliation but also requires PIB

02:27:13  2   to regularly review its retaliation policy and the

02:27:17  3   implementation of that policy.

02:27:19  4          While NOPD does have a very good anti-retaliation

02:27:24  5   policy, we continue to find them not yet in compliance, not

02:27:28  6   because of the policy but because of the two other things.  So

02:27:31  7   far they are unable to offer evidence that they do require an

02:27:35  8   annual policy review and are unable to offer evidence of the

02:27:39  9   required annual retaliation review.

02:27:41 10          We are -- now that they have these very specific

02:27:46 11   findings, we are hopeful they turn to these right away to fix

02:27:51 12   them and would love to be able to turn this one around quickly.

02:27:56 13   At the moment, not compliant.

02:27:58 14          Paragraph 379, Your Honor, also not in

02:28:03 15   compliance.  NOPD and the City agree to ensure sufficient

02:28:07 16   staffing resources and equipment for PIB.

02:28:10 17          The reasons we found PIB still not in compliance

02:28:16 18   here is, one, their quality assurance unit, which NOPD offered

02:28:20 19   up as an explicit way to bring PIB into compliance and solve

02:28:26 20   some of the other problems we were finding, we were thrilled

02:28:29 21   when NOPD came up with that idea.  Then that unit staffing

02:28:37 22   dropped significantly, which is going to cause significant

02:28:40 23   problems to PIB.

02:28:41 24          THE COURT:  Am I right, it went from five people to two

02:28:44 25   people?

OFFICIAL TRANSCRIPT

02:28:44  1        MR. ARONIE:  Yes.  This is -- you know, we talked over

02:28:49  2   and over about the impact of the staffing shortages, and, you

02:28:54  3   know, this is another -- another example of staffing causing a

02:28:57  4   problem for the department, and I don't think anyone disagrees

02:29:00  5   with it's a staffing problem.  So we're hoping that that unit

02:29:05  6   can get back up because they really were doing a good job.

02:29:09  7   They were solving a gap that everyone knew existed.

02:29:13  8        The other things that weigh in here on 379 is,

02:29:19  9   you know, the consistent problems with timeliness.  If there is

02:29:24 10   anything that points out maybe you don't have enough staff or

02:29:29 11   resources is you can't get your work done on time.  So I've

02:29:31 12   already talked about that.  I won't go deeper into that.

02:29:34 13        Now, it's equally important, though, that I

02:29:38 14   mention two pieces of very good news here.  First of all, we

02:29:42 15   audit the thoroughness of PIB investigations.  When we did that

02:29:46 16   in point two, there is 88 percent, meaning 88 percent of our

02:29:49 17   audit sample our experts found to be thorough investigations,

02:29:53 18   that jumped up to 95 percent in '23.  That's wonderful news.

02:29:57 19        We also -- many years talking about problems with

02:30:03 20   NOPD's credibility determinations.  We found 79 percent

02:30:10 21   compliance in that area in '22.  That also jumped up to

02:30:14 22   95 percent in '23.  I'm going to reaudit PIB in the near

02:30:18 23   future, but this is, you know, a good news/bad news story.

02:30:21 24   Some stuff, you know, optimistic and some stuff, you know,

02:30:26 25   keeps me very concerned.

                          OFFICIAL TRANSCRIPT

02:30:30  1                Paragraph 380.  Your Honor, 380 is interesting

02:30:35  2      here because we generally find them in compliance here, but I

02:30:38  3      did want to highlight a lingering concern we have.

02:30:42  4                So 380 requires PIB investigators and commanders,

02:30:45  5      they have to possess excellent investigation, reputation for

02:30:50  6      integrity, etcetera.  We generally found them in compliance for

02:30:53  7      some time and continue to find them in compliance.

02:30:56  8                We find that they are -- their professional staff

02:31:01  9      are strong investigators.  They have strong reputations.  They

02:31:05 10      have integrity.  We also find that their reports are fair and

02:31:10 11      objective.  So that's what drove the generally compliant

02:31:16 12      findings.

02:31:16 13                The lingering concern, though, as that you

02:31:19 14      probably read in papers, if not our prior reports, is the

02:31:22 15      number of PIB investigators that have been implicated in the

02:31:27 16      ongoing secondary employment scandal, and the PIB has committed

02:31:34 17      to take a hard look at everyone potentially involved, current

02:31:38 18      or former PIB.

02:31:39 19                I don't think that's been conceded yet.  At least

02:31:42 20      I'm not aware it's been conceded yet, but it is -- it is kind

02:31:46 21      of awkward to say we find them in compliance and we recognize

02:31:49 22      the integrity but at the same time have these allegations

02:31:53 23      against a surprisingly high number of the folks who are

02:31:56 24      supposed to be above reproach.

02:31:58 25                We recognize that, and so even though we stand by

                              OFFICIAL TRANSCRIPT

02:32:01 1    that they are generally in compliance, we're going to continue

02:32:05 2    to look into particular concerns.

02:32:08 3              THE COURT:  Do you think that has an impact on not

02:32:13 4    only, I guess, public confidence and also the confidence of the

02:32:19 5    other NOPD officers?

02:32:23 6              MR. ARONIE:  Absolutely.  In fact, in some ways it has

02:32:25 7    more of an impact on the confidence of the NOPD officers.  It's

02:32:30 8    fair to say that an accountability and internal affairs system

02:32:35 9    really only works if it's -- it has the trust of the various

02:32:40 10   players.  If it has the trust of those to be held accountable.

02:32:45 11             Now, there has never been a police department

02:32:49 12   that I know that loves the internal affairs department, but --

02:32:52 13   and so, you're not striving for love.  You're striving for

02:32:55 14   respect, fairness.

02:32:57 15             Where you have a situation where your

02:33:00 16   investigators who are supposed to be above reproach are, you

02:33:04 17   know, more than one or two, implicated in one of the biggest

02:33:10 18   scandals NOPD has for some time, it feeds into distrust

02:33:16 19   officers already have, and that's -- it's too bad if it's not

02:33:21 20   warranted; it's really bad if it is warranted.  Either way it's

02:33:24 21   not good.  So we're going to continue -- we're going to

02:33:32 22   continue focusing on that.

02:33:34 23             Paragraph 381.  Paragraph 381 requires that

02:33:41 24   officers promoted to lieutenant have a turn to rotate through

02:33:44 25   PIB.  It's an actually very, very well thought-out requirement.

02:33:49  1            The reason it's so smart is it helps defeat the

02:33:56  2    mythology and misunderstanding of what PIB is.  The more nonPIB

02:34:03  3    rank rotate through, the more they go back to their districts

02:34:07  4    and they share real stories as opposed to the mythology that

02:34:11  5    can often build up among the platoons.  So it's important that

02:34:15  6    NOPD does this, and the fact that they try to rotate every

02:34:18  7    lieutenant through is a very good thing.

02:34:20  8            We find them not yet in compliance, and if you

02:34:23  9    look at the details here, you'll see why.  In 2019, 19 of 23

02:34:30 10    lieutenants did serve their rotation, during our audit period

02:34:34 11    at least, and it's not perfect but it's good.  Like, I'm not --

02:34:37 12    not losing any sleep about that, but NOPD was unable to provide

02:34:41 13    any documentation for 2021 and '22.  That's a big problem.

02:34:50 14            In 2023, they were able to show us that they've

02:34:55 15    reenergized the rotation program, and they have a schedule now

02:35:00 16    to continue the rotation.  So it's an interesting situation.

02:35:04 17            The fact that we're back on track doesn't bring

02:35:08 18    the 2021 and 2022 into compliance, but that is what it is, and

02:35:14 19    we have -- we at this point focus on the now.  So we have what

02:35:18 20    looks like a good schedule, and we will reassess in the near

02:35:23 21    future to make sure it's not just a paper plan, it is, in fact,

02:35:27 22    a plan that is implemented in reality.

02:35:30 23            THE COURT:  Who is in charge of monitoring that or

02:35:33 24    making sure that happens from NOPD's standpoint?

02:35:38 25            MR. ARONIE:  Well, that might be a better question for

OFFICIAL TRANSCRIPT

02:35:42 1    NOPD, but I would say it's a combination of PIB leadership from

02:35:47 2    an operational function and PSAB leadership from an audit

02:35:54 3    function.  Someone in the court can jump up and down and

02:35:58 4    correct me if they think I got it wrong.

02:35:59 5            THE COURT:  Someone can comment on that if they would

02:36:01 6    like to.

02:36:02 7            MR. ARONIE:  Okay.  381.

02:36:06 8                382, Your Honor, is about training, misconduct

02:36:12 9    investigations -- investigators have to have a certain amount

02:36:14 10   of training, and that training has to cover certain topics.

02:36:20 11               We found NOPD not yet in compliance in this area.

02:36:23 12   This is -- this is definitely fixable, but it hasn't been fixed

02:36:30 13   yet.  NOPD wasn't able to confirm that all of the folks have

02:36:33 14   been trained.  We identified two sergeants hadn't received

02:36:38 15   their investigator training, and two special investigators

02:36:42 16   demonstrate that they had received their training.  Also, PIB

02:36:45 17   had problems producing some other data that might have

02:36:49 18   supported their compliance.

02:36:51 19               This is something where, you know, there just

02:36:58 20   aren't so many officers in PIB that it should be hard to do

02:37:01 21   this.  It's a rather simple requirement to get everyone trained

02:37:06 22   and record all the training in the system.  So we don't know

02:37:09 23   why this one is not yet in compliance, but we have -- we are

02:37:12 24   hopeful they are going to turn that around.

02:37:14 25            THE COURT:  I thought I recalled that at the academy,

OFFICIAL TRANSCRIPT

02:37:18  1   the academy kept track of all of the training that the officers

02:37:22  2   received.

02:37:23  3        MR. ARONIE:  That's a good point, and they did invest,

02:37:29  4   when Dean Magee was here, they invested in a system, a learning

02:37:36  5   system to track all the training.  Peter and I don't remember

02:37:39  6   how that related to the PIB officers, but that's a question I'm

02:37:43  7   happy to look into and meet with Deputy Chief Sanchez about

02:37:50  8   after this, if it's useful.

02:37:51  9        THE COURT:  There was a great deal of effort put into

02:37:54 10   that, too, and resources into getting the kind of software that

02:37:59 11   the academy needed.  They wanted to be able to track the

02:38:03 12   training and be sure that all officers had gotten the training

02:38:08 13   they were supposed to get.

02:38:09 14        So I don't know what happened.  This might be

02:38:13 15   another one of those cyber-attack things that, unfortunately,

02:38:17 16   that happened, and then a lot of things weren't put back in

02:38:20 17   place that were affected by the cyber-attacks.  It could be one

02:38:27 18   of those things.  I would like for you just to inquire.

02:38:29 19        MR. ARONIE:  Absolutely.  I'll also talk to the folks

02:38:34 20   at the academy to figure out where this went wrong.  If it's a

02:38:40 21   minor thing, great.  If it's a major thing, then we got to put

02:38:43 22   our heads together to fix it.  Either way, I'll figure it out.

02:38:46 23        Paragraph 383.  Your Honor, this one we actually

02:38:51 24   talked about for quite some time.  Paragraph 383 requires the

02:38:55 25   department to conduct what colloquially would be referred to as

OFFICIAL TRANSCRIPT

02:39:01  1    *sting audits*.  The best way to understand a sting audit is to

02:39:05  2    contrast it from an investigation.

02:39:06  3         An investigation is:  Think an officer did

02:39:09  4    something wrong, and we go and investigation to figure out

02:39:13  5    whether he or she did or didn't.  A sting audit is more

02:39:16  6    proactive.  It's to figure out if an officer would do something

02:39:19  7    wrong when put in a certain situation.

02:39:21  8         If you want a specific example, picture PIB

02:39:28  9    leaving a wallet filed with money on a conference room table to

02:39:31 10    see if an officer returns it or keeps it.  That would be an

02:39:35 11    example of a sting audit.

02:39:37 12         You have to be careful how you do these,

02:39:39 13    obviously.  You don't want to, you know, wrongly entrap people.

02:39:44 14    The consent decree does require these, and it requires them in

02:39:48 15    a number of different areas -- with respect to stops and

02:39:51 16    seizures, secondary employment abuses, failure to report

02:39:55 17    complaints.

02:39:56 18         An example of that, Your Honor, would be somebody

02:39:58 19    gives a fake complaint to an officer on a street, and then we

02:40:02 20    track whether that makes it into the PIB system.

02:40:04 21         We have talked for multiple years that NOPD has

02:40:10 22    not done its sting audits.  NOPD's first response was:  We do

02:40:20 23    them when we conduct our investigations.  In other words, our

02:40:24 24    reactive investigations are our proactive sting audits.  Now,

02:40:30 25    that's just incorrect definitionally, but that was NOPD's first

02:40:36 1    response.

02:40:36 2         The second response -- this was probably a year

02:40:39 3    or two ago.  The second response was:  Well, we're doing some

02:40:42 4    proactive work with respect to secondary employment abuses.

02:40:48 5    They were doing some work there, but that's only one of the

02:40:51 6    areas, and that's the only one NOPD could provide any evidence

02:40:55 7    that it was doing.  And, in fact, PIB conceded back then that

02:41:01 8    they weren't doing the other ones.

02:41:04 9         More recently, when we reiterated this issue in

02:41:09 10   our more recent report, NOPD took the position that they are in

02:41:13 11   compliance.  I don't understand the basis for that position.  I

02:41:18 12   think it's wrong, but that's what NOPD said.

02:41:21 13        We intend to continue working with NOPD and PIB

02:41:26 14   to fix this until it comes into compliance with the actual

02:41:31 15   language of consent decree.

02:41:36 16        Next I'm going to hit 403.  403 is one we have

02:41:44 17   already talked about to a great extent, Your Honor.  It's about

02:41:47 18   the timeline.  There are a number of timelines at play here.

02:41:51 19   NOPD is not yet in compliance.  I don't think anyone disagrees

02:41:57 20   with this.

02:41:58 21        With respect to completing investigations on

02:42:00 22   time, we found compliance rates which were various audits and

02:42:05 23   spot audits as low as 76 percent.  With respect to the failure

02:42:11 24   to impose discipline on time, compliance rates dropped

02:42:13 25   20 percent in some cases.

OFFICIAL TRANSCRIPT

02:42:15  1        This is important for a number of reasons.  If an

02:42:19  2  officer is guilty of something, then the community has a very

02:42:23  3  big interest in having the investigation and the discipline

02:42:29  4  imposed in a timely fashion.

02:42:31  5        If an officer is not guilty of something, then

02:42:33  6  the officers themselves and the community have the same

02:42:38  7  interests in having that person exonerated in a timely fashion.

02:42:41  8        To your earlier point, Your Honor, where you said

02:42:44  9  don't things like this reduce the trust for PIB among the

02:42:48 10  officers?  Absolutely.  When I meet with officers, they

02:42:51 11  frequently mention timeliness issues at PIB as totally eroding

02:42:57 12  the trust in the system.  So we pushed for this for a long

02:43:00 13  time, and we're going to continue to push.

02:43:07 14        Paragraph 404.  This is similar to what I

02:43:12 15  mentioned earlier, Your Honor, where we generally find them in

02:43:14 16  compliance but with a caveat.  So this one requires that

02:43:17 17  misconduct investigations have to be thorough, reliable, and

02:43:20 18  complete, and we generally find the PIB investigations to be in

02:43:24 19  compliance.

02:43:27 20        We found that they do interview the complainants,

02:43:31 21  which is one of the specific requirements of 404.  Our last

02:43:36 22  review, we found that 95 percent of the investigations were

02:43:39 23  adequately thorough.  So we're pleased to report that and

02:43:44 24  that -- and the thoroughness has increased every time.  So this

02:43:47 25  has been a very positive trend.

OFFICIAL TRANSCRIPT

02:43:49  1          Here is our caveat here:  We continue to not see

02:43:56  2   robust investigations of supervisors in conjunctions with the

02:44:02  3   investigations of officers.

02:44:04  4          I said in these reports for years that whenever

02:44:09  5   an officer engages in misconduct, the department should be very

02:44:14  6   focused looking at the supervisors to find out what he or she

02:44:18  7   knew or didn't know, did or didn't do, and make sure that

02:44:22  8   everyone is being held accountable that should be held

02:44:26  9   accountable, but we still see an absence of that.

02:44:28 10          We have some other concerns in this area,

02:44:31 11   Your Honor, significant concerns, but for reasons we've already

02:44:33 12   described, we're not going to discuss those until June 7th at a

02:44:37 13   conference.

02:44:39 14          I'm going to go on to paragraph 420.  The PIB has

02:44:46 15   an obligation to keep the complainant informed of the status of

02:44:50 16   the investigation and of the outcome of the investigation.

02:44:52 17          PIB has struggled with this for some time.  I

02:44:58 18   don't quite understand why they struggle with this.  I think

02:45:00 19   years ago one of the reasons was I think they said they didn't

02:45:05 20   have an adequate stamp machine or something.

02:45:08 21          I don't quite know why they are still not in

02:45:12 22   compliance, but we found in both of these topics continued

02:45:16 23   noncompliance.  From the perspective of community trust, I

02:45:20 24   don't think we can put too high a premium on keeping the

02:45:25 25   complainant informed, status, and results.

OFFICIAL TRANSCRIPT

02:45:32  1          Paragraph 423 -- and I should say, I think we

02:45:35  2    have only two more to go, and then I'll summarize with one or

02:45:39  3    two slides.

02:45:40  4          Paragraph 423 talks about unified discipline

02:45:45  5    system.  NOPD does have a discipline matrix that was required

02:45:48  6    by the consent decree and also the requirement that any

02:45:54  7    deviations have to be documented.  Discipline generally has to

02:45:58  8    be documented.  So this is a pretty important paragraph.  NOPD

02:46:00  9    is still not in compliance here.

02:46:03 10          With respect to documentation, our audit showed

02:46:07 11    only 50 percent compliance.  In fact, we -- part of it could be

02:46:13 12    caused by the delay in discipline.  If you're not -- if you're

02:46:17 13    never getting to the discipline stage, then you're certainly

02:46:21 14    not compliant with the documentation requirement or to -- or

02:46:25 15    for us to even know if you're following the matrix or not.  I

02:46:29 16    think once they start getting the timelines in control, it will

02:46:33 17    be a little more easy -- a little easier to comply with this.

02:46:36 18          This is important.  Documentation is not just an

02:46:43 19    administrative burden.  Documentation is what builds trust

02:46:46 20    among officers and among the community members.  This is an

02:46:49 21    important one, Your Honor.

02:46:50 22          Paragraph 424.  Paragraph 424 requires NOPD, who

02:47:02 23    worked with the City Attorney's Office, make sure the City

02:47:06 24    Attorney's Office is providing close guidance to PIB during the

02:47:10 25    discipline stages of investigations.

OFFICIAL TRANSCRIPT

02:47:13  1          NOPD has not been in compliance -- actually, I

02:47:15  2   should say NOPD and the City haven't been in compliance with

02:47:19  3   this for some time.  We found no documented policy or procedure

02:47:22  4   for this report from the City Attorney's Office.

02:47:27  5          Now, very recently, PIB -- NOPD informed us that

02:47:30  6   PIB has created a new directive to provide for this sort of

02:47:36  7   support.  By the way, I'm not suggesting that the

02:47:39  8   City Attorney's Office never provided support to PIB.  That's

02:47:42  9   not the issue.  The issue is actual policy and guidance to make

02:47:47  10  this a regular thing, a routine, a system so it would outlast

02:47:47  11  all of us.

02:47:53  12         I am now told that we do have such a document.

02:47:57  13  We look forward to reviewing it and then, you know, assessing

02:47:59  14  the implementation.  For the moment, it's still in the

02:48:03  15  noncompliance line.

02:48:05  16         So, Your Honor, there is, obviously, more

02:48:08  17  paragraphs and plenty of paragraphs that are fully in

02:48:12  18  compliance that I didn't run through, but it's in all the

02:48:14  19  report.

02:48:16  20         I think the best way to summarize this is what I

02:48:19  21  have here.  Without question, PIB is far improved from what we

02:48:22  22  saw when we started this or what DOJ saw in 2011 when it

02:48:26  23  started it.

02:48:28  24         In certain significant areas, like timeliness,

02:48:32  25  PIB continues to come up short, and in other areas, some of

OFFICIAL TRANSCRIPT

02:48:37  1    them less important than timeliness, but all of them, we have

02:48:40  2    seen some back-sliding.

02:48:42  3            You know, I might be the eternal optimist,

02:48:45  4    Your Honor, I don't think bringing them into compliance should

02:48:47  5    be a monumental effort there, but it clearly will take

02:48:51  6    dedication, focus, and cooperation among NOPD, the monitoring

02:48:58  7    team, and DOJ.  So if we all can do that, I have no doubt soon

02:49:01  8    enough we'll have better reports to you.

02:49:04  9            I think the last slide I want to hit, unless you

02:49:06 10    have -- I'm sorry.  I just want -- before I get to the last

02:49:12 11    slide, we don't have to go through all the details here, but

02:49:15 12    the monitoring team put together a lengthy list of

02:49:18 13    recommendations to PIB to help them bring themselves into

02:49:21 14    compliance.

02:49:21 15            We don't usually hear back from NOPD when we give

02:49:25 16    them recommendations, but I think if NOPD used this, you know,

02:49:31 17    and kind of then came back to us and said, "Hey, here is what

02:49:35 18    we've done, here is what we haven't done here, here is where we

02:49:39 19    disagree with you, here is where we have a better approach than

02:49:41 20    you have," I think probably they would bring themselves into

02:49:44 21    compliance more quickly.

02:49:45 22            You can see here on the list a partial list of

02:49:48 23    some of the things that we specifically recommend to bring them

02:49:52 24    into compliance.

02:49:54 25            Is there anything here you want me to spend

                              OFFICIAL TRANSCRIPT

02:49:56  1  particular time on, Your Honor?

02:49:59  2          THE COURT:  Let me look at it.

02:50:00  3          MR. ARONIE:  Yep.

02:50:04  4          THE COURT:  I think it's a summary of the things that

02:50:07  5  you've already gone over, so I understand.

02:50:10  6          MR. ARONIE:  Yes, absolutely.  In the report itself,

02:50:14  7  there are many more of these.  I just took the highlights out.

02:50:17  8          Okay.  Then, let me wrap up then by just talking

02:50:23  9  about what's going on now or what's next.

02:50:26 10          As I mentioned, in early June, we release our

02:50:30 11  analysis of PIB's Vappie investigation, and then we have a

02:50:34 12  hearing on that on June 7th.

02:50:36 13          Also, within probably the next 30 days, we

02:50:41 14  release a special report on NOPD's sexual assault

02:50:45 15  investigation.  We're conducting audits of sexual assault and

02:50:50 16  child abuse, focusing on the follow-up investigation.

02:50:53 17          We're auditing performance evaluations.  Now,

02:50:56 18  that's one that we can really only audit only once a year.

02:50:58 19  They just filed their performance evaluations, so now we're at

02:51:03 20  a position where we can see if all the work they put in has

02:51:06 21  paid off.

02:51:07 22          I suspect that it will continue -- it will have

02:51:10 23  continued to improve.  I also suspect that it's not going to be

02:51:14 24  perfect.  Of course, that's not the standard here, but we do

02:51:17 25  want to see significant and meaningful improvement.  These

                          OFFICIAL TRANSCRIPT

02:51:20  1   prior performance evaluations have been very problematic.

02:51:23  2          We're doing a supplemental review of PIB

02:51:27  3   dispositions to make sure they are fair and consistent for the

02:51:30  4   officers.  Our initial review indicated that they are fair and

02:51:34  5   consistent, but it was a very limited review, so we're

02:51:41  6   extending that.

02:51:42  7          We're auditing Insight, the early warning system.

02:51:44  8   I think you'll you remember it's taken a lot at of time for the

02:51:48  9   department to get in compliance with the various Insight

02:51:49 10   requirements.  They have made some positive steps recently, so

02:51:52 11   we're going to go back and audit that and see if has stuck.

02:51:55 12          Continue to review disciplinary hearings,

02:51:59 13   continue to attend MAX meetings and the use of force review

02:52:02 14   board hearings.  It's time for the City to think to its next

02:52:09 15   biennial survey, so we sent a letter to the law department to

02:52:10 16   start talking about the logistics for doing that.

02:52:12 17          We obviously continue to present your status

02:52:15 18   conferences, and we'll continue to hold the public meetings

02:52:19 19   with the community stakeholders, and we continue to do that as

02:52:23 20   much as we can.

02:52:24 21          I'll end with this slide.  I won't walk through

02:52:27 22   it, Your Honor, before I ask if you have any questions, but I

02:52:30 23   just want to highlight that this is in the deck.  We continue

02:52:31 24   to want to make it clear to the public that there is ways for

02:52:35 25   them to get information.

OFFICIAL TRANSCRIPT

02:52:36  1          We obviously have our website which publishes all

02:52:39  2     the reports.  There is an email if anyone wants to ask the

02:52:43  3     monitoring team a question.  There is an email thing for the

02:52:46  4     Court where people can send in questions and comments, and you

02:52:49  5     read those yourself, as you know, and, more appropriate, you

02:52:53  6     can bring answers into court.  Then, finally, to make it easier

02:52:56  7     for people to know when we published a report, we have a

02:53:00  8     LinkedIn page.

02:53:01  9          With that, I'm going to stop sharing but stay on

02:53:03  10    the screen should you have any questions for me, Your Honor.

02:53:07  11         THE COURT:  I have one question.  I think you've been

02:53:10  12    looking at gone on arrival statistics and how that impacts

02:53:15  13    different functions of the NOPD?  Where does that fit in?

02:53:21  14         MR. ARONIE:  Yes.  So we undertook a review of the

02:53:27  15    three very closely related issues.  One, an NOPD response time.

02:53:33  16    Two, classifications called *gone on arrival*, meaning by the

02:53:37  17    time the officer showed up, the victim or complainant wasn't

02:53:41  18    there, and there was nothing for the officer to do.  Then, the

02:53:45  19    third piece of this is something called *NUA*, no unit available,

02:53:49  20    which means that no officer was dispatched to a call on a

02:53:55  21    timely fashion because there was no officer to send to the

02:53:58  22    call.

02:53:58  23         So we looked at this initially because we saw in

02:54:03  24    are our ride-alongs and in the data, we saw a lot of calls that

02:54:08  25    came out as a code-two emergency call being deprioritized as a

OFFICIAL TRANSCRIPT

02:54:13  1    code-one nonemergency call.  That concerned me because it

02:54:18  2    would -- it could falsely decrease the response time for

02:54:22  3    code two calls, if you just move emergency calls into a

02:54:27  4    different bucket.

02:54:28  5             That's what prompted it.  The more we looked into

02:54:31  6    it, the more we started to see the potential impacts of no unit

02:54:36  7    available and gone on arrival to certain areas of the

02:54:38  8    consent decree, like victims of sexual assault or community

02:54:42  9    members in mental health crisis.

02:54:44 10             Let's take CIT for example.  NOPD has very good

02:54:49 11    CIT training, and they have officers that care very much about

02:54:52 12    providing compassionate and effective support, but if you can't

02:54:55 13    get those officers to the scenes, then they are not much good

02:55:02 14    at any of it.

02:55:03 15             So what we did is we put a report together, sent

02:55:07 16    it over to NOPD.  It has not yet been published, Your Honor.

02:55:10 17    NOPD took it very seriously, and we agreed we wanted to dig

02:55:16 18    into it more deeply.

02:55:18 19             We wanted to make sure that, one, that no one was

02:55:21 20    playing with these codes cavalierly, right?  It's one thing if

02:55:26 21    you say I'm deprioritizing something because it's not a

02:55:29 22    priority, right?  It happened two months ago.  That would be a

02:55:33 23    correct deprioritization.

02:55:35 24             But if you're deprioritizing simply because you

02:55:39 25    simply don't have enough officers to get there, it's still an

OFFICIAL TRANSCRIPT

02:55:42 1    emergency, it's still a priority, but you're just triaging it,

02:55:48 2    that would be wrong, in our view, to say it's now a Code One.

02:55:50 3    You should just say it's a Code Two but can't get there.

02:55:54 4              So we're looking it closely with NOPD.  Some

02:55:57 5    pieces of it we have included in our forthcoming sexual assault

02:56:01 6    investigation report.  The bigger study here will be when we

02:56:07 7    and PSAB finish our review, and then we put together a broader

02:56:13 8    report.

02:56:13 9              THE COURT:  Okay.  Well, thank you very much, and I

02:56:15 10   hope you'll stay tuned, listen to the rest of the proceeding.

02:56:20 11             Now I want to give the City and the NOPD an

02:56:23 12   opportunity to make any remarks that they have.

02:56:33 13             MR. ZIMMER:  Thank you, Your Honor.  Again,

02:56:34 14   Charles Zimmer on behalf of the City and the NOPD.

02:56:37 15             First, Your Honor, a little bit of housecleaning.

02:56:40 16   At the last status conference you had, I requested that we let

02:56:44 17   the Court know our preference for an evidentiary hearing for

02:56:48 18   the motion to terminate.  Based on the Court's recent rulings

02:56:53 19   regarding the evidence that would be available, we don't see

02:56:57 20   any real procedural benefit to the Court in conducting an

02:57:01 21   evidentiary hearing, so --

02:57:02 22             THE COURT:  Which are you talking about?  About what

02:57:04 23   evidence would be available?

02:57:05 24             MR. ZIMMER:  The information that was submitted in the

02:57:07 25   reply that would have brought -- that would have addressed the

OFFICIAL TRANSCRIPT

02:57:10 1   concerns from after August last year, so if that information is

02:57:16 2   not there, there is not a lot to, you know, really inform the

02:57:20 3   Court with, so there is no point in using your time to listen

02:57:25 4   to the old data.

02:57:26 5       THE COURT:  So is what you're suggesting that it would

02:57:28 6   be oral argument?

02:57:29 7       MR. ZIMMER:  Your Honor, we don't see the benefit of

02:57:31 8   oral argument at this time.  You are thoroughly aware of where

02:57:36 9   everyone is.  I think the briefs do that part of it as well as

02:57:40 10  can be done.

02:57:41 11      THE COURT:  I may want argument anyway to assist me,

02:57:45 12  but I'll let you know.  I'm glad you're letting me know what

02:57:49 13  your position is.

02:57:50 14      MR. ZIMMER:  Your Honor, again, our position was that

02:57:52 15  if there is not going to be a hearing, once again, we don't

02:57:55 16  think it would be helpful.  We would respectfully ask that the

02:57:59 17  Court rule within 60 days so that we would be able to promptly

02:58:03 18  move on to our appellate rights for the City so that we can get

02:58:07 19  that track moving.

02:58:09 20      THE COURT:  Well, I can't guarantee you when it will be

02:58:13 21  issued.  I understand.

02:58:15 22          I would ask that the DOJ, not today, but if you

02:58:20 23  would, in light of what the City had to say, you all let me

02:58:24 24  know what your position is, and we'll figure it out.

02:58:26 25      MR. ZIMMER:  Very quickly, Your Honor, and I apologize

OFFICIAL TRANSCRIPT

02:58:30  1    for not giving you a time estimate, if I could have five

02:58:34  2    minutes of the Court's time, I think that would be as much as I

02:58:37  3    need.

02:58:38  4            The PIB report was filed, and a response was

02:58:44  5    provided by NOPD.  That is document -- Document 697 in the

02:58:50  6    record, for anyone that's looking at it or looking for it.

02:58:53  7    That was filed on May 3rd, 2023, I believe, and that addresses

02:58:59  8    certain items in the PIB section.  Some of those are the

02:59:03  9    duplicative here.

02:59:04 10            As noted in the report of the monitor, a lot of

02:59:08 11    the issues that are raised regarding PIB are timing issues,

02:59:14 12    that things aren't happening as fast as they should happen or

02:59:17 13    are required to happen.  Just for the public, I did want to

02:59:21 14    point out that there is new leadership at PIB, and that

02:59:26 15    Keith Sanchez, who is in charge of that division now, is

02:59:29 16    working to bring those things back into compliance, where they

02:59:33 17    were in the past.  So hopefully, we expect the future reports

02:59:38 18    to find better data on those timing issues.

02:59:41 19            The third -- excuse me.  The first quarter report

02:59:47 20    for 2023 that has been provided today into the record and which

02:59:52 21    NOPD was provided a draft on, which is basically what this will

02:59:58 22    respond to, that response by the NOPD will be published today

03:00:03 23    on the NOPD website, which is Nola.gov/NOPD/NOPD-ConsentDecree.

03:00:11 24         THE COURT:  So you had a response, but you didn't

03:00:14 25    provide it to the Court or to the monitoring team?

OFFICIAL TRANSCRIPT

03:00:19  1          MR. ZIMMER:  We had -- they have a response to the
03:00:20  2  report, yes, Your Honor.
03:00:21  3          THE COURT:  So, I would let you know that in the
03:00:24  4  future, when the monitoring team does a report and you want to
03:00:29  5  respond to it, that you provide -- the consent decree says you
03:00:33  6  provide your response within ten business days.
03:00:40  7              We specifically plan these hearings so that there
03:00:44  8  are ten business days after you get the draft, which is quite a
03:00:47  9  bit of time, so that the monitors can look at your response and
03:00:52 10  see if they made any typographical errors or factual errors or
03:00:57 11  things that they need to address.
03:00:58 12              So I'm letting you know that what I expect from
03:01:00 13  the City is that you provide your response to the monitoring
03:01:05 14  team and to the Court, and I'm going to put it on the record
03:01:08 15  because you apparently want it on the record, before the
03:01:12 16  hearing, the day before the public hearing, the status
03:01:18 17  conference at which it's going to be discussed.  In case you
03:01:22 18  didn't understand that, that's the concept.
03:01:23 19          MR. ZIMMER:  I understand the concept.  It's not what
03:01:26 20  the consent decree states.
03:01:28 21          THE COURT:  I'm telling you that is -- it says you will
03:01:31 22  provide -- Jonathan, can you hear me?  I believe the
03:01:34 23  consent decree says that they provide a response -- remind me
03:01:41 24  what it says.
03:01:43 25          MR. ARONIE:  Sure.  If I recall, while Charles is

OFFICIAL TRANSCRIPT

03:01:47  1    looking it up, the consent decree provides for us to give

03:01:51  2    drafts to the parties, and then the parties have ten business

03:01:55  3    days to comment on those drafts.

03:01:57  4           Now, the point of waiting those ten business days

03:02:00  5    is only to get useful information from the parties to make the

03:02:03  6    report more accurate, more thorough.  If there are any

03:02:07  7    mistakes, to correct them.  Those ten days are not for any

03:02:11  8    other reason.

03:02:14  9           NOPD has previously always provided their

03:02:19 10    thoughts on the report prior to the ten days.  Usually not in a

03:02:23 11    lengthy written document.  Usually we get on a Zoom together,

03:02:27 12    and they highlight areas that they disagree with, maybe some

03:02:29 13    wording choices, Your Honor, that they think are inflammatory,

03:02:33 14    and we can change them, if necessary, but that's the point of

03:02:37 15    the ten days.

03:02:37 16           Now, if they have no substantive edits to the

03:02:42 17    document, then there is no requirement for them to submit

03:02:45 18    anything.  I don't -- it seems kind of strange, if they do have

03:02:50 19    disagreements, to withhold them where they could make the

03:02:54 20    report better and then just post them afterwards.  That's not

03:02:57 21    the purpose of the waiting period.

03:02:58 22        THE COURT:  It would always make this discussion we're

03:03:02 23    having today better because we would have, in writing -- have

03:03:05 24    you got a copy to give to me now?

03:03:07 25        MR. ZIMMER:  I do not.  It's not complete, Your Honor.

OFFICIAL TRANSCRIPT

03:03:10  1    We just got their final draft today, so we're changing it to

03:03:10  2    address their final draft too.

03:03:14  3          THE COURT:  You know when you get the draft, ordinarily

03:03:16  4    it changes very little unless they get comments from the City,

03:03:20  5    and you didn't give them any comments, so the draft is almost

03:03:25  6    always virtually the same as the final report, so I don't think

03:03:29  7    that you can legitimately say you didn't have it until

03:03:35  8    yesterday, because they are waiting to post it yesterday,

03:03:38  9    waiting for your comments.

03:03:42 10          MR. ZIMMER:  Your Honor, that's -- to be clear, that's

03:03:43 11    not what I'm saying.  There are changes to the draft as a

03:03:47 12    result of there are changes to the document.  We've identified

03:03:52 13    them, and we are changing them.  We just got the document this

03:03:56 14    morning, we had to review it, and we're making those changes.

03:04:01 15    I'm not saying we didn't have a draft of it before.  We did.

03:04:02 16          THE COURT:  Okay.  I think what we need to do -- so

03:04:03 17    your position is that the consent decree doesn't require you to

03:04:08 18    provide a response before we have the report discussed at a

03:04:14 19    status conference?  Instead --

03:04:16 20          MR. ZIMMER:  Yes.

03:04:17 21          THE COURT:  -- you're going to do it afterwards, when

03:04:19 22    then I won't have an opportunity to visit with you about it and

03:04:22 23    to ask.  So I am going to consider whether the consent decree

03:04:25 24    needs to be changed to clarify that to make it what has been

03:04:33 25    the practice of the parties.

                              OFFICIAL TRANSCRIPT

03:04:35 1          I think the people who have been involved in this

03:04:38 2     for many years would say that has always been the practice,

03:04:43 3     that the City provided its comments within ten business days,

03:04:48 4     and then the monitor looked at it to see if they needed to make

03:04:52 5     any changes, and they would talk to the City about it, and it

03:04:55 6     would be a collaborative process.  Then the monitor's report

03:04:59 7     would be issued, and the City's response would be issued.

03:05:04 8     Then, when we talked about it in court, we would have the

03:05:07 9     benefit of both.

03:05:08 10         If that's not clear in the consent decree, I'll

03:05:12 11    go back and look at the provisions, and then I may, myself -- I

03:05:19 12    can sua sponte change a provision of the consent decree.  I'll

03:05:22 13    give you all an opportunity to tell me your thoughts about

03:05:25 14    whether I should or not, but that's what I'm going to consider,

03:05:31 15    not just for my benefit but for the benefit of the public and

03:05:34 16    the DOJ and the monitors.

03:05:38 17         It just doesn't make sense for us to spend this

03:05:41 18    time getting together to talk about this and then find out that

03:05:44 19    you've withheld your report -- your response so that we can't

03:05:48 20    talk about it today.  That's the way it sounds to me.

03:05:53 21         Jonathan, did you want to say something?

03:05:55 22    MR. ARONIE:  Yeah, I just wanted to raise one point:

03:06:00 23    To the extent there are changes from drafts to the final -- and

03:06:04 24    sometimes there because the parties raise questions; sometimes

03:06:08 25    I notice mistakes -- but to the extent there are changes, then

OFFICIAL TRANSCRIPT

03:06:16  1    NOPD can respond to those or publish whatever it wants.  The

03:06:17  2    point we're missing if they wait, as you're saying, is to

03:06:22  3    incorporate their thoughts, to the extent they have them, into

03:06:25  4    the final report, and that's where the public benefits.

03:06:29  5         MR. ZIMMER:  For the record, Your Honor, paragraph 458

03:06:33  6    states, "The monitor shall provide a copy of the quarterly

03:06:36  7    reports" -- This is the first quarterly report we've had since

03:06:40  8    2017, so this is not a practice that has been routine.  "The

03:06:41  9    monitor shall provide a copy of the quarterly reports to the

03:06:46 10    parties in draft form at least ten business days prior to court

03:06:49 11    filing and public release of the reports to allow the parties

03:06:53 12    to informally comment on the reports.  The monitor shall

03:07:16 13    consider the parties' responses and make appropriate changes,

03:07:21 14    if any, before issuing the report."

03:07:24 15         THE COURT:  I think that's pretty clear that you're

03:07:26 16    supposed to get it to them so they can consider it before they

03:07:30 17    issue it.  The monitors waited ten business days.  I understand

03:07:35 18    the monitor even contacted NOPD and said, "Did we miss it?  Did

03:07:40 19    you have any comments?"  Were told there were none, and so they

03:07:43 20    issued the reports.  That's all they could do.  They waited ten

03:07:47 21    days, and then they checked with NOPD and then issued it.

03:07:51 22         MR. ZIMMER:  I agree, Your Honor.

03:07:52 23         THE COURT:  It sounded to me like -- I don't understand

03:07:55 24    your interpretation.  It sounds like it's clear.

03:07:58 25         MR. ZIMMER:  Your Honor, respectfully, I don't

OFFICIAL TRANSCRIPT

03:08:00  1    understand yours.  This is a statement that says we have the

03:08:03  2    option to give them our opinion informally before it's issued.

03:08:07  3    It doesn't say that we have to give them an opposition, and it

03:08:11  4    doesn't say that we give up the First Amendment right to state

03:08:14  5    a report that says we disagree or we have these things to point

03:08:17  6    out.

03:08:17  7              Again, if your court wants to order that we file

03:08:20  8    responses, I mean, we certainly will, you know, be prepared to

03:08:24  9    do that.  In the past, this wasn't normally done.

03:08:26 10         THE COURT:  Well, that is what I want you to do.  As I

03:08:29 11    say, that has always been the practice, and if anybody

03:08:34 12    disagrees with that, I would like for them to let the monitors

03:08:37 13    know because this is totally different from what the practice

03:08:40 14    has been.

03:08:43 15              It's always been understood this is how it's

03:08:46 16    going to be done, so this is something new, and I don't know

03:08:49 17    whether you talked to anybody about this before you decided to

03:08:52 18    take this approach, but they should have told you this is --

03:08:57 19         MR. ZIMMER:  I or the City?

03:09:01 20         THE COURT:  You.  Whether you talked to anyone.

03:09:02 21         MR. ZIMMER:  This is the NOPD's report, Your Honor.

03:09:02 22         THE COURT:  Did you discuss with them when it would

03:09:05 23    be released?

03:09:05 24         MR. ZIMMER:  I'm not going to tell you, Your Honor, any

03:09:07 25    of my privileged conversations with my client.

                            OFFICIAL TRANSCRIPT

03:09:09  1      THE COURT:  Well, then my assumption is you talked to

03:09:12  2  them about when they were going to release it, and you and they

03:09:16  3  decided to change what has been a 10-year-long habit, but if

03:09:21  4  it's unclear, that's fine.  I can clarify it.  Then if you --

03:09:27  5      MR. ZIMMER:  Your Honor, I take offense to you making

03:09:30  6  those accusations against me based on literally nothing, but

03:09:33  7  that's fine.

03:09:34  8      THE COURT:  There is nothing wrong -- there is nothing

03:09:36  9  wrong with you talking to your client and you all making a

03:09:39  10  decision.  It's not an accusation.  There is nothing wrong with

03:09:42  11  that.

03:09:42  12      MR. ZIMMER:  Being asked to reveal those conversations

03:09:44  13  to the Court, Your Honor, is a bit much but that's fine.

03:09:49  14      THE COURT:  All I was asking was were you aware of what

03:09:55  15  the course of conduct had been, but you can tell me without

03:10:00  16  revealing any attorney-client privilege.

03:10:01  17      MR. ZIMMER:  I have been in this case since 2019.  The

03:10:04  18  number of written responses that have been done has been maybe

03:10:09  19  four that I can remember, one of which OCDM edited for us so

03:10:14  20  that they could approve what NOPD would say in response to

03:10:18  21  their report.

03:10:20  22      Generally, there is not a written response.  I

03:10:22  23  will tell you I have encouraged NOPD to make written responses

03:10:26  24  so that there is a record, which now that's what this is.  This

03:10:30  25  paragraph does not demand that they file a response.  They have

OFFICIAL TRANSCRIPT

03:10:35  1   an obligation to report to the public under this document about

03:10:40  2   this process, and they are, and this is part of that process.

03:10:43  3          THE COURT:  Yeah, I understand what your point is, but

03:10:46  4   I'm going to clarify however I need to do that -- I'll have to

03:10:50  5   think about it -- that I want you to do it before the date for

03:10:53  6   publication of the report, and I'll deal with that.

03:10:59  7          MR. ZIMMER:  Thank you.

03:11:04  8          THE COURT:  All right.  Anything else?

03:11:05  9          MR. ZIMMER:  Yes, Your Honor.  Sadly, I hadn't gotten

03:11:08 10   started on the actual content.

03:11:09 11          THE COURT:  Okay.  Let me say one more thing.  When you

03:11:13 12   do file this, your response on your website, then the

03:11:17 13   monitoring team and the DOJ can look at that, and if they have

03:11:20 14   anything they would like to respond to at the next status

03:11:25 15   conference, they can do it then.

03:11:27 16          MR. ZIMMER:  Certainly, Your Honor, or at the public

03:11:32 17   meetings that they had all the time that we're not a part of.

03:11:35 18          THE COURT:  You're always invited to the public

03:11:38 19   meetings.  You're welcome to attend, and many NOPD officers and

03:11:42 20   superintendents do attend.  So you know that you're invited,

03:11:48 21   and many NOPD representatives have attended.

03:11:51 22          MR. ZIMMER:  May we speak at those?

03:11:54 23          THE COURT:  No, I don't think that.  If you would like

03:11:57 24   to, you can make that request, and we can discuss it.  In the

03:12:00 25   past, NOPD has not.

                          OFFICIAL TRANSCRIPT

03:12:03  1          MR. ZIMMER:  Okay.

03:12:04  2          THE COURT:  Were the monitors invited to your public

03:12:09  3  meetings?

03:12:09  4          MR. ZIMMER:  Yes, Your Honor, they were.

03:12:10  5          THE COURT:  To making presentations?

03:12:12  6          MR. ZIMMER:  Yes.

03:12:13  7          THE COURT:  No, I don't think so.

03:12:13  8          MR. ZIMMER:  You were invited along with (speaking

03:12:16  9  simultaneously) --

03:12:16 10          THE COURT:  Oh, no, I'm not -- I don't think that I was

03:12:18 11  invited to make a presentation.  Nobody said that.

03:12:22 12          MR. ZIMMER:  Your Honor, you're always invited to make

03:12:25 13  presentations.  It would be highly unusual for a federal judge

03:12:28 14  to make a presentation, but you are always --

03:12:30 15          THE COURT:  I didn't say I would have.  I just said you

03:12:33 16  didn't invite me or the monitors to come and make a

03:12:36 17  presentation.  But, Jonathan?

03:12:38 18          MR. ARONIE:  Your Honor, I just wanted to add, your

03:12:41 19  point, you are correct that members of NOPD and the City

03:12:47 20  attended our public meetings frequently but not on a

03:12:51 21  presentation table with us.  That would be a very different

03:12:54 22  sort of different presentation.  If we were ever going to do

03:12:57 23  that, we would just separate it from our typical public

03:13:00 24  meeting.

03:13:00 25          But NOPD has in the past made comments and asked

OFFICIAL TRANSCRIPT

03:13:03  1    questions and said things from the seats, just like any other
03:13:07  2    member of the public does, and the public, I think, has been
03:13:12  3    generally responsive when they contributed that way.
03:13:15  4        THE COURT:  And provided them another opportunity to
03:13:19  5    visit with members of the public, and I'm sure they did.
03:13:21  6    There's a lot of the informal visiting before, during, and
03:13:24  7    after those public meetings.  So apparently, this confirmation
03:13:31  8    they do attend and that they have made comments.
03:13:34  9        MR. ZIMMER:  Okay, Your Honor.
03:13:36 10            Just to be clear, we'll get the emails that were
03:13:39 11    transmitted, so there is no confusion about me misrepresenting
03:13:43 12    anything about the court invitation.
03:13:45 13        THE COURT:  I'm sorry, which emails are you talking
03:13:46 14    about?
03:13:46 15        MR. ZIMMER:  The invitations from the NOPD.
03:13:49 16        THE COURT:  Oh, I said, "You invited."  I think
03:13:51 17    somebody sent me an invitation saying, "You're welcome to" --
03:13:53 18    I'm not sure, but I think somebody might have.  Maybe
03:13:58 19    Deputy Superintendent Gernon?  I'm not sure.  He's shaking his
03:14:02 20    head yes, so maybe he did, but I don't believe he invited me to
03:14:06 21    come and make a presentation.
03:14:08 22            Do you recall that, Deputy Superintendent Gernon?
03:14:11 23    Did you invite me to make a presentation?
03:14:11 24        MR. ZIMMER:  Your Honor, I'm going to ask you not to --
03:14:13 25    I'm going to ask you not to examine my client in open court.

                          OFFICIAL TRANSCRIPT

03:14:16  1                THE COURT:  That's fine.

03:14:17  2                MR. ZIMMER:  Your Honor, I'm sorry.  It's a court

03:14:20  3      proceeding, I mean.

03:14:22  4                THE COURT:  Proceed.

03:14:23  5                MR. ZIMMER:  Okay.  Your Honor, the first quarter

03:14:29  6      report, I'm not going to get into the deep details of it, but I

03:14:34  7      wanted to hit some of the highlights that we think would be

03:14:36  8      important for the public to know.

03:14:38  9                Use of force, there was a mention of neck holds,

03:14:40 10      and the report goes into multiple examples of neck-hold issues.

03:14:45 11      In -- the report claims that NOPD's use of force board did not

03:14:49 12      consider the fact a neck hold may have occurred.  In one

03:14:53 13      example stating, quote, it did not inquire about the neck hold

03:14:56 14      during the use of force review board hearing even after the

03:15:00 15      monitoring team raised it on the record.

03:15:04 16                This is incorrect.  NOPD had already raised that

03:15:06 17      issue of a potential neck hold, both in the investigative

03:15:09 18      report and during the review board.  The investigation, as well

03:15:12 19      as the review board members, determined there was not enough

03:15:16 20      evidence to make a finding that a neck hold had occurred.

03:15:19 21                NOPD's use of force board still took action

03:15:23 22      finding that the officer was in violation of department

03:15:27 23      policy -- was in violation of department policy in use of an

03:15:35 24      unauthorized Level 4 use of force, so the point being -- which

03:15:39 25      is a minimum 60-day unpaid suspension.

                              OFFICIAL TRANSCRIPT

03:15:41   1          So the point being that in that case, it's being
03:15:45   2   raised as an example of violations of the use of force section,
03:15:50   3   and we think it's important for the public to understand that
03:15:55   4   discipline was still merited, and the discipline was issued in
03:16:00   5   that case despite there being a disagreement as to whether or
03:16:03   6   not a choke hold or a neck hold actually occurred.
03:16:07   7          On the vehicle pursuits, NOPD drafted new
03:16:15   8   policies in November of 2022.  They have been seeking the
03:16:24   9   OCDM's response to those since then.  The -- they issued a
03:16:28  10   statement in January of 2023 requesting feedback on five of
03:16:32  11   those pursuits.
03:16:35  12          That request raised issues about the timeliness
03:16:39  13   of the investigation, not issues with the actual pursuits
03:16:45  14   themselves.  We think that distinction is different.  We agree
03:16:48  15   reporting is certainly important but that the public needs to
03:16:53  16   understand the difference between a vehicle pursuit that is out
03:16:56  17   of policy and deficiencies allegedly in how those vehicle
03:17:00  18   pursuits are being tracked or reported internally.  We wanted
03:17:06  19   to make that clear.
03:17:08  20          Another example in the use of force section,
03:17:14  21   there is a Taser deployment at page 16 of the report or at
03:17:18  22   least in the draft report.  The OCDM report provides, quote,
03:17:22  23   the disciplinary committee's rationale is that some Taser
03:17:27  24   cycles will not count as use of force if one of the Taser's
03:17:32  25   barbs does not make a connection.

OFFICIAL TRANSCRIPT

03:17:35  1          This is a -- this is an inaccurate summary of

03:17:40  2    that proceeding because the NOPD initiated disciplinary

03:17:43  3    investigations into both of those cases.  These investigations

03:17:46  4    involved allegations of unauthorized use of force which were

03:17:49  5    found by NOPD's disciplinary board to be sustained.  So there

03:17:53  6    was a finding of improper use of force.

03:17:55  7          The OCDM may be confused by NOPD's discussion at

03:18:00  8    the board that a Level 4 use of force requires the application

03:18:03  9    of a CEW.  NOPD policy approved by the OCDM describes a Level 4

03:18:11 10    CEW use as more than two applications of a CEW on an individual

03:18:17 11    in a single interaction.  Application requires the barbs to

03:18:22 12    actually connect and electricity to be delivered; therefore,

03:18:25 13    these were found to be violations of Level 2 uses of force.

03:18:29 14          Again, this is sort of minutiae in one way,

03:18:36 15    obviously not for the people involved, including the officers

03:18:38 16    and the citizens, but it is important for the public to

03:18:42 17    understand that there was discipline meted out here, that it

03:18:46 18    was a violation of policy, and the dispute is whether or not

03:18:47 19    it's a Level 2 violation of policy or a Level 2 use of force or

03:18:52 20    a Level 4.  We think that the monitor's report does not

03:18:56 21    highlight that sufficiently.

03:18:58 22          The canine check that came up earlier, again,

03:19:01 23    canine falls under use of force because canines was a source of

03:19:08 24    force when DOJ did their investigation.

03:19:09 25          This dog is not used for apprehensions.  This dog

OFFICIAL TRANSCRIPT

03:19:15 1    is a drug-sniffing dog.  So the failure to have medical records

03:19:17 2    or training records, again, we can debate whether or not this

03:19:23 3    dog fits into that category of the consent decree.  Let's say

03:19:25 4    it does.  It's important for the public to understand that this

03:19:29 5    is not a dog that is used in apprehension that was not properly

03:19:33 6    recorded.

03:19:33 7               On the SSA audit, Your Honor, the monitoring team

03:19:38 8    references the audit they conducted on stop, search, and

03:19:41 9    arrest; however, they didn't provide the NOPD with the audit

03:19:44 10   until May 8th.  That was after we had requested it, and it was

03:19:48 11   after they had already published the quarterly report, so we're

03:19:54 12   reviewing the quarterly -- the draft quarterly report before we

03:19:55 13   get to see the audit that drives the data behind it.

03:20:00 14        THE COURT:  There will be now a ten-business-day period

03:20:02 15   for you to provide your comments, and we'll talk about that at

03:20:06 16   another status conference, so you'll have an opportunity to

03:20:09 17   fully discuss that.

03:20:11 18        MR. ZIMMER:  Well, right, but the report is already

03:20:14 19   filed.

03:20:14 20        THE COURT:  I don't think the SSA -- you mean the

03:20:17 21   quarterly report?

03:20:17 22        MR. ZIMMER:  Yes, Your Honor.

03:20:18 23        THE COURT:  Jonathan, is that more of a very high-level

03:20:23 24   discussion?

03:20:25 25        MR. ARONIE:  I believe that he's not talking about a

                            OFFICIAL TRANSCRIPT

03:20:29  1    published report.  I believe, correct me if I'm wrong, you're

03:20:31  2    talking about the audit report that we do, and then we share

03:20:35  3    them with NOPD and DOJ, and we talk about them, a form of the

03:20:38  4    back-up to the published reports offered?

03:20:41  5          THE COURT:  I think he's talking about that some

03:20:44  6    discussion was included in the quarterly report that is public

03:20:48  7    now, and at that time they didn't have a full SSA audit.

03:20:56  8          MR. ZIMMER:  The backup data, yes, that was summarized

03:20:59  9    in the quarterly report.

03:21:01  10         THE COURT:  Yes.  Which is accurate but before we have

03:21:04  11   a full discussion of that, you will have it.  I think you say

03:21:07  12   you have it now, and you'll have ten business days to look at

03:21:11  13   it and see if you want to make a response.

03:21:13  14         MR. ZIMMER:  Your Honor, in order to get ready for the

03:21:15  15   hearing, NOPD requested that they have a meeting but could not

03:21:18  16   get the meeting scheduled.  We then sent -- NOPD sent written

03:21:23  17   issues with the report, which have not been responded to yet

03:21:27  18   either.  So we have -- NOPD has, not me, NOPD has tried to get

03:21:32  19   this information and get the review done as your court was --

03:21:36  20   as the Court was describing.

03:21:37  21         THE COURT:  I guess I'm trying to explain to you, I

03:21:39  22   think this was a -- I have to look back, you know, exactly at

03:21:45  23   the quarterly report, but I bet it was a much shorter

03:21:50  24   discussion than what's in the SSA report and that the full

03:21:54  25   report is going to be the subject of a separate status

                           OFFICIAL TRANSCRIPT

03:21:57  1    conference at which you will have plenty of time to review it

03:22:03  2    and prepare.

03:22:03  3         MR. ZIMMER:  Okay.  NOPD -- those concerns were relayed

03:22:08  4    in writing on May 11th.  We haven't gotten a response back yet.

03:22:13  5    The audit -- the SSA data demonstrates 88 percent compliance

03:22:20  6    with the paragraphs in that section, which we think is

03:22:22  7    important for the public to see.

03:22:24  8         The NOPD found several examples of noncompliance

03:22:28  9    that we think were factually incorrect.  We pointed those out

03:22:33 10    again in advance of today's hearing, Your Honor.  These are not

03:22:36 11    surprise points.  We're still waiting for a response on that.

03:22:39 12         There was one finding that the NOPD should ensure

03:22:47 13    that all stops are documented on FICs, field interview cards.

03:22:53 14    NOPD noted at the last audit that was done was -- showed a

03:22:58 15    96 percent compliance rate with that.  So, NOPD believes there

03:23:02 16    is either a data issue or something that's causing that

03:23:05 17    deviation because there hasn't been a change in policy or

03:23:08 18    practice that would warrant the change.

03:23:11 19         I would also note, I did not -- I went back and

03:23:14 20    double checked, I don't see this in the quarterly report.  I

03:23:20 21    thought I understood Mr. Aronie to say that there was a finding

03:23:23 22    of discrimination against black passengers being asked to exit

03:23:27 23    a vehicle, and I don't see that in the quarterly report,

03:23:31 24    Your Honor, so we would ask that if that's -- the source for

03:23:33 25    the data so that we can address that as well.

                              OFFICIAL TRANSCRIPT

03:23:36  1          The only the time I'm aware of that issue would

03:23:38  2     have been a bias-free report from last year, but that is not

03:23:42  3     the context that it came up in, so --

03:23:44  4          THE COURT:  The things you're bringing up right now are

03:23:47  5     exactly the reason why, in the past, the NOPD has provided its

03:23:52  6     comments ahead of time so that the monitor could look at it and

03:23:56  7     discuss it with NOPD, and if there is anything incorrect in

03:24:02  8     their report, it could be better explained so they'll have an

03:24:06  9     opportunity to do it.  It seems like a good process for all

03:24:11 10     parties.

03:24:11 11          MR. ZIMMER:  Understood, Your Honor.

03:24:13 12          The final issue, Your Honor, is the review of

03:24:19 13     misconduct complaints related to sexual and domestic violence.

03:24:25 14     The report does not point out, and I think it's important for

03:24:27 15     the public to know, that on December 8th, 2022, the monitor

03:24:30 16     tendered four audit reports related to sex crimes, domestic

03:24:35 17     violence, and child abuse.

03:24:36 18          Those audit results showed domestic violence --

03:24:39 19     the domestic violence unit detective audit showed 100 percent

03:24:45 20     compliance with the consent decree.  The NOPD domestic violence

03:24:50 21     patrol audit showed 98 percent compliance with the

03:24:54 22     consent decree.  The child abuse cases investigated by child

03:24:57 23     abuse investigators or detectives was 100 percent compliant.

03:25:03 24     The sex crimes audit was -- came out at 100 percent compliant

03:25:09 25     with the consent decree.

                          OFFICIAL TRANSCRIPT

03:25:10  1          NOPD is aware that OCDM is conducting a review of

03:25:15  2     randomly sampled cases to determine whether the department's

03:25:19  3     response to "police sexual violence," that's a quote, "police

03:25:24  4     sexual violence is appropriate."  We await those findings and

03:25:31  5     look forward to being able to respond to those timely.

03:25:32  6          That's all they have on this presentation,

03:25:35  7     Your Honor.

03:25:36  8          THE COURT:  Does anybody else have any other

03:25:38  9     presentations on behalf of the City or NOPD?

03:25:40 10          All right.  How about from the DOJ?

03:25:44 11          MR. RIAZ:  Briefly on my end, and then I'll have my

03:25:47 12     colleague.

03:25:48 13          Sorry, briefly on my end, Your Honor, and then

03:25:51 14     I'll invite my client, Jonas Geissler, also to make some

03:25:56 15     remarks.

03:25:57 16          Two threshold issues:  The United States will

03:25:59 17     provide you our view of the evidentiary hearing, given hearing

03:26:03 18     the City's position today, and we'll also await your

03:26:08 19     instructions and views on modifying the consent decree

03:26:11 20     regarding the responses to the monitoring team's draft reports.

03:26:16 21     We tendered our responses and feedback a couple days before the

03:26:21 22     deadline, and so we'll, you know, be happy to consider any

03:26:25 23     modification that might be needed to formalize that process.

03:26:29 24          I also just wanted to thank the monitoring team

03:26:31 25     for their ongoing efforts and appreciate the work that they've

                              OFFICIAL TRANSCRIPT

03:26:34  1    done on the spot audits and the other assessments that they've

03:26:38  2    been doing.

03:26:39  3              I also want to acknowledge the progress that NOPD

03:26:42  4    has made; although, we recognize there is still more work that

03:26:46  5    needs to be done.  The United States remains committed to

03:26:49  6    working collaboratively with the City and NOPD as they work

03:26:53  7    toward achieving and sustaining full and effective compliance.

03:26:56  8              With that, I'll turn it over to Jonas to talk

03:26:59  9    about some specific responses.

03:27:00 10          THE COURT:  All right.  Thank you.

03:27:09 11          MR. GEISSLER:  Good afternoon, Your Honor.  May I

03:27:10 12    proceed?

03:27:10 13          THE COURT:  Good afternoon.

03:27:11 14          MR. GEISSLER:  I have about five minutes, and I

03:27:12 15    appreciate the accommodation of the Court to allow me to stay

03:27:16 16    on-site working with the other law enforcement agency today on

03:27:19 17    their remedies.

03:27:19 18              In response to the PIB report, Your Honor, I

03:27:22 19    would like to address three simple points:  Plans of

03:27:25 20    correction, concessions, and neck holds.  This report from OCDM

03:27:31 21    was adopted basically in spirit, but it covers a period of

03:27:36 22    October 2022 to April 2023 for some of its assessments, and for

03:27:42 23    other parts of its assessments, it covers 2021 and 2022.  It's

03:27:45 24    also the time period when the City asserts that it would have

03:27:49 25    been in full and effective compliance --

                          OFFICIAL TRANSCRIPT

03:27:50  1          THE COURT:  Jonas, hold on for a second.

03:27:54  2              Brad, is there anything we can do to make the

03:27:57  3  audio clearer?

03:28:02  4              Do you happen to have a headset?

03:29:02  5          MR. GEISSLER:  I do.  I'll attempt to use it.

03:29:02  6          THE COURT:  Let's see if it makes the audio a little

03:29:02  7  clearer in the courtroom.

03:29:02  8              Are you on mute?

03:29:02  9          MR. GEISSLER:  Can you hear me now?

03:29:02 10          THE COURT:  That's better.  Thank you.

03:29:05 11          MR. GEISSLER:  Thank you, Your Honor.  I apologize, for

03:29:05 12  the beginning.

03:29:10 13              I was covering the three main points of plans of

03:29:15 14  corrections for neck holds.  This report, Your Honor, is from

03:29:18 15  OCDM on PIB coverage October 2022 to April 2023 for some of its

03:29:25 16  assessments and from 2021 to 2022 other parts of its

03:29:30 17  assessment, and that's the time period that the City asserts it

03:29:33 18  was in full and effective compliance.

03:29:35 19              If NOPD had remedied the many deficiencies that

03:29:39 20  OCDM identified in this report, great.  That would mean that we

03:29:43 21  are all working toward a durable remedy that this case aims to

03:29:47 22  achieve.  But, concerningly, if the monitor's findings persist

03:29:50 23  today, then we are no closer to the durable remedy.  So what

03:29:54 24  did we see in response to the monitor's PIB report?  Not a plan

03:29:57 25  of correction, but we saw instead a partial response that

03:30:06 1    denies, in part, the monitor's findings.

03:30:09 2            There were some concessions, Your Honor.

03:30:11 3    The City's response docketed at 697 is not denying, therefore,

03:30:17 4    concedes many of the findings.  Specifically, with respect to

03:30:20 5    PIB, the City does not dispute the Court monitor's

03:30:24 6    noncompliance findings with 377, prohibiting retaliation; 379,

03:30:24 7    sufficient PIB personnel; paragraph 403, timely investigations

03:30:28 8    and discipline and discipline; paragraph 420, communication --

03:30:47 9            THE COURT:  We're still having trouble.  Maybe if you

03:30:50 10   speak slowly and try to articulate even more than normal.

03:31:15 11           One other option is for you call in on your

03:31:35 12   cell phone.

03:31:36 13           Do you have that, Brad?  Can you give him that

03:31:41 14   number.

03:32:58 15           We're ready.

03:33:04 16        MR. GEISSLER:  Paragraph 379, sufficient PIB personnel;

03:33:08 17   paragraphs 403, timely investigations and discipline;

03:33:16 18   paragraph 420, communications with plaintiff; paragraph 423,

19   adherence to disciplinary matrix.

20           THE COURT:  Wait a second.  Wait a second.

21           THE DEPUTY CLERK:  If you could mute your audio on your

22   computer.

23           MR. GEISSLER:  Better?

03:33:25 24           With respect to noncompliant paragraph 377, the

03:33:58 25   Court monitor's sample covered all complaints investigated in

                          OFFICIAL TRANSCRIPT

03:34:00 1   2021 and 2022, the same period that the City has asserted it

03:34:03 2   was in compliance.  The monitor's report does not address

03:34:09 3   uninvestigated allegations.

03:34:10 4        We note that the City has still declined its last

03:34:14 5   three to our information forms to investigate an allegation by

03:34:15 6   a member of the public.  There was retaliation against an

03:34:18 7   executive member of the NOPD.  When the public member advised

03:34:21 8   the monitor and DOJ that he had raised this allegation with

03:34:24 9   NOPD, he informed the City Attorney's Office the member of the

03:34:28 10  public had raised the allegation with us.  The City has not

03:34:32 11  commenced an investigation, Your Honor, to our understanding.

03:34:32 12  We welcome correction, of course, if the City has recently

03:34:32 13  reached out to that complainant --

03:34:32 14        THE COURT:  Slow down.

03:34:49 15        MR. GEISSLER:  We welcome correction if the City has

03:34:52 16  recently reached out to that complainant who initiated the

03:34:57 17  investigation.

03:34:57 18        With respect to paragraph 383 requiring integrity

03:35:04 19  checks, the City did respond to the monitor's finding.  The

03:35:09 20  City asserted that it had complied with integrity checks based

03:35:13 21  upon checks of secondary employment.  It is our understanding

03:35:16 22  that the City has still not investigated, however, supervision

03:35:20 23  which permitted secondary employment of abuses to persist.

03:35:25 24  Again, we welcome correction if the City has recently initiated

03:35:29 25  such investigations.

OFFICIAL TRANSCRIPT

03:35:30  1          The City does not present a plan of correction to

03:35:35  2     bring the nine noncompliant paragraphs identified by the

03:35:40  3     monitor, not even the five that the City concedes were

03:35:45  4     noncompliant, into compliance.

03:35:46  5          The monitor presents a series of recommendations

03:35:48  6     to assist the City in complying with the PIB provisions.  Still

03:35:53  7     there is no response from the City to these recommendations.  I

03:35:59  8     submit, Your Honor, that there could be a more productive way

03:36:01  9     forward trying to obtain compliance.

03:36:05 10          Lastly, Your Honor, I would like to address neck

03:36:09 11     holds.  One of the main purposes of an accountability remedy in

03:36:13 12     the consent decree is to ensure that NOPD governs force in a

03:36:17 13     constitutional manner.  The monitor found that NOPD mishandled

03:36:21 14     investigations of neck holds.  The City denies that the first

03:36:26 15     8/11/22 incident was a neck hold.  The City did not account for

03:36:33 16     the PIB captain's admission recorded in the monitor's report.

03:36:38 17     The matter should have been investigated as a Level 4 use of

03:36:43 18     force.

03:36:44 19          Second, the City admitted the 8/10/22 incident,

03:36:48 20     which the City identified as 8/11/22, was referred to criminal

03:36:53 21     investigation.  This then should have triggered consent decree

03:36:57 22     paragraph 454's requirement that the City give notice of the

03:37:02 23     ongoing criminal investigation of the serious misconduct to the

03:37:06 24     monitor.  Query whether the City did so.

03:37:09 25          Third, the City also admits that the 2/17/23,

                              OFFICIAL TRANSCRIPT

which the City identifies as 8/17/22, involved an allegation of
excessive force on a passive person.  This, too, should have
triggered paragraph 454.  We don't know if the City gave the
required notice to the monitor.

The fourth and last one reported in the monitor's
report is also an allegation of excessive force albeit against
an armed subject, very serious for the officer.  This excessive
force allegation also should have triggered paragraph 454 or
notice to the monitor whether or not that occurred.

We share the common goal still with the City and
the monitor and the Court, we believe, in reaching the
constitutional and effective policing and ensure its continued
existence.  The accountability remedies are there to ensure
that such remedies are in place, effective, and durable.  Going
forward, we would be pleased to see plans of correction for
admitted deficiencies and clear dialog between the City and the
monitor where there is disagreement about compliance.

We thank the Court and we're happy to respond to
any of the Court's questions.

THE COURT:  All right.  Jonas, thank you.  I hope
you'll be with us the next time so we won't have any audio
issues, and we'll be sure we hear every word you say.

MR. GEISSER:  Thank you, Your Honor.  I am planning to
be there on the 7th.

THE COURT:  I think you may have responded as we went,

OFFICIAL TRANSCRIPT

03:38:57 1   Jonathan, but does the monitoring team have any additional

03:39:01 2   comments you would like to make?

03:39:04 3       MR. ARONIE:  No.  No need for anything at this time.

03:39:07 4   Thank you.

03:39:09 5       THE COURT:  All right.  So we'll all be on the lookout

03:39:13 6   for the City's response.  I believe it's to the quarterly

03:39:22 7   report, right?  Yes.  Okay.  That should be posted today.

03:39:27 8           As I mentioned in the beginning, the next status

03:39:30 9   conference is June 7th at two o'clock.  Am I correct?

03:39:36 10  Jonathan -- are you still there and David maybe -- that there

03:39:41 11  will be public meetings in connection with the June 7th status

03:39:47 12  conference?

03:39:49 13      MR. ARONIE:  I believe I'm almost certain the answer is

03:39:53 14  "yes."  The next public meeting will be in June in association

03:39:55 15  with that.  I still can't be in groups of people, so I'll be

03:39:58 16  virtual, but I suspect David will be in person.  We'll confirm

03:40:02 17  that and get right back to you.

03:40:05 18      MR. DOUGLASS:  That's correct, Your Honor.

03:40:06 19      THE COURT:  Okay.  Thank you, David.

03:40:07 20          So we will let everyone know as soon as possible

03:40:10 21  when those public meetings were scheduled.

03:40:13 22          As I said, the NOPD is always welcome to attend

03:40:17 23  those meetings, and apparently, in the past they've attended,

03:40:21 24  and they asked the questions or made comments from the floor,

03:40:25 25  not in a formal presentation on the stage, but they have been

OFFICIAL TRANSCRIPT

03:40:29  1    allowed to participate, so I assume that will continue.

03:40:35  2                    All right.  Anything from anyone else we need to

03:40:39  3    discuss?

03:40:40  4                    All right.  Thank you and thanks for being here.

03:40:43  5    Court is adjourned.

03:40:44  6               THE DEPUTY CLERK:  All rise.

          7               (WHEREUPON, at 3:40 p.m., the proceedings were

          8    concluded.)

          9                              *   *   *

         10

         11                         REPORTER'S CERTIFICATE

         12

         13         I, Cathy Pepper, Certified Realtime Reporter, Registered

         14    Merit Reporter, Certified Court Reporter in and for the State

         15    of Louisiana, Official Court Reporter for the United States

         16    District Court, Eastern District of Louisiana, do hereby

         17    certify that the foregoing is a true and correct transcript to

         18    the best of my ability and understanding from the record of the

         19    proceedings in the above-entitled and numbered matter.

         20

         21                              *s/Cathy Pepper*
                                         _____

         22                              Cathy Pepper, CRR, RMR, CCR
                                         Certified Realtime Reporter
         23                              Registered Merit Reporter
                                         Official Court Reporter
         24                              United States District Court
                                         Cathy_Pepper@laed.uscourts.gov
         25

                              OFFICIAL TRANSCRIPT