

5 June 2023

<mark>ADVANCE COPY FOR PARTIES' STATUS CONFERENCE PREP</mark>

Dear Judge Morgan:

This report focuses on the New Orleans Police Department's investigation into allegations against Officer Jeffrey Vappie. As you know, in early November 2022, local New Orleans TV station Fox8 ran a series of stories involving Mayor Latoya Cantrell's executive protection team. The story raised a number of questions regarding the operation of that team as well as the actions and inactions of Officer Vappie. PIB opened an investigation into the allegations raised in the story on November 9, 2022.

Following PIB's investigation, the Monitoring Team, per Consent Decree paragraph 454, submitted a detailed analysis to PIB commending the investigators for the quality of their underlying investigation, but pointing out a number of critical shortcomings in the investigation analysis and report. The NOPD's response to the Monitoring Team's analysis raises serious concerns that we believe require the Court's immediate attention.

**Background**

As noted above, following the early November 2022 Fox8 stories involving Mayor Latoya Cantrell's executive protection team, PIB opened an investigation on November 9, 2022 into multiple allegations against Officer Jeffrey Vappie. Immediately thereafter, on November 10, 2022, the New Orleans City Council requested that the Office of the Consent Decree Monitor and the Office of the Independent Monitor conduct their own independent investigations into the Vappie allegations, citing "significant concerns about the apparent conflict of interest with the New Orleans Police Department being allowed to, again, investigate serious allegations involving Mayor Cantrell."[1] The Monitoring Team responded to the City Council on November 11 explaining that it lacked the authority to conduct an investigation, but that it would monitor PIB's investigation of Officer Vappie closely to ensure it was effective, efficient, and without bias.[2]

Consistent with its response to the City Council and its obligations under the Consent Decree to closely monitor significant misconduct investigations,[3] the Monitoring Team met with Deputy Chief Keith Sanchez and PIB's investigators Captain Kendrick Allen and Lieutenant Lawrence Jones on an almost weekly basis over the course of PIB's investigation. While we were not involved in the day-to-day affairs of the investigation (the Consent Decree makes clear

---

[1]     The City Council letter is attached to this Report as Attachment A.

[2]     The Monitoring Team's response to City Council is attached to this Report as Attachment B.

[3]     *See, e.g.,* Consent Decree paragraphs 377, 444, 454, 455.



the Monitoring Team has no role in running the NOPD[4]), the PIB team was open with us regarding their strategy and the status of their activities. We appreciate the cooperation we received from PIB prior to the preparation of the PIB investigation report.

On February 17, 2023, prior to the conclusion of PIB's investigation, the Monitoring Team sent an "immediate action notice" to Deputy Chief Sanchez alerting him to several issues we believed the NOPD should address right away.[5] Rather than waiting until the conclusion of PIB's investigation, we brought these matters to PIB's attention at that time to ensure NOPD would take immediate steps to correct the concerns we identified. Our opinions and recommendations related only to larger policy/process issues that were unrelated to the then-still-forthcoming substantive findings of the PIB Vappie investigation team.

PIB completed its investigation into the actions/inactions of Officer Vappie on March 10, 2023, and submitted the final investigation report to Deputy Chief Sanchez the same day. Deputy Chief Sanchez reviewed and concurred with the investigators' findings on March 16, 2023. Despite multiple requests from the Monitoring Team and the IPM for a copy of PIB's investigative report, NOPD refused to share it with the Monitoring Team until April 3, 2023.

Per Consent Decree paragraph 454, and the specific request of the New Orleans City Council, we analyzed PIB's investigative report and prepared a series of recommendations, which we shared with Interim Superintendent Woodfork on April 7, 2023. Per Consent Decree paragraph 454, the Interim Superintendent was required either to accept our recommendations or to prepare a written response as to why she did not accept our recommendations.

Because the Monitoring Team had not heard back from the Interim Superintendent by April 13, we wrote to her again asking about the status of NOPD's response. Deputy Chief Sanchez responded that we would receive a formal response by April 18.

On April 18, NOPD requested additional time to respond due to the death of an officer. The Monitoring Team, of course, acceded to the request. NOPD committed to respond by April 20.

The Monitoring Team didn't receive a response from NOPD on the 20th, 21st, 22nd, or 23rd. The NOPD finally responded to our analysis on April 24. The response, however, was wholly inadequate in that it (a) ignored the requirements of Consent Decree paragraph 454, (b) mischaracterized the scope of the investigation regarding payroll fraud, and (c) ignored almost all of the Monitoring Team's substantive recommendations. We have attached the Monitoring Team's analysis and NOPD's response to this report as Attachments E and F.

---

[4]     Consent Decree paragraph 445.

[5]     The Monitoring Team's recommendations are attached to this Report as Attachment C.



As noted above, the City's actions here raise serious concerns that we believe require the Court's immediate attention.

**Summary Of Concerns**

The following paragraphs summarize the Monitoring Team's concerns regarding the NOPD's response to our analysis of the PIB investigation into the actions and inactions of Officer Jeffrey Vappie.

### 1.    The City Is In Violation Of Consent Decree Paragraph 454

Paragraph 454 of the Consent Decree provides as follows:

> City and NOPD shall provide each investigation of a serious use of force or use of force that is the subject of a misconduct investigation, and each investigation report of a serious misconduct complaint investigation (i.e., criminal misconduct; unreasonable use of force; discriminatory policing; false arrest or planting evidence; **untruthfulness/false statements**; unlawful search; retaliation; sexual misconduct; domestic violence; and **theft**), to the Monitor before closing the investigation or communicating the recommended disposition to the subject of the investigation or review. The Monitor shall review each serious use of force investigation and each serious misconduct complaint investigation and recommend for further investigation any use of force or misconduct complaint investigations that the Monitor determines to be incomplete or for which the findings are not supported by a preponderance of the evidence. The Monitor shall provide written instructions for completing any investigation determined to be incomplete or inadequately supported by the evidence. The Superintendent shall determine whether the additional investigation or modification recommended by the Monitor should be carried out. Where the Superintendent determines not to order the recommended additional investigation or modification, the Superintendent will set out the reasons for this determination in writing. The Monitor shall provide recommendations so that any further investigation or modification can be concluded within the timeframes mandated by state law. The Monitor shall coordinate with the IPM in conducting these use of force and misconduct investigation reviews.

Consent Decree paragraph 454 (emphasis added). Pursuant to its authority under the Consent Decree, including this paragraph, the Monitoring Team requested access to the PIB investigation report on multiple occasions during weekly status calls with the PIB and the IPM. The IPM made



similar requests during these weekly calls. PIB responded it would not share a copy of the investigation report.

After multiple requests and a suggestion by the Monitoring Team that the matter be taken to Judge Morgan for resolution, PIB ultimately did turn over its investigation report on April 3, 2023. Such a late production, however, conflicts with paragraph 454 of the Consent Decree, and, more importantly, prejudices the ability of PIB to remedy material errors in its investigative report in a timely fashion. Nonetheless, as noted above, the Monitoring Team performed and shared its detailed analysis of the PIB report with NOPD on April 7, 2023.

In its April 24th response to the Monitoring Team's analysis of the PIB investigation, the NOPD failed to provide a substantive response to the Monitoring Team's recommendations, arguing it had no legal obligation to do so. According to NOPD, paragraph 454 of the Consent Decree does not apply here because, in NOPD's view, PIB's investigation into the actions/inactions of Officer Vappie was not a "serious misconduct complaint investigation." NOPD Response at 2. NOPD's view not only is wrong, it reflects a cavalier attitude toward PIB's obligations and the importance of officer accountability.

The facts tell a far different story from the one PIB now is sharing regarding the nature of the Vappie investigation.

From the very first weekly meeting with PIB, the Monitoring Team and the IPM stressed the importance of the scope of the Vappie investigation. The Monitoring Team and IPM emphasized that it was critical that PIB investigate *all allegations*, including the 16.58 hour violation allegation, the professionalism violation allegation, the conflict of interest violation allegation, the nepotism violation allegation, and, importantly, the payroll fraud allegation. This issue was discussed on multiple zoom meetings with PIB, and in each meeting PIB assured the Monitoring Team and the IPM that its investigation would cover <u>all</u> of these allegations. [6]

Following several status meetings, PIB shared its draft investigation plan with the Monitoring Team and the IPM on December 5, 2022. In its draft plan, PIB wrote that it was investigating Officer Vappie for

> 16.35, devoting entire time to duty, ethics, moral conduct, nepotism and employee conflicts.

Email from Captain Kendrick Allen (12/5/22). The Monitoring Team responded to Captain Allen noting that the investigation plan was missing the payroll fraud allegation, an issue, as noted,

---

[6]   It is worth noting here that paragraph 399 of the Consent Decree requires NOPD to employ a classification protocol for all complaints that is "allegation-based rather than anticipated outcome-based." If, in light of the scope of the allegations against Officer Vappie and the representations made to the Monitoring Team and the IPM regarding the scope of the investigation, NOPD failed to classify the investigation as involving "serious misconduct," the Department likely violated paragraph 399 as well.



discussed in multiple prior status meetings. The Monitoring Team recommended updating the investigation plan to more explicitly reflect what PIB confirmed orally, *i.e.*, that PIB's investigation would cover

> Potential policy violations, working hours beyond mandatory ceilings (e.g., the 16.35 hour rule) (Chapter 13.15), devoting entire time to duty (Chapter 26.2.1), ***billing for time not worked*** (Chapter ??), ethics, professional conduct (Rule 3), moral conduct (Rule 2), nepotism and employee conflicts (Chapter 13.38).

Email from Jonathan Aronie to Captain Kendrick Allen (12/5/22) (emphasis added).

In the same email, the Monitoring Team specifically requested PIB be more specific that it was investigating the payroll fraud issue (*i.e.*, charging for time not worked). *Id.* PIB assured the Monitoring Team and IPM in the next weekly zoom status meeting that it would be fully investigating the payroll fraud allegation against Officer Vappie.

On December 8, the Monitoring Team shared with NOPD an email from community member Dr. Skip Gallagher to Judge Morgan. Email from Anne Perry to Keith Sanchez (12/8/23). Dr. Gallagher has been instrumental in raising a number of issues regarding NOPD payroll fraud with the NOPD, the IPM, the OIG, and the Monitoring Team. In his note to Judge Morgan, Dr. Gallagher reiterated his prior concerns about the pervasiveness of NOPD payroll fraud. Email from Skip Gallagher to Judge Morgan (11/14/22). Among other things, Dr. Gallagher emphasized the following:

> As can be seen in recent Lee Zurik pieces, ***payroll fraud is alive and well and extends into the upper ranks of the NOPD as well as the Mayor's own security detail.*** As I have mentioned to the OIG, the IPM, the Mayor, the City Council, Jonathan Aronie and to the NOPD itself, an independent audit of the NOPD must be conducted. The response to this request has been deafening in its silence. The result is that I am the only person examining these payroll fraud allegations and must initiate each investigation through a direct request or by providing the press with the relevant records.

*Id.* In sharing Dr. Gallagher's concerns with PIB, the Monitoring Team noted that Dr. Gallagher's findings "may be helpful re the ongoing Vappie investigation. Some also might go beyond Vappie. The material that goes beyond Vappie I assume you will treat as a new public complaint/allegation." Email from Jonathan Aronie to Deputy Chief Keith Sanchez (12/8/22).[7]

---

[7]    It is not clear at this time whether PIB opened the additional investigations recommended by the Monitoring Team. Similarly, it also is not clear at this time whether PIB opened an investigation into allegations raised by Fox8 that Officer Vappie flew first class and stayed in upgraded hotel suites while traveling on City



On January 5, 2023, the Monitoring Team again reminded PIB of its multiple commitments to investigate all aspects of the allegations against Officer Vappie, including the payroll fraud allegation. In an email from the Monitoring Team to PIB, the Monitoring Team wrote the following:

> Thank you for making time for the rescheduled tag-up call this Friday. To help you prepare for the call, here are the issues I'd like to make sure we discussion [sic] well. Other members of the OCDM and IPM teams may have more, and are welcome to share them as well.
>
> \*          \*          \*
>
> -PIB's current thinking re:
>
> **-Potential time card fraud (FQ Apartment, Hano Board, Travel)**
>      -Potential personal relationship conflict
>      -Potential other conflict (e.g., significant increase in overtime following start of relationship)
>      -Potential violation of travel rules (upgraded hotels, etc.)
>      -Potential 16.35 violations
>      -Potential professionalism violations
>
> \*          \*          \*

Email from Jonathan Aronie to Deputy Chief Sanchez (1/5/23) (emphasis added). Each allegation under investigation was discussed on the ensuing phone call, and PIB reconfirmed, once again, it was investigating every issue, including potential payroll fraud.

In short, it was clear from the beginning of the PIB investigation that a fundamental issue under investigation was whether Officer Vappie committed payroll fraud – that is, whether he lied about his time at work and whether he wrongly charged the City for time not worked. *PIB agreed with this understanding of scope from the very beginning of the investigation.*

At its core, an investigation into payroll fraud is an investigation into a "serious misconduct complaint," which the Consent Decree defines to include an "untruthfulness/false statements" or a "theft" investigation. (CD at 454) Billing the City for time not worked is inherently a false statement; indeed, if done knowingly, it is likely a criminal false statement.

---

business. The Monitoring Team recommended PIB question Officer Vappie regarding his travel in an email dated December 28, 2022. Specifically, the Monitoring Team recommended including the following question: "How did you travel when you traveled with the Mayor? First class? Upgraded hotel rooms?" Email from Jonathan Aronie to Captain Allen, Deputy Chief Sanchez, *et al.* (12/28/22). Per Consent Decree paragraph 390, which requires NOPD to "accept all misconduct complaints, including anonymous and third-party complaints, for review and investigation," the Monitoring Team is requesting data from NOPD to determine whether PIB opened investigations into these matters, and, if not, why not.



NOPD's position that such an investigation does not constitute a serious misconduct complaint investigation is simply wrong and, quite frankly, defies common sense.[8]

The fact that PIB declined to include a meaningful discussion of the payroll fraud matter in its investigation report (despite (a) its multiple commitments to the Monitoring Team and the IPM that its investigation would fully cover the alleged payroll fraud issues and (b) the investigators clearly questioning Vappie and other witnesses during hours of testimony about the payroll fraud allegation[9]), does not change the fact that the investigation was undertaken to investigate payroll fraud. It is wholly disingenuous to argue PIB's investigation wasn't "serious" simply because PIB failed to discuss in its final report a critical issue it committed to fully investigate.[10]

Because the Vappie investigation clearly does constitute a serious misconduct complaint investigation in that it clearly involves allegations of truthfulness, false statements, and theft, NOPD had an obligation to comply with paragraph 454 of the Consent Decree. Specifically, that means the Monitoring Team was authorized to:

- Review the serious misconduct complaint investigation.

- Recommend for further investigation areas the Monitoring Team determined to be incomplete or for which the findings are not supported by a preponderance of the evidence.

- Provide written instructions to the NOPD for completing those portions of the investigation the Monitoring Team found incomplete or inadequately supported by the evidence.

Consent Decree paragraph 454. Subsequent to these steps, the Consent Decree requires that "the Superintendent shall determine whether the additional investigation or modification recommended by the Monitor should be carried out. Where the Superintendent determines not to order the recommended additional investigation or modification, the Superintendent will set out the reasons for this determination in writing." *Id*.

---

[8]      Under Louisiana law, public payroll fraud under La. R.S. 14:138 is considered a type of theft. *See, e.g.*, *State v. Fruge*, 251 La. 283 (1967).

[9]      The recordings of the PIB witness interviews, subsequently made available to the media through an inadvertent City disclosure, make clear PIB questioned Officer Vappie and other witnesses about the payroll fraud matter and about the truthfulness of Officer Vappie's various assertions.

[10]      It is worth also remembering that PIB decided to conduct the Vappie investigation on its own rather than referring it out to a different bureau, something it would have done had the matter been non-serious. Paragraph 63 of NOPD Policy 52.1.1 provides that "the investigation of an alleged administrative violation involving serious misconduct shall be completed by PIB . . . ," and that "the investigation of other alleged administrative violations may be assigned by the PIB Deputy Superintendent or his/her designee to another bureau . . . ."



The NOPD's response to the Monitoring Team's analysis ignores this clear Consent Decree process. By doing so, NOPD also defeated the Monitoring Team's ability to comply with the City Council's request that the Monitoring Team closely monitor PIB's investigation and puts the integrity of its Vappie investigation at risk.[11]

### 2.	The City Is In Violation Of Consent Decree Paragraphs 470 and 472

Paragraph 470 of the Consent Decree explicitly provides "the Monitor shall have access to all necessary individuals, facilities, **_and documents_**, which shall include access to Agreement related trainings, meetings, and reviews, such as critical incident reviews, use of force review boards, and disciplinary hearings." Consent Decree ¶470 (emphasis added). Likewise, Paragraph 472 explicitly requires the City to ensure that the Monitoring Team has "**_full and direct access to City and NOPD documents_**** that the Monitoring reasonably deems necessary to carry out the duties assigned to the Monitor . . . ." Consent Decree ¶472 (emphasis added). These are clear statements regarding the Monitoring Team's unfettered right to the documents it needs to get its job done.

As noted above, the Monitoring Team and the IPM requested the Officer Vappie investigation report from PIB on multiple occasions during their weekly status meetings. PIB rejected these requests. NOPD ultimately closed its investigation of Officer Vappie on March 10, 2023, and presented Officer Vappie with a verbal notice of disposition at that time. _See_ PIB Investigation Report at 29.[12]

On March 27, 2023, the Monitoring Team again asked for a copy of PIB's report, this time by email:

> Separately, please let me know the status of the Vappie investigation. Has the final report been prepared/submitted for approval? I'm going to want to see all iterations of the report (i.e.,

---

[11]	Further to the integrity of the investigation, the Monitoring Team's analysis of PIB's investigation raised several concerns about PIB's failure to take appropriate steps to protect the confidentiality of investigation materials. Among other things, we questioned PIB's decision to share interview recordings with another City office, its failure to password protect the USB drive on which interview recordings were stored, and its decision to allow PIB work to be conducted outside PIB. Consent Decree paragraph 409 clearly requires "all misconduct investigation interview recordings shall be stored and maintained in a secure location within PIB." Similarly, paragraph 419 requires that "all investigation reports and related documentation and evidence shall be securely maintained in a central and accessible location . . . ." NOPD's handling of the interview recordings runs afoul of these clear provisions.

[12]	NOPD's closure of its investigation without looking into the actions/inactions of Officer Vappie's chain of command (i.e., his supervisors) further prejudices the Department's ability to hold those supervisors accountable for their potential failure to provide close and effective supervision to officers working on the Executive Protection team. Consent Decree paragraph 306 makes clear that "NOPD supervisors shall be held accountable for providing the close and effective supervision necessary to direct and guide officers."



all drafts submitted to you or any other supervisor for
review/comment).

Email from Jonathan Aronie to Keith Sanchez (3/27/23). PIB responded by phone that NOPD
would not be sharing the report as requested. This refusal prompted the Monitoring Team to
reiterate its request to PIB by email:

> Keith,
>
> Thanks for the time on the Vappie call this morning. It was very
> informative.
>
> Thanks also for confirming you will be responding to my earlier
> email and the several outstanding requests very soon.
>
> Regarding my request for copies of all iterations of the Vappie
> investigation report, please let me know when I will be receiving
> those. Please keep in mind that paragraph 470 of the CD makes
> clear:
>
> **The Monitor shall have access to all necessary individuals,
> facilities, *and documents*, which shall include access to
> Agreement related trainings, meetings, and reviews, such as
> critical incident reviews, use of force review boards, *and
> disciplinary hearings*.**
>
> Further, paragraph 472 provides as follows:
>
> **City and NOPD shall ensure that the Monitor has full and
> direct access to all City and NOPD documents and data that
> the Monitor reasonably deems necessary to carry out the
> duties assigned to the Monitor by this Agreement, except any
> documents or data protected by the attorney-client privilege....**
>
> Fortunately, we never had had to press these issues because, until
> now, we have been provided timely access to all documents and
> data we requested. If NOPD has made a decision to change the
> level of cooperation we have historically received, I need to know
> that immediately so we can discuss it with Judge Morgan.
>
> Thanks.
>
> Be well and be safe.
>
> -Jonathan



Email from Jonathan Aronie to Keith Sanchez (3/27/23).

Two days later, on March 29th, still not having received the investigation report, the Monitoring Team reminded PIB of its paragraph 454 obligations:

> Keith,
>
> Per your earlier request for the CD provisions relating to documents requested by the Monitoring Team, you probably want to ensure Michelle is aware of this one as well.
>
> -Jonathan
>
> 454. City and NOPD shall provide each investigation of a serious use of force or use of force that is the subject of a misconduct investigation, and each investigation report of a serious misconduct complaint investigation (i.e., criminal misconduct; unreasonable use of force; discriminatory policing; false arrest or planting evidence; untruthfulness/false statements; unlawful search; retaliation; sexual misconduct; domestic violence; and theft), to the Monitor before closing the investigation or communicating the recommended disposition to the subject of the investigation or review. The Monitor shall review each serious use of force investigation and each serious misconduct complaint investigation and recommend for further investigation any use of force or misconduct complaint investigations that the Monitor determines to be incomplete or for which the findings are not supported by a preponderance of the evidence. The Monitor shall provide written instructions for completing any investigation determined to be incomplete or inadequately supported by the evidence. The Superintendent shall determine whether the additional investigation or modification recommended by the Monitor should be carried out. Where the Superintendent determines not to order the recommended additional investigation or modification, the Superintendent will set out the reasons for this determination in writing. The Monitor shall provide recommendations so that any further investigation or modification can be concluded within the timeframes mandated by state law. The Monitor shall coordinate with the IPM in conducting these use of force and misconduct investigation reviews.

Email from Jonathan Aronie to Keith Sanchez (3/29/23).



Still not having received the investigation report on March 31st, the Monitoring Team again wrote to PIB:

> Keith-
>
> Have you sent me the report(s)? I do not see it/them in my inbox.
>
> Jonathan

Email from Jonathan Aronie to Keith Sanchez (3/31/23). In a follow-up phone call, Deputy Chief Sanchez explained he was working to obtain permission to share the requested report.

The Monitoring Team still had not received the PIB investigation report by April 3rd, and again wrote to PIB for a status update:

> Keith,
>
> You said I'd have the documents last week. I still do not have them. I need them and am entitled to them. Shall I call Michelle directly, or will you have them to me this morning?
>
> -Jonathan

Email from Jonathan Aronie to Keith Sanchez (4/3/23). On the same day, the lead monitor, Jonathan Aronie, wrote to and called Interim Superintendent Woodfork, explaining that the Monitoring Team had no choice but to bring the matter to the attention of Judge Morgan. Following that conversation, Interim Superintendent Woodfork agreed to provide the investigation report. The Monitoring Team immediately reached back out to Deputy Chief Sanchez:

> Keith,
>
> Michelle just informed me she okayed you sharing the Vappie report with me. Please ensure I receive all iterations of the Report if there are more than one. Please have it/them to me by noon.  Thank you.
>
> -Jonathan

Email from Jonathan Aronie to Keith Sanchez (4/3/23).



Later the same day, NOPD finally shared with the Monitoring Team a copy of the final PIB report we initially requested in mid-March.[13] Sadly, it took multiple meetings, phone calls, and emails, and a threat to take the matter to Court, to get what the Monitoring Team clearly is entitled to. As sadly, by the time NOPD shared the investigation report with us, it was long after the completion of the PIB investigation, which, according to NOPD, was concluded on March 10 and signed by the Deputy Chief and for the Interim Superintendent (by the Deputy Chief) on March 16th.

NOPD does not disagree it refused to share the PIB report with the Monitoring Team. Indeed, NOPD concedes the point:

> We disagree with the Monitoring Team's analysis that PIB violated the Consent Decree by refusing to share a copy of the PIB report with the Monitoring Team when requested.

PIB Response to Monitoring Team Analysis at 1 (4/24/23). While PIB agrees it refused to share a properly requested, non-privileged document with the Monitoring Team, NOPD argues its refusal is excused because, in its view that, per Consent Decree paragraph 454, payroll fraud does not constitute a serious misconduct complaint. *Id*. This argument, however, not only is wrong, it is irrelevant. The clear language of paragraphs 470 and 472 gives the Monitoring Team "full and direct access to City and NOPD documents that the Monitoring reasonably deems necessary to carry out the duties assigned to the Monitor." Regardless of how the City wants to read paragraph 454 (and, as discussed above, it reads it very wrongly), there can be no serious dispute regarding the clarity of paragraphs 470 and 472.

### 3. NOPD Failed To Correctly Apply The Preponderance Of The Evidence Standard In Its Investigation Of Officer Vappie

As noted in the Monitoring Team's analysis of PIB's investigative report, administrative investigation findings must be made using the "preponderance of the evidence" standard. No one disputes this. NOPD Policy 51.1.2 aligns with the Consent Decree by requiring that misconduct investigators "reach a conclusion supported by the preponderance of the evidence and prepare a written recommendation . . . ." NOPD Policy 26.2 likewise aligns with the Consent Decree and defines the preponderance of the evidence standard as follows:

> **Preponderance of the evidence**—Such evidence that when considered and compared with that opposed to it has more convincing force and produces in one's mind the belief that what is sought to be proven is more likely true than not true.

---

[13] To date, PIB still has not shared any other iterations of the investigation report as requested by the Monitoring Team.



NOPD Policy 26.2; *see also* NOPD Policy 51.1.2. To use more commonplace terminology, the preponderance of the evidence standard is a greater-than-50% standard, or a more-likely-than-not standard. In contrast, criminal investigations apply a different standard – beyond a reasonable doubt. The administrative preponderance of the evidence standard places a far lower burden on the investigating agency.

In the Monitoring Team's analysis of PIB's investigative report, we criticized PIB's failure properly to apply and document the investigators' use of the preponderance of the evidence standard. The details of our assessment are set forth in the attached analysis shared with PIB and will not be repeated here. Suffice it to say, while NOPD did reach a reasonable conclusion in sustaining multiple counts against Officer Vappie, it did not describe the standard it applied accurately.

This is a critical error not only because it violates the Consent Decree and NOPD policy, but because it leaves PIB's investigation open to attack by the subject of the investigation (i.e., Officer Vappie). In response to our concerns, PIB responded with nothing more than the following:

> Although the governing standard for administrative investigations is a preponderance of the evidence, PIB does not approach investigations with an intention to make the facts fit. We investigate the complaint by following the lead of the facts wherever they lead and when the trail of the facts ends, we begin the conclusion of the investigation.

NOPD Response to Monitoring Team at 2. To the extent this response is coherent at all, it is wholly non-responsive as it totally misses the point raised in the Monitoring Team's analysis.

In its analysis, the Monitoring Team noted multiple places where the PIB report misapplied and misstated the preponderance of the evidence standard. Our concerns have nothing to do with when or how to conclude an investigation. Our concerns refer only to the misapplication of the proper legal standard. NOPD ignores these concerns, and its refusal to engage in a meaningful discussion almost certainly will haunt PIB if Officer Vappie appeals his ultimate discipline.[14]

### 4.    PIB Review Process

The PIB investigation report shared with the Monitoring Team has two signature lines – one for the Deputy Chief of PIB and one for the Superintendent of Police. Both lines have a

---

[14]    Even more fundamentally, NOPD's refusal to abide by the Consent Decree renders it more likely PIB will fail to hold Officer Vappie and, potentially, his supervisors, accountable for their actions and inactions. The misconduct section of the Consent Decree is designed to ensure NOPD holds officers and supervisors accountable for policy violations. *See* Consent Decree Section XVII.



signature indicating both individuals reviewed and concurred with the information in the report. According to NOPD's response to the Monitoring Team's analysis, however, the Interim Superintendent never actually reviewed the report and the Deputy Chief signed on her behalf wrongly indicating that she concurred in the findings. NOPD describes this as a practice "loosely described in old policies" and "subject to various interpretations." PIB Response at 3. NOPD goes on the say it is "reviewing to determine its utility at this stage." *Id*.

NOPD does not indicate in what "old policies" this practice is "loosely described." NOPD's current policy, however, as well as the Consent Decree itself, make clear the Superintendent herself is required to sign the investigation report.

Consent Decree paragraph 416 provides as follows:

> 416. The PIB commander shall accept the investigator's recommended disposition **and the Superintendent shall approve the disposition**, unless the disposition is unsupported by a preponderance of the evidence or additional investigation is necessary to reach a reliable finding. Where the disposition is unsupported by a preponderance of the evidence, the PIB Commander may correct the disposition or order additional investigation, as necessary.

Consent Decree ¶416 (emphasis added). This clear statement is consistent with NOPD's misconduct investigation policy 52.1.1, paragraph 105 of which states the following:

> 105. The report shall conclude with the following format for each person in the investigator's chain of command, **up to and including the Superintendent of Police**:
>
> CONCUR I DO NOT CONCUR          Date:_____
> _____
> [rank and name of person in chain of command]
> [title and/or place of assignment]
>
> The date alongside each signature will be the date the reviewer signed the document, not the date appearing at the top of the report.

NOPD Policy 52.1.1 at §105 (emphasis added).

The "up to and including" language is clear. But even if it were not clear, paragraph 136 of the same policy makes the same point:



> 136. Once the Deputy of Superintendent of PIB has approved the disposition of an investigation conducted by PIB, **the investigation disposition shall be transmitted to the Superintendent of Police for review and final approval.** For those investigations conducted by a bureau other than PIB, the Deputy Superintendent of PIB's review concludes the investigation.

Id. at §136 (emphasis added). Nothing in Policy 52.1.1 is unclear. And even if there were, as NOPD suggests, "old policies" "subject to various interpretations" that "loosely describe" NOPD's current practice of the superintendent not reviewing and signing PIB reports, such policies clearly have been superseded by the Department's current policy, which was reviewed and approved by the Monitoring Team and the DOJ.

In any event, it is unclear to the Monitoring Team what possible utility there could be in a deputy chief signing an official document – one which will become a key exhibit in any legal action relating to the investigation – for a superintendent who never has reviewed the document and, according to NOPD, never gave her authorization to sign on her behalf.[15] Nonetheless, we are pleased PIB is reviewing its purportedly historic practice to determine its continued "utility."

### 5. Failure to Consider or Document Circumstantial Evidence

As spelled out in the Monitoring Team's attached analysis, the PIB investigation report fails to consider a wealth of circumstantial evidence relating to the many hours Officer Vappie spent in the Upper Pontalba apartment both on and off duty. Among other things, we noted in our analysis that

> The Consent Decree mandates that "in each investigation, NOPD shall consider all relevant evidence, *including circumstantial, direct, and physical evidence*, as appropriate, and make credibility determinations based upon that evidence. . . .

Monitoring Team Analysis at 7. Paragraph 26 of NOPD policy 52.1.2 contains the same requirement:

> In each investigation, the investigator shall consider all relevant evidence, ***including circumstantial, direct, and physical evidence***,

---

15      We note in this regard that NOPD's response to the Monitoring Team's analysis was signed by Deputy Chief Keith Sanchez "for" Interim Superintendent Woodfork. In light of NOPD's position that a deputy can sign "for" a superior without the superior ever seeing, concurring with, or even knowing about that which is signed, it is unclear whether the Interim Superintendent ever even saw NOPD's response – let alone understood her obligation to respond to it per Consent Decree paragraph 454.



> as appropriate, and make credibility determinations based upon
> that evidence. . . .

Policy 52.1.2 (emphasis added).

    In our analysis, the Monitoring Team criticized the PIB investigation report for failing to consider the significant circumstantial evidence regarding the time Officer Vappie spent in the Upper Pontalba apartment and its relation to the payroll fraud allegation. The Monitoring Team described it this way:

> While PIB admittedly did not have visibility into what was going on in that apartment — i.e., whether Officer Vappie was there in service of his executive protection function or was there for more social reasons — there is much circumstantial evidence that suggests Officer Vappie was *not* present in furtherance of his executive protective duties. ***This circumstantial evidence should have been included in the PIB report since it all is relevant to NOPD's application of the Preponderance of the Evidence standard***.

Monitoring Team analysis at 8 (emphasis added). To highlight the importance of abiding by NOPD policy and considering all circumstantial evidence, the Monitoring Team noted that a proper analysis would have considered and documented the following:

- Officer Vappie spent many hours in the City's Upper Pontalba apartment.

- Officer Vappie was the only officer among the executive protection team who spent any time in the Upper Pontalba apartment. All other officers stayed outside the apartment while protecting the Mayor. Had the time in the Upper Pontalba apartment truly been work time, other officers presumably would have taken their turn doing the same.

- Officer Vappie changed clothes, used the shower, and undertook various non-security tasks (*e.g.*, watering plants) while in the apartment with and without the Mayor.

- Officer Vappie spent time in the Upper Pontalba apartment both on and off duty.

- Even when Officer Vappie left the Upper Pontalba apartment late at night after spending several hours in the apartment, the Mayor often walked alone to her car in the French Quarter without any security, strongly suggesting Officer Vappie was not spending time in the apartment because of any credible threat to the Mayor's safety. If there had been a credible threat to the Mayor's safety, (a) other officers would have rotated through the in-apartment assignment and (b) the



executive protection team would not have allowed the Mayor to walk to and from the apartment alone.

• The news story about the time Officer Vappie spent in the Upper Pontalba apartment led to a prompt divorce filing from Officer's Vappie wife, an unlikely reaction to an actual, transparent executive protection detail.

• No officer spent time inside the Mayor's residence, which would have been the case had there been a credible threat to the Mayor's safety.

• Multiple other members of the Mayor's Executive Protection team testified during the PIB investigation to the unprofessional nature of Officer Vappie's actions, which, they felt, brought discredit to the NOPD.

Monitoring Team analysis at 8-9.

Our analysis explained that while these facts do not *prove* beyond the shadow of a doubt Officer Vappie was not working while in the Upper Pontalba apartment, "they demonstrate *by a preponderance of the evidence that* Officer Vappie was not working while in the apartment. Yet he was billing the City of New Orleans for much of his time there." In other words, the circumstantial evidence strongly suggests that Officer Vappie may have been involved in payroll fraud. Our findings are spelled out in more detail in the attached analysis.

Not only did PIB's investigation report ignore this circumstantial evidence, NOPD's response to the Monitoring Team's analysis similarly ignores the Monitoring Team's concerns. NOPD's actions here not only fail to comport with the requirements of the Consent Decree, they again put the integrity of their underlying investigation at risk.

### 6. PIB Failed To Respond To Multiple Other Shortcomings Identified By The Monitoring Team

In addition to the items summarized above, the Monitoring Team identified a number of other shortcomings in its analysis of PIB's investigation report. These include a failure on the part of PIB to aggressively pursue interviews with all material witnesses, including the Mayor, the former superintendent, and Consulting Chief of Operations[16] Fausto Pichardo;[17] a failure

---

[16]     We used the title "Consulting Chief of Operations" for Mr. Pichardo because the Mayor of New Orleans has used it publicly. The Monitoring Team, however, has not seen that title on NOPD organizational charts and does not know what role Mr. Pichardo plays within the Department. In any event, the Consent Decree makes clear it is "binding upon all Parties hereto, by and through their **officials, agents, employees**, and successors." Consent Decree at ¶8 (emphasis added).

[17]     The Mayor, former Superintendent Ferguson, and Consulting Chief of Operations Pichardo all refused to be interviewed by the PIB. As noted in the analysis we shared with PIB, these refusals suggest a lack of understanding of or respect for NOPD's accountability systems.



properly to assess the credibility of witnesses; a failure to take adequate steps to protect the confidentiality of its investigation; and a failure to cooperate with the New Orleans Office of Inspector General. PIB ignored all of these concerns in its response to the Monitoring Team. Pursuant to paragraph 454 of the Consent Decree, NOPD should be required to either accept the Monitoring Team's recommendation to remedy the flaws in its investigation or should be required to explain in writing why it is rejecting those recommendations. Failure to do so not only violates the Consent Decree, but, as noted above, it also puts the integrity of the investigation at risk and makes it more likely any discipline imposed will be appealed successfully.

\*     \*     \*

It is difficult to understand the City's position with regard to the Monitoring Team's analysis. The purpose of paragraph 454 is to help improve the quality and integrity of PIB's investigations. Each of the Monitoring Team's recommendations would benefit the NOPD and, by extension, its officers and the community. As things stand now, two professional investigators, Captain Kendrick Allen and Lieutenant Lawrence Jones, will have spent months conducting an important investigation only to see their hard work potentially overturned by the Civil Service Commission or an appeals court. Either the NOPD is hoping for that result, it has a remarkable blind spot regarding the quality of its final investigation report, or it stubbornly is avoiding taking any recommendation of the Monitoring Team. In any case, the NOPD's position is unfortunate and flies in the face of the letter and spirit of the Consent Decree.

Regardless of the NOPD's inexplicable position regarding the Monitoring Team's recommendations, we remain ready and willing to engage with PIB in a meaningful way to remedy the shortcomings of and improve the quality of the PIB report to the extent time still is available to do so. Until that happens, however, and without taking away from what we have said was a serious effort on the part of the investigators to conduct a professional investigation, we remain extremely concerned with the way NOPD has approached this matter.

Thank you Your Honor for the opportunity to submit this report to the Court. As is our common practice, we shared a draft of this report with the parties for comment on Monday, May 1, 2023. DOJ responded with comments on May 8, 2023. NOPD chose not to submit comments, although, as noted above, NOPD previously submitted a response to the Monitoring Team's analysis of the Vappie investigation. The Monitoring Team considered and incorporated, where appropriate, the feedback received from the parties into this final report.



Should the Court have additional questions for the Monitoring Team, we will be happy to answer them.

Respectfully submitted,


Jonathan S. Aronie
Consent Decree Monitor
Partner, Sheppard Mullin LLP

CC:
City Attorney Donesia Turner
DOJ Counsel Jonas Geissler
Superintendent Michelle Woodfork
Deputy Superintendent Keith Sanchez
Deputy Monitor David Douglass
Independent Police Monitor Stella Cziment



**Attachments**

CDM020



**Attachment A**

**City Council Letter to Monitoring Team**



*City of New Orleans*

November 10, 2022

Judge Susie Morgan
500 Poydras Street
Room C322
New Orleans, LA 70130

Jonathan Aronie
2099 Pennsylvania Avenue, NW
Suite 100
Washington, DC 20006-6801

Dear Judge Morgan & Mr. Aronie:

We are writing to express our significant concerns about the apparent conflict of interest with the New Orleans Police Department being allowed to, again, investigate serious allegations involving Mayor Cantrell. The NOPD cannot be allowed to handle this matter fully and internally because of the inherent conflict of interest.

By this letter, we formally request that immediate steps be taken to appoint the Consent Decree Monitor, in partnership with Office of the Independent Police Monitor to take the lead on this investigation. We believe swift action is required to cure apparent conflicts of interest and preserve the integrity of the investigations of the Mayor.

Regards,

JP Morrell
Councilmember at-Large
Governmental Affairs Committee Chair

Joseph I. Giarrusso, III
Councilmember District A
Budget Committee Chair

CC:
Stella Cziment, Independent Police Monitor

CDM022



**Attachment B**

**Monitoring Team's Response To City Council**

# NOPD CONSENT DECREE MONITOR
# NEW ORLEANS, LOUISIANA



202.747.1902 direct
jaronie@sheppardmullin.com

File Number:  37PA-191555

November 11, 2022

JP Morrell, Councilmember at-Large
Joseph I. Giarrusso, III, Councilmember District A
City Hall
1300 Perdido St.
New Orleans, LA  70112

Dear Sirs:

This letter confirms receipt of your request that the Consent Decree Monitoring Team and the IPM jointly investigate matters relating to alleged time card misconduct involving the Mayor's NOPD security detail.  As you know, the Monitoring Team does not investigate specific matters.  Likewise, at the moment, the IPM is not staffed to investigate specific matters.  Nonetheless, we understand your belief that matters relating to high-ranking officials within the police department or the City require extra diligence to ensure there is no real or perceived pressure on the investigators.  Accordingly, we have conferred with the IPM, and agreed we both will work closely with the New Orleans Police Department Public Integrity Bureau to ensure their investigation of NOPD's role in this matter is effective, efficient, and without bias.  The U.S. District Court has agreed that this is wholly consistent with our role of monitoring and providing technical assistance to the New Orleans Police Department.  We believe this approach will address your concerns and ensure that our role is well within the scope of the Consent Decree and that the IPM's role is met within its current resources.

Thank you for your confidence in us.

Jonathan S. Aronie
For SHEPPARD MULLIN RICHTER & HAMPTON LLP*
2099 PENNSYLVANIA AVE., N.W., SUITE 100
WASHINGTON, DC  20006

CC:   HONORABLE SUSIE MORGAN (VIA ELECTRONIC MAIL)
      DAVID L. DOUGLASS, ESQ. (VIA ELECTRONIC MAIL)
      TIMOTHY MYGATT, U.S. DEPARTMENT OF JUSTICE (VIA ELECTRONIC MAIL)
      DONESIA D. TURNER, CITY OF NEW ORLEANS (VIA ELECTRONIC MAIL)



**Attachment C**

**Monitoring Team's 2/17/23 Immediate Action Notice to PIB**



February 17, 2023

Dear Mr. Sanchez,

In early November 2022, local TV station Fox 8 began a series of stories involving the Mayor's security detail. The story raised a number of questions regarding the operation of that detail as well as the actions of a particular member, Officer Jeffrey Vappie. On November 10, the New Orleans City Council requested that the Office of the Consent Decree Monitor and the Office of the Independent Monitor conduct an independent investigation of the matter, citing "significant concerns about the apparent conflict of interest with the New Orleans Police Department being allowed to, again, investigate serious allegations involving Mayor Cantrell."

The Monitoring Team responded to the City Council on November 11 explaining that it lacked the authority to conduct investigations, but that it would monitor PIB's investigation of Officer Vappie closely to ensure it was effective, efficient, and without bias. As we understand it, PIB opened an investigation into the allegations in late November or early December 2022.

As you know, over the course of PIB's investigation, the Monitoring Team has met with your investigators, Captain Kendrick Allen and Lieutenant Lawrence Jones, on a weekly basis. While we have not been involved in the day-to-day affairs of the investigation, your team has been open with us regarding their strategy and the status of their activities. We appreciate the cooperation your team has shown us throughout this matter.

While we know the Vappie investigation has not yet concluded, the Monitoring Team has become aware of several issues that we believe the NOPD should address right away. Rather than waiting until the conclusion of PIB's investigation, we are bringing these matters to your attention at this time to ensure NOPD considers taking immediate steps to correct the concerns we identified. Importantly, we offer no opinions or recommendations regarding the Vappie investigation itself at this time. Our opinions and recommendations relate only to larger policy/process issues that are unrelated to the forthcoming substantive findings of the Vappie PIB investigation team.

Should you have any questions regarding these recommendations, do not hesitate to reach out to us.

Thank you for your continued cooperation in this matter.

Respectfully,

Jonathan Aronie
Consent Decree Monitor

CDM026



**Interim Recommendations Based On Vappie Investigation**

1. **Supervision**. As you are aware, the NOPD officers assigned to the Executive Protection detail receive little if any oversight from NOPD supervisors. This appears to have been the case for years. The members of the detail indicated their belief that their only supervisor was the Mayor herself. While the Mayor seemingly is responsible for assignments and schedules, there is no indication the Mayor played any role in supervision beyond that. ***NOPD should take immediate action to ensure the members of the Executive Protection detail receive the "close and effective supervision" required by the Consent Decree.***

2. **Policy**. Currently, no written policy guides the operation of the Executive Protection detail or the actions of the officers assigned to that detail. Likewise, no written document (policy or otherwise) sets out the standards and protocols with which members of the Executive Protection team are expected to comply. The lack of written guidance almost certainly will impact PIB's investigation of Officer Vappie. ***NOPD should take immediate action to develop clear policies and procedures governing the operation of Executive Protection detail and the officers assigned to that detail.*** As required by the Consent Decree, such policies and procedures should "define terms clearly, comply with applicable law and the requirements of the Consent Decree, and comport with best practices."

3. **Performance Evaluations.** The Consent Decree requires that "officers who police effectively and ethically are recognized through the performance evaluation process, and that officers who lead effectively and ethically are identified and receive appropriate consideration for promotion" and that "poor performance or policing that otherwise undermines public safety and community trust is reflected in officer evaluations so that NOPD can identify and effectively respond." Without any meaningful NOPD supervision, it is unclear to us who, if anyone, evaluates the performance of members of the Executive Protection detail. ***NOPD should take immediate action to ensure members of the Executive Protection detail are evaluated in the same manner as other NOPD officers.***

4. **Efficiency.** We understand that members of the Executive Protection team get paid for a full shift whether or not the Mayor is in town. It is unclear, however, what work they are performing while the Mayor is not in town beyond occasional administrative tasks like cleaning the Mayor's car and catching up on Departmental paperwork. At a time when NOPD has vocally complained about its lack of officers — and used the lack of officers to explain its inability to comply with various Consent Decree obligations — it would seem to be quite inefficient to have multiple days when 1-2 additional officers are available to perform patrol work, but they are not performing patrol work. ***NOPD should consider identifying meaningful tasks members of the Executive Protection team can perform while the Mayor is out of town to contribute to the Department's well-publicized efforts to combat its lack of personnel.***



5. **Legal Conflicts**. The City Attorney provides "legal advice to the Mayor, the City Council, and other city offices, departments, and boards," including the NOPD. While this joint representation normally creates no conflict, when the Mayor is or may be a material witness in a PIB investigation, the risk of a real or perceived conflict is significant. Indeed, this occurred in the Vappie investigation when the City Attorney visited PIB to monitor the second interview of Officer Vappie. Situations like this can create the perception that City Hall is attempting to intimidate interviewees or investigators, or otherwise interfere in a PIB investigation. Such perception may be avoided when the Mayor is or may be a witness by (i) the imposition of a formal wall to block the exchange of information between the Mayor's office/City Attorney's Office and PIB and (ii) engaging outside counsel to support PIB throughout the investigation. The Office of the Independent Monitor made this suggestion in a thoughtful public letter to the City Council on February 9, 2023. The Monitoring Team agrees with the IPM's concerns. ***NOPD should consider engaging outside counsel to advise PIB on matters when the City Attorney's representation of the City, Mayor's Office, and PIB could create a real or apparent conflict of interest.***

6. **Reassignment Of Officers Under Investigation.** We understand, pursuant to Policy 13.1, the Superintendent has the discretion to administratively reassign officers during certain PIB investigations. In this case, Officer Vappie had been moved out of the Executive Protection detail pending the PIB investigation, which was a sensible decision considering the nature of the allegations, the public profile of the investigation, and the likelihood that the Mayor would be a material witness in the investigation. Outgoing Superintendent Ferguson, however, hours before his retirement, directed the return of Officer Vappie to the Mayor's security detail. While this order, fortunately, was reversed by a deputy chief and the City Attorney, the order itself created at the very least the appearance of interference in a PIB investigation. ***NOPD should consider revising its policy to prohibit officers reassigned due to a PIB investigation from being assigned back to their units until the conclusion of the PIB investigation without the express approval of the PIB Deputy Chief.***

7. **PIB Investigators**. During the course of the PIB investigation, the two investigators assigned to the Vappie investigation were moved out of PIB. The lead investigator, Lawrence Jones, was promoted to lieutenant and moved to the district patrol. The PIB Captain, Kendrick Allen, was assigned to command a district. Without at all suggesting these two promotions were not warranted, NOPD should have considered detailing both individuals back to PIB until the completion of the Vappie investigation. While Superintendent Woodfork assured the Monitoring Team both officers would be given adequate time to complete their investigation, as a practical matter, this is difficult to accomplish in practice. PIB readily concedes it lacks adequate personnel to perform aspects of its investigation in the best of times (*e.g.*, reviewing videos and documents). Adding a full time job to Allen's and Jones's schedules on top of their PIB jobs virtually guarantees both jobs will be compromised to some extent. ***NOPD should consider adopting a policy of detailing promoted officers back to PIB for limited timeframes when necessary to complete significant pending investigations.***



8. **Initial Investigation Letters.** At the outset of the investigation, PIB alerted Officer Vappie it had opened an administrative investigation initiated by a public complaint. The letter advised Officer Vappie that PIB would focus on an alleged violation of the 16.35 hour rule *as well as other matters*. PIB was aware at that time, however, of several other potential violations by Officer Vappie as a result of the Fox 8 coverage, including potential violations of NOPD's professionalism, conflict, and time charging rules. While PIB represented to the Monitoring Team that the general "other matters" language was all that was required to put Officer Vappie on notice of the allegations against him, the limited wording of the initial letter created avoidable problems during the Vappie interview. ***NOPD should consider the pros and cons of including a more complete description of the conduct under investigation in its initial letters to investigation subjects.***



**Attachment D**

**PIB Investigation Report**

2022-0513-R
Page 1 of 42

## DEPARTMENT OF POLICE

## INTEROFFICE CORRESPONDENCE

**TO:** Michelle M. Woodfork
Superintendent of Police

**DATE:** March 10, 2023

**FROM:** Captain Kendrick Allen
Field Operations Bureau / First District

**SUBJECT:** P.I.B. Complaint Tracking Number 2022-0513-R
Senior Police Officer Jeffery Vappie,
Employee Number 08913

### INTRODUCTION

On Tuesday, November 8, 2022, approximately 7:00p.m., Public Integrity Bureau Sergeant Lawrence Jones was contacted by Public Integrity Bureau Deputy Chief Keith Sanchez. Deputy Chief Sanchez informed Sergeant Jones that a media request was sent to the Public Integrity Bureau relative to New Orleans Police Department Senior Police Officer Jeffery Vappie assigned to the Investigative Services Bureau, Executive Protection. Deputy Chief Sanchez forwarded the request to Sergeant Lawrence Jones for review.

On Wednesday, November 9, 2022, Sergeant Lawrence Jones reviewed the request and learned that Senior Police Officer Jeffery Vappie was accused of working more than 16 Hours and 35 minutes with in a 24-hour period. The request indicated Officer Vappie may have violated this rule when on several occasions while assigned to the Executive Protection Section he may have violated this NOPD policy.

Based on the information provided, Sergeant Lawrence Jones initiated a departmental FDI **(EXHIBIT B)** and a form (230) the Initial Intake Form for Commendation, Complaint, or Documentation of Minor Violation **(EXHIBIT C)** on Senior Police Officer Jeffery Vappie on Wednesday, November 9, 2022, for potential violations of, **Rule 4 Performance of Duty: Paragraph 4 Neglect of Duty C6 Failing to comply with instructions. oral or written from any authoritative source to wit: N.O.P.D. Chapter 22.08 Police Secondary Employment Paragraph 32 which states: No member. including Reserve officers, shall work more than more than 16 hours and 35 minutes (16.58 hours) within a 24-hour period.**

2022-0513-R
Page 2 of 42

## Brief Synopsis

On Wednesday, November 9, 2022, Sergeant Lawrence Jones reviewed a media request from WVUE a local news station indicating that Senior Police Officer Jeffery Vappie may have violated NOPD policy.   The request indicated Officer Vappie may have violated policy when on several occasions while assigned to the City of New Orleans Mayor Executive Protection team he work more than 16 Hours and 35 minutes with in a 24-hour period.  The request also indicated Officer Vappie may have neglected his duty when he attended a Board meeting with the City of New Orleans Housing Authority while on duty.  The request also indicated that Officer Vappie may have spent numerous hours with his Protectee at the Upper Pontalba Apartments both on duty and off duty.  The media request will be attached to this investigation as **(EXHIBIT D)**

## Allegations

Based on the information provided, Sergeant Lawrence Jones initiated a departmental FDI on Senior Police Officer Jeffery Vappie on Wednesday, November 9, 2022, for potential violations of, **Rule 4 Performance of Duty: Paragraph 4 Neglect of Duty C6 Failing to comply with instructions, oral or written from any authoritative source to wit: N.O.P.D. Chapter 22.08 Police Secondary Employment Paragraph 32 which states: No member, including Reserve officers, shall work more than more than 16 hours and 35 minutes (16.58 hours) within a 24-hour period.**

## INVESTIGATION

This Administrative Investigation was assigned to Captain Kendrick Allen and Sergeant Lawrence Jones of the Public Integrity Bureau on Friday, November 11, 2022, by Deputy Chief Keith Sanchez, bureau chief of the New Orleans Police Department Public Integrity Bureau. For the purpose of this investigation Captain Kendrick Allen will be identified as Captain Allen and Sergeant Lawrence Jones will be identified as Lieutenant Jones.

Captain Allen and Lieutenant Jones began this investigation when on Wednesday, November 9, 2022, approximately 1:00p.m., Lieutenant Jones contacted Senior Police Officer Jeffery Vappie and requested that he relocate to the Public Integrity Bureau, located at 1340 Poydras Street, Suite 1900.  Officer Vappie later arrived at the Public Integrity Bureau and he was placed on Administrative Re-assignment.  Officer Jeffery Vappie was released from reassignment on Wednesday, December 21, 2022, 4:00pm. **(EXHIBIT E)**

2022-0513-R
Page 3 of 42

Captain Allen realize that more time would be needed to conduct a thorough, fair and impartial investigation. Therefore, on Thursday, November 17, 2022, in accordance with Civil Service Rule IX, Section 1:4 for the City of New Orleans Captain Kendrick Allen petitioned Ms. Amy Trepaginer, the personnel Director of the Department of Civil Service. Captain Allen respectfully requested an extension of time so Captain Allen could conduct a thorough investigation **(EXHIBIT F)**. On Tuesday, November 22, 2022, Captain Kendrick Allen's extension request was presented to Civil Service Hearing examiner Jay Ginsberg, by PIB Sergeant Omar Garcia. The hearing was conducted at 1340 Poydras Street Suite 900. At the conclusion of the hearing, Examiner Ginsberg granted Captain Allen's request for an extension and allowed an additional 60 days to complete the administrative investigation of Senior Police Officer Jeffery Vappie **(EXHIBIT G)**.

To complete a thorough investigation, Captain Allen and Lieutenant Jones thought it would be best to obtain a historical information relative to previous officers assigned to the Executive Protection Detail. Lieutenant Jones was aware from previous job knowledge of the assignment that Senior Police Office Kristy Johnson-Stokes and retired Sergeant Wondell Smith were recently assigned to the Executive Protection team. Therefore, on Tuesday, November 29, 2022, Lieutenant Lawrence Jones contacted former members of the Mayor's executive protection team, New Orleans Police Senior Police Officer Kristy Johnson–Stokes now assigned to the New Orleans Police Department Investigative Services Division / Intelligence Unit and New Orleans Police Retired Sergeant Wondell Smith. Lieutenant Jones requested an interview of both officers to obtain any investigative knowledge they could provide to the investigation. Both, Officer Kristy Johnson-Stokes and Retired Sergeant Wondell Smith agreed to be interviewed. Officer Johnson-Stokes interview was set for Monday, December 5, 2022 at 11:30am and Retired Sergeant Wondell Smith was scheduled for Tuesday, December 6, 2022 at 10:00a.m.

Captain Allen and Lieutenant Jones met with Senior Police Officer Kristy Johnson-Stokes on Monday, December 5, 2022 at 12:00p.m., the interview was conducted at 3925 North I-10 service Road, Suite 212, Metairie, Louisiana 70002.

Lieutenant Jones commenced the audio-recorded interview **(EXHIBIT H)** by advising Officer Johnson-Stokes of her rights as outlined in the Police Officers Bill of Rights, Louisiana Revised Statue 40:2531. Lieutenant Jones informed Officer Johnson-Stokes she was only being interviewed as a witness relative to a New Orleans Police Officer being accused of potential violations of Rule 4 Performance of Duty: Paragraph 4 Neglect of Duty C6 Failing to comply with instructions, oral or written from any authoritative source to wit: N.O.P.D. Chapter 22.08 Police Secondary Employment Paragraph 32 which states: No member. including Reserve officers, shall work more than more than 16 hours and 35 minutes (16.58 hours) within a 24-hour period.

Investigating Officer's Initials: _K A_ EDM033

2022-0513-R
Page 4 of 42

Lieutenant Jones then advised Officer Johnson-Stokes of New Orleans Police Department Chapter 52.1.1 requires all New Orleans Police Department employees to answer questions in official inquiries and refusal to comply will result in termination.

Additionally, employees are to be truthful at all times in their spoken, written, or electronic communications, whether under oath or not, in all matters and official investigations relating to the scope of their employment and operations of the Department. Failure to comply will result in termination. Officer Johnson-Stokes indicated she understood her rights and began her statement at 12:06p.m. Officer Johnson-Stokes stated the following:

## <u>Statement of Officer Kristy Johnson-Stokes (Witness)</u>

Kristy Johnson Stokes...NOPD OFFICER...was trained and assigned to the mayor's office/security detail under retired Sergeant Wondell Smith for Mayor Landrieu part time until Mayor Cantrell's 1st term for 3yrs. The team working schedule was 12hr days except on Wednesday when they would work an eight (8) hour day. On special events, the entire team would be scheduled to work. Some of the responsibilities for the team was transporting the daughter to and from school, practice or whatever is in the daughter's schedule. After Sergeant. Smith's transfer out of the executive protection team, the mayor did not assign another supervisor and Sergeant. Lane (worked in Headquarters) entered the protective team's time but was not assigned to the unit. Via Mayor Cantrell she'll sometimes say, "If I need you, I'll call you." Orders came from the mayor after Sergeant. Smith left. Sometimes the mayor gave instructions to Officer Martinez or Orleans Parish Sheriff Deputy Charles Ellis. If a day exceeded 12hrs, the protection team would stay as long as the mayor was conducting business. Officer Johnson-Stokes stated, no one had keys to the mayor's residence, but they did know where an extra key to the apartment (Upper Pontalba) was located. The executive protection team would receive an email from the mayor's assistant giving them the schedule for the next working day. Via Officer Johnson-Stokes the Mayor may ask an executive protection team member to water plants which was not against the law. At times there would be a gap in the mayor's schedule that would be filled in with things like going to lunch, in the office, or church. On the schedule would be dinner parties, city events, or anything other business involving the city. Via Officer Johnson-Stokes during her time in executive protection, they didn't have keys, nor would they be inside of the Upper Pontalba apartment, nor did they travel, however, the team would occasionally, do some walk/run with the mayor. Officer Johnson-Stokes concluded her statement at 1:02p.m.   Senior Police Officer Kristy Johnson-Stokes transferred to the Intelligence Section of the New Orleans Police department on May 23, 2021.  A transcribed copy of Officer Kristy Johnson-Stokes statement will be attached to this investigation as **(EXHIBIT I)**

CDM034

Investigating Officer's Initials: _____

2022-0513-R
Page 5 of 42

On Tuesday, December 6, 2022, approximately 10:00a.m., Captain Allen and Lieutenant Jones met with Retired Sergeant Wondell Smith. The interview was conducted in the 4700 Block of Lennox Street inside of Retired Sergeant Smith's residence. Note: To maintain the integrity of retired Sergeant's Smith residence, the residence location will not be listed in this investigation, at Sergeant Smith's request.   After advising Retired Sergeant Smith of the nature of the investigation, Sergeant Smith advised he wishes to continue and began his taped recorded statement at 10:11a.m., **(EXHIBIT J).**   Retired Sergeant Wondell Smith stated the following;

## Statement of Retired Sergeant Wondell Smith (Witness)

Sergeant Smith advised he was a 35-year veteran of the New Orleans Police Department.  He began his career in the 5th District; 6th District, Mounted for 10 years and three (3) years in the academy.  After the academy he transferred to the Mayor's office where he served 18 years in Executive Protection.  Sergeant Smith sated he served under Mayor Nagin, Landrieu and the first term of Mayor Latoya Cantrell.  Sergeant Smith sated he was promoted to the rank of Sergeant in 2004 whiles serving under Mayor Nagin and remained as the Executive Protection Supervisor until he was transferred to Intelligence 2021.

Lieutenant Jones inquired from Sergeant Smith if he could provide insight on his job duties as Executive Protection through his time of service.  Sergeant Smith responded, for the most part, it transcends.  Your responsibilities are to the mayor and to the mayor's immediate family. Sergeant Smith stated, they normally work in teams of two and get the itinerary the day before either by email or text.  Often Sergeant Smith would direct someone to conduct an advance review of the location, the Mayor would be visiting the following day.  The itinerary received the previous day would discuss pick up location, which is normally the Mayor's residence.  The Protection team members would leave their take home vehicle at the pickup location and drive the Mayor's assigned SUV for the work day.  Once the Protectee is ready they would go to office or the first appointment.  Once the Mayor has gone through the entire schedule, at that point it becomes family time. Sergeant Smith was very clear the Executive Protection team works at the Mayor's discretion.  "If Mayor goes to the movies, you got to go to the movies."

Sergeant Smith indicated he serve under the current administration with team members, Kristy Johnson-Stoke, Louis Martinez and Orleans Parish Criminal Sheriff Charles Ellis.  Sergeant Smith stated although he was the supervisor "You do what the mayor tells you to do Period." Sergeant Smith explained that all Executive Protection members goes through Executive Protection training, either before assignment or immediately after assigned.  Each Mayor would meet with the perspective candidate and the final decision was the mayor's decision.  Captain Allen inquired from Sergeant Smith if he considered the mayor to be a part of his Chain of command.  Sergeant Smith stated, "Absolutely, the Superintendent takes orders from the Mayor and so did I."

Investigating Officer's Initials: _____ PDM035

2022-0513-R
Page 6 of 42

Lieutenant Jones inquired from Sergeant Smith if he could describe how he interacted with the Protectee.   Sergeant Smith responded, always professional.  During each mayor he served, he and all team members were always professional. Lieutenant Jones then inquired from Sergeant Smith if he ever served with Officer Jeffery Vappie.   Sergeant Smith responded, "Yes he worked part time with Mayor Nagin." At no time doing the appointment with Mayor Nagin did he ever observe Officer Vappie to be unprofessional.

Captain Allen inquired from Sergeant Smith if he had a key to the Mayors Personal residence or the Upper Potable Apartment.  Sergeant Smith responded, "No" to the personal residence, as to the Apartment nobody had a personal key, the key was kept in the car in the glove box. Lieutenant Jones then inquired from Sergeant Smith, if there was ever a moment he had to go to the apartment alone.  Sergeant Smith responded, <u>"No, you only went to that apartment like and this is like for everybody, for all the previous mayors, we went – you know you're going there Christmas, for the Christmas caroling in Jackson Square. You know you're going their New Year's Eve. You know you're going there because that's, uh, Sugar Bowl and New Year, bring in the new year, dropping the ball and all that in the French Quarter. And you might go to it during some other special event, but it's always a gathering of people coming and going,"</u> never going just hanging out.

As it relates to the payroll for the Executive protection team.  Sergeant Smith stated he would enter the time and often Sergeant Tokishiba Lane would call and inquire.  But, he would never discuss the Mayor's itinerary with Sergeant Lane, so she would just approve the time.  Sergeant Lane was not assigned to Executive Protection, she was a Supervisor in the Investigative Services Bureau, so Sergeant Smith indicated he did not give her reasons for the hours. Sergeant Smith described the schedule as a four day (12) hour work day.  Lieutenant Jones inquired from Sergeant Smith if he had any SOP's or Department Regulations associated with executive Protection.   Sergeant Smith responded, "No," he normally just worked out any problems he had.  Retired Sergeant Wondell Smith concluded his statement at 11:20a.m. A transcribed copy of Sergeant Smith's statement will be attached to this investigation as **(EXHIBIT K).**

On Thursday, December 8, 2022, Lieutenant Lawrence Jones also contacted New Orleans Police Department retired Sergeant Todd Henry.  Sergeant Henry Served as a member of the former New Orleans Police Superintendent Richard Pennington's executive protection team. Lieutenant Jones was aware of this appointment because of previous Job knowledge.  After informing Sergeant Henry of the nature of the call and a request to interview him relative to his historical expert knowledge as it pertains to executive protection Sergeant Henry immediately agreed and requested an appointment time.  Lieutenant Jones informed retired Sergeant Henry the interview will be conducted on Monday, December 12, 2022, at 1:00p.m.  The interview location will be the New Orleans Police Department Public Integrity Bureau's office located at 1340 Poydras Street Suite 1900.

Investigating Officer's Initials: _KA_
CDM036

2022-0513-R
Page 7 of 42

Captain Allen and Lieutenant Jones met with retired Sergeant Todd Henry on Monday, December 12, 2022, at 1:00p.m., at the Public Integrity Bureau's office located at 1340 Poydras Street Suite 1900. Sergeant Henry provided a detailed recorded interview relative to his knowledge and training as a former Executive Protection member. **(EXHIBIT L).** Retired Sergeant Henry began his statement at 1:21p.m. and stated the following;

## Statement of Retired Sergeant Todd Henry (Witness)

Retired Sergeant Henry informed the Lieutenant Jones, he was 35-year veteran of the New Orleans Police department. Prior to retirement, he served as the Executive Protection for former Superintendent Richard Pennington. Sergeant Henry explained that he never served as the Mayor's executive protection, but he attended executive protection training. As to the duties, Sergeant Henry explained he would meet the Chief at his residence or he may tell Sergeant Henry to just meet him at Head Quarters. Often the Chief would drive himself to the Office then Sergeant Henry would drive throughout the day. Sergeant Henry explained he worked for the Superintendent's office for approximately four (4) years. Sergeant Henry explained he took several trips out of state with the Superintendent during his tenure as Executive Protection.

Sergeant Henry was asked if he was following the story involving Officer Vappie and his thoughts. Sergeant Henry responded, "That's a bad move on his part. You know, you can't, you know you're not supposed to get involved or go beyond the scope of your duties. Hey, if you got a team and you're the only one have a key, you're the only one going in, that's a problem. That is a problem. Because you're different from the rest of the guys; the number from the news story, the number of trips you take compared to the other guys, that -- looking from the outside, that looks that's more than you being security. You know, you seem to be favored over everybody else, you know, and that's -- you can't do that. You know." Retired Sergeant Todd Henry concluded his statement at 1:50p.m. A transcribed copy of Sergeant Henry's statement will be attached to this investigation as **(EXHIBIT M).**

At the conclusion of the interviews of Officer Kristy Johnson-Stokes, Retired Sergeant Wondell Smith and Retired Sergeant Todd Henry it was clear that instruction to members of the Executive Protection detail are often delivered by text via the city issued cell or email. It was necessary for Captain Allen and Lieutenant Jones to gain access to Officer Vappie work issued cell phone and City Emails. The review will provide evidentiary value in the event instructions are received allowing Officer Vappie to attend HANO meetings while at work and any instructions he may have received as it relates to his time spent in the Upper Pontalba Apartments both on duty and off duty.

2022-0513-R
Page 8 of 42

Furthermore, Lieutenant Jones and Captain Allen also wished to obtain the video surveillance video located near the Pontalba to corroborate the claims indicated in the WVUE media request. For this reason, Lieutenant Lawrence Jones instructed members of the Public Integrity Bureau Special Investigation Section to obtain the following;

1. Obtain access to Officer Vappie city emails associated with email address Jvappie@nola.gov , from March 1, 2022, to November 30, 2022, the dates Officer Vappie was assigned to the Executive Protection team. This task was accomplished on December 12, 2022. **(EXHIBIT N).**

2. Officer Vappie work issue Cell Phone **5042698509**. This task was accomplished on December 12, 2022, at 7:12p.m., SIS members met with Officer Vappie at his reassignment location and retrieved his department cell. It should also be noted; Officer Vappie does not have Fourth Amendment protection as it relates to the city issued cell phone. The phone was later released to the New Orleans Police Department Digital Forensic Unit for analysis. Once complete the analysis will be provided to Lieutenant Jones for review. The analysis will be attached to this investigation as **(EXHIBIT O).**

3. Complete a Public Records request to the French Market Corporation to obtain the video surveillance of the camera located on the light pole on St. Peter Street, in Jackson Square Pedestrian Mall outside of the Upper Pontalba apartment. The Public Records request will be attached to this investigation as **(EXHIBIT P).** The Public records request was granted and the video was provided. The date range of the video was July 30, 2022, to November 17, 2022. The video surveillance will be attached to this investigation as **(EXHIBIT Q).**

To also corroborate the inferences that Officer Vappie may have neglected his duty when he attended a HANO board meeting while on duty. Lieutenant Jones queried the Housing Authority of New Orleans official website "hano.org" and obtained historical data relative to "HANO" Board meetings from the March, 2022 to December 2022. The information obtained consisted of meeting minutes, meeting agenda and an audio recording of the meeting. The HANO information obtained from the HANO website will be attached to this investigative report as **(EXHIBIT R).** Note: The analysis information obtained will be discussed at a later portion of the investigative report.

Captain Allen and Lieutenant Jones continued to obtain expert background information as it pertains to Executive Protection. The investigators sought to obtain Education and Training information from experts who previously trained New Orleans Police Members for executive protection. Mr. John Douglass of the Falcon Group Tactical out of the State of Mississippi and Captain Dewight Robinette of the Louisiana State Police were chosen by the investigators because both previously trained members of the NOPD Executive Protection team.

Investigating Officer's Initials: _ICA_                    CDM038

This information was firsthand knowledge to Lieutenant Jones, because officer he recently supervised attended the training of Mr. John Douglass and Captain Dewight Robinette was identified by retired Sergeant Wondell Smith as previously training NOPD Officers.

On Wednesday December 14, 2022, Lieutenant Lawrence Jones contacted both Mr. John Douglass and Captain Robinette. Lieutenant Jones informed both of the nature of the call then requested an interview relative to the investigation. Mr. Douglass and Captain Robinette both agreed to be interviewed and appointments were set. Mr. John Douglass interview was set for Friday, December 16, 2022 at 10:00a.m. and Captain Robinette interview was set for Wednesday, December 21, 2022 at 1:30p.m. Due to the fact both members were located outside of the jurisdiction of Orleans Parish they were interviewed via telephone at their request.

On Friday, December 16, 2022, at 10:00a.m., Lieutenant Lawrence Jones contacted Mr. Douglass via telephone for the interview. Mr. Douglass was using telephone number 662-883-0025 and Lieutenant Jones and Captain Allen was using telephone number 504-421-8333. Mr. Douglass began his taped recorded telephone interview at 10:08 a.m. **(EXHIBIT T)** and stated the following to the investigators;

## Statement of Mr. John Douglass (Training Expert)

Mr. Douglass stated he is a law enforcement officer in the state of Mississippi, for over 25 years probably somewhere closer to 27 years. Mr. Douglass further stated over the course of his career, he served as a patrol officer, an investigator, a narcotics agent, a SWAT team member and a protection agent for the State of Mississippi. Mr. Douglass further stated over the last 10 years, he oversees protection of at least two circuit judges.

Mr. Douglass stated he is a practitioner in protective service operations, better known as, or otherwise known as Dignitary Protection. Mr. Douglass stated he was trained at the Federal Law Enforcement Training Academy in Glencoe, Georgia. Mr. Douglass further explained he is a certified law enforcement instructor for the state of Mississippi for several years and has developed training curriculum in many different subjects, most of being, tactical firearms training and Basic SWAT training for law enforcement officers. Mr. Douglass has also developed the basic protective service operations training program for the State of Mississippi. The Program was submitted to the Board of Law Enforcement Minimum Standards for the State of Mississippi and it was upheld and granted status of a POST certification for the state of Mississippi which is reciprocal throughout the United States. Mr. Douglass went on to say he is contracted by a private company through the state of Mississippi called Falcon Group Tactical. Through the Falcon Group Tactical Mr. Douglass indicated he has trained many officers from the New Orleans Police Department. Note; Lieutenant Jones was aware that recently members of the New Orleans Police Department attended Training thru the Falcon Group.

Investigating Officer's Initials: _KA_ CDM039

Lieutenant Jones inquired from Mr. Douglass if he could discuss his training curriculum. Mr. Douglass stated they often discussed academic definition or a description of how a dignitary protection agent should interact with a **Protectee**, also known as a **Principal**. The communication and interaction between the two or any member of the protection detail should be kept on a **PROFESSIONAL LEVEL ONLY**.

Mr. Douglass went on to discuss the training provided by the Falcon Group also covers, escorting and eating with the principal. Mr. Douglass stated at no point should a Protection member sit with the principal unless invited and even then they position themselves with the Protectee safety in mind. Mr. Douglass further stated he believes all Executive Protection units should have a supervisor embedded in the group. The supervisor would have the authority to ensure the Protectee request align with the departments rules and regulation. The supervisor would also monitor the other members of the unit and replace them if need be. Mr. Douglass concluded his statement at 10:32a.m. A transcribe copy of Mr. John Douglass statement will be attached to this report as **(EXHIBIT U)**

On Wednesday, December 21, 2022, at 1:30p.m., Lieutenant Lawrence Jones contacted Captain Dewight Robinette via telephone for the interview. Captain Robinette was using telephone number 225-379-2029 and Lieutenant Jones and Captain Allen was using telephone number 504-421-8333. Captain Robinette began his taped recorded telephone interview at 1:36 p.m. **(EXHIBIT V)** and stated the following to the investigators;

## Statement of Louisiana State Police Captain Dewight Robinette (Training Expert)

Captain Robinette stated he is currently the commander over the Governor's protection team and that is protective services for Louisiana State Police. Captain Robinette is a 27 years veteran of the Louisiana State Police with 16 of the years serving in Executive Protection. Captain Robinette stated he started Executive Protection as a Trooper and worked his way to commander of the Unit, serving under Governor Jindal and Edwards. Captain Robinette further stated he is currently the President of the National Governor's Security Association.

Captain Robinette further explained in 2014, he was in charge of operations for protective services; which entailed overseeing the daily operations of all teams, the Governor's mansion, facilitate all travel, daily movements, scheduling and all of the positions within protective services. Captain Robinette also oversaw Governor Jindal's presidential campaign in 2015.

Captain Robinette further explained he trained many members of the New Orleans Police Department Executive Protection unit, while serving as the operations Lieutenant. The last training class he could recall was February 11-14, 2019. Captain Robinette stated many NOPD members along with other agencies attended. During the training protection, officers are taught to not only protect the Protectee well-being, but to also protect them from any embarrassment, whether it's your actions or the Protectee actions that may cause them embarrassment. Captain Robinette also explained, your attire should blend in and not overshadow your Protectee. All conversations should remain professional and limited to "Good Morning" not good morning and how was your day. The executive protection officer should gain the trust of the Protectee, but never cross the line of being unprofessional. Captain Robinette explained having a supervisor in the unit is intricate with helping to curve unprofessional behavior from either the Protectee or the team members. Captain Robinette further explained it is common for the protection team members to exercise with the Protectee, to include running, biking, walking or weight lifting. For the purpose of the Governor, it was always two Executive Protection personnel. Captain Robinette further explained as it relates to the primary living quarters of the Protectee. The team only goes there if it is a security issue.

Lieutenant Jones inquired from Captain Robinette insight on working hours for his Protection team. Captain Robinette explained all of the Louisiana State Police Executive Protection members work 12-hour days, which they normally exceed. Captain Robinette explained they follow the moto, "We wake them up and we put them to bed." The Captain also indicated they have a responsibility to the Protectee family members. Captain Robinette further explained all members of the Louisiana State Police Executive Protection team are hand selected. They take into account the persons work ethic, personality background and an interview process. Previous supervisors interviewed and a review of their internal affairs record is reviewed.

Captain Robinette explained all protection teams' whether it is federal, state or local are consistent and do the same duties. Those duties are to protect a particular dignitary. Your focus and main goal is to provide cover for that principal, regardless to whether or not you run a one-man detail or multiple man detail.

Captain Robinette concluded his statement with, "**You never do anything – and we preach this: don't do anything that's immoral, illegal or unethical. Those three things can get you in jail, fired or hurt, or get your Protectee in trouble and that's my, that's my, uh, my policy. That is what I preach all the time and I've preached it to a lot of people. And when we teach that class, we always say that: don't ever do anything that's illegal, immoral or unethical.**" Captain Dwight Robinette concluded his telephone statement at 2:25p.m. A transcribe copy of Captain Dwight Robinette statement will be attached to this report as **(EXHIBIT W).**

2022-0513-R
Page 12 of 42

After interviewing both training experts Captain Dewight Robinette and John Douglass, Lieutenant Jones and Captain Allen then wished to interview current members of the Executive Protection team.   Therefore, Lieutenant Lawrence Jones contacted New Orleans Police Department Senior Police Officer Louis Martinez. Lieutenant Jones requested to interview Officer Martinez relative to his knowledge of this investigation.  Officer Martinez informed Lieutenant Jones that he would be willing to provide a statement then requested a date and time to be interviewed.  Lieutenant Jones advised Officer Martinez the interview would take place at the Public Integrity Bureau's office located at 1340 Poydras Street, Suite 1900. An appointment was set to interview Officer Louis Martinez on Tuesday, December 27, 2022 at 11:00a.m.

Lieutenant Jones and Captain Allen met with Officer Martinez on Tuesday, December 27, 2022 at 11:05a.m., at the Public Integrity Bureau's office, interview room number one.  Prior to the interview, Captain Kendrick Allen presented Officer Louis Martinez with New Orleans Police Department Internal Investigation Rights and Responsibilities of Employees Under Investigation and Notification to Appear and Render a Statement Form.  Both Captain Allen and Officer Martinez signed and dated the form, with a duplicated copy to be included with the internal investigation **(EXHIBIT X)**.

Lieutenant Jones inquired from Officer Martinez if he had a reasonable time to summon an Attorney or Representative.  Officer Martinez responded, "Yes,", then informed Lieutenant Jones that he would continue the interview without an Attorney or representative present.

Lieutenant Jones commenced the audio and video-recorded interview **(EXHIBIT Y)** by advising Officer Martinez of his rights as outlined in the Police Officers Bill of Rights, Louisiana Revised Statue 40:2531.  Lieutenant Jones advised Officer Martinez he would be interviewed as a witness.  Lieutenant Jones then advised Officer Martinez of New Orleans Police Department Chapter 52.1.1 requires all New Orleans Police Department employees to answer questions in official inquiries and refusal to comply will result in termination. Additionally, employees are to be truthful at all times in their spoken, written, or electronic communications, whether under oath or not, in all matters and official investigations relating to the scope of their employment and operations of the Department. Failure to comply will result in termination. Officer Martinez indicated he understood his rights and began his statement at 11:16a.m. Officer Martinez stated the following:

## Statement of Officer Louise Martinez (Witness)

Officer Martinez explained to the investigators prior to joining the Executive Protection team he had several assignments throughout his 34 year NOPD Career. Officer Martinez explained that he served under Mayor Ray Nagin then again with his present assignment under Mayor Latoya Cantrell. Officer Martinez continued to explain he attended Executive Protection training with the Gretna Police Department, the Louisiana State Police and he attended training seminars with United States State Department in Virginia.

Lieutenant Jones inquired about his duties as an Executive Protection Officer. Officer Martinez stated, Executive Protection members are assigned to the Mayor and the Mayor's family. On occasion he the Mayor may request that the members pick up her family members and other family. Officer Martinez explained that both Mayor's he served under would normally request team members to pick up and transport family. When asked by Lieutenant Jones, how are members chosen for the Executive Protection team. Officer Martinez explained, the current members would make recommendations then the selected officers would be interviewed by the Mayor, who makes the final selection. Officer Martinez explained it was this way during both Administration he served, Mayor Nagin and Cantrell.

Lieutenant Jones then inquired about supervisors assigned to the team. Officer Martinez explained Sergeant Wondell Smith was the on team Supervisor prior to his transfer, however no Sergeant is currently assigned to the unit. Officer Martinez also explained, Sergeant Tokishibia Lane-Hart only responsibility was to enter payroll and ensure the members were scheduled for annual in-service training. Sergeant Lane had no responsibility to the day to day operations of the team. Officer Martinez then stated, ultimately the Mayor is the Supervisor.

Officer Martinez then explained the schedule the unit operated. Officer Martinez explained the scheduled was adopted by Sergeant Wondell Smith when he was the supervisor. Sergeant Smith adopted the State Trooper scheduled which required 12 Hour Shifts. The unit operated in Teams, he and Deputy Charles Ellis and Officer Vappie and Robert Monlyn were partners. The teams work 12-hour shifts Friday, Saturday, Sunday, Monday, 8-hours shift on Tuesday and off on Wednesday and every other weekend, unless special events or unusual circumstances like furlough, training etc.

2022-0513-R
Page 14 of 42

Lieutenant Jones then inquired from Officer Martinez if he traveled when the Protectee would travel out of town.   Officer Martinez explained that he did not travel because of an illness. Martinez then explained the Protection team did not travel until Officer Vappie joined the team. Officer Martinez explained that he initially inquired from the Protectee if the team needed to travel and the answer were "NO."  Officer Martinez stated, Officer Vappie mentioned to him that he suggested to the Protectee that the Executive Protection team travels with her.

Officer Martinez then explained that he started to notice Officer Vappie unprofessional behavior with the Protectee.  Officer Martinez explained how Officer Vappie would sit at the table with the Protectee. Officer Martinez stated, <u>"I found it strange, uh, when I'm waiting for him to get a parking spot to go in, I go in the restaurant; he's sitting, sitting with his back to the door, which we don't do by ourselves. The mayor was sitting at the table, sitting at the table and I just looked at him and I, I said, it just didn't look right. I'm, I'm working for you and I'm sitting down having dinner with you. This didn't look right. We always have a table off to the side, it just didn't look right and I told him again. I said, man, you know you're not following protocol."</u>  Martinez stated, he approached Officer Vappie and stated to him **"There's a line that you, you don't cross it. And I asked him did he crossed it; did he cross it and he said no. I took him at his word."**  Lieutenant Jones inquired from Officer Martinez if he ever told a supervisor about Officer Vappie's unprofessional behavior.  Officer Martinez stated, "No, I made it known to him that I didn't approve of what he was doing.

Lieutenant Jones then inquired from Officer Martinez, what was his relationship like with the current Protectee.  Officer Martinez explained, <u>"You don't have a relationship with uh, the mayor, it is the mayor's office and then there's the mayor and your executive protection, you don't have a relationship with the mayor period."</u>

Officer Martinez went on to say he was disappointed about what he was hearing about Vappie being in the Upper Pontalba Apartment abnormal hours.  Officer Martinez also stated, "Um, I was surprised. Like I said, I was hurt. I don't know. I don't get hurt but, uh, I was, when I asked him did he cross the line and he said no, I was concerned about if he was telling me the truth. Watching him walk in, coming out all hours of the night, uh, that, that's the only thing that bothered me. You know, we all are grown men. We have common sense and you know, you can only speculate what, what happened because, you know, you don't really know what happened. But we're grown men and women, so Hum, I cannot see, they go in there with workout clothes. They come out dressed in your work attire. They spend 5 hours a day, I mean, that's strange. It was, it was strange to me."  Senior Police Officer Louis Martinez concluded his statement at 12:40p.m.  A transcribed copy of Officer Martinez's statement will be attached to this investigation as **(EXHIBIT Z).**

2022-0513-R
Page 15 of 42

After interviewing Officer Martinez, Lieutenant Jones individually contacted Senior Police Officer Robert Monlyn and OPCSO Deputy Charles Ellis, both are members of the current Executive Protection team. Lieutenant Jones informed both of the nature of the call then requested an interview relative to the investigation. Officer Robert Monlyn and Deputy Charles Ellis both agreed to be interviewed and appointments were set. Officer Monlyn interview was set for Wednesday, December 28, 2022 at 10:30a.m. and Deputy Ellis interview was set for Wednesday, December 28, 2022 at 3:00p.m.

Lieutenant Jones and Captain Allen met with Officer Robert Monlyn on Wednesday, December 28, 2022 at 10:35a.m., at the Public Integrity Bureau's office interview room number one. Prior to the interview, Captain Kendrick Allen presented Officer Robert Monlyn with New Orleans Police Department Internal Investigation Rights and Responsibilities of Employees Under Investigation and Notification to Appear and Render a Statement Form. Both Captain Allen and Officer Monlyn signed and dated the form, with a duplicated copy to be included with the internal investigation **(EXHIBIT AA)**.

Lieutenant Jones inquired from Officer Monlyn if he had a reasonable time to summon an Attorney or Representative. Officer Monlyn responded, "Yes,", then informed Lieutenant Jones that he would continue the interview without an Attorney or representative present.

Lieutenant Jones commenced the audio and video recorded interview **(EXHIBIT BB)** by advising Officer Monlyn of his rights as outlined in the Police Officers Bill of Rights, Louisiana Revised Statue 40:2531. Lieutenant Jones advised Officer Monlyn he was only being interviewed as a witness. Lieutenant Jones then advised Officer Monlyn of New Orleans Police Department Chapter 52.1.1 requires all New Orleans Police Department employees to answer questions in official inquiries and refusal to comply will result in termination. Additionally, employees are to be truthful at all times in their spoken, written, or electronic communications, whether under oath or not, in all matters and official investigations relating to the scope of their employment and operations of the Department. Failure to comply will result in termination. Officer Monlyn indicated he understood his rights and began his statement at 10:42a.m. Officer Monlyn stated the following:

### Statement of Officer Robert Monlyn (Witness)

Senior Police Officer Robert Monlyn is a 25-year veteran of the New Orleans Police Department. Officer Monlyn explained that he previously worked Executive Protection for former Mayor Mitch Landrieu on a part time basis, prior to joining the current team in June 2020. Officer Monlyn explained that once he arrived to the team he had no ranking supervisor and he considered Officer Louis Martinez as the senior person to be his supervisor. As far as payroll all payroll was sent to Sergeant Tokishiba Lane-Hart for entry. As to the Protectee, the schedule came via email from Katrina Simmons the Protectee scheduler.

CDM045
Investigating Officer's Initials: _KA_

Officer Monlyn explained he attended Executive Protection training with the Louisiana State Police. Officer Monlyn also provided a description of the work schedule and the hours the team members work. Lieutenant Jones inquired about the team's schedule from Officer Monlyn. Officer Monlyn informed Lieutenant Jones the team work four 12 hour days and are off every other weekend. Monlyn also confirmed that his partner was Officer Jeffery Vappie. Officer Monlyn also confirmed that he and Officer Vappie would do most of the traveling with the Protectee.

Officer Monlyn then explained to investigators that occasionally he would accompany the Protectee and Officer Vappie when the Protectee wanted to exercise. Monlyn further stated they would often exercise at Audubon Park or Napoleon Avenue and once completed the Protectee would return to her residence and he and Officer Vappie would leave.

Lieutenant Jones inquired from Officer Monlyn if he had any keys to the Protectee personal home or the Pontalba Apartment. Officer Monlyn responded "No." Lieutenant Jones inquired if he knew if Officer Vappie had keys to either the house or the apartment. Officer Monlyn responded, "I don't know." Officer Monlyn continued to inform the investigators he first visited the Pontalba apartment for a New Year's Eve party for the 300 Year Anniversary. Officer Monlyn then explained when he and Officer Vappie would drop the Protectee off at the Pontalba, he would stay with the car and Officer Vappie would escort the Protectee to the apartment. Officer Monlyn stated he would often park in the Police Zone near the Cathedral or Chartres street. Once Officer Vappie would return they would leave, retrieve their take home vehicle and remain on call available to return if they were summoned by the Protectee. Officer Monlyn stated the longest he recalls waiting for Officer Vappie to return was about 20 minutes.

Officer Monlyn was then asked "Talk to me about the relationship that you recognize when y'all were together in the car, with him and the Protectee." Officer Monlyn responded, "It really, honestly, bruh, I didn't, I didn't see anything."

Lieutenant Jones inquired from Officer Monlyn if he had any conversations with any of his other team members about the relationship with Vappie and the Mayor? Officer Monlyn responded, "Yeah, well, I would say, uh, I want to say, uh, so this is, this, this was one of the things that was, that came forward and I don't know if it was uh, if it was Louis or Charles. But I know somebody mentioned, uh, like, him, they were like, man, we see, you know, Jeffrey always got his hand out, you know, reaching for her. But she says, y'all leave him alone. I, that's what he's supposed to do. He's a man. I'm a female. I need help getting out the car. So, I think it was Louis. Louis would joke about that all the time. Yeah, you know, I gotta do like Jeffrey do it, put my hand out. But I mean, it was fun and games. She would, we would all laugh it off."

Officer Monlyn went on to say, "So, when it came, when it came up, like, she would laugh about it, too. It's like, no, you know, I got a dress on. I'm stepping out of a, a tall vehicle; I need help getting down. You know, so, we kind of all started doing that. But, so, I mean, for us, it was just, you know, it just was no separation from a man or a woman. If it's, you know, we're here. You get out the car, you get out the car. Now, we protected you once you get out. We're not worrying about, you know, grabbing your hand and stuff like that." Lieutenant Jones then inquired from Officer Monlyn if that's what you were trained to do?  Officer Monlyn responded, "No."

At the conclusion of the interview Lieutenant Jones inquired from Officer Monlyn, "Is there anything I did not ask you, that you think is important?"  Officer Monlyn responded, "I mean, so it, it's a bad look. That's definitely not a professional look. I mean anything that, anything that happened, uh, had to be done when I wasn't, when I wasn't there. And I think that's the, that's the thing that is probably what's confusing you now."  Senior Police Officer Robert Monlyn concluded his statement at 12:19p.m. A transcribed copy of Officer Monlyn's statement will be attached to this investigation as **(EXHIBIT CC).**

On Wednesday, December 28, 2022, at 3:00p.m. Captain Allen and Lieutenant Jones met with OPCSO Deputy Charles Ellis at the Public Integrity Bureau's office located at 1340 Poydras Street Suite 1900.  Deputy Ellis provided a detailed recorded interview relative to his knowledge of the investigation involving Officer Jeffery Vappie **(EXHIBIT DD).**  Deputy Ellis began his statement at 3:08p.m. and stated the following;

## Statement of OPCSO Deputy Charles Ellis (Witness)

Deputy Charles Ellis explained that he is member of the Orleans Parrish Criminal Sheriff office and detailed to the Mayor's Office executive Protection detail.  Deputy Ellis explained that he was the Mayor's security when she served on the City Council then transferred with her to the Mayor's Office after the election.  In all, Deputy Ellis have served as Executive Protection for Latoya Cantrell for more than 10 years, City Council and Mayor's Office combined).  Deputy Ellis also discussed he attended Executive Protection training with the Gretna Police Department along with other trainings periodically.  Lieutenant Jones inquired about the team's schedule from Deputy Ellis.  Deputy Ellis informed Lieutenant Jones the team work four 12 hour days and are off every other weekend.

Deputy Ellis description of Executive Protection Duties mirrored the duties identified by Officer Martinez.  Deputy Ellis further confirmed that all schedules and itinerary were sent by the Mayor's scheduler Kertrina Simmons either by text or email.

As it relates to traveling, Deputy Ellis explained the travelling started when Officer Vappie arrived and suggested to the Protectee that the team should travel, however, Deputy Ellis never traveled even after obtaining a Passport and new luggage.

Investigating Officer's Initials:  _KA_ CDM047

2022-0513-R
Page 18 of 42

Deputy Ellis further stated he noticed Officer Vappie became overly charismatic with the Protectee.  The Deputy provided an example and stated, "We are at -- she go to eat dinner; one of her favorite places is Houston's and protocol is, you do not sit with the principal at the table. Because if you're sitting with your principal at the table, who's watching your back."  Deputy Ellis stated he noticed that and brought it to Officer Vappie's attention.  According to Ellis, Vappie responded, "Yeah, I see how that, that, that could look."

Deputy Ellis then stated, "After seeing a couple of incidents, uh, I told him, I said, 'hey, man,' I said, 'look,' I said, 'I don't know what's going on, but that what you're doing is inappropriate. You've been to executive protection school,' you know. I say, 'now from a security standpoint,' I said, 'you're not only putting yourself in danger, but you're putting the mayor in danger' because you can't see behind you if there's somebody wants to do her harm."  Again, according to deputy Ellis Vappie responded, "Oh, yeah, man, I understand how it look."  Deputy Ellis explained he noticed the unprofessional behavior with Officer Vappie four or five times.

Deputy Ellis explained that he and the other members of the team talked with Officer Vappie as a whole, but he never told any NOPD or Orleans Parish Criminal Sheriff Office supervisor.  As it relates to the HANO Board Deputy Ellis stated, "It was just dropped on us."  At the conclusion of the interview Lieutenant Jones inquired from Deputy Ellis if believed Officer Vappie were unprofessional, Deputy Ellis responded "Yeah. Absolutely."  Deputy Charles Ellis concluded his statement at 3:52p.m. A transcribed copy of Deputy Ellis' statement will be attached to this investigation as **(EXHIBIT EE).**

After interviewing the other members of the Executive Protection team, it was clear to Captain Allen and Lieutenant Jones, that the members felt Officer Vappie actions were inappropriate and brought discredit to the team.  Deputy Ellis in fact indicated he personally spoke with Officer Vappie about his unprofessional behavior and requested that Officer Vappie stop. According to Deputy Ellis he personally witnessed Officer Vappie inappropriate behavior 4 or 5 times.  As to Officer Louis Martinez, Officer Martinez stated he inquired from Officer Vappie if he crossed the line, Officer Vappie stated 'No," Officer Martinez stated, "I took him at his word."

On Tuesday, January, 3, 2022, approximately 2:00p.m., Captain Kendrick Allen contacted Senior Police Officer Jeffery Vappie and requested an Administrative interview relative to the investigation involving Executive Protection.  Officer Vappie informed Captain Allen that he would be willing to provide a statement then requested a date and time to be interviewed. Captain Allen advised Officer Vappie the interview will be conducted at the Public Integrity Bureau's office located at 1340 Poydras Street, Suite 1900.  An appointment was set to interview Officer Vappie on Monday, January 9, 2023, at 2:00p.m.

Captain Allen and Lieutenant Jones met with Officer Vappie on Monday, January 9, 2023, at 2:00p.m., at the Public Integrity Bureau's Office interview room number one.  Prior to the interview, Lieutenant Lawrence Jones presented Officer Jeffery Vappie with New Orleans Police Department Internal Investigation Rights and Responsibilities of Employees Under Investigation and Notification to Appear and Render a Statement Form.  Both Lieutenant Jones and Officer Vappie signed and dated the form, with a duplicated copy to be included with the internal investigation **(EXHIBIT FF)**.

Lieutenant Jones inquired from Officer Vappie if he had a reasonable time to summon an Attorney or Representative.  Officer Vappie responded, "Yes,", then informed Lieutenant Jones that Attorney Nicholas Linder and Brandon Villavaso would be present for his statement as his Attorney and representative.

Lieutenant Jones commenced the audio and video recorded interview **(EXHIBIT GG)** by advising Officer Vappie of his rights as outlined in the Police Officers Bill of Rights, Louisiana Revised Statue 40:2531.  Lieutenant Jones advised Officer Vappie he was being accused of potential violations of Rule 4 Performance of Duty: Paragraph 4 Neglect of Duty C6 Failing to comply with instructions. oral or written from any authoritative source to wit: N.O.P.D. Chapter 22.08 Police Secondary Employment Paragraph 32 which states: No member. including Reserve officers, shall work more than more than 16 hours and 35 minutes (16.58 hours) within a 24-hour period.  Lieutenant Jones then advised Officer Vappie of New Orleans Police Department Chapter 52.1.1 requires all New Orleans Police Department employees to answer questions in official inquiries and refusal to comply will result in termination.

Additionally, employees are to be truthful at all times in their spoken, written, or electronic communications, whether under oath or not, in all matters and official investigations relating to the scope of their employment and operations of the Department. Failure to comply will result in termination. Officer Vappie indicated he understood his rights and began his statement at 2:14p.m. Officer Vappie stated the following:

## Statement of Officer Jeffery Vappie (Accused)

On January 9, 2023 the investigators meet with Officer Jeffery Vappie for an interview. Investigators learned that Officer Vappie is a 25-year veteran of the New Orleans Police Department and have served in several prestigious units such as Homicide, Intelligence and Assets Forfeiture. Vappie, during former Mayor Ray Nagin's second term in office was assigned to his executive protection team by former NOPD Superintendent Warren Riley. During his time there, Officer Vappie received training from the Black Cats Executive Protection Agency sponsored by the Gretna Police Department and further training from Louisiana State Police executive protection team.

Investigating Officer's Initials: _KA_ CDM049

While working Mayor Nagins detail, the team would work twelve (12) hour shifts, just like now, and would travel with the mayor on business related trips. Vappie relayed that some of his duties include taking care of maintenance on the mayor's city vehicle and doing advance site security as it relates to the mayor's upcoming events. Vappie also stated that if Mayor Nagin was out of town that you would still work your twelve-hour shift. It was also revealed to investigators that the executive protection team would often pick up and drop Mayor Nagin, and his family, off at the city owned Pontalba Apartment. Officer Vappie stated that during the Nagin administration, that Sergeant Wondell Smith was the supervisor of the unit.

After Mayor Landrieu was sworn in, Officer Vappie went back to Asset Forfeiture until May of 2021 when he was assigned to Mayor Cantrell's executive protection team by then NOPD Superintendent Shaun Ferguson. During this time with the Executive Protection team, the schedule and the hours worked were the same as with Mayor Nagin. Investigators learned that during this second assignment with the EP team, Sergeant Wondell Smith had been removed from the team. Investigators asked Vappie who was the supervisor, without hesitation Vappie responded "THE BOSS". When investigators asked for clarification, Vappie stated that he was referring to Mayor Cantrell. During this tour with the EP team Vappie stated that he would receive an email or text, to city phone, with the mayor's schedule and assignments for the next day. Vappie also stated that he would email his time to Sergeant Tokishiba Lane-Hart to be entered into ADP, however, he would not check for accuracy. Officer Vappie and Monlyn would accompany the mayor on travel trips because Officers Martinez was too sick to, and Deputy Ellis did not want to. Vappie also stated that travel with Mayor Cantrell started after she received two threats made on her life. Note: The investigators were unable to verify the Threats discussed by Officer Vappie. Vappie also stated that the mayor appointed him to the HANO Board and she wanted him to attend the meetings. Officer Vappie explained while at the meeting he was not performing the duty of an Executive Protection member. Vappie also indicated that the Protectee was never present at the HANO Board meetings.

Investigators questioned Vappie about his time at the Pontalba apartment. Vappie stated that he would exercise with the mayor some mornings before work and some evenings off the clock. Vappie stated that if he would exercise before duty with the mayor that he would take a shower in the Pontalba and change into business attire to start his shift. Vappie further explained that he was the only member of the Executive Protection team that would work out with the Protectee. Occasionally Officer Monlyn would be present when they worked out in Audubon Park, but he would drive the vehicle. Officer Vappie also indicated Officer Monlyn was not present when he worked out with the Protectee before work I the morning.  vi  Investigators also learned that several times Officer Vappie would sit at the table with the mayor and have dinner at restaurants, which is a violation of his Executive Protection Training. Investigators learned that September 1, 2022 that Officer Vappie was assigned to the Police Consultant Fausto Pichardo by Mayor Cantrell.  Officer Jeffery Vappie concluded his statement at 5:13p.m. A transcribed copy of Officer Vappie's statement will be attached to this investigation as **(EXHIBIT HH).**

CDM050

2022-0513-R
Page 21 of 42

Captain Kendrick Allen contacted New Orleans Police Department Sergeant Tokishiba Lane-Hart. Captain Allen requested to interview Sergeant Lane-Hart relative to her knowledge of this investigation. Sergeant Lane-Hart informed Captain Allen that she would be willing to provide a statement then requested a date and time to be interviewed. Captain Allen advised Sergeant Lane-Hart the interview will be conducted at Police Head Quarters MSB Office located at 715 S. Broad Street, 4th floor. An appointment was set to interview Sergeant Lane-Hart on Thursday, January 19, 2023 at 11:00a.m.

Captain Allen met with Sergeant Lane-Hart on Thursday, January 19, 2023 at 11:00a.m., at Police Head Quarters MSB Office located at 715 S. Broad Street, 4th floor. Prior to the interview, Captain Kendrick Allen presented Sergeant Lane-Hart with New Orleans Police Department Internal Investigation Rights and Responsibilities of Employees Under Investigation and Notification to Appear and Render a Statement Form. Both Captain Allen and Sergeant Lane-Hart signed and dated the form, with a duplicated copy to be included with the internal investigation **(EXHIBIT II)**.

Captain Allen inquired from Sergeant Lane-Hart if she had a reasonable time to summon an Attorney or Representative. Sergeant Lane-Hart responded, "Yes,", then informed Captain Allen that, Captain Michael Glasser would be present for the interview as her representative present.

Captain Allen commenced the audio and video recorded interview **(EXHIBIT JJ)** by advising Sergeant Lane-Hart of her rights as outlined in the Police Officers Bill of Rights, Louisiana Revised Statue 40:2531. Captain Allen advised Sergeant Lane-Hart she was only being interviewed as a witness. Captain Allen then advised Sergeant Lane-Hart of New Orleans Police Department Chapter 52.1.1 requires all New Orleans Police Department employees to answer questions in official inquiries and refusal to comply will result in termination. Additionally, employees are to be truthful at all times in their spoken, written, or electronic communications, whether under oath or not, in all matters and official investigations relating to the scope of their employment and operations of the Department. Failure to comply will result in termination. Sergeant Lane-Hart indicated she understood her rights and began her statement at 11:07a.m. Sergeant Lane- Hart Martinez stated the following:

### Statement of Sergeant Tokishiba Lane-Hart (Supervisor)

On Thursday, January 19, 2023, at 11:07am Captain Kendrick Allen interviewed Sergeant. Lane-Hart with her representative Captain Michael Glasser present. Before the interview started, Captain Allen read into record the Police Officer Bill of rights and confirmed that Sergeant Lane-Hart understood her rights. During this interview, Sergeant Lane expressed that her job duties as it relates to the Mayor's Executive Protection Team was only administrative and limited to her entering their payroll and assuring that they completed all mandated training.

Investigating Officer's Initials: _K_ ACDM051

Sergeant Lane was very direct in answering that she received the Executive Protection Team member's payroll time by email and sometimes text messages but was not privy to the mayor's schedule nor did she communicate with the mayor's scheduler. Sergeant Lane-Hart stated that she also enters the time from officers assigned to the City Attorney's Office as well as the City Council Chambers. However, she can go to where those officers are assigned to conduct checks on those officers, which she did occasionally. Also, related to the officers in the City Attorney Office and the Council Chambers, she has a civilian point of contact unlike the situation with the Mayors Executive Protection Team. Sergeant Lane-Hart also stated that she has no input into who goes to executive protection and she only find out that a new member of the team has been added when she's contacted by the new officer for payroll entry.  Sergeant Tokishiba Lane-Hart concluded her statement at 11:21a.m. A transcribed copy of Sergeant Lane-Hart's statement will be attached to this investigation as **(EXHIBIT KK).**

On Wednesday, February 8, 2023, Officer Jeffery Vappie returned to the Public Integrity Bureau for a follow-up interview with Lieutenant Jones and Captain Allen.  The follow-up interview was conducted in interview #1 of the Public Integrity Bureaus Office.  Prior to the interview, Captain Kendrick Allen presented Officer Jeffery Vappie with New Orleans Police Department Internal Investigation Rights and Responsibilities of Employees Under Investigation and Notification to Appear and Render a Statement Form.  Both Captain Allen and Officer Vappie signed and dated the form, with a duplicated copy to be included with the internal investigation **(EXHIBIT FF)**.

Captain Allen inquired from Officer Vappie if he had a reasonable time to summon an Attorney or Representative.  Officer Vappie responded, "Yes,", then informed Captain that Attorney Nicholas Linder and Brandon Villavaso would be present for his statement as his Attorney and representative.  Captain Allen commenced the audio and video recorded interview **(EXHIBIT GG)**

### Follow-up Statement of Officer Jeffery Vappie (Accused)

Officer Vappie explained during the follow-up statement that he was assigned to the Consultant Chief by the Protectee.  Officer Vappie stated his task was to make sure he got "To/from throughout the department and around the city to investigate things that he needed to investigate; to do his consulting".

Lieutenant Jones inquired from Officer Vappie if he can discuss the HANO Board and his appointment to the Board.  Officer Vappie stated, "Okay. So, the reason I was at that HANO board meeting is because I was appointed commissioner by the mayor, and the mayor gave me permission while I was working executive protection to be there at that, to be there at the, uh, the meeting. But at no time, if the mayor was to call at any time, while I'm on that board, on that panel, that I could not or would not be prevented from leaving to go take care of my police duties.



Investigating Officer's Initials: *KA*CDM052

2022-0513-R
Page 23 of 42

So, it was, it was no issue. I was not being paid. So, uh, yeah, I had the city phone; on call. If I was to get a call, because I'm still on call, I went to that, I went to uh, the HANO board meeting was called, but I'm still on call; I'm still available if needed, I would go. I didn't see the issue. That's it. That's my answer."

Prior to the conclusion of Officer Vappie supplemental statement, Captain Allen presented him and his attorney with a copy of NOPD Chapter 13.38, *Nepotism and Employment Conflicts*. Captain Allen then read to Officer Vappie the definition of Personal Relationship per the Chapter. "Okay. Personal Relationships, including Marriage, Co-habitation, Dating or any other Romantic or Intimate Relationships beyond Mere Friendship. All right. You understand, the definition?" Officer Vappie informed the investigators his relationship with his Protectee, Mayor Latoya Cantrell was only "Professional". The audio taped statement will be attached to this investigation as **(EXHIBIT GG).** A transcribed copy of Officer Vappie continued statement will be attached to this investigation as **(EXHIBIT HH).**

## **Analysis Review**

At the conclusion of the interviews of the Executive Protection team members and Sergeant Lane-Hart, Lieutenant Lawrence Jones began to conduct a review of the previously obtained evidence. Lieutenant Jones began the analysis review with the material obtain from the Housing Authority of New Orleans. To conduct this thorough review Lieutenant Jones obtained a copy of Officer Jeffery Vappie Employee ID#08913 ADP (Payroll) records from January 1, 2022 to December 31, 2022. The payroll records will be attached to this investigation as **(EXHIBIT LL).**

Per the HANO website it was determined that Officer Jeffery Vappie joined the HANO Board in March of 2022. The March meeting was held on **March 29, 2022, at 4:00p.m.** According to the agenda the meeting was an in-person meeting held at the Helen W. Lang Memorial Boardroom, building "B", located at 4100 Touro Street, New Orleans, LA 70122. Per the agenda the 3rd item was "ROLL CALL." The roll call is where the names of the present board members is called to determine if a quorum is present.

The roll call was captured via the recording also obtained from the HANO website. At the 1 minute and 33 seconds mark, you could hear the name Jeffery Vappie called, in response you hear Jeffery Vappie respond "PRESENT", indicating he is present at the meeting. Again, the meeting began at 4:00p.m., 1 minute and 33 seconds into the meeting Officer Jeffery Vappie responds "PRESENT". A review of Officer Vappie payroll records for March 29, 2022, indicated that Officer Vappie was on duty from 8am – 8pm. Officer Vappie was assigned to the Executive Protection Unit and his responsibility was to perform protection of his Protectee the Mayor of New Orleans. During Officer Vappie interview on Monday, January 9, 2023, Officer Vappie stated, he was appointed to the non-paid volunteer Board by Mayor Latoya Cantrell, however, Mayor Cantrell was never present at any of the board meetings.

Investigating Officer's Initials: _K A_ CDM053

2022-0513-R
Page 24 of 42

Officer Vappie also indicated during his interview that he was not performing Executive Protection duties while at the HANO Board Meeting. According to NOPD Policy Rule 4: Performance of Duty, paragraph 3; devoting entire time to duty, officers shall not engage in activities or personal business which would cause them to neglect or be inattentive to duty. Clearly Officer Vappie was not attentive to his duty as an Executive Protection member when he attended the HANO Board meeting at 4:00p.m., while still on duty until 8:00p.m.

According to the HANO obtained records, the **April Board Meeting was cancelled**. The May meeting was held on **May 24, 2022, at 4:00p.m.** and the June Board meeting was held on **June 28, 2022, at 4:00p.m.**, According to the Roll Call Audio Officer Vappie was present for both meetings. The May and June meeting was also held at Helen W. Lang Memorial Boardroom, building "B", located at 4100 Touro Street, New Orleans, LA 70122. A review of Officer Vappie payroll records for May 24, 2022 and June 28, 2022, Officer Vappie was listed as "SICK" and not on duty. Officer Vappie presence at the meetings while "SICK" did not violate any NOPD policy. Reason, according to NOPD Policy Chapter 22.4 Title Sick Leave, Paragraph 13, employees are not required to remain confined to a specific location while sick. The **July 26, 2022**, Board meeting again according to the HANO records Officer Vappie was present at the meeting, but his NOPD payroll records indicate Officer Vappie was OFF DUTY.

The August 30, 2022, HANO Board meeting, started at 4:04p.m. and ended at 5:44p.m. Although, at the August meeting Officer Vappie is not heard on the audio acknowledging present. The meeting minutes indicate that Officer Vappie was present at the meeting, as seen below with ATTACHMENT "1". The minutes also indicate that Officer Vappie made and 2nd a Motion on two separate Resolutions during the meeting, as seen below with ATTACHMENT "2". A review of Officer Vappie NOPD Payroll records for August 30, 2022, indicates that Officer Vappie was on Duty from 8:00am to 9:00pm. Again, Officer Vappie was not attentive to his duty as an Executive Protection member when he attended the HANO Board meeting at 4:04p.m. to 5:44pm, while still on duty until 9:00p.m.

Investigating Officer's Initials: KA

2022-0513-R
Page 25 of 42



The September 20, 2022, Board meeting officer Vappie again was not heard on the roll call audio and the minutes indicate he was not present. The October 25, 2022, Board meeting, Officer Vappie was present for the meeting which began at 4:03p.m., according to the minutes. Officer Vappie payroll records indicate his shift ended at 4:00p.m. on October 25, 2022. According to the HANO website, no meeting information was posted for November 2022 and the December 2022 meeting was cancelled.

Lieutenant Jones analysis review of Officer Jeffery Vappie and the HANO Board meetings indicated that on two separate occasions, March 29, 2022 and August 30, 2022, Officer Jeffery Vappie attended a HANO Board meeting while still on duty with the New Orleans Police Department.

Lieutenant Jones also reviewed Officer Vappie ADP payroll for 16 hours and 35 minutes' violation. The review covers the time frame of May 1, 2021 through December 31, 2022. Lieutenant Jones observed on four (4) different occasion during the review time period where Officer Vappie payroll exceeded 16 hours and 35minutes in single day. The dates were Friday, November 5, 2021 (Attachment 3), Monday, January 10, 2022 (Attachment 4), August 29, 2022, (Attachment 5) and September 28, 2022 (Attachment 6).

Investigating Officer's Initials: _KA_ CDM055

2022-0513-R
Page 26 of 42

Attachment 3 is a depiction of Officer Vappie ADP time card for the week of October 31, 2021 to November 6, 2021.  As you can see, on November 5, 2021, it appears that Officer Vappie worked for 20 hours.  The time card was entered by NOPD Sergeant Tokishiba Lane, and the remarks indicate that Officer Vappie was on an out of town Trip with the Mayor at a Climate Control Summit.  According to the ADP records for Officer Vappie and the other Executive Protection team members (Martinez and Monlyn), Officer Vappie was the only Executive Protection traveling.  The investigator located no evidence that Officer Vappie was not acting in his official capacity as an Executive Protection member.

(Attachment 3)



Attachment 4 and 4A is a depiction of Officer Vappie and Robert Monlyn's ADP time card for the week of January 9, 2022 to January September 15, 2022.  As you can see, on January 10, 2022, it appears that Officer Vappie worked for 19 hours.  The time card was entered by NOPD Sergeant Tokishiba Lane, and the remarks indicate that Officer Vappie worked the Mayor's Inauguration Celebration. Officer Vappie time mirrored his partner Officer Robert Monlyn's time for January 10, 2022.  The investigator located no evidence that Officer Vappie or Monlyn was not acting in their official capacity as an Executive Protection member.

(Attachment 4)          (Attachment 4A)



CDM056

Investigating Officer's Initials: _JLA_

2022-0513-R
Page 27 of 42

Attachment 5 is a depiction of Officer Vappie ADP time card for the week of August 28, 2022 to September 3, 2022.  As you can see, on August 29, 2022, it appears that Officer Vappie worked for 21 hours.  The time card was entered by Tiesha Lewis assigned to the NOPD Management Services Bureau.  The remarks indicate that Officer Vappie travelled with the Mayor, no further information. The investigator located no evidence that Officer Vappie was not acting in his official capacity as an Executive Protection member.  Officer Vappie was the only Executive Protection traveling.

(Attachment 5)



Attachment 6 is a depiction of Officer Vappie ADP time card for the week of September 26, 2022, to October 8, 2022.  As you can see, on September 28, 2022, it appears that Officer Vappie worked for 18 hours.  The time card was also by Tiesha Lewis assigned to the NOPD Management Services Bureau.  The remarks indicate that Officer Vappie was assigned to the Consultant Chief Fausto B. Pichardo and not his normal Executive Protection assignment.  Therefore, on January 25, 2023, Captain Kendrick Allen emailed Consultant Chief Pichardo and requested an interview relative to his knowledge of Officer Vappie possibly violating NOPD police relative to 16 hour and 35 minutes within a 24-hour period.  On Wednesday, January 25, 2022, Consultant Chief responded, **"Respectfully, there is nothing that I can contribute to aid this investigation."**   A copy of the email will be attached to this investigation as **(EXHIBIT MM).**

Investigating Officer's Initials: _K A_          ACDM057

(Attachment 6)

ADP

Timekeeping   Timecards   □ | X

Timecards

Vappie, Jeffrey P   ‹ ( 1 of 1 ) ›   008913                    Loaded 12:29 PM   9-25-2022 - 10-08-2022   ⌄   16 Employee(s) Selected

| | Date | Pay Code | Amount | In | Transfer | Out | In | Transfer | Out | Schedule | Daily | Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ✦ ✕ | Sun 9-25 | VAPK... | 7:00 | | | | | | | | 7:00 | 7:00 |
| ✦ ✓ | Mon 9-26 | | | 8:00AM | POL-01-2760•9M | 2:33PM | 4:35PM | ...HFT UNSCHEDULED | 8:00PM | 8:00AM... | 12:00 | 19:00 |
| ✦ ✓ | Tue 9-27 | | | 7:00AM | POL-01-2760•9M | 2:33PM | 3:35PM | ...HFT UNSCHEDULED | 8:00PM | 7:00AM... | 13:00 | 32:00 |
| ✦ ✕ | Wed 9-28 | | | 4:00AM | POL-01-2760•9M | 12:35PM | 12:35PM | ...HFT UNSCHEDULED | 10:00PM | 4:00AM... | 18:00 | 50:00 |
| ✦ ✕ | Thu 9-29 | | | 6:00AM | POL-01-2760•9M | 2:33PM | 2:33PM | ...HFT UNSCHEDULED | 10:00PM | 6:00AM... | 16:00 | 66:00 |
| ✦ ✓ | Fri 9-30 | | | 6:00AM | POL-01-2760•9M | 2:35PM | 2:35PM | ...HFT UNSCHEDULED | 10:00PM | 6:00AM... | 16:00 | 82:00 |
| ✦ ✕ | Sat 10-01 | | 15:00 | 3:00AM | ...HFT SHFT UNSCHEDULED | 1:33PM | 1:35PM | ...HFT UNSCHEDULED | 8:00PM | | 15:00 | 97:00 |
| ⌄ ✕ | Sun 10... | | | | | | | | | | | 97:00 |
| ✦ ✓ | Mon 10... | | | 7:00AM | POL-01-2760•9M | 2:33PM | 3:35PM | ...HFT UNSCHEDULED | 7:00PM | 7:00AM... | 12:00 | 109:00 |
| ✦ ✕ | Tue 10-04 | | | 8:00AM | POL-01-2760•9M | 2:33PM | 4:33PM | ...HFT UNSCHEDULED | 8:00PM | 8:00AM... | 12:00 | 121:00 |
| ✦ ✕ | Wed 10... | | | 8:00AM | POL-01-2760•9M | 4:33PM | 4:33PM | ...HFT UNSCHEDULED | 8:00PM | 9:00AM... | 12:00 | 133:00 |
| ✦ ✓ | Thu 10... | | | 8:00AM | POL-01-2760•9M | 4:33PM | 4:33PM | ...HFT UNSCHEDULED | 8:00PM | 8:00AM... | 12:00 | 145:00 |
| ✦ ✕ | Fri 10-07 | | | 8:00AM | POL-01-2760•9M | 4:33PM | 4:35PM | ...HFT UNSCHEDULED | 8:00PM | 8:00AM... | 12:00 | 157:00 |
| ✦ ✕ | Sat 10-08 | | | | | | | | | | | 157:00 |

Lieutenant Jones further reviewed the surveillance video obtained from the French Market Corporation of the camera located on the light pole on St. Peter Street, in Jackson Square Pedestrian Mall, outside of the Upper Pontalba apartment. The investigator reviewed a representative sample of the video. The dates included January 21, 2022, August 23, 2022, August 30, 2022, April 9th and 10th 2022 and various dates in September and October of 2022. Lieutenant Jones observed on several occasions Officer Vappie entering the Pontalba apartment, both on duty and not on duty. Lieutenant Jones noticed that Officer Vappie was at times clad in a suit and other times in "Exercise Clothing." The video further depicted Officer Vappie at the residence with his Protectee various hours of the day and night both on and off duty.

During Officer Vappie interview with Captain Allen and Lieutenant Jones, Officer Vappie indicated his Protectee requested to work out and he volunteered to do so. Officer Vappie further explained he was the only member of the Executive Protection team to work out with the Protectee and most of the work out occurred prior to work in morning. Officer Vappie explained after working out he would return to the Upper Potable Apartment with the Protectee, take a shower, change clothes then go to work.

Officer Vappie emails Jvappie@nola.gov , from March 1, 2022, to November 30, 2022 **(EXHIBIT N)** and the telephone **5042698509** analysis **(EXHIBIT O)** were also reviewed by Lieutenant Jones. The emails confirmed that Kertrina Simmons would email the Protectee itinerary to the staff. No further evidentiary value was located in the telephone analysis or the emails. The Executive Protection Training certificates for Officers Jeffery Vappie, Louis Martinez and Robert Monlyn will be attached to this investigation as **(EXHIBIT S)**

JDM058

Investigating Officer's Initials: _____

On Friday, March 10, 2023, at 4:03p.m. Captain Kendrick Allen presented Officer Vappie with a verbal Notice of Disposition, which signifies the conclusion of his investigation. The notification was verbal because Officer Vappie was out of state and unable to meet with Captain Allen. Therefore, Captain Allen provided Officer Vappie with a verbal notification and will allow Officer Vappie to sign the notification upon his return. Captain Allen informed Officer Vappie of the disposition and completion of the investigation. Officer Vappie acknowledged he understood the disposition was **SUSTAINED** and the investigation under Public Integrity Bureau tracking number **2022-0513-R** was officially concluded **(EXHIBIT NN)**.

On Tuesday, March 14, 2023, at approximately 1:30pm, Captain Kendrick Allen and Lieutenant Lawrence Jones met with Senior Police Officer Jeffery Vappie and presented him with a detail (181) page copy of his transcribed statement he provided to Captain Kendrick Allen and Lieutenant Jones on Monday, January 9, 2023 and Wednesday, February 8, 2023. Officer Vappie reviewed the transcribed statements and affixed his initials to each page then signed, dated and printed his signature on the last page. **(EXHIBIT HH)**. Note: The transcriptions were completed by Ms. Elise Triplett. Officer Vappie signed his transcriptions upon his return to the City of New Orleans, after he received his verbal notification on Friday, March 10, 2023.

## Witnesses

1. **Officer Kristy Johnson-Stokes.** Emp.ID#14237, kjjohnson@nola.gov, Intelligence Unit.

2. **Retired Sergeant Wondell Smith.**

3. **Retired Sergeant Todd Henry.**

4. **Mr. John Douglass (Training Expert).**

5. **Louisiana State Police Captain Dewight Robinette (Training Expert).**

6. **Officer Louise Martinez.** Emp.ID 6236, lmartinez@nola.gov, Mayor Office

7. **Officer Robert Monlyn.** Emp.ID 06111, Rmonlyn@nola.gov, Mayor Office

8. **OPCSO Deputy Charles Ellis.**

9. **Sergeant Tokishiba Lane-Hart.** Emp.ID 7609, tlane@nola.gov, SID

Investigating Officer's Initials: _KA_  CDM059

## Credibility Assessment

**Senior Police Officer Kristy Johnson-Stokes-**   Officer Johnson-Stokes was deemed to be credible. Officer Johnson-Stokes provided the investigators with valuable knowledge and insight into the duties of an Executive Protection member.

**Retired Sergeant Wondell Smith-**   Retired Sergeant Smith was deemed to be credible. Sergeant Smith provided the investigators with valuable knowledge and insight into the duties of an Executive Protection member. Sergeant Smith provided historical knowledge that was crucial to the investigation after serving as one of the New Orleans Police Department longest serving Executive Protection officer, prior to retirement.

**Retired Sergeant Todd Henry-**   Retired Sergeant Henry was deemed to be credible. Like Sergeant Smith, Retired Sergeant Henry also served as a former member of the Executive Protection staff for former Superintendent Richard Pennington. Sergeant Henry provided a historical insight into the duties of an Executive Protection member.

**Mr. John Douglass (Training Expert)** -   John Douglass was deemed to be credible. Mr. Douglass is a Law Enforcement Officer from the State of Mississippi and an Executive Protection Instructor for Falcon Group Tactical. Mr. Douglass trained Executive Protection Officers from the New Orleans Police Department and was able to provide an insight of the expert training to the investigators.

**LSP Captain Dewight Robinette (Training Expert)** - Captain Dewight Robinette was deemed to be credible. Captain Robinette is a member of the Louisiana State Police and an Executive Protection Expert and Commander of the State Police Executive Protection Team. Captain Robinette trained Executive Protection Officers from the New Orleans Police Department and was able to provide an insight of the expert training to the investigators.

**Officer Louis Martinez (Witness)** -   Officer Louis Martinez was deemed creditable, because Lieutenant Jones as unable to locate any evidence in this investigation that proved otherwise.

**OPCSO Deputy Charles Ellis (Witness)** – Deputy Charles Ellis was deemed creditable, because Lieutenant Jones as unable to locate any evidence in this investigation that proved otherwise.

**Sergeant Tokishiba Lane-Hart (Witness)-** Sergeant Lane-Hart was deemed creditable, because Lieutenant Jones as unable to locate any evidence in this investigation that proved otherwise.

**Officer Robert Monlyn (Witness)** –   Officer Robert Monlyn was deemed creditable, because Lieutenant Jones as unable to locate any evidence in this investigation that proved otherwise.

Investigating Officer's Initials: _/LH_

CDM060

**Senior Police Officer Jeffery Vappie** –   After comparing Officer Vappie administrative statement with the evidence reviewed during this investigation, the investigators were unable to confidently assess his credibility. During his interview Officer Vappie seemed confused about is work schedule rotation, antagonistic regarding his tactical positioning while dining with his Protectee and unable to articulate some of his duties when he was not with the Protectee. However, the investigator does not have any evidence that Officer Vappie made any attempt to willfully misled or was untruthful in any statement that was given during this administrative investigation. During the interview, related to the 16:35 overage, Officer Vappie stated several times that "It's always been that way" when dealing with overtime. However, the investigators observed when Sergeant Wondell Smith was embedded in the executive protection team he would move the teams time to adjust for the Protectee schedule, if a late event occurred. This in fact is not a blemish on Officer Vappie credibility but rather a paradigm shift in how the executive protection team time was managed after a removal of a supervisor and the lack of a policy governing this unit.

### Summary

On Tuesday, November 8, 2022, approximately 7:00p.m., Public Integrity Bureau Sergeant Lawrence Jones was contacted by Public Integrity Bureau Deputy Chief Keith Sanchez. Deputy Chief Sanchez informed Sergeant Jones that a media request was sent to the Public Integrity Bureau relative to New Orleans Police Department Senior Police Officer Jeffery Vappie assigned to the Investigative Services Bureau, Executive Protection. Deputy Chief Sanchez forwarded the request to Sergeant Lawrence Jones for review.

On Wednesday, November 9, 2022, Sergeant Lawrence Jones reviewed the request and learned that Senior Police Officer Jeffery Vappie was accused of working more than 16 Hours and 35 minutes with in a 24-hour period. The request indicated Officer Vappie may have violated this rule when on several occasions while assigned to the Executive Protection Section he may have violated this NOPD policy.

This Administrative Investigation was assigned to Captain Kendrick Allen and Lieutenant Lawrence Jones of the Public Integrity Bureau on Wednesday, November 9, 2022, by Deputy Chief Keith Sanchez, bureau chief of the New Orleans Police Department Public Integrity Bureau.

To complete a thorough investigation, Captain Allen and Lieutenant Jones thought it would be best to obtain a historical information relative to officers assigned to the Executive Protection Detail. Therefore, on Tuesday, November 29, 2022, Lieutenant Lawrence Jones identified and contacted former members of the Mayor's executive protection team, New Orleans Police Senior Police Officer Kristy Johnson–Stokes now assigned to the New Orleans Police Department Investigative Services Division / Intelligence Unit and New Orleans Police Retired Sergeants Wondell Smith and Todd Henry.

Investigating Officer's Initials: _KA_ CDM061

2022-0513-R
Page 32 of 42

Officer Kristy Johnson-Stokes, Retired Sergeant Wondell Smith and Retired Sergeant Todd Henry, explained the mission of the Executive Protection team are to the mayor and to the mayor's immediate family. The team members normally work in teams of two and the itinerary is received the day before either by email or text. Sergeant Smith explained he would direct someone to conduct an advance review of the location they would visit the following day. As to pick up, the itinerary received the previous day would discuss pick up, which is normally the Mayor's residence. The Protection team members would leave their take home vehicle at the pickup location and drive the Mayor's assigned SUV for the work day. Once the Protectee is ready they would go to the office or the first appointment. Once the Mayor has gone through the entire schedule, at that point it becomes family time. Sergeant Smith was very clear the Executive Protection team works at the Mayor's discretion. "If Mayor goes to the movies, you got to go to the movies." Sergeant Smith explained he as the Supervisor would direct, instruct and give assignments as the team supervisor. However, he was clear the ultimate authority was the Mayor.

Captain Allen and Lieutenant Jones continued to obtain expert background information as it pertains to Executive Protection. The investigators sought to obtain Education and Training information from experts who previously trained New Orleans Police Members for executive protection. Mr. John Douglass of the Falcon Group Tactical out of the State of Mississippi and Captain Dewight Robinette of the Louisiana State Police were chosen by the investigators because both previously trained members of the NOPD Executive Protection team.

During the interview of Mr. John Douglass, he explained the communication and interaction between the Protectee and any member of the protection detail should be kept on a **PROFESSIONAL LEVEL ONLY**. Mr. Douglass went on to discuss the training provided by the Falcon Group also covers, escorting and eating with the principal. Mr. Douglass stated at no point should a Protection member sit with the principal unless invited and even then they position themselves with the Protectee safety in mind. Mr. Douglass further stated he believes all Executive Protection units should have a supervisor embedded in the group. The supervisor would have the authority to ensure the Protectee request align with the departments rules and regulation. The supervisor would also monitor the other members of the unit and replace them if need be.

During the interview of Captain Robinette, he explained he trained many NOPD members along with other agencies. During the training protection, officers are taught to not only protect the Protectee well-being, but to also protect them from any embarrassment, whether it's your actions or the Protectee actions that may cause them embarrassment. Captain Robinette also explained, your attire should blend in and not overshadow your Protectee. All conversations should remain professional and limited to "Good Morning" not good morning and how was your day.

Investigating Officer's Initials: _KA_  CDM062

The executive protection officer should gain the trust of the Protectee, but never cross the line of being unprofessional. Captain Robinette explained having a supervisor in the unit is intricate with helping to curve unprofessional behavior from either the Protectee or the team members. Captain Robinette further explained it is common for the protection team members to exercise with the Protectee, to include running, biking, walking or weight lifting. Captain Robinette further explained as it relates to the primary living quarters of the Protectee. The team only goes there if it is a security issue.

Captain Robinette explained all protection teams' weather it is federal, state or local are consistent and do the same duties. Those duties are to protect a particular dignitary. Your focus and main goal is to provide cover for that principal, regardless to whether or not you run a one-man detail or multiple man detail.

Captain Robinette concluded his statement with, "**You never do anything – and we preach this: don't do anything that's immoral, illegal or unethical. Those three things can get you in jail, fired or hurt, or get your Protectee in trouble and that's my, that's my, uh, my policy. That is what I preach all the time and I've preached it to a lot of people. And when we teach that class, we always say that: don't ever do anything that's illegal, immoral or unethical.**"

Captain Allen and Lieutenant Jones also interviewed the current members of the Executive protection team, Officer Louise Martinez, Robert Monlyn and OPSO Deputy Charles Ellis. During the interview of Senior Police Officer Louis Martinez, he explained Sergeant Wondell Smith was the on team Supervisor prior to his transfer, however no Sergeant is currently assigned to the unit. Officer Martinez also explained, Sergeant Tokishiba Lane only responsibility was to enter payroll and ensure the members were scheduled for annual in-service training. Sergeant Lane had no responsibility to the day to day operations of the team. Officer Martinez then stated, ultimately the Mayor is the Supervisor.

Lieutenant Jones then inquired from Officer Martinez, what was his relationship with the current Protectee. Officer Martinez explained, "You don't have a relationship with uh, the mayor. it is the mayor's office and then there's the mayor and your executive protection, you don't have a relationship with the mayor period." Officer Martinez then explained that he started to notice Officer Vappie unprofessional behavior with the Protectee. Officer Martinez explained how Officer Vappie would sit at the table with the Protectee. Officer Martinez stated, "I found it strange, uh, when I'm waiting for him to get a parking spot to go in, I go in the restaurant; he's sitting, sitting with his back to the door, which we don't do by ourselves. The mayor was sitting at the table, sitting at the table and I just looked at him and I, I said, it just didn't look right. I'm, I'm working for you and I'm sitting down having dinner with you. This didn't look right. We always have a table off to the side, it just didn't look right and I told him again. I said, man, you know you're not following protocol."

Investigating Officer's Initials: _KA_    CDM063

Martinez stated, he approached Officer Vappie and stated to him **"There's a line that you, you don't cross it. And I asked him did he crossed it; did he cross it and he said no. I took him at his word."** Lieutenant Jones inquired from Officer Martinez if he ever told a supervisor about Officer Vappie's unprofessional behavior. Officer Martinez stated, "No, I made it known to him that I didn't approve of what he was doing.

After interviewing the other members of the Executive Protection team, it was clear to Captain Allen and Lieutenant Jones, that the members felt Officer Vappie actions were inappropriate and brought discredit to the team. Deputy Ellis in fact indicated he personally spoke with Officer Vappie about his unprofessional behavior and requested that Officer Vappie stop. According to Deputy Ellis he personally witnessed Officer Vappie inappropriate behavior 4 or 5 times. As to Officer Louis Martinez, Officer Martinez stated he inquired from Officer Vappie if he crossed the line, Officer Vappie stated 'No," Officer Martinez stated, "I took him at his word."

The investigators found it necessary to gain access to Officer Vappie work issued cell phone **5042698509** and City Emails Jvappie@nola.gov. The review will provide evidentiary value in the event instructions are received allowing Officer Vappie to attend HANO meetings while at work and any instructions he may have received as it relates to his time spent in the Upper Pontalba Apartments both on duty and off duty. No emails were located with those instructions.

Members of the Public Integrity Bureau also completed a Public Records request to the French Market Corporation to obtain the video surveillance of the camera located on the light pole on St. Peter Street, in Jackson Square Pedestrian Mall outside of the Upper Pontalba apartment. The date range of the video was July 30, 2022, to November 17, 2022.

To also corroborate the inferences that Officer Vappie may have neglected his duty when he attended a HANO board meeting while on duty. Lieutenant Jones queried the Housing Authority of New Orleans official website "hano.org" and obtained historical data relative to "HANO" Board meetings from the March, 2022 to December 2022. The information obtained consisted of meeting minutes, meeting agenda and an audio recording of the meeting. Lieutenant Jones analysis review of Officer Jeffery Vappie and the HANO Board meetings indicated that on two separate occasions, **March 29, 2022 and August 30, 2022,** Officer Jeffery Vappie attended a HANO Board meeting while still on duty with the New Orleans Police Department.

2022-0513-R
Page 35 of 42

Lieutenant Jones reviewed the surveillance video obtained from the French Market Corporation of the camera located on the light pole on St. Peter Street, in Jackson Square Pedestrian Mall, outside of the Upper Pontalba apartment. The investigator reviewed a representative sample of the video. The dates included January 21, 2022, August 23, 2022, August 30, 2022, April 9th and 10th 2022 and various dates in September and October of 2022. Lieutenant Jones observed on several occasions Officer Vappie entering the Pontalba apartment, both on duty and not on duty. Lieutenant Jones noticed that Officer Vappie was at times clad in a suit and other times in "Exercise Clothing." The video further depicted Officer Vappie at the residence with his Protectee various hours of the day and night both on and off duty.

During Officer Vappie interview with Captain Allen and Lieutenant Jones, Officer Vappie indicated his Protectee requested to work out and he volunteered to do so. Officer Vappie further explained he was the only member of the Executive Protection team to work out with the Protectee and most of the work out occurred prior to work in the morning. Officer Vappie explained after working out he would return to the Upper Potable Apartment with the Protectee, take a shower, change clothes then go to work.

The telephone analysis and Officer Vappie emails were also reviewed by Lieutenant Jones. The emails confirmed that Kertrina Simmons would email the Protectee itinerary to the staff. No further evidentiary value was located in the telephone analysis or the emails.

Lieutenant Jones also reviewed Officer Vappie ADP time card for the week of September 26, 2022, to October 8, 2022. On September 28, 2022, it appears that Officer Vappie worked for 18 hours. The time card remarks indicated Officer Vappie was assigned to the Consultant Chief Fausto B. Pichardo and not his normal Executive Protection assignment.

Therefore, on January 25, 2023, Captain Kendrick Allen emailed Consultant Chief Pichardo and requested an interview relative to his knowledge of Officer Vappie possibly violating NOPD police relative to 16 hour and 35 minutes within a 24-hour period. On Wednesday, January 25, 2022, Consultant Chief responded, **"Respectfully, there is nothing that I can contribute to aid this investigation."** Officer Vappie indicated in his statement he was assigned to the consultant chief by the Protectee.

The investigators were unable to locate any substantial evidence that proved Officer Vappie and the Protectee relationship was more than mere friendship, the investigators believed that Officer Vappie actions brought discredit to the New Orleans Police Department. The fact that Officer Vappie spent numerous hours alone with the Protectee outside of his regular tour of duty goes against the training and ethics of an Executive Protection member. So much so, that Deputy Charles Ellis and Officer Louis Martinez, brought his behavior to his attention and requested that he stop.

Investigating Officer's Initials: _KA_  CDM065

In fact, Officer Louis Martinez went a step further and asked Officer Vappie **if his relationship with the Protectee was more than Friendship, "Vappie" stated, it was not. Louis Martinez explained to the investigators that he took Vappie at his word so he did nothing further.** Officer Vappie unprofessional behavior with his Protectee caused a major embarrassment to the New Orleans Police Department and discredits the hard work the other members of the Executive Protection team display.

It's the belief of the investigators that the Police Departments failure to have a Supervisor embedded into the Executive Protection team contributed to the behavior of Officer Jeffery Vappie.   Not having a Policy specifically for Executive Protection failed to provide a management guide to the members of the team to follow.  A dedicated supervisor would give the team members the necessary support when the requests of the Protectee don't align with the Rules, Regulations, Morals and Standards of the New Orleans Police Department.  It would also provide a dedicated support network in place; when an issue arises the team members would have a direct contact to confidently turn to.  This task should not be the reasonability of the Protectee, but to an immediate supervisor or members of the Officer Chain of Command, Lieutenant, Captain, Deputy Chief or Superintendent.   Furthermore, the supervisor will be able to monitor the officer's payroll, actions and delegate tasks based on the current workload. Ultimately, a supervisor will prevent a member of the team from becoming overloaded and ensure each member is contributing equally. If an employee has to be accountable to a supervisor, they are more likely to take ownership and as a result, the team member would self-monitor their behavior or be reminded by a supervisor and if need be properly disciplined.

Based upon this administrative investigation, Captain Kendrick Allen and Lieutenant Lawrence Jones concluded beyond a preponderance of evidence that Senior Police Officer Jeffery Vappie did violate rules and regulations of the New Orleans Police Department.

### Training, Tactical, and/or Policy Recommendations

As it relates to training, it is the belief of this investigator that Senior Police Officer Vappie need to be reminded to adhere to all rules and regulations.  Along with obeying all City, State and Federal Laws.   It is also recommended that a Department Policy and Unit Operating Procedures are created to govern the Executive Protection team members, along with their duties and responsibilities. In addition to a direct supervisor whose sole responsibility is equivalent to retired Sergeant Wondell Smith.

2022-0513-R
Page 37 of 42

## Disciplinary Recommendations

## Senior Police Officer Jeffery Vappie

Rule 4: Performance of Duty: Paragraph 2: Instructions from an authoritative source; to wit N.O.P.D. Chapter 22.08 Police Secondary Employment Paragraph 32.................................................................................................**SUSTAINED**

*No member, including Reserve officers, shall work more than 16 hours and 35 minutes (16.58 hours) within a 24-hour period. (The 24-period begins the first time the member reports for either regular duty or police secondary employment.) These hours are cumulative and include normal scheduled work hours, overtime, court time, off-duty police secondary employment, or outside employment*

**Captain Kendrick Allen proved beyond a preponderance of evidence that Senior Police Officer Jeffery Vappie violated this rule when on, on September 28, 2022, Officer Vappie worked for 18 hours within a 24 hour period. The remarks indicate that Officer Vappie was assigned to the Consultant Chief Fausto B. Pichardo and not his normal Executive Protection assignment.**

## OTHER SUSTAINED VIOLATIONS

## Rule 3: Professional Conduct, Paragraph 1: Professionalism...........................**SUSTAINED**

*Employees shall conduct themselves in a professional manner with the utmost concern for the dignity of the individual with whom they are interacting. Employees shall not unnecessarily inconvenience or demean any individual or otherwise act in a manner which brings discredit to the employee or the New Orleans Police Department.*

**Senior Police Officer Vappie may have violated this rule when Officer Vappie spent numerous hours alone with the Protectee outside of his regular tour of duty goes against the training and ethics of an Executive Protection member. So much so, that Deputy Charles Ellis and Louis Martinez, brought his behavior to his attention and requested that he stop.**

## Rule 4: Performance of Duty, Paragraph 3: Devoting Entire Time to Duty..............................................................................................**SUSTAINED**

*Employees shall not read, play games, watch television/movies, or otherwise engage in entertainment while on duty, except as may be required in the performance of duty, or by authority of their respective Bureau Chief. They shall not engage in activities or personal business which would cause them to neglect or be inattentive to duty.*

**Senior Police Officer Vappie was not attentive to his duty as an Executive Protection member when he attended the HANO Board Meeting on two separate occasions, <u>March 29, 2022</u> and <u>August 30, 2022</u>, while still on duty with the New Orleans Police Department.**

Senior Police Officer Jeffery Vappie may also have violated Rule IX of the Civil Service Rules for the City of New Orleans, relative to Maintaining Standards of Service.

Respectfully Submitted,

Captain Kendrick Allen
Public Integrity Bureau

Date: 3-10-2023

Investigating Officer's Initials: _____ CDM067

2022-0513-R
Page 38 of 42

CONCUR / DOES NOT CONCUR

Deputy Keith E. Sanchez
Public Integrity Bureau

Date: 3/16/23

CONCUR / DOES NOT CONCUR

Michelle M. Woodfork
Superintendent of Police

Date: 3/16/23

CDM068

Investigating Officer's Initials: _KA_

2022-0513-R
Page 39 of 42

# EXHIBITS

1. **Exhibit "A"** - P.I.B. Case Investigation Transmittal, Control Tracking Number 2022-0513-R.

2. **Exhibit "B"** - Initiation of a Formal Disciplinary Investigation Form Control Tracking Number 2022-0513-R, three (3) pages, original.

3. **Exhibit "C"** - P.I.B. Initial Intake Form (230) for Commendation, Complaint, or Documentation of Minor Violation, three (3) pages, original.

4. **Exhibit "D"** — Media request sent by WVUE three (3) pages photocopied.

5. **Exhibit "E"** — Officer Jeffery Vappie reassignment notification dated Wednesday, November 9, 2022.

6. **Exhibit "F"** - Extension Request sent by Captain Kendrick Allen, dated Thursday, November 17, 2022.

7. **Exhibit "G"** — Extension request granted by Examiner Ginsberg. Dated Tuesday, November 22, 2022.

8. **Exhibit "H"** — CD containing Senior Police Officer Kristy Johnson-Stokes Audio Recorded statement.

9. **Exhibit "I"** - A transcribed copy of Officer Kristy Johnson-Stokes statement completed by Ms. Elise Triplitt. 43 pages photocopied.

10. **Exhibit "J"** — CD containing Retired Sergeant Wondell Smith Audio recorded statement.

11. **Exhibit "K"** — A transcribed copy of Retired Sergeant Wondell Smith statement completed by Ms. Elise Triplitt. 56 pages photocopied.

12. **Exhibit "L"** — CD containing Retired Sergeant Todd Henry Audio recorded statement.

13. **Exhibit "M"** — A transcribed copy of Retired Sergeant Todd Henry statement. Completed by Ms. Elise Triplitt. 20 pages photocopied.

2022-0513-R
Page 40 of 42

**14. Exhibit "N"** – One external hard drive containing emails of Senior Police Officer Jeffery Vappie, from March 1, 2022 to November 30, 2022.

**15. Exhibit "O"** - One external hard drive containing Senior Police Officer Jeffery Vappie Cell phone analysis completed by NOPD Digital Forensic Unit.

**16. Exhibit "P"** - Public records request sent to the French Market Corporation. One page Photocopied.

**17. Exhibit "Q"** - One external Hard drive containing the surveillance video obtained from the French Market Corporation of the camera located on the light pole on St. Peter Street, in Jackson Square Pedestrian Mall outside of the Upper Pontalba apartment. Dated July 30, 2022 to November 17, 2022.

**18. Exhibit "R"** - One external Hard drive containing HANO Board meetings obtained from the HANO.ORG website, dated March 2022 to December 2022. The information obtained consisted of meeting minutes, meeting agenda and an audio recording of the meeting.

**19. Exhibit "S"** - Executive Protection Training certificates for Senior Police Officer Jeffery Vappie, Robert Monlyn and Louis Martinez. Five (5) pages photocopied.

**20. Exhibit "T"** - CD containing Mr. John Douglass Audio recorded statement.

**21. Exhibit "U"** – A transcribed copy of Mr. John Douglass statement. Completed by Ms. Elise Triplitt. 15 pages photocopied.

**22. Exhibit "V"** - CD containing Louisiana State Police Captain Dewight Robinette Audio recorded statement.

**23. Exhibit "W"** – A transcribed copy of Captain Dewight Robinette statement. Completed by Ms. Elise Triplitt. 34 pages photocopied.

**24. Exhibit "X"** – Notice of NOPD Internal Disciplinary Investigation Rights and Responsibilities of Employee Under Investigation and Notification to Appear to Render a statement form for Senior Police Officer Louis Martinez. one (1) Page, original.

**25. Exhibit "Y"** - CD containing Senior Police Officer Louis Martinez Audio recorded statement.

**26. Exhibit "Z"** – A transcribed copy of Senior Police Officer Louis Martinez statement. Completed by Ms. Elise Triplitt. 59 pages photocopied.

CDM070

Investigating Officer's Initials: _KA_

2022-0513-R
Page 41 of 42

**27.Exhibit "AA"** – Notice of NOPD Internal Disciplinary Investigation Rights and Responsibilities of Employee Under Investigation and Notification to Appear to Render a statement form for Senior Police Officer Robert Monlyn.  one (1) Page, original.

**28.Exhibit "BB"** -  CD containing Senior Police Officer Robert Monlyn Audio recorded statement.

**29.Exhibit "CC"** – A transcribed copy of Senior Police Officer Robert Monlyn statement. Completed by Ms. Elise Triplitt. 67 pages photocopied.

**30.Exhibit "DD"** -  CD containing Deputy Charles Ellis Audio recorded statement.

**31.Exhibit "EE"** – A transcribed copy of Deputy Charles Ellis statement. Completed by Ms. Elise Triplitt. 39 pages photocopied.

**32.Exhibit "FF"** – Notice of NOPD Internal Disciplinary Investigation Rights and Responsibilities of Employee Under Investigation and Notification to Appear to Render a statement form for Senior Police Officer Jeffery Vappie.  one (2) Pages, original.

**33.Exhibit "GG"** -  CD containing Senior Police Officer Jeffery Vappie Audio recorded statement. Dated Monday, January 9, 2023 and Wednesday, February 8, 2023.

**34.Exhibit "HH"** – A transcribed copy of Senior Police Officer Jeffery Vappie statement. For Monday, January 9, 2023 and Wednesday, February 8, 2023, both were Completed by Ms. Elise Triplitt. 181 pages photocopied.

**35.Exhibit "II"** – Notice of NOPD Internal Disciplinary Investigation Rights and Responsibilities of Employee Under Investigation and Notification to Appear to Render a statement form for Sergeant Tokishiba Lane-Hart. One (1) Page, original.

**36.Exhibit "JJ"** -  CD containing Sergeant Tokishiba Lane-Hart Audio recorded statement.

**37.Exhibit "KK"** – A transcribed copy of Sergeant Tokishiba Lane-Hart statement. Completed by Ms. Elise Triplitt. 10 pages photocopied.

**38.Exhibit "LL"** – Officer Jeffery Vappie ADP (Payroll) records from January 1, 2022 to December 31, 2022. 10 pages photocopied.

Investigating Officer's Initials: _KA_  CDM071

2022-0513-R
Page 42 of 42

**39.Exhibit "MM"** – Email sent to Consultant Chief Fausto B. Pichardo by Captain Kendrick and response from Chief Pichardo. Dated January 25, 2023. One (1) page photocopied.

**40.Exhibit "NN"** - Notice to the Accused of Completed Investigation and Notice of Disciplinary Hearing (form 308) issued to Senior Police Officer Jeffery Vappie One (1) page original.

Investigating Officer's Initials: _KA_



**Attachment E**

**Monitoring Team Analysis of PIB Report**

CDM073



**Confidential**

**Monitoring Team Analysis of PIB Investigation of Officer Jeffrey Vappie**

**April 7, 2023**

CDM074

Monitoring Team Review of Vappie Investigation Report
April 7, 2023
Page 2



## Contents

I.      Introduction ........................................................................................................................ 3

II.     Analysis of Investigation ................................................................................................... 5

   A.   PIB Failed To Include An Analysis Of The Circumstantial Evidence Supporting Its Professionalism Finding........................................................................................................................................... 7

   B.   PIB Created Needless Ambiguity When It Used "May Have Violated" Language In The Context Of Sustaining The Rule 3 Violation. ................................................................................. 10

   C.   PIB Failed To Aggressively Pursue All Potential Material Witnesses. ............................... 11

   D.   PIB Failed To Take Advantage Of Opportunities To Cooperate With The New Orleans Office Of The Inspector General.......................................................................................................... 12

   E.   PIB Failed To Take Adequate Steps To Protect The Confidentiality Of Its Investigation. .............. 12

   F.   PIB Violated The Consent Decree By Refusing To Share A Copy Of The PIB Report With The Monitoring Team When Requested. ............................................................................... 13

   G.   PIB Failed To Make An Effort To Secure Officer Vappie's Personal Cell Phone............................ 14

   H.   Conclusion ....................................................................................................................... 15

III.    Policy Recommendations................................................................................................ 16

IV.     Conclusion....................................................................................................................... 20

CDM075



## I.     Introduction

In early November 2022, local New Orleans TV station Fox8 ran a series of stories involving the Mayor Latoya Cantrell's executive protection detail. The story raised a number of questions regarding the operation of that detail as well as the actions of a particular member, Officer Jeffrey Vappie. PIB opened an investigation into the allegations raised in the story on November 9, 2022.

On November 10, 2022, the New Orleans City Council requested that the Office of the Consent Decree Monitor and the Office of the Independent Monitor conduct their own independent investigation into the Vappie allegations, citing "significant concerns about the apparent conflict of interest with the New Orleans Police Department being allowed to, again, investigate serious allegations involving Mayor Cantrell."[1] The Monitoring Team responded to the City Council on November 11 explaining that it lacked the authority to conduct investigations, but that it would monitor PIB's investigation of Officer Vappie closely to ensure it was effective, efficient, and without bias.[2]

Consistent with its response to the City Council and its obligations under the Consent Decree to closely monitor significant misconduct investigations,[3] the Monitoring Team met with Deputy Chief Keith Sanchez and PIB's investigators Captain Kendrick Allen and Lieutenant Lawrence Jones on an almost weekly basis over the course of PIB's investigation. While we were not involved in the day-to-day affairs of the investigation (the Consent Decree makes clear the Monitoring Team has no role in running the NOPD[4]), the PIB team seemingly was open with us regarding their strategy and the status of their activities. We appreciate the cooperation we received from PIB throughout this matter.

On February 17, 2023, prior to the conclusion of the investigation, the Monitoring Team sent an "immediate action notice" to Deputy Chief Sanchez alerting him to several issues we believed the NOPD should address right away. Rather than waiting until the conclusion of PIB's investigation, we brought these matters to PIB's attention at that time to ensure NOPD would take immediate steps to correct the concerns we identified. Our opinions and recommendations related only to larger policy/process issues that were unrelated to the then-still-forthcoming substantive findings of the PIB

---

[1]     The City Council letter is attached to this Report as Exhibit A.
[2]     The Monitoring Team's response to City Council is attached to this Report as Exhibit B.
[3]     *See, e.g.*, Consent Decree paragraphs 377, 444, 454, 455.
[4]     Consent Decree paragraph 445.

CDM076



Vappie investigation team. We have incorporated those earlier recommendations into this Report.

PIB completed its investigation into the actions/inactions of Officer Vappie on March 10, 2023, and submitted the investigation report to Deputy Chief Sanchez the same day. Deputy Chief Sanchez and Interim Chief Michelle Woodfork reviewed and concurred with the investigators' findings on March 16, 2023, as reflected in the signature block of the PIB report, copied here:



NOPD, however, refused to share a copy of its investigation report with the Monitoring Team until April 3, 2023.

The Consent Decree requires NOPD to provide every serious misconduct complaint investigation "to the Monitor before closing the investigation or communicating the recommended disposition to the subject of the investigation or review." CD at 454. This was not done here despite the Monitoring Team making numerous requests for access to the investigators' report. This is a violation of the Consent Decree that impacts the Monitor's obligations to review "each serious misconduct complaint investigation and recommend for further investigation any . . . misconduct complaint investigations that the Monitor determines to be incomplete or for which the findings are not supported by a preponderance of the evidence." *Id*. Further, the Consent Decree directs the Monitoring Team to "provide written instructions for completing any investigation determined to be incomplete or inadequately supported by the evidence." *Id*. By withholding the investigation from the Monitoring Team until well after communicating the disposition of the investigation with the subject, NOPD thwarted the Monitoring Team's ability to meet its obligations under the Consent Decree.



Nonetheless, the Monitoring Team has performed a careful review of the PIB report shared with us on April 3, and provides the recommendations set out in this Report as contemplated by the Consent Decree.

## II.    Analysis of Investigation

NOPD opened its investigation into Officer Vappie on November 9, 2022 and concluded its investigation on March 10, 2023. PIB sustained multiple allegations against Officer Vappie, including violations of the 16.58 hour work day limitation, violations of NOPD's professionalism rules, and violation of NOPD's rules requiring officers to devote their entire time on duty to their actual NOPD duties. PIB's specific findings and recommendations are shown here:

---

2022-0513-R
Page 37 of 42

### Disciplinary Recommendations

#### Senior Police Officer Jeffery Vappie

Rule 4: Performance of Duty: Paragraph 2: Instructions from an authoritative source; to wit N.O.P.D. Chapter 22.08 Police Secondary Employment Paragraph 32……………………………………………………………………**SUSTAINED**
*No member, including Reserve officers, shall work more than 16 hours and 35 minutes (16.58 hours) within a 24-hour period. (The 24-period begins the first time the member reports for either regular duty or police secondary employment.) These hours are cumulative and include normal scheduled work hours, overtime, court time, off-duty police secondary employment, or outside employment*
**Captain Kendrick Allen proved beyond a preponderance of evidence that Senior Police Officer Jeffery Vappie violated this rule when on, on September 28, 2022, Officer Vappie worked for 18 hours within a 24 hour period. The remarks indicate that Officer Vappie was assigned to the Consultant Chief Fausto B. Pichardo and not his normal Executive Protection assignment.**

---

CDM078



## OTHER SUSTAINED VIOLATIONS

**Rule 3: Professional Conduct, Paragraph 1: Professionalism**...........................**SUSTAINED**
*Employees shall conduct themselves in a professional manner with the utmost concern for the dignity of the individual with whom they are interacting. Employees shall not unnecessarily inconvenience or demean any individual or otherwise act in a manner which brings discredit to the employee or the New Orleans Police Department.*
**Senior Police Officer Vappie may have violated this rule when Officer Vappie spent numerous hours alone with the Protectee outside of his regular tour of duty goes against the training and ethics of an Executive Protection member. So much so, that Deputy Charles Ellis and Louis Martinez, brought his behavior to his attention and requested that he stop.**

**Rule 4: Performance of Duty, Paragraph 3: Devoting Entire Time to Duty**...................................................................................................... **SUSTAINED**
*Employees shall not read, play games, watch television/movies, or otherwise engage in entertainment while on duty, except as may be required in the performance of duty, or by authority of their respective Bureau Chief. They shall not engage in activities or personal business which would cause them to neglect or be inattentive to duty.*
**Senior Police Officer Vappie was not attentive to his duty as an Executive Protection member when he attended the HANO Board Meeting on two separate occasions, <u>March 29, 2022</u> and <u>August 30, 2022</u>, while still on duty with the New Orleans Police Department.**

Senior Police Officer Jeffery Vappie may also have violated Rule IX of the Civil Service Rules for the City of New Orleans, relative to Maintaining Standards of Service.

Respectfully Submitted,

_____
Captain Kendrick Allen
Public Integrity Bureau

Date: _3 - 10 - 2023_

Investigating Officer's Initials: _KA_

---

As will be discussed below, the Monitoring Team finds these conclusions to be reasonable based upon the facts available to PIB.

The Monitoring Team met regularly with the lead PIB investigators, the Deputy Chief of PIB, and the IPM throughout the PIB investigation. While we were not given access to PIB's report until April 3, 2023, which is a serious violation of the Consent Decree, we otherwise did receive meaningful cooperation from the PIB team.

Overall, we are satisfied that PIB's investigation into the actions and inactions of Officer Vappie met the requirements of the Consent Decree. Captain Allen and Lieutenant Jones took their jobs seriously and pursued the investigation with diligence and integrity. The Monitoring Team reviewed all witness and subject interviews conducted by PIB and can confirm the seriousness of the questions asked by the investigators, their lack of bias, and the appropriate scope of the questions.

CDM079



We did not see any evidence of "pulling punches" in the interviews. The questions were well thought out, relevant, and meaningful.[5]

Additionally, PIB performed well, particularly in the absence of policies governing the Mayor's executive protection detail. The absence of policies makes administrative investigations much harder. The absence of policies here almost certainly negatively impacted material elements of the Vappie investigation. Nonetheless, PIB appropriately considered the lack of policies and properly incorporated that fact into its decision-making process.

While PIB's investigation was reasonable and meaningful, the Monitoring Team does have some concerns, all of which we expressed previously to PIB. These concerns are outlined in the subsections below.

### A.    PIB Failed To Include An Analysis Of The Circumstantial Evidence Supporting Its Professionalism Finding.

The Consent Decree mandates that all investigative findings in a misconduct investigation be supported using the "preponderance of the evidence standard."[6] Further, the Consent Decree mandates that "in each investigation, NOPD shall consider all relevant evidence, *including circumstantial, direct, and physical evidence*, as appropriate, and make credibility determinations based upon that evidence."[7] There is much to unpack in these requirements.

- First, it is important to note NOPD has an obligation to consider direct *and circumstantial* evidence in its administrative investigations.

- Second, because facts are often not clear in an investigation, NOPD must make credibility determinations based upon the direct and circumstantial evidence available to it. In doing so, NOPD must not credit an officer's account of the events simply because he/she is an officer.

- Third, NOPD must apply a "preponderance of the evidence" standard. This means, to sustain a complaint, the NOPD need not have uncontroverted

---

[5]    We note that we are unable to opine on the quality of PIB's data analysis (e.g., its review of emails, Officer Vappie's phone, and video evidence from the French Quarter security cameras) as we were not given detailed insight into the scope of these reviews. We do note, however, that notwithstanding the diligence of Captain Allen and Lieutenant Jones, it is likely PIB lacked the time and resources to conduct fully in-depth reviews of these sources.

[6]    Consent Decree paragraph 414.

[7]    Consent Decree paragraph 413 (emphasis added).



evidence. Rather, NOPD simply must determine whether the events complained of are more likely than not (i.e., 51%) to have occurred.[8]

While investigators understandably like concrete facts, uncontroverted allegations, and evidence beyond a reasonable doubt, such is not the requirement for sustaining a complaint in an administrative investigation.

Here, the PIB investigators did a good job applying the Preponderance of the Evidence standard and, in our view, came to the correct conclusion regarding the allegations sustained. However, PIB incorporated incorrect and confusing language in its investigation report and missed an important opportunity to explain the basis for its findings by not including an analysis of how it applied the Preponderance of the Evidence standard to the facts before it, especially in the area of the significant time Officer Vappie spent in the Upper Pontalba apartment during work and non-work hours. This gap in the investigation report will make it harder for NOPD to defend its position should Officer Vappie appeal the discipline imposed.

While PIB admittedly did not have visibility into what was going on in that apartment – i.e., whether Officer Vappie was there in service of his executive protection function or was there for more social reasons – there is much circumstantial evidence that suggests Officer Vappie was *not* present in furtherance of his executive protective duties. This circumstantial evidence should have been included in the PIB report since it all is relevant to NOPD's application of the Preponderance of the Evidence standard. For example, a robust Preponderance of the Evidence analysis would have noted and documented the following:

- Officer Vappie spent many hours in the City's Upper Pontalba apartment.[9]

- Officer Vappie was the only officer among the executive protection detail who spent any time in the Upper Pontalba apartment. All other officers stayed outside the apartment while protecting the Mayor. Had the time in the Upper Pontalba apartment truly been work time, other officers presumably would have taken their turn doing the same.

---

[8]     We note that in the Disciplinary Recommendation section of its report, PIB uses the phrase "proved beyond a preponderance of evidence." The proper phrase is "by a preponderance of the evidence." Incorporating the word "beyond" creates needless confusion since that word most often is used in connection with a criminal finding of "beyond a reasonable doubt," which is a wholly different standard of proof.

[9]     According to information made public by Fox8 news, Officer Vappie spent at least 112 hours in the Upper Pontalba apartment during the period analysis by the station.



- Officer Vappie changed clothes, used the shower, and undertook various non-security tasks (*e.g.*, watering plants) while in the apartment with or without the Mayor.

- Officer Vappie spent time in the Upper Pontalba apartment both on and off duty.

- Even when Officer Vappie left the Upper Pontalba apartment late at night after spending several hours in the apartment, the Mayor often walked alone to her car in the French Quarter without any security, strongly suggesting Officer Vappie was not spending time in the apartment because of any credible threat to the Mayor's safety. If there had been a credible threat to the Mayor's safety, (a) other officers would have rotated through the in-apartment assignment and (b) the executive protection team would not have allowed the Mayor to walk to and from the apartment alone.

- The news story about the time Officer Vappie spent in the Upper Pontalba apartment led to a prompt divorce filing from Officer's Vappie wife, an unlikely reaction to an actual, transparent executive protection detail.

- No officer spent time inside the Mayor's residence, which would have been the case had there been a credible threat to the Mayor's safety.

- Multiple other members of the Mayor's Executive Protection detail testified during the PIB investigation to the unprofessional nature of Officer Vappie's actions, which, they felt, brought discredit to the NOPD.

While these facts do not *prove* beyond the shadow of a doubt Officer Vappie was not working while in the Upper Pontalba apartment, they demonstrate *by a preponderance of the evidence that* Officer Vappie was not working while in the apartment. Yet he was billing the City of New Orleans for much of his time there.

The only evidence refuting this circumstantial evidence is Officer Vappie's own statement in his PIB interview that his relationship with the Mayor was professional and, while in the apartment, he was working and stayed in the common areas (although he couldn't describe what those common areas were). But Officer Vappie's own statement is the only evidence in support of Officer Vappie's position. The one other witness who could have corroborated Officer Vappie's statement, the Mayor, refused to be interviewed by PIB. Indeed, the Mayor's unwillingness to meet with PIB for an interview is further circumstantial evidence that Officer Vappie was not working while in the Upper Pontalba apartment.

CDM082



The circumstantial evidence here not only paints a compelling picture in support of PIB's finding that Officer Vappie acted unprofessionally with regard to his time in the Upper Pontalba apartment, it also strongly suggests Officer Vappie's statements regarding what he was doing in the apartment were not credible. As noted above, it is PIB's obligation to assess the credibility of witness and officer statements.[10] It is inappropriate for PIB to accept an officer's account of a situation in the face of more credible circumstantial evidence, especially where the officer has an incentive (i.e., preservation of his job) to not be fully transparent regarding the facts.

Here, PIB found every witness to be credible except Officer Vappie. With regard to Officer Vappie, PIB found that, "After comparing Officer Vappie's administrative statement with the evidence reviewed during this investigation, the investigators were unable to confidently assess his credibility." PIB Report at 31. The Monitoring Team submits that a more robust analysis of the circumstantial evidence available to PIB would have supported a stronger statement regarding Officer Vappie's lack of credibility in several of his interview statements.[11]

We find that the circumstantial evidence available to PIB strongly suggests some manner of a social relationship between Officer Vappie and the Mayor which led to unprofessional actions by Officer Vappie – actions that the other witnesses agreed were unprofessional, not within protocol, and not consistent with executive protection. While PIB came to the correct conclusion regarding the disposition of the professionalism allegation (*i.e.*, Sustained), PIB should have done a better job analyzing *and documenting* the circumstantial evidence supporting its conclusions.

### B.   PIB Created Needless Ambiguity When It Used "May Have Violated" Language In The Context Of Sustaining The Rule 3 Violation.

PIB's use of the phrase "may have violated this rule" in the context of sustaining the Rule 3 professional violation was a mistake. There is no room for a "may have violated" finding in a PIB investigation. PIB either finds a violation by a preponderance of the evidence (i.e., by 51%), or finds no violation by a preponderance of the evidence. We read PIB's "may have violated" language as ambiguous and likely to be challenged on appeal by the subject of the investigation.

PIB did not create any such confusion regarding its other findings. with regard to its Rule 4 sustain involving the 16.58 hours violation, PIB concluded Officer violated

---

[10]   *See, e.g.*, Consent Decree paragraph 413.

[11]   Assessing credibility is not always an easy task. But the complexity of the analysis does not relieve NOPD of the obligation to make the assessment. Saying "we were unable to assess his credibility" is simply another way of saying we did not do what is required of us with regard to credibility assessments.



NOPD's rules by a preponderance of the evidence. PIB did not equivocate. Likewise, in sustaining the other Rule 4 violation, devoting entire time to duty, PIB found that Officer Vappie "was not attentive to duty." There is no reason PIB should have used weaker language from the Rule 3 violation involving professionalism.[12]

As discussed above, the Monitoring Team sees significant circumstantial evidence that Officer Vappie acted unprofessionally while spending extensive hours in the Upper Pontalba apartment and while dining with the Mayor with his back to the door of the restaurant. We see no reason for ambiguous "may have violated" language in this context. PIB should state it found a violation by a preponderance of the evidence just as it did with the other two violations.

### C.    PIB Failed To Aggressively Pursue All Potential Material Witnesses.

At the outset of the investigation, PIB identified the witnesses it intended to interview. Neither the Mayor (the only witness beyond Vappie himself who could confirm whether Vappie was working while in the Upper Pontalba apartment), the former Superintendent, nor various supervisors in Vappie's chain of command were included in PIB's initial investigation plan. The Monitoring Team raised this issue and PIB agreed to request an interview from Chief Ferguson and the Mayor. Unfortunately, both declined to be interviewed. These refusals reflect a lack of respect for the NOPD PIB process, and made it harder for PIB to get its job done.

Further, PIB did not attempt to interview the several officers in Vappie's chain of command. The Monitoring Team believes it is critical to interview supervisors – up to and including the cognizant deputy chief – in cases like this. What supervisors knew and didn't know, what they approved and didn't approve, and what steps they took, if any, to provide close and effective supervision are important components of a robust administrative investigation. PIB missed this opportunity here.

Finally, with regard to the sustained 16.58 hour violation relating to the time Officer Vappie was assigned to consultant Fausto Pichardo (and not to the Mayor's executive protection detail), we commend NOPD for attempting to interview Mr. Pichardo. In response to this effort, however, Mr. Pichardo refused to participate in the PIB process, informing PIB "there is nothing that I can contribute to aid this investigation." PIB should not have rolled over so easily in the face of this unprofessional refusal. According to statements made by the Mayor, Mr. Pichardo is serving as the NOPD's Consulting Chief of Operations.[13] Presumably, he must abide by NOPD's rules and

---

12    PIB also used vague language with regard to its finding that Officer Jeffrey Vappie "may also have violated Rule IX of the Civil Service Rules for the City of New Orleans." Here again, PIB should have found a violation or not by a preponderance of the evidence.

13    While the Mayor has used the title "Consulting Chief of Operations" to describe Mr. Pichardo, we note that that title does not appear in any of NOPD's organizational charts. The Monitoring Team

CDM084



procedures, and comply with the directions of his NOPD supervisors. Had NOPD directed Mr. Pichardo to meet with PIB, presumably he would have done so. But there appears to have been no real effort to make that happen.

The quality of PIB investigations hinges on the willingness of material witnesses to participate in the PIB process. Every officer requested to participate, whether current or former, did so. In contrast, retired Chief Ferguson, the Mayor, and NOPD's Consulting Chief of Operations refused to do so. NOPD should have explored whether it had other tools available to it to convince these individuals to participate in such an important process.

> ### D.    PIB Failed To Take Advantage Of Opportunities To Cooperate With The New Orleans Office Of The Inspector General.

The New Orleans Inspector General reached out to NOPD and PIB on numerous occasions offering to support PIB's investigation. Apparently, the IG is conducting its own investigation into broader issues regarding the French Quarter apartment, and, in the course of that investigation, has reviewed hundreds of hours of video showing the time Officer Vappie spent in the Upper Pontalba apartment while on duty and off duty. PIB, however, failed to accept the IG's offer of assistance. In the Monitoring Team's view this was a mistake. The New Orleans IG has resources – forensic, data analysis, and personnel – NOPD simply does not have.

> ### E.    PIB Failed To Take Adequate Steps To Protect The Confidentiality Of Its Investigation.

At the outset of the Vappie investigation, the Monitoring Team and the IPM advised PIB to implement additional protections to ensure the confidentiality of its investigation. Because of public and media focus on the investigation and the fact that the Mayor, their boss, likely would be a material witness in the investigation, we felt extra precautions were necessary to protect the integrity of the investigation and avoid any appearance of impropriety. Among other things, the Monitoring Team and the IPM advised PIB to establish a small circle of individuals authorized to have access to investigation materials, and to preclude all others from such access. PIB agreed on the importance of confidentiality and agreed that only a small circle within PIB would have access to investigation materials.

PIB failed to take the necessary steps to implement the protections it promised.

---

has asked NOPD numerous time what role Mr. Pichardo is playing and what his responsibilities he has within the NOPD, but has never received a consistent answer.



- First, it appears PIB shared a copy of all witness interview audio recordings with the City Attorney's Office. While we recognize the City Attorney represents PIB and the City and, at some point, may have a need to review those recordings (*e.g.*, as part of a Civil Service appeal), requesting those recordings prior to the conclusion of the investigation created a risk of an inadvertent breach as well as an appearance of impropriety.[14]

- Second, the audio recordings shared with the City Attorney apparently were shared on a non-password protected USB drive, increasing the risk and consequence of an inadvertent disclosure.

- Third, NOPD reassigned the two PIB investigators into the districts during the investigation, which meant they were working on highly confidential matters from their district offices rather than from the protected confines of PIB. This decision created an additional risk of an inadvertent breach of confidentiality.

The confidentiality of PIB investigations is critical for many reasons, including ensuring the integrity of the investigation itself, avoiding improper pressure on the investigation team and the witnesses, and avoiding the risk that information from an administrative investigation could contaminate a parallel or subsequent criminal investigation. It is too early to know whether the failure to ensure the confidentiality of the Vappie investigation will lead to these problems.

### F. PIB Violated The Consent Decree By Refusing To Share A Copy Of The PIB Report With The Monitoring Team When Requested.

Well before the conclusion of the PIB investigation, the Monitoring Team (and the IPM) requested a copy of the near-final PIB investigation report. NOPD rejected the Monitoring Team's request. The Monitoring Team repeated its request multiple times over the course of the following weeks, to no avail.

The failure to share drafts of the PIB report with the Monitoring Team violates the clear terms of the Consent Decree, paragraph 454 of which provides as follows:

> 454. City and NOPD shall provide each investigation of a serious use of force or use of force that is the subject of a misconduct investigation, and each investigation report of a serious misconduct complaint investigation (i.e., criminal misconduct; unreasonable use of force; discriminatory policing; false arrest or planting evidence;

---

[14]     The City Attorney's Office has acknowledged an inadvertent public disclosure of all PIB interview recordings in the Vappie matter.

CDM086



> untruthfulness/false statements; unlawful search;
> retaliation; sexual misconduct; domestic violence; and
> theft), to the Monitor before closing the investigation or
> communicating the recommended disposition to the
> subject of the investigation or review. The Monitor shall
> review each serious use of force investigation and each
> serious misconduct complaint investigation and
> recommend for further investigation any use of force or
> misconduct complaint investigations that the Monitor
> determines to be incomplete or for which the findings are
> not supported by a preponderance of the evidence. The
> Monitor shall provide written instructions for completing
> any investigation determined to be incomplete or
> inadequately supported by the evidence. The
> Superintendent shall determine whether the additional
> investigation or modification recommended by the
> Monitor should be carried out. Where the Superintendent
> determines not to order the recommended additional
> investigation or modification, the Superintendent will set
> out the reasons for this determination in writing. The
> Monitor shall provide recommendations so that any further
> investigation or modification can be concluded within the
> timeframes mandated by state law. The Monitor shall
> coordinate with the IPM in conducting these use of force
> and misconduct investigation reviews.

It is unclear why NOPD refused to share its report with the Monitoring Team when it was required by the Consent Decree to do so. This is the first time over the course of the Consent Decree NOPD has withheld information from the Monitoring Team.

Ultimately, after multiple requests and a threat to take the matter to Judge Morgan, PIB did turn over its report on April 3, 2023. Such a late production, however, made it much harder for the Monitoring Team to fulfill its obligations under paragraph 454 of the Consent Decree.

### G.    PIB Failed To Make An Effort To Secure Officer Vappie's Personal Cell Phone.

Soon after the launch of the Vappie investigation, it became clear Officer Vappie may have been communicating with the Mayor or the Mayor's staff via cell phone. Consequently, PIB secured Officer Vappie's work phone. However, a forensic analysis of the work phone failed to turn up relevant texts, emails, or voicemails. Yet, clearly, considering the extensive hours Officer Vappie spent in the Upper Pontalba



apartment both on and off the clock, Officer Vappie and the Mayor's office must have been corresponding somehow. The most likely vehicle for such frequent communications, if not Officer Vappie's work phone, must be Officer Vappie's personal cell phone. The evidence on his personal phone (*e.g.*, texts, locations, voicemails, etc.) could have been relevant to support or rebut Officer Vappie's testimony regarding what he was doing while spending so many hours in the Upper Pontalba apartment both on and off the clock.

While PIB did appropriately secure Officer Vappie's work phone, it chose not even to request Officer Vappie's personal phone. In the view of the Monitoring Team, this was a mistake. While the law is not perfectly clear in this area, the prevailing legal view seems to be a police agency can secure an officer's personal phone where it is reasonable to do so. We submit that, while not without room for an opposing view, NOPD did have adequate reason to do so here. Witnesses confirmed the Mayor's office did communicate with officers on the executive protection detail using cell phones. Since PIB did not find communications regarding the time spent in the Upper Pontalba apartment on Vappie's work phone, it stands to reason such communications must have come via Officer Vappie's personal phone. Consequently, reviewing the content of that phone could have supported Officer Vappie's statement that he was working while in the Upper Pontalba apartment. It also could have countered Officer Vappie's statement. Either way, the information on the personal phone would have been relevant to PIB's investigation.

### H.   Conclusion

The shortcomings noted above are substantive and material. NOPD should take immediate action to implement a corrective action plan to (a) fix what it can within the timeframe available for the Vappie investigation, and (b) ensure no recurrence of these shortcomings in future investigations. Notwithstanding these shortcomings and opportunities for improvement, however, we reiterate our finding that the PIB investigators did a good job in their investigation of Officer Vappie. Their decision to sustain multiple allegations against Officer Vappie was reasonable and supported by the facts. We commend Captain Allen and Lieutenant Jones for undertaking a quality investigation in a high pressure situation. We also commend Deputy Chief Sanchez for taking this matter seriously.

One final recommendation is worth mentioning here. The NOPD Discipline Review Board should seriously consider "mitigating up" the discipline imposed on Officer Vappie considering the significant circumstantial evidence demonstrating his lack of professionalism stemming from his time in the Upper Pontalba apartment during working and non-working hours, and his meals with the Mayor with his back to the door during working hours.

CDM088



The PIB discipline matrix[15] gives NOPD the opportunity to increase discipline beyond the matrix where aggravating circumstances are present. NOPD's Discipline Policy 26.2.1 describes aggravating circumstances as "conditions or events that increase the seriousness of misconduct and may increase the degree of penalty. Aggravating circumstances may be considered at a penalty hearing to deviate from the recommended or presumptive punishment. For example, if an offense carries a penalty range of one to three days' suspension, a hearing officer may choose to impose a three-day suspension in light of aggravating circumstances."

Moreover, NOPD policy 26.2 makes clear "Discipline shall be based upon the nature of the violation, *with consideration of aggravating and mitigating circumstances*, rather than the identity of the accused or his or her status within the NOPD." Further, Chapter 26.2.1 provides that the penalty hearing officer must recommend the presumptive penalty *unless aggravating or mitigating circumstances exist and are specifically articulated in the hearing record*.

In the discussion above, we set out the Monitoring Team's view regarding how PIB should have better documented the circumstantial evidence relating to Officer Vappie's lack of professionalism. While we agree with PIB's decision to sustain on the professionalism count, we see an appropriate use of that same extensive circumstantial evidence to deviate upward from the presumptive discipline set out in the matrix.

## III.    Policy Recommendations

On February 17, 2023, prior to the conclusion of the investigation, the Monitoring Team sent an "immediate action notice" to the Deputy Chief of PIB alerting him to several policy and structural issues we believe the NOPD should address right away. Rather than waiting until the conclusion of PIB's investigation, we brought these matters to PIB's attention at that time to ensure NOPD could take immediate steps to correct the concerns we identified. We made clear to PIB we were offering no opinions or recommendations regarding the Vappie investigation itself since we had not seen the investigation report yet. Our opinions and recommendations related only to larger policy/process issues that are not tied to the substantive findings of the Vappie PIB investigation team.

The Monitoring Team recommended the following actions based on our review of the early stages of the PIB investigation into the actions/inactions of Officer Vappie, and reiterates those recommendations here since we have not yet heard back from PIB on our February 17 letter:

---

[15]       Consent Decree paragraph 422 requires NOPD's use of a discipline matrix.

CDM089



- **Supervision**. The NOPD officers assigned to the Executive Protection detail receive little if any oversight from NOPD supervisors. This appears to have been the case for years. The members of the detail indicated their belief that their only supervisor was the Mayor herself. While the Mayor seemingly is responsible for assignments and schedules, there is no indication the Mayor played any role in supervision beyond that. NOPD should take immediate action to ensure the members of the Executive Protection detail receive the "close and effective supervision" required by the Consent Decree.[16]

- **Policy**. No written policy guides the operation of the Executive Protection detail or the actions of the officers assigned to that detail. Likewise, no written document (policy or otherwise) sets out the standards and protocols with which members of the Executive Protection team are expected to comply. The lack of written guidance almost certainly hindered PIB's investigation of Officer Vappie. NOPD should take immediate action to develop clear policies and procedures governing the operation of Executive Protection detail and the officers assigned to that detail. As required by the Consent Decree, such policies and procedures should "define terms clearly, comply with applicable law and the requirements of the Consent Decree, and comport with best practices."[17]

- **Performance Evaluations**. The Consent Decree requires that "officers who police effectively and ethically are recognized through the performance evaluation process, and that officers who lead effectively and ethically are identified and receive appropriate consideration for promotion" and that "poor performance or policing that otherwise undermines public safety and community trust is reflected in officer evaluations so that NOPD can identify and effectively respond."[18] Without any meaningful NOPD supervision, it is unclear to us who, if anyone, evaluates the performance of members of the Executive Protection detail. NOPD should take immediate action to ensure members of the Executive Protection detail are evaluated in the same manner as other NOPD officers.

- **Efficiency**. We understand that members of the Executive Protection team are paid for a full shift whether or not the Mayor is in town. It is unclear, however, what work they are performing while the Mayor is not in town beyond occasional administrative tasks like cleaning the Mayor's car and catching up on Departmental paperwork. At a time when NOPD has vocally complained about its lack of officers – and used the lack of officers to explain its inability to

---

[16]    *See* Consent Decree section XV for a discussion of "close and effective" supervision.
[17]    *See* Consent Decree section II.A.
[18]    Consent Decree section XIV sets out the requirements regarding Performance Evaluations.



comply with various Consent Decree obligations – it is quite inefficient to have multiple days when 1-2 additional officers are available to perform patrol work, but they are not performing patrol work. NOPD should consider identifying meaningful tasks members of the Executive Protection team can perform while the Mayor is out of town to contribute to the Department's well-publicized efforts to combat its lack of personnel.

- **Legal Conflicts**. The City Attorney provides "legal advice to the Mayor, the City Council, and other city offices, departments, and boards," including the NOPD.[19] While this joint representation normally creates no conflict, when the Mayor is or may be a material witness in a PIB investigation, the risk of a real or perceived conflict is significant. Indeed, this occurred in the Vappie investigation when the City Attorney visited PIB to monitor the second interview of Officer Vappie. Situations like this can create the perception that City Hall is attempting to intimidate interviewees or investigators, or otherwise interfere in a PIB investigation. Such perception may be avoided when the Mayor is or may be a witness by (i) the imposition of a formal wall to block the exchange of information between the Mayor's office/City Attorney's Office and PIB and (ii) engaging outside counsel to support PIB throughout the investigation. The Office of the Independent Police Monitor made this suggestion in a thoughtful public letter to the City Council on February 9, 2023. The Monitoring Team agrees with the IPM's concerns. NOPD should consider engaging outside counsel to advise PIB on matters when the City Attorney's representation of the City, Mayor's Office, and PIB could create a real or apparent conflict of interest.

- **Reassignment Of Officers Under Investigation**. We understand, pursuant to Policy 13.1, the Superintendent has the discretion to administratively reassign officers during certain PIB investigations. In this case, Officer Vappie had been moved out of the Executive Protection detail pending the PIB investigation, which was a sensible decision considering the nature of the allegations, the public profile of the investigation, and the likelihood that the Mayor would be a material witness in the investigation. Outgoing Superintendent Ferguson, however, hours before his retirement, inexplicably directed the return of Officer Vappie to the Mayor's security detail. While this order, fortunately, was reversed by a deputy chief and the City Attorney, the order itself created at the very least the appearance of interference in a PIB investigation. NOPD should consider revising its policy to prohibit officers reassigned due to a PIB investigation from being assigned back to their previous units until the

---

[19]     *See* www.nola.gov/city-attorney.



conclusion of the PIB investigation without the express approval of the PIB Deputy Chief.

- **PIB Investigators**. During the course of the PIB investigation, the two investigators assigned to the Vappie investigation were moved out of PIB. The lead investigator, Lawrence Jones, was promoted to lieutenant and moved to a district patrol unit. The PIB Captain, Kendrick Allen, was assigned to command a district. Without at all suggesting these two promotions were not warranted, NOPD should have considered detailing both individuals back to PIB until the completion of the Vappie investigation. While Superintendent Woodfork assured the Monitoring Team both officers would be given adequate time to complete their investigation, as a practical matter, this is difficult to accomplish in practice. PIB readily concedes it lacks adequate personnel to perform aspects of its investigations in the best of times (*e.g.*, reviewing videos and documents). Adding a full time job to Allen's and Jones's schedules on top of their PIB jobs virtually guaranteed both jobs would be compromised to some extent. NOPD should consider adopting a policy of detailing promoted officers back to PIB for limited timeframes when necessary to complete significant pending investigations.

- **Initial Investigation Letters**. At the outset of the investigation, PIB alerted Officer Vappie it had opened an administrative investigation initiated by a public complaint. The letter advised Officer Vappie that PIB would focus on an alleged violation of the 16.58 hour rule as well as other matters. PIB was aware at that time, however, of several other potential violations by Officer Vappie as a result of the Fox 8 coverage, including potential violations of NOPD's professionalism, conflict, and time charging rules. While PIB represented to the Monitoring Team that the general "other matters" language was all that was required to put Officer Vappie on notice of the allegations against him, the limited wording of the initial letter created avoidable problems during the Vappie interview. NOPD should consider the pros and cons of including a more complete description of the conduct under investigation in its initial letters to investigation subjects.

The Monitoring Team believes these recommendations are critical to ensure compliance with the Consent Decree and to ensure the sustainability of the many reforms NOPD has made over the years. While we are aware that the NOPD has taken steps to implement some of these recommendations, PIB has not yet responded to our February 2023 letter outlining these recommendations so we are not in a position to opine on the meaningfulness of NOPD's corrective actions at this time.

CDM092

Monitoring Team Review of Vappie Investigation Report
April 7, 2023
Page 20



## IV.    Conclusion

The Vappie investigation was a stressful one for PIB. The City Council made clear it would be reviewing the matter closely. The media made clear they would be reviewing the matter closely. And the Monitoring Team and the IPM made clear they would be reviewing the matter closely. Notwithstanding the stress likely caused by so much oversight, PIB undertook its investigation professionally and with integrity. While the Monitoring Team takes issue with some aspects of the investigation report, as noted in this Report, overall, we find that PIB did a good job with the underlying investigation. Investigators Allen and Jones took the matter seriously, comported themselves professionally, and showed no signs of being influenced by outside pressures. We commend PIB for its investigative work. We are hopeful, however, that the opportunities for improvement outlined in this Report will be taken seriously by PIB and NOPD and will be implemented promptly.

To that end, pursuant to Consent Decree paragraph 454, the NOPD Superintendent now must determine whether or not to order the recommendations set out in this Report. Should the Superintendent decide not to order the Monitoring Team's recommendations, she must "set out the reasons for this determination in writing."

As always, the Monitoring Team will make itself available to discuss any element of this Report or the remedial measures NOPD plans to take in response thereto.

CDM093



**Attachment F**

**NOPD Response to Monitoring Team Analysis**

CDM094

*CITY OF NEW ORLEANS*

# DEPARTMENT OF POLICE

*715 South Broad Street*
*New Orleans, LA  70119*



*"to protect and to serve"*

**LaToya Cantrell**
MAYOR

**Michelle M. Woodfork**
SUPERINTENDENT

April 24, 2023

Mr. Jonathan Aronie
Consent Decree Monitor (NOPD)
Leader, Governmental Practice
Sheppard Mullin Richter & Hampton LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC  20006

**Re:  Officer Jeffery Vappie**

Dear Mr. Aronie,

The Officer Jeffery Vappie administrative investigation has drawn an uncanny amount of attention and has become a polarizing jewel for many factions.  However, the Public Integrity Bureau (PIB) has not wavered from its goal to fairly and thoroughly investigate misconduct allegations made against employees of the New Orleans Police Department.  PIB's overall mission is consistent with the express language of the opening paragraph of section XVII of the Amended and Restated Consent Decree ("Consent Decree") that ensures "all allegations of officer misconduct are received and are fully and fairly investigated".  From the moment the allegation was received and assigned, without question, Captain Kendrick Allen and Lieutenant Lawrence Jones fully, thoroughly, and fairly investigated the allegations of misconduct against Officer Vappie.  We agree with your assessment that PIB undertook its investigation professionally and with integrity and we further join you in commending the investigators and PIB for a good job.

The highly public nature of the complaint and its subsequent investigation has drawn unprecedented interest, as you stated, from the City Council, the media, the Monitoring Team and the OIPM.  This level of review and scrutiny has been fruitful in several ways.  First, it allows casual observers an opportunity to learn of the high quality, expertise, and performance of the men and women of the New Orleans Police Department.  It specifically showcases the skills and professionalism of the investigators and the completeness of investigations conducted within the Public Integrity Bureau.  This is noteworthy and these efforts are worthy of applause.

Second, the numerous monitoring reviews have presented concerned parties with another reason and opportunity to review, with specificity, the tenets of the Consent Decree.  We disagree with the Monitoring Team Analysis that PIB violated the Consent Decree by refusing to share a copy of the PIB report with the Monitoring Team when requested.  The plain language of Paragraph 454 of the Consent Decree states that "City and NOPD shall provide each investigation of a serious use of force or use of force that is the subject of a misconduct investigation, and each investigation report of a serious misconduct complaint investigation (i.e., criminal misconduct; unreasonable use of force; discriminatory policing; false arrest or planting evidence; untruthfulness/false statements; unlawful search; retaliation; sexual misconduct; domestic violence; and theft), to the Monitor before closing the investigation or communicating the recommended disposition to the subject of the investigation or review".

CDM035

Here, under the most liberal reading and interpretation, the Consent Decree would <u>not</u> describe the Officer Vappie investigation as one that entitles the Monitor to the investigation before its completion.  It would not identify the investigation as a use of force investigation or a serious misconduct complaint investigation.   More precisely, the investigation: 1) did not involve a serious use of force; 2) did not involve use of force that is the subject of a misconduct investigation; and 3) was not a serious misconduct complaint investigation further enumerated and clarified as "criminal misconduct; unreasonable use of force; discriminatory policing; false arrest or planting evidence; untruthfulness/false statements; unlawful search; retaliation; sexual misconduct; domestic violence; and theft".   Under the Consent Decree only these three specific types of investigations trigger the requirement of NOPD to provide the Monitor the investigation prior to its conclusion.

No allegation of misconduct, by Officer Vappie, was described, suggested, hinted at or articulated as conduct that requires the release of the investigation pursuant to Paragraph 454.  The Monitor is expressly granted limited power and authority to "<u>review each serious use of force investigation and each serious misconduct complaint allegation</u> and recommend for further investigation…".  At its request, the Monitor is not eligible to receive each, every, and all investigations, no matter the stage of the investigation.  Therefore, we vehemently disagree with the suggestion that the Public Integrity Bureau violated the Consent Decree by refusing to share a copy of the PIB report with the Monitoring Team.

Third, the NOPD has the occasion to educate and clarify the role of the Public Integrity Bureau.  As you know, the PIB is critical to the overall success of the New Orleans Police Department.  It is important to note that PIB is not a prosecutorial or disciplinary agency, but it is a fact-finding bureau.  Although the governing standard for administrative investigations is a preponderance of the evidence, PIB does not approach investigations with an intention to make the facts fit.  We investigate the complaint by following the lead of the facts wherever they lead and when the trail of the facts ends, we begin the conclusion of the investigation.

While we appreciate your suggestion that the investigators should have obtained the Officer's personal cell phone for further research and investigation.  However, we find no legal, fair, or reasonable basis for doing so.  Under my administration, we hold constitutional policing as an ongoing and unwavering standard.  As we understand it, the Fourth Amendment prohibits warrantless searches of places or seizures of persons or objects where there is a reasonable expectation of privacy.  The courts, as you know, apply a test that basically weighs and balances the public interest against the intrusion of privacy.

Here, the initial complaint alleged that the officer may have violated the 16.35-hour rule.  Based on an investigation and review of the officer's timesheets and payroll records it was determined that the Officer violated the NOPD policy.  The information that <u>could have been</u> discovered in Officer Vappie's cellphone was discovered early in the investigation and through other means.  Applying the balance test under the facts of the Officer Vappie administrative investigation, to take his personal cellphone reeks of a constitutional violation making this issue ripe for an appeal.

Furthermore, the ramifications of taking an officer's personal cellphone as part of an administrative investigation would deplete and flatten the morale of the entire NOPD. This type of rogue and violative action is not the direction in which I am leading and intend to lead the bureau.

Lastly, it presents opportunities for the New Orleans Police Department to consider ways to improve and make appropriate adjustments. We recognize that NOPD must create new policies and procedures to ensure that our employees' behavior reflects the professional and accountability standards of the NOPD. We are working to upgrade the protocols within the Executive Protection team. We are establishing procedures that incorporate this specialized unit within a clearly defined and delineated chain of command for supervision and accountability. This includes the placement of an immediate supervisor within the EP team.

Through this process we have also recognized the need to adjust our current documents and forms to more clearly reflect our operating procedures. In other words, we have an opportunity to make our documents less confusing and commensurate with our actual protocols. One such example is in the penalty recommendation document wherein the investigators submit their recommendations to their chain of command. These recommendations allow for the investigators' Platoon Commanders, District Captains, and their respective Deputy Superintendent to review the investigation and acknowledge their opinion by circling either "concur" or "does not concur" and then signing their signature above their name.

This recommendation form/document allows for two final signatures, the Deputy Superintendent of the Public Integrity Bureau and the Superintendent of Police. As a matter-of-sequence, the Deputy Superintendent signs in their official capacity, and then signs "for" the Superintendent. While this practice is loosely described in old policies and is subject to various interpretations, we are reviewing to determine its utility at this stage. However, in the Officer Vappie investigation, this process was continued.

By way of clarity, Superintendent Michelle M. Woodfork did not review this investigation, nor did she sign acknowledging that she did at this phase. Perhaps because the practice is commonplace it seems obvious that the signature for the Deputy Superintendent of PIB and the signature for the Superintendent of Police are the same. Additionally, the word "for" after the Deputy Superintendent's signature with an arrow pointing to the Superintendent's name should have been a clear identifier that the Deputy Superintendent was in fact signing for the Superintendent.

As previously described, Deputy Superintendent Keith A. Sanchez signed his name in his official capacity on the recommendations and as customary Deputy Superintendent Keith A. Sanchez signed for Superintendent Michele M. Woodfork. This customary policy has been in place for many years, and it presents an opportunity to evaluate the reason it has been done this way or should it continue. I would welcome any recommendation or approach you have considered over

the years to change this since it was the practice ever since the Monitoring Team has been convened.

Under my administration, I intend to work in partnership with those who seek to help the New Orleans Police Department improve and operate at its maximum capacity. I appreciate your level of insight and your willingness to separate your strongly held opinions of what could have been done and yet fairly grade our investigators and the PIB on what they did. As stated before, I agree with the Monitoring Team Analysis that PIB did a good job with this investigation. Although we have created new policies, procedures, and protocols to address the issues that we both discovered through this investigation, I look forward to reviewing further your recommendations and seeing how we may utilize them best.

Very truly yours,

MICHELLE M. WOODFORK
Superintendent of Police

By: Keith Sanchez, Deputy Superintendent
Public Integrity Bureau

CDM098