## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CIVIL ACTION** |
| **VERSUS** | **NO.  12-1924** |
| **CITY OF NEW ORLEANS** | **SECTION: "E" (2)** |

### RULE TO SHOW CAUSE

On July 24, 2012, the United States filed the complaint in this matter against the City of New Orleans ("City"), seeking declaratory and injunctive relief after an extensive investigation of the New Orleans Police Department ("NOPD"),[1] pursuant to the Violent Crime Control and Law Enforcement Act, 42 U.S.C. § 14141 ("Section 14141"); the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d (the "Safe Streets Act"); and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d to 2000d-7, and its implementing regulations, 28 C.F.R. §§ 42.101-.112 ("Title VI").  The Consent Decree contains detailed provisions concerning changes in NOPD policies and practices related to: (1) the use of force; (2) investigatory stops and detentions, searches, and arrests; (3) custodial interrogations; (4)  photographic lineups; (5) bias-free policing; (6) community engagement; (7) recruitment; (8) training; (9) officer assistance and support; (10) performance evaluations and promotions; (11) supervision; (12) the secondary employment system, also known as the paid detail system; (13) misconduct complaint intake, investigation, and adjudication; and (14) transparency and oversight.  In addition,

---

[1] R. Doc. 1 at ¶¶ 1, 14-16.

the Consent Decree includes detailed provisions regarding the implementation and enforcement of the Consent Decree.

On that same day, July 24, 2012, the City and the United States Department of Justice ("DOJ") filed a Joint Motion and Memorandum for Entry of Consent Decree.[2] On September 14, 2012, the City and DOJ filed a Joint Supplemental Motion for Entry of Consent Decree incorporating certain agreed upon modifications to the Consent Decree.[3] The Consent Decree "is effectuated pursuant to the authority granted to DOJ under Section 14141, the Safe Streets Act, and Title VI to seek declaratory or equitable relief to remedy a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges, or immunities secured by the Constitution or federal law."[4] The Court approved the Joint Motion for Entry of Consent Decree, as amended, on January 11, 2013.[5] The Court specifically retained jurisdiction over this matter, including but not limited to the right to interpret, amend, and enforce the Consent Decree until the final remedy contemplated by the Consent Decree has been achieved.[6]

The Supreme Court has "long recognized that a district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"[7] The Fifth Circuit notes that one inherent power flowing from Article III of the U.S. Constitution is a court's "power 'to control the disposition of the causes on its docket

---

[2] R. Doc. 2.
[3] R. Doc. 114.
[4] R. Doc. 159-1 at 7.
[5] R. Doc. 159.
[6] R. Doc. 159 at 8.
[7] *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962) and citing *United States v. Hudson*, 7 Cranch 32, 34 (1812)).

with economy of time and effort for itself, for counsel, and for litigants."[8] "[T]his power fits most appropriately in the . . . second category of inherent powers[, which] encompasses those 'necessary to the exercise of all others.' For the most part, these powers are those deemed necessary to protect the efficient and orderly administration of justice and those necessary to command respect for the court's orders, judgments, procedures, and authority."[9]

"[A] consent decree, although founded on the agreement of the parties, is a judgment."[10] "[A] consent decree is a 'settlement agreement subject to continued judicial policing.'"[11] "It is well-settled that a federal court has the inherent authority to enforce its own orders, including consent decrees agreed to by parties and approved by the Court."[12] "'[T]he [C]ourt has an independent duty to ensure that the terms of the decree are effectuated.'"[13] "Exactly how a court should enforce and protect its orders is an issue largely left to the discretion of the court entering the order, so long as that discretion is exercised reasonably."[14] District courts have the power to hold parties to the terms of a consent decree and have wide discretion to implement remedies for decree violations, including holding the parties in civil contempt.[15]

---

[8] *In re Stone*, 986 F.2d 898, 903 (5th Cir. 1993) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)).
[9] *Id.* at 902–03.
[10] *United States v. City of Miami*, 664 F.2d 435, 439 (5th Cir. 1981) (Rubin, J., concurring) (citing *United States v. Kellum*, 523 F.2d 1284, 1287 (5th Cir. 1975).
[11] *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)).
[12] *Chisom v. Jindal*, 890 F.Supp.2d 696, 710 (E.D. La. Sept. 1, 2012) (Morgan, J.) (citing *United States v. Alcoa, Inc.*, 533 F.3d 278, 287 (5th Cir. 2008)).
[13] *Sweeton v. Brown*, 1991 WL 181751, at *6 (6th Cir. Sept. 17, 1991) (quoting 10 CYCLOPEDIA OF FEDERAL PROCEDURE § 35.25 at 294 (3d ed. 1984) (citing *Stotts v. Memphis Fire Dep't*, 679 F.2d 541 (6th Cir. 1982), *rev'd on other grounds sub. nom. Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561 (1984))); *see also* R. Doc. 565 at p. 122, ¶ 486 (imposing a duty on the Court to "ensure that the requirements of th[e] [Consent Decree] are properly and timely implemented").
[14] *Chisom*, 890 F.Supp.2d at 711; *see also Alcoa*, 533 F.3d at 287 ("Discretion must be left to a court in the enforcement of its decrees." (cleaned up)).
[15] *Alcoa*, 533 F.3d at 286.

Two concerns are addressed by this Rule to Show Cause. First, the Court addresses specific issues stemming from an email sent to the New Orleans Police Department's Public Integrity Bureau ("PIB") by a member of the news media, which PIB correctly treated as a complaint.[16] The author of the email questioned whether, among other things, a member of the Mayor's executive security detail (Officer Jeffrey Vappie) engaged in payroll fraud, violated NOPD's daily hours limitations, and acted unprofessionally by spending extensive hours alone with his protectee in the City's Upper Pontalba apartment while he was both on and off duty. Upon receipt of the email, PIB promptly opened an administrative investigation.

In accordance with the terms of the Consent Decree, the Monitor, in cooperation with the Office of the Independent Police Monitor, monitored the PIB investigation. Although the complaint initiating the investigation centered on Officer Vappie's conduct, the Monitor's review focused on PIB's compliance with the Consent Decree in the course of the Officer Vappie investigation.

On March 10, 2023, PIB issued its Investigation Report on Officer Vappie.[17] Upon review of the PIB Investigation Report, the Monitor acknowledged that the PIB investigators took their task seriously and conducted meaningful witness interviews, but the Monitor nevertheless identified multiple material flaws in PIB's investigation, particularly in the analysis included in PIB's report. Among other things, the Monitor found that PIB, in violation of the clear terms of the Consent Decree, did not include in the complaint intake form an allegation of payroll fraud and, as a result, did not fully investigate the payroll fraud allegation, did not give the payroll fraud allegation a

---

[16] Consent Decree ¶ 390 ("NOPD agrees to accept all misconduct complaints, including anonymous and third-party complaints, for review and investigation. . . .").

[17] R. Doc. 714-4.

disposition, did not document its analysis of the payroll fraud allegation, did not apply the correct legal standard to all of its findings, and did not make a credibility determination regarding Officer Vappie. The Monitor shared these and other findings with the parties and the Court in its May 3, 2023 Report ("Monitor's PIB Report").[18] The City filed a response to the Monitor's PIB Report.[19]

After the PIB investigation of Officer Vappie was complete, the Monitor issued its June 15, 2023 Special Report on PIB's handling of the Vappie investigation (the "Monitor's Vappie Investigation Report"), noting that "the NOPD's response to the Monitoring Team's analysis raises serious concerns that we believe require the Court's immediate attention."[20] The City filed a response to the Monitor's Vappie Investigation Report.[21] DOJ's response to the Monitor's Vappie Investigation Report followed shortly thereafter.[22] In its Response, DOJ expressed its agreement with the Monitor's conclusions.[23]

On Thursday, June 21, 2023, this Court held a public status conference to hear from the Monitor regarding its review of PIB's handling of the administrative investigation into allegations against Officer Vappie.[24] The Court heard from the Monitor, DOJ, and the City. The Court reviewed all pertinent documents in advance of the status conference.

---

[18] R. Doc. 694.
[19] R. Doc. 697.
[20] R. Doc. 714.
[21] R. Doc. 718.
[22] R. Doc. 715.
[23] *Id.* at 4.
[24] R. Doc. 726.

At the public status conference, the Monitor presented substantial evidence of numerous Consent Decree violations by the City in the course of the PIB investigation of Officer Vappie.[25] The Monitor presented evidence that:

1. The City and NOPD violated Consent Decree paragraph 399 – NOPD failed to include each factual allegation in the complaint intake form.

2. The City and NOPD violated Consent Decree paragraph 415 – NOPD failed to identify and recommend one of the required dispositions (unfounded, sustained, not sustained, exonerated) for each factual allegation.

3. The City and NOPD violated Consent Decree paragraph 414 – NOPD failed to reach a conclusion as to whether each allegation had or had not been proven by a preponderance of the evidence.

4. The City and NOPD violated Consent Decree paragraph 413 – PIB failed to consider all circumstantial evidence and failed to make credibility determinations for each witness.  Specifically, PIB failed to make a credibility determination with respect to Officer Vappie.

5. The City and NOPD violated Consent Decree paragraph 454 – NOPD failed to provide its report to the Monitor prior to closing its investigation to allow the monitor time to review and make recommendations regarding the need for further investigation.[26]

6. The City and NOPD violated Consent Decree paragraphs 470 and 472 – NOPD failed to provide the Monitor reasonable access to all individuals, facilities, and documents relevant to the investigation.

7. The City and NOPD violated Consent Decree paragraphs 409 and 419 – NOPD failed to take appropriate steps to maintain the confidentiality of the investigation.

8. The City and NOPD violated Consent Decree paragraphs 306 and 313 – NOPD failed to investigate and hold supervisors accountable for any lack of supervision.

In its written response to the Monitor's Vappie Investigation Report, the City denied that violations of the Consent Decree had occurred and, as proof, asserted that the

---

[25] *Id.*

[26] Toward the end of the PIB investigation, the Monitor requested certain documents from the NOPD, including a copy of the draft PIB investigation report. The NOPD refused to share a copy when requested.

Officer Vappie investigation proceeded in just the same manner as any other investigation. For example, with respect to Officer Vappie's return to the Mayor's security detail on December 21, 2022, the City provided several affidavits and asserted that "it is NOPD standard practice that during an administrative investigation by PIB that the officer is returned to active duty—i.e., the officer is taken off 'administrative reassignment.' This occurs via an NOPD form from PIB to the head of the Bureau the officer was reassigned from when the investigation began. The Bureau Chief, or Superintendent, then determines where the officer will be assigned."[27] The City also asserted Officer Vappie "cannot be subjected to a different process or receive different discipline than any other NOPD officer simply because he is on a mayor's EP team."[28] At the public status conference, counsel for the City reiterated that the Officer Vappie investigation was conducted just as any other investigation would be.[29] Counsel for the City stressed that the functioning of PIB is "at the heart of NOPD's ability to prevent misconduct, build trust among its officers, and build community trust. . . . It is critically important that each officer receive the exact same treatment no matter where the complaint arises, no matter what their role is . . . and that is exactly what the PIB investigators in this case did. They [PIB] applied the exact same tools, techniques, and procedures [to Officer Vappie] they always apply."[30] Because of the assertions made by the City, a determination of whether the City violated the Consent Decree in the course of the Officer Vappie investigation must include an examination of whether, as the City repeatedly asserts, he was treated exactly as any other NOPD officer.

---

[27] R. Doc. 718 at 17.
[28] *Id*. at 27.
[29] R. Doc. 726.
[30] *Id*. at pp. 63-64.

To support its argument, counsel for the City referenced a variety of policies, standard operating procedures, and practices related to the eight violations listed by the Monitor. The Court summarizes the City's statements below, followed by the documents now ordered by the Court to be produced to allow the Court to evaluate whether the City has violated the Consent Decree:

1.    In the context of its discussion of Consent Decree paragraph 399, the City stated that PIB routinely does not fully investigate or document all factual allegations of misconduct if the lead investigator makes an early determination that the allegation lacks merit. The City stated NOPD intends to continue this practice notwithstanding the clear requirement in the Consent Decree that all allegations be accepted, recorded and investigated.[31]

     The Court directs the City to provide any policy, directive, or standard operating procedure that authorizes NOPD's practice and supports its stated intention to continue this practice.

2.    In the context of its discussion of Consent Decree paragraph 415, the City stated NOPD did not give the payroll fraud allegation an analysis or disposition because the lead investigator did not think the initial evidence warranted it. The City went on to state that it is a routine practice of PIB not to fully analyze and give dispositions to all allegations.[32]

     The Court directs the City to provide any policy, directive, or standard operating procedure that authorizes what the City describes as its routine practice.

3.    The City represented to the Court that it is the routine practice of NOPD to assign officers to the Orleans Parish Communications District (OPCD) while they are on administrative leave pending a PIB administrative investigation.[33]

     The Court directs the City to provide policies, standard operating procedures, or other documentation that authorizes what the City describes as its routine practice, including concrete examples of when this has occurred previous to the Officer Vappie investigation.

---

[31] R. Doc. 718 at 25.
[32] *Id.*
[33] R. Doc. 726 at 85-86.

4.      The City stated it is NOPD's standard practice to reassign officers back to their original duty locations at some point after the opening of an administrative investigation.[34]

The Court directs the City to provide the policy, directive, or standard operating procedure authorizing such reassignments and to provide information regarding any event that occurred on or around December 21, 2022 that led to Officer Vappie being reassigned on that date.

5.      The City represented that it is standard practice for the bureau to which an officer under investigation has been reassigned to then immediately further reassign that officer to a different duty location.[35]

The Court directs the City to provide the policy, directive, or standard operating procedure that authorizes this practice, including concrete examples of when this has occurred previous to the Officer Vappie investigation.

6.      The City represented that Officer Vappie's reassignments were handled according to policy.[36]

The Court directs the City to provide all paperwork regarding Officer Vappie's various reassignments over the course of his PIB investigation, including the paperwork reflecting his initial reassignment to OPCD (including paperwork showing who approved the reassignment), his reassignment (including paperwork showing who approved the reassignment) back to executive protection on December 21, 2022, his reassignment out of executive protection into Assets and Forfeitures on December 21 or 22, 2022 (including paperwork showing who approved the reassignment), and his reassignment to executive protection detail in June 2023 (including paperwork showing who approved the reassignment).

The Court also directs the City to provide all policies, directives, and standard operating procedures that authorize the manner in which Officer Vappie's reassignments were handled.

7.      In its June 15th report, the Monitor took issue with the March 10, 2023 PIB Vappie Investigation Report because it was not reviewed or signed by the Superintendent, but instead was signed "for" the Superintendent by the Deputy Chief of PIB. Counsel for the NOPD represented in the Department's original response to the Monitoring Team's PIB report that this practice is "loosely described in old policies" and "subject to various

---

[34] R. Doc. 718 at 17; R. Doc. 726 at 81.
[35] R. Doc. 718 at 17-18; R. Doc. 726 at 83.
[36] R. Doc. 718 at 18.

interpretations." NOPD went on to say it is "reviewing to determine [the policy's] utility at this stage."[37]

The Court directs the City to provide the "old policies" that "loosely describe" the practice referenced in the NOPD's response.

The second concern addressed by this Rule to Show Cause is the timeliness of PIB's investigations and imposition of discipline, both of which were raised in the Monitor's PIB Report, Vappie Investigation Report, 2022 Annual Report (published in 2023),[38] and 2023 First Quarter Report.[39] The timeliness of the City's notification of the outcome of an investigation also is of concern. The Monitor reached several conclusions regarding these topics. Specifically, the Monitor concluded that:

1.  The City and NOPD violated Consent Decree paragraph 403 by failing to ensure that all administrative investigations conducted by PIB shall be completed within the time limitations mandated by state law and within 90 days of the receipt of the complaint, including assignment, investigation, review, and final approval, unless granted an extension as provided for under state law or Civil Service exemption, in which case the investigation shall be completed within 120 days. Further, where an allegation is sustained, NOPD shall have 30 days to determine and impose the appropriate discipline, except in documented extenuating circumstances, in which case discipline shall be imposed within 60 days.[40]

2.  The City and NOPD violated Consent Decree paragraph 420 by failing to ensure that each misconduct complainant be notified of the outcome of the investigation, in writing, within 10 business days of the completion of the investigation, including whether any disciplinary or non-disciplinary action was taken.[41]

The City and NOPD do not contest the Monitor's findings with respect to the timeliness of investigations and imposition of discipline or the timeliness of notification to complainants of the outcome of investigations.[42] Instead, they state that these paragraphs "are being addressed and have been addressed and the non-compliant nature

---

[37] R. Doc. 697 at 4.
[38] R. Doc. 674.
[39] R. Doc. 702.
[40] R. Doc. 694 at 30.
[41] *Id.* at 32.
[42] R. Doc. 697 at 5.

reflects the audited period only and not our current compliance."[43] Despite the City's repeated assurances that the timeliness of PIB investigations, its imposition of discipline, and the notification of complainants is being addressed, the Court has seen no evidence that these clear violations of the Consent Decree are being corrected. Instead, the violations remain with no resolution in sight.

The New Orleans Police Department Consent Decree is an Order of this Court. This Court has an independent duty to ensure that the terms of its Order are effectuated in an expeditious manner. To preserve the procedures necessary to command respect for the Court's Order and its authority, the Court finds it necessary to issue this Rule to Show Cause.

The City is required to appear in Court on the **16th day of August 2023 at 2:00 p.m.** to show cause why it should not be found to have violated (1) the eight provisions of the Consent Decree with respect to the conduct of PIB investigations, as set forth above,[44] and (2) the provisions of the Consent Decree regarding timeliness of investigations, imposition of discipline, and notification of complainants.[45] The City and DOJ may, upon notice to the Court by August 11, 2023, present live testimony at the hearing. A finding that the City has not shown cause why it should not be found to be in violation of these provisions of the Consent Decree may, after notice and hearing, result in the City being held in contempt of Court and sanctioned.

---

[43] R. Doc. 697 at 6.

[44] See the listing of violations on page 6. To the extent the City concedes it has violated any of these provisions of the Consent Decree, the City will not be subject to sanction so long as it has remedied the violations and produces the policies, training, and operational procedures put in place to ensure that future violations will not occur.

[45] See the listing of violations on page 10.

The City must file a pre-hearing memorandum, not to exceed twenty-five pages excluding attachments, on or before **August 4, 2023**, addressing the issues raised above and attaching the documents the City has been ordered to produce[46] and any additional documents the City wishes to rely on at the Show Cause hearing.

The DOJ must file a pre-hearing memorandum, not to exceed twenty-five pages excluding attachments, on or before **August 11, 2023**, addressing the issues raised above and  attaching any documents it wishes to rely on at the Show Cause hearing.

**New Orleans, Louisiana, this 21st day of July, 2023.**[47]


_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[46] See the /listing on pages 8-10.
[47] This rule is limited to violations concerning the operations of the Public Integrity Bureau.