# Exhibit 3

**Redaction by Agreement between Counsel on Pages 136-138**

# DEPOSITION TRANSCRIPT OF:

## Keith Sanchez, Sr.

### DATE TAKEN:
**8/2/2023**

### CASE:
**United States of America vs City of New Orleans**

Affiliated Reporting
P.O. Box 6078, Metairie, LA 70009
504-568-9111
Email: pages@affiliatedreporting.com
Website: www.affiliatedreporting.com

**The transcript files, exhibits and invoice have been emailed to the attorney.**
**If you'd like an electronic version, please email pages@affiliatedreporting.com**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO.
2:12-CV-01924-SM-DPC
JUDGE SUSIE MORGAN

UNITED STATES OF AMERICA,
Plaintiff,

v.

CITY OF NEW ORLEANS,
Defendant.

Deposition of KEITH A. SANCHEZ, SR., 1340 POYDRAS STREET, SUITE 1900, NEW ORLEANS, LA 70112, taken in the offices of DAVILLIER LAW GROUP, on Wednesday, August 2, 2023.

APPEARANCES:

U.S. DEPARTMENT OF JUSTICE
CIVIL RIGHTS DIVISION
SPECIAL LITIGATION SECTION
Attorneys at Law
BY:  R. JONAS GEISSLER, Esquire
BY:  S. MEHVEEN RIAZ, Esquire
950 Pennsylvania Avenue, N.W.
4CON 10.1126
Washington, DC  20530

ATTORNEYS FOR PLAINTIFF

DAVILLIER LAW GROUP
Attorneys at Law
BY:  CHARLES F. ZIMMER, II, Esquire
935 Gravier Street, Suite 1702
New Orleans, Louisiana  70112

ATTORNEYS FOR DEFENDANT
ALSO PRESENT:
NICHOLAS L. GERNON
REPORTED BY:

VERNE B. MULLINS
Certified Court Reporter
Registered Diplomate Reporter
Certified Shorthand Reporter (TX)

UNITED STATES OF AMERICA VS. CITY OF NEW ORLEANS

Deposition of KEITH A. SANCHEZ, SR.

Taken on August 2, 2023


EXHIBIT INDEX


1 - Document, Bates stamped CDM002 through
    CDM095.

2 - Initiation of a Formal Disciplinary
    Investigation.

3 - Affidavit of Captain Kendrick C. Allen.

4 - Administrative Reassignment Notification.

5 - Letter, dated March 13, 2013, to J.P.
    Morrell, from Stella Cziment.

6 - Department of Police, Interoffice
    Correspondence, dated 12/15/2022.

7 - E-mail, most recently dated August 1, 2023.

8 - New Orleans Police Department Operations
    Manual, Chapter 1.3.8.

I N D E X

EXAMINATIONS

                              Page  |  Line

EXAMINATION BY MR. ZIMMER          5         6

EXAMINATION BY MR. GEISSLER        58        19

EXAMINATION BY MR. ZIMMER          140       1

EXAMINATION BY MR. GEISSLER        140       25

EXHIBITS

Exhibit #1                         10        6

Exhibit #2                         11        24

Exhibit #3                         50        4

Exhibit #4                         51        20

Exhibit #5                         100       10

Exhibit #6                         106       13

Exhibit #7                         122       6

Exhibit #8                         139       24

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;

That the formalities of reading and signing are specifically not waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

VERNE B. MULLINS, Registered Diplomate Reporter, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, and Certified Shorthand Reporter (TX), officiated in administering the oath to the witness.

1                    KEITH A. SANCHEZ, SR.,

2     after having been first duly sworn by the

3     above-mentioned court reporter, did testify

4     as follows:

5              (On the record at 10:12 a.m.)

6     EXAMINATION BY MR. ZIMMER:

7     Q. Good morning.

8              Could you state your name for the record,

9        please.

10    **A. My name is Keith Sanchez.**

11    Q. And you're employed by the New Orleans Police

12       Department.  Correct?

13    **A. Yes, I am.**

14    Q. And what's your current position?

15    **A. My current position is Deputy Chief of the**

16       **Public Integrity Bureau.**

17    Q. And could you give me just a real short

18       version of your career path to that position?

19    **A. The short version, I was a police officer for**

20       **City of New Orleans from '97 to 2005.  I went**

21       **to law school, finished from law school.  I**

22       **came back to the police department in 2016 as**

23       **a constitutional policing instructor, teaching**

24       **legal updates at the police academy, and in**

25       **2022, I was appointed as Deputy Chief of the**

1    **Public Integrity Bureau for N.O.P.D., for the**

2    **New Orleans Police Department.**

3    Q. And in your prior experience, had you had any

4    dealings with PIB, or disciplinary matters,

5    more generally?

6    **A. The only dealings I had with the Public**

7    **Integrity Bureau was, before I took the job as**

8    **the legal instructor for the training academy,**

9    **I worked with one of the unions as one of the**

10   **reps for the police officers.**

11            (Discussion off the record.)

12   EXAMINATION BY MR. ZIMMER:

13   Q. In your current -- and you said it was 2022

14   when you were first assigned to PIB?

15   **A. Yes.  It was October of 2022.**

16   Q. And just as a ballpark figure, not as some

17   kind of, you know, pop quiz, but do you know

18   how many disciplinary matters are in your

19   office right now that are open matters?

20   **A. So right now in PIB, the complaints that we**

21   **receive, it's somewhere in the ballpark of**

22   **475, to date.  The projected for 2023 is**

23   **probably going to be around 730 complaints for**

24   **the year of 2023.**

25   Q. Is that a pretty average year?

 1   A. Well, last year, we had probably about 580.

 2      So it's a little bit elevated.  Not sure why,

 3      but...

 4   Q. And in -- again, just ballpark figures, how

 5      much time have you spent on the Vappie matter,

 6      as opposed to just an average case of similar

 7      facts?

 8   A. So in my -- my short career as the Public

 9      Integrity Bureau Chief, in my opinion, I've

10      spent an exorbitant amount of time on the --

11      the Jeffrey Vappie matter, this case, much

12      more so than any other case I've -- that's a

13      part of my office.  This case -- I've spent

14      quite a bit of time on this particular matter.

15   Q. Has that impacted your abilities to function

16      as the Deputy Chief, in your opinion?

17   A. In my opinion, yes, it does impact the ability

18      to function as Deputy Chief of the Public

19      Integrity Bureau.

20         You know, when, I took over the job as the

21      Deputy Chief, perception -- it was my goal to

22      change the perception of the Public Integrity

23      Bureau, and this particular case has not

24      stopped me from doing that, but because of the

25      amount of time I've spent on this case, I

1      **haven't had the opportunity to focus on those**

2      **areas that I would like to have focused on**

3      **more at this point.**

4   Q. Again, just in ballpark figures, so that the

5      Court will have kind of a view of the

6      landscape, how many -- or -- or what

7      percentage of disciplinary matters would be

8      matters regarding stop, search and arrest, or

9      other constitutional policing issues?

10  **A. So overall, I would say that those matters**

11     **would be in the ballpark of maybe 30.**

12  Q. Thirty in number or 30 percent?

13  **A. Percent.   Percent.**

14  Q. Percent?

15  **A. Yeah.**

16  Q. Okay.

17  **A. If you look at use of force, stop, search and**

18     **arrest, other matters, such as maybe some**

19     **detail cases, probably about 30 -- maybe 30,**

20     **40 percent, somewhere in that ballpark.**

21         **Again, I'm -- those are rough, rough**

22     **numbers.**

23  Q. Yeah.  No, fair enough.  That's -- again, it's

24     not a pop quiz.

25         And feel free to tell me if you don't know

1       the answer to something.

2   **A. Uh-huh.**

3   Q. Our goal here is to get the accurate answer.

4           Do you have an idea of what percentage

5       deal with -- I don't want to say just 16:35

6       issues, but basically officer hour issues,

7       secondary employment, you know, excessive

8       overtime, things like that?

9   **A. I do not.  I know before I started at PIB,**

10      **there was an issue with the 16:35 issue, but**

11      **with the, you know, details, things of that**

12      **nature, but I don't have the numbers to**

13      **support -- I don't know at this point.**

14  Q. All right.  Is it -- is it something you

15      commonly deal with, a common type of issue?

16  **A. It is -- it's common.  It's common, yeah.**

17  Q. And looking now at -- I'm going to try and do

18      this as efficiently as possible, but I'll

19      probably fail.

20          We're going to use the monitor's letter as

21      an exhibit, that has a lot of the attachments

22      in it already, and everyone has some

23      familiarity with it, so I'm going to try that.

24  **A. Uh-huh.**

25  Q. And we'll just have to bounce around a little

1    bit.

2        MR. ZIMMER:

3            So I know you'll have plenty of

4        these, but I'll give you this document,

5        and we'll mark this as Exhibit One.

6            (Exhibit #1 was marked for

7        identification.)

8        MS. RIAZ:

9            Here you go.

10       MR. ZIMMER:

11           Oh, they are right here.  I've got

12       some.

13   EXAMINATION BY MR. ZIMMER:

14   Q. And I'm not going to ask you to identify the

15       whole document, because I don't even know that

16       it went to you, but if you look through the

17       document, you'll see that, starting at about

18       page -- we've got Bates numbers at the bottom,

19       so at about CDM19, you start getting to some

20       exhibits and attachments that were attached.

21           So this was a letter and report from the

22       monitor that attached a series of documents,

23       including an investigative report and some

24       other documents, and so we'll be using this as

25       the source of those documents, so that -- you

 1      know, it already has a lot of reference of use

 2      in other places.

 3          If you'll turn to page 28 -- or 00 -- I

 4      mean, 028 on the Bates number.

 5  **A. Uh-huh.**

 6  Q. Could you identify that document for me?

 7          And take as much time as you need to

 8      review it.

 9  **A. 028, this is the investigation by Captain**

10  **Kendrick Allen.  It's the first page of the**

11  **investigation by Captain Kendrick Allen.  It**

12  **is the introduction page.**

13  Q. Okay.

14  **A. As relates to Officer Jeffrey Vappie.**

15  Q. And do the pages that follow represent the

16      investigative report that was produced by the

17      PIB investigators?

18  **A. Yes, they do.**

19          MR. ZIMMER:

20              And we'll come back to this document

21          in a little bit.  The next document I'm

22          going to show you, I'm going to mark as

23          Exhibit Two.

24              (Exhibit #2 was marked for

25          identification.)

EXAMINATION BY MR. ZIMMER:

1

Q. And I'll ask you to review this and tell me if
   you can identify this document, for the
   record?

A. **Yeah.  This is the initiation of a formal**
   **disciplinary investigation by Sergeant, at the**
   **time, Lawrence Jones.**

Q. Okay.  And is this the initiation form that
   started the investigation into Officer Vappie?

A. **Yes, it is.**

Q. And am I correct that -- or can you explain to
   the -- for the record, what your role was in
   the initiation of this investigation?

A. **Sure.  So I received an e-mail from the City**
   **Attorney, on November 7th of 2022, and the**
   **e-mail I received referenced an e-mail that**
   **was sent to the Mayor's communication team, by**
   **Lee Zurich, requesting information as it**
   **relates to -- some events dealing with the**
   **Mayor and Officer Jeffrey Vappie.**

   **When I saw the e-mail, it was a bit**
   **concerning, because there was some things in**
   **the e-mail that I thought that there may be**
   **some questionable activity by Officer Vappie.**
   **Once I saw this, I contacted Sergeant Lawrence**

1    Jones, and sent this e-mail to him, and had

2    him to look at it and tell me what his

3    thoughts were, as it relates to this

4    particular e-mail right here, and then based

5    off of that is when we believe that there was

6    the 16:35 or 16.58 issue, in terms of the time

7    that was based on the e-mail itself.

8         Lieutenant Jones can give more information

9    as relates to what his thoughts were in

10    relation to that.

11   Q. Okay.

12   A. But that's -- that -- that was the premise

13    behind this.

14   Q. Okay.  And the fourth page of this document,

15    there's a e-mail marked Exhibit -- it has a

16    pre -- a preexisting stamp, it says Exhibit B.

17         Is that the e-mail from Lee Zurich that

18    you were referencing?

19   A. Yes, it is.

20   Q. Okay.  So this is the e-mail you received that

21    started the investigation process in your

22    mind?

23   A. Yes.

24         So the e-mail wasn't sent to me, it was

25    sent to Chief Ferguson.  I was cc'd on the

1      e-mail.

2  Q. Gotcha.

3  **A. And then based off of that is when I decided**

4      **to move forward and contact -- at the time it**

5      **was Sergeant Jones.**

6  Q. So when you initiate a complaint like this,

7      based on an e-mail asking for information, is

8      that what you would call a rank-initiated

9      investigation?

10 **A. Yes.**

11 Q. And how is that different than a

12     public-initiated investigation?

13 **A. So a rank-initiated investigation is when a**

14     **N.O.P.D. supervisor, an N.O.P.D. rank,**

15     **sees what they see as a possible violation of**

16     **policy.  They will initiate the actual formal**

17     **investigation, as opposed to someone comes in**

18     **or someone files a complaint with the Public**

19     **Integrity Bureau.**

20         **So there's several different ways to do**

21     **that.  They can come into the office, they can**

22     **do it online, they can go through the IPM,**

23     **Independent Police Monitor, and that is a**

24     **complaint that is coming from the actual**

25     **public.**

1          **In this case, we did not receive any**

2     **complaints from the public.  We -- we -- when**

3     **we received this, we decided to initiate the**

4     **complaint, initiate an investigation.  That's**

5     **the reason why this is a rank-initiated**

6     **investigation.**

7   Q. And am I correct that the -- the control

8      number, which in this case is 2022-0513-R, the

9      R suffix at the end designates that this is a

10     rank-initiated complaint?

11  **A. That's correct.**

12  Q. Okay.  And other than the initiation of the

13     complaint as being a public complaint or a

14     rank-initiated complaint, is there anything

15     different about the investigation after that

16     point?

17  **A. No, there's -- there's not anything different.**

18  Q. Okay.  The first page of Exhibit Two, at the

19     bottom, includes the alleged rule violations?

20  **A. Correct.**

21  Q. And this is what you were describing, that

22     this was the result of -- I think you said

23     Officer Jones?  Or, I'm sorry, Lieutenant

24     Jones?

25  **A. Lieutenant Jones.  At the time, it was**

1    Sergeant Jones.

2  Q. Okay.

3  **A. Yeah.**

4  Q. And so you did not craft the language that is

5     at the alleged rule violation section?

6  **A. I did not.**

7  Q. Okay.  And is that something that's normally

8     left to the investigators?

9  **A. Yes, it is.**

10 Q. Do you have an understanding as to whose

11    responsibility it is to categorize complaints

12    that are initiated?

13 **A. So the Public Integrity Bureau has an intake**

14    **unit.  An intake unit is primarily responsible**

15    **for categorizing complaints.**

16       **In this case, Lieutenant Jones -- or**

17    **Sergeant Jones at the time, his wealth of**

18    **knowledge, he's -- he's initiated probably**

19    **hundreds of complaints in the past, and so he**

20    **has the -- he had the ability and the**

21    **experience to initiate complaints, but the**

22    **normal process, if you will, or the standard**

23    **process, is through the -- it comes through**

24    **the intake unit.**

25 Q. Okay.  So is it accurate that, for example,

1    for a public complaint, that it is not the
2    complainant's job to classify the allegation,
3    it's PIB's job to classify the allegation?
4  A. That is correct.  It is definitely PIB's job
5    to classify the complaint.
6         There's -- there's several -- there's
7    different steps here.  Right?
8         So there's a cognizance date, meaning once
9    PIB -- or once the department's made aware of
10   a particular allegation, all right, but then
11   there's a time frame, the classification date
12   that PIB has time to classify the actual
13   allegation.  It is not necessarily left up to
14   the public to decide what that's going to be.
15 Q. The alleged rule violations at the first
16   page --
17 A. Uh-huh.
18 Q. -- is that designed to be a statement of the
19   factual allegations, or is that just -- is it
20   just the rules that are relative to the
21   factual allegations?
22 A. It's just the rules that's relative to the
23   factual allegations.
24 Q. Okay.  And is it correct that there is a
25   requirement to include the factual allegations

1    that are made in the initiation form?

2  **A. Yes.**

3  Q. And where -- where does this form include the

4     factual allegations that were made?

5  **A. It's -- it's a little -- on the page, it's a**

6     **little smaller gist.**

7  Q. Okay.

8  **A. That's written out.**

9  Q. Yeah.

10        And is that what's on page two of three?

11 **A. That is correct.**

12 Q. Okay.  So -- we're still on Exhibit Two.

13        So this is the -- the attempt to

14    encapsulate the factual allegations as made in

15    this complaint?

16 **A. That is correct.**

17 Q. And is it accurate that this is supposed to be

18    a theory, in this case, because you've got an

19    e-mail, and this is supposed to be basically

20    summarizing what's in the e-mail?

21 **A. That is correct.**

22 Q. And as the Court and the monitor have noted,

23    this does not include an allegation of payroll

24    fraud.  Correct?

25 **A. That is correct.**

1   Q. In your opinion, does it include the factual

2       allegations that were made?

3   **A. Yes.**

4   Q. Can you explain for the Court, PIB's

5       process -- and again, let me just note for the

6       record that I know you haven't been there a

7       long time, so please don't -- I'm not asking

8       you to speak on behalf of the N.O.P.D., I'm

9       asking you in your role as a fact witness in

10      this investigation, not a corporate

11      representative of an entity representative.

12          So from that basis, can you explain to me

13      how the factual allegations drive the

14      investigation of the case, as opposed to any

15      type of classification of those facts?

16          Or is that even an accurate statement?

17  **A. It is an accurate statement.**

18      **So once the complaint is classified, and**

19      **there's factual allegations, those**

20      **allegations, from the investigator's**

21      **perspective, they decide which way they're**

22      **going to proceed forward as it relates to --**

23      **based on the factual allegations.  All right?**

24      **In this case -- they -- they look at the**

25      **policies, see what the policies are, and**

1   decide if they're going to move forward.

2       In this case, there were no policies, as

3   it relates to executive protection.  Right?

4   Our investigation was in regards to Officer

5   Jeffrey Vappie, and Jeffrey Vappie only.  So

6   his actions are what we were concerned about.

7   We had no way of kind of guiding it, because

8   there were no policies as it relates to EP,

9   but they say that he violated these particular

10  EP policies.  Right?

11      So in this particular case, from the

12  outset, my thought process was, Hey, look, we

13  have to develop a standard as it relates to

14  this case to be able to move forward and --

15  and investigate this matter, and that's why a

16  decision was made to -- in this case, to

17  interview experts.

18  Q. Okay.

19  A. To -- and the experts were able to give us a

20  background, an historical background, on what

21  Officer Vappie should have been doing, as

22  relates to EP.

23  Q. Okay.

24  A. And so that was the beginning part of this

25  process.

1  Q. So is it -- is it a fair summary of that, that

2     the experts that were interviewed let you kind

3     of form the boundaries of a policy to say that

4     his conduct was professional or not

5     professional?

6  **A. Yeah.  So -- so all of EP, in order for them**

7     **to become part of EP, had to receive some type**

8     **of training, and so that -- while there was no**

9     **N.O.P.D. policy in place, there was that**

10    **training as the guide, and that's why it was**

11    **important to interview those particular**

12    **individuals who gave us the foundation or the**

13    **background, the historical knowledge about**

14    **what EP should be doing.  Hence, the reason**

15    **why the professionalism came into place.**

16 Q. Okay.  And as an investigation moves forward,

17    are PIB investigators allowed or required --

18    that's a terrible question.

19        Let me try that again.

20        As a PIB investigation moves forward, how

21    do the investigators deal with new facts that

22    may warrant additional charges?

23 **A. So the PIB investigators, if they identify**

24    **additional -- what they see as addition al**

25    **violations, those violations would be added as**

1   additional violations.  It just depends on the

2   facts or the information that they -- they

3   ascertain from the witnesses themselves.

4   Q. And in this case, did the PIB investigators

5   generate any additional charges?

6   A. They did.

7   Q. And what were those related to?

8   A. So one of the additional charges was the

9   professionalism, and the other one was

10  devoting the entire time of duty -- and I

11  don't know what the specific numbers are, but

12  devoting the entire time of duty.

13      Throughout the investigation, it was

14  learned that Officer Vappie was a member of

15  the HANO board, and so that's where devoting

16  the entire time of duty came into play, and

17  the professionalism came into play based off

18  of, one, the witnesses themselves, meaning the

19  other EP members, the protection members, and

20  the -- and the experts, as well.

21  Q. And so in this case, looking back at Exhibit

22  Two, the alleged rule violations, does this

23  include any professionalism violations?

24  A. It does not.  It does not, and that's a normal

25  process.  Right?

1        So -- and Lieutenant Jones will maybe

2     explain this better when he gets here, but the

3     initial violation was a 16:35.  That's --

4     that's -- when he read the e-mail, that's what

5     he saw.  Right?

6        As the investigation continues, and we

7     learn more things that relates to what

8     happened, is when the additional violations

9     come into play.

10  Q.  Okay.  And there's no limitation on that, just

11     because the original intake form had -- or

12     didn't include that professionalism charge?

13  A.  No, no limitation.

14  Q.  Okay.  And in this case, the -- you had -- the

15     office of consent decree monitor was involved

16     in the investigation in some way?

17  A.  Yeah.  The -- the consent decree monitors made

18     contact with us, and they wanted to monitor

19     the investigation as it was proceeding on --

20     as it was going on.

21  Q.  Okay.  And explain to me what that

22     participation -- how did that manifest itself,

23     what -- what was their participation?

24  A.  Yeah.  So we spoke to them at the outset of

25     the investigation, and they wanted to be a

1       part of, you know, every step of the
2       investigation, if you will.  Well, at least
3       monitor the investigation.  I don't want to
4       say part of the investigation, but monitor the
5       investigation, as we were doing -- as the
6       investigators were doing the investigation.
7            We had weekly calls with the monitors to
8       discuss steps moving forward, as it relates to
9       the investigation itself.
10  Q.  And did you -- and again, when I say you,
11      please stop me if I'm asking you to speak on
12      behalf of other people.
13  A.  Uh-huh.
14  Q.  So were you involved in these meetings or just
15      the PIB investigators?
16  A.  I was involved, not as much as the actual
17      investigators, because it wasn't just the --
18      the weekly meetings, they also met outside of
19      that.  My primary -- primary involvement was
20      the weekly meetings.  When available, I was a
21      part of that.
22  Q.  Okay.  And in these meetings, did you
23      discuss -- or did your -- did the PIB team
24      discuss with the monitors the strategy they
25      were using in the investigation?

1    A. They did.  They discussed it with -- they did

2       discuss it with the monitors, and it just

3       wasn't OCDM, the consent decree monitors, but

4       it was also the Independent Police Monitor, as

5       well.  So there was two different monitoring

6       teams.

7           And there was discussion about -- there

8       was a discussion about strategies moving

9       forward, who we were going to interview, even

10      to the point where there was questions that --

11      that the monitoring team wrote down for the

12      investigators, and there was discussion about

13      those questions and -- you know, it's things

14      of that nature.

15   Q. Okay.  Do you recall, at any point, the

16      monitoring team instructing or advising you

17      that you should make a -- a criminal complaint

18      out of this matter?

19   A. So the monitoring team, from the outset of

20      this investigation, wanted --

21           MR. GEISSLER:

22               Objection.

23               Are you preserving objections on the

24           record or not?

25           MR. ZIMMER:

1           Yeah.

2      MR. GEISSLER:

3           Okay.  So do you -- as we go along, I

4      could give you objections not just to

5      form but to other things.  Is that -- is

6      that your goal?

7      MR. ZIMMER:

8           All you need is to object to the

9      form.  That's it.

10     MR. GEISSLER:

11          I don't know what rules you have

12     set -- I don't know what rules you have

13     set here.

14     MR. ZIMMER:

15          Yeah.

16     MR. GEISSLER:

17          Lack of personal knowledge, hearsay.

18     Do you want all these objections on the

19     record?

20          If not, we'll agree to reserve

21     everything except as to form.

22     MR. ZIMMER:

23          Yes.

24     MR. GEISSLER:

25          So for the entirety of the

1          deposition, everything except as to
2          form?
3     MR. ZIMMER:
4          Yes.  You lodge your objection as to
5          form, and we -- if someone wants to use
6          the testimony later, then we'll fight
7          about, you know, what the objection was,
8          that way you and I don't have to tumble
9          on the table in this 100-degree heat.
10    MR. GEISSLER:
11         Very well.  Thank you.
12 EXAMINATION BY MR. ZIMMER:
13 Q. Okay.  So Mr. Geissler objected --
14 **A. Uh-huh.**
15 Q. -- but you can go ahead and answer the
16    question.
17         Do you remember what the question was?
18 **A. We can review it.**
19    MR. GEISSLER:
20         I'm sorry.
21         Is the witness seeing something on
22         that screen that I am not seeing?
23    MR. ZIMMER:
24         No.  It's the live feed of the
25         transcript from the court reporter to

1          me.

2      MR. GEISSLER:

3          Oh.   Thank you.

4      MR. ZIMMER:

5          So when I forget questions like this,

6      I can actually go see them.

7  (The requested testimony was read back:

8          QUESTION:

9          Do you recall at any point the

10     monitoring team instructing or advising

11     you that you should make a -- a criminal

12     complaint out of this matter?)

13     THE WITNESS:

14         Yeah, so I wouldn't classify it as

15     instructed.

16         I would say that they -- based on, I

17     guess, information that they had,

18     thought that we should add payroll

19     for -- to the -- to the complaint

20     itself.  This was -- this was done

21     repeatedly, but I think, in terms of the

22     investigators, I kind of left it up to

23     them, in terms of whatever their

24     investigation strategy was going to be,

25     and what they saw, and so there was --

1           there was dialogue back and forth with

2           the monitors as relates to the payroll

3           fraud allegation.

4    EXAMINATION BY MR. ZIMMER:

5    Q. Okay.  And the payroll fraud allegation, that

6       could be either criminal or administrative; is

7       that correct?

8    **A. It could be.**

9    Q. Okay.  And if it's -- was there ever, to your

10      knowledge or that you are aware of, a

11      suggestion to make it a criminal

12      investigation?

13   **A. I don't recall.**

14   Q. Okay.  Do you know if the monitor -- I mean,

15      the PIB investigators ever informed the

16      district attorney or the U.S. Attorney

17      regarding this matter?

18   **A. Not to my knowledge.**

19   Q. Are you aware of any outside agency

20      investigating the claims regarding Mr. Vappie,

21      besides PIB?

22          And we can seal this part of the record.

23   **A. Yes.  So early on in this investigation --**

24   **again, Lawrence Jones would be able to give**

25   **you more specific details, but he advised me**

1    that he was contacted by the feds, who were --

2    who wanted to look this into this particular

3    case.  They -- they had asked for specific

4    information early on this investigation, and

5    at the conclusion of the investigation, we

6    sent the feds the entire -- entire file.  They

7    have the entire file.

8  Q. Okay.  And when you say --

9  **A. They --**

10  Q. I'm sorry.  I didn't mean to cut you off.

11  **A. Yeah.**

12        They have the entire file.

13  Q. When you say the feds --

14  **A. The FBI and the U.S. attorney's office.  My**

15  **unit dropped off the entire file to them just**

16  **a few weeks ago, but they've been asking for**

17  **stuff throughout the investigation itself.**

18  Q. Okay.

19  **A. Because they -- they were going to look into**

20  **it.**

21  Q. All right.

22        MR. ZIMMER:

23            And, Jonas, just to be clear, I -- my

24            goal will be to seal that section, if

25            there's anything that's confidential to

1        your department.

2     MR. GEISSLER:

3          Understood.

4     MR. ZIMMER:

5          I don't care if it's public, but if

6          y'all want to seal it, I have no

7          objection to that.

8  EXAMINATION BY MR. ZIMMER:

9  Q. And beyond knowing that there are potentially

10    other investigations involved, has your team

11    or you been involved in any other

12    investigations?

13 **A. No.**

14 Q. So the -- the PIB universe that we've looked

15    at is the entire universe of your knowledge?

16 **A. My knowledge, yeah.**

17     MR. GEISSLER:

18          Sorry.  Mr. Gernon is offering

19          questions?  He's not an attorney.

20     MR. ZIMMER:

21          No.  He's my client, though.

22     MR. GEISSLER:

23          But he's going to offer questions in

24          the deposition?

25     MR. ZIMMER:

1              No.  He's going to send me notes.

2              He's definitely sending me notes.

3              That's attorney/client privilege.

4              Do you disagree or -- I mean, I --

5      MR. GEISSLER:

6              Proceed.

7      MR. ZIMMER:

8              Yeah.

9  EXAMINATION BY MR. ZIMMER:

10 Q. All right.  Did the monitoring team ever

11     recommend that you refer this to any other

12     criminal investigative agency?

13 **A. I don't recall that.  Not to my knowledge.**

14     **I know there was some discussion about**

15     **the -- the OIG, because they had -- I think**

16     **OIG may have had an investigation going on.  I**

17     **know there was some discussion about maybe**

18     **working with the OIG, as it relates to some of**

19     **the data.**

20     **But as it relates to PIB, sending the**

21     **investigation to another agency, another unit,**

22     **I don't think that was the case.**

23 Q. Okay.  And I believe the monitor had noted, at

24     some point, that there were, you know,

25     potential conflicts, and that PIB should

1      consider, you know, referring this out to

2      someone else.

3          So are you not aware of that ever having

4      taken place?

5   A. It's -- I don't recall.  It's been so -- I

6      really don't recall.

7   Q. Yeah.  That's fine.

8   A. There was some discussion about, you know, our

9      attorney, other things of that nature, but I

10     don't recall whether or not the monitoring

11     team actually asked us to refer it out, or

12     whether there was discussion about potential

13     conflicts, if that makes sense.

14  Q. Okay.  And just to be clear, separate from the

15     monitoring team --

16  A. Uh-huh.

17  Q. -- recommending it or discussing it, do you

18     know of any effort by N.O.P.D. to try to refer

19     it out to a different agency, the

20     investigation?

21  A. I don't recall.

22  Q. Okay.  And I may have already asked you this,

23     but just to be clear.

24          In terms of the classification of this

25     investigation as a serious misconduct or

1        nonserious misconduct, who makes that

2        determination?

3   **A. That determination is made by PIB, based off**

4        **of the allegations that we have.**

5   Q. Okay.  And who, in the PIB structure, is

6        tasked with making that classification?

7        And again, I'm talking specifically about

8        the serious misconduct versus nonserious

9        misconduct.

10  **A. Yeah.**

11       **That -- that's made at the intake section,**

12  **but it can always be updated by the**

13  **investigators.**

14  Q. Okay.  And to your knowledge, was this matter

15       classified as a serious misconduct case?

16  **A. It was not.**

17  Q. And as you have seen in -- well, that's an

18       assumption on my part.

19       Have you seen the various reports that

20       have been issued by the monitor regarding the

21       PIB investigation of Mr. Vappie?

22  **A. Yes.**

23  Q. Okay.  So you're aware that one of their

24       contentions is that the PIB investigators

25       failed to fully investigate the payroll fraud

1    aspects of the case?

2  **A. Uh-huh.**

3   Q. You have to --

4  **A. Yes.**

5      **I'm sorry.**

6   Q. You know that?

7  **A. Yes, I do.  Yes.**

8      **Sorry about that.**

9   Q. You've got to speak -- you've got to vocalize

10    your responses --

11 **A. Yes.**

12  Q. -- otherwise, Verne will let me fill in

13    whatever I want.

14      Okay.  And so, in your opinion, did that

15    happen in this case?

16 **A. I think the PIB investigators, in my opinion,**

17    **fully investigated all the allegations that**

18    **were presented to them.  In fact, I think that**

19    **throughout their investigation, as the**

20    **investigation says, they also -- they actually**

21    **added charges, based on the investigation, as**

22    **the investigation proceeded forward.**

23  Q. Okay.  And I believe the affidavit of Captain

24    Allen had mentioned that they had -- that the

25    investigators had discussions with you about

1    that topic; is that accurate?

2  **A. Yeah.  They -- they -- as part of their**

3     **investigative strategy, they did discuss it**

4     **with me, but -- as far as the investigative**

5     **strategy on how they were going to move**

6     **forward, and I supported the investigators.**

7  Q. Okay.  And if you had disagreed with them,

8     would you have advised them to go a different

9     direction?

10 **A. Yes.**

11 Q. From your vantage point regarding the

12    investigation, did the investigators take into

13    account circumstantial evidence?

14 **A. Yes, they did.**

15 Q. And from your evaluation of the case, did the

16    investigators take into account the

17    credibility of the witnesses?

18 **A. Yes.**

19 Q. And do you know if -- well, there's no reason

20    to overcomplicate it.

21       If you look at -- again, back to Exhibit

22    One, at page -- okay.  We're starting at page

23    CDM057.

24 **A. 057.  Okay.**

25 Q. And at the top of that page, which is page 30

1   of 42 of the actual report, it's titled

2   Credibility Assessment.  Correct?

3   **A. Correct.**

4   Q. And is it your understanding that this is the

5   Credibility Assessment of each witness in the

6   case by the PIB investigators?

7   **A. That is correct, yes.**

8   Q. And if you turn the page to CDM058, they have

9   an assessment of Officer Vappie's credibility?

10  **A. Correct.**

11  Q. And in your opinion, was this evaluation of

12  his credibility sufficient?

13  **A. I think that the investigators, based off of**

14  **the information that they had, did the best**

15  **that they could at that particular time.  I**

16  **think it is sufficient.**

17  **I know that it says that they were unable**

18  **to assess it, but if you look at it, you read**

19  **it a little bit further down, it gets into**

20  **specific information about what took place.**

21  **So I think at the time, the officers did**

22  **the best they could with this.**

23  Q. Okay.  If you turn to page CDM078 of this same

24  exhibit -- well, I guess you should start at

25  71, because that will be the first page of the

1    document.

2         So this would be attachment E to the

3    monitor's June 5th letter, and at page 71,

4    we've got a copy of the monitor's Monitoring

5    Team Analysis of PIB Investigation of Officer

6    Jeffrey Vappie, dated April 7, 2023.  Correct?

7  **A. Yes, correct.**

8  Q. And if you turn to CDM078, at the second

9    paragraph, it states that:  "The PIB

10    investigators did a good job applying the

11    preponderance of the evidence standard, and in

12    our view, came to the correct conclusion

13    regarding the allegations sustained."

14         Do you agree with that?

15  **A. Yes.**

16  Q. Are you aware of anything that changed --

17    after April 7th, that would change your

18    opinion regarding the PIB's investigator's

19    application of the preponderance of the

20    evidence standard?

21  **A. I'm not, because the investigation was**

22    **completed.**

23  Q. And that's an appropriate foundational

24    objection.

25         Did anything happen in the PIB

1        investigation of Officer Vappie, after the

2        investigative report was completed on March

3        10th?

4   **A. No.**

5   Q. And actually, I want to clarify that, too, and

6        ask you, the investigative report is signed on

7        March 10th by the PIB investigators, and then

8        it's signed by you on March 16th?

9   **A. That is correct.**

10  Q. What is the date that PIB considers the end of

11       the investigation?

12  **A. The investigation is considered closed, as it**

13      **relates to the police officer's bill of**

14      **rights, once the officer received the notice**

15      **of disposition.**

16  Q. Okay.  And do you know when that happened?

17  **A. That was on the -- the March 10th date.**

18  Q. Okay.  So before you signed?

19  **A. Yes.**

20  Q. Okay.

21  **A. Yes.**

22  Q. All right.  The monitor also points out -- or

23       makes an allegation that your office failed to

24       protect the confidentiality of the

25       investigation.

1              Are you aware of that?

2   **A. I am aware of that, yes.**

3   Q. And you're aware that there was an error at

4      the City Attorney's office that resulted in

5      the release of some confidential information?

6   **A. I'm aware of that.**

7   Q. Are you -- or is your -- I used the wrong word

8      there.  Strike that.

9          Is PIB responsible for the City Attorney's

10      possession of information?

11  **A. No.**

12  Q. Do -- does PIB have any ability to control the

13     City Attorney's office, in terms of how

14     they -- their custody of information?

15  **A. No.**

16  Q. We discussed earlier the weekly meetings that

17     the PIB team had with the monitors.

18          How long were those meetings, generally?

19  **A. Generally speaking, those meetings may have**

20  **been an hour to -- sometimes maybe an hour,**

21  **hour-and-a-half.  Generally speaking.**

22  Q. All right.  And in those meetings, would the

23     participants actually discuss items of

24     evidence?

25  **A. Yes.**

1  Q. From your involvement in the matter, was the

2     PIB investigative team open with the monitors

3     regarding their strategies and thoughts for

4     the investigation?

5  **A. Yes, they were.**

6  Q. Okay.  If you look at page CDM023.  This one

7     is to you.

8        I'll ask you if you can identify this

9     document?

10 **A. Yes, I can.**

11 Q. And to your recollection, what is this

12    document?

13 **A. This was a document that was sent to me by**

14    **Jonathan Aronie, as it relates to suggestions**

15    **based off of the information -- where we were**

16    **at that particular moment, because the**

17    **investigation was still going on, but these**

18    **were recommendations that he was making as it**

19    **relates to, not just PIB, because a lot of the**

20    **things in here that relate to the department**

21    **were kind of outside of PIB's control, but**

22    **it's a recommendation that he made.**

23 Q. Okay.  And he notes in here, at the -- sorry.

24       Oh, item seven suggests that the PIB

25    investigators should be reassigned or assigned

1     differently, in order for them to complete the

2     PIB investigation.

3          Do you recall that?

4  **A. Yes, I do.**

5  Q. Do you have any ability to control the

6     assignment of N.O.P.D. employees that are

7     conducting PIB investigations?

8  **A. I do not.**

9  Q. Does PIB use investigators who are assigned to

10    other units?

11  **A. Yes.**

12  Q. Is that the norm?

13  **A. It is the norm.**

14  Q. So all PIB investigators have other

15    responsibilities for N.O.P.D.?

16  **A. Repeat the question?**

17  Q. Okay.  So in this case, these PIB

18    investigators had other responsibilities?

19  **A. That is correct.**

20  Q. And I'm trying to understand if that is normal

21    or if that is -- is that a unique event here?

22  **A. So PIB investigators assigned to PIV -- PIB,**

23    **I'm sorry, have PIB responsibilities.**

24       **However, if a case comes in and PIB**

25    **decides they're going to send the case out to**

1    the districts, then those officers or

2    supervisors in the district will have other

3    responsibilities, outside of that

4    investigation.

5  Q. Okay.  And the allegations that were made

6     against Officer Vappie, are those of a nature

7     that could have been handled by a district --

8     or in the district?

9  A. Could have been, yes.

10 Q. Okay.  What's the -- the delineation as to

11     what is a matter that can be handled by the

12     district versus what has to be handled by PIB?

13 A. So if it's considered a criminal matter, it

14     stays at PIB, or an allegation that is

15     classified as serious misconduct, or any case

16     that the PIB -- that the PIB Deputy Chief

17     wants to give to PIB.

18 Q. And what kind of reasons can go into fitting

19     into that last category?

20 A. Potentially high profile cases, something of

21     that nature.

22 Q. Okay.  And is that why it was kept in this

23     case?

24 A. Yes.

25 Q. Okay.  If you look at page 90 -- CDM090 --

1    which, again, I guess I'll just start you on

2    the first page of the document, which will be

3    CDM071, which is that same document we were

4    just looking at.

5  **A. Okay.**

6  Q. So if you go to CDM90 -- yes, 90 -- the

7    conclusion on that page -- and you can read

8    it, take as much time as you need, but

9    basically it says that the Vappie

10   investigation was a stressful one for PIB.

11       Do you agree with that?

12 **A. Yes.**

13 Q. And what -- what made the investigation of

14   Officer Vappie stressful, as the monitor

15   notes?

16 **A. I guess the nature of -- just the dynamics of**

17   **the case itself.  Right?**

18       **Clearly, it was a high profile case, there**

19   **was a lot of media attention toward this**

20   **particular case, and we had several parties**

21   **that was involved, as it relates to monitoring**

22   **the case.  And so that combination of all**

23   **those different factors is what made the case,**

24   **in my opinion, stressful.**

25 Q. Okay.  And if you look at page four of this

1    document, CDM004, which again is the June 5th

2    letter from the monitor, at page four in the

3    third paragraph, it starts:  From the very

4    first weekly meeting with PIB, the monitoring

5    team and IPM stressed the importance of the

6    scope of the Vappie investigation, the

7    monitoring team and the IPM -- and it goes on

8    to say, you know, emphasize these critical

9    things, and the last one is a payroll fraud

10   allegation.

11       Is that accurate -- is this paragraph an

12   accurate summary of the monitor's relationship

13   at that point?

14   **A. Yeah.  I mean, I think the monitoring team,**

15   **they did stress -- and you've talked about it**

16   **numerous times, about the scope of the**

17   **investigation and what they believe the scope**

18   **should be.  We discussed that numerous times.**

19   Q. And is it accurate that the monitor stressed

20   the importance of the payroll fraud

21   allegations?

22   **A. That's accurate.**

23   Q. And from your view, did the PIB investigators

24   investigate the payroll fraud allegation?

25   **A. In my view, the investigators investigated the**

1    case, and the payroll fraud issue, it was

2    looked at as it relates to the case itself.

3        The investigators, in my opinion, reviewed

4    the facts of the case and determined that,

5    based off of the facts, that payroll fraud did

6    not fit, based on those particular facts.

7 Q. Okay.  And as part of these discussions where

8    the monitor notes that it stressed the

9    importance of payroll fraud and other things,

10   did it ever suggest or advise that you change

11   the intake form to reflect a payroll fraud

12   charge?

13 A. I don't recall.

14 Q. Can you explain for the Court the difference

15   between a payroll fraud violation and a

16   violation of the 16.58 hour rule?

17 A. Payroll fraud means that there was some -- in

18   my opinion, some intention to mislead or to

19   steal money, if you will.

20       The 16:35 basically means that you worked

21   beyond the hours that you were allowed to work

22   for that particular time frame.

23 Q. Okay.  And did your -- from your view, did the

24   PIB investigators investigate the possibility

25   of nepotism in this case?

1   A. In my opinion, they did, yes.

2   Q. And what's your understanding of the findings

3      they reached regarding nepotism?

4   A. They did not see any nepotism.  They

5      investigated it, they asked the appropriate

6      questions, based on the policy itself, they

7      read straight from the policy to the

8      witnesses, as it relates to the nepotism, and

9      it just wasn't present.

10  Q. And on an analysis like that, does the PIB

11     investigative staff have discretion, in terms

12     of how to apply, you know, a policy like

13     nepotism to the facts of the case?

14  A. Can you rephrase the question?

15  Q. Yeah.  That was bad.

16        The -- I guess what I'm trying to

17     understand is how much discretion do PIB

18     investigators have in doing an investigation?

19  A. There's discretion that's present.  However,

20     if the facts, based off of -- well, if the

21     information that the PIB investigators

22     ascertain delineates a particular type of

23     violation, the PIB investigators at that point

24     must move forward with that particular

25     violation of policy.

1  Q. Okay.  And let's say -- this is theoretical,

2     but a PIB investigator makes a sustained or an

3     exonerated finding or recommendation, is there

4     a mechanism to correct an erroneous finding

5     after that?

6  **A. Yes.  So the PIB investigator, at the close of**

7     **the investigation, when the officer receives**

8     **the notice of disposition, that is only a**

9     **recommendation.  Okay?**

10       **It still has to go through the chain of**

11    **command, and a determination is made whether**

12    **or not the supervisor, if you will, of that**

13    **particular investigator, reaches a different**

14    **conclusion based off of the facts.**

15 Q. And in this case, that would be the

16    three-captain panel?

17 **A. No.  That would be -- so this is just the**

18    **recommendation stage.  All right?**

19       **So that would have been -- in this case,**

20    **since Captain Allen was the investigator, that**

21    **would have been me.**

22 Q. Okay.

23 **A. Yeah.**

24 Q. Okay.  And then if you failed to correct

25    something that was wrong in this hypothetical,

1      what is the role of the three-captain panel?

2  A. So it's -- the case is set for a

3     predisposition conference, and a

4     predisciplinary hearing at that point.  Based

5     on the nature of this particular case, it was

6     a captain's panel, and it was three captains

7     that -- there was a hearing that was held

8     where the accused employee had the opportunity

9     to come in and to present additional

10    information or evidence to support why the

11    allegation should not have been sustained.

12         That three-person panel -- or

13    three-captain panel in this case -- would then

14    discuss the case and decide whether or not

15    they're going to -- if they recommend a

16    sustained violation or whether they were going

17    to exonerate or make a recommendation that the

18    allegation is unfounded.

19  Q. Does the three-captain panel have the ability

20    to send it back for further investigation or

21    something like that?

22  A. They do.

23  Q. Okay.  So if they see something and they go,

24    "You missed this, go back and do it again"?

25  A. They do, yeah.

1  Q. Okay.

2        MR. ZIMMER:

3            I'll mark this as Exhibit Three.

4            (Exhibit #3 was marked for

5        identification.)

6        MR. GEISSLER:

7            Thank you.

8  EXAMINATION BY MR. ZIMMER:

9  Q. And are you familiar with this document?

10 **A. Yes.  It's the affidavit of Captain Kendrick**

11    **Allen.**

12 Q. And as I'm sure you're aware, since it's been

13    included in a lot of briefs and hearing

14    discussions, Captain Allen mentioned some

15    facts in here regarding PIB and their

16    interaction with the monitors.  Correct?

17 **A. Correct.**

18 Q. And specifically at paragraphs four, 12, 13

19    and 14, he describes -- he has his own words,

20    but I'll call it -- I'll call it pressure

21    applied by the monitoring team.

22        Do you -- from your view, are you aware of

23    that -- those events?

24 **A. So I was aware of some of the events that took**

25    **place.  I -- I think for me -- and again, this**

1      is -- this is Captain Allen's affidavit.

2   Q. Absolutely.  Yeah.  And to be clear, I'm not

3      asking you to vouch for him.

4         I'm asking if the facts alleged comport

5      with that issue and your experience on the

6      case?

7   **A. Yes.**

8   Q. In light of the pressure or conduct, however

9      you want to describe it, did you feel that the

10     PIB investigators did their job properly?

11  **A. I do.**

12  Q. And so to say that another way, is it your

13     opinion that the PIB investigators were not

14     moved by any perceived pressure?

15  **A. That is correct.**

16  Q. Okay.

17     MR. ZIMMER:

18         I'll mark this document as Exhibit

19        Four.

20         (Exhibit #4 was marked for

21        identification.)

22     MR. ZIMMER:

23         I've only got one copy of that one.

24     MR. GEISSLER:

25         That's all right.  Thank you.

1    EXAMINATION BY MR. ZIMMER:

2    Q. Chief Sanchez, can you describe what this

3       document is?

4    **A. This is an administrative reassignment**

5       **notification.  Whenever there's an**

6       **investigation, disciplinary investigation that**

7       **goes on, depending upon the nature of the**

8       **investigation itself, PIB will reassign**

9       **officers from their current position to a**

10      **different position.**

11   Q. And is that considered an administrative

12      reassignment?

13   **A. That is.**

14   Q. And is this the form that's used in cases to

15      achieve that?

16   **A. That is correct.**

17   Q. And this document, this was authored by you --

18      or at least authorized by you?

19   **A. Yes, it was.**

20   Q. And is it something that your office

21      generates?

22   **A. Yes.**

23   Q. Does this happen in every case, this form?

24   **A. It's not every case.  It's just those cases**

25      **where I believe there may be a potential**

1    conflict with the officer being in that same

2    position, or there's an indication that it may

3    be some type of pattern of behavior that could

4    be detrimental to the public, then we'll

5    reassign the officer.

6         So it just depends.  It's not in every

7    case.

8  Q. Okay.  And how long does the reassigned -- the

9    administrator reassignment last?

10 A. It just depends.  I revisit reassignments

11    every week.  So we have a reassignment log.  I

12    get an update every week, and I look at those

13    administrative reassignments to see if the

14    officer still needs to be on reassignment, and

15    that's done on a weekly basis.

16         So there's no time frame that -- that

17    reassignments last.  It just depends.

18 Q. And what causes an officer, who is under

19    administrative investigation, to be returned

20    back to active duty -- or, I guess, is it more

21    appropriate to say taken off of administrative

22    reassignment?

23 A. Taken off of administrative reassignment.

24 Q. Okay.  So what -- what factors are you looking

25    at to determine if someone should be taken off

1      of administrative reassignment?

2  A. If the case itself -- let's say there's some

3      criminal allegation involved in the case.

4      Right?

5          If those allegations are looked at, and

6      they say, you know what, there's nothing --

7      you know, we don't see it, then the officer

8      can come off administrative reassignment.  It

9      just -- it really just depends.

10          I would like to say that the ultimate

11      person who makes the determination is actually

12      the superintendent --

13  Q. So when --

14  A. -- and --

15  Q. Oh, go ahead.  I didn't mean to cut you off.

16  A. Yeah.  So it's not necessarily PIB, the

17      superintendent.  Most of the time, the

18      superintendent will defer to PIB, but there is

19      communication that takes place, "Hey, look,

20      Chief, I think this person needs to come off

21      of reassignment."  Something of that nature.

22  Q. Okay.  Is that a conversation that you have,

23      based on the list that you were talking about?

24  A. Yes.

25  Q. So that's a routine conversation?

1   A. It's a routine conversation with the Chiefs.

2       If I look at the list and I see something that

3       an officer, in my opinion, should come off of

4       reassignment, I will make the necessary calls

5       and say, "Hey, look, Chief, you know, I think

6       this person needs to come off of

7       reassignment."

8   Q. Okay.  And if we look at the third page of

9       this document, we have the -- I guess this

10      would be the end of the administrative

11      reassignment?

12  A. Return to full duty, yes.

13  Q. And so is this the standard form that's

14      generated when that event occurs?

15  A. It is.

16  Q. And so this is a document that your office

17      would generate, relatively frequently?

18  A. Yes.

19  Q. And in this case, do you recall what triggered

20      the initiation of Officer Vappie's return, or

21      end of his administrative reassignment?

22  A. Yeah.  So in this particular case here -- and

23      again, this information comes from the Chief.

24      The Chief instructs individuals, in terms of

25      reassignment itself, and in this case, I think

1    the superintendent felt like there was

2    nothing -- there wasn't any criminal

3    allegation, no criminal case, so the

4    individual can come up for reassignment.

5        I think here, it -- there's some room for

6    growth here within N.O.P.D., an opportunity

7    here, because part of my overall issue with

8    this particular form is the -- when the

9    individual comes off reassignment, it is not

10   PIB's determination as to what division the

11   individual's going to go to.  It is actually

12   the Bureau Chief that makes that

13   determination.

14       This form doesn't reflect that, and that's

15   an issue that we can address within N.O.P.D.,

16   because it is not -- it is not the supervisor,

17   it is the Bureau Chief that makes the

18   determination of where the individual actually

19   would go, as it relates to when you come off

20   reassignment.

21  Q.  In terms of the process --

22  A.  Uh-huh.

23  Q.  -- is it -- when the person is on

24      administrative reassignment, they are removed

25      from their bureau?

1    A. They can be.  Not -- not in all cases.  In

2       this particular case here, Officer Vappie was

3       removed from his bureau.

4    Q. Okay.

5    A. He was placed -- the determination was made by

6       then Deputy Chief Chris Goodly -- and I don't

7       know if there was some communication between

8       Chris Goodly and Shaun Ferguson, but in this

9       case, it was made by Deputy Chief Chris Goodly

10      on where Officer Vappie would -- would go.

11   Q. All right.  As a -- I don't want to say a

12      legal matter, because that may not be right,

13      but if someone is on administrative

14      reassignment, and then that reassignment ends,

15      are they kind of, like, just magically

16      transported at that moment back to where they

17      came from?

18   A. No.

19   Q. They have to physically be moved --

20   A. Uh-huh.

21   Q. Okay.  So the paperwork is needed to move them

22      back?

23   A. Yeah.

24   Q. Okay.  It's not like you're on suspension and

25      now you're off suspension and you're just --

1   **A. No.**

2   Q. Okay.  All right.  I appreciate that, for the

3       single lay folk in the room who doesn't know.

4               MR. ZIMMER:

5                   I tell you what, give me two minutes

6                   and I think I'm done.  I just want to

7                   make sure I didn't miss anything.

8                   I think that's all I've got.  That's

9                   the end of my questions.  I tender the

10                  witness.

11                  Thank you.

12              MR. GEISSLER:

13                  Mr. Sanchez, I'm Jonas Geissler, an

14                  attorney for the United States.  I

15                  appreciate you being here today on the

16                  Defendant's notice of your deposition.

17              THE WITNESS:

18                  Yes, sir.

19   EXAMINATION BY MR. GEISSLER:

20   Q. We've met each other a few times in the past.

21       Have you been deposed before?

22   **A. That's a good question.**

23   **        Years ago.**

24   Q. Okay.  So for the sake of today's

25       deposition --

1  **A. Yeah.**

2  Q. -- we didn't go fully through the ground rules

3     ahead of time, but I understand from Mr.

4     Zimmer's representation, that we are

5     preserving objections, except as to form.

6         Let me lay a couple of my expectations

7     down for you, if I may.

8         If you do not hear or understand my

9     questions, please ask for clarification or

10    restatement, otherwise I will assume you heard

11    and understood the question.

12        The court reporter is recording verbal

13    responses today.  I know there was a few head

14    nods, and I heard a few things along with

15    them; if you could please verbalize your

16    response.

17        We have a lot of ground to cover in a

18    short period of time, so I'd appreciate

19    succinct answers.  Of course, you are welcome

20    to give the answer that you need to for the

21    question presented, but I ask you to answer

22    the question presented.

23        Is there any reason why you believe that

24    today's deposition should not go forward?

25 **A. No.**

1   Q. Okay.  If you need a break, please say so.

2      It's not an endurance test.

3         We try to be friendly about this, there's

4      going to be some direct questions, and for

5      part of today's discussion, if we talk about

6      employment history or what have you, this is

7      not a -- any sort of personal attack, this is

8      not an attack hominem.  Really, we're just

9      trying to get to some background.

10  **A. Okay.**

11  Q. And if there -- if that information is

12      necessary, it is definitely not intended to

13      embarrass you.

14         Do you understand these basic ground

15      rules?

16  **A. I do.  Yes, sir.**

17  Q. You said that you've worked for PIB since you

18      were assigned there in 2022; is that correct?

19  **A. That is correct.**

20  Q. And that your only experience with PIB before

21      2022, was that prior experience of one

22      representation for a union -- excuse me.

23         Your only prior experience was serving as

24      a union representative in one particular

25      matter?

1   **A. Outside of being a police officer who may have**

2   **had a complaint in -- 30 years ago, that's it.**

3   Q. When you assumed the command of PIB -- and you

4       are in command of PIB.  Correct?

5   **A. That is correct.**

6   Q. When you assumed command of PIB, did you

7       receive any training specific to PIB?

8   **A. I did not.**

9   Q. Now, did you receive any investigator

10      training?

11  **A. I did not.**

12  Q. And did you receive any supplemental training

13      at all for -- to prepare you for your move

14      from the academy to PIB?

15  **A. I did not.**

16  Q. As head of PIB, is one of your jobs to ensure

17      that there's proper investigations of

18      potential violations of PIB -- excuse me -- of

19      N.O.P.D. policy?

20  **A. Yes.**

21  Q. And do you agree with me that the -- that an

22      N.O.P.D. officer has the duty to dedicate the

23      time that they are on the clock for the City,

24      to official police work?

25  **A. Yes.**

1  Q. Would you agree with me that N.O.P.D. could

2     not -- for example, an officer could not sleep

3     on the job?

4  A. Correct.

5  Q. An officer could not, for example, bill time

6     to the City or to a secondary employer,

7     specifically working through office of the

8     secondary employment?

9  A. Correct.

10 Q. They could not bill for no-show jobs?

11 A. No-show, what is that?

12 Q. Fair enough.  Let's try to define that.

13        Let's say, for example, an officer said

14    they would be at the Fair Grounds, said that

15    they were working at the Fair Grounds, billed

16    for that time, but was, in fact, not at the

17    Fair Grounds.

18 A. That -- that's correct.

19 Q. That's correct.

20        So it's correct that that would be a

21    no-show job?

22 A. Correct.

23 Q. And they couldn't bill for that time?

24 A. Correct.

25 Q. And doing so would violate policy or civil

1    service rule?

2  **A. Possibly, yes.**

3  Q. Would PIB investigate them for payroll fraud?

4        MR. ZIMMER:

5              Object to the form of the question.

6        THE WITNESS:

7              Not necessarily.

8  EXAMINATION BY MR. GEISSLER:

9  Q. Would PIB investigate them for dishonesty?

10        MR. ZIMMER:

11              Object to the form of the question.

12        THE WITNESS:

13              Not necessarily.

14  EXAMINATION BY MR. GEISSLER:

15  Q. And if you received information about an

16     N.O.P.D. officer billing for time not worked,

17     would you have an obligation to investigate

18     that allegation?

19  **A. Yes.**

20  Q. Do you agree with me that an N.O.P.D. officer

21     could have a personal -- excuse me.

22        Would you agree with me that an N.O.P.D.

23     officer could have a personal relationship, as

24     defined in chapter 13.3A, with a person that

25     the officer works with, but would have to

1    notify a supervisor?

2          MR. ZIMMER:

3                Object to the form of the question.

4          THE WITNESS:

5                I would agree, if that's what the

6          chapter says.

7    EXAMINATION BY MR. GEISSLER:

8    Q. And the officers are obliged to -- obliged to

9       obey the chapter.  Correct?

10   **A. That's correct.**

11   Q. And I'd like to ask you about some specific

12      allegations you received as head of PIB.

13          Did you receive a November 1, 2022,

14      e-mail, from Lee Zurich to the City of New

15      Orleans?

16   **A. I did.**

17   Q. And in that communication, did Mr. Zurich

18      state:  Mayor Cantrell appointed Officer

19      Vappie to the HANO board.  He attended the

20      first meeting in March, 2022.  On at least

21      three occasions, he attended the HANO

22      meetings, while also being on the N.O.P.D.

23      clock?

24          MR. ZIMMER:

25                Object to the form of the question.

 1           THE WITNESS:

 2                Yes.

 3    EXAMINATION BY MR. GEISSLER:

 4    Q. And can you point to --

 5           MR. ZIMMER:

 6                Just to be clear, you're asking him

 7             the contents of it?  Or...

 8           MR. GEISSLER:

 9                I'm asking -- I'm asking him the

10             content in that question.  He's stated

11             to me that he's received the e-mail.

12           MR. ZIMMER:

13                Okay.  I just want to instruct you to

14             be clear, if he's asking for the

15             contents of a document, you're

16             confirming that you've -- that's your --

17             you're confirming the contents of a

18             document that's not in front of you, so

19             I just instruct you to make sure you're

20             answering carefully.

21           MR. GEISSLER:

22                Let's -- let's limit coaching here.

23           MR. ZIMMER:

24                Well, you're asking him about a

25             document that's not in front of him, as

1              if it's a memory test, so...

2         MR. GEISSLER:

3              I refer you to Exhibit Two from the

4         defense.

5         MR. ZIMMER:

6              That helps.

7         MR. GEISSLER:

8              Which is that document.

9    EXAMINATION BY MR. GEISSLER:

10   Q. Marked Exhibit B, within Exhibit Two, is an

11      e-mail from November 1st, 2022, from Lee

12      Zurich.  Correct?

13   **A. That is correct.**

14   Q. And, in fact, there's a e-mail above this

15      e-mail that's not included.  Correct?

16        MR. ZIMMER:

17             Object to the form of the question.

18        THE WITNESS:

19             I don't see any e-mails.

20   EXAMINATION BY MR. GEISSLER:

21   Q. Did Gregory A. Joseph receive that e-mail and

22      forward it to you?

23   **A. No.**

24   Q. Who forwarded you that e-mail?

25   **A. This is the e-mail that was forwarded to the**

1       **Mayor's communication team, which was**

2       **forwarded to the City Attorney's office.  The**

3       **City Attorney's offices forwarded it to Chief**

4       **Ferguson, and I was cc'd on it, that's how I**

5       **got this e-mail.**

6    Q. Very well.  And I'd like to again refer you to

7       Mr. Zurich's content of his e-mail.

8            Can you point to any policy, or written

9       order, that directed any N.O.P.D. member to

10      spend N.O.P.D. time on the HANO board?

11   **A. Repeat the question?**

12   Q. Can you point to any N.O.P.D. policy or

13      written order that directs any N.O.P.D. member

14      to spend N.O.P.D. time on the HANO board?

15   **A. Can I point -- no.**

16   Q. So do you agree with me that the N.O.P.D.

17      received an allegation that an officer worked

18      on the HANO board while on the clock for

19      N.O.P.D.?  Setting aside whether you believe

20      the allegation is true or false, did N.O.P.D.

21      receive that allegation?

22   **A. If it's in the e-mail, then we received the**

23      **allegation, yes.**

24   Q. And that allegation was that the officer

25      worked on the HANO board while on the N.O.P.D.

1   clock?

2   **A. Yes.**

3   Q. As head of PIB, did you receive a November

4      7th, 2022, e-mail, from Lee Zurich, to the

5      City of New Orleans?  November 7th?

6   **A. Did I receive?**

7   Q. Would you like -- would you like me to

8      restate?

9   **A. Did I receive?**

10  Q. Let me restate.

11  **A. Did I receive?**

12  Q. If I'm going too fast, I apologize.

13      As head of PIB, did you receive a November

14      7th, 2022, e-mail, from Lee Zurich to the City

15      of New Orleans?

16  **A. Did I receive from Lee Zurich is your**

17     **question?**

18  Q. Did you receive it, in general?  I will

19     commend to your attention, two pages later in

20     the same exhibit.

21  **A. I received the e-mail from the Mayor's**

22     **communication -- well, from Donesia Turner,**

23     **that's what I recall.**

24  Q. And you -- that e-mail is contained in Exhibit

25     Two from defense?

1  **A. Yes.**

2  Q. And is the e-mail dated November 7th, 2022?

3  **A. I don't recall receiving this e-mail.**

4  Q. Do you have before you a document that you've

5     seen in the past, the initiation of a formal

6     disciplinary investigation?  The document in

7     your hand, sir.

8        MR. ZIMMER:

9           Yeah, first page.

10       THE WITNESS:

11          Yes.

12  EXAMINATION BY MR. GEISSLER:

13  Q. And have you seen that document before?

14  **A. This document -- yes, I've seen this, yes, I**

15    **have.**

16  Q. And attached to that document is a November

17     7th, 2022, e-mail from Lee Zurich?

18  **A. It is correct, but I think the question was,**

19    **did I receive this e-mail?  And I do not**

20    **recall receiving this e-mail.**

21  Q. The e-mail from November 1st, 2022, ends at

22     the -- excuse me.  Was this e-mail part of the

23     investigative file for Mr. Vappie's

24     investigation?

25  **A. Yes.  But I -- I did not -- as Deputy Chief of**

1      **PIB, I did not receive the e-mail.  I only**

2      **recall receiving the first e-mail.  It was a**

3      **part of the investigative file, but I do not**

4      **recall receiving the e-mail on -- from Lee**

5      **Zurich.**

6   Q. Very well.  Did you see that e-mail in the

7      investigative file?

8   **A. I did not.**

9   Q. Is it your job, as PIB Deputy Superintendent,

10     to review the investigative file, to ensure

11     its completeness and its compliance with

12     N.O.P.D. policy?

13  **A. It is correct.**

14  Q. In the e-mail that is attached to Defendant's

15     Exhibit Two, dated November 7th, 2022 --

16  **A. Uh-huh.**

17  Q. -- does Mr. Zurich state, Sunday, September

18     19th, 2021, according to Mayor Cantrell's

19     schedule, it was an all-day New Orleans day,

20     nothing was on her schedule.  Officer Vappie

21     billed taxpayers for 24 straight hours of

22     work, from 7 a.m. Sunday to 7 a.m. Monday, he

23     took an hour off, then billed taxpayers an

24     additional 15 hours, from 8 a.m. Monday until

25     11 p.m.  Mayor Cantrell's last meeting was at

1        3 p.m.?

2            MR. ZIMMER:

3                Object to the form.

4            THE WITNESS:

5                That's what it says, yes, sir.

6    EXAMINATION BY MR. GEISSLER:

7    Q. Do you recall our discussion about sleeping on

8        the job?

9    **A. Yes.**

10   Q. Did Officer Vappie sleep during that two-day

11       period?

12   **A. I don't know what he did.**

13   Q. Now, as your role as PIB Chief, to ensure the

14       completeness of the investigation, did your

15       investigators ask him if he slept during that

16       two-day period?

17   **A. That's a question you'll have to raise to**

18       **them.  I wasn't part of the --**

19   Q. As Chief of PIB, do you anticipate that

20       your -- excuse me.  As Chief of PIB, is it

21       your expectation of those you supervise, that

22       they completely investigate allegations

23       against an N.O.P.D. officer?

24   **A. That is my expectation.**

25   Q. And as -- in your role as supervisor, did your

1    subordinates completely investigate the

2    allegation, including whether Officer Vappie

3    slept on the job?

4    **A. Rephrase the question.**

5    Q. Did your subordinates completely investigate

6    whether Officer Vappie slept on the job?

7    **A. You'd have to ask them.**

8    Q. Respectfully, you're an attorney, as well?

9    **A. Yeah.**

10   Q. Great guy.  On the record, you're a great guy.

11        I'm asking you.  You're responsible for

12   making sure the investigations are complete,

13   as you've testified.  Correct?

14   **A. That is correct.**

15   Q. Did your investigators investigate whether

16   Officer Vappie slept on the job?

17   **A. I am the supervisor of these particular**

18   **investigators.  They conducted an**

19   **investigation.  Whether Officer Vappie slept**

20   **on the job or not was part of their**

21   **investigation.  I am strictly the supervisor**

22   **of that investigation.  I supervise these**

23   **particular investigators.**

24        **I can't speak to whether they investigated**

25   **whether Officer Vappie slept on the job or**

1      **not.  That's a question that's best left for**

2      **them to explain why -- what their process was.**

3      **I was just the overseer of the investigation.**

4      Q. Did you approve an investigative report for

5         the Officer Vappie investigation?

6      **A. I did.**

7      Q. And in the investigative report that you

8         approved, was Officer Vappie charged with

9         sleeping on the job?

10     **A. He was not.**

11     Q. In both Mr. Zurich's November 1st and November

12        7th e-mails, did he describe Officer Vappie as

13        spending time alone in the Upper Pontalba

14        apartment with the Mayor, and with no other

15        members of the executive protection detail?

16     **A. Yes.**

17           MR. ZIMMER:

18                Object to the form.

19           THE WITNESS:

20                Yes.

21     EXAMINATION BY MR. GEISSLER:

22     Q. And did you view any of the videos or news

23        stories, showing the videos of Officer

24        Vappie's time in the apartment?

25     **A. I did.**

1    Q. Based on Mr. Zurich's description and Officer

2       Vappie being in the apartment with the Mayor

3       when others were not, in the videos that you

4       said you reviewed, do you agree that an

5       objectively reasonable person could perceive

6       Officer Vappie's actions may have been

7       influenced by his relationship with the Mayor?

8          MR. ZIMMER:

9             Object to the form of the question.

10         THE WITNESS:

11            I think that -- that the term

12            objectively reasonable, I would use the

13            term -- and I'm saying this because of

14            the nature of the job itself.  Right?

15            And the investigators had some

16            empirical information as it relates to

17            that particular function, is the reason

18            why the decisions that were made were

19            made.  They had some empirical

20            information from the experts.

21            And so I think, when you talk about

22            spending time in a particular place with

23            the protectee, I think that it has to be

24            looked at in its totality, not just what

25            the public sees on TV.

1   EXAMINATION BY MR. GEISSLER:

2   Q. In your testimony earlier today, you said that

3       there would be a reassignment if there was a

4       conflict in the position; is that correct?

5   **A. Uh-huh.**

6   Q. In chapter 13.3A, is there a prohibition on

7       working for someone with an actual or

8       perceived conflict of interest?

9           MR. ZIMMER:

10              Object to the form of the question.

11          THE WITNESS:

12              I need to see chapter 13.  I don't

13          know.  I need to see the chapter 3A.

14          MR. GEISSLER:

15              We'll return to that in a moment.

16              We'd like to show you this on the

17          screen, if we may.  This is from

18          N.O.P.D.'s website.  It's mutually

19          available to the defenses to the

20          plaintiff.  It's chapter 13.3A,

21          definition of conflict of interest.

22          Scroll down to the definition, please.

23          THE WITNESS:

24              Okay.  What's the question?

25   EXAMINATION BY MR. GEISSLER:

1  Q. So the question was:  Is there a prohibition

2     on an actual or perceived conflict of

3     interest?

4  **A. Yes.**

5  Q. And as you testified earlier, you moved --

6     excuse me, you authorized the movement of

7     Officer Vappie to a new position owing to a

8     conflict?

9  **A. Yes.**

10 Q. Chapter 13.3 would then prohibit him from

11    working for the executive protection, while

12    that conflict existed?

13 **A. Yes.  The reason why he was reassigned, yes.**

14 Q. And without saying whether or not there was an

15    actual personal relationship, as defined by

16    chapter 13.3A, did you give any notice of an

17    allegation to Officer Vappie of a violation of

18    chapter 13.3A?

19 **A. I didn't give -- I did not.**

20 Q. Did PIB give any notice of violation of

21    chapter 13.3A to Officer Vappie?

22 **A. I don't want to speak on behalf of the**

23    **investigators.  I believe they did, but I'm --**

24    **I'm not sure.**

25 Q. You are in charge of PIB.  Correct?

1    **A. Yes.**

2    Q. Did PIB -- did PIB give notice to Officer

3       Vappie of an alleged violation of chapter

4       13.3A?

5          MR. ZIMMER:

6              Object to the form of the question.

7          THE WITNESS:

8              I believe that the officers did give

9              Officer Vappie -- I can't say whether

10             they gave it to him or not, but I know

11             they made him aware of 13.3A.

12   EXAMINATION BY MR. GEISSLER:

13   Q. Was the formal disciplinary notice in this

14      case revised to include chapter 13.3A?

15   **A. Can I see a copy of it?**

16   Q. If you'll look at the first page of defense

17      Exhibit Two.

18   **A. Oh, Two.  What's the question again?**

19   Q. Was the formal disciplinary notice amended to

20      include an alleged violation of chapter 13.3A?

21   **A. No, it was not.**

22   Q. Are you required by N.O.P.D. policy to fully

23      investigate all allegations of misconduct,

24      regardless of what the outcomes or merits of

25      the allegations may be?

1    **A. Yes.**

2    Q. Are you familiar with the consent decree in

3        this matter?

4    **A. Yes.**

5    Q. And do you agree with me that, under

6        N.O.P.D.'s policy requiring compliance with

7        the law, from an authoritative source, that

8        you obliged to follow the consent decree?

9    **A. Yes.**

10           MR. ZIMMER:

11               Object to the form of the question.

12           THE WITNESS:

13               Yes.

14   EXAMINATION BY MR. GEISSLER:

15   Q. And do you also agree with me that, as an

16       agent for the City, the consent decree

17       requires that you comply with its terms that

18       apply to your role at N.O.P.D.?

19   **A. Yes.**

20           MR. ZIMMER:

21               Object to the form of the question.

22           THE WITNESS:

23               That is correct.

24   EXAMINATION BY MR. GEISSLER:

25   Q. As Chief of PIB, did you approve an

1       administrative reassignment notice that

2       Officer Vappie -- excuse me, notice for

3       Officer -- let me rephrase, beg your pardon.

4           As Chief of PIB, did you approve an

5       administrative reassignment notice for Officer

6       Vappie that charged, in accordance with the

7       following complaint:  It has been determined

8       that you may have violated rule 4, performance

9       of duty, paragraph four, neglect of duty,

10      failing to comply with instructions, oral or

11      written, from an authoritative source, to wit,

12      N.O.P.D. chapter 22.08, police secondary

13      employment, paragraph 32, which states no

14      member, including reserve officers, shall work

15      more than 16 hours and 35 minutes (16.58

16      hours) within a 48 -- excuse me, within a

17      24-hour period?

18          Did you approve that administrative

19      reassignment notice?

20  **A. Yes.**

21          MR. ZIMMER:

22              Object to the form of the question.

23  EXAMINATION BY MR. GEISSLER:

24  Q. As Chief of PIB, did you approve a complaint

25      intake form for the investigation of Officer

1     Vappie?

2  **A. A complaint intake form?**

3  Q. Yes.  I encourage you to look at what's marked

4     as Exhibit A within Exhibit Two.

5  **A. As part of the entire investigation, yes, as**

6     **the PIB Chief, I don't approve every single**

7     **document that's a part of the investigation.**

8     **It's presented to -- once the case is closed,**

9     **it's presented up the chain of command through**

10    **the rank structure, where it's approved, but**

11    **each and every individual document is not**

12    **approved specifically by the Chief, it's in**

13    **its totality as the entire investigation.**

14       **So if you're asking me whether I**

15    **individually approved the initiation form, the**

16    **intake form separately, no, I did not.  I did**

17    **improve -- approve the investigation as a**

18    **whole.**

19    Q. Thank you for the candor in that, and I want

20    to flesh out just a couple of issues in that.

21    **A. Uh-huh.**

22    Q. Mr. Sanchez, you used the word closed, and

23    before, you defined closed as the notice to

24    the involved officer.

25       Are you referring to something different

1    when you say closed this time?

2  **A. No, I'm referring to the notice of the**

3  **officer, per the police officer bill of**

4  **rights, the case is at a close, or from that**

5  **perspective, at that moment.  It's not over,**

6  **but it's closed as it relates to the officer.**

7  Q. Does your --

8  **A. So --**

9  Q. Sorry.

10  **A. -- at that particular juncture is when I**

11  **received the entire investigation, and when --**

12  **that's when the investigation -- the**

13  **recommended penalties are either concur or do**

14  **not concur, but there's another phase.  The**

15  **case is not closed.  The case is still moving**

16  **forward to the next phase.**

17  Q. In this particular investigation --

18  **A. Uh-huh.**

19  Q. -- did you have knowledge of the scope of

20    allegations presented to Officer Vappie, prior

21    to the closure?

22  **A. Yes.**

23  Q. Did you, in fact, have an in-camera meeting

24    with Judge Morgan about the scope of the

25    Vappie investigation, and other matters to the

1        Vappie investigation?

2   **A. With Judge Morgan, and I think you said -- I**

3   **think you were present, too, and a couple**

4   **other people, yes.**

5   Q. And do you agree with me that there are no

6        allegations listed on the intake form, or

7        formal disciplinary investigation, other than

8        the 16:35 rule?

9   **A. I agree with that, yes.**

10  Q. And so that you and I have a common

11       understanding, 16:35 was a term that Mr.

12       Zimmer used earlier.  I take it that you'd

13       agree with me, that refers to a limitation on

14       the maximum number of hours an officer may

15       work in a 24-hour period, no more than 16

16       hours, 35 minutes?

17  **A. That is correct, yes, sir.**

18  Q. And we'd apply that definition throughout the

19       scope of this deposition.

20  **A. Good.**

21  Q. And since there were no allegations listed on

22       either of those forms, can you point to any

23       investigative report that reached a unfounded,

24       sustained, not sustained or exonerated

25       finding, for any of the allegations -- any of

1    the allegations, other than the 16:35 rule?

2         MR. ZIMMER:

3              Object to the form of the question.

4         THE WITNESS:

5              On -- on the initiation form?

6         MR. GEISSLER:

7              Let's break that down.  Mr. Zimmer's

8              objected to the form of the question.

9    EXAMINATION BY MR. GEISSLER:

10   Q. Would you agree with me that there is no

11      investigative report that reached a finding of

12      unfounded, sustained, not sustained or

13      exonerated, for any allegation, other than the

14      16:35 rule?

15        MR. ZIMMER:

16             Still object to the form.

17        THE WITNESS:

18             I disagree with that.

19   EXAMINATION BY MR. GEISSLER:

20   Q. Can you point to any investigative report that

21      reached unfounded for a payroll fraud

22      allegation?

23   **A. No.**

24   Q. Can you point to any report that reached

25      sustained for payroll fraud investigation?

1    **A. No.**

2    Q. Can you point to any report that reached not

3        sustained for a payroll fraud investigation?

4    **A. No.**

5    Q. Can you point to any report that reached

6        exonerated for a payroll fraud investigation?

7    **A. No, but I don't think that was your question.**

8    Q. These are the questions I'm presenting now.

9    **A. Okay.**

10   Q. Can you point to any report that reaches a

11       unfounded finding for a nepotism allegation?

12   **A. No.**

13   Q. Can you point to any report that reaches a

14       sustained finding for a nepotism allegation?

15   **A. No.**

16   Q. Can you point to any report that reaches a not

17       sustained finding for a nepotism allegation?

18   **A. No.**

19   Q. Can you point to any report that reaches an

20       exonerated finding for a nepotism allegation?

21   **A. No, sir.**

22   Q. Were there any formal findings for any

23       allegations against Officer Vappie, other than

24       16:35?

25   **A. Yes.**

1   Q. What specific allegations?

2   **A. That were sustained was professionalism and**

3   **devoting entire time to duty.**

4   **And, of course -- well, 16:35 was deemed**

5   **not sustained, but, yes, there were findings**

6   **for three -- three allegations.**

7   Q. And since there were no findings for nepotism

8   or payroll fraud, would you agree with me that

9   there was not an application of the

10  preponderance of evidence, to reach a finding

11  for payroll fraud or nepotism?

12      MR. ZIMMER:

13          Object to the form of the question.

14      THE WITNESS:

15          Repeat the question?

16  EXAMINATION BY MR. GEISSLER:

17  Q. Since there was no formal finding -- let's go

18  back and define formal.

19      A formal finding is required by the

20  consent decree, would be sustained, not

21  sustained, unfounded or exonerated.

22      Since there are no findings of, as you've

23  said, unfounded, sustained, not sustained or

24  exonerated, for nepotism or payroll fraud, do

25  you agree with me that there is no application

1    of preponderance of evidence, to reach a

2    finding?

3         MR. ZIMMER:

4              Object to the form of the question.

5         THE WITNESS:

6              I disagree with that summation.

7    EXAMINATION BY MR. GEISSLER:

8    Q. Can you point to a specific credibility

9       finding, finding either credible or

10      incredible, Officer Vappie, in the completed

11      investigation report?

12   **A. Are you referring to his Credibility**

13      **Assessment?**

14   Q. I'm referring to his Credibility Assessment.

15      Was there a finding that he was credible or

16      incredible in the investigation report?

17   **A. There was a finding that the investigator said**

18      **that he was unable to determine credibility at**

19      **that time.**

20   Q. There was not a finding that he was either

21      credible or not credible?

22   **A. That is correct, based off of the report.**

23   Q. May I take it that you agree with me that

24      N.O.P.D. did not provide the full

25      investigation report to the court monitor,

1    before the closure of the investigation --

2         MR. ZIMMER:

3              Objection.

4    EXAMINATION BY MR. GEISSLER:

5    Q. -- using your definition of closure?

6         MR. ZIMMER:

7              Object to the form of the question.

8         THE WITNESS:

9              That's correct.

10   EXAMINATION BY MR. GEISSLER:

11   Q. And since the court monitor was not given that

12      open report, may I take it that you do not

13      dispute the court monitor was not given access

14      to the open report, as required by paragraphs

15      470, 472 of the consent decree?

16         MR. ZIMMER:

17              Object to the form of the question.

18         THE WITNESS:

19              I agree with that.

20   EXAMINATION BY MR. GEISSLER:

21   Q. Did the City's own office of Independent

22      Police Monitor ask for the open investigative

23      file, as well?

24   **A. I don't recall.**

25   Q. Do you agree with me that N.O.P.D. did not

1      give OIPM access to the open file?

2          MR. ZIMMER:

3              Object to the form of the question.

4          THE WITNESS:

5              I agree with that.

6      EXAMINATION BY MR. GEISSLER:

7      Q. As head of PIB, are you responsible for

8         approving investigative reports that come out

9         of PIB, at the completion of an investigation?

10     **A. Repeat that?**

11     Q. As head of PIB, are you responsible for

12        approving the investigative reports that come

13        out of PIB, at the completion of an

14        investigation?

15     **A. Are you referring to the recommendations**

16        **that's made by the investigator?**

17     Q. Let's take a step back.  If an investigative

18        report is insufficient, in your opinion, would

19        you send it back?

20     **A. Yes.**

21     Q. If an investigative report is complete, could

22        you then approve it?

23          MR. ZIMMER:

24              Object to the form of the question.

25          THE WITNESS:

1              Yes.

2    EXAMINATION BY MR. GEISSLER:

3    Q. And in the case of the Officer Vappie

4       investigation, did you approve that report?

5    **A. I did.**

6    Q. Does that signal your belief that it was

7       complete?

8    **A. Yes.**

9    Q. And would you agree with me that, for your

10      approval, you would have to check to make sure

11      an investigation's properly done, according to

12      N.O.P.D. policy?

13   **A. Properly done, based on the information I have**

14      **in front of me, that the investigators**

15      **presented, yes.**

16   Q. And do you agree with me that consent decree

17      paragraph 405 requires that, to appropriately

18      approve the investigative report, all

19      witnesses provide a written statement

20      regarding the incident or be interviewed?

21   **A. Paragraph 405?**

22   Q. Of the consent decree.

23   **A. I do not have that paragraph; if that's what**

24      **it says, that's what it says.**

25   Q. And for the sake of the court reporter, so

1      it's on the record, Ms. Riaz is showing

2      Mr. Sanchez paragraph 405 in the consent

3      decree, a document that's mutually available

4      to both parties.

5  **A. Yes, I agree.**

6  Q. And do you agree with me that there were two

7      witnesses that did not provide interviews or

8      written statements to PIB investigators?

9  **A. I don't know.**

10 Q. Did the Mayor provide a written statement or

11     interview to PIB investigators?

12 **A. She did not.**

13 Q. Did Fausto Pichardo provide a written

14     statement or interview to PIB investigators?

15 **A. Did not.**

16 Q. And as we already discussed that, as an agent

17     for the City, you need to follow the consent

18     decree; is that correct?

19 **A. That is correct.**

20 Q. In fact, doesn't the consent decree, in

21     paragraph 14 -- if you don't mind pulling up

22     14, please -- 14 defined N.O.P.D. to include

23     N.O.P.D. members, its agents, officers,

24     supervisors, and employees, both sworn and

25     unsworn?

1          If you can go to N.O.P.D., please.

2          For the sake of the court reporter,

3     Ms. Riaz is now going to show the screen with

4     the definition DDD, under paragraph 14 of the

5     consent decree, defining the term N.O.P.D.

6   **A. Yes.**

7   Q. And would you agree that paragraph eight of

8     the consent decree also requires that the

9     City's agents and employees requires the

10    consent decree applies to all of the City's

11    agents and employees?

12         And for the court reporter, Ms. Riaz is

13    now showing paragraph eight of the consent

14    decree to Mr. Sanchez.

15  **A. Yes.**

16  Q. The consent decree then binds the Mayor?

17         MR. ZIMMER:

18             Object to the form of the question.

19  EXAMINATION BY MR. GEISSLER:

20  Q. Would you agree with me, the consent decree

21    binds the Mayor?

22  **A. I would not.**

23         MR. ZIMMER:

24             Object to the form of the question.

25  EXAMINATION BY MR. GEISSLER:

1    Q. Would you agree with me, the consent decree

2       binds Fausto Pichardo?

3           MR. ZIMMER:

4               Object to the form of the question.

5           THE WITNESS:

6               I would not agree with that

7           assessment, no.

8    EXAMINATION BY MR. GEISSLER:

9    Q. We talked about the intake form for PIB

10      investigation of Officer Vappie.  It lists a

11      supervisor for executive protection on the

12      intake form, does it not?

13          MR. ZIMMER:

14              Which exhibit, Jonas?

15          MR. GEISSLER:

16              Beg your pardon, trying to get you

17          the exact page.

18   EXAMINATION BY MR. GEISSLER:

19   Q. Who was the supervisor -- let's do it this

20      way.

21          Who was the supervisor for Officer Vappie?

22   A. **The supervisor for Officer Vappie, at that**

23      **time, as I knew it, was Sergeant Tokishiba**

24      **Lane.**

25   Q. Has PIB initiated any investigation of

1    Sergeant Lane, for the lack of oversight of

2    Officer Vappie?

3  **A. Did not.**

4  Q. Has PIB investigated Officer -- excuse me,

5    Sergeant Lane, for lack of oversight of

6    executive protection?

7  **A. Did not.**

8  Q. Who's the next supervisor up the chain, after

9    Sergeant Lane?

10  **A. Do not know her chain of command.**

11  Q. Has PIB investigated anyone above Sergeant

12    Lane's chain -- excuse me, has PIB

13    investigated anyone in Sergeant Lane's chain

14    of command, for lack of oversight of Officer

15    Vappie?

16  **A. PIB has not.**

17  Q. Has PIB investigated anybody in Sergeant

18    Lane's chain of command, for lack of oversight

19    of executive protection?

20  **A. Repeat that question?**

21  Q. Has PIB investigated anybody in Sergeant

22    Lane's chain of command for lack of oversight

23    of executive protection?

24  **A. No.**

25  Q. We referred earlier to the 16:35 rule; we had

1      a common understanding of that.  We agree?

2  **A. Yes.  Yes.**

3  Q. I believe you testified earlier that it is not

4      an uncommon charge; is that correct?

5  **A. That is correct.**

6  Q. There have been several violations by N.O.P.D.

7      officers; in fact, many sustained, of the

8      16:35 rule?

9  **A. Yes.**

10 Q. Did you resolve any of those during your

11     tenure as head of PIB?

12         MR. ZIMMER:

13             Object to the form of the question.

14         THE WITNESS:

15             Not to my knowledge.  Not to my

16             knowledge.

17 EXAMINATION BY MR. GEISSLER:

18 Q. And has PIB initiated any investigations of

19     supervisors, whose subordinates violated the

20     16:35 rule?

21 **A. Not to my knowledge.**

22 Q. Has PIB initiated any investigations of those

23     supervisors for failure to supervise the

24     officers who violated the 16:35 rule?

25 **A. Not to my knowledge.**

1   Q. We talked earlier about a no-show job.

2        Were there officers that N.O.P.D. employed

3   that had no-show jobs?

4        MR. ZIMMER:

5            Object to the form of the question.

6        THE WITNESS:

7            It's a very vague question.  I don't

8         understand the question.

9        MR. GEISSLER:

10            I'll be more specific.

11        THE WITNESS:

12            Uh-huh.

13   EXAMINATION BY MR. GEISSLER:

14   Q. Were there officers who were no-show for the

15   Fair Grounds detail?

16   **A. I don't know the answer to that question.**

17   Q. Can you point to a single investigation of any

18   of the supervisors of officers who worked the

19   Fair Grounds detail?

20        MR. ZIMMER:

21            Object to the form of the question.

22        THE WITNESS:

23            I cannot.

24   EXAMINATION BY MR. GEISSLER:

25   Q. Has PIB investigated any of the supervisors of

1      the officers who worked the Fair Grounds

2      detail?

3           MR. ZIMMER:

4                Object to the form of the question.

5           THE WITNESS:

6                I'm unaware of Fair Grounds.  I don't

7           know.

8      EXAMINATION BY MR. GEISSLER:

9      Q. Has PIB initiated any investigations of

10     officers who worked the Fair Grounds detail --

11     excuse me.

12          Has PIB initiated any investigations of

13     supervisors who purport -- of officers who

14     purport to have worked the Fair Grounds

15     detail, but were no-shows?

16          MR. ZIMMER:

17               Object to the form of the question.

18          THE WITNESS:

19               I don't -- I don't know.  When you

20          say Fair Grounds details, what are you

21          referring to?

22          MR. GEISSLER:

23               I'm referring to a specific area

24          called the Fair Grounds, and a secondary

25          employment detail that works the

1              protection for that area.
2         THE WITNESS:
3              I'm aware of the -- I'm aware of the
4         Fair Grounds, I just don't know --
5         there's several details that -- is there
6         a particular time frame, or is it just
7         the Fair Grounds detail?  I don't -- I
8         don't know the answer to that question.
9    EXAMINATION BY MR. GEISSLER:
10   Q. Is it accurate -- is it accurate that N.O.P.D.
11      members are routinely reassigned during
12      investigations about their -- excuse me.
13         If someone represented to the Court that
14      reassignment to the Orleans Parish
15      Communications District is a standard practice
16      for officers under investigation, would that
17      be accurate?
18   **A. That is something that's happened in the past.**
19      **This predates me, but I'm aware that it has**
20      **happened in the past, yes.**
21   Q. You said earlier that your knowledge of PIB is
22      limited to your tenure there, one
23      representation, and your role as a police
24      officer?
25   **A. Correct.**

1   Q. And the police officer role was quite some

2      time ago?

3   **A. Yes.**

4   Q. Not trying to age either one of us.

5   **A. That's okay.**

6   Q. And if someone represented to the Court that

7      reassignment ending and returing to a once

8      prior role as the standard practice, would

9      that be accurate?

10  **A. Repeat that question again?**

11  Q. If someone represented to the Court that

12     ending reassignment and returning to their

13     prior role as standard, would that be

14     accurate?

15  **A. Yes.**

16  Q. Would you agree with me that you had frequent

17     contact with Court Monitor Jonathan Aronie

18     about the Officer Vappie investigation?

19  **A. Yes.**

20  Q. And did you have occasion to have private

21     discussions with Mr. Aronie?

22  **A. Yes.**

23  Q. In one of those discussions, did you advise

24     Mr. Aronie that Officer Vappie, to your

25     understanding at the time, was set to be

1      transferred back to executive protection?

2  **A. I don't recall that.  I recall having a**

3  **conversation with -- with Aronie about Officer**

4  **Vappie being taken off reassignment.  I don't**

5  **recall whether or not it was -- he was going**

6  **to be transferred back to executive**

7  **protection.**

8  Q. Did you express to Mr. Aronie your concern

9     that Officer Vappie may be transferred back to

10    executive protection?

11  **A. There's always a concern that -- that was**

12  **everybody's concern, that they didn't want him**

13  **going back to executive protection.**

14  Q. On December 26th, 2022, did Mr. Aronie e-mail

15    you about a transfer of Officer Vappie back to

16    executive protection?

17  **A. I don't recall that.  If it's there, it's**

18  **there.**

19  Q. You said that there's always a concern.  Did

20    you express to Mr. Aronie that concern?

21  **A. Yeah, I expressed that concern even today.**

22  Q. Do you recall a letter from OIPM, on March

23    3rd, 2022, addressed to you, about a security

24    breach regarding investigative material?

25  **A. Yes.**

1    MR. GEISSLER:

2         Since we're not marking exhibits as

3         either Plaintiff or Defendant, I'll just

4         ask the court reporter to mark this as

5         Exhibit Four, if you don't mind.

6    THE STENOGRAPHIC REPORTER:

7         Five.

8    MR. GEISSLER:

9         Five.  I beg your pardon.

10        (Exhibit #5 was marked for

11        identification.)

12   MR. ZIMMER:

13        Thanks.

14        (Discussion off the record.)

15   EXAMINATION BY MR. GEISSLER:

16   Q. Is Exhibit Five the letter from OIPM from

17      March 3rd, 2023?

18   **A. March 13.**

19   Q. March 13, thank you.  That is my typographical

20      error.

21        Is Exhibit Five the OIPM letter from March

22      13, 2023?

23   **A. Yes, sir, it is.**

24   Q. Did N.O.P.D. initiate an investigation of the

25      leak on March 3rd -- March 13?  Excuse me.

1  **A. No.**

2  Q. Did N.O.P.D. initiate an investigation on

3     March 14th?

4  **A. No.**

5  Q. Has N.O.P.D. initiated an investigation?

6  **A. No.**

7  Q. Did PIB send unencrypted data to the City

8     Attorney's office?

9  **A. I don't know.**

10 Q. Did PIB send audio recordings of interviews

11    from the Officer Vappie investigation to the

12    City Attorney's office?

13 **A. Yes.**

14 Q. Is PIB required to keep that information

15    secure?

16 **A. PIB's required to keep information secure.**

17 **However, the information -- as part of the**

18 **ongoing investigation, the information was**

19 **transferred to PIB's attorney.**

20 **So, yes, to answer the question, but the**

21 **information was given to the attorneys for**

22 **PIB, City Attorney's office.**

23 Q. Not trying to get to that communication --

24 **A. Right.**

25 Q. -- I'm trying to understand where it went.

1       That attorney's in the City Attorney's office?

2   **A. Yes.**

3   Q. And as we discussed earlier, the consent

4       decree applies to all agents and employees in

5       the City; is that correct?

6   **A. Yes.**

7   Q. So the consent decree applies to the City

8       Attorney, and her staff, as well?

9           MR. ZIMMER:

10              Object to the form of the question.

11  EXAMINATION BY MR. GEISSLER:

12  Q. So the consent decree applies to the City

13      Attorney and her staff, as well?

14          MR. ZIMMER:

15              Object to the form of the question.

16          THE WITNESS:

17              The consent decree, no.

18  EXAMINATION BY MR. GEISSLER:

19  Q. Is the City Attorney permitted to violate the

20      consent decree?

21          MR. ZIMMER:

22              Object to the form of the question.

23          THE WITNESS:

24              I don't -- is the City Attorney

25              allowed to violate the consent decree?

1      MR. GEISSLER:

2           Correct.

3      THE WITNESS:

4           No.

5  EXAMINATION BY MR. GEISSLER:

6  Q. Is the City Attorney bound by the consent

7     decree?

8      MR. ZIMMER:

9           Object to the form of the question.

10     THE WITNESS:

11          If the City of New Orleans -- from my

12          perspective, I'm going to say no.

13 EXAMINATION BY MR. GEISSLER:

14 Q. I don't want to take up a great deal of time

15    here, because there's other depositions today.

16 **A. Uh-huh.**

17 Q. But I would really love to know why, in your

18    opinion?

19 **A. Because --**

20     MR. ZIMMER:

21          Wait a minute, object to the form of

22          the question, calls for a legal

23          conclusion.  You can answer.

24     THE WITNESS:

25          Yeah, based on my limited knowledge,

1               it relates to the consent decree, as it
2               relates to what happens within PIB, I'm
3               not in a position to say what happens
4               with the City Attorneys or with the
5               Mayor, as it relates to -- or Fausto, as
6               it relates to the consent decree.
7     EXAMINATION BY MR. GEISSLER:
8     Q. Have you put in in place any protections to
9        ensure that there is not a leak in the future?
10    **A. There was not a leak in the past, with PIB.**
11    Q. Have you put in any protections at PIB to
12       ensure that data are not transmitted
13       unencrypted?
14    **A. Yes.  We have -- we have protocols in place as**
15       **it relates to information that's given to**
16       **anyone outside of PIB.**
17    Q. What are those protocols?  Could you please
18       identify them by name and number?
19    **A. I cannot.**
20    Q. What are those protocols?
21            MR. ZIMMER:
22                Object to the form of the question.
23            THE WITNESS:
24                Information is not to be transferred
25            unencrypted.

Keith Sanchez, 3/16

1  EXAMINATION BY MR. GEISSLER:

2  Q. Is that written?

3  **A. No, it's not.**

4  Q. Why is it not written?

5  **A. Because we have not revised our standard**

6  **operating procedures at this moment.**

7  Q. So between March 13th, 2023, and today, you

8  have not put in place written direction to

9  ensure that only transmitted -- only encrypted

10  data are transmitted?

11  **A. That is correct.**

12  Q. We talked about your coming to the -- to PIB

13  from the Academy?

14  **A. Yes, sir.**

15  Q. And you talked about trying to improve the --

16  change the perception of PIB was your goal; is

17  that correct?

18  **A. That is correct, yes, sir.**

19  Q. What was the perception before?

20  **A. The perception was that PIB was out to --**

21  **wanted to sustain officers, wanted to**

22  **discipline officers in all cases, was the**

23  **disciplinary body for the department, as a**

24  **whole, it was PIB.**

25  Q. Do you recall why there was a change in PIB

1    leadership?

2         MR. ZIMMER:

3              Object to the form of the question.

4         THE WITNESS:

5              I do not.

6         MR. GEISSLER:

7              Mr. Sanchez, I can provide to you a

8         document, and we can discuss with

9         counsel later if it needs to be placed

10        under seal.  And I will represent to you

11        that Chief Gernon provided this document

12        to the United States.

13             (Exhibit #6 was marked for

14        identification.)

15   EXAMINATION BY MR. GEISSLER:

16   Q. Are you familiar with this document?

17   **A. No.**

18   Q. Was Chief Westbrook removed from PIB?

19   **A. Yes.**

20   Q. Why was Chief Westbrook removed from PIB?

21        MR. ZIMMER:

22             Object to the form of the question.

23        THE WITNESS:

24             Why was she removed from PIB?

25        MR. GEISSLER:

1              Correct.

2         THE WITNESS:

3              I'm not a hundred percent certain on

4         why she was removed from PIB.  I know

5         that the interactions I had with the --

6         with the rank and file, if you will, was

7         not happy with Chief Westbrook.  I'm not

8         sure if that's the reason she was

9         removed, though.

10   EXAMINATION BY MR. GEISSLER:

11   Q. Was Chief Westbrook sustained on an allegation

12      that she manipulated cognizance dates of SIS

13      investigations?

14   **A. I do not know.**

15   Q. Since assuming the role of the head of PIB --

16   **A. Uh-huh.**

17   Q. -- have you put in place any written direction

18      on the cognizance dates of SIS investigations?

19   **A. No written directives.  The cognizance date,**

20      **overall, is outside of SIS, just in general.**

21      **There was no written direction that was put in**

22      **place, but my direction then and now is the**

23      **cognizance date is the date that is utilized**

24      **for the 120 deadline.  But there's no written**

25      **direction.**

1   Q. And what day did you come to PIB?

2   **A. It was in October of last year.**

3   Q. So from October of 2022 until August 2nd,

4      2023, you've not given any written direction

5      on the cognizance date to be used for SIS

6      investigations?

7   **A. There is no written direction, but there is**

8      **instruction that was given to every PIB**

9      **employee, as it relates to the cognizance**

10     **date.**

11  Q. What instruction was that?

12  **A. The cognizance date is the date that effects**

13     **the 120 deadline, not the classification date.**

14  Q. Who gave that instruction?

15  **A. That was by Deputy Chief Sanchez, after**

16     **meeting with the City Attorney's office,**

17     **regarding investigations and the timeliness of**

18     **the investigation that was ruled on by the**

19     **Fourth Circuit.**

20        **And so that decision was made, based on**

21     **communication with the City Attorney's office,**

22     **that that was going to be the date.**

23        **Now, there hasn't been any written**

24     **direction at this point, but that's coming,**

25     **yes.**

1   Q. Is it fair to say that, since you've joined

2      PIB, there was some catching up to do on a

3      backlog at PIB?

4          MR. ZIMMER:

5              Objection to the form of the

6          question.

7          THE WITNESS:

8              That is -- that is a fair assessment,

9          yes, sir.

10  EXAMINATION BY MR. GEISSLER:

11  Q. Do you recall a January 2023 meeting with the

12     court monitor and DOJ, in which you said PIB

13     had not completed an annual report?

14  **A. I do recall that, yes, sir.**

15  Q. And do you also recall stating that there was

16     a backlog of disciplinary hearings that had

17     not yet been heard?

18  **A. That is correct, yes, sir.**

19  Q. How is that backlog going today?

20  **A. The Bureau Chief's hearings, there is no**

21     **backlog.  The backlog has been cleared up.**

22          **Currently, we have seven cases, the Bureau**

23     **Chief hearings.  Five of those cases are cases**

24     **that were set for a hearing, but could not**

25     **move forward because either the attorney**

1    wasn't present or the officer was military

2    leave, or out sick or injured, five of those

3    cases.  And so those cases are being reset.

4        The other two cases just -- just came up

5    because the officer's investigation, there was

6    criminal allegations of DWI, and those cases

7    have just been closed, so now they're set

8    for -- they're on the Bureau Chief's schedule,

9    but other than that, the Bureau Chief's

10   hearings are caught up.

11       We've been conducting hearings pretty much

12   around the clock.  Prior to -- well, say like

13   this, since my coming to PIB, we've conducted

14   numerous amount of hearings, it was set at

15   maybe once a month, we bumped it up to three

16   times a month, to make sure that we caught up

17   on those hearings.

18   Q. Other than Bureau Chief hearings, what other

19      hearings are there?

20   A. There are PIB captain's hearings, and there

21      are district level captain's hearings.  The

22      PIB's captain's hearings are currently -- I

23      think the backlog may be -- it's minor, it's

24      maybe 10 to 12, maybe something in that

25      nature.

1      They've been holding hearings around the

2      clock, as well.  We've had the assistance of

3      the entire department to participate in that.

4      And, also, to the district captain's hearings.

5      I don't think -- they're doing a good job, as

6      well.  We're getting an influx of those

7      particular hearings.

8          And so, in terms of the hearings, I think

9      we're in a much better spot than where we were

10     in October of last year.

11  Q. What is the deadline set for the finish of an

12     investigation before a hearing must be held?

13  A. The deadline set?

14  Q. Let me rephrase.  Is there a 30-day deadline

15     to have a hearing?

16         MR. ZIMMER:

17             Object to the form of the question.

18         THE WITNESS:

19             So the way we interpreted the 30-day

20         deadline is -- well, yes, there's a

21         30-day deadline, yes.

22  EXAMINATION BY MR. GEISSLER:

23  Q. How many days, on average, are officers

24     waiting for their hearings?

25         MR. ZIMMER:

1           Object to the form of the question.

2      THE WITNESS:

3           If you're speaking of currently, we

4      try to set the hearings as soon as

5      possible, as soon as we get the

6      hearings.  I don't have an actual time

7      frame or date.

8           However, that process is -- is highly

9      problematic, and it's probably -- and

10     part of the issue is that, since October

11     of last year, once we caught up on these

12     hearings, we've stressed to the officers

13     that they have the ability to request

14     their entire file, to actually have a

15     hearing.  And sometimes that takes

16     longer than 30 days to get that process

17     done.

18 EXAMINATION BY MR. GEISSLER:

19 Q. Okay.  Does PIB currently have a quality

20    assurance unit?

21 **A. Yes.**

22 Q. Is it staffed?

23 **A. It is staffed.  We've gotten more people since**

24    **October of last year.  And it's much better**

25    **now than what it was -- the desert it was back**

1      in October.

2  Q. Does the quality assurance unit present data

3      on the time investigations spend at each step

4      of the investigative process?

5  **A. Repeat the question?  I'm sorry.**

6  Q. Does the quality assurance unit present you

7      data on the time investigations spend at each

8      step of the investigative process?

9  **A. They do not.  However, I would like that data.**

10     **I think it's important.  You said presented to**

11     **me?  No.**

12  Q. All right.  Let's return to the payroll fraud

13      issue.

14  **A. Uh-huh.**

15  Q. Can you describe the kinds of allegations that

16      you would consider sufficient to allege

17      payroll fraud?

18          MR. ZIMMER:

19              Object to the form of the question.

20          THE WITNESS:

21              Yeah.  I mean, I'll give you a

22          classic example.  Let's say, if Officer

23          Vappie sat on the HANO board, and he was

24          getting paid for both.  That may be an

25          indication of payroll fraud.

1   EXAMINATION BY MR. GEISSLER:

2   Q. Would getting paid by N.O.P.D., while not

3       doing N.O.P.D. work, be an allegation of

4       payroll fraud?

5   **A. No.  If Officer Vappie had gotten paid from**

6       **the HANO board, and with N.O.P.D. -- the**

7       **N.O.P.D., then that could be considered**

8       **payroll fraud.**

9   Q. So it's your representation here, on the

10      record and to the Court, that you would not

11      charge an officer with payroll fraud, if they

12      were being paid by N.O.P.D., and doing

13      non-N.O.P.D. work?

14          MR. ZIMMER:

15              Object to the form of the question.

16          You can answer.

17          THE WITNESS:

18              I think that the -- the question --

19          the finality of -- would not -- I can't

20          say would not in every single

21          circumstance.  Right?

22              But what I would say is that it could

23          be -- it could be payroll fraud if

24          officer -- if an officer's getting paid

25          at HANO, and getting paid at N.O.P.D.,

1          accepting -- accepting a stipend at HANO

2          and accepting payroll at N.O.P.D.

3     EXAMINATION BY MR. GEISSLER:

4     Q.  Is payroll fraud a crime?

5          MR. ZIMMER:

6               Object to the form of the question.

7          THE WITNESS:

8               Yes.

9     EXAMINATION BY MR. GEISSLER:

10    Q.  Did PIB refer the allegations against Officer

11        Vappie for criminal investigation?

12    **A.  The short answer is no.  We did not refer it,**

13        **but we did and, again, this conversation we**

14        **had earlier as it relates to the federal**

15        **government, we did not refer it.  It's mainly**

16        **because the case was -- the question came up**

17        **from the federal government, early on in the**

18        **investigation, that they wanted to look at the**

19        **investigation.  So it was never referred to a**

20        **district attorney's office or anything of that**

21        **nature.**

22    Q.  Earlier, you said that some officers were

23        under criminal investigation for DUI,

24        therefore it elongated the administrative

25        investigation process; is that correct?

1    **A. That is correct, yeah.**

2    Q. So in the case of Officer Vappie, is it your

3        testimony that N.O.P.D. did not refer Officer

4        Vappie until after -- excuse me.  N.O.P.D. did

5        not provide the investigative file until after

6        the investigation was closed?

7    **A. Yeah, administrative investigation.**

8    Q. The N.O.P.D. did not provide the

9        administrative investigation until after the

10       administration -- the administrative

11       investigation was closed?

12   **A. Yeah, I think.  Lieutenant Jones can give you**

13       **some more specific information as it relates**

14       **to that.**

15   Q. But your answer is yes?

16   **A. Yes.**

17   Q. So unlike the usual course of conduct for

18       other N.O.P.D. officers, in Officer Vappie's

19       case, you waited until the close of the

20       administrative investigation to provide the

21       information to prosecutors?

22           MR. ZIMMER:

23               Object to the form of the question.

24           THE WITNESS:

25               To prosecutors?  So Officer Vappie's

1          case was never referred to any

2          criminal -- to any organization or

3          agency as it relates to being a criminal

4          matter.  There was -- the case was never

5          referred, as it relates to being a

6          criminal matter.  It was an

7          administrative case that was handled by

8          the Public Integrity Bureau.

9             The federal government requested

10         information as it relates to this case,

11         prior to the close of the investigation.

12         We provided the file, the entire file,

13         to the federal government, at the close

14         of their investigation.  But there was

15         information that was requested prior to

16         from the federal government.

17    EXAMINATION BY MR. GEISSLER:

18    Q. Do you believe that the investigators

19       adequately investigated payroll fraud?

20    **A. I think the officers, or the investigators in**

21       **this case, adequately investigated this**

22       **particular case.  And I think that payroll**

23       **fraud was -- well, all allegations, potential**

24       **allegations, based on the internal**

25       **investigation, were looked at, in this**

1    particular case, such as -- such as the

2    professionalism.

3        So I think that, if the investigators

4    would have believed, based off of information

5    that they had, or they received, would have

6    believed that they, investigators, sought

7    payroll fraud, it would have been added as one

8    of the other sustained violations.

9    Q. I'll repeat the question, and I'll ask you to

10   answer the specific question.

11       Do you believe that the investigators in

12   this case adequately investigated payroll

13   fraud allegations against Officer Vappie?

14       MR. ZIMMER:

15           Object to the form of the question.

16       THE WITNESS:

17           Yes.

18   EXAMINATION BY MR. GEISSLER:

19   Q. You have Kendrick Allen's affidavit before you

20   in which he states, in part:  At no time was

21   Officer Vappie under investigation for payroll

22   fraud, at paragraph eight.  You're welcome to

23   look at the exhibit, I believe it's Exhibit

24   Three.

25   A. Uh-huh.

1   Q. Was Kendrick Allen ever bought up on charges

2       for dishonesty?

3           MR. ZIMMER:

4               Object to the form of the question.

5           THE WITNESS:

6               No.

7   EXAMINATION BY MR. GEISSLER:

8   Q. Is payroll fraud serious misconduct, under the

9       consent decree?

10  **A. I think the consent decree lays out**

11      **specific -- specific titles of what is**

12      **considered serious misconduct.  I do not have**

13      **that in front of me.  But it's per the consent**

14      **decree.**

15  Q. Payroll fraud would be a crime, you said.

16      Correct?

17  **A. Yes.  And if it says any criminal activity,**

18      **then, yes, payroll fraud would be considered a**

19      **serious misconduct allegation.**

20  Q. In consent decree paragraphs 399 to 454, both

21      include criminal conduct, criminal

22      allegations, as serious misconduct; is that

23      correct?

24  **A. Yes.**

25  Q. N.O.P.D. chapter 51.1.1, which is the chapter

1    governing PIB, does that also include
2    potentially criminal conduct as serious
3    misconduct?
4  **A. Yes.**
5  Q. Do you believe -- excuse me.  Do you agree
6    with me that N.O.P.D. would not have charged
7    Officer Vappie with nepotism in order to bring
8    an allegation of payroll fraud?
9  **A. Yes.**
10 Q. During the Vappie investigation, did PIB
11   receive an e-mail from Skip Gallagher, either
12   directly or indirectly, that referenced
13   allegations from Officer Vappie, may have been
14   engaging in payroll fraud?
15       MR. ZIMMER:
16           Object to the form of the question.
17       THE WITNESS:
18           Yes.
19 EXAMINATION BY MR. GEISSLER:
20 Q. You said earlier, if a investigator uncovers
21   other violations during the course of the
22   investigation, the PIB investigator, quote,
23   Must move forward, unquote.
24       But that violates your policy; is that
25   correct?

1   **A. That is correct.**

2          MR. ZIMMER:

3              Object to the form of the question.

4   EXAMINATION BY MR. GEISSLER:

5   Q. During the course of this investigation, did

6      the Office of Consent Decree Monitor raise an

7      allegation of payroll fraud?

8   **A. They raised allegation of -- they mentioned**

9      **payroll fraud several times, yes.**

10  Q. During the course of this investigation, did

11     Skip Gallagher raise an allegation of payroll

12     fraud?

13  **A. Skip Gallagher, if you have a copy of the**

14     **e-mail, I need to see the e-mail, but...**

15             (Discussion off the record.)

16         MR. GEISSLER:

17             For the sake of the record of this

18         deposition, we'd like to make clear that

19         the investigation of former Deputy

20         Superintendent Arlinda Westbrook is

21         marked as Exhibit Six.  Fair?

22         MR. ZIMMER:

23             Uh-huh.

24         THE WITNESS:

25             Fair.

1      MR. GEISSLER:

2           So now, back on record, resuming, of

3           course, the questioning.  We're talking

4           about the e-mail from Professor Skip

5           Gallagher.

6           (Exhibit #7 was marked for

7           identification.)

8    EXAMINATION BY MR. GEISSLER:

9    Q. And the question was:  Did Skip Gallagher

10      raise an allegation of payroll fraud?

11          I commend to your attention what's marked

12      on the subscript to the bottom, it's four.

13      It's the second to last printed page, the

14      third paragraph.

15   **A. You said page four?**

16   Q. Oh, I'm sorry.  Correct.  Page four, yes.

17      Paragraph, it's fifth down, starts with:  "As

18      can be seen."

19          MR. ZIMMER:

20          Can you repeat the question?

21   EXAMINATION BY MR. GEISSLER:

22   Q. Did professor Gallagher raise an allegation of

23      payroll fraud?

24          MR. ZIMMER:

25          Object to the form of the question.

```
 1              THE WITNESS:

 2                   This allegation of payroll fraud, it

 3              speaks to the security team for security

 4              detail for the Mayor, as he makes

 5              reference to it, yes.  In this article,

 6              yes.

 7      EXAMINATION BY MR. GEISSLER:

 8      Q. Did professor Gallagher serve as a source for

 9         prior investigations of the 16:35 rule?

10              MR. ZIMMER:

11                   Object to the form of the question.

12              THE WITNESS:

13                   Are you speaking before I got to PIB,

14              before I was assigned to PIB?

15      EXAMINATION BY MR. GEISSLER:

16      Q. I will represent that it's my understanding

17         that the investigations began before you

18         started PIB, but I don't know if they continue

19         or if any portion of it continues.

20         Did Professor Gallagher serve as a source

21         for allegations of violations of the 16:35

22         rule?

23              MR. ZIMMER:

24                   Object to the form of the question.

25              THE WITNESS:
```

1            Based on my limited knowledge, yes.

2  EXAMINATION BY MR. GEISSLER:

3  Q. And in that case, PIB opened investigations

4     for the 16:35 allegations.  Correct?

5       MR. ZIMMER:

6            Object to the form of the question.

7       THE WITNESS:

8            Yes.

9  EXAMINATION BY MR. GEISSLER:

10  Q. And in this case, did PIB open investigations

11     of executive protection for payroll fraud?

12       MR. ZIMMER:

13            Object to the form of the question.

14       THE WITNESS:

15            No.

16  EXAMINATION BY MR. GEISSLER:

17  Q. And OCDM -- excuse me, the Office of Consent

18     Decree Monitor, OCDM.

19  **A. Uh-huh.**

20  Q. In their review of, let's say, body-worn

21     cameras, could they see potentially matters

22     that might raise an allegation of unlawful

23     search or unlawful force?

24  **A. They could, yes.**

25  Q. And could they refer those over to PIB for

1      investigation?

2  **A. They could.**

3  Q. And if one of Jonathan Aronie's team members

4      referred to you any specific officer and said,

5      "This looks like an excessive use of force,"

6      would you open up an investigation of that?

7  **A. Is there currently an ongoing investigation?**

8     **Or is it a totally separate matter?**

9  Q. I'm offering a hypothetical here.  On a not

10     previously-opened investigation, an OCDM

11     auditor sees a video, refers that video over

12     to PIB with an allegation that there is

13     excessive force --

14  **A. Yes.**

15  Q. Sorry, let me finish the question, although I

16     know you know the answer.

17  **A. I'm sorry.**

18  Q. Would PIB open an investigation into that

19     case?

20  **A. Yes, they likely would, yes.**

21  Q. But PIB did not open an investigation of

22     payroll fraud in this case, after OCDM raised

23     it?

24        MR. ZIMMER:

25           Object to the form of the question.

1        THE WITNESS:

2            They opened up -- an investigation

3            that was ongoing?

4    EXAMINATION BY MR. GEISSLER:

5    Q. In this Officer Vappie investigation?

6    **A. Uh-huh.**

7    Q. After OCDM raised payroll fraud as an issue,

8        did PIB open an allegation of payroll fraud

9        against Officer Vappie?

10        MR. ZIMMER:

11            Object to the form of the question.

12        THE WITNESS:

13            PIB did not add payroll fraud to the

14            ongoing investigation, as it relates to

15            Officer Vappie, that is correct.

16    EXAMINATION BY MR. GEISSLER:

17    Q. Earlier today, you said that PIB must consider

18        all circumstantial evidence; is that correct?

19        MR. ZIMMER:

20            Object to the form of the question.

21        THE WITNESS:

22            PIB considers circumstantial

23            evidence, yes, they do.

24    EXAMINATION BY MR. GEISSLER:

25    Q. Did PIB seek to obtain a search warrant for

1       Officer Vappie's personal phone?

2    **A.  No.**

3    Q.  Could his personal phone contain

4       circumstantial evidence?

5    **A.  I'm not sure what his personal cell phone**

6       **could have contained.  The information that we**

7       **were seeking, we were able to get without the**

8       **personal cell phone.**

9    Q.  You don't know what information you didn't

10      get, because you didn't obtain the cell phone.

11      Right?

12   **A.  We did not apply for a search warrant, that's**

13      **correct.**

14   Q.  And you don't know what information could have

15      been gleaned from that phone.  Correct?

16   **A.  No.**

17   Q.  That's not correct?

18   **A.  I don't know what information -- I don't know**

19      **what information is in his personal cell**

20      **phone, as it relates to the investigation**

21      **itself.  The information that we needed for**

22      **the investigation was information we already**

23      **had.**

24      **But I don't know what would have been in**

25      **his personal cell phone, I don't know.  That**

1      **is a correct statement, yeah.**

2   Q. It is correct that you don't know what was in

3      the cell phone?

4   **A. I have no idea.**

5   Q. And when you say information you needed, is it

6      your job to ensure that PIB investigation is

7      complete?

8   **A. That is correct.**

9   Q. And if you don't know what was in the cell

10     phone, how can that be complete?

11        MR. ZIMMER:

12           Object to the form of the question.

13        THE WITNESS:

14           I don't know what was in his house, I

15           don't know, but based on -- based on the

16           nature of this particular case, and the

17           information that we had, the personal

18           cell phone was not -- there was no

19           information that we had, what we could

20           have put in the application for a search

21           warrant, to a district judge, to say,

22           Hey, we want his personal cell phone.

23           You're asking about a search warrant.

24              There was no information that we had

25           that we felt we could have put into a

1               search warrant, to get -- to take his

2               personal cell phone, and to get -- to

3               get the information.  We don't have any

4               information like that.

5     EXAMINATION BY MR. GEISSLER:

6     Q. Has PIB used vehicle -- excuse me, license

7        plate readers to locate officers throughout

8        the city or elsewhere, for PIB investigations?

9     **A. To my knowledge, yes.**

10    Q. Has PIB used location data from cell phones to

11       locate officers within or without the city for

12       PIB investigations?

13    **A. To my knowledge, yes.**

14    Q. Has PIB collected text messages from cell

15       phones, to determine their communications for

16       PIB investigations?

17    **A. I do not know.**

18    Q. Has PIB solicited pen register records to

19       understand calls to and from cell phones, for

20       PIB investigations?

21    **A. I do not know.**

22    Q. Has PIB monitored telephone calls or

23       voicemails for PIB investigations?

24    **A. I do not know.**

25    Q. Did your investigators ask Officer Vappie if

1   he had his personal cell phone with him?

2   **A. You have to ask the investigators that.   I**

3   **don't know.   I wasn't part of the interview.**

4   Q. But you signed off -- you signed off on the

5   investigative file as complete.   Correct?

6   **A. I did, but I was not part of the interview,**

7   **sir.**

8   Q. Did your investigators uncover the Paul Noel

9   e-mail, that Officer Vappie ultimately

10  presented at the captain's hearing?

11  **A. I believe so, as part of another**

12  **investigation.**

13  Q. With respect to Officer Vappie, did your

14  investigators uncover the Paul Noel e-mail?

15  **A. I do not recall.**

16  Q. If your investigators had uncovered the Paul

17  Noel e-mail, would they have sustained?   Would

18  you have approved a sustained finding?

19       MR. ZIMMER:

20            Object to the form of the question.

21       THE WITNESS:

22            Well, let me ask you another -- what

23       e-mail are you referring to?

24       MR. GEISSLER:

25            Fair.

1    EXAMINATION BY MR. GEISSLER:

2    Q. Did Officer Vappie present an e-mail from Paul

3       Noel saying that officer's on executive

4       protection, we're not subject to the 16:35

5       rule?

6    **A. Was this during his hearing?**

7    Q. Yes.

8    **A. I was not present for the hearing.**

9    Q. I'm not asking if you were present for the

10      hearing.

11   **A. Right, I don't know.**

12   Q. You're affirmatively representing that you

13      don't know whether or not Officer Vappie

14      presented an e-mail that then resulted in a

15      not-sustained finding?

16   **A. I think there may have been two different**

17      **e-mails.  Do you have a copy of the e-mail, so**

18      **I can look at it?**

19   Q. We may leave this deposition open to revisit

20      that.

21   **A. That's fine.  I -- I -- there was something**

22      **presented at the hearing, but I don't know**

23      **what the e-mail exactly said.  If you can give**

24      **me a copy of the e-mail, I can tell you.  I**

25      **know -- I know that there was -- the 16:35 was**

1      exonerated because of an e-mail, but I'm not

2      familiar with the e-mail.  That's what I'm

3      saying.

4   Q. Did your investigators uncover that e-mail?

5   A. I do not think they did.  I think the e-mail

6      may have been presented at the hearing itself.

7      I do know that there was a different e-mail,

8      prior to that, but I don't think they got that

9      particular e-mail.  So I guess the short

10     answer, I don't know.

11  Q. As supervisor for those investigators, have

12     you counselled those investigators for having

13     an incomplete investigation, not having had

14     that e-mail?

15  A. No.

16  Q. Mr. Sanchez, I'd like to show you the City's

17     own pleading, it's document entry 718, it's

18     the response to Officer Vappie investigation

19     report, in which Mr. Zimmer signs the

20     pleading, quotes directly from the e-mail to

21     which we are referring.  It's the block quote

22     showed on the screen in front of you now, for

23     the sake of the court reporter.

24          MR. ZIMMER:

25               Well, what was the question, again?

1   EXAMINATION BY MR. GEISSLER:

2   Q. The question is:  Did your investigators

3      uncover that e-mail?

4          MR. ZIMMER:

5             Asked and answered, object to the

6          form of the question.

7          THE WITNESS:

8             I can't answer the question.  I don't

9          think they did.  I mean, I think this

10          was presented at the hearing.  And I

11          wasn't present for the hearing, so I

12          don't know.  I wasn't present for that.

13          And so I think there was a different

14          e-mail that was a part of a different

15          investigation, but I don't ever remember

16          seeing that particular e-mail.

17   EXAMINATION BY MR. GEISSLER:

18   Q. And, Mr. Sanchez, or Chief, if you'd like.

19   **A. That's fine.**

20   Q. Have you counselled your investigators for

21      incomplete investigation, for Officer Vappie,

22      given that e-mail's presentation at the

23      hearing?

24          MR. ZIMMER:

25             Object to the form, asked and

1          answered.

2          THE WITNESS:

3              I did not.

4     EXAMINATION BY MR. GEISSLER:

5     Q. Have you initiated any disciplinary

6        investigations against your investigators,

7        regarding not uncovering that e-mail?

8     **A. I did not.**

9     Q. Let's return for a second, if you will,

10       please, to the transfers.  You spoke with Mr.

11       Zimmer about transferring back and forth.

12          Could you please point us to the specific

13       written direction on transfers that N.O.P.D.

14       uses to transfer officers away from an

15       assignment during an investigation and back

16       after an investigation?

17    **A. Are you referring to reassignments?**

18    Q. To reassignments, yes, sir.

19          I'm asking the witness here, so I'm not

20       asking Mr. Zimmer to present something, if

21       he's looking for something to review.

22    **A. I don't -- I don't have the policy in front of**

23       **me, sir.**

24    Q. Is there a written direction on reassignments?

25    **A. There is.**

1              MR. ZIMMER:

2                   Are you saying I can't look at my

3              documents?  Damn, man, I object.

4              MR. GEISSLER:

5                   Not at all, not at all.

6                   With that answer now on the record,

7              if you would like to furnish us all with

8              a copy of your policy, that's great.

9              "Your," meaning the City.

10             MR. ZIMMER:

11                  Was this administrative reassignment?

12             MR. GEISSLER:

13                  Reassignment during investigation.

14     EXAMINATION BY MR. GEISSLER:

15     Q. Is that administrative reassignment?

16     **A. Administrative reassignment, that's it, yes,**

17        **sir.**

18             MR. ZIMMER:

19                  I do have a copy.

20                  I don't have a copy.

21     EXAMINATION BY MR. GEISSLER:

22     Q. Since the issues of reassignment, during the

23        investigation, were raised by the consent

24        decree monitor --

25     **A. Yes, sir.**

1  Q. -- have you given any further written

2     direction on reassignments during the course

3     of the investigation?

4  **A. I have not.**

5  Q. Is there a need for more written guidance?

6  **A. There is.  In my opinion, that policy needs to**

7  **be revisited, as it relates to administrative**

8  **reassignment.**

9        MR. ZIMMER:

10            We can go off the record for a

11        second.

12        MR. GEISSLER:

13            Sure.

14            (A recess was taken at 12:47 p.m.)

15            (On the record at 12:51 p.m.)

16        MR. GEISSLER:

17            All right.  So we just had a short

18        recess, which counsel for the United

19        States had a chance to confab.  Just a

20        couple more things.

21  EXAMINATION BY MR. GEISSLER:

22  ████████████████████████████████████

23     ██████████████████████████████████████

24     ████████████████████████████████████

25  ████████████████████



[redacted]

1

2

3    Q. What is Officer Vappie's current assignment?

4    **A. He's still currently assigned to executive**

5    **protection.**

6    Q. And who's his current supervisor?

7    **A. As far as I know, it is Tokishiba Lane.  I**

8    **don't know if it was anybody that was --**

9    **that's not a PIB.**

10   Q. All right.  Have you understood all the

11      questions that I've asked of you today?

12   **A. Yes, sir.**

13         MR. GEISSLER:

14             All right.  I have no further

15          questions.

16             Mr. Zimmer, it's your deposition, if

17          you want to leave it open or closed?

18         MR. ZIMMER:

19             We'll close it, but I have one real

20          quick redirect.

21         MR. GEISSLER:

22             And my blanket admonition of these

23          depositions is, in the usual course,

24          there's an errata sheet, and you get to

25          correct typographical errors.  You don't

1          really change the substance of your

2          answers, but your counsel will give you

3          direction or legal advice on that.

4             I won't give you legal advice, but

5          our request is that you not attempt to

6          change substantive answers in the errata

7          sheet.  We don't much see that in an

8          errata sheet, anyway.

9             Are there any questions for me?

10   THE WITNESS:

11             No, sir.

12   MR. GEISSLER:

13             Again, I really appreciate your time

14        here.

15   THE WITNESS:

16             Thank you.  Appreciate it.

17   MR. ZIMMER:

18             Those are exhibits.  This would be

19        number eight?

20   THE WITNESS:

21             Number eight.

22   MR. ZIMMER:

23             This is Exhibit Eight.

24             (Exhibit #8 was marked for

25        identification.)

1  EXAMINATION BY MR. ZIMMER:

2  Q. Chief Sanchez, could you identify this

3     document for me?

4  **A. This is N.O.P.D. policy, chapter 1.3.8, that**

5     **is titled Serious Disciplinary Action Review**

6     **Board.**

7  Q. And is it accurate that this policy empowers

8     the investigation of supervisors of N.O.P.D.

9     employees that are found to have had

10    disciplinary violations?

11 **A. That is correct.**

12 Q. And is it accurate that this applies to

13    investigations that result in excess of 20-day

14    suspensions?

15 **A. That is correct.**

16 Q. Was Officer -- what was Officer Vappie's

17    discipline that was melted out in this case?

18 **A. He received two letters of reprimand.**

19 Q. Was he suspended for 20 days or more?

20 **A. No, sir.**

21       MR. ZIMMER:

22             No further questions.

23       MR. GEISSLER:

24             I'll follow up to that, please.

25 EXAMINATION BY MR. GEISSLER:

1  Q. Could you kindly to turn to page four,

2     paragraphs 19(b).  Could you kindly read

3     19(b)?

4        I can read it into the record or you can.

5     How would you prefer?

6        MR. ZIMMER:

7           I'd prefer you do it.

8        MR. GEISSLER:

9           I'll do it for 19(b).

10          Review -- this is the SB -- excuse

11          me, the SDRB responsibilities are to --

12          going to B -- review each serious

13          imposition of discipline within 30 days

14          of issuance of the disciplinary letter

15          by the Superintendent of Police to

16          determine the supervisor's role in the

17          infraction.

18  EXAMINATION BY MR. GEISSLER:

19  Q. Is N.O.P.D. currently meeting the 30-day

20     requirement of 19(b)?

21        MR. ZIMMER:

22           Object to the form of the question.

23        THE WITNESS:

24           Yes.  So this is referring to the 30

25          days, once the superintendent signs the

1           letter, yes.  We each -- in possession
2           of this note -- within 30 days of
3           issuance of the disciplinary letter by
4           the Superintendent of Police, to
5           determine the supervisor's role and the
6           infraction -- yes, Chief Woodfork is
7           adamant about making sure, once she
8           signs the letter, that -- now,
9           obviously, there are issues that come
10          up, but, yes, that's something that
11          we're definitely working on.
12   EXAMINATION BY MR. GEISSLER:
13   Q. Definitely working on?  I couldn't hear you,
14      I'm sorry?
15   **A. Yes, yes, yes.  This is something that we're**
16      **working on, and it is my belief that we are**
17      **meeting this 30-day deadline, based on -- from**
18      **the letter itself.**
19   Q. So if I went back to October 2022, going
20      forward, would I see an SDRB hearing every
21      single month since then?
22          MR. ZIMMER:
23              Object to the form of the question.
24          THE WITNESS:
25              No, but the question is whether or

Keith Sanchez, Sr.

1          not we're meeting the 30-day deadline.

2          We haven't -- we haven't actually done a

3          board.  This was going to have to be a

4          board itself.  You asked me if we were

5          reaching the 30-day deadline, the

6          issuance of discipline, but as far as

7          the board is concerned, I don't think

8          there's -- there's not been a board

9          since I've been -- I don't think there

10         was ever a board.

11      MR. GEISSLER:

12          One moment, please.

13  EXAMINATION BY MR. GEISSLER:

14  Q. Could you please turn to paragraph 13.

15  **A. (Witness complies.)**

16  Q. Is there a requirement to meet every 30 days?

17  **A. There is a requirement to meet every 30 days.**

18     **Maybe I misunderstood the question, the**

19     **previous question, but I was answering the**

20     **question, whether or not N.O.P.D. was meeting**

21     **the 30-day issuance of a disciplinary letter.**

22         **In terms of this particular policy,**

23     **from -- from what I understand is, there's not**

24     **been a SRDB board.**

25      MR. GEISSLER:

1                    Okay.   I have no further questions.

2          MR. ZIMMER:

3               No further questions.

4                (The proceedings were concluded at

5          12:57 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Deposition of KEITH A. SANCHEZ, SR.

2              Taken on August 2, 2023

3

4

5              WITNESS' CERTIFICATE

6

7

8      I have read or have had the foregoing

9  testimony read to me and hereby certify that it

10  is a true and correct transcription of my

11  testimony, with the exception of any attached

12  corrections or changes.

13

14

15

16

17

18              KEITH A. SANCHEZ, SR.

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2

 3          This certification is valid only for a
      transcript accompanied by my original signature
 4    and original required seal on this page.
           I, Verne B. Mullins, Certified Court Reporter
 5    in and for the State of Louisiana, as the officer
      before whom this testimony was taken, do hereby
 6    certify that the above-mentioned witness, after
      having been duly sworn by me upon authority of
 7    R.S. 37:2554, did testify as hereinbefore set
      forth; that this testimony was reported by me in
 8    the stenotype reporting method, was prepared and
      transcribed by me, or under my personal direction
 9    and supervision, and is a true and correct
      transcript, to the best of my ability and
10    understanding; that the transcript has been
      prepared in compliance with transcript format
11    guidelines required by statute or by rules of the
      board, and that I am informed about the complete
12    arrangement, financial or otherwise, with the
      person or entity making arrangements for
13    deposition services; that I have acted in
      compliance with the prohibition on contractual
14    relationships, as defined by Louisiana Code of
      Civil Procedure Article 1434 and in rules and
15    advisory opinions of the board; that I have no
      actual knowledge of any prohibited employment or
16    contractual relationship, direct or indirect,
      between a court reporting firm and any party
17    litigant in this matter, nor is there any such
      relationship between myself and a party litigant
18    in this matter.  I am not related to counsel or
      to the parties herein, nor am I otherwise
19    interested in the outcome of this matter.

20

21          VERNE B. MULLINS, CCR, RDR, CSR (TX)
            CERTIFIED COURT REPORTER
22          REGISTERED DIPLOMATE REPORTER
            CERTIFIED SHORTHAND REPORTER (TX)
23

24

25
```