**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**                    **CIVIL ACTION**

**VERSUS**                                       **NO. 12-1924**

**CITY OF NEW ORLEANS**                          **SECTION: "E" (2)**

<u>**REPORT OF THE CONSENT DECREE MONITOR FOR THE NEW ORLEANS**</u>
<u>**POLICE DEPARTMENT CONSENT DECREE**</u>
<u>**COVERING THE SECOND QUARTER OF 2023**</u>
<u>**RELEASED AUGUST 14, 2023**</u>



# Report of the Consent Decree Monitor
# For the New Orleans Police Department Consent Decree
# Covering the Second Quarter of 2023
# Released August 15, 2023

**Office of the Consent Decree Monitor**
**New Orleans, Louisiana**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana



## WHAT'S IN THIS REPORT?



**Office of the Consent Decree Monitor**

**August 15, 2023**

| WHAT WE DID THIS PERIOD |
| --- |

- Published the Monitor's First Quarterly Report for 2023
- Audited PIB Professionalism Investigations
- Audited Effective Supervision (through Insight)
- Reviewed the Professional Standards & Accountability Bureau ("PSAB") Audit of 2022 Annual Performance Evaluations
- Reviewed open cases of the Special Victims Division (SVD)
- Published a Special Report on the Monitor's Review of Sexual Violence & Domestic Violence Complaint Investigations
- Published a Special Report on the Public Integrity Bureau's (PIB) Investigations into Allegations Relating to Officer Jeffrey Vappie
- Published a Special Report on the Monitor's Review of the PIB Administrative Investigations Processes
- Conducted an audit of NOPD Code 2 Response Times and GOA designations, and partnered with PSAB to conduct a deeper dive into NOPD's GOA data
- Attended weekly MAX meetings
- Attended monthly Use of Force Review Board (UFRB) hearings
- Provided a presentation to the Court on the Monitoring Team's Review of PIB Administrative Processes and NOPD's Investigation into Officer Vappie
- Hosted multiple public meetings to explain our public reports and gain the community's perspective
- Met weekly with the NOPD PSAB to review compliance



## WHAT WE FOUND

- Steady improvement with performance evaluations, although there still is significant room for progress;

- Additional investigation and supplemental documentation is needed for Special Victim Division open cases, and the unit would benefit greatly from additional personnel to reduce caseloads and improve follow-ups;

- A troublingly high number of Gone On Arrivals (GOAs) often caused by inadequate officers available;

- A concerning number of significant investigative deficiencies related to PIB professionalism investigations; and

- A number of concerns related to effective supervision (as reflected in a targeted review of the four officers with the highest number of complaints against them).

## NEXT QUARTER FORECAST

- Audit Insight (the Early Warning System);

- Finalize review of Use of Force Review Board cases and timeliness of hearings;

- Compare robustness of 2022 UFRB hearings to 2023 hearings;

- Finalize the Monitoring Team/Independent Police Monitor spot check of active pointings;

- Review past and attend future Disciplinary Hearings;

- Continue to attend weekly MAX meetings and monthly UFRB hearings;

- Work with the City to commence the required Biennial survey;

- Present at hearings as ordered by Judge Morgan; and

- Hold public meetings and meet with community stakeholders.



## I.    CONSENT DECREE AUTHORITY

"The Monitor shall file with the Court quarterly written, public reports covering the reporting period that shall include:

a) A description of the work conducted by the Monitoring Team during the reporting period;

b) A listing of each [Consent Decree] requirement indicating which requirements have been: (1) incorporated into implemented policy; (2) the subject of sufficient training for all relevant NOPD officers and employees; (3) reviewed or audited by the Monitoring Team in determining whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitoring Team to have been fully implemented in practice;

c) The methodology and specific findings for each audit or review conducted, redacted as necessary for privacy concerns.  An unredacted version shall be filed under seal with the Court and provided to the Parties.  The underlying data for each audit or review shall not be publicly available but shall be retained by the Monitoring Team and provided to either or both Parties upon request;

d) For any requirements that were reviewed or audited and found not to have been fully implemented in practice, the Monitor's recommendations regarding necessary steps to achieve compliance;

e) The methodology and specific findings for each outcome assessment conducted; and

f) A projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the [Consent Decree]."

**Consent Decree Paragraph 457**



## II.     NOTES

"The Monitor shall be subject to the supervision and orders of the [United States District Court for the Eastern District of Louisiana], consistent with [the Consent Decree].  The Monitoring Team shall only have the duties, responsibilities, and authority conferred by [the Consent Decree].  The Monitoring Team shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent."

**Consent Decree Paragraph 455**



## III.    TABLE OF CONTENTS

I.      CONSENT DECREE AUTHORITY ................................................................................ 4

II.     NOTES ................................................................................................................ 5

III.    TABLE OF CONTENTS ........................................................................................... 6

IV.     GLOSSARY OF ACRONYMS .................................................................................... 7

V.      INTRODUCTION TO QUARTERLY REPORT ............................................................... 9

VI.     SUMMARY OF SECOND QUARTER MONITORING ACTIVITIES ................................. 12

VII.    CONSENT DECREE REQUIREMENTS – COMPLIANCE STATUS .............................. 14

        A.    Policies                                                                    14

        B.    Training                                                                    14

   C.   Implementation ....................................................................................... 14

VIII. AUDITS, FINDINGS, AND RECOMMENDATIONS .................................................. 15

   A.  Performance Evaluations ......................................................................... 15

   B.   Policing Free of Gender Bias – Review of Special Victims Division Open Cases ........... 18

   C.   PIB Professionalism Investigations ............................................................ 19

   D.   Supervision – Insight and PIB Administrative Investigations ............................ 23

IX.     FUTURE PLANS: MONITORING ACTIVITIES FOR QUARTER THREE ........................ 27

X.      CONCLUSION ..................................................................................................... 28

XI.     APPENDIXES ..................................................................................................... 29

   A.    Appendix A:  Compliance Dashboard Tool (Current as of June 30, 2023) ................ 29



## IV.      GLOSSARY OF ACRONYMS

"ASU"          Administrative Services Unit
"AUSA"         Assistant United States Attorney
"AVL"          Automatic Vehicle Locator
"BWC"          Body Worn Cameras
"CIT"          Crisis Intervention Team
"CCMS"         Criminal Case Management System
"CD"           Consent Decree
"CIT"          Crisis Intervention Team
"CODIS"        Combined DNA Index System
"ComStat"      Computer Statistics
"COCO"         Community Coordinating [sergeants]
"CPI"          California Psychological Inventory
"CSC"          Civil Service Commission
"CUC"          Citizens United for Change
"DA"           District Attorney
"DI-1"         Disciplinary Investigation Form
"DOJ"          Department of Justice
"DV"           Domestic Violence
"DVU"          Domestic Violence Unit
"ECW"          Electronic Control Weapon
"EPIC"         Ethical Policing is Courageous (NOPD peer intervention program)
"EWS"          Early Warning System
"FBI"          Federal Bureau of Investigation
"FIT"          Force Investigation Team
"FOB"          Field Operations Bureau
"FTO"          Field Training Officer
"IACP"         International Association of Chiefs of Police
"ICO"          Integrity Control Officers
"IPM"          Independent Police Monitor
"KSA"          Knowledge, Skill and Ability
"LEP"          Limited English Proficiency
"LGBT"         Lesbian, Gay, Bi-sexual, and Transgender
"MMPT"         Minnesota Multiphasic Personality Inventory



| "MOU" | Memorandum of Understanding |
|---|---|
| "NNDDA" | National Narcotics Detection Dog Association |
| "NOFJC" | New Orleans Family Justice Center |
| "NOPD" | New Orleans Police Department |
| "NPCA" | National Police Canine Association |
| "OCDM" | Office of Consent Decree Monitor |
| "OIG" | Office of Inspector General |
| "OPSE" | Office of Public Secondary Employment |
| "PIB" | Public Integrity Bureau |
| "POST" | Police Officer Standards Training Counsel |
| "PsyQ" | Psychological History Questionnaire |
| "QOL" | Quality of Life [officers] |
| "RFP" | Request for Proposal |
| "SA" | Sexual Assault |
| "SART" | Sexual Assault Response Team |
| "SOD" | Special Operations Division |
| "SFL" | Supervisor Feedback Log |
| "SRC" | Survey Research Center |
| "SUNO" | Southern University of New Orleans |
| "SVS" | Special Victims Section |
| "UNO" | University of New Orleans |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |
| "VAW" | Violence Against Women |



## V.      INTRODUCTION TO QUARTERLY REPORT

The second quarter of 2023 was another mixed bag for the NOPD. On one hand, the Department continues to make progress in meeting the Consent Decree's requirements. Over the last few months, several additional paragraphs have been moved "into the green," which indicates the Monitoring Team's ability to spend less time auditing and reviewing those elements. Also, NOPD's Professional Standards and Accountability Bureau ("PSAB"), the U.S. DOJ, and the Monitoring Team continue to have constructive weekly meetings to ensure everyone is on the same page regarding what has been done and what is left to do.

At the same time, NOPD continues to struggle in some areas. The Monitoring Team's recent report on PIB's investigation of a member of the Mayor's executive protection detail, for example, identified nine material violations of the Consent Decree by NOPD. Making matters worse, when presented with these violations, the NOPD (i) refused to acknowledge them, (ii) refused to engage in meaningful dialogue to remedy them, and (iii) represented that it intended to continue violating some of them. This certainly is not the response one would expect from a Department claiming to be fully committed to Consent Decree compliance, nor is it consistent with the high level of cooperation that used to be characteristic of the NOPD's approach to working with the Monitoring Team.

In early July 2023, the NOPD announced it had opened new misconduct investigations into another eleven officers who appeared to be "double dipping" – that is, charging the NOPD and their secondary employment customers for the same time. This is the same conduct that brought 11 different officers under criminal investigation in 2022. At the same time, NOPD admitted that the system implemented to remedy the problem in 2022 is not working as intended.

In the area of patrol responses to calls for service, the Monitoring Team conducted a joint audit with NOPD's PSAB that produced troubling findings. While this will be the subject of a forthcoming Special Report, the Monitoring Team's audit showed that 80% of calls for service involving domestic violence were deprioritized (*i.e.*, moved from a Code 2 emergency priority to a Code 1 non-emergency priority) by NOPD supervisors from January 2022 – November 2022, causing NOPD to underreport its response times on Code 2 calls. Moreover, of these deprioritizations, the Monitoring Team identified 75% as unreasonable.[1]

---

[1]      PSAB reviewed the same deprioritized cases as the Monitoring Team and found 32% unreasonable. The reasons for the delta will be spelled out in the forthcoming report. Suffice it here to say, however, that whether the number is 75% (as the Monitoring Team found) or 32% (as PSAB found), PSAB and the Monitoring Team agree the number is too high.



The joint PSAB/Monitoring Team audit also looked at the high (and increasing) number of GOAs ("gone on arrivals") in domestic violence and rape calls. This is not a new issue. The City Council's data analyst Jeff Asher identified the problem last year, finding that 40% of all rape calls were downgraded from a Code 2 to a Code 1, and that 40% of those were marked GOA by the responding officers. The recent joint PSAB/Monitoring Team audit (conducted between February – July 2023) revealed similarly troubling findings. The Monitoring Team found that NOPD supervisors deprioritized DV calls 80% of the time, and that they downgraded rape calls 77% of the time. (It seems most deprioritizations were due to the unavailable of officers to respond in a timely fashion.)

While already the subject of a Special Report issued on July 7, 2023, our reviews of the NOPD Sexual Violence Division (SVD) continues to turn up problems – not with the SVD detectives or the quality of their investigations, but with the resources made available by the City to those detectives. Far and away, NOPD's SVD detectives are committed, hard-working, compassionate, empathetic individuals. However, as shown in our Special Report, the Department is putting way too much on their plates. Their caseloads have become unmanageable and unsustainable. NOPD reports SVD caseloads can be as high as 64 per detective. The New Orleans Sexual Violence Response Advisory Committee has reported officers can have caseloads up to 89 per detective.

With caseloads this high, investigations inevitably suffer. Our recent audit found inadequate follow-up by SVD detectives in 25% of the cases we reviewed. NOPD does not disagree there is a significant problem here. As NOPD noted in response to the Monitoring Team's Special Report, "SVD detectives /supervisors are unfortunately placed in a position where they must constantly triage cases. It's impossible to conduct thorough, victim-centered, aggressive, and complete investigations with a closed disposition for every single case assigned to them without the proper manpower/caseload ratio."

We also have noted a number of issues recently that give us concern in the area of Use of Force (CD Section III). While the data continue to show low numbers in terms of firearms discharges and uses of force generally, the Monitoring Team is seeing signs of backsliding in a number of UOF-related areas. These signs include a less robust Use of Force Review Board; a failure by the current UFRB leadership to ask hard questions and consider broad implications of the matters before them; a reduced willingness by the UFRB to consider comments and recommendations by the Monitoring Team and the Independent Monitor; shortcomings in some PIB FIT UOF investigations, including several involving neck holds; an increased willingness by the NOPD disciplinary committee to reverse PIB sustained findings; and an increase in unauthorized vehicle pursuits and an accompanying inability to track them efficiently and effectively.



Taken together, these issues raise red flags for the Monitoring Team, as they should for the public and the NOPD. It's unclear what is driving this trend. But it occurs against a backdrop of statements and actions by the Mayor, the City, and the Superintendent that signal a change in attitude and policy toward Consent Decree compliance and cooperation with the Monitoring Team. These include, multiple comments by the Mayor that NOPD officers should not "be handcuffed when they know how to police and they know how to effectively do their job," and that "the consent decree handcuffs officers by making their jobs harder, pestering them with punitive punishment and burying them with paperwork that is an overburden" (Press Conference statements from August 2022); the City's disregard of Consent Decree requirements applicable to the Vappie investigation; the City's refusal to disclose to the Monitoring Team the recommendations by Consulting Chief of Operations Fausto Pichardo; the Mayor's and Superintendent's decision to no longer permit City or NOPD employees to report to the Court concerning their progress implementing the Consent Decree; and the City's motion to terminate the Consent Decree.

These actions suggest the City believes it must choose between crime fighting and Consent Decree compliance. That is a false choice, and an unacceptable one. The data show little correlation between complying with the Consent Decree and crime fighting. In fact, from 2016 through 2020, right in the middle of the NOPD Consent Decree, New Orleans experienced a steady decline in murders.

The Consent Decree is a court order, to which the City consented, entered to ensure constitutional policing in New Orleans.  The City made its greatest progress toward Consent Decree compliance, while experiencing a reduction in crime, when it cooperated with the Monitoring Team and DOJ as partners in achieving a shared goal of constitutional, safe, and effective policing.

Notwithstanding these concerns and the hurdles facing the NOPD because of its ongoing recruitment and retention problems, there still is reason for optimism. The members of NOPD's PSAB unit continue to work tirelessly to audit compliance, identify areas needing improvement, devise creative and meaningful corrective actions, and look for ways to replicate things that are going well. PSAB drafts well-crafted policies, supports other bureaus' efforts to draft actionable Standard Operating Procedures, and provides meaningful input to the Academy's training program. And we would be remiss if we did not recognize the contributions of NOPD's officers and supervisors, most of whom work tirelessly under trying circumstances to provide the level of Constitutional policing the New Orleans community has come to expect from the NOPD.



## VI.    SUMMARY OF SECOND QUARTER MONITORING ACTIVITIES

The Monitoring Team spent significant time during the period covered by this Quarterly
Report (April 2023 – June 2023) reviewing, auditing, and evaluating multiple areas of
Consent Decree compliance.  Among other things, the Monitoring Team:

- Participated in regular meetings with the parties to review compliance status
  and NOPD's path to full and sustained compliance (April-June 2023).

- Reviewed open cases of the Special Victims Division (SVD) (April 2023).

- Conducted an audit of NOPD Code 2 Response Times and GOA designations,
  and partnered with PSAB to conduct a deeper dive into NOPD's GOA data
  (Feb. 2023 – July 2023).

- Published First Quarter Report for 2023 (May 2023).

- Reviewed PSAB's Audit of 2022 Annual Performance Evaluations (May 2023).

- Published Special Report on PIB (June 2023).

- Published Special Report on PIB's Investigation of Officer Jeffrey Vappie
  (June 2023).

- Finalized and Published Special Report on Sexual Violence Investigations
  (June 2023).

- Audited PIB Professionalism Investigations (June 2023).

- Audited Effective Supervision (through Insight) (June 2023).

- Provided a presentation to the Court on the Monitoring Team's Review of PIB
  Administrative Processes and NOPD's Investigation into Officer Vappie (June
  2023).

- Hosted multiple public meetings to explain our public reports and gain the
  community's perspective (June 2023).

- Attended MAX meetings (weekly).

- Attended Use of Force Review Board (UFRB) hearings (April -  June 2023).



- Per CD paragraph 461, met with community stakeholders, including community members, victims' rights advocates, business leaders, and officers to hear their perspectives on NOPD's reform efforts.

\*       \*       \*

As we have done since our appointment, the Monitoring Team also spent significant time meeting with, and listening to, the parties to the Consent Decree.  The Monitoring Team is in regular contact with the City, the NOPD, and the DOJ. We also continue to meet regularly with the NOPD PSAB, the PIB, the NOLA IG, the Independent Police Monitor, and various community advocacy groups.



## VII.    CONSENT DECREE REQUIREMENTS – COMPLIANCE STATUS

### A.    Policies

The NOPD has developed and published its policies covering and implementing all areas of the Consent Decree. The policies are publicly available on the NOPD's website. The NOPD continues to develop and issue new policies as necessary and appropriate. The Monitoring Team reviews and provides feedback on each policy. Currently, the Department is finalizing policies to govern cell phone usage, the ISB Executive Protection Unit, Alternative Police Response (APR), and PIB investigations of high-ranking NOPD command staff; and standard operating procedures governing APR, DA Refusals; and FOB Inspections.

### B.    Training

The Department provides training (both in the Academy for new recruits and annual in-service training for officers) as required by the Consent Decree. The Department's master training plan is available on the NOPD website. The Monitoring Team continues to monitor training to ensure it is sufficient to meet the needs of NOPD officers and community members, and the requirements of the Consent Decree. PSAB currently is conducting a full audit of the Academy, which has never been done before. The Monitoring Team will conduct a "look-behind" of the PSAB Academy audit once it is complete.

### C.    Implementation

To help NOPD manage implementing the Consent Decree's requirements and tracking compliance status, the Monitoring Team developed and has provided the parties an Excel spreadsheet that (a) tracks the compliance status of each Consent Decree paragraph; (b) notes the next steps needed for NOPD to come into compliance; and (c) provides a place for NOPD to state when it expects to accomplish the task (although, to date, NOPD has not provided this information). A high-level version of this Excel spreadsheet is provided at the end of this Report as **Appendix A**.

The spreadsheet is a valuable compliance management tool, but it is important to understand that it is a tool for the parties' and Monitoring Team's use only. It does not reflect a finding by the Court. Moreover, it is a living document that reflects the Monitoring Team's assessment of NOPD's compliance at a point in time. Paragraphs can—and do—move into and out of compliance. Ultimately, regardless of the recommendations reflected in the Tracker, whether NOPD has satisfied the terms of the Consent Decree is a legal determination that will be made by Judge Morgan.



## VIII.    AUDITS, FINDINGS, AND RECOMMENDATIONS

During the second quarter of 2023 ("Q2"), in addition to its regular monitoring activities, the Monitoring Team conducted multiple audits, reviews, and spot-checks directed by the District Court. The following sections provide an overview of each audit, including a summary of the methodology, key findings, and any associated recommendations.

### A.    Performance Evaluations

In March 2023, PSAB conducted an audit of the Department's 2022 performance evaluations. During its audit, PSAB reviewed 381 randomly selected performance evaluations. Overall, PSAB's audit reflected similar results of prior PSAB and Monitoring Team audits. For example, PSAB found NOPD supervisors needed to improve their evaluations of report writing, decision-making, safety, community engagement/problem solving, supervisors use of Insight, and supervisors' use of recordings to evaluate officer performance. PSAB also found some areas that achieved 100% (or near 100%) levels of compliance

In May 2023, the Monitoring Team randomly selected 62 of the Department's 2022 performance evaluations to conduct a look behind of PSAB's 2022 performance evaluation audit. Of the 62 evaluations chosen by the Monitoring Team, 25 previously were audited by PSAB. Of the 37 evaluations not audited by PSAB, two evaluations had not been completed (and were counted as non-compliant for purposes of the review). The purpose of the Monitoring Team's look behind was (1) to verify the PSAB findings for the performance evaluations PSAB audited; and (2) to compare the evaluations that were audited by the Monitoring Team but *not* audited by PSAB to PSAB's audit findings.

Overall, when reviewing the 25 evaluations that also were reviewed by PSAB, the Monitoring Team agreed with the majority of PSAB's findings *except* in Sections 4 (community engagement and problem solving), 8 (quarterly reviews and areas of growth), and 10 (how well supervisors completed supervisory activities). Although PSAB found low levels of compliance with Sections 4 (44% compliance) and 8 (49% compliance), the Monitoring Team found *even lower* levels of compliance. In particular, out of the 25 evaluations the Monitoring Team reviewed, in Section 4(b), the Monitoring Team agreed with only 16 (or 64%) of the evaluations. In Section 8b, the Monitoring Team agreed with only 9 (or 36%) of the evaluations.

Additionally, PSAB found high levels of compliance in Section 10 (which is applicable only to supervisors), while the Monitoring Team found lower levels of compliance. For example:

Page 16 of 29
August 15, 2023
www.consentdecreemonitor.com



| Section | PSAB Compliance Assessment (%) | % with which Monitor Agreed with PSAB |
|---|---|---|
| 10.1 (Described how employee deterred and/or addressed misconduct) | 97% | 67% |
| 10.2 (Conducted regular reviews of Insight) | 98% | 75% |
| 10.3 (Addressed all non-compliance as distributed by ARU) | 100% | 89% |
| 10.4 (Ability and effectiveness conducting supervisory reviews) | 98% | 56% |

For the 37 evaluations reviewed by the Monitoring Team (but not previously reviewed by PSAB during the 2022 PSAB audit), the Monitoring Team generally found a range of compliance with especially low levels of compliance in some areas (again, particularly for Sections 4, 8 and 10). The Monitoring Team's findings are summarized in the following table:

| Section/Question | Monitor's Compliance Assessment (%) |
|---|---|
| 1 – Reporting skills | 86% |
| 2 – Decision making | 92% |
| 3 – Safety employed | 84% |
| 4a – Community engagement | 68% |
| 4b – Problem solving | 35% |
| 5a – Insight verification (attendance) | 92% |
| 5b - Insight verification | 95% |
| 5c - Insight verification | 95% |



| Section/Question | Monitor's Compliance Assessment (%) |
|---|---|
| 5d - Insight verification (citizen complaints) | 89% |
| 5e - Insight verification (rank complaints) | 89% |
| 5f - Insight verification (discipline) | 92% |
| 5g - Insight verification | 95% |
| 5h - Insight verification (commendations) | 92% |
| 6 – Search warrant log verification | 95% |
| 7 – Stops, pat-downs, or arrests verification | 92% |
| 8a – Quarterly reviews | 32% |
| 8b – Areas of growth | 24% |
| 9 – Bilingual pay verification | 95% |
| 10.1 - Described how employee deterred and/or addressed misconduct | 75% |
| 10.2a - Conducted regular reviews of Insight | 58% |
| 10.2b - Number of late reviews | 67% |
| 10.2c - Patterns identified | 67% |
| 10.2d - Non-disciplinary corrective action taken | 50% |
| 10.3 - Addressed all non-compliance as distributed by ARU | 58% |
| 10.4 - Ability and effectiveness conducting supervisory reviews | 67% |



Although NOPD's performance evaluations have steadily improved, the Department still has more work to do.[2]

To accelerate progress in this area, NOPD's PSAB reports that it has begun requiring supervisors to prepare supplemental documentation in their quarterly reviews to ensure they have sufficient materials to reference when it comes time to complete the annual reviews. Further, PSAB now is requiring supervisors at the rank of lieutenants and above to put a note in the Department's SFL system documenting how their subordinate supervisors performed on the prior year's evaluations, which will help them measure trends over time. The Monitoring Team applauds NOPD for these initiatives and looks forward to seeing positive results therefrom.

### B.    Policing Free of Gender Bias – Review of Special Victims Division Open Cases

In response to concerns from local victim advocates regarding insufficient case follow up in the NOPD's Special Victims Division, the Monitoring Team conducted a review of SVD open cases. At the time of our review, there were 728 "open and unsolved" cases from January 2022 – March 2023. The Monitoring Team randomly selected 80 cases (just over 10%) to review. The purpose of the review was to determine whether the cases were being satisfactorily investigated and documented after the initial investigation, which normally occurs on the scene or during the initial report of the crime.

Overall, we found 20 of the 80 cases (25%) were in need of some additional investigation and/or supplemental documentation. Several of the case deficiencies noted require a supplement indicating whether there was anything remaining to investigate. It is possible those cases should be moved into "Open and Inactive" status. Other cases were simply left open – leaving the Monitoring Team unable to determine the next steps of the investigation, or whether anyone actively was working on the case. Notably, in prior audits, the Monitoring Team found that there often has been follow-up in cases that had not yet been documented in the case files. Following the audit, the Monitoring Team sent our case comments to SVD leadership for their comments, explanations, or supplements.[3]

---

[2]    The Monitoring Team recognizes that getting supervisors to complete thorough and thoughtful performance evaluations is tough in any profession. Nonetheless, since performance evaluations will continue to determine the future of the Department, until a better approach comes along, it's important that NOPD keep trying to improve its results in this area.

[3]    NOPD has explained that, of the 20 cases the Monitoring Team identified as in need of additional investigation, 11 belonged to one detective. According to NOPD, "this detective had shown signs of (and later expressed) burnout by calling in sick monthly and declining in productivity. Counseling, mentoring, and eventually progressive discipline were implemented (SFL) but to no avail. That detective was recently



The results of our review suggest that additional personnel, whether sworn detectives or Social Service Workers, would aid in completing required follow-ups and providing documentation that would verify the results of a continuing and thorough investigation in all assigned cases.[4]

### C. PIB Professionalism Investigations

In June 2023, the Monitoring Team conducted a comprehensive review of PIB's investigative case files. Our objective was to assess the quality, effectiveness, and adherence to PIB's established protocols in the investigation of professional misconduct allegations against NOPD officers. To conduct the review, the Monitoring Team randomly selected a sample of 79 complaints (about 10% of the total number) of employee misconduct related to professionalism received by PIB between January 1, 2020 and December 31, 2022. The review involved a detailed examination of the sample of PIB investigative case files, including the documentation, evidence collection, interviews, analysis, and final determinations.

The following chart summarizes the Monitoring Team's findings:

| Final Disposition | # of Cases Reviewed | # of Cases w/ Minor Deficiencies | # of Cases w/ Major Deficiencies |
|---|---|---|---|
| Exonerated | 10 | 3 (30%) | 2 (20%) |

---

transferred out of the unit (with no replacement). The detective's caseload must now be reassigned out to other detectives and investigators; this is the trend. All 20 cases have since been reassigned and/or corrected with the appropriate follow-up action." This is a helpful explanation that puts some of Monitoring Team's findings in context. The explanation, however, also drives home the Monitoring Team's comments at the conclusion of its June Special Report on SVD Investigations that "Working sexual assault cases is no easy task. It is physically and emotionally draining. Low staffing and high caseloads not only impact the quality of investigations, they increase the risk of burnout among detectives."

[4]     These matters were discussed in greater detail in the Monitoring Team's July 7, 2023 Special Report on NOPD Sexual Assault Investigations. In that report, we noted "To NOPD's credit, it is not running away from the concerns identified in this Report. The Department responded to a draft of this report (which we are required to share with the Parties before filing per the terms of the Consent Decree) with a very thoughtful letter written by Lieutenant Sheila Celious of the Special Victims Division detailing NOPD's agreement with many of the Monitoring Team's findings, raising some useful clarifications with respect to others, and sharing elements of the Department's remedial action plan. The Monitoring Team has enjoyed a very constructive working relationship with Lt. Celious over the years, continues to be impressed by her commitment to improving the Special Victims Division, and thanks her for her constructive input. Many of her comments have been incorporated into the final draft of this Special Report."



| Final Disposition | # of Cases Reviewed | # of Cases w/ Minor Deficiencies | # of Cases w/ Major Deficiencies |
|---|---|---|---|
| Not Sustained | 12 | 0 (0%) | 4 (33%) |
| Pending | 9 | 1 (11%) | 2 (22%) |
| Sustained | 10 | 1 (10%) | 6 (60%) |
| Unfounded/NFIM | 24 | 1 (4%) | 0 (0%) |
| Mediation | 8 | 0 (0%) | 2 (25%) |

As a result of the review and findings, the Monitoring Team made several observations and associated recommendations:

1.  **Mediation Policy.** The mediation program serves as an effective tool for resolving conflicts between citizens and law enforcement. However, under the current Mediation Policy, the investigation is automatically closed when citizens do not attend scheduled mediations. This policy has the potential to leave serious misconduct complaints uninvestigated. NOPD should review and consider updating the Mediation Policy to close this loophole and to ensure accountability.

2.  **Focus of Investigations.** The Monitoring Team observed multiple instances where the wrong policy violation was investigated. For instance, an allegation of sexual harassment and two clear use of force incidents were both inappropriately investigated as matters of professionalism.[5] To ensure fair and accurate outcomes, NOPD should enhance education and training; clarify investigative guidelines; promote collaboration/consultation; enhance the quality assurance (QA) process; analyze data to identify misclassifications; and establish or clarify reporting and documentation procedures.

3.  **Investigative Curiosity**. To ensure comprehensive and effective investigations, it is essential for investigators to demonstrate a proactive approach and a willingness to explore beyond the information provided in

---

[5]      Similarly, the PIB investigation into allegations against Officer Jeffrey Vappie was investigated primarily as a 16.48 hours violation although the complaint equally alleged payroll fraud.



the complaint intake form. NOPD should consider providing training on enhanced interviewing techniques; foster inter-departmental collaboration; provide regular case review and feedback; and enhance supervisory support and guidance.

4. **Investigative Effort**. The Monitoring Team observed instances where potentially relevant evidence was not examined due to the requirement of physically going to a different location to review an archived case file. This lack of access to crucial information hindered the thoroughness of the investigation. NOPD should consider digitizing archived case files to improve access; implementing a centralize digital repository; using remote access technology; streamlining the archived case file request process; encouraging collaboration and knowledge sharing; offering continuous training and professional development.

5. **Credibility Assessments.** The Monitoring Team observed instances where credibility assessments were either absent or appeared to lack objectivity. It is important to ensure that credibility assessments are conducted objectively and consistently to maintain the integrity of the investigative process. To correct this, NOPD should consider establishing/enhancing clear guidelines; implementing structured interview techniques; documenting credibility assessments; encouraging collaboration and peer review; establishing an independent review mechanism; establishing a QA process; and providing ongoing training and professional development.

6. **File Organization.** The Monitoring Team observed that many files contained excessive and often duplicative information, which can hinder the investigative process and create unnecessary inefficiencies. To correct this, NOPD should consider developing templates; ensuring sections are clearly labeled and organized; establishing a file naming convention; implementing a QA process; and providing training on effective case file organization.

7. **Use of Supervisory Feedback Logs (SFLs).** The Monitoring Team observed that some professionalism complaints could have been addressed through an SFL, rather than going through a formal investigative process. To address this NOPD should consider instituting a re-energized awareness campaign regarding the purpose and use of SFLs.

8. **Lack of BWC Footage**. When there is a lack of additional information, such as BWC footage, and conflicting accounts of an incident between a citizen and an officer, it often leads to a Not Sustained outcome. This means that without



sufficient evidence to substantiate or refute the allegations, it becomes challenging to reach a conclusive determination regarding the incident, and the investigation may result in an improper Not Sustained finding. To address this NOPD should consider mandating BWC usage for all officers and assignments (including those working off-duty assignments), providing training on proper evidence collection and interview techniques; and implementing standardized documentation.

9. **Acceptance of Unprofessional Behavior**. The Monitoring Team observed a concerning pattern where numerous officers were found to use profanity toward citizens, which was corroborated by reviewing BWC footage. The use of offensive language by officers toward citizens is a serious issue that undermines professionalism and can negatively impact community trust in the police. Although the officers are counseled when they use offensive language, this pattern of behavior demonstrates a need for further corrective action and additional training.[6]

Proper investigation of professional conduct complaints is important and is directly related to Consent Decree section V[7] and VI[8]; and Consent Decree paragraphs 181[9] and 185,[10] among many others. The percentage of major investigative deficiencies for several of the case types is concerning. The Monitoring Team encourages NOPD to review and implement the recommendations above.

---

[6]    The Monitoring Team is not naïve. We recognize, due to the pressures of the job and the frequency of high-stress and dangerous encounters, some officers may use language they regret later. Such language does not necessarily make an officer a bad officer, a problem officer, or even one necessarily deserving of discipline (depending on the nature and extent of the language, of course). But the Consent Decree is clear about the respect officers must show to everyone they encounter. Moreover, as a purely tactical matter, it is worth noting that profanity by officers has been tied to increased excessive force complaints. In one study, community members against whom force was used were more likely to report the force as excessive if it was accompanied by officer profanity. The matter was put succinctly by a student with whom the Monitoring Team met toward the beginning of the Consent Decree. He said, "if I'm doing something wrong, arrest me. But don't disrespect me in the process." Well said.

[7]    Section V of the Consent Decree requires searches, seizures, and arrests to be "carried out with fairness and respect."

[8]    Section VI of the Consent Decree requires that custodial interrogations are "conducted professionally."

[9]    Section 181 of the Consent Decree requires officers to act "with professionalism and courtesy throughout the interaction regardless of any provocation."

[10]    Section 185 of the Consent Decree requires officers to "treat LGBT individuals with courtesy, professionalism, and respect…."



### D.      Supervision – Insight and PIB Administrative Investigations

Prior Monitoring Team audits have focused separately on each of the following areas of the Consent Decree: PIB administrative investigations, use of force, discipline, performance evaluations, the early warning system (Insight), and supervision. But, determining whether officers are being supervised closely and effectively requires a review across multiple sections of the Consent Decree. Accordingly, this review was designed to take a more holistic approach to reviewing close and effective supervision by focusing our review on a limited number of officers (across multiple areas) to determine how their supervisors use Insight to address officer misconduct, take corrective action, and evaluate each officer's progress.

To accomplish this, the Monitoring Team reviewed Insight/IAPro data and PIB records related to the four NOPD officers[11] with the greatest number of complaints (from 2015-present):[12]

---

[11]      As indicated in the chart below, two of the NOPD officers included in the review are Sergeants. For ease, we do not distinguish between officers and Sergeants in the discussion that follows.

[12]      Though the officers' names are not provided in this public report, they have been shared with NOPD.

Page 24 of 29
August 15, 2023
www.consentdecreemonitor.com



| NOPD Officer: | Public-Initiated Complaints (2015-Present): | Rank-Initiated Complaints (2015-Present): | Total: |
|---|---|---|---|
| Officer A (Sgt.) | 28 | 7 | 35 |
| Officer B | 18 | 15 | 33 |
| Officer C (Sgt.) | 26 | 5 | 31 |
| Officer D | 22 | 7 | 29 |

We undertook this review (and focused on the four officers with the highest number of complaints) because, if Insight is being used properly, one would expect to see not only multiple flags being raised about these officers, but also meaningful actions being taken by their supervisors. The Monitoring Team reviewed the four officers' Insight information including complaints (both citizen and rank-initiated), sustained complaints, discipline, use of force incidents, non-disciplinary corrective action (supervisor feedback log data on counseling and redirection), alerts, quarterly reviews, and ultimately performance evaluations. This review related to Consent Decree paragraphs 289, 299, 301, 306, 312, 313, 316, 317, 319, 325, and 403.

Overall, related to effective supervision, the Monitoring Team found:

- The Monitoring Team found 85 Insight alerts concerning the four officers / supervisors we reviewed. *Of those 85 alerts, 27 (32%) received no response from any supervisor.* Of the 21 various supervisors who received an alert, only three supervisors noted a pattern of problematic behavior. Moreover, only one supervisor took progressive actions for four quarters until the officer was removed from street duty.

- When reviewing the four officers' quarterly reviews over 60 quarters, the Monitoring Team found

  o  44 quarterly reviews (73%) had no documentation regarding officer performance challenges and areas of growth.

  o  3 quarterly reviews (5%) listed some problematic behavior but failed to list any actions taken.

  o  9 quarterly reviews (15%) stated there were no problems with the officer's performance.

  o  Only 4 quarterly reviews (7%) properly listed challenges and areas of growth," identified a pattern, and demonstrated progressive actions



to address poor officer behavior/performance. All four properly documented reviews were completed by the same sergeant.

- Many supervisors regularly completed performance evaluations rating subordinates as "meeting expectations" (3 of 5), "exceeds expectations" (4 of 5), and "exceptional" (5 of 5). In addition to the large number of complaints, the same officers/sergeants had multiple sustained complaints, multiple use of force incidents exceeding their peer groups (Insight alerts), and multiple non-disciplinary corrective actions with many of them involving serious offenses. Failure to address these behaviors in quarterly reviews added to the deficiencies we often noted in their performance evaluations.

The nature of policing requires close and effective supervision, which is why the Consent Decree requires it. When you give a large number of people guns and badges, the community expects they will be well trained *and well supervised.* One of the key tools available to supervisors to achieve close and effective supervision is the Insight early warning system. Unfortunately, NOPD's Insight system still has unfixed technical flaws, and supervisors still are not well versed in using the system and the wealth of information the system can generate.

NOPD recognizes more work is needed to ensure supervisors are using – and getting the benefits of – Insight. Accordingly, NOPD is pursuing a number of remedial measures that show promise. First, the Department reports it is working closely with the Insight vendor to explore a number of technological fixes. Second, the Department is working to enhance its performance evaluation process in a number of ways, several of which are expected to improve NOPD's Insight scores as well. Third, NOPD is actively reviewing outstanding quarterly reviews and following up on delinquent supervisors. Done regularly this will assist the Department address several of the issues identified by the Monitoring Team. Fourth, NOPD's PSAB has begun sharing specific audit findings with supervisors so they can see exactly how they stack up against their peers. NOPD is hopeful this level of internal transparency will help incentivize supervisors to pay more attention to this important element of management (and Consent Decree compliance).

In the meantime, other tools are available to NOPD supervisors to facilitate close and effective supervision. Supervisors have access to their Supervisor Feedback Logs (SFLs), which afford them, in appropriate cases, a simple way to recognize officer achievements and record officer mistakes without going down the PIB discipline route. Supervisors also now have policies, Standard Operating Procedures, and training that previously were unavailable. Their technology also has improved, including in-case recording equipment, body worn cameras (BWC), better translation devices, and much more. Leveraging this technology, like leveraging Insight itself, will go a long way in helping



officers meet their Consent Decree obligations, and provide close and effective supervision to all under their command.



## IX.  FUTURE PLANS: MONITORING ACTIVITIES FOR QUARTER THREE

During the third quarter of 2023, in addition to our regular monitoring activities, the Monitoring Team plans to:

- Conduct a spot check of Custodial Interrogations & Photo Line Up to ensure the improvement we saw law quarter has been sustained;

- Audit Insight (the Early Warning System);

- Finalize review of Use of Force Review Board cases and timeliness of hearings;

- Finalize the Monitoring Team/Independent Police Monitor spot check of active firearm pointings;

- Review past and attend future Disciplinary Hearings;

- Finalize and publish Special Report on GOAs and NOPD Response Times;

- Continue to attend weekly MAX meetings and monthly UFRB hearings;

- Work with the City to commence the required Biennial survey (CD ¶¶ 230-233);

- Present at hearings and status conferences as ordered by Judge Morgan, including a hearing focusing on the Monitoring Team's Special Report on Sexual Assault Investigations; and

- Hold public meetings and meet with community stakeholders.

We will report on these activities, including any findings and associated recommendations, in our third quarterly report.



X.      **CONCLUSION**

As the Monitoring Team noted in the Q1 Report, NOPD continues to progress toward compliance. Ultimately, the NOPD must meet all the material requirements of the Consent Decree. NOPD's progress has been hindered recently by some backsliding in some areas, but this does not negate the progress NOPD has made in others. As we have said at many public hearings, two things can be true. NOPD (and the community) should be proud of its achievements, *and* also frustrated with its ongoing shortcomings. Whether and when NOPD has met all its obligations under the Consent Decree sufficiently is a determination for the Court to make. The Monitoring Team's role simply is to monitor, provide technical assistance when requested, and report to the Court and the public on the status of NOPD compliance. We are hopeful the information reflected in this Quarterly Report helps NOPD meet its obligations and ensures the public has accurate information regarding NOPD's efforts in doing so.



## XI.    APPENDIXES

### A.    Appendix A:  Compliance Dashboard Tool (Current as of June 30, 2023)

The following is a snapshot of the Dashboard Tool, as of June 30, 2023 (the last day of Q2). NOPD has provided what it considers to be proof of compliance with several of the paragraphs marked as a "2" and the Monitoring Team currently is assessing the provided documentation. A current version of the Dashboard Tool is being used by NOPD and the Monitoring Team as a compliance tool, and an updated version will be provided in our next quarterly report.

INFORMATION CURRENT AS OF JUNE 30, 2023 -- THIS DOCUMENT IS INTENDED SIMPLY AS A TOOL/WORKING DOCUMENT.

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| **2. POLICIES** | | | | |
| **Policies & Training Generally** | 15 | Policy Development, Review, and Implementation | 1 | NOPD agrees to develop comprehensive and agency-wide policies and procedures that ensure consistency with, and full implementation of, this Agreement. Unless otherwise noted, NOPD agrees that all policies, procedures, and manuals shall be developed within 365 days of the Effective Date. |
| **Policies & Training Generally** | 16 | Policy Development, Review, and Implementation | 1 | NOPD agrees that its policies and procedures shall define terms clearly, comply with applicable law and the requirements of this Agreement, and comport with best practices. |
| **Policies & Training Generally** | 17 | Policy Development, Review, and Implementation | 2 | NOPD agrees to apply policies uniformly and hold officers accountable for complying with NOPD policies and procedures. |
| **Policies & Training Generally** | 18 | Policy Development, Review, and Implementation | 1 | NOPD agrees to review each policy or procedure 365 days after it is implemented and annually thereafter, to ensure that the policy or procedure provides effective direction to NOPD personnel and remains consistent with the Agreement, best practices, and current law. NOPD also agrees to review and revise policies and procedures as necessary upon notice of a significant policy deficiency during audits or reviews. NOPD agrees that Department-wide policies and procedures shall be collected in a Department-level policy and procedure manual, and unit-wide policies and procedures shall be collected in unit-level policy and procedure manuals. NOPD agrees to develop and implement policy and procedure manuals for, at a minimum, the following NOPD functions: a) Field operations, including patrol, task forces, and special operations: b) Supervisory Procedural Manual: c) PIB, including case and records management, administrative investigations, confidential investigations, parallel criminal and administrative investigations, audits, and officer drug testing: d) Use of Force Reporting, Investigation, and Review, including both Supervisory and FIT investigations: e) Criminal investigations, including sub-units assigned to investigate homicides, sexual assaults, domestic violence, narcotics, vice, and illegal firearms: and f) Recruitment and Training, including Academy and In-Service training. |
| **Policies & Training Generally** | 19 | Policy Development, Review, and Implementation | 1 | NOPD agrees that these manuals shall incorporate and otherwise be consistent with the requirements of this Agreement. |
| **Policies & Training Generally** | 20 | Policy Development, Review, and Implementation | 1 | Within 90 days of the Effective Date, NOPD shall set out a schedule for completing all policies, procedures, and manuals within 365 days of the Effective Date. |
| **Policies & Training Generally** | 21 | Policy Development, Review, and Implementation | 1 | NOPD agrees to submit new and revised policies, procedures, and manuals related to: Use, Reporting, and Review of Force: Crisis Intervention Team: Stops, Searches, and Arrests: Custodial Interrogations: Biased Policing: Community Engagement: Academy and In-service Training: Supervision: and Misconduct Investigations ("the specified provisions"), to the Monitor and DOJ for review and comment prior to publication and implementation. If the Monitor or DOJ objects that the proposed new or revised policy, procedure, or manual does not incorporate the requirements of this Agreement, or is inconsistent with this Agreement or the law, it shall note this objection in writing to all parties within 15 business days of the receipt of the policy from NOPD. If neither the Monitor nor DOJ objects to the new or revised policy, procedure, or manual, NOPD agrees to implement it within 30 days of it being provided to DOJ and the Monitor. |
| **Policies & Training Generally** | 22 | Policy Development, Review, and Implementation | 1 | NOPD shall have 15 days to resolve any objections to the new or revised policies, procedures, and manuals implementing the specified provisions. If, after this 15-day period has run, DOJ maintains its objection, then the Monitor shall have an additional 15 days to resolve the objection. If either party disagrees with the Monitor's resolution of the objection, either Party may ask the Court to resolve the matter. The Monitor shall determine whether in some instances an additional amount of time is necessary to ensure full and proper review of policies. Factors to consider in making this determination include: (1) complexity of the policy: (2) extent of disagreement regarding policy: (3) number of policies provided simultaneously: and (4) extraordinary circumstances delaying review by DOJ or the Monitor. In determining whether these factors warrant additional time for review, the Monitor shall fully consider the importance of prompt implementation of policies, and shall allow additional time for policy review only where it is clear that additional time is necessary to ensure full and proper review. Any extension to the above timelines by the Monitor shall also toll NOPD's deadline for policy completion. |
| **Policies & Training Generally** | 23 | Policy Development, Review, and Implementation | 1 | For all other new and revised policies, procedures, and manuals related to this Agreement, NOPD agrees to provide the policy, procedure, or manual to DOJ and the Monitor For all other new and revised policies, procedures, and manuals related to this Agreement, NOPD agrees to provide the policy, procedure, or manual to DOJ and the Monitor |
| **Policies & Training Generally** | 24 | Training on Revised Policies, Procedures, and Practices | 1 | Within 60 days of the Effective Date, NOPD agrees to provide an opportunity for each officer and employee to learn about this Agreement and the responsibilities of each officer and employee pursuant to it. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Policies & Training Generally | 25 | Training on Revised Policies, Procedures, and Practices | 2 | Within 90 days of issuing a policy or procedure pursuant to this Agreement, NOPD agrees to ensure that all relevant NOPD personnel have received and read their responsibilities pursuant to the policy or procedure, including the requirement that each officer or employee reports violations of policy: that supervisors of all ranks be held accountable for identifying and responding to policy or procedure violations by personnel under their command: and that personnel be held accountable for policy and procedure violations. NOPD agrees to document that each relevant NOPD officer or other employee has received and read the policy. Training beyond roll call, or similar training, will be necessary for many new policies to ensure officers understand and can perform their duties pursuant to the policy. |
| Policies & Training Generally | 26 | Training on Revised Policies, Procedures, and Practices | 2 | Unless otherwise noted, the training required pursuant to this Agreement shall be delivered within 365 days of the Effective Date, and annually thereafter. Within 180 days of the Effective Date, NOPD shall set out a schedule for delivering all training required by this Agreement within 365 days of the Effective Date. |
| 3. USE OF FORCE | | | | |
| Use of Force | 27 | Use of Force Principles | 1 | Use of force by NOPD officers, regardless of the type of force or weapon used, shall abide by the following requirements:<br>a) officers shall use advisements, warnings, and verbal persuasion, when possible, before resorting to force:<br>b) force shall be de-escalated immediately as resistance decreases:<br>c) when feasible based on the circumstances, officers will use disengagement: area containment: surveillance: waiting out a subject: summoning reinforcements: and/or calling in specialized units, in order to reduce the need for force and increase officer and civilian safety:<br>d) officers shall allow individuals time to submit to arrest before force is used wherever possible:<br>e) NOPD shall explicitly prohibit neck holds, except where lethal force is authorized:<br>f) NOPD shall explicitly prohibit head strikes with a hard object, except where lethal force is authorized:<br>g) NOPD shall explicitly prohibit using force against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons, or, as objectively reasonable, where physical removal is necessary to overcome passive resistance:<br>h) NOPD shall explicitly prohibit the use of force above unrested handcuffing to overcome passive resistance, except that physical removal is permitted as necessary and objectively reasonable:<br>i) unholstering a firearm and pointing it at a person constitutes a use of force, and shall accordingly be done only as objectively reasonable to accomplish a lawful police objective:<br>j) officers shall not use force to attempt to effect compliance with a command that is unlawful. Any use of force by an officer to subdue an individual resisting arrest or detention is unreasonable when the initial arrest or detention of the individual was unlawful:<br>k) immediately following a use of force, officers and, upon arrival, a supervisor shall inspect and observe subjects for injury or complaints of pain resulting from the use of force, and immediately obtain any necessary medical care. This may require an officer to provide emergency first aid until professional medical care providers are on scene. |
| Use of Force | 28 | General Use of Force Policy | 1 | NOPD agrees to develop and implement an overarching, agency-wide use of force policy that complies with applicable law and comports with best practices and current professional standards. The comprehensive use of force policy shall include all force techniques, technologies, and weapons, both lethal and less-lethal, that are available to NOPD officers, including standard-issue weapons that are made available to all officers, and weapons that are made available only to specialized units. The comprehensive use of force policy shall clearly define and describe each force option and the circumstances under which use of such force is appropriate. The general use of force policy will incorporate the use of force principles articulated above, and shall specify that the unreasonable use of force will subject officers to discipline, possible criminal prosecution, and/or civil liability. |
| Use of Force | 29 | General Use of Force Policy | 1 | In addition to a primary agency-wide use of force policy, NOPD agrees to develop and implement policies and protocols for each authorized force, including each of the types of force addressed below. No officer shall carry any weapon, or use force, that is not authorized by the Department. NOPD use of force policies shall include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon. |
| Use of Force | 30 | Vehicle Pursuits | 2 | NOPD agrees to prohibit vehicle pursuits, except where an officer obtains express supervisory approval, and the officer and supervisor have considered multiple factors and determined that the immediate danger to the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large. NOPD agrees to strictly prohibit the creation of roadblocks (i.e., completely blocking the roadway with vehicles or any obstructions, with the exception of approved devices designed to demobilize the pursued vehicle's movement) during a vehicle pursuit, intentionally positioning oneself in the path of the pursued vehicle, boxing in a violator with moving vehicles, and ramming a violator. |
| Use of Force | 31 | Vehicle Pursuits | 2 | NOPD agrees to track and analyze vehicle pursuits, including the violation that prompted the pursuit: the officer(s) involved in the pursuit: the supervisor approving the pursuit: the outcome of the pursuit: any officer, suspect, or bystander injuries or deaths: property damage: and related criminal or civil legal actions. This data and analysis shall be included in the EWS and in NOPD's Use of Force Annual report. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Use of Force | 32 | Use of Firearms | 1 | Officers shall not possess or use unauthorized firearms or ammunition while on-duty. |
| Use of Force | 33 | Use of Firearms | 1 | All officers' firearms shall be filled with the capacity number of rounds while on-duty. |
| Use of Force | 34 | Use of Firearms | 1 | Critical firearm discharges by officers on- or off-duty shall be reported and investigated. |
| Use of Force | 35 | Use of Firearms | 1 | Officers shall not discharge a firearm from a moving vehicle or at a moving vehicle unless the occupants of the vehicle are using deadly force, other than the vehicle itself, against the officer or another person, and such action is necessary for self defense or to protect the other person: shall not intentionally place themselves in the path of, or reach inside, a moving vehicle: and, where possible, shall attempt to move out of the path of a moving vehicle before discharging their weapon. |
| Use of Force | 36 | Use of Firearms | 2 | Officers shall not draw or exhibit a firearm unless the circumstances surrounding the incident create a reasonable belief that a situation may escalate to the point where lethal force would be authorized. NOPD policy and training shall require and teach proper techniques for unholstering, drawing, or exhibiting a firearm. |
| Use of Force | 37 | Use of Firearms | 1 | Officers shall be required at least once each year to successfully qualify with each firearm they are authorized to use or carry while on-duty. Officers who fail to qualify shall immediately relinquish NOPD issued firearms on which they failed to qualify. Those officers who still fail to qualify after remedial training within a reasonable time shall be subject to disciplinary action, up to and including termination of employment. Critical firearms discharge related data and analysis shall be tracked in the EWS and in NOPD's Use of Force Annual Report. |
| Use of Force | 38 | Use of Canines | 1 | DOJ acknowledges that NOPD has implemented an interim canine policy and has initiated significant improvements in its canine operations, including improvements in the quality and amount of training of canine teams, improvements in handler control of canines, personnel changes, and equipment procurement. Building on these steps, NOPD agrees to finalize and implement canine policies and procedures that comply with applicable law and the requirements of this Agreement, and that comport with best practices and current professional standards. |
| Use of Force | 39 | Use of Canines | 1 | Canine handlers shall limit off-leash canine deployments, searches, and other instances where there is an increased risk of a canine bite to a suspect to instances in which the suspect is wanted for a violent felony or is reasonably suspected to be armed based upon individualized information specific to the subject. |
| Use of Force | 40 | Use of Canines | 1 | A canine handler shall keep his or her canine within visual and auditory range during deployments at all times, except when a canine clears a threshold (e.g., rounding a corner, entering a room, ascending/descending a stairwell, or entering a confined space, such as a crawlspace). |
| Use of Force | 41 | Use of Canines | 1 | A canine supervisor shall be on call or on-duty at all times. A canine handler shall have approval from a canine supervisor (sergeant or higher) prior to deployment. If the handler is unable to contact a canine-unit supervisor, the handler shall seek approval from the watch commander before the canine can be deployed. The approving supervisor shall not serve as a canine handler in the deployment. |
| Use of Force | 42 | Use of Canines | 2 | Canine handlers shall issue three loud and clear warnings that a canine will be deployed and advise the suspect to surrender, unless such warnings impose an imminent threat of danger to the canine handler or other officers on scene. A canine handler shall allow a sufficient period of time between each warning to provide a suspect an opportunity to surrender. These warnings shall be given in either Spanish or Vietnamese if the suspect is reasonably believed to be a Latino or Vietnamese LEP individual. |
| Use of Force | 43 | Use of Canines | 1 | Canine handlers will only allow their canines to engage a suspect by biting if: (a) the suspect's actions pose a risk of imminent danger to the handler or others: a risk of serious harm to the canine: or the suspect is actively resisting (active resistance does not include concealment and refusal to surrender without more) and (b) the handler is in visual and auditory range of a suspect, except where the suspect is hiding in a confined space (e.g., a crawl space) and refuses to surrender, or escaping. Handlers will not allow their canine to engage a suspect by biting if a lower level of force could reasonably be expected to control the suspect or allow for the apprehension. |
| Use of Force | 44 | Use of Canines | 1 | In instances where a canine apprehends a suspect by biting, the handler will call the canine off at the first moment the canine can be safely released, taking into account that the average person will struggle if seized or confronted by a canine. |
| Use of Force | 45 | Use of Canines | 1 | Whenever an individual sustains a canine bite, the handler or an on-scene officer shall immediately contact an NOPD dispatcher to request Emergency Medical Services Response. If additional medical attention is required, the individual shall be transported to a medical facility for treatment. |
| Use of Force | 46 | Use of Canines | 1 | For each canine apprehension, the involved handler, as well as all other officers who used or observed force, shall complete a Force Statement before the end of shift. In addition to the information that must be included in all Force Statements, a canine handler's Force Statement documenting a canine apprehension shall include the following: (1) whether there was contact between the canine and the subject, including contact with the subject's clothing: (2) documentation of the duration of the canine's contact with a subject: and (3) the approximate distance of the canine from the handler at time of apprehension. In addition, in all apprehensions where there is canine contact, visible injury to a suspect, or a complaint of injury, an uninvolved supervisor shall be summoned to the scene for the purpose of completing a Use of Force Report consistent with investigative requirements established under this Agreement. |
| Use of Force | 47 | Use of Canines | 1 | An uninvolved canine supervisor shall evaluate each canine deployment for compliance with NOPD policy and state and federal law, and document this evaluation. |
| Use of Force | 48 | Use of Canines | 1 | NOPD agrees to establish and maintain a canine certification program that ensures that: (1) canines and their handlers demonstrate control and proficiency in specific, widely accepted obedience and criminal apprehension exercises: (2) canines and their handlers receive a minimum of 16 hours of training every four weeks: (3) the trainer keeps detailed records of whether each canine team has met specific control criteria for each control exercise, and what remedial training was given if a canine team was deficient in any area: and (4) the trainer reports all deficiencies to the unit supervisor. The program shall ensure that canines are certified annually by a nationally recognized trainer or organization, and that a canine is not deployed unless its certification is current. NOPD agrees to ensure that the certifying agency's standards are consistent with NOPD policy and standards. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Use of Force | 49 | Use of Canines | 1 | NOPD agrees to employ the services of a qualified trainer who is capable of providing certified canine training, and who delivers such training and maintains training records in accordance with NOPD policy and this Agreement. |
| Use of Force | 50 | Use of Canines | 1 | NOPD agrees to centrally record and track each canine team's training records, certification records, and health records, regardless of whether individual handlers also maintain records. |
| Use of Force | 51 | Use of Canines | 1 | NOPD agrees to track canine deployments and canine apprehensions, and to calculate and track canine bite ratios on a monthly basis to assess its canine unit and individual canine teams. |
| Use of Force | 52 | Use of Canines | 1 | NOPD agrees to include canine bite ratios as an element of the EWS, and to provide for the review, pursuant to the protocol for that system, of the performance of any handler whose bite ratio exceeds 20 percent during a six-month period, or the entire unit if the unit's bite ratio exceeds that threshold, and to require interventions as appropriate. Canine data and analysis shall be included in NOPD's Use of Force Annual Report. |
| Use of Force | 53 | Use of Canines | 1 | NOPD agrees not to request or use the services of any canine, whether owned by NOPD or any other jurisdiction, without first ensuring that the canine is controllable and otherwise able to meet the standards required by NOPD policy. |
| Use of Force | 54 | Electronic Control Weapons | 1 | Officers shall use ECWs only when such force is necessary to protect the officer, the subject, or another party from physical harm, and other less intrusive means would be ineffective. Officers shall be authorized to use ECWs to control a violent suspect when attempts to subdue the suspect by other tactics have been, or will likely be, ineffective and there is a reasonable expectation that it will be unsafe for officers to approach the suspect within contact range. |
| Use of Force | 55 | Electronic Control Weapons | 1 | Unless doing so would place any person at risk, officers shall issue a verbal warning to the subject that the ECW will be used prior to its use. Where feasible, the officer will defer ECW application for a reasonable time to allow the subject to comply with the warning. |
| Use of Force | 56 | Electronic Control Weapons | 1 | ECWs will not be used where such deployment may cause serious injury or death from situational hazards, including falling, drowning, losing control of a moving vehicle, or igniting a potentially explosive or flammable material or substance, except where lethal force would be permitted. |
| Use of Force | 57 | Electronic Control Weapons | 1 | After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary. Officers shall be trained in the risks of prolonged or repeated ECW exposure, including that exposure to the ECW for longer than 15 seconds, whether due to multiple applications or continuous cycling, may increase the risk of death or serious injury. Officers shall independently justify each cycle used against a subject in written Force Statements. |
| Use of Force | 58 | Electronic Control Weapons | 1 | Officers shall not intentionally activate more than one ECW at a time against a subject. |
| Use of Force | 59 | Electronic Control Weapons | 1 | ECWs shall not be used in drive-stun mode as a pain compliance technique. ECWs shall be used in drive-stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject so that officers can consider another force option. |
| Use of Force | 60 | Electronic Control Weapons | 1 | ECWs shall not be used against visibly pregnant women, elderly persons, young children, or visibly frail persons, except where lethal force would be permitted, or where the officer has reasonable cause to believe there is an imminent risk of serious physical injury. Officers shall determine the reasonableness of ECW use based upon all circumstances, including the subject's age, size, physical condition, and the feasibility of lesser force options. Officers shall be trained in the increased risks that ECWs may present to the above-listed vulnerable populations. |
| Use of Force | 61 | Electronic Control Weapons | 1 | ECWs may not be applied to a subject's head, neck, or genitalia, except where lethal force would be permitted, or where the officer has reasonable cause to believe there is an imminent risk of serious physical injury. |
| Use of Force | 62 | Electronic Control Weapons | 1 | ECWs shall not be used on handcuffed subjects, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, and if lesser attempts of control have been ineffective. |
| Use of Force | 63 | Electronic Control Weapons | 1 | Officers shall keep ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm. |
| Use of Force | 64 | Electronic Control Weapons | 1 | Officers shall receive annual ECW certifications, which should consist of physical competency: weapon retention: NOPD policy, including any policy changes: technology changes: and scenario-based training. |
| Use of Force | 65 | Electronic Control Weapons | 1 | Officers shall be trained in and follow protocols developed by NOPD, in conjunction with medical professionals, on their responsibilities following ECW use, including:<br>a) the removal of ECW probes, including requiring medical or specially trained NOPD personnel to remove probes that are embedded in a subject's skin, except for probes that are embedded in a subject's head, throat, groin, or other sensitive area, which should be removed by medical personnel only:<br>b) the risk of positional asphyxia, and training officers to use a restraint technique that does not impair the subject's respiration following an ECW application:<br>c) the transportation to a hospital for evaluation of all subjects who: have been exposed to prolonged application (more than 15 seconds): are members of one of the vulnerable populations listed above: or had an ECW used against them in circumstances presenting a heightened risk of harm, such as subjects under the influence of drugs and/or exhibiting symptoms associated with excited delirium: or were kept in prone restraint after ECW use: and<br>d) the monitoring of all subjects who have received ECW application while in police custody. |
| Use of Force | 66 | Electronic Control Weapons | 1 | Officers shall report all ECW discharges (except for training discharges), laser painting, and/or arcing of weapons to their supervisor and the communications command center as soon as possible. |
| Use of Force | 67 | Electronic Control Weapons | 2 | NOPD agrees to develop and implement integrity safeguards on the use of ECWs to ensure compliance with NOPD policy, including conducting random and directed audits of ECW deployment data. The audits should compare the downloaded data to the officer's Force Statement. Discrepancies within the audit should be addressed and appropriately investigated. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Use of Force | 68 | Electronic Control Weapons | 1 | NOPD agrees to include the number of ECWs in operation, and the number of ECW uses, as elements of the EWS. Analysis of this data shall include a determination of whether ECWs result in an increase in the use of force, and whether officer and subject injuries are affected by the rate of ECW use. In addition, the analysis shall include laser painting and arcing of weapons to measure the prevention/deterrence effectiveness associated with the use of ECWs. ECW data and analysis shall be included in NOPD's Use of Force Annual Report. |
| Use of Force | 69 | Oleoresin Capsicum Spray | 1 | NOPD agrees to prohibit the use or possession of Oleoresin Capsicum Spray by on-duty officers, including officers working secondary employment. |
| Use of Force | 70 | SWAT Teams | 1 | The mission of the Special Operation Division's Tactical Platoons (currently known as "SWAT" Teams) shall be limited to providing a specialized response to critical situations where a tactical response is required, such as hostage rescue, barricaded subjects, high-risk warrant service and high-risk apprehension, and terrorism response. The policy shall prohibit SWAT tactics and equipment from being deployed or used for routine or "proactive" patrol functions or crime prevention, or for the service of non-high-risk warrants, unless approved in writing by a Deputy Superintendent. This provision does not prohibit SWAT Team members from providing uniformed policing services. |
| Use of Force | 71 | SWAT Teams | 1 | NOPD agrees to provide written guidance on what types of warrants may be considered "high-risk," and what tactics are permissible for the service of high-risk warrants. Barring emergency circumstances, the SWAT Team shall have the primary responsibility for execution of any high-risk warrant utilizing tactical team officers equipped with special equipment, training, and weapons. |
| Use of Force | 72 | SWAT Teams | 1 | In addition to any Use of Force Reports, the SWAT Team shall document its activities in detail, including by preparing written operational plans in consistent formats, and written after-action reports subsequent to call-outs and deployments to critical situations, such as hostage rescue, barricaded subjects, high-risk warrant service, high-risk apprehension, and terrorism response. After-action reports shall address any areas of concern related to policy, training, equipment, or tactics. |
| Use of Force | 73 | SWAT Teams | 1 | Supervisory review of SWAT Team deployments shall be conducted by an uninvolved, command-level supervisor possessing the requisite knowledge and expertise to analyze and critique specialized response protocols, and shall identify any policy, training, equipment, or tactical concerns raised by the action. Command staff shall identify areas of concern or particular successes, and shall implement the appropriate response, including modifications to policy, training, equipment, or tactics. |
| Use of Force | 74 | SWAT Teams | 1 | PARAGRAPH STRIKEN |
| Use of Force | 75 | SWAT Teams | 1 | NOPD agrees to track and analyze the number of SWAT Team deployments. The analysis shall include the reason for each activation, the legal authority, type of warrant (if applicable), and the result of each deployment, including: (1) the location: (2) the number of arrests: (3) the type of evidence or property seized: (4) whether a forcible entry was required: (5) whether a weapon was discharged by a SWAT Team member: and (6) whether a person or domestic animal was injured or killed. This data analysis shall be entered into the EWS and included in NOPD's annual Use of Force Report. |
| Use of Force | 76 | Use of Force Reporting Policy and Use of Force Report | 1 | NOPD agrees to develop and implement a uniform reporting system pursuant to a Use of Force Reporting policy, using a uniform supervisor Use of Force Report, which will include individual officer Force Statements. NOPD uses of force shall be divided into four levels:<br>a) Level 1 uses of force include pointing a firearm at a person and hand control or escort techniques (e.g., elbow grip, wrist grip, or shoulder grip) applied as pressure point compliance techniques or that result in injury or complaint of injury.<br>b) Level 2 uses of force include use of an ECW (including where an ECW is fired at a person but misses): use of an impact weapon to strike a person but where no contact is made: use of a baton for non-striking purposes (e.g., prying limbs, moving or controlling a person): and weaponless defense techniques (e.g., elbow strikes, kicks, leg sweeps, and takedowns).<br>c) Level 3 uses of force include any strike to the head (except for a strike with an impact weapon): use of impact weapons where contact is made (except to the head), regardless of injury: or the destruction of an animal.<br>d) Level 4 uses of force include all serious uses of force, as defined by this Agreement, and shall be investigated by NOPD's Force Investigation Team. |
| Use of Force | 77 | Use of Force Reporting Policy and Use of Force Report | 1 | Hand control or escort techniques applied for the purposes of handcuffing or escorts that are not used as pressure point compliance techniques, do not result in injury or complaint of injury, and are not used to overcome resistance, are not reportable uses of force. |
| Use of Force | 78 | Use of Force Reporting Policy and Use of Force Report | 1 | All officers using a Level 1 through 4 use of force, and officers observing a Level 2, Level 3, or Level 4 use of force, shall write a Force Statement before the end of shift, which shall be included in the Use of Force Report. The officer's Force Statement shall include: (1) a detailed account of the incident from the officer's perspective: (2) the reason for the initial police presence: (3) a specific description of the acts that led to the use of force: (4) the level of resistance encountered: and (5) a description of every type of force used. |
| Use of Force | 79 | Use of Force Reporting Policy and Use of Force Report | 1 | Officers' Force Statements shall completely and accurately describe the force used or observed. The use of force reporting policy shall explicitly prohibit the use of conclusory statements without supporting detail, including "boilerplate" or "pat" language (e.g., "furtive movement" or "fighting stance") in all statements and reports documenting use of force. Officers shall be subject to disciplinary action for material omissions or inaccuracies in their Force Statements. |
| Use of Force | 80 | Use of Force Reporting Policy and Use of Force Report | 1 | Officers who use or observe force shall notify their supervisors immediately following any use of force incident or upon receipt of an allegation of unreasonable or unreported use of force by any officer. Officers who use or observe force and fail to report it shall be subject to disciplinary action, up to and including termination. |
| Use of Force | 81 | Use of Force Reporting Policy and Use of Force Report | 1 | Use of Force Reports, including Force Statements, shall be maintained centrally by PIB. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Use of Force | 82 | Use of Force Reporting Policy and Use of Force Report | 1 | At least annually, NOPD agrees to analyze the year's force data, including the force-related outcome data listed in section XIX.C. below, to determine significant trends; identify and correct deficiencies revealed by this analysis; and document its findings in a public report. |
| Use of Force | 83 | Use of Force Supervisory Investigations | 2 | The direct supervisor of the officer using a Level 1 use of force shall review and approve in writing the Level 1 use of force before the end of the shift during which the Level 1 force was used. Supervisors shall elevate and investigate any use of force that appears to have been inappropriately categorized as a Level 1 use of force. |
| Use of Force | 84 | Use of Force Supervisory Investigations | 1 | The direct supervisor of the officer(s) using force, upon notification of a Level 2, Level 3, or Level 4 use of force incident or allegation of excessive force, shall respond to the location of occurrence. The direct supervisor of the officer(s) involved in the reportable use of force incident shall investigate all uses of force, with the exception of: <br>a) those incidents involving a serious use of force (Level 4 uses of force); <br>b) uses of force indicating apparent criminal conduct by an officer, as defined in this Agreement; <br>c) a use of force incident by NOPD personnel of a rank higher than the supervisor assigned to investigate the incident; or <br>d) a use of force investigation reassigned to FIT by the Superintendent or his designee or PIB. |
| Use of Force | 85 | Use of Force Supervisory Investigations | 1 | A supervisor who was involved in a reportable incident, including by participating in or ordering the force being investigated, shall not investigate the incident or review the Force Statements for approval. |
| Use of Force | 86 | Use of Force Supervisory Investigations | 1 | For all Level 2 and Level 3 uses of force, the investigating supervisor shall: <br>a) respond to the scene, examine the subject of the force for injury, interview the subject for complaints of pain after advising the subject of his/her rights, and ensure that the subject receives medical attention from an appropriate medical provider; <br>b) notify PIB immediately of the use of force and obtain a use of force tracking number; <br>c) identify and collect all relevant evidence and evaluate that evidence to determine whether the use of force: (1) was consistent with NOPD policy and/or (2) raises any policy, training, tactical, or equipment concerns; <br>d) ensure that all evidence to establish material facts related to the use of force, including audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected; <br>e) ensure that a canvass for, and interview of, civilian witnesses is conducted. In addition, civilian witnesses should be encouraged to provide and sign a written statement in their own words; <br>f) ensure that all officers witnessing a use of force incident by another officer provide a Force Statement. Officers involved in a use of force incident shall be separated until interviewed. Group interviews shall be prohibited. Supervisors shall ensure that all Use of Force Reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred. Supervisors shall not ask officers or other witnesses leading questions that improperly suggest legal justifications for the officers' conduct, where such questions are contrary to appropriate law enforcement techniques. Investigating supervisors shall record all interviews with civilian witnesses and all follow-up interviews with officers, and shall record all interviews with subjects, after advising them of their rights and that they seek to question them only about the use of force. The recording requirements set out in Custodial Interrogations do not apply to subject interviews regarding the use of force. <br>g) review all Force Statements and ensure that all reports include the information required by this Agreement and NOPD policy; and h) consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible. Supervisors will make all reasonable efforts to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force claimed by the officer and the subject's injuries. NOPD will train all of its supervisors on the factors to consider when evaluating credibility, incorporating credibility instructions provided to jurors. Where a reasonable and trained supervisor would determine that there may have been misconduct, the supervisor shall immediately notify FIT to respond to the scene. |
| Use of Force | 87 | Use of Force Supervisory Investigations | 1 | Each supervisor shall provide a written gist to the Division Commander by the end of the shift documenting the supervisor's preliminary determination of the appropriateness of the use of force, including whether the force was reasonable and within policy; whether the injuries appear proportionate to the use of force described; and summaries of subject, witness, and officer statements. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Use of Force | 88 | Use of Force Supervisory Investigations | 1 | Each supervisor shall complete and document a use of force supervisory investigation using a supervisor's Use of Force Report within 72 hours of learning of the use of force. Any extension to this 72-hour deadline must be authorized by a Division Commander. This Report shall include:<br>a) the supervisor's narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on the supervisor's independent review of the facts and circumstances of the incident:<br>b) documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report shall specifically state this fact. In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number or address of those witnesses, the report shall state the reasons why. The report should also include all available identifying information for anyone who refuses to provide a statement:<br>c) the names of all other NOPD employees witnessing the use of force:<br>d) the investigating supervisor's evaluation of the use of force, based on the supervisor's review of the evidence gathered, including a determination of whether the officer's actions appear to be within NOPD policy and consistent with state and federal law: and an assessment of the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options: and<br>e) documentation of any non-disciplinary corrective action taken. |
| Use of Force | 89 | Use of Force Supervisory Investigations | 1 | Upon completion of the supervisor's Use of Force Report, the investigating supervisor shall forward the report through their chain of command to the ICO (if applicable) and/or Division Commander, who shall review the report to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard. The Division Commander and/or ICO shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings. |
| Use of Force | 90 | Use of Force Supervisory Investigations | 1 | Where the findings of the Use of Force Report are not supported by a preponderance of the evidence, the investigating supervisor's chain of command shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation. The investigating supervisor's superior shall counsel the investigating supervisor regarding the inadequately supported determination and of any investigative deficiencies that led to it. The Division Commander and/or ICOs shall be responsible for the accuracy and completeness of Use of Force Reports prepared by supervisors under their command. |
| Use of Force | 91 | Use of Force Supervisory Investigations | 1 | Where an investigating supervisor repeatedly conducts deficient investigations, the supervisor shall receive the appropriate corrective action, including training, demotion, and/or removal from a supervisory position in accordance with performance evaluation procedures and/or Civil Service Rules. |
| Use of Force | 92 | Use of Force Supervisory Investigations | 1 | Whenever an investigating supervisor, reviewing supervisor, ICO, or Division Commander finds evidence of a use of force indicating apparent criminal conduct by an officer, he or she shall suspend the force investigation immediately and notify PIB. PIB shall immediately notify FIT, which will take over the investigation. |
| Use of Force | 93 | Use of Force Supervisory Investigations | 1 | When the Division Commander finds that the investigation is complete and the findings are supported by the evidence, the investigation file shall be forwarded to PIB. PIB shall review the investigation to ensure that it is complete and that the findings are supported by the evidence. |
| Use of Force | 94 | Use of Force Supervisory Investigations | 1 | At the discretion of the Superintendent, his designee, or PIB, a use of force investigation may be assigned or re-assigned for investigation to FIT or to another supervisor, whether within or outside of the District in which the incident occurred, or may be returned to the Unit for further investigation or analysis. This assignment or re-assignment shall be explained in writing. |
| Use of Force | 95 | Use of Force Supervisory Investigations | 1 | Where, after investigation, a use of force is found to be out of policy, the Superintendent shall direct and ensure appropriate discipline. Where the use of force indicates policy, training, tactical, or equipment concerns, the Superintendent shall ensure also that necessary training is delivered and that policy, tactical, or equipment concerns are resolved. |
| Use of Force | 96 | Force Investigation Team | 1 | NOPD agrees to establish a single, uniform reporting and investigation/review system for all Level 4 uses of force (i.e., serious uses of force, including critical firearm discharges), as defined by this Agreement. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Use of Force | 97 | Force Investigation Team | 2 | NOPD agrees to ensure that all serious uses of force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved: that policy, training, equipment, or tactical deficiencies related to the use of force are identified and corrected: and that investigations of sufficient quality to ensure that officers are held accountable, as necessary, are conducted. To achieve this outcome, NOPD agrees to:<br>a) create a FIT to conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by NOPD personnel of a rank higher than sergeant, or uses of force reassigned to FIT by the Superintendent or his designee or PIB. FIT shall also investigate all instances where an individual has died while in, or as an apparent result of being in, the custody of NOPD. FIT shall be comprised of personnel who are specially trained in both criminal and administrative force investigations. Members of FIT shall be assigned to PIB and shall not be assigned to any District. FIT investigations may result in criminal charges, administrative action, or both.<br>b) Within 280 days from the Effective Date, NOPD agrees to recruit, assign, and train a sufficient number of personnel to FIT to fulfill the requirements of this Agreement. Prior to performing FIT duties, FIT members shall receive 40 hours of FIT-specific training in FIT procedures: call out and investigative protocols: proper roles of on-scene counterparts such as crime scene technicians, the Monitor, the DA, the IPM, and the City Attorney's Office: and investigative equipment and techniques. FIT members shall also receive FIT-specific annual in-service training.<br>c) NOPD agrees to create a FIT procedural manual. The procedural manual shall include:<br>(1) definitions of all relevant terms:<br>(2) clear statements of the mission and authority of FIT:<br>(3) procedures on report writing:<br>(4) procedures for collecting and processing evidence:<br>(5) procedures to ensure appropriate separation of criminal and administrative investigations in the event of compelled subject officer statements:<br>(6) procedures for consulting with the DA, including ensuring that administrative investigations are not unnecessarily delayed while a criminal investigation is pending:<br>(7) scene management procedures: and<br>(8) management procedures. |
| Use of Force | 98 | Force Investigation Team | 1 | Where appropriate to ensure the fact and appearance of impartiality, for investigations of serious uses of force or force indicating apparent criminal conduct by an officer, NOPD may refer the incident for investigation by an independent and highly competent entity outside NOPD. |
| Use of Force | 99 | Force Investigation Team | 1 | NOPD's Homicide Section shall not investigate any NOPD officer-involved serious use of force as defined by this Agreement, or any in-custody death. |
| Use of Force | 100 | Force Investigation Team | 1 | In every incident involving a serious use of force, or any use of force indicating apparent criminal conduct by an officer, the supervisor shall immediately notify FIT. Unless it can verify that the supervisor has already done so, FIT shall immediately notify PIB of the use of force and obtain a use of force tracking number. |
| Use of Force | 101 | Force Investigation Team | 1 | FIT shall respond to the scene of every incident involving a serious use of force: any use of force indicating apparent criminal conduct by an officer: any use of force by an officer of a rank higher than sergeant: and any incident where an individual has died while in, or as an apparent result of being in, the custody of NOPD, or as ordered by the Superintendent or his designee or PIB. |
| Use of Force | 102 | Force Investigation Team | 1 | The Commander of PIB shall immediately notify and consult with the DA, IPM, FBI, and the USAO regarding any use of force indicating apparent criminal conduct by an officer, evidence of apparent criminal conduct by an officer discovered during a misconduct investigation, any use of force in which an officer discharged his firearm, or where an individual has died while in, or as an apparent result of being in, the custody of NOPD. |
| Use of Force | 103 | Force Investigation Team | 1 | If the case may proceed criminally, or where NOPD requests a criminal prosecution, any compelled interview of the subject officers shall be delayed. No other part of the investigation shall be held in abeyance unless specifically authorized by the Superintendent in consultation with the agency conducting the criminal investigation. |
| Use of Force | 104 | Force Investigation Team | 1 | NOPD agrees to make good faith efforts to work with the Orleans Parish Coroner's Office in requesting that that Office provide a completed Coroner's report within 30 days regarding a death proximate to a use of force and with the DA or other investigating agency regarding any criminal declination within 60 days after the use of force. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Use of Force | 105 | Force Investigation Team | 2 | In conducting its investigation, FIT shall:<br>a) review all Force Statements to ensure that these statements include the information required by this Agreement and NOPD policy;<br>b) respond to the scene, examine the subject for injury, interview the subject for complaints of pain after advising the subject of his or her rights, and ensure that the subject receives medical attention from an appropriate medical provider;<br>c) ensure that all evidence to establish material facts related to the use of force, including but not limited to audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;<br>d) ensure that a canvass for, and interview of, civilian witnesses is conducted. In addition, civilian witnesses should be encouraged to provide and sign a written statement in their own words;<br>e) ensure, consistent with applicable law, that all officers witnessing a serious use of force incident by another officer provide a Force Statement regarding the incident. Officers involved in a use of force incident shall be separated until interviewed. Group interviews shall be prohibited. FIT shall ensure that all FIT investigation reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred. FIT shall not ask officers or other witnesses leading questions that improperly suggest legal justifications for the officers' conduct, when such questions are contrary to appropriate law enforcement techniques. FIT shall record all interviews; and<br>f) consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible. FIT will make all reasonable efforts to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force claimed by the officer and the subject's injuries. NOPD will train all of its FIT members on the factors to consider when evaluating credibility, incorporating credibility instructions provided to jurors. |
| Use of Force | 106 | Force Investigation Team | 1 | FIT shall complete a preliminary report that shall be presented to the Superintendent or the Superintendent's designee as soon as possible, but in no circumstances later than 24 hours after learning of the use of force. |
| Use of Force | 107 | Force Investigation Team | 2 | FIT shall complete its administrative use of force investigation within 30 days from the use of force. Any request for an extension to this time limit must be approved by the Deputy Superintendent of PIB through consultation with the Superintendent. At the conclusion of each use of force investigation, FIT shall prepare an investigation report. The report shall include:<br>a) a narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on FIT's independent review of the facts and circumstances of the incident;<br>b) documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report shall specifically state this fact. In situations in which witnesses were present but<br>circumstances prevented the author of the report from determining the identification, phone number, or address of those witnesses, the report shall state the reasons why. The report should also include all available identifying information for anyone who refuses to provide a statement;<br>c) the names of all other NOPD employees witnessing the use of force;<br>d) FIT's evaluation of the basis for the use of force, based on FIT's review of the evidence gathered, including a determination of whether the officer's actions appear to be within OPD policy and consistent with state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options;<br>e) if a weapon was used, documentation that the officer's certification and training for the weapon are current; and<br>f) documentation of any disciplinary and/or non-disciplinary corrective action recommended. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Use of Force | 108 | Use of Force Review Board | 2 | NOPD agrees to develop and implement a Use of Force Review Board to review all serious uses of force and other FIT investigations. The UFRB shall be comprised of the Deputy Superintendent of the Public Integrity Bureau, the Deputy Superintendent of the Field Operations Bureau, and the Deputy Superintendent of the Investigations & Support Bureau. The UFRB shall conduct timely, comprehensive, and reliable reviews. The UFRB shall:<br>a) review each FIT investigation within 30 days of receiving the FIT investigation report to ensure that it is complete and that the findings are supported by a preponderance of the evidence;<br>b) hear the case presentation from the lead investigator and discuss the case as necessary with the investigator to gain a full understanding of the facts of the incident. The officer(s) who used the force subject to investigation, or who are otherwise the subject(s) of the FIT investigation, shall not be present;<br>c) order additional investigation when it appears that there is additional relevant evidence<br>that may assist in resolving inconsistencies or improve the reliability or credibility of the findings. Where the findings are not supported by a preponderance of the evidence, the UFRB shall document the reasons for this determination, which shall be included as an addendum to the original investigation, including the specific evidence or analysis supporting their conclusions;<br>d) determine whether the force violated NOPD policy. If the force violated NOPD policy, the UFRB shall refer it to PIB for disciplinary action;<br>e) determine whether the incident raises policy, training, equipment, or tactical concerns, and refer such incidents to the appropriate unit within NOPD to ensure they are resolved;<br>f) direct District supervisors to take and document non-disciplinary corrective action to enable or encourage an officer to improve his or her performance; and<br>g) document its findings and recommendations in a UFRB Report within 45 days of receiving the FIT investigation and within 15 days of the UFRB case presentation. |
| Use of Force | 109 | Use of Force Training | 1 | NOPD shall provide all NOPD officers with 40 hours of use of force training within 365 days of the Effective Date, and 24 hours of use of force training on at least an annual basis thereafter, including, as necessary, developments in applicable law and NOPD policy. NOPD shall coordinate and review all use of force training to ensure quality, consistency, and compliance with the Constitution, Louisiana law, this Agreement and NOPD policy. NOPD's use of force training shall include the following topics:<br>a) NOPD's use of force model, as described in this Agreement;<br>b) proper use of force decision-making;<br>c) use of force reporting requirements;<br>d) the Fourth Amendment and related law;<br>e) role-playing scenarios and interactive exercises that illustrate proper use of force decision-making, including training on the importance and impact of ethical decision making and peer intervention;<br>f) the proper deployment and use of all intermediate weapons or technologies, including batons, canines, and ECWs;<br>g) de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;<br>h) threat assessment;<br>i) basic crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies (the Crisis Intervention Training provided to all new and current officers pursuant to this Agreement may be combined with this training);<br>j) factors to consider in initiating or continuing a pursuit;<br>k) appropriate training on conflict management; and<br>l) for supervisors of all ranks, as part of their initial and annual in-service supervisory training, additional training in conducting use of force investigations; strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force; and supporting officers who report unreasonable or unreported force, or who are retaliated against for using only reasonable force or attempting to prevent<br>unreasonable force. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Use of Force | 110 | Use of Force Training | 1 | Included in the use of force training set out above, NOPD shall deliver firearms training to all officers within 365 days of the Effective Date and at least yearly thereafter. NOPD firearms training shall:<br>a) require officers to complete and satisfactorily pass firearm training and to qualify for regulation and other service firearms, as necessary, on an annual basis;<br>b) require recruits, officers in probationary periods, and officers who return from unarmed status to complete and satisfactorily pass firearm training and to qualify for regulation and other service firearms before such personnel are permitted to carry and use firearms;<br>c) incorporate professional night training, stress training (e.g., training in using a firearm after undergoing physical exertion), and proper use of force decision-making training, including continuous threat assessment techniques, in the annual in-service training program; and<br>d) ensure that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times. |
| **4. CIT** | | | 2 | |
| Crisis Intervention Team | 111 | Crisis Intervention Planning Committee | 1 | Within 180 days of the Effective Date, NOPD and the City agree to implement a Crisis Intervention Planning Committee ("Planning Committee") to direct the development and implementation of the CIT. The Planning Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill with the goal of de-escalating the potential for violent encounters. |
| Crisis Intervention Team | 112 | Crisis Intervention Planning Committee | 2 | The Planning Committee shall include representation from NOPD command leadership and City-contracted mental health professionals. NOPD shall also seek representation from the civilian leadership of the MCTU, local municipal government, the New Orleans Metropolitan Human Services District, community mental health professionals, professionals from emergency health care receiving facilities, members of the local judiciary, the Orleans Parish Criminal Sheriff's Office, homeless service agencies, and mental health professionals and advocates. |
| Crisis Intervention Team | 113 | Program Development | 1 | NOPD and the City agree to implement a comprehensive first responder CIT program to develop and maintain specially trained CIT officers. This program shall incorporate the following:<br>a) Within 270 days of the Effective Date, an operations subcommittee, appointed by and reporting to the Planning Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between NOPD, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the existing roles and responsibilities of the existing MCTU and NOPD patrol officers, and of CIT officers.<br>b) NOPD agrees to continue using the MCTU and to continue staffing it with well-trained and dedicated community volunteers, to assist NOPD patrol units in the management and transportation of persons suffering a mental health crisis or from a diagnosed behavioral disorder. MCTU shall retain its duties and responsibilities in providing transportation for individuals experiencing a mental health or behavioral crisis.<br>c) Within 365 days of the Effective Date, the Planning Committee shall select CIT officer volunteers, based upon supervisor recommendations, PIB records, and interviews. Preference should be given to officers with at least three years of field experience.<br>d) CIT officers shall be assigned to the patrol division and maintain their standard patrol duties, except when called to respond to potential behavioral or mental health crisis events outside of their assigned patrol district.<br>e) CIT officers who are dispatched to a crisis event shall have the responsibility for the scene and discretion to determine strategies for resolving the event unless an appropriate supervisor is present and affirmatively assumes the scene responsibility.<br>f) NOPD shall also track CIT use through data provided by the CIT officer or MCTU after each response. NOPD shall gather and track the following data at a minimum:<br>(1) Date, time, and location of the incident;<br>(2) Subject's name, age, gender, and address;<br>(3) Whether the subject was armed, and the type of weapon;<br>(4) Whether the subject is a U.S. military veteran;<br>(5) Complainant's name and address;<br>(6) Name and badge number of CIT officer on the scene;<br>(7) Whether a supervisor responded to the scene;<br>(8) Techniques or equipment used;<br>(9) Any injuries to officers, subject, or others;<br>(10) Disposition: and<br>(11) Brief narrative of the event (if not included in any other document).<br>g) NOPD shall publicly report this data, aggregated as necessary to protect privacy. |
| Crisis Intervention Team | 114 | CIT and First Responder Training | 1 | NOPD shall require officers selected for the CIT program to undergo a 40-hour initial comprehensive training prior to being assigned CIT duties, and eight hours of in-service training annually thereafter. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Crisis Intervention Team | 115 | CIT and First Responder Training | 1 | Within three years of the Effective Date, NOPD shall train at least 20% of its patrol division in the CIT program to ensure that NOPD can provide a CIT-trained officer in each shift in each District. |
| Crisis Intervention Team | 116 | CIT and First Responder Training | 1 | Within 270 days of the Effective Date, a curriculum subcommittee of the Planning Committee shall develop a 40-hour curriculum and in-service training for first responders based on the national CIT model. The curriculum subcommittee may adapt MCTU's existing training curriculum for this purpose. CIT training faculty should include volunteer local area professionals and advocates to the greatest extent possible. This crisis intervention training shall emphasize mental health-related topics, crisis resolution skills, de-escalation training, and access to community-based services. |
| Crisis Intervention Team | 117 | CIT and First Responder Training | 1 | Training for all newly selected CIT officers shall begin within 365 days of the Effective Date and shall be completed within three years. This training shall include not only lecture-based instruction, but also on-site visitation and exposure to mental health facilities, intensive interaction with individuals with a mental illness, and scenario-based de-escalation skills training. |
| Crisis Intervention Team | 118 | CIT and First Responder Training | 1 | In addition to the more extensive training for CIT officers set out above, NOPD agrees to provide all new recruits at least 16 hours of training on responding to persons in behavioral or mental health crisis, and four hours of in-service training annually thereafter. NOPD and the City further agree to provide all current officers with eight hours of training on responding to persons in behavioral or mental crisis within 365 days of the Effective Date, and four hours of in-service training annually thereafter. |
| Crisis Intervention Team | 119 | CIT and First Responder Training | 1 | Within 365 days of the Effective Date, NOPD agrees to offer the 40-hour crisis intervention training to all new and current dispatchers to enable them to identify calls for service that involve behavioral or mental health crisis events. NOPD agrees to offer to provide this training to new dispatchers within 90 days of their start date. NOPD agrees to offer crisis intervention in annual in-service training for dispatchers. |
| Crisis Intervention Team | 120 | Maintenance of CIT Program | 1 | NOPD agrees to maintain the CIT Planning Committee after the CIT program is operational. The Planning Committee shall serve as a problem-solving forum for interagency issues and shall monitor ongoing outcome indicators collected by each agency. These indicators may include data such as NOPD CIT use, NOPD CIT behavioral event disposition data, Orleans Parish Prison booking data, the number of individuals with a mental health diagnosis at the jail, and the transfer of custody and voluntary referral rates between NOPD, emergency receiving facilities, and community agencies. |
| Crisis Intervention Team | 121 | Maintenance of CIT Program | 1 | NOPD agrees to review the outcome data generated through the process described above to: determine whether to recognize individual CIT officer performance that deserves commendation; develop new response strategies for repeat calls for service; identify training needs for the annual CIT in-service; make CIT curriculum changes; and identify other NOPD issues to allow NOPD to provide an appropriate response to a behavioral crisis event. |
| **5. SSA** | | | | |
| Stops, Searches, and Arrests | 122 | Investigatory Stops and Detentions | 2 | NOPD officers may only conduct investigatory stops or detentions where the officer has reasonable suspicion that a person has been, is, or is about to be engaged in the commission of a crime. |
| Stops, Searches, and Arrests | 123 | Investigatory Stops and Detentions | 2 | NOPD officers shall use accurate and specific descriptive language and not rely solely on "boilerplate" or "pat" language in any reports documenting investigatory stops, detentions, or searches. Articulation of reasonable suspicion and probable cause shall be specific and clear. |
| Stops, Searches, and Arrests | 124 | Investigatory Stops and Detentions | 1 | NOPD officers shall not use or rely on information known to be materially false or incorrect in effectuating an investigatory stop or detention. |
| Stops, Searches, and Arrests | 125 | Investigatory Stops and Detentions | 2 | NOPD officers shall not use race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, or gender identity as a factor, to any extent or degree, in establishing reasonable suspicion or probable cause, except as part of an actual and apparently credible description of a specific suspect or suspects in any criminal investigation. |
| Stops, Searches, and Arrests | 126 | Investigatory Stops and Detentions | 2 | NOPD officers shall continue to require reasonable suspicion to conduct field interviews, and document investigatory field contacts, including field interviews, in accordance with the stop and search data collection requirements of this Agreement. |
| Stops, Searches, and Arrests | 127 | Searches | 2 | NOPD officers shall not use race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, or gender identity in exercising discretion to conduct a warrantless search or to seek a search warrant, except as part of an actual and apparently credible description of a specific suspect or suspects in any criminal investigation. |
| Stops, Searches, and Arrests | 128 | Searches | 1 | An officer shall immediately notify a supervisor when considering a search based on consent, and the supervisor shall approve the search before it is conducted. |
| Stops, Searches, and Arrests | 129 | Searches | 2 | Where an officer seeks consent for a search, the officer shall affirmatively inform the subject of his or her right to refuse and to revoke consent at any time, and document the subject's consent on a written form that explains these rights. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Stops, Searches, and Arrests | 130 | Searches | 2 | NOPD officers shall only conduct searches of individuals on probation or parole where legal authority for the search has been established. |
| Stops, Searches, and Arrests | 131 | Searches | 1 | NOPD agrees to ensure that the consent to search form includes separate signature lines for civilians to affirm that they understand they have a right to refuse, and for officers to certify that they have read and explained the right to refuse to the civilian. |
| Stops, Searches, and Arrests | 132 | Searches | 1 | NOPD agrees to ensure that officers understand how strip and body cavity searches are different than regular searches and are trained on how to conduct proper field strip searches. NOPD shall ensure that field strip searches of arrestees are performed only in the rarest of circumstances under exigent circumstances where the life of officers or others may be placed at risk, under conditions that provide privacy, and with the explicit approval of a supervisory officer. NOPD agrees to ensure that strip searches are only performed when the officer has articulable probable cause that a subject is concealing a weapon or contraband. |
| Stops, Searches, and Arrests | 133 | Searches | 1 | When approval to conduct a strip search is requested, the supervisor shall immediately respond to the scene to approve the strip search. In situations where strip searches are legally justified, necessary under NOPD policy, and authorized by a supervisor, the search shall be conducted in a professional manner by trained personnel: include the least number of personnel necessary: be performed only by those of the same sex as the identified sex of the individual: and under conditions that provide privacy from all but those authorized to conduct the search. |
| Stops, Searches, and Arrests | 134 | Searches | 1 | NOPD agrees to ensure that body cavity searches are performed only after obtaining a search warrant and by specially trained medical personnel. |
| Stops, Searches, and Arrests | 135 | Searches | 1 | An affidavit or sworn declaration supporting an application for a search warrant shall provide an accurate and clear description of the reasons for the request for the search, the place or thing to be searched, and items or possible evidence that are the purpose of the search. |
| Stops, Searches, and Arrests | 136 | Searches | 1 | A supervisor shall review each request for a search or arrest warrant, including each affidavit or declaration, before it is filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with NOPD policy and this Agreement. The supervisor shall assess the information contained in the warrant application and supporting documents for authenticity, including an examination for "boilerplate" or "pat" language, inconsistent information, and lack of articulation of a legal basis for the warrant. |
| Stops, Searches, and Arrests | 137 | Searches | 2 | As part of the supervisory review, the supervisor shall document in an auditable format those warrant applications that are legally unsupported, are in violation of NOPD policy or this Agreement, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The supervisor shall take appropriate action to address violations or deficiencies, including recommending non-disciplinary corrective action for the involved officer, and/or referring the incident for administrative or criminal investigation. The quality and accuracy of search warrants and supportive affidavits or declarations shall be taken into account in officer performance evaluations. |
| Stops, Searches, and Arrests | 138 | Searches | 2 | A supervisor shall assist in developing an operational plan for the execution of a search warrant, be present for execution of the search warrant, and review and document the search in an after-action report within 24 hours of the execution of the warrant. |
| Stops, Searches, and Arrests | 139 | Searches | 1 | NOPD officers shall not detain non-occupants present at the location where a search warrant is executed for longer than reasonably necessary to secure the area, or to determine whether they are occupants of the premises being searched, or where the officer has individualized reasonable suspicion that the non-occupant is involved in criminal activity or poses a danger to officer safety. |
| Stops, Searches, and Arrests | 140 | Searches | 2 | NOPD shall maintain, centrally and in each NOPD District and specialized unit, a log listing each search warrant, the case file where a copy of such warrant is maintained, the officer who applied for the search warrant, and each supervisor who reviewed the application for a search warrant. |
| Stops, Searches, and Arrests | 141 | Arrests | 1 | An NOPD officer shall only arrest an individual where the officer has probable cause. |
| Stops, Searches, and Arrests | 142 | Arrests | 2 | In effectuating an arrest, NOPD officers shall not rely on information known to be materially false or incorrect. Officers may not consider race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, or gender identity in effecting an arrest, except as part of an actual and apparently credible description(s) of a specific suspect or suspects in any criminal investigation. |
| Stops, Searches, and Arrests | 143 | Arrests | 2 | An officer shall immediately notify a supervisor when effectuating a felony arrest: an arrest where the officer used force: an arrest for obstructing or resisting an officer: a custodial arrest where the most serious violation was a vehicle infraction, simple drug possession, or, outside the French Quarter and Central Business District, any of the following city or state laws: Disturbing the Peace (City Code 54-103: LSA-R.S. 14:103): Criminal Trespass (City Code 54-153: LSA-R.S. 14:63): Obstructing Public Passages (City Code 54-40: LSA-R.S. 14:100.1): or Begging/Vagrancy (City Code 54-411: 14:107). Upon notification, the supervisor shall respond to the scene. |
| Stops, Searches, and Arrests | 144 | Arrests | 1 | The responding supervisor shall approve or disapprove the officer's arrest recommendation based on the existence of probable cause and NOPD policy. The supervisor shall take appropriate action to address violations or deficiencies in the officer's arrest recommendation, including releasing the subject, recommending non-disciplinary corrective action for the involved officer, and/or referring the incident for administrative or criminal investigation. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Stops, Searches, and Arrests | 145 | Arrests | 1 | NOPD patrol officers shall complete all arrest reports before the end of shift. NOPD field supervisors shall review each arrest report of officers under their command and shall memorialize their review in writing within 12 hours of receiving the report, absent exceptional circumstances. Supervisors shall review reports and forms for "boilerplate" or "pat" language, inconsistent information, lack of probable cause, or other indications that the information in the reports or forms is not authentic or correct. |
| Stops, Searches, and Arrests | 146 | Arrests | 2 | As part of the supervisory review, the supervisor shall document in an auditable format those arrests that are unsupported by probable cause, are in violation of NOPD policy or this Agreement, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The supervisor shall take appropriate action to address violations or deficiencies in making arrests, including recommending non-disciplinary corrective action for the involved officer, and/or referring the incident for administrative or criminal investigation. For each subordinate, the supervisor shall track each violation or deficiency and the corrective action taken, to identify officers needing repeated corrective action. The supervisor shall ensure that each violation or deficiency is noted in the officer's performance evaluations. The quality of these supervisory reviews shall be taken into account in the supervisor's own performance evaluations. NOPD shall take appropriate corrective or disciplinary action against supervisors who fail to conduct reviews of adequate and consistent quality. |
| Stops, Searches, and Arrests | 147 | Arrests | 2 | A command-level official shall review, in writing, all supervisory reviews related to arrests that are unsupported by probable cause, are in violation of NOPD policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The commander's review shall be completed within seven days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident to PIB for investigation, if appropriate. |
| Stops, Searches, and Arrests | 148 | Arrests | 2 | NOPD shall track centrally and at the District level the DA's acceptance and refusal rates of arrests made by NOPD and reasons for refusals, when made available by the DA, including those factors and information indicating that a failure to prosecute was due to the quality of officer arrests or concerns regarding officer conduct. Each District Commander shall be held accountable for referring to PIB for investigation any information regarding specific incidents of possible officer misconduct related to officer arrests noted in the DA's refusal reasons. |
| Stops, Searches, and Arrests | 149 | Stop and Search Data Collection and Review | 2 | Within 270 days of the Effective Date, NOPD shall develop a written or electronic report format to collect data on all investigatory stops and searches, whether or not they result in an arrest or issuance of a citation. This system shall allow for summarization and searches and also shall be integrated into the EWS. NOPD's stop and search data collection system shall be subject to the review and approval of the Monitor and DOJ, and shall require officers to document the following:<br>a) officer's name and badge number;<br>b) date and time of the stop;<br>c) location of the stop;<br>d) duration of the stop;<br>e) subject's apparent race, ethnicity, gender, and apparent age;<br>f) if a vehicle stop, presence and number of any passengers and the apparent race, ethnicity, gender, and age of each passenger; if a non-vehicle stop (e.g., pedestrian or bicycle), number of individuals stopped and the apparent race, ethnicity, gender, and age of each person: g) reason for the stop, including a description of the facts creating reasonable suspicion:<br>h) if a vehicle stop, whether the driver or any passenger was required to exit the vehicle, and reason:<br>i) whether any individual was asked to consent to a search and whether such consent was given:<br>j) whether a probable cause search was performed on any individual, including a brief description of the facts creating probable cause:<br>k) whether a pat-and-frisk or other search was performed on any individual, including a description of the facts justifying the pat-and-frisk or other search:<br>l) whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence: and<br>m) disposition of the stop, including whether a citation or summons was issued to, or an arrest was made of, any individual. |
| Stops, Searches, and Arrests | 150 | Stop and Search Data Collection and Review | 2 | Officers shall document investigatory stops and detentions, and any searches resulting from or proximate to the stop or detention. In all instances where property or evidence is seized, the officer shall immediately complete a police incident report documenting a complete and accurate inventory of the property or evidence seized, and submit the property or evidence seized to Central Property and Evidence before the end of shift. All documentation of stops, detentions, searches, and seizures shall be submitted to the officer's supervisor by the end of shift. Absent exceptional circumstances, field supervisors shall review investigatory stops and detention or search reports by field officers within 12 hours of receiving this report. Supervisors shall report and shall document: (1) those investigatory stops and detentions that appear unsupported by reasonable suspicion: (2) those searches that appear to be without legal justification: (3) stops or searches in violation of NOPD policy or this Agreement, or (4) stops or searches that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. |
| Stops, Searches, and Arrests | 151 | Stop and Search Data Collection and Review | 2 | The supervisor shall take appropriate action to address all violations or deficiencies in investigatory stops, detentions, or executions of searches, including recommending non-disciplinary corrective action for the involved officer, and/or referring the incident for administrative or criminal investigation. For each subordinate, the supervisor shall track each violation or deficiency and the corrective action taken, if any, in order to identify officers needing repeated corrective action. The supervisor shall ensure that each violation or deficiency is noted in the officer's performance evaluations. The quality and completeness of these supervisory reviews shall be taken into account in the supervisor's own performance evaluations. NOPD shall take appropriate corrective or disciplinary action against supervisors who fail to conduct complete, thorough, and accurate reviews of officers' investigatory detentions and searches. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Stops, Searches, and Arrests | 152 | Stop and Search Data Collection and Review | 1 | NOPD shall develop a protocol for comprehensive analysis, on at least an annual basis, of the stop and search data collected. This protocol shall be subject to the review and approval of the Monitor and DOJ, and shall identify and incorporate appropriate benchmarks for comparison. |
| Stops, Searches, and Arrests | 153 | Stop and Search Data Collection and Review | 1 | On at least an annual basis, NOPD shall issue a report summarizing the stop and search data collected, the analysis of that data, and the steps taken to correct problems and build on successes. The report shall be publicly available. |
| Stops, Searches, and Arrests | 154 | Stop and Search Data Collection and Review | 1 | NOPD shall ensure that all databases containing individual-specific data comply fully with federal and state privacy standards governing personally-identifying information. NOPD shall develop a process to restrict database access to authorized, identified users who are accessing the information for a specific and identified purpose. |
| Stops, Searches, and Arrests | 155 | First Amendment Right to Observe and Record Officer Conduct | 1 | NOPD shall ensure that, in accordance with their rights secured or protected by the Constitution and laws of the United States, onlookers or bystanders may witness, observe, record, and/or comment on officer conduct, including stops, detentions, searches, arrests, or uses of force. Officers shall respect the right of civilians to observe, record, and/or verbally comment on or complain about the performance of police duties occurring in public, and NOPD shall ensure that officers understand that exercising this right serves important public purposes. |
| Stops, Searches, and Arrests | 156 | First Amendment Right to Observe and Record Officer Conduct | 1 | Individuals observing stops, detentions, arrests, and other incidents shall be permitted to remain in the proximity of the incident unless one of the conditions in paragraph 160 is met. |
| Stops, Searches, and Arrests | 157 | First Amendment Right to Observe and Record Officer Conduct | 1 | Individuals shall be permitted to record police officer enforcement activities by camera, video recorder, cell phone recorder, or other means, unless one of the conditions in paragraph 160 is met. |
| Stops, Searches, and Arrests | 158 | First Amendment Right to Observe and Record Officer Conduct | 1 | Officers shall not threaten, intimidate, or otherwise discourage an individual from remaining in the proximity of or recording police officer enforcement activities. |
| Stops, Searches, and Arrests | 159 | First Amendment Right to Observe and Record Officer Conduct | 1 | Officers shall not detain, prolong the detention of, or arrest an individual for remaining in the proximity of, recording, or verbally commenting on officer conduct directed at the individual or a third party, unless one of the conditions in paragraph 160 is met. |
| Stops, Searches, and Arrests | 160 | First Amendment Right to Observe and Record Officer Conduct | 1 | Officers shall take appropriate law enforcement action against a bystander only if a bystander's presence would jeopardize the safety of the officer, the suspect, others in the vicinity or crime scene integrity; the bystander violates the law; or the bystander incites others to violate the law. |
| Stops, Searches, and Arrests | 161 | First Amendment Right to Observe and Record Officer Conduct | 1 | Officers shall not seize or otherwise coerce production of recorded sounds or images without obtaining a warrant, or order an individual to destroy such recordings. Where an officer has a reasonable belief that a bystander or witness has captured a recording of critical evidence related to a felony, the officer may secure such evidence for no longer than required to obtain a legal subpoena, search warrant, or other valid order. |
| Stops, Searches, and Arrests | 162 | Stop, Search, and Arrest Training | 2 | NOPD shall provide all officers with at least 24 hours within 365 days of the Effective Date, and at least four hours on at least an annual basis thereafter, of training on stops, searches, and arrests, including the requirements of this Agreement. Such training shall be taught by a qualified legal instructor with significant experience in Fourth Amendment issues, and shall:<br>a) address Fourth Amendment and related law, NOPD policies, and requirements in this Agreement regarding searches and seizures;<br>b) address First Amendment and related law, NOPD policies, and requirements in this Agreement on the rights of individuals to verbally dispute, observe, and record officer conduct;<br>c) address the difference between various police contacts by the scope and level of police intrusion: between probable cause, reasonable suspicion, and mere speculation: and between voluntary consent and mere acquiescence to police authority:<br>d) provide guidance on the facts and circumstances that should be considered in initiating, conducting, terminating, and expanding an investigatory stop or detention:<br>e) provide guidance on the level of permissible intrusion when conducting searches, such as "pat-downs" or "frisks:"<br>f) provide guidance on the legal requirements for conducting searches, with and without a warrant;<br>g) provide guidance on the permissible nature and scope of searches based on the level of intrusion on an individual's privacy interests, including searches conducted pursuant to probation or parole release provisions;<br>h) specify the procedures for executing searches, including handling, recording, and taking custody of seized property or evidence;<br>i) provide guidance on effecting an arrest with and without an arrest warrant: and<br>j) provide guidance regarding the nature and scope of searches incident to an arrest. |
| 6. CUSTODIAL INTERROGATIONS | | | | |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Custodial Interrogations | 163 | Interrogation Resctrictions and Equipment | 1 | Officers shall not use physical violence or make threats to carry out harm to the individual or the individual's family during custodial interrogations. |
| Custodial Interrogations | 164 | Interrogation Resctrictions and Equipment | 1 | All custodial interrogations that take place in a police facility, and all interrogations that involve suspected homicides or sexual assaults, shall be video and audio recorded. All recorded custodial interrogations will be recorded in their entirety. NOPD rejects the concept of a "pre-interview" and prohibits any decision not to record any portion of the interrogation based on such categorization. The recording equipment shall not be turned off unless the suspect states that he/she does not want the interview to be recorded. If the suspect requests that he/she does not want the interview to be recorded, the interviewer will record the subject making this request and shall document this request in the case report. |
| Custodial Interrogations | 165 | Interrogation Restrictions and Equipment | 1 | If the interrogation is not able to be video and audio recorded because of equipment failure or malfunction, detectives shall record the interrogation by means of a digital or cassette recorder. Any equipment failure shall be explained and documented in the case report, the case file, and in a memo to the Deputy Chief of the Investigation & Support Bureau. |
| Custodial Interrogations | 166 | Interrogation Restrictions and Equipment | 1 | All officers shall maintain in the case file their notes taken during interviews and interrogations. |
| Custodial Interrogations | 167 | Interrogation Restrictions and Equipment | 1 | Within 270 days from the Effective Date, NOPD shall designate interview rooms for all Districts and specialized units, and ensure that interview rooms are equipped with functioning audio and video recording technology that allows for recording and maintenance of all phases of interrogations. |
| Custodial Interrogations | 168 | Interrogation Restrictions and Equipment | 1 | Within 270 days from the Effective Date, NOPD shall use qualified interpreters for any interrogation of an LEP individual, and Miranda warnings shall be provided to the subject in his or her primary language. Because of the dual role bilingual NOPD employees may have when conducting an interrogation and simultaneously acting as an interpreter, they should only be used as an interpreter during an interrogation if they have identified themselves as officers or employees of the Department, are authorized as NOPD interpreters, and are trained in using interpretation protocols consistent with best practices, as required by this Agreement and NOPD's language assistance policy and plan. |
| Custodial Interrogations | 169 | Detective Selection and Interrogation Training | 1 | NOPD shall post all detective openings throughout the Department and shall revise eligibility criteria for detectives in Districts and specialized units to require appropriate experience, writing samples, supervisor recommendations, and an interview. |
| Custodial Interrogations | 170 | Detective Selection and Interrogation Training | 1 | Within 365 days of the Effective Date, NOPD shall develop and deliver at least 24 hours of formal training for newly assigned detectives on interrogation procedures and methods. This training shall include legal standards, ethics, the mechanics of conducting effective and constitutional investigations, and causes for investigative failures and false confessions. NOPD shall provide regular, and at least annual, in-service training to all detectives on updates and changes to the law regarding interrogations and confessions. |
| **7. PHOTO LINE UPS** | | | | |
| Photographic Line-Ups | 171 | Photographic Line-Ups | 1 | No officer who is involved in the investigation shall participate in administering the photographic lineup. The individual who administers the lineup shall not have any knowledge as to which photograph depicts the suspect in the investigation. |
| Photographic Line-Ups | 172 | Photographic Line-Ups | 1 | NOPD agrees that, before any lineup is administered, eyewitnesses shall be admonished that the suspect might or might not be present in the lineup. |
| Photographic Line-Ups | 173 | Photographic Line-Ups | 1 | NOPD agrees to select "filler" photographs—those that do not depict the suspect—of individuals who generally fit the witness's description of the perpetrator. When there is a limited or inadequate description of the perpetrator provided by the witness, or when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features. |
| Photographic Line-Ups | 174 | Photographic Line-Ups | 1 | NOPD agrees to keep a complete record of each display procedure and results. The record shall include the time, date, location, identity of the viewing person, photograph numbers, and name of the administrator of the line-up. |
| Photographic Line-Ups | 175 | Photographic Line-Ups | 2 | NOPD agrees to document other information pertinent to the display procedure, including any statements made by the viewing individual and identities of other persons present during the procedure. |
| Photographic Line-Ups | 176 | Photographic Line-Ups | 2 | If a suspect selection is made, NOPD agrees to mark and maintain as evidence the photographs used in the lineup, including a copy of the photo array if one was used. It shall be kept as evidence until the final disposition of the case, at which time it shall become a part of the permanent case file. |
| **8. BIAS FREE** | | | | |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Bias-Free Policing | 177 | Bias-Free Policing Training | 1 | NOPD agrees to provide all officers with four hours of comprehensive training on bias-free policing within 365 days of the Effective Date, and four hours annually thereafter, based on developments in Louisiana or federal law and NOPD policy. Such training shall emphasize that discriminatory policing in the form of either selective enforcement or non-enforcement of the law, including the selection or rejection of particular tactics or strategies based upon stereotypes or bias, is prohibited by policy and will subject officers to discipline. This training shall address: a) methods and strategies for more effective policing that rely upon non-discriminatory factors; b) police and community perspectives related to discriminatory policing; c) Constitutional and other legal requirements related to equal protection and unlawful discrimination, including the requirements of this Agreement; d) the protection of civil rights as a central part of the police mission and as essential to effective policing; e) the existence and impact of arbitrary classifications, stereotyping, and implicit bias; f) instruction in the data collection protocols required by this Agreement; g) identification of key decision points where prohibited discrimination can take effect at both the incident and strategic-planning levels; and h) methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including problem-oriented policing strategies. |
| Bias-Free Policing | 178 | Ensuring Bias-Free Policing | 1 | NOPD agrees to apply and administer programs, initiatives, and activities without discrimination on the basis of race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, or gender identity. |
| Bias-Free Policing | 179 | Ensuring Bias-Free Policing | 1 | NOPD agrees to provide clear guidance on prohibited conduct, including selective enforcement or non-enforcement of the law and the selection or rejection of particular tactics or strategies based upon stereotypes or bias. |
| Bias-Free Policing | 180 | Ensuring Bias-Free Policing | 1 | NOPD leadership and supervising officers shall consistently reinforce to subordinates that discriminatory policing is an unacceptable tactic, including in making decisions to use particular police tactics in particular communities based upon stereotypes or bias. |
| Bias-Free Policing | 181 | Ensuring Bias-Free Policing | 1 | NOPD agrees to incorporate the following elements in its training of officers: (1) introducing themselves at the initiation of contact with a civilian; (2) stating the reason for a investigatory stop or detention as soon as practicable; (3) ensuring an investigatory stop or detention is no longer than necessary to take appropriate action; and (4) acting with professionalism and courtesy throughout the interaction regardless of any provocation. |
| Bias-Free Policing | 182 | Ensuring Bias-Free Policing | 2 | Within 365 days of the Effective Date, NOPD agrees to incorporate requirements regarding bias-free policing and equal protection into its hiring, promotion, and performance assessment processes, including giving significant weight to an individual's history of sustained bias-related violations, as well as using interviews and other methods to assess the individual's ability to effectively practice bias-free policing. |
| Bias-Free Policing | 183 | Ensuring Bias-Free Policing | 1 | Within 365 days of the Effective Date, NOPD agrees to develop and implement a plan to provide all individuals within the City essential police services regardless of immigration status, in order to build and preserve trust among community members, and to more effectively prevent and solve crime. As part of this plan: a) Officers shall not take law enforcement action on the basis of actual or perceived immigration status; b) Officers shall not question victims of, or witnesses to, crime regarding their immigration status. Nothing in this provision shall prohibit NOPD from assisting nonimmigrant victims/witnesses in obtaining U-Visa / T-Visas, where appropriate; c) Officers shall not enforce La. R.S.14:100.13, which the Court of Appeals of Louisiana, Fourth Circuit, has found to unlawfully pre-empt federal regulations; and d) NOPD shall seek the assistance of community advocates in widely disseminating to the public, in English and in Spanish, NOPD's written policy incorporating these requirements. |
| Bias-Free Policing | 184 | Ensuring Bias-Free Policing | 1 | NOPD agrees to develop and implement a specific policy to guide officers' interactions with members of the LGBT community, which shall prohibit discrimination based on sexual orientation, gender identity, or gender expression. |
| Bias-Free Policing | 185 | Ensuring Bias-Free Policing | 1 | NOPD agrees that officers will treat LGBT individuals with courtesy, professionalism, and respect, and that officers are specifically prohibited from using harassing, intimidating, or derogatory language regarding or toward LGBT individuals. This shall include addressing transgender individuals with their chosen name, title, and pronoun. |
| Bias-Free Policing | 186 | Ensuring Bias-Free Policing | 1 | NOPD agrees that officers shall not construe sexual orientation, gender identity, or gender expression as reasonable suspicion or probable cause that an individual is or has engaged in any crime, and that officers shall not request identification from or otherwise initiate a contact solely on the basis of sexual orientation or gender identity/expression. |
| Bias-Free Policing | 187 | Ensuring Bias-Free Policing | 1 | NOPD agrees that officers will not subject transgender individuals to more invasive or more frequent frisk procedures due to transgender status. Officers shall not frisk any person for the purpose of determining that person's gender or to view or touch the person's genitals. Where same-gender searches are required by law or NOPD policy, the officer shall respect the gender identification expressed by the individual. Where the individual does not self-identify and the gender identity is not clear to a reasonable person or the officer is uncertain, the officer will take reasonable, non-invasive steps to determine the gender identity, such as asking the individual how the individual would like to be addressed. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Bias-Free Policing | 188 | Ensuring Bias-Free Policing | 2 | Within 365 days of the Effective Date, and at least annually thereafter, NOPD agrees to assess all NOPD programs, initiatives, and activities to ensure that no program, initiative, or activity is applied or administered in a manner that discriminates against individuals on the basis of race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, or gender identity. As part of its assessment, NOPD agrees to specifically include an assessment of misconduct complaints involving discrimination, use of force, motor vehicle and pedestrian stops, and arrests, including the selection or rejection of particular geographic deployment tactics or strategies based upon stereotypes or bias. NOPD shall base its assessment of programs, initiatives, and activities on accurate, complete, and reliable data, including data contained in the EWS, stop and detention data, use of force analyses, crime trend analysis in relation to population demographics, enforcement practices based on community concerns, operations plans, and after-action reports. NOPD agrees to make this assessment publicly available. |
| Bias-Free Policing | 189 | Language Assistance | 2 | NOPD agrees to effectively communicate with and provide timely and meaningful access to police services to all members of the community, regardless of their national origin or limited ability to speak, read, write, or understand English. To achieve this outcome, NOPD shall: <br>a) develop and implement a language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law, and that comports with best practices and current professional standards; <br>b) ensure that all NOPD personnel take reasonable steps to provide timely, meaningful language assistance services to LEP individuals they encounter and whenever an LEP individual requests language assistance services; <br>c) identify and assess demographic data, specifically the number of LEP individuals within its jurisdiction and the number of LEP victims and witnesses who seek NOPD services; d) use collected demographic and service data to identify and meet hiring needs for bilingual staff; <br>e) regularly assess the proficiency and qualifications of bilingual staff to become an NOPD Authorized Interpreter; <br>f) create and maintain an NOPDAI List and provide that list to the Orleans Parish Communications District 911 Communications Center; <br>g) ensure that Orleans Parish Communications District 911 call takers are trained to recognize the need for a NOPDAI to respond to an incident involving an LEP individual and dispatch a NOPDAI as appropriate. If no NOPDAI is available, the personnel shall contact a telephonic interpretation service provider. The call taker shall note in information to the radio dispatch that the 911 caller is an LEP individual and indicate the language; <br>h) develop protocols for interpretation for interrogations and interviews of LEP individuals to ensure a qualified interpreter is used for the taking of any formal statement from a suspect or witness in order to protect their legal rights; <br>i) develop and implement a process for taking, responding to, and tracking citizen complaints and resolutions of complaints filed by LEP individuals; <br>j) identify official and vital documents that are subject to public dissemination, and require translation of such documents into Spanish and Vietnamese, at a minimum. Such vital documents include: consent to search forms; witness and victim statement forms; citation forms; victim rights notification forms; citizen complaint forms; and notices advising LEP persons of free language assistance in connection with NOPD activities; <br>k) implement a process for recruiting qualified bilingual personnel to meet demonstrated service needs. As part of this process, NOPD agrees to establish meaningful relationships with local and state-wide institutions and community organizations that can serve as the source of qualified bilingual applicants and facilitate outreach to such advocates; and <br>l) implement incentives for bilingual employees to become  NOPDAIs, such as pay differentials, consideration in performance evaluations, or assignments. |
| Bias-Free Policing | 190 | Language Assistance | 1 | NOPD agrees to translate the language assistance plan and policy into Spanish and Vietnamese, and if it becomes appropriate, other languages, and post the English and translated versions in a public area of the police department building, District police stations, and the PIB building, as well as online, and in any other locations throughout the City where individuals go to seek police assistance. NOPD agrees to distribute the language assistance plan and policy to a variety of community organizations serving LEP communities encountered by NOPD. |
| Bias-Free Policing | 191 | Language Assistance | 1 | NOPD agrees to distribute its language assistance plan and policy to all staff and police personnel, and, within 365 days of the Effective Date, provide training to all personnel on providing language assistance services to LEP individuals. This training shall include: <br>a) NOPD's LEP plan and policies; and the requirements of Title VI and this Agreement; <br>b) how to access NOPD-authorized telephonic and in-person interpreters; <br>c) how to work with interpreters in the field; <br>d) cultural diversity; <br>e) how to communicate with LEP individuals in commonly encountered scenarios; and <br>f) basic command of Spanish or Vietnamese, for officers assigned to Districts with significant LEP populations. |
| Bias-Free Policing | 192 | Language Assistance | 2 | Within 180 days of Effective Date, NOPD agrees to designate a language access coordinator who shall coordinate and monitor compliance with its language assistance plan. The language access coordinator shall assess the effectiveness and efficiency of the plan on an ongoing basis and shall report to the Superintendent or his designee regarding needed improvements and any accountability concerns. The Superintendent or his designee shall consider the information provided by the coordinator and respond as necessary to ensure that NOPD's language assistance plan is effective. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Bias-Free Policing | 193 | Language Assistance | 2 | Within 180 days of the Effective Date, NOPD agrees to develop and implement a process of consultation with representatives of the LEP community to develop and at least annually review: implementation of the language assistance plan, including areas of possible collaboration to ensure its effectiveness; identification of additional languages that would be appropriate for translation of materials: accuracy and quality of NOPD language assistance services: and concerns, ideas, and strategies for ensuring language access. |
| Bias-Free Policing | 194 | Language Assistance | 1 | Within 270 days of the Effective Date, NOPD agrees to develop a process for determining, on an ongoing basis, whether new documents, programs, services, and activities need to be made accessible for LEP individuals. As part of this process NOPD shall: <br> a) document the number of LEP persons requiring NOPD services and their primary language: <br> b) collect data regarding the number of times an interpreter has been used, listed by language and type of interpreter (telephonic or in-person): <br> c) document the number of bilingual staff who have been evaluated for language proficiency, by language, job title, and level of proficiency: and <br> d) document use of translators, vital documents translated, and languages into which vital documents are translated. |
| **9. GENDER BIAS** | | | | |
| Policing Free of Gender Bias | 195 | Sexual assault | 2 | NOPD agrees to develop and implement clear policies and procedures governing its response to reports of sexual assault. NOPD agrees to ensure its policies and procedures on sexual assault comply with applicable law and comport with best practices and current professional standards. NOPD agrees to clearly delineate in policy the respective duties of patrol officers/first responders, sex crimes detectives, and supervisors, and to provide clear and detailed guidelines for steps at each stage of NOPD's response to a reported sexual assault, including dispatch response, initial officer response, and on-scene and follow-up investigation. |
| Policing Free of Gender Bias | 196 | Sexual assault | 1 | Patrol officers or other first responders shall document their observations and any actions taken, including any statements of victims, witnesses, and reporting persons, in calls for service related to sexual assaults. |
| Policing Free of Gender Bias | 197 | Sexual assault | 1 | NOPD protocols for conducting initial and follow-up victim interviews shall reflect the special needs of victims who may be in crisis or suffering from trauma. |
| Policing Free of Gender Bias | 198 | Sexual assault | 1 | NOPD agrees to provide clear and detailed guidelines for on-scene and follow-up investigation, including identifying, locating, and interviewing witnesses and suspects: collaborating with victim advocates: collecting evidence: special procedures for drug-facilitated sexual assaults: and documentation. |
| Policing Free of Gender Bias | 199 | Sexual assault | 1 | NOPD agrees to establish protocols for forensic examinations of both victims and suspects, as well as evidence preservation and crime scene management in the sexual assault context. These protocols shall be established in collaboration with the New Orleans SART and shall incorporate the recommendations of the National Protocol for Sexual Assault Medical Forensic Examination recommended protocols governing police procedure. |
| Policing Free of Gender Bias | 200 | Sexual assault | 1 | Through its on-going training, NOPD agrees to keep officers apprised, and shall inform victims, of available services, referrals, or other assistance. |
| Policing Free of Gender Bias | 201 | Sexual assault | 1 | Special Victims Section supervisors shall provide direct supervision of their subordinates by: <br> a) responding to assist officers investigating felony sexual assaults as defined under the Louisiana Criminal Code of Procedure: RS 14:42, Aggravated Rape: RS 14:42.1, Forcible Rape: RS 14:43, Simple Rape: RS 14:43.1, Sexual Battery: RS 14:43.2, Second Degree Sexual Battery: and RS 14:43.3, Oral Sexual Battery: <br> b) building relationships and enhancing cooperation with victim advocates and forensic examination programs, both to respond to and reduce the risk of sexual assault: <br> c) continually seeking and creating opportunities for training to enhance investigators' skills: <br> d) closely reviewing investigative reports and dispositions: <br> e) demonstrating a detailed understanding of victim issues and setting clear expectations of detectives regarding their treatment of victims: <br> f) incorporating victim interactions and services into subordinates' performance evaluations: and <br> g) following up all investigative leads generated from CODIS hits developed as a result of testing of the evidence in the case. |
| Policing Free of Gender Bias | 202 | Sexual assault | 1 | NOPD agrees to track all CODIS hit outcomes with the CODIS Hit Outcome Program software provided by National Institute of Justice. This software will provide accountability and outcome data for review by appropriate bodies, and provide feedback to the DNA Database Unit maintained by the Louisiana State Police. |
| Policing Free of Gender Bias | 203 | Sexual assault | 1 | NOPD agrees to incorporate IACP recommendations for VAW Law Enforcement Best Practices into its training, and update procedural requirements annually, to reflect changes in policy and law and developments in research and best practice. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Policing Free of Gender Bias | 204 | Sexual assault | 1 | In addition to annual in-service training, NOPD agrees to provide initial training for sex crimes detectives of no fewer than 32 hours. This training shall include:<br>a) realistic dynamics of sexual assault, including issues related to response to trauma and delayed reporting;<br>b) overcoming the perception of false/unfounded allegations to successfully investigate nonstranger sexual assault;<br>c) drug and alcohol facilitated sexual assault;<br>d) skills-based training on interviewing, including taped mock victim interviews;<br>e) report-writing;<br>f) discovery: and<br>g) collection, preservation, and submission of evidence in sexual assault cases, including selecting the evidence to be submitted for testing. |
| Policing Free of Gender Bias | 205 | Sexual assault | 1 | NOPD agrees to provide detailed initial and recruit training on responding to sexual assault for patrol officers and other first responders of no fewer than four hours, and ongoing annual in-service training. Additionally, NOPD agrees to incorporate fact-based scenarios involving stranger and non-stranger sexual assault into recruit and in-service training on topics such as general investigation, crime scene preservation, and report writing. NOPD's training on sexual assault shall include:<br>a) realistic dynamics of sexual assault, including issues related to response to trauma and delayed reporting;<br>b) report writing;<br>c) victim interviewing: and<br>d) initial assessment of victim and crime scene. |
| Policing Free of Gender Bias | 206 | Sexual assault | 1 | During the first year of this Agreement, neither patrol officers nor detectives shall code reported sexual assaults in a miscellaneous or non-criminal category without the express written approval of the Investigative Services Bureau Special Victim Section Commander and the Investigative Services Bureau Criminal Investigations Division Commander. Following this period, patrol officers shall not code reported sexual assaults in a miscellaneous or non-criminal category. Any decision by a detective to do so shall receive close secondary review and shall be approved in writing by an immediate Sex Crimes unit supervisor and the Division commander. |
| Policing Free of Gender Bias | 207 | Sexual assault | 1 | NOPD agrees to train supervisors and investigators in the Sex Crimes unit in the proper definitions and application of "unfounded," "false," and "baseless" classifications in the context of sexual assault. The immediate supervisor in the Sex Crimes Unit and the Special Victims Section Commander shall closely review and approve in writing any decision to classify a report as "unfounded." NOPD agrees to track each of these conclusions separately in NOPD's CCMS and publicly report them on at least a semi-annual basis. |
| Policing Free of Gender Bias | 208 | Sexual assault | 1 | NOPD agrees to separately track all reports of felony sexual assault, including drug-facilitated sexual assault, sexual assaults involving persons with disabilities rendering them unable to consent, sodomy, and male victims of sexual assault. NOPD agrees to collect data on the final disposition of sexual assault investigations, including whether an arrest was made and whether the DA charged the suspect or rejected the case and, if so, the reason for the rejection if the DA provides a reason. NOPD agrees to track this data in NOPD's CCMS. NOPD further agrees to make a reasonable effort to enter into a Memorandum of Understanding with the DA to track information related to the outcomes of domestic violence cases including whether the case was ultimately dismissed, resulted in a plea agreement, or tried, and the final outcome of the trial. |
| Policing Free of Gender Bias | 209 | Sexual assault | 2 | NOPD agrees to track in its Justice Trax Laboratory Information Management System the evidence collected and whether it was submitted to a crime lab for testing. Where evidence is not submitted, NOPD agrees to record in this System the justification for this decision. |
| Policing Free of Gender Bias | 210 | Sexual assault | 1 | NOPD agrees to work with the DA, community service providers, and other stakeholders to develop and implement a SART and collaborative SART agreement within 180 days of the Effective Date, to provide a coordinated and victim-centered approach to sexual violence. NOPD agrees to comply with its obligations under the SART collaborative agreement. |
| Policing Free of Gender Bias | 211 | Sexual assault | 1 | Within 365 days of the Effective Date, NOPD agrees to develop a mechanism to select and permit a committee of representatives from the community, including rape crisis advocates, service providers, and/or legal providers, to review, on a semi-annual basis: (1) sexual assault investigations disposed of as "unfounded;" (2) a random sample of open sexual assault investigations with the approval of the DA: and (3) after the first year of this Agreement, reported sexual assaults placed in a miscellaneous or non-criminal category. NOPD agrees to develop a protocol to ensure that feedback and recommendations from this committee are incorporated into policies, general training, remedial training for specific officers or detectives, and the decision to re-examine and re-open investigations, if warranted. This mechanism shall include appropriate safeguards to protect ongoing criminal or administrative investigations, confidential or privileged information, or personal information that is protected from disclosure by applicable laws. |
| Policing Free of Gender Bias | 212 | Domestic violence | 1 | NOPD agrees to delineate the respective duties of communications staff, patrol officers/first responders, District-level detectives, domestic violence detectives, and supervisors in its domestic violence policies and procedures, and agrees to provide clear and detailed guidelines for steps at each stage of NOPD's response to a report of domestic violence, including dispatch response; initial officer response, including entry procedures: and on-scene and follow-up investigation. |
| Policing Free of Gender Bias | 213 | Domestic violence | 2 | NOPD agrees to prioritize victim safety and protection at each stage of its response to a report of domestic violence and provide, through the New Orleans Integrated Domestic Violence Protocol, clear guidelines for on-scene and follow-up investigation, including identifying, locating, and interviewing suspects and witnesses, including child witnesses: assessment of the crime scene; evidence collection, including documentation of victim injuries; and seizure of weapons. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Policing Free of Gender Bias | 214 | Domestic violence | 1 | NOPD agrees to discourage dual arrests of offenders and victims. NOPD agrees to provide guidance on when dual arrests are permissible and require supervisory approval to effectuate a dual arrest. NOPD policies shall require the custodial arrest of domestic violence offenders who violate the terms of a valid and outstanding protection order, and those the officer has probable cause to believe have committed a domestic violence offense. NOPD training shall include training on how to identify the primary aggressor. |
| Policing Free of Gender Bias | 215 | Domestic violence | 1 | NOPD agrees to continue to participate in the operation, development, and sustainability of the NOFJC; work in co-location with other civil and criminal agencies and community-based organizations; and support a centralized, multi-agency Family Justice Center model in the handling of domestic violence and sexual assault cases in New Orleans. |
| Policing Free of Gender Bias | 216 | Domestic violence | 1 | NOPD agrees to collaborate and refer all victims to the NOFJC. |
| Policing Free of Gender Bias | 217 | Domestic violence | 1 | NOPD agrees to continue close collaboration with the DA and community providers to ensure that policies and protocols remain victim-centered and effective. To facilitate this collaboration, the Superintendent or a designee at the level of Commander or above shall meet with the Executive Committee of the NOFJC on at least a quarterly basis to discuss and coordinate policy, training, and other aspects of NOPD's response to domestic violence. NOPD agrees also to designate, and include at this quarterly meeting, an NOPD employee at the rank of sergeant or above responsible for reviewing and coordinating NOPD's policies on domestic violence. This designated officer shall review NOPD's domestic violence policies for internal consistency, and consistence with the Integrated Protocol developed by the NOFJC, the Blueprint for Safety, and any similar plan adopted by the City. He or she shall closely collaborate with NOFJC and the DA to strengthen the Integrated Protocol and/or the Blueprint for Safety to ensure that they comport with best practices, NOPD policies, and this Agreement, and to review and update policies at least annually, or as necessary. He or she also shall be responsible for identifying training needs with respect to implementing NOPD domestic violence policies, the Integrated Protocol, and/or the Blueprint for Safety. |
| Policing Free of Gender Bias | 218 | Domestic violence | 1 | NOPD agrees to assign sufficient staff to the DVU at the NOFJC to permit detectives to review, on a weekly basis, District-level reports on incidents of domestic violence, for the purpose of identifying training needs and tracking the Districts' response to domestic violence. The DVU shall have sufficient staff to conduct appropriate follow-up investigation on felony offenses, including incidents where a weapon was involved or the victim suffered serious bodily injury. This follow-up investigation shall include field work and coordination with the DA's Domestic Violence Prosecution Unit. NOPD shall assign sufficient detectives to the DVU based on the calls for service. |
| Policing Free of Gender Bias | 219 | Domestic violence | 1 | NOPD agrees to offer training on domestic violence that incorporates IACP recommendations for VAW Law Enforcement Best Practices and to annually update the training to reflect changes in policy, law, and developments in research and best practice. |
| Policing Free of Gender Bias | 220 | Domestic violence | 1 | NOPD agrees to provide at least four hours of initial and recruit training on domestic violence for all officers, and ongoing annual in-service training. Additionally, NOPD agrees to incorporate fact-based scenarios involving domestic violence into recruit and in-service training on such topics as general investigation, crime scene preservation, and report writing. NOPD's training on domestic violence shall include:<br>a) NOPD's policies and procedures on domestic violence, including the Integrated Protocol and/or Blueprint for Safety;<br>b) dynamics of domestic violence;<br>c) identifying the primary aggressor;<br>d) responding to and investigating strangulation in the context of domestic violence;<br>e) interviewing victims, witnesses and suspects;<br>f) report-writing; and<br>g) discovery. |
| Policing Free of Gender Bias | 221 | Domestic violence | 1 | NOPD agrees to provide domestic violence detectives with initial training of no fewer than 32 hours, and ongoing annual in-service training. This training shall include advanced, skills-based instruction in evidence collection; victim assistance; interviewing, including taped mock victim interviews; and other topics. |
| Policing Free of Gender Bias | 222 | Domestic violence | 1 | NOPD agrees to track dispositions of domestic violence investigations, including arrests and acceptance or refusal by the DA. NOPD further agrees to make a reasonable effort to enter into Memoranda of Understanding with appropriate agencies to track information related to the outcomes of domestic violence cases, including whether the case was ultimately dismissed, resulted in a plea agreement, or tried, and the final verdict or outcome of the trial. NOPD agrees to track dual arrests and domestic violence arrests by gender. NOPD agrees to publicly report this data on at least an annual basis |
| **10. COMMUNITY ENGAGEMENT** | | | | |
| Community Engagement | 223 | Community and Problem Oriented Policing | 2 | Within 180 days of the Effective Date, NOPD agrees to reassess its staffing allocation and personnel deployment, including its use of specialized units and deployment by geographic area, to ensure that core operations support community policing and problem-solving initiatives, and shall agree to modify any deployment strategy found to be incompatible with effective and community-oriented policing. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Community Engagement | 224 | Community and Problem Oriented Policing | 2 | NOPD agrees to deploy an adequate number and distribution of officers to ensure that all neighborhoods have a regularly assigned officer who is familiar with the geographic area, its issues, problems, and community leaders; engages in problem identification and solving activities with the community members around the community's priorities; works proactively with other city departments to address quality of life issues; and is not assigned to answer calls to service absent exigent circumstances. |
| Community Engagement | 225 | Community and Problem Oriented Policing | 1 | NOPD agrees to ensure its mission statement reflects its commitment to community-oriented policing and agrees to integrate community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems. |
| Community Engagement | 226 | Community and Problem Oriented Policing | 2 | Within 365 days of the Effective Date and annually thereafter, NOPD agrees to provide eight hours of structured annual in-service training on community policing and problem-oriented policing methods and skills for all officers, including supervisors, managers and executives.<br>This training shall include:<br>a) methods and strategies to improve public safety and crime prevention through community engagement;<br>b) scenario-based training that promotes the development of new partnerships between the police and community, targeting problem solving and prevention;<br>c) leadership, ethics, and interpersonal skills;<br>d) community engagement, including how to establish formal partnerships and actively engage community organizations, including youth, immigrant, and LGBT communities;<br>e) problem-oriented policing tactics, including a review of the principles behind the problem solving framework developed under the "SARA Model" (Scanning, Analysis, Response, Assessment), which promotes a collaborative, systematic process to address issues of the community, including safety and quality of life;<br>f) conflict resolution and verbal de-escalation of conflict; and<br>g) cultural awareness and sensitivity training. Cultural awareness training shall be designed and delivered in cooperation with City Human Relations Commission staff and community representatives selected by the Commission. |
| Community Engagement | 227 | Community and Problem Oriented Policing | 2 | NOPD agrees to continue to support community groups in each District (e.g., NONPACC) and to meet regularly with the communities each District serves. In addition, within 240 days of the Effective Date, NOPD agrees to develop and implement mechanisms to measure officer outreach to a broad cross-section of community members, with an emphasis on youth outreach, to establish extensive problem-solving partnerships and develop and implement cooperative strategies that build mutual respect and trusting relationships with this broader cross-section of stakeholders. NOPD agrees to develop and implement partnerships to provide immediate and ongoing support to families of victims of homicides and other serious crimes. |
| Community Engagement | 228 | Community and Problem Oriented Policing | 1 | Within 240 days of the Effective Date, NOPD agrees to develop measurements to assess the effectiveness of its community partnerships and problem-solving strategies, including the effectiveness of the Community Coordinating Sergeant program. NOPD agrees to prepare a publicly available report on at least a quarterly basis detailing its community policing efforts in each District, including developing community partnerships and participating in public meetings, and its problem-solving activities, including specific problems addressed and steps taken by NOPD and the community toward their resolution. This report shall also identify obstacles faced and recommendations for future improvement. At least annually, NOPD agrees to issue a publicly available report that summarizes these problem-solving and community policing activities. |
| Community Engagement | 229 | Community and Problem Oriented Policing | 2 | Within 180 days of the Effective Date, NOPD agrees to remake the COMSTAT meeting. The COMSTAT meeting will use the underlying collection and reporting of accurate and meaningful data regarding crime trends and other public safety measures to drive discussion of community-policing successes and challenges. NOPD agrees to ensure the COMSTAT meeting includes discussion and analysis of trends in misconduct complaints and community priorities to identify areas of concern, and to better develop interventions to address them. NOPD agrees to use techniques such as spatial mapping and scientific deployment analysis to enable COMSTAT to better support and measure community and problem-solving policing efforts. |
| Community Engagement | 230 | Biennial Community Survey | 1 | Within 180 days of the Effective Date, and every two years thereafter, NOPD and the City agree to conduct a reliable, comprehensive, and representative survey of members of the New Orleans community regarding their experiences with and perceptions of NOPD and of public safety. |
| Community Engagement | 231 | Biennial Community Survey | 1 | To conduct the biennial community survey, the Monitor shall retain an individual or entity, to be approved by DOJ, that shall:<br>a) develop a baseline of measures on public satisfaction with policing, attitudes among police personnel, and the quality of police-citizen encounters;<br>b) design, conduct, and analyze baseline and subsequent biennial surveys of a representative sample of City residents, police personnel, and detained arrestees;<br>c) review and consider prior law enforcement surveys in New Orleans and other cities, as well as current or recent concerns in New Orleans, in designing the survey;<br>d) engage in informal conversations with New Orleans residents, NOPD officers and command staff, and DOJ representatives, and observe community meetings;<br>e) ensure that the resident and arrestee surveys are designed to capture a representative sample of New Orleans residents, including members of each demographic category;<br>f) conduct the survey in English, Spanish, and Vietnamese, as necessary, to ensure representation of the entire New Orleans community; and<br>g) formally discuss the survey methodology with NOPD supervisors and DOJ and consider these opinions in the development of the initial survey and in making improvements to subsequent surveys. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Community Engagement | 232 | Biennial Community Survey | 1 | NOPD and the City agree to cooperate with the design and conduct of the survey by, for example, helping to organize focus groups of officers and obtaining and providing previous survey instruments and data. |
| Community Engagement | 233 | Biennial Community Survey | 1 | The report of the baseline survey and subsequent biennial surveys shall be publicly distributed and available. |
| **11. RECRUITMENT** | | | | |
| Recruitment | 234 | Comprehensive Recruitment Program | 1 | Within 180 days of the Effective Date, NOPD, working with Civil Service, agrees to develop a written, strategic recruitment plan that includes clear goals, objectives, and action steps for attracting high-quality applicants. The strategic recruitment plan shall clearly identify the duties and goals of NOPD's Recruitment Unit. The recruitment plan shall include specific strategies for attracting applicants with strategic thinking and problem-solving skills, interpersonal skills, emotional maturity, capacity to use technology, fluency in Spanish and Vietnamese (because these languages are spoken by a significant segment of the New Orleans Community), and the ability to collaborate with a diverse cross-section of the community. |
| Recruitment | 235 | Comprehensive Recruitment Program | 1 | The Recruitment Unit staff shall be publicly identified, shall work with Civil Service, and shall interact directly with candidates applying for NOPD positions. NOPD agrees to develop a protocol that includes specific criteria for assigning officers to the Recruitment Unit, including officers' work history, disciplinary history, length of employment at NOPD, and demonstrated commitment to community-oriented policing. |
| Recruitment | 236 | Comprehensive Recruitment Program | 2 | NOPD agrees to staff the Recruitment Unit sufficiently to permit the Unit to fulfill its responsibilities as set out in this Agreement, NOPD policy, and applicable law. |
| Recruitment | 237 | Comprehensive Recruitment Program | 2 | NOPD agrees to train all current and new staff assigned to the Recruitment Unit on recruiting a qualified and diverse workforce, including training on employment law. NOPD agrees to establish specific performance criteria to evaluate recruitment staff effectiveness in hiring increasing numbers of high quality recruits. |
| Recruitment | 238 | Comprehensive Recruitment Program | 1 | Within 180 days of the Effective Date, NOPD agrees to develop and implement a system for psychological screening and assessment of all NOPD recruit candidates, and to set criteria to ensure that only individuals suitable for policing are accepted into NOPD training academy. |
| Recruitment | 239 | Comprehensive Recruitment Program | 1 | The Recruitment Unit shall conduct affirmative outreach to a broad group of community members (e.g., college and university initiatives, military outreach, the PCAB, and community meetings in each District), and shall create and foster relationships with those organizations to enhance recruitment efforts. |
| Recruitment | 240 | Comprehensive Recruitment Program | 1 | NOPD and the City, working with Civil Service, agree to ensure that the dates and times of the officer recruit application period and testing dates are advertised widely. |
| Recruitment | 241 | Comprehensive Recruitment Program | 1 | Within 180 Days of Effective Date, NOPD and the City, working with Civil Service, agree to establish standardized qualifications and guidance for who may serve on a recruit applicant interview panel. Eligibility for serving on a recruit applicant interview panel shall include a review of the officer's internal disciplinary file and personnel file. |
| Recruitment | 242 | Comprehensive Recruitment Program | 1 | NOPD and the City, working with Civil Service, agree to ensure that interview panelists and all officials who interview potential NOPD recruits receive specialized training in the goals of NOPD recruitment and hiring, including emphasis on integrity, community policing, and non-discriminatory policing. |
| Recruitment | 243 | Comprehensive Recruitment Program | 1 | Within 180 days of the Effective Date, NOPD and the City agree to work with Civil Service to establish a standardized scoring system to be used by interview panelists. The scoring system shall be used to assess recruit applicants immediately following the applicant's interview. These assessment forms shall be maintained by the Recruitment Unit. |
| Recruitment | 244 | Comprehensive Recruitment Program | 1 | The Recruitment Unit will annually report its recruiting activities and outcomes, including the number of applicants, interviewees, and selectees, and the extent to which the Recruitment Unit has been able to recruit applicants with needed skills, such as problem-solving abilities or fluency in Spanish or Vietnamese, and a discussion of any challenges to recruiting highly qualified applicants. |
| **12. ACADEMY** | | | | |
| Academy and In-Service Training | 245 | Training Coordination and Planning | 1 | The Training Division shall be the central coordination point for all training, including: the recruit training academy: field training: all in-service training, including firearms and other use of force training: roll-call training: supervisory training: tactical and task force training: and all elective training. |
| Academy and In-Service Training | 246 | Training Coordination and Planning | 1 | NOPD's Training Division Commander shall be responsible for overseeing all NOPD training, including recruit academy: field training: all in-service training, and for ensuring that training is delivered consistent with NOPD's written training plan. |
| Academy and In-Service Training | 247 | Training Coordination and Planning | 1 | Within 90 days of the Effective Date, NOPD agrees to create a full-time Department-wide Training Liaison position within the Training Division, and designate a single training coordinator in each District and central organizational unit to coordinate and document training. The Training Liaison shall establish and maintain communications with each District training coordinator to ensure that all officers complete training as required and that documentation of training is provided to the Training Division. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Academy and In-Service Training | 248 | Training Coordination and Planning | 2 | Within 120 days of the Effective Date, NOPD agrees to establish a Training Advisory Committee that shall include staff from the NOPD Training Division, NOPD field personnel, high-level NOPD command staff (Deputy Superintendent or above), a community representative from the Police-Community Advisory Board, two representatives from area colleges and universities, an outside police professional with expertise in model training practices, and a representative from the FBI, the District Attorney's office, the USAO, and the City Attorney's Office. |
| Academy and In-Service Training | 249 | Training Coordination and Planning | 1 | Within 270 days of the Effective Date, NOPD's Training Advisory Committee shall develop a written training plan for NOPD's recruit academy, field, and in-service training, to ensure that recruits, officers, and civilian personnel are trained to effectively and lawfully carry out their duties in accordance with the Constitution and laws of the United States. The plan shall comport with best practices and the requirements of this Agreement and shall:<br>a) define responsibilities and authority of personnel involved in managing, supervising, and implementing training;<br>b) identify training priorities and broad training goals;<br>c) delineate an industry-recognized, systematic approach to training development that includes the following concepts: analysis, design, development, implementation, and evaluation. This approach should enable NOPD to identify and validate job tasks in sufficient detail to derive learning objectives, which, in turn, should drive the selection of instructional strategies and assessments;<br>d) develop instructional strategies that incorporate active learning methods such as problem-solving and scenario-based activities, based on current theories of learning;<br>e) address program administration policies, classroom/facility use, and instructor training and<br>development; and<br>f) establish the frequency and subject areas for recruit and in-service training. |
| Academy and In-Service Training | 250 | Training Coordination and Planning | 1 | Upon the Superintendent's approval of the training plan, NOPD shall submit the training plan to the Monitor and DOJ. The Monitor shall review the training plan and provide the Parties with written comments within 30 days of receipt thereof. DOJ shall have 30 days from receipt of the Monitor's comments on the training plan to determine whether the training plan is consistent with the requirements of this Agreement and to make its decision on approval. DOJ shall not unreasonably withhold approval. |
| Academy and In-Service Training | 251 | Training Coordination and Planning | 1 | The Training Advisory Committee shall annually review and update NOPD's training plan. To inform this update, the Training Advisory Committee shall conduct a needs assessment, taking into consideration: trends in misconduct complaints; problematic uses of force; analysis of officer safety issues; input from members at all levels of NOPD; input from members of the community, including community concerns; court decisions; research reflecting the latest in law enforcement trends; individual District needs; and any changes to Louisiana or federal law, or to NOPD policy. |
| Academy and In-Service Training | 252 | Curriculum Development | 1 | Within 365 days of the Effective Date, NOPD shall create and staff a full-time position of Curriculum Director to establish and oversee a formal training curriculum development and assessment process consistent with the training plan described above. The Curriculum Director shall ensure that curricula and related lesson plans are based on learning objectives that are directly linked to validated job tasks. |
| Academy and In-Service Training | 253 | Curriculum Development | 1 | Within 365 days of the Effective Date, NOPD agrees to develop and implement a lesson plan template that will be used for all training courses at NOPD. At a minimum, each template shall include: course title; course overview; date lesson plan was created or updated; learning objectives; prerequisites (if any); course length; required materials, equipment, and facilities; safety measures required (if applicable); testing/certification, and reference list. The lesson plan shall describe content and instructional strategies in sufficient detail to ensure consistent delivery of instruction by different instructors. |
| Academy and In-Service Training | 254 | Curriculum Development | 1 | Within 365 days of the Effective Date, NOPD agrees to develop and implement recruit academy curricula that comport with NOPD's training plan and comprehensively address the subject areas listed in paragraph XII.E., below. |
| Academy and In-Service Training | 255 | Curriculum Development | 1 | Within 365 days of the Effective Date, NOPD agrees to develop and implement in-service curricula that comport with NOPD's training plan and that comprehensively address each of the subject areas in which this Agreement requires in-service training. |
| Academy and In-Service Training | 256 | Curriculum Development | 2 | The Curriculum Director shall review all training curricula, lesson plans, and procedures for consistency, quality, accuracy, currency, completeness, and compliance with applicable law and NOPD policy. The Curriculum Director shall ensure that a variety of adult learning techniques, scenario-based training, and problem-solving practices, in addition to traditional lecture formats, are incorporated into all training. The Curriculum Director shall also ensure that all curricula, lesson plans, instructor's qualifications, and testing materials are reviewed by the Training Advisory Committee and, where appropriate, persons external to NOPD with expertise in the relevant lesson areas. |
| Academy and In-Service Training | 257 | Curriculum Development | 1 | NOPD shall submit all new or revised training curricula and lesson plans for training required by this Agreement to the Monitor and DOJ for review and comment at least 90 days prior to the scheduled date of training delivery. The Monitor shall review the curricula or lesson plans and provide the Parties with written comments within 30 days of receipt thereof. Within 30 days of receipt of the Monitor's comments, DOJ shall have the right to review and comment on whether the curricula and lesson plans are consistent with, and incorporate the requirements of, this Agreement and applicable law. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Academy and In-Service Training | 258 | Instructor Selection | 2 | NOPD agrees to implement the Knowledge, Skills, and Ability Protocols for all staff assigned to the training division and all adjunct instructors within NOPD. NOPD agrees that minimum qualification requirements for Academy staff shall include:<br>a) Baccalaureate Degree or exceptional practical law-enforcement or subject matter expertise with at least six years of combined NOPD service;<br>b) Successful completion of the FBI Instructor Development Course; and<br>c) No 'sustained' PIB investigations within 24 months of applying for an Academy position or a pending 'open' investigation at time of application. |
| Academy and In-Service Training | 259 | Instructor Selection | 1 | NOPD agrees to actively seek out and retain qualified instructors, including instructors from outside NOPD, with expertise in areas such as law and investigations, as necessary, to supplement the skills of in-house training staff and adjunct instructors. Additionally, NOPD agrees to incorporate experts and guest speakers such as judges, prosecutors, including representatives of the USAO, crime victims, and community members, to participate in courses at the Training Academy. |
| Academy and In-Service Training | 260 | Instructor Selection | 1 | NOPD agrees to ensure that all new and current Training Division staff and NOPD adjunct instructors receive 40 hours of initial training, including training on effective teaching, adult-learning techniques, curriculum development, and annual in-service training. NOPD agrees to require and ensure that instructors use only curricula and lesson plans that have been approved by the Training Division. NOPD agrees to further require that instructors use a variety of adult learning techniques, scenario-based training, and problem-solving practices, in addition to traditional lecture formats. |
| Academy and In-Service Training | 261 | Instructor Selection | 2 | Annually, NOPD agrees to evaluate the performance of Training Division staff and all adjunct or other training instructors and shall remove staff and instructors who do not meet NOPD criteria. NOPD agrees to document each evaluation using an established set of criteria to be developed pursuant to this Agreement. |
| Academy and In-Service Training | 262 | Training Evaluation | 1 | Within 365 days of the Effective Date, NOPD agrees to develop and implement a process that provides for the collection, analysis, and review of data to document the effectiveness of training and to improve future instruction, course quality, and curriculum. This process shall measure and document student reaction to and satisfaction with the training they received; and student learning as a result of training, including the extent to which students are applying the knowledge and skills acquired in training to their jobs. |
| Academy and In-Service Training | 263 | Training Evaluation | 1 | Within 365 days of the Effective Date, NOPD agrees to develop and implement documented and approved testing policies and procedures to ensure that all testing is valid, reliable, and fair. Both knowledge-based and performance-based tests shall be designed, developed, administered, and scored according to established professional standards of practice. All tests shall be job-related, testing knowledge and skills required for successful job performance. |
| Academy and In-Service Training | 264 | Recruit Training Academy | 1 | Within 365 days of the Effective Date, NOPD agrees to develop and implement a recruit training program that comports with NOPD's written training plan described above, and that reflects the requirements of this Agreement. |
| Academy and In-Service Training | 265 | Recruit Training Academy | 1 | NOPD agrees to modify the amount and content of recruit academy training to comport with its written training plan and the requirements of this Agreement. NOPD agrees to provide recruits with at least 880 hours of academy instruction. |
| Academy and In-Service Training | 266 | Recruit Training Academy | 1 | In addition to the training requirements reflected in the substantive provisions of this Agreement, NOPD agrees to ensure sufficient recruit academy instructional hours in the following specific areas:<br>a) appropriate use of force;<br>b) stops, searches, and arrests;<br>c) bias-free policing and community/problem-solving policing;<br>d) investigations, including crime scene investigations and investigative techniques;<br>e) ethics, including preventing and reporting misconduct and peer intervention;<br>f) crisis intervention;<br>g) crowd control, including consistent application of field-force tactics and crowd management;<br>h) report writing;<br>i) recognizing, taking, and responding to allegations of misconduct received in the field;<br>j) statutory law, including definitions of specific offenses, and scenario-based exercises to determine the specific elements of offenses; and<br>k) how to communicate with LEP individuals in commonly encountered scenarios. |
| Academy and In-Service Training | 267 | Recruit Training Academy | 1 | NOPD agrees to structure the recruit training academy so that instruction is delivered in logical progression to ensure that each skill or unit builds on previous skills or units. NOPD agrees to schedule training modules so that recruits become proficient in fundamental tasks before progressing to more advanced skills and activities. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Academy and In-Service Training | 268 | Recruit Training Academy | 1 | In addition to inclusion in separate training modules, NOPD agrees to incorporate training on constitutional and statutory law: ethical decision making; community policing: de-escalation of force; and bias-free policing throughout the course of the recruit training academy. NOPD agrees to reinforce legal concepts in the context of instruction on interviewing and interrogation, crime scene processing, and report writing. |
| Academy and In-Service Training | 269 | Recruit Training Academy | 1 | NOPD agrees to use problem-based learning and scenario-based exercises throughout the course of the recruit academy. NOPD agrees to ensure that scenario-based exercises have specific training objectives, and to evaluate achievement in multiple areas, such as constitutional and statutory law, officer safety, NOPD procedures, and report writing. NOPD agrees to require recruits to produce actual reports and statements at the end of scenario-based exercises. |
| Academy and In-Service Training | 270 | Recruit Training Academy | 1 | NOPD agrees to intersperse skills training in areas such as driving, firearms, and defensive tactics throughout the course of the recruit training academy, to allow recruits to develop and reinforce these skills over time. |
| Academy and In-Service Training | 271 | Recruit Training Academy | 1 | NOPD agrees to not add recruit candidates after the first week of the recruit training academy. |
| Academy and In-Service Training | 272 | Recruit Training Academy | 1 | To ensure continuity of training, NOPD agrees to minimize interruptions to recruit academy training for the purpose of staffing special events and other functions. This does not preclude the use of recruits for Mardi Gras-related service functions or in case of emergencies. |
| Academy and In-Service Training | 273 | Recruit Training Academy | 1 | Within 365 days of the Effective Date, NOPD agrees to ensure that the recruit academy is sufficiently staffed to effectively train recruits, and that the deployment of recruit academy staff to cover patrol shifts or other duties does not disrupt training activities. This does not prohibit academy staff from working 'Mission' patrols. Recruit classes shall not exceed 30 candidates per class. |
| Academy and In-Service Training | 274 | Recruit Training Academy | 1 | Within 365 days of the Effective Date, NOPD agrees to provide recruits and officers with appropriate training facilities to ensure adequate access to safe and effective training. The Parties agree that such training can be provided without constructing any new facilities. |
| Academy and In-Service Training | 275 | Field Training Program | 1 | Within 365 days of Effective Date, NOPD agrees to develop and implement a field-training program for recruit academy graduates that comports with NOPD's written training plan and this Agreement. NOPD's field training program shall follow academy training and shall be at least 16 weeks. |
| Academy and In-Service Training | 276 | Field Training Program | 2 | NOPD's policies and procedures on field training shall delineate the criteria and methodology for selecting FTOs and Field Training Sergeants. Only highly qualified officers shall serve as FTOs and Field Training Sergeants. NOPD agrees to establish formal eligibility criteria for FTOs and Field Training Sergeants based on performance evaluations, previous superior performance as police officers, and complaint and disciplinary histories. FTO appointments will be subject to review for reappointment at the Training Division Commander's discretion. District commanders will also have discretion, upon consultation with the Training Academy staff, to remove a field-training officer from the FTO program. |
| Academy and In-Service Training | 277 | Field Training Program | 1 | NOPD agrees to ensure that all current and new FTOs and Field Training sergeants receive at least 40 hours of initial supervisory-level training and annual in-service training in the following areas: management and supervision: community-oriented policing: effective problem solving techniques: and field communication. FTOs and Field Training sergeants shall be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, practicing and teaching community-oriented policing, and solving problems effectively. NOPD shall maintain current documentation of FTOs' evaluations and training. |
| Academy and In-Service Training | 278 | Field Training Program | 1 | NOPD agrees to ensure that recruits in the field-training program are trained in a variety of geographic areas within New Orleans: in a variety of shifts: and with several FTOs. |
| Academy and In-Service Training | 279 | Field Training Program | 1 | Annually, NOPD agrees to review and evaluate the performance of FTOs and Field Training Sergeants, with re-certification dependent on satisfactory prior performance and feedback from the Training Division staff. |
| Academy and In-Service Training | 280 | Field Training Program | 1 | Within 365 days of the Effective Date, NOPD agrees to create a mechanism for recruits to provide confidential feedback regarding the quality of their field training, including the extent to which their field training was consistent with what they learned in the Academy, and suggestions for changes to Academy training based upon their experience in the FTO program. NOPD agrees to consider feedback and to document its response, including the rationale behind any responsive action taken or decision to take no action. |
| Academy and In-Service Training | 281 | Field Training Program | 1 | Within 365 days of the Effective Date, NOPD agrees to review and revise its FTO participation policy to establish and implement a program that effectively attracts the best FTO candidates. |
| Academy and In-Service Training | 282 | Field Training Program | 1 | NOPD's training advisory committee shall conduct, within 365 days of the Effective Date, a study of the feasibility of implementing a Police Training Officer model that would incorporate community- and problem-oriented policing principles, and problem-based learning methods of teaching. If NOPD and the City find it feasible, NOPD and the City agree to implement this program. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Academy and In-Service Training | 283 | In-Service Training | 1 | Within 365 days of the Effective Date, NOPD agrees to develop and implement a mandatory annual in-service training program that comports with NOPD's written training plan and the requirements of this Agreement. NOPD agrees to provide at least 64 hours of in-service training to each officer pursuant to this program within 365 days of the Effective Date of this Agreement and annually thereafter. In-service training will be comprised of a 40-hour core curriculum and 24 hours of additional elective training. Specialized training for officers in certain units or assignments (such as the initial 40-hour training for specialized CIT officers) shall be considered additional elective training. |
| Academy and In-Service Training | 284 | In-Service Training | 1 | NOPD agrees to create core-training requirements for the following positions: officers; command staff; lieutenants and sergeants; detectives; narcotics investigators; and specialized units. |
| Academy and In-Service Training | 285 | In-Service Training | 1 | NOPD agrees to plan, develop, and implement a comprehensive roll-call training program. Roll-call training shall be provided at the beginning of each shift. Roll-call training shall include special topics selected by the Training Division Commander or District Commanders that address officer safety, readiness, community concerns, or departmental procedural matters. |
| Academy and In-Service Training | 286 | Training Records | 1 | Within 365 days of the Effective Date, NOPD agrees to develop and implement a system that will allow the Training Division to electronically track, maintain, and report complete and accurate records of current curricula, lesson plans, training delivered, and other training materials in a centralized electronic file system. This system shall, at a minimum:<br>a) maintain training records for each recruit and each sworn member of the Department;<br>b) record the course description, duration, curriculum, date and location of training, name of instructor, and the personnel who completed the training; and<br>c) document officers who did not complete required training and all corrective actions taken. |
| Academy and In-Service Training | 287 | Training Records | 1 | Within 365 days of the Effective Date, NOPD agrees to develop and implement accountability measures, including disciplinary and non-disciplinary corrective action, to ensure that all officers successfully complete all required training programs in a timely manner. |
| Academy and In-Service Training | 288 | Training Records | 1 | NOPD agrees to document all training provided to or received by NOPD officers, whether required or otherwise. Officers shall sign an acknowledgement of attendance or digitally acknowledge completion of training. NOPD shall report training delivered and received annually. This report shall include a:<br>a) description of each course, including a summary of the subject matter; the duration, date and location, the name of the instructor, and the number of persons who completed the training;<br>b) listing of all officers who completed in-service, recruit, specialized, or elective training; and<br>c) listing of officers who did not complete required training and the corrective action taken for each officer. |
| **13. OAP** | | | | |
| Officer Assistance & Support | 289 | Department-Wide Health and Wellness Program | 2 | NOPD agrees to further develop and offer a centralized and comprehensive range of mental health services that comports with best practices and current professional standards, which include: readily accessible confidential counseling services with both direct and indirect referrals; critical incident debriefings and crisis counseling; peer counseling; and stress management training. |
| Officer Assistance & Support | 290 | Department-Wide Health and Wellness Program | 2 | Within 180 days, NOPD agrees to develop a department-wide mental and physical health and wellness program that:<br>a) provides and specifies access to mental health services for officers following traumatic incidents;<br>b) ensures that in situations where an officer is referred for a fitness-for-duty evaluation to assess psychological fitness, the evaluation is performed by a provider external to NOPD;<br>c) ensures that the roles, duties, and responsibilities of NOPD mental health professionals are properly delineated to avoid risk of conflict and increase officer confidence in NOPD provided mental health services;<br>d) provides access to consistent counseling and treatment by mental health professionals; and<br>e) fosters participation and compliance by ensuring confidentiality under federal and state privacy laws; and<br>f) incorporates mental health services for NOPD officers and their families into NOPD's crisis response and emergency preparedness planning. |
| Officer Assistance & Support | 291 | Department-Wide Health and Wellness Program | 2 | NOPD agrees to compile and distribute a list of internally and externally available mental health services to all officers and employees. NOPD should periodically consult with community and other outside service providers to maintain a current and accurate list of available providers. |
| Officer Assistance & Support | 292 | Department-Wide Health and Wellness Program | 2 | NOPD agrees to train management and supervisory personnel in officer support services protocols to ensure wide availability and use of officer support services; and agrees to incorporate discussion of currently available officer support services, and how to access those services, into annual officer in-service training. |
| Officer Assistance & Support | 293 | Department-Wide Health and Wellness Program | 2 | NOPD agrees to involve mental health professionals in developing and providing academy and in-service training on mental health stressors related to law enforcement and the mental health services available to officers. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Officer Assistance & Support | 294 | Department-Wide Health and Wellness Program | 2 | NOPD agrees to involve mental health professionals in officer training on use of force, to address such topics as: peer intervention by fellow officers to stop the use of excessive force; the interaction of human perception and threat assessment; decision making under highly charged conditions; psychological methods of situation control; patrol de-escalation and defusing techniques that not only provide a tactical response, but also respond to the fear stimulated by confrontations; anger management programs; and training in verbal control and communication, including conflict resolution. |
| **14. PERFORMANCE EVALS & PROMOTIONS** | | | | |
| Performance Evaluations & Promotions | 295 | Performance Evaluations | 1 | Within 365 days of the Effective Date, NOPD agrees to work with Civil Service to develop and implement an NOPD-specific system that comports with best practices and the requirements of this Agreement to accurately evaluate officer performance in areas related to integrity, community policing, and critical police functions, on both an ongoing and annual basis. |
| Performance Evaluations & Promotions | 296 | Performance Evaluations | 1 | As part of this program, NOPD agrees to work with Civil Service to establish a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor that shall include assessment of: a) community engagement and communication with the public as appropriate to assignment; b) use of community-policing and problem-solving strategies as appropriate to assignment; c) civilian commendations and complaints; d) disciplinary actions; e) compliance with policies on usage of sick leave and other leave; f) compliance with policies on secondary employment; g) safety (e.g., POST officer safety standards and vehicle operations); h) training; i) report writing; and j) decision-making skills. |
| Performance Evaluations & Promotions | 297 | Performance Evaluations | 1 | Annual performance evaluations shall be based upon all work performed during the specific rating period. The officer's current direct supervisor shall complete the performance evaluation. |
| Performance Evaluations & Promotions | 298 | Performance Evaluations | 2 | Performance evaluations shall include a narrative by the supervisor that discusses any areas in which the officer's performance needs to improve, and areas of particular growth and achievement during the rating period. |
| Performance Evaluations & Promotions | 299 | Performance Evaluations | 2 | As part of the annual performance review process, supervisors shall meet with the employee whose performance is being evaluated to discuss the evaluation. In addition, supervisors shall meet with their subordinates on an ongoing basis to discuss their performance and shall document the supervisor's ongoing efforts and communications regarding officer performance challenges and areas of growth. |
| Performance Evaluations & Promotions | 300 | Performance Evaluations | 1 | Supervisors shall complete training consistent with best practices on how to effectively evaluate officer performance. Within 365 days of the Effective Date, and as part of initial supervisory training, supervisors shall be required to complete at least four hours of training, focused on how to effectively evaluate officer performance. This training is in addition to any training on the mechanics of how to complete employee performance evaluations. The performance evaluations for each supervisor (whether first-line or commander) shall include assessment of the supervisor's ability and effectiveness in conducting the supervisory reviews as required by this Agreement, including monitoring, deterring, and addressing misconduct by officers they supervise. |
| Performance Evaluations & Promotions | 301 | Performance Evaluations | 2 | NOPD agrees to hold supervisors of all ranks accountable for conducting timely, accurate, and complete performance evaluations of their subordinates. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Performance Evaluations & Promotions | 302 | Promotions | 1 | Within 365 days of the Effective Date, NOPD agrees to work with Civil Service to develop and implement fair and consistent promotions practices that comport with best police practices and the requirements of this Agreement and result in the promotion of officers who are both ethical and effective. NOPD agrees to work with Civil Service to provide clear guidance on promotional criteria, and to prioritize effective, constitutional, and community-oriented policing as criteria for promotion. |
| Performance Evaluations & Promotions | 303 | Promotions | 1 | NOPD agrees to request that Civil Service remove from the promotional eligibility list any officer whose history does not strongly indicate that the officer is likely to be ethical and effective in the position to which he or she is being considered for promotion. Factors to be considered in making this assessment include:<br>a) effective use of community-policing strategies;<br>b) number of sustained and not sustained complaints;<br>c) number and circumstances of uses of force, including any found out of policy and use of force complaints;<br>d) disciplinary history;<br>e) problem-solving skills;<br>f) interpersonal skills;<br>g) education; and<br>h) support for departmental integrity measures. |
| Performance Evaluations & Promotions | 304 | Promotions | 1 | NOPD agrees to work with Civil Service to establish specific criteria for disciplinary findings, which shall make an officer presumptively ineligible for promotion for a certain time period. Officers with pending investigations or disciplinary action in a matter alleging serious misconduct shall not be eligible for promotion. |
| Performance Evaluations & Promotions | 305 | Promotions | 1 | The City agrees to work with Civil Service to create opportunities for officers to be placed on the promotional list at least every two years. |
| **15. SUPERVISION** | | | | |
| Supervision | 306 | Duties of Supervisors | 2 | NOPD supervisors shall be held accountable for providing the close and effective supervision necessary to direct and guide officers. Close and effective supervision requires that supervisors: respond to the scene of certain arrests; review each arrest report; respond to the scene of uses of force as required by this Agreement; investigate each use of force (except those investigated by FIT); review the accuracy and completeness of officers' Daily Activity Reports; respond to each complaint of misconduct; ensure that officers are working actively to engage the community and increase public trust and safety; and provide counseling, redirection, and support to officers as needed, and that supervisors are held accountable for performing each of these duties. |
| Supervision | 307 | Duties of Supervisors | 1 | Within 270 days of the Effective Date, all Field Operations Bureau District officers (including patrol, task force, district investigative, and narcotics units) shall be assigned to a single, consistent, and clearly-defined supervisor. |
| Supervision | 308 | Duties of Supervisors | 2 | Task force and narcotics supervisors shall actually work the same days and hours as the officers they are assigned to supervise absent unusual circumstance or when the supervisor is on vacation, in training, or ill. Investigative unit supervisors shall work generally the same days and hours as the officers they are assigned to supervise, taking into account that shift differences will not permit complete supervisory overlap. |
| Supervision | 309 | Duties of Supervisors | 1 | District Platoon Patrol supervisors shall be assigned to the same platoon as the officers they supervise and shall actually work the same days and hours as the officers of that platoon absent unusual circumstances or when the supervisor is on vacation, training, or ill. |
| Supervision | 310 | Duties of Supervisors | 1 | Within 270 days of the Effective Date, first-line patrol supervisors shall be assigned to supervise no more than eight officers. On duty patrol supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units. |
| Supervision | 311 | Duties of Supervisors | 1 | Within 270 days of the Effective Date, NOPD agrees to develop and implement a program to identify and train acting patrol supervisors who can fill-in, on a temporary, as-needed basis, for assigned supervisors who are on vacation, in training, ill, or otherwise temporarily unavailable. NOPD shall ensure consistent supervision by acting supervisors for supervisors who are on extended leave, and shall reassign officers to a new permanent non-acting supervisor when the currently assigned supervisor has been or is expected to be absent for an extended period of over six weeks. |
| Supervision | 312 | Duties of Supervisors | 2 | District commanders and platoon lieutenants shall be responsible for the close and effective supervision of officers under their command. All NOPD commanders and platoon lieutenants shall ensure that all subordinates under their direct command comply with NOPD policy, state and federal law, and the requirements of this Agreement. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Supervision | 313 | Duties of Supervisors | 2 | NOPD shall hold commanders and supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate. |
| Supervision | 314 | Supervisor and Command-Level Training | 2 | NOPD agrees to develop and implement mandatory supervisory training for all new and current supervisors. All current supervisors shall receive 200 hours of mandatory supervisory training within two years of the Effective Date. NOPD shall receive credit for professional police leadership training being provided in 2012 to current NOPD supervisors. All officers becoming supervisors within two years of the Effective Date shall receive 160 hours of initial supervisory training before assuming supervisory duties. All officers becoming supervisors after two years of the Effective Date shall receive 80 hours of initial supervisory training before assuming supervisory duties. In addition to this initial supervisory training, NOPD agrees to require each supervisor to complete at least 40 hours of supervisor-specific training annually thereafter. In-service training for supervisors, including commanders, shall provide necessary updates and refreshers, as well as training in new skills. |
| Supervision | 315 | Supervisor and Command-Level Training | 2 | NOPD's supervisory training program shall include instruction in the following topics:<br>a) techniques for effectively guiding and directing officers, and for promoting effective and ethical police practices;<br>b) de-escalating conflict, including through peer intervention when necessary;<br>c) evaluation of written reports, including what constitutes a fact-based description, and how to identify "pat," "boilerplate," or conclusory language that is not explained by specific facts;<br>d) investigating officer uses of force;<br>e) responding to and investigating allegations of officer misconduct;<br>f) operation of supervisory tools such as the EWS, mobile recording equipment, and AVL;<br>g) burdens of proof, interview techniques, and the factors to consider when evaluating officer, complainant, or witness credibility, to ensure that investigative findings, conclusions, and recommendations are unbiased, uniform and legally supported;<br>h) evaluating officer performance as part of NOPD's annual performance evaluation system;<br>i) fostering positive career development and imposing appropriate disciplinary sanctions and non-disciplinary corrective action;<br>j) building community partnerships and guiding officers on same; and<br>k) incorporating integrity-related data into COMSTAT reporting. |
| Supervision | 316 | Early Warning System | 2 | The City and NOPD agree to develop, implement, and maintain an EWS to support the effective supervision and management of NOPD officers and employees, including the identification of and response to potentially problematic behaviors as early as possible. NOPD will regularly use EWS data to promote constitutional and professional police practices; to manage risk and liability; and to evaluate the performance of NOPD employees across all ranks, units, and shifts. |
| Supervision | 317 | Early Warning System | 2 | Within 90 days of the Effective Date, the City and NOPD agree to create a plan for the implementation of the EWS, which shall include the hiring of at least one full-time-equivalent qualified information technology specialist within 270 days of the Effective Date, to facilitate the development, implementation, and maintenance of the EWS. The City and NOPD agree to maintain sufficient staffing to facilitate EWS data input and provide training and assistance to EWS users. |
| Supervision | 318 | Early Warning System | 1 | The City and NOPD agree to develop and implement a protocol setting out which fields shall include historical data; the historical start date for each field; deadlines for inputting data related to current and new information; and the individuals responsible for capturing and inputting data. NOPD is not expected to include any historical data prior to January 1, 2006. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Supervision | 319 | Early Warning System | 2 | The City and NOPD agree to develop and implement a protocol for using the EWS and information obtained from it. The protocol for using the EWS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying officers for intervention, supervisory use, supervisory/departmental intervention, documentation and audit. Among protocol requirements, the City and NOPD agree to include:<br>a) comparative data analysis, including peer group analysis, to identify patterns of activity by individual officers and groups of officers;<br>b) NOPD commander and supervisor review, on a regular basis, of EWS reports regarding each officer under the commander or supervisor's direct command and, at least quarterly, broader, pattern-based reports;<br>c) NOPD commander and supervisor initiation, implementation, and assessment of the effectiveness of interventions for individual officers, supervisors, and units, based on assessment of the information contained in the EWS;<br>d) an array of intervention options to facilitate an effective response to identified problems. Interventions may take the form of counseling or training, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. NOPD agrees to seek the services of mental health professionals and others to ensure that interventions are appropriate and effective. All interventions will be documented in writing and entered into the automated system;<br>e) specify that the decision to order an intervention for an employee or group using EWS data shall include peer group analysis, including consideration of the nature of the employee's assignment and appropriate thresholds, and not solely on the number or percentages of incidents in any category of information recorded in the EWS;<br>f) prompt review by NOPD commanders and supervisors of the EWS system records of all officers upon transfer to their supervision or command;<br>g) evaluation of NOPD commanders and supervisors based on their appropriate use of the EWS to enhance effective and constitutional policing and reduce risk; and<br>h) mechanisms to ensure monitored and secure access to the EWS to ensure the integrity, proper use, and appropriate confidentiality of the data. |
| Supervision | 320 | Early Warning System | 2 | The EWS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:<br>a) all uses of force, including critical firearm discharges, both on-duty and off-duty;<br>b) the number of ECW units in use;<br>c) each canine officer's canine bite ratio;<br>d) all injuries to persons in-custody, including in-custody deaths;<br>e) all instances in which force is used and a subject is charged with obstructing or resisting an officer, interfering with a law enforcement investigation, or similar charges;<br>f) all misconduct complaints (and their dispositions);<br>g) data compiled under the stop data collection mechanism;<br>h) all criminal proceedings initiated against an officer, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the City and/or its officers or agents, resulting from NOPD operations or the actions of NOPD personnel;<br>i) all judicial proceedings where an officer is the subject of a protective or restraining order;<br>j) all vehicle pursuits and traffic collisions involving NOPD equipment;<br>k) all loss or theft of NOPD property or equipment in the custody of the employee, including currency, firearms, force instruments, and identification cards;<br>l) all interviews or interrogations in violation of NOPD policy;<br>m) all instances in which NOPD learns or is informed by a prosecuting or judicial authority that a declination to prosecute any crime was based upon concerns about the credibility of an NOPD employee or that a motion to suppress evidence was granted on the grounds of a constitutional violation by an NOPD employee;<br>n) all disciplinary action taken against employees;<br>o) all non-disciplinary corrective action required of employees;<br>p) all awards and commendations received by employees;<br>q) training history, including firearm qualification and other weapon certifications, for each employee; and<br>r) sick leave usage. |
| Supervision | 321 | Early Warning System | 1 | The EWS shall include appropriate identifying information for each involved employee (i.e., name, badge number, shift, and supervisor) and civilian (e.g., race, ethnicity, and gender). |
| Supervision | 322 | Early Warning System | 1 | The City and NOPD agree to maintain computer hardware, including servers, terminals, and other necessary equipment, in sufficient amount and in good working order to permit personnel, including supervisors and commanders, ready and secure access to the EWS system to permit timely input and review of EWS data as necessary to comply with the requirements of this Agreement. |
| Supervision | 323 | Early Warning System | 1 | NOPD shall maintain all personally identifiable information about an officer included in the EWS for at least five years following the officer's separation from the agency except where prohibited by law. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EWS. On an ongoing basis, NOPD will enter information into the EWS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within NOPD shall have access to individually identifiable information that is maintained only within the EWS and is about an officer not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Supervision | 324 | Early Warning System | 1 | The EWS computer program and computer hardware will be operational, fully implemented, and used in accordance with policies and protocols that incorporate the requirements of this Agreement pursuant to an interim schedule that includes full implementation within three years of the Effective Date. Prior to full implementation of the new EWS, NOPD will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of officers. |
| Supervision | 325 | Early Warning System | 2 | NOPD agrees to provide in-service training to all employees, including officers, supervisors, and commanders regarding EWS protocols prior to its implementation, as required to facilitate proper understanding and use of the system. NOPD supervisors shall be trained in and required to use the EWS to ensure that each supervisor has a complete and current understanding of the employees under the supervisor's command. Commanders and supervisors shall be trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. |
| Supervision | 326 | Early Warning System | 1 | Following the initial implementation of the EWS, and as experience and the availability of new technology may warrant, the City and NOPD may add, subtract, or modify thresholds, data tables, and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports and queries as appropriate. NOPD will submit all such proposals for review and approval to the Monitor and DOJ before implementation to ensure it continues to comply with the intent of this Agreement. |
| Supervision | 327 | Visual and Audio Documentation of Police Activities | 2 | Within two years of the Effective Date, NOPD agrees to maintain and operate video cameras and AVL in all marked or unmarked vehicles that are assigned to routine calls for service, task forces, tactical units, prisoner transport, or SOD canine and shall repair or replace all non-functioning video cameras or AVL units, as necessary for reliable functions. One-half of these vehicles will be equipped with video cameras and AVL within one year of the Effective Date. NOPD agrees to ensure that recordings are captured, maintained, and reviewed as appropriate by supervisors, in addition to any review for investigatory or audit purposes, to assess the quality and appropriateness of officer interactions, uses of force, and other police activities. |
| Supervision | 328 | Visual and Audio Documentation of Police Activities | 1 | NOPD agrees to develop and implement policies and procedures regarding AVL, in-car cameras, ECWs, and similar equipment that require: <br> a) activation of in-car cameras for all traffic stops and pursuits until the motor vehicle stop is completed and the stopped vehicle departs, or until the officer's participation in the motor vehicle stop ends; <br> b) activation of ECW cameras when the ECW's safety switch is turned off; <br> c) activation of in-car cameras, where vehicle is so-equipped, to record requests for consent to search a vehicle, deployment of drug- detection canines, and vehicle searches; <br> d) activation of in-car cameras for incidents in which a prisoner being transported is violent or resistant; <br> e) supervisors to review AVL, in-car camera recordings, and ECW recordings of all officers listed in any NOPD report regarding any incident involving injuries to a prisoner or an officer, uses of force, vehicle pursuits, or misconduct complaints; <br> f) supervisors to review recordings regularly and to incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers; <br> g) NOPD to retain and preserve recordings for at least three years, or, if a case remains under investigation or litigation longer than three years, at least three years after the final disposition of the matter, including appeals; and <br> h) an officer to notify a supervisor immediately when an event was not recorded. |
| Supervision | 329 | Visual and Audio Documentation of Police Activities | 1 | Within 90 days of the Effective Date, NOPD agrees to develop and implement a schedule for testing AVL, in-car camera, and ECW recording equipment to confirm that it is in proper working order. Officers shall be responsible for ensuring that recording equipment assigned to them or their car is functioning properly at the beginning and end of each shift and shall report immediately any improperly functioning equipment. |
| Supervision | 330 | Visual and Audio Documentation of Police Activities | 1 | Supervisors shall be responsible for ensuring that officers under their command use in-car camera recording equipment, AVL equipment, ECW cameras, and similar equipment, as required by policy. Supervisors shall report equipment problems and seek to have equipment repaired as needed. Supervisors shall refer for investigation any officer found to fail to properly use or care for in-car camera recording, AVL, ECW camera, or similar equipment. |
| Supervision | 331 | Visual and Audio Documentation of Police Activities | 1 | Within 365 days of the Effective Date, NOPD agrees to provide each supervisor with handheld digital recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations. |
| **16. OPSE** | | | | |
| Secondary Employment System | 332 | Secondary Employment Coordinating Office | 2 | The Secondary Employment Coordinating Office ("Coordinating Office") shall have sole authority to arrange, coordinate, arrange fully-auditable payment, and perform all other administrative functions related to NOPD employees' off-duty secondary law enforcement employment (historically referred to as paid details) and shall be operated in accordance with the requirements of this Agreement. |
| Secondary Employment System | 333 | Secondary Employment Coordinating Office | 1 | The Coordinating Office shall be directed by a civilian with no actual conflict of interest or appearance of conflict of interest. This Coordinating Office Director ("Director") shall not be a present or former NOPD employee. The Director shall be an unclassified civil servant appointed by and serving at the pleasure of the Mayor, and shall remain independent from actual or perceived influence by NOPD. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Secondary Employment System | 334 | Secondary Employment Coordinating Office | 2 | The Coordinating Office shall employ a civilian in the role of "Major Special Events" Coordinator with no actual conflict of interest or appearance of conflict of interest. This Major Special Events Coordinator shall not be a present or former NOPD employee. This Coordinator will report to the Director.<br>a) Major Special Events include Mardi Gras, Jazz Fest, Essence Music Festival, French Quarter Festival, Voodoo Fest, college bowl and college championship events, professional sporting events, and other events as designated by the Mayor, Chief Administrative Officer, the Deputy Mayor for Public Safety, the City Attorney, City Council, or the Superintendent as a Major Special Event. |
| Secondary Employment System | 335 | Secondary Employment Coordinating Office | 1 | The Director's and all other Coordinating Office employees' salaries shall be independent of the number of off-duty secondary jobs worked or the amount of revenue generated by secondary employment. |
| Secondary Employment System | 336 | Secondary Employment Coordinating Office | 2 | The Coordinating Office shall be staffed with civilians with no actual conflict of interest or appearance of conflict of interest, and shall not have been NOPD employees within the previous two years. |
| Secondary Employment System | 337 | Secondary Employment Coordinating Office | 1 | The Coordinating Office shall not be located in, or immediately adjacent to, NOPD Headquarters, District Headquarters, or a District Substation. |
| Secondary Employment System | 338 | Coordinating Office Responsibilities | 2 | Within 365 days of the Effective Date, or as funding is established, the City shall develop and implement and the Coordinating Office shall maintain a searchable list of off-duty secondary employment opportunities, which can be accessed through either the existing NOPD employee web site or another accessible database. |
| Secondary Employment System | 339 | Coordinating Office Responsibilities | 2 | The Coordinating Office shall maintain a roster of NOPD employees interested in working off-duty secondary employment. |
| Secondary Employment System | 340 | Coordinating Office Responsibilities | 2 | The Coordinating Office shall establish a rotation system that provides a fair and equitable number of secondary employment opportunities to all NOPD employees in consideration of preferences for assignment and availability. The Coordinating Office shall rotate NOPD employees working Recurring Secondary Employment positions at least every 365 days. The Director shall determine whether NOPD employees may return to work for the same employer. This 365-day RSE rotation requirement shall not apply to those individual officers who regularly work recurring assignments at Major Special Events, schools, banks, churches, and hospitals. The Director may grant an exception to this rule if the secondary employment requires a unique skill, education, equipment, or specialized knowledge or training. |
| Secondary Employment System | 341 | Coordinating Office Responsibilities | 2 | The Coordinating Office shall fill all new secondary employment opportunities and temporary vacancies pursuant to written and consistently applied criteria. NOPD employees shall not be permitted to select substitutes or allow another employee to work an assigned secondary job in place of the employee. |
| Secondary Employment System | 342 | Coordinating Office Responsibilities | 2 | The Coordinating Office shall establish an after-hours notification system, which provides them the capability of accepting information and making assignments 24 hours a day, 365 days per year. |
| Secondary Employment System | 343 | Coordinating Office Responsibilities | 2 | The Coordinating Office shall remove NOPD employees from the secondary employment roster where the employees are performing unsatisfactorily, are under suspension, administrative reassignment, or have been charged with a crime. |
| Secondary Employment System | 344 | Coordinating Office Responsibilities | 2 | Approval to work secondary employment is not automatically based on assignment through the Coordinating Office. Members shall also be required to comply with all NOPD internal procedures governing off-duty secondary employment, including the completion of an NOPD Secondary Employment Authorization Form. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Secondary Employment System | 345 | Coordinating Office Responsibilities | 2 | The Coordinating Office shall develop and implement a plan for working with NOPD to ensure that supervisors conduct in-person inspections of secondary employment sites based upon the frequency worked. Supervisory oversight at Major Special Events or larger venues, which meet minimum supervisor staffing level requirements specified under this Agreement, shall be the responsibility of those ranking officers who were selected by the Coordinating Office to work the secondary employment assignment. The required number of supervisory officers specified under minimum staffing requirements for Major Special Events or larger venues must be present for the duration of the secondary employment assignment. |
| Secondary Employment System | 346 | Coordinating Office Responsibilities | 2 | The Coordinating Office shall ensure that no NOPD employee is supervising another employee of higher rank. |
| Secondary Employment System | 347 | Coordinating Office Responsibilities | 1 | The Coordinating Office shall be responsible for collecting and maintaining a searchable database of all secondary employment worked. This database shall be searchable by secondary employment assignment and by employee and shall identify the employee working the secondary employment, secondary employment hours, and assignment locations. This database shall maintain historic and current information on all employees' secondary employment. |
| Secondary Employment System | 348 | Coordinating Office Responsibilities | 1 | A schedule of fees will be established by the Court to offset costs associated with the coordination and required support provided through the Coordinating Office to take into account costs, including but not limited to, administrative fees, hourly wage rates, and equipment usages. The schedule of fees shall be publicly available. |
| Secondary Employment System | 349 | Coordinating Office Responsibilities | 1 | The Coordinating Office shall be responsible for the annual, public release of the following information:<br>a) The number of NOPD employees who worked secondary employment by District and rank;<br>b) The average number of secondary employment hours worked by District and rank;<br>c) The salaries of Coordinating Office employees and the Coordinating Office's administrative operational costs; and<br>d) The net and gross amounts of City income derived through secondary employment. |
| Secondary Employment System | 350 | Coordinating Office Responsibilities | 2 | The Coordinating Office shall ensure that all potential employers are notified of their responsibilities, including:<br>a) Agreeing that individuals or entities seeking to employ off-duty NOPD employees to work secondary employment must work through the Coordinating Office;<br>b) Making all payments in advance and acknowledgement that advanced payments may be subject to forfeiture or penalty assessment associated with late cancellations;<br>c) Agreeing to have secondary employees sign in and sign out every work day; and<br>d) Acknowledging that they are prohibited from providing any compensation, either cash or in-kind, including bonuses or gifts, beyond nominal compensation in the form of food or beverages, to an NOPD employee or the friend or relative of an NOPD employee in exchange for any secondary employment services provided. |
| Secondary Employment System | 351 | Secondary Employment Compensation | 1 | The Coordinating Office, working with NOPD and the City, shall develop and implement an auditable payment system that ensures that secondary employment pay is made to NOPD employees. |
| Secondary Employment System | 352 | Secondary Employment Compensation | 1 | NOPD employees working secondary employment shall not be permitted to receive any compensation, either cash or in-kind, including bonuses or gifts, unless such compensation, bonus, or gift, is provided through and documented by the Coordinating Office and is in accordance with the Louisiana Ethics Code for public employees. Nominal compensation in the form of food or beverages is permitted in accordance with the Louisiana Ethics Code for public employees. |
| Secondary Employment System | 353 | Secondary Employment Compensation | 2 | Travel time to and from secondary employment shall not be compensated, unless it involves specialized patrol services or use of specialized equipment. |
| Secondary Employment System | 354 | Secondary Employment Compensation | 1 | NOPD employees are not permitted to solicit secondary compensation or employment. Individuals or entities seeking to employ NOPD employees to work secondary employment must work through the Coordinating Office. |
| Secondary Employment System | 355 | Secondary Employment Compensation | 2 | NOPD shall advise all officers that attempting to circumvent or circumventing the secondary employment policy or the Coordinating Office shall subject officers to discipline as warranted, up to and including dismissal. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Secondary Employment System | 356 | Secondary Employment Compensation | 2 | NOPD and the Coordinating Office shall establish a standard form by which NOPD employees can register to work secondary employment assignments. No employee shall be eligible to work secondary employment without first registering with the NOPD Compliance Section and obtaining authorization from the employee's direct supervisor and unit commander. Secondary employment authorization shall be valid for one calendar year. When determining whether an NOPD employee qualifies for authorization to work secondary employment, NOPD and the Coordinating Office shall evaluate factors that include:<br>a) The quality of the employee's primary employment performance, assessed pursuant to written criteria:<br>b) Whether the employee is an active member of the NOPD or grandfathered Reserve officer in good standing:<br>c) The applicant's disciplinary record, complaint history, and work performance history:<br>d) The applicant's level of experience: and<br>e) Whether the employee is seeking a supervisory or non-supervisory position.<br>Non-supervisory NOPD employees may not supervise secondary employment. |
| Secondary Employment System | 357 | Secondary Employment Compensation | 2 | Only a POST certified commissioned member who has successfully completed his/her FTO training may work police-related secondary employment assignments |
| Secondary Employment System | 358 | Secondary Employment Compensation | 2 | POST certified commissioned members who completed FTO training, but have not obtained permanent status of Civil Service "Police Officer I," may work secondary employment if supervised by a ranking officer at the grade of sergeant or above. |
| Secondary Employment System | 359 | Secondary Employment Compensation | 2 | POST certified commissioned members hired as lateral transfers successfully completing FTO training may work authorized secondary employment unsupervised. |
| Secondary Employment System | 360 | Secondary Employment Compensation | 2 | Regardless of prior approval, members shall not engage in secondary employment while absent in the following status: sick: Injured On-Duty: Worker's Compensation: Maternity Leave: Leave Without Pay: or Suspended or under Administrative Reassignment with a restricted police commission. Members must return to full duty status and have completed a full tour of duty prior to working a secondary employment opportunity. |
| Secondary Employment System | 361 | Secondary Employment Compensation | 1 | Secondary employment for City departments and agencies shall be prohibited. Instead, departments and agencies shall cover compensation for employees through authorized City reimbursement procedures. |
| Secondary Employment System | 362 | Secondary Employment Compensation | 1 | In addition to the secondary employment positions prohibited under current NOPD policy, the following types of work or services shall be prohibited as secondary employment:<br>a) Work in or for Alcoholic Beverage Outlets as defined under NOPD policy:<br>b) Private investigations:<br>c) Chauffeur services: except where chauffeur services to public officials, executives or celebrities is secondary to a primary purpose of security. Notwithstanding the foregoing prohibition, motorcycle escorts for chauffeur services and limousines are permitted:<br>d) Security at sexually oriented businesses:<br>e) Employment requiring that the employee act as a civil process server: and<br>f) Security at pawn shops. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Secondary Employment System | 363 | Secondary Employment Compensation | 2 | NOPD employees are prohibited from working secondary employment that conflicts with the employee's NOPD duties and ethical obligations. Prohibitions include:<br>a) Representing anyone before any court or agency of the City, with or without compensation, on a matter in which the City is a party or has a substantial interest;<br>b) Serving as an expert witness in his or her private capacity in any civil or criminal proceeding in which the City is a party or has a substantial interest;<br>c) Working secondary employment during court hours while the employee is under a conflicting subpoena;<br>d) Disclosing confidential information acquired in an official capacity to any secondary employer;<br>e) Using on-duty time to conduct investigations or take other law enforcement action on behalf of a secondary employer where there would be an actual conflict of interest or appearance of a conflict of interest;<br>f) Knowingly participating in, or soliciting the creation of, any corporation, company, trust, fund, or cooperative banking account for the purpose of billing, receiving compensation, or coordinating services of secondary employment; and<br>g) Taking an assignment that will interrupt or occur during the employee's assigned on-duty NOPD shift. |
| Secondary Employment System | 364 | Secondary Employment Compensation | 2 | Secondary employment by NOPD employees will be limited to a maximum of 24 hours per seven-day work week (Sunday through Saturday). Exceptions to the hour limitation may be granted for Major Special Events where manpower requirements are so intensive that sufficient resources may not be available for the safe operation of the event (e.g., Jazz Fest, Mardi Gras). Application for such an event exception will be made in advance via interoffice correspondence (NOPD Form 105) by an employee or event commander that estimates the number of hours an employee can exceed the maximum threshold. The application will be forwarded through the appropriate chain of command for final approval by the Superintendent. Secondary employment in excess of the 24-hour limitation cannot be worked unless approved in advance by the Superintendent. |
| Secondary Employment System | 365 | Secondary Employment Compensation | 2 | No employee, including Reserve officers, shall work more than 16 hours within a 24-hour period. (The 24-hour period begins the first time the employee reports for either regular duty or secondary employment allowing for a minimum of eight hours of rest within each 24-hour period.) These hours are cumulative and include normal scheduled work hours, overtime, off-duty secondary employment, and outside employment. |
| Secondary Employment System | 366 | Secondary Employment Compensation | 2 | 366. Commissioned Reserve officers are allowed to register for and work secondary employment assignments through the Coordinating Office if they are full time active duty officers in good standing or Commissioned Reserve Officers on the Effective Date. The following further limitations and restrictions shall apply to all Reserve members, however:<br>a) Plain clothes secondary employment coordinated through the Coordinating Office must be approved by the Superintendent or his designee prior to allowing any Reserve officer to work in plain clothes;<br>b) Reserve officers shall not work secondary employment for their current employer or for anyone for whom they have worked full time during any period within two years of the Effective Date;<br>c) Reserve officers shall not work secondary employment during the first year after graduation from the Reserve Police Academy;<br>d) Reserve officers who volunteer a minimum of 36 hours in a calendar month are eligible to work a maximum of 28 hours in secondary employment during the following calendar month (e.g., a reserve officer who volunteers 36 hours in August would be eligible to work a maximum of 28 hours of secondary employment in September);<br>e) Reserve officers who volunteer a minimum of 40 hours in a calendar month will be eligible to work a maximum of 32 hours of secondary employment during the following calendar month;<br>f) Reserve ranking officers are not authorized to approve secondary employment. All request forms shall be submitted to the Commander of the Reserve Division for approval and forwarding through the chain of command;<br>g) The Coordinating Office shall monitor monthly time reports for reserve officers to ensure compliance with this agreement;<br>h) Reserve officers shall follow all policies and procedures of NOPD, the NOPD Reserve Division and this Agreement while working secondary employment; and<br>i) Reserve officers are prohibited from coordinating secondary employment for any member of the Department, either regular or reserve members. Reserve officers are also prohibited from individually or cooperatively coordinating secondary employment and the collection of fees for secondary employment contracted through the Coordinating Office." |
| Secondary Employment System | 367 | Secondary Employment Employee Responsibilities | 2 | NOPD employees seeking to work any secondary employment shall submit a signed Secondary Employment Registration Form ("Registration Form") initially and annually thereafter to the Coordinating Office. This Registration Form shall include acknowledgment that:<br>a) the employee understands that working secondary employment is a privilege subject to strict criteria;<br>b) the employee represents NOPD while working secondary employment;<br>c) the employee must abide by all NOPD policies while working secondary employment; and<br>d) the employee may be disciplined by NOPD for policy violations committed while working secondary employment. |
| Secondary Employment System | 368 | Secondary Employment Employee Responsibilities | 2 | Employees working secondary employment shall have the same responsibility to carry appropriate departmental equipment (e.g., police radios) and document their activities in the same manner as if they were on-duty, including completing incident, arrest, and use of force reports, and reporting allegations of misconduct or observed misconduct. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Secondary Employment System | 369 | Secondary Employment Supervision | 1 | Working with NOPD, the Coordinating Office shall determine the number of employees and supervisors necessary to work a secondary job, considering factors that include:<br>a) The anticipated number of people attending the function;<br>b) Whether alcoholic beverages will be served;<br>c) Whether the event is open to the public or is private/by invitation only;<br>d) The location of the event; and<br>e) The history of the event and employer. |
| Secondary Employment System | 370 | Secondary Employment Supervision | 2 | The minimum supervisory requirements for any secondary employment assignment shall be:<br>a) Secondary employment requiring the simultaneous or overlapping schedule of one to four officers may be worked without a ranking officer. In these instances, the most senior officer accepts responsibility for secondary employment related notifications. Supervisory oversight shall be the responsibility of a patrol supervisor in the District of the secondary employment assignment, though officers engaged in secondary employment are expected to abide by general directions from the coordinating office;<br>b) Secondary employment requiring the simultaneous or overlapping schedule of five to nine officers shall include at least one ranking officer of at least the grade of sergeant or lieutenant;<br>c) Secondary employment requiring the simultaneous or overlapping schedule 10 to 14 officers shall include at least two ranking officers of at least the grade of sergeant or lieutenant;<br>d) Secondary employment requiring the simultaneous or overlapping schedule of 15 to 19 officers shall include at least two ranking officers of at least the grade of sergeant and one supervisor of at least the grade of lieutenant;<br>e) Secondary employment requiring the simultaneous or overlapping schedule of 20 to 24 officers shall include at least three ranking officers of at least the grade of sergeant and one supervisor of at least the grade of lieutenant;<br>f) Secondary employment requiring the simultaneous or overlapping schedule of 25 to 29 officers shall include at least three ranking officers of at least the grade of sergeant and two supervisors of at least the grade of lieutenant;<br>g) Secondary employment requiring the simultaneous or overlapping schedule of 30 officers or more shall include supervisory coverage in addition to that specified above based on the following graduated scale:<br>(1) One sergeant or above for every five members;<br>(2) One lieutenant or above for every two sergeants;<br>(3) One captain or above for every three lieutenants. |
| Secondary Employment System | 371 | Secondary Employment Supervision | 2 | Sergeants and lieutenants shall be allowed to back-fill a police officer opening, but those supervisors electing to fill such a vacancy are eligible for compensation at the hourly rate approved for the police officer position as negotiated between the Coordinating Office and the employer. Captains or above shall only be allowed to fill open vacancies at a supervisory staffing level equivalent to a captain's position. |
| Secondary Employment System | 372 | Secondary Employment Supervision | 2 | Supervisors shall supervise NOPD employees working secondary employment in the same manner as if they were working their primary employment. |
| Secondary Employment System | 373 | Secondary Employment Supervision | 2 | The Coordinating Office will implement a system so that on-duty NOPD patrol supervisors are aware of each secondary job within that supervisor's geographical coverage area and the identity of each employee working each secondary job. |
| Secondary Employment System | 374 | Secondary Employment Supervision | 2 | The Coordinating Office will implement a system so that each District shall have a current and historical record of all secondary employment worked in the District. |
| 17. PIB | | | | |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Misconduct Complaint Intake, Investigation, and Adjudication | 375 | Reporting Misconduct | 1 | NOPD agrees to continue to require any Department employee who observes or becomes aware of any act of misconduct by another employee to report the incident to a supervisor or directly to PIB for review and investigation. Where an act of misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to PIB. Failure to report or document an act of misconduct or criminal behavior is an egregious offense and shall be grounds for discipline, up to and including termination of employment. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 376 | Reporting Misconduct | 1 | NOPD agrees to develop and establish protocols that require supervisors to take appropriate disciplinary or non-disciplinary corrective action when the supervisor becomes aware of an infraction committed by an officer that is not reported from outside the Department and does not require an immediate PIB notification (e.g., improper use of sick leave, improper attire). The infraction and the supervisor's response shall be reported to PIB within five business days. PIB shall review the report and supervisory response to determine whether additional investigation is required and to evaluate the imposed discipline or corrective action to determine whether the supervisory response was fair and consistent with NOPD disciplinary protocols. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 377 | Preventing Retaliation | 2 | The City and NOPD agree to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. Within 270 days of the Effective Date, and annually thereafter, the City, through PIB, shall review NOPD's anti-retaliation policy and its implementation. This review shall consider the alleged incidents of retaliation that occurred or were investigated during the reporting period, the discipline imposed for retaliation, and the supervisors' performance in addressing and preventing retaliation. Following such review, the City shall modify policy and practice as necessary to protect individuals, including other NOPD officers and employees and civilians, from retaliation for reporting misconduct. Retaliation for reporting misconduct or for cooperating with an investigation of misconduct is an egregious offense and shall be grounds for discipline, up to and including termination of employment. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 378 | Staffing, Selection, and Training Requirements | 1 | NOPD agrees to continue to have a civilian serve as PIB commander. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 379 | Staffing, Selection, and Training Requirements | 2 | NOPD and the City agree to ensure that a sufficient number of well-trained staff is assigned and available to complete and review thorough and timely misconduct investigations in accordance with the requirements of this Agreement. NOPD and the City further shall provide sufficient resources and equipment to ensure that thorough and timely criminal and administrative misconduct investigations are conducted. **ICOs shall report directly to the PIB Commander on PIB-related matters.** |
| Misconduct Complaint Intake, Investigation, and Adjudication | 380 | Staffing, Selection, and Training Requirements | 1 | Within 365 days of the Effective Date, NOPD agrees to review the staffing of PIB and ensure that misconduct investigators and commanders possess excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an officer committed misconduct. Officers with a sustained complaint of, or who have been disciplined for, excessive use of force, false arrest, unlawful search or seizure, sexual harassment, discrimination, or dishonesty shall be presumptively ineligible for assignment to PIB. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 381 | Staffing, Selection, and Training Requirements | 2 | Officers promoted to the rank of Lieutenant shall, within a reasonable time frame, serve a rotation in PIB. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Misconduct Complaint Intake, Investigation, and Adjudication | 382 | Staffing, Selection, and Training Requirements | 2 | All personnel conducting NOPD officer misconduct investigations, whether assigned to PIB, a District, or elsewhere, shall receive at least 40 hours of initial training in conducting officer misconduct investigations within 365 days of the Effective Date, and shall receive at least eight hours of training each year. This training shall include instruction in: a) investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, surveillance, and data and case management; b) the particular challenges of administrative police misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation, properly weighing credibility of civilian witnesses against officers, using objective evidence to resolve inconsistent statements, and the proper application of the preponderance of the evidence standard; c) relevant state, local, and federal law, including state employment law related to officers and the rights of public employees, including but not limited to La. Rev. Stat. 40:2531, "Rights of Law Enforcement Officers While Under Investigation," and local Civil Service Commission requirements, as well as criminal discovery rules such as those set out in Garrity v. New Jersey, 385 U.S. 493 (1967), and Brady v. Maryland, 373 U.S. 83 (1963); and d) NOPD rules and policies, including the requirements of this Agreement, and protocols related to criminal and administrative investigations of alleged officer misconduct. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 383 | Staffing, Selection, and Training Requirements | 2 | Within 365 days of the Effective Date, NOPD agrees to develop and implement a plan for conducting regular, targeted, and random integrity audit checks, or "sting" audits, to identify and investigate officers engaging in at-risk behavior, including: unlawful stops, searches, and seizures (including false arrests); discriminatory policing; use of excessive force; secondary employment abuse; failure to take a complaint, failure to report misconduct or complaints, or other patterns of misconduct or potentially criminal behavior. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 384 | Complaint Information | 1 | Within 365 days of the Effective Date, the City and NOPD agree to develop and implement a program to ensure broad knowledge throughout the New Orleans community about how to make misconduct complaints, and the availability of effective mechanisms for making misconduct complaints. The requirements below shall be incorporated into this program. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 385 | Complaint Information | 1 | The City and NOPD agree to make complaint forms and informational materials, including brochures and posters, available at appropriate government properties, including, at a minimum, NOPD headquarters, District stations, NOPD and City websites, City Hall, courthouses within New Orleans, all public libraries, the IPM, the Orleans Public Defenders, and at the offices or gathering places of community groups. Individuals shall be able to submit misconduct complaints through NOPD and City websites and these websites shall include complaint forms and information regarding how to file misconduct complaints. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 386 | Complaint Information | 1 | NOPD agrees to post and maintain a permanent placard at all police facilities describing the external complaint process. The placards shall include relevant contact information, such as telephone numbers, email addresses, and internet sites. Officers shall provide the officer's name and badge number upon request. If an individual indicates that he or she would like to make a complaint or requests a complaint form, the officer shall immediately inform his or her supervisor who will respond to the scene to assist the individual in providing appropriate forms and/or other available mechanisms for filing a misconduct complaint. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 387 | Complaint Information | 1 | Complaint forms and related informational materials shall be made available and posted in Spanish, Vietnamese, and English. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 388 | Complaint Intake, Classification, Assignment, and Tracking | 1 | NOPD agrees to, within 365 days of the Effective Date, revise policy and train all officers and supervisors to ensure that they properly handle complaint intake, including how to properly provide complaint materials and information and the consequences for failing to take complaints. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 389 | Complaint Intake, Classification, Assignment, and Tracking | 1 | The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint, shall be grounds for discipline, up to and including termination. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Misconduct Complaint Intake, Investigation, and Adjudication | 390 | Complaint Intake, Classification, Assignment, and Tracking | 1 | NOPD agrees to accept all misconduct complaints, including anonymous and third-party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or electronic mail. Any LEP individual who wishes to file a complaint about an NOPD officer or employee shall be provided with a complaint form in English, Spanish, or Vietnamese, as appropriate, and the appropriate translation services required to file a complaint, and such complaints will be investigated in accordance with this Agreement. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 391 | Complaint Intake, Classification, Assignment, and Tracking | 1 | All officers and employees who receive a misconduct complaint in the field shall immediately inform a supervisor of the misconduct complaint so that the supervisor can ensure proper intake of the complaint. All misconduct complaints received outside of PIB shall be documented and submitted to PIB by the end of the shift in which it was received. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 392 | Complaint Intake, Classification, Assignment, and Tracking | 1 | Upon notification by the City Attorney's Office, the DA, or judges or magistrates, NOPD agrees to ensure that allegations of officer misconduct are identified and investigated as misconduct complaints. The City Attorney's Office agrees to forward copies of all civil suits alleging misconduct by an NOPD officer to PIB. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 393 | Complaint Intake, Classification, Assignment, and Tracking | 1 | NOPD agrees to track, as a separate category of misconduct complaints, allegations that an officer has in any way interfered with a civilian's First Amendment right to observe, record, and/or verbally comment on the performance of police duties in an area open to the public, or where the individual has a right to be, such as a person's home or business. Improper interference with this right includes improperly detaining or arresting individuals for interfering with a law enforcement investigation, disorderly conduct, or similar charges. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 394 | Complaint Intake, Classification, Assignment, and Tracking | 1 | NOPD agrees to track, as a separate category of misconduct complaints, allegations of discriminatory policing, along with characteristics of the complainants. NOPD agrees to ensure that complaints of discriminatory policing are captured and tracked appropriately. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 395 | Complaint Intake, Classification, Assignment, and Tracking | 1 | Within 365 days of the Effective date, PIB shall develop and implement a centralized numbering and tracking system for all misconduct complaints. Upon the receipt of a complaint, PIB shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant at the time the complaint is made. Where a misconduct complaint is received in the field, a supervisor shall obtain the unique numerical identifier and provide this identifier to the complainant. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 396 | Complaint Intake, Classification, Assignment, and Tracking | 1 | NOPD's centralized numbering and tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. This system shall be used to determine the status of complaints and to confirm that a complaint was received, as well as for periodic assessment of compliance with NOPD policies and procedures and this Agreement, including requirements on the timeliness of administrative investigations. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 397 | Complaint Intake, Classification, Assignment, and Tracking | 1 | Where a supervisor receives a misconduct complaint in the field alleging that misconduct has just occurred, the supervisor shall gather all relevant information and evidence and provide this information and evidence to PIB. This information includes the names and contact information for all complainants and witnesses, the names of all NOPD officers and employees involved in or witnessing the alleged misconduct, and any available physical evidence, such as voluntarily provided video or audio recordings, or documentation of the existence of such recordings where the witness chooses not to provide the recording. The supervisor shall take photographs of apparent injuries, or the absence thereof, unless the complainant/subject objects or declines. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 398 | Complaint Intake, Classification, Assignment, and Tracking | 1 | Within three business days of the receipt of a misconduct complaint, PIB shall determine whether the complaint will be: assigned to a ICO or supervisor: retained by PIB for investigation or referred to the appropriate outside agency: and whether it will be investigated criminally. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Misconduct Complaint Intake, Investigation, and Adjudication | 399 | Complaint Intake, Classification, Assignment, and Tracking | 1 | NOPD agrees to develop and implement a complaint classification protocol that is allegation-based rather than anticipated outcome-based to guide PIB in determining where a complaint should be assigned. This complaint classification protocol shall ensure that PIB or an authorized outside agency investigates allegations including: a) serious misconduct, including but not limited to: criminal misconduct; unreasonable use of force; discriminatory policing: false arrest or planting evidence; untruthfulness/false statements; unlawful search: retaliation: sexual misconduct: domestic violence: and theft; b) misconduct implicating the conduct of the supervisory or command leadership of the subject officer; and c) subject to the approval by the Deputy Superintendent of PIB, allegations that any commander requests be conducted by PIB rather than the subject officer's District/Division. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 400 | Complaint Intake, Classification, Assignment, and Tracking | 1 | Where NOPD or the City determines that an externally-generated complaint contains no allegations of misconduct, the complaint shall receive a disposition of "exonerated" or "unfounded" and include for tracking purposes an indication that it was a complaint regarding service or otherwise contained no allegations of misconduct. NOPD agrees to cease the use of "No Violation Observed," "NIMS," or similar dispositions of misconduct allegations. NOPD will use the classification "No Formal Investigation Merited" to resolve only the following types of complaints: a) complaints disputing traffic citations, except that allegations of misconduct contained in such complaints (e.g., racial profiling, illegal search, excessive force) will be classified and investigated according to its merits; b) complaints alleging a delay in police service such as patrol response or detective follow-up, where the preliminary investigation demonstrates that the delay is due to workload. However, if the preliminary investigation discloses that misconduct such as negligence rather than workload caused the delay, the complaint will be classified according to its merits; c) complaints regarding off-duty officer conduct of a civil nature, unless the alleged conduct or its effects constitute misconduct or have a substantial nexus to the officer's employment; and d) complaints in which the preliminary investigation demonstrates that the subject officer does not work for NOPD or where the identity of the subject officer cannot be determined, despite the best efforts of PIB. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 401 | Complaint Intake, Classification, Assignment, and Tracking | 1 | A misconduct complaint investigation may not be conducted by any officer who used force during the incident; whose conduct led to the injury of a person; who authorized the conduct that led to the reported incident or complaint; or who witnessed or was involved in the incident leading to the allegation of misconduct. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 402 | Investigation Timeframe | 1 | NOPD and the City agree to make good faith efforts to have state law amended to permit a reasonable timeframe for the completion of administrative investigations of officer misconduct so that such investigations can be thorough, reliable, and complete. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 403 | Investigation Timeframe | 2 | All administrative investigations conducted by PIB shall be completed within the time limitations mandated by state law and within 90 days of the receipt of the complaint, including assignment, investigation, review and final approval, unless granted an extension as provided for under state law or Civil Service exemption, in which case the investigation shall be completed within 120 days. Where an allegation is sustained, NOPD shall have 30 days to determine and impose the appropriate discipline, except in documented extenuating circumstances, in which case discipline shall be imposed within 60 days. All administrative investigations shall be subject to appropriate interruption (tolling period) as necessary to conduct a concurrent criminal investigation or as provided by law. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 404 | Collection of Evidence | 1 | Officer misconduct investigations shall be as thorough as necessary to reach reliable and complete findings. The misconduct complaint investigator shall interview each complainant in person, absent extenuating circumstances, and this interview shall be recorded in its entirety, absent specific, documented objection by the complainant. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 405 | Collection of Evidence | 1 | All witnesses, including officers witnessing or involved in an incident that becomes the subject of a misconduct complaint, shall provide a written statement regarding the incident or be interviewed as described below. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Misconduct Complaint Intake, Investigation, and Adjudication | 406 | Collection of Evidence | 1 | Where the alleged misconduct is particularly serious or interviews of the subject officer(s) or other witnesses may be necessary to sufficiently investigate the allegation, the investigator shall conduct an in-person interview. The interview shall be recorded in its entirety, absent, in the case of non-officer witnesses, specific documented objection. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 407 | Collection of Evidence | 1 | Each officer, witness, and complainant shall be interviewed separately. A NOPDAI not involved in the underlying complaint will be used when taking statements or conducting interviews of any Vietnamese or Spanish speaking LEP complainant or witness. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 408 | Collection of Evidence | 1 | The misconduct investigator shall seek to identify all persons at the scene giving rise to a misconduct allegation, especially all NOPD officers. The investigator shall note in the investigative report the identities of all officers and other witnesses who were on the scene but assert they did not witness and were not involved in the incident. The investigator shall conduct further investigation of any such assertions that appear unsupported by the evidence. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 409 | Collection of Evidence | 1 | All misconduct investigation interview recordings shall be stored and maintained in a secure location within PIB. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 410 | Collection of Evidence | 1 | NOPD agrees to require officers to cooperate with administrative investigations, including appearing for an interview when requested by an NOPD or Inspector General investigator and providing all requested documents and evidence. Supervisors shall be notified when an officer under their supervision is summoned as part of an administrative investigation, and shall facilitate the officer's appearance, absent extraordinary and documented circumstances. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 411 | Collection of Evidence | 1 | If at any time during complaint intake or investigation the investigator determines that there may have been criminal conduct on the part of any officer or employee, the investigator shall immediately notify the PIB commander. The PIB commander shall immediately notify the Superintendent, the DA and/or USAO, and the Monitor of the initiation of a criminal investigation. The subject officer shall not be compelled to provide a statement to administrative investigators where there is a potential criminal investigation or prosecution of the officer until the remainder of the investigation has been completed, unless after consultation with prosecuting agency (e.g., DA or USAO) and the PIB commander, such compulsion is deemed appropriate by the Superintendent. NOPD and the City agree to consult with the DA to develop and implement protocols to ensure that the criminal and administrative investigations can be conducted in parallel as appropriate and are kept separate after a subject officer has provided a compelled statement. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 412 | Collection of Evidence | 1 | Nothing in this Agreement or NOPD policy shall hamper an officer's obligation to provide a public safety statement regarding a work related incident or activity. NOPD agrees to make clear in policy and training that all officer statements in incident reports, arrest reports, use of force reports, and similar documents, and statements made in interviews such as those conducted in conjunction with NOPD's routine use of force review and investigation process, are part of each officer's routine professional duties. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 413 | Analysis of Evidence | 1 | In each investigation, NOPD shall consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations based upon that evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will NOPD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. NOPD shall make efforts to resolve material inconsistencies between witness statements. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 414 | Analysis of Evidence | 1 | The resolution of any misconduct complaint must be based upon the preponderance of the evidence. A misconduct investigation shall not be closed simply because the complaint is withdrawn or because the alleged victim is unwilling or unable to provide additional information beyond the initial complaint. In such instances, the investigation shall continue as necessary within the allowable investigation timeframes established under this Agreement to resolve the original allegation(s) where possible based on the evidence and investigatory procedures and techniques available. In each investigation, the fact that a complainant pled guilty or was found guilty of an offense shall not be the deciding factor as to whether an NOPD officer committed the alleged misconduct, nor shall it justify discontinuing the investigation. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Misconduct Complaint Intake, Investigation, and Adjudication | 415 | Analysis of Evidence | 1 | The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation: a) "Unfounded," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did not occur or did not involve the subject officer; b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur; c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or d) "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate NOPD policies, procedures, or training. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 416 | Analysis of Evidence | 1 | The PIB commander shall accept the investigator's recommended disposition and the Superintendent shall approve the disposition, unless the disposition is unsupported by a preponderance of the evidence or additional investigation is necessary to reach a reliable finding. Where the disposition is unsupported by a preponderance of the evidence, the PIB Commander may correct the disposition or order additional investigation, as necessary. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 417 | Analysis of Evidence | 1 | In addition to determining whether the officer committed the alleged misconduct, administrative investigations shall assess and document whether: (a) the police action was in compliance with training and legal standards; (b) the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures; and (d) the incident suggests that NOPD should revise its policies, strategies, tactics, or training. This information shall be shared with the relevant commander(s) who shall document the commander's disagreement or agreement with these findings, refer any recommendations to the appropriate individual to implement the recommended change, document the implementation of these recommendations, and return the documentation to PIB. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 418 | Integrity of Investigative File and Evidence | 1 | Division/District-Level investigation reports and all related documentation and evidence shall be provided to PIB immediately upon completion and approval by the appropriate supervisor of the investigation, but no later than three business days. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 419 | Integrity of Investigative File and Evidence | 1 | All investigation reports and related documentation and evidence shall be securely maintained in a central and accessible location until the officer who was a subject of the complaint has severed employment with NOPD. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 420 | Communication with Complainant | 2 | Each misconduct complainant will be kept informed periodically regarding the status of the investigation. The complainant will be notified of the outcome of the investigation, in writing, within 10 business days of the completion of the investigation, including regarding whether any disciplinary or non-disciplinary action was taken. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 421 | Discipline Process and Transparency | 2 | NOPD agrees to ensure that discipline for sustained allegations of misconduct will be based on the nature of the allegation and defined and consistent mitigating and aggravating factors, rather than the identity of the officer or his or her status within NOPD or the broader community. NOPD and the City agree to develop and implement procedures to ensure that discipline is fair and consistent. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 422 | Discipline Process and Transparency | 1 | NOPD agrees to use a disciplinary matrix that: a) establishes a presumptive range of discipline for each type of rule violation; b) increases the presumptive discipline based both on an officer's prior violations of the same or other rules; c) sets out defined mitigating or aggravating factors; d) requires that any departure from the presumptive range of discipline must be justified in writing; e) provides that NOPD shall not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and f) provides that NOPD shall consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Misconduct Complaint Intake, Investigation, and Adjudication | 423 | Discipline Process and Transparency | 2 | NOPD and the City agree to establish a unified system for reviewing sustained findings and assessing the appropriate level of discipline pursuant to NOPD's disciplinary matrix, in order to facilitate consistency in the imposition of discipline. All disciplinary decisions shall be documented, including the rationale behind any decision to deviate from the level of discipline set out in the disciplinary matrix. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 424 | Discipline Process and Transparency | 2 | NOPD and the City agree to develop and establish written policies and procedures to ensure that the City Attorney's Office provides close guidance to NOPD at the disciplinary stage to ensure that NOPD's disciplinary decisions are as fair and legally defensible as possible. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 425 | Discipline Process and Transparency | 1 | The City agrees to request the Civil Service Commission to, within 90 days of the Effective Date, post online its full decisions related to NOPD discipline in a timely manner. |
| Misconduct Complaint Intake, Investigation, and Adjudication | 426 | Annual Report | 1 | PIB shall include in its annual report a summary of each misconduct complaint, including a description of the allegation, the final approved disposition, and any discipline imposed. PIB's annual report shall also include aggregate misconduct complaint data showing the number of each type of complaint and the number and rate of sustained cases after final approval, and shall provide an analysis of this data that identifies trends and concerns and documents NOPD's response to the identified trends and concerns. The PIB and IPM should coordinate and confer with each other in collecting, analyzing, and reporting this data to avoid or minimize duplication of efforts or resources. |
| **18. TRANSPARENCY** | | | | |
| Transparency and Oversight | 427 | Data Collection and Public Reporting | 1 | All NOPD audits and reports related to the implementation of this Agreement shall be publicly available via website and at the Police Department, City Hall, and other public locations, to the fullest extent permissible under law. |
| Transparency and Oversight | 428 | Data Collection and Public Reporting | 1 | Within 30 days of its implementation, each NOPD policy, procedure, and manual, including those created pursuant to this Agreement, shall be posted online and otherwise made publicly available, unless NOPD documents a reasonable security reason for keeping the policy, procedure, or manual private.  Where a portion of a manual may not be suitable for public availability, NOPD agrees to make the remainder of the manual publicly available. |
| Transparency and Oversight | 429 | Data Collection and Public Reporting | 1 | NOPD shall collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to NOPD decision making and activities, as permitted by law. |
| Transparency and Oversight | 430 | United States Attorney Criminal Justice Coordination Group | 2 | Within 120 days of the Effective Date, NOPD shall develop and implement a system of formal coordination between a command-level NOPD official and the DA, municipal and state court judges, the Orleans Public Defenders, the FBI, the USAO, and the IPM. This criminal justice coordination group shall be convened by the USAO and shall meet monthly to share regular feedback regarding the quality of NOPD arrests and indicia of misconduct; to refer specific allegations of misconduct for investigation; and to receive an update on the status of previous referrals. |
| Transparency and Oversight | 431 | United States Attorney Criminal Justice Coordination Group | 2 | The NOPD command-level official shall be accountable for documenting feedback and referrals received; ensuring that operational changes based upon this feedback are considered and made as appropriate; ensuring that all allegations of misconduct are investigated; and providing an update each month to the USAO-convened criminal coordination group regarding the status of investigations of previously referred allegations of misconduct, and the status of consideration of operational changes as a result of feedback received from the group. |
| Transparency and Oversight | 432 | District Community Outreach Programs and Meetings | 1 | Within 180 days of the Effective Date, NOPD agrees to develop and implement a Community Outreach and Public Information program in each NOPD District. |
| Transparency and Oversight | 433 | District Community Outreach Programs and Meetings | 1 | The Community Outreach and Public Information program shall include at least one semi-annual open meeting in each of NOPD's eight Districts for the first year of this Agreement and  public about the requirements of this Agreement; NOPD's progress meeting these requirements; and address areas of community concern related to public trust and constitutional policing. At least one week before such meetings, the City shall widely publicize the meetings using earned media opportunities.  In determining the locations of the meetings, NOPD shall consider factors such as each access to public transportation and child care. |

| CD Chapter | ¶ | Chapter Sub Section | Compliance Status | CD Text |
|---|---|---|---|---|
| Transparency and Oversight | 434 | District Community Outreach Programs and Meetings | 1 | The Community Outreach and Public Information meetings shall include summaries of all pertinent audits and reports completed pursuant to this Agreement and inform the public of any policy changes or other significant actions taken as a result of this Agreement. |
| Transparency and Oversight | 435 | District Community Outreach Programs and Meetings | 1 | For at least the first two years of this Agreement, every NOPD officer and supervisor assigned to a District shall attend at least two community meetings (e.g., NONPACC and other meetings with residents, and business and religious groups) per year in the geographic area to which the officer is assigned. |
| Transparency and Oversight | 436 | Police-Community Advisory Board | 1 | DOJ acknowledges that NOPD and community representatives have acted jointly to create a PCAB to facilitate regular communication and cooperation between the Department, the City, and community leaders, including youth leaders, such as through the development of a community advisory panel and the collaborative development of policing strategies and priorities. |
| Transparency and Oversight | 437 | Police-Community Advisory Board | 2 | NOPD agrees to work collaboratively with PCAB to develop and implement public safety strategies that respect and reflect each community's public safety priorities and concerns about particular police tactics.  To the extent specified below, NOPD agrees to seek PCAB's assistance, counsel, and input to build community consensus on potential recommendations in areas including the following: a) community policing strategies: b) accountability for professional/ethical behavior by individual police officers: c) special task forces that meet high priority community need: d) central policy changes, where applicable, that improve quality of life: e) resource allocations to meet high priority, difficult issues: f) strategies for a qualified and diverse workforce: g) providing information to the community and conveying feedback from the community to NOPD: and h) ways to provide data and information, including information about NOPD's compliance with this Agreement, to the public in a transparent and public-friendly format, to the greatest extent allowable by law. |
| Transparency and Oversight | 438 | Police-Community Advisory Board | 2 | NOPD further agrees to participate in quarterly meetings scheduled by PCAB: to allow the meeting agenda to be determined by the PCAB: and to have command/executive level staff representation present at all regularly scheduled meetings. |
| Transparency and Oversight | 439 | Community-Based Restorative Justice Project | 1 | NOPD and the City agree to participate in a community-based restorative justice project.   NOPD, the City, and DOJ will work to identify an entity to fund and administer this project.  The aim of this project shall be to help remedy mistrust between NOPD and the broader New Orleans community and create an environment for successful problem-solving partnerships. |
| Transparency and Oversight | 440 | Office of the Independent Police Monitor | 1 | This Agreement in no way diminishes the authority and oversight provided by the IPM pursuant to city ordinance and the related Memorandum of Understanding between the IPM and NOPD. |
| Transparency and Oversight | 441 | Office of the Independent Police Monitor | 2 | NOPD and the City agree to provide the IPM ready and timely access to the information necessary to fulfill its duties. The IPM shall have all access to confidential information, including all protections and authority of state law, as does New Orleans' Office of Inspector General. |
| Transparency and Oversight | 442 | Office of the Independent Police Monitor | 1 | NOPD and the City agree to abide by the November 10, 2010, Memorandum of Understanding between the NOPD and the IPM. This MOU is hereby incorporated by reference into this Agreement. |
| Transparency and Oversight | 443 | Office of the Independent Police Monitor | 1 | In determining the timing and content of its reviews and audits, the IPM may coordinate with the Monitor and NOPD to minimize duplication of effort, recognizing that overlapping or redundant audits may be necessary on occasion to assess the quality and reliability of various internal and external oversight mechanisms. |