## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** <br> Plaintiff, | **CIVIL ACTION NO.** <br> **2:12-CV-01924-SM-DPC** |
| **V.** | **JUDGE SUSIE MORGAN** |
| **CITY OF NEW ORLEANS,** <br> Defendant. | **MAG. DONNA PHILLIPS** <br> **CURRAULT** |

---

## RESPONSE OF THE CITY AND NOPD
## TO RULE TO SHOW CAUSE

---

*Davillier Law Group, LLC*
Daniel E. Davillier La. No. 23022
Charles F. Zimmer II (T.A.) La. No. 26759
935 Gravier Street, Suite 1702
New Orleans, LA  70112
Phone: (504) 582-6998
Fax: (504) 582-6985
ddavillier@davillierlawgroup.com
czimmer@davillierlawgroup.com

*Counsel of Record for*
*the City of New Orleans and the*
*New Orleans Police Department*

# Contents

I.     Summary of the City's Response ..........................................................- 1 -

II.    Specific Responses ...........................................................................- 2 -

III.   Order for Document Production ...................................................- 21 -

IV.    Notice of May-Call Witness at the Rule to Show Cause Hearing.................- 27 -

V.     Notice of May-Use Documents for the Rule to Show Cause Hearing..........- 27 -

**Now Into Court**, comes Defendant, the City of New Orleans (the "City") and its New Orleans Police Department ("NOPD"), who, in compliance with the Court's Order (R. Doc. 739) responds, as follows:

## I.   SUMMARY OF THE CITY'S RESPONSE

After a thorough investigation, PIB investigators found Officer Jeffrey Vappie had violated NOPD policy.[1] On June 8, 2023, a three-Captain disciplinary panel forwarded its Disciplinary Hearing Disposition which recommended that the Superintendent sustain three of the four charges.[2] Discipline according to the mandated NOPD disciplinary matrix was recommended for each sustained violation. On June 14, 2023, the Superintendent sustained the recommendation of the disciplinary panel.[3]

The PIB investigators and staff were single-minded in their focus and showed absolute fidelity to NOPD policy and procedure despite outside pressure to treat Officer Vappie differently. Opinions to the contrary are unfounded and unfortunate. The Office of Consent Decree Monitor ("OCDM") disagrees with the investigator's recomendation. Even assuming for the sake of argument that OCDM is correct, the errors alleged would be policy violations. A single policy violation is not a *de facto* trigger for non-compliance with the Consent Decree. The Consent Decree sets forth a detailed process to evaluate and report on systemic compliance. The City

---

[1] Interoffice Correspondence at R. Doc. 714-4.
[2] *See* Ex. 1 at NOPD_0002780, Disciplinary Hearing Disposition.
[3] *See* Ex. 1 at NOPD_0002780.

maintains its objections to selecting one investigation as a litmus test for PIB compliance.

The Consent Decree expressly provides in Paragraph 447 that the Monitor shall conduct compliance reviews or audits as necessary to determine whether the City and NOPD have implemented and continue to comply with the material requirements of the Decree.  That paragraph makes it clear that "[c]ompliance with a material requirement of this Agreement requires that the City and NOPD have: (a) incorporated the requirement into policy; (b) trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) ensured that the requirement is being carried out in actual practice."

Importantly, Paragraph 447 also provides that any compliance reviews and audits shall contain the elements necessary for reliability and comprehensiveness. This shows that the Consent Decree always contemplated that compliance would be determined based on a comprehensive review of whether the City has adopted policies, trained officers, and implemented the requirement in actual practice.  The Decree does not require that every requirement in the Consent Decree be performed in every instance by every officer in order for NOPD to be in full and effective compliance. Such a standard would be impossible for any police department to achieve.

## II.   SPECIFIC RESPONSES

The City and NOPD responded to the allegations by OCDM regarding the investigation of Officer Vappie on multiple occasions already. The City will not

repeat each statement in light of the applicable page limits. The City does

incorporate by reference NOPD's responses at R. Doc. 697, R. Doc. 714-6 and R. Doc.

716 and the exhibits attached thereto.

> **Paragraph 399:** NOPD agrees to develop and implement a complaint classification protocol that is allegation-based rather than anticipated outcome-based to guide PIB in determining where a complaint should be assigned. This complaint classification protocol shall ensure that PIB or an authorized outside agency investigates allegations including:
>
> **a)**   serious misconduct, including but not limited to: criminal misconduct; unreasonable use of force; discriminatory policing; false arrest or planting evidence; untruthfulness/false statements; unlawful search; retaliation; sexual misconduct; domestic violence; and theft;
>
> **b)**   misconduct implicating the conduct of the supervisory or command leadership of the subject officer; and
>
> **c)**   subject to the approval by the Deputy Superintendent of PIB, allegations that any commander requests be conducted by PIB rather than the subject officer's District/Division.

**NOPD Response**: The NOPD did in fact develop and implement a complaint

classification protocol that is allegation-based rather than anticipated outcome-

based.  It is set forth in the New Orleans Police Department Operations Manual at

Chapter 52.1.1 titled "Misconduct Complaint Intake and Investigation" and Chapter

52.1.2. titled "Misconduct Complaint Investigator Responsibilities."

The investigation of Officer Vappie complied with NOPD policy adopted

pursuant to the Consent Decree. The request for information from Fox 8 News

listed numerous allegations of violation of the limit on hours worked in a single day.

*See* Ex. 1 at NOPD_0002767-70. As detailed by the NOPD PIB investigative team,

Lieutenant Lawrence Jones considered the factual allegations and classified them on the intake form according to his extensive experience at PIB.

> I reviewed the e-mail, and in the e-mail, it was very noticeable where one of the identified -- an identified violation was four days with 16-hours-and-35-minute rule, which immediately brought attention to me. I'd just recently been involved in the detail case. So I was very familiar with it, at that time, when this investigation happened, so that's what I initiated the administrative investigation on.[4]

Captain Kendrick Allen and Lieutenant Jones testified clearly as to their process. Lieutenant Jones specifically details how he evaluated the factual allegations and determined the initial classification should be an alleged hour violation. And critically, he makes clear that if he had discovered support for a payroll fraud complaint at any point thereafter he could, and would, have pursued that criminal complaint. *See* R. Doc. 735-1, Jones testimony at 12:5 – 13:3.

NOPD policy states that PIB alone is charged with the classification of factual allegations. Chapter 52.1.1. OCDM effectively demands that PIB use a prohibited outcome-based system to conclude that the factual allegations would result in payroll fraud. Or, alternatively, a system that uses a legal conclusion by the complainant to direct the investigation of the facts actually alleged. Nothing in this paragraph or NOPD policy supports this change in process. Moreover, this is prohibited by the very NOPD Policies adopted pursuant to the requirements of Paragraph 399 of the Consent Decree (which policies were reviewed and approved by both the DOJ and OCDM). More importantly, both investigators made explicit

---

[4] R. Doc. 735-1, Jones testimony at 11:8 – 12-4.

that they could, and would without hesitation, bring additional charges, including criminal payroll fraud, if they found evidence to support that allegation. *See, e.g.*, R. Doc. 735-1, Jones testimony at 21:8 – 22:13.

OCDM was aware from the first day that PIB had not listed a criminal payroll fraud allegation on the intake form. OCDM confirms this allegation would be a criminal allegation, which would require referral to the district attorney. With that knowledge and based on a front row view of every aspect of the investigation, OCDM concluded that, "[o]verall, we are satisfied that PIB's investigation into the actions and inactions of Officer Vappie met the requirements of the Consent Decree."[5] That was correct in April 2023 and remains correct in August 2023.

> **Paragraph 415:** The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:
>
> a) "Unfounded," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did not occur or did not involve the subject officer;
>
> b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;
>
> c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or
>
> d) "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate NOPD policies, procedures, or training.

---

[5] R. Doc. 714-4 at 6.

**NOPD Response**: The PIB investigators did recommend a disposition for each allegation that was included on the Intake Form and for additional misconduct added to the investigation based on the information obtained during the course of the investigation of Officer Vappie. The issue here is the insistence that payroll fraud was a factual allegation that needed to be  listed on the intake form. If that assumption fails, the failure to include a disposition also fails.

Payroll fraud is a conclusion and would require the referral for a criminal investigation, not the administrative investigation described here, per Chapter 52.1.1.  As Captain Allen described in his sworn deposition testimony, PIB considered payroll fraud, as it was stressed by the OCDM team at the weekly meetings,[6] but did not have a basis to initiate a criminal investigation.[7] Lieutenant Jones reiterated that every member of this investigative team was of the same mind regarding an openness to payroll fraud charges, but only if they were supported by the facts:

> Q. And their contention is that your team, by failing to investigate payroll fraud, failed to address each of the factual allegations. Can you explain, from your participation, what's wrong with that assertion?
>
> A. Well, we didn't have a charge of payroll fraud, so there would not have been the disposition for it. The disposition that we gave were charges that we found throughout the investigation.
>
> Q. If you would have found support for a payroll fraud allegation, you would have made that allegation?

---

[6] *See* R. Doc. 714, R. Doc. 714-3, R. Doc. 714-4, and R. Doc. 735-2, Allen testimony at 33:12 – 42:24.

[7] *See, e.g.,* R. Doc. 735-2, Allen testimony at 35:12 - 19.

A. It would not have been in this investigation. It would have been in a separate criminal investigation that would have been initiated.

Q. [A]s an investigator, if you would have found support for that, you would have had no hesitation in making that criminal complaint move forward?

A. Not at all.[8]

Nothing about the investigation of Officer Vappie violated NOPD policy or this Consent Decree paragraph.

**Paragraph 414:** The resolution of any misconduct complaint must be based upon the preponderance of the evidence. A misconduct investigation shall not be closed simply because the complaint is withdrawn or because the alleged victim is unwilling or unable to provide additional information beyond the initial complaint. In such instances, the investigation shall continue as necessary within the allowable investigation timeframes established under this Agreement to resolve the original allegation(s) where possible based on the evidence and investigatory procedures and techniques available. In each investigation, the fact that a complainant pled guilty or was found guilty of an offense shall not be the deciding factor as to whether an NOPD officer committed the alleged misconduct, nor shall it justify discontinuing the investigation.

**NOPD Response**: The testimony of Captain Allen and Lieutenant Jones makes clear that they applied the preponderance of the evidence standard at every phase of the investigation.

Q. During this investigation, did you seek to apply the preponderance of the evidence standard?

A. Yes. That was done.

---

[8] R. Doc. 735-1, Jones testimony at 21:8 – 22:13.

> Q. And was that done as to each of the allegations made?
>
> A. Each of the allegations that were -- the allegation that was made in the initial, plus the other sustained allegations, yes.[9]

Moreover, OCDM publicly reported that based on its firsthand review, PIB applied the appropriate preponderance of evidence standard, explaining that:

> **Overall, we are satisfied that PIB's investigation into the actions and inactions of Officer Vappie met the requirements of the Consent Decree**.[10]
> ….
>
> Here, the **PIB investigators did a good job applying the Preponderance of the Evidence standard and, in our view, came to the correct conclusion regarding the allegations sustained**. However, PIB incorporated incorrect and confusing language in its investigation report and missed an important opportunity to explain the basis for its findings by not including an analysis of how it applied the Preponderance of the Evidence standard to the facts before it...[11]

OCDM has suggested that a criminal referral for payroll fraud should have been evaluated based on circumstantial evidence, witness credibility, and the preponderance of the evidence standard. And it was. Circumstantial evidence was considered by the investigators, they simply did not agree with OCDM that this evidence supported a payroll fraud complaint. *See* R. Doc. 735-2, Allen testimony at 19:16 – 21:5, and R. Doc. 735-1, Jones testimony at 22 - 24.

---

[9] R. Doc. 735-2, Allen testimony at 26:2 – 27:6.
[10] R. Doc. 714-4 at 6.
[11] R. Doc. 714-4 at 9.

However, as stated by OCDM,[12] and as explained in detail by Captain Allen and Lieutenant Jones, payroll fraud is a criminal charge and would have been evaluated through a different process and under a higher standard of proof.[13] "In contrast, criminal investigations apply a different standard – beyond a reasonable doubt."[14] It does not follow that Captain Allen and Lieutenant Jones failed to find a preponderance of evidence to support payroll fraud, when payroll fraud is a crime that requires a separate criminal investigation and a beyond a reasonable doubt evidentiary standard. If the investigators found probable cause for a criminal referral for payroll fraud, they could also add an administrative allegation for "Adherence to Law" *via* Rule 2, Paragraph 1. However, the sworn testimony states they never reached the threshold to initiate a criminal referral.

> **Paragraph 413:** In each investigation, NOPD shall consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations based upon that evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will NOPD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. NOPD shall make efforts to resolve material inconsistencies between witness statements.

**NOPD Response**: The PIB investigators that handled this investigation testified under oath that they considered all relevant evidence, including circumstantial evidence, in the investigation of Officer Vappie. *See, e.g.*, R. Doc. 735-2, Allen testimony at 19:16 – 21:5, and R. Doc. 735-1, Jones testimony at 22 – 24.

---

[12] R. Doc. 714-5 at 6. ("Under Louisiana law, public payroll fraud under La. R.S. 14:138 is considered a type of theft.")
[13] Allen Deposition, at R. Doc. 735-2 at 63:1
[14] R. Doc. 714-4 at 12.

Lieutenant Jones gave an example of their pursuit of circumstantial leads through his effort to reach out to the Officer Vappie's wife based on news reports, but she refused to give an interview. R. Doc. 735-1, Jones testimony at 24.

OCDM declares that the circumstantial evidence "suggests some manner of a social relationship between Officer Vappie and the Mayor" – *i.e.*, a violation of the NOPD nepotism policy.[15] And OCDM has been very open about its opinion and desire to reach this finding. But the independent PIB investigators did not agree. As Lieutenant Jones explained, "some manner of a social relationship" is not the standard.

> Q. So who would -- who would be the person that Officer Vappie would have had to report a personal relationship with, under N.O.P.D. policy, as you mentioned?
>
> A. If it was a personal relationship that was more than a mere friendship, and that's important, just a personal relationship is not -- it has to be more than a mere friendship…[16]

This goes to the core of the payroll fraud analysis and why the City has repeatedly pointed out the undue influence exerted by at least one member of the OCDM team to ignore this critical definition.[17] Moreover, Captain Allen explained that circumstantial evidence was considered on both sides:

> Circumstantial evidence goes two ways. What we did not see on there is we did not see an officer that was caressing the Mayor. We did not see an officer with his hand on the small of the Mayor's back. We did not see any intimate touches to validate anything other than what was said and the question that we asked by policy.

---

[15] R. Doc. 714-5 at 11.
[16] R. Doc. 735-1, Jones testimony at 66:19 – 68:5.
[17] *See also*, R. Doc. 735-2, Allen testimony at 37:12 – 41:25.

The relationship -- the question got answered in the interview room about a relationship. There is nothing else in the evidence to prove otherwise. So, yeah, did we look at everything? We did.[18]

The PIB investigative report also clearly details the credibility

determinations for each witness, including Officer Vappie. R. Doc. 714-4 at 31.

Captain Allen and Lieutenant Jones testified clearly that they did make credibility

determinations as is done in the ordinary course of PIB investigations:

Q. [T]he monitor also asserts that your investigative team failed to make a credibility determination regarding Officer Vappie. Do you agree with that?

A. No.

…

Q. Does that report include a Credibility Assessment of Officer Vappie?

A. Yes, it does.

…

Q. Having done a lot of PIB investigative work, do you -- do you think this is a sufficient statement of a Credibility Assessment?

A. I would think so, yes. I've done credibilities where there was not a specific credible or noncredible --[19]

Captain Allen explained in detail that the included credibility assessment was

detailed to let the reader see that the team was not comfortable picking a strict

"credible" or "not credible" and instead detailed their full assessment of credibility:

[T]he explanation gives the reason why we didn't check the box. I don't think, in this investigation, if we said he's not 7 credible, then, I mean, he's being untruthful. Right? If we said he's credible, that would mean that we didn't

---

[18] R. Doc. 735-2, Allen testimony at 22:11 – 23:11
[19] R. Doc. 735-1, Jones testimony at 24:21 – 26:10

- 11 -

> have any issues in the investigation -- in the interview, should I say, which both is not -- not true. We didn't have any evidence that he was untruthful. We was just concerned with the fact of him -- of the -- the posture, the defensive posture that he was taking.[20]

Captain Allen further testified that "[t]here was zero preferential treatment to Officer Jeffrey Vappie… As a matter of fact, we went as far as assigning a lieutenant and a captain to this case, to make sure that we did it by the book." R. Doc. 735-2, Allen testimony at 17:19 – 18:17. This was confirmed by OCDM when it reported:

> Captain Allen and Lieutenant Jones took their jobs seriously and pursued the investigation with diligence and integrity. **The Monitoring Team reviewed all witness and subject interviews conducted by PIB and can confirm the seriousness of the questions asked by the investigators, their lack of bias, and the appropriate scope of the questions. We did not see any evidence of "pulling punches" in the interviews. The questions were well thought out, relevant, and meaningful.**
>
> Additionally, **PIB performed well**, particularly in the absence of policies governing the Mayor's executive protection detail. The absence of policies makes administrative investigations much harder. The absence of policies here almost certainly negatively impacted material elements of the Vappie investigation. Nonetheless, **PIB appropriately considered the lack of policies and properly incorporated that fact into its decision-making process.**[21]

Nothing about these facts demonstrates a policy violation, and certainly not evidence of systemic non-compliance of the Consent Decree warranting contempt of court accusations.

---

[20] R. Doc. 735-2, Allen testimony at 29:5-16.
[21] R. Doc. 714-5 at 8 - 9.

**Paragraph 454:** City and NOPD shall provide each investigation of a serious use of force or use of force that is the subject of a misconduct investigation, and each investigation report of a serious misconduct complaint investigation (i.e., criminal misconduct; unreasonable use of force; discriminatory policing; false arrest or planting evidence; untruthfulness/false statements; unlawful search; retaliation; sexual misconduct; domestic violence; and theft), to the Monitor before closing the investigation or communicating the recommended disposition to the subject of the investigation or review. The Monitor shall review each serious use of force investigation and each serious misconduct complaint investigation and recommend for further investigation any use of force or misconduct complaint investigations that the Monitor determines to be incomplete or for which the findings are not supported by a preponderance of the evidence. The Monitor shall provide written instructions for completing any investigation determined to be incomplete or inadequately supported by the evidence. The Superintendent shall determine whether the additional investigation or modification recommended by the Monitor should be carried out. Where the Superintendent determines not to order the recommended additional investigation or modification, the Superintendent will set out the reasons for this determination in writing. The Monitor shall provide recommendations so that any further investigation or modification can be concluded within the timeframes mandated by state law. The Monitor may coordinate with the IPM in conducting these use of force and misconduct investigation reviews.

**NOPD Response**:  NOPD disputes the characterization of time card misconduct as a "serious misconduct complaint" according to this paragraph. The description of the types of complaints that constitute serious misconduct complaints shows that they are of a criminal nature or involve violations of the civil rights of citizens (planting evidence, unlawful search, false arrest, unreasonable use of force, discriminatory policing . . .).  The inclusion of the word untruthfulness in a list of false arrests and planting evidence would be all inclusive if applied as OCDM now

demands. It has never been applied this way and PIB was deemed in full and effective compliance by OCDM in 2021.

The allegations relating to Officer Vappie are related to the time for which he was paid while working in the Executive Protection Unit. There was no allegation of any violation of any citizen's rights, or any action that would constitute unconstitutional policing. As Captain Allen testified:

> Under normal circumstances, this would not be a serious misconduct case. This case would not get the publicity that it got, this case would not have a lieutenant and a captain as the investigators, this case would not have the Deputy Chief of PIB in a meeting with us, as often as we met, this case would not have a weekly meeting with the monitors, and subsequential meetings -- subsequently meetings, some weeks. This case, in every which way, as investigator and then the commander of PIB, this case, the allegations in this case would not be a major case.[22]

In fact, there was no specific allegation of either an untruthful statement or theft by Officer Vappie.  The factual allegations suggested to a very experienced investigator – Lieutenant Jones – that Vappie may have worked more than the permitted number of hours in a day, and called into question whether he was working during the hours for which he was paid. According to the PIB investigators, not working while being paid would be investigated as a failure to devote entire time to duty, not administrative payroll fraud.[23] Payroll fraud is investigated as a criminal complaint.[24]

---

[22] R. Doc. 735-2, Allen testimony at 30:9-25.
[23] R. Doc. 735-2, Allen testimony at 104:20 – 105:13.
[24] *Id.*

Even if the Vappie investigation was a serious misconduct case, the purpose of paragraph 454 was accomplished by OCDM having a role not contemplated by the Decree. The issues raised by OCDM were all on the table during the PIB investigation according to Captain Allen and Lieutenant Jones. OCDM and IPM were given open access to the investigation, including its plans and findings. Nothing was withheld. Paragraph 454 envisions OCDM reviewing an investigation "cold" and pointing out additional investigative steps: "[t]he Monitor shall provide written instructions for completing any investigation determined to be incomplete or inadequately supported by the evidence." In this case OCDM not only had the ability to point out incomplete steps, it reviewed the plan and guided the steps taken *via* weekly meetings. Paragraph 454 was not only satisfied, but far exceeded in the Vappie Investigation. OCDM complains that its desired outcome – a finding of payroll fraud – was not reached. But paragraph 454 does not provide an avenue to influence that outcome.

> **Paragraph 470:** To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City and NOPD. The Monitor shall have access to all necessary individuals, facilities, and documents, which shall include access to Agreement related trainings, meetings, and reviews, such as critical incident reviews, use of force review boards, and disciplinary hearings. NOPD shall notify the Monitor as soon as practicable, and in any case within 12 hours, of any critical firearms discharge, in-custody death, or arrest of any officer.

> **Paragraph 472:** City and NOPD shall ensure that the Monitor has full and direct access to all City and NOPD documents and data that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement, except any documents or data protected by the attorney-client privilege. The attorney-client privilege may not be used to prevent the Monitor from observing

- 15 -

reviews and trainings such as use of force review boards, or disciplinary hearings. Should the City and NOPD decline to provide the Monitor access to documents or data based on privilege, the City and NOPD shall inform the Monitor and DOJ that they are withholding documents or data on this basis and shall provide the Monitor and DOJ with a log describing the documents or data and the basis of the privilege for withholding.

**NOPD Response**: The above response is reasserted here. The Monitor was given unprecedented access to the documents and investigation into Officer Vappie. In fact, as Captain Allen explained in his deposition, the Monitor was given access to every interview via Google Drive, and the Monitor would have its representatives sit in the room right outside of the interview and monitor the interview in real time.[25] Further, there were a series of questions that were given to PIB by the Monitoring Team that were asked in the various interviews conducted in the Officer Vappie matter.

This molecular level involvement is far beyond what the Consent Decree envisions, as it exceeds the limits on OCDM found at paragraph 445: "[t]he Monitor shall only have the duties, responsibilities, and authority conferred by this Agreement. The Monitor shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent." The Monitor was involved in virtually every aspect of the investigation, which was abnormal, but also prevents any concern that it lacked access to material information and the ability to point out investigative steps.

OCDM is not allowed to guide the outcome of the PIB investor's analysis, and

---

[25] *See, e.g.*, R. Doc. 735-2, Allen testimony at 31 - 32.

that is the only thing that could have been achieved if it had received the

investigative report before completion of the investigation. As the April 7, 2023,

report makes plain, OCDM wanted a different outcome. "While we agree with PIB's

decision to sustain on the professionalism count, we see an appropriate use of that

same extensive circumstantial evidence to deviate upward from the presumptive

discipline set out in the matrix."[26]

> **Paragraph 409:** All misconduct investigation interview recordings
> shall be stored and maintained in a secure location within PIB.

> **Paragraph 419:** All investigation reports and related documentation
> and evidence shall be securely maintained in a central and accessible
> location until the officer who was a subject of the complaint has
> severed employment with NOPD.

> **NOPD Response**:  Both paragraphs 409 and 419 were complied with by

PIB. An error occurred at the City Attorney's office, but NOPD cannot supervise the

City Attorney's office. The Consent Decree, at paragraph 424, requires that the City

and NOPD establish methods for the City Attorney to provide "close guidance to

NOPD" during PIB investigations to "ensure that NOPD's disciplinary decisions are

as fair and legally defensible as possible." As Captain Allen explained, "[t]he City

Attorney, which in the SOPs of PIB, we actually work with often on cases, was

actually given the information much later [than OCDM], after all of the interviews

was conducted."[27] OCDM received all of PIB's investigative files and never asked

that they be encrypted, as they demand now.[28] The loss of confidentiality was not

---

[26] R. Doc. 714-5 at 17.
[27] *See* R. Doc. 735-2, Allen testimony at 31:1 – 32:25.
[28] *See* R. Doc. 735-2, Allen testimony at 32:21-25

the result of a failure by the NOPD or PIB to properly store and maintain its interview recordings in a secure location.

>**Paragraph 306:** NOPD supervisors shall be held accountable for providing the close and effective supervision necessary to direct and guide officers. Close and effective supervision requires that supervisors: respond to the scene of certain arrests; review each arrest report; respond to the scene of uses of force as required by this Agreement; investigate each use of force (except those investigated by FIT); review the accuracy and completeness of officers' Daily Activity Reports; respond to each complaint of misconduct; ensure that officers are working actively to engage the community and increase public trust and safety; and provide counseling, redirection, and support to officers as needed, and that supervisors are held accountable for performing each of these duties.

>**Paragraph 313:** NOPD shall hold commanders and supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.

**NOPD Response**: This Consent Decree Requirement has been codified into an approved NOPD policy. Chapter 1.3.8 creates a Serious Discipline Action Review Board to review a supervisor's role in any "serious disciplinary action." For the supervisory discipline that OCDM demands to apply, by NOPD policy, the discipline issued to Officer Vappie must exceed 20 days suspension. Officer Vappie's discipline did not involve any suspension, and as such NOPD policy would not trigger a serious discipline review board under this chapter to examine supervisor culpability.

Moreover, for the Executive Protection Unit, the officers are effectively supervised by the Executive for whom they are providing protection. There was effectively no NOPD supervisor in charge of Executive Protection at that time:

> [D]uring the Vappie investigation, there was not a supervisor assigned, nor policy, assigned to the detail of the Mayor, of the executive protection. There was not a supervisor.[29]

As Captain Allen explained, "on paper, it was Sergeant Tokishiba Lane…[Vappie] believed the Mayor to be his supervisor."[30] NOPD does not have disciplinary power over the office of mayor of New Orleans. The investigative report makes clear this seemingly unusual arrangement is not unique to this administration. "Sergeant Smith [expert witness] stated he served under Mayor Nagin, Landrieu and the first term of Mayor Latoya Cantrell… Sergeant Smith stated although he was the supervisor 'You do what the mayor tells you to do Period.'"[31]

> **Paragraph 403:** All administrative investigations conducted by PIB shall be completed within the time limitations mandated by state law and within 90 days of the receipt of the complaint, including assignment, investigation, review and final approval, unless granted an extension as provided for under state law or Civil Service exemption, in which case the investigation shall be completed within 120 days. Where an allegation is sustained, NOPD shall have 30 days to determine and impose the appropriate discipline, except in documented extenuating circumstances, in which case discipline shall be imposed within 60 days. All administrative investigations shall be subject to appropriate interruption (tolling period) as necessary to conduct a concurrent criminal investigation or as provided by law.

Lieutenant Jones initiated a departmental FDI and Form 320 Initial Intake Form for Commendation, Complaint or Documentation of Minor Violation against Officer

---

[29] R. Doc. 735-1, Jones testimony at 66:25 – 67:12.
[30] R. Doc. 735-2, Allen testimony at 108:23 – 109:3.
[31] R. Doc. 714-4 at 6.

Vappie on November 9, 2022.[32] *See* Ex. 1 at NOPD_00002842. Captain Allen and Lieutenant Jones had 135 days to timely complete this PIB Investigation, pursuant to La. R.S. 40:2531(B)(7), (amended on August 1, 2021, to allow 75 days to complete an investigation without extension, and 135 days to complete an investigation with an extension). Accordingly, this investigation, initiated on November 9, 2022, would be timely completed if the officer was given notice of their disciplinary hearing by March 24, 2023. NOPD calculated an internal 120-day return of the investigation after extensions was March 11, 2023. *See* Ex. 1 at NOPD_00002842. The report was completed on March 10, 2023.[33] The investigation, therefore, was completed timely.

Regarding the 30-day period of paragraph 403, the allegations are not formally "sustained" until the Superintendent approves the recommendation of the Disciplinary Panel. That event occurred on June 14, 2023. Discipline was determined and imposed in that same document which sustained the allegations in accordance with the recommendation of the three-captain panel. Officer Vappie was informed of the discipline issued on June 15, 2023. This paragraph is written in a manner that does not align with the actual process as an allegation is not sustained until the end of the disciplinary process.

> **Paragraph 420:** Each misconduct complainant will be kept informed periodically regarding the status of the investigation. The complainant will be notified of the outcome of the investigation, in writing, within ten business days of the completion of the investigation, including regarding whether any disciplinary or non-disciplinary action was taken.

---

[32] R. Doc. 714-4 at 2.
[33] R. Doc. 714-4 at 38.

This investigation was "rank initiated" by the Deputy Superintendent of PIB based on a request for information sent to the City. Ex. 1 at NOPD_0002799. He was aware of the status at all times. There was no complaint field with PIB, the FDI intake form was completed by Lieutenant Jones.

## III.  ORDER FOR DOCUMENT PRODUCTION

The Court ordered the City to produce certain documents to assist the Court in evaluating whether the City has violated the paragraphs of the Consent Decree listed above. The City responds as follows:

> 1.  **Any policy, directive, or standard operating procedure that authorizes NOPD to not fully investigate or document all factual allegations of misconduct if the lead investigator makes an early determination that the allegation lacks merit.**

There is no policy that reads this way, and the City disagrees that PIB conducted the Vappie investigation in such a manner. The testimony of NOPD witnesses demonstrates that PIB did document and investigate all factual allegations of misconduct. The investigators explain that they did not see payroll fraud in the factual allegations or facts discovered. *See* R. Doc. 735-2, Allen testimony, and R. Doc. 735-1, Jones testimony. They were focused on the assertion of payroll fraud constantly by OCDM.[34] As they testified, if they had seen support for a criminal complaint for payroll fraud, both would have had no hesitation initiating criminal proceedings against Officer Vappie for payroll fraud. *See, e.g.,* R. Doc. 735-1, Jones testimony at 12:5 – 13:3.

---

[34] *See* R. Doc. 714, R. Doc. 714-3, R. Doc. 714-4.

Moreover, CD paragraph 404 does not require a "full investigation," but rather that "Officer misconduct investigations shall be as thorough as necessary to reach reliable and complete findings." The same standard is has been codified at NOPD Chapter 52.1.1, paragraph 4, which requires, in part, that "[m]isconduct investigations shall be as thorough as necessary to reach reliable and complete findings." The record reflects this was done, while the standard of "fully investigated" is not a term used in the NOPD policy or the CD.

2. **Any policy, directive, or standard operating procedure that authorizes the City to not fully analyze and give dispositions to all allegations.**

There is no policy that reads this way, and the City disagrees that PIB conducted the Vappie investigation in such a manner. The Initiation of Formal Disciplinary Investigation form was drafted by Lieutenant Jones, and he did not see payroll fraud as the specific rule allegedly broken by the facts alleged. If the investigation had revealed payroll fraud Lieutenant Jones and Captain Allen would have initiated a criminal investigation. *See, e.g.,* R. Doc. 735-1, Jones testimony at 12:5 – 13:3. The investigation did not reveal support for such a complaint and thus it was not given a disposition.

NOPD Policy Chapter 52.1.1 states that "only PIB has the authority to classify an allegation of employee misconduct. PIB shall have exclusive authority to initiate an appropriate complaint action." And NOPD Policy Chapter 52.1.2 states that a disposition must be made for each allegation of misconduct.

3. **Policies, standard operating procedures, or other documentation that authorize the City to assign officers on**

- 22 -

> **administrative leave to the Orleans Parish Communications District, including concrete examples of when this has occurred previous to the Officer Vappie investigation.**

NOPD Policy Chapters 13.1 "Administrative Reassignment," 52.8

"Suspensions and Emergency Suspensions of Members," and 16.1 "Detailing /

Transfers / Filling Vacancies / Selection Process for Specialized Units" and PIB

SOP's guide assignments. Attached at Ex. 1, NOPD_0005009 - 5054 are prior

concrete examples of officers assigned to the Communications District.

> 4. **The policy, directive, or standard operating procedure authorizing reassignment of officers on administrative leave back to their original duty locations, and information regarding any event that occurred on or around December 21, 2022 that led to Officer Vappie being reassigned on that date.**

NOPD Policy Chapters 13.1 "Administrative Reassignment," 52.8 "Suspensions and

Emergency Suspensions of Members," and 16.1 "Detailing / Transfers / Filling

Vacancies / Selection Process for Specialized Units" and PIB SOP's guide

assignments. *See* Ex. 1, at NOPD_0005066, NOPD_0003750-3811, and

NOPD_0005627-5637. Documentation regarding the transfer of Officer Vappie is

attached at Ex. 1, at NOPD_0002771-72, NOPD_0005373, NOPD_0005640,

NOPD_0005641, affidavit of Lawrence Dupree at NOPD_0005005, and affidavits at

R. Doc. 716-7 (Woodfork), R. Doc. 716-8 (Ferguson), and R. Doc. 716-9 (Turner).

> 5. **The policy, directive, or standard operating procedure that authorizes the bureau to which an officer under investigation has been reassigned to then immediately further reassign that officer to a different duty location, including concrete examples of when this has occurred previous to the Officer Vappie investigation.**

NOPD Policy Chapters 13.1 "Administrative Reassignment," 52.8 "Suspensions and Emergency Suspensions of Members," and 16.1 "Detailing / Transfers / Filling Vacancies / Selection Process for Specialized Units" and PIB SOP's guide assignments. *Supra*. The Superintendent, or her designee, may place an employee on administrative reassignment. The Superintendent has the authority to conduct all administrative, supervisory and disciplinary related actions she deems necessary. *See* NOPD Policy Chapter 11.0. PIB's SOP also direct that "[o]nly the Superintendent of Police or a Deputy Superintendent has the authority to approve an emergency suspension or an administrative re-assignment, or to return to full duty a suspended or re-assigned employee. The PIB investigator shall ensure that prior to taking any such action, both the PIB Deputy Superintendent and the PIB Commander are notified through the investigator's chain of command and that all required authorization has been granted." Ex. 1 at NOPD_0005066; *see* also, the affidavit of Deputy Superintendent Lawrence Dupree at Ex. 1, NOPD_0005005.

6. **All paperwork regarding Officer Vappie's various reassignments over the course of his PIB investigation, and all policies, directives, and standard operating procedures that authorize the manner in which Officer Vappie's reassignments were handled.**

NOPD Policy Chapters 13.1 "Administrative Reassignment," 52.8 "Suspensions and Emergency Suspensions of Members," and 16.1 "Detailing / Transfers / Filling Vacancies / Selection Process for Specialized Units" and PIB SOP's guide assignments. *See* Ex. 1, at NOPD_0005066, NOPD_0003750-3811, and

NOPD_0005627-5637. Documentation regarding the transfer of Officer Vappie is

attached at Ex. 1, at NOPD_0002771-72, NOPD_0005373, NOPD_0005640,

NOPD_0005641, affidavit of Lawrence Dupree at NOPD_0005005, and affidavits at

R. Doc. 716-7 (Woodfork), R. Doc. 716-8 (Ferguson), and R. Doc. 716-9 (Turner).

7. **The "old policies" that "loosely describe" the practice of PIB investigations being reviewed and approved by the Deputy Chief of PIB rather than the Superintendent.**

There is no written policy for this longstanding practice. However, the

disciplinary files of PIB going back years include evidence of this practice. NOPD

has provided examples for the Court at Ex. 1, NOPD_0005374-5626.

*Respectfully submitted*, this 25th day of August 2023.

*Davillier Law Group, LLC*

/s/ Charles F. Zimmer II
Daniel E. Davillier La. No. 23022
Charles F. Zimmer II (T.A.) La. No. 26759
Jonathan D. Lewis, La. No. 37207
935 Gravier Street, Suite 1702
New Orleans, LA  70112
Phone: (504) 582-6998
Fax: (504) 582-6985
ddavillier@davillierlawgroup.com
czimmer@davillierlawgroup.com

*Counsel of Record for the
City of New Orleans and the
New Orleans Police Department*

- 25 -

**CERTIFICATE OF SERVICE**

I certify that I have served a copy of the above and foregoing pleading via Notice of Electronic filing using this Court's CM/ECF system to counsel of record participating in the CM/ECF system on this 25th day of August 2023.

/s/ Charles F. Zimmer II

## IV.    NOTICE OF MAY-CALL WITNESS AT THE RULE TO SHOW CAUSE HEARING

1.  Deputy Superintendent Keith Sanchez

2.  Captain Kendrick C. Allen

3.  Lieutenant Lawrence Jones

4.  Deputy Superintendent Lawrence Dupree

5.  Deputy Superintendent Nicholas L. Gernon

## V.    NOTICE OF MAY-USE DOCUMENTS FOR THE RULE TO SHOW CAUSE HEARING

In addition to the documents attached hereto as Ex. 1, the City may rely on:

1.  policies and standard operating procedures publicly available at

    https://nola.gov/nopd/policies/;

2.  any documents already in the record of this matter, including, but not limited

    to, R. Doc. 697 and the exhibits attached thereto, R. Doc. 714 and the exhibits

    attached thereto, and R. Doc. 716 and the exhibits attached thereto;

3.  any published reports and presentations of the court appointed monitor listed

    at http://nopdconsent.azurewebsites.net/reports; and

4.  transcripts of proceedings in this matter.