**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


**UNITED STATES OF AMERICA**                     **CIVIL ACTION**

**VERSUS**                                       **NO. 12-1924**

**CITY OF NEW ORLEANS**                          **SECTION: "E" (2)**


**SPECIAL REPORT OF THE CONSENT DECREE MONITOR REGARDING**
**DEPRIORITIZING CALLS FOR SERVICE AND ITS IMPACT ON "GONE ON**
**ARRIVAL" DISPOSITIONS AND "CODE 2" RESPONSE TIMES**
**RELEASED OCTOBER 27, 2023**



**<u>SPECIAL REPORT OF THE CONSENT DECREE MONITOR REGARDING DEPRIORITIZING CALLS FOR SERVICE AND ITS IMPACT ON "GONE ON ARRIVAL" DISPOSITIONS AND "CODE 2" RESPONSE TIMES</u>**

**October 27, 2023**

**Office of the Consent Decree Monitor**
**New Orleans, Louisiana**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana



**I.      Executive Summary**

This report focuses on the impact of NOPD response times on the Department's compliance with the Consent Decree in three areas: (1) the accuracy of NOPD's published Code 2 (emergency) response time data, (2) the impact of slow response times on Gone On Arrival (GOA) dispositions, especially in the context of Sexual Assault, Domestic Violence, and Rape cases, and (3) the reasonableness of NOPD's justifications for deprioritizing calls from a Code 2 to a Code 1 because a police officer was not available to handle the call. Due to the importance of these topics – from a societal and Consent Decree perspective – the Monitoring Team partnered with NOPD's Professional Standards and Accountability Bureau to conduct a joint review. The joint review highlighted what many already know – lack of officers and slow response times are problems. Specifically, the data revealed the following:

- Slow response times, often caused by the unavailability of officers, are increasing GOAs, especially in the area of SA, DV, and rape calls.

- The increase in GOAs negatively impacts NOPD's ability to fully investigate crimes, decreases community trust in the police, and contributes to the harm to victims by creating a perception that the NOPD "does not care."

- Supervisors are deprioritizing emergency Code 2 calls to non-emergency Code 1 calls often due to the unavailability of officers even though the call remains an emergency.[1]

- By deprioritizing emergency Code 2calls to non-emergency Code 1 calls, NOPD is wrongly deflating its published average Code 2 response times, which are data used by NOPD and City decision-makers, the City Council, and the public.

This report also discusses the meaningful remedial measures NOPD has agreed – and, in many cases, already has begun – to put in place to ameliorate as many of these problems as possible.

---

[1]      The NOPD and the Monitoring Team have a fundamental disagreement as to what police calls warrant a Code 2 emergency designation. The disagreement is discussed in depth in Section VII.C.1 below.



## II.    Table Of Contents

I.   Executive Summary ............................................................................................ 3

II.   Table Of Contents ............................................................................................ 4

III.   Introduction ..................................................................................................... 5

IV.   Background ...................................................................................................... 6

V.   Why We Conducted This Review ..................................................................... 8

VI.   Methodology ................................................................................................. 11

VII.   Findings ........................................................................................................ 13

    A.   Initial Findings ........................................................................................ 13

    B.   Additional Initial Findings Regarding Rape Cases ................................ 16

    C.   Supplemental Findings From Joint PSAB/Monitoring Team Follow-up Audit ............... 17

        1.   Domestic Violence .......................................................................... 18

        2.   Aggravated Rape ............................................................................ 19

VIII.   Recommendations ........................................................................................ 22

IX.   NOPD Remedial Measures ........................................................................... 24

X.   Conclusion .................................................................................................... 27



### III.    Introduction

This report of the New Orleans Police Department (NOPD) Consent Decree Monitoring Team originally was to focus on the accuracy of NOPD response time data and the impact of the deprioritizing[2] by NOPD of emergency ("Code 2") calls for service on those data. Pursuant to the Consent Decree, NOPD is obligated to "collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to NOPD decision making and activities, as permitted by law." (CD ¶ 429) The Monitoring Team's analysis of the manner in which NOPD supervisors deprioritize some emergency calls, and the collateral impact that has on publicly available NOPD response time data, raised questions about the accuracy of NOPD's response time data and, thus, the Department's compliance with this Consent Decree requirement.

As required by the Consent Decree, the Monitoring Team shared a draft of this Special Report with the NOPD. While the Department had some disagreements over some of our interpretations of the data, overall, it shared our general concern over the number, context, and impact of the multitude of deprioritizations in the data.

The Monitoring Team and PSAB also noticed a high number of deprioritizations in the area of Sexual Assault (SA), Domestic Violence (DV), and Rape calls, often associated with the unavailability of an officer to take the call and a resulting "gone on arrival" (GOA) disposition of the call. Accordingly, NOPD's Professional Standards and Accountability Bureau (PSAB) and the Monitoring Team agreed to conduct a joint deeper dive into the data. We have incorporated the findings of this joint effort into this Special Report.

The Monitoring Team thanks PSAB Innovations Manager Matthew Seagraves for his constructive cooperation throughout this project. NOPD has committed to taking meaningful corrective action to remedy the concerns reflected in our findings. We are confident our collective efforts will benefit NOPD and the Community — and foster compliance with the Department's Consent Decree obligations. The Monitoring Team will re-audit this area in the coming months to ensure a meaningful implementation of the Department's corrective actions.

---

[2]    We use the term "deprioritizing" rather than "downgrading" in this report since "downgrading" often is used for situations where one crime, say a sexual battery, is wrongly recorded as a lower level crime, say a domestic disturbance. So as not to confuse the terms, we use the term deprioritizing to refer to a call for service that comes out as an emergency "Code 2" call and is changed to a non-emergency "Code 1" call. While both the NOPD and the Orleans Parish Communications District are able to deprioritize calls, this report focuses on deprioritizing by the NOPD.



## IV.   Background

There has been much public discussion about NOPD's response times over the past 12 months. Highly respected data analysts engaged by the New Orleans City Council, Jeff Asher and Ben Horwitz, concluded in July 2022 that NOPD officers were averaging 2.5 hours to respond to 911 calls. NOPD took issue with this analysis, pointing out that the 2.5-hour figure included emergency *and* non-emergency calls. (NOPD readily admits it takes a long time to get an officer to a non-emergency call.) When adjusted to include emergency calls only, NOPD argued, its "median response time" was approximately 13 minutes per call. ([NOPD News](#), 7/27/2022)[3] While there certainly is logic in separating emergency and non-emergency calls, looking at *median* response times for emergency calls brings with it its own set of problems as this approach can mask a large number of slow responses.



An alternative way to look at response times is to examine the number of calls not responded to within a given period of time, say 20 minutes. Asher and Horwitz created a dashboard, available to the public, that takes this approach. ([City Council Dashboard](#)) Their data show that in 2020, NOPD responded to 83% of its emergency calls within 20 minutes. In 2021, that number dropped to 78%. In 2022, that number dropped further to 72%. So far this year, NOPD has responded to emergency calls within 20 minutes only 68% of the time. In other words, the data show it takes NOPD more than 20 minutes to respond to one of every three emergency calls it receives. No one thinks this is a good thing – not the Monitoring Team, not the community, not the NOPD.

There are many factors that drive a law enforcement agency's response times. One certainly is the number of officers available. At the end of 2019, NOPD had 1,148 commissioned officers. This number fell to 941 by the end of December 2022 – a drop of 18%. During the same period, the rolling average of new applications to the NOPD fell from 469 to 216. ([City Council Dashboard](#)) The NOPD, the City, and many others are working to increase recruitment and decrease attrition, but, for the moment, most agree NOPD has too few officers to police a 350

---

[3]     NOPD's disagreement with the data presented by Asher and Horwitz is set forth as follows on the NOPD website: "Unfortunately, the data presented to the City Council's Criminal Justice Committee today conflate response times in true emergencies with response times for routine non-emergency service calls, including calls which do not even involve an alleged crime. The best measure of how well we are fulfilling our duty to respond to 911 emergencies is to confine the response time average and median calculations to Code 2 or higher calls for service.  This is the method we use to continually monitor our performance by district, shift, hour and day in real-time, and the measure we think will best reflect the typical experience of a citizen calling our department to request emergency assistance."



square mile city of 400,000 residents (and many more visitors) the way NOPD historically has done it.[4]

Time will tell whether the multi-pronged efforts to improve recruitment and retention will be successful in improving NOPD's response times, but there is no question the effort is important. The impact on a community of slow response times is anything but academic. Slow response times put citizen's lives at risk, increase anxiety among community members, reduce trust in the police, exacerbate harm to victims and to others (like their children) who are witnesses to the violence, embolden criminals, and hinder efforts to solve crimes. For example, the Asher and Horwitz analysis noted that, for certain types of calls, due to slow response times, the caller is gone before police arrive *34% of the time*. Asher and Horwitz also found that the frequency of *Gone on Arrivals* (GOAs) has increased significantly as NOPD's response times have increased. Without a victim or witness to talk to, the call may be "closed" without police action, and whatever harm prompted the call for service goes unchecked by the police.[5]

In addition to focusing on recruitment and retention, another component of the solution to slow response times is ensuring NOPD and City decision-makers have access to reliable data. NOPD cannot manage what it does not accurately measure. Indeed, it was the reliability of the data, and its relationship to the Consent Decree's focus on transparency, that prompted the Monitoring Team's initial audit in this area.

---

[4]     The Monitoring Team has been working with NOPD to help reduce the burden on officers by identifying alternative police response (APR) approaches. These approaches include increasing the number of police reports taken online or by telephone, engaging civilian professionals to respond to traffic accidents, and sending civilian investigators into the field to investigate property and other crimes. Collectively, these could dramatically reduce the number of sworn officers NOPD needs to provide public safety for the City of New Orleans.

[5]     We recognize that, more recently, the SVD has made it a standard practice to attempt to contact all SA callers to follow-up in the event of a GOA. Likewise, NOPD reports that its SVD Domestic Violence Unit attempts to follow with every DV caller in the event of a GOA. According to NOPD, the DV unit not only makes follow-up calls, but documents them and prepares an internal weekly report so their progress can be tracked and assessed by NOPD leadership. This is a welcomed and thoughtful enhancement to NOPD's prior practices, but obviously NOPD still must continue its efforts to eliminate GOAs to the extent possible in the first place.



**V.     Why We Conducted This Review**

The Monitoring Team is interested in NOPD response times and the deprioritizing of calls for several reasons.

- *First*, providing fair, impartial, and unbiased police service to New Orleans is at the heart of the Consent Decree. *See, e.g.,* Consent Decree Chapter VII. If officers can't consistently respond to calls for service in a timely manner, the NOPD cannot meet this fundamental obligation.

- *Second*, an increase in GOAs could indicate that segments of New Orleans are not receiving the police protection they deserve. This is so because GOAs typically do not break down evenly across the City. For example, residents in some districts may end up waiting for a police response for much longer than residents in other districts.[6] While there are many potential reasons for this delta – size of districts, crime rates, officer deployment strategies – few would argue a fundamental tenet of constitutional policing is ensuring services are timely provided regardless of where an individual lives.

- *Third,* the data suggest that the increase in GOAs is having a disproportionate impact on certain types of calls — most notably domestic violence calls — a troubling number of which are being deprioritized by the NOPD due to the unavailability of officers. The Consent Decree speaks loud and clear about the need for the NOPD to police "free of gender bias." CD at §IX. The Consent Decree calls upon NOPD to "prioritize victim safety and protection at each stage of its response to a report of domestic violence . . . ." CD ¶213. The increase in GOAs and the consequent increase in response times raises serious concerns regarding whether NOPD is currently meeting this obligation.

- *Fourth*, the NOPD's ability to fairly and aggressively investigate crimes is significantly impacted by slow response times and the consequent GOAs they create.[7] Without a victim or a witness for the police to talk to, crimes go unsolved and perpetrators go unapprehended.[8] The Consent Decree speaks to the need for NOPD to investigate crimes

---

[6]     Our audits show, for example, that response times, and thus GOAs, are significantly higher in the 7th District as compared to other districts.

[7]     NOPD response times and GOAs are not the only contributors to the efficiency and effectiveness of NOPD's investigations. The fact that NOPD does not have its own DNA lab, the State Police limits NOPD to submitting no more than 3 pieces of evidence in any one case, and it can take from 8-12 months to receive the results of a DNA test back from the State Police Crime Lab are other significant contributors to the number of open investigations NOPD has at any given time.

[8]     Multiple studies have shown the impact between response times and crime solving. One study found that a mere 10% increase in response times created a 4.7 percentage point decrease in the likelihood



robustly. For example, a failure to fully investigate crimes against women was a key finding of the DOJ in its initial investigation of the Department. According to DOJ, the Department's culture tolerated and encouraged "under-enforcement and under-investigation of violence against women."[9]

- *Fifth,* in many cases, but especially in DV cases, if victims do not believe the police will arrive in time to help, they often simply do not call the police.[10] As response times increase, fewer DV calls get reported. In DV cases, it's important to understand the history of the violence. If victims don't report such calls because they believe it will do them no good, this history never gets captured, creating more risk for victims and making SVD's job even harder.

- *Sixth*, our personal observations during ride-alongs with officers suggested an increase in deprioritizations. The Monitoring Team rides with NOPD officers and supervisors frequently. In the aggregate, our ride-alongs over the years have taken place in all districts, during all shifts, on all days of the week. Over the past 24 months, we have observed an increase in supervisors deprioritizing calls from Priority 2 to Priority 1 due to a real or perceived view that insufficient officers were available to respond to the call. The unavailability of officers, however, is not material to the actual priority of a call.

- *Seventh,* the public is entitled to accurate response time data. NOPD's response time data are shared with the public via NOPD's website as well as via NOPD press releases. Additionally, NOPD's data are shared with the City Council and with the Council's data analysts, who then use those data to build public-facing dashboards. If the data underlying these websites, press releases, and dashboards are not accurate, the public is not being accurately informed.

Fortunately, several entities report they are looking into and working on solutions to NOPD's slow response times, including the City Council, the media, outside experts, and NOPD itself. No one disagrees the NOPD response time problem is real and consequential. Moreover, the Monitoring Team previously has shared with the NOPD multiple recommendations to reduce the

---

of clearing the crime. *See* Vidal, Jordi Blanes and Tom Kirchmaier, "The Effect of Police Response Time on Crime Clearance Rates." *The Review of Economic Studies*, vol. 85, no. 2 (303), 2018, pp. 855–91. *JSTOR*, https://www.jstor.org/stable/26543905.

[9]     DOJ Investigation of the New Orleans Police Department Findings Report (3/16/2011) at page v.

[10]     This reality extends well beyond DV cases. As a general rule, if victims do not believe they will receive a timely response, they are less likely to report a crime, which then leads to an erosion of community trust in the police, fewer criminals being apprehended, and the underreporting of crime data. *See* Asher, Jeff, *Police Are Taking Longer To Respond* (January 2023) at https://jasher.substack.com/p/police-are-taking-longer-to-respond.



administrative burdens on officers, which we believe will contribute to faster response times, more meaningful community engagement, and increased officer job satisfaction.[11]

  The Monitoring Team has focused this Special Report on three aspects of this problem:

- First, the impact of GOAs and response times on SA, DV, and Rape calls for service,

- Second, the reasonableness of NOPD deprioritizing calls from a Code 2 to a Code 1 simply because a police officer was not available to handle the call, and

- Third, whether the response time data being presented by NOPD to the public are accurate.

  For the reasons outlined in this report, it appears to us (i) the negative impact on DV and rape responses is significant, (ii) the justifications given for NOPD's deprioritization decisions is inconsistent, and (iii) certain components of NOPD's response time data are not accurate.

---

[11] *See, e.g.,* Doc. 640 (OCDM Technical Assistance Report) (Sept. 12, 2022).



## VI.    Methodology

The Monitoring Team initiated its initial review by asking NOPD to construct a table of all calls for service (CFS) in 2022 that indicated "no unit available" (i.e., that included the term "NUA" in the comments of the Computer Aided Dispatch (CAD) system). During 2022, NOPD had 19,354 calls for service Department-wide that had NUA in the CAD comments and 5,123 (26%) of these calls subsequently received a priority deprioritization from emergency to non-emergency status. The data we received were broken down by NOPD police district and by hour of the day.

NOPD employed two different platoon deployment strategies during 2022 for which we had to account. Between January through May, NOPD deployed three 8-hour platoon shifts (6:25 AM, 2:25 PM, 10:25 PM) in each district station to cover the 24-hour cycle. From June through December, NOPD changed to two 12-hour platoon shifts (7 AM, 7 PM) to cover the 24-hour cycle. The hour-by-hour NUA with subsequent priority deprioritization statistics were analyzed in the context of both deployment strategies.

The Monitoring Team's initial Department-wide analysis focused on NUAs and priority deprioritizations in the context of domestic violence (DV) and aggravated rape calls. During 2022, there were 901 DV calls (excluding domestic disturbance calls[12]) with NUA in the CAD comments. 210 of these calls were deprioritized (23%). Also during 2022, NOPD identified 54 aggravated rape calls with NUA in the CAD comments. 25 of these calls were deprioritized (46%). NOPD provided these data to the Monitoring Team by District and time of day.

To get a clear understanding of how and why aggravated rape calls were being deprioritized, we requested that NOPD provide CAD data on all aggravated rape CFS that were deprioritized during the third quarter of 2022 (July 1st through September 30th). There were 128 aggravated rape CFS that were deprioritized during this period. The Monitoring Team then reviewed all the transcribed broadcasted comments within each of these calls to determine exactly how and why NOPD supervisors were deprioritizing the aggravated rape calls.

Due to questions and concerns raised in our initial audit regarding GOAs and deprioritizations, PSAB and the Monitoring Team agreed further review was necessary. To NOPD's credit, it exhibited a genuine desire to understand the data, understand their impact, and, if necessary, implement a meaningful corrective action plan. Accordingly, PSAB and the

---

[12]     NOPD policy defines "Domestic Violence" to include "battering, a crime of violence, or property damage between individuals with a domestic relationship (R.S. 46:2151, M.C.S.17271 54-525)." NOPD policy defines "Domestic Disturbance" as a "call for service involving individuals with a domestic relationship that does not involve a crime." *See* NOPD Policy 42.4 and 42.4.1.



Monitoring Team partnered on a follow-on audit, which focused primarily on assessing the "correctness" and "reasonableness" of the GOA deprioritizations we were seeing in the data.

      The follow-on audit involved a substantive review of 110 calls involving priority deprioritizations. The initial review sample included 30 DV calls and 30 rape calls. Through further analysis, we determined that some items in the original sample had not been deprioritized. These were removed from the review universe. The ultimate sample for review comprised 60 calls for service, including 23 rape calls and 24 domestic violence calls.[13] The Monitoring Team and PSAB independently reviewed each call to assess the reasons for and the reasonableness of the deprioritizations.

---

[13]    The PSAB and the Monitoring Team disagreed on the classification on one particular call, which means our sample sizes were off by one. This disagreement did not impact the material conclusions of the audit.



VII.    **Findings**

A.    *Initial Findings*

The Consent Decree requires NOPD to "collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to NOPD decision making and activities, as permitted by law." (CD 429) Consistent with this requirement, as noted above, the Monitoring Team analyzed whether emergency calls for service (*i.e.*, Code 2 calls) are being "deprioritized" by the Department to non-emergency Code 1 calls. Such a practice would inaccurately reduce the Department's actual response times for Code 2 calls.

As noted above, our on-the-ground observations revealed that NOPD supervisors often deprioritize priority calls when insufficient officers are available to respond to the call ("NUA," which stands for No Unit Available, is an indicator for this). Our review of the relevant data confirms this observation in several ways.

<u>First</u>, our analysis confirmed that, regardless of the reason, the data reflect a high number of code deprioritizations, and have for some time. While we focused just on NUAs with a deprioritization as a possible indicator that NOPD supervisors are basing their priority decisions on the availability of officers, the overall number for deprioritizations is high. There were 78,042 total CFS from January 1st through the end of November 2022 that began as a Code 2 priority call; 34,230 of these calls were subsequently deprioritized. This equates to 43% of all calls.

A caveat is critically important here. The 34,230 figure encompasses all deprioritized calls, including those deprioritized by the Orleans Parish Communications District (*i.e.*, the 911 call center) without any NOPD involvement, as well as those deprioritized by NOPD officers after they arrive at a scene (*e.g.*, a call comes out as a possible prowler in someone's backyard, but turns out to be a neighbor's dog). *Our analysis found that 32% of the deprioritized calls in our sample were deprioritized by an NOPD supervisor, which equates to 14% of all calls for service during the review period.*

Further, it also should be noted that NOPD statistics do show that during this same time frame some calls for service were *upgraded* from a non-priority call to a priority call, suggesting that some supervisors seem to be making Code 1 or Code 2 decisions based on factors other than the availability of officers at least some of the time.

Provided below are two separate hour-by-hour charts placing the 5,123 NUA calls in our sample with a priority deprioritization within each hour of a 24-hour cycle (0 indicates midnight, 23 indicates 11 pm). The numbers are high throughout the day, growing significantly during the evening hours. The charts reflect the actual number of NUAs with deprioritizations for each of the platoon shift deployment strategies.





Certainly, some of these deprioritizations are perfectly appropriate. If the 911 dispatcher mistakenly designates a call that happened days or weeks ago as Priority 2, it may be appropriate for the NOPD supervisor to deprioritize that call to a Priority 1. But scenarios like this do not explain the inordinate number of deprioritizations shown in the data.

Second, as shown in the charts below, the data show a spike in NUAs with a deprioritization right around shift change time.







These spikes strongly suggest deprioritizations are not solely due to dispatcher error. There is no reason to think dispatchers wrongly prioritize calls more frequently during shift changes. But there is good reason to think NOPD supervisors are more likely to deprioritize calls around shift change time. Sending an officer to a Code 2 call at the end of his/her shift makes it far more likely that officer will end up working overtime – a personal hardship for the officer and a financial hardship for the Department. Further, calls tend to pile up over the course of a



shift, meaning that the number of calls "on hold" (*i.e.*, not yet assigned to an officer) increase and response times are longer around shift changes.[14] It appears, based on the Monitoring Team's many ride-alongs, that at least some Code 2 calls are deprioritized to Code 1 calls to reduce Code 2 response times.

<u>Third</u>, there is a high correlation between deprioritizations and the unavailability of officers. *More than 26 percent* of calls with no officers available end up being deprioritized from a Code 2 to a Code 1. The percentage is even greater for certain types of calls. When we looked at aggravated rape calls, for example, we noted that 46% of the deprioritized calls had "NUA" as one of the factors that led to the deprioritizing. The absence of an officer, however, does not mean the call is not a priority. It simply means NOPD was not able to get to the call in a timely fashion.

Changing a call's priority due to the unavailability of personnel causes multiple problems. It unfairly distorts the Department's emergency response times. It removes a potentially important call from a supervisor's visibility – especially during shift change when the first question a new supervisor asks is "how many Code 2s are we holding." It also reduces citizen trust in NOPD data – as well as in the NOPD itself.

> *"More than 26 percent of calls with no officers available end up being deprioritized from a Code 2 to a Code 1."*

## B.   *Additional Initial Findings Regarding Rape Cases*

Because deprioritized rape cases had such a high correlation with "NUA" designations, we spent additional time analyzing deprioritizations in those cases. Our review raised additional concerns.

As noted above, a high number of rape cases were deprioritized in the sample we reviewed. Several of these deprioritizations were accompanied by a supervisor's direction to "have the next [free patrol] unit handle, and notify sex crimes or child abuse to respond." It appears supervisors may be justifying the deprioritizing of rape cases by referring the matter to a different unit (*e.g.*, the Special Victims Division (SVD)). In practice, however, those other units may not be notified as the supervisor requested. Our conversations with personnel from the NOPD SVD strongly suggest that the SVD is not consistently notified of these deprioritized calls purportedly referred to them.

---

[14]   NOPD argues that some supervisors become more attentive to the accuracy or inaccuracy of original designations as they near the end of their shifts and, thus, are more likely to correct errant designations.



The Monitoring Team recognizes that often there are legitimate reasons to deprioritize a call that comes out as a rape to a lower priority call. For example, our analysis found justified deprioritizations where (1) the crime occurred days, months, or years prior; (2) the location of the crime could not be determined; (3) the call came from a complainant who was out of state, or (4) a co-worker allegedly touched another co-worker at work (*i.e.*, not a rape call). These cases very well may warrant a deprioritization. But situations like this do not explain the bulk of the deprioritizations we saw in our analysis.

**C.**     ***Supplemental Findings From Joint PSAB/Monitoring Team Follow-up Audit***

As noted above, the findings of the initial Monitoring Team audit prompted PSAB and the Monitoring Team to partner on a deeper dive into the data. This effort involved a substantive analysis of a large number of deprioritizations in an effort to determine whether the deprioritizations were justified under the circumstances. While the two teams disagreed on the reasonableness of the justifications in several cases, overall, our independent assessments both found a large number of deprioritizations based on nothing other than the unavailability of officers.

"Our findings should not be read as an outright condemnation of supervisors, but rather as an effort to bring to light the negative consequences of these decisions, their impact on officers and the community, and their impact on Consent Decree compliance."

Before sharing the specific findings, it bears repeating a caveat noted earlier in this report. In many cases, supervisors are making difficult on-the-fly triage decisions on what calls to send officers to without having enough officers to treat all calls as a priority. Thus, our findings should not be read as an outright condemnation of supervisors, but rather as an effort to bring to light the negative consequences of these decisions, their impact on officers and the community, and their impact on Consent Decree compliance.

That being said, below is a summary of the PSAB/Monitoring Team audit findings. The table is organized into two sections — the Monitoring Team's findings and PSAB's findings. Each section reflects the auditor's findings in the areas of deprioritizations involving (i) all calls (total universe of calls), (ii) DV calls, and (iii) aggravated rape calls. The columns show the initial sample size, the number of incidents in the sample that were deprioritized by dispatchers or by officers at the scene (N/A), the number of incidents in the sample that were deprioritized by NOPD supervisors, the number of incidents where the auditors found the deprioritizations reasonable, and the number of incidents where the auditors found the deprioritizations unreasonable.



| OCDM Results | Sample Size | # NOPD Supervisors Did Not Deprioritize (NA) | # NOPD Supervisors Decided to Deprioritize | Justified | Disagree With the Decision |
|---|---|---|---|---|---|
| Universe Sample Count | 50 | 34 | 16 | 9 | 7 |
| Universe Sample Percentage | | 68% | 32% | 56% | 44% |
| Domestic Violence Sample Count | 30 | 6 | 24 | 6 | 18 |
| Domestic Violence Sample Percentage | | 20% | 80% | 25% | 75% |
| Aggravated Rape Sample Count | 30 | 7 | 23 | 19 | 4 |
| Aggravated Rape Sample Percentage | | 23% | 77% | 83% | 17% |
| **Total Sample Count** | 110 | 47 | 63 | 34 | 29 |
| **Total Sample Percentage** | | 43% | 57% | 54% | 46% |

| PSAB Innovation Manager Results | Sample Size | # NOPD Supervisors Did Not Deprioritize (NA) | # NOPD Supervisors Decided to Deprioritize | Justified | Disagree With the Decision |
|---|---|---|---|---|---|
| Universe Sample Count | 50 | 35 | 15 | 10 | 5 |
| Universe Sample Percentage | | 70% | 30% | 67% | 33% |
| Domestic Violence Sample Count | 30 | 6 | 22 | 15 | 7 |
| Domestic Violence Sample Percentage | | 20% | 73% | 68% | 32% |
| Aggravated Rape Sample Count | 30 | 7 | 23 | 21 | 2 |
| Aggravated Rape Sample Percentage | | 23% | 77% | 91% | 9% |
| **Total Sample Count** | 110 | 48 | 60 | 46 | 14 |
| **Total Sample Percentage** | | 44% | 55% | 77% | 23% |

As an initial matter, we note that PSAB and the Monitoring Team did not agree in all cases. With regard to DV calls, for example, the Monitoring Team found that 75% of the deprioritizations were not reasonable, whereas PSAB found only 32% to be not reasonable. First, whether it's 32% or 75%, it is too large a number. This is something on which PSAB and the Monitoring Team wholeheartedly agree. But it's nonetheless important to understand the basis for the disagreement.

     1.    *Domestic Violence*

The disagreement between the NOPD and the Monitoring Team stems primarily from a fundamental difference of opinion over whether it is reasonable to deprioritize a DV call from a Code 2 to a Code 1 call merely because the alleged perpetrator left the scene.



To put the difference in specific context, consider this scenario: A 911 call comes in from the victim of a domestic violence incident where physical violence has occurred and the caller informs the 911 operator that the perpetrator just left her apartment.[15] Due to the risk of an imminent return of the perpetrator, the risk of escalating violence, the risk of emboldening perpetrators if they see no consequence of their actions, and the fact that a significant number of these calls will remain in the queue and, when answered hours later, will result in a GOA disposition, the Monitoring Team views such calls as properly Code 2. The fact that the perpetrator fled the scene doesn't change that. In NOPD's view, such calls are properly deprioritized to Code 1 calls; not because they are not important, but because they are not AS pressing as other calls coming in where the perpetrator still is on the scene. NOPD further seems to believe that if the perpetrator has left the scene, it is no longer a true emergency call that requires an immediate response (*i.e.*, the victim no longer is in imminent danger thus the call can be deprioritized).

We submit that the nature of DV calls suggests the Monitoring Team has the better argument. As noted above, the fact that a DV perpetrator flees the scene of his crime does not render the call a lesser priority. DV criminals are known to return to their victims to commit more harm, often only minutes after the initial abuse. Further, from the perspective of the victims of the abuse, they take little solace that their abuser stormed out the door. The prospect of not seeing an officer for hours is terrifying. It's important to remember the Consent Decree calls for NOPD to "prioritize victim safety and protection at each stage of its response to a report of domestic violence" for a very good reason.

## 2. *Aggravated Rape*

The delta between PSAB's findings and the Monitoring Team's findings regarding the several aggravated rape cases may seem less stark at first glance. Of the 23 rape cases in our sample, 77% were deprioritized.[16] The Monitoring Team took issue with 4 of the deprioritizations (or 17%), while PSAB took issue with only 2 (9%). While that reflects a significant difference of opinion, it's important to recognize that when one is dealing with small

---

[15]     We recognize that domestic violence is not uniformly committed by men against women, but since that is the far more common scenario, we have used those pronouns in our scenario for convenience.

[16]     According to data published by analyst Jeff Asher, from January 2022 through August 2022, 98 calls reporting an aggravated rape in New Orleans were reclassified from emergencies to non-emergencies while the call was being dispatched. That amounted to 40% of all aggravated rape reports in 2022. *See Advocate* Story (8/28/22). It's important to note Asher's findings focused on calls deprioritized "while being dispatched," while the PSAB/Monitoring Team audit focused on calls deprioritized by supervisors subsequent to the initial dispatch.



numbers (a sample of 23 and only 2 versus 4 unreasonable findings), small differences can result in significant swings in the data.

Unlike with the DV review, the delta between PSAB's findings and the Monitoring Team's findings cannot be so easily attributed to a single difference of opinion. The reasons for deprioritizations of rape cases are wide ranging. Here are a few of the more common justifications:

- The alleged rape occurred long ago (perhaps weeks, months, or even years).

- The alleged rape wasn't really a rape, but rather sexual harassment or battery that occurred earlier in the day (perhaps in a workplace or school setting).

- The victim is known to have relocated out of state.

- The victim is an individual known to be in long-term mental health crisis and the alleged facts are not credible.

While unquestionably all these calls warrant a police response, there certainly is room for reasonable disagreement whether they constitute a Code 2 priority requiring the immediate dispatch of an already-stretched-thin police department.

Nonetheless, whether one credits the Monitoring Team's finding that 17% of the review sample was wrongly deprioritized, or PSAB's finding that 9% of the review sample was wrongly deprioritized, both findings strongly suggest the need for further review and remedial measures. As discussed above, deprioritizing calls from Code 2 to Code 1 brings with it significant consequences, including a much slower NOPD response time and a much higher likelihood that the perpetrator or the victim will no longer be at the scene when officers finally arrive (leading to a GOA disposition). This, in turn, brings with it its own consequences, including a potentially devastating emotional toll on the rape victim and the increased likelihood that the case may not be solved — or even investigated at all.

*     *     *

NOPD and the Monitoring Team agree there is a problem here, which needs prompt meaningful corrective action. The community deserves it, NOPD's officers deserve it, and the Consent Decree requires it. NOPD and the Monitoring Team also agree there is no easy fix here. Turning the numbers of GOAs around will require enhanced training, supplemented policies, more close and effective supervision, increased civilian resources to free-up officers, and, over time, more officers. The Monitoring Team will continue working closely with the NOPD to implement as many of these solutions as possible as quickly as possible.



While some of the fixes will take longer to implement than others, NOPD already has begun taking meaningful actions. Most notably, the Department has constituted a working group of officers of different ranks to meet regularly and come up practical solutions to the problems outlined in this report. The group includes a member of the Orleans Parish Communications District and a PSAB policy expert. The group has been charged with taking a hard look at the problem and developing practical solutions, which can be implemented right away. Importantly, the group was instructed not to be constrained by any existing policy or practice.

NOPD invited the Monitoring Team to help kick off the working group initiative at the group's first meeting. The attendees were attentive and serious. We look forward to seeing what they come up with.

Finally, it is fair to note in closing that, while this Special Report focuses on DV and rape calls, NOPD's GOA problem is not unique to such calls. For example, Jeff Asher's 2022 analysis found that "431 domestic batteries, 74 armed robberies or carjackings, 252 aggravated assaults and 1,486 domestic disturbances that had been de-prioritized."[17] It is in everyone's interest to reduce the number of GOAs in all these cases. On this, PSAB and the Monitoring Team also strongly agree.

---

[17]      *See Advocate* article (8/28/22)



## VIII.   Recommendations

Based on our review and data analysis, the Monitoring Team recommended the NOPD consider implementing the following corrective actions:

- Direct PSAB to conduct additional audits to continue monitoring the extent of deprioritizations, determine whether the deprioritization decisions are proper (*i.e.*, based on meaningful criteria other than the non-availability of officers), and identify further corrective actions as appropriate. Further, PSAB should include in these audits a more detailed review of deprioritizations in the 7th District as this district had significantly higher overall NUAs with a deprioritization than other districts.[18]

- Designate a new priority code for Code 2 priority calls with a delayed response solely because officers are not available to respond to the call. As noted above, the unavailability of an officer does not indicate the call is not a priority, and such a change in the classification system would help NOPD and City decision-makers to understand the reasons for deprioritizations and obtain more accurate response time data.[19]

- Include response time data for the new priority code calls as part of Code 2 response time data in all reports, press releases, and dashboards, including reports to City Council, the IPM, and the public.[20]

- Direct supervisors to include the basis for any deprioritization decision in their radio requests to OPCD dispatchers. This will promote thoughtfulness, increase transparency, and facilitate PSAB audits.

- Supplement relevant policies to better define what constitutes an emergency, clarify which calls should receive a priority designation and which calls should not, and set out the process for deprioritizing calls.[21]

- Prepare a thorough Standard Operating Procedure that guides officers and supervisors (and dispatchers) in making reasonable and consistent priority decisions.

---

[18]      *See* Consent Decree § IX, ¶ 427, ¶ 429, ¶ 467.

[19]      *See* Consent Decree ¶ 427, ¶ 429.

[20]      *See* Consent Decree ¶ 427, ¶ 429.

[21]      *See* Consent Decree § 15.



- Conduct additional training to ensure supervisors are deprioritizing calls only for reasons relating to actual priority, and not the availability of resources.[22]

- Launch an education/reinforcement campaign (roll call reminders, posters, daily training bulletins, etc.) to remind officers of the new approach.

- Work with the Orleans Parish Communications District to examine and improve its protocols for designating priority calls.

- Work with the Orleans Parish Communications District to enhance training to dispatchers.

- Interview a select number of NOPD supervisors and OPCD dispatchers on calls that PSAB and the Monitoring Team found an unreasonable deprioritization to get a better understanding of their decision-making process.  Insight gained from this may help in improving training and policy.[23]

- Install CAD display monitors in the NOPD SVD so that SA and DV personnel can observe and respond to calls for service within their area of expertise.[24]

These recommendations are not the sole province of the Monitoring Team. The Monitoring Team has worked closely with NOPD's PSAB and we are in general agreement regarding the wisdom of these remedial measures.

---

[22]     *See* Consent Decree § II.

[23]     *See* Consent Decree § II.

[24]     *See* Consent Decree § IX.



## IX.    NOPD Remedial Measures

Motivated by our joint findings, following a review of a pre-publication draft of this Special Report, PSAB constituted a working group of officers and supervisors to identify (i) practical and innovative solutions to the concerns raised by the Monitoring Team, and (ii) concrete "next steps" to implement the solutions. The NOPD working group was charged with "addressing OCDM's recommendations regarding de-prioritizations," and coming up with additional recommendations of their own. The working group, guided by PSAB innovations manager Matthew Segraves, met throughout August and September, 2023. The Orleans Parish Communications District generously participated in the working group's meetings since many of the corrective actions likely will require OPCD's cooperation.

In summary fashion, here are the solutions and next-steps identified by the working group and committed to by NOPD:

- **Ensure All Violent Crimes Receive A Priority 2 Code**. As noted in this Special Report, Domestic Violence calls are often de-prioritized to a Code 1 when the aggressor had left the scene. As explained above, the Monitoring Team sharply criticized this practice because, among other things, the departure of the aggressor frequently does not mean the call is no longer an emergency. NOPD now will keep all violent crimes as Code 2 Priority calls, and use new sub-codes (see below) to indicate whether the aggressor is on the scene and whether the victim has relocated to a safe location (*e.g.*, hospital, police station, fire station).

- **Restore Priority Modifiers**. The OPCD and the NOPD use priority codes to designate the priority of every call for service. As described earlier in this report, a Code 2 call is an emergency call warranting an immediate "lights and sirens" officer response. A Code 1 call, on the other hand, requires less immediacy, and often receives a delayed NOPD response. Previously, each numerical code – Priority 0 through Priority 3 – had a number of "sub-codes" or "modifiers," *e.g.*, 1A, 1B, 2A, 2B, etc. These sub-codes stopped being used at some point in the past, making it harder to prioritize competing priority calls. NOPD commits to work with OPCD to restore sub-codes A-F for Priority 1 calls and sub-codes A-G for Priority 2 calls, allowing more accurate coding and decision-making for a wider range of emergency calls.

- **Enhance Training**. NOPD will work with OPCD to ensure officers, supervisors, and dispatchers understand the newly-expanded coding protocols. The training will focus on, among other things, when and how to use the new 2G Priority Code through the issuance of Daily Training Bulletins, mandated roll call trainings, and leadership emails to all NOPD personnel. NOPD also will provide enhanced training to supervisors on the use of the new 2G Priority Code.



- **Provide Additional Resources To Officers And Supervisors**. NOPD commits to develop a Standard Operating Procedure (SOP) that provides guidance to supervisors on managing call priorities. The SOP will explain that the availability of officers does not dictate the priority code for a call. It also will give further guidance on how and when to use the new 2G Priority Code, and when it is appropriate to de-prioritize a call.

- **Update Relevant NOPD Policies**. NOPD has identified a host of policy changes designed to reduce response times and, thus, reduce GOAs on priority calls. Among these changes are (i) clarify the definition of an "emergency" call, (ii) allow officers to respond to some Code 2 calls (*e.g.*, DV calls) without lights and sirens; (iii) require supervisors to state the reason for priority deprioritizations on the air when communicating with OPCD, (iv) permitting a single officer to respond to DV calls, among others.

- **Return To Simple Signals To Describe Calls**. Currently, OPCD employs a version of "plain talk" signals that doesn't align with Louisiana's Criminal Codes. While the point of moving to "plain talk" signals was to reduce confusion, it apparently has had the opposite effect since many of the "plain talk" signals are not intuitive, *e.g.*, "SHOTP," "BURGR," and "DOMDIS." NOPD believes that a re-alignment of OPCD's signals and NOPD's signals will allow for more accurate and precise call prioritization.

- **Measure And Report Response Times With Greater Precision**. NOPD will develop a new system to identify priority changes and measure response times by initial priority code (i.e., the priority code initially assigned by OPCD) as well as final priority code (i.e., the priority code as changed by OPCD or by an NOPD supervisor). NOPD will develop a public-facing dashboard that will allow the community to see NOPD response times by priority code (initial and/or final).

- **Supplement NOPD's Current Audit Program**. NOPD commits to working with the Monitoring Team to conduct a follow-up audit following the implementation of the Department's corrective action plan. NOPD also plans to incorporate a Priority Code Audit into its standard annual or bi-annual audit program conducted by PSAB.

- **Give Supervisors Access To Real-Time Computer Aided Dispatch (CAD) Data**. Currently, supervisors have access to real-time call data only in their cars or by walking to the desk in the lobby of each police district. This makes it hard for supervisors not in the field to keep track of priority calls and priority code changes. NOPD will develop the technology to give supervisors live CAD access from their desks. The new technology will give supervisors real-time access to calls holding, call priority, changes in call priority, and officer availability – critical information to ensure close and effective supervision.



- **Dispatch SVD Detectives To Sex Crimes And Child Abuse Calls Where The Victim Is In A Safe Location**. Rather than dispatching a patrol officer to sex crimes and child abuse calls where the victim has relocated to a safe location (*e.g.*, hospital, police station, fire station), NOPD will work with OPCD to dispatch SVD detectives to ensure victims get the prompt attention they need from specially trained officers while ensuring the Department's patrol officers are free to respond more quickly to priority calls where an individual's safety is immediately at risk.

- **Explore Opportunities For Greater Efficiency In Handling DV Calls**. Responding to DV calls understandably takes a significant among of time; more time than most other violent crimes. Some of this extra time is necessitated by the additional paperwork required in DV cases. To its credit, NOPD is not naïve to the possibility that some officers may consciously or subconsciously avoid such calls due to the additional work involved. NOPD plans to work with its officers and other DV stakeholders (*e.g.*, Family Justice Center, New Orleans Health Department, New Orleans Sexual Response Advisory Committee, etc.) to explore opportunities to reduce time and burden without sacrificing quality of service.

- **Explore Expanding The Use Of Civilians**. Consistent with the public statements of NOPD Superintendents from Ronal Serpas to Anne Kirkpatrick, and the Mayor herself, NOPD will work to increase the number of civilians supporting its SVD. Among other improvements, NOPD plans to explore expanding the use of civilians to conduct callbacks on DV calls that have yet to be handled to inform callers about the services available to them and to attempt to convince callers to relocate to a safe space. NOPD believes putting victims in touch with the DV unit prior to officers making the scene not only will provide the victim faster service, but also will save officers time by negating the need for officers to inform victims about the services available to them.

This corrective action plan is thoughtful and meaningful. The Monitoring Team looks forward to providing technical assistance to the NOPD as it goes about implementing this plan if requested, and closely monitoring the plan's implementation over the coming months.



## X.      Conclusion

It is clear NOPD is struggling with response times, and, consequently, with GOAs. This struggle is not surprising considering the significant decrease in NOPD personnel over the past few years. There are many efforts ongoing to help improve recruitment and reduce attrition; as well as efforts to help NOPD modernize its approach to take better advantage of civilian employees, make more use of alternative police responses, and implement other changes that will allow sworn officers to respond to emergency calls faster.

A thoughtful and disciplined focus on GOAs in the context of sexual assault, domestic violence, and rape cases will have a significant positive impact on crime fighting, victim-centered responses, and citizen trust in the police.

Measuring the impact of these potential solutions – and identifying new solutions – depends on the accuracy of NOPD's data. Currently, as noted in this report, NOPD's response time data are flawed due to the deprioritizing of calls because no officer is available. We look forward to working with the NOPD to implement its corrective action plan and the recommendations outlined in this Report.