**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CIVIL ACTION** |
| **VERSUS** | **NO.  12-1924** |
| **CITY OF NEW ORLEANS** | **SECTION: "E" (2)** |

## ORDER AND REASONS

"The Court approved the joint motion of the City and DOJ for entry of the New Orleans Police Department's Consent Decree on January 11th, 2013. In the order approving the Consent Decree, the Court specifically retained jurisdiction to enforce the Consent Decree until the final remedy contemplated by the Consent Decree has been achieved."[1]

On July 21, 2023, the Court issued a Rule to Show Cause ("Rule") why the City of New Orleans ("City") should not be found to have violated eight provisions of the Consent Decree with respect to the conduct of Public Integrity Bureau ("PIB") investigations and two provisions of the Consent Decree regarding timeliness of investigations, imposition of discipline, and notifications to complainants.[2]

The City filed Objections to the Rule.[3] The United States Department of Justice ("DOJ") filed a Memorandum of Law in Opposition to the City of New Orleans' Objections to the Rule.[4] The Court overruled the City's objections and scheduled the hearing on the Rule.[5]

---

[1] R. Doc. 159 at 8.
[2] R. Doc. 729.
[3] R. Doc. 734. Although the City captioned the pleading as "objections," the City makes only one objection—that the Court has amended the Consent Decree by making a material change to its terms.
[4] R. Doc. 735.
[5] R. Doc. 739.

The Court held a hearing on the Rule on August 31, September 5, and September 6, 2023. The Court heard testimony from Captain Kendrick C. Allen, Lt. Lawrence Jones, Deputy Superintendent Lawrence Dupree, Deputy Superintendent Keith Sanchez, and Deputy Superintendent Nicholas Gernon. City Exhibits 1, 2, 3, 6, 7, 17, 11, 10, 15, 18, and 19 were admitted into evidence; DOJ Exhibits 23, 24, 25-39, and 41 were admitted into evidence; and the Court's Exhibit 40 was admitted into evidence.[6]

Prior to the hearing, the City produced documents on August 28, 2023,[7] August 29, 2023,[8] and September 1, 2023.[9] The DOJ produced documents on August 29, 2023.[10]

The Court now issues its Order and Reasons on the Rule to Show Cause.[11]

## SUMMARY OF FINDINGS

Having considered the evidence presented by the parties and their arguments in their pre-hearing briefs and at the hearing, the Court finds that the City of New Orleans has failed to show cause why it should not be found to have violated Paragraphs 399, 415, 414, 413, 454, 470, 472, 409, 419, 306, and 313 of the Consent Decree having to do with the conduct of PIB investigations, and Paragraphs 403 and 420 regarding timeliness of investigations, imposition of discipline, and notification of complainants. As discussed in greater detail below, the Court finds as follows:

- The disciplinary investigation of Officer Vappie was not conducted in the same manner as other investigations and was not conducted in accordance with NOPD Policies.

---

[6] R. Docs. 748, 750, and 751.
[7] R. Doc. 743.
[8] R. Doc. 746.
[9] R. Doc. 749.
[10] R. Doc. 747.
[11] The Court relies on documents admitted into evidence at the hearing or appearing otherwise in the record.

- The NOPD violated Paragraph 399 of the Consent Decree by failing to accurately and completely record all allegations against Officer Jeffrey Vappie in PIB CTN# 2022-0513-R.[12]

- The NOPD violated Paragraph 415 of the Consent Decree by failing to explicitly identify and recommend a disposition for each allegation against Officer Jeffrey Vappie.

- The NOPD violated Paragraph 414 of the Consent Decree by failing to document that the resolution of the misconduct complaint was based upon the preponderance of the evidence.

- The NOPD violated Paragraph 413 of the Consent Decree by failing to give meaningful consideration to circumstantial evidence available to the PIB investigators that could have suggested to a reasonable person that Officer Vappie charged the NOPD for time not worked.

- The NOPD violated Paragraph 454 of the Consent Decree by refusing to provide a copy of the PIB investigation report in PIB CTN# 2022-0513-R to the Monitor so the Monitor could review and timely provide recommendations as required by the Consent Decree.

- The NOPD violated Paragraphs 470 and 472 of the Consent Decree by refusing to produce non-privileged documents reasonably requested by the Monitoring Team.

- The NOPD violated Paragraph 409 and 419 of the Consent Decree by failing to take reasonable measures to protect the confidentiality of its investigatory materials.

- The NOPD violated Paragraphs 306 and 313 of the Consent Decree by failing to undertake a reasonable effort to assess the culpability of supervisors and failing to hold supervisors accountable for their actions/inactions where appropriate.

- The NOPD violated Paragraphs 403 and 420 of the Consent Decree by failing to conduct its administrative investigations in a timely manner, failing to impose discipline in a timely manner, and failing to keep complainants apprised of the status of their complaints in a timely manner.

---

[12] PIB uses a standard formulation to identify complaints, called a PIB Complaint Tracking Number, or PIB CTN#. NOPD Policy 52.1.1 explains that the PIB CTN is a "unique number assigned by PIB Intake to each complaint received and entered on the Complaint Form and all documents associated with intake, classification, investigation and adjudication of the complaint. The CTN includes the year the complaint was filed followed by a four digit sequential number starting with 0001 for the first recorded allegation of the year, followed by an alpha character indicating the source of the complaint (i.e., P = public; R = rank). For example, 2014-0001 P would identify the first complaint received in 2014 and indicate it was filed by a member of the public." *See* NOPD Policy 52.1.1.

While a one-time transgression of any one of these Consent Decree provisions would not typically warrant a show cause hearing and a formal finding of non-compliance, the facts in this instance are unprecedented in that (i) the City and the NOPD refuse to acknowledge any non-compliance, which suggests the non-compliant behavior will continue, (ii) the City's witnesses suggest (and sometime outright state) they intend to continue the non-compliant practices, and (iii) some of the identified non-compliant practices have been ongoing for an extended period of time. Further, the haphazard manner in which the City produced documents to the Court, the multiple unsupported statements made by the City's counsel in the City's briefs and at this Court's various hearings, and the unsupported statements made by several City witnesses during the hearing, do nothing to convince the Court the City is committed to remediating the multiple non-compliant practices identified by the Monitor, the DOJ, and this Court.

In the face of these facts, the Court has the inherent power to impose sanctions upon the City. In the normal course, such sanctions could include, but need not be limited to, financial penalties. As explained herein, however, prior to the issuance of this Order, newly confirmed NOPD Superintendent Anne Kirkpatrick submitted to the Court a Remedial Action Plan, attached hereto as Attachment 1, that reflects a meaningful effort to remediate the multiple non-compliant practices identified by the Court. Accordingly, the Court will defer any imposition of sanctions to give the NOPD time to demonstrate it has implemented its Remedial Action Plan.

## **BACKGROUND**

The Court's July 21, 2023 Rule to Show Cause followed an NOPD Public Integrity Bureau ("PIB") investigation (designated PIB CTN# 2022-0513-R) into and report on

Officer Jeffrey Vappie,[13] as well as two reports by the Consent Decree monitors,[14] and an in-court status conference on Thursday, June 21, 202.[15] At the in-court status conference, the Monitor emphasized that the Monitor's work was not a review of Officer Vappie, but a "review of PIB's processes and procedures and how PIB undertook the investigation."[16]

The Monitor's reports and the in-court status conference focused on PIB's compliance with the Consent Decree, specifically as PIB performed the Officer Jeffrey Vappie investigation. The Monitor has presented substantial evidence of numerous Consent Decree violations by the City in the course of PIB's investigation. The Monitor presented evidence that the City and NOPD have violated paragraphs 399, 415, 414, 413, 454, 470, 472, 409, 419, 306, and 313 of the Consent Decree having to do with the conduct of PIB investigations, and paragraphs 403 and 420 regarding timeliness of investigations, imposition of discipline, and notification of complainants.

In its order, dated October 21, 2023, the Court explained that NOPD has steadfastly denied that it violated the Consent Decree in any way during the Officer Vappie investigation and as proof has asserted that the Officer Vappie investigation proceeded in just the same manner as any other investigation. PIB has repeatedly represented that it handles all investigations the same way it handled the Officer Vappie investigation and that it intends to continue to do so. Apparently, this is true even though the Monitor has raised legitimate concerns that PIB's actions during the course of that investigation violated the Consent Decree.

---

[13] R. Doc. 714-4.
[14] R. Docs. 694 (Ex. 25) and 714 (Ex. 26).
[15] R. Doc. 719.
[16] R. Doc. 726 at 7.

This is troubling because the violations identified by the Monitor involve core components of the reform of PIB, such as including all factual allegations in the complaint intake form, fully investigating and reaching a disposition on all factual allegations, applying the preponderance of evidence standard to all of its findings, considering all evidence, including circumstantial evidence, and making credibility assessments of all witnesses.

The importance of these issues strikes at the core of the Consent Decree as it extends far beyond the significance of the Officer Vappie investigation. In fact, in its 2011 report on its investigation of the New Orleans Police Department, which led to the entry of the Consent Decree, DOJ cited long-standing and entrenched practices of the NOPD and structural deficiencies in its systems and operations, importantly including its failure to fully investigate allegations of misconduct as justification for the entry of the Consent Decree.[17]

The City's failure (until the recent submission by Superintendent Kirkpatrick) to take advantage of the Court's invitation to demonstrate that the violations identified by the Monitor have been or are being remediated, coupled with the City's statements that PIB intends to continue conducting investigations in the same way it conducted the Officer Vappie investigation, raised the Court's legitimate concern, and that concern led to the entry of the Rule to Show Cause requiring the City to show cause why it should not be found to have violated the Consent Decree.

---

[17] R. Doc. 1-1.

I.    **PIB's Failings With Respect To The Officer Vappie Investigation Involve Core Components Of The Consent Decree And Justified The Court's Entry Of The Rule To Show Cause.**

Throughout this matter, the City has contended that NOPD did not treat Officer Vappie any differently from the way it would treat any other officer going through a PIB investigation.[18] The evidence tells a different story.

A.    **Officer Vappie was Sent To Work At The Orleans Parish Communications District, But No Other Officer On Administrative Reassignment Has Been Sent There Since 2016.**

PIB opened the administrative investigation into the allegations against Officer Vappie on November 9, 2022.[19] On the same day, Officer Vappie was reassigned from the Mayor's Executive Protection team to NOPD's Field Operations Bureau.[20] The reassignment notice instructed Officer Vappie to report to NOPD Headquarters at 750 Broad Street in plain clothes the next day.[21] Instead of working at Headquarters, however, Officer Vappie actually reported to the Orleans Parish Communications District ("OPCD")(also known as the 911 call center), a separate entity which is not a part of the City or the NOPD.[22]

At this Court's in-court status conference on June 21, 2023, counsel for the City represented to the Court that it is a routine practice of NOPD to assign officers to OPCD while they are on administrative leave pending a PIB administrative investigation.[23] Specifically, counsel for the City represented the following:

---

[18] R. Doc. 754 (Transcript) at 41; R. Doc. 718 at 23.
[19] R. Doc. 747-1 at 1.
[20] R. Doc. 740-1 at 15 (Ex. 1 at NOPD_0002772).
[21] *Id.*
[22] R. Doc. 753 (Transcript) at 117. Captain Kendrick Allen testified he learned Officer Vappie was at OPCD when he had to go there to get Officer Vappie's city-owned cell phone. Deputy Superintendent Keith Sanchez testified that he was aware of no other officers under investigation since his appointment in October 2022 who worked at the OPCD while they were reassigned.
[23] R. Doc. 726 (Transcript) at 85-86.

> All I know is that [the OPCD] is one place that they will often send officers that are on off-assignment section until they figure out if they can get back to their bureau or not.[24]

The City's counsel could not identify the support for this statement.[25]

In response to this Court's order that the City produce the documents evidencing this "routine practice," [26] the City produced documents purportedly supporting the statement. Rather than supporting the City's representations, however, the documents produced by the City demonstrate that no NOPD officer other than Officer Vappie has been sent to work at OPCD since the consolidation of all emergency call center services in 2016.[27]

Not only was Officer Vappie given an unprecedented reassignment in an agency outside the NOPD, the City claims not to have a single piece of paper documenting that move and has been unable to identify the individual who authorized it.[28] In contrast, the City was able to produce documentation for Officer Vappie's other administrative transfers.[29]

## B.   NOPD Attempted To Prematurely Reassign Officer Vappie To The Executive Protection Detail Before The PIB Investigation Was Complete.

Also on the topic of favorable treatment, the Monitor in its February 17, 2023 Immediate Action Notice to Deputy Superintendent Keith Sanchez expressed concern that, in late December 2022, NOPD outgoing Superintendent Shaun Ferguson directed the return of Officer Vappie to the Mayor's security detail. [30] This statement by the

---

[24] *Id.*
[25] *Id.*
[26] R. Doc. 729 at 8.
[27] R. Doc. 753 (Transcript) at 14-15.
[28] R. Doc. 753 (Transcript) at 23-24.
[29] *See, e.g.*, R. Doc. 740-1 (Ex. 1); R. Doc. 740-8 at 207 (Ex. 7 at NOPD_0005373).
[30] R. Doc. 714-3 at 4.

Monitor prompted a vitriolic response from the City. In one court filing, for example, the City described the Monitor's statement as an "erroneous conspiracy theory about reinstating Officer Vappie to the Mayors EP team." [31] Calling the statement by the Monitor "untrue," the City publicly alleged that the Monitor was attempting to "drive the outcome of the PIB investigation of Officer Vappie to a specific, public result."[32]

At the Show Cause hearing, however, the City's witnesses told a very different story from the one asserted by the City's lawyers. Indeed, the City's witnesses confirmed the details shared by the Monitor regarding the attempt to reinstate Officer Vappie to the Executive Protection team prior to the conclusion of the PIB investigation and the efforts taken by several members of the NOPD leadership team to prevent that from happening.[33] In short, there was an attempt to prematurely reassign Officer Vappie to the Executive Protection team. The City's own witnesses refute the accusations made by the City's lawyers against the Monitor.

---

[31] R. Doc. 716-3 at 31.

[32] *Id.* at 18.

[33] R. Doc. 754 (Transcript) at 110. Deputy Superintendent Dupree testified regarding the December 2022 effort to reassign Officer Vappie to Executive Protection as follows: "Well, I don't know what led to it happening. But I know I was not in agreement with returning Officer Vappie to his former assignment, and I was aware that he was still under administrative investigation. So I put a stop to it since that was my option." With regard to how Chief Dupree learned of the reinstatement attempt, he had this to say: "Well, first, I found out in roundabout ways that the potential was that he, Officer Vappie, was being returned to Executive Protection. And it's clear on the form that he was being returned to full duty. So with that, the normal process is that the form would be given to Officer Vappie, and then Officer Vappie would notify his sergeant, Sergeant Lane. And so I just simply interrupted that process and pumped the brakes before Sergeant Lane has to make a decision she is not comfortable with which she later indicated. I actually just made the decision for her and for the department." Chief Dupree went on to explain why the effort to reinstate Officer Vappie may have occurred on December 21, 2022; "So without speculation, but bringing truth to the obvious, obviously, that was former Superintendent Ferguson's last day at work. So that could be the most obvious as to what was going on. I'm not going to be naive about that by it being his last day. And I do want to correct something. I couldn't make the ultimate decision to stop it. Superintendent Woodfork had to ultimately stop it which she did. So what was going on December 21st, Superintendent Ferguson's last day." *Id.* at 111. Likewise, Deputy Superintendent Sanchez testified that he reached out to the Monitor following Superintendent Ferguson's direction to take Officer Vappie off reassignment because he (Deputy Superintendent Sanchez) had "concerns" about Officer Vappie going back to Executive Protection. R. Doc. 752 (Transcript) at 20-21.

### C.   The Allegation That Officer Vappie Committed Payroll Fraud Was Not Recorded Or Investigated.

The undocumented assignment of Officer Vappie to OPCD and the foiled effort to reinstate Officer Vappie to the Executive Protection team prior to the conclusion of the PIB investigation were not the only indicia of favorable treatment toward Officer Vappie revealed at the Show Cause hearing.

On December 12, 2022, PIB received a citizen complaint forwarded by the Office of the Independent Police Monitor "OIPM" alleging misconduct by multiple members of the Executive Protection Team, including Officer Vappie.[34] PIB logged the complaint under PIB CTN# 2022-0566-P. Specifically, the complaint alleged that the members of the Executive Protection Team were recording "unreasonable and improbable" hours, in other words that they were recording time not actually worked.[35] The OIPM[36] and the NOPD investigator[37] characterized the complaint as one alleging payroll fraud.

When it came time to investigate PIB CTN# 2022-0566-P, however, the NOPD investigator excluded Officer Vappie from his investigation, noting that the investigation into Officer Vappie "will be conducted under PIB CTN# 2022-[0513] -R."[38] As testified to by the PIB investigators in the PIB CTN# 2022-0513-R matter, however, Officer Vappie was not investigated for payroll fraud under PIB CTN# 2022-0513-R.[39]

---

[34] R. Doc. 740-1 at 97-102 (Ex. 3 at NOPD_0002859-2864).
[35] *Id.*
[36] R. Doc. 740-7 at 9 (NOPD_0004604) (12/12/22 Letter from OIPM to Deputy Superintendent Sanchez).
[37] R. Doc. 740-2 at 118 (NOPD_0003469) (Letter from Sgt. Schuler to Ms. Trepagnier); *see also* R. Doc. 740-1 at 309 (NOPD_0003071).
[38] R. Doc. 740-1 at 3 (Ex. 1 at NOPD_0002760). The investigation report actually refers to 2022-0559. A PIB quality control reviewer noticed the typographical mistake and subsequently corrected it to 2022-0513-R. *See* R. Doc. 740-1 at 227 (Ex. 34 at NOPD_0002989).
[39] *See, e.g.,* R. Doc. 718-3 at 3 ("To be clear, at no time was Officer Vappie under investigation for Payroll fraud....").

A few months later, PIB received another citizen complaint against Officer Vappie from the OIPM.[40] This complaint, logged under number PIB CTN# 2023-0141-P, alleged criminal payroll fraud against Officer Vappie. [41] PIB closed this matter without investigation, again explaining Officer Vappie already had been investigated for the same violations under PIB CTN# 2022-0513.[42] Yet, as noted above, the investigators in PIB CTN# 2022-0513-R did *not* investigate Officer Vappie for payroll fraud. Deputy Superintendent Keith Sanchez admitted at the hearing on the Rule to Show Cause that he never informed the Officer Vappie complainants of the disposition of their complaints in PIB CTN# 2022-0566-P or PIB CTN# 2022-0513-R.[43]

In short, PIB excluded Officer Vappie from the PIB CTN# 2022-0566-P investigation and did not pursue the PIB CTN# 2023-0141-P investigation because, purportedly, those investigations duplicated the PIB CTN# 2022-0513-R investigation, but the City's witnesses have confirmed Officer Vappie was not investigated for payroll fraud as part of the PIB CTN# 2022-0513-R investigation. There is a troubling circularity to PIB's reasoning, which, as with the inexplicable and undocumented reassignment of Officer Vappie to the OPCD, gives the Court no assurance that the City's position that Officer Vappie "was treated just like everyone else" is accurate.

---

[40] *See* R. Doc. 740-2.
[41] *See* R. Doc. 752 (Transcript) at 136; *see also* Hearing Ex. 35. Notwithstanding the City's position throughout this matter that the allegations against Officer Vappie could not conceivably be seen as payroll fraud, it turns out the NOPD had in its hands two additional complaints against Officer Vappie alleging similar, if not the same, facts that the NOPD did in fact record as payroll fraud allegations. *See* PIB CTN# 2022-0566-P and PIB CTN# 2023-0141-P. The United States brought this troubling fact to the fore during its cross examination of the Deputy Superintendent of PIB "Q . So since March 17, 2023, and this entire time we have been arguing about this issue, you had an affirmative duty, because this is serious misconduct, as you said, to give it to the Court Monitor, but you didn't give it to him, right? A. We did not give it to the Court Monitor. That is correct." R. Doc. 752 (Transcript) at 138-39.
[42] R. Doc. 752 (Transcript) at 145.
[43] R. Doc. 752 (Transcript) at 119, 123, and 194-195.

**D.    PIB's Failure To Consider Requesting Officer Vappie's Personal Cell Phone Was a Violation of NOPD Policy.**

In its June 15, 2023 analysis of PIB's investigation of Officer Vappie (PIB CTN#

2022-00513-R), the Monitor criticized PIB for failing to make an effort to secure Officer

Vappie's personal cell phone.[44] The Monitor put its concern this way:

> Soon after the launch of the Vappie investigation, it became clear Officer Vappie may have been communicating with the Mayor or the Mayor's staff via cell phone. Consequently, PIB secured Officer Vappie's work phone. However, a forensic analysis of the work phone failed to turn up relevant texts, emails, or voicemails. Yet, clearly, considering the extensive hours Officer Vappie spent in the Upper Pontalba apartment both on and off the clock, Officer Vappie and the Mayor's office must have been corresponding somehow. The most likely vehicle for such frequent communications, if not Officer Vappie's work phone, must be Officer Vappie's personal cell phone. The evidence on his personal phone (e.g., texts, locations, voicemails, etc.) could have been relevant to support or rebut Officer Vappie's testimony regarding what he was doing while spending so many hours in the Upper Pontalba apartment both on and off the clock.

The Monitor went on to explain that

> [R]eviewing the content of that phone could have supported Officer Vappie's statement that he was working while in the Upper Pontalba apartment. It also could have countered Officer Vappie's statement. Either way, the information on the personal phone would have been relevant to PIB's investigation.

Notwithstanding the likelihood of evidence on Officer Vappie's personal cell phone, PIB

refused not only to require the production of the cellphone, but even to request the

voluntary production of the cell phone.[45]

The United States expressed similar frustration over PIB's refusal to even request

access to Officer Vappie's personal cell phone during the hearing on the Rule:

---

[44] R. Doc. 714-5 at 15-16.
[45] *Id*. at 16.

> [C]ircumstantial evidence was not considered because NOPD did not voluntarily -- ask for a voluntary provision of Officer Vappie's personal cell phone. And then, after asserting, we can get that information from the interviews, and asserting, again, in the written response, but we got all that information in interviews, they didn't even ask in the interviews, what was on the phone, will you give us the phone, did you text on that phone, did you send pictures on that phone, did you communicate by that phone, did you do scheduling with the Mayor's scheduler on that phone, did you conduct any official business at all on that phone. They didn't ask those questions, and, therefore, they didn't establish the basis needed to obtain a warrant for the phone . . . .[46]

The United States likens the failure to even ask for the personal cell phone to "voluntarily turning one's head away and not even asking the important questions that are required to understand what is the circumstantial evidence in this investigation . . . ."[47]

The NOPD concedes it did not ask Officer Vappie for access to his phone.[48] According to then-Interim Superintendent Michelle Woodfork, NOPD found "no legal, fair, or reasonable basis" for obtaining the phone.[49] Former Interim Superintendent Woodfork opined further that obtaining the phone was prohibited by the Fourth Amendment since the complaint was only that Officer Vappie "may have violated the 16.35-hour rule"[50] and the PIB purportedly was able to gather all the evidence it needed

---

[46] R. Doc. 752 (Transcript) at 291.

[47] *Id.* at 291-92.

[48] R. Doc. 752 (Transcript) at 109.

[49] R. Doc. 714-6 at 3.

[50] There has been much discussion throughout this matter about the "16 hour 35 minute" rule. The rule limits the number of hours (combining scheduled work, overtime, detail hours, and outside employment) an officer may work in a 24 hour period for health and safety reasons. The testimony and filings in this matter suggest there is some confusion regarding the actual hours limitation. The limitation variously has been referred to as the 16 hour 35 minute rule, the 16:35 rule, the 16 hour 48 minute rule, the 16:48 rule, and the 16.58 hour rule. The original Consent Decree, entered by the Court on January 11, 2013 (R. Doc. 159-1 at ¶ 365) limited work in any 24 hour period to 16 hours. The Consent Decree subsequently was amended in October 2018 to increase the limit to 16 hours and 49 minutes (otherwise stated as 16.82 hours). *See* R. Doc. 565 at 97. NOPD's policy, however, still limits officers to working 16 hours and 35 minutes (which may also be stated as 16.58 hours) in any 24 hour period. *See* NOPD Policy 13:15 (January 14, 2018). For convenience, the Court will refer to the rule as the "16:35 hour rule." While this formulation does not track to the language of the Consent Decree, it does seem to be the formulation most frequently used by the

by looking at Officer Vappie's timecards.[51] Finally, Former Interim Superintendent Woodfork also argued that obtaining "an officer's personal cellphone as part of an administrative investigation would deplete and flatten morale of the entire NOPD."[52]

In its various briefs, the City adopts NOPD's position, stating simply that "PIB does not issue search warrants for an officer's private phones in administrative investigations."[53]

It is clear to the Court that PIB *can*, under certain circumstances, obtain officers' personal cell phones in an administrative investigation and *should have* asked the questions necessary to determine whether it had the need to do so. NOPD policy makes clear that personal communications devices used in the course of an officer's business are subject to Department review:

> The use of any computer, Internet service, telephone service or other wireless service, **including member-owned devices and services**, to send or receive information that may be related to departmental or public business may be subject to review or disclosure.[54]

A personal cell phone constitutes a member-owned device. The NOPD should have investigated whether Officer Vappie used his personal cell phone to send or receive information related to departmental or public business but did not do so.

The NOPD's fear that obtaining an officer's personal cell phone, when the officer has used the cell phone in the course of NOPD business, will "deplete and flatten the morale of the entire NOPD," likely is overstated in light of the other personal intrusions a

---

parties. References throughout this Order using different formulations (e.g., references in briefs, documents, testimony, or hearing arguments) will be viewed as referring to the same rule.
[51] R. Doc. 714-6 at 4.
[52] *Id*. At the hearing, Deputy Superintendent Sanchez likewise expressed concern about how requesting an officer's personal cell phone "would destroy the morale of the department." R Doc. 752 (Transcript) at 42.
[53] R. Doc. 718 at 32.
[54] NOPD Policy 41.3.4 (12/10/17).

police officer is subject to in the course of an administrative investigation, including "1) a polygraph examination; 2) a Computer Voice Street Analyzer (CVSA) examination; 3) a Psychological Stress Exam (PSE); 4) urinalysis, blood test, and/or other medical laboratory test; 5) a psychological and/or psychiatric evaluation; 6) a physical line-up; 7) the taking of photographs; and/or 8) Handwriting analysis...."[55] One would be hard pressed to argue the review of a personal cell phone used in the course of department business is more likely to deplete morale than any of the foregoing.

Finally, the NOPD's conclusion that obtaining an officer's personal cell phone would violate the Fourth Amendment is lacking. Courts have upheld a law enforcement agency's right to obtain and review an officer's personal cell phone used in the course of department business. The basis of the search simply must be reasonable and the search must be reasonable in scope, with what is reasonable depending on the specific facts of each case.[56]

PIB should have ensured its investigation was robust enough to determine whether it had a reasonable basis to request Officer Vappie's personal cell phone for a reasonable search. If it had a reasonable basis, it should have done so. While the morale of the NOPD workforce obviously is a serious concern, it cannot be the reason for failing to conduct a thorough and complete investigation.

---

[55] NOPD Policy 51.1.1.
[56] *See New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985) (a search must be reasonable and "what is reasonable depends on the context within which a search takes place"); *see also O'Connor v. Ortega*, 480 U.S. 709, 717 (1987) (plurality opinion) ("The employee's expectation of privacy must be assessed in the context of the employment relation."); *Spears v. Smith*, 996 F.2d 304, 1993 WL 241470 at *2 (5th Cir. 1993) (unpublished) (*citing Ortega*, 480 U.S. at 718–19).

**E.    The Officer Vappie Predisposition Conference Was Not Conducted In Accordance With NOPD Policy.**

The Court has an additional concern regarding the PIB investigation of Officer Vappie. Specifically, the Court has lingering questions regarding the Pre-Disposition Conference panel's rejection of the PIB investigators' finding that Officer Vappie worked more than 18 hours and 35 minutes in a 24 hour period while assigned to NOPD consultant Fausto Pichardo, rather than to his normal Executive Protection assignment.[57]

At the hearing on the Rule to Show Cause, the Deputy Superintendent of PIB, Keith Sanchez, was asked by the City's counsel whether he had "an example of additional information coming in during the [Officer Vappie] trial process or the [Officer Vappie] hearing process?" [58] Deputy Superintendent Sanchez testified that he did have an example.[59] He described the "additional information" this way:

> There was an email that was sent from the superintendent, I want to say from Paul Noel, saying that the executive protection [sic] can work more than a 16, 35.[60]

Deputy Superintendent Sanchez went on to testify that the Noel Email was *not available* to the investigators when they closed their investigation and issued their report on March 10, 2023.[61]

The City made the same representation (and others) in its pre-hearing brief. The City's argument is worth quoting here at length:

> The Pre-Disposition Conference and Pre-Disciplinary Hearing for Officer Vappie were conducted on May 25, 2023. At this time *Officer Vappie introduced evidence and exculpatory arguments* for consideration by the panel of three NOPD Captains that would evaluate the PIB investigation and

---

[57] R. Doc. 714-4 at 38.
[58] R. Doc. 752 (Transcript) at 216.
[59] *Id.*
[60] *Id.*
[61] *Id.* ("Q. So that was a fact that was not available to the investigators when they issued their report, correct? A. That's correct.")

make recommended findings and suggest appropriate discipline to the Superintendent.[62] At this conference *Officer Vappie produced an email* that authorized EP details to work overtime as necessary, *effectively voiding the 16.58-hour rule for that EP detail*. The email states as follows, according to the record:

> [A]s a member of the NOPD Executive Protection overtime was expressly authorized in an email authored by former NOPD Deputy Chief Paul Noel on February 23, 2021. The email advised that *"per the Superintendent the Mayor's Security Detail can work overtime as necessary"* and it was disseminated to Capt. Joseph Waguespack Sr., Sgt. Shumeca Chadwick, Lt. Christopher Johnson, and Sgt. Tokishiba Lane.

The referenced email will be attached to this correspondence.

> *NOPD policy was changed by this email authorization*, as conveyed by the NOPD Chief of Detectives, Paul Noel. *The PIB investigators did not have access to this email during their investigation.*[63]

In support of the City's representations, the City cites to the affidavit of Captain Kendrick Allen.[64] In his affidavit, Captain Allen states the following:

> *After the investigation was complete,* and before the Pre-Disciplinary Hearing, an email *was provided by Officer Vappie* that showed that all overtime for the executive protection team was authorized by the Superintendent of Police. This email was communicated by former Deputy Chief Paul M. Noel. *This excused deviations from the 16:35-hour rule* by Officer Vappie or any executive protection team member.[65]

After examining the evidence, the Court has multiple concerns regarding these representations. First, the evidence does not support the testimony that the Noel Email was unavailable to the investigators when they issued their report on March 10, 2023.

---

[62] It is noteworthy that the City often refers to the Pre-Disposition Conference and the Pre-Disciplinary Hearing as though they are one event. But they are different events with materially different purposes. As one illustration, NOPD policy allows an officer to present evidence relative to his or her defense at the Pre-Disposition Conference, but not at the Pre-Disciplinary Hearing. *See* NOPD Operations Manual at 26.2; *see also* Section I.E.2, *infra*.

[63] R. Doc. 716-3 at 20 (emphasis added).

[64] R. Doc. 746-1 at 209 (NOPD_0005840) (also filed as R. Doc. 716-6).

[65] R. Doc. 746-1 at 211-12 (NOPD_0005842-43).

Second, the evidence does not support the testimony that Officer Vappie provided the Noel Email at his Pre-Disposition Conference. Third, the Noel Email does not state that members of the Executive Protection team are authorized to violate the 16:35 hour rule. Fourth, contrary to the City's witnesses' testimony, the Superintendent of the NOPD cannot override NOPD policy. Fifth, the Noel Email is additional evidence collected after the timelines in La. RS 25:2531.[66] Each concern is discussed below.

### 1. Captain Kendrick Allen Received The Noel Email On March 7, 2023, Three Days Before the PIB Investigation Was Completed.

With regard to the Court's first concern, the evidence shows that Captain Kendrick Allen received a copy of the Noel Email from Sgt. Lane on Tuesday, March 7, 2023, three days *before* the completion and closure of the Officer Vappie investigation.[67] Captain Glasser received the email from Sgt. Lane the same day.[68] Captain Allen replied to Sgt. Lane requesting a "follow up statement just regarding this email."[69] Sgt. Lane confirmed she was available and the two planned to meet on March 8 at Sgt. Lane's office.[70] The PIB investigation report on March 10, 2023 makes no mention of the Noel Email, the Lane correspondence, or any supplemental interview of Sgt. Lane.[71]

---

[66] *See* OIPM Report of July 11, 2023.
[67] R. Doc. 740-1 at 26-27 (Ex. 1 at NOPD_0002783-84). Interestingly, Sgt. Lane copied Captain Michael Glasser on her email to Captain Allen. According to PIB's investigation report, Captain Glasser represented Sgt. Lane during her PIB interview. Captain Glasser also apparently served on Officer Vappie's Pre-Disposition Conference panel and his Pre-Disciplinary Hearing panel. *See* R. Doc. 746-1 at 180 and 189 (Ex. 10 at NOPD_0005816 and NOPD_0005823). The Court questions why PIB did not recognize the conflict in having the representative of Officer Vappie's supervisor also serve on the Pre-Disposition Conference panel and the Pre-Disciplinary Hearing panel.
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *See, generally,* R. Doc. 714-4 at 2-43.

In short, contrary to the testimony of Deputy Superintendent Sanchez, Captain Allen's affidavit, and the City's pre-hearing brief, the Noel Email *was* available to the PIB investigators three days *before* they issued their report on March 10, 2023.

> **2.    The Noel Email Was Not Presented By Officer Vappie At His Pre-Disposition Conference.**

With regard to the Court's second concern, the testimony at the hearing raised more questions than it answered regarding how the Pre-Disposition Conference panel came into possession of the Noel Email.

Under NOPD Operations Manual, Chapter 26.2 Adjudication of Misconduct, Section 16, during the Predisposition Conference, "the accused employee may present relevant information to dispute or clarify the allegations made against him/her or present information relevant to his/her defense."[72]

There is no evidence in the record, including in the recording of the Pre-Disposition Conference, that Officer Vappie provided the Noel Email to the Pre-Disposition Conference panel. Indeed, there is no indication in the record that Officer Vappie was even aware of the Noel Email. He did not mention it in either of his two PIB interviews and did not raise its existence at his Pre-Disposition Conference. Neither did any other PIB witness mention it during their witness interviews, including Sgt. Lane.

There is evidence that Captain Allen forwarded the Noel Email to Ms. Audrey Thomas, an investigator with the PIB Quality Assurance Unit, on May 25, 2023, after the Pre-Disposition Conference concluded and before the Pre-Disciplinary Hearing began.[73]

---

[72] Section 63(A) of Chapter 26.2 repeats this same concept providing the accused employee shall get notice that "a pre-disposition conference will be held, during which the accused employee may present information relevant to his or her defense."

[73] R. Doc. 740-1 at 26-27 (Ex. 1 at NOPD_0002783-84).

Presumably, one of the three – Captain Allen, Captain Glasser, or Ms. Thomas – shared the email with the Pre-Disposition Conference panel members.

There is no evidence in the documents or the audio recordings of the Pre-Disposition Conference that Officer Vappie provided the Noel Email to anyone. Indeed, since the Noel Email was not mentioned in either of Officer Vappie's interviews, it seems likely Officer Vappie did not even know about the email prior to or during the Pre-Disposition Conference.

When evidence comes in during a PIB investigation, the investigators have the opportunity to test the evidence. They ask questions of witnesses, review additional documents, look at meta-data, etc. A document that is introduced for the first time *after* a Pre-Disposition Conference receives none of that vetting.[74] Neither the investigators nor the Pre-Disposition Conference panel was able to ask a single question regarding the validity or authenticity of the email or what it authorized. Yet, the document not only was provided to the panel *after* the Pre-Disposition Conference, it was used by the Hearing Officer to overturn a recommendation by the PIB investigators that a violation be sustained. Furthermore, as discussed below, the recommendation was overturned based upon an unreasonable reading of the email itself.

---

[74] In its analysis of the PIB investigation of Officer Vappie, the Office of the Independent Police Monitor raised the following additional concern: "The OIPM is unclear as to whether the information was verified, how it was analyzed (weighed) or utilized by the panel in their decision 6 making, since the defense did not formally submit it as evidence nor was Officer Vappie questioned about the email during the hearing nor did the investigators include this information in their investigation (all of which are the ordinary mechanisms to allow this email to be included in the deliberations for the hearing)." OIPM Letter to Former Interim Superintendent Woodfork (7/11/23) at 5-6 (https://nolaipm.gov/wp-content/uploads/2023/08/8-16-2023-OIPM-Report-re-CTN-2022-0513-R-Vappie-NOPD-NOPD-Formal-Response.pdf). The Court shares the OIPM's concern.

It is clear the hearing officer in the Pre-Disposition Conference relied on the email as her basis to exonerate Officer Vappie on the Rule 4 violation.[75] According to Captain Precious Banks, the Pre-Disposition Conference hearing officer:

> [A]s a member of the NOPD Executive Protection overtime was expressly authorized in an email authored by former NOPD Deputy Chief Paul Noel on February 23, 2012. The email advised that "per the Superintendent the Mayor's Security Detail can work overtime as necessary" and it was disseminated to Capt. Joseph Waguespack Sr., Sgt. Shumeca Chadwick, Lt. Christopher Johnson, and Sgt. Tokishiba Lane.[76]

NOPD Policy makes clear, the Pre-Disposition Conference is an opportunity only for the "accused employee" "to provide the accused with an opportunity to respond to misconduct allegations."[77] Instead, it appears that in this case, the Pre-Disposition Conference members were provided the email for consideration *after* the Pre-Disposition Conference, when the opportunity for Officer Vappie to offer evidence to dispute the allegations against him had ended.

### 3. The Noel Email Did Not Authorize Members Of The Executive Protection Detail To Work More Than 16 Hours And 35 Minutes In A 24-Hour Period.

With regard to the Court's third concern, the evidence does *not* support the City's position that the Noel Email authorized members of the Executive Protection team to work more than 16 hours and 35 minutes in a 24-hour period.

The Noel Email reads as follows: "Per the Superintendent the Mayor's Security Detail *can work overtime* as necessary."[78] It says nothing about authorizing the Mayor's Security Detail to work more than 16 hours and 35 minutes in a 24-hour period. Nor could

---

[75] R. Doc. 746-1 at 190 (Ex. 10 at NOPD_0005824).
[76] *Id.*
[77] NOPD Policy 52.1.2.
[78] R. Doc. 740-1 at 27 (Ex. 1 at NOPD_0002784) (emphasis added).

it since that would violate NOPD Policy[79] and the Consent Decree.[80] NOPD Operations Manual Chapter 13.15 provides that "no employee . . . shall work more than 16 hours and 35 minutes within a 24-hour period . . . . These hours are cumulative and shall include normal scheduled worked hours, **overtime**, off-duty secondary employment and outside employment."[81]

There is a material difference between working overtime, as authorized in the Noel Email, and working more than 16 hours and 35 minutes in a 24 hour period. Obviously, one may work overtime without violating the 16:35 hour rule. The overtime limits were put in place by NOPD primarily as a cost-savings measure. The 16:35 hour rule, in contrast, is mandated by the Consent Decree to promote public and officer safety. The authority to work overtime does not grant the authority to violate the 16:35 hour rule.[82] In fact, NOPD policy makes clear the 16:35 hours allowed includes all hours an officer works, including overtime.[83] Yet, the NOPD and the City inexplicably read the Noel Email otherwise.[84]

### 4.   The Superintendent Does Not Have The Authority To Change NOPD Policy Via Email.

The City's representation that "*NOPD policy was changed by [the Noel] email authorization*" also is not supported by the record.[85] By its express terms, the Noel Email

---

[79] NOPD Policy 13.15.

[80] Consent Decree Paragraph 365.

[81] *Id.* (emphasis added).

[82] *See* NOPD Policy 13.15 at ¶ 6.

[83] *Id.*

[84] The Court pressed the Deputy Superintendent of PIB on this matter during the hearing. The Court asked the following questions: "So, do you agree? This email does not exempt people who are on executive protection from being subject to the rule in Chapter 2208 that they can't work more than 16 hours, 35 minutes, does it?" R. Doc. 752 (Transcript) at 221. Notwithstanding the clear language of the Noel Email, Deputy Superintendent Keith Sanchez disagreed with the Court's interpretation. According to the Deputy Superintendent, "I agree with the [Pre-Disposition Conference] interpretation that it allows him to work more than the 16, 35. I do agree with that." *Id.*

[85] R. Doc. 716-3 at 20.

authorizes Executive Protection officers to work overtime, a decision well within the authority of the Superintendent to make. But that is a far cry from insisting the email changed NOPD's policy concerning the 16:35 hour rule.[86] The email says nothing about changing the daily hours limit, which is imposed on all officers for health and safety reasons. Moreover, the concept that the Superintendent has the authority to change NOPD policy by having a conversation with a deputy chief who then communicates the information to employees in an email is not credible.[87] NOPD has a formal process for revising its policies, and nothing suggests that process was followed here.[88]

In short, the testimony at the hearing, the representations by the City and its witnesses, and the documents in evidence raise far more questions than they answer regarding the discovery, meaning, and use of the Noel Email. What is clear is that the Noel Email did not serve as a legitimate basis for finding that Officer Vappie did not violate the 16:35 hour rule.

### 5.    PIB May Not Consider Evidence Introduced After The Close Of The Investigation.

The Louisiana Law Enforcement Officer Bill of Rights ("LEOBOR") sets forth deadlines for administrative investigations. The key deadline, which is modified from time to time, governs how much time a law enforcement agency has between its knowledge of a complaint against an officer (called the Cognizance Date) and the completion of the investigation. The LEOBOR provides that an investigation is "complete upon notice to the police employee or law enforcement officer under investigation of a pre-disciplinary hearing or a determination of an unfounded or unsustained

---

[86] *See* NOPD Policy 13.15.
[87] The City's witnesses testified during the hearing that the Superintendent can "override" NOPD policy. *See* R. Doc. 752 (Transcript) at 223. *See* NOPD Policy 12.1.
[88] *See* NOPD Policy 12.1.

complaint."[89] Following completion of the investigation, the agency may not supplement the investigation with further evidence.[90]

The consequence of a violation of the LEOBOR deadline is severe. The statute makes clear that "There shall be no discipline, demotion, dismissal, or adverse action of any sort taken against a police employee or law enforcement officer unless the investigation is conducted in accordance with the minimum standards provided for in this Section."[91] To emphasize the point, the statue provides that "Any discipline, demotion, dismissal, or adverse action of any sort whatsoever taken against a police employee or law enforcement officer without complete compliance with the foregoing minimum standards is an absolute nullity."[92] Louisiana courts have no hesitation overturning disciplinary decisions following investigations that have run afoul of the statutory deadline.[93]

While in this case the NOPD PIB Pre-Disposition Hearing Panel considered evidence introduced after the close of the investigation—the Noel Email—to exonerate an officer, the consideration of the evidence for the first time after the close of the investigation is in violation of Louisiana law and creates all manner of problems as described in Section 2 above.

### 6.    Summary

The unexplained and likely preferential reassignment of Officer Vappie, PIB's failure to follow NOPD policy with respect to information presented at Officer Vappie's

---

[89] La. R.S. 40:2531 (B)(7); *see, e.g. Young v. Dep't of Police*, 152 So. 3d 193 (La. Ct. App. 2014) (applying § 40:2531 in context of NOPD investigation).

[90] *See, e.g. Pozzo v. Dep't of Police*, No. 2018-CA-0832 (La. Ct.  App. 2018) (finding discipline an absolute nullity because NOPD failed to demonstrate "complete compliance" with the timelines set forth in § 40:2531).

[91] La. RS 40:2531(C).

[92] *Id.*

[93] *See, e.g., See Young v. Dep't of Police*, 152 So. 3d 193, (La. Ct. App. 2014) (finding discipline imposed an "absolute nullity" because the NOPD failed to comply with the deadlines set forth in RS 40:2531).

Pre-Disposition Conference, the use of the Noel Email to circumvent NOPD policy, PIB's refusal to acknowledge that it violated policy with respect to the Officer Vappie investigation, and PIB's insistence that it handled the Officer Vappie investigation just as it would have any other investigation all led to the Rule to Show Cause, to which the Court now turns its attention.

## II. The NOPD Has Failed To Show Cause Why It Should Not Be Found to Have Violated Eight Paragraphs of the Consent Decree.

### A. The City violated Paragraph 399 of the Consent Decree.

**Paragraph 399:** *NOPD agrees to develop and implement a complaint classification protocol that is allegation-based rather than anticipated outcome-based to guide PIB in determining where a complaint should be assigned.* This complaint classification protocol shall ensure that PIB or an authorized outside agency investigates allegations including:

> a) serious misconduct, including but not limited to: criminal misconduct; unreasonable use of force; discriminatory policing; false arrest or planting evidence; untruthfulness/false statements; unlawful search; retaliation; sexual misconduct; domestic violence; and theft;

> b) misconduct implicating the conduct of the supervisory or command leadership of the subject officer; and

> c) subject to the approval by the Deputy Superintendent of PIB, allegations that any commander requests be conducted by PIB rather than the subject officer's District/Division.[94]

The Monitor found NOPD violated paragraph 339 of the Consent Decree, which requires NOPD to implement an "allegation-based" complaint classification protocol.[95] An allegation-based classification system is one that records and classifies allegations based on the allegation itself, and not on the likelihood of that allegation being sustained.[96] As discussed in more detail below, the Monitor's findings that the City

---

[94] R. Doc. 726 (Transcript) at 9-10.
[95] R. Doc. 714 at 4 (Ex. 26); Consent Decree Paragraph 399.
[96] Consent Decree Paragraph 399.

violated this provision of the Consent Decree were based on the information NOPD received from the initial Fox8 email, coupled with the content of the subsequent Fox8 TV report, a complaint by Dr. Skip Gallagher received a few days later, and multiple conversations with the Monitor and the OIPM. According to the Monitor, these facts should have been viewed by NOPD as an allegation that Officer Jeffrey Vappie billed NOPD for time not worked (i.e., payroll fraud) while serving on the Mayor's Executive Protection team.[97]

In its multiple filings and court presentations, the United States agrees with the Monitor's findings.[98] The City disagrees. The basis for the City's position, however, is not altogether clear. In its brief, the City argues PIB did in fact conduct a payroll fraud investigation,[99] but the City attached the affidavit of Captain Kendrick Allen in which he testified that he did *not* conduct a payroll fraud investigation.[100] This Court puts far more weight on the testimony of the City's witnesses that it did not conduct a payroll fraud investigation than on the argument of the City's counsel that it did.[101] Moreover, the absence of any discussion relating to billing for time not worked or payroll fraud in the PIB investigation report strongly supports the City's witnesses' testimony that PIB did not meaningfully investigate payroll fraud.[102]

---

[97] Throughout this matter, the parties and the Monitor have used the phrase "payroll fraud" and "billing for time not worked" interchangeably. From the Court's perspective, for purposes of this matter, any legal difference in the terms is immaterial. The operative question here simply is whether the complaint(s) that served as the genesis of PIB's CTN# 2022-0513-R investigation alleged that Officer Vappie spent time not performing NOPD duties while being paid by NOPD.

[98] R. Doc. 715 at 4-5.

[99] R. Doc. 718 at 24 ("Payroll fraud was investigated").

[100] R. Doc. 718-3 at 3 ("To be clear, at no time was Officer Vappie under investigation for Payroll fraud....").

[101] *See, e.g.,* 5th Circuit Pattern Jury Instruction (Civil) 3.1 (2020) ("The testimony of the witnesses and other exhibits introduced by the parties constitute the evidence. The statements of counsel are not evidence; they are only arguments. It is important for you to distinguish between the arguments of counsel and the evidence on which those arguments rest. What the lawyers say or do is not evidence....").

[102] *See generally* R. Doc. 714-4.

In any case, the City argues a payroll fraud investigation was not warranted because the Fox8 allegation lacked even a "hint" of serious misconduct.[103] Here again, as detailed below, the evidence belies the City's argument.

Having considered the evidence presented by the parties and their argument, the Court finds that the Fox8 communication, especially when coupled with (i) the content of the subsequent Fox8 news story, which the PIB investigators concede they watched; (ii) a subsequent citizen complaint;[104] and (iii) frequent reminders by the Monitor and the OIPM,[105] demonstrate that PIB should have recorded the allegation against Officer Vappie as one alleging, among other things, billing for time not worked (i.e., payroll fraud).[106] Accordingly, PIB should have investigated the allegation either criminally or administratively.

The facts that lead the Court to this conclusion include the following:

- The initial Fox8 communication[107] clearly says Officer Vappie spent extensive hours in the Upper Pontalba apartment with his protectee during work and non-work hours.[108] For example, Fox8 alerted NOPD to the fact that on August 9, Officer Vappie "arrived [at the Pontalba apartment] at

---

[103] R. Doc. 714-6 at 3 ("No allegation of misconduct by Officer Vappie was described, suggested, hinted at or articulated as conduct that requires the release of the investigation pursuant to Paragraph 454."); *see also* R. Doc. 753 (Transcript) at 50 (Cpt. Allen testifying that there was nothing in the Fox8 allegations "that would lead us to a payroll fraud violation.").

[104] R. Doc. 740-2 at 1.

[105] *See, e.g.*, R. Doc. 753 (Transcript) at 52 (testifying the Monitoring Team raised the "payroll fraud" issue "several times" over the course of the PIB investigation).

[106] As the City's witnesses explained at the Hearing, it is PIB's obligation to record all allegations on the relevant intake paperwork. *See, e.g.*, R. Doc. 754 (Transcript) at 56 (...Anything that's learned from the intake, from the initial complaint will be on the intake form. That answer is correct, yes....").

[107] The Deputy Superintendent of PIB testified that the Fox8 communication served as the origin of the PIB investigation into the actions of Officer Vappie. *See, e.g.*, Doc 752 at 111. The Court recognizes that the communication from Fox8 was not styled as a "complaint," but that semantic distinction is of no moment. The Consent Decree defines "complaint" broadly to include "any complaint regarding NOPD services, policy or procedure, any claim for damages, or any criminal matter that alleges possible misconduct by an NOPD officer or employee." Consent Decree at ¶14(p). How a complainant styles a complaint is not determinative of whether the communication is a complaint. It also is worth noting that NOPD Policy 52.1.1 (8) makes clear that "Any complaint received by NOPD via an anonymous source or third-hand from any known source (e.g., news media . . .) shall be investigated fully and fairly with what information is given and/or discovered during the course of the investigation."

[108] R. Doc. 747-1 at 10-13.

7:55 am with a bag of groceries and a case of bottled water. He was there until 3:09 pm. He returned at 8:36 pm and left at 12:42 am. According to City documents, he was on the clock for the NOPD from 8 am – 8 pm that day."[109]

- The initial Fox8 communication further states Officer Vappie may have spent time serving on a local board (the HANO Board) performing non-NOPD functions while being paid by the NOPD.[110]

- The subsequent Fox8 news story, which the PIB investigators concede they watched,[111] clearly states Officer Vappie may have been spending time not conducting NOPD business while being paid by NOPD.[112]

- The Fox8 news story further clearly reported that Officer Vappie spent time serving on the Housing Authority of New Orleans ("HANO") Board while being paid by NOPD.[113]

- Early on in the PIB investigation, PIB believed there was an ongoing federal criminal investigation into the same actions of Officer Vappie that formed the basis of the PIB CTN# 2022-0513-R investigation into the actions Officer Vappie.[114]

- From the start of the PIB investigation, the Monitor and the OIPM reiterated the importance of recording and investigating the "time not worked/payroll fraud" allegations. The City's witnesses agree this was a frequent topic of conversation on their weekly calls.[115]

- Shortly after the opening of the investigation into Officer Vappie, the Monitor forwarded to PIB a complaint from Dr. Skip Gallagher clearly alleging that "payroll fraud is alive and well within the Mayor's Executive

---

[109] *Id.*

[110] R. Doc. 747-1 at 10-13.

[111] *See, e.g.,* R. Doc. 752 (Transcript) at 98.

[112] R. Doc. 747-1 at 11 ("Mayor Cantrell appointed Officer Vappie to the HANO Board. He attended the first meeting in March 2022. On at least three occasions, he attended a HANO meeting while also being on the NOPD clock.").

[113] R. Doc. 747-1 at 12-13. The Deputy Superintendent of PIB testified at the hearing that the initial correspondence from Fox8 did include an allegation that Officer Vappie billed NOPD while sitting on the HANO Board. *See* R. Doc. 752 at 116. Further, while not in the record, the Court takes notice that the Fox8 televised news story regarding Officer Vappie, as the correspondence from Fox8 said it would, did cover the HANO Board allegations. *See* Fox8 "ZURIK: NOPD investigating officer frequently inside Cantrell's city-owned apartment" (https://www.fox8live.com/2022/11/10/zurik-nopd-investigating-officer-frequently-inside-cantrells-city-owned-apartment/).

[114] R. Doc. 752 (Transcript) at 82-83.

[115] *See, e.g.,* R. Doc. 718-3 at 3; R. Doc. 753 (Transcript) at 52-53 (testifying the Monitor raised the payroll fraud allegation against Officer Vappie "several times").

Protection Team."[116] Dr. Gallagher included a detailed discussion in support of his allegation.[117]

Notwithstanding these facts, the City stands firm that NOPD had no obligation to record payroll fraud as an allegation or to investigate payroll fraud.[118] Indeed, NOPD strongly suggests PIB plans to handle similar situations in the future in the same manner.[119]

With regard to *evidence* in support of NOPD's position, the City offers very little. At one point, its witnesses suggested that billing NOPD for time not working for NOPD categorically did not constitute payroll fraud.[120] This is incorrect as a matter of law. Billing for time not worked may constitute payroll fraud.[121] Furthermore, billing for time not worked may be investigated criminally or administratively.[122]

At another point, the City's witnesses supported its position by arguing the Fox8 communications had no "supporting evidence for payroll fraud."[123] This argument is unpersuasive for several reasons.

- First, as the Deputy Superintendent of PIB explained, NOPD classifies allegations based not on the specific wording used by the complainant, but

---

[116] R. Doc. 747-4 at 4 (Ex. 39).

[117] *See* Doc 754 (Transcript) at 155-156 ("My impression was that they strongly encouraged us to find – not find. Strongly encouraged us to add payroll fraud. They kept saying payroll fraud, payroll fraud, payroll fraud. That it was very important that payroll fraud was included in the allegations themselves."); *see also generally*, Doc 747-4 at 1-5 (Ex. 39).

[118] R. Doc. 752 (Transcript) at 271-73; R. Doc. 718 at 25-26.

[119] R. Doc. 746-1 (Allen Affidavit) at 211 (NOPD_0005842); *see also* Doc 752 (Transcript) at 9 (Deputy Superintendent Sanchez testifying that the PIB investigation of Officer Vappie "proceeded as any other investigation would."); R. Doc. 716-3 at 25 (representing that PIB does not detail all the allegations it considers but rejects).

[120] *See, e.g.,* 753 (Transcript) at 53-55 (explaining that Officer Vappie's time on the HANO Board did not constitute payroll fraud because "he was not paid for any time on the board . . . ." and had no intent to defraud).

[121] Under Louisiana law, public payroll fraud under La. R.S. 14:138 is considered a type of theft. *State v. Fruge*, 251 La. 283 (1967).

[122] R. Doc. 752 (Transcript) at 58 and 134 (payroll fraud can be investigated administratively); R. Doc. 753 (Transcript) at 58 (payroll fraud can be investigated criminally).

[123] R. Doc. 753 (Transcript) at 50. Further to this point, Captain Allen testified that had the complaint used the actual words "payroll fraud," PIB would have treated the matter differently. R. Doc. 753 (Transcript) at 59.

on the nature of the facts alleged by the complainant.[124] This statement is consistent with the Consent Decree.[125] As noted above, while the Fox8 communications did not use the word "payroll fraud," the communications did include clear suggestions that Officer Vappie was billing for time not worked.[126]

- Second, as the Deputy Superintendent of PIB also explained, subsequent to the opening of the Vappie investigation, PIB received a second allegation alleging the entire Mayor's Executive Protection Team was recording and billing for "inordinate and impossible hours."[127] The investigator who led this second investigation referred to it as a "payroll fraud investigation."[128]

- Third, in March 2023, PIB received yet another complaint (designated PIB CTN# 2023-0141-P) focusing on Officer Vappie's time on the HANO Board.[129] The City treated this complaint as a criminal "payroll fraud" complaint, but ultimately closed its investigation without action because the City viewed it as a "duplicate" of the PIB CTN# 2022-0513-R complaint.[130] According to the City, however, the PIB CTN# 2022-0513-R allegation did not involve payroll fraud.[131]

- Finally, the City argues the *evidence uncovered* by the PIB investigators did not suggest payroll fraud. The City's witnesses testified to this effect as well.[132] The City and its witnesses, however, seem to confuse an allegation with evidence of a violation. What PIB uncovers during an investigation does not have a bearing on the nature of the initial *allegation*. The question here is not what PIB uncovered during its investigation. The question is what PIB reasonably should have recorded as an allegation at the outset of its investigation.

NOPD's failure to record an allegation properly brings with it a host of cascading

consequences. The nature of the allegation guides the subsequent investigation.[133] It also

---

[124] R. Doc. 754 (Transcript) at 142 ("PIB's classification system . . . [is] based off of factual allegations . . .").
[125] *See* Consent Decree Paragraph 399 ("NOPD agrees to develop and implement a complaint protocol that is allegation-based rather than anticipated outcome-based to guide PIB in determining where a complaint should be assigned.").
[126] R. Doc. 747-1 at 10-13.
[127] R. Doc. 754 (Transcript) at 156-159.
[128] R. Doc. 740-2 (Sgt. Schuler request to Civil Service for more time) at 118.
[129] R. Doc. 752 (Transcript) at 145; *see also* R. Doc. 746-1 at 6.
[130] R. Doc. 752 (Transcript) at 146.
[131] *Id.* at 148-149.
[132] *See, e.g.,* Doc 754 (Transcript) at 31; R. Doc 753 (Transcript) at 53 (discussing evidence collected rather than substance of allegation).
[133] *See, e.g.,* R. Doc. 752 (Transcript) at 274 (counsel explaining that the way the allegation is recorded dictates whether the allegation will receive a disposition); La RS 40:2531(B)(1) (the stated nature of the investigation guides the conduct of interrogations); R. Doc. 752 (Transcript) at 273 (the classification of the investigation as administrative or criminal dictates the involvement or not of the District Attorney's Office).

impacts whether PIB gives the allegation a disposition.[134] It further impacts the substance of the investigation report.[135] In short, including all allegations and a clear disposition for each in PIB's reports not only is a requirement of the Consent Decree, it is critical to ensure fairness, transparency,  and accountability.[136]

Based on these facts, the Court finds the City has failed to present adequate evidence that it adhered to Consent Decree Paragraph 399 with regard to the classification of the allegations against Officer Jeffrey Vappie. While certainly a single transgression does not evidence a pattern of ongoing noncompliance, the City's refusal to acknowledge its mistake and its suggestion that it plans to continue operating the same way it did during the Officer Vappie investigation led to the Court's finding of a violation of Paragraph 399.

### B.    The City violated Paragraph 415 of the Consent Decree.

**Paragraph 415:** *The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

> *a) "Unfounded," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did not occur or did not involve the subject officer;*
>
> *b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;*

---

[134] R. Doc. 752 (Transcript) at 274 (counsel explaining that the way the allegation is recorded dictates whether the allegation will receive a disposition). It is worth noting here that NOPD's instruction to PIB investigators on how to complete their investigation reports emphasizes how important it is to accurately and broadly record the allegations in those reports: "The synopsis of the allegations shall also set forth the alleged violations. Identify and list every possible misconduct violation contained within the complaint or identified during the supervisor's initial inquiry into the complaint or through his/her own observation." NOPD Policy 52.1.1 (102)(a)(2).

[135] *See* NOPD Policy 51.1.1 at § 102.

[136] Additionally, while transcripts of the witness interviews were not introduced at the hearing, the Court notes that the absence of a properly articulated intake form including an allegation of payroll fraud led to objections during the witness interviews themselves. The publicly available recordings of the PIB interview of Officer Vappie, for example, show that Officer Vappie's lawyers raised objections to interview questions that went beyond the recorded 16:35 hour rule violation.

> *c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or*
>
> *d) "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate NOPD policies, procedures, or training.[137]*

In its presentation to this Court on June 21, 2023, the Monitor asserted that PIB failed to give a disposition to each allegation encompassed by the complaint against Officer Vappie.[138] Specifically, the Monitor found that NOPD violated Paragraph 415 of the Consent Decree by failing to analyze and give a disposition to the payroll fraud allegation.[139]

The City and NOPD dispute the Monitor's finding for two primary reasons. First, they argue there was no need to include a disposition on payroll fraud in PIB's report because there was no allegation of payroll fraud.[140] As discussed above, the Court finds the presumption underlying this argument to be factually and legally incorrect. There was an allegation of payroll fraud. The fact that PIB neglected to record it as such and neglected to investigate it cannot be bootstrapped into a justification for failing to include a disposition in its investigation report, as required by Paragraph 415 of the Consent Decree.

Second, the City argues it is a routine practice for PIB to "not detail all the allegations it considered but ultimately determined were unsupported by the evidence...."[141] To the extent this is a "routine practice" of PIB, it is a practice that must

---

[137] *Id.* at 15-16.
[138] Monitor Presentation To Court (June 21, 2023) (accompanying presentation slides available at www.consentdecreemonitor.com).
[139] *Id.*
[140] R. Doc. 752 (Transcript) at 274.
[141] R. Doc. 718 at 25.

come to an end.[142] The Consent Decree is clear that PIB shall explicitly identify and recommend a disposition for each allegation of misconduct in an administrative investigation.[143] PIB's ultimate determination of the validity of this allegation does not play a part at this stage.

Paragraph 415 of the Consent Decree provides as follows regarding dispositions:

> 415. The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:
>
> • A) Unfounded...
>
> • B) Sustained...
>
> • C) Not Sustained...
>
> • D) Exonerated...[144]

In short, if there has been an allegation of misconduct, there must be an accompanying disposition.

As there was an allegation of payroll fraud in this case – indeed, there were multiple allegations of payroll fraud from multiple sources – it was incumbent upon PIB to record the allegations, investigate the allegations, and give the allegations a formal disposition in the final report. PIB failed to do so here.[145]

---

[142] To the extent the City's witnesses are referring to potential additional violations *not alleged* but explored during the course of an investigation, the Court recognizes that those additional unalleged violations may not warrant a full discussion and disposition in the final investigation report when they turn out to be unsupported by the evidence. But that is a different issue. The requirement of the Consent Decree is that *all allegations* be given a disposition, not that every issue investigators consider during the course of an investigation be given a disposition.

[143] Consent Decree Paragraph 415.

[144] Consent Decree Paragraph 415.

[145] *See* R. Doc. 714-4 at 2-43. The Court recognizes that prior audits of the Monitor have shown NOPD to be in compliance with its obligations under Consent Decree Paragraph 415. *See, e.g.*, R. Doc. 702 at 90. Against this background, a single transgression typically would not garner any attention from this Court. In this case, however, the City's attorney has represented that "PIB does not detail all the allegations it considered but ultimately determined were unsupported by the evidence." R. Doc. 716-3 at 25. One of the City's witnesses, Captain Allen, made a similar representation in his affidavit attached to one of the recent City

The disposition requirement in the Consent Decree serves multiple purposes. In no particular order, this requirement both provides clarity to the officer who is the subject of the investigation and makes it harder for NOPD to sweep uncomfortable or embarrassing situations under the proverbial rug, which is something that concerned DOJ when it investigated NOPD prior to the Consent Decree.[146] Requiring a disposition of all allegations also helps ensure PIB conducts complete investigations that can be meaningfully reviewed by NOPD reviewers, by the New Orleans Civil Service Department, and by the courts.

These considerations are important components of the NOPD's and the City's commitment to "to ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported using the preponderance of the evidence standard and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent."[147]

### C.    The City violated Paragraph 414 of the Consent Decree.

**Paragraph 414:** *The resolution of any misconduct complaint must be based upon the preponderance of the evidence.* A misconduct investigation shall not be closed simply because the complaint is withdrawn or because the alleged victim is unwilling or unable to provide additional information beyond the initial complaint. In such instances, the investigation shall continue as necessary within the allowable investigation timeframes established under this Agreement to resolve the original allegation(s) where possible based on the evidence and investigatory procedures and techniques available. In each investigation, the fact that a complainant pled guilty or was found guilty of an offense shall not be the deciding factor as to whether an NOPD officer committed the alleged misconduct, nor shall it justify discontinuing the investigation.[148]

---

filings. *See* R. Doc. 718-3 at 2-3. It is these representations, that fly in the face of Paragraph 415 of the Consent Decree, that give the Court such great concern.

[146] DOJ Investigation of the New Orleans Police Department(Findings Report) (March 16, 2011) at 81.

[147] Consent Decree § XVII.

[148] *Id*. at Paragraph 414.

The Monitor has asserted that PIB failed to document that it used the correct legal standard in reaching its conclusion regarding the allegations against Officer Vappie. Specifically, the Monitoring Team pointed out that the PIB Report in PIB CTN# 2022-0513-R uses three different formulations to describe the level of evidence supporting the investigators' findings:

- With regard to Officer Vappie violation of Rule 4, Paragraph 2, PIB noted that "Captain Kendrick Allen proved beyond a preponderance of evidence that" Officer Vappie violated the applicable rules.[149]

- With regard to Officer Vappie's violation of Rule 3, Paragraph 1, PIB noted that Officer Vappie "may have violated this rule."[150]

- With regard to Officer Vappie's violation of Rule 4, Paragraph 3, PIB noted that Officer Vappie "was not attentive to his duty as an Executive Protection member" when he attended HANO Board meetings.[151]

The Monitor believes the PIB investigators applied the preponderance of the evidence standard during the investigation. Nevertheless, the Monitor found that "PIB incorporated incorrect and confusing language in its investigation report and missed an important opportunity to explain the basis for its findings by not including an analysis of how it applied the Preponderance of the Evidence standard to the facts before it . . . ."[152] The Monitor went on to note that "this gap in the investigation report will make it harder for NOPD to defend its position should Officer Vappie appeal the discipline imposed."[153]

The United States agreed with the Monitor's findings.[154]

In response to the Monitor's report, the NOPD said:

Although the governing standard for administrative investigations is a preponderance of the evidence, PIB does

---

[149] R. Doc. 714-4 at 38.
[150] *Id.*
[151] *Id.*
[152] R. Doc. 714-5 at 9.
[153] *Id.*
[154] R. Doc. 715 at 4.

> not approach investigations with an intention to make the
> facts fit. We investigate the complaint by following the lead of
> the facts wherever they lead and when the trail of the facts
> ends, we begin the conclusion of the investigation.[155]

This statement is non-responsive at best. The City's discussion in its brief to this Court was equally unresponsive, focusing on the sufficiency of the evidence rather than on the Monitor's finding that PIB failed to document the correct legal standard.[156]

The City's witnesses at the hearing conceded that the investigation report did not document that the correct legal standard was used. The lead PIB investigator Captain Allen testified that he did apply the "preponderance of the evidence" standard "for every sustain." [157] According to Captain Allen, "even though it's a poor choice of words, the standard was used."[158] Similarly, while he also could not explain the "poor choice of words," Lieutenant Lawrence Jones concurred with Captain Allen that PIB did apply the correct preponderance of the evidence standard in reaching their conclusions.[159]

The Consent Decree makes clear that administrative investigation findings must be made using the "preponderance of the evidence" standard.[160] No one disputes this. NOPD Policy 51.1.2 aligns with the Consent Decree by requiring that misconduct investigators "reach a conclusion supported by the preponderance of the evidence and prepare a written recommendation."[161] NOPD Policy 26.2 likewise aligns with the Consent Decree and defines the preponderance of the evidence standard as follows: "Preponderance of the evidence—Such evidence that when considered and compared with

---

[155] R. Doc. 714-6 at 3.
[156] *See, e.g.,* 716-3 at 30-32.
[157] R. Doc. 753 (Transcript) at 88.
[158] R. Doc. 753 (Transcript) at 89.
[159] R. Doc. 754 (Transcript) at 89.
[160] Consent Decree Paragraph 414.
[161] NOPD Policy 51.1.2.

that opposed to it has more convincing force and produces in one's mind the belief that what is sought to be proven is more likely true than not true."[162]

The evidence presented at the hearing, and the argument of the parties, suggests PIB likely did apply the correct legal standard in reaching its findings sustaining the allegations against Officer Vappie. The language used by PIB in its investigation report, however, clearly was inaccurate. As the Monitor noted in its reports and presentations, this sort of loose language in an official report – i.e., using "may have violated" instead of "violated by a preponderance of the evidence" – creates a high likelihood that the investigation findings, if challenged, would be overturned on appeal.[163] Obviously, investigation findings overturned due to procedural errors benefit neither the NOPD nor the community.[164] The Court finds the City violated Paragraph 414 of the Consent Decree.

### D.   The City violated Paragraph 413 of the Consent Decree.

> **Paragraph 413:** *In each investigation, NOPD shall consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations based upon that evidence.* There will be no automatic preference for an officer's statement over a non-officer's statement, nor will NOPD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. NOPD shall make efforts to resolve material inconsistencies between witness statements.[165]

---

[162] NOPD Policy 26.2; *see also* NOPD Policy 51.1.2.

[163] While not material to the Court's findings above, it is notable that Officer Vappie's lawyers did raise this very defense in Officer Vappie's Pre-Disposition Conference. With regard to PIB's second finding, Officer Vappie's lawyers argued that PIB cannot support a sustained finding if the officer only "may have violated" the rule. *See* Audio Transcript of Vappie Pre-Disposition Conference (5/24/23).

[164] The use of inaccurate language in the PIB investigation report raises an additional concern. The City's witnesses' testimony focused on the standards applied to PIB's sustained findings. *See, e.g.*, R. Doc. 753 (Transcript) at 88. The imprecise language regarding the legal standard applied, however, leads this Court to wonder whether the correct legal standard was applied to the allegations not reflected in the PIB report. Captain Allen testified that PIB routinely considers potential violations that do not make it into the final report when there is inadequate evidence of the violation. *See* R. Doc. 718 at 25 (citing Allen Affidavit). For example, PIB apparently considered the possibility of payroll fraud in PIB CTN# 2022-0513-R, but decided not to investigate due to inadequate evidence. *See, e.g.*, R. Doc 753 (Transcript) at 53. It is not clear to this Court what standard PIB applied to make that decision.

[165] *Id.* at 20-26.

In its analysis of PIB's investigation, the Monitor found that PIB failed to consider and document circumstantial evidence in its investigation of Officer Vappie. [166] Specifically, the Monitor criticized PIB for seemingly ignoring significant circumstantial evidence that could suggest to a reasonable person that Officer Vappie was not engaged in police work during the hours he spent in the Upper Pontalba apartment, both on and off duty, with his protectee.[167] The Monitor put it this way:

> While PIB admittedly did not have visibility into what was going on in that apartment — i.e., whether Officer Vappie was there in service of his executive protection function or was there for more social reasons — there is much circumstantial evidence that suggests Officer Vappie was not present in furtherance of his executive protective duties. This circumstantial evidence should have been included in the PIB report since it all is relevant to NOPD's application of the Preponderance of the Evidence standard.[168]

The Monitor outlines a long list of circumstantial evidence that was not considered by the investigators and did not find its way into PIB's analysis or report.[169]

The United States agrees with the Monitor's critique.[170] The United States goes further, though, and identifies additional circumstantial evidence not considered by PIB because, according to DOJ, PIB failed to conduct an adequate investigation. [171] Specifically, DOJ points to PIB's failure (i) to interview all potential witnesses including, employees and agents of NOPD, (ii) to interview certain employees of the City,[172] (iii) to

---

[166] R. Doc. 714 at 14-15 (Ex. 26).

[167] R. Doc. 714-5 at 9.

[168] *Id.*

[169] *Id.* at 9-10.

[170] R. Doc. 715 at 4.

[171] R. Doc. 752 (Transcript) at 291.

[172] With regard to PIB's failure to interview all witnesses, the Monitor and the United States point out that the Mayor and NOPD consultant Fausto Pichardo both refused to be interviewed by PIB. *See* R. Doc. 714 at 16 (Ex. 26); *see also* R. Doc. 752 (Transcript) at 290. While the Court understands why PIB may have thought its hands were tied following these refusals, DOJ correctly points outs the Mayor had no right to say no to a PIB interview. According to DOJ, the City's counsel "tries to differentiate the Mayor and the Mayor's staff as not being part of NOPD, that completely overlooks the Consent Decree's provision that

interview the complainant Lee Zurik and the subsequent complainant Dr. Skip Gallagher; (iv) to ask questions of Officer Vappie about the evidence that might be on his personal cell phone, and (v) to ask officer Vappie to give PIB access to his personal cell phone.[173] In sum, DOJ argues, PIB's actions were equivalent to "voluntarily turning one's head away and not even asking the important questions that are required to understand what is the circumstantial evidence in this investigation."[174]

In response, the City offers two arguments. First, the City contends the circumstantial evidence pointed out by the Monitor is "speculation," not "circumstantial evidence."[175] Second, the City notes that at least one NOPD witness testified that PIB did consider circumstantial evidence in its investigation and another explained he did watch certain videos of Officer Vappie entering and leaving the Upper Pontalba apartment.[176]

The Court finds that the evidence presented at the hearing demonstrates that PIB did not adequately consider or document circumstantial evidence. The Consent Decree mandates that "in each investigation, NOPD shall consider all relevant evidence, *including circumstantial, direct, and physical evidence*, as appropriate, and make credibility determinations based upon that evidence. . . ."[177] NOPD Policy contains the same requirement: "In each investigation, the investigator shall consider all relevant

---

says, this Consent Decree applies to all City employees and agents. They don't get to say no. It's a federal court order. To act in derogation of that federal court order is violative of the order, to be most charitable." R. Doc. (Transcript) 752 at 290. DOJ is correct. The Consent Decree governs the actions of all City and NOPD employees and agents, including the Mayor and consultant Pichardo. Consent Decree Paragraph 8. The Court suggests that the next time an employee or agent of the City or NOPD refuses to participate in a process mandated by the Consent Decree, PIB should promptly bring the matter to the attention of this Court through the Monitor.

[173] R. Doc. 752 (Transcript) at 290-92.
[174] *Id.*
[175] R. Doc. 716-3 at 31.
[176] *See, e.g.*, R. Doc. 753 (Transcript) at 79.
[177] Consent Decree ¶ 413 (emphasis added).

evidence, *including circumstantial, direct, and physical evidence*, as appropriate, and make credibility determinations based upon that evidence...."[178]

The commonplace definition of circumstantial evidence is "indirect evidence that does not, on its face, prove a fact in issue, but gives rise to a logical inference that the fact exists."[179] For example, in a murder case, an eyewitness who saw the suspect shoot the victim would be direct evidence. In contrast, an eyewitness who saw the suspect leaving the house following the shooting would be circumstantial evidence.

Turning our attention to the facts before PIB in its investigation of Officer Vappie, PIB rightly states it lacked direct evidence of whether Officer Vappie was or was not engaged in police work while in the Upper Pontalba apartment for extensive hours. In other words, PIB lacked direct evidence that Officer Vappie may have been billing NOPD for time not engaged in his official duties. But as the Monitor pointed out, PIB had significant circumstantial evidence that could suggest to a reasonable person that Officer Vappie was not engaged in police work while in the apartment. The Monitor laid out that evidence in its Report, and the list will not be repeated here.[180]

The City attempts to excuse PIB's failure to consider, analyze, and document this circumstantial evidence by labeling it "speculation."[181] The City confuses its terms. The items identified by the Monitor and the United States are not speculation, they are facts. Officer Vappie did spend numerous hours in the Upper Pontalba apartment with his protectee. That is a fact. Officer Vappie was the only member of the Mayor's Executive

---

[178] NOPD Policy 52.1.2 (emphasis added).
[179] Cornell Law School Legal Information Institute. *Black's Law Dictionary* offers a similar definition: "Evidence directed to the attending circumstances; evidence which inferentially proves the principal fact by establishing a condition of surrounding and limiting circumstances, whose existence is a premise from which the existence."
[180] R. Doc. 714 at 15-16 (Ex. 26).
[181] R. Doc. 716-3 at 31.

Protection Team who spent time in the Upper Pontalba apartment with the Mayor. That also is a fact. Officer Vappie allowed his protectee to walk to her car alone in the evening or early morning after spending significant time with her in the Upper Pontalba apartment. That is another fact. There is nothing speculative about this evidence. These events happened. Calling them "speculation," as the City does, does not change that.

This is not to say that PIB necessarily had to interpret these facts as demonstrating by a preponderance of the evidence that Officer Vappie was billing for time not working while in the Upper Pontalba apartment. But PIB should have considered the evidence, analyzed the evidence, reached a disposition, and explained its disposition in its report.[182]

### E.   The City violated Paragraph 454 of the Consent Decree.

**Paragraph 454:** *City and NOPD shall provide each investigation of a serious use of force or use of force that is the subject of a misconduct investigation, and each investigation report of a serious misconduct complaint investigation (i.e., criminal misconduct; unreasonable use of force; discriminatory policing; false arrest or planting evidence; untruthfulness/false statements; unlawful search; retaliation; sexual misconduct; domestic violence; and theft), to the Monitor before closing the investigation or communicating the recommended disposition to the subject of the investigation or review. The Monitor shall review each serious use of force investigation and each serious misconduct complaint investigation and recommend for further investigation any use of force or misconduct complaint investigations that the Monitor determines to be incomplete or for which the findings are not supported by a preponderance of the evidence. The Monitor shall provide written instructions for completing any investigation determined to be incomplete or inadequately supported by the evidence. The Superintendent shall determine whether the additional investigation or modification recommended by the Monitor should be carried out. Where the Superintendent determines not to order the recommended additional investigation or modification, the Superintendent will set out the reasons for this determination in writing. The Monitor shall provide recommendations so that any further investigation or modification can be*

---

[182] The Court recognizes that Captain Allen testified that he did consider circumstantial evidence in his analysis (*see* R. Doc. 753 (Transcript) at 79), but the absence of a single mention of such evidence in the PIB report suggests PIB's consideration may have been less than robust. NOPD policy makes clear investigators are responsible for documenting "a detailed account of every aspect of the investigation . . . ." NOPD Policy 52.1.2.

*concluded within the timeframes mandated by state law. The Monitor may coordinate with the IPM in conducting these use of force and misconduct investigation reviews.*[183]

The Monitor asserts that NOPD violated the Consent Decree by refusing to provide a draft of PIB's investigation report of Officer Vappie to the Monitor before closing its investigation, as required by Paragraph 454 of the Decree.[184] The Monitor "requested access to the PIB investigation report on multiple occasions during weekly status calls with the PIB and the OIPM. The OIPM made similar requests during these weekly calls. PIB responded that it would not share a copy of the investigation report."[185]

The United States agrees that NOPD was required to produce the draft Officer Vappie investigation report to the Monitor before closing its investigation and failed to do so in violation of Consent Decree Paragraph 454.[186] According to the United States, the City's refusal to produce the report prevented the Monitor from performing its "mandated role under 454, which has to do not with a large, systemic view of NOPD, but a specific look at the microcosm of one investigation."[187]

The City does not dispute the underlying facts presented by the Monitor. Neither does the City dispute the assertion that it refused to provide the Monitor a copy of the draft PIB report when asked.[188] Instead, the City offers two arguments in an effort to excuse its refusal to provide the draft.

---

[183] Consent Decree Paragraph 454.

[184] R. Doc. 714 at 1-7 (Ex. 26).

[185] *See* R. Doc. 714 at 2-3 (Ex. 26); *see also* R. Doc. 714-5 at 15. The City's witnesses concede the Monitor requested to review the Officer Vappie report before it was finalized. *See, e.g.*, R. Doc. 752 (Transcript) at 76.

[186] R. Doc. 715 at 4.

[187] R. Doc. 752 (Transcript) at 27.

[188] *See* R. Doc 752 (Transcript) at 76; R. Doc. 714-6 at 3 (asserting that its refusal to share the draft of the PIB Report with the Monitor did not violate the Consent Decree). PIB eventually did turn over its investigation report to the Monitor on April 3, 2023, well after the completion and closing of the PIB investigation.

First, the City argues it had no obligation to accede to the Monitor's request because the Officer Vappie investigation did not involve "serious misconduct."[189] The NOPD goes further and asserts that "under the most liberal reading and interpretation, the Consent Decree would not describe the Officer Vappie investigation as one that entitles the Monitor to the investigation before its completion."[190] In NOPD's view, "No allegation of misconduct by Officer Vappie was described, suggested, hinted at, or articulated as conduct that requires the release of the investigation pursuant to paragraph 454."[191] Second, the City argues the Monitor was not harmed by the City's refusal to provide the draft Officer Vappie report because the Monitor had an "unprecedented level of access" to the PIB investigation team prior to PIB's preparation of its report.[192]

For the reasons that follow, the City's reading of the Consent Decree is strained to say the least, as is its characterization of the facts of the Officer Vappie allegations and investigation. In short, the City's position is incorrect. The operative question is whether the allegations communicated by Fox8 regarding Officer Jeffrey Vappie – and supplemented by a number of other sources – constitute "serious misconduct" pursuant to Paragraph 454.[193] The evidence presented to this Court makes clear they do.

There are two parts to the inquiry of whether the City was required to provide the Monitor with its draft report before the investigation was complete and before communicating the recommended disposition to the subject of the investigation or review. First, do the allegations fit within the Consent Decree definition of "serious

---

[189] R. Doc. 752 (Transcript) at 11-12 and 276-79.
[190] R. Doc. 714-6 at 2; *see also* Doc 752 (Transcript) at 74-75.
[191] R. Doc. 714-6; *see also* R. Doc. 752 (Transcript) at 77.
[192] R. Doc. 752 (Transcript) at 279.
[193] R. Doc. 747-1 at 10-13.

misconduct"? <u>Second</u>, does the Monitor's purported "unprecedented level of access" somehow relieve the City of its obligation to comply with Paragraph 454?

The Monitor has pointed to the facts that show there was an allegation of payroll fraud[194] against Officer Jeffrey Vappie, including

- The text of two separate communications from Fox8 to the City,[195]

- The content of the even more explicit Fox8 investigative report aired shortly thereafter, which key members of PIB concede they watched,[196]

- A contemporaneous complaint from a citizen (Dr. Skip Gallagher) alleging that "payroll fraud is alive and well and extends into the upper ranks of the NOPD as well as the Mayors own security detail. . . ,"[197]

- PIB's awareness that the FBI was conducting a criminal investigation of Officer Vappie at the same time PIB was investigating Officer Vappie,[198]

- Multiple statements from the Monitor and the OIPM to PIB that there had been an allegation of payroll fraud against Officer Vappie,[199] and

- NOPD's own characterization of two additional complaints involving Officer Vappie as including allegations of "payroll fraud."[200]

---

[194] A number of different terms have been used throughout this matter to describe the relevant allegation against Officer Jeffrey Vappie, including payroll fraud, public payroll fraud, timecard fraud, billing for time not worked, theft, and adherence to law, among others. Regardless of the particular phrase used, for purposes of this matter, all refer to a situation in which an officer engages in (or is alleged to have engaged in) non-NOPD activities while being paid by NOPD.

[195] R. Doc. 747-1 at 10-13.

[196] R. Doc. 754 (Transcript) at 70; R. Doc. 752 (Transcript) at 98.

[197] R. Doc. 747-4 at 4 (Ex. 39).

[198] R. Doc. 752 (Transcript) at 82.

[199] R. Doc. 714 at 3-7 (Ex. 26); *see also, e.g.*, R. Doc. 754 (Transcript) at 46.

[200] *See* R. Doc. 740-2 at 118 (NOPD_003469)(a letter to the Civil Service Department describing the related investigation of Sgt. Tokishiba Lane-Hart, SPO Robert Monlyn, and SPO Louis Martinez under PIB CTN# 2022-0566-P as payroll fraud); PIB CTN# 2023-0141-P attached hereto as Attachment 2 (describing a complaint made by Belden Batiste against Officer Vappie as being "Relative to payroll fraud" and referencing La. R.S. 14:138). In these matters, however, PIB either exempted Officer Vappie from the investigation (as it did in the PIB CTN# 2022-0566-P matter) or terminated the investigation altogether (as it did in the PIB CTN# 2023-0141-P matter). The basis for these decisions was that PIB purportedly already was investigating Officer Vappie for these same allegations under PIB CTN# 2022-0513-R. The troubling reality, of course, is that, by the City's own admission, PIB was not investigating Officer Vappie for payroll fraud under PIB CTN# 2022-0513-R. *See, e.g.*, R. Doc. 718-3 at 3 ("To be clear, at no time was Officer Vappie under investigation for Payroll fraud....").

While the City apparently reads the texts of the initial Fox8 correspondence differently from the Monitor, the OIPM, and the DOJ,[201] the City does not dispute the existence of the foregoing communications or events.

Based upon the documents presented at the hearing and the testimony of witnesses, this Court finds the evidence clearly establishes there was an allegation of payroll fraud against Officer Vappie. Accordingly, that allegation should have been acknowledged, recorded, investigated, and given a disposition. PIB did none of these things.

With that established, the next question is does an allegation of payroll fraud of the type made against Officer Vappie fall within the Consent Decree definition of "serious misconduct"? The answer to that question is "yes, it does."

Consent Decree Paragraph 454 defines "serious misconduct" as encompassing allegations of "untruthfulness," "false statements," and "theft."[202] Billing NOPD for time not worked is inherently an act of untruthfulness and involves making false statements. Further, if done with the requisite intent, it may also constitute the crime of "theft." [203]

The City offers two arguments in support of its position that payroll fraud does not constitute serious misconduct as used in the Consent Decree. First, the City suggests payroll fraud is not the kind of false statement, untruthfulness, or theft contemplated by the Consent Decree, which the City claims focuses more on the "violation of civil rights,

---

[201] The United States complains of the City's "circular reasoning of choosing to avoid the absolute clear allegation that this investigation of Officer Vappie involved payroll fraud . . . ."). R. Doc. 752 (Transcript) at 286.
[202] Consent Decree Paragraph 454.
[203] Under Louisiana law, public payroll fraud under La. R.S. 14:138 is considered a type of theft. *See, e.g.*, *State v. Fruge*, 251 La. 283 (1967). As the City explained during the hearing, allegations of payroll fraud against members of the NOPD may be investigated administratively or criminally, depending on the details of the allegation. *See* R. Doc. 752 (Transcript) at 68.

such as planting evidence, unlawful search, false arrest, unreasonable use of force, discriminatory policing."[204] The City's interpretation of the Consent Decree is not based on fact or law.[205] There is no reason to believe the parties to the Consent Decree did not intend the terms false statement, untruthfulness, and theft to be given their common meanings which go beyond planting evidence, unlawful search, false arrest, unreasonable use of force, and discrimination.

Next the City argues, even if payroll fraud were encompassed by Paragraph 454, payroll fraud was not alleged in this case. According to the City "you get to theft [which, the City concedes is covered by Paragraph 454] only by virtue of saying, well, payroll fraud is stealing. Sure, but that's not what this investigation was about. So, that's the flaw in the analysis on 454 in terms of its applicability at all."[206] For the reasons discussed above, the evidence does not support the City's position. As recognized by the Monitor, the OIPM, the United States, and this Court, the multiple allegations against Officer Vappie clearly alleged payroll fraud among a number of other potential violations. The City is using its violation of Paragraph 399 of the Consent Decree to excuse its violation of Paragraph 454.

Because the Court has found that payroll fraud was alleged and payroll fraud does fall within the definition of "serious misconduct" set forth in Paragraph 454, the final question is whether the Monitor's purportedly "unprecedented level of access" to PIB during the Officer Vappie investigation somehow relieved the City of its obligation to comply with paragraph 454 of the Consent Decree.[207] It did not.

---

[204] R. Doc. 752 (Transcript) at 277.
[205] The City did not cite any evidence or any law to support this interpretation.
[206] Id. at 12.
[207] The City's counsel repeatedly has described the access given to the Monitor as "unprecedented." The City's own witness, Lt. Jones, however, testified that PIB and the Monitor met on a weekly basis over the course of PIB's investigation into alleged payroll fraud involving officers working Secondary Employment details. See R. Doc. 754 (Transcript) at 10. Thus, the weekly meetings in the course of the Officer Vappie

There is no question PIB cooperated with the Monitor (and with the OIPM) during its investigation of Officer Vappie. The City's witnesses all testified to the broad access PIB gave the Monitor and the Monitor itself recognized this access in its various reports and court presentations.[208] Nevertheless, the City did not give the Monitor the chance to review and comment on PIB's *draft* report *before* the investigation was complete and *before* communicating the recommended disposition to Officer Vappie. Consequently, while the Monitor knew the facts PIB had uncovered during its investigation, the Monitor had no idea, until it was too late, which allegations were addressed, how PIB evaluated the facts it had gathered, which facts would be credited/rejected, or how the policies would be applied to the facts. The Monitor likewise was not afforded the opportunity to see how PIB was dealing with circumstantial evidence, how it planned to describe the standard under which it reached its conclusions, or how it handled its credibility determinations; nor was the Monitor afforded the opportunity to communicate with the Superintendent prior to the release of the report as contemplated by the Consent Decree.

The Department of Justice summarized the importance of Paragraph 454 well in its closing argument:

> By circumventing 454 by merely saying we won't characterize this as payroll fraud, which is theft by their own admission, they avoid the specific provision of the Consent Decree and, frankly, the chance to gets out from under it. The chance to have the court monitor help and correct the error before they have an unforced error. It's like deliberately throwing the interception.

---

investigation perhaps are not as "unprecedented" as the City suggests. In any event, whether the access provided the Monitor was "unprecedented" is wholly immaterial to the question at hand.
[208] R. Doc. 714 at 1 (Ex. 26) ("We appreciate the cooperation we received from PIB prior to the preparation of the PIB investigation report.").

The Court agrees with the United States. By ignoring its obligations under Paragraph 454, the City not only violated the Consent Decree, it also impaired its own ability to receive assistance from the Monitor in a manner that, in hindsight, clearly would have benefited the City.

PIB's investigation into the allegations against Officer Vappie did constitute a serious misconduct complaint investigation because the complaint clearly involved allegations of truthfulness, false statements, and theft. As a result, NOPD was required to comply with Paragraph 454 of the Consent Decree. By not doing so, it precluded the Monitor from doing its job, and prevented the NOPD from gaining the benefit of the Monitor's input in a timely fashion. Considering the issue more broadly, the Court is concerned that PIB may be making similar decisions in other matters as well. This concern is exacerbated by the NOPD's view, expressed by former Interim Superintendent Woodfork, that it did nothing wrong and that there was not even a "hint" of serious misconduct in the allegations against Officer Vappie.[209] A mistake in an individual matter is one thing, but a refusal to recognize the mistake is a strong indicator the errant practice will continue. This cannot be allowed.

### F.   The City violated Paragraphs 470 and 472 of the Consent Decree.

**Paragraph 470:** *To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City and NOPD. The Monitor shall have access to all necessary individuals, facilities, and documents, which shall include access to Agreement related trainings, meetings, and reviews, such as critical incident reviews, use of force review boards, and disciplinary hearings.* NOPD shall notify the Monitor as soon as practicable, and in any case within 12 hours, of any critical firearms discharge, in-custody death, or arrest of any officer.[210]

---

[209] *See* R. Doc. 714-6 at 3 ("No allegation of misconduct, by Officer Vappie, was described, suggested, hinted at or articulated as conduct that requires the release of the investigation pursuant to Paragraph 454.").
[210] *Id.* at 31-33.

**Paragraph 472:** *City and NOPD shall ensure that the Monitor has full and direct access to all City and NOPD documents and data that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement, except any documents or data protected by the attorney-client privilege.* The attorney-client privilege may not be used to prevent the Monitor from observing reviews and trainings such as use of force review boards, or disciplinary hearings. Should the City and NOPD decline to provide the Monitor access to documents or data based on privilege, the City and NOPD shall inform the Monitor and DOJ that they are withholding documents or data on this basis and shall provide the Monitor and DOJ with a log describing the documents or data and the basis of the privilege for withholding.[211]

In its June 5, 2023 Officer Vappie Report, the Monitor reported to the Court that, for the first time since the entry of the Consent Decree in 2013, the NOPD had refused to produce documents requested by the Monitor.[212] Specifically, the Monitor (and the OIPM) requested from PIB a draft of the Officer Vappie investigation report prior to the completion of the investigation on multiple occasions during the weekly status meetings.[213] PIB rejected these requests.[214] As the Monitor noted in its various reports and presentations to the Court, this is the first time in memory NOPD refused to produce materials required to be produced by the Consent Decree.[215]

The United States raised the same serious concern in its Court filings[216] and in its closing argument at the Show Cause hearing.[217]

---

[211] *Id.*
[212] R. Doc. 714 at 7-10 (Ex. 26).
[213] *See, e.g.,* R. Doc. 714; *see also* R. Doc. 752 (Transcript) at 76.
[214] R. Doc. 752 (Transcript) at 76.
[215] R. Doc. 714-5 at 15.
[216] *See, e.g.,* R. Doc. 735 at 14.
[217] R. Doc. 752 (Transcript) at 293.

The City does not dispute that it refused to turn over the requested documents.[218] Indeed, the City's witnesses expressly confirmed NOPD did not produce the materials.[219] The NOPD, however, "vehemently disagree[s] with the suggestion that the Public Integrity Bureau violated the Consent Decree by refusing to share a copy of the draft PIB Report with the Monitoring Team."[220] The NOPD offers no justification for its "vehement disagreement" other than its argument that, since the Officer Vappie investigation purportedly did not involve an allegation of "serious misconduct," the materials requested by the Monitor are not covered by Paragraph 454.[221]

The City has remained relatively quiet on this issue in its various filings. In its closing argument at the hearing, however, the City's counsel asserted "I don't believe there is any evidence at all that they were denied reasonable access to individuals or documents." Upon being reminded by the Court that the City's own witnesses had conceded NOPD refused to produce a copy of the draft PIB investigation report regarding Officer Vappie to the Monitor, counsel pivoted to argue instead that that NOPD's refusal was not a violation of the Consent Decree because Paragraph 454 purportedly trumps the requirements of Paragraph 470 and 472 under the "rules of contract interpretation."[222]

For the reasons detailed below, the City's and NOPD's arguments are wholly unpersuasive, in large part because they conflate two different obligations under the

---

[218] R. Doc. 752 (Transcript) at 76; *see also* R. Doc. 714-6 at 2 ("We disagree with the Monitoring Team's analysis that PIB violated the Consent Decree by refusing to share a copy of the PIB report with the Monitoring Team when requested.").
[219] R. Doc. 752 (Transcript) at 76. On April 3, 2023, NOPD finally shared with the Monitor a copy of the PIB investigation initially requested in mid-March. By the time NOPD shared the investigation report with the Monitor, it was long after the completion of the PIB investigation, which was concluded and closed on March 10.
[220] R. Doc. 714-6 at 3.
[221] *Id.*
[222] R. Doc. 752 (Transcript) at 279-80.

Consent Decree – NOPD's Paragraph 454 obligations and NOPD's *independent* obligations under Paragraphs 470 and 472.

Paragraph 470 of the Consent Decree provides that "the Monitor **shall have access to all** necessary individuals, facilities, and **documents**, which shall include access to Agreement related trainings, meetings, and reviews, such as critical incident reviews, use of force review boards, and disciplinary hearings."[223] Paragraph 472 similarly requires that the City give the Monitor "full and direct access to City and NOPD documents that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor...."[224] These are broad, clear provisions designed to ensure the Monitor has what it needs to get its job done. The only exception to these clear rules is that the Monitor is not entitled to documents covered by the Attorney Client Privilege or Attorney Work Product Doctrine,[225] neither of which apply to the current dispute.

As to the City's argument that, "under the rules of contract interpretation," Paragraph 454 takes precedence over Paragraphs 470 and 472,[226] the City apparently misunderstands the application of that rule. In the first instance, a Court must look to the plain language of the agreement itself.[227] Only if that language is ambiguous does the Court resort to general rules of contract interpretation.[228] Consent decrees, as the majority rightly points out, are interpreted according to the general principles of contract law.[229] Under Louisiana law, courts seek the parties' common intent starting with the

---

[223] Consent Decree Paragraph 470 (emphasis added).
[224] Consent Decree Paragraph 472 (emphasis added).
[225] Consent Decree Paragraph 472.
[226] R. Doc. 752 (Transcript) at 280.
[227] *Chisom v. State of La.*, No. 22-30320 (5th Cir. Oct. 25, 2023), ECF No. 95.
[228] *Id.*
[229] *See Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015).

contract's words, which control if they are clear and lead to no absurdities. [230] "Furthermore, a contract is to be construed as a whole and each provision in the contract must be interpreted in light of the other provisions." [231]

The Consent Decree is clear. Paragraphs 470 and 472 require the City and NOPD to give the Monitor access to *all* documents reasonably necessary to carry out the Monitor's duties. Consistent with this basic requirement, Paragraph 454 sets out *an additional process and timeline* for serious misconduct complaints. Specifically, Paragraph 454 contemplates the production of a serious misconduct investigation report *before PIB closes the investigation* or communicates the recommended disposition to the subject of the investigation or review so the Monitor may provide substantive recommendations to PIB and the Superintendent. If the Superintendent chooses not to accept those recommendations, she must respond to the Monitor with her reasons in writing.[232]

There is nothing inherently contradictory or ambiguous in paragraphs 454, 470, or 472. Accordingly, there is no justification for the NOPD's decision to ignore its obligations under any of the three paragraphs.[233]

Regardless of how the City interprets Paragraph 454 (and, as discussed above, it interprets the paragraph incorrectly), there can be no serious dispute regarding the clarity of Paragraphs 470 and 472. The Monitor was entitled to the materials it requested in

---

[230] *See* La. Civ. Code arts. 2045, 2046.

[231] *Baldwin v. Bd. of Supervisors for Univ. of La. Sys.*, 2014-0827 (La. 10/15/14), 156 So. 3d 33, 38 (citing La. Civ. Code art. 2050).

[232] Consent Decree Paragraph 454.

[233] Even if the City were correct that Paragraph 454 somehow does away with NOPD's obligations under Paragraph 470 and 472, the argument would fall prey to the City's conflicting argument that Paragraph 454 has no application here because there is no allegation of "serious misconduct." If the City were correct that 454 does not apply, then the City's argument that 454 precludes the application of 470 and 472 would collapse under its own weight. Any way you look at it, the City's creative legal rationalization for NOPD's refusal to provide documents to the Monitor is without merit.

connection with the investigation of Officer Vappie, and the City had no reasonable basis to deny or delay that request.

### G.     The City violated Paragraphs 409 and 419 of the Consent Decree.

**Paragraph 409:** *All misconduct investigation interview recordings shall be stored and maintained in a secure location within PIB.[234]*

**Paragraph 419:** *All investigation reports and related documentation and evidence shall be securely maintained in a central and accessible location until the officer who was a subject of the complaint has severed employment with NOPD.[235]*

In its May 3, 2023 Special Report on PIB, the Monitor expressed concern regarding PIB's compliance with its obligations under the Consent Decree to keep investigative materials confidential.[236] To ensure the confidentiality of PIB's work product, the Monitor and the OIPM advised PIB at the outset of the Officer Vappie investigation to "establish a small circle of individuals authorized to have access to investigation materials, and to preclude all others from such access."[237] The Monitor explained the basis for this recommendation as follows: "Because of public and media focus on the investigation and the fact that the Mayor, their boss, likely would be a material witness in the investigation, we felt extra precautions were necessary to protect the integrity of the investigation and avoid any appearance of impropriety."[238] The Monitor asserts that PIB failed to take reasonable steps to protect the confidentiality of the information gathered during its investigation.[239]

---

[234] Consent Decree Paragraph 409.
[235] *Id.* at Paragraph 419.
[236] R. Doc. 694 at 14 (Ex. 25).
[237] *Id.* at 16.
[238] *Id.*
[239] R. Doc. 714-5 at 13-14.

Specifically, the Monitor identifies three actions PIB took that put the confidentiality of its investigation at risk: (1) PIB shared a copy of all audio recordings of witness interviews with the City Attorney's Office prior to the conclusion of the investigation,[240] (2) the audio recordings shared with the City Attorney apparently were shared on a non-password protected USB drive, increasing the risk and consequence of an inadvertent disclosure, and (3) NOPD reassigned the two lead PIB investigators into the districts during the investigation, which resulted in their working on highly confidential matters from their district offices rather than from the protected confines of PIB.[241] In the view of the Monitor, these actions created an increased risk of an inadvertent breach of confidentiality.[242]

The United States raised similar concerns regarding confidentiality.[243] The OIPM likewise expressed concern with the public disclosure of the PIB witness interviews.[244]

The City does not dispute that confidential recordings of the witness interviews were released to the public.[245] The City argues, however, that NOPD should not be held responsible for the disclosure since it was the fault of the City Attorney's Office.[246] The City argues further that the failure of NOPD to institute the protections identified by the Monitor did not violate the Consent Decree.[247]

---

[240] The City Attorney's Office has acknowledged an inadvertent public disclosure of the PIB interview recordings in the Officer Vappie matter. *See* Public Statement of City Attorney (March 15, 2023) (https://nola.gov/next/mayors-office/news/articles/march-2023/2023-03-15-city-attorney-pib-statement/ ).

[241] R. Doc. 714-5 at 14. With regard to the third recommendation, the City's witness testified that all confidential materials were maintained at PIB throughout the investigation. *See* R. Doc. 754 (Transcript) at 145.

[242] R. Doc. 694 at 17 (Ex. 25).

[243] R. Doc. 715 at 7.

[244] Letter From OIPM To the City Council, the Monitor, the DOJ, and this Court (March 13, 2023).

[245] R. Doc. 752 (Transcript) at 280; *see also* Public Statement of City Attorney, *supra*, (March 15, 2023).

[246] R. Doc. 752 (Transcript) at 280.

[247] *Id*. at 281.

In response, DOJ points out that the Consent Decree governs NOPD and the City, including the City Attorney's Office, thus, it is of no significance whether the disclosure was the fault of NOPD or the City Attorney's Office.[248] DOJ put it this way in its closing argument at the hearing:

> The City's statement, today and previously, had been, but that wasn't NOPD; that was the City Attorney. Again, that overlooks the definite and specific provision of the Consent Decree that says this applies to all agents and employees of the City. The City Attorney and others cannot act in derogation of this Court's order and let NOPD get off, if you will, scot-free, because, oh, it was another division of the City.[249]

The United States is correct that the Consent Decree binds the City, the NOPD, and the City Attorney's Office.[250]

The United States also is correct that the Consent Decree is clear with regard to the obligations of NOPD and the City to protect the integrity of PIB investigations. Paragraph 409 of the Consent Decree requires that "All misconduct investigation interview recordings shall be stored and maintained in a secure location *within PIB*."[251] Similarly, Paragraph 419 provides that "All investigation reports and related documentation and evidence shall be securely maintained in a central and accessible location until the officer who was a subject of the complaint has severed employment with NOPD."[252] While the City's witnesses testified that PIB materials are typically kept in a secure location,[253] the disclosure of the interview recordings would suggest this is not always the case.

---

[248] *Id.* at 293.
[249] *Id.*
[250] Consent Decree Paragraph 8.
[251] Consent Decree Paragraph 409. (Emphasis added.)
[252] Consent Decree Paragraph 419.
[253] *See, e.g.,* R. Doc. 754 (Transcript) at 145.

After considering the testimony and evidence presented at the hearing, this Court finds that NOPD and the City failed to take all necessary steps to protect the confidentiality of the Officer Vappie investigation materials. The City has represented that reviews are underway to determine the reason for the disclosure of the interview recordings.[254]

With regard to the Monitor's recommendations regarding protecting confidential PIB information more generally, the City and NOPD would be wise to seriously consider those recommendations whether or not they are expressly required by the Consent Decree.[255]

### H.    The City violated Paragraphs 306 and 313 of the Consent Decree.

**Paragraph 306:** *NOPD supervisors shall be held accountable for providing the close and effective supervision necessary to direct and guide officers.* Close and effective supervision requires that supervisors: respond to the scene of certain arrests; review each arrest report; respond to the scene of uses of force as required by this Agreement; investigate each use of force (except those investigated by FIT); review the accuracy and completeness of officers' Daily Activity Reports; respond to each complaint of misconduct; ensure that officers are working actively to engage the community and increase public trust and safety; and provide counseling, redirection, and support to officers as needed, and that supervisors are held accountable for performing each of these duties.[256]

**Paragraph 313:** *NOPD shall hold commanders and supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*[257]

---

[254] R. Doc. 752 (Transcript) at 163 (confirming City has opened an investigation into the disclosure). The New Orleans Office of Inspector General acknowledged in its March 2023 Monthly Report that it had received a request from the New Orleans City Council to investigate the disclosure of the interview recordings. It is unknown whether the OIG has opened such an investigation.

[255] The City represented at the hearing that NOPD was open to the Monitor's recommendations. *See* R. Doc. 752 (Transcript) at 281 ("You know, I'm not sure of the current status of that. I believe they would be open to discussions about that . . . .").

[256] Consent Decree Paragraph 306.

[257] Consent Decree Paragraph 313.

In its report on PIB's investigation of Officer Jeffrey Vappie, the Monitor commented that "NOPD's closure of its investigation without looking into the actions/inactions of Officer Vappie's chain of command (i.e., his supervisors) further prejudices the Department's ability to hold those supervisors accountable for their potential failure to provide close and effective supervision to officers working on the Executive Protection team."[258] The Monitor noted that the Consent Decree makes clear that "NOPD supervisors shall be held accountable for providing the close and effective supervision necessary to direct and guide officers."

The United States expressed the same concern, identifying "The status of any investigation of Officer Vappie's chain of command" as an "open item" that the City has not yet addressed.[259] Like the Monitor, DOJ emphasized that Consent Decree Paragraph 306 requires that "NOPD supervisors shall be held accountable for providing the close and effective supervision necessary to direct and guide officers."[260]

There is no evidence in the record that the NOPD made any effort to explore whether any supervisors failed in their duty to provide close and effective supervision to Officer Vappie, as required by paragraphs 306 and 313.

The City's response to this shortcoming seems to be that Officer Vappie had no supervisor beyond the Mayor, thus, the NOPD cannot be faulted for its failure to explore supervisor accountability.[261] The City's reasoning is flawed. The individuals assigned to the Executive Protection team are NOPD officers. They remain under the supervision of

---

[258] R. Doc. 714 at 8 (Ex. 26). On many occasions, the Monitor reminded PIB of its obligation to investigate supervisors in Officer Vappie's chain of command.
[259] R. Doc. 715 at 7-8.
[260] *Id.* at 8.
[261] R. Doc. 752 (Transcript) at 171.

the NOPD even when they are providing protection to the Mayor. NOPD has the obligation to provide close and effective supervision of these NOPD officers. Until very recently, the NOPD completely failed to meet this obligation. Yet, no supervisor has been held accountable for this serious violation of NOPD policy and the Consent Decree.[262]

This, of course, is not to say that supervisors always are responsible for the failings of their officers. Certainly, officers make mistakes, violate policies, and otherwise act in an unprofessional manner through no fault of their supervisors. But the Consent Decree's supervision requirements obligate NOPD to at least ask the question of whether there has been a failure of supervision in a meaningful way. What did the supervisor know? When did the supervisor know it? Did the supervisor's action or inaction contribute to or condone the non-compliance in any way? These are the sorts of questions a department truly interested in close and effective supervision and supervisor accountability routinely would ask.[263]

It is notable that the NOPD has a process in place specifically to facilitate a review of supervisors-- the Serious Discipline Review Board (SDRB).[264] The stated purpose of the SDRB is "to review the supervisor's role in any serious disciplinary action involving a member of the Department and any cases forwarded to the SDRB by a disciplined

---

[262] Relatedly, the Court reiterates its concern regarding NOPD's decision to place Captain Glasser on the Officer Vappie Pre-Disposition Conference panel. Captain Glasser not only represented a witness in this matter during her interview (Sgt. Lane), but he also is in the chain of command of Sgt. Lane and Officer Vappie. *See* R. Doc. 752 (Transcript) at 172-74. The Court is unable to comprehend how NOPD did not identify this as a conflict of interest and act accordingly.

[263] Importantly, the obligation to hold supervisors accountable does not require PIB necessarily to open a formal "DI1" investigation into every accused officers' supervisor. The Department has a number of ways to explore supervisor accountability, including a PIB investigation, a management review, and referral to a Supervisory Discipline Review Board. The Department also has a number of ways to record the findings of such a review, including a PIB finding, an entry in the Supervisory Feedback Log, a performance evaluation, an Insight entry, and/or an SDRB report.

[264] NOPD Policy 1.3.8 (11/15/20).

member's Bureau Chief."[265] NOPD incorporated the following statement into the SDRB policy:

> The SDRB serves as a quality control mechanism to ensure timely reviews of all serious discipline imposed on members *to determine the appropriateness of the supervision* of the members involved in the infraction and if inadequate supervision or a failure in the chain-of-command was present and caused or enabled the violation(s).[266]

While the City concedes, as it must, the existence of the SDRB policy, it argues that NOPD did not violate the policy because the policy is triggered only when an officer is suspended for 20 days or more.[267] This argument, though, plays fast and loose with the facts, as the United States' cross examination of the PIB Deputy Superintendent made clear:

> Q. On STRB's (sic), serious discipline review boards, you answered Mr. Zimmer's questions. You said, in this case, there were no suspensions of greater than 20 days, correct?
>
> A. That is correct.
>
> Q. But since October -- excuse me -- since October 2022, when you took over PIB, there have been officers that have been fired from NOPD based upon allegations of misconduct, right?
>
> A. Yes.
>
> Q. And still, there have not been any serious discipline review board meetings, even though officers have been fired, right?
>
> A. That is correct, sir. Yes.
>
> Q. So in no instances has the STRB (sic) convened to hold supervisors responsible, as required in Paragraphs 313 and 303 of the Consent Decree, correct?

---

[265] *Id.*
[266] *Id.* (emphasis added).
[267] *See* R. Doc. 752 (Transcript) at 214.

A. That's correct.[268]

The PIB Deputy Superintendent admitted that he had *never* convened the SDRB during his tenure. He also admitted that officers had been terminated during this time. Termination is a more severe punishment than suspension for 20 days and should have led to the convening of the SDRB. As the City's witnesses confirm, NOPD has not implemented its SDRB as promised.[269]

The United States' closing argument at the hearing summarized the matter well and is worth quoting at length:

> Paragraphs 316 and 313 have to do with supervisory accountability. And the City's pointing to the serious discipline review board. Well, [the City argues,] there was no need with Officer Vappie to convene the serious discipline review board. There are two faulty assumptions there. One is the cascading effect of having not categorized this as serious misconduct on the front end, under 399, and, therefore, never reaching a disposition on payroll fraud that could result in a suspension of over 20 days. The second is the serious discipline review board doesn't just apply to Officer Vappie. It applies to all these individuals, who, as Your Honor heard, even if they were fired by NOPD, there was no serious discipline review board convened from October 2022 to present, despite the 30-day requirement in NOPD's own policy. And for each of those individuals, no one at NOPD then makes that serious discipline review board determination whether their supervisors should be held accountable. And as Your Honor saw in Sergeant Tokishiba Lane-Hart's interview, no supervisors were held accountable up her chain of command for the lack of supervision of executive protection.[270]

---

[268] R. Doc. 752 (Transcript) at 227.

[269] The Court recognizes there is no explicit requirement to have an SDRB in the Consent Decree. The Consent Decree does, however, require NOPD to hold supervisors accountable for any failure to provide close and effective supervision of their officers. The NOPD itself devised the SDRB to help it meet its close and effective supervision obligations. This Court expects NOPD to honor its commitments whether or not they flow from the explicit language of the Consent Decree. Moreover, whether or not a given event triggers the need for a SDRB, the actions/inactions of supervisors must be reviewed per the clear language of the Consent Decree.

[270] R. Doc. 752 (Transcript) at 294.

This Court agrees with the United States' summary of the matter.

Notably, this is not the first time the issue of supervisor accountability has come up. The Monitor shared a similar finding in its 2022 Annual Report:

> [W]e would be remiss if we did not note a lack of follow-up by the NOPD in certain areas relating to Supervision. For example, one of the commitments NOPD undertook in 2020 was to develop a Serious Discipline Review Board that would operate like the existing Use of Force Review Board. The SDRB was to be made up of Department Deputy Chiefs and was to review the accountability of supervisor for actions of subordinates; look for patterns and trends across matters, bureaus, and districts; and seek to identify opportunities for further structural improvements in terms of policies, training, and internal controls. The SDRB was a very encouraging innovation to promote close and effective supervision. The Department failed to hold a single SDRB session in 2022, however. . . .[271]

Clearly, the NOPD's failure to hold supervisors accountable goes well beyond the Officer Vappie investigation.

The evidence is clear that NOPD still has not fully grasped the importance of meaningfully exploring the potential role supervisors play in their subordinates' misconduct. This is a critical component of close and effective supervision (Paragraph 306) and holding supervisors accountable for their failure to provide close and effective supervision (Paragraph 313).

## I.    The City violated Paragraphs 403 and 420 of the Consent Decree.

**Paragraph 403:** *All administrative investigations conducted by PIB shall be completed within the time limitations mandated by state law and within 90 days of the receipt of the complaint, including assignment, investigation, review and final approval, unless granted an extension as provided for under state law or Civil Service exemption, in which case the investigation shall be completed within 120 days. Where an allegation is sustained, NOPD shall have 30 days to determine and impose the*

---

[271] R. Doc. 674-1 at 46 (Ex. 28).

*appropriate discipline, except in documented extenuating circumstances, in which case discipline shall be imposed within 60 days.* All administrative investigations shall be subject to appropriate interruption (tolling period) as necessary to conduct a concurrent criminal investigation or as provided by law.[272]

**Paragraph 420:** *Each misconduct complainant will be kept informed periodically regarding the status of the investigation. The complainant will be notified of the outcome of the investigation, in writing, within ten business days of the completion of the investigation, including regarding whether any disciplinary or non-disciplinary action was taken.*[273]

The Monitor found NOPD violated Paragraphs 403 and 420 of the Consent Decree, which set forth three deadlines regarding PIB investigations.[274] First, Paragraph 403 requires administrative investigations to be completed within 90 days (or 120 days if Civil Service grants an exemption) of receipt of the complaint.[275] Second, Paragraph 403 also gives NOPD 30 days (or 60 days where extenuating circumstances are shown) "to determine and impose the appropriate discipline . . . ."[276] Finally, Paragraph 420 requires NOPD to notify complainants of the outcome of the investigation within 10 days of the completion of the investigation.[277]

The Monitor and the United States asserted in their various reports, briefs, and presentations that (a) PIB took more than 30 (and more than 60) days to determine and impose discipline on Officer Vappie, (b) NOPD took more than 120 days to conduct its

---

[272] R. Doc. 694 at 30 (Ex. 25).

[273] *Id.* at 32 (Ex. 25).

[274] *See* R. Doc. 694 (Ex. 25) (Monitor's Special Report on PIB); R. Doc. 17 (Monitor's Special Report on PIB's Investigation of Officer Jeffrey Vappie); R. Doc. 674-1 (Ex. 28) (Monitor's Annual Report for 2022); R. Doc. 702 (Monitor's First Quarterly Report for 2023).

[275] Consent Decree Paragraph 403.

[276] Consent Decree Paragraph 493.

[277] Consent Decree Paragraph 420 ("Each misconduct complainant will be kept informed periodically regarding the status of the investigation. The complainant will be notified of the outcome of the investigation, in writing, within 10 business days of the completion of the investigation, including regarding whether any disciplinary or non-disciplinary action was taken.").

investigation of Officer Vappie, and (c) NOPD failed to notify the complainant of the status of the Officer Vappie investigation.[278]

In response, the City contends that it met its obligations regarding timing in the Officer Vappie investigation because (a) Louisiana law was changed to allow 135 days instead of 120 days to conduct administrative investigations, (b) the 30-day timeline for the imposition of discipline only began to run once the Superintendent signed the final discipline paperwork, which occurred on June 15, 2023,[279] and (c) there was no complainant to be notified following the closing of the Officer Vappie investigation.[280] For the reasons discussed below, the Court finds the City has violated Paragraphs 403 and 420.

### 1.   Administrative Investigations Are Required To Be Completed Within 120 Days.

Consent Decree Paragraph 403 requires that NOPD administrative investigations be completed within 60 days, or 120 days with an exemption from Civil Service.[281] This Consent Decree language was drawn from the Louisiana Law Enforcement Officer Bill of Rights ("LEOBOR") as it existed at the time the Consent Decree was entered.[282] The City's witnesses accurately testified at the hearing, however, that the LEOBOR was modified on August 1, 2021 to provide 135 days for administrative investigations rather than 120

---

[278] *See* R. Doc. 694 (Ex. 25) (Monitor's Special Report on PIB); R. Doc. 147 (Monitor Special Report on PIB's Investigation of Officer Jeffrey Vappie); R. Doc. 674-1 (Ex. 28) (Monitor's Annual Report for 2022); R. Doc. 702 (Monitor's First Quarterly Report for 2023); *see also* R. Doc. 735.

[279] R. Doc. 740-1 at 16.

[280] R. Doc. 752 (Transcript) at 109-10; R. Doc. 740 at 23.

[281] Consent Decree Paragraph 403.

[282] *See* La. RS 40:2531.

days.[283] Accordingly, the City contends PIB "had 135 days to timely complete this PIB investigation . . . ."[284] The City is wrong.

While the Court acknowledges Louisiana State Law was modified in 2021, the Consent Decree has not been modified. The City could have requested a modification to the Consent Decree at any time, as it has done several times in the past, but it elected not to do so. Thus, until the Consent Decree is modified, NOPD remains subject to the 120-day investigation timeline.

The City goes on to argue that PIB nonetheless met the Consent Decree 120-day investigation timeline.[285] According to the City, the Officer Vappie investigation was "initiated on November 9, 2022," which established a closure date (i.e., an investigation deadline) of March 11, 2023.[286] Since the Vappie report "was completed on March 10, 2023," the City argues, "the investigation . . . was completed timely."[287] Here again, the City is wrong. The evidence presented at the hearing tells a different story from the one offered in the City's briefs.

According to the documents presented at the hearing and witness testimony, PIB recorded the Officer Vappie investigation as being opened on November 8, 2022 – not November 9 as the City contends in its brief – and closed on March 10, 2023.[288] The City's witnesses concede, however, that PIB became aware of the complaint against Officer Vappie on November 7, 2022.[289] DOJ argues, accordingly, that the "cognizance date"

---

[283] R. Doc. 752 (Transcript) at 85; *See* La. R.S. 40:2531(B)(7), (amended on August 1, 2021, to allow 75 days to complete an investigation without extension, and 135 days to complete an investigation with extension).
[284] R. Doc. 740 at 22.
[285] *Id.*
[286] *Id.*
[287] *Id.*
[288] *Id.* at 22.
[289] R. Doc. 752 (Transcript) at 83-84.

actually was November 7, not November 8 as shown on the City's intake forms and not November 9 as the City argues in its brief.[290] The Court agrees with the United States.

NOPD policy defines the cognizance date of an investigation as "The date on which an NOPD supervisor, whether assigned to PIB or assigned to another bureau, receives a complaint of alleged employee misconduct from any source, observes employee misconduct, or gains knowledge from any source of employee misconduct."[291] PIB received the Fox8 communication on November 7, 2022.[292] Consistent with this definition, the Court finds the cognizance date of the Officer Vappie investigation was November 7. Consequently, the 120-day deadline was March 7, 2023, not March 11, 2023 as argued by the City. PIB completed its investigation on March 10, 2023, three days after the 120-day deadline imposed by the Consent Decree.

The Court recognizes that, in this case, missing the Consent Decree deadline by 3 days did not run afoul of state law and probably did not prejudice any party. Nonetheless, it did run afoul of the express terms of the Consent Decree. Missing an investigation deadline, even by one day, can result in PIB's finding being overturned on appeal, as has happened in several PIB cases of recent vintage.[293]

Beyond NOPD's failure to meet the Consent Decree-imposed deadlines in the Officer Vappie case, the Court is more troubled by the fact that NOPD's Formal Disciplinary Investigation ("FDI") Transmittal form reflects the 120-day requirement

---

[290] R. Doc. 752 (Transcript) at 84.
[291] NOPD Policy 52.1.1 at 2.
[292] R. Doc. 752 (Transcript) at 84.
[293] See, e.g., Dupree v. New Orleans Police Department, No. 2021-CA-0134 (La. Ct. of Ap. 4th Circuit), Oct. 27, 2021. See also R. Doc. 752 (Transcript) at 91 (Deputy Superintendent Sanchez acknowledging that there were issues with the cognizance date in the Dupree investigation and, as a result, "Commander [Jennifer] Dupree [was] reinstated and then even promoted despite having an untruthfulness finding in her initial SIS investigation.").

(which is proper under the Consent Decree), but the due date entered by PIB on the intake form in the Officer Vappie matter was *based on a 135 day calculation* (proper under state law). NOPD's FDI form for Officer Vappie lists the cognizance date as November 8, 2022 and the 120-day deadline as March 23, 2023.[294] Even if the correct cognizance date were November 8, the March 23, 2023 deadline is actually 135 days after November 8, not 120 days, as the form suggests. To the extent this reflects a practice beyond the Officer Vappie investigation, it reflects, at best, carelessness, and at worst, deception. Either way, the practice must be remedied immediately. NOPD must adhere to the plain terms of the Consent Decree or move the Court to modify the Consent Decree.

More broadly, the Court notes that the Monitor has pointed out for some time that NOPD continues to fail to demonstrate compliance with Consent Decree Paragraph 403. In its 2022 Annual Report (published February 27, 2023), for example, the Monitor emphasized "Our audit revealed that an excessive number of investigations were not completed within prescribed timelines and NOPD had no justification for this noncompliance. The paragraphs related to compliance with timelines and with properly documenting disciplinary cases and decisions saw the highest rates of non-

---

[294] *See* R. Doc. 740-1 at 1 (Ex. 1 at NOPD_0002758). *See also* R. Doc. 747-1 at 1. In its August 25, 2023 filing with this Court, the City represented that the operative FDI Transmittal document was Bates page NOPD_0002842 of R. Doc. 740-1 (Ex. 2), which reflects a due date of March 11, 2023. As discussed above, this is based upon an incorrect cognizance date. *See* R. Doc. 740 at 22. At the hearing, however, the City and its witnesses relied upon a different FDI, Bates page NOPD_0002758 of R. Doc. 740-1, (Ex. 1) which reflects a due date of March 23, 2023. The City's witnesses testified that they were operating in accordance with the March 23, 2023 deadline reflected on page NOPD_0002758 of R. Doc. 740-1 (Ex. 1). R. Doc. 754 (Transcript) at 155. The City offered no explanation for these conflicting statements, and the haphazard manner of the City's production renders it nearly impossible to determine the reason for the discrepancy or which document is correct. At the end of the day, however, the difference is immaterial here because PIB missed its due date in either case.

compliance."[295] Likewise, in its May 3, 2023 Special Report, the Monitor noted PIB continues to be "not compliant" with paragraph 403.[296]

More specifically, in its May 3, 2023 Special Report, the Monitor presented findings from its audit of 26 of the 52 paragraphs in the Misconduct Section of the Consent Decree. The Monitor concluded that nine out of the 26 audited paragraphs were "not compliant," including Paragraph 403. [297] The Monitor found NOPD's compliance rates for the timeliness of investigation "to range from 76% to 95%."[298] The City filed a response to the Monitor's Special Report on PIB, in which it conceded it has violated Paragraph 403.[299]

Like the City itself, the City's witnesses did not take issue with the Monitor's findings of non-compliance. Indeed, the Deputy Superintendent of PIB readily acknowledged there "was a backlog of investigations and hearings" when he assumed command of the PIB in September 2022.[300] It is undisputed that NOPD is in violation of paragraph 403 of the Consent Decree.

### 2.      Discipline Is Required To Be Imposed Within 30 Days Of the Close Of the Investigation.

In addition to providing deadlines for administrative investigations, Paragraph 403 of the Consent Decree also imposes deadlines for the imposition of discipline.[301] Specifically, in this regard, Paragraph 403 provides as follows: "Where an allegation is sustained, NOPD shall have 30 days to determine and impose the appropriate discipline,

---

[295] R. Doc. 674-1 at 50 (Ex. 28).
[296] R. Doc. 694 at 21 (Ex. 25).
[297] *Id*. at 21-22.
[298] *Id*. at 30.
[299] *See* R. Doc. 697 at 6 (Ex. 27).
[300] R. Doc. 752 (Transcript) at 90.
[301] Consent Decree Paragraph 403.

except in documented extenuating circumstances, in which case discipline shall be imposed within 60 days."[302]

The Monitor presented compelling evidence in its reports and at recent court proceedings that NOPD continues to violate this requirement. The United States agrees with this assessment.[303]

While the City did not take issue with the Monitor's finding regarding PIB's long-time failure to meet the 30-day discipline requirements of the Consent Decree, one of the City's witnesses took issue with the Monitor's and the DOJ's interpretation of the 30-day requirement for imposing discipline. The Monitor and DOJ point to the language of Paragraph 403 of the Consent Decree that provides the 30-day discipline timeline begins on the day an investigation is closed pursuant to the LEOBOR and ends on the day the Superintendent imposes discipline on the accused officer.[304] In the Officer Vappie case, for example, the investigation was closed on March 10, 2023 and discipline was required to be imposed by April 10, 2023, but instead was imposed by the Superintendent on June 15, 2023 – a period of 97 days.[305]

The City's witnesses, in contrast, argued that the 30-day discipline requirement in the Consent Decree actually refers to the period of time between the Superintendent's approval of the final discipline (in the Officer Vappie case, when Interim Superintendent Woodford sent a letter to Officer Vappie on June 15, 2023 informing him of what  his

---

[302] *Id.*
[303] R. Doc. 715 at 4.
[304] R. Doc. 694 at 30; R. Doc. 735 at 10.
[305] R. Doc. 740-1 at 16 (Ex. 1 at NOPD_0002773).

discipline would be)[306] and the NOPD's imposition of that discipline (in the Officer Vappie case, the same day, June 15, 2023).[307]

The Court finds the City's reading of the Consent Decree does not comport with its clear terms for at least two reasons. First, the 30-day requirement is incorporated into Paragraph 403 of the Consent Decree,[308] which deals with the PIB investigation itself, not with the subsequent approval process. Second, and perhaps more importantly, the City's reading would introduce a massive and unfair loophole into the Consent Decree. By the City's reading, there would be no deadline for the conduct of the PIB Pre-Disposition Conference, the Bureau's Pre-Disciplinary Hearing, or the Superintendent's ultimate imposition of discipline.

Such a reading flies in the face of a basic concept of construction. As the Fifth Circuit Court of Appeals has noted, "[a] contract is to be construed as a whole and each provision in the contract must be interpreted in light of the other provisions."[309]

The United States said it well during its closing argument at the hearing:

> The City now says we don't need to impose discipline within 30 days because we can wait an indefinite period of time between disclosure and the superintendent consideration. That is a frustrated reading of paragraph 403, and nowhere in 403 is there room for an indefinite extension of time between closure and the superintendent's consideration. And as Your Honor pointed out, in the Vappie investigation, that resulted in a 97-day gap.
>
> That is also unfair to NOPD officers who await the result of their investigations so they could be promoted, and it's also

---

[306] *Id.*

[307] R. Doc. 752 (Transcript) at 56-58; R. Doc. 752 (Transcript) at 240.

[308] *See* Consent Decree, Section XVII (G) Investigation Timeline.

[309] Allen v. Louisiana, 14 F.4th 366, 371 (5th Cir. 2021) (quoting Baldwin v. Bd. of Sup'rs for Univ. of La. Sys., 2014-0827, p. 7 (La. 10/15/14), 156 So. 3d 33, 38); *See also*, La. Civ. Code art. 2050 ("Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.")

> unfair to the complainants, the people and the public who
> deserve an outcome. . . .[310]

The Court agrees with the United States. Under the City's interpretation, the NOPD could leave officers with a sustained finding hanging over their heads like the sword of Damocles for months or even years. This is unfair to officers, unfair to the public, and certainly not a reading consistent with the purpose of the Consent Decree.

This does not mean the Court is insensitive to witnesses' testimony that it is not practical to expect a complex PIB administrative investigation to go from closing to the imposition of discipline within 30 days.[311] That may be true, but the solution to that problem is to request a modification to the Consent Decree, not to ignore its clear terms.

### 3. Complainants Must Be Notified Within 10 Days Of The Close Of The Investigation.

The Consent Decree requires that complainants be notified of the outcome of the investigation prompted by their complaint within 10 days of the closing of PIB's investigation.[312] The City concedes it did not notify Mr. Zurik or Dr. Gallagher in the Officer Vappie matter.[313] More broadly, the City also concedes it historically has not complied with its notification obligations.[314]

With respect to the Officer Vappie investigation, the City's witnesses contend there was no complainant to notify since the matter was "rank initiated."[315] As a purely technical matter, the City is correct that there is no complainant to notify in a rank-

---

[310] R. Doc. 752 (Transcript) at 288.
[311] R. Doc. 752 (Transcript) at 57-58 (Court noting that "Whether the 30 days is reasonable or not, that you can discuss with the parties, and you all might agree to change that date; but, that's a different issue from what the language means.").
[312] Consent Decree Paragraph 420.
[313] R. Doc. 752 (Transcript) at 110. According to the City, there was no complainant to notify as the matter was "rank initiated."
[314] R. Doc. 697 at 5-6.
[315] R. Doc. 752 (Transcript) at 119, 123, and 194-195.

initiated complaint. The City's position is based on the difference between a complaint from a citizen made directly to PIB versus a letter from a citizen to the City that alleges misconduct and is subsequently forwarded to PIB. Nevertheless, in this case, the Court is not persuaded by the City's reasoning because there was a complainant, Lee Zurik.

The Consent Decree makes clear NOPD is required "to accept all misconduct complaints, including anonymous and third-party complaints, for review and investigation."[316] The source of the complaint is not relevant. The City's witnesses conceded an email may constitute a complaint.[317] In this case, the City, and subsequently PIB, received correspondence from a Fox8 journalist that alleged several instances of misconduct by Officer Vappie.[318] Following receipt of the Fox8 correspondence, a PIB supervisor opened a "rank-initiated" investigation.[319]

The PIB investigator who opened the Officer Vappie investigation conceded at the hearing that Mr. Zurik's email "gave genesis" to the complaint, "but [Mr. Zurik] did not make a complaint."[320] The Court views this as splitting hairs. Regardless of the subject line of Mr. Zurik's correspondence or the label placed upon it by the City, PIB knew full well that the email amounted to a complaint and that it had been initiated by a citizen, albeit a citizen who is an investigative reporter. It would have taken little effort to apprise Mr. Zurik of the status of his complaint as contemplated by Paragraph 420 of the Consent Decree. PIB, however, made no effort to keep Mr. Zurik, the complainant, apprised of the status.

---

[316] Consent Decree Paragraph  389.
[317] R. Doc. 753 (Transcript) at 43, 52; R. Doc. 754 (Transcript) at 68.
[318] R. Doc. 747-1 at 10-13.
[319] *See* R. Doc. 747-1 at 1 (the "R" in PIB CTN# 2022-0513-R indicated a rank-initiated complaint).
[320] R. Doc. 752 (Transcript) at 97 and 111.

The Court would understand if PIB simply made a mistake here due to the atypical vehicle of Mr. Zurik's complaint (i.e., the complaint coming in as a media request versus a typical complaint). But the City has not conceded it made a mistake. To the contrary, the City contends it did the right thing by labeling the complaint as rank-initiated and not keeping Mr. Zurik apprised. Apparently, the City intends to follow the same approach into the future. Moreover, the failure to keep the complainant advised is not an isolated incident. In its May 3, 2023 Special Report on PIB, the Monitor explained its recent audit of PIB's compliance with Paragraph 420 of the Consent Decree as follows:

> To assess compliance with Paragraph 420, the Monitoring Team audited a sample of 2022 and early 2023 administrative investigations with a specific focus on start and end dates, and the dates correspondence with shared with the complainant. Our audit revealed that NOPD is NOT yet in compliance with its Paragraph 420 obligations. Specifically, in 10% of the cases we reviewed, the complainant was not kept informed of the investigation process or progress. Further, in 24% of the cases we reviewed, the complainant was not informed of the result of the investigation within 10 days of the conclusion of the investigation.[321]

While the City asserts there was no violation in the context of the Officer Vappie investigation (for the reasons cited above), neither the City nor its witnesses take issue with the Monitor's overall finding of ongoing noncompliance more generally.

In summary, the Court finds the City has not presented evidence contradicting the Monitor's and DOJ's assertions that the City violated paragraph 403 and 420 in the context of the Officer Vappie investigation, and the City continues to be in non-compliance with both paragraphs more generally.

---

[321] R. Doc. 694 at 32 (Ex. 25).

### 4. The Superintendent is Required to Sign the PIB Investigation Report.

In its initial analysis of the PIB investigation of Officer Vappie, the Monitor commented that "Deputy Chief Sanchez and Interim Superintendent Michelle Woodfork reviewed and concurred with the investigators' findings on March 16, 2023, as reflected in the signature block of the PIB report . . . ."[322] NOPD took issue with this comment, noting that, despite a signature appearing on the Superintendent's signature line of the PIB investigation report, the Superintendent did not review or sign the report.[323] NOPD explained it this way:

> This recommendation form/document allows for two final signatures, the Deputy Superintendent of the Public Integrity Bureau and the Superintendent of Police. As a matter-of-sequence, the Deputy Superintendent signs in their official capacity, and then signs "for" the Superintendent. While this practice is loosely described in old policies and is subject to various interpretations, we are reviewing to determine its utility at this stage. However, in the Officer Vappie investigation, this process was continued.[324]

NOPD goes on to assert that "Superintendent Michelle M. Woodfork did not review this investigation, nor did she sign acknowledging that she did at this phase."[325]

This practice, which according to NOPD, is "loosely described in old policies and is subject to various interpretations," and apparently been going on for years,[326] runs afoul of the Consent Decree and of NOPD's own policies.

---

[322] R. Doc. 694 at 15 (Ex. 25).
[323] R. Doc. 714-6 at 4.
[324] *Id.*
[325] *Id.*
[326] R. Doc. 754 (Transcript) at 149.

The Monitor described it this way in its Special Report on the Officer Vappie investigation:

> Consent Decree paragraph 416 provides as follows:
>
> 416. The PIB commander shall accept the investigator's recommended disposition **and the Superintendent shall approve the disposition**, unless the disposition is unsupported by a preponderance of the evidence or additional investigation is necessary to reach a reliable finding. Where the disposition is unsupported by a preponderance of the evidence, the PIB Commander may correct the disposition or order additional investigation, as necessary.
>
> Consent Decree ¶416 (emphasis added). This clear statement is consistent with NOPD's misconduct investigation policy 52.1.1, paragraph 105 of which states the following:
>
> 105. The report shall conclude with the following format for each person in the investigator's chain of command, **up to and including the Superintendent of Police**:
>
> CONCUR   I DO NOT CONCUR   Date:_____
>
> _____
>
> [rank and name of person in chain of command] [title and/or place of assignment]
>
> The date alongside each signature will be the date the reviewer signed the document, not the date appearing at the top of the report.
>
> NOPD Policy 52.1.1 at §105 (emphasis added).
>
> The "up to and including" language is clear. But even if it were not clear, paragraph 136 of the same policy makes the same point:
>
> 136. Once the Deputy Superintendent of PIB has approved the disposition of an investigation conducted by PIB, **the investigation disposition shall be transmitted to the Superintendent of Police for review and final approval**. For those investigations conducted by a bureau other than PIB, the Deputy Superintendent of PIB's review concludes the investigation.

> Id. at §136 (emphasis added). Nothing in Policy 52.1.1 is unclear. And even if there were, as NOPD suggests, "old policies" "subject to various interpretations" that "loosely describe" NOPD's current practice of the superintendent not reviewing and signing PIB reports, such policies clearly have been superseded by the Department's current policy, which was reviewed and approved by the Monitoring Team and the DOJ.[327]

The Court agrees with the Monitor's identification and reading of the relevant Consent Decree provisions and NOPD policies. NOPD's current practice clearly does not comport with the Consent Decree or with current policy.

The Court recognizes, though, that the current NOPD practice has been in place for years[328] without, as far as this Court can tell, complaint from the Monitor, the OIPM, or the DOJ. While that does not excuse a non-compliance by NOPD, it does suggest that perhaps the current *practice* is more sensible than the current policy.

The Consent Decree provides a vehicle for modifying policies and the Consent Decree itself.[329] The Court recommends NOPD avail itself of that process promptly. If the City can show that a different process from the one set forth in the Consent Decree (and NOPD policy) better serves the needs of the NOPD and the community, this Court is confident the City will find a receptive ear in the Monitor, the DOJ, and the OIPM.[330]

## CONCLUSION

The City violated the Consent Decree in the course of the Officer Vappie investigation. The City also has failed to show cause why it should not be found to have

---

[327] R. Doc. 714 at 13 (Ex. 26).
[328] *See, e.g.,* R. Doc. 752 (Transcript) at 165.
[329] Consent Decree Paragraph 487.
[330] To the extent the City does move this Court to modify the Consent Decree to change the timing of the Superintendent's review and signature, the City should note that an exception must be made for cases of serious misconduct, which pursuant to Paragraph 454 of the Consent Decree require earlier Superintendent involvement than in more routine matters.

violated Paragraphs 399, 415, 414, 413, 454, 470, 472, 409, 419, 306, and 313 of the Consent Decree having to do with the conduct of PIB investigations and Paragraphs 403 and 420 regarding timeliness of investigations, imposition of discipline, and notification of complainants.

The Court recognizes, however, that the City recently supplemented its prior filings with a detailed and thoughtful Remedial Action Plan to remedy the violations found by the Court prepared by newly confirmed Superintendent Anne Kirkpatrick. The Court commends the Department for taking that step. Accordingly, the Court will defer its ruling on the imposition of sanctions on the City for its violations of the paragraphs of the Consent Decree noted above to give the City and NOPD an opportunity to remedy the violations, as it now promises to do.

The City is ordered to file in the record a monthly report, starting December 1, 2023, on its progress on the Remedial Action Plan.

**New Orleans, Louisiana, this 2nd day of November, 2023.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**