**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

      **v.**
                               **CIVIL ACTION NO.**
                               **12-1924-SM-DPC**

**CITY OF NEW ORLEANS,**                  **SECTION: "E" (2)**

      **Defendant.**

# Report of the Consent Decree Monitor
# For the New Orleans Police Department Consent Decree
# Covering the First Quarter of 2024
# Released July 3, 2024



# Report of the Consent Decree Monitor
# For the New Orleans Police Department Consent
# Decree Covering the First Quarter of 2024
# Released July 3, 2024

**Office of the Consent Decree Monitor**
**New Orleans, Louisiana**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana



## WHAT'S IN THIS REPORT?



**Office of the Consent Decree Monitor**

**July 3, 2024**

### WHAT WE DID THIS PERIOD

- Participated in multi-day on-site meetings with NOPD, DOJ, and OIPM
- Reviewed and provided feedback on various NOPD Policy Chapters
- Prepared for and participated in the February 21, 2024 Consent Decree Status Conference
- Prepared for and participated in the March 21, 2024 Public Hearing – Update on Stops, Searches, and Arrests
- Provided technical support to NOPD related to the forthcoming Professional Standards and Accountability Bureau (PSAB) audit of Public Integrity Bureau (PIB) administrative case files
- Reviewed NOPD's use of Limited English Proficiency (LEP) Phones
- Attended Use of Force Report Board (UFRB) hearings
- Observed and reviewed NOPD's canine training
- Conducted a spot check of the Crisis Intervention Team (CIT)
- Conducted a spot check of the Child Abuse Unit
- Began a review of gun-related arrests during Mardi Gras
- Began a review of unreported uses of force

### WHAT WE FOUND

- Although NOPD lost a certified canine instructor, a replacement is being certified.
- NOPD reviewed the two out-of-policy canine bites and recommended changes to reduce the likelihood of recurrence.
- The Department has continued to hold regular UFRB hearings and we have been impressed with the thoughtful discussions in Q1.
- While the availability of LEP phones is high, the usage is low and there are a high number of associated "gone on arrivals" (GOAs). We will review this more closely in Q2.
- NOPD is continuing to do remarkably well with responding to persons in mental health crisis. Additionally, based on our review, we believe the PSAB CIT audit is accurate.
- Based on our review, we do not have any concerns with the accuracy of the PSAB Child Abuse Unit audit and we do not have any substantive concerns with the Child Abuse Unit.



| | NEXT QUARTER FORECAST |
|---|---|
| | • Report on May public Court Hearing on Bias Free Policing |
| | • Finalize and report on review of gun-related arrests during Mardi Gras |
| | • Finalize and report on review of unreported uses of force |
| | • Conduct a follow-on review of LEP phone usage and related GOAs |
| | • Audit Performance Evaluations |
| | • Review the Department's Recruitment efforts |
| | • Monitor certain PIB investigations subject to CD ¶ 454 |
| | • Review new materials for Captains' and Majors' promotions exams |
| | • Work with NOPD to Improve PCAB performance |



## I.      CONSENT DECREE AUTHORITY

"The Monitor shall file with the Court quarterly written, public reports covering the reporting period that shall include:

> a) A description of the work conducted by the Monitoring Team during the reporting period;

> b) A listing of each [Consent Decree] requirement indicating which requirements have been: (1) incorporated into implemented policy; (2) the subject of sufficient training for all relevant NOPD officers and employees; (3) reviewed or audited by the Monitoring Team in determining whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitoring Team to have been fully implemented in practice;

> c) The methodology and specific findings for each audit or review conducted, redacted as necessary for privacy concerns.  An unredacted version shall be filed under seal with the Court and provided to the Parties.  The underlying data for each audit or review shall not be publicly available but shall be retained by the Monitoring Team and provided to either or both Parties upon request;

> d) For any requirements that were reviewed or audited and found not to have been fully implemented in practice, the Monitor's recommendations regarding necessary steps to achieve compliance;

> e) The methodology and specific findings for each outcome assessment conducted; and

> f) A projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the [Consent Decree]."

**Consent Decree Paragraph 457**



## II.     NOTES

"The Monitor shall be subject to the supervision and orders of the [United States District Court for the Eastern District of Louisiana], consistent with [the Consent Decree]. The Monitoring Team shall only have the duties, responsibilities, and authority conferred by [the Consent Decree]. The Monitoring Team shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent."

**Consent Decree Paragraph 455**



## III.    TABLE OF CONTENTS

# Contents

I.      CONSENT DECREE AUTHORITY ......................................................................... 3

II.     NOTES ................................................................................................................ 4

III.    TABLE OF CONTENTS ....................................................................................... 5

IV.     GLOSSARY OF ACRONYMS ............................................................................. 7

V.      INTRODUCTION TO QUARTERLY REPORT ..................................................... 9

VI.     SUMMARY OF FIRST QUARTER MONITORING ACTIVITIES ........................ 11

VII.    CONSENT DECREE REQUIREMENTS – COMPLIANCE STATUS ................... 13

  A.    Policies ........................................................................................................ 13

  B.    Training ....................................................................................................... 13

  C.    Implementation .......................................................................................... 14

VIII.   AUDITS/REVIEWS, FINDINGS, AND RECOMMENDATIONS ......................... 15

  A.    Use of Force ............................................................................................... 15

    1.    Review of NOPD Annual Report .......................................................... 15

    2.    Use of Canines ..................................................................................... 15

    3.    Use of Force Review Board .................................................................. 16

  B.    Stops, Searches, and Arrests (SSA) ......................................................... 16

  C.    Bias Free Policing ...................................................................................... 17

    1.    May and June Public Hearings ............................................................ 17

    2.    Limited English Proficiency (LEP) Telephonic Translation Services ........... 17

    3.    Gun-Related Stops, Searches, and Arrests During Mardi Gras ........... 19

  D.    Crisis Intervention Team (CIT) Spot Check ............................................... 20

  E.    Gender Bias – Child Abuse Spot Check .................................................... 20

  F.    Status of PIB Remedial Measures ............................................................. 21

  G.    GOA Status Report .................................................................................... 21

  H.    Community Policing .................................................................................... 22

  I.    Transparency .............................................................................................. 22

IX.     CONCLUSION .................................................................................................... 25



X.    APPENDICES...................................................................................................................26

A.    Appendix A – Community Q&A............................................................................27



## IV.    GLOSSARY OF ACRONYMS

| | |
|---|---|
| "ASU" | Administrative Services Unit |
| "AUSA" | Assistant United States Attorney |
| "AVL" | Automatic Vehicle Locator |
| "BWC" | Body Worn Cameras |
| "CIT" | Crisis Intervention Team |
| "CCMS" | Criminal Case Management System |
| "CD" | Consent Decree |
| "CIT" | Crisis Intervention Team |
| "CODIS" | Combined DNA Index System |
| "ComStat" | Computer Statistics |
| "COCO" | Community Coordinating [sergeants] |
| "CPI" | California Psychological Inventory |
| "CSC" | Civil Service Commission |
| "CUC" | Citizens United for Change |
| "DA" | District Attorney |
| "DI-1" | Disciplinary Investigation Form |
| "DOJ" | Department of Justice |
| "DV" | Domestic Violence |
| "DVU" | Domestic Violence Unit |
| "ECW" | Electronic Control Weapon |
| "EPIC" | Ethical Policing is Courageous (NOPD peer intervention program) |
| "EWS" | Early Warning System |
| "FBI" | Federal Bureau of Investigation |
| "FIT" | Force Investigation Team |
| "FOB" | Field Operations Bureau |
| "FTO" | Field Training Officer |
| "GOA" | Gone on Arrival |
| "IACP" | International Association of Chiefs of Police |
| "ICO" | Integrity Control Officers |
| "IPM" | Independent Police Monitor |
| "KSA" | Knowledge, Skill and Ability |
| "LEP" | Limited English Proficiency |
| "LGBT" | Lesbian, Gay, Bisexual, and Transgender |
| "MMPT" | Minnesota Multiphasic Personality Inventory |



| | |
|---|---|
| "MOU" | Memorandum of Understanding |
| "NNDDA" | National Narcotics Detection Dog Association |
| "NOFJC" | New Orleans Family Justice Center |
| "NOPD" | New Orleans Police Department |
| "NPCA" | National Police Canine Association |
| "OCDM" | Office of Consent Decree Monitor |
| "OIG" | Office of Inspector General |
| "OPSE" | Office of Public Secondary Employment |
| "PIB" | Public Integrity Bureau |
| "POST" | Police Officer Standards Training Counsel |
| "PSAB" | Professional Standards and Accountability Bureau |
| "PsyQ" | Psychological History Questionnaire |
| "QOL" | Quality of Life [officers] |
| "RFP" | Request for Proposal |
| "SA" | Sexual Assault |
| "SART" | Sexual Assault Response Team |
| "SOD" | Special Operations Division |
| "SFL" | Supervisor Feedback Log |
| "SRC" | Survey Research Center |
| "SUNO" | Southern University of New Orleans |
| "SVS" | Special Victims Section |
| "UNO" | University of New Orleans |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |
| "VAW" | Violence Against Women |



## V.      INTRODUCTION TO QUARTERLY REPORT

The Monitoring Team began this year, as we have done in past years, by convening with the DOJ, the NOPD, and the City to (i) assess the state of NOPD's progress toward compliance with its obligations under the Consent Decree, (ii) identify what remains to be accomplished, and (iii) develop an agreed upon plan for progressing to full and effective compliance. Over the course of two days, the participants engaged in a section-by-section compliance evaluation. We also broke into smaller working groups to focus on specific needs the evaluation revealed. Superintendent Kirkpatrick and her Command Staff attended and fully participated. The Superintendent  stepped away infrequently, and only when her other public safety responsibilities required it. The OIPM attended as well. Judge Morgan also participated in several of the sessions.

The meetings were constructive and productive. We were pleased that NOPD continues to work diligently to achieve full and effective compliance. While we had seen slippage in some Consent Decree sections in 2023, the backsliding seems to have ended and most of the prior deficiencies remedied. Consequently, we are pleased that the previous backsliding did not require us to change the compliance status of any areas previously moved "into the green."[1] As a  result of these meetings, the Monitoring Team can say with confidence that we see light at the end of the tunnel. (This sentiment was echoed by Judge Morgan in her closing remarks at the recent SSA court hearing.) The meetings enabled the Monitoring Team and the parties to develop a consensus as to the state of NOPD's compliance and what will be required to complete the job and move into the Sustainment Period.

There are two areas that have not yet been moved "into the green," Stops, Searches, and Arrests (SSA) and Bias-Free policing. These two areas are closely-related. For example, our SSA audits include questions designed to identify potential bias. As discussed in this Quarterly Report, the Court held a two-part hearing on Bias Free Policing. (The first part of that hearing was held in mid-May and the second part was held in early June, both of which are outside the time period covered in this report but will be addressed in our Q2 report). The Monitoring Team believes these last two sections are on track to be moved into the green in the near future.

Of course, as we have previously said, the fact that the Monitoring Team believes an area is "in the green" does not mean that issues, including potentially serious issues, will not arise from time to time. Perfection is not and can never be the compliance standard. Rather, the requirement and expectation is that NOPD recognize the likelihood of non-compliance, and

---

[1]      While the issues was not discussed in terms of "into the green" or "out of the green," we note that the Court did expressly find that the NOPD violated multiple provisions of the Consent Decree in its November 2, 2023 ruling relating to PIB.



identify and correct failures when they occur. Recent facts demonstrate that NOPD is meeting that standard.

Looking ahead to the next six months, we will be preparing for the NOPD to achieve the initial compliance milestone; full and effective compliance. That milestone, once achieved, will begin the two-year period in which the City and NOPD must demonstrate their ability to sustain compliance (the "Sustainment Period"). Preparation for entering the Sustainment Period includes identifying and reaching agreement with NOPD and DOJ on a detailed plan to address specific issues as a condition of an initial compliance determination. Additionally, we will be preparing materials and information to review with the public to explain why a finding of full and effective compliance is warranted. We have heard the concerns from some New Orleanians that the  NOPD has not changed sufficiently to find it compliant with the Consent Decree. We hope that the information we present will assure them that a compliance determination is warranted and give them confidence that compliance will be sustained. Of course, only Judge Morgan can make the full and effective compliance determination and we expect that she will hold a hearing before making that finding.

The NOPD deserves great credit for its ongoing commitment to becoming a model for constitutional, safe, and effective policing practices, including its commitment to overcoming some of the challenges and setbacks it experienced in 2022 and 2023. We are confident NOPD is back on the right track to compliance.



## VI.    SUMMARY OF FIRST QUARTER MONITORING ACTIVITIES

The Monitoring Team spent significant time during the period covered by this Quarterly Report (January 2024 – March 2024) reviewing, auditing, and evaluating multiple areas of Consent Decree compliance. Among other things, the Monitoring Team:

- Organized and participated in a multi-day meeting in New Orleans with NOPD, the DOJ, and members of the Office of the Independent Policy Monitor (OIPM) (January 2024)

- Participated in regular meetings with the parties to review compliance status and NOPD's path to full and sustained compliance (Jan. – Mar. 2024)

- Attended Use of Force Report Board hearings (Jan. – Mar. 2024)

- Provided technical support to NOPD related to the forthcoming PSAB audit of PIB administrative case files (January 2024)

- Conducted a spot check of the Child Abuse Unit (January 2024)

- Prepared for and participated in public court hearing on a comprehensive Consent Decree status update (February 2024)

- Reviewed NOPD's use of LEP Phones (February 2024)

- Conducted a spot check of the Crisis Intervention Team (February 2024)

- Observed and reviewed NOPD's canine training (February and March 2024)

- Prepared for and participated in SSA public court hearing (March 2024)

- Published the 2023 Annual Report (March 2024)

- Began a review of gun-related arrests during Mardi Gras (March 2024)

- Began a review of unreported uses of force (March 2024)

As we have done since our appointment, the Monitoring Team also spent significant time meeting with, and listening to, the parties to the Consent Decree. The Monitoring Team is in regular contact with the City, the NOPD, and the DOJ. We also continue to meet with the NOPD PSAB, the PIB, the NOLA IG, the New Orleans Independent Police Monitor, the New Orleans District Attorney's Office, and various community advocacy groups. A representative list of the



frequently asked questions (FAQs) we received during Q1, along with our responses, are included as **<u>Appendix A</u>** to this Report.



## VII.    CONSENT DECREE REQUIREMENTS – COMPLIANCE STATUS

### A.    Policies

The NOPD continues to develop and publish policies addressing the topics mandated by the Consent Decree. The policies are publicly available on the NOPD's website. The NOPD continues to develop and issue new policies as necessary and appropriate. The Monitoring Team reviews and provides feedback on each policy. For example, this quarter the Monitoring Team provided feedback on Chapter 1.7 Taser Energy Weapon, Chapter 43.4 UAS (drones), Chapter 13.1 Administrative Reassignment, Chapter 52.5 Disciplinary Matrix, and Chapter 16.3 Police Reserve Officer Program, among others.[2]

Additionally, as we noted in our 2023 Annual Report, NOPD has created a policy review panel that will meet monthly, and its members will include representatives from the Education and Training Division, Public Integrity Bureau, Field Operations Bureau, Management Services Bureau, Investigative Support Bureau, Professional Standards & Accountability Bureau, Office of the Superintendent, and Office of the Independent Police Monitor. The panel will review the Department's policies, and discuss the suggested updates, changes, or suggestions for streamlining processes to reduce burdens throughout the Department while maintaining the spirit and the letter of each policy.

### B.    Training

The Department provides training (both in the Academy for new recruits and annual in-service training for officers) as required by the Consent Decree. The Department's 2024 master training plan is available HERE. The Monitoring Team continues to monitor training to ensure it is sufficient to meet the requirements of the Consent Decree and the needs of NOPD members.

NOPD has been "in the green" in this area for some time. PSAB completed its first full audit of the Academy in June 2023. As discussed in our 2023 Annual Report, the PSAB audit found high levels of compliance (i.e., an overall score of 93%). The Department has committed to implementing a corrective action plan intended to address the areas of the audit that found non- compliance. We will monitor these corrective actions going forward to ensure they have been implemented.

---

[2]    Occasionally, policy changes require modifications to the Consent Decree. This occurred most recently in April 2024. The slightly revised Consent Decree is posted on the Court's and the Monitoring Team's websites.



### C.       Implementation

To help NOPD manage implementing the Consent Decree's requirements and tracking compliance status, the Monitoring Team developed and shared with NOPD and DOJ a spreadsheet that tracks the compliance status of each Consent Decree paragraph; and notes the next steps needed for NOPD to come into compliance. A summary version of this Excel spreadsheet is forthcoming and will be posted to the Monitoring Team's website.

The spreadsheet is a valuable compliance management tool, but it is important to understand that it is only a tool to aid the parties and Monitoring Team manage the compliance process. It is a living document that reflects the *Monitoring Team's* assessment of NOPD's compliance at a point in time. Paragraphs can—and do— move into and out of compliance. The spreadsheet does not reflect a compliance finding. Ultimately, regardless of the compliance status reflected in the spreadsheet, whether NOPD has satisfied the terms of the Consent Decree is a legal determination that will be made by Judge Morgan.



### VIII.    AUDITS/REVIEWS, FINDINGS, AND RECOMMENDATIONS

#### A.    Use of Force

##### 1.    Review of NOPD Annual Report

In February 2024, NOPD published its 2022 Use of Force Annual Report.[3] The Monitoring Team reviewed NOPD's report and identified some potential issues including, among other things, an increase in the ratio of the force per arrest and an increase in pointings of firearms by NOPD officers. The Monitoring Team and DOJ have asked NOPD to provide data analysis on the root cause of the increase in force-per-arrest ration. Additionally, the Monitoring Team currently is assessing ways to conduct a spot check of NOPD's 2022 Use of Force Report. Additionally, the Monitoring Team currently is conducting a review of the integrity of NOPD's use of force data, and specifically, whether there are any instances of unreported uses of force by NOPD officers. We expect to publish the findings of this review in our Q3 report.

##### 2.    Use of Canines

The Monitoring Team generally has been impressed with the progress NOPD has made regarding use of canines since the inception of the Consent Decree, but a few issues warrant addressing.

In March, during an on-site visit, the Monitoring Team observed and assessed the NOPD's canine training and related certifications. The Monitoring Team found the last certified canine trainer training was conducted on February 6, 2024. NOPD has confirmed this information is accurate because NOPD no longer has a certified trainer (though a new trainer will be joining NOPD soon and is in the process of getting certified). NOPD has reported it is working diligently to resolve the issue and has contacted outside agencies to attempt to find a solution in the interim. In the meantime, NOPD has continued with weekly supervised maintenance training. We will continue to monitor and report on this important issue.

In January 2024, there were two separate incidents involving canine bites that caused some concern. First, during a search for two carjacking suspects, a canine deployment resulted in a bite of a homeowner who was in a shed on his property. This deployment and bite were reviewed by the Use of Force Review Board (UFRB) as all canine bites are. The Board raised concerns related to the deployment and, as a result, held a separate meeting on-site at the K9 Headquarters in April 2024. Superintendent Kirkpatrick attended the meeting, along with all

---

[3]       DOJ and the Monitoring Team were given time to review and provide feedback on a draft of the report ahead of its publication.



other command staff. The Monitoring Team also attended and found the discussions and demonstrations to be informative and likely to reduce the risk of recurrence.

The second incident involved a bite of a substitute teacher in the carpool lane while an NOPD K9 handler was picking up his son from school in his NOPD K9 vehicle. The substitute teacher opened the rear door of the NOPD vehicle (without realizing the canine was in the vehicle) and the canine bit the substitute teacher. During the associated UFRB hearing,[4] the Board raised several concerns relating to this incident. As a result, NOPD has modified its standard operating procedure (SOP) such that officers are no longer allowed to transport their children in the NOPD K9 vehicles. NOPD also is providing additional "CAUTION K9" decals on the outside of NOPD K9 vehicles.

These issues illustrate that the purpose of a Consent Decree is not to produce the perfect police department. That would be an unattainable ideal. Rather, the purpose of a Consent Decree is to correct past failures, and ensure that consent decree compliance is the rule, deviations the exception, and when deviations occur (as they inevitably will) they are detected and remedied. That is what we have seen with respect to NOPD's canine services. Although NOPD lost a certified canine instructor, his replacement is being certified. NOPD reviewed the two out of policy canine bites and recommended changes to reduce the likelihood of recurrence. The canine unit has demonstrated that consent decree compliance is the rule and that where deviations occur they are detected and remedied.

### 3.    Use of Force Review Board

As noted in our 2023 Annual Report, we previously identified an issue in 2022 relating to NOPD's lack of holding consistent UFRB hearings, which created a backlog of hearings. In our 2023 Annual Report, we were happy to report the Department worked hard to conduct regular UFRB hearings throughout 2023, and cleared the backlog. For the first quarter of 2024, the Department has continued to hold regular hearings, which the Monitoring Team has attended. Overall, we have been impressed with the thoughtful discussions among the Board members, who have been engaged with the dynamics of the cases before them. We will continue to monitor the UFRB hearings and report on our observations.

### B.    Stops, Searches, and Arrests (SSA)

In preparation for the SSA public court hearing that occurred on March 21, 2024, the Monitoring Team participated—along with NOPD and DOJ—in a comprehensive review of NOPD's compliance with the SSA portion of the Consent Decree. We reviewed the Department's

---

[4]        Notably, the NOPD reviewed this matter as a use of force even though the officer did not actually deploy the canine.



holistic approach to SSA compliance, including the Department's policies, training, Field Operations Bureau (FOB) inspections, SSA audits, Field Interview Card (FIC) reviews, process for addressing DA refusals, non-disciplinary corrective actions, and misconduct investigations. NOPD's presentation slides can be found HERE. Following the presentation, Judge Morgan provided her very positive assessment of NOPD's SSA presentation.

### C.  Bias Free Policing

Bias Free is a complex area of the Consent Decree where the Monitoring Team, the DOJ, and the NOPD have worked collaboratively, and NOPD has progressed substantially toward compliance. As discussed in detail in our 2022 Annual Report and 2023 Annual Report, the Department has implemented a number of policies, procedures, and training aimed at prohibiting biased policing.[5] Additionally, NOPD developed an innovative audit tool in conjunction with the Monitoring Team, the DOJ and Dr. Matthew Ross, an outside expert retained by the DOJ. NOPD relied heavily on technical assistance from Dr. Ross to analyze the results from its first audit, and NOPD is now exploring local partnerships so that it can conduct the next Bias Free audit with limited reliance on DOJ or OCDM going forward.

#### 1.  May and June Public Hearings

Much like the March 2024 SSA public court hearing, the Court scheduled public court hearings to hear from the parties and the Monitoring Team regarding the state of NOPD compliance in the area of Bias Free Policing. Although outside the time period covered by this Q1 Report, Part I of the Bias Free hearing was held on May 15, 2024. Part II was held on June 2024. Over the course of these two proceedings, the Department provided a comprehensive presentation to inform the Court and the public about the Department's holistic approach to bias-free policing. As before, the Monitoring Team and DOJ provided their comments and assessment during the hearing as well. The materials from both hearings, as well as a recording of the June hearing, are available on the Court's website (https://www.laed.uscourts.gov/case-information/mdl-mass-class-action/nopdconsent).

#### 2.  Limited English Proficiency (LEP) Telephonic Translation Services

The Consent Decree requires NOPD to "…[E]ffectively communicate with and provide timely and meaningful access to police services to all members of the community, regardless of their

---

[5]        Notwithstanding the positive progress in the area of bias-free policing, the Monitoring Team, DOJ, and the NOPD acknowledge the existence of certain racial disparities that will benefit from further review. For purposes of this report, we define "disparity" as an observed difference in outcome by race regardless of cause, while we define "bias" as a difference in treatment based on race, whether conscious or unconscious.



national origin or limited ability to speak, read, write, or understand English."[6] To meet this requirement, one strategy NOPD uses is the deployment of cellphones to the field to facilitate telephonic translation services for individuals with Limited English Proficiency (LEP). NOPD contracted with Voiance to provide these telephonic translation services to officers in the field, and NOPD demonstrated used of these phones during the public court hearing in February 2024.

In February 2024, the Monitoring Team traveled to randomly selected District Headquarters buildings to assess the status and availability of the LEP phones designated for translation services. The results are summarized in the table below:

| District | Date | Phones Present | Phones Charged | Log Book Updated |
|---|---|---|---|---|
| 1 | 02/23/2024 | Yes | Yes | Yes |
| 2 | 02/23/2024 | Yes | Yes | Yes |
| 6 | 02/23/2024 | Yes | Yes | Yes |
| 8 | 02/22/2024 | Yes | Yes | Yes |

The Monitoring Team also reviewed CAD data for LEP calls for service from September 1, 2022 through August 30, 2023. There were a total of 765 calls for service marked as LEP during the review period. Of those calls, 341 (44.6%) were designated as either a duplicate call, voided call, or GOA.  These calls required no translation services because the caller was not on the scene when the police arrived. The remaining 424 (55.4%) calls were designated as either NAT or RTF, presumably requiring some form of translation services.  Of these 424 calls, 231 (54.5%) involved a bilingual caller and did not require the use of Voiance or an NOPD Authorized Interpreter (NOPDAI). Voiance was used 26 (6.1%) times and an NOPDAI was used 92 (21.7%) times. The remaining 75 (17.7%) either did not have corresponding BWC videos for PSAB to review, or were addressed by other means. Based on our review, only one call that required interpretation did not receive it.

Of the 765 calls for service marked by the Orleans Parish Communications District (OPCD) as LEP, the vast majority, 88.5%, required Spanish language translation. The following chart breaks down the total number of calls by language:

| Language | Number of Calls |
|---|---|
| Arabic | 4 |
| ASL | 6 |
| Chinese | 3 |
| French | 4 |

---

[6]      CD ¶ 189.



| Language | Number of Calls |
|----------|-----------------|
| Hindi | 3 |
| Mandarin | 1 |
| Portuguese | 5 |
| Russian | 2 |
| Spanish | 677 |
| Unknown | 50 |
| Vietnamese | 10 |
| **Grand Total** | **765** |

Although by the end of the review period NOPD had issued nearly 200 telephones to the field for translation services, these phones were utilized only 118 times to access translation services through either Voiance or an NOPDAI.

Our review yielded observations that warrant further investigation. First, the remaining 75 (17.7%) of calls either lacked corresponding BWC videos to review, provided translation services through other means, or were missing sufficient information to assess the type of interpretation utilized. Second, overall usage appears low, but it is difficult to determine the underlying reasons (i.e., whether NOPD officers are not taking advantage of the phones, or whether other factors outside of NOPD's control are the cause). Third, we noted a relatively high number of GOAs on calls requiring interpretation (34.5%). The Monitoring Team will continue our review to attempt to gain insight into these issues, and will report on our findings and associated recommendations in our next quarterly report.

### 3.    Gun-Related Stops, Searches, and Arrests During Mardi Gras

In February 2024, various media outlets released stories about NOPD's gun-related arrests during Mardi Gras. The stories raised concerns related to bias, reporting that those stopped for suspicion of carrying a concealed firearm were overwhelmingly young, black males.

NOPD and the Monitoring Team took these concerns seriously and undertook a multifaceted review of NOPD's gun-related arrests during Mardi Gras 2024. Specifically, NOPD conducted a full audit of the stops, searches, and arrests related to concealed carry incidents that occurred between February 2nd, 2024 and February 13th, 2024, during the Mardi Gras season. Additionally, the Monitoring Team conducted a 100% review of the body worn camera (BWC) footage of the top six officers with the most arrests during the same time (February 2 - February 13, 2024). The Monitoring Team also reviewed a 50% sample of BWC footage of the officers with the highest number of missing FICs to identify potentially unreported stops and searches. We will provide the findings of our reviews in a forthcoming Special Report.



### D.    Crisis Intervention Team (CIT) Spot Check

In January 2024, NOPD's PSAB released its CIT Audit Report, covering the period of May 1, 2023 - October 31, 2023. PSAB randomly selected 5% (109) of the 2,214 reported calls for service with a 103M (mental health crisis) classification in CAD during the audit period. PSAB generally found high levels of compliance in the 17 Audit Checklist questions, with an overall compliance score of 96%.

In February 2024, the Monitoring Team conducted a spot check of NOPD's audit. The Monitoring Team randomly selected a sample of 22 events that were reviewed by PSAB (i.e., 20% of the 109 events audited by PSAB). The Monitoring Team also randomly selected eight cases that were not audited by PSAB to conduct an independent review of the quality and effectiveness of the NOPD's CIT response. In total, the Monitoring Team selected and reviewed 30 CIT events to assess compliance with NOPD's policies and Consent Decree requirements.

For the 22 events that were also reviewed by PSAB, we found six auditor scores (in two events) with which we disagreed.[7] Notably, in four (18%) of the 22 events reviewed, there were no CIT-certified officers on the call. Generally, the non-certified CIT officers responded with empathy and appeared well-trained. There were, however, some safety policy violations for 'failure to search' by both CIT and non-CIT trained officers.

We identified no issues in the eight cases we reviewed that were not audited by PSAB. outside of the PSAB audit. There was one item that had no associated BWC footage. The Monitoring Team will follow-up with a request for documentation and to determine if PSAB can locate a BWC elsewhere (e.g., possibly listed under an incorrect item number).

Overall, the Monitoring Team found the NOPD is continuing to do remarkably well with responding to persons in crisis. In each of the incidents the Monitoring Team reviewed, we found the CIT-trained personnel were professional, empathetic, and used appropriate de-escalation techniques, where necessary. Based on our review, we believe the PSAB audit is accurate, with few minor exceptions (noted above). Additionally, we recommend officers be reminded of the importance of searches and safety precautions for all incidents.

### E.    Gender Bias – Child Abuse Spot Check

In March 2024, NOPD's PSAB published its Child Abuse Unit Audit Report, covering the period from September 2023 - January 2024. PSAB audited 55 of the 554 (10%) case files from the audit review period. PSAB found an overall compliance score of 99.8% and noted only a few

---

[7]    For context, in 22 events, there are a total of 374 auditor scores (17 checklist items for each event), so six incorrect scores is only about 1.6%.



minor deficiencies. It also recommended "Supervisors should address deficiencies with specific training through specific In-service Training classes or Daily Training Bulletins (DTBs). Such training should be reinforced by close and effective supervision in addition to Supervisor Feedback Logs entries."

The Monitoring Team conducted a spot check of 10 (18%) of the 55 cases audited by PSAB. We found all ten cases to be in good order and sufficiently investigated, to the extent possible, based on evidence and victim cooperation. We did not identify any audit deficiencies in the cases we reviewed. Based on our review, we do not have any concerns with the accuracy of the PSAB audit and we do not have any substantive concerns with the Child Abuse Unit.

### F.      Status of PIB Remedial Measures

In mid-2023, the Monitoring Team issued a report on the investigation and disposition of complaints made against Officer Jeffry Vappie arising from his service on the Mayor's Executive Protection detail. The report was followed by a hearing on an Order to Show Cause issued by Judge Morgan at which Judge Morgan found that NOPD had violated the Consent Decree in several respects. Consequently, the NOPD committed to implementing a number of remedial measures. In compliance with Judge Morgan's order, the NOPD has filed with the court monthly status reports on its implementation of the remedial measures. The NOPD has continued to make progress implementing the measures. It has revised policies and procedures in order to address the deficiencies found by the Court as a result of the hearing on the Order To Show Cause. Although outside of the period covered by this Report, a copy of the NOPD's most recent, April, report to the Court on its remedial measures can be found **HERE**.

The Monitoring Team looks forward to NOPD's completion of its promised remedial measures. Relatedly, in this context, we will be reviewing (i) PSAB's forthcoming audit of OPSE (which relates to alleged timecard violations and PIB's investigation thereof); (ii) PIB's investigation into several new matters, including an alleged leak of personal information to the Mayor's office; and (iii) the effectiveness of the Department's efforts to "outsource" certain investigations of high-ranking NOPD officers.

### G.      GOA Status Report

In October 2023, the Monitoring Team issued a Special Report focusing on NOPD deprioritizing calls for service and its impact on "gone on arrival" (GOA) dispositions and "Code 2" response times. As noted in the Special Report, the NOPD recognized similar problems and promptly began instituting a number of corrective actions to address the shortcomings identified in the Special Report.



The Monitoring Team followed the progress of NOPD's corrective actions during January and February 2024. On February 21, 2024, the NOPD presented its progress to the Court at a public hearing, focusing specifically on six efforts aimed at reducing GOAs. These efforts included (1) adding additional officers to the 7th District, (2) expanding the Department's use of reserve officers to cut down on response times, (3) developing new policies and SOPs, (4) employing a wider range of priority signal codes to facilitate a more appropriate triaging of calls for service, (5) returning to "plain talk" on the police radio to better allow for nuanced distinctions in calls, and (6) continuing to look for new ways to expand the use of Alternative Police Response (APR) for eligible calls.

In addition to these steps, NOPD also committed to enhance the way it handles sexual assault and domestic violence calls when the victim is no longer on the scene when the police arrive (i.e., the victim is GOA). NOPD now assigns all sexual assault calls to a detective for investigation regardless of whether the initial call resulted in a GOA. Relatedly, NOPD now ensures all domestic violence calls are followed up by a civilian investigator the next day, again, regardless of whether the initial call resulted in a GOA.

The Monitoring Team continues to review NOPD response to the GOA Special Report and will provide a more detailed update in our Q2 report.

### H.    Community Policing

Earlier this year, the NOPD submitted its Community Engagement and Policing Reports for the first and second quarters of 2023, which can be found HERE. These reports are significantly overdue, which impairs the Monitoring Team's ability to assess the current state of NOPD's community policing activities. Nevertheless, we are currently conducting a spot check of the data reported. We also will be conducting our own audit of NOPD's community engagement activities, focusing on problem solving activities. We expect to report on that audit in our Q3. We also are working closely with NOPD and the Office of the Independent Police Monitor to assess the effectiveness of, and provide technical assistance regarding, the current PCAB structure.

### I.    Transparency

The Consent Decree provides, "To ensure comprehensive, effective, and transparent oversight of NOPD, NOPD and the City agree to develop, implement, and maintain systems that are meant to be sustained after the completion of this Agreement. To facilitate effective and constitutional policing and increase trust between NOPD and the broader New Orleans community, these



oversight systems shall ensure improper incidents, practices or trends are identified and corrected in an equitable and timely manner."[8]

The effect of this requirement is to provide the public with information and data that enables it to monitor the NOPD's performance and hold it accountable long after the Consent Decree ends. This purpose is being achieved.

For example, NOPD posts on its website its Consent Decree-related court filings and required reports, its audits, community policing plans, data reports, Annual Master Training Plan, and other information, such as information regarding its highly successful EPIC[9] program. These reports can be found HERE.

In this quarter, we saw another example of how publicly reported data can empower the public to monitor the activities of the NOPD. In September 2023, the Monitoring Team was contacted by a well-known civil rights attorney on behalf of a sexual assault victims' advocate. The attorney advised us that she and the advocate had observed some discrepancies in NOPD's publicly reported rape data. We reviewed the data and when we could not explain the discrepancies, we put the attorney and the advocate in touch with the Deputy Chief of the NOPD's PSAB. As a result of that meeting, PSAB immediately began looking into the matter.

In March, 2024, NOPD's PSAB reported that the NOPD had determined it had undercounted rape data for 2020 and 2021. The error was due to a shift from the FBI's Uniform Crime Reporting program to the National Incident-Based Reporting System.[10] There were different classifications of rape between state reporting databases and the federal database. It is important to understand that this was a data reporting error, not an investigative error. The alleged rapes were investigated, but the reported data were incorrect. NOPD moved immediately to correct the error. An article describing this issue can be found HERE.

---

[8]      CD at ¶ 109.

[9]      In 2020, with the support of the NOPD, a national program was launched based on NOPD's EPIC active bystandership program. The national program, called the Active Bystandership for Law Enforcement (ABLE) Project, is now in almost 400 law enforcement agencies across the U.S. NOPD is an ABLE agency. As a recognition of the critical role NOPD's EPIC program played in the launch of the ABLE Project, NOPD was permitted to continue to call its program EPIC. Notwithstanding the historic name, NOPD has committed to adhere to the national ABLE standards.

[10]     We note that we (and NOPD) continue to await details on the replacement of the now-cancelled Hexagon record keeping system.



That public watchdogs were able to use NOPD's reported data to identify a problem, and prompt the NOPD to investigate and fix the problem, demonstrates the importance and benefit of NOPD's public reports, data, and information.



## IX.    CONCLUSION

NOPD has positioned itself well to achieve Full and Effective Compliance with its Consent Decree obligations, which we believe will trigger the two-year Sustainment Period, in the near future. The Department's disciplined attention to the lingering shortcoming in the area of SSA allowed the NOPD to demonstrate its progress in complying with that section earlier this year, leaving Bias Free Policing and the PIB remedial measures plan as the primary outstanding areas of the Consent Decree. The Department, however, has shown the same dedication to achieving compliance with the Bias Free Policing section of the Consent Decree as it did with the SSA section, which has led to equally encouraging results. Although there still is need for progress on some specific Consent Decree requirements in a few areas, such as the structure and effectiveness of PCABs, we expect that with equally focused attention these areas will be addressed in short order.

Because of this accelerated progress on the part of the NOPD, the parties and the Monitoring Team have begun working on a draft Sustainment Plan, which will guide the parties and the Monitoring Team through the next phase of the Consent Decree during which NOPD has the opportunity (and the obligation) to demonstrate that its reforms are durable; and that they will be sustained with less active technical assistance and monitoring. The Monitoring Team commends the men and women of the NOPD for the work they have put into bringing the Department to this point.



## X.    APPENDICES



## A.      Appendix A – Community Q&A

The Monitoring Team and the Court receive questions and comments from community members from time to time. We review all communications and where an issue of general public interest is involved (as compared to a specific question relating to a specific individual), we do our best to answer those questions in our various public reports. The questions and answers below are illustrative of the communications received during the first quarter of 2024.

**Q. There were two canine incidents in January of this year. Does this indicate NOPD is no longer complying with the Consent Decree?**

A. No. The NOPD continues to run a canine program that meets the requirements of the Consent Decree. The two incidents are discussed in greater detail in this Quarterly Report. Suffice it ~~here~~ to say neither incident indicates that the NOPD's canine program is not compliant with the Consent Decree.

**Q. Why does the Monitoring Team not make themselves available for radio and/or newspaper interviews as a means of providing the public more current information regarding the Consent Decree and NOPD's compliance?**

A. The Consent Decree (Paragraph 462) prohibits the Monitoring Team from making statements to the press other than in the context of a public meeting where press questions are answered just as any other community questions are answered. However, the Monitoring Team believes that such outreach would benefit the public, the NOPD, and the Consent Decree process generally. The City and the DOJ would have to agree to a modification to the Consent Decree to make this to happen. We suspect the Court would be amenable to such modification as it has to most every modification proposed jointly by the parties to date.

**Q. It seems like the Court and the Monitoring Team are rushing to find the NOPD in compliance with the Consent Decree and move them into the Sustainment Period. Why?**

A. Neither the Court nor the Monitoring Team is rushing to find NOPD in compliance or start the Sustainment Period. The fact is that NOPD has spent more than 10 years building a constitutional organization and its efforts are paying off. The Department now has first class policies, meaningful training, highly improved supervision, and a credible accountability / discipline system. It must be kept in mind that the purpose of a Consent Decree is not to replace the police department or the local oversight mechanisms. The purpose of the Consent Decree is to build durable structures that promote constitutional public safety and law enforcement. While the process no doubt was an arduous and time-consuming one, the NOPD is close to meeting its current obligations under the Consent Decree, which, upon a finding the District Court, allows it to move in the two-year Sustainment Period.



**Q. The PCABs are not working. What is the Monitoring Team doing about that?**

A. Prior to the institution of the Consent Decree, the City and the NOPD established two structures to increase the community's voice in law enforcement affairs. First, in 2008, the City established the Office of the Independent Monitor, an independent local oversight office charged with providing accountability ~~for~~ and oversight of the New Orleans Police Department. Second, also prior to the institution of the Consent Decree, the City created its Police Community Advisory Boards (PCABS). The stated purpose of the PCABS is to "create the framework for a public participation plan with the NOPD to engage in a collaborative problem-solving process that supports both the community and the police desire to enhance public safety." The Consent Decree explicitly recognizes "that NOPD and community representatives have acted jointly to create a PCAB to facilitate regular communication and cooperation between the Department, the City, and community leaders, including youth leaders, such as through the development of a community advisory panel and the collaborative development of policing strategies and priorities."

The Consent Decree further notes that the NOPD agreed "to work collaboratively with PCAB to develop and implement public safety strategies that respect and reflect each community's public safety priorities and concerns about particular police tactics. Notwithstanding these commendable goals, the Monitoring Team has reported multiple times over the years that the PCABs are not operating as intended. Accordingly, the Monitoring Team has re-energized its effort to work with the NOPD, the DOJ, and the OIPM to strengthen the PCABs' performance. We are hopeful we will be in a position to report further on this effort in the next quarterly report.

**Q. I read that a very high percentage of firearms-related stops during Mardi Gras involved young Black males. This seems like bias to me. Is the Monitoring Team looking into this?**

A. The Monitoring Team, the DOJ, and the NOPD all recognize the disparity in the Mardi Gras gun stops data. Disparity, however, does not always signal bias. But it does signal a need for further analysis. Accordingly, the Monitoring Team, the DOJ, and the NOPD PSAB undertook a joint analysis of the Mardi Gras stops, seizures, and arrests earlier this year. The analysis involved both qualitative and quantitative assessments. We are hopeful to issue a Special Report on the issue in July.