UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CIVIL ACTION NO. 2:12-CV-01924** |
| **Plaintiff,** | |
| **V.** | **SECTION E JUDGE SUSIE MORGAN DIVISION 2 MAG. DONNA PHILLIPS CURRAULT** |
| **CITY OF NEW ORLEANS,** | |
| **Defendant.** | |

## UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION TO BEGIN SUSTAINMENT PERIOD AND APPROVE SUSTAINMENT PLAN

Plaintiff United States of America (United States) joins Defendant City of New Orleans (City) to move this Court to find that the City has achieved compliance sufficient to begin the sustainment period under Paragraph 491 of the Consent Decree (Decree) and approve the proposed Sustainment Plan submitted by the Parties. This Court should approve the Joint Motion and begin the sustainment period because: (1) the City has achieved compliance sufficient to enter the sustainment period as set forth by Paragraph 491 of the Decree; (2) the Sustainment Plan addresses the discrete remaining tasks and provides a mechanism for the City to demonstrate compliance for the required two years; and (3) the Sustainment Plan provides safeguards to pause the sustainment period or to remove the City from the sustainment period if the City fails to maintain compliance. Accordingly, this Court should approve the Joint Motion and start the sustainment period as set forth in the Sustainment Plan.

## I.    BACKGROUND

### A.  Investigation and Decree

The United States Department of Justice's Civil Rights Division opened an investigation of the New Orleans Police Department (NOPD) in May 2010 pursuant to the Violent Crime

Control and Law Enforcement Act of 1994, 42 U.S.C. 14141 (recodified at 34 U.S.C. 12601), the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. 3789d, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d–2000d-7.  On March 16, 2011, the United States issued an investigative report, which concluded there was reasonable cause to believe that NOPD was engaging in a pattern or practice of excessive force, unconstitutional stops, searches and seizures, and discriminatory policing in violation of the Constitution and laws of the United States.  The report also identified longstanding deficiencies that caused or contributed to those violations, including deficiencies in NOPD's policies, recruitment, training, supervision, methods for evaluating officers and holding them accountable, and other systems.

Following negotiations with the City, the United States filed a joint motion for entry of a proposed Decree on July 24, 2012; this Court approved and entered the Decree on January 11, 2013.  The Decree provides two paths for its termination:  (1) the City must demonstrate compliance with all material provisions of the Decree; or (2) the City must show "continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures."  Decree ¶ 486, 491, 492.  Under either option, the City must sustain compliance for two years to qualify for termination.  *Id.*  The Decree does not provide for partial termination.

### B.  Implementation of the Decree

From 2012 until 2021, NOPD made meaningful progress in complying with the Decree. Between January 2019 and April 2021, the Court deemed all but two of the 18 substantive sections of the Decree were in "the green," i.e., an informal finding of compliance with the section of the Decree.  Section V – Stop, Search, and Arrest (SSA) and Section VII – Bias-Free Policing were the two sections that had not reached compliance as of April 2021.

In 2022 and 2023, NOPD experienced backsliding in some areas of compliance, particularly Section XVI – Secondary Employment System and Section XVII – Misconduct Complaint Intake, Investigation, and Adjudication.  Nevertheless, in 2022, the City moved to terminate the Decree.  *See* ECF Nos. 629, 698.  The United States filed an opposition to the Motion to Terminate based, in part, on the City's failure to follow the termination procedures set forth in the Decree and the absence of evidence showing sustained compliance with material provisions of the Decree.  ECF No. 682.  This Court has not yet ruled on the Motion to Terminate, but if the Court approves the Sustainment Plan, that will render the City's Motion moot.

During the pendency of the Motion to Terminate, the Monitor issued reports concerning the City's non-compliance with multiple sections of Decree.[1]  One of the Monitor's most significant concerns involved the Decree's accountability provisions (Section XVII) (*see* ECF No. 694) and NOPD's administrative investigation into a high-profile officer (*see* ECF No. 714). Based on the Monitor's concerns, this Court entered an Order to Show Cause as to why the City should not be held to have violated provisions of the Decree concerning the conduct and timeliness of administrative investigations and conducted two hearings.  ECF No. 739, 748, 750. On November 2, 2023, the Court found the City had violated the Decree's accountability provisions, but withheld sanctions; instead accepting an offer from NOPD to voluntarily undertake remedial measures and monthly reporting to the court.  ECF 756.  The City has now implemented the majority of that remedial plan.

This Court conducted a status conference on February 21, 2024, at which the City reported on remedial measures aimed at re-achieving compliance in all areas previously found in

---

[1] *See* ECF 702, ECF 727, ECF 771, ECF 758, ECF 786.

"the green" and laying the foundation for moving the two remaining sections—SSA and Bias Free—into the green.  On March 21, 2024, May 16, 2024, and June 5, 2024, this Court conducted status conferences at which NOPD presented data supporting an "into the green" determination for the SSA and Bias Free sections of the Decree.  The Monitor and the United States also presented at these status conferences, noting NOPD's improved compliance with these sections.

## II.   DISCUSSION

The proposed joint motion is appropriate because:  (1) the City has achieved compliance sufficient to enter the sustainment period as set forth by Paragraph 491 of the Decree; (2) the Sustainment Plan addresses the discrete remaining tasks and provides mechanisms for the City to demonstrate compliance for the required two years; and (3) the Sustainment Plan provides safeguards to pause the sustainment period or to remove the City from the sustainment period if the City fails to maintain compliance.

## A.  The City has achieved compliance sufficient to enter the sustainment period as set forth by Paragraph 491 of the Decree.

The City has achieved compliance sufficient to begin the two-year sustainment period as set forth in Paragraph 491, the Decree's termination provision.  Though the City is in a position to begin the sustainment period, there are some tasks in certain sections that NOPD will complete during the sustainment period for the City to show sustained compliance as required by the Decree.  The Decree must remain in place and the City must fulfill its terms during the sustainment period to ensure that the City has fully remedied the United States' investigative findings that gave rise to the Decree.

Our investigative findings fell into two categories:  (1) patterns or practices of unconstitutional conduct and/or violations of federal law—including (a) use of excessive force,

(b) unconstitutional stops, searches, and arrests, and (c) discriminatory policing, including on the bases of race, gender, and national origin in failing to provide policing to people with limited English proficiency; and (2) systemic deficiencies that cause or contribute to these violations—including (a) failed systems of officer recruitment, promotion, and evaluation, (b) inadequate training, (c) inadequate supervision, (d) ineffective systems of complaint intake, investigation and adjudication, (e) a failed paid detail system, (f) failure to engage in community oriented policing, (g) inadequate officer assistance and support services, and (h) a lack of sufficient community oversight.[2]   The Decree provided remedies for both the unlawful conduct and the underlying systemic deficiencies.   In the following sections, we briefly describe:  (1) the Decree's requirements for each of these areas; (2) the City's efforts to achieve compliance, any slippage in compliance, and efforts to address non-compliance; and (3) the current status of compliance.

**1.  Use of Force**

The Consent Decree requires NOPD to make substantial changes to its use of force practices.  The required changes include updating policies and training on use of force generally, as well as specific guidance on the use of firearms, canines, electronic control weapons, oleoresin capsicum spray, vehicle pursuits, and SWAT teams.  NOPD also had to revise its procedures regarding use of force reporting and investigations, including creating a force investigation team and a force review board.

NOPD first achieved compliance with the Decree's force provisions in 2019.[3]

---

[2] *See* Letter from AAG Thomas E. Perez to Mayor Mitchell J. Landrieu, re Investigation of NOPD, March 16, 2011, at 2-3, available at https://www.justice.gov/sites/default/files/crt/legacy/2011/03/17/nopd_letter.pdf.
[3] "Preparing For Sustainment," U.S. District Court for the Eastern District of Louisiana, Public Proceeding, Loyola University New Orleans School of Law, March 23, 2021, at slide 8, available at https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/Loyola%20Proceeding%20Deck%20-%20March%202021.pdf.

Unfortunately, several deficiencies regarding use of force emerged since then.  These included untimely Use of Force Review Board hearings (which led to a significant backlog of cases), unjustified serious uses of force identified from Use of Force Review Board (UFRB) hearings covering 2021, and unauthorized vehicle pursuits.  Over the past two years, however, the Monitor has found that NOPD has cleared its backlog of UFRB hearings.[4]  NOPD referred all unjustified uses of force from its UFRB hearings to administrative investigations.  NOPD's most recent use of force audit (reporting on 2023 data), conducted pursuant to a protocol approved by the Monitor and United States, found 94% compliance with the Decree's requirements for all levels of use of force.[5]  And, NOPD's use of conductive energy weapons, i.e., Tasers, has been 100% compliant with the Consent Decree in the most recent audit.[6]  Moreover, since entry of the Decree, both NOPD's total uses of force and its serious uses of force have declined:[7]





---

[4] Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Year 2023, Released March 19, 2024, at 15, available at https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/0771%20Annual%20Report%20for%202023.pdf

[5] Use of Force Audit Report, Report # UOF012024, (Data Sample – July 2023 - December 2023), Published June 25, 2024, at 2, available at https://nola.gov/nola/media/NOPD/Consent%20Decree/NOPD%20Audits/Use-of-Force-Audit-Report-Jan-2024-Public_1.pdf.

[6] Conducted Energy Weapon (CEW) Audit Report – Final April 2024, Report # CEW042024, (Data Sample – Nov 2023-Mar 2024), Published: June 18, 202, at 2, available at https://nola.gov/nola/media/NOPD/Consent%20Decree/NOPD%20Audits/CEW-Audit-Report-April-2024-Public.pdf.

[7] Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Year 2023, Released March 19, 2024, at 15, available at https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/0771%20Annual%20Report%20for%202023.pdf.  The Monitor's reports are admissible evidence.  *See, e.g.*, *United States v. Hinds County*, 2022 U.S. Dist. LEXIS 25537, 2022 WL 439481 (S.D. Miss., Feb. 12, 2022) (relying on reports of a monitor jointly selected by the parties to an institutional reform consent decree); *Njones v. Gusman*, No. 12-859, 2014 U.S. Dist. LEXIS 35110 (E.D. La. June 6, 2013) (overruling City of New Orleans' objection to admissibility of a lead monitor's report).

Accordingly, NOPD has achieved sufficient compliance with the Consent Decree's requirements regarding use of force that now merits initiation of the sustained compliance period.

### 2. Stops, Searches, and Arrests (SSA)

The Consent Decree requires NOPD to make substantial changes to SSA practices.  The Decree requires updating policies and training, improving documentation of and review by supervisors of SSA, and annual auditing and reporting on SSA data by NOPD.  Unlike use of force, the Court has not previously deemed SSA in "the green."  Indeed, past NOPD audits did not show full compliance with several of the Decree's SSA provisions, including inadequate justifications for pat-downs, failure to advise people of their *Miranda* rights, and deficient documentation and supervision of stops, searches, and arrests.

This year, however, this Court conducted a hearing in which extensive evidence concerning improved SSA practices was provided.  Recent audits of SSA practices illustrate overall improvements.  For instance, NOPD's 2023 SSA audit—which used a comprehensive protocol approved by the Monitor and DOJ—showed substantial improvement with the Decree's SSA provisions and found an overall 95.4% rate of compliance with the SSA section of the Decree.[8]  More specifically, the audit showed that 93% of pat-downs were justified, *Miranda* warnings were properly given in 97% of incidents reviewed, and officers documented the legal

---

[8] Stops, Searches & Arrest Audit, June 2023 (FOB and ISB), Sample Period June 1st, 2022 – May 31st, 2023, at 2, available at https://nola.gov/nola/media/NOPD/Consent%20Decree/NOPD%20Audits/SSAPJ-June-2023-Audit-Report-Final-Public-Amended.pdf.

basis for their searches in 95% of incidents reviewed.[9]  The Monitor's subsequent spot-check audit verified NOPD's audit scores.[10]

Even with this level of compliance, during the proposed sustainment period, there will be some discrete tasks that NOPD must complete to obtain and demonstrate full and effective compliance.  These tasks include:  improving their District Attorney declination process, institutionalizing a centralized review process for their SSA forms, refining documentation related to consent searches, and providing training on specific SSA protocols.  Even with these remaining tasks to complete, the latest audits indicate that NOPD has achieved a level of compliance with the Decree's SSA provisions sufficient to begin the sustainment period.

### 3.  Bias-Free Policing

The Consent Decree requires NOPD to implement remedies to ensure bias-free policing and also includes remedies designed to ensure that NOPD adequately provides services for people with Limited-English proficiency.  NOPD has created a specific, stand-alone policy on bias-free policing and has integrated bias-free principles in its stops, searches, and arrests, misconduct, supervision, and community engagement policies.  It provides training on these policies as well as specific training on implicit and explicit bias.

Similar to SSA, this Court has not reached an in "the green" finding with the Bias-Free section of the Decree, though NOPD presented this Court with evidence of compliance at the May 16 and June 5, 2024, hearings.  As we identified in our opposition to the Motion to

---

[9] Stops, Searches & Arrest Audit, June 2023 (FOB and ISB), Sample Period June 1st, 2022 – May 31st, 2023 at 20, available at https://nola.gov/nola/media/NOPD/Consent%20Decree/NOPD%20Audits/SSAPJ-June-2023-Audit-Report-Final-Public-Amended.pdf.
[10] Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Year 2023, Released March 19, 2024, at 18, available at https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/0771%20Annual%20Report%20for%202023.pdf.

Terminate, the bias-free and language access audits that NOPD conducted in the past revealed several deficiencies.[11]  NOPD's latest audits, however, have shown substantial improvement.

NOPD's bias-free audit evaluates racial and gender disparities across a range of enforcement activity including SSA, uses of force, misconduct complaints, and response times. In 2021, the United States retained an expert in empirical testing to help NOPD develop and conduct the assessments in their annual Bias-Free Audit.  Through this technical assistance, NOPD analyzed eight different law enforcement actions to determine whether officers' conduct showed disparities consistent with discriminatory policing, including:  (1) the decision to initiate a traffic stop; (2) requiring people to exit their vehicles; (3) pat down searches; (4) uses of force; (5) handcuffing; (6) response times; (7) misconduct; and (8) arrests for sex work offenses.[12]

To evaluate the decision to initiate a traffic stop, NOPD uses a widely accepted method to evaluate racial disparities called the veil-of-darkness test.[13] Applying the test to NOPD data showed a racial disparity in 2016, but not in any other year between 2017-2023.  The audit also includes several hit-rate analyses, including for vehicle exists, pat downs, force, and handcuffing—all of which showed no disparity for minority and Black or African American people since 2021.  The 2022 and 2023 audit found a disparity for females in vehicle exits in all years assessed, in pat downs for several years, and to a lesser degree for use of force.  NOPD has committed to conducting a deep dive into its data to better understand and address this gender disparity.[14]

---

[11] ECF 682 at 20-21.

[12] There were no relevant sex work arrests in 2022 and 2023.  NOPD has represented that there were sex work arrests in 2024 and they will be analyzed in the upcoming 2024 Bias-Free Annual report.

[13] This analysis views stops data both during daylight hours when the race of drivers and occupants are visible to officers before a traffic stop, and during non-daylight hours when they are not.

[14] *See* NOPD's 2022-2023 Bias-Free Policing Annual Report at 16, available at https://nola.gov/nola/media/NOPD/Consent%20Decree/NOPD%20Audits/2022-23-Bias-Free-Policing-Annual-Report.pdf.

NOPD's response times analysis has shown disparities when comparing majority Black or African American neighborhoods to majority white neighborhoods since 2021.  In 2023, the response times were slower by two minutes for "Code 2" (i.e., priority response) calls and 42 minutes for "Code 1" calls when comparing majority Black neighborhoods to majority white neighborhoods.  NOPD has been exploring ways to balance response times, and, over the past year, it has piloted adding a new platoon to one of its busiest districts during peak service times.  Looking at data from January to May 2024, Code 1 and Code 2 response times were faster when the additional platoon was working in the district.  NOPD has committed to evaluating whether it can add a new platoon to other districts and also exploring other workload balancing strategies.[15]  With respect to misconduct allegations, NOPD found that complaint investigations were more likely to be completed on time when the majority of accused officers were Black or African American than when the majority of accused officers were white in 2022.  NOPD will be monitoring the timeliness of these investigations to determine whether corrective action is needed.   Taken together, these analyses show that some disparities have been remedied while other still persist.  NOPD has committed to further investigate the cause of existing disparities and take ongoing remedial steps during the sustainment period.

With regard to language access, the Decree requires that NOPD provide timely and meaningful access to police services to all members of the community, regardless of their national origin or limited ability to speak, read, write, or understand English.  The Decree's language access remedies are intended to address the United States' Title VI findings.  At this point, NOPD has translated key policies and forms into Spanish and Vietnamese (two of New

---

[15] *See* NOPD's 2022-2023 Bias-Free Policing Annual Report at 20, available at https://nola.gov/nola/media/NOPD/Consent%20Decree/NOPD%20Audits/2022-23-Bias-Free-Policing-Annual-Report.pdf.

Orleans' commonly spoken languages besides English), increased the number of their certified Spanish and Vietnamese interpreters, rolled out a smart phone application to enable telephone translation in the field, and created a Language Access Plan that requires the Department to periodically assess the translation services needed throughout the city.

NOPD's latest language access audit also shows positive results.  NOPD has increased responses to calls for service in which interpretation is provided from 63% in 2021 to 79% in 2023.[16]  NOPD also has decreased its response times for calls for service coded as needing LEP (Limited English Proficiency) services.[17]  During interrogations, NOPD has a 100% compliance rate in providing interpretation for individuals with limited English proficiency.[18]  Though the rate of providing interpretation is not as high as the compliance rates that the Monitor and the United States have expected in other areas of the Decree moved to "green," NOPD has improved interpretation services and must continue to do so during the sustainment period—and now has more smart phones available to officers so that they can access the telephonic translation application in the field.  Accordingly, the City has reached a sufficient level of compliance with the Decree's language access provisions to begin the two-year sustainment period.

### 4.  Crisis Intervention Team (CIT)

The Decree requires NOPD to create a CIT program with specially trained CIT officers to minimize the necessity for the use of force against individuals in crisis.  NOPD has been in

---

[16] NOPD Bias-Free Policing Analysis presentation slides, June 5, 2024, at slide 54 available at https://www.laed.uscourts.gov/sites/default/files/pdfs/6524_Additional_Materials.pdf.

[17] Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Year 2023, Released March 19, 2024, at 24, available at https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/0771%20Annual%20Report%20for%202023.pdf.

[18] NOPD Bias-Free Policing Analysis presentation slides, June 5, 2024, at slide 55, available at https://www.laed.uscourts.gov/sites/default/files/pdfs/6524_Additional_Materials.pdf.

compliance with the Decree's CIT provisions since 2019.[19]  In our opposition to the Motion to

Terminate, we did not identify any non-compliance or concerns with whether NOPD had

maintained compliance in this area, and the Monitor did not identify any concerns in its reports.

Most recently, the Monitor has found that "NOPD is continuing to do remarkably well with

responding to persons in crisis," and that "CIT-trained personnel were professional, empathetic,

and used appropriate de-escalation techniques, where necessary."[20]  In fact, the City has

exceeded the requirements of the Decree's CIT remedy by developing a Mobile Crisis

Intervention Unit (MCIU) that handles calls in place of NOPD or as a co-responder with

NOPD.[21]  MCIU reports that the City's dispatch system diverted 3,360 calls for service to MCIU

from June 1, 2023 to July 17, 2024.[22]  There are no additional corrective actions necessary for

CIT.  Accordingly, the Decree's City has sufficiently complied with the Decree's CIT provisions

to now begin the sustainment period.

### 5.  Custodial Interrogations

The Decree requires NOPD to change its policies and training so that custodial

interrogations are conducted professionally, effectively, and elicit accurate and reliable

information.  NOPD first achieved compliance with the Decree's Custodial Interrogation

provisions in 2019.[23]  However, as we identified in our opposition to the Motion to Terminate,

---

[19] "Preparing For Sustainment," U.S. District Court for the Eastern District of Louisiana, Public Proceeding, Loyola University New Orleans School of Law, March 23, 2021, at slide 8, available at https://nopdconsent.azurewebsites. net/Media/Default/Documents/Reports/Loyola%20Proceeding%20Deck%20-%20March%202021.pdf.
[20] OCDM q1 2024 report at 20, available at https://nopdconsent.azurewebsites.net/Media/Default/Documents/ Reports/0789%202024-07-02%20Report%20of%20the%20Monitor%20First%20Quarter%20of%202024,%204867-2062-0494%20v%201.pdf.
[21] Mobile Crisis Intervention Unit available at https://nola.gov/health-department/behavioral-health/mciu/.
[22] Email from Chief Nic Gernon to Jonas Geissler, July 25, 2024.  *See also* MCIU Data Dashboard, available at https://app.powerbigov.us/view?r=eyJrIjoiNjM2MzI1MDItM2Q0OC00MzE4LWIzMDEtNjIyNWY0Y2ZmZDUyIi widCI6IjA4Y2JmNDg1LTFjYjctNGEwMi05YTIxLTBkZDliNDViOWZmNyJ9.
[23] "Preparing For Sustainment," U.S. District Court for the Eastern District of Louisiana, Public Proceeding, Loyola University New Orleans School of Law, March 23, 2021, at slide 8, available at

NOPD experienced significant backsliding with this section in 2022 because its busiest police district failed to electronically log and record custodial interrogations.[24]  Since then, NOPD changed leadership in this district and installed a new camera system in the interrogation rooms to more reliably record interrogations.[25]  The Monitor's March 2023 audit found NOPD to be 100% compliant with the Decree's custodial interrogation provisions in each police district, including the previously non-compliant district.[26]  The Sustainment Plan also requires NOPD to conduct an audit of the previously non-compliant district within 90 days of its entry.[27] Accordingly, NOPD has reached a sufficient level of compliance with the Decree's custodial interrogations provisions to begin the sustainment period.

### 6.  Photographic Line-Ups

The Decree requires NOPD to change its policies and training so that photographic line-ups are conducted professionally, effectively, and elicit accurate and reliable information. NOPD first achieved compliance with the Decree's Photographic Line Up provisions in 2019.[28] Here, too, there was backsliding in 2022, attributable to the same district that failed to comply with custodial interrogation requirements.  NOPD took remedial steps to address the slippage in this district.  In the Monitor's 2023 audit, most NOPD districts scored 100% across the Decree's

---

https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/Loyola%20Proceeding%20Deck%20-%20March%202021.pdf.

[24] ECF 674-1 at 23.

[25] ECF 702 at 20.

[26] ECF 702 at 21; Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Year 2023, Released March 19, 2024, at 22, available at https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/0771%20Annual%20Report%20for%202023.pdf.

[27] Plan Sec. II.C.1.h.1.

[28] "Preparing For Sustainment," U.S. District Court for the Eastern District of Louisiana, Public Proceeding, Loyola University New Orleans School of Law, March 23, 2021, at slide 8, available at https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/Loyola%20Proceeding%20Deck%20-%20March%202021.pdf.

six operative paragraphs concerning photographic lineups.[29]  Here, too, the Plan requires a new audit of the previously non-compliant district within 90 days of its entry.  Accordingly, NOPD has reached a sufficient level of compliance with the Decree's photographic line ups section to begin the sustainment period.

### 7.  Policing Free of Gender Bias

The Decree requires NOPD to make substantial changes to the way NOPD responds to and investigates reports of sexual assault and domestic violence.  The required changes include revising polices and trainings for patrol officers and detectives, assigning sufficient staff to investigate these crimes, and enhancing the documentation and tracking of these investigations. NOPD first achieved compliance with the Decree's gender bias provisions in 2019,[30] but then experienced some backsliding.  Based on look-behind audits in 2023, the Monitor found mixed results on NOPD's compliance with the Decree requirements for this section.[31]  A review of open cases in the Special Victims Division (SVD) found the caseloads as high as 64 per detective, which NOPD conceded were "unmanageable and unsustainable."[32]  These high caseloads contributed to the Monitor's 2023 finding that 25% of the cases reviewed showed the need for additional investigation or supplemental documentation.[33]  However, NOPD has taken action on the Monitor's findings.  NOPD recently added 11 new SVD investigators, which the

---

[29] Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Year 2023, Released March 19, 2024, at 23, available at https://nopdconsent.azurewebsites.net/Media/Default/ Documents/Reports/0771%20Annual%20Report%20for%202023.pdf.

[30] "Preparing For Sustainment," U.S. District Court for the Eastern District of Louisiana, Public Proceeding, Loyola University New Orleans School of Law, March 23, 2021, at slide 8, available at https://nopdconsent.azurewebsites .net/Media/Default/Documents/Reports/Loyola%20Proceeding%20Deck%20-%20March%202021.pdf.

[31] Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Year 2023, Released March 19, 2024, at 26, available at https://nopdconsent.azurewebsites.net/Media/Default/ Documents/Reports/0771%20Annual%20Report%20for%202023.pdf.

[32] Report of the Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Second Quarter of 2023, Released August 14, 2023, at 11, available at https://nopdconsent.azurewebsites.net/Media/ Default/Documents/Reports/0736%202023-08-15%202nd%20Quarter%202023%20Report.pdf.

[33] *Id.* at 18.

Monitor expects will reduce individual caseloads.[34]  The Monitor also lauded NOPD's implementation of a call-back process for calls that had been recorded as gone on arrival (GOA) when NOPD responded on scene.[35]  This follow-up process is a remedy for a prior finding of unduly long response times.  Separately, the Monitor verified NOPD's 98% compliance finding for appropriate responses by its Domestic Violence Patrol to calls for service.[36]  And, the Monitor verified NOPD's 95% compliance rate for child abuse investigations in 2023,[37] and 99.8% compliance in the first quarter of 2024.[38]

The Sustainment Plan requires that the City publish quarterly data on domestic violence and sexual assault and, importantly, commits the City to ongoing use of the GOA follow-up process specified in the Monitor's report.[39]  With the commitment to continue the corrective actions that have already proven successful, NOPD has reached sufficient compliance with the gender bias section of the Decree to begin the sustainment period.

### 8.  Community Engagement

The Decree requires NOPD to promote and strengthen its community partnerships and engage in community and problem-oriented policing.  To meet its obligations, NOPD has established several different structures and processes related to community engagement.  This includes geographically deploying officers throughout the City, establishing a community engagement unit and manual, hiring community liaison officers, setting up New Orleans

---

[34] Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Year 2023, Released March 19, 2024, at 26, available at https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/0771%20Annual%20Report%20for%202023.pdf.

[35] *Id.*

[36] *Id.*

[37] *Id.* at 27.

[38] OCDM q1 2024 report at 22-23, available at 0789 2024-07-02 Report of the Monitor First Quarter of 2024, 4867-2062-0494 v 1.pdf (nopdconsent.azurewebsites.net).

[39] Plan at Sec. II.C.d-e.

Neighborhood Police Anti-Crime Councils in each district, and developing neighborhood policing plans for each district that outline the specific policing goals that the community wants addressed.  NOPD first achieved compliance with this section in October 2021, but it has struggled to document and measure the efficacy of their community engagement efforts since then.[40]  To address this, the Plan requires NOPD to conduct quarterly community engagement audits using a protocol approved by the Monitor and the United States and to report out the results of those audits publicly.  If these audits identify deficiencies, the NOPD must create corrective action plans that outline steps needed to address any identified deficiencies.  The Plan also requires NOPD to work with the Monitor to complete biennial community surveys that had been postponed due to the Covid 19 pandemic.[41]  Given that NOPD has established the systems needed to achieve its community engagement obligations and committed to auditing the efficacy of these systems during the Sustainment Period, it is appropriate for the City to enter into the sustainment period for the Decree's community engagement provisions.

### 9.      Recruitment

The Decree requires NOPD to develop and implement a comprehensive recruitment program that attracts and hires a diverse group of highly qualified individuals to become NOPD police officers.  NOPD first reached compliance with the Decree's Recruitment provisions in 2021.[42]  Since that time, NOPD suffered a decline in recruiting, as did many other law enforcement agencies across the country.  Nonetheless, more recently, the Monitor found that

---

[40] Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Year 2023, Released March 19, 2024, at 29, available at https://nopdconsent.azurewebsites.net/Media/Default/ Documents/Reports/0771%20Annual%20Report%20for%202023.pdf.

[41] Plan Sec. II.C.1.f, "NOPD agrees to conduct the Biennial Community Survey as required in Paragraph 230 of the Consent Decree during the first year of the Sustainment Period."

[42] "Preparing For Sustainment," U.S. District Court for the Eastern District of Louisiana, Public Proceeding, Loyola University New Orleans School of Law, March 23, 2021, at slide 9, available at https://nopdconsent.azurewebsites .net/Media/Default/Documents/Reports/Loyola%20Proceeding%20Deck%20-%20March%202021.pdf.

recruitment has increased—rising from 28 hires in 2022 to 90 hires in 2023.[43]  Notably, the Monitor found that this increase in recruited cadets was *not* accompanied by a decrease in candidate quality.[44]  NOPD's audit of recruitment, applying the approved audit protocol, showed 100% compliance for 2023.[45]  Accordingly, NOPD has reached sufficient compliance with the recruitment section of the Decree to begin the sustainment period.

### 10. Academy and In-Service Training

The Decree requires NOPD to substantially change the way it trains officers.  To achieve the requirements of the Decree, NOPD hired a Training Commander, established a training plan (approved by the Monitor and DOJ), and incorporated adult learning principles into all Decree related curriculums.  NOPD consistently has been in compliance with the Decree's Academy provisions since 2021.[46]  The Monitor's last quarterly report includes its concurrence with NOPD's Academy audit finding of 93% compliance.[47]  Accordingly, NOPD has reached sufficient compliance with the academy and in-service training section of the Decree to begin the sustainment period.

### 11. Officer Assistance and Support (OAP)

The Decree requires NOPD to provide officers and employees access to mental health and support resources.  NOPD had been in compliance with the Decree's OAP provisions since

---

[43] Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Year 2023, Released March 19, 2024, at 31, available at https://nopdconsent.azurewebsites.net/Media/Default/ Documents/Reports/0771%20Annual%20Report%20for%202023.pdf.

[44] *Id.*

[45] Recruitment Unit Audit Report #Recr202312, January 25, 2024, available at https://nola.gov/nola/media/NOPD/ Consent%20Decree/NOPD%20Audits/Recruitment-Audit-Report-FY2023-Public.pdf.

[46] "Preparing For Sustainment," U.S. District Court for the Eastern District of Louisiana, Public Proceeding, Loyola University New Orleans School of Law, March 23, 2021, at slide 9, available at https://nopdconsent.azurewebsites .net/Media/Default/Documents/Reports/Loyola%20Proceeding%20Deck%20-%20March%202021.pdf.

[47] OCDM q1 2024 report at 13, available at  0789 2024-07-02 Report of the Monitor First Quarter of 2024, 4867- 2062-0494 v 1.pdf (nopdconsent.azurewebsites.net).

2021, though NOPD suffered some regression with the loss of OAP staff.[48]  Following their replacement, however, NOPD's compliance quickly recovered.  In its year-end report for 2023, the Monitor reported that OAP was "back on track," and cited NOPD's audit finding 100% compliance.[49]

Above and beyond the Decree's requirements, NOPD pioneered the national model of officer intervention with its Ethical Policing Is Courageous (EPIC) program.  Accordingly, NOPD has reached sufficient compliance with the OAP section of the Decree to begin the sustainment period.

### 12. Performance Evaluations and Promotions

The Decree requires NOPD to make substantial changes to its performance evaluation and promotions process.  With technical assistance from the Monitor and the United States, NOPD developed a system for performance evaluations and promotions that includes updated evaluation questionnaires and promotions rubrics.  NOPD first achieved compliance with this section in April 2022.  NOPD's subsequent audit, however, found only a 73% compliance rate.[50] The Sustainment Plan contains commitments to fix two outstanding issues that are driving NOPD's low audit score:  (1) supplemental quarterly supervisory entries in NOPD's early warning system to produce timely annual performance evaluation; and (2) properly coded chains of command in the electronic system so that the correct supervisors are associated with their

---

[48] "Preparing For Sustainment," U.S. District Court for the Eastern District of Louisiana, Public Proceeding, Loyola University New Orleans School of Law, March 23, 2021, at slide 9, available at https://nopdconsent.azurewebsites .net/Media/Default/Documents/Reports/Loyola%20Proceeding%20Deck%20-%20March%202021.pdf.

[49] Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Year 2023, Released March 19, 2024, at 34, available at https://nopdconsent.azurewebsites.net/Media/Default/ Documents/Reports/0771%20Annual%20Report%20for%202023.pdf.

[50] *Id.* at 35; 2022 Performance Evaluation Audit Report # PE042023, July 25, 2023, available at https://nola.gov/ nola/media/NOPD/Consent%20Decree/NOPD%20Audits/Performance-Evaluation-Audit-Report-April-2023.pdf.

subordinates for feedback logs and evaluations.[51]  Given the overall progress that NOPD has made with regard to performance evaluations and promotions as well as its commitment to complete these corrective actions, it is appropriate for the performance evaluations and promotions section of the Decree to move into the sustainment period.

### 13. Supervision

The Decree requires NOPD to make substantial changes to ensure it provides close and effective supervision for its officers.  Though NOPD first achieved compliance with supervision in April 2022, it has had mixed success implementing the Decree's supervision remedies.  This is, in part, because the supervision section of the Decree includes requirements related to NOPD's early warning systems, which have been plagued by technical difficulties.  Despite these challenges, NOPD has made strides with fulfilling its obligations under the Supervision section of the Decree.  In response to concerns about supervisors whose subordinates have had serious, sustained administrative complaints, NOPD developed a serious discipline review board to assess supervision.[52]  To remedy the technical failings of the early warning system, NOPD has agreed to replace the current system during the sustainment period.[53]

NOPD has also taken corrective action to address supervisory deficiencies in secondary employment.  NOPD implemented a dispatch recording system and an inspection system to ensure that officers are where they are supposed to be.[54]  In January 2024, NOPD also presented the Monitor and DOJ with the results of time sheet checks to reveal any double billing for

---

[51] Plan Sec. II.C.g.
[52] Plan Sec. II.C.h.2.
[53] Plan Sec. II.C.h.6.
[54] Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Year 2023, Released March 19, 2024, at 38, available at https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/0771%20Annual%20Report%20for%202023.pdf.

secondary employment.  These changes effectively remedy the supervision aspects of secondary employment.

In this Court's ruling on the Order to Show Cause, it found the supervision of NOPD's Executive Protection Unit (EPU) did not comply with the Decree.[55]  NOPD has implemented most of the remedial plan submitted in response to the Court's ruling, and it has committed to completing the remainder in the Sustainment Plan.  NOPD also agreed in the Plan to separately audit EPU.[56]

NOPD's 2023 supervision audit found compliance scores between 97-100% for each of the seven audited areas.[57]  Given NOPD's recent audit and the related commitments it has made regarding supervision in the Sustainment Plan, it is appropriate for the supervision section of the Decree to move into the sustainment period.

### 14. Secondary Employment System

The Decree requires NOPD to completely restructure its secondary employment practices.  To achieve the objectives of this section, NOPD created the Office of Police Secondary Employment in May 2012[58] and established policies and training regarding the appropriate processes that officers must follow when participating in NOPD's secondary employment system.  NOPD first achieved compliance with the Decree's secondary employment section in 2019.[59]  In our opposition to the Motion to Terminate, however, we argued that though

---

[55] ECF 756 at 56-58.
[56] Plan Sec. II.C.h.4.
[57] Supervision Audit, Report # S092023, Final Report: 2/7/2024, at 2, available at https://nola.gov/nola/media/NOPD/Consent%20Decree/NOPD%20Audits/Supervision-Audit-Report-September-2023-Public.pdf.
[58] ECF 327-1 at 36.
[59] "Preparing For Sustainment," U.S. District Court for the Eastern District of Louisiana, Public Proceeding, Loyola University New Orleans School of Law, March 23, 2021, at slide 8, available at https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/Loyola%20Proceeding%20Deck%20-%20March%202021.pdf.

NOPD's revamped secondary employment system had long been in place, recent incidents indicated that the system was subject to abuse.[60]

NOPD last audited the secondary employment system in 2017, and the Monitor is currently assisting NOPD with revising an audit protocol for this section.  The Sustainment Plan calls for NOPD to conduct a secondary employment audit and implement any necessary corrective actions.[61]  The Plan also requires linking NOPD's electronic payroll systems with the Office of Police Secondary Employment's payroll system to prevent double billing.[62]  Given these ongoing measures to ensure compliance, as well as NOPD's establishment of the Office of Police Secondary Employment, its successful use of that office for many years, and NOPD's commitment to audit this section during the sustainment period, it is appropriate for the secondary employment section of the Decree to move into the sustainment period.

### 15. Misconduct Complaint Intake, Investigation, and Adjudication

The Decree requires NOPD to ensure that all allegations of officer misconduct are received and are fully and fairly investigated and that officers are held accountable pursuant to a disciplinary system that is fair and consistent.  To meet its obligations under this section of the Decree, NOPD revised its policies and procedures relating to its Public Integrity Bureau (PIB) (NOPD's administrative investigations unit), hired and trained qualified investigators, and overhauled its complaint intake, classification, and tracking systems.  NOPD first achieved compliance with this section of the Decree in January 2021.  In our opposition to the Motion to Terminate, however, we identified significant slippage with this section, namely problems with

---

[60] ECF 682.
[61] Plan at Sec. II.C.i.
[62] *Id.*

the timeliness of investigations, failures to timely notify civilian complainants, and untimely discipline.[63]

Since we filed our opposition, the Court also issued an Order to Show Cause due to concerns that the Monitor raised regarding the operation of PIB—most of which centered around the alleged manipulation of the system to favor a single former NOPD member of EPU. Though this Court found that NOPD had violated the Decree's misconduct provisions, the Court deferred imposing sanctions because NOPD committed to implement a remedial plan to correct administrative investigations and supervision. Dkt. 756. In October 2023, the City submitted its PIB remedial action plan and has since been reporting monthly on its implementation of the remedial measures contained therein. *See, e.g.*, Dkt. 791-1. NOPD is nearing completion of all the tasks required under that remedial plan and any remaining items have been incorporated into the Sustainment Plan.[64] NOPD also will be conducting a PIB audit pursuant to an approved audit protocol during the sustainment period.[65] Additionally, the Plan addresses an outstanding concern with affirmative "integrity checks" that the Decree requires. NOPD will use reviews of body-worn camera recordings as a means of implementing affirmative investigations of officers.[66] The Plan also requires NOPD to issue public notice letters with the results of administrative investigations (subject to appropriate redactions for parties' privacy).

Given NOPD's commitment to implementing the PIB remedial plan and specific steps that the City will complete under the Sustainment Period, it is appropriate for the misconduct complaint intake, investigation, and adjudication section of the Decree to move into the sustainment period.

---

[63] ECF 682 at 33.
[64] Plan Sec. II.C.j.1.
[65] Plan Sec. II.C.j.2.
[66] Plan Sec. II.C.j.3-4.

### 16. Transparency and Oversight

The Decree requires NOPD to develop, implement, and maintain systems that will help promote oversight of NOPD long after the termination of the Decree.  One aspect of this section required NOPD to publish its policies, audits, and other reports on a publicly accessible website, which NOPD has done for nearly a decade.  The other aspect of this section requires NOPD to conduct outreach and support the Police-Community Advisory Boards (PCABs) in each police district.  NOPD first reached compliance with the Decree's transparency provisions in 2021,[67] though since then the City has not consistently supported the PCABs.  In its most recent report, the Monitor reported positively on NOPD's transparency efforts, but the Monitor noted concerns about the operation of the PCABs.[68]  In order to address the concerns, the City and NOPD have committed to develop a separate plan for improving the operations of the PCABs within 15 days of the Plan's Effective Date.  Given the progress that NOPD has made with respect to transparency and given its commitment to creating the PCAB plan, it is appropriate for the transparency and oversight section of the Decree to move into the sustainment period.

### B.  The Sustainment Plan addresses the discrete remaining tasks and provides mechanisms for the City to demonstrate compliance for two years.

The Sustainment Plan provides specific remedies for certain sections of the Decree that City will complete during the sustainment period.  The Sustainment Plan also provides an auditing structure to assess whether the City maintains compliance with each section of the Decree over the two-year sustainment period.  As described above, the City still needs to

---

[67] "Preparing For Sustainment," U.S. District Court for the Eastern District of Louisiana, Public Proceeding, Loyola University New Orleans School of Law, March 23, 2021, at slide 9, available at https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/Loyola%20Proceeding%20Deck%20-%20March%202021.pdf.
[68] OCDM q1 2024 report at 25, available at   https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/0789%202024-07-02%20Report%20of%20the%20Monitor%20First%20Quarter%20of%202024,%204867-2062-0494%20v%201.pdf.

complete certain discrete tasks in the following areas:  SSA; bias free policing; custodial interrogations; photographic line-ups; policing free of gender bias; community engagement; performance evaluations and promotions; supervision; secondary employment; misconduct; and transparency.  The Sustainment Plan outlines these specific tasks as well as deadlines for their completion.  *See* Sustainment Plan, Section II.C.

The City must demonstrate full and effective compliance during the sustainment period through the use of audits for each section of the Decree, using audit protocols approved by the United States and Monitor.  *See* Sustainment Plan, Section II. B. 1.  The Sustainment Plan includes an audit schedule which identifies the deadline by which NOPD must complete each audit.  *See* Attachment V.B. to Sustainment Plan.  In addition, under the Sustainment Plan, the Monitor will also conduct audits.  These audits will occur annually in the following areas: custodial interrogations, photographic lineups, bias-free policing (non-LEP), CIT, OAP, and transparency.  *See* Sustainment Plan, Section III.A.  The Monitor will conduct quarterly audits in the following areas:  language access, SSA, gender bias, community engagement, recruitment, academy, performance evaluations and promotions, supervision, secondary employment, and misconduct.  *See* Sustainment Plan, Section III.B.  The Monitor also retains its rights to conduct other as-needed reviews.  *See* Sustainment Plan, Section III.C.  Finally, the Sustainment Plan requires the City and NOPD to file quarterly status reports with the Court identifying their ongoing progress in meeting the obligations outlined in the Plan.  *See* Sustainment Plan, Section II.B.3.  In addition to NOPD's reports, the Monitor will also provide reports during the sustainment period assessing NOPD's progress in meeting the requirements of the Sustainment Plan.

**C. The Sustainment Plan provides a safeguard to pause or remove the City from the sustainment period if the City fails to maintain compliance.**

Importantly, as set forth in the Plan, if the City backslides on compliance with the Consent Decree during the sustainment period, this Court may toll the sustainment period or remove the City from the sustainment period.[69]  This flexibility ensures the Court can hold the City accountable if they fail to comply with the Decree, but also allows the City to avoid restarting the two-year sustainment period for temporary non-compliance.  The Plan's flexible approach to sustaining compliance promotes the goals of the Decree—to ensure a durable remedy for the unlawful practices the United States found in its investigation.

---

[69] Sustainment Plan Sec. IV.B. 1, "The Court has the authority to Toll or Terminate the Sustainment Period for failure of the NOPD or the City to comply with the provisions of the Sustainment Plan."  *See also* Sec. I.B.8 and 9, defining tolling and termination of the sustainment period.

## III.    CONCLUSION

For the foregoing reasons, the United States request that the Court approve the Sustainment

Plan and begin the two-year sustainment period pursuant to Decree Paragraph 491.

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division
REGAN RUSH
Acting Chief
TIMOTHY D. MYGATT (DC 1021564)
Deputy Chief

/s/ R. Jonas Geissler
R. JONAS GEISSLER (NJ 025752001)
MEHVEEN RIAZ (DC 1030021)
ARUSHA GORDON (DC 1035129)
Trial Attorneys
Special Litigation Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel.: (202) 532-5527
Email: jonas.geissler@usdoj.gov

*Attorneys for the United States*

26

## **Certificate of Service**

I hereby certify that on September 27, 2024, I filed the foregoing through the Court's CM/ECF system, which will serve a true and correct copy of the filing on all counsel of record in this matter.

/s/ Jonas Geissler