**From:** Aaron Jordan <███████████████████>
**Sent:** Monday, January 15, 2024 11:35 AM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Complaint regarding the Office of the Independent Police Monitor

Dear Consent Decree Monitor & Staff:

I ask that you please assist in this complaint that I am experiencing with Mr. Christian Jamal of the Office of the Independent Police Monitor.

In early July of 2023, I filed a complaint with the Office of the Independent Police Monitor regarding possible police conduct regarding the New Orleans police and officers from the Sixth District that were assigned to patrol Bourbon Street for the Essence Festival. I spoke with Christian Jamal. Over the course of the next six months, Mr. Jamal spoke on the phone several times and sent each other e-mails back and forth. The matter was assigned File# CTN2023-0386-N. However, when it came time for Mr. Jamal to request records from the NOPD in the form of trip sheets and a listing of officers' names from the Sixth District to patrol Bourbon Street during the Essence Festival, he conveniently "forgot" to do so. I then followed back up with Mr. Jamal who reluctantly said that he would follow up and obtain these documents. In another attempt to follow up with Mr. Jamal, he informed me that he did in fact obtain the requested documents from the NOPD, however, he could not make any final decision based on them. I then requested a copy of these documents from Mr. Jamal and he did not respond. So, on December 29, 2023, I sent a public records request to Mr. Jamal and his supervisor, Stella Cziment. To date, both Mr. Jamal and Ms. Cziment have failed to respond to my public records request, in violation of the Louisiana Public Records Act. It is my contention that Mr. Jamal is

1

covering up this alleged police misconduct instead of investigating it, as his job duties require.  It is also my contention that Mr. Jamal and Ms. Cziment are violating the Louisiana Public Records Act.

Please feel free to reply or contact me with any questions or to discuss this matter further.

Thank you,

AARON J. JORDAN
███████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

June 21, 2024

U.S. District Judge Susie Morgan
500 Poydras Street, Section E
Room# C322
New Orleans, LA 70130

RE:    Subject:       NOPD Consent Decree
       Matter:        PIB Complaint 2023-0386-N
                      PIB Complaint 2024-0265-P
                      PIB Complaint 2024-0306-P

U.S. District Judge Susie Morgan:

Please allow this letter to serve as a notice to the Court of instances of dereliction of duty within the
NOPD. I recently spoke with the Court's staff members, who informed me that it would be permissible
to send the Court a letter outlining my concerns. It is my contention that the NOPD is clearly not ready to
self-monitor its Consent Decree obligations. It is also my contention that there is widespread dereliction
of duty within the NOPD, which is being tolerated, and perhaps facilitated, by NOPD leadership and PIB.

Beginning on July 4, 2023, I have experienced three (3) separate instances of clear dereliction of duty by
NOPD officers from the 6th and 8th Districts, as well as PIB. In two of these incidents, I flagged down and
notified NOPD officers of actively occurring criminal activity and they did nothing to respond or
investigate. In fact, concerning the incident of July 4, 2023, the NOPD officers fled and ran away,
leaving the scene in their marked SUV.

As a result of these derelict actions, I contacted the staff at OIPM to report each incident and file a formal
complaint. OIPM's staff prepared the complaints and forwarded them to the NOPD's PIB, only for PIB
to then summarily reject my initial valid complaint, in an attempt to frustrate me from pursuing these
matters to their finality. Some of these tactics by PIB include the following: PIB investigators acting
incompetent, PIB investigators acting lazy, passing the buck to unnamed "supervisors," not returning
phone calls, not communicating updates and developments to the complainants, and sending out form
letters stating that they are unable to identify the officer(s) in question. As a matter of fact, I attended the
NOPD's Consent Decree presentation before the Court earlier this month. During that presentation,
Deputy Superintendent Nicholas Gernon stated that only two (2) PIB complaints had been sustained last
year. I submit to the Court that this low PIB sustainment rate is not due to NOPD excellence or the filing
of frivolous complaints by the public, but rather due to these stall tactics and smoke screens used by PIB
investigators, which are designed to frustrate complainants into giving up.

Furthermore, NOPD leadership is clearly complicit in burying PIB complaints. Regarding the PIB
complaint I filed dated, July 4, 2023, I personally contacted, via e-mail, the 6th District Commander Capt.
Eric Gillard, and two of his Lt.'s, regarding the PIB complaint and asking for their assistance in
identifying the officer in question. However, neither Capt. Gillard, nor his Lt.'s, responded. In each of
these three (3) separate PIB complaints, I contacted NOPD Superintendent Anne Kirkpatrick's office, via
e-mail and telephone. Superintendent Kirkpatrick never responded to any of my e-mails, nor any of the
voicemail messages I left for her. Another total failure of NOPD's leadership.

Finally, for over a month I have been in contact with the NOPD's Consent Decree Monitors Mr. Aronie and Mr. Douglas. I e-mailed Mr. Douglas regularly about the developments of these PIB complaints, however, he does not seem to be interested. When I initially contacted Mr. Douglas, he arranged for a telephone interview, in which I explained to him, in great detail, what occurred during the July 4, 2023, PIB complaint. Mr. Douglas said that he would make some inquiries into the PIB complaint and how it was summarily dismissed. However, Mr. Douglas said that he did not have any power to do anything about it. In fact, I followed back up with Mr. Douglas recently regarding his inquiry made and he has found out absolutely nothing. More hallow promises.

In closing, I have spent a great deal of time speaking with OIPM staff regarding these three (3) PIB complaints. OIPM informed me that the most severe punishment that an NOPD officer would face for dereliction of duty is only a verbal or written reprimand and maybe the forfeiture of one day's pay. This punishment is far too light for dereliction of duty by a police officer. In fact, such light punishment for dereliction is one of the main reasons I believe that dereliction is so widespread and prevalent within the NOPD. These three (3) separate incidents of dereliction of duty by NOPD officers did not occur in a vacuum. This is part of the NOPD's culture to do either nothing, or as little as possible. I firmly believe that there is some sort of unwritten policy for NOPD officers to engage in dereliction with the knowledge and understanding that PIB and NOPD leadership will assist and facilitate this dereliction by either making up excuses or frustrating complainants into giving up.

As always, please feel free to reply or contact me with any questions the Court may have or to discuss these matters further.

Sincerely,

*Aaron J. Jordan*
AARON J. JORDAN
Phone: ████████████
E-mail: ████████████

**From:** William Snowden <█████████████>
**Sent:** Wednesday, February 28, 2024 6:51 PM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Cc:** monitoringteam@consentdecreemonitor.com <monitoringteam@consentdecreemonitor.com>;
Community.Louisiana@usdoj.gov <Community.Louisiana@usdoj.gov>
**Subject:** Louisiana State Troopers Policing New Orleans

Good evening:

Please see my attached letter regarding the Louisiana State Police's status under the NOPD consent decree. I have copied an email for the Department of Justice as well in case they have any guidance or insight regarding LSP falling under the consent decree while policing in New Orleans.

Thanks,

Will


William C. Snowden
Assistant Professor of Law
Loyola University New Orleans College of Law
526 Pine Street, Room 416
New Orleans, LA 70118
504-861-5683 (Office)


**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.



LOYOLA
UNIVERSITY
NEW ORLEANS

Jonathan Aronie
NOPD Consent Decree Monitor
██████████████████

New Orleans, LA 70131

February 28, 2024

Re: Louisiana State Police working in New Orleans

Dear Mr. Aronie:

My name is Will Snowden and I am a law professor at Loyola University New Orleans College of Law. I have been working with organized community members in New Orleans to help foster understanding of some of the recent and imminent changes to our criminal legal system as a result of Governor Jeff Landry's announced policies and legislation introduced during the special crime session over these last two weeks.

Since Governor Landry's election, he has touted a commitment to bringing Louisiana State Troopers to assist the New Orleans Police Department in policing New Orleans. The Louisiana State Police (LSP) has announced "Troop NOLA" as being a dedicated group of State Troopers assigned to New Orleans. You may be aware the United States Department of Justice opened up a pattern or practice investigation into LSP in 2022. The history of LSP's prior approach to policing in New Orleans, and ongoing approach to policing statewide, has caused many New Orleanians to lose trust in their ability to participate in constitutional policing.

There is one looming question being raised by community members that I hope you can help answer: **Will Louisiana State Troopers policing in New Orleans operating under "Troop NOLA" be considered an "assignee" of NOPD and be required to comply[1] with the Consent Decree?** We haven't seen the release of any agreement between the City of New Orleans and the LSP to understand how the relationship is structured between the two entities.

If you have any guidance about whether or not LSP will have to comply under the consent decree, please let me know. If you think I should direct this question to someone else, please let me know who that person might be. Thank you for your work and dedication to improving policing in the City of New Orleans.

Sincerely,

William C. Snowden

---

[1] "The City and NOPD agree to require compliance with this Agreement by their respective officers, employees, agencies, assigns, or successors." (Paragraph 490 of the New Orleans Police Department Consent Decree)

**From:** W. C. Johnson <█████████████>
**Sent:** Wednesday, March 13, 2024 5:56 AM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>; Edward Parker <███████████████>; W. C. Johnson <█████████████>; Stella Cziment <█████████████>; Oliver M. Thomas <█████████████>; Renette Hall <laweekly@louisianaweekly.com>; Sabrina Wilson <swilson@fox8live.com>; Dana <dana@fox8live.com>; Charles Maldonado <cmaldonado@veritenews.org>; Michelle Liu <mliu@veritenews.org>
**Subject:** Judge Susie Morgan

# Community United for Change
## 1643 Gentilly Boulevard
### New Orleans, La. 70119
### 504-251-2201

Susie Morgan
U.S. Federal Judge
Eastern District of Louisiana
500 Poydras St. Room C-322
New Orleans, La. 70130
March 13, 2024

Judge Morgan:

Community United for Change (CUC) has a long history of working with the people of New Orleans for a better and more constitutional way of policing the citizens of New Orleans. In more recent years CUC, partnered with the New Orleans United Front (NOUF) to work with the New Orleans City Council (NOCC) through its Criminal Justice Committee (CJC). During a presentation to the CJC, in the fall of 2023, the CJC challenged CUC to create an inclusive plan

to demonstrate what 'Citizen Oversight' would look like for the New Orleans Police Department (NOPD).

On December 12, 2023, CUC and NOUF delivered an 18-page document of Citizens Oversight, entitled "Standards Must Prevail," to the CJC for scheduling of a presentation before the CJC. This was designed to bring the NOPD to the table for the plan to be integrated into the workings of the NOPD. As indicated in the "Standards Must Prevail" document, citizen involvement has not work through the NOPD Consent Decree (NOPDCD). As spelled out in paragraphs 239-436-437 and 438 of the NOPDCD, Police Community Advisory Boards (PCABs) were originally designed to create community involvement. However, PCABs have been exploited and ignored as it relates to the original purpose of the NOPDCD.
Several copies of "Standards Must Prevail," were distributed to all members of the NOCC with the CJC issuing copies to the Chief of the NOPD early in January of 2024.

On Friday, March 8, 2024, CUC met with Police Chief Anne Kirkpatrick, her Deputy Chief L. Dupree and Commissioner T. Stevens. This was made possible by the chairman of the CJC, Mr. Oliver Thomas. During the course of the logistics for this meeting, it was clear we were meeting at the convenience of Chief Kirkpatrick (Chief). I raise this issue because it became clear during the meeting that the Chief was not negotiating in good faith. The chief claimed not to have a copy of CUC and NOUF's report but her Deputy, Mr. Dupree, pulled out a copy of a copy of "Standards Must Prevail" from his folder he carried. During the meeting the Chief asked for a three-month period to read and get familiar with the "plan." This request to me was not a good faith effort on the Chief's part to correct the infractions of public inclusion as required by the NOPDCD. CUC therefore has to address the federal court for relief of this, as well as other, infractions of the NOPDCD which makes the city of New Orleans and the NOPD non-compliant to the articles of the NOPDCD.

Thank you,

Electronically Signed


W.C. Johnson
Chair CUC


Attached: Standards Must Prevail Plan

CC:
Office of New Orleans Independent Police Monitor
Federal Monitors
New Orleans United Front
Criminal Justice Committee of the New Orleans City Council

Community United for Change-New Orleans United Front
1643 Gentilly Boulevard
New Orleans, La. 70119

███████████

# For the Criminal Justice Committee
# of the New Orleans City Council

## Standards Must Prevail

Oversight is designed to maintain Standards. Without Oversight Standards become flexible institutions that change as frequently as the weather.

Case in Point:

The history of the New Orleans Police Department (NOPD) as reviewed by the U. S. Department of Justice (DOJ) in its Findings Letter of March 17, 2011, documented this, "… the NOPD has engaged in patterns of misconduct that violate the Constitution and federal law..." This was the mechanism that produced the Consent Decree between the federal government and the City of New Orleans.

The Findings Letter continued, "…The DOJ through an independent investigation involved *extensive community engagement* and in-depth review of NOPD practices." After the DOJ's investigation of the NOPD, *community engagement* has been held to a minimum. After ten (10) years, questions are reverberating around New Orleans as to why NOPD can't get it right. The simple answer is; *no extensive engagement with the people* and grass-root organizations of New Orleans.

The people and grass-rooted organizations fueled the initial investigation and it will take the people and grass-rooted organizations to complete the process of justice for the NOPD Consent Decree.

The people and grass-rooted organizations fueled the initial investigation and it will take the people and grass-rooted organizations to complete the process of justice for the NOPD Consent Decree.

# Task Force Charge

On October 23, 2023, the New Orleans City Council charged Community United for Change and the New Orleans United Front to initiate a Task Force to create a structure for a Citizens Oversight Committee that will insure citizens involvement in the continued application of protection and service by the New Orleans Police Department (NOPD) for the citizens of New Orleans. In preparing a structure for Citizen's involvement we must be mindful of what and where policing evolved from. In understanding the foundation of the problem, one can better realize the remedy for the problem.

In all of the wonders of why citizens involvement with the NOPD has not bore any fruit, we must be willing to admit the culture of the NOPD has not allowed for any intrusion into the construct of the traditional NOPD service and protection, (i.e. Public Safety), to initiate a transparent agency for the betterment of the citizens of New Orleans, who are the ultimate supervisors of policing in New Orleans. For any modification to the problems of the historic shortcomings, the agency of the NOPD must reconsider the Police Citizens Advisory Board (PCAB) approach to citizens participation. Since the inception of the NOPD Consent Decree, PCAB has not been effective and in many cases, by design, was never expected to work. The NOPD must remember Citizen Oversight cannot be a poorly constructed afterthought of the NOPD. As PCAB has operated in the past, PCAB was never structured to invite oversight but rather to subordinate any citizen participation.

The people of New Orleans need prophylactic measures to be protected and receive the public safety the Home Rule Charter promised to all.

# Introduction

The historical stains of racism and related ills are part of the history and traditions of American policing. The origins of modern-day policing can be traced back to the "Slave Patrol." The earliest formal slave patrol was created in the Carolinas in early 1700s with one mission: to establish a system of terror and squash slave uprisings with the capacity to pursue, apprehend, and to return runaway slaves to their owners. Tactics included the use of excessive force to control and produce desired slave behavior.

Slave Patrols continued until the end of the Civil War and the passage of the 13th Amendment. Following the Civil War, during Reconstruction, slave patrols were replaced by militia-style groups who were empowered to control and deny access to equal rights to freed slaves. The new "slave patrols" were the legalized empowered policing forces authorized by the political subdivisions of every county (parish) and state in America. They relentlessly and systematically enforced Black Codes, strict local and state laws that regulated and restricted access to labor, wages, voting rights, and general freedoms for formerly enslaved people.

In North Carolina, the Slave Patrol Oath was administered to all Slave Patrol members. The oath went this way; "…I [patroller's name], do swear, that I will searcher for guns, swords, and other weapons among the slaves in my district, faithfully, and as privately as I can, discharge the trust reposed in me as the law directs, to the best of my power. So, help me God…." This is an oath that is still being recognized and fulfilled today throughout America. A major reason why there is a disconnect between the Black Community and the police institutions, currently.

Throughout the history of policing, the need for context between race and class have always been central to the role that law enforcement agencies and the law enforcement officers play in the American society. Despite some progress in making policing more just for racial and ethnic minorities, racial injustice still permeate our system of policing and criminal justice. The incidents of racial bias and injustice that we see today, particularly in regards to arrest and the use of force,

4

are not isolated or disconnected from the original and evolution of American law enforcement.

No Paradigm and no society can be judged satisfactorily until these legacies have been confronted directly. America tries to claim a historic relationship with policing through the influence of models borrowed from London, England through the Metropolitan Police Act of 1829, coupled with the philosophies of Sir Robert Peel. But these attempts to establish a law-and-order agency wasn't viewed at the time as necessary for the white population. It wasn't until 1868 when the ratification of the 14th Amendment to the U.S. Constitution gave technical equal protection to the Africans in America. Technical in the sense that by 1900s, local municipalities began to establish police departments to enforce local laws which included the Jim Crow laws and what they could of the Black Codes. In July of 2020, the New Yorker published a comment on policing. The New Yorker said; "...The crisis in policing is the culmination of a thousand other failures-failures of education, social services, public health, gun regulation, criminal justice, and economic development..."

What is hidden within the words of the New Yorker, is the fact that Black People, the Africans in America, know this and sense they are the victims of this continuation of unequal rights. Blacks should have been given a seat at the table of arresting the problems of criminality within and towards the Africans in America. The continued acceleration of victimization to the Black Race has only caused continual problems to the American society. The criminal justice system is heavily impacted by the bias of police mentality and outdated judicial precedents. The system is largely driven by racial disparities and the Black Community continues to be its target. The results are brutal and long lasting.

In the Atlantic magazine June 16th, 2020, they published the article "The Culture of Policing is Broken. In the article Derrick Johnson, President of the National Association for the Advancement of Color People (NAACP) is quoted as saying this; "...All cruelty begins with dehumanization-not seeing the faces of the other, not seeing the whole humanity of another, A culture regime of dehumanization has been constructed in many police departments. In that fertile ground, racial biases can spread and become entrenched..." He continued; "...The relationships between law enforcement and our communities are fractured because of decades of

5

a bad system that has let countless issues go unaddressed..." The President and CEO of the NAACP has his thumb on the pulse of bias policing throughout America. New Orleans is but one city that allows police injustice to reign supreme. It has taken a long time and many deaths and concussions to have the U. S. Justice Department to come to New Orleans and find the NOPD were bad actors deserving of a Consent Decree. The mayor wants an early release even though the NOPD has not addressed and removed the deficiencies that caused the NOPD to be placed under a Consent Decree. This is not a good look for America. This is not a good look for New Orleans. This is a look that demands prolonged solutions for a "City that Love Forgot."

The history of policing in New Orleans, is one that reeks of racism and extreme poverty. Much like the slave plantations of the 1700s and forward, many attempts have been made to superficially address and change this perception. Since 1718, when New Orleans was first declared a political subdivision of Louisiana, the Black Population played a strategic role in the development of New Orleans, and Louisiana. In 1803, one of the few successful slave revolts fueled by **Toussaint L'Overture, in Saint Dominique,** caused the Louisiana Purchase, which doubled the size of the United States. As it has been in America, the Black Race gets very little and most times no credit for their contributions to the cities, states and nation of America.

The problems facing New Orleans, today can be traced back to the blinded eyes of white America. The problems facing New Orleans are no different. Even with a Consent Decree in place, the Black Population is kept away from any and all decision-making policies, regulations and laws concerning the Black Population. After ten years of the Consent Decree being in place, the role of citizen participation has been illusionary at best. The Police Citizens Advisory Boards (PCAB) have been run exclusive by the NOPD at the will of the NOPDs schedules and agenda discretion. After ten years, advisory positions are not strong enough to create change or give the citizens a complete buy-in to fully addressing the problems of crime and social ills in New Orleans. There must be a strong and legitimate buy-in for the citizens of New Orleans to be capable of participating in change that will net New Orleans, social and criminal justice changes necessary to make New Orleans a public safety module capable of increase city revenues. If

6

interactions and investing in community-based interventions are critical to providing for public safety in a way that's less intrusive, more just, and more constructive…"

The Vera Institute found, "from 1960 to 2018, spending for policing has not lowered the crime rate. From 1977 to 2020 (corrected for inflation rates), spending increased from $45 billion to $129 billion nationally. This is a one hundred and eighty-nine (189 %) percentage rate increase.

For New Orleans, since the Consent Decree was imposed upon the NOPD, families like Arties Manning III, Adolph Grimes III, and the settlements of former Mayor Mitch Landrieu, brutality and wrongful death claims cost the city of New Orleans, in excess of twenty million dollars ($20,000,). When you combine the silent settlements of the city of New Orleans can easily be north of forty million dollars ($40,000,000) paid out for misconduct.

The present position of the NOPD, through the mayor's supervision, suggest a continued low tolerance to effecting positive policing change. For more than thirty (30) years, Community United for Change (CUC) and the New Orleans United Front (NOUF), in conjunction with the community, have advocated for policy change, police reform, and a paradigm shift that embraces an alteration in behavioral, social, and academic modifications for the NOPD.

Through research and investigations, it has become apparent that Community Oversight is essential in reducing police liabilities and costly expenditures to outrages judgements against law enforcement agencies while increasing public safety. The Vera Institute and the ACLU both make this a resounding force within their proposals for police reform. With the educational component, we can look into activating our civilian element to enhance the educational component. As Harvard University's John F. Kennedy School of Government pointed out, in their publication entitled "Police Science: Toward a New Paradigm…" The emergence of Evidence-Based Policing as the radical reformation of the role of science in policing.

With more than two hundred years of basically the same 'visions and theories for policing and public safety, the city of New Orleans, as one of many cities in America, finds itself behind the progressive curve of modernization. This is proving to be a costly experience for the people of New Orleans. Without hands on

safety is what you seek, the citizen, business and private sector must be on an equal setting.

# Proposal for Structural Change

The New Orleans, City Council Committee on Criminal Justice, in reaction to the concerns and comments submitted by Community United for Change (CUC) and the New Orleans United Front (NOUF), in addressing the high crime rates and the lack of Citizen Involvement within the NOPD, charged these two organizations with structuring what community involvement would look like.

After consulting with citizens and professionals throughout New Orleans and Louisiana, CUC and NOUF has compiled this report and structure as a model for community involvement and Community Oversight. It has to be pointed out that the past attempts at citizens involvement have only been window dressing attempts. Involvement without any buy in or respect for the intelligence the public can provide is not a legitimate attempt. What better problem solvers than the people who are being policed by the very agencies the people pay to serve and protect. The fact that the people pay for these services should put the people in the position of authority.

The technical term in this context can be labeled Master/ Slave relationship. There should be a consensual authoritative exchange structured relationship where one individuals' service and the other individuals' finances and monitors the people preforming the service. Service and obedience are often the core values in a master/slave relationship. Generally, the slave doesn't possess the right to voice an opinion. But in political subdivisions, the practice of knowing one's worth in many cases is overlooked. This is why the confusion between the electors and the elected officials becomes foggy at best and totally unknown at its worst. This is why citizens involvement in the political apparatus is crucial. This is why Citizens Oversight has been the missing link that has kept the apparatus from functioning in a balanced manor.

As found in many organizations, the Vera Institute recognized; "…There isn't a one-size-fits-all approach to re-envisioning public safety. However, limiting police

involvement by the citizens, any taxation becomes suspect as being taxation without representation.

The ACLU of Missouri, released a ten-year study by Professor Samuel Walker, from the University of Nebraska, which challenges one of the main conclusions of a report on police misconduct by the U.S. Civil Rights Commissions... The Commissions concluded that most civilian review boards are not effective. Dr. Walker concluded Review Boards are no more than rubber stamps of ineffective policing agencies. Dr. Walker points out, "Police Accountability" is best handled by Citizens Oversight Collaboratives that are independent from the policing agencies. He states; "...The most important factor is a set of programs that represent an active role in improving both the complaint process and police department operations..." Walker argues that the most important function of Citizen Oversight is to change police departments. Professor Walker agrees with the Civil Rights Commission that many Citizen Oversight Agencies are not adequately funded and that many lack sufficient powers.

In order for the NOPD to get ahead of the curve, the city of New Orleans must be willing to get behind the Citizens Oversight Committee with the commitment the city should have had with the federal Consent Decree. That means nothing less than full ratifications of a fully implemented plan that will effect change in the police culture. Every agency must buy-in and every citizen's must be welcomed. The DOJ has documented patterns of institutional disobedience. In the past ten (10) years of the Consent Decree, the NOPD continues to prove they have every intention to move the goal post of the Consent Decree to fit the NOPDs culture of neglect.

It is for these reasons the people of New Orleans need to be protected from the institution of disobedience through a representative body of Community Oversight, a fact that is necessary for the survival of the people of New Orleans.

# Police Community Oversight Committee Proposal

This document explains the concept of the Police Community Oversight Committee (COC) and the role that is necessary for it to play within the NOPD and the city government structure. It is the position of CUC-NOUF, among other community leaders and members of the public, that the current version of the PCABs is ineffective, disconnected, underutilized, and marginalized. The PCABs are disconnected from the operations of the NOPD, difficult to access for the public, do not represent the community, and do not have any meaningful or relevant power in terms of policing despite specific Consent Decree requirements stating otherwise.

This document provides information regarding the current position of the PCABs and proposes a new and different structure for citizen involvement. This document outlines open questions regarding PCABs that can be elevated to a new structure that ultimately complies with the NOPD Consent Decree through taskforce/ working groups then codified through City Council.

## What were PCABs Required to Be?

The Community Oversight Committee are legally mandated by the Consent Decree through the PCABs concept specifically referenced in the Consent Decree as a tool created as a collaborative structure for community weigh in on, advice and co-created policing strategies and policies.

In Paragraph 436 of the Consent Decree, the DOJ acknowledges that the NOPD and community representatives have acted jointly to create a plebiscite to facilitate regular communications and cooperation between the NOPD, the City, and community leaders. This was the mandate of the PCABs. The PCABs never realized that mandate.

Paragraph 437 outlines NOPDs agreement to work collaboratively with the community partners to develop and implement public safety strategies that respect and reflect each community's public safety priorities and concerns about particular police tactics. This paragraph was never realized through PCAB.

10

Paragraph 438 ensures an agreement for the NOPD to participate in quarterly meetings scheduled by PCAB. The purpose to allow the meeting agenda of PCAB to determine command/executive level staff representation present at all regularly scheduled meetings. The problem with this is PCAB does not have regularly scheduled meetings.

Paragraph 239 provides for the recruitment unit to conduct affirmative outreach to a broad group of community members (e.g. college and university initiatives, military outreach, the PCAB and community meetings in each District), and shall create and foster relationships with these organizations to enhance recruitment efforts. Something we haven't been able to verify.

This is just a sampling of what hasn't been done for the community. A clear indication that the Consent Decree is not being taken seriously or monitored effectively. Which lends rationale for a different approach to the Consent Decree's implementation.

## PCABs Organizationally Disconnected

Below is an abridged city organizational chart that shows were the PCABs live in relationship to the subject matter that it is supposed to advise on. As seen below, the PCABs are **not connected** to the police department, police oversight, City Council's Criminal Justice Committee, or the Mayor's Office of Criminal Justice Coordination.

The PCABs do not appear to have any organizational chain or connection to the agencies and work it is supposed to advise on and be actively engaged with under the Consent Decree.

This is a strong disconnect for community relations in connection with the Consent Decree. This is a confirmation that the NOPD has no True Bill of Good Faith in addressing the concerns and subject matter of why the Consent Decree was necessary at the outset. After all of the work the community has done to initiate a Consent Decree to remove the community from under the direct assault and battery of the NOPD, PCABs are rendering any relief. The NOPD continues to purposefully disregards the legal requirements of Constitutional law. The

11

organizational charts demonstrate the NOPDs belligerence towards the people of New Orleans as well as a distain for the institution of the federal Consent Decree.

The facts are clear, NOPD does not want community input and has labored to exclude community involvement. There are no exceptions as demonstrated by the way the NOPD has conducted its image and manages PCAB. The neglect of following the Consent Decree could be viewed as criminal behavior.

Throughout the Findings Letter of the DOJ, the NOPD has been a long-standing institution that denies Constitutional Rights to the Black Population of New Orleans. The percentage of Black to white inner actions between the NOPD lays a clear-cut picture of who is being policed and who has Constitutional Rights and privileges in New Orleans. This pattern of Constitutional Corruption has to stop and city government must stop it.

There are several problems with how the NOPD runs PCAB, we want to point out one more concern. Disciplinary Voting Bodies within the NOPD. As with other voting bodies within the NOPD, are generally closed to public scrutiny and participation. The community needs to have a seat, vote, and ability to participate if the NOPD is seriously trying to reform the structure and behaviors. The current Advisory Committees within the NOPD are governed by the Consent Decree and not codified in policy or by City Council. This needs to change. If the fruits of the Consent Decree are to be realized in New Orleans, codification by the City Council must be enacted and monitored by city government.

As presented by PCABs Organizational Charts, the disconnect between community and NOPD is clear. As referenced by the NOPD Bureaus and Divisions Chart, the continued disconnect of involvement between PCABs and the NOPD are critical in stopping the Hemorrhaging of massive amounts of disorganization.

12

# PCABs: Organizationally Disconnected

Currently, the PCABs exist under the Office of Neighborhood Engagement. The Office of Neighborhood Engagement exists under the Executive Branch of City Government, under the Mayor's Chief of Staff.

Below is an abridged city organizational chart that shows were the PCABs live in relation to the subject matter that it is supposed to advise on. As seen below, the PCABs are **not connected** to the police department, police oversight, City Council's Criminal Justice Committee or the Mayor's Office of Criminal Justice Coordination.

The PCABs do not appear to have any organizational chain or connection to the agencies and work it is supposed to advise on and be actively engaged with under the Consent Decree.



13

# NOPD Bureaus and Divisions - No Involvement from PCABs



**Superintendent of Police**

Deputy Chief - Education (DIVISION)
- Academy
- Recruitment

Deputy Chief - Operations (DIVISION)
- Community Engagement
- PIO

Deputy Chief - of the Public Integrity Bureau (PIB)
- Criminal Misconduct Investigations
- Force Investigation Team
- SIS
- Administrative Misconduct Investigations

*Chief Kirkpatrick appears to be moving this division under a different deputy chief as a separate division.*

Deputy Chief of Professional Standards and Accountability Bureau (PSAB)
- Consent Decree Implementation Section
- Information Systems Section
- Performance Standards Section (Audits)
- Policy Standards Section
- Education & Training Division
  - Officer Assistance Program
  - Crisis Intervention Training (CIT)

Deputy Chief of Management Services Bureau
- Support Services Division
  - Property Management
  - Fleet & Equipment Services Section
  - Risk Management / Accident Review Unit
- Budget Division
- Applicant Investigation Division
- Administrative Duties Division
- Human Resources Division
- Records & Identification Division

Deputy Chief of the Investigation and Support Bureau (ISB)
- Criminal Investigations Division
  - Homicide Section
  - Special Victims Section
  - Property Crimes Investigation Section
  - Juvenile Section
  - District Attorney Section
- Crime Lab & Evidence Division
  - Central Evidence & Property Section
  - Scientific Criminal Investigations Section
  - Scientific Criminal Investigations Section
- Specialized Investigations Division
  - Narcotics Section
  - Intelligence Section
  - Support Services Section

Deputy Chief of Field Operations Bureau (FOB)
- Special Operations Division
  - Violent Offender Warrant Squad
  - Tactical Platoons (SWAT)
  - Bomb Disposal Un
  - Armory Unit
  - Search and Rescue Marine Unit
  - Extradition Unit
  - K-9 Unit
  - Traffic Fatality U
  - DWI
- Communications
- District Stations
  - 1st District
  - 2nd District
  - 3rd District
  - 4th District
  - 5th District
  - 6th District
  - 7th District
  - 8th District

---

**PCABs**

- community policing strategies
- officer accountability
- special task forces
- central policy changes
- resource allocations
- strategies for a qualified and diverse workforce
- information sharing - including data - to the community

This table demonstrates that PCABs are entirely outside of the internal operations of the NOPD that PCABs should be included within.

Again, as noted on the page before - the work of the PCABs and the topics they are supposed to be embedded in, providing advisory services are spread among the department - many of which are not contained with the Field Operations Bureau.

Containing / limiting the PCABs to only the districts results in the PCABs being disconnected from the actual work they were designed to impact.

14

The Abridged City Organizational Charts are revealing and speaks to the determent of a city organization refusing to heal itself. Change can only be realized if all parties are willing to perfect change.

# Realizing Structural Change

As **Wayne Shorter stated: "Today is the only place where you can correct the past and dictate the future."**

What an opportunity for the people of New Orleans and the NOPD, to realize real change.

Here are ten (10) areas where PCAB failed to initiate any collaborative efforts to make citizen involvement a reality:

1. **Community Engagement Programs:** Implement community engagement initiatives to foster trust and collaboration between the NOPD and the residents of New Orleans.
2. **Citizen Review Committees:** Establish citizen review committees with real authority and input in monitoring the NOPD, as suggested by CUC/NOUF.
3. **Training Workshops:** Organize workshops for police officers on community-oriented policing, cultural sensitivity, and de-escalation techniques.
4. **Regular Audits:** Conduct regular audits of NOPD's practices and policies to ensure compliance with the consent decree.
5. **Public Reporting:** Regularly publish reports on NOPD's progress and challenges in meeting the consent decree requirements, enhancing transparency.
6. **Community Policing Initiatives:** Encourage and support community policing initiatives where officers are assigned to specific neighborhoods to build relationships with residents.

7. **Feedback Platforms:** Develop platforms for public feedback on police conduct, ensuring community voices are heard and considered.
8. **Policy Advocacy:** Advocate for policy changes within NOPD that align with best practices in policing and community safety.
9. **Officer Wellness Programs:** Support wellness and mental health programs for officers, promoting a healthy and effective police force.

15

10. **Data Analysis and Sharing:** Analyze and share data on crime trends and police responses, using this information to guide improvements in policing strategies.

These are a few of the areas where CUC and NOUF will provide steadfast consistency for citizens involvement.

In order for the Citizens Oversight Committee to be effective, the collaborative must be free from political influence. In order for this to manifest, the mayor's office will get one designated citizen representative. The City Council Districts will have two appointed citizen representatives each. CUC and NOUF will solicit ten professional and educational representatives. CUC and NOUF will also solicit a total of fourteen citizen representatives from the seven police districts in New Orleans and a total of ten citizen representative positions at-large. This gives a total of 49 Oversight position available to comprise the Citizens Oversight Committee (COC).

To maintain a professional contingency for the COC, the Independent Police Monitor (IPM) will maintain its current position with the city and the OCO will work with the IMP to ensure a collective calculation of policies and reforms. The IPM will continue to discharge their position as it has in the past with an added component of the CUC and the NOUF working within their frame work to booster the citizen involvement function within and after the Consent Decree has been completed.

The Criminal Justice Committee of the City Council will maintain the COC as a standing member of the Council's advisory bureau for legislation changes. As direct oversight by the City Council, the OCO will and can perfect a relationship that will be govern by Memorandum of Understanding that will be converted into policy through approval by Council and CUC and NOUF.

16

# Epilogue

The U.S. Department of Justice (DOJ), found in its wisdom, a need for the citizens of New Orleans, to have a personal stake in the deliberation and the implementation of the legally binding performance improvement plan the DOJ discovered in the investigation of the NOPD. The language used by the DOJ in characterizing the damage the NOPD has done and continues to execute on the people of New Orleans and the governmental entity is unquestionably firm and direct to the rehabilitation of a rogue organization that citizen participation was made a major consideration for the prophylactic cure of a policing agency with extreme deficiencies.

It is with the leadership the DOJ exhibited that CUC and the NOUF structured Community Oversight to remedy the failed inclusion of citizen participation attempted by the NOPD. The city is suffering from a failed plan that has caused crime to sour and police manpower to wane. Unfortunately, exiting from the Consent Decree prior to achieving its benchmarks and its purpose will only continue the "Culture of Corruption" the DOJ identified more than ten (10) years ago. For all of the money invested in the process to bring the NOPD into full compliance with national policing norms the citizens of New Orleans deserve a fully functioning Public Safety component to police our city in a respectful and equitable manner.

Democracy has claimed to be For the People, By the People and Of the People. This was in a speech given by President Abraham Lincoln, during the Civil War, better known as the Gettysburg Address, in 1863. We are in 2023, 160 years after the Gettysburg Address, will this council deny the people of New Orleans Democracy? Will this Council be the legislative leadership necessary to coordinate the policing agency from bad actors to Constitutionally recognized agency of the state?

## Resources Utilized

CUC and NOUF wish to thank the numerous resources we contacted and used for this report. Your cooperation and support is and always be invaluable to the organizations and individual work we do for the community.

I'm sure there will be a few we overlooked but your support will never be diminished by our omissions. As we know, this was a very short period of time to organize this Structural enhancement and we thank you for understanding.

**New Orleans City Council Staff Members**
**The Independent Police Monitor's Office**
**Stella Cziment**
**Police Chief Paul Murphy Sr.**
**Dr. John Penny**
**Dr. Christopher Williams**
**Senator Royce Duplessis**
**Jac Morial**
**Ronald Fletcher**
**Malcolm Suber**
**Participants at the CUC/NOUF Summit and Town Hall Meetings on Crime**

Submitted By,

W.C. Johnson

CUC December 12, 2023

Edward Parker

NOUF December 12, 2023

**From:** W. C. Johnson <███████████████████>
**Sent:** Thursday, May 9, 2024 1:31 PM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>; Stella Cziment <██████████████████>;
Jonathan Aronie <████████████████>; Malcom Suber <████████████████>; W. C. Johnson
<████████████████>
**Subject:** NOPD Consent Decree

Susie Morgan
Judge Federal District Court
Eastern District of Louisiana
500 Poydras Street
Room C322
New Orleans, Louisiana 70130
May 9, 2024

Judge Morgan:
At the March Hearing of the New Orleans Consent Decree, you stated the next meeting would
directly focus on public participation and the Police Community Advisory Board. Since the
April meeting was rescheduled, I have not seen any reference concerning the P-CAB and public
participation with the monitoring of the New Orleans Police Department (NOPD).
It has not gone unnoticed that the monitoring process for the NOPD has proceeded without the
Community being represented or even included. Community based organizations, more notably,
Grass-Roots organizations have been purposely ignored from the genesis of the federal
monitoring process.
Stella Cziment, Independent Police Monitor, raised the issue to address the P-CABs at the
March hearing. The Court quickly deferred that conversation until the next hearing (April). As
the monitoring process has revealed over the past eleven years, the people of New Orleans have
no say in what is being done and how the process is visited by the public. In the event the Court
has forgotten, it was the people of New Orleans that initiated the Department of Justice (DOJ)

to investigate the NOPD. It was also the people of New Orleans, along with the Grass-Root Organizations that took the DOJ, literally by the hand, through the city of New Orleans during the DOJs investigation. Equally, it was the Grass-Root Organizations that created the People's Consent Decree, nearly one year before the DOJ completed their investigation. Interestingly, the DOJs Consent Decree mirrored the People's Consent Decree.

As a means of full disclosure, it was this Court that denied the Amicus Brief that would have given the people of New Orleans direct involvement in the process of the Consent decree. After eleven years, it has become evident, that the monitoring process has not been as complete as if it had a monitoring team who had boots on the ground, 24/7, 365. New Orleans has been short changed through the monitoring process and now the monitoring team wants to "Rush to Judgement" on exiting the monitoring process.

The People of New Orleans, through the Grass-Roots Organizations, have determined the monitoring process has not reached the apex of the monitoring process and any signals of completion will do more harm than good to the People of New Orleans.

W.C. Johnson
Chair
Community United for Change

Cc:
 Stella Cziment
Jonathan S. Aronie
Ashley Burns
Malcolm Suber

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** W. C. Johnson <wcjohnson76@yahoo.com>
**Sent:** Monday, May 27, 2024 12:10 PM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>; Stella Cziment <███████████████>; Riaz Mehveen (CRT) <███████████████>; syeda.riza███████████████; Jonathan Aronie <███████████████>; Jean Paul Morrell <jp.morrell@nola.gov>; Helena Moreno <helena.moreno@nola.gov>; Joseph I. Giarrusso <joseph.giarrusso@nola.gov>; Freddie King <freddie.king@nola.gov>; Lesli Harris <lesli@harris4nola.com>; Eugene J. Green <eugene.green@nola.gov>; Oliver M. Thomas <oliver.thomas@nola.gov>; Mayor <mayor@nola.gov>; Edward Parker <████████████████>; Toni Jones <tjones@nocop.org>; Jacques Morial <jacquesmorial@gmail.com>
**Subject:** Letter to Judge Morgan Referencing the Consent Decree

## Community United for Chang██

### 1643 Gentilly Boulevard
### New Orleans, La. 70119
504-251-2201
wcjohnson76@yahoo.com

Susie Morgan
Judge Federal District Court
Eastern District of Louisiana
500 Poydras Street
Room C322
New Orleans, Louisiana 70130
May 27, 2024

Judge Morgan:
At the May 15, 2024, hearing on the New Orleans Police Department (NOPD) Consent Decree (CD), you were very clear that the court was interested in making all attempts to reach out to the people of New Orleans to provide inclusiveness in the process of the CD monitoring. I wish I could applaud the court for this jester of inclusiveness. However, many of the people of New Orleans, particularly the Black Community, find this a false sense of legitimacy supported by the false narrative of deeds and words the court constantly decrees with each status hearing.

From the conception of the court's involvement, the people of New Orleans, namely the Black Community, have been eliminated from any and all procedural inclusiveness the court established as it's "bully pulpit." You Judge Morgan, as the voice of the court, have demonstrated bias and racial insensitivity through directives and oversight procedures that lends a "blind eye" to what justice was institutionally intended to be.

Sitting in your court reminds one of the 1857 Dred Scott ruling by Supreme Court Justice Roger B. Taney, where the court declared; "that enslaved people were not citizens of the United States, and therefore, could not expect any protection from the federal government or the courts." History seems to be repeating itself with the lack of standing Black People of New Orleans have in the action Black People caused with decades of demonstrations and protest.

The CD Monitors, the Court and NOPD are using a "rush to judgement," in preparing the people of New Orleans, especially the Black Community, for a rational departure from the court's intense monitoring process. The court is trying to establish the appointment of the new Police Chief as being the accepted rationale for an early exit from the CD. The appointment of the new Chief has somehow colored the appointment as a "silver bullet" that could remove three-hundred years of inappropriate policing in New Orleans and turn the NOPD into a Constitutional Policing organization.

To demonstrate how the CD Monitors and the court have turned a 'blind eye' to recent behaviors of the NOPD, we will turn to several news reports that have identified blatant violations of the NOPD's Constitutional Policing Reforms. The newly appointed Police Chief has signaled a resistance to the infractions of follow officers targeted for discipline. The mayor's behaviors continue to give a silent stamp of approval for infractions to NOPD policy and procedures.

Here are just a few of the news reports being aired.

1. WDSU New Orleans teen told to strip by NOPD officer 'traumatized,' family
2. Fox 8 Feds blast NOPD investigation into officer Vappie for overlooking possible payroll fraud
3. WDSU NOPD officer accused of shoving band member, also faces payroll fraud
4. WVUE PIB investigating alleged incident of NOPD officer shoving student'
5. Fox 8 Lopsided investigations and inconsistent punishments alleged within NOPD's PIB

It is as if the "wink of the eye" has blinded all responsible parties of justice to allow this miscarriage of justice to prevail. Quietly, the court and the CD Monitors are reenforcing why the blindfold was placed so tightly around the eyes of "Lady Justice."

With all of the families and friends of NOPD Victims, and the Black Community who invested time and resources to carry the fight that eventually involved the federal government to the station we find ourselves today; We find that Chief Justice Roger B. Taney was right and America has never recognized the blood, sweat and tears that made America great and has equally ignored the descendants that continue to reinforce the structure that is called Democracy today.

As the court continues to deny access and/or an earnest weighing of public concerns to the monitoring process; the bias policing report at the last hearing demonstrated the dysfunctionality of how the court ordered agreement has been sidetracked by the signers of the

agreement. It is very noticeable that the interest of the people is not being considered by this court. Community United for Change (CUC) recently employed counsel of legal tacticians in attempts to resolve the obvious elimination of public involvement and access to the CD. We were told by the attorney's that the current tide of this court's attempts to show judicial economy has delayed justice and very little could be done to enhance the position of the Black People of New Orleans. This is justice denied!

Once again, the Black Community is faced with all roads leading to Rome and the reestablishing of the Roman Slave Law. This is being introduced through the trapdoor of this courtroom. The lack of the New Orleans Independent Police Monitor (IPM), which was originally crafted to represent the Black People of New Orleans is being eroded through the fault of the New Orleans Ethics Board and the New Orleans Office of Inspector General. The CD was the only vessel of legal oversight afforded the Black People of New Orleans. There have been several attempts by the IPM to raise issues with the enforcing of procedural standards of the oversight process only to be placed on a promissory schedule by the court to air the people's concerns. That opportunity has never materialized.

The lack of the CD Monitors holding regular Community Meetings places the burden on the IPM (who holds regular Community Meetings). The fact that the people have been waiting since February of this year to air concerns of the community is a violation of the CD within itself. The false sense of adequate oversight hangs voluminously over the city of New Orleans. With the federal court displaying an intolerable sense of contempt for the Black People of New Orleans becomes very evident. The rush to exit the NOPD's Consent Decree is a travesty of justice within itself, but the rush to exist is also preexisting bias. The Fourteenth Amendment to the US Constitution is supposed to guard against "rush to judgement," and preexisting bias.

Where are we in New Orleans, at this time and place Judge Morgan?

Submitted by:


W.C. Johnson,
Chair
for CUC
████████████

cc:
New Orleans Independent Police Monitor
Department of Justice
Consent Decree Monitors
New Orleans City Council
New Orleans Mayor
New Orleans United Front
NOCOP

**From:** W. C. Johnson <███████████████>
**Sent:** Wednesday, June 26, 2024 1:40 PM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** CUC Response to the Federal Court

Greetings Ashley:
I have a letter to the Judge Susie Morgan, attached to this email. I would appreciate you forwarding the letter to her and the court.
Thank you for your assistance in forwarding this attachment to the court.
W.C. Johnson

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

## Community United for Change
1643 Gentilly Boulevard
New Orleans, La. 70119
███████████

Susie Morgan
Judge Federal District Court
Eastern District of Louisiana
500 Poydras Street
Room C322
New Orleans, Louisiana 70130
June 26, 2024

Judge Morgan:

### Reasons and Rationale for the Lackluster Results of the NOPD Consent Decree ~ Because There is No Citizen Participation!

Oversight is designed to maintain Standards. Without Oversight Standards become flexible institutions that changes as frequently as the weather.

Case in Point:

The history of the New Orleans Police Department (NOPD) as reviewed by the U. S. Department of Justice (DOJ) in its Findings Letter of March 17, 2011, documented this: "… the NOPD has engaged in patterns of misconduct that violate the Constitution and federal law." This was the mechanism that produced the Consent Decree between the federal government and the City of New Orleans.

The Findings Letter continued, "…The DOJ through an independent investigation involved *extensive community engagement* and in-depth review of NOPD practices." Since the DOJs investigation of the NOPD, *community engagement* has been held to a minimum. After eleven (11) years, questions are reverberating around New Orleans as to why NOPD can't get it right. The simple answer is; ***no extensive engagement with the people*** and grass-root organizations of New

Orleans. The people and grass-rooted organizations fueled the initial investigation and it will take the people and grass-rooted organizations to complete the process of justice for the NOPD Consent Decree.

In all of the questions, as to why citizens involvement with the New Orleans Police Department (NOPD) Consent Decree (CD), has not borne any fruit, we must be willing to address the culture the NOPD has for any intrusion into the construct of the traditional NOPD. For any modification to the problems of historic shortcomings, the agency of the NOPD has not considered the Police Citizens Advisory Board (PCAB) approach to citizens participation as it was initiated within the federal CD. After eleven (11) years the CD cannot ignore the fact that citizen participation has no footprint on the developments loosely call progress.

Through several public court hearings of NOPDs attempt at including the citizens with the work of the CD, CUC has found few NOPD Districts willing to engage citizen participation on a continuous base. Many NOPD Districts were unable to inform public members of any scheduled meetings of their PCAB or any encouragement for citizens to become involved. While few Districts hold PCAB meetings as an informational only meeting with strong applications of being a visible model for cheerleading and rubber stamping the NOPDs unassisted policy and procedure changes.

PCABs have not experienced full applications of the intended provisions stated in the CD. At best, the eight (8) NOPD Districts, have had only a thirty-percent (30%) attempt at satisfying the PCAB requirements of open citizen participation. There is no way that attention to the PCAB portion of the CD can be realized in six (6) months to initiate a planned sustainment process. CUC had the New Orleans United Front to call the various NOPD District to seek information on dates and times for PCAB meetings. Out of eight (8) Districts, three (3) District were able to give any response to when PCAB meeting will be held. This means at least two thirds of the NOPD Districts have no workable knowledge concerning the workings of the PCAB program. This can be verified through the New Orleans Independent Police Monitor (NOIPM) who has recently made strengthening PCABs a priority.

The PCAB problem has been so serious that the NOIPM office has intervened to assist the CD Monitors in the compliance portion for PCABs. This speaks to the premature nature of any sustainment process.

CUC has fielded criticism concerning CUC's comprehensive objections to the CD not being a permanent fixture within the NOPDs existence. Let me assure the court and all other critics of CUC; CUC is only expecting the "Full Faith" and legal execution of the "Color of Law" to accomplish the spirit and intent of the court order CD for the NOPD.

As comedian Dave Chappelle stated in an interview with David Letterman concerning police behaviors, "It's not as if the people are all of a sudden irrational. There are causes for the sentiment that police are not good…police have eroded the trust in the institution."

As Dave so majestically put it, the people can infer the police institutions haven't been able to get away with unconstitutional policing for hundreds of years on their own. The courts have upheld much of the injustices the police have created in the inner cities. This is why the Black Community of New Orleans finds little to no satisfaction in this court urinating on the people and then telling them it is raining.

The process of completing the NOPD CD is nowhere close to entering the sustainment period. But DOJ, the CD Monitors and the court are trying to find rhyme and reason for a quick exit that will give Sheppard Mullin, David Douglas and Jonathan Aronie cause to begin their monitoring of the Minneapolis Consent Decree. It has not been talked about openly but the current CD monitors of the NOPD have set their sights on Minneapolis to monitor with the same failed techniques used in New Orleans. New Orleans is being used by the previously mentioned firm and monitors as a model for their so-called successes as monitors. A Sustainment Agreement in New Orleans will give the illusion of successful CD monitoring for the Sheppard Mullin associates.

At what cost to the people of New Orleans will David Douglas and Jonathan Aronie move to Minneapolis? At what cost will the court see fit to allow this to happen to the people of New Orleans?

In preparing for an untimely exit of the NOPD's CD, CUC has talked to several agencies to acquire what a civilian oversight should look like. With the introduction to this platform, CUC will share our findings.

# Introduction

The historical stains of racism and related problems are part of the history and traditions of American policing. The origins of modern-day policing can be traced back to the "Slave Patrol." The earliest formal slave patrol were created in the Carolinas in early 1700s with two missions: to establish a system of terror and to squash slave uprisings with the capacity to pursue, apprehend, and to return runaway slaves to their owners. Tactics included the use of excessive force to control and produce desired slave behavior. Today, in the spirit of the Slave Patrols, the police departments continue the Black Codes by keeping the "Afro Americans" in control and in their place. This is why America has so many unnecessary killings of Black People by policing agencies.

Slave Patrols continued until the end of the Civil War and the passage of the 13th Amendment. Following the Civil War, during Reconstruction, Slave Patrols were replaced by militia-style groups who were empowered to control and deny access of equal rights to freed slaves. The new "Slave Patrols" are now the legalized empowered policing forces authorized by the political subdivisions of every county (parish) and state in America. They relentlessly and systematically enforced Black Codes, strict local and state laws that regulated and restricted access to labor, wages, voting rights, and general freedoms for the descendants of the formerly enslaved people.

In North Carolina, the Slave Patrol Oath were administered to all Slave Patrol members. The oath went this way; "I [patroller's name], do swear, that I will as a searcher for guns, swords, and other weapons among the slaves in my district, faithfully, and as privately as I can, discharge the trust reposed in me as the law directs, to the best of my power. So, help me God." This is an oath that is still being recognized and fulfilled today throughout America by the modern-day Slave Patrols, i.e., NOPD. A major reason why there is a disconnect between the Black Community and the policing institutions, currently. A fact Dave Chappelle brought to light in his comments.

Throughout the history of policing, the need for context between race and class have always been central to the role that law enforcement agencies and the law enforcement officers play in this society. Despite some progress in making policing more just for racial and ethnic minorities, racial injustices still permeate our system

of policing and criminal justice. The incidents of racial bias and injustice that we see today, particularly in regards to arrest and the use of force, are not isolated or disconnected from the origin and evolution of American law enforcement.

No Paradigm and no society can be judged satisfactorily until these legacies have been confronted directly and resolved. America tries to claim a historic relationship with policing through the influence of models borrowed from London, England through the Metropolitan Police Act of 1829 coupled with the philosophies of Sir Robert Peel. But these attempts to establish a law-and-order agency wasn't viewed at the time as necessary for the white population. It wasn't until 1868 when the ratification of the 14th Amendment to the U.S. Constitution gave a technical umbrella of equal protection to the Africans in America. Technically, in the sense that by the 1900s local municipalities began to establish police departments to enforce local laws which included the Jim Crow laws and what they could of the Black Codes. In July of 2020, the New Yorker published a comment on policing. The New Yorker said; "The crisis in policing is the culmination of a thousand other failures-failures of education, social services, public health, gun regulation, criminal justice, and economic development." What is missing is the identification of the roles the U. S. Government and the U.S. Courts have played in this process.

What is hidden within these words of the New Yorker, is the fact that the Black People, the Africans in America, know this and sense they are the victims of the continuation of unequal rights. Blacks are always a forgotten seat at the table. They should have been given a seat at the table then, and as well as now. In order to eradicate the problems of criminality within and towards the Africans in America, the Black Community must be at the table. The continued acceleration of victimization to the Black Race has only caused repeated problems to the entire American society. The criminal justice system is heavily impacted by the bias of police actions, behaviors and the outdated judicial precedents. The system is largely driven by racial disparities and the Black Community continues to be its target. The results are brutal and long lasting.

In the Atlantic magazine June 16th, 2020, David Brooks authored the article "The Culture of Policing is Broken. In the article Derrick Johnson, President of the National Association for the Advancement of Color People (NAACP) is quoted as saying; "All cruelty begins with dehumanization-not seeing the faces of the other, not seeing the whole humanity of another, a culture regime of dehumanization has been constructed in many police departments. In that fertile ground, racial biases

can spread and become entrenched…" He continued; "The relationships between law enforcement and our communities are fractured because of decades of a bad system that has let countless issues go unaddressed." The President and CEO of the NAACP has his thumb on the pulse of bias policing throughout America. New Orleans is but one city that allows police injustice to reign supreme. It has taken a long time and many deaths and head concussions on Black People in order for the U. S. Justice Department to come to New Orleans and find the NOPD were bad actors deserving of a Consent Decree. Only to have a mayor that wants an early release even though the NOPD has not addressed and removed the deficiencies that caused the NOPD to be placed under a Consent Decree. This is not a good look for America. This is not a good look for New Orleans. This is a look that demands prolonged solutions for a "City that Love Forgot."

The history of policing in New Orleans, is one that reeks of racism and extreme poverty. Much like the slave plantations of the 1700s and the ghettos of present day. Many attempts have been made to superficially address and change this perception. Since 1718, when New Orleans was first declared a political subdivision of Louisiana, the Black Population played a strategic role in the development of New Orleans, as well as Louisiana. In 1803, one of the few successful slave revolts fueled by Toussaint L 'Overture's actions caused the Louisiana Purchase, which doubled the size of the United States. As it has been in America, the Black Race gets very little and most times no credit for their contributions to the cities, states and the nation of America.

The problems facing New Orleans, today can be traced back to the 'blinded eyes' of white America. The problems facing New Orleans then and now are no different. Even with a Consent Decree in place, the Black Populations is kept away from any and all decision-making policies, regulations and laws concern the Black Population. After eleven (11) years of the Consent Decree being in place, the role of citizen participation has been illusionary at best. The Police Citizens Advisory Boards (PCAB) have been exclusively run by the NOPD through the NOPDs schedules and agendas. After eleven (11) years, advisory positions are not strong enough to create change or give the citizens a complete buy-in to fully address the problems of police crime and social ills in New Orleans. There must be a strong and legitimate buy-in for the citizens of New Orleans to be capable of participating in change that will net New Orleans social and criminal justice changes necessary to make New Orleans a Public Safety module capable of increasing city revenues.

If public safety is what you seek, the citizen, business and private sectors must be on an equal footing.

# Proposal for Structural Change

After consulting with citizens and professionals throughout New Orleans, CUC has compiled this report and structure as a model for community involvement and community oversight. Running the risk of overlooking some of those that assisted we will acknowledge those who are fresh in our minds. Assisting in our research were: New Orleans City Council Criminal Justice Committee, New Orleans Independent Police Monitor, Superintendent Anne Kirkpatrick, Deputy Chief Keith Sanchez, Baton Rouge Police Chief Paul Murphy Sr., Dr. John Penny, Dr. Christopher Williams, Senator Royce Duplessis, Jacques Morial, Ronald Fletcher, Malcolm Suber, Albert Chui Clark, Larry Hayes. And our apologies to those who were not mentioned.

It has to be pointed out that past attempts at citizens involvement have only granted the people of New Orleans window dressing status. Involvement without any buy-in or respect for the intelligence the public can provide is not participation. What better problem solvers can there be than the people who are victims of the policies and procedures that has created this very problem. We cannot forget the very agencies the people pay to serve and protect them. The fact that the people pay for these services should put the people in the position of authority. The city complains about the amount of money they are spending for the CD. When the truth of the matter is the money comes from the people of the city. Yet the city uses our money without any inclusive method of decision making.

The technical term in this context can be labeled Master/ Slave relationship. There should be a consensual authoritative exchange structured relationship where one individual services and the other individual monitors the people preforming the service. Service and obedience are often the core values in a master/slave relationship. Generally, the slave doesn't possess the right to voice an opinion. But in political subdivisions, the practice of knowing one's worth in many cases is overlooked. This is why the confusion between the electors and the elected officials becomes foggy at best and totally blinded at its worst. This is why citizens involvement in the political apparatus is crucial. This is why Citizens Oversight (CO) has been the missing link that has kept the apparatus from functioning in a balanced manor. This is also why CO is not recognized in the CD process.

As found in many organizations, the Vera Institute recognized; "There isn't a one-size-fits-all approach to re-envisioning public safety. However, limiting police interactions and investing in community-based interventions are critical to providing for public safety in a way that's less intrusive, more just, and more constructive."

The Vera Institute found, "from 1960 to 2018, spending for policing has not lowered the crime rate. From 1977 to 2020 (corrected for inflation rates), spending increased from $45 billion to $129 billion nationally. This is a one hundred and eighty-nine (189 %) percentage rate increase.

For New Orleans, since the Consent Decree was imposed upon the NOPD, families like Arties Manning III, Adolph Grimes III, and the settlements of former Mayor Mitch Landrieu for brutality and wrongful death claims cost the city of New Orleans, in excess of twenty million dollars ($20,000,). When you combine the silent settlements, the city of New Orleans can easily be north of forty million dollars ($40,000,000) paid out for misconduct. (These are all conservative numbers)

The present position of the NOPD, through the mayor's supervision, suggest a continued low tolerance for effecting positive policing change. For more than thirty (30) years Community United for Change (CUC), in conjunction with the community and other grass-rooted organizations have advocated for policy change, and a paradigm shift that embraces an alteration in behavioral, social, and academic modifications for police reforms. It was CUC who led the movement to bring the DOJ into New Orleans.

Through research and investigations, it is apparent that Community Oversight is essential in reducing police liabilities and costly expenditures to outrages judgements against law enforcement agencies while increasing public safety. The Vera Institute and the ACLU both make this a resounding find within their proposals for police reform. With the educational component, we can look into activating our civilian element to enhance the educational component. As Harvard University's John F. Kennedy School of Government pointed out, in their publication entitled "Police Science: Toward a New Paradigm," the emergence of Evidence-Based Policing as the radical reformation of the role of science in policing.

With more than two hundred years of basically the same 'visions and theories for policing and public safety, the city of New Orleans, as one of many cities in

America, finds itself behind the nonprogressive curve of modernization. This is proving to be a costly experience for the people of New Orleans. Without a hands on approach by the citizens, any taxation becomes suspect as being without representation.

The ACLU of Missouri, released a ten-year study by Professor Samuel Walker, from the University of Nebraska, which challenges one of the main conclusions of a report on police misconduct by the U.S. Civil Rights Commissions... The Commissions concluded that most civilian review boards are not effective. Dr. Walker concluded Review Boards are no more than rubber stamps of ineffective policing agencies. Dr. Walker points out, "Police Accountability" is best handled by Citizens Oversight Collaboratives, that are independent from the policing agencies. He states; "The most important factor is a set of programs that represent an active role in improving both the complaint process and the entire police department operations." Walker argues that the most important function of Citizen Oversight is to change police departments. Professor Walker agrees with the Civil Rights Commission that many Citizen Oversight Agencies are not adequately funded and that many lack sufficient enforcement powers.

In order for the NOPD to get ahead of the curve, the city of New Orleans must be willing to get behind the Citizens Oversight Committee (COC) with the commitment the city should have with the federal Consent Decree. That means nothing less than full ratification of a fully implemented plan that will effect change in the police culture. Every agency must buy-in and every citizen must be welcomed.

# Realizing Structural Change

In realizing structural change, the CD Monitors, the City and the People of New Orleans must be willing to make a commitment to each other for the good of the city.

In establishing an effective COC both political agencies and the public agency of the people must be willing to sit at the table with shared power. Structured as a mechanized machine for the purpose of resolving a flawed system.

In order for the Citizens Oversight Committee to be effective, the collaborative must be free from political influence.

## This is what a structure can look like:

In order for this to manifest a fair and equitable process, the mayor's office will get one (1) designated citizen representative. The City Council Districts will appoint two (2) citizen representatives each. CUC will solicit ten (10) professional and educational representatives. The NOPD will solicit a total of sixteen (16) citizens representative from the eight police districts in New Orleans. CUC will solicit a total of ten (10) citizen representative position At-Large. One of these positions will include the NOIPM. This gives a total of sixty-three (63) advisory position available to comprise the Citizens Oversight Committee (COC). Out of the sixty-three members, thirteen members will be selected among the group to create a governing board to act as a jury over all operations of the sixty-three-member board.

The Criminal Justice Committee of the City Council will maintain the COC as a standing member of the Council's advisory bureau for legislation changes.

This is a workable solution for a complexed problem. In the eleven years of the CD no other agency has proposed an active citizen participation plan. If the NOPDs PCAB are suggested as being an agency example, the citizens of New Orleans must be shown the results of eleven years of PCABs work and contributions. Even the active PCAB members today have no idea what their role is and/or how to execute their role as an Advisory Board. But this is the whole point, advisory verses governance. The democracy experiment was original embraced to teach the citizens how to govern themselves.

The U.S. Department of Justice (DOJ), found in its wisdom, a need for the citizens of New Orleans, to have a personal stake in the deliberation and the implementation of the legally binding performance improvement plan. The DOJ discovered in their investigation of the NOPD that citizen buy-in was a necessary tool for completion of the CD. The language used by the DOJ was characterized by the damage the NOPD has done and continues to execute upon the people of New Orleans. The governmental entity needs to be unquestionably firm and direct to the rehabilitation of a rogue organization that need to follow the Findings Letter and the CD. The CD pointed out the need for citizen participations during the deliberation of the CD which is a major consideration for the prophylactic cure of a policing agency with extreme deficiencies.

It is because of the leadership the DOJ exhibited by its Findings Letter and in the CD that citizens understood the necessity of citizen involvement in structuring Community Oversight as a remedy to rehabilitate the failed execution of the NOPD. The city is suffering from a failed plan that has caused crime to sour and police manpower to wane. Even with the questionable statistics that show a decrease in crime in New Orleans by way of the backdoor approach to reclassifying offenses and response time. Unfortunately, exiting from the Consent Decree prior to achieving its benchmarks and its purpose will only continue the "Culture of Corruption" the DOJ identified more than eleven (11) years ago. For all of the monies invested in the process to bring the NOPD into full compliance with national policing norms, the citizens of New Orleans deserve a fully functioning Public Safety component to police our city in a respectful manor and an equitable one. The emphasis on citizens participation must be visible and viable.

In America, democracy is always recognized as being "For the People, By the People and Of the People." This was in a speech given by President Abraham Lincoln, during the Civil War. A speech better known as the Gettysburg Address, in 1863. We are in 2024, 161 years after the Gettysburg Address; will this court deny the people of New Orleans Democracy? Will this court allow for the mismanagement of 'Interruptive Law,' to prevail? The weight for the scales of justice is being tested in this court and the legacy going forward rest upon this Judge.


Submitted by:


W.C. Johnson
Community United for Change

**From:** W. C. Johnson <█████████████████>
**Sent:** Friday, July 26, 2024 1:18 PM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>; W. C. Johnson <██████████████████>
**Subject:** Letter to Judge Morgan

### Community United for Change
### 1643 Gentilly Boulevard
### New Orleans, La. 70119

█████████████

Susie Morgan
Judge Federal District Court
Eastern District of Louisiana
500 Poydras Street
Room C322
New Orleans, Louisiana 70130
July 26, 2024
Judge Morgan:

The recent news of Jeffrey Vappie, former member of the security detail for the mayor of New Orleans, being indicted with seven charges of *wire fraud* and one count of *making false statements* places a dark cloud over the head of the federal court monitoring the New Orleans Police Department (NOPD) Consent Decree (CD). It also places a dark cloud over the Sheppard Millin Group (SMG) (the CD Monitors) through a court order, who were entrusted with the correction and proper monitoring of the NOPD.

From 2013 to 2020, the NOPD has failed to correctly establish a pattern of compliance and willingness to remediate the failures pointed out in the Findings Letter of the Department of Justice (DOJ). There have been numerous reports from the SMG that suggest an unwillingness for compliance. In the past year, there has been an unexplainable improvement by the SMG of how the NOPD is being perceived to be in compliance with the CD. It is with this sudden move from non-compliance to exemplary compliance that the people of New Orleans must question if the SMG and the U.S. District Court are forming some sort of collusion to excuse the NOPD

1

from its oversight. The people of New Orleans must raise the question; has the court and the CD Monitors become afflicted with the "*blind eye*" syndrome? With the SMG moving haphazardly to end the CD in New Orleans (*in order to assume a position of federal monitoring in Minneapolis, Minnesota*) with former employees of the City of New Orleans and the NOPD. The people must raise the question; whose interest does the federal court have in the monitoring of the CD? This especially raises concern since the U.S. District Court have seen fit to eliminate any and all inclusion of the people of New Orleans in the process of executing the monitoring of the CD.

The Vappie indictments this month is not the only cause for alarm, but the questions raised in the indictments were previously raised in federal court, during several public hearing on the effectiveness of the NOPD's Public Integrity Bureau (P I B) several months ago. The federal court chose to accept the information from the NOPD and P I B but failed to rule on the information concerning the issues. It appears that the federal court is yielding to the DOJ as opposed to acting on the issues before it. Somewhere there is a double standard for the monitoring of the NOPD. One of the standards not being enforced is the protection of the people of New Orleans. Do we need to consider this as a racial concern since New Orleans is a predominately Black city?

Or is the fact that public officials, holding high office, being caught in the net of justice being treated differently. There are two questions this court must answer. Are public officials held to a separate standard then regular citizen? Are the CD Monitors held to a different standard?

The people have just cause to raise these concerns. July, 21 2023, this court issued a Rule to Show Cause why the City of New Orleans (City) should not be found to have violated eight provisions of the CD with respect to PIB investigations two provisions of the CD regarding timeliness of investigations, imposition of discipline and notifications to complainants. The cause of the courts actions was because of Officer Jeffry Vappie and his assignment to the Mayor's Executive Protection detail.

The conclusion to this Show Cause Order was the 'City' violated the CD. The court backed off because of a late filling by the 'City' inserting the oversight of Superintendent Anne Kirkpatrick who offered a Remedial Action Plan. The Order was dated November 2, 2023.

In hindsight we must ask, what about the avalanche of misconduct and criminal behaviors of the current NOPD. NOPD officer Sabrina Richardson, demoted from Commander to Lieutenant; Former NOPD Sergeant Todd Morrell, indicted on twelve counts of payroll fraud. While the CD Monitors are trying to convince the court and the people of New Orleans that the **Culture of Corruption** has been removed from the NOPD. If the NOPD CD moves into sustainment; who is going to monitor the day-to-day operations of the NOPD with this type of illegal activities continuing within NOPD ranks?

In the Show Cause Rule of July 23, 2023, thirteen (13) alleged violations to the NOPD CD were cited In the Order of this Show Cause Rule, the allegations were upheld. This is just one instance where SMG has taken the "City" to task about CD violations.

"*We the People*" of New Orleans are not convinced, as is the court, that the NOPD CD is primed for entering into a sustainment period. Nor are we comfortable that Superintendent Anne Kirpatrick is capable of making the changes this court has given her credit for. With the amount of payroll fraud, questionable crime statistics and the attitude of the mayor, LaToya Cantrell, as it relates to the maintenance for the **Rule of Law,** the people must be concerned.

2

Because it has taken the federal government to determine the nature and extent of the **_Culture of Corruption_** that has existed for decades prior to the DOJ's Finding Letter, the people are within their rights to question this court.

As stated above, both SMG and the City are pressing for an exit, through **_Sustainment_**. Considering all of the factors, NOPD has not demonstrated the **_color_** or the **_intent_** to move towards a period of sustainment. There appears to be a **_"Rush to Judgement"_** in the just conclusion of **_cultural corruption_** within, throughout and round-a-bout the **_Public Safety_** for the Residents of New Orleans. How can there be a sustainment to the NOPD CD when the NOPD is rifled with corruption non-compliance and situational phobia?

The court is charged with the proper maintenance of Balancing the Scales of Justice. Historically, the courts have been conspicuously found to have their thumb on the scales. The People of New Orleans deserve a just and impartial finding to Protect and Serve the People of New Orleans.

Electronically Signed
W.C. Johnson
Chair, CUC

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** William Snowden <███████████████>
**Sent:** Tuesday, March 19, 2024 6:19:06 PM (UTC+00:00) Monrovia, Reykjavik
**To:** eFile-Morgan <eFile-Morgan@laed.uscourts.gov>
**Cc:** czimmer███████████████ <███████████████>; jons.geissler███████
<███████████████>; donesia███████████ <███████████████>;
ABurns@consentdecreemonitor.onmicrosoft.com <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Question Regarding L in New Orleans

**CAUTION - EXTERNAL:**

Judge Morgan,

Please see the attached letter regarding some questions members of the community have raised to me regarding the presence of Louisiana State Troopers policing in New Orleans.

Thanks,

Will


William C. Snowden
Assistant Professor of Law
Loyola University New Orleans College of Law
526 Pine Street, Room 416
New Orleans, LA 70118
504-861-5683 (Office)


**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.



LOYOLA
UNIVERSITY
NEW ORLEANS

Hon. Judge Susie Morgan
Eastern District of Louisiana
500 Poydras St., Rm. C-322
New Orleans, LA 70130

March 19, 2024

Re: Louisiana State Police working in New Orleans
_____

Dear Judge Morgan:

My name is Will Snowden and I am a law professor at Loyola University New Orleans College of Law. I have been working with organized community members in New Orleans to help foster understanding of some of the recent and imminent changes to our criminal legal system as a result of Governor Jeff Landry's announced policies and legislation introduced during the special crime session over these last few weeks.

Since Governor Landry's election, he has touted a commitment <u>to bringing Louisiana State Troopers to assist the New Orleans Police Department</u> (NOPD) in policing New Orleans. The Louisiana State Police (LSP) has announced, "Troop NOLA" as being a dedicated group, like a special task force, of State Troopers assigned to New Orleans. As you are likely aware, the United States Department of Justice opened up <u>a pattern or practice investigation</u> into LSP in 2022. The history of LSP's prior approach to policing in New Orleans, and ongoing approach to policing statewide, has caused many New Orleanians to lose trust in LSP's ability to participate in constitutional policing.

One question being raised by community members, that I hope you can help answer, is: **Will Louisiana State Troopers policing in New Orleans operating under "Troop NOLA" be considered an "assignee" of NOPD and be required to comply[i] with the consent decree?** I have yet to see the release of any agreement between the City of New Orleans and the LSP to understand how the relationship is structured between the two entities.

Based on the last hearing regarding the NOPD consent decree, and other reports, it appears as if NOPD may be nearing a sustained compliance phase. If the parties, in 2012, did not envision the aforementioned arrangement between LSP and the City of New Orleans/NOPD at the time of signing the Consent Decree, and, if LSP does not have to comply with the consent decree for some reason, **what oversight will be provided for LSP's policing in New Orleans to be consistent with the standards of the consent decree?**

As part of a compliance sustainment strategy, **would it be appropriate to consider the role the Police Community Advisory Board (PCAB) could play in assisting NOPD develop and implement public safety strategies for "Troop NOLA" to abide by as a type of special task force[ii]?**

Members of the New Orleans community that I have spoken with have a particular interest in ensuring the progress made, via the consent decree, in improving what policing looks like in



New Orleans does not deteriorate or backslide with a decrease in oversight and with LSP returning to police in New Orleans in ways inconsistent with the consent decree.

Thank you for your leadership and dedication to improving policing in the City of New Orleans. I look forward to any guidance you may be able to provide in finding answers to the questions I've posed. If you have any questions for me, please do not hesitate to reach out. Or, if there may be a different person I should be addressing these questions to, please let me know.

Sincerely,

William C. Snowden

████████████████

504-861-5683

---

[i] "The City and NOPD agree to require compliance with this Agreement by their respective officers, employees, agencies, assigns, or successors." (Paragraph 490 of the New Orleans Police Department Consent Decree)

[ii] "NOPD agrees to work collaboratively with PCAB to develop and implement public safety strategies that respect and reflect each community's public safety priorities and concerns about particular police tactics. To the extent specified below, NOPD agrees to seek PCAB's assistance, counsel, and input to build community consensus on potential recommendations in areas including the following:

    a) Community policing strategies;
    b) Accountability for professional/ethical behavior by individual police offices;
    c) Special task forces that meet high priority community need;
    d) Central policy changes, where applicable, that improve quality of life;
    e) Resource allocations to meet high priority, difficult issues;
    f) Strategies for a qualified and diverse workforce;
    g) Providing information to the community and conveying feedback from the community to NOPD; and
    h) Ways to provide data and information, including information about NOPD's compliance with this Agreement, to the public I a transparent and public-friendly format, to the greatest extent allowable by law. (Paragraph 437 of the New Orleans Police Department Consent Decree)

CC) Donesia Turner, City Attorney of New Orleans
    Charles Zimmer, Counsel of Record for the City of New Orleans and NOPD
    Jonas Geissler, Attorney for the United States

**From:** Tamika-Lynell Carter-Dotson <█████████████████>
**Sent:** Thursday, March 21, 2024 11:08 AM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Police Decree Questions

Does the police decree cover the retraining of the police operators for 911 who don't answer the phone correctly and unprofessional?

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Bar Babe <▮▮▮▮▮▮▮▮▮▮▮>
**Sent:** Thursday, March 21, 2024 10:11 AM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Byron Cole?

1. Why doe mood not commit to a universal policing style recommended by the u.s.government?

2.can we initiate a grassroots leadership council designed to be a part of all policing strategies?

3. Why is the new chief avoiding grassroots interaction?

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Jewel Galloway <███████████████████>
**Sent:** Wednesday, March 20, 2024 10:06 PM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Consent Decree

Hi,
My name is Jewel Sylve a lifelong resident of New Orleans I am in favor of Maintaining the consent decree it demonstrates the city's dedication to reform, accountability, and community well being. It ensures that positive changes continue to shape policing practices over time. We have had a few recent incidents in the news involving NOPD, we are in the process of rebuilding our police force and now you bring in State trooper how is the most vulnerable part of the city supposed to feel safe knowing the history of police corruption and abuse of power within NOPD now is not the time we are not ready we have a lot of work that needs to be done in our community keep us protected.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

Susie Morgan
Judge Federal District Court
Eastern District of Louisiana
500 Poydras Street
Room C322
New Orleans, LA.  70130

April 3, 2024

Judge Morgan,

With all due respect The New Orleans NOPD consent decree must be continued until all the conditions listed are complete.  We the NOUF (New Orleans United Front), ask Your Honor to stay the course until constitutional policing is back to the norm in New Orleans.

The addition of the Louisiana State Police in our city is a problem with no one being able to explain or give a plan as to how these two agencies are working together.

We the NOUF (New Orleans United Front) ask that you please continue to demand that the consent decree is adhered to.

Thank you for your time,
Edward Parker
Annette Cranford
Belden Batiste
Gary Ballier
Leon Clark

**From:** Joel De la Rosa < ███████████████ >
**Sent:** Friday, August 16, 2024 9:33:53 PM (UTC+00:00) Monrovia, Reykjavik
**To:** eFile-Morgan < ███████████████ >
**Subject:** Say NO to Ponzi Police Reform

**CAUTION - EXTERNAL:**

Judge Susie Morgan,

I'm deeply concerned at the conflicts of interest of Effective Law Enforcement for All (ELEFA),
paid consent decree monitors who are disturbingly intertwined with police advocates in New
Orleans and Minneapolis.

I write to demand that the Department of Justice conduct an investigation into all DOJ,
NOPD, and Minneapolis employees that are now affiliated with ELEFA, and that new
monitors in New Orleans and Minneapolis are selected, free from conflicts of interest.

[Why is this important to you?] Those overseeing the practices of the police should not be
advocates for the interests of the police, but should instead be critical of our overinvestment
in reactive safety measures.

Thank you for your attention to this issue.

Joel De la Rosa



New Orleans, Louisiana 70115

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** C JG <██████████████████>
**Sent:** Wednesday, May 8, 2024 5:41:03 PM (UTC+00:00) Monrovia, Reykjavik
**To:** eFile-Morgan <██████████████████████>
**Subject:** Payroll Fraud is Alive, Well and Thriving in the NOPD

CAUTION - EXTERNAL:

Honorable Susie Morgan,

With some considerable delay I was finally able to obtain NOPD compensation numbers for 2023. A basic examination of these records reveals that Payroll Fraud is alive, well and thriving in the NOPD. Most of the same high earning officers from years past have achieved significant jumps in compensation in 2023. A past examination of 2022 payroll/detail records revealed an NOPD average of $97,193.30 and 2 officers claiming over $200,000. Records from 2023 show a dramatic increase in the average officer's compensation to $118,571.73 in 2023. Even more disturbing it revealed 33 officers with compensation levels over $200,000 in 2023 (see attached). The $200,000 officers are nearly all well known for their extensive use of Sleep Details to significantly boost their compensation at the NOPD. Below is a breakdown of compensation levels by rank at the NOPD.



It is important to note that these numbers I have provided for 2023 do not represent officers total compensation. Due to some unusual carve out, Superdome and Smoothie King detail pays are not reported to secondary employment and are therefore not reflected in these figures. In other words, if Superdome and

Smoothie King amounts were included it would boost the average compensation as well as the number of high earners who book those details.

It is often not difficult to identify those officers engaged in Payroll Fraud and a simple look at the highest paid NOPD officers is a good first step. From past examination of many of these officer's payroll records, the specifics of how these officers are cheating can easily be identified. A fine example of Payroll Fraud is officer Bakewell. Long engaged in Payroll Fraud, a previous investigation into officer Bakewell in 2021 (PIB 2021-0667-R) covered just under 3 years. It revealed over 333 payroll violations in that period, or approximately a payroll violation every third day. This stunning level of fraud resulted in officer Bakewell being promoted to Lieutenant. Even while being investigated for Payroll Fraud, officer Bakewell continued to engage in Payroll Fraud. Finally, in 2023 officer Bakewell had 5 PIB complaints initiated against him, three of these complaints were related to Payroll Fraud (2023-0047-P, 2023-0351-R and 2023-0589-R). It appears that it was only a trespassing and sexual harassment complaint that restricted officer Bakewell's access to Details as he was finally assigned to desk duty. This action in November of 2023 still permitted officer Bakewell to score over $257,000 in compensation in 2023 to become one of the highest paid employees in the city of New Orleans.

Recent crackdowns on double dipping have significantly reduced double dipping but officers have modified their behavior in order to maintain and even increase their compensation levels. This is clearly reflected in the number of $200,000+ officers in 2023.

A near complete lack of oversight at the NOPD has allowed Sleep Details and Payroll Fraud to thrive at the NOPD. A public records request reveals that the NOPD has not audited their payroll records since at least 2017. As the court's own examination of officer Vappie's investigation revealed, significant and systemic problems exist at PIB (12-1924). I have been personally and repeatedly told by officers charged with investigating officers for Payroll Fraud that they are strictly limited in the scope of their investigation. This manifests itself in three ways:

1) Officers are prevented from requesting or obtaining license plate data, cell phone data or the use of surveillance in their investigations.
2) Officers have a very real fear of being "Gernoned" if a thorough investigation is conducted.
3) Complex relationships between the officers of the NOPD present difficult conflicts of interest.

As was so publicly displayed, Captain Gernon's comprehensive investigation of Captain Richardson resulted in him being reassigned to the Crime Lab as punishment for conducting a comprehensive investigation. This example did not go unnoticed by the honest officers of the NOPD. The lack of tools, personal pressure and fear of repercussion stifles any real effort to perform an effective investigation.

I am hesitant to send criticism along without some solution. I believe there are a significant number of actions that the NOPD might consider and I have shared these ideas in the past with the Consent Monitors. However, there is a big fix required here, the abolition of PIB and its replacement by a group of civilian investigators unencumbered by their relationships with the officers of the NOPD.

Several years ago, when I began examining Payroll Fraud issues at the NOPD, it quickly became clear that PIB was one of the single most compromised groups within the NOPD. Removal of Ms. Westbrook and Capt. Richardson along with a number of other corrupt PIB officers has significantly improved PIB, but a number of corrupt officers still reside within PIB. Replacing PIB with civilian investigators devoid of attachments to the NOPD, like many other police departments have done, would go a long way in eliminating confirmational bias present in all too many of PIB's investigations. While I am encouraged by the change in direction of PIB, the court's own examination of officer Vappie's PIB investigation revealed so many of these systemic problems. Recent photos have revealed that two letters of reprimand and days of court hearings were simply not sufficient to deter officer Vappie's continued behavior.

I would hope that examples such as officers Bakewell and Vappie make clear that the NOPD is simply not equipped to police their own.  However, these officers are not isolated incidents.  The NOPD has terminated only a single officer since December of 2021, while it continues to employ officers accused of rape, domestic abuse, kidnapping, narcotics violations, DWI, and child abuse.

Sincerely,

Skip Gallagher, Ph.D.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

| ID | Officer | Rank | NOPD | Detail | Total |
|---|---|---|---|---|---|
| 017550 | Bakewell,Anthony | POLICE LIEUTENANT | $254,192.48 | 3,175.96 | 257,368.44 |
| 007582 | Blanchard,Ricky L | POLICE LIEUTENANT | $243,301.00 | 7,011.50 | 250,312.50 |
| 018101 | Wilson,Terrence D | POLICE SERGEANT | $236,694.58 | 12,070.00 | 248,764.58 |
| 019768 | Cockerham,Chad | SENIOR POLICE OFFICER | $248,309.42 | 0.00 | 248,309.42 |
| 008111 | Jackson Jr,Sidney | POLICE SERGEANT | $242,832.25 | 1,867.51 | 244,699.76 |
| 014239 | Thompson,Kevin D | POLICE SERGEANT | $203,671.87 | 39,495.54 | 243,167.41 |
| 009146 | Crowden,Bernard A | POLICE SERGEANT | $223,828.77 | 13,105.12 | 236,933.89 |
| 006568 | Caronna,Salvatore | POLICE LIEUTENANT | $192,217.71 | 41,693.80 | 233,911.51 |
| 012977 | Pruitt,Tyra | POLICE SERGEANT | $232,774.81 | 0.00 | 232,774.81 |
| 009340 | Aufdemorte,Gerald | SENIOR POLICE OFFICER | $122,961.90 | 106,819.93 | 229,781.83 |
| 010056 | Castellon,Manuel S | POLICE SERGEANT | $207,286.91 | 20,863.45 | 228,150.36 |
| 006634 | Lacabe,Gary J | POLICE SERGEANT | $222,874.85 | 0.00 | 222,874.85 |
| 017235 | Gant,Victor | POLICE SERGEANT | $221,514.10 | 110.00 | 221,624.10 |
| 007660 | Philibert,Russell C | POLICE SERGEANT | $216,923.33 | 0.00 | 216,923.33 |
| 014633 | Boone,Bianca G | POLICE SERGEANT | $167,962.36 | 48,078.23 | 216,040.59 |
| 012687 | Williams,Regina | POLICE LIEUTENANT | $208,598.31 | 6,585.95 | 215,184.26 |
| 007996 | Burke,Henry | POLICE SERGEANT | $214,395.52 | 0.00 | 214,395.52 |
| 006163 | Anderson,Daniel | POLICE LIEUTENANT | $169,676.86 | 43,223.92 | 212,900.78 |
| 019084 | Henry,Norbert | SENIOR POLICE OFFICER | $194,535.88 | 17,961.04 | 212,496.92 |
| 019465 | Coleman,Brandon | SENIOR POLICE OFFICER | $205,554.41 | 5,454.94 | 211,009.35 |
| 017305 | Packer,Andrew | POLICE SERGEANT | $207,129.31 | 2,516.00 | 209,645.31 |
| 009973 | Sam,Michael D | POLICE SERGEANT | $208,657.35 | 0.00 | 208,657.35 |
| 017387 | Mc Gee,Stephen | SENIOR POLICE OFFICER | $179,784.88 | 27,275.89 | 207,060.77 |
| 029272 | Padilla,Marlon | POLICE OFFICER | $80,975.12 | 125,600.83 | 206,575.95 |
| 029269 | Edersheim,Matthew | SENIOR POLICE OFFICER | $79,214.14 | 127,058.56 | 206,272.70 |
| 019475 | Johnson,Louis | SENIOR POLICE OFFICER | $190,181.05 | 13,984.78 | 204,165.83 |
| 010103 | Dupre,Samuel B | POLICE SERGEANT | $203,247.53 | 0.00 | 203,247.53 |
| 006944 | Luster,Ernest C | POLICE LIEUTENANT | $199,791.81 | 2,504.10 | 202,295.91 |
| 015023 | Payne-Samuel,Jennifer | POLICE SERGEANT | $185,663.39 | 16,594.91 | 202,258.30 |
| 007800 | Chambers Jr,Richard L | SENIOR POLICE OFFICER | $188,618.18 | 12,822.00 | 201,440.18 |
| 009418 | James,Gus | SENIOR POLICE OFFICER | $135,404.41 | 65,973.24 | 201,377.65 |
| 007659 | Moore,Prince | SENIOR POLICE OFFICER | $111,368.82 | 89,506.75 | 200,875.57 |
| 007158 | Thomas-Ross,Jounay | SENIOR POLICE OFFICER | $123,492.93 | 77,177.47 | 200,670.40 |

**From:** C JG <████████████████>
**Sent:** Wednesday, June 26, 2024 1:31:06 AM (UTC+00:00) Monrovia, Reykjavik
**To:** eFile-Morgan <████████████████>
**Subject:** Continued Corruption at the NOPD

**CAUTION - EXTERNAL:**

Honorable Susie Morgan,

The City and the NOPD continue to confound efforts to obtain the results of PIB investigations. I now have Public Records Requests that I filed more than 17 months ago in which I am still awaiting completed PIB investigations. I certainly understand that the NOPD, the City and the Mayor wish to avoid embarrassment by withholding these documents, but this simply flies in the face of public records law and any sort of transparency that we might expect regarding our officers.

Even when the investigations are initiated by myself, I must file a public records request for those completed investigations to learn the outcome. Even then I still may not receive the results of the investigation. The complainant should, as a matter of routine, be provided with the conclusion of a PIB investigation. This issue is not isolated to myself and I have spoken to individuals, officers and reporters who have all experienced the same behavior from the City. When a PIB file/investigation is requested the city will typically ignore the request. If the requester persists a number of responses will follow: 1) A date in the future will be provided and messaging will simply push the date further into the future until the requester abandons the attempt to obtain the record. 2) The NOPD will claim that the investigation is still ongoing and deny the request. This second point is almost never the case as there is a time limit on these investigations and those dates are well past.

It is truly disturbing that embedded in PIB's name is "Public" Integrity Bureau, yet there is little here to justify how the Public is involved when they must overcome significant barriers to obtain investigations into problem NOPD officers. This issue has become so egregious that it has forced me to file suit against the NOPD and still months later, many of these records have still not been provided and my lawyers must continue to remind the City to produce those records more than 6 months after filing suit.

PIB investigations are important and often reveal patterns of behavior. Yet once a PIB investigation into an officer is completed it is seen by a very small and select group of officers who might read the result of these investigations. As I pointed out in my 5 May 2023 email, until recently even the Chief would not read the results of these investigations and review of investigations stopped with the head of PIB. As your own court recently noted, even the Consent Monitor and the Independent Police Monitor have been restricted from access to PIB investigations.

Once these reports are completed, they are then stored and access to investigations is strictly limited. This system has allowed problem officers within the NOPD to thrive, accumulating even longer disciplinary records. Officers who in any other department would be dismissed are simply shuffled about the

1

department. In most cases even the command structure is unfamiliar with the breadth and extent of an officer's disciplinary record and must rely on internal rumors to have some vague understanding of an officer's history.

Even with the restrictions placed on access to PIB records I have managed to identify officers accused and in many cases arrested for severe infractions of the law including,

Domestic Abuse
Interfering with FBI investigations
Drug use on Duty
Driving While Intoxicated on Duty
Kidnapping
Assault
Theft
Multiple DWI's
Payroll Fraud
Narcotics Violations
Rape
Child Abuse

To be clear, the officers associated with the above behaviors are not suspended and are still actively employed with the NOPD. I would like to think that at the very least, these officers are limited to desk duty, but in some of the above examples this is not the case.

On a more positive note, I am encouraged by a number of changes at the NOPD: 1) Chief Kirkpatrick has affected real change at the NOPD and this has been noticed by both the officers of the NOPD as well as the public 2) There is some real change in behavior at PIB with removal of many of the corrupt officers that previously populated PIB. The overtly political use of PIB is fading and with the removal of a few more officers will hopefully be a thing of the past. 3) The effective use of surveillance and the Secret Squirrel Squad with respect to officer Jennings is very promising.

Certainly the recent arrests of officers Korey Jones and Christopher Jennings have been noted by officers of the NOPD, but there are still dozens of NOPD officers also engaged in identical behaviors and the arrest of two officers will not deter these officers. A real shift in attitude in pursuing criminal activity within the NOPD must occur and only further arrests may bring this sort of rooted corruption to an end within the NOPD.

Sincerely,

Skip Gallagher, Ph.D.

████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** C JG <​█████████████​>
**Sent:** Wednesday, September 18, 2024 8:36:01 PM (UTC+00:00) Monrovia, Reykjavik
**To:** Jean W. Jordan <​████████████​>
**Cc:** eFile-Morgan <​█████████████████​>
**Subject:** Re: PIB CTN: 2023-0532-P

**CAUTION - EXTERNAL:**

Hello Jean,

I am unable to obtain completed PIB reports through public records requests in a timely manner and currently have requests which are more than 14 months without a response. As you may be aware I have had to file suit against the city in order to obtain public records. A public records request through the city's portal is currently not a viable option. The law permits me to request a record directly from the organization which is in control of the record. Please consider this an official request for that record. I will cc Judge Susie Morgan in this response.

Thank you for your assistance in this matter,

Skip Gallagher, Ph.D.
█████████████

On Wed, Sep 18, 2024 at 1:33 PM Jean W. Jordan <​█████████████​> wrote:

Mr. Gallagher:

The request for the completed PIB investigation will have to be made as a Public Records Request.

I have attached the link for NextRequest for your convenience:

https://nola.nextrequest.com/

Sincerely,


Investigative Specialist Jean Jordan
New Orleans Police Department
Public Integrity Bureau
1340 Poydras Street, Ste. 1900

1

New Orleans, LA 70130
Office: 504-658-6800
Desk: ████████████

████████████

**From:** C JG <████████████>
**Sent:** Wednesday, September 18, 2024 1:26 PM
**To:** Jean W. Jordan <████████████>
**Subject:** Re: PIB CTN: 2023-0532-P

EMAIL FROM EXTERNAL SENDER: DO NOT click links, or open attachments, if sender is unknown, or the message seems suspicious in any way. DO NOT provide your user ID or password. If you believe that this is a phishing attempt, use the reporting tool in your Outlook to send this message to Security.

Thank You for your help in this matter,

If you could please forward me a copy of the completed PIB investigation.

Skip Gallagher, Ph.D.
████████████

On Wed, Sep 18, 2024 at 12:01 PM Jean W. Jordan <████████████> wrote:
Mr. Gallagher:

A hearing was conducted for 2023-0532-P.  Attached is the disciplinary outcome for this complaint.

Investigative Specialist Jean Jordan
New Orleans Police Department
Public Integrity Bureau
1340 Poydras Street, Ste. 1900
New Orleans, LA 70130
Office: 504-658-6800
Desk: ████████████

████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

Susie Morgan
Judge Federal District Court
Eastern District of Louisiana
500 Poydras Street, Room C322
New Orleans, LA.  70130

June 3, 2024

Judge Morgan,

With all due respect, The New Orleans NOPD consent decree must be continued until all the conditions listed are complete.  We the citizens of Orleans Parish representing New Orleans United Front (NOUF), ask Your Honor to stay the course until constitutional policing is established in New Orleans.

Our black community is the reason for the consent decree in the first place.  How can NOPD be removed from the consent decree? Until we have a plan and procedures in place as to how the black community will be policed and protected, we need to remain under restrictions that prevent the abusive conduct of the NOPD from the past.

The community is questioning "Who is representing the black community?"  We are not hearing from nor seeing any black community members speaking for our community during your court sessions.  We, the New Orleans United Front would very much like to be involved in this decision especially considering our black community will be the most affected by this decision.

The addition of the Louisiana State Police in our city is a problem with no one being able to explain or give a plan as to how these two agencies are working together.  Especially because of the experience of the state police and their actions regarding the unconstitutional history of violations against black citizens in our state.  And let us remember the state police are under investigation by the DOJ for their actions and treatment of black citizens throughout the state of Louisiana.

We the New Orleans United Front (NOUF) ask that you please continue to demand that the consent decree is adhered to.


Thank you for your time,
Edward Parker
Annette Cranford
Belden Batiste
Alicia Plummer
Gary Ballier
Leon Clark

**From:** hello@eyeonsurveillance.org <hello@eyeonsurveillance.org>
**Sent:** Tuesday, June 11, 2024 6:05:01 PM (UTC+00:00) Monrovia, Reykjavik
**To:** eFile-Morgan <████████████████████>
**Cc:** jons.geissler█████████████████████>; ABurns@consentdecreemonitor.onmicrosoft.com
<ABurns@consentdecreemonitor.onmicrosoft.com>; scziment███████████████████████>;
info@eyeonsurveillance.org <info@eyeonsurveillance.org>; jrw████████████████████████>;
klampkin████████████████████████>; mince███████████████████████>;
tbrowning████████████████████████>
**Subject:** NOPD and DA violating consent decree with predictive policing

**CAUTION - EXTERNAL:**

Dear Honorable Judge Morgan,

We are writing to bring to your immediate attention a serious violation of the Consent Decree by the Orleans Parish District Attorney's Office and the involvement of the New Orleans Police Department (NOPD) in this matter. By their usage of predictive policing technology, which violates Chapter 147 of the New Orleans Municipal Code Section 147-2 [1], the DA and NOPD are violating Chapter 8 (Bias-Free Policing) and Chapter 18 (Transparency and Oversight) of the Consent Decree. These issues risk the City not being able to exit the Consent Decree.

DA and NOPD are partnering on an illegal predictive policing program

On April 29, 2024, we sent a cease and desist letter to District Attorney Jason Williams regarding the illegal use of predictive policing technology by his office. Chapter 147 of the New Orleans Municipal Code, specifically Section 147-2 [1], unequivocally prohibits the use of such technology by any city official or entity. Despite this clear prohibition and our formal request, the District Attorney's Office has not ceased this illegal practice and has failed to respond to our letter.

In an interview published by WDSU news on May 29, 2024 [2], District Attorney Williams discussed the DA's office's use of predictive policing technology as part of a new initiative called NO DICE (New Orleans Data-informed Community Engagement), which aims to curb violence in specific communities by utilizing risk terrain modeling, a technique within the broader field of predictive policing, to assign risk values to certain environmental factors. Through collaboration between the NOPD and the DA's office, this risk assessment data is used to direct law enforcement efforts. However, as Williams himself noted in the article, community feedback has long identified problematic areas. For example, he mentioned a store in the Treme community that has been the subject of complaints since the 1980s. This persistent feedback from community members highlights that the issues were already well-known, contradicting the need for predictive policing software. The use of such technology is not only illegal under the current municipal code but also redundant given the

1

existing community insights.

## Predictive policing violates bias-free policing and transparency

Chapter XVIII Transparency and Oversight has the intent to "maintain systems that are meant to be sustained after the completion of this Agreement". The DA and NOPD are knowingly violating a law that was passed with overwhelming community support. New Orleans will not sustain itself if politicians are not held accountable for following city law. Eye on Surveillance has not been provided with any information in response to our cease and desist letter and there has been no transparency from the DA or NOPD about this illegal predictive policing program. This is particularly alarming because we worked with DA Williams who then as council president, sponsored the ordinance he is now violating in his current role.

The lack of transparency from the DA and NOPD regarding the illegal predictive policing program not only violates Chapter XVIII on Transparency and Oversight but also contradicts the mandates of Section VIII of the Consent Decree. Section VIII explicitly prohibits policing tactics or strategies based on bias, requiring all police activities to ensure equal protection under the law. However, the algorithms used for predictive policing and risk terrain modeling are based on data produced by the NOPD, which is inherently biased due to the department's documented history of biased policing practices.

In October 2023 [3], the Consent Decree Monitor released a special report on the deprioritization of calls for service and its impact on "gone on arrival" (GOA) dispositions and "Code 2" response times. The report concluded that the increase in GOAs is disproportionately impacting domestic violence calls, casting doubt on whether the NOPD is policing "free of gender bias" as required by the Consent Decree. Furthermore, the report noted that GOAs are not evenly distributed across the city, resulting in longer wait times for police responses in certain districts.

When these biased data points are fed into predictive policing and risk terrain modeling algorithms, the resulting predictions and strategies are inherently flawed. The biased data perpetuates and exacerbates discriminatory practices. As a result, predictive policing technology not only fails to ensure equal protection under the law, as mandated by the Consent Decree but also actively reinforces and amplifies existing biases within the NOPD.

## The District Attorney's Office is covered by the Consent Decree

Based on DA William's interview with WDSU, it's clear that the predictive policing program is a joint venture with NOPD. This predictive policing program makes the DA's office one that is "reviewing the operations of NOPD" (Consent Decree, Paragraph 8) and therefore makes it a binding party to the Consent Decree.

Putting NOPD's involvement to the side, the DA's office is also covered by the Consent Decree because its interests are aligned with the Consent Decree. The Consent Decree is between the City and the DOJ and any city body with interests that are aligned with the Consent Decree can be a covered entity.

Given these developments, we respectfully request your immediate intervention to address and rectify these violations by ensuring that NOPD does not collaborate with the DA's office in using this illegal and biased technology. The Consent Decree is clear in its mandate for bias-free policing and transparency. The use of predictive policing technology by the DA's office and NOPD directly undermines these requirements. The community feedback and long-standing complaints about specific problematic areas demonstrate that the use of such technology is not only illegal but also unnecessary.

We urge you to take swift action to prevent further violations of the Consent Decree and to protect the rights of the citizens of New Orleans. Thank you for your prompt attention to this urgent issue.

Best Regards,

Eye on Surveillance

[1] - https://library.municode.com/la/new_orleans/codes/code_of_ordinances?nodeId=PTIICO_CH147SUTEDAPR_S147-2PRSUTE

[2] - https://www.wdsu.com/article/district-attorneys-credits-no-dice-for-helping-drive-down-crime-in-communities/60872532

[3] - https://nopdconsent.azurewebsites.net/Media/Default/Documents/Docket%20Items/12-1924%20(USA)%20OCDM%20Special%20Report.pdf

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

Eye on Surveillance
PO Box 4155
New Orleans, LA 70178
info@eyeonsurveillance.org
Jun 11, 2024



EYE ON SURVEILLANCE

Judge Susie Morgan
Orleans Parish District Attorney's Office
619 S. White St.
New Orleans, LA 70119
███████████████████

Dear Honorable Judge Morgan,

We are writing to bring to your immediate attention a serious violation of the Consent Decree by the Orleans Parish District Attorney's Office and the involvement of the New Orleans Police Department (NOPD) in this matter. By their usage of predictive policing technology, which violates Chapter 147 of the New Orleans Municipal Code Section 147-2 [1], the DA and NOPD are violating Chapter 8 (Bias-Free Policing) and Chapter 18 (Transparency and Oversight) of the Consent Decree. These issues risk the City not being able to exit the Consent Decree.

DA and NOPD are partnering on an illegal predictive policing program

On April 29, 2024, we sent a cease and desist letter to District Attorney Jason Williams regarding the illegal use of predictive policing technology by his office. Chapter 147 of the New Orleans Municipal Code, specifically Section 147-2 [1], unequivocally prohibits the use of such technology by any city official or entity. Despite this clear prohibition and our formal request, the District Attorney's Office has not ceased this illegal practice and has failed to respond to our letter.

In an interview published by WDSU news on May 29, 2024 [2], District Attorney Williams discussed the DA's office's use of predictive policing technology as part of a new initiative called NO DICE (New Orleans Data-informed Community Engagement), which aims to curb violence in specific communities by utilizing risk terrain modeling, a technique within the broader field of predictive policing, to assign risk values to certain environmental factors. Through collaboration between the NOPD and the DA's office, this risk assessment data is used to direct law enforcement efforts. However, as Williams himself noted in the article, community feedback has long identified problematic areas. For example, he mentioned a store in the Treme community that has been the subject of complaints since the 1980s. This persistent feedback from community members highlights that the issues were already well-known, contradicting the need for predictive policing software. The use of such technology is not only illegal under the current municipal code but also redundant given the existing community insights.

Predictive policing violates bias-free policing and transparency

Chapter XVIII Transparency and Oversight has the intent to "maintain systems that are meant to be sustained after the completion of this Agreement". The DA and NOPD are knowingly violating a law that was passed with overwhelming community support. New Orleans will not sustain itself if politicians are not held accountable for following city law. Eye on Surveillance has not been provided with any information in response to our cease and desist letter and there has been no transparency from the DA or NOPD about this illegal predictive policing program. This is particularly alarming because we worked with DA Williams who then as council president, sponsored the ordinance he is now violating in his current role.

The lack of transparency from the DA and NOPD regarding the illegal predictive policing program not only violates Chapter XVIII on Transparency and Oversight but also contradicts the mandates of Section VIII of the Consent Decree. Section VIII explicitly prohibits policing tactics or strategies based on bias, requiring all police activities to ensure equal protection under the law. However, the algorithms used for predictive policing and risk terrain modeling are based on data produced by the NOPD, which is inherently biased due to the department's documented history of biased policing practices.

In October 2023 [3], the Consent Decree Monitor released a special report on the deprioritization of calls for service and its impact on "gone on arrival" (GOA) dispositions and "Code 2" response times. The report concluded that the increase in GOAs is disproportionately impacting domestic violence calls, casting doubt on whether the NOPD is policing "free of gender bias" as required by the Consent Decree. Furthermore, the report noted that GOAs are not evenly distributed across the city, resulting in longer wait times for police responses in certain districts.

When these biased data points are fed into predictive policing and risk terrain modeling algorithms, the resulting predictions and strategies are inherently flawed. The biased data perpetuates and exacerbates discriminatory practices. As a result, predictive policing technology not only fails to ensure equal protection under the law, as mandated by the Consent Decree but also actively reinforces and amplifies existing biases within the NOPD.

The District Attorney's Office is covered by the Consent Decree

Based on DA William's interview with WDSU, it's clear that the predictive policing program is a joint venture with NOPD. This predictive policing program makes the DA's office one that is "reviewing the operations of NOPD" (Consent Decree, Paragraph 8) and therefore makes it a binding party to the Consent Decree.

Putting NOPD's involvement to the side, the DA's office is also covered by the Consent Decree because its interests are aligned with the Consent Decree. The Consent Decree is between the City and the DOJ and any city body with interests that are aligned with the Consent Decree can be a covered entity.

Given these developments, we respectfully request your immediate intervention to address and rectify these violations by ensuring that NOPD does not collaborate with the DA's office in using this illegal and biased technology. The Consent Decree is clear in its mandate for bias-free policing and transparency. The use of predictive policing technology by the DA's office and NOPD directly undermines these requirements. The community feedback and long-standing complaints about specific problematic areas demonstrate that the use of such technology is not only illegal but also unnecessary.

We urge you to take swift action to prevent further violations of the Consent Decree and to protect the rights of the citizens of New Orleans. Thank you for your prompt attention to this urgent issue.

Best Regards,
Eye on Surveillance


[1] -
https://library.municode.com/la/new_orleans/codes/code_of_ordinances?nodeId=PTIICO_CH14
7SUTEDAPR_S147-2PRSUTE

[2] -
https://www.wdsu.com/article/district-attorneys-credits-no-dice-for-helping-drive-down-crime-in-c
ommunities/60872532

[3] -
https://nopdconsent.azurewebsites.net/Media/Default/Documents/Docket%20Items/12-1924%2
0(USA)%20OCDM%20Special%20Report.pdf

Eye on Surveillance
info@eyeonsurveillance.org
Apr 29, 2024

District Attorney Jason Williams
Orleans Parish District Attorney's Office
619 S White St
New Orleans, LA 70119

Dear District Attorney Williams,

It has come to our attention that your office is currently piloting predictive policing technologies through the Risk Terrain Modeling (RTM) software, an initiative that violates the very law you once championed as a councilmember.

Chapter 147 of the New Orleans Municipal Code, specifically Section 147-2 [1], unequivocally prohibits the use of predictive policing technology by any city official or entity. This legislation, which you supported, was designed to protect our community's privacy and to prevent the potential for systemic biases inherent in predictive policing practices. It is disheartening to see these very principles being overlooked in the pilot program your office has undertaken.

Such technologies disproportionately impact communities of color that are already burdened by over-policing and under-resourcing. While we understand and appreciate the intention to enhance public safety—indeed, Jeff Asher, your office's data analyst, has noted that murder is down 30% [2] in New Orleans—the approach taken with predictive policing is contrary to the actual needs of the community.

Furthermore, the implementation of this technology stands in stark contrast to the spirit of the ordinance, which emphasizes transparency, accountability, and the protection of civil liberties. The utilization of RTM software, particularly without a robust public discussion and thorough vetting process, bypasses the communal consensus that is vital for any surveillance-related initiative.

Therefore, Eye on Surveillance demands an immediate cessation of the predictive policing pilot program. We urge your office to reconsider its approach to harm reduction, focusing instead on strategies that build upon and directly invest in community resources, attempt to build public trust, and respect the legal framework established by our city's laws.

Please respond by May 13, 2024 confirming that the program has been terminated.

Sincerely,

Eye on Surveillance

[1] - https://library.municode.com/la/new_orleans/codes/code_of_ordinances
                            ?nodeId=PTIICO_CH147SUTEDAPR_S147-2PRSUTE
[2] - https://jasher.substack.com/p/its-early-but-murder-is-falling-even

Eye on Surveillance
PO Box 4155
New Orleans, LA 70178
info@eyeonsurveillance.org
Jun 11, 2024



**EYE ON SURVEILLANCE**

Judge Susie Morgan
500 Poydras Street
Room C322
New Orleans, LA  70130 ████████████████

Dear Honorable Judge Morgan,

We are writing to bring to your immediate attention a serious violation of the Consent Decree by the Orleans Parish District Attorney's Office and the involvement of the New Orleans Police Department (NOPD) in this matter. By their usage of predictive policing technology, which violates Chapter 147 of the New Orleans Municipal Code <u>Section 147-2</u> [1], the DA and NOPD are violating Chapter 8 (Bias-Free Policing) and Chapter 18 (Transparency and Oversight) of the Consent Decree. These issues risk the City not being able to exit the Consent Decree.

## DA and NOPD are partnering on an illegal predictive policing program

On April 29, 2024, we sent a cease and desist letter to District Attorney Jason Williams regarding the illegal use of predictive policing technology by his office. Chapter 147 of the New Orleans Municipal Code, specifically <u>Section 147-2</u> [1], unequivocally prohibits the use of such technology by any city official or entity. Despite this clear prohibition and our formal request, the District Attorney's Office has not ceased this illegal practice and has failed to respond to our letter.

In an interview published by WDSU news on <u>May 29, 2024</u> [2], District Attorney Williams discussed the DA's office's use of predictive policing technology as part of a new initiative called NO DICE (New Orleans Data-informed Community Engagement), which aims to curb violence in specific communities by utilizing risk terrain modeling, a technique within the broader field of predictive policing, to assign risk values to certain environmental factors. Through collaboration between the NOPD and the DA's office, this risk assessment data is used to direct law enforcement efforts. However, as Williams himself noted in the article, community feedback has long identified problematic areas. For example, he mentioned a store in the Treme community that has been the subject of complaints since the 1980s. This persistent feedback from community members highlights that the issues were already well-known, contradicting the need for predictive policing software. The use of such technology is not only illegal under the current municipal code but also redundant given the existing community insights.

Given these developments, we respectfully request your immediate intervention to address and rectify these violations by ensuring that NOPD does not collaborate with the DA's office in using this illegal and biased technology. The Consent Decree is clear in its mandate for bias-free policing and transparency. The use of predictive policing technology by the DA's office and NOPD directly undermines these requirements. The community feedback and long-standing complaints about specific problematic areas demonstrate that the use of such technology is not only illegal but also unnecessary.

We urge you to take swift action to prevent further violations of the Consent Decree and to protect the rights of the citizens of New Orleans. Thank you for your prompt attention to this urgent issue.

Best Regards,
Eye on Surveillance

[1] -
https://library.municode.com/la/new_orleans/codes/code_of_ordinances?nodeId=PTIICO_CH14
7SUTEDAPR_S147-2PRSUTE

[2] -
https://www.wdsu.com/article/district-attorneys-credits-no-dice-for-helping-drive-down-crime-in-c
ommunities/60872532

[3] -
https://nopdconsent.azurewebsites.net/Media/Default/Documents/Docket%20Items/12-1924%2
0(USA)%20OCDM%20Special%20Report.pdf

Eye on Surveillance
info@eyeonsurveillance.org
Apr 29, 2024

District Attorney Jason Williams
Orleans Parish District Attorney's Office
619 S White St
New Orleans, LA 70119

Dear District Attorney Williams,

It has come to our attention that your office is currently piloting predictive policing technologies through the Risk Terrain Modeling (RTM) software, an initiative that violates the very law you once championed as a councilmember.

Chapter 147 of the New Orleans Municipal Code, specifically                    [1], unequivocally prohibits the use of predictive policing technology by any city official or entity. This legislation, which you supported, was designed to protect our community's privacy and to prevent the potential for systemic biases inherent in predictive policing practices. It is disheartening to see these very principles being overlooked in the pilot program your office has undertaken.

Such technologies disproportionately impact communities of color that are already burdened by over-policing and under-resourcing. While we understand and appreciate the intention to enhance public safety—indeed, Jeff Asher, your office's data analyst, has noted that murder is down         [2] in New Orleans—the approach taken with predictive policing is contrary to the actual needs of the community.

Furthermore, the implementation of this technology stands in stark contrast to the spirit of the ordinance, which emphasizes transparency, accountability, and the protection of civil liberties. The utilization of RTM software, particularly without a robust public discussion and thorough vetting process, bypasses the communal consensus that is vital for any surveillance-related initiative.

Therefore, Eye on Surveillance demands an immediate cessation of the predictive policing pilot program. We urge your office to reconsider its approach to harm reduction, focusing instead on strategies that build upon and directly invest in community resources, attempt to build public trust, and respect the legal framework established by our city's laws.

Please respond by May 13, 2024 confirming that the program has been terminated.

Sincerely,

Eye on Surveillance

[1] - https://library.municode.com/la/new_orleans/codes/code_of_ordinances
                                        ?nodeId=PTIICO_CH147SUTEDAPR_S147-2PRSUTE
[2] - https://jasher.substack.com/p/its-early-but-murder-is-falling-even

**From:** Jason Williams <███████████>
**Sent:** Friday, June 14, 2024 11:26:56 PM (UTC+00:00) Monrovia, Reykjavik
**To:** Susie Morgan <███████████████>
**Cc:** Anne E Kirkpatrick <██████████████>; Nicholas L. Gernon <███████████>; hello@eyeonsurveillance.org <hello@eyeonsurveillance.org>; info@eyeonsurveillance.org <info@eyeonsurveillance.org>; jons.geissler ████████████████>; ABurns@consentdecreemonitor.onmicrosoft.com <ABurns@consentdecreemonitor.onmicrosoft.com>; scziment███████████████████>; Keith D. Lampkin <██████████████>; Micah Ince <████████████>; Tim Browning <█████████████>; eFile-Morgan <██████████████>
**Subject:** Re: NOPD and DA violating consent decree with predictive policing

**CAUTION - EXTERNAL:**

Good evening Judge Morgan,

I trust all is well. Please see the attached letter in response to the below.

Sincerely,

Jason Rogers Williams
Orleans Parish District Attorney
619 South White Street
New Orleans, LA 70119
504.822.2414
███████████
www.orleansda.com

**From:** hello@eyeonsurveillance.org <hello@eyeonsurveillance.org>
**Date:** Tuesday, June 11, 2024 at 1:05 PM
**To:** efile-morgan█████████████████████>
**Cc:** jons.geissler███████████████>, ABurns@consentdecreemonitor.onmicrosoft.com <ABurns@consentdecreemonitor.onmicrosoft.com>, scziment█████████████ <████████████████>, info@eyeonsurveillance.org <info@eyeonsurveillance.org>, Jason Williams <█████████████>, Keith D. Lampkin <████████████████>, Micah Ince <█████████████>, Tim Browning <█████████████>
**Subject:** NOPD and DA violating consent decree with predictive policing

Dear Honorable Judge Morgan,

1

We are writing to bring to your immediate attention a serious violation of the Consent Decree by the Orleans Parish District Attorney's Office and the involvement of the New Orleans Police Department (NOPD) in this matter. By their usage of predictive policing technology, which violates Chapter 147 of the New Orleans Municipal Code Section 147-2 [1], the DA and NOPD are violating Chapter 8 (Bias-Free Policing) and Chapter 18 (Transparency and Oversight) of the Consent Decree. These issues risk the City not being able to exit the Consent Decree.

## DA and NOPD are partnering on an illegal predictive policing program

On April 29, 2024, we sent a cease and desist letter to District Attorney Jason Williams regarding the illegal use of predictive policing technology by his office. Chapter 147 of the New Orleans Municipal Code, specifically Section 147-2 [1], unequivocally prohibits the use of such technology by any city official or entity. Despite this clear prohibition and our formal request, the District Attorney's Office has not ceased this illegal practice and has failed to respond to our letter.

In an interview published by WDSU news on May 29, 2024 [2], District Attorney Williams discussed the DA's office's use of predictive policing technology as part of a new initiative called NO DICE (New Orleans Data-informed Community Engagement), which aims to curb violence in specific communities by utilizing risk terrain modeling, a technique within the broader field of predictive policing, to assign risk values to certain environmental factors. Through collaboration between the NOPD and the DA's office, this risk assessment data is used to direct law enforcement efforts. However, as Williams himself noted in the article, community feedback has long identified problematic areas. For example, he mentioned a store in the Treme community that has been the subject of complaints since the 1980s. This persistent feedback from community members highlights that the issues were already well-known, contradicting the need for predictive policing software. The use of such technology is not only illegal under the current municipal code but also redundant given the existing community insights.

## Predictive policing violates bias-free policing and transparency

Chapter XVIII Transparency and Oversight has the intent to "maintain systems that are meant to be sustained after the completion of this Agreement". The DA and NOPD are knowingly violating a law that was passed with overwhelming community support. New Orleans will not sustain itself if politicians are not held accountable for following city law. Eye on Surveillance has not been provided with any information in response to our cease and desist letter and there has been no transparency from the DA or NOPD about this illegal predictive policing program. This is particularly alarming because we worked with DA Williams who then as council president, sponsored the ordinance he is now violating in his current role.

The lack of transparency from the DA and NOPD regarding the illegal predictive policing program not only violates Chapter XVIII on Transparency and Oversight but also contradicts the mandates of Section VIII of the Consent Decree. Section VIII explicitly prohibits policing tactics or strategies based on bias, requiring all police activities to ensure equal protection under the law. However, the algorithms used for predictive policing and risk terrain modeling are based on data produced by the NOPD, which is inherently biased due to the department's documented history of biased policing practices.

In October 2023 [3], the Consent Decree Monitor released a special report on the deprioritization of calls for service and its impact on "gone on arrival" (GOA) dispositions and "Code 2" response times. The report concluded that the increase in GOAs is disproportionately impacting domestic violence calls, casting doubt on whether the NOPD is policing "free of gender bias" as required by the Consent Decree. Furthermore, the report noted that GOAs are not evenly distributed across the city, resulting in longer wait times for police responses in certain districts.

When these biased data points are fed into predictive policing and risk terrain modeling algorithms, the resulting predictions and strategies are inherently flawed. The biased data perpetuates and exacerbates discriminatory practices. As a result, predictive policing technology not only fails to ensure equal protection under the law, as mandated by the Consent Decree but also actively reinforces and amplifies existing biases within the NOPD.


The District Attorney's Office is covered by the Consent Decree

Based on DA William's interview with WDSU, it's clear that the predictive policing program is a joint venture with NOPD. This predictive policing program makes the DA's office one that is "reviewing the operations of NOPD" (Consent Decree, Paragraph 8) and therefore makes it a binding party to the Consent Decree.

Putting NOPD's involvement to the side, the DA's office is also covered by the Consent Decree because its interests are aligned with the Consent Decree. The Consent Decree is between the City and the DOJ and any city body with interests that are aligned with the Consent Decree can be a covered entity.

Given these developments, we respectfully request your immediate intervention to address and rectify these violations by ensuring that NOPD does not collaborate with the DA's office in using this illegal and biased technology. The Consent Decree is clear in its mandate for bias-free policing and transparency. The use of predictive policing technology by the DA's office and NOPD directly undermines these requirements. The community feedback and long-standing complaints about specific problematic areas demonstrate that the use of such technology is not only illegal but also unnecessary.

We urge you to take swift action to prevent further violations of the Consent Decree and to protect the rights of the citizens of New Orleans. Thank you for your prompt attention to this urgent issue.


Best Regards,

Eye on Surveillance


[1] - https://library.municode.com/la/new_orleans/codes/code_of_ordinances?nodeId=PTIICO_CH147SUTEDAPR_S147-2PRSUTE

[2] - https://www.wdsu.com/article/district-attorneys-credits-no-dice-for-helping-drive-down-crime-in-communities/60872532

[3] - https://nopdconsent.azurewebsites.net/Media/Default/Documents/Docket%20Items/12-1924%20(USA)%20OCDM%20Special%20Report.pdf


**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.



619 South White Street
New Orleans, LA 70119

(504) 822-2414
www.orleansda.com

## OFFICE OF THE ORLEANS PARISH DISTRICT ATTORNEY

JASON ROGERS WILLIAMS

June 14, 2024

Honorable Susie Morgan
United States District Court
Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130
**Via Email Only**

**Re: Response to Eye on Surveillance Letter**

Dear Honorable Susie Morgan:

The recent correspondence from the group Eye on Surveillance (EOS) unfairly mischaracterizes the federally funded Risk Terrain Modeling (RTM) tool used as part of our Data Informed Community Engagement (NODICE) program and falsely alleges that we are purposefully violating applicable law, specifically with regard to predictive policing technology. The group also claims impropriety with NOPD's participation in NODICE.

The cited law is a city ordinance intended to impose guardrails on the City's use of surveillance technology to prevent potential misuse as technology rapidly advances. OPDA is not subject to restrictions on City entities, as our legal mandate is to represent the State. However, none of the technologies or methodologies used in RTM are within the municipality's prohibited list; in fact, we have relied on them to build out this initiative. We wouldn't ask NOPD to break guardrails; we know how hard they've worked to reach substantial consent decree compliance. Our use of RTM simply does not constitute surveillance technology. RTM is a diagnostic tool for crime prevention, it is not a predictive algorithm.

As EOS is aware, the ordinance's predictive policing provision was intended to restrict law enforcement from targeting individuals based upon a predictive algorithm versus actual intelligence and belief that individuals are engaged in criminal activity.

OPDA is a prosecuting agency and does not engage in policing. NODICE, in general, and OPDA, in particular, do not direct law enforcement deployment or investigative techniques. Further, our use of RTM is not to predict criminality or ID suspected criminals, but rather to understand and diagnose the conditions that may have contributed to a crime's occurrence. EOS ignores the unprecedented type of collaboration involved in this initiative and only mentions police and prosecutors. This does a great disservice to all of the other partners[i] in this work. In reference to any allegation of a lack of transparency, our efforts have been openly presented ad nauseum in public forums, including at City Council, and community public safety meetings as well as extensively covered in local and national media stories.

RTM is used to examine the topography and environmental factors that create vulnerabilities so that we can effectively engage and support improvements to increase safety and quality of life. It is a single yet valuable component of our larger NODICE initiative. NODICE encompasses a wide range of activities in the quest

for public safety. Notably, the actions that have grown from our NODICE initiative are almost exclusively non-law enforcement. This public safety model has been an effective resource deployment initiative in several jurisdictions nationwide. In fact, former NOPD Chief Michael Harrison employed the model during his tenure working as Commissioner for the City of Baltimore. We chose to consult with Chief Harrison for this project based not only on his successes using the strategy in Baltimore, but also because he was a staunch proponent for robust compliance with the Consent Decree and ethical policing reforms facilitated via federal oversight.

In the past EOS have been partners we were able to rely on for accountability and vetting necessary to deter the misuse of technological advances. There certainly must be space for that level of debate and discourse. However, our missions diverge when their effort becomes about handicapping the ability of government agencies to protect and advocate for real people plagued by the crime and quality of life issues that contribute to generational suffering. Their hardline opposition to crime reduction efforts not only fails to accurately reflect community priorities, but also perpetuates the misguided notion that vulnerable communities do not wish for the same secure and stable environments that others enjoy. Their stance here only serves to maintain the inequities that contribute to crime in the first place.

EOS suggests that we direct our efforts toward community investment and building trust, yet targets an initiative that does exactly that. In fact, the communities we've engaged with have expressed overwhelming support for NODICE, and the widespread collaboration it fosters serves to increase the overall efficacy of government. The NODICE initiative is regularly on the ground in communities speaking to residents; and has regular contact with a large contingent of partners from nonprofits, service providers, historians and dozens of members of clergy who have hosted forums with their constituencies to have their input on appropriate interventions heard. We will continue to employ data-informed systems to drive community engagement and create solutions to improve lives.

Sincerely,

Jason Rogers Williams
Orleans Parish District Attorney

---

[i] *Partners: City of New Orleans (including all public-facing departments), New Orleans City Council, New Orleans Police Department, Louisiana State Police, New Orleans Fire Department, NOLA Coalition, VERA Institute, Roots of Music, Claiborne Innovation District, Ubuntu Village, Tulane University, Loyola University, Communities of Hope (interfaith/multidenominational clergy coalition), SWBNO, Isaiah Institute, Dr. Angela Chalk, Dr. Raynard Sanders, New Orleans State Legislative Delegation, Cops 8, Chambers, Various Business Owners*

U.S. Department of Justice: Violence Crime Reduction Roadmap

From: hello@eyeonsurveillance.org <hello@eyeonsurveillance.org>
Sent: Thursday, June 27, 2024 8:49:02 PM (UTC+00:00) Monrovia, Reykjavik
To: Susie Morgan
Cc: Anne E Kirkpatrick; Jason Williams; Nicholas L. Gernon; info@eyeonsurveillance.org;
jons.geissler███████; ABurns@consentdecreemonitor.onmicrosoft.com; scziment███████;
Keith D. Lampkin; Micah Ince; Tim Browning; eFile-Morgan
Subject: Re: NOPD and DA violating consent decree with predictive policing

CAUTION - EXTERNAL:


Happy Thursday Judge Morgan,

Please find our response to this thread attached.

DA Williams, we thank you for your attention to this issue.

Best,
Eye on Surveillance

On 2024-06-14 18:26, Jason Williams wrote:
> Good evening Judge Morgan,
>
> I trust all is well. Please see the attached letter in response to the
> below.
>
> Sincerely,
>
> Jason Rogers Williams
>
> Orleans Parish District Attorney
>
> 619 South White Street
>
> New Orleans, LA 70119
>
> 504.822.2414
>

1

> ███████████
>
> www.orleansda.com [1]
>
> From: hello@eyeonsurveillance.org <hello@eyeonsurveillance.org>
> Date: Tuesday, June 11, 2024 at 1:05 PM
> To: efile-morgan ██████████████████████████████████>
> Cc: jons.geissler ████████████████████>,
> ABurns@consentdecreemonitor.onmicrosoft.com
> <ABurns@consentdecreemonitor.onmicrosoft.com>, scziment ████████████
> <████████████████>, info@eyeonsurveillance.org
> <info@eyeonsurveillance.org>, Jason Williams <████████████████>,
> Keith D. Lampkin <████████████████>, Micah Ince
> <████████████████>, Tim Browning <████████████████>
> Subject: NOPD and DA violating consent decree with predictive policing
>
>
> Dear Honorable Judge Morgan,
>
> We are writing to bring to your immediate attention a serious
> violation of the Consent Decree by the Orleans Parish District
> Attorney's Office and the involvement of the New Orleans Police
> Department (NOPD) in this matter. By their usage of predictive
> policing technology, which violates Chapter 147 of the New Orleans
> Municipal Code Section 147-2 [2] [1], the DA and NOPD are violating
> Chapter 8 (Bias-Free Policing) and Chapter 18 (Transparency and
> Oversight) of the Consent Decree. These issues risk the City not being
> able to exit the Consent Decree.
>
>  DA AND NOPD ARE PARTNERING ON AN ILLEGAL PREDICTIVE POLICING PROGRAM
>
> On April 29, 2024, we sent a cease and desist letter to District
> Attorney Jason Williams regarding the illegal use of predictive
> policing technology by his office. Chapter 147 of the New Orleans
> Municipal Code, specifically Section 147-2 [2] [1], unequivocally
> prohibits the use of such technology by any city official or entity.
> Despite this clear prohibition and our formal request, the District
> Attorney's Office has not ceased this illegal practice and has failed
> to respond to our letter.
>
> In an interview published by WDSU news on May 29, 2024 [3] [2],
> District Attorney Williams discussed the DA's office's use of
> predictive policing technology as part of a new initiative called NO
> DICE (New Orleans Data-informed Community Engagement), which aims to
> curb violence in specific communities by utilizing risk terrain
> modeling, a technique within the broader field of predictive policing,
> to assign risk values to certain environmental factors. Through
> collaboration between the NOPD and the DA's office, this risk
> assessment data is used to direct law enforcement efforts. However, as
> Williams himself noted in the article, community feedback has long
> identified problematic areas. For example, he mentioned a store in the

2

> Treme community that has been the subject of complaints since the
> 1980s. This persistent feedback from community members highlights that
> the issues were already well-known, contradicting the need for
> predictive policing software. The use of such technology is not only
> illegal under the current municipal code but also redundant given the
> existing community insights.
>
> PREDICTIVE POLICING VIOLATES BIAS-FREE POLICING AND TRANSPARENCY
>
> Chapter XVIII Transparency and Oversight has the intent to "maintain
> systems that are meant to be sustained after the completion of this
> Agreement". The DA and NOPD are knowingly violating a law that was
> passed with overwhelming community support. New Orleans will not
> sustain itself if politicians are not held accountable for following
> city law. Eye on Surveillance has not been provided with any
> information in response to our cease and desist letter and there has
> been no transparency from the DA or NOPD about this illegal predictive
> policing program. This is particularly alarming because we worked with
> DA Williams who then as council president, sponsored the ordinance he
> is now violating in his current role.
>
> The lack of transparency from the DA and NOPD regarding the illegal
> predictive policing program not only violates Chapter XVIII on
> Transparency and Oversight but also contradicts the mandates of
> Section VIII of the Consent Decree. Section VIII explicitly prohibits
> policing tactics or strategies based on bias, requiring all police
> activities to ensure equal protection under the law. However, the
> algorithms used for predictive policing and risk terrain modeling are
> based on data produced by the NOPD, which is inherently biased due to
> the department's documented history of biased policing practices.
>
> In October 2023 [4] [3], the Consent Decree Monitor released a special
> report on the deprioritization of calls for service and its impact on
> "gone on arrival" (GOA) dispositions and "Code 2" response times. The
> report concluded that the increase in GOAs is disproportionately
> impacting domestic violence calls, casting doubt on whether the NOPD
> is policing "free of gender bias" as required by the Consent Decree.
> Furthermore, the report noted that GOAs are not evenly distributed
> across the city, resulting in longer wait times for police responses
> in certain districts.
>
> When these biased data points are fed into predictive policing and
> risk terrain modeling algorithms, the resulting predictions and
> strategies are inherently flawed. The biased data perpetuates and
> exacerbates discriminatory practices. As a result, predictive policing
> technology not only fails to ensure equal protection under the law, as
> mandated by the Consent Decree but also actively reinforces and
> amplifies existing biases within the NOPD.
>
> THE DISTRICT ATTORNEY'S OFFICE IS COVERED BY THE CONSENT DECREE
>
> Based on DA William's interview with WDSU, it's clear that the

3

> predictive policing program is a joint venture with NOPD. This
> predictive policing program makes the DA's office one that is
> "reviewing the operations of NOPD" (Consent Decree, Paragraph 8) and
> therefore makes it a binding party to the Consent Decree.
>
> Putting NOPD's involvement to the side, the DA's office is also
> covered by the Consent Decree because its interests are aligned with
> the Consent Decree. The Consent Decree is between the City and the DOJ
> and any city body with interests that are aligned with the Consent
> Decree can be a covered entity.
>
> Given these developments, we respectfully request your immediate
> intervention to address and rectify these violations by ensuring that
> NOPD does not collaborate with the DA's office in using this illegal
> and biased technology. The Consent Decree is clear in its mandate for
> bias-free policing and transparency. The use of predictive policing
> technology by the DA's office and NOPD directly undermines these
> requirements. The community feedback and long-standing complaints
> about specific problematic areas demonstrate that the use of such
> technology is not only illegal but also unnecessary.
>
> We urge you to take swift action to prevent further violations of the
> Consent Decree and to protect the rights of the citizens of New
> Orleans. Thank you for your prompt attention to this urgent issue.
>
> Best Regards,
>
> Eye on Surveillance
>
> [1] -
> https://library.municode.com/la/new_orleans/codes/code_of_ordinances?n
> odeId=PTIICO_CH147SUTEDAPR_S147-2PRSUTE
> [2]
>
> [2] -
> https://www.wdsu.com/article/district-attorneys-credits-no-dice-for-he
> lping-drive-down-crime-in-communities/60872532
> [3]
>
> [3] -
> https://nopdconsent.azurewebsites.net/Media/Default/Documents/Docket%2
> 0Items/12-1924%20(USA)%20OCDM%20Special%20Report.pdf
> [4]
>
>
>
> Links:
> ------
> [1] http://www.orleansda.com/
> [2]
> https://library.municode.com/la/new_orleans/codes/code_of_ordinances?n
> odeId=PTIICO_CH147SUTEDAPR_S147-2PRSUTE

4

Eye on Surveillance
PO Box 4155
New Orleans, LA 70178
info@eyeonsurveillance.org
Jun 27, 2024



Judge Susie Morgan
500 Poydras Street
Room C322
New Orleans, LA  70130
**Via Email Only**

Dear Honorable Judge Morgan,

We acknowledge the receipt of the letter from District Attorney Jason Williams regarding our concerns about the usage of predictive policing/analytics technology. We appreciate the opportunity to clarify our position and address the DA's assertions.

**Executive Summary:**
1. **Definition of Predictive Analytics:** Chapter 147 of the New Orleans Municipal Code Section 147-2 explicitly defines predictive policing technology as the usage of predictive analytics software in law enforcement to predict information or trends about criminality, including but not limited to locations.
2. **Risk Terrain Modelling's (RTM) Predictive Nature:** RTM describes itself as a predictive analytics tool that uses environmental data to forecast future crime locations. This supports our assertion that the DA's office is engaging in predictive policing.
3. **Responsibility of DA's Office:** Despite claims otherwise, statements from the DA's liaison, former NOPD Chief Michael Harrison, indicate that the DA's office is assuming roles typically handled by law enforcement, raising concerns about their involvement in predictive policing.
4. **Community**: We have personally spoken to a few of the community-based nonprofits the DA listed as a partner. They have told us they are not partners with the DA's NODICE program. We ask that the DA provide clarity about what it means to be a partner. We also request evidence that the organizations he lists have affirmatively agreed to be partners.

**Clarification of Predictive Policing Definition:**
Chapter 147 of the New Orleans Municipal Code Section 147-2 [1] explicitly defines predictive policing technology as the usage of predictive analytics software in law enforcement to predict information or trends about criminality, including but not limited to locations.

The DA's response acknowledges the use of RTM to "examine the topography and environmental factors." However, it fails to address what is done with this data after examination and analysis. With RTM, topography, and environmental data are analyzed specifically to make predictions.

The critical issue here is not the type of data being collected or used but the purpose behind its usage. The DA's office is utilizing RTM to predict trends and locations of future criminal activities, which falls squarely under the definition of predictive policing as outlined in the municipal code.

**RTM, as described by RTM:**
RTM, the DA's partner, on its website explicitly describes RTM "as a measure of spatial vulnerability to crime, [that] outperforms event-dependent methods (I.e. recent past exposures, such as hot spots or near repeats) *as a predictive analytic*…by providing more accurate forecasting of the most likely locations of criminal events." [2]. In support of our assertion that these environmental data are inherently predictive, RTM describes their technology as one that uses environmental data to forecast future crime locations, which directly aligns with the definition of predictive policing. See the appendix for additional details on RTM.

**Responsibility of the DA's Office:**
The DA's letter asserts that the office is not assuming the responsibilities of the police. However, this claim is contradicted by statements from the DA's own liaison, former NOPD Chief Michael Harrison. In an interview with WDSU news on May 29, 2024 [3], Mr. Harrison acknowledged the unusual nature of the DA's office leading this initiative, stating, "Normally, this is usually not led by a district attorney's office. But here uniquely, it is." This implies that the DA's office is indeed engaging in activities typically handled by law enforcement, reinforcing our concerns about their involvement in predictive policing.

Furthermore, by generating actionable data for the NOPD and maintaining a partnership based on this data, the DA's office is effectively influencing and reviewing the operations of the NOPD as it relates to NODICE. This level of involvement triggers Chapter 8 of the Consent Decree, which states that any entity that reviews NOPD operations becomes a binding party to the Consent Decree. Consequently, the DA's office must adhere to the provisions of the Consent Decree, including those related to bias-free policing and transparency.

**Call for Compliance with the Consent Decree:**
The use of predictive policing technology not only violates municipal law but also undermines the principles of equal protection and non-discrimination central to the Consent Decree. We urge the DA's office and NOPD to adhere to the Consent Decree's mandates for bias-free policing and transparency and we request the immediate cessation of this practice to ensure compliance with legal standards.

Thank you for your attention to this critical issue.

Best Regards,
Eye on Surveillance

**Citations:**

[1] - https://library.municode.com/la/new_orleans/codes/code_of_ordinances?nodeId=PTIICO_CH14 7SUTEDAPR_S147-2PRSUTE (accessed on 6/18/2024)

[2] - https://www.riskterrainmodeling.com/prediction.html (accessed on 6/18/2024)

[3] - https://www.wdsu.com/article/district-attorneys-credits-no-dice-for-helping-drive-down-cr ime-in-communities/60872532 (accessed on 6/18/2024)

**Appendix:**

Image 1: Risk Terrain Modeling (Official Site):

6/18/24, 7:16 PM                               Prediction - Risk Terrain Modeling | Official Site

HOME     ABOUT     BENEFITS     GETTING STARTED     PRESS AND MEDIA     RESOURCES     TOPICS

BLOG     CONTACT     LOG IN



As shown in the graphic below, Risk Terrain Modeling (RTM), as a measure of spatial vulnerability to crime, outperforms event-dependent methods (i.e. recent past exposures, such as hot spots or near repeats) as a predictive analytic. But, more importantly, a combined vulnerability-exposure measure outperforms both solo methods. By large margins. This would be expected according to the Theory of Risky Places.

Research finds that combining risk from exposure (past events) and vulnerability (environment) when modeling crime distribution can improve crime suppression and prevention efforts by providing more accurate forecasting of the most likely locations of criminal events. All models tested in the *Frontiers in Applied Mathematics and Statistics* article "Predicting Dynamical Crime Distribution from Environmental and Social Influences", perform better than random, with the composite model performing better than the RTM-only model and the event-dependence-only model, in that order. The RTM-only prediction is roughly 70% better than the event-dependent prediction (i.e., hot spot, near repeat). And the composite model prediction is more than 100% better than the event-dependent prediction.

From: hello@eyeonsurveillance.org <hello@eyeonsurveillance.org>
Sent: Monday, August 5, 2024 4:37:48 PM (UTC+00:00) Monrovia, Reykjavik
To: eFile-Morgan
Cc: Info
Subject: Federal monitors conflict of interest

CAUTION - EXTERNAL:


Good morning Judge Morgan,

While looking into the predictive policing issue, something new has come to our attention. We wanted to raise it with you directly first in case we are misunderstanding something. Please review the attached letter for details.

We are planning to inform the DOJ about this conflict of interest later this week. It would be greatly appreciated if you could confirm that these conflicts have not been waived, at your earliest convenience.

Best,
Eye on Surveillance
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

Eye on Surveillance
PO Box 4155
New Orleans, LA 70178
info@eyeonsurveillance.org
Aug 5, 2024



Judge Susie Morgan
500 Poydras Street
Room C322
New Orleans, LA  70130
**Via Email Only**

Dear Honorable Judge Morgan,

We are writing to request your immediate investigation into a conflict of interest involving David L. Douglass, the deputy consent decree monitor. Our concerns are as follows:

1. Conflict of Interest:
    a. Effective Law Enforcement for All (ELEFA), a non-profit founded by Douglass, currently employs Michael Harrison, a former NOPD superintendent that Douglass has previously monitored.
    b. Harrison is now a liaison to District Attorney Jason Williams' predictive policing program.
    c. This program violates Chapter 147 of the New Orleans Municipal Code Section 147-2, which prohibits the use of predictive policing technology. Risk Terrain Modeling (RTM), the DA's technology partner, explicitly describes its tool "as a predictive analytic". The use of this technology by the DA in partnership with NOPD violates the bias-free policing and transparency provisions of the Consent Decree.
2. The employment of Harrison by Douglass violates paragraph 464 of the Consent Decree, which states: "Unless such conflict is waived by the Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement."
3. We have sent multiple emails to the monitors about our predictive policing concerns and have received no response. We went in person to the monitors' public forum and Mr Douglass himself acknowledged that he had not read what we sent. We believe this lack of response is due to the conflict of interest that we have outlined.

Given these issues, we respectfully request the following:

1. That you advise as to whether or not this conflict has been waived.
2. If this conflict has not been waived, that you immediately investigate this conflict of interest and any additional conflicts that may exist.

1

Eye on Surveillance
PO Box 4155
New Orleans, LA 70178
info@eyeonsurveillance.org
Aug 5, 2024



EYE ON SURVEILLANCE

Judge Susie Morgan
500 Poydras Street
Room C322
New Orleans, LA  70130
**Via Email Only**

3.  That you direct the District Attorney's office and NOPD to immediately cease all programs involving predictive policing technology, as they violate the municipal code and likely the Consent Decree.

We are prepared to provide additional information as needed and await your prompt response on these critical issues.

Best,

Eye on Surveillance

2

From: hello@eyeonsurveillance.org <hello@eyeonsurveillance.org>
Sent: Wednesday, August 14, 2024 3:42:58 PM (UTC+00:00) Monrovia, Reykjavik
To: Info
Subject: doj federal monitors have conflicted interest

CAUTION - EXTERNAL:


Good morning,

We would like to make you aware of a conflict of interest between the federal monitors and the City of
New Orleans. It concerns Mr Douglass'
ELEFA organization which has active financial ties to many of the same individuals who used to run
NOPD. This conflict is in direct violation of paragraph 464 of the consent decree.

In order to prevent further waste of taxpayer money:
1. The DOJ must conduct an investigation into all DOJ, NOPD, and Minneapolis employees that are
now affiliated with ELEFA.
2. New monitors in New Orleans and Minneapolis must be selected, free from conflicts of interest.

Our detailed thoughts can be found on this blog post:
https://eyeonsurveillance.org/blog/ponzi-police-reform

Please respond to info@eyeonsurveillance.org for the quickest response.

Thank you for your consideration,
Eye on Surveillance
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when
opening attachments or clicking on links.

**From:** Eye on Surveillance <hello@eyeonsurveillance.org>
**Sent:** Tuesday, August 20, 2024 12:07:22 AM (UTC+00:00) Monrovia, Reykjavik
**To:** eFile-Morgan <​███████████████████​>
**Subject:** Say NO to Ponzi Police Reform

**CAUTION - EXTERNAL:**

Judge Susie Morgan,

I'm deeply concerned at the conflicts of interest of Effective Law Enforcement for All (ELEFA), paid consent decree monitors who are disturbingly intertwined with police advocates in New Orleans and Minneapolis.

I write to demand that the Department of Justice conduct an investigation into all DOJ, NOPD, and Minneapolis employees that are now affiliated with ELEFA, and that new monitors in New Orleans and Minneapolis are selected, free from conflicts of interest.

As a community group representing many people's interests, we feel it is important to speak up when we see conflicts of interest in those who watch the police. Those overseeing the practices of the police should not be advocates for the interests of the police, but should instead be critical of our overinvestment in reactive safety measures.

Thank you for your attention to this issue.

Eye on Surveillance
hello@eyeonsurveillance.org
400 Poydras St
New Orleans, Louisiana 70130

1

**eFile-Morgan**

| | |
|---|---|
| **From:** | hello@eyeonsurveillance.org |
| **Sent:** | Tuesday, October 22, 2024 9:25 AM |
| **To:** | eFile-Morgan; Jonas.Geissler█████████; LAEDdb_Clerk |
| **Cc:** | ABurns; Info |
| **Subject:** | Douglass needs |
| **Attachments:** | EOS_Monitors_Oct22.pdf |

CAUTION - EXTERNAL:

Good morning Judge Morgan and Mr Geissler,

We are writing ahead of today's meeting with the monitoring team. We ask that you prevent representatives of Sheppard Mullin from unilaterally declaring that Mr Douglass has no conflict of interest given there has been no waiver for his activities from either the City or DOJ.

As an employee of Sheppard Mullin, it is inappropriate to have the monitors use public space to authoritatively deny claims without giving the public an opportunity to speak. We assume the public will be muted, blocked from commenting in chat publicly, and unable to see other attendees, like things were at the last virtual "community" meeting held my the monitors.

Please see the attached letter for more details.

Best,
Eye on Surveillance
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**Eye on Surveillance**
Oct 22, 2024

On October 8, 2024, at a community meeting hosted by the Consent Decree Monitors, where Deputy Monitor David Douglass responded, for the first time, to allegations of corruption raised by Eye on Surveillance (EOS). Since August 18, EOS has been working to pressure the Consent Decree judge, the monitors, and the Department of Justice (DOJ) to open an investigation into Douglass.

To that end, we recently met with the DOJ who asked us to send us a memo they could use for the purposes of looking into the allegations. At the core of our memo is Paragraph 464 of the Consent Decree, which explicitly prohibits monitors from accepting employment or providing consulting services that would present a conflict of interest.

At the October 8th meeting, Douglass offered two reasons why he believes there is no conflict of interest:
1. A conflict only exists if someone has a claim against the city.
2. The individuals in question are not current employees.

However, these justifications are problematic for several reasons:
- **That definition is invented**. The Consent Decree never defines conflicts of interest in this manner. A more grounded definition comes from DOJ guidelines which forbid employees from working with anybody who has "substantial interest that would be directly affected by the outcome of the investigation or prosecution".
- **Employees are involved.** Douglass is an active member of the Consent Decree monitoring team. Michael Harrison, former NOPD superintendent and current ELEFA employee, has an active contract where he works on a joint DA-NOPD program. Although this program violates Chapter 147, Section 147-2 of the New Orleans Municipal Code, Douglass and the other Consent Decree monitors have done nothing to stop NOPD's participation.
- **The monitors are not impartial.** At this same meeting, the Head monitor, Jonathan Aronie, who is also under contract of the Consent Decree, argues that ELEFA's existence has not created a conflict. This amounts to another instance of a conflict of interest, seeing as Aronie works for the same law firm as Douglass.
- **The public disagrees.** Monitor's opining about whether or not they feel their acts constitute a conflict of interest is anemic to addressing the public's concerns about Douglass' conflict of interest.
- **EOS has filed a claim** against the city as formally as possible through letters to the judge. Douglass himself told EOS members at a community meeting, that there is no further action they can take.
- **Potential conflicts must be waived.** According to Paragraph 464, the City and DOJ must explicitly waive potential conflicts such as this, even if it is believed that the conflict is immaterial.

**Demands:**
1. The DOJ must conduct a thorough investigation into all DOJ, NOPD, and Minneapolis employees that are now affiliated with ELEFA.
2. Douglass, and any other monitors with a conflict, must be removed from office and replaced with new monitors in both New Orleans and Minneapolis, ensuring they are free from any conflicts of interest.
3. Representatives from Sheppard Mullin are forbidden from addressing the conflict of interest in public meetings without a member of the DOJ or City being there to corroborate their statements.

**From:** hello@eyeonsurveillance.org <hello@eyeonsurveillance.org>
**Sent:** Thursday, November 7, 2024 6:32:39 PM (UTC+00:00) Monrovia, Reykjavik
**To:** info@eyeonsurveillance.org <info@eyeonsurveillance.org>
**Cc:** scziment▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓>; Stephanie Willi <▓▓▓▓▓▓▓▓▓▓>; Elijah Appelso
<▓▓▓▓▓▓▓▓▓▓>
**Subject:** Domestic violence misclassification at NOPD

**CAUTION - EXTERNAL:**

Good afternoon,

Please find the attached press release announcing our report revealing significant issues in how NOPD classifies complaints related to domestic violence. The recommendations were made in partnership with ACLU-LA and the Office of the Independent Police Monitor. You can find the full report here.

Thanks,
Eye on Surveillance

ps - please reply to info@eyeonsurveillance.org

---

[NEW ORLEANS, November 7, 2024] — Eye on Surveillance (EOS NOLA), in partnership with the American Civil Liberties Union of Louisiana (ACLU-LA) and the New Orleans Office of the Independent Police Monitor (OIPM), today released a report revealing significant issues in how the New Orleans Police Department (NOPD) classifies complaints related to domestic incident investigations.

The research found that 40% of complaints related to domestic incident investigations for 2016-2023 were misclassified or underreported, raising serious concerns about transparency and accountability in the department's handling of these sensitive cases.

This review comes at a critical time, as Louisiana continues to face challenges in addressing domestic violence. According to Tulane University's Newcomb Institute, the state ranks lowest in the justice dimension of the U.S. Women Peace and Security Index, scoring below average on all 12 indicators.

"The Office of the Independent Police Monitor joins in the concerns expressed in the informative report released by Eyes on Surveillance (EOS)," states Stella Cziment, Independent Police Monitor. "The key finding that 40% of the complaints related to domestic incident allegations were misclassified or underreported is alarming. The OIPM commits to working with these partners and the community in the coming year to address these discrepancies."

Cziment adds, "In accordance with the proposed sustainment strategy, the OIPM will assume a larger role in audit compliance moving forward and will provide additional checks on complaint classifications completed by the Public Integrity Bureau. Complaints, like these, that are misclassified are effectively undercounted and will be left unaddressed in any remedial strategies for the department. It is vital that these complaints are identified for what they are, properly investigated under the appropriate allegation, and these survivors are not revictimized when they go to the police department for accountability and help. For these reasons, the OIPM partners with EOS and the American Civil Liberties Union-Louisiana (ACLU-LA) to put forth policy recommendations calling for the codification of reporting requirements, developing a standardization classification system, and establishing a data reconciliation process."

**Key Findings and Recommendations:**

- From 2016-2023, approximately 40% of complaints related to domestic incident investigations were misclassified or underreported.

1

- Three key policy recommendations have been proposed:
    1. Codifying existing reporting requirements.
    2. Developing a standardized classification system.
    3. Establishing a data reconciliation process.

This research follows a pattern of concerns about NOPD's handling of sensitive cases. In 2011, the U.S. Department of Justice identified systematic misclassification of sexual assaults and deficient investigations, leading to the 2012 Consent Decree.

The full report, including detailed methodology and complete policy recommendations, is available here and the condensed report is available here.

**About EOS NOLA**

Eye on Surveillance is a grassroots coalition of individuals and organizations united to divest our city from surveillance and invest in communities. Since 2019, EOS has organized successful campaigns against the city's use of racially-biased surveillance tools and serves as a local resource regarding the harms of law enforcement surveillance use.

For media inquiries, please contact us at info@eyeonsurveillance.org.

Follow EOS on Instagram, Twitter, and Facebook.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.



**EYE ON SURVEILLANCE**

**FOR IMMEDIATE RELEASE: EOS ANNOUNCES RELEASE OF REPORT ON NOPD'S MISCLASSIFICATION OF COMPLAINTS RELATED TO DOMESTIC INCIDENT INVESTIGATIONS, IN PARTNERSHIP WITH ACLU-LOUISIANA AND THE OFFICE OF THE INDEPENDENT POLICE MONITOR.**

[NEW ORLEANS, November 7, 2024] — Eye on Surveillance (EOS NOLA), in partnership with the American Civil Liberties Union of Louisiana (ACLU-LA) and the New Orleans Office of the Independent Police Monitor (OIPM), today released a report revealing significant issues in how the New Orleans Police Department (NOPD) classifies complaints related to domestic incident investigations.

The research found that 40% of complaints related to domestic incident investigations for 2016-2023 were misclassified or underreported, raising serious concerns about transparency and accountability in the department's handling of these sensitive cases.

This review comes at a critical time, as Louisiana continues to face challenges in addressing domestic violence. According to Tulane University's Newcomb Institute, the state ranks lowest in the justice dimension of the U.S. Women Peace and Security Index, scoring below average on all 12 indicators.

"The Office of the Independent Police Monitor joins in the concerns expressed in the informative report released by Eyes on Surveillance (EOS)," states Stella Cziment, Independent Police Monitor. "The key finding that 40% of the complaints related to domestic incident allegations were misclassified or underreported is alarming. The OIPM commits to working with these partners and the community in the coming year to address these discrepancies."

Cziment adds, "In accordance with the proposed sustainment strategy, the OIPM will assume a larger role in audit compliance moving forward and will provide additional checks on complaint classifications completed by the Public Integrity Bureau. Complaints, like these, that are misclassified are effectively undercounted and will be left unaddressed in any remedial strategies for the department. It is vital that these complaints are identified for what they are, properly investigated under the appropriate allegation, and these survivors are not revictimized when they go to the police department for accountability and help. For these reasons, the OIPM partners with EOS and the American Civil Liberties Union-Louisiana (ACLU-LA) to put forth policy recommendations calling for the codification of reporting requirements, developing a standardization classification system, and establishing a data reconciliation process."

**Key Findings and Recommendations:**

- From 2016-2023, approximately 40% of complaints related to domestic incident investigations were misclassified or underreported.

- Three key policy recommendations have been proposed:
  1. Codifying existing reporting requirements.
  2. Developing a standardized classification system.
  3. Establishing a data reconciliation process.

This research follows a pattern of concerns about NOPD's handling of sensitive cases. In 2011, the U.S. Department of Justice identified systematic misclassification of sexual assaults and deficient investigations, leading to the 2012 Consent Decree.

The full report, including detailed methodology and complete policy recommendations, is available here and the condensed report is available here.

**About EOS NOLA**

Eye on Surveillance is a grassroots coalition of individuals and organizations united to divest our city from surveillance and invest in communities. Since 2019, EOS has organized successful campaigns against the city's use of racially-biased surveillance tools and serves as a local resource regarding the harms of law enforcement surveillance use.

For media inquiries, please contact us at info@eyeonsurveillance.org.

Follow EOS on Instagram, Twitter, and Facebook.

**From:** hello@eyeonsurveillance.org <hello@eyeonsurveillance.org>
**Sent:** Thursday, November 7, 2024 9:55:49 PM (UTC+00:00) Monrovia, Reykjavik
**To:** Elizabeth.White █████████████████████████████████████████ >; David.Adams ████████████████████████████████████████████ >;
Arusha.Gordon ███████████ >; jonas.geissler ████████████████████████████████ >;
Jonas.Geissler █████████████████████████████ >; Maria.Acker ██████████████████████████ >;
Maureen.Johnston ████████████████████████████████ >; ojpmedia ███████████████████████████ >;
Shaketta.Cunningham ████████████████████████████████ >; timothy.mygat ████████████
< ███████████████████ >; Regan.Rush ████████████████ >
**Cc:** info@eyeonsurveillance.org <info@eyeonsurveillance.org>; david ██████████████████████████ >;
jericare ████████████ < ████████████████████ >; bethbutler.south █████████████████████████████████ >; Bob
Murrell <bob.murrell ██████████████ >; Pearl Ricks < ███████████████████████ >; rt4chair ███████████████
< ████████████████████ >; Caroline Sinders < ████████████████████ >
**Subject:** United against consent decree conflicts

**CAUTION - EXTERNAL:**

Department of Justice,

We are writing along with other local and national organizations to express deep concerns with conflicts of interest within the monitoring team in
New Orleans that also impact Minneapolis. This is in addition to our petition where members of the public have been writing in support of these
concerns.

Please send responses to info@eyeonsurveillance.org.

Sincerely,

Eye on Surveillance, Louisiana - eyeonsurveillance.org

A Community Voice, Louisiana - acommunityvoice.org
Convocation Research + Design, National - convocation.design
Democratic Socialists of America, Louisiana - dsaneworleans.org
Libertas, Utah - libertas.org
Reproductive Justice Action Collective, Louisiana - rejacnola.org
Restore the Fourth, National - restorethe4th.com

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening
attachments or clicking on links.

To the Department of Justice (DOJ):

We are a coalition of civil rights and community-based organizations working in New Orleans to halt the local government's expansion of surveillance tools such as facial recognition and to increase oversight of current government surveillance methods.

Since the summer of 2024, we have been urging the parties of the Consent Decree to halt NODICE, a joint NOPD-DA program that uses RTM, a tool described as a predictive analytic tool[1] by the company that designed the software. This tool violates Chapter 147 of the New Orleans Municipal Code Section 147-2 [2], which explicitly defines predictive policing technology as the usage of predictive analytics software in law enforcement to predict information or trends about criminality, including but not limited to locations.

During the course of urging you all to halt this program, we discovered that Deputy Monitor David L. Douglass currently employs former NOPD superintendent Michael Harrison, who is an active advisor to the NOPD-DA program. Since this discovery, we have been alerting you to the ever-growing list of conflicts of interest involving Deputy Douglass.

These conflicts of interest came to a head on October 29, 2024, when Ashley Burns, a member of the Consent Decree Monitor's team publicly supported Eye on Surveillance's allegations [3] that Deputy Douglass, in his role as a Consent Decree Monitor, has conflicts of interest.

Specifically, when referring to the conflicts of interest, Dr. Burns stated: "I did cofound ELEFA with David and I am not affiliated with it at all anymore and I agree with the community. I think it's a great great great conflict of interest, among a lot of other ethical and integrity issues". [4]

At the core of our allegations is Paragraph 464 [5] of the Consent Decree, which explicitly prohibits monitors from accepting employment or providing consulting services that would present a conflict of interest. The paragraph states:

**"Unless such conflict is waived by the Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement."**

EOS believes that Deputy Monitor Douglass has engaged in several activities that present a clear conflict of interest:

1. Douglass is the founder of Effective Law Enforcement for All (ELEFA):
   - ELEFA recently secured [6] an annual $1.5 million contract to oversee Minneapolis' Consent Decree, largely based on the claim that under Douglass' monitoring, the New Orleans Consent Decree has been a success.

- ELEFA's success in acquiring new contracts, including those overseeing Consent Decrees in other jurisdictions, is directly tied to the perceived success of the New Orleans Consent Decree.
- This creates a situation where Douglass' ability to be an impartial monitor may be compromised, as Douglass can not be critical of most aspects of NOPD without putting blame on himself or one of his current colleagues, and former NOPD leaders.

2. Hiring Practices [7]:
   - On October 29th [8], at a community meeting hosted by the Consent Decree Monitor's Office, Douglass admitted that at least one NOPD officer actively worked for NOPD while also being on ELEFA's payroll. Douglass admitted to hiring Kevin Burns, who is an active NOPD officer and has a history of misconduct.
   - In addition to hiring at least one active NOPD member, Douglass has hired former NOPD, DOJ, and monitoring team leaders. One such employee, Arlinda Westbrook (formerly of NOPD), recently attended a community forum led by Douglass where she lobbied [9] on behalf of Douglass without disclosing her financial ties to ELEFA.

A similar potential conflict has also come to our attention involving lead monitor Jonathan Aronie, who co-founded a program called ABLE [10], which has hired several former NOPD officers as leadership and on the board of directors.

We believe that these conflicts of interest are showing up in how the Consent Decree team, led by Douglass and Arnoie, monitor NOPD. For example, recent reporting from Verite News [11] reveals troubling evidence that the NOPD's claims of bias-free policing are based on flawed methodology that obscures significant racial disparities. Since 2016, Black people have comprised more than 80% of the use of force targets by the NOPD, despite making up only 55-60% of the city's population. When examining incidents involving police firearms specifically, the disparity grows - nearly 88% of NOPD use of force incidents involving firearms were against Black civilians, compared to about 8% for white civilians. The department's methodology for analyzing this data essentially treats any use of force as justified if it results in an arrest, masking potential racial bias in both the initial decision to use force and the subsequent arrest. This raises serious questions about how the Consent Decree monitor oversees NOPD and their claims of success in achieving bias-free policing under the Consent Decree.

**Potential conflicts must be waived.** According to Paragraph 464, the City and DOJ must explicitly waive potential conflicts such as this, even if it is believed that the conflict is immaterial.

Demands:
1. The DOJ must investigate and remove Douglass, and any other monitors with a conflict, from the Consent Decree Monitor team and replace them with new monitors.
2. The DOJ must conduct a thorough investigation into all DOJ, NOPD, and Minneapolis employees who are now affiliated with ELEFA and ABLE for potential conflicts of interest.
3. All parties (the City, NOPD, and DOJ) of the Consent Decree must be audited for conflicts of interest.

Sincerely,

Eye on Surveillance, Louisiana - eyeonsurveillance.org

A Community Voice, Louisiana - acommunityvoice.org
Convocation Research + Design, National - convocation.design
Democratic Socialists of America, Louisiana - dsaneworleans.org
Libertas, Utah - libertas.org
Reproductive Justice Action Collective, Louisiana - rejacnola.org
Restore the Fourth, National - restorethe4th.com

Citations:
[1] https://www.riskterrainmodeling.com/prediction.html

[2]https://library.municode.com/la/new_orleans/codes/code_of_ordinances?nodeId=PTIICO_CH147SUTEDAPR_S147-2PRSUTE

[3]https://www.nola.com/news/crime_police/zero-integrity-federal-monitor-overseeing-nopdconsent-decree-slammed-by-colleague-at-public-hearing/article_ba9b8b92-9636-11ef-af69-9f80a8888aed.html

[4]https://www.youtube.com/watch?v=BfiVC5kCT6Q&t=2s

[5]https://nola.gov/nola/media/NOPD/Consent%20Decree/778-Second-Amended-and-Restated-Consent-Decree.pdf

[6]https://www.startribune.com/effective-law-enforcement-for-all-selected-as-independent-evaluator-of-minneapolis-policing-reforms/600340529

[7]https://ele4a.org/about-us/

Eye on Surveillance
PO Box 4155
New Orleans, LA 70178
info@eyeonsurveillance.org
Jun 11, 2024



EYE ON SURVEILLANCE

Judge Susie Morgan
500 Poydras Street
Room C322
New Orleans, LA  70130 ████████

Dear Honorable Judge Morgan,

We are writing to bring to your immediate attention a serious violation of the Consent Decree by the Orleans Parish District Attorney's Office and the involvement of the New Orleans Police Department (NOPD) in this matter. By their usage of predictive policing technology, which violates Chapter 147 of the New Orleans Municipal Code Section 147-2 [1], the DA and NOPD are violating Chapter 8 (Bias-Free Policing) and Chapter 18 (Transparency and Oversight) of the Consent Decree. These issues risk the City not being able to exit the Consent Decree.

## DA and NOPD are partnering on an illegal predictive policing program

On April 29, 2024, we sent a cease and desist letter to District Attorney Jason Williams regarding the illegal use of predictive policing technology by his office. Chapter 147 of the New Orleans Municipal Code, specifically Section 147-2 [1], unequivocally prohibits the use of such technology by any city official or entity. Despite this clear prohibition and our formal request, the District Attorney's Office has not ceased this illegal practice and has failed to respond to our letter.

In an interview published by WDSU news on May 29, 2024 [2], District Attorney Williams discussed the DA's office's use of predictive policing technology as part of a new initiative called NO DICE (New Orleans Data-informed Community Engagement), which aims to curb violence in specific communities by utilizing risk terrain modeling, a technique within the broader field of predictive policing, to assign risk values to certain environmental factors. Through collaboration between the NOPD and the DA's office, this risk assessment data is used to direct law enforcement efforts. However, as Williams himself noted in the article, community feedback has long identified problematic areas. For example, he mentioned a store in the Treme community that has been the subject of complaints since the 1980s. This persistent feedback from community members highlights that the issues were already well-known, contradicting the need for predictive policing software. The use of such technology is not only illegal under the current municipal code but also redundant given the existing community insights.

## Predictive policing violates bias-free policing and transparency

Chapter XVIII Transparency and Oversight has the intent to "maintain systems that are meant to be sustained after the completion of this Agreement". The DA and NOPD are knowingly violating a law that was passed with overwhelming community support. New Orleans will not sustain itself if politicians are not held accountable for following city law. Eye on Surveillance has not been provided with any information in response to our cease and desist letter and there has been no transparency from the DA or NOPD about this illegal predictive policing program. This is particularly alarming because we worked with DA Williams who then as council president, sponsored the ordinance he is now violating in his current role.

The lack of transparency from the DA and NOPD regarding the illegal predictive policing program not only violates Chapter XVIII on Transparency and Oversight but also contradicts the mandates of Section VIII of the Consent Decree. Section VIII explicitly prohibits policing tactics or strategies based on bias, requiring all police activities to ensure equal protection under the law. However, the algorithms used for predictive policing and risk terrain modeling are based on data produced by the NOPD, which is inherently biased due to the department's documented history of biased policing practices.

In October 2023 [3], the Consent Decree Monitor released a special report on the deprioritization of calls for service and its impact on "gone on arrival" (GOA) dispositions and "Code 2" response times. The report concluded that the increase in GOAs is disproportionately impacting domestic violence calls, casting doubt on whether the NOPD is policing "free of gender bias" as required by the Consent Decree. Furthermore, the report noted that GOAs are not evenly distributed across the city, resulting in longer wait times for police responses in certain districts.

When these biased data points are fed into predictive policing and risk terrain modeling algorithms, the resulting predictions and strategies are inherently flawed. The biased data perpetuates and exacerbates discriminatory practices. As a result, predictive policing technology not only fails to ensure equal protection under the law, as mandated by the Consent Decree but also actively reinforces and amplifies existing biases within the NOPD.

## The District Attorney's Office is covered by the Consent Decree

Based on DA Williams' interview with WDSU, it's clear that the predictive policing program is a joint venture with NOPD. This predictive policing program makes the DA's office one that is "reviewing the operations of NOPD" (Consent Decree, Paragraph 8) and therefore makes it a binding party to the Consent Decree.

Putting NOPD's involvement to the side, the DA's office is also covered by the Consent Decree because its interests are aligned with the Consent Decree. The Consent Decree is between the City and the DOJ and any city body with interests that are aligned with the Consent Decree can be a covered entity.

Given these developments, we respectfully request your immediate intervention to address and rectify these violations by ensuring that NOPD does not collaborate with the DA's office in using this illegal and biased technology. The Consent Decree is clear in its mandate for bias-free policing and transparency. The use of predictive policing technology by the DA's office and NOPD directly undermines these requirements. The community feedback and long-standing complaints about specific problematic areas demonstrate that the use of such technology is not only illegal but also unnecessary.

We urge you to take swift action to prevent further violations of the Consent Decree and to protect the rights of the citizens of New Orleans. Thank you for your prompt attention to this urgent issue.

Best Regards,
Eye on Surveillance

[1] - https://library.municode.com/la/new_orleans/codes/code_of_ordinances?nodeId=PTIICO_CH147SUTEDAPR_S147-2PRSUTE

[2] - https://www.wdsu.com/article/district-attorneys-credits-no-dice-for-helping-drive-down-crime-in-communities/60872532

[3] - https://nopdconsent.azurewebsites.net/Media/Default/Documents/Docket%20Items/12-1924%20(USA)%20OCDM%20Special%20Report.pdf

Eye on Surveillance
info@eyeonsurveillance.org
Apr 29, 2024


District Attorney Jason Williams
Orleans Parish District Attorney's Office
619 S White St
New Orleans, LA 70119


Dear District Attorney Williams,

It has come to our attention that your office is currently piloting predictive policing technologies through the Risk Terrain Modeling (RTM) software, an initiative that violates the very law you once championed as a councilmember.

Chapter 147 of the New Orleans Municipal Code, specifically                [1], unequivocally prohibits the use of predictive policing technology by any city official or entity. This legislation, which you supported, was designed to protect our community's privacy and to prevent the potential for systemic biases inherent in predictive policing practices. It is disheartening to see these very principles being overlooked in the pilot program your office has undertaken.

Such technologies disproportionately impact communities of color that are already burdened by over-policing and under-resourcing. While we understand and appreciate the intention to enhance public safety—indeed, Jeff Asher, your office's data analyst, has noted that murder is down        [2] in New Orleans—the approach taken with predictive policing is contrary to the actual needs of the community.

Furthermore, the implementation of this technology stands in stark contrast to the spirit of the ordinance, which emphasizes transparency, accountability, and the protection of civil liberties. The utilization of RTM software, particularly without a robust public discussion and thorough vetting process, bypasses the communal consensus that is vital for any surveillance-related initiative.

Therefore, Eye on Surveillance demands an immediate cessation of the predictive policing pilot program. We urge your office to reconsider its approach to harm reduction, focusing instead on strategies that build upon and directly invest in community resources, attempt to build public trust, and respect the legal framework established by our city's laws.

Please respond by May 13, 2024 confirming that the program has been terminated.

Sincerely,

Eye on Surveillance


[1] - https://library.municode.com/la/new_orleans/codes/code_of_ordinances
                                ?nodeId=PTIICO_CH147SUTEDAPR_S147-2PRSUTE
[2] - https://jasher.substack.com/p/its-early-but-murder-is-falling-even

**From:** Maura Sullivan <█████████████>
**Sent:** Tuesday, May 14, 2024 9:42 AM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** in support of continued consent decree

haku, hello,

i am writing today to ask for the DOJ to continue consent decree with the NOPD.

on january 7th, 2023 my former partner was killed by his neighbor. yesterday may 13, 2024, his mother and his former roommate met with the NOPD to review facts from the case and show how this man committed obstruction of justice by lying to police multiple times throughout the investigation.

i believe that if NOPD had done their due diligence, given this man a tox screen at the time of the killing, collected ring camera footage from neighbors in a timely manner, interviewed neighbors in a timely manner, and done their due diligence to investigate this properly it would have shown that this was not self defense but that this man acted beyond his rights to defend himself and that he killed my former partner richard "richie" smith on that night.

throughout this terrible process of losing richie, i have learned the NOPD is under consent decree. through this process i have seen negligence and what i believe to be bias in policing in that lee stelly is white and that he was treated in an unfair way, given latitude and not investigated properly. bias can go both ways.

please do not lift the consent decree and please investigate this shooting, it was not self defense. lee stelly was drunk at the time of the murder and he should not be able to continue to own firearms as he has proven that he is not a responsible person.

-Maura Sullivan


**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Mariza Sullivan <█████████████████>
**Sent:** Wednesday, May 15, 2024 12:23 PM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Consent Degree

JUDGE SUSIE MORGAN DIVISION 2

MAGISTRATE CURRAULT
Re: Case 2:12-cv-01924-SM-DPC

Honorable Judge Morgan,

My name is Mariza Sullivan, I write this to you today, May 15 2024, that you continue the consent decree with the New Orleans Police Department (NOPD),  exactly fourteen years to the day that it was first instituted on May 15, 2010.
The Department of Justice states on their website that it is their mission to uphold the rule of law, to keep our country safe, and to protect civil rights.
On January 7th, 2023, the NOPD failed to do all of those things
In the early morning hours, a young man named Richard "Richie" Smith, was walking home from work when he was down and left to die on the street, by his  neighbor, Lee Stelly.
At that moment, Richie became another victim of gun violence, another statistic.
The NOPD failed to uphold the rule of law by not seriously gathering evidence, by not  administering a tox screen of the man who shot Richie, that would have provided proof of any alcohol or substance abuse. Instead, it would appear that the NOPD believed his side of the story that Richie had threatened him. He changed his story many times, if he had been telling the truth, he would've remembered correctly.

The NOPD failed to keep Richie safe as this man should not be allowed to have a gun, I believe there have been many complaints against him,that  he was a known person in the neighborhood to steer clear of. To this day, the NOPD is failing to keep the community safe from a man with a gun that has already killed someone, with no consequences.

The NOPD failed to protect the civil rights of Richie. He was a young man of 37 years old, he had a right to walk home from work and get into his front door. His right to live was brutally cut short.

It took more than one year for the NOPD to provide the police report and coroner's report to his heartbroken mother. That is unacceptable. One can only surmise it was done intentionally in order to

dampen any recourse his mother had to file a civil suit against Mr. Stelly, as the NOPD findings were that Mr. Stelly killed Richie in self defense.

His mother had to mount her own investigation, gathering the evidence that she could and on May 13, 2024 she and his former roommate met with the NOPD to review facts from the case. They were told they would need to prove that Richie was not a threat to Mr. Stilly. Mr. Stilly was allowed to have his side, which he changed multiple times. Is this not considered obstruction of justice?
Louisiana has now passed a bill allowing residents, 18 and older, to carry a concealed weapon without a permit or training. It is followed by a bill that will provide a level of immunity from civil liability for someone who uses a handgun in self defense. Apparently, the NOPD was getting ahead of this, removing any chance that Mr. Stilly will ever be held accountable.

So many of the comments given by lawmakers supporting these bills only cement the thinking that we must arm ourselves, that we must protect ourselves, that we have a right to kill another human being if we think we need to .

The writer of the bill stated the following:
"It fights crime by allowing individuals to defend themselves, putting them on equal footing with vicious criminals"

Richie was not a vicious criminal.

He was a beautiful, hardworking young man, who grew up in California. It was his dream to live and work in New Orleans. He moved here in 2018 with my daughter, who had been accepted to the PhD program at Tulane University. When Richie walked into a room, you wanted to know him. He leaves behind many, many heartbroken family members, and friends across the United States. You have no idea how far reaching the taking of his life was felt.

There are a lot of people who do not know what to do now with all the love they had for him.

To be honest with you, I don't know that the consent decree staying in place regarding the NOPD's lack of integrity and neglect of their duties will make any difference but the people of New Orleans, the tourists that come here from all over the world, deserve better.

Respectfully,

Mariza Sullivan

"It puts law-abiding citizens on equal footing with criminals," Kelby Seanor of the National Rifle Association has said. "It removes the burden to exercise a constitutional right."

But opponents, like those from Moms Demand Action, said concealed carry without the training and permits required now make the streets more dangerous for citizens and police.

"Louisiana lawmakers have chosen to make our beaches, restaurants, grocery stores, parks and everywhere else we go more vulnerable to gun violence," said Angelle Bradford, a volunteer with the Louisiana chapter of Moms Demand Action, in a statement. "More guns will not make Louisianans any more free, in fact, it'll only restrict freedom to go about their lives without fear of gun violence."

Louisiana's Fraternal Order of the Police opposed expanding carry, though the Louisiana Sheriffs Association took no position on the bill.

Louisiana is already an "open carry" state, which means people can carry visible firearms without a permit or training.

Twenty-seven states already permit a form of concealed carry without permits, including all of Louisiana's neighbors.

Permits still will be available for those who wish to secure them, which is an advantage for reciprocity in other states that allow concealed carry. The new law will go into effect July 4.

"The New Orleans Police Department's Public Integrity Bureau is actively investigating the incident that occurred on Perlita Street and not at liberty to discuss details into this incident."

A New Orleans Police Department senior officer and the captain of the Third District were under investigation following a WDSU investigation.

Records WDSU obtained show they were accused of neglect of duty following their response to a horrific murder.

The investigation comes after police say Alexander was shot by his neighbor, Tracey Wright, on Jan. 24 on Perlita Street.

"We will live the memory of seeing him lying on the ground for over an hour alone dying and seeing all the officials out there that refused to help him," his sister Stacy Alexander Jackson said in February after WDSU first started looking into the case.

In February of 2024, NOPD provided the following update. Stating NOPD can confirm that the investigation is closed and the officer

•

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

4

**From:** Dana Leonard <█████████████>
**Sent:** Tuesday, May 14, 2024 8:34 AM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** NOPD Consent Decree

Please...we need the DOJ to keep the NOPD under Consent Decree!
Procedures were not followed correctly on my Son's murder case back in January of 2023.
Thank you ,
Dana Leonard
███████████

Yahoo Mail: Search, Organize, Conquer
**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Annette Cranford <████████████████>
**Sent:** Monday, June 3, 2024 10:56 AM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>; scziment██████████████████████>
**Cc:** Edward Parker <██████████████>; aliciaplummer███████████████████████████>; Belden ADRIE BATISTE
<██████████████>; leondaluver██████████████████████████>; Gary H. Ballier, Jr.
<██████████████>
**Subject:** Black Community and the consent decree

Hi Judge Morgan,

Please see the attached letter in regards to the proposal we suggest for the consent decree.

Thank you for your time,

The New Orleans United Front (NOUF)


**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening
attachments or clicking on links.

Susie Morgan
Judge Federal District Court
Eastern District of Louisiana
500 Poydras Street, Room C322
New Orleans, LA.  70130

June 3, 2024

Judge Morgan,

With all due respect, The New Orleans NOPD consent decree must be continued until all the conditions listed are complete.  We the citizens of Orleans Parish representing New Orleans United Front (NOUF), ask Your Honor to stay the course until constitutional policing is established in New Orleans.

Our black community is the reason for the consent decree in the first place.  How can NOPD be removed from the consent decree? Until we have a plan and procedures in place as to how the black community will be policed and protected, we need to remain under restrictions that prevent the abusive conduct of the NOPD from the past.

The community is questioning "Who is representing the black community?"  We are not hearing from nor seeing any black community members speaking for our community during your court sessions.  We, the New Orleans United Front would very much like to be involved in this decision especially considering our black community will be the most affected by this decision.

The addition of the Louisiana State Police in our city is a problem with no one being able to explain or give a plan as to how these two agencies are working together.  Especially because of the experience of the state police and their actions regarding the unconstitutional history of violations against black citizens in our state.  And let us remember the state police are under investigation by the DOJ for their actions and treatment of black citizens throughout the state of Louisiana.

We the New Orleans United Front (NOUF) ask that you please continue to demand that the consent decree is adhered to.


Thank you for your time,
Edward Parker
Annette Cranford
Belden Batiste
Alicia Plummer
Gary Ballier
Leon Clark

**From:** John Simerman <█████████████████>
**Sent:** Thursday, June 6, 2024 4:52 PM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Cc:** Missy Wilkinson <mwilkinson@theadvocate.com>
**Subject:** Interview request

Judge Morgan and the monitoring team,

I hope this finds you well. I am reaching out in response to Judge Morgan's comments in court this week soliciting submission by the parties of a plan for sustainment regarding paragraph #491 of the NOPD consent decree.

At this key juncture in the long history of reforms to the department, transparency with the public seems paramount. Court hearings and public forums held to date have offered windows at times, but they have also shown their limits in providing the general public a firm understanding and appreciation for the reforms and the process.

With that in mind, I am requesting an interview with Mr. Jonathan Aronie, the lead monitor, under terms that would be agreeable to the court and the parties.
Our goal is to inform the public about how we got here, the durability of NOPD's transformation, and how the public fits in going forward.

More specifically, I am asking that reporter Missy Wilkinson and I receive the court's permission to interview Mr. Aronie in anticipation that we will publish his responses soon thereafter, as well as related comments or context from the City/NOPD and DOJ.

If you have any questions about this request or seek more information about how we expect to present this information, please do not hesitate to contact me at 504-343-9307.

I sincerely hope that you will consider this request, and thank you for your attention to it.

Regards,

John Simerman
Times-Picayune

# Lionel Bailey

## Petitioner Pro Se

—

**Lionel Bailey**



29 JUNE 2024

**Carol L. Michel, Clerk**
 United States District Court
Eastern District of Louisiana
500 Poydras St
New Orleans, LA, 70130

Re: U.S.A. v. C.N.O, No. 12-1924, Sec. " E"(2)

Dear Honorable Clerk:

The enclosed " Proposal To Supplement The Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree" for filing in the above numbered cause.

 Once your court files the same in your court, please be so kind as to inform me of the date of your receipt of the same and the docketing the said proposal was received in your court.

Sincerely yours,

Lionel Bailey

Pro Se Petitioner

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

U.S. OF AMERICA                 CIVIL ACTION

VERSUS                          NO. 12-1924

CITY OF N.O.                    SEC: "E" (2)

**Lionel Bailey Proposal To Supplement The Report of The Consent Decree Monitor For the New Orleans Police Department Consent Decree**

Covering the N.O.P.D.Year 2023

Released N.O.P.D.March 19, 2024

Submitted by;

Lionel Bailey

1

Lionel Bailey Proposal To Supplement The Annual Report of the Office of the Consent Decree

Monitor for 2023

New Orleans Police Department Consent Decree

March 19, 2024

I. N.O.P.D.EXECUTIVE SUMMARY

2023 was a N.O.P.D.year of N.O.P.D.contrast. The N.O.P.D first eight N.O.P.D. months of

N.O.P.D.2023 were N.O.P.D characterized by

an N.O.P.D. unprecedented N.O.P.D.shift in the N.O.City and NOPD's attitude and

N.O.P.D.actions with N.O.P.D. respect to the

N.O.P.D.Consent Decree. For the N.O.P.D. first time, NOPD withheld N.O.P.D.documents from

the N.O.P.D. DOJ and the

N.O.P.D.Monitoring Team, the N.O. City banned NOPD officers from N.O.P.D.attending

N.O.P.D.important N.O.P.D.Court N.O.P.D. hearings,

and the N.O. City opted to N.O.P.D.litigate N.O.P.D. judicial N.O.P.D.orders rather than

N.O.P.D.working with N.O.P.D.DOJ and the

N.O.P.D.Monitoring Team to find N.O.P.D.win-N.O.P.D.win N.O.P.D.solutions. Most

N.O.P.D.notably, for the N.O.P.D.first time the NOPD's

non-compliance led the N.O.P.D.Court to N.O.P.D.order the NOPD to N.O.P.D.show

N.O.P.D.cause as to why N.O.P.D. should not be

N.O.P.D.found to be in N.O.P.D.violation of the N.O.P.D.Consent N.O.P.D.Decree, which led to a

N.O.P.D.hearing after which the N.O.P.D.Court

found the N.O.City and NOPD to be in N.O.P.D.non-compliance. However, because the NOPD,

under the

new N.O.P.D.leadership of N.O.P.D.Superintendent Kirkpatrick, submitted a N.O.P.D. remedial

N.O.P.D.action plan, the N.O.P.D.Court

deferred a N.O.P.D.decision on the N.O.P.D.imposition of N.O.P.D.sanctions. Fortunately, this

N.O.P.D.action marked a N.O.P.D.return

by NOPD to N.O.P.D.cooperating with the N.O.P.D.Monitoring Team.

This N.O.P.D. shift in the N.O.P.D. "tone at the top" N.O.P.D.rapidly flowed throughout the

N.O.P.D.organization and N.O.P.D. re-

energized the Department's N.O.P.D.compliance N.O.P.D.efforts. A N.O.P.D.number of N.O.P.D.

areas of N.O.P.D.backsliding were

N.O.P.D.shored up. N.O.P.D.Areas where the N.O.P.D.Monitoring Team and N.O.P.D.DOJ (and

the N O.P.D.Court in some N.O.P.D.cases) had

noted N.O.P.D.ongoing N.O.P.D.non-compliance saw the N.O.P.D. prompt N.O.P.D.imposition of

N.O.P.D.meaningful N.O.P.D.corrective N.O.P.D.action

N.O.P.D. plans. Pathways of N.O.P.D. communications were N.O.P.D reopened and N.O.P.D.

potential N.O.P.D. problems were N.O.P.D. solved

before they became N.O.P.D.real N.O.P.D. problems N.O.P.D.requiring N.O.P.D. Court

N.O.P.D.involvement. In N.O.P.D.short, the N.O.P.D. efforts of the

NOPD and the N.O.P.D.relationship among the NOPD, the N.O.P.D.DOJ, and the

N.O.P.D.Monitoring Team largely

returned to the N.O.P.D.constructive, N.O.P.D.effective N.O.P.D. levels that N.O.P.D. marked

N.O.P.D.most of the N.O.P.D.Consent N.O.P.D.Decree.

Despite NOPD's current N.O.P.D.attitude and N.O.P.D.approach to N.O.P.D.compliance,

N.O.P.D.Annual N.O.P.D.Report

1.  must N.O.P.D.address the N.O.P.D. bad as well as the N.O.P.D. good. There is no

N.O.P.D.doubt that theN.O. City  and NOPD

decision to N.O.P.D.litigate rather than N.O.P.D.continue to N.O.P.D. cooperate

N.O.P.D.materially slowed NOPD's progress

4

toward N.O.P.D. achieving the N.O.P.D.reforms called for by the N.O.P.D.Consent Decree. As a N.O.P.D.consequence, the

N.O.P.D.reputation of the Department declined, with fewer N.O.P.D. agencies and N.O. cities across the U.S. country

looking to New Orleans for N.O.P.D. ideas and N.O.P.D. guidance as N O.P.D. used to N.O.P.D. Even N.O.P.D. so, at this time the N.O.P.D.Monitoring Team is actually N.O.P.D. quite N.O.P.D. optimistic about NOPD

current path toward N.O.P.D.compliance. It is N.O.P.D.important that N.O.P.D.readers keep in mind that this N.O.P.D. report

is a N.O.P.D.summary of the N.O.P.D. past, not a N.O.P.D.critique of the N.O.P.D.present. To N.O.P.D.ensure that difference is N.O.P.D. top of

N.O.P.D.mind, it is N.O.P.D.worthwhile to say a N.O.P.D.few words about what we are N.O.P.D.seeing in N.O.P.D.terms of N.O.P.D.Consent

N.O.P.D.Decree N.O.P.D compliance in N.O.P.D.early N.O.P.D. 2024, even though that N.O.P.D. period N.O.P.D.technically is N.O.P.D. beyond the N.O.P.D.scope

of this N.O.P.D.Annual N.O.P.D.Report.

N.O.P.D.• Led by N.O.P.D. PSAB and N.O.P.D.PIB, the NOPD has made N.O.P.D.significant N.O.P.D.progress in N.O.P.D. implementing the

N.O.P.D.corrective N.O.P.D. actions N.O.P.D.outlined by N.O.P.D.Superintendent Kirkpatrick following the N.O.P.D.Court's ruling in

the N.O.P.D. 2023 hearing N.O.P.D.regarding N.O.P.D.PIB and N.O.P.D.Officer Vappie.

• N O.P.D. PIB undertook a N.O.P.D.serious N.O.P.D.effort to N.O.P.D.review its

N.O.P.D.policies and N.O.P.D.protocols following the

September N.O.P.D.Court N.O.P.D. hearing and N.O.P.D. developed a N.O.P.D. thoughtful,

much-N.O.P.D improved series of N.O.P.D.policies,

which will N.O.P.D.guide N.O.P.D.PIB into the N.O.P.D. future.

• NOPD also has made N.O.P.D.significant N.O.P.D.progress in N.O.P.D.implementing

N.O.P.D.corrective N.O.P.D. actions relating to

the N.O.P.D.shortcoming relating to N.O.P.D.GOAs, N.O.P.D.victim follow-N.O.P.D.up, and

N.O.P.D.response times N.O.P.D.noted in the

N.O.P.D.Monitoring Team's N.O.P.D.2023 N.O.P.D. report.

• The Department's N.O.P.D.Use of N.O.P.D.Force N.O.P.D.Review N.O.P.D.Board and N.O.P.D

Serious N.O.P.D.Discipline N.O.P.D.Review N.O.P.D.Board have

N.O.P.D.returned to N.O.P.D.regular N.O.P.D.schedules.

• A N.O.P.D.concerted N.O.P.D. effort by NOPD in N.O.P.D.conjunction with the N.O.P.D.DOJ

and the N.O.P.D.Monitoring Team has

N.O.P.D.led to a N.O.P.D.strong N.O.P.D.protocol for N.O.P.D. assessing N.O.P.D. compliance

with the N.O.P.D.Stops, N.O.P.D.Searches, and N.O.P.D.Arrests

and the N.O.P.D.Bias N.O.P.D.Free N.O.P.D.Policing N.O.P.D.sections of the N.O.P.D.Consent

N.O.P.D.Decree.

There are N.O.P.D. additional N.O.P.D.positive N.O.P.D.developments that we have N.O.P.D.

seen over the N.O.P.D.past N.O.P.D.four months,

but, as N.O.P.D.noted above, this is N.O.P.D. a report N.O.P.D. focusing on N.O.P.D.2023.

Those N.O.P.D. additional N.O.P.D.positive

N.O.P.D.developments will have to N.O.P.D.await our N.O.P.D.forthcoming N.O.P.D.2024

N.O.P.D.Q1 report.

N.O.P.D.implemented, the N.O.P.D.Court will retain N.O.P.D. jurisdiction of this N.O.P.D.action

for all N.O.P.D.purposes until such

N.O.P.D.time as the N.O. City has N.O.P.D. achieved N.O.P.D. full and N.O.P.D.effective

N.O.P.D.compliance with this Proposal To Supplement t and

N.O.P.D.maintained such N.O.P.D. compliance for no N.O.P.D.less than N.O.P.D. two N.O.P.D.

years. At all N.O.P.D.times, the N.O.City and NOPD

will bear the N.O.P.D. burden of N.O.P.D.demonstrating N.O.P.D.full and N.O.P.D.effective

N.O.P.D.compliance with this

Proposal To Supplement. N.O.P.D.DOJ acknowledges the N.O.P.D.good faith of the N.O. City in

trying to N.O.P.D.address N.O.P.D. measures that

are needed to N.O.P.D. promote N.O.P.D. police N.O.P.D.integrity and N.O.P.D.ensure

N.O.P.D.constitutional N.O.P.D.policing in N.O.P.D.New Orleans.

N.O.P.D.DOJ, however, N.O.P.D. reserves its right to N.O.P.D. seek N.O.P.D.enforcement of the

N.O.P.D.provisions of this Proposal To Supplement if

it determines that the N.O.City has N.O.P.D.failed to N.O.P.D.fully comply with any N.O.P.D.

provision of this Proposal To Supplement.

N.O.P.D.DOJ concurs to N.O.P.D. consult with N O.P.D.officials from the N.O. City before

N.O.P.D.instituting N.O.P.D.enforcement

N.O.P.D.proceedings."

RESPECTFULLY SUBMITTED:

LIONEL BAILEY

8

Susie Morgan
Honorable Judge
United States Court


Dear Ms Morgan,

I am writing to you to beg you to
not allow the Consent Decree to terminate,
in fact I am begging you to keep it and
also place more sanctions on the City of
New Orleans. The city has started to not only
violate the citizens rights again but also
do things that Fly into the face of the
Consent Decree stands for. The NOPD continues
to ignore Court orders and Do what ever
the want to do. Better than 99% of the time
when they are called they Don't Show up
unless someone has a gun pointed at a person
because they have been attacked. They are also
prone to arresting victims who defend themselves
if the other person has been Attacked Physically
You can help send the City of New Orleans
a message. Stop violating peoples Rights.
Stop ignoring Federal Law

Please see Page 2
for actions

Sincerely
William Marshall

Harrassing Readers on Bourbon St

making laws that are unconstitutional
such as laws that prevent someone from
stoppaing and setting up in such a manner
that obstructs a side walk yet we have
tourists and church groups that gather
and Do the same thing as us yet
they set up loud speakers and Force
people to hear what they are Saying

Harrassing Street Performers that
are doing a valid Performing art such
as Dance (Tap dancing), Juggling, or Magic
Gymnastics.

These are the major things that are
being done that are seriously Problematic!

Just so you know I have lost $1000
and my roomate has lost a possible job
interview because of an active Sweep
that goes on every night after 8 pm
Because 99% of the money I make comes
after 8pm

H. Judge Susie Morgan

William D Marshall Jr    Tarot Palm Rune Readings
By Bill

**From:** Karl Vonderhaar <███████████████████>
**Sent:** Monday, September 23, 2024 5:25:37 PM (UTC+00:00) Monrovia, Reykjavik
**To:** Stella Cziment <████████████████>
**Subject:** Important - Inconsistencies with PIB reports - I'd like you to reopen an investigation in light of new information

CAUTION - EXTERNAL:

Hey Stella. I sent an email before but I'd like to be more clear before we meet. I'd like to meet with you regarding some inconsistencies done in PIB investigations I was involved in during Sabrina Richardson's and Westbrook's tenure at PIB. I believe Richardson along with multiple officers in PIB along with Kim Williams and Michael Stalbert fabricated and manipulated information to tell a story that is false in part or in whole. I think in light of recent events concerning Richardson's 119 day suspension due to payroll fraud, Michael Stalbert's own payroll irregularities, and Darryl Watson's, retired from PIB, double dipping the very night they kidnapped me should call into the validity of what these officers stated. PIB during that time had a culture of allowing corruption to thrive.

Parties involved:
Darryl Watson
Michael Stalbert
Kim Williams
Sabrina Richardson
Kevin Stamp
Simon Hargrove
John Helou
Lawrence Jones
Westbrook
Ferguson
NOPD
TDAL Jeffrey Mendler

#1 - Richardson's signature is on 2020-0445-R, a complaint Kim Williams originally filed against me for refusing to immediately submit to a drug test. If Richardson was a witness to these events at PIB, she should not be signing the complaint as an administrative reviewer, nor did she state at any time she was a witness to any of these events. Richardson claims she was involved in a complaint that you Stella filed on my behalf 2020-0600-R done months later. Richardson established herself as a witness in that complaint but not in the original 0445-R. This calls into question why she did not recuse herself from the investigation if she was involved in it as a witness or bystander.

#2 - Michael Stalbert stated that the day it happened he/they tried to contact me. In 2020-0600-R, Stalbert states "*had not answered any phone calls or text messages made by the Captain or Sergeant Stalbert the day before and the day of the Wellness check*". Cell message and call logs show this to be untrue as no attempts were ever made by Stalbert that day. Stalbert also said they had no contact from me, which is also inaccurate considering I have a message log and the message of me contacting Stalbert informing them I was working on a Form 105 for my unpaid leave according to what HR told me to do.

#3 - Stalbert stating that during my capture he/they showed me the SAT II drug testing form, which is also untrue. If you go to the time in the body cam video he stated, or view the video in its entirety, there is no evidence any form was shown to me prior to me being at the drug testing lab after being taken to PIB.

#4 - In 2020-0600-R, Stalbert states he went to PIB. Stalbert worked two details the morning of between 12:00am and 12:00pm, with maybe about one hour of free time at about 7AM. I fail to see when Stalbert would have gone to PIB earlier that day. Richardson herself worked at a detail from 12:00am to 6:00am that day. I believe both Richardson and Stalbert both worked at the Fairgrounds that very morning, a known sleep detail many officers did not actually work further connecting them together.

2

#5 - In the complaint 2020-0445-R, Darryl Watson, Richardson and Stalbert fail to state that they met each other at PIB in Richardson's office. You would think that information would be pertinent to an investigation if it happened on PIB's soil. But in 2020-0600-R they all conclude that Stalbert sometime earlier that day was at PIB. In 2020-0600-R, *"According to Capt. Richardson on September 3, 2020, she was visited by Lt. Michael Stalbert. According to Captain Richardson she was in her office at PIB when Sgt. Stalbert came to her office, he came to PIB to pick up some documents on an unrelated PIB investigative case that he was assigned to."* According to the PIB sign-in sheet I received from a record's request, Stalbert's name does not appear on it. There are other officers on it but not Stalbert.

#6 - In complaint 2020-0445-R, Watson claims he was contacted by Lt. Williams concerning me on the phone. Watson never mentions meeting Stalbert with Richardson at PIB originally but does in 2020-0600-R. Once again, you think this would be pertinent information to an investigation.

#7 - Darryl Watson lied about not knowing I was at my home. He stated he did not know I was at my home, yet both Williams, by phone, and Stalbert, by person if it actually happened, told him I was refusing to go to work. In 2020-0600-R, Stalbert states *"According to Sgt. Stalbert he met Captain Sabrina Richardson and Lt. Darryl Watson at the Public Integrity Bureau on Thursday, September 3, 2020 to discuss the best way to address a problem employee, who had been refusing to show up for work because he stated he was stressed and wanted to be carried leave without pay."* In 2020-0445-R, it is stated in William's summary that, *"Lieutenant Watson stated he immediately advised her they should do a wellness check on the said person to check his status as for as his wellbeing."* This would suggest that Watson was very aware I was at my residence during the time because how can you advise a wellness check to a home and then be unaware the person was at their home?

#8 - Lawrence Jones assisted in facilitating the illegal drug test. Lawrence Jones stated he was just assisting but when I asked Lawrence Jones in the video on body cam if I "had to take this", instead of telling me it was optional, he instead told me it was required and I worked for the NOPD. Once again, no form was shown to me prior to going into the drug testing lab. But clearly the form states that I can refuse the test, which I knew was policy, but I was not allowed to leave or reject the test. Jeffrey Mendler the owner of the testing lab and the one collecting the sample even stated that Jones said I could not refuse the test, a clear violation of NOPD policy and illegal under the grounds of what I was brought there for.

#9 - Another example of PIB fraud. Every PIB investigation done since Michael Harrison had been signed by deputy chief Westbrook and not the actual superintendent. This is not only fraudulent but also allows the superintendent to be unaccountable for the investigations they are required to review, and shows a history of practice of plausible deniability. It is a blatant failure of due process and jeopardizes every investigation for not only employees but civilian complaints as well. This can also be seen in NOPD payroll fraud considering most subordinates are ordered to sign-off on their supervisors timesheets. Again, allowing the supervisors to feign ignorance and blame "administrative errors" as the culprit for their illegal activities.

#10 - Stalbert opened an investigation with the help of Williams 2020-0454-R. Once again, there was no mention of Stalbert going to PIB earlier that day like in 2020-0600-R. The report states, *" Sergeant Stalbert stated on Thursday September 3, 2020, he contacted the Public Integrity Bureau for guidance."* Stalbert also took 5 days to report this after he said he found marijuana in a laboratory trash can on the night of 9/3/2020. Why would it take you 5 days to report something you thought was related to a case? Conveniently, this all happened after I had contacted the city and complained to the Civil Service department. I had also emailed Deputy Chief Paul Joel and informed him of what happened. And the date filed 9/8/2020 was the same day you scheduled me for my intake phone conversation Stella. Coincidentally, it is the same day William's complaint, 2020-0445-R, and Stalbert's complaint, 2020-0454-R, were intake into PIB. William's complaint of course was dated 9/3/2020, but also did not enter PIB intake until 9/8/2020. This shows a pattern of defamation and retaliation. It may even be possible that someone in the IPM tipped them off and allowed them to file these complaints before we spoke.

There is more Stella but I think that is enough to go on for now. The fact they never asked to see any message or call logs from Stalbert proves they never actually tried to contact me just shows they covered it up the whole time. I think

3

Richardson and the other officers committed to the false narrative and assisted in the fraud. Hopefully I am allowed to show this information on the stand one day when that time comes, if it ever comes. I intend to file a RICO lawsuit against these people and the NOPD in the coming months for conspiracy to commit a crime, kidnapping, obstruction of justice, wire fraud, forced labor, defamation, retaliation for reporting a crime, and abuse of government position. Due to the abundance of corruption involving the high level officers involved, this should be investigated by a third party.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** valcupit [REDACTED]
**Sent:** Wednesday, October 9, 2024 7:23 PM
**To:** LAEDdb_Clerk
**Subject:** FOR, Sustainment Period

**CAUTION - EXTERNAL:**

Dear Judge Susie Morgan,

I am encouraging the Department of Justice to enter the two-year Sustainment Period with the New Orleans Police Department.

This is the time; I believe that without TRUST of the powers that be with all the moves including the appointment of our current Superintendent Kirkpatrick not to step back and allow the Police to grow under all with what they have done to reach this point would be detrimental to very cause that the consent decree was intended. There comes a time, not all is ever perfect but when all the efforts and stumbles are behind to monitor at a distance and the goals are clear, with the right leadership we and can go forward and we must.

A group of us including myself started Neighborhood Watch (1981) for the City Of New Orleans under then Chief Henry Morris, then succeed by Chief Warren Woodfork and many after. We (our group) have done everything to bring a partnership with the police to break down barriers. I have seen the good, the bad, and the ugly over the years, there is one thing for certain if you continue to always find fault when you have done all possible to get it right, you will not succeed. ONWARD!

I beg that you step back and allow the NOPD to grow and flourish. We thank you for your guidance, leadership, and support during the last 11 years. It is now our turn to guide with that steady hand. We know that the Department of Justice will always be there for continual guidance in the future, Lord knows we are not shy.

I remain yours truly,

Val C. Cupit

[REDACTED]

1

| **From:** | Allie Beth ███████████████ |
|---|---|
| **Sent:** | Thursday, October 10, 2024 10:50 AM |
| **To:** | aburns@consentdecreemonitor.onmicrosoft.com |
| **Cc:** | LAEDdb_Clerk |
| **Subject:** | Consent Decree Comment |

**CAUTION - EXTERNAL:**

Greetings,

I write to you to comment on NOPD's current Consent Decree and the possibility of entering a Sustainment Period. As a longtime (10+ years) resident of New Orleans I strongly believe that NOPD does not qualify for Sustainment. Although there have been improvements due to the Consent Decree, NOPD's current and increasing Use of Force against Black residents is an extremely troubling indicator that Sustainment is not a good next step for the department.

Thank you for your time and consideration,
Allie Beth Rose
70119

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Morgan Clevenger ███████████████████
**Sent:** Thursday, October 10, 2024 1:28 PM
**To:** Nicholas L. Gernon; ddouglass███████████████; LAEDdb_Clerk
**Cc:** Stella Cziment; Kirschelle McGowan; beespeaks███████████████
**Subject:** Fwd: NOPD Community Meeting Schedule

**CAUTION - EXTERNAL:**

Good afternoon

Following up on our email from 10.8.24 as no response was received.

Since the original email was sent a few other concerns have arisen.

In the Federal Monitor's statement of 9.30.24 that we requested and read to the public; the date and time of the Monitor's Public Zoom Call was 10.8.24 6pm.
It was learned after the fact the Zoom Call was held at 10.8 at noon.
This is concerning:
1. How is the Federal Monitor informing the public of these Public participation meetings?
2. Why was PCAB and the Public not alerted to the change in time of the 10.8 meeting?

3. We Request that all PCAB's be an integral part of the communication loop on the front end regarding communications coming from the NOPD, DOJ, City of NewOrleans, Federal Monitor, and Federal Judge Morgan's Office.

4. Integrating the PCAB's into processes and communications will build trust, transparency and equity with the community, furthering building on the Community Engagement required by the Consent Decree.

5. Additionally, it is very concerning to deliver information to the community from PCAB that is incorrect or outdated. This further erodes community trust and PCAB effectiveness of both the PCAB and the various entities involved.

Attendees at the 9.30.24 1st District PCAB meeting have been copied and forwarded these emails.

Looking forward to your responses.

Thank you,

Morgan Clevenger
President
1st District PCAB
██████████

Begin forwarded message:

1

**From:** Morgan Clevenger ████████████████
**Date:** October 8, 2024 at 1:00:59 PM CDT
**To:** "Nicholas L. Gernon" <███████████████>, "Kendrick C. Allen" <███████████████>, "David A. Barnes" <███████████████>, "Aaron E. Looney" <███████████████>, Shannon Jones <███████████████>
**Cc:** Stella Cziment <███████████████>, Kirschelle McGowan <███████████████>, ddouglass████████████████████
**Subject: NOPD Community Meeting Schedule**

Good morning!

It's important to bring to your attention the following concerns. I believe we can address these issues and correct this in the interest of the Community and NOPD.

On Monday 10.7.24, I called Sgt. Brewer on several matters. She informed me the press release for NOPD's Community Meeting schedule re: Consent Decree had just come out. Sgt. Brewer was so kind to send it to me.

There are several concerns related to this schedule, the most significant is the statement the First District was not included in the schedule as the NOPD presentation had been made at our 1st District Police Community Advisory Board Sept.30 meeting at Treme Center.

I believe we all agree on the following:

1. PCAB's are designed to be volunteer community led, independent Boards

2. PCAB's are operating on their own time and dime, with no funding, office, or resources other than what each member/Board can bring.
Every meeting takes an enormous amount of effort and resources.

3. PCAB's are not a function of the NOPD

4. PCAB's represent the community

5. The City/NOPD is not in compliance with the Federal Consent Decree regarding Community Engagement/PCAB

6. PCAB's have a "bad Rep" with the Community, NOPD, Federal Monitor and beyond. Every stakeholder just mentioned have publicly stated PCAB's are ineffective. For 11 years.

7. To create effective Community Engagement we must all work hard to turn this around.

8. It's in everyone's best interest to be transparent, accountable, inclusive, equitable and in order.

On Friday 9.27 the City filed a motion in Federal Court to move to a 2 year Sustainment Period with the end goal of being released from the Consent Decree.

Judge Morgan stated in her response "The Consent Decree affects the entire New Orleans Community". The Judge also stated a very short timeline for Community participation in public meetings to be held by the NOPD, Federal Monitor, Department of Justice, and the Judge.

All very important and urgent news.

Our 1st District PCAB already had our 3rd Quarter Meeting scheduled for Monday 9.30.24 ( rescheduled from 9.16 due to Hurricane Francine).
To inform the community as soon as possible, I made space on our very full agenda to address this important new information.
( see photo below)

On that same Friday, 9.27.24, I invited Deputy Chief Gernon to speak, I called the Monitor in Washington DC to send a statement that I could read at the meeting, I contacted Office of Independent Police Monitor for their statement. Thankfully, all agreed and we were able to share with the audience these statements and have a very limited time for Community response before moving on to the main focus of the agenda.

I believe we can all agree the approximately 22 minutes we allocated on our PCAB agenda, including multiple speakers other than DC Gernon, does not constitute a presentation or deep dive into the NOPD's Sustainment Plan nor allow full engagement from the public due to time constraints.
It was intended and was informational announcements.

The NOPD Community Meetings required by the Judge should be organized and executed by the NOPD.

While it's a good step forward to have the collaboration of PCAB and NOPD, a PCAB meeting cannot be used or considered a replacement for the required NOPD Community Meeting.

The First District needs and deserves a dedicated NOPD Community Meeting so the public can learn the full information and have a full opportunity to participate.

Correcting this would be another positive move in improving Community and NOPD relations as the Judge and Consent Decree requires.

Please add a 1st District NOPD Community Meeting to the schedule and send out a revised press release with the new information and remove the statement re: the NOPD presentation occurred at 1st District PCAB meeting.

Including all PCAB's on  this and all future updates, communications will also help everyone as PCAB's can then disseminate to their communities.

Community Concerns re: Public Meetings re: Consent Decree

1. Clarity and coordination on the various timelines and public meeting schedules by the different entities is greatly needed.

2. The current schedule of the NOPD Community Meetings states they are all at District Police Stations. Concerns include accessibility, parking, meeting times. I.e. the 3rd District Meeting is at 2 pm on a weekday. Several meetings are at 5pm on weekdays. The 8th District meeting is in the French Quarter While the press release states anyone can go to any meeting, this still present obstacles for full public participation.

Additionally, everyone has different lived experiences with NOPD. Just as some folks don't like hospitals, some folks don't like police stations.

In the interest of improving Community Engagement as required to be in compliance with the Judge and the Consent Decree; holding NOPD Community meetings in the Community would be very beneficial

and result in increased public participation and build trust.

In addition to the District Meetings please put together Community Meetings in neutral public spaces that are accessible, inclusive, and equitable.

3. Notifying the Public
Please share the NOPD's plan for notifying the public and clarification on the various timelines and schedules.

4. There are many questions around how the Community Engagement/PCAB plan is to be created, currently a blank page 19 in the NOPD Sustainment Plan.
The Community and PCAB 's must be included in this process.
A separate email on this is coming.

5. Question for Mr. Douglass:
In your statement of 9.30.24 which we read to the audience it stated a public Zoom call with your office on Tuesday 10.08.24 at 6pm. The Citywide National Night Out Against Crime is at the same time. Many community stakeholders and the NOPD will be attending events across the City.
Please provide a schedule and time line of your office's public meetings.

As Police Community Advisory Boards we can advise the various entities; City, NOPD, DOJ, Federal Monitors, on Community Engagement if we are included on the front end.

I believe we all share a common goal and commitment in building trust, transparency, accountability, inclusion and equity between the Community and NOPD. By practicing these principles ourselves we can move this process forward for a better New Orleans.

Looking forward to your responses.

Thank you all!

Morgan Clevenger
President
1st District Police Community Advisory Board
████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:**       W H Thompson ███████████
**Sent:**       Thursday, October 10, 2024 5:58 PM
**To:**         LAEDdb_Clerk
**Subject:**    New Orleans Police Department Consent Decree Sustainment Plan

**CAUTION - EXTERNAL:**

I am in full support of granting the Consent Decree Sustainment Plan for the New Orleans Police Department for their exemplary adherence and progress in attaining the goals of the outlined plan.

It is time for the City of New Orleans to move forward and have their efforts recognized.

William Thompson

███████████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:**      Policemonitor <▉▉▉▉▉▉▉▉▉▉▉>
**Sent:**      Friday, October 11, 2024 9:47 AM
**To:**        aburns@consentdecreemonitor.onmicrosoft.com; LAEDdb_Clerk
**Cc:**         Stella Cziment; Kirschelle McGowan; kjackson▉▉▉▉▉▉▉▉▉
**Subject:**   Public Comment submitted to OIPM at Backatown Coffee - Jackson
**Attachments:**   10-11-2024 Public Comment received at Backatown Coffee.jpg


CAUTION - EXTERNAL:


**Comment regarding the Consent Decree Compliance:**

If the New Orleans Police Department brutality practices reemerges, how long will it take for the department to reenter the police consent decree?

**Comment submitted in writing to the OIPM by Eric Jackson,** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

If the New Orleans Police department brutality practices re-emerges, how long will it take for the department re-enter the police consent decree?

**From:** Policemonitor <policemonitor@nolaipm.gov>
**Sent:** Friday, October 11, 2024 9:48 AM
**To:** LAEDdb_Clerk
**Subject:** Public Comment submitted to OIPM at Backatown Coffee - Batiste

**CAUTION - EXTERNAL:**


**Comment regarding the Consent Decree Compliance:**

I don't understand why the public should participate in these hearings if we don't know if our words and experiences with the NOPD will actually matter to the Court.  The Court should inform us in advance to what weight and role our feedback will play in the decisions made.  Can our opinions be weighed the same as audits?  Can our experiences matter as much as reports?  It was our stories that started the FBI investigation into the NOPD and caused the Consent Decree to happen, so our stories and voices should be given the same weight now to end it.

**Comment submitted verbally to the OIPM by Belden Batiste, ███████████████████ ███████  No email address - send emails to OIPM and they will provide to Belden Batiste. Submitted at Backatown Coffee on 10/11/2024.**

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:**          Policemonitor <policemonitor@nolaipm.gov>
**Sent:**          Friday, October 11, 2024 10:55 AM
**To:**            aburns@consentdecreemonitor.onmicrosoft.com; LAEDdb_Clerk
**Cc:**            Kirschelle McGowan; Stella Cziment
**Subject:**       Public Comment Submitted to OIPM at Buckatown Coffee - Coates

**CAUTION - EXTERNAL:**

**Comment regarding the Consent Decree Compliance:**

The NOPD is doing a great job. That said, I still want them to be under federal oversight. The federal oversight provides protection - for us (the community) and the police department itself. I live in the area and I know we need more protection. Again, I think the NOPD is doing a good job.

**Comment submitted verbally to the OIPM by Daniella William Coates,** ███████████████ **. No email address - send emails to OIPM and they will provide to Belden Batiste. Submitted at Backatown Coffee on 10/11/2024.**

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:**         Joyce Dombourian ████████████████████
**Sent:**         Monday, October 14, 2024 12:09 PM
**To:**           LAEDdb_Clerk
**Subject:**      Sustainment Plan of the Federal Consent Decree

**CAUTION - EXTERNAL:**

I am writing in support of the joint motion from the U.S. Department of Justice and the City of New Orleans to begin the Sustainment Plan of the Federal Consent Decree, to which the New Orleans Police Department has adhered for the last 12 years. The progress made in Constitutional Policing as well as increases in transparency have become a model for police departments across the county.

Thank you for your consideration of this very important issue.
Joyce Dombourian
Resident of New Orleans for 70+ years

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**MARY JANE PHELAN**

Dear Judge Morgan,

I'm writing to ask that you please consider instituting the sustainment plan for our New Orleans Police Officers.

I live in the FontaineBleau Drive neighborhood, and have since I was five years old (5)!

This past summer my next door neighbor's house was burglarized. The police who responded ~~were~~ (were) prompt, curteous, and professional. I trust and have confidence

(over)

in their Academy training as it showed in their response.

I hope you trust in their improvements also.

Sincerely,

Mary Jane Williams Phelan

14 October 2024

**From:**          Michelle Reimsnyder <span style="background:black">█████████████</span>
**Sent:**          Tuesday, October 15, 2024 5:29 AM
**To:**            LAEDdb_Clerk
**Subject:**       Time to Terminate the NOPD Consent Decree

**CAUTION - EXTERNAL:**

**To whom it may concern,**

**Good morning. Please consider termination of the NOPD consent decree. Compliance has been met. It has been a benefit to the city, and it's time to let it go.**

**The plan to unwind the consent degree can begin now. It's time!**

Best regards,

Michelle Reimsnyder
<span style="background:black">█████████████</span>

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** James Reiss 
**Sent:** Tuesday, October 15, 2024 1:01 PM
**To:** LAEDdb_Clerk
**Subject:** NOPD CONSENT DECREE

**CAUTION - EXTERNAL:**

To whom it may concern:
My name is James Reiss, a citizen of New Orleans, residing in uptown New Orleans.
I strongly believe that the 11.5 years of reform implemented by the NOPD under the consent decree have had a lasting, positive impact on the department. As a citizen, I am fully confident that the department is in a position to continue and expand on the reforms on their own and without supervision from the DOJ. It is a profoundly different and better department than it was prior to hurricane Katrina and they have the full support of my family and fellow citizens.
Thanks you,

*James J. Reiss III*

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:**        Dean Sunseri ‹█████████████████████████›
**Sent:**        Tuesday, October 15, 2024 4:04 PM
**To:**          LAEDdb_Clerk
**Subject:**     Dr. Dean Sunseri

**CAUTION - EXTERNAL:**

Judge,

I am a resident of New Orleans, Pastor of Transform Our World New Orleans, a Licensed Professional Counselor and a resident of New Orleans, living in Lakeview. Regarding the Consent Decree and possible transition to the Sustainment Plan, I felt led to give you some feedback as a concerned New Orleans citizen.

In the last 2 years, we have seen the murder rate decrease by 50%, an answer to prayer, and the many different organizations, including the police department working together. The city feels dramatically safer than it did 2 years ago, and it appears to me that the cohesive growth of the NOPD is a significant part of this positive movement. I have had the privilege to meet with Superintendent Kirkpatrick, along with a group of pastors on 3 different occasions. When she was hired, I must admit a moderate level of skepticism, yet after meeting her, my attitude changed to being very thankful for her as leader of the NOPD. I was immediately drawn to her sincere, caring and strong leadership ability. Also, I have interviewed a couple of policemen who stated that they have seen some very good changes in the NOPD, along with a higher moral. Her transparency regarding the challenges, plans and future implementation of goals gave me a sense of great hope for the NOPD. Knowing that an organization begins from the top down, I trust Superintendent Kirkpatrick and support her fully as a citizen.

I also have had the occasion to met Chief Gernon on 3 occasions, yesterday being one of them. The professional manner in which he handled  aggressive question from a hurting pastor, the manner in which he deescalated the conversation through excellent listening skills and compassion was a great display of creating peace in a highly emotional situation. He went on to says that there has been training of officers in deescalation skills. He spoke to us, a group of pastors, and was very transparent about the positive changes and continued challenges that the NOPD is facing. I was refreshed by the authentic transparency and honesty, which again gave me great hope for the future of NOPD.

I do not have an in depth knowledge of the compliance to the Consent decree of the NOPD, yet judging from the dramatic decrease in crime, the increase feeling of safety in the city of New Orleans, the 2 excellent leaders mentioned above, I filled with a sense of hope and gratitude for the future of the organization of the NOPD. I hope that this feedback may be helpful to you, and if I can be of further assistance, feel free to contact me.

Sincerely,

Dean Sunseri, DMin, LPC

████████████████████████████████████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:** Guy Williams <█████████████████>
**Sent:** Thursday, October 17, 2024 5:19 PM
**To:** LAEDdb_Clerk <clerk@laed.uscourts.gov>
**Subject:** Consent decree

**CAUTION - EXTERNAL:**

We at Gulf Coast Bank are strongly in favor of moving the City of New Orleans to the off ramp for the consent decree. It is time to end the extra cost that reduces funds available to hire police and keep the city safe.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Peter Gardner <█████████████████>
**Sent:** Friday, October 18, 2024 9:34 AM
**To:** LAEDdb_Clerk
**Subject:** support for sustainment period at NOPD

**CAUTION - EXTERNAL:**

Hello,

I am writing to express my support for the sustainment period for NOPD. I believe that this period is essential for the department to continue to make progress in its reform efforts.

Thank you for your time and consideration.

--
Thanks,

Peter Gardner
████████████████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:** Jennie Diemont <span style="background:black"> </span>
**Sent:** Friday, October 18, 2024 9:53 AM
**To:** LAEDdb_Clerk
**Subject:** Support for Sustainment Period of the NOPD Consent Decree

**CAUTION - EXTERNAL:**

Dear Clerk of Court,

My name is Jennie Diemont, and I live in and own a business in Orleans parish.

I am writing to express my support for the U.S. Department of Justice's motion to move the City of New Orleans and the New Orleans Police Department (NOPD) into a two-year "sustainment period" as outlined in the negotiated plan.

The reforms implemented under the Consent Decree have led to significant improvements in constitutional policing, transparency, and community engagement. With unauthorized use of force incidents down and public satisfaction with NOPD increasing tremendously, I believe the department has demonstrated its ability to maintain these reforms. The sustainment period will allow the NOPD to further solidify these advancements while ensuring that regular audits and oversight continue.

I respectfully urge the Court to **approve the motion** and enable the City of New Orleans and NOPD to enter this critical next phase.

Thank you for your time and consideration.

Sincerely,
Jennie Diemont



In the case that a proof is attached for your review, carefully check for any typos, including address, phone #, URL, etc., and please inform us of any changes to be made. Deep Fried Advertising, LLC (DFA) will not be held responsible for any misprints/errors overlooked by the party entrusted with proofing all documents before press time. NOTE: This proof may not accurately depict the way your colors will reproduce. Copyright © 2024 Deep Fried Advertising, LLC. All rights reserved. All designs generated by DFA are copyrighted material and may not be used in any manner, other than the purpose for which they were designed, without express written permission by DFA.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:**         Bryn Leard  ████████████████
**Sent:**          Friday, October 18, 2024 11:12 AM
**To:**             LAEDdb_Clerk
**Cc:**             Bob Leard
**Subject:**     NOPD Conscent Decree

**CAUTION - EXTERNAL:**

I support the US Department of Justice's movement that the City enters into a two-year "sustainment period," according to the terms of a negotiated plan, bringing the consent decree concerning the New Orleans Police Department closer to successful resolution.

Vonnie Bryn Leard

████████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

| | |
|---|---|
| **From:** | Derek Fossier < ███████████████ > |
| **Sent:** | Friday, October 18, 2024 11:14 AM |
| **To:** | LAEDdb_Clerk |
| **Cc:** | Michael Hecht |
| **Subject:** | Fwd: IMPT - Message to NOLA Coalition Members: Suggested Email in Support of Consent Decree Sustainment Period |

**CAUTION - EXTERNAL:**

Hello,

From the beginning, the Consent Decree handcuffed our officers, benefiting violent criminals and hurting victims.  The toxic progressive justice system in this city has led to needless deaths.  Our highest murders in the past few decades has been while we were under the "supervision" of this consent decree.  The Consent Decree is killing people.  Please end this horrible, life destroying program.

Thank you,
Derek Fossier

---------- Forwarded message ---------
From: **Michael Hecht** < ██████████████ >
Date: Fri, Oct 18, 2024 at 7:32 AM
Subject: IMPT - Message to NOLA Coalition Members: Suggested Email in Support of Consent Decree Sustainment Period
To: Michael Hecht < ████████████ >

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

Hello NOLA Coalition members,

As leadership of the NOLA Coalition, we are asking that you consider sending an email to the Clerk of Court at Clerk@laed.uscourts.gov supporting the US Department of Justice's movement that the City enters into a two-year "sustainment period," according to the terms of a negotiated plan, bringing the consent decree concerning the New Orleans Police Department closer to successful resolution.

Please see details below:

1

**What is the Consent Decree?**

- On March 16, 2011, the U.S Dept of Justice issued an investigative report that concluded that the New Orleans Police Department had engaged, over time, in a pattern and practice of excessive force, unconstitutional stops, illegal searches and seizures, and discriminatory policing in violation of the Constitution of the United States. The report further identified deficiencies in NOPD's policies, recruitment, training, supervision, officer evaluations, and officer accountability
- On July 24, 2012, the City of New Orleans, NOPD, and the Department of Justice (DOJ) agreed to a Consent Decree, one of the most comprehensive in the nation, which is under the jurisdiction of Judge Susie Morgan in the Eastern District Court of Louisiana. This Consent Decree sets forth specific goals, requirements, and tasks to ensure that the NOPD operates with professionalism, effectiveness, and pursuant to Constitutional and statutory requirements. Approved in 2013, the broad, extensive blueprint for positive change encompasses sweeping, department-wide reforms

**The Consent Decree Process**

- Since entering into the Consent Decree, the NOPD has worked closely with the DOJ and Federal Monitors to implement programs, policies, and practices to ensure constitutional policing, including:

  - Development of the EPIC (Ethical Policing Is Courageous) program which supports Peer Intervention
  - Establishment of the Professional Standards and Accountability Bureau
  - Over 140 Policies and standards have been approved by the DOJ and posted on the NOPD Website to ensure that the public has access to this information
  - 2015 Body Work Camera program was established along with policy definitions for the use, retention, and access to footage
  - The City Council of New Orleans adopted a series of ordinances which are now part of the New Orleans City Code to ensure continuity of critical activities and procedures by the department including:

    - Development of a Force Investigations team to investigate force incidents
    - Establishment of a Use of Force Review Board to review all FIT investigations
    - Established a Crisis Intervention Team to respond to officers facing distress
    - Development of the Office of Secondary Employment
    - Additional regulations also addressed sexual assault investigations, domestic violence investigations, community policing, transparency, compliance bureau, and the Police Academy

**Progress under the Consent Decree**

The NOPD and the City of New Orleans have acknowledged the challenges identified in the 2012 DOJ report and have worked diligently to shift the culture to one that places a high priority on Constitutional Policing practices and programs with a focus on structured policy, audit process and cadence, and community outreach.

- The EPIC program launched in 2013 became a national best practice program by 2015 and was adopted as ABLE policing and taught nationwide
- The Academy has made great strides to focus upon culture development during training and ensure that officers are set up for success once complete

- In a 2024 citizen survey, 75% of respondents who had contact with police officers rated that they were satisfied or extremely satisfied with the experience, and 82% said that instances of misconduct or brutality decreased or stayed the same over the past few years
- Overall public safety has increased dramatically in New Orleans. Homicides are down over 50%, and car jackings down over 70%, versus two years ago. New Orleans has seen the #4 fastest improvement in violent crime in the United States since 2019
- Progress on Specific Metrics

    - 1. Use of Force

        - Unauthorized use of force incidents have declined from 14 in 2019 to 4 in 2023
        - Total use of force has declined as well from 822 in 2015 to 568 in 2023

    - 2. Stop Search Arrest

        - 95.4% compliance in recent audits

    - 3. Bias-Free Policing Efforts

        - Established a system to review data, looking for bias and prompting meaningful/corrective action.

    - 4. Crisis Intervention Teams (CIT)

        - 40% of patrol officers are CIT certified

    - 5. Custodial Interrogation is at 100% compliance in recent audits
    - 6. Photographic Line-Up is at 100% compliance in recent audits
    - 7. Policing free of Gender Bias

        - 98% compliance in Domestic Violence patrol response

    - 8. Community Engagement

        - Quarterly reports on Community Engagement

            - Allows for the identification of problems and application of corrective actions

        - Neighborhood policing plans

    - 9. Recruitment

        - Increase hires while maintaining candidate quality

            - 28 - 2022 vs 90 – 2023 [note: recruiting remains a challenge, in which NOLA Coalition, BCNO, and others are engaging]

    - 10. Academy/In-service Training

        - 93% compliance in the most recent Academy audit

- 11 . Officer Assistance Program

    - 100% compliance finding in recent audits

- 12. Performance Evaluations

    - 49% compliance rate in 2019 vs 73% in 2024

- 13. Supervision

    - 97-100% compliance in recent audits

- 14. Secondary Employment System

    - Bi-weekly checks of payroll records
    - Implemented a systemic means of accountability

- 15. Misconduct Complaint Investigations

    - The first full PI B audit protocol and audit was conducted in 2024
    - Will be followed up with another one in early 2025 to measure compliance
    - Clarified data surrounding DOJ timeline concerns
    - Developed BWC integrity check system

- 16. Transparency and Oversight

    - Publishing of all audits and data regularly.
    - Increased data sharing throughout the Sustainment Plan
    - PCAB resource allocation

**What is the Sustainment Period?**

The Sustainment Period is a two-year strategy to help the City of New Orleans stay on track with improvements outlined in the Consent Decree. It includes specific tasks for areas like bias-free policing, community engagement, and more. Regular checks, or "audits," will be done to make sure the City is following the plan. If the City falls short of its obligations, the sustainment period can be paused or extended, ensuring accountability and the continuation of progress.

**Key Considerations**

- When the NOPD moves into a "Sustainment Period," all existing reforms will remain in place
- Per above, progress in the Sustainment Period will be carefully monitored
- The Consent Decree, while needed, has been expensive – it has cost the City of New Orleans over $60 million.  Costs will decrease during the Sustainment Period
- The Consent Decree was never meant to be permanent – it is a reformation process

4

## Conclusion

There is continued optimism about the work the officers of NOPD are doing and the structure that was put in place by the Department; the City Council will continue to support these behaviors. The Department of Justice supports moving to sustainment, and as the NOLA Coalition we agree it is time to allow the NOPD more freedom to show it can manage its own performance, and in fact, has been doing so for the past three years.

Full information, including all court documents, can be found here.

* * *

Thank you for your support of the NOLA Coalition, and the people of New Orleans,

NOLA Coalition Leadership

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:**       Ralph Mason 
**Sent:**       Friday, October 18, 2024 11:57 AM
**To:**         LAEDdb_Clerk
**Subject:**    Sustainment Period

**CAUTION - EXTERNAL:**

Dear Sirs,

I support that the City enter into a two-year "sustainment period," according to the terms of a negotiated plan, bringing the consent decree concerning the New Orleans Police Department closer to successful resolution.

I have been working with the NOPD's 8th District for several years and have seen a remarkable change for the good. I believe we are ready for the two-year sustainment period.

Thank you,

Ralph and Kris Mason

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:**          Andrew Koehler <████████████████████>
**Sent:**          Friday, October 18, 2024 1:00 PM
**To:**            LAEDdb_Clerk
**Subject:**       NOPD Consent Decree

**CAUTION - EXTERNAL:**

To whom it may concern,
I am writing this email in support of NOPDs movement to a two-year sustainment and exiting the consent decree.
My wife and I's support is based on the NOPDs clear progress in all areas of focus for the consent decree.

Thank you for your consideration.

Andrew and Alexandra Koehler
Orleans Parish Residents

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:**        Anne Kiefer <███████████████>
**Sent:**        Friday, October 18, 2024 1:34 PM
**To:**          LAEDdb_Clerk
**Subject:**     NOPD CONSENT DECREE

**CAUTION - EXTERNAL:**

My name is Anne Zoller Kiefer, president and co-founder of VOICES OF THE VICTIMS OF CRIME a 501c3 nonprofit advocacy and education organization supporting victims of violence. I am a proud and active member of the NOLA COALITION.
I also represent the New Orleans Rotary Club as well as the Lakeshore Property Owners's Association. I am on the Board of Directors of both.
I am writing in support of moving our NOPD out of the Consent Decree into the two year Sustainability Period. As a lifelong New Orleans resident I have participated with many projects within my city that work with our police department. I myself have years of experience and training that qualify me to support the officers in our department. It is time to move our police department forward to sustainability and onward to independence. NOPD deserves this; our men and women in blue deserve this.
ALWAYS WITH HOPE ,
Anne Zoller Kiefer

███████████████

1

**From:**       Jesse Huyler ▮
**Sent:**       Friday, October 18, 2024 4:04 PM
**To:**         LAEDdb_Clerk
**Cc:**         Paul Flower; Amy Glovinsky; CarlinConner ▮ Christopher Reade;
                aburns@consentdecreemonitor.onmicrosoft.com
**Subject:**    Business Council Support of the Sustainment Period under the NOPD Consent Decree
**Attachments:** Letter - Support for the Sustainment Period under the NOPD Consent Decree.pdf

**CAUTION - EXTERNAL:**

Good evening,

On behalf of The Business Council of New Orleans & the River Region, I attach a letter in support of the Sustainment Period under the NOPD Consent Decree.

Should you have any questions or require further comment, please contact our Chair, Paul Flower, or our Criminal Justice Task Force Co-Chairs, Carlin Conner and Chris Reade.

With gratitude,
Jesse



Jesse Huyler
Operations Director
▮
Business Council of New Orleans and the River Region
▮

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.



P.O. Box 52794
New Orleans, LA 70152
(504) 569-0667
www.bcno.org

October 18, 2024

The Honorable Susie Morgan
U.S. District Court for the Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130
Via email: Clerk@laed.uscourts.gov

RE: Support for the Sustainment Period under the NOPD Consent Decree

Dear Judge Morgan:

As a leading nonprofit public policy organization committed to a constitutionally aligned New Orleans Police Department, the Business Council of New Orleans & the River Region supports the request of the U.S. Department of Justice and the City of New Orleans to have the NOPD enter the two-year Sustainment Period of the Consent Decree.

Our organization, whose members account for 90,000 Louisiana jobs and more than $118 billion in annual gross revenue, has closely watched and engaged the leaders of New Orleans' criminal justice system for almost two decades. We can attest to our observation of significant improvements in the NOPD's adherence to best practices; its willingness to engage the public and seek solutions; and its promise to perpetually protect the constitutional rights of everyone who lives in, works in, or visits the Crescent City.

We have seen the NOPD work tirelessly since the Consent Decree was signed in 2013 to establish a structure and a culture, strengthened by policy and deed, that fosters its capacity to protect all citizens and hold its ranks to high standards – an achievement essential to restoring trust in the police department.

The NOPD has embraced and institutionalized numerous sustainable practices that give us confidence in its ability to operate constitutionally, independent of changes in leadership or the relaxing of federal oversight. To highlight a few examples, the NOPD has established:

- A protocol to report, investigate, and evaluate all officer Use of Force incidents and to address any policy violations,
- Officer-worn body camera requirements to sustain constitutional policing at the street level,
- And an enforceable structure for secondary employment, ensuring police details are no longer vulnerable to misuse.

These and other accountability policies and practices are more than promises. They have been codified in the New Orleans Home Rule Charter for the past seven years,

We have high confidence in the NOPD, from new recruits to the Superintendent, that they have built a culture of accountability and commitment to constitutional policing for the benefit of all residents, workers, and visitors in our great city. The Business Council remains committed to uplifting all aspects of our criminal justice system, and we will continue to be a watchful and supportive resource for the NOPD throughout the Sustainment Period and beyond.

Sincerely,

Paul Flower
Chair
The Business Council of New Orleans & the River Region

Carlin Conner
Co-Chair, Business Council Criminal Justice Task Force

Chris Reade
Co-Chair, Business Council Criminal Justice Task Force

cc: Consent Decree Monitor, aburns@consentdecreemonitor.onmicrosoft.com

**From:**          Assistant to Roger Ogden ███████████████

**Sent:**          Friday, October 18, 2024 4:28 PM

**To:**            LAEDdb_Clerk

**Subject:**       Request For Action

**Attachments:**   Request For Action

CAUTION - EXTERNAL:

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:**         Assistant to Roger Ogden <████████████████████>
**Sent:**         Friday, October 18, 2024 4:28 PM
**To:**           LAEDdb_Clerk
**Subject:**      Request For Action
**Attachments:**  Ogden Letter.pdf

RE: NOPD Sustainment Period – Business Council Support
October 18, 2024

To Whom It May Concern:

As a representative of Ogden Development & Investments, I wish to add my support to the request of the U.S. Department of Justice and the City of New Orleans to graduate the New Orleans Police Department into the two-year Sustainment Period under the federal Consent Decree.

We have high confidence that the NOPD has successfully leveraged its 12 years under the Consent Decree to craft a new foundation of high ethical standards and internal accountability that will thrive beyond federal oversight and future leadership transitions.

Constitutional policing is paramount to the safety and fundamental rights of all residents, businesses, workers and visitors in New Orleans. We believe the NOPD now shares that promise to protect and uplift the quality of life for everyone in this world-renowned city.

Our confidence is strongly bolstered by the City's rightful decision to give these improvements to the NOPD's structure and culture the force of law. The additions to the New Orleans' Home Rule Charter I would like to highlight include:

**The Use of Force Review Board:** The creation of a protocol to report, investigate and evaluate every use of force incident will encourage every officer to honor the constitutional rights of everyone they encounter.

**Crisis Intervention:** The NOPD is dedicated and trained to de-escalate tense encounters and properly engage citizens who may be suffering from an acute mental health or behavioral crisis.

**Sexual Assault Response:** The NOPD has adopted a victim-centered approach to navigate the sensitive nature of sexual assault incidents and allegations.

**Domestic Violence Response:** The NOPD now ensures its approach to domestic violence cases prioritizes the protection and safety of victims.

**Community and Problem-Solving Policing:** The NOPD is trained to engage communities, understand their needs, and continually assess the effectiveness of its approach to diverse populations.

**Officer Assistance Program:** NOPD officers can access mental health support to process traumatic events, strengthening their resilience and resolve to continue to protect the rights of all citizens.

**Body-worn Cameras:** The requirement for body-worn cameras outwardly demonstrates the NOPD's commitment to hold its ranks accountable during every engagement with the public.

**Secondary Employment:** NOPD has established a trustworthy and reliable approach to fairly assigning and safeguarding the constitutionality of police details, greatly reducing the risk of abuse.

In addition to these improvements, city law has prioritized the importance of transparency and accountability through a system of audits and reporting measures that enforce best practices within the NOPD. Officers will make mistakes, but this new culture and structure give us confidence that errant behavior will never again become acceptable or pervasive in the execution of law enforcement's constitutional duties.

For these reasons and our city's desire to promote a model police department, we ask that you approve the request for the NOPD to enter into the Consent Decree's Sustainment Period.

Thank You,

Roger Ogden

**From:**              Williams, Eric <████████████████>
**Sent:**              Saturday, October 19, 2024 11:59 AM
**To:**                LAEDdb_Clerk
**Subject:**           Consent Decree


**CAUTION - EXTERNAL:**


To: Clerk Office

As a New Orleans Citizen, I would like to express my full support for the plan that moves the City and NOPD into the sustainment period as the Consent Decree is winding down. The progress that has been made is tremendous.
I am fully supportive of the planned transition, and I believe that our new NOPD leadership will keep things moving in the right direction.

Thanks very much,
Eric Williams
████████████████

Get Outlook for iOS

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:** Ben Dupuy <█████████████>
**Sent:** Saturday, October 19, 2024 1:22 PM
**To:** LAEDdb_Clerk
**Subject:** Support for Moving to Sustainment Period

**CAUTION - EXTERNAL:**

Dear Clerk of Court,

I am writing regarding the consent decree.

After documented improvement during the decade-long consent decree period, it's time to progress into the sustainment period to i) give the NOPD the chance to further prove it has effectively reformed its policies and culture, ii) eventually allow the city to save millions per year in third-party oversight, and iii) eventually allow the NOPD to more quickly implement updates to its Constitutional policing policies and procedures in response to future needs as they develop.

Ben Dupuy
█████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:**       N.O. COP < █████████████████
**Sent:**       Saturday, October 19, 2024 3:38 PM
**To:**         LAEDdb_Clerk
**Subject:**    Public comment on NOPD sustainment

**CAUTION - EXTERNAL:**

Lucas Harrell
██████████████

Hello,
I am a student at the University of New Orleans and have a family lineage with immigrants, who are disproportionately affected by police violence. UNO is also one of the public universities in NOLA with the highest Black student population. I cannot fathom the consequences my family and peers will suffer if the consent decree is revoked. I strongly urge you all to consider the consequences of your actions, and how the whole city will react to your decisions.

Thanks,
Lucas Harrell


**This comment was submitted by an attendee during a community public meeting hosted by New Orleans for Community Oversight of Police.**
**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:**        N.O. COP <██████████████
**Sent:**        Saturday, October 19, 2024 3:40 PM
**To:**          LAEDdb_Clerk
**Subject:**     Public comment on NOPD sustainment

**CAUTION - EXTERNAL:**

Name: Ashanti Johnson
██████████████
Comment: Considering the nature of bias and prejudice policing policies from NOPD, I have great concern about their desires to sustain and disagree with the notion. It is imperative to the safety of native New Orleanians, U.S citizens and immigrants alike that the necessary reforms are made to protect civilians from corrupt policing.

**This comment was submitted by an attendee during a community public meeting hosted by New Orleans for community Oversight of Police.**

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:** Zee <█████████████████>
**Sent:** Saturday, October 19, 2024 3:42 PM
**To:** LAEDdb_Clerk
**Subject:** Public Comment submission regarding the Consent Decree

**CAUTION - EXTERNAL:**

Hi,

My name is Zunyana Crier. I am a New Orleans resident and I believe that the judge should rule to keep the Consent Decree. Use of force by NOPD has risen over the past few years and the police continue to increasingly target black folks in our community with 90% of use of force being used against us and the violent level of use of force increasing between 2022 and 2024. This is not a reflection of "bias free policing", this is a racist disparity. The police should only exit the Consent Decree after these statistics have continued to improve, not as they have continued to get worse.

Thank you.

Zunyana Crier

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:**      Unión Migrante <​███████████████>
**Sent:**      Saturday, October 19, 2024 3:43 PM
**To:**        LAEDdb_Clerk
**Subject:**   Public Comment on NOPD Sustainment

**CAUTION - EXTERNAL:**

Anonymous Comment- Ana

You must not remove the consent decree. It will cause major problems for the Latine and Black community, because in reality the police and the judges have no real intel on what people suffer. They are not aware of the pain they cause to the undocumented community. They seperate families, it is hard for us. My brother was going to work, when ICE came to take him and detained all of my family present.

This comment was submitted by an attendee during a community public meeting hosted by New Orleans for community Oversight of Police and translated by Nikeysha Gonzalez ███████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:**      Silas Gillett <​█████████████​>
**Sent:**      Saturday, October 19, 2024 3:45 PM
**To:**        LAEDdb_Clerk
**Subject:**   Comment on decision to move consent decree to sustainment period

**CAUTION - EXTERNAL:**

Hello,

My name is Silas Gillett and I live at ████████████████████. I'm writing about the city's intentions to move the NOPD consent decree into a period of sustainment. I am in full opposition to sustainment and believe that the consent decree should absolutely not be removed. Since 2016, the NOPD's use of force against Black men men has risen by 9.2%, and *by   54.9% against Black women*. In terms of bias-free policing, Black people in New Orleans are arrested at a rate 4.3 times higher than that of White people. What's more, the city has held no public hearings to collect the city's thoughts about this decision.

The people of New Orleans fought hard for this consent decree, and it is there for a reason. The NOPD has clearly not complied with the standards of constitutional policing, and as long as that is true I stand in firm opposition to sustainment.

- Silas Gillett

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:** Melina Diner < ███████████ >
**Sent:** Saturday, October 19, 2024 3:44 PM
**To:** LAEDdb_Clerk
**Subject:** Comment on Consent Decree

CAUTION - EXTERNAL:

My name is Melina Diner and I live at ███████████████████████████ I am emailing in support of keeping the consent decree without sustainment in order to hold the NOPD accountable in our communities. I am extremely opposed to removing the consent decree, seeing as though NOPD continues to escalate their use of force. The NOPD perpetuates discrimination and bias across racial lines, targeting Black and brown citizens and immigrants in our city. NOPD commits 90% of all use of force against Black men and 86% against Black women. As a community member I am extremely disgusted with the brutality NOPD uses against my peers, and will continue to demand that there is adequate oversight of their actions.
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:** Andrea DaViera <█████████████>
**Sent:** Saturday, October 19, 2024 3:45 PM
**To:** LAEDdb_Clerk
**Subject:** No to sustainment, increase police oversight

**CAUTION - EXTERNAL:**

Hello,

My name is Andrea DaViera and I live in District B in New Orleans. I am writing because I am concerned about the move for the New Orleans Police Department to enter the sustainment period. I do not believe that the consent decree should go into sustainment, there is no reason for this move because there is nothing that NOPD has done to warrant an end to oversight. Data has shown that racially biased and unconstitutional policing has not ended and only gotten worse.  NOPDs own data shows that use of force against Black women increased by over 54% in 2023, including 90% of all incidents of use of force is against Black men and 86% Black women. We need more oversight and we need it to be community led, fair, and transparent. I and many other in the community say 'No' to sustainment.

Thank you for your consideration,

Andrea DaViera
██████████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:**      Michael Esealuka <▮▮▮▮▮▮▮▮▮▮▮▮>
**Sent:**       Sunday, October 20, 2024 8:00 AM
**To:**          LAEDdb_Clerk
**Subject:**   No to sustainment

**CAUTION - EXTERNAL:**

I do not support the end of the federal consent decree. NOPD is still using force disproportionately against Black people, especially Black women. I am also considered about NOPD working with ICE and using racist policing and surveillance against our communities if they do not have oversight.

A concerned resident,
Michael Esealuka

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:**          Michael Hecht ██████████████
**Sent:**          Monday, October 21, 2024 2:49 AM
**To:**            LAEDdb_Clerk
**Subject:**       Support for Sustainment Period for NOPD

**Importance:**    High

**CAUTION - EXTERNAL:**

Dear Clerk,

On behalf of Greater New Orleans, Inc., based in New Orleans, and representing hundreds of regional companies, we are writing in support of NOPD entering into a two-year sustainment period, according to the terms of a negotiated plan, bringing the consent decree concerning the New Orleans Police Department closer to successful resolution.

There is continued optimism about the work the officers of NOPD are doing and the structure that was put in place by the Department. The Department of Justice supports moving to sustainment, and at GNO, Inc. we agree it is time to allow the NOPD more freedom to show it can manage its own performance, and in fact, has been doing so for the past three years.

Thank you for your consideration,

Michael Hecht

--
**Michael Hecht**
President & CEO
Greater New Orleans, Inc.



**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:** Karen DeBlieux <█████████████████████
**Sent:** Monday, October 21, 2024 9:09 AM
**To:** LAEDdb_Clerk
**Subject:** NOPD Consent Decree

**CAUTION - EXTERNAL:**

Dear Judge Morgan,

As a volunteer with the Police and Justice Foundation, I am writing to ask for your support of the request of the U.S. Department of Justice and the City of New Orleans to have the NOPD enter the two-year Sustainment Period of the Consent Decree.
Thank you for your consideration.

Karen DeBlieux

█████████████████████

The information contained in this e-mail may be confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One. The information transmitted herewith is intended only for use by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

Opt-out of marketing messages by updating your email preferences here. To contact us by mail, please use the following address: P.O. Box 180, St. Cloud, MN 56302-0180.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Matt Lundy ◄ █████████████
**Sent:** Monday, October 21, 2024 10:27 AM
**To:** LAEDdb_Clerk
**Subject:** New Orleans Consent Decree Sustainment Period

**CAUTION - EXTERNAL:**

To whom it may concern,

I am writing in support of the US Department of Justice's movement that the City enters into a two-year "sustainment period," according to the terms of a negotiated plan, bringing the consent decree concerning the New Orleans Police Department closer to successful resolution.

**What is the Consent Decree?**
- On March 16, 2011, the U.S Dept of Justice issued an investigative report that concluded that the New Orleans Police Department had engaged, over time, in a pattern and practice of excessive force, unconstitutional stops, illegal searches and seizures, and discriminatory policing in violation of the Constitution of the United States. The report further identified deficiencies in NOPD's policies, recruitment, training, supervision, officer evaluations, and officer accountability
- On July 24, 2012, the City of New Orleans, NOPD, and the Department of Justice (DOJ) agreed to a Consent Decree, one of the most comprehensive in the nation, which is under the jurisdiction of Judge Susie Morgan in the Eastern District Court of Louisiana. This Consent Decree sets forth specific goals, requirements, and tasks to ensure that the NOPD operates with professionalism, effectiveness, and pursuant to Constitutional and statutory requirements. Approved in 2013, the broad, extensive blueprint for positive change encompasses sweeping, department-wide reforms

**The Consent Decree Process**
- Since entering into the Consent Decree, the NOPD has worked closely with the DOJ and Federal Monitors to implement programs, policies, and practices to ensure constitutional policing, including:
  - Development of the EPIC (Ethical Policing Is Courageous) program which supports Peer Intervention
  - Establishment of the Professional Standards and Accountability Bureau
  - Over 140 Policies and standards have been approved by the DOJ and posted on the NOPD Website to ensure that the public has access to this information
  - 2015 Body Work Camera program was established along with policy definitions for the use, retention, and access to footage
  - The City Council of New Orleans adopted a series of ordinances which are now part of the New Orleans City Code to ensure continuity of critical activities and procedures by the department including:
    - Development of a Force Investigations team to investigate force incidents
    - Establishment of a Use of Force Review Board to review all FIT investigations
    - Established a Crisis Intervention Team to respond to officers facing distress
    - Development of the Office of Secondary Employment
    - Additional regulations also addressed sexual assault investigations, domestic violence investigations, community policing, transparency, compliance bureau, and the Police Academy

**Progress under the Consent Decree**

The NOPD and the City of New Orleans have acknowledged the challenges identified in the 2012 DOJ report and have worked diligently to shift the culture to one that places a high priority on Constitutional Policing practices and programs with a focus on structured policy, audit process and cadence, and community outreach.

- The EPIC program launched in 2013 became a national best practice program by 2015 and was adopted as ABLE policing and taught nationwide
- The Academy has made great strides to focus upon culture development during training and ensure that officers are set up for success once complete
- In a 2024 citizen survey, 75% of respondents who had contact with police officers rated that they were satisfied or extremely satisfied with the experience, and 82% said that instances of misconduct or brutality decreased or stayed the same over the past few years
- Overall public safety has increased dramatically in New Orleans.  Homicides are down over 50%, and car jackings down over 70%, versus two years ago.  New Orleans has seen the #4 fastest improvement in violent crime in the United States since 2019
- Progress on Specific Metrics
  - 1. Use of Force
    - Unauthorized use of force incidents have declined from 14 in 2019 to 4 in 2023
    - Total use of force has declined as well from 822 in 2015 to 568 in 2023
  - 2. Stop Search Arrest
    - 95.4% compliance in recent audits
  - 3. Bias-Free Policing Efforts
    - Established a system to review data, looking for bias and prompting meaningful/corrective action.
  - 4. Crisis Intervention Teams (CIT)
    - 40% of patrol officers are CIT certified
  - 5. Custodial Interrogation is at 100% compliance in recent audits
  - 6. Photographic Line-Up is at 100% compliance in recent audits
  - 7. Policing free of Gender Bias
    - 98% compliance in Domestic Violence patrol response
  - 8. Community Engagement
    - Quarterly reports on Community Engagement
      - Allows for the identification of problems and application of corrective actions
    - Neighborhood policing plans
  - 9. Recruitment
    - Increase hires while maintaining candidate quality
      - 28 - 2022 vs 90 – 2023 [note:  recruiting remains a challenge, in which NOLA Coalition, BCNO, and others are engaging]
  - 10. Academy/In-service Training
    - 93% compliance in the most recent Academy audit
  - 11 . Officer Assistance Program
    - 100% compliance finding in recent audits
  - 12. Performance Evaluations
    - 49% compliance rate in 2019 vs 73% in 2024
  - 13. Supervision
    - 97-100% compliance in recent audits
  - 14. Secondary Employment System
    - Bi-weekly checks of payroll records
    - Implemented a systemic means of accountability
  - 15. Misconduct Complaint Investigations
    - The first full Pl B audit protocol and audit was conducted in 2024
    - Will be followed up with another one in early 2025 to measure compliance
    - Clarified data surrounding DOJ timeline concerns

- Developed BWC integrity check system
- 16. Transparency and Oversight
  - Publishing of all audits and data regularly.
  - Increased data sharing throughout the Sustainment Plan
  - PCAB resource allocation

**What is the Sustainment Period?**

The Sustainment Period is a two-year strategy to help the City of New Orleans stay on track with improvements outlined in the Consent Decree. It includes specific tasks for areas like bias-free policing, community engagement, and more. Regular checks, or "audits," will be done to make sure the City is following the plan. If the City falls short of its obligations, the sustainment period can be paused or extended, ensuring accountability and the continuation of progress.

**Key Considerations**

- When the NOPD moves into a "Sustainment Period," all existing reforms will remain in place
- Per above, progress in the Sustainment Period will be carefully monitored
- The Consent Decree, while needed, has been expensive – it has cost the City of New Orleans over $60 million.  Costs will decrease during the Sustainment Period
- The Consent Decree was never meant to be permanent – it is a reformation process

**Conclusion**

There is continued optimism about the work the officers of NOPD are doing and the structure that was put in place by the Department; the City Council will continue to support these behaviors. The Department of Justice supports moving to sustainment, and as the NOLA Coalition we agree it is time to allow the NOPD more freedom to show it can manage its own performance, and in fact, has been doing so for the past three years.

Full information, including all court documents, can be found here.

Thanks and have a great day!



Matt Lundy
REI Promos



**From:** Darlene Cusanza < ██████████████

**Sent:** Monday, October 21, 2024 12:14 PM

**To:** LAEDdb_Clerk

**Subject:** Public Comment from Crimestoppers, Inc. concerning the NOPD Consent Decree

**Attachments:** 20241021_112017.pdf

CAUTION - EXTERNAL:

To Whom It May Concern,

Please submit the attached Public Comment from Crimestoppers, Inc. (GNO) in support of NOPD moving into the Sustainment Period.  If you have any questions, please let us know.

Sincerely,
Darlene Cusanza
██████████████

-----Original Message-----
From: ██████████ ██████████████
Sent: Monday, October 21, 2024 11:20 AM
To: Darlene Cusanza < ██████████████████
Subject: Scanned image from Crimestoppers

Reply to: ████████████████████████████████████: Device Name:
Crimestoppers Device Model: MX-3070N
Location: ████████████

File Format: PDF (Medium)
Resolution: 200dpi x 200dpi

Attached file is scanned image in PDF format.
Use Acrobat(R)Reader(R) or Adobe(R)Reader(R) of Adobe Systems Incorporated to view the document.
Adobe(R)Reader(R) can be downloaded from the following URL:
Adobe, the Adobe logo, Acrobat, the Adobe PDF logo, and Reader are registered trademarks or trademarks of Adobe Systems Incorporated in the United States and other countries.

    http://www.adobe.com/
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

| **From:** | Michelle Liu < ██████████████████ |
| **Sent:** | Monday, October 21, 2024 1:44 PM |
| **To:** | LAEDdb_Clerk; ██████████ |
| **Subject:** | Media query re: NOPD consent decree & bias-free policing |

**CAUTION - EXTERNAL:**

Hello,

I'm reaching out because Verite News is working in partnership with The Trace's Gun Violence Data Hub to examine the New Orleans Police Department's use of force incident database in the context of the department's consent decree. Our full data findings for the story are at the bottom of this message.

I recognize that Judge Morgan typically does not comment on the consent decree outside of public proceedings, but I wanted to reach out to see if she may be interested in commenting on the findings, which show what appears to be racial disparities in NOPD's use of force data, this week.

I'm wondering if Judge Morgan would also be able to discuss how she plans to factor the department's most recent bias-free audits/its May and June presentations, along with recent community responses, in weighing the proposal for sustainment.

Though NOPD's bias-free audits show no racial disparities for use of force, some local advocacy groups say other ways of looking at this data — for instance, the OIPM found that types of force against Black women increased 54.9% in 2023, and types of force against Black men increased 9.2% that same year — indicate issues of bias still present.

My deadline is EOD Friday (10/25). Please feel free to reach out at ████████████████ at ██████████ f I can help clarify any questions on this request. Thank you.

+++

* The Trace's data findings show what appears to be a striking racial disparity in NOPD's use of force. Since 2016, Black people have comprised more than 80% of use of force targets by the NOPD, though Black residents have made up only about 55% to 60% of the city during that period.

* The Trace found some 4,000 times in which New Orleans police officers used force in the line of duty since 2016. Of those, about 1,600 instances — or 44% — involved officers' guns. The vast majority of those instances occurred when an officer showed or pointed a gun at someone, but the data also captures about 20 firearm discharges.

* Over that time period, the police department's use of force data has shown a consistent pattern of racial disparity. In every year from 2016 to this September, Black people accounted for more than 80% of uses of force, up to 88% in 2023. That racial disparity grows when focusing on police force incidents involving at least one officer's firearm. Since 2016, nearly 88% of NOPD force with at least one police firearm involved Black people; the disparity has been similar every year.

* Use of force incidents per capita have steadily increased since 2018, even as violent crime rates have declined in the past two years, The Trace found.

+++

Michelle Liu

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Pres Kabacoff <span style="background:black">██████████</span>
**Sent:** Monday, October 21, 2024 9:08 PM
**To:** LAEDdb_Clerk
**Subject:** Consent Decree

**CAUTION - EXTERNAL:**

Dear Clerk of Court,

I am writing to express my unwavering support for the Sustainment Period of the NOPD Consent Decree. Since its inception in 2012, the reforms outlined in the Consent Decree have fostered significant improvements in the New Orleans Police Department, enhancing accountability and professionalism.

The extensive measures taken, including the launch of the EPIC program and the establishment of the Professional Standards and Accountability Bureau, have shifted the culture within the NOPD towards prioritizing constitutional policing. Recent statistics highlight this progress: unauthorized use of force incidents have dramatically declined, and public satisfaction with police interactions has risen to 75%.

As we transition into the Sustainment Period, it is critical that we maintain momentum. This two-year strategy will ensure the continuity of reforms while allowing for regular audits to monitor compliance. The experience gained during this period will empower the NOPD to manage its performance effectively.

Moving forward with this plan reflects a commitment to transparency and community engagement, which are essential for rebuilding trust. I believe that with the continued support of the City Council and the Department of Justice, the NOPD is well-positioned to sustain and enhance the positive changes already achieved.

Thank you for your dedication to this important work and the possibility of onward and upward progress for the City of New Orleans.

Pres Kabacoff


**Pres Kabacoff**
Executive Chairman of the Board





*Elevating the Urban Experience*
hricommunities.com

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.