**From:** Lionel Bailey <▮▮▮▮▮▮▮▮▮▮▮▮▮▮>
**Sent:** Thursday, October 3, 2024 7:47 AM
**To:** clerk@laed.uscourts.gov <clerk@laed.uscourts.gov>; Ashley Burns
<ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** WRITTEN OBJECTIONS

To Whom It May Concern:


Please find the attached WRITTEN OBJECTIONS TO THE NOTICE TO THE PUBLIC
REGARDING MOTION TO ENTER SUSTAINMENT PERIOD somewhat self explanatory. I
would appreciate your assistance in helping me file the said objections and thereafter
notifying of the same once filed.

Thanks in advance for your assistance,

Sincerely your,
Lionel Bailey

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution
when opening attachments or clicking on links.

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA.                    C.A.NO 2:12-4V-4124

                                              SEC: E JUDGE S. MORGAN

Versus

                                              DIV: 2 MAG D. P. CURRAULT

CITY OF NEW ORLEANS

Defendant

<u>NOFIPRJP WRITTEN OBJECTIONS TO THE NOTICE TO THE PUBLIC REGARDING
MOTION TO ENTER SUSTAINMENT PERIOD</u>

The New Orleans Formerly Incarcerated Prisoners Restorative Justice Program  ( NOFIPRJP)
objects to the US DOJ and the CNO filing with the Court a Joint Motion To Enter Into The
Sustainment Period For The Consent Decree  because according to the paragraph 491 of the
Termination of the Agreement For The Consent Decree the CNO and the New Orleans Police
Department had to endeavor reaching full and effective compliance within 4 years of April 18,
2024.

NOFIPRJP objects to the monitor and the Court having explained on several occasions, the parties to the Consent Decree agreeing NOPD would be released from the Consent Decree once the CNO and NOPD has been in full and effective compliance with the Sustainment Plan for 2 years because according to paragraph 485 of the Consent Decree states that the Court Jurisdiction, Modification of the Agreement and Enforcement would become effective upon entry by the Court.

NOFIPRJP concur with the public being assured that there will be continued monitoring and Court oversight during the Termination of the Agreement for the Consent Decree of the CNO and NOPD must endeavor reaching full and effective compliance within four years of April 18, 2024 because the parties can agree to jointly ask the Court to terminate the Agreement after April 18, 2024; provided that the CNO and NOPD having being in full and effective compliance with termination of the Agreement for 2 years.

Respectfully submitted,

Lionel Bailey

NOFIPRJP CEO



This 3rd day of October, 2024.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of October,2024; I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system which will send notice of electronic filing to all

counsel of record.

Lionel Bailey

NOFIPRJP CEO

Criminal Justice Expert



Expert for the Community

**From:** Michelle Liu <███████████>
**Sent:** Monday, October 7, 2024 4:11 PM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Question for 10/8 NOPD consent decree public meeting

Hello,

I'm a reporter with Verite News here in New Orleans. I'm wondering if the federal monitors would be able to address the following during the consent decree public meeting tomorrow:

In a recent presentation to Judge Morgan, NOPD maintains it is not seeing racial disparities in uses of force or in firearm pointings, comparing the rates at which different populations are arrested following a use of force/firearm pointing. But local advocacy groups say other ways of looking at the data — for instance, the OIPM found that types of force against Black women increased 54.9% in 2023, and types of force against Black men increased 9.2% that same year — indicate issues of bias still present.

Can you speak to the monitor's audit process for use of force and racial disparity/bias? Does this process differ at all from NOPD's own audit methodology for UOF and bias-free policing? How can we square NOPD's recent audit with the OIPM numbers?

Thank you!
michelle

Michelle Liu
assistant managing editor, Verite News


Liu

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** julieann992 <███████████████████>
**Sent:** Tuesday, October 8, 2024 8:31 AM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Question for Consent Decree public meeting today at noon regarding Sustainment Period

The sustainment documents include plans by NOPD to address accurate FBI reporting for sex crimes and to follow up on gone on arrival calls, but they do not address sex crime investigations. The July 2023 special report by the monitor found a "troubling rate of noncompliance" after auditing investigations, with 25% in need of supplemental documentation or additional investigation. The latest FBI data released last months shows NOPD had a clearance rate of just 6.75% in 2023 for rape cases. While additional staffing with civilian investigators is certainly a step in the right direction, there may be other factors besides high caseloads hindering thorough investigations. Why do the sustainment conditions not address this critical issue by requiring a detailed independent audit of open cases including speaking with advocates and survivors and not relying solely on police reports as a data source?

Julie F

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** David Lewis <███████████████████>
**Sent:** Tuesday, October 8, 2024 10:27 AM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Consent decree

Sirs, mad'ams:
I want to express my full-throated support for continuing the consent decree. NOPD has made great strides toward more just and effective policing, but New Orleans could lead the country in equitable, community-oriented police practices, and considering the department's history, should be monitored until it is the model. I know too many police and hear too often their private comments on the citizens they police and, sadly, we aren't there yet: this department is just waiting for reduced scrutiny and will certainly return to their jingoistic practices as soon as they unsupervised. I feel safer as a citizen knowing they are monitored, and knowing the city's police monitor is there, providing a last line of defense against abuses.
Keep it. We need it. "Punitive punishments?" no…those are better called "standards."

With my regards,

David S. Lewis

███████████████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Policemonitor <████████████████>
**Sent:** Friday, October 11, 2024 9:33 AM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Cc:** Stella Cziment <████████████>; Kirschelle McGowan <████████████████>
**Subject:** Public Comment submitted to OIPM at Backatown Coffee - Batiste

**Comment regarding the Consent Decree Compliance:**

I don't understand why the public should participate in these hearings if we don't know if our words and experiences with the NOPD will actually matter to the Court. The Court should inform us in advance to what weight and role our feedback will play in the decisions made. Can our opinions be weighed the same as audits? Can our experiences matter as much as reports? It was our stories that started the FBI investigation into the NOPD and caused the Consent Decree to happen, so our stories and voices should be given the same weight now to end it.

**Comment submitted verbally to the OIPM by Belden Batiste, ████████████████ ████████████. No email address - send emails to OIPM and they will provide to Belden Batiste. Submitted at Backatown Coffee on 10/11/2024.**

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Meg Gonzalez <███████████████>
**Sent:** Monday, October 14, 2024 9:34 PM
**Subject:** New Orleans Consent Decree "Sustainment Period"

Public Comment:

As a resident of New Orleans, and having seen a fraction of the historic and contemporary police brutality in this city, I do not believe that NOPD and New Orleans should be able to move forward to exit the consent decree and federal oversight. From the implementation of the consent decree until now, NOPD has never been in full compliance with the mandates of the decree. The police force will only backtrack without the oversight that moves them slowly further towards compliance and hopefully towards more transparent and accountable policing and practices.

Sincerely,
Meg Gonzalez

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Njeri Yancy <​████████████████> |
| **Sent:** | Wednesday, October 16, 2024 10:39 PM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | Consent decree |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

CAUTION - EXTERNAL:

My name is Njeri Yancy ..I am a single
Mother of 3 children currently battling a domestic abused who has constantly violated a protective
order ..I have shown proof to police officers and the station and also by calling and making
reports..with proof to back up my claims...I have reported this individual over and over again And
NOPD has not done a great job of even investigating my claims nor passing them on to somebody or
an agency that could..I think it should stay in place ... Sent from my iPhone CAUTION - EXTERNAL
EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or
clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | john███████████ |
| **Sent:** | Friday, October 18, 2024 9:56 AM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | NOPD Consent Decree |

Good morning,

As a New Orleans resident, I'm writing to advocate for NOPD to move to the next phase of the consent decree. The police department has spent more than a decade under this burdensome and expensive construct. NOPD has cooperated and has made remarkable progress. It's time to recognize and respect their progress and move them along to the final phase with an eye toward exiting the consent decree as soon as possible.

Residents want NOPD to again have full ownership of their Constitutional policing policies, practices, and results. We want NOPD to not hesitate when it comes to Constitutional pursuit of suspects who have made life in the city dangerous for residents and visitors. After 10+ years, it's well past time to remove the training wheels. Let's end the consent decree.

Thank you for your time and consideration.

Sincerely,

John Genin
Attorney at Law

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Jack <██████████████> |
| **Sent:** | Saturday, October 19, 2024 3:32 PM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | No to sustainment! Keep the consent decree! |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

CAUTION - EXTERNAL:


No to sustainment! Keep the consent decree! Down with racist policing!
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Greicy Barrio Lopez <​███████████████​> |
| **Sent:** | Saturday, October 19, 2024 3:53 PM |
| **To:** | LAEDdb_Clerk |

CAUTION - EXTERNAL:


Dear Honorable Judge,

Please take into consideration and please do not eliminate the Consent Decree, because we, the residents of New Orleans are the ones living out the consequences of police abuse.

I am a survivor of an attempted rape and I feel that NOPD did not adequately defend me due to my identity. I am a Black, immigrant, Spanish speaking woman. I work cleaning City Hall. I was headed into work one morning and a man attacked me and sexually assaulted me. I screamed and tried to escape and called 911. I feel that the police did not really take seriously what happened to me. Rather than searching for the perpetrator, the officer began to ask me if what I was saying was true. I feel that I am doubly discriminated against, based on my identity and my language. I never heard any follow up whatsoever from the case, just one message where the officer asked for my ID, but he never gave me any details that the perpetrator had been caught or that they were looking for him or anything. This man was allowed to continue aggressing victims in the community with impunity. When we as immigrants and people of color are not taken seriously as equals to other community members, all of New Orleans are less safe. Just as he tried to attack me, who else may he now be attacking?

The Consent Decree must remain in place. Already, NOPD is not protecting immigrants and people of color equally. With less oversight, we fear the situation will become even worse. We fear they may begin to ask for immigration status, collaborate with ICE - which we fear they may already be doing in violation of the Consent Decree. When we do not feel safe with the police, survivors and witnesses will not come forward to share testimony, and all suffer from reduced public safety.

Greicy Barrio
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

3

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Lucia Upham <█████████████████> |
| **Sent:** | Saturday, October 19, 2024 5:08 PM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | Opposition to Consent Decree Sustainment |

CAUTION - EXTERNAL:


I am writing to express my opposition to NOPD entering the sustainment period of the federal consent decree. Statistics clearly indicate that NOPD is still highly biased, particularly against the Black community. For example, 90% of all use of force committed by NOPD is against Black men. Particularly concerning is the 54.9% rise in use of force against Black women, indicating that bias is getting worse not better. NOPD has more use of force incidents now than when the consent decree was first implemented. This is incredibly concerning, especially how high the rates of force are against the Black community. NOPD should absolutely not be allowed to enter the sustainment period given the backsliding they have shown. Stop racist policing, and do not allow NOPD to begin the process of exiting the consent decree.



Lucia Upham



CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**From:** julieann992 <█████████████████>
**Sent:** Monday, October 21, 2024 10:46 AM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Re: Question for Consent Decree public meeting today at noon regarding Sustainment Period

Hello,
I submitted a question for the last public meeting ahead of time that was not answered on the call. I see that the website says questions and answers are linked HERE, but it does not appear the link is functional. Can you direct me to the location of the public's questions and answers to date?


--------

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.



**From:** Michelle Liu <███████████████>
**Sent:** Monday, October 21, 2024 1:15 PM
**To:** jaronie███████████████████████████████>; Ashley Burns
<ABurns@consentdecreemonitor.onmicrosoft.com>; ddouglass█████████████████
<███████████████████████>
**Subject:** Media query re: NOPD consent decree & bias-free policing

Hello,

Hoping all's well. I'm reaching out because Verite News is working in partnership with The Trace's Gun Violence Data Hub to examine the New Orleans Police Department's use of force incident database in the context of the department's consent decree. Our full data findings for the story are at the bottom of this message.

I recognize that the monitor typically does not comment on the consent decree outside of public proceedings, but I wanted to reach out to see if you may be interested in discussing the findings this week. We're interested in understanding how the methodology for NOPD's bias-free audits, particularly for use of force, was developed, and how the monitor factors the findings of such audits when assessing compliance for bias-free policing.

We're also trying to understand how the monitor squares seeming discrepancies between different analyses of the use of force data, including that of the OIPM, which in its 2023 report noted that "African-American males are still significantly more likely to be subjects of force than any other demographic." Does the monitor have a response to community groups opposing sustainment/the eventual end of the consent decree that have cited the OIPM report?

My deadline is EOD Friday (10/25). Please feel free to reach out at ██████████████████ or at ██████████████ if I can help clarify any questions on this request. Thank you.

+++

* The Trace's data findings show what appears to be a striking racial disparity in NOPD's use of force. Since 2016, Black people have comprised more than 80% of use of force targets by the NOPD, though Black residents have made up only about 55% to 60% of the city during that period.

* The Trace found some 4,000 times in which New Orleans police officers used force in the line of duty since 2016. Of those, about 1,600 instances — or 44% — involved officers' guns. The vast majority of those instances occurred when an officer showed or pointed a gun at someone, but the data also captures about 20 firearm discharges.

* Over that time period, the police department's use of force data has shown a consistent pattern of racial disparity. In every year from 2016 to this September, Black people accounted for more than 80% of uses of force, up to 88% in 2023. That racial disparity grows when focusing on police force incidents involving at least one officer's firearm. Since 2016, nearly 88% of NOPD force with at least one police firearm involved Black people; the disparity has been similar every year.

* Use of force incidents per capita have steadily increased since 2018, even as violent crime rates have declined in the past two years, The Trace found.

+++

Michelle Liu
assistant managing editor, Verite News

███████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Ayyub Ibrahim <████████████████████> |
| **Sent:** | Tuesday, October 22, 2024 12:19 PM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | Deputy Monitor Douglass |

CAUTION - EXTERNAL:

Dear Consent Decree Monitor's Office,

Deputy Monitor Douglass has engaged <https://url.avanan.click/v2/r01/___https://eyeonsurveillance.us9.list-manage.com/track/click?u=685a0e6caa01771b548e4189c&id=7fa2555d64&e=a4ecf8ff83___.YXAz Omlwbm86YTpvOmFlN2I5ZTBjMDA0YjZiOGJlYTcxMDcxYTBjMGI3OWEwOjc6NTdjYT01ZmI0ZjA 2MzQyZmFmMzU5MGNhZGM4MDZiYjFlYmRlMjExYTZmYTg3NjI0NDdmNjYzNjdlZDE1NjU2YW M0YWZkOmg6VDpO> <https://url.avanan.click/v2/r01/___https://eyeonsurveillance.us9.list-manage.com/track/click?u=685a0e6caa01771b548e4189c&id=8400e82992&e=a4ecf8ff83___.YXAz Omlwbm86YTpvOmFlN2I5ZTBjMDA0YjZiOGJlYTcxMDcxYTBjMGI3OWEwOjc6N2YzMjo5YTc4ND kxMWZmMjk3MGY1MWJkYjY4Y2UzOWZiOTJiODkzZTc0ZTgxM2ViM2M1NTYyM2M5MDBlYTExY mQxN2Y1Omg6VDpO> in several activities that present a clear conflict of interest:

1.      Douglass is the founder of Effective Law Enforcement for All (ELEFA):

*       ELEFA recently secured <https://url.avanan.click/v2/r01/___https://eyeonsurveillance.us9.list-manage.com/track/click?u=685a0e6caa01771b548e4189c&id=388b91ca22&e=a4ecf8ff83___.YXAz Omlwbm86YTpvOmFlN2I5ZTBjMDA0YjZiOGJlYTcxMDcxYTBjMGI3OWEwOjc6NDgwZDowZTZkY mFjMjU1MzQ0ZGY2ZjhiMzRhODY5MjNjNDMzYzZjNWZkZGRjZjk5MzEzNDczOTQzMzEwOTg4ZD M4NDlmOmg6VDpO> a contract to oversee Minneapolis' Consent Decree, largely based on the claim that under Douglass' monitoring, the New Orleans Consent Decree has been a success.
*       ELEFA's success in acquiring new contracts, including those overseeing Consent Decrees in other jurisdictions, is directly tied to the perceived success of the New Orleans Consent Decree under Douglass' watch.
*       This creates a situation where Douglass' ability to be an impartial monitor may be compromised, as ELEFA's success is contingent on the New Orleans Consent Decree being viewed as successful.

Potential conflicts must be waived. According to Paragraph 464, the City and DOJ must explicitly waive potential conflicts such as this, even if it is believed that the conflict is immaterial.

The Consent Decree Monitor's Office must immediately open an investigation into Deputy Douglass!

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Lou B <███████████████> |
| **Sent:** | Tuesday, October 22, 2024 12:53 PM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | Avoid conflicts of interest for police monitor |

CAUTION - EXTERNAL:


1.    Potential conflicts must be waived. According to Paragraph 464, the City and DOJ must explicitly waive potential conflicts such as this, even if it is believed that the conflict is immaterial.
2.    The public disagrees. Monitor's opining about whether or not they feel their acts constitute a conflict of interest is anemic to addressing the public's concerns about Douglass' conflict of interest.


3.    The DOJ must conduct a thorough investigation into all DOJ, NOPD, and Minneapolis employees that are now affiliated with ELEFA.
4.    Douglass, and any other monitors with a conflict, must be removed from office and replaced with new monitors in both New Orleans and Minneapolis, ensuring they are free from any conflicts of interest.
5.    Representatives from Sheppard Mullin are forbidden from addressing the conflict of interest in public meetings without a member of the DOJ or City being there to corroborate their statements.

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Ayyub Ibrahim <​███████████████> |
| **Sent:** | Thursday, October 24, 2024 4:24 PM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | Public Records Request |

CAUTION - EXTERNAL:


Dear Custodian of Records,


Under the Louisiana Public Records Act, Louisiana Revised Statutes § 44:1 et seq., I am requesting an opportunity to obtain copies of the public comments submitted regarding the 10/8/2024 NOPD Consent Decree Virtual Public Meeting.


Section 44:32(D) of the Louisiana Public Records Act requires a response within five business days. If you deny any or all of this request, please cite each specific exemption you feel justifies the refusal to release the information and notify me of the appeal procedures available to me under the law.


Thank you for considering my request.


Ayyub Ibrahim

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Brian Gibbs < ██████████ > |
| **Sent:** | Thursday, October 24, 2024 6:38 PM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | NOPD - Support for Consent Decree Sustainment Period |

**CAUTION - EXTERNAL:**

To whom it may concern:

I am writing in support of the US Dept of Justice's movement that the City of New Orleans enter into a Sustainment Period as a transition towards ending the Consent Decree.

Great progress has been made towards the goals of the Consent Decree.

NOPD needs more freedom to manage its own affairs.

Public Safety is the #1 issue keeping New Orleans at the bottom of most every Quality of Life metric. As a life-long resident of New Orleans, it hurts my soul. Please let's start the steps to bring a better Quality of Life to all of New Orleans' citizens and visitors.

Sincerely,

Brian Gibbs
Brian Gibbs Development, LLC



This electronic message, including any and all attachments hereto, is intended solely to be used by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to its intended recipient, you are herewith notified that any dissemination, distribution, copying or retention of this communication or the information contained herein is strictly prohibited. If you have received this message communication in error, please notify us by telephone immediately and permanently delete the original and any electronic or printed copy thereof. Statements made in, or attachments to, this email are not intended to be contractual in nature and are therefore not binding on this firm or any principal thereof until mutually satisfactory agreements memorializing the subject matter of this transmission are executed by hand, in ink, (or by facsimile if authorized by the parties) and hard copies are mutually delivered by the parties thereto.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Charles Tolleson <████████████> |
| **Sent:** | Thursday, October 24, 2024 9:19 PM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | NOPD Consent Decree Public Comment |

CAUTION - EXTERNAL:

Comment/Concern

1. Under the Consent Decree, NOPD has been required/forced to make changes across multiple city administrations and NOPD leadership structures under the direct accountability, supervision and mandate of the presiding Consent Decree Court.

2. The recent - arbitrary?? - decision to withhold NOPD officer promotions brings into question if the NOPD political environment and force leadership can expected/trusted to follow - not circumvent - law, policy, and personnel procedure.

Thank you

Dr Charles Tolleson
████████████████
Sent from my iPhone
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Kim Barnett < ████████████ > |
| **Sent:** | Friday, October 25, 2024 10:23 AM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | NOPD Sustainment |

CAUTION - EXTERNAL:

Judge Morgan,

I'm writing in support of your approving City of New Orleans and NOPD's move from under the Consent Decree to a period of sustainment. This is not coming from the office of a big business, but from a concerned citizen. Living in New Orleans as a single woman in her 60's became a huge concern several years ago when crime hit its peak. Given the choice to move, complain or engage, I decided to become involved in the solution.

Joining the NOLA Coalition in its formative months, allowed me to closely follow the recent progress and see the real time results of changes made under the Consent Decree. The policies and standards put in place over the last 10 years have brought tangible changes within the NOPD and on the streets of our city.

At the NOLA Coalition business leaders, non-profits, city leaders and members of the justice system came together to address the task of supporting the city, NOPD and its youth to make New Orleans a safe community. Progress made from the early days of our organization, to Chief Anne Kirpatrick's hiring, to the present has given me a renewed level of confidence, optimism and excitement for our city.

I believe that the progress of the last three years could not have happened without the foundation built during the Consent Decree. Hearing leaders of NOPD and the city speak to our group and watching them work together has shown that they are committed to building on this foundation and ready to enter the sustainment period.

Your oversight through the Consent Decree and your interest in hearing from those who call New Orleans home is greatly appreciated. We are passionate about our city and will continue to support its progress.

Always grateful,

Kim Barnett
████████████

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Jovande Young <██████████████████> |
| **Sent:** | Sunday, October 27, 2024 8:03 PM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | Consent Decree |

CAUTION - EXTERNAL:


Hello,

I am writing you today to plead with you to change your mind about ending the consent decree. In current times especially around reelection season, police racial bias and misconduct has increased. Although the decree doesn't fully stop police brutality, it would give the people (citizens) a chance to monitor the unjust and vile behavior of the people (police) who are suppose to protect us. The community and eventually the entire city as you to reconsider your decision to take away something that could save us from wrongdoings by those with authority/power.


Thank you,

Jovande Young
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** SAFE. GOSPEL ACCORDING TO SETH <████████████████████>
**Sent:** Wednesday, October 30, 2024 11:28 AM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** 10/28/18 Seth Donaldson murder coverup

Dear Consent Decree Monitor,

It would be hard for me to imagine you have not already heard from me. For 6 years I've been investigation our son's death only reported by WWL 8 months after it occurred. You can search for the "Shattered" Award Winning story but I do not claim it because there's no video proof that Seth even went through a 3'x4' window and Property Crimes Detective Marshall Scallan testified in our civil suit when asked about it "No just speculative based on what the Holts said… specifically Kyle Holt"— (Who was in North Carolina at the time of the incident).

After 7 trips to New Orleans and only finding that NOPD was going to continue to lie I wrote my own digital newspaper documenting our quest for a believable narrative.

It is all documented here on YouTube:
https://youtube.com/@safe.gospelaccordingtoseth?si=OVC2vpWyj1lvOP5e

Here is former Office of Inspector Derry Harper's 08/17/20 assessment of misconduct of "The White Shirts" here: https://youtu.be/MMZHNFidRUI?si=ra6ks-rv2q-CBSfN

Of course Mr Harper was removed from the OIG office less than a month after this recording and no follow-up or NOPD report has been provided.

I have been arrested. I have been jailed. My husband and I have suffered terrible consequences in our own community and as of April we have also lost our oldest son. His car has never been located and it appears there is no investigation.

I now face more legal issues with the "witnesses" to the Snapchat video that was, I suppose, meant to replace any actual security footage at the location. It appears to be very organized, in my opinion… and so I have been.

https://youtu.be/IQsSA0MUVS8?si=QcePjeP5eh2PzT4J

Good luck with the NOPD and the Consent Decree,

Amy Donaldson and Dr Scott Donaldson
==**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution==

**From:** W. C. Johnson <▮▮▮▮▮▮▮▮▮▮▮▮>
**Sent:** Monday, November 4, 2024 12:54 PM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>; Stella Cziment
<▮▮▮▮▮▮▮▮▮▮▮>; Johnny Massey <▮▮▮▮▮▮▮▮▮▮▮>; Jean Paul Morrell
<jp.morrell@nola.gov>; Helena Moreno <helena.moreno@nola.gov>; Joseph I. Giarrusso
<joseph.giarrusso@nola.gov>; Lesli Harris <lesli@harris4nola.com>; Freddie King
<freddie.king@nola.gov>; Eugene J. Green <eugene.green@nola.gov>; Oliver M. Thomas
<oliver.thomas@nola.gov>; Mayor <mayor@nola.gov>; Bouie Sen. Joseph (District Office)
<bouiej@legis.la.gov>; <Delisha Boyd <hse102@legis.la.gov>; Hughes Rep. Jason (District Office)
<hse100@legis.la.gov>; Alonzo L. Knox <hse93@legis.la.gov>; Matthew Willard
<hse97@legis.la.gov>
**Subject:** Letter to DOJ Sustainment Comments

## Community United for Change
## 1643 Gentilly Boulevard
## New Orleans, La. 70119
### 504-251-2201

U.S. Department of Justice
Civil Rights Division
civilrights.justice.gov
October 31, 2024

 In response to your agencies request for comments on the Joint Motion and
Sustainment Plan, Community United for Change (CUC) would like to go on
record with the following:

On October 29, 2024, CUC, through W.C. Johnson, attended the Community
Meeting the Office of Consent Decree Monitors (CD) held at the Nora Navra
Public Library. During this meeting, several informative revelations became
clear that the CD Monitors, as well as the City of New Orleans have committed
several possible infractions of law that reasonable people would believe the
need for an investigated by the USDOJ. DOJ representative, Jonas Geissler,
was one of the presenters who stated the USDOJ was not a part of the Joint

Motion to enter sustainment. However, many news accounts have validated the inclusion of the DOJ in the Sustainment Motion. John Simerman, of NOLA.com, published this report on September 27, 2024; "*New Orleans, DOJ seek to enter final phase of police department consent decree*." Several other news agencies in the Metro area made similar reports.

After thirty-two years of my active role in fighting police brutality and police murder, I have found the politicians of New Orleans fought the people of New Orleans to keep the DOJ out of NOPDs business. Now it appears, after the people were able to get the DOJ in NOPDs business, that the DOJ is conspiring with the City of New Orleans for a "rush to judgement" in exiting from the CD before benchmarks have been realized. At the University meeting and at least one community meeting the overwhelming support of the people of New Orleans is that criteria for sustainment has not been met and exiting at this time is not recommended.

Personally, I find it appalling that the highest law enforcement agency in America has joined with the City of New Orleans in attempting to shortchange the people of New Orleans by agreeing to exit the CD. Communally, I find it illegal for the DOJ to sit in quiet agreement with the NOPD and the CD Monitors to sugar-coat the results of the monitoring process when people of New Orleans and several concerned agencies find the results of the Monitors have been camouflaged to give the appearance of acceptability.

The category of '*Use -of Force*' has been labeled as acceptable when there are several outstanding reports that suggest the opposite. Within the recent public meetings, concerns of rape by NOPD officers were brought up. The refusal of NOPD to take action when reports are filed against a known personality who is purposefully spreading HIV to unsuspecting victims. The case of Anthony Cowart, being targeted by NOPD, shot and arrested for being Black in an expensive automobile. The courts would not sustain the charges the NOPD booked him with to cover up the bad arrest and physical harm to Mr. Cowart's being.

Another agency, the ACLU found through Elijah Appelson, after reviewing the data stated," *In the year(s) from 2016 to 2023, Black People accounted for more than 80% of uses of force.*" Mr. Appelson continued, "*...Yet in recent public meetings, neither NOPD officials nor a team of outside monitors appointed by the judge overseeing the consent decree offered an in-depth explanation on how the NOPD arrived at the conclusion that racial bias is no longer a serious problem.*"

From the beginning of the monitoring process the people of New Orleans were excluded from the monitoring process by Judge Morgan. My suspicions are the judge, the city and DOJ knew the purpose of the DOJ's investigation was not to make the people of New Orleans whole. The Judge eliminated any possibility

of citizen involvement with her denial of the Amicus Brief the people of New Orleans filed at the beginning of the monitoring process. Even with citizen involvement being made part of the CD through the PCAB inclusion, the PCABS have never been utilized as it was intended.

The recent attempts, through the Office of the New Orleans Police Monitor to have the public involved at court hearings has been squashed by the judge. The fact that the CD Monitors used minimal standards for citizens involvement through PCAB is evident by the lack of CD Monitor reports evaluating the PCABs. The involvement of the PCABs were never made part of the monitoring process. Today less than half of the NOPD police precincts have functional PCABs and even those are mainly used as people to fetch for the police officers. To date, CUC has found no PCAB that is functioning according to the intent and description found in the CD.

In the words of Elijah Appelson, *"... From all the numbers I've seen, use of force is gigantic and it's almost exclusively against Black people and Black men specifically. It does not show that they have reduced their bias whatsoever."*

As a community leader, speaking for the majority of Black People in New Orleans, the NOPD is nowhere close to Sustainment. Any suggestion to try to validate sustainment is a direct act of urinating on the people of New Orleans and telling the people it is raining. With the recent disclosures from the CD Monitors at the October 29th 2024 public meeting the people believe it is time for the DOJ to investigate the Monitors for possible crimes and ethical violations. Fortunately. Jonas Geissler, from the DOJ, witnessed the transfer of information that clearly points to the deceptive methods the CD Monitors have and continue to use against the people of New Orleans. The fabrication of untruthful information caused the citizens representative, Dr. Ashley Burns, to openly refute the misinformation CD Monitor Jonathan Aronie, lead monitor, uttered in an attempt to justify what appeared to be conflicts of interest.

The people of New Orleans take a firm stance on rejecting any Sustainment of the NOPDs CD.

W.C. Johnson
Chair
CUC

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** hello@eyeonsurveillance.org <hello@eyeonsurveillance.org>
**Sent:** Thursday, November 7, 2024 12:32 PM
**To:** info@eyeonsurveillance.org <info@eyeonsurveillance.org>
**Cc:** scziment█████████████████████████████>; Stephanie Willi <swillis@laaclu.org>; Elijah
Appelso <EAppelson@laaclu.org>
**Subject:** Domestic violence misclassification at NOPD

Good afternoon,

Please find the attached press release announcing our report revealing significant issues in how NOPD classifies complaints related to domestic violence. The recommendations were made in partnership with ACLU-LA and the Office of the Independent Police Monitor. You can find the full report here.

Thanks,
Eye on Surveillance

ps - please reply to info@eyeonsurveillance.org

---

[NEW ORLEANS, November 7, 2024] — Eye on Surveillance (EOS NOLA), in partnership with the American Civil Liberties Union of Louisiana (ACLU-LA) and the New Orleans Office of the Independent Police Monitor (OIPM), today released a report revealing significant issues in how the New Orleans Police Department (NOPD) classifies complaints related to domestic incident investigations.

The research found that 40% of complaints related to domestic incident investigations for 2016-2023 were misclassified or underreported, raising serious concerns about transparency and accountability in the department's handling of these sensitive cases.

This review comes at a critical time, as Louisiana continues to face challenges in addressing domestic violence. According to Tulane University's Newcomb Institute, the state ranks lowest in the justice dimension of the U.S. Women Peace and Security Index, scoring below average on all 12 indicators.

"The Office of the Independent Police Monitor joins in the concerns expressed in the informative report released by Eyes on Surveillance (EOS)," states Stella Cziment, Independent Police Monitor. "The key finding that 40% of the complaints related to domestic incident allegations were misclassified or underreported is alarming. The OIPM commits to working with these partners and the community in the coming year to address these discrepancies."

Cziment adds, "In accordance with the proposed sustainment strategy, the OIPM will assume a larger role in audit compliance moving forward and will provide additional checks on complaint classifications completed by the Public Integrity Bureau. Complaints, like these, that are misclassified are effectively undercounted and will be left unaddressed in any remedial strategies for the department. It is vital that these complaints are identified for what they are, properly investigated under the appropriate allegation, and these survivors are not revictimized when they go to the police department for accountability and help. For these reasons, the OIPM partners with EOS and the American Civil Liberties Union-Louisiana (ACLU-LA) to put forth policy recommendations calling for the codification of reporting requirements, developing a standardization

classification system, and establishing a data reconciliation process."

**Key Findings and Recommendations:**

- From 2016-2023, approximately 40% of complaints related to domestic incident investigations were misclassified or underreported.
- Three key policy recommendations have been proposed:
    1. Codifying existing reporting requirements.
    2. Developing a standardized classification system.
    3. Establishing a data reconciliation process.

This research follows a pattern of concerns about NOPD's handling of sensitive cases. In 2011, the U.S. Department of Justice identified systematic misclassification of sexual assaults and deficient investigations, leading to the 2012 Consent Decree.

The full report, including detailed methodology and complete policy recommendations, is available here and the condensed report is available here.

**About EOS NOLA**

Eye on Surveillance is a grassroots coalition of individuals and organizations united to divest our city from surveillance and invest in communities. Since 2019, EOS has organized successful campaigns against the city's use of racially-biased surveillance tools and serves as a local resource regarding the harms of law enforcement surveillance use.

For media inquiries, please contact us at info@eyeonsurveillance.org.

Follow EOS on Instagram, Twitter, and Facebook.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** hello@eyeonsurveillance.org <hello@eyeonsurveillance.org>
**Sent:** Thursday, November 7, 2024 3:55 PM
**To:** Elizabeth.White███████████████████████████████████>; David.Adams███████████████
<███████████████████████████>; Arusha.Gordon███████████████████████████>;
jonas.geissler███████████████████████████████████
<Jonas.Geissler███████████████>; Maria.Acker███████████████████████>;
Maureen.Johnston███████████████████████████████>; ojpmedia███████████████
<███████████████████>; Shaketta.Cunningham███████████████████████████████>;
timothy.mygatt███████████████████████████████>; Regan.Rush███████████████
<███████████████████████>
**Cc:** info@eyeonsurveillance.org <info@eyeonsurveillance.org>; david@libertas.org
<david@libertas.org>; jericare16███████████████████████████>;
bethbutler███████████████████████████████████>; Bob Murrell
<███████████████████████████>; Pearl Ricks <███████████████████>; rt4chair
<███████████████████████████>; Caroline Sinders <███████████████████>
**Subject:** United against consent decree conflicts

Department of Justice,

We are writing along with other local and national organizations to express deep concerns with conflicts of interest within the monitoring team in New Orleans that also impact Minneapolis. This is in addition to our petition where members of the public have been writing in support of these concerns.

Please send responses to info@eyeonsurveillance.org.

Sincerely,

Eye on Surveillance, Louisiana - eyeonsurveillance.org

A Community Voice, Louisiana - acommunityvoice.org
Convocation Research + Design, National - convocation.design
Democratic Socialists of America, Louisiana - dsaneworleans.org
Libertas, Utah - libertas.org
Reproductive Justice Action Collective, Louisiana - rejacnola.org
Restore the Fourth, National - restorethe4th.com

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

To the Department of Justice (DOJ):

We are a coalition of civil rights and community-based organizations working in New Orleans to halt the local government's expansion of surveillance tools such as facial recognition and to increase oversight of current government surveillance methods.

Since the summer of 2024, we have been urging the parties of the Consent Decree to halt NODICE, a joint NOPD-DA program that uses RTM, a tool described as a predictive analytic tool[1] by the company that designed the software. This tool violates Chapter 147 of the New Orleans Municipal Code Section 147-2 [2], which explicitly defines predictive policing technology as the usage of predictive analytics software in law enforcement to predict information or trends about criminality, including but not limited to locations.

During the course of urging you all to halt this program, we discovered that Deputy Monitor David L. Douglass currently employs former NOPD superintendent Michael Harrison, who is an active advisor to the NOPD-DA program. Since this discovery, we have been alerting you to the ever-growing list of conflicts of interest involving Deputy Douglass.

These conflicts of interest came to a head on October 29, 2024, when Ashley Burns, a member of the Consent Decree Monitor's team publicly supported Eye on Surveillance's allegations [3] that Deputy Douglass, in his role as a Consent Decree Monitor, has conflicts of interest.

Specifically, when referring to the conflicts of interest, Dr. Burns stated: "I did cofound ELEFA with David and I am not affiliated with it at all anymore and I agree with the community. I think it's a great great great conflict of interest, among a lot of other ethical and integrity issues". [4]

At the core of our allegations is Paragraph 464 [5] of the Consent Decree, which explicitly prohibits monitors from accepting employment or providing consulting services that would present a conflict of interest. The paragraph states:

**"Unless such conflict is waived by the Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement."**

EOS believes that Deputy Monitor Douglass has engaged in several activities that present a clear conflict of interest:
1. Douglass is the founder of Effective Law Enforcement for All (ELEFA):
   - ELEFA recently secured [6] an annual $1.5 million contract to oversee Minneapolis' Consent Decree, largely based on the claim that under Douglass' monitoring, the New Orleans Consent Decree has been a success.

- ELEFA's success in acquiring new contracts, including those overseeing Consent Decrees in other jurisdictions, is directly tied to the perceived success of the New Orleans Consent Decree.
- This creates a situation where Douglass' ability to be an impartial monitor may be compromised, as Douglass can not be critical of most aspects of NOPD without putting blame on himself or one of his current colleagues, and former NOPD leaders.

2. Hiring Practices [7]:
   - On October 29th [8], at a community meeting hosted by the Consent Decree Monitor's Office, Douglass admitted that at least one NOPD officer actively worked for NOPD while also being on ELEFA's payroll. Douglass admitted to hiring Kevin Burns, who is an active NOPD officer and has a history of misconduct.
   - In addition to hiring at least one active NOPD member, Douglass has hired former NOPD, DOJ, and monitoring team leaders. One such employee, Arlinda Westbrook (formerly of NOPD), recently attended a community forum led by Douglass where she lobbied [9] on behalf of Douglass without disclosing her financial ties to ELEFA.

A similar potential conflict has also come to our attention involving lead monitor Jonathan Aronie, who co-founded a program called ABLE [10], which has hired several former NOPD officers as leadership and on the board of directors.

We believe that these conflicts of interest are showing up in how the Consent Decree team, led by Douglass and Arnoie, monitor NOPD. For example, recent reporting from Verite News [11] reveals troubling evidence that the NOPD's claims of bias-free policing are based on flawed methodology that obscures significant racial disparities. Since 2016, Black people have comprised more than 80% of the use of force targets by the NOPD, despite making up only 55-60% of the city's population. When examining incidents involving police firearms specifically, the disparity grows - nearly 88% of NOPD use of force incidents involving firearms were against Black civilians, compared to about 8% for white civilians. The department's methodology for analyzing this data essentially treats any use of force as justified if it results in an arrest, masking potential racial bias in both the initial decision to use force and the subsequent arrest. This raises serious questions about how the Consent Decree monitor oversees NOPD and their claims of success in achieving bias-free policing under the Consent Decree.

**Potential conflicts must be waived.** According to Paragraph 464, the City and DOJ must explicitly waive potential conflicts such as this, even if it is believed that the conflict is immaterial.

Demands:
1. The DOJ must investigate and remove Douglass, and any other monitors with a conflict, from the Consent Decree Monitor team and replace them with new monitors.
2. The DOJ must conduct a thorough investigation into all DOJ, NOPD, and Minneapolis employees who are now affiliated with ELEFA and ABLE for potential conflicts of interest.
3. All parties (the City, NOPD, and DOJ) of the Consent Decree must be audited for conflicts of interest.

Sincerely,

Eye on Surveillance, Louisiana - eyeonsurveillance.org

A Community Voice, Louisiana - acommunityvoice.org
Convocation Research + Design, National - convocation.design
Democratic Socialists of America, Louisiana - dsaneworleans.org
Libertas, Utah - libertas.org
Reproductive Justice Action Collective, Louisiana - rejacnola.org
Restore the Fourth, National - restorethe4th.com

Citations:
[1] https://www.riskterrainmodeling.com/prediction.html

[2]https://library.municode.com/la/new_orleans/codes/code_of_ordinances?nodeId=PTIICO_CH147SUTEDAPR_S147-2PRSUTE

[3]https://www.nola.com/news/crime_police/zero-integrity-federal-monitor-overseeing-nopdconsent-decree-slammed-by-colleague-at-public-hearing/article_ba9b8b92-9636-11ef-af69-9f80a8888aed.html

[4]https://www.youtube.com/watch?v=BfiVC5kCT6Q&t=2s

[5]https://nola.gov/nola/media/NOPD/Consent%20Decree/778-Second-Amended-and-Restated-Consent-Decree.pdf

[6]https://www.startribune.com/effective-law-enforcement-for-all-selected-as-independent-evaluator-of-minneapolis-policing-reforms/600340529

[7]https://ele4a.org/about-us/

[8]https://www.youtube.com/watch?v=UF_u6Hyrb6U&ab_channel=EyeOnSurveillance

[9]https://www.youtube.com/watch?v=rDjStKFEh-4&ab_channel=EyeOnSurveillance

[10] https://www.law.georgetown.edu/cics/able/

[11]https://veritenews.org/2024/10/31/nopd-consent-decree-force-racial-disparity/

| | |
|---|---|
| **From:** | Mary Howell <████████████████████> |
| **Sent:** | Thursday, November 7, 2024 6:12 PM |
| **To:** | LAEDdb_Clerk |
| **Cc:** | aburns@consentdecreemonitor.onmicrosoft.com; Jonathan Aronie; Donesia Turner; ddavillier███████████████; Geissler, Jonas (CRT); Riaz, Mehveen (CRT); Gordon, Arusha (CRT); David Douglas |
| **Subject:** | USA v City of New Orleans, Docket No. 2:12-CV-01924. Public Comment |
| **Attachments:** | 241107_CD Comment_SectionIXGenderBias_Submit.pdf |

<mark>**CAUTION - EXTERNAL:**</mark>

Please file the attached document with the Court for consideration as Public Comment regarding the Joint Motion to Begin Sustainment Period and Approve Sustainment Plan filed in the captioned case.
Please advise if any additional information is needed.
Thank you.

Mary E. Howell
Attorney at Law
316 S. Dorgenois St.
New Orleans, La. 70119
504 822 4455 (o)
504 822 4458 (fax)
████████████

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any,
is intended only for the person or entity to which it is addressed and may
contain confidential and/or privileged material. Any unauthorized review,
use, disclosure or distribution is prohibited. If you are not the intended
recipient, please contact the sender by reply e-mail and destroy all
copies of the original message. Thank you!

<mark>**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.</mark>

November 7, 2024

**Re: Public Comment Regarding NOPD's Compliance with Section IX. Policing Free of Gender Bias with Recommendations**

### I.    Introduction

This document is submitted to the Court as public comment regarding the current status of the New Orleans Police Department's (NOPD's) compliance with Section IX of the Consent Decree, Policing Free of Gender Bias, specifically as it relates to Subsection A, Sexual Assault.[1]

The primary author of these Comments is a Ph.D. student and survivor of sexual violence who studies how sexual assault cases move through the criminal legal system and has been researching NOPD's handling of sex crimes for over five years. Due to privacy concerns as a survivor, this Author requests that her name not be publicly disclosed at this time. Mary Howell, a local civil rights attorney who has been actively engaged for over 47 years in multiple civil rights lawsuits and community efforts to reform NOPD's policies and practices, has assisted the author in preparing, reviewing and filing these comments with the Court and supports the findings and recommendations presented in this document.

On April 3, 2023, the researcher and Ms. Howell (the Commentators) filed public comments with the Court expressing serious concerns regarding the then-status of NOPD's policies and practices in the investigation and handling of sex crimes. While there have been a number of improvements since that filing, unresolved issues remain and require the attention of this Court.

 It is requested that the Court and the parties seriously review and consider these comments before entering into any Sustainment Period. Should the Court determine that Sustainment is warranted and grants the Joint Motion of the Parties to enter Sustainment, it is urged that any Sustainment Plan address and incorporate the recommendations included in this comment, and that oversight and monitoring by the Court and the Monitoring Team continue until these issues are addressed and corrected.

We believe the Consent Decree offers the best opportunity to finally address and resolve, hopefully in a meaningful and lasting way, many of the critical issues which for decades have plagued and undermined effective policing in the investigation of sex crimes in the City of New Orleans. We see this as a once in a lifetime, multi-generational opportunity, in which significant and lasting reform is indeed possible.

---

[1] The NOPD's Special Victims Division (SVD) includes Sex Crimes, Child Abuse, and Domestic Violence Units. Where there are issues that overlap all areas, those issues are included here; however, the Sexual Assault section of Section IX Policing Free of Gender Bias is the primary focus of this document and its recommendations.

While we understand the desire and the impetus to move into the Sustainment Period and ultimately exit the Consent Decree, we also believe it would be a serious error with long-lasting implications for the City, its residents and visitors, if NOPD were to exit the Consent Decree without addressing and solving the significant remaining problems outlined in this Comment.

We wish to acknowledge that during the past year we have had a number of conversations with representatives of the NOPD regarding our concerns and appreciate the professional courtesies extended by the NOPD in those discussions.

We are aware that the City of New Orleans is a party to this lawsuit, and indeed, solving many of the problems identified in this Comment will require the City to dedicate additional resources, including targeted funding to support NOPD's Special Victims Division (SVD).

We urge the parties and the Court to pay close attention to the issues outlined in this Comment—many of which have persisted over the many years the Consent Decree has been in force, and all of which remain both current and pressing—and hopefully proceed in the spirit of addressing these remaining outstanding areas while there is still an opportunity to do so.

We also wish to state that while we have shared many of our concerns directly with the NOPD, these Comments are solely our own and are offered in the spirit of improving the current situation, maintaining those achievements which have taken place under the Consent Decree and ensuring, to the extent that it is possible, that additional improvements take place and are maintained over time.

In furtherance of that goal, we acknowledge there is a substantial amount of data and information provided in this Comment which may necessitate further explanation and discussion. We would welcome the opportunity and are available to meet with the Court and the parties to further discuss the issues raised in this Comment and our recommendations.

## II.    Recent Statistics Illustrate the Impact of a Lack of Resources on the Ability of NOPD's Special Victims Division (SVD) to Effectively Respond to and Investigate Sexual Assaults

A.  NOPD's caseload per detective is currently 74.[2] The recommended caseload per detective is 26-40.[3]

B.  There are currently six (6) detectives assigned to investigate sex crimes, with six (6) vacant positions.[4]

---

[2] Meeting with NOPD (2024, October 29).

[3] New Orleans Health Department. (2022, April). Sexual Violence Response Advisory Committee (SVRAC) Memo: Follow up to the Committee's 2015 Report. Sexual-Violence-Response-Advisory-Committee-Report-April-2022-Final-6-8-22.pdf (nola.gov). This report recommended a caseload of 26, citing a 2022 caseload of 89 for Sex Crimes and Child Abuse. Given this SVRAC Report was issued in 2022, we hope there will be a more updated report released to the public. We understand NOPD's current target caseload is 40, and we are unaware of a plan from NOPD to reach this target, nor an explanation as to why the target has been raised to 40 (from 26).

[4] Meeting with NOPD (2024, October 29). For details, refer to Section 1 of this document, Staffing and Caseloads. It is our understanding that caseloads refer to active cases. The volume of cold cases should also be

C. NOPD's clearance rate for rape in 2023 was 6.75%. This is the lowest NOPD clearance rate recorded by the FBI since the NOPD has been under the Consent Decree.[5] The national average clearance rate for rape for 2013-23 was approximately 35% (range of 24-45%) for law enforcement agencies located in population groups with 100,000 or more. See Appendix A, Figure 1.

D. NOPD's rape clearance rate in 2023 was 434th out of 496 agencies, placing NOPD near the very bottom of law enforcement agencies located in population groups with 100,000 or more. [6] See Appendix A, Figure 3.

E. In 2023, NOPD reported 187 rapes per 100,000 to the FBI. In this same sample of 496 agencies, NOPD had the highest rate of reported rapes per 100,000 people, underscoring the need to prioritize sex crimes in the City's overall strategies to prevent and respond to violent crime.[7] See Appendix A, Figure 4.

F. NOPD has recently reported a 19% increase in first- and second-degree rape, [8] year to date, when compared with 2023.[9] This increase in reported rapes has taken place in the midst of significant reductions across other types of violent crime.

## III.    Background

In the 11 years since the Consent Decree[10] was signed, the NOPD has made progress in addressing specific reforms related to Section IX. Policing Free of Gender Bias, such as hiring social workers, establishing a local Sexual Assault Response Team (SART), conducting monthly multi-disciplinary team (MDT) case reviews for adult sex crimes,[11] updating policies, training

---

considered when assessing SVD staffing needs. The number of cold cases is currently unknown to the Commentators, but it is our understanding that there are only 1.5 detectives assigned to these cases (a case is cold after one year and a day).

[5] FBI Uniform Crime Report. (2024, September). cde.ucr.cjis.gov. Refer to Appendix A for more.

[6] An in-depth review of the factors driving NOPD's very low and declining clearance rate for rape, including a breakdown of clearance by type of cases and/or characteristics, by an outside expert is recommended.

[7] An in-depth review of NOPD's classification and reporting of rapes by an outside expert is recommended to properly assess the significance of this high number and what it represents.

[8] These reports are released weekly by NOPD, so they fluctuate week to week. We are using the most recent weekly report dated October 20-26. In a recent October 13, 2024 Times Picayune article, this number was cited as a 23% increase (for first-and second-degree rape): https://www.nola.com/everyones-working-together-new-orleans-police-health-officials-aim-to-extend-steep-declines-in-violent/article_d0adcb4c-8813-11ef-bb01-3bfebff0cbb5.html

[9] New Orleans Police Department, NOPD Announces Preliminary Crime Statistics for October 20-26, 2024. https://nopdnews.com/post/october-2024/nopd-announces-preliminary-crime-statistics-fo-(3)/. It is important to note that Domestic Violence is not tracked in the weekly reports; however, Domestic Violence was also up in NOPD's most recent Preliminary Special Victims Division Sex Crime Data, Domestic Violence Data for Third Quarter of 2024. https://nopdnews.com/post/october-2024/nopd-announces-quarterly-preliminary-special-victi/. To our knowledge, neither the City, nor NOPD have undertaken any review or analysis of this increase in reports of rapes during a time when there is an on-going downward trend of reports of other violent crimes in the City.

[10] Second Amended and Restated NOPD Consent Decree (2024, April 18). https://www.laed.uscourts.gov/sites/default/files/nopdconsent/12-1924%202nd%20Amend%20CD.pdf

[11] New Orleans Health Department. Sexual Assault and Domestic Violence Programs. Health Department - Domestic Violence and Sexual Assault Program - Provider Resources - City of New Orleans (nola.gov)

and equipment, correcting FBI data reporting errors and notifying the public, and more recently, hiring civilian investigators to assist in reducing caseloads for detectives in their Special Victims Division (SVD).[12]

**While these much-needed reforms are important, there are still significant areas which need to be addressed and resolved, under the Court's direct supervision.**

One of two recent assessments of the status of NOPD's compliance with Section IX. Policing Free of Gender Bias, the July 7, 2023 Consent Decree Monitoring Team's Special Report on NOPD Sexual Assault Investigations (Special Report), "revealed some backsliding by NOPD as well as some reason to question the durability of the Department's prior achievements in this area."[13]

Importantly, the Special Report also emphasized "NOPD acknowledges it must take immediate actions to turn these negative trends around."[14]

The areas highlighted in the Special Report—extremely large and unsustainable caseloads for Special Victims Division (SVD) detectives, one-quarter of audited cases missing documentation or follow-up investigatory steps, and precipitous declines in SVD clearance rates—have been documented as ongoing and urgent issues for many years.[15]

These areas of concern are not minor; in fact, they are of central importance to the Consent Decree's requirement that NOPD "respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias."[16]

The Special Report also referred to a forthcoming Corrective Actions Plan: "The Monitoring Team looks forward to continuing to work with NOPD's SVD to devise a meaningful corrective actions plan that will bring the Department back into compliance with the Consent Decree, and back to providing the level of services victims of sexual violence have come to expect from the NOPD since the outset of the Department's reform efforts."[17]

Despite this statement, **it does not appear that a Corrective Actions Plan focused on addressing these serious investigatory issues was ever released, nor was such a plan referenced or incorporated in the Sustainment Plan**. If indeed such a plan does exist, it does not appear to have been made available to the public.

---

[12] New Orleans Health Department. (2022, April). Sexual Violence Response Advisory Committee (SVRAC) Memo: Follow up to the Committee's 2015 Report. Sexual-Violence-Response-Advisory-Committee-Report-April-2022-Final-6-8-22.pdf (nola.gov)

[13] Consent Decree Monitoring Team. (2023, July 7). Special Report on NOPD Sexual Assault Investigations. 0727 2023-07-07 Special Report of the Consent Decree Monitor on NOPD Sexual Assault Investigations.pdf (nopdconsent.azurewebsites.net); page 3. A subsequent October 2023 Special Report focused on Deprioritizing Calls for Service. 12-1924 (USA) OCDM Special Report.pdf

[14] Consent Decree Monitoring Team. (2023, July 7); page 3.

[15] Recommendations from the 2015 Report are outlined in the 2022 SVRAC memo (2022, April).

[16] Consent Decree Monitoring Team. (2023, July 7); page 6.

[17] Consent Decree Monitoring Team. (2023, July 7); page 22.

Many of the issues outlined in the Special Report echo previous findings by the City of New Orleans Sexual Violence Response Advisory Committee (SVRAC), which chronicled NOPD SVD's successful reforms alongside remaining areas of need in an April 2022 report. (SVRAC Report).[18] This report was presented by the SVRAC as a follow up to the group's prior 2015 report.[19]

At the time of this SVRAC Report, it appeared a number of reforms suggested in 2015 had yet to be implemented. According to the committee, the issues which remained were both necessary and urgent—reducing caseloads to the recommended level of 26 per detective,[20] processing Sexual Assault Kits (SAKs) in a timely manner,[21] addressing low clearance rates to "ensure that severe and acute cases receive the attention they deserve,"[22] providing additional training and equipment, offering incentive pay and opportunities for mobility within the Special Victims Division (SVD), and creating a survivor emergency fund.

Despite these recommendations by the SVRAC in 2015 and 2022 and the Monitoring Team's Special Report in 2023, **it appears that NOPD's Special Victims Division (SVD) is still suffering from a lack of critical resources necessary for achieving substantial compliance with the Consent Decree** in the following areas:

- ***Ensuring Adequate Staffing*** to facilitate the timely response of patrol officers and detectives to calls for service, and to implement sustainable investigatory caseloads,

- ***Improving Investigatory Quality and Completeness*** to improve case clearance and survivor experiences,

- ***Expanding Sexual Assault Kit (SAK) Testing Infrastructure***, to eliminate lengthy backlogs, and to prevent backlogs and delays from re-occurring,

- ***Providing for Proper Supervision, Training and Equipment*** to support SVD's work.

---

[18] New Orleans Health Department. (2022, April).

[19] Advocate Staff Editorial. Our Views: Sex crimes must be prosecuted with greater accountability, and more swiftly. (2022, August 16). https://www.theadvocate.com/baton_rouge/opinion/our_views/our-views-sex-crimes-must-be-prosecuted-with-greater-accountability-and-more-swiftly/article_16985230-191c-11ed-b511-87f277bec249.html

[20] 26 cases/detective recommended by: New Orleans Health department (2022, April). Sexual Violence Response Advisory Committee Memo. Quoted again in: Consent Decree Monitoring Team. (2023, July 7). Special Report on NOPD Sexual Assault Investigations.

[21] Jones, David. (2024, July 2). Councilwoman says New Orleans on track to clear backlog of untested DNA samples by end of year. https://www.fox8live.com/2024/07/03/councilwoman-says-new-orleans-track-clear-backlog-untested-dna-samples-by-end-year/ and Jones, David. (2024, July 6). Orleans DA asks for more funding for DNA processing as state launches rape kit tracking. https://www.fox8live.com/2024/07/06/orleans-da-asks-more-funding-dna-processing-state-launches-rape-kit-tracking/

[22] New Orleans Health Department. (2022, April); page 15.

On September 27, 2024, the Department of Justice (DOJ) and City of New Orleans filed a Joint Motion to Enter the Sustainment Period of the Consent Decree, including a Sustainment Plan (Sustainment Plan). The memorandum included in this filing (Sustainment Memo) acknowledged the recent backsliding outlined in the July 2023 Special Report, specifically the findings of "unmanageable and unsustainable" caseloads, and that 25% of audited cases were in need of further investigation and/or documentation. [23]

The Sustainment Memo described recent actions NOPD has taken, including the hiring of additional investigators and the implementation of a callback process for 911 calls with delayed responses, in which the initial caller was no longer on scene once police arrived (calls designated as gone on arrival or "GOA"). [24] **While these actions are encouraging, due to their very recent implementation, there has not yet been an opportunity to thoroughly evaluate the effects of these improvements**.

The Sustainment Plan currently includes the following appendices related to Section IX. Policing Free of Gender Bias:

- Domestic Violence/Sexual Assault Public Reporting Corrective Actions
- Domestic Violence ("DV")/Sexual Assault ("SA") GOA Corrective Action Plan

However, the Sustainment Plan does not address the issues of caseloads and staffing, investigatory thoroughness and completion, and the timely processing of sexual assault kits (SAKs)—all of which are of primary importance and have been previously identified as areas of backsliding and/or noncompliance by the Monitoring Team and SVRAC.

 In addition, the Sustainment Plan does not address keeping in place successful existing reforms such as the New Orleans Sexual Assault Response Team (SART)[25], Multi-disciplinary Team (MDT) case reviews,[26] or the Sexual Violence Response Advisory Committee (SVRAC).

As the City attempts to move into the Sustainment Period of the Consent Decree, it is imperative that remaining areas of continued noncompliance with Section IX. Policing Free of Gender Bias be thoroughly evaluated, addressed, and resolved for there to be any confidence that the goals of Section IX have been substantially completed and that reforms which have been achieved will be sustained. Moreover, it is also important that existing reforms and systems are required to remain in place to avoid future backsliding.

---

[23] United States' Memorandum of Law in Support of Joint Motion to Begin Sustainment Period and Approve Sustainment Plan. (2024, September 27). https://nopdconsent.azurewebsites.net/Media/Default/Documents/Docket%20Items/0794%202024-09-27%20MEMORANDUM%20Filed%20by%20USA%20re%20%5b793%5d%20Joint%20Motion%20to%20Begin%20Sustainment.pdf

[24] Gone on Arrival or GOA calls are calls for service where the victim-survivor is no longer on scene when police arrive, often due to response delays.

[25] New Orleans Health Department. Provider Resources, Open Working Groups (2024). https://nola.gov/health-department/domestic-violence-and-sexual-assault-program/provider-resources/

[26] New Orleans Health Department. Provider Resources, Closed Working Groups (2024). https://nola.gov/health-department/domestic-violence-and-sexual-assault-program/provider-resources/

Many of these serious, unresolved issues have been repeatedly documented for over a decade. Unfortunately, the inability of the City and NOPD to provide adequate resources to NOPD's SVD and to resolve these issues have undermined—and will continue to undermine— the ability of the SVD to accomplish its mission to "effectively" respond to and investigate reports of sexual assault.[27]

**We are writing to urge the Court, the Monitoring Team and the parties to make a closer inquiry into the following issues and to devise meaningful and timely solutions to address and resolve these issues as they pertain to Section IX. Policing Free of Gender Bias, prior to moving NOPD into the Sustainment Period.**

## IV.     Analysis and Recommendations

### 1. Staffing and Caseloads

The Monitoring Team's July 7, 2023 Special Report found disproportionately slow NOPD response times (often due to a lack of available personnel) and the deprioritization of sexual assault and domestic violence Calls for Service. The Monitoring Team found this led to an increase in gone on arrival (GOA) calls in which a survivor was no longer on scene when NOPD arrived at a later date/time, a conclusion later supported by their subsequent report dated October 27, 2023.[28] The Sustainment Memo acknowledges NOPD's progress in this area; however, the Commentators are unaware of a public follow up report by the Monitoring Team reviewing how NOPD's corrective actions have impacted this particular issue.

Meanwhile, overwhelming detective caseloads have plagued NOPD's Special Victims Division (SVD) for many years—an issue that has arisen in multiple recent reports. The heavy caseload carried by the under-staffed SVD detectives is unreasonable and untenable. The serious lack of sufficient manpower to work these time-consuming cases appears to be one of the main factors in NOPD's struggle to complete investigations and make timely arrests.

In 2015, the Sexual Violence Response Advisory Committee (SVRAC) recommended 26 cases as an appropriate caseload—a finding supported by the Monitoring Team. Yet, in 2022, the SVRAC reported a per detective caseload of 89.[29] In mid-2023 the Monitoring Team reported caseloads of up to 64 per detective (relying upon information from NOPD)[30], According to the NOPD, the most recent caseload is 74 cases per detective.[31]

---

[27] Consent Decree Monitoring Team. (2023, July 7); page 6.

[28] AH Datalytics. (2022, August 31). Gone on Arrival and Deprioritization Report, City Council's Government Affairs Committee. cityofno.granicus.com/GeneratedAgendaViewer.php?view_id=7&clip_id=4185 and CD Monitoring Team (2023, October 27). Special Report Regarding Deprioritizing Calls for Service and Its Impact on Gone on Arrival Dispositions and Code 2 Response Times. 12-1924 (USA) OCDM Special Report.pdf (nopdconsent.azurewebsites.net).

[29] New Orleans Health Department. (2022, April); page 8.

[30] Consent Decree Monitoring Team. (2023, July 7); page 11.

[31] Meeting with NOPD (2024, October 29). It is our understanding that these figures are current, however, they need to be confirmed in writing. We suggest NOPD issue a public report on the current staffing levels of the

The below list reflects our understanding of NOPD SVD's current staffing:[32]

- Sex Crimes: 6 detectives, 5 civilian investigators, 2 sergeants
  - 6 detective openings/vacancies
- Child Abuse: 8 detectives, 3 civilian investigators, 3 sergeants
  - 4 detective openings/vacancies
- Domestic Violence: 1 detective, 5 civilian investigators, 1 sergeant
  - 3 detective openings/vacancies
- Child Exploitation/Human Trafficking: 1 detective
- Sex Offender Registry: 1 detective, 3 civilian investigators
- Cold Cases: 1.5 detectives (1 of the two splits their time)
- Technicians: 2 (1 in Sex Crimes, 1 in Child Abuse)

The lack of adequate staffing for SVD is a chronic problem which has existed for years and consistently undermined the ability of the NOPD to engage in effective policing in sexual assault cases. As was noted in the Monitor's 2023 Special Report: "The Monitoring Team has discussed the dangers of heavy caseloads with NOPD leadership on multiple occasions since the release of the Committee's 2015 report. NOPD leadership consistently has conceded the need for additional personnel. Due to competing needs across the Department, however, we consistently have been told NOPD is unable to add personnel to the SVD."[33]

NOPD's ongoing inability to adequately staff or prioritize staffing for the Special Victims Division is highly problematic. According to the Monitoring Team, "NOPD candidly concedes that 'SVD detectives /supervisors are unfortunately placed in a position where they must constantly triage cases. It's impossible to conduct thorough, victim-centered, aggressive, and complete investigations with a closed disposition for every single case assigned to them without the proper manpower/caseload ratio.'"[34]

NOPD's hiring and retention struggles are well-known; however, they appear to be disproportionately impacting the Special Victims Division (SVD). By extension, this impact predominately affects women, children, and other victim-survivors of gender and power-based violence. The slow response times and de-prioritization of sexual assault and domestic violence calls for service coupled with NOPD's inability to adequately staff the SVD (due to "competing needs across the Department") further speak to the "under-enforcement and under-investigation of violence against women" discovered in the initial 2011 Department of Justice Investigation into NOPD.[35]

---

SVD, including assignments and duties of personnel and current vacancies and applications, allowing their staffing levels to be considered alongside other departments. Refer to Appendix B for a list of questions we asked NOPD.

[32] Meeting between NOPD and Commentators (2024, October 29). Refer to Appendix B.

[33] Consent Decree Monitoring Team. (2023, July 7); page 11.

[34] Consent Decree Monitoring Team. (2023, July 7); page 10.

[35] United States Department of Justice. (2011, March 16); page v.
https://www.justice.gov/sites/default/files/crt/legacy/2011/03/17/nopd_report.pdf

**1.R. Recommendations Related to Staffing and Caseloads:**

a.  <u>Transparency:</u> NOPD should provide accurate and up-to-date statistics regarding response times and prioritization of cases, as well as current caseloads.

   1.  It is good news that NOPD has hired 11 additional "investigators";[36] however, it is unclear from the Sustainment Memo whether these new hires are civilian investigators or detectives, and how this has impacted or will impact caseloads.

   2.  A thorough staffing analysis is recommended, to be conducted by an outside expert, focused on reducing inefficiencies, determining a reasonable caseload per detective, and identifying necessary resources and support systems for NOPD's SVD.

b.  <u>Corrective Actions Plan:</u> NOPD must have a sustainable plan—both short-term and long-term—with explicit benchmarks for implementation to adequately staff the SVD.

   1.  NOPD must assign SVD detectives reasonable caseloads in accordance with best practices and national standards, and to take whatever steps are necessary to ensure that this chronic, unresolved issue of inadequate staffing of the SVD is addressed.

   2.  This chronic issue of under-resourcing the SVD must be corrected while the Consent Decree is in effect, instead of simply passing it along to the next generation.

**2. Investigations**

Since the onset of the Consent Decree, NOPD has implemented comprehensive policies for sexual assault response and investigation; however, the July 2023 Special Report revealed "backsliding" by the Special Victims Division (SVD), including issues with both the response to and investigation of reports of sexual assault.[37]

While the average FBI clearance rate for rape ranged between 24-45%[38] over the past decade in agencies with similar populations, NOPD's clearance rate for reported rapes has fallen to a low of 6.75% in 2023.[39] This recently released statistic aligns closely with the findings of the Special Report, which indicated NOPD's clearance rate for all sex crimes (an umbrella more expansive than the FBI's definition of rape) had declined sharply in recent years, to 6% in 2021 and just 3% in 2022.

---

[36] United States' Memorandum of Law in Support of Joint Motion to Begin Sustainment Period and Approve Sustainment Plan. (2024, September 27).
[37] Consent Decree Monitoring Team. (2023, July 7); page 3.
[38] Calculated using a sample of agencies in areas with populations over 100,000.
[39] FBI Uniform Crime Report. (2024, September). cde.ucr.cjis.gov

The Monitoring Team concluded, "While NOPD has accomplished most of the specific requirements spelled out in the Consent Decree, it is hard to argue the Department's efforts are "effective" with its current clearance rate trend."[40] This on-going, extremely low clearance rate is a chronic, deeply troubling condition.

As these clearance rate and staffing issues suggest, it is unlikely NOPD's SVD is able to conduct thorough investigations, without bias, for every case. While NOPD has not provided public details as to their "triage" process including which cases are prioritized over others, the very use of the word "triage" in the Special Report suggests that a number of reported sex crimes are not being thoroughly investigated—a particularly concerning problem given the department's prior history of gender bias and inadequate training and supervision as it relates to investigations.

It is important to note that clearance rates *alone* should not be used to evaluate a department or unit's effectiveness; however, two recent audits conducted of SVD investigations suggest that while NOPD's SVD has improved their provision of support services to survivors as well as conducting initial investigatory steps and generating initial reports, it is those secondary follow-up steps—critical to building a strong investigation leading to case clearance—that appear to be lacking. Brief summaries of these audits are included below:

### 2A: Consent Decree Monitoring Team's Special Report on Sexual Assault Investigations

Issues relating to SVD investigations remain both current and persistent, and these problems were illustrated in the July 7, 2023 Special Report of the Consent Decree Monitoring Team. Their audit of the investigatory completeness of a random sample of cases revealed a "troubling rate of noncompliance." One quarter of these cases (25%) were in need of additional documentation or investigatory effort.[41]

Within this same review, the Monitoring Team also revealed that of their 54 randomly selected case reports, "the facts of 30 raised issues requiring very little investigation (for example, clear signs the victim was in mental health crisis and was not actually sexually assaulted)."[42] In the words of the Monitoring Team, more than half (55%) of these randomly selected cases included language in their police reports suggesting very little investigation was warranted or that no sexual assault occurred.

This is an unusual and a marked deviation from decades of national research showing false reports are exceedingly rare, at approximately 2-10%,[43] and suggests that deeper

---

[40] Consent Decree Monitoring Team. (2023, July 7); page 20.
[41] Consent Decree Monitoring Team. (2023, July 7); page 12.
[42] Consent Decree Monitoring Team. (2023, July 7); page 20.
[43] National Sexual Violence Research Center (2012). Publications_NSVRC_Overview_False-Reporting.pdf and End Violence Against Women International (Undated). voice_false:1033065_The_Voice_v1n3_PRINT and Orchowski et al. (2020, May 15). False Reporting of Sexual Victimization: Prevalence, Definitions, and Public Perceptions | SpringerLink

10

investigation/analysis is needed—including audits or reviews which are not solely dependent upon police reports.

Another obvious concern is whether there is a possible bias, conscious or unconscious, towards minimizing reports made by persons suffering with mental illness who in fact have been assaulted, but whose cases are not thoroughly investigated due to their mental status. A recent report by a leading organization, End Violence Against Women International (EVAWI) found that "individuals with a physical or mental impairment are among the most vulnerable to sexual assault," meaning these reports should not be discounted.[44]

### 2B. NOPD Professional Standards and Accountability Bureau (PSAB) Sex Crimes Unit Audit Report

As part of the positive reforms which have taken place under the Consent Decree, NOPD's Professional Standards and Accountability Bureau (PSAB) now conducts periodic audits of sexual assault investigations. While the PSAB's most recent audits have shown high levels of compliance by NOPD as it relates to investigations, we have concerns with some of the methods used in the most recent audit, related to scoring.

For example, in the most recent PSAB audit, released June 13, 2024[45] NOPD shows a 99.9% rate of compliance with the checklist implemented to evaluate investigations. However, for some investigatory follow-up items, the checklist step appears to be incomplete for a majority of cases, yet, rather than being marked with a "0" score, the incomplete checklist step is instead marked as "NA." This practice appears to greatly inflate the department's overall compliance score. The Scope of the audit states, "This audit will determine and document whether there was a proper response by investigators and supervisors of the New Orleans Police Department's Sex Crimes Unit in conducting follow-up investigations,"[46] so these follow-up checklist items are extremely relevant.

For their audit sample, NOPD randomly selected 47 of the 311 cases taken by the Sex Crimes Unit of the SVD in the second half of 2023. The results of the audit indicated NOPD had a 99.9% overall score of compliance. However, while NOPD appears to be compliant with many of the *initial* investigatory steps on the 31-point audit checklist, many critical *follow-up* steps appear to be missing or incomplete.

Of the 47 randomly selected cases reviewed by NOPD, each of these follow-up investigatory steps received a 100% audit score, even though:

1. 100% of cases had no documentation of a CODIS hit notification (47/47).
   a. *NOPD reason listed: No DA submitted, no crime, no suspect*

---

[44] End Violence Against Women International (EVAWI). (2023, December). False Reports: Moving Beyond the Issues to Successfully Investigate and Prosecute Non-Stranger Sexual Assault. https://evawintl.org/wp-content/uploads/False-Reports-1.pdf; page13. EVAWI is a nationally recognized leader in developing best practices and training for sexual assault investigations, geared toward police departments and founded by a police sergeant.

[45] PSAB Audit (2023, June 13). Microsoft Word - Sex Crimes Audit Report May 2024 Public

[46] PSAB Audit (2023, June 13), p. 3.

2. 100% of cases had no suspect composite sketches made (47/47).
   a. *NOPD reason listed: No suspect sketches made*
3. 95.7% lacked crime scene photos (45/47).
   a. *NOPD reason listed: No crime scene, or no crime committed*
4. 93.6% lacked crime lab reports (44/47).
   a. *NOPD reason listed: Crime lab was not called to the scene, there was no evidence to submit*
5. 91.5% lacked a follow up investigator and supplemental report (43/47).
   a. *NOPD reason listed: Case is still open, and follow-up hasn't occurred yet or victim chose not to proceed with case, lack of evidence or necessary information*
6. 91.5% lacked suspect statements (43/47).
   a. *NOPD reason listed: No suspect located or identified, or suspect refused interview*
7. 91.5% lacked a witness canvas[47] (43/47).
   a. *NOPD reason listed: No witnesses present, no crime occurred, a witness reported the crime, or victim was a district walk-in*
8. 89.4% lacked a follow up victim interview (42/47).
   a. *NOPD reason listed: Has not occurred yet, or victim chose not to proceed with case*
9. 87.2% lacked medical or SANE reports (41/47).
   a. *NOPD reason listed: Victim refused medical attention, no victim was found, or no crime occurred*

For 7of these 9 follow-up investigatory steps, NOPD achieved a 100% audit score, even though 87-99 percent cases in these categories were marked "NA," or Not Applicable. For the two other steps where 100% of cases did not complete the checklist item, they were marked "No Score," and as such, did not factor into NOPD's overall composite score.

Some of NOPD's justifications listed for not completing these follow up checklist items included: a lack of evidence or necessary information to continue an investigation, no witnesses, no crime occurred, no suspect identified, a suspect refused an interview, the crime lab was not called to the scene, there was no witness canvas, or there were no suspect sketches made.

Typically, one would use "NA" or Not Applicable only in situations where the particular checklist item could not apply to the case in question. This may be appropriate for some items like composite sketches (if a suspect is already known) or CODIS hits (if there was no SAK tested due to a delayed report), yet we cannot know if these "NA" designations were properly applied, because the supporting information provided by NOPD is not detailed enough.

Indicating "NA" for not completing a follow up investigator and supplemental report seems reasonable if the victim notified NOPD they did not want to pursue the case and it will not

---

[47] This should also include efforts to speak with friends and family of the victim. In drug or alcohol facilitated cases, witnesses are also crucial to establish what the victim's condition was like at the time of the incident and whether they were able to consent. These steps are especially critical for delayed reports. Full article: Moving On or Dropping Out: Police Processing of Adult Sexual Assault Cases; Microsoft Word - TB Reporting Methods #9 Best Practice Part 1.docx

move forward at the time; however, if this report has not been completed yet for other reasons (but still can or should be completed), the case should have a score of "0," not "NA."

NOPD's use of "no crime occurred" or "lack of evidence" as the reasoning behind some of these follow-up steps not being taken is also concerning. As mentioned previously, we acknowledge some cases lack the ability to forensically test physical evidence or visit the scene in a timely manner, or to generate a composite sketch (if the victim did not see the subject's face, or if this step was not necessary because the suspect was known to the victim). However, some of these follow up actions should be completed in most case scenarios, such as a follow up victim interview, a suspect interview,[48] a witness canvas[49], and a follow up investigator and supplemental report documenting subsequent investigative steps—all efforts which have been found to increase the likelihood of prosecution.[50]

Given that this audit's Scope specifically identified follow-up investigatory steps as its focus, it is concerning that NOPD concluded with a 99.9% audit score, yet many follow up actions are precisely the items that were not completed in the majority of all audited cases. Refer to Appendix C for the checklist used for NOPD's audit, and for a more detailed breakdown of each of the above 9 follow-up checklist items and NOPD's scoring rationale.

### 2C. NOPD's Issues with FBI Case Classification, Reporting, and Clearance Methods

Issues with accurately classifying, clearing, and reporting cases also impacts NOPD's effectiveness, and the ability to evaluate their progress under the Consent Decree. NOPD's response to the low clearance rate numbers in the Monitor's July 2023 Special Report's Appendix suggested some confusion related to case classification per FBI guidelines,[51] specifically clearance methods. NOPD's response included the following rationales for the SVD's low clearance rate (below each is our response).

- NOPD Response: They take reports/cases even if they occur in other jurisdictions, negatively impacting their clearance rates.
  - Per FBI guidelines, only cases in the agency's jurisdiction should be reported to the FBI and count in both total crime numbers, and clearance rate calculations

---

[48] If the suspect is known. Statistically, the majority of suspects are known to the victim. The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Sexual Violence

[49] This should include speaking with friends and family to corroborate events and who the victim told.

[50] Full article: Moving On or Dropping Out: Police Processing of Adult Sexual Assault Cases "Victims were less likely to withdraw from the process in cases in which law enforcement invested moderate to a great deal of investigational effort. This variable was a subjective rating based on the information provided in the police files. To code a case as having moderate to high investigational effort, we looked for documentation of investigational practices such as collecting scene evidence; interviewing witnesses; conducting multiple interviews with the victim and/or suspect; attempting to resolve inconsistencies between conflicting accounts from victim, suspect, and/or witnesses; and/or consulting with other professionals (e.g., SANEs, crime lab staff). It is possible that when detectives put forth this kind of effort, victims may feel like they are being taken seriously and believed by the police and that their cases are important."

[51] Consent Decree Monitoring Team. (2023, July 7); Appendix, page 25.

- NOPD Response: When they reported under FBI's UCR program "cleared by warrant" was counted as a clearance, whereas in the new NIBRS format, warrants do not count toward clearance, just arrests.
  - Per FBI guidelines, "cleared by warrant" was never considered or counted as a clearance, even in the UCR Summary Reporting System (SRS) format, which preceded NIBRS. Cases are cleared by arrest or exception only.

- NOPD Response: Unfounded cases are another factor negatively impacting their clearance rate.
  - Per FBI guidelines, unfounded cases are removed prior to clearance calculations, meaning they do not negatively impact clearance statistics.

- NOPD Response: "D" cases or "cases that cannot be solved due to lack of evidence or not acceptable to the DA's office" also negatively impact their clearance rate.
  - "Cases that cannot be solved due to lack of evidence" should remain open in case evidence arises in the future, thus NOPD is correct in leaving these open, and this is what other agencies are trained to do as well. Leaving cases open due to lack of evidence is something that impacts all agencies and is not specific to NOPD.
  - NOPD should be conducting full investigations and building complete cases, and if there is probable cause, making an arrest (which would clear a case on their part) and then the case would be referred to the DA's office for prosecution. If the DA refuses the case at that point, it would still reflect a cleared case for NOPD, thus it should not impact clearance numbers.

**2.R. Recommendations related to Investigations:**

a. <u>Transparency:</u> NOPD's SVD should provide accurate incident-level and summary statistics regarding all open cases (including cold cases) and clearance (and type of clearance) by signal type and/or charge code, using the standard FBI definition of clearance, for the past 5 years, to the Monitoring Team and the Public.

b. <u>Outside Review:</u> An outside review team with expertise in this area of study should be brought in to conduct a landscape analysis of NOPD SVD's investigations—reviewing all open cases (including cold cases) at both an aggregate and incident level.[52]
  1. Currently, all we know is that the clearance rate is extremely low and trending downward, despite the efforts to date under the Consent Decree, and much deeper investigation is needed to understand why this is taking place prior to NOPD's move into the Sustainment Period.

---

[52] Agencies such as the Police Executive Research Forum (PERF) and RTI International have conducted similar comprehensive reviews, in Austin services.austintexas.gov/edims/pio/document.cfm?id=397024 and New York rti-final-report-2022.pdf (nyc.gov) respectively.

2. There is enough circumstantial information in the most recent SVRAC Memo,[53] Monitoring Team Special Report,[54] and PSAB Audit,[55] to raise serious concerns regarding investigatory thoroughness and effectiveness.

3. Such an analysis would help both the Monitoring Team and SVD to identify points of case attrition (where cases effectively drop out of the system and either remain unsolved or do not end in arrest) and inform corrective actions.

4. An outside expert is assisting with Section VIII. Bias-Free Policing audits as part of this Sustainment Plan, so it seems warranted that the same should be done for Section IX. Policing Free of Gender Bias.

c. <u>Corrective Actions Plan:</u> A Corrective Action Plan should be drafted for SVD investigations, to address the Consent Decree Monitor's July 2023 Special Report findings, amended as needed after the completion of an outside review, and in collaboration with members of the SART/MDT and SVRAC.

## 3. DNA

The 2011 Department of Justice (DOJ) investigation that led to the NOPD Consent Decree stated that "at the time of our review, there were 800 untested forensic examination kits in NOPD's property room."[56] In years since, that backlog appears to have been substantially reduced if not eliminated at points; however, in 2023, it was revealed that there was, yet again, a backlog of nearly 800 SAKs awaiting testing at the Louisiana State Police Crime Lab.[57]

New Orleans City Councilmember Lesli Harris, who successfully obtained funding to send these kits to a private lab for testing, recently shared that this testing should be complete by the end of 2024; however, the New Orleans crime lab will not be fully operational and able to test DNA until 2027.[58]

While it is a relief that the testing of this backlog of 776 kits will be completed soon, with no additional dedicated funding in place to send future kits to private labs—and an NOPD crime lab that will likely not be ready to test SAKs until 2027—what will happen to kits being

---

[53] New Orleans Health Department. (2022, April).

[54] Consent Decree Monitoring Team. (2023, July 7).

[55] Professional Standards and Accountability Bureau, NOPD (2024, June 13) Microsoft Word - Sex Crimes Audit Report May 2024 Public

[56] United States Department of Justice. (2011, March 16); page 49.

[57] Buercklin, Kacey. (2023, April 7). New Orleans City Council approves to clear sexual assault kit backlog. https://www.wdsu.com/article/new-orleans-city-council-approves-to-clear-sexual-assault-kit-backlog/43542058.

[58] Jones, David (2024, July 2). Councilwoman says New Orleans on track to clear backlog of untested DNA samples by end of year. https://www.fox8live.com/2024/07/03/councilwoman-says-new-orleans-track-clear-backlog-untested-dna-samples-by-end-year/ and Jones, David (2024, July 6). Orleans DA asks for more funding for DNA processing as state launches rape kit tracking. https://www.fox8live.com/2024/07/06/orleans-da-asks-more-funding-dna-processing-state-launches-rape-kit-tracking/

collected today, tomorrow, next week, or next month? It remains unclear how many CODIS hits will be generated after all these kits are processed, but given the personnel and caseload struggles already outlined here, how does NOPD plan to properly pursue all generated leads?

Will an overload of cold case testing results exacerbate NOPD SVD's caseload problem and force them to "triage" even more cases?[59] Will survivors be told of CODIS hits years after reporting, only to find their cases are unable to move forward in a timely manner due to a lack of resources and staffing?[60] How many of these backlogged SAKs held evidence involving multiple offenses by individual perpetrators who continued to offend and cause serious harm, without consequence? And perhaps more importantly, how do we ensure this backlog does not recur?

What measures are in place to ensure that this same situation will not occur in the future, especially over the next few years and before the NOPD crime lab has the capacity to test SAKs? What proper planning, testing infrastructure, and other necessary resources will be in place in the interim, as well as in the future?

### 3.R. Recommendations related to DNA:

a. Transparency: NOPD must provide and maintain a current and accurate accounting of the status of all SAKs, at both summary and incident level.

b. Outside Review: As part of the previously suggested Outside Review (2. Investigations), reviewers should also ensure NOPD SVD detectives are pursuing generated CODIS hits appropriately and in a timely manner and referring cases for prosecution.

c. Timeline: NOPD and the City of New Orleans should provide a detailed timeline for the new Crime Lab's DNA testing capacity (including accreditation milestones) and an interim testing plan for all SAKs to be tested in a timely manner as well as funding to ensure this can be completed at a private lab as needed, prior to entering the sustainment period of the Consent Decree.

d. Policy: NOPD should develop—alongside advocates—a trauma informed method of notifying survivors of cold case CODIS hits per best practices.

---

[59] Consent Decree Monitoring Team. (2023, July 7); page 11 footnote 22. "NOPD acknowledges "SVD detectives /supervisors are unfortunately placed in a position where they must constantly triage cases. It's impossible to conduct thorough, victim-centered, aggressive, and complete investigations with a closed disposition for every single case assigned to them without the proper manpower/caseload ratio." NOPD Response at 2. This reality obviously is no good for officers, SVD detectives, or community members."

[60] As previously mentioned, NOPD's SVD has just 1.5 detectives assigned to cold cases.

### 4. Supervision and Training

*4A. Recent Reports and Convictions of NOPD Officers for Sex Offenses Raise Questions about Supervision and Training:*

In 2023, an anonymous group the Umbrella Coalition released a report showing that between 2014-2020, nearly 200 NOPD officers were accused of sexual misconduct, domestic violence, or harassment.[61]

In August, 2024, a jury in a federal civil rights lawsuit found the City of New Orleans and the NOPD displayed "deliberate indifference" in their hiring and inadequate supervision of NOPD Officer Rodney Vicknair, who responded to a teenager's report of a sexual assault and then proceeded to groom and sexually assault the young victim-survivor.[62] The sexual assault of this young teenager by an NOPD officer took place in 2020, after the Consent Decree had been in place for 8 years. The trial revealed unacceptable actions at multiple levels of the NOPD, from the bystander officer who witnessed the initial grooming of the victim at the hospital and neglected to intervene or report, all the way up to the then-NOPD Superintendent and then-head of the Public Integrity Bureau (PIB).

Current NOPD Superintendent Anne Kirkpatrick was designated and called as an expert in the Vicknair federal civil rights trial, by the plaintiff's attorneys. In a positive and encouraging step forward as an NOPD police chief, she testified that had she been the Chief at the time, based upon the information disclosed during discovery, she would not have hired Officer Vicknair.

In addition to the jury in the Vicknair case, concerns about reports of sexual misconduct by NOPD officers in the context of the Consent Decree have arisen in public discourse, raising

---

[61] The Umbrella Coalition. (2022, November 15). https://copwatchnola.wordpress.com/data/ and O'Connor, Meg. (2023, March 7). The Appeal. Report: Nearly 200 New Orleans Cops Were Accused Of Sexual Misconduct, Domestic Violence, or Harassment - The Appeal.
    Given public concerns regarding the methodology of this report, the primary author of this document replicated Umbrella's report and classified incidents per EVAWI's definition of "sexual misconduct," finding 125 unique sexual misconduct/harassment/violence and/or domestic violence complaints filed against NOPD officers during the time span (still a high number, even if somewhat lower than Umbrella's 236).
    The Monitoring Team, in their July 2023 Special Report, reviewed Umbrella's Report and identified 156 unique cases for review. Then, they selected 50% of the 114 cases not sustained by PIB (and added an additional 8 cases in which the disposition was sustained and then later reversed). The Monitoring Team's analysis ultimately concluded 91% of these PIB investigations were "in good order," p. 16.
    The Monitoring Team's numbers suggest 114/156 sexual assault and domestic violence cases against NOPD officers were not sustained, or approximately 73%, meaning that officers were only found responsible in 27% of accusations. For 73% of these accusations of sexual or domestic violence to be without merit seems high, given the statistics for false reporting (quoted earlier in this report, between 2-10%).
[62] Contrera, Jessica, and Jenn Abelson. (2024, August 21). https://www.washingtonpost.com/investigations/2024/08/21/new-orleans-police-sexual-abuse-verdict/. At the time of the civil trial, former officer Vicknair was deceased, having died in prison after being convicted of 18 USC 242 for "deprivation of rights under color of law" involving the rape of the young woman he had encountered as a police officer in response to the report that she had been sexually assaulted.

important questions as to what steps NOPD has taken to identify and pursue proper investigations officers who have been accused or convicted of sexual assault.[63]

According to the Washington Post, six NOPD officers have been convicted of child sex abuse crimes since 2011, and two remained on the force after they were accused of the abuse.[64] The Post further reported that during a pre-trial FRCP Rule 30(b)(6) deposition in the federal civil rights trial related to the Vicknair case, when asked by the plaintiff's attorney if Vicknair's actions had resulted in changes to NOPD policies and procedures, the sergeant being interviewed responded he was unaware "of anything NOPD has done differently….to prevent another Officer Vicknair."

Mr. William Most, one of the attorneys for the victim-survivor in the Vicknair civil rights case, has submitted to this Court, as public comment, a list of "red flags" and hiring, policy, supervision and training failures which were revealed during that litigation, along with suggested remedies to be incorporated into any Sustainment Plan issued by the Court in the Consent Decree. We endorse and support these recommendations, and we have enclosed Mr. Most's public comment in Appendix D of this document.[65]

While Vicknair's actions in this case occurred in 2020, his behavior does not represent an isolated incident within NOPD's ranks. In one recent example (March 2024), NOPD officer Tyler Sirois was arrested after he allegedly unlawfully and inappropriately forced a teenager who had been previously involved in a car accident to remove their clothing.[66] This additional case is cause for concern and suggests there may be a need for additional NOPD policies, training, and oversight related to allegations of sexual misconduct, and/or abuse by officers.

### 4B. April 2024 Acknowledgement by NOPD of Rape Underreporting to the FBI Raises Serious Concerns About Current Classification and Reporting Policies and Practices

The Consent Decree requires that NOPD "appropriately classify"[67] reports of sexual assault. In April 2024, NOPD publicly disclosed that it had under-reported hundreds of rapes to the FBI's Uniform Crime Reporting System over a two-year period.[68]

It was NOPD's Appendix response in the Monitoring Team's July 2023 Special Report regarding case clearance[69]—a response that did not appear to align with FBI classification and

---

[63] Office of the Independent Police Monitor. (2024, September 17). Instagram video https://www.instagram.com/reel/DACbdcZNb7T/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA==

[64] Contrera, Jessica, Jenn Abelson and John Harden. (2024, August 21). https://www.washingtonpost.com/dc-md-va/interactive/2024/new-orleans-police-child-sexual-abuse-rodney-vicknair/?itid=ap_jessicacontrera&itid=lk_inline_manual_6

[65] Most, William. (2024, October 23). Public Comment to Judge Susie Morgan.

[66] Killion, Aubry (2024, May 13). New Orleans teen told to strip by NOPD officer 'traumatized,' family says. https://www.wdsu.com/article/new-orleans-officer-teen-strip-investigation/60777858

[67] Second Amended and Restated NOPD Consent Decree (2024, April 18). "NOPD agrees to appropriately classify and investigate reports of sexual assault and domestic violence." page 60.

[68] New Orleans Police Department. (2024, April 2). NOPD Addresses Data Reporting Error Regarding Special Victims Section Statistics for 2021, 2022. https://nopdnews.com/post/april-2024/nopd-addresses-data-reporting-error-regarding-spec/

[69] Consent Decree Monitoring Team. (2023, July 7); Appendix, page 25.

clearance guidelines—that led the primary author of this Comment to compare 2021-22 FBI data with NOPD's public EPR data.[70] The results of this preliminary analysis suggested the number of rapes in 2021 and 2022 had very likely been underreported by NOPD to the FBI. The analysis further suggested NOPD had only counted a portion of the reported crimes that met the FBI's definition of rape, likely based upon a misunderstanding of how that definition related to their own internal signal types and to Louisiana state charge codes. Refer to Appendix A, Figure 2.

Once this analysis was presented to NOPD, to their credit, they did their own detailed review and ultimately informed the public of the issue and corrected the numbers with the state and FBI. However, this situation raises concern regarding training, supervision and proper oversight as it relates to classification and reporting within the SVD. It is also concerning that this error was overlooked for some period of time and only discovered by an outside researcher.

### 4.R. Recommendations related to Supervision and Training:

a. <u>Corrective Actions Plan – Officer Sexual Misconduct:</u> NOPD must implement policies, procedures, and extensive training to ensure that officers and staff recognize the signs of grooming and/or sexual abuse, the importance of peer intervention to prevent such acts and reporting their fellow officers' conduct.

b. <u>Policy:</u> Screening and hiring procedures must be re-evaluated in light of these recent (and not isolated) events. Six NOPD officers *convicted* of child sex abuse crimes since 2011[71] in a relatively small department suggests the need for clear policies, training and supervision to be put into place to stop this from occurring in the future. NOPD's Serious Disciplinary Action Review Board[72] is required to "review each serious disciplinary action taken by the police department with a goal of identifying and correcting systemic issues related to inadequate supervision or a failure in the chain-of-command" and "review the incident to determine whether it raises policy, training, equipment, or tactical concerns, and refer such to the appropriate unit within NOPD to ensure the concerns are resolved." The Board's review of the Vicknair case should inform a robust policy update.

c. <u>Corrective Actions Plan – FBI Classification and Data Management:</u> NOPD must also implement clear policies, procedures and training as it relates to case documentation, classification and reporting (both to the FBI and the public), especially at supervisory levels of the SVD. While NOPD's new quarterly SA and DV reports are encouraging, as is news that a NIBRS-compliant records management system (RMS) is on the horizon, NOPD currently does not have a reliable system for monitoring and reporting data on the handling of reports of sexual assaults from the initial report all the way through final disposition—nor is there adequate transparency and reporting

---

[70] NOPD Electronic Police Report (2021) Electronic Police Report 2021 | Data.NOLA.gov and (2022) Electronic Police Report 2022 | Data.NOLA.gov.
[71] Contrera, Jessica, Jenn Abelson and John Harden. (2024, August 21).
[72] NOPD Policy Manual: nola.gov/getattachment/NOPD/Policies/Chapter-1-3-8-Serious-Discipline-Review-Board-Effective-12-17-2023.pdf/?lang=en-US

19

of that data to the public. It is encouraging that the Sustainment Plan identifies this as an area of focus, but the plan only mentions the implementation of the new records management system.

d.  Policy: The records management system is key; however, it is also critical that policies related to supervision and training must be in place to ensure officers and detectives understand the nuances of 1) classifying and charging these crimes correctly; 2) understanding the FBI definition of rape, and 3) understanding proper FBI clearance procedures for sex crimes. These items should be included in Appendix D: Domestic Violence/Sexual Assault Public Reporting Corrective Actions prior to NOPD's movement into the Sustainment Period. The failure to have a robust system in place to ensure that these crimes are correctly classified, charged, cleared, and documented, prevents researchers, concerned citizens, service providers, advocacy groups, elected officials and others from being adequately informed as to the full extent and nature of violent crime trends in our City. When reporters, community watchdog groups, and advocates do not have faith in the accuracy of NOPD's data related to sex crimes, they will be far less likely to share this data with the public. A lack of public awareness regarding the prevalence and investigation of sex crimes interferes with the ability of the community-at-large from being able to hold elected officials accountable for policy and performance failures in addressing these crimes.

e.  Transparency: Many of the questions and lack of clarity in the areas outlined in this document speak to a need for accurate and complete data, in order to identify specific remedies and corrective actions to be taken. NOPD should work with the Monitoring Team, SVRAC, local researchers, and outside experts to ensure not only that data on these crimes is being tracked and reported to the FBI properly, but also that it is publicly communicated, so that the community can be well informed as to what needs to be done to address sexual violence in New Orleans, with the same attentiveness and importance we publicly place on other types of violent crime.

**5. Summary: Specific Recommendations for Corrective Actions to be Incorporated into the Sustainment Plan**

a.  **Existing Attachment V.D.: Domestic Violence/Sexual Assault Public Reporting Corrective Actions (additions):**

1.  NOPD to achieve state validation (full LIBRS/NIBRS compliance) and report crime data to the FBI (within one year and six months of effective date).[73]

---

[73] Our understanding is that 6 months of accurate LIBRS/NIBRS reporting must be completed at state level before a jurisdiction is allowed to report data in NIBRS format to the FBI. NOPD must have a timeline that includes this validation process.

2. NOPD to develop an updated SVD policy,[74] outlining proper FBI classification/clearance procedures, guided by best practices.

3. NOPD to provide an Annual SA and DV Case Disposition Report:

   a. Evaluate how SA and DV cases progress through the entire CJ system, from reporting through adjudication

   b. Provide statistics for each type of case, using NOPD signal type, state charge code, and LIBRS/NIBRS code

   c. The City of New Orleans to coordinate between the justice agencies (NOPD, DA, Courts) to require all agencies share data for the completion of this report

   d. This information should be released to the Court, the parties, the City Council, the Monitoring Team and the Public.

**b. Existing Attachment V.E.: Domestic Violence ("DV")/Sexual Assault ("SA") GOA Corrective Action Plan (additions):**

1. Include Response Time, Gone on Arrival, and Deprioritization statistics in Quarterly Reports on Sex Crimes and Domestic Violence, currently issued by NOPD Analytics

**c. Proposed Addition: Sexual Assault ("SA") and Domestic Violence ("DV") Maintenance of Existing Reforms:**

1. NOPD to maintain active participation in the SART and MDT reviews.

2. NOPD to issue Quarterly and Annual Public Reports on SVD incidents including overall case counts, and summary data of case disposition information such as case status (open, closed, cold, etc.), FBI clearance counts and NOPD solve counts, unfounded cases, etc.[75] Summary data should be stratified by NOPD signal type, state charge code, and LIBRS/NIBRS classification.[76] Reports should include current staffing and caseload information, current response times for sexual assault and domestic violence 911 calls, and how many were designated Gone on Arrival (GOA). Quarterly reports are currently issued by NOPD Analytics and should expand to include the additional items listed above.

---

[74] Sex crimes do have more complicated criminal statutes and thus signal types and charge codes, which makes it critical that NOPD understands how to properly classify these cases per FBI guidelines. It is also important to standardize clearance procedures to guide SVD detectives as well, using case examples. EVAWI has a best practices document that is a good example of such guidance. Clearance of Sexual Assault Cases

[75] Clearance per FBI definition does not include cases where a warrant has been issued but an arrest has not yet been made, whereas NOPD solve rate includes warrants.

[76] Once NOPD is LIBRS/NIBRS compliant.

3. NOPD should provide accurate incident-level public data (in the Electronic Police Reports, and/or the future public data once the new RMS is implemented) for all SVD incidents, including state charge codes for each incident,[77] allowing researchers and other users of the public data to properly classify and count these crimes. Given that domestic violence may not always be identifiable by NOPD signal type or state charge code, we would suggest NOPD add a DV column in the data (Y/N).

4. NOPD's PSAB to conduct regular audits of SVD investigations: NOPD should work with expert members of the SVRAC and SART to implement a more comprehensive audit process, including speaking with victim-survivors and advocates, and marking incomplete tasks that could or should have been completed with an appropriate score, rather than "NA."

5. NOPD to provide detailed case summary and disposition information to the Sexual Violence Response Advisory Committee (SVRAC) for their reports, including summary of cases by signal type/charge code, FBI clearance counts and NOPD solve rate counts, information on open cases such as the types and counts of cases that remain unsolved, and any additional information the SVRAC requests for its reports (including incident-level data), within the legal limits of information that can be shared by NOPD. SVRAC should meet monthly and issue reports annually.

d. **Proposed Addition: Sexual Assault ("SA") and Domestic Violence ("DV") Staffing and Caseloads Corrective Action Plan:**

1. Quarterly Reports on Sex Crimes and Domestic Violence, issued by NOPD Analytics, to include current staffing levels for SVD (by unit), including Detectives, Sergeants, Civilian Investigators, Technicians and other employees, as well as current caseload for Detectives, and for Civilian Investigators.

2. NOPD to draft a Recruitment and Retention Challenges Report and Action Plan for SVD, including an evaluation of staffing counts and caseloads over time (since 2020), factors influencing Detective attrition and hiring, feasibility review of SVRAC recommendations such as incentive pay, a plan to improve retention through addressing Detective secondary trauma and burnout, and a timeline of caseload/staffing benchmarks. NOPD to engage with an outside expert or

---

[77] Currently, NOPD's Electronic Police Reports (EPR), the vast majority of sex crimes have state charge codes missing. This information should be included for every incident so that they can be properly classified (or, LIBRS/NIBRS codes). The missing charge codes per incident make it difficult for interested parties to work with the public data and to even count these crimes appropriately, since NOPD signal types do not include the necessary specificity in some cases. In a previous review of a sample of unique EPR incidents that could be classified as FBI rape, in 2021 (10.9%) had charge codes in EPR, 2022 = (17.9%), 2023 = (33.6%). Conversely, for homicide, charge codes were included in EPR for the majority of cases: 2021 = (77.6%), 2022 = (79.8%), 2023 = (79.4%).

consultant to assist with best practices and creative solutions to reduce caseload amidst their persistent hiring challenges. This information should be released to the Court, the parties, the City Council, the Monitoring Team and the Public.

3. NOPD to reduce caseload to 40 per Detective (within two years of the effective date), with a future plan and timeline to reduce caseload to the recommended 26 per detective.

**e. Proposed Addition: Sexual Assault ("SA") Kit Corrective Actions Plan:**

1. NOPD Sexual Assault Kit Status Report: for all open cases (including cold cases), with NOPD Item Number, date of collection, date NOPD received the kit, date NOPD sent it to a forensic testing facility, lab name, date of testing, and CODIS hit status. NOPD follow up actions on CODIS hits should also be tracked with dates of action. NOPD should also provide an explanation for any SAKs not transmitted to a lab within the state-required period of time. Public incident level data should be updated regularly (weekly or monthly), while summary reports should be released quarterly and can be incorporated into NOPD's existing Quarterly Reports on Sex Crimes. This information should be released to the Court, the parties, the City Council, the Monitoring Team and the Public.

2. NOPD Action Plan to Address CODIS Hits from Backlogged SAKs: including the number of CODIS hits returned, grouped by incident year, and a detailed plan and timeline to ensure equitable and thorough investigatory follow-up for all victim-survivors. This plan should also include a trauma-informed plan to notify victim-survivors of CODIS hits, with advocate input. This information should be released to the Court, the parties, the City Council, the Monitoring Team and the Public.

3. The City to provide a SAK Testing Plan including: the number of SAKs the LSP Crime Lab is accepting per week, a detailed timeline for the NOPD Crime Lab to be able to test SAKs (including capacity), an interim testing plan for all SAKs to be tested in a timely manner, and dedicated funding to ensure testing can be completed at a private lab (and additional needs like funding for lab technicians to testify) are also funded long-term. This information should be released to the Court, the parties, the City Council, the Monitoring Team and the Public.

**f. Proposed Addition: Sexual Assault ("SA") Investigations Corrective Actions Plan:** Engage an outside qualified reviewer to conduct Landscape Analysis of SVD Investigations to address the following:

1. Reviewers should review all open cases, including cold cases, and a sample of cleared cases.

23

2. Are unsolved cases being investigated fully/thoroughly?

3. If not, what are the characteristics of the cases without complete investigations?

4. What additional investigatory steps (if any) are missing?

5. How do SAK processing times impact case clearance?

6. For cases in which police do not believe a rape occurred or that a victim-survivor is "uncooperative," reviewers should speak with advocates or victim-survivors to confirm the information in the police report is accurate and reflects their experiences.

7. Reviewers should provide suggestions to improve case clearance and reduce attrition, including but not limited to additional in person training for investigators focused on best practices for investigations, clearance, and understanding false reporting.

8. Results of this analysis should be released to the Court, the parties, the City Council, the Monitoring Team and the Public.

**g. Proposed Addition: Sexual Assault ("SA") Supervision and Training Corrective Actions Plan:**

1. NOPD's Serious Disciplinary Action Review Board to review Vicknair case and make policy recommendations to address training officers to recognize signs of grooming and sexual abuse.

2. NOPD to draft Report on lessons learned regarding Screening, Hiring and Supervision Procedures as it relates to the Vicknair case. This information should be released to the Court, the parties, the City Council, the Monitoring Team and the Public.

V.    **Conclusion**

We understand and appreciate that a great deal of work has taken place over the years by the Court, the Monitoring Team, the Department of Justice, the NOPD, the City, the OIPM, and a concerned and engaged community, all of whom have a stake in the City and NOPD accomplishing the goals of the Consent Decree in complying with its requirements and maintaining these accomplishments for years to come.

We understand and appreciate that there has been progress from where we were in 2011 regarding Section IX. Policing Free of Gender Bias to where we are today, thanks to this hard work and commitment of these parties.

We also understand that Consent Decrees are not supposed to last forever.

We raise these issues and concerns not for the purpose of delaying the proceedings, but in the interest of ensuring that compliance with section A. Sexual Assaults, a hugely important and often under-served issue in our community, is *real and sustainable*.

We also want to do whatever we can to assist in the incorporation of appropriate measures and standards to be put into place to ensure, to the extent humanly possible, that the results of all this hard work by so many for these past years are not short-lived, but last for years to come.

The issues outlined in this Comment indicate that, despite important reforms, the requirements of Section IX. Policing Free of Gender Bias, A. Sexual Assaults, have not yet been met and that there are still additional issues that must be addressed and resolved prior to NOPD and the City transitioning into the Sustainment Period. In the alternative, should the Court decide to grant the parties' motion, it is submitted that the recommendations described in this Comment should be adopted and incorporated into the Sustainment Plan.

Many of these issues are chronic; if they are not dealt with now and resolved, this historic effort to transform the department and to secure and maintain effective policing in the investigation of sexual assaults, will not succeed.

Survivors of sexual violence who endure the mentally and physically painful, traumatizing, and emotionally draining process of reporting a violent crime to police—more often than not because they feel compelled to protect others from future harm—deserve to be believed, valued, counted and treated appropriately by those meant to protect and serve them.

They deserve to have their reports of sexual assault, which happen alongside violence, terror, and the ever-present threat of recurrence, fully investigated by detectives who are not forced to "triage" their assigned cases and who can devote their full attention to each and every case, with adequate resources and staff support provided to them.

If survivors of a sexual assault choose to go through the arduous and often debilitating process of engaging the criminal justice system, they deserve the respect, support and access to justice that the criminal justice system is tasked with providing them, "free of gender bias and in

accordance with the rights secured or protected by the Constitution and laws of the United States."[78]

The observations and recommendations included in this Public Comment are intended and designed to help ensure that this goal is indeed obtained.

**We urge the Court, the Monitoring Team, and the parties to undertake a serious discussion and investigation of the issues outlined in this Public Comment, and at the conclusion of such consideration, include and incorporate these recommendations into Corrective Actions in further proceedings, including the Sustainment Plan.**

---

[78] Second Amended and Restated NOPD Consent Decree (2024, April 18); page 60.

**Appendix A[79]**

Recent FBI Statistics for Rapes Reported to the New Orleans Police Department

**Figure 1.**

2009-2023 – New Orleans and National Rape Clearance Rates (Source: FBI)



[79] FBI Uniform Crime Report. (2024, September). For national average clearance rate comparison (green line in the chart), the sample included all agencies who reported in 2023, with last reporting month as December, associated with the following population Group: 1A-cities 1,000,000 or over; 1B-cities 500k-999,999; 1C-cities 250k-499,999; 2-cities 100k-249,999; 8A-non MSA counties 100k or over; 9A-MSA counties 100k or over. Resulting sample (N=496) agencies total. Note that not all law enforcement agencies report to the FBI, nor is their data always accurate/complete. Clearance rates are a snapshot in time. The number of crimes cleared in a calendar year are compared with the number of crimes reported in that same calendar year, and because a crime can be reported in one year and cleared in another, it is best to consider these rates over time and as trend indicators. National average clearance rates after 2020 are from FBI NIBRS reporting agencies, while 2020 and before are in SRS reporting format. After 2020 FBI stopped sharing national average clearance rates in SRS reporting format, which is what NOPD is currently still, using, so we should use caution when comparing to national rates in those years.

**Figure 2.**

2009-2023 NOPD Reported Rape Counts*



*Chart shows both original FBI reported numbers for 2021-22 (red line) and newly updated FBI numbers for those years released on 9/25/24*

**Figure 3.**[80]

2023 Rape Clearance %, Reporting Agencies in areas with populations >100k (Source: FBI)



[80] FBI Uniform Crime Report. (2024, September). Sample included all agencies who reported in 2023, with last reporting month as December, associated with the following population Group: 1A-cities 1,000,000 or over; 1B-cities 500k-999,999; 1C-cities 250k-499,999; 2-cities 100k-249,999; 8A-non MSA counties 100k or over; 9A-MSA counties 100k or over. Resulting sample (N=496) agencies total. Note that not all law enforcement agencies report to the FBI, nor is their data always accurate/complete. Clearance rates are a snapshot in time. The number of crimes cleared in a calendar year are compared with the number of crimes reported in that same calendar year, and because a crime can be reported in one year and cleared in another, it is best to consider these rates over time and as trend indicators. NOPD was similarly positioned in adjacent years 2020-22 (all years, within top 3 for rape prevalence per 100k, in the bottom half of the sample for clearance in 2021 and in the bottom quarter for 2020 and 2022).

**Figure 4.**[81]

2023 Rape per 100k, Reporting Agencies in areas with populations >100k (Source: FBI)



[81] FBI Uniform Crime Report. (2024, September). Sample included all agencies who reported in 2023, with last reporting month as December, associated with the following population Group: 1A-cities 1,000,000 or over; 1B-cities 500k-999,999; 1C-cities 250k-499,999; 2-cities 100k-249,999; 8A-non MSA counties 100k or over; 9A-MSA counties 100k or over. Resulting sample (N=496) agencies total. Note that not all law enforcement agencies report to the FBI, nor is their data always accurate/complete. Clearance rates are a snapshot in time. The number of crimes cleared in a calendar year are compared with the number of crimes reported in that same calendar year, and because a crime can be reported in one year and cleared in another, it is best to consider these rates over time and as trend indicators. NOPD was similarly positioned in adjacent years 2020-22 (all years, within top 3 for rape prevalence per 100k, in the bottom half of the sample for clearance in 2021 and in the bottom quarter for 2020 and 2022).

**Appendix B**[82]

10/10/24 Request for Information, Current Status, NOPD SVD & Related Issues

### Staffing and Caseloads:

1. What are the current staffing levels of SVD?
    a. How many detectives, how many civilian investigators, and how many social workers? And how do those break down per unit, i.e., child abuse, DV, sex crimes?
    b. How many vacant positions are there for each unit and what, if any plans are there to fill those positions?
    c. Does each unit have clerical/administrative staff to assist them and if so, how many and how are they assigned?
        i. If not, are there plans to provide this assistance, and what is the timeline?
2. What is the current caseload for SVD detectives?
    a. Do all detectives have investigators assigned to them? If not, how are investigators assigned?
3. What is the current caseload for SVD civilian investigators?
    a. What, if any, limitations are there on the investigatory tasks of civilian investigators?
    b. Are civilian investigators assigned as lead on any investigations, instead of detectives, and if so, what is the criteria for lead and what is the line of supervision, for example, do they report first to a detective?
4. Are there any plans/goals to further expand staffing for SVD and if so, what are those plans/goals and what is the timeframe?
5. Does NOPD have a goal to reach staffing levels recommended by the Sexual Violence Response Advisory Committee, i.e., 26 per detective?[83]
    a. If so, how and when is it expected that this goal will be reached? And if this is not a goal, please explain.
    b. What additional resources/support is needed for this goal to be reached?
6. What are NOPD's plans to sustain and support the staffing SVD over time, especially related to full time detectives and civilian investigators?
    a. What is NOPD's position on implementing suggestions from the SVRAC like incentive pay and opportunities for promotion within SVD?
    b. Does NOPD have a plan to address secondary trauma experienced by detectives and investigators to reduce burnout and if so, what is it?
7. Will current staffing and caseload numbers be included in the future quarterly reports on SVD?
    a. If not, why not, and are there other ways that NOPD intends to use to insure that the public can be kept aware of staffing and caseload numbers?

---

[82] Inquiry submitted to NOPD as part of participation in community engagement with the Consent Decree.
[83] New Orleans Health Department. (2022, April); page 8.

31

**Investigations:**

8. How has NOPD addressed the "troubling rate of noncompliance" the Monitor's 2023 report found with 25% of audited investigations "in need of additional investigation and/or supplemental documentation"?[84]

9. Are SVD investigations being "triaged"?[85]
    a. If so, what are the current "triage" standards and procedures for investigations?
    b. Is there a plan to eliminate the need for triaging cases for investigation, so that all cases are investigated in a timely manner?
        i. If so, what is it that plan and what is the timeline for implementation?
    c. What additional resources are needed to discontinue having to triage investigations and to be able to fully investigate all cases in a timely manner?
        i. What is the plan for obtaining those resources and the timeline for implementation?

10. What are NOPD's clearance[86] and solve rates[87] for 2023 and 2024?[88][89]

11. What is the current count of SVD open or unsolved cases?
    a. How many sex crimes, child abuse cases, and DV cases are open/unsolved?

12. Has NOPD considered bringing in an outside auditing agency to conduct a full review of all cases that have not been cleared by arrest per the FBI definition?[90] [91]
    a. If so, what is the status of such a review? If not, what is NOPD's plan for reviewing open cases?

13. Does NOPD have plans to include regular reporting to the public which would include summary counts of open, unfounded, and cleared by exception cases in the following categories?[92]  And if so, what are those plans and what is the timing for implementation? And if not, why not?
    a. The incident occurred outside of Orleans Parish.
    b. The case has been fully investigated and no sex crime occurred, e.g. the report is truthful but doesn't meet the criteria for a sex crime.[93]

---

[84] Consent Decree Monitoring Team. (2023, July 7).

[85] In the July 2023 report, the CD Monitor said that NOPD acknowledged "SVD detectives /supervisors are unfortunately placed in a position where they must constantly triage cases."

[86] FBI clearance, which does not include warrants

[87] In which NOPD includes warrants

[88] Solve rates can be provided for sex crimes by signal type and/or state charge code (whereas FBI clearance would only be provided for crimes designated as FBI rape).

[89] The most recent FBI data released in September 2024 indicates a 2023 clearance rate of 6.75% for rape. https://cde.ucr.cjis.gov/

[90] Doing so would clarify the state of the SVD and help the new team of investigators coordinate their work.

[91] Agencies such as the Police Executive Research Forum (PERF) and RTI International have conducted similar comprehensive reviews, in Austin services.austintexas.gov/edims/pio/document.cfm?id=397024 and New York rti-final-report-2022.pdf (nyc.gov) respectively.

[92] Categories based, in part, on NOPD's response in: Consent Decree Monitoring Team. (2023, July 7); Appendix, page 25.

[93] A "baseless" but not "false" report, see Clearance of Sexual Assault Cases (evawintl.org)

    c.   The case has been fully investigated and found to be a false report through evidence.[94]

    d.   The reporting person could not be located after the initial report, and this is the reason the case did not move forward.[95]

    e.   The reporting person states they do not want to participate in the investigation, and this is the reason the case did not move forward.

    f.   The police report suggested, per the CD Monitoring Team's audit: "issues requiring very little investigation (for example, clear signs the victim was in mental health crisis and was not actually sexually assaulted)."[96]

    g.   The case has been cleared by warrant, but no arrest made.

    h.   After a thorough investigation,[97] there is not enough evidence for probable cause for an arrest.[98]

    i.   There is enough evidence to make an arrest (probable cause), but no arrest is made, because it is believed that the DA will not accept the charges for prosecution, for a reason *other than lack of probable cause*.[99]

    j.   There is enough evidence to make an arrest (probable cause), but no arrest is made, because it is believed that the DA will not accept the charges for prosecution (due to a lack of probable cause or evidence).

**Sexual Assault Kit (SAK) testing:**

14. How many untested kits are currently awaiting testing?
    a.   At the state lab?
    b.   At a private lab?

15. How many kits per week are currently being accepted by LSP?
    a.   How are these prioritized, and where do sex crimes against children fall into the prioritization of testing SAKs?
    b.   How long does LSP currently take to process SAKs and return results to NOPD?

16. Are any kits on current incidents going to private labs? How many? How long does it take to process those? Are there any restrictions on what can be sent to private lab instead of LSP? What is the status re those private labs re capacity, term of contract, funding, etc.

---

[94] False Reports (evawintl.org)

[95] Including how many were tourists/visitors, were gone on arrival, were unhoused.

[96] This is a quote from the July 2023 Monitor's report, which suggests 30 of the 54 cases they audited meet this description, from reading police reports. False reports are typically 2-10%, so it is statistically unlikely that over 50% of audited cases were ones in which "no sexual assault occurred", but we still need to understand how many of these cases NOPD considers or labels in this way

[97] Including evidence collection, interviewing both victim and suspect if there is one identified, receiving results from forensic testing…e.g. they are not waiting on these results to complete the investigation or identify a suspect

[98] NOPD should come up with subcategories for these types of cases to identify known issues that are hindering further investigatory paths

[99] These would be cases where the DA also agrees that there is probable cause for arrest, and that NOPD has done a thorough investigation, but they are not planning to prosecute due to factors other than a lack of probable cause. Clearance of Sexual Assault Cases (evawintl.org) p. 17-18 Exceptional Clearance

33

17. How many kits in the backlog have been tested and returned?
    a. How many CODIS hits were generated?
18. What is NOPD's plan to pursue the cases (especially cases from past years) that have recently returned CODIS hits after testing at the private lab?
    a. Is there a plan to work with advocates to notify cold case survivors in a trauma informed way?
    b. Are these cases incorporated into the NOPD's staffing and caseload estimates?
19. What is the plan in the interim to stop a backlog of SAKs from accumulating again?[100]
    a. Is there funding allocated to continue sending SAKs to the private lab?
    b. How much funding is needed and is that funding currently available?

**Supervision and Training:**

20. Does NOPD have a "critical incident review" process which could be invoked in appropriate cases involving sex crimes to do a comprehensive review of all aspects of a critical incident for recommendations re policy, training, hiring, supervision, etc.? If so, is such a comprehensive review being undertaken re the Vicknair incident? And if not, why not?
21. If there isn't a "critical incident review" process that would cover the Vicknair and similar sex crimes critical incidents, what changes need to be made to incorporate one?
22. Will there be a "lessons learned" report on Policies, Screening, Hiring, Training and Supervision Procedures as it relates to the Vicknair case? If so, when will that be taking place and will the final report be released to the public, and if not, why not?
23. Is there a training plan of action proposed by NOPD to train all officers, not just detectives, in recognizing signs of grooming and abuse and if so, is there a timeline for that to be implemented
24. Has NOPD put a written policy and procedure in place to ensure proper FBI case classification, clearance methods, and reporting? What is that policy/procedure? And if that hasn't been done, why not and is it planned to be done and if so, when?
    a. Is there a training plan for individuals who will be making case classification and clearance decisions? What is that plan? Is it already in place and if not, what is the time frame for implementing that training? And if there is no plan, why not?
    b. Are there supervisory checks and balances in place to validate the data and decision making, especially given the complexities of SVD cases?
    c. Are sex crimes that include any kind of penetration now being classified (in both NOPD signal and charge code) as first, second, or third degree rape?[101]

---

[100] NOPD's crime lab is not anticipated to be able to test SAKs until at least 2027 Councilwoman says New Orleans on track to clear backlog of untested DNA samples by end of year (fox8live.com)
[101] See 2022 law that clearly defines rape as inclusive of all types of penetration. Our understanding of this law is that you should not have a case with penetration classified as a sexual battery or molestation, but rather one of the rape charges. https://www.legis.la.gov/legis/Law.aspx?d=78528 and the original act signed into law in 2022: https://legis.la.gov/legis/ViewDocument.aspx?d=1286268

34

25. Has NOPD followed up with the DA's office to track DV case disposition through adjudication?[102]  And what efforts have been made to enter into MOUs with other agencies to track outcomes in DV cases? Are there any MOUs that have been entered into and if not, why not?

    a. Are there any timelines for implementation of these agreements and MOUs?

    b. If so, will the tracking include case disposition at NOPD level, using both FBI clearance and solve rate, with regular updates as cases progress through the investigatory process?

        i. Is additional technical consulting or expertise needed to address the unique data tracking needs of the SVD, specifically reclassifications over time as investigations progress? If so, what steps are being taken to implement this and what is the timeline.

    c. If so, will the tracking include the ability to track cases through the DA's office and provide statistics on overall case outcomes?

    d. Same questions re Sex Crimes and Child Abuse and tracking cases through adjudication.

26. When will the new Records Management System (RMS) be implemented by NOPD?

    a. When will NIBRS reporting be active? When does NOPD anticipate reporting these numbers monthly to the state? When is the first anticipated date they will be sent to the FBI?

    b. Will SVD use the new system or have their own system (SAMS)?

    c. How will the new system reduce physical paperwork and improve efficiency for SVD?

    d. Will the new system make it easier for SVD to report statistics including case counts, dispositions, and track investigatory progress over time?

    e. Will the new system improve public data and address the shortcomings in current Electronic Police Report public data for sex crimes?[103]

**Maintenance of Existing Reforms:**

27. Will NOPD's participation in the SART and MDT reviews continue during the sustainment period? If not, why not?

28. Will the quarterly SVD/DV reports continue during the sustainment period? If not, why not?

29. Will there be regular audits of SVD investigations through PSAB?  Through other entities?

    a. What is the schedule for these?

---

[102] This is in the Consent Decree re DV, Para.222. Has this been followed up with the current DA's office? Any other "appropriate agencies"?

[103] SVD incidents in public EPR files regularly lack charge codes, when compared with other types of violent crime; Public EPR does not include case disposition as it relates to FBI clearance types; Public EPR does not include a variable/flag for Domestic or Intimate Partner Violence cases (making it difficult for the public and researchers to understand the scope of these crimes)

      b.  Will they include additional scope in addition to reviewing police reports, such as talking to advocates and victim-survivors and listening to interview recordings? If not, why not?

30. Will NOPD's SVD continue to provide data to the Health Department's Sexual Violence Response Advisory Committee (SVRAC) for their annual reports during the sustainment period?[104]

---

[104] The interdisciplinary SVRAC is a wealth of knowledge and expertise, collaborated well with NOPD, and was very active in early reforms between 2015-2018. This committee, currently housed under the Health Department, could be extremely helpful in assisting NOPD with data and tracking needs as well as more in-depth analyses and/or audits, including providing support for the external open case review we suggest above.

**Appendix C**

Additional Details Regarding NOPD PSAB's Audit (May 2024):[105]



### Sex Crimes Unit Scorecards

| # | Sex Crimes Check-List Audit Scores (Target 95%) | Score |
|---|---|---|
| 1 | Is there BWC video applicable to this case? | 100% |
| 2 | Was there an on-scene response by SVS? | 100% |
| 3 | Is there an Incident Report in the case file? | 100% |
| 4 | Is there a MORF in the case file? | 100% |
| 5 | Is there an Initial Investigator Supplemental Report? | 100% |
| 6 | Is there a Follow-up Investigator and Supplemental report? | 100% |
| 7 | Is there a victim statement (video, audio, or transcribed)? | 100% |
| 8 | Is there evidence of attention to the victim's needs? | 100% |
| 9 | Was there a follow-up interview after the initial on-scene inves | 100% |
| 10 | Are there documented witness (video, audio, or transcribed)... | 100% |
| 11 | Is there a communications log? | 98% |
| 12 | Is there a documented 911 recording available? | 100% |
| 13 | Were there crime scene photos taken when evidence could be... | 100% |
| 14 | Is there documentation of CASTNET usage (criminal history... | 100% |
| 15 | If there is evidence of a drug-facilitated sexual assault with... | 100% |
| 16 | Is there a medical and/or SANE report? | 100% |
| 17 | Does the EPR or Supplemental Report document the required... | 100% |
| 18 | Is there documentation of a CODIS hit notification in the file? | No Score |
| 19 | Is there arrest or search warrant documentation? | 100% |
| 20 | Is there a suspect statement (video, audio, or transcribed)? | 100% |
| 21 | Is evidence collection documented in a report? | 100% |
| 22 | Were the evidence and property receipts included within the... | 100% |
| 23 | If evidence was not submitted for testing, was the reason... | 100% |
| 24 | Are there crime lab reports? | 100% |
| 25 | Is there documentation of a search of surveillance video? | 100% |
| 26 | Is there documented evidence of a witness canvas? | 100% |
| 27 | Are there composite sketches relative to the case? | No Score |
| 28 | Did the Detective complete (initial and date) the Case File Index... | 100% |
| 29 | Was the incident appropriately classified? | 100% |
| 30 | Was there documented authorization for a Signal change if... | 100% |
| 31 | Is there documented supervisory review of reports and... | 100% |
| 34 | Overall Score | 99.9% |

---

[105] PSAB Audit (2023, June 13), p. 5.

**While NOPD appears to be compliant with many of the initial investigatory steps on the checklist, many critical follow up steps appear to be missing or incomplete:**

1. For the section "Is there documentation of a CODIS hit notification in the file?" ALL 47 cases reviewed were marked "NA," with "either no DNA submitted or no crime or no suspect;" however, NOPD's audit score was 100%.

2. For the section "Are there composite sketches relative to the case?" ALL 47 of cases reviewed were marked "NA," with "no suspect sketches made;" however, NOPD's audit score was 100%.

3. For the section "Were there crime scene photos taken when evidence could be captured/recorded, as appropriate?" 45 of the 47 cases reviewed were marked "NA" as "either no crime scene or no crime committed;" however, NOPD's audit score was 100%.

4. For the section "Are there crime lab reports?" 44 of 47 cases reviewed were "NA" as "the crime lab was not called to the scene. There was no evidence to submit to the crime lab to generate a report;" however, NOPD's audit score was 100%.

5. For the section "Follow up investigator and supplemental reports," of 47 cases reviewed, 43 were marked "NA," because "either the case is still open, and follow-up hasn't occurred yet or victim chose not to proceed with case. If a follow-up has yet to occur it is due to a lack of evidence or necessary information to continue an investigation." Just 4 cases were "audited as positive" for this section; however, NOPD's audit score was 100%.

6. For the section "Is there a suspect statement (video, audio, or transcribed)?" 43 of the 47 cases reviewed were marked "NA" as "either no suspect located, or no suspect identified, or suspect refused;" however, NOPD's audit score was 100%.

7. For the section "Is there documented evidence of a witness canvas?" 43 of 47 cases reviewed were "NA," as "either there were no witnesses present at the scene, no crime occurred, a witness reported the crime, or the victim was a district walk-in;" however, NOPD's audit score was 100%.

8. For the section "Was there a follow-up interview after the initial on-scene investigation?" 42 of the 47 cases reviewed were marked "NA," because "either case still open and follow-up hasn't occurred yet or victim chose not to proceed with the case;" however, NOPD's audit score was 100%.

9. For the section "Is there a medical and/or SANE report?" NOPD's score was also 100%; however, 41 of 47 cases were marked "NA" as "either victim refused medical attention, or no victim was found, or no crime occurred."

**Appendix D.** Public Comment by William Most



| | |
|---|---|
| **MOST &** | 201 St. Charles Ave.    (504) 509-5023 |
| **ASSOCIATES** | Ste. 2500 #9685    mostandassociates.com |
| | New Orleans, LA 70170    williammost@gmail.com |

Judge Susie Morgan                                                          October 23, 2024
United States District Court, Eastern District of Louisiana
Via email to Clerk@laed.uscourts.gov

Re:     *U.S. v. City of New Orleans*, 12-cv-1924
        **Comment regarding Joint Motion To Enter Into The Sustainment Period**

Dear Judge Morgan,

        This letter is to provide public comment on the proposed consent decree sustainment
period, as requested in your September 27, 2024 notice.[1]

        I am a civil rights attorney in New Orleans. I represent the plaintiff in the lawsuit *Hainey
v. City of New Orleans*, 21-407 (E.D. La.) which went to trial earlier this year. The case was
about a NOPD officer who repeatedly sexually assaulted a minor child and the failure of NOPD
supervisors – up to and including the former Superintendent – to take swift action once warned.

        Before trial, Judge Barbier determined that the City of New Orleans was liable for former
Officer Rodney Vicknair's state law torts of sexual assault, battery, and false imprisonment of a
minor child.[2]

        At trial, a jury determined that the City was also liable for Vicknair's constitutional
violations against the child.[3] The jury concluded that both the City's decision to hire Officer
Vicknair and also the City's inadequate supervision of Vicknair reflected "deliberate indifference
to the risk of sexual assault, battery, or false imprisonment."[4]

        In discovery, however, I was troubled to hear a NOPD 30(b)(6) representative testify that
he did not "know of anything NOPD has done differently or changed directly in response to
Vicknair to prevent another Officer Vicknair."[5]

        For that reason, I ask that the specific measures below be included in the Sustainment
Plan to mitigate the risk of similar misconduct in the future. Adoption of such measures is
recommended to ensure NOPD's compliance with the Policing Free of Gender Bias requirement
of the consent decree.[6]

---

[1] *USA v. City of New Orleans*, 12-cv-01924-SM-DPC (E.D. La.), R. Doc. 795.
[2] *Hainey v. City of New Orleans*, 21-cv-407 (E.D. La.), R. Doc. 157.
[3] *Id.*, R. Doc. 258 (Jury Verdict).
[4] *Id.*
[5] Deposition of 30(b)(6) witness Sgt. David Barnes at 78:16-20 ("Q. So the answer is no, you don't
know of anything NOPD has done differently or changed directly in response to Vicknair to prevent
another Officer Vicknair, correct? A. Correct.")
[6] Consent Decree § IX.

39

1.      **NOPD should re-run background checks for officers hired in the post-Katrina era.**

Background: At trial, NOPD representatives testified that Vicknair's criminal history had multiple arrests (from 1987 and 1990) that did not appear in a 2006 background check, but did appear in a subsequent 2020 background check. That suggests that the post-Katrina-era background check system was inadequate.

For context, this was Vicknair's criminal history prior to being hired as a NOPD officer in 2007:

| Vicknair Pre-NOPD History | | |
|---|---|---|
| **Date** | **Arrest / Conv.** | **Crime** |
| March 1982 | Arrest & Conviction | Disturbing the Peace |
| May 1985 | Arrest | Illegal Use of a Weapon, Damage to Property |
| June 1986 | Arrest & Conviction | Disturbing the Peace |
| July 1986 | Arrest | Attempted Burglary |
| April 1987 | Arrest & Conviction | Simple Battery (against a juvenile) |
| Dec. 1990 | Arrest | Disturbing the Peace |
| June 2005 | Arrest | Aggravated Assault, Simple Battery |

Requested Action: NOPD should re-run NCIC/NLETS/Triple III background checks for all officers currently on the force who were hired from 2005 to 2010.

2.      **NOPD should train officers to spot the red flags of "grooming" behavior.**

Background: In 2020, Officer Curtis Carkum witnessed Officer Rodney Vicknair show "modeling photos" to the child sex crime victim, talk to her about "[il]licit photos" and give the child his phone number, but Carkum did not report those behaviors to anyone.[7] In testimony, Carkum could not identify any training to recognize red flags like this, other than to say it is "frowned upon."[8] And the City's representative conceded that if officers saw behavior like this and did not report it – like Carkum – that could implicate a training problem.[9]

This problem intersects with the NOPD Ethical Policing Is Courageous (EPIC) program. If officers aren't properly trained to identify certain behaviors regarding grooming, inappropriate displays of photos, or other red flags of the sexualization of children, that diminishes officers' ability to assess the situation and intervene as necessary.

---

[7] Deposition of Curtis Carkum at 23:5-7, 26:21-27:13; 25:11-13, 31:16-19.

[8] Id. at 31:12-15 ("Q. Did you receive any training about giving your personal contact information to victims? A. It's frowned upon.")

[9] Barnes 30(b)(6) Dep.at 68:8-22 ("Q. If officers don't know that that's a red flag, that would be a training issue, agreed? . . . The Witness: I don't necessarily know if it would be a training issue. I mean, I guess it could be. It certainly could be a training issue. It could be a whole host of other issues, but I think a training issue would definitely -- would definitely come into play.")

Requested Action: NOPD should develop and implement training for officers on the red flags of "grooming" behavior, with particular training to be on the look-out for that behavior in other officers. A place to begin the research would be the "Level of Concern Guide" of "Red Flag Child Sexual Grooming Behaviors."[10]

3.      **NOPD should require PIB to either take action once "grooming" is identified or alternatively document the reasons why action is not being taken.**

Background: In 2020, Sgt. Lawrence Jones identified behaviors by Vicknair that he recognized as "grooming" behaviors. PIB did not, however, take any action to separate Vicknair from the child until an arrest warrant was obtained. PIB did not begin surveillance of Vicknair, place him on administrative detail, or even advise him to stay away from the child. As a result, he had the freedom to sexually abuse the child a final time.

Requested Action: NOPD should amend its Operations Manual to require that when PIB becomes aware of officer behavior that raises a reasonable suspicion of "grooming," PIB must (1) begin surveillance of the officer; (2) place the officer on administrative detail; (3) advise the officer not to contact or approach the child; or (4) document the reasons in writing as to why PIB has chosen not to take each of these options.

4.      **NOPD should utilize Automatic Vehicle Locator GPS data to monitor officer behavior.**

Background: NOPD patrol vehicles have a GPS tracking device called an Automatic Vehicle Locator. At trial, Sgt. Barnes testified that NOPD keeps historical AVL GPS data, that can be obtained via a request to the IT department. At deposition, Chief Kirkpatrick agreed that "if NOPD has GPS data, it should be looking for suspicious patterns in that GPS data."[11]

NOPD is not, however, looking for suspicious patterns in that GPS data. It has no automatic system for evaluating suspicious patterns in that GPS data, and did not pull Vicknair's GPS history even after the red flags of his behavior were identified.

Requested Action: NOPD should develop a system for assessing suspicious patterns of officer behavior in AVL GPS data, such as an officer returning repeatedly to the location of a sex-crime victim's home. As an interim step prior to the implementation of such a system, NOPD's operations manual should be amended to require that if PIB becomes aware of officer behavior that raises a reasonable suspicion of "grooming" and there is a specific location associated with the potential grooming victim, PIB shall request the officer's AVL data and review it for trips to that area.

---

[10] See Jeglic et al., _Identification of red flag child sexual grooming behaviors_, Child Abuse & Neglect (Feb. 2023). Level of Concern Guide available here: https://ars.els-cdn.com/content/image/1-s2.0-S0145213422005324-mmc1.pdf

[11] Superintendent Kirkpatrick Dep. at 18:24-19:2.

5.    **NOPD should adopt a policy regarding the transport of child sex crime victims by specialized officers.**

Background: Rodney Vicknair conducted part of his grooming during the process of transporting the minor sex crime victim to the hospital. At deposition, a NOPD representative testified that there was no prohibition against a regular patrol officer transporting a minor sex crime victim to the hospital for a rape kit.[12]

Requested Action: NOPD should amend its Operations Manual to require that child sex crime victims be transported by Special Victim Section officers, except in exigent circumstances where no Special Victim Section officer is available. The Operations Manual should require that in such an event, the officers involved shall document the nature of the exigency.

6.    **NOPD should conduct a Serious Discipline Review Board process for this matter.**

Background: NOPD Policy Manual Chapter 1.3.8 establishes a Serious Discipline Review Board (SDRB) to evaluate whether "inadequate supervision or a failure in the chain-of-command was present and caused or enabled the violation(s)." This review is to be "in addition to any other review or investigation."

Requested Action: Given that a federal jury found that the "City of New Orleans inadequately supervised Rodney Vicknair reflecting a deliberate indifference to the risk of sexual assault, battery, or false imprisonment," a SDRB review would be appropriate here.

Very truly yours,

/s/ William Most
William Most

Cc:    City of New Orleans, via Attorney Donesia Turner (Donesia.Turner@nola.gov)

Office of the Independent Police Monitor, via scziment@nolaipm.gov, sharonda0624@gmail.com

Office of the Consent Decree Monitor, via jaronie@sheppardmullin.com, aburns@consentdecreemonitor.onmicrosoft.com

U. S. Department of Justice (Civil Rights Division), via Jude.Volek@usdoj.gov, jonas.geissler@usdoj.gov, arusha.gordon@usdoj.gov, paul.killebrew@usdoj.gov, suraj.kumar@usdoj.gov, timothy.mygatt@usdoj.gov, syeda.riaz@usdoj.gov

---

[12] See Barnes Dep. at 68:24-82:18.

**LAEDdb_Clerk**

**From:**         Clinton, Lauren E <█████████████>
**Sent:**         Thursday, November 7, 2024 7:40 PM
**To:**           LAEDdb_Clerk
**Subject:**      Public Comment - Say NO to NOPD Sustainment Period

CAUTION - EXTERNAL:

Dear Judge Morgan,

I am asking that say NO to a sustainment period for the federal consent decree. NOPD is guilty of violent and racist policing and should not be permitted to exit federal consent decree oversight. As is, they fail to even meet the bare-minimum constitutional requirements of the decree. I urge you to protect the people of New Orleans by saying NO to a sustainment period.

Sincerely,

Lauren Clinton (she/they)
B.S Candidate - Ecology and Evolutionary Biology Tulane University Class of 2026
████████████████

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Ayyub Ibrahim <██████████> |
| **Sent:** | Thursday, November 7, 2024 8:11 PM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | Consent Decree Comment |

CAUTION - EXTERNAL:

The consent decree should not enter sustainment until the allegations of corruption raised by Consent Decree monitor Burns are investigated.

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | C JG <████████████████> |
| **Sent:** | Thursday, November 7, 2024 8:56 PM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | NOPD Reform - Opposed to bringing the Consent Decree to an End |
| **Attachments:** | NOPD Reform Oct 2024.docx |

**CAUTION - EXTERNAL:**

To Whom it May Concern,

I am opposed to ending the NOPD Consent Decree. I have attached a list of reforms which should be addressed by the Consent team prior to the NOPD exiting the Consent Decree.

Please do not hesitate to reach out if you have any questions about the attached document.

Sincerely,

Skip Gallagher, Ph.D.
████████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# NOPD Reform
## Skip Gallagher, Ph.D.

The NOPD still faces serious issues which require the intense oversight of the Consent Decree. Clearly the Federal Consent Decree put in place in 2012 to address issues such as the "aorta of corruption" (the Detail system) has failed as I continue to identify Payroll Fraud within the NOPD. As rules have been tweaked, officers have simply adapted to work around any new limitations producing fictional schedules which no human could reasonably achieve.

After reviewing thousands of documents, timesheets, emails, PIB reports and NOPD's own policy I have developed a series of suggestions that might be enlisted to combat corruption issues within the NOPD.

1. Increase officers' base pay. Officers should receive a level of compensation which does not encourage them to participate in Details. There are more than a few cities which ban Details, and the level of corruption we see embedded in New Orleans Detail system explains why these other cities have made this decision.
2. Attack and dismantle the "Sleep" Detail system. It serves no useful function other than to line the pockets of officers with questionable ethical standards. Attempts to regulate the Detail system have been futile and a select group of officers continue to control lucrative "Sleep Details" by coordinating with those working at Secondary Employment and/or the current or former NOPD officer arranging the Detail.
3. An examination of all special units in the NOPD. Payroll fraud has disproportionately affected special units. It is clear from records obtained that in many cases officers assigned to special units are working very little. The worst of these cases fall into three categories:
   1) In the most common example, it is clear that the officer is working their Duty section, but they are not working the Details reported. These are typically "Sleep" Details in which their presence is not expected.
   2) The officer is rarely on Duty but does work the Details for which they are being paid. These are often referred to as "Detail Rangers" or "Submarines". Honest officers realize that they cannot rely on these Detail Rangers as they are exhausted from their Details and are often sleeping on Duty. For officers working a District a clear indication of this can be found by comparing officers tripsheets. Honest officers can be seen responding to calls while Detail Rangers rarely if ever respond to a call while on Duty. This is again a failure in supervision. Certainly, commanding officers should know where their officers are on a shift and understand that particular officers are not responding to calls.
   3) In the final group, an officer is rarely at their Duty station and does not typically show up to their Details either. These officers typically have a close relationship with their superior and take advantage of lax or nonexistent oversight by their superiors. This third group are also "working" Sleep Details in which they are not expected to appear.
4. Address Hidden Details. There are two types of hidden Details:
   1) Those recorded by Secondary employment but paid independently (Superdome and Smoothie King). For those working the Superdome and Smoothie King Center, total reported compensation is under-reported. As this Total compensation amount is helpful in recognizing pay issues it should reflect all compensation. Superdome and Smoothie King Center pay should pass through Secondary Employment as other Details do.

1

NOPD Reform                                         Skip Gallagher, Ph.D.

    2) Secret Details - Under the table Details which do not go through Secondary Employment in any form. These can be difficult to identify (Superdome, VIP, French Quarter).

5. If the Detail system is retained, reduce Details to 12 hours per week (As noted above eliminating Details is the ideal solution but failing this Details must be strictly limited) Details are simply not an effective use of a uniformed NOPD officer. As many of the Details in New Orleans are "Sleep Details", these certainly have no use as previously discussed. In nearly all legitimate Details, officers can be replaced by a security guard.

6. Officers cannot work more than 12:35 hours in a 24-hour period. With only strict exceptions for special events. Pilots, Train Conductors and Truck Drivers are strictly limited in the number of hours they are permitted to work before a minimum of 10 hours of rest is required. Officers are given a badge, a gun and a vehicle. A demanding job, officers should be well rested. It might also be important to note that a poorly rested officer may adversely affect racial bias and use of force incidents.

-The Stability of Implicit Racial Bias in Police officers
https://journals.sagepub.com/doi/full/10.1177/1098611117732974

-King County Sheriff's Office Overtime: Better Strategy Could Reduce Hidden Costs and Safety Risks
https://kingcounty.gov/~/media/depts/auditor/new-web-docs/2017/kcao-overtime-2017/kcao-overtime-2017.ashx?la=en

7. A minimum of 10 hours' break must be required after the officer's work 12 or more hours in a day. This will ensure an officer can achieve a minimum of 8 hours sleep and would include time for transit to or from their home. The following is from an audit of the King County Sheriff.

(https://kingcounty.gov/~/media/depts/auditor/new-web-docs/2017/kcao-overtime-2017/kcao-overtime-2017.ashx?la=en)



Source: King County Auditor's Office analysis of PeopleSoft and off-duty data for all KCSO officers during 2014-2016.

NOPD Reform                                                    Skip Gallagher, Ph.D.

8. As mentioned, any shift of 12:35 or greater must be followed by 10 hours off-duty
The rules will have to be tightened to prevent future abuse of the rules. I would also suggest providing a clear penalty in the new rules which must be enforced without a PIB complaint and investigation for each event. For example, an automatic 1-day suspension for each violation of 12:35.

9. Reduce the 16:35 hour daily limit to 12:35 hr.
Some officers have looked at the 16:35 limit as a reasonable goal to hit on their daily schedule, rather than something that would occasionally be permitted, 16:35 should be eliminated. Currently, violating 16:35 is rarely noted and even officers with 100's of 16:35 violations have produced trivial penalties or 2 to 5-day suspensions (PIB 2021-0667-R).

10. Payroll violations should include disciplinary action against the officer approving the offending officer. A lack of oversight within the NOPD continues to date. Officers are rubber stamping payroll without any real oversight. In the worst-case scenarios officers are actually inserting time into officers' schedules after the fact which is entirely fictional. This can be found in the officer's audit trail and most commonly occurs days after the date of this fictional inserted work period.

11. Details should never outnumber Duty hours weekly
There are a number of officers working "Sleep" Details far more than they are working Duty hours. These officers present the appearance that they have a badge in order to work a Detail. Duty should always be the officer's primary responsibility.

12. Details cannot be worked while on Leave. Too often officers are using leave to work a lucrative Detail. This of course leaves the officers shift short staffed. It is the residents of New Orleans who pay the price here. The lack of an officer to respond to a call, while that officer is "working" some Detail is detrimental to the security and safety of New Orleans as a whole. In addition, many of these most lucrative Details seem to go to the same well-connected officers year after year. (Jazzfest, French Quarter Fest,…). These connected officers seem to have no problem using their Annual Leave to work these exceptionally well-paid Details. In some example's officers have managed pays of $1,300 for a single day during Jazzfest, with multiple days producing an $8,000+ pay bump for 7 days.

13. Captains cannot work Details
This is currently spelled out in policy but unenforced. At one point at least 6 Captain's were working Details while I have found 1 Captain working a Secret Detail. The policy which prohibits Captains routinely working Details is well thought out and serves a purpose. A Captains position in the NOPD is to ensure that the integrity of the Department is preserved. An officer working a Detail could feel indebted to those paying for the Detail. A Captain should never be exposed to that kind of pressure and as rank, should remain above the Detail system. Reasonable exceptions to this policy are already spelled out in departmental policy.

14. Lieutenants should work Details at the lower rank.
Policy also dictates that Lieutenants should work in a supervisory position yet often continue to work routine Details and at Lieutenants pay with no apparent justification. Lieutenants are most definitely in the command structure. Current policy addresses this issue, yet it is currently unenforced. This is particularly true at some of the more lucrative "Sleep" Details.

15. Reduce Secondary Employments take –
Secondary Employment seems to have morphed into a pimping agency for officers and they have failed to perform even the most basic oversight function spelled out in their own

3

NOPD Reform                                                    Skip Gallagher, Ph.D.

policies.  Secondary employment should perform their oversight function or give up their percentage of officers' Detail payment.

16. As we move into 2024, Detail pay has bumped upward significantly.  Officers are now frequently being paid $70+ per hour.  This produces an even greater incentive to work a Detail rather than Duty.  For example, if an officer was to work a 40-hour week at $70 per hour their weekly pay would be $2,800 per week or $145,000 per year.  Considering a Sgt's base pay is in the mid $70,000 range, a considerable bump in pay is taken by working Details instead of their Duty section.  Again, the appearance of having a badge to perform a Detail, rather than working the job they were hired to perform.

17. Stop current and past officers from controlling "Sleep" Details
This must be occurring with the assistance of the employees at Secondary Employment.  These links between the officers or former officers and Secondary Employment must be severed.  This has been a particular problem with Lakeview, MidCity, French Quarter, Fairgrounds, Uptown and Downtown Development Details.

18. Require 30 minutes break between Duty and Detail
Officers routinely have little or no time between Duty and Detail.  This is of course unrealistic as transit is nearly always required.  Even since the addition of the 15-minute policy I have found officers still reporting shorter breaks and transit times which require more than 15 minutes.

19. Rotate ALL Details, so that no officer is working a particular Detail for more than 1 year
A relationship has developed on some Details (esp. "Sleep" Details), in which officers do not appear, nor are expected to appear.  In situations where a pair of officers are present, the same officers are paired in order to provide cover for each other as neither are present for the Detail.

20. Actively investigate "Sleep" Details and ask for Federal assistance in doing so
For example, the Fairgrounds Detail is among one of the worst of the "Sleep" Details, this Detail is embedded in the Law by the mother of two of the officers who have taken advantage of this Detail for many years.  This appears to have continued with the knowledge of the coordinating person (a former NOPD officer) at the Fairgrounds and Secondary Employment.  Continued arrangements must exist when the Fairgrounds continues to pay officers, yet understands the officers are not present for the paid Detail.  A similar situation exists at the Downtown Development District (DDD) where another former NOPD officer coordinates this "Sleep" Detail.  Even the most casual investigation of these "Sleep" Details would show the officers assigned to these Details are not present.

21. Reform Secondary Employment
Secondary Employment is currently tasked with ensuring officers are present at their Detail.  A random sampling of Details should be performed every day.  Even the most rudimentary checks of officers on a Detail would quickly expose missing officers.  Of course, this would also quickly result in officers no longer volunteering for Details and the ultimate collapse of the Detail system.

22. Force officers to actually log into work on their own
Officers who log into their Duty or Detail at exactly the same time for weeks on end are highly suspect.  In these cases, it is extremely unlikely that an officer's true schedule is reflected, and it is instead a fictional schedule repeated day after day, week after week.

23. Ensure signatures match when sign-in sheets are present at a Detail.  It is clear that others are often signing in for an officer and signatures simply do not match.

NOPD Reform                                                      Skip Gallagher, Ph.D.

24. Heavily edited timesheets should immediately trigger an audit of that officer
    Extensive editing is occurring on nearly all the officers engaged in Payroll fraud. In many
    cases, the number of officers involved in the audit trail of select officers is stunningly long.
    Simply examining the length of an officer's audit trail is indicative of Payroll fraud. While it
    can be determined from audit trail who edited or altered the timesheet, there seems to be
    multiple reasons these officers are editing timesheets:
    1) "Work" duty times added when they were not present or on Duty.
    2) Remove conflicts in their schedule (Duty/Detail conflict or Detail/Detail conflicts)
    3) Timesheets are being edited or altered by other officers engaged in Payroll Fraud in return
    for their own timesheets being modified.

25. Subordinates cannot alter/edit timesheets of their superior, yet just this is routinely happening
    in some cases.

26. Edits of timesheets only performed by officers in Chain of Command
    This is already spelled out in departmental policy, but there are too many exceptions still
    occurring. In some instances, "Super Users" from other commands are altering timesheets or
    subordinates are provided with the officer's own access to input another officer's hours.

27. Require a minimum of 5 days off a month (5 days or 5 – 24-hour periods)
    Working every day for weeks and/or months on end is unacceptable. I have now identified
    officers with 12, 14, even 16 months without a single day off. For the most part, the officers
    making these extraordinary claims are not actually working these hours. Schedules devoid of
    days off are humanly impossible. Instead, the officers involved are simply committing
    Payroll Fraud. For those officers taking just a few days off, officers have a gun and a vehicle
    and there is no excuse for an exhausted officer on duty. This policy change should be
    coupled with restricting the use of Annual Leave used to work Details as I previously
    discussed above.

28. Officers calling in Sick to instead work Details. While this is not common, there seems to be
    little oversight, and it happens frequently enough. Officers realize there is little chance they
    will be caught and an insignificant penalty if they are identified.

29. Officers nearing retirement will make heavy use of Sick and Leave time to miss significant
    portions of their remaining months at the NOPD. A difficult problem to tackle as the officers
    are short timers who are unlikely to even respond to disciplinary action.

30. Under Arlinda Westbrook and Sabrina Richardson, PIB was the most morally compromised
    organization within the NOPD. The removal and Ms. Westbrook and Richardson along with
    a number of other officers has gone a long way in redeeming PIB but ethically compromised
    officers still reside at PIB. Every effort should be made to ensure that PIB represents the best
    the NOPD has to offer. Finally, PIB should not be a career option, and officers should be
    rotated out of PIB after some reasonable period. The weaponization of PIB should be a thing
    of the past.

31. Other departments of the NOPD have serious ethical problems and the rotation of officers out
    of those departments should be used to break up these corrupt clicks. This includes Traffic,
    SOD and SWAT.

32. A new civilian leader of PIB. Clearly the current chief of PIB has been part of the problem
    and not part of the solution.

33. GPS on all NOPD vehicles

NOPD Reform                                                      Skip Gallagher, Ph.D.

The City of New Orleans has made every effort to block information which might locate a patrol car. According to public records requests there seems to be no way to currently track an officer's location.

34. GPS tracking should also be used to ensure that the NOPD's generous take-home vehicle policy is not abused as seen in an officer towing his boat to Mississippi in his take-home vehicle. It seems every other vehicle in the city has GPS, but not police vehicles.

35. No more than 4 hours of Detail immediately prior to and an 8-hour Duty shift and no Detail permitted prior to a 12-hour shift. The public should expect well rested officers

36. An automatic audit of any officer who has worked more than 60 hours in a single week (Duty and Detail). This would have no effect on the average officer who works few if any Details. This would immediately bring an end to some of the worst Payroll Fraud officers. Of course, a carve out for Mardi Gras could be made.

37. Officers can never exceed a 70-hour work week for any reason.
There are too many officers routinely claiming 80, 90, 100, 110+ hours. An 80-hour week represents two full-time jobs. Instead of paying these high earning officers who appear to do little or nothing. Provide a realistic raise to the average officer who is doing their job.

38. The Traffic division appears to be second only to PIB in corruption. GPS of the officer's motorcycles to ensure: 1) They are actually at assigned Details 2) Are Traffic officers working the Detail for the time period stated. Currently if an escort Detail is assigned to 6 Traffic officers, only 4 may appear and the 2 additional officers who did not appear will also claim that Detail. The favor is later returned for the officers that actually worked that particular Detail.

39. New leadership in the Traffic division. With recent efforts to clean up PIB, this leaves the Traffic division as the most corrupt division in the NOPD. New supervision is desperately needed in Traffic.

40. The NOPD must seriously consider removing officers from special units in the NOPD. Payroll Fraud has been far more serious in special units. In many cases the officers involved in those special units perform poorly and could easily be replaced by more qualified civilians. An excellent example of this is the NOPD Crime Lab. In most cases the crime lab is a place used to place problem officers to punish them or to minimize public contact between the officer and the public. In examining all officers assigned to the crime lab, not a single officer is qualified to serve at the crime lab. Replacing all the officers in the crime lab would save considerable money as well as placing additional officers on the street to perform a job which they are qualified to perform. Please refer to the Houston crime lab model.

41. Supervisors must supervise. Promotions in the NOPD have been used to place officers into elevated positions in which less is asked of them, and they are paid more. Past promotions have ensured that like-minded officers receive promotions. The quantity and severity of payroll issues in the NOPD reflects a distinct lack of leadership across the entire department.

42. Through officer's trip sheets, select officers seem to do little or nothing while on Duty. This is another example of a failed leadership at the NOPD.

43. Increase training – For years the dwindling numbers at the NOPD have meant even less time for training. Officers should have dedicated time for training. Technology and techniques change quickly and officers with proper training should be able to work more effectively. In the long run, properly trained officers will save time. This should be in person specialized training, not ineffective online click courses.

NOPD Reform                                                          Skip Gallagher, Ph.D.

44. A truly integrated payroll system. Currently the NOPD is manually looking for the worst of the payroll fraud problems, Double Dipping. But there clearly are many more issues at play here. Even a system which can integrate the Detail and ADP payroll system after the fact would be useful in identifying problem officers. The NOPD should have at least one dedicated civilian whose sole purpose is to look for and address payroll issues. The payroll fraud issues in the NOPD are costing the city millions of dollars yearly. These issues could easily have been caught by a trained accountant who has some familiarity with NOPD policy.

45. Domestic Abuse, Sexual Assault, DWI, Payroll Fraud should immediately be considered as criminal in nature and PIB investigations should move forward as a criminal investigation not as administrative to avoid Garrity issues.

46. Effective use of the Secret Squirrel Squad to address allegations. Once a substantial complaint is made against an officer, the officer is immediately informed either formally or informally of the complaint. This permits the officer to change their behavior. There are literally dozens of officers such as Todd Morrell or Christopher Jennings using the system to enrich themselves. Effective use of the Secret Squirrel Squad could help to bring this behavior to an end.

47. Every effort should be used to identify officers with criminal records or those facing serious criminal charges. A liberal use of suspensions should be implemented for Rape, domestic abuse, DWI, narcotics violations and child abuse. The NOPD has far too many officers with a criminal past or facing serious criminal issues. The city and the NOPD continue to assist in hiding these officers from public scrutiny by refusing to release PIB reports regarding these compromised officers.

Skip Gallagher, Ph.D.

**From:** PSL- Louisiana <████████████████████>
**Sent:** Thursday, November 7, 2024 8:57 PM
**To:** Clerk@laed.uscourts.gov <Clerk@laed.uscourts.gov>; Ashley Burns
<ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Public Comment on Consent Decree

To whom it may concern,

The Louisiana branch of the PSL (Party for Socialism and Liberation) strongly urges against the New Orleans Police Department's exit from the Consent Decree Monitor. As a multiracial community organization of working class New Orleanians, we are deeply concerned with the NOPD's record of racially based policing. In 2023, 90% of NOPD use of force cases against men were against Black men, and between 2021-23, the rate of use of force against Black women increased by 54.9%.

Given the deeply troubling, decades-long record of misconduct — namely the use of excessive force, unconstitutional stops, and discriminatory policing targeting Black residents — we are not confident that the department will be able to maintain compliance with established benchmarks absent federal oversight.

Black, working class residents— who are the majority of our city — have suffered the brunt of racialized violence at the hands of the NOPD, just as Black working class communities across the country have been terrorized by their respective police departments. We reject the notion that these incidents of "misconduct" are isolated incidents; rather, it is a pattern of terror that has been carried out with near total impunity. We stand in absolute solidarity with all victims of racist police terror and demand that the City of New Orleans and Department of Justice hold the NOPD accountable by extending the consent decree.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Rory Macdonald <███████████████████> |
| **Sent:** | Thursday, November 7, 2024 11:27 PM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | Public Comment on NOPD Sustainment Period |

CAUTION - EXTERNAL:

Dear Judge Susie Morgan,

The New Orleans Police Department absolutely should not be permitted to exit the consent decree. No matter what the police monitor says, the most recent statistics show that about 90% of NOPD's use of force was against Black people, despite only 56% of the city being Black. Black people in New Orleans are 11 times more likely to be subjected to the use of force from NOPD than white people. Additionally, last April, a mounted police officer from NOPD kicked a Tulane student in the head with his horse while she was being pinned down by other police officers. This kind of reckless use of force is unacceptable. A young woman could have been killed on her own campus by that officer. NOPD's racist policing is unacceptable! We need more oversight, not less. Do not grant the request for sustainment!

Sincerely,
Rory Macdonald
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | NOCOP Media Team <media@nocop.org> |
| **Sent:** | Friday, November 8, 2024 12:02 AM |
| **To:** | LAEDdb_Clerk |
| **Subject:** | NOCOP Consent Decree Letter to Judge Morgan |
| **Attachments:** | NOCOP_Consent Decree Letter Judge Morgan_Nov7_2024.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

<mark>**CAUTION - EXTERNAL:**</mark>


Greetings,

Attached please find a letter from New Orleans for Community Oversight of Police (NOCOP) submitted as a public comment on the unreadiness of the NOPD to enter the sustainment period of the consent decree. We thank the court for soliciting public comment.

Kind Regards,
The NOCOP Data Analytics Team

<mark>**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.</mark>

To:    Hon. Judge Susan Morgan

       United States District Court

       Eastern District of Louisiana,

       Section E, Division 2

       clerk@laed.uscourts.gov


From:  New Orleans for Community Oversight of Police (NOCOP)

       Data Analytics Team

       info@nocop.org


To The Honorable Judge Morgan,

During the last consent decree hearing on June 5th, 2024, the court was presented with the "bias-free policing" assessment of the New Orleans Police Department by members of the federal Consent Decree Monitor's team and NOPD staff. This report declared the NOPD free of racial and other biases and fit to exit the federal consent decree despite large and ongoing racial disparities in arrest, search, traffic stop and use-of-force data, along with significant backsliding in 2023 and 2024 on important measures of compliance with the consent decree itself. Our organization, New Orleans for Community Oversight of Police (NOCOP), took considerable time to read and assess the 2022-2023 Bias-Free Policing Annual Report, which the federal monitors and NOPD officials cited repeatedly throughout the June 5th hearing. Our review left us with grave concerns related to the methodologies deployed by both the NOPD and the federal monitors in terms of both data collection and analysis, which we will detail in this letter along with other data inconsistent with the finding that the NOPD is free of harmful and consequential bias. This contradictory data was gathered largely by the Office of the Independent Police Monitor (OIPM) and the Professional Standards and Accountability Bureau (PSAB) in their annual reports and use of force audits, respectively.

Take, for instance, the OIPM's finding that in 2023 90% of all use of force (UOF) by the NOPD was against Black people, despite the overall Black population of the city being only about 57%.[1] The NOPD's use of force against Black people also increased dramatically in 2023, up nearly 10% for Black men from 2022, and up an absolutely staggering 54.9% against black women.[2] NOPD also committed 93.3% of all stop-and-frisks in relation to suspected gun-possession during Mardi Gras 2024 on Black people, despite the fact that the majority of American gun owners and gun-owning households are white by a wide margin.[2] Most of these statistics remained unacknowledged or were downplayed during the last hearing. The few that did receive attention were subject to attempts to minimize staggering racial disparities using statistical methods that simply would not pass the standard of peer-review in the scholarly community.

While it was obvious enough to us why NOPD statisticians would seek to manipulate data in bad-faith to minimize shocking racial disparities evident in its own data and OIPM reports, we were initially puzzled as to why members of the Consent Decree Monitor's team would do the same. We received our answer when our colleagues at local watchdog group, Eyes on Surveillance, exposed a damning conflict of interest in which Deputy Consent Decree Monitor Douglass' private consulting firm, ELEFA, was found to have hired many of the same NOPD officers that he was charged to monitor, in direct violation of the terms of the consent decree, paragraph 464.[3] Even the appearance of a conflict of interest works to cast doubt upon the veracity of the Monitor's report, and to undermine public confidence in the whole monitoring process. This is why we encourage the court to direct the city of New Orleans to conduct a truly independent scholarly peer review of all data, methods and findings in the recent 2022-2023 Bias Free Policing Report.

Good data analyzed with sound methods should be able to stand the test of scrutiny by experts in the field who have no connection to the police and nothing to personally gain from the outcome of the monitoring process. We contend that until such a review has been made, the NOPD has not provided sufficient evidence to demonstrate that they are any less biased now than they were before the implementation of the consent decree. The NOPD should not be permitted to enter a sustainment period in which the "success" being sustained is characterized by an increasing use

---

[1] "2023 Annual Report of the Office of the Independent Police Monitor," (Office of the Independent Police Monitor, June 2024), https://nolaipm.gov/wp-content/uploads/2024/06/OIPM-2023-Annual-Report.pdf.
U.S. Census Bureau, "U.S. Census Bureau QuickFacts: New Orleans City, Louisiana," accessed September 20, 2024, https://www.census.gov/quickfacts/fact/table/neworleanscitylouisiana/PST045223.
[2] Federal Consent Decree Monitor, "City of New Orleans NOPD Bias-Free Policing Data Analyses and Audits, Public Hearing June 5, 2024," June 5, 2024,
https://www.laed.uscourts.gov/sites/default/files/pdfs/6524_Additional_Materials.pdf.
"Gun Ownership in the U.S. by Ethnicity 2023," Statista, accessed November 7, 2024,
https://www.statista.com/statistics/623356/gun-ownership-in-the-us-by-ethnicity/.
[3] Eye on Surveillance, "Ponzi Police Reform: Surveillance, New Orleans, and the Deep State," accessed September 20, 2024, https://eyeonsurveillance.org/blog/ponzi-police-reform.

of force against Black New Orleanians—higher now than at the time of the consent decree's implementation—and troublingly-high racial disparities on a variety of metrics.[4]


## Problems with The Bias-Free Policing Report and its Findings of "No Bias"

### *A limited definition of bias and a failure to explain racial disparities in data*

In their presentation to the court on June 5th, 2024, the consent decree monitoring team and NOPD declared that a racial disparity in stop search and arrest (SSA) rates was not evidence of racial bias. Rather they stated that such disparities must be investigated more closely to see if bias was present. Yet the 2022-2023 Bias-Free Policing Report does not actually investigate implicit (unconscious) bias or explicit (conscious) bias of officers in most cases.[5] Instead they substitute a different measure of racial disparity such as a hit-rate analysis or a veil-of-darkness analysis which conveniently makes those stark racial disparities disappear. Use of these methodologies by Dr. Matthew Ross, the federal Consent Decree Monitors and NOPD statisticians are addressed below for their failure to adhere to best practices in the field and their tendency to produce misleading results through improper sample size and faulty study parameters. We argue, as do respected names in the field of statistical bias, that these tests should never be used alone to rule out the possibility of racial bias, but as is the case with all racial disparities, they can point towards its presence as a possible cause. To substitute one racial disparity that looks terrible for the NOPD with one that is constrained to look better by bad methods is not to eliminate the possibility of bias. In order to do that you would need to test for implicit and explicit bias of the officers involved as well as for systemic biases in policy and procedure. Notably the definition of bias deployed in the June 5th bias-free policing presentation focused only on systemic bias, implying that that individual officer bias was either not-preventable, or isolated enough not to be a factor that could create such a robust racial disparity as those painfully-evident in use-of-force and stop-and-search data.

We also found it curious that after declaring that bias could not possibly be the cause of the large racial disparities evident in their data, the presenters offered no other possible explanation for those extensive disparities. If it was not bias, then why are Black people arrested, searched and subjected to force at rates many times that of white people by the NOPD? We suspect that the implied answer, one that the presenters assiduously avoided saying out loud because they know it

---

[4] "2023 Annual Report of the Office of the Independent Police Monitor," (Office of the Independent Police Monitor, June 2024), 37 https://nolaipm.gov/wp-content/uploads/2024/06/OIPM-2023-Annual-Report.pdf.
[5] Naicker R. and Nunan D. 2024 "Racial Bias." Catalogue of Bias. Last Modified 2023. https://catalogofbias.org/biases/racial-bias/https://catalogofbias.org/biases/racial-bias/

would be deeply offensive, is that they are suggesting that Black people are many times more criminal or deserving of these measures than their white counterparts. Not only is such a supposition offensive, it is not supported by national statistics on gun ownership, drug use or crime by race.[6] White and Black Americans use drugs at roughly the same rate, and white people are actually far more likely to commit crime, to be gun owners or live in a gun-owning household than Black people.

### Data Collection Issues

**It is a conflict of interest for police to report data and audit themselves for racial bias without robust oversight**

A majority of the data used in the report was self-reported by NOPD officers. For example, the data used for the hit-rate analysis, comes from NOPD officers self-reporting on Field Interview Cards (FICs). FICs are audited by the Professional Standards and Accountability Bureau (PSAB), an office within the NOPD rather than the Federal Monitors or another independent reviewer. Independent review is an essential part of verifying any self-reported data. Otherwise the process is merely reduced to police evaluating police– a conflict of interest. According to the Bias-Free Policing Report, there was a lack of peer review or involvement from other evaluators outside of the NOPD itself in the audit protocol, and little to no federal oversight in the data collection and audit. Specifically, unlike in 2021 when the DOJ conducted all of the assessments for the bias free audit, "NOPD conducted the entire audit for 2022 and 2023 and received feedback and technical assistance from the DOJ on the results."[7] The lack of oversight not only in the data collection process, but also in conducting the audit increases the likelihood of biased results.

---

[6] Substance Abuse and Mental Health Services Administration, "Highlights by Race/Ethnicity for the 2023 National Survey on Drug Use and Health," https://www.samhsa.gov/data/sites/default/files/NSDUH%202023%20Annual%20Release/2023-nsduh-race-eth-highlights.pdf
"Gun Ownership in the U.S. by Ethnicity 2023," Statista, accessed November 7, 2024, https://www.statista.com/statistics/623356/gun-ownership-in-the-us-by-ethnicity/. United States Department of Justice and Federal Bureau of Investigation, "Crime in the United States" (September 2020). https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-43/#overview
[7] Federal Consent Decree Monitor for New Orleans, "2022-2023 Bias-Free Policing Annual Report," accessed August 17, 2024, 13 https://nola.gov/nola/media/NOPD/Consent%20Decree/NOPD%20Audits/2022-23-Bias-Free-Policing-Annual-Report.pdf.

**NOPD officers broke consent decree protocol while collecting data that was used in the report**

In the "Use-of-Force Audit Report" from both August 2023 and January 2024 we found that some districts have as little as 0% compliance in use-of-force reporting mandated by the consent decree in criteria like interviewing subjects of force on-record, dash cam activation, and supervisors submitting approved UOF reports to Force Investigation Team within 21 days. The August 2023 report found that only 83% of officers submitted force statements by the end of their tour of duty (ETOD), in the 2024 report the figures were even worse with only 76% compliance and many districts performing well below that mark. This means that 17% - 24% of use-of-force reports were documented many hours, days or even weeks after the stop.[8] Such police reports are likely to demonstrate cognitive bias linked to memory susceptibility that can be exacerbated by delayed reporting.[9] When officers do not fill out their use-of-force reports in a timely manner, it affects their accuracy and introduces the risk of memory bias. The 2023 audit also found that only 61% of supervisors submitted an approved use-of-force report to the Force Investigation Team (FIT) within the required 21 days, with that figure dropping to just 48% compliance in 2024, only months later. In some districts on both reports, supervisor compliance on submitting approved UOF reports to the FIT within 21 days is as low as 0% with many districts at less than 50% compliance. This lack of compliance for the reporting policies laid out by the consent decree is not only concerning for the victims of UOF, but for the bias it introduces into NOPD reports. These data points are considered complete and accurate enough to be used to analyze bias in the department when in fact the data is incomplete.

**There are data inconsistencies in the reports**

2022 patdown rates for Black and white people do not match in the most recent bias free policing report and the 2022 Stop and Search Annual report (Table 17).[10] In the bias free report 2022 the number of black people subjected to a pat down was 1358. In the 2022 Stop and Search report

---

[8] Audit and Review Unit Professional Standards and Accountability Bureau, "Use of Force Audit Report August 2023" (New Orleans, LA, September 5, 2023), https://nola.gov/nola/media/NOPD/Consent%20Decree/NOPD%20Audits/Use-of-Force-Audit-Report-August-2023 -Public.pdf ; Audit and Review Unit Professional Standards and Accountability Bureau, "Use of Force Audit Report January 2024" (New Orleans, LA, February 12, 2024), https://nola.gov/nola/media/NOPD/Consent%20Decree/NOPD%20Audits/Use-of-Force-Audit-Report-Jan-2024-Pu blic.pdf.

[9] Schade, S., and M. M. Thielgen. "Commentary: Problems with Police Reports as Data Sources: A Researchers' Perspective." *Frontiers in Psychology* 13 (2022): 873235. https://doi.org/10.3389/fpsyg.2022.873235.

[10] Federal Consent Decree Monitor for New Orleans, "2022-2023 Bias-Free Policing Annual Report," accessed August 17, 2024, 13 https://nola.gov/nola/media/NOPD/Consent%20Decree/NOPD%20Audits/2022-23-Bias-Free-Policing-Annual-Rep ort.pdf: 83

New Orleans Police Department, "2022 Stop and Search Annual Report," accessed October 15, 2024: 39

the number reported was 1380. This inconsistency comes from the fact that in the bias-free policing report NOPD records 10,447 black subjects stopped versus 10,304 black subjects stopped in the 2022 FIC report. We could find no stated reason for this discrepancy. There is a similar discrepancy found for white subjects across multiple years. We came across these discrepancies by chance when we were fact-checking the Bias-Free Policing Report.

Similarly, the "Use of Force Audit Report January 2024"[11] contains a "Use of Force Level 1 -4 Checklist Audit By District" table. In this table each police district is rated for compliance and an "overall score" is calculated for NOPD compliance. We noticed that even though some districts have 0% compliance for certain standards on the checklist (see table 1, line 10) the overall score can be as high as 92%. This means that districts are not equally weighted to give the overall score. The report refers to a "protocol" that explains how the overall score is calculated, but the "protocol" is not included in the report's appendix and we were not able to locate it anywhere online, making the scoring completely non-transparent. Therefore, we must question why a district can have 0% compliance for a procedural improvement in UOF tracking mandated by the consent decree, but the NOPD can still receive a passing rating of 92%.

| | Check-List Questions | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | SOD | Overall Score |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Supervisor GIST Submitted by ETOD (L1-L3) | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 2 | Force Statement(s) Found (L1-L3) | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 3 | Boilerplate Language was avoided in Force Statement(s) (L1-L3) | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 83% | 97% |
| 4 | Officer Force Statement(s) Submitted by ETOD  (L1-L3) | 67% | 100% | 67% | 100% | 50% | 100% | 67% | 100% | 50% | 76% |
| 5 | Reason(s) for Encounter Documented in Force Statement(s) (L1-L3) | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 6 | Supervisor Responded to the Incident (L2-L4) | - | - | - | - | 100% | 100% | 100% | 100% | 100% | 100% |
| 7 | Force Details Documented (L1-L3) | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 83% | 97% |
| 8 | BWC was Activated Per Policy (L1-L3) | 100% | 100% | 100% | 100% | 100% | 100% | 83% | 100% | 100% | 97% |
| 8 N/D | BWCS: BWCs Found: / BWCs Expected: | 100% | 100% | 100% | 100% | 100% | 100% | 81% | 100% | 97% | 96% |
| 9 | BWC was Reviewed by Supervisor (L1-L3) | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 10 | Dash Cam (In Car Camera) was Activated Per Policy (L1-L3) | 100% | 100% | 100% | 100% | 0% | 100% | 83% | 100% | 100% | 92% |
| 11 | Dash Cam (In Car Camera) was Reviewed by Supervisor (L1-L3) | 100% | - | 100% | 100% | - | 100% | 67% | 100% | 100% | 94% |
| 12 | If CEW was Activated, it was reviewed (L2-L3) | - | - | - | - | - | - | - | - | - | - |
| 13 | Each CEW cycle was Justified within Policy, if Activated (L2-L3) | - | - | - | - | - | - | - | - | - | - |
| 14 | CEW was Reviewed by Supervisor, if Activated (L2-L3) | - | - | - | - | - | - | - | - | - | - |
| 15 | Officer was Checked For Injuries (L1-L3) | - | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 16 | Photograph(s) taken of Officer Injuries (L1-L3) | | | 100% | | 100% | - | 100% | 100% | 100% | 100% |
| 17 | Subject of Force was Checked For Injuries (L1-L3) | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 18 | Photograph(s) taken of Subject of Force Injuries (L1-L3) | | | 100% | | 100% | 100% | 100% | 100% | 100% | 100% |
| 19a | Subject of Force Interviewed | 100% | 100% | 100% | 100% | 100% | 100% | 83% | 100% | 100% | 96% |
| 19b | Subject of Force Interview Exists (L1 L3) | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 20 | Supervisor Avoided Leading Questions (L1-L3) | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 21 | Canvass for Civilian Witness(es) was Made (L1-L3) | 100% | - | - | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 22A | Supervisor's UoF Investigation Completed within 72 hrs (L1-L3) | 100% | 100% | 100% | 100% | 100% | 100% | 83% | 80% | 100% | 91% |
| 22B | Supervisor's approved use of force report submitted to FIT within the required 21 Days from Incident Date: | 67% | 50% | 100% | 50% | 0% | 100% | 33% | 40% | 20% | 48% |
| 23 | Supervisor's UoF Extension Request Sent to Division Captain (L1-L3) | 67% | 100% | 100% | 75% | 100% | | 80% | 100% | 83% | 84% |
| 24 | Reasonableness of Force was Documented (L1-L3) | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 25 | Equip, Training or Policy Issues were Addressed by Supervisor (L1-L3) | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 26 | Report established officer had reasonable suspicion or probable cause to stop subject: | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 27 | CEW force statements consistent w/videos | - | - | - | - | - | - | - | - | - | - |
| 28 N/D | # CEW cycles explained in force statement / Total # CEW cycles | - | - | - | - | - | - | - | - | - | - |
| | Total | 95% | 97% | 98% | 96% | 90% | 100% | 91% | 96% | 91% | 94% |

Table. 1: Use of Force Level 1-4 Checklist Audit by District from the "Use of Force Audit Report January 2024"

[11] Professional Standards and Accountability Bureau. "Use of Force Audit Report January 2024," March 20, 2024.

## *Methodological Issues*

### Hit Rate Analysis

NOPD uses a hit-rate analysis to determine whether a stop or officer-initiated action during a stop is racially-biased. In a standard hit rate analysis, when an officer finds a weapon or contraband, it is considered a "hit."[12] The hit rate is then calculated as the percentage of stops or searches that result in evidence seized. Evidence can be a weapon, drugs, or other contraband (See Equation 1). If a police officer is racially-biased their hit rate will be lower for a minority group (ex. Black, women, etc.) than for their counterparts. This analysis relies on the assumption that if an officer is biased, they require less evidence to stop or search a minority group, which will result in a lower hit rate for that minority group.

$$hit\ rate\ =\ \#of\ times\ evidence\ is\ seized\ from\ a\ stop/\ \#\ of\ times\ a\ stop\ occurs^{13}$$

A weighted disparity test would compare the rate at which a specific demographic is subjugated to officer action to the percentage of that demographic in the overall population. When conducting a population-weighted disparity analysis, results consistently show a disparity in NOPD action that targets black people anywhere from 4-13 times more than white people depending on the report. NOPD statisticians also use a different definition of a "hit" than the leading studies. NOPD defines a hit as an arrest, as opposed to evidence seized. NOPD also uses a different denominator to determine the hit rate. Instead of the total number of stops, NOPD uses the total number of times an "officer action is taken" (ex. patdown, vehicle exit or UOF) as the denominator. See Equation 2 below.

$$hit\ rate\ (NOPD)\ =\ \#\ of\ arrests\ made\ after\ officer\ action/\ \#\ of\ times\ officer\ action\ occurs$$

[14]

---

[12] David Abrams, Hanming Fang, and Priyanka Goonetilleke. *Do Cops Know Who to Stop? Assessing Optimizing Models of Police Behavior with a Natural Experiment.* NBER Working Paper No. 31594. Cambridge, MA: National Bureau of Economic Research, August 2023. http://www.nber.org/papers/w31594.
David S. Abrams, Hanming Fang, and Priyanka Goonetilleke. "Police Frisks." *All Faculty Scholarship* 2816 (2022). https://doi.org/10.1257/pandp.20221100.
Persico, Nicola, and Petra Todd. *Using Hit Rate Tests to Test for Racial Bias in Law Enforcement: Vehicle Searches in Wichita.* Working Paper no. 10947. Cambridge, MA: National Bureau of Economic Research, December 2004. http://www.nber.org/papers/w10947

[13] Equation 1: Standard formula used to conduct a Hit Rate Analysis
[14] Equation 2: NOPD's formula to conduct a hit rate analysis

NOPD's report does not clarify if it is possible to be arrested without the presence of physical evidence. Conversely, it is also not clear if evidence can be seized from a suspect when no arrest is made. It is possible that these scenarios can be influenced by race or other marginalized identity. If that is the case, the disparity would not be captured by NOPD's test. Without a separate analysis on how changing the definition of a "hit" and the mathematical equation for a "hit rate" from standard statistical practice affects results, it is misleading to determine the absence of bias based on a hit rate analysis. Additionally, NOPD uses use-of-force instead of a stop or search as the denominator in their hit rate equation, implying that an arrest always justifies use of force. Our critique of the hit rate analysis is shared by Nicole Napolitano from the Center for Policing Equity.[15]

The accuracy of a standard hit rate analysis is a topic of debate amongst researchers with many pointing to the "omitted variables problem" and "infra-marginality problem." NOPD's hit rate analysis suffers from these two statistical errors while distracting the public from the population weighted disparities. A population weighted disparity test assesses the rate a specific demographic is subjugated to officer action compared to the prevalence of that demographic in the population. When conducting a population weighted disparity analysis, results consistently show NOPD targets black people anywhere from 4-13 times more than white people depending on the specific types of action (See Table 2). The more violent actions like gun pointing represent the highest disparities for Black people at a rate of thirteen times that of white people. By comparison, handcuffing and vehicle exits are less violent and are five and four times as likely to happen to black people than white people.

| 2022 NOPD Officer Total Actions Taken after a Stop by Subject Race | | | | | |
|---|---|---|---|---|---|
| | Pat down | Vehicle Exit | Use of Force | Gun Pointing | Handcuffing |
| Black | 1358 | 672 | 438 | 234 | 3933 |
| White | 250 | 171 | 65 | 18 | 799 |

---

[15] Michelle Liu, "New Orleans police say their use of force data shows no racial disparities. We checked the numbers," *WWNO,* November 1, 2024 https://www.wwno.org/2024-11-01/new-orleans-police-say-their-use-of-force-data-shows-no-racial-disparities-we-checked-the-numbers

| Total Population | 1664 | 850 | 515 | 256 | 4818 |
|---|---|---|---|---|---|
| *2022 NOPD Officer Rate of Actions Taken after a Stop by Subject Race* | | | | | |
| Black | 82% | 79% | 85% | 91% | 82% |
| White | 15% | 20% | 13% | 7% | 17% |

Table 2: 2022 NOPD Officer Actions Taken After a Stop by Subject Race[16]

**Veil-of-Darkness Analysis**

At the June 5, 2024 Consent Decree Hearing we heard members of the federal monitoring team and NOPD address the disproportionately-high percentage of traffic stops involving Black motorists by the NOPD. Using a definition of bias in which large racial disparities do not constitute sufficient evidence of bias, they suggested that the use of the so-called "veil of darkness" (VOD) method would be a better way to determine whether this disparity was caused by anti-Black bias.

First, it should be noted that the veil-of-darkness method still only detects disproportionality by race, in this case between minority drivers stopped by police during the day and during the night, with the presumption that racial profiling would be more difficult after dark due to low visibility. VOD does not directly measure either implicit or explicit bias, so at best it is a different way of gauging disparity based on race, one that the presenters argued was preferable to the simple population weighted disparity evident in the NOPD's traffic stop data that showed disproportionate stops of Black motorists. Notably, prominent researchers in the field do not share confidence in the VOD method, observing that vehicle profiling can be used as a proxy for race,[17] and that when street lighting is taken into effect to refine the definition of "darkness," discrepancies between daytime and nighttime traffic stops may become more distinct, showing bias where little or none may have been previously detected.[18]

---

[16] New Orleans Police Department, "2022 Stop and Search Annual Report," accessed October 15, 2024
[17] Taniguchi, T. A., Hendrix, J. A., Levin-Rector, A., Aagaard, B. P., Strom, K. J., & Zimmer, S. A. (2017). "Extending the veil of darkness approach: An Examination of Racial Disproportionality in Traffic Stops in Durham, NC." *Police Quarterly* 20 no. 4 (2017): 420–448.
[18] Horrace, W. C., & Rohlin, S. M., "How dark is dark? Bright Lights, Big City, Racial Profiling." *Review of Economics and Statistics* 98 no. 2 (2016): 226–232.

Indeed, a 2021 analysis of VOD methods performed by Stacey and Bonner suggests that when sample-restricted VOD models like those presented to the court are performed on data for a medium-sized city like New Orleans, VOD modeling can actually reverse day/night disproportionalities detected by other VOD models.[19] They further suggest that an annual sample size of less than 1,800 traffic stops would be likely to produce dubious results. For reference, the annual data samples used for the NOPD veil-of-darkness analysis were for 1000 stops in 2022 and 900 stops in 2023, falling quite short of the minimum sample size suggested.[20] Crucially, Stacey and Bonner caution that a finding of no disperity in VOD analyses could be due to a "lack of power" in the model where sample sizes are as small as those used for the NOPD's analysis. Essentially, the finding of "no bias" could be an artifact of statistical methods rather than real-world evidence, and could actually make very real findings of racial bias completely disappear in the statistics.

Stacey and Bonner further argue that researchers should be especially cautious when certain data constraints are used: when stops examined are 1.) confined to those between the end and beginning of "civil twilight," 2.) to just those stops before and after the onset of daylight savings time and 3.) when the analysis is performed on a "mid-sized city," like New Orleans. Sadly, the VOD analysis put before the court by the monitoring team and NOPD statisticians uses these parameters, suggesting that the results presented to this court could easily be an artifact of the methods used to restrict the data, insufficient sample size and a lack of power in the model. Using a less-restricted analysis of the same data could produce very different findings as Stacey and Bonner showed convincingly with a VOD analysis done three different ways on the same traffic stop data from the same police department. In fact, they warn that caution should be exercised in drawing any conclusions about bias from VOD models alone. We share this concern and beseech the court not to be swayed by statistical methods which remain unproven within the scholarly community.


## Conclusions

For all of the many problems with data collection and methods conveyed in our critique above, not to mention the conflicts-of-interest and integrity issues with the federal monitoring team, NOCOP and many of our community allies strongly refute the claim that the NOPD is ready for

---

[19] Michele Stacey and Heidi S. Bonner, "Veil of Darkness and Investigating Disproportionate Impact in Policing: When Researchers Disagree," *Police Quarterly* 24, no. 1 (2021): 55–73, https://doi.org/10.1177/1098611120932905.
[20] Federal Consent Decree Monitor, "City of New Orleans NOPD Bias-Free Policing Data Analyses and Audits, Public Hearing June 5, 2024," June 5, 2024, https://www.laed.uscourts.gov/sites/default/files/pdfs/6524_Additional_Materials.pdf.

sustainment. We felt it particularly important to challenge these questionable statistical practices because we have repeatedly witnessed representatives from the DOJ, the federal consent decree monitors and NOPD officials use these questionable findings to invalidate and dismiss the spoken concerns and experiences of community members in community feedback meetings on the consent decree.

Through years of deep engagement with the New Orleans community, NOCOP has listened to many valid concerns about police racism, the end of the consent decree and the lack of community oversight over local police. Our Spanish-speaking brothers and sisters have repeatedly conveyed experiences of NOPD-profiling and voiced fears about NOPD cooperation with ICE. Contrary to claims made to the court in the latest Bias Free Policing Report, we hear stories from immigrant communities of broken translation tablets and sexual harassment from NOPD officers. On the October 29th at Nora Navra Public Library meeting, head monitor Jonathan Aronie claimed that he is reviewing Louisiana's recent anti-immigration laws that could force NOPD to cooperate with ICE in violation of the consent decree. Until that review is complete and we can be sure that the civil rights of our immigrant community are not at risk we cannot move into sustainment. [21]

From attending numerous Police Community Advisory Board (PCAB) meetings across the city over multiple years, which were supposed to be the primary means for community engagement by the consent decree, we know them to have been set up for failure. They are underfunded, not independent of the NOPD, and according to the president of one PCAB who inquired with the NOPD about past recommendations submitted from PCABs, the NOPD has *never enacted any recommendations made by a PCAB*. Many of their meetings have also been held in police stations which are historically places of trauma for vulnerable community members. In this we see utter contempt for the concerns of community members and a "community engagement" process that is largely for show.

We have also witnessed troubling bias in the way that the NOPD has responded to our muslim community members and their allies as they have sought to exercise their first amendment rights. As veterans of peaceful protest in this city, it is fair to say that we at NOCOP  have rarely witnessed such efforts to politically repress the free speech of our community members as we have seen in relation to the muslim community and their allies in the past year. NOPD officers have attempted to stop large marches in their tracks, making up arbitrary rules about numbers of vehicles or floats permitted that are stated nowhere in the NOPD's first amendment policing policy and that we have never known to be an issue at previous marches, even at the height of the

---

[21] This claim is made in the video recording of the Public Consent Decree Feedback Meeting at the Nora Navra Library held on October 29, 2024 with the federal monitoring team at timestamp 1:23:14, "102924 NOPD Meeting Part 1," https://vimeo.com/1026135302/d347e46c14?ts=0&share=copy

Black Lives Matter movement. NOPD officers have claimed that marches and gatherings with an approved license from the city were unpermitted and would be forbidden just as such marches were about to take place, even when presented with physical copies of the stamped and approved permit. The same officers have likewise attempted to prevent or otherwise hinder these lawful, peaceful and approved free speech actions even after calling in to verify permits at the insistence of police negotiators from the community. We have also seen increasing NOPD cooperation with the Louisiana State Police, who are not constrained by the consent decree (but should be) to escalate violence against peaceful protestors with catastrophic results. Bias free policing should include religious minorities, immigrants, students, our poor and unhoused populations and those exercising their right to express political views not held by the mainstream or the officers on-site. The most recent bias free policing report falls woefully short in addressing any of these topics with seriousness.

Finally, we reiterate the need for independent peer review of the 2022-2023 Bias-Free Policing Report before any attempt to enter sustainment is approved by the court. We specifically suggest that scholars cited in this letter for their sound critiques of "veil-of-darkness" and "hit-rate" analyses would be well-suited to scrutinize the data and methods of the federal monitors and NOPD statisticians. Until NOPD officers are regularly being tested for implicit and explicit bias, both as a condition of employment and in relation to possible misconduct and use-of-force violations we cannot say that the NOPD is "bias-free." We humbly ask the court not to yield to political pressure or a false sense of urgency generated by the NOPD, the mayor or federal monitors to enter sustainment prematurely. The people of New Orleans deserve constitutional policing.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Jessica Wheeler < ███████████████████ > |
| **Sent:** | Friday, November 8, 2024 7:48 AM |
| **Subject:** | New Orleans Police Department Consent Decree |

CAUTION - EXTERNAL:

To whom it may concern:

My name is Jessica Wheeler, and as a resident, employee, and voter in Orleans Parish, I am calling on you to continue the consent decree for the New Orleans Police Department. Robust oversight of and accountability for our police force is necessary to protect our community's well-being. The data gathered by the consent decree allows us to hold the force accountable and recognize discriminatory trends in policing. The consent decree also protects the civil rights of our immigrant residents in Orleans Parish, which is critical in wake of state and forthcoming federal policies.

Sincerely,
Jessica Wheeler
████████████

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Melanie Talia < ███████████████ >
**Sent:** Friday, November 8, 2024 9:27 AM
**To:** clerk@laed.uscourts.gov <clerk@laed.uscourts.gov>
**Cc:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Comment on Motion to Enter Sustainment Period

Clerk of Court
U. S. District Court, EDLA
500 Poydras Street, Room C-151
New Orleans, LA 70130


The Honorable Judge Morgan,

The time has come for the New Orleans Police Department (NOPD) to stand tall and to stand on its own merit. The Federal Consent Decree was a necessary oversight willingly entered by the City of New Orleans to reform policing practices and policies 12 years ago. The progress made in Constitutional Policing in that time as well as increases in transparency by the NOPD have become a model for police departments across the country. The New Orleans Police and Justice Foundation (NOPJF) urges the Court to move the City of New Orleans, more specifically the New Orleans Police Department, into the Sustainment Period of the Federal Consent Decree. This is not an abrupt end to the Consent Decree but a path toward becoming a department that is no longer under the intensive supervision of federal monitors.

It is easy to point to the mountains of compliance data showing reductions in use of force or the incredible progress in bias-free policing, de-escalation, and crisis intervention training. The historic decreases in violent crime speak for themselves; however, the NOPJF offers a view of a future that a successful exit

of the Consent Decree may ultimately bring about:

1. **Restored Public Trust:** The NOPD can demonstrate its commitment to reform and rebuild trust within the community. This will undoubtedly lead to improved relationships between the police and the public, fostering further cooperation and support.

2. **Reduced Financial Burden:** Many of the financial burdens of staffing and oversight now totaling in the millions will be alleviated, thus enabling the department to allocate resources to other priorities focused on public safety.

3. **Increased Autonomy:** The department can regain more control over its operations, allowing for greater flexibility and innovation while still maintaining policies from the Consent Decree emphasizing transparency to the community.

4. **Recognition of Progress:** This achievement will boost the public perception of the department and enhance the department's standing both locally and nationally. Whereas the NOPD has trained other major metropolitan police departments, new opportunities for partnerships may be possible.

5. **Enhanced Officer Morale:** A Consent Decree can sometimes lead to low morale and job dissatisfaction. A successful exit may help to improve morale by demonstrating that the department's efforts to reform have been successful and that the department is moving forward in a positive direction.

6. **Improved Recruitment and Retention:** The department may become more attractive to potential recruits and may retain existing officers by demonstrating a commitment to professional standards and accountability.

7. **Increased Federal Funding Opportunities:** Departments under a Consent Decree may be ineligible for certain federal grants or funding programs. Successfully exiting the Decree may open new opportunities for funding that can be used to support community initiatives, officer training, and

other important programs.

8. **Positive Impact on Local Economy:** A City such as New Orleans that thrives on tourism may see an increase in visitors upon public understanding that the City has reached a significant accomplishment demonstrating the New Orleans Police Department's commitment to reform and progress.

9. **Positive Impact on Future Generations:** A successful exit from a Consent Decree can leave a lasting legacy for future generations. By demonstrating that reform is possible and that departments can overcome challenges, the department can inspire others to strive for excellence and accountability.

It is important to note that the sustainment period and eventual exit of the Consent Decree should not be seen as a complete end to reform efforts. The department has a plan to continue the progress it has made and enact, in every bureau and district, ongoing improvement to ensure that the positive changes implemented during the Decree are sustained. The NOPD is demonstrating their commitment, and we believe the future holds much for which to stand.

Behind Every Badge

*Melanie A. Talia*

Melanie A. Talia, J.D.
President & CEO
New Orleans Police and Justice Foundation

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Morgan Clevenger <█████████████████████>
**Sent:** Friday, November 8, 2024 1:10 PM
**To:** Nicholas L. Gernon <█████████████████>; Stephen Mosgrove <████████████████████>
**Cc:** Stella Cziment <████████████████████>; Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Working group/Committee to address Community Engagement/PCABs re: Sustainment Plan

Good afternoon,

As you know, I've been advocating for a working group/ committee to address the Community Engagement/PCAB's re: the current Sustainment Plan; currently a blank page.

What is the current status of this? I have heard rumors that a group has been or is being formed. The first step in Community Engagement is communication; timely, inclusive, and transparent.

Let's put a stop to rumors and include everyone in the loop.

Any working group/committee must include representatives of all PCAB's and the community.

Looking forward to your response and information.

Thank you!

==**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.==

**From:** Thorn Chen <​███████████████​>
**Sent:** Friday, November 8, 2024 4:35 PM
**To:** clerk@laed.uscourts.gov <clerk@laed.uscourts.gov>; Ashley Burns
<ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** no to sustainment on consent decree

Dear whom it may concern:

I am writing as a resident of New Orleans of six years urging the city NOT to phase out the
federal consent decree oversight period for the NOPD. The racial disparity of NOPD's
policing has not gone away: as of 2023, 90 percent of the NOPD's use of force cases were
against Black men. NOPD will have to do much more than they have so far to demonstrate a
reversal of the egregious decades long record of misconduct that led to the enactment of the
consent decree to begin with.


Best,
Hongwei Thorn Chen
Zip code 70130

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution
when opening attachments or clicking on links.

**From:** Becka McLaughlin <██████████████>
**Sent:** Friday, November 8, 2024 4:53 PM
**To:** clerk@laed.uscourts.gov <clerk@laed.uscourts.gov>; Ashley Burns
<ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** New Orleans needs the consent decree

Good afternoon,

I am writing to express my strong opposition as a resident of New Orleans to any
ending of the consent decree and oversight of the NOPD. I have lived in New Orleans
for 15 years and have never had a positive interaction with an NOPD officer. They
regularly drive recklessly for no reason (like slowly rolling towards pedestrians while
staring at their cell phones) and harass residents who are just going about their lives.
In addition to the extreme racial bias demonstrated by any analysis of arrests and
violent incidents, I have been present at many peaceful protests where the NOPD
instigated violence, even under the eye of the consent decree. I can't imagine how
racist, violent, and abusive they would be without it. I was on the bridge in July 2020
when they tear gassed us and sent people panicked running, if we hadn't kept each
other safe people would have been trampled or fallen over the side. I was at a student
protest of high schoolers uptown in 2020 when I saw NOPD officers speeding down
the sidewalk on motorcycles as children and their families jumped out of the way to
avoid being hit. And I witnessed NOPD officers pushing police horses into crowds of
protestors, knocking people over who were only saved from being trampled by horses
by other protestors, who were then violently arrested.

These are all incidents that I have personally witnessed, I know there are many many
more, and so many people with stories of being racially profiled and abused by the
NOPD. All of this occurs even with the Consent Decree. Clearly the reasons for the
consent decree remain. Please help keep us safe from these out of control officers.

-Rebecca McLaughlin
**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution
when opening attachments or clicking on links.

**From:** Samantha Hinds < ███████████████ >
**Sent:** Friday, November 8, 2024 5:37 PM
**To:** clerk@laed.uscourts.gov <clerk@laed.uscourts.gov>; Ashley Burns
<ABurns@consentdecreemonitor.onmicrosoft.com>
**Subject:** Extend the Consent Decree, No to Sustainement

I am writing to strongly urge against the New Orleans Police Department's exit from the
Consent decree monitor.

In 2023 alone, 90% of use of force cases were against Black men. In the last 3 years, we have
seen an increase in use of force against Black women by more than 54%. This is unacceptable
and demonstrates the fact that the NOPD should not be losing any oversight.

Given the long and violent history of misconduct from NOPD, we are not convinced or
confident that the department will be able to maintain compliance without federal oversight.

The Black citizens of New Orleans have suffered under the brutal violence of the NOPD for
far too long. The people of this city demand that the City of New Orleans and the Department
of Justice hold the NOPD accountable by extending the consent decree.

Samantha Hinds
███████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution
when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Kim Mosby < ███████████ > |
| **Sent:** | Friday, November 8, 2024 5:24 PM |
| **To:** | LAEDdb_Clerk; aburns@consentdecreemonitor.onmicrosoft.com |
| **Subject:** | Public comment on NOPD request to enter sustainment period |

CAUTION - EXTERNAL:


To whom it may concern:


As a Black mother & researcher in New Orleans, I am writing to express my concern about allowing NOPD to move into the Sustainment Period at this time. The data does not show that the issues have been resolved. There is still considerable bias & racial disparities in policing in New Orleans. There is a tremendous amount of missingness in the publicly available data that limits true transparency. The police department data is not reliable and cannot be considered accurate because of poor tracking & lack of consistency in how incidents are recorded.


Please do not allow NOPD to start the journey of ending oversight until change has actually occurred as proven by independent researchers not affiliated with NOPD.


Sincerely,
Kim Mosby, PhD




NOTICE: This message, including all attachments transmitted with it, is intended solely for the use of the Addressee(s) and may contain information that is PRIVILEGED, CONFIDENTIAL, and/or EXEMPT FROM DISCLOSURE under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein is STRICTLY PROHIBITED. If you received this communication in error, please destroy all copies of the message, whether in electronic or hard copy format, as well as attachments and immediately contact the sender by replying to this email or contact the sender at the telephone numbers listed above. Thank you!
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**LAEDdb_Clerk**

| | |
|---|---|
| **From:** | Lionel Bailey < ████████████████████ > |
| **Sent:** | Thursday, November 21, 2024 6:15 AM |
| **To:** | LAEDdb_Clerk; Ashley Burns; Charles Rice; governor@louisiana.gov; mayor@nola.gov; constituentservice@ag.louisiana.gov; Congressman Troy Carter; Harris, Sen. Jimmy (District Office); Helena N. Moreno; info@voiceoftheexperienced.org; info@promiseofjustice.org; info@innocenceproject.org; lesterlove@thecityoflove.com; SectionL; Simone Smith; jwilliams@theadvocate.com; poet.wolf@theadvocate.com; swind@coloradotech.edu |
| **Subject:** | NOFIPRJP CEO Public Comments |

**CAUTION - EXTERNAL:**

To Whom It May Concern:

Please find the attached opposition to the A.G. requests somewhat self explanatory.

With best regards, I am

Sincerely,
Lionel Bailey, NOFIPRJP CEO

https://docs.google.com/document/d/1_NdbkeYAlbQQZwPQKG_g2c-97IsZuk-T8pczfZW74tI/edit?usp=drivesdk

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

NOFIPRJP CEO Lionel Bailey opposes Attorney
General Liz Murrill calling on a federal judge to end the
12-year-old consent decree governing the New Orleans
Police Department, arguing that it has outlived its
purpose and is now harming the city's ability to address
public safety challenges.

NOFIPRJP opposes the parties agreeing that the city of
New Orleans has met its obligations under the current
consent decree because the new one imposes new
obligations and new costs with no sign of ending
anytime soon, NOFIPRJP CEO added , in a written
opposition  to U.S. Judge Susie Morgan  ,  NOFIPRJP
CEO opposes it being time to end NOPD's consent
decree once and for all, to take the handcuffs off of the
brave men and women who serve as officers in that
police department, and put them back on the criminals to
increase public safety for all residents because the
consent decree, implemented in 2012 following a
damning Department of Justice investigation, was
designed to reform systemic issues in the NOPD,
including unconstitutional use of force, discriminatory
practices, and inadequate oversight because
Murrill acknowledged the decree's initial necessity but
argues it has become a financial and operational
burden.

NOFIPRJP CEO concurs that over the last decade, the
monitoring fees and reform costs together are estimated
to have cost the city a jaw-dropping $150 million dollars,
NOFIPRJP agrees but NOFIPRJP adds that those
millions of dollars are the very funds NOPD has been
monitored and reformed with for over the last decade
was designed to reform systemic issues in the NOPD,
including unconstitutional use of force, and
discriminatory practices and NOFIPRJP opposes Murrill
acknowledging the decree's initial necessity but arguing
it has become a financial and operational burden
because:

1. The NOPD is grappling with its lowest officer numbers since the 1940s, with just 897 commissioned officers as of November.

2. Recruitment efforts have also dwindled; only 35 recruits have joined the force so far in 2024, compared to 88 in 2023 and 25 in 2022.

NOFIPRJP CEO opposes critics, including Gov. Jeff Landry, arguing the consent decree had exacerbated those challenges by deterring recruitment and retention.

NOFIPRJP CEO opposes the New Orleans Police Department being in shambles, because of a federal consent decree and a federal judge,  NOFIPRJP opposed .

NOFIPRJP CEO concurs that the staffing shortage has raised concerns about the department's ability to comply with the decree's mandates for constitutional and effective policing because
a federal monitor overseeing the decree highlighted issues with NOPD's response times to emergency calls, particularly for domestic violence and sexual assault cases.

NOFIPRJP further concurs that "If NOPD officers cannot consistently respond to calls for service in a timely manner, the NOPD has not  met this fundamental obligation," the NOFIPRJP CEO added.

NOFIPRJP also opposes Murrill also criticizing the financial impact of the decree's oversight, which she described as enriching out-of-state law firms at the city's expense because the Court-imposed Monitor... bills the City a whopping $115,000 per month on average, and to urged Morgan to terminate the consent decree or, at minimum, start the process for its conclusion will not  restore local control, NOFIPRJP CEO added.

NOFIPRJP CEO opposes Attorney General Liz Murril asking the Court to start the two-year clock now without

imposing any new injunctions beyond what the Consent Decree already requires because the NOFIPRJP CEO and Expert, Lionel Bailey opposed New Orleans police having to investigate two separate shootings that left 10 injured and 2 dead because The New Orleans Police Department was on the scene via appointment duty and should not be investigating two separate shootings that left at least 10 people injured and two people dead in the St. Roch area.

   According to police, the first shooting happened around 3:40 p.m. in the 1800 block of
Almonaster Avenue in the St. Roch area and New Orleans police Superintendent Anne Kirkpatrick should have been saying a car shot into a crowd, hitting and injuring nine people and the offender(s)was arrested and or transported to a local hospital.

 The New Orleans Formerly Incarcerated Prisoners Restorative Justice Program  ( NOFIPRJP) objected to the US DOJ and the CNO filing with the Court a Joint Motion To Enter Into The Sustainment Period For The Consent Decree  because according to the paragraph 491 of the Termination of the Agreement For The Consent Decree the CNO and the New Orleans Police Department had to endeavor reaching full and effective compliance within 4 years of April 18, 2024, NOFIPRJP CEO added.


References:

https://docs.google.com/document/d/1F864xxIV8CBRCg DVOa8XfWg_Hm1oKlYxvk9IsArqso4/edit?usp=drivesdk

https://docs.google.com/document/d/1Q92WiI3a-CPh00M7KhOiPJgK0xVKwmSoEhOAJAsPdGQ/edit?usp=drivesdk

https://www.thecentersquare.com/louisiana/article_a7cb 28e6-a780-11ef-abaa-f7f5ff10bda9.html

**From:** Lionel Bailey <███████████████████>
**Sent:** Thursday, November 21, 2024 6:48 PM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>; Charles Rice
<████████████████>; governor@louisiana.gov <governor@louisiana.gov>;
constituentservice@ag.louisiana.gov <constituentservice@ag.louisiana.gov>; Congressman Troy
Carter <LA02.Outreach@mail.house.gov>; Harris, Sen. Jimmy (District Office) <Harrisj@legis.la.gov>;
Helena N. Moreno <helena.moreno@nola.gov>; mayor@nola.gov <mayor@nola.gov>;
info@voiceoftheexperienced.org <info@voiceoftheexperienced.org>; info@promiseofjustice.org
<info@promiseofjustice.org>; info@innocenceproject.org <info@innocenceproject.org>;
lesterlove@thecityoflove.com <lesterlove@thecityoflove.com>; Simone Smith
<ssmith@orleansda.com>; jwilliams@theadvocate.com <jwilliams@theadvocate.com>;
poet.wolf@theadvocate.com <poet.wolf@theadvocate.com>
**Subject:** NOFIPRJP CEO

To Whom It May Concern:

Please find the attached agreement of the NOFIPRJP CEO hereto somewhat self explanatory.

With best regards, I am

Sincerely Yours,
Lionel Bailey, Expert

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

NOFIPRJP CEO concurs with NOPD knowing who they were and NOPD Superintendent saying suspect arrested, 2 others sought in fatal French Quarter shooting because the shooting occurred at the intersection of Iberville and Royal streets on Thursday afternoon.

NOFIPRJP CEO opposes the New Orleans Police Department was investigating a fatal shooting involving 4 victims in the French Quarter on Thursday because Serpas said in such scenarios, people will always outnumber police and it was why he believes the use of technology such as drones could help officers not only read the crowd but also react to it.

NOFIPRJP CEO concurs that it is about intelligence gathering. NOPD used mounted officers for the same reason. That was a very old intelligence device. NOPD sat on top of a horse, which he did, and now could see the crowd. NOPD could see how it was moving. NOPD could see what was going on behind rows of people, the NOFIPRJP CEO agreed. Imagine a scenario where NOPD had 2 or 3 drones that could keep track of the French Quarter from a high level. NOPD could look from a distance, and NOPD could see the bigger picture, which is really the essence of that kind of technology.

NOFIPRJP CEO says with all the technology and all the manpower, it would not be very difficult to stop what was called a motivated offender and deter other potential offenders.

References:

https://www.fox8live.com/2024/11/19/securing-second-lines-large-parades-is-full-challenges-former-nopd-chief-says/

https://www.wwltv.com/article/news/crime/four-shot-one-dead-in-french-quarter-shooting-nopd-says/289-58f74ce0-b92b-4a9c-b2ae-1bc6522d9e92

**From:** Mary Howell <███████████████████>
**Sent:** Thursday, November 28, 2024 11:45:02 PM
**To:** LAEDdb_Clerk <clerk@laed.uscourts.gov>
**Cc:** aburns@consentdecreemonitor.onmicrosoft.com <aburns@consentdecreemonitor.onmicrosoft.com>; Jonathan Aronie <████████████████████>; Donesia Turner <████████████████>; ddavillier <████████████████████>; Geissler, Jonas (CRT) <████████████████>; Riaz, Mehveen (CRT) <████████████████>; Gordon, Arusha (CRT) <████████████████>; David Douglas <████████████████>
**Subject:** Re: USA v City of New Orleans, Docket No. 2:12-CV-01924. Public Comment: Addendum

**CAUTION - EXTERNAL:**

The enclosed documents are submitted to the Court as Supplements to previous public comment and exhibits filed on Nov. 7, 2024 by the undersigned regarding the current status of the New Orleans Police Department's (NOPD's) compliance with Section IX of the Consent Decree, Policing Free of Gender Bias, specifically as it relates to Subsection A, Sexual Assault.

The primary Author of these Comments is a Ph.D. student and survivor of sexual violence who studies how sexual assault cases move through the criminal legal system and has been researching NOPD's handling of sex crimes for over five years. Due to privacy concerns as a survivor, the Author requests that her name not be publicly disclosed at this time. Mary Howell, a local civil rights attorney who has been actively engaged for over 47 years in multiple civil rights lawsuits and community efforts to reform NOPD's policies and practices, has assisted the author in preparing, reviewing and filing these comments with the Court and supports the findings and recommendations presented in this document.

On April 3, 2023, and November 7, 2024, the researcher and Ms. Howell (the Commentators) filed public comments with the Court expressing serious concerns regarding the status of NOPD's policies and practices in the investigation and handling of sex crimes. The enclosed documents are intended as an Addendum to the November 7, 2024 document and exhibits, with the intent of summarizing and prioritizing our prior Recommendations related to the Sustainment Plan, Consent Decree Section IX. Policing Free of Gender Bias.

Enclosed are the following documents:

- One page document summarizing Recommended Corrective Actions related to Staffing and Caseloads, Investigations, Sexual Assault Kits, and Supervision and Training
- One page document summarizing Recommendations related to Public Reporting, Data and Transparency

• Spreadsheet document summarizing all Recommendations, prioritizing them, incorporating related Consent Decree citations, and including a Source reference to our original November 7, 2024 Public Comment and Exhibits.

Thank you for your consideration of these comments. Please advise if any additional information is needed. We are available to meet with the Court and any interested parties to further discuss the issues raised in these documents.

Sincerely,

Mary E. Howell
Attorney at Law
316 S Dorgenois St.
New Orleans, La. 70119
504 822 4455 (o)
504 822 4458 (fax)

On Thu, Nov 7, 2024 at 6:12 PM Mary Howell < > wrote:
Please file the attached document with the Court for consideration as Public Comment regarding the Joint Motion to Begin Sustainment Period and Approve Sustainment Plan filed in the captioned case.
Please advise if any additional information is needed.
Thank you.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

CONCERNS REGARDING THE NOPD CONSENT DECREE:

# IX. Policing Free of Gender Bias

Overview of Public Comment Submitted November 7, 2024

## STAFFING, INVESTIGATIONS, SEXUAL ASSAULT KITS, SUPERVISION & TRAINING

## Overview

It has been over a decade since the federal Consent Decree began, and NOPD has made significant progress with specific reforms related to *Section IX. Policing Free of Gender Bias.*[4]

Our recent analysis of public data revealed *outstanding issues related to Sexual Assault* that must be addressed and resolved by the City and NOPD while under the Court's supervision.



**74**[1]

*CASELOAD PER SVD DETECTIVE*
Recommended is 26-40



**6.75%**[2]

*NOPD RAPE CLEARANCE RATE IN 2023*
Average of agencies in areas over 100k = 35%



**1 in 4**[3]

*SVD CASES AUDITED*
by the CD Monitoring Team were in need of further investigation or documentation, which the Monitoring Team called a *"troubling rate of noncompliance."*

1 *Current caseload per Detective = 74, from meeting with NOPD (2024, October 19). The Sexual Violence Response Advisory Committee (SVRAC) reported 89 cases per Detective in 2022: https://nola.gov/health department/domestic violence and sexual assault program/reports/*

2 *2023 FBI Return A Master File, Offenses Known and to Law Enforcement (Downloaded 2024). Crime Data Explorer: https://cde.ucr.cjis.gov/*

3 *Second Amended and Restated Consent Decree (2024, April 18). p. 60.*

4 *Consent Decree Monitor Special Report on NOPD Sexual Assault Investigations (2023, July 7). p.12, consentdecreemonitor.com*

5 *Parties' Joint Motion for Approval of Sustainment Plan (2024, September 27).*

6 *Contrera, Jessica, Jenn Abelson and John Harden. (2024, August 21). Washington Post Abused by the Badge Series.*

## BACKGROUND 

The issues highlighted in the July 7, 2023 Consent Decree Monitoring Team's Special Report[3]—*large and unsustainable caseloads* for Special Victims Division (SVD) detectives, one-quarter of audited cases *missing documentation or follow-up investigatory steps*, and precipitous *declines in SVD's clearance rates*—have been flagged as ongoing and urgent issues for many years.

These areas of concern are not minor; in fact, they are of central importance to the Consent Decree's requirement that NOPD "respond to and investigate reports of Sexual Assault and Domestic Violence *professionally, effectively, and in a manner free of gender-based bias."*[4] However, the Sustainment Plan does not currently include a Corrective Actions Plan to address *caseloads and investigations*.

Below are our *Recommendations for the Sustainment Plan,*[5] which also include timely Sexual Assault Kit (SAK) processing and follow up, and additional review of Supervision and Training in light of NOPD officers who have committed child sexual abuse in recent years.[6]

## RECOMMENDATIONS 

 **Staffing & Caseloads**

NOPD to submit a *SVD Staffing and Caseload Challenges Report* including an evaluation of staffing and Detective caseloads over time. NOPD to engage with an outside expert/consultant to craft a *Staffing & Caseloads Action Plan* incorporating best practices related to burden reduction and efficiency, and creative solutions to reduce Detective caseloads. *Timeline:* Reduce caseload to 40/detective within *2 years*, provide future plan to reduce to 26/detective.

 **Investigations**

NOPD is to engage an outside expert/consultant to conduct a *Landscape Analysis of SVD Investigations for all open cases (including cold cases)* to include Recommendations. Results may necessitate additional *Corrective Actions*.

 **Sexual Assault Kits (SAKs)**

NOPD to commission a *Sexual Assault Kit (SAK) Status Report* for all open cases (including cold cases), an *Action Plan to Address CODIS Hits* from backlogged SAKs, and necessary resources including outside assistance as needed to supplement inadequate staffing and review all open cold cases. City to provide a *SAK Testing Plan and dedicated funding,* to maintain timely testing of SAKs until the NOPD Crime Lab is fully accredited to process SAKs.

 **Supervision and Training**

NOPD's *Serious Disciplinary Action Review Board* to review the Rodney Vicknair case and make *Policy, Training, and Supervision Recommendations* regarding officer sexual abuse and/or grooming, and officer bystander intervention.

CONCERNS REGARDING THE NOPD CONSENT DECREE:

# IX. Policing Free of Gender Bias

Overview of Public Comment Submitted November 7, 2024

PUBLIC REPORTING: DATA & TRANSPARENCY

## Overview

It has been over a decade since the federal Consent Decree began, and NOPD has made significant progress with specific reforms related to *Section IX. Policing Free of Gender Bias.*[4]

Our recent analysis of public data revealed **outstanding issues related to Sexual Assault** that must be addressed and resolved by the City and NOPD while under the Court's supervision.



**418**[1]
*NUMBER OF RAPES UNDER-REPORTED* by NOPD in 2021 and 2022 (to State & FBI)



**$1M**[2]
*APPROXIMATE FUNDS LOST TO ORLEANS CRIME VICTIMS FOR FY23 AND FY24* due to missing NOPD crime data impacting federal funding.



**66%**[3]
*OF SEX CRIMES WERE MISSING CHARGE CODES IN PUBLIC DATA* 2023 Electronic Police Report Public Data

1  *NOPD Addresses Data Reporting Error Regarding Special Victims Section Statistics for 2021, 2022: (2024, April 2). https://nopdnews.com/post/april 2024/nopd addresses data reporting error regarding spec/*

2  *Special Report of the Consent Decree Monitor Regarding Deprioritizing Calls for Service and its Impact on "Gone on Arrival" Dispositions and "Code 2" Response Times (2023, October 27). p.12, consentdecreemonitor.com*

3  *NOPD Public Electronic Police Report Data (2023): data.nola.gov*

4  *Second Amended and Restated Consent Decree (2024, April 18). p. 60.*

5  *Myers, Ben (2024, October 29) New Orleans Crime Victims Are Losing Funding, Here's Why. https://www.nola.com/news/politics/new orleans nonprofits federal grants crime victims/article_4fd4eb3a 92e6 11ef a2e9 cf0e31ec2e38.html*

## BACKGROUND

Recent events have highlighted gaps in NOPD's data accuracy and transparency. On April 2, 2024,[1] NOPD publicly acknowledged the **under-reporting of over 400 rapes to the FBI** over a two-year period.

FBI data is not only used for tracking crime trends, but also for allocating funding. Another recent report revealed that because **NOPD had not yet upgraded to the FBI's current reporting system (NIBRS)**, one year of their crime numbers (2021) was omitted in state-level funding calculations, leading to **a devastating loss in funding for New Orleans area organizations supporting survivors of violence.**[5]

Sex crimes are unique in their complexity due to the number of state charges they encompass, so it is **critical that data is collected and shared clearly and in sufficient detail.** Improved data accuracy and transparency has the potential to increase NOPD accountability, reveal patterns across incidents, and improve outcomes for victim-survivors.

## RECOMMENDATIONS

**5** **Timeline for NOPD LIBRS/NIBRS Compliance**
NOPD to achieve state validation, including full LIBRS/NIBRS compliance, and to **report crime data successfully to the FBI within one year and six months of effective date.** While the Sustainment Plan addresses FBI reporting, it does not include sufficient detail to address the lengthy validation process required for full LIBRS/NIBRS reporting compliance.

**6** **Policy for FBI Classification and Clearance Procedures**
NOPD to develop an updated **SVD policy, outlining proper FBI classification and clearance procedures**, guided by best practices. The 2021-22 reporting errors necessitate not only an updated records management system and FBI reporting compliance by NOPD (both included in the Sustainment Plan) but also an **updated SVD policy** to ensure NOPD has **proper training in place regarding best practices** for data reporting long-term.

**7** **Robust Public Data Reporting & Transparency**
NOPD Quarterly Sexual Assault and Domestic Violence Reports should **expand to include information on SVD caseloads and staffing, response times and Gone on Arrival (GOA) statistics, case disposition information, and Sexual Assault Kit (SAK) statistics**, all stratified by signal type and/or state charge code. Such information will also help NOPD to track trends and target areas for improvement.

**8** **Data Sharing and Coordination**
NOPD should **enter into agreements to share summary and incident level data** with Sexual Violence Response Advisory Committee, DA's office, the Office of Criminal Justice Coordination and other necessary parties, to **track trends and case outcomes across the criminal legal system.**

**Public Comment Regarding NOPD's Compliance with Section IX. Policing Free of Gender Bias, Submitted November 28, 2024**

Specific Recommendations for Corrective Actions to be Incorporated into the Sustainment Plan: Addendum to Previously Submitted Public Comment dated November 7, 2024

*Included is a **Priority** for each Recommendation submitted in our 11/7/24 Public Comment (refer to **Section** for location in original document). Refer to **CD No**. for related Consent Decree paragraph/citation.*

| Priority | Sustainment Plan | Recommendation | Recommendation Details | CD No. | Consent Decree Reference | Section |
|---|---|---|---|---|---|---|
| 1A | Staffing and Caseloads | SVD Staffing and Caseload Challenges Report and Action Plan | NOPD to submit a Staffing and Caseload Challenges Report and Action Plan for SVD, including an evaluation of staffing counts and caseloads over time (since 2020), current situation and goals, factors influencing Detective attrition, hiring, and internal transfers, feasibility review of SVRAC recommendations such as incentive pay, addressing Detective secondary trauma and burnout, and a timeline for meeting established caseload/staffing benchmarks. NOPD to engage with an outside expert/consultant to review, recommend and assist with implementation of best practices related to burden reduction and efficiency, and creative solutions to reduce Detective caseloads (short-term and long-term). Recommendations are to address strategies for maintaining reasonable caseloads in the midst of persistent hiring/retention challenges, increasing incident reports and cold case backlogs, including but not limited to considering cross-training district-level detectives to assist with SVD caseloads. This report is to be released to the Court, the parties, the City Council, the Monitoring Team and the Public. | IX. POLICING FREE OF GENDER BIAS Introduction | **Introduction.** NOPD agrees to respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias, in accordance with the rights secured or protected by the Constitution and laws of the United States. | d. 2. |
| 1B | Staffing and Caseloads | SVD Caseload Reduction Target and Timeline | NOPD to reduce caseload to 40 per Detective (within two years of the effective date), with a future plan and timeline to reduce caseload to the recommended 26 per detective. | IX. POLICING FREE OF GENDER BIAS Introduction | **Introduction.** NOPD agrees to respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias, in accordance with the rights secured or protected by the Constitution and laws of the United States. | d. 3. |
| 1C | Staffing and Caseloads | Quarterly and Annual Public Reports on all SVD Incidents: Include Additional Information on Caseload/Staffing | Quarterly Reports on Sex Crimes and Domestic Violence, issued by NOPD Analytics, to include current staffing levels for SVD (by unit), including Detectives, Sergeants, Civilian Investigators, Technicians and other employees, as well as current caseload for Detectives, and for Civilian Investigators. | 429 | **429.** NOPD shall collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to NOPD decision making and activities, as permitted by law. | d. 1. |

**Public Comment Regarding NOPD's Compliance with Section IX. Policing Free of Gender Bias, Submitted November 28, 2024**

Specific Recommendations for Corrective Actions to be Incorporated into the Sustainment Plan: Addendum to Previously Submitted Public Comment dated November 7, 2024

*Included is a **Priority** for each Recommendation submitted in our 11/7/24 Public Comment (refer to **Section** for location in original document). Refer to **CD No**. for related Consent Decree paragraph/citation.*

| | | | | | |
|---|---|---|---|---|---|
| 2 | Investigations | Engage an outside qualified reviewer to conduct Landscape Analysis of SVD Investigations | Scope of work will include the following: Review all open cases, including cold cases, and a sample of cleared cases, to determine whether all unsolved cases have been fully investigated and all leads exhausted. If investigations are found lacking, identify what needs to be done to complete investigations, including any outstanding investigatory steps. Speak with advocates and victim-survivors regarding their interactions with NOPD and to confirm information in police reports is accurate and reflects victim-survivor experiences. Provide recommendations to improve case clearance and reduce case attrition, including but not limited to additional in-person training for investigators focused on best practices for investigations, clearance, and understanding false reporting (with additional recommendations for training to address issues identified in the review). Include recommendations for bringing in outside assistance to complete investigations as needed to reduce and eventually eliminate the backlog of cold cases. Results of this analysis are to be released to the Court, the parties, the City Council, the Monitoring Team and the Public. | IX. POLICING FREE OF GENDER BIAS Introduction | **Introduction.** NOPD agrees to respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias, in accordance with the rights secured or protected by the Constitution and laws of the United States. | f. |
| 3A | Sexual Assault Kits | NOPD Sexual Assault Kit (SAK) Status Report | NOPD Sexual Assault Kit Status Report: for all open cases (including cold cases), with NOPD Item Number, date of collection, date NOPD received the kit, date NOPD sent it to a forensic testing facility, lab name, date of testing, and CODIS hit status. NOPD follow up actions on CODIS hits to also be tracked with dates of action. NOPD to also provide an explanation for any SAKs not transmitted to a lab within the state-required period of time. Public incident level data to be updated regularly (weekly or monthly), while summary reports to be released quarterly and be incorporated into NOPD's existing Quarterly Reports on Sex Crimes. This information is to be released to the Court, the parties, the City Council, the Monitoring Team and the Public. | 209, 429 | **209.** NOPD agrees to track sexual assault evidence collected and whether it was submitted to a crime lab for testing. Where sexual assault evidence is not submitted, NOPD agrees to record the justification for this decision in an electronic database that includes date collected and all dispositions. **429.** NOPD shall collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to NOPD decision making and activities, as permitted by law. | e. 1. |
| 3B | Sexual Assault Kits | NOPD Action Plan to Address CODIS Hits from Backlogged Sexual Assault Kits (SAKs) | NOPD Action Plan to Address CODIS Hits from Backlogged SAKs: including the number of CODIS hits returned, grouped by incident year, and a detailed plan and timeline to ensure equitable and thorough investigatory follow-up for all victim-survivors. This plan must also include a trauma-informed plan to notify victim-survivors of CODIS hits, with advocate input. This information to be released to the Court, the parties, the City Council, the Monitoring Team and the Public. | 201 | **201.** Special Victims Section supervisors shall provide direct supervision of their subordinates by: g) following up all investigative leads generated from CODIS hits developed as a result of testing of the evidence in the case. | e. 2. |

**Public Comment Regarding NOPD's Compliance with Section IX. Policing Free of Gender Bias, Submitted November 28, 2024**

Specific Recommendations for Corrective Actions to be Incorporated into the Sustainment Plan: Addendum to Previously Submitted Public Comment dated November 7, 2024

*Included is a **Priority** for each Recommendation submitted in our 11/7/24 Public Comment (refer to **Section** for location in original document). Refer to **CD No**. for related Consent Decree paragraph/citation.*

| | | | | | | |
|---|---|---|---|---|---|---|
| 3C | Sexual Assault Kits | Sexual Assault Kit (SAK) Testing Plan | The City to provide a SAK Testing Plan including: the number of SAKs the LSP Crime Lab is accepting per week, a detailed timeline clarifying when the NOPD Crime Lab will be able to test SAKs in the future (including weekly capacity), an interim testing plan for all SAKs to be tested in a timely manner, and dedicated funding to ensure testing can be completed at a private lab (and additional needs including but not limited to funding for lab technicians to testify) are also funded long-term. This information to be released to the Court, the parties, the City Council, the Monitoring Team and the Public. | 201 | **201.** Special Victims Section supervisors shall provide direct supervision of their subordinates by: g) following up all investigative leads generated from CODIS hits developed as a result of testing of the evidence in the case. | e. 3. |
| 4A | Supervision and Training | Serious Disciplinary Action Review with Policy, Training and Supervision Recommendations | NOPD's Serious Disciplinary Action Review Board to review Vicknair case and make policy recommendations to address training officers to recognize signs of grooming and sexual abuse. | 417 | **417.** In addition to determining whether the officer committed the alleged misconduct, administrative investigations shall assess and document whether: (a) the police action was in compliance with training and legal standards; (b) the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures; and (d) the incident suggests that NOPD should revise its policies, strategies, tactics, or training. This information shall be shared with the relevant commander(s) who shall document the commander's disagreement or agreement with these findings, refer any recommendations to the appropriate individual to implement the recommended change, document the implementation of these recommendations, and return the documentation to PIB. | g. 1. |
| 4B | Supervision and Training | Screening, Hiring, and Supervision Procedures | NOPD to draft Report on lessons learned regarding Screening, Hiring and Supervision Procedures as it relates to the Vicknair case. This information to be released to the Court, the parties, the City Council, the Monitoring Team and the Public. | 417 | **417.** In addition to determining whether the officer committed the alleged misconduct, administrative investigations shall assess and document whether: (a) the police action was in compliance with training and legal standards; (b) the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures; and (d) the incident suggests that NOPD should revise its policies, strategies, tactics, or training. This information shall be shared with the relevant commander(s) who shall document the commander's disagreement or agreement with these findings, refer any recommendations to the appropriate individual to implement the recommended change, document the implementation of these recommendations, and return the documentation to PIB. | g. 2. |

**Public Comment Regarding NOPD's Compliance with Section IX. Policing Free of Gender Bias, Submitted November 28, 2024**

Specific Recommendations for Corrective Actions to be Incorporated into the Sustainment Plan: Addendum to Previously Submitted Public Comment dated November 7, 2024

*Included is a **Priority** for each Recommendation submitted in our 11/7/24 Public Comment (refer to **Section** for location in original document). Refer to **CD No**. for related Consent Decree paragraph/citation.*

| | | | | | | |
|---|---|---|---|---|---|---|
| 5 | Public Reporting | Timeline for NOPD LIBRS/NIBRS Compliance | NOPD to achieve state validation (full LIBRS/NIBRS compliance) and *accurately* report crime data to the FBI (within one year and six months of effective date). | 195 & 203 | **195.** NOPD agrees to develop and implement clear policies and procedures governing its response to reports of sexual assault. NOPD agrees to ensure its policies and procedures on sexual assault comply with applicable law and comport with best practices and current professional standards. **203.** NOPD agrees to incorporate IACP recommendations for VAW Law Enforcement Best Practices into its training, and update procedural requirements annually, to reflect changes in policy and law and developments in research and best practice. | a. 1. |
| 6 | Public Reporting | Policy for FBI Classification and Clearance Procedures | NOPD to develop an updated SVD policy, outlining proper FBI classification/clearance procedures, guided by best practices. | IX. POLICING FREE OF GENDER BIAS Introduction, 195 & 203 | **Introduction.** NOPD agrees to appropriately classify and investigate reports of sexual assault and domestic violence. **195.** NOPD agrees to develop and implement clear policies and procedures governing its response to reports of sexual assault. NOPD agrees to ensure its policies and procedures on sexual assault comply with applicable law and comport with best practices and current professional standards. **203.** NOPD agrees to incorporate IACP recommendations for VAW Law Enforcement Best Practices into its training, and update procedural requirements annually, to reflect changes in policy and law and developments in research and best practice. | a. 2. |
| 7 | Public Reporting | Robust Public Data Reporting and Transparency | NOPD to provide an Annual SA and DV Case Disposition Report: a. Evaluate how SA and DV cases progress through the entire CJ system, from *initial* reporting through *final* adjudication; Provide statistics for each type of case, using NOPD signal type, state charge code, and LIBRS/NIBRS code; This information is to be released to the Court, the parties, the City Council, the Monitoring Team and the Public. NOPD to assign analytics personnel to SVD to coordinate public reporting and other SVD data analysis and reporting needs. | 208 | **208.** NOPD agrees to separately track all reports of felony sexual assault, including drug-facilitated sexual assault, sexual assaults involving persons with disabilities rendering them unable to consent, sodomy, and male victims of sexual assault. NOPD agrees to collect data on the final disposition of sexual assault investigations, including whether an arrest was made and whether the DA charged the suspect or rejected the case and, if so, the reason for the rejection if the DA provides a reason. NOPD agrees to track this data in NOPD's CCMS. NOPD further agrees to make a reasonable effort to enter into a Memorandum of Understanding with the DA to track information related to the outcomes of domestic violence cases including whether the case was ultimately dismissed, resulted in a plea agreement, or tried, and the final outcome of the trial. | a. 3. |

**Public Comment Regarding NOPD's Compliance with Section IX. Policing Free of Gender Bias, Submitted November 28, 2024**
Specific Recommendations for Corrective Actions to be Incorporated into the Sustainment Plan: Addendum to Previously Submitted Public Comment dated November 7, 2024
*Included is a **Priority** for each Recommendation submitted in our 11/7/24 Public Comment (refer to **Section** for location in original document). Refer to **CD No.** for related Consent Decree paragraph/citation.*

| | | | | | | |
|---|---|---|---|---|---|---|
| 8 | Public Reporting | Data Sharing and Coordination | The City of New Orleans to coordinate with other criminal justice agencies, i.e. NOPD, DA, and Courts, to share data related to case disposition generally as well as for the completion of the Annual SA and DV Case Disposition Report. NOPD to enter into agreements (including but not limited to Memorandums of Understanding or MOUs) to share summary and incident level data with the DA's office, the Office of Criminal Justice Coordination, the Sexual Violence Response Advisory Committee, and any other necessary parties, to track trends and case outcomes across the criminal legal system on a regular basis. | 208 | **208.** NOPD agrees to separately track all reports of felony sexual assault, including drug-facilitated sexual assault, sexual assaults involving persons with disabilities rendering them unable to consent, sodomy, and male victims of sexual assault. NOPD agrees to collect data on the final disposition of sexual assault investigations, including whether an arrest was made and whether the DA charged the suspect or rejected the case and, if so, the reason for the rejection if the DA provides a reason. NOPD agrees to track this data in NOPD's CCMS. NOPD further agrees to make a reasonable effort to enter into a Memorandum of Understanding with the DA to track information related to the outcomes of domestic violence cases including whether the case was ultimately dismissed, resulted in a plea agreement, or tried, and the final outcome of the trial. | a. 3. |
| 9A | Maintenance of Existing Reforms | Quarterly and Annual Public Reports on all SVD Incidents: Maintain and Include Additional Information | NOPD to issue Quarterly and Annual Public Reports on SVD incidents including overall case counts, and summary data of case disposition information such as case status (open, closed, cold, etc.), FBI clearance counts and NOPD solve counts, unfounded cases, etc.  Summary data to be stratified by NOPD signal type, state charge code, and LIBRS/NIBRS classification.  Reports to include current staffing and caseload information, current response times for sexual assault and domestic violence 911 calls, and how many were designated Gone on Arrival (GOA). Quarterly reports are currently issued by NOPD Analytics, but do not include all the above information. | 429 | **429.** NOPD shall collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to NOPD decision making and activities, as permitted by law. | c. 2. |
| 9B | Maintenance of Existing Reforms | SVD Incident Level Public Data - Additional Detail and Accuracy | NOPD to provide accurate incident-level public data (in the Electronic Police Reports, and/or the future public data once the new RMS is implemented) for all SVD incidents, including state charge codes for each incident,  allowing researchers and other users of the public data to properly classify and count these crimes. Given that domestic violence may not always be identifiable by NOPD signal type or state charge code,  a DV column (Y/N) is to be added to the data. | 429 | NOPD shall collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to NOPD decision making and activities, as permitted by law. | c. 3. |
| 9C | Maintenance of Existing Reforms | NOPD Internal Audits of SVD - Improve Audit Process | NOPD's PSAB to conduct regular audits of SVD investigations: NOPD to work with expert members of the SVRAC and SART to implement a more comprehensive audit process, including speaking with victim-survivors and advocates, and marking incomplete tasks that could or should have been completed with an appropriate score, rather than "NA." | 429 | **429.** NOPD shall collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to NOPD decision making and activities, as permitted by law. | c. 4. |

**Public Comment Regarding NOPD's Compliance with Section IX. Policing Free of Gender Bias, Submitted November 28, 2024**

Specific Recommendations for Corrective Actions to be Incorporated into the Sustainment Plan: Addendum to Previously Submitted Public Comment dated November 7, 2024

*Included is a **Priority** for each Recommendation submitted in our 11/7/24 Public Comment (refer to **Section** for location in original document). Refer to **CD No**. for related Consent Decree paragraph/citation.*

| | | | | | | |
|---|---|---|---|---|---|---|
| 9D | Maintenance of Existing Reforms | SVD to Maintain SART and MDT Reviews | NOPD to maintain active participation in the SART and MDT reviews. | 210 & 211 | **210.** NOPD agrees to work with the DA, community service providers, and other stakeholders to develop and implement a SART and collaborative SART agreement within 180 days of the Effective Date, to provide a coordinated and victim-centered approach to sexual violence. NOPD agrees to comply with its obligations under the SART collaborative agreement. **211.** Within 365 days of the Effective Date, NOPD agrees to develop a mechanism to select and permit a committee of representatives from the community, including rape crisis advocates, service providers, and/or legal providers, to review, on a semi-annual basis: (1) sexual assault investigations disposed of as "unfounded;" (2) a random sample of open sexual assault investigations with the approval of the DA; and (3) after the first year of this Agreement, reported sexual assaults placed in a miscellaneous or non-criminal category. NOPD agrees to develop a protocol to ensure that feedback and recommendations from this committee are incorporated into policies, general training, remedial training for specific officers or detectives, and the decision to re-examine and open investigations, if warranted. This mechanism shall include appropriate safeguards to protect ongoing criminal or administrative investigations, confidential or privileged information, or personal information that is protected from disclosure by applicable laws. | c. 1. |
| 9E | Maintenance of Existing Reforms | SVD to Share Data with the Sexual Violence Response Advisory Committee for Analysis | NOPD to provide detailed case summary and disposition information to the Sexual Violence Response Advisory Committee (SVRAC) for their reports, including summary of cases by signal type/charge code, FBI clearance counts and NOPD solve rate counts, information on open cases such as the types and counts of cases that remain unsolved, and any additional information the SVRAC requests for its reports (including incident-level data), within the legal limits of information that can be shared by NOPD. SVRAC to meet monthly and issue reports annually to the Court, the parties, the City Council, the Monitoring Team and the Public. | 429 | **429.** NOPD shall collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to NOPD decision making and activities, as permitted by law. | c. 5. |

**From:** Lionel Bailey <████████████████████>
**Sent:** Tuesday, December 3, 2024 7:03 AM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>; Charles Rice <crice@ricegrpllc.com>; governor@louisiana.gov <governor@louisiana.gov>; constituentservice@ag.louisiana.gov <constituentservice@ag.louisiana.gov>; mayor@nola.gov <mayor@nola.gov>; Helena N. Moreno <helena.moreno@nola.gov>; Congressman Troy Carter <LA02.Outreach@mail.house.gov>; Harris, Sen. Jimmy (District Office) <Harrisj@legis.la.gov>; info@voiceoftheexperienced.org <info@voiceoftheexperienced.org>; info@promiseofjustice.org <info@promiseofjustice.org>; info@innocenceproject.org <info@innocenceproject.org>; SectionL <SectionL@criminalcourt.org>
**Subject:** Intelligent Crimestoppers of New Orleans

To Whom It May Concern:

Please find the attached opposition to the continuous violent crimes occurring in New Orleans without effective crime prevention techniques being employed. The NOPD response time is unacceptable because murderers are at large and the NOPD are without suspects. No-one should be allowed to come to New Orleans and feel that murder is free because we lack in Police. You are the officials with the intelligence to inform the officials on how to better protect our environment by all means. Mr. Ron Serpas, a former NOPD official gave you all a similar picture that I had given in my " fastest respond time " senario. Chicago is the best in responding to emergency situations because they utilize technology to their advantage.

With best regards, I am
Lionel Bailey, NOFIPRJP CEO

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

NOFIPRJP CEO Lionel Bailey opposes three being dead and eight being injured in 6 separate holiday weekend shootings across New Orleans because
New Orleans police should not be investigating several separate shootings that killed 3 people, including a 3 year-old boy.

The NOFIPRJP CEO concurs that in total, eleven victims were shot, 8  of which survived with injuries because Early Sunday morning, police were called to the heart of New Orleans' downtown hotels and shops.

NOFIPRJP CEO opposes when investigators got to the 700 block of Canal Street, they found 4 people suffering from gunshot wounds because Investigators shut down the busy block, as thousands of visitors for the holiday weekend maneuvered around crime scene tape but, had no throne surveillance in the French Quarter area to assist in the speedy apprehension of the violent offenders NOFIPRJP added.

NOFIPRJP CEO says that in at least 1 of 3 separate Canal Street shootings this weekend, if thrones were employed :

Earlier, around 7:30 p.m., detectives were called to the Marriott Hotel in the 500 block of Canal Street. A throne source could have told NOPD that a man stumbled into the lobby with a gunshot wound and that he was taken to the hospital by EMS.

Then, around 8:15 p.m., police were called to a shooting near the Ritz Carlton hotel in the 900 block of Canal Street. A throne source there would have found another man suffering a gunshot wound, and EMS taking him to treatment, the NOFIPRJP CEO added.

Around that same time, in New Orleans East, NOPD officers found a man shot in the 8900 block of Bunker Hill Road. A throne source a short time later, would have also captured a second victim showing up at the hospital for treatment, NOFIPRJP CEO added.

NOFIPRJP CEO opposes the first shooting of the weekend, a double homicide, happening around 4:30 Saturday afternoon in the West Lake Forest neighborhood because Officers found 2 men shot to death in the 6700 block of Tara Lane, near the Cypress Parc apartments and Police have not yet named suspects or announced arrests in any of the 6 shooting investigations. NOFIPRJP CEO has information that could help police, and NOFIPRJP CEO has reported NOFIPRJP tips anonymously through New Orleans Crimestoppers/ elected officials NOFIPRJP added.

NOFIPRJP CEO opposed the New Orleans Police Department  investigating a fatal shooting involving 4 victims in the French Quarter on Thursday because Serpas said in such scenarios, people will always outnumber police and it was why he believes the use of technology such as drones could help officers not only read the crowd but also react to it.

NOFIPRJP CEO concurred that it was about intelligence gathering. NOPD used mounted officers for the same reason. That was a very old intelligence device. NOPD sat on top of a horse, which he did, and now could see the crowd. NOPD could see how it was moving. NOPD could see what was going on behind rows of people, the NOFIPRJP CEO agreed. Imagine a scenario where NOPD had 2 or 3 drones that could keep track of the French Quarter from a high level. NOPD could look from a distance, and NOPD could see the bigger picture, which is really the essence of that kind of technology.

References:

https://docs.google.com/document/d/1LO2AFooQYBBH0eSQ3MNEn1S6g2fUcaNhEg-Rrq0jVC Q/edit?usp=drivesdk

https://www.fox8live.com/2024/12/01/3-dead-8-injured-six-separate-holiday-weekend-shootings-across-new-orleans/

**From:** Lionel Bailey <████████████████████>
**Sent:** Thursday, December 5, 2024 2:12 PM
**To:** Ashley Burns <ABurns@consentdecreemonitor.onmicrosoft.com>; Charles Rice <crice@ricegrpllc.com>; governor@louisiana.gov <governor@louisiana.gov>; constituentservice@ag.louisiana.gov <constituentservice@ag.louisiana.gov>; mayor@nola.gov <mayor@nola.gov>; Helena N. Moreno <helena.moreno@nola.gov>; Congressman Troy Carter <LA02.Outreach@mail.house.gov>; Harris, Sen. Jimmy (District Office) <Harrisj@legis.la.gov>; info@voiceoftheexperienced.org <info@voiceoftheexperienced.org>; info@promiseofjustice.org <info@promiseofjustice.org>; info@innocenceproject.org <info@innocenceproject.org>; SectionL <SectionL@criminalcourt.org>; lesterlove@thecityoflove.com <lesterlove@thecityoflove.com>
**Subject:** Throne Technology

To Whom It May Concern:

Please find the attached opposition related to the man that was killed in little woods yesterday afternoon somewhat self explanatory.

With best regards, I am

Just Another Citizen,

Lionel Bailey, NOFIPRJP CEO

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

NOFIPRJP CEO opposes a Man being killed in Little Woods, Lionel Bailey says the man was killed in Little Woods Wednesday afternoon, according to the New Orleans Police Department.

NOFIPRJP CEO concurs with Emergency services being called to an apartment complex in the 7900 block of Bullard Avenue about 3 p.m. on Wednesday in what was initially categorized as a medical call but opposes that when paramedics arrive they had to pronounce the man dead at the scene because this was the perfect scenario to utilize the drones because NOPD could have immediately release drones in the 7900 block of Bullard Avenue about 3 p.m. on Wednesday in what was initially categorized as a medical call and probably could have avoided the cause of death or other details about the case.

NOFIPRJP CEO opposes that at least 2 of the buildings in the complex being surrounded by police tape early Wednesday evening as investigators, who had obtained a search warrant after the killing, examined the property because the evidence (of any) had been contaminated and or destroyed as the murder occurred in the afternoon and it was being investigated in the evening, NOFIPRJP added.

NOFIPRJP CEO opposes that outside the apartments, a few women sobbed while being comforted by relatives and nearby, police raising the tape to let another family through to the apartment building next to the one they were investigating because without drone technology no one with information regarding the crime will call Crimestoppers at (504) 822-1111. Drone technology could help NOPD to develop Tipsters who may be eligible for a cash reward.

Reference:

https://share.newsbreak.com/a875ru64

**From:** ALITA RICHARDSON <█████████████████>
**Sent:** Thursday, December 5, 2024 6:10 PM
**To:** Consent Decree Monitor <comments@CONSENTDECREEMONITOR.COM>
**Subject:** NOPD

Hello,

    My name is Alita Richardson, I'm a former New Orleans Police Officer. In the truest form I can say NOPD needs continuing monitoring based on my life changing experiences.

    I won't make a long statement because my situation has years of history behind it, but I'll attach the most recent occurrence.

    I have repeatedly asked NOPD to do. a thorough investigation yet they respond with Sgt. Jones didn't do anything wrong. If he used a fake subpoena, that's a crime-if there isn't a subpoena and he obtained my records without authorization, that's a crime.

    If NOPD can overlook Sgt. Jones' crimes, one can only imagine how many other crimes happen because an officer was "doing their job". I was accused of involvement in a murder, had a wanted poster distributed through the department and lost my career.

# "Former DA Used 'Fake Subpoena' in PIB Investigation of Ex-NOPD Officer"

In 2018, "The Lens" reported that the New Orleans DA's Office issued 249 so-called "fake subpoenas" to victims and witnesses in criminal cases. Well, make that 250 fake subpoenas now. However, "The NOLA Tabloid" reveals in this exclusive that the subpoena was used in a 2007 PIB investigation of an ex-NOPD officer, not a criminal case. Moreover, it was issued under the administration of former DA Eddie Jordan, not Leon Cannizzaro. So, what does all of this mean?

RECE__ED

NOV 9 6 2007

1024570

STATE OF LOUISIANA                    CRIMINAL DISTRICT COURT

VERSUS                                PARISH OF ORLEANS

SPECIAL INVESTIGATION                 P.I.B. NO. 2007/4984

MOTION FOR ISSUANCE OF SUBPOENA DUCES TECUM

On motion of the District Attorney for the Parish of Orleans, through the undersigned Assistant District Attorney, and upon suggesting to this Honorable Court that:

I.

The Office of the District Attorney has before it the above-captioned investigation. Certain medical records are in the custody of Tulane Medical Center, 1415 Tulane Avenue, New Orleans, Louisiana 70012, that are necessary to this prosecution. They are:

Any records indicating whether the below named individual was a patient of or treated by Tulane Medical Center:

Patient:        Alita M. Richardson
Race:           Black
S.S.N.:         
Dates:          January 2007- November 2007

II.

In accordance with La.R.S. 13:3715.1, the State has attached an affidavit that attests to the fact that such records are of a party to this litigation and a copy of this subpoena

WHEREFORE, the State prays that a Subpoena Duces Tecum be issued herein ordering Tulane Medical Center, 1415 Tulane Avenue, New Orleans, Louisiana 70012, Custodian of Records, to produce the aforementioned records at the date and time specified on the below Order.

Dustin H. Davis
Assistant District Attorney

COPIED BY loo
NOV 08 2007

According, to Black's Law Dictionary, a subpoena is requested by an attorney but issued by a court. In the matter of the fake subpoenas, a prosecutor with the District Attorney's Office unilaterally sends the subpoena to a witness without the approval of a judge. This circumventing of a court's approval means that the target has ultimately been denied due process and the recipient is tricked into believing that a penalty will result for refusal to comply.

In 2008, ex-NOPD officer Alita Richardson was terminated from the force and she has been fighting it through Civil Service ever since. She was assigned to the 4th District when a PIB investigation was launched. Yet, the result of that investigation concluded in an administrative separation from the department, not a criminal case. In fact, no criminal charges were ever filed against Richardson by the DA's Office.

This revelation by "The NOLA Tabloid" means that so-called fake subpoenas were also used by former DA Eddie Jordan and included PIB investigations of New Orleans police officers in addition to victims & witnesses in criminal cases under current DA Leon

subpoena to a witness without the approval of a judge. This circumventing of a court's approval means that the target has ultimately been denied due process and the recipient is tricked into believing that a penalty will result for refusal to comply.

In 2008, ex-NOPD officer Alita Richardson was terminated from the force and she has been fighting it through Civil Service ever since. She was assigned to the 4th District when a PIB investigation was launched. Yet, the result of that investigation concluded in an administrative separation from the department, not a criminal case. In fact, no criminal charges were ever filed against Richardson by the DA's Office.

This revelation by "The NOLA Tabloid" means that so-called fake subpoenas were also used by former DA Eddie Jordan and included PIB investigations of New Orleans police officers in addition to victims & witnesses in criminal cases under current DA Leon Cannizzaro.

Continue following "The NOLA Tabloid" for the latest in this exclusive!

What do you think? "KNOW THE NOLA!" Be sure to like, comment & share! Like on Facebook & Follow on Twitter @thenolatabloid

f    X    in

**From:** Eye On Surveillance <eyeonsurveillancenola@gmail.com>
**Sent:** Saturday, December 21, 2024 6:33:26 PM (UTC+00:00) Monrovia, Reykjavik
**To:** eFile-Morgan <eFile-Morgan@laed.uscourts.gov>; LAEDdb_Clerk <clerk@laed.uscourts.gov>
**Subject:** Letter for Judge Susie Morgan

**CAUTION - EXTERNAL:**

Please receive the letter attached addressed to Judge Susie Morgan.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

Eye on Surveillance
PO Box 4155
New Orleans, LA 70178
info@eyeonsurveillance.org
Dec 21, 2024



Judge Susie Morgan
500 Poydras Street
Room C322
New Orleans, LA  70130
**Via Email Only**


NEW VERSION:

Dear Judge Morgan,

At your confirmation hearing you noted that a judge's role is to apply the law to the facts and to be fair and impartial. We too believe this. We also believe that If monitors have conflicts, then everything must be re-evaluated and sustainment should not be granted.

Now here are some past positions you've taken on conflicts of interest.
- May 2013: Brennan v. Brennan
  - You ruled that Stone Pigman's concurrent representation presents a serious conflict of interest, and that the counsel must be disqualified. Just as the monitors should be disqualified here.
- Nov 2021: Addison v. Louisiana Regional Landfill Company
  - You cited Collins v Benton which concludes that courts have ample discretion to substitute an expert if the expert previously worked with the opposing party. Just as former NOPD employees used to be opposing parties to Aronie and Douglass, but are now colleagues.
- Closer to home, Paragraph 332 of the consent decree: About secondary employment states
  - "The Coordinating Office shall be directed by a civilian with no actual conflict of interest or appearance of conflict of interest."
- The next paragraph, 333: enforces the same limitations on the "Major Special Events" Coordinator


You once told a group of Loyola students:

*"Some of the things I think we do to inspire confidence from the bottom up, not the top down… We avoid conflicts of interest, even the appearance of a conflict, because that erodes confidence in the judiciary."*

Eye on Surveillance
PO Box 4155
New Orleans, LA 70178
info@eyeonsurveillance.org
Dec 21, 2024



Judge Susie Morgan
500 Poydras Street
Room C322
New Orleans, LA  70130
**Via Email Only**

We want to believe that you have done everything you can to make your rulings fair and impartial. You have a long history of contributing to judicial ethics standards, and legal experience across countless domains. But as a busy judge, you largely rely on what you hear from the federal monitors, police chief, and other bodies.

Here are some facts regarding the conflicts of interest that undermine the New Orleans Consent Decree:
- Deputy Monitor Douglass founded an organization, ELEFA, where he employs Harrison and several other former NOPD leaders.
- Dr. Burns, co-founder of ELEFA, who is an active monitor publicly stated that she agrees that there is a conflict of interest.
- Douglass has even admitted to hiring at least one CURRENT NOPD officer.
- Lead monitor Aronie is the co-founder of an organization, ABLE, that Michael Harrison sits on the board of and that is run by a former NOPD employee.
- And this problem goes beyond the monitors. Former DOJ officials, Jude Volek and Roy Austin, who initially recommended Sheppard Mullin are now on the board of ELEFA.

Paragraph 464 of the Consent Decree prohibits monitors from accepting employment or providing consulting services that **would** present a conflict of interest. It reads: "Unless such conflict is waived by the Parties, the Monitor shall not accept employment or provide consulting services that **would** present a conflict of interest with the Monitor's responsibilities under this Agreement".

Douglass, in his capacity as a Deputy Monitor, has engaged in several activities that we believe would present a conflict of interest. At the moment, we are not alleging that Douglass has acted impartially, only that his actions may represent a conflict of interest. If these activities do not represent a conflict of interest, we ask for the you to to inform us as to why they have not waived, per Chapter 464 which states that actions that may represent a conflict of interest must be waived. If these actions do represent a conflict of interest, we ask for the DOJ to immediately remove Douglass as a monitor.

Eye on Surveillance
PO Box 4155
New Orleans, LA 70178
info@eyeonsurveillance.org
Dec 21, 2024



Judge Susie Morgan
500 Poydras Street
Room C322
New Orleans, LA  70130
**Via Email Only**

The decision to leave the consent decree has been totally top-down. It's obvious that the powers that be want out. Community outreach has felt like a dog and pony show. The fairness hearing on December 17th was scheduled with limited notice, right as many people are already traveling for the holidays. The court clerk didn't even know the comment period had been extended and several community members got confusing responses. To add insult to injury, our deputy monitor appears to have a conflict of interest.

We are now in touch with groups like Minneapolis for a Better Police Contract. The view from the ground there is just as bleak as here. They have expressed many of the same frustrations with Mr Douglass as we have raised. Together, we will fight for true sustained change up and down the Mississippi. From Louisiana to Minnesota. A national outrage is growing at how consent decrees go and you have the sole power to decide how New Orleans fits into that narrative. Given your history of strong bipartisan support, you are perfectly positioned to cut through the politics of the moment. Say no to sustainment, replace corrupt monitors, and be the leader that New Orleans needs.

Thank you,

Eye On Surveillance

**OLD VERSION:**

Dear Judge Morgan,
I believe that the judge's role is to apply the law to the facts and to be fair and impartial. Your honor, these are not my words, this is what you said at your own confirmation hearing.

My name is Marvin Arnold. In my day job, I'm a computer programmer. But I am also a volunteer with Eye on Surveillance. And I do want to believe that you have done everything you can to make your rulings fair and impartial. You have a long history of contributing to judicial

Eye on Surveillance
PO Box 4155
New Orleans, LA 70178
info@eyeonsurveillance.org
Dec 21, 2024



Judge Susie Morgan
500 Poydras Street
Room C322
New Orleans, LA  70130
**Via Email Only**

ethics standards, and legal experience across countless domains. But as a busy judge, you largely rely on what you hear from the federal monitors, police chief, and other bodies.

I hope you will hear me out while I describe how NOPD is really operating and why you should not grant sustainment until the facts actually support that decision.

- From 2017 - 2021, I was a data analyst at the Office of the Independent Police Monitor (OIPM. I have personally audited NOPD body worn camera reports and found their results to be totally unreproducible.)
- Eye on Surveillance, in partnership with the ACLU-LA and the OIPM, recently wrote a report that found that 40% of domestic incidents are misclassified by NOPD.
- In 2023, the monitors themselves wrote a scathing report on gone-on-arrival calls for service, with a focus on its impact on sexual assault and domestic violence.
- And in coalition with many other community organizations, we wrote and passed a city ordinance putting checks and balances on NOPD. NOPD is in direct violation of that law today. See the previous correspondence sent to you by Eye on Surveillance where we discuss how NOPD's involvement with the DA's NODICE program is a violation of Chapter 147 of the New Orleans Municipal Code Section 147-2.

But many of the other speakers today will talk about the various issues NOPD has. I want to focus on the conflicts of interest within the monitoring team. If monitors have conflicts, then everything must be re-evaluated and sustainment should not be granted.

Here are some facts:
- Lead monitor Aronie is the cofounder of an organization, ABLE, that Michael Harrison sits on the board of and that is run by a former NOPD employee.
- Deputy monitor Douglass also started an organization, ELEFA, with Harrison and several other former NOPD leaders.
- Douglass has even admitted to hiring at least one CURRENT NOPD officer.
- Dr Burns from the monitoring herself even publicly stated that she agrees that there is a conflict of interest.
- And this problem goes beyond the monitors.

Eye on Surveillance
PO Box 4155
New Orleans, LA 70178
info@eyeonsurveillance.org
Dec 21, 2024



Judge Susie Morgan
500 Poydras Street
Room C322
New Orleans, LA  70130
**Via Email Only**

- - ○ Former DOJ officials, Jude Volek and Roy Austin, who initially recommended Sheppard Mullin are now on the board of ELEFA.

Now here are some past positions you've taken on conflicts of interest.
- May 2013: Brennan v. Brennan
  - ○ You ruled that Stone Pigman's concurrent representation presents a serious conflict of interest, and that the counsel must be disqualified. Just as the monitors should be disqualified here.
- Nov 2021: Addison v. Louisiana Regional Landfill Company
  - ○ You cited Collins v Benton which concludes that courts have ample discretion to substitute an expert if the expert previously worked with the opposing party. Just as former NOPD employees used to be opposing parties to Aronie and Douglass, but are now colleagues.
- Closer to home, Paragraph 332 of the consent decree: About secondary employment states
  - ○ "The Coordinating Office shall be directed by a civilian with no actual conflict of interest or appearance of conflict of interest."
- The next paragraph, 333: enforces the same limitations on the "Major Special Events" Coordinator

You once told a group of Loyola students:
*"Some of the things I think we do to inspire confidence from the bottom up, not the top down…
We avoid conflicts of interest, even the appearance of a conflict, because that erodes confidence
in the judiciary."*

On behalf of all the regular residents who aren't getting paid by the city or their organization to be here: **WE DO NOT HAVE CONFIDENCE IN THIS PROCESS.**

The decision to leave the consent decree has been totally top-down. It's obvious that the powers that be want out. Community outreach has felt like a dog and pony show. The fairness hearing on December 17th was scheduled with limited notice, right as many people are already traveling for

Eye on Surveillance
PO Box 4155
New Orleans, LA 70178
info@eyeonsurveillance.org
Dec 21, 2024



Judge Susie Morgan
500 Poydras Street
Room C322
New Orleans, LA  70130
**Via Email Only**

the holidays. The court clerk didn't even know the comment period had been extended and several community members got confusing responses.

- We are now in touch with groups like Minneapolis for a Better Police Contract.
- The view from the ground there is just as bleak as here. They have expressed many of the same frustrations with Mr Douglass as we have raised.
- Together, we will fight for true sustained change up and down the Mississippi. From Louisiana to Minnesota.
- A national outrage is growing at how consent decrees go and you have the sole power to decide how New Orleans fits into that narrative.
- Given your history of strong bipartisan support, you are perfectly positioned to cut through the politics of the moment.
- Follow the facts, not political figures
- Say no to sustainment, replace corrupt monitors, and be the leader that New Orleans needs.

Thank you,

Marvin Arnold
Eye On Surveillance