**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CIVIL ACTION** |
| **VERSUS** | **NO. 12-1924** |
| **CITY OF NEW ORLEANS** | **SECTION: "E" (2)** |

**ORDER AND REASONS**

Before this Court are four motions: The City's Motion to Terminate the Consent Decree,[1] the City's Motion To Issue Ruling On Pending Motion,[2] the Parties' Joint Motion for Approval of Sustainment Plan,[3] and the City's Motion to Enroll Additional Counsel of Record.[4] This Order and Reasons resolves all four motions.[5]

**Motion For Approval Of Sustainment Plan**

On July 12, 2012, the City of New Orleans and the Department of Justice entered into a Consent Decree under which the City agreed to make sweeping changes to the way the New Orleans Police Department operates.[6] For well over ten years, the City and NOPD have worked diligently, in partnership with the Department of Justice and with the oversight and

---

1 R. Doc. 629.

2 R. Doc. 816.

3 R. Doc. 793.

4 R. Doc. 815.

5 As discussed below, the Court will grant the Motion to Issue Ruling, deny the Motion to Terminate the Consent Decree, grant the Motion to Approve the Sustainment Plan, and denywithout prejudice the Motion to Enroll Additional Counsel.

6 On July 24, 2012, the City and the United States Department of Justice ("DOJ") filed a Joint Motion and Memorandum for Entry of Consent Decree. R. Doc. 2. On September 14, 2012, the City and DOJ filed a Joint Supplemental Motion for Entry of Consent Decree incorporating certain agreed upon modifications to the Consent Decree. R. Doc. 114. The Consent Decree "is effectuated pursuant to the authority granted to DOJ under Section 14141, the Safe Streets Act, and Title VI to seek declaratory or equitable relief to remedy a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges, or immunities secured by the Constitution or federal law." R. Doc. 159-1 at 7. The Court approved the Joint Motion for Entry of Consent Decree, as amended, on January 11, 2013. R. Doc. 159. The Court specifically retained jurisdiction over this matter, including but not limited to the right to interpret, amend, and enforce the Consent Decree until the final remedy contemplated by the Consent Decree has been achieved. R. Doc. 159 at 8.

guidance of the Court and the Consent Decree Monitor, to meet their obligations under the Consent Decree.

On September 27, 2024, the City and the Department of Justice filed a Joint Motion for Approval of Sustainment Plan.[7] The Joint Motion reflects the Parties' shared belief that, although the City has not achieved full and effective compliance with the Consent Decree, it has made sufficient progress to warrant allowing it to enter into the two-year "Sustainment Period" called for by the Consent Decree.[8]

In support of the Joint Motion, the Parties acknowledged and represented to the Court the following:

- "NOPD and the City require additional time to satisfy some specific elements of the Consent Decree."
- "[C]ertain ongoing corrective actions and remedial measures have not been fully implemented or have not been in place long enough for the United States and the Monitor to fully evaluate implementation, effectiveness, sustainability, and durability."
- "[B]y completion of the Sustainment Plan, the City will address any current outstanding issues of material compliance with the Consent Decree as set forth in the Sustainment Plan to demonstrate full and effective compliance as required by Consent Decree Paragraph 491."

Based on these shared beliefs, the Parties' Joint Motion seeks to start the two-year sustainment clock.

As the Joint Motion recognizes, entering the Sustainment Period does not mean the Consent Decree is at an end. During these two years, the NOPD and the City must demonstrate to the Court – and to the community – (1) that they have completed the work

---

[7] R. Doc. 793.

[8] The Consent Decree provides that the City will not be released from the Consent Decree until the City and NOPD have been in full and effective compliance with its requirements *for two years*. R. Doc. 778 at para. 491.

required by the Consent Decree as identified in the Sustainment Plan AND (2) that all of the reforms achieved are durable and will outlive this Court's involvement in this matter. To ensure this is the case, the Sustainment Plan provides for continued monitoring and Court oversight during the Sustainment Period. Should there be a failure by NOPD or the City to comply with the Sustainment Plan, the Court will take swift and decisive corrective action as appropriate to protect the interests of the citizens of the City of New Orleans, as well as visitors to our city.

As the Court has stated in numerous public hearings over the years, the Court is tremendously proud of the achievements the NOPD has made since the entry of the Consent Decree. Notwithstanding some delays,[9] missteps, and occasional backsliding, the hard work of the civilian and sworn members of the NOPD has paid off. The NOPD is a far different agency from the one that spawned DOJ's investigation in 2011 and the imposition of the Consent Decree in 2013.

NOPD policies have been comprehensively revamped, and the police practices experts on the Monitoring Team and within DOJ confirm they comply with best practices. The NOPD Academy has been transformed into a professional institution with a meaningful and public annual master training plan, committed instructors, and up-to-date lesson plans incorporating scenarios and adult learning techniques. NOPD's efforts to collect, analyze, and share data are a far cry from the Department's pre-Consent Decree practices. Many of the Department's historic approaches to serving the community have been materially

---

9 Events beyond the Parties' control also delayed the NOPD's progress toward compliance. In 2019, a cyber-attack crippled the City's computer systems, including systems developed by NOPD to implement and track compliance. In 2021, Hurricane Ida inflicted widespread damage in New Orleans, taxing the NOPD and its members. The COVID-19 pandemic imposed unprecedented strains on the NOPD, as NOPD members struggled to meet their public safety responsibilities while coping with the illness's impact on themselves and their families.

transformed in an effort to protect community members and officers, including its Crisis Intervention Team, its enhanced Officer Assistance Program, its Use of Force Review Board, its Serious Discipline Review Board, its robust PSAB-led audit program, and more.

What perhaps is most notable to the Court, however, is the willingness of NOPD to identify and take meaningful steps to correct shortcomings on its own. The Court has seen the Department take ownership of problems identified by community members and, just as often, identify problems on its own and bring them to the attention of the Monitor and the Court. Law Enforcement agencies have a reputation across the U.S. of ignoring – or even hiding – their mistakes. The pre-Consent Decree NOPD was a poster-child for such a destructive culture. Today's NOPD is not.

These achievements, however, do not blind the Court to several NOPD missteps in the recent past or to the additional work required of the NOPD and the City before the terms of the Consent Decree are satisfied. For example:

- NOPD must ensure that its Use of Force Review Board hearings are scheduled and held in accordance with NOPD policy.[10]
- The public has raised questions and concerns regarding some of NOPD's use of force data and what it might reveal about the use of force against certain groups (e.g., Black women). NOPD acknowledges these concerns and has committed to addressing them. This commitment is essential to ensuring the public's trust that its Fourth Amendment[11] right to be free from unconstitutional force is real.
- The Monitor has expressed concerns regarding the NOPD Crisis Intervention Team program. Specifically, while lauding the professionalism, empathy, and patience of NOPD's CIT officers, the Monitoring team noted a high number of instances in which a CIT officer was needed, but did not make it to the scene

[10] In its March 2024 Report, the Monitor observed the following: "In 2022, we identified an issue relating to NOPD's UFRB hearings, in particular, that NOPD held UFRB hearings only in March, April, May, October, November, and December of 2022. This lack of consistent hearings, not surprisingly, resulted in a backlog, which is unfair to officers and to the public. In early 2023, the Department committed to clearing the backlog of hearings." R. Doc. 771. The Monitor went on to note: "We are happy to report the Department kept its promise, conducted regular UFRB hearings throughout 2023, and cleared the backlog. We also have confirmed there is no backlog so far in 2024." *Id.*

[11] This right is made applicable to the states by the Fourteenth Amendment.

quickly enough to provide assistance.[12] The Court expects the Monitor to continue to work closely with NOPD during the Sustainment Period to explore new and innovative ways to continue reducing response time and, thus, GOAs. Individuals experiencing a mental health event are no less entitled to the constitutional guarantee of equal protection under the law.

- NOPD's Supervision efforts have come up short from time to time as reflected in a number of recent highly-publicized failures to comply, including a lack of supervision over the Executive Protection Unit,[13] PIB's handling of the Vappie investigation,[14] and the ongoing non-compliances relating to Secondary Employment.

- Unlike the quality of the investigation conducted directly by PIB investigators, the quality and thoroughness of the investigations conducted in the Districts are inconsistent at best. The Court recognizes the burdens on field supervisors and understands sometimes disciplinary investigations take a backseat to public safety imperatives. But that does not excuse the Department's obligations to ensure all misconduct investigations – whether conducted by PIB or the Districts – are fair, timely, and as thorough as necessary to reach reliable and complete findings.[15]

The foregoing, while not exhaustive, are important items that must not be lost among the deserved celebration of NOPD's achievements. The Sustainment Plan manifests the City's and NOPD's recognition that work remains to be done before NOPD is in substantial

[12] The following note included in the Monitor's February 2023 report explains the concern. The difference of opinion referred to relates to the Monitor's observation that the high number of Gone On Arrival (GOA) designations was impacting individuals in mental health crisis and indicated a non-compliance with the Consent Decree: "The NOPD does not agree that the response time data cited above indicate non-compliance. NOPD argues, among other things, that its slow response times reflect not 'a failure to provide services for a certain group of individuals, but a decline in available policing services for all members of the community.'" This is a fair point, which the Monitoring Team recognizes. But saying many members of the New Orleans community are not receiving prompt police service does not change that fact that individuals in mental health crisis also are not receiving prompt police service. NOPD further emphasizes that its officers respond "effectively and with compassion and empathy" when they do make it to calls in a timely fashion. As noted above, the Monitoring Team agrees with this point. But compassion and empathy are effective only if the officers actually make it to the calls while the individual in crisis is still there. Through no fault of the officers, this is not happening consistently." R. Doc. 674-1, p. 19 n. 13.

[13] In February 2023, the Monitor issued recommendations to the NOPD noting, among other things, the following: "The NOPD officers assigned to the Executive Protection team receive little if any oversight from NOPD supervisors. This appears to have been the case for years. The members of the team indicated their belief that their only supervisor was the Mayor herself. While the Mayor seemingly is responsible for assignments and schedules, there is no indication the Mayor played any role in supervision beyond that. NOPD should take immediate action to ensure the members of the Executive Protection team receive the 'close and effective' supervision required by the Consent Decree." *See* R. Doc. 694 at 17.

[14] PIB's handling of its investigation of Officer Jeffrey Vappie was the subject of a Show Cause hearing, following which the Court identified a number of clear failures to comply. *See* R. Doc. 756.

[15] Consent Decree R. Doc. 778 p. 104, para. 404.

compliance with all requirements of the Consent Decree and their willingness to do that work.[16]

As the Court has recognized, the Consent Decree affects the entire New Orleans community, as well as visitors to our city. Over the life of the Consent Decree, the Court has been gratified by the significant public interest in the implementation of the Consent Decree's requirements by the City and NOPD. Reflecting that interest, the Court and the Monitor have received extensive communication and input from organizations and individual members of the public.

In light of the public's interest in the implementation of the Consent Decree, the Court provided a number of opportunities for members of the public to learn about the proposed Sustainment Plan and to raise any concerns they had. These opportunities included the following:

- Two virtual public meetings held by the Monitor.[17]
- Three in-person public meetings held by the Monitor.[18]
- An email address allowing the public to submit comments to the Court through the Monitor.[19]
- An email address allowing the public to submit comments to the Court directly through the Clerk's Office.[20]
- A public hearing during which any member of the public was permitted to

---

[16] The City has argued the NOPD has done more than is required with respect to some portions of the Consent Decree. This does not relieve NOPD of the requirement to comply with those obligations of the Consent Decree not yet met.

[17] *See* www.consentdecreemonitor.com.

[18] *Id.* Notably, at the same time, the NOPD held multiple public meetings across the City to explain and answer questions regarding the Joint Motion and the proposed Sustainment Plan. At those meetings, the NOPD represented to the citizens its desire to enter the Sustainment Plan. The NOPD did not disclose that it would also seek to terminate the Consent Decree.

[19] *See, e.g.*, R. Doc. 797.

[20] *Id.*

present his/her comments or concerns directly to the Court.[21]

- Numerous less formal meetings and discussions between the Monitoring Team and various groups and members of the public.

To ensure the public had adequate time to take advantage of these many opportunities, the Court extended the public comment period on several occasions.[22]

On December 12 and 23, 2024, the Court entered on the docket of this case the comments received by the Court with the Parties and the public.[23] The purpose of this disclosure was to promote transparency in the Consent Decree process and to ensure the Parties would be prepared to respond directly to community concerns at the hearing on the Joint Motion to Approve the Sustainment Plan.

As of December 23, 2024, the Court had received approximately 343 written comments from the public in response to the filing of the Joint Motion. The Court heard from more than 35 community members in person at the December 17, 2024 public hearing. Additionally, the Court has reviewed the comments shared with the Monitor by email and at the Monitor's public meetings, and has listened to the recordings of those several public meetings.

Without restating everything that has been shared with the Court, the comments from the community generally can be summarized into the following categories:

- Comments opposing moving into the Sustainment Period, asserting generally that the NOPD has not sufficiently reformed itself since the outset of the Consent Decree.
- Comments supporting moving into the Sustainment Period, pointing to positive changes in the Department since the outset of the Consent Decree and

[21] R. Doc. 812.

[22] R. Docs. 795, 797, 799.

[23] R. Docs. 803 and 808.

the Sustainment Plan.

- Comments raising concerns over favoritism in the treatment of officers within the City and the NOPD.
- Comments raising concerns and sharing data regarding NOPD's handling of Sexual Assault and Domestic Violence matters, including very high caseloads, failure to follow-up investigations, cold cases, data transparency, and the processing of rape kits.
- Comments that certain members of the NOPD Sexual Assault unit covered up a failure on the part of NOPD to investigate a local disc jockey for intentionally infecting others with HIV.
- Comments objecting to the manner in which the NOPD conducts its various bias analyses.
- Comments expressing concern that NOPD data shows an increase in police uses of force against Black women indicating potential gender or racial bias.
- Comments questioning the independence of the Monitoring Team.
- Comments expressing frustration regarding the role the community has been permitted to play in the Consent Decree process and the role it is contemplated to play during the Sustainment Period.
- Comments expressing frustration regarding the City's inattention and lack of support to the Police Community Advisory Boards ("PCAB").
- Comments regarding the Public Integrity Bureau's failure to fully and fairly investigate certain complaints.

Although not an exhaustive list, it is reflective of the variety of comments the Court has received. These comments capture the reality that some members of the public believe the NOPD is ready to enter the Sustainment Period, while others believe such a move is premature. [24]The Sustainment Plan, in effect, balances those competing views by allowing the NOPD two years to complete the work not yet done and earn the trust of the entire New Orleans community that federal oversight is no longer necessary.

[24] The Courts notes the public hearing was centered on whether or not the City should enter the Sustainment Period. The Court wonders whether the comments would have been different had the public known that the City would, on the eve of the hearing, make a fundamental change in its position and re-urge its motion to terminate the Consent Decree entirely.

The Court very much appreciates the input from the public and has considered it all in reaching its decision on the Joint Motion. The comments have informed the Court with regard to a number of items that must be closely observed – by the Monitor and by the Court – during the Sustainment Period. The comments regarding NOPD's Sexual Assault/Domestic Violence caseloads, follow-up investigations, and data analysis, for example, were extremely informative and will be incorporated into the Monitor's Sustainment Period audits and technical assistance plan. Likewise, the comments regarding PCABs and PIB will guide the Monitor's work during the Sustainment Period.

The Court has reviewed and considered the Parties' Joint Motion for Approval of Sustainment Plan; the United States's Memorandum in Support of the Motion; the relevant portions of the record, including the many public reports issued by the Monitor; the public comments submitted following the Joint Motion; the Parties' arguments at the January 13, 2025 public hearing;[25] and governing law. Being fully advised, the Court grants the Parties' Joint Motion for Approval of Sustainment Plan and approves the Sustainment Plan, including Attachments A through G. The Sustainment Period shall begin as of the date of this Order.

**<u>Motion To Terminate The Consent Decree</u>**

In the Motion for Approval of the Sustainment Plan, the Parties agreed that, "On the issuance of the Court's Order granting the Sustainment Plan, the City's pending Motion to Terminate will be rendered moot."[26] The Court Agrees. Unexpectedly, at the last minute, the

---

25 The Court initially scheduled a hearing on the Joint Motion for Wednesday, January 8, 2025. The tragic Bourbon Street events of January 1, 2025, however, prompted the City to request a continuance of that hearing to Monday, January 13th. The Court granted the motion on January 3, 2025. R. Doc. 811.

26 R. Doc 793 at 2 n.2.

City argued at the hearing that moving to enter the Sustainment Plan and moving to terminate the Consent Decree altogether are not mutually exclusive. The Court disagrees. The request to terminate the Consent Decree is based on the City's argument that the NOPD has fulfilled all its obligations under the Consent Decree. The request to enter the Sustainment Period, on the other hand, recognizes that "NOPD and the City require additional time to satisfy some specific elements of the Consent Decree," and that "certain ongoing corrective actions and remedial measures have not been fully implemented or have not been in place long enough for the United States and the Monitor to fully evaluate implementation, effectiveness, sustainability, and durability."[27] The City cannot have it both ways.

Whether by the doctrine of waiver, judicial estoppel, or law of the case, the City cannot ask the Court both to grant its request to enter the two-year Sustainment Period and to terminate the Consent Decree. Thus, as the Parties have stated, and the Court agrees, the Motion to Terminate has been rendered moot.

Even if the Motion to Terminate were not moot, however, it is denied on the basis that the City has failed to meet the elements of Federal Rule of Civil Procedure 60(b)(5), which requires that "the judgment has been satisfied, released, or discharged . . . ." In the Sustainment Plan, the City acknowledges that it has not satisfied all the Consent Decree's requirements. Indeed, that is the essence of the City's request, to enable it to move into the two-year Sustainment Period on the promise that it will complete those Consent Decree requirements still unmet.

---

[27] R. Doc. 793.

Further, the City has not supplemented its Rule 60(b)(5) motion to address various breaches of the Consent Decree subsequent to the filing of its Motion to Terminate. For example, not long ago, the Court was compelled to order the City to Show Cause as to why it should not be found in violation of the Consent Decree on the basis of clear Consent Decree violations of the City's obligation to ensure that misconduct allegations are "fully and fairly investigated" and that "all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent."[28] In response, the City submitted a remedial action plan that is not yet complete.

Another example of an unmet constitutional guarantee relates to the Policing Free of Gender Bias section of the Consent Decree, which still is not in full and effective compliance with the Consent Decree.[29] This is no minor matter. The U.S. Constitution guarantees equal protection to everyone.

As counsel for the Department of Justice argued at the January 13, 2025 hearing, without having to repeat the entirety of the United States' factual presentation and legal argument on the prior motion to terminate, the Department of Justice believes it is sufficient to say that the Motion to Terminate is moot because in the time since the motion to terminate, the City has not achieved substantial compliance with the Consent Decree.[30] Thus, even while urging the Court to allow the City to enter the Sustainment Period, DOJ acknowledged ongoing deficiencies concerning the City's compliance with the Consent Decree.

---

28 Consent Decree, Section XVII at 96, Misconduct Complaint Intake, Investigation, And Adjudication. R. Doc. 778.

29 R. Doc. 778. "NOPD agrees to respond to and investigate reports of sexual assault and domestic violence professionally, ***effectively***, and in a manner free of gender bias in accordance with the rights secured and protected by the Constitution and laws of the United States." (Consent Decree Section IX, emphasis added).

30 Comments of Counsel for United States at January 13, 2025 public hearing.

Finally, it is worth noting the City would have the Court grant the Motion to Terminate, thereby, ignoring the comments by hundreds of citizens. As noted above, many citizens vehemently support no change to the status of the Consent Decree. Others acknowledge that some change in status is appropriate, and support entering the Sustainment Period. Allowing the NOPD to focus on those tasks that remain to be done and giving it the time to demonstrate to the Court, the Department of Justice, and the New Orleans community that they will maintain the reforms put into place thus far seems to achieve a fair balance of these widely-held views.

**Motion To Enroll Additional Counsel Of Record**

On January 10, 2025, the City filed a motion to enroll Deputy Solicitor General Morgan Brungard, with the Louisiana Office of the Attorney General, as counsel of record. The City, however, has failed to address (i) whether the enrollment of the Attorney General as counsel to the City complies with the City's Home Rule Charter,[31] (ii) whether styling the motion as an *ex parte* motion complies with Local Rules, (iii) whether the enrollment of the Attorney General as counsel for the City presents a conflict as the Attorney General has announced its investigation of the City and the NOPD, and (iv) whether the motion to enroll raises law-of-the-case concerns in that the Court previously denied the Attorney General's request to intervene in this matter. Accordingly, the Court denies the City's motion without prejudice.[32]

---

31 The Court directs counsel's attention to R. Doc. 819, which is a letter from the New Orleans City Counsel stating that the legal process was not followed and that it has not approved the retention of special counsel.

32 R. Doc. 815.

**CONCLUSION**

In conclusion, the Court must be clear. On September 27, 2024, the City asked this Court to approve the Sustainment Plan and begin the Sustainment Period.[33] At that time, the Mayor of the City of New Orleans championed the motion, exclaiming in a public press statement and on social media that "we have arrived at a point where the NOPD can confidently move into the sustainment phase of the Consent Decree."[34] The Parties and the Monitor then worked tirelessly for months on the Sustainment Plan and the attached plans. Indeed, the Court recognized the Parties' efforts in its closing remarks at the June 2024 hearing on Bias Free Policing.

Members of the New Orleans City Council recently added their voices to the chorus of individuals and groups supporting NOPD's entry into the Sustainment Period:

> The New Orleans Police Department is poised to enter the sustainment period of their consent decree, marking a positive and crucial step towards concluding a more than decade-long process. The Council remains committed to supporting the ongoing efforts of the NOPD to reach this milestone and urges against any adversarial actions that could hinder this progress. Friday's 11th-hour legal maneuvering undermine a decade of work by the NOPD and needlessly politicize this important legal proceeding.[35]

The City's motive in seeking to revive the dormant Motion to Terminate is unclear. It appears to the Court to be political gamesmanship that threatens the integrity of this Court's role in the implementation of the Consent Decree. Certainly, it diminishes the credibility of

---

33 The Parties have worked on a mutually-acceptable Sustainment Plan for months. Indeed, the Court recognized the Parties' efforts at the June 2024 hearing on Bias Free Policing. Subsequently, the Parties and the Monitor have continued to work tirelessly toward this goal.

34 The Court judicially notices the press statement of Mayor LaToya Cantrell (September 9, 2024).

35 The Court judicially notices the press release issued by multiple City Council members on January 13, 2025. https://x.com/JPMorrell/status/1878863378422411557.

the top leadership of the City. Nevertheless, the Court is convinced the New Orleans Police Department is committed to the Sustainment Plan. The NOPD's presentation at the Hearing emphasized the Department's commitment to the Sustainment Period and the Sustainment Plan. Every presenter for the City confirmed his or her commitment to finishing the job started.[36]

The Court recognizes and credits the City's and NOPD's stated commitment, as clearly reflected in the Joint Motion and reiterated at the Hearing, to continue working with the Monitor, the DOJ, and the community on the issues that must be accomplished during the Sustainment Period. The Court is persuaded the proposed Sustainment Plan clearly delineates the work left to do and provides a realistic yet aggressive timeline to get that work done.

For this reason, the Court agrees to do what the City requested – grant the motion to approve the Sustainment Plan and begin the two-year Sustainment Period.

The Court, once again, acknowledges and extends its appreciation to the men and women of the NOPD whose hard work and dedication brought the City and the New Orleans Police Department to this important achievement. While the work is not complete, the Sustainment Plan provides adequate assurance that the City and NOPD will sustain the improvements they have made and will complete their unfinished work. The Court and the

[36] The Court recognizes that outside counsel to the City has argued that the City's request to enter the Sustainment Period and its request to terminate the Consent Decree are not inconsistent and not mutually exclusive. The Court disagrees. The request to terminate the Consent Decree presumes the NOPD has fulfilled all its obligations under the Consent Decree. The request to enter the Sustainment Period, on the other hand, recognizes that "NOPD and the City require additional time to satisfy some specific elements of the Consent Decree," and that "certain ongoing corrective actions and remedial measures have not been fully implemented or have not been in place long enough for the United States and the Monitor to fully evaluate implementation, effectiveness, sustainability, and durability." The City cannot have it both ways.

Monitor will remain vigilant to ensure that implemented reforms are sustained and the Parties' commitments under the Sustainment Plan are honored.

Accordingly,

**It is ordered** that the City's Motion To Issue Ruling On Pending Motion[37] is GRANTED.

**It is further ordered** that the City's Motion to Terminate the Consent Decree[38] is DENIED.[39]

**It is further ordered** that the Parties Joint Motion for Approval of Sustainment Plan[40] is GRANTED. The Sustainment Period shall begin as of the date of this Order.

**Is it further ordered** that the Sustainment Plan and Attachments are entered as an order of this Court.

**It is further ordered** that the City's Motion to Enroll Additional Counsel of Record is DENIED WITHOUT PREJUDICE.

**New Orleans, Louisiana, this 14 day of January, 2025.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

37 R. Doc. 816.

38 R. Doc. 629.

39 *See* R. Doc. 793 at fn. 2 ("On the issuance on the Court's Order granting the Sustainment Plan, the City's pending Motion to Terminate will be rendered moot. (Rec. Doc. 629).").

40 R. Doc. 793.