**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**                    **CIVIL ACTION**

**VERSUS**                                       **NO. 12-1924**

**CITY OF NEW ORLEANS**                          **SECTION: "E" (2)**

Report of the Consent Decree Monitor
For the New Orleans Police Department Consent Decree
Covering the Second Quarter of 2024
Released February 7, 2025



# Report of the Consent Decree Monitor
# For the New Orleans Police Department Consent Decree
# Covering the Second Quarter of 2024
# Released February 7, 2025

**Office of the Consent Decree Monitor**
**New Orleans, Louisiana**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order of The U.S. District Court For The Eastern District Of Louisiana



# WHAT'S IN THIS REPORT?



**Office of the
Consent Decree
Monitor**



**February 7, 2025**

## WHAT WE DID THIS PERIOD

- Reviewed and provided feedback on various NOPD Policy Chapters

- Prepared for and participated in the May 15, 2024, and June 5, 2024, Public Hearings – Bias Free and NOPD's Bias Free Audit

- Attended NOPD's weekly MAX meetings

- Attended Use of Force Report Board (UFRB) hearings

- Observed and reviewed NOPD's canine training

- Reviewed the materials for the Major's and Captain's exams

- Reviewed NOPD's audits and annual reports released during Q2

- Reviewed documentation and body worn camera footage to identify unreported uses of force.

- Reviewed NOPD's response to the Tulane and Jackson Square protests

- Conducted a spot check of Domestic Violence Patrol Audit

- Conducted an audit of Performance Evaluations

- Reviewed Supervision, including an audit of INSIGHT and a review of NOPD's Supervision Audit

- Began reviewing the Public Integrity Bureau's (PIB's) treatment of complaints submitted via the Independent Police Monitor (IPM)

- Provided the Parties Technical Assistance regarding building durability protections into a proposed Sustainment Plan



## WHAT WE FOUND

- We expressed concerns about one of NOPD's K9 handlers (training and certifications)

- Based on our review, we did not uncover any unreported uses of force (which aligns with NOPD's findings)

- Based on our review, although there is room for improvement with respect to planning and communication, we did not find any constitutional violations or NOPD policy violations during the NOPD's handling of the Jackson Square and Tulane protests

- High levels of compliance relating to Domestic Violence Patrols, and, though we continue to see high rates of GOAs, NOPD has made considerable improvements with following-up and providing resources to victims

- Steady continued improvement with performance evaluations

- Improvement in data accuracy for many areas of Insight (Early Warning System)

## NEXT QUARTER FORECAST

- Report on the results of our review of PIB's treatment of complaints submitted via the IPM

- Host a number of public community meetings and listening sessions

- Spot check NOPD's SSA Audit

- Review the Department's recruitment efforts

- Conduct the second phase of our review relating to gun arrests made during Mardi Gras

- Review and provide technical assistance to NOPD relating to its PIB Audit

- Conduct a spot check of NOPD's Crisis Intervention Team (CIT) Audit

- Conduct a spot check of NOPD's Sex Crimes Audit

- Continue to work with the parties on a meaningful Sustainment Plan



## I.    CONSENT DECREE AUTHORITY

"The Monitor shall file with the Court quarterly written, public reports covering the reporting period that shall include:

a) A description of the work conducted by the Monitoring Team during the reporting period.

b) A listing of each [Consent Decree] requirement indicating which requirements have been: (1) incorporated into implemented policy; (2) the subject of sufficient training for all relevant NOPD officers and employees; (3) reviewed or audited by the Monitoring Team in determining whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitoring Team to have been fully implemented in practice;

c) The methodology and specific findings for each audit or review conducted, redacted as necessary for privacy concerns.  An unredacted version shall be filed under seal with the Court and provided to the Parties.  The underlying data for each audit or review shall not be publicly available but shall be retained by the Monitoring Team and provided to either or both Parties upon request.

d) For any requirements that were reviewed or audited and found not to have been fully implemented in practice, the Monitor's recommendations regarding necessary steps to achieve compliance.

e) The methodology and specific findings for each outcome assessment conducted; and

f) A projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the [Consent Decree]."

**Consent Decree Paragraph 457**

Page 4 of 53
February 7, 2025
www.consentdecreemonitor.com



## II.    NOTES

"The Monitor shall be subject to the supervision and orders of the [United States District Court for the Eastern District of Louisiana], consistent with [the Consent Decree].  The Monitoring Team shall only have the duties, responsibilities, and authority conferred by [the Consent Decree].  The Monitoring Team shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent."

**Consent Decree Paragraph 455**



## III.    TABLE OF CONTENTS

## Contents

I.     CONSENT DECREE AUTHORITY ....................................................................................... 3

II.    NOTES ......................................................................................................................... 4

III.   TABLE OF CONTENTS .................................................................................................... 5

IV.    GLOSSARY OF ACRONYMS ............................................................................................ 7

V.     INTRODUCTION TO QUARTERLY REPORT ...................................................................... 9

VI.    SUMMARY OF second QUARTER MONITORING ACTIVITIES ......................................... 10

VII.   consent Decree Requirements – Compliance Status ................................................. 11

   A.    Policies .................................................................................................................. 11

   B.    Training ................................................................................................................. 11

   C.    Implementation .................................................................................................... 12

VIII.  Audits, Reviews, OBSERVATIONS, and Recommendations .......................................... 13

   A.    Use of Force ......................................................................................................... 13

      1.    Canine ............................................................................................................ 13

      2.    Potential Unreported Uses of Force .............................................................. 13

   B.    Protests at Jackson Square and Tulane University ................................................ 15

   C.    Bias Free Policing ................................................................................................. 16

   D.    Community Engagement ....................................................................................... 17

   E.    Domestic Violence (DV) Patrol – Spot Check ...................................................... 17

   F.    Performance Evaluations Audit ............................................................................ 18

      1.    Evaluations Reviewed by PSAB and by the Monitoring Team ......................... 19

      2.    Evaluations Reviewed by the Monitoring Team, but Not Audited by PSAB ......... 21

   G.    Supervision - Insight Audit (CD Paragraph 320) .................................................. 22

IX.    CONCLUSION .............................................................................................................. 25

X.     APPENDICES ............................................................................................................... 26

   A.    Special Report of the Consent Decree Monitoring Team Regarding NOPD Gun Arrests
        During Mardi Gras 2024 .................................................................................... 26

   I.    Executive Summary .............................................................................................. 28



II.    Acknowledgement............................................................................................ 30

III.    Introduction.................................................................................................... 31

IV.    Overview of the Reviews ............................................................................... 33

V.    DISCUSSION .................................................................................................. 35

A.    PSAB's SSA Audit of Mardi Gras Gun Arrests ...................................... 35

1.    PSAB Methodology................................................................................ 35

2.    PSAB Findings........................................................................................ 35

B.    BWC Review of Officers with Highest Numbers of Gun Arrests and Highest Number of Uncompleted FICs ............................................................................... 38

1.    Monitoring Team Methodology........................................................... 38

2.    Monitoring Team Observations ........................................................... 39

3.    General Observations............................................................................ 41

C.    Unreported Stops, Searches, and Arrests ................................................ 41

1.    Monitoring Team Methodology........................................................... 42

2.    Monitoring Team Observations ........................................................... 42

D.    Additional Review of Officers with Highest Numbers of Gun Arrests............ 44

1.    Officer Demographics and Disciplinary Histories............................ 44

2.    Officer Interviews .................................................................................. 44

VI.    Conclusion ...................................................................................................... 46

VII.    APPENDIX A: NOPD Mardi Gras Crime and Arrest Maps ...................... 48

A.    Heatmap showing incidents from the 2023 Parade Season........................ 48

B.    Incidents from the 2023 Parade Season with the call/signal description.................... 49

VIII.    APPENDIX B: PSAB SSA Audit of Mardi Gras Gun Arrests...................... 50

IX.    APPENDIX C: SSA Audit Protocol ................................................................ 51



## IV.    GLOSSARY OF ACRONYMS

"ASU"        Administrative Services Unit
"AUSA"       Assistant United States Attorney
"AVL"        Automatic Vehicle Locator
"BWC"        Body Worn Cameras
"CIT"        Crisis Intervention Team
"CCMS"       Criminal Case Management System
"CD"         Consent Decree
"CIT"        Crisis Intervention Team
"CODIS"      Combined DNA Index System
"ComStat"    Computer Statistics
"COCO"       Community Coordinating [sergeants]
"CPI"        California Psychological Inventory
"CSC"        Civil Service Commission
"CUC"        Citizens United for Change
"DA"         District Attorney
"DI-1"       Disciplinary Investigation Form
"DOJ"        Department of Justice
"DV"         Domestic Violence
"DVU"        Domestic Violence Unit
"ECW"        Electronic Control Weapon
"EPIC"       Ethical Policing is Courageous (NOPD peer intervention program)
"EWS"        Early Warning System
"FBI"        Federal Bureau of Investigation
"FIT"        Force Investigation Team
"FOB"        Field Operations Bureau
"FTO"        Field Training Officer
"IACP"       International Association of Chiefs of Police
"GOA"        Gone on Arrival
"ICO"        Integrity Control Officers
"IPM"        Independent Police Monitor
"KSA"        Knowledge, Skill and Ability
"LEP"        Limited English Proficiency
"LGBT"       Lesbian, Gay, Bisexual, and Transgender



| | |
|---|---|
| "MMPT" | Minnesota Multiphasic Personality Inventory |
| "MOU" | Memorandum of Understanding |
| "NNDDA" | National Narcotics Detection Dog Association |
| "NOFJC" | New Orleans Family Justice Center |
| "NOPD" | New Orleans Police Department |
| "NPCA" | National Police Canine Association |
| "OCDM" | Office of Consent Decree Monitor |
| "OIG" | Office of Inspector General |
| "OPSE" | Office of Public Secondary Employment |
| "PIB" | Public Integrity Bureau |
| "POST" | Police Officer Standards Training Counsel |
| "PSAB" | Professional Standards and Accountability Bureau |
| "PsyQ" | Psychological History Questionnaire |
| "QOL" | Quality of Life [officers] |
| "RFP" | Request for Proposal |
| "SA" | Sexual Assault |
| "SART" | Sexual Assault Response Team |
| "SOD" | Special Operations Division |
| "SFL" | Supervisor Feedback Log |
| "SRC" | Survey Research Center |
| "SUNO" | Southern University of New Orleans |
| "SVS" | Special Victims Section |
| "UNO" | University of New Orleans |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |
| "VAW" | Violence Against Women |



## V.    INTRODUCTION TO QUARTERLY REPORT

During the second quarter of 2024, the Monitoring Team continued to monitor closely the City's and NOPD's Consent Decree compliance and observed the NOPD's continued progress toward compliance. As the NOPD continues to build on the changes it has implemented, the Monitor's role has shifted increasingly to oversight, although we continue to pay close attention to areas needing attention and specific incidents that arise. Important accomplishments for Q2 included NOPD's substantial progress in the areas of Bias-Free policing, which was presented to the Court in two public hearings, implementation of Insight (NOPD's Early Warning System), and the quality of PSAB audits, as confirmed in our spot audits. A professional audit capability is essential to sustaining the improvements NOPD has made under the Consent Decree.

This Quarterly Report describes this progress, but also notes those areas in need of further improvement, most notably in this category with regard to Police Community Advisory Boards (PCABs). While some PCABs consistently function well, too many others do not. Effective and independent PCABs are not only a Consent Decree requirement, they are an important element of meaningful community engagement with the Consent Decree. Additionally, we continue to have concerns about certain aspects of NOPD's canine training and handling, which were first reported in our Q1 report.

Overall, the NOPD story is a good, if imperfect, story that continues to improve.



## VI.    SUMMARY OF SECOND QUARTER MONITORING ACTIVITIES

The Monitoring Team spent significant time during the period covered by this Quarterly Report (April 2024 – June 2024, i.e., "Q2") reviewing, auditing, spot checking, and evaluating multiple areas of Consent Decree compliance. Among other things, the Monitoring Team:

- Reviewed and provided feedback on draft policy revisions including, Negotiated Settlements, Mediation, Adjudication of Misconduct, Disciplinary Matrix, Transfer Selection Process, Executive Protection Unit (and the associated Standard Operating Procedure, Cadet Training Program, Concealed Firearms Carry, and Rule 2.

- Prepared for and participated in Court hearings on Bias-Free Policing.

- Observed NOPD meetings, hearings, and training.

- Conduced audits and spot checks of PSAB audits.

- Audited to identify potential unreported uses of force.

- Reviewed NOPD's response to the Tulane and Jackson Square protests.

- Reviewed Supervision and the Early Warning System (Insight).

As we have done since our appointment, the Monitoring Team also spent significant time meeting with, and listening to, the parties to the Consent Decree. The Monitoring Team is in regular contact with the City, the NOPD, and the DOJ. We also continue to meet with the NOPD PSAB, the PIB, the NOLA Inspector General, the New Orleans Independent Police Monitor, the New Orleans District Attorney's Office, and various community advocacy groups.



## VII.    CONSENT DECREE REQUIREMENTS – COMPLIANCE STATUS

### A.    Policies

The NOPD continues to develop and publish policies addressing the topics mandated by the Consent Decree. The policies are publicly available on the NOPD's website. The NOPD continues to develop and issue new policies as necessary and appropriate. The Monitoring Team reviews and provides feedback on each policy. For example, this quarter the Monitoring Team provided feedback on draft policies including Chapter 52.2 Negotiated Settlements, Chapter 52.3 Mediation, Chapter 52.4 Adjudication of Misconduct, Chapter 52.5 Disciplinary Matrix, Chapter 16.1 Transfer Selection Process, Chapter 46.4 Executive Protection Unit (and the associated Standard Operating Procedure), Chapter 33.5 Cadet Training Program, Chapter 1.25 Concealed Firearms Carry, and Rule 2 Moral Conduct.

In addition to review and feedback provided by the Monitoring Team and the Department of Justice, the NOPD's Policy Review Panel (which we discussed in our 2023 Annual Report and in our 2024 Q1 Report) meets monthly to review the Department's policies. The public also is invited to review and comment on the Department's current and draft policies. The list of policies up for review on a monthly basis are listed on the Annual Review Policy Schedule, which can be accessed via NOPD's website at https://nola.gov/nopd/policies/. Comments or concerns can be emailed to NOPD at policyandplanning@nola.gov.

### B.    Training

The Department provides training (both in the Academy for new recruits and annual in-service training for officers) as required by the Consent Decree. The Department's 2024 master training plan is available HERE. The Monitoring Team continues to monitor training to ensure it is sufficient to meet the requirements of the Consent Decree and the needs of NOPD members. As noted in our Q1 Report, NOPD has been meeting its obligations in this area for some time.

Training is one key part of the Remedial Action Plan that the Department submitted in response to the Court's July 21, 2023 Rule to Show Cause relating to the Department's violation of the Consent Decree in connection with the Department's investigation of Officer Jeffrey Vappie. Specifically, the Remedial Action Plan references six training-related tasks, including:

- NOPD to train Executive Protection Unit ("EP") on policies and the SOP.
- Enhance Academy training regarding supervisory use of Insight and escalating concerns.
- PIB and PSAB to retrain intake personnel on complaint classifications.
- Enhance training for PIB investigators on circumstantial evidence.
- Ensure training on applying the preponderance of evidence standard is sufficient.



- PIB personnel to seek additional information on this matter at the IAPro training at the end of October.

During Q2, the Monitoring Team reviewed the training tasks referenced above and confirmed all were sufficient and complete.

### C.    Implementation

To help NOPD manage implementing the Consent Decree's requirements and tracking compliance status, the Monitoring Team developed and shared with NOPD and DOJ a spreadsheet that tracks the compliance status of each Consent Decree paragraph; and notes the next steps needed for NOPD to come into compliance. A summary version of this Excel spreadsheet is forthcoming and will be posted to the Monitoring Team's website.

The spreadsheet is a valuable compliance management tool, but it is important to understand that it is only a tool to aid the parties and Monitoring Team manage the compliance process. It is a living document that reflects the *Monitoring Team's* assessment of NOPD's compliance at a point in time. Paragraphs can—and do— move into and out of compliance. The spreadsheet does not reflect a compliance finding by the Court. Ultimately, regardless of the compliance status reflected in the spreadsheet, whether NOPD has satisfied the terms of the Consent Decree is a legal determination that will be made by Judge Morgan.



## VIII.   AUDITS, REVIEWS, OBSERVATIONS, AND RECOMMENDATIONS

### A.     Use of Force

We continue to closely monitor areas relating to Use of Force. In Q2, we continued to monitor some issues we previously identified with NOPD's K9 Unit. Additionally, we conducted a review aimed at identifying *unreported* uses of force. Both reviews are discussed in more detail below.

### 1.     Canine

As described in our Q1 Report, we identified various concerns in Q1 that we continued to review and monitor during Q2. Based on our monitoring activities in Q2, we continue to have some concerns with respect to the K9 Unit. In particular, in late March 2024, one of NOPD's K9 handlers ("Handler 1") failed the recall portion of the National Narcotic Detector Dog Association (NNDA) test. Our team reviewed the training records since February 2024 to assess NOPD's weekly training (which still is occurring without a certified trainer, as discussed in our Q1 Report). Two of the notations from the training materials indicate Handler 1 and the K9 performed poorly on recall exercises and require further training. We were informed there is an additional certification due in August 2024 and we will contact NOPD following that certification test to obtain the results.[1] Additionally, the Monitoring Team will continue to closely review the weekly training materials until NOPD can provide evidence our concerns have been adequately addressed.

### 2.     Potential Unreported Uses of Force

As part of NOPD's Use of Force Audit, PSAB audits for potential unreported uses of force by reviewing BWC footage and documentation relating to incidents where (1) an officer was identified as being injured; (2) a suspect was identified as being injured; (3) a suspect was injured in custody; and (4) the subject was identified as resisting arrest.[2] The rationale is that incidents involving this type of conduct are more likely to involve uses of force. In NOPD's most recent Use of Force Audit, PSAB found no unreported uses of force (100% audit score).

To confirm these findings, the Monitoring Team also conducted a review designed to identify any unreported uses of force between July and December 2023. For each of the four criteria identified above, the Monitoring Team identified the incident numbers that did not have any corresponding Use of Force documentation. Then, for all incident numbers that were determined by NOPD not to require a force tracking number (FTN) due to PSAB's review of the electronic

---

[1]     Following the August 16, 2024 training, we contacted NOPD and confirmed Handler 1 and the K9 successfully completed the Patrol certification and are eligible to continue their assigned duties.

[2]     NOPD also reviews for unreported uses of force during PSAB's SSA Audit.



police report (EPR) (which is reflected in the "PSAB Eliminated after Review of EPR" column in the chart below) or BWC footage, the Monitoring Team took the following steps:

1. For sample sizes *less than or equal to 15*, we reviewed all available BWC footage to determine whether there was an unreported use of force.
2. For sample sizes *greater than 15*, we randomly selected and reviewed 10% of the available BWC footage to determine whether there was an unreported use of force.

Following these two steps, the Monitoring Team identified 75 incidents to review:

| Data Sets Created by PSAB | Jul – Dec 2023 Count (approx.) | FTN | No FTN | PSAB Eliminated after Review of EPR | Number for OCDM to Review | PSAB Eliminated after Review of BWC | Number for OCDM to Review |
|---|---|---|---|---|---|---|---|
| Resisting Arrest Charge | 12 | 10 | 2 | 0 | 0 | 2 | 2 |
| Injury/Death in Custody | 13 | 6 | 7 | 0 | 0 | 7 | 7 |
| Officer Injured | 6 | 2 | 4 | 0 | 0 | 4 | 4 |
| Subject Injured | 330 | 18 | 312 | 33 | 33 | 281* | 29 |
| **TOTAL** | | | | | **33** | | **42** |

* 1 - No Approved EPR; 1 - Non-NOPD Officer made arrest.

We reviewed all 75 incidents and did not identify any unreported use of force. This finding aligns with PSAB's finding of a 100% overall score for the Unreported Use of Force Audit.

In addition to the 75 incidents identified above, the Monitoring Team requested PIB provide all public and internal complaints of use of force for 2023 that resulted in an outcome of either not sustained or unfounded. PIB provided us with a list of 86 complaints. We then randomly selected 10% (i.e., 9) of the cases and reviewed the available BWC footage to determine whether there was an unreported use of force associated with the complaints. Based on our review of the BWC



footage, we did not identify any unreported uses of force associated with the complaints, and ultimately agreed with PIB's unfounded or exonerated determinations. Based on PSAB's findings, and the findings of our reviews, we are comfortable most NOPD officers are reporting uses of force as required by NOPD policy.

### B.    Protests at Jackson Square and Tulane University

During Q2, NOPD was involved in crowd control efforts to clear protestors relating to two pro-Palestinian protests. The first occurred on April 28, 2024 in Jackson Square and the second occurred at Tulane University, on May 1, 2024.

Although NOPD did not receive any public complaints regarding either of the protests, NOPD's Force Investigation Team (FIT) investigated the Jackson Square protest. During the investigation, a complaint was initiated internally against an officer for a possible unauthorized use of force.[3] The complaint later was cleared by BWC review and closed with a disposition of Unfounded. Separately FIT concluded the actions of personnel at the Jackson Square protest were justified and closed its force investigation.[4] FIT did not conduct a Use of Force investigation regarding the Tulane University Protest as it was determined through a review of BWC footage that no NOPD personnel used force during the Tulane protest.

The Monitoring Team also reviewed  both incidents, focusing on identifying any excessive force by responding officers, unconstitutional behaviors, and violations of NOPD policies. As discussed below, our reviews are consistent with NOPD's findings.

With respect to the Jackson Square protest, the Monitoring Team reviewed 77 BWC videos associated with the incident. Based on our review of the BWC footage, the scene in the square was chaotic, with many protestors actively resisting arrest after being warned by the State Police to leave the Square. NOPD officers used force in the course of apprehending individuals but the force was proportional to the individuals' resistance. Based on our observations, none of the uses of force appeared to be excessive or outside of NOPD policy.

With respect to the Tulane protest, the Monitoring Team reviewed 13 randomly selected BWC videos from the morning hours of May 1, 2024, associated with the incident. Here again, our review focused on identifying any excessive uses of force by responding officers, unconstitutional behaviors, and/or any NOPD policy violations. Compared to Jackson Square, the response at Tulane was much more coordinated, which led to a less chaotic scene. In advance of the operation, NOPD developed a plan to ensure the effectiveness and safety of both the protestors and law enforcement alike.  Numerous law enforcement personnel were present for the

---

[3]    CTN2024-0245-R.

[4]    FTN2024-0156.



operation and, based on our review, the coordination and communication between the law enforcement agencies involved was excellent. The dispersal instructions were loud and clear, and avenues of egress were open and available to the protestors. We did not observe any excessive uses of force or NOPD policy violations.

Although we did not observe any policy violations, based on our review of both incidents, we do offer some important observations and recommendations (which already have been communicated to NOPD). First, although numerous protests focusing on the Israeli and Hamas military conflict recently had taken place on college campuses around the United States, there did not appear to be any advanced planning for a similar protest in New Orleans. In the future, NOPD should anticipate such activity and plan for it in advance. Second, with multiple law enforcement agencies present during the Jackson Square operation, there did not appear to be clear lines of communication and coordination between these agencies. In the future, NOPD should anticipate such activity and create communication and coordination plans with any likely law enforcement partners in advance.

### C.    Bias Free Policing

During Q2, the Court held two hearings on the Bias Free Policing section of the Consent Decree. The first hearing was held on May 15, 2024, and focused on NOPD's overall progress with the Bias Free requirements in the Consent Decree. The NOPD provided a comprehensive presentation to the Court that discussed relevant policies, training, employee performance metrics, addressing misconduct, limited English proficiency (LEP) services, and LGBTQ+ coordination, community outreach, and audit criteria. NOPD's presentation from the hearing is available HERE.

On June 5, 2024, the Court held a follow-on hearing focusing on NOPD's Bias Free Policing data analysis and audits. Again, NOPD provided a comprehensive presentation that covered its various data analysis efforts relating to Bias Free, and its Limited English Proficiency audits. Additionally, the Monitoring Team provided a presentation on its initial review of the gun arrests made during Mardi Gras. The presentation materials are available HERE, and an audio recording of the public hearing is available HERE.

As we previewed in our Q1 Report, in February 2024, various media outlets raised concerns relating to bias, reporting that individuals stopped for suspicion of carrying a firearm during Mardi Gras 2024 were overwhelmingly young, Black men. These reports prompted NOPD and the Monitoring Team to conduct a multifaceted review of NOPD's gun-related arrests during Mardi Gras. We provided a brief summary of our reviews in our Q1 Report. Since then, based on feedback from the community, the Monitoring Team conducted an additional review relating to the arrests. In summary, we found there was probable cause for each stop, but have been unable to determine whether the disparity is attributable to individual or institutional bias. We will, however, continue to monitor this issue with a special focus on the 2025 Mardi Gras season. A



full copy of our Special Report Regarding NOPD Gun Arrests During Mardi Gras 2024 is included as Appendix A to this report.

### D.    Community Engagement

NOPD publishes reports on its community engagement efforts on a quarterly basis. The Monitoring Team reviewed NOPD's most recent Community Engagement report, covering Q1 of 2024. The Department completed 306 community policing forms (CPFs) for the first quarter of 2024. The number of forms completed in each district varied significantly – for example, District 3 completed 81 CPFs during the quarter, while District 6 completed none.

Each District's community relations efforts are comprised of six categories, including (1) meetings, (2) problem solving, (3) community policing plan, (4) strengthening relationships, (5) crime prevention, and (6) activities. Although some Districts and officers appear to be taking community engagement seriously, much of the documentation we reviewed demonstrated that some officers either still do not understand the community engagement categories (i.e., meetings, problem solving, community policing plan, strengthening relationships, crime prevention, and activities) or are not making an effort in these areas. For example, we reviewed a sample of the activities NOPD reported as meetings that took place between NOPD and the community in each district during Q1. We found 30% did not include any meeting with community members (rather, they were administrative meetings). With respect to problem solving, of the sample problem solving CPFs we reviewed, only 23% actually demonstrated problem solving. We found similar issues in the other categories.

The final part of the community engagement report focused on Police Community Advisory Boards (PCABs).[5] Based on NOPD's report, the Districts generally appear to have PCAB meetings, but they often are canceled or lightly attended by Board members or citizens. This generally aligns with feedback the Monitoring Team has received during community meetings. Some PCABs function well, while others do not. We have met with NOPD and the Independent Police Monitor to discuss the issue and to come up with a plan to restructure the PCABs to make them more useful to the community and to NOPD. On November 13, 2024, NOPD posted a copy of its proposed PCAB Compliance and Sustainment Plan to its website.

### E.    Domestic Violence (DV) Patrol – Spot Check

On May 8, 2024, the Monitoring Team received and reviewed PSAB's Audit Report on Domestic Violence Patrol response to calls for service for the period of July 2022- March 2024 (available HERE). PSAB's Audit reported an overall compliance score of 97%. The Monitoring

---

[5]    Although discussion of the PCABs are included in the Community Engagement report, the PCAB requirements in the Consent Decree can be found under the Transparency section (paragraphs 436-438).



Team reviewed the PSAB Audit Report, the underlying scoring documents completed by PSAB auditors, and the CAD report for the audit timeframe.

For our "spot check," we randomly selected three cases completed by each of the eight PSAB auditors (i.e., 24 cases). Additionally, we reviewed five randomly selected cases from the entire universe (of 13,038 items), which were not selected or reviewed as part of PSAB's audit. In all, we reviewed 29 cases as part of our DV Patrol "spot check." For each of the selected cases, we reviewed the auditor reports (for the 24 cases reviewed as part of the PSAB audit) and the related BWC's to substantiate and confirm the accuracy of the PSAB Audit findings.

Overall, we found no concerns with the auditors' scoring or with the officers' response to the DV calls for service we reviewed. From our review of the BWC footage, we found that when officers arrived on the scene of the calls for a Domestic Disturbance or Domestic Violence, they handled the call for service within policy and within Consent Decree requirements. The Monitoring Team observed no violations of NOPD policy in the 29 cases we reviewed.

While the results of our spot check were positive, we note that Gone On Arrivals (GOAs) continue to be a problem. Here, of the 97 cases selected by the PSAB auditors, 31 of the incidents (32%) were GOAs. Similarly, of the 29 incidents we reviewed during the spot check, 11 were GOA (38%). The Monitoring Team recognizes that not all GOA clearances are the fault of the NOPD as they may result from a held call in Communications, a late response due to no available units, or an occasion when the caller leaves the scene even though the call is dispatched in a timely manner and the officer(s) arrive promptly.

Notably, NOPD initiated a GOA Response Unit in 2023 to initiate call-backs to all DV-related calls for service. The Monitoring Team and Judge Morgan have visited this unit, located in the New Orleans Family Justice Center (NOFJC). The civilian staff appear well-trained and competent to make follow-up calls to citizens who made previous calls to 911 that were cleared as GOA. As a result, citizens have a second chance to report a domestic violence incident or crime or to be informed about available NOPD and NOFJC services. We continue to believe, however, that periodic assessments by NOPD of the GOAs on DV calls may indicate where re-allocation of personnel or other corrective measures may be appropriate.[6]

## F.    Performance Evaluations Audit

PSAB's audit of the Department's 2023 annual performance evaluations included review of 380 randomly selected evaluations.[7] The results of the PSAB Audit reflected some similar results as

---

[6]    The Monitoring Team continues to receive and evaluate statistics from NOPD relating to GOAs on DV calls.

[7]    The sample also included two evaluations from each supervisor to ensure each supervisor's performance evaluations were completed accurately.



compared to prior PSAB and Monitoring Team annual audits. PSAB found some evaluation sections were completed with nearly 100% or 100% compliance, while other evaluation sections continue to need improvement.

PSAB provides its data (tracking spreadsheet), evaluations, attachments, and scorecard to the Monitoring Team for review. During June 2023, the Monitoring Team randomly selected 60 evaluations for review. Of the 60 evaluations, 50 were evaluations previously audited by PSAB during the PSAB audit (those included 35 officer evaluations and 15 supervisor evaluations). We also randomly selected and reviewed 10 evaluations that were not previously reviewed by PSAB, (those included 7 officer evaluations and 3 supervisor evaluations).

Overall, we found evaluations continue to improve, especially in the first five responses, in which supervisors explain their ratings of subordinates in the areas of report writing, decision-making, safety, community engagement, and problem solving.

### 1.    Evaluations Reviewed by PSAB and by the Monitoring Team

Overall, we continue to see NOPD's performance evaluations improving steadily from year to year. Supervisors are providing more detail as compared to prior years and, in many cases, they provide good examples of performance to justify the ratings. We also found the PSAB auditors have provided accurate assessments as to whether the ratings and explanations were adequate to demonstrate compliance with Consent Decree requirements in most areas. We also found, however, that certain sections would benefit from additional training for the supervisors when completing the evaluations and for the auditors when assessing the completed evaluations. The areas include section 4b (community policing and problem solving), 8a and 8b (quarterly reviews and subordinates' areas of growth and challenges), and all sections from 10.1 through 10.4 (sections completed for all supervisors being evaluated).

We agreed with the majority of PSAB's audit findings, except in sections 4, 8, and 10 (section 10 is applicable to supervisor evaluations only). Although PSAB found low levels of compliance with sections 4 and 8, the Monitoring Team found even lower levels of compliance. Additionally, PSAB found high levels of compliance in section 10 while the Monitoring Team found lower levels of compliance. The chart below shows the questions where PSAB's findings and the Monitoring Team's findings differed:

| Question# | # of Evals the Monitor Rated Higher | # of Evals the Monitor Rated Lower | % In Agreement |
|---|---|---|---|
| 1 – Reporting Skills | 5 | 2 | 86% |
| 2 – Decision Making | 4 | 3 | 86% |



| Question# | # of Evals the Monitor Rated Higher | # of Evals the Monitor Rated Lower | % In Agreement |
|---|---|---|---|
| 3 – Safety Employed | 5 | 6 | 96% |
| 4a – Community Engagement/Problem Solving | 2 | 11 | 74% |
| 4b - Community Engagement/Problem Solving | 3 | 14 | 66% |
| 5a – Insight Verification | 1 | 0 | 98% |
| 5d – Insight Verification | 0 | 2 | 96% |
| 5e – Insight Verification | 0 | 2 | 96% |
| 5f – Insight Verification | 0 | 2 | 96% |
| 5h – Insight Verification | 0 | 1 | 98% |
| 6 – Search Warrant Log Verification | 0 | 1 | 98% |
| 8a – Quarterly Check-ins | 0 | 14 | 72% |
| 8b – Quarterly Check-ins | 0 | 22 | 56% |

Additionally, the chart below shows the questions from Section 10 (which is applicable only to supervisor evaluations) where PSAB's findings and the Monitoring Team's findings differed:

| Section # / Description | % Where PSAB and the Monitor Were in Agreement |
|---|---|
| 10.1 – Evaluation addresses misconduct | 67% |
| 10.2a – Completed quarterly reviews | 80% |
| 10.2b – Number of late reviews | 87% |



| | |
|---|---|
| 10.2c – Patterns identified | 87% |
| 10.2d – Non-disciplinary corrective action taken | 73% |
| 10.3 – Evaluation addresses non-compliance in SSA | 87% |
| 10.4 – Effectiveness in supervisory reviews | 67% |

## 2. Evaluations Reviewed by the Monitoring Team, but Not Audited by PSAB

For the 10 evaluations the Monitoring Team reviewed that were *not* audited by PSAB, our overall findings are below:

| Question # | Compliance Percentage |
|---|---|
| 1 – Reporting Skills | 100% |
| 2 – Decision Making | 90% |
| 3 – Safety Employed | 100% |
| 4a – Community Engagement/Problem Solving | 100% |
| 4b - Community Engagement/Problem Solving | 80% |
| 5a – Insight Verification | 100% |
| 5b – Insight Verification | 100% |
| 5c – Insight Verification | 100% |
| 5d – Insight Verification | 80% |
| 5e – Insight Verification | 100% |
| 5f – Insight Verification | 100% |
| 5g – Insight Verification | 90% |
| 5h – Insight Verification | 90% |



| | |
|---|---|
| 6 – Search Warrant Log Verification | 100% |
| 7 – Stops, Pat-Downs, or Arrests Verification | 100% |
| 8a – Quarterly Check-ins Date(s) Verification | 70% |
| 8b – Quarterly Check-ins Date(s) Verification | 50% |
| 9 – Bilingual Pay Verification | 100% |
| 10.1 – Evaluation addresses misconduct | 100% |
| 10.2a – Completed quarterly reviews | 67% |
| 10.2b – Number of late reviews | 67% |
| 10.2c – Patterns identified | 100% |
| 10.2d – Non-disciplinary corrective action taken | 100% |
| 10.3 – Evaluation addresses non-compliance in SSA | 100% |
| 10.4 – Effectiveness in supervisory reviews | 67% |

Generally, we found high levels of compliance except in the areas 4b (80%), 5d (80%), 8a (70%), 8b (50%), 10.2a (67%), 10.2b (67%), and 10.4 (67%). Notably, these generally were the same areas where PSAB and the Monitoring Team found low levels of compliance for the evaluations PSAB audited.

### G.    Supervision - Insight Audit (CD Paragraph 320)

In May 2024, the Monitoring Team met with representatives from PSAB to conduct an annual audit of Insight data (outlined in CD Paragraph 320). Overall, we found high levels of accuracy for the Insight data. The chart below shows a yearly comparison in the accuracy rates from our Insight audits from 2021 through 2024:[8]

---

[8] * indicates the system was being updated; ** indicated a system change was needed.



| Sub-Paragraph | 2021 Accuracy % | 2022 Accuracy % | 2023 Accuracy % | 2024 Accuracy % |
|---|---|---|---|---|
| Use of force - a | 99 | 93 | 92 | 94 |
| Weapons discharge-a | 17 | 96 | 90 | 95 |
| ECW in use - b | 100 | 100 | 100 | 100 |
| Canine bite - c | 100 | 100 | 100 | 93 |
| In-custody injuries - d | 100 | 99 | 99 | 100 |
| Resisting/arrest -e | 100 | 100 | 100 | 98 |
| Complaints - f | 91 | 91 | 92 | 98 |
| Stop data - g | * | 98 | 98 | 96 |
| Lawsuits - h | 100 | 100 | 100 | 70 |
| Criminal charges - h | ** | 89 | 100 | 100 |
| Restraining order - i | * | 100 | 100 | 100 |
| Vehicle pursuits - j1 | 100 | 55 | 46 | 91 |
| Vehicle collisions - j2 | 100 | 93 | 95 | 97 |
| Loss of property - k | ** | 83 | 92 | 100 |
| Interrogations - l | * | N/A | N/A | N/A |
| Decline/prosecute - m1 | ** | N/A | N/A | N/A |
| Motion to suppress- m2 | ** | 0 | 33 | 44 |
| Disciplinary action - n | * | 40 | 98 | 90 |
| Non-disc. action - o | 92 | 48 | 74 | 89 |
| Awards - p | 96 | 82 | 77 | 90 |
| Training - q | * | 100 | 100 | 100 |
| Sick leave -r | 100 | 92 | 86 | 92 |

The audit revealed several corrective actions that were supposed to be completed by Quartech during 2023 had not been completed. Two categories were marked "N/A" because there were no (i) reported incidents of officers violating the Department's interrogation policy, and (ii) cases declined for prosecution due to officer credibility issues. Motions to Suppress (m2) was one area with particularly low accuracy. This appears to be due to supervisors reluctancy to enter a suppression hearing into Insight under the belief that it may reflect poorly on an officer's performance – particularly where an assistant district attorney stated she/he did not think the officer did anything incorrectly. However, during a MAX meeting in May, Chief Gernon reminded supervisors that, per the Consent Decree requirements, they are required to make SFL entries for all suppressed evidence.



It is also worth noting that the Department recently switched to tracking vehicle pursuits via a platform called "Blue Team" and the accuracy rate in Insight for vehicle pursuits increased dramatically (from 46% in 2023 to 91% in 2024) as a result. That is a marked improvement and shows the value of using Blue Team to track pursuit data.

Overall, however, our findings reveal a significant improvement in not merely Insight's Consent Decree compliance, but its ability to serve as a useful tool to monitor officer performance and to remedy small problems before they evolve into big ones, which is the ultimate purpose of an early warning system.



## IX.    CONCLUSION

In short, the NOPD continued to demonstrate a commitment to its obligations to the community, its officers, and the Consent Decree during the Second Quarter of 2024, albeit with some elements of some areas needing more work to bring them into full compliance with the Consent Decree. It is important to keep in mind, though, that this Quarterly Report covers NOPD's and the Monitor's activities from April – June 2024, and, consequently, some items identified as requiring additional work may have been remedied in the more recent seven months.

In that regard, although not matters falling within the scope of this report, we have posted the presentations from our October public meetings regarding the Parties' Joint Motion to enter the Sustainment Period to our website (www.consentdecreemonitor.com). Additionally, we soon will posting a comprehensive list of questions asked at those meetings along with a summary of the answer, a statement or Special Report on the October promotions issue, and, soon, the Monitor's Third Quarter Report.

Additionally, we recommend checking NOPD's Consent Decree website (https://nola.gov/nopd/nopd-consent-decree/ ) frequently, which houses a wealth of information regarding NOPD's audits, court filings, and other materials of relevance to the Consent Decree.



X.    **APPENDICES**

A.    **Special Report of the Consent Decree Monitoring Team Regarding NOPD
      Gun Arrests During Mardi Gras 2024**





Special Report of the Consent Decree Monitoring Team
Regarding NOPD Gun Arrests During Mardi Gras 2024

December 2024



## I.    EXECUTIVE SUMMARY

Following this year's Mardi Gras celebration, the City of New Orleans announced that the NOPD and its partner law enforcement agencies seized 143 guns on or near parade routes and on Bourbon Street. Most of those from whom guns were seized were Black. As part of its ongoing focus on Paragraph 178 of the Consent Decree relating to Bias Free Policing, the Monitoring Team and the NOPD launched a joint review to explore whether this *disparity* was the result of *bias*.

The joint review consisted of three components:

1.    An NOPD-led review of 83 gun arrests during the 2024 Mardi Gras season,

2.    A Monitoring Team qualitative review of 324 NOPD body worn camera videos of the officers with the highest number of gun arrests on the parade route during the 2024 Mardi Gras season, and

3.    A Monitoring Team qualitative review of 72 additional videos to ensure NOPD/community interactions were being documented as required by NOPD policy.

In response to community feedback relating to our initial findings, we also reviewed the officer demographics and disciplinary histories, and conducted interviews of the officers with the highest number of gun arrests on the parade route during the 2024 Mardi Gras season. The interviews focused on the deployment strategies, training/instructions, supervision, tactics used by the officers, and information relied upon when making a decision to stop.

As explained in detail in this supplement to our Quarterly Report, while the available data clearly reveals a racial disparity in those being stopped and searched for guns, the data do not show that that disparity results from officer bias. Nonetheless, the disparity itself highlights the need for continued vigilance and ongoing review by the NOPD in this important area.

One important caution should be added here. The three analyses reflected in this Report are inherently limited in that they do not answer the question, "did racial bias (explicit or implicit) drive the selection of the individuals stopped by the NOPD for suspicion of carrying a concealed firearm?" While NOPD's and our analyses do not show evidence of bias in the treatment of individuals stopped and do not show evidence of pretextual stops, the available evidence is currently insufficient to determine whether Black individuals carrying guns during Mardi Gras were stopped more frequently than White individuals carrying guns in the same geographic locations.



# Contents

I.    Executive Summary ...................................................................................... 28

II.   Acknowledgement ...................................................................................... 30

III.  Introduction ................................................................................................ 31

IV.   Overview of the Reviews ........................................................................... 33

V.    DISCUSSION .............................................................................................. 35

  A.   PSAB's SSA Audit of Mardi Gras Gun Arrests .................................. 35

    1.   PSAB Methodology ..................................................................... 35

    2.   PSAB Findings ............................................................................. 35

  B.   BWC Review of Officers with Highest Numbers of Gun Arrests and Highest Number of
       Uncompleted FICs .............................................................................. 38

    1.   Monitoring Team Methodology ................................................... 38

    2.   Monitoring Team Findings ........................................................... 39

    3.   General Observations ................................................................... 41

  C.   Unreported Stops, Searches, and Arrests ........................................... 41

    1.   Monitoring Team Methodology ................................................... 42

    2.   Monitoring Team Findings ........................................................... 42

VI.   Conclusion .................................................................................................. 44

VII.  APPENDIX A: NOPD Mardi Gras Crime and Arrest Maps ......................... 48

  A.   Heatmap showing incidents from the 2023 Parade Season ................. 48

  B.   Incidents from the 2023 Parade Season with the call/signal description. ........................ 49

VIII. APPENDIX B: PSAB SSA Audit of Mardi Gras Gun Arrests ......................... 50

IX.   APPENDIX C: SSA Audit Protocol ............................................................... 51



## II.    ACKNOWLEDGEMENT

Policing is a complicated profession and, even in the best law enforcement agencies, as in most any other complex organization, there will be instances of misconduct. While the NOPD Consent Decree was crafted to promote constitutional policing and reduce misconduct—and it has been doing precisely that since its execution in 2013—no one should think a Consent Decree offers a magic formula to *eliminate* all misconduct. It does not. Instead, the Consent Decree ensures the existence of a robust process within the NOPD to critically examine potential problems when they arise; to deal with such problems legally, fairly, and promptly; and to be transparent about the problems and the solutions. Here, the NOPD did just that.

When the data regarding the Mardi Gras gun arrests were brought to NOPD's attention, rather than sweeping them under the rug, the Department promptly initiated an assessment into whether the disparities it saw in the data were the result of bias. The review the Department undertook was meaningful and sensible, albeit understandably limited in some respects. The Department shared every detail of its review plan with the U.S. Department of Justice and the Monitoring Team. We thank the NOPD, and particularly its Professional Standards & Accountability Bureau, for focusing on this matter in such a prompt and meaningful way.

The Monitoring Team also thanks the Department of Justice for its critical cooperation throughout this review.



## III.    INTRODUCTION

Following this year's Mardi Gras celebration, the City of New Orleans announced that the NOPD and its partner law enforcement agencies seized 143 guns on or near parade routes and on Bourbon Street.[9] According to NOPD data, most of those from whom guns were seized were Black.[10] Local and national media ran stories about the arrests, some of which applauded NOPD for taking so many guns off the streets, while others focused on the racial disparity of the stops and arrests. A similar fact pattern is evident in 2023, and perhaps in prior years as well.[11] Seeing the obvious disparity in the published data, the NOPD launched an internal review led by its Professional Accountability and Standards Bureau ("PSAB") to explore whether the disparity was the result of bias. NOPD requested the Monitoring Team and DOJ's technical assistance in the review.

For purposes of this Special Report, we define "disparity" as an observed difference in outcome by race regardless of cause, while we define "bias" as a difference in treatment based on race, whether conscious or unconscious. NOPD, DOJ, and the Monitoring Team considered various types of assessments focused on ferreting out bias. We first explored the effectiveness of a "hit-rate analysis" (i.e., an analysis that compares, for example, stops vs. recovery of guns for Black people to stops vs. recovery of guns for White people), but the numbers were too small to be statistically significant. We also considered evaluating the officers' initial decision to stop (or not to stop) an individual, but this too is extremely difficult because the basis for the stop typically is not articulated orally by the officer at the time of the stop. With these constraints, we focused our collective reviews on the available body worn camera (BWC) footage involving firearms stops to look for "red flags" surrounding the initial decision to stop the community member for possibly possessing a concealed firearm.

Ultimately, we conducted  three different reviews to assess bias:

---

9        https://www.nola.com/news/crime_police/mardi-gras-2024-sees-more-new-orleans-arrests-sicker-people-compared-to-last-year-numbers-show/article_94713cca-d5c3-11ee-8100-bb4205597deb.html#:~:text=Those%20and%20other%20agencies%20made,leading%20up%20to%20Fat%20Tuesday.  The 143 gun seizures include seizures by both NOPD and non-NOPD law enforcement agencies. The data we discuss in more detail in this report are limited only to NOPD's data and do not include stops, searches, and arrests made by non-NOPD law enforcement agencies.

10       Based on data provided by NOPD's PSAB, 93% (77 out of 83) of the individuals arrested by NOPD for illegally carrying a concealed firearm during the 2024 Mardi Gras season were Black.

11       https://thelensnola.org/2024/02/08/gun-arrest-data-raises-questions-about-profiling/; https://www.wwltv.com/article/news/investigations/mike-perlstein/nopd-body-cam-footage-reveals-last-years-carnival-season-gun-arrests/289-8ac583a7-2b9a-4e87-8b22-8a1e547c43e7



- First, PSAB conducted a Stops, Searches & Arrest (SSA) Audit of the gun arrests made during the Mardi Gras season February 2 – February 13, 2024 (the "Review Period").

- Second, in parallel, the Monitoring Team reviewed 100% of the BWC footage of the six NOPD officers with the highest number of arrests for concealed firearms on the parade route during the Review Period.

- Third, the Monitoring Team conducted a BWC footage review aimed at identifying unreported[12] searches during the Review Period.

After informally reporting on our initial findings, we received thoughtful feedback from the community with suggestions on how to further bolster our review. Based on that feedback, we requested and reviewed the officer demographics and disciplinary histories of the officers with the highest number of gun arrests on the parade route during the 2024 Mardi Gras season. While we were on-site in New Orleans, we also conducted in-person interviews of those officers. The interviews focused on the deployment strategies, training/instructions, supervision, tactics used by the officers, and information relied upon when making a decision to stop.

This Special Report shares the Monitoring Team's observations as well as our review and comments on the NOPD's findings.

We should note, however, that on March 5, 2024, the Louisiana Legislature made it legal to carry a concealed firearm in the state without a permit, although there are certain exceptions.[13] This new right became effective on July 4, 2024 and applies with very few location-based restrictions.[14] Because the law is so new, we will have to wait to see what the impact will be.

This change in the law, however, does not change the importance of this joint review or this Special Report. The question that drove the NOPD's and the Monitoring Team's assessment was not a question about guns, it was a question about disparity and potential bias. That question is an important one regardless of whether the actions that formed the basis of the officers' stop and search are permissible today.

---

[12]   For purposes of this Special Report, we define "unreported" as stops or searches where no officer completed the required field interview card ("FIC") or generated an electronic police report ("EPR").

[13]   *See* SB 1, available at https://legis.la.gov/Legis/ViewDocument.aspx?d=1348797.

[14]   *Id*.  In early March 2024, the City of New Orleans attempted to prompt the Louisiana Legislature to incorporate an exception to the permitless concealed carry law for parade routes and demonstrations. The effort failed. *See* FOX 8 "Louisiana Bill to Restrict Concealed Gun Near Parade Routes Fails" (May 6, 2024) available at https://www.fox8live.com/2024/05/07/louisiana-bill-restrict-concealed-guns-near-parade-routes-fails-debate-continues-over-thc-products/



## IV.    OVERVIEW OF THE REVIEWS

While generally it is not hard to identify disparity, it is quite hard to identify bias. One can look at top level data to see disparity—93% of people arrested for concealing firearms during Mardi Gras 2024 were Black—but one must dig much deeper into the data to determine whether that observed disparity is the result of bias.

To get our collective arms around the bias question here, the NOPD, the Monitoring Team, and DOJ discussed the matter at length and ultimately conducted three separate reviews aimed at identifying bias:

- First, the NOPD PSAB conducted a detailed audit of the 83 Mardi Gras gun arrests using a 62-point audit protocol developed as part of the Consent Decree Stops, Search, and Arrest review and previously approved by DOJ and the Monitoring Team. The Monitoring Team also conducted a spot check of PSAB's audit to confirm the audit findings.

- Second, the Monitoring Team reviewed <u>all</u> of the BWC footage (i.e., 324 videos) of the six officers with the highest numbers of arrests relating to concealed firearms during the Review Period. As described in more detail below, the Monitoring Team focused on whether the officers had articulable suspicion for the stop, acted professionally, adhered to NOPD policy, and generally were guided by the rules of procedural justice.

- Third, the Monitoring Team also conducted a review of BWC footage aimed at identifying *unreported stops and searches*.

The methodology and findings for each review is discussed in more detail in the sections below.

Two important points warrant mention here. First, when considering the question of bias, the Monitoring Team focuses on broad sets of data to look for *institutional bias*. Obviously, an individual officer may exhibit bias that is not reflected in a broad review of the data. And certainly an individual member of the community may be the victim of bias that likewise is not reflected in a broad review of the data. But in looking for patterns of institutional bias in the context of a Consent Decree, it is it is critical to draw conclusions from the data rather than from an individual experience. Other protections are in place to identify, assess, and hold officers accountable for individual cases of bias.

Second, as noted above, the three analyses reflected in this Special Report are inherently limited in that they do not answer the question, "did racial bias (explicit or implicit) drive the selection of the individuals stopped by the NOPD for suspicion of carrying a concealed firearm?" While NOPD's and our analyses do not show evidence of intentional bias in the treatment of



individuals stopped and do not show evidence of pretextual stops, the available evidence is currently insufficient to determine whether Black individuals carrying guns during Mardi Gras were stopped more frequently than White individuals carrying guns in the same geographic locations.



# V.     DISCUSSION

### A.     PSAB's SSA Audit of Mardi Gras Gun Arrests

The NOPD PSAB conducted a detailed audit of 100% of the Mardi Gras gun stops, searches, and arrests (*i.e.*, 83) using a 62-point audit protocol developed as part of the Consent Decree Stops, Search, and Arrest review and previously approved by DOJ and the Monitoring Team. While this audit did not focus on bias exclusively, it did evaluate each stop in terms of compliance with law, compliance with the Consent Decree, and adherence to the dictates of procedural justice.

#### 1.     PSAB Methodology

PSAB's SSA Audit of Mardi Gras Gun Arrests (the "PSAB Mardi Gras Audit," attached to this Special Report as <u>Appendix B</u>) discusses PSAB's methodology in detail. The purpose of PSAB's Audit was to ensure that all stops, searches, and arrests along the parade route during the Review Period relating to illegal possession of a firearm were conducted consistent with NOPD policy and constitutional law; were documented appropriately; that the documentation was complete and accurate; and that the stops, searches, and arrests were carried out with fairness and respect.

The Monitoring Team did not participate in this review. We did, however, previously approve the SSA audit protocol, and we reviewed the PSAB Mardi Gras Audit Report to be sure it aligned with that protocol. Additionally, we conducted a spot check to ensure we agreed with the PSAB auditors' findings. Our spot check consisted of a random sample of eight (approximately 10%) of the items reviewed by PSAB in its Mardi Gras Audit. For each of the eight items, we reviewed the auditor's findings and then reviewed the corresponding BWC footage, FIC, and Electronic Police Report (EPR) data (to the extent such data existed) to confirm the auditor's findings. This spot check, coupled with our knowledge and approval of the protocol used, gave us confidence in the integrity of the PSAB review.

#### 2.     PSAB Findings

PSAB audited all 83 arrests relating to gun incidents that occurred during the Review Period. To guide this audit, PSAB used the SSA review protocol previously approved by DOJ and the Monitoring Team. The protocol measures things like adequate completion of required documentation, professionalism and communication, and constitutional policing issues (such as reasonable articulable suspicion, probable cause, and Miranda warnings). A copy of the complete protocol is attached to this Special Report as <u>Appendix C</u>.

Overall, PSAB found a 94% compliance score, with sub-section breakdowns as follows:



| Audit Section | Topics Assessed | Score | Summary of Deficiencies (if any) | PSAB Recommendation |
|---|---|---|---|---|
| SSA Incidents - Oversight | Assesses whether the incident was properly documented (e.g., with an FIC) and whether there was proper oversight/supervision. | 80% | The audit identified procedural deficiencies in (1) creating FICs as required (82%); (2) FIC submittal by end of shift (22%); and (3) FIC approved in 72 hours (81%). | Specific training with In-Service Training classes or Daily Training Bulletins (DTBs) need to be utilized to reinforce close and effective supervision. |
| SSA Incidents - Procedural Justice | Assesses procedural justice issues like whether the officer introduced him/herself, explained the reason for the stop, responded to questions, and whether the officer was professional/ courteous. | 96% | The "Officer Introduced Themselves" category, with an 84% compliance rate, is the lowest category score. | When reasonably possible, officers should identify themselves as soon as practical on a stop. |
| SSA Incidents - Evidence | Assesses whether evidence was properly documented, submitted, and described. | 100% | There is no indication of FOB officers handling property and evidence outside of policy requirements. | |
| SSA Subjects - Stops | Assesses whether the officer had a proper basis for the stop, whether the stop was adequately documented, and whether handcuffing was within policy and documented. | 96% | The "Reason for Handcuffs Documented in Report" scored 81% in this audit. | |



| Audit Section | Topics Assessed | Score | Summary of Deficiencies (if any) | PSAB Recommendation |
|---|---|---|---|---|
| SSA Subjects - Searches | Assesses whether the officer had a reasonable basis for the search and adequately documented the search. | 98% | The score for "Officers adequately documenting a legal basis to search" scored 96%. The "Pat-Downs Officer Didn't Give Specific Details" category scored 32 of 36. There were 4 incidents with insufficient documentation. | |
| SSA Subjects - Arrests | Assesses whether the officer had probable cause to arrest, adequately documented the arrest, provided a Miranda warning, etc. | 98% | The "Miranda Given, if required" metric scored 93%. Probable cause, approved arrest summaries (Gists), and documentation policies continue to be adhered to in a consistent, and timely manner. | |
| SSA Subjects – Vehicle Exits | Assesses whether the justification for the vehicle exit was documented and within policy. | 100% | Probable cause, approved arrest summaries (Gists), and documentation policies continue to be adhered to in a consistent, and timely manner. | |

Generally, PSAB found very high levels of compliance, and we found PSAB's audit to be credible and well done. The largest deficiency identified during the audit related to completion of field interview cards (FICs).[15] PSAB correctly recommended additional training on FIC and EPR documentation, especially during major events such as Mardi Gras.

Importantly, the area that came in below 90% consisted primarily of procedural, not constitutional, violations. While procedural shortcomings certainly matter and clearly are covered by the Consent Decree, in the big picture, they are less problematic and far more manageable than evidence suggesting unconstitutional searches and seizures.

---

[15]     The PSAB's and the Monitoring Team's prior audits show a higher level of compliance with regard to completing timely FICs. We strongly suspect the realities of Mardi Gras (crowd size, crowd concentration, frequency of incidents, etc.) contributed to the lower-than-usual finding here.



As mentioned above, to confirm the accuracy of PSAB's Mardi Gras Audit, the Monitoring Team conducted a spot check of the audit findings. Based on the spot check, we agreed with the PSAB auditors' findings for all eight cases we reviewed. This provided the Monitoring Team with further assurance that the PSAB Mardi Gras Audit followed the applicable protocol and that the auditors' findings can be relied upon.

### B.    BWC Review of Officers with Highest Numbers of Gun Arrests and Highest Number of Uncompleted FICs

The Monitoring Team reviewed 100% of the BWC footage (*i.e.*, 324 videos) of the six officers with the highest numbers of arrests relating to concealed firearms during the Review Period. To ensure we also captured *unreported* stops, searches, and arrests, we also reviewed a 50% sample of the BWC footage of the officers with the highest number of uncompleted FICs. As described in more detail below, the Monitoring Team focused on whether the officers had articulable suspicious for the stop, acted professionally, adhered to NOPD policy, and generally were guided by the rules of procedural justice.

#### 1.    Monitoring Team Methodology

Per our request, PSAB compiled and provided the Monitoring Team with the names of the 20 officers with the most arrests relating to concealed firearms during the Review Period. The Monitoring Team selected the top six officers from the list (each of whom had six or more arrests) and reviewed the totality of each officer's BWC footage from February 2 – February 13, 2024.

In total, we reviewed 324 BWC videos; however, for purposes of this review, we focused only on the videos involving stops, searches, and arrests relating to firearms. Accordingly, if a BWC video indicated the incident was unrelated to a concealed firearm, we eliminated it from our review. Of the 324 BWC total videos, 131 involved possible concealed firearms. To supplement the review and data, we also included an additional 25 incidents concerning suspected concealed firearms from our review of the BWC footage of the officers with the highest number of uncompleted FICs.[16] After removing duplicates (because many incidents were captured by more than one officers' BWC)[17], we were left with 105 unique incidents concerning suspected concealed firearms.

---

[16]    The methodology for the review of the unreported stops, searches, and arrests is discussed in more detail in section VII.A., below.

[17]    While we removed duplicates from our initial review universe, where an incident benefited from viewing from different angles, we returned to and watched the relevant duplicate recordings.



We reviewed each of the BWC videos in detail (including using the Department's "multicam view," which allowed us to view the incident from different officers' BWC angles and perspectives) and noted the following information:

- The reason for the initial stop (*e.g.*, officer visual observation; citizen complaint; etc.)

- The gender of the subject (i.e., male or female)

- The race of the subject (e.g., Black, White, Hispanic; etc.)

- The outcome of the stop (*e.g.*, arrest; release – no gun; release – concealed carry permit; etc.)

We also noted any additional pertinent information and relevant observations, including any actions that appeared to violate NOPD Policy, the Consent Decree, or the principles of procedural justice.

2.    **Monitoring Team Observations**

a.    **Total Incidents**

The tables below provide a breakdown (by Race and by Gender) of the total SSA incidents the Monitoring Team reviewed relating to firearms. Notably, "incidents" include any time an officer stopped individuals for suspicion that they were carrying a concealed firearm. These incidents did not always result in an arrest (as discussed in more detail below).

Race

| Race | No. of SSA Incidents | Percent of Total Incidents Identified |
|---|---|---|
| Black | 98 | 93.3 % |
| Hispanic | 2 | 1.9 % |
| White | 5 | 4.8 % |
| **Total** | **105** | **100 %** |

Gender

| Gender | No. of SSA Incidents | Percent of Total |
|---|---|---|
| Male | 104 | 99.0 % |
| Female | 1 | 1.0 % |
| **Total** | **105** | **100 %** |



b.    **Stops Resulting in Arrests**

Out of the 105 total stops, 55 (52%) resulted in arrests. The table below provides a breakdown of the number and percentage of stops resulting in arrest by race.

| Race | Number of Stops | Number of Arrests | Percent of Stops Resulting in Arrests |
|------|-----------------|-------------------|----------------------------------------|
| Black | 98 | 50 | 51.0 % |
| Hispanic | 2 | 2 | 100.0 % |
| White | 5 | 3 | 60.0 % |
| **Total** | **105** | **55** | **52.4%** |

Although most stops resulted in a temporary detention, there are a number of reasons a lawful stop might not have resulted in an arrest. The reasons we observed included (1) the subject did not actually have a concealed firearm; (2) the subject had a BB-gun (that could reasonably be mistaken for a firearm); (3) the subject had a concealed carry permit; (4) the subject was current or former military; (5) the subject was current or former law enforcement. For reasons 3-5, if NOPD was able to verify one of those reasons applied (*e.g.*, the subject provided their concealed carry permit, the subject provided a copy or a photo of a military ID, etc.), then NOPD released the subject.

c.    **Number of Stops Where Subject Did Not Have a Concealed Weapon**

The following table provides a breakdown, by race, of the numbers and percentages of instances where the officer was incorrect about the subject possessing a concealed firearm. Overall, officers were correct about the subject possessing a concealed firearm 68.6% of the time.

| Race | Number of Stops | Number of Stops without Concealed Firearm | Percent Stops Where a Concealed Firearm Was Found | Percent of Stops Where a Concealed Firearm Was Not Found |
|------|-----------------|-------------------------------------------|--------------------------------------------------|-----------------------------------------------------------|
| Black | 98 | 31 | 68.4% | 31.6 % |
| Hispanic | 2 | 0 | 100% | 0.0 % |



| | | | | |
|---|---|---|---|---|
| White | 5 | 2 | 60.0% | 40.0 % |
| **Total** | **105** | **33** | **68.6%** | **31.4%** |

### 3.      General Observations

Overall, officers very often were correct with respect to the subject having a concealed firearm. Additionally, based on our review of the BWC footage, most of the stops resulted from an officer indicating he/she visually observed the concealed weapon (*e.g.*, gun-shaped object in front pocket, bulge near waistband, etc.).[18] Often, when the officer initiated the stop, he/she articulated the exact location of the firearm (*e.g.*, gun in front right pocket). Accordingly, based on our observations officers had reasonable articulable suspicion to believe the subject was carrying a concealed firearm, and the majority of the time, the suspicion turned out to be correct. We did not observe any instances where an officer appeared to indicate (at any point) – or acted in a manner that suggested – the stop was initiated due to race or gender.

We also did not observe any discrepancies relating to the officers' decision to arrest or release a subject *after* the initial stop. All subjects, regardless of race, were temporarily detained until the officer was able to verify that the subject either had a right to carry a concealed firearm (in which case they were released) or did not (in which case the firearm was confiscated and they were arrested).

### C.      Unreported Stops, Searches, and Arrests

The Monitoring Team also conducted a review of BWC footage aimed at identifying *unreported stops, searches, and arrests*. We conducted this additional review primarily to ensure there were no unreported stops, searches, or arrests that we would have missed in the other two reviews. We also wanted to ensure officers were not hiding bad behavior by not documenting encounters.

---

[18]      Under Louisiana law, an officer can stop someone upon reasonable suspicion that the individual is concealing a firearm. The officer does not need to have reasonable suspicion that someone is concealing a firearm *without a permit*. *See United States v. Wilson*, No. CR 22-92, 2003 WL 3601590 at *4-5 (E.D. La. May 23, *19 2023) ("Louisiana law makes the carrying of a concealed firearm 'presumptively unlawful'" and possession of a valid permit is merely an affirmative defense); *see also United States v. Conner et al.*, No. CR 23-54, 2024 WL 343143 at *7 (same).



### 1. Monitoring Team Methodology

To find the most likely instances of *unreported* stops, searches, or arrests,[19] PSAB compiled a list of officers who, based on the PSAB Mardi Gras Audit, were on the scene for incidents where no FIC was completed (although an FIC was required). We then selected the four officers who appeared most frequently on that list. Initially, there were 237 total incidents associated with the four officers during the Review Period. At our direction, PSAB eliminated any incidents that had an associated FIC or electronic police report ("EPR") item number,[20] which resulted in a total of 143 incidents without a corresponding FIC or EPR.

The Monitoring Team randomly selected 50% (*i.e.*, 72) of the BWC videos associated with each officer and reviewed those BWC videos in detail (including using the "multicam view," which allowed us to view the incident from different officers' BWC angles and perspectives) and noted the following information:

- The type of engagement (*e.g.*, whether it related to a firearm)

- The reason for the initial stop (*e.g.*, officer visual observation; citizen complaint; etc.)

- The gender of the subject (*i.e.*, male or female)

- The race of the subject (*e.g.*, Black, White, Hispanic; etc.)

- The outcome of the stop (*e.g.*, arrest; release – no gun; release – concealed carry permit; etc.)

We also noted any additional pertinent information and relevant observations, including any actions that appeared to violate NOPD Policy, the Consent Decree, or the principles of procedural justice.

### 2. Monitoring Team Observations

Of the 72 videos the Monitoring Team reviewed in an effort to ensure all stops, searches, and arrests were being reported as required by NOPD policy, 25 captured a stop, search, or arrest relating to firearms. Although we conducted a qualitative analysis of all 25 BWC videos, because

---

[19] To be clear, this was *not a random sample*. It was a targeted reviewed aimed specifically at finding the officers most likely to have unreported encounters.

[20] Incidents with an FIC or EPR item number were eliminated because this portion of the review focused on unreported stops and searches and an FIC or EPR item number would indicate the stop, search, or arrest was reported.



we primarily were interested in *unreported* stops, searches, and arrests, we also sent the 25 videos to NOPD's PSAB to determine whether those incidents actually were unreported.[21]

After further investigation, PSAB confirmed 13 of the 25 stops, searches, and arrests either had an FIC or were recorded in the EPR system (leaving 12 unreported). Therefore, our review found 48% of stops and searches relating to suspicion of concealed firearms from our targeted review sample were unreported. It is important to note (again) that we cannot generalize these findings because we used a targeted sample, not a random one. In other words, we <u>cannot</u> conclude 48% of all stops, searches, and arrests relating to concealed firearms during Mardi Gras were unreported.

Other than the failure to complete the required documentation, we did not observe deficiencies or concerns with the unreported stops/searches from our review of the BWC footage. We did not find that officers were attempting to hide bad stops or searches by not reporting them. Instead, it seems more likely that officers simply forget to complete FICs due to the unique nature of Mardi Gras. Still, failure to properly document such encounters does violate NOPD policy (and the Consent Decree. As such, we echo PSAB's recommendation that specific training should be provided (with In-service Training classes or Daily Training Bulletins ("DTBs")) to reinforce the importance of properly documenting stops, searches, and arrests, including those that take place during major events. Further, we recommend NOPD conduct additional analyses over the coming months to determine (i) whether the 48% is unique to the Mardi Gras environment and (ii) whether incidents involving concealed firearms are more likely to go unreported by officers than other stops.

---

[21]     Most of the BWC videos we reviewed involved multiple officers. However, only one officer is required to complete the paperwork associated with a stop, search, or arrest. As such, it is possible another officer (i.e., not the officer whose BWC footage we watched) completed the required paperwork to properly document the stop, search, or arrest. We asked PSAB to investigate the 25 incidents further to determine how many were in fact unreported by any involved officer.



### D.    Additional Review of Officers with Highest Numbers of Gun Arrests

In response to thoughtful feedback we received from the community, we requested and reviewed the demographics and disciplinary histories of the six officers with the highest numbers of gun arrests on the parade route during the 2024 Mardi Gras season. Additionally, while we were on-site in New Orleans, we conducted in-person interviews of five of the six officers with the highest numbers of gun arrests on the parade route during the 2024 Mardi Gras season.[22]

### 1.    Officer Demographics and Disciplinary Histories

Regarding officer demographics, four of the arresting officers were White and two were Black. We also reviewed the officers' disciplinary histories. Notably, we reviewed the entire disciplinary histories (going back as far as 2009), not just discipline based on complaints received during the 2024 Mardi Gras season. Importantly for this review, none of the allegations/complaints we identified related to bias. This provides us additional comfort that there is no apparent pattern or practice of biased policing with respect to these officers.

### 2.    Officer Interviews

All five officers we interviewed were deployed in the 8th District. The purpose of the interviews was to gather additional information and context that we could not obtain purely by analyzing the arrest data or watching BWC footage. In particular, our questions focused on the instructions and/or training given to officers prior to their shifts, the basis of NOPD's deployment strategies, what officers look for when spotting concealed firearms, the information that informs a decision to stop, and the tactics officers use when making a stop. Overall, we found the officers to be very professional, thoughtful, engaging, and credible.

#### a.    Deployment Strategies

The decision on where to deploy NOPD officers is based on a number of factors including prior experience during Mardi Gras, where secondary units will be deployed, and proximity to the 8th District station (which provides more resources, e.g., EMS, additional officers, etc.). Ultimately, the majority of NOPD officers from the 8th District were deployed near the 300-500 blocks of Bourbon Street, which is the most densely populated area and historically has had the most issues with large fights and shootings during the Mardi Gras season.

#### b.    Instructions/Training Given Prior to Shifts

The 8th District officers do not receive any formal (e.g., at academy or in-service) on spotting concealed firearms. They learn from one another on the job by discussing what they are looking

---

[22] One of the six officers was unavailable due to a family emergency.



for and seeing. They review everything together in real time. Additionally, they were not provided any specific instruction on looking for concealed firearms at roll calls prior to starting their shifts. Rather, they were instructed to be proactive (which some officers understood to include looking for concealed firearms) and to focus on officer and public safety. The roll calls also did not provide any instruction relating to bias free policing or constitutional policing because they did not have any recent issues or complaints relating to those topics.

### c.    Spotting Concealed Firearms / Making a Decision to Stop

Spotting concealed firearms and making a decision to stop involves multiple factors and a totality of the circumstances. It also is important to remember that during the Mardi Gras season, officers deployed on Bourbon Street generally are scanning hundreds of people in a very large and dense crowd. Officers initially look from the mid-chest to waist/hip area and are looking for an abnormal bulge under individuals' shirts or at their belts. Once an abnormal bulge is identified, officers then focus on body language – for example, if the individual is looking at the officer, has darting eyes, and/or is trying to move away. Officers also look to see if the individual is putting their hand on the bulge or dropping their arm over the bulge (i.e., a security tap), or walking in a strange manner (e.g., concave with the shoulders hunches to better conceal the weapon). If several of those factors are present, the officers begin to coordinate by dictating exactly who potentially has the concealed weapon and where on the body the officer believes it is located. If the first officer is not fairly certain based on multiple indicators, other officers will also do an assessment and provide feedback. If the officers are not reasonably certain there is a concealed firearm, they do not make a stop.

The officers we spoke to also conceded that they sometimes are wrong. The most common reason is that there is an outline of a hard edge (e.g., large belt buckle, large vape, wallet with phone on top) coupled with unusual body language. If the officers get it wrong, they explain why they made the stop, and apologize. We saw examples of this during our review of the BWC footage.

### d.    Bias

Lastly, we asked the officers about bias. We conveyed community concerns (as well as our own) that the vast majority (93.3%) of individuals stopped by officers during the Review Period were Black males, which is a significant disparity that is hard to explain. The officers acknowledged what the data showed, but consistently conveyed that their decisions to make a stop were dictated by observing a gun, not by race. These statements were consistent with our observations during the review.



## VI.    CONCLUSION

Unquestionably, the vast majority (93.3%) of individuals stopped by officers during the Review Period were Black males, of which 68.4% were found to actually be carrying a concealed firearm. This is an obvious disparity. Determining whether this disparity results from officer bias, however, is a different – and far more complicated – question.

The Monitoring Team's review of the available data and BWC videos does not show that bias was the driver of the Mardi Gras gun stops. While we cannot definitively state that bias (racial or gender; conscious or unconscious) played no role in an individual officer's decision to stop a subject, our review did not reveal evidence of such bias. Indeed, our review did not reveal any stops that appeared to be driven by anything other than a reasonable belief that the subject was carrying a concealed weapon.

This observation, of course, leaves open the question of why the disparity is so great. One possibility the Monitoring Team explored was whether NOPD's Mardi Gras deployment strategy might have contributed to the disparity, and exhibited conscious or unconscious bias, by focusing the search for guns only on the areas frequented by young Black males. This does not appear to be the case, though. The Monitoring Team reviewed NOPD Mardi Gras deployment strategy (a copy of which is attached to this Report as Appendix A), *which seems to have been driven primarily by an analysis of the areas experiencing prior criminal activity*. This seems to be a sensible means of deploying officers.

The Monitoring Team also explored whether NOPD's Bourbon Street deployment strategy contributed to the disparity, and exhibited conscious or unconscious bias, by selectively focusing only on the portions of Bourbon Street frequented by young Black males. Here again, this does not appear to have been the case. The NOPD and the Louisiana State Police divided up Bourbon Street to ensure a law enforcement presence covering the entirety of the 100 block to the 1000 block of the street. NOPD had primary responsibility for the 100-500 block while the LSP has primary responsibility for the 600-1000 block. Thus, it was not the case that NOPD selectively enforced the then-existing gun laws discriminatorily.

A few officers we spoke with about the disparity speculated that young people are more likely to carry guns in their front belt or in their pockets, making them easier to identify by officers; while older people are more likely to carry guns in a side or ankle holster, making them harder to identify. While an interesting observation, we have no data to suggest this is true. It does highlight, though, that there could be any number of factors contributing to the disparity, including factors that suggest bias and factors that do not.

In short, there are any number of *possible* explanations for the disparity shown in the data, including potential bias. But it is not our job or purpose to speculate. What we can say at this



point is simply that our analysis to date does not show the disparity in Mardi Gras gun stops was the result of a pattern of bias. That said, the question is worthy of continued exploration.



## VII.    APPENDIX A: NOPD MARDI GRAS CRIME AND ARREST MAPS

### A.    Heatmap showing incidents from the 2023 Parade Season





**B.    Incidents from the 2023 Parade Season with the call/signal description.**





## VIII.   APPENDIX B: PSAB SSA AUDIT OF MARDI GRAS GUN ARRESTS



## Auditing and Review Unit
## Professional Standards and Accountability Bureau

# Stops, Searches & Arrest Audit

## (Mardi Gras Gun Arrests)
## March 2024

Sample Period Feb 2nd, 2024 – Feb 13th, 2024

Report# **SSAMGGA032024**
Submitted by PSAB: 4/1/2024.
Response from NOPD: TBD
Report: TBD

**Audit Team**
This audit was managed and conducted by the Audit and Review Unit individuals listed below:
Timothy Lindsey, Innovation Manager – Auditing
Bianca Harris, Auditor
Chelsea Albritton, Auditor
Jovan Berry, Auditor
Melinda Foy, Auditor
Cardell Silas, Auditor
Chris Porter, Auditor
Danta Lewis, Auditor
Taneva Bowers, Auditor
Lonnal Lamb, Auditor
Ernest Crayton, Special Investigator

## Executive Summary

The Audit and Review Unit of the Professional Standards and Accountability Bureau conducted an audit of Stops, Searches and Arrests (SSA) related to Gun Arrest incidents which occurred between February 2nd, 2024, and February 13th, 2024, during the Mardi Gras season.  The audit is designed to measure compliance to NOPD policies and the Consent Decree, thereby ensuring that the stops, searches, and arrests executed during the Mardi Gras were conducted and executed consistent with those policies and constitutional law.  The audit aims to ensure all incidents are documented appropriately, that the documentation is complete and accurate, and that stops, searches, and arrests are carried out with fairness and respect.

**Stops, Searches, and Arrests – Audit**

o **SSA Overall -** Scorecard has an overall compliance score of **94%.**  No previous audit conducted related to Mardi Gras gun arrests.

o **SSA Incidents - Oversight -** Scorecard has an overall compliance score of **80%.** The categories include the following: "FIC Exists, If Required", "FIC Submitted By ETOD", "FIC Approved in 72 Hrs.", "No Boilerplate", "Videos and Reports Are Consistent", "Arrested in Residence with Consent, Warrant, or Exigent Circumstances", and "Supervisor Made Scene, If Required".  Most of the categories on this scorecard pertain to the officer documenting his/her action with the public. FICs and EPRs should be complete, accurate and timely. The deficiencies with regard to FIC submittals and approvals within policy timeframes are currently being addressed through the SSA Inspections as part of the FOB Corrective Action Plan. However, the completion of FIC's if required, need to be addressed specifically as it relates to conducting self-initiated stops during the Mardi Gras season.  The audit confirmed that the deficiencies in (1) creating FIC's as required was **82%**; (2) FIC submittal by ETOD was **22%**; FIC Approved in 72hrs. was **81%**; (4) video to report consistency was **94%**. Specific training with In-service Training classes or Daily Training Bulletins (DTBs) need to be utilized to reinforce close and effective supervision.  FIC submittal and approval timeliness remains below NOPD goals.

   ▪ Compliant CD paragraphs include 123, 124, 136, 145
   ▪ CD paragraphs below target compliance percentage include 126, 149 (FIC Exists), 150 (sub-paragraph: report submittal and approval timeliness).

o **SSA Incidents - Procedural Justice -** Scorecard has an overall compliance score of **96%.** The categories include the following: "Officers Introduced Themselves", "Officers Explained Reason for Stop", "Officers Allowed Subject to Explain", "Officers Responded to Subject's Reasonable Questions", "Officers Communicated Result Stop", "Took No Longer than Necessary", and "Officers Were Reasonably Courteous and Professional".  The "Officer Introduced Themselves" category with an **84%** compliance rate is the lowest category score.  When reasonably possible, officers should identify themselves as soon as practical on a stop. This improvement is indicative of concerted efforts by FOB to ensure officers

identify themselves in an expeditious manner.
- Compliant CD paragraphs include 181 (sub-paragraph 2-4-Explanation, Timely, Professional).
- CD paragraphs below target compliance percentage include 181 (sub-paragraph: 1-Identified).

o **SSA Incidents - Evidence -** Scorecard has an overall compliance score of **100%.** The categories include the following: "Evidence Documented", "Evidence Submitted Immediately", and "Evidence Description Matches Video". There is no indication of FOB officers not handling property and evidence outside of policy requirements.
- Compliant CD paragraphs include 123, 149, 150 (sub-paragraph Evidence).
- CD paragraphs below target compliance percentage – None

o **SSA Subjects - Stops -** Scorecard has an overall compliance score of **96%.** The categories include the following: "Officer had RS/PC for Stop", "Officer Adequately Documented RS/PC to Stop", "Reason for Handcuffs Documented in Report" and "Handcuffing Within Policy". The "Reason for Handcuffs Documented in Report" scored **81%** in this audit.
- Compliant CD paragraphs include 122, 123, 126, 149, 150 (sub-paragraph-Documentation).
- Non-Compliant - Handcuffing is NOT audited as a CD paragraph, but as NOPD Policy.

o **SSA Subjects - Searches -** Scorecard has an overall compliance score of **98%.** The categories include the following: "Officer Had Valid Legal Basis to Search Subject" and "Officer Adequately Documented Legal Basis to Search". The score for "Officers adequately documenting a legal basis to search" scored **96%.** The "#Pat-Downs Officer Didn't Give Specific Details" category scored 32 of 36. There were 4 incidents with insufficient documentation.
- Compliant CD paragraphs include 123 (Searches), 149, 150 (sub-paragraph-Documentation).
- CD paragraphs below target compliance percentage include 123 (Pat Downs).

o **SSA Subjects - Arrests -** scorecard has an overall compliance score of **98%.** The categories include the following: "Supervisor Approved Gist Prior to Booking", "Officer had Probable Cause to Arrest Subject", "Officer Adequately Documented PC to Arrest", and "Miranda Given, if required". The "Miranda Given, if required" metric scored **93%.** Probable cause, approved arrest summaries (Gist's), and documentation policies continue to be adhered to in a consistent, and timely manner.
- Compliant CD paragraphs include 141, 144, 145.
- Non-Compliant: Miranda is NOT audited as a CD paragraph, but as NOPD Policy.

o **SSA Subjects – Vehicle Exits -** scorecard has an overall compliance score of **100%.** The categories include the following: "Vehicle Exit Justification Documented", and "Vehicle Exit Justification Compliant". Probable cause, approved arrest summaries (Gist's), and documentation policies continue to be adhered to in a consistent, and timely manner.
- Compliant CD paragraph includes 149.

3

# Table of Contents

Executive Summary ........................................................................................................... 2

**Introduction** ................................................................................................................... 6
*Purpose* ............................................................................................................................ 6
*Objectives* ........................................................................................................................ 6
*Background* ...................................................................................................................... 6
*Methodology* .................................................................................................................... 6

**Initiating and Conducting the SSA Audit** ...................................................................... 9

**Reviews - Scorecards** ..................................................................................................... 11

**Stops, Search, Arrests (SSA) Audit Summary Table**

## Stops Searches and Arrests Sample - March 2024 - MG Gun Arrests

| Audit Form # | CD §/Chapter | Form | Field Name | Field Text | Number Compliant | Number Required | Compliance Rate | Compliance Threshold Met (>=95%) | Number NA | Total Reviewed | PSAB Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CD 124 | Incident | Known to be Materially False | | Offline Process through Direct Supervisor and PSS Notify | | | | | | |
| | | | | If you suspect an officer relied on information he or she knew to be materially false or incorrect to make a stop or detention, contact your supervisor. | | | | | | | |
| 2 | CD 126, 149, 150 | Incident | FIC Exists If Required | If required, does an FIC exist for this stop? | 59 | 72 | 82% | FALSE | 11 | 83 | |
| 3 | CD 150 | Incident | FIC Submitted By ETOD | Did the officer submit the FIC to his/her supervisor by the end of the shift? | 12 | 54 | 22% | FALSE | 29 | 83 | 5 Kicked back(Marked NA) (Most were entered Post MG) |
| 4 | CD 150 | Incident | FIC Approved in 72Hrs | Did the supervisor review the FIC within 72 hours? | 48 | 59 | 81% | FALSE | 24 | 83 | |
| 5 | CD 133, 136, 145, | Incident | No Boilerplate | In the reports, did the officer(s) use specific descriptive language when articulating reasonable suspicion and/or probable cause for any stop, detention, search, or arrest? | 80 | 82 | 98% | TRUE | 1 | 83 | |
| 6 | CD 123 | Incident | Videos and Reports Are Consistent | Are the video(s) and reports significantly consistent? | 76 | 81 | 94% | FALSE | 2 | 83 | |
| 7 | Ch 1.9 p27-29 | Incident | Arrest in Residence Circumstances | If yes [video or reports show the officer entered a residence to make the arrest], which of the following apply? Options: (Consent, Exigent Circumstances, Warrant, None of the above (Not Compliant)) | 1 | 1 | 100% | TRUE | 82 | 83 | |
| 8C (8A,8B) | CD 133, 143 | Incident | Video Shows Supv Make Scene | If the supervisor is required to make scene, does video show the supervisor made the scene? | 20 | 21 | 95% | TRUE | 62 | 83 | |
| 9 | CD 80, Ch 1.3 | Incident | Use of Force Observed | Did any officer use reportable force during this officer-civilian interaction? | 8 | 80 | | | 3 | 83 | NA - 3 no video available |
| 10, 11 | CD 80, Ch 1.3 | Incident | Use of Force Reported | If Force Observed, is there a corresponding Blue Team Report? (No could indicate it is unreported) 11. Provide Video Documentation. | 5 | 6 | 83% | FALSE | 77 | 83 | one potential gun pointing (sent to PSS Notify); 5 confirmed UoF |
| 12 | CD 132, 133, 134 | Incident | Strip Cavity Search Occurred | Did the incident involve a strip or cavity search? (Informational Only) | 0 | 83 | | | 0 | 83 | |
| 13 | CD 132, 133, 134 | Incident | Strip Cavity Search Documented | If Strip/Cavity search is observed( yes), is the strip or cavity search documented in the FIC or EPR? | 0 | 0 | NA | TRUE | 0 | 83 | |
| 14 | CD 131, 149 | Incident | Consent to Search Occurred | Does the incident involve a consent to search search? (Informational Only) | 0 | 83 | | | 0 | 83 | |
| 15 | CD 131, 149 | Incident | Consent to Search Documented | If yes, is the consent to search documented in the FIC or EPR? | 0 | 0 | NA | TRUE | 0 | 83 | |
| 16 | CD 150 | Incident | Evidence Documented | If evidence was seized, is there a CE=F receipt? | 79 | 79 | 100% | TRUE | 4 | 83 | |
| 17 | CD 150 | Incident | Evidence Submitted Immediately | If evidence was seized, was it submitted to CE=F before next Code1 call or ETOD, whichever is first? | 79 | 79 | 100% | TRUE | 4 | 83 | |
| 18 | CD 123, 149, 150 | Incident | Evidence Description Matches Video | If evidence was seized, and there is a CE=P receipt, does the description on the receipt match the evidence as seen on video? | 79 | 79 | 100% | TRUE | 4 | 83 | |
| 27 | CD 181 | Incident | Reasonably Courteous | Does video show the officer was reasonably professional and courteous when interacting with the subject or other civilians during the stop? | 81 | 82 | 99% | TRUE | 1 | 83 | |
| 28 | CD 181 | Incident | Identified | If reasonably possible, does video show the officer verbally identify him/herself as a soon a practical? | 69 | 82 | 84% | FALSE | 1 | 83 | 8 - 8th (6-Promenade); 2 - 6th; 2-2nd; 1-1st. |
| 29 | CD 181 | Incident | Explained | If reasonably possible, does video show the officer explain the reason for the stop/interaction as soon as practical? | 79 | 82 | 96% | TRUE | 1 | 83 | |
| 30 | Ch 41.13 P9E | Incident | Subject Could Explain | Does video show the officer allowed the subject an opportunity to explain his/her situation, ask questions, or voice concerns? | 81 | 82 | 99% | TRUE | 1 | 83 | |
| 31 | Ch 41.13 P9E | Incident | Responded to Subjects Qs | If the subject was allowed to ask questions, and if the subject had reasonable questions or concerns, does video show the officer respond to them? | 71 | 71 | 100% | TRUE | 12 | 83 | |
| 32 | Ch 1.2.4.1 P18 | Incident | Conclusion | Does video show the officer communicate the result of the stop/interaction to the subject (arrest, ticket, etc.)? | 78 | 82 | 95% | TRUE | 1 | 83 | |
| 33 | 139, 181 | Incident | No Longer than Necessary | Does video show the stop was no longer than necessary to take appropriate action? | 82 | 82 | 100% | TRUE | 1 | 83 | |
| 36 | Ch 41.3.10 P11 | Incident | Complete Vid Num and Complete Vid Denom | Did each officer who conducted a stop, search, or arrest and who has been issued a BWC activate his/her BWC as required? And did each supervisor who made the scene and who has been issued a BWC activate his/her BWC as required? | 172 | 185 | 93% | FALSE | | | |
| 1A | CD 122 | Subject | RS/PC to Stop | Based on all the evidence available to you, did the officer(s) have reasonable suspicion or probable cause to stop this subject? | 84 | 84 | 100% | TRUE | 1 | 85 | |
| 2A | CD 122, 123, 126, 149, 150 | Subject | RS/PC to Stop in Report | Does the report clearly articulate reasonable suspicion or probable cause to stop this subject? | 84 | 84 | 100% | TRUE | 1 | 85 | |
| 3A | Ch. 1.3.1.1 P25 | Subject | Reason for Handcuffs Documented | If the officer put the subject in handcuffs, did the officer document a reason to handcuff in the FIC? | 60 | 74 | 81% | FALSE | 11 | 85 | |
| 3B | C. 1.3.1.1 | Subject | Discretionary Handcuffs Within Policy | If this subject was handcuffed, does the evidence available to you show the handcuffing was within policy? | 39 | 40 | 98% | TRUE | 44 | 84 | |
| 3B | Ch. 1.3.1.1 | Subject | Mandatory Handcuffs Within Policy | If this subject was handcuffed, does the evidence available to you show the handcuffing was within policy? | 83 | 83 | 100% | TRUE | 2 | 85 | |
| 4 | CD 149, 150, Ch. 1.2.4 P1 | Subject | Search Legal Numerator and Search Legal Denominator | Based on all the evidence available to you, did the officer(s) have a valid legal basis to search the subject? | 106 | 106 | 100% | TRUE | 9 | 115 | |
| 5 | CD 123, 149 | Subject | Reason to Search in Report Numerator and Reason to Search in Report Denominator | Does the "Report" sufficiently document a valid legal basis for every search of this subject? | 99 | 103 | 96% | TRUE | 9 | 112 | |
| 6 | 123, Ch.41.12 P12) | Subject | Pat Down Justification | If a pat down was correctly indicated, did the officer give specific details about the pat down that would lead a reasonable person to believe the subject was armed and dangerous in the justification for pat down text box? Informational Only. Included in Search Report Q5. | 32 | 36 | 89% | FALSE | 49 | 85 | |
| 7 & 4 | CD 130 | Subject | (7) Search Subject on Probation or Parole & (4) Search Legal Numerator, and Search Legal Denominator | (7) Was this subject on parole or probation? & (4) Based on all the evidence available to you, did the officer(s) have a valid legal basis to search the subject? | 6 | 6 | 100% | TRUE | 81 | 87 | |
| 8 | CD 144 | Subject | Supervisor Approved Gist Prior to Booking | Was the arrest gist for this subject approved by a supervisor before the subject was booked by the officer? | 81 | 81 | 100% | TRUE | 4 | 85 | |
| 9 | CD 141 | Subject | Officer Had PC to Arrest | Based on all the evidence available to you, did the officer have probable cause to arrest this subject? | 80 | 81 | 99% | TRUE | 4 | 85 | |
| 10 | CD 141, 145, Ch 1.9 P14, Ch 82.1 P4, Ch 41.12 P15 | Subject | PC Clearly Articulated | Did the officer clearly document the probable cause in the report (FIC or EPR)? | 80 | 81 | 99% | TRUE | 4 | 85 | |
| 11 | | Subject | Stop Result | What was result of Stop? Multiple choice (Informational Only) | Physical Arrest 81 | Citation Issued 0 | No Action Taken 1 | Summons Issued 4 | Verbal Warning 0 | 86 | |
| 12 | | Subject | Break Given | Did the officer use their discretion to give the subject a break? (Informational Only) | 2 | 84 | | | 1 | 85 | |
| 15 | Ch 1.9.1 | Subject | Miranda Given | Did the officer give Miranda Rights, if required? Officers shall advise suspects of their Miranda Rights at the time of arrest or prior to any custodial interrogation. See Chapter: 1.9.1; Note: Miranda does not apply to roadside questioning of a stopped motorist or a person briefly detained on the street under a Terry stop. | 78 | 84 | 93% | FALSE | 1 | 85 | |
| 13 | | Subject | ID Checked | Did the officer run the subject's ID? | 85 | 85 | 100% | TRUE | 0 | 85 | |
| 14 | CD 189 | Subject | LEP | Did the officer request translation services, if needed? | 0 | 0 | | TRUE | 85 | 85 | |
| 20 | CD 149 (h) Ch 1.2.4.3 P16, Ch 41.12 P12(f) | Subject | Required to Exit Vehicle | Did an officer require this subject to exit a vehicle? (Informational Only) | 8 | 10 | | | 75 | 85 | |
| 21 | CD 149 (h) Ch 1.2.4.3 P19, Ch 41.12 P12(f) | Subject | Vehicle Exit Justification Documented | If you chose yes for "Required to Exit Vehicle", did an officer document the justification to require this subject to exit the vehicle in the FIC? | 7 | 7 | 100% | TRUE | 78 | 85 | 1 NA (FIC not required; officer responding to shots) |
| 22 | CD 149 (h) Ch 1.2.4.3 P19, Ch 41.12 P12(f) | Subject | Vehicle Exit Justification Compliant | If you chose yes for Vehicle Exit Justification Documented, is the justification specific to this subject, and/or was a legal vehicle search conducted requiring all occupants to exit the vehicle? | 7 | 7 | 100% | TRUE | 78 | 85 | |
| 23 | CD 149 (h) Ch 1.2.4.3 P19, Ch 41.12 P12(f) | Subject | Vehicle Exit Justification Category | If this subject was required to exit a vehicle, pick the option below that best describes the justification: (Informational Only) | Driver arrested or not allowed to drive (1) | Subject suspected of an arrestable offense (3) | Other (2) | | | 6 | |
| 16 | CD 189/CD125/183 | Subject | Arrest Immigration Status | Was the subject arrested because of or in part due to the subject's immigration status? | 80 | 80 | 100% | TRUE | 5 | 85 | |
| 17 | CD 183/CD125/183 | Subject | Questioned Immigration Status | Was the subject questioned about their immigration status in a manner that was not relevant to the crime in question? | 84 | 84 | 100% | TRUE | 5 | 85 | |
| 18 | CD 185/cd125 | Subject | Officer Comment LGBTQ | Did the officer say something that is possibly offensive about to LGBTQ individuals? | 84 | 84 | 100% | TRUE | 1 | 85 | |
| 19 | CD 185/Cd125 | Subject | Officer Address LGBTQ | Did the officer address the subject by their chosen name, title, and pronoun? | 84 | 84 | 100% | TRUE | 1 | 85 | |

......................**11**

Conclusion..............................................................................................................**12**

**Appendix A – SSAPJ Audit Forms** ...................................................................................................**15**

**Appendix B – Report Distribution** ..................................................................................................**32**

## Introduction

The Audit and Review Unit of the Professional Standards and Accountability Bureau conducted an audit of Stops, Searches and Arrests (SSA) related to Mardi Gras gun arrest incidents which occurred between February 2nd, 2024, and February 13th, 2024.  This focused audit is designed to ensure that all stops, searches, and arrests are conducted and executed consistent with NOPD policy and constitutional law, are documented appropriately, that the documentation is complete and accurate, and that stops, searches, and arrests are carried out with fairness and respect.

**Purpose**
The Stops, Searches, and Arrests audits are completed to ensure stops, searches, and arrests are constitutional and are within policy. Stops, Searches, and Arrests are regulated by, but not limited to, the following Chapters: 1.2.4 – Search and Seizure; 1.2.4.1 – Stops/Terry Stops; 1.2.4.2 – Search Warrant Content, Forms and Reviews; 1.3.1.1 – Handcuffing and Restraint Devices; 1.9 – Arrests; 35.1.7 Non-Disciplinary Responses to Minor Violations; 41.3.10 Body Worn Camera; 41.12– Field Interview Cards; 41.13 Bias-Free Policing; 52.1.1 – Misconduct Intake and Complaint Investigation.

**Objectives**
This audit is designed to ensure that all Stops, Searches, and Arrests are consistent with NOPD policy and constitutional law. Also, to ensure all are documented appropriately, the documentation is complete and accurate, and that stops, searches, and arrests are carried out with fairness and respect. This audit procedure entails the review of stops, searches, and arrests. Consent searches, strip and cavity searches, search warrants, and performance evaluations are covered in separate audits.

**Background**
This comprehensive Stops, Searches and Arrest Procedural Justice (SSAPJ) Audit utilizing the standard protocol has now been further enhanced to ensure all relevant issues regarding the last audit have been addressed. Originally, Stops, Searches and Arrests were each audited independently. In December of 2019, Stop, Search and Arrest audits were redesigned and consolidated into one audit. Then, following the 2021 audit, further enhancements were made relative to the corrective actions implemented, as well as additional audit questions being added. This resulting audit was more detailed, and a deeper diving review of the most fundamental actions taken by officers.

**Methodology**
Auditors qualitatively assessed each incident using the SSA forms listed below to ensure each stop, search, and arrest is compliant with legal requirements and NOPD policy. Auditors analyzed reports, field interview cards, body-worn cameras and or in-car cameras to ensure officers had a valid legal

6

basis to conduct a stop, search, or arrest, that officers documented such basis, and that documentation was complete and accurate.

The following SSA forms document the focused audit criteria:
1.            SSA Subject Audit Form
2.            SSA Incident Audit Form

Each stop (CAD or FIC), search (FIC), or arrest (FIC or EPR) incident the sample required one SSA Incident form and one SSA subject form for each person suspected of a crime during the incident. For the purposes of this audit, every person an officer identified who was not a victim or witness is a subject and requires an SSA subject form. For example, consider an incident involving an officer stopping a vehicle because he/she believed the driver matched a description of a wanted person. He/she identified the driver and the front passenger in the vehicle and none of the rear passengers. For this incident, an SSA subject form was required for the driver (suspected of being wanted) and for the front passenger (identified by the officer). Although the officer was required to document approximate demographics for the rear passengers in a FIC, SSA subject forms were not needed for them.

All documents and related incidents that are in the sample and were not audited because there is no stop, search or arrest were to be deselected. All deselections were recorded in the Deselection Log.

Auditors searched for and reviewed all documentation related to the incident sampled. This involved:
1. Reading the documents sampled to determine which officers were on scene and when.
2. Searching Evidence.com by officer and time and by using multi-camera option to find related videos that were labelled differently.
3. Reviewing the prior and proceeding CAD activity for the officers on scene.
4. Searching for FICs and EPRs using subject names and the date of the incident as documented on video or in reports.
5. Searching for FICs and EPRs using officer information and the date of the incident as documented on video or in reports.
6. Reviewing the related item numbers as documented in FICs and EPRs.

If video is available for the incident, auditors watched all interactions between officers and non-members. Auditors skipped through sections of video that did not involve interactions between officers and non-members. Auditors watched videos recorded by other officers on scene to observe all interactions. Auditors also watched the beginning and end of each officer's BWC video to determine whether the officer activated and deactivated their BWC as required by policy.

Auditors read the guidance in the audit forms on a regular basis. Changes to audit forms were clearly communicated to auditors by the audit supervisor. Auditors re-read policies when guidance in audit forms recommended, they do so or when the policy requirements were not clear enough to the auditor to allow them to confidently score an audit criterion.

7

When audit results required comments, auditors thoroughly explained the evidence that they observed that led to their Response of the result for the audit criteria in question. For example, if an auditor scored "Videos and Reports as Significantly Consistent" with a "No" indicating non-compliance, they explained how the video shows something that is not consistent with the report. Such a comment read like the following: "The FIC documents a pat down, however the BWC shows a search incident to arrest."

Drawing on their knowledge of NOPD policies, auditors noted any policy violations they observed that were not specifically addressed in the SSA audit tools in the "Notify PSS" section of the form.

## Initiating and Conducting the SSA Audit

The final **SSA** sample size for this audit was determined to be **83** incidents due to stratification and rounding.

1. The universe of Stops, Searches, and Arrests are exported into an excel spreadsheet. Stops, searches and arrests are sorted based on the date the digital document is created. Incidents are assigned a random number using Excel's random number function (RAND).

2. Documents are sampled starting from the smallest random number assigned and continuing from smallest to largest until the required sample size is reached.

3. Sample sizes are normally representative of the Department, not each District/division, when reporting publicly. This focused audit was initiated with a spreadsheet containing 152 rows obtained from the Data Analytics team. After subtracting the duplicate incidents known, the sample shrunk to 107; a further review resulted in 24 additional rows being deselected, leaving **83** incidents to review.

4. The following incidents were deselected:

| Sample ID | District | Deselection Reason |
|---|---|---|
| B-01702-22 | 4 | ON SUNDAY, FEBRUARY 11, 2024, AT 8:30 A.M., OFFICER HERMAN CLARK WAS NOTIFIED VIA ORLEANS PARISH COMMUNICATIONS DISTRICT DISPATCHER OF A PRISONER REQUIRING PICK UP AT 100 DOLHONDE STREET. (JEFFERSON PARISH CORRECTIONS CENTER). |
| B-02460-24 | 8 | This event was handled by the Orleans Parish Sheriff's Office's Deputy Dionicha Jenkins. There were no NOPD officers involved. JMB 3/20/2024 |
| L-26342-23 | 8 | Item number L-26342-23 does not involve an arrest. This item number involves the original incident, where several vehicles were burglarized, resulting in stolen firearms. The arrest occurred under item number B-01796-23. JMB 3/20/24 |
| C-08891-23 | 8 | No arrest occurred under this item number. The arrest occurred under item B-01830-24. The firearm confiscated during that arrest was discovered to be stolen under item number C-08891-23 |
| B-03584-24 | * | Firearm was found on subject by outside agency (Orleans Parish Sheriffs Office) |
| B-13074-24 | 7 | Stop and Arrest by outside agency. NOPD transported Subject to lockup. |
| I-24300-23 | * | Related to Item B-03503-24 |
| F-18669-22 | 6 | This item number is associated with Item number B-06533-24 |
| B-09160-24 | 6 | Unrelated to parade activity and does not involve a firearm. |
| B-09919-24 | 8 | Stop and Arrest by OPSE. |
| A-21191-24 | 3 | A stop/interaction with the subject had not occurred at the time of the audit. An arrest warrant was issued, however the subject is still out wanted. |
| I-14435-22 | 4 | The item involves transport of the subject from the Jefferson Parish Correctional Center. A stop or arrest did not occur. |
| B-07677-24 | 8 | There was no 95G involved with this item. |
| B-08650-24 | 8 | TUPD Case |
| A-23683-24 | 7 | Vehicle stop in N.O. East (Hayne Blvd).  Gun found in car. February 11. |
| B-01686-24 | 5 | Task Force operation in 5th District.  Nacrotics operation. February 2. |
| B-03423-24 | 5 | Task force operation in 5th District .  Narcotics. drug deal. February 4th. |
| B-03537-24 | 5 | Suspicious person; burglary involved.  Suspect riding bicycle wrong way carrying a tv.  Detective recognized person as one seen on video committing robberies in area.  5th District. |
| B-05468-24 | 7 | SOD TAC operation in the 7th District, involving real time crime cameras in an area showing individuals with concealed weapons. |
| B-08086-24 | 5 | Initially a shoplifting incident in the 5th District on St. Claude.  Officers found weapons on juveniles who committed the offense.  Same incident as B-11681-24 which was also deselected. |
| B-11681-24 | 5 | February 12th incident in 5th District relative to a shoplifting incident.  Same incident as B-08086-24 which was also deselected. |
| B-12116-24 | 5 | Tactical operation in the 5th District.  February 12.  Federal task force operation. |
| B-14489-16 | 8 | Completed under associated item # B-10261-24 |
| I-02196-21 | 8 | This incident was a duplicate of B-10882-24.  That item was audited by another member. |

9

5. When reporting publicly, audit results are stratified by division/District; the number of audit results per division/District are proportionate to the actual activity by the division/District. The results include at least one incident from each division/District with activity during the reporting time period to ensure all Districts/divisions with activity are included in public reports.

6. Randomly sampled documents (CAD, FIC, or EPR) that do not document a stop, search, or arrest by NOPD will be deselected. For the purposes of this audit, anyone who is identified by an officer and who is not a witness or victim, is considered stopped. If the document is part of the arrest universe and an auditor determines the related incident does not include an arrest by NOPD, but does include a stop or search by NOPD, the document and related incident will be audited focusing on the stop and search. When a document is deselected, the auditor will continue to the document with the next lowest random number.

## Reviews - Scorecards

### Stops, Search, Arrests (SSA) Audit Summary Table

**Stops Searches and Arrests Sample - March 2024 - MG Gun Arrests**

| Audit Form # | CD ¶/Chapter | Form | Field Name | Field Text | Number Compliant | Number Required | Compliance Rate | Compliance Threshold Met (>=95%) | Number NA | Total Reviewed | PSAB Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CD 124 | Incident | Known to be Materially False | If you suspect an officer relied on information he or she knew to be materially false or incorrect to make a stop or detention, contact your supervisor. | Offline Process through Direct Supervisor and PSS Notify | | | | | | |
| 2 | CD 126, 149, 150 | Incident | FIC Exists If Required | If required, does an FIC exist for this stop? | 59 | 72 | 82% | FALSE | 11 | 83 | |
| 3 | CD 150 | Incident | FIC Submitted By ETOD | Did the officer submit the FIC to his/her supervisor by the end of the shift? | 12 | 54 | 22% | FALSE | 29 | 83 | S Kicked back(Marked NA) (Most were entered Post MG) |
| 4 | CD 150 | Incident | FIC Approved in 72hrs | Did the supervisor review the FIC within 72 hours? | 48 | 59 | 81% | FALSE | 24 | 83 | |
| 5 | CD 123, 136, 145, | Incident | No Boilerplate | In the reports, did the officer(s) use specific descriptive language when articulating reasonable suspicion and/or probable cause for any stop, detention, search, or arrest? | 80 | 82 | 98% | TRUE | 1 | 83 | |
| 6 | CD 123 | Incident | Videos and Reports Are Consistent | Are the video(s) and reports significantly consistent? | 76 | 81 | 94% | TRUE | 2 | 83 | |
| 7 | Ch 1.9 p27-29 | Incident | Arrest in Residence Circumstances | If yes (video or reports show the officer entered a residence to make the arrest), which of the following apply? Options: (Consent, Exigent Circumstances, Warrant, None of the above (Not Compliant)) | 1 | 1 | 100% | TRUE | 82 | 83 | |
| 8C (8A,8B) | CD 133, 143 | Incident | Video Shows Supv Made Scene | If the supervisor is required to make scene, does video show the supervisor made the scene? | 20 | 21 | 95% | TRUE | 62 | 83 | |
| 9 | CD 80, Ch 1.3 | Incident | Use of Force Observed | Did any officer use reportable force during this officer-civilian interaction? (Informational Only) | 8 | 80 | | | 3 | 83 | NA - 3 no video available |
| 10, 11 | CD 80, Ch 1.3 | Incident | Use of Force Reported | If Force Observed, Is there a corresponding Blue Team Report? (No could indicate it is unreported) 11. Provide Video Documentation. | 5 | 6 | 83% | FALSE | 77 | 83 | one potential gun pointing (sent to PSS Notify); S confirmed UoF |
| 12 | CD 132, 133, 134 | Incident | Strip Cavity Search Occurred | Does the incident involve a strip or cavity search? (Informational Only) | 0 | 83 | | | 0 | 83 | |
| 13 | CD 132, 133, 134 | Incident | Strip Cavity Search Documented | If Strip/Cavity search is observed( yes), is the strip or cavity search documented in the FIC or EPR? | 0 | 0 | NA | TRUE | 83 | 83 | |
| 14 | CD 131, 149 | Incident | Consent to Search Occurred | Does the incident involve a consent to search search? (Informational Only) | 0 | 83 | | | 0 | 83 | |
| 15 | CD 131, 149 | Incident | Consent to Search Documented | If yes, is the consent to search documented in the FIC or EPR? | 0 | 0 | NA | TRUE | 83 | 83 | |
| 16 | CD 150 | Incident | Evidence Documented | If evidence was seized, is there a CE+P receipt? | 79 | 79 | 100% | TRUE | 4 | 83 | |
| 17 | CD 150 | Incident | Evidence Submitted Immediately | If evidence was seized, was it submitted to CE+P before next Code1 call or ETOD, whichever is first? | 79 | 79 | 100% | TRUE | 4 | 83 | |
| 18 | CD 123, 149, 150 | Incident | Evidence Description Matches Video | If evidence was seized, and there is a CE+P receipt, does the description on the receipt match the evidence as seen on video? | 79 | 79 | 100% | TRUE | 4 | 83 | |
| 27 | CD 181 | Incident | Reasonably Courteous | Does video show the officer was reasonably professional and courteous when interacting with the subject or other civilians during the stop? | 81 | 82 | 99% | TRUE | 1 | 83 | |
| 28 | CD 181 | Incident | Identified | If reasonably possible, does video show the officer verbally identify him/herself as a soon a practical? | 69 | 82 | 84% | FALSE | 1 | 83 | 8 - 8th (6 Promenade); 2 - 6th; 2-2nd; 1- 1st, |
| 29 | CD 181 | Incident | Explained | If reasonably possible, does video show the officer explain the reason for the stop/interaction as soon as practical? | 79 | 82 | 96% | TRUE | 1 | 83 | |
| 30 | Ch 41.13 P9E | Incident | Subject Could Explain | Does video show the officer allowed the subject an opportunity to explain his/her situation, ask questions, or voice concerns? | 81 | 82 | 99% | TRUE | 1 | 83 | |
| 31 | Ch 41.13 P9E | Incident | Responded to Subjects Qs | If the subject was allowed to ask questions, and if the subject had reasonable questions or concerns, does video show the officer respond to them? | 71 | 71 | 100% | TRUE | 12 | 83 | |
| 32 | Ch 1.2.4.3 P18 | Incident | Conclusion | Does video show the officer communicate the result of the stop/interaction to the subject (arrest, ticket, etc.)? | 78 | 82 | 95% | TRUE | 1 | 83 | |
| 33 | 139, 181 | Incident | Stop No Longer than Necessary | Does video show the stop was no longer than necessary to take appropriate action? | 82 | 82 | 100% | TRUE | 1 | 83 | |
| 36 | Ch 41.3.10 P11 | Incident | Complete Vid Num and Complete Vid Denom | Did each officer who conducted a stop, search, or arrest and who has been issued a BWC activate his/her BWC as required? And did each supervisor who made the scene and who has been issued a BWC activate his/her BWC as required? | 172 | 185 | 93% | FALSE | | | |
| 1A | CD 122 | Subject | RS/PC to Stop | Based on all the evidence available to you, did the officer(s) have reasonable suspicion or probable cause to stop this subject? | 84 | 84 | 100% | TRUE | 1 | 85 | |
| 2A | CD 122, 123, 126, 149, 150 | Subject | RS/PC to Stop in Report | Does the report clearly articulate reasonable suspicion or probable cause to stop this subject? | 84 | 84 | 100% | TRUE | 1 | 85 | |
| 3A | Ch. 1.3.1.1 P25 | Subject | Reason for Handcuffs Within Policy | If the officer put the subject in handcuffs, did the officer document a reason to handcuff in the FIC? | 60 | 74 | 81% | FALSE | 11 | 85 | |
| 3B | Ch. 1.3.1.1 | Subject | Discretionary Handcuffs Within Policy | If this subject was handcuffed, does the evidence available to you show the handcuffing was within policy? | 39 | 40 | 98% | TRUE | 44 | 84 | |
| 3B | Ch. 1.3.1.1 | Subject | Mandatory Handcuffs Within Policy | If this subject was handcuffed, does the evidence available to you show the handcuffing was within policy? | 83 | 83 | 100% | TRUE | 2 | 85 | |
| 4 | CD 149, 150, Ch. 1.2.4 P1 | Subject | Search Legal Numerator and Search Legal Denominator | Based on all the evidence available to you, did the officer(s) have a valid legal basis to search the subject? | 106 | 106 | 100% | TRUE | 9 | 115 | |
| 5 | CD 123, 149 | Subject | Reason to Search in Report Numerator and Reason to Search in Report Denominator | Does the "Report" sufficiently document a valid legal basis for every search of this subject? | 99 | 103 | 96% | TRUE | 9 | 112 | |
| 6 | 123, Ch.41.12 P12/ | Subject | Pat Down Justification | If a pat down was correctly indicated, did the officer give specific details about the subject of the pat down that would lead a reasonable person to believe the subject was armed and dangerous in the justification for pat down text box? Informational Only. Included in Search Report QS. | 32 | 36 | 89% | FALSE | 49 | 85 | |
| 7 & 4 | CD 130 | Subject | (7) Search Subject on Probation or Parole & (4) Search Legal Numerator, and Search Legal Denominator | (7) Was this subject on parole or probation? & (4) Based on all the evidence available to you, did the officer(s) have a valid legal basis to search the subject? | 6 | 6 | 100% | TRUE | 81 | 87 | |
| 8 | CD 144 | Subject | Supervisor Approved Gst Prior to Booking | Was the arrest gist for this subject approved by a supervisor before the subject was booked by the sheriff? | 81 | 81 | 100% | TRUE | 4 | 85 | |
| 9 | CD 141 | Subject | Officer Had PC to Arrest | Based on all the evidence available to you, did the officer have probable cause to arrest this subject? | 80 | 81 | 99% | TRUE | 4 | 85 | |
| 10 | CD 141, 145, Ch 1.9 P14, Ch 82-1 P4, Ch 41.12 P15 | Subject | PC Clearly Articulated | Did the officer clearly document the probable cause in the report (FIC or EPR)? | 80 | 81 | 99% | TRUE | 4 | 85 | |
| 11 | | Subject | Stop Result | What was result of Stop? Multiple choice (Informational Only) | Physical Arrest 81 | Citation Issued 0 | No-Action Taken 1 | Summons Issued 4 | Verbal Warning 0 | 86 | |
| 12 | | Subject | Break Given | Did the officer use their discretion to give the subject a break? (Informational Only) | 2 | 84 | | | 1 | 85 | |
| 15 | Ch 1.9.1 | Subject | Miranda Given | Did the officer give Miranda Rights, if required? Officers shall advise suspects of their Miranda Rights at the time of arrest or prior to any custodial interrogation. See Chapter: 1.9.1; Note: Miranda does not apply to roadside questioning of a stopped motorist or a person briefly detained on the street under a Terry stop. | 78 | 84 | 93% | FALSE | 1 | 85 | |
| 13 | | Subject | ID Checked | Did the officer run the subject's ID? | 85 | 85 | 100% | TRUE | 0 | 85 | |
| 14 | CD 189 | Subject | LEP | Did the officer request translation services, if needed? | 0 | 0 | | TRUE | 85 | 85 | |
| 20 | CD 149 (h) Ch 1.2.4.3 P19, Ch 41.12 P12(f) | Subject | Required to Exit Vehicle | Did an officer require this subject to exit a vehicle? (Informational Only) | 8 | 10 | | | 75 | 85 | |
| 21 | CD 149 (h) Ch 1.2.4.3 P19, Ch 41.12 P12(f) | Subject | Vehicle Exit Justification Documented | If you chose yes for "Required to Exit Vehicle", did an officer document the justification to require this subject to exit the vehicle in the FIC? | 7 | 7 | 100% | TRUE | 78 | 85 | 1 NA (FIC not required; officer responding to shots) |
| 22 | CD 149 (h) Ch 1.2.4.3 P19, Ch 41.12 P12(f) | Subject | Vehicle Exit Justification Compliant | If you chose yes for Vehicle Exit Justification Documented, is the justification specific to this subject, and/or was a legal vehicle search conducted requiring all occupants to exit the vehicle? | 7 | 7 | 100% | TRUE | 78 | 85 | |
| 23 | CD 149 (h) Ch 1.2.4.3 P19, Ch 41.12 P12(f) | Subject | Vehicle Exit Justification Category | If this subject was required to exit a vehicle, pick the option below that best describes the justification: (Informational Only) | Driver arrested or not allowed to drive (1) | Subject suspected of an arrestable offense (3) | Other (2) | | | 6 | |
| 16 | CD 180/CD125/183 | Subject | Arrest Immigration Status | Was the subject arrested because of or in part due to the subject's immigration status? | 80 | 80 | 100% | TRUE | 5 | 85 | |
| 17 | CD 180/CD125/183 | Subject | Questioned Immigration Status | Was the subject questioned about their immigration status in a manner that was not relevant to the crime in question? | 84 | 84 | 100% | TRUE | 1 | 85 | |
| 18 | CD 185/cd125 | Subject | Officer Comment LGBTQ | Did the officer say something that is possibly offensive about/to LGBTQ individuals? | 84 | 84 | 100% | TRUE | 1 | 85 | |
| 19 | CD 185/Cd125 | Subject | Officer Address LGBTQ | Did the officer address the subject by their chosen name, title, and pronoun? | 84 | 84 | 100% | TRUE | 1 | 85 | |

11

## Conclusion

Results

The results of this audit were verified through two processes:

1. Single auditor peer review
2. Audit supervisor review

In the single auditors peer review, the auditor independently assessed each incident and completed the initial SSA Incident and Subject form entries. Any discrepancy that cannot be resolved was escalated to their supervisor who then resolved the discrepancy, and who may have also drawn on the expertise of others, including but not limited to the PSAB Deputy Superintendent, the PSAB Captain, other PSAB Innovation Managers, members of the Education and Training Division, members of the District Attorney's office, members of the Office of the Consent Decree Monitor, and members of the Department of Justice.

During the Audit Supervisor review, the team supervisor, reviewed the resolved audit results for accuracy and completeness. Any issues were sent back to auditors for corrections and the interaction is documented on the audit forms.

The following deviations from compliance were identified in the SSA Mardi Gras gun arrests audit results:

FICs Exist, if required, scored **82%**. FICs should be submitted by the end of the shift and approved by a supervisor within 72 hours. FIC submitted scored **22%.** The FIC approved within 72 hours scored **81%**. The previous score was 78%.

Videos and reports consistent metric scored 76 of 81 **(94%)**. The discrepancies involve minor errors, such as typographical errors. Examples include incomplete or inadequate documentation.

For the "Complete Video" question, auditors check if each officer that conducted a stop, search, or arrest activated his/her BWC as required. If the officer is not assigned a BWC, the question is NA. The includes supervisors who made the scene and have been issued a BWC. Of the 13 non-compliant videos reviewed, 11 incidents where the officer was early or late in activating their BWC, and 2 missing or could not be found. This category was scored **93%**.

If reasonably possible, officers should identify him/herself as soon as practical during an interaction. Auditors review if video shows that the officer verbally identified him/herself. This category was scored **84%**.

The category "Reason to Search in Report" scores whether the reason for each search was sufficiently documented in the report. This category does not address whether a valid reason to search existed, only whether a valid legal basis to search was documented in the corresponding report. For this audit, the category was scored **96%**.

12

*For "Pat Down Justification," if a pat down was correctly indicated, auditors check if the officer gave specific details about the subject of the pat down that would lead a reasonable person to believe the subject was armed and dangerous in the corresponding text box of the FIC. This category was scored was scored (25/26) compliant. The previous audit score was (13/20). Note that these audit counts are included in the categories "Search Legal" and "Reason to Search in Report".*

"Miranda Given, if required" determines if the subject was read their "Miranda Rights" following an arrest. This metric was added to the previous audit review. The score for the category scored **93%.** It should be noted that Miranda may have been executed outside of camera capture or video could not be found.

"Vehicle Exit Justification Documented" determines if the officer properly documented the reason they requested a subject to exit a vehicle during a stop. This metric was added to the previous audit review. The score for the category scored **100%.**

Only material policy deficiencies identified in the review process were forwarded to the PSS Captain via the "Notify PSS" protocol for follow-up, redirection, or disciplinary action if needed. One potential unreported Use of Force was sent for PSS review. Currently no update as yet.

All auditing deficiencies identified in the review process were documented in the PSAB reports and scorecards and sent directly to the various Districts for review and action if needed. Note the Districts which responded back to PSAB with their follow-up actions and re-evaluations.

**Recommendations**

1. Continue to work with Academy and the Field Operations Bureau to provide additional training on:
   **a. FIC/EPR documentation; especially during major events such as Mardi Gras.**
   b. BWC activation and de-activation
   c. Pat Down, especially during major events.
2. Continue to work with Policy Standards Section to develop appropriate training, to include DTB's to address deficiencies.
3. Continue PSAB centralized FIC review of all incidents to improve FIC documentation and allow for early identification of trends.

## District Re-Evaluation Results

TBD

*Timothy A. Lindsey*
**Innovation Manager, Auditing**
**Professional Standards and Accountability Bureau**

## Appendix A – SSAPJ Audit Forms

SSAPJ Audit Forms:



# SSAPJ Incident Audit Form

| Read Me | ID Info | 1-6 | 7-8 | 9-11 | 12-15 | 16-18 | 19-22 | 23-29 | Misc | Video | Review |
|---------|---------|-----|-----|------|-------|-------|-------|-------|------|-------|--------|

1. Watch as much video as reasonably possible to ensure you have thoroughly reviewed the incident. You must watch video of all the interactions between an officer and a non-employee. You may skip through or fast forward through parts of the video that do not involve interactions with non-employees. If another officer interacts with a non-employee and you cannot see and hear the interaction in the video you are currently watching, you must watch the other officer's video, if it exists. Clearly document the video segments you watch under question 31 - Video Info of the SSA Incident form so that any reviewer knows exactly what video segments you watched and did not watch.

2. Notify your supervisor when:
a. It appears officers rely on demographics to establish reasonable suspicion or probable cause for a stop, detention, search, or arrest.
b. It appears officers rely on information they know to be materially false to conduct a stop, detention, search, or arrest.
c. You observe policy violations that are not captured by your audit results
d. Officers' actions are egregious and therefore require prompt intervention

3. Do not discuss this incident with any auditor, peer, or supervisor, until you have thoroughly reviewed the incident.

4. If you do not think this incident involves a stop, search or arrest, please discuss the possible deselection with an auditor or the ARU supervisor. If you decide to deselect, close this form without saving and record the deselection in the deselection log.

| Read Me | ID Info | 1-6 | 7-8 | 9-11 | 12-15 | 16-18 | 19-22 | 23-29 | Misc | Video | Review |
|---------|---------|-----|-----|------|-------|-------|-------|-------|------|-------|--------|

## Use?

If you do not think this incident involves a stop, search or arrest, please discuss the possible deselection with an auditor or the ARU supervisor. If you decide to deselect, close this form without saving and record the deselection in the deselection log.

## Sample/Distribution Identifying Information

Field names (column names) are in grey text.

| Pick your name below. | In which sample is this incident? | Enter the Item # | If an FIC exists, enter the FIC ID # | If an EPR exists, enter the EPR ID # |
|---|---|---|---|---|
| Created By | Sample Type | Item Number | FIC ID | EPR ID |
| Tim Lindsey<br>Faith Thornton<br>Charmel Peterson<br>Betty Johnson<br>Michael Sarver<br>Matt Segraves | ▮▮▮▮▮▮▮<br>Stop<br>Search<br>Arrest | | | |

15

What is the reporting year, month, week, district, and platoon?

| Review Year | Review Month | Week | District | Platoon |
|---|---|---|---|---|
| 2019 | Jun | WK1 | 1 | A |
| 2020 | Jul | WK2 | 2 | B |
| 2021 | Aug | WK3 | 3 | C |
| 2022 | Sep | WK4 | 4 | GA |
| 2023 | Oct | WK5 | 5 | Promenade |
| | Nov | | 6 | Mounted |
| | Dec | | 8 | DWI |
| | Jan | | 7 | K9 |
| | Feb | | ISB | MC1 MC2 |
| | Mar | | MSB | VOWS |

## Known to Be Materially False

1   CD 124:  If you suspect an officer relied on information he or she knew to be materially false or incorrect to make a stop or detention, contact your supervisor. CD 124 reads: NOPD officers shall not use or rely on information known to be materially false or incorrect in effectuating an investigatory stop or detention. Materially false information could be planted evidence or results from running a different plate.

## Stops Scorecard

2   If required, does an FIC exist for this stop?

CD 126, 139

See Ch. 41.12 FICs for guidance on when FICs are required.

**FIC Exists If required**

| |
|---|
| Yes |
| No |
| FIC Not Required |

If the FIC is under a different item number than the CAD item number, please record the itemnumber on the FIC.

**FIC Item if Different than CAD**

3   Did the officer submit the FIC to his/her supervisor by the end of the shift?

Review the BWC recording time and the FIC Submit Date. If a BWC does not exist, review the CAD times. For the purposes of this question, the end of the shift is when the officer left work.

[The FIC Submit date reflects the most recent submit date. When an FIC is kicked-back and an officer updates it and re-submits it, we lose the first submit date.]

CD 150, Ch. 41.12 P9

**FIC Submitted By ETOD**

| |
|---|
| Yes |
| No |
| No FIC |

4   Did the supervisor review the FIC within 72 hours? For the purposes of this question use the Submit Date and the Approval Date.

If the FIC is currently disapproved, use the Supervisor Last Modified Date.

CD 150 [modified interpretation, CD amendment likely], Ch. 41.12 P15

**FIC Approved in 72Hrs**

| |
|---|
| Yes |
| No |
| No FIC |

## Boilerplate Language

5   In the reports, did the officer(s) use specific descriptive language when articulating reasonable suspicion and/or probable cause for any stop, detention, search, or arrest?

CD 123, 145; Ch. 41.12 P1, 1.2.4 P16, 1.9 P14

Officers cannot use "boilerplate" or "pat" language, such as "traffic violation" or "officer safety" when explaining their actions.

Choose "Yes" if the officer did NOT use any boilerplate language. Choose "No" if the officer used boilerplate language.

If you selected "No", please record the boilerplate language in the FIC:

Boilerplate Explanation

**No Boilerplate**

| |
|---|
| Yes |
| No |
| NA No FIC/EPR |

16

6    Are the video(s) and reports significantly consistent?

If there is anything you see on video that proves as aspect of the report to be inaccurate, choose "No."

Use the Inconsitency Categories below like a checklist. Check that each category is reported accurately.

CD 123; Ch. 1.9 P14; Ch 1.2.4 P63,65; Ch 82.1 P7-8; Rule 2 P3B

If you chose "No," indicating something about the report is inaccurate, please explain below, including the relevant timestamp of the videos. Please list every inaccuracy.

Videos and Reports Are Consistent

| |
|---|
| Yes |
| No |
| NA No FIC/EPR |
| NA No Video |

Discrepancy Explanation

Please pick all the inconsistency categories that apply. These categories should match your discrepancy explanation above.

Inconsistency Categories

- ☐ Passenger Info
- ☐ Search Info
- ☐ Subject Info
- ☐ Exit Vehicle Info
- ☐ Result Info
- ☐ Reason for Stop Info
- ☐ Evidence Info
- ☐ Vehicle Description Info
- ☐ Consent to Search not Documented
- ☐ Other

7    Do video or reports show the officer entered a residence to make the arrest?

See Chapter 1.9 paragraphs 27-29 for guidance.

Arrest in Residence

| |
|---|
| Yes |
| No |
| NA - No Arrest |

If yes, which of the following apply?

Arrest in Residence Circumstances

| |
|---|
| Consent |
| Exigent Circumstances |
| Warrant |
| None of the above (Not Compliant) |
| NA - Not in Residence |
| NA - No Arrest |

8 A    Do video or reports suggest a supervisor required to make the scene?

CD 143; Ch. 1.9 P9, 12

If the incident met the narcotics arrests exception in Ch. 1.9, choose "No."

Narcotics arrest exception requirements:
(a) The arrest only involved narcotics;
(b) The suspect was relocated to the station to test the narcotics;
(c) The supervisor was present at the station to review the arrest recommendation;
(d) And there were no injuries involved.

SupervisorRequiredtoMakeScene

| |
|---|
| ████████████████ |
| Yes |
| No |
| No - Narcotics Exception |
| NA - No Arrest |
| Unknown/DV |

8 B    If the supervisor was required to make the scene, please pick the reason below.

Reason Supe required to make scene

| |
|---|
| One or more charges can be charged as a felony. Look up the charge and see if it includes "with hard labor" or "with or without hard labor" |
| An officer used L2 or L3 force |
| Custodial arrest for crossing or traversing a police cordon(Municipal Code §54-442) or resisting an officer (Municipal Code § 54-441) |
| Custodial arrest and the most serious violation is vehicle infraction or simple drug possession |
| Custodial arrest that is not in FQ or CBD & the charge is Disturbing the Peace, Criminal Trespass, Obstructing Public Passages, or Begging/Vagrancy |
| Unknown/DV |

8 C    If the supervisor is required to make scene, does video show the supervisor made the scene?

CD 143; Ch. 1.9 P9, 12

VideoShowsSupeMadeScene

| |
|---|
| ████████████████ |
| Yes |
| No |
| NA - Not Required |
| NA - No Arrest |
| NA - No Video |
| NA - Unknown/DV |

17

We use these questions to ensure our universe of uses of force is complete. Reportable uses of force identified here will be included in the use of force audit.

| 9 | Did any officer use reportable force during this officer-civilian interaction? | UseOfForce |
|---|---|---|
| | | ████████████████ |
| | | Yes |
| | | No |
| | | No Video |

| 10 | Is there a corresponding Blue Team Report? There likely won't be an APPROVED Blue Team report. But there should be an incomplete one.<br><br>[Because IAPro and BlueTeam are down and MAX is down, check the FTN log to see if a corresponding use of force report has been initiated.]<br><br>If you chose "No," indicating you believe this incident involves unreported reportable force, notify your supervisor. | ForceReported |
|---|---|---|
| | | ████████████████ |
| | | Yes |
| | | No |
| | | No Use of Force |
| | | No Video |

11   If an officer used reportable force, give the video details including the min/sec mark of the force

UoFVidDetails

|  |
|---|
|  |

We use these questions to ensure our universes of strip and cavity searches are complete. Such searches identified here will be included in the strip/cavity audit.

| 12 | Does the incident involve a strip or cavity search? | Strip Cavity Search Occurred |
|---|---|---|
| | | ████████████████ |
| | | Yes |
| | | No |

| 13 | If yes, is the strip or cavity search documented in the FIC or EPR?<br><br>If you chose "No," inidicating this incident involved an undocumented strip or cavity search, notify your supervisor. | Strip Cavity Documented |
|---|---|---|
| | | ████████████████ |
| | | Yes |
| | | No |
| | | NA-No Strip/Cavity |

### Consent to Search Scorecard

| 14 | Did this incident involve a consent to search?<br><br>Sometimes officers will ask for consent when they do not need consent. If the officer had another valid legal basis to perform the search, it was not a search by consent. | Consent Search Occurred |
|---|---|---|
| | | ████████████████ |
| | | Yes |
| | | No |

| 15 | If yes, is the consent to search documented in an FIC or EPR?<br><br>If you choose "No," indicating this incident involved an undocument consent to search, notify your supervisor. | Consent Search Documented |
|---|---|---|
| | | ████████████████ |
| | | Yes |
| | | No |
| | | NA-No Consent Search |

18

## Evidence

| | | Evidence Documented |
|---|---|---|
| 16 | If evidence was seized, is there a CE+P receipt?<br><br>A CE+P receipt should be attached to an EPR. They can also be in DTS.<br><br>CD 150; Ch 84.1 P8, 24 | Yes<br>No<br>No Evidence Seized<br>No EPR |

| | | Evidence Submitted Immediately |
|---|---|---|
| 17 | If evidence was seized, was it submitted to CE+P before the next Code 1 call the officer(s) handled or ETOD, whichever is first?  Review the Chain of Custody History report in BEAST and the unit's CAD activity. The date/time the item was submitted into property must be before the unit's next Code 1 arrival time or ETOD, whichever is first.<br><br>[Audit method incomplete for evidence placed in dropboxes.]<br><br>CD 150 | Yes<br>No<br>No Evidence Seized |

| | | Evidence Description Matches Video |
|---|---|---|
| 18 | If evidence was seized, and there is a CE+P receipt, does the description on the receipt match the evidence as seen on video?<br><br>CD 123; Ch 82.1 P7-8; RS 14-134.2, 14-130.1; Rule 2 P3B | Yes<br>No<br>No Evidence Seized<br>CE+P Receipt Not Available |

## Supervisory Review

Because this section pertains to the entire incident, complete the rest of this form and the subject forms prior to completing this section.

| | | Non-Compliance Should Have Been Addressed |
|---|---|---|
| 19 | Did you find any non-compliance related to this incident? | Yes<br>No |

| 20 | The following questions A-E determine whether a supervisor knew or should have known about the non-compliance: | |
|---|---|---|

| | | Missing Documentation |
|---|---|---|
| 20 A | Is there non-compliance because there is missing documentation (FIC, EPR, etc.)? | Yes<br>No<br>NA-Full Compliance |

| | | Non-compliance Evident in Approved Reports |
|---|---|---|
| 20 B | Is the non-compliance evident in the report(s) (FICs/EPRs) and the report(s) are approved?<br><br>If a supervisor needed to watch video to know about the non-compliance, choose "No." | Yes<br>No<br>NA-Full Compliance |

| | | Supervisor On Scene During Non-Compliance |
|---|---|---|
| 20 C | Did a supervisor make the scene and did the non-compliance occur while the supervisor was on scene? | Yes<br>No<br>NA-Full Compliance |

| | | Supervisor Required to Watch Video |
|---|---|---|
| 20 D | Was a supervisor required to watch the video?<br><br>Supervisors are required to watch videos if one or more of the following occurred: a use of force, someone was injured, a complaint was made or an officer told a supervisor that he/she thinks a complaint may be made, a vehicle pursuit, or an officer terminated his/her video early to protect the privacy of an individual. | Yes<br>No<br>NA-Full Compliance |

| | | Supervisor Reviewed Video |
|---|---|---|
| 20 E | Did the supervisor watch the video?  Review the audit trail for the videos in Evidence.com. | Yes<br>No<br>NA-Full Compliance |

19

**20 F**  Did a supervisor know or should have known about the non-compliance?

Choose "Yes" if any of A-E are "Yes."

Supervisor Aware or Should Have Been Aware of Non-compliance

Yes
No
NA-Full Compliance

---

**21**  Please list the SFLIDs for any corresponding SFLs or Control numbers for any corresponding FDIs?

SFLIDs-CNTRL Nos

---

**22**  Did a supervisor address all the non-compliance you found related to this incident?

CD 144, 146, 151; Ch 1.9 P16-17; Ch 41.12 P16-17; Ch 35.1.7 P9; Ch 11.0.1 P16C

If a corresponding SFL or FDI exists but does not cover all non-compliance, please explain:

Non-Compliance Addressed by Supervisor

Yes
No
NA - Full Compliance

Supervisory Review Comments

---

### Procedural Justice

**23**  Does video show the officer was reasonably professional and courteous when interacting with the subject or other civilians during the stop?

CD 181; Ch 41.13 P9A; Civil Service Rule 3?

Enter "No," if the officer(s) should have been more professional or courteous.

If you selected "No", please explain::

Reasonably Courteous

Yes
No
NA - No Video

NotCourteousEnoughExplanation

---

**24**  If reasonably possible, does video show the officer verbally identify him/herself as a soon as practical?

CD 181; Ch 41.13 P9B

Identified

Yes
No
NA - No Video

| 25 | If reasonably possible, does video show the officer explain the reason for the stop/interaction as soon as practical?<br><br>CD 181; Ch 41.13 P9B | Explained |
|---|---|---|
| | | Yes<br>No<br>NA - No Video |

| 26 | Does video show the office allowed the subject an opportunity to explain his/her situation, ask questions, or voice concerns? | Subject Could Explain |
|---|---|---|
| | | Yes<br>No<br>NA - No Video |

| 27 | If the subject was allowed to ask questions, and if the subject had reasonable questions or concerns, does video show the officer respond to them?<br><br>Ch 41.13 P9E | Responded to Subjects Qs |
|---|---|---|
| | | Yes<br>No<br>NA - No Video<br>NA - No Qs |

| 28 | Does video show the officer communicate the result of the stop/interaction to the subject (arrest, ticket, etc.)? | Conclusion |
|---|---|---|
| | | Yes<br>No<br>NA - No Video |

| 29 | Does video show the stop was no longer than necessary to take appropriate action?<br><br>CD 181, Ch 1.2.4.1 P20, Ch 1.2.4.3 P8; ; Ch 41.13 P9C<br><br>Constitutional law requires that stops are no longer than necessary to carry out the purpose of the stop. See Rodriguez v. United States, 575 U.S. 348, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015) ("If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'. . . [A] traffic stop 'prolonged beyond' that point is 'unlawful.'"). | Stop No Longer than Necessary |
|---|---|---|
| | | Yes<br>No<br>NA - No Video |

21

## Flag for Academy Training

| 30 A | Would this make a good training video?: | FlagforAcademy |
| --- | --- | --- |

<div style="background:black;"> </div>

Yes
No
No Video

| 30 B | If you are flagging the video for the academy, please identify the exact portion of the video you think the academy should consider using. | FlagforAcademyBWCInfo |
| --- | --- | --- |

| 30 C | If you want to flag this video for Academy, please select your reason(s): | FlagForAcademyReason |
| --- | --- | --- |

Video Shows Exemplary Police Actions
Video Shows Non-Exemplary Police Actions
Use of Force Tactics
Handcuffing
Arrest and Search
Other

## EPIC

| 31 | Does this incident involve an EPIC Moment; an officer confronting a peer about what they could do better? (Doing something encouraged by NOPD's EPIC program?) | EPICIncident |
| --- | --- | --- |

Yes
No
No Video

If yes please explain, including the video label and the minute of the example:
EPICExplain

## Video Coverage

| 32 | Did each officer who conducted a stop, search, or arrest and who has been issued a BWC activate his/her BWC as required? And did each supervisor who made the scene and who has been issued a BWC activate his/her BWC as required? | # of such officers who had complete video (numerator) |
| --- | --- | --- |
| | | CompleteVidNum |
| | Ch 41.3.10 P11 | / |
| | | # of such officers (denominator) |
| | | CompleteVidDenom |

List the officers you included in the denominator. And describe any incomplete or missing video.
CompleteVidExplain

## Video Info

| 33 | To help someone review your work, please record below the officer name and BWC ID (usually an Item #) for the best video coverage of the incident. Include minutes if the video is long and the important parts are hard to find. If L3 is critical, please include A# and starting time. If you did not watch all the videos, record the minutes of the videos you watched. |
| --- | --- |

Video Info

22

# SSAPJ Subject Audit Form

**Instructions** | Identifying Info | Subject Info | Stop | Searches | Arrests | Miscellaneous | Immigration | LGBTQ | Review

1. Watch as much video as reasonably possible to ensure you have thoroughly reviewed the incident. You must watch video of all the interactions between an officer and a non-employee. You may skip through or fast forward through parts of the video that do not involve interactions with non-employees. If another officer interacts with a non-employee and you cannot see and hear the interaction in the video you are currently watching, you must watch the other officer's video, if it exists. Clearly document the video segments you watch under question 31 - Video Info of the SSA Incident form so that any reviewer knows exactly what video segments you watched and did not watch.

2. Notify your supervisor when:
a. It appears officers rely on demographics to establish reasonable suspicion or probable cause for a stop, detention, search, or arrest.
b. It appears officers rely on information they know to be materially false to conduct a stop, detention, search, or arrest.
c. You observe policy violations that are not captured by your audit results
d. Officers' actions are egregious and therefore require prompt intervention

3. Do not discuss this incident with any auditor, peer, or supervisor, until you have thoroughly reviewed the incident.

4. If you do not think this incident involves a stop, search or arrest, please discuss the possible deselection with an auditor or the ARU supervisor. If you decide to deselect, close this form without saving and record the deselection in the deselection log.

***Complete this form for each subject stopped, searched, or arrested for every incident in the Stop, Search or Arrest sample. If the subject was not documented in the reports, complete the fields based on your observations.***

A stopped subject is:
• a suspect in an investigation with whom an officer is interacting in person
• someone an officer attempts to identify and who is not a victim or witness

| Reviewing Auditor | In which sample is this incident? | Enter the Item # | Enter FIC ID | Enter the EPR ID # |
|---|---|---|---|---|
| Reviewing Auditor | Sample Type | Item Number | FIC ID | EPR ID |
| Tim Lindsey | | | | |
| Faith Thornton | Stop | | | |
| Charmel Peterson | Search | | | |
| Betty Johnson | Arrest | | | |
| Michael Sarver | | | | |
| Matt Segraves | | | | |

23

What is the reporting year, month, week, district, platoon?

| Review Year | Review Month | Week | District | Platoon |
|---|---|---|---|---|
| 2019 | Jun | WK1 | 1 | A |
| 2020 | Jul | WK2 | 2 | B |
| 2021 | Aug | WK3 | 3 | C |
| 2022 | Sep | WK4 | 4 | GA |
| 2023 | Oct | WK5 | 5 | Promenade |
| | Nov | | 6 | Mounted |
| | Dec | | 8 | DWI |
| | Jan | | 7 | K9 |
| | Feb | | ISB | MC1 MC2 |
| | Mar | | MSB | VOWS |
| | Apr | | Other | TIGER |
| | May | | SOD | GANG |
| | | | | Other |

## Subject Info

If the subject was not documented in the reports, complete the fields based on your observations.

**Subject First**

**Subject Last**

**Subject Sex**

Male
Female
Unknown

**Subject Race-Ethnicity**

Black/African-American
White
Hispanic/Latino
Asian
Amer.Ind./Alaskan Nat.
Unknown

**Subject DOB**          -And-          **Event Date**          -Or-          **Subject Age**

24

## Subject Stop

**1 A**  Based on all the evidence available to you, did the officer(s) have reasonable suspicion or probable cause to stop this subject?

RS/PC to Stop

Ch. 1.2.4.1, Ch 41.13 P10 and others

Reasonable Suspicion (Definition)—Articulable facts that, within the totality of the circumstances, lead an officer to reasonably suspect that criminal activity has been or is about to be committed.. The standard for reasonable suspicion is less than probable cause but must be more than a hunch or a subjective feeling.

Probable Cause (Definition)—The facts and circumstances known to the officer at the time that would justify a reasonable person in believing the suspect committed or was committing an offense.

If this subject was ID'd and was not suspected of any crime (e.g., a passenger in a vehicle who was asked for ID without being suspected of a crime), choose "No-ID'd and NOT a Suspect."

Yes - RS
Yes - PC
No
No-ID'd and NOT a Suspect

**1 B**  If you chose "No" for 1 A, therefore indicating there was no reasonable suspicion or probable cause to stop the subject, please explain:

No RS/PC to Stop Comments

**2 A**  Does the report clearly articulate reasonable suspicion or probable cause to stop this subject?

RS/PC to Stop in Report

Refer to guidance in 1 A. Additionally, if the officer relied on boilerplate language, choose "No."

CD 122, 123, 126, 149;  Ch 41.13 P10; Ch 41.12 P12H, Ch 1.9 P14

If this subject was ID'd and was not suspected of any crime (e.g., a passenger in a vehicle who was asked for ID without being suspected of a crime), choose "No-ID'd and NOT a Suspect."

Yes - RS
Yes - PC
No
No-ID'd and NOT a Suspect
No-No FIC/EPR

**2 B**  If you chose "No" for 2 A, therefore indicating the officer did not document reasonable suspicion or probable cause to stop this subject, please explain:

No RS/PC to Stop in Report Comments

**3 A**  If the officer put the subject in handcuffs, did the officer document a reason to handcuff in the FIC?

Reason for Handcuffs Documented

Ch. 1.3.1.1 P25

If the FIC checkbox for "Arrest Made" under "Actions Taken" is checked and the video or FIC documents the subject was taken to lock-up, choose "Yes."

If an FIC does not exist and one was required per Ch 41.12, choose "No-No FIC."

If you chose "Yes," what was the reason for handcuffing documented in the FIC?

Yes
No
No-No FIC
NA-No Handcuffs
NA-FIC Not Required

Reason for Handcuffs Text

25

**3 B**  If this subject was handcuffed, does the evidence available to you show the handcuffing was within policy? Record compliance with discretionary and mandatory handcuffing requirements separately.

Ch. 1.3.1.1

See Ch. 1.3.1.1 P 12, 13, 22 for guidance.  These paragraphs allow an officer to handcuff a subject if one of the following are true:

• the officer intended to book the subject (take to lock-up)
• the subject resisted detention
• the subject posed a safety concern
• the subject posed a flight concern, or
• the subject posed an interference concern.

However, also see P 30-41 for special circumstances under which subjects may not be handcuffed.

If based on your understanding of Ch 1.3.1.1 you think the subject was handcuffed in violation of policy, choose "No" and explain below. If you think the handcuffing was within policy, choose "Yes" and explain below.

Discretionary Handcuffs Within Policy

▬▬▬▬▬▬▬▬▬

Yes
No
No Handcuffs

Mandatory Handcuffs Within Policy

▬▬▬▬▬▬▬▬▬

Yes
No
No Handcuffs

Handcuffs Within Policy Comments

26

## Subject Searches

**4**  Based on all the evidence availabe to you, did the officer(s) have a valid legal basis to search the subject?

Ch. 1.2.4 P1

An officer must have a legal reason to stop a subject and a legal reason to search a subject in order to search a subject.

Refer to Ch. 1.2.4 Search and Seizure for more guidance. Discuss the search(es) with an officer if necessary.

If a search of a vehicle occurs, most of the time it will make the most sense to include the search on the driver's audit form. There may be scenarios in which it makes more sense to include the search on a passenger's audit form.

Please describe the searches conducted on this subject and this subject's property and explain any non-compliance. Hypothetical text: "Vehicle Exception/Pat Down/Consent to Search Person/Search Incident to Arrest. There does not appear to be probable cause to justify the vehicle exception to the warrant requirement."

Enter the number of searches conducted on this subject and this subject's property that had a valid legal basis.

Search Legal Numerator

[                                    ]

/

Enter the number searches conducted on this subject and this subject's property.

Search Legal Denominator

[                                    ]

Search Legal Comments

[                                    ]

**5**  Does the report document a valid legal basis for every search of this subject?

CD 149; Ch 41.12 P12I-L; Ch 1.2.4 P62A; Ch 82.1 P4

If the FIC indicates a pat down occurred the justification for the pat down must give specific details about the subject of the pat down that would lead a reasonable person to believe the subject was armed and dangerous.

Refer to Ch. 1.2.4 Search and Seizure for more guidance. Discuss the search(es) with an officer if necessary.

See guidance above for vehicle searches.

Please describe the searches conducted on this subject and this subject's property and explain any non-compliance.

Enter the number of searches conducted on th subject and this subject's property for which th FIC

Reason to Search in Report Numerator

[                                    ]

/

Enter the number of searches conducted on th subject and this subject's property.

Reason to Search in Report Denominator

[                                    ]

Reason to Search in Report Comments

[                                    ]

27

| 6 | If a pat down was correctly indicated, did the officer give specific details about the subject of the pat down that would lead a reasonable person to believe the subject was armed and dangerous in the justification for pat down text box?

Ch 41.12 P12J

If one of the reasons the officer conducted the pat down was for contraband, choose "No."

If you chose "No" for "Justification Specifies Armed and Dangerous," please pick a noncompliant category. Leave blank if you chose "Yes." | PatDownJustification

████████████████
Yes
No
NA-No Pat Down

PatDownNotCompliantCat

Justification Insufficient
For More Than Weapons
Justification Insufficient & For More than Weapons |

| 7 | Was this subject on parole or probation?

Use the spreadsheet provided by the corrections department. Search by subject name, demographics, and address. | Search Subject on Probation or Parole

Yes
No
Subject Not Searched |

| 8 | Was the arrest gist for this subject approved by a supervisor before the subject was booked by the sheriff?

[need to verify ability to audit]

CD 145; Ch 1.9 P13,49-50 | Supervisor Approved Gist Prior to Booking

Yes
No
NA-Existing Warrant
Subject Not Arrested |

| 9 | Based on all the evidence available to you, did the officer have probable cause to arrest this subject?

CD 141; Ch 1.9 P1

Is at least one charge good? Do you believe:
-the officer had a legal reason to stop the subject,
-the officer had a legal reason to search the subject, if relevant to the charge,
-and the facts and circumstances known to the officer at the time would justify a reasonable person in believing the suspect committed or was committing an offense?

Please explain PC for the arrest or the lack thereof. | OfficerHadPCtoArrest

Yes
No
Subject Not Arrested |

|  | OfficerHadPCtoArrest Comments | |

| 10 | Did the officer clearly document the probable cause in the report (FIC or EPR)?
In other words, does the report give the facts and circumstances known to the officer at the time which would justify a reasonable person in believing the suspect committed or was committing an offense?

The report must also clearly articulate a legal reason to stop the subject, and a legal reason to search the subject, if a search was relevant to the arrest charge.

Ch 1.9 P14; Ch 82.1 P4; Ch 41.12 P15

Please explain PC for the arrest or the lack th as articulated in the report | PC Clearly Articulated

Yes
No
Subject Not Arrested |

|  | PC Clearly Articulated Comments | |

## Subject Miscellaneous

**11**   Did the officer use their discretion to give the subject a break?

Break Given

Just because an officer checks the verbal warning box in the stop result section of the FIC, doesn't mean a break was given. There must be an offense for which the officer chooses not to cite, summons, or arrest.

Yes
No
No Video
NA-No Crime

If the officer gave this subject a break, please explain what officer could have done but decided not to.

Break Given Explain

**12**   Did the officer run the subject's ID?:

ID Check

Yes
No
No Video
The Offcer did not have a chance to

**13**   Did the officer request translation services, if needed?

LEP

Yes
No
No Video
No Translation Needed
Flag

**15**   Did the officer give Miranda Rights, If required?

Miranda Given, If Required

Officers shall advise suspects of their Miranda Rights at the time of arrest or prior to any custodial interrogation.  See Chapter: 1.9.1;

Yes
No
NA

Note: Miranda does not apply to roadside questioning of a stopped motorist or a person briefly detained on the street under a Terry stop.

**Previous Page**                    **Next Page**

**SUBJECT
IMMIGRATION**

16 Was the subject arrested because of, or in part due to the subject's immigration status?

StopImmigrationStatus

| Find items | ▼ |
|---|---|

17 Was the subject questioned about their immigration status in a manner that was not relevant to the crime in question?

QuestionedImmigrationStatus

| Find items | ▼ |
|---|---|

ImmigrationComments

| |
|---|

## Subject LGBTQ

**16**  Did the officer say something that is possibly offensive about/to LGBTQ individuals?

OfficerCommentLGBTQ

Yes
No
No Video

**17**  Did the officer address the subject by their chosen name, title, and pronoun?

OfficerAddressLGBTQ

Yes
No
Gender Identity Unknown
No Video

LGBTQComments:

#Name?

**SUBJECT EXIT VEHICLE**

Required to Exit Vehicle

Did an officer require this subject to exit a vehicle?

| Find items | ⌄ |

Vehicle Exit Justification Documented

If you chose yes for "Required to Exit Vehicle", did an officer document the justification to require this subject to exit the vehicle in the FIC?

| Find items | ⌄ |

Vehicle Exit Justification Compliant

If you chose yes for Vehicle Exit Justification Documented, is the justification specific to this subject, and/or was a legal vehicle search conducted requiring all occupants to exit the vehicle?

| Find items | ⌄ |

Vehicle Exit Justification Category

If this subject was required to exit a vehicle, pick the option below that best describes the justification:

| Find items | ⌄ |

Vehicle Exit Justification Category Other Explanation

If you chose Other, please explain

31

## Appendix B – Report Distribution

Superintendent

Chief Deputy Superintendent Field Operations Bureau

Deputy Superintendent Professional Standards and Accountability Bureau

Deputy Superintendent Public Integrity Bureau

Deputy Superintendent Management Services Bureau City Attorney Sunni

City Attorney's Office

Assistant City Attorney

32



## IX.    APPENDIX C: SSA AUDIT PROTOCOL



# CONSENT DECREE COMPLIANCE AUDIT REVIEW STANDARDS

# ARTICLE 5 Stops, Searches, & Arrests (SSA)

1

**ARTICLE 5 STOPS, SEARCHES, & ARRESTS (SSA)**
**AUDIT NUMBER:** _____
**AUDIT DATE:** _____

## GENERAL

V. STOPS, SEARCHES, & ARRESTS: "NOPD agrees to ensure that all NOPD investigatory stops, searches, and arrests are conducted in accordance with the rights secured or protected by the Constitution and laws of the United States. NOPD agrees to ensure that investigatory stops, searches, and arrests are part of an effective overall crime prevention strategy; are consistent with community priorities for enforcement; and are carried out with fairness and respect."

The stops, searches, and arrests audits will be completed to ensure stops, searches, and arrests are constitutional and are within policy. Stops, searches, and arrests are regulated by, but not limited to, the following chapters: 1.2.4 – Search and Seizure; 1.2.4.1 – Stops/Terry Stops; 1.2.4.2 – Search Warrant Content, Forms and Reviews; 1.3.1.1 – Handcuffing and Restraint Devices; 1.9 – Arrests; 35.1.7 Non-Disciplinary Responses to Minor Violations; 41.3.10 Body Worn Camera; 41.12 – Field Interview Cards; 41.13 Bias-Free Policing; 52.1.1 – Misconduct Intake and Complaint Investigation.

## AUDIT SCOPE

This audit is designed to ensure that all stops, searches, and arrests are consistent with NOPD policy and constitutional law, are documented appropriately, that documentation is complete and accurate, and that stops, searches, and arrests are carried out with fairness and respect. This audit procedure entails review of stops, searches, and arrests. Search warrants and performance evaluations are covered in other protocols. See appendix A2 for CD Article 5 paragraphs that are not covered by protocols.

## AUDITOR TRAINING

For SSA review or auditing, the auditor will receive training in core policies, additional related policies, and will receive training hosted by NOPD's Education and Training Division (ET&D). Policy training will involve reading the policy, discussing the policy in a group, and being quizzed on the policy. The audit supervisor or others more familiar with the policy will facilitate policy discussions and quizzes. See the list of Core Policies and Additional Related Policies for the stops, searches, and arrests audit below. All updates to these policies will be discussed with the auditors. Training hosted by ET&D may be recruit or in-service training. Auditors must receive all ET&D training related to the constitutionality of stops, searches, and arrests. If ET&D training is not available due to unforeseen circumstances, the audit team supervisor will study lesson plans with the audit team. At a minimum, the lesson plans studied by the team must cover the same courses the audit supervisor intended the auditors to take that year.

1. Core Policies
   A. 1.2.4 - Search and Seizure
   B. 1.2.4.1 - Stops/Terry Stops
   C. 1.2.4.3 - Vehicle Stops
   D. 1.3.1.1 - Handcuffing and Restraint Devices
   E. 1.9 – Arrests
   F. 41.3.10 - Body Worn Camera
   G. 41.12 – Field Interview Cards
   H. 84.1 Evidence and Property
   I. 41.13 - Bias-Free Policing
2. Additional Related Polices
   A. 1.2.4.2 - Search Warrant Content, Forms and Reviews
   B. 1.2.6 - Alternatives to Arrest
   C. 1.2.7 - Alternatives to Arrest - Sobering Center
   D. 1.3 - Use of Force
   E. 1.9.1 - Miranda Rights

2

F.   1.9.2 - Arrest Warrant Wanted Persons
G.   41.4 - Foot Pursuits
H.   35.1.7 - Non-Disciplinary Responses to Minor Violations
I.   41.3.8 - In Car Camera
J.   41.13.1 - Interactions With Lesbian, Gay, Bisexual, Transgender, and Questioning Persons
K.   44.3 Juvenile Warning Notice and Summons
L.   44.1.4 Temporary Custody of Juveniles
M.   44.2 Juveniles
N.   41.25 Crisis Intervention
O.   41.36 Interacting with Homeless Persons
P.   55.4 Limited English Proficiency Services (LEP)
Q.   55.5 Disability Services
R.   55.5.1 Communication with Persons who are Deaf or Hearing Impaired
S.   55.5.2 Service Animals
T.   61.1.11 D.W.I. Procedures
U.   61.3 Traffic Citations
V.   52.1.1 - Misconduct Intake and Complaint Investigation

## AUDITING DATA

All stops, searches, and arrests are required to be documented in call data, field interview cards, and/or police reports. Five samples will be used to audit stops, searches and arrests:

1.   A random sample of all incidents in call data (CAD) that might involve a stop and all field interview cards (FICs)
2.   A random sample of all FICs that indicate a search occurred
3.   A random sample of all FICs and police reports that indicate a subject was arrested
4.   All FICs and EPRs that indicate a consent to search
5.   All FICs and EPRs that indicate a strip or cavity search
6.   All FICs indicating a search of a person on probation or parole

Because documents are sampled based on the digital time stamp for when they were created, the date of the actual incident can be much earlier. See Data Selection for deselection guidance.

Auditors will use the data types below to assess audit criteria:

1.   CAD
2.   FICs
3.   Body worn camera (BWC) video
4.   In Car Camera (ICC) video
5.   Police reports and supplemental reports (EPRs)
6.   Search warrants (available in CloudGavel or in EPRs)
7.   Central evidence and property receipts (available in EPRs or the BEAST)
8.   Probation and parole data (Google Sheet provided by Orleans Probation and Parole)
9.   Non-disciplinary corrective action documents (SFL)
10.  Disciplinary investigations (IAPro)

SSA Sampling Universes Details:

### A. Stops
FICs with a create date greater than or equal to 72 hours before the sample date.
And CAD incidents with the following exclusions:
- Excluding incidents with Type and Initial Type that are the following signals:

| Signal | Description |
|--------|-------------|
| 20 | Auto accident |
| 24 | Medical |
| 29 | Death |
| 58 | (10-18) Additional Information |
| 100 | Hit and run |
| 542 | Sex offender check |
| 911 | Unknown trouble call |
| 100C | Hit and run city vehicle |
| 100F | Hit and run, fatality |
| 100I | Hit and run, injury |
| 100X | Hit and run, police vehicle |
| 18A | Abandoned Vehicle |
| 18DE | Directed traffic enforcement |
| 20C | Accident involving city vehicle |
| 20F | Fatal accident |
| 20I | Injury accident |
| 20X | Accident involving police vehicle |
| 21F | Flood event |

| Signal | Description |
|--------|-------------|
| 21J | Missing juvenile |
| 21M | Missing adult |
| 21P | Found Property |
| 21TEST | Miscellaneous test |
| 22A | Area Check |
| 22B | Business Check |
| 22D | Directed Patrol |
| 22R | Residence Check |
| 22W | Walking Beat |
| 24K | Medical Sexual Assault Kit |
| 29U | Unclassified death |
| 52F | Fire |
| 62A | Burglary alarm |
| 62ANR | Alarm non-response |
| 62L | Local alarm |
| DETAIL | Officer working secondary employment |
| TOW | Vehicle towing |

- Excluding incidents with the following dispositions:

| Disposition | Description |
|-------------|-------------|
| GOA | Gone On Arrival |
| DUP | Duplicate |
| TEST | Test |

- And excluding incidents with no NOPD units listed as assigned.

**B. Searches**

FICs with:
- A create date greater than or equal to 72 hours before the sample date
- Indicate a subject was searched by any of the following being true:
  - The officer picked "Yes" in response to "Was subject searched?" (ActionTypeID 6)
  - The officer picked "Yes" in response to "Was a Pat-Down performed on the subject?" (ActionTypeID 40)
  - The officer picked "Yes" in response to "Was Vehicle Searched?" (ActionTypeID 31), and
  - The officer picked "Yes" under "Evidence Seized" (ActionTypeID 18)
  - The officer picked the Search Type "Vehicle" (ActionTypeID 8, No Longer Active)
  - The officer picked the Search Type "Pat-Down" (ActionTypeID 9, No Longer Active)
  - The officer picked the Search Type "Driver" (ActionTypeID 10, No Longer Active)
  - The officer picked the Search Type "Passenger" (ActionTypeID 11, No Longer Active)

**C. Arrests**

Electronic police reports and supplemental reports (EPRs) with:
- A create date greater than or equal to 72 hours before the sample date, and
- An offender with an arrested status, and

And FICs with:

4

- A create date greater than or equal to 72 hours before the sample date, and
- The officer checked "Physical Arrest" under "Stop Result" (ActionTypeID 3).

**D. Consent Searches**

FICs with:

- A create date greater than or equal to 72 hours before the sample date, and
- The officer indicated a consent to search occurred or was requested by checking the consent to search box in the Vehicle Search or Person Search section ActionTypeID 35 or ActionTypeID 12, or by checking "Yes" for "Was Subject asked to Consent to Search" ActionTypeID 27, or
- Text indicating a consent to search occurred.

EPRs with:

- A create date greater than or equal to 72 hours before the sample date, and
- Text indicating a consent to search occurred.

**E. Strip/Cavity Searches**

FICs with:

- A create date greater than or equal to 72 hours before the sample date, and
- The officer indicated a strip or cavity search occurred by checking one of the Strip or Cavity search boxes ActionTypeIDs 48, 50, 51, 52 or 53, or
- Text indicating a strip or cavity search occurred.

EPRs with:

- A create date greater than or equal to 72 hours before the sample date, and
- Text indicating a strip or cavity search occurred.

**F. Probation and Parole**

FICs indicating a search of a person with the same name and date of birth as someone on probation and parole according to the Orleans Parish Probation and Parole office.

---

**DATA SELECTION**

1. The universe of stops, searches, arrests, consent searches, and strip and cavity searches will be exported into an excel spreadsheet. Stops, searches and arrests will be sorted based on the date the digital document was created. Incidents will be assigned a random number using Excel's RAND function. All consent, strip, and cavity searches will be audited, negating the need for randomization.

2. Documents will be sampled starting from the smallest random number assigned and continuing from smallest to largest until the required sample size is reached.

3. Sample sizes for stops, searches, and arrests will be representative of the Department, not each district/division, when reporting publicly. For reference, in May 2020, NOPD's Stops, Searches, and Arrests universes amounted to 15,000+ incidents. Per the sample size calculator given to NOPD by the Los Angeles Police Department Auditing Unit, a sample size of about 95 incidents is representative of a population of 15,000 when doing a one-tailed test, with a 95% degree of confidence, and a 4% error rate. The sample will include an equal number of incidents from the stops, searches, and arrests universes.

4. When reporting publicly, audit results will be stratified by division/district; the number of audit results per division/district will be proportionate to the actual activity by the division/district. The results will include at least one incident from each division/district with activity during the reporting time period to ensure all districts/divisions with activity are included in public reports.

5. Randomly sampled documents (CAD, FIC, or EPR) that do not document a stop, search, arrest, consent search, strip search, or cavity search by NOPD will be deselected. For the purposes of this audit, anyone who is identified by an officer and who is not a witness or victim, is considered stopped. Incidents sampled that contain a stop, search, or arrest will be audited, even if the action does not include the act for which it was sampled. If the document is part of the arrest universe and an auditor

5

determines the related incident does not include an arrest by NOPD, but does include a stop or search by NOPD, the document and related incident will be audited focusing on the stop and search. When a document is deselected, the auditor will continue to the document with the next lowest random number.

## AUDIT PROCEDURES & ANALYSIS

The Department will be notified about how often PSAB will audit stops, searches, arrests, consent searches, and strip/cavity searches. PSAB will initially release preliminary scorecards to help the Department become familiar with the audit criteria.

Auditors will qualitatively assess each incident using the forms listed below to ensure each stop, search, arrest, consent search, and strip/cavity search is compliant with legal requirements and NOPD policy. Generally speaking, auditors will watch video and read reports to ensure officers had a valid legal basis to conduct a stop, search or arrest, that officers documented such bases, and that documentation is complete and accurate.

The following forms document the audit criteria:
1.  SSA Subject Audit Form
2.  SSA Incident Audit Form
3.  Consent to Search Form
4.  Strip/Cavity Search Form

Each stop (CAD or FIC), search (FIC), or arrest (FIC or EPR) document in the samples requires one SSA Incident form and one SSA subject form for each person suspected of a crime during the incident. If the incident also involves a consent, strip, or cavity search those forms are required as well. An incident with a consent and strip search will require the SSA Incident form, the Consent to Search Form, the Strip/Cavity Form and as many SSA Subject forms as there are subjects. For the purposes of this audit, every person an officer identifies who is not a victim or witness is a suspect and requires an SSA subject form. For example, consider an incident involving an officer stopping a vehicle because she believes the driver matches a description of a wanted person. She identifies the driver and the front passenger in the vehicle and none of the rear passengers. For this incident an SSA subject form is required for the driver (suspected of being wanted) and for the front passenger (identified by the officer). Although the officer is required to document approximate demographics for the rear passengers in an FIC, SSA subject forms are not needed for them.

All documents and related incidents that are in the sample and are not audited must be deselected. See Data Selection for guidance on when deselection is appropriate. All deselections will be recorded in the Deselection Log.

Auditors must search for and review all documentation related to the document sampled. This may involve:
*   Reading the documents sampled to determine which officers were on scene and when.
*   Searching Evidence.com by officer and time and by using multi-cam to find related videos that are labelled differently.
*   Reviewing the prior and proceeding CAD activity for the officers on scene.
*   Searching for FICs and EPRs using subject names and the date of the incident as documented on video or in reports.
*   Searching for FICs and EPRs using officer information and the date of the incident as documented on video or in reports.
*   Reviewing the related item numbers as documented in FICs and EPRs, and
*   Asking the relevant administrator.

If video is available for the incident, auditors must watch all interactions between officers and non-members. Auditors may skip through sections of video that do not involve interactions between officers and non-members. Auditors may need to watch videos recorded by other officers on scene to observe all interactions. At the very least, auditors need to watch the beginning and end of each officer's BWC video to determine whether the officer activated and deactivated her BWC as required by policy.

Auditors will read the guidance in the audit forms on a regular basis. Changes to audit forms will be clearly communicated to auditors by the audit supervisor. Auditors will re-read policies when guidance in audit forms recommends they do so or when the policy requirements are not quite clear enough to the auditor to allow her to confidently score an audit criteria.

When audit results require comments, auditors will thoroughly explain the evidence they observed that led to their determination of the result for the audit criteria in question. For example, if an auditor scores "Videos and Reports are Significantly Consistent" with a "No" indicating non-compliance, she will explain how the video shows something that is not consistent with the report. Such a comment may read like the following: The FIC documents a pat down, the BWC shows a search incident to arrest.

6

Drawing on their knowledge of NOPD policies, auditors will note any policy violations they observe that are not specifically addressed in the SSA audit tools in the "Notify PSS" section of the form. See the Notify PSS protocol for guidance on what types of observations auditors are instructed to document in the Notify PSS section and how PSAB uses the information.

## RESULTS VERIFICATION

The results of the SSA audit will be verified through two processes:

1.    Auditor Peer Review
      A.    Two auditors will independently assess each incident and will not discuss the incident with anyone until they have thoroughly reviewed the incident and have completed their SSA Incident and Subject form entries.
      B.    The two auditors will discuss and resolve any discrepancies between the two sets of results.
      C.    Discrepancies the two auditors cannot resolve will be escalated to their supervisor who will resolve the discrepancy, and who may draw on the expertise of others, including but not limited to: the PSAB Deputy Superintendent, the PSAB Captain, other PSAB Innovation Managers, members of the Education and Training Division, members of the District Attorney's office, members of the Office of the Consent Decree Monitor, and members of the Department of Justice.
      D.    A third set of audit entries will document the reconciled audit results. The original entries by the two auditors will be preserved.
2.    Internal Audit Review and Resolution
      A.    Once preliminarily released to the Department, district/division captains or their designee(s) will review the audit results.
      B.    Any disagreement with audit results will be documented on the Audit Re-Evaluation Request Form and sent to nopdaudits@nola.gov.
      C.    An auditor will initially respond to the request within two regular business days.
      D.    The auditor must finalize his/her response within five regular business days or receive an extension from the audit supervisor.
      E.    The auditor will document the resolution in an email to the requestor, including the requestor's district/division Captain or Administrator, the PSAB Captain, and the audit supervisor. The reconciled audit results will be updated, if necessary, as will the related reports.
      F.    All Audit Re-Evaluation Request Forms submittals and their resolution will be tracked by the Audit and Review Unit in a database. If changes are made as a result of the review, the original audit results will be preserved. And the forms will be stored in the Audit and Review networked drive.
      G.    The Unit will stop taking re-evaluation requests two weeks after the preliminary release. Once all re-evaluation requests are resolved, and the reconciled results are updated accordingly, the audit supervisor will officially release the results to the Department.

## FINAL REPORT

The audit supervisor shall provide an audit report to the PSAB Deputy Superintendent and PSAB Captain within ten days of the final reconciliation of the audit results.

The Final Report will include:

1.    The audit criteria with compliance scores and compliance/non-compliance indicated for each criterion.
2.    A description of the audit samples and universes.
3.    A list of the types of documentation reviewed and/or accessed during the audit process (e.g. CAD data, FICs, EPRs, body worn camera footage).
4.    A summary analyzing any deficiencies noted in the SSA audit (e.g. trends, isolated but notable deficiencies identified using the audit tool; policy violations observed in other areas and referred using Notify PSS)
5.    Any recommended remedial actions to remedy deficiencies identified by the audit
6.    Any recommended changes to the audit process (sampling, forms, access to data, etc.)

**IMMEDIATE ACTION REPORTING**

See the Notify PSS Protocol for details on NOPD's immediate action reporting processes.

**AUDIT SCHEDULE**

Stops, searches, and arrests audits will be reported publicly once a year, at a minimum. Smaller batches of results may be reported internally as frequently as weekly to give more timely feedback to the Department, and these smaller batches may be combined to get to a sample that is representative of all stops, searches, and arrests each year, as determined by using LAPD's tool.

**ADDENDUMS & AUDITING MATERIALS**

A. See the attached Access database to review the SSA Subject Audit Form, SSA Incident Audit Form, Consent to Search Audit Form, and Strip/Cavity Search Audit Form

A2. SSA: CD Areas Not Covered by this Protocol

Performance Evaluations (CD 137, 146, 151): PSAB audits performance evaluations annually. See the Performance Evaluation audit protocol (pending) for more details.

Bias Free (CD 125): NOPD, DOJ, and OCDM worked together to design bias-free audit methods. See the Bias Free audit protocol for more details.

District Attorney Refusals are Addressed (CD 148): Per Ch. 42.15 – District Attorney Arrest Case Screening, PSAB's PSS unit receives all emails from the DA regarding refusals, forwards them to the appropriate command, and ensures the appropriate corrective action has been taken. PSAB performs regular reviews of the email notifications from OPDA and the corresponding SFL entries to ensure that all required processes are being followed and corrective measures are being taken in a timely and appropriate manner.

Policy, Tactics, Training Recommendations (CD 137, 146, 147, 150, 417): The Policy, Tactics, and Training Recommendation form used by PIB is designed to require corrective/remedial training of officers who are the subject of a misconduct investigation. PSAB created a separate form, Form 358 – Program Review Request (PRR) which is available to the entire department and enables members to recommend programmatic changes to departmental policy, tactics, and training. Form 358 is covered by Chapters 41.3.10, 1.2.4, 1.2.4.2, 52.1.1, 1.3.6, 1.9, and 41.12. PSAB tracks form 358 submissions and partners with relevant bureaus to address submissions. PSAB will review the use of form 358 bi-annually and encourage members to make submissions.

All Stops Are Documented (CD 150): PSAB will work with OCDM and DOJ to determine methods for finding undocumented stops and for incentivizing documentation of all stops. Methods and timing have yet to be determined.

8