**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**                    **CIVIL ACTION**

**VERSUS**                                       **NO. 12-1924**

**CITY OF NEW ORLEANS**                          **SECTION: "E" (2)**

Annual Report of the Consent Decree Monitor
For the New Orleans Police Department Consent Decree
Covering the Year 2024
Released April 23, 2025



# Annual Report of the Consent Decree Monitor
## For the New Orleans Police Department Consent Decree[1]
## Covering the Year 2024
## Released April 23, 2025

**Office of the Consent Decree Monitor**
**New Orleans, Louisiana**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana

---

[1]    To avoid duplication and promote efficiency, this Annual Report incorporates the Monitoring Team's 2024 Q3 and Q4 reports.



## I.    CONSENT DECREE AUTHORITY

"The Monitor shall file with the Court quarterly written, public reports covering the reporting period that shall include:

> a) A description of the work conducted by the Monitoring Team during the reporting period;
>
> b) A listing of each [Consent Decree] requirement indicating which requirements have been: (1) incorporated into implemented policy; (2) the subject of sufficient training for all relevant NOPD officers and employees; (3) reviewed or audited by the Monitoring Team in determining whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitoring Team to have been fully implemented in practice;
>
> c) The methodology and specific findings for each audit or review conducted, redacted as necessary for privacy concerns.  An unredacted version shall be filed under seal with the Court and provided to the Parties.  The underlying data for each audit or review shall not be publicly available but shall be retained by the Monitoring Team and provided to either or both Parties upon request;
>
> d) For any requirements that were reviewed or audited and found not to have been fully implemented in practice, the Monitor's recommendations regarding necessary steps to achieve compliance;
>
> e) The methodology and specific findings for each outcome assessment conducted; and
>
> f) A projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the [Consent Decree]."

**Consent Decree Paragraph 457**



## II.    NOTES

"The Monitor shall be subject to the supervision and orders of the [United States District Court for the Eastern District of Louisiana], consistent with [the Consent Decree].  The Monitoring Team shall only have the duties, responsibilities, and authority conferred by [the Consent Decree].  The Monitoring Team shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent."

**Consent Decree Paragraph 455**



## III.    TABLE OF CONTENTS

## Contents

I.    CONSENT DECREE AUTHORITY ................................................................. 1

II.    NOTES .......................................................................................................... 2

III.    TABLE OF CONTENTS ................................................................................ 3

IV.    GLOSSARY OF ACRONYMS ..................................................................... 5

V.    INTRODUCTION ......................................................................................... 7

VI.    OVERVIEW OF 2024 MONITORING ACTIVITIES ................................ 10

VII.    CONSENT DECREE REQUIREMENTS – COMPLIANCE STATUS ........... 13

A.    Policies .................................................................................................. 13

B.    Training ................................................................................................. 14

C.    Implementation ..................................................................................... 14

VIII.    AUDITS, REVIEWS, OBSERVATIONS, AND RECOMMENDATIONS ..... 15

A.    Use of Force .......................................................................................... 15

    1.    Review of NOPD's August 2024 Use of Force Audit Report ................ 15

    2.    Spot Check of NOPD's April 2024 Conducted Energy Weapon (CEW) Audit Report 15

B.    Stops, Searches, and Arrests (SSA) ...................................................... 16

C.    Gender Bias ........................................................................................... 17

    1.    Spot Check of NOPD's Sexual Assault Audit ..................................... 17

    2.    Spot Check of NOPD's Domestic Violence Unit Audit ....................... 18

D.    Public Integrity Bureau ......................................................................... 19

    1.    Spot Check of NOPD's PIB Audit ....................................................... 19

    2.    Review of Specific PIB Investigations ................................................. 20

    3.    Review Of Outsourced Investigations ................................................. 20

E.    Recruitment ........................................................................................... 21

F.    Promotions ............................................................................................ 22

IX.    SUSTAINMENT .......................................................................................... 24

A.    Public Meetings and Feedback ............................................................. 24



B.    Hearing and Order Granting Sustainment........................................................ 25

C.    What to Expect During the Sustainment Period ............................................. 25

X.    CONCLUSION .................................................................................................. 27

XI.   APPENDIXES .................................................................................................... 28

A.    APPENDIX A – PROMOTIONS LETTER ....................................................... 28



## IV.   GLOSSARY OF ACRONYMS

"ASU"        Administrative Services Unit
"AUSA"      Assistant United States Attorney
"AVL"        Automatic Vehicle Locator
"BWC"       Body Worn Cameras
"CIT"         Crisis Intervention Team
"CCMS"      Criminal Case Management System
"CD"          Consent Decree
"CIT"         Crisis Intervention Team
"CODIS"     Combined DNA Index System
"ComStat"   Computer Statistics
"COCO"      Community Coordinating [sergeants]
"CPI"         California Psychological Inventory
"CSC"        Civil Service Commission
"CUC"        Citizens United for Change
"DA"          District Attorney
"DI-1"        Disciplinary Investigation Form
"DOJ"        Department of Justice
"DV"          Domestic Violence
"DVU"        Domestic Violence Unit
"ECW"        Electronic Control Weapon
"EPIC"       Ethical Policing is Courageous (NOPD peer intervention program)
"EWS"        Early Warning System
"FBI"         Federal Bureau of Investigation
"FIT"         Force Investigation Team
"FOB"        Field Operations Bureau
"FTO"        Field Training Officer
"IACP"       International Association of Chiefs of Police
"ICO"        Integrity Control Officers
"IPM"        Independent Police Monitor
"KSA"        Knowledge, Skill and Ability
"LEP"        Limited English Proficiency
"LGBT"      Lesbian, Gay, Bisexual, and Transgender
"MMPT"     Minnesota Multiphasic Personality Inventory



| | |
|---|---|
| "MOU" | Memorandum of Understanding |
| "NNDDA" | National Narcotics Detection Dog Association |
| "NOFJC" | New Orleans Family Justice Center |
| "NOPD" | New Orleans Police Department |
| "NPCA" | National Police Canine Association |
| "OCDM" | Office of Consent Decree Monitor |
| "OIG" | Office of Inspector General |
| "OPSE" | Office of Public Secondary Employment |
| "PIB" | Public Integrity Bureau |
| "POST" | Police Officer Standards Training Counsel |
| "PsyQ" | Psychological History Questionnaire |
| "QOL" | Quality of Life [officers] |
| "RFP" | Request for Proposal |
| "SA" | Sexual Assault |
| "SART" | Sexual Assault Response Team |
| "SOD" | Special Operations Division |
| "SFL" | Supervisor Feedback Log |
| "SRC" | Survey Research Center |
| "SUNO" | Southern University of New Orleans |
| "SVS" | Special Victims Section |
| "UNO" | University of New Orleans |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |
| "VAW" | Violence Against Women |



## V.    INTRODUCTION

2024 was a busy year, with the NOPD continuing to make steady progress in meeting its obligations under the Consent Decree. Notwithstanding occasional setbacks and missteps, NOPD's hard work culminated in a September 27, 2024 Joint Motion by the City and the DOJ to move into the two-year "Sustainment Period" contemplated by the Consent Decree.[2] The purpose of the Sustainment Period is to give NOPD and the City the chance to demonstrate their reforms are durable with less technical assistance from the Monitoring Team or DOJ. To use DOJ's words, the Sustainment Period serves as "a glide path toward resolution" of the Consent Decree.

In support of their Joint Motion, the parties acknowledged that

- "NOPD and the City require additional time to satisfy some specific elements of the Consent Decree."

- "[C]ertain ongoing corrective actions and remedial measures have not been fully implemented or have not been in place long enough for the United States and the Monitor to fully evaluate implementation, effectiveness, sustainability, and durability."

- "[B]y completion of the Sustainment Plan, the City will address any current outstanding issues of material compliance with the Consent Decree as set forth in the Sustainment Plan to demonstrate full and effective compliance as required by Consent Decree Paragraph 491."[3]

The Monitoring Team agrees with all three points.

According to the United States, the move into the Sustainment Period was warranted because "(1) the City has achieved compliance sufficient to enter the sustainment period as set forth by Paragraph 491 of the Decree; (2) the Sustainment Plan addresses the discrete remaining tasks and provides a mechanism for the City to demonstrate compliance for the required two years; and (3) the Sustainment Plan provides safeguards to pause the sustainment period or to remove the City from the sustainment period if the City fails to maintain compliance."[4]

---

[2]    The Consent Decree provides that the City will not be released from the Consent Decree until the City and NOPD have been in full and effective compliance with its requirements for two years. R. Doc. 778 at para. 491.

[3]    *See* R. Doc. 793 at one (as summarized in the Court's Order granting the Joint Motion).

[4]    R. Doc. 794 at 1. While the City fully supported the move into the Sustainment Period, at the same time it continued to argue the Sustainment Period was unnecessary and the Consent Decree should be terminated



The parties' Join Motion was met with mixed reactions among community observers. [5] Some groups recognized NOPD's steady progress under the Consent Decree and welcomed the achievement of the Sustainment milestone. Other groups argued that the NOPD had not changed enough and still needed constant federal oversight to ensure it would not immediately backslide. Still other stakeholders welcomed the move into Sustainment, but argued for a more robust Sustainment Plan.

The Court considered the parties' arguments along with the community's perspectives and granted the Joint Motion on January 14th, beginning the Sustainment Period. According to the Court,

> As the Court has stated in numerous public hearings over the years, the Court is tremendously proud of the achievements the NOPD has made since the entry of the Consent Decree. Notwithstanding some delays, missteps, and occasional backsliding, the hard work of the civilian and sworn members of the NOPD has paid off. The NOPD is a far different agency from the one that spawned DOJ's investigation in 2011 and the imposition of the Consent Decree in 2013.

The Court docketed the resulting Sustainment Plan on January 14.

Considering the current state of things – *i.e.*, being in the Sustainment Period – one fairly could question the relevance of compliance actions undertaken in 2024, which is the subject of this Annual Report. While we concede much of what is in this report has been overcome by more recent events, the community nonetheless has the right to see the work that has been done that has brought us to the important Sustainment milestone.

---

outright. The City's motion to terminate the Consent Decree was denied on January 14th. The City has informed the Court it will appealing that denial.

[5]  The Court provided a number of opportunities for members of the public to learn about the proposed Sustainment Plan and to share comments, questions, and concerns. These opportunities included (i) two virtual public meetings held by the Monitor, (ii) three in-person public meetings held by the Monitor, (iii) an email address allowing the public to submit comments to the Court through the Monitor, (iv) an email address allowing the public to submit comments to the Court directly through the Clerk's Office, (v) a public hearing during which any member of the public was permitted to present his/her comments or concerns directly to the Court, and (vi) numerous less formal meetings and discussions between the Monitoring Team and various groups and members of the public. To ensure the public had adequate time to take advantage of these many opportunities, the Court extended the public comment period on several occasions. *See* Order and Reasons at 6-7.



The Monitoring Team is thankful for the cooperation, hard work, and energy we received from the NOPD throughout 2024. We look forward to continued forward movement over the next two years.



## VI.    OVERVIEW OF 2024 MONITORING ACTIVITIES

The Monitoring Team spent significant time during 2024 reviewing, auditing, and evaluating multiple areas of Consent Decree compliance, including the following, broken down by quarter:

- **Q1 2024 (The below items are discussed in more detail in our Q1 Report)**

  o Participated in multi-day on-site meetings with NOPD, DOJ, and OIPM
  o Reviewed and provided feedback on various NOPD Policy Chapters
  o Prepared for and participated in the February 21, 2024 Consent Decree Status Conference
  o Prepared for and participated in the March 21, 2024 Public Hearing – Update on Stops, Searches, and Arrests
  o Provided technical support to NOPD related to the forthcoming Professional Standards and Accountability Bureau (PSAB) audit of Public Integrity Bureau (PIB) administrative case files
  o Reviewed NOPD's use of Limited English Proficiency (LEP) Phones
  o Attended Use of Force Report Board (UFRB) hearings
  o Observed and reviewed NOPD's canine training
  o Conducted a spot check of the Crisis Intervention Team (CIT)
  o Conducted a spot check of the Child Abuse Unit
  o Began a review of gun-related arrests during Mardi Gras
  o Began a review of unreported uses of force

- **Q2 2024 (The below items are discussed in more detail in our Q2 Report)**

  o Reviewed and provided feedback on various NOPD Policy Chapters
  o Prepared for and participated in the May 15, 2024, and June 5, 2024, Public Hearings – Bias Free and NOPD's Bias Free Audit
  o Attended NOPD's weekly MAX meetings
  o Attended UFRB hearings
  o Observed and reviewed NOPD's canine training
  o Reviewed the materials for the Major's and Captain's exams
  o Reviewed NOPD's audits and annual reports released during Q2
  o Reviewed documentation and body worn camera footage to identify unreported uses of force.
  o Reviewed NOPD's response to the Tulane and Jackson Square protests
  o Conducted a spot check of Domestic Violence Patrol Audit
  o Conducted an audit of Performance Evaluations
  o Reviewed Supervision, including an audit of INSIGHT and a review of NOPD's Supervision Audit



- o Began reviewing the PIB treatment of complaints submitted via the Independent Police Monitor (IPM)
- o Provided the Parties Technical Assistance regarding building durability protections into a proposed Sustainment Plan

- **Q3 2024 (The below items are discussed in more detail in this Annual Report)**

  - o Reviewed and provided feedback, as needed, on various NOPD policy chapters
  - o Attended and monitored NOPD's weekly MAX meetings
  - o Attended UFRB hearings
  - o Held multiple community meetings to update the community and answer questions about NOPD' progress under the Consent Decree
  - o Reviewed NOPD's audits and annual reports released during Q3
  - o Provided technical assistance to NOPD relating to the PIB Audit Protocol
  - o Conducted a spot check of PSAB's CEW Audit
  - o Conducted a spot check of SSA (strip/cavity searches)
  - o Conducted a spot check of PSAB's PIB Audit, focusing on priority areas identified by PSAB as requiring additional review
  - o Conducted a spot check of PSAB's Sexual Assault Audit
  - o Conducted a spot check of PSAB's Domestic Violence Unit (DVU) Audit
  - o Reviewed background investigations of NOPD applicants conducted by Recruitment
  - o Continued to track progress with the OPSE and ADP payroll system compatibility
  - o Provided the Parties Technical Assistance regarding building durability protections into a proposed Sustainment Plan

- **Q4 2024 (The below items are discussed in more detail in this Annual Report)**

  - o Held multiple public meetings to present on the Parties Joint Motion To enter Sustainment Period and accompanying proposed Sustainment Plan
  - o Met with the community to hear feedback and answer questions regarding the Parties' proposed Sustainment Plan
  - o Compiled and reviewed all comments and questions submitted in response to the Parties' proposed Sustainment Plan
  - o Met with the Police Community Advisory Board (PCAB) leaders to hear feedback on proposed changes to the PCAB process
  - o Worked with the Parties to draft a proposed plan for the PCABs
  - o Conducted a Use of Force spot audit
  - o Reviewed the Department's Major's and Captain's exams promotion results
  - o Reviewed various PIB complaints raised by members of the community
  - o Reviewed audits and reports completed by NOPD during Q4



Additionally, we spent significant time preparing for the possibility of the parties entering into the "Sustainment Period," as provided for in Consent Decree paragraph 491. The Monitoring Team provided significant support to prepare for that prospect. We discuss this process in more detail in Section IX, below.

Finally, as we have done since our appointment, the Monitoring Team spent significant time meeting with, and listening to, the parties to the Consent Decree. The Monitoring Team is in regular contact with the City, the NOPD, and the DOJ. We also continue to meet with the NOPD PSAB, the PIB, the NOLA Inspector General, the New Orleans Independent Police Monitor, the New Orleans District Attorney's Office, and various community advocacy groups.



## VII.    CONSENT DECREE REQUIREMENTS – COMPLIANCE STATUS

### A.    Policies

Throughout 2024, NOPD continued to develop, update, and publish policies and Standard Operating Procedures. The official policies are publicly available on the NOPD's website. The NOPD continues to develop and issue new policies as necessary and appropriate, following review and feedback by the Monitoring Team and the DOJ. During 2024, the Monitoring Team reviewed and provided feedback as necessary on draft policies including (among others):

- Concealed Firearms Carry (1.25)

- Taser Energy Weapon (TEW) (1.7)

- Administrative Reassignment (13.01)

- Transfer Selection Process (16.1)

- Police Reserve Officer Program (16.3)

- Cadet Training Program (33.5)

- Alternative Police Response (41.4.2)

- Immigration Enforcement (41.6.1)

- Unmanned Aircraft Systems (UAS/Drones) (43.5)

- Executive Protection Unit (46.4) (and the associated Standard Operating Procedure)

- Negotiated Settlements (52.2)

- Mediation (52.3)

- Adjudication of Misconduct (52.4)

- Disciplinary Matrix/Penalty Schedule (52.5)

- Rule 2: Moral Conduct

In addition to review and feedback provided by the Monitoring Team and the Department of Justice, the NOPD's Policy Review Panel (which we discussed in our 2023 Annual Report and in



our [2024 Q1 Report](#)) meets monthly to review the Department's policies. The public also is invited to review and comment on the Department's current and draft policies. The list of policies up for review on a monthly basis are listed on the Annual Review Policy Schedule, which can be accessed via NOPD's website at [https://nola.gov/nopd/policies/](https://nola.gov/nopd/policies/). Comments or concerns can be emailed to NOPD at [policyandplanning@nola.gov](mailto:policyandplanning@nola.gov).

### B.    Training

The NOPD provides training (for new recruits and veteran officers) as required by the Consent Decree. The Department's 2024 Master Training Plan is available [HERE](#). We note, however, that although the 2025 MTP has been provided to and reviewed by the Monitoring Team, it has not yet been posted for the public. We encourage NOPD to post the 2025 training plan as soon as possible. The Monitoring Team continues to monitor training to ensure it is sufficient to meet the requirements of the Consent Decree and the needs of NOPD members.

### C.    Implementation

To help NOPD manage implementing the Consent Decree's requirements and track compliance status, the Monitoring Team developed and shared with NOPD and DOJ a spreadsheet that tracks the compliance status of each Consent Decree paragraph; and notes the next steps needed for NOPD to come into compliance. A summary version of this Excel spreadsheet will be posted to the Monitoring Team's website.

The spreadsheet is a valuable compliance management tool. That said, it is important to remember that it is only a tool to aid the parties and Monitoring Team manage the compliance process. It is a living document that reflects the Monitoring Team's assessment of NOPD's compliance at a point in time. Paragraphs can—and do— move into and out of compliance. The spreadsheet does not reflect a compliance finding by the Court. Ultimately, regardless of the compliance status reflected in the spreadsheet, whether NOPD has satisfied the terms of the Consent Decree is a legal determination that will be made by Judge Morgan.



## VIII.    AUDITS, REVIEWS, OBSERVATIONS, AND RECOMMENDATIONS

### A.    Use of Force

#### 1.    Review of NOPD's August 2024 Use of Force Audit Report

Prior to its publication, the Monitoring Team reviewed and provided feedback to NOPD on PSAB's August 2024 Use of Force Audit Report (covering the period of January 2024 – June 2024). NOPD reported high levels of compliance, with an overall score of 96% for the Use of Force L1-L4 Audit and 100% for the Unreported Use of Force Audit. While we did not find any material issues with those numbers, it is important to note we only reviewed PSAB's audit report and did not conduct an audit of our own. Even so, the Monitoring Team identified some minor issues including, (1) this audit covered a six-month period, but the audit protocol calls for quarterly audits and (2) NOPD continues to struggle with the requirement that a supervisor's approved use of force report must be submitted to FIT within 21 days from the incident date (this area was only 56% compliant). The Monitoring Team plans to look into the second issue in more detail in the near future.

#### 2.    Spot Check of NOPD's April 2024 Conducted Energy Weapon (CEW) Audit Report

The Monitoring Team conducted a review and spot check of PSAB's April 2024 Conducted Energy Weapon (CEW) Audit Report. PSAB's audit covered the period from November 2023 to March 2024, during which time there were a total of eleven CEW incidents. The Monitoring Team reviewed six of the eleven incidents by reviewing available body-worn camera videos, reports, and documents associated with each incident. Following our initial review, the Monitoring Team agreed with PSAB's findings for three of the six incidents.

For one of the three incidents with which we did not agree, the Monitoring Team found two of the assessment questions that PSAB deemed "not applicable" (because there was no BWC available) could have been answered by relying on other documentation (*i.e.*, the Blue Team Report). Notably, these changes did not negatively impact the compliance score as they were changed from "N/A" to a positive finding. PSAB agreed with the Monitoring Team's finding and updated its audit report accordingly.

The Monitoring Team discussed the two remaining cases with PSAB and was able to resolve the potential concerns regarding one of the two cases. For the one remaining case, the Monitoring Team disagreed with PSAB's finding that the use of the CEW was appropriate. Specifically, the Monitoring Team identified concerns with the reason for the stop (*i.e.*, the suspect looked away from the officer), where the reason for the stop was documented (*i.e.*, in the police report rather than in the officer use of force statement), and the reason for deploying the TASER (i.e., the



suspect ran away from officers). These concerns have been communicated to NOPD and will be the subject of further discussions.

**B.      Stops, Searches, and Arrests (SSA)**

The Monitoring Team conducted a spot check of PSAB's June 2024 Stops, Searches & Arrest Audit Report (covering the period from June 1, 2023 – May 31, 2024).[6] Our spot check focused on two particular "sub-audits": (1) strip/cavity search incidents (we reviewed all three that occurred during the review period) and (2) the consent to search incidents (we reviewed four of the seven incidents). For these two sub-audit areas, PSAB found an overall compliance score of 23% for consent to search and 71% for strip/cavity search incidents.

Overall, we found PSAB's June 2024 SSA Audit Report to be complete. With regard to the underlying data, however, we identified multiple incidents of concern that could involve constitutional and/or policy violations.

With respect to the consent to search incidents, we disagreed with PSAB's findings for one of the four incidents as follows:

| Incident | Monitor Agreed/Disagreed with PSAB | Summary of Monitor Team Finding |
|----------|-----------------------------------|--------------------------------|
| J-03050-23 | Agreed | No policy violations identified. |
| A-04769-24 | Agreed | PSAB correctly identified this incident as a Public Safety Ride (not a consent to search). PSAB correctly noted the officers did not turn on their BWCs as required by policy. The officers did not follow the policy in Chapter 10.1 for a Public Safety Ride (however, this is outside the scope of the PSAB Audit).[7] |
| D-06546-24 | Disagreed | The subject was arrested and then questioned without being Mirandized. The PSAB auditor did not catch this policy and constitutional violation. NOPD agreed the subject should have been Mirandized after he was arrested, and before he was questioned. NOPD indicated it will forward the incident to the District for review and counseling of the officer involved. |

---

[6]      As of the date of this Q3 Report, the June 2024 SSA Audit Report has not yet been published.

[7]      The Monitoring Team will audit Public Safety Rides in 2025.



| Incident | Monitor Agreed/Disagreed with PSAB | Summary of Monitor Team Finding |
|---|---|---|
| G-02726-23 | Agreed | PSAB correctly identified this incident as a Public Safety Ride (not a consent to search). The officers did not follow the policy in Chapter 10.1 for a Public Safety Ride (however, this is outside the scope of the PSAB Audit). |

With respect to the strip/cavity search incidents, we disagreed with PSAB's findings for one of the three incidents as follows:

| Incident | Monitor Agreed/Disagreed with PSAB | Summary of Monitor Team Finding |
|---|---|---|
| G-17366-23 | Disagreed | The officer did not activate his BWC prior to the search, as required by NOPD policy. The PSAB auditor did not catch this issue. |
| C-23616-24 | Disagreed | The EPR does not include any articulable reason for the stop and pat-down. Additionally, one officer drew his TASER (prior to establishing a crime) to induce the subject to surrender during a foot chase. NOPD's explanation was that using a TASER to induce a subject to surrender is a form of de-escalation. However, per NOPD's Use of Force policy, use of a CEW would have been inappropriate in this situation. |
| D-07264-24 | Agreed | No policy violations identified. |

Concerningly, neither of the incidents that involved constitutional violations were identified by the PSAB auditor. We communicated our concerns to NOPD and will follow-up during our next review to ensure our recommendations have been implemented.

## C. Gender Bias

### 1. Spot Check of NOPD's Sexual Assault Audit

On August 13, 2024, the Monitoring Team reviewed and conducted a spot check of PSAB's Sexual Assault Audit Report dated June 13, 2024. The purpose of our spot check was to gauge the Sexual Violence Division's (SVD) investigative thoroughness, to verify compliance with the Consent Decree, and to validate the assessment scores of the PSAB auditors.

For its audit, PSAB selected 47 cases (15%) from the universe of 311 sex crimes cases reported and initiated during the period July 1, 2023, through December 31, 2023. The Monitoring Team



randomly selected seven of the 47 cases (or 15%) audited by PSAB for our review of file content and audit score accuracy. Based on our review, we found the seven cases to be in good order and sufficiently investigated, given the constraints of the available evidence and victim cooperation. In the seven cases we reviewed, there were no cases where a follow-up investigation and/or report of supplemental investigation was overdue. PSAB auditors, using the established protocol and checklist, do not determine whether a second supplement should have been entered into the file.

Overall, based on our review, the Monitoring Team believes PSAB's June 2024 audit score of 99.9% is accurate based on the current protocol and checklist. The current audit protocol assesses only the initial response and the investigator's supplement to the initial response. It does not include a review of whether an additional supplement was required several months after the initial response. We continue to believe the audit protocol should be updated to include an objectively reasonable way to determine whether a full investigation has been completed and documented (*e.g.*, by looking back further to see if an additional supplement was required and included to complete the full investigation). We believe this could be accomplished by looking beyond the first supplement to determine whether the case has been fully investigated within a reasonable timeframe, or at a minimum, supplemented with information indicating the case has been reviewed since the first entry and notating what actions have been taken since the detective's first contact and report.

Finally, we continue to note that the SVD remains under-staffed, and its detectives are handling caseloads well over the recommended 26 cases per detective. The SVD leadership agrees that due to heavy case workloads, in some cases, follow-up investigations are not completed in a timely manner or sometimes not at all. As we have reported in the past, not all case investigations are receiving the necessary additional follow up and the timely documentation of the case status. We encourage SDV to continue to address its staffing issue.[8] We also encourage PSAB to consider updating the audit protocol to more adequately measure whether a full investigation has been completed and documented.

### 2.    Spot Check of NOPD's Domestic Violence Unit Audit

On August 15, 2024, the Monitoring Team reviewed and looked behind PSAB's Domestic Violence Unit (DVU) Audit, which audited cases from October 1, 2023 – March 31, 31, 2024.

For its audit, of the 184 DVU cases within the audit range, PSAB randomly selected and reviewed 15% (i.e., 28 case files). PSAB rated all 28 cases as 100% compliant, except for one case that received a rating of 96% compliant. For our spot check, we reviewed 6 of the 28 case files. Based on our review, we found the case files were in good order and all of the

---

[8]    The Monitoring Team recognizes that Superintendent Kirkpatrick has made a concerted effort to increase SDV staffing, and did add several new detectives toward the end of 2024 into early 2025.



investigations we reviewed were thorough and professional. Our findings were consistent with PSAB's.

### D.    Public Integrity Bureau

#### 1.    Spot Check of NOPD's PIB Audit

In May 2024, PSAB conducted a full audit of PIB administrative investigations received from January 1, 2023 to December 31, 2023, using the misconduct complaint intake, investigation, and adjudication audit protocol that previously was developed by PSAB and approved by the Monitor. PSAB's initial findings reflected unexpectedly low compliance scores in several areas. After internally discussing the audit and receiving PIB's feedback, PSAB proactively reached out to the Monitoring Team (1) for technical assistance in determining if the audit correctly measured the areas of interest, and (2) to conduct spot checks and reviews of certain portions of the audit. PSAB, PIB, the Monitoring Team, and DOJ had multiple discussions about the audit and audit protocol and determined that the audit protocol required updates in certain areas.

Separately, the Monitoring Team reviewed each case file (40 in total) that PSAB determined during its audit were not compliant due to inadequacies in at least one of the following areas: (1) credibility, (2) preponderance of the evidence, and/or (3) thoroughness of the investigation. Our team rated only five of the 40 cases as not compliant. We relayed our findings to PSAB, with an explanation of the difference in our compliance findings.

Next, the Monitoring Team (along with PSAB) reviewed ten cases to ensure the complaints were properly classified. The Monitoring Team and PSAB agreed all ten cases were properly classified, though we found one investigation was closed by PIB as No Further Investigation Merited (NFIM) when it should have been investigated.

Finally, the Monitoring Team reviewed eight case files from 2023 and eight case files from 2024 which had not been audited by PSAB. We reviewed each of those sixteen files for proper classification, credibility, preponderance of the evidence standard, and thoroughness of the investigation. For the 2023 cases, we found all eight investigations compliant for classification, credibility, preponderance of the evidence standard, and thoroughness. For the 2024 cases, we found seven of the eight investigations compliant for classification, credibility, preponderance of the evidence standard, and thoroughness. In one case, the investigator did not conduct sufficient interviews and thus we found it was not thoroughly investigated.

Generally, the results of our PIB audit review were positive. We commend PSAB for identifying a potential issue with the audit protocol and for proactively reaching out for technical support. As a result, the PIB audit protocol will be updated to ensure it properly measures all areas. The Monitoring Team will be conducting a full PIB audit in the near future and will report on the findings of our review.



## 2. Review of Specific PIB Investigations

The Monitoring Team received complaints from individuals in the community alleging failures by NOPD and/or PIB to thoroughly and impartially investigate their complaints. Although the Monitoring Team is not an investigative agency, we reviewed each complaint in the course of monitoring NOPD's compliance with the Consent Decree's requirements, specifically including the requirement that "all allegations of officer misconduct are received and are fully and fairly investigated, that all investigative findings are supported using the preponderance of the evidence standard and documented in writing, and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent."[9] Consistent with our responsibilities, we reviewed NOPD's handling of these individual complaints.

It is important to keep in mind that our review of these complaints does not constitute audit findings. Our audits are based on a random sample of cases and, thus, can be considered as representative of PIB's performance overall on the elements assessed. Our review of discrete complaints, while informative, may not reflect PIB's overall performance. Nevertheless, we recognize the importance of combining audit findings with individual cases to help identify potential deficiencies as well as practices that could be improved. Additionally, we appreciate that public perception of PIB's impartiality is important to engendering public confidence in NOPD's reforms. Here, while the most recent audits of PIB by the Monitoring Team and PSAB generally have found high levels of compliance, our review of certain individual complaints identified certain deficiencies with respect to both how NOPD officers responded to the initial complaint as well as PIB's investigation of NOPD's handling of the complaint. We have communicated our findings, along with specific recommendations, to PIB.

## 3. Review Of Outsourced Investigations

NOPD policy contemplates that certain matters will be referred outside of PIB for investigation. Paragraph 64 of Policy 52.1 provides that "Where the facts of an allegation suggest NOPD may not be viewed as impartial when conducting investigations involving criminal misconduct by an officer, administrative investigations involving public officials, or serious uses of force indicating apparent criminal conduct by an officer, these investigations may be referred to an independent and highly competent entity outside of NOPD, as determined by the Superintendent of Police or their proxy." This is consistent with the terms of the Consent Decree.[10]

---

[9]     Consent Decree at Section XVII (Misconduct Complaint Intake, Investigation, and Adjudication).

[10]    Paragraph 98 of the Consent Decree, for examples, directs that "Where appropriate to ensure the fact and appearance of impartiality, for investigations of serious uses of force or force indicating apparent criminal conduct by an officer, NOPD may refer the incident for investigation by an independent and highly competent entity outside NOPD." Similarly, paragraph 398 of the Consent Decree provides that "Within three business days of the receipt of a misconduct complaint, PIB shall determine whether the complaint



The Monitoring Team reviewed several investigations conducted by outside entities during 2024 and generally found those investigations to be thoughtful, thorough, and undertaken in accordance with NOPD policy. Where we identified shortcomings, we brought them to the immediate attention of the investigating entity for resolution.

One shortcoming we identified over the course of our review of outsourced investigation was a failure on the part of the City, including the Mayor herself, to fully cooperate in those matters. The law firm conducting the outsourced Vappie investigation, for example, noted a lack of cooperation by the City's Law Department with regard to producing documents and a refusal by the Mayor to make herself available for a witness interview. Such non-cooperation is inconsistent with the letter and spirit of the Consent Decree.

### E.    Recruitment

In September 2024, the Monitoring Team met with the Commander of Recruitment, Lt. Powell, to discuss recent changes to and progress within the Recruitment Division. The Monitoring Team also reviewed the quality of recent background investigations conducted by Recruitment. The Monitoring Team reviewed the Summary Reports[11] for the background investigations of 27 recruits, including 24 from Class 203, two recruits recycled from Class 200 and 201, and one recruit from Class 199 that recently was terminated for theft while in the Academy.

Overall, we found the background investigations we reviewed to be completed with sufficient detail. There were some areas where possible hiring criteria violations were identified, but there was not much elaboration in the Summary Report relating to those concerns. For example, if an applicant was arrested, it would be helpful to more fully explain the circumstances in the Summary Report. We note there may have been additional details available to the reviewers (such as arrest reports) that the Monitoring Team was not aware of because we reviewed only the Summary Reports. The Monitoring Team will complete a more fulsome audit during the Sustainment Period, including a review of the underlying electronic files rather than only the Summary Reports.

Based on our review of the Summary Reports, we did not find any significant issues with the background investigations for the two recycled applicants or the applicant who was terminated for theft. We agree with NOPD's determination that these three applicants were acceptable for hire.

---

will be:  assigned to an ICO or supervisor; retained by PIB for investigation or referred to the appropriate outside agency; and whether it will be investigated criminally."

[11]    The Recruitment Division recently moved, and some backup material was still in boxes. The Summary Reports were pulled off the data base and printed for the Monitoring Team's review.



Relating to the 24 recruits from Class 203, we found most of these hires to be qualified; however, we did identify significant concerns with four of the applicants. Here again, it is important to note we did not have information beyond the Summary Report, including, for example, some of the back story or discussions with the background investigators. As such, while we found the backgrounds of the four applicants to have questionable matters listed in the Summary Reports, we understand there may be other reasons for moving forward with their hires. We communicated our specific concerns to the Recruitment Division and will continue to monitor this area during the Sustainment Period.

> **F.    Promotions**

On November 11, 2024, Superintendent Kirkpatrick announced a "pause" in the pending Captains and Majors promotions to respond to concerns expressed by Mayor Cantrell that one or more of the NOPD Deputy Chiefs responsible for the NOPD portion of the promotions evaluation (referred to as "Part 2") may have introduced bias into that process. To address the Mayor's concern, the Superintendent proposed engaging a group of outside assessors to independently score Part 2 for all Captain and Major candidates following the same rules, rubric,[12] and guidelines used by the Deputy Chiefs. The purpose of this secondary review was not to serve as a substitute for the Deputy Chiefs' review. Rather, it was to assess whether the Deputy Chiefs' evaluations were unbiased, in which case they would be used. Neither the Monitoring Team nor DOJ objected to the Superintendent's proposal. The Monitoring Team informed NOPD and the City that it would undertake an independent review of the Deputy Chiefs' scoring of the candidates and compare them to the outside assessors' scoring.

While the outside assessment was underway, and prior to the completion of the outside evaluators' assessment of Part 2, NOPD received several anonymous complaints alleging that one or more officers cheated on *Part 1* of the promotions evaluation (the portion run by Civil Service) by revealing to candidates questions and/or answers to the scenario-based (Part 1) portion of the exam. NOPD referred the complaints to the New Orleans Inspector General for a thorough investigation. On January 31, 2025, the Inspector General advised the NOPD and the Monitor that its investigation was complete and that it found *all cheating allegations unfounded*.

The Monitoring Team sent a letter to Judge Morgan summarizing the results of the Monitoring Team's review. Among other things, the Monitoring Team found the following:

- The Deputy Chiefs undertook their evaluations consistent with the process approved by the Court, the Monitor, and the DOJ, and consistent with the approved evaluation rubric developed to promote consistent and fair evaluations.

---

[12]    A "rubric" is an official scoring guide that defines how a review, test, or other assessment will be evaluated. It sets expectations for candidates and guides the evaluation of assessors.



- The findings of the outside assessors reveal no credible evidence of bias in the NOPD Deputy Chiefs' Part 2 evaluations."

- The Deputy Chiefs followed the approved process, adhered to the approved scoring rubric, and conformed to the Consent Decree.

- The Deputy Chiefs were internally consistent in their evaluations. [13]

In short, we found no evidence the Deputy Chiefs were biased in their Part 2 assessment of the candidates for captain and major. Our letter to the Court is attached to this Annual Report as Appendix A.[14]

Following receipt of our letter and the IG's findings, Judge Morgan issued an "Order and Reasons" that the NOPD could proceed to fill the Captains and Majors positions through the recent promotions process using the NOPD Deputy Chiefs' rankings (after correcting one error identified by the Monitoring Team). Judge Morgan also ordered NOPD to develop and publish to its employees its plan for making these promotions, and ordered NOPD, DOJ, and the Monitoring Team work together to make recommendations to the Court regarding steps that may be taken in the future to improve the promotions process.

---

[13] As noted in more detail in the Letter to Judge Morgan, we did identify of several errors made by the outside assessors, which further supported using the original Deputy Chief evaluations.

[14] On April 14, 2025, the New Orleans Civil Service Commission issued a ruling in a petition brought by the Police Association of New Orleans (PANO) and the Black Organization of Police (BOP). PANO and BOP alleged that Mayor Cantrell "improperly interfered in the recent promotion process for Police Captain and Police Major in violation of the Louisiana Constitution…." The Commission held an evidentiary at which the Mayor refused to testify. Among other things, the Commission found the Mayor did "engage[] in improper infringement" into the promotions process in violation of the Louisiana Constitution and applicable Civil Service rules, and that the Mayor's allegations of bias in the promotions process were "totally unfounded."



## IX.    SUSTAINMENT

The Consent Decree allows the City of New Orleans (including the NOPD) and the United States (collectively, the "Parties") to jointly ask the Court to terminate the Consent Decree "provided that the City and NOPD have been in full and effective compliance with this Agreement for two years."[15] This two year period during which NOPD must sustain compliance with all material requirements of the Consent Decree is referred to as the "Sustainment Period."

On September 27, 2024, the Parties filed with the Court a Joint Motion to begin the "Sustainment Period" and for the Court to approve the Parties' "Sustainment Plan," which was included as an attachment to the Joint Motion. The Motion did not ask the Court to find that the City had substantially complied with the Consent Decree's requirements. In fact, the Motion acknowledged that some Consent Decree requirements have not yet been met. Rather, the Parties' position was that the City and NOPD had made sufficient progress that the Court should allow them to enter the two year period in which the City and NOPD are required to demonstrate their ability to sustain the Consent Decree's reforms. In support of the Joint Motion, the Parties acknowledged that "NOPD and the City require additional time to satisfy some specific elements of the Consent Decree" and that "[B]y completion of the Sustainment Plan, the City will address any current outstanding issues of material compliance with the Consent Decree as set forth in the Sustainment Plan to demonstrate full and effective compliance as required by Consent Decree Paragraph 491."[16]

### A.    Public Meetings and Feedback

Following the Parties' filing of the Joint Motion, the Monitoring Team held five public meetings (two virtual meetings on October 8 and October 22, and three in-person meetings on October 28 and October 29) to discuss NOPD' progress toward compliance and to respond to and document public comments and questions. The Monitoring Team also participated in numerous less formal meetings and discussions with various community groups and members of the public regarding Sustainment.

In parallel, NOPD held a series of more than a dozen public meetings and feedback sessions across the City to explain and answer questions regarding the Joint Motion and the proposed Sustainment Plan. NOPD also accepted written comments via a dedicated email address.

On December 17, 2024, the Court held a public hearing where any member of the community was allowed to make comments directly to the Court. Approximately 35 members of the New Orleans community made comments to the court during that hearing.

---

[15]     Consent Decree at ¶ 491.

[16]     Joint Motion, R-Doc 793 at 1.



In addition to the various public meetings, the Court and the Monitoring Team reviewed the many written questions and comments received from the public. In an effort to promote transparency, the Court entered on the docket the comments it received.[17]

## B.    Hearing and Order Granting Sustainment

On January 13, 2025, the Court held a Hearing on the Joint Motion.[18] Members of the public and media were invited to attend in person, and the public also was able to listen to the hearing via the Court's conference line. On January 14, 2025, the Court held another hearing during which Judge Morgan read the Court's decision to grant the Parties Joint Motion, and ruled on related issues.

## C.    What to Expect During the Sustainment Period

The Sustainment Plan contemplates a reduced role for the Monitoring Team during the Sustainment Period because a key purpose of the Sustainment Period is to afford NOPD and the City the opportunity to demonstrate the durability of the many reforms implemented to date. But that does not mean the Monitoring Team will be absent.

The Sustainment Plan requires the Monitoring Team to conduct audits and reviews, including Annual Spot Audits[19] of six areas of the Consent Decree, Quarterly Spot Audits of nine areas of the Consent Decree, and regular/as needed reviews of new and revised NOPD policies, the Annual Training Plan, uses of force/Use of Force investigations, serious misconduct / serious misconduct investigations, Misconduct Complaint Intake, Investigations, & Adjudication (i.e., the sections of the Consent Decree relating to PIB), and investigation of any issue that may cause tolling or termination of the Sustainment Period.

Additionally, during the Sustainment Period, NOPD also must demonstrate a meaningful commitment to self-monitoring via PSAB audits for compliance with the material provisions of the Consent Decree,[20] and must also have audits conducted by an outside auditing entity (or entities). NOPD also is required to continue to review and update its policies, to provide quarterly reports to the DOJ, Monitor, Court, and City Council, and to complete various ongoing

---

[17]    The comments are available HERE, HERE, and HERE.

[18]    The Hearing originally was scheduled for January 8, 2025, but following the terrorist attack on Bourbon Street, the Court pushed the date back to the following week.

[19]    A "Spot Audit" is a limited review by the Monitor of a prior audit by NOPD. A Spot Audit typically does not involve a detailed review of a statistically valid sample size, and is designed: (i) to identify any material issues uncovered by the NOPD audit, and (ii) to confirm the NOPD auditor(s) adhered to agreed-upon audit protocols and audit schedules.

[20]    The 2025 and 2026 PSAB Audit Schedule is available as Attachment B to the Sustainment Plan. *See* the Court's Order at p. 39-41.



corrective actions and remedial measures relating to Use of Force Investigations, SSA, Bias-Free Policing, Policing Free of Gender Bias – Sexual Assault, Policing Free of Gender Bias – Domestic Violence, Community Engagement, Performance Evaluations & Promotions, Supervision, Secondary Employment, and Misconduct Complaint Intake, Investigation, and Adjudication.

An important element of the Sustainment Plan is that the City reform and revitalize the Police Community Advisory Boards (PCABs). Despite efforts by NOPD and the Monitoring Team through the life of the Consent, PCAB performance has been, at best, inconsistent. Some have functioned reasonably well and their members are satisfied. But many have not consistently met their obligations under the Consent Decree. As part of the Sustainment Plan the City created a plan for strengthening the PCABs including (1) creating a coordinating committee to support the PCABs and serve as a liaison to the NOPD, (2) providing financial and administrative support, (3) communicating PCAB recommendations to the NOPD and ensuring that NOPD considered them, (4) improving orientation and training for PCAB members, and (5) revising the PCAB manual.[21]

Consistent with the above requirements, both NOPD and the Monitoring Team will continue to publish a number of audits and reports throughout the Sustainment Period. NOPD's audits and reports will continue to be available at https://nola.gov/nopd/nopd-consent-decree/ and the Monitoring Team's reports will continue to be available at http://consentdecreemonitor.com/reports.

---

[21]    While the NOPD plays an important role in the functioning and effectiveness of the PCABs, it is the Mayor's Neighborhood Engagement Office that is primarily responsible for the PCAB program.



## X. CONCLUSION

The NOPD deserves significant credit for its hard work throughout 2024. The Court's willingness to grant the parties' Joint Motion to enter into the Sustainment Period is a recognition of that hard work. During the hearing on the Joint Motion, NOPD invited two young officers to speak about their experiences working with the many reforms the Department has implemented over the years. One of the speakers, a homicide detective, commented that he is proud of working for a department that promotes ethical and constitutional policing. He said he views it as a badge of honor that he and his colleagues can be effective and compliant at the same time. He vehemently insisted that nothing about the Consent Decree keeps him from getting his job done. The Mayor's public comments that the Department's "commitment to constitutional policing . . . has contributed to the continued decrease in overall crime in the city"[22] reinforces this same point. We completely agree. The Consent Decree has been good for the community – and for the police. We are excited to watch the NOPD's continued progress during the Sustainment Period.

---

[22]    https://www.wdsu.com/article/new-orleans-consent-decree-two-year-sustainment-period/63421122.



**XI.    APPENDIXES**

   **A.    APPENDIX A – PROMOTIONS LETTER**



January 20, 2025

The Honorable Judge Susie Morgan
United States District Court, Eastern District of Louisiana
500 Poydras Street
New Orleans, Louisiana

Your Honor:

As you know, on November 11th, the Superintendent of the New Orleans Police Department announced a "pause" in pending captains and majors promotions to respond to concerns expressed by Mayor LaToya Cantrell that one or more of the NOPD Deputy Chiefs responsible for the NOPD portion of the promotions evaluation (referred to as "Part 2") may have introduced bias into that process.

To address the mayor's concern, the Superintendent proposed engaging a group of outside assessors to independently score Part 2 for all captain and major candidates following the same rules, rubric,[1] and guidelines used by the Deputy Chiefs.[2] The Monitoring Team and DOJ informed the NOPD and the City that they did not object to this additional due diligence to address the mayor's concern. The Monitoring Team further informed NOPD and the City that it would undertake an independent review of the Deputy Chiefs' scoring of the candidates and compare them to the outside assessors' scoring.[3]

This letter summarizes the results of our review.

---

[1]      A "rubric" is an official scoring guide that defines how a review, test, or other assessment will be evaluated. It sets expectations for candidates and guides the evaluation of assessors.

[2]      The technical name for this process is a "test/retest reliability assessment." The point of such an assessment, as the name implies, is to test the reliability of the original evaluation, not to serve as a substitute for the original evaluation.

[3]      As the Court knows, the Monitoring Team has authority to conduct – and is responsible for conducting – "compliance reviews or audits as necessary to determine whether the City and NOPD have implemented and continue to comply with the material requirements of this Agreement." R. Doc. 778 (Consent Decree) at 447. The Consent Decree expressly covers performance evaluations and promotions in Section XIV. Likewise, the recently-ordered Sustainment Plan re-confirms the ongoing role the Monitoring Team plays in conducting reviews and audits. *See* R. Doc. 822.

Letter to Judge Morgan
January 20, 2025
Page 2



## I.    RELEVANT BACKGROUND

### A.    The Consent Decree and the NOPD Promotions Process

As approved by the Court on January 11, 2023, the 2nd Amended and Restated Consent Decree[4] requires that "officers who lead effectively and ethically are identified and receive appropriate consideration for promotion." Paragraph 302 of the Consent Decree requires NOPD to "work with Civil Service to develop and implement fair and consistent promotions practices that comport with best police practices and the requirements of this Agreement and result in the promotion of officers who are both ethical and effective."[5] NOPD further is required to "provide clear guidance on promotional criteria, and to prioritize effective, constitutional, and community-oriented policing as criteria for promotion."[6]

Fundamental to these Consent Decree obligations is the principle that officer promotions be conducted fairly, free from bias, and that officers be promoted on the basis of merit alone.

### B.    The Approved Promotions Process

To comply with its Consent Decree obligations, the NOPD long ago worked with the Monitoring Team and DOJ to develop a promotions process that (a) met NOPD's internal needs and (b) met NOPD's obligations under the Consent Decree. The process approved by the Monitoring Team and DOJ – and still controlling today – includes two parts:

- **Part 1**, conducted by the New Orleans Civil Service, involves a written, multiple-choice exam and an oral, scenario-based assessment conducted by outside law enforcement professionals.
- **Part 2**, conducted by NOPD Deputy Chiefs, includes a review of each officer's Performance Evaluations, Discipline, and Job History.[7]

Each part determines one-half of a candidate's score.[8] Each of the three elements of the Deputy Chiefs' Part 2 evaluation is worth one-third of the total Part 2 score.

---

[4]    R. Doc. 778.

[5]    R. Doc. 778 at para. 302.

[6]    *Id.*

[7]    The original process approved by DOJ and the Monitoring Team also included an interview with a panel of Deputy Chiefs. In 2023, in an effort to reduce the perception of potential bias, and with the permission of the Court, the Monitoring Team, and DOJ, NOPD moved the interview component from Part 2 to Part 1 of the evaluation process.

[8]    While Part 1 and Part 2 of the promotions evaluation process each is worth one half of a candidate's score, because the Civil Service adjusts a candidate's score based on how the score compares to all other candidates (i.e., Civil Service grades candidates on a curve), a candidate's Part 1 score actually impacts a candidate's final ranking far more than his/her Part 2 score.



Letter to Judge Morgan
January 20, 2025
Page 3

As discussed below, Part 2 of the evaluation process performed by NOPD Deputy Chiefs was crafted to ensure fair, consistent, and merit-based evaluations of promotions candidates using objective factors to the extent practicable. Two of the three elements of the Part 2 evaluation – Performance Evaluations and Discipline – are entirely objective. In contrast, the Job History element of Part 2 allows for some subjectivity consistent with the guidelines reflected in the scoring rubric.

The City first used the approved process for captains in 2021. The Monitoring Team reviewed the process to ensure it was implemented consistent with the City's commitments. We found it was. The New Orleans Independent Police Monitor also reviewed the process and likewise concluded that it was implemented fairly and properly. In a note to the community following the 2021 captains exam, the IPM shared the following observation:

> The OIPM concludes this was a fair and consistent process to select the captain candidates, conducted in compliance with both the CAO Policy Memorandum 143(R) and NOPD policy.[9]

While some officers in their communications with the Monitoring Team continued to express concern that any process that used NOPD Deputy Chiefs as evaluators is inherently biased, most agreed the new process was a vast improvement over the Department's prior approach.

### C.    The Cheating Allegations

Subsequent to the mayor's expression of concern regarding potential bias, and prior to the completion of the outside evaluators' assessment of Part 2, NOPD received several anonymous complaints alleging that one or more officers cheated on *Part 1* of the promotions evaluation (the portion run by Civil Service) by revealing to candidates questions and/or answers to the scenario-based (Part 1) portion of the exam. NOPD referred the complaints to the New Orleans Inspector General for a thorough investigation.

## II.    THE MONITORING TEAM'S REVIEW OF PART 2

At the same time the NOPD was engaging a group of outside assessors to conduct its additional due diligence on Part 2, the Monitoring Team initiated an independent review of the Part 2 evaluations. The Monitoring Team has reviewed the process, work papers, and conclusions of the Deputy Chiefs and the outside assessors.

### A.    The Monitoring Team's Review of the Deputy Chiefs' Evaluations

Our review revealed that the Deputy Chiefs undertook their evaluations consistent with the process approved by the Court, the Monitor, and the DOJ, and consistent with the approved scoring rubric developed to promote consistent and fair evaluations.

---

[9]    https://nolaipm.gov/wp-content/uploads/2021/11/OIPM-Report-NOPD-Police-Captain-Promotions-2021.pdf.



Letter to Judge Morgan
January 20, 2025
Page 4

As noted above, Part 2 of the promotions process includes three separate assessments of the candidates:

- Performance Evaluations,
- Discipline, and
- Job History.

The first two, Performance Evaluations and Discipline, are purely ***objective***. For example, the rubric dictates how many "exceptional" ratings on Performance Evaluations an officer needs to receive a HIGH Performance Evaluation score. Similarly, the rubric dictates the Discipline score based on the number of sustained disciplinary violations and the level of each violation. As a result, all evaluators should give the same scores for Performance Evaluations and Discipline, which is what happened here.

The Job History assessment is more ***subjective,*** and gives the evaluators a bit more leeway. As a result, the evaluators' scores are less likely to align completely as they do in the objective categories. For example, one NOPD Deputy Chief gave lower grades than his colleagues in the Job History category.[10] The difference, however, had a minimal impact on candidates' rankings.

In any event, differences of opinion among the Deputy Chiefs in the area of Job History are contemplated by the approved promotions process. The rubric and the weight given to this portion of the evaluations are designed to prevent a single overly negative (or overly positive) view from having a disproportionate impact on any officer's ranking.[11]

Our analysis of the Deputy Chiefs' work papers and conclusions confirmed that the Deputy Chiefs followed the approved rubric. Consistent with the objective nature of the first two categories, all five evaluators assigned the same scores to their evaluations of Performance Evaluations and Discipline. In the more subjective area of Job History, there were differences of opinion among the Deputy Chiefs, but these were minor and infrequent – and, as noted above, are contemplated by the approved process and are not an indicator of bias.

### B.     The Monitoring Team's Review of the Outside Assessor Evaluations

It is important to keep in mind the reason NOPD sought the outside assessment. The exercise was undertaken strictly to test the validity of the mayor's concern that the in-house Deputy Chief evaluators might be biased in their Part 2 evaluations. *It was not performed as a substitute for the*

---

[10]     We do not mean to suggest that such lower grades were improper or that any Deputy Chief's evaluations were wrong or unfair. We simply mean that one Deputy Chief found certain Job History elements less relevant than his colleagues.

[11]     Importantly, a single Deputy Chief's Job History evaluation accounts for only a small portion of a candidate's total score. Part 2 is 50% of the final score. Job History is 33% of that 50%. And each of the five Deputy Chiefs' scores is only 20% of that 33%. In other words, each Deputy Chief's Job History score accounts for less than 7% of a candidate's overall ranking.



*Deputy Chiefs' work.*[12] It was understood that, if the outside assessment did not reveal bias by the Deputy Chiefs, the Deputy Chiefs rankings would control – ***not*** the outside assessors' rankings.

For the reasons discussed, ***the Monitoring Team believes the findings of the outside assessors reveal no credible evidence of bias in the NOPD Deputy Chiefs' Part 2 evaluations***.

If the Deputy Chiefs had been biased, we would have expected to see material differences between the evaluations by the Deputy Chiefs and by the outside evaluators not tied to a misapplication of the rubric or a subjective evaluation of Job History. Instead, what we saw was agreement among both sets of assessors with a few differences driven by readily observable mistakes in the application of the rubric or by allowable subjective differences of opinion regarding Job History. The issues that collectively drove any differences in scoring between the Deputy Chiefs and the outside assessors were the following:

**Objective Factors**

- In two instances on the captains evaluation and one instance on the majors evaluation, the outside assessors treated Performance Evaluations that reflected an equal number of "exceeds" and "exceptionals" as warranting a HIGH score, whereas the Deputy Chiefs rated those candidates MEDIUM in that category. We note that all evaluators were told in training that the correct approach was the one employed by the Deputy Chiefs, *i.e.*, to score such cases MEDIUM, not HIGH.

- In three instances (all relating to aspiring captains), the outside assessors gave higher scores than the Deputy Chiefs to candidates who submitted the wrong performance evaluation form.[13] Specifically, the Deputy Chiefs rated such candidates LOW in the Performance Evaluation category, while the majority of the outside assessors rated such candidates MEDIUM.[14]

- In a small number of cases, the outside assessors simply made a mistake in their review of a candidate's Discipline file by failing properly to account for a given disciplinary matter.

---

[12]    The Monitoring Team made this point clear to the City during a series of discussions prior to NOPD engaging the outside assessors. Likewise, the Superintendent made this point clear to the promotions candidates in her November 11th email to NOPD leaders and supervisors: "…If the outside analysis demonstrates that the process was conducted in accordance with the approved rubric, we will promote from the current list (subject to the results of the cheating investigation, described below)."

[13]    NOPD's promotions policy requires officers to submit NOPD evaluations, not Civil Service evaluations.

[14]    While the NOPD Deputy Chiefs and the outside assessors were given the same pre-assessment training, it is possible the NOPD evaluators were more familiar with the two different evaluations and more aware that candidates had been instructed on the correct form to use.



Letter to Judge Morgan
January 20, 2025
Page 6

**Subjective Factor**

- The outside assessors gave lower scores in their evaluation of Job Histories than several of the Deputy Chiefs. This difference impacted the scores of 6 of the 11 major candidates and 13 of the 22 captain candidates. This appears to reflect a subjective difference of opinion regarding the relevance of certain experiences and activities and/or a subjective difference of opinion regarding *what is important to be a police leader in New Orleans*. Such subjective differences of opinion are contemplated by the process approved by the DOJ, the Monitoring Team, and the Court, and are not evidence of bias.

The differences we found are easy to identify and understand, and do not evidence bias on the part of the Deputy Chiefs.

## III.    CONCLUSION

The Monitoring Team's review found that the Deputy Chiefs followed the approved process, adhered to the approved scoring rubric, and conformed to the Consent Decree. We also found that the Deputy Chiefs were internally consistent in their evaluations. The Monitoring Team found no evidence the Deputy Chiefs were biased in their Part 2 assessment of the candidates for captain and major.[15]

*      *      *

Thank you Your Honor for considering our observations.

Respectfully,

Jonathan S. Aronie
Consent Decree Monitor
Sheppard Mullin LLP

CC:

City Attorney Donesia Turner
DOJ Counsel Jonas Geissler
Deputy Monitor David Douglass

---

[15]    Additionally, as noted above, our identification of several errors made by the outside assessors, further supports using the original Deputy Chief evaluations for the forthcoming promotions.