UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CIVIL ACTION NO. 2:12-CV-01924** |
| Plaintiff, | |
| V. | **SECTION E** |
| | **JUDGE SUSIE MORGAN** |
| **CITY OF NEW ORLEANS,** | **DIVISION 2** |
| | **MAG. DONNA PHILLIPS CURRAULT** |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF JOINT MOTION FOR INDICATIVE RULING ON RULE 60(B)(5) MOTION TO DISSOLVE CONSENT DECREE**

Pursuant to Federal Rule of Civil Procedure 62.1, the City of New Orleans and the United States respectfully move for an indicative ruling on a motion for relief from final judgment under Rule 60(b)(5) and for voluntary dismissal under Rule 41(a)(2). An indicative ruling is necessary when this Court lacks authority to afford the requested relief "because of an appeal that has been docketed and is pending." Fed. R. Civ. P. 62.1(a). Rule 62.1 creates a special exception that allows this Court to indicate how it would rule on a joint Rule 60(b)(5) motion, over which the Court lacks jurisdiction while the City's appeal is pending before the United States Fifth Circuit Court of Appeals. *See United States v. City of New Orleans,* No. 25-30053 (5th Cir.) (Doc. 826). This Court recently issued an indicative ruling regarding the dissolution of another consent decree because the motion raised "substantial issues" under Rule 60(b)(5). *Chisom v. Louisiana ex rel. Landry*, 2024 WL 2187837, at *3 (E.D. La. May 14, 2024), *rev'd*, 116 F.4th 309, 316 (5th Cir. 2024). The City and the United States will jointly file a motion to stay all proceedings in the Fifth Circuit for 30 days following the filing of this motion.

In 2012, the United States filed a complaint alleging that the City of New Orleans and the New Orleans Police Department (NOPD) engaged in a pattern or practice of conduct that violated the Fourth and Fourteenth Amendments of the Constitution, as well as Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. In 2013, this Court entered the Consent Decree proposed by the Parties. Over the last twelve years, new policies, training, supervision, discipline and audit procedures have been established through the joint effort of the City, NOPD, the United States, the court-appointed Monitor, and this Honorable Court. In January 2025, the Court denied the City's motion to terminate the Decree but approved the Parties' joint motion to begin the sustainment period, recognizing that today's NOPD "is a far different agency from the one that spawned DOJ's investigation in 2011 and the imposition of the Consent Decree in 2013." Doc. 822 at 3.

Eight months into the Sustainment Plan, the Parties agree that the City has established a durable remedy regarding the violations alleged in the complaint and that the City has achieved substantial compliance with the Consent Decree. The Parties' position is based on audits and reports conducted by NOPD and the Monitor, as well as developments since the City's prior motion to terminate and the Court's entry of the Sustainment Plan.

Accordingly, pursuant to Rule 62.1, the United States and the City of New Orleans jointly request an indicative ruling on a Rule 60(b)(5) motion to terminate the Second Amended and Restated Consent Decree Regarding the New Orleans Police Department (Doc. 778) and the Sustainment Plan (Doc. 822-1). The City and the United States respectfully ask that the Court issue an indicative ruling within 30 days, when the parties' proposed stay would expire in the Fifth Circuit.

**PERTINENT PROCEDURAL HISTORY**

On August 16, 2022, the City moved to terminate the Consent Decree pursuant to Rule 60(b)(5). Doc. 625-2. On January 14, 2025, the Court denied the City's motion and granted the Parties' joint motion for approval of the Sustainment Plan. Doc. 822. The Court observed that "NOPD policies have been comprehensively revamped," the training academy "has been transformed into a professional institution," and "many of [NOPD's] historic approaches to serving the community have been materially transformed in an effort to protect community members and officers." Doc. 822 at 3-4. The Court highlighted NOPD's "willingness . . . to identify and take meaningful steps to correct shortcomings on its own." Doc. 822 at 4. At the same time, the Court pointed to areas where "additional work [was] required of the NOPD and the City before the terms of the Consent Decree are satisfied." Doc. 822 at 4. The Court cited Use of Force Review Board hearings, Crisis Intervention Team responses, supervision and secondary employment issues, and gender bias. Doc. 822 at 4-5, 11. The Court also noted that the City had not yet completed its Remedial Action Plan to address the Court's Order to Show Cause regarding misconduct investigations. Doc. 822 at 11.[1]

The City appealed the Court's denial of the City's termination motion to the Fifth Circuit, Doc. 826, and briefing is ongoing before the Court of Appeals. The United States' responsive brief is currently due by September 12, 2025. The Parties will jointly move the Fifth Circuit to hold the City's appeal in abeyance for 30 days to allow this Court to consider an indicative ruling.

---

[1] The City completed the Remedial Action Plan on April 1, 2025. Doc. 847.

## LEGAL STANDARD

Federal Rule of Civil Procedure 60(b)(5) provides that courts can terminate a judgment when "the judgment has been satisfied" or when "applying it prospectively is no longer equitable." As to whether a judgment is satisfied, courts must "analyze a request for [the] dissolution" of a consent decree by interpreting the decree "as it is written," recognizing the decree's "clear limits." *Chisom v. Louisiana ex rel. Landry*, 116 F.4th 309, 316-18 (5th Cir. 2024). Where a defendant has shown "substantial compliance," the court should terminate the decree. *Id.* at 318.

Relief under Rule 60(b)(5) is also appropriate if "'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 447-48 (2009) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992)). As the Supreme Court has noted, in institutional reform cases such as this one, Rule 60(b)(5) serves a "particularly important function." *Horne*, 502 U.S. at 447. The "passage of time" in these cases "frequently brings about changed circumstances"—including "changes in the nature of the underlying problem" and "new policy insights"—that "warrant reexamination of the original judgment." *Id.* at 448. In assessing the prospective application of an institutional reform injunction, courts examine whether "the objective" of the judgment "has been achieved." *Id.* at 450. "If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Id.* The Fifth Circuit decisively instructed:

> At the outset, we note that consent decrees are not intended to operate in perpetuity. This is because case-by-case resolution and accountability is the norm from the perspective of our national Constitution. Consent decrees are the rare exception, with long-running decrees being rarer still. It follows then that a federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials.

4

> Thus, the starting point for courts in consent-decree cases is an understanding that the decree has an end, and it is the courts' duty to ensure that control is returned to the State when that end is reached . . . The Supreme Court has explained that remedies fashioned . . . to address constitutional infirmities must directly address and relate to the constitutional violation itself, and federal court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation. Once the alleged constitutional deficiency has been remedied, it is the courts' duty to bring federal control over the issue to its proper end.

*Chisom*, 116 F.4th at 316-17 (cleaned up, citations omitted). Accordingly, remediation of the unconstitutional conditions at which a consent decree is aimed necessitates the end of the decree. *See Horne*, 557 U.S. at 450.

## ARGUMENT

The Parties agree that the City has achieved substantial compliance with the Consent Decree and established a durable remedy to address the violations alleged in the United States' complaint. Accordingly, pursuant to binding precedent that courts must "bring federal control . . . to its proper end" once "the alleged constitutional deficiency has been remedied" (*Chisom*, 116 F.4th at 317), and that changes in fact render prospective application of a consent decree inequitable (*Horne*, 557 U.S. at 447-48), this case should now come to its end. The City and the United States, therefore, move this Court to indicate whether it would grant a Rule 60(b)(5) motion if the pending appeal were remanded for such a ruling, pursuant to Rule 62.1.

    A.    **NOPD Has Established a Durable Remedy Regarding Excessive Force.**

In its 2011 findings report and 2012 complaint, the United States alleged that NOPD "engage[d] in a pattern or practice of using unreasonable force against persons in New Orleans" and that "officers . . . routinely use[d] unnecessary and unreasonable force in violation of the Constitution and NOPD policy." Doc. 1 at 5; R. Doc. 1-1 at 7. The Consent Decree requires

5

NOPD to revise its policies and training related to use of force, as well as its procedures for use of force reporting and investigations, including creating a force investigation team and a force review board.

NOPD first achieved compliance with the Decree's requirements regarding the Use of Force in 2019, and developments since then show that NOPD has established a durable remedy. Doc. 794 at 5; Ex. 1 (Jan. 2025 Use of Force Audit Report); Doc. 574-1 at 13. For example, NOPD's most recent audit data—employing a methodology approved by the Court Monitor and the United States—demonstrates continued compliance in Use of Force as of January 2025.[2] The Executive Summary of the report states:

> The overall score of the Use of Force L1-L4 Audit is as follows: Overall – **96%**
>
> The overall score of the Unreported Use of Force Audit is as follows: Overall – **100%**
>
> The overall score of the Use of Force Review Board (UFRB) meeting reviews: Overall – **100%**

These results are in line with prior Use of Force audits. For example, NOPD reported the following results in the June 2024 audit[3]:

> The overall score of the Use of Force L1-L4 Audit is as follows: Overall – **94%**
>
> The overall score of the Unreported Use of Force Audit is as follows: Overall – **100%**

And NOPD reported that its use of conductive energy weapons, *i.e.*, Tasers, was 97% compliant with the Consent Decree in the most recent audit, after scoring 100% on the prior audit.[4]

---

[2] Ex. 1, Use of Force Audit Report (Jan. 2025).
[3] Doc. 794 at 6 & n.5.
[4] Ex. 14, Conducted Energy Weapon (CEW) Audit Report (May 6, 2025), at 2; Ex. 15, Conducted Energy Weapon (CEW) Audit Report (June 18, 2024), at 2.

NOPD's investigations have found low rates of unjustified force. In 2023, only two of NOPD's investigations found unjustified force, which accounted for just "0.4% of all use of force investigations" and represented "a decrease from 13 (3.3%) in 2021 and 6 (1.3%) in 2022."[5] This trend continued in 2024, when NOPD found unjustified force in seven investigations, accounting for 1.6% of all use of force investigations.[6] Importantly, NOPD officers themselves are identifying and reporting concerns of misconduct: NOPD investigated 68 officer-initiated unjustified use of force allegations in 2020-2023, more than double the amount from 2016-2019.[7]

Moreover, as the Court recognized in its January 2025 Order, the Monitor found that NOPD has cleared its backlog of Use of Force Review Board ("UFRB") hearings over the past few years.[8] NOPD's January 2025 Use of Force Audit assessed a sample of UFRB meetings conducted in 2024 and found 100% compliance with Consent Decree requirements, including that NOPD referred policy violations from its UFRB hearings to the Public Integrity Bureau for administrative investigations.[9]

Since entry of the Decree, NOPD has used force less often: NOPD reported 584 force incidents in 2016 and 451 force incidents in 2024.[10]

---

[5] Ex. 2, 2023 Use of Force Annual Report at 17.
[6] Ex. 13, 2024 Use of Force Annual Report, at 17 (tendered to OCDM for approval on August 3, 2025).
[7] Ex. 2, 2023 Use of Force Annual Report at 16 (showing 68 rank-initiated allegations in 2020-2023 and 28 such allegations in 2016-2019).
[8] Doc. 822 at 4 n.10; Report of The Consent Decree Monitor for the New Orleans Police Department Consent Decree Covering the Year 2023, Released March 19, 2024, at 15, available at https://nopdconsent.azurewebsites.net/Media/Default/Documents/Reports/0771%20Annual%20Report%20for%202023.pdf.
[9] Ex. 1, Use of Force Audit Report (Jan. 2025) at 18.
[10] Ex. 13, 2024 Use of Force Annual Report, at 9.

Based on the data available, the Parties agree that NOPD has achieved substantial compliance with the Decree's requirements and established a durable remedy regarding use of force, and the Decree should be ended pursuant to this joint request.

### B. NOPD Has Established a Durable Remedy Regarding Stops, Searches, and Arrests.

In its findings report and complaint, the United States alleged that NOPD "engage[d] in a pattern or practice of unlawfully stopping, searching, and arresting persons in New Orleans." Doc. 1 at 5-6; Doc. 1-1 at 9. The Consent Decree requires NOPD to make substantial changes to stop, search, and arrest (SSA) practices, including updated policies, training, documentation, supervisory review, and auditing and reporting procedures.

This Court conducted a hearing in 2024 in which the City provided extensive evidence concerning remedied SSA practices. NOPD also reported strong results in its 2023 SSA audit, which was verified by the Monitor's subsequent spot-check.[11] The 2023 audit showed that 93% of pat-downs were justified, NOPD properly gave *Miranda* warnings in 97% of incidents reviewed, and officers documented the legal basis for their searches in 95% of incidents reviewed.[12] NOPD's June 2024 and June 2025 SSA audits report continued progress. The June 2025 audit reported an overall compliance rate of 96% and broad compliance across all metrics. For example, the audit reports that:[13]

- Officers clearly articulated a legal basis for stops in 95% of the incidents reviewed.

---

[11] Doc. 794 at 7-8; Ex. 17, Stops, Searches & Arrest Audit, June 2023 (FOB and ISB), Sample Period June 1st, 2022 – May 31st, 2023, at 2.
[12] Ex. 17, Stops, Searches & Arrest Audit, June 2023 (FOB and ISB), Sample Period June 1st, 2022 – May 31st, 2023 at 20.
[13] Ex. 3, Stops, Searches & Arrest Audit June 2025 at 2 - 4.

- Officers properly gave *Miranda* warnings in 95% of incidents reviewed.
- Officers had a valid legal basis for their searches in 96% of incidents reviewed.

These results track the progress made by NOPD in prior reports. As the Monitor noted regarding the 2023 audit:

> Overall, NOPD found very high overall levels of compliance. The 2023 SSAPJ Audit also included a number of sub-audits, including SSA Probation and Parole; Consent to Search; and Strip & Cavity. NOPD found high levels of compliance for each of these sub-audits as well. The scores in NOPD's audit not only show high levels of compliance generally, but in most cases also reflect continued improvement over the 2022 audit scores (as verified by the Monitoring Team).

And, as this Court correctly noted on March 21, 2024, NOPD has decreased the number of sustained misconduct findings related to SSA from 35 in 2016 to 3 in 2023.[14] In 2024, NOPD sustained 6 allegations of SSA-related misconduct.[15] The Court also relayed the Monitor's findings that the Orleans Parish District Attorney's Office "refuse[s] very few cases from the NOPD based on officer misconduct related to a stop, search, or arrest," and NOPD had "incorporated" improvements into its "standard practices," meaning that "as individuals move on, these systems should stay in place."[16]

---

[14] Judge Susie Morgan's Excerpted Closing Remarks Regarding NOPD's Stop, Search, and Arrest Presentation March 21, 2024, located at https://nopdconsent.azurewebsites.net/Media/Default/Documents/Judge%20Closing%20Remarks%20-%20March%2021%20SSA%20Hearing%204891-9819-9984%20v.1.pdf.

[15] Ex. 4, 2024 Stop and Search Annual Report, at 50.

[16] Judge Susie Morgan's Excerpted Closing Remarks Regarding NOPD's Stop, Search, and Arrest Presentation March 21, 2024, *supra*.

Based on the data available, the Parties agree that NOPD has achieved substantial compliance with the Decree's requirements and established a durable remedy regarding stops, searches, and arrests and the Decree should be ended pursuant to this joint request.

    **C.    NOPD Has Established a Durable Remedy Regarding Services for Persons with Limited English Proficiency.**

In its findings report and complaint, the United States alleged that NOPD violated Title VI of the Civil Rights Act of 1964 by "failing to provide police services to persons with limited English proficiency" (LEP). Doc. 1 at 6; Doc. 1-1 at 12-13. Approximately 8% of New Orleans residents speak a language other than English.[17] The Consent Decree requires that NOPD provide timely and meaningful access to police services to all members of the community, regardless of their national origin or limited ability to speak, read, write, or understand English. The Decree's language access remedies are intended to address the United States' Title VI findings.

As noted in NOPD's most recent audit:

> Limited English Proficiency is addressed in accordance with the rights secured or protected by the Constitution and laws of the United States. This process is regulated by the New Orleans Police Department's Chapter 55.4: Limited English Proficiency Services, Chapter 42.11: Custodial Interrogations, Chapter 52.1.1: Misconduct Complaint Intake and Investigation, and the Language Assistance Plan.[18]

---

[17] Ex. 5, Limited English Proficiency Audit Report (July 3, 2025), at 18.
[18] Ex. 5, Limited English Proficiency Audit Report (July 3, 2025), at 2.

NOPD presented this Court with evidence of compliance at the May 16 and June 5, 2024, hearings. At the June 5, 2024 hearing, the United States acknowledged that NOPD's interpretation tools are working.[19]

Consent Decree paragraph 189(j) requires NOPD to translate six documents into Spanish and Vietnamese. NOPD now has a total of 51 translated forms and documents accessible by all NOPD personnel for public consumption.[20] All of NOPD's translated chapter policies and forms are posted on the City's website, NOLA.gov. During this most recent audit period, NOPD provided interpretation services in Spanish, Vietnamese, American Sign Language, Arabic, Hindi, Mandarin, Portuguese, French, and Haitian Creole, among others.[21] NOPD expanded the distribution of the Electronic Interpretation Devices (smartphones) in 2024, distributing ten (10) additional devices to Authorized Interpreters to obtain access to Language Interpretation Services through a third-party vendor, VOIANCE.[22]

At this point, NOPD has translated key policies and forms into Spanish and Vietnamese (two of New Orleans' commonly spoken languages besides English), increased the number of their certified Spanish and Vietnamese interpreters, rolled out a smart phone application to enable telephone translation in the field, and created a Language Access Plan that requires NOPD to periodically assess the translation services needed throughout the city.

NOPD's latest language access audits also show positive empirical results. NOPD reported increasing responses to calls for service in which interpretation is provided from 63% in

---

[19] At the June 5, 2024, status conference, the United States also acknowledged that NOPD's adaptation of its interpretation tools to provide ASL interpretation exceed the Consent Decree requirements.
[20] Ex. 5, Limited English Proficiency Audit Report (July 3, 2025), at 11.
[21] Ex. 16, Limited English Proficiency Audit Report (Nov. 15, 2023), at 2 and 8.
[22] Ex. 6, 2024 Limited English Proficiency Services Annual Report at 3.

11

2021 to 79% in 2023.[23] NOPD's July 2025 audit found compliant language access services in over 90% of calls assessed.[24] NOPD also reported decreasing its response times for calls for service coded as needing LEP services. Doc 771 at 25. During interrogations, NOPD reported a 100% compliance rate in providing interpretation for individuals with limited English proficiency.[25] Though the rate of providing interpretation is not as high as the compliance rates that the Monitor has expected in other areas of the Decree moved to "green," NOPD has materially improved its interpretation services, and the United States stated at the June 5, 2024 hearing that the evidence was sufficient for a compliance finding. Notably, the Monitor conducted a spot audit of NOPD's 2024 LEP audit and "identified no significant deficiencies." Doc. 852 at 10.

Based on the data available, the Parties agree that NOPD has achieved substantial compliance with the Decree's requirements and established a durable remedy regarding policing services for persons with limited English proficiency, and the Decree should be ended pursuant to this joint request.

### D.   NOPD Has Established a Durable Remedy Regarding Discriminatory Policing.

The United States' findings report and complaint alleged that NOPD engaged in discriminatory policing on the basis of race and gender, including by failing to adequately investigate sexual assault and domestic violence. Doc. 1 at 6. The Consent Decree requires NOPD to implement remedies to ensure bias-free policing and improve the response to and investigation of sexual assault and domestic violence.

---

[23] Ex. 12, NOPD Bias-Free Policing Analysis presentation slides, June 5, 2024, at slide 55.
[24] Ex. 5, Limited English Proficiency Audit Report (July 3, 2025), at 3.
[25] Ex. 12, NOPD Bias-Free Policing Analysis presentation slides, June 5, 2024, at slide 55.

NOPD has created a policy on bias-free policing, integrates bias-free principles into its operations, and provides training on these policies. And as the United States previously explained, NOPD has conducted a bias-free audit to evaluate racial and gender disparities across a range of enforcement activity including SSA, uses of force, misconduct complaints, and response times.[26] To evaluate the decision to initiate a traffic stop, for example, NOPD uses a widely accepted method to evaluate racial disparities called the veil-of-darkness test. Applying the test to NOPD data showed a racial disparity in 2016, but not in any other year between 2017-2023.[27] The audit also includes several hit-rate analyses, including for vehicle exits, pat downs, force, and handcuffing—all of which showed no disparity for minority and Black people since 2021. Audits have shown gender disparities in vehicle exits and pat-downs, as well as disparities in response times to majority-Black neighborhoods. But the City and NOPD have committed to addressing these disparities, including by exploring strategies to improve response times.[28]

NOPD has also provided evidence of substantial compliance and a durable remedy regarding gender bias. For example, NOPD's 2022-2023 Bias-Free audit does not show significant gender disparities in the disposition and timeliness of misconduct complaint investigations.[29] NOPD recruits now complete 40 hours of domestic violence training before they enter the field, and annual in-service curricula routinely include domestic violence training.[30] In July 2023, NOPD's Domestic Violence Unit created a unit of one commissioned police sergeant and five civilian investigators to address domestic violence calls for service with

---

[26] Doc. 794 at 10.
[27] Doc. 794 at 9.
[28] Doc. 794 at 10. This includes adding a new patrol platoon to one of NOPD's Districts during peak service times.
[29] Ex. 7, 2022-2023 Bias-Free Policing Annual Report, at 58.
[30] Ex. 8, 2023 Domestic Violence Annual Report, at 5

13

a disposition of gone on arrival (GOA).[31] From July 2023 through December 2023, the GOA Response Unit reported authoring 1,347 police reports and made 537 contacts with a victim and/or reporting person. NOPD reported that "[a]ll victims were offered support services through the partnering agencies."[32]

As a direct result of these actions, the February 2025 audit of the Domestic Violence Unit scored 100%. As the report explained:

> The February 2025 audit was completed utilizing the most recent DV Audit Protocol at the time of the audit. This audit consists of thirty-two (32) questions and additional follow-up requests, which cover paragraphs 212-222 of the Consent Decree (CD). Based on the combined total of "seven hundred and four" (704) checklist items rated from the sample size of twenty-two (22) case files audited, the "overall score" of this Domestic Violence Unit case file audit conducted by the Audit and Review Section was **100.0%**.[33]

The Sex Crimes Unit Audit Report for November 2024 reported that, "[b]ased on the combined total of the one thousand five hundred fifty (1,550) checklist items rated, from the sample size of fifty (50) case files audited; the "'overall score' of this 1st Half 2024 Semi-Annual Sex Crimes Unit case file audit conducted by the Auditing Review Unit was **99.6%**."[34] Finally, the Monitor reported in July 2025 that NOPD's audit of case files from the Child Abuse Unit was "conducted on time and in accordance with the approved audit protocol," and nearly all of the cases reviewed were "thoroughly investigated." Doc. 852 at 10.

Based on the data available, the Parties agree that NOPD has achieved substantial compliance with the Decree's requirements and established a durable remedy regarding

---

[31] Ex. 8, 2023 Domestic Violence Annual Report, at 6.
[32] Ex. 8, 2023 Domestic Violence Annual Report, at 6.
[33] Ex. 9, Domestic Violence Unit Audit February 2025 Report, at 2.
[34] Ex. 10, Sex Crimes Unit Audit Report November 2024, at 18.

discriminatory policing based on race and gender, and the Decree should be ended pursuant to this joint request.

### E.   Additional Factual Developments Provide Further Support for Relief under Rule 60(b)(5).

In addition to the evidence above, factual developments since the entry of the Sustainment Plan provide further support for this motion. The City and NOPD have completed the Remedial Action Plan related to misconduct investigations. Doc. 847. The City has also made significant progress in the Sustainment Plan: the Monitor's July 2025 report identifies 11 items as complete and four other items as being verified. Doc. 852 at 15. NOPD has reported completing additional tasks, including a corrective action plan to address Gone on Arrivals.[35] Many of the remaining tasks listed in the Sustainment Plan are reports by the City or the Monitor. *See* Doc. 852 at 16.

The Parties agree that the City has achieved substantial compliance with the Consent Decree and the Sustainment Plan, as well as a durable remedy to address the violations of federal law alleged in the United States' complaint. Accordingly, the Parties request that the Court issue an indicative ruling on a joint motion to dissolve the Consent Decree. *See Chisom v. Louisiana ex rel. Landry*, 2024 WL 2187837, at *3 (E.D. La. May 14, 2024) (issuing indicative ruling where motion raised "substantial issues").

---

[35] Ex. 11, Sustainment Plan Item 15 Completion (May 13, 2025, submission regarding GOA corrective action plan).

**CONCLUSION**

For these reasons, the City and the United States jointly request that the Court issue an indicative ruling pursuant to Rule 62.1 stating that it would grant a joint Rule 60(b)(5) motion to dissolve the Consent Decree and dismiss this matter with prejudice.

Respectfully submitted, this 4th day of September 2025.

| | |
|---|---|
| /s/ Charles F. Zimmer II<br>Daniel E. Davillier La. No. 23022<br>Charles F. Zimmer II (T.A.) La. No. 26759<br>Davillier Law Group, LLC<br>935 Gravier Street, Suite 1702<br>New Orleans, LA 70112<br>Phone: (504) 582-6998<br>Fax: (504) 582-6985<br>ddavillier@davillierlawgroup.com<br>czimmer@davillierlawgroup.com<br><br>*Counsel of Record for*<br>*the City of New Orleans*[36] | HARMEET K. DHILLON<br>Assistant Attorney General<br>Civil Rights Division<br>R. JONAS GEISSLER<br>Deputy Assistant Attorney General<br>PATRICK MCCARTHY<br>Chief<br>LAURA COWALL<br>Deputy Chief<br><br>/s/ Suraj Kumar<br>SURAJ KUMAR (NY 5620745)<br>Trial Attorney<br>Special Litigation Section<br>Civil Rights Division<br>United States Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530<br>Tel.: (202) 598-1211<br>Email: suraj.kumar@usdoj.gov<br><br>*Attorneys for the United States* |

---

[36] The City's lawyers here would include attorneys from the Louisiana Attorney General's Office except that the Court denied the City's motion to enroll those lawyers as additional counsel. Doc. 822. The City has a right to choose its own counsel and therefore protests having to file this motion without those lawyers' participation.

**CERTIFICATE OF SERVICE**

I certify that I have served a copy of the above and foregoing pleading via Notice of Electronic filing using this Court's CM/ECF system to counsel of record participating in the CM/ECF system on this 4th day of September 2025.

/s/ Charles F. Zimmer II