**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CIVIL ACTION** |
| **v.** | **NO. 12-1924** |
| **CITY OF NEW ORLEANS** | **SECTION: "E" (2)** |

# Final Report of the Consent Decree Monitor
For the New Orleans Police Department Consent Decree

## November 19, 2025



# Final Report of the Consent Decree Monitor
## For the New Orleans Police Department Consent Decree

## November 19, 2025

Office of the Consent Decree Monitor New Orleans, Louisiana
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana

## I.    Preface

On October 9, 2025 – 12 years and 2 months after our appointment as Monitor over the New Orleans Police Department – U.S. District Court Judge Susie Morgan indicated that the Consent Decree is coming to an end. It has been a privilege to play a role in the transformation of the NOPD. When the Monitoring Team began this reform journey in 2013, we – and Judge Morgan, to whom we report – were wading into uncharted waters. At that time, coming in at 492 paragraphs, the NOPD Consent Decree was the most extensive in U.S. history. And it came with no roadmap. There was no guide to Consent Decree implementation or oversight. But there was a collection of energetic and thoughtful individuals from the NOPD, the New Orleans community, the Department of Justice, and the Monitoring Team committed to righting the unconstitutional patterns and practices of the preceding decades.

When we first set boots (or in our case, shoes) on the ground in New Orleans in August 2013, we were told over and over by community members that we would fail because NOPD would fail. "The Department will never change," they said. While the naysayers were wrong, the stories they shared (often accompanied by pictures), more than once caused us to wonder if they might be right. More than a decade later, I still am haunted by some of things I have heard and seen over the past 10-plus years doing this work.

At the same time, I am buoyed by the countless beautiful moments I have witnessed while in New Orleans. The heroism of officers; the willingness of most NOPD leaders to embrace change even when many of their peers across the state (and country) refused to do so; the resilience of community members; and the spirit of New Orleans, which somehow, no matter what is thrown its way, remains high and propels this wonderful city forward.

While this project tried my nerves, skills, and patience on many occasions, it far more often was inspirational. Few have the opportunity to participate in an effort with such laudable goals: Protect the constitutional rights of some 400,000 people (plus millions more visitors), provide the public access to accurate data upon which they can take action, ensure police officers have the tools they need to do their jobs and come home safely to their families every night, and help those marginalized by others. My team and I are thankful to be among those few.

I'm extremely proud of what we – the Monitoring Team, the DOJ, the NOPD, the Court, and the community – have accomplished over the past 10-plus years. We worked through more than our fair share of surprises, including hurricanes, COVID, a massive City-wide cyber-attack, and, on a personal level, my diagnosis of FLT3 AML Leukemia in 2022. But we never gave up; never slowed down.

And neither did the NOPD. As a result, the NOPD is not the department it was in 2013, and its officers and the communities they serve are the beneficiaries of that transformation.

NOPD's journey, however, is not over. Consent Decrees were designed by Congress to be temporary solutions to patterns of unconstitutional behavior. When those patterns are materially remedied and those remedies appear durable, the Consent Decree comes to an end, the District Court divests itself of jurisdiction, and the Monitoring Team returns home. At that point, it is up to others to hold the NOPD accountable for the standards it has set and ensure that achievements

of the past are not squandered. In our case, those "others" include the NOPD, the City Council, the Office of the Mayor, various local oversight institutions, and, perhaps most importantly, *the community*.

The Monitoring Team has no crystal ball that tells us whether the NOPD will continue its journey or backslide. But we have many reasons for optimism. First, the Department's current leadership is reform-minded and wants to keep moving forward. Of course, police leaders come and go, and an institution dependent upon the vision of a given chief ultimately will fail. Which is why, over the past 10-plus years, the NOPD, the DOJ, and the Monitoring Team put in place countless structures that will help prevent backsliding. The policies, standard operating procedures, training, supervision tools, availability of data, audit programs, and accountability systems all will help maintain the durability of NOPD's reform.

What gives us the most confidence that the NOPD will continue moving forward, though, is that the reforms of the past decade-plus have been as good for the officers as they have been for the community. Policies are clearer and easier to follow. Trainings are more dynamic and employ scenario-based adult learning techniques, making them more engaging, more memorable, and, ultimately, more effective. The accountability system is more fair and more transparent than it ever was. The City invests more in officer health and wellness than it had previously. The Department continues to participate in the national Active Bystandership for Law Enforcement (ABLE) Project, which teaches officers how to intervene in other officers' behavior to reduce mistakes, prevent misconduct, and promote officer health and wellness.

There are many more examples, but these illustrations should suffice to make our point. The Department's officers, supervisors, and leaders have benefited immeasurably from the professionalization of their department.

Finally, I am hopeful that the Monitoring Team's work over the past 10-plus years has given the New Orleans community a roadmap to play its critical role in holding the NOPD (and the City) responsible for their oft-stated commitment to keep moving forward. "This is who we are now," City and Department leaders often say. The community should hold them to this.

Jonathan Aronie
Lead Monitor
Partner, Sheppard Mullin LLP

## II.    Executive Summary

This Final Report of the Monitoring Team summarizes NOPD achievements over the past 10-plus years, as well as areas that would benefit from further attention. In the interest in efficiency (for those who do not have the time or interest in reviewing a lengthy report), these recommendations for further action are summarized here.

### A.    Policies & Practices

#### 1.    Policies Generally

- *Community Input*: Expand avenues for community input in policy development by including one or more PCAB members on NOPD's policy review team on a rotating basis.

- *Technology Readiness*: Adopt and train on policies addressing emerging technologies (*e.g.*, AI, facial recognition, drones) well before deployment.

- *Implementation of Discipline*: Implement comprehensive rollout plans for new/updated policies (roll call training, Academy instruction, daily training bulletins, and other awareness measures).

#### 2.    Use of Force

- *Use of Force Review Board (UFRB)*: Re-invigorate UFRB with targeted training for Board members, ensure PSAB audits the robustness of UFRB discussions, maintain regular meetings, and ensure members critically review decisions leading up to the use of force.

- *Transparency*: Continue expanding publicly available data in accessible, easy-to-understand formats.

- *Cooperation*: Foster stronger collaboration between NOPD and the Office of the Independent Police Monitor.

- *Accountability*: Share data/audit findings/corrective actions with the City Council on a regular basis, and attend regular public hearings to present progress and implementation.

#### 3.    Sexual Assault and Domestic Violence (SA/DV)

- *Community Stakeholders*: Maintain and deepen partnerships with key SA/DV organizations and advocates.

- *Quality Control*: Maintain Special Victims Unit supervisory case review discipline and ensure all case supplements are organized and maintained; continue to press for completion and accuracy of all reports.

- ***Data***: Improve SA/rape data capture and integrity by engaging knowledgeable experts outside the NOPD to help remediate remaining issues.

- ***Reduce GOAs***: Implement and continuously audit corrective actions to reduce "Gone On Arrival" rates on SA/DV calls; PSAB should regularly assess progress.

### 4. Stops / Searches / Arrests (SSA)

- ***Sustain Inspections and Audits***: Continue weekly SSA inspections and PSAB audits; use findings to target retraining and supervision; emphasize adherence to constitutional standards and accurate documentation.

## B. Public Trust

- ***Audit Program***: Maintain and enhance PSAB's robust, annual audit plan; publicly share audits, findings, and corrective actions.

- ***Council Reporting***: Establish a regular cadence of quarterly reporting to City Council focusing on PSAB audits, corrective actions, and implementation status.

- ***Data Transparency***: Continue timely publication of dashboards/reports; improve accessibility; encourage outside groups to monitor for any retreat from transparency.

- ***Biennial Surveys***: Continue community, detainee, and officer surveys at least every two years, and publish findings (as required by current City Regulation).

- ***Accreditation***: Consider obtaining department accreditation to reflect and sustain professionalism and public trust.

## C. Accountability

### 1. Professional Standards & Accountability Bureau (PSAB)

- ***Funding and Tools***: Address staffing shortages and invest in modern technology.

- ***Responsiveness***: Require written responses from unit leaders to audit findings; escalate unfulfilled corrective actions to the Superintendent and, as needed, City Council.

- ***Rotation***: Explore a lieutenant rotation through PSAB similar to the current rotation through PIB to broaden organizational understanding and buy-in.

- ***Durability Vigilance***: Remain vigilant against future rollbacks of PSAB function and resources.

2.      **Public Integrity Bureau (PIB)**

- *Prioritization Control*: Require written approval at appropriate rank to cancel/ postpone a scheduled discipline hearing.

- *Hearing Schedules*: Set a dedicated day(s) weekly/monthly for discipline hearings; only change date for exigent circumstances with approval of senior leadership.

- *Milestone Dashboard*: Build a real-time dashboard tracking investigation milestones.

- *Audit Coverage*: Direct PSAB to ensure current PIB audits capture all milestone timelines and compliance.

- *Leadership Accountability*: Incorporate PIB timeline compliance into leadership performance evaluations.

- *Case "Chaperone"*: Assign a civilian "process guide" to shepherd each case through all stages and bureaus to ensure timeliness.

- *Data Clean-Up*: Task administrative staff to identify and add missing items to PIB databases.

- *Database Utilization*: Engage a subject matter expert to properly configure and train on use of IAPro (the department's current data management platform), or an equivalent platform. Ensure the platform provides tracking of deadlines and alerts.

- *Workflow Platform*: Implement a robust workflow system with automatic alerts or ensure timely rollout and adequate funding of the City's platform.

- *Ownership*: Assign end-to-end ownership of the PIB process to a single Deputy Chief (*e.g.*, PIB Chief or Chief of Staff).

- *Streamline*: Task PSAB with identifying and removing inefficiencies in the discipline process.

- *Balanced Remedies*: Use education-based discipline, counseling, and recognition/reward programs alongside traditional sanctions where appropriate.

3.      **Outside Audits**

- **Biennial External Audits**: Enforce the Ordinance requiring periodic audits of NOPD's compliance efforts; City Council and community should monitor adherence to the schedule.

### D. Management

#### 1. Leadership

- ***Nationwide Candidate Pool***: When a future superintendent is needed, conduct a broad search including *external and internal* candidates.

- ***Reduce Provincialism***: Increase opportunities for officers to attend national conferences and programs, and exchange best practices.

- ***Prevent Political Interference***: Empower OIG, Civil Service Commission, and Ethics Board to detect and deter improper political influence over police affairs.

- ***Fieldwork***: Encourage leaders to periodically ride along and engage on the ground to maintain perspective.

- ***Management vs. Discipline***: Train leaders to differentiate performance/management issues from disciplinary violations and use management tools accordingly.

- ***Supervisor Role Analysis***: Use of Force Review Boards/Serious Discipline Review Boards to consistently scrutinize supervisory actions/inactions when there have been serious incidents.

- ***Leadership Education***: Build a robust internal leadership program or partner with reputable external programs to provide training for upper management and first-line supervisors.

- ***Operational Efficiency***: Engage an external efficiency consultant every five years to modernize processes, reduce manual paper flows, and improve retention.

- ***Upward Mobility***: Consider a mandatory retirement age to create opportunities at higher ranks and refresh leadership perspectives.

#### 2. Supervision

- ***SDRB Sustainability***: Maintain the current Serious Discipline Review Board and have PSAB regularly review its effectiveness regardless of membership changes.

- ***Supervisor Training***: Expand participation in recognized supervisory leadership programs (*e.g.*, FLETC, National Command & Staff College, FBI-LEEDA).

- ***Early Warning System (EWS)***: Develop or acquire a modern EWS within six months; fund and prioritize deployment.

- ***EWS Data Integrity***: Have PSAB regularly audit EWS data for accuracy and completeness; pair with adequate analyst resources to build/maintain the system.

### 3.     Recruitment & Internal Development

- *Recruitment Criteria*: Comprehensively evaluate applicants, aiming to hire "the good" rather than only screening out "the bad."

- *Attrition Review*: After each Academy class, analyze recruitment/retention "wash outs," including background and application stages, and remediate reasons for missed red flags.

- *Equipment Allowances*: Ensure recruits/officers receive sufficient uniform/equipment allowances; eliminate out-of-pocket purchase of essentials.

- *Evaluation Completeness*: Eliminate gaps in performance evaluations; ensure annually completed evaluations for all members.

- *Pattern Recognition Training*: Train supervisors (especially lieutenants and above) to detect performance and behavior patterns, not just address isolated incidents.

- *Evaluation Detail*: Require supervisors to provide substantive narrative feedback, avoiding one-word responses in evaluation sections.

### E.     Training

- *Academy Leadership*: Fund and appoint an experienced academic Dean to lead the Academy.

- *Innovation Culture*: Sustain openness to new ideas; build on successful initiatives (EPIC/ABLE, BWCs, proactive critical incident releases).

- *Resource Investment*: Increase Academy funding for facilities, technology, and professional development for instructors.

- *Facilities Expansion*: Pursue relocation to the vacant Lower Ninth Ward high school to expand class capacity; complete transfer of ownership as needed.

- *Scenario Training Facility*: Invest in an indoor, real-life scenario training environment (e.g., "Hogan's Alley"-style).

- *Simulation Support*: Enhance preparatory support for simulation training to reduce recruit attrition on this component.

- *Emotional Intelligence (EI)*: Increase EI content in recruit and in-service training; leverage external EI programs for future leaders.

- *Pattern Recognition*: Train supervisors at the Academy on how to identify cross-domain performance patterns; complement EWS improvements with human skills.

**F.    Community Involvement**

    **1.    Community Oriented Problem Solving**

- *Training*: Strengthen officer/supervisor training to leverage community knowledge and collaboration.

- *Cross-Agency Scope*: Decentralize and integrate community engagement across Public Works, Education, Parks & Rec, Libraries, and other safety-related agencies.

- *National Exposure*: Provide community leaders exposure to peer volunteer models and innovations from other jurisdictions.

    **2.    Police Community Advisory Boards (PCABs)**

- *Coordinating Committee Composition*: Expand membership to better reflect district composition, include affiliated community members from each district, and add a youth representative (*e.g.*, universities/youth programs).

- *Rotations and Selection*: Rotate PCAB officers through the Coordinating Committee on staggered terms; adopt transparent, open selection processes and intentional inclusion of perspectives from marginalized groups.

- *Transparency Practices*: Publish agendas/minutes; hold regular listening sessions; create a standing subcommittee dedicated to community feedback.

- *Data Access*: Provide PCABs real-time district-level data (arrests, complaints, community policing activities).

- *Recruitment Partnership*: Involve PCAB members in officer recruitment campaigns and solicit input on valued candidate qualities.

- *Interagency Bridges*: Build PCAB relationships with relevant City agencies to support comprehensive public safety strategies.

- *Entertainment Industry Engagement*: Periodically involve city agencies beyond NOPD in PCAB meetings to surface neighborhood-level concerns early.

- *Durability Steps*: Finalize revisions to PCAB Policy Manual/SOP; conduct mandatory training for PCAB members and NOPD liaisons; enforce attendance requirements; replace inactive members promptly.

    **3.    Community Education**

- *Resource Guides*: Publish short, accessible community Resource Guides explaining NOPD reforms, data, and processes; host on website and distribute at district stations and public libraries.

- *Maintenance Cadence*: Review, update, and supplement the Guides on a regular schedule to ensure accuracy and relevance.

   **4.**    **Civilian Monitoring**

      ***a.***    ***Skills and Experience Profile for Post-Consent Decree Oversight***

- Review/audit capabilities across qualitative/quantitative methods and sampling.

- Neutral posture (neither pro- nor anti-police); evidence-based.

- Law enforcement experience to contextualize operations.

- Subject matter expertise (civil rights, constitutional policing, use of force, probable cause).

- Investigative experience.

- Legal expertise suited to policy review and institutional assessment.

- Clear, accurate public communication skills.

- Sound judgment and discretion (context-aware transparency).

- Uncompromising integrity to sustain public trust.

      ***b.***    ***Potential Oversight Tasks (for City consideration)***

- Review/comment on policies, training, implementation, SOPs, and public reports.

- Review serious uses of force and serious misconduct; participate in UFRB/SDRB.

- Conduct spot audits of PSAB work; assess Regulation compliance; spot check public reports against audit results.

- Assess resource and personnel sufficiency.

**G.**    **Culture**

- *Tone at the Top*: Model values and accountability consistently; routinely self-assess leader behaviors.

- *Transparent Culture Work*: Share cultural aspirations and expected benefits openly to build internal trust.

- *Integrity Beyond Compliance*: Emphasize moral/ethical responsibility alongside policy adherence.

- ***Active Bystandership***: Continue and expand EPIC/ABLE beyond training modules into daily practice.

- ***Measure to Manage***: Establish transparent metrics for culture-related objectives and track progress.

- ***Evaluate Culture***: Incorporate values-based assessments into performance evaluations and supervisory reviews.

**H.     Miscellaneous**

- ***Civil Service Commission***: Work with Civil Service to strengthen safeguards against political interference in decisions; overturn discipline only when clearly compelled by evidence.

- ***Management Discretion***: Empower leaders to take personnel action for unfitness even absent a specific policy violation when performance supports it.

- ***Associations***: Encourage police associations to amplify recruitment and celebrate reforms and positives, not only critique problems.

- ***Compensation***: Maintain competitive pay and increase uniform/equipment allowances to eliminate out-of-pocket purchases for essentials.

- ***District Attorney and Courts***: Work with DA and courts to press for internal process reviews to complement NOPD reforms and bolster community trust.

- ***ABLE Engagement***: Leverage NOPD's role in ABLE to involve officers/leaders in national programs and promote the initiative locally.

- ***Emotional Intelligence***: Further integrate EI training across modules to strengthen communication, judgment, and resilience.

- ***Cross-Agency Public Safety***: Engage Public Health, Behavioral Health, Homeland Security, Public Works, Recreation, Neighborhood Engagement, and Library Services in durable, coordinated public safety strategies.

# Contents

I.   Preface ................................................................................................................. 3

II.   Executive Summary ............................................................................................ 5

   A.   Policies & Practices ...................................................................................... 5

      1.   Policies Generally ................................................................................. 5

      2.   Use of Force ........................................................................................ 5

      3.   Sexual Assault and Domestic Violence (SA/DV) ............................... 5

      4.   Stops / Searches / Arrests (SSA) ......................................................... 6

   B.   Public Trust .................................................................................................. 6

   C.   Accountability .............................................................................................. 6

      1.   Professional Standards & Accountability Bureau (PSAB) .................. 6

      2.   Public Integrity Bureau (PIB) ............................................................. 7

      3.   Outside Audits ..................................................................................... 7

   D.   Management ................................................................................................. 8

      1.   Leadership ............................................................................................ 8

      2.   Supervision ......................................................................................... 8

      3.   Recruitment & Internal Development ................................................... 9

   E.   Training ........................................................................................................ 9

   F.   Community Involvement ............................................................................ 10

      1.   Community Oriented Problem Solving .............................................. 10

      2.   Police Community Advisory Boards (PCABs) .................................. 10

      3.   Community Education ........................................................................ 10

      4.   Civilian Monitoring ........................................................................... 11

   G.   Culture ....................................................................................................... 11

   H.   Miscellaneous ............................................................................................ 12

III.   Introduction ...................................................................................................... 15

IV.   Report and Recommendations .......................................................................... 17

   A.   Policies & Practices .................................................................................... 17

      1.   Policies Generally ............................................................................... 17

      2.   Use of Force ...................................................................................... 18

      3.   Sexual Assault and Domestic Violence ............................................. 19

      4.   Stops / Searches / Arrests .................................................................. 20

   B.   Public Trust ................................................................................................ 21

C.    Accountability.................................................................................... 22

    1.    Professional Standards & Accountability Bureau............................ 22

    2.    Public Integrity Bureau .................................................................. 23

    3.    Outside Audits ............................................................................... 25

D.    Management....................................................................................... 25

    1.    Leadership...................................................................................... 25

    2.    Supervision .................................................................................... 28

    3.    Recruitment & Internal Development............................................. 29

E.    Training............................................................................................... 31

F.    Community .......................................................................................... 34

    1.    Community Oriented Problem Solving ........................................... 34

    2.    Police Community Advisory Boards (PCABs)................................ 35

    3.    Community Education ..................................................................... 37

    4.    Civilian Monitoring ........................................................................ 37

G.    Culture................................................................................................ 39

H.    Miscellaneous .................................................................................... 41

V.    Conclusion ............................................................................................... 43

VI.    Acknowledgements............................................................................... 44

### III.    Introduction

The NOPD has undergone a remarkable transformation over the past 10-plus years. The Department of Justice, the Monitoring Team, and the Court have recognized this on multiple occasions. As the Consent Decree comes to an end – as all Consent Decrees are meant to do – the Court directed the Monitoring Team to prepare a final report laying what has been accomplished thus far and set out concrete steps the NOPD, the City, and the community can take to help ensure the long-term durability of the Department's many reforms.

We prepared this report against the backdrop of NOPD's and the City's oft-stated commitment to keep in place the reforms implemented to date. Superintendent Kirkpatrick said it plainly earlier this year:

> We remain committed to continuing our efforts in delivering a constitutionally based police department for a world-class city.

"Chief Anne," as she likes to be called, is not the only City official who has made this commitment. City Attorney Donesia Turner recently described the current NOPD this way: "This is who we are now. This is who we will continue to be." Criminal Justice Commissioner Tenisha Stevens offered a similar commitment upon the City's entry into the Sustainment Period:

> While much has been accomplished, this moment is not the end of our efforts but the start of a new chapter to ensure that the positive changes we've worked toward are not only maintained, but furthered.

And Mayor Cantrell expressed the same sentiment in an October 2024 social media post, in which she celebrated the Department's successes and committed to "continue to stay focused to do the work" and "continue to do the job."

Against this background, this Final Report is not an argument for the importance of durability of reforms. That is a topic on which everyone seems to agree. Rather, the purpose of this Report is to summarize the progress that has been made and to present recommendations for promoting the durability of that progress.

We are hopeful the recommendations in this Report will serve as a roadmap to the many stakeholders with an interest in ensuring the sustainability of NOPD's reforms. This includes, but is not limited to, the following:

- **The NOPD**. The men and women of the NOPD (sworn and civilian) clearly benefit from thoughtful, understandable, fair, and constitutional policies, training, supervision, and discipline. NOPD likewise benefits from the community's respect, which is driven by the community's trust in the Department's commitment to sustaining its reforms.

- **City Hall**. The City obviously plays a critical role in ensuring the durability of the Consent Decree reforms. We are hopeful the recommendations in this Report help guide the new Mayor's efforts to maintain the reforms of the past decade.

- **The City Council**. Pursuant to the Home Rule Charter, the City Council is the legislative body of the City of New Orleans. Among other powers, the City Council has the ability to hold public hearings to ensure the various City institutions are operating as intended. Included among these, obviously, is the NOPD. The recommendations in this Report should help the City Council conduct more robust oversight over the NOPD to ensure the Department is living up to its public commitments.

- **The Ethics Board**. The mission of the Ethics Review Board is to enforce the New Orleans Code of Ethics. Among other things, the Ethics Board appoints and oversees the Office of the Independent Police Monitor. The recommendations set out in this Report should help the Ethics Board guide the post-Consent Decree tasks that office might assume, as well as the abilities the people of New Orleans should expect to find in an IPM.

- **The Public**. The New Orleans community has an obvious interest in continuing the reforms made over the past 10-plus years. The increased transparency of the NOPD has provided the community an unprecedented ability to observe NOPD's performance and to hold the Department to its commitments. We already have seen this in practice. Community voices have materially contributed to identifying shortcomings with regard to Sexual Assault investigations, the Office of Police Secondary Employment, and the Public Integrity Bureau. We are hopeful the recommendations in this Report provide additional guidance for ongoing community observations and engagement, whether through the Office of the Independent Police Monitor, through the many community groups that populate the New Orleans landscape, and/or through the direct voices of community members themselves.

We recognize there are other stakeholders with an interest in the future of the NOPD – *e.g.,* community groups, police associations, victims' rights groups, academics, and more – and we do not mean in any way to downplay their interest in maintaining the Department's reforms. We have written this Report in an effort to provide a blueprint that may be of use to *all* stakeholders, whether or not specifically listed above.

As New Orleans heads into this next phase of its transformation journey, it has a lot to be proud of. The NOPD of today is a far cry from the NOPD that spawned the Consent Decree. Experience tells us, however, that different law enforcement agencies react differently to the end of federal oversight. Some build upon their successes and continue their journey. Others revert back to their old ways. We have little doubt the current Department leadership falls into the first camp. But the Department's current leaders will not always be at the helm. It will be up to the men and women of the NOPD, the City's elected leaders, and the community at large to ensure future NOPD leaders make the right choices. We are hopeful the recommendations set out in this Report will help keep the NOPD on the right course.

## IV.    Report and Recommendations

For simplicity, we have organized our report recommendations into several broad topics: Policies and Practices, Public Trust, Accountability, Management, Training, Community, and Culture.

### A.    Policies & Practices

#### 1.    Policies Generally

DOJ's Findings Letter from 2011 began by starkly stating the following:

> The NOPD has long been a troubled agency. Basic elements of effective policing— clear policies, training, accountability, and confidence of the citizenry—have been absent for years.

Because so much of the Consent Decree – training, supervision, accountability – hinged upon the existence of clear, constitutional, evidence-based policies, the Monitoring Team began its work here. Over the course of approximately two years, the Monitoring Team, the DOJ, and the NOPD worked tirelessly; reviewing, revising, and often rewriting wholesale many NOPD policies (as well as related Standard Operating Procedures to facilitate implementation of the policies), including most importantly policies concerning use of force, stops, searches, and arrests, misconduct and use of force investigations, discipline, officer assistance, training, promotions, and many others.

The Monitoring Team, the DOJ, and the NOPD continued attending to policies throughout the life of the Consent Decree as new issues arose, community concerns raised no needs, and research identified new best practices.

Policies, however, evolve over time as new best practices come to light. To facilitate this expected evolution, NOPD developed a process to review and assess its policies every one or two years, depending on the policy, to ensure they continue to reflect best practices.[1] Relatedly, NOPD implemented a process to identify, assess, and draft new and updated policies as needs materialize. That process involves opportunities for public comment.[2]

The advantages of keeping policies current cannot be overstated. In addition, we offer the following recommendations regarding policies generally:

- **Community**. Continue to explore new ways to ensure the input of the community informs the policy process. For example, consider including one or more PCAB members to serve on the NOPD policy review team on a rotating basis.

- **Technology**. When the Consent Decree began, Body Worn Cameras were just being introduced and were considered quite high tech. Policing was years away

---

[1]    NOPD policies can be found here: https://nola.gov/next/nopd/topics/policies/.

[2]    NOPD publishes a list of policies up for review on a monthly basis here: https://nola.gov/nola/media/NOPD/Policies/Policy-Review-Schedule-Public.pdf.

from having to grapple with the advantages and consequences of things like artificial intelligence, facial recognition, and drone technology. NOPD should strive to stay ahead of technology changes by preparing policies as early as possible.

- **Implementation**. Policies are critical in policing, but policies are only as good as their implementation. Over the years, NOPD has improved significantly its processes for ensuring policies are implemented in a sensible and organized fashion. NOPD should re-dedicate its effort to ensure new and updated policies are rolled out in an organized fashion that includes roll call training, Academy training, daily training bulletins, and other awareness efforts.

NOPD should be proud of the work it put into to review, revise, and rewrite its policies. The work paid off, and the Department's policies are second to none. We are hopeful the Department will continue putting in the time and effort needed to ensure this holds true into the future.

## 2.     Use of Force

In its 2011 report, DOJ found serious constitutional shortcomings in multiple areas involving use of force, including inadequate (1) use of force policies; (2) use of force training; (3) force reporting and investigation; (4) use of force review, including reviews of officer-involved shootings; and (5) tracking, analysis, and response to use of force data and trends, including use of an early warning system. NOPD's current programs and practices have remedied these constitutional failures. Today, NOPD's policies and training comport with national best practices. Officers routinely report uses of force as required. The NOPD Force Investigative Team engages quality and thoughtful investigators. PSAB conducts meaningful Use of Force audits. And the Department's Use of Force Review Board generally does a good job.

In addition to maintaining the reforms of the past 10-plus years, we offer the following recommendations to ensure those reforms are durable:

- **Use of Force Review Board**.[3] Re-invigorate the UFRBs by providing the members additional training and ensuring PSAB audits the robustness of UFRB discussions. Over the years, the quality of UFRB reviews has ebbed and flowed depending on the individuals involved and the Superintendent's appreciation of the importance of the process. The Department and, thus, the community, will benefit from a UFRB that meets regularly, includes open minded individuals who are willing to be critical of the Department when necessary and who understand the importance of reviewing not only the use of force itself, but the various decisions that led to the use of force.

---

[3]     NOPD's Use of Force Review Board (UFRB) serves as a quality control mechanism to ensure timely reviews of all serious use of force investigations to determine the appropriateness of the investigative findings, and to quickly appraise use of force incidents from a tactics, training, policy, and agency improvement perspective.

- **Transparency**. NOPD currently makes a wealth of data available to the public. The Department should continue to identify ways to make data available in easily to understand formats.

- **Cooperation**. The relationship between NOPD and the OIPM has been a rocky one over the years. The City should identify ways to foster greater cooperation between the two organizations.

- **Accountability**. The Sustainment Plan clearly calls for NOPD to share data, audit reports, and corrective actions with the City Counsel, and then meet with the City Counsel to discuss the Department's ongoing compliance efforts. Over the course of the Sustainment Plan, NOPD shared reports, but did not meet with or present to the Council. The City Council should schedule regularly public hearings to hear from the NOPD regarding its audits, its findings, and, as importantly, the implementation of any/all recommended corrective actions.

The data over the past decade demonstrates the dividends from the attention the NOPD has paid to Use of Force by officers. But we are not naïve and we recognize that use of force trends are tied to many things beyond the NOPD's control, including crime rates, mental health issues, community focus, national trends, and political priorities (at the local, state, and federal level). We are hopeful the structures put in place will help NOPD maintain its progress in this area regardless of these external factors.

### 3. Sexual Assault and Domestic Violence

In 2011, DOJ found, among other things, that the NOPD "failed to adequately investigate violence against women, including sexual assaults and domestic violence." Indeed, one would have thought New Orleans was the safest place on Earth for women in light of the unbelievably low rates of reported sexual assaults. This, of course, was not true. As DOJ pointed out: NOPD had "systematically misclassified large numbers of possible sexual assaults, resulting in a sweeping failure to properly investigate many potential cases of rape, attempted rape, and other sex crimes."

Over the course of the past 10-plus years, NOPD's Special Victims Unit has worked in overdrive to right its ship, often doing so with insufficient personnel and inadequate funding. While there still is much work to be done in this area, the unit is a far cry from what it was in 2011. Its achievements have included (1) meaningful partnerships with community and victims advocacy groups, (2) moving data to an electronic database to promote current, complete, and accurate recordkeeping, (3) the implementation of a "Gone On Arrival" response protocol for all sex crimes and child abuse calls for service, and (4) the assignment of 25 investigators to supplement the detectives in each SVU unit, and many other achievements.

In addition to maintaining the reforms of the past 10-plus years, we offer the following recommendations to ensure the reforms are durable:

- **Community Stakeholders**. NOPD and the community benefit from the Department's continued engagement with key Sexual Assault/Domestic Violence

community stakeholders. The Family Justice Center, for example, has proved to be an invaluable partnership for the NOPD. More recently, NOPD's work with advocates Mary Howell and Julie Ford has resulted in changes to NOPD's processes. While more work needs to be done in this area, the difference in the way the SVU operates today versus how it operated prior to the Consent Decree is extraordinary.

- **Quality Control**. NOPD should maintain the Special Victims Unit quality controls process, including ensuring supervisors regularly review cases and case updates. While the Monitoring Team has witnessed significant improvements over the years, we still see second and third supplements sometimes missing from the files. This is fixable and community stakeholders should continue to press to do so.

- **Data**. NOPD still has room to improve its data gathering and record keeping regarding sexual assaults and rapes. We recommend the Department continue to engage with Ms. Ford and other knowledgeable experts to remedy all remaining issues with questionable data.

- **Reduce GOAs**. The Monitoring Team published a report in October 2023 focusing on the adverse consequences of slow response times, specific in the context of SA/DV calls. Among other things, we found that "slow response times, often caused by the unavailability of officers, are increasing [Gone On Arrivals] (GOAs), especially in the area of SA, DV, and rape calls," and that the "increase in GOAs negatively impacts NOPD's ability to fully investigate crimes, decreases community trust in the police, and contributes to the harm to victims by creating a perception that the NOPD 'does not care.'" In response to our findings, NOPD identified and began implementing a number of thoughtful corrective actions. We recommend NOPD's PSAB unit audit the progress of the ongoing corrective actions on a regular basis.

NOPD's current leadership clearly views SA/DV matters as a priority. We are hopeful that focus is maintained into the future.

### 4.     Stops / Searches / Arrests

In its 2011 Findings Report, the U.S. DOJ found long-standing and serious deficiencies concerning the NOPD's stops, searches, and arrests ("SSA") policies and training. The DOJ also found that the NOPD's emphasis on arrests encouraged unlawful stops, pat downs, and arrests.

As part of its implementation of the Consent Decree requirements, NOPD adopted new policies and training that are constitutional, easier for officers to understand, and promote procedurally just policing. Of course, appropriate policies and training that do not change how officers operate on the street are meaningless. Achieving better policing requires overcoming years of ingrained, albeit wrong, practices. Further, achieving the intended changes in this area is a problem compounded by the fact that conducting stops, searches, and/or arrests is a daily activity for

virtually all officers Thus, change in this area entails changing the behavior of hundreds of NOPD members.

To drive the necessary change, in 2021, the NOPD implemented an "SSA Inspection" program. The program involves weekly reviews of stops, searches, and arrests. Non-compliant conduct is then targeted for additional training. These inspections have allowed the NOPD to focus additional training and supervision on problem areas until they come into compliance. In addition to inspections, the PSAB conducts comprehensive SSA audits. The results are communicated back to the FOB, which then should take follow-up action as necessary.

The results of NOPD's focus on SSA are clear. Over time, NOPD achieved high compliance rates on all aspects of SSA, from the initial stop, to the pat down or frisk, to searches incident to arrest, as well as the arrests. Moreover, in many instances the non-compliance did not indicate unlawful action by the officer, but rather inaccurate documentation. A common deficiency, for example, was describing inaccurately an appropriate search incident to a lawful arrest as a pat-down. While accurate documentation is important to effective accountability, what is most important is that the public's constitutional rights are honored. Without continued vigilance, however, there is a risk that old practices will recur. We recommend that the NOPD continue to emphasize proper SSA standards and techniques, and audit stops, searches, and arrests to catch any non-compliant conduct.

### B.    Public Trust

When the Consent Decree began, NOPD shared very little information with the public. And what information it did share often was inaccurate and/or incomplete. Over the course of the last 10-plus years, the Department has transformed itself into a much more open organization. Key compliance metrics (*e.g.*, audit results) are shared with the public in easily accessible and digestible reports.[4] Key data (*e.g.*, crime, searches, arrests, and more) are shared through extensive public dashboards.[5] Critical incident videos are proactively and promptly shared with the public. Significant PIB findings are posted to the Department's website.

In addition to maintaining the achievements made to date, we recommend the NOPD consider the following once the Consent Decree comes to an end:

- **Audit**. Continue to review and enhance PSAB's robust audit plan and schedule, and review the plan annually to ensure it stays current. Relatedly, as discussed below, make it a regular practice to share audits undertaken, audit findings, and corrective actions

- **Transparency**. Establish a regular cadence of public reports to the City Council focusing on the PSAB audits, the recommended corrective actions, and the Department's success (or not) in implementing those recommendations.

---

[4]    *See* https://nola.gov/next/nopd/consent-decree/#heading4.

[5]    *See* https://nopdnews.com/transparency/dashboards/.

- **Transparency**. Accurate and public data empowers external accountability. NOPD should continue to make its reports and dashboards available to the public in a timely fashion, but explore new ways to make those data more accessible. Relatedly, one or more outside groups should make it a practice to ensure NOPD does not back away from its now-decade-long commitment to transparency.

- **Biennial Surveys**. Continue to conduct a regular survey that incorporates the views of officers, detainees, and community members. It is worth keeping in mind that this is required by the recently-passed NOPD Ordinance.

- **Accreditation**. Police accreditation is a voluntary process through which law enforcement agencies demonstrate their adherence to certain established professional standards to the satisfaction of a neutral accrediting agency (*e.g.*, CALEA). Police accreditation serves to promote professionalism and accountability within police departments, and to promote community trust. NOPD should consider becoming an accredited agency as a reflection of the extraordinary achievements over the past 10-plus years.

A law enforcement agency is a service organization, and like any service organization, it cannot do its job without the trust of its customers – in this case, the New Orleans community. The Department has taken material steps to increase community trust over the last 10-plus years. We are hopeful it continues to do so. The benefits are unassailable.

## C.    Accountability

Law enforcement officers are given powers unavailable to the rest of us, including the power to deprive individuals of their liberty and, in appropriate cases, use of serious or lethal force. To prevent the often corrupting influence of power, law enforcement agencies across the United States incorporate multiple accountability mechanisms. Unfortunately, in its 2011 Findings Letter, the United States found a near total absence of effective accountability structures in New Orleans. Since that time, the NOPD has developed multiple effective accountability structures, including a Public Integrity Bureau, a Professional Standards and Accountability Bureau, multiple review Boards, and a commitment to transparency that empowers the community to undertake its own accountability efforts.

In addition to maintaining the extensive reforms made to date, we recommend NOPD consider ways to continue building upon its successes. We have organized our recommendations into three areas: PSAB, PIB, and External Audits.

### 1.    Professional Standards & Accountability Bureau

NOPD's Professional Standards & Accountability Bureau (PSAB) has been a jewel in the Department's reinvention crown since the early days of the Consent Decree. The Department has been and continues to be well structured, smartly staffed, and professionally led. Many of NOPD's successes over the years can be placed squarely at the feet of the PSAB. The Bureau conducts meaningful audits, writes professional reports, and makes thoughtful remediation recommendations.

We are aware that many police organizations operate without a PSAB-like unit. This is a disservice to the community and the officers. NOPD, fortunately, has understood the value of an effective PSAB throughout the Consent Decree.[6] NOPD should retain its current PSAB structure and continue exploring ways to make the Bureau's work even more impactful. To that end, we offer the following recommendations:

- **Funding**. Currently, PSAB is short staffed and is operating without modern technology. The City Council and the CAO's office should rectify this as soon as possible.

- **Responsiveness**. PSAB conducts quality audits and generally composes thoughtful and understandable reports that identify shortcomings and recommend corrective actions. The recommended corrective actions, however, are not always adopted in a prompt or meaningful way. NOPD should require a written response from the leader of any unit or bureau with identified shortcomings, and unfulfilled corrective actions should be brought to the attention of the Superintendent and, if necessary, the City Council.

- **Rotation**. PIB – and NOPD more generally – has benefited over the years from an established supervisor rotation system that requires all lieutenants to spend a period of time working in PIB. This process gives upper level supervisors important insight into the workings of PIB and helps supervisors dispel myths about PIB when they return to their various districts. NOPD should explore establishing a similar rotation program for PSAB.

NOPD and the City have committed to maintaining a PSAB function following the conclusion of the Consent Decree. We strongly support that decision. The community should be vigilant in ensuring this important function remains in place following the conclusion of the Consent Decree.

## 2.    Public Integrity Bureau

PIB has made significant progress since the outset of the Consent Decree. In 2011, when DOJ published its findings from its pre-Consent Decree investigation of the NOPD, the United States found that

> NOPD's system for receiving, investigating, and resolving misconduct complaints, despite some strength s and recent improvements, does not yet function as an effective accountability measure.

---

[6]    Initially, PSAB was called the NOPD "Compliance Bureau." This is the term used in the Consent Decree and the NOPD Regulation. In 2019, to reflect NOPD's commitment to transform itself into a professional law enforcement organization with or without the Consent Decree, the Department changed the name to the "Professional Standards and Accountability Bureau" (PSAB).

DOJ further found "significant weaknesses in policies governing complaint classification, documentation and investigation, as well frequent departures from existing policies." Further, DOJ found "deficiencies in resources, training, supervision, and accountability, which serve to weaken investigations and result in poorly-supported investigative outcomes." "As a consequence of these deficiencies and an accompanying lack of transparency," DOJ concluded,

> NOPD's system for investigating and responding to allegations of officer misconduct does not effectively change officer behavior or hold officers responsible for their actions, giving it little legitimacy within the Department or in the broader New Orleans community.

Since 2011, the NOPD has dedicated significant time and effort to turning PIB into a respectable accountability organization. Today's PIB, while still in need of further reforms, is a far cry from the PIB of 2011. The Bureau conducts meaningful investigations, bases its decisions on the preponderance of the evidence, and issues understandable reports based upon the evidence presented. With occasional notable exceptions, investigators generally conduct thorough investigations, free from improper interference, and base their recommendations on the proper legal standard.

In addition to maintaining the achievements PIB has made to date, we recommend the NOPD consider the following once the Consent Decree comes to an end:

- **Hearings**. Consider dedicating a specific day each week or month on which discipline hearings are held, which can change only due to exigent circumstances.

- **Dashboard**. Engage PSAB or other SME to create real-time dashboard reflecting dates of all investigation milestones.

- **Audit**. Direct PSAB to ensure current PIB audit captures all investigation milestones.

- **Accountability**. Ensure leadership's performance evaluations include meeting PIB timelines.

- **Chaperone**. Assign a civilian to guide each investigation through entire PIB process, ensuring all members of the process, regardless of bureau, complete their tasks in a timely manner.

- **Clean Up**. Assign administrative personnel to identify and add missing items to database.

- **Scheduling**. Direct PIB to engage a proper subject matter expert and learn how to use its "IAPro" software to alert PIB of pending and past deadlines. PIB currently is not doing tracking the many deadlines applicable to an administrative investigation. Taking full advantage of IAPro (or a similar program) would solve this ongoing shortcoming.

- **Workflow**. Develop or purchase a robust workflow system with automatic alarms OR facilitate a more efficient and timely rollout of the City's under-funded current workflow platform.

- **Leadership**. Assign "ownership" of entire process to a single Deputy Chief. PIB Chief or Chief of Staff would be likely candidates.

- **Streamline Process.** Task PSAB with developing recommendations to remove inefficiencies from the discipline process as practicable.

- **Prioritize**. Require written approval for rank to cancel or postpone scheduled discipline hearing.

The Monitoring Team has met with NOPD regarding these recommendations and NOPD has agreed to implement them.

Two final notes. First, NOPD (and the community) should keep in mind that harsh discipline is not always the right remedy for a policy violation. Some situations call for a softer touch. Indeed, some situations call for no discipline at all, but rather counseling or education (sometimes referred to as "education based discipline"). In these cases, over-discipline can be just as damaging as under-discipline is in other situations. Second, there is good evidence that rewarding individuals can be even more effective in driving positive behavior than punishing them. This is not to say discipline does not have a place in holding officers accountable. It certainly does. Rather, it is simply to say that both a meaningful discipline program and a meaningful rewards or recognition program are important elements to drive positive behavior.

### 3.    Outside Audits

The recently-passed Ordinance requires NOPD to engage an outside entity to conduct an audit of NOPD compliance with the Ordinance and NOPD's policies and procedures relating thereto. NOPD should ensure that the outside auditor reports its findings in detail, including recommended corrective actions and/or enhancements. The auditor's report should be made public. The decision by the City Council to implement this requirement highlights the City's commitment to the durability of its reform efforts. We recommend the community and the City Council ensure NOPD lives up to its commitment to conduct such regular outside audits.

### D.    Management

### 1.    Leadership

It is a widely known adage in policing that programs succeed or fail at the sergeant level. While our experience has shown us the truth of that adage, it likewise is true that sergeants typically reflect the attitudes of their leaders. Thus, "tone at the top" matters as much in law enforcement as it does in any other complex, high-functioning organization.

Over the course of our decade-plus working alongside the NOPD, we have seen the power of good leaders and the detrimental effect of weak leaders. While there is no magic formula to

guarantee leaders always will be forward-thinking, we offer the following recommendations to help promote the engagement of great leaders and the growth of new great leaders.

- **National**. Prior to the hiring of Superintendent Kirkpatrick, there was a robust debate within New Orleans regarding whether the new leader of the NOPD should be home grown (i.e., from within the NOPD) or external to the NOPD. The City's selection, Kirkpatrick, obviously was not from New Orleans. Our experience with the Superintendent demonstrates the wisdom of the City's decision. We recommend that when it comes time for Superintendent Kirkpatrick to move on to new adventures, the City continue to look for leaders from around the country, including, but not exclusively, from within the NOPD.

- **Provincialism**. We recommend NOPD explore ways to increase opportunities for NOPD officers to participate in national educational events. The most common phrase we heard when we first came to New Orleans was "but this is how we always have done it." We quickly learned that one of the drivers of that provincial view was that officers only infrequently were given the opportunity to journey outside New Orleans to participate in national conferences, programs, and events. This changed (a bit) over the course of the Consent Decree, but New Orleans officers continue to miss out on important opportunities to share best practices with other agencies.

- **Interference**. Over the course of the Consent Decree, the Monitoring Team was witness to several instances that appeared to be interference in police affairs by City Hall. NOPD generally did a good job resisting such interference. However, it is unfair to put officers and police leaders in such a position. We recommend the New Orleans Inspector General, the Civil Service Commission, and/or the Ethics Board enhance their efforts at preventing improper interference by political leaders in police affairs.

- **Leave The Desk**. One of the Monitoring Team's most useful tools over the course of the Consent Decree was spending time in the community – with community members and with officers. Every member of the Monitoring Team spent time riding with officers of all ranks. While we cannot stand in an officer's (or a community member's) shoes, we can stand right next to those shoes. The insights gained from on-the-ground experience is invaluable. We recommend NOPD leadership make it a practice periodically to return to the field and re-experience policing from the viewpoint of a patrol officer.

- **Management v. Leadership**. One of the most frustrating recurring issues over the course of the Consent Decree had to be the inability of many NOPD leaders to distinguish between discipline and management. Discipline is what the Department does to punish a member who violates policy. Management, on the other hand, is what Department leaders do to correct negative behavior (and drive positive behavior) whether or not the behavior violates policy. An illustration will help make the point.

Monitor: "Chief, Officer Sally has an unfriendly face while she patrols and always looks irritated. She never smiles and never engages with the community You really should do something about that."

Deputy Chief:" I can't send that to PIB. She is not violating any specific policy."

Monitor: "I'm not saying it's a PIB matter. It's a management matter."

Deputy Chief: "What do you mean?"

While this is a hypothetical conversation, it mirrors multiple conversations we have had over the years with multiple NOPD leaders in multiple contexts. NOPD would benefit from a concerted effort to teach its leaders the difference between management and discipline.

- **Supervisors**. While NOPD has made significant improvements to PIB, it still occasionally drops the ball when it comes to examining the role supervisors play (through their actions or inactions) in troubling officer behavior. We recommend NOPD make a more concerted effort to use its Use of Force Review Board and its Serious Discipline Review Board to examine the role of supervisors in all serious incidents.

- **Education**. Future NOPD leaders would benefit from a more robust internal "Leadership Academy" – or, alternatively, participation in one of the many reputable leadership academies across the country. We recommend that upper management and first line supervisors be given the first opportunity to participate in such a program, followed by other supervisors over time.

- **Efficiency**. Notwithstanding NOPD's many reforms, it would be an exaggeration to say the Department is a model of efficiency. To this day, many internal processes still involve a live, highly trained police officer walking pieces of paper from one office to another. This not only is inefficient, is not likely to contribute to officer retention. We recommend NOPD consider bringing in an outside efficiency consultant to conduct an efficiency study every five years or so. We submit the efficiencies gained would more than pay for the cost of the studies.

- **Upward Mobility**. The City Council should explore the pros and cons of implementing a mandatory retirement age for police officers below the rank of Deputy Chief if legal to do so in the state of Louisiana. (The FBI, for example, has a mandatory retirement age of 57.) In order to attract and retain the best and the brightest officers, NOPD must demonstrate that being a New Orleans police officer brings with it realistic opportunities for upward mobility. This currently exists at the sergeant and lieutenant levels, but there are far fewer opportunities available at higher levels (*e.g.*, Major and Captain). To be clear, we are not saying that older officers cannot be effective, only that agencies like NOPD need to rethink their approaches to retirement in order to encourage new thoughts, ideas, and energy.

The NOPD's ability to maintain the successes of the past 10+ years will largely depend upon its ability to attract and retain leaders (at all levels) who believe that constitutional policing and effective policing go hand in hand. We are hopeful the recommendations above help attract the type of leaders NOPD needs to continue moving forward.

## 2.    Supervision

It took the NOPD a long time to meet its Consent Decree obligations regarding Supervision, in part because unlike some areas of the Consent Decree, supervision is embedded throughout ALL areas of the Consent Decree. But even with this complexity, NOPD has made great strides over the course of the last 10 years. The Department's training and policies are a great improvement over what existed at the outset of the Consent Decree. The Supervisor Feedback Log (SFL) process gives supervisors a meaningful tool to record positive and negative supervisory comments that don't rise to the level of a PIB matter. The Department operates a Serious Discipline Review Board, which, while its implementation has had its fits and starts, when operated as intended, can play a significant role in promoting quality supervision.

We recommend the NOPD consider the following once the Consent Decree comes to an end:

- **Review**. NOPD should maintain its Serious Discipline Review Board. Over the years, we have seen various NOPD review Boards be effective or not depending on the individuals' on the Boards and leadership's understanding of the purpose of the Boards. We recommend PSAB regularly review the functioning of the SDRB to ensure it remains effective regardless of its composition.

- **Training**. NOPD should continue to explore new and better supervisor training programs. There are a number of high quality programs across the country (*e.g.,* FLETC's Law Enforcement Supervisors Leadership Training Program, the National Sheriff Association's National Command & Staff College, the FBI's LEEDA training program) that could support NOPD's efforts in this regard.

- **Early Warning System**. To be effective, according to the United States, an early warning system should be able to serve as a "single source of real time information that can assist line supervisors and upper level commanders alike in identifying officers who may need closer supervision or particular interventions." NOPD's current EWS, developed years ago, has not met the Department's needs. The Department requires a new system, whether purchased commercially or developed in-house. We recommend NOPD commit to – and the City fund – the development of a proper system within the next six months.[7]

---

[7]    Despite working with an inadequate EWS for years and despite multiple reports from the Monitoring Team highlighting the current system's shortcomings, NOPD still is operating without a fully functional EWS. This makes it harder for supervisors to identify patterns – including patterns suggesting health and wellness concerns. Unfortunately, between the City's financial struggles and its antiquated procurement process, it is extremely unlikely the City will be in a position to purchase a new EWS any time soon. NOPD's PSAB, however, employs an

- **Early Warning System**. We further recommend that PSAB conduct regular audits to ensure the data in the EWS are correct. Systems with incorrect or incomplete data aren't trusted by the supervisors who need to rely on those data, which causes them to abandon the EWS system totally.

Close and effective supervision is fundamental to policing. Indeed, it is the glue that holds a department together. You cannot give people the right to detain community members, and use firearms to enforce that right, without supervising the way they exercise that right. The recommendations above will help NOPD remain a model of constitutional policing.

### 3.    Recruitment & Internal Development

#### a.    Recruitment

Evaluating personnel, from initial hires to performance reviews, presents a challenge for many organizations, and the NOPD is no exception. The Department long has struggled to improve its recruitment efforts and performance evaluations. Both are critical to establishing and maintaining a high-quality police force.

Recruitment, over the years, has suffered from lack of leadership, lack of resources, and, frankly, lack of institutional commitment to overcoming weaknesses and deficiencies. In fairness, it should be acknowledged that recruiting police officers is a challenge for departments nationwide. Nevertheless, for years NOPD's recruitment practices further hampered what already is a challenging task.

Over time, however, the NOPD made progress, adopting more modern practices, eliminating inefficiencies, replacing underperforming personnel, broadening its outreach efforts, and, most recently, bringing in new leadership. Among its improvements, it adopted an online application process, removed a residency requirement that reduced the candidate pool, streamlined the pre-employment process, outsourced background investigations to a professional firm, and increased its advertising.

#### b.    Performance Evaluations

NOPD's performance evaluations also were inadequate to hold its personnel to high-levels of performance. While some supervisors produced excellent performance reviews, far too many were cursory. They were not tailored to the individual's performance, and failed to identify performance deficiencies or highlight exceptional performance. As a result, they were not useable to identify performance issues that required correction or performers who should be

---

excellent analyst who has the skills to build a functional system internally. Considering the multiple projects on this individual's plate, he currently lacks the resources to take on this important project. The City could remedy this by authorizing the hiring of two civilian data analysts. We previously have emphasized the importance of making these hires. We are hopeful the new CAO will approve this path forward as soon as possible.

promoted. In fact, in the early years of the Consent Decree, it appeared that performance evaluations were not a tool used by management at all.

The Monitoring Team paid close attention to performance evaluations and provided extensive technical assistance to help NOPD meet the Consent Decree's requirement to have a meaningful performance evaluation system. One challenge to improving the process is that performance evaluations occur only once a year. Thus, there is a long lag time between identifying a deficiency and seeing the results of corrective action.

Working closely with the Monitoring Team, however, the NOPD has demonstrated significant improvement. Members now provide self-evaluations that their supervisors can use to inform their individualized performance reviews (and to assess their subordinates' self-awareness). Supervisors also now prepare quarterly performance reviews, which they can then use when doing the annual evaluations. Supervisors at the rank of Lieutenants and above now are required to document how their subordinate supervisors performed on completing the prior year's evaluations of the individuals they supervise.

We cannot over-stress the importance of honest and meaningful performance evaluations. Several times over the course of our 10-plus years working with the NOPD we have come upon uninterested and underperforming officers – often senior officers – who, frankly, should not be wearing a badge. Quite often, NOPD management shared our views of these individuals and bemoaned their inability to terminate them because "they have not violated a policy." That attitude, however, ignores the primary tool at the disposal of leadership to get rid of underperforming members – an honest performance evaluation and then personnel action based thereon. NOPD leaders are permitted to terminate chronically underperforming members, but historically have been very reluctant to do so. If this reluctance is ever to change, it must begin with a re-energized focus on robust and honest performance evaluations.

### c.    Promotions

The Monitoring Team and the Department of Justice worked closely with the NOPD over many months to improve the promotions process. While the process was arduous, it was worthwhile as the Department now uses a comprehensive approach instead of the prior test-driven approach. The promotions process now incorporates a healthy balance of written testing, performance evaluations, job experience reviews, discipline reviews, and personal interviews.

More recently, the Monitoring Team learned that Superintendent Kirkpatrick is preparing to implement one additional improvement to the promotions process. Based on feedback from officers, she plans to engage outside assessors to conduct the promotions interviews rather than NOPD's own leaders. The driver behind this decision is to reduce the perception of possible favoritism in the promotions process.

In short, the current promotions process reflects a significant improvement over the Department's prior process.

d.     *Recommendations*

In addition to maintaining the foregoing improvements, we recommend the following:

- **Background**. Recruit applications should be looked at holistically rather than being reviewed solely to ensure no violations of NOPD's hiring criteria. In other words, NOPD should focus on hiring the good rather than simply eliminating the bad.

- **Review**. NOPD should review its recruitment and retention numbers after each Academy class, and follow up on the results of the review to determine the cause for any "wash outs." This process should include a meaningful review of the background investigation and application review to see if any "red flags" were missed.

- **Funding**. While the City has increased funding for NOPD over the years, officers and recruits still are forced to spend their own money to buy essential equipment. This is unfair to the officers and an embarrassment for the Department and the City. The City Council should ensure officers and recruits receive an adequate allowance that fully covers essential purchases, uniforms, and equipment.

- **Consistency**. NOPD should re-energize its focus on performance evaluations. The Monitoring Team continues to see occasional missing evaluations for officers and supervisors. No officer or supervisor should lack a performance evaluation for any year.

- **Training**. Supervisors of the rank of lieutenant and above would benefit from additional training regarding the importance of identifying patterns of conduct.

- **Detail**. All supervisors should be instructed to explain each portion of the performance evaluation when they complete them and not answer any portion of the evaluation with a one-word answer.

NOPD's most valuable assets are its personnel. NOPD's transformation under the Consent Decree will not be sustainable if the Department and the City do not continue to invest in the tools to compete with other departments for high-quality recruits, the educational practices necessary to prepare these recruits to meet the high-standards of the new NOPD, and the performance evaluation systems to identify high performing and underperforming personnel.

### E.     Training

The United States' investigation that led to the Consent Decree found "The training NOPD has provided to its officers during the last several years is severely deficient in nearly every respect." The Department has made a concerted effort to turn its training program around over the last 10-plus years and has made remarkable achievements. The Academy now runs like a professional educational institution. Each course conforms to a thoughtful lesson plan. The various course are organized in a sensible fashion in accordance with an annual master training plan. New courses

have been added, like the EPIC/ABLE active bystandership program and a new Field Training Officer program. Instructors have the requisite certifications to teach the classes they teach. And, until a few years ago, the Academy was run by an actual academic professional holding a PhD. In short, today's Academy looks nothing like the Academy of 2011.

That said, there remains work to be done to ensure officers receive the training they deserve to ensure they – and those they serve – come home safely at the end of every day. Here are our recommendations as the Academy moves forward in a post-Consent Decree world:

- **Dean**. The training academy was one of the first NOPD units to bring itself into compliance with the Consent Decree. Its subsequent success was due, in large part, to the Department's forward-thinkingness of putting an experienced academic professional with a PhD at the helm. Unfortunately, that individual left the Department some time ago, and the Academy continues to run without a true academic dean. While the Academy continues to employ a number of thoughtful committed professionals, we continue to believe the engagement of an academic dean is a key factor in the future success of the program. We recommend the City release the necessary funding to engage an experienced academic to serve as Academy Dean as soon as possible.

- **Open-Mindedness**. Historically, policing was not known as a testbed for innovation. Police leaders were notoriously stuck in their ways and phrase "well, that's the way we've always done it," stopped many a good idea from ever seeing the light of day. While we can't speak for policing generally, we can say that, over the course of the Consent Decree, the NOPD's willingness to try new things increased by leaps and bounds. NOPD was the first police department in the country to develop and implement a holistic, department-wide active bystandership program (EPIC). It was one of the first agencies to provide body-warn cameras to all officers. It crafted and implemented a proactive critical incident video release policy well before other agencies did so. These are just three of many examples. We recommend the City's current and future elected leaders find ways to meaningful encourage the continuation of this unprecedented open-mindedness.

- **Resources**. The City's willingness to fund the Academy has ebbed and flowed over the years. With a coordinated effort involving the NOPD, the DOJ, and the Monitoring Team, the City ultimately funded the Academy's move into a then-new building, the construction of a firing range, necessary IT resources, and an accomplished academic dean. We recommend the City closely examine and identify ways to increase the Academy's current funding. In additional to funding better facilities (see below) and proper technology, the City should fund an expansive effort to provide professional development opportunities for all Academy instructors.

- **Facilities**. With great effort on the part of the NOPD and the Monitoring Team, the NOPD Academy moved into a new building several years ago. It was a significant step along the path of creating a professional, academic organization.

Over time, however, that once-shiny Academy is showing its age and the Department has outgrown the available space. It now appears the Department has the opportunity to move into an unused high school in the Lower Ninth Ward owned by the City. This would be a great benefit to the Department and would help the Department expand its academy classes. We recommend the City move forward with plans of acquiring the property to from the Department of Education to the Police Department for this purpose.

- **Facilities**. The shooting range was an undeniable  improvement, but the Department would benefit from a facility in which to conduct real-life scenario-based training (an indoor "Hogan's Alley," to use an old phrase).

- **Simulations**. The Academy should enhance its efforts to assist recruits with Simulation Training. Too many fail this element of the Academy. More support and learning opportunities prior to final testing would likely decrease the attrition rate.

- **Emotional Intelligence**. The importance of Emotional Intelligence training for officers is widely acknowledged. Such training was absent from NOPD's curriculum when the Consent Decree began. Over time, elements of such training were embedded into various aspects of the NOPD Academy curriculum. The Department's use of force training and active bystandership training (EPIC), for example, incorporate emotional intelligence elements. We recommend NOPD identify additional ways to incorporate emotional intelligence training into its recruit and in-service training program. Relatedly, NOPD should explore opportunities available nationally to send future leaders to emotional intelligence training outside New Orleans.

In addition to the foregoing recommendations, there is one area deserving of a slightly longer discussion – *pattern recognition training*.

After years of reviewing performance evaluations, the Monitoring Team still sees very few (if any) instances in which a supervisor has identified and commented on patterns of behavior by an officer. This is true despite the fact that, obviously, many officers have been disciplined, suspended, and/or terminated during that same period.

In mid-August 2025, the Monitoring Team reviewed a sample of officers and supervisors terminated or suspended within the prior five years. We identified eighteen officers for a further review of their PIB "short forms," their performance evaluation ratings, and their Early Warning System data to determine if patterns were present that could have been identified by an attentive supervisor. We found that patterns were present, but no supervisors in our sample identified a pattern of conduct.

Identifying patterns is not always an easy task. It's one thing to see an obvious pattern – *e.g.*, an officer with multiple professionalism complaints. It's harder to see patterns when they arise from facially different underlying actions or inactions. For example, an officer who comes in late for work, has missed a court date, has had a recent professionalism complaint, and has engaged in a

use of force presents a pattern worthy of further inquiry. Knowing how to identify such patterns takes training and time.

While quality Early Warning Systems are designed to help supervisors identify such patterns, NOPD's current EWS has not performed as expected for many years. Thus, it is all the more important that supervisors receive the necessary training to look for, identify, and act on patterns on their own. To this end, we recommend supervisors receive additional Academy training on pattern recognition. This will benefit NOPD, its officers, and the public.

*    *    *

In many ways, training is the bedrock upon which the future of the NOPD stands. The Department has turned its training program around over the course of the Consent Decree. But its job is not complete. We are hopeful the Department, the City, and all those who will be observing the future of the NOPD will keep in mind the criticality of the NOPD Academy.

### F.    Community

#### 1.    Community Oriented Problem Solving

At the outset of the Consent Decree, the United States found that NOPD's "policies, training, and tactics support neither a community policing orientation, nor the ultimate goal of proactively addressing problems to reduce and prevent crime, rather than merely reacting to it." As the United States recognized in its initial Findings Report, community policing strategies must "balance reactive responses to calls for service with thoughtful and proactive problem-solving. This problem-solving is achieved in large part by forging robust relationships in the community." A failure to understand the importance of this relationship will harm NOPD and its community in countless ways.

Over the course of the past 10 years, the NOPD has made strides toward more meaningful partnerships with community members to solve programs. Notwithstanding these successes, the NOPD and the City still have a way to go to fully take advantage of what such partnership have to offer – to the Department and the community. We recommend the NOPD consider the following once the Consent Decree comes to an end:

- **Training**. Enhance officer and supervisor training to better take advantage of what community members have to offer.

- **Scope**. Further decentralize community engagement efforts to include other city agencies with a nexus to community safety, *e.g.*, Public Works, Education, Parks & Rec, Libraries, etc.

- **Exposure**. Provide community leaders exposure to community peer volunteers involved in police community innovations around the U.S.

The success of a police department is closely tied to the success of its efforts partnering with and building trust within the community. We are hopeful the foregoing recommendations offer New

Orleans community members and NOPD leaders some ideas for continuing to build such partnerships.

## 2.    Police Community Advisory Boards (PCABs)

The United States recognized the power of well-run PCABs in helping to "facilitate regular communication and cooperation between the Department, the City, and community leaders, including youth leaders. . . . ," and incorporated the City's existing PCAB system into the Consent Decree. Over the years, however, the City has not done an adequate job supporting the PCAB process or the various PCABs. Consequently, there are significant differences in the functioning of the various Boards across the City, with some far more effective than others.

Well run PCABs play an important role in building community consensus on potential recommendations to the NOPD in areas including the following: (a) community policing strategies; (b) accountability for professional/ethical behavior by individual police officers; (c) special task forces that meet high priority community need; (d) central policy changes, where applicable, that improve quality of life; (e) resource allocations to meet high priority, difficult issues; (f) strategies for a qualified and diverse workforce; (g) providing information to the community and conveying feedback from the community to NOPD; and (h) ways to provide data and information to the public in a transparent and public-friendly format.

In an effort finally to turn the PCAB system into a meaningful component of the City's public safety structure, the parties and the Monitoring Team incorporated a PCAB corrective action plan into the Sustainment Plan. The existing plan provides an important framework for moving forward with the progress made to date.

In addition to the items identified on the current PCAB plan attached to the Sustainment Plan, we recommend the following actions to promote the effectiveness of the PCABs:

- **Coordinating Committee**. To improve the legitimacy and effectiveness of the PCAB Coordinating Committee, the composition of its membership should be expanded to better reflect the diverse populations it serves. We recommend adding community members from each district who are unaffiliated with City government. Including a designated youth representative—preferably drawn from local universities or youth programs— would help ensure that younger voices are not left out of public safety conversations.

- **Coordinating Committee**. Rotating PCAB officers through the Coordinating Committee on staggered terms would allow each district to play a more consistent role in the leadership structure. Broadening the selection process through open nominations and applications, combined with transparent selection criteria, would enhance public confidence in the Committee's composition. Special effort should be made to include individuals with direct experience or insight into marginalized communities, such as immigrants, people with disabilities, and formerly incarcerated individuals.

- **Transparency**. The Committee should ensure that its agendas and meeting minutes are publicly accessible and that its meetings include regular listening sessions. Establishing a dedicated subcommittee for community feedback would help the Coordinating Committee remain responsive to evolving public concerns.

- **Data**. We recommend providing PCABs with real-time access to district-level data on arrests, complaints, and community policing activities. When paired with joint neighborhood events, safety walks, and community roundtables, these efforts can create a strong and visible partnership between officers and residents.

- **Recruiting**. To further institutionalize the NOPD/Community collaboration, we recommend PCAB members participate in officer recruitment campaigns and be invited to provide feedback on qualities the community values in police candidates.

- **NOPD Partners**. Public safety is not solely the domain of police departments. Numerous city agencies play a significant role in shaping the social, economic, and physical conditions that influence crime. PCABs, therefore, should build bridges to these agencies if they are to effectively support comprehensive safety strategies.

- **Entertainment Industry**. The regulation of liquor establishments, restaurants, and nightclubs is a critical but often overlooked element of public safety. In New Orleans, these businesses are primarily regulated by the Alcoholic Beverage Outlet (ABO) division of the City's Office of Finance, with significant support from the Departments of Health, Sanitation, and Safety & Permits. Given their community grounding, PCABs are well-positioned to provide informed input on new business permits and to flag issues that might not be immediately apparent to regulatory agencies. The periodic inclusion of ABO staff in PCAB meetings would promote transparency and allow for neighborhood-level concerns to be raised early in the licensing process.

- **Durability**. In order to fully realize the vision laid out in the PCAB Plan and the Consent Decree, a multi-pronged reform strategy is required. The City should prioritize finalizing the revised PCAB Policy Manual and SOP, followed by mandatory training for all board members and NOPD liaisons. Attendance expectations must be enforced, with inactive members replaced in a timely manner.

NOPD leadership recognizes the power of well-run PCABs. Unfortunately, we have not seen the same level of commitment from the City. We are hopeful this changes. In the meantime, we are our hopeful the PCAB Plan attached to the Sustainment Plan provides a roadmap for those seeking to ensure the PCABs play the role they were intended to play.

### 3.    Community Education

Navigating city government in any city, including the various bureaus and functions of a police department, is no easy task. To help the public navigate the NOPD, the Department has vastly improved its website since the outset of the Consent Decree. The Department's current site includes easy-to-locate links to policies, audit reports, data dashboards, discipline reports, and much more. The wealth of information now available, ironically, has created a different problem for the New Orleans public – sifting through that information to find what they are looking for.

To help community members understand NOPD's accomplishments and ongoing reform efforts, and the impact of these accomplishments and efforts, we recommend NOPD publish a series of short, easy-to-follow *Resource Guides* for community members. To facilitate the development of these guides, we have prepared five and provided them to NOPD. We recommend the Department publish these Resources Guides on its website and consider also making them available at district stations and public libraries. We further recommend the Department maintain a regular cadence of reviewing, updating, and/or supplementing these Guides to ensure they stay current and accurate.

### 4.    Civilian Monitoring

For the last 10-plus years, the Consent Decree Monitoring Team has played an integral role in supporting the reform of the NOPD and building institutions that will help ensure the durability of those reforms. Upon the termination of the Consent Decree, we believe NOPD, the City, and the people of New Orleans will benefit from continued oversight of the Department. At the moment, there are two existing entities that serve this function – the Office of Inspector General and the Office of the Independent Police Monitor (obviously, in addition to the City Council). Of course, there is nothing preventing the City from establishing a new entity or entities to serve this function should it choose to do so.

The Monitoring Team takes no position on what entity – existing or otherwise – is best suited to take on this role. That said, we do offer the following recommendations regarding the expertise the leadership of the entity should have and the tasks the entity may be called upon to play

#### a.    *Skills and Experience*

Using the Monitoring Team's decade-plus experience as a guide, we recommend that any post-Consent Decree oversight/audit team should have the following skills/experience:

- **Review Skills**. The Monitoring Team has conducted scores of reviews, audits, and assessments over the life of the Consent Decree. These have included simple spot checks, detailed audits of statistically sound samples, use of force reviews, and qualitative and quantitative reviews of policies and practices, among many other things. Whatever group is responsible for providing civilian oversight in the future, should possess these skills.

- **Neutrality**. Policing is a difficult profession. Overseeing policing is an equally difficult profession. To be an effective overseer, a monitor must be neutral. A monitor cannot be anti-police or pro-police; an activist or an apologist. A monitor

must be strictly and unwaveringly focused on providing the NOPD, the City, the City Council, and the community with evidence-based findings based on credible audits and reviews.

- **Law Enforcement Experience**. Diversity of experience matters. Among the experience relevant to any law enforcement overseer is law enforcement experience. The work of a police officer and the context of that work is not readily apparent to most lay people. The Consent Decree Monitoring Team included multiple retired law enforcement officials as well as other experienced individuals. The law enforcement experience proved invaluable as we performed our monitoring and technical assistance tasks.

- **Subject Matter Expertise**. Closely tied to law enforcement experience is experience in the subject matter of policing, *e.g.*, civil rights, use of force, probable cause, constitutional searches, etc. Here again, diversity of expertise matters.

- **Investigation Experience**. While the Monitoring Team does not conduct investigations, one of the reasons we were selected and appointed by the Federal Court was our extensive *experience* conducting investigations. That skill set proved indispensable throughout our tenure as Monitor.

- **Legal Experience**. When the Court appointed Sheppard Mullin to serve as Monitor, it explained its reasoning to the public. First, the court noted that "the duties of the Monitor closely track the kinds of activities that are the bread and butter of legal practice." The Court went on to find that the Monitor is responsible for reviewing policies to ensure that they comport with the Constitution, concluding that this is "precisely the kind of advisory role that lawyers are accustomed to playing." The Court also emphasized that a monitor is responsible for assessing compliance with policies, concluding that "that kind of institutional investigation and assessment, which involves the collection, review, and synthesis of large amounts of information, is also a task that lawyers . . . routinely perform."

- **Communications Skills**. The Court's order appointing the Monitoring Team emphasized that a Monitor has a responsibility to communicate with the public "in clear and concise terms." Our experience over the course of the monitorship confirmed the criticality of accurate, clear, and concise communications.

- **Discretion**. Discretion has multiple meanings. We use the term here because it connotes good judgement, responsible decision-making, and discreetness. It is a fundamental job of a Monitor to share information with the public. That information, however, has to be accurate and provided in context. Overseers who do not appreciate the importance of this obligation – i.e., who, for example, make statements based on inference, inuendo, and anecdotes rather than data – are doing themselves, law enforcement, and the community a disservice.

- **Integrity**. It goes without saying that integrity is an essential qualification for the job of overseer. A Monitor's reports are only as good as a reader's willingness to trust those reports.

Obviously, there are countless other skills that can help an oversight team succeed, but the foregoing list is a good start.

### *b.    Tasks*

The scope of an oversight function external to NOPD is a matter within the discretion of the elected leaders of the City of New Orleans. The Consent Decree Monitoring Team's role was strictly authorized (and constrained) by the Consent Decree. In very summary fashion, here are the tasks we performed:

- Review and comment on policies.

- Review and comment on training.

- Review and comment on the implementation of policies and training.

- Review and comment on Standard Operating Procedures, audit reports, and other public reports.

- Review serious uses of force and serious misconduct.

- Participate in and provide feedback during Use of Force Review Board hearings and Serious Discipline Review Board hearings.

- Conduct spot audits on all audits conducted by PSAB.

- Assess compliance with elements of the November 2025 NOPD Ordinance.

- Review NOPD public reports and spot check them against audit results.

- Assess whether resources and personnel are adequate.

By sharing this list, we do not mean to suggest a future overseer must perform the same tasks. As we said, we will leave that decisions to the City's elected leaders. We simply are sharing this information to help inform the judgement of those called upon to craft the structure of the post-Consent Decree environment.

### G.    Culture

Long-time law enforcement thought-leader Sheriff Sue Rahr is fond of saying "culture eats policy for lunch every day." The United States Department of Justice takes a similar view. DOJ's guidelines for evaluating corporate ethics and compliance programs, for example, expressly direct prosecutors to assess whether the subject of their corporate investigations "has established

policies and procedures that incorporate the culture of compliance into its day-to-day operations."

The Monitoring Team echoes these – and the many other – statements about the importance of culture in driving behavior. But shaping culture is no easy task. Creating a positive, compliance-focused culture is much harder and more time-consuming than drafting a policy. Driving cultural change requires a holistic approach.

We have little doubt that NOPD's current Superintendent Anne Kirkpatrick understands the importance of culture. But police chiefs come and go, even chiefs as valuable to "Chief Anne." Accordingly, we offer the following recommendations to future NOPD leaders interested in continuing the Department's journey to creating meaningful and durable cultural change.

- *Understand what it means to have "tone at the top."* Most in law enforcement leadership have heard the phrase "tone at the top," and most think they exhibit it. But police leaders regularly should take a hard look at their *actions* and ensure they are consistent with the view they have of themselves.

- *Be transparent in your efforts to shape your culture.* When complex entities (like law enforcement agencies) pay attention to the importance of ethics and compliance, the faith their members (sworn and civilian) have in those efforts increases. One way to build employee faith is by being transparent with regard to the Department's aspirations and the expected benefits therefrom.

- *Treat integrity as something greater than compliance.* While policy requirements are one way to think about what it means to "do the right thing," it is important to remember that what is "right" often goes beyond policy; it often reflects a combination of moral, ethical, legal, cultural, and other normative values. NOPD's future leaders should focus on integrity as much as compliance.

- *Train members HOW to be active bystanders.* In other words, continue the Department's focus on EPIC/ABLE. The ABLE Project now has more than 420 law enforcement members across the U.S. The program has its origins right here in New Orleans. NOPD should re-energize its efforts to promote active bystandership beyond its EPIC/ABLE training program.

- *Measure what you want to manage.* Peter Drucker, the famed business management consultant, said, "if you can't measure it, you can't manage it." The concept is a critical one for driving cultural change and sustaining it over time. To put a slight spin on Professor Drucker's management adage, if you want to manage something, measure it.

- *Don't shy away from measuring culture.* While not always easy or obvious, culture is measurable and, with effort, manageable. Performance evaluations, for example, can include evaluations of the extent to which an employee's performance reflects the standards that comprise NOPD's values.

This certainly is not an exhaustive list, and we have little doubt the thoughtful leaders of the NOPD will come up with a number of their own ideas. The real take away here, in our view, is

that a positive culture does not come about by accident. It takes thought, effort, and time. But the results is worth the effort.

### H.    Miscellaneous

The role of a Federal Monitor is strictly constrained by the four corners of the operative Consent Decree. The complexities of policing, however, call for holistic solutions that go well beyond what a Consent Decree can offer. Accordingly, we would be remiss if we did not offer a few observations of steps that would benefit the NOPD and the New Orleans community, but that are outside the scope of the Consent Decree.

- **Civil Service**. Over the course of the Consent Decree, we have seen the importance of the Civil Service system. At the same time, we have seen that system overturn good discipline decisions by the NOPD. We recommend the Civil Service Commission consider ways to ensure (a) the Commission identifies and takes action against political interference in the police accountability process and (b) overturns disciplinary decisions only where clear evidence compels the decision to do so.

- **Management**. NOPD – and, frankly, policing across the U.S. – is very driven by rules and policies. While rules and policies are necessary, they do not and cannot cover every element in a profession as complex as policing. Consequently, leaders must – and must be permitted to – take personnel action where an officer proves him/herself to be unworthy of the badge even if the specific action does not violate a specific policy.

- **Associations**. Police associations serve a valuable function. That said, in our experience, they spend an inordinate amount of time criticizing perceived problems and relatively little time promoting positives. Take recruitment, for example. The NOPD has a lot to offer recruits, including an exciting job in a constitutional, forward-thinking police department in a great city. We can recall only a few times, however, that the New Orleans police associations actively promoted the NOPD's reforms as a positive. We view this as a missed opportunity – for the Department and for the associations themselves.

- **Pay**. Officer pay should be commensurate with the complexity of the work and the risk they undertake. Over the course of the Consent Decree, we pushed for and saw an increase in pay as well as the introduction of a retention bonus system. The City should make a concerted effort to ensure its pay structure continues to attract the best talent possible. Along these lines, the City should increase the uniform and equipment allowance for recruits and officers. As noted earlier in this report, members should not have to purchase essential equipment with their personal funds.

- **District Attorney**. The DA and the local court system play a critical role in law enforcement and the community's trust in law enforcement. Both organizations should make a concerted effort to assess organizational opportunities and

shortcomings that, if focused on, could complement the many reforms NOPD has achieved over the past decade.

- **Active Bystandership**. In 2015, with the full support of then-chief Michael Harrison, the NOPD rolled out the nation's first department-wide law enforcement active bystandership program, called EPIC. The Department's efforts subsequently led to the creation of the Active Bystandership for Law Enforcement (ABLE) Project,[8] a national initiative focusing on training officers in evidence-based active bystandership to reduce mistakes, prevent misconduct, and promote officer health and wellness. More than 420 law enforcement agencies currently take part in the ABLE Project. While ABLE has its roots in New Orleans, the NOPD takes little advantage of its being the creator of such a critical program. We recommend NOPD explore opportunities to involve its officers and leaders in ABLE's many national programs.

- **EQ**. NOPD's training program has evolved from being non-existent, dysfunctional, and/or dangerous, to being thoughtful, well-run, and pedagogically sound. There is more NOPD could do, however, to continue the path toward creating a best-in-class academic institution. One step down that path would be to look for ways to incorporate more training on emotional intelligence into its existing training modules.

Obviously, there is more City agencies could do to complement and support the transformation that has taken place within the NOPD. The City's Public Health, Behavioral Health, Homeland Security, Public Works, Recreation, Neighborhood Engagement, and even Library Services all play an important role in public safety. We are hopeful the City finds ways to engage these and other subject matter experts to help identify new approaches to foster the durability of NOPD's reforms.

---

[8]     Multiple current and former NOPD officers serve on the volunteer ABLE Board of Advisors. Lead Monitor Jonathan Aronie is actively involved in the ABLE Project on a 100% pro bono basis.

## V.    Conclusion

Over the past 10-plus years, the NOPD has worked hard to reinvent itself from a notoriously unconstitutional police department into a professional, empathetic, constitutional organization that cares about people, holds itself accountable, and thoughtfully evaluates and implements best practices. By all accounts (including ours), its efforts have made a material difference in the lives of the New Orleans community and the officers themselves. Yes, there still is work to be done; yes, some areas need additional attention; and yes, some individuals have had negative personal experiences over the years (some quite extreme) that have left scars that will not disappear simply because the NOPD as an institution has changed; but one would be hard pressed to come up with a material element of the Department that has not been changed for the better.

None of this could have happened were it not for the men and women of the NOPD. The road to compliance was a long and hard one. And it certainly was not without bumps along the way, including hurricanes, cyber-attacks, funding problems, national tragedies, and COVID. But the effort was worth it. Over the course of the last decade-plus, the Monitoring Team has had the honor of working with many incredible officers and leaders. Some of those continue to wear the NOPD badge; others have moved on to new adventures. The people of New Orleans owe these men and women a huge debt of gratitude.

Rather than running away from the reforms called for by the Consent Decree, most NOPD officers and leaders leaned into the changes. This should not come as a surprise as the core principles of the Consent Decree are rather unobjectionable: Better policies; better training; close and effective supervision; a fair accountability system; respect for all; and public transparency. It's hard to object to goals that are so obviously good for the community and for the officers themselves. But many officers and departments across the country do run away from change. The NOPD did not.

Of course, the NOPD did not make this journey on its own. The Consent Decree gave the Department the roadmap it needed to undertake the reforms its community and its officers demanded and deserved; while the United States Civil Rights Division and the Court-Appointed Monitoring Team gave the Department the technical assistance and the oversight required to get the job done. The members of the Monitoring Team (current and past), the DOJ Civil Rights Division (current and past), and the Court worked tirelessly alongside NOPD throughout this journey.

The community too deserves its share of recognition for the critical role it played in helping NOPD move forward. Over the course of our work in New Orleans, we had the privilege of meeting with and working alongside community stakeholders from all walks of New Orleans life. The often gut-wrenching stories they shared were critical in informing our audits and reviews.

It's bittersweet to write this Final Report. Not a day has gone by since August 2013 that David and I and our team have not thought about the NOPD and the people of New Orleans. But we are excited to leave the City in the hands of an extremely capable NOPD with the structures it needs to remain on its journey should it choose to do so. We sincerely hope it does.

## VI.    Acknowledgements

Including an acknowledgements section in a report concluding a thirteen-year effort is fraught with risk. The individuals who played a meaningful role in transforming the NOPD are far too numerous to mention. That said, we would be remiss if we did not give at least a few shout-outs before concluding this Final Report.

In addition to the many current NOPD officers and leaders who played and continue to play critical roles in leading the NOPD forward, there are many who no longer are with the Department and thus may not have the opportunity to receive the real-time pat on the back they deserve upon the termination of the Consent Decree. These folks include Paul Noel, John Thomas, Chris Goodly, Deidre Magee, Arlinda Westbrook, Otha Sandifer, Danny Murphy, Richard Williams, Jay Ginsberg, and Ben Horwitz. While they have moved on to new adventures, their contributions to the success of the Department have not been forgotten.

Likewise, the Consent Decree has seen the coming and going of multiple Superintendents. We recognize being a police chief is no easy task and being a police chief in the midst of a Consent Decree is even more difficult. We are thankful for the contributions made by each superintendent with whom we worked, including Ronal Serpas, Michael Harrison, Shawn Ferguson, Michelle Woodfork, and, of course, Anne Kirkpatrick, whose high level of engagement was instrumental in driving NOPD across the finish line.

Over the course of this project, the Monitoring Team also received critical support from a few City officials. Notably, Gilbert Montano, Andy Kopplin, Jennifer Avegno, Ed Michel, Joe Giarrusso, Michael Cowan, and the several City Attorneys with whom we worked closely deserve our thanks.

Multiple members of the New Orleans community provided invaluable insight and support over the course of the Consent Decree. Unfortunately, there are far too many individuals who fall into this category to mention them all here. Thus, we will mention only one. Thank you Mary Howell for your generosity and doggedness throughout this project, and for constantly pushing us as monitors. You are a jewel. The community and the NOPD are lucky to have you.

A monitoring project of this scope and complexity requires a group effort. David and I could not have asked for a better, more knowledgeable, and more committed group of subject matter experts with whom to work. Thank you Dennis, Mitch, Mary Ann, Bob, Bill, Chet, Geoff, Theron, Alex, Ashley, Judith, Alex, Ryan, Nikki, and Scot for your unwavering commitment to making the NOPD a better place. Thank you also Luca, Dan, Guy, Anne, and all our Sheppard Mullin partners for supporting our work and covering our cases while we spent countless hours in New Orleans. You all are true partners and friends. And an equally big thanks to Tina Flores of Judge Morgan's Chambers and Alex Duncan of Sheppard Mullin who went above and beyond to provide administrative support to the Monitoring Team throughout this project.

Fortunately, the Monitoring Team was not operating alone. The experts from the United States Department of Justice played a critical active role throughout the Consent Decree. Thank you Roy, Christy, Emily, Jonas, Tim, Paul, Mehveen, Megan, Arusha, Jude, Puneet, Jennifer, Ted, Steve, and Suraj. Your contributions to this process were second to none.

Finally, everyone involved in the NOPD's journey owes a debt of gratitude to U.S. District Court Judge Susie Morgan. Judge Morgan worked tireless over the course of the Consent Decree, not once letting the daunting task before us all slow her down. She has been NOPD's biggest cheerleader throughout this process, while, at the same time, holding the Department and the City (and the DOJ and the Monitoring Team) accountable for living up to our respective commitments. Everyone involved in this project thanks you.